UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | |
| **Plaintiff,** | § § | |
| v. | § § | |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATTHEW DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH; ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; and WINDSPEED TRADING, LLC, | § § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-CV-01171 |
| **Defendants.** | § § | |

**ORIGINAL COMPLAINT**

NOW COMES D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC), Plaintiff, and files this Original Complaint for civil violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c)) ("RICO"), fraud, civil conspiracy to commit fraud, breach of fiduciary duties, civil conspiracy to commit breach of fiduciary duties, and Texas Uniform Fraudulent Transfer Act violations against (i) Baymark Partners, LP; (ii) Baymark Partners Management, LLC ("BP Management"); (iii) Super G Capital, LLC ("Super G"); (iv) SG Credit Partners, Inc. ("SG Credit"); (v) Baymark ACET Holdco, LLC; (vi) Baymark ACET Direct Invest, LLC; (vii) Baymark

Partners ("Baymark"); (viii) David Hook ("Hook"); (ix) Tony Ludlow ("Ludlow"); (x) Matthew Denegre ("Denegre"); (xi) William Szeto ("Szeto"); (xii) Marc Cole ("Cole"); (xiii) Steven Bellah ("Bellah"); (xiv) Zhexian "Jane" Lin ("Lin"); (xv) Dana Marie Tomerlin ("Tomerlin"); (xvi) Padasamai Vattana ("Vattana"); (xvii) Paula Ketter ("Ketter"); (xviii) Vanessa Torres ("Torres"); and (xix) Windspeed Trading, LLC ("Windspeed").   Predicate acts giving rise to the RICO claims include (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) obstruction of the due administration of justice in violation of 18 U.S.C. § 1503; (iv) bankruptcy fraud in violation of 18 U.S.C. § 152; and (v) money laundering in violation of 18 U.S.C. § 1956.  In support thereof, Plaintiff states as follows:

## I.   **SHORT SUMMARY**

1. **"Matthew, shut the fuc\* up."**[1] During the deposition of Defendant and co-conspirator Matthew Denegre, fellow Defendant and co-conspirator Tony Ludlow[2] interrupted and exclaimed, "Matthew, shut the fuc\* up," after a question was posed about the fraudulent foreclosure sale at issue in this case.  Denegre refused to answer the then-pending question after Ludlow, his boss, interrupted the deposition.  It was, at the time, Ludlow and his co-conspirators' latest obstructionist act designed to carry out their criminal enterprise.[3]

2. **Baymark is a criminal enterprise.**  Baymark[4] and its directors orchestrated a multi-million-dollar fraudulent transfer and engaged in a years-long pattern of racketeering. They orchestrated the

---

[1] *See infra* note 72 and accompanying text; *see infra* p. 128; *see also* Exhibit 1, Dep. of Matt Denegre, 128:17-129:01. All exhibits hereto are adopted and incorporated by reference in this Original Complaint for all purposes and as if set forth herein in full.
[2] Ludlow is a licensed attorney and CPA in the state of Texas.
[3] Some of the defendants to this suit are parties to an ongoing state court proceeding: D&T Partners v. ACET Global, LLC, Cause No. DC-19-09828 (116th District Court of Dallas County) (J., Parker).  Plaintiff anticipates seeking a limited stay of that suit or other relief.
[4] As stated above, Baymark Partners is referred to in this Complaint as "Baymark." However, Baymark; Baymark ACET Holdco, LLC; Baymark Partners, LP; Baymark ACET Direct Invest, LLC; and Baymark Management, LLC were collectively used as a sham to commit fraud under the umbrella of Baymark and at the direction and control of Denegre, Ludlow, and Hook.

wholesale transfer of ACET Global, LLC's ("ACET Global") assets and operations to an entity that they secretly owned and controlled—all in avoidance of its creditor, D&T Partners, LLC ("D&T Partners"). Six months after transferring those assets and operations, they drafted, executed, and backdated documents intended to create a misleading and false trail of a foreclosure. As a result of their fraud and collusive after-the-fact "foreclosure" (of phantom assets), they stole millions of dollars. This sophisticated fraud involved the wholesale theft of ACET Global's intellectual property and the use of a secret set of books. Baymark and its principals laundered funds and proceeds of their frauds through a string of shell entities. They carried out a bankruptcy fraud designed to cover up the fraud.[5] Baymark and its principals then engaged in the solicitation of perjury and committed extensive perjury and obstruction of proceedings. They committed tax fraud to further the scheme. Aiders and abettors—not all of whom are currently named as defendants in this lawsuit—emboldened the Defendants.

3.  The Defendants conspired to defraud D&T Partners. D&T Partners is and was a secured creditor of ACET Global. ACET Global owed a $3.2 million note ("D&T Note") to D&T Partners. (Exhibit 12, Secured Promissory Note). A security interest in all of ACET Global's assets secured the D&T Note. (Exhibit 11, Security Agreement). Payments on the D&T Note came due on October 31, 2018. (Exhibit 12).

4.  Baymark held 100% beneficial ownership in, and control over, ACET Global through a string of shell entities that were, according to Baymark's managing director and partner, Hook, "just pieces of paper." (Exhibit 7, Dep. of David Hook, 165:01-04). Ludlow and Hook owned Baymark. They and their co-defendants carried out a fraudulent scheme to transfer ACET Global's assets and business operations to a new entity that they secretly owned and controlled.

---

[5] The bankruptcy court denied relief.

5.   Two weeks before the $3.2 million D&T Note payments came due, the Defendants carried out the fraudulent transfer of ACET Global's assets (tangible and intangible) and complete business operations to a newly formed entity: Windspeed.  That transfer was designed to allow the Defendants to continue the business operations free from D&T Partners' security interest in ACET Global's assets and business operations.

6.   The scheme was set in motion in 2017.  The critical steps were carried out in the summer and fall of 2018.  On September 27, 2018, Szeto, while still operating as the Baymark-installed CEO of ACET Global, filed a certificate of formation for Windspeed. (Exhibit 13, Windspeed Certificate of Formation). Baymark and Super G utilized Szeto to form Windspeed to hide their interest in the new entity.

7.   Baymark, Super G, and Szeto beneficially owned Windspeed. (Exhibit 14, Windspeed Operating Agreement). They memorialized the ownership in an undisclosed agreement whereby Baymark Partners held warrants (exercisable for a nominal price of $100) for 40% of Windspeed. (Exhibit 15, Warrant Purchase Agreement (Windspeed-Baymark)). Super G also held warrants (exercisable for a nominal price of $100) for 40% of Windspeed. (Exhibit 16, Warrant Purchase Agreement (Windspeed-Super G Capital)). Szeto held the remaining 20% of Windspeed. (Exhibit 14).

8.   Baymark and Super G, however, maintained complete operational control over Windspeed through guaranteed board positions under Windspeed's operating agreement.  Under that agreement, Baymark and Super G, together, controlled all decisions regarding Windspeed.

9.   Baymark, Super G, and Szeto, as part of their fraudulent-transfer scheme, caused ACET Global to transfer all of its assets and operations to Windspeed in **October of 2018**.

10. The following occurred after this October 2018 transfer: (i) the Defendants caused Szeto to simultaneously serve as the CEO of ACET Global and Windspeed; (ii) the Defendants transferred all

of ACET Global's employees to Windspeed;[6] (iii) the Defendants transferred all of ACET Global's assets to Windspeed (*e.g.*, desks, microwave, inventory, and intellectual property); (iv) Denegre instructed Szeto to maintain "two separate books *for obvious reasons*" for Windspeed and ACET Global; (v) Ludlow and Denegre requested "consolidated reports" for ACET Global and Windspeed; (vi) Ludlow testified that he did not know where ACET Global's inventory was located between October of 2018 and March of 2019;[7] (vii) Windspeed usurped ACET Global's website and published a carbon copy of ACET Global's former website; (viii) Windspeed began to sell the same distinct and unique ACET products that would later be reflected on ACET Global's inventory of items in a fraudulent "Foreclosure Sale Agreement," which would not be drafted and executed for another six months; (ix) the Defendants did not segregate ACET Global's inventories from Windspeed's, but instead sold both off indiscriminately;[8] (x) the Defendants "s[old] off all the ACET inventory;"[9] (xi) the Defendants diverted revenues from the sale of ACET Global's inventory;[10] (xii) the Defendants continued to conduct the business's operations,[11] purchasing new assets and inventory under ACET Global's existing accounts; "finishe[d] up ACET's business,"[12] utilizing the "same employees,"[13] "same equipment,"[14] "same vendors,"[15] and "the same customers;"[16] and usurped ACET Global's partner and marketplace accounts and relationships;[17] (xiii) the Defendants wrongfully attempted to change an issued IRS Form 1099-K, which reported that Windspeed had received revenue in every month of 2018, to reflect that the revenue reported was to ACET instead; and (xiv) the Defendants caused the

---

[6] *See infra* pp. 67-70..

[7] *See* infra p. 77*; see also* Exhibit 3, Dep. of Tony Ludlow, 22:25-23:02.

[8] *See infra* pp. 82-24; *see also* Exhibit 4, Dep. of Dana Tomerlin, 47:02-14.

[9] *See infra* p. 82; *see also* Exhibit 2, Dep. of William Szeto, 219:01-13.

[10] *See infra* pp. 86-87; *see also* Exhibit 2, Dep. of William Szeto, 251:21-25.

[11] *See infra* p. 84; *see also* Exhibit 5, Dep. of Jane Lin, 77:04-08; Exhibit 4, Dep of Dana Tomerlin, 37:17-38:07.

[12] *See infra* p. 85; *see also* Exhibit 2, Dep. of William Szeto, 200:09-201:09.

[13] *See infra* p. 85.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] On December 5, 2018, for example, Jane Lin, a former employee of ACET Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of an ACET Global account (using her Windspeed email address).

intentional deletion of all of ACET Global's emails and electronic data after the October 2018 default on the D&T Note.[18]

11.  In January of 2019, after most of ACET Global's inventory had been sold, Baymark and Super G coordinated to serve a Notice of Disposition and Sale of Collateral ("Notice") upon ACET Global to provide notice of a "foreclosure" *on the very assets that the Defendants had already transferred to Windspeed months before.* (Exhibit 17, Notice of Disposition and Sale of Collateral).  Hallett & Perrin represented Baymark as its legal counsel.  Hallett & Perrin and Super G's law firm drafted this Notice.  Hallett & Perrin then drafted a Foreclosure Sale Agreement between Windspeed and Super G (despite the fact that it now maintains that it did not represent Windspeed),[19] and **"backdated" the Foreclosure Sale Agreement** at Baymark's instruction.  **Hallett & Perrin has, in sworn testimony, acknowledged that it backdated the Foreclosure Sale Agreement**, and justified the backdating (which was not *effective* dating, but was actual backdating) with the following testimony: "it's not uncommon to backdate something."[20]  (Exhibit 18, Foreclosure Sale Agreement).

12.  The Foreclosure Sale Agreement "memorialized" a sham transaction.  First, it was backdated to March 1, 2019.  Second, it stated that Windspeed was purchasing the assets (the same assets that it had already taken over and begun selling/utilizing some six months before) for $514,144.86.  Notably, ACET Global owed Super G $514,515 at this time—an amount that the Defendants and Hallett & Perrin have testified was "not correlated with the value of ACET Global's assets."[21]  Also of note, Baymark had contributed exactly $516,000 of "capital" to ACET Global from 2017 until the date of the execution of the Foreclosure Sale Agreement.

---

[18] *See infra* pp. 129-31; *see also* Exhibit 2, Dep. of William Szeto, 124:11-20, and 260:07. Likewise, Ludlow (and others) further testified to the spoliation right after the fraudulent transfer and breach of the D&T Note in October 2018. *See* Exhibit 3, Dep. of Tony Ludlow, 113:05-18.

[19] Hallett & Perrin not only drafted the purported Foreclosure Sale Agreement, it served as the notice attorney for Windspeed.  As detailed at Exh. 38 and paragraph 206 hereof, Super G's attorney has admitted that Hallett & Perrin represented Windspeed in the transaction.

[20] *See infra* p. 105; *see also* Exhibit 6, Dep. of Julie Smith, 35:07-36:01.

[21] *See infra* p. 108; *see also* Exhibit 3, Dep. of Tony Ludlow, 174:08-175-04.

13. In actuality, ACET Global's assets were worth millions of dollars.  Just several months later (as set forth in paragraph 17 and in more detail later), Baymark, Ludlow, and Hook informed the IRS that the assets were worth *more than $3 million*—although only months before *then*, they (fraudulently) informed a federal bankruptcy court that the assets were worth a mere $30,000.

14. On October 23, 2019, Ludlow, Denegre, and Baymark filed a fraudulent bankruptcy petition to complete and mask their fraud. The bankruptcy petition falsely stated that within two years of the petition ACET Global had not transferred any inventory to any person.  (Exhibit 19, Bankruptcy Petition).  Indeed, as set forth in the Bankruptcy Section of this Complaint below, the bankruptcy petition, which Ludlow signed, contained an alarming number of knowingly and intentionally false statements intended to hide the October 2018 transfer of ACET Global's assets to an entity that Baymark and its affiliates owned. The bankruptcy petition included material false statements that (i) no accountant or other person (other than Denegre) had ACET Global's books and records; (ii) no inventories of ACET Global had been taken within two years of the petition; (iii) there had been no transfers of any assets to insiders or affiliates; (iv) ACET Global and its affiliates had not stored any inventories or property in an offsite storage unit within a year of the petition; (v) ACET Global had not transferred any property other than in the ordinary course of business; and (vi) the property transferred to Super G was only valued at $30,000 (despite a "purchase price" of $514,000 in the fraudulent Foreclosure Sale Agreement between Windspeed and Super G).

15. The Defendants engaged in the fraudulent scheme well aware of the legal risks.  Indeed, Baymark consulted with its legal counsel, Hallett & Perrin, who advised Baymark that the transaction gave rise to criminal and civil fraud risks.  Nonetheless, that same law firm drafted the transaction documents.  Those communications were subject to the crime-fraud exception.

16. Several of the co-conspirators have been deposed in another judicial matter. They deliberately and knowingly gave false testimony in those matters—the most recent acts in furtherance of their

conspiracy and fraudulent scheme.  That testimony was part of a scheme to carry out their fraud, to obstruct justice, and to mask their bankruptcy fraud.

17.  After executing the fraud and transferring all of ACET Global's assets to Windspeed, Baymark unwittingly left a detailed admission of the damages and the value of ACET Global's assets by filing federal tax returns with the Internal Revenue Service. (Exhibit 20, ACET  2019 Tax Return). In the 2019 tax return reporting of ACET Global's assets and activities, Baymark, Ludlow, and Hook reported that ACET Global had $3.169 million of assets as of December 31, 2018.[22] Ludlow executed a tax return under penalty of perjury averring as much. (Exhibit 21, ACET 2019 Efile Authorization).

18.  Additionally, Ludlow submitted a 2019 tax return to the IRS reflecting that Baymark had received $2,907,290 in "proceeds" from the foreclosure sale of ACET Global's assets.[23] (Exhibit 20). He also signed a return reflecting that ACET Global had paid a management fee of $112,500 to Baymark's management company, evidencing its efforts to siphon off funds for the benefit of Baymark's principals.[24]

19.  To date, not a penny has been paid on the D&T Note.  They have intimated willingness to settle for nuisance-suit figures.

## II.  **JURISDICTION & VENUE**

20.  This Court has subject matter jurisdiction over this action under 18 U.S.C. § 1964.  This Court has original subject-matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

21.  Venue is proper in this judicial district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and reside in this district.

---

[22] *See infra* note 71 and accompanying text; *see infra* p. 132; *see also* Exhibit 7, Dep. of David Hook, 158:03-23.

[23] *See infra* pp. 127, 132, 133; *see also* Exhibit 7, Dep. of David Hook, 161:08-24.

[24] *See infra* pp. 122, 133; *see also* Exhibit 7, Dep. of David Hook, 159:04-21.

22. A substantial part of the events or omissions giving rise to the action occurred in this district. 28 U.S.C. § 1391(a)(2).

23. A substantial part of this action arises under the laws of the United States. 28 U.S.C. §§ 1331 and 1337.

24. This Court has personal jurisdiction over Defendant Super G because Super G has purposefully directed actions at this forum to obtain benefits from the scheme. Super G entered into a contract with an entity domiciled in and doing business in Texas (*i.e.*, ACET Global); had an employee in Texas (*i.e.*, Steven Bellah); became an owner of, and board member of, a Texas-based entity (Windspeed); and conspired with Texas-based persons. The exercise of jurisdiction over Super G is reasonable.

25. Likewise, the Court has personal jurisdiction over Defendant SG Credit because it has purposefully directed actions at this forum to obtain benefits from the scheme. SG Credit assumed a contract with an entity domiciled in and doing business in Texas (*i.e.*, ACET Global); had an employee in Texas (*i.e.*, Steven Bellah); assumed ownership of, and a board member seat of, a Texas-based entity (Windspeed); and conspired with Texas-based persons.

26. This Court has personal jurisdiction over Cole because he purposefully directed actions at this forum to obtain benefits from the scheme. Cole was the executive and primary beneficiary of Super G Capital and SG Credit Partners. Cole was engaged personally in many of the acts pled in this Complaint. The exercise of jurisdiction over Cole is reasonable.

27. This Court further has personal jurisdiction over Super G, SG Credit, and Cole under 28 U.S.C. § 1965(b) because in any action brought under the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Given these facts, and that no other district has personal jurisdiction over

all defendants, the ends of justice require this Court's exercise of personal jurisdiction over Super G, SG Credit, and Cole.

28. Along with the acts alleged in this Complaint, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce and the United States mail.

29. Baymark Partners is an enterprise within the meaning of 18 U.S.C. §1961(4) that operates in interstate commerce and the activities of which affect interstate commerce.

### III. PARTIES[25]

30. Plaintiff D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC) is a limited liability company formed in the state of Texas.

31. Defendant Baymark Partners, LP was a limited partnership formed in the state of Delaware, although it forfeited its certificate and limited liability status in Texas over a decade ago. It may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

32. Defendant BP Management is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

33. Defendant Super G is a limited liability company formed in the state of Delaware and may be served with process at 23 Corporate Plaza Drive, Suite 135, Newport Beach, California 92660, or wherever it may be found.

34. Defendant SG Credit is a corporation formed in the state of Delaware and may be served with process at 301 Carnation Avenue, Corona Del Mar, California 92625, or wherever it may be found.[26]

---

[25] Plaintiff reserves the right to add ACET Global, LLC as a defendant. However, at this time, it has deliberately elected not to do so.

[26] According to the sworn testimony of Marc Cole, the "SG" in SG Credit Partners is an acronym that stands for "Super G"—that is, "Super G" Credit Partners, LP.

35. Defendant Baymark ACET Holdco, LLC is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

36. Defendant ACET Direct Invest, LLC is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

37. Defendant Baymark Management, LLC is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

38. Defendant Baymark is a general partnership between Hook and Ludlow with its principal place of business at 5700 Granite Parkway, Suite 435, Plano, Texas 75024.  Its management and employees hold it out as "Baymark Partners."

39. Defendant Hook is an individual and managing director of Baymark at all times relevant to this Complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever he may be found.

40. Defendant Ludlow is an individual and managing director of Baymark at all times relevant to this Complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever he may be found.

41. Defendant Denegre is an individual and a director of Baymark at all times relevant to this Complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

42. Defendant Szeto is an individual and the CEO of ACET Global and Windspeed at all times relevant to this Complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

43. Defendant Cole is an individual and the Managing Director of SG Credit and CFO of Super G at all times relevant to this complaint. He can be served with process at his place of residence at 215 Redlands St, Playa Del Rey, California 90293.

44. Defendant Bellah is an individual and senior executive of SG Credit and Super G at all times relevant to this complaint. He can be served with process at his place of residence at 647 Lake Park Dr, Coppell, Texas 75019.

45. Defendant Lin is an individual and Accountant for Windspeed and ACET Global at all times relevant to this Complaint. She can be served with process at her place of residence at 4536 Bending Oak Trail, Plano, Texas 75024.

46. Defendant Tomerlin is an individual and fulfillment center employee at Windspeed and ACET Global at all times relevant to this Complaint. She can be served at her place of residence at 3701 Lamesa Drive, Garland, Texas 75041.

47. Defendant Vattana is an individual and Sales Manager for Windspeed and ACET Global at all times relevant to this Complaint. She can be served at her place of residence at 1468 Santa Anita Boulevard, Irving, Texas 75060.

48. Defendant Ketter is an individual and fulfillment center employee at Windspeed and ACET Global at all times relevant to this Complaint. She can be served at her place of residence at 4528 W Pioneer Dr, Apt 383, Irving, Texas 75061.

49. Defendant Torres is an individual and employee at Windspeed and ACET Global at all times relevant to this Complaint. Her current address or location for service of process is currently unknown.

50. Defendant Windspeed is a limited liability company formed in the state of Texas and may be served with process at 2711 N. Haskell Ave., Suite 2400, Dallas, Texas 75024, or wherever it may be found.

## IV.  <u>FACTS</u>

51. In the summer of 2017, Baymark and its principals (*i.e.*, Ludlow, Hook, and Denegre) approached Tomer Damti ("Damti") seeking to purchase the assets of ACET Venture Partners, LLC. D&T Partners was engaged in a successful e-commerce business and had built a significant e-commerce platform.  Baymark and its principals wanted to diversify their operations and particularly sought a platform to engage in e-commerce.  They planned to ultimately divest the company of its assets and operations and to use those assets to bolster other business investments and operations.

52. **Baymark Forms ACET Global to Purchase the Assets.**  Following negotiations, Baymark structured a transaction to purchase the assets of ACET Venture Partners, LLC for $ 4,050,000. Baymark formed an entity to serve as the vehicle for the purchase: ACET Global.  Via multiple shell companies (as further described below), Baymark held 100% beneficial ownership of ACET Global.[27]

53. **The Asset Purchase Agreement.**  ACET Global purchased the assets of ACET Venture Partners, LLC according to an Asset Purchase Agreement (the "APA") dated July 14, 2017.

54. **The Shell Entities That Hook Describes as "Just Pieces of Paper."** Before the APA, Baymark ACET Direct Invest, LLC wholly owned and controlled Baymark ACET Holdco, LLC. Baymark (and Ludlow and Hook) controlled Baymark ACET Direct Invest, LLC. Baymark ACET Direct Invest, LLC remained the majority member of Baymark ACET Holdco, LLC after the APA.  At that time, Baymark ACET Holdco, LLC wholly owned and controlled ACET Global. Baymark (and Ludlow and Hook) ultimately controlled Baymark ACET Direct Invest and, by extension, also controlled

---

[27] Nonetheless, David Hook, the managing member of Baymark Partners and the president of ACET Global, has maintained under oath that Baymark Partners actually owned and owns ACET Global directly.  He has testified as follows:

> Q.  Okay.  So, Baymark Partners owned ACET Global?
> A.  Part of it.
> Q.  What do you mean "part of it"?
> A.  Majority.
> Q.  Okay.  Baymark Partners owned the majority of ACET Global?
> A.  Yeah. One of those entities.

(Exhibit 7, Dep. of David Hook, 84:03-09).

Baymark ACET Holdco, LLC and ACET Global.  Ludlow and Hook also ultimately exercised control

over BP Management, as well as Baymark.

55. According to Hook, the string of Baymark shell entities were "just pieces of paper." (Exhibit

7, Dep. of David Hook, 165:01-04). Nothing truly happened within the shell entities. Further, the shell

companies didn't do anything or serve an economic purpose.  Hook has testified to this effect

regarding the shell entities:

> A.  They were entities.  So, they're either -- in our office at Baymark Partners.
> Q.  So, they -- they shared Baymark Partners' office?
>> MR. PERRIN: Objection, form.
> A.  It -- it's an entity. It's a piece of paper.
> Q.  (By Mr. Freeman)  Right.  So, I mean, I – I get it.  **Each of these entities
> is -- just basically is a piece of paper?**
>> MR. PERRIN: Objection, form.
> **A.  Yes.**

(Exhibit 7, Dep. of David Hook, 164:19-165:4) (bold added).

> A.  They got formed due to the buying of the company. There's nothing that happens
> in there at all.
> Q.  (By Mr. Freeman)  **They don't do anything, really?**
> **A. No.**

(Exhibit 7, Dep. of David Hook, 166:6-10) (bold added).

> Q.  Okay.  I mean, are these entities, like, they just all kind of the same to you?
>> MR. PERRIN: Objection, form.
> A.  Yes, and -- yes.

(Exhibit 7, Dep. of David Hook, 45:24-46:02).

56. Indeed, Hook elaborated on the fact that the string of shell entities, over which he, as

managing member of Baymark, had authority, was a façade:

> Q.  Okay.  Mr. Hook, whenever -- for each of your -- your Baymark entities
> involved in this -- you know, we went over quite a number of them.  And
> you'll recall these included ACET Global, LLC; Baymark ACET Holdco,
> LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC;
> Baymark Partners -- the various interest -- entities.  Do each of these entities
> have their own email?
>> MR. PERRIN: Objection, form.

A.  No.

Q.  (By Mr. Freeman)  No?

A.  No.

Q.  So, what email address do you use when you're corresponding on behalf of those entities?

A.  David@Baymarkpartners or Dhook@baymarkpartners.com.

Q.  Okay.  So that's your Baymark Partners' email address?

A.  Those two are, uh-huh.

Q.  Okay.  And do you have a separate phone number for each of these entities?

A.  No.

Q.  Okay.  So what phone number do you use when you're corresponding on behalf of these entities?

A.  [REDACTED]

Q.  Is that your Baymark Partners' phone number?

A.  Yes.

Q.  Do each of these entities have separate bank accounts?

A.  I don't think so.

Q.  Okay.  So they just use Baymark Partners' bank accounts?

            MR. PERRIN: Objection, form.

A.  Yeah.  Again, the Baymark Management is our operating company.

Q.  (By Mr. Freeman)  Okay.  And who are its directors or officers?

A.  Tony Ludlow and myself.

Q.  Okay.  That's Baymark Management, LLC?

A.  I think it's an LLC.

Q.  With these other entities, did they -- did they hold -- any of them have a board of directors?

            MR. PERRIN: Objection, form.

A.  No.

Q.  (By Mr. Freeman)  Did any of them hold meetings?

A.  No.

Q.  Are there any minutes from any meetings related to these companies?

A.  No.

Q.  Any resolutions for these companies?

A.  No.

Q.  Where were their offices?

A.  They were entities.  So, they're either -- in our office at Baymark Partners.

Q.  So, they -- they shared Baymark Partners' office?

            MR. PERRIN: Objection, form.

A.  It -- it's an entity. It's a piece of paper.

Q.  (By Mr. Freeman)  Right.  So, I mean, I – I get it.  **Each of these entities is -- just basically is a piece of paper?**

            **MR. PERRIN: Objection, form.**

**A.  Yes.**

Q.  (By Mr. Freeman)  Okay.  I mean, did they have any employees?

A.  No.

Q.  Did they have attorneys?

A.  No.

Q.  Did they have, you know, extra capital?

A.  No.

Q.  I mean, were these just, like, single-venture entities; or did they have multiple purposes?

A.  No.

MR. PERRIN: Objection, form.

Q.  (By Mr. Freeman)  I mean, where did their revenues go?

A.  They didn't have any revenues.

Q.  Did they have any, like, corporate processes or formalities they went through?

A.  No.

MR. PERRIN: Objection, form.

Q.  (By Mr. Freeman)  Who ultimately controlled them?

MR. PERRIN: Objection, form.

A.  I don't know how to answer that question. There's no control.

Q.  (By Mr. Freeman)  I mean, who -- who ended up controlling or making decisions for them?

MR. PERRIN: Objection, form.

A.  They got formed due to the buying of the company.  **There's nothing that happens in there at all.**

**Q.  (By Mr. Freeman)  They don't do anything, really?**

**A.  No.**

MR. PERRIN: Objection, form.

Q.  (By Mr. Freeman)  They're just a piece of paper for the file to -- for all the paperwork?

MR. PERRIN: Objection, form.

A.  They -- they serve a purpose, but it's a legal purpose.

Q.  (By Mr. Freeman)  Okay.  Not like a real economic purpose, I guess?

MR. PERRIN: Objection, form.

A.  No.

Q.  (By Mr. Freeman)  Okay.  Did they have -- you know, if they shared the office space with you, did they have separate signs?

MR. PERRIN: Objection, form.

A.  No.  And it's not "they."  There's no "they."

Q.  (By Mr. Perrin)  Okay.  I mean, did -- it's just y'all?

A.  Yes.

Q.  Just Baymark Partners?

A.  Yes.

Q.  Okay.  I mean, did you keep a -- like, effectively keep a consolidated balance sheet, then?

MR. PERRIN: Objection, form.

A.  No.  There's no bank account.  There's nothing.

Q.  (By Mr. Freeman)  Nothing.  Okay.

(Exhibit 7, Dep. of David Hook, 162:16-167:10) (bold added).

57. Ludlow, who was Hook's partner, has testified to the same effect:

Q.  When you're corresponding on behalf of Baymark Partners Management, what e-mail address do you use?

A. Keep it simple. It's all used under my convenient e-mail address that I have at Baymark Partners. Dludlow@baymarkpartners.

Q. Okay. So you use your Baymark Partners e-mail address. Do you use a different signature block?

A. No, I don't.

Q. Does -- do you have a different phone number for Baymark Partners Management?

A. I do not.

Q. Different office location?

A. It is the same office location.

Q. Does it have different, distinct employees?

A. Trying to -- So there are certain people that work on some or the other, but it's -- for convenience, I would say it's the same employees. Different employees work on different things.

Q. Same employees. Okay. Are they paid by Baymark Partners?

A. Paid by Baymark Management.

Q. Baymark Management?

A. Baymark Partner – yeah. Baymark Management.

Q. Is that the entity we were just talking about, or is that a different entity?

A. It's the same.

(Exhibit 3, Dep. of Tony Ludlow, 101:2-102:3).

Q.  Did Baymark Partners management, did it have -- you know, did it have a separate sign outside to designate, outside the office?

A. No, it didn't.

Q. And no separate website, right?

A. No, it didn't.

(Exhibit 3, Dep. of Tony Ludlow, 103:20-25).

58. **Szeto and Windspeed.**  At the time of the APA, Baymark had not yet formed Windspeed. But Baymark had a plan in place to do so. Baymark intended to utilize Szeto to obscure both the formation of Windspeed and its ties to Baymark.  Szeto's father had used the name "Windspeed Trading," and Szeto was partial to the entity name.  (Exhibit 2, Dep. of William Szeto, 194:03-05).[28] At the time of the APA, Baymark and Denegre were not working on any other transaction involving

---

[28] *See* Exhibit 2, Dep. of William Szeto, 194:03-05 ("Windspeed Trading happened to be one of the names my dad use.  So we try to figure out what name to use, and we said, Well, let's just use that name.").

an entity or project named Windspeed.  (Exhibit 1, Dep. of Matt Denegre, 168:15-23).[29] But Denegre nonetheless had a recurring weekly call scheduled on his calendar for "Windspeed" that first began on June 13, 2017, roughly a month before closing on the APA.  (Exhibit 1, Dep. of Matt Denegre, 15:12-19; 169:08-24).[30]

59. **The APA's Terms.**   Under the APA, ACET Global agreed to (1) pay $850,000 to D&T Partners, subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners; and (3) to provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC.

---

[29]        Q.  Okay.  There wasn't some other Windspeed you were working with before that?
          A.  Before what?
          Q.  Before that time in 2018.
          A.  No.
          Q.  You're sure of that?
          A.  Certain of it.
          Q.  Absolutely certain?
          A.  Yes.
(Exhibit 1, Dep. of Matt Denegre, 168:15-23).
[30]        Q.  Did you have a weekly call on your calendar for the subject of Windspeed at any time?
          A.  I may have.
          Q.  Did you have a weekly call on your calendar for the subject of Windspeed in 2017?
          A.  What do you mean by "weekly call"?
          Q.  A recurring weekly calendar.
          A.  I may have.
(Exhibit 1, Dep. of Matt Denegre, 15:12-1).

          Q.  Okay.  Does it appear to be a weekly recurring calendar marker?
          A.  Yes, it does.
          Q.  And is the organizer Matt Denegre?
          A.  Yes.
          Q.  Okay.  And is the subject "Windspeed weekly call"?
          A.  Yes, it is.
          Q.  Okay.  And is the date -- the starting date June 13th of 2017?
          A.  That's what it says in this email.
          Q.  Was the ACET transaction closed in the summer of 2017 as well?
          A.  July 2017.
          Q.  Okay.  Does this appear to be a true and correct copy of what it reflects?
          A.  This all looks true and correct.
(Exhibit 1, Dep. of Matt Denegre 169:08-24).

60. **The $3.2 Million Note.**  As part of the transaction, ACET Global, LLC entered into a promissory note with D&T Partners, memorializing the $3,230,000 payable to D&T Partners (*i.e.*, the D&T Note).  The first installment payment was to come due in **October of 2018**. (Exhibit 12).

61. **The Security Agreement.**  Separately, Baymark ACET Holdco, LLC entered into a Security Agreement (the "Security Agreement") with D&T Partners. (Exhibit 11).

62. **Baymark Makes False Representations.**  Hook and Ludlow, as the principals for Baymark, ensured Damti that he would be the CEO of ACET Global and that he would maintain managerial authority and discretion.  Damti's presence as CEO would, given his knowledge of the business, operations, and industry, safeguard Plaintiff's interest in the transaction and was a substantial inducement to enter into the transaction.  In reality, Hook and Ludlow did not actually intend to keep Damti as the CEO or to provide him with managerial authority or discretion.  Hook and Ludlow intended to keep Damti around long enough to learn the platform and to complete the fall selling season.  After that, Hook and Ludlow planned to remove ACET Global's assets.  Throughout this time, Hook and Ludlow refused to provide Damti with authority to function as a "CEO" and then Denegre, on behalf of Baymark, improperly purported to terminate and remove Damti.

63. **The Super G Collateral Assignment.**  Following the APA, Hook caused ACET Global to enter into a Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement (the "Collateral Assignment") with Super G, which provided that Super G would provide a term loan facility of up to $1,000,000 ("the Super G Note"). (Exhibit 24, Collateral Assignment of Rights).

64. **Super G and Bellah.**  Baymark had a pre-existing and uniquely close relationship with Bellah, who was an officer of Super G.  Bellah was located and worked in Dallas, Texas.  Super G, through Bellah, closely coordinated the "Windspeed" plan.

65. Super G was not a "financial institution." It was a small outfit of individuals who engaged in unorthodox investments and practices—seeking high-risk, high-return investments. They were a perfect fit with Baymark.

66. Cole, as Super G's Chief Financial Officer, exercised virtually unfettered control over Super G's investments. Cole held and used many titles with Super G—whatever was needed to facilitate business. He has acknowledged this in sworn testimony:

> Q. What position, specifically, did you hold at Super G?
> A. Many. I took the title of chief financial officer because we needed someone in that seat for investor purposes. I took the title of chief credit officer at one point. It was a three-partner organization, and I was one of three partners.
> Q. Who were those partners?
> A. Myself, Darrin Ginsberg, and Jon Engleking.

(Exhibit 8, Dep. of Marc Cole, 79:13-21).

67. Super G had a rudimentary record-keeping system, maintaining its records on Dropbox. All the records related to the transactions at issue were also stored in Super G's Dropbox folder.[31] Although Cole maintains that he has moved from Super G to SG Credit,[32] he still maintains access to all of Super G's records via its Dropbox account:

> A. Super G had a Dropbox filing system. Nearly everything was electronic other than a deed or a mortgage that it received as collateral. Everything was electronic. There was a folder tree, if you will, hierarchy of what files were important to a loan transaction, and that the employees were required to maintain a fairly strict adherence to that so that it wasn't haphazard.
> We terminated all of the employee access to the -- to the Dropbox system. Because it was a friendly separation, I kept my files; Alex and the other employees kept their files, other than terminated employees who had to surrender everything. They never do, but to the extent you can.

(Exhibit 8, Dep. of Marc Cole, 94:4-17).

---

[31]    Q.  The terms of the loan file, are all of the records you just mentioned, are those maintained in the loan file?
         A.  Yes.
         Q.  Are those maintained on Dropbox?
         A.  Yes.
(Exhibit 8, Dep. of Marc Cole, 110:09-14).
[32] *See supra* note 26.

68. As a small, unorthodox outfit, Super G had no document-retention policy or document-destruction policy.[33]  According to Cole, at the time of the transactions at issue, Super G had become a "rubber stamp" for what Cole and his team wanted to do.[34]

69. According to Cole's testimony, during 2017, Super G was "way too small an[d] entrepreneurial" to memorialize many of its transactions, and decisions were "really [just a] thumbs up or thumbs down" type of process.[35]  Further elaborating on the lack of records that one would expect with a typical entity in the industry, Cole testified that:

> Q. (BY MR. FREEMAN)  Okay.  And what type of record gets made to memorialize that?
> A.   At the time, none.  It [Super G] was a very small business at the time.
> Q.   So is that just an oral approval?
> A.   Yes.
> Q.   Is that done by phone or in person?
> A.   It would likely be done by a call with Steve in his home office and me in my Newport Beach office.

(Exhibit 8, Dep. of Marc Cole, 25:23-26:06).

70. Indeed, Cole confirms that he approved the transactions at issue, which obtained "investment committee" approval because the "investment committee" consisted of one person: Cole.  As he testified:

> A.   Yes. Any – the proposal required capital, and any capital required the investment committee, which at the time would have been me.

---

[33]    Q.  Did Super G or does Super G have a document-retention policy?
     A.  No.
     Q.  Does it have a document-destruction policy?
     A.  No.
(Exhibit 8, Dep. of Marc Cole, 93:23-94:02).

     Q.  Okay.  Does SG Credit Partners have a document-retention policy?
     A.  No.
     Q.  Does it have a document-destruction policy?
     A.  No.
(Exhibit 8, Dep, of Marc Cole, 79:01-05).

[34] *See* Exhibit 8, Dep. of Marc Cole, 104:13-15 ("It [Super G] was moving towards a Darrin rubber stamp of what my team wanted to do.").

[35] *See* Exhibit 8, Dep. of Marc Cole, 104:20-24 ("A bank would have a response memorialized and, sort of, saved with the transaction.  At some point, Super G Capital moved to an email approval process, but in 2017, it was way too small an entrepreneurial.  It was really thumbs up or thumbs down.").

Q.   (BY MR. FREEMAN)  Okay.  And what type of record gets made to memorialize that?
A.   At the time, none.  It was a very small business at the time.

(Exhibit 8, Dep. of Marc Cole, 25:20-26:01).

71.  Nonetheless, when Cole "transitioned" to SG Credit,[36] he and his associates maintained access to the records from their group's loan clients, **including ACET Global**.  As Cole has admitted in testimony:

A.   So when Alex and I left Super G Capital, we maintained records from our former loan clients.  And so Alex and I both have the Dropbox file system that was in place at the time.  We have those -- we retained a copy of those files.

(Exhibit 8, Dep. of Marc Cole, 37:23-38:02).  Indeed, Cole was the Super G corporate representative and agent in 2021.  The ACET Global transaction was transferred to Cole and SG Credit, and Cole and his associates oversaw and handled the ACET matter—continuing the fraudulent scheme in the same manner.

### The Subordination to Super G Capital

72.  The Collateral Assignment contemplated that D&T Partners' security interest under the Security Agreement would be subordinated to Super G's lien. (Exhibit 24). D&T Partners subordinated its security interest to Super G based on Hook, Ludlow, and Baymark's representations in June and July of 2017 that (1) Damti would maintain managerial authority and discretion and (2) ACET Global did not intend (and that Baymark, Hook, and Ludlow did not intend to cause it) to default on the loan to D&T Partners or default on the loan from Super G. As a result, Baymark, on false pretenses, induced D&T Partners to subordinate its security interest under the Collateral Assignment.

73. **Baymark Required and Drafted the Subordination Agreement.**   Notably, Baymark Partners is the party that sought the subordination agreement.  In fact, Super G has testified that it

---

[36] *See supra* note 26.

did not draft the subordination agreement that Baymark required and that the subordination agreement does not look like its standard agreement or any document used in any other deal.[37]

## The Termination of Damti

74. On February 12, 2018, Denegre, purporting to represent Ludlow and Baymark, informed Damti that he was terminating Damti's employment with ACET Global.  Despite this, Denegre admits that he was not an employee or agent of ACET Global. (Exhibit 1, Dep. of Matt Denegre, 27:13-22).[38]

75. Denegre stated that the termination was based on poor performance by the company. However, at the time of the February "termination," January 2018 revenues for ACET Global, LLC were 248.26% of those in January 2017.  The termination was, in fact, part of the plan to injure ACET Global to carry out the plan to fraudulently transfer its assets.

---

[37]    Q.   (BY MR. FREEMAN)  Mr. Cole, do you recognize this document, or have you seen it before?
A.   Yes.
Q.   And what is this?
A.   This appears to be -- in conjunction with Super G Capital's loan, this document confirms that all of the assets of ACET Global are -- that Super G Capital is going to be the first lien lender, and that the seller, who took a note, that that note was subordinated to Super G Capital's first lien.
Q.   Okay.  Who asked you to sign this document?
MR. PERRIN: Objection, form.
A.   This was part of the transaction documents with the loan agreement.
Q.   (BY MR. FREEMAN)  And who asked you to sign it?
A.   It would have been presented to me by the deal team, which was, at a minimum, Steve Bellah and whoever else was assisting Steve in the transaction, including counsel.
Q.   Is that the first time you would have seen that document?
A.   Yes.
Q.   Would it have been sent to you by that group?
(Exhibit 8, Dep. of Marc Cole, 119:02-25).

Q.   This doesn't look like a Collateral Assignment of Rights that you've ever received from them before, does it?
A.   No.
MR. PERRIN: Objection, form.
A.   The loan agreement looks standard, but this does not look standard.
Q.   (BY MR. FREEMAN)  Are you aware of any other Super G deals with a document that looks like this?
(Exhibit 8, Dep. of Marc Cole, 120:17-25).
[38] Ludlow admits that he was also not an officer of ACET Global and did not ever have express authorization for the termination.  (Exhibit 3, Dep. of Tony Ludlow, 87:7-14; 251:12-252:06).  Despite this, Ludlow has represented himself to be the president of ACET Global.

## Baymark Installs Szeto as CEO of ACET Global

76. On or around February 14, 2018, Szeto became the CEO of ACET Global.  Accordingly, Szeto held himself out as the CEO and president of ACET Global.  (Exhibit 2, Dep. of William Szeto, 41:01-13); (Exhibit 3, Dep. of Tony Ludlow, 87:10-12).[39]

77. **Szeto's Unusual Arrangement.**  The arrangement, however, was unusual by any standard. Baymark installed Szeto as the "CEO" of ACET Global.  Hook, who was the president of ACET Global, has testified that Szeto took on the role as CEO and "was working for free" and that there was no financial promise made to him or expectation of any financial reward:

> Q.  Okay.  And, so, did you hire Mr. Szeto?
> A.  I think ACET Global hired Mr. Szeto.
> Q.  So ACET Global hired Mr. Szeto?
> A.  I believe so.
> Q.  While you were the president of ACET Global; correct?
> A.  Correct.
> Q.  And, so, ACET Global hires Mr. Szeto while you were president and what? Does he become the CEO of ACET Global?
> A.  I don't -- I don't recall what his title is, but he was -- I don't recall.  I think he worked for Tomer at the beginning.  And if I'm not mistaken, I think he was working for free.  I don't -- I don't -- I'm not positive, but he could have worked for free for a while under Tomer.
> Q.  Okay.  Why would he work for free?
> A.  Because he was retired and he had made enough money and he thought that he could help the company.
> Q.  Okay.  Was there anything promised to him?
> A.  No, not that I know of.
> Q.  No financial benefit whatsoever to go in and run this company?
>               MR. PERRIN: Objection, form.
> A.  Well, like I said, I think he worked for free. I don't know if he's -- took a salary or not.  I don't recall.

(Exhibit 7, Dep. of David Hook, 133:21-134:22).

---

[39]      Q  Bill Szeto's position at ACET Global at that time?
          A.   He was the CEO.
(Exhibit 3, Dep. of Tony Ludlow, 87:10-12).

78. Szeto was actually brought on to help form Windspeed and to serve as a puppet (though he was a *paid* puppet) in carrying out the planned wind down of ACET Global's operations and the fraudulent transfer of its assets to Windspeed for the benefit of Baymark, Super G, and Szeto.

79. During February of 2018, the final month in which Damti served as CEO, ACET Global remained in compliance with the Super G Note.  As Super G's corporate representative, Cole has testified:

> Q.   Okay.  And did the company [ACET Global] at that time comply -- was it compliant with the then existing loan agreements as of the end of January 2018?
> A.   Yes.
> Q.   And was it in compliance with the then existing loan agreements as of the end of February 2018?
> A.   I believe the -- yes, it was.

(Exhibit 8, Dep. of Marc Cole, 171:13-19).

**Szeto and Baymark Deliberately Fail to Pay the D&T Note**

80.  However, immediately after Baymark installed Szeto as the new "CEO," ACET Global

defaulted on its note to Super G, as planned:

> Q.   So in the first month in which Mr. Szeto was the CEO of ACET Global,
> did ACET Global fail to make the payment to Super G?
> A.   . . . the company -- that we did a forbearance in April '18 as the company
> failed to make payments in March.
> Q.   Okay.  So if March was the first month -- first full month in which Mr.
> Szeto was serving as the CEO of ACET Global, then ACET Global failed to
> make its required note payment in his first month as CEO?
> A.   Yes.

(Exhibit 8, Dep. of Marc Cole, 172:13-24).

81.  **A Forbearance Agreement.**   The parties entered into a Forbearance Agreement in April of

2018 that provided for a forbearance period until October 25, 2018—just days before the D&T Note

payments would become due. (Exhibit 26, Forbearance Agreement). The Forbearance Agreement was

intended to allow the parties to execute a "Wind Down" plan regarding ACET Global that would

allow them to transfer its assets and business operations to a newly-formed entity: Windspeed.   An

excerpt of the April 2018 Forbearance Agreement setting forth the forbearance period appears below:

> **Section 4.      Forbearance.**
>
>           (a)     Forbearance Period.   Subject to the conditions precedent in Section 5
> below, for the period beginning on the Commencement Date and ending on October 25, 2018
> (the "Forbearance Period"), Lender, without waiving, curing or ceasing the occurrence or
> continuance of the Designated Defaults, agrees to forbear from the exercise of any of its rights
> and remedies available under the Loan Agreement and the other Loan Documents on account of
> the occurrence or continuance of the Designated Defaults and from requiring Borrower to
> immediately pay to Lender for application to the First Loan, the unpaid balance of the First Loan
> outstanding on such date, including any and all accrued and unpaid interest thereon and fees and
> costs due Lender.   Lender's forbearance shall be effective only with respect to the Designated
> Defaults and shall automatically terminate and cease to be of any force and effect, and Lender
> may exercise all of its rights and remedies as may be available under the Loan Agreement, the
> other Loan Documents and under applicable law or in equity, if the Forbearance Period is earlier
> terminated pursuant to any other provision of this Forbearance Agreement.

82. As part of the scheme, Baymark and Szeto caused ACET Global to fail to pay vendors, carriers, and others.  They deliberately took steps to cause ACET Global to fail financially and to default on its notes.

83. This is not surprising. Hook and Ludlow exchanged multiple emails whereby they directly discussed their nefarious plans. In December 2017, just months after executing the APA with D&T Partners, Hook suggested it was time for "bankruptcy for ACET" to which Ludlow responded, "It may be an option if Super G doesn't agree to reduce payments." Further, in March 2018, in an effort to avoid paying carriers, Hook stated, "Maybe we tell them to stop or we shut the company down and they wont [sic.] get anything." Ludlow responded in agreement: "Yep, defiantly [sic.] an option. We can strategize and then get back with them."

84. Baymark and Szeto drained ACET Global of its funds and assets to their enrichment and to ACET Global's detriment.  Section 5.3 of Baymark ACET Holdco's Company Agreement authorized Baymark ACET Holdco to pay a quarterly management fee (the "Management Fee") of the greater of $150,000 or 5% of ACET Global's EBIDTA to Baymark Management, LLC.  Thus, Ludlow and Hook acted as both the managers of Baymark Management, LLC and exercised control over ACET Global and Baymark ACET Holdco.  Baymark and Szeto had planned to, and were successful in, utilizing this Management Fee to drain ACET Global and Baymark ACET Holdco of all of their assets and capital from a cash flow perspective and in terms of ACET Global's balance sheet based on accrued/owed liabilities that deliberately placed ACET Global in an insolvent position.  Baymark and its principals claimed deductions on the related tax returns, thereby receiving the benefit thereof, but on information and belief, did not include the corresponding management fee income in its taxable income and did not inform its accountants of both sides of the transaction, deliberately causing a violation of section 267 of the Internal Revenue Code.

85. On information and belief, even after ACET Global became insolvent, Hook and Ludlow continued to drain it of its assets through the Management Fee. They paid or accrued recurring "management fees" to Baymark Management, LLC, which did not correspond to services or value provided, and caused improper management fees to be paid or owed even as ACET Global and Baymark ACET Holdco became insolvent. The management fee was also used as a device to cause ACET Global to appear to be financially unsound.

## All The ACET Global "Presidents"

86. While Szeto served as the president and CEO of ACET Global, ACET Global also did business as Baymark ACET Holdco, LLC. (Szeto 41:01-13).[40]

87. During this time, Hook was also the president of ACET Global. However, following the events laid out herein, Hook demonstrated a remarkable inability to remember his role (among other things):

> Q.  Okay.  Were you the president of ACET Global?
> A.  I don't remember.
> Q.  You don't remember if you ever served as the president of ACET Global?
> A.  No.
> Q.  Okay.  Do you know how many presidents ACET Global had?
> A.  No.

(Exhibit 7, Dep. of David Hook, 18:17-24).

> Q.  Okay.  Were you ever the president of ACET Global, LLC?
> A.  I don't remember what my title was.

(Exhibit 7, Dep. of David Hook, 41:01-03).

---

[40]  Q.  (BY MR. FREEMAN)  So by executing this document, you were representing that you were the president of ACET Global, LLC?
A.  Yes.
Q.  And by signing this document, you were representing that you were the CEO of ACET Global, LLC?
MR. PERRIN: Objection, form.
A.  Yes.
Q.  (BY MR. FREEMAN)  And you were also representing that ACET Global, LLC did business as the name Baymark ACET Holdco, LLC?
MR. PERRIN: Objection, form.
A.  Yes.
(Exhibit 2, Dep. of William Szeto, 41:01-13).

88. He likewise had difficulty recalling what his role with Baymark ACET Holdco was:

> Q.  Okay.  Were you a manager of Baymark ACET Holdco?
> A.  As I said, I don't remember.
> Q.  Okay.  Were you the president of Baymark ACET Holdco?
> A.  I don't remember.

(Exhibit 7, Dep. of David Hook, 43:21-44:01).

89. Szeto has also expressed a lack of memory about key facts.  For instance, he claims that although he was serving as CEO of ACET Global, he was never informed of, and never knew about, the $3.2 million D&T Note.  Szeto testified that:

> Q.   But you knew there was a significant liability owed by ACET Global to Tomer Damti?
> A.   I do not know any details of that.
> Q.   You didn't know anything about a loan being owed by ACET Global to Tomer Damti?
> A.   I do not know anything, any loan that ACET Global owned to Tomer Damti because that is the least of my concern at that time.  I was told to take care of ACET Global, and I was not involved with any details between Tomer Damti and the others.
> Q.   Was that loan owed by ACET Global to Tomer Damti ever reflected on any of your accounting records at ACET Global?
> MR. PERRIN: Objection, form.
> A.   That's not something I look at, and there was so many things at that time that I look at.  That was not one of the things I look at.
> Q.   (BY MR. FREEMAN)  Were you ever made aware that ACET Global owed a note to Tomer Damti?
> A.   No, I was -- I did not know anything about it.

(Exhibit 2, Dep. of William Szeto, 131:02-21).

### Szeto's Braggadocio Tips the Plan

90. In June of 2018, while serving as Baymark's installed CEO of ACET Global, Szeto bragged to Monica Plaskett that he was going to "start another business."  Szeto suggested he "had friends," and that if ACET Global went bankrupt, he would continue the operations with a new company. (Exhibit 27, Affidavit of Monica Plaskett, ¶ 10).

### The Wind-Down Plan

91. In April of 2018, Baymark began to set the stage to execute their "wind down" plan. Baymark intended to wind down ACET Global, LLC by transferring its assets and operations to a new entity: Windspeed. Szeto, while still serving as the CEO of ACET Global, worked closely with Denegre and Ludlow to fine tune the "wind down" plan and, ultimately, to put it into action.

92. **At First, Szeto Denies the Existence of a Winddown Plan**. Although Szeto has, under oath, denied the existence of a "wind down" plan, documentation demonstrates its existence beyond any doubt. During Szeto's sworn testimony, Szeto stated that:

> Q.   Okay. Was it part of a plan to wind down ACET Global?
> A.   I don't know of a plan as such.
> Q.   Not a plan to wind it down and transition to Windspeed?
>            MR. PERRIN: Objection, form.
> A.   No.
> Q.   (BY MR. FREEMAN) Okay. **Was there any kind of wind-down plan?**
> **A.   Not that I know of.**
> **Q.   No plan to wind down ACET?**
> **A.   Not that I know of.**
> Q.   No plan to wind it down and somehow pay off money it owed you?
> A.   No.
> Q.   No plan to wind down ACET and pay for credit card expenses you had incurred?
> A.   Not that I know of.

(Exhibit 2, Dep. of William Szeto, 157:07-24) (bold added).

> Q.   (BY MR. FREEMAN) Okay. You said there was not a plan to wind ACET Global down; is that correct?
> A.   Yes.
> Q.   And there wasn't a plan to wind ACET Global down and, in the process, price its inventory?
> A.   Ask the question again, please.
> Q.   Was there a plan to wind ACET Global down and in the process to price its inventory or value its inventory?
> A.   No, **there was no such plan.**

(Exhibit 2, Dep. of William Szeto, 158:25-159:09) (bold added).

93. **Szeto Recants His False Testimony**.  Szeto, however, ultimately recanted his denial in the face of documented proof, which he believed had been deleted and destroyed.  Confronted with this documentation, Szeto recanted.  His false testimony is evidence of an ongoing effort to cover up the fraud and is an example of yet another predicate act supporting a RICO count.

> Q.   (BY MR. FREEMAN)  I'm putting on the screen what's marked as Exhibit
> Mr. Szeto, do you recognize this document?
> A.  Yes.
> Q.  What is that document titled?
> A.  Wind-down plan.
> Q.  Wind-down plan?
> A.  Uh-huh.
> Q.  And what's the next line says?
> A.  Wind down current location.
> Q.  **And are you familiar with this document?**
> A.  **I think I have seen it before.**
> Q.  Didn't you draft it?
> A.  No.[41]
> Q.  Who drafted it?
> A.  I don't know.
> Q.   Okay.  But you have seen it before?
> A.  **I have seen it before, yes.**
> Q.  When did you first see it?
> A.  I cannot remember.
> Q.  Was it in 2018?
> A.  I think it is in 2018, but I do not know for sure.
> Q.   Okay.  **But it refers to a wind-down plan.  Do you know what that means?**
> A.  **Yes.**
> Q.  **What does that mean?**
> A.   **That means that somehow wind it down, the operations of the company, but that's what I -- what it means.**
> Q.  **And what company?**
> A.  **That's ACET Global, I assume.**
> Q.   **So this was a plan to wind down the operations of ACET Global, LLC?**
> A.  **Yes.**

---

[41] Denegre, however, disputes Szeto's testimony, and points the finger back at Szeto.

> Q.   All right.  And who put together the wind down plan?
> A.   Bill Szeto created the wind down plan.

(Exhibit 1, Dep. of Matt Denegre, 177:09-11).

(Exhibit 2, Dep. of William Szeto, 159:11-160:20) (bold added).

94. As set forth above, Szeto, in a complete "180" from his testimony just minutes before, recanted, demonstrating that his prior testimony was false and that there was, in fact, a plan to "wind down" ACET Global's operations.

95. Indeed, Szeto ultimately admitted to carrying out critical steps of the ACET Global "wind down" plan[42] during the weeks of **September the 17th and 22nd during 2018**—roughly a month before the $3.2 million D&T Note was to come due.  (Dep. Of Szeto, 182:19-24).[43]

96. That "wind down" plan involved plots to "Wind Down Current Location," "price [ACET's] inventory which can be sold or transferred [to Windspeed]," "[r]elocating to temporary office space with current office furniture and computers," "perform last inventory prior to closing," "inform all parties on impending closing," "inform all marketplaces on closing," "send termination letter to all current employees," and "making offers to current employees," among other things.  (Exhibit 1, Dep. of Matt Denegre, 183:25-184:02);[44] (Exhibit 28).

97. Screen shots of portions (PowerPoint slides) of the Baymark/Szeto Wind Down plan for Windspeed are set forth below:

---

[42]      Q.  So was this plan to wind down ACET Global?
         A.  Yes.
                        MS. HARD-WILSON: Objection, form.
         Q.   (BY MR. FREEMAN)  So everything we have been talking about on this Exhibit 27 is about winding down and closing ACET Global?
         A.  Yes.
(Exhibit 2, Dep. of William Szeto, 180:07-13).
[43]      Q.  (BY MR. FREEMAN)  Got it.  So this was all –all of the stuff we were just talking about, these items, they were all to be done **the week of September 17th of 2018?**
                        MR. PERRIN: Objection, form.
         A.  Yes.
(Exhibit 2, Dep. of William Szeto, 182:19-24) (bold added).
[44]      Q.  Okay.  Below that, does it say, "Price inventory which can be sold or transferred"?
         A.  Yes, it does.
(Exhibit 1, Dep. of Matt Denegre, 183:25-184:02).



## Wind Down Plan

### Wind Down Current Location

- Fulfillment
  - Inventory Management
  - Fulfillment Management
  - Sales Continuation
  - Communications between sales and Fulfillment
  - Shipment pickup and delivery

- Sales and Office Staff
  - Relocating to temporary office space with current office furniture and computers
  - Internet access
  - Email Access
  - Customer Services
  - Current Business Files
  - Listing of current Debts and Credits

98. Denegre and Szeto, as well as the others, continued to email and collaborate about the Wind Down plan for ACET Global, all with their coordination regarding Windspeed, as the following screen shot from an email from Szeto to Denegre on September 29, 2018 demonstrates:

---

**Matt Denegre**

| | |
|---|---|
| **From:** | WILLIAM SZETO <bill@acetglobal.com> |
| **Sent:** | Saturday, September 29, 2018 8:53 AM |
| **To:** | Matt Denegre |
| **Subject:** | Windspeed LLC |
| **Attachments:** | EIN - Windspeed Trading LLC.pdf; Certificate of Formation.pdf; LLC Operating Agreement - Windspeed Trading, LLC.docx |

Matt

Attached are files Alex did for me.  Please feel free to send those files to your law firm for tracking, etc.  I do not believe it matters on who did the filing what so ever.  If they needed to be updated, you can have your law firm to do it or I can have Alex to do it.  I need to have those information for the following processes:

1. Leasing of a space – show that we are indeed a serious company
2. Making offers to current employees.  This will include the formation of new payroll account, etc.
3. Creating a new bank account with Texas Capital – If needed
4. Sending termination letter to current employees
5. Informing market places the change of name and banking information for future payments
6. Start to secure samples for products we want to buy – we are running out of time very fast for the upcoming Christmas and Black Friday season.  We have to move fast.  I do not want to miss the best selling season of the year.

Bill

William  Szeto, P.E.
President & CEO
ACET Global, LLC
1501 10th St., Suite 100
Plano, Texas 75074
214-868-7002 (M)

---

99. As Szeto underscored, it was important to inform the market places that ACET Global did business with and obtained revenue from to "change [the] name [to Windspeed] and banking information for future payments," and to "move fast" to take advantage of the upcoming "best selling season of the year."

100. **At First, Denegre Also Commits Perjury and Denies the Existence of a Wind Down Plan**. Like Szeto, when confronted under oath, Denegre denied having engaged in any "wind down" plan regarding ACET Global or even having knowledge of the existence of any "wind down" plan.  (Exhibit 1, Dep. of Matt Denegre, 181:24-182:02).  Denegre testified:

> Q.  (BY MR. FREEMAN) Did you ever engage in a wind down plan with
> respect to ACET Global?
> A. No.

(Exhibit 1, Dep. of Matt Denegre, 181:24-182:01).

101.     Denegre had, however, left a documentary trail of the wind down plan that was inconsistent with his false testimony.  For example, a screen shot of one of his many "wind down" emails is pasted directly below, wherein he emailed Tony Ludlow the then-latest version of the "wind down" plan:

| | |
|---|---|
| **From:** | Matt Denegre |
| **Sent:** | Monday, September 10, 2018 1:19 PM |
| **To:** | Tony Ludlow |
| **Subject:** | FW: Corrected Version |
| **Attachments:** | Winddown1-2.pptx |

Wind down plan for Super G for your review.

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

102.     Denegre   and   his   co-conspirator   Defendants   repeatedly   revised   the   "wind down"/restructuring plan for months as the process culminated in September and October of 2018. He was frequently exchanging emails with Super G and Ludlow about the wind down plan (aka the "ACET Plan")[45]:

---

[45] *See* Exhibit 32, ACET Plan.

| | |
|---|---|
| From: | Matt Denegre |
| Sent: | Friday, September 7, 2018 9:22 AM |
| To: | Steve Bellah |
| Cc: | Tony Ludlow |
| Subject: | ACET Plan |
| Attachments: | ACET Plan (Sept. 2018).pdf |

Steve,

Attached is the ACET plan.  The plan provides the company resources to grow quickly and profitably under a restructured entity.  It would require additional capital from Super G.

Let me know if you would like to discuss.

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

103.     **Denegre Gave False Testimony**.  Denegre, however, could not hide from the clear documentary evidence tying him and Baymark to the "wind down" plan. (Exhibit 1, Dep. of Matt Denegre, 175:12-176:04); (Exhibit 1, Dep. of Matt Denegre, 177:09-178:05); (Exhibit 1, Dep. of Matt Denegre, 182:03-25).   After having unequivocally denied the existence of any "wind down" plan, Denegre testified as follows:

> Q.   (BY MR. FREEMAN)  Okay.  Mr. Denegre, I'm putting on the screen what's marked as Exhibit 13.  Do you see this, sir?
> A.   Yes.
> Q.   And do you recognize this email exchange?
> A.   I recognize this first email.
> Q.   Okay.  And is this an email from you, Matt Denegre, to Tony Ludlow on September 10th, 2018?
> A.   Yes.
> Q.   Okay.  And is the subject line "corrected version"?
> A.   "Forward corrected version," uh-huh.
> Q.   Uh-huh.  And does it state attachments, "Wind down"?  Is that correct?
> A.   Yes, it does.
> Q.   Okay.  **And in your email to Mr. Ludlow, do you state, "Wind down plan for Super G for your review"?**
> **A.   Yes.**

(Exhibit 1, Dep. of Matt Denegre, 175:12-176:04) (bold added).

> **Q.   All right.  And who put together the wind down plan?**
> **A.   Bill Szeto created the wind down plan.**
> **Q.   And who reviewed it?**

**A.  I took a look at it.**
Q.  And who else?
A.  Well, I can't speak for Tony if he reviewed it or not.
Q.  All right.  Did you email it to Tony?
A.  Yes.
Q.  And did you tell him it was for your review?
A.  Yes.
Q.  And did you ever discuss it again with him after sending that email?
A.  We may have.
Q.  What did you discuss with him?
A.  I don't remember.
Q.  You don't remember what you and Tony Ludlow discussed?  How many times did you and Tony Ludlow have a discussion about the wind down plan?
                    MR. PERRIN: Objection; form.
A.  I don't recall.

(Exhibit 1, Dep. of Matt Denegre, 177:09-178:05) (bold added).

Q.   Okay.  And below is the attachment that was attached to this email that you sent to Mr. Ludlow. Does this document -- second page of the exhibit, does it state "Wind Down Plan" is the title?
A.  Yes.
Q.   Okay.   And does it state as one of the bullet items, "Inventory Management?
A.  It does.
Q.  And "Sales Continuation"?
A.  Yes.
Q.  And below that, does it state a bullet, "Sales and Office Staff"?
A.  Yes, it does.
Q.  And below that, is there a bullet that says, "Relocating to temporary office space with current office furniture and computers"?
A.  Yes, it does.
Q.  Okay.  Below -- down below, does it state, "Current business files"?
A.  Yes.
Q.   Okay.  And on this third page of the exhibit, is the title "Timeline and Cost for Wind Down"?
A.  Yes, it is.

(Exhibit 1, Dep. of Matt Denegre, 182:03-25).

Q.   Okay.  Below that, does it say, "Price inventory which can be sold or transferred"?
A.  Yes, it does.

(Exhibit 1, Dep. of Matt Denegre, 183:25-184:02).

104.     **Consistent with His Lack of Respect for Depositions and the Oath, Ludlow was Unwilling to Discuss the Wind Down.**  When first confronted, Ludlow refused to discuss the ACET Global "wind down" plan.  Ludlow, after having watched each prior Baymark deposition, initially addressed the issue with a hard "no"—a refusal to discuss the subject:

> Q. Okay. Did you have a discussion with Super G about restructuring ACET Global's notes to provide time **to wind down ACET Global's business**?
> A. Possibly.
> Q. Okay. Can you tell me about those conversations?
> **A. No.**

(Exhibit 3, Dep. of Tony Ludlow, 47:02-08) (bold added).

105. **Ludlow Later Acknowledges the Plan to Restructure ACET Global's Operations.** Ludlow has acknowledged that a restructuring plan existed to restructure ACET Global's operations "under a restructured entity" in September 2018, the same month that Szeto filed Windspeed's Certificate of Formation with the Texas Secretary of State:

> Q.  Did Mr. Denegre work with Bill Szeto on the wind-down plan for ACET Global?
> A. Yeah. He probably did.

(Exhibit 3, Dep. of Tony Ludlow, 77:20-22).

> Q. And are you familiar with this Exhibit 24?
> A. It looks like an e-mail between Matt and Steve, and I'm included.
> Q. Okay. September 7th, 2018?
> A. Yes.
> Q. Subject line, "ACET Plan"?
> A. Um-hum.
> Q. And attachment entitled "ACET Plan (September 2018)"?
> A. Yes.
> Q. Okay. And it says, "Steve, Attached is the ACET plan," correct?
> A. Yes.
> Q. The plan provides the company resources to grow quickly and profitably under a restructured entity"?
> A. Yep.
> Q. Is that correct?
> A. That is correct.

(Exhibit 3, Dep. of Tony Ludlow, 218:23-219:15).

> Q. Right. And so this is the ACET Plan, right?
> A. It looks like it.
> Q. And this is in the same month that Windspeed is formed?
> A. Well, from what you've told me, it would seem, yes. So...

(Exhibit 3, Dep. of Tony Ludlow, 221:24-222:04).

106. Ludlow's lack of knowledge regarding the plan to restructure ACET Global's operations is astounding. Indeed, in April 2018, Ludlow emailed Denegre and Bellah regarding his "strategy" for ACET Global. In his email, Ludlow suggested ACET Global had "issues" with "debt payments" and Ludlow wanted to ensure that ACET Global did not merely "default on Tomer's debt and have [Tomer] regain the company." Carrying out Baymark's plan was essential. Moreover, Ludlow called Tomer in the summer of 2018 and, in a shakedown, threatened that Tomer wouldn't get "a dime" out of the D&T Note unless Tomer agreed to major concessions. Ludlow would later make good on his threats.

107. **Hook Falsely Denies Knowledge of the Wind Down Plan.**  When questioned under oath, Hook maintained that he was never familiar with or involved in any "wind-down" plan or restricting regarding ACET Global:

> Q.  Okay.  Did you ever discuss restructuring ACET Global's business operations?
> A.  No.
> Q.  Okay.  Did you ever discuss how restructuring its operations might impact creditors?
> A.  No.

(Exhibit 7, Dep. of David Hook, 80:10-15).

108.  Hook further testified under oath:

> Q.  Okay.  Were you ever involved in the formation of a wind-down plan for ACET Global?
> A.  No.  I never heard of a wind-down plan.
> Q.  Okay.  As -- you know, as the president of ACET Global, did you ever engage in formulating a wind-down plan?
>           MR. PERRIN: Objection, form.
> A.  Mr. Freeman, will you please listen to my questions?  I just told you I'd never heard of a wind-down plan.

Q.  (By Mr. Freeman)  Okay.
A.  So, listen to my -- listen to my answers, please.
Q.  Okay.  If you will, look at Exhibit 13, please, sir.
A.  Okay.
Q.  Does this email refer to a wind-down plan?
A.  It says "wind-down plan for Super G for your review."
Q.  Okay.  And this is -- this email looks like it's addressed on September 10th
of 2018; is that correct?
A.  Yes.
Q.  And it's from Matt Denegre of Baymark Partners?
A.  Yes.
Q.  And during this time, you're still the president of ACET Global; correct?
A.  Apparently so.

. . .

Q.  Okay.  And why is -- why is your associate, Matt Denegre, involved in this
wind down?
A.  Because he and Tony were working on this company.
Q.  What company?
A.  ACET Global.
Q.  Okay.  And, now, how do we know this is a wind down for ACET Global?
A.  I didn't know.  This is the first I've heard of a wind-down plan.
Q.  Did I say that it was a wind down of ACET Global?
A.  Well, you said this was a wind-down plan.
Q.  Uh-huh.  And why would this be a wind-down plan for ACET Global?
That -- you know, you're the president of ACET Global at this time; right?
          MR. PERRIN: Objection, form.
A.  That's right.
Q.  (By Mr. Freeman)  And you're not aware of any wind-down plan for ACET
Global; right?
A.  Right.
Q.  And, so, why would we have a wind-down plan for ACET Global?
          MR. PERRIN: Objection, form.
A.  Because we tried to save the company.
Q.  (By Mr. Freeman)  Okay.  By winding it down?

. . .

Q.   This wind-down plan you said was for ACET Global?
A.  That's what the email says.  I haven't heard of a wind-down plan.
Q.  Okay.
A.  So, let me say that again.  I have not heard of a wind-down plan.
Q.  Okay.  Where does the email say it's for ACET Global?
A.  I don't know that it does.
Q.  But you just said that it does; right?
A.  I said I've never heard of a wind-down plan for any company.
Q.  Okay.  Pretty unusual to be creating a wind-down plan?

MR. PERRIN: Objection, form.
A. I don't know. I've never heard of it before.
Q. (By Mr. Freeman) Uh-huh. Never heard of a wind-down plan?
A. No.
Q. So you didn't teach Matt Denegre how to create a wind-down plan; right?
A. I've never taught anybody how to do a wind-down plan.
Q. Or how to review a wind-down plan?
A. No.
Q. Okay. And you've never seen this document?
A. No.
Q. Okay. Do you know what this document is referring to here where it says "timeline and cost for wind down"?
A. I don't know. I just said I've never seen it before.
Q. Okay. You don't know what it's referring to where it says "performed the last inventory prior to closing, price inventory that can be sold or transferred"?
A. No.
Q. No? "Inform all marketplaces on closing"?
A. No.
Q. Or to inform all major customers on closing?
A. No.
Q. Or to send termination letters to all current employees?
A. No.
Q. And you don't know what it's referring to here where it states week of 9-24?
A. No, other than it says week of 9-24.
Q. Okay. And do you recall if ACET Global, the company that you were the president of, do you recall if it sent termination letters to its employees around this time?
A. No.
Q. No? Did you authorize those termination letters?
A. No.
Q. So, as the president of ACET Global, you didn't even know that termination letters were sent out?
A. That's right.

(Exhibit 7, Dep. of David Hook, – 138:03-144:17).

109. **Hook Gave False Testimony.** Hook, however, subsequently acknowledged multiple emails indicating his knowledge of the wind down of ACET Global. For example:

Q. This is in January of 2019; correct?
A. Yes.
Q. Now, you were the president of ACET Global at that point in time. Was it in the process of winding down?
A. I don't know.
Q. How do you not know?
A. Because Tony and Matt were working on this company. I was not.

Q.  Okay.  So, at this point in time, Lori Barber tells your -- your associates, "I know you're in the process of winding down ACET."  But had you ever instructed Ms. Barber that you, as the president of ACET Global, were going to wind down ACET?
A.  No.
Q.  Okay.  Do you have -- do you have any idea why Ms. Barber may be under the impression that y'all were in the process of winding down ACET?
A.  No.

(Exhibit 7, Dep. of David Hook, 145:21-146:14).

110. **Super G Admits There Was a Plan to Restructure ACET Global into Windspeed.**  Super G, for its part, has testified that it "leaned on" Baymark to "come up with a plan" and they offered this restructuring plan."[46]  Baymark offered Super G the "Windspeed" option as an alternative restructuring of ACET Global's operations.  As Cole has acknowledged in testimony:

A.   I was made aware of the fact that there was a restructuring option that involved a new business entity.
Q.   Was that new business entity Windspeed?
A.   It is now, yes.
Q.   Was it proposed to be a different entity?
A.   No.

(Exhibit 8, Dep. of Marc Cole, 24:02-08).

Q.  (BY MR. FREEMAN)  Anytime in 2018.
          MR. PERRIN: Objection, form.
A.  I believe by the fall, there was the notion of using Mr. Szeto's new company.
Q.   (BY MR. FREEMAN)  And that would be Windspeed, correct?
          MR. PERRIN: Objection, form.
A.  Yes.
Q.   (BY MR. FREEMAN)  And those discussions involved Windspeed acquiring assets from Super G?
          MR. PERRIN: Objection, form.
A.  Yes.
Q.   (BY MR. FREEMAN)  And those assets were the assets that Super G acquired by foreclosing on ACET Global; is that correct?
A.   Well, it hadn't happened yet.

---

[46]        A.  No, his alternatives were never good.  I don't think Steve did much.  So I think he leaned on the owners of the business to come up with a plan.
          Q.  And they offered this restructuring plan?
          A.  Yes.
(Exhibit 8, Dep. of Marc Cole, 63:15-19).

> Q.   That it would obtain by foreclosing on ACET Global?

(Exhibit 8, Dep. of Marc Cole, 186:13-183:12).

111. **The Restructuring Plans were Ongoing in 2018.**   Those restructuring discussions were ongoing in the summer of 2018.[47]   The approval process required investment committee approval, which was not a significant hurdle because Cole was the sole member of the so-called "investment committee."  As Cole testified:

> Q.   . . . Did you approve it?
> A.   I did.
> Q.   When did you approve it, if you know?
> A.   When did I approve what?
> Q.   This restructuring option.
> A.   I don't know.  So likely before the sale.
> Q.   Okay.  What constitutes an approval?
>           MR. BLAKLEY: Objection, form.
> A.   At the time, I had sole investment committee approval at Super G Capital because of Darrin's absence. So I would have effectively made the decision and signed the agreement.
> Q.   (BY MR. FREEMAN)  Okay.  With a proposal of that nature, is it required to go before the investment committee?
>           MR. BLAKLEY: Objection, form.
> A.   Yes.  Any -- the proposal required capital, and any capital required the investment committee, which at the time would have been me.

(Exhibit 8, Dep. of Marc Cole, 25:04-22).

> Q.   (BY MR. FREEMAN)  Anytime in 2018.
>           MR. PERRIN: Objection, form.
> A.   I believe by the fall, there was the notion of using Mr. Szeto's new company.
> Q.   (BY MR. FREEMAN)  And that would be Windspeed, correct?
>           MR. PERRIN: Objection, form.
> A.   Yes.
> Q.   (BY MR. FREEMAN)  And those discussions involved Windspeed acquiring assets from Super G?
>           MR. PERRIN: Objection, form.
> A.   Yes.
> Q.   (BY MR. FREEMAN)  And those assets were the assets that Super G acquired by foreclosing on ACET Global; is that correct?

---

[47]   Q.   And were those discussions about restructuring going on in the summer of 2018?
         A.   Presumably.
(Exhibit 8, Dep. of Marc Cole, 151:05-07).

A.   Well, it hadn't happened yet.

(Exhibit 8, Dep. of Marc Cole, 186:01-16)[48]

## The Baymark Parties Engaged in Multiple Discussions about the Legal Risk of the Fraudulent Transfer

112. On December 31, 2018, Denegre sent an email to Ludlow, referring to their options regarding the fraudulent transfer and how to cover their tracks, stating: "From a successor liability perspective, Julie and I felt this would be incrementally riskier for Baymark but not to a point that it's too risky to assume."

113. Indeed, Baymark discussed the risks of engaging in the fraud with their counsel, Hallett & Perrin. Despite the fact that Hallett & Perrin discussed the fact that carrying out the transfer to Windspeed would subject the Defendants to fraudulent transfer liability, giving rise to the crime-fraud exception to any privilege, and despite the fact that Hallett & Perrin discussed fraudulent transfer liability risks with a third party, including Super G and its counsel, Brian Vanderwoude, Hallett & Perrin has asserted a claim of privilege over all aspects of the matter:[49]

> Q. Okay. And was there a discussion about the potential consequences to Baymark Partners as a result of the transfer of assets from ACET Global to Windspeed Trading?
> A.  Is this why you want to have a standing –
>          MR. PERRIN: Yeah.
> A.  I think that's privileged.

(Exhibit 6, Dep. of Julie Smith, 78:12-19).

---

[48]          14 Q.  So were there discussions or negotiations
            15 going on between Super G Capital and Windspeed in the
            16 fall of 2018 regarding Windspeed acquiring the assets at
            17 issue?
            18 MR. PERRIN: Objection, form.
            19 A.  The assets that would be acquired in the
            20 foreclosure.
            21 Q.  (BY MR. FREEMAN)  Is that correct?
            22 A.  Yes.

(Exhibit 8, Dep. of Marc Cole, 184:14-22).

[49] Notably, however, they have not invoked the Fifth Amendment at this time and have, therefore, waived its protection.

Q.  Did you have any discussions about whether the ultimate transfer of assets that had been held by ACET Global to Windspeed Trading could be viewed as a fraudulent transfer?

MR. PERRIN: Ms. Smith, I would caution you that -- not to disclose any communication with your clients.  If you've had any communications with other parties you can disclose it.

A.  Yeah, I think whatever communications I had would be privileged.

Q.  Did you have a discussion with your clients that the --

A.  I'll just say privileged now.

Q.  Did you have a discussion with your clients that the transfer of assets that were owned by ACET Global into Windspeed Trading would be a fraudulent act?

A.  I believe that'd be privileged.

Q.  Did you have discussions that the transfer of assets owned by ACET Global into Windspeed Trading would be a criminal act?

(Exhibit 6, Dep. of Julie Smith, 79:20-80:14).

Q.  Okay. Did you ever discuss successor liability with Matt Denegre?

A.  Again, attorney-client privilege.

Q.  Did you ever discuss successor liability with Tony Ludlow?

A.  That would also be covered by attorney-client privilege.

Q.  And did you ever discuss successor liability with Matt Denegre and Tony Ludlow related to the transactions we have been discussing in this deposition?

A.  Again, that's covered by attorney-client privilege.

Q.  Did you ever discuss successor liability with Matt Denegre and Tony Ludlow related to Windspeed Trading's acquisition of the ACET's global assets?

A.  I feel like I'm answering these questions -- yes.  Again, covered by attorney-client privilege.

Q.  Okay.  Did Baymark Partners ever express concern about exposure for liability as a result of this -- these transactions?

A.  Again, that's covered by attorney-client privilege.

Q.  Did you believe that there was any successor liability risk?

A.  I think that's attorney-client privilege as  well.

(Exhibit 6, Dep. of Julie Smith, 86:16-87:16).

Q.  Okay.  And so were you, in fact, actually concerned here about successor liability to Baymark?

A.  I think that that would be attorney-client privilege

Q.  I don't think that this is if you're discussing it with Brian.

A.  My -- whether or not I am concerned about successor liability is my mental impression.  Isn't that covered by attorney-client privilege?

Q.  No.

(Exhibit 6, Dep. of Julie Smith, 96:24-97:08).

Q.  Did you have any discussions with anyone about whether that would decrease the risk of successor liability?
A.  I don't know if -- I don't recall now the context of successor liability, and I don't recall if it was as it relates to purchase agreement versus a foreclosure sale agreement.  I know I had discussions with Brian Vanderwoude about successor liability, and we all determined it wasn't -- it was a risk but not a risk – an insurmountable risk.

(Exhibit 6, Dep. of Julie Smith, 125:13-22).

Q.  Okay.  Well, in this deal, did you have any -- did you have discussions with your clients that they might have risk on this transaction, that it would be viewed as a fraudulent transfer?
A.  Any discussions I had with my client would be covered by attorney-client privilege.

(Exhibit 6, Dep. of Julie Smith, 126:13-18).

114. Indeed, Hallett & Perrin discussed the successor liability risks related to the fraudulent transfer with Super G's counsel:

Q.  Okay.  And did you discuss the successor liability issue with Mr. Vanderwoude?
A.  Yes, it looks like I did.
Q.  Okay.  And did you discuss the risk to your clients?
A.  To Brian -- to Vanderwoude's and my clients?
Q.  Yes.

(Exhibit 6, Dep. of Julie Smith, 91:19-25).

115. The discussions at issue were subject to the crime-fraud exception.

## The Formation of Windspeed

116. Within approximately a year—and before the D&T Note came due—Baymark and its conspirators created a new and separate entity: Windspeed.

117. **Szeto Files Windspeed's Certificate of Formation.**  On September 27, 2018, while he was still CEO of ACET Global,[50] Szeto filed a Certificate of Formation Limited Liability Company for Windspeed Trading, LLC at the behest of Baymark Partners. (Exhibit 13). Szeto continued to serve

---

[50] *See* Exhibit 2, Dep. of William Szeto, 278:20-22.

as CEO for ACET Global and Windspeed **at the same time**. (Exhibit 2, Dep. of William Szeto, 278:20-22).

118. While the parties purposefully used Szeto's name on the Certificate of Formation filed with the Secretary of State, the actual ownership and control of Windspeed was far different from what they filed.  Baymark's law firm, Hallett & Perrin, spearheaded the formation of Windspeed, drafting an intricate company agreement, warrants, and warrant purchase agreements designed to obfuscate Super G and Baymark Partners' interest in the entity.  As Baymark Partners' attorney at Hallett & Perrin testified:

> Q. Okay, But did you, in fact, back on October 15th, 2018, write that you were providing these warrant purchase agreement documents in connection with the formation of Windspeed Trading, LLC?
> A. It appears that that's what I wrote in the e-mail.

(Exhibit 6, Dep. of Julie Smith, 50:23-51:03).

119. **Denegre Testifies that There was "No relationship" Between ACET Global and Windspeed.**  Denegre, however, has testified under oath that there was no relationship between the formation of Windspeed and ACET Global.  Denegre falsely testified as follows:

> Q. (BY MR. FREEMAN) Okay. So what was the relationship between the formation of Windspeed Trading and ACET Global?
>      MR. PERRIN: Objection; form.
> A.  I don't -- I don't think there is a relationship.
> Q.  (BY MR. FREEMAN)  Were they completely unrelated?
>      MR. PERRIN: Objection; form.
> A.  They are two unrelated companies.

(Exhibit 1, Dep. of Matt Denegre, 71:06-15).

> Q.  (BY MR. FREEMAN) Windspeed Trading, LLC, was not ACET Newco?
> A.  I don't believe so.
> Q.  And there was no relationship between ACET Global and Windspeed Trading, LLC?
>      MR. PERRIN: Objection; form.
> A.  Two independent companies.

(Exhibit 1, Dep. of Matt Denegre, 194:01-05).

120. **Szeto Testifies that There was "No Relationship" Between ACET Global and Windspeed.** Szeto, likewise, has testified under oath that there was no relationship between the formation of Windspeed and ACET Global.

> Q. Did ACET have anything to do with the formation of Windspeed?
> A. No.
> Q. Nothing at all?
> A. Nothing at all.
> Q. So you're certain that there was no relationship between the formation of Windspeed and ACET Global, LLC?
> A. Yes.

(Exhibit 2, Dep. of William Szeto, 12:06–14).

121. **Hook Testifies that There was "No Relationship" Between ACET Global and Windspeed.** Hook, likewise, has testified under oath that there was no relationship between the formation of Windspeed and ACET Global:

> Q. Okay. Was there any relationship between the formation of Windspeed Trading, LLC and ACET Global, LLC?
>              MR. PERRIN: Objection, form.
> A. Not -- not that I'm aware of.

(Exhibit 7, Dep. of David Hook, 79:15-19).

122. **Ludlow and Baymark Partners Testify that There was "No Relationship" Between ACET Global and Windspeed.** Ludlow and Baymark have also testified under oath that there was no relationship between the formation of Windspeed and ACET Global. They testified as follows:

> Q. Now, was there any relationship between the formation of Windspeed Trading LLC and ACET Global?
> A. None.
> Q. None?
> A. None.

(Exhibit 3, Dep. of Tony Ludlow, 158:25-159:04).

123. **Ludlow & Baymark's Testimony was False.** The testimony of Denegre, Szeto, Hook, Ludlow, and Baymark Partners was part of a coordinated effort to provide false testimony and to obstruct judicial proceedings. That false testimony further evidences their fraud.

124. **Windspeed was "ACET Newco."**  Contrary to their testimony, the conspirators referred to Windspeed as the "ACET Newco," evidencing its relationship to ACET Global. However, to cover up their fraud and to further obstruct judicial proceedings, the conspirators have falsely testified under oath that they have never referred to Windspeed as "ACET Newco."

125. **Denegre Gives False Testimony.**  Denegre, in sworn testimony, has testified as follows:

> Q.  Okay.  Was Windspeed -- was that basically the "ACET newco"?
>        MR. PERRIN: Objection; form.
> A.  What is "ACET newco"?
> Q.  (BY MR. FREEMAN)  Does that mean anything to you?
> A.  No.
> Q.  To use the phrase "ACET's newco"?
> A.  Nope.
> Q.  Doesn't mean anything?
> A.  No.

(Exhibit 1, Dep. of Matt Denegre, 193:03-13).

126. **Szeto and Windspeed Give False Testimony**. Szeto and Windspeed testified as follows:

> 10 Q.  (BY MR. FREEMAN) Were there emails about
> 11 forming a new company after ACET Global?
> 12 A. No. There's no such email concerning the
> 13 restructuring or forming a new company after ACET
> 14 Global.
> 15 Q. You're certain about that?
> 16 A. I am very certain about that.

(Exhibit 2, Dep. of William Szeto, 127:10-16).

127. **Ludlow and Baymark Give False Testimony.**  Ludlow and Baymark testified as follows:

> Q. Was there a concept -- a broad concept of an ACET Newco?
> A. No.
> Q. An entity that would take the place of ACET?
> A. No.

(Exhibit 3, Dep. of Tony Ludlow, 84:01-05).

128. But after being confronted with contrary documented evidence, Denegre, Szeto, Windspeed, Ludlow, and Baymark have all been forced to acknowledge, begrudgingly, their false testimony.

129. **Denegre Confronted with False Testimony.**   Denegre, after being confronted with incontrovertible evidence of his false testimony, has testified:

> Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting on the screen what's marked as Exhibit 15.  Do you see this, sir?
> A.  I do.
> Q.  And are you familiar with this document?
> A.  I'm not.
> Q.  Let's look at the top, sir.  Is this an email from you, Matt Denegre?
> A.  Yes.
> Q.  Okay.  **And is this an email that you sent to Tony Ludlow on October 7th, 2018?**
> A.  Yes, it is.
> Q.  Okay.  **And is the subject line "ACET Newco"?**
> A.  Yes.
> **Q.  There are some attachments to your email; is that correct?**
> **A.  Yes.**
> **Q.  And are those attachments a PDF titled "EIN Windspeed Trading, LLC" and a Word document entitled – no, excuse me -- a PDF entitled "Certificate of Formation" and a Word document entitled "LLC Operating Agreement-Windspeed Trading, LLC"?**
> **A.  Yes.**
> Q.  Okay.  And did you, in fact, send this email to Tony Ludlow on October 7th, 2018?
> A.  Yes.
> Q.  And is this, in fact, a true and correct copy of the email that you sent?
> A.  Yes.
> **Q.  And did you state to Tony Ludlow, "These are the formation documents for ACET's Newco."  Is that correct?**
> **A.  That's how it reads.**
> Q.  Okay.  Did you state there in that last sentence of the paragraph, "The operating agreement will certainly have changes and maybe a complete redo."  Is that correct?
> A.  Yes.
> Q.  And did you state that you were going to send this to Julie?
> A.  Yes.
> Q.  Who is Julie?
> A.  This would be Julie Smith.
> Q.  Okay.  Did you send these documents to Julie Smith?
> A.  I don't remember.
> Q.  Is Julie Smith an attorney?
> A.  Yes.
> Q.  And who does she work for?
> A.  Hallett & Perrin.

(Exhibit 1, Dep. of Matt Denegre, 194:12-196:11) (bold added).

130. **Szeto and Windspeed Confronted with False Testimony.**   Szeto, after being confronted with incontrovertible evidence of his false testimony, has testified:

> Q. Mr. Szeto, I'm putting on the screen what's marked as Exhibit 36. Can you see this document?
> A. Uh-huh.
> (Exhibit 36 marked.)
> Q. (BY MR. FREEMAN) Do you recognize this document?
> A. It looks familiar.
> Q. Okay. Will you tell me what it is?
> A. Well, it looks like an old email, but I cannot tell you exactly why and what it was.
> Q. Okay. Is your name listed here?
> A. Yes.
> **Q. And is this an email that was sent from you?**
> **A. Looks like it.**
> **Q. And is it an email that was sent from you on October 10th, 2018?**
> **A. Looks like -- I look at the date, yes.**
> **Q. Okay. And is the subject line "ownership of newco"?**
> **A. Yes.**
> Q. And was this sent to Steve Bellah, Matt Denegre and Tony Ludlow?
> A. Yes.
> Q. And was this sent from your acetglobal.com email address?
> A. Yes.

(Exhibit 2, Dep. of William Szeto, 12:15–25, 13:1–15) (bold added).

131. **Ludlow and Baymark Confronted with False Testimony.**   Ludlow and Baymark have testified:

> Q. And is that an e-mail -- what's in Exhibit 15, is that an e-mail from Matt Denegre to you on October 7th, 2018?
> A. It is.
> **Q. Okay. And is the Subject line "ACET Newco"?**
> **A. Uh-huh, it is.**
> **Q. What did you understand ACET Newco to refer to?**
> **A. So below it, it says, "EIN." It appears that there's Windspeed Trading formation documents attached to it. So I guess that's he's talking about Windspeed.**
> Q. You understood ACET Newco to refer to Windspeed Trading?

(Exhibit 3, Dep. of Tony Ludlow, 112:01-13) (bold added).

132. **The Defendants Referred to the Windspeed Loan as the "Old ACET Loan."**   The conspirators referred to Windspeed's note with Super G as the "old ACET loan," further evidencing

the relationship between ACET Global and Windspeed.  However, to cover up their fraud, the

conspirators have falsely testified under oath that they have never referred to the Windspeed loan as

the "old ACET loan."

133. Denegre, in sworn testimony, has testified as follows:

> Q. (BY MR. FREEMAN) Did you ever refer to the Windspeed loan from
> Super G Capital as the "ACET note"?
>> MR. PERRIN: Objection; form.
> A. Potentially.
> Q. (BY MR. FREEMAN) What do you mean "potentially"?
> A. I would have see an email that says that.  I know -- I don't know. I don't
> recall.  So we'd have to look at something.
> Q. Why would you refer to a loan to Windspeed Trading from Super G Capital
> as the "ACET note"?
>> MR. PERRIN: Objection; form.
> A. Well, Super G was -- ACET Global was in default with Super G. Super G
> was also financing Windspeed, a separate transaction. There was a foreclosure
> going on. It's very likely that there was an mistake in the email with calling the
> loan the
> correct name.
> Q. (BY MR. FREEMAN) Why do you say it's very likely that there was a
> mistake in an email calling it that name?
>> MR. PERRIN: Objection; form.
> A. Well, if you recall, I was working on helping with the transaction with
> Windspeed on the Baymark side, as well as ACET Global with Super G. It's
> just -- it's a possibility that the name in the email got titled wrong.
> Q. (BY MR. FREEMAN) Does anything lead you to believe that actually
> happened?
>> MR. PERRIN: Objection; form.
> A. That what happened?
> Q. (BY MR. FREEMAN) That you actually referred to the wrong note as the
> "ACET note"?
> A. I believe so.
> Q. What leads you to believe that happened?
> A. Because Windspeed -- again, if I see the loan agreement, that is not an
> ACET note. It's probably a different loan.

(Exhibit 1, Dep. Of Matt Denegre, 85:23-87:10).

134. **Denegre is Confronted with his False Testimony.**  But Denegre later demonstrated that

testimony was false:

> Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting up on the screen what's
> marked as Exhibit 18.  Do you see that, sir?

A.  I do.

Q.  Do you recognize this document?

A.  I do not.

Q.  Is this an email from you, Matt Denegre, on January 19th, 2019, to William Szeto?

A.  Yes.

**Q.   And are you forwarding a document entitled "Windspeed-Old ACET loan agreement"?**

**A.  Yes.**

Q.  Okay.  And what is that document?

A.  It's an Amended and Restated Business Loan and Security Agreement.

Q.  Okay.  And why were you receiving it?

A.  Julie had sent it to me.

Q.  Okay.  And why did Julie send it to you?

A.  She asked me to review the first two pages of the addendum.

**Q.  Okay.  And what does she say here?  Did she say, "Matt, attached is a draft of an amended and restated loan agreement that represents the old ACET loan that Windspeed is going to assume"?**

**A.  Yes, it does.**

**Q.  What does that mean?**

**A.  It means what it says.**

Q.  What is that?

A.   Attached is a draft of an amended and restated loan agreement that represents the old ACET loan that Windspeed is going to assume.

**Q.  Was Windspeed going to assume ACET's loan?**

**A.  I think so. I think so.**

(Exhibit 1, Dep. of Matt Denegre, 207:06-208:13) (bold added).

**Q.   Okay.  So what did you mean here by, "We agreed to assume the old ACET note"?**

                    MR. PERRIN: Objection; form.

**A.  This was -- this was likely referring to Bill and Windspeed.**

Q.  (BY MR. FREEMAN)  Okay.  When you said "we," did you mean by that that Windspeed was a completely unrelated, separate, independent company?

A.  I don't know what I meant by "we."

(Exhibit 1, Dep. of Matt Denegre, 225:21-226:04) (bold added).

135. **Szeto Gives False Testimony.**  Szeto, in sworn testimony, has testified as follows:

Q.  Okay.  Mr. Szeto, did Windspeed have a debt to Super G in 2018?

A.  Yes.  We have a loan from Super G for $200,000.

**Q.  And, in fact, did you refer to Windspeed's debt to Super G as the "ACET note"?**

**A.  No.  It was a loan.**

**Q.  Did Matt ever refer to that note as the "ACET note"?**

**A.  No.**

(Exhibit 2, Dep. of William Szeto, 14:15-24) (bold added).

136. **Szeto is Confronted with his False Testimony.**

> Q.  (BY MR. FREEMAN)  Mr. Szeto, down at the bottom of this page, I'd like for you to look with me. I'm highlighting on the screen so you can see it.  Is that an email from Matt Denegre?
> A.  Yes.
> **Q.  And is that an email from Matt on December 20th, 2018?**
> **A.  Yes.**
> **Q.  And is that to Steve Bellah at his Super G Capital account, Tony Ludlow and yourself?**
> **A.  Yes.**
> Q.  And does it state, "Bill is going to make a payment of $2500 this week towards **the ACET note"**?
> A.  Yes, I see that.

(Exhibit 2, Dep. of William Szeto, 15:10-23) (bold added).

137. **Hook is Confronted with his False Testimony.**  Hook originally testified that he had never heard a reference to the ACET Note:

> Q.  Okay.  Did you ever refer to Windspeed
> Trading's loan as the ACET note?
> A.  Not that I recall.

(Exhibit 7, Dep. of David Hook, 81:17-19).

138. Hook, however, could not (or would not) explain how he, as the president of ACET Global, was unaware of the ongoing discussions about Windspeed taking on the "ACET Note."  His testimony was not credible.

> Q.  Okay.  Does it state from Mr. Denegre, at his Baymark Partners email address, "Super G sent terms for the assumption of the ACET note below"?
> A.  That's what it says, yes.
> Q.  Okay.  And this email was sent while you were the president of ACET Global; correct?
> A.  I assume so.
> Q.  Okay.  What assumption of your company's note is Mr. Denegre referring to?
>                     MR. PERRIN: Objection, form.
> A.  I -- I don't know.
> Q.  (By Mr. Freeman)  No idea?  You never discussed with Mr. Denegre anyone assuming your company's note?

> A.  No.
> Q.  You don't know anything about Windspeed Trading assuming your
> company's note?
> A.  No.
> Q.  But you were president of ACET Global, and your employee appears to
> be discussing the assumption of your company's note; correct?
>                    MR. PERRIN: Objection, form.
> A.  Yes.

(Exhibit 7, Dep. of David Hook, 128:03-24).

139. **Hallett & Perrin Drafts the Transactional Documents.**  Baymark tasked its law firm,

Hallett & Perrin, with drafting the transactional documents.  As Hallett & Perrin has testified, it drafted

Windspeed's company agreement.

> Q.  Did Hallett & Perrin draft the company agreement providing for Baymark
> Partners and Super G Capital to maintain board members on Windspeed
> board of managers?
> A.  Yes.

(Exhibit 6, Dep. of Julie Smith, 14:14-18).

140. Hallett & Perrin also drafted the warrant purchase agreements for Windspeed:

> Q.  Okay.  But did you, in fact, back on October 15th, 2018, write that you
> were providing these warrants purchase agreement documents in connection
> with the formation of Windspeed Trading, LLC?
> A.  It appears that that's what I wrote in the e-mail.
> Q.  Does this e-mail -- does this document appear to be a true and correct
> copy of what it purports to be?
> A.  Yes.

(Exhibit 6, Dep. of Julie Smith, 50:23-51:06).

141. Hallett & Perrin also drafted the warrants for Windspeed:

> Q. Okay. And did Hallett and Perrin also draft the warrants themselves?
> A.  Yes, same.
> Q.  Okay.  So all of that is Hallett & Perrin drafted the amended and restated
> company agreement of Windspeed Trading, LLC, correct?
> A.  Yes.
> Q.  And Hallett & Perrin drafted the warrant purchase agreements with respect
> to Windspeed Trading, LLC?
> A.  Yes.

(Exhibit 6, Dep. of Julie Smith, 38:11-21).

142. **Hallett & Perrin Attempts to Distance Itself from Windspeed.**   Nonetheless, despite Super G's counsel referring to Hallett & Perrin as "Windspeed's counsel," Hallett & Perrin has now attempted to distance itself from its representation of Windspeed—because it presented an obvious conflict of interest and violation of its fiduciary duties to its then-client, ACET Global:

> Q.  Were you involved in the formation of Windspeed?
> A.  No.

(Exhibit 6, Dep. of Julie Smith, 37:13-15).

143. **The Parties Execute the Windspeed Company Agreement.**  On October 18, 2018—some two weeks before the D&T Note would come due on October 31, 2018—Szeto, on behalf of Windspeed; Ludlow, on behalf of BP Management; and Cole, on behalf of Super G, executed the Amended and Restated Company Agreement of Windspeed. (Exhibit 14). They became business partners in Windspeed. Hallett & Perrin drafted the Amended and Restated Company Agreement. Szeto was still serving as the CEO of ACET Global.

144. Following the execution of the Windspeed transactional documents, Hallett & Perrin emailed to congratulate the parties:[51]

> **From:** "Julie A. Smith"
> **Date:** Thursday, October 18, 2018 at 3:03 PM
> **To:** Alex Godinez , WILLIAM SZETO , "Matt Denegre (mdenegre@baymarkpartners.com)" , "Alexander Szeto (aszeto@higierallen.com)" , Steve Bellah
> **Cc:** "Carrie P. Williamson"
> **Subject:** RE: Windspeed executed documents
>
> Great! Congratulations, folks. The transaction is closed!
>
> Alex G, can you send around the fed reference number for the wire transfer to indicate you have initiated the wire?
>
> Julie A. Smith
> Shareholder
> Hallett & Perrin, P.C.
> 1445 Ross Avenue, Suite 2400
> Dallas, Texas 75202
> Direct: 214.922.4113 Fax: 214.953.0053
> jsmith@hallettperrin.com | www.hallettperrin.com
> Disclaimer

---

[51] *See* Exhibit 33, H&P Congratulatory Email.

**Windspeed Trading, LLC**

145. Windspeed was established as a sham; it was nothing more than a vehicle to fraudulently transfer the assets and business operations of ACET Global for the benefit of Baymark, Windspeed, and Szeto—all free of D&T Partners' security interest.

146. Szeto, the Baymark-installed CEO yet again, was merely a puppet.  The parties used Szeto to hide Baymark and Super G's ownership, control, and association to Windspeed.  The operating agreement, however, stripped Szeto of any actual control and relegated him to a small economic interest.

147. At the same time, and as described in more detail below, Super G contributed another $200,000 to Windspeed although, at the time, it had no assets whatsoever.  Super G did so, of course, because it knew that Windspeed would soon have control over ACET Global's assets and business operations.[52]

148. **The Ownership of Windspeed**.  Baymark, Super G, and Szeto established Windspeed with the following beneficial ownership: BP Management (40%); Super G (40%); and Szeto (20%). (Exhibits 14, 15, and 16).

149. **Szeto Gives False Testimony About Windspeed's Ownership Splits.**  To conceal the relationship, however, Szeto has testified under oath that that there was no such ownership split regarding Windspeed:

> Q.  Mr. Szeto, do you own Windspeed?
> A.  Yes, I do.
> Q.  And that's Windspeed Trading, LLC?
> A.  Yes.
> Q.  Is there any kind of ownership split?

---

[52]     14 Q.  So at the time that Super G made the $200,000
         15 loan in October of 2018, did it know or believe that
         16 Windspeed would acquire the assets of ACET Global?
         17 A.  Yes.

(Exhibit 8, Dep. of Marc Cole, 59:14-17).

A.  I don't understand.
Q.  Is there any kind of split in ownership?
A.  No.
Q.  When you set it up, did you want to set it up
with an ownership split?
A.  No.
Q.  You're certain about that?
A.  Yes.
Q.  Is there an ownership split with Super G
Capital?
A.  No.
Q.  Is there an ownership split with Baymark?
A.  No.
Q.  No ownership split with any Baymark party?
A.  No.
Q.  Did you want them -- did you want Super G to
have a share of Windspeed when you formed it?
A.  No.
Q.  Did you want any Baymark party to have a share
of Windspeed when you formed it?
A.  No.
Q.  You didn't want them to have a share that
would compensate them for something?
A.  No.
Q.  You didn't want them to have a share that
would compensate them for their investment in ACET
Global?
A.  No.
Q.  Did you want Super G to get its fair share of
Windspeed because of its investment in ACET Global?
A.  No.
Q.  Did you want Baymark to get its fair share of
Windspeed for its investment in ACET Global?
A.  No.
Q.  Did ACET have anything to do with the
formation of Windspeed?
A.  No.
Q.  Nothing at all?
A.  Nothing at all.

(Exhibit 2, Dep. of William Szeto, 10:17-12:10).

150. **Szeto Recants his False Testimony about Ownership Splits.**  After being confronted with

documentary evidence, however, Szeto subsequently turned yet another "180" and admitted that he

had in fact established the company with an ownership split providing Super G 40% and BP

Management (40%):

> Q. And Mr. Szeto, am I correct in reading this email that was sent from you on October 8th, 2018, to Matt Denegre stating that "After considering the amount of investment you and Super G put into the ACET Global company, here is the percentage I am willing to live with"?  Is that correct?
> A.  Yes.
> Q.   And then does it provide a breakdown for an undiluted percentage with respect to Baymark and yourself?
> A.  Yes.
> Q.   And then does it provide for -- does it state, "Super G warrant for 40 percent"?
> A.  Yes.
> Q.   And then does it, right under that, provide for diluted percentages following the exercise of a warrant of 40 percent for Baymark, 20 percent for yourself and 40 percent for Super G?
> A.  Yes.

(Exhibit 2, Dep. of William Szeto, 13:21-14:14); (Exhibit 34, Szeto Ownership Proposal).

151. Denegre similarly testified under oath that there was no ownership split in Windspeed:

> Q. Okay. Mr. Denegre, who owns Windspeed?
> A. Bill Szeto.
> Q. And does Bill Szeto own 100 percent of Windspeed?
> A. Yes.
> Q. Would you -- would you be concerned about buying a company on which the majority of its stock was subject to a warrant agreement?
>              MR. PERRIN: Objection; form.
> A. I don't have an opinion on that.

(Exhibit 1, Dep. of Matt Denegre, 191:10-19).

152. And Hook could not recall whether any Baymark entity had an interest in Windspeed:

> Q. Do you know how Windspeed is structured?
> A. No.
> Q. You don't have any position at Windspeed?
> A. No.
> Q. Do you know whether Baymark does?
>              MR. PERRIN: Objection, form.
> A. I am not sure.
> Q. (By Mr. Freeman) Okay.
> A. Not sure.
> Q. Okay.  Have you ever seen the company agreement for Windspeed Trading, LLC?

A. No.
. . .
Q. Do you -- do you know whether Baymark Partners or any of its affiliates
have any interest in Windspeed Trading, LLC?
MR. PERRIN: Objection, form.
A. I don't know for sure if we have anything or not.

(Exhibit 7, Dep. of David Hook, 89:12-23; 90:17-22).

153. **Ludlow and Baymark Admit to BP Management's 40% Stake in Windspeed.**  Ludlow

and Baymark also admit that BP Management obtained a 40% equity stake in Windspeed.  ("Bill asked

us to take equity [in Windspeed]." Noting in this context that he uses "equity or warrant"

"interchangeably."). (Exhibit 3, Dep. of Tony Ludlow, 108:11-13).  Ludlow testified as follows:

Q. Did -- who owns Windspeed?
A. Who owns Windspeed? I'm not sure right now. I think at the time, I had a
warrant. I think Super G had it, and I would assume Bill Szeto does. I don't
know where it stands.
Q. Okay. But you think Super G had ownership in Windspeed?
A. I believe so. When I say "ownership," I'm being casual, blending of
warrant and ownership, save the difference.
Q. Got it. So you think Bill Szeto had some?
A. Yeah, he had to, right. I mean, he put it together and he's doing all this
footwork. I would assume he'd have some.
Q. Did -- and does Baymark Partners Management?
A. Yeah, the warrant that he told me was 40 percent.

(Exhibit 3, Dep. of Tony Ludlow, 201:14-202:05).

154. **Hallett & Perrin Structured Windspeed's Ownership and Control.**   Julie Smith

acknowledges that she and Hallett & Perrin helped Baymark set up a structure that would allow BP

Management to both control Windspeed and to have ownership of 40% of its membership interests

for a nominal exercise price of $100.  Smith has testified as follows:

Q.  Does Baymark Partners have a contractual right to purchase 40 percent of
Windspeed for $100?
A.  Yes.

(Exhibit 6, Dep. of Julie Smith, 13:25-14:02).

Q.   Does Super G have a contractual right to purchase 40 percent of
Windspeed for $100?

A. Yes.

(Exhibit 6, Dep. of Julie Smith, 14:11-13).

> Q. Okay. And if you'll look down in the warrant section of the agreement, was there, in fact, an exercise price of $100 to exercise the warrants?
> A. Yes.
> Q. And on the exercise of those warrants, would it entitle the warrant holder to own 40 percent of the outstanding membership interests of Windspeed Trading?
> A. Yes.
> Q. And those warrants' rights were drafted to be provided to both Super G Capital and to Baymark Partners; is that correct?
> A. This was a form of an agreement that was going to be used for both.
> Q. Okay. And who paid the legal fees to draft the warrant agreement?
> A. Baymark.

(Exhibit 6, Dep. of Julie Smith, 52:14-53:04).

155. **The Windspeed Company Agreement**. The Windspeed Company Agreement gives Super G and BP Management perpetual authority to appoint and control a board member of Windspeed's three-person board (and the right to replace those board members). (Exhibit 14, § 3.4). Under the Company Agreement, the board members manage **all** of the business and affairs of Windspeed by majority—*i.e.*, Super G and BP Management maintain complete control. (Exhibit 14, § 3.1). As Cole testified regarding the clear provisions of the Company Agreement, Super G and BP Management held complete control over every aspect of Windspeed:

> Q. Does this appear to give complete operational authority to the board of managers?
>         MR. BLAKLEY: Objection, form.
> A. Yes, in my opinion.

(Exhibit 8, Dep. of Marc Cole, 143:05-08).

> Q. does this appear to remove any authority on behalf of a member, at least in their capacity as a member?
>         MR. BLAKLEY: Objection, form.
>         MR. PERRIN: Objection, form.
> A. Taken together, 3.1 and 3.2 tells me the board controls the Company.
> Q. (BY MR. FREEMAN) Okay. And I want to look at the board that was formed on October 18th, 2018. Did that board consist of three persons?
> A. Yes.

> Q.   And was one of those persons named Anthony Ludlow --
> A.   Yes.
> Q.   -- and was he titled as the Baymark manager?
> A.   That's correct.
> Q.   And was one of those persons Steven Bellah?
> A.   Yes.
> Q.   And was he titled the Super G manager?
> A.   That's correct.
> Q.   And was one of those persons named William Szeto?
> A.   Yes.
> Q.   And was he titled *the Szeto manager?
> A.   Yes.

(Exhibit 8, Dep. of Marc Cole, 146:24-147:20).

156.  The Company Agreement even provides that "members" have no right to control any aspect of Windspeed's operations: "**No Control by Members**." (Exhibit 14, § 3.2).  It provides that "No Member . . . will participate in or have any control over the Company business or will have any authority or right to act for or bind the Company." *Id.*

157. Super G and BP Management own warrants for 80% of the membership interests of Windspeed. (Exhibit 14, Exhibit A, Members; Warrantholders; Interest).

158. The Company Agreement prohibits Szeto from transferring his "ownership" in Windspeed to any person without the consent of Super G and BP Management. (Exhibit 14, § 9.1).  As Cole acknowledged:

> Q. Does this provision appear to provide that Mr. Szeto could not sell, transfer, pledge, encumber, hypothecate or otherwise assign his interest in Windspeed Trading without the consent of both the Super G manager and the Baymark manager?
> A.   That would be my interpretation, yes.

(Exhibit 8, Dep. of Marc Cole, 149:11-16).

159. In fact, Super G and BP Management are granted authority under the Company Agreement to force Szeto to sell all of his interest in "his" company without his consent. (Exhibit 14, §§ 3.1, 9.1, 9.6). The Company Agreement also requires that Szeto provide the "Baymark Manager" and "Super

G Manager" a power of attorney to engage in virtually any act with unfettered discretion on his behalf regarding Windspeed—even to amend the Company Agreement without his consent. *Id.* at § 11.3.

160. **Windspeed's Board was a Sham**. Windspeed never followed any corporate formalities, and its board was a sham.  Indeed, its purported "board" never had a single board meeting:

> Q. (BY MR. FREEMAN) So you're saying, no, it wasn't a real board?
>           MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN)  Correct?
> A.   Yes.  No, it wasn't a real board.

(Exhibit 2, Dep. of William Szeto, 234:23-235:02).

> Q.   So y'all didn't ever have a board meeting? Did y'all -- is that correct?
> A.   Yes.

(Exhibit 2, Dep. of William Szeto, 103:23-25).

> Q. Did anyone else -- I mean, did anyone – while you're taking your job as CEO serious -- I mean, was anybody else doing anything as a board member?
> A.  Not that I know of.
> Q.   Did they seem to take their role as a board member serious or --
> A.   I cannot tell.
>           MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN)  Okay.  You never saw anybody do anything as a board member?
> A.   Not that I know of.
> Q.   Okay.  What was the purpose of the board?
> A.   I cannot tell you for sure for this particular board.

(Exhibit 2, Dep. of William Szeto, 105:10-23).

161. **No Board Minutes or Resolutions.**  There were never any board minutes or resolutions; nor did the board take any action.

> Q. Were there ever any board resolutions adopted?
> A.  No.
> Q.   Was there ever any action taken by the board?
> A.  No.
> Q.   Was there ever -- was there ever any discussion about the board?
> A.  No, not that I know of.

(Exhibit 2, Dep. of William Szeto, 104:19-25).

162. **BP Management and Super G Imposed the Board Structure.**  Rather, Super G and BP Management, as part of their fraudulent scheme, imposed the board.  Szeto was a mere puppet and had no actual control:

> Q.   So Baymark and Super G are made directors on this board because they tell you that's how it's going be?
>> MR. PERRIN: Objection, form.
> A.   Yes.
> Q.   (BY MR. FREEMAN)  And you didn't really have a choice in the matter, did you?
> A.   Well, no, not that I know of.

(Exhibit 2, Dep. of William Szeto, 108:02-09).

163. **Super G Contributes More Capital.**  On October 18, 2018, the same date as the Windspeed Amended and Restated Company Agreement (among Super G, BP Management, and Szeto) as part of the scheme, Super G provided Windspeed with $200,000 of capital.

> Q.   (BY MR. FREEMAN)  How much new money did you put in to Windspeed?
> A.   $200,000.
> Q.   And did Super G receive anything in return?
> A.   Yes.  It received a warrant for ownership in Windspeed Trading.

(Exhibit 8, Dep. of Marc Cole, 56:12-15).

164. Super G and Cole, in testimony, acknowledged that Windspeed had "no" assets at the time that Super G extended $200,000 to Windspeed, and that it was unusual to make a loan to a company with no assets:

> Q. (BY MR. FREEMAN) What assets did Windspeed have at the time that Super G made the $200,000 loan in October of 2018?
>> MS. HARD-WILSON: Objection, form.
> A. Are you asking pre-foreclosure or post?
> Q. (BY MR. FREEMAN) Yes, sir, pre-foreclosure.
> A. I'm not aware that they brought any assets into the company.
> Q. Is it typical for Super G to extend a $200,000 loan to a company with no assets?
>> MR. BLAKLEY: Objection, form.
> A. No.

(Exhibit 8, Dep. of Marc Cole, 61:17-62:03).

165. However, as Super G and Cole acknowledged, Super G believed that Windspeed would acquire all of ACET Global's assets, explaining the loan:

> Q. So at the time that Super G made the $200,000 loan in October of 2018, did it know or believe that Windspeed would acquire the assets of ACET Global?
> A. Yes.

(Exhibit 8, Dep. of Marc Cole , 62:18-21).

166. At the time it made loan in October 2018, Super G knew that Windspeed would acquire ACET Global's assets, because the Defendants had already agreed upon the plan.  As Cole testified:

> Q.  So at the time that Super G made the $200,000 loan in October of 2018, did it know or believe that Windspeed would acquire the assets of ACET Global?
> A.  Yes.

(Exhibit 8, Dep. of Marc Cole, 62:18-21).[53]

167. Notably, again, there had been no foreclosure at that time.  Indeed, even though the defendants fraudulently transferred all of ACET Global's assets and business operations to Windspeed in late October of 2018, the purported "foreclosure"—which was a sham and was designed to create a document record to hide the fraud and to help the defendants carry out their scheme—did not occur until 2019.  As Super G and Cole admitted in testimony:

> Q.   (BY MR. FREEMAN)  Okay.  Did -- just to be clear, did Super G foreclose on ACET Global's assets in 2018?
> A.   No.
>        MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN)  **Did Super G foreclose on ACET Global's assets in October of 2018?**
>        MR. PERRIN: Objection, form.
> **A.   No.**

---

[53] Likewise, even Hook acknowledged that it was an "unusual" transaction:

> Q.  . . . I'm asking do you believe that it is an unusual transaction for Baymark, or one of its affiliates, to have both a member -- both a role as a manager on the board of managers and to have warrant rights in the company?
> A.  Yes, that is unusual.

(Exhibit 7, Dep. of David Hook, 96:05-10).

(Exhibit 8, Dep. of Marc Cole, 182:11-19) (bold added).

168. **Szeto as CEO of Windspeed.**   In October of 2018, Szeto began serving as the CEO of Windspeed (while he simultaneously maintained his position as CEO of ACET Global).

169. **Transfer of Employees.**   Although Baymark and its co-conspirators claim that there is and was never a relationship or connection between ACET Global and Windspeed, every single employee of ACET Global was transferred over to Windspeed when the "wind down" was executed. (Exhibit 4, Dep. of Dana Tomerlin, 30:11-14).   That is, ACET Global's entire workforce simply transferred over to Windspeed.  (Exhibit 4, Dep. of Dana Tomerlin, 30:11-14); (Exhibit 2, Dep. of William Szeto, 150:16-153:15).  ACET Global's former employees have acknowledged this in their testimony.  For example:

> Q.   So everyone that worked at ACET Global in September of 2018 began working at Windspeed in October of 2018?
> A.   To my recall, yes.

(Exhibit 4, Dep. of Dana Tomerlin, 30:11-14).

> Q.   (BY MR. FREEMAN)  In September of 2018, did any of these people work for ACET Global: Sai Vattana?
> . . .
> Q.   Sai Vattana?
> A.   Yes.
> Q.   Sai worked for ACET Global in September of 2018.  Did Jane Lin work for ACET Global in September of 2018?
> A.   Yes.
> Q.   Did Dana Tomerlin work for ACET Global in September of 2018?
> A.   Yes.
> Q.   Did Paul Ketter?
> A.   Paula.
> Q.   Paula Ketter, excuse me.
> A.   Yes.
> Q.   Did Vanessa Torres?
> A.   Yes.
> Q.   Okay.  Now, in September or October of 2018, did any of these people work for Windspeed: Sai Vattana?
> A.   Yes.
> Q.   Jane Lin?
> A.   Yes.
> Q.   Dana Tomerlin?

A. Yes.
Q. Paula Ketter?
A. Yes.
Q. Vanessa Torres?
A. Yes.
Q. Were those all of the employees that were at ACET Global previously?
A. Yes.
Q. And they all came to work for Windspeed?
A. Yes.
Q. Including yourself?
A. Yes.
Q. Did you terminate each of those employees of ACET Global?
A. Yes.
Q. And did you terminate each of them prior to hiring them as employees of Windspeed?
A. Yes.
Q. Okay.  And so -- and when was that?
A. When was what?
Q. When did you terminate them?
A. At the end of September.

(Exhibit 2, Dep. of William Szeto, 150:16-152:15).

170. **The Retroactive Employment Letter**.  The transfer, however, was made retroactive.  That is, each employee was notified on **October 9, 2018**, via email that they had been terminated from ACET Global effective September 28, 2018, and that their employment with Windspeed had become effective thereafter.  A screen shot of a representative email from Szeto appears immediately below:[54]

---

[54] *See* Exhibit 29, Retroactive Termination Email.

**From:** WILLIAM SZETO <bill@acetglobal.com>
**Sent:** Tuesday, October 9, 2018 2:52 PM
**To:** Jane Lin <jane@acetglobal.com>
**Subject:** Your employment with ACET Global

1501 10th Street, Suite 100,
Plano, Texas, USA 75074

Jane

This is to inform you that your employment with ACET Global is terminated effective
September 28, 2018.

Bill

**William C Szeto**
**President and CEO**
**ACET Global, LLP**

171. Interestingly, to that date, each of the employees thought that they were still working for

ACET Global. Szeto's testimony on the matter follows:

> Q.   Okay.  I'm showing you what's marked as Exhibit 26 on the screen.
> A.   Uh-huh.
> Q.   Do you recognize this document?
> A.   Yes.
>                (Exhibit 26 marked.)
> Q.   (BY MR. FREEMAN)  Should look pretty familiar, right?
> A.   Yes.
> Q.   Is that on top of your package of documents there?
> A.   Yes.
> Q.   And is this an email from you?
> A.   Yes.
> Q.   Is it dated October 9th, 2018?
> A.   Yes.
> Q.   It's an email to Jane Lin?
> A.   Yes.
> Q.   And is the subject line "Your employment with ACET Global"?
> A.   Yes.
> Q.   Okay.  And is this sent from your ACET Global email address?
> A.   Yes.
> Q.   And does this say, "Jane, this is to inform you that your employment with
> ACET Global is terminated effective September 28th, 2018"?

A.  Yes.
Q.  Okay.  And so do you understand this to have terminated her as of
September 28th, 2018?
A.  Yes.
Q.  Okay.  Was there a reason that you backdated this termination?
20 A.  I cannot –
                 MR. PERRIN: Objection, form.
A.  -- recall the reason.
Q.  (BY MR. FREEMAN)  Excuse me?
A.  I don't remember the reason.
Q.  You don't recall why you backdated it?
A.  No.
                 MR. PERRIN: Objection, form.
Q.  (BY MR. FREEMAN)  But you did backdate it, correct?
A.  Well --
                 MR. PERRIN: Objection, form.
A.  -- yes.
Q.  (BY MR. FREEMAN)  That was a yes?  Is that a yes, sir?
A.  Yes.
Q.  Thank you.  Were those -- did you send similar emails to the rest of your
employees?
A.  Yes.

(Exhibit 2, Dep. of William Szeto, 154:12-156:13).

172. **Two Sets of Books**.  After transferring ACET Global's business over to Windspeed, Szeto

instructed Windspeed's accountant to maintain "two sets of books."  Szeto admits to the instruction

in testimony:

Q.  And did you instruct Jane Lynn to keep two sets of books?
A.  Yes, until the end of January.
Q.  January when?
A.  2019.
Q.  So until the end of January 2019, you maintained two sets of books?
A.  Yes.
Q.  And those two sets of books were for ACET Global and for
Windspeed?
A.  Yes.

(Exhibit 2, Dep. of William Szeto, 63:12-22).

Q.  Got it.  So it was difficult to keep the financial information clean because
you had two sets of books?
                 MS. HARD-WILSON: Objection, form.
A.  Yes.
                 MR. PERRIN: Objection, form.

Q.   (BY MR. FREEMAN)  So it was -- just want to make sure the record was clear.  It was difficult to keep all the data clean because you had more than one set of books, right?
   MS. HARD-WILSON: Objection, form.
   MR. PERRIN: Objection, form.
A.   Yes.

(Exhibit 2, Dep. of William Szeto, 207:09-21).

A.   Let me explain this this way.  Okay?  **I have two sets of book.  One is for sales and -- basically, for ACET's data.  And I have one set of book for Windspeed Trading data.  Well, quite often, that the two companies were selling the similar kind of merchandise. And when fulfillment pack them, they do not know which one is which.  So they just pack them and ship them.**

(Exhibit 2, Dep. of William Szeto, 208:10-16) (bold added).

173. Denegre, however, denies recalling giving Szeto instructions to maintain two sets of books.

In sworn testimony, Denegre claimed the following:

Q.   Okay.  Did you discuss having Windspeed Trading maintain two sets of books?
   MR. PERRIN: Objection; form.
A.   Again, I don't recall.
Q.   (BY MR. FREEMAN)  Did you ever direct Bill Szeto to keep two sets of books?
   MR. PERRIN: Objection; form.
A.   I don't recall.

(Exhibit 1, Dep. of Matt Denegre, 90:09-16).

174. **Denegre Falsely Testifies About Two Books.**  Again, however, Denegre's prior email correspondence tells a far different story, demonstrating that he instructed Szeto to maintain "two separate books *for obvious reasons*."  Denegre gave false testimony under oath to cover up the fraud.

His testimony provides as follows:

Q.  (BY MR. FREEMAN)  Okay.  If you look at the email on the bottom, the email from you at your Baymark Partners email address says, "Bill, Jane will need to set up a new QuickBooks file for Windspeed and maintain the old QuickBooks file for ACET." Does that appear to be correct?
A.   That's how I read it.
Q.   Okay.  And does it go on to say, **"It will need to be two separate books for obvious reasons"?  Is that correct?**

> **A.  That's how I read it.**
> Q.  Okay.  What were the obvious reasons, sir?
> A.  There's two separate companies.
> Q.  Okay.  Two separate and distinct companies?
> A.  Correct.
> Q.  Okay.  Is that the only obvious reason?
> A.  I can't think of another reason.

(Exhibit 1, Dep. of Matt Denegre, 94:09-25) (bold added).

175.  A screen shot of Denegre's October 2018 email with instructions to Szeto to maintain "two separate books for obvious reasons" is set forth below:[55]

---

**From:** Matt Denegre <mdenegre@baymarkpartners.com>
**Date:** Friday, October 19, 2018 at 9:34 AM
**To:** WILLIAM SZETO <bill@acetglobal.com>
**Subject:** WIndspeed QuickBooks File

Bill,

Jane will need to set up a new QuickBooks file for Windspeed and maintain the old QuickBooks file for ACET.  It will need to be two separate books for obvious reasons.  All the ongoing ACET sales/expenses will still need to be recorded in the ACET QuickBooks.  We can figure out the opening balance sheet entries for Windspeed after the funding.

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

---

176.  Likewise, Hook has attempted to distance himself of any knowledge of the financial records of the company over which he served as president:

> Q.  Did Windspeed Trading maintain the financial records of ACET Global?
> A.  I -- I don't know.
> Q.  But you were the president of ACET Global; correct?
> A.  Yes, I was.
> Q.  Okay.  And you don't know if Windspeed Trading ever maintained the financial records of ACET Global?
> A.  No.
> Q.  That's a no, they didn't?  Or no, you don'tknow?
> A.  No, I don't know.

---

[55] *See* Exhibit 30, Separate Books Email.

(Exhibit 7, Dep. of David Hook, 80:16-81:02).

> Q. Okay. And you don't know whether there were separate books and records for ACET Global and Windspeed Trading?
> A. No.
> Q. Did you ever provide instructions to Windspeed Trading regarding ACET Global's financial records?
> A. No.

(Exhibit 7, Dep. of David Hook, 81:03-09).

177. Ludlow, in sworn testimony, has denied that Windspeed maintained any financial records of ACET Global:

> Q. Did Windspeed Trading maintain the financial records of ACET Global?
> A. I don't know how to answer that. I mean, no. They were separate companies and they had separate books.

(Exhibit 3, Dep. of Tony Ludlow, 164:02-06).

178. **Reports Consolidating Windspeed and ACET.** Denegre and Baymark requested consolidated reports, so that they could monitor ACET Global's business, which was being continued under Windspeed.

179. When questioned under oath, Denegre, of course, initially denied having requested consolidated reports regarding ACET Global and Windspeed:

> Q. Okay. Did you instruct Windspeed to combine Windspeed financial reports with ACET Global's financial reports?
> A. Don't think so.
> Q. You don't think you did?
> A. No.
> Q. Is there any reason you might have ever asked for that?
> A. Not that I can recall.
> Q. Okay. Are you pretty certain you did not?
> A. Not that I can recall.
> Q. Given that Windspeed was a completely separate company, is there any reason you would have asked for that?
>     MR. PERRIN: Objection; form.
> A. Not that I can recall.

(Exhibit 1, Dep. of Matt Denegre, 119:06-21).

> Q.   And did you want those financial statements to report – to report ACET
> Global and Windspeed on a combined basis?
> A.   No.
> Q.   No reason you would have wanted that, is there?
> A.   No.

(Exhibit 1, Dep. of Matt Denegre, 121:06-12).

180. **Denegre's Emails Show His Consolidation Request.**   Once again, however, Denegre's

emails tell a different story and when confronted with them he acknowledged that his testimony was

false and that he indeed requested consolidated statements—that is, that his prior sworn testimony

was false:

> Q.    And does he say, "I told her not to.  I do not want to mix the ACET
> results together with the Windspeed results in a single report.  The January
> report is a pure Windspeed report and is not part of ACET combined
> report." Do you know what any of that is referring to?
> A.   I don't.
> Q.    Is there any reason you would have responded and still wanted them
> combined?
> A.   I don't know how I responded to this.
> Q.    Okay.  If you'll look right above that and look at your response on
> February 28th, 2019, at 12:19 p.m., three minutes later, you state, "I would still
> include it."  Do you see that?
> A.   I see that.
> Q.   Why did you say that?
> A.   I don't know.
> Q.    There's no reason you can think of for why you would have wanted that
> included still?
> A.   It would be speculating for me to say.
> Q.   Did Bill agree to that?
> A.   I don't know.
> Q.   Okay.  Is it possible you wanted these
> combined because they were the same business?
> A.   I don't know.

(Exhibit 1, Dep. of Matt Denegre, 122:14-123:14).

181. Throughout this time, Denegre and Baymark received monthly financial statements from

Windspeed.  Denegre has acknowledged this is sworn testimony:

> Q.    Did you receive monthly financial statements from Bill Szeto and
> Windspeed Trading in 2019?
> A.   Bill Szeto would have shared financial statements with me, yes.

(Exhibit 1, Dep. of Matt Denegre, 120:24-121:02).

182. **The Transfer of Assets**.   After forming Windspeed, the Defendants jointly engaged to fraudulently transfer all of the assets and business operations of ACET Global over to Windspeed.

183. Szeto has acknowledged the transfer of ACET Global's inventory to Windspeed in 2018 (long before the purported "foreclosure" sale):

> Q.   (BY MR. FREEMAN)  Got it.  So in 2018, ACET's -- ACET Global's inventory was moved?
> A.   Yes, in September.
> Q.   In 2018, it was -- it was moved to Windspeed's new office, wasn't it?
> A.   No.  It was moved to the trailer.
> Q.   You kept it in the trailer during all of 2018?
> A.   We did not move into the new office -- the Windspeed Trading new office until the end of -- until the end of November.
> Q.   Okay.  And the ACET Global inventory was not -- was not ever moved over to that?
> A.   Yes, it was.
> Q.   When was it moved over there?
> A.   At the same time we move everything.
> Q.   So the ACET Global inventory was moved to the new Windspeed office in 2018, correct?
> A.   Yes.
> Q.   Okay.  How was it moved?
> A.   By hand.
> Q.   Just picked it up and carried it all?
> A.   Is that what you mean?  Yes, somehow.  By hand, we have to move it.  Is that what you mean?

(Exhibit 2, Dep. of William Szeto, 209:01-23).

> Q.   When you -- when you transitioned over, did Windspeed start using the ACET desks?
> A.   The ACET desk?
> Q.   Yes, sir.
> A.   The desk was moved from the storage unit to the new building.  The answer is yes, we did use the ACET desk.
> Q.   Okay.  Did you use the ACET cabinets?
> A.   Well, that's only one cabinet, yes.
> Q.   And you used it?
> A.   Yes.
> Q.   Did you use the ACET computers?
> A.   A few of them.  And I bought new ones.
> Q.   Okay.  Did you use the ACET fulfillment desktop computer?

A.  Yes.
Q.  Did you use the ACET monitors?
A.  Yes, some of them.
Q.  Okay.  Did you use the ACET laser printer?
A.  No.  It broke before we moved.
Q.  Okay.  Did you use the ACET warehouse desk?
A.  Yes.
Q.  Did you use the ACET customer service desk?
A.  Yes.
Q.  Did you use the ACET accounting desk?
A.  Yes.
Q.  Did you use some accounting -- the ACET accounting cabinets?
A.  There were two of them, yes.
Q.  Did you use the ACET CEO desk?
A.  Yes.
Q.  Did you use the ACET CEO chair?
A.  Yes.
Q.  Is that a comfortable chair?
A.  No.  I bought a new one after that.
Q.  Did you use the ACET conference table?
A.  Yes.
Q.  Did you use the ACET receptionist desk?
A.  No.  It's sitting out in the lobby.  We did not use it.
Q.  Okay.  Did you move it over, though?
A.  Well, we moved it over, yes.
Q.  Okay.  Just don't use it much?
A.  No, we don't have a reception.
Q.  Okay.  But it's still there, correct?
A.  It's still there, yes.
Q.  Okay.  Also, did you move over a couple of ACET chairs for the foyer?
A.  Yes.
Q.  Did you move over --
A.  It's still sitting in the lobby.
Q.  Okay.  Did you move over the ACET refrigerator?
A.  Yes.
Q.  Did you move over the ACET microwave?
A.  Yes.
Q.  Did you move over the ACET water cooler?
A.  Yes.
Q.  Did you move over the ACET folding machine?
A.  Yes.

(Exhibit 2, Dep. of William  Szeto, 56:12-58:21).

184. Notably, Defendants Ketter and Tomerlin assisted the Defendants in moving the inventory

from ACET Global to Windspeed. Ketter and Tomerlin obtained a temporary storage unit at

CubeSmart Self Storage of Dallas ("CubeSmart") in September 2018. In an attempt to conceal their fraud, the Defendants set up the account with CubeSmart only under Tomerlin's name and using Tomerlin's personal address. However, the account email addresses were listed as Lin and Szeto's ACET Global email addresses.

185. **Windspeed's Sale of ACET Global's Inventory.** And right after the transfer to Windspeed, Windspeed continued selling the inventory with the same customer marketplaces and the same software used at ACET Global. Dana Tomerlin, who was Windspeed's "fulfillment manager," has testified that:

> A.   We were still shipping. I was still shipping out orders with the different marketplaces.
> Q.   (BY MR. FREEMAN) Using the same software, right?
> A.   Yes.
> Q.   Okay.
> A.   To the best of my knowledge, yes.

(Exhibit 4, Dep. of Dana Tomerlin, 35:11-17).

186. Hook, who was ACET Global's "president," however, has testified that he does not know where ACET Global's hundreds of thousands of dollars' worth of inventory was after the formation of Windspeed:

> Q. Okay. Between October of 2018 and March of 2019, where was ACET Global's inventory located?
> A. I don't know.

(Exhibit 3, Dep. of Tony Ludlow, 22:25-23:02).

187. Denegre has admitted that he and Baymark were receiving reports from Windspeed about ACET Global's inventory in 2018 and into 2019. Yet, he could not explain why Windspeed would have possession of ACET Global's assets long before the purported (and fraudulent) "foreclosure" sale:

> Q.   So as of January 2019 and as of 2018, you were receiving reports from Windspeed about ACET Global's inventory, correct?

A.   Yes.  If that's the dates on those emails, that would be – that would
sound correct.
Q.   And that was, in fact, prior to March of 2019, correct?
A.   That would be correct.
Q.   Why is that?
A.   Why is what?
Q.   Why were you receiving reports about ACET Global's inventory prior to
March of 2019?
A.   Super G was – well, we were – ACET Global was in default with Super
G, and Super G was planning to do a foreclosure, and they wanted to see the
assets.
Q.   Okay.  And that's why you were getting them from Windspeed?
A.   Yes.  That's what – that's correct.
Q.   And why did Windspeed have them?
A.   I think – I actually don't know the reason why Windspeed had the assets.
My guess, a conversation between Super G and Windspeed. I wasn't part of
that. I don't know.

(Exhibit 1, Dep. of Matt Denegre, 163:02-24).

188. **Windspeed Continues its Fraud.**  In 2018, Windspeed, through its then-employee Torres, expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts. That same year, Windspeed began to hold ACET Global's inventory out for sale on its website. As of at least **December 12, 2018**, Windspeed's website was a carbon copy of the former ACET Global website. (*See* Exhibit 39, Declaration of Tomer Damti ¶¶ 14-16, 20; Exhibit 39, Exhibit B-6 and B-7). The Windspeed website included postings holding out for sale hundreds of products— distinct and unique products (such as the Tear of a Fairy Bracelet) that were in fact one and the same as those reflected on ACET Global's inventory of items in the Foreclosure Sale Agreement (*Id.*; Exhibit 18 (a foreclosure sale that would not, supposedly, take place until the following year when it, according to Windspeed and Baymark, then gave Windspeed ownership over the inventories, including the Tear of a Fairy Bracelet)).

189. **Windspeed's Website was a Copy of ACET Global's Website.**  Windspeed's website on **December 12, 2018** reflects that Windspeed was already marketing inventory items included in Super G's Notice of Disposition and Sale of Collateral and the Bill of Sale executed between Super G and

Windspeed. (Exhibit 39, Exhibits B-3 and B-5). The items include, but are not limited to, the "Iphone 6/6 Plus Sport Armband," "Mini Portable USB Rechargeable Battery Clip Fan," and "Bye Bye Clog." *Id.* To be clear, Windspeed copied ACET Global's website and product descriptions, **even down to an exact product description typographical error**. (*Cf.* Exhibit 39 *with* Exhibits B-6 and B-7).

190. **No Change in Business**. After BP Management; Super G; and Szeto transferred all of ACET Global's operations and assets to Windspeed, there was no change in the business operations. The employees of Windspeed, who had all been employees of ACET Global just days before the change, have testified that there was no change whatsoever:

> Q.   Okay. So Windspeed was finishing up ACET's business?
> A.   Right. Windspeed had nothing to ship at that time.
> Q.   So it was just continuing ACET's business?
> A.   Yes.
>           MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN) And that was kind of easy because it was all the same employees, right?
> A.   Right.
>           MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN) All the same equipment?
>           MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN) It was easy because it was all the -- pretty much all the same equipment, wasn't it?
> A.   Yes.
>           MS. HARD-WILSON: Objection.
>           MR. PERRIN: Objection.
> Q.   (BY MR. FREEMAN) And it was easy because it was all the same vendors, right?
>           MR. PERRIN: Objection, form.
> A.   Yes.
> Q.   (BY MR. FREEMAN) And it was easy because it was pretty much all the same customers, wasn't it?
> A.   Yes.

(Exhibit 2, Dep. of William Szeto, 200:09 - 201:09).

> Q.   (BY MR. FREEMAN) The change from ACET Global to Windspeed.
> A.   I feel like we are the same group, and we just moved into a new building and we're doing the same business.

(Exhibit 5, Dep. of Jane Lin, 77:04-08).

Q.   How did Windspeed compare to ACET Global?
          MS. HARD-WILSON: Objection; form.
A.   It's another e-commerce company. I continue to do the same.  I print orders, I pack the orders and ship them out.
Q.   (BY MR. FREEMAN)  As far as you could see, were there any changes?
A.   Not in my position.
Q.   Did you see changes in any other position?
A.   No, not that I -- I don't know.
Q.   Did anyone ever talk to you about how things had thanked in their position?
A.   No, not that I remember.
Q.   Did the products noticeably change?
          MR. PERRIN: Objection; form.
A.   Not that I remember.

(Exhibit 4, Dep. of Dana Tomerlin, 37:17-38:07).

Q.   Were they way different than what you're -- than what Windspeed sells?
A.   No, they were almost the same.  But we just have new products now, and I'm more familiar with Windspeed's products.
Q.   It's been a little while?
A.   Uh-huh.
Q.   (BY MR. FREEMAN)  Are they -- they were pretty much the same, like the same basic products?
A.   Yes.
Q.   Okay.  Almost the exact --
A.   Mm-hm.

(Exhibit 5, Dep. of Jane Lin, 34:06-17).

Q.   (BY MR. FREEMAN)  How did Windspeed compare to ACET Global?
A.   In what aspect?  What -- what do you mean?
Q.   How -- yeah, I mean, did they have different businesses?
          MR. PERRIN: Objection; form.
A.   They are doing e-commerce, too.  They were doing e-commerce, too.
Q.   (BY MR. FREEMAN)  And how was it different from like what ACET Global was doing?
A.   Actually, I'm doing kind of same thing.
Q.   What about others?  Were the other employees doing the same thing?
A.   I think so.
Q.   Were -- was the business different?
A.   No.  E-commerce.  Same -- same thing.
Q.   Same thing?
A.   Mm-hm.
Q.   Was it selling the same types of products?
A.   Yes, same type.
Q.   Same inventory was being sold?
A.   Mm-hm.

> MR. PERRIN: Object to form.
> A.   But not the same item, but same kind of products.
> Q.   (BY MR. FREEMAN)  Okay.  Same kind of products?
> A.   Mm-hm.
> Q.    Were there different types of customers or was it the same kinds of customers?

(Exhibit 5, Dep. of Jane Lin, 60:14-61:18).

191. **No Accounting for ACET Global's Assets.**   There was no accounting prepared when ACET Global was shut down and no effort to separately account for its inventory.  As ACET Global's and Windspeed's internal accountant has testified:

> Q.   Did anyone ever ask you to prepare an inventory of what ACET Global had when it closed?
> A.   No.
> Q.   Do you know if anyone ever prepared an inventory of what ACET Global had when it closed?
> A.   I do not know.
> Q.   Okay.  Who would have done that if they -- if someone did?  Who would know how to do that?
> A.   Separate inventory?
> Q.   Yes, ma'am.
> A.   That was too complicated.  I do not know.
> Q.   Did the accounting system -- would it have allowed someone to do that?
> A.   You mean separate inventory?
> Q.   Yes, ma'am.
> A.   No.  I didn't do it.
> Q.   Who else would have kept track of that?
> A.   Okay.  You mean inventories?
> Q.   Yes, ma'am.
> A.   In 2018, I -- I don't think anybody did.

(Exhibit 5, Dep. of Jane Lin, 75:22-76:16).

192. **Windspeed Sold ACET's Inventory.**  Windspeed simply continued to sell ACET Global's inventory, pocketing the revenues for itself and its owners.   As Tomerlin, ACET Global and Windspeed's fulfillment manager, testified:

> Q.   Okay.  How did you distinguish between ACET Global's inventory and Windspeed's inventory?
> A.   I don't know who owned what.
> Q.   Was ACET Global's inventory moved over to the Windspeed warehouse?

A.   The inventory -- I'm not sure who owned what inventory, but the inventory from the other house was -- I mean, not other house -- the other warehouse was moved, yes.

Q.   Okay.  Do you know when that was?

A.   September, I believe.  October. Sometime the fall of 2018.

(Exhibit 4, Dep. of Dana Tomerlin, 43:06-17).

193.  Indeed, Szeto admits that Windspeed simply continued selling ACET Global's assets:

Q.   (BY MR. FREEMAN)  Got it. And Windspeed just -- Windspeed just kept carrying out the sales of that inventory, though, right?

A.  Yes.

Q.   Okay.  **So Windspeed during this time was selling that old ACET inventory --**

**A.  Yes.**

**Q.  -- because there were still orders coming in? Was that a yes?**

**A.  Yes.**

**Q.  Okay.  So Windspeed was selling off all the ACET inventory?**

**A.  Yes.**

(Exhibit 2, Dep. of William Szeto, 219:01-13) (bold added).

194. **No Segregation of Inventory.**   In keeping with this fraudulent effort, there was no segregation of the inventory; it was simply sold off without distinction:

Q. So what happened with the inventory after that?

A.   Then it was moved to the Windspeed location.

Q.   How long was it in the storage units?

A.   Maybe two months.

Q.   Okay.  Were you in charge of moving it back to the -- or, to the new office?

A.   Bill Szeto oversaw it, but I did -- I was here, yes.

Q.   Okay.  What did you do and what did you see?

A.   I just saw the movers moving everything in, then I locked the door and left.

Q.   Okay.  And when was that?

A.   Possibly -- maybe November 2018.

Q.   November of 2018?

A.   Possibly, yes.

Q.   Okay.  Did all the inventory look like it was still there?

A.   Yes.

Q.   What happened to that inventory after that?

A.   The inventory was here.  We -- I continued to print orders and pack and ship from the inventory I had on hand.

Q.   Did that include that inventory?

A.   Yes.

Q.   Okay.  Did you sell all of that inventory or --

A.   I --

Q.   -- is it still around?

A.   -- don't know. I don't remember.  We receive new inventory coming in as well.

Q.   Okay.  **Was it ever -- was that inventory ever segregated in any way?**

**A.   No, not that I -- no.**

**Q.   It was just mixed in with everything else?**

MR. PERRIN: Objection; form.

**A.  Yes.**

**Q.   (BY MR. FREEMAN)  Okay.  I'm sorry.  Was -- was that inventory mixed in with all the other inventory?**

**A.   Yes.  The inventory wasn't separated.**

**Q.   Okay.  Was it possible to distinguish that inventory from the other inventory?**

**A.   No.**

Q.   Okay.  Did anyone ever come and take that inventory from Windspeed?

A.   Not that I'm aware of.

Q.   Or, like, did anyone ever come and separate it off and say, "You can't sell this inventory"?

A.   I'm not responsible for selling.

Q.   Okay.

A.   But, no, no one said anything about shipping the inventory.

Q.   Okay.  Did Mr. Szeto know that that was -- that inventory was being held this way?

MS. HARD-WILSON: Objection; form.

A.   I'm sure he did.

Q.   (BY MR. FREEMAN)  Okay.  Did Mr. Szeto ever say to segregate that inventory?

A.   Not that I remember.

Q.   Did Mr. Szeto ever say to treat that inventory differently or in any particular way?

A.   Not that I'm aware of.

Q.   Okay.

A.   The inventory was just placed in the warehouse, and I pulled orders and packed those orders and shipped out.

Q.   Okay.

A.   I don't know who owned or what was going on on that -- that end, on selling.  I was just packing orders, using the inventory on hand.

Q.   Was there -- was there any other information from ACET Global that you know of that did not go into those storage units?

A.   Not that I'm aware of.

(Exhibit 4, Dep. of Dana Tomerlin, 46:20-49:20) (bold added).

195.  Indeed, no one could tell the difference between the inventory.  It was simply sold off as

Windspeed continued ACET Global's business:

A.   We had ACET Global old inventories in the warehouse at that time . . .
Q.    So in 2018 -- in 2018 Windspeed had some of ACET Global's old inventories?
          MR. PERRIN: Objection; form.
A.   They were sitting in our warehouse, yes.
 . . .
A. . . . So I know we had old ACET Global inventory in our warehouse and we bought a lot of new items for Windspeed, and this -- they're sitting together; so we -- so it's really hard to, you know, distinguish which one was under ACET or which one was under Windspeed.
Q.   Do you know if anyone ever tried to distinguish between them?
A.   No.  I don't think so.

(Exhibit 5, Dep. of Jane Lin, 74:04-75:21).

196. **Windspeed Continued ACET Global's Business Operations and Relationships.**

Windspeed continued to conduct ACET Global's operations, purchasing new assets and inventory

under ACET Global's existing accounts.

Q.   (BY MR. FREEMAN)  The change from ACET Global to Windspeed.
A.   I feel like we are the same group, and we just moved into a new building and we're doing the same business.

(Exhibit 5, Dep. of Jane Lin, 77:04-08).

Q.   Were they way different than what you're – than what Windspeed sells?
A.   No, they were almost the same.
 . . .
Q.   (BY MR. FREEMAN)  Are they -- they were pretty much the same, like the same basic products?
A.   Yes.
Q.   Okay.  Almost the exact –
A.   Mm-hm.

(Exhibit 5, Dep. of Jane Lin, 34:06-17).

Q.   (BY MR. FREEMAN)  How did Windspeed compare to ACET Global?
A.   In what aspect?  What -- what do you mean?
Q.   How -- yeah. I mean, did they have different businesses?
          MR. PERRIN: Objection; form.
A.   They are doing e-commerce, too.  They were doing e-commerce, too.
Q.   (BY MR. FREEMAN)  And how was it different from like what ACET Global was doing?
A.   Actually, I'm doing kind of same thing.
Q.   What about others?  Were the other employees doing the same thing?
A.   I think so.

Q.   Were -- was the business different?
A.   No.  E-commerce.  Same -- same thing.
Q.   Same thing?
A.   Mm-hm.
Q.   Was it selling the same types of products?
A.   Yes, same type.
Q.   Same inventory was being sold?
A.   Mm-hm.
        MR. PERRIN: Object to form.
A.   But not the same item, but same kind of products.
Q.   (BY MR. FREEMAN)  Okay.  Same kind of products?
A.   Mm-hm.
Q.   Were there different types of customers or was it the same kinds of customers?

(Exhibit 5, Dep. of Jane Lin, 60:14-61:18).

197.  Szeto likewise confirms that Windspeed was "just continuing ACET's business."

Q.   Okay.  So Windspeed was finishing up ACET's business?
A.   Right.  Windspeed had nothing to ship at that time.
Q.   So it was just continuing ACET's business?
A.   Yes.
        MR. PERRIN: Objection, form.
Q.   (BY MR. FREEMAN)  And that was kind of easy because it was all the same employees, right?
A.   Right.
        MR. PERRIN: Objection, form.
Q.   (BY MR. FREEMAN)  All the same equipment?
        MR. PERRIN: Objection, form.
Q.   (BY MR. FREEMAN)  It was easy because it was all the -- pretty much all the same equipment, wasn't it?
A.   Yes.
        MS. HARD-WILSON: Objection.
        MR. PERRIN: Objection.
Q.   (BY MR. FREEMAN)  And it was easy because it was all the same vendors, right?
        MR. PERRIN: Objection, form.
A.   Yes.
Q.   (BY MR. FREEMAN)  And it was easy because it was pretty much all the same customers, wasn't it?
A.   Yes.

(Exhibit 2, Dep. of William Szeto, 200:09 - 201:09).

198. Tomerlin has testified to the same effect:

Q.   How did Windspeed compare to ACET Global?

> MS. HARD-WILSON: Objection; form.
> A.  It's another e-commerce company. I continue to do the same.  I print orders, I pack the orders and ship them out.
> Q.  (BY MR. FREEMAN)  As far as you could see, were there any changes?
> A.  Not in my position.
> Q.  Did you see changes in any other position?
> A.  No, not that I -- I don't know.
> Q.  Did anyone ever talk to you about how things had thanked in their position?
> A.  No, not that I remember.
> Q.  Did the products noticeably change?
>       MR. PERRIN: Objection; form.
> A.  Not that I remember.

(Exhibit 4, Dep. of Dana Tomerlin, 37:17-38:07).

199. **Windspeed Diverts Revenues and Closes ACET Accounts.**  Throughout 2018, including in January 2018 and each month thereafter, the Defendants diverted revenues from Windspeed's sales into a Chase Bank account. On January 10, 2019, Szeto—functioning as CEO of both ACET and Windspeed, and using Windspeed letterhead—directed Chase Bank to close the account down, as the Defendants would conduct all operations through Windspeed's accounts from that point forward. Szeto testified:

> Q.    So whenever Windspeed sold ACET Global's inventory, were the revenues going into Windspeed's bank account?
>       MR. PERRIN: Objection, form.
> A.  Yes, at that time, but we did not sell anything.

(Exhibit 2, Dep. of William Szeto, 251:21-252:01).

200. **Windspeed Takes Over ACET Accounts.**  On December 5, 2018, Lin, a former employee of ACET Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of an ACET Global account. Using her Windspeed email address, Lin listed herself as the "New Account Owner" for an account held in ACET Global's name. (*See* Exhibit 39, Exhibit B-2). This occurred across the board, with Windspeed usurping every ACET Global account.

201. **Windspeed Usurps ACET Payment Accounts.**  On December 5, 2018, Windspeed took ownership and control over an ACET Global payment account, using a Windspeed email address. This occurred across the board, with Windspeed usurping every ACET Global payment account.

202. **Windspeed Continues to Direct ACET Accounts.**  On January 10, 2019, Szeto, <u>the CEO of both ACET Global and Windspeed</u>, issued a memo on behalf of Windspeed and on Windspeed letterhead, directing the closure of "three accounts under ACET Global LLC," effective immediately. (Exhibit 31, Memo Closing Bank Accounts).

203. **IRS Records Reflect that Windspeed Received Revenues During Every Month in 2018.** In 2019, an IRS Form 1099-K was issued reporting that Windspeed had received revenue in every month of 2018. (Exhibit 39, Exhibit B-8, Groupon, Inc. 2018 Form 1099-K).

<u>**Hallett & Perrin Had Blatant Conflicts of Interest And Fiduciary Duties**</u>

204. **Hallett & Perrin Represented Every Side of the Transaction.**  Hallett & Perrin represented all of the parties.  For instance, Hallett & Perrin represented Baymark, BP Management; and ACET Global:

> Q. Who was Baymark Partners' lawyers?
> A. Hallett & Perrin.

(Exhibit 3, Dep. of Tony Ludlow, 99:01-02).

> 20 Q. (BY MR. FREEMAN) Did -- who was Baymark
> 21 Partners Management's attorneys?
> 22 A. Hallett & Perrin.

(Exhibit 3, Dep. of Tony Ludlow, 98:20-22).

> Q. Okay. So, now, did – did ACET Global have attorneys?
> A. Yes.
> Q. And who were they?
> A. ACET Global had Hallett & Perrin, Julie -- or
> Gordon at first, and then Julie.

(Exhibit 3, Dep. of Tony Ludlow, 98:6-11).

205. **Hallett & Perrin represented Windspeed.**   Cole has acknowledged in testimony that Hallett & Perrin represented Windspeed in the transaction:

> Q. . . . So counsel to Windspeed Trading was Hallett & Perrin; is that correct?
> A.   Yes, I believe so.

(Exhibit 8, Dep.of Marc Cole, 192:03-05).

> Q.   (BY MR. FREEMAN)  So Hallett & Perrin was representing Windspeed Trading in the foreclosure sale agreement with Super G?
>               MS. HARD-WILSON: Objection, form.
> A.   Yes, they were representing Windspeed, not Super G.

(Exhibit 8, Dep. of Marc Cole, 188:07-12).

206. **Vanderwoude States that Hallett & Perrin Represented Windspeed.**   During the transactions at issue, Hallett & Perrin was interacting "closely" with Brian Vanderwoude, an attorney representing Super G.  Vanderwoude repeatedly stated that Hallett & Perrin represented Windspeed:

> Q.  Now, Mr. Vanderwoude was the attorney that you were working on this transaction with closely, right?
> A.  Yes.
> Q.  And you and Mr. Vanderwoude were having lots of discussions and exchanges of e-mails on this transaction?
> A.  I don't know about the word "lots," but yes, there were discussions and e-mails.
> Q.  Y'all were proposing changes for your clients?
> A.  We were, yes, proposing changes to the documents.
> Q.  Okay.  Any idea why Mr. Vanderwoude would be mistaken that you were Windspeed's lawyer?
> A.  You'll have to ask him.

(Exhibit 6, Dep. of Julie Smith, 130:12-25).  As another example, Vanderwoude often referred to Hallet & Perrin as "Windspeed's lawyer[s]":

**From:** Brian Vanderwoude <vanderwoude.brian@dorsey.com>
**Date:** Monday, March 4, 2019 at 10:52 AM
**To:** Steve Bellah <steve@supergcapital.com>
**Subject:** FW: Windspeed/Super G- loan agreement

See comments below from Windspeed's lawyer. Please let me
know what to put in the blank for the Total Interest Charge and
please confirm that Super G has agreed to remove the $50,000
minimum deposit balance from Addendum 3.

Thanks,

Brian

**J. Brian Vanderwoude**

DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
**P:** 214.981.9953 **F:** 214.853.5095 **C:** 214.673.0050
WWW.DORSEY.COM :: DALLAS :: BIO :: V-CARD

**From:** Julie A. Smith <JSmith@hallettperrin.com>
**Sent:** Sunday, March 3, 2019 8:59 PM
**To:** Vanderwoude, Brian <vanderwoude.brian@dorsey.com>;
Matt Denegre (mdenegre@baymarkpartners.com)
<mdenegre@baymarkpartners.com>
**Subject:** Windspeed/Super G- loan agreement

Brian, Attached is a redline of the version you sent on Friday to the latest
version in our system. There is a blank on the first page (the Total Interest
Charge) that needs to be filled in. Also, I believe the parties agrees to remove
the $50,000 minimum deposit balance requirement from Addendum 3. The
remainder of your changes looks fine.

Matt, please confirm the numbers, amortization, calculation of Total Payback
Amount (after the number for Total Interest Charge has been inserted) are
consistent with your understanding of the business terms.

Thanks, Julie

207. **Hallett & Perrin Repeatedly Coordinated and Interacted with its Client, Windspeed.**

Hallett & Perrin attorneys regularly and repeatedly interacted directly with Windspeed one-on-one (which, of course, it could not have done had it been separately represented). The following screen shot of communications (with Szeto, CEO of Windspeed) is just an example, as Hallett & Perrin corresponded to get signature pages on the "foreclosure sale agreement" that it would later backdate to March 1, 2019:[56]

---

[56] *See* Exhibit 35, H&P Email to Szeto.

On Mar 26, 2019, at 12:38 PM, Julie A. Smith <JSmith@hallettperrin.com> wrote:

Bill,

Just touching base to see if you'd had the chance to sign the Windspeed/Super G loan documents. Let me know if you have any questions about the documents or the process.

Thanks, Julie

Julie A. Smith
Shareholder
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Direct: 214.922.4113 Fax: 214.953.0053
jsmith@hallettperrin.com | www.hallettperrin.com
Disclaimer

208. As another example, Hallett & Perrin, along with its other client, Baymark (Denegre) corresponded directly with Windspeed:[57]

**From:** Julie A. Smith
**Sent:** Friday, March 22, 2019 9:18 AM
**To:** WILLIAM SZETO <bill@windspeedtrading.com>; Matt Denegre (mdenegre@baymarkpartners.com) <mdenegre@baymarkpartners.com>
**Subject:** Windspeed/Super G- loan agreement

Bill,

I apologize. I thought you'd seen the final documents. Attached are the final documents for the Windspeed transaction. Matt and Super G confirmed the numbers on the first page of the Amended & Restated Loan Agreement. You should be signing four signature pages. Let me know if you have any questions.

Thanks, Julie

Julie A. Smith
Shareholder
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Direct: 214.922.4113 Fax: 214.953.0053
jsmith@hallettperrin.com | www.hallettperrin.com
Disclaimer

209. Likewise, Hallett & Perrin corresponded directly with Vanderwoude (Super G's counsel). Examples of correspondence are set forth below—exchanges involving an "agreement" between only two parties: Windspeed and Super G:[58]

---

[57] *See* Exhibit 35.
[58] *See* Exhibit 36, Vanderwoude Email to H&P.

**From:** vanderwoude.brian@dorsey.com <vanderwoude.brian@dorsey.com>
**Sent:** Thursday, March 21, 2019 12:10 PM
**To:** Julie A. Smith <JSmith@hallettperrin.com>
**Subject:** RE: Windspeed/Super G- loan agreement

Attached are revised versions of the agreements for your review and approval.

### J. Brian Vanderwoude

210. **Examples of such Exchanges Abound.**  Yet another example of one-on-one communication between Hallett & Perrin (Windspeed's law firm) and Vanderwoude is pasted below:[59]

| | |
|---|---|
| **From:** | Julie A. Smith |
| **Sent:** | Tuesday, March 26, 2019 5:16 PM |
| **To:** | 'vanderwoude.brian@dorsey.com' |
| **Subject:** | FW: Windspeed/Super G- loan agreement |
| **Attachments:** | scan0007.pdf |
| **Importance:** | High |

Brian,

Attached are Windspeed's signature pages to the various documents. Can you compile fully-executed documents?

Thanks, Julie

Julie A. Smith
Shareholder
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Direct: 214.922.4113 Fax: 214.953.0053
jsmith@hallettperrin.com | www.hallettperrin.com
Disclaimer

211. **Hallett & Perrin Now Attempts to Distance Itself From the Windspeed Representation.**  Despite drafting and redlining a purported Foreclosure Sale Agreement (six months after the assets at issue had already been transferred to Windspeed) between only two parties—Windspeed and Super G—Hallett & Perrin now has attempted to distance itself from having represented Windspeed.

Q. Okay.  Let me show you what's marked as Exhibit 2, Ms. Smith.
(Exhibit No. 2 marked.)

---

[59] *See* Exhibit 37, H&P Email to Vanderwoude.

Q.  Are you familiar with this document?
A.  Yes.
Q.  Okay.  And what is this?
A.  The foreclosure sale agreement between Windspeed and Super G.
Q.  Okay.  Is it dated March 1st, 2019?
A.  Yes.
Q.  And it's between Windspeed Trading as the buyer and Super G Capital as the seller?
A.  Yes.
Q.  Okay.  Was anyone else a party to this document, that you recall?
A.  No.  It's a two-party agreement.
Q.  Okay.  Just between Windspeed and Super G?
A.  Yes.
Q.  Okay.  And do you represent either of those parties?
A.  No.

(Exhibit 6, Dep. of Julie Smith, 32:08-33:03).

Q.  Okay.  Were you involved in drafting this document?
A.  I reviewed the document.
Q.  Okay.  Did you offer any suggested revisions?
A.  Yes.
Q.  Red lines?
A.  Yes, if I had offered any revisions, I would have red-lined them.
Q.  Okay.  So you engaged in drafting and revisions with other attorneys?
A.  Yes.

(Exhibit 6, Dep. of Julie Smith, 33:14-24).

Q.  I'll show you what's marked as Exhibit 10.
            (Exhibit No. 10 marked.)
Q.  Do you see that document?
A.  Yes.
Q.  And are you familiar with that document?
A.  The e-mail?
Q.  Yes, ma'am.
A.  Looks like an e-mail I sent to Brian Vanderwoude. 5
Q.  Okay.  It's an e-mail you sent to Brian Vanderwoude and Jamie Whatley?
A.  Yes.
Q.  Okay.  And cc'd Michelle Shriro?
A.  Shriro (different pronunciation).
Q.  Shriro?
A.  Yes.
Q.  On December 19th, 2018?
A.  Yes.
Q.  Subject line, Super G Windspeed-Foreclosure Sale Agreement?
A.  Yes.

Q.  Okay.  And do you say that, attached is a revised draft of the foreclosure sale agreement?
A.  Yes.
Q.  Okay.  And this document that's attached, the numbering convention, is that a convention that's used by Hallett and Perrin?
A.  Yes . . . .

(Exhibit 6, Dep. of Julie Smith, 54:08-55:10).

Q.  Okay.  So this foreclosure sale agreement was on Hallett and Perrin's document system?
A.  Yes.
Q.  Okay.  How many drafts of this document did you make?
A.  Well, that's version 3, so I assume version would have come from -- well, Dorsey.  I don't know what happened to version 2, so there's at least versions.

(Exhibit 6, Dep. of Julie Smith, 55:14-22).

Q.  So you didn't have a client that was going to be executing the foreclosure sale agreement?
A.  No.

(Exhibit 6, Dep. of Julie Smith, 57:14-16).

212. **Denegre Instructed Szeto to Keep Windspeed's Counsel with Hallett & Perrin.**  Indeed, Denegre and Baymark Partners directed Szeto to utilize Hallett & Perrin as Windspeed's counsel:

Q.  (BY MR. FREEMAN)  Exhibit 17, sir.  Do you recognize this document?
A.  I don't recognize this.
Q.  Does this appear to be an email from William Szeto, email address at bill@windspeedtrading.com to you, Matt Denegre, dated October 19th, 2018?
A.  I see that.
Q.  Okay.  And does the subject line state, "New Office"?
A.  Yes.
Q.  And does this, in fact, appear to be a true and correct copy of the email exchanged between you and Mr. Szeto on or about that date?
A.  Yes.
Q.  And right below that, is that an email from you, Matt Denegre at your address, mdenegre@baymarkpartners.com?
A.  Yes, it is.
Q.  And is that dated October 19th, 2018, and to William Szeto at his Windspeed Trading email address?
A.  Yes.
Q.  Okay.  Does he state -- do you state, "Using the same counsel shouldn't matter.  Unrelated to the separation.  It's going to get confusing using two different law firms, and we use Hallett & Perrin on all of our companies"?
A.  That's what I said.

(Exhibit 1, Dep. of Matt Denegre, 203:07-204:08).

> Q.   (BY MR. FREEMAN)  Okay.  Let's keep going down here, this email
> from you to Mr. Szeto at 11:09 a.m., Friday, October 19th. You stated -- please
> tell me if this is correct:  "Please keep counsel with Hallett & Perrin after the
> lease."  Is that correct?
> A.   Yes.
> Q.   Okay.  And then you said, "They have all the records from ACET, and
> that's who we use on all of our companies."  Is that correct?
> A.   Yes.

(Exhibit 1, Dep. of Matt Denegre, 205:06-15).

> Q.   (BY MR. FREEMAN)  Okay.  And was this email discussing Windspeed
> Trading, LLC?
> A.   I believe so.

(Exhibit 1, Dep. of Matt Denegre, 206:05-07).

213.  Hallett & Perrin continued to represent (i) ACET Global, LLC; (ii) Baymark Partners; and

(iii) Windspeed.  Super G and its counsel repeatedly referred to Hallett & Perrin as Windspeed's

counsel:

> Q. (BY MR. FREEMAN)  Okay.  In this email on January 18th, 2019, to you
> from Steve Bellah with the subject line, "re: Merged weekly report
> (Windspeed)," does Steve Bellah state, "We are waiting for your counsel to
> turn a document"?
> A.   Again, at 3:42 p.m.?
> Q.   Yes, sir.
> A.   Yes, it says that.
> Q.   What is he referring to?  Do you know?
> A.   I don't know.

(Exhibit 1, Dep. of Matt Denegre, 109:06-15). Vanderwoude and Cole have acknowledged that Hallett

& Perrin represented Windspeed.[60]  And excerpts from Vanderwoude's emails bear out the fact that

he, while working closely with Hallett & Perrin, referred to H&P as Windspeed's lawyers:[61]

---

[60] *See supra* p. 89; *see also* Exhibit 6, Dep. of Julie Smith, 130:12-25; Exhibit 8, Dep. of Marc Cole, 192:03-05; Exhibit 8, Dep. of Marc Cole, 188:07-12.
[61] *See* Exhibit 38, Vanderwoude's Reference to Windspeed's Lawyer.

**From:** Brian Vanderwoude <vanderwoude.brian@dorsey.com>
**Date:** Monday, March 4, 2019 at 10:52 AM
**To:** Steve Bellah <steve@supergcapital.com>
**Subject:** FW: Windspeed/Super G- loan agreement

See comments below from Windspeed's lawyer. Please let me know what to put in the blank for the Total Interest Charge and please confirm that Super G has agreed to remove the $50,000 minimum deposit balance from Addendum 3.

Thanks,

Brian

**J. Brian Vanderwoude**
DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
**P:** 214.981.9953 **F:** 214.853.5095 **C:** 214.673.0050
WWW.DORSEY.COM :: DALLAS :: BIO :: V-CARD

**From:** Julie A. Smith <JSmith@hallettperrin.com>
**Sent:** Sunday, March 3, 2019 8:59 PM
**To:** Vanderwoude, Brian <vanderwoude.brian@dorsey.com>; Matt Denegre (mdenegre@baymarkpartners.com) <mdenegre@baymarkpartners.com>
**Subject:** Windspeed/Super G- loan agreement

Brian, Attached is a redline of the version you sent on Friday to the latest version in our system. There is a blank on the first page (the Total Interest Charge) that needs to be filled in. Also, I believe the parties agrees to remove the $50,000 minimum deposit balance requirement from Addendum 3. The remainder of your changes looks fine.

Matt, please confirm the numbers, amortization, calculation of Total Payback Amount (after the number for Total Interest Charge has been inserted) are consistent with your understanding of the business terms.

Thanks, Julie

## The Default

214. On October 31, 2018, the first monthly installment under the D&T Note became due. According to the Defendants' plan, ACET Global failed to pay Plaintiff.

215. Just weeks before, BP Management, Super G, and Szeto had executed agreements for Windspeed and had effected the purported transfer of ACET Global's assets to Windspeed. ACET Global had millions of dollars of assets and an ongoing business operation.

216. BP Management, Super G, and Szeto continued their effort to build a retroactive paper trail to support their theft. After waiting several months after the transfer of ACET Global's assets and operations, they initiated an after-the-fact "foreclosure" process to carry out their fraud and to purport

to transfer the ACET Global assets to Super G (although Super G admits that it never took possession

of any assets) to Windspeed—merely to create documented records to create a false factual record of

an actual foreclosure.

### The Foreclosure Notice

217. On January 31, 2019, Super G (in coordination with Baymark) issued a Notice of Forfeiture

("Notice").  (Exhibit 17). The Notice was sent to the attention of Hook at his Baymark address (not

the old ACET Global address).  A screen shot excerpt of the Notice appears below:



January 31, 2019

Via Certified Mail, Return Receipt Requested

ACET Global, LLC
Attn: David J. Hook
5700 Granite Parkway, Suite 435
Plano, Texas 75024

> Re:  Notice of Disposition and Sale of Collateral:  Business Loan and Security
> Agreement dated as of July 20, 2017 (as amended, restated, or otherwise modified
> from time to time, the "Loan Agreement"), by and among ACET Global, LLC, a
> Texas limited liability company ("Borrower" or "Debtor") and Super G Capital, LLC,
> a Delaware limited liability company ("Lender" or "Secured Party")

Dear Borrower:

> Events of Default have occurred and are continuing with respect to the obligations owed
> by the Debtor to the Secured Party under the Loan Agreement.  As such, pursuant to sections
> 9.609(a) and 9.609(b) of the Texas Business and Commerce Code (the "Code"), Borrower must
> immediately surrender to Lender possession of the collateral described in the attached Exhibit A
> (collectively, the "Collateral").  Pursuant to section 9.609(c) of the Code, the Lender will take
> possession of the Collateral at the premises located at 5700 Granite Parkway, Suite 435, Plano,
> Texas 75024, or wherever the Collateral may be located.

> Pursuant to section 9.610 and 9.611 of the Code, the Collateral will be disposed of in a
> commercially reasonable manner by private sale on or after the 11th day after the date of this
> letter.  The Secured Party reserves the right to sell the Collateral in a single lot or multiple lots,
> by way of one or more contracts, and on such terms and conditions as are agreed upon between
> the Secured Party and any purchaser of the Collateral. The Secured Party reserves the right to
> add to, withdraw, or otherwise modify or amend in any respect whatsoever all or any portion of
> the Collateral listed in Exhibit A as being subject to the sale, for any reason whatsoever.  The
> Secured Party is not purporting to sell any interest in any asset that is (i) not owned by Borrower
> or (ii) not subject to a security interest in favor of Secured Party.

218.  Remarkably, the Notice was issued with all of the parties having full knowledge that the assets

at issue (*i.e.*, ACET Global assets) had all already been transferred months before to Windspeed, an

entity that was beneficially owned and controlled by Super G, BP Management, and Szeto.

219. Baymark (the beneficial owner of the debtor) repeatedly urged Super G (the lender) to move

forward with the foreclosure.  For example, Denegre sent an email to Bellah of Super G, stating "Steve,

I'd like to discuss next steps for ACET Global and get your thoughts on how to **move forward with**

**foreclosure**?" (Denegre 139:25-140:04); (Exhibit 40, Email to Move Forward with Foreclosure) (bold added). For example, on October 23, 2018, Denegre was pushing Bellah to "move forward with foreclosure":

| | |
|---|---|
| **From:** | Matt Denegre |
| **Sent:** | Tuesday, October 23, 2018 11:38 AM |
| **To:** | Steve Bellah |
| **Subject:** | ACET |

Steve,

I'd like to discuss next steps for ACET global and get your thoughts on how to move forward with foreclosure. I have time today at 4:00, 4:30 or could anytime on Thursday. I'm travelling tomorrow.

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

220. Ludlow was also pushing Super G to hurry up with the foreclosure:

> Q. Okay. But Baymark Partners was asking them to go ahead and move forward with the foreclosure in 2018, right?
> A. We did throw that out there.

(Exhibit 3, Dep. of Tony Ludlow, 211:25-212:03).[62]

221. Just as remarkably, Super G did not even draft the Notice.[63] Hallett & Perrin—who represented ACET Global, Windspeed, and Baymark—was, however, involved in drafting and reviewing the Notice. Hallett & Perrin attorneys discussed the Notice with Super G's counsel before Hallett & Perrin's client received the Notice. And Hallett & Perrin even coordinated its transmission

---

[62] In fact, Super G had never done a foreclosure of this nature. It was done at the behest of Baymark.
[63]          Q.   Okay.  Were you involved in drafting this notice?
                A.   No, signing and sending.
(Exhibit 8, Dep. of Marc Cole, 160:19-21).

to their client.[64]  According to testimony from Hallett & Perrin, they were "involved in it and then []

read it and reviewed it."[65]

    222. Baymark continued to drive the foreclosure notice and process forward:

> Q. Okay.  I would like for you to look at Exhibit 10, sir.  Does this appear to be an email sent from Matt Denegre to Alex Godinez in late January 2019?
> A. January -- yes.
> Q. Okay.  And is the subject line "Windspeed/ACET"?
> A. Yes.
> Q. Okay.  Why would there be a subject line of Windspeed/ACET?  Do you have any idea?
> A. I don't.
> Q. Okay.  Down below, if you'll look towards the bottom of the -- the first page, Mr. Denegre states, "We still need the dates on when the foreclosure notice got sent out or when you plan to send them out." Any idea why he's asking for that?
> A. No.
> Q. He says, "Then we can finalize."
> A. That -- that's what it says.  But I don't know why.
> Q. Okay.  He sent this email from his Baymark Partners email address; correct?
> A. Yes.
> Q. Okay.  And then down below that, does there appear to be an email from Alex Godinez to Mr. Denegre in January 29th, 2019 stating, "Just want -- just wanted to follow up on status for the final version of the foreclosure agreement. Are we good to finalize?" Does that -- did I read that correctly?
> A. Yes.
> Q. And this was an email between Alex Godinez at Super G Capital and Matt Denegre at his Baymark Partners email address with the subject line "Windspeed/ACET"; is that correct?
> A. Yes.
> Q. Okay.  And that's the same ACET Global that -- that you were the president of at this time; correct?
> A. Correct.
> Q. Okay.  But you don't know what he's referring to?
> A. I've never seen it before.
> Q. And you don't know what foreclosure agreement he's referring to?
> A. No.

---

[64]    Q. Okay. And did you discuss this letter with Super G counsel prior to receiving it?
        A. Yes.
(Exhibit 6, Dep. of Julie Smith 27:07-09).
[65]    Q. Okay.  And were you involved at all in drafting this notice of disposition and sale of collateral?
        A. I didn't draft it.  I was involved in it and then I read it and reviewed it.  I was not the -- I did not initially draft it.
(Exhibit 6, Dep. of Julie Smith, 31:15-19).

> Q.  All right.  And no idea if this deals with the assets of ACET Global or the assumption of those assets by Windspeed Trading, LLC?
> A.  No.

(Exhibit 7, Dep. of David Hook, 129:03-130:24).

223. The purported "foreclosure" included ACET Global's entire operating business.  According to Cole:

> A. Super G Capital did a foreclosure on ACET. And when I say "ACET," I'm referring to the operating business.

(Exhibit 8, Dep. of Marc Cole, 21:07-09).

## The Foreclosure Sale

224. **No Actual Foreclosure Sale**.  There was no physical foreclosure sale, given that ACET's assets and operations had already been transferred over to Windspeed, and Windspeed continued those operations and sold off the inventory.

225. **Hook Cannot Remember the Foreclosure.**  Although he was serving as the president of ACET Global during the purported "forfeiture," David Hook has testified that he does not remember any foreclosure:

> Q.  And while you were president of ACET Global, LLC, didn't Super G Capital foreclose on ACET Global's assets?
> A.  While I was president?
> Q.  Yes, sir.
> A.  I guess so.
> Q.  Okay.  But you don't remember that at all?
> A.  No.

(Exhibit 7, Dep. of David Hook, 112:14-21).

226. While the fact that a president of a company does not recall the company's entire operating business and assets being foreclosed upon would, under normal circumstances, be rather remarkable, here that fact is consistent with the reality that no foreclosure actually took place.  The Defendants had Hallett & Perrin create and put the paperwork in place after the fact only to build a record to help hide their fraud.

227. **Szeto Gives False Testimony.**  To cover up the fraudulent transfer, Szeto has falsely testified that Super G foreclosed upon the ACET Global assets before the formation of Windspeed:

> Q.   (BY MR. FREEMAN)  So are you telling me that the assets of ACET Global were foreclosed upon prior to  your formation of Windspeed Trading, LLC?
> A.  Yes.
> Q.  Are you sure about that?
> A.  Yes.

(Exhibit 2, Dep. of William Szeto, 22:19-24).

228.  But of course, that is not the case.  Once again, the documentation demonstrates that the testimony is another fabricated lie designed to obstruct judicial proceedings and carry out a fraudulent scheme.  For example, the Foreclosure Sale Agreement itself is dated March 1, 2019 (and that is a *backdated* date).  And even Super G and Cole admit that the ACET Global assets were not foreclosed upon until the following year:

> Q.  (BY MR. FREEMAN) Okay.  Did -- just to be clear, did Super G foreclose on ACET Global's assets in 2018?
> A.  No.
>                MR. PERRIN: Objection, form.
> Q.   (BY MR. FREEMAN)  **Did Super G foreclose on ACET Global's assets in October of 2018?**
>                MR. PERRIN: Objection, form.
> **A.  No.**

(Exhibit 8, Dep. of Marc Cole, 182:11-19) (bold added).

229. Moreover, Tomerlin, who packaged and shipped all of ACET Global's and Windspeed's inventory, was never even made aware of any purported foreclosure:

> Q.  (BY MR. FREEMAN)  Okay.  Were there ever any discussions about that inventory that came from ACET Global?
> A.  I'm not sure what you're asking.
> Q.  Any discussions in particular that -- that you would remember.
> A.  Not that I remember.
> Q.   Okay.  Any discussion with anybody about there being a lien on that inventory?
> A.  No.  I don't have that information, no.
> Q.  Ever any discussion about anybody conducting a foreclosure sale on that inventory?

> A.  No, I don't know that information.
> Q.   Really?  So nobody ever said anything about some party foreclosing on the inventory of ACET Global?
>           MS. HARD-WILSON: Objection; form.
> A.  No.  I don't know anything about foreclosing or anything like that.

(Exhibit 4, Dep. of Dana Tomerlin, 50:08-51:01).

230. **Denegre Commits Perjury over Foreclosure Involvement.**  To cover up the fraud, Denegre and Baymark Partners have testified that they were not involved in the foreclosure process at all:

> Q.  (BY MR. FREEMAN)  Okay.  But you weren't involved in that process at all?
> A.  In what process?
> Q.  The foreclosure process.
>           MR. PERRIN: Objection; form.
> A.  How would I be involved in that?
> Q.  (BY MR. FREEMAN)  Correct.  Were you --
> A.  No.

(Exhibit 1, Dep. of Matt Denegre, 89:11-18).

> Q.   Okay.  And Baymark Partners didn't have anything to do with the foreclosure process, correct?
> A.  Correct.

(Exhibit 1, Dep. of Matt Denegre, 212:08-10).

> Q.  Even looking at this, you didn't have anything to do with ACET Global's foreclosure?
> A.  Super G foreclosed on ACET.  Super G --
> Q.  You didn't have anything do with that?
>           MR. PERRIN: Objection; form.
> A.  No.
> Q.  (BY MR. FREEMAN)  And Baymark Partners didn't have anything to do with that, right?
>           MR. PERRIN: Objection; form.
> A.  Nope.
> Q.  (BY MR. FREEMAN)  And Tony Ludlow didn't have anything do with that, correct?
> A.  No.
> Q.  And that was completely unrelated to Windspeed Trading, LLC?
> A.  What's that?
> Q.  The foreclosure upon ACET Global's assets.
>           MR. PERRIN: Objection; form.

A.  Yes.

(Exhibit 1, Dep. of Matt Denegre, 251:01-19).

Q.  Okay.  Why did you want to get his thoughts on how to move forward
with foreclosure?
A.  I can't recall.
Q.  Was he hesitant to do a foreclosure?
A.  I can't recall.
Q.  Did Super G not want to do a foreclosure?
A.  I can't recall.
Q.  Did you keep after them to do a foreclosure?
A.  Can't recall.
Q.  You can't recall?  You don't recall this email at all?
A.  No.
Q.  And you don't recall any discussions about ACET Global's foreclosure?
A.  I don't recall specifics.

(Exhibit 1, Dep. of Matt Denegre, 140:11-25).

231.  In fact, however, Denegre and Baymark repeatedly requested the collusive foreclosure and

were the driving force behind it.  They were also instrumental in preparing the foreclosure documents:

Q.  Okay.  And did you say, "Steve, I'd like to discuss next steps for ACET
Global and get your thoughts on how to move forward with foreclosure"?
Did I read that correctly?
A.  Yes.

(Exhibit 1, Dep. of Matt Denegre, 139:25-140:04).

Q.  Okay.  And what did you mean by "We are updating the foreclosure
documents"?
A.  I'm not sure.  I'm not sure what documents those are.
Q.  When did you first start preparing foreclosure documents?
A.  I don't know.
Q.  Do you know what documents you were updating?
A.  I don't.
Q.  You don't know what you're referring to?
A.  I do not.

(Exhibit 1, Dep. of Matt Denegre, 146:03-13).

Q.  Okay.  And did you state, "Bill, can you update the sellable inventory list
for ACET inventory; we are updating the foreclosure documents"?  Is that
correct?
A.  Yes.

(Exhibit 1, Dep. of Matt Denegre, 143:23-144:02).

> Q.   If you look below that, there's an email from November 2nd, 2018, in which Mr. Szeto had sent -- there's an email exchange between you, Mr. Steve Bellah and Bill Szeto.  And for sake of clarity, Steve Bellah's email address is spelled out as steve@supergcapital.com. Do you see that?
> A.   I see that.
> Q.   And is the subject line of that email, "ACET fixed assets, inventory list"?
> A.   Yes.
> Q.   Okay.  And was that an email from you?
> A.   Yes, it was.
> Q.   Okay.  Do you know why you were emailing about that?
> A.   I don't recall.  And it would be speculating if I made a call on it.
> Q.   Okay.  But you don't remember -- you don't remember having any email correspondence regarding the ACET foreclosure?
> A.   Well, Super G had requested some documents around ACET's assets. And so –

(Exhibit 1, Dep. of Matt Denegre, 144:15-145:10).

232.  **Denegre's False Testimony.**  Indeed, Denegre and Baymark have falsely testified that they had "nothing" to do with the Foreclosure Sale Agreement:

> Q.   Okay.  But you didn't have anything to do with the actual foreclosure agreement?
> A.   I don't think so.

(Exhibit 1, Dep. of Matt Denegre, 155:25-156:02).

> Q.   Okay.  Let's go down here to the bottom, sir. There's an email here from Alex Godinez on January 29th, 2019, at 5:29 -- 5:23 p.m. to Matt Denegre at baymarkpartners.com.  Is that you, sir?
> A.   Yes, it is.
> Q.   Okay.  And this email from Alex Godinez at Super G Capital to you with the subject line "Windspeed/ACET" says, "Hi Matt, just wanted to follow-up on status for the final version of the foreclosure agreement.  Are we good to finalize?" Did I read that correct, sir?
> A.   You did.
> Q.   Okay.  What is that referring to?
> A.   It's referring to a foreclosure agreement, and I'm not even quite sure what that foreclosure is.  I'm assuming it's related to Super G's foreclosure on ACET.
> Q.   Okay.  Did you have anything to do with that foreclosure agreement?
> A.   I don't think so, other than I provided information to Super G when they requested information about the assets.

(Exhibit 1, Dep. of Matt Denegre, 155:04-24).

233. **Hallett & Perrin Backdated the Foreclosure Sale Agreement**. Although the parties, with the assistance and blessing of their counsel, dated the Foreclosure Sale Agreement and loan documents as of March 1, 2019, the documents had, in fact, not been completed or executed by that time. As Hallett & Perrin has testified:

> Q. So wasn't it, in fact, the case that at least of March 19th, 2019, the loan agreement had not been finalized?
> A. It appears so.

(Exhibit 6, Dep. of Julie Smith, 128:23-129:01).

234. When asked about the Foreclosure Sale Agreement, Hallett & Perrin testified that it was deliberately backdated:

> Q. -- is that right? When was this document actually signed?
> A. I believe the end of March, to be effective as of March 1st.
> Q. Okay. So does it reflect a date that was earlier than the date it was actually executed?
> A. Does the document reflect a date that was earlier than the day it was executed?
> Q. Yes, ma'am.
> A. Yes.
> Q. And was that done intentionally?
> A. Yes.
> A. Yes. And so why is it backdated?

(Exhibit 6, Dep. of Julie Smith, 34:12-24).

235. In attempting to justify the backdating process, Hallett & Perrin testified that it regularly engaged in backdating and that backdating is not uncommon among large, reputable law firms:

> Q. Okay. Other than this transaction, have you ever backdated a document?
>                   MR. PERRIN: Objection, form.
> A. Yes.
> Q. Okay. Is that a standard practice?
> A. I don't know about standard, but it's certainly not uncommon.
> Q. At Hallett and Perrin?
> A. Anywhere.
> Q. What other firms have you worked at?
> A. Gibson Dunn & Crutcher.
> Q. Okay. And your experiences that backdating is a standard practice?

20 MR. PERRIN: Objection, form.
A.  I don't know that I would say standard, but it's not uncommon.
Q.  Okay.
A.  A lot of deals that we do, we're working with other attorneys representing the other side, **it's not uncommon to backdate something**.

(Exhibit 6, Dep. of Julie Smith, 35:07-36:01) (bold added).

236. **Hallett & Perrin Drafts the Foreclosure Sale Agreement to Protect Windspeed.**

Although it was purportedly representing ACET Global, Hallett & Perrin drafted the Foreclosure Sale Agreement to ensure that Windspeed (its other client) did not assume the liability to ACET Venture Partners.

Q.  Okay.  So Section 2.3 of this foreclosure sale agreement that you sent, it states, no assumption of obligations.  Do you see that?
A.  Yes.
Q.  Okay.  And it says, notwithstanding anything to the contrary in this agreement, buyer is not assuming and shall not be liable for any debt, obligation, responsibility, or liability of debtor, seller, or of any other party, whether known or unknown, contingent, or absolute or otherwise, and whether relating to the purchased assets, the excluded assets, or otherwise, including but not limited to any debt, obligation, responsibility, or liability with respect to tax, employment, benefits, personal injury or products, liability claims, equipment leases, license agreements, or contracts. It goes on to state, in furtherance and not in limitation of the foregoing, which seemed to cover everything to me, buyer does not assume any liability of debtor or seller under the loan agreements that certain secured promissory note dated July 20th, 2017, payable by debtor to ACET Venture Partners, LLC in the stated principal amount of 3,230,000 any equipment lease, any license agreement or any other contract or obligation of debtor, its principals, officers, direct directors, or any other party or any other person.

(Exhibit 6, Dep. of Julie Smith, 63:18-64:18).  Hallet & Perrin's email correspondence further bears this out:

| | |
|---|---|
| **From:** | Julie A. Smith |
| **Sent:** | Wednesday, December 19, 2018 10:44 AM |
| **To:** | 'vanderwoude.brian@dorsey.com'; 'whatley.jamie@dorsey.com' |
| **Cc:** | Michelle E. Shriro · Singer & Levick, P.C. (mshriro@singerlevick.com) |
| **Subject:** | Super G/Windspeed· foreclosure sale agreement |
| **Attachments:** | DOCS-#534044-v3-Windspeed-_Foreclosure_Sale_Agreement_(Super_G).DOCX; Windspeed- Foreclosure Sale Agreement (Super G) - Windspeed- Foreclosure Sale Agreement (Super G).pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Brian,

Attached is a revised draft of the foreclosure sale agreement. Most of the changes were to eliminate the bifurcated closing (it is my understanding we will sign and close on the same day) and clean up the document (i.e. defined terms that were not used). There were some substantive changes as well and I am happy to discuss those if you have any questions. Just let me know.

Thanks, Julie

Julie A. Smith
Shareholder
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Direct: 214.922.4113  Fax: 214.953.0053
jsmith@hallettperrin.com | www.hallettperrin.com
Disclaimer

| | |
|---|---|
| **From:** | Julie A. Smith |
| **Sent:** | Thursday, December 27, 2018 1:59 PM |
| **To:** | 'vanderwoude.brian@dorsey.com'; 'whatley.jamie@dorsey.com' |
| **Subject:** | Super G/Windspeed· amendment to loan agreement |
| **Attachments:** | DOCS-#534656-v2-Windspeed-_Amendment_to_Loan_Agreement_(Super_G).DOCX; Windspeed- Amendment to Loan Agreement (Super G) - Windspeed- Amendment to Loan Agreement (Super G).pdf; Business Loan & Security Agreement (10-18-18-).pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Brian,

Attached is a revised draft of the Windspeed/Super G loan agreement. The document Super G provided to you appeared to reference the ACET loan agreement so I revised it to reflect the provisions of the Windspeed loan agreement. In addition, the loan provisions in the amendment were not clear to me and were perhaps inconsistent with each other so I have tried to clarify, but not modify, the loan terms for our better understanding. Note, Baymark has not had a chance to review or comment on these terms and these terms may or may not be acceptable to Baymark. The purpose of this draft is to conform the document to the Windspeed loan agreement and to clarify the terms Super G is proposing.

Windspeed has agreed to acquire the assets of ACET for a purchase price equal to the principal balance of the ACET loan. I know we have used $502,000 as a placeholder in the foreclosure sale agreement, but I'm not sure what the principal balance actually is. Can you provide that number and provide a breakdown, allocating the amount among principal, interest and fees?

For your easy reference, I have attached the current loan agreement between Windspeed and Super G.

Thanks, Julie

Julie A. Smith
Shareholder
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Direct: 214.922.4113  Fax: 214.953.0053
jsmith@hallettperrin.com | www.hallettperrin.com
Disclaimer

From:                Julie A. Smith
Sent:                Tuesday, February 5, 2019 4:36 PM
To:                  vanderwoude.brian@dorsey.com
Cc:                  Michael B. Franklin
Subject:             RE: ACET

Brian,

The foreclosure sale agreement looks good to me. I have asked Windspeed to confirm the inventory and
equipment schedules are in final form, and also for the name and title of the person to sign on behalf of
Windspeed. I'll let you know when I hear from them and we can execute this document.

Do you have an execution version of the A&R loan agreement to circulate? I seem to recall that the only things
that needed to be updated were dates in the document, and a loan number needed to be added to the footer. Just
let me know.

Thanks, Julie

Julie A. Smith
Shareholder
Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Direct: 214.922.4113 Fax: 214.953.0053
jsmith@hallettperrin.com | www.hallettperrin.com
Disclaimer

From: vanderwoude.brian@dorsey.com
Sent: Monday, February 4, 2019 2:48 PM
To: Julie A. Smith
Subject: RE: ACET

Please see the attached version of the agreement and let me know if it is acceptable to you and Windspeed.

Thanks,

Brian

J. Brian Vanderwoude
DORSEY & WHITNEY LLP
300 Crescent Ct, Suite 400 | Dallas, TX 75201
P: 214.981.9953 F: 214.853.5095 C: 214.673.0050
WWW.DORSEY.COM : DALLAS : BIO :: V-CARD

237. **Purchase Price Inexplicably Matches the Super G Note.**  And although Hallett & Perrin

drafted the purported Foreclosure Sale Agreement, its lead attorney on the transaction could not

explain why the purported "purchase price" of (the amount Windspeed would purport to "pay" to

Super G for) the purportedly foreclosed-upon assets was equal to the amount of the Super G Note:

> Q.  Okay.  Why was the purchase price equal to the amount of the ACET loan?
> A.  I think that was the agreement between the parties.
> Q.  Okay.  Why was the purchase price not equal to the value of the collateral?
> A.  You'll have to ask Windspeed that.

(Exhibit 6, Dep. of Julie Smith, 75:01-07).

238.  Nonetheless, the transaction was structured such that the "purchase" price of the assets (the

phantom assets that no longer existed or that Windspeed had already usurped half a year earlier) was

equal to the amount that ACET Global owed to Super G (although the parties have maintained and

testified that the value of the assets had no relationship to the amount owed by ACET Global to Super

G and that Windspeed had no relationship to ACET Global).  For example, as Ludlow has testified:

> Q.  Around the time of the foreclosure and the foreclosure sale, was the amount owed to Super G by ACET Global, was it about 514,000?
> A. If you'll allow me some room, yes, I yes, I think the original note was 785, 750, we paid it down to maybe near 400-ish. But what happens is once you go into default and get – there are these penalties that show up and accrued interest. So it had gone back up to around $500,000 at that time, so yes. That was a long answer longer.
> Q. Makes sense. **But was it about 514,515 at that time?**
> **A. Upon foreclosure when they were going to do it, yes.**
> **Q. And that amount that was owed to Super G by ACET, that was not correlated with the value of ACET Global's assets, correct?**
> **A. Correct.**
> Q. Those were two just totally distinct things?
> A. The assets that they took in foreclosure were vastly less valuable than the loan.
> Q. Okay?

(Exhibit 3, Dep. of Tony Ludlow, 174:08-175-04) (bold added).

239.  **Super G and Cole Give Conflicting Testimony.**  Super G and Cole, however, testified that

"Windspeed believed there was more than $516[,000] in value" in ACET's assets:

> A.   I believe they thought the value exceeded or equaled what they were paying, which is what rational folks do, which was a note for $516,000.
> Q.  (BY MR. FREEMAN)  Did they ever indicate that to you?
> A.  Well, they indicate it by signing up for the liability.  So that was the best offer that we had received for the assets.
> Q.  So their actions indicated to you that they valued the assets at $516,000 or more?
> > MR. BLAKLEY: Objection, form.
> > MS. HARD-WILSON: Objection, form.
> A.  Yes.

(Exhibit 8, Dep. of Marc Cole, 54:08-20).  The conflicting testimony underscores the lack of candor

and fidelity to their oath by Baymark and Szeto.

240.  **Mr. Szeto Executes Foreclosure Sale Agreement.**  In late March 2019, Szeto (on behalf

of Windspeed) and Cole (on behalf of Super G) executed a Foreclosure Sale Agreement by which

Windspeed purported to purchase all of ACET Global's inventory (the inventory that Windspeed had

already been advertising and selling for many months). ACET Global purportedly owed Super G approximately $514,515. Windspeed did not pay out of pocket; instead, Super G Capital "sold" Windspeed the inventory for a loan in the amount of $514,144.86. Super G, of course, had warrants to 40% of the membership of Windspeed. BP Management had warrants to another 40% of the membership. The Foreclosure Sale Agreement was backdated to reflect a date of March 1, 2019.

241.  **OMG!**  As the transaction neared an end, Hallett & Perrin emailed Denegre to congratulate him on the transaction:

> **From:** Julie A. Smith
> **Sent:** Thursday, March 21, 2019 12:30 PM
> **To:** Matt Denegre
> **Subject:** FW: Windspeed/Super G- loan agreement
>
> Matt,
>
> These changes are fine with me if the numbers look correct to you. Just let me know.
>
> OMG, we could be close to signing this thing!
>
> Julie
>
> Julie A. Smith
> Shareholder
> Hallett & Perrin, P.C.
> 1445 Ross Avenue, Suite 2400
> Dallas, Texas 75202
> Direct: 214.922.4113 Fax: 214.953.0053
> jsmith@hallettperrin.com | www.hallettperrin.com
> Disclaimer

242. Notably, however, the transaction at issue (*i.e.,* the Foreclosure Sale Agreement) was directly between Windspeed and Super G.   Hallett & Perrin (Smith) now maintains that it has never represented Windspeed.  Denegre maintains that he has never had anything to do with Windspeed and knows very little about it.  Amazingly, the two were congratulating themselves in March of 2019 as it appeared close that they ("we") could be close to signing the Foreclosure Sale Agreement—which, again, ended up reflecting a date of March 1, 2019.

## The Bankruptcy

243. **A Fraudulent Bankruptcy Petition.**  In 2019, Baymark (Ludlow and Hook, signing on behalf of Baymark ACET Holdco, LLC) filed a bankruptcy petition on behalf of ACET Global.  In their sworn statement, they acknowledged that Plaintiff had a valid $3.2 million claim against ACET Global.  In that bankruptcy petition, they also informed the bankruptcy court of the value of the assets that ACET Global had transferred to Super G: $30,000.

244. Baymark and Ludlow filed the ACET Global bankruptcy petition listing *Baymark's* address at 5700 Granite Parkway in Plano, Texas, not ACET Global's address (which was 1501 10th Street Suite 100 Plano, Texas 75074).  Ludlow falsely used the address of Baymark to ensure that it would maintain control over the bankruptcy.

245. Denegre and Ludlow specifically reviewed the bankruptcy petition before filing it.[66]

246. Hook, however, maintains that he did not know anything about anyone filing a bankruptcy for ACET Global—despite the fact that he was the president of the company:

> Q.  Okay.  Has Mr. Ludlow ever told you that he did not sign the bankruptcy petition that was filed for ACET Global?
> A.  No.
> Q.  Have you ever had any discussion with him about ACET Global's bankruptcy?
> A.  No.
> Q.  Okay.  Did you ever discuss with anyone ACET Global's bankruptcy?
> A.  No.
> Q.  Have you ever discussed the possibility that ACET Global might go into bankruptcy?
> A.  I don't recall.

(Exhibit 7, Dep. of David Hook, 22:12-24).

---

[66]     9 Q. Okay. And did you see this document before it
        10 was filed?
        11 A. I did.
        12 Q. Did anyone ask for you input on this document?
        13 A. Yes.
        14 Q. Did anyone ask you to review it?
        15 A. I would have been involved reviewing it.
        (Exhibit 1, Dep. of Matt Denegre, 228:09-15)

247. But the reality is that Hook knew that the plan was to place ACET Global into bankruptcy from the beginning. Indeed, he was openly discussing it with Ludlow in 2017:

On Dec 13, 2017, at 1:19 PM, David Hook <dhook@baymarkpartners.com> wrote:

The guys said everyone had a good time for the $680 dinner. I think is went great.

What about bankruptcy for ACET?

David J. Hook
Managing Director
**Baymark Partners**
Granite Park II
5700 Granite Parkway
Suite 435
Plano, Texas 75024
www.baymarkpartners.com
Direct: 972-991-5457

1

**From:** Tony Ludlow
**Sent:** Wednesday, December 13, 2017 12:38 PM
**To:** David Hook
**Subject:** Check in

Conference is good. Am I missing anything? I enjoyed our dinner. We should do it again. How much was it?

Best regards,

Tony Ludlow, CPA, JD
Baymark Partners
(w) 972.991.5457
(c) 214.578.1296

248. Hook also falsely maintains that he and Baymark have never and would never threaten a creditor with a bankruptcy as leverage:

> Q. Okay. Do you think -- have you ever used the threat of bankruptcy as leverage against a creditor?
> A. I do not believe I have in almost 40 years of being involved in companies.
> Q. Do you think that would be wrong, or you've just never done it?
> A. I think it would be -- will you repeat the question, please?
> Q. Yeah. Do you think it would be wrong to use the threat of bankruptcy against a creditor?
> A. It depends on the circumstance.
> Q. And can you explain what you mean by that?
> A. Well, I -- I'd have to have what the circumstance is.
> Q. Okay. Let's say a creditor is owed money by a company. Do you think it is okay for that company's directors to threaten bankruptcy?
>                   MR. PERRIN: Objection, form.
> A. In almost all cases I would say that...
> Q. (By Mr. Freeman) In almost all cases you would say that. That is your answer or --
> A. We have no interest in -- in doing any kind of acts like that.

(Exhibit 7, Dep. of David Hook, 24:24-25:22).

249. Nonetheless, Hook utilizes the threat of bankruptcy whenever it provides him with leverage.

> Q. (By Mr. Freeman)  Okay.  But you don't recall ever having discussions about -- about ACET Global being put into bankruptcy?
> A. No.
> Q. At any point?
> A. No.
> Q. Sir, if you will, I'm putting up what's Exhibit 34.  It's marked as Exhibit 34.  Do you see this, sir?
> A. Uh-huh.
> Q. And this is an email exchange between you and Tony Ludlow?
> A. Yes, it is.
> Q. And is it an email exchange in December of 2017?
> A. December '17, yes.
> Q. Okay.  And if you'll go down to the email from you, at the bottom of the first page, on December 13, 2017 from -- from David Hook, it says DHook@BaymarkPartners.com.  Is that your email address?
> . . .
>
> Q. (By Mr. Freeman)  Okay.  And there on the second line of that, **you said "what about bankruptcy for ACET?"**
> **A. Yes.**
> **Q. Do you see that?  Is that a correct reading of your email?**
> **A. Yes.**
> Q. Okay.  And what did you mean by that?
> A. I don't recall.
> Q. Okay.  And you don't recall having any discussions at all about the possibility of ACET Global going into bankruptcy?
> A. No.
> Q. Okay.  You don't recall having any of those discussions with Tony Ludlow; correct?
> A. No.
> Q. Okay.  Do you recall Mr. Ludlow's response in which he said it may be an option if Super G doesn't agree to reduce payments?
> A. That's what it says, uh-huh.

(Exhibit 7, Dep. of David Hook, 26:07-27:25) (bold added).

250. Indeed, Ludlow and Hook regularly made threats to shut businesses down to gain leverage against creditors.  For example, they made these threats to numerous ACET Global creditors, given their eagerness to move forward with the Windspeed conversion.  Below is a screen shot of one such threat:

From:           Tony Ludlow
Sent:           Thursday, March 15, 2018 11:01 AM
To:             David Hook
Cc:             Matt Denegre
Subject:        Re: FedEx. And DHL Payments (ACET)

Yep, defiantly an option. We can strategize and then get back with them.

Best regards,

Tony Ludlow, CPA, JD
Baymark Partners
(w) 972.991.5457
(c) 214.578.1296

On Mar 15, 2018, at 9:55 AM, David Hook <dhook@baymarkpartners.com> wrote:

    Maybe we tell them to stop or we shut the company down and they wont get anything.

    David J. Hook
    Managing Director
    **Baymark Partners**
    Granite Park II
    5700 Granite Parkway
    Suite 435
    Plano, Texas  75024
    www.baymarkpartners.com
    Direct: 972-991-5457

251.  Baymark, Ludlow, and Denegre used the bankruptcy as an attempt to wash their hands of the fraud—ultimately, completing the fraudulent scheme.  In the process, Ludlow and Denegre deliberately caused the bankruptcy petition to present a number of glaring and materially false statements.

252. **Ludlow Falsely Represents that He is ACET Global's President.**  Ludlow falsely represented that he was the president of ACET Global.  In fact, he was not, and thus the bankruptcy petition was not authorized in the first place.

253. In the section of the bankruptcy petition titled, "Details About the Debtor's Business or Connections to Any Business," Ludlow, Denegre, and Baymark set forth a number of materially false statements designed to hide the fraud from creditors, trustees, and the court.

254. For instance, the second question in that section, Question No. 26a, was titled "Books, records, and financial statements" and required them to "List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case."  The question and their response follows:

**26. Books, records, and financial statements**
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

■ None

| Name and address | Date of service From-To |
|---|---|
| | |

255.  Despite their knowledge that Lin and Szetzo had maintained these records, Ludlow and his co-conspirators answered, **"None."**[67]  This was hidden to divert attention from persons with knowledge of the events described herein.

256.  The next question, No. 26b, stated, "List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case." The question and their response follows:

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

■ None

257. Despite having directed Lin to prepare multiple financial statements in the months before filing, Ludlow and his co-conspirators answered, "None."  They did so to prevent the Bankruptcy Trustee from fully investigating the matter, to misuse the bankruptcy system and to carry out their fraud.

258. The next question, Question No. 26c, required them to "List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed."  The question and their response follows:

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1.  Matt Denegre 5700 Granite Parkway Suite 435 Plano, TX 75024 | |

---

[67] If Szeto's testimony were true, that could be because they had deliberately failed to inform him about the $3.2 million D&T Note.

259. Ludlow and his co-conspirators falsely stated, "Matt Denegre," a co-conspirator, despite the fact that they knew that the books of accounts and records remained in the possession of Windspeed, Szeto, and Lin, and that Denegre did not in fact have possession of them.

260. On the next question, Ludlow caused the bankruptcy petition to falsely state that no inventories of ACET Global had been taken within two years before filing the bankruptcy. Specifically, Question No. 27 asked, "Have any inventories of the debtor's property been taken within two years before filing this case." The question and their response follows:

**27. Inventories**
Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

261. Ludlow and his co-conspirators answered, "No," although they were aware that all of the debtor's property and inventories were taken only months before. Indeed, Denegre has since admitted to this false statement:

> Q. (BY MR. FREEMAN) Right. So within two years before that case, before that date, had an inventory of ACET Global's property been taken?
> A. Yes

(Exhibit 1, Dep. of Matt Denegre, 233:23-234:01).

> Q. And that question asks, "Have any inventories of the debtor's property been taken within two years before filing this case," correct?
> A. I read that.
> Q. And it says "no" as the answer?
> A. Correct.
> Q. Okay. Is that a correct statement or false statement?
>        MR. PERRIN: Objection; form.
> A. Have any inventories of the debtor's property been taken within two years -- well, given there was a foreclosure, I'm not sure if that's -- if there was a foreclosure, then I'm assuming the answer would have been yes.

(Exhibit 1, Dep. of Matt Denegre, 231:03-16).

262. In fact, Ludlow and Denegre specifically discussed the inventory just days before, evidencing that they deliberately and knowingly provided a false answer to the question on the bankruptcy petition.  Confronted with indisputable evidence, Denegre has admitted under oath that Ludlow and he exchanged copies of an inventory that had been taken in 2019 (months before the bankruptcy) and that Ludlow had asked to discuss these documents with him several days before the bankruptcy petition was filed.

> Q. Okay. If we look down below, is that an email from Tony Ludlow to you on October 15th, 2019, with the subject line "Bankruptcy"?
> A. Yes.
> Q. Okay. And does he say to you, "Let's discuss today"?
> A. Yes, he does.
> . . .
> Q. Okay. If this document was filed with a Federal court on October 23rd, 2019, this email in which you forward both the Voluntary Bankruptcy Petition and the foreclosure sale -- bill of sale with the inventory of ACET Global's assets to Mr. Ludlow just a few days before, correct?
>                  MR. PERRIN: Objection; form.
> A. So the date on this email says October 16th, 1 2019?

(Exhibit 1, Dep. of Matt Denegre, 242:13-19; 245:18-246:01).

263. Ludlow's testimony also implicates the fact that he had reviewed the inventory listing just days before he filed a bankruptcy petition that knowingly stated that no inventory had been taken or existed.

> Q. Does this appear to be an e-mail from Matt Denegre to you?
> A. Yes, it does.
> Q. And it's on **October 16th, 2019**?
> A. Um-hum.
> Q. And it's got a **Subject line of "Bankruptcy" and has a number of attachments?**
> A. It does.
> Q. And does this appear to be a true and correct copy of the e-mail reflected here?
> A. It appears authentic, yes.
> Q. And among those attachments, was there a Bill of Sale attached?
> A. That would indicate that there was. I don't see it there but that's not on there unless there is an attachment so I assume there was.
> Q. I'll scroll down on it in just a second. But a number of other attachments as well?
> A. Yes.
> Q. (Scrolling.) Does that appear to be the Bill of Sale that's referenced?

A. It does, yes.

Q. Was -- **does that Bill of Sale list or have as an attachment to it an inventory of ACET Global's assets**?

A. Well, again. The word "inventory," here. **So that says "Inventory."**

. . . But, yes, it appears to be a list of stuff.

(Exhibit 3, Dep. of Tony Ludlow, 150:18-151:24) (bold added).

264. Indeed, just days before filing the Bankruptcy petition, Denegre and Ludlow had discussed the inventory issues in depth, and Denegre had forwarded a copy of the inventory items to Ludlow again on October 16, 2019.  An excerpt of that email is pasted below:

| | |
|---|---|
| **From:** | Matt Denegre |
| **Sent:** | Wednesday, October 16, 2019 9:44 AM |
| **To:** | Tony Ludlow |
| **Subject:** | RE: Bankruptcy |
| **Attachments:** | Bill of Sale (executed).pdf; Baymark ACET Holdco LLC - 2018 Form CLNT.pdf; Baymark ACET Holdco LLC - 2017 Form 1065 CLNT.PDF; Declaration.pdf; Schedule A-B.pdf; Schedule D.pdf; Schedule E-F.pdf; Schedule G.pdf; Statement of Affairs.pdf; Voluntary Petition.pdf; Unsecured Creditors.xlsx |

Tony, attached are the bankruptcy documents.  A few of these need your signature after you review.

- Petition (needs your signature)
- Petition Declaration (needs your signature)
- Schedule A/B
- Schedule D
- List of creditors with unsecured claims (this is for Schedule E/F)
- Schedule G
- ACET Tax Returns (2017, 2018).  The company did not exist in 2016.  This is for Part-1, Statement of Affairs
- Bill of Sale.  This is for Part 2.5, Statement of Affairs
- Statement of Affairs (needs your signature)

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

**From:** Tony Ludlow <tludlow@baymarkpartners.com>
**Sent:** Tuesday, October 15, 2019 11:23 AM
**To:** Matt Denegre <mdenegre@baymarkpartners.com>
**Subject:** FW: Bankruptcy

Matt,

Lets discuss today.

Best Regards,

**Tony Ludlow, CPA, JD**
Managing Director

**Baymark Partners**
W 972.991.5457  C 214.578.1296
www.BaymarkPartners.com

1

265. That email contained a multi-page inventory of ACET Global's assets.  Among the inventories was, for example, an inventory of ACET Global's assets dated January 28, 2019.  An excerpt of that particular ACET Global inventory that was exchanged between Denegre and Ludlow just days before

they filed a fraudulent bankruptcy petition claiming that no inventory had been taken with two years of the October 2019 bankruptcy filing is pasted directly below:

**EXHIBIT 1**

**INVENTORY**

| Inventory 01-28-2019 | On Hand |
|---|---|
| 10734 (Romantic Mystery Necklace) | 1 |
| 30219 (Tear of A Fairy Bracelet) | 21 |
| A-0927Black (Wood Spinner Black) | 137 |
| A-0927Blue (Wood Spinner Blue) | 115 |
| A-0927White (Wood Spinner White) | 197 |
| A-0927Yellow (Wood Spinner Yellow) | 246 |
| A-1179 (Vehicle Windshield Protector with Double Waterproof Coat and Magnetic Clips) | 0 |
| A-139Double L (Double O Swim Suit - L) | 1 |
| A-139Eye S (Eye See Curves Swim Suit - S) | 6 |
| A-139Polka S (Polka Dot Swim Suit - S) | 4 |
| A-139Sassy L (Sassy Classy Swim Suit - L) | 1 |
| A-139Sassy M (Sassy Classy Swim Suit-M) | 9 |
| A-139Sassy S (Sassy Classy Swim Suit - S) | 6 |
| A-1622BLK (Anti-radiation tempered glass screen protector- Black) | 1 |
| A-1622WHT (Anti-radiation tempered glass screen protector- White) | 9 |
| A-1968Blue (Bat Wing Spinner Blue) | 6 |
| A-1968Green (Bat Wing Spinner Green) | 199 |
| A-1968Yellow (Bat Wing Spinner Yellow) | 64 |
| A-2016ZOrange-N (Waist Belt ) | 8 |
| A-3168 red (Bunny coin wristlet purse) | 3 |
| A-3168 tan (Bunny coin wristlet purse) | 1 |
| A-3168Bunny (Memo Holder) | 21 |
| A-3220 BLACK (LED LIGHTED CELL PHONE CASE) | 188 |
| A-3220 WHITE (LED LIGHTED CELL PHONE CASE) | 139 |
| A-4991Black-8P (Self Mounting Case- BLACK 6P) | 34 |
| A-4991White-8P (Self Mounting Case- WHITE 6P) | 37 |
| A-5 (Water Bag- for drinking backpack) | 15 |
| A-5000 GREEN (Water bag for drinking backpack) | 1 |
| A-5157Black (LED Fidget Spinner Black) | 1 |
| A-5157Yellow (LED Fidget Spinner Yellow) | 2 |
| A-5252- BLU (Wrist Wallet) | 1 |
| A-5252- RED (Wrist Wallet) | 8 |
| A-6152 black (vintage bag) | 6 |
| A-6211GRN (Bluetooth LED spinner) | 3 |
| A-6211PNK (Bluetooth LED spinner) | 29 |

266.  Moreover, Ludlow and his co-conspirators falsely answered the next question: Question No. 28, requires "List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case."  Indeed, Denegre has since admitted to this false statement:

28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Baymark ACET Holdco, LLC | 5700 Granite Parkway Suite 435 Plano, TX 75024 | Sole Manager | 100% |

267. They listed only "Baymark ACET Holdco, LLC," in an attempt hide other persons from the trustee or any creditor regarding the matter.

268. Ludlow and his co-conspirators then falsely answered the next question. Question No. 29 asked, "Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions."

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

■ No
☐ Yes. Identify below.

269. Ludlow and his co-conspirators then falsely answered the next question. Question No. 30 was titled "Payments, distributions, or withdrawals credited or given to insiders." It asked, "Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised."

30. **Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

■ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|

270. Ludlow and his co-conspirators then falsely answered the next question. Question No. 31 asked, "Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes." ACET Global's tax reporting was rolled up into the tax return of ACET Holdco.

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

■ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer identification number of the parent corporation |
|---|---|

271. Ludlow signed the bankruptcy petition directly below this section, and directly under a "WARNING – Bankruptcy fraud is a serious crime. Making a false statement, concealing property,

or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both." In doing so, he falsely stated that his position was "President."

272. Question No. 20 "Off-premises storage" "List any property kept in storage units or warehouses within one year before filing this case." Ludlow and his co-conspirators falsely answered "None" to hide the fraudulent transfer of assets for their benefit.

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

■ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|

273. Question no 18, "Closed financial accounts," "Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred." Ludlow and his co-conspirators referred only to accounts they claimed were closed in "2018" and that had "0" balances:

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☐ None

|  | Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | Texas Capital Bank 2000 McKinney Avenue Suite 700 Dallas, TX 75201 | XXXX-2956 | ■ Checking ☐ Savings ☐ Money Market ☐ Brokerage ☐ Other___ | 2018 | $0.00 |
| 18.2. | Texas Capital Bank 2000 McKinney Avenue Dallas, TX 75201 | XXXX-2972 | ■ Checking ☐ Savings ☐ Money Market ☐ Brokerage ☐ Other___ | 2018 | $0.00 |

274. However, Szeto closed three ACET Global bank accounts in 2019, after diverting funds from those accounts to Windspeed. (Exhibit 31). He closed the accounts using his Windspeed letterhead. A screen shot of the letter is reflected below:

## WINDSPEED TRADING, LLC

1761 INTERNATIONAL PARKWAY, SUITE 133                    RICHARDSON, TEXAS 75081

January 10, 2019

Please close the following three accounts under ACETGlobal LLC, effective immediately.
Thank you

#1111202956
#1111202972
#1111202964

William C Szeto, P.E.
President & CEO,
Windspeed Trading, LLC
Richardson, Texas, 75081

275. Question No. 13 – "List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security." Ludlow and his co-conspirators provided a false answer: "None."

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

■ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|
| | | | |

276. Among other false statements, they had just recently caused the transfer of all of ACET Global's assets to Windspeed, a company in which they and Super G had a combined 80-percent economic interest. Ludlow and Hook had previously filed a tax return stating that ACET Global had

paid a management fees of $112,500 to another company that Ludlow and Hook wholly owned.  In testimony, Hook could not explain this discrepancy:

> Q.  (By Mr. Freeman)  Okay.  On Baymark ACET Holdco, LLC's tax return, if you'll look at the twentieth page of the PDF, there's a line for a management fee?
> A.  Yes.
> Q.  Management fee of $112,500; is that correct?
> A.  Yes.
> Q.  Did you report that expense to the federal government?
> A.  That's what the tax return says.
> Q.  Okay.  Now, are you aware your lawyers have represented that there was no management fee?
>          MR. PERRIN: Objection, form.
> A.  I don't recall us ever taking a management fee out of the company.
> Q.  (By Mr. Freeman)  Okay.  Why is -- why is Baymark ACET Holdco taking a deduction for $112,500?
> A.  I don't know.

(Exhibit 7, Dep. of David Hook, 159:04-21).

277. Question No. 14 required that Ludlow and his co-conspirators "[l]ist all previous addresses used by the debtor within 3 years before filing the[e] case and the dates the addresses were used." They checked "Does not apply."

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

278. Question No. 8 required that Ludlow "[l]ist any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case." He checked "None."

8. **Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

Official Form 207                    Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                                     page 2

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                                                     Best Case Bankruptcy

---

Case 19-42878   Doc 1   Filed 10/23/19   Entered 10/23/19 15:24:30   Desc Main
Document   Page 20 of 29

Debtor   **ACET Global, LLC**                                        Case number (if known) _____

■ None

279. Question No. 5, required that Ludlow list the "value of property" obtained by a creditor within 1 year before the bankruptcy.

5. **Repossessions, foreclosures, and returns**
List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☐ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|
| Super G Capital<br>23 Corporate Plaza Drive<br>Suite 100<br>Newport Beach, CA 92660 | Personal property | 01/2019 | $30,000.00 |

280. Ludlow falsely stated that the property was valued at "$30,000" and that the transfer was made "01/2019."   Ludlow   knew   this   was   false.   In   fact,   at   around   the   same   date   that   he   signed   the bankruptcy petition, Ludlow signed another document (a federal tax return) stating that ACET Global's assets were in excess of $3.1 million.[68]

> Q. But basically. Any reason to believe that anything recorded in this return
> is false or incorrect?
> A. Not materially, no.
> Q. And there's a -- particularly a Schedule L,
> A, which is the balance sheet.
> A. Yep.
> Q. And it states that there was a beginning --beginning balance for "Total
> assets," if you look here at line 14B, a beginning balance in 2019 of a little
> over $3 million in assets?
> A. Yeah, I see it.

---

[68] (Exhibit 3, Dep. of Tony Ludlow, 121:14-122:11; 123:12-24).

Q. And do you believe that to be -- have been correct?
A. Well, yes.

(Exhibit 3, Dep. of Tony Ludlow, 134:08-21)[69]

281. In addition, Ludlow had caused Windspeed to purport to purchase the assets at issue for $514,144 just a few months before.

282. Question No. 4 stated: "Payments or other transfers of property made within 1 year before filing this case that benefited any insider."   "List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider . . . Insiders include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliated; and any managing agent of the debtor."

---

[69] This was also consistent with the 2018 tax return filed by Hook.

> Q. (By Mr. Freeman)  Okay.  If you'll look down there within Schedule L, there is a line, line And if you will look over to the right, there's a -- there's a box for the end-of-the-year value.
> A. That's right, uh-huh.
> Q. And did you report to the federal government that there were assets of $3.169 million as of 12-31-2018?
> A. Intangible assets.
> Q. Right?
> A. Yes.
> Q. Okay.  And that's what you reported to the federal government was held by Baymark ACET Holdco, LLC as of 12-31-2018; correct?
> A. Correct.
> Q. Okay. And all that you're aware of it holding is its interest in ACET Global, LLC; correct?
> A. Like I said, probably.
> Q. Right.  And you were the president of that company; correct?
> A. Correct.

(Exhibit 7, Dep. of David Hook, 158:03-23).

4.  **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
    List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed

Official Form 207                    Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                    page 1

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

---

Case 19-42878    Doc 1    Filed 10/23/19    Entered 10/23/19 15:24:30    Desc Main
Document    Page 19 of 29

Debtor    **ACET Global, LLC**                                    Case number *(if known)*

or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

■ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|

5.  Repossessions, foreclosures, and returns

---

283. Ludlow and his co-conspirators falsely and knowingly answered the question, "None."

284. Ultimately, Ludlow and Baymark caused and oversaw the transfer of all of ACET Global's assets to Windspeed in 2018—approximately one year prior to causing a fraudulent bankruptcy petition to be filed. Ludlow sat on the Windspeed board. Ludlow and Hook held themselves out as officers of ACET Global. Baymark controlled Windspeed and beneficially owned 40% of Windspeed. Ludlow, Hook, Denegre and all of the Baymark-affiliated defendants were insiders. Likewise, Super G beneficially owned 40% of Windspeed. Super G held a board seat on Windspeed. It exercised an extraordinary degree of control under highly unusual circumstances. Courts have held that creditors with unusual influence are insiders. *See e.g., In re Tankersley*, 382 B.R. 522 (Bkrtcy. D. Kan. 2008). Likewise, Szeto held himself out as the CEO and president of ACET Global and Windspeed. Szeto was an insider as well. Yet Ludlow, Denegre, and the Baymark Defendants deliberately failed to disclose this.

## Super G's Attempt to Cover Up the Fraud

285. In early 2019, Damti called Bellah to inform Bellah that Baymark had started Windspeed, thinking Damti's and Super G's interests were aligned (*i.e.*, not knowing of the collusive fraud). Bellah,

however, stated that he was unaware of Windspeed—despite the fact that Bellah was already serving as Super G's board manager of Windspeed. He indicated that Super G had no interest in pursuing any action against Baymark. His statements were designed to deliberately mislead Damti, the principal of D&T Partners.

286. Super G employed questionable and fraudulent tactics to avoid sharing information during the investigation of this matter. For example, Super G and Cole employed an attorney who sent the following email to undersigned counsel:

**From:** Tim Silvestre <tsilvestre21@gmail.com>
**Date:** Wednesday, March 10, 2021 at 7:59 PM
**To:** Ryan Dean <rdean@freemanlaw.com>, Jason Freeman <Jason@freemanlaw.com>, Zach Montgomery <zmontgomery@freemanlaw.com>, Evan J. Davis <davis@taxlitigator.com>
**Subject:** Super G Capital, LLC

Gentlemen, with respect to the operational status of Super G Capital, LLC (the "**Company**"), I have been informed as follows:

· The Company is no longer in business, has no employees or operations and is the process of liquidating all assets/covering remaining liabilities;

· Marc Cole is not an employee of the Company and has been simply assisting its founder, on an unpaid basis, in this wind down process;

· The Company's founder suffers from a terminal illness and is not functional at this time;

· Mr. Cole may have access to a portion of the written documents addressed in your production subpoena but he is no longer on the Company's email server.

Regards, Tim

(Exhibit 41, Email with Super G Counsel). The highly irregular and untrue claims underscore the Defendant's obstructionist efforts and further evidence the fraud.

### The Rest of the Cover Up

287. Baymark ACET Holdco LLC and the Baymark Defendants made yet another admission. In 2019, they reported to the IRS that they received "Proceeds (sales price)" of "$2,907,290" from a "SALE FROM FORECLOSURE" for a transaction in 2019 on assets that were "acquired" on "07/21/17" (the date of the APA).

288. **Ludlow States "Shut the Fuc\* Up" During Denegre's Deposition.** During the deposition testimony of Denegre in a separate matter—immediately after a question regarding the importance of the fraudulent foreclosure—Ludlow interrupted during Denegre's testimony, stating **"Matthew, shut the fuc\* up."**[70] Following this statement, Denegre "could not recall" further facts or information about the foreclosure.

289. **Ludlow is a licensed attorney and CPA in the state of Texas**.  In Ludlow's subsequent deposition, he compounded his bad faith and lack of candor by falsely claiming that he made the statement because he believed that Denegre had already answered the question.  Ludlow testified as follows on the point:

> Q. Were you concerned at all about the content of his response?
> A. No, because -- again, I'm going from memory. I think he'd already answered a couple of times. I don't want to guess. The record will show if that's true or not. From what I remember, I think he had already answered two or three times. So I wasn't worried about the fourth answer, I guess.

(Exhibit 3, Dep. of Tony Ludlow, 74:12-19).

290. Ludlow's testimony was false.   The transcript of Denegre's testimony reflects—quite literally—that Denegre had not answered the question:

> Q. Okay.  Why did you believe the foreclosure was important?
>          MR. PERRIN: Objection; form.
> A. When did I indicate that?
> Q.  (BY MR. FREEMAN) Well, did you believe it was important?
> A.   **I'm not sure I have an answer to that.**
> Q.   Why do you not have an answer to that?
> A.   It was important for closure on the business.
>          MR. LUDLOW: Matthew, shut the fuck up.

(Exhibit 1, Dep. of Matt Denegre, 128:17-129:01) (bold added).

291.  Ludlow, after being confronted with his false testimony to cover up his prior obstruction, testified as follows:

---

[70] *See* Exhibit 1, Dep. of Matt Denegre, 128:17-129:01.

Q (BY MR. FREEMAN) You had -- I had asked about the outburst during Mr. Denegre's deposition and my understanding from your testimony was you were concerned that I might have been going a little hard on him.

A. Yeah, it was more of an emotional response than what you were doing. Concern for Matt.

. . .

A.  I just had frustration over the fact that -- for Matt because it looked like -- I could see the look on his face, and he was -- like I said, he has trouble hearing, and he was leaning in, and so **it was just -- a question that was asked, but I believe it was answered a few times, and asked. As you do, you ask the same question multiple different ways, and so I felt he had answered the question.** So I was saying that it's -- to myself, if I was Matt, it's okay. Just be quiet. You've said enough.

Q. Okay. It wasn't a concern that the answer he was giving was sensitive, problematic?

A. No. No. As a matter of fact, well -- I don't know, I'm sure you've asked me or will ask me the same questions, and I'm sure we can cover can it. I don't know what his answers were to those questions or those that you come back around to, so...

(Exhibit 3, Dep. of Tony Ludlow, 127:21-129:20) (bold added).

292. Ludlow's partner, Hook (who serves as the managing member of Baymark), has testified that he has no opinion on whether Ludlow's statements—"Matthew, shut the fuc* up"—made during Denegre's deposition were appropriate or inappropriate.[71]

293. **Szeto and Baymark Deleted all ACET Global Emails**.  In addition, Szeto and Baymark deliberately caused the loss and destruction of key ACET Global emails and electronic evidence. Indeed, even though they knew that they had just caused a breach of the $3.2 million D&T Note, the parties ensured that ACET Global's emails and electronic files would be destroyed.  The obligation to

---

[71]    Q.  . . . Would -- do you approve of Mr. Ludlow's instruction to Mr. Denegre during his deposition?

                MR. PERRIN: Objection, form.

A.  I -- I don't know.

Q. (By Mr. Freeman)  You don't have an opinion on whether it was appropriate to make the statement "shut the fuck up"?

A.  No, I don't know the other circumstances in the conversation.

Q.  Okay.  So you don't have an opinion on whether it was appropriate for Mr. Ludlow to instruct Mr .Denegre to shut up during his deposition?

                MR. PERRIN: Objection, form.

A.  No.

(Exhibit 7, Dep. of David Hook, 11:03-16).

safeguard the evidence at that time was unequivocal.  But, of course, they caused the destruction of the evidence because they had just executed a fraudulent transfer of all of ACET Global's assets and business operations to Windspeed—they wanted to destroy evidence that would lead back to them. This occurred while at least three people were holding themselves out as "president" of ACET Global: (i) Hook; (ii) Ludlow; and (iii) Szeto.  And Denegre had purported to exercise the authority to fire ACET's CEO.  Szeto testified under oath as follows regarding lost emails:

> Q. So you lost all of your ACET Global emails around the time that you started Windspeed?
> A. Yes.
> Q. And that you lost all of the employees' ACET Global emails about the time you formed Windspeed?
> A. Yes.
> Q. Did you make a backup of those emails?
> A. No.
>           MS. HARD-WILSON: Objection, form.
> A. We did not make a backup of those emails.

(Exhibit 2, Dep. of William Szeto, 124:11-20).

> Q. So all of your ACET Global emails were gone? A. As far as I know, they were all gone.
> Q. And that's all your correspondence with Matt Denegre?
> A. As far as I know, all emails were gone when we stop paying them.
> Q. And your correspondence with David Hook was all gone?
>           MR. PERRIN: Objection, form.
> A. I don't think there was any exception. They were all gone, yes.
> Q. (BY MR. FREEMAN) So also all of your correspondence with Tony Ludlow was gone?
>           MR. PERRIN: Objection, form.
> A. Yes.
> Q. (BY MR. FREEMAN) And all your correspondence with Baymark Partners was gone?
>           MR. PERRIN: Objection, form.
>           MS. HARD-WILSON: Objection, form.
> A. Yes.
> Q. (BY MR. FREEMAN) All your correspondence with Super G was gone?
>           MS. HARD-WILSON: Objection, form.

(Exhibit 2, Dep. of William Szeto, 123:03-25).

> 17 A. That the emails on their server were cleared
> 18 out because of nonpayment. They don't hold that data

19 after a certain amount of time.
20 Q. So those emails had all been deleted?
21 A. If you want to call it deleted, I guess that's
22  he appropriate way. They don't keep data after a
23  certain amount of time.
24. Those emails had been destroyed, correct?
25 MR. PERRIN: Objection; form.
1A. Yes, the third-party website or hosting site
2 would have gotten rid of those emails.

(Exhibit 2, Dep. of William Szeto, 260:07-261:0).

294. Ludlow, the president of ACET, indeed confirms that they took no steps to secure the emails

or electronic data:

> Q. . . . Did Bill indicate that he had taken any steps to preserve all of those
> ACET Global e-mails in October of 2018 when ACET Global defaulted on
> the seller note?
> A. No, he didn't.
> Q. And did you take any steps to secure those ACET Global e-mails in
> October of 2018 or thereafter around the time that ACET Global had
> defaulted on the seller note?
> A. No.
> Q. Did anyone from ACET Global take any steps to preserve those e-mails?
> A. No steps were taken after the nonpayment.

(Exhibit 3, Dep. of Tony Ludlow, 122:02-13).  The emails were deleted to cover up and further the

fraud.

295. **Windspeed Deleted its Website**.  Following the depositions of Windspeed employee and

Szeto, in which undersigned counsel raised questions about Windspeed's website (and noted the fact

that it was a carbon copy of ACET Global's prior website), the Defendants caused Windspeed's

website to be completely removed from publication on the internet.  Despite multiple requests to

Szeto's counsel that all website data be maintained and safeguarded, undersigned counsel has not

received any confirmation that the website has been safeguarded. Further, Szeto's counsel has refused

to provide any status or a description of the steps taken to ensure its safekeeping.  It is unclear whether

the data has been deleted or is recoverable.  The website contained highly relevant evidence and

demonstrated the fraudulent transfers.

296. **Tax Returns.**  Hook and Ludlow filed a 2019 Form 1065 reporting the activities of ACET Global, all of which rolled up into Baymark ACET Holdco, LLC, which Baymark Partners owned. That 2019 Form 1065 reported net income attributable to ACET Global of $1,463,298.  A screen shot from the tax return is set forth below:

| | | |
|---|---|---|
| **3** Net income (loss) per books | | **1,463,298.** |
| **4** Other increases (itemize): | | |

297. The tax return that Hook and Ludlow executed under penalty of perjury reflected that ACET Global had total assets as of the beginning of 2019 of $3,023,970.  A screen shot from the tax return is set forth below:

| | | | |
|---|---|---|---|
| **14**  Total assets | | **3,023,970.** | **0.** |
| **Liabilities and Capital** | | | |

298. Moreover, the tax return that Hook and Ludlow executed under penalty of perjury reported that ACET Global stated that the Baymark defendants obtained proceeds from ACET Global of $2,907,290.  A screen shot from the tax return is set forth below:

| **1** | **(a)** Description of property (Example: 100 sh. XYZ Co.) | **(b)** Date acquired (Mo., day. yr.) | **(c)** Date sold or disposed of (Mo., day. yr.) | **(d)** Proceeds (sales price) |
|---|---|---|---|---|
| | SALE FROM FORECLOSURE | 07/21/17 | 01/01/19 | 2907290. |

299.  Under cross examination, Hook acknowledged:

> Q.  (By Mr. Freeman)  Okay.  If you'll look down there within Schedule L, there is a line, line 12.  And if you will look over to the right, there's a -- there's a box for the end-of-the-year value.
> A.  That's right, uh-huh.
> **Q.  And did you report to the federal government that there were assets of $3.169 million as of 12-31-2018?**
> **A.  Intangible assets.**
> **Q.  Right?**
> **A.  Yes.**
> Q.  Okay.  And that's what you reported to the federal government was held by Baymark ACET Holdco, LLC as of 12-31-2018; correct?
> A.  Correct.

> Q.  Okay.  And all that you're aware of it holding is its interest in ACET Global,
> LLC; correct?
> A.  Like I said, probably.
> Q.  Right.  And you were the president of that company; correct?
> A.  Correct.

(Exhibit 7, Dep. of David Hook, 158:03-23) (bold added).

> Q.  (By Mr. Freeman)  Okay.  On Baymark ACET Holdco, LLC's tax return,
> if you'll look at the twentieth page of the PDF, there's a line for a management
> fee?
> A.  Yes.
> Q.  Management fee of $112,500; is that correct?
> A.  Yes.
> Q.  Did you report that expense to the federal government?
> A.  That's what the tax return says.
> Q.  Okay.  Now, are you aware your lawyers have represented that there was
> no management fee?
>                 MR. PERRIN: Objection, form.
> A.  I don't recall us ever taking a management fee out of the company.
> Q.  (By Mr. Freeman)  Okay.  Why is -- why is Baymark ACET Holdco taking
> a deduction for $112,500?
> A.  I don't know.

(Exhibit 7, Dep. of David Hook, 159:04-21).

> Q.  Okay.  Now, there's also, on Page 17, seventeenth page of this PDF, there
> is a -- there's a form that lists a sale from foreclosure.  Do you see
> that?
> A.  Yes.
> Q.  Okay.  **And does it state that the assets at issue, the date acquired
> was 7-21-17?**
> **A.  Yes.**
> **Q.  And that is, in fact, the date that you executed the asset purchase
> agreement?**
> **A.  I don't know.**
> **Q.  Okay.  It states that, in column C, the date sold or disposed of was
> 1-1-2019. Do you see that?**
> **A.  Yes.**
> **Q.  And then does it state that the proceeds were $2,907,290?**
> **A.  Yes.**

(Exhibit 7, Dep. of David Hook, 161:08-24) (bold added).

300.  **Issued a K-1 to Tomer Damti**.  In 2020, the Baymark Defendants caused a K-1 to be issued

to Damti, reporting $365,824 of income to him attributable to ACET Global.  The K-1 appears to

have been issued as a bad-faith, abusive litigation tactic during prior litigation before the matters at issue were consolidated into this federal court Complaint.  Excerpts of the K-1 (excerpted to protect disclosure of tax id numbers) are below, reflecting the attribution of more than $365,000 to Damti, despite the fact that Damti (the principal/owner of D&T Partners) (i) never received a single payment on the $3.2 million note and (ii) never received a single penny from the operations of ACET Global following the sale to Baymark in 2017:



## V.  CLAIMS

### Count I: Violations of 18 U.S.C. § 1962(c) (Civil RICO)
### (All Defendants)

301.  Plaintiff realleges paragraphs 1-300 as if set forth fully herein.

302. All Defendants violated 18 U.S.C. § 1962(c), injuring Plaintiff and giving rise to liability under 18 U.S.C. § 1964(c).

303. Under 18 U.S.C. § 1964(c):

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

304. 18 U.S.C. § 1962(c) provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

305. Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

306. The Defendants together form an association-in-fact (along with being separate legal enterprises) for the common and continuing purpose of fraudulently transferring the assets out of the reach of Plaintiff and intentionally defaulting on payment obligations to Plaintiff. This constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4). The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the culpable individuals. The Defendants, together, directed the enterprise by fraudulently facilitating the foreclosure sale to avoid payment of amounts owed to Plaintiff, in addition to other fraudulent acts meant to conceal the illegal activity, such as the filing of a fraudulent bankruptcy petition. The employees of both ACET Global and Windspeed facilitated the fraudulent transfer. At the direction of Szeto, they each gave demonstrably false testimony during depositions and coordinated with Szeto to provide misleading and false information to carry out the frauds of the enterprise.

307. The enterprise engaged in and affected interstate commerce. Plaintiff is a legal entity formed under the laws of the State of Texas and with its principal office based in Texas. Defendants, namely Super G (based in California), utilized email and other forms of correspondence, in addition to wiring funds, across state lines.

308. The Defendants, each a distinct person associated with the enterprise, did conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961 (5), and l962(c).

309.  Predicate acts of racketeering activity are acts that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged above and below. The Defendants committed at least two such acts or aided and abetted the acts committed by other members of the enterprise.

310.  Specifically, the Defendants committed wire fraud by facilitating a fraudulent transfer to avoid loan obligations payable to Plaintiff. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1343 (wire fraud), 152 (false oaths and claims involving bankruptcy), 157 (bankruptcy fraud), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

311.  Defendants committed acts constituting the aiding and abetting of offenses under 18 U.S.C. §§ 1343 (wire fraud), 152 (false oaths and claims involving bankruptcy), 157 (bankruptcy fraud), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

312.  The acts of racketeering were not isolated.  Rather, they were related in that they had the same or similar purpose and result, participants, victims, and method of commission. Further, the acts of racketeering by the Defendants have been continuous. There was repeated conduct during a period beginning at least as early as 2018 and continuing to the present, and there is a continued threat of repetition of such conduct, as Defendants have continued to operate the fraudulent enterprise.

313. Defendants participated in the management and operation of the association-in-fact enterprise by managing, facilitating, and committing multiple acts of racketeering as described above and below.

314.  The unlawful actions of Defendants have proximately caused and continue to cause injuries to Plaintiff under 18 U.S.C. § 1964(c).  Specifically, the Defendants' violations of these statutes resulted

in the failure to pay millions of dollars owed to Plaintiff. Furthermore, Plaintiff would not have entered into any transaction with Defendants if it had knowledge of the Defendants' plan to defraud.

315. Plaintiff accordingly seeks an award of three times the damages it sustained based on the amount due to Plaintiff under the applicable agreements, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## Count II: Violations of 18 U.S.C. § 1962(a) (Civil RICO)
### (Baymark Partners, Ludlow, Hook, Denegre, Super G Capital, SG Credit Partners, Baymark Partners Management)

316. Plaintiff realleges 1-315 as if set forth fully herein.

317. All Defendants violated 18 U.S.C. § 1962(a), injuring Plaintiff and giving rise to liability under 18 U.S.C. § 1964(c).

318. Under 18 U.S.C. § 1964(c):

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

319. 18 U.S.C. § 1962(a) provides as follows:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

320. Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

321. The Defendants, either directly or indirectly, received income from the pattern of racketeering activity through the fraudulent transfer (avoiding amounts payable to Plaintiff), and the proceeds were reinvested back into the enterprise. The Defendants also, directly or indirectly, received income from the continued operation of Windspeed, and that income was then used or invested back into the enterprise. There may also be other members of the enterprise who are unknown at this time.

322. The enterprise engaged in and affected interstate commerce.

323. Predicate acts of racketeering activity are acts that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged above and below. The Defendants committed at least two such acts or aided and abetted the acts committed by other members of the enterprise.

324. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1343 (wire fraud), 152 (false oaths and claims involving bankruptcy), 157 (bankruptcy fraud), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

325. Defendants committed acts constituting the aiding and abetting of offenses under 18 U.S.C. §§ 1343 (wire fraud), 152 (false oaths and claims involving bankruptcy), 157 (bankruptcy fraud), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

326. The acts of racketeering were not isolated.  Rather, they were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the Defendants acts of racketeering have been continuous. There was repeated conduct during a period of time beginning at least as early as 2018 and continuing to the present, and there is a continued threat of repetition of such conduct.

327. Defendants participated in the management and operation of the association-in-fact enterprise by managing, facilitating, and committing multiple acts of racketeering as described above and below.

328. The unlawful actions of Defendants have proximately caused and continue to cause injuries to Plaintiff under 18 U.S.C. § 1964(c).  Specifically, the Defendants' violations of these statutes resulted in the failure to pay millions of dollars owed to Plaintiff.  Furthermore, Plaintiff would not have entered into any transaction with Defendants if it had knowledge of the Defendants' plan to defraud.

329.  Plaintiff accordingly seeks an award of three times the damages it sustained based on the amount due to Plaintiff under the applicable agreements, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

### Count III: Violations of 18 U.S.C. § 1962(d) (Civil RICO)
### (All Defendants)

330. Plaintiff realleges paragraphs 1-329 as if set forth fully herein.

331. Each Defendant violated RICO and Plaintiff was injured as a result.

332. All Defendants violated 18 U.S.C. § 1962(d), injuring Plaintiff and giving rise to liability under 18 U.S.C. § 1964(c).

333. Under 18 U.S.C. § 1964(c):

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

334. 18 U.S.C. § 1962(d) provides as follows:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

335. Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

336. **The Enterprise.**   The Defendants form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

337.  Alternatively, Baymark constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

338. Alternatively, Windspeed constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

339. Alternatively, Super G and/or SG Partners constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

340.  The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity.  Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of investment and management.

341.  **Interstate or Foreign Commerce**.  The activities of the enterprise or the predicate acts of racketeering affected interstate commerce.  For instance, Super G operated in California and loaned or extended funds to persons and entities in Texas based upon the acts at issue, and ACET Global and Windspeed conducted online economic transactions across states and internationally.

342.  **Pattern of Racketeering Activity.**  Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c).  Defendants' regular and repeated use of the

facilities and services of the enterprise made the racketeering activity possible. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

343. Predicate acts of racketeering activity are acts that are indictable under provisions of the U.S. Code under 18 U.S.C. § 1961(1)(B). Defendants each committed at least two such acts or else aided and abetted such acts.

344. **Mail Fraud.** The Defendants acted under a scheme or artifice to defraud. They engaged in a scheme to fraudulently transfer assets in violation of the Texas Uniform Fraudulent Transfer Act (TUFTA).

345. The Defendants acted under a scheme or artifice for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

346. The Defendants or someone associated with the scheme used the mails or "caused" the mails to be used. For instance, on or around January 31, 2019, the Defendants caused the mailing the Notice of Forfeiture. The use of the mails was for the purpose of executing the scheme.

347. **Wire Fraud.** The Defendants acted under a scheme or artifice to defraud. They engaged in a scheme to fraudulently transfer assets in violation of the Texas Uniform Fraudulent Transfer Act (TUFTA).

348. The Defendants acted under a scheme or artifice for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

349. The Defendants or someone associated with the scheme used wires for the purpose of executing the scheme. For example, as set forth above, the Defendants communicated extensively via email and over the internet.

350. **Obstruction of the Due Administration of Justice.** The Defendants, through illegal instructions during depositions, solicitation of perjury, obstructionist actions, and perjurious testimony, corruptly or by threats or force, or by any threatening letter or communication, influenced,

obstructed, or impeded, or endeavored to influence, obstruct, or impede, the due administration of justice in violation of 18 U.S.C. § 1503.

351. **Concealment of Assets, False Oaths.**   The Defendants knowingly and fraudulently concealed from a trustee or creditor or other office of the court with a case under title 11 property belonging to the estate of a debtor in violation of 18 U.S.C. § 152(1); knowingly and fraudulently made a false oath or account in or in relation to a case under title 11 in violation of 18 U.S.C. § 152(2); knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury in relation to any case under title 11 in violation of 18 U.S.C. § 152(3); as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transferred or concealed property in violation of 18 U.S.C. § 152(7); after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently concealed, destroyed, mutilated, falsified, or made a false entry in recorded information (including books, documents, records, and papers) relating to the property or financial affairs of ACET Global in violation of 18 U.S.C. § 152(8).

352. The violations set forth in the immediately preceding paragraph constitute a "specified unlawful activity" under 18 U.S.C. § 1956 (**money laundering**).   The Defendants, knowing that property involved in a financial transaction represented the proceeds of a form of unlawful activity conducted such financial transaction involving the proceeds of such specified unlawful activity with the intent to promote the carrying on of the specified unlawful activity or knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, all in violation of 18 U.S.C. § 1956 (money laundering).   18 U.S.C. § 1956 (money laundering) is a predicate offense to a Civil Rico charge.

353. These racketeering activities have been continuous. They were part of a concerted plan carried out over the period of several years, and the defendants have continued to engage in racketeering activities as part of an ongoing effort to obstruct justice to carry out their fraud.

354. The defendants have demonstrated that they pose a continued threat. They continue to disregard any obligation to pay the multi-million-dollar debt at issue. Their continued activities will harm additional victims and will continue to jeopardize the business operations and assets at issue.

355. The racketeering activities are related to each other. Indeed, they were critical pieces of the overall fraud.

356. As alleged above, all Defendants conspired to violate 18 U.S.C. §§ 1962(a) and 1962(c).

357. Plaintiff accordingly seeks an award of three times the damages it sustained based on the amount due to Plaintiff under the applicable agreements, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## Count IV: Common Law Fraud
### (Baymark Partners; Denegre; Szeto; Super G Capital; Cole; Ludlow; Denegre; and Hook)

358. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

359. The Defendants made materially false representations to Plaintiff with the knowledge of their falsity or with reckless disregard of the truth with the intention that Plaintiff act on those representations, and Plaintiff relied on these representations to its detriment. As a proximate result of this fraud, Plaintiff sustained the damages described more fully herein.

## Count V: Breach of Fiduciary Duty
### (Ludlow; Szeto; Hook; Denegre; Baymark ACET Holdco)

360. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

361. During the period when ACET Global became insolvent or was in the zone of insolvency, ACET Global, Ludow (as president), Szeto (as president and CEO), Hook (as president), Denegre (as acting president), and Baymark ACET Holdco (collectively, the "Fiduciary Claim Defendants") owed a fiduciary duty of care to preserve the assets of ACET Global for the benefit of its creditors, including Plaintiff.[72]  The Fiduciary Claim Defendants breached their fiduciary duty by willfully and/or through gross negligence (i) allowing the business and assets to waste, (ii) failing to cause ACET Global to pay under the D&T Note, and (iii) failing to cause ACET Global to otherwise comply with the terms of the D&T Note.  The Fiduciary Claim Defendants' breaches resulted in injury to Plaintiff, and also significant benefit to Defendants.

362. During the relevant time, ACET Global did not make any payments to Plaintiff.  Instead, the Fiduciary Claim Defendants caused ACET Global to remit revenues and/or accrued payments to the ultimate benefit of Baymark Management, LLC in the form of Management Fees.  As ACET Global's financial conditions declined, the Fiduciary Claim Defendants continued to allow ACET Global to make payments and/or accrue payments to Baymark Management, LLC.  These payments constituted improper self-dealing transactions.  The improper payments and neglect/waste of the business were the proximate cause of the damages suffered by Plaintiff.  The Fiduciary Claim Defendants caused the transfer of all of ACET Global's assets and business operations to Windspeed, a company that they owned and controlled.  This transfer violated their fiduciary duties.  It constituted improper self-dealing.

---

[72]      Q. (By Mr. Freeman)  Okay.  So, at this point, even though you're still president of ACET Global, were you taking any steps to attempt to protect the interests of any creditors of ACET Global?
              MR. PERRIN: Objection, form.
     A. Like I said many times, I wasn't involved in the decisions for the company.
     Q. (By Mr. Freeman)  Okay.  So, as president of ACET Global, you weren't involved in any decisions with respect to the company? A. Yes.
(Exhibit 7, Dep. of David Hook, 86:09-19).

363. The conduct of the Fiduciary Claim Defendants was intentional, willful, and/or grossly negligent. Thus, the Fiduciary Claim Defendants are liable for exemplary and/or punitive damages.

## Count VI: Aiding and Abetting Breach of Fiduciary Duties to Plaintiff
### (All Defendants)

364. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

365. The Defendants (collectively in this section, the "Aiders and Abettors") aided and abetted the Fiduciary Claim Defendants in breaching the duties of care and loyalty they owed to Plaintiff.

366. The Aiders and Abettors knew or should have known that ACET Global was insolvent, and because it was insolvent, ACET Global owed a fiduciary duty to manage its assets for the benefit of its creditors, including Plaintiff. The Aiders and Abettors directly controlled Baymark Management, LLC and its operations inured to their personal benefit. Baymark Management, LLC, and the Fiduciary Claim Defendants knowingly participated in self-dealing described above by accepting payments or obligations for management fees from (directly or indirectly) ACET Global while the Aiders and Abettors had actual knowledge that ACET Global was insolvent. Baymark Management, LLC's acceptance, through the efforts of the Aiders and Abettors, of payments from ACET Global aided and abetted ACET Global in breaching the fiduciary duties owed to Plaintiff. The actions of the Aiders and Abettors in aiding and abetting such acts were materially and substantially detrimental to Plaintiff and caused substantial damages to Plaintiff.

## Count VII: Texas Uniform Fraudulent Transfer Act
### (All Defendants)

367. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

368. The Defendants violated the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Comm. Code 24.001 *et seq.*, by transferring substantially all of the assets of ACET Global to Windspeed. These

transfers were made after or within a reasonable time before Plaintiff's claims arose. These transfers and obligations are also fraudulent because the Defendants made the transfers and obligations with actual intent to hinder, delay, or defraud Plaintiff.

369. Hook and Ludlow caused ACET Global to be used for the purpose of perpetuating and did perpetuate actual fraud (*i.e.*, fraudulent transfers) on D&T Partners primarily for one or both of Hook and Ludlow's direct personal benefit. These fraudulent transfers involved dishonesty of purpose or intent to deceive because the transfers were made with the actual intent to hinder, delay, or defraud any creditor. Further, the transfers were primarily for the direct personal benefit of Baymark Partners, Super G, and Szeto because all of the assets transferred out of ACET Global went into Windspeed, which was controlled by BP Management, Super G, and Szeto. ACET Global was a sham to perpetuate a fraud.

370. Baymark caused ACET Global; Baymark Partners, LP; BP Management; Super G; SG Credit, Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC; Baymark; and Windspeed (collectively, the "Transfer Defendants") to be used for the purpose of perpetuating and did perpetuate actual fraud (*i.e.*, fraudulent transfers) on D&T Partners primarily for Baymark's direct personal benefit. These fraudulent transfers involved dishonesty of purpose or intent to deceive because the transfers were made with the actual intent to hinder, delay, or defraud any creditor. Further, the transfers were primarily for the direct personal benefit of Baymark because all of the assets transferred out of ACET Global went into Windspeed, which was ultimately controlled by Baymark. The Transfer Defendants were a sham to perpetuate a fraud.

### Count VIII: Civil Conspiracy
### (All Defendants)

371. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

372. Defendants, in combination with one another, agreed to accomplish for an unlawful purpose or a lawful purpose by unlawful means, each of the violations described above, including to breach the fiduciary duties owed to Plaintiff. Defendants had a meeting of the minds on the object or course of action to divert Plaintiffs funds and property under the above causes of action. One or more of the Defendants committed an unlawful, overt act to further this object or course of action. Plaintiff has suffered a substantial injury as a proximate result of these wrongful acts.

## VI. __DAMAGES__

373. Plaintiff seeks monetary relief over $5,000,000 plus treble damages, attorneys' fees, and costs.

374. As a result of the foregoing causes of action, Plaintiff suffered the following damages:

- Nonpayment of a $3.2 million note plus interest;

- Costs incurred in pursuing collection;

- Direct and compensatory damages;

- Lost profits from the operation of its pre-existing business;

- Loss of goodwill;

- Inability to engage in new business operations;

- Exemplary damages.

375. Plaintiff further specifically pleads for the remedy of rescission.

376. Plaintiff further specifically pleads for the remedy of piercing the veil of ACET Global, LLC; Baymark Partners, LP; Baymark Partners Management, LLC; Super G Capital, LLC; SG Credit Partners, LLC, Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC; Baymark Partners; and Windspeed Trading, LLC.

377. Plaintiff further specifically pleads for the remedy of a determination that there is no limited liability for any director, owner, or other agent of Baymark Partners (or, if it is a different entity, Baymark Partners, LP).

The conduct of the Defendants was intentional, willful, and/or grossly negligent. As such, they are liable for exemplary and/or punitive damages.

<h2 style="text-align:center">VII.   <u>PRAYER</u></h2>

WHEREFORE Plaintiff asks to be awarded a judgment against Defendants for actual damages, rescission, court costs, attorney's fees, and all other relief to which Plaintiff is entitled.

Respectfully submitted,

By: /s/ Jason Freeman
Jason B. Freeman
TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFF**