PLAINTIFF'S
EXHIBIT

8

Page 1

NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC (Successor in interest to ACET VENTURE PARTNERS, LLC), | ) IN THE DISTRICT COURT<br>)<br>)<br>) |
| Plaintiffs | ) |
| | ) |
| VS. | ) |
| | ) |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK MANAGEMENT, LCC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | ) DALLAS COUNTY, TEXAS<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | ) 116th JUDICIAL DISTRICT |

-----------------------------------
REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

MARC COLE

March 29, 2021
-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF MARC COLE, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on March 29, 2021, from 2:04 p.m. to 8:45 p.m., before Mary Karen Usher, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure and pursuant to the current Emergency Order Regarding the COVID-19 State of Disaster.

Marc Cole  *  March 29, 2021

## Page 2

```
 1
 2    APPEARANCES
 3  FOR THE PLAINTIFFS:
 4    MR. JASON B. FREEMAN
      MR. ZACHARY MONTGOMERY
 5    Freeman Law, PLLC
      2595 Dallas Parkway
 6    Site 420
      Frisco, Texas 75034
 7    (214) 984-3410
      jason@freemanlaw.com
 8    zmontgomery@freemanlaw.com
 9
10  FOR THE DEFENDANTS BAYMARK ENTITIES, DAVID HOOK, TONY
    LUDLOW:
11
      MR. EDWARD PERRIN
12    Hallett & Perrin
      1445 Ross Avenue
13    Suite 400
      Dallas, Texas 75202
14    (214) 953-0053
      eperrin@hallettperrin.com
15
16
17  FOR THE DEFENDANT WINDSPEED TRADING, LLC:
18    MS. BRENDA HARD-WILSON
      MR. TIM WOODS
19    Higier Allen
      2711 North Haskell Avenue
20    Suite 2400
      Dallas, Texas 75204
21    (972) 371-2481
      bhard-wilson@higierallen.com
22    twoods@higierallen.com
23
24
25
```

## Page 3

```
 1  FOR THE WITNESS:
 2    MR. JOHN DAVID BLAKLEY
      Dunn Sheehan LLP
 3    3400 Carlisle Street
      Suite 200
 4    Dallas, Texas 75204
      (214) 764-8333
 5    jdblakley@dunnsheehan.com
 6
    ALSO PRESENT:
 7    Mr. Tomer Damti
      Mr. Matt Denegre
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX
                                    PAGE
 2  Appearances........................................ 2
 3
 4  MARC COLE
 5    EXAMINATION BY MR. FREEMAN.................... 6
 6
    Signature and Changes............................ 201
 7  Reporter's Certificate............................ 203
 8           EXHIBITS
 9  NO.   DESCRIPTION                           PAGE
10   5    Amended and Restated Company Agreement of
         Windspeed..................................... 31
11   8    Business Loan & Sale Agreement................116
     9    Collateral Assignment of Rights..............119
12  15    Foreclosure Sale Agreement...................187
    17    Notice of Disposition........................156
13  23    ACET Global Bankruptcy Petition.............. 64
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1           PROCEEDINGS
 2              MARC COLE,
 3  having been first duly sworn, testified as follows:
 4       THE REPORTER:  Pursuant to the current
 5  emergency order regarding COVID-19 State of Disaster,
 6  this deposition of Marc Cole is being conducted remotely
 7  via Zoom.  Today's date is March 29, 2021, and the time
 8  is 2:04 p.m.  The witness is located in Orange County,
 9  California.
10       My name is Karen Usher, Texas CSR
11  No. 5536.  I have administered the oath, and I am
12  reporting the deposition remotely by stenographic means
13  from my residence within the State of Texas.
14       The witness has represented to me under
15  oath that he is Marc Cole.  Will counsel please state
16  their appearances and any agreements for the record.
17       MR. BLAKLEY:  Jason Blakley on behalf of
18  deponent Marc Cole.
19       MR. FREEMAN:  Jason Freeman on behalf of
20  plaintiffs.
21       MR. PERRIN:  Ed Perrin on behalf of all
22  defendants with the exception of Windspeed Trading
23  Company.  Karen, I'll be happy to read those in if you'd
24  like, but do you need me to?
25       THE REPORTER:  No, sir.  That's fine.
```

Usher Reporting Services
(214) 755-1612

Marc Cole  *  March 29, 2021

Page 6

1      MS. HARD-WILSON:  Brenda Hard-Wilson on
2   behalf of Windspeed.
3      MR. WOODS:  With Tim Woods as well.
4      MR. FREEMAN:  And just to be clear, there
5   are a couple of agreements on the record.  One is that
6   objections by one of the defendants' counsel will apply
7   to all of the other defendants so that we can avoid
8   unnecessarily cluttering the record.  And then one other
9   item that we discussed at the outset is that Mr. Cole
10  will be testifying in this deposition in his capacity as
11  a corporate representative.  We will later during the
12  deposition, if necessary, begin in his individual
13  capacity.
14           EXAMINATION
15  BY MR. FREEMAN:
16     Q.  Mr. Cole, could you state your full name for
17  the record?
18     A.  Marc Adam Cole.
19     Q.  Mr. Cole, my name is Jason Freeman.  I
20  represent D&T Partners, LLC, which is the successor in
21  interest to ACET Partners, LLC.  Do you understand that
22  you're here today in connection with a lawsuit between
23  D&T Partners and several other defendants here?
24     A.  I do.
25     Q.  Have you ever participated in a deposition

Page 7

1   before?
2      A.  Yes.
3      Q.  One second.
4         MR. FREEMAN:  Karen, are we recording?
5         THE REPORTER:  You mean video?
6         MR. FREEMAN:  Yes, ma'am.
7         THE REPORTER:  No, sir.  I can't act as
8   the videographer and the court reporter.  So I can
9   transfer hosting abilities to you, and you can record
10  it.  Would you like me to do that?
11        MR. FREEMAN:  Yeah.
12        THE REPORTER:  Okay.  I just made you the
13  host.
14        MR. FREEMAN:  Thanks, Karen.
15     Q.  (BY MR. FREEMAN)  I'm going to ask that
16  question again just so we can make a clean transition.
17        Mr. Cole, have you ever participated in a
18  deposition before?
19     A.  Yes.
20     Q.  When was that?
21     A.  I believe the last deposition was 2018 or
22  2019.
23     Q.  And what was that in connection with?
24     A.  I was called as a witness related to an oil
25  and gas investment where I was a former employee of the

Page 8

1   organizer of the investment.
2      Q.  Who was the organizer of that investment?
3      A.  Metropolitan Equity Partners out of New York.
4      Q.  What was your role with Metropolitan?
5      A.  I was acting as a managing director of
6   originations and deal structuring.  And although I had
7   not participated in that investment, I had solicited
8   investors on its behalf.
9      Q.  Were you -- were there any allegations that
10  you engaged in any violations?
11     A.  No.
12     Q.  Were you sued as a result of that case?
13     A.  No.
14     Q.  Did you have any kind of settlement as a
15  result of that case?
16     A.  No.
17     Q.  Is that case still ongoing?
18     A.  I'm not aware.
19     Q.  When was the last time you spoke with anybody
20  about that case?
21     A.  It would have been in the deposition.
22     Q.  Have you ever been involved with another
23  deposition?
24     A.  Yes.
25     Q.  Could you tell me about that one?

Page 9

1      A.  I was called as a witness in another
2   investment, equity investment, where my employer, Melon
3   Ventures, was sued in connection with an investment.
4      Q.  And what was the nature of that?
5      A.  The plaintiff alleged that although Melon was
6   the largest shareholder in the company, that it acted to
7   suppress third-party investment interest in that company
8   to maximize its own position.
9      Q.  And what was your position with Melon
10  Ventures?
11     A.  I was an investment associate, which is fairly
12  low.
13     Q.  What time frame was this?
14     A.  I was with Melon from 1999 to 2003, and I
15  suspect it was between the years of 2000 and 2001.
16     Q.  That you had your deposition taken?
17     A.  Yes.
18     Q.  Okay.  Were you sued as a result of that --
19     A.  No.
20     Q.  -- case?  Did you face any regulatory inquiry?
21     A.  No.
22     Q.  Do you know what the outcome of that case was?
23     A.  I believe either the case was dismissed or --
24  there was no penalty or settlement on Melon's behalf, so
25  either the case was withdrawn or Melon prevailed.

Page 10

1      Q.  Okay.  Have you ever had your deposition taken
2  in any other matter?
3      A.  Once more, and I'm going to be very foggy on
4  the details because I was truly a witness.
5      Q.  Do you know what that case was?
6      A.  There was a lawsuit related to an investment
7  that I did not make.  I have been in the investment or
8  lending business for 20 years, and so I review hundreds
9  of transactions.  One partner in this particular company
10  sued the other and wanted my opinion as to the viability
11  or valuation that an investor would have made had I
12  invested in the company.  So it was never clear to me
13  why I was called because I had not affirmatively
14  invested in the company.
15      Q.  Were you designated as an expert witness, do
16  you know?
17      A.  I don't know.  And quite frankly, it was so
18  outside of my doing that I did not retain counsel.
19      Q.  And you have not been -- you have not had your
20  deposition taken in any other matter?
21      A.  No.
22      Q.  Did you have any ownership in Melon Ventures?
23      A.  I did not have any ownership in Melon
24  Ventures.  The nature of the partnership was I had an
25  investment participation on a deal-by-deal basis.

Page 11

1      Q.  What does that mean?
2      A.  That means if the deals were successful and
3  the limited partners recovered their capital and an
4  additional coupon we call it, then there was a
5  partnership profit to be shared.  And I had a very small
6  percentage in that profit.
7      Q.  What about Metro Managers?  Did you have any
8  ownership?
9      A.  No.  I had a variation of what I had at Melon
10  Ventures.  I had deal-by-deal economics.
11      Q.  So you have been through this process a few
12  times, it sounds like, in other contexts.  I will give
13  you a little bit of laying the groundwork for what's to
14  come.
15          Do you understand that you're here under
16  oath today?
17      A.  I do.
18      Q.  Do you understand that it's a crime to lie
19  under oath?
20      A.  I do.
21      Q.  Just a few ground rules.  When I ask a
22  question, if you will, just let me complete it before
23  you give an answer just for the sake of -- for Karen's
24  sake.  Does that make sense?
25      A.  Yes.  And I will avoid "ums" and "you knows"

Page 12

1  and nodding my head to the extent I remember, but you'll
2  remind me if I forget.
3      Q.  Well, I will or Karen probably will.  But I
4  think you have anticipated several of the words of
5  advice.  So, just the last couple I'll ask, is it fair
6  to say that if you don't tell me that you don't
7  understand a question that I ask, that I'll be safe in
8  assuming you understood the question?
9      A.  I will say it in the affirmative.  If I don't
10  understand a question, I'll let you know.
11      Q.  Great.  And if you need to take a break at any
12  time, please just let me know.  All that I'll ask is
13  that you, you know, answer or address the question
14  that's on the table at that time, and then we can take a
15  break, restroom break, water break, any time you need.
16      A.  Understood.
17      Q.  Mr. Cole, who did you discuss this deposition
18  with?
19      A.  With J.D. Blakley.
20      Q.  Anyone else?
21      A.  I, initially, before I understood this matter,
22  had consulted with two other attorneys; but when it was
23  clear to me that I was going to be deposed and that I
24  needed Texas counsel, I discussed this matter with J.D.
25  and his colleagues and no one else.

Page 13

1      Q.  Well, I'll go on the record and tell you you
2  got a good lawyer.  I know J.D.; I think you picked
3  well.
4          What else did you do to prepare for this
5  deposition?
6      A.  The facts of the transaction, as you know,
7  occurred several years ago, and I'm in a very
8  transactional business where I review hundreds if not
9  thousands of opportunities.  So I would say I
10  principally did three steps.
11          One, I reviewed several of the files that
12  were available to me through my file storage system.
13  Two, I asked a current investment colleague that works
14  with me today that would have had more operational
15  involvement what background he remembered about this
16  specific transaction.  And three, I reviewed some
17  documentation provided to me by my counsel.
18      Q.  Okay.  Can I ask you about a few topics, just
19  specifically in terms of what you may have done to
20  prepare regarding Super G Capital, LLC's, relationship
21  with ACET Global, LLC, ACET Venture Partners, LLC,
22  Baymark Holdco, LLC, Baymark ACET Direct Invest, LLC,
23  Baymark Management, LLC, Baymark Partners, Baymark
24  Partners Management, LLC, Windspeed Trading, LLC, David
25  Hook, Anthony "Tony" Ludlow, or William Szeto?

Page 14

1    A.  Is there a question?
2    Q.  Yes, sir.  Asking what you did specifically to
3  prepare with respect to those -- that category.
4    A.  Okay.  And I don't --
5      MR. BLAKLEY:  Objection, form.  Go ahead.
6    A.  I don't know all of the entities that you
7  mentioned or their relationship.  I believe, in my
8  reviewing the materials provided to me by counsel,
9  reviewing documents that were in Super G Capital's
10  document storage system -- and we can talk about that,
11  including a general description of the company and final
12  form legal documents, that I understand big picture the
13  nature of the parties.  I do not know the specifics of
14  the Baymark-level or ACET-level entities.
15    Q.  (BY MR. FREEMAN)  I'm going to ask you about a
16  couple of other -- a few other categories.  What did you
17  do to prepare with respect to the category of any
18  agreements entered into between or involving Super G
19  Capital, LLC, and any of those parties?
20      MR. BLAKLEY:  Objection, form.
21    A.  As I said, I reviewed documents that were in
22  my possession when I left Super G Capital through our
23  file storage system.  You may hear me reference Dropbox.
24  That was the folder and file storage system that we
25  used.  I reviewed legal agreements and filings largely

Page 15

1  that were prepared and sent to me by counsel, and I had
2  conversations with a former employee.
3    Q.  (BY MR. FREEMAN)  What did you do to prepare
4  with respect to the category of Super G Capital, LLC's,
5  ownership of warrants in or any control with respect to
6  Windspeed Trading, LLC?
7    A.  I reviewed an operating agreement that was
8  provided to me by counsel that reflected the ownership
9  and governance of Windspeed Trading.
10    Q.  And did you do anything else?
11    A.  I'm not aware of anything else.
12    Q.  What did you do to prepare with respect to the
13  category of Super G Capital, LLC's, discussions with any
14  agent of any party that I just described with respect to
15  ACET Global, LLC, or Windspeed Trading, LLC?
16      MR. BLAKLEY:  Objection, form.
17    A.  I reviewed the documentation that I had.  As
18  far as conversation, I did look through my Outlook email
19  client to see if there were relevant email
20  communications that were in my possession.
21    Q.  (BY MR. FREEMAN)  Did you find any?
22    A.  I found a few emails that were in form and
23  substance the same captured by counsel and presented
24  back to me.
25    Q.  Okay.  One last category.  What did you do to

Page 16

1  prepare with respect to the category of the foreclosure
2  sale of ACET Global, LLC's, assets to Windspeed Trading,
3  LLC?
4    A.  I reviewed the foreclosure agreement that was
5  both in my possession, as well as provided to me by
6  counsel.
7    Q.  Okay.  Mr. Cole, you mentioned someone in
8  there -- that you had had some conversations with a
9  former employee or employees.  Could you tell me who
10  those were?
11    A.  I had an employee at my company, which is
12  called SG Credit Partners, named Alex Godinez,
13  G-O-D-I-N-E-Z.
14    Q.  Okay.
15    A.  Alex was an employee at Super G Capital that
16  was closer to the documentation and the records and
17  filing at the individual loan level than I was.  Alex
18  reported to me at Super G Capital, and he was one of a
19  dozen team members I took to start SG Credit Partners in
20  2018.
21    Q.  Okay.  Was there anyone else?
22    A.  No.
23    Q.  Who did Alex Godinez report to?
24    A.  Me.
25    Q.  While at Super G?

Page 17

1    A.  Yes.
2    Q.  Okay.  Was there anyone else who was
3  particularly -- was there anyone else who was involved
4  in the transaction related to ACET Global?
5    A.  Yes.  Super G Capital had an employee named
6  Steven Bellah.  Steve was Dallas/Metro area based and
7  was the loan officer originator and relationship manager
8  for the investment in question.
9    Q.  Does Steven Bellah still work at Super G?
10    A.  No.
11    Q.  Do you know where he works now?
12    A.  I don't.
13    Q.  Mr. Cole, I understand you're here in your
14  capacity as corporate representative of Super G Capital?
15    A.  Yes.
16    Q.  Are you authorized to speak as the corporate
17  representative of Super G Capital, LLC?
18    A.  I don't know how to answer that.  And I know
19  it sounds like a simple question.
20    Q.  Why is that?
21    A.  I am not an employee of the company.  I am and
22  have been assisting its founder and shareholder in the
23  liquidation of the business as a friend and trustee of
24  his estate.  And he is aware of the fact that there is a
25  lawsuit and is aware of the fact that I'm participating

5 (Pages 14 to 17)

Marc Cole  *  March 29, 2021

Page 18

```
 1   as an authorized representative.  What I'm unaware of is
 2   if that has a legal definition that I might not meet.
 3        Q.  Fair enough.  So is it your understanding --
 4   let's back up.
 5            Is the founder and shareholder that you
 6   refer to, is that Darrin Ginsberg?
 7        A.  Correct.
 8        Q.  Is it your understanding that Darrin Ginsberg
 9   has the authority to designate a corporate
10   representative for Super G?
11        A.  Yes.  He's the manager of the entity.  He's
12   the CEO of the business, and his and his trusts are the
13   owners of the business.
14        Q.  Got it.  And it is your understanding he has
15   authorized you in that capacity?
16        A.  Yes.  And furthermore, there is a legal
17   servicing agreement between my company, SG Credit
18   Partners, and his company, Super G Capital, that was put
19   in place so that SG Credit would use its staff to assist
20   in the collection on identified outstanding loans.  And
21   I believe that Windspeed is listed as an identified
22   outstanding loan.
23        Q.  Got it.
24        A.  So I'll re-answer the question and say I
25   believe I have the authority.
```

Page 19

```
 1        Q.  Understood.  Does Super G hold you out as an
 2   employee of Super G Capital?
 3        A.  Yes and no.  The yes is that Super G has
 4   maintained a website with my appearance on it, and I'll
 5   explain why.  And the no is that, at this point, Super G
 6   Capital is Darrin Ginsberg, and he understands that I am
 7   not an employee and I am not compensated for assisting
 8   him.
 9        Q.  Okay.  And why is it that they hold you out on
10   the company website?
11        A.  Super G Capital is in wind-down.  Winding down
12   a portfolio of loans is the single worst way to monetize
13   a pool of assets.  And Darrin Ginsberg and I shared a
14   concern that it is possible a borrower might use the
15   company's and Darrin's circumstances as a reason not to
16   pay.  So we are not publicly advertising that the
17   business is in wind-down.
18        Q.  And why is it that Darrin Ginsberg is not
19   serving as the corporate representative?
20        A.  For a variety of reasons.  One, Darrin is ill;
21   and two, I led the initiative at Super G Capital to make
22   what we called cash flow loans of which ACET and
23   Windspeed fell under.  And Darrin would have absolutely
24   no knowledge of those transactions.  Over time, it was
25   clear that our businesses were very different, which is
```

Page 20

```
 1   why I took my team and we spun out of Super G Capital.
 2        Q.  Got it.  Okay.  I'm going to transition a bit
 3   here.  You are familiar with Super G Capital, LLC,
 4   correct?
 5        A.  Yes.
 6        Q.  How are you familiar with it?
 7        A.  I was an employee beginning in 2013 where I
 8   held a variety of executive level roles.  And I continue
 9   to advise Darrin Ginsberg in the full liquidation of the
10   business and the satisfaction of his creditors.
11        Q.  And are you familiar with ACET Global, LLC?
12        A.  The company; perhaps not the legal entity.
13        Q.  How is it that you're familiar with the
14   company?
15        A.  I recall that Steve Bellah led a loan to the
16   company; and I, as CFO, was familiar with all of the
17   loan transactions.
18        Q.  Does Super G have any relationship to ACET
19   Global, LLC?
20            MR. BLAKLEY:  Objection, form.
21        Q.  (BY MR. FREEMAN)  And Mr. Cole, even though
22   there's an objection, you can -- you still have to
23   answer.
24        A.  Okay.
25            MR. PERRIN:  Jason, just for
```

Page 21

```
 1   clarification, when -- although J.D. is not representing
 2   a defendant, we'll have the same agreement that an
 3   objection by him can be deemed an objection by all the
 4   defendants as well as the deponent's counsel?
 5            MR. FREEMAN:  Yes, sir.
 6            MR. PERRIN:  Thank you.
 7        A.  Super G Capital did a foreclosure on ACET.
 8   And when I say "ACET," I'm referring to the operating
 9   business.  And as a result of that procedure, there
10   would be no further ongoing relationship between Super G
11   Capital and ACET.
12        Q.  (BY MR. FREEMAN)  Okay.  Let me ask it another
13   way.  Has Super G ever had any relationship or ownership
14   with respect to ACET Global, LLC?
15            MR. BLAKLEY:  Objection, form.  Go ahead.
16        A.  Super G had extended a loan to ACET.
17        Q.  (BY MR. FREEMAN)  And that's it?
18        A.  That's it.
19        Q.  Who was involved in establishing that
20   particular relationship?
21        A.  Steve Bellah led the loan and was the loan
22   officer.
23        Q.  Okay.  Was anyone else, you know, not just
24   from Super G, but any other persons involved in that?
25        A.  I can only speak to Super G.
```

6 (Pages 18 to 21)

Marc Cole  *  March 29, 2021

Page 22

1      Q.  Okay.  Do you know who proposed establishing
2  the relationship or the loan?
3      A.  Steve Bellah.
4      Q.  Do you know what it was intended to
5  accomplish?
6      A.  Yes.  And again, I'm not fully aware of the
7  legal entities.  But my recollection, which was aided by
8  the materials that I reviewed in the last few weeks and
9  consistent with my memory, was the Super G loan proceeds
10  enabled the private equity firm that I know as Baymark
11  to acquire a significant position in ACET.
12      Q.  Did you or did Super G ever discuss any other
13  possible ways to accomplish that objective?
14      A.  I didn't.
15      Q.  Do you know if anyone else at Super G did?
16      A.  No.
17      Q.  And I think I already asked this, but just to
18  be clear, does Super G currently have any interest in
19  ACET Global, LLC?
20      A.  My understanding is that interest would be
21  discharged with the foreclosure.
22      Q.  Okay.  Are you familiar with Windspeed
23  Trading, LLC?
24      A.  I am.
25      Q.  How are you familiar with Windspeed Trading?

Page 23

1      A.  I was involved in approving the foreclosure
2  and, more broadly, the restructuring of the ACET loan at
3  Super G.  And that included the sale of assets and
4  formation of what I believe is Windspeed Trading.
5      Q.  Okay.  Does Super G have any relationship with
6  Windspeed Trading, LLC?
7          MR. BLAKLEY:  Objection, form.
8      A.  Yes.  Super G has a loan receivable from
9  Windspeed, which has not been satisfied; and Super G has
10  a warrant position to acquire equity, which it has not
11  exercised.
12      Q.  (BY MR. FREEMAN)  Okay.  When was that
13  relationship established with Windspeed?
14          MR. PERRIN:  Objection, form.
15      A.  May I look at the documentation that I have?
16      Q.  (BY MR. FREEMAN)  Yes, sir.
17      A.  It is neatly organized, but I will need a
18  minute.  It appears that on March 1, 2019, there was a
19  bill of sale that was executed and related to that --
20  I'm not sure if you're looking for an exact date, but --
21      Q.  No, just a -- you know, actually, your
22  understanding of what it is.  Ballpark date is fine.
23      A.  March of 2019 was the foreclosure.  The entity
24  would have been formed prior.
25      Q.  Okay.  Was Super G involved in the formation

Page 24

1  of the entity?
2      A.  I was made aware of the fact that there was a
3  restructuring option that involved a new business
4  entity.
5      Q.  Was that new business entity Windspeed?
6      A.  It is now, yes.
7      Q.  Was it proposed to be a different entity?
8      A.  No.
9      Q.  Just wasn't specified at the time?
10      A.  I don't recall.
11      Q.  Okay.  Who made you aware of this?
12      A.  Steve Bellah.
13      Q.  And how did Steve Bellah become aware of it?
14          MS. HARD-WILSON:  Objection, form.
15      A.  Steve spoke to the various -- to the borrower,
16  and the borrower in the case was ACET, and likely its
17  investors.
18      Q.  (BY MR. FREEMAN)  And Steve Bellah was an
19  employee of Super G at the time?
20      A.  Yes.
21      Q.  Is it your understanding that the investors
22  made him aware of this other option to restructure?
23          MR. PERRIN:  Objection, form.
24          MS. HARD-WILSON:  Objection, form.
25      A.  Yes sir.

Page 25

1      Q.  (BY MR. FREEMAN)  Is that correct?
2      A.  That's my understanding.
3      Q.  Now, you mentioned you were made aware of it.
4  Did you approve it?
5      A.  I did.
6      Q.  When did you approve it, if you know?
7      A.  When did I approve what?
8      Q.  This restructuring option.
9      A.  I don't know.  So likely before the sale.
10      Q.  Okay.  What constitutes an approval?
11          MR. BLAKLEY:  Objection, form.
12      A.  At the time, I had sole investment committee
13  approval at Super G Capital because of Darrin's absence.
14  So I would have effectively made the decision and signed
15  the agreement.
16      Q.  (BY MR. FREEMAN)  Okay.  With a proposal of
17  that nature, is it required to go before the investment
18  committee?
19          MR. BLAKLEY:  Objection, form.
20      A.  Yes.  Any -- the proposal required capital,
21  and any capital required the investment committee, which
22  at the time would have been me.
23      Q.  (BY MR. FREEMAN)  Okay.  And what type of
24  record gets made to memorialize that?
25      A.  At the time, none.  It was a very small

Usher Reporting Services
(214) 755-1612

Page 26

1   business at the time.
2       Q.  So is that just an oral approval?
3       A.  Yes.
4       Q.  Is that done by phone or in person?
5       A.  It would likely be done by a call with Steve
6   in his home office and me in my Newport Beach office.
7       Q.  Okay.  Are any other persons involved in that
8   call or on that call?
9       A.  I don't recall.
10      Q.  Would it be typical for other persons to be on
11  that call?
12      A.  When we had an investment committee, yes.  But
13  the company was in transition; and so for a small legacy
14  matter involving a small amount of capital, it would be
15  typical for the loan officer and myself to make the
16  decision.
17      Q.  So would there -- would it be typical for a
18  representative of ACET Global on such a transaction to
19  have been part of that conversation?
20      A.  Absolutely not.
21      Q.  Okay.  In terms of establishing this
22  relationship, the warrants, for example, with respect to
23  Windspeed, who was involved in establishing that
24  relationship?
25      A.  For Super G Capital, it would have been myself

Page 27

1   and Steve Bellah.  And Steve was discussing the
2   transaction with the other participants, which would
3   have been Baymark and I believe it's pronounced Szeto.
4       Q.  So I'm going to give a pointer on this because
5   I just learned last week.  I believe it's Szeto with a
6   hard Z.  We'll know what we're talking about; Karen may
7   not.
8           Were there any other agents or
9   representatives involved in establishing that
10  relationship?
11      A.  I don't know.  I'm not aware of any other.
12      Q.  And why was that relationship established?
13          MR. PERRIN:  Objection, form.
14          MS. HARD-WILSON:  Objection, form.
15      A.  Super G Capital had a nonperforming loan, a
16  significantly nonperforming loan.  The company that I
17  call ACET was unable to make payments.  And Super G
18  Capital needed to preserve that loan.  And so in my
19  world, that is a workout; and so Steve Bellah and I
20  would have discussed several workout scenarios, which is
21  sub-scale companies are always the lesser of
22  unattractive options.  And it is from that review of
23  options that we concluded the best or least bad option
24  was a foreclosure and the transaction that you're aware
25  of with Windspeed.

Page 28

1       Q.  (BY MR. FREEMAN)  Okay.  Who proposed
2   establishing that relationship?
3       A.  I don't recall.
4       Q.  And did Super G ever discuss any other
5   possible ways to -- any possible alternatives to that
6   relationship?
7           MR. PERRIN:  Objection, form.
8       A.  I don't recall the discussions with Steve, but
9   I know how I conduct workouts and would have solicited
10  or inquired as to an alternative from a set of lenders,
11  foreclosure alternatives.
12      Q.  (BY MR. FREEMAN)  Do you know why any of those
13  were not ultimately used?
14          MR. PERRIN:  Objection, form.
15      A.  I know that Baymark, at a certain point,
16  refused to contribute capital.  The default move with
17  a -- sponsor, as we call them in a transaction, is to
18  lean on the sponsor to put more money into the company.
19  And I became aware that that was not going to happen.
20  So the other option is a liquidation of the inventory.
21      Q.  (BY MR. FREEMAN)  When you refer to "sponsor,"
22  you're referring to representatives of the Baymark
23  parties?
24          MR. PERRIN:  Objection, form.
25      A.  We use the term "sponsor" to describe a

Page 29

1   private equity owner of a business.
2       Q.  (BY MR. FREEMAN)  In this specific context,
3   would that be Tony Ludlow?
4       A.  I don't know and was never fully aware of the
5   Baymark entities.  I refer to the Baymark ownership as
6   Baymark, and I understand from the documentation I have
7   seen in the last few weeks that Tony is affiliated with
8   Baymark.
9       Q.  Okay.  Would it have included David Hook?
10          MR. PERRIN:  Objection, form.
11      A.  Same answer.  I have seen his name recently.
12      Q.  (BY MR. FREEMAN)  Understood.  Are you
13  familiar with Tony Ludlow?
14      A.  I'm not.
15      Q.  Are you familiar with David Hook?
16      A.  I'm not.
17      Q.  Are you familiar with Baymark Partners
18  Management, LLC?
19      A.  I'm familiar with an entity that I believe is
20  in Texas known as Baymark that was our partner -- who
21  was the sponsor, but I am not familiar with the -- with
22  the entity-level information.
23      Q.  Fair enough.  I'm going to go ahead and just
24  to simplify our lives, I'm going to define a phrase
25  here, the Baymark parties.

Marc Cole  *  March 29, 2021

Page 30

1    A.  Okay.
2    Q.  So when we speak of that, unless we clarify
3  within it, let's assume that that means -- that includes
4  the Baymark Partners Management, LLC, ACET Global, LLC,
5  Baymark ACET Holdco, LLC, Baymark ACET Direct Invest,
6  LLC, Baymark Management, LLC, Baymark Partners, Tony
7  Ludlow, David Hook, and Matt Denegre --
8    A.  Thank you.
9    Q.  -- are the Baymark parties.
10    A.  Okay.
11    Q.  Can you tell me about each agreement that
12  Super G had with any of the Baymark parties?
13        MR. PERRIN:  Objection to the definition;
14  objection to the form of the question.
15    A.  Could you rephrase the question?
16    Q.  (BY MR. FREEMAN)  Yes, sir.  And I can go
17  through all of them individually.
18    A.  No, that's all right.
19    Q.  Can you tell me about each agreement that
20  Super G had with any of the Baymark parties?
21    A.  We had an operating agreement for Windspeed
22  Trading for which surely one of those Baymark entities
23  you just mentioned was an equity or warrant holder in
24  Windspeed.  And Super G Capital was a warrant holder in
25  Windspeed.

Page 31

1    Q.  Okay.  Any others that you can think of?
2    A.  That's the only relationship I'm aware of.
3    Q.  Okay.  With that relationship, what documents
4  memorialized the scope of the relationship with which --
5    A.  There's an operating agreement.
6    Q.  And is there -- are there multiple versions of
7  the operating agreement?
8        MS. HARD-WILSON:  Objection, form.
9    A.  I'm only aware of one.
10    Q.  (BY MR. FREEMAN)  I'm sorry, Mr. Cole?
11    A.  I'm only aware of one version.
12    Q.  Okay.  Is that the amended and restated
13  version?
14        THE WITNESS:  Question for counsel,
15  Jason.  Do you know which document binder and which tab
16  that is?
17        MR. FREEMAN:  If you have the exhibits,
18  that is --
19        MR. BLAKLEY:  Exhibit 5 in plaintiff's
20  binder.
21        MR. FREEMAN:  Correct.
22    A.  I'm staring at it now, yes.
23        (Exhibit 5 marked.)
24    Q.  (BY MR. FREEMAN)  Okay.  Was there also a
25  warrant agreement?

Page 32

1    A.  I don't know.
2    Q.  Mr. Cole, with respect to your affidavit that
3  was produced in this matter, have you given more than
4  one affidavit in this matter?
5    A.  I don't know.  The only affidavit I can recall
6  was given within the last 90 days.
7    Q.  Okay.  Not aware of another affidavit?
8    A.  I'm not aware of any other proceedings prior
9  to the last 90 days.
10    Q.  Fair enough.  Who requested your affidavit?
11    A.  I believe it was Baymark counsel.
12    Q.  And do you know specifically who that was?
13    A.  I have communicated with Ed Perrin, but I
14  can't recall if it was Ed or a colleague on the very
15  first conversation.
16    Q.  Okay.  How many conversations did you have
17  regarding that affidavit?
18    A.  One or two.
19    Q.  And who were those with?
20    A.  Again, I believe I was dealing with Baymark
21  counsel at the time.
22    Q.  Okay.  Were you represented by counsel during
23  that?
24    A.  No.
25    Q.  Who drafted your affidavit?

Page 33

1    A.  I believe it was Baymark counsel.
2    Q.  And do you know which of their counsel drafted
3  that?
4    A.  I don't.
5    Q.  Did they send you a copy of it?
6    A.  Yes.
7    Q.  Were there any changes to the first version
8  you received?
9    A.  I don't recall.
10    Q.  Do you recall if they sent it to you more than
11  one time?
12    A.  I don't recall.
13    Q.  Do you recall if you requested any changes?
14    A.  I don't recall.
15    Q.  Do you recall if you requested to remove any
16  statements from the affidavit?
17    A.  I don't recall.
18    Q.  Do you recall what your initial reaction was
19  when you got that affidavit, initially?
20    A.  Nuisance.  This is a former company and a
21  nonperforming loan from many years ago, and I'm in the
22  middle of a large financing.  So quite frankly, any
23  legacy matter, I was probably thinking nuisance.  Not to
24  you-all, but to me.
25    Q.  Did you have any reaction to the substance of

9 (Pages 30 to 33)

Page 34

1   the affidavit?
2       A.  I understand the significance of one, so I
3   would have read it carefully to make sure everything I
4   was representing was truthful to the best of my
5   knowledge.  As far as the substance, I don't recall.
6       Q.   When you spoke with Baymark counsel about that
7   affidavit, did they ask you about the background of this
8   case?
9       A.   If someone called me and asked me to look at
10  an affidavit, I would want to understand what the
11  situation was.  So I -- while I don't recall the details
12  of the conversation, I would have inquired as to what
13  was preceding -- what precipitated my involvement.
14      Q.   Did you look into your files before or after
15  you received the affidavit?
16          MR. BLAKLEY:  Objection, form.
17      A.   I believe I looked before so that I knew the
18  time frame and the events that were in my possession.  I
19  say that because it's the prudent thing to do, not that
20  I remember doing it.
21      Q.   (BY MR. FREEMAN)  Part of what I'm getting at,
22  Mr. Cole, is did you provide any input to Baymark
23  counsel about what should be in your affidavit before it
24  was sent to you?
25          MR. BLAKLEY:  Objection, form.

Page 35

1       A.  I was brought into this matter; I didn't seek
2   this matter out.  I would have corrected an incorrect
3   statement, and I don't think I did any more than that,
4   if I did that.
5       Q.   (BY MR. FREEMAN)  Did you consider providing
6   an affidavit to be an important event?
7           MR. BLAKLEY:  Objection, form.
8           MR. PERRIN:  Objection, form.
9       A.  Not to me.
10      Q.   (BY MR. FREEMAN)  How many affidavits have you
11  signed in the last 90 days?
12      A.  This one.
13      Q.   Only this one?
14      A.  Yes.
15      Q.   Who did you correspond with about the
16  affidavit?
17      A.  Baymark counsel.
18      Q.   Was there anyone else?
19      A.  Alex Godinez in my office.
20      Q.   Was there anyone else?
21      A.  I don't recall who was on the initial phone
22  call that came in first through Alex Godinez and routed
23  to me.  I do recall one evening sitting at my desk
24  having a conversation and receiving the request for an
25  affidavit.  But it wasn't a call I arranged, and I don't

Page 36

1   know who was on the call.
2       Q.   Do you know if it was one of the parties to
3   this case?
4       A.  I don't know.
5       Q.   Did you believe that it might be?
6           MR. BLAKLEY:  Objection, form.
7       A.  I didn't think about it.
8       Q.   (BY MR. FREEMAN)  Did they speak during the
9   call?
10          MR. BLAKLEY:  Objection, form.
11          MR. PERRIN:  Objection, form.
12      A.  Someone spoke.  I was -- I was contacted and
13  asked if I would review an affidavit.  I did.  But I
14  don't know -- I know that I was speaking with Baymark
15  counsel.  I don't know who at Mr. Perrin's firm, and I
16  don't know who else was on the line.
17      Q.   (BY MR. FREEMAN)  But you understood there was
18  someone else on the line with Baymark's counsel?
19      A.  I had no idea.
20      Q.   So with respect to Alex Godinez, did --
21  actually, let me back up just to make sure so I
22  understand.
23          So the only people you spoke with about
24  your affidavit was Alex Godinez and Baymark counsel, and
25  then if there was someone else on that phone with

Page 37

1   Baymark counsel, that person?
2       A.  Correct.
3       Q.   Okay.  What did you discuss with Alex Godinez?
4       A.  And my counsel, which took me through three
5   attorneys to get to J.D.
6       Q.   Got it.  What did you discuss with
7   Mr. Godinez?
8       A.  That we were contacted -- because I believe
9   Alex was initially contacted -- about a lawsuit
10  involving our former client ACET.  And I would have
11  asked Alex to remind me of the nature of the
12  transactions between Super G Capital and ACET.
13      Q.   Okay.  And what did he say?
14      A.  I don't recall.
15      Q.   Was he concerned?
16      A.  No.
17      Q.   Did he provide any input?
18      A.  Yes, I believe he briefed me on the
19  relationships, and I would have asked Alex to review his
20  files for the timeline of the various transactions.
21      Q.   Are those files available at SG Capital
22  Partners?
23      A.  So when Alex and I left Super G Capital, we
24  maintained records from our former loan clients.  And so
25  Alex and I both have the Dropbox file system that was in

Page 38

1    place at the time.  We have those -- we retained a copy
2    of those files.
3         Q.  Okay.  So Alex reviewed those and then y'all
4    discussed it again?
5         A.  Yes.
6         Q.  Do you recall what he -- what kind of input he
7    provided at that point?
8         A.  No.
9         Q.  What about in your call with Baymark counsel?
10   What did they ask you about?
11        A.  It wasn't a memorable call.  I believe we
12   talked about my knowledge of the ACET and Windspeed
13   transactions which I haven't thought about in at least
14   one to two years.
15        Q.  When was that call?
16        A.  I believe it was in the last 90 days.
17        Q.  How soon after that did you provide the
18   affidavit?
19        A.  It all happened very quickly.
20        Q.  Can you define very quickly?
21        A.  Within a week.
22        Q.  So within a week, you have been called by
23   Baymark counsel and have provided an affidavit?
24        A.  Yes.
25        Q.  Okay.  Could you walk me through the timeline

Page 39

1    on that?  You were called by Baymark's counsel.  How
2    long was that phone call?
3         A.  I don't recall.
4         Q.  Was it more or less than 30 minutes?
5         A.  Less.
6         Q.  More or less than 15 minutes?
7         A.  I don't recall.
8         Q.  How soon after that did you contact Alex
9    Godinez?
10        A.  Alex may have sat in for the call.  I believe
11   the call initially came to Alex, and he works down the
12   hall from me.  And I don't know if it happened in real
13   time or if we called back, but we had a conversation,
14   and I agreed to provide an affidavit.
15        Q.  Okay.  So you agreed on your call with Baymark
16   counsel?
17        A.  Yes.
18        Q.  On that initial call?
19        A.  I believe so.  I don't think there was a
20   subsequent call about this matter, but I would be
21   speculating.
22        Q.  Had you ever spoken with Baymark counsel
23   before?
24        A.  I'm not sure.  I don't recall the details of
25   the restructuring; but I certainly had not spoken with

Page 40

1    them in years, if that was the case.
2         Q.  Okay.  So you agreed to provide the affidavit
3    on the initial call.  Did you remember any of the
4    details at that point during the conversation?
5         A.  Broad details, yes.
6         Q.  Okay.  What did they ask you to provide an
7    affidavit about?
8         A.  About the foreclosure and the sale, that Super
9    G had not been paid and we did an Article IX and we
10   contributed or sold those assets to Windspeed.
11        Q.  And then that day, did Alex begin researching
12   this?
13        A.  I don't recall.  It would have been very
14   promptly thereafter.
15        Q.  And then did you have another meeting with
16   Alex?
17        A.  I don't recall.
18        Q.  Do you recall what you did to prepare yourself
19   to sign an affidavit?
20        A.  I discussed it with Alex, and I don't recall
21   if we looked through his files or mine; but we
22   researched the time frame, and I reviewed the affidavit
23   that was prepared for me.
24        Q.  Okay.  Again, did you request any changes to
25   that affidavit, or did you sign it exactly as it was

Page 41

1    sent to you?
2             MR. BLAKLEY:  Objection, form.
3         A.  I believe I requested a change, but I don't
4    recall the change and I could be wrong about that.  But
5    I believe I requested a change or deletion.
6         Q.  (BY MR. FREEMAN)  Could there have been more
7    than one?
8         A.  Possibly.
9         Q.  Okay.  Did you have any of those conversations
10   via email?
11        A.  I don't think so.
12        Q.  Did you have any of them via text?
13        A.  Definitely not.
14        Q.  Any other written medium?
15        A.  No.
16        Q.  Were they all oral?
17        A.  I believe it was -- consisted of one to two
18   phone calls and my signing and scanning a declaration.
19        Q.  Was there any discussion about why it was all
20   via phone call?
21        A.  With me?
22        Q.  Yes, sir.
23        A.  From the call, I know they wanted to speak
24   with me.
25        Q.  There was no discussion about all of the

11 (Pages 38 to 41)

Case 3:21-cv-01171-B   Document 1-8   Filed 05/21/21   Page 12 of 52   PageID 638

## Page 42

1    conversation being oral?
2         A.  I know that Alex either transferred the
3    initial call in to me or asked that I call.  I'm not
4    aware of any email exchange on this matter until after
5    the deposition -- or the subpoena was received by me.
6         Q.  Was there any discussion, though, about the
7    need for discussion about your affidavit to be done
8    orally?
9         A.  I know that Alex asked that I speak to Baymark
10   counsel, and that I talk to them.  As to the nature of
11   why they didn't send me an email or a text, I don't
12   know.  But I do recall that Alex said it was important
13   that they speak with me, and we did.
14        Q.  Did Baymark counsel acknowledge the fact that
15   they did not send you an email?
16             MR. PERRIN:  Objection, form.
17        A.  I don't recall.
18        Q.  (BY MR. FREEMAN)  Did anyone indicate that you
19   should not engage in any written correspondence about
20   the affidavit?
21             MR. PERRIN:  Objection, form.
22        A.  I don't recall if I was told either way.  I
23   know how I communicate, and so I believe that I emailed
24   the affidavit to whomever I was asked to.  And I don't
25   know that I was instructed not to.  I recall one to two

## Page 43

1    calls, and I would have scanned and emailed an
2    affidavit.
3         Q.  (BY MR. FREEMAN)  Did you feel that you were
4    not supposed to engage in written correspondence about
5    your affidavit?
6              MR. PERRIN:  Objection, form.
7         A.  I felt that I -- as in other antagonistic
8    disputes, that I was best to not email anyone that
9    wasn't involved.  That's been hammered into me from a
10   young investment associate is when in doubt, pick up the
11   phone.  And I imagine I applied that standard to this
12   dispute as well, which is why I quickly got counsel.
13        Q.  (BY MR. FREEMAN)  Did you -- if there were
14   any -- well, let's go back.
15             You think there may have been one or more
16   changes to the initial affidavit?
17        A.  Yes.
18        Q.  Did you discuss those with Baymark counsel
19   orally, or did you discuss them by email?
20        A.  I don't know if I discussed -- number one, I
21   don't know if I made changes.  And if I did, I don't
22   know if I discussed them with Baymark counsel or if I
23   discussed them with Alex who was acting as an
24   intermediary.  I just don't recall.
25        Q.  Would you have input the changes yourself?

## Page 44

1         A.  No.
2         Q.  Would Alex have made the changes?
3         A.  Possibly.
4         Q.  Would Baymark counsel have made the changes?
5         A.  Possibly.
6         Q.  When did Super G first loan funds to ACET
7    Global?
8         A.  First loan, July 20th, 2017.
9         Q.  When did Super G begin negotiating that loan?
10        A.  I don't recall, but ours is -- was/is a
11   high-turn, high-velocity business.  It's not done
12   through years.  It's done through weeks and months, so
13   probably in the summer of 2017.
14        Q.  Who was involved in that process?
15        A.  Principally Steve Bellah.
16        Q.  Did ACET Global ever make payments on that
17   loan?
18        A.  Yes.
19        Q.  Did ACET Global ever default on the loan?
20        A.  Yes.
21        Q.  How did it default?
22        A.  ACET did not and could not make its payment
23   obligations and did not maintain the minimum cash that
24   Super G Capital required.  So there were multiple
25   defaults.

## Page 45

1         Q.  Were there any other defaults?
2         A.  There always are, but I would have to look
3    back at the loan agreement.  The principal one is making
4    the payment.
5         Q.  When ACET Global defaulted on the loan, did
6    Super G decide to exercise its right as a secured
7    creditor with respect to any collateral?
8              MR. BLAKLEY:  Objection, form.
9         A.  Not initially.  As we frequently did, we
10   entered into several amendments trying to help the
11   company by reducing the payment amount.  And as I looked
12   through the documents, it got down to what I would call
13   an absurdly low payment, 1,000 or even $500.
14        Q.  (BY MR. FREEMAN)  And they weren't able to
15   make that payment?
16        A.  They were not.
17        Q.  Do you know how many versions or amendments
18   there were to the loan agreement?
19        A.  At least two.
20        Q.  And do you know when those were entered into?
21        A.  Yes.  I wrote it down.  December 2017 was
22   Amendment 1.
23        Q.  Is that 2018?
24        A.  December, 2017, so just six months after the --
25   five months after the initial loan.

Page 46

1      Q.  Okay.
2      A.  I have a note that in April of 2018, the
3   borrower had failed to make its March payments.  And
4   then I believe again in October there was an amendment.
5   So there may have been a total of three, which would
6   have ranged from an email modification with the borrower
7   to an actual formal amendment.
8      Q.  Do you have a copy of the October 2018
9   amendment?
10      A.  I don't know.  And I say that because I have a
11   question mark next to October from my conversation with
12   Alex, so I'm not sure.
13      Q.  Okay.  Would Alex be the person to ask about
14   that?
15      A.  Yes.
16      Q.  Do you know what the terms of those loan
17   agreements were?
18      A.  Well, I have the initial loan agreement in my
19   possession, and it was 65 weekly payments.
20          Jason, are you aware if I have an amended
21   agreement in these folders?
22      Q.  Mr. Cole, I am not sure that you do, although
23   there are some exhibits from defense counsel.
24      A.  I do see an April forbearance agreement which
25   required that we move the weekly payments down to

Page 47

1   $15,000.
2      Q.  The weekly payments to 15?
3      A.  Sorry.  I think this must be referencing the
4   December amendment because it says the borrower failed
5   to make the weekly payments of $15,000 due on
6   March 22nd, 2018, and March 29, 2018, and that the
7   borrower had failed to maintain a cash minimum of
8   $50,000.  So we did a forbearance agreement in April
9   2018, which significantly reduced the payments.
10      Q.  And what was the date of that forbearance
11   agreement?
12      A.  April 12, 2018.
13      Q.  Do you know what that reduced the payments to?
14      A.  Yes.  One moment.  $5,000.
15      Q.  Is that 5,000 a week?
16      A.  5,000 a week in May and then $15,000
17   thereafter, picking up -- yes.
18      Q.  Okay.
19      A.  And it required a capital contribution from
20   Baymark.
21          (Reporter clarification.)
22      Q.  (BY MR. FREEMAN)  Do you know how much that
23   capital contribution was?
24      A.  $30,000.
25      Q.  30,000?

Page 48

1      A.  Yes.
2      Q.  Do you know if that was made?
3      A.  I don't know, but it -- the document says that
4   lender, which was Super G Capital, acknowledges that
5   borrower has received $15,000 of such contribution.  So
6   I know that at least half was paid.
7      Q.  Was that capital contribution supposed to be
8   designated as -- in the same manner as the initial
9   50,000 that was set aside?
10          MR. PERRIN:  Objection, form.
11          MR. BLAKLEY:  Objection, form.
12      Q.  (BY MR. FREEMAN)  If you know.
13      A.  This capital would have been required to be
14   deposited in the borrower's bank.
15      Q.  And maintained at that level?
16      A.  Separate concept.
17      Q.  Got it.  Did ACET Global comply with this
18   forbearance agreement?
19      A.  No.
20      Q.  Did it make any of the $5,000 payments?
21      A.  I believe it did, but I don't have the record
22   in front of me.
23      Q.  Okay.  Your best recollection, how many did it
24   make?
25      A.  Well, the notation that I have is that the

Page 49

1   agreement was modified again in October.  So I'm
2   assuming they made payments for several months, but they
3   clearly stopped at some point because of what happened
4   in the fall and winter of 2018 suggested that they were
5   unable to maintain those payments.
6      Q.  Okay.  So there was a loan modification in
7   October of 2018?
8      A.  I have a notation in my -- from my
9   conversation with Alex about the timeline if there was.
10   I have a question mark next to it, and I don't know if
11   that means we didn't have the agreement or it was an
12   email and not -- at times in situations like this, to
13   save legal expense, we will do an email modification.
14   But I'm not sure what that notation means, but we wrote
15   "October 2018: Amended agreement?"  So Alex clearly
16   thought there was some reduction or modification.
17      Q.  Okay.  Do you know what the terms of that
18   modification were?
19      A.  I don't.
20      Q.  Do you know if it resulted in a lower payment
21   amount?
22      A.  In the exhibits or materials provided to me,
23   there was an email with Steve Bellah that described --
24   here it is.  This is not the October but in July -- in
25   July of 2018 --

Marc Cole  *  March 29, 2021

Page 50

1      MR. BLAKLEY:  Marc, are you looking at
2  Baymark Defendants Exhibit 9?
3      THE WITNESS:  Yes.
4      MR. BLAKLEY:  Just to clarify.
5      THE WITNESS:  Thank you.
6      A.  And there is an email from Steve to Tony and
7  Matt, and it says, "Following up to the conversation.
8  For the next 10 weeks, the new amortization schedule
9  will be $1,000 per week.  In the event the shareholders
10 must contribute cash support in any given week, the
11 payment will be $500."
12     Q.  (BY MR. FREEMAN)  Okay.  And that's Exhibit 9?
13     A.  Yes.
14     Q.  Do you know if they complied with that, if
15 ACET Global complied with that?
16     A.  My belief is they did until they couldn't, and
17 that's when we began pursuing other remedies.
18     Q.  And what was the date of that email?
19     A.  July 2nd, 2018.
20     Q.  Now, is that a common way for Super G to amend
21 a loan agreement?
22     A.  I would say the most desirous is a full, legal
23 amendment, a drafted contract; but in instances where
24 there is small dollars and limited appetite for legal
25 expense on either side, for a limited period of time,

Page 51

1  email was acceptable.  If this was going to be a
2  three-year restructuring, then we would have moved to
3  even a simple one-page amendment.
4      Q.  How long was this expected to occur?
5      A.  It says 10 weeks, so not very long.
6      Q.  So was Super G anticipating going back to the
7  agreement that was in place when that 10 weeks expired?
8      A.  It would have gone back to the last agreement.
9      Q.  That would have been the April 12th, 2018
10 agreement?
11     A.  Yes, I believe so.
12     Q.  So the -- did there come a time when Super G
13 Capital foreclosed on the assets of ACET Global?
14     A.  Yes.
15     Q.  And was that collateral sold to Windspeed
16 Trading, LLC?
17     A.  Yes.
18     Q.  What was the value of the collateral that
19 Super G sold to Windspeed?
20     A.  I don't know how to answer that question.  I
21 know that Super G sold whatever assets were in its
22 possession, whatever assets it could foreclose on for
23 the loan deficiency.
24     Q.  So was that not necessarily the value of the
25 assets?

Page 52

1      MS. HARD-WILSON:  Objection, form.
2      MR. BLAKLEY:  Objection, form.
3      Q.  (BY MR. FREEMAN)  Let me ask that another way.
4  Was the loan deficiency equal to the value of the
5  assets?
6      A.  Not necessarily.
7      Q.  In a foreclosure sale with a third party,
8  would Super G sell the assets for more than the loan
9  deficiency?
10     MR. BLAKLEY:  Objection, form.
11     A.  I mean --
12     Q.  (BY MR. FREEMAN)  Let me ask it another way.
13 Why would a third party pay more than the value of the
14 assets?
15     MR. BLAKLEY:  Objection, form.
16     MS. HARD-WILSON:  Objection, form.
17     A.  At the end of the day, a third party would pay
18 what they perceive the value to be of the assets.  Super
19 G Capital did not do a third-party appraisal.  We made a
20 determination that the restructuring plan with Baymark
21 would be more lucrative than hiring a liquidator and
22 selling the inventory out of the back of the truck.  But
23 ultimately, a secured creditor has to make that
24 calculation.
25     Q.  (BY MR. FREEMAN)  What did Super G believe to

Page 53

1  be the value of the assets that it foreclosed upon?
2      A.  I don't know.
3      Q.  Did it have any idea?
4      A.  My recollection from Steve Bellah, who was an
5  experienced lender, was that the asset value, the hard
6  asset value in a liquidation would be very low.
7      Q.  What does "very low" mean?
8      A.  Less than the balance owed to Super G Capital.
9      Q.  Does that mean, like, 30,000?
10     A.  I don't know.  If it were even close to
11 516,000, if that's -- thereabouts -- if the liquidation
12 value were even close to 516, we would have taken the
13 liquidation value.
14     Q.  Why did Windspeed pay $516,000 for the
15 collateral?
16     A.  They wanted the assets.
17     MS. HARD-WILSON:  Objection, form.
18     MR. BLAKLEY:  Objection, form.
19     Q.  (BY MR. FREEMAN)  Why did they want the
20 assets?
21     MS. HARD-WILSON:  Objection, form.
22     A.  They thought there was value in assuming a
23 note for $516,000 that -- they made a business decision.
24 I don't know.
25     Q.  (BY MR. FREEMAN)  Did they think there was a

Usher Reporting Services
(214) 755-1612

## Page 54

```
 1   lot of value in the assets?
 2         MR. BLAKLEY:  Objection, form.
 3         MS. HARD-WILSON:  Objection, form.
 4     A.  I don't know.
 5     Q.  (BY MR. FREEMAN)  Did they think the assets
 6   were necessary for any business endeavors?
 7         MR. BLAKLEY:  Objection, form.
 8     A.  I believe they thought the value exceeded or
 9   equaled what they were paying, which is what rational
10   folks do, which was a note for $516,000.
11     Q.  (BY MR. FREEMAN)  Did they ever indicate that
12   to you?
13     A.  Well, they indicate it by signing up for the
14   liability.  So that was the best offer that we had
15   received for the assets.
16     Q.  So their actions indicated to you that they
17   valued the assets at $516,000 or more?
18         MR. BLAKLEY:  Objection, form.
19         MS. HARD-WILSON:  Objection, form.
20     A.  Yes.
21     Q.  (BY MR. FREEMAN)  Did they ever state that
22   verbally?
23     A.  I have no idea.
24     Q.  Don't recall?
25     A.  Don't recall.
```

## Page 55

```
 1     Q.  But it's your belief that the actions of the
 2   Baymark parties indicated that the value of ACET
 3   Global's assets was $516,000 or more?
 4         MR. BLAKLEY:  Objection, form.
 5     A.  They were willing to assume our liability, so
 6   that was the determining factor in going with that
 7   transaction.
 8     Q.  (BY MR. FREEMAN)  Were they willing to do more
 9   than just assume that liability?
10         MR. BLAKLEY:  Objection, form.
11     A.  That's a no because the business needed
12   working capital; and I do recall that I insisted either
13   Baymark or Szeto put up that working capital, and
14   neither one would.  So I am reminded from the
15   documentation that Super G committed the cardinal sin of
16   chasing bad money with good and put more money into
17   Windspeed.
18     Q.  (BY MR. FREEMAN)  Why would neither Szeto or
19   the Baymark parties put in additional capital?
20         MR. BLAKLEY:  Objection, form.
21         MS. HARD-WILSON:  Objection, form.
22     A.  You start and own the business.
23     Q.  (BY MR. FREEMAN)  So why did Super G end up
24   making this deal?
25     A.  We bluffed and lost.  We didn't want to
```

## Page 56

```
 1   take -- Super G didn't want to take the write-off and
 2   insisted that Baymark and Szeto fully fund the plan, and
 3   they declined.  But they said they would make the
 4   business work, and that would repay Super G Capital.
 5   And so clearly my opinion at the time that a liquidation
 6   would have been such a poor idea, that we put new money
 7   in to support Windspeed in the hope of recovering the
 8   old money and the new money.
 9         (Reporter clarification.)
10     Q.  (BY MR. FREEMAN)  How much new money did you
11   put in to Windspeed?
12     A.  $200,000.
13     Q.  And did Super G receive anything in return?
14     A.  Yes.  It received a warrant for ownership in
15   Windspeed Trading.
16     Q.  Did it receive that warrant at the time that
17   it made the loan?
18         MR. PERRIN:  Objection, form.
19     A.  I can answer that, if you give me a minute.
20   Thereabouts, yes.  The actual timing -- I'll defer to
21   the documentation, but thereabouts, yes.
22     Q.  (BY MR. FREEMAN)  So -- and when I say
23   "received the warrants," that means the right to
24   exercise the warrants.  They received those at around
25   the same time as the loan?
```

## Page 57

```
 1     A.  The loan was made around March 1st, and I
 2   believe that was -- I believe it all happened around the
 3   1st of March, both the loan --
 4     Q.  Okay.
 5     A.  Actually, you pointed me to the operating
 6   agreement before, and so I can tell you dates.  I would
 7   imagine the operating agreement was signed before the
 8   new money went in.
 9     Q.  Would you have expected it to be signed around
10   the same time as the new money?
11         MR. BLAKLEY:  Objection, form.
12     A.  Plus or minus a few months, yes.
13     Q.  (BY MR. FREEMAN)  Okay.  Would a few months
14   be, like, one or two months or 12?
15     A.  The loan was made October 2018 to Windspeed,
16   so I assume Windspeed was in place as the legal entity
17   if Super G were funding it.
18     Q.  So Super G made a loan to Windspeed in October
19   of 2018?
20     A.  That's correct.
21     Q.  And do you know what date that loan agreement
22   was?
23     A.  October 18.
24     Q.  October 18th?
25     A.  Yes.
```

## Page 58

1      Q. And what was the amount of that loan?
2      A. $200,000 even.
3      Q. And what were the terms of that loan?
4      A. 24 monthly payments of $3,000, which was an
5 interest payment, and a bullet for the $200,000 of
6 principal plus a $50,000 exit fee due November 18, 2020.
7      Q. You mentioned a $50,000 exit fee?
8      A. Yes.
9      Q. What does that mean?
10      A. It means that $250,000 would have been owed
11 two years later.
12      Q. What is that fee designed to compensate for?
13      A. The risk of putting the capital up.
14      Q. But that's not interest?
15      A. It's not. It's in addition to.
16      Q. Is that -- can you help me understand that?
17 Is that more of an equity-type stake?
18      A. No, it's fairly common in commercial finance,
19 sometimes in banking, but certainly in private
20 commercial finance companies is to have a monthly
21 interest rate imbedded in the loan and then a kicker.
22 Sometimes there's an origination fee. In this case,
23 there was no origination fee, but there was an exit fee.
24 Lenders try to come up with a menu of ways to make more
25 money.

## Page 59

1      Q. From Super G's side, do they -- in terms of
2 the accounting for it, do they amortize that into the
3 interest, or do they account for it as a separate line
4 of revenue?
5      A. Origination fees --
6       MS. HARD-WILSON: Objection --
7      A. Origination fees are amortized through the
8 life of the loan. Exit fees are accounted separately
9 when and if received.
10      Q. (BY MR. FREEMAN) And why was this not done as
11 an origination fee?
12      A. I don't know, but I will assume to maximize
13 the dollars received by the company to meet its working
14 capital needs.
15      Q. Okay. So did Super G obtain its rights to the
16 warrants in Windspeed on or about October 18th of 2018?
17       MR. BLAKLEY: Objection, form.
18       THE WITNESS: You said it was Number 9?
19 Here we are.
20      A. This agreement, which is the amended and
21 restated Windspeed Trading, LLC, agreement, was
22 October 18th, 2018. So that is the -- okay. That was
23 the same date as the loan agreement. I would have
24 thought within a few months, but it happened
25 simultaneously.

## Page 60

1      Q. (BY MR. FREEMAN) Okay. Is that the document
2 that grants the rights to warrants in favor of Super G?
3      A. Correct.
4       MR. BLAKLEY: Objection, form. Go ahead
5 and answer, Marc.
6      A. Correct, yes.
7      Q. (BY MR. FREEMAN) When did Super G first begin
8 negotiating its loan agreement that occurred on
9 October 18th, 2018?
10      A. From the documentation that I reviewed, there
11 were several negotiations and evaluating several plans
12 over the summer of 2018.
13      Q. Okay. Was this plan contemplated by Super G
14 at the time that it entered into the modification to the
15 loan in July of 2018?
16      A. I don't think it would be because I would have
17 moved right to the next plan.
18      Q. Were there any discussions at that time, June
19 or July of 2018, about needing to have anything in place
20 in order to move to that plan?
21       MR. BLAKLEY: Objection, form.
22      A. I don't know. I recall that Steve Bellah was
23 having frequent communications with the Baymark team
24 over that period of time that led to this fall of '18
25 plan.

## Page 61

1      Q. (BY MR. FREEMAN) Okay. Going back, was --
2 with respect to the collateral that was foreclosed upon
3 by Super G Capital, was all of it sold to Windspeed?
4      A. Yes.
5      Q. So Super G Capital did not keep any of the
6 collateral?
7      A. Not even a bracelet for my wife. It was all
8 foreclosed and sold.
9      Q. Not even a fairy tear bracelet?
10      A. Not even a fairy tear bracelet.
11       MR. PERRIN: Jason, are we getting near a
12 stopping point? We've been going for about an hour and
13 45.
14       MR. FREEMAN: We are. Give me about five
15 more minutes or so, and I think we'll be to a pretty
16 good stop to take a break.
17      Q. (BY MR. FREEMAN) What assets did Windspeed
18 have at the time that Super G made the $200,000 loan in
19 October of 2018?
20       MS. HARD-WILSON: Objection, form.
21      A. Are you asking pre-foreclosure or post?
22      Q. (BY MR. FREEMAN) Yes, sir, pre-foreclosure.
23      A. I'm not aware that they brought any assets
24 into the company.
25      Q. Is it typical for Super G to extend a $200,000

Usher Reporting Services
(214) 755-1612

Page 62

1    loan to a company with no assets?
2         MR. BLAKLEY:  Objection, form.
3    A.  No.
4    Q.  (BY MR. FREEMAN)  Why did Super G make a
5    $200,000 loan to a company with no assets?
6    A.  Well, it was purely defensive.  Super G was
7    facing a significant deficiency, and the restructuring
8    plan that we chose as the lesser of bad options was --
9    and I don't say this with any ill intent to irritate
10   anybody -- was to partner with the folks on the ground.
11   And we concluded that the combination of the assets that
12   were being foreclosed and contributed, their involvement
13   and unfortunately additional capital would result in the
14   best overall financial recovery.
15   Q.  Okay.
16   A.  I did not want to be the provider of that last
17   round of funding.
18   Q.  So at the time that Super G made the $200,000
19   loan in October of 2018, did it know or believe that
20   Windspeed would acquire the assets of ACET Global?
21   A.  Yes.
22        MS. HARD-WILSON:  Objection, form.
23   Q.  (BY MR. FREEMAN)  That was yes?
24   A.  Yes.
25   Q.  Why did it believe that?

Page 63

1    A.  I don't know.  They were -- we, Super G
2    Capital, was in negotiation with the other parties and
3    still thought this was the best outcome.  Had someone
4    shown up and paid Super G Capital $518,000, we would
5    have sold the assets to that party and had a $200,000
6    loan to a Szeto start-up.
7    Q.  Did you seek out another party?
8    A.  I personally did not.
9    Q.  Did Super G?
10   A.  I don't know who Steve Bellah spoke to.  I
11   know that he continued to provide me with a lousy list
12   of restructuring options.
13   Q.  Where did he get that list of restructuring
14   options?
15   A.  No, his alternatives were never good.  I don't
16   think Steve did much.  So I think he leaned on the
17   owners of the business to come up with a plan.
18   Q.  And they offered this restructuring plan?
19   A.  Yes.
20   Q.  The other parties that Super G was negotiating
21   with as part of this that were representing ACET Global
22   and the Baymark parties, was that Tony Ludlow?
23        MR. PERRIN:  Objection, form.
24   A.  I was not familiar with that name.  I believe
25   that Matt Denegre was the primary point person.

Page 64

1    Q.  (BY MR. FREEMAN)  Matt Denegre?
2    A.  Yes.
3    Q.  What about David Hook?
4    A.  I was not familiar with David's name.
5    Q.  Okay.  Did you understand whether -- did you
6    perceive whether Matt Denegre took his marching orders
7    from Tony Ludlow or David Hook?
8         MR. PERRIN:  Objection, form.
9    A.  I had no idea.
10        MR. FREEMAN:  I think we're to a good
11   stopping point, if y'all would like to take a break,
12   maybe a ten-minute break, roughly?
13        THE WITNESS:  Ten would be great.  I have
14   to have something notarized.
15        (Break taken from 3:49 p.m. to 4:04 p.m.)
16        MR. FREEMAN:  We are back on the record.
17   Q.  (BY MR. FREEMAN)  Mr. Cole, did you ever
18   discuss ACET Global's bankruptcy?
19   A.  No.
20   Q.  Were you aware that it had filed for
21   bankruptcy?
22   A.  No.
23   Q.  Show you what's listed as Exhibit 23.  I will
24   do a screen share.
25        (Exhibit 23 marked.)

Page 65

1    Q.  (BY MR. FREEMAN)  Mr. Cole, I am putting up on
2    the screen what's marked as Exhibit 23 of this
3    deposition.  Can you see this document?
4    A.  I do.
5    Q.  And have you ever seen this document before?
6    A.  Only in the context of the materials that were
7    sent to me.
8    Q.  Okay.  What do you understand this document to
9    be?
10   A.  A voluntary bankruptcy for the entity ACET
11   Global.
12   Q.  Okay.  On line 4, can you tell me the listed
13   principal place of business of ACET Global, LLC?
14   A.  5700 Granite Parkway in Plano, Texas.
15   Q.  And Mr. Cole, do you know who signed this
16   document?
17   A.  Looks like Anthony Ludlow.  And I can't -- and
18   Michael [sic] Shriro.
19   Q.  And in what capacity has Mr. Ludlow signed
20   this document?
21        MR. PERRIN:  Objection, form.
22   A.  President.
23   Q.  (BY MR. FREEMAN)  And do you know a president
24   of what entity?
25        MR. BLAKLEY:  Objection, form.

                                    17 (Pages 62 to 65)

Page 66

1   A.  Well, the debtor is listed as ACET Global,
2   LLC, in this document.
3   Q.  (BY MR. FREEMAN)  So does it appear to you
4   from reviewing this document that Anthony Ludlow has
5   executed this bankruptcy petition in his capacity as
6   president of ACET Global, LLC?
7       MR. BLAKLEY:  Objection, form.
8       MR. PERRIN:  Objection, form.
9   A.  That's what it appears to me.
10  Q.  (BY MR. FREEMAN)  And can you tell me what
11  date is reflected on top of that signature?
12  A.  October 23rd, 2019.  I'm sorry -- yes,
13  October 23rd, 2019.
14  Q.  Were all of the debts owed by ACET Global,
15  LLC, to Super G Capital extinguished at that time?
16      MR. PERRIN:  Objection, form.
17  A.  All of the debts were extinguished as of the
18  date of the foreclosure agreement.
19  Q.  (BY MR. FREEMAN)  All right.
20  A.  Which is March 1st, 2019.
21  Q.  Okay.  So this filing -- again, you can see
22  the date up on top.  This filing in Schedule D lists
23  creditors who have claims that are secured by property,
24  secured creditors.
25  A.  Yes.

Page 67

1   Q.  Does there appear to be just one secured
2   creditor of ACET Global, LLC, that's listed?
3       MR. PERRIN:  Objection, form.
4   A.  On this page, yes.  I'm not sure if there's
5   additional --
6   Q.  (BY MR. FREEMAN)  Who is that creditor?
7   A.  ACET Venture Partners, LLC.
8   Q.  And what is the amount of that secured claim
9   that's reflected on this document?
10  A.  $3.23 million.
11  Q.  And I'm going to scroll up so that you can see
12  all of Schedule D, and it's just that one page.
13  A.  I see.
14  Q.  Is Super G, LLC, reflected on this document?
15  A.  No.
16      MR. PERRIN:  Objection, form.
17  Q.  (BY MR. FREEMAN)  And when I say "Super G,"
18  you understand me to be referring to Super G Capital,
19  LLC, correct?
20  A.  Yes.
21  Q.  So Super G Capital is not reflected as a
22  secured creditor on this form.  Was that a correct
23  representation to the bankruptcy court?
24      MR. BLAKLEY:  Objection, form.
25  A.  Super G Capital did not participate in this

Page 68

1   bankruptcy.  And looking at the dates, Super G Capital
2   had exchanged its note and deficiency for the company's
3   collateral.  So it would be correct that Super G Capital
4   is not a party to this bankruptcy filing.
5   Q.  (BY MR. FREEMAN)  So as of this date, it's no
6   longer a creditor of ACET Global?
7   A.  Correct.
8   Q.  Okay.  I would like to go to Page 24 of 29 in
9   this Exhibit 23.  Mr. Cole, if you'll look at the page
10  in front of you, you'll see Question Number 27, which
11  asks, "Have any inventories of the debtor's property
12  been taken within two years before filing this case?"
13      Can you see that?
14  A.  Yes.  I see that "no" is checked.
15  Q.  So this reflects an answer of "no"?
16  A.  Yes, it does.
17  Q.  Okay.  I would also like to draw your
18  attention to Question Number 30 on Page 24 of 29.  And
19  this question is titled, "Payments, distributions, or
20  withdrawals credited or given to insiders."  And it
21  states or asks, "Within one year before filing this
22  case, did the debtor provide an insider with value in
23  any form, including salary, other compensation, draws,
24  bonuses, loans, credits on loans, stock redemptions, and
25  options exercised."

Page 69

1       And how is this item answered?
2   A.  "No."
3   Q.  Mr. Cole, I'd like to take you up to Page 22
4   of 29 in Exhibit 23, specifically to Question Number 20,
5   which is entitled, "Off-premises storage."  And the
6   statement reflected on the form states, "List any
7   property kept in storage units or warehouses within one
8   year before filing this case.  Do not include facilities
9   that are in a part of a building in which the debtor
10  does business."
11      And how is this marked by the debtor?
12  A.  "None."
13  Q.  Mr. Cole, I'm going to take you to Page 21 out
14  of 29 of this Exhibit 23 that's before you, specifically
15  Question Number 13.  If you'll follow along with me,
16  it's captioned, "Transfers Not Already Listed on This
17  Statement."  And it states, "List any transfers of money
18  or other property by sale, trade, or any other means
19  made by the debtor or a person acting on behalf of the
20  debtor within two years before the filing of this case
21  to another person, other than property transferred in
22  the ordinary course of business or financial affairs.
23  Include both outright transfers and transfers made as
24  security.  Do not include gifts or transfers previously
25  listed on this statement."

Usher Reporting Services
(214) 755-1612

Marc Cole  *  March 29, 2021

Page 70

1      And how is this item reflected -- or
2  answered by the debtor?
3      A.  "None."
4      Q.  Mr. Cole, who do you work for?
5      A.  I work for SG Credit Partners, Inc.
6      Q.  And what is SG Credit Partners, Inc?
7      A.  We are a boutique commercial finance company.
8  We make loans to other businesses.
9      Q.  And what does "SG" stand for?
10     A.  Well, it doesn't stand for anything, but it
11  pays tribute to where we came from, which is Super G
12  Capital.
13     Q.  And when was it formed?
14     A.  In 2018.
15     Q.  And when did it begin doing business?
16     A.  It operated as a balance sheet repository in
17  2018 when we raised capital.  And it began as an
18  operating entity, if you will, with actual employees in
19  2019.
20     Q.  Okay.  And can you explain to me what you mean
21  by balance sheet repository?
22     A.  So when I was an employee of Super G Capital,
23  and as were several colleagues, we raised a pool of
24  capital under the name SG Credit Partners.  And we
25  originated loans as Super G Capital and sold those loans

Page 71

1  to SG Credit Partners.  And when that pool of assets got
2  large enough to generate income to hire my team, we
3  resigned from Super G Capital and became employees of SG
4  Credit Partners.
5      Q.  Was there any kind of formal transfer of that
6  loan pool?
7      A.  Very much so.  The loans were sold at
8  negotiated prices.
9      Q.  What is your role with SG Credit Partners?
10     A.  I'm its chief executive officer, and I am a
11  member -- I'm a member of the board of directors, and I
12  am a minority shareholder in its parent company.
13     Q.  Who is its parent company?
14     A.  A holding company called SGCP Holdings.
15     Q.  And what does "SGCP" stand for?
16     A.  It's just an abbreviation for Super G Credit
17  Partners.  Sorry.  SG Credit Partners, I guess,
18  technically.  I get confused by all the acronyms.
19     Q.  Is -- who else is a shareholder in SGCP
20  Holdings?
21     A.  There are two significant family offices that
22  each have an investment entity that together are the
23  majority holders of SGCP.  And then individuals on my
24  management team and I represent minority holders.
25     Q.  So who on the management team has shares?

Page 72

1      A.  Myself, our chief investment officer, our head
2  of credit -- head of special assets, I should say; my
3  partner, Charlie Perer, who was a co-founder with me;
4  and then a total of four, I believe, other initial
5  employees.
6      Q.  Okay.  Who is the CIO, chief investment
7  officer?
8      A.  Name's Andrew Hettinger, H-E-T-T-I-N-G-E-R.
9      Q.  And who is the head of special assets?
10     A.  Lon Brown.  L-O-N, Brown, B-R-O-W-N.
11     Q.  Okay.  And what about the four other initial
12  employees?
13     A.  Charlie Perer, P-E-R-E-R, is my partner;
14  Spencer Brown; Chris Koenig, K-O-E-N-I-G; Nick
15  Serayadarian, S-E-R-A-Y-A-D-A-R-I-A-N; Oren Moses,
16  M-O-S-E-S.
17     Q.  Is that all of them?
18     A.  I believe that is all of the shareholders.
19     Q.  Okay.  And what about the two significant
20  family offices?  Who are those?
21     A.  It's a company in Utah called Cynosure,
22  C-Y-N-O-S-U-R-E.  And there's another firm in Atlanta
23  that its legal entity is called 4612.
24     Q.  It's 4612?
25     A.  Yes, 4-6-1-2.

Page 73

1      Q.  What percentage do these two entities own?
2      A.  40 percent each.
3      Q.  Do you know what kind of entities those are?
4      A.  They're registered investment advisors.
5      Q.  And do you know if they are LLCs or
6  corporations?
7      A.  Bear with me one second.
8      Q.  Sure.
9      A.  Cynosure Investment Partners is an LLC, and
10  4612-SG Holdco is an LP.  I have one other board member
11  that I omitted who owns shares.
12     Q.  Who is that?
13     A.  Jeffrey Brown.
14     Q.  So 4612-SG Holdco, LP, who owns that company
15  or that limited partnership?
16     A.  I don't know all of the individual investors.
17  I know that it is considered the family office for an
18  Atlanta-based real estate developer named Tom Cousins.
19  And they have many foundations and friends who I believe
20  participate in a deal-by-deal investment.
21     Q.  Okay.  Do you understand that particular LP to
22  have been a -- what's called a special-purpose vehicle
23  or a vehicle for this particular investment?
24     A.  Yes.
25     Q.  With respect to Cynosure Investment Partners,

Usher Reporting Services
(214) 755-1612

Page 74

1  who are the members of that LLC?
2      A.  It's a large organization, and their side of
3  the ledger I am unaware of.  I know that there are four
4  principals -- there were initially four principals in
5  Cynosure.  I believe that it's a series or multiple-fund
6  manager, meaning that Cynosure has investors that are
7  unique to their ownership in SG that are not in their
8  other portfolio companies; but the details of that are
9  not shared with me.
10     Q.  Okay.  Do you know any of the members or
11  principals of that LLC?
12     A.  Yes.
13     Q.  Who are they?
14     A.  Cynosure is broadly the -- I should say,
15  initially the family office of a prominent Utah family
16  named Eccles, which I believe is E-C-C-L-E-S.  And they
17  manage over a dozen foundations.
18     Q.  Okay.  And who else?
19     A.  The managing member who signs all of my
20  documentation is named Keith Taylor.
21     Q.  Okay.
22     A.  There's another partner named Spencer Eccles,
23  who is the family representative.  And I know a founding
24  partner whose name is Herbert Scruggs.
25     Q.  Okay.  Anyone else?

Page 75

1      A.  There is a board member named Mark
2  Oligschlaeger, which is O-L-I-G-S-C-H-L-A-E-G-E-R --
3      Q.  Okay.
4      A.  -- but I do not know if he is a member because
5  he joined while the investment was being made.
6      Q.  Okay.  Anyone else you can -- that you know
7  of?
8      A.  I'm not aware of the limited partners, so to
9  speak.
10     Q.  Okay.  Please tell me if any of the following
11  persons have any association with Cynosure.
12     A.  Okay.
13     Q.  Matt Denegre?
14     A.  Not that I'm aware of.
15     Q.  David Hook?
16     A.  Not that I'm aware of.
17     Q.  Tony Ludlow?
18     A.  Not that I'm aware of.
19     Q.  Baymark Partners?
20     A.  Not that I'm aware of.
21     Q.  Baymark Management, LLC?
22     A.  Not that I'm aware of.
23     Q.  Baymark ACET Direct Invest, LLC?
24     A.  Not that I'm aware of.
25     Q.  Baymark ACET Holdco, LLC?

Page 76

1      A.  Not that I'm aware of.
2      A.  ACET Global, LLC?
3      A.  Not that I'm aware of.
4      Q.  Baymark Partners Management, LLC?
5      A.  Not that I'm aware of.
6      Q.  Any other entity associated with any of those
7  entities?
8      A.  No.  And I'm fairly confident they're not.
9      Q.  Okay.  What about with respect to 4612-SG
10  Holdco?  Are any of the entities I just listed
11  associated with that company?
12     A.  I'm fairly confident no, because if they were,
13  I think the investment would have shared that with me in
14  diligence when they saw our track record.
15     Q.  Okay.  Are any of those entities that I listed
16  associated with or related in any way to SG Credit
17  Partners?
18     A.  No.
19     Q.  So SG Credit Partners, fair to say it was a
20  spin-out of Super G Credit?
21     A.  SG Credit Partners was a spin-out of Super G
22  Capital Partners.
23     Q.  Okay.  Was it a particular portion of it that
24  was spun out or all of it or...
25     A.  Super G Capital operated two businesses, a

Page 77

1  merchant services lending business, which we call ISO,
2  I-S-O, that Darrin Ginsberg and another partner are in,
3  and a cashflow lending business that I lead.  And the
4  spin-out was that I took my team out.
5      Q.  Okay.  Does Darrin Ginsberg have any ownership
6  in SG Credit Partners?
7      A.  He does not now.
8      Q.  Did he at one time?
9      A.  Yes, he did at the time of the spin-out.
10     Q.  What was the nature of his ownership interest?
11     A.  For enabling us to run the platform without
12  overhead, which is what I did for one year.  And by
13  paying the freight of my team while we established SG
14  Credit Partners, he received approximately 50 percent
15  ownership interest in SG Credit Partners.
16     Q.  And when and how was that bought out?
17     A.  In August of 2019, we sold SG Credit Partners
18  to the two families, and they purchased 100 percent of
19  Darrin's interest in the company.
20     Q.  Did anyone else sell any of their interest at
21  that time?
22     A.  My partner Charlie and I sold a small portion
23  of -- sold a portion of our interest.  And Darrin's
24  partner Jon Engleking sold all of his interest.
25     Q.  Were you involved in the formation of SG

Page 78

1    Credit Partners?
2        A.  Yes.
3        Q.  Who else was involved in its formation?
4        A.  My partner, Charlie Perer, Michael Charles
5    Perer.
6        Q.  And who were its directors or its board?
7        A.  At the time of formation, it was myself,
8    Charlie Perer, and Darrin Ginsberg.
9        Q.  Okay.  And how has that changed over time?
10       A.  Significantly.  When the investors came in and
11   purchased the shares, they reconstituted the board.  And
12   how --
13       Q.  In what way did they do that?
14       A.  Well, they received the majority of the seats.
15   Charlie and I received one seat on the board, which is
16   mine.  I received the nomination of an independent
17   director, which is Jeff Brown.
18       Q.  Okay.
19       A.  The investors brought three executives to the
20   team who each received a board seat.  And the investors
21   each have a board seat.
22       Q.  Okay.  And who are the executives?
23       A.  Andrew Hettinger, Lon Brown.  And the chairman
24   of the board, his name is Morris McNair, who goes by
25   Mack McNair.

Page 79

1        Q.  Okay.  Does SG Credit Partners have a
2    document-retention policy?
3        A.  No.
4        Q.  Does it have a document-destruction policy?
5        A.  No.  I -- I think we have developed an IT
6    manual in the last few months that I was not very much
7    involved in that I think has some boilerplate language
8    around use of company systems.
9        Q.  Okay.  With respect to Super G Capital,
10   you're -- correct, you're not currently an employee of
11   Super G?
12       A.  That's correct.
13       Q.  What position, specifically, did you hold at
14   Super G?
15       A.  Many.  I took the title of chief financial
16   officer because we needed someone in that seat for
17   investor purposes.  I took the title of chief credit
18   officer at one point.  It was a three-partner
19   organization, and I was one of three partners.
20       Q.  Who were those partners?
21       A.  Myself, Darrin Ginsberg, and Jon Engleking.
22       Q.  What did you do in those positions?
23       A.  Raised money.  I assisted in evaluating loan
24   transactions, in building out various products, loan
25   products.  I did investor relations.  I did some

Page 80

1    investment sourcing.  And then, ultimately, I took what
2    was a very different business model from the one I
3    joined and negotiated an exit.
4        Q.  Who did you report to in those positions, if
5    anyone?
6        A.  Darrin Ginsberg.
7        Q.  And did you have ownership in Super G Capital?
8        A.  I received phantom ownership.
9        Q.  And what was the nature of that?
10       A.  The company was owned by Darrin's trusts.  Jon
11   Engleking and I received a phantom stake such that upon
12   a sale event, he and I would receive a portion of the
13   profits derived above a return of capital to Darrin.
14       Q.  Okay.  Who owns Super G Capital now?
15       A.  A trust for Darrin, of which I believe I am
16   the trustee, and Darrin's now ex-wife.
17       Q.  What is his ex-wife's name?
18       A.  Sharon Ginsberg.
19       Q.  Sharon Ginsberg?
20           So how was that ownership split up?
21       A.  They are 50/50, Darrin's trust and Sharon.
22       Q.  And do you know what the name of that trust
23   is?
24       A.  I believe it is the Darrin M. Ginsberg Family
25   Trust.

Page 81

1        Q.  Okay.  How is Super G Capital managed?  What
2    is its management structure?
3        A.  Darrin is the only employee.
4        Q.  Does it have a board?
5        A.  He's the sole manager.
6        Q.  Who are its attorneys?
7        A.  We used several firms over the years.  The
8    corporate firm, if you will, is a firm in New Haven,
9    Connecticut, that has done many deals and projects for
10   me named Brenner, Saltzman & Wallman.
11       Q.  Okay.  Anyone else?
12       A.  In which capacity?
13       Q.  In any capacity that they have represented
14   Super G Capital.
15       A.  I would say that Darrin's divorce attorney is
16   probably the only active attorney interfacing with the
17   legal entities right now.
18       Q.  Is that Tim Sylvester?
19       A.  No.  His name -- he's a spitting distance from
20   my office, too.
21       Q.  But it's his attorney in the divorce?
22       A.  Yes.  Give me one second, please.  I have
23   blocked it out for obvious reasons.  I'm sorry.  There
24   was a firm that I brought in recently, "recently"
25   meaning last year.  The BakerHostetler firm out of Ohio

21 (Pages 78 to 81)

Page 82

1  assisted me with some restructuring of Super G's debts.
2  Q.  Okay.
3  A.  And Ben Phillips is the divorce attorney.
4  Q.  Okay.
5  MR. BLAKLEY:  Jason?
6  MR. FREEMAN:  Yes.
7  MR. BLAKLEY:  Dunn Sheehan is representing
8  Super G to the extent necessary to respond to
9  third-party discovery having to do with this matter.
10  MR. FREEMAN:  Okay.  Got it.
11  Q.  (BY MR. FREEMAN)  Who is Tim Sylvester?
12  A.  Tim is a corporate lawyer that has done work
13  for SG Credit Partners.
14  Q.  Does he represent Super G Capital?
15  A.  He does not now.  I have moved the
16  representation of this matter to J.D.'s firm.
17  Q.  Did he previously represent Super G Capital?
18  A.  Only as pertains to the subpoena and the
19  subpoena process of information.
20  Q.  Okay.  Who hired him?
21  A.  I hired him.
22  Q.  Okay.  Is Super G Capital affiliated with any
23  other entities that we have discussed?
24  A.  Darrin has a personal holding company called
25  Super G, LLC, to further add to the confusion, and

Page 83

1  that's it.
2  Q.  Other than the name similarity, does it have
3  any -- that you know of, any direct legal affiliation?
4  A.  To Super G, LLC?
5  Q.  Yes, sir.
6  A.  Yes.  Super G, LLC, provided capital to Super
7  G Capital.
8  Q.  Okay.  Do you know why that structure is in
9  place?
10  A.  I do.  Darrin Ginsberg, this being a community
11  property state, had wanted to separate his premarital
12  property from his marital property with Sharon Ginsberg,
13  which turned out to be a good decision since they had a
14  dissolution of that marriage.
15  Q.  Does Super G operate under any licenses?
16  A.  Super G had a lender's license in the state of
17  California, which is through the Department of Business
18  Oversight.  And it surrendered that license.
19  Q.  When did it do that?
20  A.  Recently.  I believe year end 2020.
21  Q.  Okay.  Was it subject to any other regulatory
22  agency?
23  A.  No.
24  Q.  Did it file reports with the Department of
25  Business Oversight?

Page 84

1  A.  Annual.
2  Q.  Annually?
3  A.  Yes.
4  Q.  Did those require disclosure of loans?
5  A.  The department wants to know which of the
6  loans pertain to California domicile borrowers, so that
7  was the nature of the reporting.
8  Q.  Would the loan made to ACET Global, LLC, be
9  reflected on any reports made to the Department of
10  Business Oversight?
11  A.  It's a very voluminous report that I had the
12  pleasure of never preparing personally, so I can't
13  answer your question accurately.  I know that -- ACET
14  Global would not be considered a California borrower
15  from the reporting standpoint in the numerator of loans
16  made.  I don't know if the department asked about the
17  denominator of loans.
18  Q.  Okay.  What about with respect to the
19  Windspeed loan?  Would that be reflected in a report to
20  the Department of Business Oversight?
21  A.  No, as it was a Texas borrower, as well.
22  Q.  Did Super G have licenses in any other states?
23  A.  Licenses?  Not that I'm aware of.  I believe
24  it had filed to do business in various states, but it
25  had just one lender license.

Page 85

1  Q.  Okay.  Where were its offices located?
2  A.  Newport Beach, California.
3  Q.  Were there any other offices?
4  A.  Initially in Virginia, but in the last five
5  years, no.
6  Q.  What office did Steve Bellah operate out of?
7  A.  Home office.
8  Q.  Where was that?
9  A.  I believe in the Dallas Metro area.
10  Q.  How many employees were there of Super G?
11  A.  At the peak, perhaps a dozen to 15.  We had an
12  office in Los Angeles, as well.
13  Q.  Who is Charlie Perer?
14  A.  He was a Super G Capital employee, and he was
15  my partner in the spin-out of SG Credit Partners.
16  Q.  Okay.  And what about David Ginsberg?
17  A.  Darrin's brother, and was a clerical employee
18  of Super G Capital.
19  Q.  Okay.  What about Joey Moore?
20  A.  Darrin's brother-in-law, and was also an
21  administrative or clerical employee of Super G Capital.
22  Q.  Okay.  And Jon Engleking?
23  A.  Engleking.
24  Q.  Engleking.  Who was he?  He was his partner?
25  A.  Yes.  They ran the merchant services lending

22 (Pages 82 to 85)

Page 86

1  business together.
2      Q.  What is his background?
3      A.  In merchant services operations.
4      Q.  Did he put up capital for Super G?
5      A.  No.
6      Q.  Who is Oren Moses?
7      A.  Employee of Super G Capital who is now an
8  employee of SG Credit Partners.
9      Q.  Okay.  What does Oren do?
10     A.  He's my portfolio manager.
11     Q.  Okay.  What about Gerardo Mora?
12     A.  Gerardo is a junior employee and credit
13  associate of SG Credit Partners in Los Angeles.
14     Q.  Okay.  Was Gerardo with Super G Capital?
15     A.  I believe that he joined -- yes, he was our
16  intern, and I believe he joined full time prior to the
17  spin-out.
18     Q.  Okay.  What about Devin Minna?
19     A.  Terminated employee of Super G Capital.
20     Q.  Why was Devin terminated?
21     A.  Off the record, because you all have difficult
22  jobs like mine.  He has the distinction of being fired
23  by both my company and my wife's company, which says a
24  lot.
25         Back on the record, he was not a

Page 87

1  performing employee.
2      Q.  I have made those mistakes as well.
3         How many times has Super G foreclosed on a
4  loan?
5      A.  I don't know the answer to that.  I joined in
6  2013.  Darrin had started lending with his own capital
7  in 2008.
8      Q.  Since the time you joined, how many times had
9  it foreclosed?  Or were there other foreclosures other
10  than the one at issue here?
11     A.  There were lawsuits against borrowers.  There
12  were what I would describe as friendly foreclosures,
13  principally on the merchant services side which I did
14  not manage.  I cannot think of another Article IX.
15     Q.  When you say Article IX, are you referring to
16  the UCC?
17     A.  I believe that's what this type of foreclosure
18  was called, that that was the code.
19     Q.  What do you mean by -- what do you mean an
20  Article IX foreclosure?
21     A.  My understanding of the foreclosure is that
22  there is a UCC provision where the lender gives notice
23  to the borrower that it believes the borrower is
24  insolvent and cannot repay its debt, and that borrower
25  has a specified period of time to either retire the debt

Page 88

1  or purchase the assets from the lender.  And if that
2  time has lapsed, then it's a, I believe, nonjudicial
3  approach to repossessing the assets.
4         MR. PERRIN:  Object to the form of the
5  question.  I didn't get that in before you started your
6  answer.
7         MR. FREEMAN:  I'm sorry.  Could you
8  restate that?
9         MR. PERRIN:  Yeah.  I objected to the
10  form of the question because I didn't get it in before
11  he started his answer.
12         MR. FREEMAN:  Got it.
13     Q.  (BY MR. FREEMAN)  So by Article IX, do you
14  roughly mean that it's a foreclosure that doesn't
15  require a court to intervene?
16     A.  Yes.  That's how I --
17         MR. BLAKLEY:  Objection, form.
18     Q.  (BY MR. FREEMAN)  Okay.  So what side of the
19  business were you on?
20     A.  Financial and credit.
21     Q.  Okay.  And was that the side of the business
22  that --
23     A.  I misunderstood your question.  I was on the
24  cash flow lending side, not the merchant services
25  lending side.

Page 89

1      Q.  Okay.  Could you say that again?  The cash
2  flow --
3      A.  Lending.
4      Q.  Cash flow lending side?
5      A.  Yes.
6      Q.  Was the cash flow lending side of the business
7  the side of the business that made the ACET Global loan?
8      A.  Yes.
9      Q.  And during the time that you were at ACET
10  Global, were you always on the cash flow lending side?
11     A.  At Super G Capital, you mean?
12     Q.  Excuse me.  Yes, at Super G Capital.
13     A.  Initially, there was really one company, and
14  then Charlie Perer and I created a division which I
15  always had financial oversight for the entire company,
16  but I spent the majority of my time administering.
17     Q.  Okay.  And since you came to Super G Capital
18  in 2013 -- is that correct?
19     A.  Yes.
20     Q.  Since you came to Super G Capital in 2013, had
21  you ever -- had you ever seen another foreclosure on a
22  loan made in the cash flow lending side of the business?
23     A.  To the best of my knowledge, they were all
24  done through the court process.  They were done
25  judicially.

23  (Pages 86 to 89)

Marc Cole  *  March 29, 2021

Page 90

1      Q.  So the loan foreclosure on ACET Global, LLC,
2   was the only nonjudicial foreclosure that you have ever
3   seen on Super G Capital's cash flow lending side?
4      A.  I believe that's correct.
5      Q.  Was the foreclosure on Super G -- excuse me.
6          Was the foreclosure on ACET Global's
7   assets the only Article IX foreclosure that you had ever
8   seen Super G Capital engage in?
9      A.  Yes.
10     Q.  Had Super G Capital -- strike that.
11         Have you ever -- has Super G Capital ever
12  sold foreclosed assets to an entity in which it had an
13  ownership stake?
14         MR. BLAKLEY:  Objection, form.
15     A.  Super G Capital had been granted negotiated
16  equity stakes in companies through forbearance
17  agreements before, but I don't think it had ever done it
18  through an Article IX vehicle or transaction.
19     Q.  (BY MR. FREEMAN)  When it engaged in the
20  sale -- in the foreclosure sale of ACET Global's assets
21  to Windspeed, prior to that, did you discuss with Steve
22  Bellah the fact that Super G Capital had negotiated
23  equity stakes through forbearance agreements?
24         MR. BLAKLEY:  Objection, form.
25     A.  I don't -- I don't know.  Probably not.  Each

Page 91

1   one was unique.
2      Q.  (BY MR. FREEMAN)  But to your knowledge, Super
3   G Capital had never sold assets to an entity in which it
4   had an ownership stake --
5          MR. PERRIN:  Objection, form.
6      Q.  (BY MR. FREEMAN)  -- prior to this?
7      A.  I may be incorrect.  There were two oil and
8   gas transactions that required a similar transaction
9   structure, but I do not know if they were before or
10  after the ACET transaction.
11     Q.  Do you recall the name of those transactions?
12     A.  Yes.  One was called Toro Oil Field Services,
13  and I'm still involved with that successor company; and
14  the other was called Grande Oil --
15     Q.  Grande Oil?
16     A.  -- where Super G Capital had a loan and the
17  parent company was unable to make the payments.  I would
18  be speculating as to the nature of the transaction, but
19  in substance, there was a contribution made to a new
20  borrower for which principals of Super G had received an
21  equity stake in those companies.
22     Q.  So it was principals, but not Super G itself?
23     A.  Yes.
24     Q.  Were you one of those principals?
25     A.  Yes.

Page 92

1      Q.  Who are the other principals?
2      A.  They were the employees that made a cash
3   equity investment into those companies.
4      Q.  Did you make a -- personally make a cash
5   equity investment?
6      A.  I did.
7      Q.  Did you receive an equity stake equal to the
8   value of that cash equity investment?
9      A.  Yes.
10     Q.  Did you receive an additional equity stake?
11     A.  No, no.
12     Q.  These two oil and gas transactions we were
13  just discussing, Toro and Grande --
14     A.  Yes.
15     Q.  -- did they involve foreclosures?
16     A.  Let me think about that.  I do not recall the
17  legal structure because I had a very trusted employee
18  handling the legal side of the agreements.
19     Q.  Okay.  Who is that?
20     A.  Oren Moses.
21     Q.  So as we sit here today, you don't really know
22  whether Toro or Grande involved a foreclosure by Super
23  G?
24     A.  I don't really know, and they may have come
25  after ACET.

Page 93

1      Q.  Okay.  When's the last time you spoke to
2   Darrin Ginsberg?
3      A.  We text often, and I spoke with him last week.
4      Q.  Is Darrin Ginsberg functional at this point in
5   time?
6          MR. BLAKLEY:  Objection, form.
7      A.  Yes, he's able to communicate.  He's not
8   working.
9      Q.  (BY MR. FREEMAN)  Okay.  Has Darrin Ginsberg
10  been suffering from a terminal illness?
11     A.  Yes.
12     Q.  What is that illness?
13     A.  He has brain and lung cancer.
14     Q.  Sorry to hear that.
15     A.  Thank you.
16     Q.  Have you ever discussed the ACET Global loan
17  or transaction with Darrin Ginsberg?
18     A.  I informed Darrin last week that there's a
19  dispute and that I was going to be retaining counsel on
20  Super G Capital's behalf; and ideally, I would be
21  handling the matter, including depositions, so he would
22  not have to.
23     Q.  Did Super G or does Super G have a
24  document-retention policy?
25     A.  No.

24  (Pages 90 to 93)

Marc Cole  *  March 29, 2021

## Page 94

1       Q.  Does it have a document-destruction policy?
2       A.  No.
3       Q.  Do you know how its records are stored?
4       A.  Super G had a Dropbox filing system.  Nearly
5    everything was electronic other than a deed or a
6    mortgage that it received as collateral.  Everything was
7    electronic.  There was a folder tree, if you will,
8    hierarchy of what files were important to a loan
9    transaction, and that the employees were required to
10   maintain a fairly strict adherence to that so that it
11   wasn't haphazard.
12          We terminated all of the employee access
13   to the -- to the Dropbox system.  Because it was a
14   friendly separation, I kept my files; Alex and the other
15   employees kept their files, other than terminated
16   employees who had to surrender everything.  They never
17   do, but to the extent you can.
18          And then there was a hosted Outlook
19   exchange that all of the employees were under that
20   archived emails after 12 months but retained them in a
21   web-based Cloud-hosted function.  And as we pared down
22   expenses, all of the employees gave up their access to
23   that other than Darrin.
24       Q.  Do you know if -- has the company placed a
25   litigation hold on any files related to this matter?

## Page 95

1       A.  No.
2       Q.  Who would be in charge of placing a litigation
3    hold or ensuring that one exists?
4       A.  Well, at this point, Darrin is the only
5    employee of Super G Capital, and that's really for
6    medical benefit purposes.  I assume he has his files.  I
7    don't know how he maintained the former employee files.
8       Q.  Would you have the ability to inform him of
9    any need to put in place a litigation hold?
10      A.  Yes.
11      Q.  Would you be willing to -- after consulting
12   with your counsel, to request that one be put in place?
13      A.  I don't know that you -- I think if you tell
14   me what you want, we can likely get it.  There's no
15   proactive transfer at this point; whatever he's got,
16   he's got and there's no new file creation at this point.
17   What I would, you know, very much like to do is -- as
18   I'm trying to keep expenses down on the Super G Capital
19   side, is minimize what I understand to be very expensive
20   electronic file discovery.
21      Q.  Understood.
22          MR. FREEMAN:  J.D., just to make a point,
23   my only concern, obviously, is with any destruction of
24   documents going forward.  And, you know, I'll make the
25   point here that I am always interested in informal

## Page 96

1    document exchange or discovery, particularly if we can,
2    you know, help you keep costs down as well and avoid --
3          THE WITNESS:  We can certainly prevent
4    any document destruction.
5          MR. FREEMAN:  It's been about an hour
6    since we went back on the record.  I know this gets
7    pretty exhausting.  It's tiring, and I've got the easy
8    job on my end.  So if you'd like, we can take another
9    ten-minute break.  We're to a relatively good stopping
10   point, or we can just keep going.  But I'll offer that
11   up.  I'm guessing we've got a lot of support for a
12   break.
13          MR. BLAKLEY:  Might depend on how much
14   longer you anticipate going.
15          MR. FREEMAN:  I've probably got another
16   two to three hours.
17          THE WITNESS:  Let's take a break.
18          (Break taken from 5:05 p.m. to 5:23 p.m.)
19          MR. FREEMAN:  We are back on the record.
20      Q.  (BY MR. FREEMAN)  Mr. Cole, does Super G have
21   any ownership interest in ACET Global?
22      A.  No.
23      Q.  Do you know who owns ACET Global?
24      A.  Baymark entities, to my understanding, and I
25   believe that the ACET founder has equity, as well.

## Page 97

1       Q.  Okay.  Was Super G ever offered any form of
2    ownership in ACET Global?
3       A.  I don't think so.
4       Q.  Did Super G ever attempt to acquire any
5    interest in ACET Global?
6       A.  I don't think so.
7       Q.  Prior to the ACET Global deal, had Super G
8    Capital ever done a deal involving Tony Ludlow?
9       A.  No.
10      Q.  David Hook?
11      A.  No.
12      Q.  Matt Denegre?
13      A.  No.
14      Q.  Any of the Baymark parties, to your knowledge?
15      A.  No, I don't think so.  I would have known.
16      Q.  Had you ever been involved in a transaction
17   with any of those persons?
18      A.  No, and I have never met them.
19      Q.  Have you ever had discussions with Bill Szeto
20   regarding Tomer Damti?
21      A.  I had discussions with Bill Szeto about the
22   workout and the restructuring and the plan for ACET, but
23   no.
24      Q.  Okay.  Did you ever have any discussions with
25   Mr. Ludlow, Tony Ludlow?

25 (Pages 94 to 97)

Page 98

1      A.  I don't believe that I have ever spoken to
2  him.
3      Q.  Don't believe you have ever?
4      A.  No, I don't think so.
5      Q.  What about Mr. Hook?
6      A.  Same answer.
7      Q.  Did you have discussions with Bill Szeto?
8      A.  Yes.
9      Q.  What was the nature of those discussions?
10     A.  What I recall is I wanted to hear that there
11  was a business that could pay Super G Capital back.  I
12  wanted to hear that he had a plan, and I do specifically
13  remember trying to talk him into either putting capital
14  in the business or personally guaranteeing the Super G
15  note.  And he would do neither.
16     Q.  How did he react to that request?
17     A.  I recall that he felt that he had not taken a
18  paycheck or had incurred some credit card expense, but
19  that that was -- you know, he felt that that was skin in
20  the game.  And I, of course, argued that it wasn't.
21  Money is skin in the game, and that if Super G Capital
22  were going to figure out any solution, that somebody had
23  to raise their hand and say they wanted this business to
24  succeed.  And I wanted there to be money in that hand to
25  help share the burden.  And he wouldn't budge and felt

Page 99

1  that his time was his commitment.
2      Q.  Okay.  What did he mean by not taking a
3  paycheck?
4      A.  I think --
5          MS. HARD-WILSON:  Objection, form.
6      A.  I think at some point he was working as --
7  well, I'll start with my recollection was that Baymark
8  had recruited Bill to be CEO, but he wasn't getting
9  paid, at least at some point in time.
10     Q.  (BY MR. FREEMAN)  Did you understand why he
11  was not being paid?
12         MR. BLAKLEY:  Objection, form.
13         MS. HARD-WILSON:  Objection, form.
14     A.  Well, I don't think the company was insolvent
15  by -- from the lender's perspective, it didn't have the
16  cash to stay in business or certainly make any debt
17  service, so I guess there was limited ability to pay the
18  CEO.
19     Q.  (BY MR. FREEMAN)  Did he indicate that he
20  might be receiving anything else in lieu of a paycheck?
21     A.  I don't know.
22         MS. HARD-WILSON:  Objection, form.
23     A.  I'm not sure.  My recollection is only we
24  squeezed for capital support, and the wells were dry.
25     Q.  (BY MR. FREEMAN)  Did Mr. Szeto discuss what

Page 100

1  his ownership stake would be in any restructured
2  vehicle?
3      A.  I don't have much recollection.  I can see
4  where the agreement landed through the operating
5  agreement, but I don't remember the back and forth to
6  get there.
7      Q.  Do you recall if he wanted more than
8  20 percent?
9      A.  I don't recall.
10     Q.  When did you first have conversations with
11  Mr. Szeto?
12     A.  I don't recall.  But I would have been brought
13  in later, meaning I felt that Steve Bellah, who was my
14  senior in an experience standpoint, twisted me into
15  approving a loan that didn't make sense on paper, that
16  didn't have great credit profiles.  And when it was not
17  performing, I was very angry with him; and I felt that
18  he needed to fix it, and he needed to make it right.
19  And so I was not the front person in it, in really any
20  discussions, including with Szeto.  Steve came to me
21  when he needed approval for the ultimate agreements.
22  But I leaned on my senior loan officer to fix his mess.
23     Q.  Did it appear to you that Super G Capital
24  should have made the loan to ACET Global in the first
25  place?

Page 101

1          MR. BLAKLEY:  Objection, form.
2      A.  In hindsight, every non-performing loan has
3  weak underlying assumptions, including this one.  And I
4  re-read the credit memo, the R&R, Steve's internal
5  document; and it's not a transaction that I would
6  approve today or anything like it.
7      Q.  (BY MR. FREEMAN)  And what is the R&R?
8      A.  What do you mean by that?
9      Q.  What is the document you referenced?
10     A.  A deal summary, we called it, which was
11  Steve's description of the transaction.
12     Q.  How many deal summaries are there?
13     A.  One.
14     Q.  Just one related to ACET Global?
15     A.  Yeah.
16     Q.  Is there a deal summary related to Windspeed?
17     A.  No.
18     Q.  Why is that?
19     A.  Because it was $200,000 of defensive money
20  that I just approved.
21     Q.  Mr. Cole, you mentioned earlier that this loan
22  didn't make sense on paper.  Could you explain what you
23  mean by that?
24     A.  My frustration with the loan was that we like
25  to see the sponsor put in more cash and that Super G

26  (Pages 98 to 101)

Marc Cole  *  March 29, 2021

---

Page 102

1    Capital wrote the largest check for the acquisition.
2    And so I tend to view an acquisition as not what you
3    could get, but what you are paid in cash up front and
4    who provided that cash. And so from that perspective,
5    Super G Capital was too big a player relative to a
6    credit that I would do today. Others should have more
7    to lose than we did.
8        Q.  Did you any discussions with Mr. Szeto
9    regarding ACET Venture Partners, which was the seller of
10   assets to ACET Global?
11       A.  I don't recall having discussions with them.
12       Q.  Did you have discussions with anybody
13   regarding ACET Venture Partners?
14       A.  I knew there was a seller, obviously, that we
15   were financing the purchase of. I knew it was a
16   rollover situation; and I was informed at some point
17   that there was a separation, and I don't think it was
18   amicable. That's about the extent of my knowledge.
19       Q.  Okay.  Talk just about the loan process at
20   Super G. What is the loan process for approving a loan?
21       A.  It really depends on the date. And the reason
22   that's important is initially there was a three person
23   investment committee:  Myself, Jon Engleking, Darrin
24   Ginsberg. We added a committee member for cash flow
25   loans. I basically booted off a committee member, which

---

Page 103

1    was Jon Engleking. And then when Darrin got sick, I ran
2    my side of the business to the best I could, and Jon ran
3    his side of the business to the best he could. So the
4    loan approval process went from more formal to informal
5    during -- you know, for several years, which is one of
6    the reasons left the organization.
7        Q.  Okay. How would a loan generally be
8    initiated?
9        A.  Well, a loan officer -- we called them
10   business development officers, first and foremost. So
11   someone would find a capital need. We would have a
12   weekly discussion, and the loan officer would explain
13   something to rise to the level of a term sheet. And we
14   as a team would debate the credit merits of issuing as
15   term sheet. There would be a negotiation with the loan
16   officer and the borrower, in the case the borrower and
17   buyer.
18           If we had a signed term sheet, we did
19   fairly typical lender of commercial due diligence, and
20   then a credit write-up was done, and we would have a
21   more robust deal discussion. By that point, typically
22   attorneys were involved working on a loan document
23   between Super G Capital and the client. And given that
24   this was short term and expensive capital, we endeavor
25   to minimize the negotiations and minimize the use of

---

Page 104

1    third-party professionals as much as possible.
2        Q.  Okay.  Well, was there, at any point, a formal
3    loan committee?
4        A.  This was at one time.
5        Q.  Was there at the time that this ACET Global
6    loan was made?
7        A.  I don't recall.
8        Q.  Do you know if there was in the general time
9    period of July 2017?
10       A.  I would think that the loan officer -- in this
11   case Steve Bellah -- would be presenting to my team for
12   a small transaction like this. I can't recall in that
13   time frame if we had a loan committee or not. It was
14   moving towards a Darrin rubber stamp of what my team
15   wanted to do.
16       Q.  If there was a loan committee, is there
17   generally a report or a document or some memorandum of
18   some sort memorializing the decision?
19           MR. BLAKLEY:  Objection, form.
20       A.  A bank would have a response memorialized and,
21   sort of, saved with the transaction. At some point,
22   Super G Capital moved to an email approval process, but
23   in 2017, it was way too small an entrepreneurial. It
24   was really thumbs up or thumbs down.
25       Q.  (BY MR. FREEMAN)  At that point in time, 2017,

---

Page 105

1    what was the -- what was the time line necessary to
2    initiate and approve a lean?
3           MR. BLAKLEY:  Objection, form.
4        A.  Weeks, not months.
5        Q.  (BY MR. FREEMAN)  Two weeks?
6        A.  Three or four weeks, typically.
7        Q.  Three or four weeks?  What would generally --
8    what would be provided to Super G by the proposed
9    borrower?
10       A.  Historical financials, a projection, a use of
11   funds, business plan, accounts receivable aging,
12   accounts payable aging. And then Super G Capital would
13   do background checks on principals, various -- check tax
14   forms, check for any litigation; fairly typical but
15   abbreviated commercial lending. What Super G Capital
16   did not do is third-party verification work on inventory
17   and accounts receivable.
18       Q.  Did it engage in any first-party verification
19   of inventory?
20           MR. BLAKLEY:  Objection, form.
21       A.  No.
22           MR. FREEMAN:  Can I have the basis for
23   that objection?
24           MR. BLAKLEY:  Say again?
25           MR. FREEMAN:  Can I have the basis for

Usher Reporting Services
(214) 755-1612

Marc Cole  *  March 29, 2021

Page 106

1  that objection?
2      MR. BLAKLEY:  Vague and ambiguous as to
3  what "first-party investigation" means.
4      Q.  (BY MR. FREEMAN)  Did Super G engage in its
5  own direct verification of a proposed borrower's value
6  of its inventory?
7      MR. BLAKLEY:  Objection, form.
8      A.  No.
9      Q.  (BY MR. FREEMAN)  Did Super G engage in any
10  diligence itself with respect to a borrower's inventory?
11      MR. BLAKLEY:  Objection, form.
12      MR. FREEMAN:  What's the basis for your
13  objection?
14      MR. BLAKLEY:  What borrower?  Any
15  borrower?  Are we talking about the case here?  Are we
16  talking about ACET Global?  Vague and ambiguous.
17      MR. FREEMAN:  We're talking about a
18  process, J.D.
19      Q.  (BY MR. FREEMAN)  Mr. Cole, do you understand
20  what I mean when I've asked the last three questions?
21      MR. PERRIN:  Objection, form.
22      A.  Super G Capital did not verify inventory or
23  accounts receivable balances, other than review of
24  financial statements.
25      Q.  (BY MR. FREEMAN)  Okay.  Why would Super G

Page 107

1  need -- need a copy of a borrower's historical
2  financials?
3      A.  To verify -- really, is the basis of the
4  credit decision-making, to understand if what a company
5  is representing that it owns.
6      Q.  Is that to verify its performance,
7  historically?
8      A.  It's a portion of the credit decision.
9      Q.  And why is that important in the credit
10  decision?
11      A.  Typically, senior lenders advance a -- advance
12  capital and credit as a -- either a function of the
13  assets on the balance sheet or as a multiple of the
14  cashflow that they are purchasing.  And to do that work,
15  you need to know what the Company says they have.  And
16  to do it well, you need to verify it.
17      Q.  Is this -- are the company's historic
18  financials relative -- or relevant to the risk
19  associated with a loan?
20      A.  It's an important aspect to analyzing the
21  risk.
22      Q.  Why would Super G, as a lender, request
23  projections from a potential borrower?
24      A.  It's a fairly standard request to form a basis
25  around repayment, which is often more optimistic than

Page 108

1  the historical performance of the Company.
2      Q.  What does a -- what function or goal does
3  obtaining a projection serve?
4      A.  It can really vary.  It can vary from a check
5  the box because it's a "nice to have" to assessing if a
6  credit doesn't stand on its own, it may provide some
7  additional comfort to extending credit if those
8  assumptions in the projections are believable.
9      Q.  Does Super G generally accept projections on
10  their face?
11      A.  No more or less than anybody else does.  I
12  think it's a part of the story.
13      Q.  So are the projections part of the overall
14  risk assessment by Super G?
15      A.  They're a portion of them.
16      Q.  The use of funds, what is the purpose of
17  requesting description of the use of funds?
18      A.  It speaks to repayment.  If you want to borrow
19  money, the lender wants to know where that money is
20  going to go and will it contribute to either creating
21  value and ultimately cashflow and collateral to support
22  the loan repayment, or will it contribute to the erosion
23  of collateral and inability to service the debt.
24      Q.  Okay.  What was the -- describe the use of
25  funds for the transaction in which Super G loaned ACET

Page 109

1  Global in 2017.
2      A.  850,000 went to the seller.  150,000 went to
3  an escrow account.  And then there was supposed to be
4  200,000 deposited for working capital.
5      Q.  Okay.  And was that the described use of funds
6  when the loan was requested?
7      A.  Funded.  I don't know about requested, but by
8  the time of funding, yes.
9      Q.  Okay.  With respect to historic financials --
10  which are part of the initial assessment of the loan's
11  risk -- with respect to the historic financials, if
12  those historic financials demonstrated poor economic
13  performance, would Super G generally extend the loan to
14  that borrower?
15      A.  It's a bit difficult to answer.  It depends if
16  there was another source of repayment.
17      Q.  Okay.  So would there generally need to be
18  another source of repayment?
19      A.  If the historic financials were poor, yes.
20      Q.  In the process of reviewing a potential loan,
21  what records are created?
22      A.  Created by the lender?
23      Q.  Yes, sir.
24      A.  An internal description of the transaction.
25  Files are requested from the borrower and retained.

28 (Pages 106 to 109)

Page 110

1   Ideally, some credit analysis is created by the lender
2   to demonstrate repayment.  And then all legal
3   agreements, which are either created by in house or
4   through third parties, are retained and reporting is
5   required.
6       Q.  Okay.  The internal description of the
7   transaction, is that the deal summary?
8       A.  Yes.
9       Q.  The terms of the loan file, are all of the
10  records you just mentioned, are those maintained in the
11  loan file?
12      A.  Yes.
13      Q.  Are those maintained on Dropbox?
14      A.  Yes.
15      Q.  Turning to this particular transaction, the
16  transaction in which Super G, LLC loaned a million
17  dollars to ACET Global, how did that loan come about?
18      A.  Steve Bellah introduced the loan.  I believe
19  the initial funding was $750,000.  And Steve knew the
20  Baymark principal or principals.
21      Q.  So he already knew them?
22      A.  Yes, and that's the job of a -- the business
23  development officer.
24      Q.  Do you know how far back his relationship with
25  them went?

Page 111

1       A.  I don't.
2       Q.  Did he ever discuss that relationship with
3   you?
4       A.  I'm sure he did as part of the general
5   introduction of the deal, but it's not memorable.
6       Q.  What do you remember about it?
7       A.  I remember that they were a local private
8   equity firm that Steve held in high regard.
9       Q.  Anything else?
10      A.  That's all I recall.
11      Q.  So was it Steve that approached you about the
12  loan?
13      A.  Yes.
14      Q.  And do you know when that was?
15      A.  I don't, but if the loan was made in mid-2017,
16  then I'm guessing within a six month window of the.
17  Likely, within a three or four month window, max.  And
18  potentially, would have been a 60-day window of the
19  first funding.
20      Q.  Okay.  Do you know why Super G -- did you have
21  any indication of why Super G was interested in this
22  transaction?
23      A.  I'd say a combination of my respect for Steve,
24  who I had recruited heavily out of a bank environment to
25  come teach me and Super G Capital about asset-based

Page 112

1   lending.  Steve was a GE Capital professional with a
2   better pedigree than the rest of us.  And the financial
3   projections supported that the Company could service the
4   loan.
5           It was an expensive and an aggressive
6   amortization -- amortizing loan, which was Super G
7   Capital's hallmark.  So you didn't have to be right that
8   long.  And further, we had established an escrow account
9   so the Company would always have some cash collateral,
10  which was a decent size relative to a $750,000 initial
11  funding.
12      Q.  Did it offer any other upside?
13      A.  No, but it was a very high interest rate loan.
14      Q.  Okay.  When you say an aggressive
15  amortization, what does that mean?
16      A.  It means Super G Capital loans were fully
17  amortized like a mortgage, except over a year or two
18  instead of 30, as opposed to a revolver, which it would
19  remain outstanding.
20      Q.  Okay.
21      A.  So Super G only had to be right for a year or
22  two, and limited its downside by the loan repayments
23  coming in.
24      Q.  Okay.  Were the terms on this deal standard
25  for Super G?

Page 113

1       A.  They were on the fairway.  Each loan got
2   negotiated with some latitude by the loan officer, but
3   they were standard.
4       Q.  And who made the recommendation to make this
5   loan?  Was that Steve?
6       A.  That was Steve.
7       Q.  Was there any representation that Baymark
8   would contribute capital to ACET Global?
9       A.  Yes.  It was -- it was required to fund the
10  acquisition, that Super G Capital was putting proceeds
11  in, but Baymark was putting proceeds in underneath and
12  at risk, which is the right relationship between the
13  lender and the equity owner that's -- should take more
14  risk and gets significantly more upside.
15      Q.  Okay.  Was that -- was that Baymark ACET
16  Holdco, do you believe?
17          MR. PERRIN:  Objection, form.
18      Q.  (BY MR. FREEMAN)  Do you believe there a
19  representation that Baymark ACET Holdco would contribute
20  capital to ACET Global?
21          MR. PERRIN:  Objection, form.
22      A.  There was a representation that Baymark would
23  contribute capital.  And in the nomenclature of what we
24  do, what you're describing makes sense, that that would
25  be the idea.

29  (Pages 110 to 113)

Page 114

1    Q. (BY MR. FREEMAN) Okay. When we say that, do
2  you -- do you essentially mean the principals of Baymark
3  represented that there would be a capital contribution?
4         MR. BLAKLEY: Objection, form.
5    A. It was a condition of closing of our loan,
6  that Super G Capital would be putting up a large portion
7  of the purchase price, but that either Baymark or its
8  principals would be providing junior capital. The
9  actual ownership was less important than the fact that
10  the -- there was an equity owner contributing capital
11  underneath Super G.
12    Q. (BY MR. FREEMAN) Okay. Did the Baymark
13  principals make any representations about what the funds
14  that they would put in would be used for?
15         MR. BLAKLEY: Objection, form.
16    A. I'm not sure. I mean, my understanding was
17  they were used for the purchase, but I'm not sure.
18    Q. (BY MR. FREEMAN) And I mean the funds that --
19  that the principals put into ACET Global.
20    A. Don't know.
21    Q. How much did they put in?
22    A. The memo that I received for approval said
23  $400,000 of cash equity at close, including 150,000 that
24  went into an escrow account.
25    Q. Okay. Do you know whether they ultimately put

Page 115

1  $516,000 in?
2    A. I don't know. I know that they wrote checks
3  after the closing of the $750,000 loan, but I don't know
4  the magnitude.
5    Q. Okay. Did Super G perform an analysis on ACET
6  Global's ability to pay this note?
7    A. Yes. It's a simplistic analysis that compares
8  the adjusted EBITDA on an annual basis to the annual
9  debt service. And the calculation on paper was very
10  strong.
11    Q. Meaning that it would be financially able to
12  bear the note?
13    A. Yes.
14    Q. What record of that analysis exists?
15    A. I have a financial snapshot of historic and
16  projected financials in my two-page deal summary. There
17  would have been a spreadsheet worksheet with the -- with
18  detail behind that, but it was clear from the summarized
19  numbers that the Company could support its debt service.
20    Q. And who -- who worked on that analysis?
21    A. Steve Bellah would have had one of our -- one
22  of Super G's younger credit analysts available based on,
23  you know, a bench of young -- younger folks in Santa
24  Monica that would have prepared this for him.
25    Q. Okay. I believe you mentioned earlier that

Page 116

1  the ACET Global loan required payments of $15,000 a week
2  by ACET Global; is that correct?
3    A. That might have been an amended number. On
4  the initial loan --
5    Q. I'll put -- I'll put what's marked as
6  Exhibit 8 to this deposition -- hopefully -- on the
7  screen.
8         (Exhibit 8 marked.)
9    Q. (BY MR. FREEMAN) Are you able to see that,
10  Mr. Cole?
11    A. I am. And, yes, you're correct, $15,000 every
12  week.
13    Q. Okay. Was that a significant payment for a
14  company like ACET Global?
15         MR. BLAKLEY: Objection, form.
16         MR. PERRIN: Objection, form.
17    A. Super G Capital believed they could service
18  it.
19    Q. (BY MR. FREEMAN) Okay. Is that speed of
20  repayment normal?
21         MR. BLAKLEY: Objection, form.
22    A. $60,000 a month, $700,000, roughly, a year,
23  the Company was generating more than twice that. So it
24  would have left a cushion to reinvest in the Company.
25  And Super G would have had their -- it would have been a

Page 117

1  65-week relationship, which is, what, a year and a
2  little. So would have been -- the thesis was the
3  Company could easily support it, and it would have been
4  a nice return for Super G for taking the risk.
5    Q. (BY MR. FREEMAN) And when you say the Company
6  could reinvest it, does that not assume that its
7  operating costs were not equal to the amount of the debt
8  repayment?
9    A. Correct.
10    Q. Do you know what its operating costs were?
11    A. At the time I approved this loan, its
12  operating costs were slightly over $100,000 a month. So
13  with, roughly, a 50 percent gross margin, they would
14  have netted over a million dollars. This number was
15  about a million-four on a trailing basis, which would
16  have easily covered 700,000 and change of debt service
17  and left some excess for working capital, investment.
18    Q. I'm not sure I agree with the math, but it's
19  probably a moot point. It doesn't sound like there
20  would be much left there, even in the best case
21  scenario, assuming those historic numbers, for future
22  investment.
23         MR. PERRIN: Objection to sidebar.
24         MR. FREEMAN: It's a sad point.
25    Q. (BY MR. FREEMAN) Was Super G ever concerned

30 (Pages 114 to 117)

Page 118

1    about the risk related to this aggressive amortization?
2        A.   Super G was in the business of 30-percent-plus
3    returns.  So there was Groucho Marx syndrome.  Anyone
4    that accepted Super G's money, we were concerned about
5    admitting.
6        Q.   And is that because ACET Global might be
7    risky?
8        A.   It's very expensive money.  They were all
9    risky.
10       Q.   What was the risk that Super G was concerned
11   about?
12       A.   I'm making a broad statement.  Are you asking
13   me what I see as the risks in this investment with
14   hindsight?  In this loan with hindsight?
15       Q.   Or with foresight back then.
16       A.   Thin equity support.  There wasn't enough
17   dollars of other peoples' money at risk underneath Super
18   G.  And I'm sure your client would disagree.  But from
19   the equity sponsor standpoint, you would rather see that
20   ratio closer to one-to-one in a small company which has
21   lots of risk.
22       Q.   Why is that?  Does that align incentives?
23       A.   Yeah.  Yes.
24       Q.   Let me ask you about -- let me put up what's
25   marked as Exhibit 9 to this deposition.

Page 119

1            (Exhibit 9 marked.)
2        Q.   (BY MR. FREEMAN)  Mr. Cole, do you recognize
3    this document, or have you seen it before?
4        A.   Yes.
5        Q.   And what is this?
6        A.   This appears to be -- in conjunction with
7    Super G Capital's loan, this document confirms that all
8    of the assets of ACET Global are -- that Super G Capital
9    is going to be the first lien lender, and that the
10   seller, who took a note, that that note was subordinated
11   to Super G Capital's first lien.
12       Q.   Okay.  Who asked you to sign this document?
13           MR. PERRIN:  Objection, form.
14       A.   This was part of the transaction documents
15   with the loan agreement.
16       Q.   (BY MR. FREEMAN)  And who asked you to sign
17   it?
18       A.   It would have been presented to me by the deal
19   team, which was, at a minimum, Steve Bellah and whoever
20   else was assisting Steve in the transaction, including
21   counsel.
22       Q.   Is that the first time you would have seen
23   that document?
24       A.   Yes.
25       Q.   Would it have been sent to you by that group

Page 120

1    or Steve Bellah?
2        A.   Likely, Steve and team were working with
3    third-party counsel.  And then when it was signature
4    ready, it would be brought to me.
5        Q.   Who was that third-party counsel?
6        A.   I believe I saw Jeffer Mangles -- which is two
7    words -- on the initial correspondence.
8            THE REPORTER:  Can you give me that name
9    one more time?
10           THE WITNESS:  Jeffer, J-E-F-F-E-R.  And
11   then Mangles, I believe, is M-A-N-G-L-E-S.
12       A.   Which was a Los-Angeles-based firm that was
13   doing transaction work for Super G Capital at the time.
14       Q.   (BY MR. FREEMAN)  Okay.  Did they draft this
15   document?
16       A.   I don't know.
17       Q.   This doesn't look like a Collateral Assignment
18   of Rights that you've ever received from them before,
19   does it?
20       A.   No.
21           MR. PERRIN:  Objection, form.
22       A.   The loan agreement looks standard, but this
23   does not look standard.
24       Q.   (BY MR. FREEMAN)  Are you aware of any other
25   Super G deals with a document that looks like this?

Page 121

1            MR. PERRIN:  Objection, form.
2        A.   I can't answer that.  There's -- every
3    document -- every deal has what we call "ancillary
4    documents" and -- I don't know.
5        Q.   (BY MR. FREEMAN)  Okay.  Do you know if -- do
6    you know if Hallett & Perrin -- the law firm of Hallett
7    & Perrin drafted this document?
8        A.   I don't know.
9        Q.   Who would know?
10           MR. BLAKLEY:  Objection, form.
11       A.   Does it have a -- if you scroll, does it have
12   a notification provision?  Okay.  So I see Jeffer
13   Mangles, and I see Hallett & Perrin, but I'm not sure of
14   the source.
15           THE WITNESS:  Can I have a 60-second
16   break?  I anticipated home, so I just need to make
17   a quick childcare arrangement.
18           MR. FREEMAN:  Absolutely.
19           (Break taken from 6:08 p.m. to 6:12 p.m.)
20       Q.   (BY MR. FREEMAN)  Mr. Cole, we just went off
21   the record.  We were discussing what's marked as
22   Exhibit 9 to this deposition the Collateral Assignment
23   of Rights.  Who do you believe drafted this document?
24       A.   I don't know.
25       Q.   What is your -- based upon your review of the

31 (Pages 118 to 121)

Page 122

1    file, this document and your familiarity with Jeffer
2    Mangles Butler & Mitchell, who do you believe drafted
3    this document?
4              MR. BLAKLEY:  Objection, form.
5         A.  I'm truly not sure.  Just by my trips to the
6    scanner this morning, I signed 25 documents.  I'm not
7    necessarily proud of it.  But that was this morning.  So
8    I don't know.
9         Q.  (BY MR. FREEMAN)  The reality you live in?
10        A.  That's the deal business.
11        Q.  What about this document would make you
12   uncertain as to whether Jeffer Mangles drafted it?
13             MR. BLAKLEY:  Objection, form.
14        A.  Can you go back to the top?
15        Q.  (BY MR. FREEMAN)  Sure.
16        A.  What is different about it for me is that it's
17   both a -- that, typically, our business loan would cover
18   all of the collateral.  There would be a business loan
19   and a pledge agreement.  And so most subordination
20   documents are a stand-alone document.  So that's why I
21   say this is a different document for me.
22        Q.  Is the font consistent with documents you
23   would generally receive from Jeffer Mangles?
24        A.  I'm the wrong guy on that.
25        Q.  Is it a garamond, or is it a serif, do you

Page 123

1    know?
2              Anything else about this document lead you
3    to question whether it would have been drafted by Jeffer
4    Mangles?
5         A.  I don't know, but I was --
6              MR. PERRIN:  Objection, form.
7         A.  I will assume that it was reviewed by them, at
8    a minimum, if it was brought to me signature ready.
9         Q.  (BY MR. FREEMAN)  Okay.  What discussions did
10   you have about this document?
11        A.  Oh, I didn't call.
12        Q.  Okay.  What about the subordination of the
13   seller's lien?
14        A.  I don't recall the mechanics of this document.
15   The notion of subordinating a seller note is a fairly
16   common practice for me.
17        Q.  Do you know if you discussed this with
18   Mr. Szeto at any point?
19        A.  No, I don't think so.
20        Q.  Do you know if you discussed this with
21   Mr. Bellah at any point?
22        A.  I would expect that I had.
23        Q.  Do you have any emails regarding this
24   document?
25        A.  I'm not sure how to answer that question.  I

Page 124

1    don't know.  I -- I -- I don't know.
2         Q.  Okay.  That's fair.
3              Would you expect that you have any emails
4    regarding this document?
5         A.  My expectation would be that my team, with
6    proper representation, thoroughly negotiated for
7    standard senior lender rights, and that that was brought
8    to me as part of a package.  So, for example, you know,
9    I personally don't verify if Baymark made the equity
10   contribution, and I don't personally verify, you know, a
11   number of the things.  And so while Jeffers is no longer
12   my law firm, they're a competent lenders counsel, and I
13   would expect that they had been through all this
14   properly.
15        Q.  Would you have any text messages regarding
16   this document?
17        A.  Definitely not.  I'm not a texter.
18        Q.  Okay.  Who represented Super G in negotiating
19   this document?
20        A.  On the business points, Steve Bellah, and
21   legally, Jeffer Mangles.
22        Q.  Okay.  So I want to go back to Windspeed,
23   generally.  Are you familiar with Baymark Partners
24   Management, LLC?
25        A.  I'm familiar with the private equity team

Page 125

1    known as Baymark, but not their entities.
2         Q.  Okay.  Would you know who owns Baymark
3    Partners Management, LLC?
4         A.  I don't.
5         Q.  Does -- do you know if Windspeed has any
6    relationship with Baymark Partners Management, LLC?
7              MR. PERRIN:  Objection, form.
8         A.  I know that one of the Baymark entity or
9    entities received an equity stake in Windspeed.
10        Q.  (BY MR. FREEMAN)  Okay.  I am -- just so you
11   can see it, I'm putting what's marked as Exhibit 5 of
12   this deposition -- it's the Amended and Restated Company
13   Agreement of Windspeed Trading, LLC, dated October 18th,
14   2018.  And I'm going to scroll through this relatively
15   quickly.  I know you've seen it before.  Mostly for your
16   benefit, because I know these names are difficult to
17   keep straight.  And so I pulled to Exhibit A --
18        A.  I see.
19        Q.  -- of the document.
20             So does Windspeed have any relationship
21   with Baymark Partners Management, LLC?
22             MR. PERRIN:  Objection, form.
23             MS. HARD-WILSON:  Objection, form.
24        A.  Well, the document says that Baymark Partners
25   Management, LLC has a warrant for 40 percent ownership

Marc Cole   *   March 29, 2021

## Page 126

1    interest if exercised in Windspeed Trading.
2        Q.  (BY MR. FREEMAN)  Okay.  So would you say
3    there's any relationship of any nature between Baymark
4    Partners Management and Windspeed?
5            MR. BLAKLEY:  Objection, form.
6            MR. PERRIN:  Objection, form.
7        A.  I would say they're an option holder.
8        Q.  (BY MR. FREEMAN)  An option holder?
9        A.  Warrant holder.
10       Q.  Excuse me?
11       A.  Warrant holder.
12       Q.  Okay.  Warrant holder.  Under the warrants
13   here, what does it cost them to exercise those warrants?
14           MR. BLAKLEY:  Objection, form.
15       A.  I can flip through the agreement to see if
16   there's a strike price, but I -- my -- I'd have to look
17   through the agreement.  I don't know what the strike
18   price is.
19       Q.  (BY MR. FREEMAN)  Please.  By all means, do.
20           THE WITNESS:  In the binders provided for
21   me, that's 5?
22           MR. BLAKLEY:  I believe so.
23       A.  I don't know if there's a separate warrant
24   agreement, but I'm not familiar with one.  Okay.
25   There's a Warrant Purchase Agreement that would likely

## Page 127

1    state the strike price.
2        Q.  (BY MR. FREEMAN)  What does it state as
3    Baymark's strike price in Windspeed?
4        A.  That's a separate document, and I don't see --
5    I don't believe that we have that document attached
6    here.  It's referenced in the definitions.
7        Q.  In the definitions of which document?
8        A.  In the definitions of the Amended and Restated
9    Company Agreement of Windspeed Trading.  It says,
10   "Warrant Purchase Agreement means collectively that
11   Warrant Purchase Agreement dated as of October 18, 2018,
12   by Super G and the Company."  So there is a document
13   beyond this document that I think would speak to the
14   strike price.
15       Q.  Is that document not in Super G's loan files?
16       A.  I would expect that it is, but it was not
17   either provided to me by Alex or provided to me by
18   counsel.  So I would have to check.
19       Q.  That document was not provided to you by your
20   counsel?
21       A.  No.
22           MR. FREEMAN:  J.D., that's one of the
23   listed topics.
24           MR. BLAKLEY:  Okay.  I sent him a binder
25   with your exhibits.  And I sent him a binder with Ed's

## Page 128

1    exhibits.  So if you want to put a document in front of
2    him, I don't mind you doing that.  You can email it
3    around, and we can look at it.
4            MR. FREEMAN:  Yeah.  It's one of the --
5    one of the topics, though, here, so we may have to come
6    back.
7            MR. BLAKLEY:  Which topic is it?  Was
8    this a subpoena duces tecum?  Was he supposed to show up
9    with any documents?
10           MR. FREEMAN:  It's corporate rep.
11           MR. BLAKLEY:  Right.  Was this a duces
12   tecum?
13           MR. FREEMAN:  It's a corporate rep topic
14   that someone must know all of the relevant information
15   about.
16           MR. BLAKLEY:  Okay.  So which of the five
17   that you went through topics are you saying this falls
18   under?
19           MR. FREEMAN:  Warrants.  Probably all
20   five.
21           MR. BLAKLEY:  Okay.  Well, generally,
22   when I take a deposition and I want to talk about a
23   document, I include that in my exhibits.  He wasn't
24   going to show up with an entire file of documents today
25   because, again, this was not a subpoena duces tecum.  So

## Page 129

1    if you want to, you know, get that document out, email
2    it to us, and we can look at it.  And as far as your
3    question, whatever the strike price is, the document
4    probably speaks for itself.
5            MR. FREEMAN:  I'm sure it does, J.D.  It
6    would be nice if that document had been provided to us,
7    but it hasn't been.
8            MR. PERRIN:  It has been provided to you.
9    It's in the productions.
10       Q.  (BY MR. FREEMAN)  What do you believe --
11   Mr. Cole, what do you believe Super G's strike price was
12   in Windspeed?
13       A.  Probably a penny.
14       Q.  Probably a penny?
15       A.  That's a guess, but I'm pretty confident.  Or
16   let me say a nominal amount.  Whether that's a penny,
17   $100, whatever the -- a nominal amount.
18       Q.  Right.  And based on that, what do you believe
19   that Baymark Partners Management's strike price on the
20   warrants was?
21       A.  I don't know.  Probably the same.
22       Q.  Probably a penny or a nominal amount?
23       A.  Yes.  Let's assume nominal.
24       Q.  Okay.  Does that mean there's virtually no
25   economic barrier to exercise those warrants?

Usher Reporting Services
(214) 755-1612

Page 130

1      MR. PERRIN:  Objection, form.
2      A.  If that were the strike price.
3      Q.  (BY MR. FREEMAN)  So what meaningful
4  difference is there substantively between a holder of
5  warrants with a zero strike price and a holder of
6  membership interest in the LLC?
7      MR. PERRIN:  Objection, form.
8      A.  Practically, a K-1, is something I try to
9  avoid accumulating.  And potentially, I would imagine
10  different levels of -- different thresholds of
11  governance liability, ownership liability.
12      Q.  (BY MR. FREEMAN)  Okay.  What about in terms
13  of economic upside?
14      A.  Should be the same.
15      Q.  So based upon that, would you describe Baymark
16  as related in any way to Windspeed?
17      MR. BLAKLEY:  Objection, form.
18      MR. PERRIN:  Objection, form.
19      A.  I don't know how to answer that.  They're a
20  warrant holder.
21      Q.  (BY MR. FREEMAN)  And are they independent
22  entities?
23      MR. BLAKLEY:  Objection, form.
24      A.  Yes.  In my opinion, yes.
25      Q.  (BY MR. FREEMAN)  Okay.  Are they complete

Page 131

1  third parties?
2      MR. BLAKLEY:  Objection, form.
3      A.  I can't answer that for Baymark.  I own
4  warrants in companies, and I am a complete third party.
5  I'm rooting for their success, but I have -- they're not
6  under my control.
7      Q.  (BY MR. FREEMAN)  Let me ask it this way.  If
8  someone asked you whether you had any relationship at
9  all -- as a warrant holder, if you had any relationship
10  at all in those entities, do you believe it would be
11  misleading to say no, none whatsoever?
12      MR. BLAKLEY:  Objection, form.
13      MR. PERRIN:  Objection, form.
14      A.  Am I answering for me or for Baymark.
15      Q.  (BY MR. FREEMAN)  For you.
16      A.  I would say that Super G Capital has a
17  relationship with Windspeed.  It has an economic
18  interest in Windspeed.
19      Q.  Do you believe it would be misleading not to
20  say that?
21      MR. BLAKLEY:  Objection, form.
22      A.  I don't know what you mean by "relationship."
23  I don't know.  I don't think that's illegal for -- if
24  it's in the broadest way possible, then I would say a
25  warrant holder has a relationship with the Company,

Page 132

1  different than -- yeah.
2      Q.  (BY MR. FREEMAN)  Might require some
3  explanation?
4      MR. PERRIN:  Objection, form.
5      A.  Different than fiduciary affiliate, more
6  narrow.
7      Q.  (BY MR. FREEMAN)  Uh-huh.  Would you -- would
8  it be accurate to state that Super G is wholly
9  independent from Windspeed?
10      MR. PERRIN:  Objection, form.
11      Q.  (BY MR. FREEMAN)  Knowing that it is a warrant
12  holder in 40 percent of the Company and a nominal
13  exercise or strike price, would it be correct to say
14  that Super G is wholly independent from Windspeed?
15      MR. PERRIN:  Objection, form.
16      A.  Is "independent" a -- I live in the world of
17  defined terms in legal agreements.  Is "independent" a
18  legal standard?
19      Q.  (BY MR. FREEMAN)  If it's not defined, to make
20  that statement, would you need to define it?
21      A.  Yes.
22      MR. PERRIN:  Objection, form.
23      Q.  (BY MR. FREEMAN)  So without a definition
24  behind it, do you believe it would be misleading for you
25  to say that Super G is wholly independent from

Page 133

1  Windspeed?
2      MR. PERRIN:  Objection, form.
3      A.  I would say that Super G is independent of
4  Windspeed.  I'm not sure, without a definition, I would
5  say that Windspeed is independent of Super G.
6      Q.  (BY MR. FREEMAN)  Do you believe it would be
7  misleading for a lawyer in this case to represent with
8  no further definition that Super G is wholly independent
9  from Windspeed?
10      MR. BLAKLEY:  Objection, form.
11      A.  I'm not sure how to answer your question.
12      Q.  (BY MR. FREEMAN)  What is the relationship
13  between Super G and Windspeed?
14      A.  Super G Capital has warrants in Windspeed
15  Trading, LLC.
16      Q.  And when did it obtain those warrants in
17  Windspeed?
18      A.  With the creation of this document.
19      Q.  And when was this document created?
20      A.  Can you Zoom to the cover page?
21      Q.  Yes, sir?
22      A.  October 18th, 2018.
23      Q.  So since October 18th, 2018, has Super G had
24  warrants in Windspeed Trading, LLC?
25      A.  Yes.

Page 134

1   Q. And those warrants allow it to obtain
2   40 percent of the ownership of Windspeed Trading, LLC?
3         MR. PERRIN: Objection, form.
4   Q. (BY MR. FREEMAN) Is that correct?
5   A. Certainly 40 percent of the economics. And I
6   would have to do a reread of the agreement, but I'd --
7   it is fair to -- I would -- if there are no other
8   nuances of the securities, then it would convert into
9   40 percent of the ownership as well.
10   Q. Okay. And that 40 percent could be converted
11   into ownership at a nominal price, strike price?
12         MR. PERRIN: Objection, form.
13   A. Let's agree the price that's stated in the
14   Warrant Agreement.
15   Q. (BY MR. FREEMAN) Okay. Does Super G have any
16   relationship with Baymark Partners Management, LLC?
17   A. No.
18   Q. When Baymark Partners start its relationship
19   with Windspeed?
20         MR. PERRIN: Objection, form.
21   A. I don't know.
22   Q. (BY MR. FREEMAN) Did Baymark Partners have a
23   relationship with Windspeed at least as of October 18th,
24   2018?
25         MR. PERRIN: Objection, form.

Page 135

1   A. Yes, it appears so.
2   Q. (BY MR. FREEMAN) Would it be fair to say that
3   Baymark Partners had some form of a relationship with
4   Super G Capital as of at least October 18th, 2018?
5         MR. PERRIN: Objection, form.
6         MR. BLAKLEY: Objection, form.
7   A. Not in my world, no. And if -- you and I each
8   owned a share of Google, I would not describe that as a
9   relationship. And I'm not saying Windspeed is Google,
10   but I don't see being co-warrant holders as being a
11   significant relationship.
12   Q. (BY MR. FREEMAN) Let's change the scenario
13   from Google. I'll take your point there. Let's say
14   that two parties who each have the ability to exercise
15   at a nominal price a warrant for 40 percent ownership in
16   a company that has assets of $200,000. Would you say in
17   some sense that those two parties are -- have some
18   relationship?
19         MR. PERRIN: Objection, form.
20   A. I see it through the lens of a creditor, which
21   is the Company has liabilities of 700,000, and upon
22   satisfaction of those liabilities, then I would go so
23   far as to say that they were partners.
24   Q. (BY MR. FREEMAN) So that's more than just a
25   relationship, right?

Page 136

1         MR. PERRIN: Objection, form.
2   A. Beyond the satisfaction of the liability.
3   Q. (BY MR. FREEMAN) Right. So relationship --
4   the implicit relationship there is one of partners,
5   economically?
6         MR. PERRIN: Objection, form.
7   A. Beyond the satisfaction of liability.
8         THE REPORTER: I didn't hear your answer,
9   Mr. Cole.
10         THE WITNESS: I said beyond -- after the
11   satisfaction of the liabilities.
12   Q. (BY MR. FREEMAN) So as to say after the
13   satisfaction of the liabilities, as of October 18th,
14   2018, in that sense, Super G Capital and Baymark
15   Partners were related as partners?
16   A. Okay.
17         MR. PERRIN: Objection, form.
18   Q. (BY MR. FREEMAN) Is that a yes?
19   A. Yes.
20   Q. Thank you. Is Tony Ludlow a member of
21   Windspeed's board?
22   A. I don't know.
23   Q. I'll scroll up to what's on Paragraph 3.5 of
24   Exhibit 5 that's before you. After reviewing this, do
25   you know whether Anthony Ludlow is a member of

Page 137

1   Windspeed's board?
2   A. Yeah, he was appointed to be on the board.
3   Q. He was appointed to be on Windspeed's board?
4   A. Yes. I'm not sure if there's a present board,
5   but he was appointed to the board, yes.
6   Q. So as of October 18th, 2018, do you know
7   whether he -- whether Anthony Ludlow was a member of
8   Windspeed's board?
9   A. It appears from this that he was.
10   Q. As of October 18th, 2018, did Super G have a
11   member on Windspeed's board?
12   A. It appears that Steve Bellah was nominated to
13   be on the board.
14   Q. Okay. And how many members of the board were
15   there on October 18th, 2018?
16   A. I see three.
17   Q. So based on that, as of October 18th, 2018,
18   two out of the three members of Windspeed came from
19   Baymark and Super G?
20   A. It appears that way.
21   Q. Okay. Do you know what role they had on the
22   board?
23   A. I am not aware --
24         MS. HARD-WILSON: Objection, form.
25   A. I am not aware if there was ever a board

Marc Cole * March 29, 2021

## Page 138

1 meeting.
2    Q.  (BY MR. FREEMAN)  Do you know if any of the
3 formalities of this document were ever complied with?
4         MS. HARD-WILSON:  Objection, form.
5         MR. BLAKLEY:  Objection, form.
6    A.  I'm not aware of any.
7    Q.  (BY MR. FREEMAN)  Do you believe that they
8 were?
9         MS. HARD-WILSON:  Objection, form.
10    A.  I don't know.  I don't know the answer.
11    Q.  (BY MR. FREEMAN)  Do you know if any of the
12 parties intended to abide by this document when it was
13 entered into?
14         MR. BLAKLEY:  Objection, form.
15         MS. HARD-WILSON:  Objection, form.
16    A.  I know that Super G would have done what its
17 duties were under this agreement, if I was asked to sign
18 it.
19    Q.  (BY MR. FREEMAN)  Okay.  Why did Super G do
20 business with Baymark Partners?
21         MR. PERRIN:  Objection, form.
22    A.  Baymark brought a lending opportunity via
23 Steve Bellah to Super G that Super G assessed was worthy
24 of a $750,000 to a million dollar amortizing loan.
25 Steve Bellah, through personal experience or the Dallas

## Page 139

1 business community, had the positive impression of the
2 Baymark principals.
3    Q.  (BY MR. FREEMAN)  Who drafted this Exhibit 5,
4 this Amended and Restated Company Agreement of Windspeed
5 Trading, LLC?
6    A.  I don't know.  I don't recognize it.
7    Q.  Did Super G draft it?
8         MR. PERRIN:  Objection, form.
9         MS. HARD-WILSON:  Objection, form.
10    A.  I don't think so.
11    Q.  (BY MR. FREEMAN)  Did Super G's counsel draft
12 this document?
13    A.  I don't know --
14         MS. HARD-WILSON:  Objection, form.
15    A.  -- because by this point in the transaction, I
16 had asked Bellah to deal with things on a cost effective
17 basis, which meant he did not have access to Super G's
18 counsel.
19    Q.  (BY MR. FREEMAN)  Okay.  So at this point, as
20 of October 18th, 2018, or several months before then,
21 Steve Bellah would not have had budget to utilize Super
22 G's counsel -- legal counsel?
23         MR. BLAKLEY:  Objection, form.
24    A.  He would not have had access to Jeffer
25 Mangles.  I know that he used a Texas-based firm for the

## Page 140

1 Article IX.  And I don't know the details of that.  I
2 don't know if they drafted this agreement or if one of
3 the other parties to the agreement drafted it.  But I
4 know that Jeffer Mangles didn't draft it.
5    Q.  (BY MR. FREEMAN)  You know -- I'm sorry.  Go
6 ahead.
7    A.  Go ahead.
8    Q.  Do you know who that Texas-based firm was?
9    A.  Not with certainty.
10    Q.  Was it Hallett & Perrin?
11    A.  I don't know.
12    Q.  What leads you to believe -- what leads you to
13 answer in that manner?
14    A.  I recall in my review of files several weeks
15 ago coming across a firm, I believe had Dorsey in the
16 name.  And so I believe that was Super G counsel in
17 the Article IX, but I could be -- could be wrong.
18    Q.  Okay.  So you don't believe this Exhibit 5,
19 Amended and Restated Company Agreement of Windspeed
20 Trading, LLC, was drafted by Super G's counsel?
21         MR. PERRIN:  Objection, form.
22    A.  I don't think it was.
23    Q.  (BY MR. FREEMAN)  Was this document drafted by
24 Baymark's counsel?
25    A.  I don't know.

## Page 141

1         MR. BLAKLEY:  Objection, form.
2    Q.  (BY MR. FREEMAN)  How many drafts were there?
3    A.  Drafts?
4    Q.  Yes, sir.
5    A.  I'm not aware.
6    Q.  Do you have any indication in your files that
7 there were multiple drafts exchanged?
8    A.  I don't.  And part of that is good
9 housekeeping on our side.  We try to keep finals.
10    Q.  Who executed this document?
11         MR. PERRIN:  Objection, form.
12    A.  I did for Super G Capital.  Do you want the
13 others?
14    Q.  (BY MR. FREEMAN)  Yes, sir.
15    A.  William Szeto and Anthony Ludlow.
16    Q.  Okay.  And who did Mr. Szeto execute it on
17 behalf of?
18    A.  Windspeed Trading.
19    Q.  And who did Anthony Ludlow execute on behalf
20 of?
21    A.  Baymark Partners Management, LLC.
22    Q.  Did Super G propose any changes?
23    A.  I don't -- I wouldn't recall.  And from the
24 looks of it, I didn't spend a lot of time with the
25 agreement.

Usher Reporting Services
(214) 755-1612

Page 142

1    Q.  Okay.  Why is that?
2    A.  Why did I not spend a lot of time with it?
3    Q.  Yes, sir.
4    A.  Because success has many fathers, and failure
5  is an orphan, as my old partner used to say.
6    Q.  Was that because this was not Super G's
7  brainchild?
8    A.  It was a nonperforming loan.  I was now
9  spending legal dollars chasing a nonperforming loan, and
10  I was disappointed in how we got Super G Capital deeper
11  into a bad situation.  So this was an orphan.
12    Q.  Who negotiated this agreement?
13    A.  On the front line, Steve Bellah.  But I was
14  aware of the economic split, and I authorized it.
15    Q.  How did you communicate with Mr. Bellah about
16  this?
17    A.  A combination of our weekly calls.  And I saw
18  emails that were both in my quick archival, as well as
19  prepared and produced by my counsel between Steve and
20  myself.
21    Q.  So there were email exchanges regarding it?
22    A.  Yes.
23    Q.  Sorry.  Someone's voice just sounded like a
24  robot.  Marc, can you still hear me?
25    A.  Yes, I hear you fine.

Page 143

1    Q.  Okay.  Sorry.  So did you say there were
2  several emails regarding this document?
3    A.  There were emails, and Steve and I would have
4  likely spoken both in our weekly calls, as well as
5  one-on-one.
6    Q.  Okay.  Any other manner in which y'all would
7  have communicated?
8    A.  No, I try to limit everything to email and
9  call.
10    Q.  Anyone else you would have discussed this
11  document with?
12    A.  In the ordinary course, I would have discussed
13  with counsel.  But I distinctly remember that that did
14  not happen, and that we were not using Super G
15  counsel -- Super G counsel.  So I was not involved on
16  the legal side of the negotiation.
17    Q.  Was anyone --
18    A.  Steve was handling both discussions with
19  Baymark, Szeto, as well as counsel.
20    Q.  Was anyone on Super G's side concerned whether
21  counsel would have blessed this?
22    MR. PERRIN:  Objection, form.
23    A.  No.  I didn't give it much thought.
24    Q.  (BY MR. FREEMAN)  Did you have any discussions
25  about this with Hook or Ludlow?

Page 144

1    A.  I'm not aware of having ever spoken to them,
2  but it's possible.  I could be proven wrong on that.
3    Q.  Do you know if Mr. Bellah had any
4  conversations with Hook or Ludlow about it?
5    A.  I would assume that he did.  Or with Baymark,
6  the Company.
7    Q.  Do you know how or in what form he had those
8  communications?
9    MR. PERRIN:  Objection, form.
10    A.  I don't.  And they may have included a
11  meeting.
12    Q.  (BY MR. FREEMAN)  Okay.  How much money did
13  Super G contribute to Windspeed Trading?
14    A.  $200,000 of cash, plus the assumption of the
15  note, the ACET deficiency.
16    Q.  I'm sorry.  Could you explain that last half
17  of that answer?
18    A.  Well, Super G Capital sold all of the assets
19  from the Article IX of ACET to Windspeed for the
20  assumption of a, approximately, $500,000 note.
21    Q.  Okay.  And how did Super G contribute that?
22    A.  There was a bill of sale where Super G Capital
23  sold the hard assets as well as intellectual property of
24  ACET to Windspeed for the assumption of a note.
25    Q.  Did -- are you saying that Super G contributed

Page 145

1  that note back to Windspeed?
2    A.  No.  I'm saying Super G Capital sold property
3  to Windspeed.  And instead of receiving cash, which
4  would have been a home run, it received a liability, a
5  note in Windspeed.
6    Q.  Got it.  An asset from Super G's perspective,
7  correct?
8    A.  Yes.
9    Q.  More or less, I guess?
10    A.  More or less.
11    Q.  Okay.  This document that's up in front of
12  you, Exhibit 5, the Amended and Restated Company
13  Agreement of Windspeed Trading, LLC, states that it's
14  amended and restated.  Have you seen the prior version
15  of this company agreement?
16    A.  I have not, but it may have been the original
17  formation document.
18    Q.  By that, you mean this document is, or do you
19  mean that something along the lines of a Certificate of
20  Formation may have been the original?
21    A.  The latter.  Szeto may have formed Windspeed,
22  and then it was amended with the admission of the
23  warrant holders.
24    Q.  Okay.  I want to look at a couple of sections
25  in here.  Just draw your attention to what's Page --

## Page 146

1   marked as Page 7 of Exhibit 5, specifically,
2   Section 3.1, which states, "The business and affairs of
3   the Company shall be managed by the board of managers.
4   The board of managers shall be solely responsible for
5   the operation and management of the business of the
6   Company, and except as otherwise expressly provided in
7   this agreement, the board of managers shall possess all
8   rights, powers and authority generally conferred by
9   applicable law or deemed by the board of managers as
10   necessary, advisable or consistent in connection
11   therewith."
12        Does this appear to give complete
13   operational authority to the board of managers?
14        MR. BLAKLEY:  Objection, form.
15   A.  Yes, in my opinion.
16   Q.  (BY MR. FREEMAN)  I want to look at
17   Section 3.2 next.  It says, captioned, "No control by
18   members."  It states, "No member (except a member who
19   may also be a manager or officer, and then only in such
20   capacity within the scope of his/her or its authority
21   hereunder) will participate in or have any control over
22   the Company business or will have any authority or right
23   to act for or bind the Company."
24        Does this appear to remove any authority
25   on behalf of a member, at least in their capacity as a

## Page 147

1   member?
2        MR. BLAKLEY:  Objection, form.
3        MR. PERRIN:  Objection, form.
4   A.  Taken together, 3.1 and 3.2 tells me the board
5   controls the Company.
6   Q.  (BY MR. FREEMAN)  Okay.  And I want to look at
7   the board that was formed on October 18th, 2018.  Did
8   that board consist of three persons?
9   A.  Yes.
10   Q.  And was one of those persons named Anthony
11   Ludlow --
12   A.  Yes.
13   Q.  -- and was he titled as the Baymark manager?
14   A.  That's correct.
15   Q.  And was one of those persons Steven Bellah?
16   A.  Yes.
17   Q.  And was he titled the Super G manager?
18   A.  That's correct.
19   Q.  And was one of those persons named William
20   Szeto?
21   A.  Yes.
22   Q.  And was he titled the Szeto manager?
23   A.  Yes.
24        MR. FREEMAN:  I hate to suggest this, but
25   I think I'm going to need a restroom break.

## Page 148

1        THE WITNESS:  Likewise.
2        MR. FREEMAN:  All right.  Y'all want to
3   take ten minutes, and then I think we'll be on the home
4   stretch?
5        (Break taken from 6:56 p.m. to 7:04 p.m.)
6   Q.  (BY MR. FREEMAN)  Okay.  We're back on the
7   record.  Mr. Cole, with respect to Mr. Bellah, does he
8   still work at Super G?
9   A.  No.
10   Q.  Does he work at SG --
11   A.  No.
12   Q.  -- Credit Partners?  No?  Do you know where he
13   works?
14   A.  Yes.  Bear with me.  He has a firm called
15   Remuda, R-E-M-U-D-A, Credit Advisors.  And I -- in the
16   Dallas/Fort Worth area.  And it is unclear to me if he
17   is one of one or part of a team, but that is the name of
18   his current employer.
19   Q.  Okay.  Do you have any contact information for
20   him?
21   A.  We are LinkedIn.  Work number (214) 432-0575.
22   Q.  Okay.  Want to go back to the document that's
23   been on the screen that is Exhibit 5, which is the
24   Amended and Restated Company Agreement of Windspeed
25   Trading, LLC.

## Page 149

1   A.  Yes.
2   Q.  I'll go down to Section 9 -- 9.1, and I want
3   to look at this section real quick.  It's entitled
4   "Restrictions on Transfer of Interest."  And it states,
5   "Except as otherwise provided in this Article IX, no
6   member shall have the right to sell, transfer, pledge,
7   encumber, hypothecate or otherwise assign all or any
8   portion of its interest without the consent of the board
9   of managers, which consent may be withheld in its sole
10   and absolute discretion."
11        Does this provision appear to provide that
12   Mr. Szeto could not sell, transfer, pledge, encumber,
13   hypothecate or otherwise assign his interest in
14   Windspeed Trading without the consent of both the Super
15   G manager and the Baymark manager?
16   A.  That would be my interpretation, yes.
17        MR. PERRIN:  Objection, form.
18   Q.  (BY MR. FREEMAN)  Did Mr. Szeto ever state why
19   he, as a 100 percent owner of Windspeed, would place
20   these kinds of restrictions on his membership interest?
21   A.  Not to me.
22        MS. HARD-WILSON:  Objection, form.
23   Q.  (BY MR. FREEMAN)  Was that ever discussed by
24   anyone at Super G?
25   A.  Not with me.

Page 150

```
 1        Q.  We'll go down to -- back down to Exhibit A,
 2   which is the warrant holder exhibit.  And you're
 3   familiar with this exhibit, correct?
 4        A.  Yes.
 5        Q.  When did Super G first discuss the possibility
 6   of obtaining warrants in this entity?
 7        A.  Within the discussion of the restructuring and
 8   recapitalization wind down and -- I was --
 9             THE REPORTER:  Mr. Cole --
10             THE WITNESS:  Yes?
11             THE REPORTER:  You muted for a second.
12   The last thing I got was "restructuring and
13   recapitalization and wind down."
14             THE WITNESS:  Yes.  I hit the mute button.
15        A.  Better than my memory is.  There was an
16   exhibit provided with me here in December '17.
17   That's just -- nope.  That's ACET cash.  So beginning in
18   the fall of '18, it appeared that Steve and Baymark were
19   in discussions around what the restructuring would look
20   like.  And I think this is where the three parties
21   landed.
22        Q.  Okay.  Were those discussions going on in
23   August of 2018?
24        A.  I don't know how to answer that.  I know that
25   they were in early September of '18.
```

Page 151

```
 1        Q.  Okay.  And you said they came about as part of
 2   the discussion about restructuring?
 3        A.  Yes.  The Company was in multiple defaults to
 4   Super G Capital throughout 2018.
 5        Q.  And were those discussions about restructuring
 6   going on in the summer of 2018?
 7        A.  Presumably.
 8             MR. PERRIN:  Objection, form.
 9        Q.  (BY MR. FREEMAN)  Were those going on July
10   of 2018?
11             MS. HARD-WILSON:  Objection, form.
12        A.  I can speak to September.
13        Q.  (BY MR. FREEMAN)  What discussions did Super
14   G -- anyone at Super G have about the warrants?
15        A.  It's my recollection that -- I'll say "we,"
16   Super G, for putting up all of the new capital, wanted
17   material upside in Windspeed, but had to balance that
18   with recruiting a CEO and wanting Baymark to be active
19   in assisting the CEO in the management of the business.
20   And so we landed at 20/40/40, but it could have been 100
21   Super G.  This was the result of a negotiation.
22        Q.  Why did Super G want Baymark incentivized to
23   assist the CEO?
24        A.  My recollection is that we didn't know the
25   CEO, but Baymark, in our view, acted responsibility in
```

Page 152

```
 1   bringing a solution to the table for what other
 2   investors could have walked away from and said, "I'm
 3   sorry Super G Capital; it didn't work."  So they
 4   continued to be supportive of trying to get Super G
 5   Capital a recovery.  And they were agreeable to sitting
 6   behind the debt and brought a high pedigreed CEO.  So
 7   between that and Steve Bellah's opinion of Baymark, we
 8   wanted to have a partner.
 9        Q.  They didn't attempt to make good on this debt
10   out of the goodness of their hearts, did they?
11        A.  No, sir.
12             MR. PERRIN:  Objection, form.
13        Q.  (BY MR. FREEMAN)  They did so in a manner that
14   provided them significant financial upside?
15             MR. PERRIN:  Objection, form.
16        A.  I believe they valued their upside.  And I do
17   believe they valued doing right by Super G.
18        Q.  (BY MR. FREEMAN)  Have they ultimately done
19   right by Super G?
20             MR. BLAKLEY:  Objection, form.
21        A.  (No response.)
22        Q.  (BY MR. FREEMAN)  Is that a difficult
23   question?
24             MR. PERRIN:  Objection, form.
25        A.  They rolled up their sleeves to assist.  It
```

Page 153

```
 1   ultimately wasn't successful.
 2        Q.  (BY MR. FREEMAN)  Did they put any additional
 3   money in?
 4             MR. PERRIN:  Objection, form.
 5        A.  If they did, it was small personal dollars,
 6   but it wasn't significant.
 7        Q.  (BY MR. FREEMAN)  Wasn't that the single most
 8   important thing that Super G wanted?
 9        A.  It was.
10             MR. BLAKLEY:  Objection, form.
11        Q.  (BY MR. FREEMAN)  Why didn't they put any
12   additional money in?
13             MR. PERRIN:  Objection, form.
14        A.  Either they didn't have it, or they
15   out-negotiated me.
16        Q.  (BY MR. FREEMAN)  You mentioned that Mr. Szeto
17   was highly pedigreed.  What do you base that description
18   on?
19        A.  It was presented to me that Mr. Szeto had a
20   successful executive career.  And I don't recall the
21   specifics, but that he was happily retired with at least
22   one corporate win under his belt.
23        Q.  How did his prior stints go?
24             MS. HARD-WILSON:  Objection, form.
25        A.  Baymark had the relationship; I did not.
```

39 (Pages 150 to 153)

Marc Cole  *  March 29, 2021

Page 154

```
 1   But -- you're referring to pre-ACET?
 2        Q.  (BY MR. FREEMAN)  Well, I'm referring to ACET
 3   as the immediately -- immediate predecessor to his
 4   position at Windspeed.
 5        A.  Well, the results speak for themselves, which
 6   is not well.  But, in my opinion, it was a hopelessly
 7   undercapitalized company.
 8        Q.  Doomed from the beginning?
 9            MR. PERRIN:  Objection, form.
10        A.  Had he had significant working capital to
11   bring in more inventory, perhaps it would have been a
12   different outcome, but I don't know.
13        Q.  (BY MR. FREEMAN)  If Baymark had put
14   additional funds in to capitalize?
15            MR. PERRIN:  Objection, form.
16        A.  Or if he was able to recruit investors to his
17   company.
18        Q.  (BY MR. FREEMAN)  You indicated that it was
19   presented to you that he was a highly pedigreed CEO.
20   Who presented it in that manner?
21        A.  Bellah, Steve Bellah.  And I do recall I was
22   put on the phone with him -- with Mr. Szeto, at least
23   once.
24        Q.  What did Mr. Bellah base that characterization
25   on?
```

Page 155

```
 1        A.  A combination of a CV and, I believe,
 2   description from Baymark, but I -- I'm not sure.
 3        Q.  Okay.  With respect to the warrants that are
 4   memorialized on Exhibit A of Exhibit 5 of this
 5   deposition that's on the screen now, did you have
 6   discussions about those with Mr. Szeto?
 7        A.  I don't recall if I did or Steve Bellah did on
 8   Super G Capital's behalf.
 9        Q.  But one of you did?
10        A.  I can tell from the limited email exchanges
11   that I've seen that Steve was speaking with ACET -- I'm
12   sorry -- Baymark.  Steve Bellah was speaking with
13   Baymark about the capitalization.  So either Bellah on
14   behalf of Super G or myself and Bellah or Baymark was
15   presumably including Mr. Szeto because it was a
16   three-part negotiation.
17        Q.  Okay.  Did you or Mr. Bellah consult with
18   Hallett & Perrin regarding the warrants?
19        A.  I did not.
20        Q.  Do you know if Mr. Bellah did?
21        A.  I don't know.
22        Q.  Did Hallett & Perrin represent Super G in this
23   with respect to the warrants?
24            MR. PERRIN:  Objection, form.
25        A.  I don't think so.  I believe I saw another --
```

Page 156

```
 1   a Texas counsel had represented Super G counsel, and I
 2   do not think it was Hallett & Perrin.
 3        Q.  (BY MR. FREEMAN)  Has Hallett & Perrin ever
 4   represented Super G?
 5        A.  No.
 6            THE WITNESS:  Can I ask my attorney a
 7   question?
 8            MR. FREEMAN:  Yes, sir.  Do you need
 9   to --
10            THE WITNESS:  Do you have documents that
11   suggest someone other than Hallett & Perrin represented
12   Super G in the foreclosure?
13            MR. BLAKLEY:  Not anything -- I
14   haven't -- I don't know the name.  I haven't seen a
15   name.
16            THE WITNESS:  Okay.  Okay.
17        A.  I don't know.
18            (Exhibit 17 marked.)
19        Q.  (BY MR. FREEMAN)  I'll pull up what's marked
20   as Exhibit 17.  Just to put everything in context, ACET
21   Global had a liability that was owed to Super G Capital,
22   LLC, correct?
23        A.  Yes.
24        Q.  How much did it owe?  Was that, at one point,
25   a million dollars?
```

Page 157

```
 1        A.  No.
 2            MR. PERRIN:  Objection, form.
 3        A.  I believe it started at $750,000.  Quite
 4   frankly, I've seen 516,884.86.  And I've seen a record
 5   of -- no, this is the number:  516,844.86.  That is what
 6   ACET owed.
 7        Q.  (BY MR. FREEMAN)  At what point in time,
 8   roughly?
 9        A.  March 1, 2019.  So that likely included
10   accrued interest, legal fees, perhaps a late fee.  But
11   that -- the fully loaded number, which Super G would
12   have confirmed with its accountants prior to issuing
13   this, was $516,844.86.
14        Q.  Okay.  And when this loan was initially taken
15   on by ACET Global, did Baymark -- did Baymark Partners
16   contribute $400,000 to ACET?
17        A.  My credit memo says that Baymark was to
18   contribute $400,000, of which a portion would sit in an
19   escrow account to Super G Capital's behalf.  For lack of
20   documentation otherwise, I'm assuming that the Super G
21   underwriters verified that happened because I don't see
22   other -- I don't see evidence that it didn't happen.
23        Q.  And after the initiation of the loan, did
24   Baymark Partners contribute another $116,000?
25        A.  I know that they contributed capital.  I don't
```

Marc Cole   *   March 29, 2021

Page 158

1    know the amounts. They were small. And I believe that
2    the principals were putting in personal capital to
3    forestall a foreclosure.
4        Q. Okay. So if Baymark put in $400,000, and
5    subsequently, another $116,000, my math skills are
6    fairly limited, but I calculate $516,000. Does that
7    math sound correct to you?
8        A. It does.
9            MR. BLAKLEY: Objection, form.
10       Q. (BY MR. FREEMAN) And you said that the note
11   between Windspeed and Super G was $516,884.86 [sic]?
12       A. That's correct.
13       Q. As of March 1, 2019?
14       A. Yes. And I see a $490,000 internal
15   deficiency. And so I'm assuming the delta is accounted
16   for through legal accrued interest, and perhaps a
17   penalty.
18       Q. Okay. So, at some point, ACET Global was
19   making loan payments, correct?
20       A. Correct.
21       Q. And then it, at some point, stopped making
22   those loan payments; is that correct?
23       A. They were reduced, and then reduced again, and
24   then they stopped.
25       Q. Okay. Did Super G Capital talk to Mr. Szeto

Page 159

1    regarding ACET Global defaulting on its loan?
2        A. I recall a conversation that I was involved in
3    as an introduction to Mr. Szeto, and that call or a
4    subsequent call to get his plan. I know that my
5    colleague, Alex, has had further conversations with
6    Szeto, which I would characterize as a friendly
7    collection call. And those have happened on and off for
8    the last, I don't know, 24 months. But that's -- that's
9    my awareness of conversations with Mr. Szeto.
10       Q. Has Super G taken any steps to foreclose on
11   Mr. Szeto's company?
12       A. No, because there's even less here to
13   foreclose on. And he periodically sends money. And
14   Alex has a repeat of the same conversation, which is he
15   continues to think things will rebound. He sends money,
16   and thinks any further action would only push him out
17   of the business.
18       Q. At this point in time, would you describe him
19   as a highly pedigreed CEO?
20           MS. HARD-WILSON: Objection, form.
21       A. It hasn't worked out for Super G Capital.
22       Q. (BY MR. FREEMAN) Exhibit 17 is on the screen.
23   Do you recognize this document?
24       A. Super G is informing all parties that it is
25   going to foreclose on the assets.

Page 160

1        Q. And do you remember this document?
2        A. I do.
3        Q. Did you draft this document?
4        A. My recollection of the document was Steve
5    Bellah's instructions to me on the importance that we
6    follow the protocol of its delivery. And I recall, if I
7    have done nothing else right in this transaction, I
8    followed the U.S. Postal Service certified mail protocol
9    in its delivery. That's all I can remember.
10       Q. Mr. Bellah was adamant that you follow the
11   foreclosure protocol?
12           MR. PERRIN: Objection, form.
13       A. Correct.
14       Q. (BY MR. FREEMAN) Had he ever advised you
15   before in such a manner?
16       A. No. It was the first of two deals -- Steve
17   Bellah did two loans, perhaps three, that I'm aware of
18   in total, and this was the one that did not perform.
19       Q. Okay. Were you involved in drafting this
20   notice?
21       A. No, signing and sending.
22       Q. Okay. So it is -- and just going down here,
23   this is your signature on it, correct?
24       A. Yes.
25       Q. And you sent this notice?

Page 161

1        A. Registered mail. And I kept the receipts for
2    a long time.
3        Q. Did you send it to all of the parties that
4    were CC'd?
5        A. I can't answer that, but I sent multiple
6    versions of it out. So I'm assuming that I did.
7        Q. But as we sit here today, your records don't
8    demonstrate whether Super G sent this to all of the CC'd
9    parties?
10       A. I was made aware of the importance of getting
11   each of the names on here a certified copy, and I'm
12   confident in my ability to follow simple instructions.
13       Q. Was this a -- was this a
14   normal-course-of-business-type document?
15       A. No. As I said, we had not done many
16   nonjudicial foreclosures. I think I thought of one
17   other since you asked the question, but...
18       Q. Was there an established process at Super G
19   for engaging in a foreclosure of this nature?
20       A. No. There was no established process. I
21   follow the direction of counsel in these matters.
22       Q. Was there an established business process for
23   maintaining the records related to this type of
24   transaction?
25       A. No different than any other transaction, which

Page 162

```
 1   is we would retain an electronic copy in our Dropbox
 2   file system.
 3        Q.  Okay.  But that file system does not
 4   reflect -- does not provide proof of mailing this
 5   document to all of the CC'd parties?
 6             MR. BLAKLEY:  Objection, form.
 7        A.  No.  And, in fact, I retained the certified
 8   mail return slips for my mental statute of limitations
 9   that I did my job correctly.  And sure enough, I did not
10   retain them long enough.
11        Q.  (BY MR. FREEMAN)  Fair enough.  Who was
12   involved in drafting this notice?
13        A.  I believe that Super G had retained Texas
14   counsel.
15        Q.  Do you know who that Texas counsel was?
16        A.  If I can't give you a quick answer, I'm going
17   to say no.  Bear with me, and hopefully you will not get
18   all the notifications again.  Here we are, foreclosure
19   agreement.  Yes.  Larry -- I don't know how to pronounce
20   his last name -- M-A-K-E-L at Dorsey & Whitney in
21   Dallas.
22        Q.  Okay.  Had you ever used him before?  Had
23   Super G ever used him before?
24        A.  I don't believe so.
25        Q.  How did that relationship come about?
```

Page 163

```
 1        A.  Steve Bellah.
 2        Q.  Steve Bellah?  Had Steve Bellah ever worked
 3   with Mr. Makel before?
 4        A.  I don't know.
 5        Q.  Who was involved in drafting this Exhibit 17?
 6        A.  Presumably, Steve and Dorsey & Whitney.  It
 7   looks fairly -- oh, I guess this has an exhibit of all
 8   the inventory.
 9        Q.  Let's look at that.  If we look at Exhibit A
10   to Exhibit 17, Mr. Cole --
11        A.  Yes.
12        Q.  -- there's a definition of "collateral" that
13   really comprises all of Exhibit A.  Do you know who
14   drafted that Exhibit A?
15        A.  I don't.
16        Q.  There is an Exhibit 1 thereto.  It's titled
17   "Inventory."
18        A.  I see it.
19        Q.  Do you know who drafted that?
20        A.  I don't.
21        Q.  Was it your testimony that Super G did not
22   engage in any direct physical inventory of a borrower's
23   assets?
24        A.  Not of this borrower.
25        Q.  Okay.  So this sheet at Exhibit 1 appears to
```

Page 164

```
 1   be -- it appears to reflect an inventory count.  Is that
 2   what -- how you would describe it?
 3        A.  Yes.
 4        Q.  Did Super G conduct this inventory count?
 5        A.  Unless Bellah did.  I don't think he counted a
 6   bunch of zig-zags, but I -- we could ask him, but I'm
 7   assuming it was provided to us.
 8        Q.  Is -- is there any reason to believe, based
 9   upon your review of the record, that Steve Bellah took
10   this inventory?
11        A.  No.
12        Q.  And we've established you're not a huge fan of
13   legal fees.  I just don't understand why that is.  But
14   did Dorsey & Whitney, or any other legal counsel,
15   conduct this inventory?
16             MR. PERRIN:  Objection, form.
17        A.  I don't know.
18        Q.  (BY MR. FREEMAN)  Based upon your review of
19   your records, do you have any reason to believe that
20   Dorsey & Whitney or any other law firm on behalf of
21   Super G conducted this inventory?
22             MR. BLAKLEY:  Objection, form.
23        A.  Presumably not.
24        Q.  (BY MR. FREEMAN)  Do you know who drafted
25   Exhibit 2, which is the next page of Exhibit 17 of this
```

Page 165

```
 1   exhibit -- of this deposition?
 2        A.  I do not.
 3        Q.  Do you know who drafted Exhibit 3, which is
 4   Exhibit 3 of Exhibit 17 of this deposition, Bates
 5   labeled D&T Partners, LLC 000518?  Do you know who
 6   drafted this document?
 7        A.  Exhibit 3, no, I don't know where this came
 8   from.
 9        Q.  Would Super G have been familiar with the
10   various computer licenses that ACET Global had?
11        A.  No.
12        Q.  Would it have been familiar with the various
13   website domains that it maintained?
14        A.  Unlikely.
15        Q.  Would it be familiar with whether or not it
16   had a QuickBooks account?
17        A.  I don't know.  Unlikely.
18        Q.  We'll look here at Exhibit 3.  The fourth item
19   here is "Seller's computer software and licenses,
20   including but not limited to its QuickBooks,
21   ShipStation, and Microsoft 365 software and licenses."
22             Is that a standard provision in Super G's
23   documents?
24        A.  I'm not familiar with ShipStation.
25        Q.  I'm not either.  Is that a -- is this a
```

42 (Pages 162 to 165)

Marc Cole   *   March 29, 2021

---

Page 166

1    standard document in Super G's transactional library?
2         MR. PERRIN:  Objection, form.
3         A.  I wouldn't -- no, I don't think so.
4         Q.  (BY MR. FREEMAN)  Did Super G draft this
5    exhibit?
6         A.  No.
7         Q.  Do you know if Super G had any communications
8    regarding any of these exhibits?
9         A.  I don't know.
10        Q.  When did Super G -- when did Super G begin the
11   foreclosure process?
12        A.  Well, the bill of sale and the agreement that
13   you show here, January 1, 2019, is the foreclosure
14   process.  Clearly, through the fall of 2018, the company
15   was struggling, presumably insolvent if we saw a
16   financial statement; and Bellah, on behalf of Super G,
17   and Baymark were discussing what a restructuring or
18   liquidation plan would look like.
19        Q.  Okay.  And what's the date of this initiation
20   letter, this document that begins the foreclosure
21   process?
22        A.  January 31, 2019.
23        Q.  Okay.  Now, we were looking at a document
24   earlier that reflected that Super G obtained warrants
25   with respect to 40 percent of Windspeed on October 18th,

---

Page 167

1    2018 --
2         A.  Yes.
3         Q.  -- is that correct?
4         A.  Yes.
5         Q.  Why the delay for this document?
6         MR. BLAKLEY:  Objection, form.
7         Q.  (BY MR. FREEMAN)  Why the delay with respect
8    to the January 31st, 2019, document that's reflected in
9    Exhibit 17?
10        A.  I don't know.
11        MR. BLAKLEY:  Objection, form.
12        Q.  (BY MR. FREEMAN)  Did you receive a response
13   to this letter?
14        A.  No.
15        Q.  Why did you send it to the attention of David
16   Hook?
17        A.  I don't know.  I was -- this was definitely
18   given to me, as I said, execution ready and with strict
19   instructions on the delivery.
20        Q.  From Mr. Bellah?
21        A.  Yes.
22        Q.  Why was it sent to 5700 Granite Parkway, Suite
23   435, Plano, Texas?
24        A.  I don't know what that is.  Is that -- I don't
25   know.

---

Page 168

1         Q.  Is that where Super G had done business, with
2    respect to ACET Global, LLC, in the past?
3         A.  The 750,000 or million dollar loan agreement
4    would have the company address, which was Granite Park
5    Two, 5700 Granite Parkway, Plano, Texas.
6         Q.  And what about the subsequent notes?
7         A.  I believe the company had consolidated or
8    moved out of something to save money, but I'm -- I don't
9    know the details there of the subsequent notes.  I see a
10   loan agreement.  They -- they would have been -- let me
11   say it this way.  My guys would get it right the first
12   time, and then not amend it.  So I think from Super G
13   Capital's standpoint, ACET Global, LLC, is at this --
14        Q.  Okay.
15        A.  -- Suite 435.
16        Q.  Why was Julie Smith of Hallett & Perrin CC'd
17   on this letter?
18        A.  I don't know her, and I don't know why.
19        Q.  Was she reflected in any of the transactional
20   documents at that point in time?
21        MR. PERRIN:  Objection, form.
22        A.  That I'm aware.  But, again, Steve Bellah and
23   Dorsey & Whitney led that transaction.
24        Q.  (BY MR. FREEMAN)  Okay.  Were they in
25   communication with Baymark 's counsel?

---

Page 169

1         A.  I know they were in communication with
2    Baymark.  As far as Baymark's counsel, I'm not sure.
3         Q.  Were they in communication with Baymark's
4    counsel or Baymark in the weeks leading up to this
5    January 31st, 2019, letter?
6         A.  I know that representatives of Super G were
7    speaking with Baymark leading up to the October 18
8    restructuring agreement.
9         Q.  If you look on the third page of the
10   document --
11        A.  Yes.
12        Q.  -- an individual named Tomer Damti, do you
13   know who Mr. Damti is?
14        A.  He is the -- I believe he's the founder of the
15   business, was the seller in the transaction, and was
16   briefly the CEO post-closing.
17        Q.  Okay.  If I represent to you that he was CEO
18   until February 12th of 2018 -- well, I will say, I will
19   represent to you that he was CEO until February 12th of
20   2018 of ACET Global.  Up until that time, did ACET
21   Global miss a payment to Super G?
22        A.  The loan history was not good.  And I don't --
23   I could access the worksheet of payments, but I see that
24   in December of 2017, Amendment Number 1, "Reducing
25   payments due to cash problems."  So I would -- I'm not

---

Usher Reporting Services
(214) 755-1612

Page 170

1  aware that the company missed a payment, but it was
2  unable to make its full payments by the end of the
3  year -- end of the year 2017.
4      Q.  So in light of or in spite of those notations,
5  is there anything in your -- do your records reflect
6  that ACET Global had missed any payments under the
7  existing note as of the end of 2017?
8          MR. BLAKLEY:  Objection, form.
9      A.  Not aware that they missed a payment.
10     Q.  (BY MR. FREEMAN)  Did they miss a payment in
11 January of 2018?
12     A.  I could take a break and answer that, but my
13 notes are that we -- we did a reduction in December, and
14 then again in March of 2018.  I don't know that payments
15 were missed.  The company maintained -- I think of
16 missed payments as typically the company doesn't want to
17 pay us, isn't communicating.  So the company was
18 communicating with Super G Capital that it needed help
19 to make its payments beginning in December and
20 continuing through the rest of the relationship.
21     Q.  In the interest of time, let's say had it
22 defaulted as of the end of 2017?
23     A.  No.
24     Q.  Had it defaulted as of the end of
25 January 2018?

Page 171

1      A.  No, because it was restructured.  It was
2  amended.
3      Q.  In January of 2018?
4      A.  I believe in December of 2017, the payments
5  were reduced.
6      Q.  There was an amended and restated note; is
7  that correct?
8      A.  Which prevented the company from defaulting.
9  But the company was not in default at that time.
10     Q.  Or at least we can say that that changed the
11 amount of the loan payments?
12     A.  Yes.
13     Q.  Okay.  And did the company at that time
14 comply -- was it compliant with the then existing loan
15 agreements as of the end of January 2018?
16     A.  Yes.
17     Q.  And was it in compliance with the then
18 existing loan agreements as of the end of February 2018?
19     A.  I believe the -- yes, it was.
20     Q.  And I'll represent to you that after Mr. Damti
21 was terminated on February 12th, 2018, he was replaced
22 as CEO by the highly pedigreed William Szeto.
23          MR. PERRIN:  Objection, form.
24     Q.  (BY MR. FREEMAN)  In March of 2018, did ACET
25 Global default on its then much lower payment

Page 172

1  requirement under the then existing note?
2          MR. PERRIN:  Objection, form.
3      A.  It was amended again because the company
4  couldn't make it, preventing a default.
5      Q.  (BY MR. FREEMAN)  So when was it amended
6  again?
7      A.  April.
8      Q.  April of 2018?
9      A.  Yes.
10     Q.  Did ACET Global make its March 2018 payment on
11 the note?
12     A.  No.
13     Q.  So in the first month in which Mr. Szeto was
14 the CEO of ACET Global, did ACET Global fail to make the
15 payment to Super G?
16     A.  My notes from my conversation with Alex who
17 had access to the detailed payment records said that the
18 company -- that we did a forbearance in April '18 as the
19 company failed to make payments in March.
20     Q.  Okay.  So if March was the first month --
21 first full month in which Mr. Szeto was serving as the
22 CEO of ACET Global, then ACET Global failed to make its
23 required note payment in his first month as CEO?
24     A.  Yes.
25     Q.  Was the collateral that's described in Exhibit

Page 173

1  A and the Exhibit 1, 2, and 3 that follows that, in,
2  just for clarification, what is marked as Exhibit 17 of
3  this deposition -- did that collateral -- was that
4  collateral surrendered to Super G Capital?
5      A.  I will say we took it.
6      Q.  What do you mean by that?
7      A.  We exercised our rights under the foreclosure
8  agreement.  Those rights were not contested.  So the --
9  my understanding of the UCC provision is they became our
10 property.
11     Q.  I think what I want to ask you is -- here on
12 Page 3, with respect to Mr. Damti, was this address
13 reflected in any of the transactional documents
14 involving ACET Global?
15     A.  I don't know where that address came from, and
16 I'm not aware if that's Mr. Damti's address or not.
17 That's what was given to me.
18     Q.  Do you know if this address was reflected in
19 any of the notice addresses in any of the transactional
20 documents?
21     A.  I don't know.
22     Q.  That address came from Mr. Bellah?
23     A.  And counsel, yes.
24     Q.  Mr. Bellah had a history with the Baymark
25 parties?

Page 174

1      A.  I believe he knew them.
2      Q.  Okay.  You say Super G took it or exercised
3  its rights over the collateral.  When did it do that?
4          MR. PERRIN:  Objection, form.
5          MR. FREEMAN:  Ed, what's the basis for
6  that?
7          MR. PERRIN:  You've asked him this same
8  question about six different ways today.
9      Q.  (BY MR. FREEMAN)  You can still answer it,
10  Mr. Cole.
11      A.  My understanding of the Article IX provision
12  is that there is a waiting period.  I don't know what
13  that waiting period is.  I know that we were intent on
14  following it, both the disclosure requirements, the
15  notification, the waiting period.  So while I don't know
16  at what point it becomes legally our property, I'm
17  thinking it would be pretty close -- it would be
18  sometime after January 31 and before March 1, when we
19  entered into the foreclosure sale agreement.  And I --
20  I'm confident of little in this transaction, but that if
21  we -- that we waited the statutory period, or whatever
22  the required period is.
23      Q.  Okay.  Who took possession of it?
24      A.  Physically?
25      Q.  Yes, sir.

Page 175

1      A.  I would -- I'm -- I believe Szeto.
2      Q.  Szeto?  Well, did Super G ever take possession
3  of it?
4      A.  No.
5      Q.  Why did Szeto take possession of it?
6      A.  Well, it's clear to me the nature of the
7  transaction was a foreclosure and then a sale to
8  Windspeed.  And I knew that Szeto had been operating
9  ACET as its CEO, and then upon the foreclosure,
10  Windspeed Trading as its CEO with the Super G
11  collateral.  So there was no reason for Super G to
12  forklift the inventory out and then back to where it was
13  going to reside.
14      Q.  And why is that again?
15          MR. BLAKLEY:  Objection, form.
16      A.  I'm not -- I don't know how to answer the
17  question.  I'm not sure what --
18      Q.  (BY MR. FREEMAN)  But as you understood it,
19  you didn't need to because you knew Windspeed was going
20  to take it over?
21          MR. PERRIN:  Objection, form.
22      Q.  (BY MR. FREEMAN)  Is that correct or --
23      A.  We sold it for a note to Windspeed, and Szeto
24  was operating Windspeed.
25      Q.  Well, as of January 31st, 2019, though, when

Page 176

1  you sent this Exhibit 17, did you know that Windspeed
2  was going to have the inventory or assets reflected in
3  the collateral description?
4      A.  Well, I think there were only two scenarios.
5  One was that the company, if you will, or your client,
6  objected and purchased it from us, which would have been
7  the ideal scenario.  And the other, which I deemed more
8  likely, was Windspeed would buy it.  So there was no
9  reason to move it.
10      Q.  Did -- was there no chance that anyone else
11  would purchase it?
12      A.  I don't know.  I know that, you know, Steve
13  Bellah and I discussed doing a liquidation.  They're
14  very difficult for scenarios like this where you are
15  both sub-scale and then highly diversified across the
16  sku.  So we didn't think there would be a long list of
17  buyers, but whether -- I know that we complied with what
18  the Article IX is.  If that was making a public
19  solicitation, we did it.  But I was not aware of a
20  reason we needed to protect and move it, which I have
21  had to do in another instance.
22      Q.  Was -- at the time that this was -- this
23  letter -- this January 31st, 2019, letter was issued,
24  based on your discussions with Steve Bellah, was it a
25  foregone conclusion that Windspeed was going to end up

Page 177

1  with the inventory?
2          MR. BLAKLEY:  Objection, form.
3          MR. PERRIN:  Objection, form.
4      A.  Again, I would have preferred if there was
5  another party, but I wasn't aware other than your client
6  of anyone who was looking for this material.
7      Q.  (BY MR. FREEMAN)  So was it essentially a
8  foregone conclusion that Windspeed was going to end up
9  with the inventory?
10          MR. PERRIN:  Objection, form.
11          MS. HARD-WILSON:  Objection, form.
12      A.  I don't know how to answer that.  I think the
13  point of the Article IX is that you have to alert all
14  other creditors or landlord, and any one of them could
15  step up and satisfy the liability.  And nobody did,
16  which is different than the most likely conclusion.
17      Q.  (BY MR. FREEMAN)  Being that Windspeed would
18  end up with it?
19      A.  Yes.
20      Q.  Did you have reason to believe at the time
21  that this letter was sent out that Windspeed was going
22  to end up with the inventory?
23          MR. BLAKLEY:  Objection, form.
24      A.  As my prior answer, I think it was the most
25  likely outcome.

45 (Pages 174 to 177)

Marc Cole  *  March 29, 2021

Page 178

1    Q.  (BY MR. FREEMAN)  Did you tell anyone -- did
2  Super G tell anyone that it was going to take possession
3  of the inventory?
4    A.  Beyond the parties on this letter?
5    Q.  Correct.
6    A.  I'm not aware of anyone else.
7    Q.  Did it tell the parties on this letter that it
8  was going to take possession of the inventory?
9    A.  Well, I sent the letter myself to the parties
10  on the letter, so that's communicating.
11    Q.  But did you -- you indicated Super G did not
12  actually take possession of the inventory?
13    A.  Correct.
14    Q.  But did you tell the parties you were going
15  to -- that Super G was going to take possession of it?
16        MR. BLAKLEY:  Objection, form.
17    A.  We took legal possession; we didn't take
18  physical possession.
19    Q.  (BY MR. FREEMAN)  Okay.  So I want to ask you
20  to direct your attention to the last sentence of the
21  first paragraph of Exhibit 17.  And it states, "Pursuant
22  to Section 9.609(c) of the Code, the lender will take
23  possession of the collateral at the premises located at
24  5700 Granite Parkway, Suite 435, Plano, Texas 75024, or
25  wherever the collateral may be located."

Page 179

1        Did you intend to take possession of the
2  collateral?
3        MR. PERRIN:  Objection, form.
4    A.  I intended to take ownership of it.
5    Q.  (BY MR. FREEMAN)  Okay.  But not possession?
6        MR. PERRIN:  Objection, form.
7    A.  This is my first Article IX, and I have
8  never -- I had not, at this point, actually taken
9  physical possession.  I have done that subsequent to
10  this transaction, and I do understand when a landlord is
11  playing hardball, that there is a significant difference
12  between taking ownership and taking possession and being
13  locked out of a facility.  I understand that difference
14  now, and I did not understand the difference at the time
15  this letter was drafted.  But I can't tell you what I
16  was thinking then, but I do understand the difference
17  now.
18    Q.  (BY MR. FREEMAN)  In retrospect, do you
19  believe that this foreclosure was done correctly?
20        MR. PERRIN:  Objection, form.
21    A.  I do believe that it was done correctly.
22    Q.  (BY MR. FREEMAN)  Where was -- who was in
23  physical possession of the inventory at the time this
24  letter was sent?
25    A.  ACET Global.

Page 180

1    Q.  ACET Global?
2    A.  And its management.
3    Q.  Was ACET Global -- and who was its management?
4    A.  Well, Baymark was the ownership group, and
5  Bill Szeto was the CEO.
6    Q.  Of ACET Global?
7    A.  Yes.
8    Q.  At this time?  And so Mr. Szeto was in
9  possession of the inventory at this time?
10    A.  Presumably, yes.
11    Q.  Was Mr. Szeto the agent of Super G Capital?
12        MR. BLAKLEY:  Objection, form.
13    A.  I'm not sure what that means.
14    Q.  (BY MR. FREEMAN)  Was he acting as an agent of
15  Super G Capital?
16    A.  No.
17    Q.  I'm trying to piece together how it is that
18  Super G Capital had what you described as legal
19  possession of the inventory if you didn't have physical
20  possession and it was in the possession of someone who
21  was not your agent.
22    A.  I'm not familiar enough with either
23  foreclosure or the UCC Code to answer that.  I know that
24  I thought I was following the legal guidance that we
25  were receiving to initiate a foreclosure, and that the

Page 181

1  inventory belonged to Super G Capital, whether I carted
2  it off to Newport Beach or left it in ACET's possession.
3    Q.  Okay.  Did you get that understanding from
4  Mr. Bellah?
5    A.  Yes.
6    Q.  Is Mr. Bellah a licensed attorney in any
7  state?
8    A.  No.
9    Q.  Did any other entity -- is it possible that
10  any other entity actually owned this inventory as of
11  January 31st, 2019?
12        MR. BLAKLEY:  Objection, form.
13        MS. HARD-WILSON:  Objection, form.
14    A.  Super G Capital had a perfected first priority
15  lien, so I don't know how that would be the case.
16    Q.  (BY MR. FREEMAN)  Okay.  Was any other entity
17  entitled to sell this inventory prior to January 31st,
18  2019?
19    A.  ACET Global.
20    Q.  Not any other entity?
21    A.  Not -- I don't know how they would.
22    Q.  And Super G didn't authorize any other entity
23  to sell this inventory prior to January 31st, 2019, did
24  it?
25    A.  I'm not aware that it did.

46 (Pages 178 to 181)

Page 182

1    Q.  Now, after this letter, did there come a time
2   that Super G actually foreclosed on the inventory?
3        MR. PERRIN:  Objection, form.
4    A.  So my understanding is, after a passage of
5   time outlined in the UCC code, that that foreclosure was
6   in place.  We did not come with a forklift, but my
7   understanding then, and even now, is that the passage of
8   time and the lack of action on any other parties' part
9   made that inventory ours, and the intellectual property
10  and receivables and everything else.
11   Q.  (BY MR. FREEMAN)  Okay.  Did -- just to be
12  clear, did Super G foreclose on ACET Global's assets in
13  2018?
14   A.  No.
15       MR. PERRIN:  Objection, form.
16   Q.  (BY MR. FREEMAN)  Did Super G foreclose on
17  ACET Global's assets in October of 2018?
18       MR. PERRIN:  Objection, form.
19   A.  No.
20   Q.  (BY MR. FREEMAN)  What was the process at
21  Super G to authorize a foreclosure?
22       MR. PERRIN:  Objection, form.
23   A.  The process was my issuance of this letter.
24   Q.  (BY MR. FREEMAN)  Okay.  Did Super G incur any
25  expenses in the foreclosure process?

Page 183

1    A.  Yes.
2    Q.  What were those?
3    A.  I'm -- legal.  I mean, I had to pay counsel.
4    Q.  Were there any other expenses, that you're
5   aware of?
6    A.  Not that I'm aware of.
7    Q.  How did you determine the 500 and -- was it
8   $516,000 valuation?
9        MR. BLAKLEY:  Objection, form.
10   Q.  (BY MR. FREEMAN)  I did not hear that.
11   A.  I did not respond.  Super G Capital had an
12  outsourced accounting firm that handled close to 300
13  transactions over my tenure.  Is it accurate to the
14  penny through every audit?  I believe they took the
15  principal and interest owed from the loan agreement, and
16  would have gone through the loan agreement, added any
17  penalties or accruals that were permitted through the
18  agreement, plus all of the legal, which the lender is
19  entitled to collect.  And based on a $490,000
20  approximate principal balance that I see and the 516,
21  that leaves $26,000 in legal expense and miscellaneous
22  permitted expenses.
23   Q.  Okay.  With respect to the foreclosure sale,
24  when did Windspeed agree to purchase the collateral?
25       MR. PERRIN:  Objection, form.

Page 184

1    A.  Contractually or through the recapitalization
2   plan?
3    Q.  (BY MR. FREEMAN)  Let's start with the
4   recapitalization plan.
5    A.  It appears there were negotiations on what the
6   restructuring would look like through the fall.  What I
7   knew definitively is that there was a bill of sale
8   executed, I guess, in March.
9    Q.  That's March of 2019, correct?
10   A.  That's right.
11   Q.  And when you referred to "fall," that's fall
12  of 2018?
13   A.  Yes.
14   Q.  So were there discussions or negotiations
15  going on between Super G Capital and Windspeed in the
16  fall of 2018 regarding Windspeed acquiring the assets at
17  issue?
18       MR. PERRIN:  Objection, form.
19   A.  The assets that would be acquired in the
20  foreclosure.
21   Q.  (BY MR. FREEMAN)  Is that correct?
22   A.  Yes.
23   Q.  So in 2018, there were discussions and
24  negotiations between Super G and Windspeed about
25  Windspeed ultimately acquiring the assets that Super G

Page 185

1   would acquire through a foreclosure of ACET Global?
2        MR. BLAKLEY:  Objection, form.
3        MR. PERRIN:  Objection, form.
4    A.  I see in December -- oh, this is December '17.
5   Scratch that.
6        In April, there was a forbearance
7   agreement executed.  In July, there was an email
8   forbearance agreement down to a de minimis payment with
9   Windspeed -- with -- Baymark asked to put money in.
10  Going from $15,000 a week, which was the initial loan
11  agreement, down to between 500 and 1,000, this loan was
12  blinking bright red at Super G Capital.  If we were a
13  bank, we'd be reserving capital against it.
14       So reviewing this, I would say there was
15  panic by the summer of 2018.  And by the fall of 2018,
16  Super G, Steve Bellah, ACET, Baymark were discussing a
17  variety of options, including a restructuring, including
18  presumably where we landed.  So the summer was blinking
19  red, and the fall discussions were on their way.
20   Q.  (BY MR. FREEMAN)  Okay.  So in 2018, it's your
21  belief that Super G discussed with Windspeed Windspeed's
22  acquisition of ACET Global's assets through a
23  foreclosure?
24       MR. PERRIN:  Objection, form.
25   A.  Did you say summer or fall?

47 (Pages 182 to 185)

Page 186

1    Q.  (BY MR. FREEMAN)  Anytime in 2018.
2         MR. PERRIN:  Objection, form.
3    A.  I believe by the fall, there was the notion of
4    using Mr. Szeto's new company.
5    Q.  (BY MR. FREEMAN)  And that would be Windspeed,
6    correct?
7         MR. PERRIN:  Objection, form.
8    A.  Yes.
9    Q.  (BY MR. FREEMAN)  And those discussions
10   involved Windspeed acquiring assets from Super G?
11        MR. PERRIN:  Objection, form.
12   A.  Yes.
13   Q.  (BY MR. FREEMAN)  And those assets were the
14   assets that Super G acquired by foreclosing on ACET
15   Global; is that correct?
16   A.  Well, it hadn't happened yet.
17   Q.  That it would obtain by foreclosing on ACET
18   Global?
19        MR. PERRIN:  Objection, form.
20   Q.  (BY MR. FREEMAN)  Is that correct?
21   A.  If there were no other offers or purchases
22   of or satisfaction of our debt.
23   Q.  Okay.  Were there discussions by Super G with
24   anyone else about that topic?
25   A.  I'm not aware.

Page 187

1    Q.  Okay.  Mr. Cole, I have what's marked as
2    Exhibit 15 up on the screen.  Are you familiar with this
3    document?
4    A.  Yes.
5         (Exhibit 15 marked.)
6    Q.  (BY MR. FREEMAN)  And what is this document?
7    A.  This is the foreclosure sale agreement between
8    Super G Capital and Windspeed Trading of March 1st,
9    2019.
10   Q.  Okay.  Do you recall executing this document?
11   A.  I don't recall executing this specific
12   agreement, but I would imagine I'm the signatory.  And I
13   am, yes.
14   Q.  Okay.  Do you know who drafted this document?
15   A.  I don't.
16   Q.  And who is this document between?
17        MR. PERRIN:  Objection, form.
18   A.  Super G Capital is selling collateral to
19   Windspeed Trading, LLC.
20   Q.  (BY MR. FREEMAN)  And you don't know who
21   drafted this document?
22        MR. PERRIN:  Objection, form.
23   Q.  (BY MR. FREEMAN)  Scrolling through it so that
24   you can see it.
25   A.  I see Hallett & Perrin representing Windspeed,

Page 188

1    and Dorsey & Whitney representing Super G Capital.
2    Q.  So Hallett & Perrin was representing Windspeed
3    Trading, LLC?
4         MR. PERRIN:  Objection, form.
5    A.  That's a reasonable deduction here, assuming
6    that's correct.
7    Q.  (BY MR. FREEMAN)  So Hallett & Perrin was
8    representing Windspeed Trading in the foreclosure sale
9    agreement with Super G?
10        MS. HARD-WILSON:  Objection, form.
11   A.  Yes, they were representing Windspeed, not
12   Super G.
13   Q.  (BY MR. FREEMAN)  Okay.  And what date was
14   this document executed?
15   A.  Should be the same, March -- yeah, March 1,
16   2019.
17   Q.  So as of March 1, 2019, Perrin was aware that
18   Windspeed, his client, had purchased ACET Global's
19   assets from Super G Capital; is that correct?
20        MR. BLAKLEY:  Objection, form.
21        MR. PERRIN:  Objection, form.
22   A.  Well, I'd say Julie Smith of the Hallett &
23   Perrin firm was aware.
24   Q.  (BY MR. FREEMAN)  Okay.
25        MR. BLAKLEY:  Hey, Jason, how close are

Page 189

1    we getting?  I'm -- if it's going to go on awhile
2    longer, I'm going to need to get a record time check
3    because I think we're bumping up on six hours.
4         MR. PERRIN:  Yes.  And there are others
5    of us who do want to ask questions.
6         MR. FREEMAN:  That's great.  Karen, how
7    are we doing on time?  Do you know?
8         THE REPORTER:  You're at 5 hours and 26
9    minutes.
10        MR. FREEMAN:  Okay.
11        MR. PERRIN:  I would request at least the
12   remainder of the time, and some others -- for the other
13   defendants to ask questions.
14        MR. FREEMAN:  I think I've got about 30
15   minutes, 20 to 30 minutes left.
16        MR. PERRIN:  That's not my point.  You're
17   not giving me enough time to answer [sic] the questions.
18   I --
19        MR. FREEMAN:  Well, I don't mind staying
20   later.  That's fine.
21        MR. PERRIN:  That's not your call.  It's
22   the witness's call.  And it's also the Rules, which you
23   don't pay attention to.
24   Q.  (BY MR. FREEMAN)  So we're --
25        MR. PERRIN:  Are you going to pass the

Usher Reporting Services
(214) 755-1612

## Page 190

1  witness, or are you going to go six hours?
2      MR. FREEMAN: Close to six. Probably not
3  quite six.
4      MR. PERRIN: Asking the same questions
5  over and over again like you've been doing all day?
6      MR. FREEMAN: So I'm -- I'm happy --
7  we're -- this is not eating into my time right now. Do
8  we want to go back to questioning, or does Ed want to
9  talk?
10     MR. PERRIN: Ed's made his objections on
11 the record.
12     MR. FREEMAN: Excuse me?
13     MR. PERRIN: I've made my objections on
14 the record to you -- to your use of the time in this
15 deposition and exceeding the use of the time.
16     MR. FREEMAN: Okay. I'm going to go back
17 to questioning now.
18     THE WITNESS: Can I have one minute? I've
19 just -- I've got my --
20     MR. FREEMAN: Oh, yes, sir.
21     (Break taken from 8:19 p.m. to 8:19 p.m.)
22     MR. FREEMAN: We're on the record. Ed,
23 there are some serious issues with you continuing on as
24 litigation counsel in this matter. It is clear you and
25 your firm have represented Windspeed in this matter and

## Page 191

1  have made some material misrepresentations as to the
2  relationships of the parties.
3      MR. PERRIN: If you notice, my name is
4  Perrin; it's not Smith.
5      MR. FREEMAN: Right. I notice that.
6  You've read the Rules that I've cited to you, correct?
7      MR. PERRIN: Yes, which also say that I
8  can represent clients in this case.
9      MR. FREEMAN: If you don't mind, maybe
10 send that to me where you see that reading.
11     MR. PERRIN: Oh, you'll see it. Don't
12 worry.
13     MR. FREEMAN: Okay. Do those Rules also
14 allow you to make misrepresentations to counsel?
15     MR. PERRIN: Those Rules allow me to
16 represent my client in this case. I am litigation
17 counsel. I had no involvement in any of the underlying
18 transactions. I'm not a fact witness.
19     MR. FREEMAN: Okay.
20     MR. PERRIN: And you're fully aware of
21 that.
22     MR. FREEMAN: I'm clearly not.
23     MR. PERRIN: Well, then you're making
24 uninformed allegations.
25     MR. FREEMAN: No, I'm making informed

## Page 192

1  allegations. You're making fallacious statements.
2      Q. (BY MR. FREEMAN) Mr. Cole, we're still on
3  Exhibit 15. Just going back to this. So counsel to
4  Windspeed Trading was Hallett & Perrin; is that correct?
5      A. Yes, I believe so.
6      Q. I want to look down below. There is a -- what
7  appears to be the 18th page of Exhibit 15, there's a
8  Bill of Sale. Do you -- are you familiar with this
9  document?
10     A. Yes.
11     Q. And there's an inventory appended to that
12 document. Are you familiar with this?
13     A. Yes.
14     Q. That inventory appears to bear a date of
15 1/2018 [sic] 2019; is that correct?
16     A. That's right.
17     Q. And if you continue on in this document, there
18 is appended to it an Exhibit 2, "Equipment"; is that
19 correct?
20     A. Yes.
21     Q. Are you familiar with this document?
22     A. Yes.
23     Q. And if you continue on, there's an Exhibit 3,
24 "Intellectual Property." Are you familiar with this
25 document?

## Page 193

1      A. Yes.
2      Q. Following that, there is an Assignment and
3  Assumption Agreement. Have you seen this document
4  before?
5      A. Yes. I can't say I know exactly what it does
6  versus the Bill of Sale Agreement.
7      Q. Possibly generate legal fees?
8      A. Yeah, a lot of paper.
9      MR. PERRIN: Objection, form.
10     Q. (BY MR. FREEMAN) And if you continue on,
11 there's an Amended and Restated Business Loan and
12 Security Agreement. Have you seen this document before?
13     A. Okay. I understand now. So this was -- yes,
14 assigning the ACET loan to Windspeed.
15     Q. Okay. Now, is this assigning the ACET loan to
16 Windspeed, or is this a new loan?
17     A. Well, this is the -- from Super G Capital's
18 perspective, this was a consideration for contributing
19 the vacuum cleaner here and all of the smart phone
20 holders, et cetera.
21     Q. So was it part of the deal that the Baymark
22 parties cut, that they would -- they would agree to a
23 note that's reflected here in Exhibit 15 in exchange for
24 all of ACET Global's assets being contributed to
25 Windspeed?

Page 194

1          MR. PERRIN:  Objection, form.
2          MS. HARD-WILSON:  Objection, form.
3          A.  I'd say -- I would answer it a little
4   differently, which is Windspeed agreed to purchase
5   everything in Super G Capital's possession from the ACET
6   foreclosure for the assumption of this note.
7          Q.  (BY MR. FREEMAN)  Okay.  Well, why did you
8   describe it as the assignment of ACET's note?
9          A.  Well, I read "assignment and assumption," but
10  I'm not exactly sure what the legal significance is.
11  But this is the consideration.  And it --
12         Q.  Oh.
13         A.  It appears to be $2,000 short.
14         Q.  Okay.  If you look down there at the payment
15  amounts or the payment terms --
16         A.  Yes.
17         Q.  -- down at the bottom, I believe it calls for
18  the first three monthly payments of 2,000 a month, and
19  5,000 a month after that, and continues to ramp up?
20         A.  Yes.
21         Q.  Were those payments -- were all of those -- I
22  see the final payment reflects March 20, 2021.  Were all
23  of those payments made to Super G?
24         A.  No.
25         Q.  No?

Page 195

1          A.  No, I wish.  The company was not able to make
2   all of those payments.
3          Q.  When did it first default on its payments?
4          A.  I can find the answer to that, but I would --
5   if I took a -- I'd be speculating, but the company made
6   payments until they couldn't, and it did not last very
7   long.
8          Q.  Does that mean, like, it only made payments
9   for a month or two after this note?
10         A.  Longer than that.  Let me -- I will ask my
11  controller.  And I don't know if I'll get a quick answer
12  because we're heads down on something, but I will ask.
13         Q.  Okay.
14         A.  The only advantage of a Zoom deposition.  I'll
15  come back to that if he tells me, but I don't know the
16  answer.
17         Q.  Okay.  Are you familiar with Super G's tax
18  returns?
19         A.  What specifically?
20         Q.  Whether or not any of the Baymark parties
21  appear or are reflected on those returns in any way.
22         A.  They would not.  As I said, Super G Capital is
23  effectively a pass-through to the Ginsberg family.
24         Q.  Okay.  Looking at -- I'm drawing your
25  attention back to Exhibit 15, with respect to the

Page 196

1   Foreclosure Sale Agreement.  Did Mr. Szeto sign this
2   document on behalf of Windspeed?
3          A.  Yes.
4          Q.  And did he sign at the same time as you?
5          A.  I don't know how to answer that.  I know that
6   we have in our file an execution copy signed by all the
7   parties.
8          Q.  Do you have any reason to believe this
9   signature page that's reflected here is not actually the
10  signature page of the Foreclosure Sale Agreement?
11         MS. HARD-WILSON:  Objection, form.
12         A.  No, I have no reason to believe that.
13         Q.  (BY MR. FREEMAN)  Ask you, if you will, look at
14  the footer on Page 1 of Exhibit 15.  States "Foreclosure
15  Sale Agreement."
16         A.  Yes.
17         Q.  And then the footer on Page 2, "Foreclosure
18  Sale Agreement."  And Page 3, "Foreclosure Sale
19  Agreement."  And this goes on.  I'll ask you, if you
20  look at the signature pages and the footer reflected
21  therein, it refers to an Asset Purchase Agreement?
22         A.  Yeah, I see that.
23         Q.  I believe with respect to your signature page,
24  it, likewise, refers to an Asset Purchase Agreement.  Do
25  you have any reason to believe these signature pages may

Page 197

1   not actually be signature pages to the Foreclosure Sale
2   Agreement?
3          MS. HARD-WILSON:  Objection, form.
4          A.  I don't think so, but I --- again, I know
5   the -- Alex Godinez and I have done a few hundred loans
6   together, and I know he felt that we have all of the
7   proper execution documents, particularly because we were
8   sensitive to the Article IX, which is something we
9   hadn't done before.  So I can't explain that other
10  than -- I mean, I'm in a closing right now that I've
11  taken a six-and-a-half-hour break from, and I'm signing
12  things people put in front of me.
13         Q.  (BY MR. FREEMAN)  You're getting close to the
14  end with me.
15         A.  Okay.
16         Q.  Believe it or not, you may be to the end.
17         You had mentioned that there were some
18  binders, I think, prepared in preparation for this; is
19  that correct?
20         A.  Yes, prepared by Mr. Blakley.
21         Q.  And did you review those documents in
22  preparation for this deposition?
23         A.  I did.
24         Q.  What other documents, generally, did you
25  review?

Marc Cole  *  March 29, 2021

## Page 198

1    A.  The execution versions of the documents that
2  were in the Super G Capital file library, which were
3  principally the loan agreement, the two-page credit memo
4  that I mentioned, the foreclosure sale agreement,
5  the warrant -- no, not the warrant agreement -- the
6  operating agreement.
7        MR. FREEMAN:  J.D., any problem with us
8  getting a copy of those binders?
9        MR. BLAKLEY:  It is -- literally, I have a
10 copy -- I did duplicates.  It's literally "Deposition of
11 Marc Cole, Plaintiff's Exhibits."
12       MR. FREEMAN:  Are you telling me I've
13 already got a copy of all of it?
14       MR. BLAKLEY:  You already got everything,
15 buddy.
16       MR. FREEMAN:  All right.
17       MR. BLAKLEY:  I mean, I can make it a
18 triplicate.  Here's the other one; Defendants' Exhibits.
19       MR. FREEMAN:  I don't want it as long as
20 you will represent to me that all that's in there are
21 the exhibits that were put forward or transmitted for
22 this deposition.
23       MR. BLAKLEY:  I make that representation.
24       MR. FREEMAN:  Please don't copy them for
25 me then.

## Page 199

1        MR. BLAKLEY:  Okay.
2        MR. FREEMAN:  With that, Marc -- Mr. Cole,
3  I appreciate it, and I will pass the witness.
4        MR. BLAKLEY:  Hey, Karen, can I get, just
5  real quickly, record time left, and then just a
6  two-minute break to talk to my client about what he
7  wants to do?
8        THE REPORTER:  Yes.  5 hours, 39 minutes.
9        MR. BLAKLEY:  All right.  Thank you.
10       (Break taken from 8:34 p.m. to 8:45 p.m.)
11       MR. BLAKLEY:  This is J.D. Blakley,
12 counsel for deponent, Marc Cole.  The counsel for all
13 parties spoke off the record and reached an agreement
14 that we will reconvene to finish this deposition on
15 April 1st, 10 a.m. Central Time for approximately an
16 hour of record time.  And I think that should do it,
17 unless anybody has anything else to add.
18       MR. PERRIN:  I believe you said an hour
19 to an hour-and-a-half, but we'll try to get it done that
20 quickly.
21       MR. BLAKLEY:  I think, yeah, if it's
22 approximately an hour, hour-and-a-half, we should be
23 okay, Ed.
24       MR. PERRIN:  All right.
25       MR. BLAKLEY:  I know that's a fraction of

## Page 200

1  what we did today, so I appreciate it.
2        (End of proceedings.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 201

1                CHANGES AND SIGNATURE
2  WITNESS NAME: MARC COLE
3  DATE OF DEPOSITION: March 29, 2021
4  PAGE LINE    CHANGE         REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

51 (Pages 198 to 201)

Marc Cole  *  March 29, 2021

## Page 202

1      I, MARC COLE, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5      _____
6                 MARC COLE
7    THE STATE OF _____)
8    COUNTY OF _____)
9
10      Before me, _____, on this day
11    personally appeared MARC COLE, known to me (or proved to
12    me under oath or through _____
13    (description of identity card or other document) to be
14    the person whose name is subscribed to the foregoing
15    instrument and acknowledged to me that they executed the
16    same for the purposes and consideration therein
17    expressed.
18      Given under my hand and seal of office this
19    _____ day of _____, _____.
20
21      _____
22                 NOTARY PUBLIC IN AND FOR
23                 THE STATE OF _____
24                 COMMISSION EXPIRES: _____
25

## Page 203

1                    NO. DC-19-09828
2    D&T PARTNERS, LLC       ) IN THE DISTRICT COURT
     (Successor in interest to )
3    ACET VENTURE PARTNERS,   )
     LLC),                    )
4                             )
5       Plaintiffs            )
                              )
6    VS.                      )
                              )
7    ACET Global, LLC; BAYMARK ) DALLAS COUNTY, TEXAS
     ACET HOLDCO, LLC; BAYMARK )
8    MANAGEMENT, LCC; BAYMARK  )
     MANAGEMENT, LLC; BAYMARK  )
9    PARTNERS; DAVID HOOK;    )
     TONY LUDLOW; and         )
10   WINDSPEED TRADING, LLC,   )
                              )
11                            )
        Defendants            ) 116th JUDICIAL DISTRICT
12
13           REPORTER'S CERTIFICATION
              DEPOSITION OF MARC COLE
14               March 29, 2021
15
16      I, Karen Usher, Certified Shorthand Reporter in and
17    for the State of Texas, hereby certify to the following:
18      That the witness, MARC COLE, was duly sworn by the
19    officer and that the transcript of the oral deposition
20    is a true record of the testimony given by the witness;
21      That the deposition transcript was submitted on
22    APRIL 21, 2021 to the witness or to the attorney for the
23    witness for examination, signature and return to me by
24    MAY 11, 2021;
25      That the amount of time used by each party at the

## Page 204

1    deposition is as follows:
2       MR. JASON B. FREEMAN - 05 HOURS:39 MINUTES
        MR. EDWARD PERRIN - 00 HOURS:00 MINUTES
3       MS. BRENDA HARD-WILSON - 00 HOURS:00 MINUTES
4       That pursuant to information given to the
5    deposition officer at the time said testimony was taken,
6    the following includes counsel for all parties of
7    record:
8       MR. JASON B. FREEMAN, Attorney for Plaintiffs
        MR. EDWARD PERRIN, Attorney for Defendants
9         BAYMARK ENTITIES, DAVID HOOK, TONY LUDLOW
        MS. BRENDA HARD-WILSON, Attorney for Defendant
10        WINDSPEED TRADING, LLC
11      I further certify that I am neither counsel for,
12    related to, nor employed by any of the parties or
13    attorneys in the action in which this proceeding was
14    taken, and further that I am not financially or
15    otherwise interested in the outcome of the action.
16      Further certification requirements pursuant to Rule
17    203 of TRCP will be certified to after they have
18    occurred.
19      Certified to by me this 21st of April, 2021.
20
21
22    _____
      MARY KAREN USHER, CSR # 5536
23    Expiration: 1/31/2022
      Firm Registration # 10278
24    USHER REPORTING SERVICES
      1326 Lochness Drive
25    Allen, Texas 75013
      (214) 755-1612

## Page 205

1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition _____ was _____ was not
3    returned to the deposition officer;
4       If returned, the attached Changes and Signature
5    page contains any changes and the reasons therefore;
6       If returned, the original deposition was delivered
7    to MR. JASON FREEMAN, Custodial Attorney;
8       That $_____ is the deposition officer's
9    charges to the Plaintiff for preparing the original
10   deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12   with Rule 203.3, and that a copy of this certificate was
13   served on all parties shown herein on and filed with the
14   Clerk.
15      Certified to by me this ____ day of _____, 2021.
16
17
18    _____
19    MARY KAREN USHER, CSR # 5536
      Expiration: 1/31/2022
      Firm Registration # 10278
20    USHER REPORTING SERVICES
      1326 Lochness Drive
21    Allen, Texas 75013
      (214) 755-1612
22    karen@usherreporting.com
23
24
25

52 (Pages 202 to 205)