# ACET GLOBAL, LLC

## SECURED PROMISSORY NOTE

**Principal: $3,230,000**                                          **Issuance Date: July 20, 2017**

        For value received, **ACET GLOBAL, LLC** ("**Maker**"), hereby promises to pay to the order of **ACET VENTURE PARTNERS LLC** or its assigns ("**Holder**") the principal sum of Three Million Two Hundred Thirty Thousand and No/100 Dollars ($3,230,000.00) (as reduced pursuant to the terms hereof, the "**Principal**") when due, whether upon the payment dates (set forth below), acceleration, prepayment or otherwise (in each case in accordance with the terms hereof) and to pay interest ("**Interest**") on any outstanding Principal from the Issuance Date stated above ("**Issuance Date**") at the rate of fifteen percent (15%) per annum, compounded annually ("**Interest Rate**"), until the same becomes due and payable, whether upon each of the payment dates, or upon acceleration, prepayment or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 25.

        This Note is being issued by Maker pursuant to the terms of the Asset Purchase Agreement. The obligations under this Note are secured by the collateral described in the Security Agreement executed as of the date hereof by Holdco and Holder.

        (1) <u>PAYMENT OF THE PRINCIPAL</u>. The Principal shall be payable in consecutive monthly installments (each, a "**Monthly Installment**") commencing on the date which is the last day of the fifteenth (15th) month after the Issuance Date in accordance with the payment schedule set forth in <u>Schedule 1</u> attached hereto, subject to adjustment as set forth herein.

        (2) <u>INTEREST; INTEREST RATE</u>. Interest on the outstanding principal of this Note shall commence accruing on the Issuance Date, and shall be computed on the basis of a 360-day year and actual days elapsed, and shall be payable in cash together with each Monthly Installment. From and after the occurrence of an Event of Default, the Interest Rate shall be increased to the lesser of (i) 1.5% per month compounded monthly, or (ii) the maximum rate permitted under law from time to time (the "**Default Interest**"). All such Default Interest shall be paid at the time of, and as a condition precedent to, the curing of any such Event of Default. In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure.

        In no event shall the amount or rate of interest due and payable under this Note exceed the maximum amount or rate of interest allowed by applicable law, and, in the event any such excess payment is made by Maker or received by Holder, such excess sum shall be credited as a payment of principal (or, if no principal shall remain outstanding, shall be refunded to Maker). It is the express intent hereof that Maker not pay and Holder not receive, directly or indirectly or in any manner, interest in excess of that which may be lawfully paid under applicable law. All interest (including all charges, fees or other amounts deemed to be interest) which is paid or charged under this Note shall, to the maximum extent permitted by applicable law, be amortized,



allocated and spread on a pro rata basis throughout the actual term of this Note and any extension or renewal hereof.

(3) RIGHTS UPON EVENT OF DEFAULT.

(a) Event of Default. Each of the following events shall constitute an "**Event of Default**":

(i) the Maker's failure to pay to the Holder any amount of Principal, Interest, Default Interest or other amounts when and as due under this Note, provided that the failure to fully pay Principal, Interest or Default Interest when and as due continues for a period of at least three Business Days following Maker's receipt of written notice of default from the Holder;

(ii) either of the Maker or Holdco, pursuant to or within the meaning of Title 11, U.S. Code, or any similar Federal, foreign or state law for the relief of debtors (collectively, "**Bankruptcy Law**"), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a "**Custodian**"), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(iii) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that is not dismissed within thirty (30) days of filing that (A) is for relief against the Maker or Holdco in an involuntary case, (B) appoints a Custodian of the Maker or Holdco or Baymark, or (C) orders a stay of proceedings against the Maker or Holdco, or the liquidation of the Maker or Holdco;

(iv) the Maker breaches any material representation, warranty, covenant or other term or condition of the Asset Purchase Agreement or any other agreement contemplated therein (collectively, the "**Transaction Documents**") or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated thereby and hereby to which the Holder is a party, except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of at least thirty (30) consecutive days following Maker's receipt of written notice of default from the Holder; or

(v) a Change of Control occurs.

(b) Acceleration Right. Promptly after the Maker's obtaining knowledge of the occurrence of an Event of Default with respect to this Note, the Maker shall deliver written notice thereof (an "**Event of Default Notice**") to the Holder. At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default and the expiration of any notice and cure period as provided for herein, the Holder may, by delivering written notice thereof to Maker, until such Event of Default is cured or waived, do any one or more of the following: (i) declare the entire unpaid balance of Principal and accrued, unpaid Interest upon this Note to be immediately due and payable, and/or (ii) pursue and enforce any of Holder's other rights and remedies under this Note and/or applicable law.

(c) In case an Event of Default has occurred and is continuing, the Holder may by written notice to Maker, in addition to the rights granted pursuant to Section 3(b) above, at the same time or different times, foreclose or otherwise exercise its rights pursuant to the Security Agreement.

(4) <u>RIGHTS UPON FUNDAMENTAL TRANSACTION</u>. The Maker shall not enter into or be party to a Fundamental Transaction, unless the Person formed by or surviving any such Fundamental Transaction (if other than the Maker) or the Person to which such Fundamental Transaction shall have been made (in the case of a sale or other conveyance of all or substantially all of Maker's properties or assets) assumes all the obligations of the Maker under this Note and the other Transaction Documents pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction, such approval not to be unreasonably withheld, conditioned or delayed. Upon any Fundamental Transaction, the successor entity to such Fundamental Transaction shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to such "Maker" shall refer instead to the successor entity) and may exercise every right and power of the Maker and shall assume all of the obligations of the Maker under this Note with the same effect as if such successor Person had been named as the Maker herein; *provided, however*, that the predecessor Maker shall not be relieved from its obligations under the Transaction Documents except in the case of a Fundamental Transaction that meets the requirements of this section (whereby a successor "Maker" has been substituted hereunder). The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions.

(5) <u>OPTIONAL PREPAYMENT</u>. Notwithstanding anything herein to the contrary, Maker shall have the right to prepay part or all of the outstanding Principal amount owed under this Note, together with any accrued but unpaid Interest, at any time and from time to time without any penalty or premium. In order to effectuate a prepayment as set forth above, Maker must give the Holder at least three (3) days' prior written notice of the anticipated prepayment. Following such prepayment, at Maker's option, the Monthly Installment schedule set forth in <u>Schedule 1</u> attached hereto will be revised so that each remaining Monthly Installment of Principal is reduced by a percentage amount equal to the percentage amount by which the initial Principal amount of this Note has been reduced after giving effect to such prepayment (except for Monthly Installment No. 58, which will be equal to all remaining Principal then outstanding). At Maker's option in the event of such partial prepayment, Holder shall surrender the existing Note and Maker shall issue a replacement Note in the amount of the revised Principal amount and containing a revised schedule of Monthly Installments as contemplated in the preceding sentence, and otherwise in accordance with the terms of Section 11(d).

(6) <u>SECURITY</u>. This Note is secured to the extent and in the manner set forth in the Security Agreement.

(7) <u>NON-CIRCUMVENTION</u>. The Maker hereby covenants and agrees that the Maker will not, by amendment of constitutional documents or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action -- and shall ensure that none of the above actions is taken by Holdco -- avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at

all times in good faith carry out all of the provisions of this Note and take all action as may be reasonably requested by Holder from time to time to protect the rights of the Holder of this Note.

(8) RIGHT OF SET-OFF. Subject to the terms of, and as further described in, Section 7.8 of the Asset Purchase Agreement, Maker will have the right to set off against any amounts payable to Holder hereunder those indemnification claim amounts determined in good faith to be payable from Holder or its owner to Maker pursuant to the terms of Section 7.8 of the Asset Purchase Agreement.

(9) RANK.

(a) Rank. All payments due under this Note shall be subordinate to the indebtedness of the Maker to Senior Lender under the Senior Loan Agreement.

(b) Limitations on Payments. If payment of Principal or Interest hereunder would be prohibited by the terms of the Subordination Agreement or result in a default under the Senior Loan Agreement (in either case, a "Senior Lender Default"), Maker shall be required to pay only that amount of Principal or Interest as would not result in a Senior Lender Default.

(10) TRANSFER. Except for an assignment or transfer to the sole owner of Holder, this Note may not be offered, sold, assigned or transferred by the Holder, in whole or in part, without the consent of the Maker which consent shall not be unreasonably withheld or delayed, unless an Event of Default then exists.

(11) REISSUANCE OF THIS NOTE.

(a) Transfer. If this Note is to be transferred in accordance with Section 10, the Holder shall surrender this Note to the Maker, whereupon the Maker will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 11(d)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 11(d)) to the Holder representing the outstanding Principal not being transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions hereof and this Section 11(a), following prepayment of any portion of this Note pursuant to Section 5 or an adjustment to the Principal amount pursuant to Section 11(e), the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b) Lost, Stolen or Mutilated Note. Upon receipt by the Maker of evidence reasonably satisfactory to the Maker of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Maker in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Maker shall execute and deliver to the Holder a new Note (in accordance with Section 11(d)) representing the outstanding Principal.

(c) Note Exchangeable for Different Denominations. In the event of a partial assignment of this Note in accordance with Section 10, this Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Maker, for a new Note or Notes (in

accordance with Section 11(d) and in principal amounts of at least $100,000) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) Issuance of New Notes. Whenever the Maker is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 11(a) or Section 11(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall set forth accrued Interest (and Default Interest if applicable) on the Principal and Interest of this Note, from the Issuance Date.

(e) Revised Principal Under Asset Purchase Agreement. In the event of an adjustment to Principal pursuant to Section 2.3 of the Asset Purchase Agreement, Holder shall surrender the existing Note and Maker shall issue a replacement Note in the amount of the revised Principal amount and otherwise in accordance with the terms of Section 11(d) above.

(12) REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and the other Transaction Documents at law or in equity, and nothing herein shall limit the Holder's right to pursue actual damages for any failure by the Maker to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Maker (or the performance thereof).

(13) PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Maker or other proceedings affecting Maker's creditors' rights and involving a claim under this Note, then the Maker shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, reasonable attorneys' fees and disbursements.

(14) CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Maker and Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(15) FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a

waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(16) ENTIRE AGREEMENT AND INTERPRETATION. This Note, the Security Agreement, and the Asset Purchase Agreement constitute the full and entire agreement and understanding of the parties to this Note with respect to the subjects hereof, and supersedes all previous discussions and agreements, if any, of the parties hereto with respect to the subject matter of this Note. If this Note and the Asset Purchase Agreement conflict, then the terms of this Note shall control. No party shall be liable for or bound in any other manner by any representations, warranties, covenants or agreements except as specifically set forth in this Note and the Asset Purchase Agreement.

(17) NOTICES; PAYMENTS; NAMES.

(a) Notices. Whenever notice is required or permitted to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 8.4 of the Asset Purchase Agreement.

(b) Payments. Whenever any payment of cash is to be made by the Maker to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America, via wire transfer of immediately available funds to the recipient bank account as shall be notified in writing to the Maker at least two (2) Business Days prior to the payment of any Monthly Installment. Notwithstanding the above, and unless notified in writing otherwise, the payment shall be effected to the Holder's bank account, the details of which are detailed in Schedule A of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day.

(c) Names. Each of Maker and Holder (i) acknowledges that Holder is required to change its legal name on or about the Issuance Date pursuant to the Asset Purchase Agreement, (ii) agrees that Maker may change its name without Holder's prior consent, and (iii) agrees to provide the other party with written notice, accompanied by evidence provided by the Office of the Secretary of State of the State of Texas, of such name change promptly following the same.

(18) CANCELLATION. After all Principal, accrued Interest and other amounts at any time owed on this Note has been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Maker for cancellation and shall not be reissued.

(19) WAIVER OF NOTICE. To the extent permitted by law, except as otherwise set forth herein, the Maker hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Security Agreement.

(20) GOVERNING LAW. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of Texas, without giving effect to any choice

of law or conflict of law provision or rule (whether of the Texas or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than Texas.

(21) REPRESENTATIONS AND WARRANTIES OF MAKER. Maker hereby represents and warrants to the Holder that: (i) Maker has been duly formed, and is in good standing under the laws of its jurisdiction of organization, (ii) has the requisite power and authority to enter into and perform its obligations under this Note and to issue this Note pursuant to its terms, (iii) the execution, delivery and performance of this Note by Maker have been duly authorized by all necessary corporate action and no further consent or authorization of Maker or its board of directors or shareholder is required, (iv) this Note has been duly executed and delivered by Maker and constitutes the valid and binding obligations of Maker enforceable against Maker in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws effecting creditors' rights generally and by general principles of equity, (v) the membership interests to be transferred to the Holder pursuant to the Security Agreement, are and shall be at all times free and clean from any lien, pledge, other security interest, preemptive rights, rights of first refusal or any other third parties' rights (except for (a) the security interest granted to Senior Lender pursuant to the Senior Loan Agreement and (b) the security interest granted to the Holder pursuant to the Security Agreement), and (vi) there is no pending or, to Maker's knowledge, threatened, claim, audit, investigation, action or other legal proceeding or judgment, order or award of any court, agency or other governmental authority or arbitrator (each an "**Action**") which involves Maker or its assets and which would reasonably be expected to have a material adverse effect upon Maker or threaten the validity of this Note or any related document or transaction. Maker will immediately notify Holder in writing upon acquiring knowledge of any such Action.

(22) SEVERABILITY. In case any provision in this Note shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(23) **WAIVER OF JURY TRIAL**. MAKER AND HOLDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING RELATED IN ANY WAY TO THIS NOTE AND THE SECURITY AGREEMENT.

(24) **VENUE AND SERVICE OF PROCESS**. MAKER AND HOLDER AGREE THAT ANY SUCH PROCEEDING MAY BE BROUGHT AND ENFORCED IN THE STATE AND FEDERAL COURTS LOCATED IN DALLAS COUNTY, TEXAS, AND MAKER AND HOLDER HEREBY WAIVE ANY OBJECTION TO JURISDICTION OR VENUE IN ANY SUCH PROCEEDING COMMENCED IN SAID COURTS. MAKER AND HOLDER FURTHER WAIVE PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS REQUIRED TO BE SERVED ON MAKER AND HOLDER, AS APPLICABLE, IN ANY SUCH PROCEEDING AND AGREE THAT THE SAME MAY BE SERVED, WITH THE SAME EFFECT AS PERSONAL SERVICE ON MAKER OR HOLDER, AS THE CASE MAY BE, WITHIN TEXAS, BY CERTIFIED OR REGISTERED MAIL ADDRESSED TO MAKER OR TO HOLDER, AS THE CASE MAY BE, AT ITS ADDRESS FOR NOTICES AS HEREIN PROVIDED.

(25) CERTAIN DEFINITIONS. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Asset Purchase Agreement**" means the Asset Purchase Agreement dated as of the Issuance Date made and entered into by and among Holder, the sole owner of Holder, and Maker.

(b) "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in Dallas, TX are authorized or required by law to remain closed.

(c) "**Change of Control**" means any Fundamental Transaction other than a Fundamental Transaction in which holders of at least 51% of the legal and beneficial ownership of, and control of, Holdco immediately prior to the Fundamental Transaction continue after the Fundamental Transaction to hold at least 51%, directly or indirectly, of the legal and beneficial ownership of, and control of, Maker.

(d) "**Fundamental Transaction**" means that the Maker shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Maker is the surviving entity) another Person, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Maker to another Person, or (iii) enter into a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person the intent of which is to accomplish any of the foregoing, or (iv) any transaction or business combination resulting in, directly or indirectly, Holdco not having control over Maker.

(e) "**Holdco**" means Baymark ACET Holdco, LLC, a limited liability company duly registered and validly existing under the laws of Texas.

(f) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(g) "**Security Agreement**" means that certain Security and Unit Pledge Agreement, dated as of the Issuance Date, by and between Holdco and Holder.

(h) "**Senior Lender**" means Super G Capital, LLC, a Delaware limited liability company, and its successors and assigns.

(i) "**Senior Loan Agreement**" means that certain Business Loan and Security Agreement by and between Maker and Senior Lender dated as of the Issuance Date, as it may be amended from time to time.

(j) "**Subordination Agreement**" means that certain Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement dated as of the Issuance Date between Maker and Senior Lender and acknowledged by Holder and the sole owner of Holder, as it may be amended from time to time.

[Signature Page Follows]

IN WITNESS WHEREOF, the Maker has caused this Note to be duly executed as of the Issuance Date set out above.

ACET GLOBAL, LLC

By: _____
Name: David J. Hook
Title: President

## Schedule 1

### Monthly Payment Schedule

| Monthly Installment No. | Accrual Date | Beginning Principal Balance | 15% Interest Accrued | Payment Amount Due | Ending Principal Balance |
|---|---|---|---|---|---|
|  | 7/31/2017 | $ 3,230,000.00 | $ 14,326.61 | $ - | $ 3,244,326.61 |
|  | 8/31/2017 | $ 3,244,326.61 | $ 40,554.08 | $ - | $ 3,284,880.70 |
|  | 9/30/2017 | $ 3,284,880.70 | $ 41,061.01 | $ - | $ 3,325,941.70 |
|  | 10/31/2017 | $ 3,325,941.70 | $ 41,574.27 | $ - | $ 3,367,515.98 |
|  | 11/30/2017 | $ 3,367,515.98 | $ 42,093.95 | $ - | $ 3,409,609.93 |
|  | 12/31/2017 | $ 3,409,609.93 | $ 42,620.12 | $ - | $ 3,452,230.05 |
|  | 1/31/2018 | $ 3,452,230.05 | $ 43,152.88 | $ - | $ 3,495,382.92 |
|  | 2/28/2018 | $ 3,495,382.92 | $ 43,692.29 | $ - | $ 3,539,075.21 |
|  | 3/31/2018 | $ 3,539,075.21 | $ 44,238.44 | $ - | $ 3,583,313.65 |
|  | 4/30/2018 | $ 3,583,313.65 | $ 44,791.42 | $ - | $ 3,628,105.07 |
|  | 5/31/2018 | $ 3,628,105.07 | $ 45,351.31 | $ - | $ 3,673,456.39 |
|  | 6/30/2018 | $ 3,673,456.39 | $ 45,918.20 | $ - | $ 3,719,374.59 |
|  | 7/31/2018 | $ 3,719,374.59 | $ 46,492.18 |  | $ 3,765,866.77 |
|  | 8/31/2018 | $ 3,765,866.77 | $ 47,073.33 | $ - | $ 3,812,940.11 |
|  | 9/30/2018 | $ 3,812,940.11 | $ 47,661.75 | $ - | $ 3,860,601.86 |
| 1 | 10/31/2018 | $ 3,860,601.86 | $ 48,257.52 | $ 75,000.00 | $ 3,833,859.38 |
| 2 | 11/30/2018 | $ 3,833,859.38 | $ 47,923.24 | $ 75,000.00 | $ 3,806,782.62 |
| 3 | 12/31/2018 | $ 3,806,782.62 | $ 47,584.78 | $ 75,000.00 | $ 3,779,367.41 |
| 4 | 1/31/2019 | $ 3,779,367.41 | $ 47,242.09 | $ 77,500.00 | $ 3,749,109.50 |
| 5 | 2/28/2019 | $ 3,749,109.50 | $ 46,863.87 | $ 77,500.00 | $ 3,718,473.37 |
| 6 | 3/31/2019 | $ 3,718,473.37 | $ 46,480.92 | $ 77,500.00 | $ 3,687,454.29 |
| 7 | 4/30/2019 | $ 3,687,454.29 | $ 46,093.18 | $ 80,000.00 | $ 3,653,547.46 |
| 8 | 5/31/2019 | $ 3,653,547.46 | $ 45,669.34 | $ 80,000.00 | $ 3,619,216.81 |
| 9 | 6/30/2019 | $ 3,619,216.81 | $ 45,240.21 | $ 80,000.00 | $ 3,584,457.02 |
| 10 | 7/31/2019 | $ 3,584,457.02 | $ 44,805.71 | $ 82,500.00 | $ 3,546,762.73 |
| 11 | 8/31/2019 | $ 3,546,762.73 | $ 44,334.53 | $ 82,500.00 | $ 3,508,597.26 |
| 12 | 9/30/2019 | $ 3,508,597.26 | $ 43,857.47 | $ 82,500.00 | $ 3,469,954.73 |
| 13 | 10/31/2019 | $ 3,469,954.73 | $ 43,374.43 | $ 85,000.00 | $ 3,428,329.16 |
| 14 | 11/30/2019 | $ 3,428,329.16 | $ 42,854.11 | $ 85,000.00 | $ 3,386,183.28 |
| 15 | 12/31/2019 | $ 3,386,183.28 | $ 42,327.29 | $ 85,000.00 | $ 3,343,510.57 |
| 16 | 1/31/2020 | $ 3,343,510.57 | $ 41,793.88 | $ 87,500.00 | $ 3,297,804.45 |
| 17 | 2/29/2020 | $ 3,297,804.45 | $ 41,222.56 | $ 87,500.00 | $ 3,251,527.01 |
| 18 | 3/31/2020 | $ 3,251,527.01 | $ 40,644.09 | $ 87,500.00 | $ 3,204,671.10 |
| 19 | 4/30/2020 | $ 3,204,671.10 | $ 40,058.39 | $ 90,000.00 | $ 3,154,729.48 |
| 20 | 5/31/2020 | $ 3,154,729.48 | $ 39,434.12 | $ 90,000.00 | $ 3,104,163.60 |

| # | Date | Balance | Interest | Payment | New Balance |
|---|---|---|---|---|---|
| 21 | 6/30/2020 | $ 3,104,163.60 | $ 38,802.05 | $ 90,000.00 | $ 3,052,965.65 |
| 22 | 7/31/2020 | $ 3,052,965.65 | $ 38,162.07 | $ 92,500.00 | $ 2,998,627.72 |
| 23 | 8/31/2020 | $ 2,998,627.72 | $ 37,482.85 | $ 92,500.00 | $ 2,943,610.56 |
| 24 | 9/30/2020 | $ 2,943,610.56 | $ 36,795.13 | $ 92,500.00 | $ 2,887,905.70 |
| 25 | 10/31/2020 | $ 2,887,905.70 | $ 36,098.82 | $ 95,000.00 | $ 2,829,004.52 |
| 26 | 11/30/2020 | $ 2,829,004.52 | $ 35,362.56 | $ 95,000.00 | $ 2,769,367.07 |
| 27 | 12/31/2020 | $ 2,769,367.07 | $ 34,617.09 | $ 95,000.00 | $ 2,708,984.16 |
| 28 | 1/31/2021 | $ 2,708,984.16 | $ 33,862.30 | $ 97,500.00 | $ 2,645,346.46 |
| 29 | 2/28/2021 | $ 2,645,346.46 | $ 33,066.83 | $ 97,500.00 | $ 2,580,913.30 |
| 30 | 3/31/2021 | $ 2,580,913.30 | $ 32,261.42 | $ 97,500.00 | $ 2,515,674.71 |
| 31 | 4/30/2021 | $ 2,515,674.71 | $ 31,445.93 | $ 100,000.00 | $ 2,447,120.65 |
| 32 | 5/31/2021 | $ 2,447,120.65 | $ 30,589.01 | $ 100,000.00 | $ 2,377,709.65 |
| 33 | 6/30/2021 | $ 2,377,709.65 | $ 29,721.37 | $ 100,000.00 | $ 2,307,431.02 |
| 34 | 7/31/2021 | $ 2,307,431.02 | $ 28,842.89 | $ 102,500.00 | $ 2,233,773.91 |
| 35 | 8/31/2021 | $ 2,233,773.91 | $ 27,922.17 | $ 102,500.00 | $ 2,159,196.09 |
| 36 | 9/30/2021 | $ 2,159,196.09 | $ 26,989.95 | $ 102,500.00 | $ 2,083,686.04 |
| 37 | 10/31/2021 | $ 2,083,686.04 | $ 26,046.08 | $ 105,000.00 | $ 2,004,732.11 |
| 38 | 11/30/2021 | $ 2,004,732.11 | $ 25,059.15 | $ 105,000.00 | $ 1,924,791.26 |
| 39 | 12/31/2021 | $ 1,924,791.26 | $ 24,059.89 | $ 105,000.00 | $ 1,843,851.16 |
| 40 | 1/31/2022 | $ 1,843,851.16 | $ 23,048.14 | $ 107,500.00 | $ 1,759,399.29 |
| 41 | 2/28/2022 | $ 1,759,399.29 | $ 21,992.49 | $ 107,500.00 | $ 1,673,891.79 |
| 42 | 3/31/2022 | $ 1,673,891.79 | $ 20,923.65 | $ 107,500.00 | $ 1,587,315.43 |
| 43 | 4/30/2022 | $ 1,587,315.43 | $ 19,841.44 | $ 110,000.00 | $ 1,497,156.88 |
| 44 | 5/31/2022 | $ 1,497,156.88 | $ 18,714.46 | $ 110,000.00 | $ 1,405,871.34 |
| 45 | 6/30/2022 | $ 1,405,871.34 | $ 17,573.39 | $ 110,000.00 | $ 1,313,444.73 |
| 46 | 7/31/2022 | $ 1,313,444.73 | $ 16,418.06 | $ 112,500.00 | $ 1,217,362.79 |
| 47 | 8/31/2022 | $ 1,217,362.79 | $ 15,217.03 | $ 112,500.00 | $ 1,120,079.82 |
| 48 | 9/30/2022 | $ 1,120,079.82 | $ 14,001.00 | $ 112,500.00 | $ 1,021,580.82 |
| 49 | 10/31/2022 | $ 1,021,580.82 | $ 12,769.76 | $ 115,000.00 | $ 919,350.58 |
| 50 | 11/30/2022 | $ 919,350.58 | $ 11,491.88 | $ 115,000.00 | $ 815,842.46 |
| 51 | 12/31/2022 | $ 815,842.46 | $ 10,198.03 | $ 115,000.00 | $ 711,040.49 |
| 52 | 1/31/2023 | $ 711,040.49 | $ 8,888.01 | $ 117,500.00 | $ 602,428.50 |
| 53 | 2/28/2023 | $ 602,428.50 | $ 7,530.36 | $ 117,500.00 | $ 492,458.86 |
| 54 | 3/31/2023 | $ 492,458.86 | $ 6,155.74 | $ 117,500.00 | $ 381,114.59 |
| 55 | 4/30/2023 | $ 381,114.59 | $ 4,763.93 | $ 120,000.00 | $ 265,878.52 |
| 56 | 5/31/2023 | $ 265,878.52 | $ 3,323.48 | $ 120,000.00 | $ 149,202.01 |
| 57 | 6/30/2023 | $ 149,202.01 | $ 1,865.03 | $ 120,000.00 | $ 31,067.03 |
| 58 | 7/31/2023 | $ 31,067.03 | $ 388.34 | $ 31,455.37 | $0.00 |

## Schedule A

## Holder's Bank Account Information

Bank of America
Checking account: ███
Routing number: ███
Routing number for Wires: ███

37606/496974v10