PLAINTIFF'S
EXHIBIT

**14**

**Execution Version**

**AMENDED AND RESTATED COMPANY AGREEMENT**

**OF**

**WINDSPEED TRADING, LLC**

**A TEXAS LIMITED LIABILITY COMPANY**

**DATED OCTOBER 18, 2018**

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS ........................................................................................................ 1
   1.1.   Definitions ................................................................................................................. 1
   1.2.   Section References .................................................................................................... 6

ARTICLE 2 FORMATION OF THE COMPANY .................................................................... 6
   2.1.   Name and Formation ................................................................................................ 6
   2.2.   Principal Place of Business ...................................................................................... 6
   2.3.   Registered Office and Registered Agent .................................................................. 6
   2.4.   Purposes and Powers ................................................................................................ 7
   2.5.   Nature of Interests .................................................................................................... 7

ARTICLE 3 RIGHTS AND DUTIES OF MANAGERS; OFFICERS ..................................... 7
   3.1.   Duties of Board of Managers .................................................................................... 7
   3.2.   No Control by Members ........................................................................................... 7
   3.3.   Number .................................................................................................................... 7
   3.4.   Appointment ............................................................................................................ 7
   3.5.   Current Board of Managers ...................................................................................... 8
   3.6.   Removal of Managers .............................................................................................. 8
   3.7.   Vacancies ................................................................................................................. 8
   3.8.   Management of the Company .................................................................................... 8
   3.9.   Payment of Costs and Expenses ............................................................................... 8
   3.10.  Manager Expenses ................................................................................................... 8
   3.11.  Meetings of the Board of Managers ......................................................................... 9
   3.12.  Action Without a Meeting ........................................................................................ 9
   3.13.  Adjournment ............................................................................................................ 9
   3.14.  Inspection of Books and Records ............................................................................. 9
   3.15.  Officers .................................................................................................................... 9

ARTICLE 4 INDEMNIFICATION OF MANAGERS AND OFFICERS ............................... 10
   4.1.   Exculpation ............................................................................................................ 10
   4.2.   Right to Indemnification ......................................................................................... 10
   4.3.   Procedure to be Followed ....................................................................................... 11
   4.4.   Payment of Expenses in Advance ........................................................................... 11
   4.5.   Other Rights ........................................................................................................... 11
   4.6.   Insurance ................................................................................................................ 11
   4.7.   Severability ............................................................................................................ 11
   4.8.   Appearance as a Witness or Otherwise ................................................................... 11

ARTICLE 5 MEMBERS; MEETINGS OF MEMBERS ........................................................ 11
   5.1.   Meetings of the Members ....................................................................................... 11
   5.2.   Voting .................................................................................................................... 12
   5.3.   Vote by Proxy ........................................................................................................ 12
   5.4.   Conduct of Meeting ............................................................................................... 12
   5.5.   Action Without a Meeting ...................................................................................... 12
   5.6.   Registered Members .............................................................................................. 12
   5.7.   Confidentiality ....................................................................................................... 12

i

BP_003244

ARTICLE 6 CONTRIBUTIONS TO CAPITAL; CAPITAL ACCOUNTS; LOANS ................ 13
  6.1.   Initial Capital Contributions .................................................................................. 13
  6.2.   Additional Capital Contributions ........................................................................... 13
  6.3.   Preemptive Rights .................................................................................................. 13
  6.4.   Loans ...................................................................................................................... 13
  6.5.   Capital Accounts .................................................................................................... 13
  6.6.   Withdrawal or Reduction of Members' Contributions to Capital ......................... 14
  6.7.   Liability of Members ............................................................................................. 14

ARTICLE 7 DISTRIBUTIONS AND ALLOCATIONS .............................................................. 14
  7.1.   Distributions of Distributable Cash ....................................................................... 14
  7.2.   Distribution for Taxes. ........................................................................................... 15
  7.3.   Limitations on Distributions. ................................................................................. 15
  7.4.   Allocations for Book Purposes .............................................................................. 15
  7.5.   Special Allocations for Book Purposes.................................................................. 15
  7.6.   Allocation of Income, Gain, Loss and Deduction Upon a Liquidation Event.............. 17
  7.7.   Other Allocation Rules .......................................................................................... 17
  7.8.   Allocations for Federal Income Tax Purposes....................................................... 17

ARTICLE 8 ELECTIONS AND REPORTS................................................................................. 18
  8.1.   Tax Status and Tax Elections................................................................................. 18
  8.2.   Records and Reports .............................................................................................. 18
  8.3.   Books of Account ................................................................................................... 18
  8.4.   Company Tax Returns, Financial Statements and Annual Statement .................... 19
  8.5.   Bank Accounts ....................................................................................................... 19
  8.6.   Partnership Representative...................................................................................... 19

ARTICLE 9 TRANSFERABILITY .............................................................................................. 20
  9.1.   Restrictions on Transfer of Interests ..................................................................... 20
  9.2.   Transfers Generally................................................................................................ 20
  9.3.   Permitted Transfers to Specified Parties................................................................ 21
  9.4.   Permitted Sales after Right of First Refusal Is Given............................................ 21
  9.5.   Tag Along Rights.................................................................................................... 22
  9.6.   Drag Along Rights. ................................................................................................ 22
  9.7.   Substitute Members ............................................................................................... 23
  9.8.   Admissions of Additional Members ...................................................................... 23
  9.9.   Other Conditions to Transfers................................................................................ 24
  9.10.  Transfers in Violation of Agreement ..................................................................... 24

ARTICLE 10 WINDING UP AND TERMINATION ................................................................... 24
  10.1.  Withdrawal............................................................................................................. 24
  10.2.  Winding Up and Liquidation ................................................................................. 24
  10.3.  Liquidation and Termination ................................................................................. 25
  10.4.  Distribution upon Liquidation................................................................................ 26
  10.5.  Deficit Capital Accounts........................................................................................ 26
  10.6.  Certificate of Termination ..................................................................................... 26

ARTICLE 11 MISCELLANEOUS PROVISIONS ...................................................................... 26
  11.1.  Notice..................................................................................................................... 26

BP_003245

11.2.   Amendments ........................................................................................................ 26
11.3.   Powers of Attorney ............................................................................................. 27
11.4.   Governing Laws ................................................................................................... 27
11.5.   Entire Agreement ................................................................................................ 27
11.6.   Waiver .................................................................................................................. 27
11.7.   Severability ......................................................................................................... 27
11.8.   Binding Agreement ............................................................................................. 28
11.9.   Benefits of this Agreement ................................................................................ 28
11.10. Counterparts ....................................................................................................... 28

Exhibit A – Members; Warrantholders; Interests

BP_003246

## AMENDED AND RESTATED COMPANY AGREEMENT
## OF
## WINDSPEED TRADING, LLC

THIS AMENDED AND RESTATED COMPANY AGREEMENT OF WINDSPEED TRADING, LLC (this "*Agreement*") is entered into effective as of October 18, 2018, by and among Windspeed Trading, LLC, a Texas limited liability company (the "*Company*"), and each of the Persons executing this Agreement as a "Member," and for limited purposes as specified herein, each Person executing this Agreement as a "Warrantholder."

### RECITALS

WHEREAS, the Limited Liability Company Operating Agreement of Windspeed Trading, LLC was entered into effective as of September 27, 2018 (the "*Original Agreement*") by William Szeto, as the original Member; and

WHEREAS, the original Member now desires to, and hereby does, amend and restate the Original Agreement to, among other things, admit one or more additional members to the Company.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises of the parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the undersigned parties agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1.    <u>Definitions</u>.   The following terms used in this Agreement have the following meanings (unless otherwise expressly provided):

"*Act*" means the Texas Business Organizations Code, as amended.

"*Additional Member*" has the meaning set forth in <u>Section 9.8(a)</u>.

"*Adjusted Capital Account*" means the balance in each Member's Capital Account as of the end of each Fiscal Year, (i) increased by any additional Capital Contributions a Member is unconditionally obligated to make or is treated as being obligated to make pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) decreased by the amount of any items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).   This definition shall be interpreted consistent with Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

"*Agreement*" has the meaning set forth in the Preamble.

"*Baymark*" means Baymark Partners Management, LLC, a Texas limited liability company.

"***Baymark Manager***" has the meaning set forth in <u>Section 3.4(a)</u>.

"***Bipartisan Budget Act***" has the meaning set forth in <u>Section 8.6(b)</u>.

"***Board of Managers***," "***Board***," or "***Managers***" means a board of managers appointed as provided in <u>Section 3.4</u>, and which Board is authorized to manage the business and affairs of the Company subject to the terms and conditions of this Agreement. "***Manager***" refers to one of the Managers.

"***Book Value***" means, with respect to each Company asset, the asset's adjusted basis for federal income tax purposes, except as follows: (i) the initial Book Value of a Company asset contributed by a Member to the Company (including any asset deemed contributed to the Company as a result of a constructive termination of the Company pursuant to Code Section 708(b)(1)(B)) shall be the agreed fair market value of the asset on the date of contribution; (ii) upon the occurrence of a Revaluation Event, the Book Value of all Company assets shall be adjusted to their respective fair market values on such date, as determined by the Board of Managers; (iii) the Book Value of any Company asset shall be increased or decreased to reflect any adjustment to the adjusted tax basis of the asset pursuant to Code Section 734(b) or 743(b), other than in connection with a Revaluation Event, to the extent the adjustment is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m); and (iv) if the Book Value of any Company asset has been determined pursuant to subsections (i), (ii) or (iii) above, the Book Value of the asset shall thereafter be adjusted by depreciation, amortization or other cost recovery deductions determined in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3) in lieu of any depreciation, amortization or other cost recovery deductions computed for federal income tax purposes.

"***Capital Account***" means the account established for each Member pursuant to <u>Section 6.5</u>.

"***Capital Contribution***" means the amount of money and the fair market value of other property (net of liabilities secured by such assets which the Company is treated as having assumed or taken subject to under Code Section 752) contributed by a Member (or a Member's predecessors in interest) to the capital of the Company.

"***Certificate of Formation***" means the Certificate of Formation of Windspeed Trading, LLC dated September 27, 2018, as subsequently amended.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law).

"***Company***" has the meaning set forth in the Preamble.

"***Company Sale***" has the meaning set forth in <u>Section 4.2</u>.

"***Distributable Cash***" means all cash, demand deposits and short term marketable securities received from the conduct of Company operations or capital transactions (but

BP_003248

not from Capital Contributions), less the portion thereof used to pay, or establish reserves as reasonably determined by the Board of Managers, for all Company expenses, debt payments, capital improvements, replacements and contingencies, all as determined by the Board of Managers in its sole discretion.

"*Electing Member*" has the meaning set forth in <u>Section 9.4(a)</u>.

"*Event of Dissolution*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Fiscal Year*" means the annual accounting period of the Company (or any relevant portion thereof), which will initially be the calendar year, and thereafter any other period selected by the Board of Managers from time to time in accordance with the provisions of Code Section 706(b). The Fiscal Year of the Company shall be the same for federal income tax and financial accounting purposes.

"*Income*" means, for each Fiscal Year, each item of income and gain as determined, recognized and classified for federal income tax purposes, provided, that (i) items of income or gain exempt from federal income tax shall be included as items of Income, (ii) upon a disposition of any Company asset, items of income or gain arising therefrom and included as items of Income shall be computed by reference to the asset's Book Value on the date of disposition rather than the asset's adjusted tax basis, (iii) upon a distribution of any Company asset, whether or not in connection with the liquidation of the Company, any unrealized items of income or gain inherent therein which have not previously been reflected in the Members' Capital Accounts shall be included as items of Income as if the asset had been sold for its fair market value on the date of its distribution, and (iv) if the Book Value of any Company asset is adjusted upwards upon the occurrence of a Revaluation Event, the amount of the adjustment shall be treated as an item of income or gain and shall be included as an item of Income.

"*Indemnitee*" has the meaning set forth in <u>Section 4.2</u>.

"*Interests*" means the membership interests of the Company held by each Member, expressed as a percentage and initially as set forth on <u>Exhibit A</u>, including rights to distributions (liquidating and operating), allocations, voting, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate of Formation, this Agreement or otherwise) in its capacity as a Member, and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate of Formation, this Agreement, or otherwise) in its capacity as a Member; provided, however, that such term shall not include any management rights held by a Member solely in its capacity as a Manager.

"*Loss*" means, for each Fiscal Year, each item of loss or deduction as determined, recognized and classified for federal income tax purposes, provided, that (i) expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) shall be included as items of Loss, (ii) upon a disposition of any Company asset, items of loss or deduction arising therefrom and included as items of Loss shall be computed by

BP_003249

reference to the asset's Book Value on the date of disposition rather than the asset's adjusted tax basis, (iii) upon a distribution of any Company asset, whether or not in connection with the liquidation of the Company, any unrealized items of loss or deduction inherent therein which have not previously been reflected in the Members' Capital Accounts shall be included as items of Loss as if the asset had been sold for its fair market value on the date of its distribution, (iv) if the Book Value of any Company asset is adjusted downwards upon the occurrence of a Revaluation Event, the amount of the adjustment shall be treated as an item of loss or deduction and shall be included as an item of Loss, and (v) if the Book Value of any Company asset differs from the adjusted tax basis of the asset, items of depreciation, amortization or other cost recovery deductions attributable to the asset and included as items of Loss shall be determined in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"*Majority in Interest*" means, with respect to any referenced group of Members, a combination of any of such Members who, in the aggregate, own a majority of the total Interests owned by all of such referenced group of Members.

"*Majority of Managers*" means, with respect to the Managers, more than fifty percent (50%) in number of Managers who are then serving on the Board of Managers.

"*Member*" means any Person executing this Agreement as a Member or who is admitted to the Company as a Member as provided in this Agreement, but does not include any Person who has ceased to be a Member in the Company. "*Members*" refers to such Persons as a group.

"*Net Income*" and "*Net Loss*" means, for each Fiscal Year, (i) the excess of the Income for such year over the Loss for such year, or (ii) the excess of the Loss for such year over the Income for such year, respectively; provided, that Net Income or Net Loss for a Fiscal Year shall be computed by excluding from such computation any item of Income or Loss specially allocated to a Member under Section 7.5.

"*Non-Selling Member*" has the meaning set forth in Section 9.4(a).

"*Offer*" has the meaning set forth in Section 9.4(a).

"*Offer Interest*" has the meaning set forth in Section 9.4(a).

"*Offer Notice*" has the meaning set forth in Section 9.4(a).

"*Option Period*" has the meaning set forth in Section 9.4(a).

"*Permitted Transferee*" means, with respect to a Member, any of the following: (a) such Member's spouse other than a spouse who is legally separated under a decree of separate maintenance or a spouse who is a party to a pending divorce proceeding; (b) such Member's descendants, including descendants by adoption if the effective date of the adoption occurred at least one (1) year prior to the Transfer date; (c) parent or sibling of such Member; (d) any descendant of such Member's sibling including those by adoption as defined above; (e) a trust created for the benefit of any Person described in

4

BP_003250

clauses (a) through (d) of this definition; (f) a Person who is a Member at the time of the Transfer; (g) if such Member is an entity, such Member's majority owner; (h) an entity owned or controlled by, or under common control with or for the benefit of any of the aforementioned parties, or (i) an entity owned or controlled by, or under common control with, such Member.

"**_Person_**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization or joint venture, or any other legally recognizable entity.

"**_Proposal_**" has the meaning set forth in <u>Section 9.6</u>.

"**_Required Sale Notice_**" has the meaning set forth in <u>Section 9.6</u>.

"**_Revaluation Event_**" means (i) the acquisition of an additional Interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) a distribution to one or more Members of more than a de minimis amount of money or other property as consideration for all or part of the Member's Interest; (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), or (iv) such other event or occurrence as reasonably determined by the Board of Managers to be a Revaluation Event.

"**_Selling Member_**" has the meaning set forth in <u>Section 9.4(a)</u>.

"**_Subsidiary_**" means any corporation, partnership, limited liability company or other entity or organization in which the Company holds a controlling ownership interest.

"**_Substitute Member_**" has the meaning set forth in <u>Section 9.7</u>.

"**_Super G_**" means Super G Capital, LLC, a Delaware limited liability company.

"**_Super G Manager_**" has the meaning set forth in <u>Section 3.4(b)</u>.

"**_Szeto_**" means William Szeto, a resident of the State of Texas.

"**_Szeto Manager_**" has the meaning set forth in <u>Section 3.4(c)</u>.

"**_Tag Along Member_**" has the meaning set forth in <u>Section 9.5</u>.

"**_Target Account_**" means, with respect to any Member as of the date of determination, a balance (which may be positive or negative) equal to the hypothetical amount that such Member would receive from such Member's Interest upon the liquidation of the Company, assuming that (a) all assets of the Company were sold for their fair market value (as reasonably determined by the Board of Managers), (b) all liabilities of the Company became due and were satisfied in accordance with their terms (limited with respect to each non-recourse liability, to the adjusted tax basis (or other carrying value if there is a difference that is reflected in the Capital Accounts) of the asset securing such liability), and (c) all Distributable Cash of the Company was distributed

BP_003251

pursuant to <u>Section 7.1</u>, computed after the Capital Contributions have been made for the period ending on such date of determination.

"***Transfer***" shall have the meaning set forth in <u>Section 9.1</u>.

"***Treasury Regulations***" means temporary and final Treasury regulations promulgated under the Code, as amended from time to time (including corresponding provisions of succeeding regulations).

"***Unreturned Capital Contribution***" means, for any Member, the aggregate Capital Contributions made by such Member less distributions previously made to such Member pursuant to <u>Section 7.1(a)</u>.

"***Warrant***" means the warrants to acquire Interests in the Company issued pursuant to the Warrant Purchase Agreements.

"***Warrant Purchase Agreement***" means, collectively, (a) that certain Warrant Purchase Agreement dated as of October 18, 2018, by and between the Super G and the Company, and (b) that certain Warrant Purchase Agreement dated as of October 18, 2018, by and between Baymark and the Company, pursuant to which the Company issued the Warrants.

"***Warrantholders***" means Super G and Baymark, and their respective successors and permitted assigns.

1.2.   <u>Section References</u>.   All section references in this Agreement are to this Agreement unless otherwise specifically provided.

## ARTICLE 2
## FORMATION OF THE COMPANY

2.1.   <u>Name and Formation</u>. The Certificate of Formation was filed in the office of the Secretary of State of the State of Texas on September 27, 2018, as required by the Act, under the name "Windspeed Trading, LLC."   Upon the filing of the Certificate, the Company was established as a limited liability company pursuant to the Act.   By this Agreement, the Members hereby affirm and continue the existence of the Company as a limited liability company pursuant to the Act, and amend and restate the Original Agreement in its entirety as set forth herein. The rights and obligations of the parties and the administration and termination of the Company shall be governed by this Agreement, the Certificate of Formation and the Act.

2.2.   <u>Principal Place of Business</u>.   The principal place of business of the Company shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas.   The Company may have such other offices as the Managers may designate from time to time.

2.3.   <u>Registered Office and Registered Agent</u>.   The registered agent of the Company shall be Alexander M. Szeto and the registered office of the Company shall be located at 2711 N. Haskell Avenue, Suite 2400, Dallas, Texas 75204.   The registered office or the registered agent, or both, may be changed by the Board of Managers from time to time by filing the statement

BP_003252

required by the Act.  The Company shall maintain at its registered office such records as may be specified by the Act.

      2.4.   Purposes and Powers.  The purposes and character of the business of the Company shall be to accomplish any lawful business for which limited liability companies may be organized under the Act.  The Company shall have any and all powers which are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act.  The Company shall carry out the foregoing activities pursuant to the arrangements set forth in the Certificate of Formation and this Agreement.

      2.5.   Nature of Interests.  The Interests shall be personal property for all purposes. Legal title to all Company assets shall be held in the name of the Company.  Neither any Member nor any Member's successors, representatives or assigns, shall have any right, title or interest in or to any Company property or the right to seek a partition of any Company property.

## ARTICLE 3
## RIGHTS AND DUTIES OF MANAGERS; OFFICERS

      3.1.   Duties of Board of Managers.  The business and affairs of the Company shall be managed by the Board of Managers.  The Board of Managers shall be solely responsible for the operation and management of the business of the Company, and, except as otherwise expressly provided in this Agreement, the Board of Managers shall possess all rights, powers and authority generally conferred by applicable law or deemed by the Board of Managers as necessary, advisable or consistent in connection therewith.  Any reference in this Agreement to an act or decision that may be taken or approved by the Board of Managers means, unless otherwise specifically provided, that such act or decision must be approved by a Majority of Managers. The authority of the Board of Managers to take any action required or permitted under the provisions of this Agreement shall in all respects be exercised in its sole and absolute discretion.

      3.2.   No Control by Members.  No Member (except a Member who may also be a Manager or officer, and then only in such capacity within the scope of his, her or its authority hereunder) will participate in or have any control over the Company business or will have any authority or right to act for or bind the Company.  All Members hereby consent to the exercise by the Board of Managers of the powers conferred on the Board of Managers by this Agreement.

      3.3.   Number.  There shall be three (3) Managers on the Board of Manager of the Company who need not be Members or residents of the State of Texas. The number of Managers may be increased or decreased from time to time by amendment to this Agreement.

      3.4.   Appointment.  The Managers shall be appointed as set forth below:

      (a)   Baymark shall be entitled to appoint one (1) Manager to the Board of Managers (the "*Baymark Manager*") so long as Baymark is a Warrantholder or Member of the Company.

BP_003253

(b)    Super G shall be entitled to appoint one (1) Manager to the Board of Managers (the "*Super G Manager*") so long as Super G is a Warrantholder or Member of the Company.

(c)    Szeto shall be entitled to appoint one (1) Manager to the Board of Managers (the "*Szeto Manager*") so long as he is a Member of the Company.

3.5.    Current Board of Managers.    The Board of Managers as of the date of this Agreement shall consist of the following Persons:

| Name of Manager | Type of Nominee |
|---|---|
| Anthony Ludlow | Baymark Manager |
| Steven Bellah | Super G Manager |
| William Szeto | Szeto Manager |

Each of such individuals shall hold his or her office until his or her death, resignation or removal or until his or her respective successor shall thereafter have been duly elected and qualified. Each of the parties by signing this Agreement consents to the election of the nominees to the Board of Managers as listed above, effective as of the date of this Agreement.

3.6.    Removal of Managers.    Any Manager may be removed, with or without cause, at any time, by the Person entitled to appoint such Manager pursuant to Section 3.4.

3.7.    Vacancies.    If a vacancy is created on the Board of Managers by reason of the death, disability, removal (in accordance with Section 3.6) or resignation of any one of the Board of Managers, the party then entitled pursuant to Section 3.4 to nominate the Manager whose death, disability, removal or resignation resulted in such vacancy shall be entitled to designate a new Manager in accordance with the appointment procedures set forth in Section 3.4.  If the party entitled to nominate a Manager to fill any such vacancy (i) fails to nominate a Manager within ten (10) days after the vacancy is created, or (ii) is no longer entitled pursuant to Section 3.4 to nominate a Manager, then, in either case, such vacancy shall be filled with any individual selected by the vote of a majority of the remaining Managers.

3.8.    Management of the Company.    The Board of Managers and any officers of the Company appointed pursuant to Section 3.15 shall endeavor to operate and manage the business of the Company in a careful, prudent and commercially reasonable manner and in accordance with reasonable industry practice.

3.9.    Payment of Costs and Expenses.    The Company shall be responsible for paying all costs and expenses of forming and continuing the Company, and operating and conducting the business of the Company, including, without limitation, accounting costs and legal expenses. The Company shall promptly reimburse any Managers or Members for any out of pocket expenses incurred by such Manager or Member in connection with the formation and organization of the Company and the operation of its business.

3.10.    Manager Expenses.    The Company shall promptly reimburse each Manager who is not an employee of the Company or a Subsidiary for all of his or her reasonable out-of-pocket expenses incurred in attending each meeting of the Board or any committee thereof.  In addition,

8

the Company shall promptly reimburse each such Manager for all of his or her reasonable out-of-pocket expenses incurred in performing business of the Company or a Subsidiary at the request of the Company.  Unless otherwise approved by the Board of Managers, no Manager shall not be entitled to receive any compensation for the services he or she performs for the Company as a Manager; provided, however, that nothing in this Section 3.10 shall prohibit any Manager who is an officer, employee or consultant of the Company or a Subsidiary from receiving compensation or reimbursement for his or her services in such capacity.

3.11.   Meetings of the Board of Managers.  Meetings of the Board of Managers may be called by any Manager.  The notice of a meeting shall state the nature of the business to be transacted at such meeting, and actions taken at any such meeting shall be limited to those matters specified in the notice of the meeting.  Notice of any meeting shall be given to all Managers not less than three (3) and not more than thirty (30) days prior to the date of the meeting.  The attendance of all of the Managers at a meeting of the Board of Managers is necessary to constitute a quorum.  The presence of any Manager at a meeting shall constitute a waiver of notice of the meeting with respect to such Manager, unless such Manager is present solely to challenge the validity of the meeting.  The Managers may, at their election, participate in any regular or special meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  A Manager's participation in a meeting pursuant to the preceding sentence shall constitute presence in Person at such meeting for all purposes of this Agreement.

3.12.   Action Without a Meeting.   Notwithstanding any provision contained in this Article 3, all actions of the Managers provided for herein may be taken by written consent without a meeting.  Any such action that may be taken by the Managers without a meeting shall be effective only if the written consent or consents are in writing, set forth the action so taken, and are signed by the number of Managers constituting not less than the minimum number of Managers that would be necessary to take such action at a meeting at which all of the Managers entitled to vote on the action were present and voted.

3.13.   Adjournment.   A Majority of Managers present may adjourn any Board of Managers meeting to meet again at a stated day and hour or until the time fixed for the next regular meeting of the Board of Managers.

3.14.   Inspection of Books and Records.  Any Manager shall have the right to examine the list of the Company's Members entitled to vote and the Company's other books and records for a purpose reasonably related to such Manager's position as a Manager.

3.15.   Officers.  If the Board of Managers determines the Company should have officers, the officers of the Company shall be appointed by the Board of Managers.  An officer of the Company may also be a Manager.  The officers shall have only such authority as the Board of Managers may designate to them from time to time.  Any two or more offices may be held by the same individual.  The officers shall be entitled to receive such compensation, if any, from the Company for services rendered on behalf of or for the benefit of the Company as shall be determined from time to time by the Board of Managers.  In addition, the Company shall reimburse each officer from time to time for all out-of-pocket costs and expenses that such officer incurs in connection with performing services as an officer of the Company, so long as such costs and expenses are reasonably necessary and are reasonable in amount.  Each officer

9

shall hold his office until his death, resignation or removal or until his successor shall have been duly elected.  Any officer may be removed at any time and for any reason by the Board of Managers.  Any vacancy in any office occurring by reason of the death, disability, removal or resignation of an officer may be filled by the Board of Managers.

## ARTICLE 4
## INDEMNIFICATION OF MANAGERS AND OFFICERS

4.1.  <u>Exculpation</u>.  The Managers and officers shall endeavor to perform their duties under this Agreement with ordinary prudence and in a manner reasonable under the circumstances.  No officer or Manager shall be liable to the Company or the Members for monetary damages for an act or omission in such Person's capacity as an officer or Manager, except for liability for (a) a breach of such officer's or Manager's duty of loyalty to the Company or its Members, (b) an act or omission not in good faith that constitutes a breach of duty of such officer or Manager to the Company or an act or omission that involves intentional misconduct or a knowing violation of the law, (c) a transaction from which such officer or Manager received an improper benefit, whether or not the benefit resulted from an action taken within the scope of such officer's or Manager's position, or (d) an act or omission for which the liability of an officer or Manager is expressly provided for by an applicable statute under Texas law.  If the Act or other applicable Texas law is amended to authorize action further eliminating or limiting the liability of officers and Managers, then the liability of the officers and Managers shall be eliminated or limited to the fullest extent permitted by the Act or other applicable law, as so amended.  Any repeal or modification of this paragraph by the Members or the Board of Managers shall be prospective only and shall not adversely affect the right or protection of an officer or Manager existing at the time of such repeal or modification.

4.2.  <u>Right to Indemnification</u>.  The Company shall indemnify any officer or Manager (each an "***Indemnitee***") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative, or investigative, by reason of the fact that such Indemnitee is or was a Manager or officer of the Company, or is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another Person, employee benefit plan or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by such Indemnitee in connection therewith to the extent that such Indemnitee has been wholly successful on the merits or otherwise in defense of such action, suit or proceeding, and against judgments, penalties (including excise and similar taxes), fines, and amounts paid in settlement by such Indemnitee in connection therewith, (a) if and to the extent that such Indemnitee has been successful on the merits or otherwise in defense of such action, suit or proceeding; or (b) if such Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed, in the case of conduct in his or her official capacity, to be in the best interests of the Company; or, in all other cases, to be not opposed to the best interests of the Company; and, with respect to any criminal action or proceeding, if such Indemnitee had no reasonable cause to believe his or her conduct was unlawful; provided however, if such Indemnitee is found liable to the Company or is found liable on the basis that personal benefit improperly was received by him or her, the indemnification provided pursuant to this <u>Section 4.2</u> shall not apply.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith

10

and in a manner which such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, or, with respect to any criminal action or proceeding, that such Indemnitee had reasonable cause to believe that his or her conduct was unlawful.

4.3.   <u>Procedure to be Followed</u>.   Any indemnification under <u>Section 4.2</u> (unless ordered by a court or made pursuant to a determination by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Indemnitee is proper in the circumstances because such Indemnitee has met the applicable standard of conduct set forth in <u>Section 4.2</u>.   Such determination shall be made by special legal counsel selected by a Majority of Managers.

4.4.   <u>Payment of Expenses in Advance</u>.   Expenses incurred in defending an action, suit or proceeding referred to in this <u>Article 4</u> shall be paid or reimbursed by the Company in advance of the final disposition of such action, suit or proceeding, so long as there has been no determination under <u>Section 4.3</u> that indemnification is not warranted; provided, however, that any such determination will not be deemed a condition of, or requirement for, advancement or reimbursement of such expenses.

4.5.   <u>Other Rights</u>.   The indemnification provided by this Agreement shall be deemed exclusive of any other rights to which an Indemnitee seeking indemnification may be entitled under any statute, agreement, vote of Members or disinterested Managers, or otherwise both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to an Indemnitee who has ceased to be a Manager or officer and shall inure to the benefit of the estate, heirs, executors, administrators or other successors of such an Indemnitee and shall not be deemed to create any rights for the benefit of any other Person.

4.6.   <u>Insurance</u>.   The Company may purchase and maintain such insurance and/or another arrangement as approved by the Board of Managers on behalf of any Person against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

4.7.   <u>Severability</u>.   If any part of this <u>Article 4</u> is judicially determined to be invalid or unenforceable, then such determination shall not in any way affect the remaining portions of this <u>Article 4</u>, but the same shall be divisible and the remainder shall continue in full force and effect.

4.8.   <u>Appearance as a Witness or Otherwise</u>.   Notwithstanding any other provision of this <u>Article 4</u>, the Company may advance, pay or reimburse expenses incurred by a Manager, officer or other Person in connection with appearance as a witness or other participation in a proceeding at a time when he is not a named defendant or respondent in the proceeding.

## ARTICLE 5
## MEMBERS: MEETINGS OF MEMBERS

5.1.   <u>Meetings of the Members</u>.   The Company may, but is not required to, hold an annual meeting of the Members. Meetings of the Members may be called by the Board of Managers and shall be promptly called upon the written request of any one or more Members who own in the aggregate ten percent (10%) or more of the Interests owned by all Members.

11

The notice of a meeting shall state the nature of the business to be transacted at such meeting, and actions taken at any such meeting shall be limited to those matters specified in the notice of the meeting.  Notice of any meeting shall be given to all Members not less than ten (10) and not more than thirty (30) days prior to the date of the meeting.  Members may vote at such meeting in person, by proxy or via emailed ballot duly executed by the Member.

5.2.    <u>Voting</u>.  Except as otherwise expressly provided in this Agreement or required by the express provisions of the Act, the vote of a Majority in Interest of the Members shall control all decisions for which the vote of the Members is required hereunder. Each Member's voting power shall be the same as that Member's Interests at the time of the vote.  The presence of any Member at a meeting shall constitute a waiver of notice of the meeting with respect to such Member, unless such Member is present solely to challenge the validity of the meeting.  The Members may, at their election, participate in any regular or special meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  A Member's participation in a meeting pursuant to the preceding sentence shall constitute presence in person at such meeting for all purposes of this Agreement.

5.3.    <u>Vote by Proxy</u>.  Each Member may authorize any Person to act on the Member's behalf by proxy on all matters in which a Member is entitled to participate, whether by waiving notice of any meeting, or voting or participating at a meeting.  Every proxy must be signed by the Member authorizing such proxy or such Member's attorney-in-fact.  No proxy shall be valid after the expiration of eleven (11) months after the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable by the Member executing the same.

5.4.    <u>Conduct of Meeting</u>.  Each meeting of Members shall be conducted by the President or any Manager.  The meeting shall be conducted pursuant to such rules as may be adopted by the Board of Managers or the Person conducting the meeting.

5.5.    <u>Action Without a Meeting</u>.  Notwithstanding anything to the contrary in this Agreement, any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing setting forth the action so taken is approved by a Majority in Interest of the Members, which consent may be executed in multiple counterparts.  In the event any action is taken pursuant to this <u>Section 5.5</u>, it shall not be necessary to comply with any notice or timing requirements set forth in <u>Section 5.1</u>.  Written notice of the taking of any action without a meeting shall be given to the Members who have not consented in writing to such action within three (3) days of the date such action is taken or approved.

5.6.    <u>Registered Members</u>.  The Company shall be entitled to treat the holder of record of any Interests as the holder in fact of such Interests for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have express or other notice of such claim or interest, except as expressly provided by this Agreement or the laws of the State of Texas.

5.7.    <u>Confidentiality.</u>  The Members and Warrantholders acknowledge that, from time to time, they may receive information from or regarding the Company or its subsidiaries in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or its subsidiaries or Persons with which it does business. Each Member and

12

Warrantholder shall hold in strict confidence any information it receives regarding the Company or its subsidiaries and may not disclose it to any Person other than another Member or Warrantholder or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Board promptly of any request for that information, before disclosing it if practicable), (ii) to advisers or representatives of the Member or Warrantholder or Persons to which such Member's Interest or Warrantholder's Warrant may be Transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 5.7, (iii) of information such Member or Warrantholder has received from a source independent of the Company that the Member or Warrantholder reasonably believes obtained that information without breach of any obligation of confidentiality, (iv) to an affiliate of such Member or Warrantholder, or (v) to the extent reasonably necessary to permit such Member or Warrantholder to enforce any right it may have against the Company or its officers, Managers, or any other Members or Warrantholders. The Members and Warrantholders acknowledge that breach of the provisions of this Section 5.7 may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members and Warrantholder agree that the provisions of this Section 5.7 may be enforced by specific performance.

## ARTICLE 6
## CONTRIBUTIONS TO CAPITAL; CAPITAL ACCOUNTS; LOANS

6.1.    Initial Capital Contributions.  The Members have made Capital Contributions to the Company in cash and other assets in the amounts set forth on Exhibit A.

6.2.    Additional Capital Contributions.  Except as provided in Section 6.1, no Member shall have any obligation to make any Capital Contribution to the Company.  The Board of Managers may, however, accept additional Capital Contributions from the Members from time to time as it determines appropriate.

6.3.    Preemptive Rights.  If the Company determines to raise additional capital either through debt or equity, the Members shall have the right to participate pro rata based on their Interests.  Any capital so provided shall be on terms approved by the Board of the Managers. Notwithstanding the foregoing, such preemptive rights shall not apply to the sale or issuance of Interests: (a) to any Person pursuant to the terms of any equity compensation plan adopted by the Company; (b) issued or issuable pursuant to the acquisition of another business entity by the Company by merger, purchase of substantially all of the assets, or other reorganization, or to a joint venture agreement, provided that such issuances are approved by the Board of Managers and otherwise in accordance with the terms of this Agreement; (c) to any lender, vendor or other Person providing goods or services to the Company, provided that such issuance is approved by the Board of Managers and otherwise in accordance with the terms of this Agreement; or (d) issued pursuant to membership interest splits, dividends, recapitalization, or other similar reclassification for which a proportional adjustment has been made.

6.4.    Loans.  A Member may make a loan to the Company upon such terms as approved by the Board of Managers.  Loans by a Member to the Company shall not be considered Capital Contributions.

6.5.    Capital Accounts.

BP_003259

(a)     A separate Capital Account for each Member shall be established and maintained on the books of the Company in accordance with the provisions of this Agreement and Treasury Regulations Section 1.704-1(b)(2)(iv).  To the extent of any conflict between the provisions of this Agreement relating to the maintenance of Capital Accounts and the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv), the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv) shall control.  Each Member shall have a single Capital Account that reflects all of its Interests, regardless of the class of Interests owned by that Member and regardless of the time or manner in which those Interests were acquired.  On the Transfer of all or part of an Interest, the Capital Account of the transferor attributable to the Transferred Interest or part thereof shall carry over to the transferee.

(b)     Each Member's Capital Account shall be (i) increased by the Member's Capital Contributions, the Member's distributive share of Net Income and items of Income specially allocated to the Member, and (ii) decreased by the amount of cash distributed to the Member and by the fair market value of other property of the Company (net of liabilities secured by the property which the Member is considered to have assumed or taken subject to under Code Section 752) distributed to the Member, the Member's distributive share of Net Loss and items of Loss specially allocated to the Member.

6.6.     <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.

(a)     No Member shall have the right to withdraw all or any part of its Capital Contributions or to receive any return on any portion of its Capital Contributions, except as may be otherwise specifically provided in this Agreement.  Under circumstances involving a return of any Capital Contribution, no Member shall have the right to receive property other than cash.

(b)     Except as otherwise specifically provided in this Agreement, no Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income, Net Losses or distributions; provided that this subsection shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

6.7.     <u>Liability of Members</u>.   No Member shall be liable for the debts, liabilities or obligations of the Company beyond any Capital Contribution made by such Member.  Except as otherwise expressly provided in this Agreement, no Member shall be required to contribute to the capital of, or to loan any funds to, the Company.

## ARTICLE 7
## DISTRIBUTIONS AND ALLOCATIONS

7.1.     <u>Distributions of Distributable Cash</u>.   Except as otherwise provided in this <u>Article 7</u>, Distributable Cash shall be distributed to the Members at such times and in such amounts as shall be determined by the Board of Managers.  Notwithstanding the frequency or amounts of distributions, Distributable Cash shall be distributed as follows:

BP_003260

(a)   First, to the Members to make the tax distributions as provided in <u>Section 7.2</u>; and

(b)   Next, to the Members pro rata in accordance with their Unreturned Capital Contributions, in such amount and until such time as each Member's Unreturned Capital Contribution has been reduced to zero; and

(c)   Thereafter, to the Members pro rata in accordance with their respective Interests.

7.2.   <u>Distribution for Taxes.</u>   The Board of Managers shall make distributions to the Members each year in an aggregate amount equal to the estimated taxable income of the Company allocated pursuant to this <u>Article 7</u> for the prior Fiscal Year multiplied by the highest individual federal income tax rate in effect at such time of distribution (including the Medicare tax pursuant to Section 1411 of the Code).   Any distributions pursuant to this <u>Section 7.2</u> shall not be treated as an advance toward the distributions to the Members under <u>Section 7.1</u>.

7.3.   <u>Limitations on Distributions.</u>   The Company may not make a distribution to its Members to the extent that, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interest and liabilities for which the recourse of creditors is limited to specific property of the Company, exceed the fair value of the Company's assets, except that the fair market value of property that is subject to a liability for which recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

7.4.   <u>Allocations for Book Purposes.</u>   For each Fiscal Year, items of Income and Loss shall first be specially allocated as provided in <u>Section 7.5</u>, before any allocations of Net Income or Net Loss are made pursuant to this <u>Section 7.4</u>.   Thereafter items of Income and Loss shall be allocated among the Members in such amounts as determined by the Board of Managers in its sole discretion to cause the positive Capital Accounts of the Members to equal, or to the extent possible begin to equal, their respective Target Accounts.

7.5.   <u>Special Allocations for Book Purposes.</u>   For each Fiscal Year, items of Income and Loss shall be specially allocated as provided in this <u>Section 7.5</u> before any allocations of Net Income or Net Loss are made pursuant to <u>Section 7.4</u> as follows and in the following order of priority:

(a)   If there is a net decrease in "partnership minimum gain" (as defined in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d)) for any Fiscal Year then, to the extent required by the Treasury Regulations, items of Income (determined in accordance with the provisions of Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2)) shall be specially allocated to the Members in an amount equal to each Member's share of the net decrease in partnership minimum gain (determined in accordance with the provisions of Treasury Regulations Section 1.704-2(g)).   This subsection is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)   If there is a net decrease in "partner nonrecourse debt minimum gain" (as

15

defined in Treasury Regulations Section 1.704-2(i)(2)) for any Fiscal Year, then, to the extent required by the Treasury Regulations, items of Income (determined in accordance with the provisions of Treasury Regulations Sections 1.704-2(i)(4)) shall be specially allocated to the Members in an amount equal to each Member's share of the net decrease in partner nonrecourse debt minimum gain (determined in accordance with the provisions of Treasury Regulations Section 1.704-2(i)(5)).  This subsection is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     If any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which cause or increase a deficit balance in the Member's Adjusted Capital Account (determined after tentatively giving effect to all other allocations required by this Article 7)), thereafter a pro rata portion of each item of Income (including gross income) shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such deficit balance in the Member's Adjusted Capital Account as quickly as possible.  This subsection is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)     "Nonrecourse deductions" (as defined in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c)) for any Fiscal Year shall be specially allocated to the Members in proportion to their Interests.

(e)     "Partner nonrecourse deductions" (as defined in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2)) for any Fiscal Year shall be specially allocated to the Members who bear the economic risk of loss for the liability to which such deductions are attributable, determined in accordance with the principles of Treasury Regulations Section 1.704-2(i)(1).

(f)     To the extent any adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of the adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset), and the gain or loss shall be specially allocated to the Members consistently with the manner in which the Members' Capital Accounts are required to be adjusted by the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(g)     To the extent an allocation of Net Loss pursuant to Section 7.4 would cause or increase a deficit balance in any Member's Adjusted Capital Account as of the end of the Fiscal Year for which the allocation is made, the amount thereof shall instead be allocated to Members having positive Adjusted Capital Account balances as of the end of such year, if any, in proportion thereto and to the extent thereof, and any remainder shall be allocated to the Members in accordance with their Interests.

(h)     To minimize any economic distortions arising from the special allocations

16

required by Sections 7.5(a) through 7.5(g) which alter the economic arrangement of the Members, the Board of Managers may reasonably make special allocations of items of Income and Loss pursuant to this subsection so that the net amounts allocated to each Member pursuant to Section 7.4 shall, to the extent reasonably possible, be equal to the net amounts that would have been allocated to each Member pursuant to Section 7.4 if the special allocations required by Sections 7.5(a) through 7.5(g) had not occurred.

7.6.   Allocation of Income, Gain, Loss and Deduction Upon a Liquidation Event.  The Members intend that the allocation provisions of this Article 7 shall produce final Capital Account balances of the Members that will permit liquidating distributions under Section 10.3 to be made in a manner indicated in Section 10.4.  To the extent that the allocation provisions of this Article 7 would fail to produce such final Capital Account balances, then the Board of Managers shall amend such provisions, without the necessity of any Member consent, if and to the extent necessary to produce such result, and (b) Net Income and Net Loss for prior open years (or items of Income and Loss for such years) shall be reallocated among the Members to the extent it is not possible to achieve such result with allocations of items of Income (including gross income and gain) and Loss for the current year and future years.  This Section 7.6 shall control notwithstanding any other provision of this Agreement, other than Section 7.5, or the reallocation or adjustment of taxable income, taxable loss or items thereof by the Internal Revenue Service or any other taxing authority.

7.7.   Other Allocation Rules.

(a)   For purposes of determining the Members' shares of the Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)), the Members' interests in profits are in proportion to their then Interests.

(b)   For purposes of determining the Net Income, Net Loss, and items of Income and Loss allocable for any Fiscal Year, Net Income, Net Loss, and items of Income and Loss shall be determined by the Board of Managers on a daily, monthly or other basis using any method permitted by the provisions of Code Section 706 and the Treasury Regulations thereunder.

7.8.   Allocations for Federal Income Tax Purposes.

(a)   Except as otherwise provided in Section 7.8(b), for federal income tax purposes all items of Company taxable income, gain, loss and deduction for each Fiscal Year shall be allocated to the Members in the same manner as each correlative item of income, gain, loss and deduction, as determined for book purposes, is allocated pursuant to the provisions of Sections 7.4 through 7.7.

(b)   In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any Company asset contributed to the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation at the time of contribution between the adjusted tax basis of the asset to the Company and its fair market value on the date of contribution.  If the Book Value of any Company asset is adjusted upon the occurrence of a Revaluation Event, subsequent allocations of income, gain, loss and

17

deduction with respect to the asset shall take account of any variation between the adjusted tax basis of the asset and its Book Value after the adjustment in the same manner as pursuant to Code Section 704(c) and the Treasury Regulations thereunder. Allocations pursuant to this subsection shall be made by the Board of Managers under any reasonable method (taking into account the best interests of the Members as a group) permitted by Code Section 704(c) and the Treasury Regulations thereunder, and the Board of Managers is authorized to prepare and execute on behalf of the Members any amendments to this Agreement required as a condition to use of such method by the Treasury Regulations promulgated under Code Section 704(c). Allocations made pursuant to this subsection are solely for tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or distributions pursuant to this Agreement.

## ARTICLE 8
## ELECTIONS AND REPORTS

8.1.    <u>Tax Status and Tax Elections.</u>

(a)    Notwithstanding any provision contained in this Agreement to the contrary, solely for federal income tax purposes, each of the Members recognizes that the Company will be subject to all provisions of Subchapter K of the Code; provided, however, that the filing of Interested States Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.

(b)    The Board of Managers, in its reasonable discretion, may cause the Company to elect pursuant to Code Section 754 and the Treasury Regulations thereunder to adjust the basis of Company assets as provided by Code Sections 743 and 734 and the Treasury Regulations thereunder. The Company shall make such other elections for federal income tax purposes as may be determined by the Board of Managers, acting in its reasonable discretion.

8.2.    <u>Records and Reports.</u>  At the expense of the Company, the Board of Managers shall maintain records and accounts of all operations and expenditures of the Company. The Company shall keep at its principal place of business the records required by the Act to be maintained there.

8.3.    <u>Books of Account.</u>

(a)    The Company shall maintain its books and records and, except as otherwise provided in this Agreement, shall determine all items of Income, Loss, Net Income and Net Loss in accordance with the method of accounting selected by the Board of Managers, consistently applied. All of the records and books of account of the Company, in whatever form maintained, shall at all times be maintained at the principal office of the Company and shall be open to the inspection and examination of the Members or their representatives during reasonable business hours. Such right may be exercised through any agent or employee of a Member designated by it or by an attorney or independent certified public accountant designated by such Member. Such Member

18

shall bear all expenses incurred in any examination made on behalf of such Member.

(b)    All expenses in connection with the keeping of the books and records of the Company and the preparation of audited or unaudited financial statements required to implement the provisions of this Agreement or otherwise needed for the conduct of the Company's business shall be borne by the Company as an ordinary expense of its business.

8.4.    <u>Company Tax Returns, Financial Statements and Annual Statement</u>.  The Board of Managers shall cause the Company to file a federal income tax return and all other tax returns required to be filed by the Company for each Fiscal Year or part thereof.  The Company shall provide to each Person who at any time during the Fiscal Year was a Member with:

(a)    an annual statement (including a copy of Schedule K-1 to Internal Revenue Service Form 1065) indicating such Member's share of the Company's income, gain, loss, expense, deduction and other items relevant for federal income tax purposes;

(b)    unaudited financial statements of the Company for the Fiscal Year, prepared in accordance with the method of accounting selected by the Board of Managers, consistently applied; and

(c)    unaudited financial statements of the Company for each fiscal quarter, prepared in accordance with the method of accounting selected by the Board of Managers, consistently applied.

8.5.    <u>Bank Accounts</u>.    The bank account or accounts of the Company shall be maintained in the bank approved by the Board of Managers.  The terms governing such accounts shall be determined by the Board of Managers and withdrawals from such bank accounts shall only be made by the treasurer, the assistant treasurer or such other parties as may be approved by the Board of Managers.

8.6.    <u>Partnership Representative</u>.

(a)    Baymark is hereby designated as the "partnership representative" of the Company (as defined in the Code) and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with the Board of Managers and to do or refrain from doing any or all things reasonably required by the Board of Managers to conduct such proceedings.

(b)    The Members acknowledge that the Bipartisan Budget Act of 2015, H.R. 1314, P.L. 114-74, 114th Cong. (2015) (the "*Bipartisan Budget Act*") sets forth new audit procedures for tax partnerships effective for taxable years beginning after December 31, 2017, and potentially makes tax partnerships liable for income taxes attributable to adjustments of partnership items of income, gain, loss, deduction or credit. The "partnership representative" is authorized and required to represent the Company (at

19

the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings.

(c)    The Members agree that the Company shall elect out of the application of Section 6221(a) of the Code (as amended by the Bipartisan Budget Act) for its initial fiscal year and for each fiscal year thereafter, if possible.  If such election out is not possible, the Members further agree that the Company will elect the application of Section 6226 of the Code (as amended by the Bipartisan Budget Act) for its fiscal year 2018 and thereafter, in the event that it receives a "notice of final partnership adjustment" that would otherwise permit the Service to collect from the Company a deficiency of tax, for each relevant year.  The Members covenant to take into account and report to the Service any adjustment to their items for the reviewed year as notified to them by the Company in a statement furnished to them pursuant to Section 6226(a) of the Code (as amended by the Bipartisan Budget Act), in the manner provided in Section 6226(b) of the Code (as amended by the Bipartisan Budget Act), whether or not any of the Members own any Company Interests in the year of the Company's statement.  Any Member which fails to report its share of such adjustments on its tax return for its taxable year including the date of the Company's statement as described immediately above shall indemnify and hold harmless the Company against any tax, interest and penalties collected by the IRS from the Company as a result of such Member's failure.  The foregoing covenants and indemnification obligation of the Members shall survive indefinitely and shall not terminate, without regard to any transfer of a Member's Interests, withdrawal as a Member, or liquidation, dissolution or termination of the Company.

(d)    The Company shall reimburse the partnership representative for all expenses incurred by it in connection with any administrative or judicial proceeding with respect to the tax liabilities of the Members.

### ARTICLE 9
### TRANSFERABILITY

9.1.    <u>Restrictions on Transfer of Interests</u>.  Except as otherwise provided in this <u>Article 9</u>, no Member shall have the right to sell, transfer, pledge, encumber, hypothecate or otherwise assign ("***Transfer***") all or any portion of its Interest without the consent of the Board of Managers, which consent may be withheld in its sole and absolute discretion.

9.2.    <u>Transfers Generally</u>.

(a)    Upon any Transfer permitted under this <u>Article 9</u>, the Interest so transferred shall remain subject to all terms and provisions of this Agreement, and the transferee (i) shall be deemed, by accepting the transferred Interest, to have assumed all the liabilities and unperformed obligations, under this Agreement or otherwise, which are appurtenant to such Interest; (ii) shall hold such Interest subject to all unperformed obligations of the transferor Member; and (iii) shall agree in writing to the foregoing if requested by the Board of Managers.  In the case of a transferee who is not already a Member and until such transferee has been admitted as a Substitute Member, such transferee shall be entitled only to share in Company income, deductions, credits, gains, losses and distributions in accordance with the transferred Interest and Capital Account

BP_003266

appurtenant to such transferred Interest and shall only have the rights of an assignee of a membership interest under the Act.

(b)     Any Member making or offering to make a Transfer of all or any part of its Interests shall indemnify, defend and hold harmless the Company and all other Members from and against any losses, expenses, judgment, fines, settlements or damages, suffered or incurred by the Company or any such other Member arising out of or resulting from any claims by the transferee of such Interest or any offerees of such Interest in connection with such Transfer or offer, including without limitation costs, expenses and attorney's fees expended in the settlement or defense of any such claim, and shall advance such expenses and attorneys' and accountants' fees as incurred in defending such proceeding.

9.3.    <u>Permitted Transfers to Specified Parties.</u>   Notwithstanding the provisions of <u>Section 9.1</u>, a Member may Transfer all or any part of its Interest to a Permitted Transferee.  A Transfer to a Permitted Transferee may be by will or intestate succession or by inter vivos Transfer.  Any inter vivos Transfer made pursuant to this <u>Section 9.3</u> shall not be effective until the Board of Managers has received from the Permitted Transferee an irrevocable power of attorney appointing the Member Transferring such Interest or portion thereof as the attorney-in-fact for said Permitted Transferee with full power and authority to deal in any way with such Interest, or portion thereof, unless such requirement is waived by the Board of Managers.  Further, the power of attorney shall provide that in the event of the death of the attorney-in-fact the Permitted Transferee will within ninety (90) days after said death appoint one individual to deal with the Interest of such Permitted Transferee and having failed to do so the Board of Managers shall have the right to appoint a substitute attorney-in-fact to deal with such Interest or portion thereof.  Said power of attorney shall be binding upon the Permitted Transferee, its heirs, successors and assigns.  A Transfer pursuant to this <u>Section 9.3</u> shall not relieve the transferor from any of its obligations to the Company under this Agreement.

9.4.    <u>Permitted Sales after Right of First Refusal Is Given.</u>

(a)     If a Member receives a bona fide offer (the "*Offer*") it wishes to accept from a Person other than a Permitted Transferee for the purchase of all or a part of such Member's Interest (the "*Offered Interest*"), then the Member who received such Offer (the "*Selling Member*") shall promptly forward a true and correct copy of the Offer to the other Members (each, a "*Non-Selling Member*") within ten (10) days of the date of the Offer (such notice, the "*Offer Notice*").   The Non-Selling Member(s) shall have the exclusive right and option for sixty (60) days following the delivery of the Offer Notice by the Selling Member (the "*Option Period*") to purchase all, but not less than all, of the Offered Interest on the terms and conditions set forth in the Offer. Each Non-Selling Member may exercise its option to purchase the Offered Interest by delivering to the Selling Member, within the Option Period, written notice of such election.  Each Non-Selling Member shall be deemed to have elected not to purchase the Offered Interest if it fails to timely provide written acceptance.  Each Non-Selling Member who elects to purchase the Offered Interest pursuant to the Offer (each, an "*Electing Member*") shall have the right to purchase that percentage of the Offered Interest that such Electing Member's Interest bears to the total aggregate Interests of all Electing Members, or such other percentage as may be agreed upon among the Electing Members.  Each Electing

21

Member shall be obligated to close on the purchase of the Offered Interest no later than one-hundred twenty (120) days after the date of the Offer Notice.

(b)  If the Non-Selling Members do not elect to purchase all of the Offered Interest, the Selling Member may sell the Offered Interest; provided, however, that the sale (i) shall not be made at a price lower than the price offered to the Non-Selling Member, (ii) is not made to any Person other than the original offeror, (iii) is on the same terms and conditions as those specified in the Offer, and (iv) is consummated within thirty (30) days after the lapse of the Option Period.

(c)  If the price, offeror, terms or conditions of the proposed sale are materially changed or such Offered Interest has not been sold prior to the lapse of the thirty (30) day period set forth in subsection (b)(iv) above, the Selling Member must make a new offer, pursuant to the procedures in this Section 9.4, to the Non-Selling Members prior to selling such Offered Interest.

9.5.  Tag Along Rights. If after a Selling Member has complied with the provisions of Section 9.4 and the Board of Managers has consented to the Transfer in accordance with Section 9.1, such Selling Member proposes to sell an Offered Interest to a Person other than a Permitted Transferee, each of the Non-Selling Members shall have the right to require the Selling Member to require that the same transferee acquire such Non-Selling Member's proportionate share, based on its Interests, of the Offered Interest for the same consideration per Interest and on the same terms of Transfer as the Selling Member proposes to Transfer the Offered Interest.  Any Non-Selling Member electing to exercise its tag along rights and Transfer its Interest in accordance with this Section 9.5 (each, a "*Tag Along Member*") may do so by delivering a written notice of such election to the Selling Member within the Option Period. Notwithstanding anything in this Agreement to the contrary, no Tag Along Member shall be required to make any representations and warranties to any other Person in connection with such Transfer greater than those required of the Selling Member and such Tag Along Member's indemnification obligations shall not exceed the consideration such Tag Along Member received for its Interest.  The closing of such transactions shall occur concurrently with and under the same terms of Transfer as the Offered Interest.  Each Tag Along Member shall take all such reasonable actions as may be necessary or appropriate to effect the transactions contemplated by this Section 9.5.

9.6.  Drag Along Rights.  Notwithstanding anything contained herein to the contrary, if at any time a bona fide arms-length proposal for the Transfer of all of the Interests (a "*Proposal*") is approved by the Board of Managers (a "*Company Sale*"), then the Board of Managers shall deliver notice (a "*Required Sale Notice*") with respect to the Proposal to all Members stating that the Board of Managers intends to carry out the Company Sale, the price to be paid pursuant to the Proposal for the Company Sale and any other information determined by the Board of Managers to be necessary or desirable to aid in the closing of the Company Sale. The Members, upon receipt of a Required Sale Notice, shall be obligated, which obligation shall be enforceable against each Member, to sell their Interests and participate in the transaction contemplated by the Proposal; provided, that (a) a Member shall not be required to make any representations or warranties in connection with such Company Sale other than representations and warranties as to (i) such Member's ownership of his, her or its Interests to be Transferred free and clear of all liens, (ii) such Member's power and authority to effect the Transfer of his, her or its Interests, and (iii) such matters pertaining to compliance with securities laws as the

BP_003268

transferee may reasonably require except that the transferee may not require that each transferring Member be an "accredited investor," as such term is defined in Regulation D promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended, and (b) such Member's indemnification obligation shall not exceed the consideration such Member received in connection with the Company Sale.  The Members agree to take any actions reasonably requested by the Board of Managers and to execute any assignment documents or instruments reasonably necessary to evidence the Transfer the Interests.  If any Member fails to take any such actions, the Board of Managers may take such actions on behalf of such Member pursuant to the power of attorney granted to the Board of Managers by such Member in Section 11.3.

9.7.    Substitute Members.  No Member shall have the right to substitute in its place a purchaser, assignee, transferee, donee or other recipient of all or any portion of the Interest of such Member.  A transferee (other than an existing Member) of an Interest of a Member may be admitted as a substitute member ("**Substitute Member**"), and a transferor Member who has transferred its entire Interest may withdraw from the Company as a Member, on the terms specified by and only with the consent of the Board of Managers.  The Board of Managers shall reflect any admission of a transferee as a Substitute Member by preparing an amendment to this Agreement, dated as of the date of such admission and withdrawal.  Upon any such admission, a Substitute Member shall be subject to all provisions of this Agreement as if the Substitute Member originally was a party to this Agreement.

9.8.    Admissions of Additional Members

(a)    Subject to Section 6.3, the Company may issue additional Interests, and subscribers thereto may be admitted as new Members (each an "**Additional Member**"), upon the consent of the Board of Managers (which terms of admission shall specify the impact of such admission of the Additional Member and all other Members).  Any such admission shall be effective immediately following the receipt by the Company of the Additional Member's Capital Contribution and the written agreement of such Additional Member adopting and agreeing to be bound by this Agreement.  Upon the admission of an Additional Member as provided in this Agreement, the Interests of the existing Members (in effect prior to such admission) shall be adjusted to reflect the admission of such Additional Member and the Board of Managers shall reflect the admission of such Additional Member in the books and records of the Company.  Upon any such admission, an Additional Member shall be subject to all provisions of this Agreement as if the Additional Member originally was a party to this Agreement.

(b)    The Company has issued Warrants to the Warrantholders to acquire Interests in the Company, which Warrant entitles the holder thereof to the rights and privileges set forth in this Agreement and the applicable Warrant Purchase Agreement.  Neither the issuance of the Warrants nor the issuance of any Interests upon the exercise of such Warrants shall require the approval of the Board of Managers or any Member.  Any admission of a new Member pursuant to an exercise of a Warrant shall be effective only after the holder of such Warrant has executed and delivered to the Company a joinder agreement agreeing to be bound by the terms and conditions of this Agreement.  The Interests issuable upon the exercise of the Warrants is set forth on Exhibit A.

23

(c)     The Board shall reflect the issuance of any Interests issuable upon the exercise of the Warrants, and, if applicable, the admission of a new Member, in an amendment to Exhibit A, which amendment shall reflect the Member's name (if not already listed on Exhibit A), the Member's Interests, and the corresponding adjustments to the Interests of the other Members as a result of such issuance or admission.  Any admission of a new Member is effective only after the new Member has executed and delivered to the Company a joinder agreement agreeing to be bound by the terms and conditions of this Agreement in such form as is acceptable to the Board of Managers.

9.9.     Other Conditions to Transfers.    Notwithstanding any other provision of this Article 9, no Transfer of an Interest shall be effective or valid and no Person shall be admitted as a Member if such Transfer or admission would (a) have the effect of causing the Company to be re classified for Federal income tax purposes as an association (taxable as a corporation under the Code), (b) not meet applicable exemptions from securities registration and securities disclosure provided under Federal and state securities laws, (c) cause the Company to be in breach or default of any instrument or agreement to which it is bound; or (d) violate or cause a violation by the Company or any Member or Manager of any applicable federal or state law. The Board of Managers may, in its reasonable discretion, waive compliance with any or all of the conditions of this Section 9.9.

9.10.    Transfers in Violation of Agreement.  Any Transfer or purported Transfer of all or any portion of an Interest, or any direct or indirect interest in an Interest, including an ownership or beneficial interest in a Member, that is in violation of this Agreement, shall be null and void and of no force or effect whatsoever.

## ARTICLE 10
## WINDING UP AND TERMINATION

10.1.    Withdrawal.    Except as otherwise specifically provided in this Agreement, no Member shall at any time be entitled to withdraw from the Company or to withdraw any portion of its Capital Account or Capital Contributions.  Any Member withdrawing in contravention of this Section 10.1 shall indemnify, defend and hold harmless the Company and all other Members (other than a Member who is, at the time of such withdrawal, in default under this Agreement) from and against any losses, expenses, judgments, fines, settlements or damages suffered or incurred by the Company or any such other Member arising out of or resulting from such withdrawal.

10.2.    Winding Up and Liquidation.

(a)     The Company shall be wound up and liquidated upon the first of the following to occur (each, an "Event of Dissolution"):

(i)     upon the decision by the Board of Managers to wind up and liquidate the Company;

(ii)    The entry of a decree of judicial dissolution under the Act; or

24

(iii)    The sale or other disposition of all or substantially all of the assets of the Company, and the collection of all payments attributable thereto.

(b)    Upon the occurrence of an Event of Dissolution with respect to the Company, the business and affairs of the Company shall cease and the assets of the Company shall be liquidated, applied and distributed as provided in this Article 10.

(c)    Notwithstanding the occurrence of an Event of Dissolution with respect to the Company, the Company shall not terminate until there has been a winding up of the Company's business and affairs, and the assets of the Company have been applied and distributed as provided in Section 10.3.

(d)    Upon the occurrence of an Event of Dissolution of the Company, the Board of Managers shall cause any part or all of the assets of the Company to be sold in such manner as they may determine in an effort to obtain the best prices for such assets; provided, however, that the Board of Managers may distribute assets of the Company in kind to the Members to the extent practicable.

10.3.   Liquidation and Termination.

(a)    Following an Event of Dissolution of the Company, the Board of Managers shall act as liquidator or may appoint one or more Members as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board of Managers.  The steps to be accomplished by the liquidator are as follows:

(i)    as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(ii)    the liquidator shall cause the notices required by the Act to be mailed to each known creditor of and claimant against the Company;

(iii)    the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(iv)    sell its property and assets for cash at the highest price reasonably obtainable, and distribute the proceeds in liquidation of the Company to the Members as set forth in Section 10.4.  In no event shall there be a distribution of the property and assets of the Company in kind, unless such distribution is approved by the Board of Managers.

BP_003271

(b)    All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 10.3(b). The distribution of cash and/or property to a Member in accordance with the provisions of this Section 10.3(b) constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Interests and all the Company's property and constitutes a compromise to which all Members have consented.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

10.4.    Distribution upon Liquidation.  For purposes of Section 10.3, the liquidator shall distribute the proceeds of the liquidation of the Company in accordance with the distribution provisions of Section 7.1.

10.5.    Deficit Capital Accounts.  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member, upon liquidation of the Company shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

10.6.    Certificate of Termination.  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made therefor, and all of the remaining property and assets of the Company have been distributed to the Members according to their respective rights and interests, the certificate of termination shall be executed on behalf of the Company by the Board of Managers or an authorized Member and shall be filed with the Secretary of State of the State of Texas, and the Board of Managers and Members shall execute, acknowledge and file any and all other instruments necessary or appropriate to reflect the dissolution and termination of the Company.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1.    Notice.  All notices given pursuant to this Agreement shall be in writing and shall be deemed effective when personally delivered or upon being placed in the United States mail, registered or certified with return receipt requested, or when received, if delivered by hand, sent by overnight courier, guaranteed next day delivery, or sent by facsimile followed by confirmatory receipt.  For purposes of notice, the address of the Board of Managers shall be the address of the Company, and the addresses of the Members shall be as stated under their names on the attached Exhibit A; provided, however, that each Member shall have the right to change his, her or its address with notice hereunder to any other location by the giving notice to the Board of Managers in the manner set forth above

11.2.    Amendments.  Except as specifically provided elsewhere in this Agreement, this Agreement and the Certificate of Formation may be amended or modified only with the consent of all of the Managers on the Board of Managers.

BP_003272

11.3.   Powers of Attorney.  Each Member constitutes and appoints each Manager, with full power of substitution, as his, her or its true and lawful attorney-in-fact and empowers and authorizes such attorney, in the name, place and stead of such Member, to make, execute, swear to, acknowledge, deliver and file in all necessary or appropriate places the following documents (and all amendments or supplements to or restatements of such documents necessitated by valid amendments to or actions permitted under this Agreement): (a) any amendments to the Certificate of Formation or this Agreement made in compliance with this Agreement, the Certificate of Formation and applicable law; (b) any documents necessary to effect the provisions of Article 9; (c) any applications, forms, certifications, reports or other documents, or amendments thereto, which may be requested or required by any regulations, governmental agency, securities exchange, institution and which are deemed necessary or advisable by the Board of Managers; (d) any other instrument which may be required to be filed or recorded in any state or county or with any governmental agency that the Board of Managers deems advisable to file or record, including, without limitation, certificates of assumed name, documents to qualify the Company in other jurisdictions, and articles of dissolution, (e) any documents which may be necessary or appropriate to effect the purposes of or otherwise properly reflect any valid amendments to or actions permitted under this Agreement, (f) making certain elections contained in the Code or state law governing taxation of partnerships and (g) performing any and all other ministerial duties or functions necessary for the conduct of the business of the Company.  Each Member ratifies, confirms and adopts as his own, all actions that may be taken by such attorney-in-fact pursuant to this Section 11.3.    Each Member acknowledges that this Agreement permits the Board of Managers to approve and make certain amendments to this Agreement without the consent of the Members.  This power of attorney is coupled with an interest and shall continue notwithstanding the subsequent incapacity or death of the Member.  Each Member shall execute and deliver to the Board of Managers an executed and appropriately notarized power of attorney in such form consistent with the provisions of this Section 11.3 as the Board of Managers may request.

11.4.   Governing Laws.  The rights and obligations of the Members shall be interpreted, construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of laws principles.

11.5.   Entire Agreement.  This Agreement, including all Exhibits and schedules to this Agreement and, if any, schedules to such schedules, contains the entire agreement of the parties relative to the matters contained in this Agreement.

11.6.   Waiver.  No consent or waiver, express or implied, by any Member to or for any breach or default by any other Member in the performance by such other Member of his, her or its obligations under this Agreement shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligations of such other Member under this Agreement.  Failure on the part of any Member to complain of any act or failure to act of any of the other Members or to declare any of the other Members in default, regardless of how long such failure continues, shall not constitute a waiver by such Member of his, her or its rights hereunder.

11.7.   Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be

27

affected thereby, and the intent of this Agreement shall be enforced to the greatest extent permitted by law.

11.8.   <u>Binding Agreement</u>.   Subject to the restrictions on Transfers and encumbrances set forth in this Agreement, this Agreement shall inure to the benefit of and be binding upon the undersigned Members and their respective legal representatives, successors and assigns. Whenever, in this Agreement, a reference to any party or Member is made, such reference shall be deemed to include a reference to the legal representatives, successors and assigns of such party or Member.

11.9.   <u>Benefits of this Agreement</u>.   Nothing in this Agreement, whether expressed or implied, is intended or shall be construed to give to any creditor of the Company or any creditor of any Member or any other Person whatsoever, other than the Members and the Company, any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenant, condition or provision of this Agreement, and such provisions are and shall be held to be for the sole and exclusive benefit of the Members and the Company.

11.10.   <u>Counterparts</u>.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which when taken together shall constitute a single counterpart instrument.

*(Signature page follows)*

529449v4

28

BP_003274

IN WITNESS WHEREOF, the Company and its Members have executed this Agreement effective for all purposes as of the date first written above.

**COMPANY**:

WINDSPEED TRADING, LLC, a Texas limited liability company

By: _____
Name:  William Szeto
Title:   Manager

**MEMBERS**:

_____
William Szeto

**WARRANTHOLDERS**:

BAYMARK PARTNERS MANAGEMENT, LLC,
a Texas limited liability company

By:    _____
Name:  Anthony Ludlow
Title:   Manager

SUPER G CAPITAL, LLC, a Delaware limited liability company

By:    _____
Name:  Marc Cole
Title:   Chief Financial Officer

Signature Page – Amended and Restated Company Agreement
Windspeed Trading, LLC

BP_003275

IN WITNESS WHEREOF, the Company and its Members have executed this Agreement effective for all purposes as of the date first written above.

**COMPANY:**

WINDSPEED TRADING, LLC, a Texas limited liability company

By: _____
Name: William Szeto
Title:   Manager

**MEMBERS:**

_____

William Szeto

**WARRANTHOLDERS:**

BAYMARK PARTNERS MANAGEMENT, LLC, a Texas limited liability company

By: _____
Name: Anthony Ludlow
Title:   Manager

SUPER G CAPITAL, LLC, a Delaware limited liability company

By: _____
Name: Marc Cole
Title:   Chief Financial Officer

BP_003276

IN WITNESS WHEREOF, the Company and its Members have executed this Agreement effective for all purposes as of the date first written above.

**COMPANY:**

WINDSPEED TRADING, LLC, a Texas limited liability company

By:    _____
Name:  William Szeto
Title:   Manager

**MEMBERS:**

_____
William Szeto

**WARRANTHOLDERS:**

BAYMARK PARTNERS MANAGEMENT, LLC, a Texas limited liability company

By:    _____
Name:  Anthony Ludlow
Title:   Manager

SUPER G CAPITAL, LLC, a Delaware limited liability company

By:    _____
Name:  Marc Cole
Title:   Chief Financial Officer

BP_003277

**EXHIBIT A**

**MEMBERS; WARRANTHOLDERS; INTERESTS** [1]

| Name and Address of Members | Capital Contributions | Interests Before Exercise of Any Warrant | Interests Upon Exercise of All Warrants |
|---|---|---|---|
| Member<br>William Szeto<br>3408 Provine Road<br>McKinney, Texas 75074 | $0.00 | 100% | 20% |
| Warrantholders<br>Super G Capital, LLC<br>23 Corporate Plaza, Suite 100<br>Newport Beach, California 92660<br>Attn: Marc Cole | $0.00 | 0% | 40% |
| Baymark Partners Management, LLC<br>Granite Park II<br>5700 Granite Parkway, Suite 435<br>Plano, Texas 75024 USA<br>Attn: Anthony Ludlow | $0.00 | 0% | 40% |
| Total | $0.00 | 100% | 100% |

---

[1] The Company has issued warrants to the Warrantholders pursuant to warrant purchase agreements. A Warrantholder will only be admitted as a Member after the exercise of the warrant held by such Warrantholder. Except as specifically provided for in this Agreement, prior to such exercise, Warrantholders have no rights associated with Interests in the Company.