PLAINTIFF'S
EXHIBIT

2

Page 1

NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC (Successor in interest to ACET VENTURE PARTNERS, LLC), | ) IN THE DISTRICT COURT ) ) ) |
| Plaintiff | ) DALLAS COUNTY, TEXAS ) |
| VS. | ) ) |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK MANAGEMENT, LCC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | ) 116th JUDICIAL DISTRICT ) ) ) ) ) |
| Defendants | |

-------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

WILLIAM SZETO

April 2, 2021

-------------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM

SZETO, produced as a witness at the instance of the

PLAINTIFF, and duly sworn, was taken in the above-styled

and numbered cause on April 2, 2021, from 9:34 a.m. to

4:47 p.m., via videoconference before Karen Usher, CSR

in and for the State of Texas, reported by machine

shorthand, pursuant to the Texas Rules of Civil

Procedure, current Emergency Order Regarding the

COVID-19 State of Disaster, and the provisions stated on

the record or attached hereto.

William Szeto  *  April 2, 2021

## Page 2

```
 1              A P P E A R A N C E S
              (All parties appearing remotely)
 2

 3
    FOR THE PLAINTIFF:
 4
       MR. JASON B. FREEMAN
 5     MR. ZACH MONTGOMERY
       Freeman Law, PLLC
 6     7011 Main Street
       Frisco, Texas 75034
 7     (214) 984-3410
       jason@freemanlaw.com
 8     zmontgomery@freemanlaw.com

 9
    FOR THE DEFENDANTS BAYMARK ENTITIES:
10
       MR. EDWARD PERRIN
11     Hallett & Perrin
       1445 Ross Avenue
12     Suite 2400
       Dallas, Texas 75202
13     (214) 953-0053
       eperrin@hallettperrin.com
14
    FOR THE DEFENDANT WINDSPEED TRADING, LLC:
15
16     MS. BRENDA HARD-WILSON
       MR. TIM WOODS
17     Higier Allen
       2711 North Haskell Avenue
18     Suite 2400
       Dallas, Texas 75204
19     (972) 371-2481
       bhard-wilson@higierallen.com
20     twoods@higierallen.com

21
    ALSO PRESENT:
22     Matt Denegre
       Tomer Damti
23
24
25
```

## Page 3

```
 1                 INDEX
                                     PAGE
 2  Appearances........................... 2

 3
 4  WILLIAM SZETO
 5  EXAMINATION BY MR. FREEMAN.............. 6
 6
 7  Signature and Changes................. 284
    Reporter's Certificate................ 286
 8            EXHIBITS
 9  NO.  DESCRIPTION                   PAGE
10   8  Amended and Restated Company Agreement ....... 236
     9  Memo closing bank accounts.............249
11  23  Dangerous Good Authorization........... 33
    24  Dangerous Goods Authorization.......... 39
12  25  DHL Agreement............................ 43
    26  Email from Mr. Szeto dated October 9, 2018.....154
13  27  Wind-Down Plan for ACET Global............159
    28  Page from 2018 Federal income tax return.....190
14  29  DHL Address change notification.........196
    30  March 15th, 2018 email from David Hook........ 21
15  33  Email from Brian Vanderwoude to Julie Smith
        on January 28th, 2019...................132
16  34  Email from Brian Vanderwoude to Julie Smith
        dated March 27, 2019...................139
17  35  Email from Matt Denegre to Steve Bellah dated
        October 23, 2018.......................148
18  36  Email string regarding subject: Ownership
        (Newco)................................ 12
19      Email exchange regarding ownership of Newco.... 49
    38  Loan and Security Agreement.............272
20  40  Email from Matt Denegre regarding Windspeed
        revised WPA and warrant.................267
21  42  Email from Matt Denegre to Steve Bellah, Alex
        Godinez and Tony Ludlow dated October 16,
22      2018...................................254
    43  Email from Matt Denegre dated October 17,
23      2018...................................260
    44  Email from Matt Denegre on December 20th,
24      2018................................... 15
    45  Email from Matt Denegre to Tony Ludlow and
25      Steve Bellah..............................27
```

## Page 4

```
 1        Ludlow and Bill Szeto dated January 20, 2019...
    52  Updated financial report.......................205
 2  54  Email arranging conference call............... 89

 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1         P R O C E E D I N G S
 2               WILLIAM SZETO,
 3  having been first duly sworn, testified as follows:
 4         THE REPORTER:  Pursuant to the current
 5  emergency order regarding COVID-19 State of Disaster,
 6  this deposition of Bill Szeto is being conducted
 7  remotely via Zoom.  Today's date is April 2nd, 2021, and
 8  the time is 9:34 a.m.  The witness is located in Collin
 9  County, Texas.  My name is Karen Usher, Texas CSR
10  No. 5536.  I have administered the oath, and I am
11  reporting the deposition remotely by stenographic means
12  from my residence within the State of Texas.
13         The witness has represented to me under
14  oath that he is William Szeto.  Will counsel please
15  state their appearances and any agreements for the
16  record.
17         MR. FREEMAN:  This is Jason Freeman on
18  behalf of plaintiffs.
19         MS. HARD-WILSON:  This is Brenda
20  Hard-Wilson on behalf of the defendant, Windspeed
21  Trading.
22         MR. PERRIN:  And this is Ed Perrin on
23  behalf of the -- all the defendants with the exception
24  of Windspeed Trading.
25         MS. HARD-WILSON:  We would also like to,
```

2 (Pages 2 to 5)

Page 6

1  with Mr. Freeman's permission, renew our prior agreement
2  that one objection from one defendant is considered an
3  objection from all defendants.
4           MR. FREEMAN:  Agreed.
5           MS. HARD-WILSON:  Thank you.
6           MR. FREEMAN:  Karen, could you give me --
7           THE REPORTER:  Yes.
8           MR. FREEMAN:  -- I guess, permission to
9  record?
10          THE REPORTER:  Yes, I will.  There you go.
11          MR. PERRIN:  And Jason -- along that
12  line, Jason, we --
13          MR. FREEMAN:  I owe you what?  The
14  recording --
15          MR. PERRIN:  We requested the recording
16  of Mr. Cole's deposition.
17          MR. FREEMAN:  I'll have it for you -- I'll
18  have it for you before I leave here tonight.
19          MR. PERRIN:  Appreciate it.
20              EXAMINATION
21  BY MR. FREEMAN:
22      Q.  Good morning, Mr. Szeto.
23      A.  Good morning.
24      Q.  Would you please state your full name for the
25  record.

Page 7

1      A.  It is William Szeto, S-Z-E-T-O.
2      Q.  Szeto.
3      A.  Middle initial C, as in Charles.
4      Q.  Okay.  Mr. Szeto -- Szeto -- I'm going to try
5  to pronounce it right, Mr. Szeto.  My name is Jason --
6      A.  You're not the first one that pronounced it
7  wrong, so don't worry about it.
8      Q.  My name is Jason Freeman.  I represent D&T
9  Partners, LLC in this lawsuit.  Do you understand that
10  you're here today in connection with a lawsuit between
11  D&T Partners and ACET Global and several Baymark
12  entities and Windspeed Trading, LLC?
13      A.  Yes, I do.
14      Q.  Mr. Szeto, have you ever had your deposition
15  taken?
16      A.  Not with this case, no.
17      Q.  Have you had it taken before?
18      A.  Not specifically for this case.  I have taken
19  other depositions with other cases before.  So this is
20  not the first time.
21      Q.  What other cases have you had depositions
22  taken in?
23      A.  I have other technical cases that I have
24  deposition taken.
25      Q.  And when were those?

Page 8

1      A.  Oh, couple of years ago.
2      Q.  Who were the parties?
3      A.  I can't remember.
4      Q.  Were you a party?
5      A.  I was -- no, I was not a party, but I was
6  testifying on behalf of a law firm who got -- that's
7  what I did.
8      Q.  What was -- what was involved in that lawsuit?
9      A.  Basically, optical networking cases.
10     Q.  I'm sorry?  Optical networking?
11     A.  Yes, optical networking.
12     Q.  What does that mean?
13     A.  That means it's network that's made up with
14  fiber optics.
15     Q.  Okay.  Did you work for -- did you work in
16  that industry?
17     A.  Yes.
18     Q.  Was the company that you worked for a party to
19  that suit?
20     A.  Yes.
21     Q.  And what was the nature of your testimony in
22  that lawsuit?
23     A.  Explaining the technical details concerning
24  the patent requirements.
25     Q.  Okay.  Who was your former employer?

Page 9

1      A.  Xtera.
2      Q.  Xtera?
3      A.  Xtera Technologies, yes.
4      Q.  Got it.  They used to be up in Frisco, huh?
5      A.  No.  They based out in Plano.
6      Q.  Okay.  What other lawsuits have you been
7  involved in?
8      A.  None.
9      Q.  Have you had your deposition taken in any
10  other case?
11     A.  No.
12     Q.  Okay.  Do you understand you're here today
13  under oath?
14     A.  Yes.
15     Q.  What does that mean to you?
16     A.  That means I will tell exactly the truth.
17     Q.  Mr. Szeto, I'm going to read you some of the
18  ground rules for today.  One -- and this is just to keep
19  a clean record on everything.  When I ask a question, if
20  you'll try to let me complete it before you give an
21  answer, it will help us with the record.  Does that make
22  sense?
23     A.  Yes.
24     Q.  And when you do give an answer, if you'll try
25  to remember to give a verbal response rather than doing

Page 10

1  what I sometimes do, is nodding, just so the court
2  reporter can get it.
3      A.  Okay.
4      Q.  If I ask a question that you don't understand,
5  and I ask bad questions sometimes, please just let me
6  know, and I'll be happy to try and clarify.
7      A.  Okay.
8      Q.  And with that understanding, I'll just ask if
9  it's fair to say that if you don't tell me that you
10 don't understand a question, we can assume that you
11 understood it?
12     A.  Yes.
13     Q.  Okay.  At any point you need to take a break,
14 just let me know.  Need to use the restroom, get a
15 drink, no problem.
16     A.  Okay.
17     Q.  Mr. Szeto, do you own Windspeed?
18     A.  Yes, I do.
19     Q.  And that's Windspeed Trading, LLC?
20     A.  Yes.
21     Q.  Is there any kind of ownership split?
22     A.  I don't understand.
23     Q.  Is there any kind of split in ownership?
24     A.  No.
25     Q.  When you set it up, did you want to set it up

Page 11

1  with an ownership split?
2      A.  No.
3      Q.  You're certain about that?
4      A.  Yes.
5      Q.  Is there an ownership split with Super G
6  Capital?
7      A.  No.
8      Q.  Is there an ownership split with Baymark?
9      A.  No.
10     Q.  No ownership split with any Baymark party?
11     A.  No.
12     Q.  Did you want them -- did you want Super G to
13 have a share of Windspeed when you formed it?
14     A.  No.
15     Q.  Did you want any Baymark party to have a share
16 of Windspeed when you formed it?
17     A.  No.
18     Q.  You didn't want them to have a share that
19 would compensate them for something?
20     A.  No.
21     Q.  You didn't want them to have a share that
22 would compensate them for their investment in ACET
23 Global?
24     A.  No.
25     Q.  Did you want Super G to get its fair share of

Page 12

1  Windspeed because of its investment in ACET Global?
2      A.  No.
3      Q.  Did you want Baymark to get its fair share of
4  Windspeed for its investment in ACET Global?
5      A.  No.
6      Q.  Did ACET have anything to do with the
7  formation of Windspeed?
8      A.  No.
9      Q.  Nothing at all?
10     A.  Nothing at all.
11     Q.  So you're certain that there was no
12 relationship between the formation of Windspeed and ACET
13 Global, LLC?
14     A.  Yes.
15     Q.  Mr. Szeto, I'm putting on the screen what's
16 marked as Exhibit 36.  Can you see this document?
17     A.  Uh-huh.
18         (Exhibit 36 marked.)
19     Q.  (BY MR. FREEMAN)  Do you recognize this
20 document?
21     A.  It looks familiar.
22     Q.  Okay.  Will you tell me what it is?
23     A.  Well, it looks like an old email, but I cannot
24 tell you exactly why and what it was.
25     Q.  Okay.  Is your name listed here?

Page 13

1      A.  Yes.
2      Q.  And is this an email that was sent from you?
3      A.  Looks like it.
4      Q.  And is it an email that was sent from you on
5  October 10th, 2018?
6      A.  Looks like -- I look at the date, yes.
7      Q.  Okay.  And is the subject line "ownership of
8  newco"?
9      A.  Yes.
10     Q.  And was this sent to Steve Bellah, Matt
11 Denegre and Tony Ludlow?
12     A.  Yes.
13     Q.  And was this sent from your acetglobal.com
14 email address?
15     A.  Yes.
16     Q.  Okay.  Mr. Szeto, I want to go down to the
17 third page of this exhibit, which is Bates labeled
18 BP6409.  Mr. Szeto, is this part of the same email
19 thread?
20     A.  Yes.
21     Q.  And Mr. Szeto, am I correct in reading this
22 email that was sent from you on October 8th, 2018, to
23 Matt Denegre stating that "After considering the amount
24 of investment you and Super G put into the ACET Global
25 company, here is the percentage I am willing to live

4 (Pages 10 to 13)

William Szeto  *  April 2, 2021

## Page 14

1    with"? Is that correct?

2         A.  Yes.

3         Q.  And then does it provide a breakdown for an

4    undiluted percentage with respect to Baymark and

5    yourself?

6         A.  Yes.

7         Q.  And then does it provide for -- does it state,

8    "Super G warrant for 40 percent"?

9         A.  Yes.

10        Q.  And then does it, right under that, provide

11   for diluted percentages following the exercise of a

12   warrant of 40 percent for Baymark, 20 percent for

13   yourself and 40 percent for Super G?

14        A.  Yes.

15        Q.  Okay.  Mr. Szeto, did Windspeed have a debt to

16   Super G in 2018?

17        A.  Yes.  We have a loan from Super G for

18   $200,000.

19        Q.  And, in fact, did you refer to Windspeed's

20   debt to Super G as the "ACET note"?

21        A.  No.  It was a loan.

22        Q.  Did Matt ever refer to that note as the "ACET

23   note"?

24        A.  No.

25        Q.  If he did, would Super G have known what he

## Page 15

1    was talking about?

2         MR. PERRIN:  Objection, form.

3         MS. HARD-WILSON:  Objection, form.

4         A.  I cannot tell you what he's referred to, and I

5    cannot answer that question.

6         Q.  (BY MR. FREEMAN)  Mr. Szeto, I want to put on

7    the screen what's marked as Exhibit 44.

8         A.  Okay.

9         (Exhibit 44 marked.)

10        Q.  (BY MR. FREEMAN)  Mr. Szeto, down at the

11   bottom of this page, I'd like for you to look with me.

12   I'm highlighting on the screen so you can see it.  Is

13   that an email from Matt Denegre?

14        A.  Yes.

15        Q.  And is that an email from Matt on

16   December 20th, 2018?

17        A.  Yes.

18        Q.  And is that to Steve Bellah at his Super G

19   Capital account, Tony Ludlow and yourself?

20        A.  Yes.

21        Q.  And does it state, "Bill is going to make a

22   payment of $2500 this week towards the ACET note"?

23        A.  Yes, I see that.

24        Q.  Okay.  And at the top, is that an email to

25   Alex Godinez?

## Page 16

1         A.  Yes.

2         Q.  At his Super G Capital account -- email

3    address?

4         A.  Yes.

5         Q.  On December 20th?

6         A.  Yes.

7         Q.  And does it include Steve Bellah, Matt

8    Denegre, Tony Ludlow and yourself?

9         A.  Uh-huh.

10        Q.  And does it state that it is "Confirming that

11   our accounting department will pull $2,500 tomorrow"?

12        A.  Yes.

13        Q.  Okay.  And Mr. Szeto, is this a true and

14   correct copy of the emails that were exchanged?

15        A.  As far as I can tell, yes.

16        Q.  Mr. Szeto, tell me about David Hook.  Is he a

17   man of his word?

18        MS. HARD-WILSON:  Objection, form.

19        MR. PERRIN:  Objection, form.

20        A.  Well, I cannot judge his character.  I know

21   David for a long time, and I cannot answer that

22   question.

23        Q.  (BY MR. FREEMAN)  Do you think he was an

24   honest businessman?

25        A.  I cannot answer that question.

## Page 17

1         Q.  Would you do business with someone that you

2    didn't believe was an honest businessman?

3         A.  I cannot answer that question.  I done

4    business with him before, and I will not be able to

5    answer that question.

6         Q.  Can you tell me why you cannot answer that

7    question?

8         A.  Because I don't see him every day, and I'm not

9    a personal judgment of characteristics, and I will not

10   answer that question.

11        Q.  Have you dealt with him a number of times over

12   the years?

13        A.  Yes.

14        Q.  And have you had interactions with him?

15        A.  Yes.

16        Q.  And have you worked on matters -- on

17   businesses involving millions of dollars?

18        A.  Yes.

19        Q.  Based on your interactions, what is your

20   opinion of Mr. Hook?

21        A.  I will not offer an opinion because I am not

22   qualified to do so.

23        Q.  Is he an honest businessman?

24        A.  I will not answer that question.

25        Q.  Is he someone who deals fairly with creditors?

Usher Reporting Services
(214) 755-1612

Page 18

```
 1       A. I will not answer that question.  I don't
 2   know.
 3       Q. Are you sir?
 4       A. Am I what?
 5       Q. Are you someone who deals fairly with
 6   creditors?
 7       A. I do.
 8       Q. Are you someone who is an honest businessman?
 9       A. I do.
10       Q. Are you a man of your word?
11       A. Yes.
12       Q. But you don't know whether David Hook is?
13       A. I cannot answer that question.
14       Q. Did David Hook have authority to shut ACET
15   Global down?
16       A. I cannot answer that question.
17       Q. Would David Hook ever threaten to shut a
18   company down so a creditor wouldn't get paid?
19            MR. PERRIN:  Objection, form.
20       A. I cannot answer that question.
21       Q. (BY MR. FREEMAN)  Would he ever threaten to
22   shut a company down so the creditor wouldn't get
23   anything?
24            MS. HARD-WILSON:  Objection, form.
25       A. I cannot answer the question.  I don't know.
```

Page 19

```
 1       Q. (BY MR. FREEMAN)  Would he ever consider
 2   simply not paying a creditor?
 3            MS. HARD-WILSON:  Objection, form.
 4       A. I don't know.
 5       Q. (BY MR. FREEMAN)  What about Tony Ludlow?
 6       A. I barely know him, and I do not know.
 7       Q. Is he an honest businessman?
 8       A. I cannot tell you.
 9       Q. Would he shut a company down so a creditor
10   wouldn't get anything?
11            MS. HARD-WILSON:  Objection, form.
12       A. I cannot tell you.
13       Q. (BY MR. FREEMAN)  Would he consider that to be
14   an option?
15            MS. HARD-WILSON:  Objection, form.
16       A. I do not know.
17       Q. (BY MR. FREEMAN)  You don't know, sir?  Why is
18   it that you don't know?
19            MR. PERRIN:  Objection, form.
20       A. Because I only dealt with him with one
21   company, and I cannot answer what he would do with other
22   companies.  So I do not know.
23       Q. (BY MR. FREEMAN)  What company did you deal
24   with him with?
25       A. I dealt with him when -- in the ACET Global,
```

Page 20

```
 1   and that's the only company I dealt with him on.
 2       Q. Okay.  As far as with ACET Global, was Tony
 3   Ludlow honest to people who dealt with ACET Global?
 4       A. I cannot answer the question.
 5       Q. Did Tony Ludlow ever say, "We should shut ACET
 6   Global down so a creditor wouldn't get anything"?
 7       A. No, I do not know.  I cannot answer the
 8   question.
 9       Q. Would Tony Ludlow ever say that that was an
10   option?
11       A. I do not know.
12            MS. HARD-WILSON:  Objection, form.
13       A. He didn't say it to me.
14       Q. (BY MR. FREEMAN)  What about David Hook?  Was
15   he fair in those who dealt with ACET Global?
16       A. I very seldom dealt with David Hook on ACET
17   Global, so I cannot answer the question.
18       Q. Do you believe he dealt fairly with creditors
19   of ACET Global?
20       A. I cannot tell you that.
21       Q. Did he ever threaten to shut ACET Global down
22   so a creditor wouldn't get paid?
23       A. I cannot answer the question.  I do not know.
24       Q. Okay.  Mr. Szeto, I'm putting on the screen
25   what's marked as Exhibit 30.  Can you see this on your
```

Page 21

```
 1   screen, sir?
 2       A. Yes.
 3            (Exhibit 30 marked.)
 4       Q. (BY MR. FREEMAN)  And I'll ask you to look to
 5   the middle of the screen, and I'll highlight this for
 6   you to see if this helps jog your memory.  This is
 7   March 15th, 2018, an email from David Hook.  And
 8   Mr. Hook states -- Mr. Hook states, "Maybe we tell them
 9   to stop or we shut the company down and they won't get
10   anything."
11            Do you see that?
12       A. No, I have not seen that memo before.
13       Q. You've never seen that before?
14       A. No.
15       Q. Have you ever heard him say anything like that
16   before?
17       A. No.
18       Q. And if you'll look to the email response just
19   above that, and you'll see an email from Tony Ludlow,
20   and it says, "Yep, definitely an option."
21            Do you see that, sir?
22       A. Yes, I saw that.
23       Q. And -- so looking at this, can you tell me,
24   what is your opinion?  Did David Hook -- did he ever
25   threaten to shut a company down so a creditor wouldn't
```

6 (Pages 18 to 21)

## Page 22

1    get paid?
2         MR. PERRIN:  Objection, form.
3         A.  I will not offer an opinion.
4         Q.  (BY MR. FREEMAN)  Okay, sir.
5              Was there a time when the assets of ACET
6    Global were foreclosed upon?
7         A.  Please make that question again.  I'm not -- I
8    don't understand.
9         Q.  Did there come a time when the assets of ACET
10   Global were foreclosed upon?
11        A.  I was told that when the loan was default,
12   yes, the inventory was foreclosed.
13        Q.  Okay.  Who was Windspeed's lawyer during the
14   foreclosure process?
15             MR. PERRIN:  Objection, form.
16        A.  It -- I don't have a lawyer at that time.
17   That was before Windspeed was formed, so I don't need a
18   lawyer.
19        Q.  (BY MR. FREEMAN)  So are you telling me that
20   the assets of ACET Global were foreclosed upon prior to
21   your formation of Windspeed Trading, LLC?
22        A.  Yes.
23        Q.  Are you sure about that?
24        A.  Yes.
25        Q.  Why do you believe that?

## Page 23

1         A.  Because I was told that the loan was in
2    default and the inventory, the asset was in foreclose.
3    That is what I was told.
4         Q.  Who told you that?
5         A.  I don't remember.
6         Q.  But you seem pretty sure of it?
7         A.  Yes.
8         Q.  Did they tell you that in writing?
9         A.  No.
10             MR. PERRIN:  Objection, form.
11        Q.  (BY MR. FREEMAN)  And you don't know who told
12   you that?
13        A.  No.
14             MS. HARD-WILSON:  Objection, form.
15        Q.  (BY MR. FREEMAN)  Was it Matt Denegre?
16        A.  I cannot tell you for sure.
17             MS. HARD-WILSON:  Objection, form.
18        Q.  (BY MR. FREEMAN)  Was it Tony Ludlow?
19        A.  I cannot tell you for sure.
20             MS. HARD-WILSON:  Objection, form.
21        Q.  (BY MR. FREEMAN)  Was it David Hook?
22        A.  No.
23             MS. HARD-WILSON:  Objection, form.
24        A.  I cannot tell you for sure.
25        Q.  (BY MR. FREEMAN)  Was the foreclosure a

## Page 24

1    collusive process?
2             MR. PERRIN:  Objection, form.
3             MS. HARD-WILSON:  Objection, form.
4         Q.  (BY MR. FREEMAN)  Was the foreclosure a
5    collusion?
6             MS. HARD-WILSON:  Objection, form.
7         Q.  (BY MR. FREEMAN)  Mr. Szeto, you can answer
8    the question.
9         A.  I don't know.
10        Q.  Was there a conspiracy to have a foreclosure
11   on ACET Global's assets?
12             MS. HARD-WILSON:  Objection, form.
13        A.  No.
14        Q.  (BY MR. FREEMAN)  Was there an agreement prior
15   to the foreclosure to have a foreclosure on ACET's
16   assets?
17             MS. HARD-WILSON:  Objection, form.
18        A.  No.
19        Q.  (BY MR. FREEMAN)  Did Windspeed work with
20   Super G to create a foreclosure?
21        A.  No.
22             MS. HARD-WILSON:  Objection, form.
23        Q.  (BY MR. FREEMAN)  Did Baymark work with Super
24   G to facilitate a foreclosure?
25             MS. HARD-WILSON:  Objection, form.

## Page 25

1             MR. PERRIN:  Objection, form.
2         A.  That, I do not know.
3         Q.  (BY MR. FREEMAN)  Did Baymark -- did the
4    Baymark parties, ACET Global, you and Super G work
5    together to facilitate a foreclosure?
6             MS. HARD-WILSON:  Objection, form.
7         A.  No.
8         Q.  (BY MR. FREEMAN)  Did Baymark get their
9    lawyers to work on it?
10             MS. HARD-WILSON:  Objection, form.
11        A.  I do not know.
12        Q.  (BY MR. FREEMAN)  Did ACET Global get its
13   lawyers to work on it?
14             MS. HARD-WILSON:  Objection, form.
15        A.  I do not know.  We do not have a lawyer at
16   that time.
17        Q.  (BY MR. FREEMAN)  Did you get your lawyers to
18   work on it?
19             MS. HARD-WILSON:  Objection, form.
20        A.  No, I do not have a lawyer at that time.
21        Q.  (BY MR. FREEMAN)  Did Windspeed get its
22   lawyers to work on it?
23             MS. HARD-WILSON:  Objection, form that.
24        A.  No, that was before Windspeed was formed.  I
25   have no lawyer at that time.

Usher Reporting Services
(214) 755-1612

Page 26

1    Q.  (BY MR. FREEMAN)  If they had done so, would
2   that be wrong?
3          MS. HARD-WILSON:  Objection, form.
4          MR. PERRIN:  Objection, form.
5    A.  It's not a judgment I will make.
6    Q.  (BY MR. FREEMAN)  Would it be wrong to ask a
7   lender to send a foreclosure letter to you so you could
8   transfer assets and get around a creditor's lien?
9          MS. HARD-WILSON:  Objection, form.
10    A.  I have no opinion on that because it didn't
11   happen.
12    Q.  (BY MR. FREEMAN)  No, but I'm asking if
13   someone were to do that, if someone were to ask a lender
14   to send a foreclosure letter to you so you could
15   transfer assets and get around a creditor's lien, would
16   that be wrong?
17          MS. HARD-WILSON:  Objection, form.
18    A.  I have no opinion on that.  I am not a legal
19   profession, and I do not have any legal interpretation
20   of that.
21    Q.  (BY MR. FREEMAN)  Okay.  Would it be wrong to
22   set up a foreclosure so that assets could be transferred
23   to avoid a lien?
24          MS. HARD-WILSON:  Objection, form.
25    A.  I have no opinion on that, and -- and that's

Page 27

1   not my interpretation, being a nonlawyer.  I am an
2   engineer, and I cannot tell you what is right or wrong.
3    Q.  (BY MR. FREEMAN)  Would it be wrong to have a
4   purchase agreement drafted to purchase the foreclosed
5   assets prior to the foreclosure occurring?
6          MS. HARD-WILSON:  Objection, form.
7    A.  I have no opinion on that.  I cannot form any
8   kind of opinion because I do not know.
9    Q.  (BY MR. FREEMAN)  Would it be wrong to do that
10   so that a related entity could acquire the assets?
11          MS. HARD-WILSON:  Objection, form.
12    A.  I cannot tell you one way or the other.
13    Q.  (BY MR. FREEMAN)  Did Baymark do that here?
14          MS. HARD-WILSON:  Objection, form.
15    A.  I do not know what Baymark do.
16    Q.  (BY MR. FREEMAN)  Okay.  Mr. Szeto --
17    A.  Yes.
18    Q.  -- I'm putting on the screen what's marked as
19   Exhibit 45.  Do you see this document?
20    A.  Yes.
21          (Exhibit 45 marked.)
22    Q.  (BY MR. FREEMAN)  Can you tell me what this
23   is?
24    A.  This is an email from Matt to Tony and Steve.
25    Q.  Is it dated December 21st, 2018?

Page 28

1    A.  Yes.
2    Q.  Mr. Szeto, when did you form Windspeed?
3    A.  I have not seen this email, and -- and that
4   was the December 21st date that was after Windspeed was
5   formed and get funded, so I cannot tell you what this
6   email is all about.
7    Q.  I'm sorry.  Could you repeat that?
8    A.  I cannot tell you why or what this email is
9   all about because that was after Windspeed was formed,
10   and -- I really cannot tell you what, why and how.
11          THE REPORTER:  Jason, we need to stop for
12   a second.
13          MR. FREEMAN:  Certainly.
14          (Break taken from 10:03 a.m. to
15          10:04 a.m.)
16    Q.  (BY MR. FREEMAN)  Back on the record.
17          Mr. Szeto, Exhibit 45 is on your screen.
18   Can you tell me what the subject line reads?
19    A.  The subject line reads, "Windspeed November
20   financial statements."
21    Q.  Okay.  Mr. Szeto, is this an email from Matt
22   Denegre to Steve Bellah and Tony Ludlow on
23   December 21st, 2018?
24    A.  Yes.
25    Q.  Okay.  And does it state, "Steve, our attorney

Page 29

1   spoke with your attorney today.  Your attorney still has
2   a few changes in the purchase agreement that he is
3   working through.  Your attorney is also supposed to send
4   out the notice of foreclosure today, which has a 10-day
5   waiting period until title of assets can be transferred.
6   It's anticipated that we are doing a bifurcated closing
7   so that we can sign the agreement and then close after
8   the 10-day waiting period."
9          Am I reading that correct, sir?
10    A.  Yes.
11    Q.  Do you know what this was in reference to?
12          MS. HARD-WILSON:  Objection, form.
13    A.  Which one?
14    Q.  (BY MR. FREEMAN)  This email.
15    A.  This email initially was started as the
16   November financial statement, and I do not know what the
17   other part of the email was for.
18    Q.  Okay.  Were you involved in any of the
19   conversations they were referencing here?
20    A.  No.
21          MS. HARD-WILSON:  Objection, form.
22    Q.  (BY MR. FREEMAN)  At the bottom, you'll see
23   that it says -- there's an email header that says it's
24   from Steve Bellah, December 21st, 2018.  Do you see that
25   sir?

Page 30

```
 1      A.  Yes.
 2      Q.  And it's to Matt Denegre and cc William Szeto;
 3  is that correct?
 4      A.  Yes.
 5      Q.  And are you William Szeto?
 6      A.  Yes.
 7      Q.  And below that, does it say, "Do we have a
 8  final document to sign yet?"
 9          MR. PERRIN:  Objection, form.
10      A.  Yes.
11      Q.  (BY MR. FREEMAN)  Mr. Szeto, do you have an
12  opinion about what this was referencing?
13          MS. HARD-WILSON:  Objection, form.
14      A.  Well, my thought is that it is referencing to
15  the purchase agreement, but I'm not sure.
16      Q.  (BY MR. FREEMAN)  Did you have any discussions
17  or see any emails that would lead you to believe that's
18  what they were discussing?
19          MS. HARD-WILSON:  Objection, form.
20      A.  I cannot tell.
21          MR. FREEMAN:  Let me ask you a question
22  here, Brenda.  Would it be beneficial if we took five
23  minutes for you to talk with your client, or do you want
24  me to just keep going?
25          MS. HARD-WILSON:  I think we're fine.
```

Page 31

```
 1          MR. FREEMAN:  Okay.  I would like to get
 2  some truthful answers here.
 3          MS. HARD-WILSON:  I think you're asking
 4  him to speculate on emails that he wasn't the recipient
 5  of, the sender of, and wasn't even copied on.
 6      Q.  (BY MR. FREEMAN)  Mr. Szeto, you understand
 7  you're under oath, correct?
 8      A.  Yes.
 9      Q.  Do you believe your testimony thus far has all
10  been truthful?
11      A.  Yes.
12      Q.  Okay.  Mr. Szeto, what companies have you
13  served as CEO of?
14      A.  There are quite a few.
15      Q.  Can you name them for me?
16      A.  Yeah.  Ceterus Networks, and many others.
17      Q.  Excuse me?  Can you -- can you say what that
18  was again?
19      A.  Ceterus Networks.  And I have several start-up
20  that I was CEO of, and I think it's in the qualification
21  that I submitted.
22      Q.  Okay.  And can you name the other companies
23  you have served as CEO of?
24      A.  Not right offhand right now.  They were a few
25  years ago.
```

Page 32

```
 1      Q.  What about Windspeed Trading?
 2      A.  Windspeed Trading is the last one.
 3      Q.  Okay.  Are you still the CEO of Windspeed
 4  Trading?
 5      A.  Yes.
 6      Q.  Okay.  What about -- what about ACET Global,
 7  LLC?
 8      A.  I have the title of CEO, but I was not an
 9  employee.
10      Q.  Can you explain that?
11      A.  I was hired as a consultant and continued to
12  be a consultant.
13      Q.  Did you hold yourself out as the chief
14  executive officer of ACET Global?
15      A.  Please ask the question again.
16      Q.  Did you hold yourself out to others as the
17  chief executive officer of ACET Global, LLC?
18      A.  No.
19      Q.  Did you represent to others that you were the
20  chief executive officer of ACET Global, LLC?
21      A.  Yes.
22      Q.  Who did you represent to that you were the CEO
23  of ACET Global?
24      A.  There were others -- mainly sales person that
25  came to ACET Global after Mr. Demti left.  And I was
```

Page 33

```
 1  told that I am -- I was the president and CEO, so I let
 2  them know.
 3      Q.  Okay.  What about to people out of ACET
 4  Global?
 5      A.  I have not dealt with anybody outside of ACET
 6  Global.
 7      Q.  There were no third parties who didn't work
 8  for ACET Global that you -- that you represented to that
 9  you were the CEO of ACET Global?
10      A.  Not that I can remember.
11      Q.  Were you the CEO of Baymark ACET Holdco?
12      A.  No.
13      Q.  Not the CEO of Baymark ACET Holdco, LLC?
14      A.  No.
15      Q.  Did you ever hold yourself out to be the CEO
16  of Baymark ACET Holdco, LLC?
17      A.  No.
18      Q.  Not to any third party?
19      A.  Not that I know of.
20      Q.  Okay.  Mr. Szeto, I'm putting on the screen
21  what's marked as Exhibit 23.  Can you see this?
22      A.  Yes.
23          (Exhibit 23 marked.)
24      Q.  (BY MR. FREEMAN)  Do you recognize this
25  document?
```

Page 34

1    A. Yes.
2    Q. What it is?
3    A. It is a document that we asked for Dangerous
4  Goods Authorization so we can ship batteries from China.
5    Q. Okay. Who is the account holder reflected
6  here?
7    A. The account holder is Baymark ACET Holdco.
8    Q. Okay. So Baymark ACET Holdco shipping goods?
9    A. Yes.
10   Q. Okay. And did you fill this document out?
11   A. Yes.
12   Q. Okay. Did you fill documents out like this
13  often?
14   A. No. That was the only one.
15   Q. Okay. And what was your position with Baymark
16  ACET Holdco?
17   A. I have no position.
18   Q. Okay. Mr. Szeto, I want to look down at the
19  bottom of this document. Is that your name reflected
20  under the printed name William Szeto?
21   A. Yes.
22   Q. And is this document dated June 6th, 2018?
23   A. Yes.
24   Q. Mr. Szeto, do you reflect your position to be
25  president and CEO of Baymark ACET Holdco?

Page 35

1    A. Not with Baymark ACET Holdco.
2    Q. Does this document above your name state
3  president and CEO?
4    A. Yes.
5        MR. PERRIN: Objection, form.
6    Q. (BY MR. FREEMAN) Does this document state
7  president above your name?
8    A. Yes.
9    Q. Does this document state CEO above your name?
10   A. Yes.
11   Q. Is that your signature beside the statement
12  authorized signatory?
13   A. Yes.
14   Q. Did you sign this document, sir?
15   A. Yes.
16   Q. Did you sign this document representing that
17  you were the president and CEO of Baymark ACET Holdco?
18       MR. PERRIN: Objection, form.
19   A. No.
20   Q. (BY MR. FREEMAN) Can you explain that, sir?
21       MR. PERRIN: Objection, form.
22   A. The document was signed because we got
23  suspended by all the shipping companies, and this is the
24  only way that I can get a -- an agreement to ship
25  anything for -- for ACET Global. And the only way I

Page 36

1  could get an agreement was to get Baymark ACET Holdco as
2  a company to get an agreement from DHL eCommerce for the
3  account to ship. Without that, we would have been
4  closed. So there was a requirement from DHL.
5    Q. (BY MR. FREEMAN) So you needed to get
6  something done?
7    A. Yes.
8    Q. And it didn't matter if it was truthful or
9  not; you needed to act to get something done?
10       MS. HARD-WILSON: Objection, form.
11       MR. PERRIN: Objection, form.
12   A. Well --
13   Q. (BY MR. FREEMAN) You needed to get something
14  done; that's why you signed this?
15       MR. PERRIN: Objection, form.
16       MS. HARD-WILSON: Objection, form.
17   A. Well, yes. I was authorized -- it says
18  authorized signature, and I was authorized to do that.
19   Q. (BY MR. FREEMAN) Who authorized you?
20   A. I don't remember.
21       MR. FREEMAN: Can we take a break,
22  Mr. Szeto? Someone is on the line who is -- needs to
23  mute themselves. I'll ask whoever it is to mute
24  themselves, please.
25       MR. PERRIN: Can we also figure out who

Page 37

1  it is? It's (972) 991-5457.
2        MR. DENEGRE: That's me, Ed. I've been
3  on mute.
4        MR. FREEMAN: Okay. But you're also on
5  there as Matt Denegre. So I'm trying to figure out --
6        MR. DENEGRE: My computer audio is not
7  working.
8        MR. FREEMAN: Sorry about that. Didn't
9  mean to be rude. Just try to get the record clean.
10   Q. (BY MR. FREEMAN) Mr. Szeto, you said you
11  needed to get something done, so you signed this?
12   A. Yes.
13   Q. And you were -- you said you were authorized
14  to sign this?
15   A. Yes.
16   Q. Who authorized you?
17   A. I don't know. I dealt with Matt, and I asked
18  for permission to use the Baymark ACET Holdco, LLC's
19  name to apply for an account. And I was authorized to
20  sign it.
21   Q. By Matt Denegre?
22   A. As far as I can remember, yes.
23   Q. Did Matt control things at Baymark ACET
24  Holdco?
25       MR. PERRIN: Objection, form.

Page 38

1    A.  I don't understand what you mean "control
2  things."
3    Q.  (BY MR. FREEMAN)  Was Matt -- did he have
4  authority over Baymark ACET Holdco?
5    MR. PERRIN:  Objection, form.
6    A.  I do not know that.  I asked him for
7  permission, and he gave me permission after he check.
8  And that's all I know.
9    Q.  (BY MR. FREEMAN)  Did you answer to Matt
10  Denegre?
11    A.  No.
12    Q.  Was he your boss?
13    A.  No.
14    Q.  Did he control what you did?
15    A.  No.
16    Q.  Did he control Windspeed?
17    A.  He have no relationship to Windspeed.  No.
18    Q.  So he was never involved in anything related
19  to Windspeed?
20    A.  No.
21    Q.  Mr. Szeto, did you sign -- did you sign a
22  Dangerous Goods Authority letter more than once?
23    A.  No.
24    Q.  Mr. Szeto, I'll pull on the screen what's
25  marked as Exhibit 24.  Mr. Szeto, do you recognize this

Page 39

1  document?
2    (Exhibit 24 marked.)
3    A.  Well, it's the same document as you show me
4  earlier.  It's concerning lithium battery.  Now, there
5  may be one or two that were repeated because all you
6  need is one such authorization letter to ship lithium
7  batteries from China.
8    Q.  (BY MR. FREEMAN)  Okay.  So if you had one for
9  one company, you didn't need to get it for one of the
10  others?
11    A.  No.
12    Q.  Why is that?  Were all the companies working
13  together?
14    A.  That, I don't know.  But as far as -- this is
15  a DHL document that I was signed to ask for permission
16  to ship batteries, and I only need to sign one.
17    Q.  Okay.  Can you tell me what the account holder
18  name is that's reflected on this document?
19    A.  The account holder name is ACET Global, LLC.
20    Q.  Okay.  Could you continue reading the account
21  holder name?
22    A.  Doing business as Baymark ACET Holdco, LLC.
23  Okay.
24    Q.  Okay.  So the account holder name reflected on
25  here is ACET Global, LLC, d/b/a Baymark ACET Holdco,

Page 40

1  LLC; is that correct?
2    A.  Yes.
3    Q.  And who is the contact name that is listed
4  here?
5    A.  The contact -- I don't see a contact name.
6  Well, contact name is mine, William Szeto.
7    Q.  Is that your phone number reflected below it?
8    A.  Yes.
9    Q.  Okay.  Mr. Szeto, look at Page 2.  If you look
10  below, is that your signature reflected at the bottom of
11  this document?
12    A.  Yes.
13    Q.  Is that your name beside the phrase "printed
14  name"?
15    A.  Yes.
16    Q.  And above your name, does it state, "Position,
17  President/CEO"?
18    A.  Yes.
19    Q.  And Mr. Szeto, was this document dated
20  July 5th, 2018?
21    A.  Yes.
22    Q.  Okay.  Mr. Szeto, were you representing that
23  you were the president and CEO of ACET Global, LLC?
24    MR. PERRIN:  Objection, form.
25    A.  Yes.

Page 41

1    Q.  (BY MR. FREEMAN)  So by executing this
2  document, you were representing that you were the
3  president of ACET Global, LLC?
4    A.  Yes.
5    Q.  And by signing this document, you were
6  representing that you were the CEO of ACET Global, LLC?
7    MR. PERRIN:  Objection, form.
8    A.  Yes.
9    Q.  (BY MR. FREEMAN)  And you were also
10  representing that ACET Global, LLC did business as the
11  name Baymark ACET Holdco, LLC?
12    MR. PERRIN:  Objection, form.
13    A.  Yes.
14    Q.  (BY MR. FREEMAN)  Was there any relationship
15  between ACET Global, LLC and Baymark ACET Holdco, LLC?
16    A.  No.
17    Q.  Why do you list ACET Global, LLC as doing
18  business as Baymark ACET Holdco, LLC?
19    A.  I was told that I was authorized to sign this
20  request, and that was what I was told to write down.
21    Q.  Who authorized you?
22    A.  Matt.
23    Q.  Matt Denegre?
24    A.  Yes.
25    Q.  Did Matt Denegre hold himself out as having

Page 42

1    authority to act on behalf of Baymark ACET Holdco?
2        A. I cannot answer that question.
3        Q. Why can you not answer that?
4        A. Because I don't know.
5        Q. Why do you not know?
6            MS. HARD-WILSON: Objection, form.
7        A. Because I don't know.
8        Q. (BY MR. FREEMAN) Did he ever say that he had
9    authority to act on behalf of Baymark ACET Holdco?
10       A. I asked him for permission to use that name,
11   and he gave me permission, and that's all I know.
12       Q. Would you only say you had permission if you
13   thought you actually had authority?
14       A. I did not thought I have authority. I asked
15   for permission to use that name, to ask for that permit.
16   And he said, "Okay," and that's all I have.
17       Q. Why did you ask Matt Denegre for authority?
18           MR. PERRIN: Objection, form.
19       A. Because he was my contact.
20       Q. (BY MR. FREEMAN) What led you to believe that
21   he could give you that authority?
22       A. I don't know. Because he was my contact.
23       Q. Okay. What other contacts did you have?
24       A. That's it. As far as Baymark is concerned,
25   Matt is my only contact.

Page 43

1        Q. Okay. Mr. Szeto, did you hold yourself out as
2    the CEO of ACET Global to any other third party?
3        A. Not that I can remember.
4            MR. PERRIN: Objection, form.
5        Q. (BY MR. FREEMAN) No?
6        A. No.
7        Q. Mr. Szeto, I'm putting on the screen what's
8    marked as Exhibit 25. Can you see this sir?
9        A. Yes.
10           (Exhibit 25 marked.)
11       Q. (BY MR. FREEMAN) And what is this document?
12       A. This is a document to ask to create a new
13   account for DHL eCommerce.
14       Q. Okay. What is the customer name that's
15   reflected here?
16       A. Customer name is ACET Global, LLC.
17       Q. Okay. And are you familiar with this
18   document, sir?
19       A. Yes, I am.
20       Q. Okay. And is this a true and accurate copy of
21   the documents that's reflected?
22       A. As far as I know, yes.
23       Q. Okay. And so this is a form that you prepared
24   and submitted to DHL; is that correct?
25       A. Yes. After we get suspended by all the other

Page 44

1    shipping company, that is the only company that will
2    allow us to ship.
3        Q. Okay. And is this a customer service
4    agreement?
5        A. This is an agreement to open an account with
6    DHL eCommerce, yes.
7        Q. Mr. Szeto, is this your -- is this your
8    signature under -- on the line that says, "Signature of
9    authorized representative"?
10       A. Yes.
11       Q. And is that your name printed?
12       A. Yes.
13       Q. And what title is reflected beside your name?
14       A. CEO.
15       Q. Okay. And what is the date that you signed
16   this?
17       A. March 29.
18       Q. March 29th of 2018?
19       A. 2018.
20       Q. Okay. So, Mr. Szeto, did you hold yourself
21   out to be the CEO of ACET Global on March 29th, 2018?
22       A. Yes.
23       Q. Okay. Mr. Szeto, I'll go down to the third
24   page of this document. Do you recognize this?
25       A. Yes.

Page 45

1        Q. And does this say it's a Customer Services
2    Agreement?
3        A. That's what it says.
4        Q. Okay. Does it say it's effective April 26th,
5    2018?
6        A. I cannot read it. It's --
7        Q. Hard to read?
8        A. It's hard to read.
9        Q. Mr. Szeto, on the fourth page, is that your
10   signature?
11       A. Yes.
12       Q. And is that -- what is the company that's
13   referenced here? Does that state "ACET VP, LLC"?
14       A. Yeah, that's what it says.
15       Q. Okay. What is ACET VP, LLC?
16       A. As far as I know, it is ACET Venture Partner,
17   LLC.
18       Q. Were you the CEO of ACET --
19       A. No.
20       Q. -- Venture Partners, LLC?
21       A. No.
22       Q. Did you have authority to sign as CEO of Acet
23   Venture Partners, LLC?
24       A. No.
25       Q. Why did you sign as -- well, step back.

12 (Pages 42 to 45)

Page 46

1    Did you indeed sign as CEO of Acet Venture
2  Partners, LLC?
3    A. It did not say CEO of Acet Venture Partners,
4  LLC.
5    Q. Okay. Below your name, sir, does it not state
6  "CEO"?
7    A. Yes, but it did not say which company.
8    Q. Mr. Szeto, were you signing your name below
9  the company name of ACET Venture Partners, LLC and
10 providing a title that you knowingly meant to be for
11 another company?
12   MS. HARD-WILSON: Objection, form.
13   A. I do not remember.
14   Q. (BY MR. FREEMAN) Okay. Mr. Szeto, this
15 signature block on this document, it does indeed state
16 "Acet Venture Partners, LLC," correct?
17   A. Yes.
18   Q. Okay. And it is signed on March 29th, 2018?
19   A. Yes.
20   Q. And it is signed below that by you; is that
21 correct?
22   A. Yes.
23   Q. And your name is printed below that signature?
24   A. Yes.
25   Q. And your title that is reflected below that is

Page 47

1  CEO; is that correct?
2    A. Yes, but it was not in my handwriting.
3    Q. Okay. Who wrote this?
4    A. I don't know.
5    Q. Who gave you authority to sign in this manner?
6    A. Well, I can sign my own name. I don't need
7  authority to sign my own name.
8    Q. Did anyone give you authority to put a
9  signature that appeared to be the act of Acet Venture
10 Partners, LLC?
11   A. No.
12   MS. HARD-WILSON: Objection, form.
13   MR. PERRIN: Objection, form.
14   Q. (BY MR. FREEMAN) Did you intend this to be
15 interpreted as though you were the CEO of ACET Venture
16 Partners, LLC?
17   A. No.
18   Q. Did you intend this to bind ACET Venture
19 Partners, LLC?
20   A. No.
21   Q. Why did you sign this?
22   A. Well, I signed it for ACET Global, LLC, and
23 somebody add a title to it. I have to think that this
24 agreement was made out at one time for ACET VP, LLC, and
25 it was a typo, that they should've changed it when they

Page 48

1  made it to ACET Global, LLC, but it didn't get changed.
2  And somebody put down the date and the title on it after
3  I signed it, so I cannot tell you why or what.
4    Q. Okay. And you say that's not your
5  handwriting? What leads you to believe that's not your
6  handwriting?
7    A. Well, I know my handwriting. You can tell
8  from the -- my name that it -- I did not write it that
9  way, and I -- my handwriting, you can tell that the
10 handwriting was written with another size of pen. So
11 it's not my handwriting.
12   Q. Okay. But it is your signature; is that
13 correct?
14   A. It is my signature, and it's my name printed,
15 but it's not my title.
16   Q. Okay. Mr. Szeto, did you ever work at
17 Windspeed while you worked at ACET Global?
18   A. No.
19   Q. Did you ever hold yourself out as the CEO of
20 Windspeed from your ACET Global email address?
21   A. No.
22   Q. Are you certain of that, sir?
23   A. Yes.
24   Q. Did you not, in fact, do that multiple times?
25   A. No.

Page 49

1    Q. Okay. Mr. Szeto, I'm putting on the screen
2  what's marked as Exhibit 36. Do you see that, sir? You
3  probably don't yet.
4    A. No.
5    Q. Do you see that, sir?
6    A. Yes.
7      (Exhibit 36 marked.)
8    Q. (BY MR. FREEMAN) Is that Exhibit 36?
9    A. Yes.
10   Q. And do you recognize this document?
11   A. Yes.
12   Q. And is this an email from you to Steve Bellah,
13 Matt Denegre and Tony Ludlow?
14   A. Yes.
15   Q. And was it sent by you on October 10th, 2018?
16   A. Yes.
17   Q. And Mr. Szeto, is this a true and correct copy
18 of that email?
19   A. As far as I know, yes.
20   Q. Okay. Mr. Szeto, what is your -- what is your
21 title and position in your signature block?
22   A. That say, "Windspeed Trading, LLC."
23   Q. Okay. And what email did you send this --
24 what email address did you send this from?
25   A. It send -- an ACET Global email.

13 (Pages 46 to 49)

William Szeto  *  April 2, 2021

Page 50

1    Q.  Okay.  bill@acetglobal.com?
2    A.  Yes.
3    Q.  Okay.  So, sir, I'll ask you again, did you
4   ever hold yourself as CEO of Windspeed from your ACET
5   Global email address?
6    A.  I don't remember.
7    Q.  Mr. Szeto, what does the oath that you swore
8   mean?
9         MR. PERRIN:  Objection, form.
10    A.  What do you mean?
11    Q.  (BY MR. FREEMAN)  What does it mean to you?
12    A.  I don't understand what you're trying to tell
13   me.
14    Q.  Did you take an oath to tell the truth today?
15    A.  Yes, I did.  And I am --
16    Q.  Did you --
17    A.  -- telling the truth.
18    Q.  -- to tell the truth?
19    A.  I don't remember, and that's the truth.
20    Q.  Mr. Szeto, I'm going to go back over this
21   email again with you.  Do you see what's still marked as
22   Exhibit 36 on the screen?
23    A.  Yes.
24    Q.  Mr. Szeto, is this an email from you to Steve
25   Bellah, Matt Denegre and Tony Ludlow?

Page 51

1    A.  Yes.
2    Q.  And is it dated October 10th, 2018?
3    A.  Yes.
4    Q.  Mr. Szeto, is this a copy of an email that you
5   sent?
6    A.  As far as I can tell, yes.
7    Q.  Okay.  And does your signature block state
8   that you are the president and CEO of Windspeed Trading,
9   LLC?
10    A.  Yes.
11    Q.  And, Mr. Szeto, did you send this email from
12   the email address bill@acetglobal.com?
13    A.  Yes, it looks that way.
14    Q.  Is bill@acetglobal.com your -- was that your
15   ACET Global email address?
16    A.  Yes.
17    Q.  Okay.  So, Mr. Szeto, did you ever hold
18   yourself as CEO of Windspeed from your ACET Global email
19   address?
20    A.  Not at that time.
21    Q.  Okay.  Did you ever represent that you were
22   the CEO of Windspeed from your ACET Global email
23   address?
24    A.  Not that I can remember.
25         MS. HARD-WILSON:  Objection, form.

Page 52

1    Q.  (BY MR. FREEMAN)  Did you ever send anyone an
2   email stating that you were the president and CEO of
3   Windspeed Trading, LLC from your ACET Global email
4   address?
5    A.  Not that I can remember.
6    Q.  Mr. Szeto, was anyone concerned about D&O
7   insurance when they were engaging in this foreclosure
8   transaction?
9         MS. HARD-WILSON:  Objection, form.
10    A.  Not that I know.
11    Q.  (BY MR. FREEMAN)  Did anyone think this was --
12   that the foreclosure was, maybe, wrong?
13         MS. HARD-WILSON:  Objection, form.
14    A.  I cannot tell you.
15    Q.  (BY MR. FREEMAN)  Actually, did anyone think
16   that it was a criminal act?
17         MS. HARD-WILSON:  Objection, form.
18         MR. PERRIN:  Objection, form.
19    A.  I cannot tell you what is a criminal act.  I'm
20   not a judgment of that.
21    Q.  (BY MR. FREEMAN)  Was anyone concerned about
22   going to prison?
23         MS. HARD-WILSON:  Objection, form.
24    A.  Do what?
25    Q.  (BY MR. FREEMAN)  For the foreclosure process.

Page 53

1    A.  Why would I worry about going to prison?  I
2   did not do anything with it.
3    Q.  Was anyone worried about being sued for
4   engaging in the -- in the foreclosure sale?
5         MS. HARD-WILSON:  Objection, form.
6    A.  I do not know anything about it.
7    Q.  (BY MR. FREEMAN)  Did anyone ever ask you
8   whether there was any kind of insurance to cover a suit
9   like that?
10    A.  Not that I know of.
11    Q.  Okay.  Is that something you think you'd
12   remember?
13    A.  No.
14    Q.  Why not?
15    A.  Because it's not something I thought about.
16         MR. PERRIN:  Objection, form.
17    Q.  (BY MR. FREEMAN)  Okay.  Let me see here,
18   Mr. Szeto.  Putting on the screen what's marked as
19   Exhibit 47.
20         (Exhibit 47 marked.)
21    Q.  (BY MR. FREEMAN)  Do you see that, sir?
22    A.  Yes.
23    Q.  And does this -- at the very top, does this
24   appear to be an email from Matt Denegre to Steve Bellah,
25   Tony Ludlow and yourself?

14 (Pages 50 to 53)

William Szeto  *  April 2, 2021

## Page 54

1    A.  Yes.
2    Q.  And is it dated January 20th, 2019?
3    A.  Yes.
4    Q.  Okay.  And does the subject line read, "Merged
5  weekly report, Windspeed"?
6    A.  Yes.
7    Q.  Okay.  Does Mr. Denegre state here, "I'll
8  check with Bill, but I don't believe Windspeed has D&O
9  insurance"?
10    A.  Yes.
11    Q.  Okay.  Mr. Szeto, is this a true and correct
12  copy of the email you received?
13    A.  As far as I can see, yes.
14    Q.  Okay.  And below that statement by
15  Mr. Denegre, there's an email from Steve Bellah.  Do you
16  see that, sir?
17    A.  Yes.
18    Q.  And it states, "I cannot find a copy of the
19  D&O policy for the board of Windspeed.  Could you please
20  send a copy?"  Do you see that?
21    A.  Yes.
22    Q.  And below that, do you see an email from Matt
23  Denegre stating, "She is drafting the amendment and
24  restatement"?
25    A.  Yes.

## Page 55

1    Q.  Mr. Szeto, do you know what Matt Denegre is
2  referring to?
3    A.  No.
4    Q.  Below that, there's an email from Steve Bellah
5  that states, "We are waiting for your counsel to turn a
6  document.  Could you please check on the status?"
7        Mr. Szeto, do you know what that is
8  referencing?
9    A.  No.
10    Q.  Okay.  Mr. Szeto, do you think you may have
11  been the fall guy here?
12        MR. PERRIN:  Objection, form.
13        MS. HARD-WILSON:  Objection, form.
14    A.  I do not know.
15    Q.  (BY MR. FREEMAN)  Do you feel like you might
16  have been set up?
17        MS. HARD-WILSON:  Objection, form.
18        MR. PERRIN:  Objection, form.
19    A.  I cannot answer that question.
20    Q.  (BY MR. FREEMAN)  Why can't you answer that
21  question?
22    A.  Well, unless you set me up.  I do not know the
23  answer.
24    Q.  Unless I set you up?
25    A.  Yes.

## Page 56

1    Q.  Have you ever expressed that you might have
2  been the fall guy?
3    A.  No.
4    Q.  Have you ever expressed that you might have
5  been set up --
6    A.  No.
7    Q.  -- by Baymark parties?
8    A.  No.
9    Q.  I want to talk real quick about the transition
10  from ACET Global to Windspeed, sir.
11    A.  Okay.
12    Q.  When you -- when you transitioned over, did
13  Windspeed start using the ACET desks?
14    A.  The ACET desk?
15    Q.  Yes, sir.
16    A.  The desk was moved from the storage unit to
17  the new building.  The answer is yes, we did use the
18  ACET desk.
19    Q.  Okay.  Did you use the ACET cabinets?
20    A.  Well, that's only one cabinet, yes.
21    Q.  And you used it?
22    A.  Yes.
23    Q.  Did you use the ACET computers?
24    A.  A few of them.  And I bought new ones.
25    Q.  Okay.  Did you use the ACET fulfillment

## Page 57

1  desktop computer?
2    A.  Yes.
3    Q.  Did you use the ACET monitors?
4    A.  Yes, some of them.
5    Q.  Okay.  Did you use the ACET laser printer?
6    A.  No.  It broke before we moved.
7    Q.  Okay.  Did you use the ACET warehouse desk?
8    A.  Yes.
9    Q.  Did you use the ACET customer service desk?
10    A.  Yes.
11    Q.  Did you use the ACET accounting desk?
12    A.  Yes.
13    Q.  Did you use some accounting -- the ACET
14  accounting cabinets?
15    A.  There were two of them, yes.
16    Q.  Did you use the ACET CEO desk?
17    A.  Yes.
18    Q.  Did you use the ACET CEO chair?
19    A.  Yes.
20    Q.  Is that a comfortable chair?
21    A.  No.  I bought a new one after that.
22    Q.  Did you use the ACET conference table?
23    A.  Yes.
24    Q.  Did you use the ACET receptionist desk?
25    A.  No.  It's sitting out in the lobby.  We did

William Szeto  *  April 2, 2021

Page 58

```
 1   not use it.
 2       Q.  Okay.  Did you move it over, though?
 3       A.  Well, we moved it over, yes.
 4       Q.  Okay.  Just don't use it much?
 5       A.  No, we don't have a reception.
 6       Q.  Okay.  But it's still there, correct?
 7       A.  It's still there, yes.
 8       Q.  Okay.  Also, did you move over a couple of
 9   ACET chairs for the foyer?
10       A.  Yes.
11       Q.  Did you move over --
12       A.  It's still sitting in the lobby.
13       Q.  Okay.  Did you move over the ACET
14   refrigerator?
15       A.  Yes.
16       Q.  Did you move over the ACET microwave?
17       A.  Yes.
18       Q.  Did you move over the ACET water cooler?
19       A.  Yes.
20       Q.  Did you move over the ACET folding machine?
21       A.  Yes.
22       Q.  Did you move over the ACET software?
23       A.  No.  The software was under different name,
24   and I pay for it afterwards.
25       Q.  I'm sorry.  Could you explain that?
```

Page 59

```
 1       A.  There was only one software we used that --
 2   that we take order, and I have to use Windspeed
 3   Trading's name in order for us to receive order.  So
 4   that's the only software.
 5       Q.  Okay.
 6       A.  Now, in the other software, there could be,
 7   like, Word or Excel or whatever.  I pay for those
 8   licenses afterwards.
 9       Q.  Okay.  So did you -- did you, like, shift
10   those -- the software over to the new company and --
11       A.  No.
12       Q.  -- put it in the new company's name?
13       A.  I pay for -- I paid for new license for those
14   softwares.
15       Q.  Okay.  Did you --
16       A.  Under different name.
17       Q.  Okay.  So you're saying we use -- you used or
18   brought over the ACET microwave, correct?
19       A.  Yes.
20       Q.  And you brought over the ACET water cooler?
21       A.  Yes.
22       Q.  And you used -- Windspeed used the folding
23   machine -- ACET's folding machine, correct?
24       A.  Yes.
25       Q.  Windspeed brought over ACET's client list,
```

Page 60

```
 1   right?
 2       A.  Well, we did not bring over ACET's client
 3   list.  We created a new one for ourself.
 4       Q.  Did it include all of the prior ACET clients?
 5       A.  As far as I can -- we can remember because the
 6   client has to be designated to Windspeed Trading with
 7   different requirements so they can pay -- when they pay
 8   us, they will pay to Windspeed Trading, not ACET Global.
 9   So all of those are new.
10       Q.  Okay.  But did you -- when you made the new
11   client list for Windspeed, did you also put in it
12   all of the ACET Global clients?
13       A.  As far as I can remember, yes, we include all
14   the ACET clients, but I cannot tell you for sure.
15       Q.  Okay.  Did -- when you moved over to
16   Windspeed, did Windspeed start using ACET's same
17   supplier list?
18       A.  No.
19       Q.  Did you --
20       A.  We have --
21       Q.  -- create a new list?
22       A.  We have different supplier than ACET Global.
23   We bought a lot of things from suppliers in the U.S.,
24   not just from China.
25       Q.  Okay.  But back in 2018, when you formed
```

Page 61

```
 1   Windspeed and transferred over to Windspeed, did -- did
 2   Windspeed use ACET's supplier list?
 3       A.  No.
 4       Q.  Did it use its -- did Windspeed use ACET's
 5   pricing and cost information?
 6       A.  No.
 7       Q.  But Windspeed used ACET's CEO desk, correct?
 8       A.  Yes.
 9       Q.  And it used CE -- it used ACET's CEO chair,
10   correct?
11       A.  For a little while, yes.
12       Q.  And it used ACET's conference table, correct?
13       A.  Yes.
14       Q.  Did it use ACET's sales data?
15       A.  Yes.
16       Q.  Did it use ACET's marketing data?
17       A.  No.
18       Q.  Did it use ACET's pricing and cost
19   information?
20       A.  No.
21       Q.  But it used ACET's -- it used ACET's desks,
22   correct?
23       A.  We used ACET's desk, yes.
24       Q.  And it used ACET's computers, correct?
25           MR. PERRIN:  Objection, form.
```

16 (Pages 58 to 61)

William Szeto  *  April 2, 2021

## Page 62

1    A.  Some of them.  Most of them were broken.
2    Q.  (BY MR. FREEMAN)  And it used ACET's warehouse
3  desk, right?
4    A.  Yes.
5    Q.  Did it use ACET's trademarks?
6    A.  No.
7    Q.  Did it use ACET's logos?
8    A.  No.
9    Q.  Did it use the URL koolulu, K-O-O?
10    A.  No.
11    Q.  -- L-U-L-U.com?
12    A.  No.
13    Q.  Did it use the URL luluway, L-U-L-U-W-A-Y
14  .com?
15    A.  No.
16    Q.  Did it transfer over ACET Global's QuickBooks?
17    A.  No.
18    Q.  So it never got its QuickBooks mixed up with
19  old ACET financial data?
20    A.  We have the old ACET Global QuickBook for the
21  financial data, yes, we did.  But we bought a new copy
22  of ACET -- of QuickBook for ourself.  So, at one point
23  in time, we were keeping two sets of books.  That means
24  we have to have two sets of QuickBooks.
25    Q.  Okay.  So you kept two sets of books?

## Page 63

1    A.  Yes.
2    Q.  Do you rely on one of those sets of books?
3    A.  Well, I rely on both sets of books.
4    Q.  Okay.  Those two sets of books were different?
5    A.  Yes.
6    Q.  And you said --
7    A.  One is for Windspeed Trading, and one is for
8  the old ACET Global.  Yeah, there are two sets of books.
9    Q.  Okay.  So you set up the accounting department
10  to keep two sets of books?
11    A.  Yes.
12    Q.  And did you instruct Jane Lynn to keep two
13  sets of books?
14    A.  Yes, until the end of January.
15    Q.  January when?
16    A.  2019.
17    Q.  So until the end of January 2019, you
18  maintained two sets of books?
19    A.  Yes.
20    Q.  And those two sets of books were for ACET
21  Global and for Windspeed?
22    A.  Yes.
23    Q.  And you told Jane Lynn after January of 2019
24  that she could stop maintaining two sets of books?
25    A.  Yes.

## Page 64

1    Q.  Okay.  Mr. Szeto, there -- you mentioned
2  that -- that Windspeed did not -- did not use ACET
3  Global's supplier list; is that correct?
4    A.  Yes.
5    Q.  Who is in charge of your inventory system?
6    A.  Dana in charge of the inventory system.
7    Q.  And what's her last name?
8    A.  Thompson -- Thomason [sic].  You already
9  talked to her a couple days ago.
10    Q.  Correct.  And when I talked to her, if Dana
11  Tomerlin told me that you, in fact, did use ACET
12  Global's supplier list, would she be lying?
13        MS. HARD-WILSON:  Objection, form.
14    A.  She might not know for sure which one is
15  which.
16    Q.  (BY MR. FREEMAN)  Okay.  If she told me that
17  Windspeed did indeed use ACET Global's pricing and cost
18  information, would she be incorrect?
19    A.  Yes, she would be incorrect.
20    Q.  Okay.
21    A.  The reason is very simple.  ACET Global used
22  exclusively air ship, which is about 30 times higher
23  than sea ship.  And everything we used in Windspeed
24  Trading was sea ship, and -- so our pricing is
25  completely different.

## Page 65

1    Q.  Okay.  We're talking about Dana, your
2  employee.  Is actually Dana Tomerlin?
3    A.  Yes.
4    Q.  Does that sound correct?  Okay.
5        Okay.  So you mentioned something there.
6  Does Windspeed have a relationship with Ship Station?
7    A.  Yes.  Ship Station is the software we use.
8    Q.  Okay.  Is that the -- that's the inventory
9  software?
10    A.  No.
11    Q.  What is that?
12    A.  Ship Station is just a software system that
13  accepts orders from the other marketplaces, and it will
14  tell us who order what.
15    Q.  Okay.
16    A.  And there are some other items in the Ship
17  Station that we use, but that's just a -- basically,
18  it's a -- well, I would call it a purchasing system.
19    Q.  Okay.  Is that, like, your purchase and
20  fulfillment system?
21    A.  Well, yes, you can call it a fulfillment
22  system.  We use it to know what order came in.
23    Q.  Okay.  But Windspeed uses Ship Station?
24    A.  Yes.
25    Q.  Did ACET Global use Ship Station?

17 (Pages 62 to 65)

William Szeto  *  April 2, 2021

## Page 66

1    A.  They used a different system.  Not the same
2  one.
3    Q.  Not Ship Station?
4    A.  It is Ship Station, but it's a Ship Station
5  exclusively for ACET Global.
6    Q.  Okay.  And how is it different than the one
7  that Windspeed uses?
8    A.  Well, if you want to buy from ACET Global, you
9  use that system.  You want to buy from Windspeed, you
10  use this system.  So there's two different systems.
11  Just like you want to buy from Sears, you use one, and
12  you buy the JCPenney, you use the other one.  They're
13  not the same.
14    Q.  Got it.  So does it work differently, or is it
15  with a different company?
16    A.  It's -- we pay for a different software
17  system.  It works the same, but it doesn't have the
18  exact feature that we use.  So they are different.
19    Q.  So it's, like, got a different logo on it?
20    A.  Yes.
21    Q.  And --
22    A.  Well, it's the logo for Ship Station, not
23  anybody else's log.
24    Q.  Does it have Windspeed's logo on it?
25    A.  No.

## Page 67

1    Q.  All right.  But it has Windspeed's name on it
2  when they order --
3    A.  Well, it has a Windspeed name on it for that
4  particular system for us, but it's not for Windspeed.
5    Q.  Okay.  Did you transition over -- well, let me
6  ask: Does the ACET Global Ship Station account still
7  exist?
8    A.  I do not know.
9    Q.  Okay.  Did you switch over the Ship Station
10  account --
11    A.  No.
12    Q.  -- at Windspeed?  No?
13      Does Windspeed use Microsoft 365 software?
14    A.  Yes.
15    Q.  Did ACET Global use Microsoft 365 software?
16    A.  Yes.
17    Q.  Do the ACET Global licenses still exist?
18    A.  I do not know.
19    Q.  Did you change those licenses over to
20  Windspeed?
21    A.  We did not change any license to Windspeed.
22    Q.  Okay.  Mr. Szeto, who have you discussed this
23  case with?
24    A.  Nobody except my company attorney.
25    Q.  Okay.  Is that attorney your personal attorney

## Page 68

1  as well?
2    A.  Yes.
3    Q.  Okay.  Have you discussed the case with anyone
4  else?
5    A.  No.
6    Q.  Have you discussed any of the subject matter
7  of this case with anyone other than your attorney?
8    A.  No.
9    Q.  Have you emailed anyone about this case?
10    A.  Not that I can remember.
11    Q.  Other than your attorney?
12    A.  Yes.
13    Q.  So you've not emailed anyone else besides your
14  attorney?
15      MR. PERRIN:  Objection, form.
16    A.  Maybe with my own staff, but not anybody
17  outside of the company, no.
18    Q.  (BY MR. FREEMAN) Okay.  Who have you
19  forwarded -- who have you forwarded emails to about this
20  case?
21    A.  What do you mean by that?  I don't understand
22  the question.
23    Q.  Have you forwarded any emails to anyone about
24  the case?
25    A.  Not that I can remember.

## Page 69

1    Q.  Okay.  Have you forwarded any emails about
2  this case to anyone other than your attorney?
3    A.  No.
4    Q.  Okay.
5      MS. HARD-WILSON:  Without interrupting
6  your flow, if we could take a break some time soon.
7      MR. FREEMAN:  It's probably a good time
8  for a break.
9      THE WITNESS:  Okay.
10      (Break taken from 10:53 a.m. to
11      11:07 a.m.)
12    Q.  (BY MR. FREEMAN) Mr. Szeto, we're back on the
13  record.
14    A.  Okay.
15    Q.  Mr. Szeto, is there anything in your testimony
16  thus far that you want to correct?
17    A.  No.
18    Q.  Okay.  Do you believe your testimony thus far
19  has been truthful?
20      MS. HARD-WILSON:  Objection, form.
21    A.  Yes.
22    Q.  (BY MR. FREEMAN) Do you believe it's been
23  your best testimony?
24      MS. HARD-WILSON:  Objection, form.
25      MR. PERRIN:  Objection, form.

18 (Pages 66 to 69)

Page 70

1      A.  (No audible response.)
2      Q.  (BY MR. FREEMAN)  Mr. Szeto, is there any
3  reason you would not be able to testify truthfully
4  today?
5      A.  No.
6      Q.  Are you under the influence of any drugs or
7  alcohol?
8      A.  My iced tea.
9      Q.  Is that a Long Island or just an iced tea?
10      A.  That is the Gold Peak Tea.
11      Q.  Is it pretty good?
12      A.  Yes, there are very good.
13      Q.  I haven't tried that one.
14          Are you on any medications?
15          MS. HARD-WILSON:  Objection, form.
16      A.  Yes, I am on medication.  I normally take
17  medication every morning, yes.
18      Q.  (BY MR. FREEMAN)  Mr. Szeto, does that
19  medication impact your cognitive ability in any way?
20          MS. HARD-WILSON:  Objection, form.
21      A.  No.
22      Q.  (BY MR. FREEMAN)  No?  And are you feeling
23  okay today?
24      A.  I'm feeling great.  Thank you.
25      Q.  Mr. Szeto, I think where we left off, I asked

Page 71

1  if you had forwarded any emails about this case to
2  anyone.
3      A.  Not that I can remember.
4      Q.  Okay.  So you haven't forwarded this -- any
5  emails about this case to anyone other than your
6  attorney?
7      A.  I cannot remember any.
8      Q.  Have you forwarded any emails about this case
9  to Matt Denegre?
10      A.  No.
11      Q.  Have you forwarded any emails about this case
12  to Alex Godinez?
13      A.  Not that I can remember, no.
14      Q.  Have you forwarded any emails about this case
15  to Steve Bellah?
16      A.  Not that I -- not that I can remember.
17      Q.  Okay.  Have you discussed this case with Matt
18  Denegre?
19      A.  Yes, I did.
20      Q.  Okay.  Have you -- was anyone else there with
21  you when you had the discussion with Matt Denegre?
22      A.  Not that I know of.
23      Q.  What did you -- what did you discuss with Matt
24  Denegre?
25      A.  What we discussed was that whether they are

Page 72

1  going have a law firm to support it, and we did talk a
2  little bit about are they going support Windspeed
3  Trading.  And the answer was no, and that was the end of
4  it.
5      Q.  Why was there a concern about whether they
6  were going to support Windspeed Trading?
7          MR. PERRIN:  Objection, form.
8      Q.  (BY MR. FREEMAN)  Who was concerned about
9  whether they were going -- the lawyers were going to
10  represent Windspeed Trading?
11      A.  I was just asking because I do not know.
12      Q.  What was Matt's response?
13      A.  We are on our own, and that's all I want to
14  know.
15      Q.  Okay.  Did he -- did he indicate whether
16  anyone had instructed him to give that answer?
17      A.  Not that I know of.
18      Q.  Okay.  Have you -- did you discuss anything
19  else with Matt about this case?
20      A.  No.
21      Q.  So --
22      A.  Not that I can remember.
23      Q.  So no substance of the case; just whether
24  its -- his lawyers were going to represent Windspeed?
25          MR. PERRIN:  Objection, form.

Page 73

1      A.  Yes.
2      Q.  (BY MR. FREEMAN)  Okay.  Did you discuss this
3  case with Alex Godinez?
4      A.  Yes, I did.
5      Q.  Who was -- where did you discuss this case
6  with Alex Godinez?
7      A.  On the phone.
8      Q.  How many times have you discussed this case
9  with Alex Godinez?
10      A.  Maybe once or twice.
11      Q.  Okay.  When was that?
12      A.  I cannot remember.
13      Q.  Was it a month ago, or was it a year ago?
14      A.  It wasn't a year ago, I don't think.  Maybe
15  six, seven months ago.
16      Q.  Okay.  What did you discuss about this case
17  with Alex Godinez?
18      A.  That this -- inform him that -- about this
19  case and that we are going to take care of it ourself,
20  and that was it.  There was no discussion of any subject
21  matters.
22      Q.  Okay.  Did Alex already know about the case?
23      A.  I assume he does, but I cannot tell for sure.
24      Q.  Okay.  Did he reach out to you to talk about
25  the case, or did you reach out to him?

19 (Pages 70 to 73)

William Szeto  *  April 2, 2021

Page 74

1      A.  I reach out to him.
2      Q.  Okay.  Did anyone ask you to reach out to him?
3      A.  Not that I can remember.
4      Q.  Okay.  Did Matt Denegre ask you to reach out
5   to him?
6      A.  No.
7      Q.  Where did Alex -- where does Alex Godinez
8   work?
9      A.  What are you asking me?  Where he work?
10      Q.  Yes.  Who does he work for?
11      A.  He work for Super G at that time.
12      Q.  Has he worked for another company that you
13   know of?
14      A.  Not that I know of.
15      Q.  Okay.  Has he worked for a company called SG
16   Credit Partners?
17      A.  Not that I know of.
18      Q.  Okay.  Have you ever dealt with SG Credit
19   Partners?
20      A.  Not that I know of.  I just close my office
21   door.
22      Q.  No problem.
23      A.  People are doing construction work outside.
24      Q.  Mr. Szeto, you don't believe you've dealt with
25   SG Credit Partners?

Page 75

1      A.  Not that I can remember.
2      Q.  In all the time that you've worked with Alex
3   Godinez, have you understood that he was part of Super G
4   Capital?
5      A.  Yes.  That's my understanding.
6      Q.  Does he represent that he works for Super G
7   Capital?
8      A.  Yes.
9      Q.  So he's told you that he works for Super G
10   Capital?
11      A.  Yes.
12      Q.  What did you discuss about the case with him?
13      A.  Nothing.  Basically it's about us supporting
14   it ourself and no subject matter discussion at all.
15      Q.  And why did you not discuss any of the subject
16   matter?
17      A.  Well, I don't think that is appropriate to
18   discuss with him.
19      Q.  You wanted to make sure you were following all
20   the rules?
21          MR. PERRIN:  Objection, form.
22      A.  Yes, as far as I can tell.
23      Q.  (BY MR. FREEMAN)  Right.  Didn't want to --
24   okay.
25          Did you -- how long was that conversation?

Page 76

1      A.  About an hour, at the most.
2      Q.  What else did y'all talk about?
3      A.  That was about it, other than weather.
4      Q.  The weather and the case?
5      A.  Yes.
6      Q.  How was the weather then?
7      A.  It was wonderful in California.
8      Q.  What was it like?
9      A.  You mean the weather?
10      Q.  Yes.
11      A.  It was great.
12      Q.  Warm or cold?
13      A.  Yeah.
14      Q.  Was it raining?
15      A.  Oh, I don't remember.  It never rain in
16   California.
17      Q.  But you remember it was a nice day?
18      A.  It was a nice day, and that was it.
19      Q.  What else did you do that day?
20      A.  What I do?
21      Q.  Yes.
22      A.  That was just one of the many, many other
23   things I got involved in in the business.  I cannot tell
24   you for sure what other things that happened.
25      Q.  When you had that conversation, you weren't in

Page 77

1   California, correct?
2      A.  No, I was not in California.  I was in Texas.
3      Q.  Alex Godinez was in California?
4      A.  He was in California, yes.  As far as I know,
5   he was.
6      Q.  Was he at Super G Capital's office?
7      A.  I cannot tell you for sure.
8      Q.  How was the weather in Dallas that day?
9      A.  It was hot and as usual, nice.
10      Q.  How hot?
11      A.  Oh, I cannot remember for sure.  Probably
12   close to 100 degrees, as usual.
13      Q.  Yes.  That sounds about right.  So that
14   probably puts us, what do you think, August?
15      A.  I cannot tell you for sure when.  I would say
16   yes, it probably around that time of year.
17      Q.  Probably around August?
18      A.  Uh-huh.
19      Q.  And so what else?  I just want to make sure we
20   have covered them all.  You have talked about this case;
21   you talked about the weather.  What else did you talk
22   with Alex Godinez about?
23      A.  Nothing.  Nothing I can remember right now.
24   Nothing.
25      Q.  Did you frequently have calls with Alex

20 (Pages 74 to 77)

William Szeto  *  April 2, 2021

Page 78

1  Godinez?
2      A.  No.
3      Q.  Did you discuss, kind of, day-to-day things
4  with Alex Godinez?
5      A.  No.  I -- I don't do that.
6      Q.  Did you chitchat with Alex Godinez?
7      A.  Very seldom, no.
8      Q.  Were y'all close buddies?
9      A.  No.
10     Q.  Did y'all have a lot in common?
11     A.  I had never met him.
12     Q.  Okay.  Do you know a lot about him personally?
13     A.  No.
14     Q.  Do you like him?
15     A.  Like I said, I have never met him, so it's
16  difficult to say whether I like him or not.  I dealt
17  with him in a business sense, and he was very good.
18     Q.  Did you enjoy talking with him?
19     A.  I enjoy talking to him on business issues.
20     Q.  Okay.  So you talked to him about this case
21  and the weather.  Anything else that you think you
22  talked to him about?
23     A.  Nothing that I can remember.
24     Q.  Okay.  Would you generally only talk to Alex
25  if it was, like, a big issue or some big issue, or is it

Page 79

1  everyday things?
2      A.  I do not talk to him about everyday things.
3  Very, very infrequently that we may have a topic that we
4  want to talk about, but I have not remembered -- I
5  cannot remember when was the last time you talk about
6  business issues.
7      Q.  Usually it would only be, like, a pretty big
8  business issue?
9      A.  Like, five seconds.  We done well, and that
10  was it.
11     Q.  Right.  So if you -- but if you had a
12  conversation with him for a period of time, it's
13  generally going to be about an important business issue?
14     A.  No.  We did not have any important business
15  issues to talk about.
16     Q.  Okay.  Would it generally just be about an
17  important issue?
18     A.  I would say in general, yes, but we do not
19  have an important issue to talk about for a long, long
20  time.
21     Q.  Okay.  Would it have been since August?
22     A.  I cannot tell you when.
23     Q.  Okay.
24     A.  The case discussion was the last thing we talk
25  about.

Page 80

1      Q.  Okay.  And was that an important issue?
2      A.  It was an important issue to let them know,
3  let Super G know that there is a case pending against
4  us, and I assume that they need to know that.  And so it
5  is an important issue, so they were informed that there
6  is a lawsuit pending against us.  So that was it.
7      Q.  Okay.  Did you talk about whether you were
8  going to be a witness in that case?
9      A.  No.
10     Q.  Did you talk about whether he was going to be
11  a witness in that case?
12     A.  No.
13     Q.  Did you talk about the foreclosure on ACET
14  Global's assets?
15     A.  No.
16     Q.  Did you talk about Windspeed?
17     A.  We talk about -- well, the reason we call was
18  because Windspeed -- so we did not talk about Windspeed
19  in particular.
20     Q.  Did you talk about Baymark?
21     A.  No.
22     Q.  Did you talk about David Hook?
23     A.  No.
24     Q.  Tony Ludlow?
25     A.  No.

Page 81

1      Q.  Matt Denegre?
2      A.  Not that I can remember.
3      Q.  Okay.  Did you talk about any loans?
4      A.  What do you mean by "any loans"?  I have a
5  loan with them, so I did not talk about the loan.
6      Q.  Didn't talk about the loan?
7      A.  No.
8      Q.  Did you talk about Windspeed's financial
9  status?
10     A.  No, none of those.
11     Q.  Did you talk about how Windspeed was
12  performing?
13     A.  Not that I can remember to tell him how
14  Windspeed was performing, no.
15     Q.  Did you talk about really anything relating to
16  Windspeed's actual operations or business?
17     A.  No, I cannot remember talking about anything
18  about Windspeed.
19     Q.  Okay.  And you haven't talked to Alex Godinez
20  since then?
21     A.  No, I have not talked to him at all for quite
22  a few months.
23     Q.  Okay.  Did you talk about this case with
24  Steven Bellah?
25     A.  I talked to Steven Bellah one time about this

21 (Pages 78 to 81)

William Szeto  *  April 2, 2021

---

Page 82

1   case.
2       Q.   When was that?
3       A.   That was -- I forget the exact time when I
4   talk to Steve Bellah.
5       Q.   Was it -- was it a hot day in August?
6       A.   Oh, I think it was.
7       Q.   Maybe 100 degrees or so?
8       A.   I cannot tell you for sure how many 100
9   degrees that was, but it probably was a hot day.
10      Q.   Was it the same day you talked to Alex?
11      A.   I believe it was.
12      Q.   Okay.  Was Alex on the phone at the same time
13  too?
14      A.   I believe he was on the phone with me at the
15  same time when I talked to Steve.
16      Q.   Okay.  Was Matt on the phone as well?
17      A.   No, I don't think so.
18      Q.   Matt Denegre wasn't on the phone at the same
19  time?
20      A.   Not that I can remember, no.
21      Q.   Okay.  What did you talk to Steve about?
22      A.   He told me at one point that he check with
23  Tomer about purchasing the inventory, and there was a
24  memo that he sent to Tomer about buying the inventory.
25  I have never seen that memo, and I have never seen the

---

Page 83

1   letter.  And he told me at one point -- this is way
2   back -- that Tomer refuse to buy the inventory from him.
3   And I ask him whether he still have a copy of that
4   letter.  And that's what I talked to him about.
5       Q.   What did he say?
6       A.   He said he doesn't remember.
7       Q.   Okay.  What did he say?  That everything was
8   going to be okay because of that letter?
9       A.   He did not make any comment other than the
10  fact that he don't know if he still have a copy of that
11  letter.
12      Q.   Okay.  How did that topic come up?
13      A.   I just remember when it came up on the lawsuit
14  that he did offer to sell the inventory to Tomer and he
15  did mention the fact that he can now sell it to me
16  because Tomer refuse the sales.  And that's how it came
17  up.
18      Q.   Okay.  So were they saying -- was he saying
19  because he sent a notice to Tomer, and Tomer didn't
20  offer to buy it that it was okay to sell it to
21  Windspeed?
22      A.   Yes.
23           MR. PERRIN:  Objection, form.
24      Q.   (BY MR. FREEMAN)  Okay.  Did -- what else did
25  y'all talk about on that?

---

Page 84

1       A.   That was it.
2       Q.   What else did Steve have to say?
3       A.   He told me he don't remember if he has a copy
4   of that letter, and that's all the conversation we had.
5       Q.   Did Steve talk about the warrants in
6   Windspeed?
7       A.   No.
8       Q.   Did Steve seem concerned about anything, or
9   was it nothing to worry about for Steve?
10      A.   Nothing to worry about.  He was concerned
11  about going to lunch the next day.
12      Q.   Where was he going to lunch?
13      A.   We went to lunch once so often, and we were
14  just joking around.  But the main thing was about that
15  letter.
16      Q.   What -- where was he wanting to go to lunch
17  with you?
18      A.   Why he want to go to lunch with me?
19      Q.   Or where was he wanting to go to lunch with
20  you?
21      A.   Oh, we usually went to this hot and spicy
22  place that he loved.
23      Q.   What did he order?
24      A.   Oh, there's several things that he ordered.
25  They're all very hot and spicy.

---

Page 85

1       Q.   Oh, the next day, what was he ordering?
2       A.   Oh, we didn't go.  We didn't get to go at all.
3   We just talk about going, but we did not go at all.
4       Q.   Why didn't y'all end up going?
5       A.   I don't remember why, but we didn't get to go.
6       Q.   Okay.  Did y'all go after that?
7       A.   We haven't gone to lunch since then.
8       Q.   Really?
9       A.   Yeah.
10      Q.   Okay.  What else did Steve or Alex or Matt
11  talk about on the phone?
12           MR. PERRIN:  Objection, form.
13      A.   I don't remember we talk about anything else
14  on the phone.
15      Q.   (BY MR. FREEMAN)  Did Matt express any other
16  concerns on the phone?
17           MR. PERRIN:  Objection, form.
18      A.   Not that I can remember.
19      Q.   (BY MR. FREEMAN)  What did Matt think about
20  what Steve was saying about the letter, the foreclosure
21  notice?
22           MR. PERRIN:  Objection, form.
23      A.   I do not know.
24      Q.   (BY MR. FREEMAN)  Did Matt say he had a copy
25  of it?

---

22 (Pages 82 to 85)

Page 86

1        MR. PERRIN:  Objection, form.
2    A.  I do not know.
3    Q.  (BY MR. FREEMAN)  Okay.  What did Matt think
4  of the weather?
5        MR. PERRIN:  Objection, form.
6    A.  I cannot tell you.
7    Q.  (BY MR. FREEMAN)  So did you -- you discussed
8  this case with Alex Godinez, correct?
9    A.  Yes.
10    Q.  Matt Denegre?
11    A.  Well, only on the support issue, but nothing
12  on the subject matter issues and so no.
13    Q.  Was Matt on the call we were just talking
14  about?
15    A.  We were just talking about how's it going to
16  support us as part of the lawsuit, and the answer from
17  Matt was you're on your own, and that was the end of the
18  answer.
19        MR. PERRIN:  Objection, form.
20    Q.  (BY MR. FREEMAN)  Did Matt say that on that
21  phone call with Alex and Steve?
22        MR. PERRIN:  Objection, form.
23    A.  I think so, but I cannot be sure.
24    Q.  (BY MR. FREEMAN)  Okay.  So you talked about
25  the case with Matt, correct?

Page 87

1    A.  Yes.
2    Q.  And you talked about the case with Alex
3  Godinez, correct?
4    A.  Yes.
5    Q.  Did you talk with about the case -- you talked
6  about the case with Steve Bellah, correct?
7    A.  I asked for a copy of that letter, but I did
8  not discuss the case with him.
9    Q.  Did you discuss the case with anyone else?
10    A.  No, not that I can remember.
11    Q.  Okay.  On this call with Alex and Steve and
12  you think Matt, did you want to have this call, or did
13  someone else ask to have it?
14        MR. PERRIN:  Objection, form.
15    A.  I think that I want to have that call so we
16  can all understand what is going on.  And I don't
17  remember who organized the call, but we were on a
18  conference call to talk about the case.  And it was a
19  very short call.
20    Q.  (BY MR. FREEMAN)  Okay.  Did you have the call
21  because you needed a solution?
22        MR. PERRIN:  Objection, form.
23    A.  I needed a call just to make sure that we know
24  how to proceed with that lawsuit from that point on.
25    Q.  (BY MR. FREEMAN)  Did you want to have the

Page 88

1  call because you needed a solution for the situation?
2    A.  No --
3        MS. HARD-WILSON:  Objection, form.
4    A.  -- not that I can remember.  I just need to
5  know how to proceed with the case.
6    Q.  (BY MR. FREEMAN)  Did you want to have the
7  call to talk about arrangements that Baymark might have
8  had after ACET Global?
9    A.  No.  That was not the intent.
10    Q.  Did you want to have the call to talk about
11  arrangements that Super G might have had after ACET
12  Global?
13    A.  That's not the intent.
14    Q.  Did you want to talk about any arrangements
15  that Baymark had with Tomer Damti?
16    A.  No.  I do not want to know.
17    Q.  Did you want to talk about any arrangements
18  that Super G might have had with Tomer Damti?
19    A.  No.  I do not want to know.
20    Q.  Did you want to have that call because you
21  needed to prepare your story?
22    A.  No.
23        MS. HARD-WILSON:  Objection, form.
24    A.  I don't need to know how to prepare that.
25    Q.  (BY MR. FREEMAN)  Did you want to have that

Page 89

1  call so you would know how to respond in this lawsuit?
2        MS. HARD-WILSON:  Objection, form.
3    A.  I need to have that call so I know how to
4  proceed with the lawsuit.
5    Q.  (BY MR. FREEMAN)  And what do you mean by
6  that?
7    A.  So whether I need to have my own attorney and
8  all the other things.  So I have to know exactly how to
9  proceed with it.
10    Q.  Okay.  Mr. Szeto, I'm putting up on the screen
11  what is marked as Exhibit 54.
12    A.  Okay.
13        (Exhibit 54 marked.)
14    Q.  (BY MR. FREEMAN)  Do you see this document,
15  sir?
16    A.  Yes.
17    Q.  And what is this document?
18    A.  It is an email that I sent out to try to -- to
19  try to arrange for the conference call.
20    Q.  The conference call with Matt Denegre --
21    A.  And Alex.
22    Q.  -- and Alex Godinez and Steve Bellah?
23    A.  Right.
24    Q.  Okay.  And is this Exhibit 54 a true and
25  correct copy of that email correspondence you were on?

William Szeto  *  April 2, 2021

Page 90

1    A.  As far as I know, yes.
2    Q.  Okay.  And if you will, I'm going to -- I
3    would like you to follow along here.  I have highlighted
4    here an email that appears to be from William Szeto; is
5    that correct?
6    A.  Yes.
7    Q.  Sent on August 3rd, 2020; is that correct?
8    A.  Yes.
9    Q.  To Matt Denegre at Baymark Partners; is that
10   correct?
11   A.  Yes.
12   Q.  Also cc'ing Alex Godinez of SG --
13   A.  Uh-huh.
14   Q.  -- Credit Partners; is that correct?
15   A.  Yes.
16   Q.  And also Steve Bellah; is that correct?
17   A.  Yes.
18   Q.  And Steve seems to have a domain or an email
19   domain of Remuda Credit Advisors; is that correct?
20   A.  That's the email address I have for Steve,
21   yes.
22   Q.  Okay.  But was Steve part of Super G?
23   A.  I cannot tell you for sure.
24   Q.  Okay.  Did you think he was part of Super G?
25   A.  I cannot tell you for sure.  I do not know.

Page 91

1    Q.  Why did you include Steve on this email?
2    A.  Because I like to get a copy of the letter.
3    Q.  Did you already know that letter existed?
4    A.  I was told by Steve the letter existed.  I
5    have not seen it.  I have never seen it, so I need to
6    find out if indeed it exists.
7    Q.  Okay.  Did Steve tell you before this call
8    that he had that letter?
9    A.  He told me before -- he told me before -- yes,
10   he did.
11   Q.  He told you -- before you sent this email he
12   had already told you?
13   A.  Right.
14   Q.  When did he tell you that he had that letter?
15   A.  Probably it was August -- it probably
16   somewhere around February -- January, February, 2018.
17   2019, I mean.  Before he even tried to sell me the
18   inventory.
19   Q.  Oh, because Windspeed didn't get the inventory
20   until --
21   A.  March.
22   Q.  -- March of when?
23   A.  2019.
24   Q.  So Windspeed didn't have possession of the
25   inventory until March of 2019?

Page 92

1    A.  Windspeed have possession of it after the
2    foreclosure, but we did not buy it until March of 2019.
3    Q.  Okay.  And was the foreclosure, was that in
4    January of 2019?
5    A.  I cannot tell you for sure.  I was not
6    involved with the foreclosure.
7    Q.  Was the foreclosure -- is that why it was
8    important was the foreclosure?  Did that happen when
9    they sent this letter you're referring to?
10          MR. PERRIN:  Objection, form.
11   A.  I was told this letter exists, and I was told
12   that now they are legally allowed to sell me the
13   inventory.  That was the last thing I heard of, but I
14   did not get involved with anything about the foreclosure
15   or the inventory or the sales of it.
16   Q.  (BY MR. FREEMAN)  So who told you that?
17   A.  Steve.
18   Q.  Steve Bellah --
19   A.  Right.
20   Q.  -- told you that Super G could legally sell
21   you the inventory, correct?
22   A.  Yes, back in -- I believe in the March --
23   February, March time frame, yes.
24   Q.  And he told you that in the February or March
25   of 2019 time frame?

Page 93

1    A.  Yes.
2    Q.  And prior to that time, could Super G legally
3    sell you the inventory?
4          MR. PERRIN:  Objection, form.
5          MS. HARD-WILSON:  Objection, form.
6    A.  I do not know what the legal implication is.
7    Q.  (BY MR. FREEMAN)  Did Steve Bellah say they
8    couldn't legally sell it to you before that letter?
9    A.  That is what I understand, what my
10   understanding was at that time.
11   Q.  Based on what Steve Bellah told you?
12   A.  Yes.
13   Q.  Did Steve Bellah tell you where he got that
14   understanding?
15   A.  I did not ask him.
16   Q.  But Steve Bellah told you that Super G
17   couldn't legally sell you the inventory until it had
18   issued that important letter?
19   A.  As far as I know, yes.
20   Q.  Okay.  And do you know when that important
21   letter was sent?
22   A.  I cannot tell you for sure.
23   Q.  Would you know that important letter if you
24   saw it?
25   A.  I assume I will be able to see it, but I

24 (Pages 90 to 93)

William Szeto  *  April 2, 2021

## Page 94

1  cannot tell you for sure.
2  Q.  Okay.  I want to direct your attention back to
3  what's still up on the screen, Exhibit 54.
4  A.  Okay.
5  Q.  I believe your testimony was this is a true
6  and accurate copy of the email correspondence?
7  A.  That's right.
8  Q.  And this was an email, Mr. Szeto, from you on
9  August 3rd, 2020, to Matt Denegre of Baymark Partners.
10  And you also cc'd Alex Godinez of SG Credit Partners and
11  Steve Bellah; is that correct?
12      MR. PERRIN:  Objection, form.
13  Q.  (BY MR. FREEMAN)  And the subject line states,
14  "Tomer's lawsuit"; is that correct?
15  A.  Yes.
16  Q.  And you've marked this with "Importance:
17  High"; is that correct?
18  A.  I very frequently do mark "Important: High" so
19  people can read it.  So yes, I did.
20  Q.  Okay.  And you stated here -- read with me.
21  "I am trying to arrange a conference call between Alex,
22  Steve and you this week.  It is very important to me
23  that I have a solution for this situation.  It is
24  costing me a lot of attorney fees up to this point.  I
25  have no idea what you folks arranged after ACET Global

## Page 95

1  and what agreements you have with Tomer.  If I have to
2  defend myself and Windspeed on the lawsuit, that means I
3  have to do a lot of discovery costing a lot more money
4  to do so."
5      Did I read that correct?
6  A.  Yes.
7  Q.  And does the sentence that follows that state,
8  "Please let us know when we can met this week so we can
9  talk about it"; is that correct?
10  A.  Yes.
11  Q.  Okay.  Did you -- when you sent this email,
12  did you -- did you -- it looks like it's part of an
13  email chain; is that correct?
14  A.  Yes.
15  Q.  Did you -- did you black out or redact any of
16  the -- any of the emails below it?
17  A.  Not that I know of.
18  Q.  Do you ever do that?
19  A.  No.
20  Q.  Okay.  So I'd like to look at what is marked
21  as -- what's still on the screen is marked as
22  Exhibit 54.  And this is -- states that it's an email
23  from Steve Bellah to you; is that correct?
24  A.  Yes.
25  Q.  And it cc's Alex Szeto?

## Page 96

1  A.  Yes.
2  Q.  Okay.  Who is Alex Szeto?
3  A.  My son.
4  Q.  Okay.  Is he your attorney?
5  A.  Yes.
6  Q.  Okay.  Is he Windspeed's attorney?
7  A.  Yes.
8  Q.  Okay.  Is Steve Bellah your attorney?
9  A.  Steve Bellah is not an attorney.
10  Q.  Is Steve Bellah Windspeed's attorney?
11  A.  No.
12  Q.  Did you believe he was an attorney?
13  A.  Not that I know of.
14  Q.  Okay.  And this email is dated September 25th,
15  2020; is that correct?
16  A.  I can -- yes.
17  Q.  Okay.  So if you look below, he's responding
18  to an email from you.  Does that appear to be correct?
19  A.  Yes.
20  Q.  And it says, "For your information, we will
21  have to respond.  I am not copying Matt since he gave us
22  the answer that Baymark will no longer want to be
23  involved with the lawsuit.  Before I go to see the
24  lawyer, I would like to talk to two of you to prepare
25  our response and to get whatever document we have as

## Page 97

1  backup."
2      Is that correct?
3  A.  Yes.
4  Q.  Okay.  Did you end up having a conversation
5  with Steve Bellah?
6  A.  Yes.
7  Q.  Okay.  Was that after the conversation that we
8  just discussed?
9  A.  Yes.
10  Q.  Okay.  Now, I thought you had not had later
11  conversations with Mr. Bellah?
12  A.  I have a conversation with Steve Bellah,
13  continued to want to know if he has a copy of the
14  letter.
15  Q.  Okay.  How many more conversations did you
16  have with Steve Bellah after this one?
17  A.  I think that was the last one.
18  Q.  Okay.  Did you meet with Steve Bellah along
19  with your attorney?
20  A.  No, not that I know of.
21  Q.  Did Alex Szeto go with you to meet with Steve
22  Bellah?
23  A.  Not that I know of.
24  Q.  Did you and Alex talk on the phone with Steve
25  Bellah?

25 (Pages 94 to 97)

Page 98

1    A.  No.  I don't believe we talk on the phone with
2    Steve Bellah.
3        Q.  Okay.  How did Steve Bellah know what was --
4    you know, what was the subject matter of this email?
5        A.  Well, when we had the first phone call, that's
6    when he first know about the subject matter.  And that's
7    when we ask for a copy of that letter.
8        Q.  Okay.  Okay.  Had he gotten you a copy of that
9    letter by then?
10       A.  I never seen the copy of the letter, no.
11       Q.  Okay.  What did you talk with Steve Bellah
12   about on this call?
13       A.  I talk to Steve Bellah about the copy of
14   that letter that he told me at one time that he has,
15   and -- but we never got a copy of it.
16       Q.  Okay.  Did you talk to Alex -- well, excuse
17   me.
18            What else did you talk with Steve Bellah
19   about on this call?
20       A.  That was it.
21       Q.  How long did you talk with Steve?
22       A.  About five minutes.
23       Q.  About five minutes?
24       A.  Yeah.
25       Q.  Okay.  You see below here where it's blacked

Page 99

1    out.  Did you black that out?
2        A.  No.
3        Q.  But did you forward that to Steve Bellah?
4        A.  I did not forward that letter to Steve Bellah,
5    no.
6        Q.  The email that's reflected on the screen on
7    document -- that's Bates labeled Windspeed 0299?
8        A.  No.
9        Q.  Now, does it state that this is a forwarded
10   message?
11       A.  Yes.
12       Q.  And is that message from Alex Szeto to you?
13       A.  Yes.
14       Q.  And does it show that you then forwarded this
15   email to Steve Bellah?
16       A.  That, I don't remember.
17       Q.  All right.  Don't answer this question
18   quickly, but I do want a truthful answer after you pause
19   for a second.
20            Mr. Szeto, what did Alex Szeto state in
21   the box that is blocked out?
22            MS. HARD-WILSON:  Do not answer that.
23       A.  I do not remember.
24       Q.  (BY MR. FREEMAN)  Don't answer me right now.
25   Hold on.  I think your attorney is saying something.

Page 100

1            MS. HARD-WILSON:  Yes.  Do not answer
2    that.  Calls for privileged information.
3        Q.  (BY MR. FREEMAN)  Okay.  So that's an
4    assertion of privilege, Mr. Szeto, as your attorney
5    said.  You can't answer that.
6        A.  No.
7        Q.  But you do believe the email that's blacked
8    out was forwarded to Steve and also copied to Alex Szeto
9    on September 25th, 2020?
10       A.  I cannot remember.
11       Q.  When was the last time you spoke with Steve
12   Bellah?
13       A.  Probably September 2020.
14       Q.  Okay.  And when was the last time you emailed
15   him?
16       A.  That was about the last time I emailed him.  I
17   do not have any contact with him ever since.
18       Q.  When was the last time you texted him?
19       A.  I have no contact with him during -- ever
20   since.
21       Q.  How about WhatsApp?
22       A.  How about what?
23       Q.  You look like you would use WhatsApp.  Do you
24   correspond with Steve Bellah on WhatsApp?
25       A.  No.  I have no contact with Steve whatsoever

Page 101

1    since about that time.
2        Q.  Okay.  What was Steve's role at Super G?
3        A.  I do not know for sure.
4        Q.  What did you believe it to be?
5        A.  I believe he was responsible for the loan
6    management, and that's all I know.
7        Q.  Was he responsible for ACET Global's loan
8    management?
9        A.  I cannot answer that question, no.
10       Q.  Did you believe he was responsible for ACET
11   Global's loan management?
12       A.  I cannot answer the question because I do not
13   know what he is responsible for.
14       Q.  Did you believe he was responsible for
15   Windspeed's loan management?
16       A.  He's the one that agreed to loan us $200,000,
17   and that was the last time I have any dealing with him.
18   And I cannot tell what his responsibility is.
19       Q.  Okay.  Was he involved in the restructuring
20   plan?
21            MR. PERRIN:  Objection, form.
22       A.  I don't understand what you mean,
23   restructuring plan.  I was not involved with it.
24       Q.  (BY MR. FREEMAN)  Did Steve propose a
25   restructuring plan?

26 (Pages 98 to 101)

William Szeto  *  April 2, 2021

## Page 102

1    A.  I do not know.

2    Q.  How is Remuda Credit Advisors related to Super

3  G?

4    A.  I do not know what Remuda Credit Advisors is.

5    Q.  Did Steve Bellah ever tell you that he had set

6  up a new company called Remuda Credit Advisors?

7    A.  He had mentioned something about it, but I do

8  not know the details of it, nor do I have any more

9  information on it.

10    Q.  When did he mention it?

11    A.  During one of the lunch, and he said he's

12  going to start a new company.  That was it.  I don't

13  even know the name of it.

14    Q.  Did he say he was still going to be working

15  with Super G?

16    A.  I do not know.

17    Q.  Okay.  Did you believe he still worked for

18  Super G?

19    A.  I do not know for sure.

20    Q.  After he left Super G, did he continue to use

21  his Super G email account?

22    A.  I cannot tell you for sure.  I do not know.

23    Q.  Okay.  Did he remain on the Windspeed board?

24    A.  No.

25    Q.  No?  Was he taken off?

## Page 103

1    A.  He was taken off, and Alex Godinez took his

2  place.  And that's what I was told by Alex.

3    Q.  So Alex Godinez took his place?

4    A.  Yes.  That's what I was told.

5    Q.  Who told you that?

6    A.  Alex.

7    Q.  Steve never told you that?

8    A.  No.

9    Q.  What did Steve do as a board member for

10  Windspeed?

11    A.  I cannot tell you for sure.

12    Q.  Were you a board member of Windspeed?

13    A.  Was I a -- yes, I was.

14    Q.  What do you do as a board member of Windspeed?

15    A.  I manage the company.

16    Q.  Okay.  Is anybody else a board member?

17    A.  No.  Not that I know about.

18    Q.  Just you and Alex Godinez?

19    A.  Alex and Matt for a while, and the three of

20  us.  And after that -- and we never have a board meeting

21  and we never have any other discussion concerning

22  Windspeed.

23    Q.  So y'all didn't ever have a board meeting?

24  Did y'all -- is that correct?

25    A.  Yes.

## Page 104

1    Q.  Did y'all ever have a conference call that was

2  supposed to be a board meeting?

3    A.  No, not that I can remember.

4    Q.  Did y'all ever, you know, discuss board --

5  board matters by email?

6    A.  The only time we ever have a conference call

7  to talk about board was when we were trying to apply for

8  the government PPP loan, and I want to make sure the

9  board approve that because according to what I

10  understand that the board have to know it.  And they all

11  knew it and they all approve it.  So that's when I apply

12  for the PPP loan.

13    Q.  So as a board, y'all didn't do anything until

14  y'all needed to get the PPP money?

15    A.  Right.

16    Q.  And were there any -- were there ever any

17  board minutes?

18    A.  No.

19    Q.  Were there ever any board resolutions adopted?

20    A.  No.

21    Q.  Was there ever any action taken by the board?

22    A.  No.

23    Q.  Was there ever -- was there ever any

24  discussion about the board?

25    A.  No, not that I know of.

## Page 105

1    Q.  Did anyone -- you know, it sounds like you

2  kind of ran this company.

3    A.  Yes.

4    Q.  It sounds like you were the guy, I guess, that

5  was going to make it success or not success?

6    A.  Yes.

7    Q.  Did -- and it sounds like you took it pretty

8  serious?

9    A.  Yes.

10    Q.  Did anyone else -- I mean, did anyone -- while

11  you're taking your job as CEO serious -- I mean, was

12  anybody else doing anything as a board member?

13    A.  Not that I know of.

14    Q.  Did they seem to take their role as a board

15  member serious or --

16    A.  I cannot tell.

17    MR. PERRIN:  Objection, form.

18    Q.  (BY MR. FREEMAN)  Okay.  You never saw anybody

19  do anything as a board member?

20    A.  Not that I know of.

21    Q.  Okay.  What was the purpose of the board?

22    A.  I cannot tell you for sure for this particular

23  board.

24    Q.  Did you want there to be a board?

25    A.  I will refuse to answer that question because

27 (Pages 102 to 105)

William Szeto  *  April 2, 2021

---

Page 106

1   I don't know how I feel about it.
2      Q.   Did you want there to be a board?
3      A.   Not that I know of.
4      Q.   What was the purpose of the board?
5      A.   I would assume they supposed to help me with
6   advise and so on, and so as far as I'm concerned, I'm
7   not getting kind of any advice at this point in time.
8      Q.   Okay.  So nobody's giving you any advice as a
9   board member?
10     A.   No.
11          MR. FREEMAN:  Karen, could you read back
12  the question I asked before the assertion of something
13  like privilege?
14          THE REPORTER:  Yes.  Hold on one second.
15          (Requested portion was read.)
16     Q.   (BY MR. FREEMAN)  Okay.  Mr. Szeto, did you
17  want there to be a board?
18     A.   Yes, if I can get good advice and help from
19  them, a board would always be helpful.  So yes.
20     Q.   Were you concerned that they would not be
21  helpful?
22     A.   Well, yes.  If they're not helpful, why do we
23  want to have a board just to hinder my progress every
24  day?  So yes.
25     Q.   Did you have a board to reward them for

---

Page 107

1   something?
2      A.   Do I have -- I don't understand your question.
3      Q.   If you didn't feel like they were going to be
4   helpful, why did you want them on the board?
5      A.   Well, I don't.
6      Q.   You don't now or you didn't then?
7      A.   I don't now; I didn't then.
8      Q.   So why did you allow it to happen?
9      A.   I did not allow it to happen.
10     Q.   Were the terms dictated to you?
11     A.   The terms were dictated to me that I should
12  have two board members, but we never have a board as
13  such.  We never met; we never have calls and then
14  everything else worked just fine.  The only time I need
15  the board's approval when I decide to make a loan, the
16  PPP loan, and that is the only time I check with them.
17  They were helpful then.
18     Q.   And that was just because the government
19  wanted to see that the board said that?
20     A.   Yes.
21     Q.   Okay.  But it wasn't really because you
22  actually needed their authority, was it?
23     A.   No.
24     Q.   It was just to make sure the paperwork went
25  through correctly?

---

Page 108

1      A.   Yes.
2      Q.   So Baymark and Super G are made directors on
3   this board because they tell you that's how it's going
4   be?
5          MR. PERRIN:  Objection, form.
6      A.   Yes.
7      Q.   (BY MR. FREEMAN)  And you didn't really have a
8   choice in the matter, did you?
9      A.   Well, no, not that I know of.
10     Q.   They wanted to take advantage of your
11  expertise in running a business?
12          MR. PERRIN:  Objection, form.
13     A.   I cannot tell you for sure what that is.
14     Q.   (BY MR. FREEMAN)  Did it feel like they were
15  using you?
16          MR. PERRIN:  Objection, form.
17          MS. HARD-WILSON:  Objection, form.
18     A.   No, I cannot answer that question.
19     Q.   (BY MR. FREEMAN)  Did it feel like you were
20  working really hard and they weren't?
21          MR. PERRIN:  Objection, form.
22     A.   I cannot answer that question.
23     Q.   (BY MR. FREEMAN)  Did you feel like you should
24  be getting more of a reward?
25     A.   I get all the reward I want, so I cannot

---

Page 109

1   answer that question.
2      Q.   So you were happy with the situation?
3      A.   I'm very happy.
4      Q.   And you wanted them as board members?
5      A.   I would love to have board member that are
6   helpful to me, yes.
7          MS. HARD-WILSON:  Objection, form.
8      Q.   (BY MR. FREEMAN)  And they were helpful to
9   you?
10     A.   They were helpful to me in some situations,
11  yes.
12     Q.   And is the only situation you can think of
13  getting money from the government?
14     A.   Yes.
15     Q.   Did you discuss with any of your employees
16  their depositions?
17     A.   Well, I -- yes, I did.
18     Q.   Okay.  Who did you discuss their deposition?
19     A.   All of them.
20     Q.   All of them?
21     A.   I only have four employees, and yes, I talk to
22  all of them.  Yes.
23     Q.   Okay.  And who are those?
24     A.   That's Dana, Jane and Paula.
25     Q.   Dana, Jane and Paula?

---

28 (Pages 106 to 109)

Page 110

1     A.   You already talk to Dana and Jane and Paula.
2  You're going to talk to Sai, I think, next week.
3     Q.   Did you talk to Sai about Sai's deposition?
4     A.   Yes.  I talked -- I told them about the
5  depositions, and I informed them the most important
6  thing that they have to do is answer every question
7  honestly and truthfully.  And they need to answer all
8  the questions.  And that's what I told them.  I did not
9  tell them what to answer and what not to answer,
10  obviously, but they were told to answer all questions
11  truthfully and honestly.  That's what I talk to them
12  about.
13     Q.   And you take that very seriously?
14     A.   I take them very seriously that we all tell
15  the truth, yes.
16     Q.   It's very important to tell truth, right?
17     A.   Absolutely.
18     Q.   Maybe the most important thing in the world,
19  right?
20     A.   Right.  And that's why I'm not a lawyer.
21     Q.   You think lawyers -- lawyers don't tell the
22  truth?
23     A.   I cannot tell you.
24     Q.   Not all of them do.  What else did you discuss
25  with your employees?

Page 111

1     A.   That's it.
2     Q.   You didn't talk about anything else on their
3  depositions?
4     A.   No.  There are certain things that they
5  already know.  There are certain things that they're not
6  supposed to know, so I did not talk about any details.
7  And it all depend on what their job function is; they
8  all have different job functions.  There are certain
9  things they should know and certain things they should
10  not know.  So the only thing I ask them to do is to tell
11  the truth and answer all the questions they were asked.
12  And if they do not know the answer, don't try to make up
13  the answer for it.
14     Q.   So did you tell them not to answer some
15  questions?
16     A.   No.  Never tell them not to answer any
17  question.
18     MR. PERRIN:  Objection, form.
19     A.   I told them answer all questions.  If they do
20  not know the answers, say they do not know the answer.
21  I never told them not to answer any questions.
22     Q.   Okay.  What things should they not know?
23     A.   Well, depend on their job function.
24     MS. HARD-WILSON:  Objection, form.
25     A.   So there are things they do not know.  For

Page 112

1  example, like, they do not know anything about the
2  purchasing or assets.  They do not know that.  They do
3  not need to know that.  Okay.  So...
4     Q.   (BY MR. FREEMAN)  So who --
5     A.   So I'm not telling them about it.
6     Q.   Who did you tell they shouldn't know about the
7  purchasing of assets?
8     A.   I did not discuss with any one of the
9  employees about the purchasing of assets because that's
10  my function.  And they did not need to know that.
11     Q.   Okay.  So you wanted to make sure they didn't
12  know about the purchasing of inventory?
13     MR. PERRIN:  Objection, form.
14     A.   They know that I have purchased the inventory.
15  They do not know the details of it, no.
16     Q.   (BY MR. FREEMAN)  And you wanted to make sure
17  that in their depositions, your employees didn't know
18  about the purchasing of inventory?
19     MR. PERRIN:  Objection, form.
20     A.   I did not do that.
21     Q.   (BY MR. FREEMAN)  I'm sorry.  What was the
22  answer?
23     A.   I did not do that.
24     Q.   Okay.  Did you discuss the topic with any of
25  them of when they changed to being a Windspeed employee?

Page 113

1     A.   What do you mean by that?
2     Q.   Did you talk to any of them when they switched
3  from being an ACET Global employee to an Windspeed
4  employee?
5     A.   Yes.  They all receive a email at the end of
6  September telling them that Windspeed -- ACET Global
7  will be closed by the end of September.  And yes, they
8  know that.
9     Q.   So you had that discussion with them in
10  preparing them for their depositions?
11     MR. PERRIN:  Objection, form.
12     A.   No.  What deposition would that be?  They were
13  told at the end of September 2018 that ACET Global will
14  be closed.  So it have nothing to do with the
15  deposition.
16     Q.   (BY MR. FREEMAN)  So they all knew that by the
17  end of September of 2019?
18     A.   2018.
19     Q.   2018.  Excuse me.  Okay.  Did you give them
20  advice on how they should respond to any questions in
21  their depositions?
22     MS. HARD-WILSON:  Objection, form.
23     A.   No.
24     Q.   (BY MR. FREEMAN)  Did you give them advice on
25  how to respond about whether there was a gap between

Page 114

1 their employment with ACET Global and Windspeed?
2         MS. HARD-WILSON: Objection, form.
3     A.  I did not give them any advice.  ACET Global
4 was not -- I mean, Windspeed Trading start working at
5 the beginning of October, and they were told that they
6 will have a job with ACET Global -- no, no, no.  They
7 will have a job with Windspeed Trading starting in
8 October 2018.
9     Q.  (BY MR. FREEMAN)  Okay.
10     A.  And I actually paid them with my own funding
11 beginning of October 2018.
12     Q.  Okay.  Did you discuss their memories?
13     A.  Their what?
14     Q.  Their memories.
15     A.  What memories?
16     Q.  Like what they remembered.
17     A.  No.  I do not discuss about their memory what
18 they remember.
19     Q.  Did you tell them that they should ever say in
20 their deposition that they could not recall something?
21     A.  I told them --
22         MS. HARD-WILSON: Objection, form.
23     A.  -- to answer every question truthfully and
24 honestly and they should not make up any answers for it.
25 If they do not know, they should say they do not know.

Page 115

1 That's what I told them.
2     Q.  (BY MR. FREEMAN)  Okay.  When you told them
3 that, did you make a face or give any kind of gesture
4 that indicated you didn't really mean it?
5         MS. HARD-WILSON: Objection, form.
6     A.  It is very difficult to do that on the phone.
7     Q.  (BY MR. FREEMAN)  Did you have a conversation
8 with Dana Tomerlin?
9     A.  With who?
10     Q.  With Dana Tomerlin about the deposition?
11     A.  We have conversation all the time with various
12 different topics, and -- every day, basically.  So yes,
13 the answer is yes, we have conversation every day.
14     Q.  About her deposition?
15     A.  No.
16     Q.  Okay.  And that's what I'm specifically asking
17 you about.
18     A.  Well, you did not say that specifically.
19     Q.  Okay.  In your discussion with Dana about her
20 deposition, did you tell her to say that she was
21 terminated from ACET Global in September?
22     A.  Yes.
23         MS. HARD-WILSON: Objection.
24     Q.  (BY MR. FREEMAN)  And in your discussion with
25 Jane Lin about her deposition, did you tell her to say

Page 116

1 she was terminated from ACET Global in September?
2         MS. HARD-WILSON: Objection, form.
3     A.  Yes.
4     Q.  (BY MR. FREEMAN)  Okay.  What else did you
5 tell them to say?
6     A.  I did not tell them --
7         MS. HARD-WILSON: Objection, form.
8     A.  -- to say anything that is not truthful.
9     Q.  (BY MR. FREEMAN)  Okay.  When did you first
10 discuss a foreclosure with Super G?
11     A.  I did not discuss a foreclosure with Super G.
12 I never have.  Never did.
13     Q.  Now, Mr. Szeto, you were just speaking a
14 little bit ago about a conversation you had with Steven
15 Bellah?
16     A.  Yes.
17     Q.  And you've always understood him to represent
18 Super G?
19     A.  Yes.
20     Q.  What was it you were trying to get from him?
21         MR. PERRIN: Objection, form.
22     A.  I try to get from him a letter that he said he
23 has, but that's nothing to do with the foreclosure.
24     Q.  (BY MR. FREEMAN)  Nothing to do with the
25 foreclosure?

Page 117

1         (Simultaneous speaking.)
2         THE REPORTER:  Guys, guys.  Both of you
3 are talking at the same time.
4     Q.  (BY MR. FREEMAN)  Go ahead, Mr. Szeto.
5     A.  Yes?
6         THE REPORTER:  Mr. Szeto, did you answer
7 the question, "Nothing to do with the foreclosure"?
8 What was your response to that question?  I didn't hear
9 it.
10         THE WITNESS:  Will you repeat the
11 question again?
12     Q.  (BY MR. FREEMAN)  The letter you were trying
13 to get from Steve Bellah in August or September of 2020,
14 what was that letter about?
15     A.  I was told that letter was about that the
16 purchasing of inventory from Super G, and that's what
17 the letter was supposed to be all about.  I have not
18 seen the letter before.  I only heard about it from
19 Steve, and it was more than something that I'd like to
20 have the letter to defend myself on the lawsuit.
21     Q.  How was it going to help you defend?
22     A.  Because he told me during that time that I was
23 legally be able to buy the inventory, and obviously I
24 would like to have everything that -- relating to the
25 purchasing of the inventory in my hand.  So I ask for

30 (Pages 114 to 117)

William Szeto  *  April 2, 2021

## Page 118

1   the letter.
2        Q.  Okay.  Was that a -- was that letter a Notice
3   of Foreclosure?
4        A.  I do not know what the letter is about.  I was
5   told the letter that he has that he offer the
6   foreclosure of all of the inventory to Mr. Demti and he
7   send the letter back to him rejecting that offer.  And
8   he told me now he could sell me the inventory.  And
9   that's the only reason why I ask for a copy of the
10   letter so I know I have the legal mean to buy the
11   inventory.
12        Q.  After the foreclosure?
13        A.  After the foreclosure, yes.
14        Q.  Got it.  Why was it important that there be a
15   foreclosure?
16             MS. HARD-WILSON:  Objection, form.
17        A.  I was not involved with the foreclosure, and I
18   cannot answer that question.
19        Q.  (BY MR. FREEMAN)  Did David Hook think it was
20   important?
21             MS. HARD-WILSON:  Objection, form.
22        A.  I do not know what David Hook thinks.
23        Q.  (BY MR. FREEMAN)  Did Tony Ludlow think it was
24   important?
25             MS. HARD-WILSON:  Objection, form.

## Page 119

1        A.  I don't know what they're thinking.
2        Q.  (BY MR. FREEMAN)  Okay.  But you weren't
3   involved at all in the foreclosure?
4        A.  I was not involved whatsoever with the
5   foreclosure, no.
6        Q.  And not involved in the preparation of any of
7   the documents related to the foreclosure?
8        A.  No, I was not involved in any form or shape
9   with the foreclosure.
10        Q.  Did you even know it was going on?
11        A.  No.  I do not know what was going on.
12        Q.  So you only found out about it in March
13   of 2019?
14        A.  Yes.
15        Q.  But you had nothing to do with it before then?
16        A.  No, I have nothing to do with whatever they
17   were doing with the foreclosure, nothing.
18        Q.  Did -- who mailed the Notice of Foreclosure
19   out?
20        A.  I cannot --
21             MS. HARD-WILSON:  Objection, form.
22        A.  -- tell you.
23        Q.  (BY MR. FREEMAN)  Did Super G ever ask you to
24   hold on to the inventory for it after it had foreclosed?
25        A.  Super G asked me to move the inventory to a

## Page 120

1   unit because the building was going to be locked out,
2   and they do not want to lose the access to those
3   inventory.  That was the only thing that Super G asked
4   me to do.  It was nothing to do with foreclosure or
5   whatever.
6        Q.  Okay.  When was that?  Was that when you moved
7   from ACET to Windspeed?
8        A.  No.  That was when we moved from ACET Global's
9   building to a storage unit that we rented and because we
10   did not pay rent for a long, long time and the building
11   was going to lock us out.
12        Q.  Okay.  Got it.  And that's when Super G wanted
13   you to hold on to the inventory?
14        A.  Yes.
15        Q.  Okay.  Did they ask you to do that in writing?
16        A.  No.
17        Q.  What specifically did they say?
18        A.  Well, they basically say -- try to find a
19   place to move the inventory because the building going
20   to be locked down.  And that was all that was said.
21        Q.  Okay.  Did Super G need a listing of the
22   inventory for the foreclosure sale?
23        A.  Not particularly for the foreclosure sale, but
24   we always have a listing of all the inventory.  We keep
25   that all the time.  We keep up with it all the time.  So

## Page 121

1   yes, I gave them a listing of all the inventory.
2   Whether it was for foreclosure sale or for foreclosure,
3   I do not know the application of it.
4        Q.  Okay.  But at some point they asked you for an
5   inventory for the foreclosure process?
6             MS. HARD-WILSON:  Objection, form.
7        A.  Not particularly for the foreclosure process.
8   They ask for a listing of all the inventory, yes.
9        Q.  (BY MR. FREEMAN)  Okay.  Who asked you --
10        A.  I don't know what it's for.
11        Q.  Who asked you for that?
12        A.  I believe either was Matt or Steve, but I
13   cannot tell you for sure.
14        Q.  Matt Denegre or Steve Bellah?
15        A.  Yes.
16        Q.  Okay.  And you don't know exactly why they
17   needed it?
18        A.  Yes, I do not know why they needed it.
19        Q.  Was that a normal request?
20        A.  It is not an abnormal request.  They sometimes
21   say, What do you have in the inventory?  Like I said, I
22   keep up with the inventory every day as part of the
23   business.  So I have that list.
24        Q.  Did they ever ask you for a copy of an
25   inventory any other time?

31 (Pages 118 to 121)

William Szeto  *  April 2, 2021

## Page 122

1  A.  Yes.

2  Q.  When?

3  A.  I cannot tell you for sure when, but yes, they

4  do ask for a copy of the inventory.  That's why we keep

5  a list all the time.

6  Q.  Okay.  And would you generally send those by

7  email?

8  A.  No.  Well, when they ask for it, yes, I will

9  send those by email, but I cannot tell you when was the

10  last time they ask for it.

11  Q.  And in this case as part of the discovery, did

12  you search all your emails for correspondence with them?

13  A.  The email was long gone after we close --

14  after ACET Global was closed.  And I no longer have

15  access of any emails.

16  Q.  What happened to all those emails?

17  A.  I don't know.  I cannot tell you.  When we

18  stop paying, the people who manage the email for us,

19  they were all gone.

20  Q.  So you got rid of all of those emails?

21      MS. HARD-WILSON:  Objection, form.

22  A.  Huh?

23  Q.  (BY MR. FREEMAN)  Did you get rid of all of

24  emails?

25      MR. PERRIN:  Objection, form.

## Page 123

1  A.  I did not get rid of it, but when we stop

2  paying for the email, they took it all away.

3  Q.  So all of your ACET Global emails were gone?

4  A.  As far as I know, they were all gone.

5  Q.  And that's all your correspondence with Matt

6  Denegre?

7  A.  As far as I know, all emails were gone when we

8  stop paying them.

9  Q.  And your correspondence with David Hook was

10  all gone?

11      MR. PERRIN:  Objection, form.

12  A.  I don't think there was any exception.  They

13  were all gone, yes.

14  Q.  (BY MR. FREEMAN)  So also all of your

15  correspondence with Tony Ludlow was gone?

16      MR. PERRIN:  Objection, form.

17  A.  Yes.

18  Q.  (BY MR. FREEMAN)  And all your correspondence

19  with Baymark Partners was gone?

20      MR. PERRIN:  Objection, form.

21      MS. HARD-WILSON:  Objection, form.

22  A.  Yes.

23  Q.  (BY MR. FREEMAN)  All your correspondence with

24  Super G was gone?

25      MS. HARD-WILSON:  Objection, form.

## Page 124

1  A.  Yes.

2  Q.  (BY MR. FREEMAN)  And that was all at that

3  same time you formed Windspeed?

4  A.  Not at the same time, but that was --

5  Windspeed was formed after I got funding at the end of

6  October.  I think that was gone before that.  I cannot

7  tell you for sure.  But we stopped paying the people who

8  manage the emails, and they took away our email address

9  and all the correspondence was gone.  I was too late to

10  get a copy of it.  So I did not have a copy of it.

11  Q.  So you lost all of your ACET Global emails

12  around the time that you started Windspeed?

13  A.  Yes.

14  Q.  And that you lost all of the employees' ACET

15  Global emails about the time you formed Windspeed?

16  A.  Yes.

17  Q.  Did you make a backup of those emails?

18  A.  No.

19      MS. HARD-WILSON:  Objection, form.

20  A.  We did not make a backup of those emails.

21  Q.  (BY MR. FREEMAN)  Did you -- did you do

22  anything to try to save those emails?

23  A.  We tried to talk to the people to who manage

24  our email.  It was too late.

25  Q.  Why were you trying to get those emails?

## Page 125

1  A.  Just trying to get some records of what we

2  have, but it was too late, and we couldn't get it.

3  Q.  Did you need those to figure out whose assets

4  were what?

5      MS. HARD-WILSON:  Objection, form.

6  A.  We don't need those at that time, and I don't

7  need those emails to figure out what's going on.  So we

8  just let it go.

9  Q.  (BY MR. FREEMAN)  You weren't worried about

10  it; you just let all those emails go?

11      MS. HARD-WILSON:  Objection, form.

12  A.  Yes.  I'm still not worried about it.

13  Q.  Still not worried about it?  You let all those

14  emails go about the same time you formed Windspeed?

15      MR. PERRIN:  Objection, form.

16  Q.  (BY MR. FREEMAN)  Were there any emails --

17      THE REPORTER:  Wait.  Jason, I didn't get

18  an answer to that question.

19      THE WITNESS:  What was the question?

20      (Requested portion was read.)

21  A.  About the same time, yes.

22      MR. PERRIN:  Objection, form.

23  Q.  (BY MR. FREEMAN)  Were there emails -- were

24  there emails in there, those emails that were lost,

25  were there emails in there between ACET Global and Super

32 (Pages 122 to 125)

Page 126

```
 1   G?
 2           MS. HARD-WILSON:  Objection, form.
 3       A.  There's all kind of email, and I cannot tell
 4   you from whom or what, but it was gone.
 5       Q.  (BY MR. FREEMAN)  Were there emails in there
 6   about loans with Super G?
 7           MR. PERRIN:  Objection, form.
 8       A.  I assume there was email in there to talk
 9   about the loan I had with Super G, yes.  I assume that
10   is the case.  But I cannot specifically tell you, yes,
11   there is one or two or what.  I assume there has to be
12   some.
13       Q.  (BY MR. FREEMAN)  Okay.  Were there emails in
14   there about inventory?
15       A.  No.
16       Q.  Nothing on your --
17       A.  Not that I know of.  There's nothing that we
18   need to talk about inventory at that time.
19       Q.  Okay.  During the time that you worked at ACET
20   Global, did you ever have emails about inventory?
21       A.  I have inventory -- a list of inventory every
22   day.  I already said that.  So is there an email
23   concerning inventory?  There may be some, but not in the
24   issue of buying or selling inventory, no.
25       Q.  Okay.  But there were emails about inventory?
```

Page 127

```
 1           MR. PERRIN:  Objection, form.
 2       A.  I'm sure there's email concerning inventory
 3   because I have inventory every day, so I know what's in
 4   the warehouse.
 5       Q.  (BY MR. FREEMAN)  Okay.  Were there emails
 6   about -- were there emails about the restructuring of
 7   ACET Global?
 8           MS. HARD-WILSON:  Objection, form.
 9       A.  No.
10       Q.  (BY MR. FREEMAN)  Were there emails about
11   forming a new company after ACET Global?
12       A.  No.  There's no such email concerning the
13   restructuring or forming a new company after ACET
14   Global.
15       Q.  You're certain about that?
16       A.  I am very certain about that.
17       Q.  Okay.  How can you be so certain?
18       A.  Because I know when that I have that idea of
19   starting a new company, and I was -- I'm certain about
20   that.  And there was no concept of starting a new
21   company even then.  So I'm certain that there was no
22   such discussion whatsoever concerning a new company.
23       Q.  So there wasn't any discussion about starting
24   a new company until after you had formed Windspeed?
25       A.  I think that the discussion about forming
```

Page 128

```
 1   Windspeed was all the conversation I have with my son,
 2   Alex Szeto, and one day after dinner, and I said, Hey,
 3   maybe it's a good idea, go ahead and start a new
 4   company.  And he helped me with starting a new company
 5   and that was long after -- long before that we even talk
 6   about getting funding for it.
 7           I am very familiar with the process of
 8   raising funds.  I work with venture capitalists for a
 9   long, long time, and I thought I could get funding from
10   venture capitalist.  It didn't turn out that way, but
11   you know, this is not the first time I start a new
12   company.  I started about ten different companies
13   before.  So it's just a thought that came up to my head
14   and had nothing to do with ACET Global or nothing to do
15   with anything else.
16       Q.  You know, when you're talking with your son
17   about it, did you say, like, We could form this new
18   company and carry on ACET Global's --
19       A.  No --
20       Q.  -- operations or --
21           MS. HARD-WILSON:  Objection --
22       A.  -- nothing to do with ACET Global.
23           THE REPORTER:  Guys, guys.  Please, stop.
24   I had three people talking to me at the same time, and
25   it's gone.  So, Mr. Szeto, please, before you answer,
```

Page 129

```
 1   please let Jason finish his question, give your attorney
 2   a moment to object and then you answer.  Please.
 3           This record is going to be a mess, guys,
 4   if you don't help me out with this.
 5           MR. FREEMAN:  Yes, ma'am.
 6       Q.  (BY MR. FREEMAN)  Mr. Szeto, at the time you
 7   formed Windspeed, were you concerned about a potential
 8   lawsuit related to ACET?
 9       A.  No.
10       Q.  Weren't concerned about whether ACET was going
11   to fail to pay any of its loans?
12       A.  When you have a loan, you're always concerned
13   about failure to pay the loan.  So it's nothing new.
14       Q.  So you're always kind of concerned there could
15   be a lawsuit about a loan that's --
16           MR. PERRIN:  Objection, form.
17       Q.  (BY MR. FREEMAN)  Were you always kind of
18   concerned that there could be a lawsuit over a loan
19   that's not paid back?
20           MR. PERRIN:  Objection, form.
21       Q.  (BY MR. FREEMAN)  Mr. Szeto?
22       A.  Yes, there's always concern.  When you don't
23   pay back a loan, there's always concern.  But that was
24   not the thing I was concerned about at that time.
25       Q.  (BY MR. FREEMAN)  That wasn't why you let the
```

33 (Pages 126 to 129)

Page 130

1  emails go away around the time you formed Windspeed,
2  correct?
3          MR. PERRIN: Objection, form.
4      A.  No.
5      Q.  (BY MR. FREEMAN) But you were -- you were at
6  least -- you're always kind of, like, worried that there
7  could be a lawsuit about ACET not paying its loan?
8          MR. PERRIN: Objection, form.
9          MS. HARD-WILSON: Objection, form.
10     Q.  (BY MR. FREEMAN) Is that correct?
11     A.  No, that's not correct.
12     Q.  You didn't care at all that ACET didn't pay
13 its loans, did you?
14         MS. HARD-WILSON: Objection, form.
15     A.  That's not the correct way to say that. I'm
16 always concerned about not paying back the loan, but
17 that was not the reason why our email were gone. So
18 that was incorrect what you said.
19     Q.  (BY MR. FREEMAN) Got it. Were you concerned
20 that Super G might sue ACET Global?
21     A.  I do not know what they were going to do, and
22 I was not concerned.
23     Q.  Okay. Did you have any concern that Tomer
24 Damti might sue ACET Global?
25     A.  I did not know what Tomer was going to do. I

Page 131

1  do not know, and I don't have any concerns.
2      Q.  But you knew there was a significant liability
3  owed by ACET Global to Tomer Damti?
4      A.  I do not know any details of that.
5      Q.  You didn't know anything about a loan being
6  owed by ACET Global to Tomer Damti?
7      A.  I do not know anything, any loan that ACET
8  Global owned to Tomer Damti because that is the least of
9  my concern at that time. I was told to take care of
10 ACET Global, and I was not involved with any details
11 between Tomer Damti and the others.
12     Q.  Was that loan owed by ACET Global to Tomer
13 Damti ever reflected on any of your accounting records
14 at ACET Global?
15         MR. PERRIN: Objection, form.
16     A.  That's not something I look at, and there was
17 so many things at that time that I look at. That was
18 not one of the things I look at.
19     Q.  (BY MR. FREEMAN) Were you ever made aware
20 that ACET Global owed a note to Tomer Damti?
21     A.  No, I was -- I did not know anything about it.
22     Q.  Okay. Going back to the inventory listing for
23 the foreclosure sale, did Super G need an inventory --
24 an inventory listing from you so they could complete
25 that foreclosure sale?

Page 132

1          MS. HARD-WILSON: Objection, form.
2          MR. PERRIN: Objection, form.
3      Q.  (BY MR. FREEMAN) Mr. Szeto?
4      A.  I provided an inventory list, and I do not
5  know what the application would be.
6      Q.  Okay.
7          (Exhibit 33 marked.)
8      Q.  (BY MR. FREEMAN) I'm going to put on the
9  screen what's marked as Exhibit 33. Do you see that,
10 sir?
11     A.  Yes, sir.
12     Q.  Does that appear to be an email from Brian
13 Vanderwoude to Julie Smith on January 28th, 2019?
14     A.  Okay.
15     Q.  Okay. Let's read this to you to make sure
16 that it comes across as correct. But first, I want to
17 ask you, what is the subject line?
18     A.  It is ACET inventory as of 1/24/2019.
19     Q.  Okay. So that's -- this letter sent from
20 Julie Smith -- or sent to Julie Smith on January 28th,
21 2019, has a subject line of ACET inventory as of
22 1/24/2019; is that correct?
23     A.  Yes.
24     Q.  Okay. And this email says, if you'll follow
25 along with me, "Sorry for the delay. I'm in arbitration

Page 133

1  all week this week. I have traded voicemails with Steve
2  at Super G. I recall a discussion about giving Tomer
3  notice that we had foreclosed and an opportunity to
4  purchase the assets knowing he wouldn't."
5      A.  Yes.
6      Q.  "I wasn't necessarily contemplating that he
7  would be copied on the formal Notice of Foreclosure
8  since he's an unsecured creditor and thus isn't entitled
9  to notice under the UCC."
10         Did I read that correctly?
11     A.  Yes.
12     Q.  Let's see here. I want to just go down below
13 that. There appears to be an email below that from
14 Julie Smith to Brian Vanderwoude earlier that same day,
15 January 28th, 2019. Do you see that?
16     A.  Yes.
17     Q.  And it says from Julie Smith, her signature
18 block states that she's a shareholder at Hallett &
19 Perrin, PC; is that correct?
20     A.  I can read from the paper, yes.
21     Q.  Did you ever have any dealings with Julie
22 Smith?
23     A.  Yes, I did. A few things here and there, but
24 that was it.
25     Q.  Did she help Windspeed sometimes?

34 (Pages 130 to 133)

William Szeto  *  April 2, 2021

Page 134

1    A. No.
2    Q. No? Her email here says -- here -- "Brian,
3    here's an updated inventory listing for the foreclosure
4    agreement. Any word from Super G?"
5        Do you see that?
6    A. Yes.
7    Q. Where did she get that inventory listing?
8    A. I do not know. I did not give it to her
9    directly, so I cannot tell you for sure.
10   Q. So if you didn't do it directly, then you've
11   got no involvement, right?
12   A. I have no involvement whatsoever with this
13   issue.
14   Q. None at all?
15   A. None at all.
16   Q. Okay. So I want to look below there. There's
17   an email from Matt Denegre sending the inventory to
18   Julie Smith on January 28th, 2019, a little earlier that
19   day, 11:42 a.m.
20   A. Uh-huh.
21   Q. Is that correct?
22   A. Yes.
23   Q. What's the subject line of that inventory --
24   of that email?
25   A. Which one?

Page 135

1    Q. This email from Matt Denegre. It says,
2    subject line, Forward ACET inventory as of 1/24/2019; is
3    that correct?
4    A. Yes.
5    Q. Okay. How did Matt Denegre get the ACET
6    inventory?
7    A. I sent it to him.
8    Q. Oh. So Matt Denegre asked for the inventory?
9    A. Yes.
10   Q. Okay. And so if you see here, is this an
11   email from you to Matt Denegre sending that inventory?
12   A. Yes.
13   Q. And you wrote the subject line on this email,
14   didn't you?
15   A. Yes.
16   Q. And it -- that subject line says, "ACET
17   inventory as of 1/24/2019"; is that correct?
18   A. Yes.
19   Q. Uh-huh. And this was sent on January 28th,
20   2019; is that correct?
21   A. Yes.
22   Q. What did you think this inventory was being
23   used for?
24   A. I do not know.
25   Q. Okay. Now, I thought you testified earlier

Page 136

1    that you didn't have any of the ACET inventory records
2    or software.
3    A. No --
4        MR. PERRIN: Objection --
5    A. I said --
6        MR. PERRIN: Objection, form.
7    A. Okay. I'm sorry.
8    Q. (BY MR. FREEMAN) How did you know what ACET's
9    inventory was as of January 24th, 2019?
10   A. We keep track of inventory until that time.
11   We have inventory -- we have a listing of inventory all
12   the time, even at 1/24/2019. And we keep track of the
13   inventory, yes.
14   Q. Who was involved in preparing this inventory?
15   A. All of my staff, Dana and other who prepare
16   the inventory. It's the same inventory listing.
17   Nothing would change even after that.
18   Q. So all your employees were involved in it?
19   A. Yes.
20   Q. Okay. But I thought you testified earlier
21   that they wouldn't need to know anything outside their
22   roles?
23   A. Well, they don't need anything outside the
24   role, yes, it's true, but they certainly know what is in
25   the warehouse.

Page 137

1    Q. So if any employee testified to me in a
2    deposition that they had no role in preparing this
3    inventory, they would be lying?
4        MR. PERRIN: Objection, form.
5    A. Yes.
6    Q. (BY MR. FREEMAN) Your answer is yes?
7    A. Yes, they would be lying if they said they
8    don't know anything about the inventory.
9    Q. And so if any of your employees testified to
10   me in a deposition that they had no role in preparing
11   this inventory, they would be incorrect?
12   A. Yes.
13       MR. PERRIN: Objection, form.
14   Q. (BY MR. FREEMAN) Because you told them to
15   prepare this inventory, correct?
16   A. It is the normal function to prepare the
17   inventory but not at that time for ACET Global anymore
18   because ACET Global is closed. So that will be our old
19   inventory that was prepared long before ACET Global was
20   closed.
21   Q. Okay.
22   A. Not a new inventory.
23   Q. Do you think of any of your employees might
24   have felt uncomfortable about testifying about an area
25   that was outside their defined role?

35 (Pages 134 to 137)

## Page 138

1          MR. PERRIN:  Objection, form.

2          MS. HARD-WILSON:  Objection, form.

3     A.  I cannot tell you that.

4     Q.  (BY MR. FREEMAN)  No idea why they might have

5 felt uncomfortable testifying about that?

6          MS. HARD-WILSON:  Objection, form.

7     A.  I have no idea.

8     Q.  (BY MR. FREEMAN)  Okay.  But you got this

9 inventory together.  You told them to get it together,

10 correct?

11     A.  That was before ACET Global was closed.  So we

12 have that -- that is our old inventory that was done

13 before September of 2018.

14     Q.  Okay.  What date is this email that you sent?

15     A.  The email I sent was January 28th, but that

16 was the old inventory.

17     Q.  What's the subject line?

18     A.  Inventory as of 1/24.

19     Q.  Okay.  Who represented Windspeed in the

20 foreclosure process?

21          MS. HARD-WILSON:  Objection, form.

22     A.  Nobody represent Windspeed in the foreclosure

23 process.  We did not get involved in whatsoever with the

24 Windspeed foreclosure process.

25     Q.  (BY MR. FREEMAN)  No involvement at all with

## Page 139

1 the foreclosure process?

2          MS. HARD-WILSON:  Objection, form.

3     A.  Absolutely not.

4     Q.  (BY MR. FREEMAN)  Okay.  Was anybody looking

5 out for Windspeed in the foreclosure process?

6          MS. HARD-WILSON:  Objection, form.

7     A.  Not that I know of.

8     Q.  (BY MR. FREEMAN)  Did you need the Baymark

9 parties and Super G to be board members of Windspeed so

10 you could make sure that Windspeed got ACET Global's

11 inventory?

12          MR. PERRIN:  Objection, form.

13     A.  No.  That's wrong.

14     Q.  (BY MR. FREEMAN)  Okay.  Okay.  I'm going to

15 show you, Mr. Szeto, what's marked as Exhibit 34.  Do

16 you see this document?

17     A.  Yes.

18          (Exhibit 34 marked.)

19     Q.  (BY MR. FREEMAN)  Okay.  Does this appear to

20 be an email?

21     A.  Yes.

22     Q.  Does it appear to be an email from Brian

23 Vanderwoude to Julie Smith?

24     A.  Yes.

25     Q.  March 27th, 2019?

## Page 140

1     A.  Yes.

2     Q.  Okay.  And is the subject line Windspeed/Super

3 G loan agreement?

4     A.  Yes.

5     Q.  Did Windspeed get a new loan from Super G in

6 March of 2019?

7     A.  Yes, we did.

8     Q.  Okay.  Do you know when that happened?

9     A.  I don't know the exact date, but it was about

10 that time of March, at the end of March.

11     Q.  End of March?

12     A.  Yes.

13     Q.  Not early March, right?  Do you know when you

14 signed it?

15     A.  I don't remember exactly when I signed it, but

16 it was sometime in March.

17     Q.  Okay.  Sometime after March 27th?

18     A.  Yeah.

19     Q.  Sure.  The attachments that are listed here,

20 it refers to a foreclosure sale agreement; is that

21 correct?

22     A.  Yes.

23     Q.  Uh-huh.  And an A&R loan agreement?

24     A.  Yes.

25     Q.  And an Assignment and Assumption Agreement?

## Page 141

1     A.  Yes.

2     Q.  And the email from Brian Vanderwoude below

3 that, it says, "I've confirmed that scanned copies

4 acceptable to Super G.  Fully executed copies of the

5 documents are attached.  Glad we were able to get this

6 finalized."

7          Is that correct?

8     A.  Yes.

9     Q.  There's an email right below that from Julie

10 Smith; is that correct?

11     A.  Yes.

12     Q.  And Julie Smith's signature block states that

13 she is a shareholder at Hallett & Perrin; is that

14 correct?

15     A.  As far as I know, yes.

16     Q.  Okay.  And her email says, "I just emailed

17 Windspeed to ask.  I'll let you know."

18          Is that correct?

19     A.  Uh-huh.

20     Q.  Okay.  Did you get an email from Julie Smith

21 about this?

22     A.  I cannot remember.

23     Q.  Okay.  There's an email right below that

24 that's dated March 26th, 2019; is that correct?

25     A.  Yes.

William Szeto  *  April 2, 2021

## Page 142

1     Q.  It's from Brian Vanderwoude to Julie Smith; is
2  that correct?
3     A.  Uh-huh.
4     Q.  And it says, "Just following up to see when we
5  can expect to receive Windspeed's signature page."
6        Is that correct?
7     A.  Yes.
8     Q.  Any idea why Brian is emailing Julie Smith to
9  get that signature page?
10    A.  I have --
11       MS. HARD-WILSON:  Objection, form.
12    A.  I have no idea because I -- we have no
13  involvement whatsoever concerning the sales and all
14  that.  And that was the -- that one I know at that time.
15     Q.  (BY MR. FREEMAN)  Okay.  Let me go down here
16  to this email right below that is an email dated
17  March 21st, 2019; is that correct?
18    A.  Yes.
19     Q.  And that's an email from Julie Smith to Brian
20  Vanderwoude; is that correct?
21    A.  Uh-huh.
22     Q.  Okay.  And if you look at her signature block,
23  is Julie Smith a shareholder in Hallett & Perrin?
24    A.  Yes.
25     Q.  And it says, "Brian, we are good to go with

## Page 143

1  the documents.  I will have Windspeed execute the
2  signature pages and forward them to you."
3       Is that correct?
4    A.  Yes.
5     Q.  Okay.  Did Julie Smith facilitate the
6  signature pages?
7    A.  As far as I know, yes.
8     Q.  Okay.  Who drafted the Foreclosure Sale
9  Agreement?
10       MS. HARD-WILSON:  Objection, form.
11     Q.  (BY MR. FREEMAN)  Isn't that the signature
12  page she's referring to here?
13    A.  Yes.
14     Q.  You testified --
15    A.  I think that's what she refer to.
16     Q.  Didn't you sign the Foreclosure Sale
17  Agreement?
18    A.  Yes, I think I did.
19     Q.  But I thought you had nothing to do with
20  foreclosure?
21       MR. PERRIN:  Objection, form.
22    A.  I had nothing to do with the foreclosure, but
23  I signed the sales agreement afterwards.
24     Q.  (BY MR. FREEMAN)  Okay.  Do you know who
25  drafted the Foreclosure Sale Agreement?

## Page 144

1       MS. HARD-WILSON:  Objection, form.
2    A.  I do not know.
3     Q.  (BY MR. FREEMAN)  Who do you believe drafted
4  it?
5       MR. PERRIN:  Objection, form.
6    A.  I do not know.
7     Q.  (BY MR. FREEMAN)  Okay.  Did Julie Smith have
8  to get some information from Windspeed to prepare these
9  forms?
10    A.  I did not -- I don't remember providing any
11  information to Julie Smith.
12     Q.  Did she need to know how much the loan was?
13    A.  She did not get that number from me.
14     Q.  Did she need to know whether any payments had
15  been made on loans?
16       MR. PERRIN:  Objection, form.
17    A.  She did not get that number from me.
18     Q.  (BY MR. FREEMAN)  Okay.  If you look down
19  below, there's an email on this thread from Julie Smith
20  to Brian Vanderwoude dated March 20th, 2019; is that
21  correct?
22    A.  Yes.
23     Q.  And she's got an email there with a number of
24  items.  One of them is "Amount of loan" in the listing;
25  is that correct?

## Page 145

1    A.  Yes.  I can see that number.
2     Q.  Okay.  "I understand from Windspeed that
3  payments have been made on the loan."
4       Is that correct?
5    A.  I can see that, but I don't know the details.
6     Q.  Okay.  Does it say, "Would you confirm with
7  Super G that $516,844.86 is still the current balance"?
8    A.  I can see that from that email, yes.
9     Q.  Okay.  I want to go down and look at the
10  attachments here, if you'll keep scrolling with me.  Is
11  this a document on your screen that states, Foreclosure
12  Sale Agreement between Windspeed Trading, LLC and Super
13  G Capital, LLC?
14    A.  Yes.
15     Q.  And does it say that it's dated as of
16  March 1st, 2019?
17    A.  Yes, I see that date.
18     Q.  Okay.  Did you sign this as of March 1st,
19  2019?
20    A.  Not that particular document.
21     Q.  Okay.  Had you ever seen this document before?
22    A.  I have seen the document afterwards.
23     Q.  Okay.  After it was signed?
24    A.  Yes.
25     Q.  So was it not your signature on there?

37 (Pages 142 to 145)

Page 146

```
 1        A.  No.  I signed the signature page, yes.
 2        Q.  Okay.  So you saw this document before you
 3   signed it?
 4        A.  Yes.
 5        Q.  Okay.  If you'll look with me on Section 9.4
 6   of the document, "Notices," and there is Bates labeled
 7   Page BP 004265 in the bottom right corner.
 8        A.  Yes.
 9        Q.  It refers to required notices, and the first
10   one is if there is a notice required to the buyer that
11   it would be sent to Windspeed Trading to your attention;
12   is that correct?
13        A.  Yes.
14        Q.  And then it says with a required copy to Julie
15   Smith of Hallett & Perrin, PC; is that correct?
16        A.  Yes.
17        Q.  Did you ask Ms. Smith to make sure she got a
18   copy of anything that went to Windspeed?
19        A.  I did not ask her specifically for that, no.
20        Q.  Why is she listed as the person to whom a
21   notice would be sent?
22        A.  I cannot tell you for sure.
23        Q.  No idea?
24        A.  No idea.
25        Q.  Okay.  Is that your signature?
```

Page 147

```
 1        A.  Yes.
 2        Q.  On -- this is the eighteenth page of
 3   Exhibit 34, Bates labeled BP 004268; is that correct?
 4        A.  Yes.
 5        Q.  Was Baymark counsel involved in the
 6   foreclosure?
 7        A.  I do not know.
 8        Q.  You don't know if Baymark's counsel was
 9   involved?
10        A.  No, I do not know who was involved with it
11   because I was not involved with it.
12        Q.  Based on what you just saw there with the
13   correspondence with Julie Smith, do you believe
14   Baymark's counsel was involved?
15             MS. HARD-WILSON:  Objection, form.
16        A.  I cannot tell for sure.
17             MR. PERRIN:  Objection, form.
18        Q.  (BY MR. FREEMAN)  Okay.  Was Baymark needing
19   to get any financial information from Windspeed in early
20   2019?
21        A.  From where?
22        Q.  From Windspeed.
23        A.  Baymark has financial information from
24   Windspeed in 2019, yes.
25        Q.  Okay.  Did they need information about
```

Page 148

```
 1   projections?
 2        A.  I don't think that we provide projection in
 3   2019.
 4        Q.  Okay.  Why not?
 5        A.  Because we cannot provide projections.  We
 6   were still trying to get started.
 7        Q.  Okay.  Do you know when Baymark began the
 8   process or -- strike that.
 9             Do you know when Baymark began
10   coordinating with Super G on the foreclosure?
11             MS. HARD-WILSON:  Objection, form.
12        A.  I do not know any details.
13             (Exhibit 35 marked.)
14        Q.  (BY MR. FREEMAN)  Okay.  We're going to put up
15   what's marked as Exhibit 35.  Do you see this, sir?
16        A.  Yes.
17        Q.  All right.  Is this an email from Matt Denegre
18   to Steve Bellah?
19        A.  Yes.
20        Q.  Is it dated October 23rd, 2018?
21        A.  Yes.
22        Q.  Okay.  When did you form Windspeed?
23        A.  That was at the end of October after we
24   received the funding.
25        Q.  Okay.  This email has the subject line ACET;
```

Page 149

```
 1   is that correct?
 2        A.  Yes.
 3        Q.  Okay.  Why does this have an email subject
 4   line ACET?
 5             MR. PERRIN:  Objection, form.
 6             MS. HARD-WILSON:  Objection, form.
 7        A.  I do not have any idea.
 8        Q.  (BY MR. FREEMAN)  Okay.  The email, does it
 9   say, "Steve, I would like to discuss our next steps for
10   ACET Global and get your thoughts on how to move forward
11   with foreclosure."
12             Did I read that correct?
13        A.  Yes.
14        Q.  Okay.  And is this email from Matt Denegre?
15        A.  Yes.  As I can see, yes.
16        Q.  And does his signature line say Baymark
17   Partners?
18        A.  Yes.
19        Q.  And does it refer to a website called
20   BaymarkPartners.com?
21        A.  Yes.
22        Q.  Is that his Baymark Partners' phone number?
23        A.  I assume it is.
24        Q.  Okay.  So did you have any idea that this was
25   going on around the same time that you formed Windspeed?
```

---

Page 150

1    MR. PERRIN:  Objection, form.
2    A.  No, I have no idea.
3    Q.  (BY MR. FREEMAN)  No idea this was going on?
4    A.  Right.
5    Q.  Okay.
6        MR. FREEMAN:  This is good place to stop
7    for lunch.
8        THE WITNESS:  Okay.
9        (Break taken from 12:50 p.m. to 1:27 p.m.)
10   Q.  (BY MR. FREEMAN)  Back on the record.
11   Mr. Szeto, we're back from lunch.  We are going to pick
12   up, kind of, where we left off.  I want to talk a little
13   bit about the transition from ACET Global to Windspeed
14   Trading and the timing of that.
15       MR. PERRIN:  Objection, form.
16   Q.  (BY MR. FREEMAN)  In September of 2018, did
17   any of these people work for ACET Global:  Sai Vattana?
18   Did Sai Vattana work for --
19   A.  No.
20   Q.  Not in September of 2018?
21   A.  Who are you talking about?
22   Q.  Sai Vattana?
23   A.  Yes.
24   Q.  Sai worked for ACET Global in September
25   of 2018.  Did Jane Lin work for ACET Global in September

---

Page 151

1    of 2018?
2    A.  Yes.
3    Q.  Did Dana Tomerlin work for ACET Global in
4    September of 2018?
5    A.  Yes.
6    Q.  Did Paul Ketter?
7    A.  Paula.
8    Q.  Paula Ketter, excuse me.
9    A.  Yes.
10   Q.  Did Vanessa Torres?
11   A.  Yes.
12   Q.  Okay.  Now, in September or October of 2018,
13   did any of these people work for Windspeed:  Sai
14   Vattana?
15   A.  Yes.
16   Q.  Jane Lin?
17   A.  Yes.
18   Q.  Dana Tomerlin?
19   A.  Yes.
20   Q.  Paula Ketter?
21   A.  Yes.
22   Q.  Vanessa Torres?
23   A.  Yes.
24   Q.  Were those all of the employees that were at
25   ACET Global previously?

---

Page 152

1    A.  Yes.
2    Q.  And they all came to work for Windspeed?
3    A.  Yes.
4    Q.  Including yourself?
5    A.  Yes.
6    Q.  Did you terminate each of those employees of
7    ACET Global?
8    A.  Yes.
9    Q.  And did you terminate each of them prior to
10   hiring them as employees of Windspeed?
11   A.  Yes.
12   Q.  Okay.  And so -- and when was that?
13   A.  When was what?
14   Q.  When did you terminate them?
15   A.  At the end of September.
16   Q.  The end of September.  So they did not work
17   for Windspeed during October of 2018; is that correct?
18   A.  Yes.  They were working part of the time in
19   October.
20   Q.  Okay.  Can you explain that?
21   A.  Because we didn't have money to pay them.
22   Q.  Who didn't have money to pay them?
23   A.  Windspeed did not get their funding until end
24   of October.
25   Q.  When did it get funding?

---

Page 153

1    A.  I believe it is, like, October 20th.
2    Q.  So they worked for Windspeed in October
3    of 2018 or not?
4    A.  They did, and because we were start planning
5    on buying stuff for Windspeed.  So we did work.
6    Q.  Okay.  And so tell me how you terminated them.
7    A.  I sent them, each one of them, an email
8    telling them are terminated as of the end of September.
9    Q.  And when did you send that email?
10   A.  Oh, I think it is end of September.
11   Q.  Like, you sent it the same day that they were
12   terminated?
13   A.  Basically, yes.
14   Q.  Okay.  What does "basically" mean?
15   A.  I don't know exactly what date, but --
16   Q.  But as of the end of September -- can you tell
17   me what you're looking at?
18   A.  I am looking at -- let me see.  Do I find
19   the --
20   Q.  I'm going to need to know what it is exactly
21   you're looking at.
22   A.  The email was sent on October 9, 2018.
23   Q.  Mr. Szeto --
24   A.  All the employee that effective September 28
25   they are being terminated.

William Szeto  *  April 2, 2021

## Page 154

1    Q.  Are those notes, Mr. Szeto?

2    A.  Huh?

3    Q.  Are those notes that you're reading from?

4    A.  Yes.  Those are email that I sent, a copy of

5    the email.

6    Q.  That's a copy of the email.  Okay.  So you

7    didn't terminate them in September then?

8    A.  Well, I told them that they are terminated as

9    of September 28th.

10   Q.  So you terminated retrospectively?

11   A.  If you want to call it that way, yes.

12   Q.  Okay.  I'm showing you what's marked as

13   Exhibit 26 on the screen.

14   A.  Uh-huh.

15   Q.  Do you recognize this document?

16   A.  Yes.

17         (Exhibit 26 marked.)

18   Q.  (BY MR. FREEMAN)  Should look pretty familiar,

19   right?

20   A.  Yes.

21   Q.  Is that on top of your package of documents

22   there?

23   A.  Yes.

24   Q.  And is this an email from you?

25   A.  Yes.

## Page 155

1    Q.  Is it dated October 9th, 2018?

2    A.  Yes.

3    Q.  It's an email to Jane Lin?

4    A.  Yes.

5    Q.  And is the subject line "Your employment with

6    ACET Global"?

7    A.  Yes.

8    Q.  Okay.  And is this sent from your ACET Global

9    email address?

10   A.  Yes.

11   Q.  And does this say, "Jane, this is to inform

12   you that your employment with ACET Global is terminated

13   effective September 28th, 2018"?

14   A.  Yes.

15   Q.  Okay.  And so do you understand this to have

16   terminated her as of September 28th, 2018?

17   A.  Yes.

18   Q.  Okay.  Was there a reason that you backdated

19   this termination?

20   A.  I cannot --

21         MR. PERRIN:  Objection, form.

22   A.  -- recall the reason.

23   Q.  (BY MR. FREEMAN)  Excuse me?

24   A.  I don't remember the reason.

25   Q.  You don't recall why you backdated it?

## Page 156

1    A.  No.

2         MR. PERRIN:  Objection, form.

3    Q.  (BY MR. FREEMAN)  But you did backdate it,

4    correct?

5    A.  Well --

6         MR. PERRIN:  Objection, form.

7    A.  -- yes.

8    Q.  (BY MR. FREEMAN)  That was a yes?  Is that a

9    yes, sir?

10   A.  Yes.

11   Q.  Thank you.  Were those -- did you send similar

12   emails to the rest of your employees?

13   A.  Yes.

14   Q.  Okay.  And if Jane had testified that she was

15   informed of her termination in September of 2018, would

16   she have been incorrect?

17         MR. PERRIN:  Objection, form.

18   A.  No, because she know that she was terminated

19   on September 28th.

20   Q.  (BY MR. FREEMAN)  But she wasn't actually

21   informed of that in September of 2018, was she?

22         MS. HARD-WILSON:  Objection, form.

23   A.  I asked -- I remember that they been told that

24   they will be terminated by September 28, but the email

25   was sent on October 9th.

## Page 157

1    Q.  (BY MR. FREEMAN)  Okay.  So was this -- these

2    terminations, were those just part of a plan to wind

3    down ACET Global?

4    A.  I don't remember that it's a plan as such,

5    just a requirement on my part to let them know that they

6    are being terminated.

7    Q.  Okay.  Was it part of a plan to wind down ACET

8    Global?

9    A.  I don't know of a plan as such.

10   Q.  Not a plan to wind it down and transition to

11   Windspeed?

12         MR. PERRIN:  Objection, form.

13   A.  No.

14   Q.  (BY MR. FREEMAN)  Okay.  Was there any kind of

15   wind-down plan?

16   A.  Not that I know of.

17   Q.  No plan to wind down ACET?

18   A.  Not that I know of.

19   Q.  No plan to wind it down and somehow pay off

20   money it owed you?

21   A.  No.

22   Q.  No plan to wind down ACET and pay for credit

23   card expenses you had incurred?

24   A.  Not that I know of.

25   Q.  Was there any plan to wind down ACET and

Page 158

1  somehow pay for salary that you were owed from ACET?
2      A.  No.  We owe -- ACET owe people about 300-some
3  thousand dollars.  There was no wind-down plan to pay
4  off all those debts.
5      Q.  Well, now it owed Tomer Damti 3.2 million,
6  didn't it?
7          MR. PERRIN:  Objection, form.
8          MS. HARD-WILSON:  Objection, form.
9      Q.  (BY MR. FREEMAN)  Were you aware that ACET
10  Global owed Tomer Damti more than $3 million?
11         MR. PERRIN:  Objection, form.
12     A.  No, I did not.
13     Q.  (BY MR. FREEMAN)  Were you aware that this
14  transition plan caused ACET not to pay Tomer Damti
15  $3 million that he was owed?
16         MR. PERRIN:  Objection, form.
17         MS. HARD-WILSON:  Objection, form.
18     A.  I did not know any plan, anything about
19  between Tomer Damti and others.
20     Q.  (BY MR. FREEMAN)  Had you known that, would
21  you have gone forward with the restructuring plan?
22         MR. PERRIN:  Objection, form.
23         MS. HARD-WILSON:  Objection, form.
24     A.  I do not know any details of that, no.
25     Q.  (BY MR. FREEMAN)  Okay.  You said there was

Page 159

1  not a plan to wind ACET Global down; is that correct?
2      A.  Yes.
3      Q.  And there wasn't a plan to wind ACET Global
4  down and, in the process, price its inventory?
5      A.  Ask the question again, please.
6      Q.  Was there a plan to wind ACET Global down and
7  in the process to price its inventory or value its
8  inventory?
9      A.  No, there was no such plan.
10         (Exhibit 27 marked.)
11     Q.  (BY MR. FREEMAN)  I'm putting on the screen
12  what's marked as Exhibit 27.  Mr. Szeto, do you
13  recognize this document?
14     A.  Yes.
15     Q.  What is that document titled?
16     A.  Wind-down plan.
17     Q.  Wind-down plan?
18     A.  Uh-huh.
19     Q.  And what's the next line says?
20     A.  Wind down current location.
21     Q.  And are you familiar with this document?
22     A.  I think I have seen it before.
23     Q.  Didn't you draft it?
24     A.  No.
25     Q.  Who drafted it?

Page 160

1      A.  I don't know.
2      Q.  Okay.  But you have seen it before?
3      A.  I have seen it before, yes.
4      Q.  When did you first see it?
5      A.  I cannot remember.
6      Q.  Was it in 2018?
7      A.  I think it is in 2018, but I do not know for
8  sure.
9      Q.  Okay.  But it refers to a wind-down plan.  Do
10  you know what that means?
11     A.  Yes.
12     Q.  What does that mean?
13     A.  That means that somehow wind it down, the
14  operations of the company, but that's what I -- what it
15  means.
16     Q.  And what company?
17     A.  That's ACET Global, I assume.
18     Q.  So this was a plan to wind down the operations
19  of ACET Global, LLC?
20     A.  Yes.
21     Q.  Okay.  And you saw this before the operations
22  of ACET Global, LLC were wound down, correct?
23     A.  I don't know for sure when it was done, and I
24  cannot tell you for sure what is a date for this
25  document.  So I cannot tell you for sure what the

Page 161

1  wind-down plan is for.
2      Q.  You had no involvement, though, in preparing
3  this?
4      A.  I would not be able to tell you yes or no.
5      Q.  Okay.  Let's look at the bullet points here on
6  this wind-down plan.  It says, "Fulfillment" and it says
7  under that, "Inventory Management, Fulfillment
8  Management, Sales Continuation"; is that correct?
9      A.  Yes.
10     Q.  "Communications between sales and fulfillment,
11  shipment pickup and delivery."
12     A.  Yes.
13     Q.  What does "sales continuation" mean?
14         MS. HARD-WILSON:  Objection, form.
15     A.  As far as I know, that means continue to sell.
16  And what that really mean, I don't really know.
17     Q.  (BY MR. FREEMAN)  Was this intended to reflect
18  that it was important to continue the sales operations
19  of ACET Global?
20         MS. HARD-WILSON:  Objection, form.
21     A.  I do not know what it actually mean.  It's
22  important that we continue to sell, yes.
23     Q.  (BY MR. FREEMAN)  And what do you mean by
24  "we"?
25     A.  We, the staff, will continue to sell.

41 (Pages 158 to 161)

William Szeto  *  April 2, 2021

---

Page 162

1    Q. And was "we, the staff," is that what made up
2 ACET Global?
3    A. Yes.
4    Q. And is that also what made up Windspeed?
5    A. No. If we said continue to sell, that means
6 there is no Windspeed in mind at that time. It did not
7 mention anything about Windspeed. If indeed there is a
8 Windspeed, then we will not have to say sales
9 continuation. So there's no Windspeed whatsoever.
10    Q. Got it. How do you square that up with this
11 being a wind-down plan?
12    A. Well, I would guess, I would think that the
13 wind-down plan was made up long before there is thought
14 to close down ACET Global.
15    Q. You had just --
16    A. Yeah. I assume that because we have no more
17 money in the bank, we have to wind it down somehow. And
18 that's the reason for the wind-down plan. And I cannot
19 tell you when we actually had this done, and it's not
20 the first day we talk about wind-down plan because there
21 was no reason whatsoever that ACET Global could continue
22 to survive.
23    Q. So if it couldn't survive and we had an --
24 there's an important bullet point here of sales
25 continuation, does that indicate that sales needed to be

---

Page 163

1 continued through some other vehicle or company?
2    MR. PERRIN: Objection, form.
3    MS. HARD-WILSON: Objection, form.
4    A. No. That's not what it mean.
5    Q. (BY MR. FREEMAN) Okay. Does it mean that
6 this dying company needs to continuing selling?
7    MR. PERRIN: Objection, form.
8    MS. HARD-WILSON: Objection, form.
9    A. Yes, the dying company would have to continue
10 to sell, and hopefully that we can survive, but there's
11 no other option but continue to sell.
12    Q. (BY MR. FREEMAN) Okay. You mention this plan
13 was in place a long time before; is that right?
14    MR. PERRIN: Objection, form.
15    A. I cannot tell you when this plan was in place.
16 It obviously was in place some time ago, and so we -- I
17 cannot tell you exactly when.
18    Q. (BY MR. FREEMAN) Do you think this was part
19 of the Baymark parties' overall plan?
20    MS. HARD-WILSON: Objection, form.
21    A. I do not know what is a part of Baymark
22 parties' plan.
23    Q. (BY MR. FREEMAN) Okay. But this wind-down
24 plan is reflecting an intent to continue the business?
25    MR. PERRIN: Objection, form.

---

Page 164

1    MS. HARD-WILSON: Objection, form.
2    A. I do not know that for a fact, and it is just
3 things that I think is important to remember. And what
4 the plan really mean, I do not know.
5    Q. (BY MR. FREEMAN) Let's see if the next few
6 bullets will help your memory. It states, "Sales and
7 office staff," and below that it says, "Relocating to
8 temporary office space with current office furniture and
9 computers."
10    Did I read that correctly?
11    A. Yes.
12    Q. Okay. Why was the business relocating?
13    A. Because we did not pay rent for a long, long
14 time, and I think for a whole year or more. And they
15 are about ready to lock up the office. So we have to
16 find a place to move to, and so that was the reason why
17 we have to figure out we have to leave.
18    Q. Okay. So you were going to need -- looking at
19 the other bullet points, you were going to need Internet
20 access at the new place, right?
21    A. Right.
22    Q. And email access, right?
23    A. Right.
24    Q. But that new place wasn't going to really give
25 you email access, was it?

---

Page 165

1    A. Well, we don't have any idea what the new
2 place is. All we are saying is these are the important
3 things that we need to think about. What is the new
4 place? We don't know; we don't have one yet.
5    Q. Right, but ACET Global already had email
6 access, right?
7    MR. PERRIN: Objection, form.
8    A. Not if they get locked out of the building.
9    Q. (BY MR. FREEMAN) Okay. Next bullet on here
10 is "Customer services, current business files." Why
11 were the current business files important?
12    A. Well, why not? I think that current business
13 files would be very important to find out what really is
14 going on.
15    Q. Okay. Was it important that Windspeed get
16 ahold of those current business files?
17    A. No.
18    Q. Okay. The listing of "Current debts and
19 credits," why was that important?
20    A. Well, like I mention to you before, I think
21 our current debt at that time was over $300,000. So we
22 had to know exactly what the debt is, and we have to
23 know if we have any credit at all. So why is it not
24 important? It is important.
25    Q. Got it. Wasn't the debt quite a bit more than

---

42 (Pages 162 to 165)

Page 166

1  $300,000?
2      A.  Well, most of those money we owed the shipping
3  companies, the FedEx, the DHL and others.  Those amount
4  to over -- I think close to $200,000, and we were
5  suspended by all three of those companies.  And we
6  haven't paid rent for the whole year.
7      Q.  Right.
8      A.  And that was pretty bad.  And there are other
9  debts that -- we bought a bunch of stuff from Taiwan,
10  ship it to the company, but we owe a quarter of a
11  million dollars that we didn't pay.  And there are many
12  other debts that we have.  And we haven't paid the
13  lawyers for a long time.
14      Q.  Wow.  That's important.
15      A.  I think it is.  I think we will pay attention
16  to that, for sure.
17      Q.  Didn't you owe somebody else a hell of a lot
18  more money than that?
19      A.  The shipping company is the one that is most
20  important.  They haven't pay me for the whole year that
21  amount to $71,000.  That's important to me, but we have
22  no money to pay me, so even though it was promised to
23  pay me, I did not have the cash to get paid.
24      Q.  It didn't feel very good when people who owed
25  you money didn't pay it to you, did it?

Page 167

1          MR. PERRIN:  Objection, form.
2      A.  Well, I'm sure it never felt good someone owe
3  you that kind of money.  No.  But the biggest debt we
4  owe was the shipping companies, and that was a big
5  amount.  And like I said --
6      Q.  (BY MR. FREEMAN)  That was about a quarter of
7  a million dollars?
8      A.  You have a company like ours and not able to
9  ship, then that pretty much tell you they are going to
10  close down.
11      Q.  You said that was about a quarter of a million
12  dollars?
13      A.  Yes, about -- about, and --
14      Q.  Didn't you owe somebody else about
15  1200 percent more than that?
16          MR. PERRIN:  Objection, form.
17      A.  Well, we owed the rental company agent
18  $70,000.  And we owe FedEx about 85,000; UPS about
19  60,000; DHL express about 40,000 and Hallett & Perrin
20  about -- over 10,000.  Whitney Penn, about 5,000.  So I
21  would say those are pretty substantial debts.
22      Q.  (BY MR. FREEMAN)  I would, too; very
23  substantial.  Is that the full list of debts?
24      A.  That's not a full list.  I have a full list.
25  Okay.

Page 168

1      Q.  Is there -- on that list, is there a debt
2  listed that's owed to Tomer Damti?
3      A.  No.
4      Q.  So --
5      A.  I did not know anything -- any money that we
6  owed to Tomer Damti.  This is companies that I dealt
7  with that come and tell me we owe them money.
8      Q.  Okay.  There wasn't a debt that showed that it
9  was owed to ACET Venture Partners?
10      A.  Not in this list, no.
11      Q.  Okay.  What list are you looking at?
12      A.  This is a list that I kept myself.
13      Q.  Have you produced that in this case?
14      A.  Have I?  This is a list that I have given
15  to -- to other people -- not other people but this is a
16  list that I always keep as to how much money we owe
17  people.
18      Q.  Okay.
19      A.  So it's not just for this case.  No.
20      Q.  Okay.  Have you turned that over to your
21  lawyers?
22      A.  Yes.  He has a list of this, yes.
23      Q.  Okay.  Does that document have a Bates label
24  on it?
25      A.  No.  This is just a list of account total and

Page 169

1  address and that's all.  I do not have a label on it.
2      Q.  Would you mind holding it up to the screen?
3      A.  Okay.
4      Q.  Can you hold it up a little higher and closer?
5  Can you move to it your left a bit?  Your left?
6          MR. PERRIN:  Can you unshare you screen?
7  We can't see what your doing here, Jason.
8      Q.  (BY MR. FREEMAN)  Mr. Szeto, would you know --
9  that's not going to any good, is it?  Can you put
10  that up to the screen again so everyone can see it?
11      A.  Yeah.  I put it right in front of the camera.
12          MS. HARD-WILSON:  Okay.
13      Q.  (BY MR. FREEMAN)  Mr. Szeto --
14      A.  Yes?
15      Q.  -- what did you keep this list on?  Where did
16  you save it?
17      A.  I think it kept on Excel, I believe.
18      Q.  But was that was a complete list of ACET
19  Global's debts?
20      A.  That is as complete as I can remember, yes,
21  but I -- you know, I'm sure there may be some others,
22  but that's the list I kept up with when I was managing
23  ACET Global, yes.
24      Q.  And those are the only ones you knew about?
25      A.  That's the only one I knew about, yes.

43 (Pages 166 to 169)

William Szeto  *  April 2, 2021

---

Page 170

1      Q.  Is that because those are the only ones that
2  anybody had told you about?
3      A.  That's the only one that people came up to my
4  office and say, You owe me money.
5      Q.  You mean those -- that's a list of creditors
6  who came to your office and demanded payment?
7      A.  Yes.
8      Q.  Is that how you decided whether or not to pay
9  a creditor?
10     A.  No, but that is the list that I was told we
11  owe money to.
12     Q.  Who told you that?
13     A.  Well, whoever came to my office.  Let's say,
14  for example, like, FedEx, give me an invoice of
15  $82,527.13, and FedEx told me that.
16     Q.  Okay.  Who kept track of what ACET Global
17  owed?
18     A.  Who kept track of what ACET Global owes?
19     Q.  Yes, sir.
20     A.  I don't believe that at that time -- before
21  Jane's employment, an accounting girl named Sarah, she
22  keep track of most of those.  And the some of the other
23  one, like the bill from the law firm, I get a letter
24  from them saying that you owe me this.  And that's what
25  I kept track of, but -- and that's how we kept track of

---

Page 171

1  it.
2      Q.  Okay.  Who gave you the spreadsheet that kept
3  track of it?
4      A.  I made one up.
5      Q.  Just based on -- based on what?
6      A.  Based on invoices and requests and what I
7  know, yes.  Those are what I base off of.
8      Q.  Okay.  Did you have to rely on any person to
9  give you that list?
10     A.  No.
11     Q.  You just went around and found documents?
12     A.  Document came to me either through mail,
13  regular mail or invoices.  I do not have to depend on
14  anybody to give me that list.
15     Q.  But you were never told that ACET Global owed
16  Tomer Damti any money?
17     A.  No.
18         MR. PERRIN:  Objection, form.
19     A.  No.
20     Q.  (BY MR. FREEMAN) Did you ever hear anyone
21  talk about ACET Global owing Tomer Damti money?
22     A.  No.
23     Q.  And did you ever see anyone writing about ACET
24  Global owing Tomer Damti money?
25     A.  No.

---

Page 172

1      Q.  I want to go back to the exhibit that was on
2  your screen, Exhibit 27, the wind-down plan.  I'll go to
3  the second page here, which is a Time Line and Cost For
4  Wind-Down Only.  That's the title.  Do you see that,
5  sir?
6      A.  Yes.
7      Q.  Is that correct?
8      A.  Yes.
9      Q.  Okay.  And if you'll look at the -- I'll try
10  and make it a little bigger, but I think you can see
11  that fairly easily.  Can you see that?
12     A.  Yes.
13     Q.  Let's look at the left-hand side of this.  So
14  it says, "Listing all outstanding debts and credits."
15  We covered how important it was to make sure you had a
16  full list of that, correct?
17     A.  Well, which one you reading?
18     Q.  I'm looking on the left-hand side, and let's
19  go down to the second -- the second one here.  "Settle
20  on all accounts which must be paid prior to closing."
21     A.  Yes.
22     Q.  What does that mean?
23         MS. HARD-WILSON:  Objection, form.
24     A.  There may be some accounts that we may want to
25  pay off.  Now, the reason why I do that, there's an

---

Page 173

1  account in here that's listed called Pet Life, LLC.  We
2  bought stuff from them, and they're a very small
3  company.  And I did not want them to -- out of $3,000.
4  So I want to settle that account so we can pay them and
5  not to cost them to close because I owe $3,000.  They
6  will be closed down.
7      Q.  (BY MR. FREEMAN) Got it.  So close the
8  account but not the company?
9      A.  Not the company.  So I was trying to help this
10  particular account.
11     Q.  Got it.  So let's go down to the next one.
12  There's a salary accrual for Bill.  Is that you?
13     A.  That's me.
14     Q.  The company owed you some money?
15     A.  Yes.
16     Q.  Very important --
17     A.  Paycheck.
18     Q.  Very important that if the company owes you
19  money that you get paid, right?
20     A.  Absolutely.
21     Q.  All right.  It says, "Arrange for last two
22  payroll checks"; is that correct?
23     A.  Yes.
24     Q.  Next one says, "Pay Bill's credit card"; is
25  that correct?

---

44 (Pages 170 to 173)

Page 174

```
 1      A.  Yes.
 2      Q.  And company owes you money; very important you
 3   get your money, right?
 4      A.  Well, I did get my money for -- to pay the DHL
 5   off, but --
 6      Q.  So it owed you some money?
 7      A.  They owe me some money, so they -- well, I
 8   don't remember whether they pay off or not but --
 9      Q.  You wanted to try to make sure you --
10      A.  I wanted to try to pay off, and I can tell you
11   one thing.  For example, the last two payroll checks, it
12   didn't happen.
13      Q.  Got it.  The next one says, "Reserve for one
14   month's rent."  The next one says, "Perform last
15   inventory prior to closing"; is that correct?
16      A.  Yes.
17      Q.  And why did you need to do a last inventory?
18      A.  Well, I do inventory just about every month so
19   I would like to do a last inventory, make sure we know
20   what we have.  Plus, the fact there are a lot of -- I
21   wouldn't say a lot, but there is a bunch of inventory
22   that Tomer had bought that he had hidden that in some
23   employee's garage.  And those were not in the inventory.
24      Q.  So there were things that were --
25          (Simultaneous speakers.)
```

Page 175

```
 1      A.  Huh?
 2      Q.  There was even more inventory than was on the
 3   list?
 4      A.  For example, we have in here Emmanuel
 5   Industrial Company, the $20,000.  It was not in the
 6   inventory.
 7          (Simultaneous speakers.)
 8      Q.  (BY MR. FREEMAN) So there was a bunch more
 9   inventory than was on the list?
10      A.  There were --
11          MR. PERRIN:  Objection, form.
12      A.  -- and we added that back in.  He bought a
13   bunch of what I call the laughing monkeys, and that was
14   hidden in an employee's garage.  And that was -- you
15   know, and he took -- she took it back.  It was in
16   Paula's garage, and Paula took it back -- after Tomer
17   left, and there was a bunch of inventory that I need to
18   update.  And there's a bunch of other inventory that we
19   did not know about that show back up.  So yes, we need
20   to do the last inventory and we did.  So it wasn't
21   included in the last inventory.
22      Q.  (BY MR. FREEMAN) It wasn't because the
23   company was closing, right?
24      A.  No.  It was because it was hidden.
25      Q.  It was because Tomer hid a bunch of monkeys in
```

Page 176

```
 1   a garage?
 2      A.  Yes.
 3      Q.  Okay.  The next line here says, "Price
 4   inventory which can be sold or transferred"; is that
 5   correct?
 6      A.  Yes.
 7      Q.  What does that mean?
 8          MR. PERRIN:  Objection, form.
 9      A.  Well, that means we have to go through all the
10   inventory that we have in the warehouse, try to figure
11   out a couple of things.  There are some that -- some
12   inventory that Tomer bought that cannot be sold
13   whatsoever.  It cannot meet the U.S. standard
14   requirements.  He bought a bunch, for example, hair
15   driers that absolutely would not meet the U.S. standard,
16   and end up have to cut the cord off.
17          There are a whole bunch of other things,
18   like a bunch of bath bombs that he bought that were
19   completely outdated and had to be thrown away.  There's
20   a whole bunch of other things that you cannot sell them.
21   For example, like overdue lipsticks that had to be
22   thrown away.
23      Q.  (BY MR. FREEMAN)  So it was all Tomer's fault,
24   wasn't it?
25      A.  Hey, I did not say that.
```

Page 177

```
 1      Q.  Okay.  Well, now, I want to understand how
 2   this is all relevant to my question because I'm asking
 3   about a line item for pricing inventory that can be sold
 4   or transferred, and you're telling me all about assets
 5   that you say can't be sold or transferred.
 6      A.  Well, whatever is left can be sold and
 7   transferred.  So in order to find --
 8          (Simultaneous speakers.)
 9          MR. PERRIN:  Let the witness answer,
10   please.  Go ahead, Mr. Szeto.
11      A.  Is somebody talking?
12      Q.  (BY MR. FREEMAN)  I think it's your turn.
13      A.  Is it my turn?  For me to figure out how much
14   of this inventory can be sold, I had to go through the
15   inventory and figure that out.  So that is what the
16   $3,000 is for.
17      Q.  Okay.  And this was all to make sure you could
18   keep the company running, right?
19      A.  Yes.
20      Q.  And the next line item is "Return or terminate
21   all office machine lease agreements"; is that correct?
22      A.  Yes.
23      Q.  Why was that important to keep the company
24   running?
25      A.  Because that is mainly -- there were two
```

45 (Pages 174 to 177)

---

Page 178

1   things that we need take care of.  There was the copy
2   machine that Tomer had leased, and there was the
3   forklift that he also lease.  Now, I managed to talk to
4   forklift company, and they took it back.  But the fax
5   machine, copy machine is still sitting in front of our
6   lobby of Windspeed Trading, and they refuse to take it
7   back even though we stop paying them a long time ago.
8       Q.  So you stiffed another creditor?
9       A.  That is another creditor, but it's not one of
10  Windspeed's creditor.  It is another creditor for ACET
11  Global.
12      Q.  Got it.  Tomer had -- I mean, crazy Tomer,
13  huh?  He had leased these things?  Sounds like he had
14  done a bunch of -- he bought inventory and leased
15  machines?
16          MR. PERRIN:  Objection, form.
17      Q.  (BY MR. FREEMAN)  Is that right?  Is that
18  because --
19      A.  I would not say anything about that.
20      Q.  Was that because he was the CEO of the
21  company?
22      A.  I assume --
23          MR. PERRIN:  Objection, form.
24      A.  -- that he was the CEO of the company, and he
25  had the authority to do whatever necessary in his mind

---

Page 179

1   at that time.
2       Q.  (BY MR. FREEMAN)  And when he was CEO of the
3   company, you know, he left y'all with a
4   $3-and-a-half-million company, didn't he?
5           MR. PERRIN:  Objection, form.
6           MS. HARD-WILSON:  Objection, form.
7           (Simultaneous speakers.)
8           THE REPORTER:  Guys, no.
9       Q.  (BY MR. FREEMAN)  Go ahead, Mr. Szeto.
10      A.  So what was the question?
11      Q.  I can't even remember anymore.  Just move on.
12          The next line item there says, "Inform all
13  parties of impending closing."  Can you tell me what
14  that means?
15          MS. HARD-WILSON:  Objection, form.
16      A.  Well, I think basically what is said is that
17  the shipping company -- this is the shipping company --
18  that we are all closing.  Now, there are some shipping
19  company that we would like -- that we were using, and
20  the only one that still using is that DHL eCommerce.
21  And as we talk about earlier, we did not use ACET
22  Global as the name for the eCommerce account.  So all
23  the -- all the accounts were shipping, accounts that
24  suspended all of us.  So I think it is important to let
25  them know that ACET Global is closing.

---

Page 180

1       Q.  (BY MR. FREEMAN)  Oh, so this was ACET Global
2   that was closing?
3       A.  Well, I think that's what we have been talking
4   about all along.
5       Q.  Have we?
6       A.  Well, it is ACET Global that is closing, yes.
7       Q.  So was this is plan to wind down ACET Global?
8       A.  Yes.
9           MS. HARD-WILSON:  Objection, form.
10      Q.  (BY MR. FREEMAN)  So everything we have been
11  talking about on this Exhibit 27 is about winding down
12  and closing ACET Global?
13      A.  Yes.
14          MS. HARD-WILSON:  Objection, form.
15      Q.  (BY MR. FREEMAN)  Okay.  If you look below the
16  items we have been going through in red, it refers to a
17  date; is that correct?
18      A.  Yes.
19      Q.  And does it say the week of September of 2017?
20      A.  No, not 2017.
21      Q.  Oh, is that right?
22      A.  September 17th.
23      Q.  How do you know that?
24      A.  September '17 was long before I start working
25  there.

---

Page 181

1       Q.  It looks like it says 09/17 to me.
2       A.  Well, it's 09 --
3           MR. PERRIN:  Objection, form.
4       Q.  (BY MR. FREEMAN)  Does it not say 09/17?
5       A.  It does not say 09/2017.
6       Q.  How can you be so sure about that?
7       A.  Well, it don't make sense to say 09/2017, but
8   I didn't work there in 2017.
9       Q.  So this -- there's no way this was created for
10  09 of '17?
11      A.  Well does it make sense if you say week of
12  09/24?  Does that mean 2024?
13      Q.  I don't mean, how do I know this
14  wasn't created in 09 of '17?
15          MR. PERRIN:  Objection, form.
16          MS. HARD-WILSON:  Objection, form.
17      A.  Because it only make sense the other way.
18      Q.  (BY MR. FREEMAN)  Because you hadn't started
19  working there in 2017?
20      A.  That's right.
21      Q.  Okay.
22      A.  And I didn't start working there in 09/24
23  either.
24      Q.  Got it.  And wasn't created until you started
25  working there, was it?

William Szeto  *  April 2, 2021

Page 182

1    A.  Well, why would I make one up --
2        MS. HARD-WILSON:  Objection, form.
3    A.  -- like that unless I work there?
4    Q.  (BY MR. FREEMAN)  Got it.  So because you made
5    this, right?
6    A.  Well, yes, I have something to do with it,
7    yes.
8    Q.  In fact, you actually created it initially,
9    didn't you?
10   A.  Well, most likely I did.
11   Q.  Okay.  Because this was your document?
12       MS. HARD-WILSON:  Objection, form.
13   A.  I believe it is.
14   Q.  (BY MR. FREEMAN)  And this was your plan --
15   the wind-down plan was your plan?
16       MR. PERRIN:  Objection, form.
17   A.  It is not my plan.  It is something to remind
18   myself of what needed to be done.
19   Q.  (BY MR. FREEMAN)  Got it.  So this was all --
20   all of the stuff we were just talking about, these
21   items, they were all to be done the week of
22   September 17th of 2018?
23       MR. PERRIN:  Objection, form.
24   A.  Yes.
25   Q.  (BY MR. FREEMAN)  Okay.  And now, since ACET

Page 183

1    Global was closing, you weren't going to need its bank
2    accounts anymore, right?
3    A.  Well, not true.
4    Q.  Why is that?
5    A.  Because there is still a little bit of money
6    going into the ACET Global bank account to pay other
7    bills.  And customer that bought stuff from us 30 days
8    before that still paying us in our business.  Let me
9    explain that.  In our business, we operate on what we
10   call the net 30.  That means they owe us 30 days before
11   they pay.  So if the customer bought stuff from us in
12   August and July, they will pay at the beginning of
13   September or maybe later.  So we will need the bank
14   account for them to pay into it for stuff they bought 30
15   days or 60 days before that.  So we will need the bank
16   account shortly after that, and indeed, there was a
17   little bit of money going into it for that reason.  Not
18   until we completely sold out of everything, there was no
19   more money going into it, then that means we don't need
20   the accounts anymore.
21   Q.  Got it.  So once you had gotten all the money
22   out of it, you didn't need the accounts for ACET Global?
23       MR. PERRIN:  Objection, form.
24   A.  Yes.
25   Q.  (BY MR. FREEMAN)  You know, the next line

Page 184

1    there says, "Inform all active shipping companies on
2    closing."  So I assume that was to let all the shipping
3    companies know that ACET Global was closing?
4    A.  Yes.  Well, we were suspended anyway.
5    Q.  Okay.  Keep going down, and it says, "Inform
6    all marketplaces on closing; inform all major customers
7    on closing."  Why was it important to inform them?
8    A.  Well, they are the customer.  They were the
9    customers.  So they need to know we are closing so they
10   would not continue to sell stuff for us.
11   Q.  Got it.  Did you need them to start selling
12   for somebody else?
13   A.  When this list was made up, there was no such
14   thing as Windspeed.  The answer is yes, we may have to
15   sell the inventory to some other parties, so we -- that
16   was not part of this plan.
17   Q.  So as of September 24th, 2018, there was no
18   such thing as Windspeed, right?
19   A.  No.
20   Q.  And you hadn't even started -- like, you
21   hadn't even started any incurring any expenses for
22   Windspeed, right?
23   A.  Right.  We don't have money at that time, so
24   we have no money to do anything, and there was no
25   Windspeed, per se.

Page 185

1    Q.  So no start-up expenses --
2    A.  Right.
3    Q.  -- as of September 24th, 2018?
4    A.  Right.
5    Q.  Okay.  And the next line on here, it says,
6    "Send termination letter to all current employees"; is
7    that correct?
8    A.  Yes.
9    Q.  Okay.  So you were going to send those
10   termination letters during the week of September 24th?
11   A.  Yes.
12       MR. PERRIN:  Objection, form.
13   Q.  (BY MR. FREEMAN)  Is this referring to the
14   termination letter we looked at earlier that you --
15   A.  Yes.
16   Q.  -- sent to Jane Lin?
17   A.  Yes.
18   Q.  It says, "Submit final financial statement;
19   close and lock the office."  So was that it?
20       MS. HARD-WILSON:  Objection, form.
21   A.  Yeah.
22   Q.  (BY MR. FREEMAN)  Let's look at the third page
23   on here, Mr. Szeto, on Exhibit 2017 [sic].
24   A.  Okay.
25   Q.  It refers to a cost summary.  Do you see that?

47 (Pages 182 to 185)

William Szeto  *  April 2, 2021

---

Page 186

1      A.  Yes.
2      Q.  There's an item there for a salary accrual for
3   Bill Szeto.
4      A.  Yes.
5      Q.  33,700; is that right?
6      A.  Yes.
7      Q.  Who was going to pay that?
8      A.  That's a good question.  I think I was hoping
9   that Baymark was supposed to pay it.
10     Q.  Why was Baymark supposed to pay it?
11     A.  Well, I was working for them as such.  They
12  asked me to contract, to take care of ACET Global, and
13  obviously they are the one that is supposed to pay.
14  But --
15     Q.  So the Baymark parties promised they were
16  going to pay you to do what you did?
17     A.  Well, yes.  They said they would take care of
18  me.  And I was so naive for knowing -- trying to figure
19  out what take care of me means.
20     Q.  So they just said, If you do what we'll ask of
21  you, we'll take care of you?
22         MR. PERRIN:  Objection, form.
23     A.  Yes.  But they never paid it.
24     Q.  (BY MR. FREEMAN)  Okay.  Did Baymark tell you
25  to keep the second set of books?

---

Page 187

1      A.  I, myself, decided to take the second sets of
2   books because I wanted to divide up the inventory that
3   was sold for Super G and the inventory that started
4   coming in for Windspeed.  I wanted to keep the two books
5   separate.  So I decided to ask Jane to keep two sets of
6   books.
7      Q.  Did you think that would be helpful to
8   Baymark?
9      A.  I wasn't thinking about helpful to whom.  It
10  was helpful to me.
11     Q.  Okay.  Going back to this Exhibit 27, the
12  third page of it, after that line item, it says
13  "Arrangement to two payroll"?
14     A.  Yes.
15     Q.  And then after that, it says, "Pay Bill's
16  credit card"; is that correct?
17     A.  Yes.
18     Q.  And that's about 22,000?
19     A.  Yes.
20     Q.  Who was going to pay Bill's credit card?
21     A.  I was hoping that -- there were two ways that
22  I can get money.  There was some money that was still
23  part of the sales, that part of it, and then I was
24  hoping that Baymark will pay me, the rest of them for
25  the credit card I use.  And that basically the credit

---

Page 188

1   card I use was for DHL eCommerce, and I was hoping that
2   they would pay it.  I don't remember who paid it, but
3   somebody did pay it.
4      Q.  Baymark got you taken care of for this?
5      A.  Somebody did.  I cannot tell you who.
6      Q.  Baymark compensated you for executing the
7   wind-down plan?
8      A.  They did not compensate me for the wind-down
9   plan, but I believe that they did pay off my credit
10  card.
11     Q.  Did they pay -- did they compensate you for
12  these items after you began working for Windspeed?
13     A.  No.
14     Q.  They did it before?
15     A.  I don't think -- a lot of these items was
16  never taken care of.
17     Q.  So Baymark didn't take care of you?
18     A.  No, not that I know of.
19     Q.  So does that mean you're yet another creditor
20  of Baymark that they didn't take care of?
21         MR. PERRIN:  Objection, form.
22     A.  Well, I cannot tell you exactly what is
23  happening, and to me, it was over with.  And I cannot
24  answer that question.
25     Q.  (BY MR. FREEMAN)  Okay.  There's another line

---

Page 189

1   item on there that says on price inventory.  It's a
2   minus $3,000; is that correct?
3      A.  Yes.
4      Q.  Why is that a negative number?
5      A.  Because we had to pay this particular vendor,
6   Pet Life, LLC -- actually it's 3500.  It just put it as
7   $3,000 because I'm hoping that we can take care of them.
8   But I forget exactly what the $3,000 for.  It's three
9   years ago.
10     Q.  Okay.  But it says price inventory, correct?
11     A.  Right.
12     Q.  Why are all of the other numbers positive?
13     A.  Well, the $88,000 were basically the cost of
14  the -- all the other costs that, like, salary for me and
15  so on and so forth.  That's why they are positive.  And
16  so I cannot -- I cannot recall what the $3,000 is for.
17     Q.  Okay.  Was that possibly to create an
18  inventory?
19         MR. PERRIN:  Objection, form.
20     A.  I cannot tell you for sure.
21     Q.  (BY MR. FREEMAN)  Was it to price inventory?
22         MR. PERRIN:  Objection, form.
23     A.  I do not remember what it was.
24     Q.  (BY MR. FREEMAN)  Mr. Szeto, do you have any
25  reason to believe that the description beside the

---

48 (Pages 186 to 189)

Page 190

1  negative $3,000 that says price inventory, that is
2  incorrect?
3        MR. PERRIN: Objection, form.
4     A. I cannot tell you it's incorrect. I just
5  don't remember what it was.
6     Q. (BY MR. FREEMAN) Mr. Szeto, I'm putting up on
7  the screen what's marked as Exhibit 28. Do you see
8  this?
9     A. Yes.
10        (Exhibit 28 marked.)
11     Q. (BY MR. FREEMAN) All right. Do you recognize
12  this document?
13     A. I think so.
14     Q. Is this a page from your 2018 Federal income
15  tax return?
16     A. Let me think. I believe it is.
17     Q. Okay. Does this appear to be a true and
18  correct copy of that page from your income tax return?
19     A. Yes.
20     Q. Okay. Can you tell me what this form is
21  titled as?
22     A. It's a 192(B)1.
23     Q. 195(B)1?
24     A. 195(B)1 I mean.
25     Q. There's a -- more of a plain English title

Page 191

1  there that I have highlighted?
2     A. Election to Amortization Start-Up Expenditure,
3  yes.
4     Q. So an election to amortize start-up
5  expenditures, correct?
6     A. Right.
7     Q. Okay. So you have several listed on your
8  form: Travel, website name registration, email account
9  setup; is that correct?
10     A. Yes.
11     Q. Were those incurred in forming Windspeed
12  Trading, LLC?
13     A. Yes.
14     Q. Okay. And what is the date that you incurred
15  those?
16     A. That was September -- middle of September.
17     Q. Is that September 10th, 2018?
18     A. Uh-huh.
19     Q. And again, this was for the trader business of
20  Windspeed Trading, LLC; is that correct?
21     A. Yes.
22     Q. Okay. So as of at least September 10th, 2018,
23  you represented on a sworn statement to the Federal
24  government that you had incurred start-up expenditures
25  for Windspeed, correct?

Page 192

1     A. Yes.
2     Q. Okay. I thought you testified earlier that
3  when we were looking at Exhibit 2017 that as of
4  September 24, you had not incurred any expenses or even
5  thought about incurring expenses for Windspeed?
6        MR. PERRIN: Objection, form.
7     A. I did not answer it that way.
8     Q. (BY MR. FREEMAN) Okay. Did you say earlier
9  that as of September 24th, 2017, you -- 2018 -- you had
10  not incurred expenses in --
11        MS. HARD-WILSON: Objection, form.
12     Q. (BY MR. FREEMAN) -- starting up Windspeed?
13     A. No, I did not say it that way.
14     Q. Okay.
15        MR. FREEMAN: Karen, would it be terribly
16  difficult for you to go back to the transcript to see
17  that?
18        (Requested portion was read.)
19     Q. (BY MR. FREEMAN) Mr. Szeto, is that how you
20  answered it?
21     A. Yes.
22     Q. Okay. Mr. Szeto, just going back to Windspeed
23  here, you represented again that you had incurred
24  expenses on behalf of -- in forming Windspeed Trading as
25  of September 10th, 2018, correct?

Page 193

1     A. Yes.
2     Q. Okay. But you testified previously that as of
3  September 24th, 2018, you had not incurred any start-up
4  expenses --
5     A. No. That is the wrong way you put it. It's
6  not start-up expenses. I ask for a website name. I
7  register for a website name. That is not a start-up
8  expenditure.
9     Q. Got it. Did you ask someone to do that for
10  you? Is that what I'm missing?
11     A. No, I do it myself. So I register for a
12  website name. I register for other things that may and
13  may not be applicable to Windspeed Trading. I asked for
14  account setup. It did not specifically say Windspeed
15  Trading. It could be anything, and so, yes. Those are
16  expenditures that eventually I use it for Windspeed
17  Trading. But at that time, it's just a thought. It
18  just is something I use.
19     Q. Got it. Was that -- was that domain
20  WindspeedTrading.com?
21     A. Yes.
22     Q. Okay. But that wasn't for Windspeed Trading,
23  correct?
24     A. It would not be for Windspeed Trading. We
25  decide on the name quite a bit later as Windspeed

                    49 (Pages 190 to 193)

William Szeto  *  April 2, 2021

---

Page 194

1    Trading.
2         Q.   Got it.
3         A.   Windspeed Trading happened to be one of the
4    names my dad use.  So we try to figure out what name to
5    use, and we said, Well, let's just use that name.  So
6    whether we register for a website or not, those are
7    expenditures we use as part of the startup for Windspeed
8    and to try to get a website name, registration and email
9    account setup.  Actually, the email account setup was
10   much more than that, but I cannot get an email setup
11   unless I get a website name and all those things.  So
12   yes, those were the start-up expenditures eventually for
13   the company.
14        Q.   Okay.  So it's your sworn testimony today that
15   you acquired a website address of WindspeedTrading.com
16   but it was not for Windspeed Trading, LLC?
17        A.   No.
18        Q.   Got it.
19        A.   Not necessarily.
20        Q.   Got it.  Okay.  Let's see here.  How were
21   these expenses paid?
22        A.   How was this expenses paid?  From my credit
23   card.
24        Q.   From your credit card?
25        A.   Yeah, my own credit card.

---

Page 195

1         Q.   Is that the credit card that you were wanting
2    Baymark to pay you back on?
3         A.   No.
4         Q.   Oh, okay.  Did you move ACET Global's
5    inventory to a storage unit in September of 2018?
6         A.   Yes, we did.
7         Q.   Who requested that you do that?
8         A.   I believe it was Steve Bellah's suggestion.
9         Q.   Steve Bellah's suggestion --
10        A.   That we need to move it because the building
11   we were in was going to be locked up.
12        Q.   Okay.  So Steve Bellah told you to move all of
13   ACET Global's inventory to a storage unit?
14        A.   Yes, he did, so he -- his reasoning was that
15   he could sell them to somebody else.
16        Q.   Steve Bellah could?
17        A.   Yes.
18        Q.   Okay.
19        A.   According to Tomer Damti because if the
20   building is locked up, he could not even sell it to
21   Tomer.
22        Q.   Okay.  So he was very concerned about possibly
23   selling to Tomer Damti?
24        A.   I don't know what his concern about.  He
25   simply just wanted someone to lock up inside the

---

Page 196

1    building.
2         Q.   Okay.  He wanted to make sure that Tomer Damti
3    was taken care of?
4              MS. HARD-WILSON:  Objection, form.
5         A.   I do not know what he really mean, but all I
6    need to know, all I knew was he didn't want those
7    inventory to be locked up.
8         Q.   (BY MR. FREEMAN)  He didn't want Tomer Damti
9    to get it, did he?
10             MR. PERRIN:  Objection, form.
11             MS. HARD-WILSON:  Objection, form.
12        A.   No.  I did not say that.
13        Q.   (BY MR. FREEMAN)  Mr. Szeto, I've put what's
14   marked as Exhibit 29 on the screen.  Can you see that?
15        A.   Okay.
16             (Exhibit 29 marked.)
17        Q.   (BY MR. FREEMAN)  Do you recognize this, sir?
18        A.   Not really.
19        Q.   Okay.
20        A.   But I signed it.
21        Q.   Did you sign it?  Is that your signature?
22        A.   Yes.
23        Q.   Okay.  Is that your name printed below it?
24        A.   Yes.
25        Q.   Looks like the same ink, doesn't it?

---

Page 197

1         A.   It certainly do look like the same name.
2         Q.   Look like about the same size tip of the pen?
3         A.   Yes.
4         Q.   Okay.  Is that your handwriting?
5         A.   Yes.
6         Q.   Okay.  Is this letter dated September 13th,
7    2018?
8         A.   Yes.
9         Q.   Okay.  And does it say -- and I'll point you
10   to where I'm at.  Does it say, We are moving
11   September 14th, 2018?  Where's there an X --
12        A.   I can see that, yes.
13        Q.   Okay.  And does it say above that, "This
14   letter is to inform you of the following for ACET
15   Global"?
16        A.   Yeah.  I think that may be -- I don't know
17   what the document is, to tell the truth.  But it looks
18   like it's -- yeah, it is a DHL eCommerce document.  And
19   what that is is to inform DHL eCommerce to go to a
20   different place to pick up package we are sending.  They
21   need something to tell them that they will go to a
22   different place.  And you see the address is 17613 Coit
23   Road.  That is one of the trailers that we had the
24   inventory.  And that's where they go and pick up the
25   package.

---

Usher Reporting Services
(214) 755-1612

Page 198

1    Q.  Okay.  It took several trailers, didn't it?
2    A.  No.  We have two trailers.  That's one we use
3  to ship stuff as a storage, and there's one that we
4  have -- we were full of furniture and other things.
5    Q.  Okay.  This asks that DHL make these changes
6  effective as of September 17, 2018; is that correct?
7    A.  Yes.  That's what we told them.  It didn't
8  happen, I don't think.  We move the stuff, and by the
9  time we get there, they pack up the stuff.  And we asked
10  them to come and pick up stuff on September 17th, yes.
11    Q.  Okay.  And what --
12    A.  And remember, that was before the employees
13  from ACET Global were terminated.  They were terminated
14  September 28th.  So at that time, they were still
15  employees of ACET Global.
16    Q.  Why is that important?
17    A.  Why is it important?  They were picking up
18  stuff for ACET Global, not for Windspeed Trading.
19    Q.  I'm not sure I understand.
20    A.  What you have to understand is September 17,
21  what we pick up is still merchandise for ACET Global,
22  not for Windspeed Trading.  Windspeed Trading was not
23  formed even at that time.  The employees are packing
24  stuff for to ship was still employees of ACET Global.
25    Q.  Okay.

Page 199

1    A.  You understand?
2    Q.  I don't.
3    A.  Well, want me to explain that to you again?
4    Q.  Sure.
5    A.  Okay.  We are moving in September 14th.  At
6  that time, the location we move to was Coit Road.  That
7  location is still part of ACET Global, not Windspeed
8  Trading.  You see the form up on top?  The letter is to
9  inform you the following for ACET Global, 5116347, not
10  for Windspeed Trading.  So the employee at that time
11  packing those packages are still employee of ACET
12  Global.  And as of September 17th, they -- DHL eCommerce
13  still picking up for ACET Global, not for Windspeed
14  Trading.  Had nothing to do with Windspeed Trading.
15    Q.  Okay.  I got it.  So they were -- these
16  employees were still employees of ACET Global until
17  September 28th of 2018?
18    A.  Yes.
19    Q.  All right.  And they were that -- until you
20  told them on October 9th of 2018?
21    A.  Yes, that they would start shipping -- now
22  there were two different thing in October.  There were
23  some items they were shipping for -- for ACET Global at
24  that time as part of the inventory, and that was long
25  before Windspeed Trading had anything to ship.  So they

Page 200

1  were -- whatever they were shipping in October, it was
2  for ACET Global, not for Windspeed Trading.  The
3  Windspeed Trading merchandise did not come in until end
4  of December and beginning of January.  Okay?
5         There was one item that we purchase with
6  Windspeed's money that came in, was one item and that
7  was it.  So whatever they were shipping at that time was
8  for ACET Global, was for the inventory.
9    Q.  Okay.  So Windspeed was finishing up ACET's
10  business?
11    A.  Right.  Windspeed had nothing to ship at that
12  time.
13    Q.  So it was just continuing ACET's business?
14    A.  Yes.
15        MR. PERRIN:  Objection, form.
16    Q.  (BY MR. FREEMAN)  And that was kind of easy
17  because it was all the same employees, right?
18    A.  Right.
19        MR. PERRIN:  Objection, form.
20    Q.  (BY MR. FREEMAN)  All the same equipment?
21        MR. PERRIN:  Objection, form.
22    Q.  (BY MR. FREEMAN)  It was easy because it was
23  all the -- pretty much all the same equipment, wasn't
24  it?
25    A.  Yes.

Page 201

1        MS. HARD-WILSON:  Objection.
2        MR. PERRIN:  Objection.
3    Q.  (BY MR. FREEMAN)  And it was easy because it
4  was all the same vendors, right?
5        MR. PERRIN:  Objection, form.
6    A.  Yes.
7    Q.  (BY MR. FREEMAN)  And it was easy because it
8  was pretty much all the same customers, wasn't it?
9    A.  Yes.
10        MR. PERRIN:  Objection, form.
11    Q.  (BY MR. FREEMAN)  And it was easy because the
12  employees -- hell, they didn't even know they were
13  working for Windspeed, right?
14        MR. PERRIN:  Objection, form.
15        MS. HARD-WILSON:  Objection, form.
16    A.  No, that is the wrong thing to say.
17    Q.  (BY MR. FREEMAN)  Okay.  I got that one wrong.
18    A.  You got that one wrong.
19    Q.  All right.  Let me ask you, did you ever
20  discuss Tomer Damti's note with Jane Lin?
21    A.  No, not that I can remember.
22    Q.  Did you ever discuss with Jane how to account
23  for the Super G note?
24    A.  No, not that I can remember.
25    Q.  Were there ever any discussions about how ACET

Page 202

1   was going to pay it?
2       A.  No.  That was not discussed with Jane.
3       Q.  Okay.  Were there ever any steps to make sure
4   that ACET was in position to pay it?
5       A.  No.  That was not discussed.
6       Q.  No steps discussed to make sure ACET was in
7   position to pay Tomer Damti's note?
8           MR. PERRIN:  Objection, form.
9       A.  I do not know anything about Tomer Damti's
10  note, nor do I know anything about it at all.  There was
11  no discussion whatsoever concerning Tomer Damti's note.
12      Q.  (BY MR. FREEMAN)  So you never intended to pay
13  Tomer Damti's note, did you?
14          MS. HARD-WILSON:  Objection, form.
15          MR. PERRIN:  Objection, form.
16      A.  I never have any knowledge of Tomer Damti's
17  note.  The answer is no, I never have any intention, nor
18  do I have any knowledge of that note.
19      Q.  (BY MR. FREEMAN)  I mean, without even knowing
20  about it, there was no way for you to ever intend to pay
21  it, right?
22          MR. PERRIN:  Objection, form.
23      A.  No, I do not know anything about Tomer Damti's
24  note, nor do I have any intention to pay it.
25      Q.  (BY MR. FREEMAN)  I'm sorry.  You didn't have

Page 203

1   any intention to pay Tomer Damti?
2       A.  I do not know anything about that note, so
3   obviously, if I don't know anything about that note, I
4   wouldn't have any intention to pay anything.
5       Q.  Got it.  Did you discuss restructuring Tomer
6   Damti's note with Jane Lin?
7           MR. PERRIN:  Objection, form.
8       A.  No.
9       Q.  (BY MR. FREEMAN)  Okay.
10      A.  Not that I know of.
11      Q.  Did Windspeed continue to use ACET Global's
12  QuickBooks account?
13          MR. PERRIN:  Objection, form.
14      A.  No.  We had our own QuickBook account right
15  after we start business.
16      Q.  (BY MR. FREEMAN)  Okay.  And that didn't mix
17  up any of the old ACET financial data?
18          MR. PERRIN:  Objection, form.
19      A.  Yes.  We did not mix up the two financial
20  data, yes.
21      Q.  (BY MR. FREEMAN)  So Jane Lin didn't have to
22  spend a lot of time fixing the accounting data, right?
23          MS. HARD-WILSON:  Objection, form.
24      A.  I don't believe she spend any time fixing the
25  data.

Page 204

1       Q.  (BY MR. FREEMAN)  Not -- not trying to
2   separate out the old ACET financial data?
3       A.  Not that I can remember.
4       Q.  Okay.
5       A.  We started out brand new with our own
6   QuickBook account.  There's no such thing as separating
7   the data.
8       Q.  No carryover whatsoever?
9       A.  Right.
10      Q.  And so that data didn't have to be -- your
11  accounting data, was it manipulated?
12          MS. HARD-WILSON:  Objection, form.
13      A.  No.  We start out with a brand-new account.
14  There's no manipulations of any data whatsoever.
15      Q.  (BY MR. FREEMAN)  And so Steve Bellah, he knew
16  that it was all clean and separate data, right?
17          MS. HARD-WILSON:  Objection, form.
18      A.  I have no idea what Steve Bellah knows.
19      Q.  (BY MR. FREEMAN)  Did Matt Denegre think it
20  was all clean and separate data?
21          MS. HARD-WILSON:  Objection, form.
22      A.  I do not know what Matt knows.
23      Q.  (BY MR. FREEMAN)  Alex Godinez, did he think
24  it was all clean and separate data?
25          MS. HARD-WILSON:  Objection, form.

Page 205

1       A.  I do not have any idea what Alex thought.
2       Q.  (BY MR. FREEMAN)  Okay.
3           (Exhibit 52 marked.)
4       Q.  (BY MR. FREEMAN)  Mr. Szeto, I'm putting on
5   the screen what is marked as Exhibit 52.  Do you see
6   this, sir?
7       A.  Uh-huh.
8       Q.  Okay.  Do you see this -- at the top, does it
9   say that it's from Steve Bellah?
10      A.  Yes.
11      Q.  And it says it is to William Szeto, Matt
12  Denegre and Alex Godinez; is that correct?
13      A.  Yes.
14      Q.  And this was dated April 11th, 2019; is that
15  correct?
16      A.  Yes.
17      Q.  And you see the strand of emails below it; is
18  that correct, sir?
19      A.  Yes.
20      Q.  Is this a true and correct copy of those
21  emails that are reflected?
22      A.  Yes.
23      Q.  And does Steve Bellah say, "Thank you, Bill"?
24      A.  Yes.
25      Q.  Okay.  Right below that, what he's responding

Page 206

1   to, is that an email from you, Bill?
2       A.  Yes.
3       Q.  And is that an email from your
4   windspeedtrading.com email address?
5       A.  Yes.
6       Q.  And is that an email to Steve Bellah, to Matt
7   Denegre and to Alex Godinez?
8       A.  Yes.
9       Q.  And is it dated April 11th, 2019?
10      A.  Yes.
11      Q.  And is the subject line "Updated financial
12  report"?
13      A.  Yes.
14      Q.  Please let me know if I read your email
15  correctly.  It says, "Steve, Matt and Alex, Jane spent a
16  lot of time fixing all the problems she has in the
17  previous version of QuickBook.  This financial statement
18  is the result of a lot of work and a lot of corrections
19  made.  I really wish I would start with a clean sheet of
20  data instead of mixing the old ACET data."
21          Is that correct?
22      A.  Yeah, but that is for the ACET -- remember I
23  said we have two versions of financial data.  One is for
24  the old ACET that continued to use the old QuickBook on
25  the ACET side because the old -- only the old ACET

Page 207

1   QuickBook have the data that you could use to run the
2   old financial report.  We have a new version of the
3   QuickBook for Windspeed Trading that doesn't have old
4   data -- well, the only data from December -- November,
5   December to that point that it cannot -- it do not have
6   to be fixed.  So what I'm talking about is the
7   financials that they talk about for ACET but not for
8   Windspeed Trading.
9       Q.  Got it.  So it was difficult to keep the
10  financial information clean because you had two sets of
11  books?
12          MS. HARD-WILSON:  Objection, form.
13      A.  Yes.
14          MR. PERRIN:  Objection, form.
15      Q.  (BY MR. FREEMAN)  So it was -- just want to
16  make sure the record was clear.  It was difficult to
17  keep all the data clean because you had more than one
18  set of books, right?
19          MS. HARD-WILSON:  Objection, form.
20          MR. PERRIN:  Objection, form.
21      A.  Yes.
22      Q.  (BY MR. FREEMAN)  Okay.  Did Windspeed mix the
23  old ACET financial data?
24          MS. HARD-WILSON:  Objection, form.
25      A.  What do you mean by Windspeed make [sic] the

Page 208

1   old ACET financial data?
2       Q.  (BY MR. FREEMAN)  Did it -- did it mix some of
3   the old ACET financial data?
4           MS. HARD-WILSON:  Objection, form.
5       A.  No.  We did not make any financial data.
6       Q.  (BY MR. FREEMAN)  I mean, did it mix it up?
7   Did it mix it up with other financial data?
8           MR. PERRIN:  Objection, form.
9           MS. HARD-WILSON:  Objection, form.
10      A.  Let me explain this this way.  Okay?  I have
11  two sets of book.  One is for sales and -- basically,
12  for ACET's data.  And I have one set of book for
13  Windspeed Trading data.  Well, quite often, that the two
14  companies were selling the similar kind of merchandise.
15  And when fulfillment pack them, they do not know which
16  one is which.  So they just pack them and ship them.
17          Now we have to go into the book later and
18  look at the invoices and decide what was shipped, and
19  put them on a -- two different books so I know for a
20  fact that how much was sold at the ACET side and how
21  much was sold on the Windspeed side.  And that's why it
22  has a -- have two sets of books.  So I know how much
23  sales number were made for Windspeed and how much was
24  the ACET side, because they were selling similar and
25  exactly the same merchandise.  And -- that's why.

Page 209

1       Q.  (BY MR. FREEMAN)  Got it.  So in 2018,
2   ACET's -- ACET Global's inventory was moved?
3       A.  Yes, in September.
4       Q.  In 2018, it was -- it was moved to Windspeed's
5   new office, wasn't it?
6       A.  No.  It was moved to the trailer.
7       Q.  You kept it in the trailer during all of 2018?
8       A.  We did not move into the new office -- the
9   Windspeed Trading new office until the end of -- until
10  the end of November.
11      Q.  Okay.  And the ACET Global inventory was
12  not -- was not ever moved over to that?
13      A.  Yes, it was.
14      Q.  When was it moved over there?
15      A.  At the same time we move everything.
16      Q.  So the ACET Global inventory was moved to the
17  new Windspeed office in 2018, correct?
18      A.  Yes.
19      Q.  Okay.  How was it moved?
20      A.  By hand.
21      Q.  Just picked it up and carried it all?
22      A.  Is that what you mean?  Yes, somehow.  By
23  hand, we have to move it.  Is that what you mean?
24      Q.  Yeah.  Well, were there any -- was anyone
25  hired to help move it?

53 (Pages 206 to 209)

## Page 210

1   A.  Yes.  We did hire a couple of trucking firms
2   to move it.  And they do move it by hand, by the way.
3   Q.  Okay.  They hook a trailer up to a truck and
4   move that trailer to the new office?  Is that how they
5   did it?
6   A.  I -- I think so.  I think -- I think they
7   moved -- no, no, no, no.  They moved the stuff into a
8   truck, and then they drove the truck to the new office.
9   They did not move the whole building.  It's one of those
10  storage building.  They cannot move the whole building.
11  Q.  Got it.  Okay.  So they didn't reach in and
12  pull out the foundation and move the entire building?
13  A.  Oh, I'm sure they try.
14  Q.  Why was it moved over to Windspeed's office?
15  A.  Well, that's the only place we could put them.
16  Q.  Okay.
17  A.  The old office is already locked.
18  Q.  The old office was locked?
19  A.  The old office in Plano is already locked.
20  Q.  Who was involved in this process?
21  A.  In what process?
22  Q.  Moving the inventory?
23  A.  I was.
24  Q.  And who else?
25  A.  And my staff.

## Page 211

1   Q.  Okay.  Is that all of your staff?
2   A.  Yes.
3   Q.  So all of your staff knew about this process?
4   A.  They knew about we are moving into the -- into
5   the temporary housing, yes.
6   Q.  And they -- were they involved in this
7   process?
8   A.  Meaning what?  They did not do the moving.
9   Q.  No.  I mean, did they see it going on?
10  A.  Oh, I'm sure they knew the -- they saw that it
11  was moving, but they did not do the moving.
12  Q.  Was Jane Lin involved in the process?
13  A.  Every one of them were.
14  Q.  Every single one of them was?
15  A.  Yes.
16  Q.  Okay.  Was Dana Tomerlin involved?
17  A.  Yes.
18  Q.  Okay.  So they were all involved in
19  transferring the inventory over to Windspeed's new
20  office?
21  A.  Yes.
22  Q.  Okay.  What discussions did you have with them
23  about it?
24  A.  About what?
25  Q.  About moving -- transferring all of the ACET

## Page 212

1   Global inventory over to Windspeed's new office.
2   MR. PERRIN:  Objection, form.
3   A.  It wasn't transferred to Windspeed's new
4   office.  It was transferred to the temporary housing at
5   that time.  That was long before we even leased the
6   building for Windspeed.  All they know was we are moving
7   the inventory to a temporary housing so it will not be
8   locked up by the landlord because of lack of rent.  And
9   that's all we know.
10  Q.  (BY MR. FREEMAN)  Okay.  But it was moved over
11  to Windspeed's new office in 2018, right?
12  A.  At the end of November.  That was after we
13  rented the building.  We did not rent the building until
14  November.  So between October and most of the November,
15  we were in the temporary housing.
16  Q.  What do you mean by "temporary housing"?
17  A.  That storage unit that, as you mentioned, they
18  cannot pick up and move.
19  Q.  Where were you and the employees officing out
20  of?
21  A.  Where am I?
22  Q.  Where were --
23  A.  I was sitting in this chair.
24  Q.  Where -- is that the comfortable CEO chair,
25  the new one?

## Page 213

1   A.  That is the new chair.  It's very comfortable,
2   thank you.
3   Q.  It looks very nice.
4   A.  Thank you.
5   Q.  I got to tell you, mine looks really cool, but
6   it hurts the hell out of my back.
7   A.  Yes.  The old chair was very old, and I
8   decided to buy my own.  And I move it back to the house
9   when we all left the building and work at home.  So it
10  is very nice.
11  Q.  Good.  Well, let -- I'm trying to figure
12  out -- I'm going -- I'm back in 2018.  Okay?  I'm
13  thinking back -- but between -- let's call it October
14  until the end of November 2018 -- where were -- where
15  were you officing out of?
16  A.  At home.
17  Q.  And where was the rest of your staff officing
18  out of?
19  A.  Some of them were home.  Some of them in those
20  temporary housing units that do packing and whatever.
21  But most of them worked at home.
22  Q.  Okay.  So y'all were able to get email and
23  Internet at home not being in an office?
24  A.  At that time, I remember in the middle of the
25  October, I start registering email address, then they

William Szeto  *  April 2, 2021

## Page 214

1   start having email as windspeedtrading.com, yes. Still
2   at that time, they all have email from me as
3   windspeedtrading.com, yes.
4        Q.   Okay.  Okay.  What discussions did you have
5   with any of them about this whole process?
6        A.   What "whole process" you refer to?
7        Q.   Did any of them find it weird that they were
8   having to work from home?
9        A.   No.
10       Q.   Nobody said anything about it?
11       A.   No.
12       Q.   No discussions about it?
13       A.   No.
14       Q.   Did anybody ask how long they were going to be
15   working from home?
16       A.   No.
17       Q.   Did anybody say it's nice to be able to work
18   in my pajamas?
19       A.   They were not working in their pajamas, and I
20   would have a lot of objection if they do.
21       Q.   Did they say they liked not having a commute?
22       A.   Well, eventually, they have to commute to the
23   new office.  But they do have to commute even during
24   that time because we rented two storage unit.  One is in
25   Coit Road, and one is -- I forgot what it was.  So they

## Page 215

1   do have to go there, even though one of them was very
2   much just the furniture storage.  And so they do have to
3   travel there, but it's not the same traveling as they do
4   to the old office in Plano.
5        Q.   Okay.  What involvement did Matt Denegre have
6   in this?
7        A.   None.
8        Q.   What involvement did Steve Bellah have?
9        A.   None.
10       Q.   David Hook?
11       A.   None.
12       Q.   Ludlow?
13       A.   None.
14       Q.   Who set up the rental with the storage?
15       A.   I did.
16       Q.   How was it paid?
17       A.   From my credit card.
18       Q.   How long was the rental period?
19       A.   Well, we rent it for one month.  And as part
20   of that promotion, they give us one month free if I rent
21   one month.  So -- well, we practically pay for one month
22   and get two months out.
23       Q.   So you thought you'd only need one month, but
24   they basically gave you two?
25       A.   Well, we were hurry up to try to rent a place,

## Page 216

1   so yes.
2        Q.   Got it.  Who boxed up the inventory?
3        A.   The inventory, as it was, did not have to be
4   boxed up.  They sat on a shelf in the old office.  So,
5   basically, they took a -- a unit, just take it off the
6   shelf, put it in the truck.  So they don't have to be
7   boxed up.
8        Q.   Okay.  Did you inform Super G about the --
9   about transferring the inventory?
10       A.   Transferring the inventory to the temporary
11   housing?
12       Q.   Sure.  Yes, sir.
13       A.   Yes, they know about it.
14       Q.   What did they say?
15       A.   They agree with that.  They're the one that
16   really concerned about it -- if it disappeared, so they
17   knew there was a solution.
18       Q.   Right.
19       A.   So there's no other solution.  We tried to
20   lease another place before that, but that didn't work
21   out.  So we have -- we have no other option.  And the
22   landlord is already start changing the lock.
23       Q.   Okay.  And so Super G was keeping a close eye
24   on it?
25       A.   Yes.

## Page 217

1        Q.   Did they come out and inspect it?
2        A.   They did not come out and inspect it, but they
3   knew about it.
4        Q.   Okay.  And then after you transferred it to
5   the new -- the new Windspeed office, did you inform
6   Super G?
7        A.   Yes.  I inform them that we have a new office.
8   And I believe Steve Bellah actually came out and look at
9   the new office.
10       Q.   Got it.  And wanted to see the inventory?
11       A.   They wanted to see -- he wanted to see the new
12   office.
13       Q.   Did you -- did you notify Tomer Damti that his
14   collateral had been moved to the new Windspeed office?
15            MR. PERRIN:  Objection, form.
16       A.   No.
17       Q.   (BY MR. FREEMAN)  No?
18       A.   No, I did not contact Tomer.
19       Q.   Okay.  When you moved it over to the new
20   Windspeed office -- when you moved the ACET inventory
21   over to the new Windspeed office, did you instruct your
22   employees to segregate it from the other inventory?
23       A.   No.  Because when we first move in to the
24   Windspeed office, we don't have any Windspeed inventory.
25   So it's very easy to segregate.

55 (Pages 214 to 217)

## Page 218

1    Q.  So if one of your employees had testified that
2  you did, would they be incorrect?
3    A.  Yes.
4      MR. PERRIN:  Objection, form.
5      MS. HARD-WILSON:  Objection, form.
6    Q.  (BY MR. FREEMAN)  Would they have possibly
7  lied about that?
8      MR. PERRIN:  Objection, form.
9      MS. HARD-WILSON:  Objection, form.
10    A.  No.
11    Q.  (BY MR. FREEMAN)  And how do you know that?
12    A.  Because there was no Windspeed Trading
13  inventory at that time.  There's no way they could lie
14  about it.
15    Q.  What if they testified that there was, in
16  fact, Windspeed inventory at that time?
17      MR. PERRIN:  Objection, form.
18      MS. HARD-WILSON:  Objection, form.
19    A.  Then they would be wrong.
20    Q.  (BY MR. FREEMAN)  Okay.  So you didn't do
21  anything to segregate the ACET inventory?
22      MR. PERRIN:  Objection, form.
23    A.  As I answered you earlier, there was no
24  Windspeed Trading inventory.  There's nothing to
25  segregate.

## Page 219

1    Q.  (BY MR. FREEMAN)  Got it.  And Windspeed
2  just -- Windspeed just kept carrying out the sales of
3  that inventory, though, right?
4    A.  Yes.
5    Q.  Okay.  So Windspeed during this time was
6  selling that old ACET inventory --
7    A.  Yes.
8    Q.  -- because there were still orders coming in?
9      Was that a yes?
10    A.  Yes.
11    Q.  Okay.  So Windspeed was selling off all the
12  ACET inventory?
13    A.  Yes.
14    Q.  Okay.
15    A.  During that time.
16    Q.  Okay.  Did it sell most of it off?
17    A.  No.
18    Q.  Okay.  Is it still there?
19    A.  Some of them are still there.
20      MR. PERRIN:  Objection, form.
21    A.  Three years later, they were still there.  We
22  couldn't even give it away.
23    Q.  (BY MR. FREEMAN)  Is that the monkeys?
24    A.  Pardon?
25    Q.  Is that the monkeys?

## Page 220

1    A.  Oh, the monkey was long gone.  We -- the
2  monkey was a patent violation.  I cannot sell them in
3  the U.S.  And I sold them to Australia at a greatly
4  reduced price, and they were gone in a few months.  Yes,
5  the laughing monkeys were gone.  I have to sell them
6  into Australia, and I have to pay for shipping for that.
7    Q.  There was a pretty big market for them in
8  Australia?
9      MR. PERRIN:  Objection, form.
10    A.  I cannot tell you, but they bought it.
11    Q.  (BY MR. FREEMAN)  As soon as you started
12  trying to sell it in Australia, they bought it pretty
13  quickly, didn't they?
14      MR. PERRIN:  Objection, form.
15    A.  Yes, because the patent that the laughing
16  monkey has in the U.S. does not apply to Australia.  So
17  they were happy to buy it, and they were happy to buy it
18  at the lower cost.  And we were happy to sell it just to
19  get rid of it.
20    Q.  (BY MR. FREEMAN)  Sounds like that was some
21  pretty good work as the CEO finding an outlet to sell
22  that?
23    A.  Well, getting involved with patent is one of
24  my speciality.  I have quite a few patent myself, so I
25  know the patent law very well.  So, yes, I can sell

## Page 221

1  those to Australia and get rid of it.
2    Q.  Sounds pretty brilliant.
3      When did you -- when did you figure that
4  out?
5    A.  Well, as soon as I figured that that one was
6  under patent and we got letters from the patent holder
7  saying that you're selling them to that end.  Several
8  people actually got in a lot of trouble selling that
9  laughing monkey, Amazon being one of them.  And they
10  were on TV about selling this laughing monkey.  So it's
11  not something unusual.  And I know right away we have a
12  lot of them, different color, so I had to sell them;
13  otherwise, it would just sit there in the warehouse.
14    Q.  And when was that?
15    A.  Oh, I would say probably beginning of
16  September, end of August.
17    Q.  Of what year?
18    A.  2018.
19    Q.  Okay.  So -- so it sounds like that was a
20  pretty serious matter?
21    A.  It was a serious matter because if you can't
22  sell it, that's quite a few thousand dollars worth of
23  laughing monkey that you can take it home for the kids
24  to play with.
25    Q.  Pretty serious; not a laughing matter, huh?

56 (Pages 218 to 221)

William Szeto  *  April 2, 2021

---

Page 222

1    A.  No.
2    Q.  Did Windspeed have an inventory system?
3    A.  No, not really.  We eventually -- I think last
4  year, we bought an inventory system, but we find out it
5  was not useful for the way inventory work.  Then we
6  cancel that this year.  But, no, we do not have an
7  inventory system.  Paula is responsible for the
8  inventory, so she use the spreadsheets.
9    Q.  Okay.  You said the way your inventory system
10  worked.  What do you mean by that?
11    A.  Well, we have -- it used to be we have --
12  maybe we bought 500 units of X, and then we start
13  selling three at a time, ten at a time.  So every day,
14  we had to subtract that from the inventory so we know
15  exactly how many we have left.  Because what we didn't
16  want to have happen is that we sell all our inventory
17  and we are very close to selling out, and we forget to
18  buy them.  And buying new inventory sometimes takes
19  months, not days, because they have to be shipped from
20  China.  That was one of the problems that we used to
21  have was that everything was shipped by air, so it takes
22  about a week.  We cannot afford to do that, so
23  everything was shipped by sea.  And by the time we get
24  them, it will be at least two months before it get here.
25  So we have to watch the inventory very closely and make

---

Page 223

1  sure that we don't run out.  So every day we have
2  account for inventory, especially items that were
3  selling fast.
4    Q.  Okay.  But y'all just do that manually?
5    A.  We all do that manually.  Like, one, two,
6  three, four, something like that.
7    Q.  How did Tomer do it when he was at ACET?
8    A.  I cannot tell you how Tomer do it.
9    Q.  Did he use a more sophisticated inventory
10  system?
11    A.  I cannot tell you how he did it, and -- so I
12  cannot answer that question.
13    Q.  When you came on and took over as CEO in
14  February of 2018, what kind of inventory software system
15  were they running?
16    A.  There wasn't any, that I know of.
17    Q.  Okay.  As CEO, isn't that something you
18  would -- you'd look at closely?
19    A.  I looked at it, but not closely.
20    Q.  If you were really intending to make sure this
21  business did well, it succeeded, wouldn't you want to
22  know how the inventory system worked?
23          MR. PERRIN:  Objection, form.
24          MS. HARD-WILSON:  Objection, form.
25    A.  I know the inventory -- I know the inventory.

---

Page 224

1  But do we need software or do we need anything
2  sophisticated to keep track of inventory?  I don't
3  believe so.
4    Q.  (BY MR. FREEMAN)  Okay.  Was there a computer
5  that y'all used to keep the inventory on?
6    A.  No.  The computer was not used to keep the
7  inventory data.  The computer, basically, is used to
8  other applications, more like what other computers do,
9  but not for -- not for the inventory data.
10    Q.  So if Dana Tomerlin had testified in her
11  deposition that Windspeed took over the same computer
12  that ACET had used for its inventory, she would be
13  wrong?
14          MR. PERRIN:  Objection, form.
15    A.  No.  They used the computer to enter -- like,
16  after they counted up 435, they used the computer to
17  enter that information to that spreadsheet so it's not
18  wrong.
19    Q.  (BY MR. FREEMAN)  Okay.  This is like tomato,
20  tomato, I think, because I'm asking was that same
21  computer that was used at ACET to keep track of
22  inventory, was that computer used by Windspeed?
23    A.  Well, you can ask the question, but I can tell
24  you that we do not use the computer to count how many
25  items I have.  We still take the item down on the floor,

---

Page 225

1  and they count them, one, two, three, four, five, and
2  then say, "We have 125 left.  Somebody enter that into
3  that computer."  Now, is that computer-assisted?  Well,
4  it depends on the definition of computer-assisted.  But
5  the computer did not count them.
6    Q.  Got it.  Did a human being that worked at
7  Windspeed type in the inventory count into a spreadsheet
8  on a computer that Windspeed used?
9    A.  Yes.
10    Q.  And was that computer the same one that ACET
11  had used?
12    A.  I assume it is.  I cannot tell you for sure.
13    Q.  Wasn't it, in fact, the same computer that
14  Dana, a human being, punched in the numbers on when she
15  worked at ACET?
16    A.  I assume that she did use the same computer,
17  and I cannot tell you for sure.
18    Q.  Okay.  Mr. Szeto, I know that you are not
19  tired at all --
20    A.  You mean you are tired?
21    Q.  I know you don't need a break, but I need a
22  short one.
23    A.  Okay.
24    Q.  And I just sense that everybody does as well.
25  So I'm going to ask if we can, maybe, take a ten-minute

---

57 (Pages 222 to 225)

## Page 226

```
 1    break?
 2       A.  Okay.
 3           MR. PERRIN:  And Karen, could you, during
 4    the break, calculate the amount of time we have
 5    remaining?
 6           THE REPORTER:  We've been on the record
 7    for 4 hours and 41 minutes.
 8           MR. PERRIN:  Thank you.
 9           (Break taken from 3:09 p.m. to 3:23 p.m.)
10       Q.  (BY MR. FREEMAN)  Mr. Szeto, what is Baymark
11    Partners Management, LLC?
12       A.  I do not know what Baymark Partners, LLC -- I
13    do -- I do not get involved in any details other
14    than just running the company, trying to sell something
15    or buy something.
16       Q.  Okay.
17       A.  I do not get involved with any other
18    organizational management issues.
19       Q.  Okay.  Are you familiar with Baymark Partners
20    Management, LLC?
21       A.  No, I'm not.
22       Q.  Have you -- does Windspeed have a relationship
23    with Baymark Partners Management, LLC?
24           MR. PERRIN:  Objection, form.
25       A.  No.
```

## Page 227

```
 1       Q.  (BY MR. FREEMAN)  Windspeed does not have a
 2    relationship with Baymark Partners Management, LLC; is
 3    that correct?
 4           MS. HARD-WILSON:  Objection, form.
 5       A.  Yes.
 6       Q.  (BY MR. FREEMAN)  Okay.  Do you know who owns
 7    Baymark Partners Management, LLC?
 8       A.  No, I have no idea.
 9       Q.  Do you know if it's owned by Tony Ludlow?
10           MS. HARD-WILSON:  Objection, form.
11           MR. PERRIN:  Objection, form.
12       Q.  (BY MR. FREEMAN)  Do you know if it's owned by
13    David Hook?
14           MS. HARD-WILSON:  Objection, form.
15           THE REPORTER:  Jason, I didn't get an
16    answer to that last question, or the one about Tony
17    Ludlow.
18       A.  I do not know.
19       Q.  (BY MR. FREEMAN)  I'm going to ask it again,
20    just to make it clear.
21           Mr. Szeto, do you know if Tony Ludlow has
22    an ownership interest in Baymark Partners Management,
23    LLC?
24           MS. HARD-WILSON:  Objection, form.
25       A.  No, I do not know.
```

## Page 228

```
 1       Q.  (BY MR. FREEMAN)  Do you know if David Hook
 2    has an ownership interest in Baymark Partners
 3    Management, LLC?
 4           MS. HARD-WILSON:  Objection, form.
 5       A.  No, I do not know.
 6       Q.  (BY MR. FREEMAN)  Do you, yourself, have any
 7    relationship with Baymark Partners Management, LLC?
 8       A.  No, I don't.
 9       Q.  Does Windspeed have any other -- you know, any
10    other type of relationship with Baymark Partners
11    Management, LLC?
12       A.  No --
13           MR. PERRIN:  Objection, form.
14       A.  -- not that I know of.
15       Q.  (BY MR. FREEMAN)  Okay.  Is Tony Ludlow a
16    member of Windspeed's board?
17       A.  He was appointed as a member of the board, but
18    he never participated on anything.
19       Q.  He never did anything?
20       A.  He never did anything or talk about anything.
21       Q.  Did Super G get a member on the board, too?
22       A.  Steve was on the board at one time, but
23    that -- the board members pretty much went away after
24    the question concerning the PPP loan.  That was the last
25    time I talked to anybody that was on the board.
```

## Page 229

```
 1       Q.  So the board members of Windspeed, they didn't
 2    do anything from the time it was formed until Windspeed
 3    needed a PPP loan?
 4           MR. PERRIN:  Objection, form.
 5       Q.  (BY MR. FREEMAN)  Is that correct?
 6           MR. PERRIN:  Objection, form.
 7       A.  No, I -- because I -- the requirement, to make
 8    sure the board know I'm going to borrow money, so I call
 9    and ask them.  And they also give me some idea what that
10    PPP loan at that time, just the beginning, who knows
11    what and so on.  So it is information that I got from
12    them.  And, yes, I called them and asked them about the
13    PPP loan to find more information about it.
14       Q.  (BY MR. FREEMAN)  How -- how much of a loan
15    did you get?
16       A.  I got about $42,000 of PPP loan, and I have
17    since pay back.
18       Q.  Did they -- did they say anything about
19    whether the SBA had affiliation rules that may impact
20    Windspeed?
21       A.  Not that I know of.
22       Q.  Did you take any steps to look into whether
23    Windspeed actually qualified for the PPP loan?
24       A.  Yes.
25       Q.  And in the process of that, did you look at
```

Usher Reporting Services
(214) 755-1612

William Szeto  *  April 2, 2021

Page 230

1    the SBA's affiliation rules?
2       A.  Yes.
3       Q.  Okay.  And did you ask any of the Baymark
4    Partners to look at that?
5       A.  No.
6       Q.  What was your conclusion after looking at
7    that?
8       A.  I wasn't interested in that loan.
9       Q.  But you were interested in the PPP loan?
10      A.  Yes.
11      Q.  And by "PPP loan," do you mean a payroll
12   protection loan?
13      A.  Yes.
14      Q.  And is that the loan that came out of the
15   March 27th, 2020, CARES Act?
16      A.  Yes.
17      Q.  And did you understand that that Act -- that
18   Act had charged the small business administration, the
19   SBA, with administering that loan program?
20      A.  Yes.
21      Q.  And did you understand that PPP loans were
22   subject to the SBA's affiliation rules?
23      A.  Yes.
24      Q.  Okay.  And so are you understanding that you
25   had to comply with those in order to get a PPP loan?

Page 231

1       A.  Yes.
2       Q.  Did you factor in Baymark Partners Management,
3    LLC's interest in Windspeed --
4           MR. PERRIN:  Objection, form.
5       Q.  (BY MR. FREEMAN)  -- in applying for the PPP
6    loan?
7       A.  No, did not know anything about Baymark
8    Partners issues.
9       Q.  Okay.  Because you don't even know who Baymark
10   Partners Management, LLC is?
11          MR. PERRIN:  Objection, form.
12      Q.  (BY MR. FREEMAN)  Is that correct?
13      A.  No, I have no idea what Baymark Partners, LLC
14   is, and I have no interest in it.
15      Q.  And it's Baymark Partners Management, LLC,
16   correct?  You don't know what that is?
17      A.  I do not know what that is.
18      Q.  Okay.  And did you factor in Super G's
19   interest in Windspeed in applying for the PPP loan?
20          MR. PERRIN:  Objection, form.
21      A.  No.
22      Q.  (BY MR. FREEMAN)  So Tony Ludlow is a member
23   of Windspeed's board?
24      A.  He was appointed as part of the Windspeed
25   board, but we never talked about it.

Page 232

1       Q.  It wasn't really a board, was it?
2           MR. PERRIN:  Objection, form.
3       A.  It's not for me to make a comment about that.
4       Q.  (BY MR. FREEMAN)  You were -- you were kind of
5    the man running the show, though, weren't you?
6       A.  Yes.
7       Q.  It wasn't really a board, was it?
8           MR. PERRIN:  Objection, form.
9       A.  To be more exact, I didn't want to make
10   anybody mad for answering that question.
11      Q.  (BY MR. FREEMAN)  Well, I -- now,
12   unfortunately, we don't get to do that.  Let's be real.
13   You were -- you were the driving force behind Windspeed,
14   weren't you?
15          MR. PERRIN:  Objection, form.
16      A.  Yes.
17      Q.  (BY MR. FREEMAN)  It didn't have a real board,
18   did it?
19          MR. PERRIN:  Objection, form.
20          MS. HARD-WILSON:  Objection, form.
21      A.  I don't want to answer that question.  To
22   answer that question, yes, I am driving everything that
23   is with the business.  And whether there will be a board
24   or not is besides the point.
25      Q.  (BY MR. FREEMAN)  Well, you don't want to

Page 233

1    answer it because it will -- it might hurt someone's
2    feelings?
3           MR. PERRIN:  Objection, form.
4       A.  Jason, I never worry about hurting somebody's
5    feeling.
6       Q.  (BY MR. FREEMAN)  Bill, now, I got to tell
7    you, you're sitting in the big comfy CEO chair.  You've
8    got to make some hard calls sometimes.
9       A.  Well, I pay for that chair, and I think I
10   deserve to sit in that big chair.
11      Q.  I think you do.  What I'm asking you, though,
12   is a big chair question.
13      A.  Okay.  Go ahead.
14      Q.  Do you not want to say whether it was a real
15   board because you don't want to hurt someone's feelings?
16          MR. PERRIN:  Objection, form.
17      A.  I don't ever worry about somebody's feeling.
18   And I'm 76 years old.  Do I really worry about hurting
19   somebody's feeling?  No.
20      Q.  (BY MR. FREEMAN)  Well, let's be real; it
21   wasn't a real board, was it?
22          MR. PERRIN:  Objection, form.
23      Q.  (BY MR. FREEMAN)  I mean, it wasn't a real
24   board, was it?
25          MR. PERRIN:  Objection, form.

59 (Pages 230 to 233)

Page 234

```
 1        A. I don't want to answer that question.
 2        Q. (BY MR. FREEMAN) Let's say this. It was on
 3   paper, wasn't it?
 4              MR. PERRIN: Objection, form.
 5        A. It was printed on paper, but I cannot answer
 6   that question.
 7        Q. (BY MR. FREEMAN) That's about it, though,
 8   wasn't it?
 9              MR. PERRIN: Objection, form.
10        A. I'm not worried about the answer to that one.
11              MR. FREEMAN: Brenda, can I get an
12   instruction to answer a question?
13              MS. HARD-WILSON: We object --
14              MR. FREEMAN: I'm sorry?
15              MS. HARD-WILSON: We objected and
16   preserved our objections.
17              Mr. Szeto, if you could answer to the best
18   of your ability.
19              THE WITNESS: Okay.
20        A. No, I do not care about the board one way or
21   the other. And I do not worry about hurting somebody's
22   feeling saying that I don't need one.
23        Q. (BY MR. FREEMAN) So you're saying, no, it
24   wasn't a real board?
25              MR. PERRIN: Objection, form.
```

Page 235

```
 1        Q. (BY MR. FREEMAN) Correct?
 2        A. Yes. No, it wasn't a real board.
 3        Q. Okay. Thank you.
 4              Did -- now, why did you do business with
 5   Baymark Partners Management, LLC?
 6              MR. PERRIN: Objection, form.
 7        A. I don't actually do business with Baymark
 8   Partners, LLC.
 9        Q. (BY MR. FREEMAN) Okay.
10        A. I was asked by David Hook to help him to look
11   at this business he has. And the first time I ever get
12   to see it was the presentation made by Tomer. And after
13   that -- after several months after that, he asked me to
14   go and take a look at the company that he had bought,
15   and that was the -- that was one day for about two hours
16   or three hours. And that was the only time that I
17   actually look at the company that David Hook asked me to
18   look at, which is not unusual because I do that a lot
19   for other VCs as well.
20              But, eventually, at the beginning of 2018,
21   he asked me to go back and help with the sales effort
22   with ACET Global. And I went back -- at the first day,
23   I went back to start talking to the sales people and
24   talk to Tomer, and that was the first day I went back to
25   talk to -- and I wasn't exactly planning to work with
```

Page 236

```
 1   David Hook or anybody.
 2        Q. (BY MR. FREEMAN) Okay. Mr. Szeto, I have put
 3   on the screen what's marked as Exhibit 8. Do you see
 4   this, sir?
 5        A. Yes.
 6              (Exhibit 8 marked.)
 7        Q. (BY MR. FREEMAN) And do you recognize this
 8   document?
 9        A. Yes, I think so.
10        Q. Okay. What is this?
11        A. I think it is the Amended and Restated Company
12   Agreement of -- concerning the loan.
13        Q. Okay. And what is this -- what is this
14   document dated?
15        A. October 18, 2018.
16        Q. Okay. And do you know when it was executed?
17        A. I don't know for sure when it was executed,
18   and -- so -- so I cannot tell you for sure. It was
19   about that time, and -- it was in October sometime.
20        Q. Sometime around -- around or on October 18th,
21   2018?
22        A. Yes, yes.
23        Q. Who executed it?
24        A. As I mentioned to you, I received the loan --
25   the money actually October 20th, and this document came
```

Page 237

```
 1   out at the same time.
 2        Q. Okay. Were they coordinated? Was this
 3   document coordinated with the loan?
 4        A. I think so.
 5        Q. Why do you think so?
 6        A. Because I received the money about the same
 7   time.
 8        Q. Was there any other reason that might make you
 9   think they were coordinated?
10        A. No.
11        Q. Okay. Who executed this document?
12        A. I signed it.
13        Q. Do you know who else?
14        A. I do not know who else signed it. I assume
15   everybody else signed it.
16        Q. Okay. I'm showing you the signature pages --
17        A. Okay.
18        Q. -- of what's -- excuse me -- marked as
19   Exhibit 8 of this deposition. And do you see below?
20        A. Yes.
21        Q. Who else signed it besides you?
22        A. I see Tony Ludlow's signature, and that's
23   about the only other signature I saw other than mine.
24        Q. Okay. And I'm going to go down another page,
25   but who did he sign on behalf of?
```

Page 238

1    A.  I -- I don't know.  I cannot tell you who he
2  signed for.
3      Q.  Okay.  Does it look like his signature up
4  here (indicating) is under the name Baymark Partners
5  Management, LLC?
6      A.  I assume it is.
7      Q.  Does that appear to you that he's signing this
8  as Baymark Partners Management, LLC?
9      A.  I assume it is.
10      Q.  And is this his signature below it, as far as
11  you know?
12      A.  I do not know -- I do not recognize his
13  signature, one way or the other.  I have very, very
14  little dealing with Tony Ludlow.
15      Q.  Got it.  Well, he lists his title below the
16  name as manager; is that correct?
17      A.  I do not know what his title is.
18      Q.  But if it's listed as manager, does that
19  appear to you that whoever signed this is representing
20  that they're the manager of Baymark Partners Management,
21  LLC?
22      A.  I do not want to guess.  I do not know.
23      Q.  Okay.  Let's look at the page below this.  Did
24  anyone else sign this document?
25      A.  I saw a wiggly line that says, "Mark Cole."  I

Page 239

1  assume that that's Mark Cole's signature.
2      Q.  Okay.  Does Mark Cole -- does his name appear
3  above the title "chief financial officer"?
4      A.  Yes.
5      Q.  And is that of Super G Capital, LLC?
6      A.  Yes.
7      Q.  Okay.  And you signed this document as well;
8  is that correct?
9      A.  Yes.
10      Q.  And in what capacity did you sign this
11  document?
12      A.  Well, I signed it as manager.
13      Q.  Okay.  Manager of Windspeed Trading, LLC?
14      A.  Yes.
15      Q.  Okay.  This document, is it -- is it the
16  Amended and Restated Company Agreement of Windspeed
17  Trading, LLC?
18      A.  As far as I know, yes.
19      Q.  Okay.  Was there a prior version that was
20  amended?
21      A.  There was a prior version that we made up
22  earlier, which they have some suggestion to change.  So,
23  yes, there was a prior version that -- but -- and Julie
24  had modified it and whatever that was, but this supposed
25  to be the version that we are going to use.

Page 240

1      Q.  Okay.
2      A.  So -- okay?
3      Q.  So did you -- did you draft the original one?
4      A.  Yes.
5      Q.  You don't have -- you don't have -- you're the
6  CEO, right?
7      A.  Yes.
8      Q.  You don't have people that you have do that
9  for you?
10      A.  Well, I have a son that would do that for me.
11      Q.  Is that who drafted the original?
12      A.  Yes.
13      Q.  Okay.  And what is your son's name?
14      A.  Alex.
15      Q.  So that's Alex?  And what firm does he work
16  for?
17      A.  He works for the firm that -- Amanda's firm.
18      Q.  Brenda's firm?
19      A.  Yes, Brenda's firm.
20      Q.  Is -- do you have a copy of that original
21  version?
22      A.  I don't.  I'm sure that Alex have.
23      Q.  Okay.  Did you ask for a copy of that in
24  gathering the relevant documents for discovery in this
25  case?

Page 241

1      A.  I did not ask for one because it had changed
2  so many different times.
3      Q.  How many times -- has it changed since this
4  one?
5      A.  I didn't count them, but many times.
6      Q.  I'm sorry.  I didn't understand that.
7      A.  I said there may be five, six, seven times.  I
8  cannot -- I did not count them, and I cannot keep track
9  of them.
10      Q.  Since the version that's on the screen right
11  now?
12      A.  No, that has different versions of this
13  before.
14      Q.  Before --
15      A.  I do not know what version that is.
16      Q.  Before you signed this one, there were
17  different drafts; is that what you're saying?
18      A.  Yes.
19      Q.  Okay.  And as far as you know, is this the
20  active version, the signed version?
21      A.  As far as I know, yes.
22      Q.  Okay.  Mr. Szeto, this is forming your
23  company, right?
24      A.  Yes.
25      Q.  And you mentioned you got some help with this

## Page 242

1    amended agreement and that Julie had helped?
2         MR. PERRIN:  Objection, form.
3    Q.  (BY MR. FREEMAN)  Is that correct?
4         MR. PERRIN:  Objection, form.
5    A.  Julie work with Alex to work on several
6    versions of this agreement.  And, yes, I would consider
7    that Julie was helping with Alex.
8    Q.  Were they like -- were they a team?
9         MR. PERRIN:  Objection, form.
10   A.  No, they were not a team.  Alex was
11   representing me.
12   Q.  (BY MR. FREEMAN)  Okay.  And Julie was
13   representing who?
14   A.  I don't know.
15   Q.  Okay.  You think she was representing one of
16   the parties to this document?
17   A.  I do not know.
18   Q.  Okay.  If you look down on Page 7 of this
19   exhibit, I would like for you to look at Paragraph 3.1.
20   A.  Yes.
21   Q.  First, to the "Duties of Board of Managers."
22   Do you see that, sir?
23   A.  Yes.
24   Q.  It says, "The business and affairs of the
25   company shall be managed by the Board of Managers.  The

## Page 243

1    Board of Managers shall be solely responsible for the
2    operation and management of the business of the Company.
3    And except as otherwise expressly provided in this
4    agreement, the Board of Managers shall possess all
5    rights, powers and authority generally confirmed by
6    applicable law or deemed by the Board of Managers as
7    necessary, advisable or consistent in connection
8    therewith."
9         The Board of Managers, is it your
10   understanding, under this document, they're supposed to
11   manage Windspeed?
12   A.  Supposed to, yes.
13   Q.  And they're supposed to be solely responsible
14   for the operation and management of Windspeed, right?
15   A.  Yes.
16   Q.  And Paragraph 3.2, does that provide that
17   there is no control by a member -- in their capacity as
18   a member?
19        MR. PERRIN:  Objection, form.
20   A.  I don't understand what the question is.
21   Q.  (BY MR. FREEMAN)  It was not phrased well.
22   Let me -- let me read the language that I've
23   highlighted.  The caption says, "No control by members."
24   And after that, it says, "No member, (except a member
25   who may also be a manager or officer, and then only in

## Page 244

1    such a capacity within the scope of his, her or its
2    authority hereunder) will participate in or have any
3    control over the Company business or will have any
4    authority or right to act for or bind with the company."
5         Does that mean that a member -- just
6    merely being a member doesn't give someone any control
7    other the company?
8         MR. PERRIN:  Objection, form.
9         MS. HARD-WILSON:  Objection, form.
10   A.  I still don't understand what your question
11   is.
12   Q.  (BY MR. FREEMAN)  Let's go down to
13   Paragraph 3.5.  Paragraph 3.5 is captioned "Current
14   Board of Members" -- excuse me -- "Current Board of
15   Managers."  It says, "The Board of Managers, as of the
16   date of this agreement, shall consist of the following
17   persons."  It says, "Anthony Ludlow, Steven Bellah,
18   William Szeto"; is that correct?
19   A.  Yes.
20   Q.  Okay.  Is Steven Bellah a current manager on
21   the Board of Managers?
22   A.  He was on this paper, yes.
23   Q.  Okay.  I would like to go down to
24   Paragraph 13 -- excuse me -- Paragraph 9.1.  Section 9.1
25   is captioned "Restrictions on Transfer of Interest."  It

## Page 245

1    says, "Except as otherwise provided in this Article IX,
2    no member shall have the right to sale, transfer,
3    pledge, encumber, hypothecate or otherwise assign all or
4    any portion of its interest without the consent of the
5    Board of Managers, which consent may be withheld in its
6    sole and absolute discretion."
7         Did it look like I read that correctly?
8    A.  Well, that's what is on the paper, yes.
9    Q.  Is that what the reality is?
10        MS. HARD-WILSON:  Objection, form.
11   A.  I don't know what the realty is.
12   Q.  (BY MR. FREEMAN)  Okay.
13   A.  I do not know what you imply.
14   Q.  But you started Windspeed, right?
15   A.  Yes, I did.
16   Q.  And this is your company?
17   A.  Yes.
18   Q.  And you own 100 percent of it?
19   A.  So far, yes.
20   Q.  Okay.  What do you mean by "so far"?
21   A.  Well, I haven't sell any of it.
22   Q.  Okay.  But this doesn't appear to allow you to
23   sell it, does it?
24        MR. PERRIN:  Objection, form.
25        MS. HARD-WILSON:  Objection, form.

62 (Pages 242 to 245)

## Page 246

1    A.  Well, I do not know what this actually mean,
2    nor do I have any interest of selling anything or
3    transfer anything.  So -- so I don't -- I do not think
4    this actually apply.
5    Q.  (BY MR. FREEMAN)  Did you ever read this
6    before signing it?
7    A.  Yes, I read it.
8    Q.  Did you understand this when you read it?
9    A.  No.
10   Q.  Okay.  Did you ask anybody what it meant?
11   A.  I asked Alex what it meant, and I wasn't
12   concerned about it.
13   Q.  Okay.  It didn't concern you that there were
14   restrictions placed on your ability to sell your own
15   company?
16        MS. HARD-WILSON:  Objection, form.
17   A.  There's always restriction everywhere, and I'm
18   not concerned about every single little bit of
19   restriction there is.
20   Q.  (BY MR. FREEMAN)  Okay.
21   A.  I would deal with it when I come across it.
22   Q.  Okay.  We go down to Exhibit A of this
23   Exhibit 8.  Do you see that, Mr. Szeto?
24   A.  Yes.
25   Q.  And does this Exhibit A to Exhibit 8, does it

## Page 247

1    state that it -- "Members, Warrant Holders, Interests"?
2    Is that the caption?
3    A.  Yes.
4    Q.  And is this exhibit -- do you understand this
5    to be setting out the warrant rights that are owned by
6    parties to this agreement?
7    A.  Yes.
8        MR. PERRIN:  Objection, form.
9    Q.  (BY MR. FREEMAN)  And does this document state
10   that you, Mr. Szeto, contributed $0 to Windspeed?
11   A.  Yes.  At that point, yes.
12   Q.  Okay.  And does it state on the far right side
13   that your interests upon exercise of all of the warrants
14   would be 20 percent?
15   A.  Yes, I can see that.
16   Q.  Okay.  And below your name, does it state that
17   one of the warrant holders is Super G Capital?
18   A.  Yes.
19   Q.  And does it state that Super G Capital had a
20   capital contribution of $0?
21   A.  Yes.
22   Q.  And does it state that upon exercise of all of
23   Super G's warrants, that it will have a 40 percent
24   interest in Windspeed?
25   A.  Yes.

## Page 248

1    Q.  And below Windspeed -- and below Super G's
2    name, does it state that Baymark Partners Management,
3    LLC is a warrant holder?
4    A.  Yes.
5    Q.  And does it state that Baymark Partners
6    Management, LLC contributed $0 to Windspeed?
7    A.  Yes.
8    Q.  And does it state that upon exercise of
9    Baymark Partners Management, LLC's warrants, that it
10   will own 40 percent of Windspeed?
11   A.  Yes.
12   Q.  And do you know what the exercise price for
13   those warrants is --
14   A.  No.
15   Q.  -- for Super G Capital or for Baymark Partners
16   Management, LLC?
17   A.  No.
18   Q.  Do you believe it to be a significant amount
19   of money?
20   A.  No.
21   Q.  Do you believe it to be a nominal amount of
22   money?
23   A.  I do not know what that is.  I do not know
24   what it is at this point in time.
25   Q.  Okay.  Did you have any negotiations about

## Page 249

1    those warrants?
2    A.  No.
3    Q.  And why, Mr. Szeto, did you agree to allow two
4    other persons to have warrant rights to -- 40 percent
5    each of Windspeed, your company, for $0?
6    A.  I was hoping that by agreeing to the
7    percentage of warrants, they will be able to help me
8    with financing and other necessary issues, but that have
9    not turn out to be true.
10   Q.  Okay.
11        (Exhibit 9 marked.)
12   Q.  (BY MR. FREEMAN)  Mr. Szeto, I want to show
13   you what's marked as Exhibit 9 to this deposition.
14   A.  Okay.
15   Q.  Do you recognize this document, sir?
16   A.  Do I recognize this document?  Yes, I do.
17   Q.  And is the heading on this document Windspeed
18   Trading, LLC?
19   A.  Yes.
20   Q.  And is the address listed there 1761
21   International Parkway, Suite 133?
22   A.  Yes.
23   Q.  And is this document dated January 10th, 2019?
24   A.  Yes.
25   Q.  And is that your signature on the document,

63 (Pages 246 to 249)

William Szeto  *  April 2, 2021

## Page 250

1    sir?
2        A.  Yes, it is.
3        Q.  And did -- does it state that you are the
4    president and CEO of Windspeed Trading, LLC?
5        A.  Yes.
6        Q.  And does this document contain a directive to
7    "please close the following three accounts under ACET
8    Global, LLC effective immediately"?
9        A.  Yes.
10       Q.  Okay.  And were those three accounts that are
11   listed ACET Global bank accounts?
12       A.  Yes.
13       Q.  Why were your sending a document to close the
14   ACET Global bank accounts in January of 2019?
15       A.  Because we were not using it, and there was no
16   money to pay for the administrative costs for those
17   accounts.  And Texas Capital Bank told us that if we are
18   not using it, we have to close it.  And the only person
19   that can sign for the closing of those account was me
20   because it was under my name.  So I did authorize Texas
21   Capital Bank to close those accounts.
22       Q.  So ACET Global's bank accounts were under your
23   name?
24             MR. PERRIN:  Objection, form.
25       A.  Yeah, they were under my name at one time for

## Page 251

1    the whole year.  So they said you need to close it,
2    otherwise you need to pay the administrative fee.  And
3    we don't have money to pay it, and they said you have to
4    close it.  And so the only way that I could possibly
5    close it, by signing the paper and tell them to close
6    it.
7        Q.  (BY MR. FREEMAN)  Okay.  And you closed it in
8    2019, correct?
9        A.  Yes.
10       Q.  And that's because Windspeed was done using
11   these accounts?
12       A.  Windspeed was --
13             MS. HARD-WILSON:  Objection, form.
14       A.  -- using this accounts.  Windspeed had their
15   own accounts.
16       Q.  (BY MR. FREEMAN)  Well, now, I understood that
17   ACET Global -- excuse me.  Strike that.
18             I understood that Windspeed was selling
19   ACET Global's inventory; is that correct?
20       A.  Yes, but we will not use those accounts.
21       Q.  So whenever Windspeed sold ACET Global's
22   inventory, were the revenues going into Windspeed's bank
23   account?
24             MR. PERRIN:  Objection, form.
25       A.  Yes, at that time, but we did not sell

## Page 252

1    anything.
2        Q.  (BY MR. FREEMAN)  I'm sorry.  What do you mean
3    you did not sell anything?
4        A.  We had not income into any of those accounts.
5    That's why Texas Capital Bank told us to close it.  We
6    were not using those accounts, period.
7        Q.  But the accounts that are closed here at Texas
8    Capital Bank, those are ACET Global accounts, correct?
9        A.  Yes, it was.
10       Q.  And so I was asking:  When Windspeed would
11   sell ACET Global's inventory, did the money come into
12   Windspeed's bank account?
13       A.  It come -- no.  They do not come into the
14   Windspeed account.  They're supposed to go into the ACET
15   account.  The only difference is there was no money
16   coming in.
17       Q.  Okay.  What is your ownership in Windspeed?
18       A.  100 percent.
19       Q.  Do you consider yourself to have 100 percent
20   economic ownership of Windspeed?
21       A.  Yes.
22       Q.  And do you consider yourself to have 100
23   percent beneficial ownership of Windspeed?
24       A.  Yes.
25       Q.  Do you consider anyone else to have rights to

## Page 253

1    Windspeed?
2        A.  Anyone else have what?
3        Q.  Rights.
4        A.  No.
5        Q.  Do you consider anyone else to be able to
6    acquire ownership in Windspeed if they want to?
7        A.  No.
8        Q.  Do you believe that Baymark Partners
9    Management, LLC has the right to own any part of
10   Windspeed?
11       A.  No.
12       Q.  Do you believe that Super G Capital has the
13   right to own any part of Windspeed?
14       A.  No.
15       Q.  Why do you believe that?
16             MR. PERRIN:  Objection, form.
17       A.  Because I have no reason whatsoever they want
18   to have -- to own part of Windspeed or -- unless I pay
19   the debt on the loan, Super G should not have that
20   right.
21       Q.  (BY MR. FREEMAN)  Did they want to separate
22   themselves from the company until the debt and the loan
23   were repaid?
24             MS. HARD-WILSON:  Objection, form.
25       A.  I do not know exactly what that will happen,

Usher Reporting Services
(214) 755-1612

Page 254

1   nor did I ever think -- ever thought about it.
2        Q.  (BY MR. FREEMAN)  Do you think they wanted to
3   stick you with all the liability exposure?
4            MS. HARD-WILSON:  Objection, form.
5            MR. PERRIN:  Objection, form.
6        A.  I don't think so.
7        Q.  (BY MR. FREEMAN)  Maybe wait until everything
8   was cleared and they didn't have to worry about someone
9   coming and suing them?
10           MS. HARD-WILSON:  Objection, form.
11       A.  I do not -- I do not think so.  I have no idea
12   what you are talking about, first of all.
13           (Exhibit 42 marked.)
14       Q.  (BY MR. FREEMAN)  Mr. Szeto, I'm putting up
15   what's Exhibit 42 --
16       A.  Okay.
17       Q.  -- on the screen.  Do you recognize this
18   document?
19       A.  I don't remember seeing it, no.
20       Q.  Okay.  And here at the top, it shows it's an
21   email from Matt Denegre to Steve Bellah, Alex Godinez
22   and Tony Ludlow; is that correct?
23       A.  Yes.
24       Q.  And it's dated October 16th, 2018; is that
25   correct?

Page 255

1        A.  Yes.
2        Q.  And the title of the email is "Windspeed
3   revised WPA and Warrant"; is that correct?
4        A.  Yes.
5        Q.  Do you know -- do you have any reason to know
6   what this email was about?
7        A.  No, I do not.
8        Q.  Or what draft they may be referring to?
9            MS. HARD-WILSON:  Objection, form.
10       A.  I do not know what that mean.
11       Q.  (BY MR. FREEMAN)  They state -- Matt states,
12   "We finished the draft and need to review internally."
13           Do you know -- you don't know what that
14   means?
15       A.  No.
16       Q.  Okay.  Do you know what the "WPA" means?
17       A.  No, I do not know what WPA means.
18       Q.  Any idea if that refers to "warrant purchase
19   agreement."
20       A.  I have no idea what that means, nor would I
21   want to guess.
22       Q.  And you had no involvement in negotiating the
23   WPA, whatever it is?
24       A.  I have no involvement that I can think of, so
25   I cannot tell you one way or the other.

Page 256

1        Q.  Okay.  Do you know who drafted it?
2        A.  I have no idea who drafted it.
3        Q.  Okay.
4        A.  I know -- I know my attorney, Alex, was
5   involved with Julie at one time, so they did work on it
6   for a little while.  And -- but that's as far as I know.
7        Q.  Do you recall what the date of the Amended and
8   Restated Operating Agreement of --
9        A.  No.  I have good memory, but not three years
10   old.
11       Q.  Do you remember the date on the Windspeed
12   Trading, LLC company agreement?
13       A.  No, I do not remember the exact date.  I just
14   know approximately what -- what month it was in October
15   and -- yeah, I do not know the exact date.
16       Q.  Wasn't that agreement the date that's
17   reflected on October 18th, 2018?
18       A.  Well, you are looking at a piece of paper.  I
19   assume that you know what the date is, but I do not
20   know.
21       Q.  Okay.  Am I reading it correctly when I say
22   the date stated there is October 18th, 2018?
23       A.  Well, I assume you are reading it correctly,
24   yes.
25       Q.  Mr. Szeto, I'm not trying to be difficult.

Page 257

1   Unfortunately, the way this process works, I've got to
2   read it and create a record.  And so we're not testing
3   my reading abilities.  I assure you they're okay.
4   But --
5        A.  You surprise me by saying that you're not
6   trying to be difficult.  So -- I tend not to agree with
7   you, but that's okay.
8        Q.  Well, we can both trade that barb, I think, at
9   the end of this.  But I would like to confirm that the
10   date on this document is October 18th, 2018; is that
11   correct, sir?
12       A.  Yes.
13       Q.  Okay.  So the date of the emails here we're
14   looking at in Exhibit 42, at the top here, that was
15   October 16th, 2018, correct?
16       A.  Yes.
17       Q.  Okay.  Now, so down at the bottom, is that an
18   email from Julie Smith?
19       A.  Yes.
20       Q.  Julie A. Smith?
21       A.  Uh-huh.
22       Q.  And is it dated October 15th, 2018?
23       A.  Yes.
24       Q.  All right.  It looks like she's working late,
25   7:05 p.m.?

65 (Pages 254 to 257)

Page 258

```
 1        A.  I thought that's what lawyers are supposed to
 2   do.
 3        Q.  I think they are.
 4        A.  That's what I thought, too.
 5        Q.  Is it to Matt Denegre?
 6        A.  Yes.
 7        Q.  And William Szeto?
 8        A.  Yes.
 9        Q.  And that's you, right?
10        A.  I supposed to work late, too.
11        Q.  What's that?
12        A.  Yes.
13        Q.  That's you, correct, sir?
14        A.  Yes.
15        Q.  And then to Alexander Szeto?
16        A.  Yes.
17        Q.  Okay.  And the subject line says,
18   "Windspeed-revised WPA and Warrant"; is that correct?
19        A.  Yes.
20        Q.  Do you remember -- do you know what the "WPA"
21   is?
22        A.  Not exactly, but --
23        Q.  Okay.
24        A.  -- I assume it's the warrant purchase
25   agreement.
```

Page 259

```
 1        Q.  Okay.  So this email, it's from Julie Smith.
 2   And if you look at her signature line, does it say that
 3   she's a shareholder in Hallett & Perrin, PC?
 4        A.  Yes.
 5        Q.  Okay.  And does her email say, "Attached are
 6   documents of the warrant purchase agreement and the
 7   warrant revised to reflect the changes of all parties"?
 8        A.  Yes, that's what the email says.
 9        Q.  And then does it say, "The redlines compare
10   these versions to the Versions H&P, circulated earlier
11   today"; is that correct?
12        A.  Yes.
13        Q.  And do you understand "H&P" to refer to
14   Hallett & Perrin?
15        A.  I assume it is.
16        Q.  Okay.  And if you look down at the bottom
17   where it reflects the attachments to her email, does it
18   attach -- does it reflect an attachment called
19   "Windspeed Warrant Purchase Agreement"?
20        A.  Yes.
21        Q.  And does it appear to reflect Version 3 of
22   that document?
23        A.  Uh-huh.
24        Q.  And then is there also another document that
25   says, "Windspeed Warrant Purchase Agreement, Windspeed
```

Page 260

```
 1   Warrant Purchase Agreement.pdf"?
 2        A.  Yes.
 3        Q.  Okay.  Do you know who drafted this document?
 4        A.  No, I do not remember.
 5        Q.  Okay.  Do you remember being involved in that
 6   process at all?
 7        A.  I remember being involved in the process.  And
 8   I think Alexander was involved with that process for me,
 9   and I really do not remember who else was involved.
10        Q.  Okay.  Now, do you remember who drafted the
11   Amended and Restated Company Agreement for Windspeed?
12        A.  I do not remember.
13        Q.  Okay.  But you did sign that document,
14   correct?
15        A.  Well, I think that when they finally said it's
16   ready to sign, yes, I did sign.
17        Q.  Okay.  And who is "they"?
18        A.  I forget who said it was ready to be signed.
19   I think Alexander did say, yeah, it's ready to go, and I
20   signed it, yes.
21        Q.  Okay.  And does this -- this document I'm
22   placing on your screen, it's Exhibit 43.  Do you see
23   that?
24        A.  Yes.
25            (Exhibit 43 marked.)
```

Page 261

```
 1        Q.  (BY MR. FREEMAN)  And does this appear to be
 2   an email from Matt Denegre?
 3        A.  Yes.
 4        Q.  Dated October 17th, 2018?
 5        A.  Yes.
 6        Q.  To Steve Bellah?
 7        A.  Yes.
 8        Q.  CC'ing Alex Godinez and Tony Ludlow?
 9        A.  Yes.
10        Q.  Subject line "Windspeed A&R Company
11   Agreement."
12        A.  Okay.
13        Q.  Attachments listed, Version 1, Windspeed
14   Trading, LLC A&R Company Agreement; is that correct?
15        A.  Yes.
16        Q.  And do you know who drafted the attachment?
17        A.  I don't remember.
18        Q.  So the attachment is with the email here.  And
19   if you'll look in the top right-hand corner, does it
20   say, "H&P draft 10/17/18"?
21        A.  Yes, but I -- on the date down below, it
22   didn't have a date put down.  So I don't know exactly
23   what date that is.
24        Q.  Okay.  Any reason to believe that the date
25   that's stated there at the top of this Amended and
```

66 (Pages 258 to 261)

Page 262

1    Restated Company Agreement of Windspeed Trading, LLC
2    that reflects H&P draft 10/17/18, that that's incorrect?
3        A.  I do not know.
4        Q.  Okay.  And do you know what "H&P" stands for?
5        A.  I do not know for sure.
6        Q.  Do you think that it stands for Hallett &
7    Perrin?
8        A.  I assume that is what it is, but I cannot tell
9    you for sure.
10       Q.  Okay.  Why did you set the company up with
11   warrants?  Why did you set Windspeed up with warrants?
12       A.  I don't know exactly why.  And I was hoping to
13   set it up with warrants that I can get further
14   investment into the company.  And I have done that
15   before with other startup that I started, and I thought
16   that it would work out real well.  So I did that for
17   that reason.
18           Now, it didn't work this time because I
19   was hoping for additional investment.  It didn't work,
20   so -- I did set it up, but how much the warrant will
21   eventually cost and would sell and whatever depend on
22   how successful we are at that time.  So it's something I
23   don't know for sure at that point.  And I just thought
24   that maybe I do that that way, I can get some additional
25   investments.

Page 263

1        Q.  Could it also depend on how much it cost to
2    exercise that warrant?
3        A.  Exactly.
4        Q.  Okay.
5        A.  Well, that cost is depending on how successful
6    the company is.
7        Q.  Okay.  Who requested that it be set up with
8    warrants?
9        A.  I did.
10       Q.  Okay.  What is a "warrant"?
11       A.  A warrant is basically a right to sell stocks
12   or buy stocks.
13       Q.  Okay.  So just entitles the holder to buy
14   stock?
15       A.  Yes.
16       Q.  Okay.  And why did you want it done this way?
17       A.  Well, I want it done this way so I could get
18   the flexibility whether if I want to sell it or not, or
19   how much I want to sell it for.
20       Q.  And how does a warrant give you the right to
21   decide how much you sell it for?
22       A.  It depend on the success of the company.
23       Q.  So you get to decide later how much you're
24   going to sell it to the warrant holders for?
25           MR. PERRIN:  Objection, form.

Page 264

1        A.  I think so.
2        Q.  (BY MR. FREEMAN)  Okay.  Are you something of
3    an expert in warrants?
4        A.  No, I'm not an expert in anything.
5        Q.  Okay.  Where did you get your understanding of
6    how warrants work?
7        A.  I do not know for sure how it works, and I'm
8    not ready to explain it.
9        Q.  Okay.  Do you understand them at all, truly?
10           MR. PERRIN:  Objection, form.
11       A.  I understand some of it, but I do not
12   understand all.
13       Q.  (BY MR. FREEMAN)  Okay.  But your
14   understanding is that by these people -- by Baymark
15   Partners Management, LLC and Super G Capital, LLC
16   holding warrants, that you can later tell them how much
17   they're going to buy their membership interest for?
18           MR. PERRIN:  Objection, form.
19       A.  I do not, at that moment, have any idea what
20   that really mean until I have to come across it.  And,
21   no, I do not know what it really mean at that time.
22       Q.  (BY MR. FREEMAN)  Okay.  Is it possible that
23   Baymark Partners Management, LLC was the one who wanted
24   it to be warrants?
25       A.  No.  Baymark Management, LLC have no

Page 265

1    involvement whatsoever in the start-up of Windspeed
2    Trading.  They did not give me any -- any advice or
3    direction as to which way it should go.  So they did not
4    tell me what this really mean.
5        Q.  Were they pretty upset when you forced them to
6    take these warrants?
7            MS. HARD-WILSON:  Objection, form.
8        A.  If they were upset, I sure cannot tell.
9        Q.  (BY MR. FREEMAN)  Okay.  Did Super G want
10   warrants?
11       A.  Well, let me put it this way.  When I
12   suggested warrants, nobody seems to object.  So whether
13   they want warrant or they don't want warrant, nobody say
14   anything.
15       Q.  Okay.
16       Q.  Okay?
17       Q.  Is it possible Baymark wanted a warrant so
18   that its interest in the company could be hidden?
19           MR. PERRIN:  Objection, form.
20           MS. HARD-WILSON:  Objection, form.
21       A.  Let me put it this way.  Baymark did not
22   participate in any of those conversations, nor do I know
23   exactly what they want.
24       Q.  (BY MR. FREEMAN)  They didn't have -- did they
25   have any involvement in drafting the warrant agreements?

67 (Pages 262 to 265)

Page 266

1  A.  No.
2  Q.  They didn't have any --
3  A.  The drafting -- that agreement was basically
4  between my son Alex and Julie, and that was pretty much
5  the same base document that they created.  There was
6  nothing in particular.  And -- so I cannot tell you for
7  sure one way or the other who wants a warrant or whether
8  they want a warrant or not, and I cannot tell you that.
9  Q.  But Baymark's lawyers were drafting the
10  warrant documents, correct?
11      MR. PERRIN:  Objection, form.
12  A.  Julie draft those -- helped Alex to draft the
13  document, yes.
14  Q.  (BY MR. FREEMAN)  Okay.  You weren't involved
15  in any of the negotiations?
16  A.  What was that again, please?
17  Q.  You were not involved in any of the
18  negotiations, though?
19  A.  Depending on what you mean "negotiations."
20  Q.  About the warrants.
21  A.  No.  There was very little negotiation of
22  warrant.  We put it down on paper.  Everybody seems
23  happy happy with it, and that was it.  There was no
24  negotiation as such.  I did object to the 40/40/20, and
25  it didn't go very far, and that was the end of it.

Page 267

1  Q.  Okay.  Well, I'm showing you, Mr. Szeto,
2  what's marked as Exhibit 40 on your screen.  Can you see
3  that, sir?
4  A.  Yes.
5      (Exhibit 40 marked.)
6  Q.  (BY MR. FREEMAN)  And does this appear to be
7  an email from Matt Denegre on October 16th, 2018?
8  A.  Yes.
9  Q.  Is it to Steve Bellah?
10  A.  Yes.
11  Q.  And Alex Godinez and Tony Ludlow?
12  A.  Uh-huh.
13  Q.  Okay.  And the subject line reads, "Windspeed
14  revised WPA and warrant," correct?
15  A.  Yes.
16  Q.  And there appear to be two attachments, one of
17  them titled "Windspeed Warrant Purchase Agreement,
18  Version 3;" one of them entitled "Windspeed Warrant
19  Purchase Agreement;" is that correct?
20  A.  Yes.
21  Q.  And does it say, "Steve, attached is the
22  revised draft of the WPA"?
23  A.  Yes.
24  Q.  Okay.  And down below -- and we've seen this
25  one just a bit ago, but down below, is that an email on

Page 268

1  October 15th, 2018, from Julie A. Smith at Hallett &
2  Perrin?
3  A.  Yes.
4  Q.  And does that appear to contain the warrant
5  purchase agreement and the warrant?
6  A.  Yes.
7  Q.  Okay.  And if I scroll down here to look at
8  the attached warrant purchase agreement --
9  A.  Yes.
10  Q.  -- does the top of that document state, "H&P
11  draft, 10/16/18"?
12  A.  Yes.
13  Q.  Okay.  Does that appear to reflect "Hallett &
14  Perrin draft, October 16, 2018"?
15  A.  I certainly do not remember all the way back
16  that -- whatever is a draft.  So I cannot answer that
17  question effectively.
18  Q.  Okay.  But this document was sent to you,
19  correct?
20  A.  I assume that it did, but I don't remember for
21  sure, either.
22  Q.  But it was sent to you by Julie Smith,
23  shareholder at Hallett & Perrin?
24  A.  Yes, I assume that she did send it to me.
25  Q.  Okay.  Can you see from the email and confirm?

Page 269

1  A.  I would confirm it based on the email, yes.
2  Q.  And does this appear to be a true and correct
3  copy of that email attachment?
4  A.  Yes.
5  Q.  What was the exercise price for the warrants
6  that Super G and Baymark held?
7  A.  I don't think we ever talk about an exercise
8  price.
9  Q.  Okay.  Is there a reason that Super G and
10  Baymark Partners are listed in this document together?
11  A.  I do not know why they are listed in this
12  document together.  And -- so I cannot answer that
13  question either.
14  Q.  Okay.  But it appears to refer to Baymark
15  Partners, LLC?
16  A.  I do not know why they were listed together,
17  and so I cannot answer that question.
18  Q.  Okay.  If you look down here on the next page
19  of the document, it's Bates labeled BP006466, there's a
20  defined term here of "exercise price;" is that correct?
21  A.  Yes.
22  Q.  Okay.  And if you read this, "Referring to the
23  exercise thereof for a total exercise price of $100"; is
24  that correct?
25  A.  I have not seen that $100 yet.

68 (Pages 266 to 269)

## Page 270

1    Q.  Okay.  If I show you --

2    A.  I saw the number, but I -- yes, maybe.

3    Q.  All right.  Is that your understanding that

4    the exercise price of the warrants is $100?

5        MS. HARD-WILSON:  Objection, form.

6    A.  I assume it is.

7    Q.  (BY MR. FREEMAN)  Even without seeing this

8    document, wasn't it your understanding that the exercise

9    price for the warrants was a nominal amount?

10   A.  Without the dates and all the other pertinent

11   information, I look at that price as just a suggestion.

12   To me, it is not a genuine executed document.  And, yes,

13   I understand the price, $100 or 250 per one percent.  I

14   don't know what that really mean in the real world.

15   Q.  Doesn't that feel a little bit cheap for all

16   the hard work you've put into Windspeed?

17       MS. HARD-WILSON:  Objection, form.

18       MR. PERRIN:  Objection, form.

19   A.  Well, I think it is cheap considering that I

20   spent all this time answering this questions.

21   Q.  (BY MR. FREEMAN)  Answering these questions?

22   A.  Yes.

23   Q.  Well played, sir.

24       Is -- would you be surprised to learn that

25   these warrants, instead of allowing you to dictate how

## Page 271

1    much Baymark Partners and Super G pay you for shares

2    of for -- 80 percent of your company, it allows them to

3    dictate to you how much you will sell it to them for?

4    A.  I have not thought about that, no.  I did not

5    think about it that way.

6    Q.  Would you be upset to learn that this document

7    allows them legally to force you to sell them 80 percent

8    of Windspeed for $100?

9        MS. HARD-WILSON:  Objection, form.

10       MR. PERRIN:  Objection, form.

11   A.  If they want to pay me $100 for 80 --

12   40 percent, I'll take the $100 right now.

13   Q.  (BY MR. FREEMAN)  $100?

14   A.  Yes.

15   Q.  Okay.  If you want to make me an offer, I will

16   be interested in it.

17   A.  Oh, you would, huh?

18   Q.  Yeah.

19   A.  Okay.

20   Q.  So I'll just be waiting.  But if y'all want to

21   submit over an offer for $100, I'll be happy to

22   entertain that --

23   A.  Okay.

24   Q.  -- and I'll get back to you.

25       MR. PERRIN:  Objection to counsel's

## Page 272

1    sidebar.

2        MR. FREEMAN:  We cannot have any sense of

3    humor here.

4    Q.  (BY MR. FREEMAN)  Did the execution of this

5    document require the parties to sign an Amended and

6    Restated Company Agreement?

7    A.  I forgot when it was signed.  And I assume

8    that one time or the other I signed it -- and when it

9    was ready to be signed.  So I really cannot tell you

10   when it was signed and how it was signed.  As far as I

11   know, it was signed.

12   Q.  Okay.  But it appears that from Paragraph 3

13   here, I have that this is -- on your screen -- that the

14   parties would have to agree to sign an Amended and

15   Restated Company Agreement; is that correct?

16   A.  I assumed it is.

17       MS. HARD-WILSON:  Could we have a time

18   check, please?

19       THE REPORTER:  5 hours, 41 minutes.

20   Q.  (BY MR. FREEMAN)  Mr. Szeto, I'm putting on

21   your screen what's marked as Exhibit 38.  Do you see

22   this document?

23   A.  Yes.

24       (Exhibit 38 marked.)

25   Q.  (BY MR. FREEMAN)  Okay.  And is this an email

## Page 273

1    from you -- let's see here.  Is this an email from Steve

2    Bellah to you and others with an attached loan and

3    security agreement for Windspeed?

4    A.  That is an email from Steve Bellah to me and

5    others, yes.

6    Q.  Okay.  And does it appear to have a breakdown

7    of the ownership?

8    A.  Yes.

9    Q.  Okay.  I'm going back to what's marked as

10   Exhibit 40, which we were just looking at.  And I'm on

11   what's marked as Page 9 of that document.  It's Bates

12   labeled BP006473.  Do you see that, sir?

13   A.  Yes.

14   Q.  Okay.  And is there -- in what's --

15   Paragraph 9(g), do you see that?

16   A.  Yes.

17   Q.  And there are -- this is the notice -- the

18   notice paragraph, correct?

19   A.  Yes.

20   Q.  And is there a -- there are a couple of

21   parties there.  One is Windspeed Trading, LLC; is that

22   correct?

23   A.  Yes.

24   Q.  And the other is stated as Baymark/Super G; is

25   that correct?

Page 274

```
1         A.  Uh-huh.
2         Q.  Is that because Baymark and Super G were
3   partners on this deal?
4             MR. PERRIN:  Objection, form.
5         A.  That, I cannot tell you one way or the other.
6   They are not partner with me.
7         Q.  (BY MR. FREEMAN)  Okay.  Were they, kind of,
8   on the same side on this deal, and you were another
9   party to it?
10            MR. PERRIN:  Objection, form.
11            MS. HARD-WILSON:  Objection, form.
12        A.  Yes.
13        Q.  (BY MR. FREEMAN)  Okay.  It was kind of like
14  you negotiating against them on the other side?
15            MR. PERRIN:  Objection, form.
16        A.  I am not negotiating against anybody else.  I
17  am on my own, that I'm Windspeed Trading, LLC.  And if
18  Baymark and others are together, I do not know.  I do
19  not know anything.
20        Q.  (BY MR. FREEMAN)  If we go down to the
21  purchaser line, Mr. Szeto --
22        A.  Yes.
23        Q.  -- does it list a purchaser as
24  Super G/Baymark?
25        A.  I do not know what that mean.
```

Page 275

```
1         Q.  Do you have any idea why they're listed
2   together as one party on this transaction?
3             MR. PERRIN:  Objection, form.
4         A.  I have no idea.
5         Q.  (BY MR. FREEMAN)  Does that seem a little odd
6   to you?
7             MS. HARD-WILSON:  Objection, form.
8             MR. PERRIN:  Objection, form.
9         A.  There's a lot things seem a lot odd to me, so
10  I cannot tell you what that one -- how odd it is.
11        Q.  (BY MR. FREEMAN)  Okay.  Scrolling down a
12  little further to a document that's Bates labeled
13  BP006480, do you see that, sir?
14        A.  Yes.
15        Q.  And is the title of the document "Warrant
16  Purchase Agreement"?
17        A.  Yes.
18        Q.  And does it state, "H&P draft, 10/16/18"?
19        A.  What are you reading from?
20        Q.  Oh, I'll -- let me highlight that for you.  Do
21  you see that?
22        A.  Okay.
23        Q.  Does it state, "H&P draft, 10/16/18"?
24        A.  Okay.
25        Q.  And does that -- do you understand that to
```

Page 276

```
1   signify Hallett & Perrin?
2             MR. PERRIN:  Objection, form.
3         A.  I do not know exactly what it means, so I
4   cannot interpret what that mean.
5         Q.  (BY MR. FREEMAN)  Okay.  Do you see on this
6   document that there are some redline changes?
7         A.  Well, from the screen, not red.  They're
8   black.
9         Q.  As a convention, I guess.  That's a phrase.
10  That's something of a convention.  Do you understand
11  what I mean when I say "redline"?
12        A.  I understand.  That's the lawyer's term.
13        Q.  It is, but it's also a layman's term.
14        A.  Okay.
15        Q.  Not to suggest that you are a layman, whatever
16  the heck that means.
17        A.  Well, when I say, "Redline," it means red.  It
18  shows up as red.
19        Q.  Got it.  So do you see what's marked in
20  yellow?
21        A.  Yes.  That one, I understand.
22        Q.  And the lines -- the underlining, do you see
23  that?
24        A.  Yes.
25        Q.  Do you understand those to be changes to a
```

Page 277

```
1   pre-existing draft?
2         A.  I don't understand what you are trying to tell
3   me.
4         Q.  Do you understand --
5         A.  I know there were changes made.  And without
6   the original copy, I cannot tell you why it was changed,
7   what was changed, and I really don't know the changes.
8         Q.  Okay.  If we scroll down to Page 9 of that
9   document, Bates marked PB -- BP006488 --
10        A.  Okay.
11        Q.  -- that's Paragraph 9(g), a notice paragraph
12  on this document as well.  Do you see that?
13        A.  Yes.
14        Q.  And one of the notice parties that's listed is
15  listed as Baymark/Super G; is that correct?
16        A.  Yes.
17        Q.  Okay.  The purchaser listed on this document,
18  is it the party name Super G/Baymark?
19            MR. PERRIN:  Objection, form.
20        A.  I can see that on paper, but I do not know
21  exactly what it mean.
22        Q.  (BY MR. FREEMAN)  Are you used to dealing in
23  transactions where one thing is on paper but there's a
24  side deal?
25            MS. HARD-WILSON:  Objection, form.
```

Page 278

1    A.  No.
2    Q.  (BY MR. FREEMAN)  Was Windspeed one of those
3  transactions?
4        MS. HARD-WILSON:  Objection, form.
5    A.  No.
6        MR. FREEMAN:  Do you mind if we take a
7  five-minute break, and I'm going to review my notes, run
8  to the restroom, and we'll finish shortly.
9        THE WITNESS:  Promises, promises.
10        MS. HARD-WILSON:  Sounds good.
11        (Break taken from 4:30 p.m. to 4:40 p.m.)
12    Q.  (BY MR. FREEMAN)  Back on the record,
13  Mr. Szeto.
14    A.  Yes.
15    Q.  Mr. Szeto, I just had a few questions to go
16  through.
17        Are you currently an employee of Windspeed
18  Trading, LLC?
19    A.  Yes.
20    Q.  And what is your current position at
21  Windspeed?
22    A.  President and CEO.
23    Q.  And how long have you been in that position?
24    A.  Ever since Windspeed was started.
25    Q.  What were your responsibilities in that

Page 279

1  position?
2    A.  Just about everything that doesn't work.
3    Q.  You know just about everything about the
4  company?
5    A.  Yes, I do.
6    Q.  And probably as much about the company or more
7  than anybody?
8    A.  Well, I do get involved with the company, and
9  I do get involved in detail.  It's just my way of
10  running a business being an engineer.  So I do know what
11  is going on with the company, yes.
12    Q.  Do you report to anyone in that position?
13    A.  No, I do not report to anyone.
14    Q.  Okay.  Have you held any other positions at
15  Windspeed?
16    A.  No.
17    Q.  Have you held any positions with any of the
18  following entities:  ACET Venture Partners, LLC?
19    A.  No, I have nothing to do with ACET Venture
20  Partners.
21    Q.  ACET Global, LLC?
22    A.  Not after it was closed.
23    Q.  Okay.  But before it was closed, did you?
24    A.  I was the president and CEO, as designated by
25  Baymark.

Page 280

1    Q.  Okay.  And D&T Partners, LLC?
2    A.  No.  I don't know -- I don't know who they
3  are.
4    Q.  Okay.  Just a couple more here.  Baymark ACET
5  Holdco, LLC?
6    A.  The only time I know them was I borrowed the
7  name to start an account for shipping, and I do not know
8  who they are.
9    Q.  Baymark ACET Direct Invest, LLC?
10    A.  No, I do not know them.
11    Q.  Baymark Management, LLC?
12    A.  I do not know them.
13    Q.  Or Baymark Partners?
14    A.  I know who Baymark Partners were, but the only
15  one that I really know well is David Hook.  I met the
16  others when I get up there to say hello once so often.
17  Very rare, but I -- obviously, I know Matt very well,
18  but that's about it.
19    Q.  And Matt is Matt Denegre?
20    A.  Yes.
21    Q.  Okay.  When did you start working at ACET
22  Global?
23    A.  Well, to be more exact, I did not start
24  working at ACET Global.  I was there one day in -- I
25  believe, in the end of December or January for one day.

Page 281

1  And after that, Tomer told me he didn't have money to
2  pay me, don't -- he didn't want me to show up anymore,
3  so I did not show up, and then -- until beginning of
4  February, when Matt and David Hook asked me to go up
5  there to just work with his sales team.  And we met with
6  Tomer that one morning, and he knew I was going to come
7  in the next day to work with his sales team.  And that
8  was when I start showing up in ACET Global's office.
9    Q.  Okay.  So just to get the years right, was
10  that -- the first, kind of, longer stint was in February
11  of 2018?
12    A.  Yes.
13    Q.  Okay.
14    A.  February of 2018, yes.
15    Q.  Okay.  Who had hired you at ACET Global?
16    A.  Nobody hired me.  They asked me to be a
17  consultant to start with.  Just three days a week.
18    Q.  Okay.  Did you report to anyone while you were
19  at ACET Global?
20    A.  Well, you want to say "report."  I talked to
21  Matt, basically, tell him what's going on.  Not in the
22  traditional reporting relationship.  They don't sign my
23  time sheets.
24    Q.  Got it.  Did you make business decisions on
25  behalf of ACET Global?

71 (Pages 278 to 281)

William Szeto  *  April 2, 2021

## Page 282

1      A.  No.  I -- not until then because I didn't have
2  to make any decision.  In the beginning of February,
3  there was no decision to be made.  And -- so to answer
4  your question is no.
5      Q.  Okay.  And how long did you serve in your role
6  at ACET Global?
7      A.  As what?  As president and CEO?
8      Q.  Yes, sir.
9      A.  Until when it closed.
10     Q.  Yes, sir.  Until it closed?
11     A.  Until it closed.
12     Q.  Okay.
13       MR. FREEMAN:  Mr. Szeto, those are all
14  the questions that I had for you today.
15       THE WITNESS:  Thank God for that.
16       MR. FREEMAN:  I promise -- I promised
17  you, I think on the record, that I'd -- it would be
18  quick on this last run.
19       THE WITNESS:  Okay.
20       MR. FREEMAN:  I've appreciated you
21  sitting down and answering the questions and sitting
22  through this.  I hope you have wonderful Good Friday.
23  And you may have some more questions to come, actually.
24  Don't take a deep breath, but I have a feeling you might
25  be done.

## Page 283

1       THE WITNESS:  Yes.  I will say that -- I
2  will never say I enjoyed it.  I don't lie.  But it was
3  not as bad as I thought it would be.  But I do
4  appreciate everybody else in the room, Karen, and -- so
5  I do appreciate it.  And, obviously, if you have any
6  other questions, please go through the law firm, and
7  they will come and ask me.  Okay?
8       MS. HARD-WILSON:  Well --
9       THE WITNESS:  And after this all over, I
10  will bring you out to the hot and spicy place, but it
11  have to be all over.
12       MR. FREEMAN:  Clear it with your attorney
13  first, but I think -- I think that Brenda may have some
14  questions, but my job now is I'm passing you as the
15  witness.
16       THE WITNESS:  Okay.
17       MS. HARD-WILSON:  So we'll reserve our
18  questions, but MR. Perrin may have some.
19       THE WITNESS:  Okay.
20       MR. PERRIN:  Mr. Szeto, we also reserve
21  our questions until time of trial.  Which means you're
22  done.
23       THE WITNESS:  Okay.
24      (End of proceedings.)
25

## Page 284

1          CHANGES AND SIGNATURE
2  WITNESS NAME: WILLIAM SZETO
3  DATE OF DEPOSITION: April 2, 2021
4  PAGE LINE   CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

## Page 285

1      I, WILLIAM SZETO, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5      _____
6           WILLIAM SZETO
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10    Before me, _____, on this day
11  personally appeared WILLIAM SZETO, known to me (or
12  proved to me under oath or through
13  _____) (description of identity
14  card or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18    Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21      _____
22      NOTARY PUBLIC IN AND FOR
23      THE STATE OF _____
24      COMMISSION EXPIRES: _____
25

Usher Reporting Services
(214) 755-1612

## Page 286

```
 1                NO. DC-19-09828
 2  D&T PARTNERS, LLC     )  IN THE DISTRICT COURT
    (Successor in interest to )
 3  ACET VENTURE PARTNERS,  )
    LLC),               )
 4                       )
      Plaintiff      ) DALLAS COUNTY, TEXAS
 5                       )
    VS.                  )
 6                       )
    ACET GLOBAL, LLC; BAYMARK )
 7  ACET HOLDCO, LLC; BAYMARK ) 116th JUDICIAL DISTRICT
    MANAGEMENT, LCC; BAYMARK )
 8  MANAGEMENT, LLC; BAYMARK )
    PARTNERS; DAVID HOOK;
 9  TONY LUDLOW; and
    WINDSPEED TRADING, LLC,
10
      Defendants
11
12        REPORTER'S CERTIFICATION
          DEPOSITION OF WILLIAM SZETO
13              April 2, 2021
14
15      I, Karen Usher, Certified Shorthand Reporter in and
16  for the State of Texas, hereby certify to the following:
17      That the witness, WILLIAM SZETO, was duly sworn by
18  the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21      That the deposition transcript was submitted on
22  APRIL 7, 2021 to the witness or to the attorney for the
23  witness for examination, signature and return to me by
24  APRIL 27, 2021;
25      That the amount of time used by each party at the
```

## Page 287

```
 1  deposition is as follows:
 2      MR. JASON B. FREEMAN - 5 HOURS:55 MINUTES
        MR. EDWARD PERRIN - 00 HOURS:00 MINUTE(S)
 3      MS. BRENDA HARD-WILSON - 00 HOURS:00 MINUTE(S)
 4      That pursuant to information given to the
 5  deposition officer at the time said testimony was taken,
 6  the following includes counsel for all parties of
 7  record:
 8      MR. JASON B. FREEMAN, Attorney for Plaintiff
        MR. EDWARD PERRIN, Attorney for Defendants
 9  BAYMARK ENTITIES
        MS. BRENDA HARD-WILSON, Attorney for Defendant
10  WINDSPEED TRADING, LLC
11      I further certify that I am neither counsel for,
12  related to, nor employed by any of the parties or
13  attorneys in the action in which this proceeding was
14  taken, and further that I am not financially or
15  otherwise interested in the outcome of the action.
16      Further certification requirements pursuant to Rule
17  203 of TRCP will be certified to after they have
18  occurred.
19      Certified to by me this 7th of April, 2021.
20
21
                    Karen Usher
22  MARY KAREN USHER, CSR # 5536
    Expiration: 1/31/2022
23  Firm Registration # 10278
    USHER REPORTING SERVICES
24  1326 Lochness Drive
    Allen, Texas 75013
25  (214) 755-1612
```

## Page 288

```
 1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2      The original deposition _____ was _____ was not
 3  returned to the deposition officer;
 4      If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefore;
 6      If returned, the original deposition was delivered
 7  to MR. JASON FREEMAN, Custodial Attorney;
 8      That $_____ is the deposition officer's
 9  charges to the Plaintiff for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein and on file with the
14  Clerk.
15      Certified to by me this _____ day of _____, 2021.
16
17
18      _____
        MARY KAREN USHER, CSR # 5536
19      Expiration: 1/31/2022
        Firm Registration # 10278
20      USHER REPORTING SERVICES
        1326 Lochness Drive
21      Allen, Texas 75013
        (214) 755-1612
22      karen@usherreporting.com
23
24
25
```

73 (Pages 286 to 288)