PLAINTIFF'S
EXHIBIT

4

Page 1

CAUSE NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | IN THE DISTRICT COURT OF |
| Plaintiff, | |
| V. | DALLAS COUNTY, TEXAS |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | |
| Defendants. | 116TH JUDICIAL DISTRICT |

*********************************************************
REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

DANA TOMERLIN

MARCH 26, 2021
*********************************************************

    REMOTE ORAL AND VIDEOTAPED DEPOSITION of DANA
TOMERLIN, produced as a witness at the instance of the
Defendants, and duly sworn, was taken in the
above-styled and numbered cause on March 26, 2021,
from 2:03 p.m. to 4:07 p.m., before Mendy A.
Schneider, CSR, RPR, in and for the State of Texas,
recorded by machine shorthand, remotely at the offices
of MENDY SCHNEIDER, LLC, The Woodlands, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed.

Dana Tomerlin   *   March 26, 2021

---

## Page 2

1    R E M O T E   A P P E A R A N C E S
2
FOR THE PLAINTIFF:
3
     MR. JASON B. FREEMAN
4    MR. ZACHARY MONTGOMERY
     FREEMAN LAW
5    7011 Main Street
     Frisco, Texas 75035
6    (214) 984-3410
     jason@freemanlaw.com
7
8    FOR THE DEFENDANT WINDSPEED TRADING, LLC:
9    MS. BRENDA HARD-WILSON
     MR. TIM WOODS
10   HIGIER ALLEN & LAUTIN
     2711 North Haskell Ave
11   Dallas, Texas 75204
     (972) 371-2481
12   bhard-wilson@higierallen.com
13
     FOR THE DEFENDANTS ACET GLOBAL, LLC; BAYMARK ACET
14   HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK
     MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; and
15   TONY LUDLOW:
16   MR. EDWARD P. PERRIN, Jr.
     HALLETT & PERRIN
17   1445 Ross Avenue, Suite 2400
     Dallas, Texas 75202
18   (214) 922-4132
     eperrin@hallettperrin.com
19
20   ALSO PRESENT:
21   MR. CHRISTIAN BARRETT, The Videographer
     MR. RAY AGUIRRE, Worldwide IT Tech
22
23
24
25

---

## Page 3

1           EXAMINATION INDEX
2    WITNESS: DANA TOMERLIN
3    EXAMINATION                        PAGE
         BY MR. FREEMAN                  4
4
     SIGNATURE REQUESTED                83
5
     REPORTER'S CERTIFICATION           84
6
           EXHIBIT INDEX
7
                                  PAGE
8    EXHIBIT NO. 2               58
         Zulily Purchase Order
9
     EXHIBIT NO. 3               58
10       DHL Invoice
11   EXHIBIT NO. 10              61
         RDC-Merchant Promotion Agreement
12
     EXHIBIT NO. 11              66
13       Memo Closing Bank Account
14   EXHIBIT NO. 12              71
         Notice of Disposition
15
16
17
18
19
20
21
22
23
24
25

---

## Page 4

1           THE VIDEOGRAPHER:  The time is
2    2:03 p.m., and we are on the record.
3           DANA TOMERLIN,
4    having been first duly sworn, testified as follows:
5           E X A M I N A T I O N
6    BY MR. FREEMAN:
7        Q.  Hi, Ms. Tomerlin.
8        A.  Yes.
9        Q.  Could you state your full name for the
10   record?
11       A.  Dana Marie Tomerlin.
12       Q.  Thank you.
13          Ms. Tomerlin, my name is Jason Freeman.
14   I represent D&T Partners, LLC, which is the --
15   technically the successor in interest to ACET Venture
16   Partners, LLC, and I just want to make sure you know
17   we're here in connection with a lawsuit involving that
18   entity and ACET Global, LLC, Baymark ACET Holdco and
19   several Baymark companies, David Hook, Tony Ludlow and
20   Windspeed Trading, LLC.
21          Do you understand that?
22       A.  Yes.
23       Q.  Kind of?
24       A.  Yes.
25       Q.  Have you ever had to give a deposition

---

## Page 5

1    before?
2        A.  No.
3        Q.  Okay.  Well, welcome.  I'll give a few, just,
4    kind of, ground rules for you.  It's not that
5    difficult.
6           You'll be under oath today, which --
7    which means that you're -- you're swearing to tell the
8    truth, as you just did.
9           Do you understand that?
10       A.  Yes.
11       Q.  All right.
12          THE VIDEOGRAPHER:  I'm sorry to
13   interrupt.
14          Ms. Tomerlin, the spotlight that I put
15   on you is for the video recording, so -- so that
16   you're to the only one on the video recording that we
17   turn in.
18          THE WITNESS:  Okay.
19          THE VIDEOGRAPHER:  And it kept
20   cancelling, for some reason, so I just want to make
21   sure everyone knew.
22          THE WITNESS:  Oh.
23          THE VIDEOGRAPHER:  Sorry about that.
24          MR. FREEMAN:  No problem.
25       Q.  (BY MR. FREEMAN)  Dana, whenever I ask a

---

2  (Pages 2 to 5)

Dana Tomerlin  *  March 26, 2021

## Page 6

1    question, if you will, just let me complete it before
2    you give an answer so that we can make it easy on the
3    court reporter.
4         A.  Okay.
5         Q.  When you give me an answer, also -- this is
6    one that people tend to fall into -- don't give me
7    like a -- it's okay to nod, but also give a verbal
8    answer so that they can write it down.
9         A.  Understood.
10        Q.  If I ask a question that you don't
11   understand, just tell me.  Tell me it's a bad
12   question, ask me to rephrase it, but just please let
13   me know.
14        A.  Okay.
15        Q.  And then, we'll just say, if it -- if it's
16   fair, that if you don't tell me you don't understand
17   the -- the question, I'll -- I assume that you -- you
18   understood it.
19             And then, at any point, if you need to
20   take a break -- you need to use the restroom, grab a
21   drink, whatever you need -- just -- just say so, and
22   we'll take a break.  I'll -- I'll probably only ask,
23   if there's -- if there's a question that I've already
24   left on the table, just ask that you answer that, and
25   then we'll take a break any time you need.

## Page 7

1         A.  Okay.
2         Q.  Do you have a preference on how I refer to
3    you?  As Ms. Tomerlin, Dana, or any other name?
4         A.  Just -- no, I'm fine.
5         Q.  Okay.  All right.
6             Ms. Tomerlin, did you do anything to
7    prepare for the deposition today?
8         A.  We had a meeting yesterday, with coworkers
9    and the attorney, about what takes place in a
10   deposition.
11        Q.  Okay.  Did you discuss it with anyone else?
12        A.  The -- the coworkers were at the meeting.
13        Q.  Okay.
14        A.  The attorney.  And Bill, our boss, was at the
15   meeting.
16             They went over the deposition today.
17        Q.  Okay.  And is that all -- is that the only
18   universe of people you met with to prepare for the
19   deposition?
20        A.  Bill told me about the deposition.  He said
21   there would be a deposition and gave me the
22   information from the attorney and just said that they
23   were going to ask some questions, and just to give
24   them what I know.
25        Q.  Okay.  Did Bill talk about any specific

## Page 8

1    areas?  Not -- not that I remember, no.
2         A.  Not -- not that I remember, no.
3         Q.  Okay.  Are you currently an employee of
4    Windspeed Trading?
5         A.  Yes.
6         Q.  Okay.  And what's your position?
7         A.  I work in fulfillment.
8         Q.  Okay.  And what does that mean?
9         A.  I print the orders, pack the orders and ship
10   them out.
11        Q.  Okay.  So that's orders from customer
12   customers?
13        A.  They come into our ShipStation.  I print the
14   orders and pack them out, yes, to the customers.
15        Q.  Okay.  How long have you been in that
16   position?
17        A.  I've been doing that for Windspeed this whole
18   time.
19        Q.  Okay.  What are your -- what -- what are your
20   other responsibilities in that position?
21        A.  I -- I print the orders that come in.
22             The orders arrive.  I print them, I pack
23   them and I ship them out.  I give them to the carrier
24   that comes by to pick them up.
25        Q.  Okay.

## Page 9

1         A.  And I assist with some customer service
2    e-mails.
3         Q.  Okay.  Do you -- do you order inventory?
4         A.  No.
5         Q.  Okay.  Who do you report to for this
6    position?
7         A.  Bill.  Bill Szeto.
8         Q.  Bill Szeto?
9         A.  Yes.
10        Q.  Is there anyone else?
11        A.  No.
12        Q.  And who signs your paycheck?
13        A.  I don't know, really.  Bill Szeto, Windspeed.
14   I'm not...
15        Q.  Okay.
16        A.  I haven't looked at the signature.
17             I mean, it says "Windspeed Trading" --
18        Q.  Okay.
19        A.  -- on my check.
20        Q.  Who is the -- who owns Windspeed Trading?
21        A.  Bill Szeto.
22        Q.  Okay.  Do -- do you know how long Bill Szeto
23   has been the owner of Windspeed?
24        A.  I believe, since it was created.
25        Q.  Do you know if there are any other owners of

3  (Pages 6 to 9)

Dana Tomerlin   *   March 26, 2021

## Page 10

1   Windspeed?

2      A.  I don't know of any.

3      Q.  Okay.  Have you had any other positions with

4   Windspeed?

5      A.  No.

6      Q.  Since you've been there, who else has worked

7   at Windspeed?

8      A.  Let's see.  Sai, our sales manager.  Jane

9   Lin, our accounting department or accounting.  Paula

10   Ketter [phonetic], she also works in fulfillment.

11      Q.  Okay.

12      A.  That's who is there now.

13          We had a former employee, Vanessa.  I

14   can't remember her last name.  She worked in customer

15   service.

16      Q.  Okay.  Anybody else?

17      A.  No.

18      Q.  I'm going to ask you about several entities

19   and whether you've held any positions with these

20   entities.

21          Have you ever worked for ACET Venture

22   Partners?

23      A.  I worked for Koolulu; which, I think that was

24   ACET Venture.  I'm not completely clear on that.

25      Q.  Okay.

## Page 11

1      A.  Yes, I worked for Koolulu.  I packed.

2      Q.  Okay.  Let me ask you about a few more, and

3   I'll come back to that.

4          D&T Partners, LLC?

5      A.  I don't know that name.

6      Q.  Baymark ACET Holdco, LLC?

7      A.  I don't -- I don't know.

8      Q.  Baymark ACET Direct Invest?

9      A.  I don't know.

10      Q.  Baymark Management, LLC?

11      A.  I don't know.

12      Q.  A couple more.

13          Baymark Partners?

14      A.  I don't know that one.

15      Q.  ACET Global, LLC?

16      A.  Yes.

17      Q.  So are you currently an employee of Acet

18   Global, LLC?

19      A.  No.

20      Q.  Okay.  When did you start working for ACET

21   Global?

22      A.  I don't remember.  I think it was 2017.

23      Q.  Okay.  Do you remember when you stopped

24   working for ACET Global?

25      A.  Yes.

## Page 12

1      Q.  What -- when was that?

2      A.  I believe it was the end of September of

3   2018.

4      Q.  Okay.  What was your position at ACET Global?

5      A.  I worked for the fulfillment.  I printed

6   orders, I packed them and I shipped them out.

7      Q.  Okay.  Did you have any other

8   responsibilities?

9      A.  No.

10      Q.  Did you hold any other positions while at

11   ACET Global?

12      A.  No.

13      Q.  So if I'm hearing you correctly, it was

14   essentially the same exact position?

15          MR. PERRIN:  Objection; form.

16      Q.  (BY MR. FREEMAN)  Was it a different position

17   than the one you hold at Windspeed?

18      A.  No.

19      Q.  Was it the same position as the one you hold

20   at Windspeed?

21          MR. PERRIN:  Objection; form.

22      A.  Yes.  I do the same things.  I print the

23   orders, I pack them and I ship them out.

24      Q.  (BY MR. FREEMAN)  Okay.  Who did you report to

25   in that position at -- at ACET Global?

## Page 13

1      A.  At first I reported to someone named Amanda,

2   and then I reported to Tomer Damti.

3      Q.  Okay.  Who is Amanda?

4      A.  She was a person that was doing fulfillment

5   before.

6          Before, I packed orders; and then Amanda

7   left, and then I started printing orders.

8      Q.  Okay.  Do you remember when that was?

9      A.  No, I don't.

10      Q.  Okay.  And then you reported to Tomer Damti?

11      A.  Yes.

12      Q.  Okay.  Did that ever change?

13      A.  During ACET Global?  I'm sorry, I don't

14   understand the question.

15      Q.  Yes, ma'am.

16          While you were at ACET Global, did you

17   ever report to anyone else?

18      A.  After Tomer, I reported to Bill Szeto.

19      Q.  Okay.  And do you recall when that changed to

20   Bill Szeto?

21      A.  I think, February.  February, March.

22   February of 2018.

23      Q.  Okay.  Was -- was Bill Szeto -- was he the

24   boss at ACET Global at that point?

25      A.  I don't understand the question.

4 (Pages 10 to 13)

Dana Tomerlin   *   March 26, 2021

Page 14

1    Q.  What was -- what was Bill Szeto's title or
2  role at ACET Global?
3    A.  I believe he was the CEO.
4    Q.  Okay.  Did he -- did he hold himself out as
5  the CEO, or do you know?
6    A.  What -- what does that mean?  I don't
7  understand what you're asking.
8    Q.  Did he refer to himself as the CEO?  Did
9  other people refer to him as a CEO?
10    A.  Yes, I believe so.
11    Q.  Who had hired you at ACET Global
12  partners?
13    A.  I had an interview --
14        MS. HARD-WILSON:  Objection; form.
15    Q.  (BY MR. FREEMAN)  You can answer the question.
16    A.  Oh.
17        I -- I had an interview with Monica, and
18  she had me report to work.
19    Q.  With ACET Global, what happened to
20  ACET Global?
21        MR. PERRIN:  Objection; form.
22        MS. HARD-WILSON:  Objection; form.
23    A.  I don't -- I don't know what you're asking.
24    Q.  (BY MR. FREEMAN)  Is it still around?
25    A.  I'm not sure.  I don't know.

Page 15

1        I know I received a termination letter
2  from ACET Global.
3    Q.  Okay.  That's what I'm wondering; what --
4  what happened, as far as you know, to ACET Global.
5        MS. HARD-WILSON:  Objection; form.
6    A.  I don't have that information.  I'm not -- I
7  don't know what happened.
8    Q.  (BY MR. FREEMAN)  Okay.  Come back to that.
9  I'm -- I'm going to ask you about a few people, just
10  would like to know what you know about them.
11        Tomer Damti.  Who -- who is Tomer Damti?
12    A.  I worked for him.
13    Q.  Okay.
14    A.  At ACET Global and Koolulu.
15    Q.  Okay.  When -- when did you first meet
16  Mr. Damti?
17    A.  I think it was, I mean, 2014, at Koolulu.
18    Q.  Okay.  So he was your boss at Koolulu?
19    A.  Yes.
20    Q.  Okay.  Was it Mr. Damti that made the
21  decision to hire you?
22    A.  I am not sure.  I don't know.
23    Q.  Okay.  What was your impression of Mr. Damti?
24    A.  I had no problems with Mr. Damti.  I just
25  worked for him.

Page 16

1    Q.  Did you -- did you like him, not like him?
2    A.  He was fine.  I had no problems with him.
3    Q.  Okay.
4    A.  I just worked.
5    Q.  Let me ask you about Mr. Szeto.
6        Who is -- who is Mr. Szeto?
7    A.  It's who I -- it's -- I work for him now.
8    Q.  Okay.  When did you first meet Mr. Szeto?
9    A.  While I -- while I was at ACET Global.
10    Q.  Okay.  Was that 2017?  2018?
11    A.  I don't know.  I don't remember.
12    Q.  Okay.  What was his role, again, at -- at
13  ACET Global?
14    A.  He -- I think he was the CEO of ACET Global.
15    Q.  Okay.  And you reported to him once he took
16  that position?
17    A.  Yes.
18    Q.  How would you describe him as a boss?
19    A.  He's fine.  I work for him.  I have no
20  problems with him.
21    Q.  Okay.  What about Matt Denegre?  Do you know
22  Matt Denegre?
23    A.  I believe I've met him before.
24    Q.  Do you know when you first met him?
25    A.  No, I don't.

Page 17

1    Q.  Under what circumstances do you recall
2  meeting him or interacting with him?
3    A.  Just saw him, like, in a hallway and said
4  hello and was introduced to who he was, but that was
5  it.
6    Q.  Was he with ACET Global?
7    A.  I don't know.
8    Q.  Okay.  Don't know what his role really was?
9    A.  I don't know.
10    Q.  Did you ever report to him?
11    A.  No.
12    Q.  Did you ever have any discussions with him
13  about ACET Global?
14    A.  No.
15    Q.  Did he ever attend any company meetings?
16    A.  Not that I can remember.
17    Q.  Do you know David Hook?
18    A.  No.
19    Q.  Do you know who David Hook is?
20    A.  No, I don't know.
21    Q.  Okay.  Do you know Tony, or Anthony, Ludlow?
22    A.  No, I don't know who they are.
23    Q.  Don't know who he is?
24    A.  No.
25    Q.  Are you familiar with any of these companies?

5 (Pages 14 to 17)

Page 18

1          Baymark ACET Holdco, LLC?
2     A.  No, I'm not -- I'm not familiar.
3     Q.  Are you familiar with any entities with the
4  name Baymark in it?
5     A.  I've heard the name Baymark, yes.
6     Q.  Okay.
7     A.  But I don't know those names.
8     Q.  Let me -- let me ask you a few more specific
9  ones just to see if you're familiar.
10          Baymark ACET Direct Invest?
11     A.  No.
12     Q.  Baymark Partners, LP?
13     A.  No, I don't know.
14     Q.  Baymark Management, LLC?
15     A.  I don't know.
16     Q.  Or Baymark Partners Management, LLC?
17     A.  I don't know.  I've only heard the name
18  Baymark throughout the time.  That's the only thing
19  I've ever heard, but I don't know anything about them.
20     Q.  Do you know what context you've heard it in?
21     A.  I just heard the -- I think it's when ACET --
22  when a company was being bought and made into ACET
23  Global.
24     Q.  Okay.  Let me ask you --
25          (Speaking simultaneously.)

Page 19

1     A.  -- that name.
2          But that's all I heard, was the Baymark
3  name, kind of; but I don't know much about that.
4          I don't know anything of that.  That's
5  just --
6     Q.  (BY MR. FREEMAN)  Okay.
7     A.  -- hearsay, basically.
8     Q.  Got it.
9          Let me know if you're familiar with any
10  of these following entities or -- or people.
11          Super G Capital?
12     A.  I've heard of it.  I don't know anything
13  about it.
14     Q.  Do you know if -- if ACET Global had a
15  relationship with Super G Capital of any kind?
16     A.  I don't know.
17     Q.  Do you know if Windspeed did or does?
18     A.  I don't know.
19     Q.  Okay.  You know a gentleman named Marc Cole,
20  or have you heard that name?
21     A.  No.
22     Q.  Steven Bellah?
23     A.  No.  I don't remember that one.
24     Q.  Okay.  So I want to talk a little bit about
25  the transition from ACET Ventures [verbatim] Partners

Page 20

1  to ACET Global.  I think what you refer to as Koolulu
2  is ACET Partners -- ACET Venture Partners' operation.
3          Just to make sure we're talking the same
4  language, when were you working for what you refer to
5  as Koolulu?
6          MR. PERRIN:  Objection; form.
7     A.  2014.
8     Q.  (BY MR. FREEMAN)  Until when?
9     A.  Until I was -- my paychecks changed to ACET
10  Global in 2017, I think.
11     Q.  Okay.
12     A.  I'm not sure of the date exactly.  I don't
13  remember, to be honest.
14     Q.  No, that -- that's fair.  That -- that's
15  close enough.
16          What -- what type of business did
17  Koolulu have?
18     A.  I packed orders and shipped them out.
19     Q.  Okay.  Do you know, in bigger picture, what
20  kind of business it had or what it did generally?
21     A.  Sold inventory that we had in the -- in there
22  to pack, and -- and move it and ship it out to
23  customers.
24     Q.  What kind of inventory?
25     A.  I don't remember exactly what inventory was

Page 21

1  there at that time.
2     Q.  Okay.  It have a logo?
3     A.  I don't remember.
4     Q.  Or have a Web site?
5     A.  I don't remember.
6     Q.  And you don't have any idea what kind of
7  inventory generally it -- it was that you were dealing
8  with, that you were packing up and sorting and sending
9  out?
10     A.  Kitchen items, household goods, electronic --
11  like small electronics; variety of thing -- items like
12  that, smaller items.
13     Q.  Well, when that transitioned into ACET
14  Global -- let's call it 2017, at some point -- was it
15  a complete change of the business?
16     A.  No, not that I remember.
17     Q.  Were you packing and shipping different kinds
18  of inventory or was it essentially the same kind?
19     A.  It's the same kind of inventory; household,
20  kitchen.
21     Q.  Okay.  Was anything ever communicated to you
22  about the transition to ACET Global?
23     A.  We were told it was -- we would be working
24  for ACET Global.
25     Q.  Okay.  Who told you that?

Page 22

1    A.  I don't remember.
2    Q.  Okay.  Did you have any meetings about that?
3    A.  I don't remember.
4    Q.  Okay.  Can you just describe what that
5  transition was like, how things changed?
6    A.  I don't -- I don't remember anything standing
7  out to me.
8    Q.  So does that mean no major changes, just
9  change in name?
10    A.  I don't -- no, there was no major changes
11  that I remember.
12    Q.  Okay.  Were there new employees?
13    A.  Not that I remember.  I don't really
14  remember.
15    Q.  Okay.  Do you remember if Tomer Damti's role
16  changed at all?
17    A.  No, I don't remember that.
18    Q.  Do you remember if there were any changes to
19  his authority or power in the company?
20    A.  No, I don't know.
21    Q.  Do you know if he reported to anyone?
22    A.  I don't know.
23    Q.  How did ACET Global -- how did it perform?
24  Was it doing well?  Was it doing bad?  Any idea?
25    A.  I don't know that information, no.

Page 23

1    Q.  Let me ask, did -- at any point while you're
2  working at ACET Global, did -- did its management
3  ever -- ever express concern about ACET Global's
4  economic performance?
5    A.  I don't remember.
6    Q.  Do you remember if Mr. Szeto ever raised any
7  concern about ACET Global's economic performance?
8    A.  I don't remember.
9    Q.  Do you remember anyone else raising concern
10  about ACET Global's economic performance?
11      MR. PERRIN:  Objection; form.
12    A.  I don't remember.  I can't recall.
13    Q.  (BY MR. FREEMAN)  Okay.  Did anyone else ever
14  indicate that the business was failing?
15    A.  Not that I recall.  I just -- I -- I don't
16  remember of -- of that.
17    Q.  Don't remember anybody saying the business
18  was failing?
19    A.  No, I don't remember that.
20    Q.  Do you remember anyone ever indicating that
21  the business was not profitable?
22    A.  No.  I -- I can't...
23    Q.  Do you remember if there were -- there
24  were any meetings to discuss the future of the
25  business?

Page 24

1    A.  We had meetings.  I just don't remember what
2  was discussed in all those meetings.
3    Q.  So Mr. Damti was the -- for a while was the
4  CEO of ACET Global; is that correct?
5    A.  I believe so, yes.
6    Q.  Did his role as CEO at ACET Global end at
7  some point?
8    A.  I don't know that.
9    Q.  Okay.  Do you recall if he was fired or
10  terminated in February of 2018?
11    A.  Who -- who?  I mean, I'm sorry, I -- I don't
12  understand the question.
13    Tomer Damti.
14    A.  Yes.  What about -- what was the question
15  again?
16    Q.  Was he ever fired, terminated, removed as CEO
17  of ACET Global?
18    A.  We had a meeting; and in the meeting, we were
19  informed that -- that Tomer was no longer there and
20  that Bill Szeto would be responsible for the company.
21    Q.  Who said that in the meeting?
22    A.  I can't -- I'm trying to remember.
23    Q.  Okay.
24    A.  Maybe Matt.  That -- that's who I think,
25  maybe.

Page 25

1    Q.  Matt Denegre?
2    A.  Possibly.  I really couldn't tell you for
3  sure.  Possibly.
4    Q.  Any idea why Matt would have been the one
5  conveying that message?
6    A.  No.
7      MS. HARD-WILSON:  Objection; form.
8    Q.  (BY MR. FREEMAN)  Okay.
9    A.  I don't know.
10    Q.  Okay.  Who all, that you recall, may have
11  been present in that meeting?
12    A.  Possibly Sai, Paula, Shira, Monica, I
13  believe.
14    Q.  Okay.  Did y'all have any -- did you have
15  discussion with any of them about it?
16    A.  I don't really remember if -- what was
17  discussed.
18    Q.  Okay.
19    A.  Things may have been discussed.  I don't
20  remember that.
21    Q.  Okay.  Whoever it was that told you, did they
22  say that Mr. Szeto was going to be the CEO going
23  forward?
24    A.  I don't remember exactly what they said.
25    Q.  But that they told you that Mr. Szeto was

Dana Tomerlin  *  March 26, 2021

## Page 26

1    going to be in charge?
2        A.  I would be -- yes.  I would be reporting to
3    him, yes.
4        Q.  Okay.  Did they say anything about why Tomer
5    Damti was fired?
6        A.  Not that I remember.
7        Q.  Did they say anything about it having to do
8    with the company performing poorly?
9            MS. HARD-WILSON:  Objection; form.
10       A.  Not that I remember.
11       Q.  (BY MR. FREEMAN)  Do you remember if the
12   company was performing poorly at that time?
13       A.  I don't -- I wasn't involved in the
14   financial --
15       Q.  Okay.
16       A.  -- business.
17       Q.  Were there any major changes after Mr. Damti
18   was -- was let go?
19       A.  I don't know what you're asking.
20       Q.  I mean were there -- were there any changes
21   to the employees.
22           Were there any employee changes?
23       A.  Not that I remember.
24       Q.  Any changes to the types of business that
25   were engaged in?

## Page 27

1        A.  I mean, I still continued to print, pack and
2    ship the orders.
3        Q.  Let me kind of shift topics here.  I -- I
4    want to talk about next the -- the shift from ACET
5    Global to Windspeed Trading, LLC.
6        A.  Okay.
7        Q.  So you worked at ACET Global with essentially
8    the same position you -- you currently have.
9            When did you stop working at ACET
10   Global?
11       A.  I received a termination letter at the end of
12   September 2018.
13       Q.  Okay.  Were you concerned receiving that?
14       A.  I don't -- I don't really don't remember what
15   I was at the time.
16       Q.  Okay.  You don't remember if you were
17   concerned about losing your job?
18       A.  Yes, I was -- I was concerned.
19       Q.  Okay.  Did you start looking for another job?
20       A.  No.
21       Q.  And why not?
22       A.  I just didn't have a chance to look for
23   another job.
24       Q.  And why did you not have a chance to after
25   receiving the termination letter?

## Page 28

1        A.  I didn't immediately start looking for a job.
2        Q.  Okay.  Did you get another job after that?
3        A.  Yes.  Bill approached me about working for
4    another company.
5        Q.  Okay.  What -- what other company was that?
6        A.  Windspeed.
7        Q.  Okay.
8        A.  Trading.
9        Q.  When did -- when did he approach you about
10   that?
11       A.  I'm not sure.  I don't -- I don't remember.
12       Q.  When did you start working at Windspeed?
13       A.  Right around October, near the same time.
14       Q.  Near the same time as you were terminated
15   from --
16       A.  Close to that, yes.
17       Q.  Shortly?
18       A.  Shortly after.
19       Q.  Did he possibly ask you to work at Windspeed
20   at the -- the same day that he gave you the
21   termination notice?
22       A.  I -- I really can't recall the exact timing.
23       Q.  But you weren't worried, weren't concerned?
24   Or you were?
25           MR. PERRIN:  Yeah.

## Page 29

1        A.  Yeah, I think I was concerned, if I remember
2    correctly.  Yes.
3        Q.  (BY MR. FREEMAN)  Okay.  So you started
4    working at Windspeed beginning of October 2018; is
5    that correct?
6        A.  I believe so, yes.
7        Q.  Okay.  Who else started working at Windspeed
8    at that time?
9        A.  Sai -- I can't say her last name, Paula
10   Ketter, Jane Lin and, I believe, Vanessa.  I don't
11   remember her last name.
12       Q.  Okay.  So Sai, Paula, Jane, Vanessa and you
13   began working at Windspeed in October of 2018?
14       A.  Yes, I believe so.
15       Q.  Was Sai working at ACET Global in September
16   of 2018?
17       A.  Yes.
18       Q.  Was Paula working at ACET Global in September
19   of 2018?
20       A.  Yes.
21       Q.  Was Jane working at ACET Global in September
22   of 2018?
23       A.  Yes.
24       Q.  Was Vanessa working at ACET Global in
25   September of 2018?

8 (Pages 26 to 29)

Dana Tomerlin   *   March 26, 2021

Page 30

1    A. Yes.
2    Q. Were you working at ACET Global in September
3    of 2018?
4    A. Yes.
5    Q. Was Mr. Szeto working at ACET Global in
6    September of 2018?
7    A. Yes. I was reporting to him.
8    Q. Was there anyone else working at ACET Global
9    in September of 2018?
10   A. Not that I remember.
11   Q. So everyone that worked at ACET Global in
12   September of 2018 began working at Windspeed in
13   October of 2018?
14   A. To my recall, yes.
15   Q. Okay. And Mr. Szeto was the boss at ACET
16   Global.
17        Whatever his title was, was the boss at
18   ACET Global; is that correct?
19   A. I reported to him, yes.
20   Q. Okay. Who started Windspeed?
21   A. I believe, Bill Szeto.
22   Q. Okay. So did Mr. Szeto start Windspeed while
23   he was working at ACET Global?
24        MS. HARD-WILSON: Objection; form.
25   A. I don't know that.

Page 31

1    Q. (BY MR. FREEMAN) Okay. What was your role
2    when working for Windspeed? Was it the same role you
3    had?
4    A. I printed orders, yes, and packed and shipped
5    out inventory -- or, shipped out to customers.
6    Q. Okay. Did you get a -- formal offer of
7    employment?
8    A. Yes, I believe so.
9    Q. Was there an employment contract of any sort?
10   A. I don't believe so. I don't remember that.
11   Q. Okay. Do you recall if there was any kind of
12   onboarding, formal onboarding process?
13   A. I don't understand what you're asking.
14   Q. Did you go through any kind of HR process or
15   anything, or did things just switch over to a new
16   company name?
17        MR. PERRIN: Objection; form.
18   A. I -- I don't remember anything.
19   Q. (BY MR. FREEMAN) Okay.
20   A. HR process.
21   Q. When this -- when this all happened, were
22   y'all working at the same location or did y'all
23   immediately move to a new location?
24   A. We were not at the -- the -- there was an old
25   warehouse but, no, Windspeed was at another location.

Page 32

1    Q. So Windspeed never operated from that old
2    address?
3    A. No.
4    Q. Okay. Did you get a new e-mail address?
5    A. Yes.
6    Q. Did it -- you use -- from that point forward,
7    did you use the ACET e-mail address?
8    A. I don't remember.
9    Q. Okay. Do you remember if there was ever a
10   point you were working for both ACET Global and
11   Windspeed at the same time?
12   A. No.
13   Q. Do you know if Windspeed ever paid for work
14   that you did while you were working at ACET Global?
15   A. No, not that I'm aware of.
16   Q. Can you just describe to me -- describe to me
17   how this -- from your vantage point, your -- your
18   view, how did this transition from ACET Global to
19   Windspeed occur? What happened?
20        MS. HARD-WILSON: Objection; form.
21        MR. PERRIN: Jason, just for the record,
22   can we have the agreement again one -- one objection
23   suffices for all defendants?
24        MR. FREEMAN: We can.
25        Ms. Tomerlin, just one second.

Page 33

1        THE WITNESS: Mm-hm.
2        MR. FREEMAN: Just for the record, I'm
3    going to reflect that the parties have an agreement
4    amongst themselves that one defendant's objection to
5    any question or answer in the deposition will be --
6    will preserve that objection for the other defendants
7    as well.
8        MR. PERRIN: And let's just, if we can
9    agree, we'll do that in all depositions.
10       MR. FREEMAN: Agreed.
11       MR. PERRIN: All right. Thank you.
12       MS. HARD-WILSON: Agreed.
13   Q. (BY MR. FREEMAN) Sorry, Ms. Tomerlin. I was
14   asking if you could describe how the transition --
15   what took place; what did you see in terms of how this
16   transition took place.
17       MS. HARD-WILSON: Objection; form.
18   A. I printed orders that came into our
19   software -- ShipStation, on our software -- and I
20   packed them and I shipped them out.
21   Q. (BY MR. FREEMAN) Was -- did the software
22   change? Was it new software?
23   A. Not that I remember.
24   Q. Did you have to go in and input new customers
25   into the software or was it all still there?

9 (Pages 30 to 33)

Dana Tomerlin   *   March 26, 2021

Page 34

1     A.  I am not understanding your question.
2     Q.  Well, let me ask.
3         Did -- when it changed, were you -- did
4   you still use the same computer to run that software?
5     A.  Yes.
6     Q.  Was it the still exact software or was it a
7   new software?
8     A.  I believe it was the same.
9     Q.  Did it still have all of the preexisting
10  information in it that was there in September of 2018?
11    A.  Like, what are you -- I'm sorry, I am not
12  understanding the question exactly.
13    Q.  Well, so I'm trying to visualize what it is
14  you do in inputting in there but I'm assuming it
15  auto-populates or populates with certain customers or
16  certain delivery vendors.
17        Is -- is that basically right?
18    A.  Right.  We receive orders through the
19  marketplaces, and then I print those orders out
20  that -- that -- and so, there's new customer orders
21  every day, so there's no saved customer information.
22        So I printed new orders, and packed
23  those and shipped them out.
24    Q.  Okay.  So I'm -- you know, another example
25  here would be, did you -- did -- did -- did the

Page 35

1   company have a relationship with Zulily?
2     A.  I believe that, yes, we -- we had.  That was
3   one of the marketplaces I shipped with, yes; I would
4   receive orders for, yes.
5     Q.  So, for example, that data that would have
6   been in your software system in -- in the September of
7   2018, was still part of the system in October of
8   2018; is -- is that right?
9     A.  It --
10        MR. PERRIN:  Objection; form.
11    A.  We were still shipping.  I was still shipping
12  out orders with the different marketplaces.
13    Q.  (BY MR. FREEMAN)  Using the same software,
14  right?
15    A.  Yes.
16    Q.  Okay.
17    A.  To the best of my knowledge, yes.
18    Q.  Okay.  Were there ever any meetings about the
19  transition from ACET Global to -- to Windspeed that
20  you were a part of?
21        MR. PERRIN:  Objection; form.
22    A.  Not that I remember.  There --
23    Q.  (BY MR. FREEMAN)  Did you ever --
24    A.  There were meetings at ACET Global, and then
25  there was meetings at Windspeed Trading.  I don't

Page 36

1   remember --
2     Q.  Okay.
3     A.  -- everything that was discussed in all of
4   those meetings.
5     Q.  And when you -- when you say there were
6   meetings, are you saying that there were meetings
7   about that transition or just meetings about business
8   generally?
9     A.  There were meetings about business in
10  general.  I don't recall everything that was discussed
11  in those meetings.
12    Q.  Okay.  You recall if you had any
13  conversations with anyone about the transition from
14  ACET Global to Windspeed?
15        MR. PERRIN:  Objection; form.
16    A.  What -- what do you mean by that?  I don't
17  understand.  Conversations?
18    Q.  (BY MR. FREEMAN)  Yeah.  Like talking like
19  we're doing here, with any employee, with Mr. Szeto
20  with anyone, about the transition from ACET Global to
21  Windspeed.
22    A.  Not that I remember.
23    Q.  Do you remember whether you had any of those?
24    A.  No, I don't remember that.
25    Q.  Okay.  Do you remember whether there were any

Page 37

1   e-mails regarding that transition?
2     A.  No, I don't remember that.
3     Q.  Do you remember whether there were any text
4   messages regarding that transition?
5     A.  No, I don't remember that.
6     Q.  Okay.  So you didn't get any kind of e-mail
7   or -- or messaging that said, you know, "This is how
8   we're going to do things completely different in
9   Windspeed than how we did them in ACET Global"?
10    A.  I don't remember the e-mails.  I don't
11  remember -- no, I don't remember that.
12        I don't -- I don't remember any of the
13  e-mails.  If there were e-mails, I don't remember
14  that.
15    Q.  Okay.
16    A.  I can't recall that.
17    Q.  How did Windspeed compare to ACET Global?
18        MS. HARD-WILSON:  Objection; form.
19    A.  It's another e-commerce company.  I continue
20  to do the same.  I print orders, I pack the orders and
21  ship them out.
22    Q.  (BY MR. FREEMAN)  As far as you could see,
23  were there any changes?
24    A.  Not in my position.
25    Q.  Did you see changes in any other position?

10 (Pages 34 to 37)

Dana Tomerlin  *  March 26, 2021

## Page 38

1      A. No, not that I -- I don't know.
2      Q. Did anyone ever talk to you about how things
3  had thanked in their position?
4      A. No, not that I remember.
5      Q. Did the products noticeably change?
6          MR. PERRIN: Objection; form.
7      A. Not that I remember.
8      Q. (BY MR. FREEMAN) Did the employees noticeably
9  change?
10      A. Not that I remember.
11      Q. Did the Web site noticeably change?
12      A. I don't know about the Web site. I never
13  worked on the Web site.
14      Q. Okay. And you didn't work on the logo,
15  either, or know about the logo?
16      A. No.
17      Q. Okay. Do you remember the Koolulu logo or
18  Web site?
19      A. No. I don't remember.
20      Q. Okay. Did anyone else get more involved in
21  Windspeed -- you know, anyone new get involved in
22  Windspeed that wasn't involved in ACET Global?
23      A. Not that I know of.
24      Q. Okay. And -- and do you know why the
25  business changed?

## Page 39

1          MS. HARD-WILSON: Objection; form.
2          MR. PERRIN: Objection; form.
3      A. I don't understand your question.
4      Q. (BY MR. FREEMAN) Why the business changed
5  from ACET Global to Windspeed.
6          MR. PERRIN: Objection; form.
7      A. I was terminated from ACET Global, so, I
8  don't know -- and I -- I worked -- went to work for
9  Windspeed. I don't know of any change or any --
10  anything about that.
11      Q. (BY MR. FREEMAN) You say that was the only
12  change, was the change of the name?
13          MR. PERRIN: Objection; form.
14      A. No. I'm saying I don't know what happened
15  with ACET Global.
16      Q. (BY MR. FREEMAN) Okay. Can you tell me
17  what -- what did change besides the name, if that
18  wasn't the only -- you know, if that wasn't the only
19  thing?
20          MR. PERRIN: Objection; form.
21      A. I went to work for Windspeed, so it's a new
22  company.
23      Q. (BY MR. FREEMAN) Right. What other change
24  was there?
25      A. What do you mean? I still continue to do the

## Page 40

1  same --
2      Q. So --
3      A. -- work.
4      Q. My question is, was there any change besides
5  the -- the name of the company you were working for?
6          MR. PERRIN: Objection; form.
7      A. Yes.
8      Q. (BY MR. FREEMAN) And what were those?
9      A. We were in a new location.
10      Q. Okay.
11      A. And I was working for Windspeed Trading now.
12      Q. Right. And what other changes were there?
13      A. I don't know.
14      Q. Okay. Were there other changes or is that
15  all you know of?
16      A. I'm not -- I don't know that. I don't know
17  what all changes.
18          I know I printed and packed orders and
19  shipped.
20      Q. And as we sit here today, the only changes
21  that you can identify are: it was a change in the
22  company name, and there was another location?
23          MR. PERRIN: Objection; form.
24      A. I don't think it was a change in name.
25      Q. (BY MR. FREEMAN) Can you explain what you

## Page 41

1  mean by that?
2      A. I no longer worked for ACET Global.
3      Q. Okay. You went -- you now work for a company
4  with a different name, correct?
5          MR. PERRIN: Objection; form.
6      A. I worked for Windspeed Trading.
7      Q. (BY MR. FREEMAN) Right. And that -- to my
8  question, you worked for a company with a different
9  name; is that correct?
10          MR. PERRIN: Objection; form.
11      A. I worked for Windspeed Trading. That's all
12  I -- I don't know --
13          MR. FREEMAN: Objection; nonresponsive.
14      Q. (BY MR. FREEMAN) So you worked for ACET
15  Global first, correct?
16      A. I worked for Koolulu first, is what you're
17  referring to; and then I worked for ACET Global.
18      Q. Okay.
19      A. And now I work --
20      Q. Then, did you begin to --
21      A. -- for Windspeed Trading.
22      Q. -- work for a company with a different name?
23      A. I work for Windspeed Trading now.
24      Q. So just -- I'm going to ask it one more time.
25  I'm going to ask you to answer the question that I ask

11 (Pages 38 to 41)

Dana Tomerlin   *   March 26, 2021

Page 42

1  you.
2  A.  Okay.
3  Q.  All right?
4     In September of 2018 you worked for what
5  company?
6  A.  ACET Global.  ACET Global.
7  Q.  Okay.  In October of 2018, did you go to work
8  for a company with a different name?
9  A.  I went to work, yes, for Windspeed Trading.
10  Q.  What other changes were there with respect to
11  Windspeed Trading compared to ACET Global?
12  MR. PERRIN:  Objection; form.
13  MS. HARD-WILSON:  Objection; form.
14  A.  I still continued to work in fulfillment.
15  Q.  (BY MR. FREEMAN)  No other changes?
16  A.  Not that I remember.
17  Q.  Did anyone inform you that it was -- that
18  there was going to be a change prior to ACET Global
19  shutting down?
20  MR. PERRIN:  Objection; form.
21  A.  Not that I remember.  I don't remember.
22  Q.  (BY MR. FREEMAN)  Okay.  Was there a change in
23  vendors whenever you began to work for Windspeed
24  Trading?
25  A.  What do you mean by "vendors"?

Page 43

1  Q.  Did you begin to use other companies, for
2  example, to purchase inventory from or did you use any
3  of the same companies?
4  A.  I don't know.  I didn't purchase the
5  inventory.
6  Q.  Okay.  How did you distinguish between ACET
7  Global's inventory and Windspeed's inventory?
8  A.  I don't know who owned what.
9  Q.  Was ACET Global's inventory moved over to the
10  Windspeed warehouse?
11  A.  The inventory -- I'm not sure who owned what
12  inventory, but the inventory from the other house
13  was -- I mean, not other house -- the other warehouse
14  was moved, yes.
15  Q.  Okay.  Do you know when that was?
16  A.  September, I believe.  October.  Sometime the
17  fall of 2018.
18  Q.  Okay.  Would that have been -- if that was in
19  September of 2018, was that before you were
20  terminated?
21  A.  The -- it went from the warehouse to a
22  storage unit, then from a storage unit to the
23  Windspeed office location.
24  Q.  Okay.  Did that process begin before you were
25  terminated or after?

Page 44

1  A.  I was -- the process began before.  I believe
2  it was in the storage warehouses -- storage units at
3  that time.
4  Q.  Did you ask why it was being moved to storage
5  units?
6  A.  No, Bill asked me to help see it being moved.
7  Q.  Did you do whatever Bill said?
8  A.  Yes.
9     The movers came, and I helped oversee to
10  that; for it to be moved into the storage units.
11  Q.  Okay.  Where were those storage units?
12  A.  I don't remember exactly.  Off of Coit Road.
13  Q.  Okay.  Can you remember the name of the
14  company?
15  A.  The name?  No, I don't remember the name.
16  Q.  Do you remember what they looked like, what
17  color?
18  A.  No.
19  Q.  No?  Don't remember any of that?
20  A.  They were just long storage units.
21  Q.  Okay.  How many storage units, about?
22  A.  There were two.
23  Q.  How big were the storage units?
24  A.  I'm not sure the size.  They were large.
25  Q.  Okay.

Page 45

1  A.  But I don't know the size.
2  Q.  So this was occurring in September of 2018;
3  is -- is that correct?
4  MR. PERRIN:  Objection; form.
5  A.  I don't --
6  Q.  (BY MR. FREEMAN)  Let's --
7  A.  -- remember --
8  Q.  Let's ask it --
9  A.  -- the date, but it was, yes, sometime in the
10  fall of 2018.
11  Q.  (BY MR. FREEMAN)  Let's ask it this way,
12  Ms. Tomerlin.
13     Did that occur while you were still
14  working at ACET Global?
15  MR. PERRIN:  Objection; form.
16  A.  From the old warehouse to the storage unit,
17  yes.
18  Q.  (BY MR. FREEMAN)  Okay.  And did anyone ever
19  tell you why that was being done?
20  A.  Not that I remember, no.
21  Q.  Was it all of the inventory?
22  A.  I believe so, yes.
23  Q.  Okay.  How long was that before you were
24  terminated?
25  A.  I'm not exactly sure.

12 (Pages 42 to 45)

Dana Tomerlin  *  March 26, 2021

Page 46

1      Q.  Okay.  Was it a month before you were
2   terminated?
3          MS. HARD-WILSON:  Objection; form.
4      A.  I don't remember exactly.
5      Q.  (BY MR. FREEMAN)  Okay.  Was it closer to a
6   month or a day?
7          MS. HARD-WILSON:  Objection; form.
8      A.  I do not remember exactly.  Possibly more
9   than a day, yes, but I don't remember the time frame.
10     Q.  (BY MR. FREEMAN)  Did you know you were about
11  to be terminated at that time?
12     A.  Not that I remember.
13     Q.  Okay.  Did anyone raise any concerns at that
14  time about the movement of the inventory?
15     A.  Not -- not that I remember.
16     Q.  Okay.
17     A.  It was a while back, so it's hard to remember
18  a lot of this.
19     Q.  Okay.
20         So what happened with the inventory
21  after that?
22     A.  Then it was moved to the Windspeed location.
23     Q.  How long was it in the storage units?
24     A.  Maybe two months.
25     Q.  Okay.  Were you in charge of moving it back

Page 47

1   to the -- or, to the new office?
2      A.  Bill Szeto oversaw it, but I did -- I was
3   here, yes.
4      Q.  Okay.  What did you do and what did you see?
5      A.  I just saw the movers moving everything in,
6   then I locked the door and left.
7      Q.  Okay.  And when was that?
8      A.  Possibly -- maybe November 2018.
9      Q.  November of 2018?
10     A.  Possibly, yes.
11     Q.  Okay.  Did all the inventory look like it was
12  still there?
13     A.  Yes.
14     Q.  What happened to that inventory after that?
15     A.  The inventory was here.  We -- I continued to
16  print orders and pack and ship from the inventory I
17  had on hand.
18     Q.  Did that include that inventory?
19     A.  Yes.
20     Q.  Okay.  Did you sell all of that inventory
21  or --
22     A.  I --
23     Q.  -- is it still around?
24     A.  -- don't know.
25         I don't remember.  We receive new

Page 48

1   inventory coming in as well.
2      Q.  Okay.  Was it ever -- was that inventory ever
3   segregated in any way?
4      A.  No, not that I -- no.
5      Q.  It was just mixed in with everything else?
6          MR. PERRIN:  Objection; form.
7      A.  Yes.
8      Q.  (BY MR. FREEMAN)  Okay.  I'm sorry.  Was --
9   was that inventory mixed in with all the other
10  inventory?
11     A.  Yes.  The inventory wasn't separated.
12     Q.  Okay.  Was it possible to distinguish that
13  inventory from the other inventory?
14     A.  No.
15     Q.  Okay.  Did anyone ever come and take that
16  inventory from Windspeed?
17     A.  Not that I'm aware of.
18     Q.  Or, like, did anyone ever come and separate
19  it off and say, "You can't sell this inventory"?
20     A.  I'm not responsible for selling.
21     Q.  Okay.
22     A.  But, no, no one said anything about shipping
23  the inventory.
24     Q.  Okay.  Did Mr. Szeto know that that was --
25  that inventory was being held this way?

Page 49

1          MS. HARD-WILSON:  Objection; form.
2      A.  I'm sure he did.
3      Q.  (BY MR. FREEMAN)  Okay.  Did Mr. Szeto ever
4   say to segregate that inventory?
5      A.  Not that I remember.
6      Q.  Did Mr. Szeto ever say to treat that
7   inventory differently or in any particular way?
8      A.  Not that I'm aware of.
9      Q.  Okay.
10     A.  The inventory was just placed in the
11  warehouse, and I pulled orders and packed those orders
12  and shipped out.
13     Q.  Okay.
14     A.  I don't know who owned or what was going on
15  on that -- that end, on selling.  I was just packing
16  orders, using the inventory on hand.
17     Q.  Was there -- was there any other information
18  from ACET Global that you know of that did not go into
19  those storage units?
20     A.  Not that I'm aware of.
21     Q.  Okay.  And then, was there any other
22  inventory from those storage units that did not then
23  go to Windspeed's new location?
24     A.  Not that I'm aware of.
25     Q.  Okay.  Let me ask this way.

                              13 (Pages 46 to 49)

Page 50

1    Did -- was there ever a time when
2    Windspeed bought $500,000 worth of new inventory, that
3    you remember?
4         MR. PERRIN:  Objection --
5    A.  I didn't purchase --
6         MR. PERRIN:  -- to form.
7    A.  -- inventory.
8    Q.  (BY MR. FREEMAN)  Okay.  Were there ever any
9    discussions about that inventory that came from ACET
10   Global?
11   A.  I'm not sure what you're asking.
12   Q.  Any discussions in particular that -- that
13   you would remember.
14   A.  Not that I remember.
15   Q.  Okay.  Any discussion with anybody about
16   there being a lien on that inventory?
17   A.  No.  I don't have that information, no.
18   Q.  Ever any discussion about anybody conducting
19   a foreclosure sale on that inventory?
20   A.  No, I don't know that information.
21   Q.  Really?  So nobody ever said anything about
22   some party foreclosing on the inventory of ACET
23   Global?
24        MS. HARD-WILSON:  Objection; form.
25   A.  No.  I don't know anything about foreclosing

Page 51

1    or anything like that.
2    Q.  (BY MR. FREEMAN)  Okay.  And Mr. Szeto never
3    discussed that with you?
4    A.  About foreclosing?
5         MS. HARD-WILSON:  Objection.
6    Q.  (BY MR. FREEMAN)  Yes, about -- about anyone
7    foreclosing on -- on that inventory.
8    A.  I don't even know what you mean by
9    "foreclosing."
10   Q.  Was there ever a lender who came and took
11   that -- took the inventory, ACET Global's former
12   inventory?
13   A.  No.  No one came and took any inventory.
14   Q.  Okay.
15   A.  That I'm aware of.
16   Q.  Do you ever remember -- do you know if
17   Windspeed ever went and purchased that inventory from
18   ACET Global or anyone else?
19        MS. HARD-WILSON:  Objection; form.
20   A.  I believe they did; I -- I don't know that,
21   though.
22        I don't know that information for sure.
23   Q.  (BY MR. FREEMAN)  Okay.  Do you know if -- do
24   you know if Windspeed ever purchased that inventory
25   from Super G Capital?

Page 52

1    A.  I don't know that for sure.  I don't know
2    that.
3    Q.  Okay.  Do you know if Super G Capital had any
4    ownership interest in Windspeed?
5    A.  I don't know.
6    Q.  Do you know if it has a 40 percent interest
7    in Windspeed?
8    A.  I don't know.
9    Q.  Do you know if any entity with the name
10   "Baymark" has a 40 percent interest in Windspeed?
11   A.  I don't know.
12   Q.  Would that be inconsistent with the way that
13   Mr. Szeto has described his ownership in Windspeed?
14   A.  I don't know that information.
15        My own understanding, that -- that Bill
16   Szeto owns Windspeed.
17   Q.  Okay.
18   A.  But I don't have any financial information on
19   that.
20   Q.  Okay.  Do you work pretty closely with the
21   inventory, in your position?
22   A.  Yes.  I -- I print orders and then I pull
23   from the inventory and pack it and ship it out.
24   Q.  In your day-to-day job, do you -- do you
25   basically see the warehouse?

Page 53

1    A.  Yes.
2    Q.  Would you notice if there was an influx of a
3    bunch of new inventory?
4    A.  We did receive inventory.  We do receive
5    inventory coming in, yes.
6    Q.  All right.  That's -- that's a common
7    occurrence, correct?
8    A.  Yes.
9    Q.  Do you ever receive -- let me ask you, do you
10   have any idea how much that inventory costs, like what
11   a normal typical inventory purchase runs?
12   A.  No.  I'm not aware of that.
13   Q.  Do you remember any time in January of 2019 a
14   large amount of inventory coming into the warehouse?
15   A.  I remember inventory coming in, yes, at a
16   regular basis.
17   Q.  Just normal course?
18   A.  I just don't remember the quantity.
19   Q.  Do you remember anyone ever telling you that
20   Windspeed had acquired inventory from Super G Capital?
21   A.  I don't remember.
22   Q.  Do you remember ever fulfilling orders with
23   inventory from Super G Capital?
24   A.  I don't know who would have owned inventory.
25   That wasn't -- I was just pulling the orders and

14 (Pages 50 to 53)

Page 54

1    packing from the inventory that we have here, that we
2    had on hand.
3        Q.  Okay.  Do you recall what the address of ACET
4    Venture Partners was?
5        A.  No.
6        Q.  How about ACET Global?  I'm sorry I'm testing
7    you on this.  I'm just...
8        A.  It's in Plano.
9        Q.  Okay.
10       A.  I just can't remember the street name.
11       Q.  That's okay.
12       A.  It was Plano.
13       Q.  Plano.  That's good enough.
14           What about Windspeed Trading?
15       A.  Yes.  We're in --
16           (Speaking simultaneously.)
17       A.  It's International Parkway, Richardson,
18   Texas.
19       (BY MR. FREEMAN)  Got it.  Okay.
20           Did Windspeed have any other business
21   locations?
22       A.  Not that I -- I know of.
23       Q.  Okay.  Do you know if it generally used any
24   other company addresses?
25       A.  No, I don't know that.  I'm not aware of any.

Page 55

1        Q.  I am going to attempt to do a screen share
2    with you.
3            Ms. Tomerlin, can you see the PDF that's
4    up on your screen?
5        A.  Yes.
6        Q.  Okay.  I have marked this as Exhibit 2 to
7    identify it.
8        A.  Mm-hm.
9        Q.  Does this document look familiar?
10       A.  It looks like a purchase order.  Yes.
11       Q.  Okay.  Could you explain to me what a -- what
12   a purchase order is?
13       A.  The marketplace, Zulily, will order so many
14   items.  We fulfill that by pulling the inventory,
15   packing it, and then shipping it directly to Zulily.
16       Q.  Okay.  And when was this shipped, if you can
17   tell?
18       A.  February the 6th, 2019.
19       Q.  Okay.  So am I understanding this correct
20   that the -- the items or the inventory reflected on
21   this Exhibit 2, this purchase order, appeared to have
22   been all shipped in -- on February 6th of 2019 to
23   Zulily?
24       A.  Correct.
25       Q.  And do you know who would write -- who would

Page 56

1    write this designation, "All Shipped"?
2        A.  We do in fulfillment.  It could have been me
3    or Paula Ketter.
4        Q.  Okay.  Was that kind of the standard
5    practice, to -- to write that on there?
6        A.  Yes.
7        Q.  Okay.  And can you tell me, on -- on this
8    purchase order with Zulily, what company is designated
9    here as fulfilling this purchase order?
10       A.  It says ACET Venture Partners, LLC.
11       Q.  Now, did you work for that company?
12       A.  I am not sure.  I think that was the Koolulu,
13   but I'm not sure.
14           But -- not sure.  I mean, ACET Venture,
15   if that was Koolulu.
16       Q.  Okay.  What about that address?  Was that
17   Colulu's address?
18       A.  No.  That is our address, Windspeed Trading's
19   address.
20       Q.  That's Windspeed Trading's address?
21           What about the e-mail address reflected
22   there?  Is that a domain that Windspeed used?
23       A.  Not that I'm aware of.
24       Q.  Do you have any idea why this purchase copy
25   reflects ACET Venture Partners?

Page 57

1        A.  No, I don't.
2            MS. HARD-WILSON:  Objection; form.
3        A.  I don't know.
4        Q.  (BY MR. FREEMAN)  Okay.  Do you know if other
5    purchase orders reflected ACET Venture Partners?
6        A.  I don't know.
7            MS. HARD-WILSON:  Objection; form.
8        A.  I don't -- I don't know.
9        Q.  (BY MR. FREEMAN)  Okay.  Ms. Tomerlin, I'm --
10   I'm putting on the screen what I've marked as
11   Exhibit 3.
12           MS. HARD-WILSON:  Before -- before you
13   start, Jason, I just wanted to ask if Dana needed a
14   break.
15           THE WITNESS:  No.  I'm fine.
16           MS. HARD-WILSON:  Okay.
17           THE WITNESS:  Thank you.
18           MS. HARD-WILSON:  Let us know.
19           THE WITNESS:  Thank you.  I'm okay.
20   Thank you.  Just need to swallow my drink.
21           MR. FREEMAN:  Let me ask another
22   question.  Does Brenda need a break?
23           MS. HARD-WILSON:  I'm good, but it's
24   been just over an hour so I wanted to make sure.
25           MR. FREEMAN:  Yeah, it's -- it's been

Page 58

1  a -- it's been a long day.  I -- I am fine to take a
2  break if y'all would like.
3          Dana, you're doing great.
4          THE WITNESS:  I just needed a drink,
5  that was it.  I'm fine to go on.
6          MR. FREEMAN:  All right.  We -- we'll go
7  a little bit longer, and then we'll take a break here
8  in just a little bit.
9      Q.  (BY MR. FREEMAN)  So, Ms. Tomerlin, I -- I
10 have what I've marked as Exhibit 3 on the screen.
11         Is that showing up for you?
12         (Marked Exhibit Nos. 2 and 3.)
13     A.  Yes.
14     Q.  (BY MR. FREEMAN)  Does that generally -- do
15 you recognize this document or this type of document?
16     A.  I'm not familiar with invoices.
17     Q.  Okay.  I'm going to scroll through it so you
18 can see the whole thing.  If you need me to slow down
19 anywhere, just let me know.  I just want you to see
20 the whole document.
21         It still doesn't look familiar, correct?
22     A.  I -- I'm just -- I'm not familiar with
23 invoices.
24     Q.  Okay.
25         MR. FREEMAN:  Let me ask you a -- some

Page 59

1  questions about a few -- well, you know what?  I'll
2  tell you what.  That's actually a -- that's actually a
3  good place for a break.  Why don't we -- why don't we
4  take like a five-minute break and then -- and then
5  circle back up after that.
6          THE VIDEOGRAPHER:  All right.  The time
7  is 3:19 p.m. and we are off the record.
8          (Break from 3:19 p.m. to 3:27 p.m.)
9          THE VIDEOGRAPHER:  The time is 3:27 p.m.
10 and we are back on the record.
11     Q.  (BY MR. FREEMAN)  Ms. Tomerlin, I want to ask
12 you about a few people and would just like for you to
13 tell me what you -- what you know about them.
14         Sai Vattana.  Who is Sai?
15     A.  She is our sales manager.
16     Q.  Okay.  When did you first meet Sai?
17     A.  At ACET Global.
18     Q.  Okay.  So was she an employee of ACET Global?
19     A.  Yes, I believe so.
20     Q.  Was she always the sales manager?
21     A.  I don't remember her title, but I don't know
22 if it was always manager.  I'm not sure.
23     Q.  But always in sales?
24     A.  Yes.
25     Q.  And what do you understand that -- what did

Page 60

1  that involve?
2      A.  I don't have that information.
3      Q.  Is she still an employee of ACET Global?
4      A.  I don't know that.
5          I know that she works at Windspeed
6  Trading.
7      Q.  Okay.  And -- her role at Windspeed is
8  the same as it was at ACET Global?
9          MR. PERRIN:  Objection; form.
10     A.  I know she is a sales manager at Windspeed
11 Trading.
12     Q.  (BY MR. FREEMAN)  Okay.  Do you know if her
13 role is the same as it was at ACET Global?
14         MS. HARD-WILSON:  Objection; form.
15     A.  I know it has to do with sales.
16     Q.  (BY MR. FREEMAN)  Okay.  What about Jane Lin?
17 Who is Jane Lin?
18     A.  She works in the accounting area.
19     Q.  Okay.  Works for Windspeed?
20     A.  Yes, I'm -- yes.  Windspeed Trading, yes.
21     Q.  When did you first meet Jane?
22     A.  At ACET Global.
23     Q.  Okay.  Was she an employee of ACET Global?
24     A.  Yes.
25     Q.  And was she in the same role with ACET

Page 61

1  Global?
2      A.  She worked in accounting.
3      Q.  Okay.  And she's currently an employee of
4  Windspeed?
5      A.  Yes.
6      Q.  Going back to Sai, was Sai involved with
7  inventory at all?
8      A.  I am not sure.  I believe she helped purchase
9  inventory.
10     Q.  Okay.  Do you know who else helped purchase
11 inventory?
12     A.  No, not -- I don't know.
13     Q.  Just Sai?
14     A.  I don't know who all is involved in
15 purchasing inventory.
16     Q.  Okay.  Okay.  I am going to put on the screen
17 what's marked as Exhibit 10.
18         Ms. Tomerlin, can you see that?
19         (Marked Exhibit No. 10.)
20     A.  I don't see anything yet.
21     Q.  (BY MR. FREEMAN)  Yeah.  I bet I know why.
22         Can you see that now?
23     A.  Yes.
24     Q.  And -- and is this document marked as
25 Exhibit 10?

16 (Pages 58 to 61)

Dana Tomerlin   *   March 26, 2021

Page 62

1    A.  Yes.
2    Q.  Just want to give you a minute to look at
3  this and look at the -- the language in the agreement.
4    A.  Okay.
5    Q.  Are you familiar with this document?
6    A.  No.
7    Q.  Does this have the name Koolulu, the company
8  you've been referring to?
9    A.  Yes.
10    Q.  Is that the Koolulu, the -- the company or
11  the brand or the Web site you -- you've referred to?
12    A.  I interviewed with the company, with Koolulu,
13  as advertised.  I mean, I -- when I went to work, I
14  interviewed with -- with Koolulu.
15    Q.  Okay.  Was that the company that Tomer Damti
16  owned?
17    A.  I don't know who owned --
18    Q.  Was it --
19    A.  -- that company.
20    Q.  -- a company that he -- he ran?
21    A.  He -- I worked for him there, yes.
22    Q.  Okay.  And that's the company that became
23  ACET Global?
24    A.  I don't know the --
25      MS. HARD-WILSON:  Objection.

Page 63

1    Q.  (BY MR. FREEMAN)  Okay.  But you -- you are or
2  are not familiar with this document or any of the
3  agreement reflected in it?
4    A.  No, I'm not familiar with it.
5    Q.  Do you have any idea why Koolulu would have
6  been engaging in this transaction, which appears to be
7  for a period from -- starting in January of 2019, and
8  why this would be signed by Jane Lin over at Windspeed
9  Trading?
10      MS. HARD-WILSON:  Objection; form.
11    A.  No, I don't know that.
12    Q.  (BY MR. FREEMAN)  Could you look at that
13  signature line and tell me what title appears
14  between -- underneath the signatory?
15      MR. PERRIN:  Objection; form.
16    A.  "Sales."
17    Q.  (BY MR. FREEMAN)  Okay.  And are you familiar
18  with Jane Lin?
19    A.  Yes.
20    Q.  Do you know why Jane Lin is signing a
21  document, representing herself as having a title in
22  sales?
23      MR. PERRIN:  Objection; form.
24    A.  I don't --
25      MS. HARD-WILSON:  Objection; form.

Page 64

1    A.  I don't know for sure.
2    Q.  (BY MR. FREEMAN)  Okay.  Is portion that's
3  highlighted here -- is that your e-mail address?
4    A.  Yes.  I check that e-mail every day.  Yes.
5    Q.  Okay.  Do you get e-mails related to Koolulu?
6    A.  No, but -- no.
7    Q.  Does this refer to products being fulfilled
8  by Koolulu?
9    A.  That's what it says.  That's what it looks
10  like.
11    Q.  Do you understand yourself to have been
12  fulfilling orders on behalf of Koolulu?
13    A.  No.
14    Q.  Do you know what this is referring to?
15    A.  I fulfill orders from restaurant.com.
16    Q.  Okay.  And is this agreement between
17  restaurant.com and koolulu.com?
18    A.  I don't know.  I'm not familiar with this.
19    Q.  Okay.  But you are acknowledging that you
20  have fulfilled inventory purchases from or to
21  restaurant.com?
22      MR. PERRIN:  Objection; form.
23    A.  I receive orders from restaurant.com that I
24  print out and pack and ship, yes.
25    Q.  (BY MR. FREEMAN)  Okay.  So you ship inventory

Page 65

1  that's being purchased by restaurant.com and you ship
2  it to restaurant.com?
3    A.  No.  I receive orders from restaurant.com, I
4  print them out, I pack them, and I ship them to the
5  customers.
6    Q.  So you --
7      (Speaking simultaneously.)
8    Q.  (BY MR. FREEMAN)  Do customers order through
9  restaurant.com?
10    A.  Yes.
11    Q.  And they order your products on their
12  platform?
13    A.  Yes.
14    Q.  Okay.  Do you do any work for koolulu.com?
15    A.  No.
16    Q.  Does Jane Lin do any work for koolulu.com?
17    A.  I don't know.  I would say no.
18      I'm not familiar with that.
19    Q.  Okay.  Is this agreement consistent with your
20  understanding of how Windspeed works?
21      MS. HARD-WILSON:  Objection; form.
22      MR. PERRIN:  Objection; form.
23    A.  I am not familiar with the agreements with
24  the marketplaces.
25    Q.  (BY MR. FREEMAN)  I'm showing you what's

17 (Pages 62 to 65)

Dana Tomerlin  *  March 26, 2021

Page 66

1    marked as Exhibit 11.
2         (Marked Exhibit No. 11.)
3    Q.  (BY MR. FREEMAN) Can you see this document,
4    Ms. Tomerlin?
5         Ms. Tomerlin, can you see --
6    A.  I'm sorry.  I thought you heard me.
7    Q.  All right.
8    A.  Sorry.
9    Q.  What is the date of this document?
10   A.  January 10th, 2019.
11   Q.  Okay.  And whose letterhead does this
12   document have?
13   A.  Windspeed Trading, LLC.
14        MR. PERRIN:  Objection; form.
15   Q.  (BY MR. FREEMAN) And who signed this
16   document?
17   A.  It says "William C. Szeto," is the name
18   written there.
19   Q.  Okay.  And take a look at the document,
20   what's written in the document, and -- and tell me
21   what this document appears to be doing or -- or
22   requesting.
23        MR. PERRIN:  Objection; form.
24   A.  I'm not familiar with this document.
25   Q.  (BY MR. FREEMAN) Okay.  Are you able to read

Page 67

1    it?
2         MR. PERRIN:  Objection; form.
3    A.  "Please close the following three accounts
4    under Acet Global LLC effective immediately.  Thank
5    you."
6    Q.  (BY MR. FREEMAN) Okay.  Was Acet Global, LLC
7    still operating in 2019?
8    A.  I don't know.
9         MS. HARD-WILSON:  Objection; form.
10   A.  I don't know.
11   Q.  (BY MR. FREEMAN) Do you have any idea why
12   William Szeto was directing the closure of its bank
13   accounts in 2019?
14        MS. HARD-WILSON:  Objection; form.
15   A.  I don't know.
16   Q.  (BY MR. FREEMAN) We talked about this a
17   little bit:  Are -- are you familiar with Super G
18   Capital?
19   A.  No.
20   Q.  And not familiar with whether or not it's a
21   lender?
22   A.  I remember hearing the name, but, no, I'm not
23   familiar with that information.
24   Q.  Who -- who do you remember hearing the name
25   from?

Page 68

1    A.  I don't remember exactly.
2    Q.  What do you remember, even if not exactly?
3    A.  I just don't remember.  I remember hearing
4    about Super G.  That's all I...
5         I can't recall.
6    Q.  Do you remember where you were when you heard
7    about Super G?
8    A.  No, I just don't remember exactly.
9    Q.  Okay.  Do you remember if ACET Global had a
10   liability to Super G Capital?
11        MS. HARD-WILSON:  Objection; form.
12   A.  I don't know.
13   Q.  (BY MR. FREEMAN) Do you know -- do you know
14   if ACET Global ever had a liability to Super G
15   Capital?
16        MS. HARD-WILSON:  Objection; form.
17   A.  I don't know.
18   Q.  (BY MR. FREEMAN) Do you know if ACET Global
19   was -- was ever failing financially?
20        MS. HARD-WILSON:  Objection; form.
21   A.  I don't know.
22   Q.  (BY MR. FREEMAN) Did you ever hear anyone
23   talk about ACET Global defaulting on any loans?
24   A.  Not that I can remember.
25   Q.  Did you ever hear anyone at ACET Global ever

Page 69

1    talk about owing Tomer Damti $3.2 million?
2         MR. PERRIN:  Objection; form.
3    A.  Not that I know of.  Not that I remember.
4    Q.  (BY MR. FREEMAN) Did you ever hear anyone at
5    ACET Global ever mention the fact that it never paid a
6    single payment on the note of $3.2 million that it
7    owed to Tomer Damti?
8         MS. HARD-WILSON:  Objection; form.
9    A.  I don't know that, no.
10   Q.  (BY MR. FREEMAN) Did you ever hear anyone at
11   ACET Global ever discuss the fact that it never paid a
12   single payment on the promissory note that it made to
13   Tomer Damti?
14        MS. HARD-WILSON:  Objection; form.
15   A.  I don't know.
16   Q.  (BY MR. FREEMAN) Did you ever hear anyone
17   talk about the fact that Tomer Damti had a lien on the
18   assets of ACET Global?
19        MS. HARD-WILSON:  Objection; form.
20   A.  Not that I remember.
21   Q.  (BY MR. FREEMAN) Okay.  Did you ever hear
22   anyone talk about the fact that ACET Global owed D&T
23   Partners or ACET Venture Partners several million
24   dollars?
25        MS. HARD-WILSON:  Objection; form.

18 (Pages 66 to 69)

Page 70

```
1       A.  No.
2       Q.  (BY MR. FREEMAN)  Did you ever hear anyone
3   talk about the fact that ACET Global failed to ever
4   make a single payment on the several million dollars
5   that it owed to ACET Venture Partners or D&T Partners?
6           MS. HARD-WILSON:  Objection; form.
7       A.  No, I -- I did not -- I don't remember
8   hearing that.
9       Q.  (BY MR. FREEMAN)  Were you aware of that
10  liability?
11      A.  No.  I wasn't involved in any of the
12  financial.
13      Q.  Okay.  No one ever discussed the fact that
14  there was a -- a liability owed of 2- to $3 million to
15  D&T Partners or Tomer Damti or ACET Venture Partners?
16          MS. HARD-WILSON:  Objection; form.
17      A.  Not that I know of.
18      Q.  (BY MR. FREEMAN)  Okay.  Did there ever come a
19  time that Super G Capital foreclosed on ACET Global's
20  inventory?
21      A.  I don't know that.
22      Q.  You were never told that Super G Capital had
23  foreclosed on ACET Global's assets or inventory?
24      A.  Not that I can remember.
25      Q.  Does that seem like something you would
```

Page 71

```
1   remember?
2           MR. PERRIN:  Objection; form.
3       A.  I wasn't aware of the financial situation.
4       Q.  (BY MR. FREEMAN)  Okay.  Ms. Tomerlin, I am
5   placing what's marked as Exhibit 12 on your screen.
6           Can you see this document?
7       A.  Yes.
8           (Marked Exhibit No. 12.)
9       Q.  (BY MR. FREEMAN)  Okay.  Can you tell me --
10  have you ever seen this document?
11      A.  No.
12      Q.  Can you tell me who this document is to?
13      A.  Who it's --
14          MR. PERRIN:  Objection; form.
15      A.  -- to?
16          No.
17      Q.  (BY MR. FREEMAN)  Does it appear to be to ACET
18  Global, LLC?
19          MR. PERRIN:  Objection; form.
20      A.  The beginning of the letter says "ACET
21  Global, LLC."
22      Q.  (BY MR. FREEMAN)  Does that normally indicate
23  who the letter is to?
24          MR. PERRIN:  Objection; form.
25      A.  I don't know.  I don't -- I'm not familiar
```

Page 72

```
1   with this.
2       Q.  (BY MR. FREEMAN)  Ms. Tomerlin, just to be
3   clear, even when someone objects or says "Objection;
4   form," you still have a legal obligation to testify if
5   you know the answer or think you know the answer.
6       A.  Yes.
7       Q.  Okay.  Has -- has anyone instructed you or
8   asked you not to -- not to answer a question if
9   someone objects?
10      A.  No.
11      Q.  Okay.
12          So who does this letter, Exhibit 12,
13  appear to be from?
14      A.  To be from?
15      Q.  Yes, ma'am.
16          MR. PERRIN:  Objection; form.
17      A.  Appears that the -- I'm not sure.  I'm
18  looking at the title -- the top of the page, and it
19  says "Super G."
20      Q.  (BY MR. FREEMAN)  Okay.
21      A.  That's all I see.
22      Q.  Do you -- do you recall ever being told that
23  there was a notice of default, notice of disposition
24  with respect to ACET Global's assets?
25      A.  No.  I don't -- I don't remember -- I don't
```

Page 73

```
1   know that information.
2       Q.  Okay.  Ms. Tomerlin, I'm going to scroll
3   through this document so you can see it.  This will
4   probably be helpful.
5           I'm stopping on a page that's Bates-
6   labeled D&T Partners, LLC 000510, and it's marked at
7   the top, "Exhibit 1," of this Exhibit 12 to this
8   deposition.
9           Do you recognize this document?
10      A.  It looks familiar, like it was some of the
11  inventory that was gathered or listed.
12      Q.  And what do you mean by that?
13      A.  Some of the inventory looks familiar.
14      Q.  How so?
15      A.  On inventory that was sold or I shipped or
16  shipped and packed.
17      Q.  While working at Windspeed?
18      A.  I am not sure.
19      Q.  Okay.  Is that because you generally sold the
20  same inventory at Windspeed that was sold at ACET
21  Global or...?
22          MR. PERRIN:  Objection; form.
23      A.  Some of the same inventory, yes.
24      Q.  (BY MR. FREEMAN)  But you -- you're not sure
25  if you've seen this document or not?
```

Page 74

```
 1      A.  There was an inventory list that we -- we did
 2  formulate an inventory list before, at ACET Global.
 3      Q.  Okay.
 4      A.  Or -- and -- I would -- it looks familiar.
 5      Q.  Okay.
 6      A.  But I can't recall.
 7      Q.  Do you remember receiving all of this
 8  inventory in March of 2019 at Windspeed?  And I'll
 9  scroll through it again so you can see all of them and
10  see the quantities.
11          Do you remember receiving this inventory
12  at Windspeed?
13      A.  Some of them looks like some of the inventory
14  moved from the older warehouse -- or, the other
15  warehouse to the new -- our Windspeed warehouse.
16      Q.  Some of the inventory that was moved --
17      A.  I --
18      Q.  -- to Windspeed in --
19      A.  I --
20      Q.  -- 2018?
21      A.  I recognize some of it as inventory --
22      Q.  Okay.
23      A.  -- that we moved.
24      Q.  Was that the inventory that was mixed in with
25  the existing inventory that you're referring to?
```

Page 75

```
 1      A.  That -- yeah, that this -- there was
 2  inventory we moved from the old warehouse to the
 3  storage unit, to Windspeed Trading; and -- and some of
 4  that, when I'm looking at, looks familiar that was
 5  moved.
 6      Q.  Okay.  Okay.
 7          Do you recognize any of these inventory
 8  numbers or the inventory numbering system?
 9      A.  It looks like an inventory count.
10      Q.  Okay.  Do you recognize any of these types of
11  inventory codes or product numbers?
12      A.  This -- I recognize some, maybe, yes.
13      Q.  Okay.  Do you recognize this item, this Tear
14  of a Fairy Bracelet?  Not really?
15      A.  Yes.  I -- I kind of remember jewelry, yes.
16      Q.  Okay.  Is that an item that you sell at
17  Windspeed, or do you know?
18      A.  I don't know.
19      Q.  Okay.  Again, you don't have much familiarity
20  with the -- Windspeed's Web site?
21      A.  No.
22      Q.  Do you know if it's currently working?
23      A.  I don't know.  I don't believe so.
24      Q.  Do you know what's wrong with it?
25      A.  No.  I -- I'm not sure.  I think it was used
```

Page 76

```
 1  as a reference.  But I didn't use the Web site.  I'm
 2  not familiar.
 3      Q.  Can you tell me what you mean by "used as a
 4  reference"?
 5      A.  I know it was not a -- a functioning site.  I
 6  think it was used for products from, like -- for
 7  descriptions.
 8      Q.  Okay.  When you say "not functioning," did it
 9  just not work?
10      A.  I didn't -- we didn't receive any orders in
11  fulfillment from the site that -- to my knowledge.
12      Q.  Was it just more for marketing?
13      A.  I'm -- I'm not sure.
14      Q.  Okay.  Have you seen any affidavit of Tomer
15  Damti?  Have you been asked to read those?
16      A.  I'm sorry.  I don't understand the question.
17      Q.  Have you been asked to read any affidavits or
18  declarations from Tomer Damti?
19      A.  No.
20      Q.  Okay.  Have you been asked to read any
21  affidavits or declarations from Monica Plaskett?
22      A.  Any affidatas [verbatim]?
23      Q.  Affidavits, like --
24      A.  Oh.  Okay.
25      Q.  -- statements or -- or declarations.
```

Page 77

```
 1      A.  No.
 2      Q.  Who all have you discussed this case with?
 3      A.  I'm sorry, what -- what --
 4      Q.  Who -- who have you -- who have you discussed
 5  this case with?
 6      A.  Bill Szeto informed us of the case, the -- us
 7  here at Windspeed Trading.
 8      Q.  Okay.  What did Bill Szeto say?
 9      A.  He -- he was just explaining there was a
10  lawsuit, and that was all I know of; and then he
11  explained that -- that -- that I was being asked to
12  give a deposition regarding the lawsuit.
13      Q.  Okay.  Did he give you any pointers?
14      A.  No.  He -- he actually just said to just be
15  honest and say what you know, if you know any of the
16  information that they're asking.
17      Q.  Okay.  Did he say to do anything if you
18  didn't know?
19      A.  No.  He just said, "If you know something,
20  yes; if you don't, you don't know."
21      Q.  So he -- he told you, if you didn't know what
22  it was, not to say anything?  Or --
23      A.  No.
24      Q.  -- what did he say?
25          MR. PERRIN:  Objection; form.
```

Usher Reporting Services
(214) 755-1612

Page 78

```
 1        A.  No.  He just explained the deposition.  They
 2   will ask us information; and if we know the
 3   information, to be honest and say the information if
 4   we know the information.
 5        Q.  (BY MR. FREEMAN)  Okay.  Did -- can you
 6   elaborate on exactly what he said?
 7        A.  That --
 8            MS. HARD-WILSON:  Objection; form.
 9            THE WITNESS:  I'm sorry.
10        A.  That was what he said.
11        Q.  (BY MR. FREEMAN)  Okay.  Did he go over what
12   areas you were going to be asked about?
13            MS. HARD-WILSON:  Objection; form.
14        A.  He said they would ask questions that --
15   about the business.
16        Q.  (BY MR. FREEMAN)  About what business?
17        A.  My -- my -- in fulfillment, what I do and
18   every -- all...
19        Q.  What aspects of your business did he tell you
20   were going to ask about?
21        A.  He did not.
22            MS. HARD-WILSON:  Objection; form.
23            THE WITNESS:  Oh.  Sorry.
24        A.  He did not.
25            I asked him what it was regarding, and
```

Page 79

```
 1   he said it was over the lawsuit over their -- a
 2   lawsuit.
 3        Q.  (BY MR. FREEMAN)  Okay.
 4        A.  "And they may ask you questions, this is what
 5   it's about."
 6        Q.  Okay.  Did he tell you any areas you
 7   shouldn't talk about?
 8        A.  No.
 9            MS. HARD-WILSON:  Objection; form.
10        A.  Not that I remember, no.
11        Q.  (BY MR. FREEMAN)  Not that you remember?
12        A.  No.
13        Q.  Is that something you would remember?
14            MS. HARD-WILSON:  Objection; form.
15        A.  What was the question again?
16        Q.  (BY MR. FREEMAN)  If someone had told you not
17   to testify about an area, is that something you would
18   remember?
19            MR. PERRIN:  Objection; form.
20        A.  Yes, I would remember that.
21        Q.  (BY MR. FREEMAN)  So -- so is the answer
22   that -- no?  Is -- is the answer not just no, he
23   didn't tell you -- tell you that?
24            MS. HARD-WILSON:  Objection; form.
25        A.  What was the question again?
```

Page 80

```
 1        Q.  (BY MR. FREEMAN)  I asked you, did he tell you
 2   not to testify about any area.
 3        A.  Oh.  No.
 4            MS. HARD-WILSON:  Objection; form.
 5            MR. FREEMAN:  Can we go off the record
 6   for a couple of minutes?
 7            THE VIDEOGRAPHER:  The time is 4:00 p.m.
 8   and we are off the record.
 9            (Break from 4:00 p.m. to 4:05 a.m.)
10            THE VIDEOGRAPHER:  The time is 4:05 p.m.
11   and we are back on the record.
12            MR. FREEMAN:  Ms. Tomerlin, I want to
13   thank you for taking the time out of your day today
14   and for sitting down with us and -- going through
15   this process.  I know it's not fun.  But you can now
16   say you've sat through a deposition.
17            Unless there are -- before you take deep
18   breaths, I guess there is theoretically a chance that
19   another attorney will want to ask you questions.  I
20   think you're about to be able to get on with your
21   weekend.
22            So I'll pass the witness.
23            MS. HARD-WILSON:  We reserve our
24   questions.
25            Thank you, Dana.
```

Page 81

```
 1            THE WITNESS:  Okay.  Thank you.
 2            MR. PERRIN:  Ed Perrin and the Baymark
 3   defendants reserve their questions as well.
 4            MR. FREEMAN:  Okay.  I think we are
 5   done.
 6            MR. PERRIN:  Which means you're done,
 7   Ms. Tomerlin.  Thank you for your time.
 8            THE WITNESS:  Oh, we done?  Okay.
 9            THE VIDEOGRAPHER:  Sounds good.
10            Before we go off the record, does
11   anybody want a copy of the video or transcript?
12            MR. FREEMAN:  I'm sorry.  I'm -- of the
13   transcript?
14            THE VIDEOGRAPHER:  Yeah.  Yeah.  I guess
15   I'll go with, like, Ms. Hard-Wilson, do you want a
16   copy of the video or transcript?
17            MS. HARD-WILSON:  No, thank you.
18            THE VIDEOGRAPHER:  Mr. Perrin?
19            MR. PERRIN:  The transcript.
20            THE VIDEOGRAPHER:  Transcript.  Perfect.
21            All right.  The time is 4:06 p.m. and we
22   are off the record.
23            (The deposition concluded at 4:07 p.m.)
24
25
```

21 (Pages 78 to 81)

## Page 82

1       WITNESS CORRECTIONS AND SIGNATURE

2      Please indicate changes on this sheet of paper,

       giving the change, page number, line number and reason

3    for the change.  Please sign each page of changes.

4    PAGE/LINE    CORRECTION   REASON FOR CHANGE

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25       DANA TOMERLIN

## Page 83

1       I, DANA TOMERLIN, have read the foregoing

2  deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary

3  Public.

4

5

6      _____

7      DANA TOMERLIN

8  STATE OF T E X A S  *

9  COUNTY OF _____ *

10

       Before me, _____, on

11  this day personally appeared DANA TOMERLIN, known to me, or proved to me under oath or through

12  _____ (description of identity card or other document), to be the person whose name is

13  subscribed to the foregoing instrument and acknowledged to me that they executed the same for the

14  purposes and consideration therein expressed.

15     Given under my hand and seal of office on this, the _____ day of _____, 2021.

16

17

18    _____

       NOTARY PUBLIC IN AND FOR THE

19      STATE OF TEXAS

20  My Commission Expires: _____

21

22

23

24

25  JOB NO. 67301

## Page 84

1       CAUSE NO. DC-19-09828

2

3  D&T PARTNERS, LLC    |  IN THE DISTRICT COURT OF
    (successor in interest   |
    to ACET VENTURE    |

4  PARTNERS, LLC),     |
                  |

5    Plaintiff,       |
                  |

6                 |

7    V.        | DALLAS COUNTY, TEXAS
                 |

8  ACET GLOBAL, LLC;   |
    BAYMARK ACET HOLDCO,  |
    LLC; BAYMARK ACET   |

9  DIRECT INVEST, LLC;   |
    BAYMARK MANAGEMENT,  |

10  LLC; BAYMARK PARTNERS; |
    DAVID HOOK; TONY    |

11  LUDLOW; and WINDSPEED |
    TRADING, LLC,      |

12                 |
    Defendants.   | 116TH JUDICIAL DISTRICT

13

14      REPORTER'S CERTIFICATION
    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF DANA TOMERLIN

15            MARCH 26, 2021

16    I, Mendy A. Schneider, a Certified Shorthand

17  Reporter in and for the State of Texas, hereby certify

18  to the following:

19    That the witness, DANA TOMERLIN, was duly sworn by

20  the officer and that the transcript of the oral

21  deposition is a true record of the testimony given by

22  the witness;

23    That the deposition transcript was submitted on

24  _____, 2021, to the witness, or to the

25  attorney for the witness, for examination, signature,

## Page 85

1  and return to Worldwide Court Reporters, Inc., by

2  _____, 2021;

3    That the amount of time used by each party at the

4  deposition is as follows:

5      MS. HARD-WILSON - 00:00:00

6      MR. FREEMAN - 01:47:18

7      MR. WOODS - 00:00:00

8      MR. PERRIN - 00:00:00

9      MR. MONTGOMERY - 00:00:00

10    That pursuant to information given to the

11  deposition officer at the time said testimony was

12  taken, the following includes counsel for all parties

13  of record:

14      MR. JASON B. FREEMAN, MR. RYAN C. DEAN, AND

    MR. MATTHEW L. ROBERTS, Attorneys for Plaintiff.

15      MS. BRENDA HARD-WILSON AND MR. TIM WOODS,

    Attorney for Defendant WINDSPEED TRADING, LLC.

16      MR. EDWARD P. PERRIN, Jr., Attorney for

    Defendants ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC;

17  BAYMARK ACET DIRECT INVEST, LLC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; and TONY LUDLOW.

18

19    I further certify that I am neither counsel for,

20  related to, nor employed by any of the parties or

21  attorneys in the action in which this proceeding was

22  taken, and further that I am not financially or

23  otherwise interested in the outcome of the action.

24    Further certification requirements pursuant to

25  Rule 203 of TRCP will be certified after they have

Page 86

1    occurred.
2         Certified to by me this ___ day of _____, 2021.
3
4
5
6    _____
     Mendy A. Schneider, CSR NO. 7761
7    Expiration Date: 1-31-2023
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1         FURTHER CERTIFICATION UNDER RULE 203 TRCP
2         The original deposition was _____ was not _____
     returned to the deposition officer on _____,
3    2021.
4         If returned, the attached Corrections and
     Signature page contains any changes and the reasons
5    therefor;
6         If returned, the original deposition was delivered
     to MR. JASON B. FREEMAN, Custodial Attorney;
7
          That $_____ is the deposition officer's charges
8    to the Attorney for Plaintiff, MR. JASON B. FREEMAN,
     TBA# 24069736, for preparing the original deposition
9    transcript and any copies of exhibits;
10        That the deposition was delivered in accordance
     with Rule 203.3, and that a copy of this certificate
11   was served on all parties shown herein and filed with
     the Clerk.
12
          Certified to by me this ___ day of _____, 2021.
13
14
     _____
15   Mendy A. Schneider, CSR NO. 7761
     Expiration Date: 1-31-2023
16
17
18   Worldwide Court Reporters, Inc.
     Firm Registration No. 223
19   3000 Weslayan, Suite 235
     Houston, TX 77027
20   (713) 572-2000
21
22   JOB NO. 67301
23
24
25

23 (Pages 86 to 87)