PLAINTIFF'S
EXHIBIT

6

Page 1

CAUSE NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | ) IN THE DISTRICT COURT ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) |
| | ) DALLAS COUNTY, TEXAS |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) 116TH JUDICIAL DISTRICT |

-----------------------------------

ORAL DEPOSITION OF

JULIE A. SMITH

APRIL 13, 2021

-----------------------------------


    ORAL DEPOSITION OF JULIE A. SMITH, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and -numbered cause

on April 13, 2021, from 1:07 p.m. to 4:42 p.m., before

Larissa L. McPhearson, CSR in and for the State of

Texas, reported by machine shorthand, by Zoom, pursuant

to the Texas Rules of Civil Procedure.

Julie Smith  *  April 13, 2021

---

## Page 2

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Jason B. Freeman
    FREEMAN LAW, PLLC
    7011 Main Street
    Frisco, Texas 75034
    Phone: (214)984-3410
    Fax: (214)984-3409
    E-mail: jason@freemanlaw.com

FOR THE DEFENDANTS, ACET GLOBAL, LLC and BAYMARK:

    Mr. Edward P. Perrin
    HALLETT & PERRIN, PC
    1445 Ross Avenue
    Suite 2400
    Dallas, Texas 75202
    Phone: (214)953-0053
    E-mail: eperrin@hallettperrin.com

FOR THE DEFENDANT, WINDSPEED TRADING, LLC:

    Ms. Brenda Hard-Wilson
    Mr. Tim Woods
    HIGIER ALLEN & LAUTIN, PC
    2711 North Haskell Avenue
    Suite 2400
    Dallas, Texas 75204
    Phone: (972)716-1888
    E-mail: bhard-wilson@higierallen.com
        twoods@higierallen.com

ALSO PRESENT:

    Mr. Anthony Ludlow, ACET Global, LLC
    Mr. Tomer Damti, D&T Partners, LLC

---

## Page 4

INDEX (continued)

15  E-mail, subject: Windspeed/Super G Transaction..91
16  E-mail, subject: Super G/Windspeed - Loan
    Agreement.....................................98

17  E-mail, subject: Super G/Windspeed.............99

18  E-mails, subject: Super G/Windspeed...........105

19  E-mails, subject: Super G/Windspeed...........107

20  E-mails, subject: ACET Inventory as of
    1/24/2019...................................112
21  E-mail, subject: ACET.........................115
22  E-mails, subject: ACET........................115
23  E-mails, subject: Windspeed/Super G - Loan
    Agreement....................................127

24  E-mails, subject: Windspeed/Super G - Loan
    Agreement....................................129
25  E-mails, subject: Windspeed/Super G - Loan
    Agreement....................................132

26  E-mails, subject: Windspeed/Super G - Loan
    Agreement....................................133
27  E-mail, subject: Windspeed/Super G - Szeto
    Signature Pages..............................134

28  E-mails, subject: Windspeed/Super G - Loan
    Agreement....................................136
30  E-mails, subject: ACET........................117

---

## Page 3

INDEX
                     PAGE
Appearances..........................................2
JULIE A. SMITH
    Examination by Mr. Jason B. Freeman..............5

Changes and Signature.............................144

Reporter's Certificate............................145

EXHIBITS

NO.  DESCRIPTION             PAGE IDENTIFIED

1  Letter dated 1/31/19, Re: Notice of
   Disposition and Sale of Collateral................25
2  Foreclosure Sale Agreement........................32
3  E-mails, subject: Damti/ACET......................22
4  E-mails, subject: ACET Newco......................41
5  E-mail, subject: Windspeed - A&R Company
   Agreement.........................................44

6  E-mail, subject: Windspeed - Company Agreement..47

7  E-mail, subject: Windspeed - Warrant Purchase
   Agreement and Warrant.............................49
8  E-mail, subject: Windspeed - Revised WPA and
   Warrant...........................................53

9  E-mails, subject: Windspeed Executed Documents.120

10  E-mail, subject: Super G/Windspeed -
   Foreclosure Sale Agreement.......................54
11  E-mail, subject: Super G/Windspeed -
   Amendment to Loan Agreement......................74

12  E-mails, subject: Schedule a Call.............84

14  E-mails, subject: Super G/Windspeed -
   Amendment to Loan Agreement......................88

---

## Page 5

          (On the record at 1:07 p.m.)

          (Witness sworn)

           JULIE SMITH,

having been first duly sworn, testified as follows:

          EXAMINATION

BY MR. FREEMAN:

    Q.  Ms. Smith, could you state your full name for
the record?

    A.  Julie Anna Smith.

    Q.  Okay.  Ms. Smith, my name is Jason Freeman.  I
represent D&T Partners, LLC which is the successor in
interest to ACET Venture Partners, LLC.  Do you
understand that you're here today in connection with a
lawsuit between D&T Partners, LLC and several other
companies including ACET Global, LLC; Baymark ACET
Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark
Management, LLC; Baymark Partners; David Hook; Tony
Ludlow; and Windspeed Trading, LLC?

    A.  Yes.

    Q.  Ms. Smith, have you ever given a deposition
before?

    A.  No.

    Q.  First time on this side of it?

    A.  Yep, first time on either side of it.

    Q.  You understand that you're under oath today,

---

Usher Reporting Services
(214) 755-1612

Julie Smith   *   April 13, 2021

Page 6

1    correct?
2    A. Yes.
3    Q. Okay. And what does that mean to you?
4    A. That I have to tell the truth.
5    Q. Ms. Smith, just a couple of ground rules. This
6    is actually pretty easy. If I ask a question, if you
7    will just let me complete it before you give an answer
8    just so the transcriptionist can get everything down.
9    And good lead-in there, because if you give an answer,
10   if you will try to give a verbal answer --
11   A. Okay.
12   Q. -- because otherwise it doesn't make it on the
13   transcript. I ask a question that you don't understand,
14   just let me know, and if you need to take a break at any
15   time for anything, just let me know. I will probably
16   just request that you answer the question that's on the
17   table at that time, and then we can take a break anytime
18   you need it.
19   A. Okay.
20        MR. FREEMAN: One -- a couple of
21   housekeeping orders I think for everyone before we jump
22   into the questions. For the defendants, I wanted to put
23   on that we have -- I assume everyone is still in
24   agreement -- we have a running agreement that any
25   objections by any of the defendants' attorneys will

Page 7

1    apply to the other defendants, and I would also like
2    to -- since we've got a few people on this Zoom that are
3    not noticed parties just to have everyone confirm that
4    there's no one else in the room with them during this
5    deposition. Can we have each of the parties without a
6    video just confirm that? Tomer, you -- can you confirm
7    that?
8        MR. DAMTI: Yes, I don't have anybody in
9    here.
10        MR. FREEMAN: Okay. Mr. Ludlow, can you
11   confirm that?
12        MR. LUDLOW: Yes, it's confirmed. No one
13   is with me.
14        MR. FREEMAN: Thank you.
15   Q. Ms. Smith, what is --
16        MR. PERRIN: Jason, before you go on, due
17   to the nature of this deposition, we'd like to have an
18   agreement with you if you can about a standing
19   instruction to the witness that, instead of having us do
20   it each time, that there would be a standing instruction
21   to the witness that, to the extent the answer to a
22   question calls for communications that are
23   attorney-client communications or with other counsel for
24   the same client communications that you're instructed
25   not to include those in your answer. If you have

Page 8

1    communications that are not -- and we'll call those
2    privileged communications -- if you have communications
3    that are not privileged and can -- that are responsive
4    to the question, you may respond to the question with
5    that information. Can we have that agreement?
6        MR. FREEMAN: Ed, well, so here's the
7    problem that I've got with that is I need to know when a
8    privilege is effectively being asserted, and that
9    doesn't sound like that will alert me to it.
10        MR. PERRIN: I hear what you're saying, but
11   if she says I can't answer that without going into
12   privilege, I think it's telling you that. If she has
13   information that is not privileged and she answers it,
14   it's telling you that she does have that information,
15   but you're saying if there's anything else that may be
16   privileged, you want me to assert that on every one?
17        MR. FREEMAN: Yes, or I mean, it's okay if
18   Ms. Smith asserts it; however, you know, whoever asserts
19   it, but I do want to know if something is being
20   withheld, you know, on a basis of privilege.
21        MR. PERRIN: Well, I mean, she can respond
22   with -- if there's privilege, she thinks there's
23   privilege, she can respond without disclosing privileged
24   information, I can say yes. How about that?
25        MR. FREEMAN: Wait. What was that?

Page 9

1        MR. PERRIN: If I can re -- I can -- to the
2    extent I can respond without providing any privilege and
3    then gives her answer. In other words, there's some
4    things she's not going to be able to probably respond to
5    because it's pure privilege, but --
6        MR. FREEMAN: Right.
7        MR. PERRIN: -- but whatever that is, there
8    may have been discussions with other parties or other
9    counsel, for example, other parties that were in the
10   transactions that is not privileged that she can respond
11   to.
12        MR. FREEMAN: Right. Now, I think we just
13   have to -- you know, I mean, I know it's not an easy
14   process, but I think we just have to state that, hey,
15   we're not going -- I'm not going into privileged areas
16   on that, and if it's super sensitive, you know, we may
17   have to ask questions to pin down exactly what the, you
18   know, what privilege or what the scope of that assertion
19   is, but I don't think I can do it on a blanket manner
20   because I don't think that will -- I don't think that
21   will -- if there's something that has to be tested or
22   challenged later, I don't think it will provide the
23   Court with a record to do that.
24        MR. PERRIN: Well, the reason for my idea
25   on the instruction was to make that instruction, and

3 (Pages 6 to 9)

Julie Smith   *   April 13, 2021

Page 10

```
 1    then to the extent she can answer, she would do so.  If
 2    she couldn't do so, she would let you know, I can't,
 3    that's all privileged.
 4              MR. FREEMAN:  I don't think I -- and maybe
 5    I'm not understanding it, Ed, but I don't think I'm in a
 6    position to agree, but I certainly understand if a
 7    privilege is asserted, you know, that's the privilege
 8    holder's right to assert it.
 9              MR. PERRIN:  Well, it -- no, it's the
10    client's right to assert it, so we just have to tell you
11    if it's privileged.
12              MR. FREEMAN:  Right.  The privilege --
13              MR. PERRIN:  We don't have the right to
14    waive it.
15              MR. FREEMAN:  Precisely.  The privilege
16    holder is the client.  It's their the decision, and an
17    attorney has got to assert it unless privileged -- you
18    know, the client tells them they're waiving it.
19              MR. PERRIN:  If I can't have that
20    instruction in the record, then I'm going to have to
21    make it every question.
22              MR. FREEMAN:  Well, you have had no problem
23    objecting to every question thus far.
24              MR. PERRIN:  Oh, I've let a couple slip
25    through.
```

Page 11

```
 1              MR. FREEMAN:  You've let a couple.  I mean,
 2    you let a couple.  You have your -- you're in good moods
 3    some days and not in others, and I know I have that
 4    effect on people.
 5              MR. PERRIN:  Well, then if that's the case,
 6    I need just a minute with the witness to make sure that
 7    we're on the same page.
 8              MR. FREEMAN:  Okay.  That's fine.
 9              (Off the record from 1:14 to 1:16 p.m.)
10              MR. PERRIN:  Jason, we will do that.  You
11    did mention something that you want an answer to a
12    question before you discuss with counsel, but, as you
13    know, the privilege issue and the question about
14    privilege, she's entitled to discuss that prior to her
15    answer, and so if she has a question on that, she may
16    have to ask, and we'll see.
17              MR. FREEMAN:  Sure.
18              MR. PERRIN:  Okay.
19              MR. FREEMAN:  Understood.  We got
20    everything else, or does that cover everything?
21              MR. PERRIN:  At this point, I think so.
22    Q.  Okay.  Ms. Smith, what is successor liability?
23    A.  I normally see it in the context of a transfer
24    of assets or an M&A transaction, but it's where someone
25    assumes liabilities of another party and becomes
```

Page 12

```
 1    successor to those liabilities.
 2    Q.  Okay.  What are the grounds that generally --
 3    what are the grounds that give rise to successor
 4    liability?
 5    A.  I'm not sure I understand what you're asking.
 6    Q.  What are the circumstances in which successor
 7    liability might apply?
 8    A.  Well, as I said, it's normally the result of a
 9    transfer of assets and liabilities, and the transferee
10    may take on some liabilities as a successor to those
11    assets and liabilities.
12    Q.  Okay.  I mean, does that generally come about
13    like as a result of expressly or implicitly assuming
14    those liabilities?
15    A.  I believe it can be both.
16    Q.  Okay.  Are there other -- are there other
17    grounds that might give rise to that liability?
18    A.  I don't know.
19    Q.  Like defrauding creditors?
20    A.  I don't know.
21    Q.  So you don't know if a transaction were
22    intended to defraud creditors if that might give rise to
23    successor liability?
24    A.  I'm a transactional attorney, not a litigation
25    attorney, so I don't -- I'm not going to try to tell you
```

Page 13

```
 1    the elements of fraud.
 2    Q.  Okay.  Is there any relationship between
 3    Baymark Partners and Windspeed Trading, LLC?
 4    A.  Yes.
 5    Q.  What is that relationship?
 6    A.  Baymark is a warrant to potentially acquire
 7    equity interests in Windspeed.
 8    Q.  Okay.  Is there any relationship between
 9    Windspeed Trading, LLC, and Super G Capital, LLC?
10    A.  Super G Capital is a senior lender, secured
11    lender to Windspeed.
12    Q.  Okay.  Any other relationship?
13    A.  Super G, I think, is part of their
14    consideration for the loan also received a warrant.
15    Q.  Okay.  And is there any relationship between
16    Baymark Partners and Super G Capital, LLC?
17    A.  No.
18    Q.  Does Baymark Partners maintain a board member
19    on Windspeed's board of managers?
20    A.  They did when we first did this transaction.  I
21    don't know if there's still one on the board.
22    Q.  Okay.  Are you aware of anyone stepping down
23    from the board or being removed?
24    A.  No.  No.
25    Q.  Does Baymark Partners have a contractual right
```

4 (Pages 10 to 13)

## Page 14

1  to purchase 40 percent of Windspeed for $100?
2      A. Yes.
3      Q. Does Super G maintain a board member on
4  Windspeed board of managers?
5      A. They did back when we originally did the
6  company agreement. I don't know that they do or don't
7  now.
8      Q. Okay. Have you seen anything to indicate that
9  they no longer do?
10     A. No.
11     Q. Does Super G have a contractual right to
12  purchase 40 percent of Windspeed for $100?
13     A. Yes.
14     Q. Did Hallett & Perrin draft the company
15  agreement providing for Baymark Partners and Super G
16  Capital to maintain board members on Windspeed's board
17  of managers?
18     A. Yes.
19     Q. Did Hallett & Perrin draft the warrant purchase
20  agreement that gave Baymark Partners and Super G Capital
21  the contractual right to purchase 40 percent each of
22  Windspeed for $100?
23     A. Yes.
24     Q. Were both documents drafted in 2018?
25     A. Yes.

## Page 15

1      Q. And signed in 2018?
2      A. Yes.
3      Q. Did Tony Ludlow serve on the board of managers
4  of Windspeed Trading, LLC?
5      A. When those documents were signed, yes.
6      Q. Okay. And so he was first named in that
7  position in 2018?
8      A. Yes.
9      Q. To your knowledge, has he ever been removed
10  from that position?
11     A. Not to my knowledge.
12     Q. Okay. To your knowledge, has he ever stepped
13  down from that position?
14     A. Not to my knowledge.
15     Q. Do you understand a manager serving on a board
16  of managers to have a fiduciary duty to that entity?
17     A. In certain instances.
18     Q. Okay. Is a fiduciary duty a result of a legal
19  relationship?
20     A. I'm not sure I understand.
21     Q. Okay. Does a fiduciary duty arise out of a
22  legal relationship?
23         MR. PERRIN: Objection, form.
24         If you can answer it, answer it. It's an
25  objection, but you can answer it.

## Page 16

1         THE WITNESS: Okay.
2      A. I'm sorry, repeat the question.
3      Q. Does a fiduciary duty, does that arise out of
4  the relationship between the fiduciary and the party to
5  whom that runs?
6         MR. PERRIN: Objection, form.
7      A. Yes, so a fiduciary relationship is -- occurs
8  within a relationship between a fiduciary and the
9  beneficiary fiduciary duty.
10     Q. Okay. And then would you understand a manager
11  serving on a board of managers to have a legal
12  relationship with that entity?
13         MR. PERRIN: Objection, form.
14     A. Yes, it has a legal relationship with that
15  entity.
16     Q. Why was the foreclosure -- in this transaction
17  or set of transactions at issue in this case, why was
18  the foreclosure important?
19     A. To whom?
20     Q. To any of the parties.
21     A. Well, I can't speak for Super G or Windspeed,
22  but for ACET Global, it was an opportunity to eliminate
23  half a million dollars of debt.
24     Q. Okay. So ACET Global wanted this transaction
25  to occur?

## Page 17

1      A. Well, no, I don't -- no, I don't know about
2  that. It was occurring whether or not ACET wanted it to
3  or not.
4      Q. Okay. Why did Baymark Partners believe that
5  the foreclosure was important?
6      A. I don't know that they thought it was
7  important. Again, this was something that was being
8  done.
9      Q. Okay.
10     A. ACET Global didn't really have a say in this.
11     Q. Who did have a say in it?
12     A. Super G.
13     Q. Only Super G?
14     A. Yes.
15     Q. Was this a contentious event?
16         MR. PERRIN: Objection, form.
17     A. Well, no one was happy.
18     Q. And what do you mean by that?
19     A. Well, I'm only speculating, but Super G wasn't
20  happy to have a nonperforming loan, ACET wasn't happy at
21  getting foreclosed upon.
22     Q. What about Baymark?
23     A. I feel confident Baymark wasn't happy that
24  their investment wasn't doing well.
25     Q. And what about Windspeed?

5 (Pages 14 to 17)

Page 18

1    A. I don't know what Windspeed was thinking.
2    Q. Okay. Why was the bankruptcy of ACET Global
3  important?
4    A. I don't know. I wasn't involved in the
5  bankruptcy.
6    Q. No involvement in that?
7    A. Correct.
8    Q. Okay. At the time of the foreclosure, did
9  anyone inform you that the inventory of ACET Global had
10  already been transferred to Windspeed's possession?
11    A. No, no that I recall.
12    Q. Did anyone inform you that Windspeed had
13  already been engaged in the sale of that inventory?
14    A. Not that I can recall.
15    Q. That Windspeed was already engaged in the sale
16  of that inventory in 2018?
17    A. I don't have any knowledge of that.
18    Q. Did anyone inform you that Windspeed was
19  already actively using ACET Global's assets?
20    A. Not to my knowledge.
21    Q. Would that knowledge have changed your view
22  about whether a foreclosure was proper?
23    MR. PERRIN: Objection, form.
24    A. No. Well, it's not my place to determine
25  whether or not a foreclosure was proper.

Page 19

1    Q. Okay.
2    A. That's Super G's place.
3    Q. Okay. Was there a conflict of interest in the
4  representation of Baymark Partners' and ACET Global's in
5  this transaction?
6    A. Which transaction?
7    Q. Well, let's talk about in the foreclosure
8  process with any of the clients that you represented or
9  that Hallett & Perrin represented. Was there a conflict
10  of interest?
11    A. No.
12    Q. So then was there not a -- was there any waiver
13  of conflict of interest?
14    A. Not with respect to any work that Hallett &
15  Perrin did.
16    Q. Okay. And Hallett & Perrin didn't seek a
17  waiver of conflict of interest from ACET Global?
18    A. No. We were representing ACET Global.
19    Q. Okay. Was David Hook the President of ACET
20  Global?
21    A. Yes.
22    Q. Okay. Was Bill Szeto the President of ACET
23  Global?
24    A. No. I think he was a CEO.
25    Q. Okay. Was Anthony Ludlow the President of ACET

Page 20

1  Global?
2    A. I don't remember. I think it was David as
3  President and Tony was a Vice President, but I don't
4  recall exactly.
5    Q. Okay. What other attorneys at Hallett & Perrin
6  have worked on this matter, and by that, I mean the
7  Baymark Partners' transaction involving ACET Global?
8    A. You mean the acquisition of it or --
9    Q. The acquisition or disposition.
10    MR. PERRIN: Objection, form.
11    THE WITNESS: Do I answer it anyway?
12    MR. PERRIN: Yeah.
13    A. So Gordon Foote, who was an attorney here,
14  handled the original acquisition of ACET Ventures by
15  Baymark or by ACET -- Baymark ACET Holdco.
16    Q. Okay.
17    A. I think Cassandra Foster, another attorney, did
18  some of the finance work with the loan modifications, et
19  cetera, with Super G.
20    Q. Okay.
21    A. I handled the fore -- ACET's interest with
22  respect to the foreclosure agreement. There may have
23  been associates that worked on the acquisition
24  transaction. I wasn't involved in that.
25    Q. Okay.

Page 21

1    A. And I don't recall that I had any associates
2  involved in the foreclosure piece of it.
3    Q. Okay.
4    A. And obviously the Hallett & Perrin attorneys on
5  this litigation.
6    Q. Okay. Who have you represented out of the
7  following parties, or who has Hallett & Perrin
8  represented: Super G Capital, LLC?
9    A. No.
10    Q. Windspeed Trading, LLC?
11    A. No.
12    Q. ACET Global, LLC?
13    A. Yes.
14    Q. Baymark ACET Holdco, LLC?
15    A. Yes.
16    Q. Baymark ACET Direct Invest, LLC?
17    A. Yes.
18    Q. Baymark Partners?
19    A. Yes.
20    Q. Baymark Management, LLC?
21    A. Yes.
22    Q. Baymark Partners Management, LLC?
23    A. Yes.
24    Q. David Hook?
25    A. I'm not sure I represented him personally. I

6 (Pages 18 to 21)

Julie Smith   *   April 13, 2021

Page 22

1    think I represented the entities.
2        Q. Okay. And what about Tony Ludlow?
3        A. Same.
4        Q. Okay. And when did your representation of
5    these parties start?
6        A. We would have represented ACET Holdco and ACET
7    direct invest and its acquisition of ACET Ventures. I
8    guess it's ACET Global also is the company acquiring it.
9    And then to the extent that they would have needed legal
10   services through the years, we may or may not have been
11   involved with that. ACET Global may have gone to other
12   counsel for advice through the years, and then we got
13   involved again -- or I got involved in the foreclosure
14   sale.
15       Q. Okay. And I guess has that representation ever
16   stopped, or has it just -- there's nothing that's
17   brought it to a close, right?
18       A. No. I don't think we did that much work for
19   them, but it -- I think it was just an open engagement
20   that wasn't needed very often.
21       Q. Okay. Were you -- I'll show you Exhibit 3.
22           (Exhibit No. 3 marked.)
23       Q. I'll put it on the screen. Were you involved
24   with Tomer Damti's lawsuit against ACET Global? This
25   was an employment lawsuit.

Page 23

1        A. I know that Tomer Damti's employment was
2    terminated and that there was a suit involved, but I was
3    not involved in the representation.
4        Q. Okay.
5        A. Again, I'm a transactional attorney.
6        Q. Okay. Well, there's this -- so this attorney
7    -- or this Exhibit 3, there's an attorney at your
8    office, David Hammack, and it looks like you're cc'd on
9    some correspondence relating to this with Mr. Damti's
10   attorney, Jon Patton.
11           MR. PERRIN: Jason, I'm don't want to
12   interrupt you here, but this is not the Exhibit 3 we've
13   got. Is that what you've got, Brenda, that was
14   forwarded? What we've got as Exhibit 3 is -- it comes
15   up, but it's --
16           MR. FREEMAN: It's not this?
17           MR. PERRIN: Well, for some reason, it
18   comes up saying your file is not working, and then it
19   says --
20           MR. FREEMAN: That's not good.
21           MR. PERRIN: -- but when I click on it, it
22   comes up, it says it cannot open because it's not
23   supported by file type or it's been damaged. Now, when
24   I do -- on your second batch, they come up, so I'm not
25   sure what's happening here.

Page 24

1            MR. FREEMAN: The first batch didn't? All
2    right. Let me do this, let me go off the record,
3    double-check that, and we'll get those over to you. It
4    sounds like there's some sort of corruption problem with
5    the files.
6            MR. PERRIN: That'll be helpful.
7            MR. FREEMAN: All right.
8            (Break taken from 1:32 p.m. to 1:37 p.m.)
9            MR. FREEMAN: Okay. We'll go back on the
10   record.
11       Q. Ms. Smith, this was an e-mail. This Exhibit 3
12   is an e-mail. It should show up on your screen. It was
13   from David Hammack to Jon Patton and cc'd several
14   individuals, including yourself. The subject line is
15   Damti/ACET. Do you see that?
16       A. Yes.
17       Q. And do you know why you were copied on this
18   e-mail?
19       A. Can you show me the bottom of the page so I can
20   read up?
21       Q. Yes, ma'am.
22       A. Keep going. That's fine. I assume that I was
23   copied on it because I'm the transactional attorney that
24   handles ACET stuff.
25       Q. Okay. But not involved in the dispute, really?

Page 25

1        A. No.
2        Q. Okay. So I'll also show you what's marked as
3    Exhibit 1 to this deposition.
4            (Exhibit No. 1 marked.)
5        Q. Do you see this document on your screen?
6        A. The Super G Capital letter?
7        Q. Yes, ma'am.
8        A. Yes.
9        Q. And are you familiar with this document?
10       A. Is this the foreclosure notice?
11       Q. Yes, ma'am.
12       A. Yes.
13       Q. Okay. Does it say that it's a notice of
14   disposition and sale of collateral?
15       A. In the Re line?
16       Q. Yes, ma'am.
17       A. Yes.
18       Q. Is it dated January 31st, 2019?
19       A. Yes.
20       Q. To ACET Global, LLC?
21       A. Yes.
22       Q. And the attention of David J. Hook?
23       A. Yes.
24       Q. Okay. And we scroll down below. Is there a cc
25   to you, Julie Smith, of Hallett & Perrin, PC?

Julie Smith   *   April 13, 2021

Page 26

1    A. Yes.
2    Q. Okay. And is that, in fact, you?
3    A. Yes.
4    Q. In receiving this notice, who were you
5  representing?
6    A. ACET.
7    Q. Okay. And why were you copied on this letter?
8    A. Because they were sending out a foreclosure
9  notice that they were foreclosing on our assets.
10    Q. Okay. And did you receive a copy of this
11  letter by mail?
12    A. Possibly.
13    Q. Okay. Does this -- is this a -- in fact, a
14  true and correct copy of the letter that was sent by
15  Super G?
16    A. I have no reason to believe it isn't.
17    Q. Okay. Did you discuss this letter with Super G
18  counsel?
19    A. Yes.
20    Q. Okay. Did you --
21        MR. PERRIN: Jason, excuse me, what exhibit
22  number is this? We've now got the new exhibit, so --
23        MR. FREEMAN: 1.
24        MR. PERRIN: Exhibit 1.
25        Is this something you'd be able to look at

Page 27

1  in here?
2        THE WITNESS: It should be.
3    A. All right. I have it.
4    Q. Okay. And did you discuss this letter with
5  Super G counsel?
6    A. Yes.
7    Q. And did you discuss this letter with Super G
8  counsel prior to receiving it?
9    A. Yes.
10    Q. What was the nature of that discussion?
11    A. They were instituting the rights to foreclose
12  under the security and loan -- loan and security
13  agreement.
14    Q. Okay. And when did you have those discussions?
15    A. It would have been around the end of the year,
16  I think.
17    Q. Okay. Around the end of 2018?
18    A. Yes.
19    Q. December 20 -- how many discussions were
20  there?
21    A. Not a ton.
22    Q. Okay. Like two or three or --
23    A. Yes, probably two or three.
24    Q. Okay. And who were those with?
25    A. Brian Vanderwoude is who, I guess, they would

Page 28

1  be with.
2    Q. Okay. Were they with anyone else?
3    A. My client.
4    Q. Okay. And who was that?
5    A. ACET.
6    Q. Okay. And anyone else?
7    A. Not that I recall.
8    Q. Okay. What topics would be discussed?
9    A. I'm not sure I understand.
10    Q. What topics during those discussions would be
11  discussed?
12    A. The discussions on the notice.
13        MR. PERRIN: Are you asking about with
14  Mr. Vanderwoude or with the clients?
15        MR. FREEMAN: Mr. Vanderwoude.
16    A. I think the discussions primarily involved
17  around ensuring that we were -- I think the discussions
18  primarily revolved around the statutory obligations and
19  rights.
20    Q. Okay. Whose statutory obligations?
21    A. Well, I guess Super G's, but also to make sure
22  that, you know, ACET wasn't -- was -- was exercising
23  what limited rights it might have.
24    Q. Okay. What limited rights did it have?
25    A. Virtually none, frankly.

Page 29

1    Q. Okay. Were there discussions about anything
2  else?
3    A. Such as?
4    Q. You know, anything else related to the
5  forfeiture.
6        MR. PERRIN: Objection, form.
7    A. Discussions with Brian Vanderwoude?
8    Q. Yes, ma'am.
9    A. Yeah, we discussed the foreclosure sale
10  agreement, we discussed the notice letter and who it
11  would need to be sent to.
12    Q. Okay. Is that all you remember?
13    A. Yes.
14    Q. Okay. Why did you -- why did y'all discuss the
15  foreclosure sale agreement at this time?
16    A. They had the right of the loans to the
17  agreement to foreclose, and we had the obligation to
18  help them with that, not compete it.
19    Q. Okay. Now, was ACET Global going to purchase
20  the assets?
21    A. No. ACET Global was being foreclosed upon. We
22  would not have been able to purchase them.
23    Q. Was ACET Global selling the assets?
24    A. No.
25    Q. Why was ACET Global engaged in the discussion

Usher Reporting Services
(214) 755-1612

Julie Smith   *   April 13, 2021

---

Page 30

1  about a foreclosure sale agreement?
2      A. Because we wanted to make sure that the half a
3  million dollar loan we had with Super G was forgiven as
4  part of this process.
5      Q. Okay.
6      A. A big (indiscernible).
7      Q. Okay.  And how did the foreclosure sale
8  agreement accomplish that?
9      A. The buyer agreed to assume the note --
10     Q. Okay.
11     A. -- the basic note.
12     Q. Who was the buyer?
13     A. Windspeed.
14     Q. Okay.  This January 31st, 2019, letter from
15 Super G, it's reflected on Exhibit 1, was this sent to
16 Tomer Damti?
17     A. I believe it was.
18     Q. Okay.  And why was it sent to Tomer Damti?
19     A. I think to see if he would be interested in
20 acquiring the assets.
21     Q. Okay.
22     A. To make sure he knew about the foreclosure and
23 he could exercise his rights as -- to purchase the
24 assets, if he so chose.
25     Q. Okay.  Did you discuss with Mr. Vanderwoude

---

Page 31

1  whether Tomer Damti would likely seek to purchase the
2  assets?
3      A. I don't recall if I spoke with him about that.
4      Q. Okay.  Don't recall any discussions regarding
5  that topic?
6      A. No.  No.
7      Q. Did you believe it was likely that Mr. Damti
8  would try to seek to purchase the assets?
9      A. I didn't have an opinion about that.
10     Q. Okay.  Who did you believe would actually
11 acquire the assets?
12     A. I think that, due to the foreclosure sale
13 process, it appeared that Windspeed would be the one
14 that wanted to do that.
15     Q. Okay.  And were you involved at all in drafting
16 this notice of disposition and sale of collateral?
17     A. I didn't draft it.  I was involved in it and
18 then I read it and reviewed it.  I was not the -- I did
19 not initially draft it.
20     Q. Okay.  Did you offer suggested revisions to the
21 document?
22     A. Not meaningful ones, if I did.
23     Q. Okay.  Did you provide any other input about
24 the content of this document?
25     A. I don't remember doing so.

---

Page 32

1      Q. Okay.  Besides this particular matter, have you
2  ever been involved in reviewing a foreclosure notice?
3      A. No.
4      Q. A foreclosure notice to your client?
5      A. No.
6      Q. So this is the only time that you've done that?
7      A. For ACET, yes.
8      Q. Okay.  Let me show you what's marked as
9  Exhibit 2, Ms. Smith.
10         (Exhibit No. 2 marked.)
11     Q. Are you familiar with this document?
12     A. Yes.
13     Q. Okay.  And what is this?
14     A. The foreclosure sale agreement between
15 Windspeed and Super G.
16     Q. Okay.  Is it dated March 1st, 2019?
17     A. Yes.
18     Q. And it's between Windspeed Trading as the buyer
19 and Super G Capital as the seller?
20     A. Yes.
21     Q. Okay.  Was anyone else a party to this
22 document, that you recall?
23     A. No.  It's a two-party agreement.
24     Q. Okay.  Just between Windspeed and Super G?
25     A. Yes.

---

Page 33

1      Q. Okay.  And do you represent either of those
2  parties?
3      A. No.
4      Q. Okay.  Look to page 12 of this document,
5  Ms. Smith.  You're listed as, under the notices
6  paragraph, as the notice attorney for notices to
7  Windspeed Trading.
8         MR. PERRIN:  Objection, form.
9      Q. Is that you?
10     A. Yes, that's me.
11     Q. Okay.  And for this notice, who are you
12 representing?
13     A. Baymark.
14     Q. Okay.  Were you involved in drafting this
15 document?
16     A. I reviewed the document.
17     Q. Okay.  Did you offer any suggested revisions?
18     A. Yes.
19     Q. Red-lines?
20     A. Yes, if I had offered any revisions, I would
21 have red-lined them.
22     Q. Okay.  So you engaged in drafting and revisions
23 with other attorneys?
24     A. Yes.
25     Q. Who else was involved?

---

Usher Reporting Services
(214) 755-1612

Page 34

1      A. Brian Vanderwoude for Super G and Alex Szeto
2   with Bill Szeto.
3      Q. Okay. And when did you first begin drafting
4   this document?
5      A. I think I got the initial copy of it in the
6   middle of December.
7      Q. Okay. December 2018?
8      A. Correct.
9      Q. Okay. And again, this document is dated
10   March 1st, 2019 --
11      A. Yes.
12      Q. -- is that right? When was this document
13   actually signed?
14      A. I believe the end of March, to be effective as
15   of March 1st.
16      Q. Okay. So does it reflect a date that was
17   earlier than the date it was actually executed?
18      A. Does the document reflect a date that was
19   earlier than the day it was executed?
20      Q. Yes, ma'am.
21      A. Yes.
22      Q. And was that done intentionally?
23      A. Yes.
24      Q. And so why is it backdated?
25          MR. PERRIN: Objection, form.

Page 35

1      A. I went on maternity -- family medical leave
2   right about this time, and I think it got kind of lost
3   in the shuffle. I adopted two children, and I kinda was
4   out very quickly and without anybody's forewarning. It
5   got lost in the shuffle, and when I came back, we
6   finalized the execution of it.
7      Q. Okay. Other than this transaction, have you
8   ever backdated a document?
9          MR. PERRIN: Objection, form.
10      A. Yes.
11      Q. Okay. Is that a standard practice?
12      A. I don't know about standard, but it's certainly
13   not uncommon.
14      Q. At Hallett & Perrin?
15      A. Anywhere.
16      Q. What other firms have you worked at?
17      A. Gibson Dunn & Crutcher.
18      Q. Okay. And in your experiences that backdating
19   is a standard practice?
20          MR. PERRIN: Objection, form.
21      A. I don't know that I would say standard, but
22   it's not uncommon.
23      Q. Okay.
24      A. A lot of deals that we do, we're working with
25   other attorneys representing the other side, it's not

Page 36

1   uncommon to backdate something.
2      Q. Okay. And when we refer to backdating, I'm not
3   referring to effective dating where it's made clear that
4   it's signed after the fact but made effective as of an
5   earlier date. I'm referring to reflecting a date that's
6   earlier than it's actually signed and executed. Is that
7   what you mean as well?
8      A. I -- say that again. I'm not sure I understood
9   you.
10      Q. When you say -- you know, when you say many
11   firms engage in backdating, are you referring to
12   effective dating, or are you referring to backdating?
13      A. I see those as the same thing. I mean, I think
14   the better way to do it is to date it effective as of,
15   but that doesn't always happen that way. I don't think
16   it changes the intent.
17      Q. Okay. Why was the date of this transaction
18   important?
19      A. I don't know that it was.
20      Q. Okay. So why not use the actual date?
21      A. I don't know.
22      Q. Okay. The document states that the debtor
23   currently owes the seller the sum of 516,844.86. I'll
24   take you to the page reflecting this. Where did you
25   obtain this figure?

Page 37

1      A. I think Super G.
2      Q. Super G provided it?
3      A. Uh-huh.
4      Q. Okay. And you represented ACET Global?
5      A. Yes.
6      Q. Okay. And did you represent Baymark ACET
7   Holdco as well?
8      A. Yes.
9      Q. Okay. So you ultimately represented the
10   company that was foreclosed upon in this set of
11   transactions, correct?
12      A. Yes.
13      Q. Were you involved in the formation of
14   Windspeed?
15      A. No.
16      Q. No --
17      A. It was a formed company.
18      Q. Okay. Did you assist in drafting the operating
19   agreement?
20      A. I amended and restated the company agreement.
21      Q. So did you draft the amended and
22   restated company agreement?
23      A. I took the initial draft and then we all
24   negotiated and drafted it --
25      Q. Okay. And who is --

Page 38

1  A. -- all three parties.
2  Q. Who is all three parties?
3  A. Super G, Windspeed, and Baymark.
4  Q. Okay. Were you involved in drafting the
5  warrant purchase agreements?
6  A. Yes.
7  Q. Okay. And did Hallett & Perrin, in fact, draft
8  those warrant purchase agreements?
9  A. We did the initial draft which, again, was
10 circulated to everyone for comment and revision.
11 Q. And did Hallett & Perrin also draft the
12 warrants themselves?
13 A. Yes, same.
14 Q. Okay. So all of that is Hallett & Perrin
15 drafted the amended and restated company agreement of
16 Windspeed Trading, LLC, correct?
17 A. Yes.
18 Q. And Hallett & Perrin drafted the warrant
19 purchase agreements with respect to Windspeed Trading,
20 LLC?
21 A. Yes.
22 Q. And the warrants?
23 A. Yes. But to be clear, it was a tri-party
24 effort. All three attorneys were involved in this
25 process. I took the initial stab at it, but each

Page 39

1  attorney and each side had comments and revisions to it.
2  Q. Okay.
3  A. And it was negotiated among all three.
4  Q. Well, who was Hallett & Perrin representing in
5  this process?
6  A. With the Windspeed company agreement and
7  warrants?
8  Q. Yes, ma'am.
9  A. Baymark.
10 Q. Is that Baymark Partners?
11 A. Yes.
12 Q. Okay.
13 A. Baymark Partners Management or -- yeah, Baymark
14 Partners Management, I think.
15 Q. Is that who it's billed under?
16 A. I think so, yeah.
17 Q. Okay. Who informed you of Windspeed?
18     MR. PERRIN: I would instruct the witness,
19 to the extent this calls for attorney-client
20 communications that -- privileged communications, if you
21 can answer that without going into privileged
22 communications, you may.
23 A. My client.
24 Q. Okay. And who was that?
25 A. What person?

Page 40

1  Q. Yes, ma'am.
2  A. It would either have been Matt Denegre or Tony
3  Ludlow.
4  Q. Okay. What about Mr. Hook?
5  A. I don't recall him being involved.
6  Q. Mr. Szeto?
7  A. No, he wasn't my client.
8  Q. Or Steven Bellah?
9  A. Definitely not my client.
10 Q. Okay. And what was Windspeed's relationship to
11 ACET Global?
12 A. None, that I'm aware of.
13 Q. What did you understand to be the purpose of
14 forming Windspeed Trading?
15 A. I have no idea.
16 Q. Did you understand it to be the ACET Newco?
17 A. No.
18 Q. Was it formed for the purpose of acquiring
19 ACET's assets?
20     MR. PERRIN: Objection, form.
21 A. I don't know why it was formed.
22 Q. Of continuing ACET's business?
23 A. I wasn't part of those discussions.
24 Q. Okay. Ms. Smith, I'm going to put on the
25 screen what's marked as Exhibit 4.

Page 41

1  (Exhibit No. 4 marked.)
2  Q. Can you see this document?
3  A. Uh-huh.
4  Q. And are you familiar with this exhibit?
5  A. No.
6  Q. Okay. Does this on top appear to be an e-mail
7  from Matt Denegre to Tony Ludlow?
8  A. It appears to be.
9  Q. Okay. And appear to be dated on October 7th,
10 2018?
11 A. Yes.
12 Q. Okay. And is the subject line ACET Newco?
13 A. Yes.
14 Q. What did you understand that to mean?
15 A. I wasn't a party to this e-mail.
16 Q. Okay. Have you ever referred to Windspeed as
17 the ACET Newco?
18 A. Not to my knowledge.
19 Q. Okay. And what does Mr. Denegre say here? It
20 says, these are the formation documents for ACET Newco
21 that Bill had his son draft up no charge which I can
22 send to Julie. Bill's son is an M&A attorney. The
23 operating agreement will certainly have changes and may
24 be a complete redo.
25     Did I read that correctly?

11 (Pages 38 to 41)

Julie Smith   *   April 13, 2021

Page 42

1      A. Yes.
2      Q. Okay.  Are you the Julie he's referring to
3  here?
4      A. I assume so.
5      Q. And did you redo the operating agreement?
6      A. I did.
7      Q. And who paid for your fees to draft the
8  operating agreement for Windspeed Trading?
9      A. Baymark.
10      Q. Okay.  And Baymark Partners?
11      A. Yes.
12      Q. Okay.  And was it a complete redo?
13      A. I think it was.
14      Q. Okay.  And what changes did you make to this
15  document that was attached?
16      A. Well, as I recall, it was set up -- I haven't
17  looked at the document since that time, but I think it
18  was set up as a single member LLC which is a pretty
19  limited company agreement, and we needed it to be a
20  company agreement among three parties, so we needed to
21  add board positions, transfer rights and restrictions,
22  that kind of stuff.
23      Q. Okay.  Why were those changes made?
24      A. Well, when you have a single member LLC, the
25  company agreement is very straightforward and very

Page 43

1  simple, five, ten pages because you're the sole member,
2  you're not having to negotiate anything with anybody.
3  When you start bringing in additional members into an
4  LLC, there are provisions that you need to negotiate
5  amongst yourselves about how the company will be
6  governed, all of that stuff within the company
7  agreement.
8      So it's not at all any -- it's very normal
9  that when a company goes from a single member LLC to one
10  with multiple members that you have to revise the
11  company agreement to reflect the rights and obligations
12  of the members among themselves.
13      Q. Okay.
14      A. You don't have to do that in a single member
15  LLC because there's nobody else but one member.
16      Q. Who did you discuss those changes with?
17      A. Alex Szeto who was representing Windspeed, and
18  then I don't think Super G had attorneys at that point.
19  I think it was Bellah.
20      Q. Okay.
21      A. Yeah.
22      Q. Okay.  And who had requested the changes?
23      A. I don't know who I -- I'm not sure
24  anybody requested them.  I think it might have just been
25  known that they needed to be made.  I don't know who

Page 44

1  requested it specifically.
2      Q. Okay.  How many drafts were there of the
3  Windspeed -- Windspeed's amended and restated company
4  agreement?
5      A. I'm not sure.  Maybe four or five.  I don't
6  remember.
7      Q. Okay.  Ms. Smith, I'll show you what's marked
8  as Exhibit 5.
9          (Exhibit No. 5 marked.)
10      Q. Do you know this document?
11      A. Yes.
12      Q. And is this an e-mail from you?
13      A. Yes.
14      Q. And it's to Matthew Denegre, William Szeto, and
15  Alex Szeto?
16      A. Yes.
17      Q. On October 17th, 2018?
18      A. Yes.
19      Q. And subject line is Windspeed A&R Company
20  Agreement?
21      A. Yes.
22      Q. Okay.  And below, do you state, attached is a
23  draft of the amended and restated company agreement for
24  Windspeed Trading, L -- PL -- excuse me, LLC; is that
25  correct?

Page 45

1      A. Yes.
2      Q. At this time, did you believe that Windspeed
3  would acquire the assets of ACET Global?
4      A. I don't -- yeah, I don't recall.
5      Q. Okay.  Who gave you instructions about the
6  company agreement?
7      A. Baymark.
8      Q. Okay.  Is that Baymark Partners?
9      A. Yes.
10      Q. Okay.  And was it Baymark Partners that told
11  you the provisions they wanted in it?
12      A. I think it was Baymark Partners Management that
13  executed this company agreement.
14      Q. Okay.  So who was it that gives you the -- gave
15  you the instructions about what they wanted in it?
16      A. Matt Denegre and Tony Ludlow.
17      Q. Okay.  And when they interact with you, who are
18  they generally interacting on behalf of?
19      A. In this instance, Baymark Partners Management.
20      Q. Okay.  Did you discuss this agreement with
21  Super G Capital?
22      A. I must have, yes.
23      Q. Okay.  Was this agreement actually negotiated?
24      A. Yes.
25      Q. Okay.  What were you trying to accomplish with

12 (Pages 42 to 45)

Page 46

1  this agreement?
2      A. Well, as I said before, it was -- we were
3  having to revise a single member LLC agreement to
4  contemplate more than one member, so we were trying to
5  just outline the rights and responsibilities of each of
6  the members.
7      Q. Okay. How did this agreement advance the
8  interests of ACET Global, LLC?
9      A. I don't think ACET Global had anything to do
10  with this.
11      Q. So this didn't protect the interests of ACET
12  Global?
13          MR. PERRIN: Objection, form.
14      A. No.
15      Q. Okay. In this agreement itself, there's a
16  provision 3.2 that provides for no control by members.
17  Do you see that on the screen?
18      A. I do.
19      Q. Why was there a provision for no control by
20  members?
21      A. It's a very standard provision in a company
22  agreement. The TBOC allows managers or members to
23  control the company. In this instance, we had a board
24  of managers who wanted to make it clear that the members
25  did not have control.

Page 47

1      Q. Okay. And so on that board of managers, you
2  provide for the appointment or entitlement to appoint
3  one manager of the board of direct -- of managers known
4  as the Baymark manager?
5      A. Yes.
6      Q. Okay. And did you also provide Super G with
7  entitlement to appoint one manager to the board of
8  managers who would be known as the Super G manager?
9      A. Yes.
10      Q. Okay. Are those --
11      A. Szeto also was a -- had a manager on the board.
12      Q. Right. Are those common provisions?
13      A. Yes.
14      Q. Okay. It's the kind of thing that Hallett &
15  Perrin does every day?
16      A. In company agreements?
17      Q. Uh-huh.
18      A. Yes. Very common to set up a board of managers
19  in a company agreement.
20      Q. Okay. Ms. Smith, I'll show you what's marked
21  as Exhibit 6.
22          (Exhibit No. 6 marked.)
23      Q. And do you recognize this document?
24      A. Yes.
25      Q. Okay. And is this an e-mail from you to

Page 48

1  Matthew Denegre, William Szeto, and Alex Szeto?
2      A. Yes.
3      Q. Okay. And does it state the subject line,
4  Windspeed Company Agreement?
5      A. Yes.
6      Q. Okay. And attached to it, are there several
7  documents that you had drafted or Hallett & Perrin had
8  drafted?
9      A. I believe it probably was a Word version of a
10  clean document and a red-line showing the changes made
11  to the previous version.
12      Q. Okay. Okay. And Ms. Smith, can you see what's
13  marked as Exhibit 7?
14      A. I don't see it marked as Exhibit 7, but I see
15  something on your screen.
16      Q. Well, let me ask you a question, then. Was the
17  warrant agreement related to the formation of Windspeed
18  Trading?
19          MR. PERRIN: Objection, form.
20      A. I believe Windspeed was already formed when
21  we --
22      Q. Okay.
23      A. -- started doing the warrant purchase
24  agreement.
25      Q. Who requested a warrant purchase agreement?

Page 49

1      A. I don't know what entity. The business points
2  were primarily resolved before the attorneys got
3  involved. I don't know which party was the one that set
4  up the capital structure.
5      Q. Okay. What was the warrant agreement intended
6  to accomplish?
7      A. I'm not sure.
8      Q. And --
9      A. Super G and Baymark an opportunity to acquire
10  equity interests.
11      Q. Okay. Have you ever drafted a warrant
12  agreement like that before?
13      A. You mean for other clients?
14      Q. Yes, ma'am.
15      A. Yes.
16      Q. Okay. And now I'm showing you what's been
17  marked electronically as Exhibit 7.
18          (Exhibit No. 7 marked.)
19      A. Okay.
20      Q. Do you see the document on your screen?
21      A. Yes.
22      Q. And are you familiar with this document?
23      A. Yes.
24      Q. Okay. And is this an e-mail from you to Matt
25  Denegre, William Szeto, and Alexander Szeto?

13 (Pages 46 to 49)

Page 50

1  A. Yes.
2  Q. And does it bear the subject line, Windspeed
3  Warrant Purchase Agreement and Warrant?
4  A. Yes.
5  Q. Okay. And below, do you state, attached is a
6  proposed draft of the warrant purchase agreement and
7  form of warrant to be used in connection with the
8  formation of Windspeed Trading, LLC?
9  A. Yes.
10  Q. Okay. And did you understand these warrant
11  agreements documents to be related to the formation of
12  Windspeed Trading?
13  A. No. I think Windspeed Trading was already
14  formed when all of this occurred -- when this -- these
15  documents were drafted.
16  Q. Okay. Did you understand these to be in
17  connection with the formation of Windspeed Trading, LLC?
18  A. I don't have that understanding one way or the
19  other. It was my understanding Windspeed Trading was an
20  existing company and that we were revising the company
21  agreement to reflect the business deal among the
22  parties.
23  Q. Okay. But did you, in fact, back on
24  October 15th, 2018, write that you were providing these
25  warrant purchase agreement documents in connection with

Page 51

1  the formation of Windspeed Trading, LLC?
2  A. It appears that that's what I wrote in the
3  e-mail.
4  Q. Does this e-mail -- does this document appear
5  to be a true and correct copy of what it purports to be?
6  A. Yes. I mean, clearly, I was misstating there.
7  We did not -- I did not form Windspeed.
8  Q. If you'll look below here, there's a document
9  that states that it's a warrant to purchase agreement
10  interest in Windspeed Trading, LLC, and this bears a
11  marker on top that says H&P draft 10/15/18. What does
12  that mean?
13  A. On the tractional practices, you frequently put
14  a header -- a draft header at the top to keep track of
15  what version and from whom it is being sent, so that
16  would be something that we would have -- either the
17  initial draft or a rewrite of, you know, provision to
18  it, existing document, I would go in there and put H&P
19  draft and the date so people knew who the comments were
20  from and the date.
21  Q. Okay. Okay. And going down into the document
22  here, on the warrant purchase agreement itself, it also
23  bears the same notation on the top right, H&P draft,
24  10/15/2018.
25  A. Yes.

Page 52

1  Q. And this warrant purchase agreement states that
2  it's entered into between Windspeed Trading, LLC and
3  Super G/Baymark Partners, LLC. Is that correct?
4  A. Yes.
5  Q. And did you understand that you were performing
6  this work on behalf of Baymark Partners?
7  A. Yes. This is a form of agreement, so we were
8  drafting a form that would be used by both part -- both
9  recipients of the warrant, and that's just a placeholder
10  to indicate that we would either put Super G's
11  information in there if this was the Super G purchase
12  agreement, or Baymark's information in there if it
13  ultimately was Baymark's purchase agreement.
14  Q. Okay. And if you'll look down in the warrant
15  section of the agreement, was there, in fact, an
16  exercise price of $100 to exercise the warrants?
17  A. Yes.
18  Q. And on the exercise of those warrants, would it
19  entitle the warrant holder to own 40 percent of the
20  outstanding membership interests of Windspeed Trading?
21  A. Yes.
22  Q. And those warrants' rights were drafted to be
23  provided to both Super G Capital and to Baymark
24  Partners; is that correct?
25  A. This was a form of an agreement that was going

Page 53

1  to be used for both.
2  Q. Okay. And who paid the legal fees to draft the
3  warrant agreement?
4  A. Baymark.
5  Q. Is that Baymark Partners?
6  A. Baymark Partners Management, I think, was the
7  entity.
8  Q. Okay. Ms. Smith, I'll show you what's marked
9  as Exhibit 8.
10  (Exhibit No. 8 marked.)
11  Q. Do you see that document?
12  A. Yes.
13  Q. Okay. And is this -- are you familiar with
14  this document or any part of it?
15  A. It looks like it was a forward of an e-mail I
16  sent of the e-mail we just looked at.
17  Q. Okay. And that was -- your e-mail was sent to
18  Matt Denegre, William Szeto, Alex Szeto, and is that
19  all?
20  A. It looks like it.
21  Q. It appears to -- one of them -- Matt Denegre
22  forwarded that to Steven Bellah?
23  A. Yes.
24  Q. And do you know who Steven Bellah is?
25  A. Yeah, he was a -- one of the lenders at Super

14 (Pages 50 to 53)

Page 54

1  G.
2    Q. Okay.
3    A. It looks like Matt forwarded this to the
4  business people involved.
5    Q. Okay. One second. Did you draft the initial
6  foreclosure sale agreement?
7    A. No.
8    Q. I'll show you what's marked as Exhibit 10.
9       (Exhibit No. 10 marked.)
10   Q. Do you see that document?
11   A. Yes.
12   Q. And are you familiar with that document?
13   A. The e-mail?
14   Q. Yes, ma'am.
15   A. It looks like an e-mail I sent to Brian
16  Vanderwoude.
17   Q. Okay. It's an e-mail you sent to Brian
18  Vanderwoude and Jamie Whatley?
19   A. Yes.
20   Q. Okay. And cc'd Michelle Shriro?
21   A. Shriro (different pronunciation).
22   Q. Shriro?
23   A. Yes.
24   Q. On December 19th, 2018?
25   A. Yes.

Page 55

1    Q. Subject line, Super G Windspeed-Foreclosure
2  Sale Agreement?
3    A. Yes.
4    Q. Okay. And do you say that, attached is a
5  revised draft of the foreclosure sale agreement?
6    A. Yes.
7    Q. Okay. And this document that's attached, the
8  numbering convention, is that a convention that's used
9  by Hallett & Perrin?
10   A. Yes, I would have received a draft from a -- if
11  I receive a draft of an agreement from another party, I
12  save it onto our system, and then the system assigns it
13  this number.
14   Q. Okay. So this foreclosure sale agreement was
15  on Hallett & Perrin's document system?
16   A. Yes.
17   Q. Okay. How many drafts of this document did you
18  make?
19   A. Well, that's Version 3, so I assume Version 1
20  would have come from -- well, Dorsey. I don't know what
21  happened to Version 2, so there's at least three
22  versions.
23   Q. Okay. And does this document appear to be a
24  true and correct copy of the document that's reflected
25  here?

Page 56

1    MR. PERRIN: Are you talking about the
2  e-mail?
3    MR. FREEMAN: Yes, the document, the
4  e-mail.
5    A. Yes.
6    Q. In your e-mail, you also stated, most of the
7  changes were to eliminate the bifurcated closing (it is
8  my understanding we will sign and close on the same day
9  and clean up the document). There were some substantive
10  changes as well, and I'm happy to discuss those if you
11  have any questions.
12       In stating that, you indicated you believed
13  y'all would sign and close on the same day. What
14  exactly did you mean?
15   A. Well, I think that I meant that the agreement
16  would be executed and the transaction closed on the same
17  day as opposed to a delayed closing or bifurcated
18  closing.
19   Q. Okay. And why would it have been done that
20  way?
21   A. Lots of reasons.
22   Q. What are they?
23   A. Oh, I can't speculate on what all they might
24  be. A simultaneous closing document is a little bit
25  more straightforward, a little bit simpler, it doesn't

Page 57

1  require as many sections, i.e., you know, less to
2  negotiate.
3    Q. Okay. Well, in terms of your understanding
4  that this would be signed and closed on the same day,
5  what gave you that understanding?
6    A. I don't -- I don't -- I'm not sure I understand
7  your question.
8    Q. Or what was it that made you believe that it
9  would be signed and closed on the same day?
10   A. I don't recall what gave me that impression.
11   Q. Okay. And was your client signing this
12  document?
13   A. No.
14   Q. So you didn't have a client that was going to
15  be executing the foreclosure sale agreement?
16   A. No.
17   Q. And what did you mean by, we will sign and
18  close on the same day?
19   A. I think collectively, the parties will close.
20  We, all of us involved in this foreclosure.
21   Q. Okay. Was your client signing any of the
22  agreements that were attached to this e-mail?
23   A. No, but stood to benefit greatly from this all
24  going through smoothly.
25   Q. Your clients, Baymark Partners, stood to

15 (Pages 54 to 57)

Page 58

1    benefit greatly?
2        A.  ACET.
3        Q.  ACET Global?  What happened to ACET after this?
4        A.  Well, they eliminated a half a million dollars
5    in debt.
6        Q.  Did they thrive after that?
7        A.  I don't believe so.
8        Q.  Okay.  How exactly was this whole foreclosure
9    transaction going to be so wonderful for ACET Global?
10            MR. PERRIN:  Objection, form.
11       A.  Well, they had a half a million dollars in
12   secured liabilities that they were going to be able to
13   be discharged as a part of this.  Certainly that cleaned
14   up the balance sheet a bit, maybe not enough to save
15   them, but it definitely was a step in the right
16   direction.
17       Q.  Right.  So everybody was pretty excited after
18   being foreclosed upon?
19       A.  I'm not sure I know what their mental state of
20   mind was, but I don't think anybody was excited with how
21   this business performed.
22       Q.  Okay.  So it'd be nothing to congratulate about
23   at the end of this?
24       A.  I don't believe so.
25       Q.  Okay.  Now, this structure, your understanding

Page 59

1    of this, eliminating the bifurcated closing and signing
2    closing on the same day, that didn't turn out to be the
3    way that this transaction took place, did it?
4        A.  No.
5        Q.  And why was the structure changed?
6            MR. PERRIN:  Objection, form.
7        A.  Originally, I think the parties had
8    contemplated signing this agreement and then Super G
9    would send out the notice, but the way that it actually
10   played out, Super G sent the notice before the agreement
11   was signed, and so there wasn't any longer a need for
12   bifurcated closing.
13       Q.  Okay.  And were you -- you were understanding
14   by this that ACET Global was going to be excited to get
15   rid of all of its liability?
16            MR. PERRIN:  Objection, form.
17       A.  I mean, I don't know about excited.  It
18   wasn't a -- being foreclosed upon is certainly not a
19   cause for celebration.
20       Q.  But getting rid of a half a million dollar debt
21   was a pretty good thing?
22       A.  Yeah, it was a good thing.
23       Q.  And freed it up --
24       A.  Presumably.
25       Q.  -- is that right?  What about the other -- what

Page 60

1    about the other 3.2 million that was owed to Tomer
2    Damti?
3        A.  What about it?
4        Q.  Well, I mean, how much did we really free up
5    here?
6            MR. PERRIN:  Objection, form.
7        A.  I don't understand.
8        Q.  Well, I mean, what about the additional
9    3.2 million that ACET Global owed to Tomer Damti?
10       A.  What about it?  I'm not trying to be snarky,
11   I'm not clear on what you're asking of me.
12       Q.  I'm just trying to reconcile this irrational
13   exuberance that ACET Global felt that being foreclosed
14   upon with the $3.2 million secured note that was still
15   sitting on its balance sheet.
16            MR. PERRIN:  Objection, form.
17       A.  Who had used the word "irrational exuberance"?
18       Q.  I -- you know, I'm just trying to understand
19   why ACET Global would be happy about this.
20       A.  I'm not sure happy -- I don't know what they
21   felt about this, but an outcome of relieving yourself of
22   getting rid of a half a million dollars in debt is not a
23   bad outcome.
24       Q.  But might it be a bad outcome if it comes at
25   the expense of millions of dollars of assets?

Page 61

1            MR. PERRIN:  Objection, form.
2        A.  Millions of dollars of assets owned by whom?
3        Q.  ACET Global.
4        A.  I don't believe they had millions of dollars of
5    assets.
6        Q.  Did you ever personally inspect them?
7        A.  No.
8        Q.  So how do you know what assets ACET Global had?
9        A.  Well, I --
10       Q.  You don't, in fact, know, do you?
11       A.  Say it again.
12       Q.  You don't, in fact, know, do you?
13       A.  You're right, I don't.
14       Q.  So you didn't know what assets ACET Global
15   actually had?
16       A.  I know what assets that -- I know with the
17   value that the bank and ACET believed the assets were --
18   just were.
19       Q.  And by, the bank, do you mean Super G Capital?
20       A.  Yes.
21       Q.  Okay.  And by your statement that you know the
22   value that Super G and ACET attributed to it, what are
23   you referring to?
24       A.  What do you mean?
25       Q.  How do you know what value they attributed to

Julie Smith  *  April 13, 2021

Page 62

1    it?
2        A. I think it's in one of the documents. I think
3    it's in the recitals of one of the documents.
4        Q. Of what documents? To what transaction?
5        A. I don't have the document in front of me, but I
6    think the foreclosure sale agreement might denote the
7    value of the assets being foreclosed upon.
8        Q. Okay. So does it denote the value of the
9    assets being foreclosed upon or the outstanding balance
10   that ACET Global owed to Super G Capital?
11       A. I don't have the agreement in front of me, but
12   I believe both of those numbers are in that document?
13       Q. Okay. But would you agree that those two
14   things are not one and the same?
15       A. No -- yes, they are not the same numbers. One
16   is a -- the amount of debt, and one is the estimated
17   firm work value of assets.
18       Q. Okay. Now, on this document, this Exhibit 10
19   that we were looking at --
20       A. Yes.
21       Q. -- that you sent on December 19th, 2018,
22   correct?
23       A. Uh-huh.
24       Q. Okay. Second 2.3 of the foreclosure sale
25   agreement that is attached, I'm going to ask you to take

Page 63

1    a look at this with me. Let me ask you before, was your
2    understanding that -- was your understanding that
3    Windspeed was assuming the note from ACET Global? How
4    was it discharging this half a million dollars?
5        A. Ultimately, yeah, it assumed the note.
6        Q. So that was your understanding at this time was
7    that Windspeed was going to be assuming the note, and so
8    ACET Global is going to be relieved of that liability?
9        A. At some -- there was some discussion. I don't
10   know if it was at this time or some other time of a new
11   note to replace the ACET note or -- a discussion of
12   whether or not they were going to assume the ACET note
13   or forgive the ACET note and issue a new note to
14   Windspeed.
15       Q. Okay. But somehow Windspeed was kind of taking
16   on the liability and that was relieving ACET?
17       A. Yes.
18       Q. So Section 2.3 of this foreclosure sale
19   agreement that you sent, it states, no assumption of
20   obligations. Do you see that?
21       A. Yes.
22       Q. Okay. And it says, notwithstanding anything to
23   the contrary in this agreement, buyer is not assuming
24   and shall not be liable for any debt, obligation,
25   responsibility, or liability of debtor, seller, or of

Page 64

1    any other party, whether known or unknown, contingent,
2    or absolute or otherwise, and whether relating to the
3    purchased assets, the excluded assets, or otherwise,
4    including but not limited to any debt, obligation,
5    responsibility, or liability with respect to tax,
6    employment, benefits, personal injury, or products,
7    liability claims, equipment leases, licensed agreements,
8    or contracts.
9        It goes on to state, in furtherance and not
10   in limitation of the foregoing, which seemed to cover
11   everything to me, buyer does not assume any liability of
12   debtor or seller under the loan agreements that certain
13   secured promissory note dated July 20th, 2017, payable
14   by debtor to ACET Venture Partners, LLC in the stated
15   principal amount of $3,230,000 any equipment lease, any
16   license agreement, or any other contract or obligation
17   of debtor, its principals, officers, or directors, or
18   any other party or any other person.
19       So what -- why did you put this provision
20   in?
21       A. Well, this is a pretty standard provision when
22   you are -- well, let me back up. I'm not familiar with
23   foreclosure sale agreements, in particular, but this
24   type of provision would be pretty common in a transfer
25   of assets where you're assuming either none or some, you

Page 65

1    know, or certain liabilities.
2        Q. Okay. And how did this help further your goals
3    for ACET Global?
4        MR. PERRIN: Objection, form.
5        A. I don't know that it did or didn't. It was an
6    agreement between Super G and Windspeed.
7        Q. Okay. And so how did this accomplish what you
8    understood this transaction to do for ACET Global?
9        MR. PERRIN: Objection, form.
10       A. Well, I'm not -- I'm not sure I understand your
11   question. Can you repeat it?
12       Q. Yeah. Well, let me ask it this way: If
13   there's a specific provision you've inserted here, and
14   now you're drafting this for Hallett & Perrin, but you
15   don't have a client that's actually a party to this
16   transaction, and you've asserted a paragraph that
17   specifically provides that Windspeed is not assuming any
18   liability for any of the loans or for the secured
19   promissory note to ACET Venture Partners, how is this
20   document leaving ACET Global, LLC better off?
21       A. Well, it looks like this is an earlier version
22   of the document where they were going to do a new note
23   to Windspeed, but ultimately ended up having Windspeed
24   assume the existing ACET note.
25       Q. Did that, in fact, actually happen?

17 (Pages 62 to 65)

Page 66

1    A.  Yes, I believe that Windspeed assumed the ACET
2    Global note.
3    Q.  So it's your understanding Windspeed Trading,
4    LLC assumed all of the debt that ACET Global owed to
5    Super G Capital?
6    A.  Yes.
7    Q.  Okay.  And did you negotiate to remove this
8    provision you had inserted?
9         MR. PERRIN:  Objection, form.
10   A.  I don't recall this provision one way or the
11   other.
12   Q.  Okay.  Do you recall anyone -- do you recall
13   having discussions with anyone about this provision?
14   A.  No.
15   Q.  Okay.
16        MR. PERRIN:  Jason, are you getting
17   anywhere to a stopping point?  We've been going about an
18   hour and a half.
19        MR. FREEMAN:  Sure.
20        MR. PERRIN:  It's --
21        MR. FREEMAN:  I'm pretty close to one.
22        MR. PERRIN:  Okay.
23   Q.  Let me ask you, there's a -- is it typical
24   and -- you know, I'm just a litigator, so I don't know a
25   lot about all of these documents.  Is it typical to have

Page 67

1    a governing law provision in there?
2    A.  Yes.
3    Q.  Okay.  And there's one here that provides for
4    governing law to be the State of Texas; is that correct?
5    A.  Yes.
6    Q.  Okay.  And Baymark Partners was in Texas,
7    correct?
8    A.  Yes, as was ACET Global.
9    Q.  And ACET Global and Windspeed Trading --
10   A.  Right.
11   Q.  -- is that correct?  But again, ACET Global
12   wasn't a party to this transaction, right?
13   A.  Correct.
14   Q.  So why would it be relevant that ACET Global is
15   in Texas?
16   A.  I'm not sure that it would, but Windspeed
17   Trading is in Texas.
18   Q.  Okay.  So maybe that's relevant, and Super G
19   Capital was in California?
20   A.  Yes, they're a California company.
21   Q.  Okay.  And so why was Super G Capital the
22   lender here?  Why were they amenable to placing the
23   governing law as the State of Texas?
24   A.  I have no idea.
25   Q.  In your experience, is that common for a

Page 68

1    lender?
2    A.  Well, I think -- again, this is not my area of
3    law, but I think that the foreclosure laws are a state
4    statutory law, and so because the businesses were
5    located in Texas, the foreclosure process was under
6    Texas law.
7    Q.  Okay.  And so that was the reason you put that
8    in there?
9    A.  I don't -- I don't know that I put it in there,
10   but that's -- I'm guessing that's why -- the reason it
11   was in there because I know we had to comply with Texas
12   statutory law.
13   Q.  Okay.  And is that your name and the firm
14   Hallett Perrin as the notice party for any notices to
15   Windspeed Trading?
16   A.  Yes.
17   Q.  Why was Michelle Shriro included on this
18   e-mail?
19   A.  She was counsel for -- foreclosure counsel to
20   Baymark.
21   Q.  To Baymark Partners?
22   A.  Baymark Partners Management, yes.
23   Q.  Okay.  And what was she advising about?
24   A.  Well, we had never been through a foreclosure
25   process.  That's not my area of law, so we went out to

Page 69

1    see -- seek someone to make sure we knew what we were --
2    doing things properly and by the book and exerting
3    whatever rights we had --
4    Q.  Okay.
5    A.  -- in this process.
6         MR. PERRIN:  Are we close to a stopping
7    point?
8         MR. FREEMAN:  Yeah, we -- just a couple
9    more questions, then we're there.
10   Q.  Was -- so this was sent to attorneys at
11   Dorsey -- is that Whitney Dorsey -- and Baymark's
12   counsel, Ms. Shriro, and you, Baymark's counsel, but not
13   to Windspeed's counsel?
14   A.  It does not look like that e-mail went to
15   Windspeed counsel.
16   Q.  And so why are you sending a document that
17   says, you know, this is the final -- looks like we've
18   got the final document ready to sign, but the other
19   party to the contract is not on the e-mail?
20   A.  They were communicating with us via e-mail and
21   over the phone their comments and changes in their
22   review of it.
23   Q.  Okay.  Normally, if there were another party
24   even if they were communicating with you by e-mail or by
25   phone, would you normally copy them on the e-mail

18 (Pages 66 to 69)

Julie Smith   *   April 13, 2021

---

Page 70

1   exchange like this?
2       A. It depends.  It depends on the circumstances.
3       Q. Okay.  What kind of circumstances might warrant
4   not including them, like what were the circumstances
5   here that warranted not including them?
6       MR. PERRIN:  Objection, form.
7       A. I don't know.  I don't recall why I did or did
8   not include them on the e-mail.
9       Q. But you weren't representing Windspeed?
10      A. Correct.
11      Q. Okay.
12      MR. FREEMAN:  Ed, yeah, do y'all want to
13  take a break?
14      MR. PERRIN:  Yeah, let's take one.
15      MR. FREEMAN:  Okay.  How long do y'all want
16  to take?
17      MR. PERRIN:  About 10 minutes.  Just go
18  down the hall, get something to drink.
19      MR. FREEMAN:  Sounds good.
20      MR. PERRIN:  All right.
21      (Break taken from 2:36 p.m. to 2:51 p.m.)
22      MR. FREEMAN:  Jason, I just found out
23  something during the break.  Apparently your Exhibit 13
24  to Ms. Smith's deposition, which is BP 012147, is part
25  of the document we snapped back this morning, and we

---

Page 71

1   request the snap back on that as well.
2       MR. FREEMAN:  Oh, okay.  Wait a second.
3   This is -- is -- this a separate document, though,
4   right?
5       MR. PERRIN:  It's a separate document, but
6   it's part of that document, and we request a snap back
7   on it as well.
8       MR. FREEMAN:  Well, we've already got it as
9   an exhibit here.
10      MR. PERRIN:  Well, I -- we -- this -- we
11  let you know this morning when we first knew it was out
12  there, and we just got the documents that we could open
13  them up on -- the exhibits during the deposition and it
14  was brought to my attention as soon as I walked out
15  about this.
16      MR. FREEMAN:  Okay.  What provision is this
17  under?
18      MR. PERRIN:  What do you mean what
19  provision is this under?
20      MR. FREEMAN:  What rule is the snap back
21  under?
22      MR. PERRIN:  Snap back is under Rule -- the
23  Texas Rules of Civil Procedure 193.3(d).  We notified
24  you of any burden of proof disclosure of it this
25  morning.  We just got this one, we notified you on that,

---

Page 72

1   and within ten days of our discovery of that production.
2       MR. FREEMAN:  Okay.  Give me just a second,
3   and I'll be back on.
4       MR. PERRIN:  I mean, we can go ahead and
5   continue as long as you don't ask her about and you can
6   just do whatever you want to do.
7       (Off the record from 2:52 to 2:57 p.m.)
8       (Exhibit No. 13 withdrawn)
9       MR. FREEMAN:  Okay.  Back on the record.
10      Q. Ms. Smith, we were looking at -- before we just
11  took a short break, we were looking at Exhibit 10, and
12  I'll put that back on the screen.  Was Baymark Partners
13  involved in reviewing the terms of the loan agreement
14  between Windspeed and Super G?
15      A. Yes.
16      Q. And why was that?
17      A. Well, they were a potential equity holder in
18  Windspeed.
19      Q. Okay.  Were you representing Windspeed in
20  drafting or revising the loan agreement with Super G?
21      A. No.  Alex Szeto represented them.
22      Q. Did you need Baymark's approval before
23  Windspeed could enter into a loan agreement with Super G
24  Capital?
25      A. Well, Baymark had a representative on the

---

Page 73

1   board.
2       Q. Okay.  And was that representative on the board
3   there to advance Baymark's interests or to advance the
4   interests of Windspeed?
5       A. I'm not sure.
6       Q. Well, are you --
7       A. Go ahead.
8       Q. Are you trying to indicate to me that you were
9   representing the Baymark manager of Windspeed?
10      A. I was representing Baymark who had a manager on
11  the board of Windspeed in connection with a pretty
12  significant transaction of the company that they had a
13  warrant in -- was participating in.
14      Q. Okay.  So you were only looking at this loan
15  agreement from the perspective of Baymark?
16      A. Yeah, although Baymark and Windspeed would have
17  been -- have similar positions in this agreement.
18      Q. Okay.  Did the terms of the agreement need to
19  be accessible to Baymark?
20      A. As a board member, yes.
21      Q. And did Baymark Partners pay the legal fees to
22  review and revise the loan agreement between Windspeed
23  and Super G?
24      A. Well, I'm assuming that Windspeed paid their
25  loan agreements and -- I mean, I'm sorry, their legal

---

19 (Pages 70 to 73)

Page 74

1  fees and Super G paid theirs and Baymark paid mine.
2      Q. Okay. Ms. Smith, if you will look at
3  Exhibit 11 which I'll put on the screen.
4          (Exhibit No. 11 marked.)
5      Q. Do you see that?
6      A. Yes.
7      Q. And are you familiar with this exhibit?
8      A. Give me a second. Yes.
9      Q. Okay. Is this an e-mail from you?
10     A. Yes.
11     Q. Okay. To Brian Vanderwoude?
12     A. Yes.
13     Q. And Jamie Whatley?
14     A. Yes.
15     Q. On December 27th, 2018?
16     A. Yes.
17     Q. Is the subject line Super G/Windspeed -
18  Amendment to Loan Agreement?
19     A. Yes.
20     Q. Okay. And does it state, attached is a revised
21  draft of the Windspeed/Super G loan agreement and go on
22  to state, Windspeed has agreed to acquire the assets of
23  ACET for a purchase price equal to the principal balance
24  of the ACET loan?
25     A. Yes.

Page 75

1      Q. Okay. Why was the purchase price equal to the
2  amount of the ACET loan?
3      A. I think that was the agreement between the
4  parties.
5      Q. Okay. Why was the purchase price not equal to
6  the value of the collateral?
7      A. You'll have to ask Windspeed that.
8      Q. Okay. What would ACET have to say about that?
9          MR. PERRIN: Objection, form.
10     A. Again, they would be happy to have half a
11  million dollars of debt relief.
12     Q. Okay. Because Windspeed seems to know nothing
13  about this, so I've asked Windspeed. I'm trying to
14  understand why on earth would the purchase price be for
15  the amount of the loan rather than the value of the
16  collateral.
17         MR. PERRIN: Objection, form, if there's a
18  question out there.
19         THE WITNESS: Do I answer it?
20         MR. PERRIN: If you think that's a
21  question.
22         THE WITNESS: I'm sorry, repeat it again.
23     Q. Well, why would the purchase price be equal to
24  the amount of the loan that ACET Global owed to Super G
25  Capital rather than the value of the collateral?

Page 76

1      A. That's a good question. I don't know.
2      Q. Okay. Did anyone ever value the collateral?
3      A. You mean like a third-party valuation firm?
4      Q. Yeah, or anyone.
5      A. I'm not aware that a third-party valuation firm
6  evaluated -- or valued the collateral. It's my
7  understanding that the three parties all agreed
8  generally as to the value which was significantly below
9  the amount of the loan.
10     Q. Okay. And where did you obtain that
11  understanding from?
12     A. I think it's actually in the foreclosure sale
13  agreement.
14     Q. That the value of the assets is substantially
15  below the amount of the loan?
16     A. Yeah, I think it references a value in the
17  foreclosure sale agreement. I don't have the agreement
18  in front of me, but I'm pretty sure.
19     Q. Okay.
20     A. The value of the assets are described in the
21  recitals.
22     Q. Okay. And we'll look at that in just a second,
23  but if I'm understanding, you're representing Baymark in
24  this transaction and --
25     A. Foreclosure sale agreement?

Page 77

1      Q. Yeah.
2      A. No. I'm representing ACET in the foreclosure
3  sale agreement.
4      Q. Okay. What about these loan documents that
5  we're looking at?
6      A. Which ones? The original $200,000 loan
7  document, or the assumption of the ACET loan?
8      Q. The assumption of the ACET loan, and the loan
9  between Windspeed and Super G Capital.
10     A. Okay. So what is your question?
11     Q. Okay. You're engaging in that process on
12  behalf of Baymark Partners; is that what you're --
13  correct?
14         MR. PERRIN: Objection, form.
15     A. I am engaging in the original Windspeed note.
16     Q. Well, you're telling me that all of the
17  parties, your client included, understood that the value
18  of the inventory and assets was way less than the amount
19  of the note that ACET owed, correct?
20     A. That is my understanding.
21     Q. Okay. Why are you advising your client that
22  it's a good idea to buy a bunch of assets for the price
23  of assuming a note that's way more than the value of
24  those assets?
25     A. That's not my client. I did not advise them to

20 (Pages 74 to 77)

Page 78

1    do that.
2        Q.  Okay.  Why are you advising Baymark, who you
3    say sits on the board and controls Windspeed, why are
4    you advising them that that's somehow in their interest?
5        A.  I think that's privileged.
6        Q.  Okay.  Well, was there a discussion about the
7    reasons that it may be in Baymark's interest to transfer
8    these assets of ACET into Windspeed Trading?
9            MR. PERRIN:  Objection, form.
10       A.  Again, I think that's privileged conversations
11   with my client.
12       Q.  Okay.  And was there a discussion about the
13   potential consequences to Baymark Partners as a result
14   of the transfer of assets from ACET Global to Windspeed
15   Trading?
16           THE WITNESS:  Is this why you want to have
17   a standing --
18           MR. PERRIN:  Yeah.
19       A.  I think that's privileged.
20       Q.  Okay.  Was there a discussion that the transfer
21   of assets from ACET Global to Windspeed might be viewed
22   as a fraudulent transfer?
23           MR. PERRIN:  Objection, form.
24       A.  Were there concerns that it might be viewed as
25   a fraudulent transfer?

Page 79

1        Q.  Yes, ma'am.
2        A.  I don't see how a fraudulent transfer is for
3    transfer of -- for less than value.  This was a transfer
4    that arguably was much more than value.
5        Q.  Okay.  So is that a no?
6            MR. PERRIN:  Objection, form.
7        A.  Are there -- so the question was -- tell me the
8    question again, and I'll answer it yes, no.
9        Q.  Yeah.  The question is, did you have
10   discussions about whether the transfer of assets from
11   ACET Global to Windspeed Trading would be viewed as a
12   fraudulent transfer?
13       A.  Well, the assets didn't transfer from ACET
14   Global to Windspeed.  The assets transferred from Super
15   G to Windspeed --
16       Q.  Okay.
17       A.  -- as a result of the foreclosure.
18       Q.  Okay.
19           MR. FREEMAN:  Objection, nonresponsive.
20       Q.  Did you have any discussions about whether the
21   ultimate transfer of assets that had been held by ACET
22   Global to Windspeed Trading could be viewed as a
23   fraudulent transfer?
24           MR. PERRIN:  Ms. Smith, I would caution you
25   that -- not to disclose any communication with your

Page 80

1    clients.  If you've had any communications with other
2    parties, you can disclose it.
3        A.  Yeah, I think whatever communications I had
4    would be privileged.
5        Q.  Did you have a discussion with your clients
6    that the --
7        A.  I'll just say privileged now.
8        Q.  Did you have a discussion with your clients
9    that the transfer of assets that were owned by ACET
10   Global into Windspeed Trading would be a fraudulent act?
11       A.  I believe that'd be privileged.
12       Q.  Did you have discussions that the transfer of
13   assets owned by ACET Global into Windspeed Trading would
14   be a criminal act?
15           MR. PERRIN:  Objection, form.
16       A.  Again, there wasn't a transfer from ACET to
17   Windspeed, but it's -- but to the extent there would
18   have been communications, those would have been
19   privileged.
20       Q.  Okay.  But there was a -- there was a
21   foreclosure by Super G on ACET Global?
22       A.  Correct.
23       Q.  And Windspeed Trading did purchase those assets
24   from Super G, correct?
25       A.  Correct.

Page 81

1        Q.  And you represented ACET Global?
2        A.  Yes.
3        Q.  And you did not represent Windspeed Trading,
4    you maintain, correct?
5        A.  Not as part of the foreclosure agreement.
6        Q.  Yet you drafted and revised a foreclosure sale
7    agreement between Windspeed and Super G Capital,
8    correct?
9        A.  I did not draft it.  I reviewed it and offered
10   provisions to it.
11       Q.  And red-lined it, correct?
12       A.  Yep.
13       Q.  But you didn't have a client that was executing
14   that document, correct?
15       A.  No, but I had a client that was going to get
16   rid of half a million dollars of debt as a result of it.
17       Q.  Okay.  Okay.  Going back to Exhibit 11,
18   Ms. Smith, you stated that attached was the revised
19   draft of the Windspeed/Super G loan agreement; is that
20   correct?
21       A.  Yes.
22       Q.  Okay.  And it says the document Super G
23   provided to you appeared to reference the ACET loan
24   agreement, so I revised it to reflect the provisions of
25   the Windspeed loan agreement; is that correct?

21 (Pages 78 to 81)

Page 82

1     A. That's what it says.
2     Q. Okay. Were -- the documents reflected here
3  attached to your e-mail, were they related to the
4  foreclosure sale?
5     A. They were related to Windspeed's assumption of
6  the ACET loan.
7     Q. Okay. Were they related to the foreclosure
8  sale?
9     A. Yes.
10     Q. Okay. And how so?
11     A. Well, part of the conditions of the sale was
12  the assumption of this note.
13     Q. Okay. And when was Windspeed going to assume
14  this note?
15     A. In connection with the foreclosure sale. I'm
16  not sure what you're asking.
17     Q. Okay. Well, are you referring to -- in this
18  e-mail, is this related to Windspeed assuming ACET
19  Global's note to Super G?
20     A. Okay. Ask your question again.
21     Q. Well, I'm trying to figure out how this is
22  related to the foreclosure sale. That's ultimately what
23  I'm trying to understand.
24     A. Well, I think this was essentially the con --
25  part of the consideration to have been paid in the

Page 83

1  foreclosure sale is the assumption of the liability by
2  Windspeed.
3     Q. Okay. Was that provided in the foreclosure
4  sale documents?
5     A. Yeah, I think so. I don't have the document in
6  front of me, but I would think it would describe the
7  consideration.
8     Q. Okay. You state in this e-mail that Baymark
9  has not had a chance to review or comment on these terms
10  and these terms may or may not be acceptable to Baymark.
11  Does that refer to Baymark Partners or some other --
12     A. Baymark Partners Management I think is the
13  entity that's in this.
14     Q. Okay. Why is Baymark needing to review these
15  terms?
16     A. Because it is an obligation that a company has
17  a potential acquired equity interest in is assuming.
18     Q. Okay. Did you have a call in late 2018 with
19  Super G counsel, Tony Ludlow, Matt Denegre?
20     A. I might have.
21     Q. Okay. And Steve Bellah, possibly, as well?
22     A. I don't think we would have talked to Super G's
23  counsel without Super G on the phone as well.
24     Q. Okay. What did you discuss?
25     A. I have no memory of it.

Page 84

1     Q. Was there a need to clarify the ACET loan at
2  that time?
3     A. I don't know.
4     Q. And would that discussion have been related to
5  the foreclosure?
6     A. Are you asking about the purpose of this
7  e-mail?
8     Q. No. I'm asking about your call in December --
9  late December of 2018.
10     A. I don't recall a phone call.
11     Q. Okay. Ms. Smith, I'm showing you what's marked
12  as Exhibit 12.
13     (Exhibit No. 12 marked.)
14     Q. Do you see that document?
15     A. Yes.
16     Q. Are you familiar with this series of e-mails?
17  I'll scroll down to the bottom so you can read.
18     A. Yeah, I see it.
19     Q. Okay. Is this e-mail correspondence between or
20  among Brian Vanderwoude, Steve Bellah, Matt Denegre,
21  Tony Ludlow, and you?
22     A. Yes.
23     Q. In December of 2018?
24     A. Yes.
25     Q. Late December of 2018?

Page 85

1     A. Yes.
2     Q. And is the Re line, schedule a call?
3     A. Yes.
4     Q. Okay. And did you get into this because
5  Mr. Vanderwoude cc'd you on an e-mail in which he said,
6  looping in buyer's counsel, I'm open anytime today?
7     A. Looks like that's what he wrote.
8     Q. Okay. And who was the buyer on the transaction
9  at issue?
10     A. Windspeed.
11     Q. Okay. And were you, in fact, buyer's counsel?
12     A. No.
13     Q. No? Did you correct Mr. Vanderwoude?
14     A. It does not look like I did in that e-mail.
15     Q. Okay. But did you work pretty closely with
16  Mr. Vanderwoude on this transaction?
17     A. I worked closely with Mr. Vanderwoude and Mr.
18  Szeto.
19     Q. Okay. And were you and Mr. Vanderwoude the two
20  primary attorneys on this transaction?
21     A. Well, there were three attorneys on the
22  transaction.
23     Q. Okay. Did he often refer to you as buyer's
24  counsel?
25     A. I don't know. I wouldn't have even remembered

22 (Pages 82 to 85)

Page 86

1    that he did it there.  He was obviously mistaken.
2         Q.  Do you have any reason for why he might be
3    mistaken that you were Windspeed's counsel?
4         A.  I -- no.
5         Q.  Okay.  Did you ever discuss the risk of this
6    transaction with Baymark Partners?
7         A.  I would have discussed the risk of any
8    transaction with any client.
9         Q.  Okay.  Did you discuss the risk of this
10   transaction with Matt Denegre or Tony Ludlow?
11        A.  Again, any transaction that a client does has
12   risks and liabilities, and it's my job to identify those
13   and try to make it -- that I can.  Any confrontations
14   that I would have had with this particular transaction
15   would have been covered by attorney-client privilege.
16        Q.  Okay.  Did you ever discuss successor liability
17   with Matt Denegre?
18        A.  Again, attorney-client privilege.
19        Q.  Did you ever discuss successor liability with
20   Tony Ludlow?
21        A.  That would also be covered by attorney-client
22   privilege.
23        Q.  And did you ever discuss successor liability
24   with Matt Denegre and Tony Ludlow related to the
25   transactions we have been discussing in this deposition?

Page 87

1         A.  Again, that's covered by attorney-client
2    privilege.
3         Q.  Did you ever discuss successor liability with
4    Matt Denegre and Tony Ludlow related to Windspeed
5    Trading's acquisition of the ACET global assets?
6         A.  I feel like I'm answering these questions --
7    yes.  Again, covered by attorney-client privilege.
8         Q.  Okay.  Did Baymark Partners ever express
9    concern about exposure for liability as a result of
10   this -- these transactions?
11        A.  Again, that's covered by attorney-client
12   privilege.
13        Q.  Did you believe that there was any successor
14   liability risk?
15        A.  I think that's attorney-client privilege as
16   well.
17        Q.  And why again would there be successor
18   liability risk?
19        A.  I can't speculate in this instance.
20        Q.  Was Baymark Partners paying the Super G loan on
21   behalf of Windspeed?
22        A.  I don't know.
23        Q.  What exactly was its interest in the
24   transaction?
25        A.  Who is it?

Page 88

1         Q.  Baymark Partners.
2         A.  What transaction?
3         Q.  The loan between Windspeed and Super G.
4         A.  It had an interest as a potential equity holder
5    in Windspeed.
6         Q.  Okay.  And did it propose any changes?
7         A.  Yes.  It, meaning me?
8         Q.  It, meaning Baymark.
9         A.  To the extent they proposed any changes, that
10   would be attorney-client privilege, I think.
11        Q.  Okay.  And who, again -- who was a party to the
12   loans between Super G and Windspeed Trading?
13            MR. PERRIN:  Objection, form.
14        A.  Super G and Windspeed.
15        Q.  Was Baymark Partners a guarantor?
16        A.  No, not that I recall.
17        Q.  And who all was involved in the negotiation of
18   the loan?
19        A.  Attorneys or business folks?
20        Q.  All.
21        A.  It would have been Super G and their counsel,
22   Windspeed and its counsel, and then Baymark and me.
23        Q.  Okay.  Ms. Smith, I'll show you what's marked
24   as Exhibit 14.
25            (Exhibit No. 14 marked.)

Page 89

1         Q.  Do you see this document?
2         A.  Yes.
3         Q.  Is this an e-mail from Matt Denegre to you on
4    January 2nd, 2019?
5         A.  Yes.
6         Q.  And he cc's William Szeto?
7         A.  Yes.
8         Q.  And the subject line is Super G/Windspeed -
9    Amendment to Loan Agreement, correct?
10        A.  Yes.
11        Q.  Okay.  And Matt requests some payment terms on
12   the loan between Windspeed and Super G?
13        A.  Yes.
14        Q.  Okay.  And who were those requested for?
15        A.  I guess those are payment terms that Windspeed
16   would provide to Super G.
17        Q.  Okay.  Did you end up proposing those payment
18   terms?
19        A.  Yes, I -- if that's what the business folks had
20   agreed to, I would have forwarded that to Super G's
21   counsel.
22        Q.  Okay.  Did Baymark control Windspeed?
23        A.  No.
24        Q.  You never got that sense?
25        A.  No.  Bill Szeto is pretty powerful -- pretty

23 (Pages 86 to 89)

Julie Smith  *  April 13, 2021

## Page 90

1  strong personality.
2      Q. I will agree with that. Did Baymark Partners
3  ever agree to allow Windspeed to assume the old ACET
4  loan?
5      A. It wasn't their place to agree or disagree.
6      Q. So it wasn't Baymark's place to agree or
7  disagree about whether Windspeed assumed the loan
8  between ACET Global and Super G?
9      A. You mean as in ACET and its responsibilities
10 for ACET?
11     Q. I mean for Windspeed.
12     A. Okay. So the question is, did Baymark have the
13 right to approve the loan between Windspeed and Super G?
14     Q. So yeah, I mean, did Baymark Partners, did it
15 have the right to allow or not allow Windspeed to assume
16 the old ACET loan that was owed to Super G?
17     A. It would have had a vote on the board.
18     Q. Okay. So it did control that, then?
19     A. I don't think controlled, no.
20     Q. Okay.
21     A. It's a unit.
22     Q. So it had a say in whether it would allow
23 Windspeed to assume the note?
24     A. Yes.
25     Q. Okay. And I'm putting on the screen what's

## Page 91

1  marked as Exhibit 15.
2          (Exhibit No. 15 marked.)
3      Q. Do you see that document?
4      A. Yes.
5      Q. Okay. And is this an e-mail between you and
6  Brian Vanderwoude?
7      A. Correct.
8      Q. In January of 2019?
9      A. Yes.
10     Q. January 17th?
11     A. Yes.
12     Q. And the subject line is Windspeed/Super G
13 Transaction; is that correct?
14     A. Yes.
15     Q. And you say on page 2 here, dropping down,
16 Baymark has agreed to allow Windspeed to assume the ACET
17 loan; is that correct?
18     A. Yes.
19     Q. Okay. And then you propose the terms that were
20 provided to you by Mr. Denegre?
21     A. And Mr. Szeto.
22     Q. Okay. And then Mr. Vanderwoude, does he ask
23 you to take the laboring oar on drafting the amended and
24 restated agreement?
25     A. Yes.

## Page 92

1      Q. Okay.
2      A. And it's important to note in that third
3  paragraph, part of the reason for that is that Windspeed
4  had already -- in their journey, they've already
5  reviewed the form of the Super G note which was
6  different than the form of note that ACET had signed.
7      Q. Okay.
8      A. So for the ease of everyone reviewing it,
9  including the Windspeed attorney, it made sense to use
10 the Windspeed note as a base --
11     Q. Okay. Did you --
12     A. -- when we --
13     Q. Did you draft the amended and restated loan
14 agreement?
15     A. I did at the request of Super G's counsel.
16     Q. Okay. Did Super G ever ask why Baymark
17 Partners was involved?
18     A. I don't know if Super G ever asked why Baymark
19 Partners was involved.
20     Q. Or why Baymark Partners was proposing terms or
21 changes?
22     A. I don't know that they ever asked that.
23     Q. Okay. And on this document, do you state that
24 there will likely be two attorneys negotiating the
25 document on behalf of Windspeed?

## Page 93

1      A. Yes.
2      Q. Okay. And were you referring to yourself as
3  one of those attorneys?
4      A. It says, I will likely review it on behalf of
5  Baymark and Alex Szeto, another attorney, will do it on
6  behalf of Bill Szeto.
7      Q. Okay. What about Windspeed?
8      A. Well, I guess these attorneys are representing
9  the members of Windspeed. I mean, are effectively --
10 yes. Yeah, Alex was representing one of the members,
11 and I was representing one of the others, or I guess
12 some of the potential equity interest in it.
13     Q. Okay. So you weren't referring there to you
14 representing on behalf of Windspeed?
15     A. No. It looks like it says I was looking -- on
16 behalf of Baymark.
17     Q. Okay. Did you refer to another attorney there
18 who was going to be reviewing it on behalf of Windspeed?
19     A. Alex Szeto.
20     Q. Okay. And who were the only two attorneys you
21 referred to after making that statement?
22     A. Two attorneys I referred to?
23     Q. Yeah, you said, there will likely be two
24 attorneys negotiating the document on behalf of
25 Windspeed, and you refer to two attorneys.

24 (Pages 90 to 93)

Page 94

1      A. Yeah, one -- me on behalf of Baymark and Alex
2  on behalf of Szeto and Windspeed.
3      Q. Okay. And down in the final paragraph, you
4  state, I think you mentioned you can send us the
5  research/cases you found that supported Super G's
6  position regarding the risk of successor liability. I
7  wanted to take you up on that offer and get copies of
8  the research/case law from you. And is that your
9  statement to Mr. Vanderwoude?
10     A. Yes. It's in the e-mail.
11     Q. Okay. And did you discuss the successor
12 liability issue with Mr. Vanderwoude?
13     A. Yes, it looks like I did.
14     Q. Okay. And did you discuss the risk to your
15 clients?
16     A. To Brian -- to Vanderwoude's and my clients?
17     Q. Yes.
18     A. Yes.
19     Q. Okay. And did you discuss the basis for that
20 potential exposure?
21     A. I think we discussed it generally to understand
22 if there was any successor liability issues.
23     Q. Okay. And what did he say?
24     A. Honestly, I don't recall.
25     Q. Okay. Was he worried about it?

Page 95

1      A. Based on the e-mail, it looks like he was not.
2      Q. Okay. Why do you think Super G could have had
3  any risk of successor liability?
4      A. I don't know.
5      Q. It wasn't implicitly or expressly assuming any
6  liabilities, was it?
7      A. No. Well, no.
8      Q. No? In the -- there really wasn't any basis
9  for successor liability other than fraud, was there?
10     MR. PERRIN: Objection, form.
11     A. There's lots of other bases for successor
12 liability other than form.
13     Q. That could apply to Super G Capital? Can you
14 name one?
15     A. Can you give me a fact situation?
16     Q. The fact situation we're dealing with here with
17 Super G as the lender, how does it have exposure for
18 successor liability?
19     A. I'm not sure that it would.
20     Q. Okay.
21     A. I think this is probably successor liability
22 for Windspeed.
23     Q. For Windspeed?
24     A. Uh-huh.
25     Q. And what kind of liability was it concerned

Page 96

1  about?
2      A. Well, it was assuming a note.
3      Q. Was it?
4      A. Yeah.
5      Q. Okay. And why would that give it concern about
6  successor liability?
7      A. Overbroadly, it was assuming assets and
8  operations of a company that was not doing well.
9      Q. Okay.
10     A. It would be reasonable to wonder if you had --
11 if the acquirer, transferee would be opening itself up
12 to any successor liabilities.
13     Q. Okay.
14     A. That's --
15     Q. So that's the best answer?
16     A. Yeah. I mean, we think about that in any
17 transaction where there's an asset transfer.
18     Q. Okay. But you weren't Windspeed's attorney,
19 correct?
20     A. Correct.
21     Q. And were you doing research here on behalf of
22 Windspeed or behalf of Baymark?
23     A. Baymark.
24     Q. Okay. And so were you, in fact, actually
25 concerned here about successor liability to Baymark?

Page 97

1      A. I think that that would be attorney-client
2  privilege.
3      Q. I don't think that this is if you're discussing
4  it with Brian.
5      A. My -- whether or not I am concerned about
6  successor liability is my mental impression. Isn't that
7  covered by attorney-client privilege?
8      Q. No.
9      MR. PERRIN: I disagree.
10     MR. FREEMAN: Ed, you can disagree all you
11 want, but if there's a privilege there, it's not
12 attorney-client privilege. It's work product. And
13 yeah, that can be waived as well. But Ed, do you want
14 to go ahead and tell me how that's attorney-client
15 privilege?
16     MR. PERRIN: She asserted privilege and
17 mental impressions. You're right, mental impressions
18 give more work product, but if it's based on client
19 communication would also be attorney-client privilege.
20     MR. FREEMAN: Okay.
21     Q. What did the cases reflect that Brian sent to
22 you?
23     A. I never got them.
24     Q. Okay. Did you discuss those cases with Baymark
25 Partners?

25 (Pages 94 to 97)

Julie Smith   *   April 13, 2021

Page 98

1    A. No.
2    Q. Ms. Smith, I'm putting on the screen what's
3  marked as Exhibit 16.
4       (Exhibit No. 16 marked.)
5    Q. Do you see that?
6    A. Yes.
7    Q. And on this e-mail, is this an e-mail from you
8  to Mr. Vanderwoude?
9    A. Yes.
10   Q. January 21st, 2019?
11   A. Yes.
12   Q. Okay.  And is it -- is what's attached to this
13  a draft of the amended and restated loan agreement
14  between Super G and Windspeed?
15   A. It looks like it is, yes.
16   Q. Okay.  And did you title the document that was
17  attached?
18   A. That would be a document number from our
19  system.
20   Q. Okay.  So this is -- the document that's
21  attached here is a document from Hallett & Perrin's
22  document system?
23   A. Yes.
24   Q. Okay.  And is -- this Exhibit 16, is this a
25  true and correct copy of the e-mail that you sent on

Page 99

1  January 21, 2019?
2    A. I believe so.
3    Q. Okay.  And did you refer to this -- do you
4  refer to this -- the loan as the old ACET loan?
5    A. Yes.
6    Q. Okay.  And is that -- did you originally plan
7  to have the parties execute the foreclosure sale
8  agreement prior to sending out notices of foreclosure?
9    A. Say that again.
10   Q. Did you originally plan to have the parties
11  execute the foreclosure sale agreement prior to sending
12  out notices of foreclosure?
13   A. I think originally Super G wanted the
14  foreclosure sale agreement executed ahead of getting
15  the -- sending the notice out that, hence the need for
16  the bifurcated closing, that ultimately didn't -- as we
17  discussed before, that ultimately didn't end up
18  happening.  They sent the notice out prior to it being
19  executed.
20   Q. Okay.  And I'm putting on the screen what's
21  marked as Exhibit 17.
22       (Exhibit No. 17 marked.)
23   Q. Do you see that?
24   A. Yes.
25   Q. Okay.  And do you recognize this document?

Page 100

1    A. Yes.
2    Q. Okay.  Is this an e-mail exchange between you
3  and Mr. Vanderwoude?
4    A. Yes.
5    Q. Friday, January 25th, 2019?
6    A. Yes.
7    Q. The subject line, Super G/Windspeed?
8    A. Yes.
9    Q. Okay.  And on the second page here, do you
10  state -- do you state also, I can't recall, did we
11  revise the sale agreement to reflect that we were
12  assuming the old ACET note rather than entering into a
13  new one?
14   A. Yes, I see that.
15   Q. Okay.  And by we, did you mean Baymark?
16   A. I think I meant the parties, generally.
17   Q. All the parties were going to assume the old
18  ACET note?
19   A. Yeah.  I mean, it was a transaction structured
20  as an assumption of the old note.
21   Q. Didn't you, in fact, mean we, as Windspeed
22  because you were representing Windspeed?
23   A. No.
24   Q. No?
25   A. I didn't represent Windspeed.

Page 101

1    Q. Okay.  And you didn't mean by that that we were
2  assuming the old ACET note, you didn't mean by that that
3  Windspeed was assuming it?
4    A. No.  I don't think I put that much thought into
5  the pronoun.
6    Q. Okay.  Would you have been able to get
7  Windspeed to execute the documents?
8    A. Well, they did execute the documents after Bill
9  and Alex looked through everything.
10   Q. Okay.  And in fact, here, didn't you state that
11  I can forward -- I can forward on to Windspeed for
12  execution?
13   A. Yes.
14   Q. Okay.  How did you know there wouldn't be any
15  further back and forth?
16   A. Well, we were in communications throughout this
17  whole process.
18   Q. Okay.
19   A. So this isn't nefarious.  It wasn't -- but we
20  had been communicating with Bill and Alex.  We knew what
21  the issues were, we knew -- we were communicating with
22  Brian and Super G.
23   Q. Have you produced those e-mails?
24   A. I think we've produced everything that was in
25  the e-mail.

26 (Pages 98 to 101)

Page 102

1    Q. Okay. You -- all of your correspondence with
2  Alex Szeto and Bill?
3    A. That's my understanding.
4    Q. And your testimony is that there was a lot of
5  correspondence from you directly with just them?
6    A. No. That was not my testimony. What I was
7  saying is that everyone was on board with this
8  agreement, and there isn't any nefarious point to me
9  saying I can get it forwarded to Windspeed for
10  execution. They were a part of this, they reviewed it.
11    Q. I mean, didn't you, in fact, say that you can
12  forward it on to Windspeed for execution because
13  Windspeed was your client?
14    A. No. No.
15    Q. Why is that so unbelievable?
16    A. I feel like I've answered this question a lot.
17  Windspeed is not my client.
18    Q. Let's go back to --
19    A. Represented by Alex Szeto and Bill Szeto was a
20  seasoned entrepreneur.
21    Q. Okay. If we go back to the first page, page 1
22  of Exhibit 17, you ask, can you update the Windspeed
23  address for notice purposes to be the same address as in
24  the A&R loan agreement; is that correct?
25    A. That's what it says.

Page 103

1    Q. Now, if Bill Szeto is such a seasoned expert
2  and Alex Szeto is such a seasoned M&A attorney, why
3  can't they request updates of their address?
4    MR. PERRIN: Objection, form.
5    A. I think they could ask for updates to their
6  notice address.
7    Q. Okay. And after that, do you state also,
8  William C. Szeto will sign as the manager of Windspeed?
9    A. Yes.
10    Q. Okay. Is that because Windspeed was your
11  client?
12    A. No. No. We were conforming a document to the
13  information that was provided in another document.
14    Q. Okay. And then did you go on to state, I will
15  have Windspeed sign the signature page and return it to
16  you?
17    A. Again, we all were working together to get this
18  agreement finalized.
19    Q. Okay. Going back to the second page, did you
20  state that, I believe Super G was going to send out the
21  foreclosure notice a couple of weeks ago?
22    A. I don't see it on this page.
23    Q. It's right here. If you'll look on the screen.
24    A. Yes, I see that.
25    Q. Okay. You stated, I believe Super G was going

Page 104

1  to send out the foreclosure notice a couple of weeks
2  ago?
3    A. Yes.
4    Q. And why did you make that statement?
5    A. It was my understanding that there was a
6  ten-day waiting period after the notice was provided to
7  other creditors before the foreclosure could happen.
8    Q. Okay.
9    A. And administratively or process-wise, trying to
10  understand where we were in the timing.
11    Q. Okay. What foreclosure notice were you
12  referring to here?
13    A. The one you showed me earlier.
14    Q. So the exhibit from the January 31, 2019,
15  letter?
16    A. I think so. It was on Super G letterhead.
17    Q. Okay. Just to be clear here, is it this --
18  what's reflected here in Exhibit 1?
19    A. Yes.
20    Q. Okay. And so now, why were you discussing that
21  with Super G weeks before it was sent out?
22    A. Well, I didn't know it wasn't sent out. The
23  understanding I had at the end of the year was that
24  Super G was sending it out.
25    Q. Okay. Let me show you what's marked as

Page 105

1  Exhibit 18.
2    (Exhibit No. 18 marked.)
3    Q. Do you see that document, Ms. Smith?
4    A. Yes.
5    Q. Okay. Are you familiar with this document?
6    A. No.
7    Q. Okay. Does this appear to be an e-mail between
8  Matt Denegre and Steve Bellah?
9    A. Yes.
10    Q. Okay. January 28th, 2019?
11    A. Yes.
12    Q. Okay. And is the subject line, Super
13  G/Windspeed?
14    A. Yes.
15    Q. Okay. And below here in this chain, is there a
16  subject line with a forward of Super G/Windspeed?
17    A. Yes.
18    Q. Okay. And does Steve Bellah there state to
19  Matthew Denegre, please look at the attached notice to
20  determine if it's the proper notice address as listed
21  for seller/seller's counsel?
22    A. Yes.
23    Q. Okay. And did Matt -- above that, did Matt
24  send your name to Steve Bellah?
25    A. Yes.

Page 106

1    Q. Why would Matt send your name in response to
2  that question?
3    A. Because this would have been noticed to ACET in
4  the foreclosure notice, and I was counsel to ACET.
5    Q. And now, wasn't Steve asking for the
6  notice address for seller, seller's counsel?
7    A. That's what it says there.
8    Q. Okay. And why did that provide for your name?
9    A. I think that was an inaccurate e-mail.
10  Probably let the -- they thought it was going to be an
11  asset purchase agreement, but the foreclosure notice, I
12  think, is required to be sent to the foreclosee, the
13  company being foreclosed upon.
14   Q. Okay.
15   A. So they were, I'm sure, clearing up who the
16  counsel was for that.
17   Q. Okay.
18   A. It's possible, too, that the loan -- the
19  original loan agreement would have had notice provision
20  to Hallett & Perrin, but to my predecessor. I don't
21  know that for sure, but possibly updating Matt to make
22  sure that it's the correct.
23   Q. Was that Mr. Foote?
24   A. Yes, or --
25   Q. Cassandra?

Page 107

1    A. -- Cassandra, one of the two.
2    Q. Okay. And you reviewed the foreclosure notice
3  before it went out, correct?
4    A. I did.
5    Q. Okay. And that was the notice that Super G was
6  foreclosing on ACET Global's assets?
7    A. Yes.
8    Q. Okay. And did you suggest some changes to the
9  foreclosure notice before it went out?
10   MR. PERRIN: Objection, form.
11   A. I might have. I don't recall a lot of
12  discussion around that document. That doesn't mean
13  there wasn't tweaks made to it, but I think it was -- it
14  stands -- it stood pretty close to final form when it
15  was drafted.
16   Q. Okay. And you were representing ACET Global --
17   A. Yes.
18   Q. -- in that process?
19   A. Yes.
20   Q. Okay. And so I'm showing what's marked as
21  Exhibit 19.
22   (Exhibit No. 19 marked.)
23   Q. Do you see this?
24   A. Yes.
25   Q. And is this an e-mail from you to

Page 108

1    Mr. Vanderwoude?
2    A. Yes.
3    Q. On January 28th, 2019?
4    A. Yes.
5    Q. And is the subject line Super G/Windspeed?
6    A. Yes.
7    Q. And the attachments here are listed as ACET
8  notice of private sale?
9    A. Yes.
10   Q. Okay. And do you know if that was the notice
11  of disposition of sale?
12   A. I believe there was only one notice of
13  foreclosure that was ever negotiated and drafted.
14   Q. Okay. And did you have a discussion with Super
15  G counsel about giving Tomer Damti notice of Super G's
16  foreclosure?
17   A. Yes.
18   Q. And about giving Tomer Damti an opportunity to
19  purchase the assets?
20   A. Yes.
21   Q. Did you discuss that parties knew he wouldn't
22  exercise it?
23   A. I don't recall specifically. I think everybody
24  was under the impression he wouldn't.
25   Q. That he wouldn't?

Page 109

1    A. That he would not.
2    Q. Okay. Like he wouldn't be able to?
3    A. Oh, I don't know about that. I think it was a
4  courtesy.
5    Q. Okay. Did Super G state that Tomer Damti was
6  not entitled a notice?
7    A. For the statute, yes.
8    Q. Super G's counsel?
9    A. I'm sorry?
10   Q. Super G's counsel said that Tomer Damti was not
11  entitled to notice?
12   A. Super G's counsel said that the Texas statute
13  does not require unsecured creditors to be given notice
14  of a foreclosure sale.
15   Q. Okay. And how did you respond?
16   A. That I thought that we should provide notice to
17  him.
18   Q. Okay. And did you, in fact, know that Tomer
19  Damti was actually a secured rather than an unsecured
20  creditor?
21   MR. PERRIN: Objection, form.
22   A. I do not believe he was a secured creditor to
23  that -- ACET's assets.
24   Q. Okay. And why do you believe that?
25   A. I don't recall any security agreement, I don't

Julie Smith   *   April 13, 2021

---

Page 110

1 recall any lien filings. I think he might have had a
2 pledge of some of the equity interest or some of the
3 economic interests of Holdco, but I don't think he had
4 any rights to any of the ACET Global assets.
5    Q. Okay. So if Tomer Damti or had a security
6 interest in the assets of ACET Global, would that change
7 your view of whether this foreclosure process was
8 proper?
9    A. No.
10    Q. And weren't the assets of ACET Global
11 originally purchased from Mr. Damti's company?
12    A. Yes.
13    Q. Okay. A transaction of that size, do you
14 typically see that done without a security agreement?
15    A. Frequently.
16    Q. And didn't Hallett & Perrin actually draft a
17 security agreement?
18    A. I don't know.
19    Q. Okay. Did you obtain an inventory listing from
20 Windspeed?
21    A. An inventory listing of what?
22    Q. Of ACET Global's assets.
23    A. I received an inventory listing from Matt.
24    Q. Okay. Who was Matt with?
25    A. Baymark.

---

Page 111

1    Q. Okay. Did you know that that inventory had
2 come from Windspeed?
3       MR. PERRIN: Objection, form.
4    A. I think it was ACET assets that Super G had
5 asked Windspeed to look after.
6    Q. Okay. ACET assets that Super G had asked
7 Windspeed to look after?
8    A. I don't know that for sure. I don't know how
9 the asset list came to be in Bill Szeto's possession.
10    Q. Okay. But that was your understanding at the
11 time?
12    A. I'm not sure I even had an understanding at the
13 time.
14    Q. Okay. Well, what gave you -- what would have
15 put in your head that Super G had, for some reason,
16 asked Windspeed to look after ACET Global's assets?
17    A. I don't know that there was anything at the
18 time that made me. I'm not even sure I'm aware that
19 Windspeed had the asset list for ACET Global at the time
20 all of this was happening.
21    Q. Okay. Well, why would you have thought at any
22 point in time Windspeed would just be watching after
23 ACET Global's assets?
24    A. Well, you told me that Windspeed was provided
25 the asset list for ACET Global.

---

Page 112

1    Q. No, I asked if you knew that.
2       MR. PERRIN: Objection, form.
3    A. And I said I did not know that at the time of
4 the (indiscernible) stuff.
5    Q. Okay. But that it was your understanding that
6 Windspeed was just looking after the assets of ACET
7 Global?
8    A. No, I don't have any understanding, or I
9 don't -- I never thought about where the inventory list
10 came from or whose it was or who produced it. It was
11 just an exhibit to a document.
12    Q. Okay. Let's look at Exhibit 20.
13       (Exhibit No. 20 marked.)
14    Q. Do you recognize this document?
15    A. Yes.
16    Q. Okay. And is this an e-mail exchange between
17 you and Mr. Vanderwoude?
18    A. Yes.
19    Q. Okay. And is the subject line ACET Inventory
20 as of 1/24/2019?
21    A. Yes.
22    Q. Okay. And why did you need this inventory?
23    A. It was an attachment to the foreclosure sale
24 agreement, I think.
25    Q. Okay. And is that what you said here on page 1

---

Page 113

1 in your e-mail to Brian, here is an updated inventory
2 listing for the foreclosure agreement, any word from
3 Super G?
4    A. That's what I said in the e-mail.
5    Q. Okay. Does this appear to be a true and
6 correct copy of your e-mail?
7    A. Yes.
8    Q. Okay. Why did you need an updated inventory as
9 of 1/24/2019?
10    A. I don't know that there was a particular reason
11 for it, but we normally want the inventory as of the
12 date of the agreement.
13    Q. Okay. And why would ACET's inventory be
14 changing from the prior version you had received?
15    A. I have no idea.
16    Q. Okay. Did you ever ask that question?
17    A. No.
18    Q. Who was in possession of ACET Global's assets
19 at this time?
20    A. I have no idea.
21    Q. Did you ever ask Windspeed to confirm the
22 inventory?
23    A. I didn't.
24    Q. Or the equipment schedules?
25    A. I did not.

---

29 (Pages 110 to 113)

Page 114

1     Q. Okay. Did you ask someone else to do that?
2     A. No.
3     Q. Okay.
4     A. I would have asked for copies of that --
5   whatever we had as an exhibit to the -- whatever agreements
6   were working, I would have asked the business folks to
7   provide me with copies of that so that I could attach it
8   to the back, but I wouldn't have spent any time thinking
9   about it.
10     Q. Okay. Did you want to make sure that the
11   inventories were in final form?
12     A. I wanted to make sure that the business folks
13   all agreed to what was being attached as the exhibit.
14     Q. Okay. And this e-mail chain, if you look
15   below, originally the ACET inventory was requested --
16   was sent by Bill Szeto of Windspeed to Matt Denegre,
17   from Matt Denegre to you, and from you to Brian
18   Vanderwoude?
19     A. Yes.
20     Q. Is that correct?
21     A. Yep.
22     Q. Okay.
23         MR. FREEMAN: Do we want to take a break?
24         MR. PERRIN: I'm good with that.
25         MR. FREEMAN: This is a decent place for a

Page 115

1   quick break.
2         MR. PERRIN: All right.
3         MR. FREEMAN: We can go off the record.
4         (Break taken from 3:51 p.m. to 4:07 p.m.)
5         MR. FREEMAN: Okay. Back on the record.
6     Q. Ms. Smith, I'm putting on the screen what's
7   marked as Exhibit 21.
8         (Exhibit No. 21 marked.)
9     Q. Do you see this document?
10     A. Yes.
11     Q. And was this an e-mail exchange between you and
12   Mr. Vanderwoude?
13     A. Yes.
14     Q. January 31st, 2019?
15     A. Yes.
16     Q. And he stated that, I'm told the attached
17   letter is going out in tomorrow's mail, so we can use
18   that date to calculate the closing date for the asset
19   sale.
20     A. Yes.
21     Q. Was he referring to the notice of disposition
22   of assets?
23     A. Yes.
24     Q. And we'll go to Exhibit 22.
25         (Exhibit No. 22 marked.)

Page 116

1     Q. Do you recognize this e-mail?
2     A. Yes.
3     Q. Is this an e-mail exchange between you and
4   Mr. Vanderwoude as well?
5     A. Yes.
6     Q. Okay. Is this in February of 2019?
7     A. Yes. I mean, it starts in January, but ends in
8   February.
9     Q. Okay. Subject line, ACET?
10     A. Yes.
11     Q. And he says -- Brian says, please see the
12   attached version of the agreement, and let me know if it
13   is acceptable to you and Windspeed?
14     A. Yes.
15     Q. Why did he ask if it was acceptable to you and
16   Windspeed?
17     A. To Baymark and Windspeed?
18     Q. Okay. Is that what he meant by that?
19     A. I presume.
20     Q. And what did you say in response? It says, the
21   foreclosure sale -- the foreclosure of sale agreement
22   looks good to me. I've asked Windspeed to confirm the
23   inventory and equipment schedules are in final form and
24   also for the name and title of the person to sign on
25   behalf of Windspeed.

Page 117

1         Why were you asking Windspeed to confirm
2   these items rather than Mr. Vanderwoude asking Windspeed
3   directly?
4     A. We were all working together to finalize this
5   transaction and close it.
6     Q. Okay.
7     A. It was just whoever was moving the ball
8   forward.
9     Q. Did he understand you to be representing
10   Windspeed?
11     A. I don't believe so. I don't know who he
12   thought I -- I mean, assuming he thought I represented
13   Baymark.
14     Q. Okay. Have you worked with Mr. Vanderwoude
15   since?
16     A. I don't think so.
17     Q. Have you worked on a number of transactions
18   with Mr. Vanderwoude?
19     A. No.
20     Q. Ms. Smith, I'm putting up what's marked as
21   Exhibit 30.
22         (Exhibit No. 30 marked.)
23     Q. Can you see this document?
24     A. Yes.
25     Q. And are you familiar with this e-mail?

Page 118

```
 1          A. Give me a second. Yes.
 2          Q. Is this an e-mail between you and
 3   Mr. Vanderwoude?
 4          A. Correct.
 5          Q. And Michelle Shriro?
 6          A. Shriro (different pronunciation).
 7          Q. Shriro. And who is Ms. Shriro?
 8          A. Counsel to Baymark.
 9          Q. And she represented Baymark Partners?
10          A. She would have represented, I think, Baymark
11   ACET Holdco.
12          Q. Okay. And is she bankruptcy counsel,
13   foreclosure counsel, corporate counsel?
14          A. She does both.
15          Q. Okay. And this e-mail is in December of 2018?
16          A. Yes.
17          Q. With the subject line ACET, correct?
18          A. Correct.
19          Q. And on page 2, Brian states, can we do a call
20   with Julie Smith -- who also represents the parties in
21   this case; is that right?
22          A. Yes.
23          Q. Okay. What parties did you represent?
24          A. ACET and ACET Holdco.
25          Q. And based on this e-mail thread, did you, in
```

Page 119

```
 1   fact, have a conference call with Brian and Michelle?
 2          A. Yes.
 3          Q. And what did you discuss?
 4          A. I think they originally had it drafted as an
 5   asset agreement, a tri-party asset purchase agreement,
 6   and I said that we would not -- we, ACET, would not sign
 7   a purchase agreement. We wouldn't impede their exercise
 8   of their foreclosure rights under the security
 9   agreement. We weren't going to voluntarily enter into a
10   purchase agreement.
11          Q. Okay. Why weren't you going to voluntarily
12   enter into a purchase agreement?
13          A. If they were going to foreclosure on us, they
14   were going to have to foreclosure on us.
15          Q. You weren't going to sell the assets to them?
16          A. No.
17          Q. What were the proposed terms of the asset
18   purchase agreement?
19          A. I never saw it that I can recall.
20          Q. Okay. Was the amount of the purchase price
21   substantially different?
22          A. I don't think so. I think it was -- I think it
23   was -- actually, I have no idea. I don't know that I
24   saw it.
25          Q. Why were you opposed to an asset purchase
```

Page 120

```
 1   agreement?
 2          A. I don't think ACET needed to be a party of its,
 3   you know, downfall, basically, but if Super G wanted
 4   access to the assets, they could foreclose on them.
 5          Q. But -- okay. So ACET -- it wouldn't be right
 6   for ACET to be a party to its own downfall?
 7              MR. PERRIN: Objection, form.
 8          A. Right. This was not a -- this wasn't a happy
 9   event. Their senior lender is foreclosing.
10          Q. Okay. So this was not something to be
11   celebrated or congratulated about?
12          A. Correct.
13          Q. Okay. Here, what -- I'm going to take you back
14   to Exhibit 9.
15              (Exhibit No. 9 marked.)
16          Q. Do you recall looking at this document?
17          A. Looking at the e-mail?
18          Q. Yes, ma'am.
19          A. Yes.
20          Q. Okay. And is this document -- does it reflect
21   an e-mail between you and Matt Denegre and Alex Szeto
22   and Alex Godinez?
23          A. Yes.
24          Q. And Steve Bellah and Carrie Williamson?
25          A. Yes.
```

Page 121

```
 1          Q. Okay. And is the subject line, Windspeed
 2   Executed Documents?
 3          A. Yes.
 4          Q. Okay. And right below, is this an e-mail from
 5   you, Ms. Smith?
 6          A. Yes.
 7          Q. And does it state, great, exclamation,
 8   congratulations, folks, the transaction is closed?
 9          A. Yes.
10          Q. Okay. And if we could, just go back to
11   Exhibit 30. Why, again, were you so opposed or was ACET
12   so opposed to an asset purchase agreement?
13          A. In relation to Exhibit 9?
14          Q. No, just -- I'm trying to understand why an
15   asset purchase agreement was so much worse than a
16   foreclosure.
17          A. Well, ACET had granted a security interest to
18   its lender, it was in default under the loan. Up until
19   some point, you know, the lender had fore -- I don't
20   know if it actually ever technically forebeared, but now
21   at this point, they were ready to -- they, Super G,
22   wanted to wind up and get out of this investment, this
23   loan. That's all fine, that's all within their rights
24   under the loan and the security agreement. We have the
25   obligations to cooperate with them, et cetera, et
```

Page 122

1    cetera, but we did not have to agree to sell the assets.
2    Q. Okay. So you're telling me, when I put Brian
3    Vanderwoude on the stand, his testimony is going to be
4    consistent with that recollection?
5    A. It should be.
6    Q. Okay. So he understood you were adamant that
7    there would be no asset purchase agreement?
8    A. He should -- yes, he should be -- he should
9    remember it that way.
10    Q. Okay. When's the last time you spoke with
11    Mr. Vanderwoude?
12    A. January of -- March of -- March of 2019.
13    Q. Okay.
14    A. It's possible we would have traded e-mails
15    shortly after that with closing binders, but I didn't
16    remember having any substantive e-mails with him beyond
17    this closing.
18    Q. Okay. And do you have any transactions
19    currently pending involving Mr. Vanderwoude?
20    A. No.
21    Q. Do you have any reason to engage in any
22    communication with him right now?
23    A. No.
24    Q. This -- on this document where he had stated
25    Julie Smith also represents the parties in this case,

Page 123

1    again, you understood that to mean ACET or Baymark, not
2    Windspeed?
3    A. Yes.
4    Q. Okay. But who were the parties to this -- to
5    the documents at issue? Was that Windspeed and Super G?
6    A. This e-mail is regarding the foreclosure sale
7    agreement --
8    Q. Okay.
9    A. -- versus a tri-party agreement with ACET. So
10    in this instance, I was representing ACET saying we
11    would not sign a tri-party agreement.
12    Q. Okay. And after you removed ACET from it, does
13    Mr. Vanderwoude then go and involve Windspeed counsel
14    about the new two-party agreement between Windspeed and
15    Super G?
16    A. I believe that Bill Adams' attorney reviewed
17    the document and negotiated that.
18    Q. Okay. And did Mr. Vanderwoude state, we
19    enjoyed speaking with you earlier, an updated draft of
20    the agreement is attached, it's now set up as a
21    foreclosure sale agreement between Windspeed and Super G
22    rather than a tri-party agreement involving ACET? Is
23    that correct?
24    A. That's what the e-mail says.
25    Q. Was Bill or Alex on that call?

Page 124

1    A. I don't recall.
2    Q. Do you know if they were consulted about
3    changing this to a two-party agreement that would not
4    involve ACET?
5    A. I don't recall.
6    Q. Did you ever express to anyone at Windspeed,
7    including Bill or Alex, that ACET Global was adamant
8    that it would not engage in an asset purchase agreement?
9    A. I don't have a specific recollection of a
10    conversation with them, but it wasn't a secret that we
11    did not want to sign a purchase agreement, so I --
12    Q. Okay.
13    A. -- I would believe that they would have heard
14    that.
15    Q. Would an agreement without ACET be cleaner?
16    MR. PERRIN: Objection, form.
17    A. Cleaner than --
18    Q. A tri-party agreement.
19    A. Well, it's clearer in that, you know, there's
20    statutory rules involved with it, so if the statutory
21    rules are followed, the results will be more certain.
22    Q. And what do you mean by -- what results would
23    be more certain?
24    A. That the asset -- that the foreclosure would
25    happen -- properly happen, and the assets would convey.

Page 125

1    Q. Okay. Would it look better?
2    MR. PERRIN: Objection, form.
3    A. What do you mean?
4    Q. Would it look better to remove ACET Global from
5    the transactional documents?
6    A. Look better to whom?
7    Q. Someone looking at it a couple of years after
8    the fact.
9    A. Oh, like Jason Freeman?
10    Q. Correct.
11    A. I don't know. I think that -- I don't know if
12    they would make it look better or worse.
13    Q. Did you have any discussions with anyone about
14    whether that would decrease the risk of successor
15    liability?
16    A. I don't know if -- I don't recall now the
17    context of successor liability, and I don't recall if it
18    was as it relates to purchase agreement versus a
19    foreclosure sale agreement. I know I had discussions
20    with Brian Vanderwoude about successor liability, and we
21    all determined it wasn't -- it was a risk but not a
22    risk -- an insurmountable risk.
23    Q. Okay. What made it not insurmountable?
24    A. Well, let me back up. We advised clients as to
25    what the risk would be -- successor liability and

Usher Reporting Services
(214) 755-1612

Julie Smith   *   April 13, 2021

---

Page 126

1   otherwise in this transaction, and they made the
2   decision of moving forward or not --
3       Q. So you --
4       A. -- in the structure, et cetera.
5       Q. You basically advised the clients there may be
6   a risk, and the client decides whether they're willing
7   to take on that risk?
8       A. Generally, that is, yes, my -- what my job is
9   is to identify a risk and liabilities and present it to
10  this client so they can make an informed decision about
11  how they want to move forward in this deal and every
12  other deal.
13      Q. Okay. Well, in this deal, did you have any --
14  did you have discussions with your clients that they
15  might have risk on this transaction, that it would be
16  viewed as a fraudulent transfer?
17      A. Any discussions I had with my client would be
18  covered by attorney-client privilege.
19      Q. In late March of 2019, were you still working
20  through the loan agreement?
21      A. My recollection is that the loan agreement was
22  finalized. It's just never been signed, and it's
23  probably in part because I was on family medical leave.
24      Q. Well, were you possibly still discussing some
25  changes to the loan agreement, though, in March -- late

---

Page 127

1   March 2019?
2       A. I don't recall changes to that. If there were
3   changes, it might have been to update dollar amounts or
4   dates. I don't -- my memory is that that agreement was
5   in basically final form at the end of January.
6       Q. Okay. I'm putting on the screen what's marked
7   as Exhibit 23.
8           (Exhibit No. 23 marked.)
9       Q. Do you see that document?
10      A. Yes.
11      Q. And is that an e-mail between you, Matt
12  Denegre, and William Szeto?
13      A. Yes.
14      Q. Okay. And is that dated March 19th, 2019?
15      A. Yes.
16      Q. And the subject line is, Windspeed/Super G loan
17  agreement?
18      A. Yes.
19      Q. Okay. And you -- on this e-mail, there's no
20  one else on here. Do you generally -- in your -- you
21  maintain the Hallett & Perrin is not representing
22  Windspeed at this point in time?
23          MR. PERRIN: Objection, form.
24      A. Yes, no, I'm -- I maintain that, yes.
25      Q. Okay. But you have not cc'd Windspeed's

---

Page 128

1   counsel on this?
2       A. No. It looks like I was responding to the
3   e-mail I received.
4       Q. Okay. And do you generally engage in
5   correspondence with another firm's client directly?
6       A. No.
7       Q. Is it possible at this point in time you might
8   have gotten confused and thought you were representing
9   Windspeed?
10      A. No.
11      Q. On this e-mail link, on page 2, excuse me, on
12  the e-mail chain on page 2, this is an e-mail from you
13  to Matt Denegre on March 19th, 2019?
14      A. Uh-huh.
15      Q. And you state that Super G's attorney and I
16  have been discussing a couple of changes to the loan
17  agreement that are not substantive, but might make Super
18  G's back office folks happy; is that right?
19      A. That's what it says.
20      Q. And that you were still working through the
21  language?
22      A. Yes.
23      Q. So wasn't it, in fact, the case that, at least
24  of March 19th, 2019, the loan agreement had not been
25  finalized?

---

Page 129

1       A. It appears so.
2       Q. And Ms. Smith, has any third parties ever
3   referred to you as Windspeed's lawyer?
4       A. I have no idea.
5       Q. Has Mr. Vanderwoude referred to you as
6   Windspeed's lawyer ever?
7       A. I don't recall.
8       Q. Ms. Smith, I'm putting up what's marked as
9   Exhibit 24 to this deposition.
10          (Exhibit No. 24 marked.)
11      Q. Do you see this?
12      A. Yes.
13      Q. And is this an e-mail between Mr. Vanderwoude
14  and you on March 19th, 2019?
15      A. Yes.
16      Q. And on the fourth page of this e-mail exchange,
17  is this an e-mail from you to Mr. Vanderwoude?
18      A. Yes.
19      Q. And it also includes Matt Denegre?
20      A. Yes.
21      Q. Okay. So you, Brian Vanderwoude, and Matt
22  Denegre on March 3rd, 2019, right?
23      A. Uh-huh.
24      Q. And the subject line is Windspeed/Super G Loan
25  Agreement?

---

33 (Pages 126 to 129)

Page 130

1    A. Yes.
2    Q. And it says, Brian, attached is a red-line of
3  the version you sent on Friday to the latest version in
4  our system.
5        Is that correct?
6    A. Yes.
7    Q. Okay. And then above that, Mr. Vanderwoude
8  e-mails Steve Bellah of Super G Capital, and he states,
9  see comments below from Windspeed's lawyer. Do you see
10  that?
11    A. I do.
12    Q. Now, Mr. Vanderwoude was the attorney that you
13  were working on this transaction with closely, right?
14    A. Yes.
15    Q. And you and Mr. Vanderwoude were having lots of
16  discussions and exchanges of e-mails on this
17  transaction?
18    A. I don't know about the word "lots," but yes,
19  there were discussions and e-mails.
20    Q. Y'all were proposing changes for your clients?
21    A. We were, yes, proposing changes to the
22  documents.
23    Q. Okay. Any idea why Mr. Vanderwoude would be
24  mistaken that you were Windspeed's lawyer?
25    A. You'll have to ask him.

Page 131

1    Q. Who wanted the foreclosure sale agreement to be
2  backdated?
3    A. I don't think -- I don't know. I think that
4  fell through the cracks when I left on leave. We
5  intended to get it closed, and then it all fell through
6  or stuff got pushed to the back of -- back burner. When
7  I came back into the office, we just finalized and
8  executed the document.
9    Q. Okay. Did anyone want the loan agreement to be
10  backdated?
11    A. I think the loan agreement says March 1st. I
12  think -- isn't that what we're talking about here?
13    Q. Right. Any of these documents, was there any
14  reason that anyone wanted them backdated?
15    A. No, other than just to represent sort of when
16  the parties had agreed to all of this stuff.
17    Q. Okay. But weren't there changes still being
18  made at this time?
19    A. I think they were primarily updating doc --
20  updating numbers. I don't think there were substantive
21  changes.
22    Q. Okay. Did you have a discussion with Baymark
23  Partners about dating a loan agreement with a prior
24  date?
25    A. I don't recall a specific discussion.

Page 132

1    Q. Let me show you what's marked as Exhibit 25.
2        (Exhibit No. 25 marked.)
3    Q. Ms. Smith, do you recognize this document as an
4  e-mail between yourself, Matt Denegre, and cc'g William
5  Szeto?
6    A. Yes.
7    Q. Is this from March 20th, 2019?
8    A. Yes.
9    Q. And did you state that Super G wants to date
10  the loan agreement as of March 1st which means the loan
11  will start accruing interest as of 3/1?
12    A. Yes, I did state that.
13    Q. Okay. Why did Super G want the loan agreement
14  to be dated March 1st?
15    A. It looks like it's because the loan would start
16  accruing interest on 3/1.
17    Q. Okay. Have they, in fact, been paying interest
18  on the loan?
19    A. I don't know. Didn't Matt respond to that?
20    Q. I don't know. Do you know if he did?
21    A. I don't know. It seems to me that we backdated
22  it to March 1st, so perhaps they were accruing interest
23  on the loan at that point and paying interest.
24    Q. Okay. I'm showing you what's marked as
25  Exhibit 26.

Page 133

1        (Exhibit No. 26 marked.)
2    Q. Do you see that?
3    A. Yes.
4    Q. And it's an e-mail from Matt Denegre to you and
5  Mr. Szeto?
6    A. Yes.
7    Q. Okay. And is this e-mail from you on March
8  21st, below that, it states, these changes are fine with
9  me if the numbers look right to you. Just let me know.
10  Then, OMG, we could be close to signing this thing.
11        Is that correct?
12    A. Yes.
13    Q. Okay. So was this a sense of excitement to be
14  nearing the end of this transaction?
15    A. "Relief" might be a better word.
16    Q. Okay. Was everyone happy to be getting to this
17  point?
18    A. Yes, because this is a -- not a transaction
19  that should have taken, you know, four months or three
20  months, December to -- I guess three months, December to
21  March.
22    Q. Okay. And why is that?
23    A. Because the documents aren't complicated.
24  They're checking, and the foreclosure agreement is
25  statutorily driven. The purchase -- the loan and

Usher Reporting Services
(214) 755-1612

Page 134

1    security agreement was based on a form that had been
2    negotiated back in the fall. It just did not need to
3    take this long, but there were things that happened, I
4    guess, in the interim that slowed the process down.
5        Q. Okay. And I'm showing you what's marked as
6    Exhibit 27.
7            (Exhibit No. 27 marked.)
8        Q. Do you see this?
9        A. Yes.
10       Q. Is this an e-mail from you to Matt Denegre and
11   William Szeto?
12       A. Yes.
13       Q. On March 21st, 2019?
14       A. Yes.
15       Q. Does this appear to be a true and correct copy
16   of that e-mail?
17       A. Yes.
18       Q. Okay. And does it state on here, Matt and
19   Bill, attached are the signature pages that Bill will
20   sign in connection with the foreclosure sale and the
21   assumption of the ACET loan?
22       A. That's what it says.
23       Q. Okay. Now, how did you understand this
24   assumption of the ACET loan to be effectuated?
25       A. What do you mean?

Page 135

1        Q. Well, how exactly was Windspeed assuming the
2    ACET loan?
3        A. I think just that. They were assuming the loan
4    -- the obligations under the loan from ACET.
5        Q. Okay.
6        A. I'm not trying to be snarky. I'm not sure I
7    understand your question.
8        Q. Well, were they -- was there actually an
9    assignment over of that loan? Is that typically how
10   that would occur?
11       A. I think the assignment was built into the loan
12   and security agreement. Again, I don't have these
13   documents in front of me, but I think the recital to the
14   loan and security agreement describe it.
15       Q. Okay. Is it possible that Windspeed merely
16   entered into a loan with Super G for the amount -- the
17   same amount of the outstanding loan that was owed by
18   ACET?
19       A. Well, they entered into an amended and restated
20   agreement of the ACET loan. Yes, they did enter into a
21   loan agreement.
22       Q. Okay. But rather than signing over the old
23   ACET loan, didn't Windspeed just enter into a loan
24   agreement directly with Super G for the same amount of
25   that old loan?

Page 136

1            MR. PERRIN: Objection, form.
2        A. No. I think that they assumed the obligations
3    of ACET under the loan in the amended and restated loan
4    agreement.
5        Q. Okay. Did you work on that?
6        A. On the amended and restated loan agreement?
7        Q. Yes, ma'am.
8        A. Yes.
9        Q. I'm on Exhibit 28.
10           (Exhibit No. 28 marked.)
11       Q. Do you recognize this document?
12       A. Yes.
13       Q. Okay. And is this an e-mail from you to
14   Mr. Vanderwoude?
15       A. Yes.
16       Q. Okay. And does it state that you're attaching
17   Windspeed's signature pages to the documents?
18       A. Yes.
19       Q. But you were not acting as Windspeed's attorney
20   here, correct?
21       A. No. I was the attorney to one of the managers
22   on the board of managers.
23       Q. Okay. And why didn't you -- well, let me ask
24   you, did that person who was on the board of managers,
25   is that the person who signed this document?

Page 137

1        A. A board member signed the document, yes.
2        Q. Okay. And when you say, a board member, are
3    you referring to the one that I just asked you about?
4        A. William Szeto signed the documents.
5        Q. The CEO of Windspeed, correct?
6        A. Yes.
7        Q. And in his capacity as the CEO of Windspeed,
8    right?
9        A. I think so. You have to look at the signature
10   pages to see if he signed it as CEO or manager.
11       Q. In fact, he signed everything that you've ever
12   seen from Windspeed as the CEO of Windspeed, correct?
13       A. No, actually, I have no idea. If he would have
14   signed it, my guess would be either CEO or manager.
15       Q. Have you ever seen him sign anything as manager
16   of Windspeed?
17           THE WITNESS: Is that on that same
18   attachment?
19           MR. PERRIN: Yes.
20       A. It looks like he signed that -- the notes
21   attached to that as manager.
22       Q. Okay. The note that's attached to this --
23       A. The document that's attached to that.
24   Assignment assumption agreement.
25       Q. Okay. So is that what you obtained from him?

Page 138

```
 1        A.  Presumably, I obtained all of the stuff from
 2   him that I sent to Brian.
 3        Q.  Okay.  Because I'm going down here to the
 4   fourth page of the PDF which is the amended and restated
 5   business loan and security agreement.
 6        A.  Okay.
 7        Q.  Looks to be signed by William Szeto.
 8        A.  As CEO.
 9        Q.  Yeah.  Is that the title under there?
10        A.  Yes.
11        Q.  William Szeto as CEO?
12        A.  Yes.
13        Q.  Okay.  In fact, isn't that how he held himself
14   out with Windspeed?
15        A.  Yeah, he was the CEO.
16        Q.  Would you be surprised to hear him refer to
17   the, quote, board of Windspeed as a sham?
18        A.  No.  Actually, I have no idea.  I don't know
19   what he said.  In what context?
20        Q.  Well, did you ever see anyone actually engage
21   in any activities in their capacity as a board member of
22   Windspeed?
23        A.  I'm not sure what you're asking.  It looks
24   like --
25            THE WITNESS:  Is this the same exhibit he's
```

Page 139

```
 1   looking at?
 2        A.  It looks like one of the signature pages on
 3   this exhibit, he signs as manager.
 4        Q.  Okay.  You're referring to the fifth page?
 5            MR. PERRIN:  Keep scrolling.
 6        A.  No, he's on it.  Yeah, the --
 7            MR. FREEMAN:  I think I'm on the page, Ed.
 8            THE WITNESS:  Yeah.
 9        Q.  This is the document you drafted, correct?
10            MR. PERRIN:  There's more than one page
11   that is signed.
12            THE WITNESS:  Oh, as manager.
13            MR. FREEMAN:  It looks the same here.
14        Q.  These are the documents you drafted, correct?
15        A.  I -- I'm not sure what documents they are, but
16   I drafted or negotiated and revised all of them.
17        Q.  Correct.  And have you ever seen him provide
18   you with anything where he wrote his title to be
19   manager?
20        A.  You mean what -- a document that gave him
21   authority?
22        Q.  No, just a document where he wrote to you and
23   held himself out as manager.
24        A.  I don't know that there was any document he
25   sent me that he signed as --
```

Page 140

```
 1        Q.  Okay.
 2        A.  I'm not sure I understand the question.  Repeat
 3   it, and I'll try to answer it.
 4        Q.  Well, that -- I'm just -- is there any
 5   document -- have you ever seen him -- outside of
 6   anything that you've provided to him, have you ever seen
 7   him represent himself to be on the board of managers of
 8   Windspeed?
 9        A.  I don't think I've ever seen any documents from
10   him other than these.
11        Q.  Okay.  And outside of this, you know, this
12   particular transaction, what are you aware of where any
13   member of this so-called board of Windspeed has ever
14   taken an action in that capacity?
15        A.  Well, I don't have the documents in front of
16   me, but I'm assuming we would have had more resolutions
17   to approve the change in the loan agreement and the
18   asset and the foreclosure sale agreement.
19        Q.  Have you ever seen those?
20        A.  I'd have to go look.
21        Q.  Do you know if those were produced in this
22   case?
23        A.  I don't know.  I don't know that we drafted
24   them.
25        Q.  Okay.  Were you involved at all in the bank --
```

Page 141

```
 1   ACET Global's bankruptcy filing?
 2        A.  Was I involved in what?
 3        Q.  The ACET Global bankruptcy filing.
 4        A.  No.
 5        Q.  But that was your client, correct?
 6        A.  Yes.
 7        Q.  And why were you not involved in any matter?
 8        A.  I'm not a bankruptcy attorney.
 9        Q.  Was Hallett & Perrin involved?
10        A.  Not to my knowledge.  If someone at Hallett &
11   Perrin was involved, it would have -- probably would
12   have been me, but I think Michelle Shriro handled all of
13   that stuff.
14        Q.  Okay.  And there's no one there with -- at
15   Hallett & Perrin with bankruptcy expertise?
16        A.  No, huh-uh.
17        Q.  Well, the good news for you is I have got to go
18   teach a class at SMU in about ten minutes.  I think we
19   are to a good stopping point.  I know this is your first
20   deposition, but when I stop, sometimes that means you've
21   got additional questions from the other side.  I'm
22   probably done, but I will go ahead and pass the witness.
23            MR. PERRIN:  On behalf of the Baymark
24   defendants, we reserve questions until the time of
25   trial.
```

36 (Pages 138 to 141)

## Page 142

1    MS. HARD-WILSON:  And on behalf of
2  Windspeed, we also reserve our questions.
3    MR. FREEMAN:  Ms. Smith, thanks for taking
4  a long period out of your day and sitting through this.
5  I know it wasn't fun.
6    THE WITNESS:  No problem.
7    MR. FREEMAN:  I appreciate it.
8    THE WITNESS:  You're welcome.
9    MR. PERRIN:  All right.  We're done?
10    THE REPORTER:  Yes.  Can I get your orders
11  -- whoever wants to order a copy, can I get your orders
12  on the record, please?
13    MR. PERRIN:  Yes.  Ms. McPhearson, Ed
14  Perrin, we'd like a copy.
15    THE REPORTER:  Okay.  Do you like
16  electronic, a hard copy?
17    MR. PERRIN:  I would like an electronic.
18    MS. HARD-WILSON:  Windspeed doesn't need a
19  copy.
20    MR. FREEMAN:  And D&T would like it
21  expedited.
22    MR. PERRIN:  Mrs. McPhearson, we would like
23  to read and sign.
24    REPORTER'S NOTE:  (Mr. Freeman agreed on a
25  rough draft)

## Page 143

(Deposition concluded at 4:42 p.m.)

## Page 144

1      CHANGES AND SIGNATURE
2  WITNESS NAME: JULIE A. SMITH   DATE:  APRIL 13, 2021
3  PAGE    LINE    CHANGE    REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14    I, JULIE A. SMITH, have read the foregoing
15  deposition and hereby affix my signature that same is
16  true and correct, with the changes, if any, as noted
17  above.
18    _____
        JULIE A. SMITH
19
20  THE STATE OF _____)
21  COUNTY OF _____)
22    Sworn to and subscribed before me on the _____ day
23  of _____, _____ by JULIE A. SMITH.
24    _____
25      NOTARY PUBLIC

## Page 145

1      CAUSE NO. DC-19-09828
2  D&T PARTNERS, LLC        ) IN THE DISTRICT COURT
   (successor in interest to    )
3  ACET VENTURE PARTNERS,    )
   LLC),                 )
4            )
        Plaintiff,      )
5            )
   VS.            )
6            ) DALLAS COUNTY, TEXAS
   ACET GLOBAL, LLC; BAYMARK   )
7  ACET HOLDCO, LLC; BAYMARK   )
   ACET DIRECT INVEST, LLC;    )
8  BAYMARK MANAGEMENT, LLC;   )
   Baymark Partners; DAVID     )
9  HOOK; TONY LUDLOW; and     )
   Windspeed Trading, LLC,     )
10            )
        Defendants.    ) 116TH JUDICIAL DISTRICT
11
12
13      REPORTER'S CERTIFICATION
      DEPOSITION OF JULIE A SMITH
14        APRIL 13, 2021
15
16    I, Larissa L. McPhearson, Certified Shorthand
17  Reporter in and for the State of Texas, hereby certify
18  to the following:
19    That the witness, JULIE A. SMITH, was duly sworn by
20  me and that the transcript of the oral deposition is a
21  true record of the testimony given by the witness;
22    That the deposition transcript was submitted on
23  _____ to the witness or to the attorney for the
24  witness for examination, signature and return to me by
25  _____;

37 (Pages 142 to 145)

Page 146

```
 1        That the amount of time used by each party at the
 2   deposition is as follows:
 3        Mr. Jason B. Freeman - 02 HOURS:56 MINUTES
          Mr. Edward P. Perrin - 00 HOURS:00 MINUTES
 4        Ms. Brenda Hard-Wilson - 00 HOURS:00 MINUTES
 5        That pursuant to information given to the
 6   deposition officer at the time said testimony was taken,
 7   the following includes counsel for all parties of
 8   record:
 9        Mr. Jason B. Freeman, Attorney for Plaintiff
          Mr. Edward P. Perrin, Attorney for Defendant, ACET
10   GLOBAL, LLC and BAYMARK
          Ms. Brenda Hard-Wilson and Mr. Tim Woods, Attorneys
11   for Defendant WINDSPEED TRADING, LLC
12        I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   taken, and further that I am not financially or
16   otherwise interested in the outcome of the action.
17        Certified to by me this 23rd day of April, 2021.
18
19
          _____
          Larissa L. McPhearson, Texas CSR 8371
20        Expiration Date:  4/30/21
          Usher Reporting Services
21        1326 Lochness Drive
          Allen, Texas  75013
22        (214)755-1612
23
24
25
```

Usher Reporting Services
(214) 755-1612