PLAINTIFF'S
EXHIBIT

**18**

# FORECLOSURE SALE AGREEMENT

between

## WINDSPEED TRADING, LLC,
as Buyer,

and

## SUPER G CAPITAL, LLC,
as Seller.

### DATED AS OF MARCH 1, 2019

BP_008219

## FORECLOSURE SALE AGREEMENT

This Foreclosure Sale Agreement (this "<u>Agreement</u>") dated as of March 1, 2019, is made by and between Windspeed Trading, LLC ("<u>Buyer</u>") and Super G Capital, LLC ("<u>Seller</u>").

## RECITALS

A.    ACET Global, LLC ("<u>Debtor</u>") is indebted to Seller pursuant to a Business Loan and Security Agreement dated as of July 20, 2017, and all other agreements and documents pertaining thereto (collectively and as the same may have been amended or modified from time to time, the "<u>Loan Agreements</u>").

B.    To secure the Debtor's obligations to Seller under the Loan Agreements, Debtor granted Seller a security interest (the "<u>Security Interest</u>") in all of Debtor's personal property, tangible or intangible, including Debtor's right, title, and interest in and to the following: all accounts, all chattel paper, all commercial tort claims, all deposit accounts (including, without limitation, the Debtor's Account (as defined in the Loan Agreements), all documents, all general intangibles (including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Debtor possesses, uses or has authority to possess or use property of others or others possess, use or have authority to possess or use property); all goods (including all equipment, fixtures and inventory), all investment property, securities and all other investment property; supporting obligations; any other contract rights or rights to the payment of money; insurance claims and proceeds; commercial tort claims; all money, all negotiable collateral, all instruments, all books and records, and all supporting obligations and proceeds arising from or relating to any of the foregoing (the "<u>Collateral</u>").

C.    Debtor is in default of its obligations under the Loan Agreements for failure to make payments under the Loan Agreements according to their terms, among other defaults, and Seller has exercised its rights as a secured creditor.

D.    Debtor currently owes Seller the sum of $516,844.86 pursuant to the Loan Agreements.

E.    Seller has the right to enforce all of its remedies against Debtor and the Collateral, and Seller has elected to conduct a foreclosure sale of certain of the Collateral.

**FORECLOSURE SALE AGREEMENT – PAGE 1**

F.      Seller has given notice of private sale in accordance with sections 9.610 and 9.611 of the UCC and, thus, is authorized pursuant to section 9.617 of the UCC to transfer title to certain Collateral to Buyer on behalf of Debtor.

G.      Buyer has agreed to purchase, and Seller has agreed to sell, certain of the Collateral in a private sale on the terms and conditions set forth in this Agreement.

H.      The parties are entering into this Agreement to effectuate the private sale transaction, subject to and conditioned upon the terms set forth in this Agreement.

I.      The parties do not intend, in entering into this Agreement and carrying out the transaction contemplated hereby, to assume or become liable for any obligation, liability, or indebtedness of Debtor.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby confessed and acknowledged, the parties hereto agree as follows:

SECTION 1.   RECITALS AND DEFINITIONS

1.1.   Recitals.   The foregoing Recital paragraphs are incorporated herein by reference.

1.2.   Definitions.   In addition to terms used in the preamble and Recitals, (a) terms used but not defined herein have the respective meanings given to them in the Uniform Commercial Code; and (b) the terms set forth below have the following meanings, respectively:

(a)      "Ancillary Agreements" means, collectively, (i) the Bill of Sale in the form attached hereto as Exhibit A (the "Bill of Sale"), (ii) the Assignment and Assumption Agreement in the form attached hereto as Exhibit B (the "Assignment Agreement"), and (iii) the Amended and Restated Business Loan and Security Agreement in the form attached hereto as Exhibit C (the "Amended Loan Agreement").

(b)      "Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in New York, New York are closed either under applicable Law or action of any Governmental Authority.

**FORECLOSURE SALE AGREEMENT – PAGE 2**

(c)     "Closing" means the closing of the transaction contemplated by this Agreement.  The verb "to Close" shall have a correlative meaning.

(d)     "Consent" means any approval, consent, ratification, waiver or other authorization.

(e)     "Contract" means any contract, purchase order, agreement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond, option, warrant, right or other instrument or consensual obligation, whether written or oral.

(f)     "Encumbrance" means any charge, claim, mortgage, servitude, easement, right of way, community or other marital property interest, covenant, equitable interest, license, lease or other possessory interest, lien, option, pledge, hypothecation, security interest, preference, priority, right of first refusal, condition, limitation or restriction of any kind or nature whatsoever (whether absolute or contingent).

(g)     "Governmental Authority" means any (a) nation, region, state, county, city, town, village, district or other jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal), (d) multinational organization or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

(h)     "Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

(i)     "Law" means any law, statute, ordinance, rule, regulation, code, order, Judgment or decree or other restriction of any Governmental Authority.

(j)     "Liability" includes liabilities, debts or other obligations of any nature, whether known or unknown, absolute, accrued, contingent, liquidated, unliquidated or otherwise, due or to become due or otherwise, whether or not required to be reflected on a balance sheet prepared in accordance with U.S. generally acceptance accounting principles.

(k)     "Person" means any individual, corporation, sole proprietorship, firm, partnership, limited partnership, limited liability partnership, limited liability company, trust, association, joint venture or other business entity or any Governmental Entity.

**FORECLOSURE SALE AGREEMENT – PAGE 3**

(l)   "Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

(m)   "Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect in the State of Texas.

1.3.   <u>Interpretation</u>.  The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement. The headings contained in this Agreement are for convenience of reference only and shall in no way affect the interpretation of this Agreement.  The term "include" and derivatives thereof shall be deemed in all cases to be followed by the words "without limitation." Unless otherwise specified, reference to (a) a Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of this Agreement; (b) any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time; (c) any Law means such Law as amended, modified, replaced or re-enacted, in whole or in part, from time to time and shall include all rules and regulations promulgated thereunder; (d) a section, an exhibit, or a schedule means a section hereof or an exhibit or a schedule hereto, respectively; and (e) a clause means the appropriate clause within the same section in which such reference occurs.

SECTION 2.  <u>PURCHASE AND SALE OF ASSETS; EXCLUDED ASSETS</u>

2.1.   <u>Purchase and Sale of the Purchased Assets</u>.  Subject to the terms and conditions of this Agreement, at the Closing, Seller, pursuant to Section 9-610 of the Uniform Commercial Code and other applicable Law, shall sell, assign, convey and transfer to Buyer, and Buyer shall purchase from Seller, all right, title and interest of the Debtor and Seller in and to the assets described in the Bill of Sale and in the Assignment Agreement, such assets listed in the Bill of Sale and Assignment Agreement, and only such assets, the "<u>Purchased Assets</u>").

2.2.   <u>Excluded Assets</u>. Notwithstanding anything to the contrary in Section 2.1 or elsewhere in this Agreement, Seller shall retain and does not sell, assign, convey or transfer to Buyer any and all assets that are not specifically included as Purchased Assets, including without limitation the following assets of the Debtor (collectively, the "<u>Excluded Assets</u>"), all of which are expressly excluded from the Purchased Assets:

**FORECLOSURE SALE AGREEMENT – PAGE 4**

(a)    any property subject to valid leases in which Debtor is the lessee that are not disguised security agreements subordinate to the lien and security interest of Seller;

(b)    to the extent the transfer contemplated herein is prohibited by any license or other agreement, any software or other licensed products that may be installed on or attached to the Purchased Assets delivered to Buyer;

(c)    original copies of all minute books, non-classified records, stock ledgers and Tax records of the Seller, and any other materials that Debtor is required by Law to retain;

(d)    the shares of the capital stock of the Debtor; and

(e)    all rights of the Seller under this Agreement, the Ancillary Agreements and any other documents, instruments or certificates executed in connection with the transactions contemplated by this Agreement.

2.3.    <u>No Assumption of Obligations</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, BUYER IS NOT ASSUMING AND SHALL NOT BE LIABLE FOR ANY DEBT, OBLIGATION, RESPONSIBILITY OR LIABILITY OF DEBTOR, SELLER OR OF ANY OTHER PARTY, WHETHER KNOWN OR UNKNOWN, CONTINGENT OR ABSOLUTE OR OTHERWISE AND WHETHER RELATING TO THE PURCHASED ASSETS, THE EXCLUDED ASSETS, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY DEBT, OBLIGATION, RESPONSIBILITY, OR LIABILITY WITH RESPECT TO TAX, EMPLOYMENT, BENEFITS, PERSONAL INJURY OR PRODUCT LIABILITY CLAIMS, EQUIPMENT LEASES, LICENSE AGREEMENTS, OR CONTRACTS.  IN FURTHERANCE AND NOT IN LIMITATION OF THE FOREGOING, BUYER DOES NOT ASSUME ANY LIABILITY OF DEBTOR OR SELLER UNDER: THE LOAN AGREEMENTS, THAT CERTAIN THAT CERTAIN SECURED PROMISSORY NOTE DATED JULY 20, 2017, PAYABLE BY DEBTOR TO ACET VENTURE PARTNERS LLC IN THE STATED PRINCIPAL AMOUNT OF $3,230,000.00, ANY EQUIPMENT LEASE, ANY LICENSE AGREEMENT, OR ANY OTHER CONTRACT OR OBLIGATION OF DEBTOR, ITS PRINCIPALS, OFFICERS, OR DIRECTORS, OR ANY OTHER PARTY OR ANY OTHER PERSON, EXCEPT AS EXPRESSLY INCLUDED IN THE PURCHASED ASSETS.

2.4.    <u>Books and Records</u>. Buyer shall comply with all applicable Laws and regulations with respect to the books and records of Debtor delivered to Buyer pursuant to this Agreement (the "<u>Books and Records</u>") and any and all confidential employee and customer information.

**FORECLOSURE SALE AGREEMENT – PAGE 5**

SECTION 3.  <u>PURCHASE PRICE</u>. As the purchase price (the "<u>Purchase Price</u>") for all of the Purchased Assets, Buyer shall pay Seller the total sum of $516,844.86.   To that end, Buyer agrees to execute, contemporaneously with the Closing, the Amended Loan Agreement.

SECTION 4.  <u>LEASE; EMPLOYEES; CONTINUING ACCESS TO BOOKS AND RECORDS</u>.

Buyer shall permit Seller and/or Debtor reasonable access to and use of the Books and Records for wind down and similar corporate purposes that do not compete with Buyer for a period of 18 months following the Closing Date. Such access and use shall be permitted during normal business hours and upon reasonably notice to Buyer and shall be conducted in such a manner so as to minimize disruption to Buyer's operations.

SECTION 5.  <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

5.1.   Seller represents and warrants to Buyer as of the Closing Date as follows:

(a)   Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

(b)   Seller has complied with the applicable provisions of Article 9 of the Uniform Commercial Code with respect to the sale of the Purchased Assets to Buyer.  To Seller's Knowledge, no Person claims a security interest in or other lien on the Purchased Assets.  Seller has not granted any release or subordination of, terminated or transferred to any other Person any security interest in, UCC financing statement right on, or other right or interest with respect to, any Purchased Assets except as to Buyer or pursuant to this Agreement.  Except for any express warranties made by Seller to Buyer set forth in this Agreement and the Ancillary Agreements, Seller makes no representation or warranty, express or implied, regarding any aspect of the Purchased Assets, including without limiting the foregoing, (i) Seller makes no representation or warranty in respect of the Purchased Assets relating to quality, quantity, collectability, merchantability or fitness for a particular use, (ii) Seller makes no implied warranties and specifically disclaims any warranties of merchantability or fitness for a particular purpose, and (iii) all Purchased Assets are transferred and sold hereunder AS IS and WHERE IS and with all defects.

(c)   Seller has good and marketable title to, a valid leasehold interest in, or a valid license to use all of the Purchased Assets and has the right to use and to transfer and assign to Buyer all of the Purchased Assets, in each case free and clear of all Encumbrances.

**FORECLOSURE SALE AGREEMENT – PAGE 6**

(d)     There are no pending or, to the knowledge of Seller, threatened Proceeding by any Governmental Authority or any other Person (i) challenging or seeking material damages in connection with this Agreement or the transactions contemplated hereunder or (ii) seeking to restrain or prohibit the consummation of the transactions contemplated hereunder or otherwise limit the right of the Buyer to own or operate the Purchased Assets.

(e)     Seller has all requisite company power and authority to execute and deliver this Agreement and all Ancillary Agreements and to perform its obligations under this Agreement and the Ancillary Agreements. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated herein and therein have been duly authorized by all necessary company action on the part of Seller. Seller has duly and validly executed and delivered this Agreement. This Agreement constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other Laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(f)     Buyer will not be obligated to pay any fee or commission to any broker, finder or intermediary in connection with the transaction contemplated by this Agreement as a result of any agreement, understanding or undertaking made by Seller.

SECTION 6.   REPRESENTATIONS AND WARRANTIES OF BUYER

6.1.     Buyer represents and warrants to Seller as of the Closing Date, as follows:

(a)     Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.

(b)     Buyer has all requisite company power and authority to execute and deliver this Agreement and all Ancillary Agreements and to perform its obligations under this Agreement and the Ancillary Agreements. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated herein and therein have been duly authorized by all necessary company action on the part of Buyer. Buyer has duly and validly executed and delivered this Agreement. This Agreement constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other Laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

BP_008226

(c)     Seller will not be obligated to pay any fee or commission to any broker, finder or intermediary in connection with the transaction contemplated by this Agreement as a result of any agreement, understanding or undertaking made by Buyer.

SECTION 7.  CLOSING.

7.1.     The Closing.  The Closing shall take place contemporaneously with the execution of this Agreement (the date of the Closing, the "Closing Date").  In lieu of an in-person Closing, the parties may elect to close by facsimile or electronic transmission of executed documents and overnight delivery scheduled for the following Business Day of executed original documents.  All tangible personal property included in the Purchased Assets is to be surrendered by Seller and delivered to Buyer at the location of such personal property on the Closing Date.  All actions shall be deemed to have occurred simultaneously and as of the closing of business on the Closing Date, and the effectiveness of any action taken at the Closing shall, unless otherwise agreed by Buyer and Seller, be conditioned upon the taking of all other actions required by this Section 7.

7.2.     Deliveries by Seller.  At the Closing, Seller shall deliver to Buyer (a) the Bill of Sale; (b) the Assignment Agreement; and (c) such other documents as Buyer reasonably may request in order to carry out the transactions contemplated under this Agreement.

7.3.     Deliveries by Buyer.  At the Closing, Buyer shall deliver to Seller (a) the Assignment Agreement, (b) the Amended Loan Agreement; and (c) such other documents as Seller reasonably may request in order to carry out the transactions contemplated under this Agreement.

7.4.     Conditions to Closing.

(a)     As a condition precedent to Seller's obligation to Close:

(i)     Buyer shall have executed Buyer's counterparts of the Ancillary Agreements and delivered them to Seller;

(ii)     All of Buyer's representations and warranties in this Agreement (considered collectively), and each of those representations and warranties (considered individually), shall be accurate in all material respects as of the time of the Closing as if then made, without giving effect to any supplement to such representations and warranties; and

(iii)     All of the covenants and obligations  that Buyer is required to perform or to comply with pursuant to this Agreement at or before the Closing (considered collectively), and each of those covenants and

FORECLOSURE SALE AGREEMENT – PAGE 8

obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)     As a condition precedent to Buyer's obligation to Close:

(i)     Seller shall have executed counterparts of the Ancillary Agreements and delivered them to Buyer;

(ii)     All of Seller's representations and warranties in this Agreement (considered collectively), and each of those representations and warranties (considered individually), shall be accurate in all material respects as of the time of the Closing as if then made;

(iii)     The Purchased Assets will not be subject to any security interest or lien superior in priority to Seller's security interest, and all junior liens against the Purchased Assets will be released at or prior to Closing or foreclosed upon at Closing;

(iv)     All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or before the Closing (considered collectively), and each of those covenants and obligations (considered individually), must have been duly performed and complied with in all material respects; and

(v)     Buyer shall have completed its due diligence and be satisfied therewith, in the sole discretion of Buyer.

SECTION 8.  <u>CERTAIN POST-CLOSING ACTIONS</u>

8.1.     <u>Covenants</u>.  The parties acknowledge and agree that, pursuant to Section 9.617 of the UCC, at Closing, Seller's disposition of the Collateral after default discharges the security interest of Seller under which the disposition was made. After Closing, Seller will use commercially reasonable efforts to amend the UCC financing statement Seller filed with the Secretary of State of Texas to delete the Purchased Assets from its collateral description and shall execute and deliver to the Buyer whatever other documents are reasonably necessary to evidence to any other governmental or regulatory filing agency the release of Seller's security interest and conveyance of the Seller's title in the Purchased Assets. Buyer's counsel shall prepare and deliver to Seller for its approval all documents reasonably necessary to terminate Seller's security interest and shall thereafter file such documents on Seller's prior written approval to do so. Buyer shall bear any expense incurred in dealing with any domestic or foreign government or regulatory agency in transferring Seller's right, title and interest in any of the Purchased Assets.

8.2.  <u>Further Assurances</u>.  From time to time for a period of one year after the Closing Date, each Party, without in any manner being required to expand to any extent, or otherwise alter to its detriment, its obligations hereunder, shall execute, acknowledge and deliver such additional documents and instruments and take such other actions (including providing reasonable cooperation in the event of any litigation relating to the validity and/or effect of the transactions contemplated hereby) as the other Party reasonably requests in order to more effectively assign, convey and transfer to Buyer the Purchased Assets and to more effectively carry out the transactions contemplated under this Agreement.

8.3.  <u>Receipt of Payments</u>.  If Seller receives any payment with respect to any of the Purchased Assets, including without limitation any accounts receivable included in the Purchased Assets (the "<u>Accounts Receivable</u>"), at any time after the Closing Date, Seller shall promptly deliver such payment to Buyer.  In addition, Seller shall cooperate with Buyer regarding any Accounts Receivable collected into the lockbox account or any other accounts of Debtor maintained by Seller, and to transfer such account and/or monies contained therein to Buyer after Closing.

SECTION 9.  <u>MISCELLANEOUS</u>

9.1.  <u>Waiver</u>.  Either party hereto may, by written notice to the other: (a) extend the time for performance of any obligation of the other party under this Agreement, (b) waive any inaccuracy in any representation or warranty of the other party contained in this Agreement or in any document delivered pursuant hereto, (c) waive compliance with any condition or covenant of the other party contained in this Agreement or (d) waive performance of any obligation of the other party under this Agreement.  Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of either party, shall be deemed to constitute a waiver by the party taking such action of compliance by the other party with any representation, warranty, covenant, condition or agreement contained herein.  The waiver by a party hereto of a breach of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

9.2.  <u>Amendment</u>.  This Agreement may not be amended except in a written document duly executed by Buyer and Seller.

9.3.  <u>Governing Law, Venue</u>.  This Agreement shall be governed by the Laws of the State of Texas applicable to contracts made and to be performed entirely within such State.  The parties agree that any suit, claim, action or Proceeding arising out of, or relating to, this Agreement will be instituted only in the Texas.  Each party waives any

**FORECLOSURE SALE AGREEMENT – PAGE 10**

objection it may have now or hereafter to such venue and irrevocably submits to the jurisdiction of such court in any such suit, claim, action or Proceeding.

      9.4.   <u>Notices</u>.  All notices, requests and other communications pursuant to this Agreement shall be in writing and shall be deemed to have been given: (i) when delivered personally, (ii) the next Business Day, if sent by a recognized overnight courier, or (iii) three Business Days after deposit in the United States mail, registered or certified and with proper postage prepaid, in each such case provided such notice, request, or communication is addressed as follows:

If to Buyer:

      Windspeed Trading LLC
      Attn: William C. Szeto
      1761 International Parkway, Suite 133
      Richardson, TX 75081

      With a required copy to:

      Julie Smith
      Hallett & Perrin, P.C.
      1445 Ross Avenue, Suite 2400
      Dallas, Texas 75202

If to Seller:

      Super G Capital, LLC
      Attn:  Marc Cole
      23 Corporate Plaza
      Suite 100
      Newport Beach, CA 92660

      With a required copy to:

      Larry Makel
      Dorsey & Whitney LLP
      300 Crescent Court, Suite 400
      Dallas, TX 75201

Any party or other recipient may from time to time change its address for purposes of this Agreement by giving notice of such change as provided herein.

**FORECLOSURE SALE AGREEMENT – PAGE 11**

9.5.    <u>Assignment</u>.  This Agreement may not be assigned or delegated by any party without the prior written consent of the other parties.

9.6.    <u>No Third Party Beneficiaries</u>.  This Agreement (excluding the forms of agreements referenced in the Exhibits) is between Buyer and Seller and their respective permitted successors and assigns.  Nothing in this Agreement (excluding the forms of agreements referenced in the Exhibits) is intended or shall act to benefit or be enforceable by any third party, including, without limitation, any Person.  Any reference herein to the "parties" or a "party" shall be deemed to be a reference to, respectively, Buyer and Seller, and Buyer or Seller, as the context may require, unless the context in which such term is used clearly indicates otherwise.

9.7.    <u>Costs and Expenses</u>.  Buyer and Seller shall pay their own costs in connection with the negotiation, preparation, execution and delivery of this Agreement and any related document.  Neither Buyer nor Seller shall have any liability for any costs or expenses incurred by any Person in connection with this Agreement or any transactions or related agreements contemplated hereby.

9.8.    <u>Waiver of Jury Trial</u>.  BUYER AND SELLER WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT.  The scope of such waiver is intended to be all-encompassing of all disputes that may be filed in any court relating to the transactions contemplated hereby, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  Each of Buyer and Seller warrants and represents that it has reviewed the foregoing waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with such counsel.  THE FOREGOING WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND SUCH WAIVER SHALL, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, APPLY TO ANY SUBSEQUENT AMENDMENT OR OTHER MODIFICATION TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

9.9.    <u>Preparation of Agreement</u>.  Seller and Buyer hereby acknowledge that (i) Seller and Buyer jointly and equally participated in the drafting of this agreement and all other agreements contemplated hereby, (ii) Seller and Buyer have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of the agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

**FORECLOSURE SALE AGREEMENT – PAGE 12**

9.10.   <u>Confidentiality</u>.   Except as otherwise expressly permitted by this Agreement, Buyer and Seller will keep confidential, will not disclose and will otherwise retain in strictest confidence the terms of this Agreement, provided however that Buyer or Seller may issue a press release upon signing of this Agreement announcing such signing (without disclosing the Purchase Price) upon review and consent by the other party.

9.11.   <u>Multiple Counterparts; Electronic Delivery</u>. This Agreement and all Exhibits hereto and each agreement referred to herein and therein may be validly executed in one or more counterparts and by different parties thereto, all of which counterparts, when taken together, shall constitute but one agreement.  This Agreement may be validly executed and delivered by fax, e-mail or other electronic means, and any such execution or delivery shall be fully effective as if executed and delivered in person.

9.12.   <u>Entire Agreement</u>.   This Agreement and the Exhibits attached hereto embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein or therein.  There are no agreements, representations, warranties or covenants other than those expressly set forth herein or therein.  This Agreement and the Exhibits attached hereto supersede all prior agreements and understandings between the Parties with respect to such subject matter.

(<i>Signature Page Follows</i>)

534044v3

BP_008232

IN WITNESS WHEREOF, each party has executed and delivered this Agreement as of the day and year first written above.

**WINDSPEED TRADING, LLC**

By: _____

William C. Szeto, its Manager

**SUPER G CAPITAL, LLC**

By: _____

Marc Cole, its Chief Financial Officer

**SIGNATURE PAGE – ASSET PURCHASE AGREEMENT**

BP_008233

IN WITNESS WHEREOF, each party has executed and delivered this Agreement as of the day and year first written above.

**WINDSPEED TRADING, LLC**

By: _____
William C. Szeto, its Manager

**SUPER G CAPITAL, LLC**

By: _____
Marc Cole, its Chief Financial Officer

**SIGNATURE PAGE – ASSET PURCHASE AGREEMENT**

**EXHIBITS**

Exhibit A          Form of Bill of Sale
Exhibit B          Form of Assignment and Assumption Agreement
Exhibit C          Form of Amended Loan Agreement

**EXHIBIT A**

**Form of Bill of Sale**

(*See attached.*)

BP_008236

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that Super G Capital, LLC ("Seller"), for good and valuable consideration, receipt of which is hereby acknowledged, paid by Windspeed Trading, LLC ("Buyer"), to Seller, and subject to the terms and conditions of the Foreclosure Sale Agreement dated on or about the date hereof (the "Foreclosure Sale Agreement") between Seller and Buyer, Seller does hereby irrevocably sell, assign, transfer and deliver to Buyer, its successors and assigns, all of Seller's right, title and interest in and to the following:

(a)     the Inventory described in Exhibit 1 hereto;

(b)     the Equipment, furniture, fixtures, furnishings, machinery, computer hardware and software, materials, vehicles, tools, dies, molds and other items of tangible personal property described in Exhibit 2 hereto;

(c)     the intellectual property described in Exhibit 3 hereto;

(d)     prepaid expenses, credits and advance payments, claims, refunds, rights of setoff and rights of recoupment;

(e)     all notes and accounts receivable of ACET Global, LLC's ("Debtor") remaining unpaid as of 5:00pm CST on the date hereof, including all trade receivables and other rights to payment from customers, and the full benefit of all security for such accounts or rights to payment;

(f)     all books, records, files, studies, manuals, reports and other materials (in any form or medium) related to the Debtor's business, including all advertising materials, catalogues, price lists, mailing lists, distribution lists, client and customer lists, referral sources, supplier and vendor lists, purchase orders, sales and purchase invoices, correspondence, production data, sales and promotional materials and records, purchasing materials and records, research and development files, records, intellectual property disclosures, manufacturing and quality control records and procedures, service and warranty records, equipment logs, operating guides and manuals, drawings, product specifications, engineering specifications, blueprints, financial and accounting records, litigation files, personnel and employee benefits records related to employees of Debtor engaged in the business to the extent transferable under applicable Law, and copies of all other personnel records to the extent Seller is legally permitted to provide copies of such records to the Buyer; in each case, to the extent relating to Debtor's business;

BILL OF SALE – PAGE 1

(g)    any Consent, license, franchise, permit, exemption, clearance or registration issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law and all pending applications therefore or renewals thereof, in each case relating to the Debtor's business and to the extent transferable to the Buyer; and

(h)    all rights and interests under all certificates for insurance, binders for insurance policies, and insurance under which Debtor, its business, or any of the Purchased Assets is or has been insured, to the extent such rights or interests arise from or relate to any of the other Purchased Assets.

TO HAVE AND TO HOLD, unto Buyer, its successors and assigns, FOREVER.

Seller hereby warrants, covenants and agrees that it:

(i)    has complete and unrestricted power to enter into this Bill of Sale and to sell, assign and transfer its right, title and interest in the Purchased Assets and such sale, assignment and transfer does not and will not require the consent or approval of any third person or governmental entity; and

(ii)    will take all steps necessary to put Buyer, its successors or assigns, in actual possession and control of the Purchased Assets.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER UNDER THE FORECLOSURE SALE AGREEMENT OR THIS BILL OF SALE, THE PURCHASED ASSETS TRANSFERRED HEREBY ARE SOLD "AS IS" AND "WHERE IS."   SELLER HEREBY DISCLAIMS ALL WARRANTIES (EXCEPT FOR THOSE WARRANTIES MADE BY SELLER UNDER THE FORECLOSURE SALE AGREEMENT OR THIS BILL OF SALE), WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Seller will execute and deliver or cause to be executed and delivered from time to time such instruments, documents, agreements, consents and assurances and will take such other action as Buyer reasonably may require more effectively to convey, transfer and vest in Buyer and to put Buyer in possession of, the Purchased Assets or property being sold, assigned, transferred and delivered hereunder.

This instrument is binding upon Seller and will inure to the benefit of and be enforceable by Buyer and its permitted successors and assigns.

*(Signature page follows.)*

BILL OF SALE – PAGE 2

IN WITNESS WHEREOF, each party has executed and delivered this Bill of Sale as of March 1, 2019.

**SUPER G CAPITAL, LLC**


By: _____

Marc Cole, its Chief Financial Officer

**SIGNATURE PAGE –BILL OF SALE**

# EXHIBIT 1

## INVENTORY

| | | | On Hand |
|---|---|---|---|
| | **Inventory 01-28-2019** | | |
| | | 10734 (Romantic Mystery Necklace) | 1 |
| | | 30219 (Tear of A Fairy Bracelet) | 21 |
| | | A-0927Black (Wood Spinner Black) | 137 |
| | | A-0927Blue (Wood Spinner Blue) | 115 |
| | | A-0927White (Wood Spinner White) | 197 |
| | | A-0927Yellow (Wood Spinner Yellow) | 246 |
| | | A-1179 (Vehicle Windshield Protector with Double Waterproof Coat and Magnetic Clips) | 0 |
| | | A-139Double L (Double O Swim Suit - L) | 1 |
| | | A-139Eye S (Eye See Curves Swim Suit - S) | 6 |
| | | A-139Polka S (Polka Dot Swim Suit - S) | 4 |
| | | A-139Sassy L (Sassy Classy Swim Suit - L) | 1 |
| | | A-139Sassy M (Sassy Classy Swim Suit-M) | 9 |
| | | A-139Sassy S (Sassy Classy Swim Suit - S) | 6 |
| | | A-1622BLK (Anti-radiation tempered glass screen protector- Black) | 1 |
| | | A-1622WHT (Anti-radiation tempered glass screen protector- White) | 9 |
| | | A-1988Blue (Bat Wing Spinner Blue) | 6 |
| | | A-1988Green (Bat Wing Spinner Green) | 199 |
| | | A-1988Yellow (Bat Wing Spinner Yellow) | 64 |
| | | A-20162Orange-N (Waist Belt  ) | 8 |
| | | A-3168 red (Bunny coin wristlet purse) | 3 |
| | | A-3168 tan (Bunny coin wristlet purse) | 1 |
| | | A-3188Bunny (Memo Holder) | 21 |
| | | A-3220 BLACK (LED LIGHTED CELL PHONE CASE) | 188 |
| | | A-3220 WHITE (LED LIGHTED CELL PHONE CASE) | 139 |
| | | A-4991Black-6P (Self Mounting Case- BLACK 6P) | 34 |
| | | A-4991White-6P (Self Mounting Case- WHITE 6P) | 37 |
| | | A-5 (Water Bag- for drinking backpack) | 15 |
| | | A-5000 GREEN (Water bag for drinking backpack) | 1 |
| | | A-5157Black (LED Fidget Spinner Black) | 1 |
| | | A-5157Yellow (LED Fidget Spinner Yellow) | 2 |
| | | A-5252- BLU (Wrist Wallet) | 1 |
| | | A-5252- RED (Wrist Wallet) | 8 |
| | | A-6152 black (vintage bag) | 6 |
| | | A-6211GRN (Bluetooth LED spinner) | 3 |
| | | A-6211PNK (Bluetooth LED spinner) | 29 |

**EXHIBIT 1 TO BILL OF SALE – PAGE 1**

BP_008240

| | | | |
|---|---|---|---|
| | | A-6211WHT (Bluetooth LED spinner) | 16 |
| | | A-6464RED/BURGUN (CRUSHED VELVET HEADBAND- RED) | 5 |
| | | A-7001Black (Wine Pump) | 1 |
| | | A-7001White (Wine Pump) | 134 |
| | | A-727 (Universal Magnetic Car Air Vent Smartphone Holder) | 17 |
| | | A-835 (FishEye Lens) | 599 |
| | | A-8911-GRN (Smart water cup- Green) | 10 |
| | | A-8911-ORG (Smart water cup- Orange) | 18 |
| | | A-9141 Blue Plaid (PLAID TARTAN SCARVES) | 9 |
| | | A-9906 (Racer Car Mount A-9906) | 41 |
| | | ACE-3000Pink (Smart Touch Screen Winter Stretch Gloves for Smart Phones & Tablets... | 30 |
| | | ACE-3000White (Smart Touch Screen Winter Stretch Gloves for Smart Phones & Tablet... | 11 |
| | | ACE-3000Yellow (Smart Touch Screen Winter Stretch Gloves for Smart Phones & Table... | 61 |
| | | Aroma-L (AROMA SENSE AROMA THERAPY CUSTOM SHOWER HEAD-LARGE) | 1 |
| | | AROMA-S (AROMA SENSE AROMA THERAPY CUSTOM SHOWER HEAD-SMALL) | 6 |
| | | B-014S (Purse Organize Small - Lt. Blue) | 8 |
| | | B-1074Black (New Hair Straightener  Black) | 19 |
| | | B-1074Pink (New Hair Straightener Pink) | 4 |
| | | B-1747 (PROFESSIONAL 10 PCS SOFT OVAL TOOTHBRUSH MAKEUP BRUSH SET CREAM) | 1 |
| | | B-1747G (Makeup Brush Gold) | 43 |
| | | B-2 (IPhone 5 Arm Band) | 183 |
| | | B-20 (Nail Tools- kit) | 243 |
| | | B-2418 (24K gold facial mask) | 24 |
| | | B-2929 (Body & Clothing Double Sided Tape) | 2 |
| | | B-3511MULTI (DAY AND NIGHT 40 COLOR EYE SHADOW PALETTE) | 64 |
| | | B-3511NETURAL (DAY AND NIGHT 40 COLOR EYE SHADOW PALETTE) | 62 |
| | | B-3995 (Makeup Brushes Beauty bag) | 1,017 |
| | | B-3999 (Makeup Brushes - New - 12 Pcs) | 5 |
| | | B-4267 (Black Mask) | 4 |
| | | B-4400Silver (Mirror Power Bank Silver) | 1 |
| | | B-50 (Thick Nail File) | 744 |
| | | B-510 (Black Peel Off Mask) | 4 |
| | | B-515 (Hair Treatment for Over Chemical Damanged) | 249 |
| | | B-516 (Hair Treatment for Over Heating Tools Damaged) | 249 |
| | | B-517 (Hair Treatement for Over Sunblock Damaged) | 248 |
| | | B-5BLK-M (Black silk Robe- size: M) | 2 |
| | | B-5GLD-M (Golden silk Robe: size: M) | 3 |
| | | B-5RED-M (Red silk Robe- size: M) | 7 |
| | | B-6294 (PROFESSIONAL MAKEUP BRUSH CLEANER) | 20 |
| | | B-651WHT (Premium Hair Straightener Brush - Assorted Colors-WHITE) | 21 |
| | | B-8419Blue (Silicone Cleanser) | 5 |

**EXHIBIT 1 TO BILL OF SALE – PAGE 2**

| | | | |
|---|---|---|---:|
| | | B-8419Pink (Silicone Cleanser) | 2 |
| | | Colorblock BBG (I Phone 6 Case - Colorblock. BBG) | 32 |
| | | Colorblock BGO (I Phone 6 Case - Colorblock BGO) | 50 |
| | | Colorblock OOG (I Phone 6 Case - Colorblock OOG) | 56 |
| | | Colorblock RYP (I Phone 6 Case - Colorblock RYP) | 35 |
| | | Colorblock WBR (I Phone 6 Case - Colorblock WBR) | 54 |
| | | E-095PURPLE (2-Way Headphone Splitter-Purple) | 2 |
| | | E-1058YLO (WATERPROOF HANGING SPEAKERS- YELLOW) | 5 |
| | | E-1088 dice (3D light with romote) | 11 |
| | | E-1088 lotus (3D light with romote) | 0 |
| | | E-11149WHT (BLUETOOTH RETRACTABLE HEADSET) | 23 |
| | | E-121 7 (TEMPERED GLASS SMARTPHONE SCREEN PROTECTOR -IPHONE 7) | 19 |
| | | E-121 X (Iphone X screen protector) | 2 |
| | | E-1216 (Tempered Glass Screen Protector) | 371 |
| | | E-1216P (Tempered Screen Protector -6P) | 368 |
| | | E-1217P (TEMPERED GLASS SMARTPHONE SCREEN PROTECTOR - IPHONE 7 PLUS) | 40 |
| | | E-121N3 (Tempered Screen Protector - N3) | 76 |
| | | E-1910 (Water Powered Alarm Clock with Indoor Temperature & Humidity) | 1 |
| | | E-1982Charcoal (WearSafe Charcoal) | 1 |
| E | | E-2221 (VR Box) | 2,348 |
| | | E-2399BLU (Earbuds Headsets- blue) | 12 |
| | | E-2981YELLOW (Mini Portable USB Rechargeable Battery Clip Fan- YELLOW) | 17 |
| | | E-3333black (KOOLULU PORTABLE POWER BANK) | 21 |
| | | E-3333White (KOOLULU PORTABLE POWER BANK) | 2 |
| | | E-5517Black (Magnetic Ear Bud) | 0 |
| | | E-5552 (3D VR Viewer) | 0 |
| | | E-605Blue (Bluetooth Smart Watch w/ Silicone Strap-Blue) | 0 |
| | | E-605Orange (Bluetooth Smart Watch w/ Silicone Strap-Orange) | 0 |
| | | E-605Pink (Bluetooth Smart Watch w/ Silicone Strap-Pink) | 0 |
| | | E-8008 (LAPEL MICROPHONE) | 101 |
| | | E-8251BLU (3 PORT USB CHARGER- BLUE) | 0 |
| | | E-8251GLD (3 PORT USB CHARGER- GOLD) | 0 |
| | | E-8251GRN (3 PORT USB CHARGER- GREEN) | 20 |
| | | E-8251SLV (3 PORT USB CHARGER- SILVER) | 0 |
| | | E-8477 (PORTABLE JUMPSTARTER) | 0 |
| | | Fruit bowl- Cantaloup (Fruit bowl- Cantaloup) | 42 |
| | | Fruit bowl- Lemon (Fruit bowl- Lemon) | 30 |
| | | Fruit bowl- ORG (Fruit bowl- ORANGE) | 34 |
| | | Fruit bowl- Watermalon (Fruit bowl- Watermelon) | 29 |
| | | G-1991Black (Fidget Spinner Black) | 465 |
| | | G-1991Green (Fidget Spinner Green) | 260 |

**EXHIBIT 1 TO BILL OF SALE – PAGE 3**

| | | | |
|---|---|---|---|
| | | G-1991 Red (Fidget Spinner Red) | 348 |
| | | G-1991 White (Fidget Spinner White) | 805 |
| | | G-20 Blue (Happy Man Cell Phone-Blue) | 0 |
| | | G-20 Yellow (Happy Man Cell Phone Holder-Yellow) | 0 |
| | | G-31 Black (Monopod for smartphone or camera holder - Black) | 8 |
| | | G-31 Blue (Monopod for smartphone or camera holder - Blue) | 1 |
| | | G-55 (High Voltage Universal Adaptor ....) | 14 |
| | | G-63 Black (IPocket Card Holder Case for Iphone 6-Black) | 154 |
| | | G-63 Gold (IPocket Card Holder Case for IPhone6-Gold) | 288 |
| | | G-63 Plus Blk (IPocket Card Holder Case for IPhone6-Black) | 77 |
| | | G-63 Plus Gold (IPocket Card Holder Case for IPhone6-Gold) | 23 |
| | | G-63 Plus Pink (IPocket Card Holder Case for Iphone6-Pink) | 54 |
| | | G-63 Plus Red (IPocket Card Holder Case for IPhone6-Red) | 129 |
| | | G-63 Plus White (IPocket Card Holder Case for IPhone6-White) | 123 |
| | | G-63 Red (IPocket Card Holder Case for IPhone6-Red) | 268 |
| | | G-63 White (Ipocket Card Holder Case for Iphone 6-White) | 123 |
| | | Gel-001 (Bumblebee Kisses Soak-off UV&LED) | 87 |
| | | Gel-011 (Perfect Pink Soak-off UV&LED) | 1 |
| | | Gel-029 (Lavender Wave Soak-off UV&LED) | 43 |
| | | Gel-033 (Orchard Eyes Soak-off UV&LED) | 100 |
| | | Gel-034 | 1 |
| | | Gel-035 (Sailor Sails) | 128 |
| | | Gel-036 (Tinted Teal Soak-off UV&LED) | 15 |
| | | Gel-037 (Denim Blue Soak-off UV&LED) | 89 |
| | | Gel-076 (Fern Leaf Soak-off UV&LED) | 87 |
| | | Gel-078 (Pistachio Cream Soak-off UV&LED) | 15 |
| | | Gel-085 (Fushia Power Soak-off UV&LED) | 32 |
| | | Gel-112 (Strawberry Shortcake Soak-off UV&LED) | 1 |
| | | Gel-117 (Sweet Girl Soak-off UV&LED) | 15 |
| | | Gel-120 | 78 |
| | | Gel-155 | 47 |
| | | Gel-158 (Ocean Deep Soak-off UV&LED) | 21 |
| | | Gel-183 (Golden Snow Soak-off UV&LED) | 9 |
| | | Gel-207 (Ruby Red Pumps Soak-off UV&LED) | 2 |
| | | Gelkit-2 (We Scream For Ice-cream Soak-off UV&LED kit: 112, 036 , 081 , 078) | 8 |
| | | Gelkit-4 (Girls Night Out Soak-off UV&LED kit: ..132 , 035 , 034 , 020) | 81 |
| | | H-156 Girl.. You look good (Wood Sign 5x5 - Girl.. You look good) | 1 |
| | | H-156 happy hour (Wood Sign 5x5 - I'll be at happy hour) | 39 |
| | | H-156 If you sprinkle (Wood Sign 5x10 If you sprinkle when you tinkle...) | 13 |
| | | H-156 Put on lipstick (Wood Sign 5x5 - Put on lipstick) | 12 |
| | | H-156 shoe addiction (Wood Sign 5x10 I only work to support my shoe addiction) | 31 |

**EXHIBIT 1 TO BILL OF SALE – PAGE 4**

| | | | |
|---|---|---|---|
| | | H-156 Step aside coffee (Wood Sign  5x5 - Step aside coffee) | 37 |
| | | H-156 When I said I do (Wood sign 5x10 When I said I do I didn't mean everything) | 21 |
| | | H-156 wine workout (Wood Sign 5x10 - The wine workout Twist, up down and repeat.) | 8 |
| | | H-29XS (Dynamic Gel Insoles for men & women 5-6.5) | 5 |
| | | H-3007 OREO/Silver sky (SEQUIN PILLOW- OREO) | 4 |
| | | H-3007FISH (SEQUIN PILLOW- FISH TAIL) | 1 |
| | | H-3007FLAMMIN (SEQUIN PILLOW-FLAMMIN) | 2 |
| | | H-3717BLK (Smart Scale Black) | 1 |
| | | H-3717White (Smart Scale White) | 0 |
| | | H-41Lg (Tens Large Pad Replacements) | 256 |
| H | | H-4427 (Soy Candle Eucalyptus) | 654 |
| H | | H-4428 (Soy Candle Orange) | 747 |
| | | H-5117 (ByeBye Clog) | 435 |
| | | H-7022 (Gardening gloves) | 3 |
| | | H-7499PINK-6 (IPHONE 6/6 PLUS SPORT ARMBAND) | 3 |
| | | H-7499PINK-6P (IPHONE 6/6 PLUS SPORT ARMBAND) | 4 |
| | | H-7499WHT (Iphone 6 Plus White Armband) | 38 |
| | | H-7499WHT6 (Iphone 6 White Armband) | 3 |
| | | HB-2Erosonic (Erisonic Heads set-Blue) | 82 |
| | | HB-2Erosonic Blk (Erisonic Heads set-Black) | 161 |
| | | HB-3Erosonic (Erisonic Heads set-Green) | 163 |
| | | HB10 (Lazy Glasses - Healthcare Prism Bed Specs) | 2 |
| | | HH-34447BLK (CRISTAL BATHROOM ACCESSORY SET- white) | 62 |
| | | Inf-Croc (My Bubbly Inflatable Stuffed Animals) | 2 |
| | | Inf-Gorilla (My Bubbly Inflatable Stuffed Animals) | 5 |
| | | K-10166 (3 pc Pantry Ware Set) | 26 |
| | | K-10173 (Chrome Mug Tree K-10173) | 71 |
| | | Memory Card | 136 |
| | | O-3229Black (Waterproof Bag Black) | 41 |
| | | O-3229Blue (Waterproof Bag Blue) | 2 |
| | | O-3229Green (Waterproof Bag Green) | 12 |
| | | O-3229Orange (Waterproof Bag Orange) | 10 |
| | | P-1016 zigzag (Pet tent-zigzag) | 11 |
| | | P-1021 polka dot (Pet tent- polka dot) | 1 |
| | | P-1023 strip (Pet tent strip) | 6 |
| | | P-3221Blue L (LED Dog Collar Large) | 4 |
| | | P-3221Blue S (LED Dog Collar Small) | 3 |
| | | P-3221Green L (LED Dog Collar Large) | 10 |
| | | P-3221Green M (LED Dog Collar Medium) | 1 |
| | | P-3221Green S (LED Dog Collar Small) | 5 |
| | | P-3221Pink L (LED Dog Collar Large) | 4 |

**EXHIBIT 1 TO BILL OF SALE – PAGE 5**

BP_008244

| | | | |
|---|---|---|---|
| | | P-3221Pink S (LED Dog Collar Small) | 1 |
| | | RC-5-HYB-T2-BKMA (Hybrid Armor Case w/ Holster) | 42 |
| | | RC-IPH5-HYB-T1-BK (RooCase Premium Case for iPhone« 5- HYB-T1-BLK) | 34 |
| | | RC-IPH5-HYB-T1-BKRD (RooCase Premium Case for iPhone« 5-HYB-T1-Red) | 3 |
| | | RC-IPH5-HYB-T2-BKDB (RooCase Premium Case for iPhone« 5- HYB-T2-Blue) | 14 |
| | | RC-IPH5C-FUSE-Orange (Roo Case Premium Case for Iphone5 - Fuse-Orange) | 45 |
| | | RC-IPH5C-FUSE-RD (RooCase Premium Case for iPhone« 5 - FUSE- RED) | 33 |
| | | RC-IPH5C-PRO-BP-GBK (RooCase Premium Case for iPhone« 5- PRO-BP-BLK) | 39 |
| | | RC-IPH5C-PRO-BP-MWH (RooCase Premium Case for iPhone« 5 -PRO-BP-White) | 39 |
| | | RC-IPH5S-HYP-DL-BL (RooCase Premium Case for iPhone« 5- HYP-DL-BLK) | 41 |
| | | RC-IPH5S-HYP-DL-WH (RooCase Premium Case for iPhone« 5-HYP-DL-White) | 44 |
| | | S-1188Purple (Purple Fish Tail Blanket) | 0 |
| | | S-1188RED (FISH TAIL BLANKET-RED) | 26 |
| | | Smarti-cap-orange | 88 |
| | | Smarti-cap-pink | 128 |
| | | Smarti-cap-purple | 126 |
| | | T-1331Black (Gaming Joystick) | 27 |
| | | T-1331Blue (Gaming Joystick) | 2 |
| | | T-1331Red (Gaming Joystick) | 6 |
| | | UMB-LED (Super-Bright LED Light for Patio Umbrellas) | 5 |
| | Total Inventory | | 17,396 |
| TOTAL | | | 17,396 |

**EXHIBIT 1 TO BILL OF SALE – PAGE 6**

BP_008245

**EXHIBIT 2**

## EQUIPMENT

| Description | Condition | Age |
| --- | --- | --- |
| Fulfillment Desktop Computer | POOR | 10 |
| Fulfillment Monitor 1 | FAIR | 10 |
| Fulfillment Laptop | FAIR | 10 |
| Fulfillment Monitor 2 | FAIR | 6 |
| Fulfillment Desk Chair 1 | POOR | 10 |
| Fulfillment Desk Chair 2 | POOR | 10 |
| Fulfillment Laser Printer | POOR | 10 |
| Small Black Table | POOR | 10 |
| Folding Machine | FAIR | 5 |
| White Small Shelf | POOR | 6 |
| Scale (lg) | GOOD | 3 |
| Scale (sm) | FAIR | 5 |
| Warehouse Desk 1 | POOR | 10 |
| Warehouse Desk 2 | POOR | 10 |
| 1 short file cabinet (warehouse) | POOR | 10 |
| Cubicle Shelf (warehouse) | FAIR | 5 |
| 5 sets of shelves (warehouse) | FAIR | 5 |
| Sales Desk | FAIR | 10 |
| Sales Chair | POOR | 10 |
| Sales Desktop Computer | POOR | 10 |
| Sales Monitor | FAIR | 5 |
| Customer Service Desk | POOR | 10 |
| Customer Service Chair | POOR | 10 |
| Customer Service Desktop Computer | GOOD | 2 |
| Customer Service Monitor | FAIR | 5 |
| Accounting Desk | FAIR | 10 |
| Accounting Chair | POOR | 10 |
| Accounting Desktop Computer | GOOD | 1 |
| Accounting Monitor | FAIR | 5 |
| 3 tall file cabinets (accounting office) | FAIR | 10 |
| shelf (accounting office) | FAIR | 10 |
| CEO/President Desk | FAIR | 10 |
| CEO/President Chair | POOR | 10 |
| small round table with 2 chairs | FAIR | 10 |
| Conference Table | FAIR | 5 |
| 6 chairs | POOR | 10 |
| Receptionist Desk | POOR | 10 |
| 2 chairs for foyer | FAIR | 5 |
| 1 small round glass table for foyer | GOOD | 5 |

**EXHIBIT 2 TO BILL OF SALE – PAGE 1**

BP_008246

| | | |
|---|---|---|
| 2 tall thin glass cabinets for foyer | GOOD | 5 |
| Refrigerator | FAIR | 10 |
| Water cooler | FAIR | 5 |
| small microwave | FAIR | 5 |
| Vacuum Cleaner | GOOD | 2 |

**EXHIBIT 2 TO BILL OF SALE – PAGE 2**

BP_008247

## EXHIBIT 3

## INTELLECTUAL PROPERTY

1.      Debtor's client and customer lists, supplier lists, pricing and cost information, sales data, marketing data, and inventory data.

2.      Debtor's right, title and interest in and to any names, trademarks, service marks, trademarks, trade dress, logos, or goodwill.

3.      Debtor's right, title and interest in and to trade names and URLs, including the URLs koolulu.com and luluway.com.

4.      Debtor's computer software and licenses, including but not limited to its QuickBooks, ShipStation, and Microsoft 365 software and licenses.

**EXHIBIT 3 TO BILL OF SALE – SOLO PAGE**

BP_008248

**EXHIBIT B**

**Form of Assignment and Assumption Agreement**

(*See attached.*)

BP_008249

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment Agreement") is made and entered into effective as of March 1, 2019, by and among Super G Capital, LLC ("Assignor") and Windspeed Trading, LLC ("Assignee").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Foreclosure Sale Agreement between the parties dated as of March 1, 2019 (the "Foreclosure Sale Agreement").

### WITNESSETH:

WHEREAS, ACET Global, LLC ("Debtor") is a party to that certain Asset Purchase Agreement by and among ACET Global, LLC, ACET Venture Partners LLC, and Tomer Damti dated as of July 20, 2017 (the "Assigned Agreement").

WHEREAS, Debtor collaterally assigned to Seller its rights and remedies under the Assigned Agreement and all right, title and interest in and to any and all sums due to or recovered by Debtor under the Assigned Agreement, including, without limitation, Debtor's rights and remedies with respect to (i) any breach by any Seller Party (as defined in the Assigned Agreement) of any representations, warranties and covenants under the Assigned Agreement and (ii) any indemnification from any Seller Party arising under or pursuant to the Assigned Agreement.

WHEREAS, the parties have entered into Foreclosure Sale Agreement, pursuant to which Assignee agreed to purchase and assume from Assignor, and Assignor agreed to sell, convey, transfer, assign, and deliver to Assignee, on the Closing Date, Assignor's right and remedies in and to (but not Assignor's or Debtor's obligations under) the Assigned Agreement.

WHEREAS, Assignor desires to assign and transfer all of its right, title and interest in and to (but not Assignor's or Debtor's obligations under) the Assigned Agreement to Assignee, and Assignee desires to accept this assignment.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor agrees as follows:

1.      Assignment.  Assignor hereby irrevocably assigns, transfers, sells, delivers and conveys to Assignee all of Assignor's right, title and interest (but not Assignor's or Debtor's obligations under), as of the Closing Date, in and to the Assigned Agreement and all right, title and interest in and to any and all sums due to or recovered by Assignor

**ASSIGNMENT AND ASSUMPTION AGREEMENT – PAGE 1**

under the Assigned Agreement, including, without limitation, Assignor's rights and remedies with respect to (i) any breach by any Seller Party (as defined in the Assigned Agreement) of any representations, warranties and covenants under the Assigned Agreement and (ii) any indemnification from any Seller Party arising under or pursuant to the Assigned Agreement, and Assignee hereby accepts this assignment, such that, as of the Closing Date, Assignee will have all of the rights and benefits of Assignor under the Assigned Agreement.

2.      <u>Governing Law</u>.  This Assignment Agreement is governed by and is to be construed in accordance with the internal Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

3.      <u>Further Action</u>.  Assignor will execute and deliver or cause to be executed and delivered from time to time such instruments, documents, agreements, consents and assurances and will take such other action as Assignee reasonably may require more effectively to assign and transfer to and vest in Assignee all right, title and interest in and to the assets and rights assigned hereunder.  Assignor will promptly remit and send to Assignee any and all payments, funds, assets, notices, reports and other documents and information received by Assignor or its agents or representatives as a direct or indirect result of or with respect to the Assigned Agreement.

4.      <u>Binding Effect</u>.  This Assignment Agreement is binding upon the parties hereto and will inure to the benefit of and be enforceable by their respective successors and assigns.

5.      <u>Counterparts</u>.  This Assignment Agreement may be executed in one or more counterparts, each of which will be deemed an original (whether such counterpart is originally executed or an electronic copy of an original), and all of which taken together will constitute one instrument binding on all the parties, notwithstanding that all the parties are not signatories to the original or the same counterpart.

(Signature page follows)

**ASSIGNMENT AND ASSUMPTION AGREEMENT – PAGE 2**

IN WITNESS WHEREOF, each party has executed and delivered this Assignment and Assumption Agreement as of the day and year first written above.

**WINDSPEED TRADING, LLC**


By: _____
     William C. Szeto, its Manager


**SUPER G CAPITAL, LLC**


By: _____
     Marc Cole, its Chief Financial Officer

BP_008252

**EXHIBIT C**

**Form of Amended Loan Agreement**

(*See attached.*)

BP_008253

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



This Amended and Restated Business Loan and Security Agreement ("Agreement"), dated as of March 1, 2019 (the "Effective Date"), is entered into by the Borrower named below and Super G Capital, LLC, a Delaware limited liability company ("Lender").

The following chart ("Loan Chart") sets forth the loan and repayment terms of the Borrower's obligation:

| BORROWER | | |
|---|---|---|
| | NAME OF BORROWER | **WINDSPEED TRADING, LLC** |
| | ADDRESS | **1761 International Parkway, Suite 133 Richardson, Texas 75081** |
| | NAME OF PRINCIPALS | **William C Szeto** |

| LOAN DETAILS | | |
|---|---|---|
| | AMOUNT OF LOAN | **$514,144.86** |
| | ORIGINATION AND/OR OTHER FEES | **$0.00** |
| | FIRST PAYMENT AND/OR FIRST & LAST PAYMENT | **$0.00** |
| | PAYMENT TO EXISTING LENDER* | **$0.00** |
| | REMAINING DISBURSEMENT AMOUNT | **$0.00** |
| | TOTAL INTEREST CHARGE** | **[intentionally omitted]** |
| | TOTAL PAYBACK AMOUNT | **$514,844.86.** |

| PAYMENT SCHEDULE | | |
|---|---|---|
| | START DATE FOR PAYMENTS | **March 30, 2019** |
| | PAYMENT FREQUENCY | **Monthly** |
| | NUMBER OF PAYMENTS | **24** |
| | PAYMENT AMOUNT | **(a)** For the first three monthly payments, $2,000 per month; **(b)** For the following five monthly payment (commencing with the monthly payment due on June 30, 2019, $5,000 per month; **(c)** For the following seven monthly payment (commencing with the monthly payment due on November 30, 2019, $12,000 per month; **(d)** For the following eight monthly payment (commencing with the monthly payment due on June 30, 2020), $36,000 per month; and **(e)** For the final payment due on March 20, 2021, $111,144.86. |

Page 1 of 19

BP_008254

# Amended and Restated Business Loan & Security Agreement

Super G Capital, LLC
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



| | | |
|---|---|---|
| **COLLATERAL** | ALL PERSONAL PROPERTY ASSETS | |
| | PERMITTED ENCUMBRANCES | SEE ADDENDUM 1 |
| | CAP ON PURCHASE MONEY DEBT | **$0.00** |

**SEE CONDITIONS TO FUNDING ON ADDENDUM 2**
**SEE ADDITIONAL COVENANTS ON ADDENDUM 3**
\*    Existing Lenders are <u>N/A</u>
\*\* Does not include any loan Origination and/or Other Processing Fees

BP_008255

# Amended and Restated Business Loan & Security Agreement

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



## RECITALS

WHEREAS, Lender and ACET Global, LLC, a Texas limited liability company ("Original Borrower") are parties to that certain Business Loan and Security Agreement dated as of July 20, 2017 (the "Original Loan Agreement") pursuant to which Lender agreed to make, and did make, certain loans to the Original Borrower (collectively, the "Original Loan");

WHEREAS, the Original Loan was secured by a security interest in all of Original Borrower's personal property;

WHEREAS, Original Borrower was in default of its obligations under the Original Loan Agreement;

WHEREAS, Lender had the right to enforce all of its remedies against the Original Borrower and elected to conduct a foreclosure sale of certain of the Original Borrower's personal property in which Lender had a security interest (the "Foreclosed Property");

WHEREAS, Borrower agreed to purchase, and Lender agreed to sell, the Foreclosed Property;

WHEREAS, as consideration for its purchase of the Foreclosed Property, Borrower has agreed to assume certain of the Original Borrower's obligations under the Original Loan Agreement, as further described in this Agreement;

WHEREAS, in connection with such assumption, Borrower and Lender desire to amend and restate in its entirety, the Original Loan Agreement;

NOW, THEREFORE, in consideration of the promises and the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower agree as follows:

## 1.   LOAN

1.1      Loan. Borrower acknowledges that Lender made a loan (the "Loan") to Original Borrower of the sum designated in the Loan Chart as "Amount of Loan," subject to the terms and conditions of the Original Loan Agreement, which has been assumed by Borrower pursuant to the terms and conditions of this Agreement.

1.2      Amendment and Restatement of Original Loan Agreement. Borrower and Lender agree that the terms and provisions of the Original Loan Agreement (including the schedules and exhibits thereto) shall be and hereby are amended, superseded and restated in their entirety by the terms and provisions of this Agreement. This Agreement is not intended to and shall not constitute a novation. All loans made and obligations incurred under the Original Loan Agreement which are outstanding on the Effective Date shall continue as Loans and Obligations under (and shall be governed by the terms of) this Agreement and the other Loan Documents..

## 2.   PAYMENT TERMS

2.1      Repayment. Borrower shall repay the Loan by paying the Total Payback Amount specified and on the terms set forth in the Loan Chart, subject to the additional terms set forth in this Agreement.

2.2      First Payment. If the Loan Chart designates a "First Payment," then as of the "Start Date for Payments" shown on the Loan Chart, Lender shall apply such portion of Loan proceeds as is required to make the first scheduled payment set forth in the Loan Chart.

2.3      Last Payment. If the Loan Chart designates a "Last Payment," then Lender shall reserve that amount from the proceeds of the Loan and shall apply that amount toward the final payment set forth in the Loan Chart when such payment becomes due.

2.4      Prepayment Limitation. Borrower shall be entitled to prepay all (but not less than all) of the Loan by paying the Total Payback Amount, without discount, either before or after an Event of Default, and any interest that may be owing and included in the Total Payback Amount shall be due and payable and not subject to any credit or deduction of the total amount due as a result of the payment's being made prior to the maturity date of the Loan as set forth in the Loan Chart.

2.5      Interest. Interest for the Loan is set forth in the Loan Chart as Total Interest Charge and is already included in the Total Payback Amount. Following the occurrence of an Event of Default, an additional interest charge of 5% per annum on the then outstanding Obligations shall be immediately due and owing from the date of the Event of Default until Lender has received the Total Payback Amount set forth in the Loan Chart.

2.6      Late Fee. If any Payment Amount set forth in the Loan Chart is not received in full by Lender as of the applicable due date, and such failure is not cured within three (3) Business Days of the date due, Borrower authorizes Lender, without notice to Borrower, to charge a late charge equal to ten percent (10%) of such Payment Amount then due, or the maximum amount permitted by applicable law, whichever is less (the "Late Fee"), by initiating debit charges to Borrower's Account. The Late Fee shall apply only to scheduled payments and shall not apply to any lump sum payment due upon acceleration.

2.7      Borrower's Obligation to Pay Is Not Conditional on Amount of Funds in Borrower's Account. Borrower's obligation to repay the Obligations is not dependent upon whether or not there are sufficient funds in the Borrower's Account, nor is Borrower's obligation to pay excused if Borrower receives insufficient income to make any payment required under this Agreement. If, for any reason, there are insufficient funds in Borrower's Account or insufficient income to cover any payment due under this Agreement, or if for any reason Lender is unable to collect on an ACH request to Borrower's Account, Borrower agrees to immediately make said payment by regular check, cashier's check, money order or by wire transfer as instructed by Lender. Borrower understands that payments made by any method other than that contemplated by the ACH Authorization may result in a delay in Lender's receipt of such payment and that Borrower may incur a Late Fee if the payment is

Page 3 of 19

BP_008256

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



received late.

### 3. SECURITY INTEREST IN COLLATERAL

3.1   Collateral And Loan Security. As security for the payment of the Loan, and all other liabilities and obligations of the Borrower to Lender hereunder, now existing or hereafter created (collectively, the "Obligations"), Borrower hereby unconditionally grants, assigns, and pledges to Lender a continuing security interest (the "Security Interest") in all personal property, tangible or intangible, of Borrower whether now owned or hereafter acquired or arising and wherever located, including Borrower's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located: all accounts, all chattel paper, all commercial tort claims, all deposit accounts (including, without limitation, the Borrower's Account), all documents, all general intangibles (including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Borrower possesses, uses or has authority to possess or use property of others or others possess, use or have authority to possess or use property); all goods (including all equipment, fixtures and inventory), all investment property, securities and all other investment property; supporting obligations; any other contract rights or rights to the payment of money; insurance claims and proceeds; commercial tort claims; all money, all negotiable collateral, all instruments, all books and records, and all supporting obligations and proceeds arising from or relating to any of the foregoing (the "Collateral").

3.2   [RESERVED].

3.3   Additional Documents. Borrower shall execute from time to time, upon the request of Lender, such financing statements or other documents as are reasonably required by Lender to perfect or continue the Security Interest described herein.

3.4   Lender Appointed Attorney-In-Fact. Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower following the occurrence of an Event of Default which is continuing, so as to permit Lender to take any action and to execute any instrument that Lender may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including but not limited to continuing perfection of Lender's Security Interest.

3.5   Consent. Borrower consents to the Lender taking any and all steps that Lender reasonably deems necessary to ensure that Lender has obtained a valid and perfected security interest in the Collateral. Accordingly, Borrower consents to having Lender file any liens, financing statements, or any other documentation, as required by the California Commercial Code or any other laws, rules, or regulations in order to establish Lender's Security Interest in the Collateral and/or perfect Lender's Security Interest.

### 4. REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to make the Loan, Borrower makes the following representations and warranties to Lender, each of which shall be deemed made as of the effective date of this Agreement and shall be continuing until all Obligations arising or related to this Agreement have been paid and performed in full. Any knowledge acquired by Lender shall not diminish its rights to rely upon such representations and warranties:

4.1   Legal Status. Borrower, if a corporation, limited liability company, partnership, trust, or other legal entity, has been duly organized and is validly existing under the laws of its jurisdiction of organization and is qualified to transact business, and has made all filings and is in good standing, in every jurisdiction in which the nature of its business or assets requires such qualification. Borrower has all requisite power and authority to own its properties and conduct its business as presently conducted and as proposed to be conducted and to execute and deliver, and to perform its Obligations under, this Agreement.

4.2   No Violation. The making and performance by Borrower of the Loan Documents do not violate any provision of law or any provision of Borrower's formation documents, including, without limitation, articles of incorporation or organization or any operating, partnership or trust agreement, or result in a breach of, or constitute a default under, any material agreement, indenture, or other instrument to which Borrower is a party or by which Borrower may be bound.

4.3   Loan For Specific Purposes Only. The proceeds of the Loan must be used only for the specific business purposes described in the application for the Loan submitted by Borrower to Lender. Borrower understands and agrees NOT to use the Loan proceeds for personal, family, or household purposes. Borrower further understands that there are certain important duties imposed upon entities making loans to consumers for personal, family, or household purposes, and certain important rights conferred upon consumers, pursuant to federal or state law and that all of those laws, rules, and regulations concerning consumer loans do NOT apply to the Loan or this Agreement. Borrower hereby confirms that he/she/it has consulted with his/ her/its own attorney or has had a fair opportunity to consult with an attorney, concerning this matter and that Borrower's counsel has explained to Borrower and/or Borrower understands that these rules, regulations, and laws concerning consumer loans do not apply to the Loan or this Agreement. Borrower also understands that Lender will be unable to confirm whether Borrower's actual use of the proceeds of the Loan conforms to the requirements of this section. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to: (i) enforce Borrower's promise to pay all amounts owed under this Agreement, regardless of Borrower's actual use of the proceeds of the Loan; or (ii) to use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer or personal purposes.

4.4   Authorization. This Agreement has been duly authorized, executed, and delivered by Borrower, and is a legal, valid and binding agreement of Borrower enforceable against Borrower in accordance with its terms, except as enforceability may be  limited

BP_008257

# Amended and Restated Business Loan & Security Agreement

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



by bankruptcy, insolvency, reorganization, moratorium or similar laws effecting creditors' rights generally and by general principles of equity.

4.5     Financial Statements. All financial statements and reports that may have been required and have been presented to Lender in conjunction with the Loan fairly and accurately present the financial condition and income of Borrower, as of the date given, and none of the foregoing contains any untrue statement of a material fact nor fails to state a material fact required in order to make such financial statements not misleading. Since the date of the last such financial statement, there has been no material adverse change in the financial condition or operations of Borrower.

4.6     Consent and Licenses. Other than financing statements to be filed in connection with the Loan, no consent, approval or authorization of, or registration or filing with any governmental body or authority, or any other person, firm or entity not a party hereto, is or will be required as a condition to the valid execution, delivery, performance, or enforceability of the Loan Documents, or the transactions contemplated hereby or thereby, or to the conduct of Borrower's business.

4.7     Litigation. There is no litigation either pending or, to the best of Borrower's knowledge, threatened against Borrower before any court or administrative agency, or before any arbitrator, which is reasonably likely to have a material adverse effect on the assets, business, financial conditions or operations of Borrower, or which would prevent or hinder the performance of Borrower's Obligations under the Loan Documents. Furthermore, Borrower is not in material violation of any law and is not, to its knowledge, the subject of any investigation by a governmental agency that could result in an indictment, criminal filing, or a forfeiture or seizure of any of its/his/her assets;

4.8     Unencumbered Collateral. Borrower has good and marketable title to all of the Collateral and will have good and marketable title to all properties and assets acquired by Borrower hereafter, except for such assets as have been disposed of in the ordinary course of business or equipment no longer used or useful in the conduct of its/his/her business. Except for the Security Interest granted hereunder and the Permitted Encumbrances set forth on Addendum I – Permitted Encumbrances, Borrower shall be the sole and exclusive owner of the Collateral which is and shall remain free from any and all liens, security interests, encumbrances, claims and interests and no security agreement, financing statement, equivalent security or lien instrument or continuation statement covering any of the Collateral is on file or of record in any public office.

4.9     [RESERVED].

4.10     Tax Returns. Borrower has filed all tax returns that were required to be filed by it and has paid all taxes and assessments which are payable by it, to the extent that the same have become due and payable and before they became delinquent. Borrower does not know of any proposed material tax assessment against it or any of its/his/her properties for which adequate provision has not been made on its/his/her books.

4.11     Past Legal Proceedings. Neither Borrower nor any member, principal or shareholder of Borrower has been: (a) the subject of any criminal conviction (excluding traffic misdemeanors);
(b) a debtor or alleged debtor in any bankruptcy proceeding, insolvency proceeding or receivership proceeding; (c) subject to liens imposed by any governmental authority; or (d) subject to any restraining order, decree, injunction or judgment in any proceeding or lawsuit, except for such matters as have been fully disclosed to Lender in writing.

4.12     Full Disclosure. All written information furnished by the Borrower, and all written information hereafter furnished by the Borrower, is and shall be true and accurate in all material respects. In the case of projections, the projections will be based on accurate information and reasonable assumptions that the Borrower believes to be true. The term "written" shall have the meaning ascribed to "writings" under section 250 of the California Evidence Code.

## 5.     AFFIRMATIVE COVENANTS

Until all Obligations are paid and performed in full, Borrower shall comply with the following covenants:

5.1     Books And Records. Borrower shall at all times keep accurate and complete books, records, and accounts of all of Borrower's business activities. Borrower shall permit the Lender, or any persons designated by the Lender, at any reasonable time and from time to time, upon reasonable prior notice, and without hindrance or delay, to: (a) visit and inspect Borrower's properties and place(s) of business; (b) inspect, audit and examine Borrower's books, records, correspondence, and accounts and to make copies or extracts thereof (and Lender may remove any of such records temporarily for the purpose of having such copies made); and (c) discuss with Borrower's principal officers and independent accountants, Borrower's business, assets, liabilities, financial condition, results of operations, and business prospects. At Lender's request, upon the occurrence and continuation of an Event of Default, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall reasonably request.

5.2     Notices. Borrower shall promptly notify Lender in writing, upon Borrower's obtaining knowledge of the occurrence of: (i) any Event of Default or any act or event which, with the giving of notice or the passage of time, or both, would be such an Event of Default; (ii) any legal action, proceeding or investigation threatened or instituted against Borrower; or (iii) Borrower's present or future inability to pay or perform the Obligations under this Agreement. If Lender has been notified pursuant to this section, or has knowledge of same from other sources, then at Lender's request, Borrower shall furnish to Lender a summary of the status of all such actions, proceedings or investigation and provide Lender with such additional information concerning the same as Lender may from time to time reasonably request

5.3     Maintain Business. Borrower shall: (i) maintain in full force and effect all licenses, permits, insurance, authorizations, bonds, franchises, and other rights necessary or desirable to the conduct of Borrower's business; (ii) continue in, and limit     Borrower's

BP_008258

# Amended and Restated Business Loan & Security Agreement

Super G Capital, LLC
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



operations to, the same general lines of business as are presently proposed to be conducted; (iii) shall comply with all applicable laws, orders, regulations, and ordinances of all governmental authorities in all material respects; (iv) if a corporation, partnership or limited liability company, shall maintain Borrower's corporate, partnership or limited liability company existence; and (v) take such actions as are necessary to maintain Borrower's legal existence and good standing in each jurisdiction where the failure to do so might have material adverse effect upon the assets, business, prospects, financial condition, or operations ofBorrower or Borrower's ability to repay the Loan or otherwise pay or perform the Obligations.

5.4    Maintain Business Property And Lender's Collateral. Borrower shall protect and preserve all assets necessary and material to Borrower's business, including intellectual property, maintain in good working order and condition (subject to ordinary wear and tear) all buildings, equipment and other tangible real and personal property, and from time to time make or cause to be made all renewals, replacements, and additions to such property necessary for the conduct of Borrower's business. Borrower shall defend the right, title, and interest of Lender in and to the Collateral against all claims and demands of all persons and entities at any time claiming the same or any interest therein. At any time Borrower acquires any assets, tangible or intangible, real or personal, having a fair market value in excess of $25,000, in which a security interest, deed of trust or mortgage is not already granted to or properly perfected by Lender on behalf of Lender, Borrower shall immediately provide notice thereof to Lender and cause to be executed such documents as may be reasonably requested by Lender in order to perfect Lender's Security Interest in such Collateral.

5.5    [RESERVED].

5.6    [RESERVED].

5.7    [RESERVED].

5.8    Insurance. Borrower shall keep all of Borrower's properties, real and personal (including the Collateral), adequately insured at all times with responsible insurance carriers, reasonably acceptable to Lender, against loss or damage by fire and other hazards (so called "All Risk Coverage"). Borrower shall at all times maintain adequate insurance with coverage amounts and with responsible insurance carriers, each acceptable to Lender, against liability on account of damage or claims of damage to persons and properties and under all applicable workers' compensation laws, andcovering such other risks as Lender may reasonably from time to time require. Borrower shall instruct the applicable insurance carrier to have all such insurance policies provide at least thirty (30) days' notice to Lender prior to cancelation or termination. Lender shall be named as loss payee, additional insured or otherwise, as Lender's interest may appear, as the case may be, under all such policies. Borrower represents that all such insurance coverage is presently in full force and effect and subject to no lapses and defaults. Borrower agrees to deliver copies of all of the foregoing insurance policies to Lender. In the event of any loss or damage to the Collateral, Borrower shall give immediate written notice to Lender and to its insurers of such loss and damage and will   promptly file

proof of loss with its insurers.

5.9    Payment of Taxes and Other Obligations; Tax Returns. Borrower shall timely file all required tax returns and pay and discharge all taxes, assessments, and governmental charges or levies imposed upon it or on income or profits or upon property belonging to it prior to the date on which penalties attach thereto and pay and perform all lawful claims, obligations, and debts which, if unpaid, might become a lien or charge upon any assetor property of Borrower, or where the failure to pay or perform might have a material adverse effect upon the assets, business, prospects, financial condition, or operations of Borrower or Borrower's ability to repay the Loan or otherwise perform Borrower's obligations under this Agreement, provided that Borrower shall not be required to pay or perform any such tax, assessment, charge, levy, claim, obligation, or debt for which Borrower has obtained a bond or insurance, or for which it has established an adequate reserve and the payment or performance of which is being contested in good faith and by appropriate proceedings which are being reasonably and diligently pursued.

5.10    Comply with Laws. Borrower shall perform and promptly comply, and cause all property of Borrower to be maintained, used and operated in accordance, in each case in all material respects, with all: (i) present and future laws, ordinances, rules, regulations, orders, and requirements (including, without limitation, zoning ordinances, building codes, and environmental laws, and the regulations adopted pursuant thereto, and any other similar applicable federal, state, or local laws, rules, regulations, or ordinances) of every duly constituted governmental or quasi-governmental authority or agency applicable to Borrower or any of Borrower's properties; (ii) similarly applicable orders, rules, and regulations of any regulatory, licensing, accrediting, insurance underwriting or rating organization, or other body exercising similar functions, to the extent usually complied with by companies engaged in similar businesses and owning similar properties in the same general areas in which Borrower operates; and (iii) similarly applicable duties or obligations of any kind imposed under any certificate of occupancy or otherwise by law, covenant, conditions, agreement or easement, public or private.

5.11    Further Assurances. Borrower shall make, execute, and deliver all such additional and further acts, things, deeds, and instruments as Lender may reasonably require to document and consummate the transactions contemplated hereby and to vest completely in and ensure Lender its rights under thisAgreement.

5.12    Financial Reporting Requirements. Borrower shall deliver to Lender the following, all in form and substance reasonably satisfactory to Lender:

(a)    within thirty (30) days after the end of each calendar month, combined management-prepared, unaudited balance sheet and statements of income, retained earnings and cash flow of Borrower as of the end of such month and for such month then ended and for the period from the beginning of the then current fiscal year of Borrower to the end of such month, setting forth in comparative form (i) the corresponding figures for the comparable monthly and year-to-date periods in the preceding fiscal year; and (ii) the

Page 6 of 19

BP_008259

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



corresponding figures for such monthly and year-to-date period as reflected in the projected budget for the then-current fiscal year, and certified for and on behalf of Borrower by the controller or chief financial officer or other comparable authorized officer of Borrower;

(b) within five (5) Business Days of each of each calendar month, reports of Borrower's inventory and accounts, including collections and sales calculations; and

(c) all annual and quarterly management-prepared, unaudited balance sheet and statements of income retained earnings and cash

flow of Borrower. Quarterly financial statements shall be delivered to Lender no later than forty-five (45) days after the end of each fiscal quarter of Borrower; and annual financial statements shall be delivered to Lender no later than sixty (60) days after the fiscal year-end of Borrower.

5.13    Disclosure of Employee Benefits. Borrower shall:

(a) Promptly, and no later than ten (10) Business Days after Borrower or any of its/his/her subsidiaries know or have reason to know that an event has occurred relating to the Borrower's plan requirements under the Employee Retirement Income Security Act of 1974 ("ERISA") that reasonably could be expected to result in a material adverse change in the Borrower's financial condition, a written statement of the chief financial officer, chief executive officer or similar governing person of such Borrower or subsidiary shall be delivered to Lender describing such ERISA event and any action that is being taking with respect thereto by Borrower or any of its/his/her subsidiaries or Affiliates, and any action taken or threatened by the Internal Revenue Service ("IRS"), the Department of Labor, of the Pension Benefit Guaranty Corporation ("PBGC"). Borrower and its/his/her subsidiaries shall: (i) be deemed to know all facts known by the administrator of any benefit plan of which it is the plan sponsor; (ii) promptly, and no later than three (3) Business Days after the filing thereof with the IRS, deliver to Lender a copy of each funding waiver request filed with respect to any benefit plan and all communications received by Borrower or any of its/his/her subsidiaries or Affiliates; and (iii) promptly, and no later than five (5) Business Days after receipt by Borrower or any of its/his/her subsidiaries of any information that the PBGC has an intention to terminate any benefit plan or to have a trustee appointed to administer a benefit plan, deliver copies of each such notice to Lender.

(b) Cause to be delivered to Lender, upon Lender's reasonable request, each of the following: (i) a copy of each benefit plan and retiree health plan (or, where any such plan is not in writing, complete description thereof) (and if applicable, related trust agreements or other funding instruments) and all amendments thereto, all material written interpretations thereof and material written descriptions thereof that have been distributed to employees or former employees of Borrower or any of its/his/her subsidiaries; (ii) the most recent determination letter issued by the IRS with respect to each benefit plan; (iii) for the three most recent plan years, annual reports on Form 5500 Series required to be filed with any governmental agency for each benefit plan; (iv) all actuarial reports prepared for the last three plan years for each benefit plan;

(v) a listing of all multiemployer plans, with the aggregate amount of the most recent annual contributions required to be made by Borrower or any of its/his/her subsidiaries or any of their ERISA affiliates to each such plan and copies of the collective bargaining agreements requiring such contributions; (vi) any information that has been provided to Borrower or any of its/his/her subsidiaries or any of their ERISA affiliates regarding withdrawal liability under any multiemployer plan; and (vii) the aggregate amount of the most recent annual payments made to former employees of Borrower or any of its/his/her subsidiaries under any retiree health plan.

(b) Cause to be delivered to Lender, upon Borrower's and Lender's mutual agreement that Lender's request is reasonable, a copy of each plan not referred to in section 5.13(c) (or, where any such plan is not in writing, complete description thereof) (and if applicable, related trust agreements or other funding instruments) and all amendments thereto, all material written interpretations thereof and material written descriptions thereof that have been distributed to employees or former employees of Borrower or any of its/his/her subsidiaries.

## 6.    NEGATIVE COVENANTS

Until all Obligations have been paid and performed in full, Borrower covenants and agrees that it will NOT, without Lender's written consent, which may be denied in its sole discretion:

6.1    Additional Encumbrances. Create or suffer to arise any (i) lien, security interest, other charge or encumbrance upon or with respect to any of the Collateral except for the Security Interest and any Permitted Encumbrances, or (ii) grant or agreement to any negative pledge that would prohibit securing the Obligations created by this Agreement and any replacement or refinancing thereof with any properties or assets of Borrower. Borrower shall notify Lender promptly in the event that any lien or charge on any Collateral shall be created, asserted, filed, or come into existence in violation of this section 6.1;

6.2    Liens. Create, permit, or suffer to exist any claim to or interest in or lien or encumbrance upon the Collateral except the Security Interest granted herein and the Permitted Encumbrances;

6.3    Other Advances. Receive any loans, incur any indebtedness for borrowed money or receive any advances or sell any accounts receivable except for the following: indebtedness (other than the Obligations, but including capitalized lease obligations), incurred at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof, including any refinancing of such Purchase Money Debt ("Purchase Money Debt"), all in the aggregate amount at any time not to exceed the "Cap on Purchase Money Debt" specified in the Loan Chart, and amounts owed to trade creditors incurred in the ordinary course of business;

6.4    Disposition of Assets. Sell, lease, assign, transfer, or otherwise dispose of any of Borrower's rights, title, or interests in and to the Collateral, excepting only sales of inventory or dispositions of obsolete equipment or equipment being replaced, in each case in the ordinary course of Borrower's business;

# Amended and Restated Business Loan & Security Agreement

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



**6.5**    **No Guaranties or Contingent Obligations.** Guaranty, assume, or otherwise become directly or contingently liable for the debt of any other person or organization;

**6.6**    **Limitations on Extensions of Credit.** Make any loan or advance or extend any credit other than extension of trade credit in the ordinary course of business;

**6.7**    **No Changes in Business or Name.** (a) Make or permit to be made any material change in the character of Borrower's business, other than to grow the business; (b) change Borrower's name from that indicated in the public record of Borrower's jurisdiction of organization without providing at least 30 days' prior written notice to Lender; (c) change the location of Borrower's headquarters, executive offices or places of operations without providing at least 30 days' prior written notice to Lender; or (d) change Borrower's form of organization;

**6.8**    **No Amendments/Modifications to Constituent Documents.** Permit the amendment, modification, restatement, or other changes to the organizational documents of Borrower including, if applicable, the articles of incorporation or organization, by-laws, or operating partnership agreement, unless Borrower sends Lender the proposed changes to organizational documents no less than thirty (30) days prior to the effective date thereto;

**6.9**    **No Prepayments of Debt.** Prepay any indebtedness for borrowed money to any person or entity other than Lender;

**6.10**    **Restricted Payments.** (a) Declare or pay or make any form of dividend or distribution other than dividends or distributions to equity holders to meet their tax obligations on income realized by such holders attributable solely to such holders' investment in Borrower in a timely manner; (b) make any payments of any indebtedness subordinated to the Obligations due Lender or otherwise redeem, repurchase or retire any instrument evidencing such amount, or reduce or terminate any commitment in respect of such indebtedness, in each case except pursuant to the provisions of a subordination agreement acceptable to Lender; or (c) redeem, repurchase, or retire any capital stock or other equity;

**6.11**    [RESERVED];

**6.12**    [RESERVED];

**6.13**    **Transactions with Affiliates.** (a) Make any loan, advance, extension of credit or non-compensation related payment to any Affiliate of Borrower; or (b) enter into any other transaction, including, without limitation, the purchase, sale, lease, or exchange of property, or the rendering or any service, to or with any Affiliate of Borrower, the terms of which are less favorable to such person than the terms such person would have been able to obtain in a similar transaction between such person and an unrelated third party obtained through arms' length dealings; provided, however, that Borrower may in any event pay reasonable compensation to any such employee or officer in the ordinary course of Borrower's business consistent and commensurate with industry custom  and

practice for the services provided by such person and may enter into any transaction with Affiliates so long as all such transactions, either singly or in the aggregate, have a value of no more than $10,000;

**6.14**    **Deposit Accounts.** (a) Close any deposit account of Borrower, including the Borrower's Account; or (b) open any deposit account of Borrower without providing Lender with a deposit account control agreement in form and substance satisfactory to Lender;

**6.15**    **Limitations on Investments.** Purchase, own, invest in, or otherwise acquire, directly or indirectly, any equity securities, any interests in any partnership or joint venture (including the creation or capitalization of any subsidiary), evidence of indebtedness or other obligation or security, substantially all or a portion of the business or assets of any other person or entity, or any other investment or interest whatsoever in any other person or entity, or make or permit to exist, directly or indirectly, any loans, advances or extensions of credit to, or any investment in cash or by delivery of property in, any person or entity other than: (i) the extension of trade credit in the ordinary course of business and consistent with past practices;  and (ii) deposits with banks or other financial institutions;

**6.16**    **No Mergers; Equity Issuances.** (a) Merge, consolidate, or enter into any similar combination with any other entity or liquidate, windup, or dissolve itself (or suffer any liquidation or dissolution); or (b) issue or sell any of Borrower's equity securities;

**6.17**    [RESERVED]; or

**6.18**    **No Transactions Prohibited by ERISA; Unfunded Liability.** Directly or indirectly

(a)    engage in any prohibited transaction which is reasonably likely to result in a civil penalty or excise tax described in sections 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available, or a private exemption has not been previously obtained from the Department of Labor;

(b)    permit to exist with respect to any benefit plan any accumulated funding deficiency (as defined in sections 302 of ERISA and 412 of the Internal Revenue Code, whether or not waived;

(c)    fail to pay timely required contributions or annual installments due with respect to any waived funding deficiency to any benefit plan;

(d)    terminate any benefit plan where such event would result in any liability of Borrower, any subsidiary of Borrower, or any of their ERISA affiliates under Title IV of ERISA which was not paid in connection with such termination;

(e)    fail to make any required contribution or payment to any multiemployer plan;

(f)    fail to pay any required installment or any other payment

BP_008261

# Amended and Restated Business Loan & Security Agreement

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423

**Super G** CAPITAL

required under section 412 of the Internal Revenue Code on or before the due date for such installment or other payment;

(g)    amend a plan resulting in an increase in current liability for the plan year such that Borrower, any subsidiary of Borrower, or any of their ERISA affiliates is required to provide security to such plan under section 401(a)(29) of the Internal Revenue Code; or

(h)    withdraw from any multiemployer plan where such withdrawal is reasonably likely to result in any liability of such entity under Title IV of ERISA; any of which, individually or in the aggregate, would reasonably be expected to result in a material adverse effect on Borrower.

## 7.    EVENTS OF DEFAULT

The occurrence of one or more of the following events shall constitute an "Event of Default" under this Agreement.

Unless expressly provided for in this section 7, Lender is under no duty to provide Borrower or any other person with any notice for an event to become an Event of Default:

7.1    Borrower shall fail to make any payment of sums due under this Agreement, including any amounts specified in the Loan Chart, within three (3) Business Days of the applicable due date. A failure to pay includes any nonpayment as a result of Lender's inability to collect the entire sum due from Borrower's Account;

7.2    Borrower shall breach any covenant or other obligation under Section 6 hereof;

7.3    Borrower shall breach any covenant, condition, or other obligation contained in this Agreement (other than covenants and obligations described in another subsection of this Section 7), which breach is not cured within fifteen (15) days after the earlier of written notice from Lender or the date on which Borrower had actual knowledge of such breach; provided, however, that is such breach is susceptible to cure and Borrower commences prosecution of such cure within such fifteen

(15) day period and diligently pursues such cure thereafter, Borrower shall be permitted forty-five (45) days to effect such cure;

7.4    Any financial statement, representation, warranty or certificate made or furnished by or on behalf of Borrower or any guarantor of the Obligations in connection with this Agreement shall be materially false or misleading (including by omission) when made or reaffirmed;

7.5    Borrower or any guarantor of the Obligations shall become insolvent, admit its/his/her insolvency, or shall be unable to pay its/his/her debts as they mature;

7.6    One or more judgments, orders, or decrees for the payment of money, either individually or in the aggregate in excess of $50,000, is entered by a court of competent jurisdiction against Borrower or any guarantor of the Obligations and such judgment, order, or decree remains unpaid, undischarged and unbonded for 30 days or longer;

7.7    (a) Borrower or any guarantor of the Obligations shall make an assignment for the benefit of its/his/her creditors, file a petition in

bankruptcy, be the subject of an involuntary

bankruptcy petition or be the subject of a pending application, motion, or petition for the appointment of a receiver if such application, motion, or petition is not dismissed with thirty (30) days of its filing, or if a receiver is appointed; or (b) Borrower or any such guarantor by any act or omission shall indicate its/his/her consent to, approval of, or acquiescence in, any application or proceeding or order for relief or the appointment of a custodian, receiver, or any trustee for any substantial part of any of its/his/her properties;

7.8    Borrower or any guarantor of the Obligations shall have received any order, or there shall have been imposed upon it any limitation, of any kind, restricting its/his/her right to do business and/or its/his/her right to free and unencumbered use and operation of any of the Collateral, by any court, administrative body, or other regulatory or judicial authority purporting to have jurisdiction over the business of Borrower or any guarantor of the Obligations or the ownership and/or operation of such Collateral;

7.9    The occurrence of any uninsured loss, theft, damage, or destruction to any material assets (or to a material portion of all assets), the value of which exceeds $5,000, of Borrower or any guarantor of the Obligations;

7.10    Any guarantor of the Obligations shall repudiate, purport to revoke, or fail to perform such guarantor's obligations under the applicable guaranty or support agreement in favor of Lender;

7.11    Any federal, state, or local governmental body, instrumentality or agency shall condemn, seize or otherwise appropriate, or take custody and control of all or substantially all of the properties of Borrower or any guarantor of the Obligations, or file a lien or levy an assessment in respect of all, or substantially all, of the properties of Borrower or any guarantor of the Obligations;

7.12    If Borrower or any guarantor of the Obligations shall dissolve or liquidate, or be dissolved or liquidated, or cease legally to exist, or merge or consolidate, or be merged or consolidated with or into any corporation or entity;

7.13    If Borrower or any guarantor of the Obligations is an individual/sole proprietorship and the owner dies; if Borrower or such guarantor is the settlor of a revocable trust and Borrower dies; if Borrower is a general partnership and the general partner dies; if Borrower or any guarantor of the Obligations is a corporation and any shareholder holding a 10% or more interest in the corporation dies; if Borrower or any guarantor of the Obligations is a limited liability company and any managing member dies, or if any member(s) directly or indirectly controlling 10% or more of the membership interests dies; or if Borrower or any guarantor of the Obligations is any other form of business entity and any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies;

7.14    Default shall occur with respect to an indebtedness for borrowed money (other than the Obligations) of Borrower or any of its subsidiaries in an outstanding principal amount  exceeding $100,000 and such default shall continue for more than the period

Page 9 of 19

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



of grace, if any, therein with respect thereof, if the effect thereof (with or without the giving of notice or further lapse of time or both) is to accelerate, or permit the holder of any such indebtedness to accelerate, the maturity any such indebtedness, or any such indebtedness shall be declared due and payable or be required to be paid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof; or

## 8.    REMEDIES UPON DEFAULT

At any time after any Event of Default has occurred and is continuing, Lender may, without presentment, demand, protest, or further notice of any kind (all of which are hereby expressly waived) and, notwithstanding the provisions contained in any other document or instrument executed or to be executed by Borrower to Lender take any one or more of the following actions:

8.1    Declare all Obligations, including the entire Total Payback Amount, together with all loan costs and expenses and reasonable attorneys' fees, to be immediately due and payable. Lender shall be entitled to immediately enforce payment of all Obligations by any means permitted by law or in equity.

8.2    Notify customers, account debtors or lessees of Borrower that Lender has a Security Interest in the accounts, rights to payment, equipment, chattel paper and general intangibles of Borrower and may collect them directly; Lender may settle or adjust disputes and claims directly with account debtors or payment processor companies or insurance companies for amounts and upon terms that Lender considers advisable, and in such cases, Lender will credit the Obligations under this Agreement with only the net amounts received by Lender, after deducting all reasonable expenses incurred or expended in connection therewith;

8.3    Make such payments and do such acts as Lender considers necessary or reasonable to protect its Security Interest and Collateral. Borrower agrees to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate at a location which is reasonably convenient to Borrower and Lender. Borrower authorizes Lender to enter the premises where the Collateral is located, take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any encumbrance, charge or lien which in the reasonable opinion of Lender appears to be prior or superior to the Security Interest (other than the Permitted Encumbrances) and to pay all expenses incurred in connection therewith. With respect to any of Borrower's owned or leased premises, Borrower hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies;

8.4    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Lender is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production, sale or general administration of the Collateral, and Borrower's rights under all

licenses and franchise agreements shall inure to Lender's benefit;

8.5    Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as is commercially reasonable in the reasonable opinion of Lender. It is not necessary that the Collateral be present at any such sale. Lender shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned;

8.6    Lender shall give notice of the disposition of the Collateral as follows:

(a)    Lender shall give Borrower and each holder of a security interest in the Collateral a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, the time on or after which the private sale or other disposition is to be made;

(b)    The notice shall be personally delivered or mailed, postage prepaid, to Borrower as provided in this Agreement, at least ten (10) days before the date fixed for the sale, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made, unless the Collateral is perishable or threatens to decline speedily in value;

8.7    Borrower agrees that Lender may obtain the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same;

8.8    Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrower. Any excess will be returned immediately, subject to the rights of third parties, and/or as provided by law, to Borrower by Lender;

8.9    All payments received by Borrower in respect of the Collateral shall be forthwith paid over to Lender in the same form as so received (with any necessary endorsement), and may be held or applied by Lender to the Obligations in such order as Lender may determine;

8.10    File suit for any sums owing or for damages; and

8.11    Exercise any other remedy or right provided in law or in equity or permitted under this Agreement or by the California Uniform Commercial Code.

## 9.    REMEDIES CUMULATIVE

Any and all remedies conferred upon Lender shall be deemed cumulative with, and non-exclusive of any other remedy conferred hereby or by law and/or equity. Lender in the exercise of any one remedy shall not be precluded from the exercise of any other. Lender may exercise any and all rights and remedies available to it concurrently or independently, in such order, as frequently, and at such time or times as Lender may, in its sole discretion, deem

BP_008263

# Amended and Restated Business Loan & Security Agreement

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



Case 3:21-cv-01171-B   Document 36-18   Filed 09/30/21   Page 46 of 54   PageID 2280

expedient.

## 10. MISCELLANEOUS

10.1 <u>Power of Attorney.</u> Borrower hereby irrevocably appoints Lender as its or his true and lawful attorney, as the case may be, with full power of substitution, in Lender's name or in its or his name or otherwise, for Lender's sole use and benefit, but at Borrower's cost and expense, without notice to Borrower or any other person, to exercise at any time and from time to time:

(a)   while any Event of Default then exists, demand, sue for, collect, receive, and give acquittance for any and all monies due or to become due upon or by virtue thereof;

(b)   receive, take, endorse, assign, and deliver any and all checks, notes, drafts, documents, negotiable or non-negotiable instruments, or chattel paper in connection therewith;

(c)   while any Event of Default then exists, settle, compromise, compound, prosecute or defend any action or proceeding, including, without limitation, a foreclosure action, with respect thereto;

(d)   while any Event of Default then exists, extend or modify terms of payment or make any allowance or other adjustment with respect thereto; or

(e)   while any Event of Default then exists, notify account debtors of the Security Interest granted hereby and instruct such account debtors that payment of their respective accounts is to be made directly to Lender and take control of any and all such payments or other proceeds of such accounts.

10.2 <u>Attorneys' Fees and Costs.</u> Borrower shall pay on demand all of Lender's reasonable attorneys' fees and costs incurred by Lender in: (a) enforcing this Agreement and Lender's rights in its Collateral; and (b) the collection of any amounts due under this Agreement, whether or not suit is brought. Further, Lender shall be entitled to all reasonable attorneys' fees and costs incurred by Lender in connection with any bankruptcy proceeding of the Borrower, including any and all reasonable attorneys' fees and costs incurred to preserve, protect, monitor, or realize upon the Obligations and any security for such Obligations. The costs incurred by Lender include but are not limited to appraisal fees, filing fees, audit and inspection fees, and all other out-of-pocket costs and expenses incurred by Lender.

10.3 <u>Waivers.</u>

(a)   Borrower hereby waives presentment, demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, collateral received or delivered or other action taken in reliance herein, and all other demands and notices of any kind or description. With respect to the Obligations and the Collateral, Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of Collateral, to the addition or release of any person or entity primarily or secondarily liable therefor, to the acceptance of partial payments thereon and the settlement,

compromise, or adjustment of any thereof, all in such manner and at such time or times as Lender may deem advisable in its sole and absolute discretion. Lender shall have no duty as to the collection or protection of the Collateral or any income therefrom, as to the preservation of rights against prior parties, or as to the preservation of any rights pertaining to the Collateral beyond the safe custody thereof. Lender may exercise its rights with respect to the Collateral without resorting or regard to any other collateral or sources of payment for liability;

(b)   Neither any failure nor any delay on the part of Lender in exercising any right, power, or privilege hereunder or under this Agreement or any other Loan Document shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Lender shall not be deemed to have waived any of its rights with respect to the Obligations or Collateral hereunder or under any other written document, unless such waiver is in writing and signed by Lender.

10.4 <u>Monitoring, Recording, and Electronic Communications.</u> In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by email.

10.5 <u>No Third-Party Beneficiary.</u> This Agreement is made solely between Borrower and Lender and no other person shall have any right of action hereunder and the parties expressly agree that no person shall be a third-party beneficiary to this Agreement.

10.6 <u>Indemnity.</u> Borrower agrees to indemnify, defend, and hold harmless Lender, its employees, members, directors, managers, officers, or agents from and against any loss, liability, damage, penalty or expense (including reasonable attorneys' fees, expert witness fees, and cost of defense) they may suffer or incur as a result of: (a) any failure by Borrower or any employee, agent or Affiliate of Borrower to comply with the terms of this Agreement or any other legal obligation to Lender; (b) any warranty or representation made by Borrower being false or misleading; (c) any representation or warranty made by Borrower or any employee or agent of Borrower to any third person; (d) negligence of Borrower or its/his/her subcontractors, agents or employees; or (e) any alleged or actual violations by Borrower or its/his/her subcontractors, employees or agents of any governmental laws, regulations or rules.

10.7 <u>Assignment.</u> This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective executors, administrators, heirs, successors, and assigns, provided, however, that neither this Agreement nor any rights or Obligations hereunder shall be assignable by Borrower without first obtaining the express written consent of Lender. Lender has no obligation to consent to the Borrower assigning this Agreement. Any purported assignment made in contravention of the forgoing consent shall be void. Lender may assign any part of or all of the Loan and its rights and Obligations hereunder at any time in its sole and absolute

Page 11 of 19

# Amended and Restated Business Loan & Security Agreement

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



discretion provided that Lender notifies Borrower of the assignment of this Agreement promptly thereafter. Lender may sell participations in all or any portion of the Loan to such other party or parties as Lender shall select, all without notice or disclosure to Borrower.

10.8    Maximum Interest. If Lender contracts for, charges, or receives any consideration that constitutes interest in excess of the highest lawful rate that is permissible under the law applicable to this Agreement, then any such excess shall be canceled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loan made hereunder or be refunded to Borrower. In determining whether the interest contracted for, charged, or received by Lender exceeds the highest lawful rate, Lender may, to the extent permitted by applicable law: (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Loan hereunder.

10.9    Time Is of the Essence. The Parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

10.10    Notices. Any notices required or permitted to be given pursuant to this Agreement shall be in writing and may be given by personal delivery, email, facsimile, first class mail via the United States Postal Service, postage prepaid, or by any overnight courier by sending said notice to Borrower at the address set forth its signature below or to Lender at the following address:

Super G Capital, LLC
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660

If either party desires to change the address or email and fax numbers to which notices are to be sent, it shall do so in writing and deliver the same to the other party in accordance with the notice provisions set forth above.

10.11    Modifications. This Agreement may not be modified, amended, waived, extended, changed, discharged, or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge, or termination is sought.

10.12    Severability. If any term or provision of this Agreement or the application thereof to any circumstance, shall be invalid, illegal, or unenforceable to any extent, such term or provision shall not invalidate or render unenforceable any other term or provision of this Agreement or the application of such term or provision to any other circumstance then to the extent permitted by law, Borrower and Lender hereto hereby waive any provision of law that renders any term or provision hereof invalid or unenforceable in any respect.

10.13    Definitions. As used herein, (a) "Affiliate" means (i) any other person or entity which, directly or indirectly, controls or is

controlled by or is under common control with Borrower or (ii) any officer, employee, member, manager, shareholder, or director of Borrower; an entity shall be deemed to be "controlled by" any other person or entity if such person or entity possesses, directly or indirectly, power to vote 10% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such entity whether by contract or otherwise; (b) "Business Day" means any calendar day other than Saturdays, Sundays and official Federal Holidays; and (c) "Loan Documents" means, collectively, this Agreement and all other documents evidencing, securing or relating to the Obligations or executed in connection herewith, and all amendments and modifications of any of the foregoing.

## 11. GOVERNING LAW, FORUM SELECTION, AND CONSENT TO JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to its choice of law provisions. Lender and Borrower agree that: (a) all actions or proceedings arising out of or related to this Agreement; (b) any written agreements between or related to Lender and Borrower; and (c) all other disputes, regardless of whether arising out of contract or solely a tort, shall be tried and litigated exclusively in the state and federal courts located in the Orange County, California in a city to be designated by Lender, or in the City of Los Angeles, State of California. This choice of venue is intended to be mandatory and not permissive, thereby precluding the possibility of litigation between the Lender and Borrower in any jurisdiction other than that specified herein. Borrower hereby waives any right it may have to assert the doctrine of forum non conveniens (or any similar doctrine) or to otherwise raise any objection to venue with respect to any proceeding arising out of or related to this Agreement or any other written agreements between Lender and Borrower.

Lender and/or Borrower irrevocably and unconditionally consent to personal jurisdiction in California and venue in in any action in Orange County, California, in a city to be designated by Lender, or in the City of Los Angeles, State of California. Borrower further stipulates that the state and federal courts located in Orange County, California or the City of Los Angeles, State of California shall have in personam jurisdiction and venue over Borrower for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to: (i) this Agreement; and (ii) all other written agreements between the Borrower and Lender, including, without limitation, petitions to compel the judicial reference and to enforce the statement of decision by the referee.

Any action filed by Borrower or Lender shall be filed in the Los Angeles County Superior Court for the Central Judicial District or the Federal District Court for the Central District of California, located in the City of Los Angeles, or the Federal District Court, Central District of California located in Orange County, California. The judicial reference proceedings shall be conducted in the City of Los Angeles, California or in Orange County, California, in a city to be designated by Lender.

## 12. JUDICIAL REFERENCE

Page 12 of 19

BP_008265

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



12.1     At the request of either Lender or Borrower, any controversy or claim between or amongst Lender and Borrower, <u>regardless of whether the dispute or controversy arises under or is related to this Agreement</u>, shall be determined by a reference in accordance with California Code of Civil Procedure sections 638, et seq. Judgment upon the award rendered by such referee shall be entered in the court in which such proceeding was commenced in accordance with California Code of Civil Procedure sections 644 and 645.

12.2     Selection or Appointment of Referee. When Lender and Borrower are involved in any dispute or controversy (the "Reference Parties") they shall jointly select a single neutral referee who shall be a retired state or federal judge. In the event the Reference Parties cannot agree upon a referee, a single neutral referee shall be appointed by the court in accordance with the procedure set forth in Code of Civil Procedure section 640(b).

12.3     Conduct of Reference. The judicial reference shall be conducted pursuant to California law. The referee shall determine all issues relating to the applicability, interpretation, legality, or enforceability of all agreements. The referee shall report a statement of decision to the court. The Reference Parties shall equally bear the fees and expenses of the referee. The prevailing party shall be entitled to recover the fees and expenses that it/he/she paid to the referee and such fees and expenses shall be awarded in the statement of decision.

12.4     Reference Constitutes a Waiver of the Right to a Jury Trial. Borrower and Lender understand and acknowledge that by agreeing to judicial reference, Borrower and Lender each are hereby knowingly, voluntarily, and intentionally waiving any right (whether arising under the Constitution of the United States, the State of California, or of any other state, or under any foreign jurisdiction, under any statutes regarding or rules of civil procedure applicable in any state or federal or foreign legal proceeding, under common law, or otherwise) to demand or have a trial by jury of any claim, demand, action, or cause of action arising under, relating, or appertaining to: (i) this Agreement; (ii) any written agreements between Lender and Borrower; (iii) any disputes or controversies in any way connected with or related or incidental to the discussions, dealings, or actions between Lender and Borrower (whether oral or written); and (iv) any claims now existing or hereafter arising between Lender and Borrower, whether sounding in contract or tort or otherwise.

Each of the Reference Parties hereby agrees and consents that any such claim, demand, action, or cause of action shall be decided by the referee without a jury, and that any of the Reference Parties may file an original counterpart or a copy of this Agreement with any court as written evidence of its waiver of right to trial by jury. The Reference Parties acknowledge and agree that they have received full and sufficient consideration for this provision (and each other provision of each other related document to which they are a party) and that this provision is a material inducement for the Lender in accepting this Agreement. By waiving a jury trial, the Reference Parties intend claims and disputes to be resolved by the referee and/or judge acting without a jury in order to avoid the delays, expense, and risk of mistaken interpretations which each Party

acknowledges to be greater with jury trials than with nonjury trials.

12.5     Provisional Remedies, Self-Help And Foreclosure. No provision of this Agreement or written agreements between the Lender and Borrower, will limit the right of Lender to: (a) foreclose against any real property collateral by the exercise of a power of sale under a deed of trust, mortgage or other security agreement or instrument, or applicable law; (b) exercise any rights or remedies as a secured party against any personal property collateral pursuant to the terms of a security agreement or pledge agreement or applicable law; (c) exercise self-help remedies such as setoff; or (d) obtain provisional or ancillary remedies such as injunctive relief, writs of attachment, writs of possession, or the appointment of a receiver from a court having jurisdiction before, during, or after the pendency of any referral. The institution and maintenance of an action for judicial relief or pursuit of provisional or ancillary remedies or exercise of self-help remedies will not constitute a waiver of the right of any party, including the plaintiff, to submit any dispute to judicial reference.

## 13.     NO FIDUCIARY RELATIONSHIP

Borrower hereby acknowledges that Lender does not have any fiduciary relationship to Borrower, and the relationship between Lender, on the one hand, and Borrower, on the other hand, is solely that of creditor and debtor and no joint venture exists between Lender and Borrower.

## 14.     RULES OF CONSTRUCTION

Lender and Borrower have participated in the preparation and/or review of this Agreement, and this Agreement shall be deemed the result of the joint efforts of Lender and Borrower. This Agreement has been accepted and approved as to its final form by Borrower and upon the advice of its counsel but shall not be deemed accepted and approved by Lender until duly executed in the State of California by its duly authorized officer. Borrower acknowledges that the Loan is being made in the State of California and that all payments of the Obligations are not accepted until received by Lender in the State of California. Borrower further acknowledges that if Borrower elected not to consult with an attorney before signing this Agreement, Borrower had ample time to hire an attorney and obtain a review this Agreement by counsel before signing this Agreement. Accordingly, any uncertainty or ambiguity existing in this Agreement shall not be interpreted against either Lender or Borrower as a result of the manner of the preparation and presentation of this Agreement. Borrower and Lender agree that any statute or rule of construction providing that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and are hereby waived.

## 15.     COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument. The signatures to this Agreement may be evidenced by facsimile or scanned email copies reflecting the party's signature hereto, and any such facsimile copy or scanned email copies shall be sufficient

BP_008266

# Amended and Restated Business Loan & Security Agreement

Super G Capital, LLC
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



to evidence the signature of such party as if it were an original signature. Any failure by such Borrower or Lender to deliver original counterparts shall not affect the validity or the delivery of this Agreement or any documents in writing between Lender and Borrower.

## 16. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Lender and Borrower with respect to the subject matter hereof, and supersedes all other agreements, oral or written, between Lender and Borrower with respect to the subject matter. Borrower acknowledges and represents that it/he/she has read this Agreement carefully and that there have been no oral or written statements made to it/he/she by Lender or any other party that contradicts, varies, or would change the meaning of any statements, promises, or agreements set forth in this Agreement. Borrower acknowledges that a failure to review this Agreement before signing it precludes any claim that it does not represent the true and accurate agreement of the Lender and Borrower. No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be made against any party herein, except upon the basis of a written instrument executed by or on behalf of such party, which written instrument must expressly reference this Agreement.

BP_008267

# Amended and Restated Business Loan & Security Agreement

Super G Capital, LLC
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



| BUSINESS LEGAL NAME | **WINDSPEED TRADING, LLC** |
|---|---|
| SIGNATURE | |
| PRINT NAME | **William C Szeto** |
| TITLE | **Manager** |
| DATE | |
| ADDRESS | |

**FOR LENDERS USE ONLY:** This Agreement has been received and accepted by Lender in the State of California after being signed by Borrower and any Guarantor(s)

| SIGNATURE | PRINT NAME Marc Cole, Chief Financial Officer | DATE |
|---|---|---|
| | | |

BP_008268

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) (this "Authorization") is part of (and is fully incorporated herein by reference into) the Business Loan and Security Agreement above (the "Loan Agreement").

By signing below, Borrower agrees and authorizes Lender to collect payments required under the terms of this Agreement by initiating ACH debit entries to Borrower's Account in the amounts and on the dates provided in the payment schedule set forth in the Loan Agreement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry by the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid returned payment charges and/or late fees. This Authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender
may suspend or terminate Borrower's enrollment in the automatic payment plan effected by this Authorization immediately if Borrower fails to keep Borrower's Account in good standing or if there are insufficient funds in Borrower's Account to process any payment. If Borrower revokes this Authorization, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Loan Agreement.

BUSINESS PURPOSE ACCOUNT. By signing below, Borrower attests that Borrower's Account was established for business purposes and not for personal, family, or household purposes.

ACCOUNT CHANGES. Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Borrower Account.

MISCELLANEOUS. Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this Authorization. The origination of ACH transactions to or from Borrower's Account must comply with all provisions of applicable law.

| BANK INFO | | |
|---|---|---|
| | BANK NAME | **Texas Capital Bank** |
| | ABA ROUTING NO. | **111017979** |
| | ACCOUNT NO. | **1511017475** |

| BORROWER | | |
|---|---|---|
| | BUSINESS LEGAL NAME | **WINDSPEED TRADING, LLC** |
| | NAME | |
| | BY NAME | **William C Szeto** |
| | TITLE | |
| | ADDRESS | |

Page 16 of 19

BP_008269

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



**ADDENDUM 1**

**PERMITTED ENCUMBRANCES**

(a)  liens arising under this Agreement and the other Loan Documents;

(b)  liens for taxes, fees, assessments or other government charges or levies, either (i) not due and payable or (ii) being contested in good faith and for which Borrower maintains adequate reserves on its books;

(c)  purchase money liens securing Purchase Money Debt (i) on equipment acquired or held by Borrower incurred for financing the acquisition of the equipment, or (ii) existing on equipment when acquired, in each case if the lien is confined to the equipment and improvements and the proceeds of the equipment;

(d)  liens of carriers, warehousemen, suppliers, landlords or other persons that are possessory in nature arising in the ordinary course of business so long as the amount secured by such liens is not delinquent or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(e)  liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business;

(f)  liens incurred in the extension, renewal or refinancing of the indebtedness secured by liens described in clause (c), but any extension, renewal or replacement lien must be limited to the property encumbered by the existing lien and the principal amount of the indebtedness may not increase;

(g)  leases or subleases of real property granted in the ordinary course of business, and leases, subleases, non-exclusive licenses or sublicenses of property granted in the ordinary course of Borrower's business, if the leases, subleases, licenses and sublicenses do not prohibit granting Lender a Security Interest;

(h)  non-exclusive license of intellectual property granted to third parties in the ordinary course of business;

(i)  liens arising from judgments, orders, decrees or attachments in circumstances not constituting an Event of Default under Section 7.6; and

(j)  easements, rights of way, covenants, restrictions, reservations, exceptions and other similar restrictions and encumbrances or title defects, in each case existing when the property was acquired or incurred in the ordinary course of business which, in the aggregate, do not materially detract from the value or usefulness of the property subject thereto or materially interfere with the ordinary conduct of business of Borrower.

BP_008270

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



**ADDENDUM 2**

**CONDITIONS TO FUNDING**

As conditions precedent to Lender funding the Loan, Borrower shall have delivered to Lender, in form and content acceptable to Lender, fully executed copies of the following:

1.  This Agreement;

2.  A certificate of insurance covering the Collateral and the location of the Collateral, naming Lender as additional insured and loss payee;

3.  Such other documents as may be reasonably required by Lender.

BP_008271

# Amended and Restated Business Loan & Security Agreement

Super G Capital
23 Corporate Plaza, Suite 100
Newport Beach, CA 92660
800-631-2423



## ADDENDUM 3

### ADDITIONAL COVENANTS

1. <u>Financial Covenants</u>. So long as any of the Obligations remain outstanding, Borrower shall cause Bank to send Lender each month a copy of the monthly statement pertaining to Borrower's deposit accounts at Bank.

2. <u>Post-Closing Covenants</u>. No later than thirty (30) days after the date of this Agreement, Borrower shall deliver to Lender, in form and substance satisfactory to Lender, a Landlord's Waiver covering the location of the Collateral.

BP_008272