PLAINTIFF'S
EXHIBIT

**23**

**ASSET PURCHASE AGREEMENT**

by and among

**ACET GLOBAL, LLC**
**(Buyer)**

**ACET VENTURE PARTNERS LLC**
**(Seller)**

and

**TOMER DAMTI**
**(Owner)**

Dated as of July 20, 2017



EXHIBIT
**A**

## TABLE OF CONTENTS

**PAGE**

ARTICLE I DEFINITIONS ............................................................................................. 1

    **1.1**      Definitions ............................................................................................ 1

ARTICLE II PURCHASE AND SALE .......................................................................... 12

    **2.1**      Purchase and Sale of Acquired Assets; Excluded Assets;
                 Assumed Liabilities; Excluded Liabilities .......................................... 12
    **2.2**      Purchase Price ..................................................................................... 13
    **2.3**      Purchase Price Adjustment ................................................................. 13
    **2.4**      Purchase Price Allocation ................................................................... 15
    **2.5**      Assets Incapable of Transfer .............................................................. 15

ARTICLE III REPRESENTATIONS OF SELLER ........................................................ 16

    **3.1**      Existence and Good Standing .............................................................. 16
    **3.2**      Authorization and Binding Obligation ................................................ 16
    **3.3**      No Violations; Approvals .................................................................... 17
    **3.4**      Financial Statements ........................................................................... 17
    **3.5**      Absence of Certain Changes ............................................................... 18
    **3.6**      Title to Properties ............................................................................... 19
    **3.7**      Material Contracts .............................................................................. 19
    **3.8**      Litigation ............................................................................................ 20
    **3.9**      Taxes .................................................................................................. 21
    **3.10**    Intellectual Property ........................................................................... 22
    **3.11**    Compliance with Laws; Permits ........................................................ 23
    **3.12**    Employee Benefit Plans ...................................................................... 24
    **3.13**    Environmental Matters ....................................................................... 25
    **3.14**    Insurance ............................................................................................ 26
    **3.15**    Broker's or Finder's Fees ................................................................... 26
    **3.16**    Customers; Vendors ........................................................................... 26
    **3.17**    Products .............................................................................................. 27
    **3.18**    Real Property ...................................................................................... 28
    **3.19**    Receivables ........................................................................................ 28
    **3.20**    Product Liability ................................................................................. 29
    **3.21**    Inventory ............................................................................................ 29
    **3.22**    Affiliate Transactions ......................................................................... 29
    **3.23**    Certain Payments ............................................................................... 29
    **3.24**    Diligence ............................................................................................ 30

ARTICLE IV REPRESENTATIONS OF BUYER.......................................................... 30

    **4.1**      Existence and Good Standing .............................................................. 30
    **4.2**      Authorization and Binding Obligation ................................................ 30

| | | |
|---|---|---|
| **4.3** | No Violations | 30 |
| **4.4** | Broker's or Finder's Fees | 30 |
| **4.5** | Litigation | 31 |

**ARTICLE V COVENANTS** ........... 31

| | | |
|---|---|---|
| **5.1** | Publicity | 31 |
| **5.2** | Tax Matters | 31 |
| **5.3** | Employee Matters | 31 |
| **5.4** | Further Assurances | 31 |
| **5.5** | Post-Closing Receipts; Payment Cooperation | 32 |
| **5.6** | Change of Name | 32 |
| **5.7** | Non-Competition | 32 |
| **5.8** | Confidentiality | 33 |
| **5.9** | Bulk Transfer Requirements. | 33 |

**ARTICLE VI CLOSING** ........... 33

| | | |
|---|---|---|
| **6.1** | Closing | 33 |
| **6.2** | Deliveries by Seller | 34 |
| **6.3** | Deliveries by Buyer | 34 |

**ARTICLE VII INDEMNIFICATION** ........... 35

| | | |
|---|---|---|
| **7.1** | Survival of Representations, Warranties and Covenants | 35 |
| **7.2** | Indemnification | 36 |
| **7.3** | Limitations on Indemnification | 36 |
| **7.4** | Exclusive Remedy | 37 |
| **7.5** | Procedure for Indemnification with Respect to Third-Party Claims | 37 |
| **7.6** | Procedure for Indemnification with Respect to Non-Third-Party Claims | 39 |
| **7.7** | Materiality | 39 |
| **7.8** | Right of Setoff | 39 |

**ARTICLE VIII MISCELLANEOUS** ........... 39

| | | |
|---|---|---|
| **8.1** | Expenses | 39 |
| **8.2** | Governing Law; Waiver of Jury Trial | 39 |
| **8.3** | Interpretation | 40 |
| **8.4** | Notices | 40 |
| **8.5** | Counterparts | 41 |
| **8.6** | Entire Agreement | 41 |
| **8.7** | Binding Effect; Assignment | 41 |
| **8.8** | Waiver; Consent | 41 |
| **8.9** | Severability | 42 |
| **8.10** | Third-Party Beneficiaries | 42 |
| **8.11** | Prevailing Party | 42 |

**App. 092**

**8.12**    Arm's Length Negotiations; Drafting.  Each party to this
Agreement in this ........................................................................... 42
**8.13**    Seller Representative......................................................................... 42

EXHIBITS

Exhibit A – Assumption Agreement
Exhibit B – Bill of Sale
Exhibit C – Accounting Principles
Exhibit D – IP Assignment and Assumption
Exhibit E – Seller Note
Exhibit F – Security Agreement
Exhibit G – Purchase Price Allocation
Exhibit H – Employment Agreement


DISCLOSURE SCHEDULES

Section 1-A - Transferred Contracts
Section 1-B – Excluded Assets
Section 1-C – Tangible Personal Property
Section 1-D – Permitted Liens
Section 1-E – Assumed Liabilities
Section 3.1 – Jurisdictions
Section 3.3(a) – Consents
Section 3.3(b) – Required Consents
Section 3.3(c) – Post- Closing Consents
Section 3.4 – Financial Statements
Section 3.5 – Absence of Certain Changes
Section 3.6 – Condition of Assets
Section 3.7 – Material Contracts
Section 3.8 – Litigation
Section 3.9(a) – Tax Returns Not Filed / Paid
Section 3.9(b) – Tax Returns
Section 3.10 – Intellectual Property
Section 3.11 – Compliance with Laws; Permits
Section 3.12(a) – Employee Benefit Plans
Section 3.12(b) – Employees/Salary
Section 3.13 – Environmental Assessments
Section 3.14 – Insurance Policies
Section 3.15 –Broker's or finder's Fees
Section 3.16(a) – Customers of Seller
Section 3.16(b) Trade Vendors of Seller
Section 3.17 - Products
Section 3.18 – Real Property
Section 3.19 - Receivables
Section 3.21 – Inventory
Section 3.22 – Affiliate Transactions

**App. 094**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated effective as of June 20, 2017 (the "Effective Date") by and among (i) ACET Global, LLC, a Texas limited liability company ("Buyer") (ii) ACET Venture Partners LLC, a Texas limited liability company ("Seller"), and (iii) Tomer Damti, a citizen of Israel and resident of the State of Texas ("Damti"). Damti may also be referred to as "Owner." Owner and Seller may be referred to in this Agreement as the "Seller Parties."

## RECITALS

A.  Seller is engaged in the Business.

B.  Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all or substantially all of the assets of Seller on the terms and subject to the conditions set forth in this Agreement.

C.  Holdco owns 100% of Buyer.

D.  Owner is the beneficial owner of Seller and as such has had access to Seller's customer lists, other trade secrets, methods of operation and other proprietary information of the Business and is receiving significant benefit from the consummation of the transactions contemplated by this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations, and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Buyer, Seller and Owner agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1**  Definitions.  For purposes of this Agreement, capitalized terms set forth in this Section 1.1 shall have the meanings ascribed to such terms in this Article I.  Other capitalized terms, when used herein, shall have the meanings ascribed to such terms.

"Accountant" has the meaning set forth in Section 2.3(a).

"Accounting Principles" has the meaning set forth in the definition of Closing Date Net Working Capital.

"Accounts Receivable" has the meaning set forth in the definition of Acquired Assets.

"Acquired Assets" means all of the properties, rights, interests and other tangible and intangible assets of Seller (other than the Excluded Assets, which are not included in the Acquired Assets) existing as of the Closing (wherever located and whether or not required to be

reflected on a balance sheet), including, without limitation, all of Seller's right, title and interest in and to the following:

(i)       the Inventory;

(ii)      the accounts receivable of Seller as of the Closing Date (the "Accounts Receivable");

(iii)     the Tangible Personal Property;

(iv)     the Intellectual Property;

(v)      all intangible assets that are not Intellectual Property, including goodwill and going concern value and all other intangible rights of Seller and all rights of Seller to the company name "ACET" and other relevant, related and/or derivative company names;

(vi)     Seller's rights under the Contracts set forth on Section 1-A of the Disclosure Schedule (the "Transferred Contracts");

(vii)    all rights with respect to products sold by Seller, including, without limitation, all "standard" products and all "customized" products (the "Company Products"), all sales order files, distributor files, engineering files and product files (including drawings, part numbers, and all representations of all Company Products), purchase order files, manufacturing records, test specifications and validation procedures, client and customer lists, supplier lists, pricing information, sales and promotional literature and paper work and business files of Seller relating to the Business and books and records relating to the Transferred Employees (including personnel files);

(viii)   all claims and counterclaims by Seller against any other Person, including but not limited to claims arising from or relating to express and implied warranties from manufacturers, vendors and suppliers;

(ix)     to the extent their transfer is permitted under Applicable Law, all Permits utilized by Seller in the conduct of the Business, including the Permits listed on Section 3.11 of the Disclosure Schedule;

(x)      all telephone or facsimile numbers, and electronic mail addresses used in connection with the Business;

(xi)     all supplies used in the Business;

(xii)    all claims for past infringement of the Intellectual Property of Seller that is an Acquired Asset; and

(xiii)   all credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items relating to the acquired Assets and for the benefit of Seller.

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the ability to elect the members of the board of directors or other governing body of such Person, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Agreement" has the meaning set forth in the Preamble.

"Annual Financial Statements" has the meaning set forth in Section 3.4.

"Applicable Laws" has the meaning set forth in Section 3.11.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement, dated as of the date hereof, to be entered into at the Closing between Seller and Buyer in the form attached as Exhibit A, pursuant to which Seller shall assign to Buyer, and Buyer shall assume, the Assumed Liabilities.

"Assumed Liabilities" means only those Liabilities of Seller arising and relating to the operation of the Business after the Closing Date and listed on Section 1-E of the Disclosure Schedule.

"Balance Sheet Date" has the meaning set forth in Section 3.4.

"Bill of Sale" means the Bill of Sale issued by Seller in favor of Buyer in the form attached as Exhibit B.

"Business" means the business of a multi-national wholesale and direct sale company (business-to-consumer and business-to-business) providing sales and sales services (including without limitation via the Internet and other media broadcast outlets), which includes but is not limited to purchasing, testing, marketing, logistics and fulfillment of products worldwide.

"Business Employees" has the meaning set forth in Section 5.3.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Indemnified Parties" has the meaning set forth in Section 7.2(a).

"Buyer W/C Amount" has the meaning set forth in Section 2.3(b)(ii).

"Buyer's Indemnifiable Claims" has the meaning set forth in Section 7.2(a).

"Cap" has the meaning set forth in Section 7.3(b).

"Cash Portion of the Purchase Price" has the meaning set forth in Section 2.2(a)(i).

"Closing" has the meaning set forth in Section 6.1.

"Closing Date" has the meaning set forth in Section 6.1.

"Closing Date Net Working Capital" means the net working capital of the Seller calculated as of the Closing Date consistent with the methodology set forth on Exhibit C (the "Accounting Principles").

"Closing Statement" has the meaning set forth in Section 2.3(a).

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Company Agreement" has the meaning set forth in Section 2.2(a)(iii).

"Company Products" has the meaning set forth in the definition of Acquired Assets.

"Competitive Activity" has the meaning set forth in Section 5.7(a).

"Computer Systems" has the meaning set forth in Section 3.10(f).

"Confidential Information" has the meaning set forth in Section 5.8.

"Contract" means any written or oral contract, agreement or instrument, including, without limitation, supply contracts, purchase orders, understandings or commitments, or leases of personal property to which the Person referred to is a party or by which any of its assets may be bound.

"Damages" (collectively) or "Damage" (individually) means all liabilities, losses, lost profits, diminution in value, injuries, penalties, fines, forfeitures, assessments, claims, suits, proceedings, investigations, actions, demands, causes of action, judgments, awards, taxes, charges, costs, expenses and damages of any nature, whether or not arising out of third party claims (including, without limitation, interest, penalties, reasonable attorneys', accountants' and other professionals' fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing).

"Deductible Amount" has the meaning in Section 7.3(a).

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plans" has the meaning set forth in Section 3.12(a).

"Employment Agreement" has the meaning set forth in Section 6.2(e).

"Environmental Laws" means any federal, state or local law, statute, ordinance, code, rule, regulation, order, judgment, decree, injunction or legally enforceable requirement of any Governmental Authority that regulates, controls or relates to (i) protection, preservation or

restoration of air, soils, surface water, groundwater, surface land, subsurface land and natural resources ("Environment"), (ii) use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Materials, (iii) health and safety of Persons (including employees), (iv) emission, release, spilling or leaking of any substance into the Environment, or (v) pollution or substances or materials which are considered to be hazardous or toxic.  Environmental Laws include, without limitation, any federal, state and local environmental law, all amendments and supplements to any of the foregoing and all regulations promulgated or issued pursuant thereto.

"Environmental Liabilities" means all liabilities and obligations of Seller or any Affiliate of Seller with respect to Releases of Hazardous Materials or violations of Environmental Law.

"Equity Interest" has the meaning set forth in Section 2.2(a)(iii).

"Excluded Assets" means (i) all of Seller's federal and state income Tax Returns and records (provided that Seller has provided copies of such Tax Returns and records to Buyer prior to Closing) and any rights to Tax refunds for periods prior to Closing, (ii) all Employee Benefit Plans, arrangements and agreements of Seller and all assets and rights relating to Employee Benefit Plans and similar arrangements and agreements of Seller, (iii) Seller's rights under this Agreement and the Related Agreements, (iv) the Excluded Contracts, (v) the Excluded Books and Records, (vi) any insurance policies of Seller, (vii) Seller's rights, claims and counterclaims of any kind and nature against any Person as to the Excluded Assets and Excluded Liabilities, and (h) those assets listed on Section 1-B of the Disclosure Schedule.

"Excluded Books and Records" means, except for the books and records that are Acquired Assets, all minute books, all books and records relating to federal or state income Taxes (provided that Seller has provided copies of such Tax books and records to Buyer prior to Closing) or employee benefit matters, all books and records relating to employees other than Transferred Employees, and any other books and records relating solely to the Excluded Assets or Excluded Liabilities.

"Excluded Contracts" means all Contracts to which Seller is a party that are not Transferred Contracts.

"Excluded Liabilities" means all Liabilities of Seller that are not Assumed Liabilities, including but not limited to:

        (i)    all Liabilities of Seller or any Affiliate of Seller for Indebtedness of Seller;

        (ii)    all Liabilities of Seller or any Affiliate of Seller for Taxes, including, (A) all Liabilities for Taxes with respect to the Acquired Assets or the Business prior to the Closing Date, (B) all Liabilities for Taxes arising in connection with, or resulting from, the consummation of the transactions contemplated by this Agreement, and (C) all Liabilities for the Taxes of any other Person as a transferee, successor, by Contract, by Applicable Law or otherwise;

(iii)    all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental Authority involving Seller, the Business or any Affiliate of Seller, whether arising prior to, pending on, or arising after the Closing Date relating to events occurring prior to the Closing, including without limitation the litigation matters listed on <u>Section 3.8</u> of the Disclosure Schedule;

(iv)    all Liabilities of Seller to its current or former employees;

(v)    all Liabilities of Seller to any current or former member, director, manager, officer or Affiliate of Seller, including, without limitation, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any member, manager, director, officer or Affiliate to Seller;

(vi)    any Liability to, or arising under any (A) workers' compensation program to which premiums or contributions are paid, and (B) Employee Benefit Plans, including, without limitation, any Liability for withdrawal from, or termination of, any Employee Benefit Plan, and any Tax including excise Taxes or penalties arising from Employee Benefit Plans or resulting from any transaction with or by any Employee Benefit Plan;

(vii)    all Liabilities related to the Excluded Assets, including any liabilities arising under any Contract that is not a Transferred Contract;

(viii)   all Recall Obligations;

(ix)    all Product Liability Obligations;

(x)    all Environmental Liabilities;

(xi)    all Warranty Obligations; and

(xii)    any and all other Liabilities relating to the Business or the Acquired Assets, other than the Assumed Liabilities, which are related to acts, omissions, circumstances or events, existing, occurring or arising on or before the Closing Date.

"<u>Financial Statements</u>" has the meaning set forth in <u>Section 3.4</u>.

"<u>Fundamental Representations</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Governmental Authority</u>" means any foreign, federal, state or local government or any court, administrative agency or commission or other governmental authority or agency, domestic or foreign.

"<u>Hazardous Materials</u>" means any hazardous substance, pollutant or contaminant, as those terms are defined under applicable Environmental Laws, solid waste and hazardous waste, as those terms are defined under applicable Environmental Laws, oil, petroleum and petroleum products, and all pollutants, contaminants, toxic or hazardous wastes that may be required to be

removed pursuant to applicable Environmental Laws, or whose generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration is or shall be restricted, prohibited or penalized under any Environmental Law (including, without limitation, lead paint, asbestos, urea formaldehyde foam insulation, petroleum and polychlorinated biphenyls).

"Holdco" has the meaning set forth in Section 2.2(a)(iii).

"Indebtedness" means when used with reference to any Person, without duplication, (i) any Liability of such Person created or assumed by such Person, or any subsidiary thereof, (A) for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (B) evidenced by a bond, note, debenture or similar instrument (including a purchase money obligation, deed of trust or mortgage) given in connection with the acquisition of, or exchange for, any property or assets (other than inventory or similar property acquired and consumed in the Ordinary Course of Business of such Person, including securities and other indebtedness), or (C) for the payment of money as lessee under leases that should be recorded as capital leases for financial reporting purposes; (ii) any Liability of others described in the preceding clause (i) guaranteed as to payment of principal or interest by such Person or in effect guaranteed by such Person through an agreement, contingent or otherwise, to purchase, repurchase or pay the related indebtedness or to acquire the security therefor; (iii) all Liabilities secured by a Lien upon property owned by such Person and upon which Liabilities such Person customarily pays interest or principal, whether or not such Person has not assumed or become liable for the payment of such Liabilities; (iv) any amendment, renewal, extension, revision or refunding of any such Liability; (v) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise; (vi) any letter of credit arrangements; (vii) any accrued interest on any of the foregoing; and (viii) any prepayment or other similar fees, expenses or penalties on or relating to the repayment or assumption of any of the foregoing (including retention or stay bonuses and any prepayment premiums or similar breakage costs payable as a result of the consummation of the transactions contemplated herein).

"Indemnifiable Claims" has the meaning set forth in Section 7.5(a).

"Indemnified Party" or "Indemnified Parties" has the meaning set forth in Section 7.2(b).

"Indemnifying Party" has the meaning set forth in Section 7.5(a).

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world, whether arising by operation of law, Contract or otherwise: (i) trademarks, service marks, copyrights (including software, databases and related documentation), logos, slogans, Internet domain names and web sites, trade or business names, and all registrations of any of the foregoing, and all applications for registration thereof, and all goodwill associated therewith; (ii) patents and patent applications, including, without limitation, continuations, continuations-in-part, divisionals, provisionals, reexaminations, reissue applications and renewals; and (iii) trade secrets, formulations, formulas, recipes, inventions, processes, know-how and confidential information.

"Intellectual Property Assignment" means the Intellectual Property Assignment to be entered into at the Closing between Seller and Buyer in the form attached as Exhibit D, pursuant to which Seller shall assign to Buyer, and Buyer shall assume, the Intellectual Property Registrations.

"Intellectual Property Registrations" means all federal, state and foreign: (i) patents, including applications therefore (including provisional applications), (ii) registered trademarks, service marks and applications to register trademarks and service marks, including intent-to-use applications, and (iii) copyrights registrations and applications to register copyrights; that are owned by Seller.

"Inventory" means all inventory owned by Seller and used in the Business as of the Closing Date, including all inventories of raw materials, work-in-process, finished goods, supplies, parts and packaging materials including inventory that is either (i) located at any Seller facility (whether owned, leased, licensed or otherwise), (ii) in transit to a Seller facility or to suppliers, (iii) with distributors (iv) with customers on consignment, or (iv) pertaining to goods manufactured or to be manufactured at sites other than a Seller facility.

"Knowledge of Seller" means the actual knowledge of Owner after reasonable inquiry with those employees or advisors of Seller reasonably expected to have material knowledge of the respective issue, which shall include but not be limited to Seller's employees.

"Lease" has the meaning set forth in Section 3.18.

"Liability" or "Liabilities" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of Seller to a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due), and including, without limitation, Indebtedness and any Damages.

"Liens" mean any encumbrance, lien, claim, charge, mortgage, pledge, adverse or other claim, condition, option, warranty, right of first refusals, easement, right of way, covenant, restriction or security interest of any kind or nature.

"Litigation Conditions" has the meaning set forth in Section 7.5(a).

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to: (i) the business, results of operations, condition (financial or otherwise) or assets of the Business (or Buyer's ability to use and operate the same substantially as did Seller prior to the Closing) for a commercially reasonable period, taken as a whole, or (ii) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change (but excluding any such event, occurrence, fact, condition or change relating to the presence or Release of Hazardous Materials relating to the Business), directly or indirectly, arising out of or attributable to: (A) general (domestic, foreign or global) economic, business or political conditions; (B) conditions generally affecting the industries in which the Business operates; (C)

any changes in financial or securities markets in general; (D) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (E) any action required or permitted by this Agreement; (F) any changes in Applicable Laws; *provided further, however,* that any event, occurrence, fact, condition or change referred to in clauses (A) through (D) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a materially disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"Material Contracts" has the meaning set forth in Section 3.7(a).

"Most Recent Balance Sheet" has the meaning set forth in Section 3.4.

"Net Working Capital Target" means an amount calculated as the one (1) month average of Seller's net working capital, calculated consistent with the Accounting Principles, during the most recent twelve (12) full calendar month period ending on the last day of the calendar month immediately preceding Closing.

"Notice" has the meaning set forth in Section 2.3(a).

"Ordinary Course of Business" means an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

      (a)      such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

      (b)      such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority); and

      (c)      such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Organizational Documents" means, with respect to any corporation, the articles or certificate of incorporation, as applicable, and the bylaws or code of regulations, as applicable, of such corporation; with respect to any limited liability company, the articles of organization (or certificate of formation) and the limited liability company agreement or operating agreement, as applicable, of such limited liability company; and with respect to any general partnership or limited partnership, the certificate of partnership or certificate of limited partnership, as applicable, and the partnership agreement or limited partnership agreement, as applicable, of such general partnership or limited partnership.

"Owner" has the meaning set forth in the Preamble.

"Permits" has the meaning set forth in Section 3.11.

"Permitted Liens" means (i) statutory Liens incurred in the ordinary course of the Business for obligations not yet due; (ii) Liens for Taxes not yet due or being contested in good faith by appropriate proceedings for which sufficient reserves are established; and (iii) Liens set forth in Section 1-D of the Disclosure Schedule, which, unless otherwise specifically stated on such Disclosure Schedule, shall be released at Closing.

"Person" means an individual, corporation, limited liability company, partnership, trust, unincorporated association or any other entity or organization.

"Personal Data" means all data relating to one or more individual(s) that is personally identifying (i.e., data that identifies an individual or, in combination with any other information or data available to Seller, is capable of identifying an individual) or non-personally identifying, including, without limitation, aggregate or de-identified data.

"Pre-Closing Debt" means the principal amount of all Indebtedness of Seller that is outstanding as of the Closing Date, together with all unpaid and accrued interest, fees and penalties (including prepayment penalties, acceleration fees or similar amounts) and all obligations under interest rate, currency swap, or hedging transactions for any Indebtedness, which is due and payable thereon or which arises out of any early prepayment of such Indebtedness, if any.

"Privacy and Data Security Policies" has the meaning set forth in Section 3.10(e).

"Product Liability Obligations" means all liabilities of Seller to any Person (including those related to death or damage to property (including loss of the use thereof)) under any product liability theory (whether negligence, breach of express or implied warranty, strict liability, violation of Applicable Laws or other), arising from any services provided by Seller or products manufactured by Seller prior to the Closing Date.

"Purchase Price" has the meaning set forth in Section 2.2(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.4.

"Quality of Earnings Report" means that certain quality of earnings report prepared by Whitley Penn, LLP and captioned Baymark Partners, L.P. Due Diligence Report for ACET Venture Partners LLC May 4, 2017, as updated from time to time.

"Real Property" has the meaning set forth in Section 3.18(a).

"Recall Obligations" means all Liabilities of Seller to customers that (i) arise from any valid recall order of a Governmental Authority issued pursuant to Applicable Law for Company Products or from a recall of defective products (including without limitation, Company Products) reasonably required to protect the image of Seller, and (ii) require the systematic repair or replacement of any products (including without limitation, Company Products), in each case arising from any products (including without limitation, Company Products) manufactured, sold or delivered by Seller on or prior to the Closing Date.

"Related Agreements" mean all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with this Agreement by any Person.

"Release" means any release, or threatened release, spill, emission, leaking, pumping, pouring, emptying, disposing, injection, deposit, discharge, leaching, or migration into any media, whether soil, surface water, ground water, building interior or components, air or any combination of the foregoing, and the movement of any contamination through any media, and including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials.

"Resolution Period" has the meaning set forth in Section 2.3(a).

"Seller" has the meaning set forth in the Preamble.

"Seller Indemnified Parties" has the meaning set forth in Section 7.2(b).

"Seller Note" has the meaning set forth in the Section 2.2(a)(ii).

"Seller Parties" has the meaning set forth in the Preamble.

"Seller Representative" has the meaning set forth in Section 8.13(a).

"Seller's Indemnifiable Claims" has the meaning set forth in Section 7.2(b).

"Tangible Personal Property" means the equipment, machinery, tools, dies, molds, tooling (including which is located at suppliers' places of business) furniture, fixtures, computers, hardware supplies, mobile phones (and associated numbers), motor vehicles, supplies and other tangible personal property owned by Seller, including those listed on Section 1-C of the Disclosure Schedule.

"Tax Return" means any report, return, document, declaration or other information or filing required to be supplied to any taxing authority or jurisdiction (foreign or domestic) with respect to Taxes, including, without limitation, information returns, any documents with respect to or accompanying payments of estimated Taxes, or with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information.

"Taxes" means any and all taxes, charges, fees, levies or other assessments, including, without limitation, income, employment, profits, use, alternative minimum, gross receipts, value added, excise, real or personal property, escheat, unclaimed property, estimated, sales, withholding, social security, retirement, unemployment, occupation, service, service use, license, net worth, payroll, franchise, transfer, recording and any other taxes, fees and charges of any kind whatsoever and however denominated, imposed by the Internal Revenue Service or any other taxing authority (whether domestic or foreign, including, without limitation, any state, county, local or foreign government or any subdivision or taxing agency thereof (including a United States possession or territory)), whether computed on a separate, consolidated, unitary, combined or any other basis; and such term includes (i) any interest, whether paid or received,

fines, penalties or additional amounts attributable to, or imposed upon, or with respect to, any such taxes, charges, fees, levies or other assessments and (ii) any liability for such amounts as a result of being a member of a consolidated, combined, unitary or affiliated group or of a contractual obligation to indemnify any other Person.

"Top Customers" has the meaning set forth in Section 3.16(a).

"Top Vendors" has the meaning set forth in Section 3.16(b).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

"Transferred Employees" has the meaning set forth in Section 5.3.

"Warranties" has the meaning set forth in Section 3.17.

"Warranty Obligations" means all liabilities under, or claims arising from any express or implied warranty relating to any products (including without limitation, Company Products) manufactured, sold or delivered by Seller on or prior to the Closing Date, excluding Customer Service Calls.

### ARTICLE II
### PURCHASE AND SALE

**2.1** Purchase and Sale of Acquired Assets; Excluded Assets; Assumed Liabilities; Excluded Liabilities.

(a)    In accordance with, and subject to, the provisions of this Agreement, at the Closing, Seller will sell, transfer, convey, assign, deliver and set over to Buyer, and Buyer will purchase and accept, all of the right, title and interest of Seller in, to and under the Acquired Assets free and clear of all Liens other than Permitted Liens, which will be effected and evidenced pursuant to the Bill of Sale. Notwithstanding anything to the contrary in this Agreement, the transfer of the Acquired Assets will not include the assumption of any Excluded Liability or any Liability relating to the Acquired Assets unless Buyer expressly assumes the same pursuant to Section 2.1(c).

(b)    Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Buyer acquire any right, title or interest in, to and under any of the Excluded Assets.

(c)    In accordance with, and subject to, the provisions of this Agreement, at the Closing, Buyer will assume and agree to pay, perform and discharge and hold Seller harmless from the Assumed Liabilities (but only the Assumed Liabilities).    The assumption of the Assumed Liabilities by Buyer will be effected and evidenced pursuant to the Assignment and Assumption Agreement. Seller will retain and will be responsible for all Excluded Liabilities, will pay, perform, and discharge each Excluded Liability in a timely and efficient manner and will hold harmless Buyer Indemnified Parties from all Excluded Liabilities.

**App. 106**

(d)     Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Buyer assume, be required to pay, perform, discharge or hold a Seller Covered Party harmless from any Excluded Liabilities.

**2.2**   Purchase Price[1].

(a)     Subject to the other terms and provisions of this Article II, the aggregate purchase price to be paid by Buyer to Seller in consideration of the Acquired Assets, shall be as follows, subject to adjustment as provided in Section 2.3 (the "Purchase Price"):

(i)     Eight Hundred Fifty Thousand and No/100 Dollars ($850,000) payable to Seller in cash in accordance with subsection (b) below (the "Cash Portion of the Purchase Price");

(ii)     a subordinated secured promissory note in the original principal amount of Three Million Two Hundred Thirty Thousand and No/100 Dollars ($3,230,000) in the form attached hereto as Exhibit E (the "Seller Note"), which Seller Note will be secured by a pledge of a 59% economic interest in Buyer pursuant to a Security Agreement in the form attached hereto as Exhibit F (the "Security Agreement");

(iii)     a 25% common membership interest (with a $0.00 capital account balance at the time of issuance) in Baymark ACET Holdco, LLC, a Texas limited liability company ("Holdco") (the "Equity Interest"), as more specifically set forth in that certain Company Agreement of Holdco (the "Company Agreement").

(iv)     Buyer's assumption of the Assumed Liabilities.

(b)     At the Closing, Buyer will pay to Seller the Cash Portion of the Purchase Price by wire transfer of immediately available funds, as follows:

(i)     Buyer will pay, on Seller's behalf, and as agreed by Buyer and Seller, the aggregate amount required to pay in full all of the Indebtedness of Seller (including but not limited to that evidenced by the payoff letters delivered to Buyer pursuant to Section 6.2(g), if any); and

(ii)     Buyer shall pay to Seller, an amount equal to the Cash Portion of the Purchase Price less those amounts paid on Seller's behalf pursuant to subsection (i) above, if any.

**2.3**   Purchase Price Adjustment.

(a)     On or before the expiration of ninety (90) days following the Closing Date, Buyer will deliver to Seller Representative a statement (the "Closing Statement") setting forth a calculation of the Closing Date Net Working Capital for Seller.  If Seller

---

[1] NTD:  It is a condition to Closing that at least $200,000 be on Seller's balance sheet and included in the Purchased Assets.

Representative has any objections to the Closing Statement as prepared by Buyer, Seller Representative must, within thirty (30) days after Seller Representative's receipt thereof, give written notice (the "Notice") to Buyer specifying in reasonable detail such objections and Seller Representative shall provide Buyer and its accountants and other representatives with access to the properties, books, records, work papers and personnel of Seller and their accountants, and shall cause the same to cooperate and work in good faith with Buyer for purposes of resolving any differences. If Seller Representative does not deliver the Notice within such thirty (30) day period, Buyer's determination of the Closing Statement shall be final, binding and conclusive on Seller and Buyer. With respect to any disputed amounts, Seller Representative and Buyer shall negotiate in good faith during the thirty (30) day period (the "Resolution Period") after the date of Buyer's receipt of the Notice to resolve any such disputes. If Seller Representative and Buyer are unable to resolve all such disputes within the Resolution Period, then, within five (5) business days after the expiration of the Resolution Period, all disputes shall be submitted to Whitley Penn, LLP (the firm that prepared the Quality of Earnings Report) (the "Accountant"), who shall be engaged to provide a final and conclusive resolution of all unresolved disputes as promptly as practicable after such engagement. Buyer, Seller and Representative agree to execute a reasonable engagement letter if requested by the Accountant. The Accountant shall determine only those issues that remain in dispute. In resolving any matters in dispute, the Accountant may not assign a value to any item in dispute greater than the greatest amount for such item assigned by Buyer in the Closing Statement, on the one hand, or Seller Representative in the Notice, on the other hand, or less than the smallest amount for such item assigned by Buyer in the Closing Statement, on the one hand, or Seller Representative in the Notice, on the other hand. The Accountant's determination will be based solely on written submissions by Buyer and Seller Representative (i.e., not on the basis of an independent review) and in accordance with the guidelines and procedures set forth in this Agreement. The Accountant's determination shall be set forth in a written report which shall include an explanation of the reasons for its determination on each matter in dispute and shall be final, binding and conclusive on the parties, absent manifest error, which report will be delivered to Seller Representative and Buyer within thirty (30) days after submission of such dispute to the Accountant. Buyer and Seller Representative agree that the procedures set forth in this Section 2.3(a) for resolving disputes with respect to the Closing Statement shall be the sole and exclusive method for resolving any such disputes. The fees and expenses of the Accountant shall be allocated by the Accountant within its written report between Seller and Buyer based on the aggregate percentage that the portions of the contested amounts not awarded to each party bear to the aggregate amounts contested by such party, and each party shall bear its own other expenses in connection therewith, including its attorneys' and accountants' fees.

(b)     Upon the final determination pursuant to Section 2.3(a) of the actual Closing Date Net Working Capital, the Cash Portion of the Purchase Price shall be adjusted as follows:

(i)     If Closing Date Net Working Capital is equal to the Net Working Capital Target, then there shall be no further adjustment to the Purchase Price based on Closing Date Net Working Capital.

**App. 108**

(ii)    If Closing Date Net Working Capital is greater than the Net Working Capital Target, then Buyer shall pay to Seller Representative an amount equal to such difference (the "Buyer W/C Amount") in accordance with Section 2.3(c).

(iii)    If Closing Date Net Working Capital is less than the Net Working Capital Target, then the Seller Note shall be amended to reduce the principal amount thereof by an amount equal to such difference. Each of Buyer and Seller shall take such action as required to evidence such amendment of the Seller Note.

(c)    The first $180,000 of the Buyer W/C Amount shall be paid in nine (9) equal monthly installments with the first such payment being due and payable on the last day of the calendar month following the determination of the Buyer W/C Amount and each successive payment being due and payable on the last day of each of the 8 calendar months thereafter. If the Buyer W/C Amount exceeds $180,000, then the Seller Note shall be amended to increase the principal amount thereof by an amount equal to such excess. Each of Buyer and Seller shall take such action as required to evidence such amendment of the Seller Note. This subsection (c) is not intended to imply that the Buyer W/C Amount will be less or more than $180,000. Buyer may prepay without penalty or fee any or all of the aforementioned monthly installments of the Buyer W/C Amount.

**2.4**  Purchase Price Allocation. Buyer and Seller agree that the Purchase Price (and any Assumed Liabilities and other capitalized costs) shall be allocated among the Acquired Assets in accordance with their fair market values and useful lives consistent with Section 1060 of the Code, as such allocation shall be mutually agreed to between the Seller and Buyer for all tax purposes as set forth on Exhibit G (the "Purchase Price Allocation"). Following the final determination pursuant to Section 2.3(a) of the actual Closing Date Net Working Capital, Buyer shall prepare and deliver Internal Revenue Service Form 8594 to the Seller for its review, which shall be consistent with Exhibit G attached hereto. Upon the agreement of all parties as to the Form 8594, it shall be timely filed with the Internal Revenue Service by all parties and Buyer and Seller shall file all Tax Returns in a manner consistent with such allocation.

**2.5**  Assets Incapable of Transfer. To the extent that any Transferred Contract or Permit is not assignable or transferable without the consent of another Person, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof and the same shall not constitute an Acquired Asset until such time as such consent is obtained, if ever. Seller will use commercially reasonable efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract or Permit to Buyer in all cases in which such consent is or may be required for such assignment or transfer. Buyer will, without incurring any additional cost or expense, cooperate with Seller in its efforts to obtain such consents. Seller will cooperate with Buyer in Buyer's efforts to obtain any Permits and agree to take such commercially reasonable actions as necessary to assist Buyer in obtaining the Permits. If any such consent will not be obtained with respect to a Transferred Contract or

Permit, Seller will use its commercially reasonable efforts to provide an alternate arrangement, including, without limitation, subcontractor agreements, satisfactory to Buyer designed to provide to Buyer the full economic benefits intended to be assigned or transferred to Buyer under the relevant Transferred Contract or Permit.  Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts or Permits, to the fullest extent permitted by the relevant Transferred Contract or Permit, will pass in full to Buyer.

## ARTICLE III
## REPRESENTATIONS OF SELLER

Seller hereby represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof, subject to the qualifications and exceptions set forth in the applicable section of the disclosure schedule provided by Seller to Buyer (the "Disclosure Schedule").  All Section headings in the Disclosure Schedule correspond to the Sections of this Agreement; provided that any information contained in any Section of the Disclosure Schedule shall constitute disclosure for purposes of any other Section of this Agreement where such disclosure is incorporated by specific reference.

3.1   Existence and Good Standing.   Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Texas.  Seller has all requisite limited liability power and authority to own, lease and operate its properties and to carry on its business as now being conducted, and Seller is duly qualified or licensed to do business, and is in good standing or full force and effect, as the case may be, in the jurisdiction in which the character or location of the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary.  A list of all such jurisdictions in which Seller is qualified or licensed to do business is set forth on Section 3.1 of the Disclosure Schedule.  Owner is the only beneficial owner of Seller, is the only member of Seller, and no other Person has any interest in or an option, warrant or other right to acquire an interest in Seller or in the Acquired Assets (other than Buyer).

3.2   Authorization and Binding Obligation.

(a)   Seller has all necessary power and authority to execute and deliver this Agreement and each of the Related Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement by Seller and each of the Related Agreements to which Seller is a party and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Seller.  This Agreement has been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies).

(b)   Owner has all necessary power and authority to execute and deliver this Agreement and each of the Related Agreements to which he is a party and to consummate the transactions contemplated by this Agreement and by the Related Agreements. This Agreement has been duly executed and delivered by Owner and,

assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of Owner, enforceable against Owner in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies).

**3.3**   No Violations; Approvals.  The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and compliance with the provisions of this Agreement will not conflict with, or result in any breach, violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or acceleration of any obligation or a loss of any rights under, or result in the creation of any Lien upon, any of the Acquired Assets under, (a) the Organizational Documents of Seller, (b) any Contract, Permit, or other agreement applicable to Seller, Owner or its respective properties or assets, or (c) subject to the governmental filings and other matters referred to in the following sentence, any Applicable Laws. No consent, approval, order or authorization of, or registration or filing with any Governmental Authority or any Person is required by or with respect to Seller or Owner in connection with the execution and delivery by Seller or Owner of this Agreement and the Related Agreements or the consummation by Seller or Owner of the transactions contemplated by this Agreement, except for those described on Section 3.3(a) of the Disclosure Schedule. As of the Closing Date, Seller has obtained the requisite consent of those Persons who are counterparty to the Contracts set forth in Section 3.3(b) of the Disclosure Schedule.  After the Closing Date, Seller and Owner will undertake good faith efforts to obtain the requisite consent of those Persons listed in Section 3.3(c) of the Disclosure Schedule.

**3.4**   Financial Statements.  Section 3.4 of the Disclosure Schedule sets forth true and correct copies of (i) the unaudited balance sheet of Seller as of December 31, 2014, December 31, 2015 and December 31, 2016, together with the related statements of income and members' equity and statements of cash flow for the fiscal years then ended (collectively, the "Annual Financial Statements") and (ii) the balance sheet of Seller as of May 31, 2017 (the "Balance Sheet Date") together with the related statements of income and cash flow for the five month period then ended (collectively, the "Most Recent Balance Sheet" and, together with the Annual Financial Statements, the "Financial Statements"). The Financial Statements (x) are true, complete and correct in all material respects and fairly present in all material respects the financial condition and results of operations, and cash flow of the Business at and as of the dates thereof and for the periods covered thereby, (y) were prepared in accordance with generally recognized accounting principles consistent with past practices of Seller, and (z) were compiled from books and records regularly maintained by management of Seller used to prepare the financial statements of Seller.  Seller has no Liability (whether known or unknown, accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when asserted), other than (A) Liabilities set forth on the Most Recent Balance Sheet (rather than any notes thereto), (B) Liabilities which have arisen after the date of the Most Recent Balance Sheet in the Ordinary Course of Business (none of which is a Liability resulting from breach of contract, tort, infringement, claim, lawsuit, Product Liability Obligations, Recall Obligations, Warranty Obligations, violation of Applicable Law or Environmental Liability), and (C) obligations of Seller pursuant to Material Contracts set forth on Section 3.7 of the Disclosure Schedule or other Contracts not required to be disclosed on

such Schedule (none of which is a Liability resulting from breach of contract, tort, infringement, claim, lawsuit, Product Liability Obligations, Recall Obligations, Warranty Obligations, violation of Applicable Law or Environmental Liability).

**3.5**   <u>Absence of Certain Changes</u>.  Except as set forth on <u>Section 3.5</u> of the Disclosure Schedule or as otherwise contemplated by this Agreement, since the Balance Sheet Date through and including the date of this Agreement, Seller has operated only in the Ordinary Course of Business in all material respects, there has not been an event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and Seller has not:

(a)      sold, leased, transferred or assigned any assets, tangible or intangible, outside the Ordinary Course of Business, or acquired any material assets, except for acquisitions of Inventory, equipment, parts and supplies in the Ordinary Course of Business;

(b)      entered into any Contract outside the Ordinary Course of Business;

(c)      accelerated, terminated, made material modifications to or canceled any Contract to which Seller is a party or by which Seller is bound outside of the Ordinary Course of Business;

(d)      made any capital expenditures outside the Ordinary Course of Business or failed to make any budgeted capital expenditures;

(e)      made any capital investment in, or any loan to, any other Person outside the Ordinary Course of Business;

(f)      created, incurred, assumed or guaranteed more than $20,000 in aggregate capitalized lease obligations;

(g)      experienced any damage, destruction or loss (whether or not covered by insurance) to its property greater than $20,000 in a single occurrence;

(h)      entered into any employment Contract or collective bargaining agreement, written or oral, or modified the material terms of any existing such Contract or collective bargaining agreement;

(i)      granted any increase in the base compensation of any of its managers, director, officers and employees outside the Ordinary Course of Business;

(j)      adopted, amended, modified or terminated any bonus, profit sharing, incentive, severance or other plan, contract or arrangement for the benefit of any of its directors, officers and employees outside the Ordinary Course of Business or except as required by Applicable Law;

(k)      made any other change in employment terms for any of its directors, officers and employees outside the Ordinary Course of Business;

(l)    made any change in Seller's accounting principles or practices or their method of application of such principles or practices;

(m)    made, changed or revoked any Tax election or accounting method of Seller, failed to file any Tax Return required to be filed by Seller in a timely manner with the appropriate Tax authorities or to pay any Taxes shown to be due thereon, settled a claim or assessment with respect to Taxes, executed a closing agreement or similar agreement with respect to Taxes, or executed a waiver of a statutory period of limitations with respect to the assessment or collection of Taxes; or

(n)    agreed, in writing or otherwise, to take any of the actions specified in paragraphs (a) through (m) above.

**3.6**    Title to Properties.  Seller has good and marketable title to all of the Acquired Assets and the right to use and to transfer and assign to Buyer all Acquired Assets, in each case free and clear of all Liens except Permitted Liens.  At the Closing, Buyer will receive good and marketable title to all of the Acquired Assets transferred to it free and clear of and from all Liens except Permitted Liens.  All of the Tangible Property, including without limitation the machinery and equipment material to the operation of the Business, as of the Closing, are in good working condition and repair (allowing for ordinary wear and tear) and are adequate for the purposes for which they are being used in Seller's normal business operations.  The Acquired Assets, including, without limitation, the machinery and equipment included in the Acquired Assets, constitute all of the assets and property now used in and necessary for the conduct of the Business as presently conducted.  Except as set forth in Section 3.6 of the Disclosure Schedule, to the Knowledge of Seller, none of the machinery and equipment is out of service or not in use and none are subject to deferred maintenance that will not be complete as of the date of this Agreement. The Acquired Assets will enable Buyer to operate the Business immediately after the Closing in the same manner as operated by Seller immediately prior to the Closing.  None of the Excluded Assets are material to the Business.

**3.7**    Material Contracts.

(a)    Section 3.7 of the Disclosure Schedule contains true and correct lists of all of the following Contracts to which Seller is a party categorized on the Disclosure Schedule by the subsections listed below ("Material Contracts"):

(i)    all Contracts involving commitments to others to make capital expenditures in excess of $20,000;

(ii)    all Contracts involving commitments to others to make purchases or sales in excess of $20,000 (applied on a per contract basis), including, without limitation, Contracts with the Top Customers and Top Vendors;

(iii)    any employment, confidentiality, non-competition, severance or termination agreements as to employees, independent contractors and consultants;

(iv)    all Contracts evidencing Indebtedness or mortgaging, pledging or otherwise placing a Lien on the assets of Seller;

(v)     all Contracts with any Governmental Authority;

(vi)     all Contracts that in any way could limit the freedom of Buyer to engage in any line of business, to hire or solicit any Person or to compete with any Person in any area or territory;

(vii)     all Contracts that provide for the indemnification by Seller of any Person;

(viii)     all Contracts with Affiliates of Seller or with Owner;

(ix)     all Contracts that cannot be terminated by Seller without cause on 30 days' or less notice without the payment of any amount or the incurrence of any liability by Seller;

(x)     all Contracts (whether exclusive or otherwise) with any sales agent, representative, franchisee, dealer or distributor;

(xi)     all capital and real property leases;

(xii)     any joint venture, any Contract that involves a sharing of revenues, profits, cash flows, expenses or losses with any other Person or any Contract that involves the payment of royalties to any other Person; and

(xiii)     all Contracts that grant to any Person any right of first refusal, option to purchase or similar rights, or exclusive rights to purchase any products or services (or equity) from Seller.

(b)     True and correct copies of each Contract listed in Section 3.7 of the Disclosure Schedule or required to be listed in Section 3.7 of the Disclosure Schedules have been delivered to Buyer. Each Material Contract is in full force and effect, is fully assignable to Buyer without the consent of any third party, except as set forth on Section 3.3 of the Disclosure Schedule, and is valid, binding and enforceable in accordance with its terms as to Seller and, to the Knowledge of Seller, the other parties to such Material Contract. Seller has performed and is performing, in all material respects, all obligations required to be performed by Seller under the Material Contracts. No default exists (or, solely as a result of the consummation of the transactions contemplated hereby, is likely to arise) on the part of Seller or, to the Knowledge of Seller, on the part of any other Person under any of the Material Contracts. Seller has not assigned, delegated or otherwise transferred any interests in any Material Contract. There are no disputes pending, or to the Knowledge of Seller, threatened under any Material Contract.

**3.8**     Litigation.     Section 3.8 of the Disclosure Schedule contains an accurate description of each lawsuit, arbitration, notice of violation, pending enforcement proceeding or other legal proceeding to which any Seller Party is currently or, since January 1, 2014, has been a party. Except as set forth on Section 3.8 of the Disclosure Schedule, there is no action, suit or proceeding at law or in equity or any arbitration, administrative or other proceeding by or before any Governmental Authority pending, or, to the Knowledge of Seller, threatened,

against any Seller Party. There is no claim, action, suit or proceeding pending or, to the Knowledge of Seller, threatened against any Seller Party by or before any Governmental Authority that would have or would reasonably be expected to impede the ability of any Seller Party to complete the transactions contemplated by this Agreement. There are no outstanding orders or judgments affecting or relating to any Seller Party or the Acquired Assets.

**3.9** <u>Taxes</u>.

(a) Except as set forth on <u>Section 3.9(a)</u> of the Disclosure Schedule, Seller has filed all Tax Returns that it was required to file, such Tax Returns are true, correct and complete in all material respects and Seller has paid all Taxes due and owing as set forth on such filed Tax Returns. Seller has not been delinquent in the payment of any Tax, nor is there any Tax deficiency outstanding or assessed against Seller.

(b) <u>Section 3.9(b)</u> of the Disclosure Schedule lists all federal and state income Tax Returns (and narratively describes all Tax Returns filed with any city or municipality) filed with respect to Seller for taxable periods ended on or after December 31, 2014, indicates which of those Tax Returns have been audited, and indicates which of those Tax Returns currently are, as of the Closing Date, the subject of audit.

(c) Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d) Seller is not a party to any Tax allocation or sharing agreement nor does Seller have any liability to any Person with respect to any previously terminated Tax allocation or sharing agreement.

(e) All monies required to be withheld by Seller from employees, independent contractors, creditors, or other third parties for Taxes have been collected or withheld, and timely paid in full to the respective Governmental Authorities. Seller is not currently the beneficiary to any extension of time within which to file any Tax Returns.

(f) There is no dispute, claim, audit, or other proceeding concerning any Tax liability of Seller pending or, to the Knowledge of Seller, threatened or proposed. There are no Tax rulings, requests for rulings, or closing agreements relating to Seller that could affect the liability for Taxes of Buyer or Seller for any period (or portion of a period) after the Closing Date. There are no Tax deficiencies of any kind assessed against Seller with respect to any taxable period ending on or before the Closing Date.

(g) The unpaid Taxes of Seller did not, as of the date of the Most Recent Balance Sheet, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet, and will not exceed that reserve as adjusted in the Ordinary Course of Business through the Closing Date in accordance with the past practices and customs of Seller in filing Tax Returns.

(h)     No claim has ever been made by an authority in a jurisdiction where a Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.

(i)     There are no Tax-related Liens against any of the Acquired Assets.

(j)     Buyer has been provided with true and complete copies of all Tax Returns, audit reports, statements of deficiencies, and examination reports of Seller for taxable periods beginning after December 31, 2014.

(k)     Buyer and Seller Parties acknowledge that Seller has engaged and relied upon tax professionals to advise Seller with respect to their tax obligations and reporting. Notwithstanding any limitations on the representations and warranties set forth in this Section, the Seller Parties acknowledge and agree that they are solely responsible for any and all errors, liabilities, disputes, claims, interest, penalties, Damages or other obligations arising from or relating to the Taxes or Tax Returns of any Selling Party.

**3.10**  Intellectual Property.

(a)     Except as set forth on Section 3.10 of the Disclosure Schedule, Seller does not own any patents, patent applications, registered or unregistered trademarks, and registered or unregistered copyrights, nor have Seller ever owned any patents, patent applications, registered or unregistered trademarks, and registered or unregistered copyrights.  The manner in which the Seller uses the Acquired Assets, including the Intellectual Property included in the Acquired Assets, in the Business does not violate or infringe the patent, trademark, copyright, trade secret or other intellectual property or other proprietary rights of any Person.  All Intellectual Property necessary for the operation of the Business is owned by Seller or is licensed by Seller under license agreements to be assigned to Buyer and, except as set forth on Section 3.10 of the Disclosure Schedule, all such Intellectual Property will be available to Buyer immediately after the Closing on substantially the same terms and conditions to those under which Seller owned or used such Intellectual Property immediately prior to the Closing.

(b)     Except as set forth on Section 3.10 of the Disclosure Schedule, no claim has been asserted and, to the Knowledge of Seller, no claim has been threatened by any Person (1) against the use by Seller of any of the Acquired Assets or any Intellectual Property included in the Acquired Assets; (2) against Seller claiming infringement upon or misappropriation or violation of any Intellectual Property or other proprietary rights of third parties as a result of the use of the Acquired Assets or the operation by Seller of the Business as presently conducted; or (3) challenging the ownership, validity or enforceability of any of the Acquired Assets or any Intellectual Property included in the Acquired Assets.

(c)     Except as otherwise disclosed on Section 3.10 of the Disclosure Schedule, (1) neither the Seller, nor to the Knowledge of Seller, any other party thereto, is in default of any material obligation under any license or similar agreement relating to the Acquired Assets or the Intellectual Property included in the Acquired Assets; (2) Seller has not

granted any right, title or interest to any Person in or to the Acquired Assets or the Intellectual Property included in the Acquired Assets; and (3) except for license fees for any off-the-shelf commercial software, Seller is not obligated to pay any amount, whether as a royalty, license fee or other payment, to any Person, in order to use the Acquired Assets or the Intellectual Property included in the Acquired Assets.

(d)     Seller has taken reasonable steps to protect Seller's rights in Seller's proprietary and/or confidential information and trade secrets or any trade secrets or confidential information of third parties provided to Seller used or useful in the Business. All trade secrets and other confidential information of Seller used or useful in the Business are owned by Seller, are not part of the public domain nor, to the Knowledge of Seller, have they been misappropriated by any Person having an obligation to maintain such trade secrets or other confidential information in confidence for Seller.   To the Knowledge of Seller, no employee or consultant of Seller has improperly used or misappropriated any trade secrets or other confidential information of any other person in the course of their work for Seller nor is Seller making unlawful use of any confidential information or trade secrets of any past or present employees of Seller.

(e)     Seller has implemented policies relating to the collection, use, storage, processing, transfer, disclosure and protection of Personal Data, including publicly available written privacy policies per brand and written information security policies (collectively, "Privacy and Data Security Policies"), and Seller is in compliance in all material respects with such Privacy and Data Security Policies.   Neither the execution, delivery or performance of this Agreement, nor the consummation of any of the transactions contemplated hereby will violate (i) the Privacy and Data Security Policies; (ii) Applicable Laws or other requirements of any Governmental Authority pertaining to the collection, storage, use, disclosure and transfer of Personal Data, data protection and e-commerce; or (iii) any Contracts between Seller and vendors, marketing affiliates, distributors, and all other customers and business partners that are applicable to the use and disclosure of Personal Data.   Seller has commercially reasonable safeguards in place to protect Personal Data in its possession or control from unauthorized access by third parties, including Seller's employees and contractors.   There has been no unauthorized access, use or disclosure of Personal Data in the possession or control of Seller, and, to the Knowledge of Seller, in the possession or control of any contractors of Seller.

(f)     The computer software, hardware, firmware, servers, networks and related systems (collectively, "Computer Systems") used by Seller are sufficient for the current needs of the Business, and, in the last twelve (12) months, there have been no material failures, crashes or other adverse events affecting the Computer Systems.

**3.11**  Compliance with Laws; Permits.  During the past three years, Seller has complied in all material respects, and is currently in material compliance, with all laws, statutes, orders, rules, regulations, policies or guidelines promulgated, and judgments, decisions or orders entered, by any Governmental Authority applicable to Seller, the Business, and the Acquired Assets (collectively, "Applicable Laws").  All approvals, permits, consents and licenses, if any, of all Governmental Authorities that are necessary to permit Seller to carry on the Business as currently conducted (collectively, "Permits") have been obtained and are in full force and

**App. 117**

effect. There has been no violation, cancellation, revocation or default of any Permit. All such Permits are set forth on Section 3.11 of the Disclosure Schedule. As of the date hereof, Seller has not received any notice of, and to the Knowledge of Seller, Seller is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any Applicable Laws or Permits.

**3.12** Employee Benefit Plans.

(a)     Except for the plans or arrangements listed on Section 3.12(a) of the Disclosure Schedule (hereinafter referred collectively to as the "Employee Benefit Plans" and individually as an "Employee Benefit Plan"), Seller does not, directly or indirectly, maintain, sponsor or have an obligation or liability with respect to, any employee benefit plan, fringe benefit, equity compensation, executive or deferred compensation, or incentive plan, bonus or severance arrangement, employment contract, collective bargaining agreement, union contract, deferred compensation agreement, stock purchase or incentive plan or arrangement, or other employee benefit plan or arrangement. To the Knowledge of Seller, each Employee Benefit Plan is in compliance in all material respects with all Applicable Laws, and is being administered and operated in all material respects in accordance with its terms. Full payment has been made, or otherwise properly accrued on the books and records of Seller, of all amounts that Seller is required under the terms of the Employee Benefit Plans to have paid as contributions to such Employee Benefit Plans on or prior to the date hereof (excluding any amounts not yet due). Notwithstanding any limitations on the representations and warranties set forth in this Section, the Seller Parties acknowledge and agree that they are solely responsible for any and all errors, omissions, claims, liabilities, disputes, Damages or other obligations arising from or relating to the Employee Benefit Plan of Seller.

(b)     Section 3.12(b) of the Disclosure Schedule contains a list of the current employees of the Business and the total salary, bonus payments and commissions received in the calendar year ended December 31, 2016 by each such employee. All of the employees of the Business will be fully paid through the Closing Date, and, other than as specifically set forth on Section 3.12(b) of the Disclosure Schedule, there shall be no unpaid or unaccrued for salary compensation, bonus, or any other salary-based employee benefit due and owing to any employee of Seller.

(c)     There is no employment-related charge, complaint, grievance, investigation or inquiry pending or, to the Knowledge of Seller, threatened, in any forum, relating to an alleged violation or breach by Seller of any Applicable Law.

(d)     Seller is not a party to any collective bargaining or other labor agreements with respect to the employees of the Business, nor has Seller ever been a party to any collective bargaining or other labor agreements with respect to the employees of the Business. There is no unfair labor practice charge or complaint against Seller pending, or to the Knowledge of Seller, threatened under any Applicable Laws with respect to the employees of the Business.

(e)     Seller has complied in all material respects with all foreign, federal, state and local laws (including common law), ordinances and regulations which relate to

employees, the employment of labor, compensation for employment, classification of employees and termination of employment relationships.

**3.13** <u>Environmental Matters</u>.

(a)  To the Knowledge of Seller, Seller is in material compliance with all Environmental Laws. Seller has not received any notice from any Governmental Authority or other third party that alleges that Seller is not in compliance with any Environmental Laws, nor is there any litigation or other legal proceedings, whether judicial or administrative, pending or, to the Knowledge of Seller, threatened with respect to the foregoing.

(b)  Neither Seller nor, to the Knowledge of Seller, any facility owned, leased or otherwise occupied by Seller, is subject to any contingent liability in connection with the Release or presence of any Hazardous Materials, including, but not limited to, any requirement or liability for the investigation, cleanup or remediation of any Hazardous materials, or the violation of any Environmental Law.

(c)  To the Knowledge of Seller, all Hazardous Materials removed from any real property ever owned, leased, or used by Seller have been handled, transported, transferred, stored, treated, recycled, received and disposed of in compliance with all Environmental Laws.

(d)  No Hazardous Materials have been or are being generated, used, processed, treated, stored, Released, emitted, transported or disposed of by Seller on or about any facility owned, leased or otherwise occupied by Seller during the period of Seller's occupancy except in material compliance with all applicable Environmental Laws.

(e)  Except for those Hazardous Materials used by Seller in its Ordinary Course of Business, which Hazardous Materials are used, processed, treated, stored, Released, emitted, transported or disposed of by Seller in compliance with all applicable Environmental Laws, no Hazardous Materials are present on or, to the knowledge of Seller, under any facility owned, leased or otherwise occupied by Seller.

(f)  To the Knowledge of Seller, there are no asbestos-containing materials located on or at any facility owned, leased or otherwise occupied by Seller.

(g)  To the Knowledge of Seller, no underground storage tanks are or have been located on or at any facility owned, leased or otherwise occupied by Seller.

(h)  To the Knowledge of Seller, there are no past or present events, conditions, circumstances, activities, practices, incidents, actions, or plans which have given or may give rise to any Environmental Liabilities, or which otherwise form the basis of any claim, suit, action, demand, proceeding, penalty, fine, hearing, notice of violation, directive, or requirement to undertake any remedial action under any Environmental Laws or otherwise relating to the Business or any facility owned, leased or otherwise occupied by Seller.

(i)     Section 3.13 of the Disclosure Schedule identifies, and Seller has provided to Buyer, true and complete copies of all environmental assessments, audits, reports, studies, analyses, correspondence, summaries, maps, photographs, tests, and monitoring results (completed or uncompleted), and all material written communications filed by Seller or between Seller and any Governmental Authority or third parties, in the possession or control of Seller, or initiated or authorized by Seller, arising under or relative to Environmental Laws or Hazardous Materials, including any orders, notices of violation, warning letters, or requests for information with respect to Seller or any real property used at any time by Seller, or any Person for whose conduct Seller is or may be held responsible.

**3.14** Insurance.  Seller maintains the insurance policies listed on Section 3.14 of the Disclosure Schedule, all of which have been provided to Buyer.  All such policies are currently in full force and effect, and Seller has not received any notice from the insurer with respect to the cancellation of any such policy or any anticipated material increase in any premium thereto. All premiums that are due and payable on such policies have been paid or accrued on the Financial Statements, no insurer has, within the last three (3) years, questioned, denied or disputed (or otherwise reserved its rights with respect to) the coverage of any claim pending under any such policy listed on Section 3.14 of the Disclosure Schedule.  Seller is not in default with respect to its material obligations under any such insurance policy.  Except as set forth in Section 3.14 of the Disclosure Schedule, at no time have any of Seller's insurance policies been cancelled and no insurance provider has ever refused to renew or has cancel an insurance policy of Seller.  Section 3.14 of the Disclosure Schedule also contains a list of all pending claims made by any Person at any time since January 1, 2014 on any insurance policy with any insurance company that is currently in place or was in place during such period and which covered the Business, including, but not limited to, all claims denied by Seller's insurance carrier or being covered under a reservation of rights letter.  The insurance listed on Section 3.14 of the Disclosure Schedule will remain in place following the Closing until the expiration or renewal of such policies.  All claims of Seller for which insurance coverages would have been available have been properly tendered to the applicable insurance provider. Seller does not have any self-insurance or co-insurance programs.

**3.15** Broker's or Finder's Fees.   Other than as set forth on Section 3.15 of the Disclosure Schedule, Seller does not have any liability for a finder's fee, brokerage commission, advisory fee or other similar payment as a result of this Agreement or the consummation of the transactions contemplated hereby.

**3.16** Customers; Vendors.

(a)     Section 3.16(a) of the Disclosure Schedule sets forth a complete and accurate list of the top fifteen (15) customers of Seller, including annual sales to such customers, as measured by the revenue received by Seller from such customers during the years ended December 31, 2015 and December 31, 2016, and year-to-date for 2017 (the "Top Customers").  To the Knowledge of Seller, the relationships of Seller with the Top Customers are good working relationships and, to the Knowledge of Seller, none of the Top Customers has, or has threatened to, cancel, terminate or otherwise materially alter its relationship with Seller in a manner materially adverse to Seller. Seller is not engaged

in any dispute (excluding immaterial disputes in the Ordinary Course of Business) with any Top Customer and, to the Knowledge of Seller, no such customer intends to terminate, limit or reduce its business relations with Seller or otherwise change its business relationship with Seller in a manner adverse to Seller. To the Knowledge of Seller, the execution of this Agreement, and the consummation of the transactions contemplated by this Agreement, will not materially adversely affect the relationships of Seller with its customers.

(b)     Section 3.16(b) of the Disclosure Schedule sets forth a complete and accurate list of the top ten (10) trade vendors of Seller, including annual purchases, as measured by the purchases made by Seller from such vendors during the years ended December 31, 2015 and December 31, 2016 and year to date 2017 (the "Top Vendors"). To the Knowledge of Seller, the relationships of Seller with the Top Vendors are good working relationships and, to the Knowledge of Seller, none of the Top Vendors has or has threatened to, cancel, terminate or otherwise materially alter its relationship with Seller in a manner materially adverse to Seller. Seller is not engaged in any dispute (excluding immaterial disputes in the Ordinary Course of Business) with any Top Vendor and, to the Knowledge of Seller, no such vendor intends to terminate, limit or reduce its business relations with Seller or otherwise change its business relationship with Seller in a manner adverse to Seller. To the Knowledge of Seller, the execution of this Agreement, and the consummation of the transactions contemplated by this Agreement, will not materially adversely affect the relationships of Seller with its vendors.

**3.17** Products. Section 3.17 of the Disclosure Schedule sets forth a true and complete list of all product categories marketed and sold, directly or indirectly, by Seller in the past twelve (12) months. Except as set forth on Section 3.17 of the Disclosure Schedule, Seller has no current claims, liabilities or obligations arising from or alleged to arise from, any injury to any person (including employees and former employees of Seller) or property as a result of the manufacture, sale, ownership, possession or use of any Company Products. Section 3.17 of the Disclosure Schedule contains correct and complete statements of all product warranties issued by Seller prior to Closing that are currently in effect (the "Warranties"). All products of Seller manufactured, shipped, or sold within the immediately preceding twelve-month period and any services provided by Seller has conformed in all material respects to the Warranties.

**3.18** Real Property.

(a)     Seller leases the real property set forth on Section 3.18 of the Disclosure Schedule (the "Real Property").  Other than with respect to the Real Property, Seller is not a party to any leases for real property, do not operate out of any other location. Seller has delivered to Buyer a complete and correct copy of the leases governing the Real Property (and any amendments or supplements thereto) (whether one or more, the "Lease"). The Lease is valid and binding, and in full force and effect. Neither Seller nor, to the Knowledge of Seller, any other party to the Lease, is in material default under the Lease, and no event has occurred that constitutes, or with the lapse of time or the giving of notice or both would constitute, a default by Seller or, to the Knowledge of Seller, a default by any other party under the Lease. There are no disputes or disagreements between Seller and any other party with respect to the Lease.  Seller does not own any real property.  Other than Seller, there are no parties in possession or parties having any current or future right to occupy any portion of the Real Property.

(b)     Use of the Real Property for the various purposes for which it is presently being used is permitted under the Lease and all Applicable Laws, including zoning, and is not subject to "permitted non-conforming" use or structure classifications (and not as a result of grandfathered or other similar provisions that would not be available to Buyer).

(c)     With respect to the Real Property:

(i)     There is no condemnation proceeding or eminent domain proceeding of any kind pending or to Knowledge of Seller, threatened against the Real Property; and

(ii)     The Real Property is occupied under valid and current certificates of occupancy or the like, and the transactions contemplated by this Agreement will not require the issuance of any new or amended certificates of occupancy or the like; there are no facts which would prevent the Real Property from being used or occupied after the Closing Date in substantially the same manner as before.

**3.19** Receivables.  Except as set forth on Section 3.19 of the Disclosure Schedule all receivables of Seller included in the Financial Statements are valid and collectible obligations (net of any reserve for collectability with respect hereto reflected in the Financial Statements which such reserve is adequate and appropriate and made in accordance with generally recognized accounting principles consistently applied), were not and are not subject to any written or any oral, material offset or counterclaim and have arisen from a bona fide transactions by Seller in the Ordinary Course of Business consistent with past practice. Seller's receivables are reflected on the Most Recent Balance Sheet included in the Financial Statements in accordance with generally recognized accounting principles consistently applied. Since the Balance Sheet Date, and except as set forth on Section 3.19 of the Disclosure Schedule, there have not been any write-offs as uncollectible of any of Seller's receivables, except for the write-offs in the Ordinary Course of Business and consistent with past practice.

**3.20** Product Liability.

(a)      There exist no pending claims and, to the Knowledge of Seller, there is no basis for any product liability, warranty or other claims by any third party (whether based on contract or tort and whether relating to personal injury, including death, property damage or economic loss) arising from (i) services rendered by or on behalf of Seller during the period through and including the Closing Date, (ii) the sale or distribution of any product, good, component or other item manufactured, sold or delivered by or on behalf of Seller whether delivered to a customer before or after the Closing Date, or (iii) the operation of the Business or the ownership of the Acquired Assets prior to and including Closing Date.

(b)      (i) within the last five (5) years there have not been any claims, recalls, consumer corrective actions, or safety advisory's relating to products formulated, manufactured, produced, distributed, consigned or sold by or on behalf of Seller, or services rendered by or on behalf of Seller which are presently pending or which are threatened or which have been asserted or commenced against Seller or the Business within the five (5) years prior to the date hereof, and (ii) the products sold by or on behalf of Seller have been formulated, manufactured and produced so as to meet and comply with all Applicable Laws, standards, requirements and contractual obligations currently in effect and are safe for use by humans.

**3.21** Inventory. All of the Inventory reflected on the Financial Statements consists of items of a quality and quantity useable or saleable in the ordinary course, except as reserved for obsolete and slow-moving inventory for which appropriate and adequate reserves have been included in the Financial Statements. No such Inventory is subject to any write-down or write-off for which appropriate reserves have not been included in the Financial Statements. Section 3.21 of the Disclosure Schedule sets forth the location of all such Inventory, including, without limitation, consigned Inventory, if any, and Inventory located in public or off-site warehouses, or otherwise.

**3.22** Affiliate Transactions.  Except as set forth in Schedule 3.22 of the Disclosure Schedule, no officer, director, shareholder, manager, employee or Affiliate of Seller, or any individual related by blood, marriage or adoption to any of the foregoing Persons or any entity in which any such Person or individual owns any beneficial interest, is or has been a party to any Contract or transaction with Seller.  Neither Seller nor any officer, director, shareholder, manager, employee or Affiliate of Seller has (i) any direct or indirect ownership interest in any company or business that either competes with the Business or has a business relationship with Seller or (ii) owns any asset, tangible or intangible, that is used or held for use in the Business.

**3.23** Certain Payments.  Neither Seller, nor any of their respective officers, directors, shareholders, managers, employees, Affiliates or, to the Knowledge of Seller, any agents, representatives or any other Person associated with or acting for or on behalf of Seller has, directly or indirectly, (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kick-back or other payment to any Person, private or public, regardless of any form, whether in money, property or services (i) to obtain favorable treatment in securing business for or on behalf of Seller, (ii) to pay for favorable treatment for business secured for or on behalf of

Seller, (iii) to obtain special concessions or for special concessions already obtained for or in respect of Seller, or (iv) in violation of any applicable federal, state, local or foreign laws, rules and regulations (including, without limitation, the Foreign Corrupt Practices Act of 1977, as amended, and any corresponding or similar anti-corruption and anti-bribery laws in the U.S. or in other countries), or (b) established or maintained any fund or asset that has not been recorded in the books and records of Seller.

**3.24** <u>Diligence</u>.  No representation or warranty by any Seller contained in this Agreement will contain any untrue statement of a material fact, or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

**ARTICLE IV**
**REPRESENTATIONS OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof:

**4.1** <u>Existence and Good Standing</u>.  Each of Buyer and Holdco is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Holdco owns 100% of the equity interest in Buyer.

**4.2** <u>Authorization and Binding Obligation</u>.  Buyer has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by Buyer, and the consummation by Buyer of the transactions contemplated by this Agreement have been duly authorized by all necessary action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and, assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies).

**4.3** <u>No Violations</u>.  The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, (a) the Organizational Documents of Buyer, (b) any contract, permit, license, loan or credit agreement, note, bond, mortgage, indenture, lease or other property agreement, or other legally binding written agreement applicable to Buyer or its respective properties or assets, or (c) subject to the governmental filings and other matters referred to in the following sentence, any Applicable Law applicable to Buyer or its respective properties or assets.

**4.4** <u>Broker's or Finder's Fees</u>.  Buyer does not have any liability for a finder's fee, brokerage commission, advisory fee or other similar payment as a result of this Agreement or the consummation of the transactions contemplated hereby.

30
**App. 124**

**4.5**   Litigation.  There is no claim, action, suit or proceeding pending or, to Buyer's knowledge, threatened against Buyer by or before any Governmental Authority that would have or would reasonably be expected to impede the ability of Buyer to complete the Closing in any respect.

## ARTICLE V
## COVENANTS

**5.1**   Publicity.  Following the Closing, neither Seller nor Owner shall issue or cause publication of any press release or other announcement or public communication with respect to this Agreement or the transactions contemplated hereby without the prior consent of Buyer, except as may be required by Applicable Law; provided, however, that if such announcement if required by Applicable Law, the party making the announcement shall provide Buyer with an opportunity to review such party's intended communication and consider in good faith any modifications requested by Buyer.

**5.2**   Tax Matters.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by Seller when due, and Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other such Taxes and fees, and, if required by Applicable Law, Buyer shall join in the execution of any such Tax Returns and other documentation.  Seller shall use its good faith reasonable efforts to obtain Tax clearance certificates from all state Taxing authorities in which Seller conducts business.

**5.3**   Employee Matters.  Effective as of the Closing Date, Seller will terminate the employment of all of the employees of the Business (the "Business Employees"). Buyer will enter into a five-year employment agreement with Tomer Damti in the form attached hereto as Exhibit H.  Buyer will make offers of at-will employment to the Business Employees as of the Closing Date. Those Business Employees who accept Buyer's offer of at-will employment shall become employees of Buyer ("Transferred Employees") upon such acceptance of Buyer's offer of at-will employment. Except as set forth above, nothing herein will require Buyer to continue the employment of or offer any specific terms of employment to any Transferred Employee following the Closing Date. The employment of each Transferred Employee will be effective and will commence no earlier than the Closing Date.  This Section 5.3 is solely for the purpose of defining the obligations between Buyer and Seller concerning the Business Employees and former employees of Seller, and will in no way be construed as creating any employment contract or other Contract between Buyer and any employees of Seller or any Transferred Employee.  Seller shall encourage each employee that Buyer desires to hire to accept employment with Buyer.

**5.4**   Further Assurances.  At any time and from time to time after the Closing, at a party's reasonable request, the other party will execute and deliver such other instruments of a sale, transfer, conveyance, assignment and confirmation, and provide such materials and information and take such other actions as the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and provide such materials and information and take such other actions as the other party may reasonably deem

31
**App. 125**

necessary or desirable in order to more effectively transfer, convey and assign to Buyer all of the Acquired Assets or otherwise give effect to this Agreement.

**5.5** <u>Post-Closing Receipts; Payment Cooperation</u>.   After the Closing, Seller will promptly, but in no event later than three (3) business days after the Closing, notify all parties obligated in respect of the Accounts Receivable to remit payments thereafter directly to Buyer, and Seller will receive and hold any payments in respect of Accounts Receivable in trust for Buyer and promptly transfer to Buyer any payments or other receipts Seller receives with respect to any Accounts Receivable in the form received and with any necessary endorsements by Seller. If payment on account of any receivable that constitutes Excluded Assets are received by Buyer, Buyer shall hold such payment in respect of such receivable in trust for Seller and promptly transfer to Seller any such payment in the form received.

**5.6** <u>Change of Name</u>.   In coordination with Buyer, an no later than 24 hours following Closing, Seller shall amend its Organizational Documents and take all other action necessary or as may be requested by Buyer to change its name to one sufficiently dissimilar to its present name (and with no reference to "ACET"), as such dissimilarity is determined in Buyer's sole discretion.

**5.7** <u>Non-Competition</u>.

(a)     Seller and Owner hereby agrees that for a period of two (2) years following the Closing Date, it or he will not, directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor or stockholder of any company or business organization, engage in any business activity, or have a financial interest in any business activity, that is in competition with the Business as currently conducted anywhere in North America ("<u>Competitive Activity</u>").   For the purposes of clarity, the engagement of Owner by Buyer pursuant to an Employment Agreement shall not be deemed a Competitive Activity.   Seller and Owner hereby agrees that, for a period of two (2) years following the Closing Date hereof, it or he will not in any capacity, either separately, jointly or in association with others, directly or indirectly, solicit, hire or contact any employees, and in connection with, or in furtherance of, a Competitive Activity, any of the consultants, agents, suppliers, customers or prospects of Buyer or the Business, that were such with respect to Seller or the Business at any time during the one-year period immediately preceding the date hereof or that to Knowledge of Seller or Owner become such with respect to Seller or the Business at any time during such two (2) year period.

(b)     Seller and Owner agrees and acknowledges that the duration and scope of the covenant not to compete, the non-solicitation/no-hire, and other provisions described in this <u>Section 5.7</u> are fair, reasonable and necessary in order to protect the legitimate interests of Buyer, and that adequate consideration has been received by Seller and Owner for such obligations.   If, however, for any reason any court determines that the restrictions in this <u>Section 5.7</u> are not reasonable or that such consideration is inadequate, such restrictions shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in this <u>Section 5.7</u> as will render such restrictions valid and enforceable.

(c)      Seller and Owner acknowledges that any breach of the provisions contained in this <u>Section 5.7</u> will result in serious and irreparable injury to Buyer. Therefore, Seller and Owner acknowledge and agree that in the event of a breach by Seller or Owner, Buyer shall be entitled, in addition to any other remedy at Applicable Law or in equity to which Buyer may be entitled, to equitable relief against Seller or Owner, including, without limitation, an injunction to restrain Seller or Owner from such breach and to compel compliance with the obligations of Seller and Owner hereunder in protecting or enforcing Buyer's rights and remedies, all without the posting of any bond.

**5.8**    <u>Confidentiality</u>.  For and after the Closing Date, Seller and Owner agrees to, and shall cause its Affiliates, employees and representatives to, treat and hold, as confidential and not disclose any non-public, confidential or proprietary information concerning Buyer, the Acquired Assets, the Assumed Liabilities or the Business, including any notes, analyses, compilations, studies, forecasts, interpretations or other documents that are derived from, contain, reflect or are based upon any such information (the "<u>Confidential Information</u>"), refrain from using any of the Confidential Information, and deliver promptly to Buyer, at the written request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information that constitute Acquired Assets or Assumed Liabilities which are in its possession or under its control.   In the event that the Seller Parties shall be legally compelled or required by any Governmental Authority to disclose any of the Confidential Information regarding the Acquired Assets or the Business, the Seller Parties shall promptly provide written notice to Buyer to enable the Buyer to seek a protective order, in camera process or other appropriate remedy to avoid public or third-party disclosure of such Confidential Information.   In the event that such protective order or other remedy is not obtained, the Seller Parties shall furnish only so much of such Confidential Information regarding the Acquired Assets or the Business that it is legally compelled to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information.   The Seller Parties shall cooperate with and assist Buyer in seeking any protective order or other relief requested by Buyer; Buyer shall reimburse to the Seller Parties all reasonable expenses incurred by the Seller Parties, including reasonable attorneys' fees, in cooperating and assisting Buyer hereunder.

**5.9**    <u>Bulk Transfer Requirements.</u>   Seller agrees to pay and discharge as they become due, all liabilities and obligations to creditors of Seller which are or may be asserted under any applicable bulk transfer act or acts, including, but not limited to, any claims against Buyer as transferee of the Acquired Assets under such applicable act or acts.   Seller and Owner hereby agree to indemnify and hold harmless Buyer from any Damages resulting from any bulk sales act or acts.

## ARTICLE VI
## CLOSING

**6.1**    <u>Closing</u>.   Upon the terms and subject to the conditions of this Agreement, the closing of the transactions contemplated by this Agreement shall take place (the "<u>Closing</u>") on the date hereof (the "<u>Closing Date</u>") by electronic mail or facsimile exchange of documents and signatures.   The Closing shall be effective as of 12:01 a.m., Dallas, Texas time, on the Closing Date.

**6.2**   <u>Deliveries by Seller</u>.  At or prior to the Closing, Seller shall deliver, or cause to be delivered, to Buyer, all duly and properly executed, the following:

(a)     the Bill of Sale;

(b)     the Assignment and Assumption Agreement;

(c)     the Company Agreement;

(d)     the Intellectual Property Assignments;

(e)     an employment agreement, in the form attached hereto as Exhibit H, executed by Damti (the "<u>Employment Agreement</u>");

(f)     certificates of good standing and/or existence from the Secretary of State of Texas (and each other state in which Seller is qualified to do business) for Seller, which will be dated not more than five (5) days prior to the Closing Date;

(g)     releases, termination statements and/or satisfaction statements for all Liens (other than Permitted Liens not to be released at Closing) encumbering the Acquired Assets, and payoff letters for all Pre-Closing Debt, in form and substance satisfactory to Buyer evidencing the payment in full of all Pre-Closing Debt;

(h)     evidence of the receipt of all consents identified on <u>Section 3.3(b)</u> of the Disclosure Schedule; and

(i)     a duly executed officer's or manager's certificate for Seller, dated as of the Closing Date, certifying and attaching (i) the resolutions of managers or directors, as the case may be, approving the execution and delivery of this Agreement and the documents ancillary hereto, and the consummation of the transactions contemplated hereby and thereby; (ii) the resolutions of members or shareholders, as the case may be, approving the execution and delivery of this Agreement and the documents ancillary hereto, and the consummation of the transactions contemplated hereby and thereby; and (iii) the incumbency and signature of the officer or manager executing this Agreement and the documents ancillary hereto on behalf of Seller.

**6.3**   <u>Deliveries by Buyer</u>.  At or prior to the Closing, Buyer shall deliver to Seller, duly and properly executed, the following:

(a)     the Cash Portion of the Purchase Price required to be paid at the Closing pursuant to <u>Section 2.2(b)</u>;

(b)     the Seller Note;

(c)     the Security Agreement;

(d)     evidence reasonably satisfactory to Seller of issuance of the Equity Interest in Holdco as set forth in this Agreement;

(e)      the Assignment and Assumption Agreement;

(f)      the Company Agreement;

(g)      the Intellectual Property Assignments;

(h)      the Employment Agreement;

(i)      a certificate of good standing and/or existence from the Secretary of State of Texas for Seller, which will be dated not more than five (5) days prior to the Closing Date; and

(j)      a duly executed manager's certificate for Buyer, dated as of the Closing Date, certifying and attaching the resolutions of the sole manager approving the execution and delivery of this Agreement and the documents ancillary hereto, and the consummation of the transactions contemplated hereby and thereby, and the incumbency and signature of the officers executing this Agreement and the documents ancillary hereto; and

(k)      payment of fifty percent (50%) of the cost of the Quality of Earnings Report prepared by Whitley Penn, LLP.

## ARTICLE VII
## INDEMNIFICATION

**7.1**    <u>Survival of Representations, Warranties and Covenants</u>.  With the exception of the representations and warranties contained in Section 3.6 (Title to Properties), claims for Damages arising out of Section 7.2(a)(ii)-(iii), claims for Damages arising from intentional misrepresentation, and any fraudulent act of fraudulent omission, which will survive the Closing indefinitely, and the representations contained in <u>Section 3.1</u> (Existence and Good Standing), <u>Section 3.2</u> (Authorization and Binding Obligations), <u>Section 3.3</u> (No Violations; Approvals), <u>Section 3.9</u> (Taxes), and <u>Section 3.13</u> (Environmental), which will survive the Closing until the expiration of the applicable statute of limitations (and all extensions thereto), all representations and warranties contained in this Agreement or in the Disclosure Schedule, and the right to commence any claim with respect thereto under <u>Section 7.2</u>, shall terminate and cease to be of further force and effect as of the date which is twenty-four (24) months from the Closing Date.  Those covenants that contemplate or may involve actions to be taken or obligations in effect after the Closing shall survive indefinitely.  The expiration of any representation, warranty or covenant shall not affect any claim made in good faith and in accordance with this Agreement prior to the date of such expiration.  For purposes hereof, the representations contained in <u>Section 3.1</u> (Existence; Good Standing), <u>Section 3.2</u> (Authorization and Binding Obligations), <u>Section 3.3</u> (No Violations; Approvals), Section 3.6 (Title to Properties), <u>Section 3.9</u> (Taxes), and <u>Section 3.13</u> (Environmental) shall be referred to herein as the "<u>Fundamental Representations</u>".

**7.2**    Indemnification.

(a)    Subject to the limitations set forth in Section 7.3, from and after the Closing, Seller and Owner shall jointly and severally indemnify and hold harmless Buyer and its Affiliates, managers, directors, officers, employees, agents, representatives, successors and assigns (collectively, the "Buyer Indemnified Parties", individually, a "Buyer Indemnified Party"), from and against any and all Damages, asserted against, resulting from or to, imposed upon, or incurred or suffered by any Buyer Indemnified Party as a result of or arising from (i) any inaccuracy in or breach or nonfulfillment of any of the representations or warranties made by Seller in this Agreement, (ii) any breach or non-performance of any covenant or agreement to be performed by Seller and/or Owner under this Agreement, or (iii) any Excluded Liabilities and the Excluded Assets (collectively, "Buyer's Indemnifiable Claims").

(b)    From and after the Closing, Buyer shall indemnify and hold harmless Seller, Owner and Seller's Affiliates, managers, directors, officers, employee, agents, representatives, successors and assigns (collectively, the "Seller Indemnified Parties" and with Buyer Indemnified Parties, the "Indemnified Parties" and each an "Indemnified Party"), from and against any and all Damages, asserted against, resulting from or to, imposed upon, or incurred or suffered by Seller Indemnified Party as a result of or arising from (i) any inaccuracy in or breach or nonfulfillment of any of the representations or warranties made by Buyer in this Agreement, (ii) any breach or non-performance of any covenants or agreements made by Buyer in this Agreement, or (iii) the Assumed Liabilities (collectively, "Seller's Indemnifiable Claims").

(c)    Notwithstanding anything contained herein to the contrary and for the avoidance of doubt, the fact that a Liability or obligation may constitute an Assumed Liability and may have been assumed by Buyer hereunder shall not in any respect prevent any Buyer Indemnified Party from seeking or receiving indemnification hereunder with respect to such Liability or obligation to the extent such Buyer Indemnified Party is entitled to indemnity with respect to such Liability or obligation pursuant to the terms of Section 7.2(a). Furthermore, Buyer shall not have any obligation to indemnify Seller Indemnified Party with respect to a Liability or obligation constituting an Assumed Liability to the extent Buyer is entitled to indemnification with respect to such Liability or obligation pursuant to the terms of Section 7.2(a). For the purposes of clarity, if a Liability is an Assumed Liability but also constitutes a breach of a representation and warranty made by Seller and/or Owner, Buyer shall be entitled to be indemnified with respect to such Liability and the Seller Indemnified Parties shall not be entitled to be indemnified by Buyer for any Damages such Persons incur with respect to such Liability (pursuant to their indemnification of the Buyer Indemnified Parties or otherwise).

(d)    To the extent permitted by Applicable Law, any indemnification payment made under this Agreement shall be characterized for all Tax and other purposes as an adjustment to the Purchase Price, as applicable.

**7.3**    Limitations on Indemnification.    Buyer's rights to indemnification hereunder are subject to the following limitations:

(a)     Notwithstanding anything contained in this Agreement to the contrary, no Buyer Indemnified Party shall be entitled to indemnification hereunder with respect to any Buyer's Indemnifiable Claim pursuant to Section 7.2(a)(i) unless the aggregate amount of Buyer's Damages with respect to all of Buyer's Indemnifiable Claims pursuant to Section 7.2(a)(i) exceeds $50,000 (the "Deductible Amount"), in which event the indemnity provided for in Section 7.2(a)(i) for Buyer's Indemnifiable Claims shall apply, subject to the other provisions of this Section 7.3, to all such Damages that exceed the Deductible Amount for Buyer's Indemnifiable Claims.

(b)     Notwithstanding Section 7.3(c) or anything contained in this Agreement to the contrary, the maximum aggregate amount to which any Buyer Indemnified Party is entitled with respect to Buyer's Indemnifiable Claims pursuant to Section 7.2(a)(i) shall be an amount equal to 50% of the Cash Portion of the Purchase Price (the "Cap"); provided that the Cap shall not apply to breaches of Fundamental Representations, and neither the Deductible Amount nor the Cap shall apply to breaches resulting from intentional misrepresentation or fraud.

(c)     Notwithstanding anything contained in this Agreement to the contrary, Seller's aggregate indemnification obligations under this Agreement, excluding Damages resulting from fraud, intentional misconduct, or a breach of the restrictive covenants set forth in Sections 5.7 and 5.8, shall not exceed the Cash Portion of the Purchase Price actually remitted to Seller.

**7.4**   Exclusive Remedy.   Except in connection with any claim arising from any intentional misrepresentation, any fraudulent act, fraudulent omission, or a breach of the restrictive covenants set forth in Sections 5.7 and 5.8 hereof, the rights of the parties for indemnification relating to this Agreement or the transactions contemplated hereby shall be strictly limited to those contained in this Article VII, and such indemnification rights shall be the exclusive remedies of the parties subsequent to the Closing with respect to any matter arising under or in connection with this Agreement.

**7.5**   Procedure for Indemnification with Respect to Third-Party Claims.

(a)     If an Indemnified Party determines to seek indemnification under this Article VII with respect to Indemnifiable Claims (as used herein, the term "Indemnifiable Claims" shall refer to Buyer's Indemnifiable Claims or Seller' Indemnifiable Claims, as the case may be) resulting from the assertion of Liability by third parties, it shall give notice to the other party (the "Indemnifying Party") as soon as practicable after the Indemnified Party becomes aware of such Indemnifiable Claim or of facts upon which such Indemnifiable Claim will be based; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder unless and only to the extent the Indemnifying Party shall be material prejudiced by such failure to so notify.  The notice shall set forth such information with respect thereto as is then reasonably available to the Indemnified Party.  If an Indemnified Party determines to seek indemnification under this Article VII with respect to Indemnifiable Claims resulting from the assertion of Liability by third parties, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so

elects by written notice delivered to the Indemnified Party within twenty (20) days (or such shorter period of time as may be necessary not to adversely affect the interests of the Indemnified Party) after the Indemnified Party delivers such notice, to assume the defense thereof, in accordance with the limits set forth in this Agreement, with counsel reasonably satisfactory to the Indemnified Party; provided, however, that (i) the defense of such Indemnifiable Claim by the Indemnifying Party must not, in the reasonable judgment of the Indemnified Party, have a Material Adverse Effect on the Indemnified Party, (ii)  the Indemnifiable Claim must seek (and continue to seek) solely monetary damages,  (iii) the Indemnifying Party expressly agrees in writing that it will be liable for any Damages incurred by the Indemnified Party, subject only to the limitations set forth in this Article VII, and (vi) the Indemnifiable Claim is not expected to have an adverse effect on, or is likely to establish a precedential custom or practice adverse to, the continuing business, the business prospects or a Tax position of Seller or Buyer after the Closing Date or may in any material respect increase the Tax liability of Seller or Buyer after the Closing Date (the conditions set forth in clauses (i) through (iii) are, collectively, the "Litigation Conditions").  If (A) any of the Litigation Conditions cease to be met or (B) the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Indemnifiable Claim, then the Indemnified Party may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense that are directly associated with obligations for which the Indemnified Party has a right of indemnification hereunder.  The Indemnified Party has the right to settle any Indemnifiable Claim for monetary damages, the defense of which has not been assumed by the Indemnifying Party.  The Indemnifying Party, if it has assumed the defense of any Indemnifiable Claim as provided in this Agreement, shall not agree to a settlement of any claim which (x) provides for any relief other than the payment of monetary damages, (y) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a complete release from all Liability in respect of such Indemnifiable Claim, or (z) may reasonably be expected to have a Material Adverse Effect on the Indemnified Party, in each case without the affected Indemnified Party's prior written consent, which consent shall not be unreasonably withheld or delayed.

(b)     Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of Liability by a third party unless such assertion is in writing; and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Indemnifiable Claims resulting from the assertion of Liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and only to the extent that, the Indemnifying Party is materially prejudiced thereby.  With respect to any assertion of Liability by a third party that results in an Indemnifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

(c)     If the Indemnifying Party, within twenty (20) days (or such shorter period as may be necessary so as not to adversely affect the interests of the Indemnified Party) after delivery of the aforesaid notice of an Indemnifiable Claim, fails to assume the

defense of the Indemnified Party against such Indemnifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account, risk and expense of the Indemnifying Party and all reasonable fees and expenses of such counsel, to the extent such fees and expenses directly relate to a claim for which the Indemnified Party has a right of indemnification hereunder, shall constitute Damages for all purposes hereunder; provided, however, that in the event the Indemnifying Party elects not to participate in the defense of the Indemnifiable Claim, it shall nevertheless have the right to participate in the defense of the same and, at its sole cost and expense, employ counsel of its own choosing.

**7.6**   Procedure for Indemnification with Respect to Non-Third-Party Claims.   If an Indemnified Party asserts the existence of an Indemnifiable Claim (excluding claims resulting from the assertion of Liability by third parties), it shall give written notice to the Indemnifying Party specifying each provision of this Agreement under which the claim is made and the nature and amount of the claim (or a good faith estimated amount) asserted.

**7.7**   Materiality.   Each of the representations and warranties that contain any "Material Adverse Effect," "in all material respects" or other materiality (or correlative meaning) qualifications shall be deemed to have been given as though there were no "Material Adverse Effect," "in all material respects" or other materiality (or correlative meaning) qualification for purposes of (a) determining whether a breach of any of Seller' representations occurred, and (b) determining the amount of indemnifiable Damages caused by any such breach.

**7.8**   Right of Setoff.   Buyer is hereby authorized, but not required, in its sole discretion and upon written notice thereof to Seller, to offset and reduce any amounts owing by Buyer to Seller under this Agreement (including, but not limited to the Seller Note), by any indemnification amounts determined in good faith to be due and owing by Seller to Buyer. The exercise of such right of setoff by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute an event of default relating to such Buyer obligation (including but not limited to the Seller Note or any instrument securing the Seller Note).  Neither the exercise of nor the failure to exercise such right of setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it.

**ARTICLE VIII**
**MISCELLANEOUS**

**8.1**   Expenses.   Each party shall pay its own expenses in connection with the negotiation, execution and performance of this Agreement, the transactions described in this Agreement, and all things required to be done by it pursuant to this Agreement, including counsel fees, brokerage, finder or financial advisor fees, filing fees and accounting fees.

**8.2**   Governing Law; Waiver of Jury Trial.

(a)   This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Texas, without regard to principles of conflicts of laws.

(b)      Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the state and federal courts located in Dallas County, Texas, for the purpose of any action arising out of or relating to this Agreement and each of the parties hereto irrevocably agrees that all claims in respect to such action shall be heard and determined in any state or federal court sitting in Dallas County, Texas.  Each of the parties hereto agrees that a final judgment in any action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  THE PARTIES HERETO IRREVOCABLY WAIVE, AND AGREE TO CAUSE THEIR RESPECTIVE AFFILIATES TO WAIVE, THE RIGHT TO TRIAL BY JURY IN ANY ACTION TO ENFORCE OR INTERPRET THE PROVISIONS OF THIS AGREEMENT.

(c)      Each of the parties hereto irrevocably consents to the service of any summons and complaint and any other process in any other action relating to the transactions contemplated hereby, on behalf of itself or its property, by the personal delivery of copies of such process to such party.  Nothing in this <u>Section 8.2</u> shall affect the right of any party hereto to serve legal process in any other manner permitted by law.

**8.3**   <u>Interpretation</u>.  When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated.  The headings and the table of contents contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  Whenever the context requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.  Each reference in this Agreement to an Exhibit or Disclosure Schedule shall mean an Exhibit or Disclosure Schedule attached to this Agreement and incorporated into this Agreement by such reference.

**8.4**   <u>Notices</u>.  All notices and other communications required or permitted under this Agreement shall be deemed to have been duly given and made if in writing and if served either by email, personal delivery to the party for whom intended (which shall include delivery by Federal Express or similar service) or three (3) business days after being deposited, postage prepaid, certified or registered mail, return receipt requested, in the United States mail bearing the address shown in this Agreement for, or such other address as may be designated in writing hereafter by such party:

If to Seller Representative:      1501 10th Street, Suite 100
Plano, Texas 75074
Attention:  Mr. Tomer Damti
Telephone:  214-695-8627, Ext. 102
Email: tomer@acetvp.com

| If to Buyer Parties: | Baymark Partners, L.P.<br>Granite Park II<br>5700 Granite Parkway, Suite 435<br>Plano, Texas 75024<br>Attn: David Hook<br>Telephone: 972-991-5457<br>Email: dhook@baymark partners.com |
| --- | --- |
| with a copy (which shall not constitute notice) to: | Hallett & Perrin, P.C.<br>1445 Ross Avenue, Suite 2400<br>Dallas, Texas 75202<br>Fax: (214) 922-4142<br>Attention: Gordon T. Foote II<br>Email: gfoote@hallettperrin.com |

**8.5**   Counterparts.   This Agreement may be executed in any number of counterparts, each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all of the parties to this Agreement notwithstanding the fact that all parties are not signatory to the original or the same counterpart.   A signed copy of this Agreement delivered by facsimile, e-mail in "portable document format" (".pdf") form or other means of electronic transmission intended to preserve the original graphic and pictorial appearance of a document shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement, and the parties agree to exchange original signatures as promptly as possible.

**8.6**   Entire Agreement.   This Agreement (including the Exhibits and the Disclosure Schedule hereto) and the other documents contemplated hereby constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, between the parties with respect to such subject matter.

**8.7**   Binding Effect; Assignment.   This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Owner, and its successors and permitted assigns, Seller, and its successors and permitted assigns, and Buyer, and its successors and permitted assigns.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be transferred or assigned (by operation of law or otherwise) by any of the parties hereto without the prior written consent of the other parties hereto; provided, however, Buyer shall be permitted to assign its rights hereunder to (a) lenders providing financing for the transactions contemplated by this Agreement for collateral security purposes and (b) any of its Affiliates and to any purchaser of all or substantially all of its assets.   Any transfer or assignment of any of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

**8.8**   Waiver; Consent.   This Agreement may not be changed, amended, terminated, augmented, rescinded or discharged (other than by performance), in whole or in part, except by a writing executed by the parties hereto, and no waiver of any of the provisions or conditions

of this Agreement or any of the rights of a party hereto shall be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given or consented thereto. Except to the extent that a party hereto may have otherwise agreed in writing, no waiver by that party of any condition of this Agreement or breach by the other party of any of its obligations or representations hereunder or thereunder shall be deemed to be a waiver of any other condition or subsequent or prior breach of the same or any other obligation or representation by the other party, nor shall any forbearance by the first party to seek a remedy for any noncompliance or breach by the other party be deemed to be a waiver by the first party of its rights and remedies with respect to such noncompliance or breach.

**8.9** <u>Severability</u>. With respect to any provision of this Agreement finally determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, Seller, Owner and Buyer hereby agree that such court shall have jurisdiction to reform such provision so that it is enforceable to the maximum extent permitted by law, and the parties agree to abide by such court's determination. In the event that any provision of this Agreement cannot be reformed, such provision shall be deemed to be severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.

**8.10** <u>Third-Party Beneficiaries</u>. Except as otherwise provided in this Agreement, each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties to this Agreement.

**8.11** <u>Prevailing Party</u>. If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any party hereto to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including reasonable attorneys' fees and court costs, incurred by the substantially prevailing party in such litigation, action, arbitration or proceeding shall be reimbursed by the other party as determined by a final, non-appealable judgment or order by a court of competent jurisdiction; provided, that if a party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.

**8.12** <u>Arm's Length Negotiations; Drafting</u>. Each party to this Agreement in this Agreement expressly represents and warrants to all other parties hereto that before executing this Agreement, said party has fully informed itself of the terms, contents, conditions and effects of this Agreement; said party has relied solely and completely upon its own judgment in executing this Agreement; said party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement, which is the result of arm's length negotiations conducted by and among the parties to this Agreement and their respective counsel. This Agreement shall be deemed drafted jointly by the parties to this Agreement, and nothing shall be construed against one party or another as the drafting party.

**8.13** <u>Seller Representative</u>.

(a)    Seller and Owner hereby appoints, authorizes, and directs Damti (the "<u>Seller Representative</u>") as his or its sole and exclusive agent, attorney in fact and representative for and on behalf of parties, with full power of substitution with respect to

all matters under this Agreement, including without limitation, (i) the right to give and receive notices and communications hereunder, (ii) to agree to, negotiate and to enter into settlements and compromises related hereto, (iii) to receive, calculate and distribute any amounts required hereunder, (iv) to engage and employ agents and representatives, (v) to comply with orders of courts with respect to such claims, (vi) to take all other actions that (A) are either necessary or appropriate in the sole judgment of the Seller Representative for the accomplishment of the foregoing or (B) are in the sole judgment of the Seller Representative specifically mandated or contemplated by the terms of this Agreement, and (vii) to incur such other expenses as Seller Representative shall deem necessary or prudent in connection with the foregoing; provided, however, that the Seller Representative shall not have any authority to enter into amendments of this Agreement or, except in the case of a breach of a representation or warranty by a particular Seller, to take any action which adversely affects an Owner disproportionately to any other Owner. No bond shall be required of the Seller Representative, and the Seller Representative shall not receive compensation for his services. Notices or communications to or from the Seller Representative shall constitute notice to or from the Seller and Owners. The appointment of the Seller Representative as Seller's and each Owner's attorney in fact revokes as of the date of this Agreement any power of attorney heretofore granted that authorized any other person or persons to represent such Seller or Owner with regard to this Agreement.

(b)     The appointment of Seller Representative as attorney in fact pursuant hereto is coupled with an interest and is irrevocable. The appointment of Seller Representative by Seller and each Owner pursuant to this Agreement (i) will not be terminated by operation of Law, death, mental or physical incapacity, liquidation, dissolution, bankruptcy, insolvency or similar event with respect to Seller or such Owner or any proceeding in connection therewith, or in the case of a trust, by the death of any trustee or trustees or the termination of such trust, or any other event, and (ii) shall survive the delivery of an assignment by Seller or such Owner of the whole or any fraction of his interest in any payment due to him under this Agreement.

(c)     The Seller Representative hereby accepts the foregoing appointment and agrees to serve as Seller Representative, subject to the provisions hereof, for the period of time from and after the date hereof without compensation except for the reimbursement from the Seller or Owners of fees and expenses incurred by Seller Representative in his capacity as such.

(d)     The Seller Representative shall act for the Seller and Owners on all of the matters set forth in this Agreement in the manner the Seller Representative believes to be in the best interest of the Seller and Owners and is authorized to act on behalf of the Seller and Owners notwithstanding any dispute or disagreement between Seller and/or Owners. The Seller Representative shall not be liable for any act done or omitted hereunder as the Seller Representative while acting in good faith and in the exercise of reasonable judgment. The Seller and Owners shall indemnify and hold the Seller Representative harmless from and against any loss, liability or expense incurred without negligence or bad faith on the part of the Seller Representative and arising out of or in connection with the acceptance or administration of the Seller Representative's duties

hereunder, including the reasonable fees and expenses of any legal counsel retained by the Seller Representative.

(e)     Subject to subsection (a) above, a decision, act, consent or instruction of the Seller Representative pursuant to this Agreement shall constitute a decision, act, consent or instruction of the Seller and Owners and shall be final, binding and conclusive upon the Seller and Owners, and the Buyer Indemnified Parties may rely upon any such decision, act, consent or instruction of the Seller Representative as being the decision, act, consent or instruction of the Seller and Owners.  The Buyer Indemnified Parties are hereby relieved from any liability to any Person for any acts done by them in accordance with such decision, act, consent or instruction of the Seller Representative.  The rights, powers and benefits of the Seller Representative under this Agreement shall survive any termination of this Agreement.

*(Signature page follows.)*

IN WITNESS WHEREOF, this Agreement has been executed by or on behalf of each of the parties hereto as of the Effective Date.

BUYER:

ACET GLOBAL, LLC

By: _____

Name: David J. Hook

Its:  President

SELLER:

ACET VENTURE PARTNERS LLC

By: _____

Name: _____

Its: _____

*(Signatures continue on following page.)*

**OWNER:**

_____
Tomer Damti, Individually