UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC<br><br>and<br><br>ACET Global, LLC,<br><br>        **Plaintiffs,**<br><br>v.<br><br>BAYMARK PARTNERS, LP;<br>BAYMARK PARTNERS<br>MANAGEMENT, LLC;<br>SUPER G CAPITAL, LLC;<br>SG CREDIT PARTNERS, INC.;<br>BAYMARK ACET HOLDCO, LLC;<br>BAYMARK ACET DIRECT INVEST, LLC;<br>et al.,<br><br>        **Defendants.** | § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-cv-01171-B |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE WINDSPEED
EMPLOYEES' MOTION TO DISMISS AND BRIEF IN SUPPORT**

Jason B. Freeman
  TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

I.    BACKGROUND. ..................................................................................................1

II.   RELEVANT FACTS. .........................................................................................3

    A.   ACET GLOBAL PURCHASES THE ASSETS OF ACET VENTURE PARTNERS, LLC. ....... 3
    B.   THE SUPER G COLLATERAL ASSIGNMENT. ............................................................ 4
    C.   DAMIT'S TERMINATION. ...................................................................................... 4
    D.   SZETO AND WINDSPEED TRADING, LLC. .............................................................. 4
    E.   THE "WIND DOWN" OF GLOBAL .......................................................................... 5
    F.   WINDSPEED. ....................................................................................................... 5
    G.   THE HIDING OF GLOBAL'S INVENTORY. ................................................................ 6
    H.   WINDSPEED CREATES A CARBON COPY WEBSITE OF GLOBAL'S WEBSITE. .............. 6
    I.   WINDSPEED TAKES OVER THE GLOBAL ACCOUNTS AND SALES. ............................. 7
    J.   D&T PARTNERS' DEMAND FOR PAYMENT ON THE D&T NOTE. ............................... 7
    K.   THE COVER UP AND FAKE FORFEITURE NOTICE. .................................................... 8
    L.   THE PURPORTED FORECLOSURE SALE. .................................................................. 8
    M.  THE FRAUDULENT BANKRUPTCY FILING AND CONTRADICTORY TAX FILINGS. ........ 9
    N.   STATE COURT LITIGATION. ................................................................................. 10

III.  STANDARD OF REVIEW UNDER RULE 12(B)(6). ................................... 11

IV.  ARGUMENTS AND AUTHORITIES. .......................................................... 11

    A.   OBJECTIONS TO THE WINDSPEED ACTORS' ATTEMPTS TO INCORPORATE ARGUMENTS FROM THE OTHER DEFENDANTS' BRIEFS. ...............................................................11
    B.   RICO CLAIMS. ................................................................................................ 12
        1.   *Plaintiffs' 18 U.S.C. § 1962(c) Claims.* .......................................................... 12
           i.   Plaintiffs have Properly Pled an Enterprise. .................................... 13
           ii.  Moreover, the Motion Mischaracterizes the Factual Allegations in the Complaint Associated with the Windspeed Actors. ...........16
           iii.  The Complaint Alleges Sufficient Involvement by the Windspeed Actors in the Pattern of Racketeering. ...............................................19
        2.   *Plaintiffs' 18 U.S.C. § 1962(d) Claims.* .......................................................... 23
    C.   STATE LAW CAUSES OF ACTION. ........................................................................ 25

V.    PRAYER ............................................................................................................ 25

CERTIFICATE OF SERVICE ................................................................................. 26

## TABLE OF AUTHORITIES

**Cases**

*Abraham v. Singh,*
    480 F.3d 351 (5th Cir. 2007) ................................................................................15

*Agar Corp. v. Electro Circuits Int'l,*
    580 S.W.3d 136 (Tex. 2019) ................................................................................25

*Allstate Ins. Co. v. Benhamou,*
    190 F. Supp. 3d 631 (S.D. Tex. 2016) ................................................................15

*Allstate Ins. Co. v. Plambeck,*
    802 F.3d 665 (5th Cir. 2015) ................................................................................13

*Bank of Mongolia v. M&P Global Fin. Svs.,*
    2010 WL 11549711 (S.D. Fla. Sept. 3, 2010) ....................................................19

*Beck v. Prupis,*
    529 U.S. 494 (2000) ............................................................................................23

*Black Cat Exploration & Production LLC v. MWW Capital Limited,*
    2015 WL 12731751 (N.D. Tex. Apr. 29, 2015) ..................................................11

*Boyle v. United States,*
    556 U.S. 938 (2009) ........................................................................13, 14, 21

*Brook v. Schlesinger,*
    898 F. Supp. 1076 (S.D.N.Y. 1995) ....................................................................22

*C&W Const. Co. v. Bhd. of Carpenters & Joiners of Am., Loc.,*
    687 F. Supp. 1453 (D. Haw. 1988) ......................................................................22

*Casperone v. Landmark Oil & Gas Corp.,*
    819 F.2d 112 (5th Cir. 1987) ........................................................................19, 20

*Cedric Kushner Promotions, Ltd. v. King,*
    533 U.S. 158 (2001) ............................................................................................15

*Chaney v. Dreyfus Serv. Corp.,*
    595 F.3d 219 (5th Cir. 2010) ................................................................................24

*City of New York v. Bello,*
    579 Fed. Appx. 15 (2d Cir. 2014) ........................................................................23

*Clapper v. Am. Realty Inv., Inc.,*
    2015 WL 3504856 (N.D. Tex. June 3, 2015) ......................................................12

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ................................................................................11

*Cypress/Spanish Fort I, L.P. v. Professional Service Industries, Inc.,*
    814 F. Supp. 2d 698 (N.D. Tex. Aug. 29, 2011) ............................................2, 13

*Delta Truck & Tractor, Inc. v. J.I. Case Co.,*
    855 F.2d 241 (5th Cir. 1988) ................................................................................12

*Dorsey v. Portfolio Equities, Inc.,*
    540 F.3d 333 (5th Cir. 2008) ..........................................................................8, 10

*El Paso, Tex. v. Jones,*
    2009 WL 4730305 (W.D. Tex. Dec. 4, 2009) ....................................................20

*Funk v. Stryker Corp.,*
    631 F.3d 777 (5th Cir. 2011) ..................................................................................3

*George v. Blue Diamond Petroleum, Inc.,*
    718 F. Supp. 539 (W.D. La. July 20, 1989) ........................................................20

*Great Plains Trust Co. v. Morgan Stanley Witter & Co.,*
   313 F.3d 305 (5th Cir. 2002) ..................................................................................23

*In re American Airlines, Inc.,*
   972 F.2d 605 (5th Cir. 1992) ..................................................................................18

*In re Motel 6 Sec. Litig,*
   161 F. Supp. 2d 227 (S.D.N.Y. 2001) .....................................................................23

*Lowrey v. Texas A&M Univ. Sys.,*
   117 F.3d 242 (5th Cir. 1997) ..................................................................................11

*Lucas v. Ocwen Home Loan Servicing,*
   2014 WL 7059274 (N.D. Tex. Nov. 21, 2014) ........................................................14

*Masimo Corp. v. Philips Elec. N. Am. Corp.,*
   62 F. Supp. 3d 368 (D. Del. 2014) ..........................................................................11

*Provost v. First Guaranty Bank,*
   2019 WL 3412432 (E.D. La. July 29, 2019) ............................................................15

*Reeves v. Ernst & Young,*
   507 U.S. 170 (1993) ............................................................................19, 20, 21

*Saffran v. Boston Sci. Corp.,*
   2008 WL 2716318, (E.D. Tex. July 9, 2008) ...........................................................11

*Salinas v. U.S.,*
   522 U.S. 52 (1997) .........................................................................................23, 24

*Sedima v. Imrex Co., Inc.,*
   473 U.S. 479 (1985) ...............................................................................................12

*Simmons v. Jackson,*
   2019 WL 3043927 (N.D. Tex. June 7, 2019) ...........................................................19

*Snow Ingredients, Inc. v. SnoWizard Incorporated,*
   833 F.3d 512 (5th Cir. 2015) .............................................................................21, 22

*St. Paul Mercury Ins. Co. v. Williamson,*
   224 F.3d 425 (5th Cir. 2000) ..................................................................................15

*Torrey v. Infectious Disease Soc. Of Am.,*
   2018 WL 10124894 (E.D. Tex. Sept. 27, 2018) .......................................................23

*Town of Kearny v. Hudson Meadows Urb. Renewal Corp.,*
   829 F.2d 1263 (3d Cir. 1987) ..................................................................................22

*U.S. v. Coiro,*
   922 F.2d 1008 (2d Cir. 1991) ..................................................................................22

*U.S. v. Elliott,*
   571 F.2d 880 (5th Cir. 1978) .............................................................................13, 19

*U.S. v. Maltos,*
   985 F.2d 743 (5th Cir. 1992) ..................................................................................24

*U.S. v. Posada-Rios,*
   158 F.3d 832 (5th Cir. 1998) .....................................................................20, 21, 24

*U.S. v. Smith,*
   2021 WL 3666431 (N.D. Ill. Aug. 17, 2021) ...........................................................22

*U.S. v. Thompson,*
   253 F.3d 700 (5th Cir. 2001) ....................................................................................2

*U.S. v. Turkette,*
   452 U.S. 576 (1981) ...............................................................................................13

*United States v. Finney,*
   714 F.2d 420 (5th Cir. 1983) .............................................................................19, 20

*Varela v. Gonzales,*
   2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) ................................................................12
*Wackman v. Rubsamen,*
   602 F.3d 391 (5th Cir. 2010) .......................................................................................25
*West Tex. Nat. Bank v. FEC Holdings, LP,*
   2013 WL 2158658 (W.D. Tex. May 17, 2013) ...........................................................15
*Wrestling Ent., Inc. v. Jakks Pac., Inc.,*
   530 F. Supp. 2d 486 (S.D.N.Y. 2007) ........................................................................22
*Zastrow v. Houston Auto Imports Greenway, Ltd.,*
   789 F.3d 553 (5th Cir. 2015) ................................................................................21, 22

## Statutes

18 U.S.C. § 1961(1) ..............................................................................................................13
18 U.S.C. § 1961(3) ..............................................................................................................13
18 U.S.C. § 1961(4) .........................................................................................................13, 14
18 U.S.C. § 1961(5) ..............................................................................................................13
18 U.S.C. § 1962(a) ............................................................................................................1, 24
18 U.S.C. § 1962(b) ..............................................................................................................24
18 U.S.C. § 1962(c) ....................................................................................................12, 23, 24
18 U.S.C. § 1962(d) .............................................................................................2, 12, 23, 24
18 U.S.C. § 1964(c) ..............................................................................................................12

## Rules

Fed. R. Civ. P. 12(b)(6) ...............................................................................................1, 2, 11

Plaintiffs, by and through counsel, file this response in opposition to Zhexian Lian ("Lian"), Dana Tomerlin ("Tomerlin"), Padasamai Vattana ("Vattana"), Paul Ketter ("Ketter"), and Vanessa Torres ("Torres" and collectively with the previously referenced defendants, the "Windspeed Actors") combined motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). For the reasons set forth below, Plaintiffs respectfully request that this Court deny the Motion.

## I.  Background.

Plaintiffs' First Amended Complaint (the "FAC") alleges causes of action against the Windspeed Actors under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In addition to the RICO claims, the Complaint alleges causes of action under Texas law for civil conspiracy.[1] The 157-page FAC is well pled. Taken together, the FAC alleges that the defendants, including the Windspeed Actors, engaged in pre-conceived, collective, and unlawful efforts to effectively steal and misappropriate all of the assets from an existing business, D&T Partners, LLC ("D&T Partners"), through the fraudulent guise of what the Defendants now attempt to label an after-the fact and lawful foreclosure sale. (Dkt. No. 47-1, at ¶¶1, 3).

In the Motion, the Windspeed Actors make a hodgepodge of meritless arguments as to why they should be dismissed from this lawsuit entirely. And perhaps recognizing that their arguments will not carry the day—or alternatively, in an apparent attempt to end run this Court's page-limitations requirement applicable to motion practice—the Windspeed Actors confusingly: (1) incorporate by reference *all* other arguments raised in the other six defendants' motions to dismiss, (2) but then attempt to *specifically* incorporate, with respect to Plaintiffs' Texas Uniform Fraudulent Transfer Act ("TUFTA"), only those "arguments asserted by Defendants Windspeed Trading, LLC and William

---

[1] Plaintiffs do not bring claims against the Windspeed Actors for aiding and abetting breach of fiduciary duties, TUFTA, or 18 U.S.C. § 1962(a).

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE WINDSPEED EMPLOYEES' MOTION TO DISMISS AND BRIEF IN SUPPORT**                    **Page 1**

Szeto in their Motion to Dismiss regarding the lack of a transfer of 'assets' when those assets are fully encumbered." (*See* Dkt. No. 47-1, Footnote 2; Dkt. No. 47-1, ¶ 52). For the reasons discussed *infra*, the Court should only address the issues specifically raised by the Windspeed Actors in their respective Motion.

At bottom, the Motion contends that Plaintiffs' RICO claims should be dismissed under Rule 12(b)(6) of the Federal Rules of Procedure because Plaintiffs have not properly alleged: (1) a RICO "enterprise," (Dkt. No. 47-1, at ¶¶ 5, 34-40); (2) that the Windspeed Actors are distinct RICO "persons" separate and apart from the alleged RICO "enterprise," (Dkt. No. 47-1, at ¶¶ 5, 34-40); (3) that the Windspeed Actors had sufficient involvement in the RICO "enterprise" to give rise to RICO liability, (Dkt. No. 47-1, at ¶¶ 38-39, 42); and (4) a cognizable RICO conspiracy under 18 U.S.C. § 1962(d) pled with particularity under Rule 9(b), (Dkt. No. 47-1, at ¶¶ 45-50).[2] With respect to the state law claims, the Motion contends that none are recognizable and, if they are, the Court should decline to exercise supplemental jurisdiction over those claims. (Dkt. No. 47-1, at ¶¶ 51-56).

---

[2] Consistent with their confusing and scattered shotgun-approach, the Motion apparently hints, albeit in the "Background" section and not the "Arguments and Authorities" section, that Plaintiffs have not met the continuity requirement for a RICO claim. (Dkt. No. 47, at ¶¶22-23). Although not properly raised, Plaintiffs disagree. As pled in the Complaint and discussed *infra*, Plaintiffs contend that the Defendants in this action sought to steal and misappropriate the assets at issue prior to execution of the Asset Purchase Agreement on July 14, 2017, and continued in a pattern of racketeering activity at least through October 2019 when they made fraudulent representations in a federal bankruptcy filing. *See also U.S. v. Thompson*, 253 F.3d 700 (5th Cir. 2001) (finding that 20-21 months was sufficient period of time to establish continuity) (and cases cited therein). Indeed, as discussed *infra*, Plaintiffs have further alleged that the racketeering activity continued throughout the state litigation, or until 2021. Plaintiffs' allegations, taken as true and with all reasonable inferences thereon, support their claims of continuity for purposes of the RICO statute. *See, e.g., Cypress/Spanish Fort I, L.P. v. Professional Service Industries, Inc.*, 814 F. Supp. 2d 698, 713-14 (N.D. Tex. Aug. 29, 2011) (Boyle, J.).

## II.    Relevant Facts.

### A.    ACET Global Purchases the Assets of ACET Venture Partners, LLC.

In the summer of 2017, Baymark Partners, LP ("Baymark") and its principals, David Hook ("Hook"), Tony Ludlow ("Ludlow"),[3] and Matthew Denegre ("Denegre") approached Tomer Damti ("Damti"), seeking to purchase the assets of ACET Ventures, LLC ("ACET"), an e-commerce business in which Damti owned. (Dkt. No. 36, ¶ 56).  To facilitate the purchase of assets, Baymark formed another entity, Global.  (Id., ¶ 57).  And, through an Asset Purchase Agreement, dated July 14, 2017 (the "APA"), Global purchased all of the assets of ACET.[4]   (Id., ¶ 58; see also Exhibit 23).

Under the APA, Global agreed to:  (1) pay $850,000 to D&T Partners, LLC ("D&T Partners"), subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners; and (3) provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC ("Baymark Holdco").  (Id., ¶ 64).  As part of the transaction, Global executed a promissory note with D&T Partners, memorializing the $3,230,000 payable to D&T Partners (the "D&T Note").  (Id. ¶ 65).  The D&T Note required a first installment payment to D&T Partners on October 31, 2018.  (Id.).  Separately, Baymark Holdco entered into a security agreement with D&T Partners.  (Id., ¶ 66).

---

[3] Baymark, Hook, and Ludlow have been named in at least one other federal RICO lawsuit.  *See Greh et al. v. Singleton et al.*, No. 3:18-cv-01439-M (N.D. Tex.), Dkt. No. 1.; *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (noting that it is well-established and "clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.").

[4] As mentioned *infra*, Denegre had a calendar invite on Outlook a month **prior** to the execution of the APA regarding "Windspeed."  Windspeed Trading, LLC would eventually be the name of the entity that all of the parties would elect to use in 2018 as a vehicle to fraudulently transfer the assets of Global away from D&T Partners.  And, the name of Windspeed Trading, LLC was chosen because William Szeto's ("Szeto") father was partial to that name prior to his death—*i.e.*, the other Defendants in this lawsuit had no connection to the name Windspeed Trading, LLC.  (Dkt. No. 36, ¶ 63).  Szeto would also later become the CEO of Global and Windspeed and effectively the 20% owner of Windspeed.  *See infra.*

**B.  The Super G Collateral Assignment.**

After the APA, Hook caused Global to enter into a Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement (the "Collateral Assignment") with Super G Capital, LLC ("Super G"), which provided that Super G would provide a term loan facility of up to $1 million (the "Super G Note").  (Id., ¶ 68).

D&T Partners subordinated its security interest to Super G based on Hook, Ludlow, and Baymark's representations in June and July of 2017 that:  (1) Damti would maintain managerial authority and discretion; and (2) Global did not intend (and that Baymark, Hook, and Ludlow did not intend to cause it) to default on the loan to D&T Partners or default on the loan from Super G.  (Id., ¶ 77).

**C.  Damti's Termination.**

On February 12, 2018, Denegre, purporting to represent Ludlow and Baymark, informed Damti that he was terminating Damti's employment with Global.  (Id., ¶ 79; see also Dkt. No. 36-25). Although Denegre, who was not an employee or agent of Global, stated that the termination was based on poor performance, at the time of the February termination, January 2018 revenues for Global were 248.26% more than those in January 2017.  (Id., ¶¶ 79-80).

**D.  Szeto and Windspeed Trading, LLC.**

When the APA was entered into, Baymark had not yet formed Windspeed. (Id., ¶ 63). Curiously, however, Denegre had a recurring weekly call scheduled on his calendar for "Windspeed" **that began roughly a month prior to the closing date of the APA**.  (Id.).

On or around February 14, 2018, Szeto became the CEO of Global.  (Id., ¶ 81).  According to Hook, Szeto "work[ed] for free" with no financial promise made to him or expectation of a financial award.  (Id., ¶ 82).

Although Baymark was in compliance with the Super G Note in February 2018, or the month in which Damti was terminated, Global "defaulted" on its note to Super G shortly after Szeto was named CEO of Global. (Id., ¶¶ 84-85). At the time of the default, "Global had millions of dollars of assets and an ongoing business operation." (Id., ¶ 224).

Because of the "default," Baymark and Super G entered into a Forbearance Agreement in April of 2018, which provided for a forbearance period until October 25, 2018. (Id., ¶ 86). Significantly, the forbearance period ended just days before the D&T Note payments would become due to D&T Partners. (Id.). Pursuant to the Forbearance Agreement, Global would "wind down" and transfer its assets and business operations to a newly-formed entity: Windspeed. (Id.). Super G relied on Baymark to "come up with [the] plan" and Baymark and its principals offered the restructuring plan to Super G. (Id., ¶ 115).

### E. The "Wind Down" of Global.

In April of 2018, Baymark began to set the stage to execute their "wind down" plan. (Id., ¶ 96). Szeto, while serving as the CEO of Global, worked closely with Denegre and Ludlow to fine tune the "wind down" plan and, ultimately, to put the plan into action. (Id.). According to an email written by Ludlow, the parties expressly wanted to ensure that Global did not "default on Tomer [Damti's] debt and have [Damti] regain the company." (Id., ¶ 111).

On September 27, 2018, while he was still CEO of Global, Szeto filed a Certificate of Formation Limited Liability Company for Windspeed. (Id., ¶ 122). Szeto continued to serve as CEO of both Global and Windspeed at the same time. (Id.).

### F. Windspeed.

On October 18, 2018, or two weeks before the D&T Note payment would become due on October 31, 2018, Szeto, on behalf of Windspeed; Ludlow, on behalf of BP Management; and Cole, on behalf of Super G, executed an Amended and Restated Company Agreement of Windspeed

("Company Agreement").  (Id., ¶ 152).   Under the Company Agreement, they became business partners with the following beneficial ownership: BP Management (40%), Super G (40%), and Szeto (20%).  (Id., ¶¶ 152, 157).  The Company Agreement provided Super G and BP Management with perpetual authority to appoint and control a board member of Windspeed's three-person board, in addition to the right to replace those board members.  (Id., ¶ 164).  Under the Company Agreement, the board members managed all of the business and affairs of Windspeed by majority—*i.e.*, Super G and BP Management maintained complete control.  (Id.).

In October of 2018, Szeto began serving as the CEO of Windspeed.  (Id., ¶ 177).  Later, every employee of Global was transferred to Windspeed after the "wind down" was executed.  (Id., ¶ 178). Specifically, each employee was notified on October 9, 2018, via email that they had been terminated from Global effective September 28, 2018, and that their employment with Windspeed had become effective thereafter. (Id., ¶ 179).

### G.  The Hiding of Global's Inventory.

After Windspeed was formed, Szeto, Ketter, and Tomerlin caused the transfer of all of Global's inventory to Windspeed.  (Id., ¶¶ 191-193).  In an attempt to conceal the true nature of the transfer, Ketter and Tomerlin obtained a temporary storage unit at CubeSmart Self Storage of Dallas ("CubeSmart") in September of 2018 to hold Global's inventory.  (Id., ¶ 193).  Rather than establishing the CubeSmart account in the name of Windspeed or Global, Tomerlin used his own name and personal address to set up the account.  (Id.).  After Global's inventory was transferred to Windspeed, Windspeed continued to sell the inventory with the same customer marketplaces and the same software used by Global.  (Id., ¶ 194).

### H.  Windspeed Creates a Carbon Copy Website of Global's Website.

In 2018, Windspeed and Torres "expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts." (Id., ¶ 197).  Indeed, "[a]s of at least December 12,

2018, Windspeed's website was a carbon copy of the former ACET Global website." (Id.). The Windspeed website included postings holding out for sale hundreds of products—distinct and unique products—that were in fact one and the same as those later reflected in Global's inventory of items in the Foreclose Sale Agreement. (Id.). Accordingly, Windspeed continued to sell Global's inventory, pocketing the revenues for itself and its owners. (Id., ¶¶ 201, 202).

## I.   **Windspeed Takes Over the Global Accounts and Sales.**

On December 5, 2018, Lin, a former employee of Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of a Global account. (Id., ¶ 209). Lin used her Windspeed email address and listed herself as the "New Account Owner" for an account held in Global's name. (Id.). Vattana was "in charge of sales." (Dkt. No. 36-10; Tr. 53:23-25). She was aware that Windspeed was selling "the same products" that had been owned by Global. (Dkt. No. 36-10, Tr. 54:01-5). And she was aware that Windspeed was "run[ning] the same business" that Global had run with Global's former employees. (Dkt. No. 36-10; Tr. 54:06-14). She also was involved in ensuring that Groupon reported income between Global and Windspeed in the manner in which the Defendants wanted it to be reflected. (Dkt. No. 36-10, Tr. 58:12-25; 59:1-11). And she was aware that income that was being credited to Windspeed should have been credited to Global. (Dkt. No. 36-10, Tr. 62:17-21).

## J.   **D&T Partners' Demand for Payment on the D&T Note.**

D&T Partners demanded payment on the D&T Note. (Dkt. No. 36, at ¶ 19). Indeed, by letter dated December 9, 2018, D&T Partners' attorney sent a demand letter to Baymark, Global, and

Hallett & Perrin.  (Ex. 1)[5]  In the demand letter, D&T Partners communicated to Baymark, Global, and Hallett & Perrin that the D&T Note was in default.  (Id.)

### K.  The Cover Up and Fake Forfeiture Notice.

Many months after the purported transfer of Global's assets to Windspeed and the wind-down of Global, and apparently to circumvent the growing demands by D&T Partners for Defendants to pay on the D&T Note, on January 31, 2019, Super G (in coordination with Baymark) issued a Notice of Forfeiture ("Forfeiture Notice").  (Id., ¶ 226; see also Dkt. No. 36-17).  The Baymark Defendants and Windspeed engaged Hallett & Perrin to represent them, and Hallett & Perrin drafted the Forfeiture Notice.  (Id., ¶¶ 215-222).  The Forfeiture Notice was sent to the attention of Hook at his Baymark address (not the old Global address).  (Id.).  Moreover, the Forfeiture Notice was issued well after all parties, including Hallett & Perrin, had full knowledge that the assets at issue (*i.e.*, Global's assets) had already been transferred months before to Windspeed, an entity that was beneficially owned and controlled by Super G, BP Management, and Szeto. (Id., ¶ 227).  Because Global had already transferred all of its assets and operations to Windspeed several months before, there was no physical foreclosure sale as Windspeed continued those operations and sold off the inventory.  (Id., ¶ 233).

### L.  The Purported Foreclosure Sale.

The parties executed a Foreclosure Sale Agreement that reflected a sales date of March 1, 2019.  (Id., ¶ 242; Dkt. No. 36-18).  However, the parties executed and completed the sale after March 1, 2019. (Id. and id. at ¶ 249). Indeed, the parties purposely backdated the Foreclosure Sale Agreement to make it appear as if the sale had occurred earlier.  (Id.). In addition, according to the Foreclosure

---

[5] Although not attached to the Complaint, the Court may consider the demand letter sent by D&T partners to the defendants because it is referenced in the Complaint.  (Dkt. No. 36, at ¶ 19).  *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

Sale Agreement, the "purchase price" (*i.e.*, the amount Windspeed agreed to "pay" to Super G) equaled the exact amount that was owed under the Super G Note.  (Id., ¶ 246).

### M. The Fraudulent Bankruptcy Filing and Contradictory Tax Filings.

On October 23, 2019, Global filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy with the Eastern District of Texas seeking relief under Chapter 7 of the Bankruptcy Code. (Dkt. No. 36, ¶ 252; see also Ex. 19).  Ludlow signed the petition on behalf of Global. (Id.)  In the petition, Global acknowledged that it owed ACET Ventures Partners, LLC $3,230,000. (Id.)  Global also asserted that it had transferred within 1 year $30,000 of property to Super G on "01/2019" and that it had no significant assets. (Id.)

The bankruptcy petition contained a multitude of false statements designed to conceal assets from the bankruptcy trustee and from D&T Partners, the latter of which had already filed a lawsuit against Global, Windspeed, and Baymark in the District Court of Dallas County on July 12, 2019.[6] (Dkt. No. 36, ¶ 15).  For example, the petition requested information as to whether "inventories of the debtor's property . . . [had] been taken within 2 years before filing this case?" (Dkt. No. 36, ¶ 269-270).  Ludlow and Global answered "No".  (Id., ¶ 270).  In deposition testimony in the state court action, the Global parties admitted that this answer was wrong and that only days prior to the bankruptcy filing they had reviewed Global's purported inventory.  (Id., ¶¶ 270-274).  In addition, the petition requested Global to "[l]ist any property kept in storage units or warehouses within one year before filing this case."  (Id., ¶ 281).  Ludlow and Global answer "None".  (Id.).  However, CubeSmart records indicate that Tomerlin, Ketter, and/or Windspeed moved Global's inventory into storage at

---

[6] Plaintiffs request the Court take judicial notice of this lawsuit in state court.  *See D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC),* Plaintiff v. *ACET Global, LLC, et al.,* No. DC-19-09828 (District Court of Dallas County, 116th Judicial District).

least as of October 25, 2018 and moved such inventory from storage on or about November 16, 2018. (Ex. 2)[7]  The bankruptcy petition contained many other fraudulent representations.  (Id., ¶ 15).

Significantly, the federal tax returns of the relevant entity, Baymark ACET Holdco, LLC, which held Global's membership interests, represented that Global's assets were significantly more than Global had reported on the bankruptcy petition.  (Dkt. No. 36, ¶ 14).  More specifically, on its 2018 IRS Form 1065, *U.S. Return of Partnership Income*, Baymark ACET Holdco, LLC represented that it had $3,023,970 of total assets as of December 31, 2018. (Id., ¶ 17). In addition, the 2019 IRS Form 1065, *U.S. Return of Partnership Income*, for Baymark ACET Holdco, LLC reported that the entity had received $2,907,290 in "proceeds" from the "foreclosure sale" of Global's assets.  (Id., ¶ 18).

**N.  <u>State Court Litigation.</u>**

During the state court litigation, the Defendants attempted to further the RICO enterprise through more deceit and strong-arm tactics.  For example, during the deposition of Denegre, after Plaintiffs' counsel asked an important question regarding the foreclosure sale at issue, Ludlow stated: "Matthew [Denegre], shut the fuc* up."  (Dkt. No. 36, ¶ 1).  Thereafter, taking his cue from Ludlow, Denegre refused to answer the question.  (Id.).  Szeto, the boss of the Windspeed Actors, also engaged in discussions with the Windspeed Actors prior to their scheduled depositions and instructed them on how to answer questions that may be asked by Plaintiffs' counsel.  (Dkt. No. 36-2, Tr. 109:15-25; 115:19-25; 116:1-3).  Taking their cue from Szeto, the Windspeed Actors committed perjury during the state litigation.  (Dkt. No. 36, ¶ 315.  To date, Windspeed continues its business operations with Szeto as its CEO.  (Id. at Tr. 32:1-5).

---

[7] Although not attached to the Complaint, the Court may consider the CubeSmart records because it is referenced in the Complaint and central to Plaintiffs' claims against Ketter and Tomerlin.   (Dkt. No. 36, at ¶¶ 191-193).  *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

### III.    Standard of Review Under Rule 12(b)(6).

In the Fifth Circuit, motions to dismiss for failure to state a claim under Rule 12(b)(6) are "viewed with disfavor and . . . [are] rarely granted." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Collins*, 224 F.3d at 498. Accordingly, the district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* The relevant question in determining whether a motion to dismiss should be granted is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Id.*

### IV.    Arguments and Authorities.

#### A.    Objections to the Windspeed Actors' Attempts to Incorporate Arguments from the Other Defendants' Briefs.

The Windspeed Actors seek to "adopt and incorporate the motions to dismiss filed by the Baymark Defendants, Holdco, SG Credit Partners, Inc. and Marc Cole, and Hallett & Perrin PC and Julie Smith, as well as the arguments incorporated into their respective briefs in support". (Dkt. No. 47-1, Footnote 2). This request is improper for at least two reasons. First, the Windspeed Actors' request would needlessly cause headaches for this Court and Plaintiffs, both of whom would be required to review each and every argument raised in the six other motions to dismiss to determine their potential applicability to the Windspeed Actors. Second, and perhaps more importantly, federal courts—including this Court—have held that these types of incorporation by reference requests are improper because they "eviscerate[ ] the court's page limit restrictions" and prejudice the non-moving party. *See, e.g., Saffran v. Boston Sci. Corp.*, No. 2-05-cv-547, 2008 WL 2716318, at FN 5 (E.D. Tex. July 9, 2008); *Black Cat Exploration & Production LLC v. MWW Capital Limited*, No. 115-cv-51, 2015 WL 12731751, at *3 (N.D. Tex. Apr. 29, 2015); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d

368, 376 (D. Del. 2014) ("Underlying briefs cannot be 'incorporated by reference' as a way of avoiding the page limits."). For these reasons, the Court should squarely address only the arguments made by the Windspeed Actors in *their* Motion. *See also Clapper v. Am. Realty Inv., Inc.*, No. 3:14-cv-2979-D, 2015 WL 3504856 (N.D. Tex. June 3, 2015) ("But it is not sufficient in the context of . . . [a motion to dismiss] for defendants to effectively shift to the court the burden of scrutinizing the amended compliant to determine whether there are deficiencies with respect to each of the 27 named defendants.").

### B. RICO Claims.

"The Racketeer Influence and Corrupt Organization Act, originally passed to target mobsters and organized crime, has been interpreted to reach even 'respected and legitimate' businesses that violate the Act's prohibitions." *Varela v. Gonzales*, 2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) (citing *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985)). Accordingly, 18 U.S.C. § 1964(c) provides a private civil action and treble damages for those who are injured by violations of RICO's substantive provisions, including 18 U.S.C. § 1962(c) and (d). *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985). Plaintiffs have brought claims against the Windspeed Actors under 18 U.S.C. § 1962(c) and (d). (Dkt. No. 36, ¶¶ 310-324 and 339-367).

Under both 18 U.S.C. § 1962(c) and (d), three threshold elements must be met: (1) a person must engage in (2) a pattern of racketeering activity; (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). "RICO is to be read broadly" and is "liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497-98.

### 1. Plaintiffs' 18 U.S.C. § 1962(c) Claims.

18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."   For these purposes, the RICO statute provides the following definitions for each relevant term:

- A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).

- A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4);

- "Racketeering activity" is defined as certain proscribed acts, *see* 18 U.S.C. § 1961(1), and a "pattern of racketeering activity" means "at least two acts of racketeering activity . . . which occurred within ten years . . . after the commission of a prior act of racketeering activity," *see* 18 U.S.C. § 1961(5).

### i.    Plaintiffs have Properly Pled an Enterprise.

The Motion contends that Plaintiffs have failed to properly plead an "enterprise" as that term is used in the RICO statute.  (Dkt. No. 47-1, ¶ 5).  As indicated above, a RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *see also Cypress/Spanish Ft. I, L.P. v. Prof. Serv.Indudsries, Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. Aug. 29, 2011) (Boyle, J.) ("An 'enterprise' is broadly defined by the Act, and it 'can be either a legal entity or an association-infact.'").  The Supreme Court in *Boyle* has held that "[t]his enumeration of included enterprises is obviously broad, encompassing any . . . group of individuals associated in fact."  *Boyle v. United States*, 556 U.S. 938, 944 (2009); *U.S. v. Elliott*, 571 F.2d 880, 897 (5th Cir. 1978) (noting that Congress gave the term "enterprise" a very broad meaning).  There is no requirement that the enterprise necessarily pursue lawful means.  *See Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 674 (5th Cir. 2015) (citing *U.S. v. Turkette*, 452 U.S. 576 (1981)).

Here, Plaintiffs have identified 21 RICO "persons" under 18 U.S.C. § 1961(3).  (Dkt. No. 36). Moreover, Plaintiffs have specifically alleged that Baymark Partners was a legal entity enterprise within

the meaning of 18 U.S.C. § 1961(4) (Dkt. No. 36, at ¶ 31). Curiously, the Windspeed Actors make no mention as to why they were not RICO "persons" with respect to the alleged Baymark Partners entity enterprise. Rather, the Windspeed Actors focus all of their efforts on Plaintiffs' alternative allegations of an association-in-fact enterprise. *Compare* Dkt. No. 36, at ¶ 31 ("Baymark Partners is an enterprise within the meaning of 18 U.S.C. § 1961(4) . . .") *with* Dkt. No. 47-1, at 15 ("The only . . . [enterprise] pled by the Plaintiff [sic] . . . is an association in fact."). Because the Windspeed Actors have apparently waived any argument that the Windspeed Actors were not RICO persons with respect to the Baymark Partners enterprise, the Motion should be denied on these grounds.[8]

Moreover, Plaintiffs have properly pled an alternative association-in-fact enterprise.[9] Although far from clear, the Motion appears to argue that because the Windspeed Actors were employees of Windspeed and/or Global, they should be completely absolved of any RICO liability. (Dkt. No. 47-1, at ¶¶ 20, 34-37, 39, 41, 42). In support, the Motion rattles off the purported job titles of each Windspeed Actor and contends that they "were only performing their routine functions as a sales manager, an accountant, working in fulfillment, or providing customer service." (Dkt. No. 47-1, at ¶¶ 20, 39). Based solely on their purported employee statuses with Windspeed and/or Global, the Motion contends that they cannot be considered distinct from Plaintiffs' alternatively alleged association-in-fact enterprise. (Dkt. No. 47-1, at ¶¶ 35-37, 39).

---

[8] To the extent the Windspeed Actors attempt to file a reply brief raising new arguments on this issue, the Court should deem them waived. *See, e.g., Lucas v. Ocwen Home Loan Servicing*, No. 3:13-cv-1057-G, 2014 WL 7059274, n. 12 (N.D. Tex. Nov. 21, 2014) ("[A] Court generally will not consider arguments raised for the first time in a reply brief.").

[9] The Windspeed Actors have not raised any contention in their Motion that the FCA fails to adequately plead the three-structured test for an association-in-fact enterprise under *Boyle v. U.S.*, 556 U.S. 938 (2009) (noting the requirement for a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.). Rather, the Windspeed Actors spill all of their ink contending, primarily, that their role as employees makes them not distinct from the alleged enterprise.

The Motion badly conflates the terms RICO "person" and RICO "enterprise." Although it is true that a RICO defendant may not be both a "person" and an "enterprise," it is equally true that a RICO defendant may be both a person and a *part* of the enterprise. *See, e.g., St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000). Similar to the facts at issue here, federal courts in other cases have universally concluded that employees may be named as RICO persons separate and distinct from the alleged entity-employer RICO enterprise. *See, e.g., Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 648-50 (S.D. Tex. 2016) (and cited cases); *West Tex. Nat. Bank v. FEC Holdings, LP*, No. MO:11-cv-0086-RAJ, 2013 WL 2158658 (W.D. Tex. May 17, 2013); *Provost v. First Guaranty Bank*, No. 18-8845, 2019 WL 3412432, at *4 (E.D. La. July 29, 2019) (and cited cases).

The Fifth Circuit has also recognized this concept of law. For example, in *Abraham*, the court concluded that it was sufficient to survive a Rule 12(b)(6) motion where the plaintiff pled and identified an employee as a RICO person and a corporate-employer as the distinct enterprise. *See Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007) ("This allegation is sufficient to demonstrate that the RICO person, an individual employee of the corporation, is distinct from the RICO enterprise, the corporation itself."); *see also St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) ("Otherwise, an individual member of a collective enterprise, such as an association-in-fact could not be prosecuted for violations of 1962(c) because he or she would not be considered distinct from the enterprise."); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) (holding that RICO applies "when . . . a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority.").

Here, Plaintiffs have alternatively pled an association-in-fact enterprise consisting of the 21-named defendants in this lawsuit. As detailed in the Complaint, each of the 21-named RICO defendants furthered the goal of the unlawful scheme—*i.e.*, effectively stealing the assets of an existing

business and continuing that business through the sale of inventory via a prolonged pattern of racketeering activity. Because each Windspeed Actor is alleged to be a *part* of the association-in-fact enterprise (and not merely part and parcel of Windspeed and/or Global), the Motion's assertion that Plaintiffs have failed to plead an association-in-fact enterprise is mistaken. The Windspeed Actors are separate and distinct for purposes of the RICO enterprise requirement.

### ii.    Moreover, the Motion Mischaracterizes the Factual Allegations in the Complaint Associated with the Windspeed Actors.

In an apparent attempt to blend the Windspeed Actors' respective roles with Windspeed and/or Global, the Motion also seeks to either downplay—or outright ignore—many of the allegations that the FCA has made against the Windspeed Actors. For example, the Windspeed Actors contend that Plaintiffs have provided "no factual allegations . . . regarding the roles the Windspeed Employees played at either [Global] or Windspeed[.]" (Dkt. No. 47-1, at ¶ 19). As discussed below, this is incorrect—and demonstrably so.

First, with respect to Ketter and Tomerlin, Plaintiffs allege that they:

> assisted the Defendants in moving the inventory from ACET Global to Windspeed. Ketter and Tomerlin obtained a temporary storage unit at CubeSmart Self Storage of Dallas ("CubeSmart") in September 2018. **In an attempt to conceal their fraud, the Defendants set up the account with CubeSmart only under Tomerlin's name and using Tomerlin's personal address**.

(Dkt. No. 36, ¶ 86) (emphasis ours). As indicated *supra*, the FCA alleges both an entity enterprise, Baymark Partners, and an association-in-fact enterprise consisting of, among others, Ketter and Tomerlin. The FCA further alleges that the association-in-fact enterprise was designed to fraudulently transfer the assets of an existing company, D&T Partners, to other named RICO defendants. Thus, the FCA's allegations that Ketter and Tomerlin assisting in the scheme through transferring the assets at issue—even going to great lengths to use their own personal identifying information with CubeSmart and not the company's identifying information—demonstrates that Ketter and Tomerlin were intimately involved in furthering the association-in-fact enterprise.

Second, with respect to Torres, the Complaint alleges that:

[i]n 2018, Windspeed, through its then-employee Torres, expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts. That same year, Windspeed began to hold ACET Global's inventory out for sale on its website. As of at least December 12, 2018, Windspeed's website was a carbon copy of the former ACET Global website. The Windspeed website included postings holding out for sale hundreds of products—distinct and unique products (such as the Tear of a Fairy Bracelet) that were in fact one and the same as those reflected on ACET Global's inventory of items in the Foreclosure Sale Agreement . . . (a foreclosure sale that would not, supposedly, take place until the following year when it, according to Windspeed and Baymark, then gave Windspeed ownership over the inventories, including the Tear of a Fairy Bracelet).

(Dkt. No. 36, ¶ 197). Similar to the other Windspeed Actors, the Motion attempts to explain away Torres's actions by contending that she was acting only in her role as an employee of Windspeed and/or Global. (Dkt. No. 47-1, at ¶¶ 20, 39). Plaintiffs will admit that they are somewhat surprised to see this assertion in the Windspeed Actors' Motion. Indeed, Windspeed's discovery response in the state litigation belies this contention:

**INTERROGATORY NO. 17:** Explain why in 2018 Windspeed Trading, LLC's website posted inventory for sale that was owned at that time by ACET Global, LLC?

**ANSWER:**

Subject to and without waiving the General Objections, Windspeed did not maintain a website in 2018 and has never offered or sold any products on or through any website that it maintained or operated for itself.

**Vanessa Torres, a former Windspeed employee, registered a domain at windspeedtradingllc.com in October 2018 without Mr. Szeto's authorization or knowledge. Windspeed believes that Ms. Torres modified or copied a website that was previously used by ACET Global, LLC at www.koolulu.com. The products shown on the windspeedtradingllc.com website were products previously shown on the koolulu.com website.** However, the windspeedtradingllc.com website did not have ecommerce functionality enabled, which meant that products could not be ordered or sold directly from the website.

(Ex. 3) In light of the above discovery response—which states that Torres acted "without [Windspeed's] authorization or knowledge"—it is somewhat perplexing that the Windspeed Actors would now state in this litigation that Torres was "only performing [her] routine functions as . . . [an

employee]." (Dkt. No. 47-1, at ¶ 39). This is particularly so because the same law firm that made the above representation on behalf of its client, Windspeed, in the state litigation, now represents both Windspeed and the Windspeed Actors in this litigation. Although Plaintiffs maintain that the allegations in the FCA are sufficient in and of themselves to support a RICO claim against Torres, to the extent the Court decides otherwise, Plaintiffs would respectfully request permission from the Court for leave to amend the FCA, especially in light of these new arguments raised by the Windspeed Actors and Windspeed (and their joint attorneys) for the first time.[10]

> Third, with respect to Lin, the Complaint alleges:
>
> On December 5, 2018, Lin, a former employee of ACET Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of an ACET Global account. Using her <u>Windspeed email address</u>, Lin listed herself as the "New Account Owner" for <u>an account held in ACET Global's name</u>.

ECF No. 36, at ¶ 209. The Motion fails to address this specific contention against Lin. And in any event, the allegation, taken as true with all of the other allegations in the FCA, support Plaintiffs' allegations that Lin participated in the association-in-fact enterprise to further Defendants' common goal to run off with Global's assets.

---

[10] Given the conflicting representations, and also because RICO claims can subject RICO defendants to joint and several liability, Plaintiffs question whether the Windspeed/Windspeed Actors' attorneys have an impermissible conflict of interest in representing both sides in this federal litigation in addition to solely representing Windspeed in the state litigation. *See, e.g.,* T.D.R.P. 1.06; *see also* Comment 3; *see also In re American Airlines, Inc.*, 972 F.2d 605, 610-11 (5th Cir. 1992) (disqualification proper in cases where district court finds that unethical conduct threatens to taint the trial). Plaintiffs have similar concerns with respect to Hallett & Perrin's representation of the Baymark Defendants and simultaneous role as a RICO defendant, particularly where Hallett & Perrin represented and gave legal and other advice to the Baymark Defendants immediately after receipt of D&T Partners' demand letter. Indeed, only months later, the defendants, including the Baymark Defendants, and presumably under the guidance of their counsel Hallett & Perrin, engaged in the very conduct Plaintiffs allege was committed to further the fraudulent RICO scheme.

### iii. The Complaint Alleges Sufficient Involvement by the Windspeed Actors in the Pattern of Racketeering.

The Motion contends that Plaintiffs have not provided "evidence of allegations" that the Windspeed Actors directed control over the planning of the predicate acts. (Dkt. No. 47-1, at ¶ 39). In addition, the Motion contends that Plaintiffs have not "assert[ed any allegations that they knew or were in agreement to participate in the RICO enterprise." (Id.). The Motion misinterprets Plaintiffs' burdens at this early stage of the litigation.

Indeed, contrary to the Motion's contentions, federal courts have concluded that the RICO statute has broad reach: "[its] net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). And the RICO statute "makes clear that RICO liability is not limited to those with formal positions in the enterprise," nor does it require "primary responsibility" or "significant control." *Reeves v. Ernst & Young*, 507 U.S. 170, 179 (1993). This Court has also recently re-affirmed the longstanding position of the Fifth Circuit Court of Appeals: "[u]nder RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme."[11] *Simmons v. Jackson*, No. 3:15-cv-01700-S-BT, 2019 WL 3043927, at *3 (N.D. Tex. June 7, 2019), *report and recommendation adopted*, No. 3:15-cv-1700-S-BT, 2019 WL 3034668 (N.D. Tex. July 11, 2019) (citing *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987) (per curiam); *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983); *see also Bank of Mongolia v. M&P Global Fin. Svs.*, No. 08-60623, 2010 WL

---

[11] The FCA alleges multiple related instances of mail fraud, wire fraud, money laundering, bankruptcy fraud, and obstruction of justice. *See* Dkt. No. 36, ¶¶ 183-84 (wire fraud); 228 (wire fraud); 231 (wire fraud); 240 (wire fraud); 241(obstruction of justice); 261-293 (bankruptcy fraud); 296 (wire/mail fraud); 297 (obstruction of justice); 305-309 (wire/mail fraud); 36-13 (mail/wire fraud); 36-17 (mail fraud); 36-19 (bankruptcy fraud); 36-20 and 36-21 (mail/wire fraud; money laundering); 36-25 (mail fraud); 36-28 (wire fraud); 36-30 (wire fraud); 36-33 (wire fraud); 36-34 (wire fraud); 36-40 (wire fraud). And these acts were not isolated events—rather, they were an interrelated series of events with a common purpose—to loot a company in order to defraud a creditor.

11549711, at *4 (S.D. Fla. Sept. 3, 2010) (same); *George v. Blue Diamond Petroleum, Inc.*, 718 F. Supp. 539, 550 (W.D. La. July 20, 1989) (same).

As the Fifth Circuit has held, a civil RICO defendant "need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *Casperone*, 819 F.2d at 115; *see also City of El Paso, Tex. v. Jones*, No. EP-09-cv-00119-KC, 2009 WL 4730305, at *22 (W.D. Tex. Dec. 4, 2009). For example, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails." *Finney*, 714 F.2d at 423.

Defendants' reliance on *Reves* to support their position that the Windspeed Actors did not have sufficient involvement in the RICO scheme is mistaken. *See* Dkt. No. 47-1, ¶¶ 39, 42). In that case, the Supreme Court found that the petitioner, an outside accounting firm engaging in the valuation of a farming cooperative, was not clearly involved in the management of the enterprise or acting under the direction of the cooperative's management, and the Court declined to "decide how far § 1962(c) extends down the ladder of operation." *Reves v. Ernst & Young*, 507 U.S. 170, 184 n. 9 (1993). And, as the Fifth Circuit has explained: "*Reves* only requires that a defendant 'take part in' the operation of the enterprise, and not that he direct affairs." *U.S. v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998). Indeed, the Fifth Circuit has counseled against precisely the arguments put forward by the Windspeed Actors:

> In *Reves* the Court held that to be convicted of a substantive RICO offense under §
> 1962(c), "one must participate in the operation or management of the enterprise
> itself." *Reves,* 507 U.S. at 185, 113 S.Ct. at 1173. The Court concluded that in
> enacting § 1962(c) Congress intended "participate" to have the "common
> understanding of the word ... 'to take part in.'" *Id.* at 179, 113 S.Ct. at 1170. The
> Court specifically rejected the D.C. Circuit's suggestion that § 1962(c) requires
> significant control over or within an enterprise. *Id.* at 179 n. 4, 113 S.Ct. at 1170 n. 4.
> The Court held that "the word 'participate' makes clear that RICO liability is not
> limited to those with primary responsibility for the enterprise's affairs, just as the
> phrase 'directly or indirectly' makes clear that RICO liability is not limited to those
> with a formal position in the enterprise...." *Id.* at 179, 113 S.Ct. at 1170. The Court
> explained that "[a]n enterprise is 'operated' not just by upper management but also by

lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184, 113 S.Ct. at 1173.

*United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998).

Here, the allegations in the Complaint, taken as true, show that the Windspeed Actors were sufficiently connected to the fraudulent scheme. More specifically, Plaintiffs have alleged that: (1) Ketter and Tomerlin obtained a temporary storage unit at CubeSmart in September 2018 by using their personal—not company—identifying information to conceal and transfer the assets from Global to Windspeed; (2) Torres misappropriated Global's website and began to close its bank accounts to steer business away from Global and towards Windspeed; (3) Lin executed an Authorize.Net request to establish a new account owner for the Global account to steer business away from Global and towards Windspeed; and (4) Vattana ensured that Groupon reported income between Global and Windspeed in the manner in which the Defendants wanted it reported. Significantly, *all* of these acts occurred well before the purported "foreclosure sale," or the event that the defendants now seemingly contend was the act that legally transferred the assets from Global to Windspeed. (Dkt. No. 47-1, ¶3). The fact that the Windspeed Actors may not have been higher-level management or owners of Global/Windspeed is irrelevant as to whether they were sufficiently connected to the fraudulent scheme for RICO purposes. *See also Boyle*, 556 U.S. at 946 (concluding that the relationships among those associated with the enterprise-in-fact need not involve a "hierarchical structure" or "chain of command.").

In addition, the FCA alleges that each of the Windspeed Actors committed the RICO predicate acts of obstruction of justice due to their falsely testifying under oath. (Dkt. No. 36, ¶ 315). The Motion contends that Plaintiffs' allegations in the FCA that they falsely testified under oath in state court litigation are not sufficient to support allegations of predicate acts under the RICO statute. (Dkt. No. 47-1, at ¶ 50). In support, the Motion cites to two decisions from the Fifth Circuit Court of Appeals: *Snow Ingredients, Inc. v. SnoWizard Incorporated*, 833 F.3d 512 (5th Cir. 2015) and *Zastrow v.*

*Houston Auto Imports Greenway, Ltd.*, 789 F.3d 553 (5th Cir. 2015).  As discussed below, the facts in *Snow Ingredients* and *Zastrow* are inapposite to the facts of Plaintiffs' RICO lawsuit.  (See *id.*).

In *Snow Ingredients*, Southern Snow, a plaintiff, alleged the RICO predicate acts of obstruction of justice and witness tampering.  833 F.3d at 524.  Specifically, it alleged "that SnoWizard, its owner, and its attorneys engaged in a criminal racket based on obstruction of justice."  *Id.* at 520.  On these facts, the Fifth Circuit concluded that bad faith litigation absent corruption could not sustain a civil RICO claim.  *Id.* at 525.  Unlike the facts in *Snow Ingredients*, Plaintiffs have alleged numerous predicate acts under RICO that occurred **prior** to the state litigation.

Similarly, *Zastrow* does not apply to the facts of this case.  In *Zastrow*, the Fifth Circuit assumed that two phone calls and a letter constituted predicate acts under § 1503 for obstruction of justice. 789 F.3d at 560.  Based on these predicate acts—all of which occurred within the month of January 2013—the Fifth Circuit reasonably concluded that Zastrow had failed to meet the RICO continuity requirement.  Id. at 558, 560-61.  Again, these facts do not echo the facts in this case—as shown *supra*, the predicate acts extended over a sufficient period of time to meet the RICO continuity requirement.

The FCA's allegations of concealment and perjury are sufficient to support claims against the Windspeed Actors that they engaged in predicate acts under RICO.  *See, e.g., U.S. v. Smith*, No. 1:19-CR-00669, 2021 WL 3666431, FN 2. (N.D. Ill. Aug. 17, 2021) *Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 512 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) ("acts of concealment may sometimes constitute a predicate act for the purposes of RICO"); *Town of Kearny v. Hudson Meadows Urb. Renewal Corp.*, 829 F.2d 1263, 1269 (3d Cir. 1987) (dicta) (perjury can be predicate under RICO); *C&W Const. Co. v. Bhd. of Carpenters & Joiners of Am., Loc.*, 687 F. Supp. 1453, 1467 (D. Haw. 1988) (a "reasoned rule would allow perjury to be a predicate act"); *U.S. v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern"); *Brook v. Schlesinger*, 898 F. Supp. 1076, 1084 (S.D.N.Y. 1995)

("repeated acts of concealing the invoicing fraud for a substantial period of time . . . adequately alleges continuity element.").

### 2. **Plaintiffs' 18 U.S.C. § 1962(d) Claims.**

The Motion contends that "[b]ecause the claims against the Windspeed Employees fail . . ., the claim for conspiracy under section 1962(d) must also fail and should be dismissed with prejudice as well." (Dkt. No. 47-1, at ¶ 46). As set forth above, Plaintiffs have sufficiently pled a claim against the Windspeed Actors under 18 U.S.C. § 1962(c). In any event, liability under § 1962(d) is governed by the general principles of conspiracy law. *Beck v. Prupis*, 529 U.S. 494, 504 (2000). Thus, so long as the plaintiff sufficiently alleges the elements necessary for a § 1962(d) claim, the conspiracy claim stands—whether or not the companion claims under another subsection of § 1962 are dismissed. *Salinas v. U.S.*, 522 U.S. 52, 65 (1997); *see also In re Motel 6 Sec. Litig*, 161 F. Supp. 2d 227, 237 (S.D.N.Y. 2001) ("It is not [even] necessary that plaintiffs allege a substantive RICO violation in order to prove liability for conspiracy."). Indeed, a defendant may be liable for conspiracy even though he was incapable of committing the substantive offense. *Salinas v. U.S.*, 522 U.S. 52, 64 (1997); *City of New York v. Bello*, 579 Fed. Appx. 15, 17 (2d Cir. 2014) ("A party 'may be liable for [RICO conspiracy] even though he was incapable of committing the substantive offense.").[12] The facts in the FCA are sufficient to demonstrate conspiracy liability under 18 U.S.C. § 1962(d), with or without proof of the 18 U.S.C. § 1962(c) RICO claim.

---

[12] Defendants request that the conspiracy and other claims be dismissed with prejudice. *See* Dkt. No. 47-1, ¶¶ 46, pg. 21, Prayer). To the extent the Court dismisses any of Plaintiffs' claims, Plaintiffs respectfully request leave to amend the Complaint. *See, e.g., Great Plains Trust Co. v. Morgan Stanley Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also Torrey v. Infectious Disease Soc. Of Am.*, No. 5:17-cv-00190-RWS, 2018 WL 10124894 (E.D. Tex. Sept. 27, 2018) (same with respect to RICO claim).

Alternatively, the Motion argues that "RICO claims grounded in predicate acts of fraud, such as mail fraud, wire fraud, and bank fraud, must meet Rule 9(b)'s heightened particularity pleading requirement." (Id., at ¶ 47). 18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of . . . [18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), or 18 U.S.C. § 1962(c)]." Thus, to establish a conspiracy claim under 18 U.S.C. § 1962(d), a plaintiff must establish that: (1) "two or more people agreed to commit a substantive RICO offense;" and (2) the defendant "knew of and agreed to the overall objective of the RICO offense." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).

Due to the clandestine nature of conspiracies, a plaintiff may not be able to muster direct evidence of the conspiracy, and, therefore, the agreement, knowledge of and participation in the conspiracy "may be inferred from the development and collocation of circumstances." *U.S. v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (quoting *U.S. v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)). Moreover, a conspirator need not know all of the details of the enterprise and identities or all of the co-conspirators as long as the evidence allows for the inference that each conspirator knowingly participated in some manner in the overall objective of the conspiracy. *Id.* at 858. But, "[a] conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor." *Chaney*, 595 F.3d at 239 (quoting *Salinas v. U.S.*, 522 U.S. 52, 65 (1997)).

Here, the Complaint provides sufficient allegations to show that the Windspeed Actors agreed to commit a substantive RICO offense and that they knew of and agreed to the overall objective of the RICO offense. Indeed, the Windspeed Actors all objectively acted in concert to steal and divert the assets of Global to Windspeed and also committed the predicate acts of obstruction of justice in an attempt to conceal the fraudulent scheme. Moreover, the Windspeed Actors' objective actions— including Ketter and Tomerlin utilizing personal identifying information—further supports that they knew of the conspiracy and adopted the goal of furthering or facilitating the criminal endeavor.

**C.  State Law Causes of Action.**

The FCA also alleges a cause of action against the Windspeed Actors for civil conspiracy.  To plead civil conspiracy under Texas law, Plaintiffs must allege:  (1) the defendant was a member of a combination of two or more persons; (2) the object of the combination was to accomplish either an unlawful purpose or a lawful purpose by unlawful means; (3) the members had a meeting of the minds on the object or course of action; (4) one of the members committed an unlawful, overt act to further the object or course of action; and (5) the plaintiff suffered injury as a proximate result of the wrongful act.  *Seee, e.g., Agar Corp. v. Electro Circuits Int'l*, 580 S.W.3d 136, 141 (Tex. 2019).

Here, the Windspeed Actors, in conjunction with the other Defendants, took overt acts to accomplish the unlawful purpose of concealing and taking assets from Plaintiffs.  Indeed, Ketter and Tomerlin provided false information to CubeSmart in an attempt to conceal the assets of Global from third parties.  Moreover, as discussed *supra*, all of the Windspeed Actors committed perjury in the state litigation to further this objective.  Plaintiffs are not required to show an express agreement under Texas law—rather, the agreement may be shown by evidence of a course of conduct from which a tacit agreement to act in concert may be inferred.  *See, e.g., Wackman v. Rubsamen*, 602 F.3d 391, 409 (5th Cir. 2010).  The FCA's allegations against the Windspeed Actors are sufficient to show a civil conspiracy.

**V.    Prayer**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Court deny the Windspeed Employees' Motion to Dismiss.  Moreover, to the extent that the Court intends to otherwise grant any portion of their Motion, Plaintiffs hereby request leave to replead to remedy any purported deficiencies.  Finally, the Plaintiffs request that the Court grant Plaintiffs all other relief, at law or in equity, to which they may show themselves justly entitled.

Dated: December 23, 2021          Respectfully submitted,

/s/ *Jason B. Freeman*
Jason B. Freeman
Texas Bar No. 24069736
Matthew L. Roberts
Texas Bar No. 24098330
Thomas L. Fahring III
Texas Bar No. 24074194
Gregory W. Mitchell
Texas Bar No. 00791285
Zachary J. Montgomery (admission forthcoming)
Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone:  214.984.3410
Fax:  214.984.3409
jason@freemanlaw.com

**ATTORNEYS FOR PLAINTIFF**

## Certificate of Service

On December 23, 2021, I filed the foregoing document with the clerk o court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or *pro se* parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

By: /s/ *Jason B. Freeman*
Jason B. Freeman