UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC<br><br>and<br><br>ACET Global, LLC,<br><br>**Plaintiffs,**<br><br>v.<br><br>BAYMARK PARTNERS, LP;<br>BAYMARK PARTNERS<br>MANAGEMENT, LLC;<br>SUPER G CAPITAL, LLC;<br>SG CREDIT PARTNERS, INC.;<br>BAYMARK ACET HOLDCO, LLC;<br>BAYMARK ACET DIRECT INVEST, LLC;<br>et al.,<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL CAUSE NO. 3:21-cv-01171-B |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO SG CREDIT'S AND COLE'S MOTION TO DISMISS AND BRIEF IN SUPPORT

Jason B. Freeman
  TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

# TABLE OF CONTENTS

**TABLE OF CONTENTS**................................................................................................ii

**TABLE OF AUTHORITIES** .....................................................................................iv

I.   **BACKGROUND.** ..................................................................................................1

II.   **RELEVANT FACTS.** ...........................................................................................1

   A.   ACET GLOBAL PURCHASES THE ASSETS OF ACET VENTURE PARTNERS, LLC....... 1

   B.   THE SUPER G COLLATERAL ASSIGNMENT. ............................................................ 2

   C.   DAMIT'S TERMINATION. ........................................................................................ 3

   D.   SZETO AND WINDSPEED TRADING, LLC. ............................................................. 3

   E.   THE "WIND DOWN" OF GLOBAL. .......................................................................... 4

   F.   WINDSPEED. ......................................................................................................... 4

   G.   D&T PARTNERS' DEMAND FOR PAYMENT ON THE D&T NOTE. ................................ 5

   H.   THE COVER UP AND FAKE FORFEITURE NOTICE. ..................................................... 5

   I.   THE PURPORTED FORECLOSURE SALE. .................................................................... 6

   J.   THE FRAUDULENT BANKRUPTCY FILING AND CONTRADICTORY TAX FILINGS. ........ 6

   K.   STATE COURT LITIGATION. .................................................................................... 7

III.   **STANDARD OF REVIEW UNDER RULE 12(B)(6).** ...................................8

IV.   **ARGUMENTS AND AUTHORITIES.** .............................................................9

   A.   OBJECTION TO INCORPORATION AND OTHER PROCEDURAL DEFICIENCIES ............... 9

      1.   *Incorporation* ................................................................................................ 9

      2.   *Failure to Conference* .................................................................................. 9

   B.   CLAIMS BROUGHT ON BEHALF OF GLOBAL AND BAYMARK ACET HOLDCO. ........... 9

      1.   *The Verification* ......................................................................................... 11

      2.   *Contrary to the Defendants' Allegations, the Plaintiffs Have, In Fact, Alleged Member status.* ........... 11

   C.   SUCCESSOR LIABILITY, AGENCY, AND PIERCING THE CORPORATE VEIL.................. 12

   D.   RICO CLAIMS. ................................................................................................... 13

      1.   *Plaintiff Have Sufficiently Pled Claims Under 18 U.S.C. § 1962(c).* ......... 14

         i.   SG Credit and Cole are RICO Persons. ................................................ 15

         ii.   Plaintiffs Have Sufficiently Alleged an Association-in-Fact Enterprise. ....... 17

         iii.   Plaintiffs Have Sufficiently Alleged a Pattern of Racketeering Activity. ...... 18

         iv.   Plaintiffs have Sufficiently Alleged that SG Credit and Cole Participated in the Enterprise. ...... 19

         v.   Plaintiffs have Sufficiently Alleged Causation for its Claims under 18 U.S.C. § 1962(c) and (d). ...... 20

      2.   *Plaintiffs Have Sufficiently Pled Claims Under 18 U.S.C. § 1962(a).* ....... 21

      3.   *Plaintiffs Have Sufficiently Pled Claims Under 18 U.S.C. § 1962(d).* ....... 22

   E.   STATE LAW CAUSES OF ACTION. ........................................................................ 23

      1.   *Plaintiffs Have Sufficiently Pled Claims of Fraud.* ..................................... 23

      2.   *Plaintiffs Have Sufficiently Pled Claims of Aiding and Abetting Breach of Fiduciary Duty.* ...... 24

      3.   *Plaintiffs Have Sufficiently Pled Claims Under the Texas Uniform Fraudulent Transfer Act.* ...... 25

      4.   *Plaintiffs Have Sufficiently Pled Claims of Civil Conspiracy.* ................... 26

      5.   *Plaintiffs have Sufficiently Pled Claims of Respondeat Superior.* ............. 26

V.   **PRAYER.** ...........................................................................................................27

**CERTIFICATE OF SERVICE** ............................................................................... 28

## TABLE OF AUTHORITIES

### Cases

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ............................................................................................................ 19

*Bank of Mongolia v. M&P Global Fin. Svs.*,
2010 WL 11549711 (S.D. Fla. Sept. 3, 2010) ............................................................... 15

*Black Cat Exploration & Production, LLC v. MWW Capital Limited, et al.*,
2015 WL 12731751 (N.D. Tex. April 29, 2015) ............................................................. 9

*Boyle v. U.S.*,
556 U.S. 938 (2009) ...................................................................................................... 14, 16

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ............................................................................................................ 19

*Cardwell v. Gurley*,
2018 WL 3454800 (Tex. App.—Dallas July 18, 2018) ................................................ 10

*Casperone v. Landmark Oil & Gas Corp.*,
819 F.2d 112 (5th Cir. 1987) ............................................................................................ 15

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ............................................................................................................ 13

*Chaney v. Dreyfus Serv. Corp.*,
595 F.3d 219 (5th Cir. 2010) ............................................................................................ 21

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ......................................................................................... 7, 8

*Crowe v. Henry*,
43 F.3d 198 (5th Cir. 1995) .............................................................................................. 15

*Delta Truck & Tractor, Inc. v. J.I. Case Co.*,
855 F.2d 241 (5th Cir. 1988) ............................................................................................ 13

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) .............................................................................................. 5

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011) .............................................................................................. 1

*George v. Blue Diamond Petroleum, Inc.*,
718 F. Supp. 539 (W.D. La. July 20, 1989) .................................................................. 15

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
492 U.S. 229 (1989) ............................................................................................................ 17

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) ................................................................................................................ 19

*Howell Petroleum Corp. v. Weaver*,
780 F.2d 1198 (5th Cir. 1986) ............................................................................................ 8

*Janvey v. Dillon Gage, Inc. of Dallas*,
856 F.3d 377 (5th Cir. 2017) ............................................................................................ 24

*Lowrey v. Texas A&M Univ. Sys.*,
117 F.3d 242 (5th Cir. 1997) .............................................................................................. 8

*Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co.*,
86 Tex. 143, 24 S.W. 16 (1893) ...................................................................................... 23

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) ................................................................................................................ 18
*Saffran v. Boston Sci. Corp.,*
   2008 U.S. Dist. LEXIS 52557 (E.D. Tex. July 9, 2008) ........................................................ 9
*Salinas v. U.S.,*
   522 U.S. 52 (1997) .............................................................................................................. 21
*Sedima v. Imrex Co., Inc.,*
   473 U.S. 479 (1985) .......................................................................................................13, 14
*Simmons v. Jackson,*
   2019 WL 3043927 (N.D. Tex. June 7, 2019) ...................................................................... 15
*Sneed v. Webre,*
   465 S.W.3d 169 (Tex. 2015) ................................................................................................ 10
*St. Paul Mercury Ins. Co. v. Williamson,*
   224 F.3d 425 (5th Cir. 2000) .............................................................................................. 20
*Surowitz v. Hilton Hotels Corp.,*
   383 U.S. 363 (1966) ............................................................................................................ 11
*Swierkiewicz v. Sorema N. A.,*
   534 U.S. 506 (2002) .............................................................................................................. 8
*Tigrett v. Pointer,*
   580 S.W.2d 375 (Tex. App.—Dallas 1978, writ refused n.r.e.) ........................................... 23
*Tuscano v. Tuscano,*
   403 F. Supp. 2d 214 (E.D.N.Y. 2005) ................................................................................ 10
*U.S. v. Elliott,*
   571 F.2d 880 (5th Cir. 1978) .............................................................................................. 18
*U.S. v. Maltos,*
   985 F.2d 743 (5th Cir. 1992) .............................................................................................. 21
*U.S. v. Posada-Rios,*
   158 F.3d 832 (5th Cir. 1998) .............................................................................................. 21
*U.S. v. Turkette,*
   452 U.S. 576 (1981) ............................................................................................................ 14
*United States v. Finney,*
   714 F.2d 420 (5th Cir. 1983) .............................................................................................. 15
*Varela v. Gonzales,*
   2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) .................................................................... 13
*Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.,*
   920 F.3d 958 (5th Cir. 2019) .............................................................................................. 19

## Statutes

18 U.S.C. § 1961(1) .................................................................................................................. 14
18 U.S.C. § 1961(3) .............................................................................................................14, 15
18 U.S.C. § 1961(4) .................................................................................................................. 14
18 U.S.C. § 1961(5) .................................................................................................................. 14
18 U.S.C. § 1962(a) ........................................................................................................13, 20, 21
18 U.S.C. § 1962(b) .................................................................................................................. 21
18 U.S.C. § 1962(c) ....................................................................................................13, 14, 19, 21
18 U.S.C. § 1962(d) ....................................................................................................13, 19, 21, 24

18 U.S.C. § 1964(c) ..................................................................................................... 13
Tex. Bus. Orgs. Code § 101.463 .................................................................................... 9
Tex. Bus. Orgs. Code § 101.463(a) .............................................................................. 10
Tex. Bus. Orgs. Code § 101.463(b) ........................................................................... 9, 10
Tex. Bus. Orgs. Code § 101.463(c) .............................................................................. 10
Tex. Bus. & Com. Code § 24.005(a)(1) ....................................................................... 24

## Rules

Fed. R. Civ. P. 9(b) ........................................................................................................ 8
Fed. R. Civ. P. 12(b)(6) ......................................................................................... 1, 7, 8

## Other Authorities

L.R. 7 (N.D. Tex.) .......................................................................................................... 9
Pub. L. 91–452, § 904(a), 84 Stat. 947 (Oct. 15, 1970) ............................................. 14

Plaintiffs, by and through counsel, file this response in opposition to Defendants SG Credit Partners, Inc.'s ("SG Credit") and Marc Cole's ("Cole") motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion").  For the reasons set forth below, Plaintiffs respectfully request that this Court deny the Motion.

## I.      Background.

Plaintiffs' Amended Complaint (the "Complaint") alleges causes of action against SG Credit and Cole under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  In addition to the RICO claims, the Complaint alleges causes of action under Texas law for:  (i) aiding and abetting breach of fiduciary duties; (ii) claims under the Texas Uniform Fraudulent Transfer Act; and (iii) civil conspiracy.  The 157-page Complaint is well pled.  Taken together, the Complaint alleges that the Defendants, including SG Credit and Cole, engaged in pre-conceived, collective, and unlawful efforts to effectively steal and misappropriate all of the assets from an existing business, D&T Partners, LLC ("D&T Partners"), through the fraudulent guise of what the Defendants now attempt to label an after-the-fact and lawful foreclosure and/or sale.

## II.     Relevant Facts.

### A.   ACET Global Purchases the Assets of ACET Venture Partners, LLC.

In the summer of 2017, Baymark Partners, LP ("Baymark") and its principals, David Hook ("Hook"), Tony Ludlow ("Ludlow"),[1] and Matthew Denegre ("Denegre") approached Tomer Damti ("Damti"), seeking to purchase the assets of ACET Ventures, LLC ("ACET"), an e-commerce business in which Damti owned. (Dkt. No. 36, ¶ 56).  To facilitate the purchase of assets, Baymark formed another entity, Global.  (*Id.*, ¶ 57).  And, through an Asset Purchase

---

[1] Baymark, Hook, and Ludlow have been named in at least one other federal RICO lawsuit.  *See Greb et al. v. Singleton et al.*, No. 3:18-cv-01439-M (N.D. Tex.), Dkt. No. 1.; *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (noting that it is well-established and "clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.").

Agreement, dated July 14, 2017 (the "APA"), Global purchased all of the assets of ACET.[2]   (*Id.*, ¶ 58; *see also* Exhibit 23).

Under the APA, Global agreed to:  (1) pay $850,000 to D&T Partners, LLC ("D&T Partners"), subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners; and (3) provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC ("Baymark Holdco").  (*Id.*, ¶ 64). As part of the transaction, Global executed a promissory note with D&T Partners, memorializing the $3,230,000 payable to D&T Partners (the "D&T Note").  (*Id.* ¶ 65.  The D&T Note required a first installment payment to D&T Partners on October 31, 2018.  (*Id.*).  Separately, Baymark Holdco entered into a security agreement with D&T Partners.  (*Id.*, ¶ 66).

### B.   The Super G Collateral Assignment.

After the APA, Hook caused Global to enter into a Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement (the "Collateral Assignment") with Super G Capital, LLC ("Super G"), which provided that Super G would provide a term loan facility of up to $1 million (the "Super G Note").  (*Id.*, ¶ 68).

D&T Partners subordinated its security interest to Super G based on Hook, Ludlow, and Baymark's representations in June and July of 2017 that:  (1) Damti would maintain managerial authority and discretion; and (2) Global did not intend (and that Baymark, Hook, and Ludlow did not intend to cause it) to default on the loan to D&T Partners or default on the loan from Super G. (*Id.*, ¶ 77).

---

[2] As mentioned *infra*, Denegre had a calendar invite on Outlook a month **prior** to the execution of the APA regarding "Windspeed." Windspeed Trading, LLC would eventually be the name of the entity that all of the parties would elect to use in 2018 as a vehicle to fraudulently transfer the assets of Global away from D&T Partners.  And, the name of Windspeed Trading, LLC was chosen because William Szeto's ("Szeto") father was partial to that name prior to his death— *i.e.*, the other Defendants in this lawsuit had no connection to the name Windspeed Trading, LLC.  (Dkt. No. 36, ¶ 63). Szeto would also later become the CEO of Global and Windspeed and effectively the 20% owner of Windspeed.  *See infra*.

### C.  Damti's Termination.

On February 12, 2018, Denegre, purporting to represent Ludlow and Baymark, informed Damti that he was terminating Damti's employment with Global.  (*Id.*, ¶ 79; *see also* Exhibit 25). Although Denegre, who was not an employee or agent of Global, stated that the termination was based on poor performance, at the time of the February termination, January 2018 revenues for Global were 248.26% more than those in January 2017.  (*Id.*, ¶¶ 79-80).

### D.  Szeto and Windspeed Trading, LLC.

When the APA was entered into, Baymark had not yet formed Windspeed. (Id., ¶ 63). Curiously, however, Denegre had a recurring weekly call scheduled on his calendar for "Windspeed" **that began roughly a month prior to the closing date of the APA**.  (*Id.*).

On or around February 14, 2018, Szeto became the CEO of Global.  (*Id.*, ¶ 81).  According to Hook, Szeto "work[ed] for free" with no financial promise made to him or expectation of a financial award.  (*Id.*, ¶ 82).

Although Baymark was in compliance with the Super G Note in February 2018, or the month in which Damti was terminated, Global "defaulted" on its note to Super G shortly after Szeto was named CEO of Global.  (*Id.*, ¶¶ 84-85).  At the time of the default, "Global had millions of dollars of assets and an ongoing business operation."  (*Id.*, ¶ 224).

Because of the "default," Baymark and Super G entered into a Forbearance Agreement in April of 2018, which provided for a forbearance period until October 25, 2018.  (*Id.*, ¶ 86). Significantly, the forbearance period ended just days before the D&T Note payments would become due to D&T Partners.  (*Id.*).  Pursuant to the Forbearance Agreement, Global would "wind down" and transfer its assets and business operations to a newly-formed entity:  Windspeed.  (*Id.*). Super G relied on Baymark to "come up with [the] plan" and Baymark and its principals offered the restructuring plan to Super G.  (*Id.*, ¶ 115).

### E.  The "Wind Down" of Global.

In April of 2018, Baymark began to set the stage to execute their "wind down" plan.  (*Id.*, ¶ 96).  Szeto, while serving as the CEO of Global, worked closely with Denegre and Ludlow to fine tune the "wind down" plan and, ultimately, to put the plan into action.  (*Id.*). According to an email written by Ludlow, the parties expressly wanted to ensure that Global did not "default on Tomer [Damti's] debt and have [Damti] regain the company."  (*Id.*, ¶ 111).

On September 27, 2018, while he was still CEO of Global, Szeto filed a Certificate of Formation Limited Liability Company for Windspeed.  (*Id.*, ¶ 122).  Szeto continued to serve as CEO of both Global and Windspeed at the same time. (*Id.*).

### F.  Windspeed.

On October 18, 2018, or two weeks before the D&T Note payment would become due on October 31, 2018, Szeto, on behalf of Windspeed; Ludlow, on behalf of BP Management; and Cole, on behalf of Super G, executed an Amended and Restated Company Agreement of Windspeed ("Company Agreement").  (*Id.*, ¶ 152).  Under the Company Agreement, they became business partners with the following beneficial ownership:  BP Management (40%), Super G (40%), and Szeto (20%).  (*Id.*, ¶¶ 152, 157).  The Company Agreement provided Super G and BP Management with perpetual authority to appoint and control a board member of Windspeed's three-person board, in addition to the right to replace those board members.  (*Id.*, ¶ 164).  Under the Company Agreement, the board members managed all of the business and affairs of Windspeed by majority—*i.e.*, Super G and BP Management maintained complete control.  (*Id.*).

In October of 2018, Szeto began serving as the CEO of Windspeed.  (*Id.*, ¶ 177).  Later, every employee of Global was transferred to Windspeed after the "wind down" was executed.  (*Id.*, ¶ 178).  Specifically, each employee was notified on October 9, 2018, via email that they had been

terminated from Global effective September 28, 2018, and that their employment with Windspeed had become effective thereafter. (*Id.*, ¶ 179).

### G. D&T Partners' Demand for Payment on the D&T Note.

D&T Partners demanded payment on the D&T Note. (Dkt. No. 36, at ¶ 19). Indeed, by letter dated December 9, 2018, D&T Partners' attorney sent a demand letter to Baymark, Global, and Hallett & Perrin. (Ex. 1)[3]  In the demand letter, D&T Partners communicated to Baymark, Global, and Hallett & Perrin that the D&T Note was in default. (Id.)

### H. The Cover Up and Fake Forfeiture Notice.

Many months after the purported transfer of Global's assets to Windspeed and the wind-down of Global, and apparently to circumvent the growing demands by D&T Partners for Defendants to pay on the D&T Note, on January 31, 2019, Super G (in coordination with Baymark) issued a Notice of Forfeiture ("Forfeiture Notice"). (*Id.*, ¶ 226; *see also* Ex. 17). The Baymark Defendants and Windspeed engaged Hallett & Perrin to represent them, and Hallett & Perrin drafted the Forfeiture Notice. (*Id.*, ¶¶ 215-222). The Forfeiture Notice was sent to the attention of Hook at his Baymark address (not the old Global address). (*Id.*). Moreover, the Forfeiture Notice was issued well after all parties, including Hallett & Perrin, had full knowledge that the assets at issue (*i.e.*, Global's assets) had already been transferred months before to Windspeed, an entity that was beneficially owned and controlled by Super G, BP Management, and Szeto. (*Id.*, ¶ 227). Because Global had already transferred all of its assets and operations to Windspeed several months before, there was no physical foreclosure sale as Windspeed continued those operations and sold off the inventory. (*Id.*, ¶ 233).

---

[3] Although not attached to the Complaint, the Court may consider the demand letter sent by D&T partners to the defendants because it is referenced in the Complaint. (Dkt. No. 36, at ¶ 19). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

### I.   The Purported Foreclosure Sale.

The parties executed a Foreclosure Sale Agreement that reflected a sales date of March 1, 2019.  (*Id.*, ¶ 242; Complaint, Ex. 18).  However, the parties executed and completed the sale after March 1, 2019.  (*Id.*, ¶ 249).  Indeed, the parties purposely backdated the Foreclosure Sale Agreement to make it appear as if the sale had occurred earlier.  (*Id.*). In addition, according to the Foreclosure Sale Agreement, the "purchase price" (*i.e.*, the amount Windspeed agreed to "pay" to Super G) equaled the exact amount that was owed under the Super G Note.  (*Id.*, ¶ 246).

### J.   The Fraudulent Bankruptcy Filing and Contradictory Tax Filings.

On October 23, 2019, Global filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy with the Eastern District of Texas seeking relief under Chapter 7 of the Bankruptcy Code. (Dkt. No. 36, ¶ 252; *see also* Ex. 19).  Ludlow signed the petition on behalf of Global. (*Id.*) In the petition, Global acknowledged that it owed ACET Ventures Partners, LLC $3,230,000. (*Id.*) Global also asserted that it had transferred within 1 year $30,000 of property to Super G on "01/2019" and that it had no significant assets. (*Id.*)

The bankruptcy petition contained a multitude of false statements designed to conceal assets from the bankruptcy trustee and from D&T Partners, the latter of which had already filed a lawsuit against Global, Windspeed, and Baymark in the District Court of Dallas County on July 12, 2019.[4]  (Dkt. No. 36, ¶ 15).  For example, the petition requested information as to whether "inventories of the debtor's property . . . [had] been taken within 2 years before filing this case?" (Dkt. No. 36, ¶ 269-270).  Ludlow and Global answered "No".  (*Id.*, ¶ 270).  In deposition testimony in the state court action, the Global parties admitted that this answer was wrong and that

---

[4] Plaintiffs request the Court take judicial notice of this lawsuit in state court.  *See D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC),* Plaintiff v. *ACET Global, LLC, et al.,* No. DC-19-09828 (District Court of Dallas County, 116th Judicial District).

only days prior to the bankruptcy filing they had reviewed Global's purported inventory. (*Id.*, ¶¶ 270-274). In addition, the petition requested Global to "[l]ist any property kept in storage units or warehouses within one year before filing this case." (*Id.*, ¶ 281). Ludlow and Global answer "None". (*Id.*). However, CubeSmart records indicate that Tomerlin, Ketter, and/or Windspeed moved Global's inventory into storage at least as of October 25, 2018 and moved such inventory from storage on or about November 16, 2018. The bankruptcy petition contained many other fraudulent representations. (*Id.*, ¶ 15).

Significantly, the federal tax returns of the relevant entity, Baymark ACET Holdco, LLC, which held Global's membership interests, represented that Global's assets were significantly more than Global had reported on the bankruptcy petition. (Dkt. No. 36, ¶ 14). More specifically, on its 2018 IRS Form 1065, *U.S. Return of Partnership Income*, Baymark ACET Holdco, LLC represented that it had $3,023,970 of total assets as of December 31, 2018. (*Id.*, ¶ 17). In addition, the 2019 IRS Form 1065, *U.S. Return of Partnership Income*, for Baymark ACET Holdco, LLC reported that the entity had received $2,907,290 in "proceeds" from the "foreclosure sale" of Global's assets. (*Id.*, ¶ 18).

**K. State Court Litigation.**

During the state court litigation, the Defendants attempted to further the RICO enterprise through more deceit and strong-arm tactics. For example, during the deposition of Denegre, after Plaintiffs' counsel asked an important question regarding the foreclosure sale at issue, Ludlow stated: "Matthew [Denegre], shut the fuc* up." (Dkt. No. 36, ¶ 1). Thereafter, taking his cue from Ludlow, Denegre refused to answer the question. (*Id.*). Szeto also engaged in discussions with the Global/Windspeed employees prior to their scheduled depositions and instructed them on how to answer questions that may be asked by Plaintiffs' counsel. (FCA, Ex. 2, Tr. 109:15-25;

115:19-25; 116:1-3).  To date, Windspeed continues its business operations with Szeto as its CEO. (FCA, Ex. 2, Tr. 32:1-5).

### III.    Standard of Review under Rule 12(b)(6).

In the Fifth Circuit, motions to dismiss for failure to state a claim under Rule 12(b)(6) are "viewed with disfavor and . . . [are] rarely granted." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). The complaint must be liberally construed in favor of the plaintiff, and all facts pled in the complaint must be taken as true. *Collins*, 224 F.3d at 498.  Accordingly, the district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*  The relevant question in determining whether a motion to dismiss should be granted is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Id.*

According to Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b)'s heightened particularly requirement with respect to claims of fraud is ai limited exception to Rule 8's notice pleading standard.  *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. . . . This Court, however, has declined to extend such exceptions to other contexts.").  Accordingly, Rule 9(b) requires the Plaintiffs to plead the wire, mail, and bankruptcy fraud predicates with particularity; however, Rule 9(b) is inapplicable to all other RICO elements.  *See, e.g., Howell Petroleum Corp. v. Weaver*, 780 F.2d 1198, 1199 (5th Cir. 1986) (holding that pleading RICO elements is governed by the "liberal notice-pleading procedure of the Federal Rules of Civil Procedure).  To the extent

the Defendants attempt to broaden Rule 9(b)'s application to non-fraud elements, they are mistaken, and only the Rule 8 pleading standard should apply.

**IV.** **Arguments and Authorities.**

    **A.** **Objection to Incorporation and other Procedural Deficiencies**

        **1.** **Incorporation**

At the outset, Plaintiffs object to SG Credit's and Cole's attempt to incorporate by reference arguments from six (6) separate motions to dismiss filed by the other Defendants in this litigation. (Dkt. No. 48-1, at 9, 10-11). The Northern District has held that it is improper to incorporate by reference arguments from other legal filing in the same litigation. *See Black Cat Exploration & Production, LLC v. MWW Capital Limited, et al.*, No. 1:15-cv-51-BL, 2015 WL 12731751 (N.D. Tex. April 29, 2015) (citing *Saffran v. Boston Sci. Corp.*, No. 2-05-cv-548, 2008 U.S. Dist. LEXIS 52557, n.5 (E.D. Tex. July 9, 2008) (holding that "allowing a party to incorporate multiple arguments by reference into its motion without obtaining prior leave of court procedurally 'eviscerates the court's page limit restriction.'")). This is especially the case here, where this Motion and motions to dismiss of most other Defendants in this litigation are at the 25-page limit for briefs under L.R. 7.1(c).

Plaintiffs further object to Defendants' reference to or attempted incorporation of any other materials not specifically included in their appendix, as required by L.R. 7.1(i)(1).

        **2.** **Failure to Conference**

Pursuant to the Motion, Defendant Super G "conditionally moves" to transfer venue of claims for which this Court denies its motion to dismiss. However, Super G failed to conference on such relief, as is required by L.R. 7.1(a). Therefore, this Court should not consider the alternative relief requested.

    **B.** **Claims Brought on Behalf of Global and Baymark ACET Holdco.**

To begin with, Plaintiff has brought claims on behalf of ACET Global, LLC *directly*.  In addition, out of an abundance of caution, plaintiff has styled an action derivatively on behalf of ACET.  (FAC Caption and ¶ 33) ("Plaintiff ACET Global . . . appears here as a direct plaintiff and a derivative plaintiff.).  (See also FAC ¶ 5, fn. 8).

Plaintiff has asserted a derivative action under section 101.463(b) of the Texas Business Organizations Code.  As the Texas Supreme Court has cautioned, "[i]t is critical to recognize, and indeed outcome determinative in this case, that article 5.14's [the predecessor to section 101.463][5] standing, demand, and mandatory dismissal requirements **do not apply to shareholder derivative lawsuits brought on behalf of closely held corporations**.  *Sneed v. Webre*, 465 S.W.3d 169, 181 (Tex. 2015) (note that the provisions apply to LLCs).

Moreover, Section 101.463(b) provides that a claim "by a member of a closely held limited liability company may be treated by a court as a direct action brought by the member for the member's own benefit."  TBOC § 101.463(c).  All that is necessary is that "justice [so] require"— a standard that is imminently satisfied on the facts before the Court.

As such, under Texas law, the "derivative" claims at issue are actually "direct actions." And as set forth in the final paragraph of the FAC, "Plaintiff requests that, to the extent this case is a derivative proceeding, the Court treat this case a direct action brought by the member for the member's own benefit pursuant to Tex. Bus. Org. Code § 101.463(c)."  (FAC ¶ 393).  Plaintiff notes that the claims at issue are brought under Texas law, and Texas law allows them to be treated as "direct" claims.[6]

---

[5] *Cardwell v. Gurley*, No. 05-09-01068-CV, 2018 WL 3454800, at *6 (Tex. App.—Dallas Jul. 18, 2018) ("A closely-held limited liability company is defined as a company with less than thirty-five shareholders and "no shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association." *Id.* at § 101.463(a). Article 5.14(L)(1) of the now-superseded Texas Business Corporations Act (TBCA), and its successor in the TBOC, include the same provision for closely-held corporations.").

[6] To the extent that the Court so finds, Defendants' objections based on derivative-claim procedure all become moot and the additional complexities created by such a characterization go away.

### 1.    The Verification

To the extent that the Court does not find that the claims by ACET Global should be treated as a direct action, Plaintiffs next address the verification argument.  To the extent Defendants raise a failure to comply with technical requirements, such as a verification, any such items can be easily addressed by repleading, if the Court believes that necessary.  However, as courts across the country have recognized, "[t]he verification requirement of rule governing shareholder derivative actions is not intended to be a general impediment to shareholder derivative actions, but, rather, to those derivative lawsuits brought solely for the purpose of harassment or to force a quick settlement." *Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 222 (E.D.N.Y. 2005).  Courts have explained that:

> Although the complaint is not verified, the plaintiff's failure to do so is not fatal to the lawsuit. The verification requirement of Rule 23.1 is not intended to be a general impediment to shareholder derivative actions but, rather, to those derivative lawsuits brought solely for the purpose of harassment or to force a quick settlement. *See Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed.2d 807 (1966). Where appropriate, courts allow plaintiffs to cure a verification defect by submitting an affidavit.

*Id.*    Plaintiff has supplemented its submission with a verification, curing any alleged defect. (Doc. No. 64).

### 2.    Contrary to the Defendants' Allegations, the Plaintiffs Have, In Fact, Alleged Member status.

With respect to "Holdco," the Defendants makes a singular argument: They tell the Court that "the FAC does not plausibly allege that any named Plaintiff is a member of either Holdco or ACET." (Mot. to Dismiss, p. 5).  On the contrary, Plaintiffs in fact alleged precisely that.  The FAC specifically alleges that D&T Partners has had "a 25% common membership interest in Baymark ACET Holdco, LLC" since July 20, 2017. (FAC ¶ 64).  Moreover, the FAC alleged precisely that D&T was a member in ACET Global:

On March 31, 2021, D&T Partners and Tomer Damti caused his 100%-owned entity, D&T Partners, LLC, to exercise its rights (pursuant to section 6(b)(vi) of the Security Agreement dated July 20, 2017) to effect the transfer of 59% of the Membership Interests of ACET Global, LLC into the name of D&T Partners, LLC. Damti owns 100% of the membership interests of D&T Partners, LLC and has sole management authority over D&T Partners, LLC. Pursuant to its rights under the relevant security agreement and company agreement, D&T Partners, LLC was appointed and is **the sole manager of ACET Global, LLC**. As a result, Plaintiff (through D&T Partners, LLC) has legal ownership of ACET Global, LLC.

(FAC ¶ 5, fn 8).

### C. Successor Liability, Agency, and Piercing the Corporate Veil.

The allegations that Credit Partners assumed the ACET relationship and loan is not "vague and wholly conclusory," as Defendants allege. It is quite clear, as is the viability of Plaintiff's well-pled agency and veil-piercing theories.

Bellah worked for SG Credit. SG Credit was the company that took over the Windspeed and Acet relationship and, according to Cole's sworn testimony, serviced Windspeed (even as the date of his deposition in 2021). To begin with the obvious, the names SG Credit and SG Capital imply that the entities are connected. According to the sworn testimony of Marc Cole, the "SG" in SG Credit Partners is an acronym that stands for "Super G"—that is, "Super G" Credit Partners, LP. (FAC, p. 17 n. 29). In 2021, Cole appeared as the "corporate representative" for Super G, although he was working full time for, as was the CEO and an owner of, SG Credit Partners. (FAC, Exh. 8). Cole testified and confirmed that there was a direct relationship between SG Credit Partner and Super G Capital. (*Id*. p. 18:16-23). He specifically testified that as of March 29, 2021 (the date of his deposition), SG Credit Partners' staff was working with Windspeed. (*Id.*). When asked if Super G still held him out as an employee of Super G at that date (of his deposition), he answered "yes and no." (*Id.* at 19:01-03). He admitted, that as of that date, "yes," that "Super G ha[d] maintained a website with my [Cole's] appearance on it. (*Id.* at 19:03-5).

When Cole "transitioned" to SG Credit, he and his associates maintained access to the records from their group's loan clients, **including ACET Global**.  (FAC ¶ 76) The ACET Global transaction was transferred to Cole and SG Credit, and Cole and his associates oversaw and handled the ACET matter—continuing the fraudulent scheme in the same manner.  (FAC ¶ 76) According to Cole, that occurred in 2018.  (FAC, Exh. 8, p. 16:15-20).  Secretary of State records in California demonstrate that the new entity (SG Credit Partners, Inc.) was registered 03/15/2018. Cole testified that he spun off "my [his] team" and the loans that he made, "called cash flow loans of which ACET and Windspeed fell under."  (FAC, Exh. 8, 19:20-20:02).  And Darrin [Super G] would have absolutely no knowledge of those transactions."  (FAC, Exh. 8, 19:20-20:02).  So he spun off, creating SG Credit, and brought *his* loan business, which as he testified, "ACET and Windspeed fell under."  (*Id.*).  He testified that he "originated loans as Super G Capital and sold those loans to SG Credit Partners.  And when that pool of assets got large enough to generate income to hire my team, we [his team, including Bellah] resigned from Super G Capital and became employees of SG Credit Partners."  (*Id.* at 70:23-71:04).

As should be clear from this briefing and the related responsive briefings, veil piercing is certainly "an option for Plaintiffs."  The facts here present precisely the type of fraud and abuses that justify piercing the veil under Texas law.  And Bellah was clearly an agent of SG Credit Partner—more to the point, Plaintiffs have clearly pled it and pled well.  And at any rate, a Rule 12(b)(6) motion in this fashion is simply not the proper vehicle to argue this theory of recovery in the guise of a motion for summary judgment.  If Plaintiffs prove out their allegations, veil piercing will be available.

### D.  RICO Claims.

"The Racketeer Influence and Corrupt Organization Act . . . has been interpreted to reach even 'respected and legitimate' businesses that violate the Act's prohibitions."  *Varela v. Gonzales,*

2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) (citing *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985)). "RICO both protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it . . . and also protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001). Accordingly, 18 U.S.C. § 1964(c) provides a private civil action and treble damages for those who are injured by violations of RICO's substantive provisions, including 18 U.S.C. § 1962(c) and (d). *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985). Plaintiffs have brought claims against the Defendant SG Credit under 18 U.S.C. § 1962(a), (c), and (d) and Defendant Cole under 18 U.S.C. § 1962(c) and (d). (Dkt. No. 36, ¶¶ 310-367).

Under a civil RICO claim, three threshold elements must be met: (1) a person must engage in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). "RICO is to be read broadly" and "'liberally construed to effectuate its remedial purposes.'" *Sedima*, 473 U.S. at 497-98 (quoting Pub. L. 91–452, § 904(a), 84 Stat. 947 (Congressional statement of intent)). These "'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima*, 473 U.S. at 498.

### 1.  Plaintiff Have Sufficiently Pled Claims Under 18 U.S.C. § 1962(c).

18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO "enterprise" is "any

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *see also Boyle v. U.S.*, 556 U.S. 938, 944 (2009) ("This enumeration of included enterprises is obviously broad, encompassing any . . . group of individuals associated in fact."); *U.S. v. Turkette*, 452 U.S. 576, 583 (1981) (holding that an "enterprise is an entity, . . . a group of persons associated together for a common purpose of engaging in a course of conduct"). "Racketeering activity" is defined under RICO to mean certain proscribed acts, *see* 18 U.S.C. § 1961(1), and a "pattern of racketeering activity" means "at least two acts of racketeering activity . . . which occurred within ten years . . . after the commission of a prior act of racketeering activity," *see* 18 U.S.C. § 1961(5).

Here, Plaintiffs have identified 21 RICO "persons" under 18 U.S.C. § 1961(3).  (Dkt. No. 36).  Plaintiffs have alleged that Baymark Partners is an entity enterprise within the meaning of 18 U.S.C. § 1961(4).  (Dkt. No. 36, at ¶31).  Plaintiffs have also alternatively pled that the Defendants, represent an association-in-fact enterprise under 18 U.S.C. § 1961(4).  (Dkt. No. 36, at ¶315).

### i.   SG Credit and Cole are RICO Persons.

Contrary to Defendants' assertions, Defendants are both clearly RICO persons under 18 U.S.C. § 1961(3).  As noted above, a RICO "person" is simply "any individual or entity capable of holding a legal or beneficial interest in property."  The Fifth Circuit has recognized that "[t]his is a very broad definition."  *Crowe v. Henry*, 43 F.3d 198 (5th Cir. 1995).

SG Credit and Cole contend that they are not RICO persons because they have not engaged in any of the predicate acts constituting a pattern of racketeering activity.  (Dkt. No. 48-1, at 11-12).  However, a plaintiff need not show that each of the associates in an associate-in-fact enterprise committed the predicate acts.  Indeed, this Court has recently re-affirmed the longstanding position of the Fifth Circuit Court of Appeals: "[u]nder RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the

fraudulent scheme." *Simmons v. Jackson*, No. 3:15-cv-01700-S-BT, 2019 WL 3043927, at *3 (N.D. Tex. June 7, 2019), *report and recommendation adopted*, No. 3:15-cv-1700-S-BT, 2019 WL 3034668 (N.D. Tex. July 11, 2019) (citing *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987) (per curiam); *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983); *see also Bank of Mongolia v. M&P Global Fin. Svs.*, No. 08-60623, 2010 WL 11549711, at *4 (S.D. Fla. Sept. 3, 2010) (same); *George v. Blue Diamond Petroleum, Inc.*, 718 F. Supp. 539, 550 (W.D. La. July 20, 1989) (same).

Nevertheless, SG Credit and Cole believe that their acts in connection with the enterprise are too "isolated and sporadic" to support a finding that they are RICO persons and that they pose no continued threat of racketeering activity. (Dkt. No. 48-1, at 11-12). The facts outlined in Plaintiffs' Complaint clearly establish SG Credit and Cole as persons subject to a civil RICO claim. SG Credit and Cole, first as sole member of Super G's "investment committee" and later as managing member of SG Credit, have been actively and continuously involved in the secret plan to steal Global's assets and place them outside of the reach of Plaintiffs. (*See* Dkt. No. 36, ¶¶ 46, 75). Accomplishing this ultimate goal required SG Credit and Cole to engage in multiple predicate acts – some of which they participated directly, others indirectly. Effecting the illegal foreclosure required the direct involvement and approval of Cole in engaging in wire and mail fraud, of which they were directly involved. (Dkt. No. 36, ¶¶ 12, 75, 226, 319, 357-359). SG Credit and Cole were also indirectly involved in other predicate acts, including bankruptcy fraud, money laundering, and obstruction of justice that were all part of the "master plan" required to pull off Defendants' heist. (Dkt. No. 36, ¶¶ 320, 360-362). Finally, SG Credit has assumed Super G's contract with Global, has a board member seat on Windspeed (the entity to which Global's assets

were fraudulently transferred), and, as directed by Cole, continues the scheme to this day. (Dkt. No. 36, ¶¶ 6, 27, 46, 76).

In addition to the continuous nature of the multiple acts required in order to attain the Defendants' ultimate goal, the conduct involved amongst the various defendants began at least as early as 2017 and is continuing to the present, and there is a continued threat of repetition of such conduct.

ii.    **Plaintiffs Have Sufficiently Alleged an Association-in-Fact Enterprise.**

Plaintiffs have sufficiently alleged an association-in-fact enterprise:

[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Boyle*, 556 U.S. at 948. Thus, even a "loosely and informally organized" association may qualify as a RICO enterprise. *Id*. at 941.

Here, Plaintiffs have alleged that the Defendants together form an association-in-fact for the common and continuing purpose of fraudulently transferring the assets out of the reach of Plaintiffs and intentionally defaulting on payment obligations to Plaintiffs. (Dkt. No. 36, ¶¶ 315, 345). Each of the Defendants contributed to this overall scheme. Cole was primarily involved with planning and implementing the details of the "wind-down" plan whereby Global would be artificially wound down and the assets of the entity simply transferred over to Windspeed, the new entity,

The Complaint is replete with factual allegations regarding how this association operated and continues to operate along with the multiple predicate acts that members of this association have taken to effectuate the association's purpose, including fraudulently facilitating a foreclosure sale to avoid payment to Plaintiff, and other fraudulent acts meant to conceal the illegal activity, such as the filing of a fraudulent bankruptcy petition.  (Dkt. No. 36, ¶¶ 12, 75, 226, 319, 320, 360-362, 357-359).

### iii.   Plaintiffs Have Sufficiently Alleged a Pattern of Racketeering Activity.

"[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).  Plaintiffs have met this requirement.

The Supreme Court has explained that:

> [C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." § 3575(e)§ 3575(e). We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice.

*H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989).

The Complaint identifies multiple predicate acts of wire fraud and mail fraud committed on the part of Defendants.  Instances of mail fraud include the mailing of a Notice of Forfeiture/Notice of Foreclosure and a Notice of Disposition and Sale of Collateral.  (Dkt. No. 36, ¶¶ 12, 198, 226, 356).  Instances of wire fraud are represented by repeated communications in implementing the fraudulent plan.  (*See, e.g.,* Dkt. No. 36, ¶¶ 107, 153, 179, 215, 218, 219, 222, 228, 245, 295).  Defendants were also indirectly involved in the bankruptcy fraud, money

laundering, and obstruction of justice that was all a part of the overall plan to fraudulently transfer the assets of ACET Global and avoid the debt of Plaintiffs. (Dkt. No. 36, ¶¶ 320, 360-362).

These predicate acts are related in that they are animated by the common and continuing purpose of fraudulently transferring the assets out of the reach of Plaintiffs and intentionally defaulting on payment obligations to Plaintiffs.  (Dkt. No. 36, ¶¶ 315, 345).  Moreover, as explained above, this conduct involved began at least as early as 2017 and is continuing to the present.  Thus, there is a continued threat of repetition of such conduct.

>    iv.    **Plaintiffs have Sufficiently Alleged that SG Credit and Cole Participated in the Enterprise.**

SG Credit and Cole contends that Plaintiffs have not alleged that they were participants in the conduct of the RICO enterprise, insisting that they "were neither operators nor managers of the RICO enterprise" and that the Complaint "is entirely devoid of any allegations concerning [SG Credit's] or Cole's role in operating or managing the RICO enterprise."  (Dkt. No. 48-1, at 13).

Nevertheless, Plaintiffs have properly alleged that Credit Partners and Cole participated in the operation and management of the enterprise.  Federal courts have reasoned that RICO's "net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).  Along these lines, the Supreme Court has held that:

> in order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise . . . .

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Indeed, the Court noted that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  *Id*. at 184.

Defendants' repeated insistence that the Complaint only alleges conduct amounting to a "single, lawful transaction" with no threat of continuing illegal conduct is without basis in reality. (See Dkt. No. 48-1, at 10, 13, 17).  As detailed above, the Complaint alleges multiple violations of federal statutes that have occurred over a substantial period of time and are still ongoing.  Thus, the Complaint alleges the very opposite of a "single, lawful transaction."

v.    **Plaintiffs have Sufficiently Alleged Causation for its Claims under 18 U.S.C. § 1962(c) and (d).**

SG Credit and Cole next attempt to claim that Plaintiffs have not properly alleged that its injuries were proximately caused by Defendant's racketeering activities.  (Dkt. No. 48-1, at 14-15).  This claim is utterly without merit.

Under RICO, proximate cause "should be evaluated in light of its common-law foundations [and] . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)).  "When a court evaluates a RICO claim for proximate cause, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  The Fifth Circuit has interpreted this burden as requiring plaintiffs to establish that their injuries "w[ere] a foreseeable and natural consequence" of the defendants' actions. *Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958 (5th Cir. 2019) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008)), cert. denied, 140 S. Ct. 628, 205 L. Ed. 2d 390 (2019).

Again, Plaintiffs have alleged that the Defendants together form an association-in-fact for the common and continuing purpose of fraudulently transferring the assets out of the reach of Plaintiffs and intentionally defaulting on payment obligations to Plaintiffs.  (Dkt. No. 36, ¶¶ 315, 345).  Defendants' violation of numerous federal statutes left Global stripped of assets and resulted

in the failure to pay millions owed to D&T Partners. (Dkt. No. 36, ¶¶ 323, 367).  Thus, Plaintiffs'
injuries were not just a "foreseeable and natural" but an intended consequence of the Defendants'
actions.

### 2.  Plaintiffs Have Sufficiently Pled Claims Under 18 U.S.C. § 1962(a).

Defendants contend that Plaintiffs have failed to state a claim under § 1962(a) because the
Complaint does not allege that SG Credit derived any income from a pattern of racketeering
activity or how the investment of this income harmed Plaintiffs.  (Dkt. No. 48-1, at 15-16).

This, however, is a mischaracterization of the Complaint.  To establish a violation under
18 U.S.C. § 1962(a), a plaintiff must prove: (1) the existence of an enterprise, (2) the defendants'
derivation of income from a pattern of racketeering activity, and (3) the use of any part of that
income in acquiring an interest in or operating the enterprise. *See St. Paul Mercury Ins. Co. v.
Williamson*, 224 F.3d 425, 441 (5th Cir. 2000). Additionally, for a viable 18 U.S.C. § 1962(a)
claim, any injury must flow from the use or investment of racketeering income. *Id*.

Here, Plaintiffs sufficiently pled their claims under 18 U.S.C. § 1962(a). As discussed
*supra*, Plaintiffs have pled the existence of an enterprise engaged in a pattern of racketeering.
Plaintiffs has also pled that the Defendants, including SG Credit, received income from the pattern
of racketeering through the fraudulent transfer and reinvested the proceeds back into the enterprise.
(Dkt. No. 36, ¶ 330).  The Defendants also received income from the continued operation of
Windspeed—income that was used or invested back into the enterprise.  (Id.)  Plaintiffs have pled
that their injury flowed from the use of investment of the racketeering income.  The actions of the
Defendants proximately caused and continue to cause injuries to Plaintiffs.  (Id., at ¶ 337).  In
effect, the continued operation of Windspeed, which is partially owned by SG Credit, perpetuates
the fraudulent transfer, using Global's inventory, assets, and income to further Global's inability
to pay creditors, particularly D&T Partners.  And as set forth above in section IV C, Cole has

testified that SG Credit was working on Windspeed and compensated and the FAC demonstrates payments to Windspeed.  (e.g., FAC ¶ 153).

### 3.   Plaintiffs Have Sufficiently Pled Claims Under 18 U.S.C. § 1962(d).

For the reasons set out above, SG Credit's and Cole's contention that Plaintiffs have "failed to plausibly plead any substantive RICO offense" is wholly incorrect.  (See Dkt. No. 48-1, at 16-17).  Plaintiffs have sufficiently pled claims under 18 U.S.C. § 1962(a) and (c).  Similarly unavailing is their argument that Plaintiffs did not "plead that how Credit Partners and Cole agreed to participate in the predicate racketeering acts . . . ." (See Dkt. No. 48-1, at 17).

18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of . . . [18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), or 18 U.S.C. § 1962(c)]."  Thus, to establish a conspiracy claim under 18 U.S.C. § 1962(d), a plaintiff must establish that:  (1) "two or more people agreed to commit a substantive RICO offense;" and (2) the defendant "knew of and agreed to the overall objective of the RICO offense."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).  Due to the clandestine nature of conspiracies, a plaintiff may not be able to muster direct evidence, and, therefore, the agreement, knowledge of and participation in the conspiracy "may be inferred from the development and collocation of circumstances."  *U.S. v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (quoting *U.S. v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)).  Moreover, a conspirator need not know all of the details of the enterprise and identities or all of the co-conspirators as long as the evidence allows for the inference that each conspirator knowingly participated in some manner in the overall objective of the conspiracy.  *Id.* at 858.  But, "[a] conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor."  *Chaney*, 595 F.3d at 239 (quoting *Salinas v. U.S.*, 522 U.S. 52, 65 (1997)).

As explained above, the defendants clearly knew of and agreed to the overall objective of the RICO defense—fraudulently transferring the assets out of the reach of Plaintiffs and intentionally defaulting on payment obligations to Plaintiffs in order to continue Global's operations free from D&T Partners' loan.  Cole actively worked with the other defendants to accomplish this objective, approving every aspect of the scheme on behalf of Super G, including the fraudulent transfer of Global's assets to Windspeed, the fraudulent filing of a notice of foreclosure against Global, and the foreclosure sale of Global assets to Windspeed for an amount far less than the assets were worth and months after the assets were in fact transferred to Windspeed.  (Dkt. No. 36, ¶¶ 12, 13, 14, 75, 78, 115, 116, 152, 156, 226-232, 246-248).  Cole acknowledges outsourcing the drafting of the subordination agreement and notice of foreclosure to the other defendants.  (*Id.*, ¶¶ 78, 230).  Moreover, SG Credit, as an owner and board member of Windspeed and under the direction of its managing member, Cole, continues the above-mentioned fraudulent scheme.  (Id., ¶¶ 27, 46, 76).  All of this is sufficient to support the conclusion that SG Credit and Cole were aware of and agreed to the overall objective of the RICO offense.

E. <u>State Law Causes of Action.</u>

1. <u>Plaintiffs Have Sufficiently Pled Claims of Fraud.</u>

In early 2019, after Damti called Bellah completely unaware that Bellah was in on the fraud against D&T, Bellah informed Damti that "he [Bellah] was unaware of Windspeed"—despite the fact that Bellah was already serving as Super G's board manager of Windspeed.  (FAC ¶ 294). Bellah's fraudulent misrepresentation was designed to prevent Damti and D&T from learning about the fraud, preventing him from taking steps prior to their destruction of all of ACET's electronic records and emails and preventing D&T from recovering.  Damti confided his suspicions and even strategy to Bellah.  Bellah used this information to help carry out the fraud.

As set out in detail herein and in the multiple responses, Plaintiffs have more than adequately pled claims of fraud.

> **2.  Plaintiffs Have Sufficiently Pled Claims of Aiding and Abetting Breach of Fiduciary Duty.**

Plaintiffs adequately pled breach of fiduciary duty on the part of multiple defendants and supported such claim with ample evidence.  Nevertheless, SG Credit and Cole argue that the Complaint does not contain any allegations that SG Credit and Cole aided and abetted breach of a fiduciary duty. (Dkt. No. 48-1, at 21-22).

Under Texas law, an insolvent entity in the type of distress that the Defendants generally claim Global was in owes fiduciary duties to its creditors, rather than its members:

> Its assets then become a trust fund for the benefit of all its creditors; consequently, its stockholders have no right, directly or indirectly through the managing officers, to pay or secure some of the creditors at the expense of others. *Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co.*, 86 Tex. 143, 24 S.W. 16, 23 (1893). In this situation, all the directors become trustees with the duty to see that the assets are devoted to the payment of corporate debts, without preferring one creditor over another.

*Tigrett v. Pointer*, 580 S.W.2d 375, 383 (Tex. App.—Dallas 1978, writ refused n.r.e.).  Thus, the director of Global, Baymark, had a fiduciary duty to preserve Global's assets for its creditors, including D&T Partners.

SG Credit and Cole were aware that D&T Partners was a creditor of Global, since they knew of the agreement subordinating D&T Partners' security interest to Super G.  (Dkt. No. 36, ¶¶ 37-38).  They were equally aware of Global's manufactured insolvency as evidenced by their approval of the forbearance agreement with Global and Baymark's subsequent "wind down" plan under which a new entity, Windspeed, acquired all of Global's assets. (Id., ¶¶ 86, 116, 152, 156).  Indeed, Super G acquired a 40% interest in Windspeed, to which SG Credit, with Cole as its

managing member and primary beneficiary, would later succeed.  (Id., ¶¶ 27, 28, 46, 76, 125).  All of this resulted in Global defaulting on D&T Partners' loan.   (Id., ¶ 223-224).

Thus, SG Credit and Cole knowingly assisted Baymark in violating its fiduciary duties to D&T Partners, and Plaintiffs have adequately pled a claim of aiding abetting breach of fiduciary duty against SG Credit and Cole.

### 3.   Plaintiffs Have Sufficiently Pled Claims Under the Texas Uniform Fraudulent Transfer Act.

The Texas Uniform Fraudulent Transfer Act ("TUFTA") pursues one overriding goal: "to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors." *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 385 (5th Cir. 2017).  Thus, under TUFTA, a creditor may sue a third party that received a fraudulent transfer from the debtor and recovered its losses by voiding that transaction.  *Id.*  A transfer is fraudulent under TUFTA if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor."  Tex. Bus. & Com. Code § 24.005(a)(1).   A fraudulent transfer can be proven in two ways:  directly or circumstantially.  *Janvey*, 856 F.3d at 385.  "Since intent . . . is seldom susceptible of direct proof, courts have relied on badges of fraud," eleven of which are listed in the statute, as circumstantial evidence of fraud."  *Id.*

Here, SG Credit and Cole worked in concert with the other Defendants to perpetrate a fraud on D&T Partners. As discussed above Cole, as sole member of Super G's "investment committee" approved the fraudulent transfer of Global's assets to Windspeed—a company beneficially owned and controlled by Super G, BP Management, and Szeto—freeing Windspeed of Global's debt owed to D&T Partners.  (See Dkt. No. 36, ¶¶ 75, 115, 125, 152, 156).  Moreover, SG Credit has succeeded to Super G's interest in Windspeed, thereby perpetuating the unlawful scheme. (Id., ¶ 27, 76).  Plaintiffs have adequately pled claims under TUFTA

4.   **Plaintiffs Have Sufficiently Pled Claims of Civil Conspiracy.**

As explained above in connection with Plaintiffs' claims under 18 U.S.C. § 1962(d) and elsewhere, the Complaint is replete with details regarding the conspiracy between and among all of the defendants, and the roles played SG Credit and Cole in this conspiracy is well described. For SG Credit and Cole to pretend that the "FAC does not plead any facts to show that [SG Credit] and/or Cole conspired with anyone or that there was some meeting of the minds between . . . any of the alleged co-conspirators" is simply mind-boggling.  (Dkt. No. 48-1, at 24) SG Credit and Cole actively participated in a plan that took the assets of one company – a company more than capable of paying its debts and which had substantial business – to another company with the goal of no longer paying the transferring company's debt.  And they didn't do it alone.  Each defendant played their part.

Plaintiffs have adequately pled a cause of action for civil conspiracy.

5.   **Plaintiffs have Sufficiently Pled Claims of Respondeat Superior.**

Plaintiffs have more than adequately pled respondent superior.  Section IV C above sets out the clear relationships between SG Credit and Super G.  Moreover, the FAC alleges that Bellah was an employee of SG Credit and based in Texas.  (FAC ¶ 27). He was in fact a senior executive of SG Credit and followed Cole to this new spin off company from Super G.   (FAC ¶ 27). Bellah, closely coordinated the "Windspeed" plan.  (FAC ¶ 69) Bellah served as the "Super G Director" for Windspeed.  (FAC ¶ 27).  Indeed, Cole testified that Bellah was on the Windspeed board.  (FAC ¶ 164).  Baymark had a pre-existing and uniquely close relationship with Bellah.  (FAC ¶ 69). And Cole testified that in 2019, Bellah was advising him on the foreclosure (which occurred after he testified he left for SG Credit with his "team."  (FAC, Exh. 8, p. 160:10-24) Because SG Credit began in 2018; and SG Credit had taken over the Windspeed relationship; and Bellah was still

working with Windspeed in 2019; then Bellah was clearly working under SG Credit and SG Credit can and should be liable for his violations through the doctrine of respondeat superior.

Indeed, Bellah was involved with the process throughout.  On October 23, 2018, Denegre and Bellah were exchanging emails" to discuss next steps for ACET Global and get your thoughts on how to **move forward with foreclosure**?"  (FAC ¶ 228).  Bellah was emailing regarding the matter throughout December and January.  (*E.g.,* FAC ¶ 145) (December 20, 2018)  In January of 2019, Bellah was emailing regarding the "merged weekly report[s]" for the ACET/Windspeed combined activity.  (FAC ¶ 222).

In early 2019, after Damti called Bellah completely unaware that Bellah was in on the fraud against D&T, Bellah informed Damti that "he [Bellah] was unaware of Windspeed"—despite the fact that Bellah was already serving as Super G's board manager of Windspeed.  (FAC ¶ 294).

## V.   Prayer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Court deny SG Credit and Cole's Motion to Dismiss.  Moreover, to the extent that the Court intends to otherwise grant any portion of their Motion, Plaintiffs hereby request leave to replead to remedy any purported deficiencies.  Finally, the Plaintiffs request that the Court grant Plaintiffs all other relief, at law or in equity, to which they may show themselves justly entitled.

Dated: December 24, 2021                    Respectfully submitted,

*/s/ Jason B. Freeman*_____
Jason B. Freeman
Texas Bar No. 24069736
Matthew L. Roberts
Texas Bar No. 24098330
Thomas L. Fahring III
Texas Bar No. 24074194
Gregory W. Mitchell
Texas Bar No. 00791285
Zachary J. Montgomery (admission forthcoming)
Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone:  214.984.3410
Fax:  214.984.3409
jason@freemanlaw.com

**ATTORNEYS FOR PLAINTIFF**

<u>**Certificate of Service**</u>

On December 24, 2021, I filed the foregoing document with the clerk o court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or *pro se* parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

By:  *<u>/s/ Jason B. Freeman</u>*
Jason B. Freeman