UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC | § § § § § | |
| and | § § | |
| ACET Global, LLC | § § | |
| **Plaintiffs,** | § § | |
| v. | § § | |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATTHEW DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH: ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; WINDSPEED TRADING, LLC; HALLETT & PERRIN, P.C.; and JULIE A. SMITH | § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-cv-01171-B |
| **Defendants.** | § | |

**Appendix in Support of Plaintiffs' Response to Non-Party Baymark Management, LLC and Defendant Baymark Partners' Motion to Set Aside Entry of Default and Brief in Support**

| Exhibit No. | Exhibit Description | Appendix Reference |
|:---:|:---:|:---:|
| 1 | Excerpts of Deposition of David Hook, dated April 12, 2021 | APP001 – APP005 |
| 2 | Asset Purchase Agreement by and among ACET Global, LLC, ACET Venture Partners, LLC, and Tomer Damti, dated July 20, 2017 | APP006 – APP056 |
| 3 | Baymark Partners, L.P. Due Diligence Report for ACET Venture Partners, LLC, dated May 4, 2017, and related email correspondence | APP057 – APP133 |
| 4 | Hallett & Perrin Selected Invoices, dated February 28, 2018 through August 9, 2021 | APP134 – APP181 |
| 5 | Application for Consent to Transfer Control of Domestic and International Section 214 Authority to the Federal Communications Commission, dated July 26, 2019 | APP182 – APP201 |

Dated: February 6, 2022.                    Respectfully Submitted,

By: */s/ Jason B. Freeman*
      Jason B. Freeman
      TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

**<u>Certificate of Service</u>**

I hereby certify that on the 6th day of February, 2022, I filed the foregoing pleading via the

Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Jason B. Freeman*
Jason B. Freeman

Page 1

CAUSE NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | ) IN THE DISTRICT COURT |
| Plaintiff, | ) |
| v. | ) DALLAS COUNTY, TEXAS |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | ) |
| Defendants. | ) 116TH JUDICIAL DISTRICT |

----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

DAVID HOOK

April 12, 2021

----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

DAVID HOOK, produced as a witness at the instance of the

PLAINTIFF, and duly sworn, was taken in the above-styled

and numbered cause on April 12, 2021, from 1:04 p.m. to

5:34 p.m., via videoconference, before Wendy Golding,

CSR in and for the State of Texas, reported by machine

shorthand, pursuant to the Current Emergency Order

Regarding the COVID-19 State of Disaster.

David Hook  *  April 12, 2021

Page 2

```
 1                A P P E A R A N C E S
                (All parties appearing remotely)
 2

 3   FOR THE PLAINTIFF:

 4        JASON B. FREEMAN
          ZACH MONTGOMERY
 5        Freeman Law, PLLC
          7011 Main Street
 6        Frisco, Texas 75034
          214-984-3410
 7        jason@freemanlaw.com
          zmontgomery@freemanlaw.com
 8

 9

     FOR THE DEFENDANTS BAYMARK ENTITIES:
10
          EDWARD PERRIN
11        Hallett & Perrin
          1445 Ross Avenue, Suite 2400
12        Dallas, Texas 75202
          214-953-0053
13        eperrin@hallettperrin.com

14
     FOR THE DEFENDANT WINDSPEED TRADING, LLC:
15
          BRENDA HARD-WILSON
16        TIM WOODS
          Higier Allen
17        2711 North Haskell Avenue
          Suite 2400
18        Dallas, Texas 75204
          972-371-2481
19        Bhard-wilson@higierallen.com
          Twoods@higierallen.com
20
21   ALSO PRESENT:
          Tomer Damti
22        Anthony Ludlow

23

24

25
```

David Hook  *  April 12, 2021

Page 32

1       Q.  Okay.  And did Mr. Ludlow respond by saying

2  "yeah, definitely an option.  We can strategize and then

3  get back with them"?

4       A.  Yes.

5       Q.  Okay.  And on the subject line of this email,

6  does it state, in parentheses, "ACET"?

7       A.  Yes.

8       Q.  And did you understand that to refer to ACET

9  Global?

10      A.  Yes.

11      Q.  Okay.  Mr. Hook, what do you do for a living?

12      A.  I'm managing director of a private equity firm.

13      Q.  Okay.  And what is that private equity firm?

14      A.  Pardon me?

15      Q.  What is that private equity firm?

16      A.  What is it?

17      Q.  Yes, sir.

18      A.  We acquire companies.

19      Q.  Okay.  Well, let's start with what's the name

20  of it.

21      A.  Baymark Partners.

22      Q.  Baymark Partners.

23          Okay.  And how long have you done that?

24      A.  Almost 11 and a half years.

25      Q.  Okay.  And who do you report to?

David Hook  *  April 12, 2021

Page 33

1       A.   Tony Ludlow and I are partners -- equal

2   partners.

3       Q.   Okay.  Do you two own Baymark Partners?

4       A.   Yes.

5       Q.   Okay.  Are you 50/50?

6       A.   Yes.

7       Q.   Okay.  How do you determine whether to invest

8   in a company?

9       A.   I need you to be more specific than that.

10      Q.   Does Baymark Partners invest in other

11  companies?

12      A.   Yes.

13      Q.   Okay.

14      A.   No, we acquire them.

15      Q.   You acquire.  Okay.

16      A.   That's right.

17      Q.   Do you -- does Baymark Partners only engage in

18  transactions in which it obtains at -- at least a

19  majority or controlling position in a company?

20      A.   Yes.

21      Q.   Okay.  How do you determine whether to make

22  that investment?

23      A.   Mr. Freeman, there's a lot of things that go

24  into making an investment.

25      Q.   Right.  Let's start with some of them.

David Hook  *  April 12, 2021

Page 47

1        Q.  (By Mr. Freeman)  Do you know if you were a

2    manager?

3                MR. PERRIN:  Objection, form.

4        A.  No.

5        Q.  (By Mr. Freeman)  Do you know if you were the

6    president?

7        A.  No.

8                MR. PERRIN:  Objection, form.

9        Q.  (By Mr. Freeman)  Baymark Partners.  What is

10    Baymark Partners?  What is the legal entity?

11                MR. PERRIN:  Objection, form.

12        A.  I think it's Baymark Partners, L -- LP, I

13    think.

14        Q.  (By Mr. Freeman)  So, when we refer to Baymark

15    Partners, we're referring to -- you understand that to

16    be Baymark Partners, LP; correct?

17        A.  That's right, the name of the firm.  Uh-huh.

18        Q.  Is there another Baymark Partners that you're

19    aware of?

20        A.  No.

21        Q.  And is that how you hold it out, as Baymark

22    Partners?

23                MR. PERRIN:  Objection, form.

24        A.  Yes.

25        Q.  (By Mr. Freeman)  And is that how other members

# ASSET PURCHASE AGREEMENT

by and among

## ACET GLOBAL, LLC
**(Buyer)**

## ACET VENTURE PARTNERS LLC
**(Seller)**

and

## TOMER DAMTI
**(Owner)**

Dated as of July 20, 2017

# TABLE OF CONTENTS

**PAGE**

ARTICLE I DEFINITIONS ............................................................................................ 1

    **1.1**     Definitions ................................................................................................ 1

ARTICLE II PURCHASE AND SALE ......................................................................... 12

    **2.1**     Purchase and Sale of Acquired Assets; Excluded Assets;
            Assumed Liabilities; Excluded Liabilities .............................................. 12
    **2.2**     Purchase Price ........................................................................................ 13
    **2.3**     Purchase Price Adjustment ..................................................................... 13
    **2.4**     Purchase Price Allocation ....................................................................... 15
    **2.5**     Assets Incapable of Transfer .................................................................. 15

ARTICLE III REPRESENTATIONS OF SELLER ....................................................... 16

    **3.1**     Existence and Good Standing ................................................................. 16
    **3.2**     Authorization and Binding Obligation .................................................... 16
    **3.3**     No Violations; Approvals ........................................................................ 17
    **3.4**     Financial Statements ............................................................................... 17
    **3.5**     Absence of Certain Changes ................................................................... 18
    **3.6**     Title to Properties ................................................................................... 19
    **3.7**     Material Contracts .................................................................................. 19
    **3.8**     Litigation ................................................................................................ 20
    **3.9**     Taxes ...................................................................................................... 21
    **3.10**   Intellectual Property ............................................................................... 22
    **3.11**   Compliance with Laws; Permits ............................................................. 23
    **3.12**   Employee Benefit Plans .......................................................................... 24
    **3.13**   Environmental Matters ........................................................................... 25
    **3.14**   Insurance ................................................................................................ 26
    **3.15**   Broker's or Finder's Fees ....................................................................... 26
    **3.16**   Customers; Vendors ............................................................................... 26
    **3.17**   Products .................................................................................................. 27
    **3.18**   Real Property .......................................................................................... 28
    **3.19**   Receivables ............................................................................................ 28
    **3.20**   Product Liability ..................................................................................... 29
    **3.21**   Inventory ................................................................................................ 29
    **3.22**   Affiliate Transactions ............................................................................ 29
    **3.23**   Certain Payments ................................................................................... 29
    **3.24**   Diligence ................................................................................................ 30

ARTICLE IV REPRESENTATIONS OF BUYER .......................................................... 30

    **4.1**     Existence and Good Standing ................................................................. 30
    **4.2**     Authorization and Binding Obligation .................................................... 30

i

| | | | |
|---|---|---|---|
| **4.3** | No Violations | ..................................................... | 30 |
| **4.4** | Broker's or Finder's Fees | ............................................. | 30 |
| **4.5** | Litigation | ............................................................ | 31 |

**ARTICLE V COVENANTS** ................................................. 31

| | | | |
|---|---|---|---|
| **5.1** | Publicity | ............................................................ | 31 |
| **5.2** | Tax Matters | ......................................................... | 31 |
| **5.3** | Employee Matters | .................................................. | 31 |
| **5.4** | Further Assurances | ................................................. | 31 |
| **5.5** | Post-Closing Receipts; Payment Cooperation | ................ | 32 |
| **5.6** | Change of Name | .................................................... | 32 |
| **5.7** | Non-Competition | ................................................... | 32 |
| **5.8** | Confidentiality | ...................................................... | 33 |
| **5.9** | Bulk Transfer Requirements. | ..................................... | 33 |

**ARTICLE VI CLOSING** ..................................................... 33

| | | | |
|---|---|---|---|
| **6.1** | Closing | ............................................................... | 33 |
| **6.2** | Deliveries by Seller | ................................................ | 34 |
| **6.3** | Deliveries by Buyer | ................................................ | 34 |

**ARTICLE VII INDEMNIFICATION** ..................................... 35

| | | | |
|---|---|---|---|
| **7.1** | Survival of Representations, Warranties and Covenants | ... | 35 |
| **7.2** | Indemnification | ..................................................... | 36 |
| **7.3** | Limitations on Indemnification | .................................. | 36 |
| **7.4** | Exclusive Remedy | .................................................. | 37 |
| **7.5** | Procedure for Indemnification with Respect to Third-Party Claims | ... | 37 |
| **7.6** | Procedure for Indemnification with Respect to Non-Third-Party Claims | ... | 39 |
| **7.7** | Materiality | ........................................................... | 39 |
| **7.8** | Right of Setoff | ...................................................... | 39 |

**ARTICLE VIII MISCELLANEOUS** ....................................... 39

| | | | |
|---|---|---|---|
| **8.1** | Expenses | ............................................................. | 39 |
| **8.2** | Governing Law; Waiver of Jury Trial | ........................... | 39 |
| **8.3** | Interpretation | ....................................................... | 40 |
| **8.4** | Notices | .............................................................. | 40 |
| **8.5** | Counterparts | ........................................................ | 41 |
| **8.6** | Entire Agreement | ................................................... | 41 |
| **8.7** | Binding Effect; Assignment | ...................................... | 41 |
| **8.8** | Waiver; Consent | .................................................... | 41 |
| **8.9** | Severability | ......................................................... | 42 |
| **8.10** | Third-Party Beneficiaries | ......................................... | 42 |
| **8.11** | Prevailing Party | .................................................... | 42 |

ii

**8.12**   Arm's Length Negotiations; Drafting.  Each party to this
Agreement in this ........................................................................... 42

**8.13**   Seller Representative .................................................................... 42

iii

EXHIBITS

Exhibit A – Assumption Agreement
Exhibit B – Bill of Sale
Exhibit C – Accounting Principles
Exhibit D – IP Assignment and Assumption
Exhibit E – Seller Note
Exhibit F – Security Agreement
Exhibit G – Purchase Price Allocation
Exhibit H – Employment Agreement


DISCLOSURE SCHEDULES

Section 1-A - Transferred Contracts
Section 1-B – Excluded Assets
Section 1-C – Tangible Personal Property
Section 1-D – Permitted Liens
Section 1-E – Assumed Liabilities
Section 3.1 – Jurisdictions
Section 3.3(a) – Consents
Section 3.3(b) – Required Consents
Section 3.3(c) – Post- Closing Consents
Section 3.4 – Financial Statements
Section 3.5 – Absence of Certain Changes
Section 3.6 – Condition of Assets
Section 3.7 – Material Contracts
Section 3.8 – Litigation
Section 3.9(a) – Tax Returns Not Filed / Paid
Section 3.9(b) – Tax Returns
Section 3.10 – Intellectual Property
Section 3.11 – Compliance with Laws; Permits
Section 3.12(a) – Employee Benefit Plans
Section 3.12(b) – Employees/Salary
Section 3.13 – Environmental Assessments
Section 3.14 – Insurance Policies
Section 3.15 –Broker's or finder's Fees
Section 3.16(a) – Customers of Seller
Section 3.16(b) Trade Vendors of Seller
Section 3.17 - Products
Section 3.18 – Real Property
Section 3.19 - Receivables
Section 3.21 – Inventory
Section 3.22 – Affiliate Transactions

iv

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated effective as of June 20, 2017 (the "Effective Date") by and among (i) ACET Global, LLC, a Texas limited liability company ("Buyer") (ii) ACET Venture Partners LLC, a Texas limited liability company ("Seller"), and (iii) Tomer Damti, a citizen of Israel and resident of the State of Texas ("Damti"). Damti may also be referred to as "Owner." Owner and Seller may be referred to in this Agreement as the "Seller Parties."

## RECITALS

A.      Seller is engaged in the Business.

B.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all or substantially all of the assets of Seller on the terms and subject to the conditions set forth in this Agreement.

C.      Holdco owns 100% of Buyer.

D.      Owner is the beneficial owner of Seller and as such has had access to Seller's customer lists, other trade secrets, methods of operation and other proprietary information of the Business and is receiving significant benefit from the consummation of the transactions contemplated by this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations, and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Buyer, Seller and Owner agree as follows:

ARTICLE I
## DEFINITIONS

**1.1**   Definitions.  For purposes of this Agreement, capitalized terms set forth in this Section 1.1 shall have the meanings ascribed to such terms in this Article I.  Other capitalized terms, when used herein, shall have the meanings ascribed to such terms.

"Accountant" has the meaning set forth in Section 2.3(a).

"Accounting Principles" has the meaning set forth in the definition of Closing Date Net Working Capital.

"Accounts Receivable" has the meaning set forth in the definition of Acquired Assets.

"Acquired Assets" means all of the properties, rights, interests and other tangible and intangible assets of Seller (other than the Excluded Assets, which are not included in the Acquired Assets) existing as of the Closing (wherever located and whether or not required to be

reflected on a balance sheet), including, without limitation, all of Seller's right, title and interest in and to the following:

(i)      the Inventory;

(ii)     the accounts receivable of Seller as of the Closing Date (the "Accounts Receivable");

(iii)    the Tangible Personal Property;

(iv)    the Intellectual Property;

(v)     all intangible assets that are not Intellectual Property, including goodwill and going concern value and all other intangible rights of Seller and all rights of Seller to the company name "ACET" and other relevant, related and/or derivative company names;

(vi)    Seller's rights under the Contracts set forth on Section 1-A of the Disclosure Schedule (the "Transferred Contracts");

(vii)   all rights with respect to products sold by Seller, including, without limitation, all "standard" products and all "customized" products (the "Company Products"), all sales order files, distributor files, engineering files and product files (including drawings, part numbers, and all representations of all Company Products), purchase order files, manufacturing records, test specifications and validation procedures, client and customer lists, supplier lists, pricing information, sales and promotional literature and paper work and business files of Seller relating to the Business and books and records relating to the Transferred Employees (including personnel files);

(viii)  all claims and counterclaims by Seller against any other Person, including but not limited to claims arising from or relating to express and implied warranties from manufacturers, vendors and suppliers;

(ix)    to the extent their transfer is permitted under Applicable Law, all Permits utilized by Seller in the conduct of the Business, including the Permits listed on Section 3.11 of the Disclosure Schedule;

(x)     all telephone or facsimile numbers, and electronic mail addresses used in connection with the Business;

(xi)    all supplies used in the Business;

(xii)   all claims for past infringement of the Intellectual Property of Seller that is an Acquired Asset; and

(xiii)  all credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items relating to the acquired Assets and for the benefit of Seller.

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the ability to elect the members of the board of directors or other governing body of such Person, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Agreement" has the meaning set forth in the Preamble.

"Annual Financial Statements" has the meaning set forth in Section 3.4.

"Applicable Laws" has the meaning set forth in Section 3.11.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement, dated as of the date hereof, to be entered into at the Closing between Seller and Buyer in the form attached as Exhibit A, pursuant to which Seller shall assign to Buyer, and Buyer shall assume, the Assumed Liabilities.

"Assumed Liabilities" means only those Liabilities of Seller arising and relating to the operation of the Business after the Closing Date and listed on Section 1-E of the Disclosure Schedule.

"Balance Sheet Date" has the meaning set forth in Section 3.4.

"Bill of Sale" means the Bill of Sale issued by Seller in favor of Buyer in the form attached as Exhibit B.

"Business" means the business of a multi-national wholesale and direct sale company (business-to-consumer and business-to-business) providing sales and sales services (including without limitation via the Internet and other media broadcast outlets), which includes but is not limited to purchasing, testing, marketing, logistics and fulfillment of products worldwide.

"Business Employees" has the meaning set forth in Section 5.3.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Indemnified Parties" has the meaning set forth in Section 7.2(a).

"Buyer W/C Amount" has the meaning set forth in Section 2.3(b)(ii).

"Buyer's Indemnifiable Claims" has the meaning set forth in Section 7.2(a).

"Cap" has the meaning set forth in Section 7.3(b).

"<u>Cash Portion of the Purchase Price</u>" has the meaning set forth in <u>Section 2.2(a)(i)</u>.

"<u>Closing</u>" has the meaning set forth in <u>Section 6.1</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 6.1</u>.

"<u>Closing Date Net Working Capital</u>" means the net working capital of the Seller calculated as of the Closing Date consistent with the methodology set forth on <u>Exhibit C</u> (the "<u>Accounting Principles</u>").

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Company Agreement</u>" has the meaning set forth in <u>Section 2.2(a)(iii)</u>.

"<u>Company Products</u>" has the meaning set forth in the definition of Acquired Assets.

"<u>Competitive Activity</u>" has the meaning set forth in <u>Section 5.7(a)</u>.

"<u>Computer Systems</u>" has the meaning set forth in <u>Section 3.10(f)</u>.

"<u>Confidential Information</u>" has the meaning set forth in <u>Section 5.8</u>.

"<u>Contract</u>" means any written or oral contract, agreement or instrument, including, without limitation, supply contracts, purchase orders, understandings or commitments, or leases of personal property to which the Person referred to is a party or by which any of its assets may be bound.

"<u>Damages</u>" (collectively) or "<u>Damage</u>" (individually) means all liabilities, losses, lost profits, diminution in value, injuries, penalties, fines, forfeitures, assessments, claims, suits, proceedings, investigations, actions, demands, causes of action, judgments, awards, taxes, charges, costs, expenses and damages of any nature, whether or not arising out of third party claims (including, without limitation, interest, penalties, reasonable attorneys', accountants' and other professionals' fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing).

"<u>Deductible Amount</u>" has the meaning in Section 7.3(a).

"<u>Disclosure Schedule</u>" has the meaning set forth in <u>Article III</u>.

"<u>Employee Benefit Plans</u>" has the meaning set forth in <u>Section 3.12(a)</u>.

"<u>Employment Agreement</u>" has the meaning set forth in <u>Section 6.2(e)</u>.

"<u>Environmental Laws</u>" means any federal, state or local law, statute, ordinance, code, rule, regulation, order, judgment, decree, injunction or legally enforceable requirement of any Governmental Authority that regulates, controls or relates to (i) protection, preservation or

restoration of air, soils, surface water, groundwater, surface land, subsurface land and natural resources ("Environment"), (ii) use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Materials, (iii) health and safety of Persons (including employees), (iv) emission, release, spilling or leaking of any substance into the Environment, or (v) pollution or substances or materials which are considered to be hazardous or toxic.  Environmental Laws include, without limitation, any federal, state and local environmental law, all amendments and supplements to any of the foregoing and all regulations promulgated or issued pursuant thereto.

"Environmental Liabilities" means all liabilities and obligations of Seller or any Affiliate of Seller with respect to Releases of Hazardous Materials or violations of Environmental Law.

"Equity Interest" has the meaning set forth in Section 2.2(a)(iii).

"Excluded Assets" means (i) all of Seller's federal and state income Tax Returns and records (provided that Seller has provided copies of such Tax Returns and records to Buyer prior to Closing) and any rights to Tax refunds for periods prior to Closing, (ii) all Employee Benefit Plans, arrangements and agreements of Seller and all assets and rights relating to Employee Benefit Plans and similar arrangements and agreements of Seller, (iii) Seller's rights under this Agreement and the Related Agreements, (iv) the Excluded Contracts, (v) the Excluded Books and Records, (vi) any insurance policies of Seller, (vii) Seller's rights, claims and counterclaims of any kind and nature against any Person as to the Excluded Assets and Excluded Liabilities, and (h) those assets listed on Section 1-B of the Disclosure Schedule.

"Excluded Books and Records" means, except for the books and records that are Acquired Assets, all minute books, all books and records relating to federal or state income Taxes (provided that Seller has provided copies of such Tax books and records to Buyer prior to Closing) or employee benefit matters, all books and records relating to employees other than Transferred Employees, and any other books and records relating solely to the Excluded Assets or Excluded Liabilities.

"Excluded Contracts" means all Contracts to which Seller is a party that are not Transferred Contracts.

"Excluded Liabilities" means all Liabilities of Seller that are not Assumed Liabilities, including but not limited to:

> (i)     all Liabilities of Seller or any Affiliate of Seller for Indebtedness of Seller;

> (ii)     all Liabilities of Seller or any Affiliate of Seller for Taxes, including, (A) all Liabilities for Taxes with respect to the Acquired Assets or the Business prior to the Closing Date, (B) all Liabilities for Taxes arising in connection with, or resulting from, the consummation of the transactions contemplated by this Agreement, and (C) all Liabilities for the Taxes of any other Person as a transferee, successor, by Contract, by Applicable Law or otherwise;

(iii)    all Liabilities arising from any litigation, arbitration or any proceeding with any Governmental Authority involving Seller, the Business or any Affiliate of Seller, whether arising prior to, pending on, or arising after the Closing Date relating to events occurring prior to the Closing, including without limitation the litigation matters listed on <u>Section 3.8</u> of the Disclosure Schedule;

(iv)    all Liabilities of Seller to its current or former employees;

(v)    all Liabilities of Seller to any current or former member, director, manager, officer or Affiliate of Seller, including, without limitation, any Liability arising out of or related to any loan, or any accrued interest related thereto, from any member, manager, director, officer or Affiliate to Seller;

(vi)    any Liability to, or arising under any (A) workers' compensation program to which premiums or contributions are paid, and (B) Employee Benefit Plans, including, without limitation, any Liability for withdrawal from, or termination of, any Employee Benefit Plan, and any Tax including excise Taxes or penalties arising from Employee Benefit Plans or resulting from any transaction with or by any Employee Benefit Plan;

(vii)    all Liabilities related to the Excluded Assets, including any liabilities arising under any Contract that is not a Transferred Contract;

(viii)   all Recall Obligations;

(ix)    all Product Liability Obligations;

(x)     all Environmental Liabilities;

(xi)    all Warranty Obligations; and

(xii)    any and all other Liabilities relating to the Business or the Acquired Assets, other than the Assumed Liabilities, which are related to acts, omissions, circumstances or events, existing, occurring or arising on or before the Closing Date.

"<u>Financial Statements</u>" has the meaning set forth in <u>Section 3.4</u>.

"<u>Fundamental Representations</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Governmental Authority</u>" means any foreign, federal, state or local government or any court, administrative agency or commission or other governmental authority or agency, domestic or foreign.

"<u>Hazardous Materials</u>" means any hazardous substance, pollutant or contaminant, as those terms are defined under applicable Environmental Laws, solid waste and hazardous waste, as those terms are defined under applicable Environmental Laws, oil, petroleum and petroleum products, and all pollutants, contaminants, toxic or hazardous wastes that may be required to be

removed pursuant to applicable Environmental Laws, or whose generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration is or shall be restricted, prohibited or penalized under any Environmental Law (including, without limitation, lead paint, asbestos, urea formaldehyde foam insulation, petroleum and polychlorinated biphenyls).

"Holdco" has the meaning set forth in Section 2.2(a)(iii).

"Indebtedness" means when used with reference to any Person, without duplication, (i) any Liability of such Person created or assumed by such Person, or any subsidiary thereof, (A) for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (B) evidenced by a bond, note, debenture or similar instrument (including a purchase money obligation, deed of trust or mortgage) given in connection with the acquisition of, or exchange for, any property or assets (other than inventory or similar property acquired and consumed in the Ordinary Course of Business of such Person, including securities and other indebtedness), or (C) for the payment of money as lessee under leases that should be recorded as capital leases for financial reporting purposes; (ii) any Liability of others described in the preceding clause (i) guaranteed as to payment of principal or interest by such Person or in effect guaranteed by such Person through an agreement, contingent or otherwise, to purchase, repurchase or pay the related indebtedness or to acquire the security therefor; (iii) all Liabilities secured by a Lien upon property owned by such Person and upon which Liabilities such Person customarily pays interest or principal, whether or not such Person has not assumed or become liable for the payment of such Liabilities; (iv) any amendment, renewal, extension, revision or refunding of any such Liability; (v) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise; (vi) any letter of credit arrangements; (vii) any accrued interest on any of the foregoing; and (viii) any prepayment or other similar fees, expenses or penalties on or relating to the repayment or assumption of any of the foregoing (including retention or stay bonuses and any prepayment premiums or similar breakage costs payable as a result of the consummation of the transactions contemplated herein).

"Indemnifiable Claims" has the meaning set forth in Section 7.5(a).

"Indemnified Party" or "Indemnified Parties" has the meaning set forth in Section 7.2(b).

"Indemnifying Party" has the meaning set forth in Section 7.5(a).

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world, whether arising by operation of law, Contract or otherwise: (i) trademarks, service marks, copyrights (including software, databases and related documentation), logos, slogans, Internet domain names and web sites, trade or business names, and all registrations of any of the foregoing, and all applications for registration thereof, and all goodwill associated therewith; (ii) patents and patent applications, including, without limitation, continuations, continuations-in-part, divisionals, provisionals, reexaminations, reissue applications and renewals; and (iii) trade secrets, formulations, formulas, recipes, inventions, processes, know-how and confidential information.

"Intellectual Property Assignment" means the Intellectual Property Assignment to be entered into at the Closing between Seller and Buyer in the form attached as Exhibit D, pursuant to which Seller shall assign to Buyer, and Buyer shall assume, the Intellectual Property Registrations.

"Intellectual Property Registrations" means all federal, state and foreign: (i) patents, including applications therefore (including provisional applications), (ii) registered trademarks, service marks and applications to register trademarks and service marks, including intent-to-use applications, and (iii) copyrights registrations and applications to register copyrights; that are owned by Seller.

"Inventory" means all inventory owned by Seller and used in the Business as of the Closing Date, including all inventories of raw materials, work-in-process, finished goods, supplies, parts and packaging materials including inventory that is either (i) located at any Seller facility (whether owned, leased, licensed or otherwise), (ii) in transit to a Seller facility or to suppliers, (iii) with distributors (iv) with customers on consignment, or (iv) pertaining to goods manufactured or to be manufactured at sites other than a Seller facility.

"Knowledge of Seller" means the actual knowledge of Owner after reasonable inquiry with those employees or advisors of Seller reasonably expected to have material knowledge of the respective issue, which shall include but not be limited to Seller's employees.

"Lease" has the meaning set forth in Section 3.18.

"Liability" or "Liabilities" means any or all obligations (whether to make payments, to give notices or to perform or not perform any action), commitments, contingencies and other liabilities of Seller to a Person (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due), and including, without limitation, Indebtedness and any Damages.

"Liens" mean any encumbrance, lien, claim, charge, mortgage, pledge, adverse or other claim, condition, option, warranty, right of first refusals, easement, right of way, covenant, restriction or security interest of any kind or nature.

"Litigation Conditions" has the meaning set forth in Section 7.5(a).

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to: (i) the business, results of operations, condition (financial or otherwise) or assets of the Business (or Buyer's ability to use and operate the same substantially as did Seller prior to the Closing) for a commercially reasonable period, taken as a whole, or (ii) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change (but excluding any such event, occurrence, fact, condition or change relating to the presence or Release of Hazardous Materials relating to the Business), directly or indirectly, arising out of or attributable to: (A) general (domestic, foreign or global) economic, business or political conditions; (B) conditions generally affecting the industries in which the Business operates; (C)

any changes in financial or securities markets in general; (D) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (E) any action required or permitted by this Agreement; (F) any changes in Applicable Laws; *provided further, however,* that any event, occurrence, fact, condition or change referred to in clauses (A) through (D) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a materially disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"Material Contracts" has the meaning set forth in Section 3.7(a).

"Most Recent Balance Sheet" has the meaning set forth in Section 3.4.

"Net Working Capital Target" means an amount calculated as the one (1) month average of Seller's net working capital, calculated consistent with the Accounting Principles, during the most recent twelve (12) full calendar month period ending on the last day of the calendar month immediately preceding Closing.

"Notice" has the meaning set forth in Section 2.3(a).

"Ordinary Course of Business" means an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

> (a)    such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

> (b)    such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority); and

> (c)    such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Organizational Documents" means, with respect to any corporation, the articles or certificate of incorporation, as applicable, and the bylaws or code of regulations, as applicable, of such corporation; with respect to any limited liability company, the articles of organization (or certificate of formation) and the limited liability company agreement or operating agreement, as applicable, of such limited liability company; and with respect to any general partnership or limited partnership, the certificate of partnership or certificate of limited partnership, as applicable, and the partnership agreement or limited partnership agreement, as applicable, of such general partnership or limited partnership.

"Owner" has the meaning set forth in the Preamble.

"Permits" has the meaning set forth in Section 3.11.

"Permitted Liens" means (i) statutory Liens incurred in the ordinary course of the Business for obligations not yet due; (ii) Liens for Taxes not yet due or being contested in good faith by appropriate proceedings for which sufficient reserves are established; and (iii) Liens set forth in Section 1-D of the Disclosure Schedule, which, unless otherwise specifically stated on such Disclosure Schedule, shall be released at Closing.

"Person" means an individual, corporation, limited liability company, partnership, trust, unincorporated association or any other entity or organization.

"Personal Data" means all data relating to one or more individual(s) that is personally identifying (i.e., data that identifies an individual or, in combination with any other information or data available to Seller, is capable of identifying an individual) or non-personally identifying, including, without limitation, aggregate or de-identified data.

"Pre-Closing Debt" means the principal amount of all Indebtedness of Seller that is outstanding as of the Closing Date, together with all unpaid and accrued interest, fees and penalties (including prepayment penalties, acceleration fees or similar amounts) and all obligations under interest rate, currency swap, or hedging transactions for any Indebtedness, which is due and payable thereon or which arises out of any early prepayment of such Indebtedness, if any.

"Privacy and Data Security Policies" has the meaning set forth in Section 3.10(e).

"Product Liability Obligations" means all liabilities of Seller to any Person (including those related to death or damage to property (including loss of the use thereof)) under any product liability theory (whether negligence, breach of express or implied warranty, strict liability, violation of Applicable Laws or other), arising from any services provided by Seller or products manufactured by Seller prior to the Closing Date.

"Purchase Price" has the meaning set forth in Section 2.2(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.4.

"Quality of Earnings Report" means that certain quality of earnings report prepared by Whitley Penn, LLP and captioned Baymark Partners, L.P. Due Diligence Report for ACET Venture Partners LLC May 4, 2017, as updated from time to time.

"Real Property" has the meaning set forth in Section 3.18(a).

"Recall Obligations" means all Liabilities of Seller to customers that (i) arise from any valid recall order of a Governmental Authority issued pursuant to Applicable Law for Company Products or from a recall of defective products (including without limitation, Company Products) reasonably required to protect the image of Seller, and (ii) require the systematic repair or replacement of any products (including without limitation, Company Products), in each case arising from any products (including without limitation, Company Products) manufactured, sold or delivered by Seller on or prior to the Closing Date.

"Related Agreements" mean all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with this Agreement by any Person.

"Release" means any release, or threatened release, spill, emission, leaking, pumping, pouring, emptying, disposing, injection, deposit, discharge, leaching, or migration into any media, whether soil, surface water, ground water, building interior or components, air or any combination of the foregoing, and the movement of any contamination through any media, and including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials.

"Resolution Period" has the meaning set forth in Section 2.3(a).

"Seller" has the meaning set forth in the Preamble.

"Seller Indemnified Parties" has the meaning set forth in Section 7.2(b).

"Seller Note" has the meaning set forth in the Section 2.2(a)(ii).

"Seller Parties" has the meaning set forth in the Preamble.

"Seller Representative" has the meaning set forth in Section 8.13(a).

"Seller's Indemnifiable Claims" has the meaning set forth in Section 7.2(b).

"Tangible Personal Property" means the equipment, machinery, tools, dies, molds, tooling (including which is located at suppliers' places of business) furniture, fixtures, computers, hardware supplies, mobile phones (and associated numbers), motor vehicles, supplies and other tangible personal property owned by Seller, including those listed on Section 1-C of the Disclosure Schedule.

"Tax Return" means any report, return, document, declaration or other information or filing required to be supplied to any taxing authority or jurisdiction (foreign or domestic) with respect to Taxes, including, without limitation, information returns, any documents with respect to or accompanying payments of estimated Taxes, or with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information.

"Taxes" means any and all taxes, charges, fees, levies or other assessments, including, without limitation, income, employment, profits, use, alternative minimum, gross receipts, value added, excise, real or personal property, escheat, unclaimed property, estimated, sales, withholding, social security, retirement, unemployment, occupation, service, service use, license, net worth, payroll, franchise, transfer, recording and any other taxes, fees and charges of any kind whatsoever and however denominated, imposed by the Internal Revenue Service or any other taxing authority (whether domestic or foreign, including, without limitation, any state, county, local or foreign government or any subdivision or taxing agency thereof (including a United States possession or territory)), whether computed on a separate, consolidated, unitary, combined or any other basis; and such term includes (i) any interest, whether paid or received,

fines, penalties or additional amounts attributable to, or imposed upon, or with respect to, any such taxes, charges, fees, levies or other assessments and (ii) any liability for such amounts as a result of being a member of a consolidated, combined, unitary or affiliated group or of a contractual obligation to indemnify any other Person.

"Top Customers" has the meaning set forth in Section 3.16(a).

"Top Vendors" has the meaning set forth in Section 3.16(b).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

"Transferred Employees" has the meaning set forth in Section 5.3.

"Warranties" has the meaning set forth in Section 3.17.

"Warranty Obligations" means all liabilities under, or claims arising from any express or implied warranty relating to any products (including without limitation, Company Products) manufactured, sold or delivered by Seller on or prior to the Closing Date, excluding Customer Service Calls.

## ARTICLE II
## PURCHASE AND SALE

**2.1**   Purchase and Sale of Acquired Assets; Excluded Assets; Assumed Liabilities; Excluded Liabilities.

(a)   In accordance with, and subject to, the provisions of this Agreement, at the Closing, Seller will sell, transfer, convey, assign, deliver and set over to Buyer, and Buyer will purchase and accept, all of the right, title and interest of Seller in, to and under the Acquired Assets free and clear of all Liens other than Permitted Liens, which will be effected and evidenced pursuant to the Bill of Sale. Notwithstanding anything to the contrary in this Agreement, the transfer of the Acquired Assets will not include the assumption of any Excluded Liability or any Liability relating to the Acquired Assets unless Buyer expressly assumes the same pursuant to Section 2.1(c).

(b)   Notwithstanding anything to the contrary contained herein, the Acquired Assets do not include, and in no event will Buyer acquire any right, title or interest in, to and under any of the Excluded Assets.

(c)   In accordance with, and subject to, the provisions of this Agreement, at the Closing, Buyer will assume and agree to pay, perform and discharge and hold Seller harmless from the Assumed Liabilities (but only the Assumed Liabilities).   The assumption of the Assumed Liabilities by Buyer will be effected and evidenced pursuant to the Assignment and Assumption Agreement. Seller will retain and will be responsible for all Excluded Liabilities, will pay, perform, and discharge each Excluded Liability in a timely and efficient manner and will hold harmless Buyer Indemnified Parties from all Excluded Liabilities.

(d)     Notwithstanding anything to the contrary contained herein, the Assumed Liabilities will not include, and in no event will Buyer assume, be required to pay, perform, discharge or hold a Seller Covered Party harmless from any Excluded Liabilities.

**2.2**   Purchase Price[1].

(a)     Subject to the other terms and provisions of this Article II, the aggregate purchase price to be paid by Buyer to Seller in consideration of the Acquired Assets, shall be as follows, subject to adjustment as provided in Section 2.3 (the "Purchase Price"):

(i)     Eight Hundred Fifty Thousand and No/100 Dollars ($850,000) payable to Seller in cash in accordance with subsection (b) below (the "Cash Portion of the Purchase Price");

(ii)     a subordinated secured promissory note in the original principal amount of Three Million Two Hundred Thirty Thousand and No/100 Dollars ($3,230,000) in the form attached hereto as Exhibit E (the "Seller Note"), which Seller Note will be secured by a pledge of a 59% economic interest in Buyer pursuant to a Security Agreement in the form attached hereto as Exhibit F (the "Security Agreement");

(iii)     a 25% common membership interest (with a $0.00 capital account balance at the time of issuance) in Baymark ACET Holdco, LLC, a Texas limited liability company ("Holdco") (the "Equity Interest"), as more specifically set forth in that certain Company Agreement of Holdco (the "Company Agreement").

(iv)     Buyer's assumption of the Assumed Liabilities.

(b)     At the Closing, Buyer will pay to Seller the Cash Portion of the Purchase Price by wire transfer of immediately available funds, as follows:

(i)     Buyer will pay, on Seller's behalf, and as agreed by Buyer and Seller, the aggregate amount required to pay in full all of the Indebtedness of Seller (including but not limited to that evidenced by the payoff letters delivered to Buyer pursuant to Section 6.2(g), if any); and

(ii)     Buyer shall pay to Seller, an amount equal to the Cash Portion of the Purchase Price less those amounts paid on Seller's behalf pursuant to subsection (i) above, if any.

**2.3**   Purchase Price Adjustment.

(a)     On or before the expiration of ninety (90) days following the Closing Date, Buyer will deliver to Seller Representative a statement (the "Closing Statement") setting forth a calculation of the Closing Date Net Working Capital for Seller.  If Seller

---

[1] NTD:  It is a condition to Closing that at least $200,000 be on Seller's balance sheet and included in the Purchased Assets.

Representative has any objections to the Closing Statement as prepared by Buyer, Seller Representative must, within thirty (30) days after Seller Representative's receipt thereof, give written notice (the "Notice") to Buyer specifying in reasonable detail such objections and Seller Representative shall provide Buyer and its accountants and other representatives with access to the properties, books, records, work papers and personnel of Seller and their accountants, and shall cause the same to cooperate and work in good faith with Buyer for purposes of resolving any differences. If Seller Representative does not deliver the Notice within such thirty (30) day period, Buyer's determination of the Closing Statement shall be final, binding and conclusive on Seller and Buyer. With respect to any disputed amounts, Seller Representative and Buyer shall negotiate in good faith during the thirty (30) day period (the "Resolution Period") after the date of Buyer's receipt of the Notice to resolve any such disputes. If Seller Representative and Buyer are unable to resolve all such disputes within the Resolution Period, then, within five (5) business days after the expiration of the Resolution Period, all disputes shall be submitted to Whitley Penn, LLP (the firm that prepared the Quality of Earnings Report) (the "Accountant"), who shall be engaged to provide a final and conclusive resolution of all unresolved disputes as promptly as practicable after such engagement. Buyer, Seller and Representative agree to execute a reasonable engagement letter if requested by the Accountant. The Accountant shall determine only those issues that remain in dispute. In resolving any matters in dispute, the Accountant may not assign a value to any item in dispute greater than the greatest amount for such item assigned by Buyer in the Closing Statement, on the one hand, or Seller Representative in the Notice, on the other hand, or less than the smallest amount for such item assigned by Buyer in the Closing Statement, on the one hand, or Seller Representative in the Notice, on the other hand. The Accountant's determination will be based solely on written submissions by Buyer and Seller Representative (i.e., not on the basis of an independent review) and in accordance with the guidelines and procedures set forth in this Agreement. The Accountant's determination shall be set forth in a written report which shall include an explanation of the reasons for its determination on each matter in dispute and shall be final, binding and conclusive on the parties, absent manifest error, which report will be delivered to Seller Representative and Buyer within thirty (30) days after submission of such dispute to the Accountant. Buyer and Seller Representative agree that the procedures set forth in this Section 2.3(a) for resolving disputes with respect to the Closing Statement shall be the sole and exclusive method for resolving any such disputes. The fees and expenses of the Accountant shall be allocated by the Accountant within its written report between Seller and Buyer based on the aggregate percentage that the portions of the contested amounts not awarded to each party bear to the aggregate amounts contested by such party, and each party shall bear its own other expenses in connection therewith, including its attorneys' and accountants' fees.

(b)     Upon the final determination pursuant to Section 2.3(a) of the actual Closing Date Net Working Capital, the Cash Portion of the Purchase Price shall be adjusted as follows:

(i)     If Closing Date Net Working Capital is equal to the Net Working Capital Target, then there shall be no further adjustment to the Purchase Price based on Closing Date Net Working Capital.

(ii)     If Closing Date Net Working Capital is greater than the Net Working Capital Target, then Buyer shall pay to Seller Representative an amount equal to such difference (the "Buyer W/C Amount") in accordance with Section 2.3(c).

(iii)     If Closing Date Net Working Capital is less than the Net Working Capital Target, then the Seller Note shall be amended to reduce the principal amount thereof by an amount equal to such difference. Each of Buyer and Seller shall take such action as required to evidence such amendment of the Seller Note.

(c)     The first $180,000 of the Buyer W/C Amount shall be paid in nine (9) equal monthly installments with the first such payment being due and payable on the last day of the calendar month following the determination of the Buyer W/C Amount and each successive payment being due and payable on the last day of each of the 8 calendar months thereafter. If the Buyer W/C Amount exceeds $180,000, then the Seller Note shall be amended to increase the principal amount thereof by an amount equal to such excess. Each of Buyer and Seller shall take such action as required to evidence such amendment of the Seller Note. This subsection (c) is not intended to imply that the Buyer W/C Amount will be less or more than $180,000. Buyer may prepay without penalty or fee any or all of the aforementioned monthly installments of the Buyer W/C Amount.

**2.4**   Purchase Price Allocation.  Buyer and Seller agree that the Purchase Price (and any Assumed Liabilities and other capitalized costs) shall be allocated among the Acquired Assets in accordance with their fair market values and useful lives consistent with Section 1060 of the Code, as such allocation shall be mutually agreed to between the Seller and Buyer for all tax purposes as set forth on Exhibit G (the "Purchase Price Allocation"). Following the final determination pursuant to Section 2.3(a) of the actual Closing Date Net Working Capital, Buyer shall prepare and deliver Internal Revenue Service Form 8594 to the Seller for its review, which shall be consistent with Exhibit G attached hereto. Upon the agreement of all parties as to the Form 8594, it shall be timely filed with the Internal Revenue Service by all parties and Buyer and Seller shall file all Tax Returns in a manner consistent with such allocation.

**2.5**   Assets Incapable of Transfer.  To the extent that any Transferred Contract or Permit is not assignable or transferable without the consent of another Person, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof and the same shall not constitute an Acquired Asset until such time as such consent is obtained, if ever. Seller will use commercially reasonable efforts to obtain the consent of such other Person to the assignment or transfer of any such Transferred Contract or Permit to Buyer in all cases in which such consent is or may be required for such assignment or transfer. Buyer will, without incurring any additional cost or expense, cooperate with Seller in its efforts to obtain such consents. Seller will cooperate with Buyer in Buyer's efforts to obtain any Permits and agree to take such commercially reasonable actions as necessary to assist Buyer in obtaining the Permits. If any such consent will not be obtained with respect to a Transferred Contract or

Permit, Seller will use its commercially reasonable efforts to provide an alternate arrangement, including, without limitation, subcontractor agreements, satisfactory to Buyer designed to provide to Buyer the full economic benefits intended to be assigned or transferred to Buyer under the relevant Transferred Contract or Permit.   Without limiting the generality of the foregoing, the beneficial interest in and to the Transferred Contracts or Permits, to the fullest extent permitted by the relevant Transferred Contract or Permit, will pass in full to Buyer.

## ARTICLE III
## REPRESENTATIONS OF SELLER

Seller hereby represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof, subject to the qualifications and exceptions set forth in the applicable section of the disclosure schedule provided by Seller to Buyer (the "Disclosure Schedule").   All Section headings in the Disclosure Schedule correspond to the Sections of this Agreement; provided that any information contained in any Section of the Disclosure Schedule shall constitute disclosure for purposes of any other Section of this Agreement where such disclosure is incorporated by specific reference.

**3.1**   Existence and Good Standing.   Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Texas.   Seller has all requisite limited liability power and authority to own, lease and operate its properties and to carry on its business as now being conducted, and Seller is duly qualified or licensed to do business, and is in good standing or full force and effect, as the case may be, in the jurisdiction in which the character or location of the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary.   A list of all such jurisdictions in which Seller is qualified or licensed to do business is set forth on Section 3.1 of the Disclosure Schedule.   Owner is the only beneficial owner of Seller, is the only member of Seller, and no other Person has any interest in or an option, warrant or other right to acquire an interest in Seller or in the Acquired Assets (other than Buyer).

**3.2**   Authorization and Binding Obligation.

(a)   Seller has all necessary power and authority to execute and deliver this Agreement and each of the Related Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement by Seller and each of the Related Agreements to which Seller is a party and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Seller.   This Agreement has been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies).

(b)   Owner has all necessary power and authority to execute and deliver this Agreement and each of the Related Agreements to which he is a party and to consummate the transactions contemplated by this Agreement and by the Related Agreements. This Agreement has been duly executed and delivered by Owner and,

496515 v8

16

**APP026**

assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of Owner, enforceable against Owner in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies).

**3.3**   No Violations; Approvals.  The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and compliance with the provisions of this Agreement will not conflict with, or result in any breach, violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or acceleration of any obligation or a loss of any rights under, or result in the creation of any Lien upon, any of the Acquired Assets under, (a) the Organizational Documents of Seller, (b) any Contract, Permit, or other agreement applicable to Seller, Owner or its respective properties or assets, or (c) subject to the governmental filings and other matters referred to in the following sentence, any Applicable Laws. No consent, approval, order or authorization of, or registration or filing with any Governmental Authority or any Person is required by or with respect to Seller or Owner in connection with the execution and delivery by Seller or Owner of this Agreement and the Related Agreements or the consummation by Seller or Owner of the transactions contemplated by this Agreement, except for those described on Section 3.3(a) of the Disclosure Schedule. As of the Closing Date, Seller has obtained the requisite consent of those Persons who are counterparty to the Contracts set forth in Section 3.3(b) of the Disclosure Schedule.  After the Closing Date, Seller and Owner will undertake good faith efforts to obtain the requisite consent of those Persons listed in Section 3.3(c) of the Disclosure Schedule.

**3.4**   Financial Statements.  Section 3.4 of the Disclosure Schedule sets forth true and correct copies of (i) the unaudited balance sheet of Seller as of December 31, 2014, December 31, 2015 and December 31, 2016, together with the related statements of income and members' equity and statements of cash flow for the fiscal years then ended (collectively, the "Annual Financial Statements") and (ii) the balance sheet of Seller as of May 31, 2017 (the "Balance Sheet Date") together with the related statements of income and cash flow for the five month period then ended (collectively, the "Most Recent Balance Sheet" and, together with the Annual Financial Statements, the "Financial Statements"). The Financial Statements (x) are true, complete and correct in all material respects and fairly present in all material respects the financial condition and results of operations, and cash flow of the Business at and as of the dates thereof and for the periods covered thereby, (y) were prepared in accordance with generally recognized accounting principles consistent with past practices of Seller, and (z) were compiled from books and records regularly maintained by management of Seller used to prepare the financial statements of Seller.  Seller has no Liability (whether known or unknown, accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when asserted), other than (A) Liabilities set forth on the Most Recent Balance Sheet (rather than any notes thereto), (B) Liabilities which have arisen after the date of the Most Recent Balance Sheet in the Ordinary Course of Business (none of which is a Liability resulting from breach of contract, tort, infringement, claim, lawsuit, Product Liability Obligations, Recall Obligations, Warranty Obligations, violation of Applicable Law or Environmental Liability), and (C) obligations of Seller pursuant to Material Contracts set forth on Section 3.7 of the Disclosure Schedule or other Contracts not required to be disclosed on

such Schedule (none of which is a Liability resulting from breach of contract, tort, infringement, claim, lawsuit, Product Liability Obligations, Recall Obligations, Warranty Obligations, violation of Applicable Law or Environmental Liability).

**3.5**   <u>Absence of Certain Changes</u>.   Except as set forth on <u>Section 3.5</u> of the Disclosure Schedule or as otherwise contemplated by this Agreement, since the Balance Sheet Date through and including the date of this Agreement, Seller has operated only in the Ordinary Course of Business in all material respects, there has not been an event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and Seller has not:

(a)   sold, leased, transferred or assigned any assets, tangible or intangible, outside the Ordinary Course of Business, or acquired any material assets, except for acquisitions of Inventory, equipment, parts and supplies in the Ordinary Course of Business;

(b)   entered into any Contract outside the Ordinary Course of Business;

(c)   accelerated, terminated, made material modifications to or canceled any Contract to which Seller is a party or by which Seller is bound outside of the Ordinary Course of Business;

(d)   made any capital expenditures outside the Ordinary Course of Business or failed to make any budgeted capital expenditures;

(e)   made any capital investment in, or any loan to, any other Person outside the Ordinary Course of Business;

(f)   created, incurred, assumed or guaranteed more than $20,000 in aggregate capitalized lease obligations;

(g)   experienced any damage, destruction or loss (whether or not covered by insurance) to its property greater than $20,000 in a single occurrence;

(h)   entered into any employment Contract or collective bargaining agreement, written or oral, or modified the material terms of any existing such Contract or collective bargaining agreement;

(i)   granted any increase in the base compensation of any of its managers, director, officers and employees outside the Ordinary Course of Business;

(j)   adopted, amended, modified or terminated any bonus, profit sharing, incentive, severance or other plan, contract or arrangement for the benefit of any of its directors, officers and employees outside the Ordinary Course of Business or except as required by Applicable Law;

(k)   made any other change in employment terms for any of its directors, officers and employees outside the Ordinary Course of Business;

(l)    made any change in Seller's accounting principles or practices or their method of application of such principles or practices;

(m)    made, changed or revoked any Tax election or accounting method of Seller, failed to file any Tax Return required to be filed by Seller in a timely manner with the appropriate Tax authorities or to pay any Taxes shown to be due thereon, settled a claim or assessment with respect to Taxes, executed a closing agreement or similar agreement with respect to Taxes, or executed a waiver of a statutory period of limitations with respect to the assessment or collection of Taxes; or

(n)    agreed, in writing or otherwise, to take any of the actions specified in paragraphs (a) through (m) above.

**3.6**    <u>Title to Properties</u>.  Seller has good and marketable title to all of the Acquired Assets and the right to use and to transfer and assign to Buyer all Acquired Assets, in each case free and clear of all Liens except Permitted Liens.  At the Closing, Buyer will receive good and marketable title to all of the Acquired Assets transferred to it free and clear of and from all Liens except Permitted Liens.  All of the Tangible Property, including without limitation the machinery and equipment material to the operation of the Business, as of the Closing, are in good working condition and repair (allowing for ordinary wear and tear) and are adequate for the purposes for which they are being used in Seller's normal business operations.  The Acquired Assets, including, without limitation, the machinery and equipment included in the Acquired Assets, constitute all of the assets and property now used in and necessary for the conduct of the Business as presently conducted.  Except as set forth in <u>Section 3.6</u> of the Disclosure Schedule, to the Knowledge of Seller, none of the machinery and equipment is out of service or not in use and none are subject to deferred maintenance that will not be complete as of the date of this Agreement. The Acquired Assets will enable Buyer to operate the Business immediately after the Closing in the same manner as operated by Seller immediately prior to the Closing.  None of the Excluded Assets are material to the Business.

**3.7**    <u>Material Contracts</u>.

(a)    <u>Section 3.7</u> of the Disclosure Schedule contains true and correct lists of all of the following Contracts to which Seller is a party categorized on the Disclosure Schedule by the subsections listed below ("<u>Material Contracts</u>"):

(i)    all Contracts involving commitments to others to make capital expenditures in excess of $20,000;

(ii)    all Contracts involving commitments to others to make purchases or sales in excess of $20,000 (applied on a per contract basis), including, without limitation, Contracts with the Top Customers and Top Vendors;

(iii)    any employment, confidentiality, non-competition, severance or termination agreements as to employees, independent contractors and consultants;

(iv)    all Contracts evidencing Indebtedness or mortgaging, pledging or otherwise placing a Lien on the assets of Seller;

(v)     all Contracts with any Governmental Authority;

(vi)    all Contracts that in any way could limit the freedom of Buyer to engage in any line of business, to hire or solicit any Person or to compete with any Person in any area or territory;

(vii)   all Contracts that provide for the indemnification by Seller of any Person;

(viii)  all Contracts with Affiliates of Seller or with Owner;

(ix)    all Contracts that cannot be terminated by Seller without cause on 30 days' or less notice without the payment of any amount or the incurrence of any liability by Seller;

(x)     all Contracts (whether exclusive or otherwise) with any sales agent, representative, franchisee, dealer or distributor;

(xi)    all capital and real property leases;

(xii)   any joint venture, any Contract that involves a sharing of revenues, profits, cash flows, expenses or losses with any other Person or any Contract that involves the payment of royalties to any other Person; and

(xiii)  all Contracts that grant to any Person any right of first refusal, option to purchase or similar rights, or exclusive rights to purchase any products or services (or equity) from Seller.

(b)     True and correct copies of each Contract listed in Section 3.7 of the Disclosure Schedule or required to be listed in Section 3.7 of the Disclosure Schedules have been delivered to Buyer. Each Material Contract is in full force and effect, is fully assignable to Buyer without the consent of any third party, except as set forth on Section 3.3 of the Disclosure Schedule, and is valid, binding and enforceable in accordance with its terms as to Seller and, to the Knowledge of Seller, the other parties to such Material Contract. Seller has performed and is performing, in all material respects, all obligations required to be performed by Seller under the Material Contracts. No default exists (or, solely as a result of the consummation of the transactions contemplated hereby, is likely to arise) on the part of Seller or, to the Knowledge of Seller, on the part of any other Person under any of the Material Contracts. Seller has not assigned, delegated or otherwise transferred any interests in any Material Contract. There are no disputes pending, or to the Knowledge of Seller, threatened under any Material Contract.

**3.8**   Litigation.   Section 3.8 of the Disclosure Schedule contains an accurate description of each lawsuit, arbitration, notice of violation, pending enforcement proceeding or other legal proceeding to which any Seller Party is currently or, since January 1, 2014, has been a party. Except as set forth on Section 3.8 of the Disclosure Schedule, there is no action, suit or proceeding at law or in equity or any arbitration, administrative or other proceeding by or before any Governmental Authority pending, or, to the Knowledge of Seller, threatened,

against any Seller Party.  There is no claim, action, suit or proceeding pending or, to the Knowledge of Seller, threatened against any Seller Party by or before any Governmental Authority that would have or would reasonably be expected to impede the ability of any Seller Party to complete the transactions contemplated by this Agreement.  There are no outstanding orders or judgments affecting or relating to any Seller Party or the Acquired Assets.

**3.9**   Taxes.

(a)   Except as set forth on Section 3.9(a) of the Disclosure Schedule, Seller has filed all Tax Returns that it was required to file, such Tax Returns are true, correct and complete in all material respects and Seller has paid all Taxes due and owing as set forth on such filed Tax Returns.  Seller has not been delinquent in the payment of any Tax, nor is there any Tax deficiency outstanding or assessed against Seller.

(b)   Section 3.9(b) of the Disclosure Schedule lists all federal and state income Tax Returns (and narratively describes all Tax Returns filed with any city or municipality) filed with respect to Seller for taxable periods ended on or after December 31, 2014, indicates which of those Tax Returns have been audited, and indicates which of those Tax Returns currently are, as of the Closing Date, the subject of audit.

(c)   Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)   Seller is not a party to any Tax allocation or sharing agreement nor does Seller have any liability to any Person with respect to any previously terminated Tax allocation or sharing agreement.

(e)   All monies required to be withheld by Seller from employees, independent contractors, creditors, or other third parties for Taxes have been collected or withheld, and timely paid in full to the respective Governmental Authorities. Seller is not currently the beneficiary to any extension of time within which to file any Tax Returns.

(f)   There is no dispute, claim, audit, or other proceeding concerning any Tax liability of Seller pending or, to the Knowledge of Seller, threatened or proposed.  There are no Tax rulings, requests for rulings, or closing agreements relating to Seller that could affect the liability for Taxes of Buyer or Seller for any period (or portion of a period) after the Closing Date.  There are no Tax deficiencies of any kind assessed against Seller with respect to any taxable period ending on or before the Closing Date.

(g)   The unpaid Taxes of Seller did not, as of the date of the Most Recent Balance Sheet, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet, and will not exceed that reserve as adjusted in the Ordinary Course of Business through the Closing Date in accordance with the past practices and customs of Seller in filing Tax Returns.

(h)     No claim has ever been made by an authority in a jurisdiction where a Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.

(i)     There are no Tax-related Liens against any of the Acquired Assets.

(j)     Buyer has been provided with true and complete copies of all Tax Returns, audit reports, statements of deficiencies, and examination reports of Seller for taxable periods beginning after December 31, 2014.

(k)     Buyer and Seller Parties acknowledge that Seller has engaged and relied upon tax professionals to advise Seller with respect to their tax obligations and reporting. Notwithstanding any limitations on the representations and warranties set forth in this Section, the Seller Parties acknowledge and agree that they are solely responsible for any and all errors, liabilities, disputes, claims, interest, penalties, Damages or other obligations arising from or relating to the Taxes or Tax Returns of any Selling Party.

**3.10** Intellectual Property.

(a)     Except as set forth on Section 3.10 of the Disclosure Schedule, Seller does not own any patents, patent applications, registered or unregistered trademarks, and registered or unregistered copyrights, nor have Seller ever owned any patents, patent applications, registered or unregistered trademarks, and registered or unregistered copyrights. The manner in which the Seller uses the Acquired Assets, including the Intellectual Property included in the Acquired Assets, in the Business does not violate or infringe the patent, trademark, copyright, trade secret or other intellectual property or other proprietary rights of any Person. All Intellectual Property necessary for the operation of the Business is owned by Seller or is licensed by Seller under license agreements to be assigned to Buyer and, except as set forth on Section 3.10 of the Disclosure Schedule, all such Intellectual Property will be available to Buyer immediately after the Closing on substantially the same terms and conditions to those under which Seller owned or used such Intellectual Property immediately prior to the Closing.

(b)     Except as set forth on Section 3.10 of the Disclosure Schedule, no claim has been asserted and, to the Knowledge of Seller, no claim has been threatened by any Person (1) against the use by Seller of any of the Acquired Assets or any Intellectual Property included in the Acquired Assets; (2) against Seller claiming infringement upon or misappropriation or violation of any Intellectual Property or other proprietary rights of third parties as a result of the use of the Acquired Assets or the operation by Seller of the Business as presently conducted; or (3) challenging the ownership, validity or enforceability of any of the Acquired Assets or any Intellectual Property included in the Acquired Assets.

(c)     Except as otherwise disclosed on Section 3.10 of the Disclosure Schedule, (1) neither the Seller, nor to the Knowledge of Seller, any other party thereto, is in default of any material obligation under any license or similar agreement relating to the Acquired Assets or the Intellectual Property included in the Acquired Assets; (2) Seller has not

granted any right, title or interest to any Person in or to the Acquired Assets or the Intellectual Property included in the Acquired Assets; and (3) except for license fees for any off-the-shelf commercial software, Seller is not obligated to pay any amount, whether as a royalty, license fee or other payment, to any Person, in order to use the Acquired Assets or the Intellectual Property included in the Acquired Assets.

(d)     Seller has taken reasonable steps to protect Seller's rights in Seller's proprietary and/or confidential information and trade secrets or any trade secrets or confidential information of third parties provided to Seller used or useful in the Business. All trade secrets and other confidential information of Seller used or useful in the Business are owned by Seller, are not part of the public domain nor, to the Knowledge of Seller, have they been misappropriated by any Person having an obligation to maintain such trade secrets or other confidential information in confidence for Seller. To the Knowledge of Seller, no employee or consultant of Seller has improperly used or misappropriated any trade secrets or other confidential information of any other person in the course of their work for Seller nor is Seller making unlawful use of any confidential information or trade secrets of any past or present employees of Seller.

(e)     Seller has implemented policies relating to the collection, use, storage, processing, transfer, disclosure and protection of Personal Data, including publicly available written privacy policies per brand and written information security policies (collectively, "Privacy and Data Security Policies"), and Seller is in compliance in all material respects with such Privacy and Data Security Policies. Neither the execution, delivery or performance of this Agreement, nor the consummation of any of the transactions contemplated hereby will violate (i) the Privacy and Data Security Policies; (ii) Applicable Laws or other requirements of any Governmental Authority pertaining to the collection, storage, use, disclosure and transfer of Personal Data, data protection and e-commerce; or (iii) any Contracts between Seller and vendors, marketing affiliates, distributors, and all other customers and business partners that are applicable to the use and disclosure of Personal Data. Seller has commercially reasonable safeguards in place to protect Personal Data in its possession or control from unauthorized access by third parties, including Seller's employees and contractors. There has been no unauthorized access, use or disclosure of Personal Data in the possession or control of Seller, and, to the Knowledge of Seller, in the possession or control of any contractors of Seller.

(f)     The computer software, hardware, firmware, servers, networks and related systems (collectively, "Computer Systems") used by Seller are sufficient for the current needs of the Business, and, in the last twelve (12) months, there have been no material failures, crashes or other adverse events affecting the Computer Systems.

**3.11**  Compliance with Laws; Permits.  During the past three years, Seller has complied in all material respects, and is currently in material compliance, with all laws, statutes, orders, rules, regulations, policies or guidelines promulgated, and judgments, decisions or orders entered, by any Governmental Authority applicable to Seller, the Business, and the Acquired Assets (collectively, "Applicable Laws"). All approvals, permits, consents and licenses, if any, of all Governmental Authorities that are necessary to permit Seller to carry on the Business as currently conducted (collectively, "Permits") have been obtained and are in full force and

effect. There has been no violation, cancellation, revocation or default of any Permit. All such Permits are set forth on Section 3.11 of the Disclosure Schedule. As of the date hereof, Seller has not received any notice of, and to the Knowledge of Seller, Seller is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any Applicable Laws or Permits.

**3.12** Employee Benefit Plans.

(a)     Except for the plans or arrangements listed on Section 3.12(a) of the Disclosure Schedule (hereinafter referred collectively to as the "Employee Benefit Plans" and individually as an "Employee Benefit Plan"), Seller does not, directly or indirectly, maintain, sponsor or have an obligation or liability with respect to, any employee benefit plan, fringe benefit, equity compensation, executive or deferred compensation, or incentive plan, bonus or severance arrangement, employment contract, collective bargaining agreement, union contract, deferred compensation agreement, stock purchase or incentive plan or arrangement, or other employee benefit plan or arrangement. To the Knowledge of Seller, each Employee Benefit Plan is in compliance in all material respects with all Applicable Laws, and is being administered and operated in all material respects in accordance with its terms. Full payment has been made, or otherwise properly accrued on the books and records of Seller, of all amounts that Seller is required under the terms of the Employee Benefit Plans to have paid as contributions to such Employee Benefit Plans on or prior to the date hereof (excluding any amounts not yet due). Notwithstanding any limitations on the representations and warranties set forth in this Section, the Seller Parties acknowledge and agree that they are solely responsible for any and all errors, omissions, claims, liabilities, disputes, Damages or other obligations arising from or relating to the Employee Benefit Plan of Seller.

(b)     Section 3.12(b) of the Disclosure Schedule contains a list of the current employees of the Business and the total salary, bonus payments and commissions received in the calendar year ended December 31, 2016 by each such employee. All of the employees of the Business will be fully paid through the Closing Date, and, other than as specifically set forth on Section 3.12(b) of the Disclosure Schedule, there shall be no unpaid or unaccrued for salary compensation, bonus, or any other salary-based employee benefit due and owing to any employee of Seller.

(c)     There is no employment-related charge, complaint, grievance, investigation or inquiry pending or, to the Knowledge of Seller, threatened, in any forum, relating to an alleged violation or breach by Seller of any Applicable Law.

(d)     Seller is not a party to any collective bargaining or other labor agreements with respect to the employees of the Business, nor has Seller ever been a party to any collective bargaining or other labor agreements with respect to the employees of the Business. There is no unfair labor practice charge or complaint against Seller pending, or to the Knowledge of Seller, threatened under any Applicable Laws with respect to the employees of the Business.

(e)     Seller has complied in all material respects with all foreign, federal, state and local laws (including common law), ordinances and regulations which relate to

employees, the employment of labor, compensation for employment, classification of employees and termination of employment relationships.

**3.13** Environmental Matters.

(a)     To the Knowledge of Seller, Seller is in material compliance with all Environmental Laws.   Seller has not received any notice from any Governmental Authority or other third party that alleges that Seller is not in compliance with any Environmental Laws, nor is there any litigation or other legal proceedings, whether judicial or administrative, pending or, to the Knowledge of Seller, threatened with respect to the foregoing.

(b)     Neither Seller nor, to the Knowledge of Seller, any facility owned, leased or otherwise occupied by Seller, is subject to any contingent liability in connection with the Release or presence of any Hazardous Materials, including, but not limited to, any requirement or liability for the investigation, cleanup or remediation of any Hazardous materials, or the violation of any Environmental Law.

(c)     To the Knowledge of Seller, all Hazardous Materials removed from any real property ever owned, leased, or used by Seller have been handled, transported, transferred, stored, treated, recycled, received and disposed of in compliance with all Environmental Laws.

(d)     No Hazardous Materials have been or are being generated, used, processed, treated, stored, Released, emitted, transported or disposed of by Seller on or about any facility owned, leased or otherwise occupied by Seller during the period of Seller's occupancy except in material compliance with all applicable Environmental Laws.

(e)     Except for those Hazardous Materials used by Seller in its Ordinary Course of Business, which Hazardous Materials are used, processed, treated, stored, Released, emitted, transported or disposed of by Seller in compliance with all applicable Environmental Laws, no Hazardous Materials are present on or, to the knowledge of Seller, under any facility owned, leased or otherwise occupied by Seller.

(f)     To the Knowledge of Seller, there are no asbestos-containing materials located on or at any facility owned, leased or otherwise occupied by Seller.

(g)     To the Knowledge of Seller, no underground storage tanks are or have been located on or at any facility owned, leased or otherwise occupied by Seller.

(h)     To the Knowledge of Seller, there are no past or present events, conditions, circumstances, activities, practices, incidents, actions, or plans which have given or may give rise to any Environmental Liabilities, or which otherwise form the basis of any claim, suit, action, demand, proceeding, penalty, fine, hearing, notice of violation, directive, or requirement to undertake any remedial action under any Environmental Laws or otherwise relating to the Business or any facility owned, leased or otherwise occupied by Seller.

(i)    Section 3.13 of the Disclosure Schedule identifies, and Seller has provided to Buyer, true and complete copies of all environmental assessments, audits, reports, studies, analyses, correspondence, summaries, maps, photographs, tests, and monitoring results (completed or uncompleted), and all material written communications filed by Seller or between Seller and any Governmental Authority or third parties, in the possession or control of Seller, or initiated or authorized by Seller, arising under or relative to Environmental Laws or Hazardous Materials, including any orders, notices of violation, warning letters, or requests for information with respect to Seller or any real property used at any time by Seller, or any Person for whose conduct Seller is or may be held responsible.

**3.14** Insurance.  Seller maintains the insurance policies listed on Section 3.14 of the Disclosure Schedule, all of which have been provided to Buyer.  All such policies are currently in full force and effect, and Seller has not received any notice from the insurer with respect to the cancellation of any such policy or any anticipated material increase in any premium thereto. All premiums that are due and payable on such policies have been paid or accrued on the Financial Statements, no insurer has, within the last three (3) years, questioned, denied or disputed (or otherwise reserved its rights with respect to) the coverage of any claim pending under any such policy listed on Section 3.14 of the Disclosure Schedule.  Seller is not in default with respect to its material obligations under any such insurance policy.  Except as set forth in Section 3.14 of the Disclosure Schedule, at no time have any of Seller's insurance policies been cancelled and no insurance provider has ever refused to renew or has cancel an insurance policy of Seller.  Section 3.14 of the Disclosure Schedule also contains a list of all pending claims made by any Person at any time since January 1, 2014 on any insurance policy with any insurance company that is currently in place or was in place during such period and which covered the Business, including, but not limited to, all claims denied by Seller's insurance carrier or being covered under a reservation of rights letter.  The insurance listed on Section 3.14 of the Disclosure Schedule will remain in place following the Closing until the expiration or renewal of such policies.  All claims of Seller for which insurance coverages would have been available have been properly tendered to the applicable insurance provider. Seller does not have any self-insurance or co-insurance programs.

**3.15** Broker's or Finder's Fees.    Other than as set forth on Section 3.15 of the Disclosure Schedule, Seller does not have any liability for a finder's fee, brokerage commission, advisory fee or other similar payment as a result of this Agreement or the consummation of the transactions contemplated hereby.

**3.16** Customers; Vendors.

(a)    Section 3.16(a) of the Disclosure Schedule sets forth a complete and accurate list of the top fifteen (15) customers of Seller, including annual sales to such customers, as measured by the revenue received by Seller from such customers during the years ended December 31, 2015 and December 31, 2016, and year-to-date for 2017 (the "Top Customers").  To the Knowledge of Seller, the relationships of Seller with the Top Customers are good working relationships and, to the Knowledge of Seller, none of the Top Customers has, or has threatened to, cancel, terminate or otherwise materially alter its relationship with Seller in a manner materially adverse to Seller. Seller is not engaged

in any dispute (excluding immaterial disputes in the Ordinary Course of Business) with any Top Customer and, to the Knowledge of Seller, no such customer intends to terminate, limit or reduce its business relations with Seller or otherwise change its business relationship with Seller in a manner adverse to Seller.  To the Knowledge of Seller, the execution of this Agreement, and the consummation of the transactions contemplated by this Agreement, will not materially adversely affect the relationships of Seller with its customers.

(b)     Section 3.16(b) of the Disclosure Schedule sets forth a complete and accurate list of the top ten (10) trade vendors of Seller, including annual purchases, as measured by the purchases made by Seller from such vendors during the years ended December 31, 2015 and December 31, 2016 and year to date 2017 (the "Top Vendors"). To the Knowledge of Seller, the relationships of Seller with the Top Vendors are good working relationships and, to the Knowledge of Seller, none of the Top Vendors has or has threatened to, cancel, terminate or otherwise materially alter its relationship with Seller in a manner materially adverse to Seller. Seller is not engaged in any dispute (excluding immaterial disputes in the Ordinary Course of Business) with any Top Vendor and, to the Knowledge of Seller, no such vendor intends to terminate, limit or reduce its business relations with Seller or otherwise change its business relationship with Seller in a manner adverse to Seller.  To the Knowledge of Seller, the execution of this Agreement, and the consummation of the transactions contemplated by this Agreement, will not materially adversely affect the relationships of Seller with its vendors.

**3.17**  Products.  Section 3.17 of the Disclosure Schedule sets forth a true and complete list of all product categories marketed and sold, directly or indirectly, by Seller in the past twelve (12) months. Except as set forth on Section 3.17 of the Disclosure Schedule, Seller has no current claims, liabilities or obligations arising from or alleged to arise from, any injury to any person (including employees and former employees of Seller) or property as a result of the manufacture, sale, ownership, possession or use of any Company Products.  Section 3.17 of the Disclosure Schedule contains correct and complete statements of all product warranties issued by Seller prior to Closing that are currently in effect (the "Warranties").  All products of Seller manufactured, shipped, or sold within the immediately preceding twelve-month period and any services provided by Seller has conformed in all material respects to the Warranties.

**3.18**  Real Property.

(a)  Seller leases the real property set forth on Section 3.18 of the Disclosure Schedule (the "Real Property").  Other than with respect to the Real Property, Seller is not a party to any leases for real property, do not operate out of any other location. Seller has delivered to Buyer a complete and correct copy of the leases governing the Real Property (and any amendments or supplements thereto) (whether one or more, the "Lease"). The Lease is valid and binding, and in full force and effect. Neither Seller nor, to the Knowledge of Seller, any other party to the Lease, is in material default under the Lease, and no event has occurred that constitutes, or with the lapse of time or the giving of notice or both would constitute, a default by Seller or, to the Knowledge of Seller, a default by any other party under the Lease. There are no disputes or disagreements between Seller and any other party with respect to the Lease.  Seller does not own any real property.  Other than Seller, there are no parties in possession or parties having any current or future right to occupy any portion of the Real Property.

(b)  Use of the Real Property for the various purposes for which it is presently being used is permitted under the Lease and all Applicable Laws, including zoning, and is not subject to "permitted non-conforming" use or structure classifications (and not as a result of grandfathered or other similar provisions that would not be available to Buyer).

(c)  With respect to the Real Property:

(i)  There is no condemnation proceeding or eminent domain proceeding of any kind pending or to Knowledge of Seller, threatened against the Real Property; and

(ii)  The Real Property is occupied under valid and current certificates of occupancy or the like, and the transactions contemplated by this Agreement will not require the issuance of any new or amended certificates of occupancy or the like; there are no facts which would prevent the Real Property from being used or occupied after the Closing Date in substantially the same manner as before.

**3.19**  Receivables.  Except as set forth on Section 3.19 of the Disclosure Schedule all receivables of Seller included in the Financial Statements are valid and collectible obligations (net of any reserve for collectability with respect hereto reflected in the Financial Statements which such reserve is adequate and appropriate and made in accordance with generally recognized accounting principles consistently applied), were not and are not subject to any written or any oral, material offset or counterclaim and have arisen from a bona fide transactions by Seller in the Ordinary Course of Business consistent with past practice. Seller's receivables are reflected on the Most Recent Balance Sheet included in the Financial Statements in accordance with generally recognized accounting principles consistently applied. Since the Balance Sheet Date, and except as set forth on Section 3.19 of the Disclosure Schedule, there have not been any write-offs as uncollectible of any of Seller's receivables, except for the write-offs in the Ordinary Course of Business and consistent with past practice.

**3.20** Product Liability.

(a)     There exist no pending claims and, to the Knowledge of Seller, there is no basis for any product liability, warranty or other claims by any third party (whether based on contract or tort and whether relating to personal injury, including death, property damage or economic loss) arising from (i) services rendered by or on behalf of Seller during the period through and including the Closing Date, (ii) the sale or distribution of any product, good, component or other item manufactured, sold or delivered by or on behalf of Seller whether delivered to a customer before or after the Closing Date, or (iii) the operation of the Business or the ownership of the Acquired Assets prior to and including Closing Date.

(b)     (i) within the last five (5) years there have not been any claims, recalls, consumer corrective actions, or safety advisory's relating to products formulated, manufactured, produced, distributed, consigned or sold by or on behalf of Seller, or services rendered by or on behalf of Seller which are presently pending or which are threatened or which have been asserted or commenced against Seller or the Business within the five (5) years prior to the date hereof, and (ii) the products sold by or on behalf of Seller have been formulated, manufactured and produced so as to meet and comply with all Applicable Laws, standards, requirements and contractual obligations currently in effect and are safe for use by humans.

**3.21** Inventory.  All of the Inventory reflected on the Financial Statements consists of items of a quality and quantity useable or saleable in the ordinary course, except as reserved for obsolete and slow-moving inventory for which appropriate and adequate reserves have been included in the Financial Statements.  No such Inventory is subject to any write-down or write-off for which appropriate reserves have not been included in the Financial Statements.  Section 3.21 of the Disclosure Schedule sets forth the location of all such Inventory, including, without limitation, consigned Inventory, if any, and Inventory located in public or off-site warehouses, or otherwise.

**3.22** Affiliate Transactions.  Except as set forth in Schedule 3.22 of the Disclosure Schedule, no officer, director, shareholder, manager, employee or Affiliate of Seller, or any individual related by blood, marriage or adoption to any of the foregoing Persons or any entity in which any such Person or individual owns any beneficial interest, is or has been a party to any Contract or transaction with Seller.  Neither Seller nor any officer, director, shareholder, manager, employee or Affiliate of Seller has (i) any direct or indirect ownership interest in any company or business that either competes with the Business or has a business relationship with Seller or (ii) owns any asset, tangible or intangible, that is used or held for use in the Business.

**3.23** Certain Payments.  Neither Seller, nor any of their respective officers, directors, shareholders, managers, employees, Affiliates or, to the Knowledge of Seller, any agents, representatives or any other Person associated with or acting for or on behalf of Seller has, directly or indirectly, (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kick-back or other payment to any Person, private or public, regardless of any form, whether in money, property or services (i) to obtain favorable treatment in securing business for or on behalf of Seller, (ii) to pay for favorable treatment for business secured for or on behalf of

Seller, (iii) to obtain special concessions or for special concessions already obtained for or in respect of Seller, or (iv) in violation of any applicable federal, state, local or foreign laws, rules and regulations (including, without limitation, the Foreign Corrupt Practices Act of 1977, as amended, and any corresponding or similar anti-corruption and anti-bribery laws in the U.S. or in other countries), or (b) established or maintained any fund or asset that has not been recorded in the books and records of Seller.

**3.24** <u>Diligence</u>.   No representation or warranty by any Seller contained in this Agreement will contain any untrue statement of a material fact, or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

<div align="center">

**ARTICLE IV**
**REPRESENTATIONS OF BUYER**

</div>

Buyer represents and warrants to Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof:

**4.1** <u>Existence and Good Standing</u>.   Each of Buyer and Holdco is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.   Holdco owns 100% of the equity interest in Buyer.

**4.2** <u>Authorization and Binding Obligation</u>.   Buyer has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.   The execution and delivery of this Agreement by Buyer, and the consummation by Buyer of the transactions contemplated by this Agreement have been duly authorized by all necessary action on the part of Buyer.   This Agreement has been duly executed and delivered by Buyer, and, assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and the availability of equitable remedies).

**4.3** <u>No Violations</u>.   The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, (a) the Organizational Documents of Buyer, (b) any contract, permit, license, loan or credit agreement, note, bond, mortgage, indenture, lease or other property agreement, or other legally binding written agreement applicable to Buyer or its respective properties or assets, or (c) subject to the governmental filings and other matters referred to in the following sentence, any Applicable Law applicable to Buyer or its respective properties or assets.

**4.4** <u>Broker's or Finder's Fees</u>.   Buyer does not have any liability for a finder's fee, brokerage commission, advisory fee or other similar payment as a result of this Agreement or the consummation of the transactions contemplated hereby.

**4.5**   Litigation.  There is no claim, action, suit or proceeding pending or, to Buyer's knowledge, threatened against Buyer by or before any Governmental Authority that would have or would reasonably be expected to impede the ability of Buyer to complete the Closing in any respect.

## ARTICLE V
## COVENANTS

**5.1**   Publicity.  Following the Closing, neither Seller nor Owner shall issue or cause publication of any press release or other announcement or public communication with respect to this Agreement or the transactions contemplated hereby without the prior consent of Buyer, except as may be required by Applicable Law; provided, however, that if such announcement if required by Applicable Law, the party making the announcement shall provide Buyer with an opportunity to review such party's intended communication and consider in good faith any modifications requested by Buyer.

**5.2**   Tax Matters.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by Seller when due, and Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other such Taxes and fees, and, if required by Applicable Law, Buyer shall join in the execution of any such Tax Returns and other documentation.  Seller shall use its good faith reasonable efforts to obtain Tax clearance certificates from all state Taxing authorities in which Seller conducts business.

**5.3**   Employee Matters.  Effective as of the Closing Date, Seller will terminate the employment of all of the employees of the Business (the "Business Employees"). Buyer will enter into a five-year employment agreement with Tomer Damti in the form attached hereto as Exhibit H.  Buyer will make offers of at-will employment to the Business Employees as of the Closing Date. Those Business Employees who accept Buyer's offer of at-will employment shall become employees of Buyer ("Transferred Employees") upon such acceptance of Buyer's offer of at-will employment. Except as set forth above, nothing herein will require Buyer to continue the employment of or offer any specific terms of employment to any Transferred Employee following the Closing Date. The employment of each Transferred Employee will be effective and will commence no earlier than the Closing Date.  This Section 5.3 is solely for the purpose of defining the obligations between Buyer and Seller concerning the Business Employees and former employees of Seller, and will in no way be construed as creating any employment contract or other Contract between Buyer and any employees of Seller or any Transferred Employee.  Seller shall encourage each employee that Buyer desires to hire to accept employment with Buyer.

**5.4**   Further Assurances.  At any time and from time to time after the Closing, at a party's reasonable request, the other party will execute and deliver such other instruments of a sale, transfer, conveyance, assignment and confirmation, and provide such materials and information and take such other actions as the other party will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and provide such materials and information and take such other actions as the other party may reasonably deem

necessary or desirable in order to more effectively transfer, convey and assign to Buyer all of the Acquired Assets or otherwise give effect to this Agreement.

**5.5** <u>Post-Closing Receipts; Payment Cooperation</u>.  After the Closing, Seller will promptly, but in no event later than three (3) business days after the Closing, notify all parties obligated in respect of the Accounts Receivable to remit payments thereafter directly to Buyer, and Seller will receive and hold any payments in respect of Accounts Receivable in trust for Buyer and promptly transfer to Buyer any payments or other receipts Seller receives with respect to any Accounts Receivable in the form received and with any necessary endorsements by Seller. If payment on account of any receivable that constitutes Excluded Assets are received by Buyer, Buyer shall hold such payment in respect of such receivable in trust for Seller and promptly transfer to Seller any such payment in the form received.

**5.6** <u>Change of Name</u>.  In coordination with Buyer, an no later than 24 hours following Closing, Seller shall amend its Organizational Documents and take all other action necessary or as may be requested by Buyer to change its name to one sufficiently dissimilar to its present name (and with no reference to "ACET"), as such dissimilarity is determined in Buyer's sole discretion.

**5.7** <u>Non-Competition</u>.

(a)     Seller and Owner hereby agrees that for a period of two (2) years following the Closing Date, it or he will not, directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor or stockholder of any company or business organization, engage in any business activity, or have a financial interest in any business activity, that is in competition with the Business as currently conducted anywhere in North America ("<u>Competitive Activity</u>").  For the purposes of clarity, the engagement of Owner by Buyer pursuant to an Employment Agreement shall not be deemed a Competitive Activity.  Seller and Owner hereby agrees that, for a period of two (2) years following the Closing Date hereof, it or he will not in any capacity, either separately, jointly or in association with others, directly or indirectly, solicit, hire or contact any employees, and in connection with, or in furtherance of, a Competitive Activity, any of the consultants, agents, suppliers, customers or prospects of Buyer or the Business, that were such with respect to Seller or the Business at any time during the one-year period immediately preceding the date hereof or that to Knowledge of Seller or Owner become such with respect to Seller or the Business at any time during such two (2) year period.

(b)     Seller and Owner agrees and acknowledges that the duration and scope of the covenant not to compete, the non-solicitation/no-hire, and other provisions described in this <u>Section 5.7</u> are fair, reasonable and necessary in order to protect the legitimate interests of Buyer, and that adequate consideration has been received by Seller and Owner for such obligations.  If, however, for any reason any court determines that the restrictions in this <u>Section 5.7</u> are not reasonable or that such consideration is inadequate, such restrictions shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in this <u>Section 5.7</u> as will render such restrictions valid and enforceable.

**APP042**

(c)     Seller and Owner acknowledges that any breach of the provisions contained in this <u>Section 5.7</u> will result in serious and irreparable injury to Buyer. Therefore, Seller and Owner acknowledge and agree that in the event of a breach by Seller or Owner, Buyer shall be entitled, in addition to any other remedy at Applicable Law or in equity to which Buyer may be entitled, to equitable relief against Seller or Owner, including, without limitation, an injunction to restrain Seller or Owner from such breach and to compel compliance with the obligations of Seller and Owner hereunder in protecting or enforcing Buyer's rights and remedies, all without the posting of any bond.

**5.8**     <u>Confidentiality</u>.  For and after the Closing Date, Seller and Owner agrees to, and shall cause its Affiliates, employees and representatives to, treat and hold, as confidential and not disclose any non-public, confidential or proprietary information concerning Buyer, the Acquired Assets, the Assumed Liabilities or the Business, including any notes, analyses, compilations, studies, forecasts, interpretations or other documents that are derived from, contain, reflect or are based upon any such information (the "<u>Confidential Information</u>"), refrain from using any of the Confidential Information, and deliver promptly to Buyer, at the written request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information that constitute Acquired Assets or Assumed Liabilities which are in its possession or under its control.   In the event that the Seller Parties shall be legally compelled or required by any Governmental Authority to disclose any of the Confidential Information regarding the Acquired Assets or the Business, the Seller Parties shall promptly provide written notice to Buyer to enable the Buyer to seek a protective order, in camera process or other appropriate remedy to avoid public or third-party disclosure of such Confidential Information.   In the event that such protective order or other remedy is not obtained, the Seller Parties shall furnish only so much of such Confidential Information regarding the Acquired Assets or the Business that it is legally compelled to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information.   The Seller Parties shall cooperate with and assist Buyer in seeking any protective order or other relief requested by Buyer; Buyer shall reimburse to the Seller Parties all reasonable expenses incurred by the Seller Parties, including reasonable attorneys' fees, in cooperating and assisting Buyer hereunder.

**5.9**     <u>Bulk Transfer Requirements.</u>  Seller agrees to pay and discharge as they become due, all liabilities and obligations to creditors of Seller which are or may be asserted under any applicable bulk transfer act or acts, including, but not limited to, any claims against Buyer as transferee of the Acquired Assets under such applicable act or acts.  Seller and Owner hereby agree to indemnify and hold harmless Buyer from any Damages resulting from any bulk sales act or acts.

<div align="center">

**ARTICLE VI**
**CLOSING**

</div>

**6.1**     <u>Closing</u>.  Upon the terms and subject to the conditions of this Agreement, the closing of the transactions contemplated by this Agreement shall take place (the "<u>Closing</u>") on the date hereof (the "<u>Closing Date</u>") by electronic mail or facsimile exchange of documents and signatures.  The Closing shall be effective as of 12:01 a.m., Dallas, Texas time, on the Closing Date.

**6.2**  <u>Deliveries by Seller</u>.  At or prior to the Closing, Seller shall deliver, or cause to be delivered, to Buyer, all duly and properly executed, the following:

(a)  the Bill of Sale;

(b)  the Assignment and Assumption Agreement;

(c)  the Company Agreement;

(d)  the Intellectual Property Assignments;

(e)  an employment agreement, in the form attached hereto as Exhibit H, executed by Damti (the "<u>Employment Agreement</u>");

(f)  certificates of good standing and/or existence from the Secretary of State of Texas (and each other state in which Seller is qualified to do business) for Seller, which will be dated not more than five (5) days prior to the Closing Date;

(g)  releases, termination statements and/or satisfaction statements for all Liens (other than Permitted Liens not to be released at Closing) encumbering the Acquired Assets, and payoff letters for all Pre-Closing Debt, in form and substance satisfactory to Buyer evidencing the payment in full of all Pre-Closing Debt;

(h)  evidence of the receipt of all consents identified on <u>Section 3.3(b)</u> of the Disclosure Schedule; and

(i)  a duly executed officer's or manager's certificate for Seller, dated as of the Closing Date, certifying and attaching (i) the resolutions of managers or directors, as the case may be, approving the execution and delivery of this Agreement and the documents ancillary hereto, and the consummation of the transactions contemplated hereby and thereby; (ii) the resolutions of members or shareholders, as the case may be, approving the execution and delivery of this Agreement and the documents ancillary hereto, and the consummation of the transactions contemplated hereby and thereby; and (iii) the incumbency and signature of the officer or manager executing this Agreement and the documents ancillary hereto on behalf of Seller.

**6.3**  <u>Deliveries by Buyer</u>.  At or prior to the Closing, Buyer shall deliver to Seller, duly and properly executed, the following:

(a)  the Cash Portion of the Purchase Price required to be paid at the Closing pursuant to <u>Section 2.2(b)</u>;

(b)  the Seller Note;

(c)  the Security Agreement;

(d)  evidence reasonably satisfactory to Seller of issuance of the Equity Interest in Holdco as set forth in this Agreement;

(e)      the Assignment and Assumption Agreement;

(f)      the Company Agreement;

(g)      the Intellectual Property Assignments;

(h)      the Employment Agreement;

(i)      a certificate of good standing and/or existence from the Secretary of State of Texas for Seller, which will be dated not more than five (5) days prior to the Closing Date; and

(j)      a duly executed manager's certificate for Buyer, dated as of the Closing Date, certifying and attaching the resolutions of the sole manager approving the execution and delivery of this Agreement and the documents ancillary hereto, and the consummation of the transactions contemplated hereby and thereby, and the incumbency and signature of the officers executing this Agreement and the documents ancillary hereto; and

(k)      payment of fifty percent (50%) of the cost of the Quality of Earnings Report prepared by Whitley Penn, LLP.

## ARTICLE VII
## INDEMNIFICATION

**7.1**    <u>Survival of Representations, Warranties and Covenants</u>.  With the exception of the representations and warranties contained in Section 3.6 (Title to Properties), claims for Damages arising out of Section 7.2(a)(ii)-(iii), claims for Damages arising from intentional misrepresentation, and any fraudulent act of fraudulent omission, which will survive the Closing indefinitely, and the representations contained in <u>Section 3.1</u> (Existence and Good Standing), <u>Section 3.2</u> (Authorization and Binding Obligations), <u>Section 3.3</u> (No Violations; Approvals), <u>Section 3.9</u> (Taxes), and <u>Section 3.13</u> (Environmental), which will survive the Closing until the expiration of the applicable statute of limitations (and all extensions thereto), all representations and warranties contained in this Agreement or in the Disclosure Schedule, and the right to commence any claim with respect thereto under <u>Section 7.2</u>, shall terminate and cease to be of further force and effect as of the date which is twenty-four (24) months from the Closing Date.  Those covenants that contemplate or may involve actions to be taken or obligations in effect after the Closing shall survive indefinitely.   The expiration of any representation, warranty or covenant shall not affect any claim made in good faith and in accordance with this Agreement prior to the date of such expiration.  For purposes hereof, the representations contained in <u>Section 3.1</u> (Existence; Good Standing), <u>Section 3.2</u> (Authorization and Binding Obligations), <u>Section 3.3</u> (No Violations; Approvals), Section 3.6 (Title to Properties), <u>Section 3.9</u> (Taxes), and <u>Section 3.13</u> (Environmental) shall be referred to herein as the "<u>Fundamental Representations</u>".

**7.2**   Indemnification.

(a)   Subject to the limitations set forth in Section 7.3, from and after the Closing, Seller and Owner shall jointly and severally indemnify and hold harmless Buyer and its Affiliates, managers, directors, officers, employees, agents, representatives, successors and assigns (collectively, the "Buyer Indemnified Parties", individually, a "Buyer Indemnified Party"), from and against any and all Damages, asserted against, resulting from or to, imposed upon, or incurred or suffered by any Buyer Indemnified Party as a result of or arising from (i) any inaccuracy in or breach or nonfulfillment of any of the representations or warranties made by Seller in this Agreement, (ii) any breach or non-performance of any covenant or agreement to be performed by Seller and/or Owner under this Agreement, or (iii) any Excluded Liabilities and the Excluded Assets (collectively, "Buyer's Indemnifiable Claims").

(b)   From and after the Closing, Buyer shall indemnify and hold harmless Seller, Owner and Seller's Affiliates, managers, directors, officers, employee, agents, representatives, successors and assigns (collectively, the "Seller Indemnified Parties" and with Buyer Indemnified Parties, the "Indemnified Parties" and each an "Indemnified Party"), from and against any and all Damages, asserted against, resulting from or to, imposed upon, or incurred or suffered by Seller Indemnified Party as a result of or arising from (i) any inaccuracy in or breach or nonfulfillment of any of the representations or warranties made by Buyer in this Agreement, (ii) any breach or non-performance of any covenants or agreements made by Buyer in this Agreement, or (iii) the Assumed Liabilities (collectively, "Seller's Indemnifiable Claims").

(c)   Notwithstanding anything contained herein to the contrary and for the avoidance of doubt, the fact that a Liability or obligation may constitute an Assumed Liability and may have been assumed by Buyer hereunder shall not in any respect prevent any Buyer Indemnified Party from seeking or receiving indemnification hereunder with respect to such Liability or obligation to the extent such Buyer Indemnified Party is entitled to indemnity with respect to such Liability or obligation pursuant to the terms of Section 7.2(a). Furthermore, Buyer shall not have any obligation to indemnify Seller Indemnified Party with respect to a Liability or obligation constituting an Assumed Liability to the extent Buyer is entitled to indemnification with respect to such Liability or obligation pursuant to the terms of Section 7.2(a). For the purposes of clarity, if a Liability is an Assumed Liability but also constitutes a breach of a representation and warranty made by Seller and/or Owner, Buyer shall be entitled to be indemnified with respect to such Liability and the Seller Indemnified Parties shall not be entitled to be indemnified by Buyer for any Damages such Persons incur with respect to such Liability (pursuant to their indemnification of the Buyer Indemnified Parties or otherwise).

(d)   To the extent permitted by Applicable Law, any indemnification payment made under this Agreement shall be characterized for all Tax and other purposes as an adjustment to the Purchase Price, as applicable.

**7.3**   Limitations on Indemnification. Buyer's rights to indemnification hereunder are subject to the following limitations:

(a)     Notwithstanding anything contained in this Agreement to the contrary, no Buyer Indemnified Party shall be entitled to indemnification hereunder with respect to any Buyer's Indemnifiable Claim pursuant to Section 7.2(a)(i) unless the aggregate amount of Buyer's Damages with respect to all of Buyer's Indemnifiable Claims pursuant to Section 7.2(a)(i) exceeds $50,000 (the "Deductible Amount"), in which event the indemnity provided for in Section 7.2(a)(i) for Buyer's Indemnifiable Claims shall apply, subject to the other provisions of this Section 7.3, to all such Damages that exceed the Deductible Amount for Buyer's Indemnifiable Claims.

(b)     Notwithstanding Section 7.3(c) or anything contained in this Agreement to the contrary, the maximum aggregate amount to which any Buyer Indemnified Party is entitled with respect to Buyer's Indemnifiable Claims pursuant to Section 7.2(a)(i) shall be an amount equal to 50% of the Cash Portion of the Purchase Price (the "Cap"); provided that the Cap shall not apply to breaches of Fundamental Representations, and neither the Deductible Amount nor the Cap shall apply to breaches resulting from intentional misrepresentation or fraud.

(c)     Notwithstanding anything contained in this Agreement to the contrary, Seller's aggregate indemnification obligations under this Agreement, excluding Damages resulting from fraud, intentional misconduct, or a breach of the restrictive covenants set forth in Sections 5.7 and 5.8, shall not exceed the Cash Portion of the Purchase Price actually remitted to Seller.

**7.4**   Exclusive Remedy.   Except in connection with any claim arising from any intentional misrepresentation, any fraudulent act, fraudulent omission, or a breach of the restrictive covenants set forth in Sections 5.7 and 5.8 hereof, the rights of the parties for indemnification relating to this Agreement or the transactions contemplated hereby shall be strictly limited to those contained in this Article VII, and such indemnification rights shall be the exclusive remedies of the parties subsequent to the Closing with respect to any matter arising under or in connection with this Agreement.

**7.5**   Procedure for Indemnification with Respect to Third-Party Claims.

(a)     If an Indemnified Party determines to seek indemnification under this Article VII with respect to Indemnifiable Claims (as used herein, the term "Indemnifiable Claims" shall refer to Buyer's Indemnifiable Claims or Seller' Indemnifiable Claims, as the case may be) resulting from the assertion of Liability by third parties, it shall give notice to the other party (the "Indemnifying Party") as soon as practicable after the Indemnified Party becomes aware of such Indemnifiable Claim or of facts upon which such Indemnifiable Claim will be based; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder unless and only to the extent the Indemnifying Party shall be material prejudiced by such failure to so notify.  The notice shall set forth such information with respect thereto as is then reasonably available to the Indemnified Party.  If an Indemnified Party determines to seek indemnification under this Article VII with respect to Indemnifiable Claims resulting from the assertion of Liability by third parties, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so

elects by written notice delivered to the Indemnified Party within twenty (20) days (or such shorter period of time as may be necessary not to adversely affect the interests of the Indemnified Party) after the Indemnified Party delivers such notice, to assume the defense thereof, in accordance with the limits set forth in this Agreement, with counsel reasonably satisfactory to the Indemnified Party; provided, however, that (i) the defense of such Indemnifiable Claim by the Indemnifying Party must not, in the reasonable judgment of the Indemnified Party, have a Material Adverse Effect on the Indemnified Party, (ii) the Indemnifiable Claim must seek (and continue to seek) solely monetary damages, (iii) the Indemnifying Party expressly agrees in writing that it will be liable for any Damages incurred by the Indemnified Party, subject only to the limitations set forth in this Article VII, and (vi) the Indemnifiable Claim is not expected to have an adverse effect on, or is likely to establish a precedential custom or practice adverse to, the continuing business, the business prospects or a Tax position of Seller or Buyer after the Closing Date or may in any material respect increase the Tax liability of Seller or Buyer after the Closing Date (the conditions set forth in clauses (i) through (iii) are, collectively, the "Litigation Conditions"). If (A) any of the Litigation Conditions cease to be met or (B) the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Indemnifiable Claim, then the Indemnified Party may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense that are directly associated with obligations for which the Indemnified Party has a right of indemnification hereunder. The Indemnified Party has the right to settle any Indemnifiable Claim for monetary damages, the defense of which has not been assumed by the Indemnifying Party. The Indemnifying Party, if it has assumed the defense of any Indemnifiable Claim as provided in this Agreement, shall not agree to a settlement of any claim which (x) provides for any relief other than the payment of monetary damages, (y) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a complete release from all Liability in respect of such Indemnifiable Claim, or (z) may reasonably be expected to have a Material Adverse Effect on the Indemnified Party, in each case without the affected Indemnified Party's prior written consent, which consent shall not be unreasonably withheld or delayed.

(b)     Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; (ii) the Indemnified Party shall not have any obligation to give any notice of any assertion of Liability by a third party unless such assertion is in writing; and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Indemnifiable Claims resulting from the assertion of Liability by third parties shall not be adversely affected by its failure to give notice pursuant to the foregoing unless, and only to the extent that, the Indemnifying Party is materially prejudiced thereby. With respect to any assertion of Liability by a third party that results in an Indemnifiable Claim, the parties hereto shall make available to each other all relevant information in their possession material to any such assertion.

(c)     If the Indemnifying Party, within twenty (20) days (or such shorter period as may be necessary so as not to adversely affect the interests of the Indemnified Party) after delivery of the aforesaid notice of an Indemnifiable Claim, fails to assume the

defense of the Indemnified Party against such Indemnifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account, risk and expense of the Indemnifying Party and all reasonable fees and expenses of such counsel, to the extent such fees and expenses directly relate to a claim for which the Indemnified Party has a right of indemnification hereunder, shall constitute Damages for all purposes hereunder; provided, however, that in the event the Indemnifying Party elects not to participate in the defense of the Indemnifiable Claim, it shall nevertheless have the right to participate in the defense of the same and, at its sole cost and expense, employ counsel of its own choosing.

**7.6**   Procedure for Indemnification with Respect to Non-Third-Party Claims.  If an Indemnified Party asserts the existence of an Indemnifiable Claim (excluding claims resulting from the assertion of Liability by third parties), it shall give written notice to the Indemnifying Party specifying each provision of this Agreement under which the claim is made and the nature and amount of the claim (or a good faith estimated amount) asserted.

**7.7**   Materiality.  Each of the representations and warranties that contain any "Material Adverse Effect," "in all material respects" or other materiality (or correlative meaning) qualifications shall be deemed to have been given as though there were no "Material Adverse Effect," "in all material respects" or other materiality (or correlative meaning) qualification for purposes of (a) determining whether a breach of any of Seller' representations occurred, and (b) determining the amount of indemnifiable Damages caused by any such breach.

**7.8**   Right of Setoff.  Buyer is hereby authorized, but not required, in its sole discretion and upon written notice thereof to Seller, to offset and reduce any amounts owing by Buyer to Seller under this Agreement (including, but not limited to the Seller Note), by any indemnification amounts determined in good faith to be due and owing by Seller to Buyer. The exercise of such right of setoff by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute an event of default relating to such Buyer obligation (including but not limited to the Seller Note or any instrument securing the Seller Note).  Neither the exercise of nor the failure to exercise such right of setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it.

## ARTICLE VIII
## MISCELLANEOUS

**8.1**   Expenses.  Each party shall pay its own expenses in connection with the negotiation, execution and performance of this Agreement, the transactions described in this Agreement, and all things required to be done by it pursuant to this Agreement, including counsel fees, brokerage, finder or financial advisor fees, filing fees and accounting fees.

**8.2**   Governing Law; Waiver of Jury Trial.

(a)   This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Texas, without regard to principles of conflicts of laws.

(b)     Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the state and federal courts located in Dallas County, Texas, for the purpose of any action arising out of or relating to this Agreement and each of the parties hereto irrevocably agrees that all claims in respect to such action shall be heard and determined in any state or federal court sitting in Dallas County, Texas.  Each of the parties hereto agrees that a final judgment in any action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  THE PARTIES HERETO IRREVOCABLY WAIVE, AND AGREE TO CAUSE THEIR RESPECTIVE AFFILIATES TO WAIVE, THE RIGHT TO TRIAL BY JURY IN ANY ACTION TO ENFORCE OR INTERPRET THE PROVISIONS OF THIS AGREEMENT.

(c)     Each of the parties hereto irrevocably consents to the service of any summons and complaint and any other process in any other action relating to the transactions contemplated hereby, on behalf of itself or its property, by the personal delivery of copies of such process to such party.  Nothing in this Section 8.2 shall affect the right of any party hereto to serve legal process in any other manner permitted by law.

**8.3**   Interpretation.  When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated.  The headings and the table of contents contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  Whenever the context requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.  Each reference in this Agreement to an Exhibit or Disclosure Schedule shall mean an Exhibit or Disclosure Schedule attached to this Agreement and incorporated into this Agreement by such reference.

**8.4**   Notices.  All notices and other communications required or permitted under this Agreement shall be deemed to have been duly given and made if in writing and if served either by email, personal delivery to the party for whom intended (which shall include delivery by Federal Express or similar service) or three (3) business days after being deposited, postage prepaid, certified or registered mail, return receipt requested, in the United States mail bearing the address shown in this Agreement for, or such other address as may be designated in writing hereafter by such party:

|  |  |
|---|---|
| If to Seller Representative: | 1501 10th Street, Suite 100 |
|  | Plano, Texas 75074 |
|  | Attention:  Mr. Tomer Damti |
|  | Telephone:  214-695-8627, Ext. 102 |
|  | Email: tomer@acetvp.com |

| If to Buyer Parties: | Baymark Partners, L.P. |
| --- | --- |
| | Granite Park II |
| | 5700 Granite Parkway, Suite 435 |
| | Plano, Texas 75024 |
| | Attn: David Hook |
| | Telephone: 972-991-5457 |
| | Email: dhook@baymark partners.com |
| with a copy (which shall not constitute notice) to: | Hallett & Perrin, P.C. |
| | 1445 Ross Avenue, Suite 2400 |
| | Dallas, Texas 75202 |
| | Fax: (214) 922-4142 |
| | Attention: Gordon T. Foote II |
| | Email: gfoote@hallettperrin.com |

**8.5**   Counterparts.  This Agreement may be executed in any number of counterparts, each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all of the parties to this Agreement notwithstanding the fact that all parties are not signatory to the original or the same counterpart.  A signed copy of this Agreement delivered by facsimile, e-mail in "portable document format" (".pdf") form or other means of electronic transmission intended to preserve the original graphic and pictorial appearance of a document shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement, and the parties agree to exchange original signatures as promptly as possible.

**8.6**   Entire Agreement.  This Agreement (including the Exhibits and the Disclosure Schedule hereto) and the other documents contemplated hereby constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, between the parties with respect to such subject matter.

**8.7**   Binding Effect; Assignment.   This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Owner, and its successors and permitted assigns, Seller, and its successors and permitted assigns, and Buyer, and its successors and permitted assigns.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be transferred or assigned (by operation of law or otherwise) by any of the parties hereto without the prior written consent of the other parties hereto; provided, however, Buyer shall be permitted to assign its rights hereunder to (a) lenders providing financing for the transactions contemplated by this Agreement for collateral security purposes and (b) any of its Affiliates and to any purchaser of all or substantially all of its assets.  Any transfer or assignment of any of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

**8.8**   Waiver; Consent.  This Agreement may not be changed, amended, terminated, augmented, rescinded or discharged (other than by performance), in whole or in part, except by a writing executed by the parties hereto, and no waiver of any of the provisions or conditions

496515 v8                                          41

of this Agreement or any of the rights of a party hereto shall be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given or consented thereto. Except to the extent that a party hereto may have otherwise agreed in writing, no waiver by that party of any condition of this Agreement or breach by the other party of any of its obligations or representations hereunder or thereunder shall be deemed to be a waiver of any other condition or subsequent or prior breach of the same or any other obligation or representation by the other party, nor shall any forbearance by the first party to seek a remedy for any noncompliance or breach by the other party be deemed to be a waiver by the first party of its rights and remedies with respect to such noncompliance or breach.

**8.9** _Severability_. With respect to any provision of this Agreement finally determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, Seller, Owner and Buyer hereby agree that such court shall have jurisdiction to reform such provision so that it is enforceable to the maximum extent permitted by law, and the parties agree to abide by such court's determination. In the event that any provision of this Agreement cannot be reformed, such provision shall be deemed to be severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.

**8.10** _Third-Party Beneficiaries_. Except as otherwise provided in this Agreement, each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties to this Agreement.

**8.11** _Prevailing Party_. If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any party hereto to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including reasonable attorneys' fees and court costs, incurred by the substantially prevailing party in such litigation, action, arbitration or proceeding shall be reimbursed by the other party as determined by a final, non-appealable judgment or order by a court of competent jurisdiction; provided, that if a party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.

**8.12** _Arm's Length Negotiations; Drafting_. Each party to this Agreement in this Agreement expressly represents and warrants to all other parties hereto that before executing this Agreement, said party has fully informed itself of the terms, contents, conditions and effects of this Agreement; said party has relied solely and completely upon its own judgment in executing this Agreement; said party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement, which is the result of arm's length negotiations conducted by and among the parties to this Agreement and their respective counsel. This Agreement shall be deemed drafted jointly by the parties to this Agreement, and nothing shall be construed against one party or another as the drafting party.

**8.13** _Seller Representative._

(a) Seller and Owner hereby appoints, authorizes, and directs Damti (the "_Seller Representative_") as his or its sole and exclusive agent, attorney in fact and representative for and on behalf of parties, with full power of substitution with respect to

all matters under this Agreement, including without limitation, (i) the right to give and receive notices and communications hereunder, (ii) to agree to, negotiate and to enter into settlements and compromises related hereto, (iii) to receive, calculate and distribute any amounts required hereunder, (iv) to engage and employ agents and representatives, (v) to comply with orders of courts with respect to such claims, (vi) to take all other actions that (A) are either necessary or appropriate in the sole judgment of the Seller Representative for the accomplishment of the foregoing or (B) are in the sole judgment of the Seller Representative specifically mandated or contemplated by the terms of this Agreement, and (vii) to incur such other expenses as Seller Representative shall deem necessary or prudent in connection with the foregoing; provided, however, that the Seller Representative shall not have any authority to enter into amendments of this Agreement or, except in the case of a breach of a representation or warranty by a particular Seller, to take any action which adversely affects an Owner disproportionately to any other Owner. No bond shall be required of the Seller Representative, and the Seller Representative shall not receive compensation for his services. Notices or communications to or from the Seller Representative shall constitute notice to or from the Seller and Owners. The appointment of the Seller Representative as Seller's and each Owner's attorney in fact revokes as of the date of this Agreement any power of attorney heretofore granted that authorized any other person or persons to represent such Seller or Owner with regard to this Agreement.

(b) The appointment of Seller Representative as attorney in fact pursuant hereto is coupled with an interest and is irrevocable. The appointment of Seller Representative by Seller and each Owner pursuant to this Agreement (i) will not be terminated by operation of Law, death, mental or physical incapacity, liquidation, dissolution, bankruptcy, insolvency or similar event with respect to Seller or such Owner or any proceeding in connection therewith, or in the case of a trust, by the death of any trustee or trustees or the termination of such trust, or any other event, and (ii) shall survive the delivery of an assignment by Seller or such Owner of the whole or any fraction of his interest in any payment due to him under this Agreement.

(c) The Seller Representative hereby accepts the foregoing appointment and agrees to serve as Seller Representative, subject to the provisions hereof, for the period of time from and after the date hereof without compensation except for the reimbursement from the Seller or Owners of fees and expenses incurred by Seller Representative in his capacity as such.

(d) The Seller Representative shall act for the Seller and Owners on all of the matters set forth in this Agreement in the manner the Seller Representative believes to be in the best interest of the Seller and Owners and is authorized to act on behalf of the Seller and Owners notwithstanding any dispute or disagreement between Seller and/or Owners. The Seller Representative shall not be liable for any act done or omitted hereunder as the Seller Representative while acting in good faith and in the exercise of reasonable judgment. The Seller and Owners shall indemnify and hold the Seller Representative harmless from and against any loss, liability or expense incurred without negligence or bad faith on the part of the Seller Representative and arising out of or in connection with the acceptance or administration of the Seller Representative's duties

hereunder, including the reasonable fees and expenses of any legal counsel retained by the Seller Representative.

(e)     Subject to subsection (a) above, a decision, act, consent or instruction of the Seller Representative pursuant to this Agreement shall constitute a decision, act, consent or instruction of the Seller and Owners and shall be final, binding and conclusive upon the Seller and Owners, and the Buyer Indemnified Parties may rely upon any such decision, act, consent or instruction of the Seller Representative as being the decision, act, consent or instruction of the Seller and Owners. The Buyer Indemnified Parties are hereby relieved from any liability to any Person for any acts done by them in accordance with such decision, act, consent or instruction of the Seller Representative. The rights, powers and benefits of the Seller Representative under this Agreement shall survive any termination of this Agreement.

*(Signature page follows.)*

**IN WITNESS WHEREOF**, this Agreement has been executed by or on behalf of each of the parties hereto as of the Effective Date.

**BUYER:**

**ACET GLOBAL, LLC**

By: _____

Name: David J. Hook

Its:  President

**SELLER:**

**ACET VENTURE PARTNERS LLC**

By: _____

Name: _____

Its: _____

*(Signatures continue on following page.)*

Signature Page – Asset Purchase Agreement

**APP055**

**OWNER:**

_____
Tomer Damti, Individually

| | |
|---|---|
| **From:** | Matt Denegre |
| **Sent:** | Tuesday, May 9, 2017 10:23 AM |
| **To:** | Steve Bellah |
| **Cc:** | David Hook |
| **Subject:** | RE: Project Fulfillment - LOC & Term Note |
| **Attachments:** | Project Fulfillment Quality of Earnings (TTM March-17).pdf |

Steve,

Attached is the QoE.

Rev - $4.0M
EBITDA - $1.4M

Look forward to speaking this afternoon.

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

**From:** Steve Bellah [mailto:steve@supergcapital.com]
**Sent:** Tuesday, May 09, 2017 8:21 AM
**To:** Matt Denegre <mdenegre@baymarkpartners.com>
**Cc:** David Hook <dhook@baymarkpartners.com>
**Subject:** Re: Project Fulfillment - LOC & Term Note

Guys,

We had good conversations internally about this deal last week.  I am preparing a term sheet.

Do we have the QofE yet?  It would help accelerate and support my process.

Sent from Steve Bellah on my iPhone   972-742-5759

On May 2, 2017, at 12:41 PM, Matt Denegre <mdenegre@baymarkpartners.com> wrote:

> Steve,
>
> How about 10:00 CT tomorrow morning?
>
> Best Regards,
>
> **Matt Denegre**
> Baymark Partners
> O: 972-991-5457 | M: 214-625-3344

1

www.baymarkpartners.com

**From:** Steve Bellah [mailto:steve@supergcapital.com]
**Sent:** Tuesday, May 02, 2017 12:03 PM
**To:** Matt Denegre <mdenegre@baymarkpartners.com>
**Subject:** Re: Project Fulfillment - LOC & Term Note

Matt,

I have been through your information.  Is there a time tomorrow morning we can have a call?

Steve


Steven R. Bellah | Director
*214-383-8100    Direct*
*972-742-5759    Cell*

Steve@SuperGcapital.com

www.linkedin.com/in/stevenrbellah


<image001.png>


---

**From:** Matt Denegre <mdenegre@baymarkpartners.com>
**Date:** Friday, April 28, 2017 at 1:43 PM
**To:** Steve Bellah <steve@supergcapital.com>
**Cc:** David Hook <dhook@baymarkpartners.com>
**Subject:** RE: Project Fulfillment - LOC & Term Note

Thanks Steve.  Attached is the CIM and financial model for Project Fulfillment.  We are finalizing the TTM March QoE.

We can flexible on the debt structure and in my assumptions I have the term note being paid back in 18 months.


Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

**From:** Steve Bellah [mailto:steve@supergcapital.com]
**Sent:** Friday, April 28, 2017 1:36 PM
**To:** Matt Denegre <mdenegre@baymarkpartners.com>
**Subject:** Re: Project Fulfillment - LOC & Term Note

2

BP_000153

Executed NDA

Steven R. Bellah | Director
*214-383-8100    Direct*
*972-742-5759    Cell*

Steve@SuperGcapital.com

www.linkedin.com/in/stevenrbellah

<image002.png>

---

**From:** Matt Denegre <mdenegre@baymarkpartners.com>
**Date:** Friday, April 28, 2017 at 12:26 PM
**To:** Steve Bellah <steve@supergcapital.com>
**Cc:** David Hook <dhook@baymarkpartners.com>
**Subject:** Project Fulfillment - LOC & Term Note

Hi Steve,

Attached is the teaser on Project Fulfillment.  The Company is based in TX and is a wholesaler and fulfillment services provider.  We are looking for a revolving line of credit ($500k) and a term note ($700k).  The Seller is rolling 48% of the equity and holding a seller note (PIK only) of $1.9M.  Let me know if you have an interest in taking a look.

- **TTM Mar-17 EBITDA is $1.5M**

- **The company sells to over 60 retailers and has over 300 unique products.  Top customer is less than 15% of total sales**

- **Planned revenues of $6.5 million and EBITDA of $2.9 million in 2017**

- **Purchase multiple of under 4.0 times at closing, leverage amount at closing is 0.8x times**

- **Owner-operator holding a 48 % retained stake going forward**

<image003.png>

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

3

BP_000154





**CPAs and Professional Consultants**

Baymark Partners, L.P.

Due Diligence Report for

ACET Venture Partners, LLC

May 4, 2017

BP_000155



Mr. Tomer Damti
ACET Venture Partners, LLC
1501 10th Street, Suite 100
Plano, Texas 75074

Dear Mr. Damti,

We are pleased to present our due diligence report to assist ACET Venture Partners, LLC (the "Target" or the "Company") in connection with the potential sale of the Company to Baymark Partners, L.P. (the "Buyer").  Our work was performed under the terms of our engagement letter dated January 13, 2017, specifically Schedule A ("the Procedures"). Our work does not constitute an audit or review of the financial statements or any part thereof, the objective of which is the expression of an opinion or limited assurance on the financial statements, or a part thereof, or verification of the accuracy of management responses to our inquiries. Our work should not be relied upon to disclose errors, irregularities, or illegal acts, including fraud or defalcations.

The sufficiency of the work plan and the contents of our findings are solely the responsibility of the Buyer's management and you agree that you will perform any additional due diligence procedures prior to proceeding or concluding on the merits of the proposed transaction. Consequently, we make no representation regarding the sufficiency of the work plan either for the purpose for which our findings have been requested or any other purpose. The decision whether to consummate the acquisition lies solely with the Buyer and neither our work nor this report shall in any way constitute a recommendation whether you should or should not consummate the acquisition, or on what terms.  This report alone will constitute satisfactory completion of our work.

The information presented is based solely on discussions with and information provided by the Target.  We have not independently verified the information gathered or contained in this report and, accordingly, our procedures do not constitute an audit, review, or compilation of the information provided.  Thus, we do not express a conclusion or provide any other form of assurance on the completeness or accuracy of the information.

Due to its special nature, our report may not be suitable for any purpose other than to assist the Buyer in the evaluation of the Company. Consequently, our report is for their information and use only and should not be used by anyone else.  In addition, our report is based on current circumstances.  Given the fact that many aspects of the transaction have either not been finalized or are not yet documented, certain changes may materially affect the financial information we received and are not reflected in this report.  We have no responsibility to update our report for events and circumstances that occur after May 4, 2017, absent a specific written request.

Our report, supporting schedules and other materials generated during the engagement are intended for the Buyer's internal use.  Our report supporting schedules and other materials generated during the engagement should not be distributed to third parties without our written approval.  Further, the report and our work may not be reviewed by or relied upon by any other party.

We appreciate the opportunity to assist you in connection with your potential sale of the Company. Should you require clarification of any of the matters contained in our report or any further information, we would be pleased to extend our work as you consider necessary.

Sincerely,

**DRAFT**

2

BP_000156



**Restriction of Access to This Report**

This report is provided to ACET Venture Partners, LLC pursuant to our engagement letter dated January 13, 2017, and is subject in all respects to the terms and conditions of that engagement letter, including restrictions on disclosure of this report to third parties.

If this report is received by anyone other than ACET Venture Partners, LLC, the recipient is placed on notice that the attached report has been prepared solely for ACET Venture Partners, LLC for its own internal use and this report and its contents may not be shared with, reviewed by, or disclosed to anyone by the recipient without the express written consent of ACET Venture Partners, LLC and Whitley Penn LLP. Unauthorized recipients must not copy the report and destroy or return it to ACET Venture Partners, LLC. Whitley Penn LLP shall have no liability, and shall pursue all available legal and equitable remedies against recipient, for the unauthorized use or distribution of this report. We recognize Baymark Partners, L.P. to be the anticipated buyer in the proposed transaction and will grant access of this report to Baymark Partners, L.P. upon receipt of a signed report access letter.

3

BP_000157



| Table of Contents | | Page |
|---|---|---|
| | Glossary | 5 |
| Section 1 | Executive Summary | 6 |
| Section 2 | EBITDA Analysis - Quality of Earnings | 15 |
| Section 3 | Net Working Capital Analysis | 26 |
| Section 4 | Income Statement Analysis | 31 |
| Section 5 | Balance Sheet Analysis | 41 |
| Section 6 | Taxation | 48 |
| Section 7 | Databook | 51 |
| Section 8 | Appendix | 68 |

4

BP_000158



| | | | | |
|---|---|---|---|---|
| AP | Accounts payable | Historical Balance Sheet Dates | December 31, 2014, 2015, 2016 and March 31, 2017 |
| AR | Accounts receivable | Historical Period | The period of January 1, 2014 through March 31, 2017 |
| Buyer | Baymark Partners, L.P. | LOI | Letter of intent |
| Company | ACET Venture Partners, LLC | LTD | Long-term debt |
| COGS | Cost of goods sold | LTM | Last twelve month period |
| Dec1X | The month ended December 31, 201X | Management | Tomer Damti |
| DIO | Days of inventory on-hand | NWC | Net working capital |
| DPO | Days of payables outstanding | NQ | Not quantified |
| DSO | Days sales outstanding | OpEx | Operating expenses |
| EBITDA | Earnings before interest, taxes, depreciation and amortization | Owner | Tomer Damti |
| EOY | End of year | QOE | Quality of earnings |
| FY1X | Fiscal year ended December 31, 201X | SG&A | Selling, general and administrative expenses |
| GAAP | Generally accepted accounting principles | Sellers | Tomer Damti, Avi Avital and Ronen Azulay |
| GM | Gross margin (expressed as a %) | TTM17 | The period of April 1, 2016 through March 31, 2017 |
| GP | Gross profit (expressed as a $) | | |

Note:  Unless otherwise indicated, all dollar amounts presented in this report are in thousands.

5



# Section 1
# Executive Summary

6

BP_000160

## Company Overview

The Company is an importing and e-commerce company providing business-to-business and business-to-consumer sales via the Internet. The Company imports and sells a wide variety of products, including electronics, kitchen tools and health and beauty products. Established in 2013, the Company primarily generates revenue through selling products to various online retailers. Management indicated the Company will ship products directly to the consumer as an additional service provided to retailers. Additionally, the Company sells products directly to consumers through various e-commerce platforms, including Koolulu.com, Nchanted Beauty and Meetpuzzi.com. The Company operates out of a single facility in Plano, Texas.

## Process and Information Considerations

This diligence report is based upon the Company's internal financial statements, general ledgers, and information obtained directly from Management during a visit to the Company's headquarters in Plano, Texas.

The financial statements of the Company have not been audited or reviewed. As such, an audit or review could potentially uncover issues and financial statement adjustments that were not discovered as part of our due diligence process.



Revenue and EBITDA

Adjusted Working Capital

Adjusted Cost Structure



| Issue | Summary Observation | Analysis |
|---|---|---|
| **Financial overview** – The Company experienced significant growth in revenues and Adjusted EBITDA from FY14 to FY16, but experienced a decline from FY16 to TTM17. Management primarily contributed the decline to a seasonal decrease in demand during the first quarter of 2017. | *(see income statement table below)* | **Pages 32-35** |

**Adjusted Income Statements - Executive Summary**

| | FY14 | FY15 | FY16 | TTM17 | Trend | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | *Net revenue growth/(decline)* | | | |
| Adjusted net revenue | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 | | | 144.1% | 72.1% | -12.3% |
| Cost of goods sold | 1,005 | 1,744 | 1,915 | 1,764 | | | | | |
| | | | | | | *Gross margin* | | | |
| Gross profit | 67 | 873 | 2,589 | 2,188 | | 6.3% | 33.4% | 57.5% | 55.4% |
| Total operating expenses | 276 | 490 | 735 | 825 | | | | | |
| Total other income (expense) | - | (1) | (3) | (4) | | | | | |
| | | | | | | *Net income margin* | | | |
| Net income | $ (209) | $ 382 | $ 1,851 | $ 1,359 | | -19.5% | 14.6% | 41.1% | 34.4% |
| | | | | | | *EBITDA margin* | | | |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 | | -19.5% | 14.9% | 41.2% | 34.5% |

| Issue | Summary Observation | Analysis |
|---|---|---|
| **Accounting policy considerations** – The Company switched from cash-basis accounting to accrual accounting in Jan15. | Prior to FY15, the Company operated on the cash basis of accounting. Management indicated in Jan15, the Company switched to preparing the financial statements on an accrual basis of accounting. The Company uses QuickBooks for accounting functions.<br><br>Revenues are recorded when the product is shipped to the customer. Management indicated the Company provides early payment discounts on a discretionary basis and records the discount upon receipt of payment. The total discounts provided were $21 in FY16 and $29 in TTM17, on a reported basis. Management indicated no discounts were provided in FY14 or FY15.<br><br>Expenses are recognized when incurred. The Company capitalizes inventory purchases and recognizes the expense when the items are shipped to the customer.<br><br>Management indicated prior to Jan17 inbound freight was not capitalized as part of the value for inventory items. Additionally, the Company has not historically recorded shipping supplies in inventory. Rather, the Company recorded the costs associated with inbound freight when incurred and shipping supplies when purchased. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information. | **General** |

8


| Issue | Summary Observation | Analysis |
|---|---|---|
| **Quality of earnings –** Management and Whitley Penn identified certain potential adjustments that increased Reported EBITDA by $848 to an adjusted amount of $1,363 in TTM17. | Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively. Management adjustments primarily relate to adjustments to inventory and various non-recurring expenses.<br><br>We identified adjustments which decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively. The adjustments include the reversal of certain Management adjustments and an adjustment to present compensation for the Owner on a pro forma basis. Additional adjustments primarily relate to adjustments required to present the financial statements in accordance with GAAP. | **Pages 16-25** |
| **Sales considerations –** The Company has historically provided early payment discounts on a discretionary basis. | The Company sets the price for each product which includes the cost plus a pre-determined markup target amount. Management indicated the markup is based upon a tiered system, with markups ranging from 60% to 100% depending upon the item and customer. Management further indicated the total cost for the product represents the cost from the manufacturer plus inbound freight, outbound freight and commissions. As an added service the Company will ship products directly to the consumer on behalf of the retailer. Management indicated in these instances the cost of outbound freight is incorporated into the price charged to the retailer.<br><br>Management indicated the Company will typically provide discounts in the form of a lower markup on price for orders with larger quantities. Additionally, the Company has historically provided early payment discounts on a discretionary basis. Management indicated the Company does not maintain any long-term contracts with customers. Refer to the Quality of Earnings section for additional information. | **General** |
| **Support and IT considerations –** The Company uses ShipStation for order fulfillment and QuickBooks for inventory and accounting functions. | The Company utilizes ShipStation to process, fulfill and ship all orders. All inventory and accounting functions are handled through QuickBooks. Management indicated the Company has historically experienced issues with the inventory module in QuickBooks which has resulted in errors in inventory counts and values. Management further indicated the Company has been evaluating the purchase and implementation of an ERP system that would fully integrate the ordering, inventory and fulfillment process with accounting functions. Refer to the Quality of Earnings section for additional information.<br><br>In Feb16, the Company switched from QuickBooks to ADP for payroll related functions. | **General** |

Within the first row, the following table appears:

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Revenue adjustments | – | – | (17) | (17) |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Reported EBITDA | $ (67) | $ 419 | $ 1,029 | $ 515 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Proposed management adjustments | $ 10 | $ 97 | $ 988 | $ 955 |
| Proposed due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Adjusted EBITDA margin | -19.5% | 14.9% | 41.2% | 34.5% |

9


| Issue | Summary Observation | Analysis |
|---|---|---|
| **Customer concentration, top customers and revenue profile** – The Company has significant customer concentration with the top five customers of TTM17 accounting for 41.4%, 16.5%, 38.3% and 46.7% of total adjusted revenues in FY14, FY15, FY16 and TTM17, respectively. Management indicated the Company's top customer, Mega Morning, utilizes an e-commerce platform to provide discounted products to consumers. | (see table and text below) | Pages 37-39 |

| Top Customers | Sales | | | | % of Total | | | | Revenue Profile | TTM17 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY14 | FY15 | FY16 | TTM17 | FY14 | FY15 | FY16 | TTM17 | | Cust. | Rev. | Avg. |
| Mega Morning | $ - | $ - | $ 476 | $ 559 | 0.0% | 0.0% | 10.6% | 14.1% | $100+ | 12 | $3,263 | $ 272 |
| Telewise | - | - | 294 | 342 | 0.0% | 0.0% | 6.5% | 8.7% | $50 - $99 | 3 | 220 | 73 |
| OpenSky | 393 | 423 | 493 | 325 | 36.7% | 16.2% | 10.9% | 8.2% | $25 - $49 | 8 | 278 | 35 |
| Woot Wholesale | 51 | 8 | 157 | 316 | 4.8% | 0.3% | 3.5% | 8.0% | $0 - $24 | 29 | 208 | 7 |
| Hollywood Steals | - | - | 305 | 305 | 0.0% | 0.0% | 6.8% | 7.7% | Total, as reported | 52 | $3,969 | $ 76 |
| Top five customers | 444 | 431 | 1,725 | 1,847 | 41.4% | 16.5% | 38.3% | 46.7% | | | | |
| Other customers | 628 | 2,186 | 2,796 | 2,122 | 58.6% | 83.5% | 62.1% | 53.7% | | | | |
| QOE adjustments to revenue | - | - | (17) | (17) | 0.0% | 0.0% | -0.4% | -0.4% | | | | |
| Total net revenue (adj.) | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 | 100.0% | 100.0% | 100.0% | 100.0% | | | | |

The Company's top five customers of TTM17 represented 41.4%, 16.5%, 38.3% and 46.7% of total adjusted revenues in FY14, FY15, FY16 and TTM17, respectively.

Management indicated the Company's ninth largest customer in TTM17, Choxi.com, Inc., utilizes an e-commerce platform to reach over 30 million end users and averages over $900 million in revenue per year. Management further indicated the Company conducts business with six different buying agents for the customer and has sold over 250 different items to the customer during the Historical Period. In FY16, the customer filed for bankruptcy. Management indicated the customer was purchased at auction in Jan17 by a private equity firm and is resuming operations under a new trade name, jClub. Management further indicated the Company has recently received new orders from the customer and anticipates the relationship to continue post-transaction.

| **Inventory and COGS considerations** – The Company utilizes the inventory module in QuickBooks and performs a physical count of inventory twice per year, in June and December. | Management indicated the Company utilizes the inventory module in QuickBooks to track inventory on a monthly basis. The Company performs a physical count of inventory twice per year, in June and December. Management indicated an average cost is used in calculating the value of each inventory item and is calculated directly in QuickBooks.

In Dec16, the Company performed a physical count of inventory and identified $153 in additional inventory items not reflected in the balance on the financial statement in QuickBooks. Additionally, the Company performed a review of the cost of inventory items and determined several errors were present which resulted in inventory being understated by $18. Management indicated the error resulted from the manner in which QuickBooks calculated average price as it included incidents when the price of an item on an invoice was zero. Management further indicated this caused the average price to be understated for use in valuing inventory on the financial statements. As such, the Company recorded an adjustment of $171 to inventory and COGS in Dec16.

Prior to Jan17, the Company did not capitalize inbound freight to inventory. Rather, the Company expensed this item when incurred. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information. | **General** |

10



| Issue | Summary Observation | Analysis |
|---|---|---|
| **Working capital** – Per terms of the LOI, the target NWC to be delivered at closing is equal to the one-month average of the most recent twelve month period completed immediately prior to closing of the proposed transaction. During TTM17, Adjusted NWC averaged $578. | NWC has been calculated from the balances of current assets and liabilities as reported by the Company. It was adjusted for cash, interest bearing debt and balances due to shareholders in accordance with the LOI and other items determined during the due diligence process. The resulting monthly Adjusted NWC averaged $578 during FY16 and ranged from a low of $340 in Apr16 to a high of $984 in Dec16. The results are illustrated below: | **Pages 27-30** |

| Net Working Capital | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | Jan17 | Feb17 | Mar17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total current assets | 659 | 768 | 852 | 937 | 486 | 542 | 631 | 1,054 | 1,211 | 1,032 | 1,005 | 1,206 |
| Total current liabilities | 261 | 253 | 256 | 275 | 278 | 2 | 102 | 117 | 163 | 151 | 146 | 138 |
| Total reported NWC | 398 | 515 | 596 | 662 | 208 | 540 | 529 | 937 | 1,048 | 881 | 859 | 1,068 |
| LOI adjustments | | | | | | | | | | | | |
| Cash | (87) | (133) | (158) | (79) | (119) | (147) | (89) | (164) | (225) | (212) | (246) | (399) |
| Debt | - | - | - | - | - | 30 | 80 | 100 | 100 | 100 | 100 | 100 |
| Due to shareholders | 250 | 250 | 250 | 250 | 250 | - | - | - | 50 | 25 | 25 | 15 |
| Total management NWC | 561 | 632 | 688 | 833 | 339 | 423 | 520 | 873 | 973 | 794 | 738 | 784 |
| Due diligence adjustments | | | | | | | | | | | | |
| Payroll accrual | (17) | (16) | (6) | (4) | (7) | (9) | (10) | (15) | (7) | (9) | (7) | (13) |
| Choxi AR | (215) | (215) | (339) | (413) | - | - | - | - | - | - | - | - |
| Invoice error | - | - | - | - | - | - | - | - | (17) | (17) | (17) | (17) |
| Prior year expense | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory adjustments | 11 | 22 | 32 | 31 | 35 | 20 | 33 | 12 | 35 | - | - | - |
| Due from employees | - | - | - | - | - | - | - | - | - | - | - | (1) |
| Undeposited funds | - | - | (1) | - | - | - | - | - | - | (75) | - | (1) |
| Total adjusted NWC | $ 340 | $ 423 | $ 374 | $ 447 | $ 367 | $ 434 | $ 543 | $ 870 | $ 984 | $ 693 | $ 714 | $ 752 |
| LTM net revenue, as adjusted | $3,506 | $3,484 | $3,728 | $3,915 | $4,241 | $4,433 | $4,527 | $4,879 | $4,504 | $3,812 | $3,773 | $3,952 |
| Adjusted NWC as % of revenue | 9.7% | 12.1% | 10.0% | 11.4% | 8.7% | 9.8% | 12.0% | 17.8% | 21.8% | 18.2% | 18.9% | 19.0% |

Low Point for Adjusted NWC

Average Adjusted NWC was $578

High Point for Adjusted NWC

11


whitleypenn
CPAs and Professional Consultants

| Issue | Summary Observation | Analysis |
|---|---|---|
| **Accrued liabilities considerations** – The Company has not historically recorded an accrual for payroll. | The Company has not historically recorded an accrual for payroll. Rather, the Company has expensed payroll when paid. In order to present the financial statements in accordance with GAAP, an accrual is necessary. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures section for additional information.<br><br>The Company does not currently offer employees any paid time off.<br><br>The Company has not historically recorded an accrual for refunds and returns. Rather, the Company has recorded the adjustment to revenue when incurred. In order to present the financial statements in accordance with GAAP, an allowance for refunds and returns may be necessary. As such, we recommend the Company evaluate the need for an accrual for refunds and returns post-transaction. We did not propose any adjustments related to this item due to the low historical refunds and returns of less than 1% of gross revenue. | General |
| **Fixed asset considerations** – The Company's fixed assets primarily consist of furniture and equipment and leasehold improvements. The Company subleases the current facility in which it operates with the current lease term expiring in June 2020. | The Company's fixed assets consist of furniture and equipment and leasehold improvements. Management indicated furniture and equipment primarily consists of computer equipment, office furniture and the shelving and storage equipment in the warehouse.<br><br>In Dec16, the Company entered into a new lease for a custom built forklift. Management indicated the lease term is 60 months with the option to purchase the forklift at fair market value at the end of the lease terms.<br><br>Historically, the Company has recorded depreciation on a tax basis at year-end based upon amounts provided by the Company's tax accountant. As of the completion of our procedures the depreciation for FY16 had yet to be recorded. Refer to the Balance Sheet Exposures section for additional information. | Page 44 |

Fixed asset table:

| Fixed Asset Summary | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Furniture & equipment | $ 2 | $ 7 | $ 23 | $ 24 |
| Leasehold improvements | - | 5 | 5 | 5 |
| Total gross fixed assets | 2 | 12 | 28 | 29 |
| Accumulated depreciation | - | (7) | (7) | (7) |
| Total net fixed assets | $ 2 | $ 5 | $ 21 | $ 22 |

12

BP_000166



whitleypenn
CPAs and Professional Consultants

| Issue | Summary Observation | Analysis |
|---|---|---|
| **Accounts receivable considerations** – The Company has not historically recorded an allowance for doubtful accounts. | The Company has not historically recorded an allowance for doubtful accounts. The total expense related to bad debt was $413 in FY16 and $413 in TTM17, with no expense recorded in FY14 or FY15. Management indicated the full amount of $413 recorded in FY16 and TTM17 related to the write-off of receivables due from Choxi.com, Inc., which recently filed for bankruptcy. Management further indicated the Company received notice in Jan17 that Choxi.com, Inc. was purchased at auction by a private equity group and that all balances due to the Company will be paid in full. No timeline was provided for when the payments will be made, but Management anticipates the collection period of the outstanding balances will stretch beyond 2017. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information. | **Page 41** |
| **Unrecorded liabilities** – The Company currently has pending litigation with Ontel Products Corporation in regards to alleged copyright infringement. | In Oct16, the Company received notice from Ontel Products Corporation ("Ontel") in regards to an alleged incident of copyright infringement. Management indicated the Company submitted a response and supporting documentation to Ontel and, in Dec16, Ontel provided a offer of settlement for $10. Management further indicated the Company responded with a counter offer of $4 but has not yet received further communication from Ontel. The Company has ceased all sales of items related to the alleged incident. Refer to the Balance Sheet Exposures section for our proposed treatment of this item. | **General** |
| **Tax considerations** – The Company is unable to produce a report of sales-by-state to determine if the Texas franchise tax return is accurate, and if additional state returns are required. | Nexus, for state tax purposes, is the minimum threshold level of activity a taxpayer must have within a specific state to subject the taxpayer to a state's various income, franchise, or business activity taxes. Management indicated the Company only transacts business in Texas, but does have multistate customers. However, the Company is unable to produce a sales-by-state report, based on ship-to address, to determine if the Texas franchise tax return is accurate, and if additional state returns are required. Most states require a company to collect and remit sales and use tax on receipts from customers for the taxable goods and services it provides. Management indicated the Company collects and remits Texas sales tax on direct sales to Texas based consumers. Management advised that all other sales are for resale and exempt from sales tax. However, in order to be exempt, the Company must receive and retain valid resale exemption certificates from all of its wholesale customers. As such, in order to eliminate any exposure, the Company should obtain valid resale exemption certificates from all of its customers for each state to which product is shipped. Most state or local jurisdictions subject business personal property and real property to property tax. In addition, the business is typically required to submit a rendition listing the value of all business personal property to the taxing jurisdiction. Management indicated the Company has property only in Texas. However, the Company does not render the value of its business personal property. Instead, the Company has historically relied on the tax jurisdiction to determine the value and issue the property tax assessment. Based on this, the property values may be undervalued, and the property taxes under assessed. | **Pages 49-50** |

13



| Issue | Summary Observation | Analysis |
|---|---|---|
| **Balance sheet exposures –** We identified certain Balance Sheet Exposure adjustments during the course of our due diligence process. These include pro forma adjustments necessary to present the Balance Sheet in accordance with the LOI agreement and exposure adjustments which will likely be necessary to present the Balance Sheet on a GAAP basis. Refer to the Balance Sheet Exposures section for additional information on our proposed adjustments. | *(see table below)* | **Pages 46-47** |

| Balance Sheet Exposures | Reported Mar17 | Exposure Adjustments | Pro forma Adjustments | Adjusted Mar17 |
|---|---|---|---|---|
| Current assets | | | | |
| Cash | $ 399 | $ - | $ (399) | $ - |
| Accounts receivable | 298 | - | - | 298 |
| Inventory | 449 | - | - | 449 |
| Undeposited funds | 1 | (1) | - | - |
| Other current assets | 59 | (18) | - | 41 |
| Total current assets | 1,206 | (19) | (399) | 788 |
| Fixed assets, gross | 29 | - | - | 29 |
| Accumulated depreciation | (7) | (17) | - | (24) |
| Fixed assets, net | 22 | (17) | - | 5 |
| Goodwill | 41 | (41) | - | - |
| Other assets | - | 413 | - | 413 |
| Total assets | $ 1,269 | $ 336 | $ (399) | $ 1,206 |
| Current liabilities | | | | |
| Line of credit | $ 100 | $ - | $ (100) | $ - |
| Credit cards | 23 | - | - | 23 |
| Due to shareholders | 15 | - | (15) | - |
| Other current liabilities | - | 23 | - | 23 |
| Total current liabilities | 138 | 23 | (115) | 46 |
| Equity | 1,131 | 313 | (284) | 1,160 |
| Total liabilities and equity | $ 1,269 | $ 336 | $ (399) | $ 1,206 |

14



# Section 2
# EBITDA Analysis – Quality of Earnings

15

BP_000169

# Quality of Earnings

**whitleypenn**
CPAs and Professional Consultants

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.*

*We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.*

*\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.*

**EBITDA Analysis**

The table to the left illustrates the Company's EBITDA adjusted for non-recurring, non-operating and out of period revenue and expense items. We provide no assurances on the amounts presented herein. Information presented was obtained from the Company's internal financial statements, which have not been reviewed or audited. As such, an audit or review could potentially uncover issues and financial statement adjustments that were not discovered as part of our due diligence process.

The following adjustments were identified by Management prior to the start of the due diligence process:

1.  **Import expenses:** In Jan17, the Company began capitalizing the cost of inbound freight to each item in inventory. Prior to Jan17, the Company expensed inbound freight when incurred. Management proposed an adjustment to EBITDA to reflect the impact of including inbound freight in the value of inventory. The Company did not have sufficient data to calculate an adjustment for FY14 as the Company was operating on a cash basis prior to FY15.

    *WP view: We agree with this adjustment.*

16

# Quality of Earnings



whitleypenn
CPAs and Professional Consultants

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.*

*We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.*

\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.

2. **Advertising and promotion:**  From Jul15 through Oct16, the Company paid to participate in a promotion program with OpenSky, one of the Company's top customers. Management indicated participation in the program did generate any significant increase in revenue from OpenSky, as illustrated in the table below. Management terminated involvement in the program and indicated the Company will not participate in such programs post-transaction. As such, Management proposed an adjustment to EBITDA to eliminate the impact of this non-recurring expense.

| | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| OpenSky revenue | $ 393 | $ 423 | $ 493 | $ 325 |
| OpenSky marketing spend | $ 1 | $ 20 | $ 160 | $ 153 |
| Marketing spend as % of revenue | 0.3% | 4.7% | 32.5% | 47.1% |

*WP view: We agree with this adjustment.*

3. **Bad debt expenses:**  In Aug16, the Company wrote off all receivables due from Choxi.com, Inc. after the customer filed for bankruptcy. Management indicated the Company later filed a lawsuit to collect the outstanding balances and received notice the balances will be paid in full. Management further indicated the Company had not yet received a specific date for payment. As such, Management proposed an adjustment to EBITDA to eliminate the impact of this non-recurring expense.

*WP view: We agree with this adjustment.*

4. **Attorney fees:**  In FY16 and TTM17, the Company incurred legal fees related to the bankruptcy of Choxi.com, Inc. Management indicated the Company acquired legal services to file a lawsuit to collect the unpaid AR balance. Additionally, the Company incurred legal fees related to two different cases of patent infringement. Management indicated one case has been closed and the second is in negotiation for a settlement. Management identified these legal fees to be non-recurring.  As such, Management proposed an adjustment to EBITDA eliminate the impact of this non-recurring expense. Refer to the Balance Sheet Exposures section for additional information the pending litigation.

*WP view: We agree with this adjustment.*

17



whitleypenn
*CPAs and Professional Consultants*

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.*

Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.

We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.

5.  **Contract labor:** During the Historical Period, the Company paid salary and commissions to Alejandra Colmenares, an independent contractor. Management indicated the individual was brought on board for the purpose of being mentored by the Owner for a full-time position in sales. Management further indicated Ms. Colmenares has not yet produced any sales on her own. Rather, she has worked directly with the Owner and the Owner has elected to pay out commissions on a discretionary basis as incentive towards future employment. Management indicated commissions are not typically paid on sales produced by the Owner. As such, Management proposed an adjustment to eliminate the impact on EBITDA.

    *WP view:  As Ms. Colmenares will continue with the Company post-transaction, this expense will be recurring. Refer to Adjustment #12 for our proposed treatment of this item.*

6.  **Early payment discount:** Historically, the Company has provided early payment discounts on a discretionary basis. Management indicated a significant portion of the expense related to these discounts is from a single customer, Telewise. Management indicated the discount provided to Telewise will be non-recurring. As such, Management proposed an adjustment to eliminate the impact on EBITDA.

    *WP view:  We agree with this adjustment. However, we note eliminating these discounts may impact customer relationships post-transaction.*

7.  **Loss of product:** In Jun16, the Company had $13 in products seized by the Food and Drug Administration while they were being imported into the United States. Management indicated the seizure occurred due to the lack of certain medical disclaimers on the product. Management further indicated the Company did not receive any refund from the manufacturer and has since implemented additional procedures to ensure all packaging is fully reviewed by the Company prior to shipping to ensure compliance. Additionally, in Dec16 the Company had to discard of $3 in product as a result of a ruling from a lawsuit for patent infringement. Management identified the expense related to these instances to be non-recurring. As such, Management proposed an adjustment to eliminate the impact on EBITDA.

    *WP view:  We agree with this adjustment.*

18

# Quality of Earnings



**whitleypenn**
CPAs and Professional Consultants

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.*

*We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.*

\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.

8. **Professional fees:** During the Historical Period, the Company incurred various professional fees which Management identified to be non-recurring. As such, Management proposed an adjustment to EBITDA, the composition of which is illustrated in the table below, to eliminate the impact on EBITDA.

| | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Recruiting services | $ - | $ - | $ 7 | $ 7 |
| Legal fees | - | - | 3 | 3 |
| Photography | 10 | 5 | 3 | 3 |
| Investment banker | - | - | 2 | 6 |
| QOE adjustment | $ 10 | $ 5 | $ 15 | $ 19 |

"Recruiting services" represents a fee paid to AppleOne Employment Service for recruitment of an accountant. "Legal fees" consists of additional fees incurred in relation to the lawsuit with Choxi.com, Inc. "Photography" consists of fees paid to a professional photographer to take product photos for the Company's websites. Management indicated the photography is now handled internally. "Investment banker" represents fees paid to Emco Partners for services related to the proposed transaction.

*WP view: We agree with this adjustment.*

9. **Rent expense:** In Jun16, the Company relocated to a larger facility. Management indicated the Company is currently utilizing only 70% of the space in the current facility. As such, Management proposed an adjustment, the calculation of which is illustrated in the table below, to reflect the impact on EBITDA.

| | FY16 | TTM17 |
|---|---|---|
| Monthly rent | $ 6 | $ 6 |
| Unused space | 33% | 33% |
| Number of months | 6 | 9 |
| QOE adjustment | $ 12 | $ 18 |

*WP view: Per the terms of the lease, the Company is liable for the full rent expense on a monthly basis. Refer to Adjustment #13 for our proposed treatment of this item.*

19

# Quality of Earnings

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.*

Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.

We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.

10. **Repairs & maintenance:** In Jun16, the Company relocated to a new facility. Management indicated the Company incurred $7 in expense related to repairs in the former facility as part of the terms of the lease. Management identified these expenses as non-recurring and proposed an adjustment to eliminate the impact on EBITDA.

*WP view: We agree with this adjustment.*

11. **Travel expense:** During FY16 and TTM17, the Company incurred a significant increase in travel expense as a result of several international trips by the Owner to meet with leadership at various manufacturing facilities. Management indicated the travel is beyond the typical travel necessary for normal operations. As such, Management proposed an adjustment to EBITDA to reflect the impact of normalizing the expense. The table below illustrates the expense as normalized.

| | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Travel expense, as reported | $      3 | $      5 | $     25 | $     29 |
| QOE adjustment | - | - | (15) | (12) |
| Travel expense, as normalized | $      3 | $      5 | $     10 | $     17 |

*WP view: We agree with this adjustment.*

The following adjustments were identified during the due diligence process:

12. **Management adj 5:** In Adjustment #5, Management proposed to eliminate the expense associated with Ms. Colmenares. Management indicated the individual was brought on board for the purpose of being mentored by the Owner for a full-time position in sales but had not yet produced any sales. As Ms. Colmenares will continue with the Company post-transaction, this expense is recurring in nature. However, the first three months of Ms. Colmenares's employment was considered to be a probationary training period. As such, we have proposed an adjustment to reverse the adjustment proposed by Management with the exception of $25 for salary received during the three month probationary training period and reflect the impact of this recurring expense on EBITDA.

20

# Quality of Earnings

Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.

We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| **Reconciliation to EBITDA** | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| **Management adjustments** | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| **Due diligence adjustments** | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.*

13. **Management adj 9:** In Adjustment #9, Management proposed to eliminate the expense associated with the unused portion of the current facility. As the terms of the lease require the Company to pay the full lease payment each month, we have determined this expense to be recurring. As such, we have proposed an adjustment to reflect the impact on EBITDA.

14. **Owner compensation:** In FY16, the Owner entered into an employment agreement with the Company which provided a yearly salary of $132. Prior to FY16, the Owner was not paid a salary but rather was compensated through distributions. As the Owner will continue to be employed post-transaction, we have proposed an adjustment to EBITDA, the calculation of which is illustrated in the table below. As the employment agreement did not go into effect until Mar16, an adjustment to FY16 has been proposed to present the expense on a pro forma basis.

| | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Owner salary (a) | $ 132 | $ 132 | $ 132 | $ 132 |
| Payroll taxes & benefits (a * 15%) | 20 | 20 | 20 | 20 |
| Owner compensation, as adjusted (b) | 152 | 152 | 152 | 152 |
| Owner compensation, as reported (c) | - | - | 128 | 110 |
| QOE adjustment (c-b) | $ (152) | $ (152) | $ (24) | $ (42) |

15. **Additional rent adjustment:** In Jun16, the Company relocated to a new facility and, as a result, paid an early termination fee of $1. In Dec16, the Company erroneously recorded $6 in expense for the payment of rent for Jan17. An adjustment to EBITDA has been proposed to eliminate the impact of the non-recurring termination fee and reflect the impact of recording rent expense in the proper period. The schedule below illustrates the components of this adjustment.

| | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Termination fee | $ - | $ - | $ 1 | $ 1 |
| Out of period expense | - | - | 6 | - |
| QOE adjustment | $ - | $ - | $ 7 | $ 1 |

21

# EBITDA Analysis – Quality of Earnings
# Quality of Earnings



whitley**penn**
*CPAs and Professional Consultants*

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1   Import expenses | NQ | 87 | 265 | 231 |
| 2   Advertising and promotion | - | 3 | 140 | 135 |
| 3   Bad debt expense | - | - | 413 | 413 |
| 4   Attorney fees | - | - | 12 | 12 |
| 5   Contract labor | - | 2 | 83 | 83 |
| 6   Early payment discount | - | - | 10 | 9 |
| 7   Loss of product | - | - | 16 | 16 |
| 8   Professional fees | 10 | 5 | 15 | 19 |
| 9   Rent expense | - | - | 12 | 18 |
| 10  Repairs & maintenance | - | - | 7 | 7 |
| 11  Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12  Management adj 5 | - | (2) | (58) | (58) |
| 13  Management adj 9 | - | - | (12) | (18) |
| 14  Owner compensation | (152) | (152) | (24) | (42) |
| 15  Additional rent adjustment | - | - | 7 | 1 |
| 16  Payroll accrual | - | (6) | (1) | (3) |
| 17  Out of period expenses | - | 14 | (38) | 30 |
| 18  Invoice error | - | - | (17) | (17) |
| 19  Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*\* - Adjusted EBITDA margin does not tie to other areas in this report due to this calculation utilizing reported revenues and not adjusted revenues.*

**Management identified adjustments which increased EBITDA by $10, $97, $988 and $955 in FY14, FY15, FY16 and TTM17, respectively.**

**We identified adjustments that decreased EBITDA by $152, $126, $163 and $107 in FY14, FY15, FY16 and TTM17, respectively.**

16. **Payroll accrual:** The Company has not historically recorded an accrual for payroll. Rather, the Company has expensed payroll when paid. In order to present the financial statements in accordance with GAAP, an accrual is necessary. As such, an adjustment to EBITDA has been proposed, the calculation of which is illustrated in the table below.

| | | |
|---|---|---|
| Dec13 (a) | $ | - |
| Dec14 (b) | $ | - |
| Dec15 (c) | $ | 6 |
| Mar16 (d) | $ | 10 |
| Dec16 (e) | $ | 7 |
| Mar17 (f) | $ | 13 |
| FY14 adjustment (a-b) | $ | - |
| FY15 adjustment (b-c) | $ | (6) |
| FY16 adjustment (c-e) | $ | (1) |
| TTM17 adjustment (d-f) | $ | (3) |

17. **Out of period expenses:** In Dec15, the Company recorded an accrual for freight expense related to an invoice that was not received prior to year-end. For all other periods during the Historical Period the Company recorded freight expense when paid. As a result, freight expense is likely misstated during the Historical Period. We have proposed an adjustment to EBITDA to reflect the impact of recording the expense in the proper period. The adjustment for FY15 represents expense incurred in Dec14 but expensed when paid in Jan15. The adjustment for FY16 represents expense incurred in Dec16 but expensed when paid in Jan16. For TTM17, the adjustment reflects expense from Mar16 that was expensed when paid in Apr16.

22



whitley**penn**
CPAs and Professional Consultants

| Quality of Earnings | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue, as reported | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| Net income, as reported | (67) | 411 | 1,026 | 511 |
| Reconciliation to EBITDA | | | | |
| Depreciation | - | 7 | - | - |
| Interest, net | - | 1 | 3 | 4 |
| Reported EBITDA | (67) | 419 | 1,029 | 515 |
| Management adjustments | | | | |
| 1    Import expenses | NQ | 87 | 265 | 231 |
| 2    Advertising and promotion | - | 3 | 140 | 135 |
| 3    Bad debt expense | - | - | 413 | 413 |
| 4    Attorney fees | - | - | 12 | 12 |
| 5    Contract labor | - | 2 | 83 | 83 |
| 6    Early payment discount | - | - | 10 | 9 |
| 7    Loss of product | - | - | 16 | 16 |
| 8    Professional fees | 10 | 5 | 15 | 19 |
| 9    Rent expense | - | - | 12 | 18 |
| 10   Repairs & maintenance | - | - | 7 | 7 |
| 11   Travel expense | - | - | 15 | 12 |
| Total management adjustments | 10 | 97 | 988 | 955 |
| Management EBITDA | (57) | 516 | 2,017 | 1,470 |
| Due diligence adjustments | | | | |
| 12   Management adj 5 | - | (2) | (58) | (58) |
| 13   Management adj 9 | - | - | (12) | (18) |
| 14   Owner compensation | (152) | (152) | (24) | (42) |
| 15   Additional rent adjustment | - | - | 7 | 1 |
| 16   Payroll accrual | - | (6) | (1) | (3) |
| 17   Out of period expenses | - | 14 | (38) | 30 |
| 18   Invoice error | - | - | (17) | (17) |
| 19   Out of period credit | - | 20 | (20) | - |
| Total due diligence adjustments | (152) | (126) | (163) | (107) |
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Reported EBITDA margin | -6.3% | 16.0% | 22.8% | 13.0% |
| Management EBITDA margin | -5.3% | 19.7% | 44.6% | 37.0% |
| Adjusted EBITDA margin (*) | -19.5% | 14.9% | 41.0% | 34.3% |

*\* - Adjusted EBITDA margin does not tie to other areas in this report due
to this calculation utilizing reported revenues and not adjusted revenues.*

Management
identified
adjustments
which increased
EBITDA by $10,
$97, $988 and
$955 in FY14,
FY15, FY16 and
TTM17,
respectively.

We identified
adjustments that
decreased
EBITDA by $152,
$126, $163 and
$107 in FY14,
FY15, FY16 and
TTM17,
respectively.

18. **Invoice error:**  In Sep16, the Company erroneously recorded revenue from an invoice for a transaction that did not occur. Management indicated a credit memo was never created to eliminate the AR balance.  As such, an adjustment to EBITDA has been proposed to eliminate the impact on EBITDA.

19. **Out of period credit:**  In Jan16, the Company recorded a credit to COGS in order to eliminate a liability that was not properly reversed.  Management indicated in Dec14 a journal entry was made to record a liability for payment received for product that would not ship until Jan15.  Management further indicated the entry was not properly reversed in Jan15, but rather in Jan16.  As such, an adjustment to EBITDA has been proposed to illustrate the impact of recording the credit in the appropriate period.

23

# Quality of Earnings



| Other EBITDA Considerations | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Adjusted EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |
| Other potential adjustments | | | | |
| A   Shipping supplies inventory | NQ | NQ | 10 | 10 |
| B   Gross margin | - | - | - | 137 |
| Total other adjustments | - | - | 10 | 147 |
| Potential EBITDA | $ (209) | $ 390 | $ 1,864 | $ 1,510 |
| Potential EBITDA margin | -19.5% | 14.9% | 41.2% | 38.0% |

**In addition to both the adjustments proposed by Management and the adjustments identified during the due diligence process, we identified other considerations for adjustment to EBITDA.**

**Other EBITDA Considerations**

In addition to the adjustments proposed by Management and the adjustments identified during the due diligence process, the adjustment below was identified for further consideration on the impact to EBITDA:

A. **Shipping supplies inventory:** Historically, the Company has not recorded inventory of shipping supplies. Rather, the Company has expensed the supplies when purchased. As such, COGS is likely misstated for the Historical Period. Management estimated the value of the shipping supplies inventory to be $10 at both Dec16 and Mar17, but did not have sufficient information to provide estimates for Dec14 and Dec15. We have proposed a potential adjustment to EBITDA to reflect the impact of properly recording shipping supplies to inventory. The actual impact on EBITDA may vary from the amounts as estimated by Management.

B. **Gross margin:** During Jan17 and Feb17, the Company experienced a significant decrease in gross margin. Management indicated the decrease is primarily a result of a decrease in demand during the first quarter of 2017, as well as errors within the inventory module in QuickBooks which caused inventory and COGS to be misstated. Management further indicated the errors are in both the total number of units for each inventory item and the price per unit. The Company did not perform a physical inventory as of March 31, 2107 to determine the magnitude of any variances with inventory. As such, Management proposed a potential adjustment to EBITDA to illustrate the impact of these errors. The calculation of the adjustment is illustrated in the tables below. Management indicated for the pro forma calculations the average gross margin for FY16 was utilized, as adjusted for the Quality of Earnings items. The actual impact on EBITDA may vary from the amounts as estimated by Management.

| | FY16 |
|---|---|
| Revenue, as adjusted | $ 4,504 |
| Gross profit, as adjusted | 2,589 |
| Gross margin, as adjusted | 57.5% |

| | Jan17 | Feb17 | Mar17 |
|---|---|---|---|
| Revenue, as reported (a) | $ 111 | $ 135 | $ 426 |
| Gross profit, as reported (b) | $ (82) | $ 52 | $ 280 |
| Gross margin, as reported | -73.9% | 38.5% | 65.7% |
| Gross margin, pro forma (c) | 57.5% | 57.5% | 57.5% |
| Gross profit, pro forma (d = a*c) | $ 64 | $ 78 | $ 245 |
| Adjustment (d-a) | $ 146 | $ 26 | $ (35) |
| TTM17 potential adjustment | $ 137 | | |

24

# Quality of Earnings (monthly)



| Monthly QOE - TTM17 | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | Jan17 | Feb17 | Mar17 | TTM17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue, as reported | $ 333 | $ 92 | $ 409 | $ 365 | $ 420 | $ 287 | $ 236 | $ 736 | $ 419 | $ 111 | $ 135 | $ 426 | $ 3,969 |
| Net income, as reported | 141 | (35) | 106 | 69 | (430) | 96 | (14) | 357 | 162 | (131) | (23) | 213 | 511 |
| Reported EBITDA | 141 | (35) | 106 | 69 | (430) | 96 | (13) | 357 | 163 | (130) | (22) | 213 | 515 |
| Management adjustments | | | | | | | | | | | | | |
| 1  Import expenses | 11 | 22 | 32 | 31 | 35 | 20 | 33 | 12 | 35 | - | - | - | 231 |
| 2  Advertising and promotion | 3 | - | 15 | 30 | 14 | 28 | 45 | - | - | - | - | - | 135 |
| 3  Bad debt expense | - | - | - | - | 464 | (40) | (11) | - | - | - | - | - | 413 |
| 4  Attorney fees | - | - | - | - | 4 | 4 | 4 | - | - | - | - | - | 12 |
| 5  Contract labor | 1 | - | 1 | 15 | 14 | 4 | 19 | 14 | 15 | - | - | - | 83 |
| 6  Early payment discount | - | - | - | - | - | - | 1 | 8 | - | - | - | - | 9 |
| 7  Loss of product | - | - | 13 | - | - | - | - | - | 3 | - | - | - | 16 |
| 8  Professional fees | - | 5 | - | - | - | - | 4 | 1 | 5 | - | - | 4 | 19 |
| 9  Rent expense | - | - | - | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 18 |
| 10  Repairs & maintenance | - | - | 7 | - | - | - | - | - | - | - | - | - | 7 |
| 11  Travel expense | 4 | 1 | 1 | 1 | 2 | 1 | - | - | 1 | - | - | 1 | 12 |
| Total management adjustments | 19 | 28 | 69 | 79 | 535 | 19 | 97 | 37 | 61 | 2 | 2 | 7 | 955 |
| Management EBITDA | 160 | (7) | 175 | 148 | 105 | 115 | 84 | 394 | 224 | (128) | (20) | 220 | 1,470 |
| Due diligence adjustments | | | | | | | | | | | | | |
| 12  Management adj 5 | (1) | - | - | - | (5) | (4) | (19) | (14) | (15) | - | - | - | (58) |
| 13  Management adj 9 | - | - | - | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (18) |
| 14  Owner compensation | (9) | (9) | (9) | (7) | - | - | (1) | (1) | 8 | (6) | (2) | (6) | (42) |
| 15  Additional rent adjustment | - | - | 1 | - | - | - | - | - | 6 | (6) | - | - | 1 |
| 16  Payroll accrual | (7) | 1 | 10 | 2 | (3) | (2) | (1) | (5) | 8 | (2) | 2 | (6) | (3) |
| 17  Out of period expenses | 30 | - | - | - | - | - | - | - | (38) | 38 | - | - | 30 |
| 18  Invoice error | - | - | - | - | - | (17) | - | - | - | - | - | - | (17) |
| Total due diligence adjustments | 13 | (8) | 2 | (7) | (10) | (25) | (23) | (22) | (33) | 22 | (2) | (14) | (107) |
| Adjusted EBITDA | $ 173 | $ (15) | $ 177 | $ 141 | $ 95 | $ 90 | $ 61 | $ 372 | $ 191 | $ (106) | $ (22) | $ 206 | $ 1,363 |
| Reported EBITDA margin | 42.3% | -38.0% | 25.9% | 18.9% | -102.4% | 33.4% | -5.5% | 48.5% | 38.9% | -117.1% | -16.3% | 50.0% | 13.0% |
| Management EBITDA margin | 48.0% | -7.6% | 42.8% | 40.5% | 25.0% | 40.1% | 35.6% | 53.5% | 53.5% | -115.3% | -14.8% | 51.6% | 37.0% |
| Adjusted EBITDA margin (*) | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 31.4% | 25.8% | 50.5% | 45.6% | -95.5% | -16.3% | 48.4% | 34.3% |



**APP084**

BP_000179



# Section 3
# Net Working Capital Analysis

26

BP_000180

# Adjusted Net Working Capital



NWC has been calculated from the balances of current assets and liabilities as reported by the Company. It was adjusted for cash, interest bearing debt and balances due to shareholders in accordance with the LOI and other items determined during the due diligence process. The resulting monthly Adjusted NWC averaged $578 during TTM17.

| Net Working Capital | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 |
| Accounts receivable | - | 487 | 448 | 298 |
| Inventory | 50 | 168 | 521 | 449 |
| Undeposited funds | - | - | - | 1 |
| Other current assets | - | - | 17 | 59 |
| Total current assets | 33 | 725 | 1,211 | 1,206 |
| **Current liabilities** | | | | |
| Accounts payable | 1 | 140 | (9) | - |
| Line of credit | - | - | 100 | 100 |
| Credit cards | 12 | 8 | 22 | 23 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Payroll liabilities | - | 14 | - | - |
| Other current liabilities | 71 | 31 | - | - |
| Total current liabilities | 191 | 444 | 163 | 138 |
| Total reported NWC | (158) | 281 | 1,048 | 1,068 |
| **LOI adjustments** | | | | |
| Cash | 17 | (70) | (225) | (399) |
| Debt | - | - | 100 | 100 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Total management NWC | (34) | 462 | 973 | 784 |
| **Due diligence adjustments** | | | | |
| Payroll accrual | - | (6) | (7) | (13) |
| Invoice error | - | - | (17) | (17) |
| Prior year expense | - | 20 | - | - |
| Inventory adjustments | NQ | 17 | 35 | - |
| Due from employees | - | - | - | (1) |
| Undeposited funds | - | - | - | (1) |
| Total adjusted NWC | $ (34) | $ 493 | $ 984 | $ 752 |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Adjusted NWC as % of revenue | -3.2% | 18.8% | 21.8% | 19.0% |



27

# Adjusted Net Working Capital


whitleypenn
CPAs and Professional Consultants

NWC has been calculated from the balances of current assets and liabilities as reported by the Company. It was adjusted for cash, interest bearing debt and balances due to shareholders in accordance with the LOI and other items determined during the due diligence process. The resulting monthly Adjusted NWC averaged $578 during TTM17.

| Net Working Capital | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Current assets | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 |
| Accounts receivable | - | 487 | 448 | 298 |
| Inventory | 50 | 168 | 521 | 449 |
| Undeposited funds | - | - | - | 1 |
| Other current assets | - | - | 17 | 59 |
| Total current assets | 33 | 725 | 1,211 | 1,206 |
| Current liabilities | | | | |
| Accounts payable | 1 | 140 | (9) | - |
| Line of credit | - | - | 100 | 100 |
| Credit cards | 12 | 8 | 22 | 23 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Payroll liabilities | - | 14 | - | - |
| Other current liabilities | 71 | 31 | - | - |
| Total current liabilities | 191 | 444 | 163 | 138 |
| Total reported NWC | (158) | 281 | 1,048 | 1,068 |
| LOI adjustments | | | | |
| Cash | 17 | (70) | (225) | (399) |
| Debt | - | - | 100 | 100 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Total management NWC | (34) | 462 | 973 | 784 |
| Due diligence adjustments | | | | |
| Payroll accrual | - | (6) | (7) | (13) |
| Invoice error | - | - | (17) | (17) |
| Prior year expense | - | 20 | - | - |
| Inventory adjustments | NQ | 17 | 35 | - |
| Due from employees | - | - | - | (1) |
| Undeposited funds | - | - | - | (1) |
| Total adjusted NWC | $ (34) | $ 493 | $ 984 | $ 752 |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Adjusted NWC as % of revenue | -3.2% | 18.8% | 21.8% | 19.0% |

**LOI Adjustments**

The following adjustments are based upon the terms of the LOI:

**Cash:** We adjusted NWC to exclude cash as these amounts are not included as part of the proposed transaction.

**Debt:** We adjusted NWC to exclude balances due on the Company's line of credit as these amounts are not included as part of the proposed transaction.

**Due to shareholders:** We adjusted NWC to exclude balances due to shareholders as these amounts are not included as part of the proposed transaction.

**Due Diligence Adjustments**

The following adjustments were identified during the due diligence process:

**Payroll accrual:** The Company has not historically recorded an accrual for payroll. Rather, the Company has expensed payroll when paid. In order to present the financial statements in accordance with GAAP, an accrual is necessary. As such, we adjusted NWC to include an accrual for payroll.

**Invoice error:** The balance of other current assets at the Historical Balance Sheet Dates, includes a receivable related to an invoice that was erroneously recorded in Sep16 for a transaction that did not occur. Management indicated a credit memo was never created to eliminate the receivable. As such, we adjusted NWC to exclude this item.

28

# Net Working Capital
## Adjusted Net Working Capital



whitleypenn
CPAs and Professional Consultants

NWC has been calculated from the balances of current assets and liabilities as reported by the Company. It was adjusted for cash, interest bearing debt and balances due to shareholders in accordance with the LOI and other items determined during the due diligence process. The resulting monthly Adjusted NWC averaged $578 during TTM17.

| Net Working Capital | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Current assets | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 |
| Accounts receivable | - | 487 | 448 | 298 |
| Inventory | 50 | 168 | 521 | 449 |
| Undeposited funds | - | - | - | 1 |
| Other current assets | - | - | 17 | 59 |
| Total current assets | 33 | 725 | 1,211 | 1,206 |
| Current liabilities | | | | |
| Accounts payable | 1 | 140 | (9) | - |
| Line of credit | - | - | 100 | 100 |
| Credit cards | 12 | 8 | 22 | 23 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Payroll liabilities | - | 14 | - | - |
| Other current liabilities | 71 | 31 | - | - |
| Total current liabilities | 191 | 444 | 163 | 138 |
| Total reported NWC | (158) | 281 | 1,048 | 1,068 |
| LOI adjustments | | | | |
| Cash | 17 | (70) | (225) | (399) |
| Debt | - | - | 100 | 100 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Total management NWC | (34) | 462 | 973 | 784 |
| Due diligence adjustments | | | | |
| Payroll accrual | - | (6) | (7) | (13) |
| Invoice error | - | - | (17) | (17) |
| Prior year expense | - | 20 | - | - |
| Inventory adjustments | NQ | 17 | 35 | - |
| Due from employees | - | - | - | (1) |
| Undeposited funds | - | - | - | (1) |
| Total adjusted NWC | $ (34) | $ 493 | $ 984 | $ 752 |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Adjusted NWC as % of revenue | -3.2% | 18.8% | 21.8% | 19.0% |

**Prior year expense:** In Dec14, a journal entry was made to record a liability for payment received for product that would not ship until Jan15. Management indicated the entry was not properly reversed in Jan15, but rather in Jan16 which resulted in the liability remaining on the balance sheet through Dec15. As this item does not reflect an actual liability beyond Jan15, we have adjusted NWC to exclude the item.

**Inventory adjustments:** During the Historical Period, the Company did not include the expense for inbound freight in the value of items in inventory. Rather, the Company expensed inbound freight when it was incurred. As such, inventory is likely misstated at the Historical Balance Sheet Dates. We adjusted NWC to reflect the accurate inventory values. An adjustment for Mar17 is not necessary as the Company began capitalizing inbound freight to inventory in Jan17.

**Due from employee:** Historically, the Company has provided employees with advances on a discretionary basis and collected payment of the advances through payroll deductions. As the balances of these advances will either be fully collected or forgiven prior to close of the proposed transaction, we have adjusted NWC to exclude this item.

**Undeposited funds:** In Mar17, the Company recorded a current asset of $1 for checks that had been received but not yet deposited in the bank account. As these items are equivalent to cash and the proposed transaction will exclude cash, we have adjusted NWC to exclude this item.

29

BP_000183

# Net Working Capital
## Adjusted Net Working Capital



| Net Working Capital | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | Jan17 | Feb17 | Mar17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total current assets | 659 | 768 | 852 | 937 | 486 | 542 | 631 | 1,054 | 1,211 | 1,032 | 1,005 | 1,206 |
| Total current liabilities | 261 | 253 | 256 | 275 | 278 | 2 | 102 | 117 | 163 | 151 | 146 | 138 |
| Total reported NWC | 398 | 515 | 596 | 662 | 208 | 540 | 529 | 937 | 1,048 | 881 | 859 | 1,068 |
| LOI adjustments | | | | | | | | | | | | |
| Cash | (87) | (133) | (158) | (79) | (119) | (147) | (89) | (164) | (225) | (212) | (246) | (399) |
| Debt | - | - | - | - | - | 30 | 80 | 100 | 100 | 100 | 100 | 100 |
| Due to shareholders | 250 | 250 | 250 | 250 | 250 | - | - | - | 50 | 25 | 25 | 15 |
| Total management NWC | 561 | 632 | 688 | 833 | 339 | 423 | 520 | 873 | 973 | 794 | 738 | 784 |
| Due diligence adjustments | | | | | | | | | | | | |
| Payroll accrual | (17) | (16) | (6) | (4) | (7) | (9) | (10) | (15) | (7) | (9) | (7) | (13) |
| Choxi AR | (215) | (215) | (339) | (413) | - | - | - | - | - | - | - | - |
| Invoice error | - | - | - | - | - | - | - | - | (17) | (17) | (17) | (17) |
| Inventory adjustments | 11 | 22 | 32 | 31 | 35 | 20 | 33 | 12 | 35 | - | - | - |
| Due from employees | - | - | - | - | - | - | - | - | - | - | - | (1) |
| Undeposited funds | - | - | (1) | - | - | - | - | - | - | (75) | - | (1) |
| Total adjusted NWC | $ 340 | $ 423 | $ 374 | $ 447 | $ 367 | $ 434 | $ 543 | $ 870 | $ 984 | $ 693 | $ 714 | $ 752 |
| LTM net revenue, as adjusted | $ 3,506 | $ 3,484 | $ 3,728 | $ 3,915 | $ 4,241 | $ 4,433 | $ 4,527 | $ 4,879 | $ 4,504 | $ 3,812 | $ 3,773 | $ 3,952 |
| Adjusted NWC as % of revenue | 9.7% | 12.1% | 10.0% | 11.4% | 8.7% | 9.8% | 12.0% | 17.8% | 21.8% | 18.2% | 18.9% | 19.0% |

In Aug16, the Company wrote off all receivables due from Choxi.com, Inc. after the customer filed for bankruptcy. Management indicated the Company later filed a lawsuit to collect the outstanding balances and received notice the balances will be paid in full. Management further indicated the Company had not yet received a specific date for payment but anticipates collection will not occur within the next year. As such, NWC has been adjusted to exclude this item as it is now a long-term receivable.



The schedule above summarizes the Company's monthly NWC during TTM17. Per terms of the LOI, the target NWC to be delivered at closing is equal to the one-month average of the most recent twelve month period completed immediately prior to closing of the proposed transaction. During TTM17, Adjusted NWC averaged $578. As such, if the proposed transaction had closed at Mar17, the purchase price would be adjusted upward by $174, or the difference between Mar17 Adjusted NWC of $752 and the Target NWC of $578.

30

BP_000184



**Section 4**

# Income Statement Analysis

31

BP_000185

# Income Statement
## Normalized Income Statements

 

whitleypenn
CPAs and Professional Consultants

| Normalized Income Statements | FY14 Reported | FY14 Adj. | FY14 Adjusted | FY15 Reported | FY15 Adj. | FY15 Adjusted | FY16 Reported | FY16 Adj. | FY16 Adjusted | TTM17 Reported | TTM17 Adj. | TTM17 Adjusted | QOE Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 1,072 | $ - | $ 1,072 | $ 2,617 | $ - | $ 2,617 | $ 4,521 | $ (17) | $ 4,504 | $ 3,969 | $ (17) | $ 3,952 | 18 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 673 | - | 673 | 1,275 | (20) | 1,255 | 1,417 | 20 | 1,437 | 1,264 | - | 1,264 | 19 |
| Shipping & delivery | 311 | - | 311 | 548 | (101) | 447 | 769 | (227) | 542 | 846 | (261) | 585 | 1,17 |
| Shipping supplies | 24 | - | 24 | 43 | - | 43 | 133 | - | 133 | 115 | - | 115 | |
| Inventory adjustment | (3) | - | (3) | (1) | - | (1) | (197) | - | (197) | (200) | - | (200) | |
| Total COGS | 1,005 | - | 1,005 | 1,865 | (121) | 1,744 | 2,122 | (207) | 1,915 | 2,025 | (261) | 1,764 | |
| Gross profit | 67 | - | 67 | 752 | 121 | 873 | 2,399 | 190 | 2,589 | 1,944 | 244 | 2,188 | |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | - | 152 | 152 | 151 | 158 | 309 | 426 | 25 | 451 | 428 | 45 | 473 | 14,16 |
| Bad debt expense | - | - | - | - | - | - | 413 | (413) | - | 413 | (413) | - | 3 |
| Advertising & promotion | 1 | - | 1 | 23 | (3) | 20 | 180 | (140) | 40 | 179 | (135) | 44 | 2 |
| Contract labor | 46 | - | 46 | 32 | - | 32 | 108 | (25) | 83 | 148 | (25) | 123 | 5,12 |
| Rent | 10 | - | 10 | 23 | - | 23 | 50 | (7) | 43 | 54 | (1) | 53 | 9,13,15 |
| Depreciation | - | - | - | 7 | - | 7 | - | - | - | - | - | - | |
| Other operating expenses | 77 | (10) | 67 | 104 | (5) | 99 | 193 | (75) | 118 | 207 | (75) | 132 | 4,6,7,8,10,11 |
| Total operating expenses | 134 | 142 | 276 | 340 | 150 | 490 | 1,370 | (635) | 735 | 1,429 | (604) | 825 | |
| Operating income | (67) | (142) | (209) | 412 | (29) | 383 | 1,029 | 825 | 1,854 | 515 | 848 | 1,363 | |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | - | - | - | (1) | - | (1) | (3) | - | (3) | (4) | - | (4) | |
| Total other income (expense) | - | - | - | (1) | - | (1) | (3) | - | (3) | (4) | - | (4) | |
| Income tax expense | - | - | - | - | - | - | - | - | - | - | - | - | |
| Net income | $ (67) | $ (142) | $ (209) | $ 411 | $ (29) | $ 382 | $ 1,026 | $ 825 | $ 1,851 | $ 511 | $ 848 | $ 1,359 | |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ 7 | $ - | $ 7 | $ - | $ - | $ - | $ - | $ - | $ - | |
| Interest, net | - | - | - | 1 | - | 1 | 3 | - | 3 | 4 | - | 4 | |
| Total EBITDA | $ (67) | $ (142) | $ (209) | $ 419 | $ (29) | $ 390 | $ 1,029 | $ 825 | $ 1,854 | $ 515 | $ 848 | $ 1,363 | |
| Gross margin | 6.3% | | 6.3% | 28.7% | | 33.4% | 53.1% | | 57.5% | 49.0% | | 55.4% | |
| Operating margin | -6.3% | | -19.5% | 15.7% | | 14.6% | 22.8% | | 41.2% | 13.0% | | 34.5% | |
| Net income margin | -6.3% | | -19.5% | 15.7% | | 14.6% | 22.7% | | 41.1% | 12.9% | | 34.4% | |
| EBITDA margin | -6.3% | | -19.5% | 16.0% | | 14.9% | 22.8% | | 41.2% | 13.0% | | 34.5% | |

32

BP_000186



Information presented in the table to the right was obtained from the Company's internal financial statements and adjusted for the Quality of Earnings items. The Company's financial statements have never been reviewed or audited.

| Adjusted Income Statements | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Cost of goods sold | | | | |
| Product COGS | 673 | 1,255 | 1,437 | 1,264 |
| Shipping & delivery | 311 | 447 | 542 | 585 |
| Shipping supplies | 24 | 43 | 133 | 115 |
| Inventory adjustment | (3) | (1) | (197) | (200) |
| Total COGS | 1,005 | 1,744 | 1,915 | 1,764 |
| Gross profit | 67 | 873 | 2,589 | 2,188 |
| Operating expenses | | | | |
| Payroll | 152 | 309 | 451 | 473 |
| Advertising & promotion | 1 | 20 | 40 | 44 |
| Contract labor | 46 | 32 | 83 | 123 |
| Rent | 10 | 23 | 43 | 53 |
| Depreciation | - | 7 | - | - |
| Other operating expenses | 67 | 99 | 118 | 132 |
| Total operating expenses | 276 | 490 | 735 | 825 |
| Operating income | (209) | 383 | 1,854 | 1,363 |
| Other income (expense) | | | | |
| Interest income (expense) | - | (1) | (3) | (4) |
| Total other income (expense) | - | (1) | (3) | (4) |
| Net income | $ (209) $ | 382 | $ 1,851 | $ 1,359 |
| **Reconciliation to EBITDA** | | | | |
| Depreciation | $ - $ | 7 $ | - $ | - |
| Interest, net | - | 1 | 3 | 4 |
| Total EBITDA | $ (209) $ | 390 | $ 1,854 | $ 1,363 |

**Net revenue:** The schedule below details the components of this item.

| Revenue | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Gross revenue | $ 1,079 | $ 2,690 | $ 4,542 | $ 3,998 |
| Refunds & adjustments | (7) | (73) | (21) | (29) |
| Total net revenue | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 |
| QOE adjustments to revenue | - | - | (17) | (17) |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |

The Company generates revenue through importing and selling a wide variety of products including electronics, kitchen tools and health and beauty products. Management indicated the Company primarily operates as a wholesaler and sells products to various online retailers. Additionally, the Company retails products directly to consumers through various e-commerce platforms, including Koolulu.com, Nchanted Beauty and Meetpuzzi.com. "Refunds & adjustments" primarily consists of discretionary price adjustments and refunds provided to customers. Management indicated the Company typically provides refunds based upon the policy provided by the retailer to the consumer. For instances were the refund results from a defective product, the Company will typically receive reimbursement from the manufacturer. In order to present the financial statements in accordance with GAAP, an allowance for refunds and returns may be necessary. As such, we recommend the Company evaluate the need for an accrual for refunds and returns post-transaction. We did not propose an adjustment to EBITDA due to the low historical refunds and returns of less than 1% of gross revenue.

**Cost of Goods Sold**

**Product COGS:** This item consists of the cost to acquire products sold by the Company. Management indicated the Company capitalizes inventory purchases and expenses the item when sold. Prior to FY15, the Company operated utilizing the cash basis of accounting and expensed all items when payment was made to the manufacturer.

33



| Adjusted Income Statements | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Cost of goods sold | | | | |
| Product COGS | 673 | 1,255 | 1,437 | 1,264 |
| Shipping & delivery | 311 | 447 | 542 | 585 |
| Shipping supplies | 24 | 43 | 133 | 115 |
| Inventory adjustment | (3) | (1) | (197) | (200) |
| Total COGS | 1,005 | 1,744 | 1,915 | 1,764 |
| Gross profit | 67 | 873 | 2,589 | 2,188 |
| Operating expenses | | | | |
| Payroll | 152 | 309 | 451 | 473 |
| Advertising & promotion | 1 | 20 | 40 | 44 |
| Contract labor | 46 | 32 | 83 | 123 |
| Rent | 10 | 23 | 43 | 53 |
| Depreciation | - | 7 | - | - |
| Other operating expenses | 67 | 99 | 118 | 132 |
| Total operating expenses | 276 | 490 | 735 | 825 |
| Operating income | (209) | 383 | 1,854 | 1,363 |
| Other income (expense) | | | | |
| Interest income (expense) | - | (1) | (3) | (4) |
| Total other income (expense) | - | (1) | (3) | (4) |
| Net income | $ (209) | $ 382 | $ 1,851 | $ 1,359 |
| **Reconciliation to EBITDA** | | | | |
| Depreciation | $ - | $ 7 | $ - | $ - |
| Interest, net | - | 1 | 3 | 4 |
| Total EBITDA | $ (209) | $ 390 | $ 1,854 | $ 1,363 |

Information presented in the table to the right was obtained from the Company's internal financial statements and adjusted for the Quality of Earnings items. The Company's financial statements have never been reviewed or audited.

**Shipping & delivery:** This item consists of both inbound and outbound freight. Management indicated prior to Jan17 inbound freight was not capitalized to inventory, but rather expensed when incurred. Management further indicated the expense for both inbound and outbound freight is incorporated in the cost of the good when applying the markup to determine the price charged to a customer. Refer to the Quality of Earnings section for additional information.

**Shipping supplies:** This item consists of the cost to acquire boxes, packaging tape and other supplies necessary to ship goods to customers. Management indicated the Company does not capitalize shipping supplies to inventory, but rather expenses the items when purchased. Refer to the Quality of Earnings section for additional information.

**Inventory adjustment:** The Company performs a physical count of inventory twice per year, in June and December. Management indicated the Company utilizes the inventory module in QuickBooks to track inventory on a monthly basis. Management further indicated the Company will record any adjustments to inventory to account for variances between the physical inventory and the inventory in QuickBooks. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet exposures sections for additional information.

**Operating Expenses**

**Payroll:** This item consists of payroll and payroll related expenses for all internal employees of the Company. Management indicated the employees are paid every two weeks and payroll is expensed when paid. The Company currently employs one full-time sales person who receives a base salary plus commission. Management indicated the commission is tiered based upon the total volume of sales for each item with a commission of 5% to 7% on the price of the product as sold to the customer. Management further indicated the Owner of the Company is heavily involved in acquiring sales for the Company, but does not receive commissions. During FY16, the Company provided bonuses to employees on a discretionary basis with a total expense of $12. If the Company develops a history of paying bonuses, an accrual for such bonuses would likely be necessary to present the financial statements in accordance with GAAP.

34



Information presented in the table to the right was obtained from the Company's internal financial statements and adjusted for the Quality of Earnings items. The Company's financial statements have never been reviewed or audited.

| Adjusted Income Statements | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Net revenue | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 |
| Cost of goods sold | | | | |
| Product COGS | 673 | 1,255 | 1,437 | 1,264 |
| Shipping & delivery | 311 | 447 | 542 | 585 |
| Shipping supplies | 24 | 43 | 133 | 115 |
| Inventory adjustment | (3) | (1) | (197) | (200) |
| Total COGS | 1,005 | 1,744 | 1,915 | 1,764 |
| Gross profit | 67 | 873 | 2,589 | 2,188 |
| Operating expenses | | | | |
| Payroll | 152 | 309 | 451 | 473 |
| Advertising & promotion | 1 | 20 | 40 | 44 |
| Contract labor | 46 | 32 | 83 | 123 |
| Rent | 10 | 23 | 43 | 53 |
| Depreciation | - | 7 | - | - |
| Other operating expenses | 67 | 99 | 118 | 132 |
| Total operating expenses | 276 | 490 | 735 | 825 |
| Operating income | (209) | 383 | 1,854 | 1,363 |
| Other income (expense) | | | | |
| Interest income (expense) | - | (1) | (3) | (4) |
| Total other income (expense) | - | (1) | (3) | (4) |
| Net income | $ (209) $ | 382 | $ 1,851 | $ 1,359 |
| **Reconciliation to EBITDA** | | | | |
| Depreciation | $ - $ | 7 $ | - $ | - |
| Interest, net | - | 1 | 3 | 4 |
| Total EBITDA | $ (209) $ | 390 | $ 1,854 | $ 1,363 |

**Contract labor:** This item primarily consists of expenses associated with temporary labor. Management indicated the Company typically utilizes temporary labor to assist with large orders. In FY14, the Company did not have any internal employees and relied entirely upon contract labor for operations. Refer to the Quality of Earnings section for additional information related to proposed adjustments for this expense item.

**Other operating expenses:** Refer to the Databook section for details regarding the components of this item.

35

BP_000189

# Monthly Adjusted Income Statements



whitleypenn
CPAs and Professional Consultants

| Adjusted Income Statements | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | Jan17 | Feb17 | Mar17 | TTM17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 333 | $ 92 | $ 409 | $ 365 | $ 420 | $ 270 | $ 236 | $ 736 | $ 419 | $ 111 | $ 135 | $ 426 | $ 3,952 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 94 | 28 | 125 | 97 | 133 | 94 | 84 | 240 | 122 | 53 | 60 | 134 | 1,264 |
| Shipping & delivery | (10) | 38 | 56 | 55 | 62 | 30 | 49 | 19 | 162 | 93 | 18 | 13 | 585 |
| Shipping supplies | 9 | 3 | 5 | 11 | 14 | - | 23 | 28 | 6 | 10 | 5 | 1 | 115 |
| Inventory adjustment | - | - | (15) | 4 | 46 | - | (63) | (6) | (163) | (1) | - | (2) | (200) |
| Total COGS | 93 | 69 | 171 | 167 | 255 | 124 | 93 | 281 | 127 | 155 | 83 | 146 | 1,764 |
| Gross profit | 240 | 23 | 238 | 198 | 165 | 146 | 143 | 455 | 292 | (44) | 52 | 280 | 2,188 |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | 56 | 27 | 49 | 41 | 38 | 34 | 34 | 38 | 48 | 36 | 34 | 38 | 473 |
| Bad debt expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Advertising & promotion | - | - | 1 | 3 | 10 | 1 | 19 | 7 | 1 | - | - | 2 | 44 |
| Contract labor | 3 | - | - | 2 | 7 | 5 | 13 | 18 | 28 | 12 | 19 | 16 | 123 |
| Rent | 2 | 2 | 3 | - | 6 | 6 | 6 | 6 | 5 | 6 | 6 | 5 | 53 |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other operating expenses | 6 | 9 | 8 | 11 | 9 | 10 | 10 | 14 | 19 | 8 | 15 | 13 | 132 |
| Total operating expenses | 67 | 38 | 61 | 57 | 70 | 56 | 82 | 83 | 101 | 62 | 74 | 74 | 825 |
| Operating income | 173 | (15) | 177 | 141 | 95 | 90 | 61 | 372 | 191 | (106) | (22) | 206 | 1,363 |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | - | - | - | - | - | - | (1) | - | (1) | (1) | (1) | - | (4) |
| Total other income (expense) | - | - | - | - | - | - | (1) | - | (1) | (1) | (1) | - | (4) |
| Net income | $ 173 | $ (15) | $ 177 | $ 141 | $ 95 | $ 90 | $ 60 | $ 372 | $ 190 | $ (107) | $ (23) | $ 206 | $ 1,359 |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest, net | - | - | - | - | - | - | 1 | - | 1 | 1 | 1 | - | 4 |
| Total EBITDA | $ 173 | $ (15) | $ 177 | $ 141 | $ 95 | $ 90 | $ 61 | $ 372 | $ 191 | $ (106) | $ (22) | $ 206 | $ 1,363 |
| Gross margin | 72.1% | 25.0% | 58.2% | 54.2% | 39.3% | 54.1% | 60.6% | 61.8% | 69.7% | -39.6% | 38.5% | 65.7% | 55.4% |
| Operating margin | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 33.3% | 25.8% | 50.5% | 45.6% | -95.5% | -16.3% | 48.4% | 34.5% |
| Net income margin | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 33.3% | 25.8% | 50.5% | 45.6% | -95.5% | -16.3% | 48.4% | 34.5% |
| EBITDA margin | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 33.3% | 25.8% | 50.5% | 45.6% | -95.5% | -16.3% | 48.4% | 34.5% |

36



**whitleypenn**
CPAs and Professional Consultants

The Company's top three customers of TTM17 represent 36.7%, 16.2%, 28.0% and 31.0% of total adjusted revenues in FY14, FY15, FY16 and TTM17, respectively. As such, a risk exists the Company's future profitability could be adversely impacted if it were to lose any one of its top customers.

| Revenues by Customer | | | | | |
|---|---|---|---|---|---|
| Customer | FY14 | FY15 | FY16 | TTM17 | TTM17 |
| Mega Morning | $    - | $    - | $  476 | $  559 | 14.1% |
| Telewise | - | - | 294 | 342 | 8.7% |
| OpenSky | 393 | 423 | 493 | 325 | 8.2% |
| Woot Wholesale | 51 | 8 | 157 | 316 | 8.0% |
| Hollywood Steals | - | - | 305 | 305 | 7.7% |
| Deal Of The Day, Inc | - | 332 | 186 | 185 | 4.7% |
| Yugster.com | - | 12 | 180 | 182 | 4.6% |
| Today Show | - | - | 26 | 179 | 4.5% |
| Zulily Inc | 73 | 125 | 137 | 172 | 4.4% |
| Jills Steals & Deals | - | - | 139 | 139 | 3.5% |
| Choxi.com, Inc. | 343 | 1,307 | 1,270 | 138 | 3.5% |
| Pick Your Plum | - | - | 71 | 93 | 2.4% |
| Mobstub | - | 172 | 96 | 65 | 1.6% |
| Groupon | - | 46 | 57 | 62 | 1.6% |
| QuiBids | 8 | 53 | 46 | 46 | 1.2% |
| Tanga | - | - | 30 | 43 | 1.1% |
| Restaurant.com | - | 1 | 39 | 42 | 1.1% |
| Sweet Jack LLC | 14 | 12 | 3 | 34 | 0.9% |
| Mediocre Corporation | - | - | 2 | 32 | 0.8% |
| Boardwalkbuy | - | - | 34 | 30 | 0.8% |
| Sudden Values | - | 44 | 31 | 26 | 0.7% |
| Top Hatter | - | - | 30 | 25 | 0.6% |
| Ruelala | - | - | - | 23 | 0.6% |
| Overstock.com | - | - | 22 | 21 | 0.5% |
| Ozsale Pty Limited | - | - | 10 | 20 | 0.5% |
| Other | 190 | 82 | 387 | 565 | 14.3% |
| Total net revenue | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 | |
| QOE adjustments to revenue | - | - | (17) | (17) | |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 | |

| As % of Total Revenue | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Top three customers | 36.7% | 16.2% | 28.0% | 31.0% |
| Other customers | 63.3% | 83.8% | 72.0% | 69.0% |

For the purpose of this analysis, a significant customer is defined as a customer with revenues that exceed 10.0% of total adjusted revenue. The Company has significant customer concentration with its top customer of TTM17 representing 14.1% of TTM17 total adjusted revenues. As such, a risk exists the Company's future profitability could be adversely impacted if it were to lose any one of its top customers.

**Mega Morning:** This customer operates an online retail platform which offers consumers short term deals on discounted products. The customer utilizes the Company to purchase goods for sale to consumers. Management anticipates continued growth with this customer.

**Telewise:** This customer is a marketing consulting company that utilizes the Company to acquire goods for television sales promotions for its clients. Management indicated the relationship began in Sep16 and the Company experienced significant growth in orders from the customer in Nov16 and Dec16. Management anticipates the relationship to continue post-transaction.

**OpenSky:** This customer is an online retailer that provides a wide variety of products through its website. Management indicated the Company experienced significant growth with this customer in FY16 due to the customer's increase in product offerings. Management anticipates the relationship to continue post-transaction.

**Woot Wholesale:** This customer operates an online retail platform which provides both daily deals and short-term sales on products. Management indicated the Company initiated a relationship with this customer in FY14 and experienced significant growth in FY16 due to the customer expanding product offerings. Management anticipates the relationship to continue post-transaction.

37

# Income Statement
# Customer Analysis


whitley**penn**
CPAs and Professional Consultants

The Company's top three customers of TTM17 represent 36.7%, 16.2%, 28.0% and 31.0% of total adjusted revenues in FY14, FY15, FY16 and TTM17, respectively. As such, a risk exists the Company's future profitability could be adversely impacted if it were to lose any one of its top customers.

| Revenues by Customer | | | | | |
|---|---|---|---|---|---|
| Customer | FY14 | FY15 | FY16 | TTM17 | TTM17 |
| Mega Morning | $ - | $ - | $ 476 | $ 559 | 14.1% |
| Telewise | - | - | 294 | 342 | 8.7% |
| OpenSky | 393 | 423 | 493 | 325 | 8.2% |
| Woot Wholesale | 51 | 8 | 157 | 316 | 8.0% |
| Hollywood Steals | - | - | 305 | 305 | 7.7% |
| Deal Of The Day, Inc | - | 332 | 186 | 185 | 4.7% |
| Yugster.com | - | 12 | 180 | 182 | 4.6% |
| Today Show | - | - | 26 | 179 | 4.5% |
| Zulily Inc | 73 | 125 | 137 | 172 | 4.4% |
| Jills Steals & Deals | - | - | 139 | 139 | 3.5% |
| Choxi.com, Inc. | 343 | 1,307 | 1,270 | 138 | 3.5% |
| Pick Your Plum | - | - | 71 | 93 | 2.4% |
| Mobstub | - | 172 | 96 | 65 | 1.6% |
| Groupon | - | 46 | 57 | 62 | 1.6% |
| QuiBids | 8 | 53 | 46 | 46 | 1.2% |
| Tanga | - | - | 30 | 43 | 1.1% |
| Restaurant.com | - | 1 | 39 | 42 | 1.1% |
| Sweet Jack LLC | 14 | 12 | 3 | 34 | 0.9% |
| Mediocre Corporation | - | - | 2 | 32 | 0.8% |
| Boardwalkbuy | - | - | 34 | 30 | 0.8% |
| Sudden Values | - | 44 | 31 | 26 | 0.7% |
| Top Hatter | - | - | 30 | 25 | 0.6% |
| Ruelala | - | - | - | 23 | 0.6% |
| Overstock.com | - | - | 22 | 21 | 0.5% |
| Ozsale Pty Limited | - | - | 10 | 20 | 0.5% |
| Other | 190 | 82 | 387 | 565 | 14.3% |
| Total net revenue | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 | |
| QOE adjustments to revenue | - | - | (17) | (17) | |
| Net revenue, as adjusted | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 | |

| As % of Total Revenue | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|
| Top three customers | 36.7% | 16.2% | 28.0% | 31.0% |
| Other customers | 63.3% | 83.8% | 72.0% | 69.0% |

**Hollywood Steals:** This customer provides deeply discounted products to consumers through a weekly online broadcast. Management indicated the Company initiated a relationship with the customer in FY16 and the customer utilizes the Company to source products for sale to consumers. Management anticipates the relationship to continue post-transaction.

**Choxi.com, Inc.:** This customer is an online retailer that utilized the Company to acquire goods for sale to end users. Management indicated the customer utilizes an e-commerce platform to reach over 30 million end users and had over $900 million in revenue during FY16. Management further indicated the Company sells to six different buying agents for the customer, which has purchased over 250 different items during the Historical Period. In FY16, the customer filed for bankruptcy. Management indicated the Company recently received notice the customer was purchased on auction by a private equity group and is resuming operations with a similar e-commerce platform under the new trade name of jClub. Management further indicated the Company has recently received new orders from the customer and anticipates this relationship to continue post-transaction.

38

BP_000192





Income Statement
# Customer Bridge

whitleypenn
CPAs and Professional Consultants

| | FY15 | FY16 | Total |
|---|---|---|---|
| Prior year total revenue | $ 1,072 | $ 2,617 | $ 1,072 |
| Current customer growth/(decline) | 910 | 259 | 1,169 |
| New customers | 663 | 1,682 | 2,345 |
| Lost customers | (28) | (37) | (65) |
| Current year total revenue | $ 2,617 | $ 4,521 | $ 4,521 |

# Income Statement
## Proof of Revenues



| Proof of Revenues | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | Jan17 | Feb17 | Mar17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deposits | $ 268 | $ 253 | $ 315 | $ 203 | $ 371 | $ 387 | $ 296 | $ 448 | $ 451 | $ 467 | $ 131 | $ 349 | $ 3,939 |
| Less: transfers | - | (50) | - | - | - | (30) | (80) | - | - | (220) | - | - | (380) |
| Adjusted deposits | 268 | 203 | 315 | 203 | 371 | 357 | 216 | 448 | 451 | 247 | 131 | 349 | 3,559 |
| Net revenue, as reported | 333 | 92 | 409 | 365 | 420 | 287 | 236 | 736 | 419 | 111 | 135 | 426 | 3,969 |
| Plus: beginning AR | 363 | 428 | 420 | 496 | 630 | 196 | 183 | 163 | 500 | 448 | 219 | 220 | 363 |
| Less: ending AR | (428) | (420) | (496) | (630) | (196) | (183) | (163) | (500) | (448) | (219) | (220) | (300) | (300) |
| Less: bad debt expense | - | - | - | - | (464) | - | - | - | - | - | - | - | (464) |
| Adjusted revenues | 268 | 100 | 333 | 231 | 390 | 300 | 256 | 399 | 471 | 340 | 134 | 346 | 3,568 |
| Difference | $ - | $ 103 | $ (18) | $ (28) | $ (19) | $ 57 | $ (40) | $ 49 | $ (20) | $ (93) | $ (3) | $ 3 | $ (9) |
| Difference % | 0.0% | 50.7% | -5.7% | -13.8% | -5.1% | 16.0% | -18.5% | 10.9% | -4.4% | -37.7% | -2.3% | 0.9% | -0.3% |



We performed a proof of revenues to determine whether the Company's reported revenues for TTM17 were collected in cash. Cash deposits were obtained from the Company's operating account and were adjusted for inter-company transfers.

The total variance was (0.3)%. Due to the low total percentage variance, we have not proposed any further adjustments to revenue as a result of this analysis.

40



# Section 5
# Balance Sheet Analysis

41

BP_000195

# Balance Sheet
## Comparative Balance Sheets



The schedule and chart to the right summarize the Company's Balance Sheet for the Historical Balance Sheet dates. All balances were taken from the Company's internal financial statements, and have not been adjusted. Refer to the Balance Sheet Exposures section for our proposed Balance Sheet adjustments.

| Comparative Balance Sheets | Dec14 | | Dec15 | | Dec16 | | Mar17 |
|---|---|---|---|---|---|---|---|
| Current assets | | | | | | | |
| Cash | $ | (17) | $ | 70 | $ | 225 | $ 399 |
| Accounts receivable | | - | | 487 | | 448 | 298 |
| Inventory | | 50 | | 168 | | 521 | 449 |
| Undeposited funds | | - | | - | | - | 1 |
| Other current assets | | - | | - | | 17 | 59 |
| Total current assets | | 33 | | 725 | | 1,211 | 1,206 |
| Fixed assets, gross | | 2 | | 12 | | 28 | 29 |
| Accumulated depreciation | | - | | (7) | | (7) | (7) |
| Fixed assets, net | | 2 | | 5 | | 21 | 22 |
| Goodwill | | - | | 41 | | 41 | 41 |
| Total assets | $ | 35 | $ | 771 | $ 1,273 | | $ 1,269 |
| Current liabilities | | | | | | | |
| Accounts payable | $ | 1 | $ | 140 | $ | (9) | $ - |
| Line of credit | | - | | - | | 100 | 100 |
| Credit cards | | 12 | | 8 | | 22 | 23 |
| Due to shareholders | | 107 | | 251 | | 50 | 15 |
| Payroll liabilities | | - | | 14 | | - | - |
| Other current liabilities | | 71 | | 31 | | - | - |
| Total current liabilities | | 191 | | 444 | | 163 | 138 |
| Equity | | (156) | | 327 | | 1,110 | 1,131 |
| Total liabilities and equity | $ | 35 | $ | 771 | $ 1,273 | | $ 1,269 |

**Cash:** The Company utilizes two bank accounts. This includes one operating account and one savings account. These accounts are reconciled monthly. We reviewed the reconciliations for the Historical Balance Sheet Dates and noted no differences between amounts reported on the financial statements and the bank reconciliations.

**Accounts receivable:** The schedule below details the Company's AR Aging for the Historical Balance Sheet Dates. We noted the majority of AR is less than 30 days outstanding. Management indicated the Company typically provides terms of Net 15 and Net 30 to customers with certain customers sending payment with the purchase order. Management anticipates all amounts over 90 days outstanding to be fully collected.

| Accounts Receivable Aging | | | | | | |
|---|---|---|---|---|---|---|
| AR - Trade | | Dec15 | | Dec16 | | Mar17 |
| Current | $ | 404 | $ | 178 | $ | 149 |
| 1 to 30 days | | 54 | | 173 | | 56 |
| 31 to 60 days | | 23 | | 86 | | - |
| 61 to 90 days | | 2 | | 5 | | 83 |
| Over 90 days | | 4 | | 6 | | 10 |
| Total AR | $ | 487 | $ | 448 | $ | 298 |

The Company has historically provided early payment discounts on a discretionary basis. The discounts totaled $21 in FY16 and $29 in TTM17.

The Company has not historically recorded an allowance for doubtful accounts. The total expense related to bad debt was $413 in FY16 and TTM17 with no expense recorded in FY14 or FY15. Management indicated the full amount of $413 recorded in FY16 and TTM17 was related to the write-off of receivables due from a customer, Choxi.com, Inc., that recently filed for bankruptcy. Management further indicated the Company received notice in Jan17 that Choxi.com, Inc. was purchased at auction by a private equity group and that all balances due to the Company will be paid in full. No timeline was provided for when the payments will be made, but Management anticipates the collection period of the outstanding balances will stretch beyond 2017. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information.

42

BP_000196



**whitleypenn**
*CPAs and Professional Consultants*

The schedule and chart to the right summarize the Company's Balance Sheet for the Historical Balance Sheet dates. All balances were taken from the Company's internal financial statements, and have not been adjusted. Refer to the Balance Sheet Exposures section for our proposed Balance Sheet adjustments.

| Comparative Balance Sheets | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Current assets | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 |
| Accounts receivable | - | 487 | 448 | 298 |
| Inventory | 50 | 168 | 521 | 449 |
| Undeposited funds | - | - | - | 1 |
| Other current assets | - | - | 17 | 59 |
| Total current assets | 33 | 725 | 1,211 | 1,206 |
| Fixed assets, gross | 2 | 12 | 28 | 29 |
| Accumulated depreciation | - | (7) | (7) | (7) |
| Fixed assets, net | 2 | 5 | 21 | 22 |
| Goodwill | - | 41 | 41 | 41 |
| Total assets | $ 35 | $ 771 | $ 1,273 | $ 1,269 |
| Current liabilities | | | | |
| Accounts payable | $ 1 | $ 140 | $ (9) | $ - |
| Line of credit | - | - | 100 | 100 |
| Credit cards | 12 | 8 | 22 | 23 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Payroll liabilities | - | 14 | - | - |
| Other current liabilities | 71 | 31 | - | - |
| Total current liabilities | 191 | 444 | 163 | 138 |
| Equity | (156) | 327 | 1,110 | 1,131 |
| Total liabilities and equity | $ 35 | $ 771 | $ 1,273 | $ 1,269 |

| Other Current Assets | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Vendor prepay | $ - | $ - | $ - | $ 41 |
| Other receivable | - | - | 17 | 17 |
| Due from employees | - | - | - | 1 |
| Total other current assets | $ - | $ - | $ 17 | $ 59 |

**Inventory:** Inventory consists of the various products sold by the Company. Management indicated the Company utilizes the inventory module in QuickBooks to track inventory on a monthly basis. The Company performs a physical count of inventory twice per year, in June and December. Management indicated an average cost is used in calculating the value of each inventory item and is calculated directly in QuickBooks. Historically, the Company has not capitalized the cost of inbound freight to inventory. Rather, the Company expenses the cost of freight when incurred. In Dec16, the Company performed a physical inventory count of inventory and identified $153 in additional inventory items not reflected in the balance on the financial statement in QuickBooks. As such, the Company recorded an adjustment to inventory and COGS in Dec16. Additionally, the Company performed a review of the cost for inventory items and determined several errors were present. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information.

**Undeposited funds:** This item represents checks that have been received by the Company but not yet deposited into the bank account. Refer to the Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information on our proposed treatment of this item.

**Other current assets:** The schedule on the lower left details the components of this item at the Historical Balance Sheet Dates. "Vendor prepay" represents payment for products which have been ordered from a vendor but not yet received. Management indicated due to shipping from international locations, delivery of items can take anywhere from five days to 90 days. "Other receivable" consists of a receivable related to an invoice that was erroneously recorded in Sep16 for a transaction that did not occur. Management indicated a credit memo was never created to eliminate the receivable. "Due from employees" represents advances that were provided to employees on a discretionary basis. Management indicated the advances will be collected through payroll deductions. Refer to the Quality of Earnings, Adjusted Net Working Capital and Balance Sheet Exposures sections for additional information.

43

# Comparative Balance Sheets



whitleypenn
*CPAs and Professional Consultants*

The schedule and chart to the right summarize the Company's Balance Sheet for the Historical Balance Sheet dates. All balances were taken from the Company's internal financial statements, and have not been adjusted. Refer to the Balance Sheet Exposures section for our proposed Balance Sheet adjustments.

| Comparative Balance Sheets | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Current assets | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 |
| Accounts receivable | - | 487 | 448 | 298 |
| Inventory | 50 | 168 | 521 | 449 |
| Undeposited funds | - | - | - | 1 |
| Other current assets | - | - | 17 | 59 |
| Total current assets | 33 | 725 | 1,211 | 1,206 |
| Fixed assets, gross | 2 | 12 | 28 | 29 |
| Accumulated depreciation | - | (7) | (7) | (7) |
| Fixed assets, net | 2 | 5 | 21 | 22 |
| Goodwill | - | 41 | 41 | 41 |
| Total assets | $ 35 | $ 771 | $ 1,273 | $ 1,269 |
| Current liabilities | | | | |
| Accounts payable | $ 1 | $ 140 | $ (9) | $ - |
| Line of credit | - | - | 100 | 100 |
| Credit cards | 12 | 8 | 22 | 23 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Payroll liabilities | - | 14 | - | - |
| Other current liabilities | 71 | 31 | - | - |
| Total current liabilities | 191 | 444 | 163 | 138 |
| Equity | (156) | 327 | 1,110 | 1,131 |
| Total liabilities and equity | $ 35 | $ 771 | $ 1,273 | $ 1,269 |

| Accounts Payable Aging | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Current | $ - | $ 139 | $ (9) | $ - |
| 1 to 30 days | - | - | - | - |
| 31 to 60 days | - | - | - | - |
| 61 to 90 days | 1 | - | - | - |
| Over 90 days | - | 1 | - | - |
| Total AP | $ 1 | $ 140 | $ (9) | $ - |

**Fixed assets:** The schedule below summarizes the components of fixed assets at the Historical Balance Sheet Dates. The Company's fixed assets consist of furniture and equipment and leasehold improvements. Management indicated furniture and equipment primarily consists of computer equipment, office furniture and the shelving and storage equipment located in the warehouse. In Dec16, the Company entered into a new lease for a custom built forklift. Management indicated the lease term is 60 months with the option to purchase the forklift at fair market value at the end of the lease terms. Historically, the Company has recorded depreciation on a tax basis at year-end based upon amounts provided by the tax accountant. As of the completion of our procedures the depreciation for FY16 had yet to be recorded. Refer to the Balance Sheet Exposures section for additional information.

| Fixed Asset Summary | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Furniture & equipment | $ 2 | $ 7 | $ 23 | $ 24 |
| Leasehold improvements | - | 5 | 5 | 5 |
| Total gross fixed assets | 2 | 12 | 28 | 29 |
| Accumulated depreciation | - | (7) | (7) | (7) |
| Total net fixed assets | $ 2 | $ 5 | $ 21 | $ 22 |

**Goodwill:** In FY15, the ownership structure of the Company changed when two new investors bought out Erez Lahav, a founder and 50% stakeholder in the Company. Management indicated Goodwill was recorded to adjust the value of the assets based upon the terms of the buyout. Refer to the Balance Sheet Exposures section for our proposed treatment of this item.

**Accounts payable:** The schedule on the lower left details the Company's AP aging for the Historical Balance Sheet Dates. For most vendors, the Company will either pay via credit card or submit payment upon receipt of the invoice. Management indicated some manufacturing vendors require a deposit prior to any items being shipped. Management further indicated in these instances the Company will record the deposit as a prepaid asset until product is received.

44

# Balance Sheet
## Comparative Balance Sheets



The schedule and chart to the right summarize the Company's Balance Sheet for the Historical Balance Sheet dates. All balances were taken from the Company's internal financial statements, and have not been adjusted. Refer to the Balance Sheet Exposures section for our proposed Balance Sheet adjustments.

| Comparative Balance Sheets | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 |
| Accounts receivable | - | 487 | 448 | 298 |
| Inventory | 50 | 168 | 521 | 449 |
| Undeposited funds | - | - | - | 1 |
| Other current assets | - | - | 17 | 59 |
| Total current assets | 33 | 725 | 1,211 | 1,206 |
| Fixed assets, gross | 2 | 12 | 28 | 29 |
| Accumulated depreciation | - | (7) | (7) | (7) |
| Fixed assets, net | 2 | 5 | 21 | 22 |
| Goodwill | - | 41 | 41 | 41 |
| Total assets | $ 35 | $ 771 | $ 1,273 | $ 1,269 |
| **Current liabilities** | | | | |
| Accounts payable | $ 1 | $ 140 | $ (9) | $ - |
| Line of credit | - | - | 100 | 100 |
| Credit cards | 12 | 8 | 22 | 23 |
| Due to shareholders | 107 | 251 | 50 | 15 |
| Payroll liabilities | - | 14 | - | - |
| Other current liabilities | 71 | 31 | - | - |
| Total current liabilities | 191 | 444 | 163 | 138 |
| Equity | (156) | 327 | 1,110 | 1,131 |
| Total liabilities and equity | $ 35 | $ 771 | $ 1,273 | $ 1,269 |

**Credit cards:** This item consists of all balances due on credit cards utilized by the Company. Management indicated the Company has two credit cards and primarily uses the cards for payment to select vendors as well as payment for travel, office supplies and meals and entertainment. Management further indicated the credit cards are reconciled monthly.

**Payroll liabilities:** This item consists of all federal and state employee tax withholdings that have yet to be paid to the taxing authority.

**Other current liabilities:** The schedule below details the components of this item.

| Other Current Liabilities | Dec14 | Dec15 | Dec16 | Mar17 |
|---|---|---|---|---|
| Other payable | $ 20 | $ 20 | $ - | $ - |
| Due to Woot | 47 | 11 | - | - |
| Due to Lifetime Media | 4 | - | - | - |
| Total other current liabilities | $ 71 | $ 31 | $ - | $ - |

"Other payable" represents a liability that was recorded in Dec14 to reflect a customer deposit. Management indicated the entry was not properly reversed in Jan15 which resulted in the liability remaining on the balance sheet. Refer to the Adjusted Net Working Capital and Balance Sheet Exposures section for our proposed treatment of this item. "Due to Woot" reflects a payment from Woot Wholesale, a customer of the Company, that was erroneously sent to the Company by the customer. Management indicated the balance was applied to AR balances due from the customer. "Due to Lifetime Media" represents a payable due to Lifetime Media, a vendor utilized by the Company for development of the Company's website.

45

BP_000199

# Balance Sheet Exposures



The table to the right details our proposed adjustments to the Mar17 Balance Sheet.

| Balance Sheet Exposures | Reported Mar17 | Exposure Adjustments | Pro forma Adjustments | Adjusted Mar17 | Reference |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash | $ 399 | $ - | $ (399) | $ - | A |
| Accounts receivable | 298 | - | - | 298 | |
| Inventory | 449 | - | - | 449 | |
| Undeposited funds | 1 | (1) | - | - | B |
| Other current assets | 59 | (18) | - | 41 | C |
| Total current assets | 1,206 | (19) | (399) | 788 | |
| Fixed assets, gross | 29 | - | - | 29 | |
| Accumulated depreciation | (7) | (17) | - | (24) | D |
| Fixed assets, net | 22 | (17) | - | 5 | |
| Goodwill | 41 | (41) | - | - | E |
| Other assets | - | 413 | - | 413 | F |
| Total assets | $ 1,269 | $ 336 | $ (399) | $ 1,206 | |
| Current liabilities | | | | | |
| Line of credit | $ 100 | $ - | $ (100) | $ - | A |
| Credit cards | 23 | - | - | 23 | |
| Due to shareholders | 15 | - | (15) | - | A |
| Other current liabilities | - | 23 | - | 23 | G |
| Total current liabilities | 138 | 23 | (115) | 46 | |
| Equity | 1,131 | 313 | (284) | 1,160 | |
| Total liabilities and equity | $ 1,269 | $ 336 | $ (399) | $ 1,206 | |

**A (Pro forma):** Per the LOI, the proposed transaction will not include cash, interest bearing debt and balances due to shareholders of the Company. As such, the pro forma adjustments eliminate these items.

**B (Exposure):** The balance of undeposited funds at Mar17 represents checks that were received by the Company but not yet deposited in the bank. As these items are equivalent to cash and the proposed transaction will not include cash, the exposure adjustment has been proposed to eliminate this item.

**C (Exposure):** The balance of other current assets at Mar17 includes a receivable of $17 that was recorded in Sep17 in relation to an invoice for a transaction that did not occur. Management indicated a credit memo was never created to eliminate the receivable. Additionally, other current assets includes $1 that is due from employees for advances. The exposure adjustment has been proposed to eliminate these items.

**D (Exposure):** Historically, the Company has recorded depreciation at year-end based upon amounts provided by the tax accountant. As of the completion of our procedures the depreciation for FY16 as well as depreciation through Mar17 had yet to be recorded. As such, we proposed the exposure adjustment to properly reflect accumulated depreciation at Mar17.

**E (Exposure):** In FY15, the ownership structure of the Company changed when two new investors bought out Erez Lahav, a founder and 50% stakeholder in the Company. Management indicated Goodwill was recorded to adjust the value of the assets based upon the terms of the buyout. This item will likely be eliminated as part of the accounting functions during closing of the proposed transaction. As such, the exposure adjustment eliminates this item.

**F (Exposure):** In Aug16, the Company wrote off all receivables due from Choxi.com, Inc. after the customer filed for bankruptcy. Management indicated the Company later filed a lawsuit to collect the outstanding balances and received notice the balances will be paid in full. Management further indicated the Company had not yet received a specific date for payment but anticipates collection will not occur within the next year. As such, an exposure adjustment has been proposed to include a long-term asset for the balances due from Choxi.com, Inc.

46

# Balance Sheet Exposures



The table to the right details our proposed adjustments to the Mar17 Balance Sheet.

| Balance Sheet Exposures | Reported Mar17 | Exposure Adjustments | Pro forma Adjustments | Adjusted Mar17 | Reference |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash | $ 399 | $ - | $ (399) | $ - | A |
| Accounts receivable | 298 | - | - | 298 | |
| Inventory | 449 | - | - | 449 | |
| Undeposited funds | 1 | (1) | - | - | B |
| Other current assets | 59 | (18) | - | 41 | C |
| Total current assets | 1,206 | (19) | (399) | 788 | |
| Fixed assets, gross | 29 | - | - | 29 | |
| Accumulated depreciation | (7) | (17) | - | (24) | D |
| Fixed assets, net | 22 | (17) | - | 5 | |
| Goodwill | 41 | (41) | - | - | E |
| Other assets | - | 413 | - | 413 | F |
| Total assets | $ 1,269 | $ 336 | $ (399) | $ 1,206 | |
| Current liabilities | | | | | |
| Line of credit | $ 100 | $ - | $ (100) | $ - | A |
| Credit cards | 23 | - | - | 23 | |
| Due to shareholders | 15 | - | (15) | - | A |
| Other current liabilities | - | 23 | - | 23 | G |
| Total current liabilities | 138 | 23 | (115) | 46 | |
| Equity | 1,131 | 313 | (284) | 1,160 | |
| Total liabilities and equity | $ 1,269 | $ 336 | $ (399) | $ 1,206 | |

**G (Exposure):** The composition of this adjustment is illustrated in the table below.

| | |
|---|---|
| Pending litigation | $ 10 |
| Payroll accrual | 13 |
| Total adjustment | $ 23 |

"Pending litigation" reflects an accrual for the settlement that is currently being negotiated between the Company and Onlet in regards to alleged copyright infringement. Management indicated Ontel offered a settlement of $10 and the Company responded with an offer of $4 but is awaiting further communication from Ontel. "Payroll accrual" reflects the recording of an accrual for payroll that is necessary to present the financial statements in accordance with GAAP.

47



# Section 6
# Taxation

48

BP_000202


### State & Local Tax Procedures

Our observations and recommendations are based on the following procedures and sources of information:

- Review of a state and local tax questionnaire completed by the Company.
- Review of the Company's Texas franchise tax returns for the years 2013, 2014 and 2015.
- Review the transaction history of the Company's Texas sales tax returns for the period of April 8, 2013 through January 11, 2017.
- Review of the Company's property tax assessment for the year 2016.

### State Registrations & Filings

The Company is a Texas limited liability company that is registered and filing the following:

- State and local income tax - Texas
- Sales tax – Texas
- Property tax - Texas
- Payroll tax – Texas

- Management indicated that no state or local income tax examinations involving the Company have taken place in the last three years.
- Management indicated that no sales/use tax examinations involving the Company have taken place in the last three years.
- Management indicated that no property tax examinations involving the Company have taken place in the last three years.
- Management indicated that no payroll tax examinations involving the Company have taken place in the last three years.
- Management is not aware of any income, sales/use, property, or payroll tax issues.

### State Income, Franchise, and Business Activity Tax

Nexus, for state tax purposes, is the minimum threshold level of activity a taxpayer must have within a specific state to subject the taxpayer to a state's various income, franchise, or business activity taxes. Public Law No. 86-272 prohibits states from imposing a tax based on net income of an entity whose only business activity within the state consists of sales of tangible personal property and the solicitation of such sales within the state. The scope of Public Law No. 86-272 does not extend to services or states that impose a non-income-based tax upon businesses. Non-income-based taxes (also known as franchise, gross receipts, or business activity taxes) include the Ohio CAT, the Texas Franchise Tax, and the Washington Business & Occupation Tax.

Management indicated the Company only transacts business in Texas, but does have multistate customers. However, the Company is unable to produce a sales-by-state report, based on ship-to address, to determine if the Texas franchise tax return is accurate, and if additional state returns are required.

49



**Sales and Use Tax**

Most states require a company to collect and remit sales and use tax on receipts from customers for the taxable goods and services it provides. This responsibility for collection is generally created when a company has a representative soliciting sales or rendering services in a state. Similarly, a company is required to remit sales and use tax when it purchases products for its own use or consumption.

Management indicated the Company does collect and remit Texas sales tax on direct sales to Texas based consumers. Management advised that all other sales are for resale and exempt from sales tax. However, in order to be exempt, the Company must receive and retain valid resale exemption certificates from all of its wholesale customers. As such, in order to eliminate any exposure, the Company should obtain valid resale exemption certificates from all of its customers for each state to which product is shipped.

**Property Tax**

Most state or local jurisdictions subject business personal property and real property to property tax. In addition, the business is typically required to submit a rendition listing the value of all business personal property to the taxing jurisdiction.

Management indicated the Company has property only in Texas. However, the Company does not render the value of its business personal property. Instead, the Company has historically relied on the tax jurisdiction to determine the value and issue the property tax assessment. Based on this, the property values may be undervalued, and the property taxes under assessed.

**Payroll Tax**

In general, an employee's wages are subject to payroll and unemployment taxes. The employer is required to withhold and remit the employee's share of these taxes, as well as pay and submit its share of the taxes.

Management indicated the Company only has employees located in Texas and that all payroll taxes have been filed and paid as required. As such, the Company's payroll tax filings appear to be in order.

50



**Section 7**

# Databook

51

BP_000205


whitley**penn**
CPAs and Professional Consultants

| Reported Income Statements | FY14 | FY15 | FY16 | TTM17 | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 1,072 | $ 2,617 | $ 4,521 | $ 3,969 | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | | | | | | | | |
| Product COGS | 673 | 1,275 | 1,417 | 1,264 | 62.8% | 48.7% | 31.3% | 31.8% |
| Shipping & delivery | 311 | 548 | 769 | 846 | 29.0% | 20.9% | 17.0% | 21.3% |
| Shipping supplies | 24 | 43 | 133 | 115 | 2.2% | 1.6% | 2.9% | 2.9% |
| Inventory adjustment | (3) | (1) | (197) | (200) | -0.3% | 0.0% | -4.4% | -5.0% |
| Total COGS | 1,005 | 1,865 | 2,122 | 2,025 | 93.8% | 71.3% | 46.9% | 51.0% |
| Gross profit | 67 | 752 | 2,399 | 1,944 | 6.3% | 28.7% | 53.1% | 49.0% |
| Operating expenses | | | | | | | | |
| Payroll | - | 151 | 426 | 428 | 0.0% | 5.8% | 9.4% | 10.8% |
| Bad debt expense | - | - | 413 | 413 | 0.0% | 0.0% | 9.1% | 10.4% |
| Advertising & promotion | 1 | 23 | 180 | 179 | 0.1% | 0.9% | 4.0% | 4.5% |
| Contract labor | 46 | 32 | 108 | 148 | 4.3% | 1.2% | 2.4% | 3.7% |
| Rent | 10 | 23 | 50 | 54 | 0.9% | 0.9% | 1.1% | 1.4% |
| Depreciation | - | 7 | - | - | 0.0% | 0.3% | 0.0% | 0.0% |
| Other operating expenses | 77 | 104 | 193 | 207 | 7.2% | 4.0% | 4.3% | 5.2% |
| Total operating expenses | 134 | 340 | 1,370 | 1,429 | 12.5% | 13.0% | 30.3% | 36.0% |
| Operating income | (67) | 412 | 1,029 | 515 | -6.3% | 15.7% | 22.8% | 13.0% |
| Other income (expense) | | | | | | | | |
| Interest income (expense) | - | (1) | (3) | (4) | 0.0% | 0.0% | -0.1% | -0.1% |
| Total other income (expense) | - | (1) | (3) | (4) | 0.0% | 0.0% | -0.1% | -0.1% |
| Net income | $ (67) $ | 411 | $ 1,026 | $ 511 | -6.3% | 15.7% | 22.7% | 12.9% |
| **Reconciliation to EBITDA** | | | | | | | | |
| Depreciation | $ - $ | 7 $ | - $ | - | 0.0% | 0.3% | 0.0% | 0.0% |
| Interest, net | - | 1 | 3 | 4 | 0.0% | 0.0% | 0.1% | 0.1% |
| Total EBITDA | $ (67) $ | 419 | $ 1,029 | $ 515 | -6.3% | 16.0% | 22.8% | 13.0% |

52

# Databook
## Adjusted Income Statements



| Adjusted Income Statements | FY14 | FY15 | FY16 | TTM17 | FY14 | FY15 | FY16 | TTM17 |
|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 1,072 | $ 2,617 | $ 4,504 | $ 3,952 | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | | | | | | | | |
| Product COGS | 673 | 1,255 | 1,437 | 1,264 | 62.8% | 48.0% | 31.9% | 32.0% |
| Shipping & delivery | 311 | 447 | 542 | 585 | 29.0% | 17.1% | 12.0% | 14.8% |
| Shipping supplies | 24 | 43 | 133 | 115 | 2.2% | 1.6% | 3.0% | 2.9% |
| Inventory adjustment | (3) | (1) | (197) | (200) | -0.3% | 0.0% | -4.4% | -5.1% |
| Total COGS | 1,005 | 1,744 | 1,915 | 1,764 | 93.8% | 66.6% | 42.5% | 44.6% |
| Gross profit | 67 | 873 | 2,589 | 2,188 | 6.3% | 33.4% | 57.5% | 55.4% |
| Operating expenses | | | | | | | | |
| Payroll | 152 | 309 | 451 | 473 | 14.2% | 11.8% | 10.0% | 12.0% |
| Advertising & promotion | 1 | 20 | 40 | 44 | 0.1% | 0.8% | 0.9% | 1.1% |
| Contract labor | 46 | 32 | 83 | 123 | 4.3% | 1.2% | 1.8% | 3.1% |
| Rent | 10 | 23 | 43 | 53 | 0.9% | 0.9% | 1.0% | 1.3% |
| Depreciation | - | 7 | - | - | 0.0% | 0.3% | 0.0% | 0.0% |
| Other operating expenses | 67 | 99 | 118 | 132 | 6.3% | 3.8% | 2.6% | 3.3% |
| Total operating expenses | 276 | 490 | 735 | 825 | 25.7% | 18.7% | 16.3% | 20.9% |
| Operating income | (209) | 383 | 1,854 | 1,363 | -19.5% | 14.6% | 41.2% | 34.5% |
| Other income (expense) | | | | | | | | |
| Interest income (expense) | - | (1) | (3) | (4) | 0.0% | 0.0% | -0.1% | -0.1% |
| Total other income (expense) | - | (1) | (3) | (4) | 0.0% | 0.0% | -0.1% | -0.1% |
| Net income | $ (209) $ | 382 | $ 1,851 | $ 1,359 | -19.5% | 14.6% | 41.1% | 34.4% |
| **Reconciliation to EBITDA** | | | | | | | | |
| Depreciation | $ - $ | 7 $ | - $ | - | 0.0% | 0.3% | 0.0% | 0.0% |
| Interest, net | - | 1 | 3 | 4 | 0.0% | 0.0% | 0.1% | 0.1% |
| Total EBITDA | $ (209) $ | 390 | $ 1,854 | $ 1,363 | -19.5% | 14.9% | 41.2% | 34.5% |

53

BP_000207

# Databook
## Other Operating Expenses



| Other Operating Expenses | FY14 | | | FY15 | | | FY16 | | | TTM17 | | | QOE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reference |
| Professional fees | $ 20 | $ (10) | $ 10 | $ 19 | $ (5) | $ 14 | $ 49 | $ (27) | $ 22 | $ 56 | $ (31) | $ 25 | 4,8 |
| Travel | 3 | - | 3 | 5 | - | 5 | 25 | (15) | 10 | 29 | (12) | 17 | 11 |
| Early payment discount | - | - | - | - | - | - | 18 | (10) | 8 | 19 | (9) | 10 | 6 |
| Computer & internet | 4 | - | 4 | 17 | - | 17 | 19 | - | 19 | 17 | - | 17 | |
| Loss on seizure of merchandise | - | - | - | - | - | - | 16 | (16) | - | 16 | (16) | - | 7 |
| Supplies | 18 | - | 18 | 15 | - | 15 | 12 | - | 12 | 10 | - | 10 | |
| Bank service charge | 6 | - | 6 | 8 | - | 8 | 9 | - | 9 | 8 | - | 8 | |
| Insurance expense | 4 | - | 4 | 6 | - | 6 | 8 | - | 8 | 9 | - | 9 | |
| Repairs & maintenance | 2 | - | 2 | 2 | - | 2 | 8 | (7) | 1 | 8 | (7) | 1 | 10 |
| Telephone expense | 1 | - | 1 | 4 | - | 4 | 7 | - | 7 | 8 | - | 8 | |
| Utilities | 2 | - | 2 | 6 | - | 6 | 8 | - | 8 | 6 | - | 6 | |
| Lease expense | - | - | - | - | - | - | 4 | - | 4 | 5 | - | 5 | |
| Meeting expense | - | - | - | - | - | - | 4 | - | 4 | 3 | - | 3 | |
| Security | 1 | - | 1 | 1 | - | 1 | 4 | - | 4 | 2 | - | 2 | |
| Vehicle expense | 1 | - | 1 | 2 | - | 2 | 1 | - | 1 | 2 | - | 2 | |
| Meals & Entertainment | 4 | - | 4 | 15 | - | 15 | 3 | - | 3 | 1 | - | 1 | |
| Merchant fees | 11 | - | 11 | - | - | - | 1 | - | 1 | 1 | - | 1 | |
| License & registration | - | - | - | - | - | - | 1 | - | 1 | 1 | - | 1 | |
| Reconciling item | - | - | - | - | - | - | (8) | - | (8) | 1 | - | 1 | |
| Property tax | - | - | - | - | - | - | 1 | - | 1 | - | - | - | |
| Growing tree | - | - | - | 1 | - | 1 | - | - | - | - | - | - | |
| Employee expense | - | - | - | 1 | - | 1 | - | - | - | - | - | - | |
| Other operating expense | - | - | - | 2 | - | 2 | 3 | - | 3 | 5 | - | 5 | |
| Total other operating expenses | $ 77 | $ (10) | $ 67 | $ 104 | $ (5) | $ 99 | $ 193 | $ (75) | $ 118 | $ 207 | $ (75) | $ 132 | |

54

BP_000208

Databook
# Rollforward – Reported Income Statements



| Rollforward<br>Reported Income Statements | FY16 | Less<br>Jan16-Mar16 | Plus<br>Jan17-Mar17 | TTM17 |
|---|---|---|---|---|
| Net revenue | $ 4,521 | $ (1,224) | $ 672 | $ 3,969 |
| Cost of goods sold | | | | |
| Product COGS | 1,417 | (400) | 247 | 1,264 |
| Shipping & delivery | 769 | (85) | 162 | 846 |
| Shipping supplies | 133 | (34) | 16 | 115 |
| Inventory adjustment | (197) | - | (3) | (200) |
| Total COGS | 2,122 | (519) | 422 | 2,025 |
| Gross profit | 2,399 | (705) | 250 | 1,944 |
| Operating expenses | | | | |
| Payroll | 426 | (86) | 88 | 428 |
| Bad debt expense | 413 | - | - | 413 |
| Advertising & promotion | 180 | (3) | 2 | 179 |
| Contract labor | 108 | (7) | 47 | 148 |
| Rent | 50 | (7) | 11 | 54 |
| Other operating expenses | 193 | (27) | 41 | 207 |
| Total operating expenses | 1,370 | (130) | 189 | 1,429 |
| Operating income | 1,029 | (575) | 61 | 515 |
| Other income (expense) | | | | |
| Interest income (expense) | (3) | 1 | (2) | (4) |
| Total other income (expense) | (3) | 1 | (2) | (4) |
| Net income | $ 1,026 | $ (574) | $ 59 | $ 511 |
| **Reconciliation to EBITDA** | | | | |
| Depreciation | $ - | $ - | $ - | $ - |
| Interest, net | 3 | (1) | 2 | 4 |
| Total EBITDA | $ 1,029 | $ (575) | $ 61 | $ 515 |

55

**APP114**

BP_000209

# Rollforward – Adjusted Income Statements



| Rollforward | | Less | Plus | |
|---|---|---|---|---|
| **Adjusted Income Statements** | **FY16** | **Jan16-Mar16** | **Jan17-Mar17** | **TTM17** |
| Net revenue | $ 4,504 | $ (1,224) | $ 672 | $ 3,952 |
| Cost of goods sold | | | | |
| Product COGS | 1,437 | (420) | 247 | 1,264 |
| Shipping & delivery | 542 | (81) | 124 | 585 |
| Shipping supplies | 133 | (34) | 16 | 115 |
| Inventory adjustment | (197) | - | (3) | (200) |
| Total COGS | 1,915 | (535) | 384 | 1,764 |
| Gross profit | 2,589 | (689) | 288 | 2,188 |
| Operating expenses | | | | |
| Payroll | 451 | (86) | 108 | 473 |
| Bad debt expense | - | - | - | - |
| Advertising & promotion | 40 | 2 | 2 | 44 |
| Contract labor | 83 | (7) | 47 | 123 |
| Rent | 43 | (7) | 17 | 53 |
| Depreciation | - | - | - | - |
| Other operating expenses | 118 | (22) | 36 | 132 |
| Total operating expenses | 735 | (120) | 210 | 825 |
| Operating income | 1,854 | (569) | 78 | 1,363 |
| Other income (expense) | | | | |
| Interest income (expense) | (3) | 1 | (2) | (4) |
| Total other income (expense) | (3) | 1 | (2) | (4) |
| Net income | $ 1,851 | $ (568) | $ 76 | $ 1,359 |
| **Reconciliation to EBITDA** | | | | |
| Depreciation | $ - | $ - | $ - | $ - |
| Interest, net | 3 | (1) | 2 | 4 |
| Total EBITDA | $ 1,854 | $ (569) | $ 78 | $ 1,363 |

56

BP_000210

# Databook
## Monthly Reported Income Statements



| Reported Income Statements | Jan14 | Feb14 | Mar14 | Apr14 | May14 | Jun14 | Jul14 | Aug14 | Sep14 | Oct14 | Nov14 | Dec14 | FY14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 13 | $ 35 | $ 34 | $ 85 | $ 174 | $ 56 | $ 69 | $ 98 | $ 107 | $ 135 | $ 112 | $ 154 | $ 1,072 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 6 | 11 | 15 | 68 | 112 | 48 | 31 | 51 | 61 | 83 | 52 | 135 | 673 |
| Shipping & delivery | 2 | 1 | 3 | 23 | 44 | 34 | 33 | 28 | 34 | 45 | 26 | 38 | 311 |
| Shipping supplies | - | - | - | 2 | 3 | 2 | 3 | 1 | 1 | 4 | 6 | 2 | 24 |
| Inventory adjustment | - | - | - | - | - | - | - | - | - | - | - | (3) | (3) |
| Total COGS | 8 | 12 | 18 | 93 | 159 | 84 | 67 | 80 | 96 | 132 | 84 | 172 | 1,005 |
| Gross profit | 5 | 23 | 16 | (8) | 15 | (28) | 2 | 18 | 11 | 3 | 28 | (18) | 67 |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bad debt expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Advertising & promotion | - | - | - | - | - | - | - | - | - | - | 1 | - | 1 |
| Contract labor | - | - | - | 1 | 3 | 2 | 4 | 7 | 6 | 7 | 8 | 8 | 46 |
| Rent | - | - | - | - | - | - | 3 | 1 | 1 | 1 | 2 | 2 | 10 |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other operating expenses | 2 | 2 | 3 | 5 | 8 | 8 | 13 | 8 | 6 | 8 | 6 | 8 | 77 |
| Total operating expenses | 2 | 2 | 3 | 6 | 11 | 10 | 20 | 16 | 13 | 16 | 17 | 18 | 134 |
| Operating income | 3 | 21 | 13 | (14) | 4 | (38) | (18) | 2 | (2) | (13) | 11 | (36) | (67) |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total other income (expense) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net income | $ 3 | $ 21 | $ 13 | $ (14) | $ 4 | $ (38) | $ (18) | $ 2 | $ (2) | $ (13) | $ 11 | $ (36) | $ (67) |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest, net | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total EBITDA | $ 3 | $ 21 | $ 13 | $ (14) | $ 4 | $ (38) | $ (18) | $ 2 | $ (2) | $ (13) | $ 11 | $ (36) | $ (67) |

57

BP_000211

# Databook
# Monthly Reported Income Statements



| Reported Income Statements | Jan15 | Feb15 | Mar15 | Apr15 | May15 | Jun15 | Jul15 | Aug15 | Sep15 | Oct15 | Nov15 | Dec15 | FY15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 263 | $ 240 | $ 67 | $ 98 | $ 114 | $ 165 | $ 178 | $ 94 | $ 78 | $ 142 | $ 384 | $ 794 | $ 2,617 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 115 | 49 | 39 | 40 | 35 | 41 | 81 | (19) | 51 | 55 | 148 | 640 | 1,275 |
| Shipping & delivery | 26 | 17 | 30 | 16 | 12 | 25 | 30 | 47 | 33 | 29 | 39 | 244 | 548 |
| Shipping supplies | 3 | 1 | 1 | 2 | 1 | 4 | - | 4 | 1 | 1 | 2 | 23 | 43 |
| Inventory adjustment | (83) | - | - | - | - | - | - | 82 | - | - | - | - | (1) |
| Total COGS | 61 | 67 | 70 | 58 | 48 | 70 | 111 | 114 | 85 | 85 | 189 | 907 | 1,865 |
| Gross profit | 202 | 173 | (3) | 40 | 66 | 95 | 67 | (20) | (7) | 57 | 195 | (113) | 752 |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | 8 | 9 | 12 | 10 | 7 | 10 | 12 | 16 | 14 | 15 | 15 | 23 | 151 |
| Bad debt expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Advertising & promotion | - | - | - | - | 3 | - | 5 | 1 | 1 | 11 | 1 | 1 | 23 |
| Contract labor | 1 | - | - | - | 2 | 9 | 2 | 1 | - | 2 | 2 | 13 | 32 |
| Rent | 3 | - | 2 | 2 | 2 | 4 | 2 | - | 2 | 2 | 2 | 2 | 23 |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | 7 | 7 |
| Other operating expenses | 6 | 8 | 13 | 7 | 7 | 10 | 7 | 12 | 7 | 14 | 7 | 6 | 104 |
| Total operating expenses | 18 | 17 | 27 | 19 | 21 | 33 | 28 | 30 | 24 | 44 | 27 | 52 | 340 |
| Operating income | 184 | 156 | (30) | 21 | 45 | 62 | 39 | (50) | (31) | 13 | 168 | (165) | 412 |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | - | - | - | - | - | - | - | - | - | - | - | (1) | (1) |
| Total other income (expense) | - | - | - | - | - | - | - | - | - | - | - | (1) | (1) |
| Net income | $ 184 | $ 156 | $ (30) | $ 21 | $ 45 | $ 62 | $ 39 | $ (50) | $ (31) | $ 13 | $ 168 | $ (166) | $ 411 |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 7 | $ 7 |
| Interest, net | - | - | - | - | - | - | - | - | - | - | - | 1 | 1 |
| Total EBITDA | $ 184 | $ 156 | $ (30) | $ 21 | $ 45 | $ 62 | $ 39 | $ (50) | $ (31) | $ 13 | $ 168 | $ (158) | $ 419 |

58

BP_000212

# Monthly Reported Income Statements



| Reported Income Statements | Jan16 | Feb16 | Mar16 | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | FY16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 803 | $ 174 | $ 247 | $ 333 | $ 92 | $ 409 | $ 365 | $ 420 | $ 287 | $ 236 | $ 736 | $ 419 | $ 4,521 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 217 | 62 | 121 | 94 | 28 | 125 | 97 | 133 | 94 | 84 | 240 | 122 | 1,417 |
| Shipping & delivery | (11) | 43 | 53 | 31 | 60 | 88 | 86 | 97 | 50 | 82 | 31 | 159 | 769 |
| Shipping supplies | 17 | 8 | 9 | 9 | 3 | 5 | 11 | 14 | - | 23 | 28 | 6 | 133 |
| Inventory adjustment | - | - | - | - | - | (15) | 4 | 46 | - | (63) | (6) | (163) | (197) |
| Total COGS | 223 | 113 | 183 | 134 | 91 | 203 | 198 | 290 | 144 | 126 | 293 | 124 | 2,122 |
| Gross profit | 580 | 61 | 64 | 199 | 1 | 206 | 167 | 130 | 143 | 110 | 443 | 295 | 2,399 |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | 32 | 21 | 33 | 40 | 19 | 50 | 36 | 35 | 32 | 32 | 32 | 64 | 426 |
| Bad debt expense | - | - | - | - | - | - | - | 464 | (40) | (11) | - | - | 413 |
| Advertising & promotion | 1 | - | 2 | 3 | - | 16 | 33 | 24 | 29 | 64 | 7 | 1 | 180 |
| Contract labor | 2 | 1 | 4 | 3 | - | 1 | 17 | 16 | 5 | 13 | 18 | 28 | 108 |
| Rent | 3 | 2 | 2 | 2 | 2 | 4 | - | 6 | 6 | 6 | 6 | 11 | 50 |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other operating expenses | 4 | 9 | 14 | 10 | 15 | 29 | 12 | 15 | 15 | 19 | 23 | 28 | 193 |
| Total operating expenses | 42 | 33 | 55 | 58 | 36 | 100 | 98 | 560 | 47 | 123 | 86 | 132 | 1,370 |
| Operating income | 538 | 28 | 9 | 141 | (35) | 106 | 69 | (430) | 96 | (13) | 357 | 163 | 1,029 |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | (1) | - | - | - | - | - | - | - | - | (1) | - | (1) | (3) |
| Total other income (expense) | (1) | - | - | - | - | - | - | - | - | (1) | - | (1) | (3) |
| Net income | $ 537 | $ 28 | $ 9 | $ 141 | $ (35) | $ 106 | $ 69 | $ (430) | $ 96 | $ (14) | $ 357 | $ 162 | $ 1,026 |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest, net | 1 | - | - | - | - | - | - | - | - | 1 | - | 1 | 3 |
| Total EBITDA | $ 538 | $ 28 | $ 9 | $ 141 | $ (35) | $ 106 | $ 69 | $ (430) | $ 96 | $ (13) | $ 357 | $ 163 | $ 1,029 |

59

# Databook
## Monthly Reported Income Statements



**whitleypenn**
CPAs and Professional Consultants

| Reported Income Statements | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | Jan17 | Feb17 | Mar17 | TTM17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 333 | $ 92 | $ 409 | $ 365 | $ 420 | $ 287 | $ 236 | $ 736 | $ 419 | $ 111 | $ 135 | $ 426 | $ 3,969 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 94 | 28 | 125 | 97 | 133 | 94 | 84 | 240 | 122 | 53 | 60 | 134 | 1,264 |
| Shipping & delivery | 31 | 60 | 88 | 86 | 97 | 50 | 82 | 31 | 159 | 131 | 18 | 13 | 846 |
| Shipping supplies | 9 | 3 | 5 | 11 | 14 | - | 23 | 28 | 6 | 10 | 5 | 1 | 115 |
| Inventory adjustment | - | - | (15) | 4 | 46 | - | (63) | (6) | (163) | (1) | - | (2) | (200) |
| Total COGS | 134 | 91 | 203 | 198 | 290 | 144 | 126 | 293 | 124 | 193 | 83 | 146 | 2,025 |
| Gross profit | 199 | 1 | 206 | 167 | 130 | 143 | 110 | 443 | 295 | (82) | 52 | 280 | 1,944 |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | 40 | 19 | 50 | 36 | 35 | 32 | 32 | 32 | 64 | 28 | 34 | 26 | 428 |
| Bad debt expense | - | - | - | - | 464 | (40) | (11) | - | - | - | - | - | 413 |
| Advertising & promotion | 3 | - | 16 | 33 | 24 | 29 | 64 | 7 | 1 | - | - | 2 | 179 |
| Contract labor | 3 | - | 1 | 17 | 16 | 5 | 13 | 18 | 28 | 12 | 19 | 16 | 148 |
| Rent | 2 | 2 | 4 | - | 6 | 6 | 6 | 6 | 11 | - | 6 | 5 | 54 |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other operating expenses | 10 | 15 | 29 | 12 | 15 | 15 | 19 | 23 | 28 | 8 | 15 | 18 | 207 |
| Total operating expenses | 58 | 36 | 100 | 98 | 560 | 47 | 123 | 86 | 132 | 48 | 74 | 67 | 1,429 |
| Operating income | 141 | (35) | 106 | 69 | (430) | 96 | (13) | 357 | 163 | (130) | (22) | 213 | 515 |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | - | - | - | - | - | - | (1) | - | (1) | (1) | (1) | - | (4) |
| Total other income (expense) | - | - | - | - | - | - | (1) | - | (1) | (1) | (1) | - | (4) |
| Net income | $ 141 | $ (35) | $ 106 | $ 69 | $ (430) | $ 96 | $ (14) | $ 357 | $ 162 | $ (131) | $ (23) | $ 213 | $ 511 |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest, net | - | - | - | - | - | - | 1 | - | 1 | 1 | 1 | - | 4 |
| Total EBITDA | $ 141 | $ (35) | $ 106 | $ 69 | $ (430) | $ 96 | $ (13) | $ 357 | $ 163 | $ (130) | $ (22) | $ 213 | $ 515 |

60

BP_000214

# Quality of Earnings (monthly) – FY16



| Monthly QOE - FY16 | Jan16 | Feb16 | Mar16 | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | FY16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue, as reported | $ 803 | $ 174 | $ 247 | $ 333 | $ 92 | $ 409 | $ 365 | $ 420 | $ 287 | $ 236 | $ 736 | $ 419 | $ 4,521 |
| Net income, as reported | 537 | 28 | 9 | 141 | (35) | 106 | 69 | (430) | 96 | (14) | 357 | 162 | 1,026 |
| Reconciliation to EBITDA | | | | | | | | | | | | | |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest, net | 1 | - | - | - | - | - | - | - | - | 1 | - | 1 | 3 |
| Income tax expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reported EBITDA | 538 | 28 | 9 | 141 | (35) | 106 | 69 | (430) | 96 | (13) | 357 | 163 | 1,029 |
| Management adjustments | | | | | | | | | | | | | |
| 1  Import expenses | - | 15 | 19 | 11 | 22 | 32 | 31 | 35 | 20 | 33 | 12 | 35 | 265 |
| 2  Advertising and promotion | 3 | - | 2 | 3 | - | 15 | 30 | 14 | 28 | 45 | - | - | 140 |
| 3  Bad debt expense | - | - | - | - | - | - | - | 464 | (40) | (11) | - | - | 413 |
| 4  Attorney fees | - | - | - | - | - | - | - | 4 | 4 | 4 | - | - | 12 |
| 5  Contract labor | - | - | - | 1 | - | 1 | 15 | 14 | 4 | 19 | 14 | 15 | 83 |
| 6  Early payment discount | - | - | 1 | - | - | - | - | - | - | 1 | 8 | - | 10 |
| 7  Loss of product | - | - | - | - | - | 13 | - | - | - | - | - | 3 | 16 |
| 8  Professional fees | - | - | - | - | 5 | - | - | - | - | 4 | 1 | 5 | 15 |
| 9  Rent expense | - | - | - | - | - | - | 2 | 2 | 2 | 2 | 2 | 2 | 12 |
| 10  Repairs & maintenance | - | - | - | - | - | 7 | - | - | - | - | - | - | 7 |
| 11  Travel expense | - | 1 | 3 | 4 | 1 | 1 | 1 | 2 | 1 | - | - | 1 | 15 |
| Total management adjustments | 3 | 16 | 25 | 19 | 28 | 69 | 79 | 535 | 19 | 97 | 37 | 61 | 988 |
| Management EBITDA | 541 | 44 | 34 | 160 | (7) | 175 | 148 | 105 | 115 | 84 | 394 | 224 | 2,017 |
| Due diligence adjustments | | | | | | | | | | | | | |
| 12  Management adj 5 | - | - | - | (1) | - | - | - | (5) | (4) | (19) | (14) | (15) | (58) |
| 13  Management adj 9 | - | - | - | - | - | - | (2) | (2) | (2) | (2) | (2) | (2) | (12) |
| 14  Owner compensation | 6 | (1) | (1) | (9) | (9) | (9) | (7) | - | - | (1) | (1) | 8 | (24) |
| 15  Additional rent adjustment | - | - | - | - | - | 1 | - | - | - | - | - | 6 | 7 |
| 16  Payroll accrual | - | 2 | (6) | (7) | 1 | 10 | 2 | (3) | (2) | (1) | (5) | 8 | (1) |
| 17  Out of period expenses | - | - | (30) | 30 | - | - | - | - | - | - | - | (38) | (38) |
| 18  Invoice error | - | - | - | - | - | - | - | - | (17) | - | - | - | (17) |
| 19  Out of period credit | (20) | - | - | - | - | - | - | - | - | - | - | - | (20) |
| Total due diligence adjustments | (14) | 1 | (37) | 13 | (8) | 2 | (7) | (10) | (25) | (23) | (22) | (33) | (163) |
| Adjusted EBITDA | $ 527 | $ 45 | $ (3) | $ 173 | $ (15) | $ 177 | $ 141 | $ 95 | $ 90 | $ 61 | $ 372 | $ 191 | $ 1,854 |
| Reported EBITDA margin | 67.0% | 16.1% | 3.6% | 42.3% | -38.0% | 25.9% | 18.9% | -102.4% | 33.4% | -5.5% | 48.5% | 38.9% | 22.8% |
| Management EBITDA margin | 67.4% | 25.3% | 13.8% | 48.0% | -7.6% | 42.8% | 40.5% | 25.0% | 40.1% | 35.6% | 53.5% | 53.5% | 44.6% |
| Adjusted EBITDA margin (*) | 65.6% | 25.9% | -1.2% | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 31.4% | 25.8% | 50.5% | 45.6% | 41.0% |

61

BP_000215

# Monthly Adjusted Income Statements – FY16



**whitley**penn
CPAs and Professional Consultants

| Adjusted Income Statements | Jan16 | Feb16 | Mar16 | Apr16 | May16 | Jun16 | Jul16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 | FY16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 803 | $ 174 | $ 247 | $ 333 | $ 92 | $ 409 | $ 365 | $ 420 | $ 270 | $ 236 | $ 736 | $ 419 | $ 4,504 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 237 | 62 | 121 | 94 | 28 | 125 | 97 | 133 | 94 | 84 | 240 | 122 | 1,437 |
| Shipping & delivery | (11) | 28 | 64 | (10) | 38 | 56 | 55 | 62 | 30 | 49 | 19 | 162 | 542 |
| Shipping supplies | 17 | 8 | 9 | 9 | 3 | 5 | 11 | 14 | - | 23 | 28 | 6 | 133 |
| Inventory adjustment | - | - | - | - | - | (15) | 4 | 46 | - | (63) | (6) | (163) | (197) |
| Total COGS | 243 | 98 | 194 | 93 | 69 | 171 | 167 | 255 | 124 | 93 | 281 | 127 | 1,915 |
| Gross profit | 560 | 76 | 53 | 240 | 23 | 238 | 198 | 165 | 146 | 143 | 455 | 292 | 2,589 |
| Operating expenses | | | | | | | | | | | | | |
| Payroll | 26 | 20 | 40 | 56 | 27 | 49 | 41 | 38 | 34 | 34 | 38 | 48 | 451 |
| Bad debt expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Advertising & promotion | (2) | - | - | - | - | 1 | 3 | 10 | 1 | 19 | 7 | 1 | 40 |
| Contract labor | 2 | 1 | 4 | 3 | - | - | 2 | 7 | 5 | 13 | 18 | 28 | 83 |
| Rent | 3 | 2 | 2 | 2 | 2 | 3 | - | 6 | 6 | 6 | 6 | 5 | 43 |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other operating expenses | 4 | 8 | 10 | 6 | 9 | 8 | 11 | 9 | 10 | 10 | 14 | 19 | 118 |
| Total operating expenses | 33 | 31 | 56 | 67 | 38 | 61 | 57 | 70 | 56 | 82 | 83 | 101 | 735 |
| Operating income | 527 | 45 | (3) | 173 | (15) | 177 | 141 | 95 | 90 | 61 | 372 | 191 | 1,854 |
| Other income (expense) | | | | | | | | | | | | | |
| Interest income (expense) | (1) | - | - | - | - | - | - | - | - | (1) | - | (1) | (3) |
| Total other income (expense) | (1) | - | - | - | - | - | - | - | - | (1) | - | (1) | (3) |
| Net income | $ 526 | $ 45 | $ (3) | $ 173 | $ (15) | $ 177 | $ 141 | $ 95 | $ 90 | $ 60 | $ 372 | $ 190 | $ 1,851 |
| **Reconciliation to EBITDA** | | | | | | | | | | | | | |
| Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest, net | 1 | - | - | - | - | - | - | - | - | 1 | - | 1 | 3 |
| Total EBITDA | $ 527 | $ 45 | $ (3) | $ 173 | $ (15) | $ 177 | $ 141 | $ 95 | $ 90 | $ 61 | $ 372 | $ 191 | $ 1,854 |
| Gross margin | 69.7% | 43.7% | 21.5% | 72.1% | 25.0% | 58.2% | 54.2% | 39.3% | 54.1% | 60.6% | 61.8% | 69.7% | 57.5% |
| Operating margin | 65.6% | 25.9% | -1.2% | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 33.3% | 25.8% | 50.5% | 45.6% | 41.2% |
| Net income margin | 65.6% | 25.9% | -1.2% | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 33.3% | 25.8% | 50.5% | 45.6% | 41.2% |
| EBITDA margin | 65.6% | 25.9% | -1.2% | 52.0% | -16.3% | 43.3% | 38.6% | 22.6% | 33.3% | 25.8% | 50.5% | 45.6% | 41.2% |

62





| Adjusted EBITDA Bridge | FY15 | FY16 | TTM17 | Total |
|---|---|---|---|---|
| Prior period EBITDA | $  (209) | $   390 | $  1,854 | $   (209) |
| Net revenue growth (decline) | 97 | 629 | (317) | 726 |
| Cost of goods sold decrease (increase) | 709 | 1,087 | (84) | 1,796 |
| Operating expense decrease (increase) | (207) | (252) | (90) | (459) |
| Change in EBITDA | 599 | 1,464 | (491) | 2,063 |
| Current period EBITDA | $   390 | $  1,854 | $  1,363 | $  1,854 |

63

BP_000217

# Databook
# COGS Analysis



| COGS Normalized | FY14 | | | FY15 | | | FY16 | | | TTM17 | | | QOE Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | |
| Net revenue | $ 1,072 | $ - | $ 1,072 | $ 2,617 | $ - | $ 2,617 | $ 4,521 | $ (17) | $ 4,504 | $ 3,969 | $ (17) | $ 3,952 | 18 |
| Cost of goods sold | | | | | | | | | | | | | |
| Product COGS | 673 | - | 673 | 1,275 | (20) | 1,255 | 1,417 | 20 | 1,437 | 1,264 | - | 1,264 | 19 |
| Shipping & delivery | 311 | - | 311 | 548 | (101) | 447 | 769 | (227) | 542 | 846 | (261) | 585 | 1,17 |
| Shipping supplies | 24 | - | 24 | 43 | - | 43 | 133 | - | 133 | 115 | - | 115 | |
| Inventory adjustment | (3) | - | (3) | (1) | - | (1) | (197) | - | (197) | (200) | - | (200) | |
| Total COGS | 1,005 | - | 1,005 | 1,865 | (121) | 1,744 | 2,122 | (207) | 1,915 | 2,025 | (261) | 1,764 | |
| Gross profit | $ 67 | $ - | $ 67 | $ 752 | $121 | $ 873 | $ 2,399 | $190 | $ 2,589 | $ 1,944 | $244 | $ 2,188 | |
| Gross margin | 6.3% | | 6.3% | 28.7% | | 33.4% | 53.1% | | 57.5% | 49.0% | | 55.4% | |

The table to the right illustrates the components of COGS during the Historical Period. Gross margin has increased over the Historical Period from 6.3% in FY14 to 55.4% in TTM17, on an adjusted basis. Management primarily contributed the increase to the Company's relocation to a larger facility as it allowed the Company to purchase in bulk which resulted in higher margins from lower prices and lower import costs.



64

BP_000218

# Databook
## OpEx Analysis



The table to the right illustrates the components of OpEx during the Historical Period. Operating margin increased from (19.5)% in FY14 to 34.5% in TTM17. Management contributed the increase to the Company's ability to maintain a similar cost structure despite a significant increase in demand.

| Normalized OpEx | FY14 | | | FY15 | | | FY16 | | | TTM17 | | | QOE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reported | Adj. | Adjusted | Reference |
| Net revenue | $ 1,072 | $ - | $ 1,072 | $ 2,617 | $ - | $ 2,617 | $ 4,521 | $ (17) | $ 4,504 | $ 3,969 | $ (17) | $ 3,952 | 18 |
| Gross profit | 67 | - | 67 | 752 | 121 | 873 | 2,399 | 190 | 2,589 | 1,944 | 244 | 2,188 | |
| OpEx | | | | | | | | | | | | | |
| Payroll | - | 152 | 152 | 151 | 158 | 309 | 426 | 25 | 451 | 428 | 45 | 473 | 14,16 |
| Bad debt expense | - | - | - | - | - | - | 413 | (413) | - | 413 | (413) | - | 3 |
| Advertising & promotion | 1 | - | 1 | 23 | (3) | 20 | 180 | (140) | 40 | 179 | (135) | 44 | 2 |
| Contract labor | 46 | - | 46 | 32 | - | 32 | 108 | (25) | 83 | 148 | (25) | 123 | 5,12 |
| Rent | 10 | - | 10 | 23 | - | 23 | 50 | (7) | 43 | 54 | (1) | 53 | 9,13,15 |
| Depreciation | - | - | - | 7 | - | 7 | - | - | - | - | - | - | |
| Other OpEx | 77 | (10) | 67 | 104 | (5) | 99 | 193 | (75) | 118 | 207 | (75) | 132 | 4,6,7,8,10,11 |
| Total OpEx | 134 | 142 | 276 | 340 | 150 | 490 | 1,370 | (635) | 735 | 1,429 | (604) | 825 | |
| Operating income | $ (67) | $(142) | $ (209) | $ 412 | $ (29) | $ 383 | $ 1,029 | $ 825 | $ 1,854 | $ 515 | $ 848 | $ 1,363 | |
| Gross margin | 6.3% | | 6.3% | 28.7% | | 33.4% | 53.1% | | 57.5% | 49.0% | | 55.4% | |
| Operating margin | -6.3% | | -19.5% | 15.7% | | 14.6% | 22.8% | | 41.2% | 13.0% | | 34.5% | |



65

BP_000219

# Comparative Balance Sheets



| Comparative Balance Sheets | Dec14 | Dec15 | Dec16 | Mar17 | As % of Total Assets | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Dec14 | Dec15 | Dec16 | Mar17 |
| Current assets | | | | | | | | |
| Cash | $ (17) | $ 70 | $ 225 | $ 399 | -48.6% | 9.1% | 17.7% | 31.3% |
| Accounts receivable | - | 487 | 448 | 298 | 0.0% | 63.2% | 35.2% | 23.4% |
| Inventory | 50 | 168 | 521 | 449 | 142.9% | 21.8% | 40.9% | 35.3% |
| Undeposited funds | - | - | - | 1 | 0.0% | 0.0% | 0.0% | 0.1% |
| Other current assets | - | - | 17 | 59 | 0.0% | 0.0% | 1.3% | 4.6% |
| Total current assets | 33 | 725 | 1,211 | 1,206 | 94.3% | 94.0% | 95.1% | 94.7% |
| Fixed assets, gross | 2 | 12 | 28 | 29 | 5.7% | 1.6% | 2.2% | 2.3% |
| Accumulated depreciation | - | (7) | (7) | (7) | 0.0% | -0.9% | -0.5% | -0.5% |
| Fixed assets, net | 2 | 5 | 21 | 22 | 5.7% | 0.6% | 1.6% | 1.7% |
| Goodwill | - | 41 | 41 | 41 | 0.0% | 5.3% | 3.2% | 3.2% |
| Total assets | $ 35 | $ 771 | $ 1,273 | $ 1,269 | 100.0% | 100.0% | 100.0% | 99.7% |
| Current liabilities | | | | | | | | |
| Accounts payable | $ 1 | $ 140 | $ (9) | $ - | 2.9% | 18.2% | -0.7% | 0.0% |
| Line of credit | - | - | 100 | 100 | 0.0% | 0.0% | 7.9% | 7.9% |
| Credit cards | 12 | 8 | 22 | 23 | 34.3% | 1.0% | 1.7% | 1.8% |
| Due to shareholders | 107 | 251 | 50 | 15 | 305.7% | 32.6% | 3.9% | 1.2% |
| Payroll liabilities | - | 14 | - | - | 0.0% | 1.8% | 0.0% | 0.0% |
| Other current liabilities | 71 | 31 | - | - | 202.9% | 4.0% | 0.0% | 0.0% |
| Total current liabilities | 191 | 444 | 163 | 138 | 545.7% | 57.6% | 12.8% | 10.8% |
| Equity | (156) | 327 | 1,110 | 1,131 | -445.7% | 42.4% | 87.2% | 88.8% |
| Total liabilities and equity | $ 35 | $ 771 | $ 1,273 | $ 1,269 | 100.0% | 100.0% | 100.0% | 99.7% |

66

# Databook
# AR Aging by Customer



| AR Aging by Customer | | | | | | |
|---|---|---|---|---|---|---|
| Customer | Total | Current | 1 to 30 days | 31 to 60 days | 61 to 90 days | Over 90 days |
| Woot Wholesale | $ 107 | $ 37 | $ - | $ - | $ 69 | $ 1 |
| Mega Morning | 64 | 64 | - | - | - | - |
| Ruelala | 24 | 1 | 23 | - | - | - |
| Telewise | 20 | - | - | - | 12 | 8 |
| Mediocre Corporation | 19 | - | 19 | - | - | - |
| Sweet Jack LLC | 14 | 10 | 4 | - | - | - |
| LuluWay.com | 14 | 14 | - | - | - | - |
| Zulily Inc | 8 | 8 | - | - | - | - |
| Pick Your Plum | 5 | - | 5 | - | - | - |
| Mobstub | 5 | 3 | - | 2 | - | - |
| Ozsale Pty Limited | 3 | 3 | - | - | - | - |
| eBags, Inc. | 3 | 2 | 1 | - | - | - |
| Groupon | 2 | 2 | - | - | - | - |
| Open Sky | 2 | - | 2 | - | - | - |
| Tanga | 2 | 2 | - | - | - | - |
| All other | 6 | 3 | 2 | (2) | 2 | 1 |
| Total AR | $ 298 | $ 149 | $ 56 | $ - | $ 83 | $ 10 |

67

BP_000221



# Section 8
# Appendix

BP_000222



*Scope of Procedures: We intend on performing the procedures listed below, to the extent they are applicable and information is available to evaluate each item. The Historical Period will include the Target's financial results for the fiscal years ended December 31, 2014, 2015, and 2016, and the trailing twelve month period ended as of March 31, 2107.*

**Financial Due Diligence**

**General**

1. Read the Letter of Intent.
2. Read the transaction documents to determine the definitions of Working Capital and other items affecting the procedures.
3. Read the Confidential Information Memorandum.
4. Obtain copies of internal financial statements for the Historical Period. Determine that such financial statements reconcile to the trial balance and/or general ledger.
5. Obtain summary of significant accounting policies, and inquire regarding any changes in accounting policies during the Historical Period.
6. Obtain a schedule detailing any transactions between the Target and any shareholder, officer, employee, or affiliate of the Target. Obtain supporting documents for any transactions identified.

**Organization**

1. Obtain a detailed organizational chart of the Company and inquire regarding the locations and activities of significant operations, entities, facilities, or employees.
2. Inquire about the general history of the current operations and recent or planned changes in the business including:
   a. Headcount.
   b. Support functions such as information technology, human resources, finance, treasury, etc.
   c. Industry specific business practices in which the Target operates.
   d. Other significant business policies, procedures and practices.
3. Obtain and analyze a listing of all related parties and related party transactions including principal terms of the arrangements.

4. Obtain and analyze listing of off balance sheet financing arrangements or other transactions that are not reflected in the financial statements.

**Financial Overview**

1. Perform a summary income statement trend analysis for the last three years and inquire regarding any significant trends.
2. Perform a summary financial statement analysis by operating location and inquire regarding any significant trends.
3. Inquire regarding:
   a. Significant and/or unusual accounting policies, procedures, practices, or estimates.
   b. Changes in accounting policies, procedures, practices, or estimates.
   c. Monthly financial statement close process such as cut-off, account reconciliations, accruals, and others.
   d. Nature and extent of period-end vs. year-end financial close and reporting process and related adjustments.
   e. Non-cash entries recorded.
   f. Reserve or other contra account reversals that are outside of normal operations.
   g. Accounting system.
4. Reconcile internal financial statements and corresponding trial balances.
5. Obtain a listing of key performance indicators, metrics, and reports used by Management to evaluate performance.

**Quality of Earnings Analysis**

1. Obtain and analyze a schedule of monthly EBITDA.
2. Reconcile net income to EBITDA from supporting financial statements.
3. Inquire regarding Management's identified EBITDA adjustments and other potential normalizing adjustments.

69



4. Obtain and analyze support for Management's adjustments to EBITDA for unusual, non-recurring, out-of-period, or other items requiring adjustments.
5. Identify other adjustments to EBITDA through these procedures.
6. Calculate adjusted EBITDA.
7. Calculate and recast financial information based upon adjustments to EBITDA.
8. Prepare a year-to-year EBITDA bridge evaluating the change in revenues, cost of revenues, operating expenses and other income/expenses.

### Working Capital Analysis

1. Reconcile Working Capital from supporting financial statements and transaction definitions.
2. Inquire regarding Management's identified Working Capital adjustments and other potential normalizing adjustments.
3. Obtain and analyze support for Management's adjustments to Working Capital.
4. Identify other adjustments to Working Capital through these procedures.
5. Calculate amount of adjusted Working Capital.
6. Calculate the Target's cash conversion cycle during the Historical Period.

### Income Statement

1. Obtain and analyze detailed income statement accounts for non-recurring or unusual items.
2. Obtain and analyze monthly income statements and investigate significant or unusual variances to prior periods.
3. Obtain and analyze monthly schedule of revenue, cost of sales and gross margin by major classification, product, or business line by location and the combined entity.
4. Perform a "proof or revenue" reconciling the Target's monthly revenues to cash collected per the monthly bank statements for the trailing twelve months.

5. Inquire regarding product defects and return rates during the Historical Period and status of returns from key customers.

### Revenues / Customers

1. Obtain and analyze schedule of gross to net revenues.
2. Understand key terms of any significant customer contracts and/or service agreements.
3. Obtain and analyze listing of the top customers and inquire regarding:
   a. Significant customer concentration.
   b. Status of relationship.
   c. Sales terms.
   d. Turnover in customer relationships.
4. Prepare a year-to-year bridge illustrating growth/decline from existing customers, new customers and lost customers during the Historical Period.
5. Inquire regarding:
   a. Significant sources of income.
   b. Revenue recognition policies and procedures.
   c. Deferral of income.
   d. Pricing policies and procedures.
   e. Sales terms and billing practices.
   f. Credit and collection policies.
   g. Seasonality or other fluctuations in revenue, and the resulting net working capital requirements.
   h. Nonrecurring revenue, unusual, and extraordinary items.
   i. Significant refunds.
   j. Potential adjustments to revenue including sales discounts and volume discounts.
   k. Trends in mix of products or services.

70



**Cost of Sales / Vendors**

1. Obtain and analyze schedule of significant components of cost of sales as a percentage of revenue.
2. Understand whether expenses are properly included in or excluded from cost of sales.
3. Understand and analyze the economics of the business on a per unit basis.
4. Inquire regarding:
   a. Significant sources of cost of sales.
   b. Direct and indirect labor and overhead programs.
   c. Cost of sales recognition policies and procedures.
   d. Nonrecurring cost of sales, unusual, and extraordinary items.
   e. Qualifying new vendors.
   f. Purchasing terms and payment practices.
   g. Potential adjustments to cost of sales including purchase discounts.
   h. Trends related to the pricing and components of cost of sales.
5. Obtain and analyze listing of purchase commitments with vendors.
6. Obtain and analyze list of vendor rebates.
7. Obtain and analyze listing of the tope vendors and inquire regarding:
   a. Significant supplier concentration.
   b. Status of relationship.
   c. Purchasing terms.
   d. Turnover in vendor relationships.
7. Obtain listing of overdue payables with significant suppliers and inquire regarding the reason for the delinquency and status of payment.
9. Evaluate the Target's accounting system and procedures with respect to revenue and inventory costs and its ability to produce reliable gross margin data.
10. Evaluate the inventory costing methodology. Inquire regarding any changes in the system or procedures during the Historical Period.

**Operating Expenses / Employees**

1. Obtain and analyze monthly schedule of significant components of operating expenses as a percentage of revenue.
2. Obtain and analyze schedule of legal and professional fees by significant category and vendor.
3. Obtain and analyze current employee roster with pay rates, potential bonuses and year-to-date payroll summary for employees.
4. Inquire regarding:
   a. Significant sources of operating expenses.
   b. Operating expense recognition policies and procedures.
   c. Nonrecurring operating expenses, unusual, and extraordinary items.
   d. Sales force structure and compensation.
   e. Compensation arrangements and benefits, including bonus programs.
   f. Trends related to the components of operating expenses.
   g. Components of "other" income and expense.
6. Inquire regarding whether the Target is self-insured, including whether insurance has been purchased that limits its exposure for individual claims and that limits its aggregate exposure.

**Balance Sheet**

1. Obtain and analyze monthly balance sheets and investigate significant or unusual variances to prior periods.
2. Obtain and analyze detailed balance sheet accounts for unusual items.

**Cash**

1. Obtain bank reconciliation from the most recently completed period that agree to the financial statements and inquire regarding any significant or unusual items.

71

BP_000225



2. Inquire regarding the procedures for receipt and disbursement of cash.

**Accounts Receivable**

1. Obtain an aged accounts receivable trial balance as of the Historical Period balance sheet dates. Discuss the basis of compilation, i.e., invoice or due date, classification of credit balances. Obtain the Target's reconciliations of the aged trial balances to the general ledger.
2. Discuss with management the receivables system and related controls.
3. Calculate the Target's days sales outstanding during the Historical Period.
4. Discuss with management credit and collections policies, i.e., terms, return policies, discounts allowed and cut-off procedures. Inquire concerning whether any customers receive non-standard terms or if there have been any changes in terms during the Historical Period.
5. Inquire regarding the Company's accounting for credit memos, discounts, rebates, promotions, damaged products, product returns, and other customer deductions. Consider whether an allowance for is needed related to these items.
6. Obtain a roll forward of the changes in the allowance for doubtful accounts for the Historical Period. The roll forward should contain the beginning balance, provision, write-offs, recoveries and ending balance. Agree the allowance balance and bad debt expense to the general ledger.
7. Gain an understanding of how the allowance is calculated. Inquire concerning the collectability of significant past due balances and the adequacy of the allowance, as of the latest available interim period.
8. Obtain a schedule of all loans to employees and copies of all related documents.
9. Obtain a schedule of any factored receivables, and understand factoring relationship and fees incurred.

**Inventory**

1. Obtain an analysis of inventory by type, i.e., raw materials, work-in-process, finished goods and inventory reserves, at the historical balance sheet dates. Inquire regarding fluctuations or trends in the components of inventory.
2. Calculate the Company's days inventory on-hand during the Historical Period.
3. Compare trends in per unit costs during the Historical Period and inquire regarding any significant fluctuations. Compare inventory by product line to sales by product line.
4. Obtain an analysis of the Company's inventory costing/valuation for each category of inventory and determine whether standard costing is used. If standard costing is used, understand the Company's methodology of determining the standard rates for fixed and variable overhead allocations.
5. Inquire regarding inventory purchasing practices, delivery, consignment policies, usage patterns, physical and accounting controls and procedures.
6. Document the Company's policies regarding vendor rebates and inquire concerning whether such rebates are accrued as a reduction to inventory.
7. Inquire as to frequency of physical inventories and the significance of book-to-physical inventory adjustments during the Historical Period. Discuss with management the causes for these adjustments. Consider the implication of the adjustments on the Company's reserve for slow moving/obsolete inventory and interim period financial results.
8. Inquire about significant inventory purchases or sale commitments, letters of credit arrangements with suppliers and pledged or consigned inventories.
9. Obtain and analyze a rollforward of the Company's reserve for slow moving/obsolete inventory for each period.

72

BP_000226



10. Determine the nature and reasons for significant write-offs during the Historical Period and analyze whether the related expense is recorded in the period to which it relates.
11. Obtain an inventory usage analysis, outlining sales/consumption by inventory item during the most recent twelve months. Compare inventory usage to quantities on hand as of the most recent balance sheet date and discuss any items that appear to be obsolete or slow moving.

**Other Current and Non-current Assets**

1. Analyze the components of other current and non-current assets and determine if the value of these assets is realizable to the Buyer.

**Fixed Assets**

1. Obtain and analyze detailed roll-forward of fixed assets including additions and disposals that agree to the financial statements.
2. Obtain and analyze support for significant additions to fixed assets.
3. Obtain and analyze a listing of repairs and maintenance expenses that could be capitalized as fixed assets.
4. Obtain and analyze listing of any assets utilized by the Company which are not owned by the Company (i.e., property owned by officer, owner).
5. Inquire regarding:
    a. Significant leased assets.
    b. Capitalization policies.
    c. Depreciation policies.
    d. Forecasted capital expenditures over the next twelve months.

**Accounts Payable**

1. Obtain an aged accounts payable trial balance, as of the historical balance sheet dates. Inquire concerning significant and unusual items, vendors, vendor balances, etc. Determine whether the aged trial balances reconcile to the general ledger and gain an understanding of significant or unusual reconciling items.

2. Calculate the Targets days payable outstanding during the Historical Period.
3. Inquire regarding:
    a. Payment terms.
    b. Discounts taken.
    c. Unrecorded liabilities.
    d. Purchase commitments, guarantees, and rebates.
    e. Posting invoices to the aging.
    f. Cut-off procedures.
    g. Issuing checks to vendors.

**Accrued Liabilities**

1. Inquire concerning whether accruals for all significant items have been considered, including compensated absences, commissions, deferred compensation, taxes, litigation, personnel-related matters, self-insurance reserves and warranty.
3. Gain an understanding of the Company's unrecorded liabilities review process and any differences in year-end and interim accounting procedures.
4. Inquire regarding:
    a. Unrecorded liabilities.
    b. Product liability.
    c. Employment agreements.
    d. Severance agreements.
    e. Compensation and bonus arrangements.
    f. Workers compensation.
    g. Legal settlements and contingencies.

**Other Liabilities**

1. Obtain a schedule of all significant lease agreements, identified as capital or operating.

73



2. Obtain a schedule of currently outstanding short-term debt, long-term debt, intercompany debt and loans to officers or employees, including amounts, maturities, interest rates and payment terms.
3. Understand any financial agreements with suppliers and/or customers.

**Tax Due Diligence**

1. Review all State and Local income tax returns of Target (including all separate entity returns for subsidiaries, if applicable) for all open statute of limitation periods.  Consider extended statute period based on a review of these returns, other documents and client interviews.
2. Review all Sales, Use, and Excise tax returns of Target and subsidiaries for all open statute of limitation periods.
3. Review all Federal and State Payroll tax returns of Target and subsidiaries for all open statute of limitation periods.
4. Review all Real, Personal and Intangible Property tax returns of Target and subsidiaries for all open statute of limitation periods.
5. Review all correspondence related to examinations by any taxing authority for the prior five tax periods including all examination closing statements, examination reports, and any other tax notices related to ongoing or scheduled examinations by any taxing authority.
6. Discuss any preferred tax status or tax benefit that may be adversely affected or eliminated as a result of the proposed acquisition.
7. Discuss with management the operations of the Target and subsidiaries in all State jurisdictions to determine the potential Nexus requirements and if all applicable filing requirements have been met.

74



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
February 28, 2018
Invoice No. 96346

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | | |
|---|---|---|
| Current Fees | 2,379.00 | |
| Current Costs | 152.80 | |
| Total Current Charges | | 2,531.80 |
| **Total Due** | | **2,531.80** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP134**

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| ACET Litigation | February 28, 2018 |
| Matter ID - 37606-00021-JAS | 96346 |

### Fees

| Date | Description of Services | Atty | Hours |
|---|---|---|---|
| 02/20/2018 | Review matter; confer with J. Smith; confer with T. Ludlow; call to J. Hafen; email to same. | BPS | 1.50 |
| 02/20/2018 | Conference calls with T. Ludlow and M. Denegre and with B. Stevens to discuss demand letter received from T. Damti; review senior loan agreement to determine whether ACET is required to provide lender notice of the Damti demand letter. | JAS | 1.00 |
| 02/21/2018 | Email with J. Smith regarding status of matter and discussion with T. Ludlow and J. Hafen; email from J. Hafen. | BPS | 0.30 |
| 02/22/2018 | Call with J. Hafen regarding T. Danti; email correspondence regarding same; call with T. Ludlow regarding matters; review and analysis of employment agreement, demand letter and explanation of termination. | BPS | 0.90 |
| 02/23/2018 | Confer with J. Hafen regarding status of dispute. | BPS | 0.40 |
| 02/23/2018 | Conference call with T. Ludlow and B. Stevens to discuss conversation with T. Damti's counsel; ██████████████████████ | JAS | 1.10 |
| 02/26/2018 | Emails with T. Ludlow. | BPS | 0.50 |
| 02/27/2018 | Email correspondence with T. Ludlow. | BPS | 0.30 |

| | | |
|---|---|---|
| | **Total Fees** | **2,379.00** |

### Costs

| Description of Costs | Amount |
|---|---|
| CPW - 189 | 37.80 |
| CPW - 400 | 80.00 |
| CPW - 175 | 35.00 |
| **Total Costs** | **152.80** |

| | |
|---|---|
| **Total Fees and Costs** | **2,531.80** |
| **Total This Invoice** | **2,531.80** |

### Fee Recap

| Timekeeper | Hours | Rate/Hour | Amount |
|---|---|---|---|
| Smith, Julie A. | 2.10 | 390.00 | 819.00 |
| Stevens, Bryan P. | 3.90 | 400.00 | 1,560.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
March 31, 2018
Invoice No. 96347

Matter:  Tomer Damti Employment                    Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | | |
|---|---|---|
| Balance Forward | | 2,531.80 |
| Current Fees | 994.00 | |
| Current Costs | 24.31 | |
| Total Current Charges | | 1,018.31 |
| **Total Due** | | **3,550.11** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP136**

# Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| ACET Litigation | March 31, 2018 |
| Matter ID - 37606-00021-JAS | 96347 |

## Fees

| Date | Description of Services | Atty | Hours |
|---|---|---|---|
| 02/22/2018 | Conference call with T. Ludlow, M. Denegre and B. Stevens to discuss ███████████ | JAS | 0.60 |
| 03/14/2018 | Call from Jon Patton regarding matters; email with T. Ludlow. | BPS | 0.20 |
| 03/19/2018 | Email and call with client regarding strategy. | BPS | 1.10 |
| 03/20/2018 | Call with J. Patton regarding settlement; email with T. Ludlow. | BPS | 0.60 |
| | **Total Fees** | | **994.00** |

## Costs

| Description of Costs | Amount |
|---|---|
| FedEx 2/28 | 24.31 |
| **Total Costs** | **24.31** |
| **Total Fees and Costs** | **1,018.31** |
| **Total This Invoice** | **1,018.31** |
| Balance Forward | 2,531.80 |
| **Total Amount Due** | **3,550.11** |

## Fee Recap

| Timekeeper | Hours | Rate/Hour | Amount |
|---|---|---|---|
| Smith, Julie A. | 0.60 | 390.00 | 234.00 |
| Stevens, Bryan P. | 1.90 | 400.00 | 760.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
April 30, 2018
Invoice No. 96348

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---|
| Balance Forward | 3,550.11 |
| Current Fees | 2,584.50 |
| Total Current Charges | 2,584.50 |
| **Total Due** | **6,134.61** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP138**

## Hallett & Perrin, P.C.

| Baymark Partners | Page 2 |
|---|---|
| ACET Litigation | April 30, 2018 |
| Matter ID - 37606-00021-JAS | 96348 |

| | Fees | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 04/03/2018 | Revise petition; email correspondence with J. Smith regarding same. | BPS | 0.30 |
| 04/09/2018 | Meet with B. Stevens to discuss petition filed by T. Damti; correspond with T. Ludlow regarding same. | JAS | 0.50 |
| 04/09/2018 | Conference with J. Smith regarding strategy; instructions to D. Hammack. | BPS | 0.50 |
| 04/10/2018 | Email correspondence with J. Smith and T. Ludlow. | BPS | 0.30 |
| 04/11/2018 | Emails with T. Ludlow regarding ███████████ | BPS | 0.20 |
| 04/13/2018 | Meeting with J. Smith regarding proposed settlement terms requested by client to be incorporated into Confidential Settlement and Release Agreement; review pleadings, correspondence, proposed settlement terms, and related materials in preparation for drafting the Confidential Settlement and Release Agreement; drafted Confidential Settlement and Release Agreement; prepared dismissal documents including a Notice of Nonsuit with Prejudice and Order. | DMH | 3.00 |
| 04/14/2018 | Review and revise Confidential Settlement Agreement to incorporate changes requested by client. | DMH | 0.50 |
| 04/15/2018 | Review and revise settlement agreement; review employment agreement, asset purchase agreement and seller note in connection with same. | JAS | 1.60 |
| 04/16/2018 | Incorporated edits requested by client ███████████████████████ ███████████████████████████████████ | DMH | 0.80 |
| 04/24/2018 | Assess status of ongoing settlement discussions between client and Plaintiff; correspondence with client regarding ██████ | DMH | 0.60 |
| 04/27/2018 | Correspondence with client transmitting Original Answer and General Denial filed this morning and ███████████████████ | DMH | 0.40 |
| | **Total Fees** | | **2,584.50** |

## Hallett & Perrin, P.C.

Baymark Partners                                                         Page 3
  ACET Litigation                                            April 30, 2018
  Matter ID - 37606-00021-JAS                                      96348

| | |
|---|---:|
| **Total Fees and Costs** | **2,584.50** |
| **Total This Invoice** | **2,584.50** |
| | |
| Balance Forward | 3,550.11 |
| **Total Amount Due** | **6,134.61** |

### Fee Recap

| Timekeeper | Hours | Rate/Hour | Amount |
|---|---:|---:|---:|
| Smith, Julie A. | 2.10 | 390.00 | 819.00 |
| Stevens, Bryan P. | 1.30 | 400.00 | 520.00 |
| Hammack, David M. | 5.30 | 235.00 | 1,245.50 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
May 31, 2018
Invoice No. 74535

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | | |
|---|---|---|
| Balance Forward | | 6,134.61 |
| Current Fees | 94.00 | |
| Total Current Charges | | 94.00 |
| **Total Due** | | **6,228.61** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

# Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| ACET Litigation | May 31, 2018 |
| Matter ID - 37606-00021-JAS | 74535 |

| **Fees** | | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 05/21/2018 | Review court order setting trial date and corresponding deadlines; Correspondence with client regarding same; | DMH | 0.40 |

| | | |
|---|---|---|
| | **Total Fees** | **94.00** |
| | **Total Fees and Costs** | **94.00** |
| | **Total This Invoice** | **94.00** |
| | Balance Forward | 6,134.61 |
| | **Total Amount Due** | **6,228.61** |

| **Fee Recap** | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Hammack, David M. | 0.40 | 235.00 | 94.00 |



<div align="right">
1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965
</div>

<div align="right">
For the Period Ending
October 31, 2018
Invoice No. 96349
</div>

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

Matter:  Tomer Damti Employment          Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---:|
| Balance Forward | 6,228.61 |
| Payments | -94.00 |
| Balance Forward | 6,134.61 |
| Current Fees | 80.00 |
| Total Current Charges | 80.00 |
| **Total Due** | **6,214.61** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

## Hallett & Perrin, P.C.

| Baymark Partners | Page 2 |
|---|---|
| ACET Litigation | October 31, 2018 |
| Matter ID - 37606-00021-JAS | 96349 |

| Fees | | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 10/01/2018 | Confer with D. Hammack regarding status of matter and deadlines relating to same. | BPS | 0.20 |

| | |
|---|---|
| **Total Fees** | **80.00** |
| **Total Fees and Costs** | **80.00** |
| **Total This Invoice** | **80.00** |
| Balance Forward | 6,134.61 |
| **Total Amount Due** | **6,214.61** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Stevens, Bryan P. | 0.20 | 400.00 | 80.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX 75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn: Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX 75024

For the Period Ending
January 31, 2019
Invoice No. 96345

Matter: Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | | |
|---|---|---|
| Balance Forward | | 6,214.61 |
| Current Fees | 85.00 | |
| Total Current Charges | | 85.00 |
| **Total Due** | | **6,299.61** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP145**

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| ACET Litigation | January 31, 2019 |
| Matter ID - 37606-00021-JAS | 96345 |

| Fees | | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 01/22/2019 | Confer with D. Hammack regarding case update and status of case. | BPS | 0.20 |

| | |
|---|---|
| **Total Fees** | **85.00** |
| **Total Fees and Costs** | **85.00** |
| **Total This Invoice** | **85.00** |
| Balance Forward | 6,214.61 |
| **Total Amount Due** | **6,299.61** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Stevens, Bryan P. | 0.20 | 425.00 | 85.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
March 31, 2019
Invoice No. 111181

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | | |
|---|---|---|
| Balance Forward | | 6,299.61 |
| Current Fees | 3,307.50 | |
| Current Costs | 63.94 | |
| Total Current Charges | | 3,371.44 |
| **Total Due** | | **9,671.05** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP147**

## Hallett & Perrin, P.C.

| Baymark Partners | Page 2 |
|---|---|
| ACET Litigation | March 31, 2019 |
| Matter ID - 37606-00021-JAS | 111181 |

| Fees | | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 10/10/2018 | Assess status of pending expert designation deadlines in light of client's ongoing efforts to resolve matter on its own. | DMH | 0.20 |
| 11/01/2018 | Assess pending expert designation deadlines in light of the client's ongoing efforts to resolve this case on its own. | DMH | 0.40 |
| 01/21/2019 | Assess status of upcoming deadlines in light of client's ongoing efforts to resolve this matter without attorney involvement. | DMH | 0.40 |
| 02/07/2019 | Draft Motion to Withdraw from Tomer Damti matter and proposed order granting Motion; review local rule requiring client's consent to Motion. | 256 | 1.70 |
| 02/12/2019 | Revise Motion to Withdraw. | 256 | 0.80 |
| 02/12/2019 | Revise ACET motion to withdraw; call and email to opposing counsel. | BPS | 1.30 |
| 02/13/2019 | Further revisions to Motion to Withdraw; draft letter to client re Motion; review upcoming deadlines in lawsuit for use in Motion and letter. | 256 | 1.60 |
| 02/14/2019 | Finalize Motion to Withdraw for filing. | 256 | 0.80 |
| 02/18/2019 | Assess status of hearing on the unopposed motion to withdraw. | DMH | 0.50 |
| 03/28/2019 | Prepare for and attend hearing on Unopposed Motion for Withdrawal; confer with B. Stevens after concluding hearing; prepare letter per the Court's request and in compliance with the Court's local rules and the Texas Rules of Civil Procedure informing the client that Hallett & Perrin has withdrawn from representation. | DMH | 3.50 |

|  | **Total Fees** | **3,307.50** |
|---|---|---|

| Costs | |
|---|---|
| **Description of Costs** | **Amount** |
|  | 14.00 |
| EKB - | 1.30 |
| EKB - | 6.55 |
| EKB - | 5.60 |
| EKB - | 0.50 |
| File & ServeXpress Stevens efiling 2/15 | 3.33 |
| File & ServeXpress Stevens efiling 2/20 | 3.33 |
| EKB - | 5.60 |
| EKB - | 5.60 |
| EKB - 6 | 1.20 |
| TMP - | 5.60 |
| TMP - | 0.50 |

## Hallett & Perrin, P.C.

| Baymark Partners | Page 3 |
|---|---|
|   ACET Litigation | March 31, 2019 |
|   Matter ID - 37606-00021-JAS | 111181 |

| **Description of Costs** | **Amount** |
|---|---|
| TMP - | 0.50 |
| File & ServeXpress Hammack efiling: 3/28 Withdrawal / Dallas Co 192nd | 3.33 |
| Petty Cash DMH - Parking at courthouse | 7.00 |

| | | |
|---|---|---|
| | **Total Costs** | **63.94** |
| | **Total Fees and Costs** | **3,371.44** |
| | **Total This Invoice** | **3,371.44** |
| | Balance Forward | 6,299.61 |
| | **Total Amount Due** | **9,671.05** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Stevens, Bryan P. | 1.30 | 425.00 | 552.50 |
| Hammack, David M. | 4.40 | 260.00 | 1,144.00 |
| Hammack, David M. | 0.60 | 235.00 | 141.00 |
| Shanks, Lily H. | 4.90 | 300.00 | 1,470.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
July 31, 2020
Invoice No. 217194

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---|
| Current Fees | 495.00 |
| Total Current Charges | 495.00 |
| **Total Due** | **495.00** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP150**

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| Tomer Damti Employment | July 31, 2020 |
| Matter ID - 37606-00032-JAS | 217194 |

### Fees

| Date | Description of Services | Atty | Hours |
|------|------------------------|------|-------|
| 07/23/2020 | Communication from Ms. Jamaica regarding new filings in Damti case for wrongful termination; review and analysis of motion to reopen, motion for default judgment and court setting of hearing for following Monday; conference with J. Poe regarding new filings and handling of same; telephone conference with Mr. Ludlow regardin g ██████████████ ██████████████████ instructions to Ms. Jamaica to prepare and file appearance; review of claims in pending petition; additional communications with Mr. Ludlow. | EPP | 0.50 |
| 07/24/2020 | Review of Damti pleadings, and ensure answer filed; revision of appearance and instructions to Ms. Jamaica regarding handling of same, contacting court regarding filing and ensure that default for lack of counsel set for Monday rendered moot. | EPP | 0.40 |

| | |
|---|---|
| **Total Fees** | **495.00** |
| **Total Fees and Costs** | **495.00** |
| **Total This Invoice** | **495.00** |

### Fee Recap

| Timekeeper | Hours | Rate/Hour | Amount |
|------------|-------|-----------|--------|
| Perrin Jr., Edward P. | 0.90 | 550.00 | 495.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

For the Period Ending
August 31, 2020
Invoice No. 217195

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

Matter:  Tomer Damti Employment                          Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---:|
| Balance Forward | 495.00 |
| Current Fees | 220.00 |
| Total Current Charges | 220.00 |
| **Total Due** | **715.00** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP152**

## Hallett & Perrin, P.C.

| Baymark Partners | Page 2 |
|---|---|
| Tomer Damti Employment | August 31, 2020 |
| Matter ID - 37606-00032-JAS | 217195 |

| Fees | | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 08/05/2020 | Review of release terms forwarding by Mr. Ludlow and applicability to plaintiff and Damti claims. | EPP | 0.20 |
| 08/06/2020 | Communications with Mr. Ludlow regarding analysis of release from closing and applicability to both suits. | EPP | 0.20 |

| | |
|---|---|
| **Total Fees** | **220.00** |
| **Total Fees and Costs** | **220.00** |
| **Total This Invoice** | **220.00** |
| Balance Forward | 495.00 |
| **Total Amount Due** | **715.00** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 0.40 | 550.00 | 220.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
November 30, 2020
Invoice No. 208594

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---:|
| Previous Balance | $715.00 |
| Balance Forward | $715.00 |
| Current Fees | $1,158.00 |
| Total Current Charges | $1,158.00 |
| **Total Due** | **$1,873.00** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP154**

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| Tomer Damti Employment | November 30, 2020 |
| Matter ID - 37606-00032-JAS | Invoice No. 208594 |

| | Fees | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 11/12/2020 | Review of Damti correspondence regarding problems leading to firing, and instructions to Ms. Goldfarb regarding handling of same. | EPP | 0.20 |
| 11/20/2020 | Review of Tomer claims in employment agreement case and ability to recover fees. | EPP | 0.20 |
| 11/23/2020 | Review of scheduling Damti employment action order and deadlines leading to trial, including amendment; instructions to J. Poe regarding preparation of counterclaim for fees under employment agreement and handling of same. | EPP | 0.20 |
| 11/24/2020 | Review and analysis of plaintiff's motion for summary judgment; review of scheduling order and deadlines for discovery and pretrial; telephone conference with Mr. Ludlow regarding ███████████ ███████████████ | EPP | 0.50 |
| 11/24/2020 | Review and analysis of Plaintiff's Motion for Summary Judgment and Exhibits attached thereto; communication with Ms. Jamaica regarding confirmation that such Motion is not currently set for hearing; communications with Mr. Perrin regarding Plaintiff's Motion for Summary Judgment and what will be required to respond thereto; outline of issues and evidence needed for response to MSJ. | JRP | 1.40 |

| | | |
|---|---|---|
| **Total Fees** | | **1,158.00** |
| **Total Fees and Costs** | | **1,158.00** |
| **Total This Invoice** | | **1,158.00** |
| Balance Forward | | 715.00 |
| **Total Amount Due** | | **1,873.00** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 1.10 | 550.00 | 605.00 |
| Poe, Jennifer R. | 1.40 | 395.00 | 553.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
December 31, 2020
Invoice No. 210969

Matter:  Tomer Damti Employment               Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---|
| Previous Balance | $828.00 |
| Balance Forward | $828.00 |

| | | |
|---|---|---|
| Current Fees | $4,658.00 | |
| Current Costs | $261.12 | |

| | |
|---|---|
| Total Current Charges | $4,919.12 |

| | |
|---|---|
| **Total Due** | **$5,747.12** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP156**

Hallett & Perrin, P.C.

| Baymark Partners | Page 2 |
|---|---|
| Tomer Damti Employment | December 31, 2020 |
| Matter ID - 37606-00032-JAS | Invoice No. 210969 |

---

| **Fees** | | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 12/11/2020 | Review of discovery needed in Tomer case prior to deadline, and confer with Ms. Poe regarding same and preparation; instructions to Ms. Poe regarding preparation of counterclaim and filing of same; communications with Mr. Ludlow ███████ | EPP | 0.40 |
| 12/11/2020 | Prepare Amended Answer and Counterclaim; communication with Mr. Perrin regarding same. | JRP | 0.60 |
| 12/17/2020 | Conference with Ms. Poe concerning pending motion for summary judgment of plaintiff, legal research regarding same, and additional information needed, communication with client regarding ███████ | EPP | 0.30 |
| 12/17/2020 | Work on Requests for Admissions and Requests for Production to Plaintiff; communication with Mr. Perrin regarding additional information needed to aid in preparation of written discovery to Plaintiff, need for legal research to aid in trial preparation; communication to Mr. Ludlow and Mr. Denegre regarding ████████████████████████; preliminary legal research regarding Texas courts' interpretation of termination for cause provisions in employment agreements. | JRP | 3.40 |
| 12/18/2020 | Legal research regarding Texas courts' interpretation and treatment of termination for cause provisions. | JRP | 1.00 |
| 12/21/2020 | Communications, including telephone conference, with Mr. Denegre regarding █████████████████████; legal research regarding standard of proof for termination for cause under Texas law, general principles of contract interpretation under Texas law that could be applied to negate Plaintiff's incorrect interpretation of the Employment Agreement's termination provisions. | JRP | 4.10 |
| 12/22/2020 | Review, revision and supplementation of requests for admission, interrogatories and requests for production of documents to Damti, and instructions to Ms. Head regarding service of same. | EPP | 0.30 |
| 12/22/2020 | Work on Interrogatories to Plaintiff and further work on Requests for Admissions and Requests for Production to Plaintiff; communication with Mr. Perrin regarding same. | JRP | 1.30 |

---

| **Total Fees** | **4,658.00** |
|---|---|

| **Costs** | |
|---|---|
| **Description of Costs** | **Amount** |
| Perrin Amended Answer & Counterclaim | 82.31 |

**APP157**

## Hallett & Perrin, P.C.

| Baymark Partners | Page 3 |
|---|---|
| Tomer Damti Employment | December 31, 2020 |
| Matter ID - 37606-00032-JAS | Invoice No. 210969 |

| **Description of Costs** | **Amount** |
|---|---|
| Westlaw | 178.81 |

| | |
|---|---|
| **Total Costs** | **261.12** |
| **Total Fees and Costs** | **4,919.12** |
| **Total This Invoice** | **4,919.12** |
| Balance Forward | 828.00 |
| **Total Amount Due** | **5,747.12** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 1.00 | 550.00 | 550.00 |
| Poe, Jennifer R. | 10.40 | 395.00 | 4,108.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
January 31, 2021
Invoice No. 211917

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---:|
| Previous Balance | $5,747.12 |
| Balance Forward | $5,747.12 |

| | | |
|---|---|---:|
| Current Fees | $974.50 | |
| Total Current Charges | | $974.50 |

| | |
|---|---:|
| **Total Due** | **$6,721.62** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP159**

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| Tomer Damti Employment | January 31, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 211917 |

---

| | **Fees** | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 01/22/2021 | Review of deadlines for trial, and Damti's failure to answer discovery and requests for admission; review of unanswered requests for admission; confer with Ms. Poe concerning pending trial date, and litigation strategy for ███████████████████████████████ communication with client.. | EPP | 0.40 |
| 01/25/2021 | Review of pending deadlines and discovery not timely answered, and requests for admission admitted; and possible litigation strategy with Ms. Poe, trial date, and handling of same; instructions to Ms. Head regarding handling and review of prior bills; telephone conference with Mr. Ludlow regarding ██████████████████████ | EPP | 0.50 |
| 01/26/2021 | Receipt and review of correspondence from counsel for Damti attempting to set motion for summary judgment for hearing within 30 days of trial setting; review of prior court orders, andconference with Ms. Poe; response to counsel for Damti regarding lack of time before trial to set hearing, and handling of same; additional communications with counsel for plaintiff concerning no agreement to move trial date or hearing date, and objection to any continuance; receipt and review of plaintiff's motion for continuance, and representations therein; | EPP | 0.60 |
| 01/26/2021 | Review of Damti admissions and additional documentation and preparation needed for any trial. | EPP | 0.20 |
| 01/26/2021 | Review and analysis of Plaintiff's Motion for Continuance of the trial date. | JRP | 0.10 |

| | | |
|---|---|---|
| **Total Fees** | | **974.50** |
| **Total Fees and Costs** | | **974.50** |
| **Total This Invoice** | | **974.50** |
| **Balance Forward** | | 5,747.12 |
| **Total Amount Due** | | **6,721.62** |

| | **Fee Recap** | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 1.70 | 550.00 | 935.00 |
| Poe, Jennifer R. | 0.10 | 395.00 | 39.50 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
February 28, 2021
Invoice No. 213144

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---|
| Previous Balance | $6,608.62 |
| Balance Forward | $6,608.62 |
| | |
| Current Fees | $3,135.00 |
| | |
| Total Current Charges | $3,135.00 |
| **Total Due** | **$9,743.62** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP161**

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| Matter - Tomer Damti Employment | February 28, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 213144 |

**Fees**

| Date | Description of Services | Atty | Hours |
|---|---|---|---|
| 02/01/2021 | Review of notice filed with court of hearing on plaintiff's motion for summary judgment, and contradiction of court's order; conference with Ms. Poe regarding need to prepare motion for summary judgment response, seeking waiver of page limitation and hearing issues with court and counsel, and strategy for handling of same. | EPP | 0.40 |
| 02/02/2021 | Review of court's order setting hearing on motion for summary judgment; review of court order setting trial and no hearings, and local rules, and correspondence with counsel for Damti; telephone conferences with court clerk, and court reporter acting as administrator, regarding motion for summary judgment hearing setting and prohibition on same under court's orders, and follow up email; telephone and email communications counsel for plaintiff regarding motion for summary judgment setting and continuance. | EPP | 0.70 |
| 02/03/2021 | Review of email from counsel for plaintiff regarding hearings; telephone conference with counsel for Damti regarding motion for summary judgment hearing, passing same and setting continuance motion for the same time, and waiving limitations on briefing and handling of same; confirming email to counsel for plaintiff; correspondence to Mr. Ludlow updating same; instructions to Ms. Poe regarding ██████████ ██████████ | EPP | 0.80 |
| 02/08/2021 | Telephone conference with Mr. Foote about, Damti lawsuit, need for his affidavit go over proposed draft and prove of documents; forwarding of draft affidavit and documents to Mr. Foote; communications with Ms. Poe regarding discussions with Mr. Foote. | EPP | 0.40 |
| 02/09/2021 | Receipt and review of notice from court and service from counsel for Damti of motion for continuance hearing; discussions regarding affidavits needed for Damti motion for summary judgment with Ms. Poe, and modificiations of affidavits and Foote declaration. | EPP | 0.10 |
| 02/16/2021 | Communications with counsel for Damti concerning hearing, continuance and new dates; additional conference with counsel for plaintiff concerning lack of basis for claims, ACET's claim for attorney's fees, plaintiff's end game and lack of basis or facts for claims; conferences with court coordinator regarding discussions with counsel for plaintiffs, cancelling hearing, new trial dates and conflicts; attend Zoom conference on continuance and email with coordinator regarding same. | EPP | 1.70 |

# Hallett & Perrin, P.C.

| Baymark Partners | Page 3 |
|---|---|
| Tomer Damti Employment | February 28, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 213144 |

| **Date** | **Description of Services** | **Atty** | **Hours** |
|---|---|---|---|
| 02/16/2021 | Communications with counsel for Damti regarding hearing and analysis of case, handling of continuance, evaluation of claims, failure to respond to requests for admission, inability to obtain motion for summary judgment, claim for fees; additional communications with counsel for plaintiffs regarding continuance. | EPP | 0.30 |
| 02/19/2021 | Communications with Mr. Foote concerning his declaration and additional information needed for Damti case and Damti motion for summary judgment. | EPP | 0.20 |
| 02/19/2021 | Communications with counsel for plaintiff and court regarding proposed new trial dates, request for additional alternative settings and handling of same. | EPP | 0.20 |
| 02/21/2021 | Review of new communications from court coordinator providing additional trial dates and questions regarding same; communications with clients regarding same. | EPP | 0.20 |
| 02/23/2021 | Communications with counsel for plaintiff regarding new trial dates and confirming same. | EPP | 0.10 |
| 02/23/2021 | Additional communications with counsel for Damti and court regarding new trial setting and agreement on same. | EPP | 0.10 |
| 02/24/2021 | Revised draft agreed order on motion for continuance; communications with counsel for plaintiff forwarding proposed order and agreement on new trial date non-jury; communications with court and instructions to Ms. Head concerning notice to court and filing. | EPP | 0.20 |
| 02/25/2021 | Receipt and review of communications from counsel for Windspeed regarding summary judgment hearing and plaintiff's attempt to move hearing by creating a conflict; conference with Ms. Poe concerning discussions with counsel for Windspeed communications regarding discussions with court, and our communications with court regarding lack of ability to obtain a hearing, and strategy for handling of same. | EPP | 0.30 |

| | | |
|---|---|---|
| **Total Fees** | | **3,135.00** |
| **Total Fees and Costs** | | **3,135.00** |
| **Total This Invoice** | | **3,135.00** |
| Balance Forward | | 6,608.62 |
| **Total Amount Due** | | **9,743.62** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 5.70 | 550.00 | 3,135.00 |

**APP163**



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
March 31, 2021
Invoice No. 213991

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---|
| Previous Balance | $9,636.62 |
| Balance Forward | $9,636.62 |

| | | |
|---|---|---|
| Current Fees | $2,977.50 | |
| Current Costs | $100.45 | |
| Total Current Charges | | $3,077.95 |
| **Total Due** | | **$12,714.57** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP164**

<div align="center">Hallett & Perrin, P.C.</div>

| Baymark Partners | Page 2 |
|---|---|
| Tomer Damti Employment | March 31, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 213991 |

---

### Fees

| Date | Description of Services | Atty | Hours |
|---|---|---|---|
| 02/25/2021 | Communications with counsel for plaintiff regarding proposed agreed order on new trial date and approval of same; review of issues for motion for summary judgment on deemed admissions and confer with Ms. Poe regarding same. | EPP | 0.30 |
| 03/03/2021 | Legal research regarding treatment of deemed admissions in contemplation of filing a motion for summary judgment on Plaintiff's claims based, in part, on the deemed admissions by Plaintiff resulting from Plaintiff's failure to respond to Requests for Admission. | JRP | 0.70 |
| 03/04/2021 | Legal research regarding deemed admissions. | JRP | 0.70 |
| 03/05/2021 | Legal research regarding standards for preventing deemed admissions for being un-deemed by the Court. | JRP | 1.90 |
| 03/16/2021 | Receipt and review of Damti's responses to requests for admission, interrogatories and requests for production of documents; outline of issues for deposition preparation and deposition of Damti. | EPP | 0.70 |
| 03/17/2021 | Continue work on requests for admission and interrogatory responses, and plaintiff's failure to seek to un-deem admitted requests for admission; communications with clients regarding ███████████ receipt, review and analysis documentation produced by plaintiff, and annotate production and outline of issues for clients; correspondence to court regarding agreed order on new trial date; communications with clients regarding ████████████████ ███████████ communications clients; outline and draft demand for supplementation of discovery responses. | EPP | 1.90 |
| 03/17/2021 | Preliminary review of Plaintiff's discovery responses and communication with Mr. Perrin regarding same. | JRP | 0.20 |

| | **Total Fees** | | **2,977.50** |
|---|---|---|---|

### Costs

| Description of Costs | Amount |
|---|---|
| Westlaw legal research | 100.45 |

| | **Total Costs** | **100.45** |
|---|---|---|

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 3 |
| Tomer Damti Employment | March 31, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 213991 |

| | |
|---|---|
| **Total Fees and Costs** | **3,077.95** |
| **Total This Invoice** | **3,077.95** |
| | |
| Balance Forward | 9,636.62 |
| **Total Amount Due** | **12,714.57** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 2.90 | 550.00 | 1,595.00 |
| Poe, Jennifer R. | 3.50 | 395.00 | 1,382.50 |



<div align="right">

1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

</div>

<div align="right">

For the Period Ending
May 31, 2021
Invoice No. 216049

</div>

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

Matter:  Tomer Damti Employment                          Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---:|
| Balance Forward | 12,714.57 |
| Current Fees | 5,104.00 |
| Total Current Charges | 5,104.00 |
| **Total Due** | **17,818.57** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP167**

<div align="center">Hallett & Perrin, P.C.</div>

| Baymark Partners | Page 2 |
|---|---|
| Matter - Tomer Damti Employment | May 31, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 216049 |

| | Fees | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 05/05/2021 | Review and analysis of documents produced in related litigation to identify those that would be useful as Trial Exhibits in this case. | JRP | 1.00 |
| 05/11/2021 | Review of motion for summary judgment and late discovery, and litigation strategy for handling of same; communications with court regarding requested pretail; investigation of Mr. Corts; communications with court regarding pre-trial and lack of response from counsel for plaintiff, and handling of pretrial. | EPP | 1.10 |
| 05/12/2021 | Communications with court and counsel regarding pretrial hearing and handling of same. | EPP | 0.30 |
| 05/13/2021 | Preparation for status conference with court, review of case and possible discovery needed, and confer with Ms. Poe regarding preparation for hearing with court. | EPP | 0.30 |
| 05/17/2021 | Review of discovery, extension of trial date, and communications with clients regarding ███████████████ litigation strategy with Ms. Poe concerning trial setting, plaintiff's motion for summary judgment and handling of deemed admissions; attend status conference call with Court; additional communications with clients; notice of conflicts letter to the Court; review and analysis for ████████████ ██████████████████ nd confer with Ms. Poe regarding same; correspondence to court regarding trial conflict and handling of same; communications with clients regarding ████████████ ████████████████ instructions to Ms. Goldfarb regarding obtaining and preserving meta data for newly found Damti recording; receipt and review of Tomer telephone call and highlights; confer with Ms. Goldfarb regarding recording and meta data; instructions to Ms. Head regarding transcription of call. | EPP | 2.70 |
| 05/17/2021 | Attend Court-ordered Zoom status conference; communications with Mr. Perrin following status conference regarding general strategy issues; review draft communication to the Court, requested by the Court during the status conference, regarding now existing conflict with the current trial date. | JRP | 0.50 |
| 05/19/2021 | Review and analysis of Court's Order entered after the Status Conference; communication to Mr. Perrin regarding same and deadlines set therein. | JRP | 0.20 |

# Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 3 |
| Tomer Damti Employment | May 31, 2021 |
| Matter ID - 37606-00032-JAS | 216049 |

| **Date** | **Description of Services** | **Atty** | **Hours** |
|---|---|---|---|
| 05/20/2021 | Receipt and review of court order resetting trial; instructions to Ms. Head regarding same; communications with clients ▮▮▮▮▮▮ pursuant to order, communication with mediator; review of mediation and case strategy; communications with Freeman regarding order and status report; communications with Mr. Foote regarding trial setting; review and analysis correspondence involving Szeto working with Damti and ▮▮▮▮▮▮ and correspondence with clients regarding ▮▮▮▮▮▮; telephone conference with Mr. Hook regarding ▮▮▮ discussions with Ms. Goldfarb regarding Tomer voice recording and obtaining additional data on same. | EPP | 1.80 |
| 05/20/2021 | Communications with Mr. Perrin regarding strategy for addressing the Court's directive to file a joint status report letter with the Court by tomorrow with Plaintiff's counsel, strategy issues with respect to presentation of evidence at trial, including ▮▮▮▮▮▮ | JRP | 0.20 |
| 05/21/2021 | Review of court's order and draft of status report required by the Court's order; obtain information needed on mediator appointed by the Court, and contact Mr. Jordon's office regarding conducting mediation as ordered by the Court; communications with clients ▮▮▮▮▮▮ | EPP | 0.60 |
| 05/21/2021 | Communications with Mr. Perrin regarding content to include in case status letter required by the Court's May 17, 2021 Order. | JRP | 0.20 |
| 05/24/2021 | Receipt and review of correspondence from office of Judge Jenkins regarding available dates for court ordered mediation; communications with clients ▮▮▮▮▮▮ responsive communications with the mediator. | EPP | 0.20 |
| 05/25/2021 | Review of Tomer phone conversation and arragements with Court reporter; outline of issues for Tomer termination; | EPP | 0.20 |
| 05/26/2021 | Receipt and review of correspondence from court appointed mediator regarding difficulty in obtaining mediation dates from plaintiff, and requests confirmation of mediation availability; review of Tomer termination documents and voice mail; telephone conference with Ms. Dalton regarding issues on mediation; | EPP | 0.40 |
| 05/27/2021 | Communications with Ms. Poe and client regarding ▮▮▮▮▮▮. | EPP | 0.10 |
| 05/27/2021 | Communication to Mr. Denegre about ▮▮▮▮▮▮ | JRP | 0.10 |

# Hallett & Perrin, P.C.

| Baymark Partners | Page 4 |
|---|---|
| Tomer Damti Employment | May 31, 2021 |
| Matter ID - 37606-00032-JAS | 216049 |

|  |  |
|---|---|
| **Total Fees** | **5,104.00** |
| **Total Fees and Costs** | **5,104.00** |
| **Total This Invoice** | **5,104.00** |
| Balance Forward | 12,714.57 |
| **Total Amount Due** | **17,818.57** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 7.70 | 550.00 | 4,235.00 |
| Poe, Jennifer R. | 2.20 | 395.00 | 869.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

---

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
June 30, 2021
Invoice No. 217075

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---|
| Balance Forward | 19,083.57 |
| | |
| Current Fees | 3,437.00 |
| Current Costs | 5.00 |
| | |
| Total Current Charges | 3,442.00 |
| **Total Due** | **22,525.57** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP171**

## Hallett & Perrin, P.C.

| Baymark Partners | Page 2 |
|---|---|
| Matter - Tomer Damti Employment | July 7, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 217075 |

| | **Fees** | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 06/02/2021 | Communications with mediator regarding lack of response to mediation dates from plaintiff, and steps needed to schedule mediation as ordered by Court. | EPP | 0.10 |
| 06/03/2021 | Communications with Mr. Denegre regarding ███████████████████ | JRP | 0.20 |
| 06/04/2021 | Communications with Mr. Denegre about █████████████ communications with Mr. Bray regarding the audio file. | JRP | 0.30 |
| 06/11/2021 | Communications with Mr. Denegre regarding ████████████ | JRP | 0.20 |
| 06/15/2021 | Review and analysis court's order, mediation deadline and other communications with mediator regarding status, lack of response from counsel for plaintiff; conference with mediator's office regarding mediation and remaining dates; review of plaintiff's discovery responses. | EPP | 0.30 |
| 06/15/2021 | Communications with Ms. Goldfarb regarding producing Mr. Denegre's voice memo with original meta data and supporting documentation. | JRP | 0.10 |
| 06/16/2021 | Receipt and review of communications from mediator regarding discussions regarding lack of response from plaintiff's counsel, discussions with Judge Jordon and handling of same; follow up with mediator. | EPP | 0.20 |
| 06/17/2021 | Communications with mediator regarding lack of response from Freeman to mediation dates, contacting court to advise no mediation taking place due to plaintiff's failure to respond, notification of court and related issues; additional communications with counsel of record regarding rules for calculation of responsive pleadings. | EPP | 0.30 |
| 06/20/2021 | Review of audio recording of February 1, 2018 telephone call between Matt Denegre and Plaintiff, Tomer Damti. | JRP | 0.60 |
| 06/21/2021 | Review of Pablo Gibbs emails and notes, and additional termination issues for Damti. | EPP | 0.50 |
| 06/21/2021 | Telephone call with transcriptionist regarding preparation of transcript of telephone call between Matt Denegre and Plaintiff, Tomer Damti, including providing her information regarding the date on which the call was recorded. | JRP | 0.10 |

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 3 |
| Tomer Damti Employment | July 7, 2021 |
| Matter ID - 37606-00032-JAS | 217075 |

| Date | Description of Services | Atty | Hours |
|---|---|---|---|
| 06/22/2021 | Work on documents and witness issues for employment case, and documents needed for Gibbs interview and testimony; conference with Ms. Goldfarb regarding obtaining all Gibbs emails and other documentation; receipt and review of summary of Gibbs documents produced, and review of same. | EPP | 2.20 |
| 06/23/2021 | Review of Damit recording and transcript, and prove up information and handling of same. | EPP | 0.40 |
| 06/24/2021 | Review and analysis Pablo Gibbs correspondence and communications, and complaints about Damti and his running of the company; telephone call to Mr. Gibbs, and forwarding of his emails. | EPP | 0.90 |
| 06/24/2021 | Communication from Mr. Perrin regarding his witness interview with Pablo Gibbs. | JRP | 0.10 |
| 06/30/2021 | Communications with clients regarding ███████████████████████ ████████████████████ | EPP | 0.20 |

| | | |
|---|---|---|
| | **Total Fees** | **3,437.00** |

| Costs | |
|---|---|
| Description of Costs | Amount |
| May web inquiry | 5.00 |

| | | |
|---|---|---|
| | **Total Costs** | **5.00** |
| | **Total Fees and Costs** | **3,442.00** |
| | **Total This Invoice** | **3,442.00** |
| | Balance Forward | 19,083.57 |
| | **Total Amount Due** | **22,525.57** |

| Fee Recap | | | |
|---|---|---|---|
| Timekeeper | Hours | Rate/Hour | Amount |
| Perrin Jr., Edward P. | 5.10 | 550.00 | 2,805.00 |
| Poe, Jennifer R. | 1.60 | 395.00 | 632.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
July 31, 2021
Invoice No. 217495

Matter:  Tomer Damti Employment

Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | | |
|---|---:|---:|
| Balance Forward | | 22,525.57 |
| Current Fees | 14,855.00 | |
| Current Costs | 524.05 | |
| Total Current Charges | | 15,379.05 |
| **Total Due** | | **37,904.62** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP174**

# Hallett & Perrin, P.C.

Baymark Partners                                                                          Page 2
   Matter - Tomer Damti Employment                                        August 3, 2021
   Matter ID - 37606-00032-JAS                                             Invoice No. 217495

| | **Fees** | | |
|---|---|---|---|
| **Date** | **Description of Services** | **Atty** | **Hours** |
| 07/07/2021 | Review of correspondence with mediator regarding lack of response from plaintiff and notification of court; review of Gibbs correspondence, resignation emails and communications with Mr. Gibbs regarding his reasons for resignation; meeting with Ms. Poe concerning strategy for upcoming trial date, handling of deemed admissions, motions and/or findings of fact and conclusions of law needed, and handling of same. | EPP | 0.60 |
| 07/09/2021 | Receipt and review of correspondence from plaintiff to mediator regarding nonsuit of plaintiff's claims; receipt and review of notice of non-suit and proposed order; conference with Ms. Poe regarding strategy for handling of same; telephone conference with mediator's office regarding same; review of mediation submissions, correspondence and counterclaim filing, status report, communications with mediator and court and court's orders; communication with mediator regarding notice to court; instructions to Ms. Head regarding obtaining all billings in matter for preparation for attorneys' fees claim. | EPP | 0.80 |
| 07/09/2021 | Review of Plaintiff's counsel's communication to the Mediator regarding Plaintiff's intention to nonsuit as well as Plaintiff's Notice of Nonsuit filed thereafter; communications with Mr. Perrin regarding strategy and proceeding on counterclaim. | JRP | 0.20 |
| 07/12/2021 | Review of legal research regarding nonsuit and prevailing party; receipt and review of correspondence from mediator to the Court regarding plaintiff's failure to respond to mediation requests, and case going forward on counterclaims; receipt and review of correspondence from Freeman regarding nonsuit and security agreement; communications with Ms. Poe regarding same; additional communication from mediator. | EPP | 0.70 |
| 07/12/2021 | Research and analyze case law pertaining to prevailing party status, and non-suits without prejudice; draft correspondence to E. Perrin and J. Poe pertaining to same | KLS | 1.90 |
| 07/13/2021 | Review of court records and court filing of nonsuit; confer with Ms. Poe regarding same; revision and supplementation of correspondence to Freeman regarding claims of foreclosure and control, and response thereto; communications with Mr. Ludlow regarding ███████████ ████████████████████████████ instructions to Ms. Shirley regarding legal research regarding incurred fees. | EPP | 1.20 |
| 07/14/2021 | Communications with Ms. Shirley regarding attorneys fees recovery handling of same. | EPP | 0.10 |

# Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 3 |
| Matter - Tomer Damti Employment | August 3, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 217495 |

| **Date** | **Description of Services** | **Atty** | **Hours** |
|---|---|---|---|
| 07/16/2021 | Confer with Ms. Poe regarding preparation for trial, additional legal research needed, handling of attorney fees, communications with court regarding court's orders and trial status; meeting with and instructions to Ms. Shirley regarding research needed on prevailing party in light of non-suit, incurred fees, collateral estoppel findings, preparation of prove up for attorneys fees; telephone conference with client regarding ███████ communications with client concerning █████ communications with clients regarding █████ communications with Ms. Smith regarding █████ meeting with Ms. Knipe to prepare attorneys fees. | EPP | 1.90 |
| 07/16/2021 | Research and analyze case law pertaining to the collateral effect of deemed admissions and non-suit; research and analyze █████; research and analyze recovery of attorneys' fees incurred and related issues. | KLS | 3.70 |
| 07/19/2021 | Outline of issues, documents and any possible testimony needed for any trial and fee prove up; instructions to Ms. Shirley regarding legal research regarding issues raised by plaintiffs' counsel concerning recovery of accrued fees, and judgment, deemed requests, and non-suit; review of summary of charges, and redaction needed for submission; meetings with Ms. Knipe and Ms. Head regarding fees and costs. | EPP | 2.30 |
| 07/19/2021 | Continue research case law pertaining to recovery of attorneys' fees incurred, work on possible objections and non-suit. | KLS | 2.10 |
| 07/22/2021 | Review of summary of attorneys fees; instructions to Ms. Head regarding handling of redaction of invoice entries. | EPP | 0.20 |
| 07/22/2021 | Additional research regarding prevailing party status after a nonsuit without prejudice, and draft memorandum pertaining. | KLS | 1.70 |
| 07/23/2021 | Confer with Ms. Shriley regarding legal research results on prevailing party criteria, and res judicata effect, procedural requirements to obtain judgment, and additional facts and documents needed for preparation of motions and attorneys' fee affidavit; review of invoices summary; outline of arguments and factual background of claims for fees, history of deemed admissions and other failures to comply with deadlines and court orders by plaintiff; memorandum to Ms. Shirley regarding same and provide supporting documentation. | EPP | 3.30 |
| 07/23/2021 | Continue to work on motion for attorney's fees; confer with E. Perrin regarding same; confer with E. Perrin regarding factual background. | KLS | 2.70 |
| 07/26/2021 | Review additional facts, correspondence, and pleadings from Mr. Perrin to incorporate into motion for attorneys' fees; review discovery responses; research and analyze Texas law pertaining to deemed admissions; continue to work on draft motion for attorneys' fees. | KLS | 3.40 |

## Hallett & Perrin, P.C.

| Baymark Partners | Page 4 |
|---|---|
| Tomer Damti Employment | August 3, 2021 |
| Matter ID - 37606-00032-JAS | 217495 |

| **Date** | **Description of Services** | **Atty** | **Hours** |
|---|---|---|---|
| 07/27/2021 | Review and analyze invoices from 2018 to present; draft full fee affidavit and incorporate charts reflecting how much time was billed by each time keeper and summarize billing tasks pertaining to same. | KLS | 4.60 |
| 07/28/2021 | Confer with Ms. Poe regarding motion for attorneys' fees; analysis and research regarding needed on possible exhibits and handling of same in motions and affidavits. | KLS | 4.70 |
| 07/29/2021 | Continue to work on motion to declare ACET the prevailing party and for attorneys' fees; continue to work on affidavit in support of attorneys' fees. | KLS | 5.10 |

| | **Total Fees** | **14,855.00** |
|---|---|---|

| Costs | | |
|---|---|---|
| **Description of Costs** | | **Amount** |
| June web inquiries | | 1.00 |
| Westlaw legal research - July | | 523.05 |

| | **Total Costs** | **524.05** |
|---|---|---|
| | **Total Fees and Costs** | **15,379.05** |
| | **Total This Invoice** | **15,379.05** |
| | Balance Forward | 22,525.57 |
| | **Total Amount Due** | **37,904.62** |

| Fee Recap | | | |
|---|---|---|---|
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 11.10 | 550.00 | 6,105.00 |
| Poe, Jennifer R. | 0.20 | 395.00 | 79.00 |
| Shirley, Katrisha | 29.90 | 290.00 | 8,671.00 |



1445 ROSS AVE, SUITE 2400 | DALLAS, TX  75202
D (214) 953-0053 F (214) 922-4142
Tax ID 75-2843965

Baymark Partners
Attn:  Tony Ludlow
Granite Park II
5700 Granite Parkway, Suite 435
Plano, TX  75024

For the Period Ending
August 9, 2021
Invoice No. 217975

Matter:  Tomer Damti Employment          Matter ID: 37606-00032-JAS

For Legal Services Rendered:

| | |
|---|---:|
| Balance Forward | 22,525.57 |
| Current Fees | 16,668.00 |
| Total Current Charges | 16,668.00 |
| **Total Due** | **39,193.57** |

Payments received after the above date are not reflected in the balance due.
Please include the invoice number on your payment.
For Billing Questions Call - 214-922-4148

**APP178**

# Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 2 |
| Matter - Tomer Damti Employment | August 9, 2021 |
| Matter ID - 37606-00032-JAS | Invoice No. 217975 |

## Fees

| Date | Description of Services | Atty | Hours |
|---|---|---|---|
| 08/02/2021 | Communications with court regarding trial setting status; review of needed trial preparation; confer with Ms. Poe concerning ████ legal research regarding ████████████; meeting with Ms. Shirley regarding preparation of fee, judgment and other materials needed for trial. | EPP | 0.80 |
| 08/02/2021 | Continue to work on motion to declare ACET the prevailing party; revise Mr. Perrin's fee affidavit; break out research for motion for attorneys fees and motion to declare ACET the prevailing party; confer with Mr. Perrin regarding strategy. | KLS | 7.30 |
| 08/03/2021 | Communications with court regarding trial setting and nature of submission needed; review and analysis motion to declare ACET prevailing party, affidavit of EPP in support, supporting exhibits, review of procedural history of case, claims, filings and orders, pleadings and related correspondence, and revision and supplementation of motion and affidavit; analysis of additional issues and testimony possibly needed for submission or hearing, and review and outline of additional exhibits, facts and arguments, and other trial presentation issues; review of deemed requests for admission and deficient responses served late, and outline of issues review of to same; preparation of chronology and other issues for trial. | EPP | 4.70 |
| 08/03/2021 | Prepare affidavit of Mr. Perrin in support of Motion to Declare ACET the Prevailing Party; revise Fee Affidavit of Mr. Perrin in support of Motion for Attorneys' Fees; confer with Mr. Perrin regarding same; review and revise final draft of both motions and send same to Mr. Perrin for review | KLS | 3.80 |
| 08/04/2021 | Revision and supplementation of draft of motion for attorney's fees, supporting affidavit and documentation, identification of additional testimony and documentation needed, and outline of issues for court; conference with client regarding trial status, handling of same and litigation strategy; continue work on evidence, testimony and billings, and review and analysis billings, and make appropriate reductions and any needed additional redactions; outline of issues for preparation for trial/hearings with court. | EPP | 4.30 |

## Hallett & Perrin, P.C.

| | |
|---|---|
| Baymark Partners | Page 3 |
| Tomer Damti Employment | August 9, 2021 |
| Matter ID - 37606-00032-JAS | 217975 |

| **Date** | **Description of Services** | **Atty** | **Hours** |
|---|---|---|---|
| 08/05/2021 | Communications with court coordinator regarding announcing ready for trial, and court's preferred method of submission of prevailing party and fees sought; meeting with Ms. Shirley regarding modifications and supplementations needed for actual filing of  motions for ruling on prevailing party and attorneys fees, additional exhibits, support and legal authority for same, and additional factual and legal issues; communications with client; obtain billings for last several months and review; meeting with Ms. Head regarding preparation of redacted bills and summaries of fees with needed deletions of identified time, and handling of same; incorporate anticipated testimony for hearing into affidavits and motions. | EPP | 0.70 |
| 08/05/2021 | Further revise motion to declare ACET the prevailing party; confer with E. Perrin regarding same; revise Fee Affidavit to include citations to invoices as exhibits; research case law █████████████████████████ ████████████████████     revise motion for fees to be consistent with revised fee affidavit | KLS | 5.60 |
| 08/06/2021 | Communications with Ms. Shirley regarding motions for judgment and fees, supporting affidavits, additional issues and documentation needed, revisions, supplementation and handling of same; continue work on attorneys' fee affidavit and related materials and bases; review of redaction of bills, and determination of matters not being submitted for fees; review and revision fee affidavit and breakdown of same for the Court; review of legal authorities concerning motion for prevailing party, instructions to Ms. Shirley regarding additional research needed; draft additional provisions for motion and supplementation of motion and affidavit; conference with Ms. Shirley regarding same; instructions to Ms. Head regarding preparation of invoices and related summaries of time and timekeepers with Ms. Shirley. | EPP | 6.60 |
| 08/06/2021 | Continue to draft, revise, and edit motion to declare ACET the prevailing party and motion for attorneys' fees, as well as exhibits of Mr. Perrin in support of same; confer with Mr. Perrin regarding same; incorporate June invoices into fee affidavit. | KLS | 2.80 |
| 08/07/2021 | Conduct additional research to ██████████████████████████ ████████████████     revise motion to declare ACET the prevailing party with same; update Mr. Perrin's fee affidavit to include June invoices and prepare exhibits in support of same. | KLS | 2.70 |
| 08/08/2021 | Review and revision of draft motion for judgment, fee affidavit and analysis of fees in support; communications with Ms. Shirley regarding same. | EPP | 1.50 |

## Hallett & Perrin, P.C.

| Baymark Partners | Page 4 |
| --- | --- |
| Tomer Damti Employment | August 9, 2021 |
| Matter ID - 37606-00032-JAS | 217975 |

| | |
| --- | --- |
| **Total Fees** | **16,668.00** |
| **Total Fees and Costs** | **16,668.00** |
| **Total This Invoice** | **16,668.00** |
| Balance Forward | 22,525.57 |
| **Total Amount Due** | **39,193.57** |

| Fee Recap | | | |
| --- | --- | --- | --- |
| **Timekeeper** | **Hours** | **Rate/Hour** | **Amount** |
| Perrin Jr., Edward P. | 18.60 | 550.00 | 10,230.00 |
| Shirley, Katrisha | 22.20 | 290.00 | 6,438.00 |

July 26, 2019

*VIA ECFS*

Ms. Marlene Dortch, Secretary
Federal Communications Commission
Office of the Secretary
445 12th Street, SW
Washington, DC  20554

       **Re:**     **CC Docket No. 00-257 – Section 64.1120(e) Notification**

Dear Ms. Dortch:

On behalf of Slappey Communications, LLC, and pursuant to section 64.1120(e) of the Commission's rules, this letter is provided as notice of the pending transfer of certain customers of Slappey Telephone, Inc. to Slappey Communications, LLC.  In accordance with the requirements of section 64.1120(e), Slappey Communications submits the following information.

1.     **Names of parties to the transaction:**

    *Transferor*:    Slappey Telephone, Inc.
    *Transferee*:    Slappey Communications, LLC

2.     **Types of telecommunications services to be affected:**  Domestic, Interstate, international, and intrastate interexchange services

3.     **Date of Transfer:**  On or about July 12, 2019

4.     **Certificate of Compliance:**  Attached hereto as Exhibit A is Slappey Communications' certification of compliance with the requirement to provide advance subscriber notice in accordance with section 64.1120(e)(3), with the obligations specified in that notice, and with other statutory and Commission requirements that apply to this streamlined process.

5.     **Copy of notice sent to affected subscribers:**  Attached hereto as Exhibit B is the notice sent by Slappey Communications to affected customers.

Please direct any questions or inquiries regarding this matter to the undersigned.

Respectfully submitted,

*/s/ Laurie Davis*

Laurie Davis
Hallett & Perrin, PC
TEL     (214) 922-4109
EMAIL  ldavis@hallettperrin.com

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC  20554**

| | |
|---|---|
| **In the Matter of** | ) |
| | ) |
| **Slappey Telephone, Inc.** | ) |
| **Transferor,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **Slappey Communications, LLC** | )   WC Docket No. _____ |
| **Transferee** | ) |
| | )   IB File No. ITC-T/C- |
| | )   2019_____ |
| Joint Application for Consent to Transfer Control of | ) |
| Domestic and International Authorizations Pursuant to | ) |
| Section 214 of the Communications Act of 1934, As | ) |
| Amended | ) |

### JOINT APPLICATION FOR CONSENT TO TRANSFER CONTROL OF DOMESTIC AND INTERNATIONAL SECTION 214 AUTHORITY (STREAMLINED PROCESSING REQUESTED)

Pursuant to section 214 of the Communications Act of 1934, as amended,[1] and section 63.04 of the Commission's Rules,[2] Slappey Telephone, Inc., an Alabama corporation ("Slappey Telephone") and Slappey Communications, LLC, a Texas limited liability company ("Slappey Communications"), together with BMP Slappey Holdco, LLC, a Texas limited liability company ("BMP Holdco") and Baymark Partners, LP, a Texas limited partnership ("Baymark Partners"), and, together with Slappey Telephone, Slappey Communications and BMP Holdco (collectively, "Applicants"), respectfully submit this application for the approval of a transaction under which Slappey Telephone

---

[1] 47 U.S.C. § 214

[2] 47 C.F.R. § 63.04.

1

will sell certain of its regulated assets to Slappey Communications, a wholly-owned subsidiary of BMP Holdco, an affiliate of Baymark Partners.

The Applicants request streamlined treatment of this Application pursuant to section 63.03 of the Commission's Rules.[3] This Application is eligible for streamlined processing pursuant to Section 63.03(b)(2) of the Commission's Rules on the basis that: (1) the proposed transaction will not result in the Applicants (including their affiliates, as that term is defined in Section 3(1) of the Act) having a market share in the interstate, interexchange market of greater than ten (10) percent; (2) the Applicants (including their affiliates) will provide competitive telephone exchange services or exchange access services exclusively in geographic areas served by a dominant local exchange carrier that is not a party to the transaction; and (3) neither the Applicants nor any of their affiliates are regulated as dominant with respect to any service.[4]

In support of their Joint Application, the Applicants hereby state as follows:

## I.    APPLICANTS

### A.    Slappey Telephone, Inc.

Slappey Telephone, Inc., an Alabama corporation, is certificated as a competitive local exchange carrier by the Alabama Public Utilities Commission.

Slappey Telephone holds a blanket domestic Section 214 authorization to provide interstate telecommunications service and an international section 214 authorization to

---

[3] 47 U.S.C. § 63.03.
[4] *Id* § 63.03(b)(1)-(3).

provide global and limited global facilities-based and resold international telecommunications services. (File No. ITC-214-20040915-00366).

Slappey Telephone offers a range of services to its customers, including voice, data, networking, and Internet services.

Slappey Telephone's principal place of business is located at 4260 Cahaba Heights Court, Birmingham, Alabama 35343.  Its telephone number is (205) 970-4209.

The following information is provided for any person or entity that owns a 10% or greater equity interest in Slappey Telephone:

| Name | Address | Citizenship | Principal Business | % Equity |
|------|---------|-------------|--------------------|----------|
| William J. Slappey, III | 2476 Altadena Rd. Vestavia Hills, AL 35243 | U.S.A. | Voice, data and Internet services | 82% |

B.    Slappey Communications, LLC

Slappey Communications is a limited liability company organized under the laws of Texas.   Slappey Communications is a wholly-owned subsidiary of BMP Holdco, which is an affiliate of Baymark Partners.

Slappey Communications' principal place of business is located at 4260 Cahaba Heights Court, Suite 100, Birmingham, Alabama 35343. Its telephone number is (205) 970-4209.

The following information is provided for any person or entity that owns a 10% or greater equity interest in Slappey Communications:

| Name | Address | Citizenship | Principal Business | % Equity |
|------|---------|-------------|--------------------|----------|
| BMP Slappey Holdco, LLC | Granite Park II 5700 Granite Parkway, Ste. 435 Plano, Texas 75024 | U.S.A | Investing/ Lending | 100.00% |

3

C.    BMP Holdco / Baymark Partners

BMP Holdco is a limited liability company organized under the state laws of Texas.  BMP Holdco is owned by certain owners of Slappey Telephone and investment funds affiliated with Baymark Partners.

Baymark Partners is a Dallas, Texas-based growth-oriented private equity firm that invests in middle market service, distribution, manufacturing and tech-enabled companies.  The professionals at Baymark Partners possess over 95 years of successful experience in transitioning middle market companies to a more mature and valuable market position.  Among other services and expertise, Baymark Partners provides owners with liquidity and companies with resources to accelerate their growth.

The following information is provided for any person or entity that owns a 10% or greater equity interest in BMP Holdco:

| Name | Address | Citizenship | Principal Business | % Equity |
|------|---------|-------------|--------------------|----------|
| BMP Slappey Investment, LP | Granite Park II 5700 Granite Parkway, Ste. 435 Plano, Texas 75024 | U.S.A | Investing/ Lending | 51.43% |
| BMP Slappey Common, LLC | Granite Park II 5700 Granite Parkway, Ste. 435 Plano, Texas 75024 | U.S.A. | Investing/ Lending | 15.00% |
| Novus Method, LLC | 3006 Asbury Park Place Vestavia Hills, Alabama 35243 | U.S.A. | Investing | 13.00% |
| Argonian, LLC | 2920 Lewis Street Vestavia Hills, Alabama 35243 | U.S.A. | Investing | 12.00% |

## II.    DESCRIPTION OF THE TRANSACTION

The transaction involves repayment of various items of indebtedness by Slappey Telephone and the sale of assets by Slappey Telephone to Slappey Communications. William J. Slappey, III, William J. Slappey, IV, and Wesley J. Slappey are the sole record

4

and beneficial owners of all issued and outstanding equity interests of Slappey Telephone.

Upon closing the transaction, William J. Slappey, IV and Wesley J. Slappey will become employees of Slappey Communications. It is also anticipated that William J. Slappey, III, will become an independent contractor of Slappey Communications on or shortly after closing of the transaction. All other existing employees of Slappey Telephone will be offered employment with Slappey Communications.

Pursuant to the terms of the transaction, Slappey Communications will acquire certain of the assets of Slappey Telephone. The assets will be held by Slappey Communications, which is wholly-owned subsidiary of Baymark Partners.

The transaction is expected to close as soon as possible, subject to regulatory approval.

## III.   PUBLIC INTEREST STATEMENT

The proposed transaction will serve the public interest. Under new ownership, Slappey Communications will continue to provide high-quality telecommunications services to its U.S. business and enterprise customers while gaining access to the additional financial resources and the operational expertise of Baymark Partners. With the strong financial backing of Baymark Partners, it is anticipated that the transfer of control will bolster Slappey Communications' ability to provide innovative enterprise services and enable the company to become a stronger competitor.

The improved financial environment resulting from the proposed transaction will help ensure a continued high level of service to existing and new customers.   Slappey

Communications will continue to be operated by highly experienced, well-qualified management, operating and technical personnel.

In addition, the transaction will not result in a change in services, rates, terms or conditions for customers.. The transaction therefore will be seamless and transparent to customers.  Future changes in rates, terms and conditions of service, if any, will be undertaken pursuant to applicable law and contract provisions.

## IV.    CONTACT INFORMATION

Correspondence concerning this Application should be sent to:

| **If to Slappey Telephone, Inc.:** | **If to BMP Slappey, Baymark Partners and/or Slappey Communications:** |
|---|---|
| Slappey Communications, LLC<br>2476 Altadena Road<br>Vestavia Hills, AL 35243<br>Attn: William J. Slappey, IV<br>Email: will.slappey@slappey.com | Granite Park II<br>5700 Granite Parkway, Ste. 435<br>Plano, TX 75024<br>Attn: David Hook Email:<br>dhook@baymarkpartners.com |
| with a copy to: | with a copy to: |
| Sirote & Permutt, P.C.<br>2311 Highland Avenue South<br>Birmingham, AL 35205<br>Attn: Todd Carlisle<br>Email: tcarlisle@sirote.com | Hallett & Perrin, P.C.<br>1445 Ross Avenue, Suite 2400<br>Dallas, TX 75202<br>Attention: Julie Smith Email:<br>jsmith@hallettperrin.com |

## V.    ADDITIONAL INFORMATION REQUIRED BY SECTION 63.04

(a)(5)    The Applicants certify that no party to this application is subject to a denial of  federal benefits pursuant to section 5301 of the Anti-Drug Abuse Act of 1988.

(a)(9)    There are no other Commission applications related to this transaction.

6

(a)(10)    The Applicants are not requesting special consideration because either party or its subsidiaries and affiliates to the transaction are facing imminent business failure.

(a)(11)    No separately filed waiver requests are being sought in conjunction with this transaction.

7

## IV.    CONCLUSION

For the reasons stated above, Applicants respectfully submit that the public interest, convenience, and necessity would be furthered by a grant of this Application. Applicants respectfully request that the Commission approve the proposed transaction pursuant to streamlined processing.

8

Respectfully submitted,

**SLAPPEY TELEPHONE, INC.**                    **SLAPPEY COMMUNICATIONS, LLC**

By: _____              By: _____

Name
(Printed): _Will Slappey_____              Name
                                           (Printed): _____

Title: _COO_____                Title: _____

Date: _____            Date: _____

8

Respectfully submitted,

**SLAPPEY TELEPHONE, INC.**          **SLAPPEY COMMUNICATIONS, LLC**

By: _____          By: _____

Name                                 Name
(Printed): _____          (Printed: _David Hook_____
                                         :

Title: _____          Title: _President_____

Date: _____          Date: _____

7

Pursuant to Section 214 of the Communications Act of 1934, as amended,[1] and Section 63.04 of the Commission's Rules,[2] Slappey Telephone, Inc., an Alabama corporation ("Slappey Telephone") and Slappey Communications, LLC, a Texas limited liability company ("Slappey Communications"), together with BMP Slappey Holdco, LLC, a Texas limited liability company ("BMP Holdco") and Baymark Partners, LP, a Texas limited partnership ("Baymark Partners") and, together with Slappey Telephone, Slappey Communications and BMP Holdco (collectively, "Applicants"), respectfully submit this application for the approval of a transaction under which Slappey Telephone will sell certain of its regulated assets to Slappey Communications, a wholly-owned subsidiary of BMP Holdco, an affiliate of Baymark Partners.

## I.    ANSWER TO QUESTION 10

### A.    Slappey Telephone (Assignor)

Slappey Telephone, FCC Registration Number ("FRN") 0011434420, is a corporation organized under the laws of and headquartered in Alabama. Slappey Telephone holds blanket section 214 authority to provide domestic telecommunications services and an international section 214 authorization for global facilities-based and resold services under File No. ITC-214-20040915-00366.

Slappey Telephone is certificated as a competitive local exchange carrier by the Alabama Public Utilities Commission.  The company offers a range of services throughout the state of Alabama, including voice, data, networking, and Internet services.

Slappey Telephone may be contacted at the following address and telephone number:

> Slappey Telephone, Inc.
> 4260 Cahaba Heights Court
> Birmingham, Alabama 35343
> Phone: (205) 970-4209

---

[1] 47 U.S.C. § 214.
[2] 47 C.F.R. § 63.04.
[2] 47 C.F.R. § 63.04.

APP193

B.    Slappey Communications (Assignee)

Slappey Communications is a limited liability company organized under the laws of Texas.   The company is registered with the FCC under FRN No. 0028495364.

Slappey Communications is a wholly-owned subsidiary of BMP Holdco, which is an affiliate of Baymark Partners.

Slappey Communications may be contacted at the following address and telephone number:

>    Slappey Communications
>    4260 Cahaba Heights Court
>    Suite 100
>    Birmingham, Alabama 35343
>    Telephone: (205) 970-4209

C.    BMP Holdco / Baymark Partners (Assignees)

BMP Holdco is a limited liability company organized under the state laws of Texas.  BMP Holdco is owned by certain owners of Slappey Telephone and investment funds affiliated with Baymark Partners.

Baymark Partners is a Dallas, Texas-based growth-oriented private equity firm that invests in middle market service, distribution, manufacturing and tech-enabled companies. Among other services and expertise, Baymark Partners provides owners with liquidity and companies with resources to accelerate their growth.

2

**APP194**

D.     Point of Contact Information

Correspondence concerning this Application should be sent to:

| **If to Slappey Telephone, Inc.:** | **If to BMP Slappey, Baymark Partners and/or Slappey Communications:** |
|---|---|
| Slappey Communications, LLC<br>2476 Altadena Road<br>Vestavia Hills, AL 35243<br>Attn: William J. Slappey, IV<br>Email: will.slappey@slappey.com | Granite Park II<br>5700 Granite Parkway, Ste. 435<br>Plano, TX 75024<br>Attn: David Hook<br>Email: dhook@baymarkpartners.com |
| with a copy to: | with a copy to: |
| Sirote & Permutt, P.C.<br>2311 Highland Avenue South<br>Birmingham, AL 35205<br>Attn: Todd Carlisle<br>Email: tcarlisle@sirote.com | Hallett & Perrin, P.C.<br>1445 Ross Avenue, Suite 2400<br>Dallas, TX 75202<br>Attention: Julie Smith<br>Email: jsmith@hallettperrin.com |

## II.    ANSWER TO QUESTION 11

The following information is provided for any person or entity that owns a 10% or greater equity interest in Slappey Telephone:

| Name | Address | Citizenship | Principal Business | % Equity |
|---|---|---|---|---|
| William J. Slappey, III | 2476 Altadena Rd.<br>Vestavia Hills, AL 35243 | U.S.A. | Voice, data and Internet services | 82% |

The following information is provided for any person or entity that owns a 10% or greater equity interest in Slappey Communications:

| Name | Address | Citizenship | Principal Business | % Equity |
|---|---|---|---|---|
| BMP Slappey Holdco, LLC | Granite Park II<br>5700 Granite Pkwy.<br>Suite 435<br>Plano, TX 75024 | U.S.A | Investing/Lending | 100% |

The following information is provided for any person or entity that owns a 10% or greater equity interest in BMP Holdco:

| Name | Address | Citizenship | Principal Business | % Equity |
|---|---|---|---|---|
| BMP Slappey Investment, LP | Granite Park II<br>5700 Granite Pkwy.<br>Suite 435<br>Plano, TX 75024 | U.S.A | Investing/Lending | 51.4% |
| BMP Slappey Common, LLC | Granite Park II<br>5700 Granite Pkwy.<br>Suite 435<br>Plano, TX 75024 | U.S.A. | Investing/Lending | 15% |
| Novus Method, LLC | 3006 Asbury Park Pl.<br>Vestavia Hills, AL 35243 | U.S.A. | Investing | 13% |
| Argonian, LLC | 2920 Lewis St.<br>Vestavia Hills, AL 35243 | U.S.A. | Investing | 12% |

4

### III.   ANSWER TO QUESTION 13

The transaction involves repayment of various items of indebtedness by Slappey Telephone and the sale of assets by Slappey Telephone to Slappey Communications.  William J. Slappey, III, William J. Slappey, IV, and Wesley J. Slappey are the sole record and beneficial owners of all issued and outstanding equity interests of Slappey Telephone.

Upon closing the transaction, William J. Slappey, IV and Wesley J. Slappey will become employees of Slappey Communications.  It is also anticipated that William J. Slappey, III, will become an independent contractor of Slappey Communications on or shortly after closing of the transaction.  All other existing employees of Slappey Telephone will be offered employment with Slappey Communications.

Pursuant to the terms of the transaction, Slappey Communications will acquire certain of the assets of Slappey Telephone.  The assets will be held by Slappey Communications, which is a wholly-owned subsidiary of Baymark Partners.

The transaction is expected to close as soon as possible, subject to regulatory approval.

## IV.     ANSWER TO QUESTION 20

The Applicants request streamlined treatment of this Application pursuant to section 63.03 of the Commission's Rules.[3] This Application is eligible for streamlined processing pursuant to Section 63.03(b)(2) of the Commission's Rules on the basis that: (1) the proposed transaction will not result in the Applicants (including their affiliates, as that term is defined in Section 3(1) of the Act) having a market share in the interstate, interexchange market of greater than ten (10) percent; (2) the Applicants (including their affiliates) will provide competitive telephone exchange services or exchange access services exclusively in geographic areas served by a dominant local exchange carrier that is not a party to the transaction; and (3) neither the Applicants nor any of their affiliates are regulated as dominant with respect to any service.[4]

The proposed transaction will serve the public interest. Under new ownership, Slappey Communications will continue to provide high-quality telecommunications services to its U.S. business and enterprise customers while gaining access to the additional financial resources and the operational expertise of Baymark Partners. With the strong financial backing of Baymark Partners, it is anticipated that the transfer of control will bolster Slappey Communications' ability to provide innovative enterprise services and enable the company to become a stronger competitor.

The improved financial environment resulting from the proposed transaction will help ensure a continued high level of service to existing and new customers. Slappey Communications will continue to be operated by highly experienced, well-qualified management, operating and technical personnel.

In addition, the transaction will not result in a change in services, rates, terms or conditions for customers. The transaction therefore will be seamless and transparent to customers.  Future changes in rates, terms and conditions of service, if any, will be undertaken pursuant to applicable law and contract provisions.

---

[3] 47 U.S.C. § 63.03.
[4] *Id* § 63.03(b)(1)-(3).

## V.   ADDITIONAL INFORMATION REQUIRED BY SECTION 63.04

Pursuant to 63.04(d), and in accordance with the requirements of 63.18, the Applicants hereby certify that:

- no party to this application is subject to a denial of federal benefits pursuant to section 5301 of the Anti-Drug Abuse Act of 1988;[5]
- there are no other Commission applications related to this transaction;[6]
- the Applicants are not requesting special consideration because either party or its subsidiaries and affiliates to the transaction are facing imminent business failure;[7]
- there are no separately filed waiver requests are being sought in conjunction with this transaction.[8]

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

---

[5] 47 C.F.R. § 63.18(a)(6).

[6] *Id*. § 63.04(a)(9).

[7] *Id*. § 63.04(a)(10).

[8] *Id*. § 63.04(a)(11).

**EXHIBIT A**

**Slappey Communications**
**4260 Cahaba Heights Court, Suite 100**
**Birmingham, AL 35243**

**CERTIFICATION**

Slappey Communications hereby certifies that it has complied with all requirements of 47 C.F.R. § 64.1120(e) by providing the advance subscriber notice in accordance with 47 C.F.R. § 1120(e)(3), with the obligations specified in that notice, and with other statutory and Commission requirements that apply to the streamlined process for acquisition of the subscriber base of another telecommunications carrier.

By:

*David Hook*
_____
David Hook
President

Date:  June 11, 2019

**SLAPPEY COMMUNICATIONS, LLC**
**4260 Cahaba Heights Court, Suite 100,**
**Birmingham, AL 35243**

**IMPORTANT NOTICE**

Dear Valued Customer:

Due to an internal corporate restructuring, the provision and management of any regulated telecommunications services (*i.e.*, local and long distance services) you currently receive from Slappey Telephone, Inc. ("Slappey Telephone") is being transferred from Slappey Telephone to Slappey Communications, LLC ("Slappey Communications"). We anticipate that the transfer will take place on or about July 12, 2019 ("transfer date"), pending required regulatory approvals.

As permitted by FCC rules, the transfer will take place automatically on the scheduled transfer date even if you previously requested that no changes be made to the preferred carrier listed on your account without your written consent (commonly referred to as a "preferred carrier freeze"). After the transfer, you may arrange a new freeze by contacting Slappey Communications.

We appreciate the opportunity to continue providing the same high-quality services you currently receive from Slappey Telephone. However, per FCC rules, we must remind you that you have the right to select a different carrier for any of the regulated telecommunications services you currently receive from Slappey Telephone. You may choose to select another carrier either before or after the transfer date. However, please note that early termination fees may apply if provided as a condition under your current contract with Slappey Telephone.

We appreciate and value your continue business. In fact, this restructuring will not have any affect on your service. Following the transfer, you will continue to receive service at the same rates, and on the same terms and conditions, as you currently enjoy with Slappey Telephone.

If you have any questions or concerns about this notice or any of your services, including any billing or customer services issues, please contact your Slappey Communications service representative at (205) 970-4209.

Sincerely,

Will Slappey
Chief Executive Officer

**APP201**