PLAINTIFF'S
EXHIBIT

1

NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC | ) IN THE DISTRICT COURT |
| (Successor in interest to | ) |
| ACET VENTURE PARTNERS, | ) |
| LLC), | ) |
| | ) |
| Plaintiff | ) DALLAS COUNTY, TEXAS |
| | ) |
| VS. | ) |
| | ) |
| ACET GLOBAL, LLC; BAYMARK | ) |
| ACET HOLDCO, LLC; BAYMARK | ) 116th JUDICIAL DISTRICT |
| MANAGEMENT, LCC; BAYMARK | ) |
| MANAGEMENT, LLC; BAYMARK | ) |
| PARTNERS; DAVID HOOK; TONY | ) |
| LUDLOW; and WINDSPEED | |
| TRADING, LLC, | |
| | |
| Defendants | |

---------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

MATT DENEGRE

April 8, 2021

---------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF MATT DENEGRE,

produced as a witness at the instance of the PLAINTIFF,

and duly sworn, was taken in the above-styled and

numbered cause on April 8, 2021, from 10:12 a.m. to 5:52

p.m., via videoconference before Karen Usher, CSR in and

for the State of Texas, reported by machine shorthand,

pursuant to the Texas Rules of Civil Procedure, current

Emergency Order Regarding the COVID-19 State of

Disaster, and the provisions stated on the record or

attached hereto.

Matt Denegre  *  April 8, 2021

Page 2

```
 1              A P P E A R A N C E S
               (All parties appearing remotely)
 2
 3
      FOR THE PLAINTIFF:
 4
        MR. JASON B. FREEMAN
 5      MR. ZACHARY MONTGOMERY
        Freeman Law, PLLC
 6      7011 Main Street
        Frisco, Texas 75035
 7      (214) 984-3410
        jason@freemanlaw.com
 8      zmontgomery@freemanlaw.com
 9
10    FOR THE DEFENDANTS BAYMARK ENTITIES:
11      MR. EDWARD PERRIN
        Hallett & Perrin
12      1445 Ross Avenue
        Suite 2400
13      Dallas, Texas 75202
        (214) 953-0053
14      eperrin@hallettperrin.com
15
      FOR THE DEFENDANTS WINDSPEED TRADING, LLC:
16
        MS. BRENDA HARD-WILSON
17      MR. TIMOTHY WOODS
        Higier Allen
18      2711 North Haskell Avenue
        Suite 2400
19      Dallas, Texas 75204
        (972) 371-2481
20      bhard-wilson@higierallen.com
        twoods@higierallen.com
21
22
      ALSO PRESENT:
23      Mr. Tomer Damti
        Mr. Anthony Ludlow
24
25
```

Page 3

```
 1                    INDEX
                                      PAGE
 2    Appearances.......................... 2
 3
      MATT DENEGRE
 4
          EXAMINATION BY MR. FREEMAN................ 7
 5
 6
 7                  EXHIBITS
 8    NO.  DESCRIPTION                     PAGE
 9    1    Voluntary Petition for Nonindividuals Filing
           for Bankruptcy............................ 226
10    2    Email from Mr. Szeto to Mr. Denegre dated
           October 19, 2018.......................... 91
11    3    Email from Mr. Szeto to Mr. Denegre in
           January of 2019........................... 102
12    4    Email from Mr. Szeto to Mr. Denegre dated
           January 24, 2019.......................... 112
13    5    Email chain between Mr. Denegre and Mr.
           Szeto regarding Monthly Financial Statement
14         2019-01................................... 120
      6    Email exchange regarding ACET K-1......... 125
15    7    Email between Mr. Denegre and Mr. Bellah
           regarding ACET next steps................. 137
16    8    Email exchange between Mr. Denegre and Mr.
           Szeto regarding ACET inventory list....... 142
17    9    Email Exchange Regarding Weekly Report 1/1... 146
      10   Email exchange between Mr. Denegre and Mr.
18         Godinez regarding Windspeed/ACET and
           foreclosure agreement..................... 151
19    11   Windspeed weekly call calendar invite from
           Mr. Denegre............................... 169
20    12   Email exchange between Mr. Denegre and Mr.
           Szeto regarding Windspeed and various
21         attachments............................... 171
      13   Email exchange regarding wind down plan....... 175
22    14   Email exchange regarding Luluway fan page.... 186
      15   Email from Mr. Denegre to Mr. Ludlow dated
23         October 7, 2018........................... 194
      16   Email from Mr. Szeto to Mr. Denegre dated
24         October 17, 2018.......................... 198
      17   Email from Mr. Szeto to Mr. Denegre dated
25         October 19, 2018.......................... 203
```

Page 4

```
 1         January 19th, 2019..........................
      19   Email with Ms. Smith to Mr. Szeto and Mr.
 2         Denegre dated March 26, 2019.................. 210
      20   Email from Brian Vanderwoude to Julie Smith
 3         on January 17th, 2019........................ 214
      21   Email from Mr. Denegre to Mr. Bellah on
 4         January 2nd, 2019............................ 218
      31   Calendar invite.............................. 256
 5    32   Email correspondence between William Szeto,
           Alex Szeto and Steve Bellah.................. 257
 6    33   Email regarding Rock Design Hosting........... 262
      36   Email from Mr. Denegre to Mr. Ludlow dated
 7         October 16, 2019............................. 240
      37   Email from Mr. Denegre to Tony Ludlow, Steve
 8         Bellah and Bill Szeto ........................246
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                P R O C E E D I N G S
 2                MATT DENEGRE,
 3    having been first duly sworn, testified as follows:
 4         THE REPORTER:  Pursuant to the current
 5    emergency order regarding COVID-19 State of Disaster,
 6    this deposition of Matt Denegre is being conducted
 7    remotely via Zoom.  Today's date is April 8th, 2021, and
 8    the time is 10:12 a.m.  The witness is located in Dallas
 9    County, Texas.  My name is Karen Usher, Texas CSR
10    No. 5536.  I have administered the oath, and I am
11    reporting the deposition remotely by stenographic means
12    from my residence within the State of Texas.
13         The witness has represented to me under
14    oath that he is Matt Denegre.  Will counsel please state
15    their appearances and any agreements for the record.
16         MR. FREEMAN:  This is Jason Freeman on
17    behalf of plaintiffs.
18         MR. PERRIN:  And this is Ed Perrin on
19    behalf of the -- all the defendants with the exception
20    of Windspeed Trading, Limited.
21         MS. HARD-WILSON:  This is Brenda
22    Hard-Wilson on behalf of Windspeed Trading.
23         MR. FREEMAN:  I believe we have a running
24    agreement that any objections made by any of the
25    defendant parties will apply to the other defendants.
```

2  (Pages 2 to 5)

## Page 6

1      MR. PERRIN:  That's correct.  And Jason,
2   just for the purposes of this deposition, you can't see
3   it, I'll turn it around if you want to, but the screen
4   we have y'all on on the wall is on the other side of
5   this table.  And so if you're going to put up documents,
6   he can try to look at them with his glasses or I can put
7   it up on my laptop and he can look at them on the laptop
8   right in front of me.
9          MR. FREEMAN:  Okay.
10         MR. PERRIN:  I think that would be the
11  simplest way to go.
12         MR. FREEMAN:  Okay.
13         MR. PERRIN:  All right.
14         MR. FREEMAN:  Fair enough.  We'll see how
15  that works on the first one, but whatever we need to do
16  is fine.
17         MR. PERRIN:  Okay.
18         MR. FREEMAN:  One other procedural
19  matter.  I would like to invoke the rule with respect to
20  any defendant parties on this deposition.  Does anyone
21  have a position on that?
22         MR. PERRIN:  I think any party to the
23  case is entitled to be in any proceeding involving this
24  case, and Mr. Ludlow is a named defendant and also a
25  representative of the entities and he's entitled to be

## Page 7

1   here and is not covered by invoking the rule.
2          MR. FREEMAN:  Is it just Mr. Ludlow on
3   the -- on the other one, I guess, that says "Anthony" or
4   are there any other witnesses?
5          MR. PERRIN:  Tony, anybody else there
6   with you?
7          MR. LUDLOW:  Just me by myself in my
8   cabin.
9          MR. FREEMAN:  Okay.  I think we're good.
10             EXAMINATION
11  BY MR. FREEMAN:
12     Q.  Okay.  Mr. Denegre, could you please state
13  your full name for the record?
14     A.  Matthew Denegre.
15     Q.  Mr. Denegre, my name is Jason Freeman.  I
16  represent D&T Partners, LLC, which is the successor in
17  interest to ACET Venture Partners, LLC.  Do you
18  understand that you're here today in connection with a
19  lawsuit between D&T Partners, LLC and several parties,
20  including ACET Global, LLC, Baymark ACET Holdco, LLC,
21  Baymark ACET Direct Invest, LLC, Baymark Management,
22  LLC, Baymark Partners, David Hook, Tony Ludlow and
23  Windspeed Trading, LLC?
24     A.  Yes.
25     Q.  Mr. Denegre, have you ever given a deposition

## Page 8

1   before?
2      A.  No.
3      Q.  Have you ever been involved in a lawsuit
4   before?
5      A.  Yes.
6      Q.  What lawsuit was that?
7      A.  This was a small-claims lawsuit.
8      Q.  Okay.  What did that involve?
9      A.  Customer payment that was never received.
10     Q.  And who were the parties to that suit?
11     A.  I was, and I don't recall the defendant's
12  name.
13     Q.  Did it involve a particular business?
14     A.  Yes.  This was a painting business I owned in
15  2006.
16     Q.  Okay.  Do you understand that you're here
17  under oath today?
18     A.  I do.
19     Q.  And understand that it's a crime to lie under
20  oath?
21     A.  I do.
22     Q.  Just lay out a few ground rules, Mr. Denegre.
23  Whenever I ask a question, if you'll try to let me
24  complete it before you give an answer, that will make it
25  easier on the court reporter.  If you -- when you do

## Page 9

1   give an answer, if you will try to give a verbal
2   response rather than a nod, that will also help us in
3   memorializing the record.
4          If I ask a question that you don't
5   understand, if you will, please let me know you don't
6   understand it.  And with that groundwork, just say, can
7   we agree that it's fair to say if you don't tell me that
8   you don't understand the question, we can assume that
9   you understand it?
10     A.  Agreed.
11     Q.  If you need to take a break at any time,
12  please just let me know; water, restroom, whatever you
13  need is fine.  And we can take them whenever you need
14  to.  The only think I will ask is if I have got a
15  particular question on the table that you answer that
16  before and then we can take a break whenever you need.
17         Mr. Denegre, are you familiar with ACET
18  Global, LLC?
19     A.  Yes.
20     Q.  And are you familiar with Windspeed Trading,
21  LLC?
22     A.  Yes.
23     Q.  And are you familiar with Super G Capital,
24  LLC?
25     A.  Yes.

Matt Denegre   *   April 8, 2021

## Page 10

1      Q.  How are you familiar with ACET Global?
2      A.  I provided oversight with Baymark Partners as
3   the investor in the company.
4      Q.  Okay.  And how are you familiar with Windspeed
5   Trading?
6      A.  I worked on a transaction that involved
7   Windspeed Trading.
8          THE REPORTER:  Matt, can you please speak
9   up a little bit for me, dear?
10         THE WITNESS:  I have a soft voice.
11         THE REPORTER:  Yes, you do.
12         MR. PERRIN:  Does that help, Karen?
13         THE REPORTER:  I think that will help.
14         THE WITNESS:  Do I need to repeat the
15   answer?
16         THE REPORTER:  If you could, just the
17   last part of it because you trailed off.
18      A.  I worked on a transaction that involved
19   Windspeed Trading.
20      Q.  (BY MR. FREEMAN)  And how are you familiar
21   with Super G Capital?
22      A.  Super G Capital was a lender to ACET Global.
23      Q.  Mr. Denegre, did you have an account under
24   your name that was used for ACET Global's business?
25         MR. PERRIN:  Objection, form.

## Page 11

1      A.  What do you mean by "account"?
2      Q.  (BY MR. FREEMAN)  Any account.
3         MR. PERRIN:  Same objection.
4      A.  I don't understand the question.
5      Q.  (BY MR. FREEMAN)  And what is it that you
6   don't understand about it?
7      A.  I'm not sure what "account" means.
8      Q.  Okay.  Anything that you refer to as an
9   account.  Did you have an account under your name that
10   was used for ACET Global's business?
11         MR. PERRIN:  Objection, form.
12      A.  Under my name?
13      Q.  (BY MR. FREEMAN)  Yes, sir.
14      A.  Again, I'm not sure what "account" would mean.
15   I don't have a bank account, if that's what you're
16   asking.
17      Q.  Okay.  Any other kind of account?
18         MR. PERRIN:  Objection, form.
19      Q.  (BY MR. FREEMAN)  Just yes or no.
20      A.  No.
21      Q.  No?  Did your report a management fee expense
22   for ACET Holdco on your 2019 tax return?
23      A.  Could you show me the tax return?
24      Q.  We can in a little bit; we'll get to it.  But
25   can you tell me if you ever reported a management fee

## Page 12

1   expense for ACET Holdco?
2      A.  I can't answer that question.
3      Q.  Did you ever report a management fee expense
4   for ACET Holdco of $69,000?
5      A.  I don't recall.
6      Q.  Did ACET Holdco ever actually provide any
7   management services to you?
8         MR. PERRIN:  Objection, form.
9      A.  Did ACET Holdco provide its management
10   services to me, personally?
11      Q.  (BY MR. FREEMAN)  Yes, sir.
12      A.  Not that I'm aware of.
13      Q.  Okay.  Did you ever discuss having Windspeed
14   maintain two sets of books?
15         MR. PERRIN:  Objection, form.
16      A.  I don't recall.
17      Q.  (BY MR. FREEMAN)  Did you ever direct that
18   Windspeed maintain two sets of books?
19      A.  I don't recall.
20      Q.  Did a foreclosure on ACET Global's assets take
21   place in March of 2019?
22      A.  I believe so.
23      Q.  And why do you believe so?
24      A.  I've seen a foreclosure document that was
25   dated March 2019.

## Page 13

1      Q.  And why did that take place?
2      A.  Super G was the lender, foreclosed on the
3   business that was in default.
4      Q.  And what business was that?
5      A.  ACET Global, LLC.
6      Q.  And were you involved in that process?
7      A.  I was involved providing documentation for the
8   process and request items.
9      Q.  And what do you mean by that?
10      A.  Super G requested items to put together for
11   their foreclosure.
12      Q.  And what items did they request?
13      A.  There was an inventory list, A/R list,
14   accounts payable list.
15      Q.  Okay.
16      A.  That's it.
17      Q.  Anything else?
18      A.  There were other assets that were included.  I
19   don't recall what those were.
20      Q.  Okay.  Were you involved in any other way?
21      A.  Not that I'm aware of.
22      Q.  And why were you involved?
23      A.  Well, ACET Global, LLC, was an investment from
24   Baymark.  As I mentioned earlier, we were providing
25   oversight for the company, or at least I was.

4 (Pages 10 to 13)

Matt Denegre   *   April 8, 2021

## Page 14

```
1        Q.  And it was an investment for who?
2        A.  Baymark.
3        Q.  And what do you mean by "Baymark"?
4        A.  Baymark Partners.  That's how I understand the
5    companies as an investor.
6        Q.  Okay.  Who is Baymark Partners?
7        A.  Well, I'm actually not quite sure.  I think of
8    Baymark Partners as a firm run by Tony Ludlow and David
9    Hook.
10       Q.  Okay.  But it was Baymark Partners' investment
11   in ACET Global is what you understood?
12       A.  Yes.
13       Q.  Did you ever request that Super G Capital
14   foreclose on ACET Global's assets?
15       A.  No.
16       Q.  Did you ever request to have a conversation
17   about moving forward with Super G Capital foreclosing on
18   ACET Global's assets?
19       A.  There was an email that I wanted to get an
20   update on the foreclosure process that was occurring.
21       Q.  And why was that?
22       A.  Well, at the time, we were in default, and the
23   company was pretty much dead by that point, and we were
24   incurring more costs to keep it running.  There needed
25   to be closure on the business because we were getting
```

## Page 15

```
1    collection calls constantly.  It was costing money to
2    keep the business up and running, and investors with
3    Baymark had already put in a significant amount of
4    capital to keep it alive, and we were done at that
5    point.
6        Q.  Okay.  How was a foreclosure going to solve
7    those issues?
8        A.  Well, we were in default, so as far as we were
9    concerned, we were done with the business.  It was Super
10   G's business.  We wanted to know what they wanted to do
11   with it.
12       Q.  Okay.  Did you have a weekly call on your
13   calendar for the subject of Windspeed at any time?
14       A.  I may have.
15       Q.  Did you have a weekly call on your calendar
16   for the subject of Windspeed in 2017?
17       A.  What do you mean by "weekly call"?
18       Q.  A recurring weekly calendar.
19       A.  I may have.
20       Q.  Mr. Denegre, what do you do for a living?
21       A.  I work with Baymark Partners.
22       Q.  How long have you done that?
23       A.  Six years.
24       Q.  Okay.  And just to go back to a question you
25   answered a while ago regarding the Windspeed weekly
```

## Page 16

```
1    calendar item, do you believe that was the case, or do
2    you know that to have been the case?
3        A.  I'm not for certain.
4        Q.  And how long did you say you have done this
5    for a living?
6        A.  I'm sorry?
7        Q.  Let's start back.  What do you do for a
8    living?
9        A.  I work with Baymark Partners.
10       Q.  Okay.  And how long have you done that?
11       A.  Six years.
12       Q.  Who do you report to?
13       A.  Tony Ludlow, David Hook.
14       Q.  And in what capacity do they work in?
15           MR. PERRIN:  Objection, form.
16       A.  What do you mean by that?
17       Q.  (BY MR. FREEMAN)  Well, what is their role
18   within the business?
19       A.  They're owners of the company.
20       Q.  Owners of the company?
21       A.  (Moving head up and down.)
22       Q.  Do they have any other titles or roles?
23       A.  Managing directors.
24       Q.  Both of them are managing directors?
25       A.  Correct.
```

## Page 17

```
1        Q.  Okay.  And what's your title or role?
2        A.  Director.
3        Q.  Are there any other managing directors?
4        A.  Not that I'm aware of.
5        Q.  How do you determine whether to invest in a
6    company?
7        A.  Well, we look at -- typically we start with a
8    confidential investment memorandum that's sent to us,
9    and we review the prospects of the business.
10       Q.  Okay.  What's contained in that?
11       A.  It will be financial statements, marketing,
12   operations of the business, industry outlook.
13       Q.  Okay.  What do you do with that information?
14       A.  We discuss it as a firm.
15       Q.  And who's involved in that?
16       A.  It's typically the whole group involved.
17       Q.  Who is the whole group?
18       A.  It's myself, David Hook, Tony Ludlow and the
19   other coworkers.
20       Q.  Who are the other coworkers?
21       A.  Connor Calwert, Andy Lautman, Ben Mimmick.
22       Q.  Ben Mimmick?
23       A.  Correct.
24       Q.  Okay.  Could you say those again?  Connor?
25       A.  Calwert.
```

5 (Pages 14 to 17)

Page 18

1      THE REPORTER: How do you spell that,
2  please?
3      THE WITNESS: I really don't know.
4      Q. (BY MR. FREEMAN) And Andy?
5      A. Lautman.
6      Q. You're a little bit difficult to hear. If you
7  can, try and project.
8      So how -- what do y'all discuss in terms
9  of whether to invest in a company or go forward with a
10  deal?
11      A. Typically, it starts with a price and if the
12  valuation makes sense. Sometimes that's provided by the
13  broker; other times it's not. So we determine if we
14  want to make an offer.
15      Q. Okay. Well, how do you determine how much
16  you're willing to make an offer for or invest?
17      A. It's typically based off of a multiple of cash
18  flow. And that multiple will depend on the type of
19  business.
20      Q. Okay. Are there other -- are there other
21  valuation models you generally look to, or is that it?
22      A. That's typically what we focus on is EBITDA,
23  which is earning before interest, taxes, depreciation,
24  amortization.
25      Q. Okay. And EBITDA is that -- for you is that

Page 19

1  the measure of cash flow or proxy?
2      A. Adjusted EBITDA is our measure of cash flow,
3  correct.
4      Q. And so is your valuation model based upon an
5  adjusted EBITDA?
6      A. Typically.
7      Q. What are the adjustments that you make to the
8  EBITDA?
9      A. We don't make any adjustments. It's the
10  sellers presenting their adjusted EBITDA.
11      Q. Okay. What kind of adjustments does a seller
12  make to the EBITDA figure?
13      A. Typically it's an adjustment for -- if there's
14  any nonrecurring abnormal expenses. We can add it back.
15      Q. Okay.
16      A. If there's -- normalization of salary would
17  get added back or adjusted.
18      Q. Okay.
19      A. I was going to say, abnormal revenues would
20  get removed. So it goes either way.
21      Q. Okay. That's an effort to effectively
22  normalize the data?
23      A. Correct.
24      Q. Do you -- is EBITDA generally the figure that
25  you use to valuate, or do you apply a multiple or some

Page 20

1  other methodology?
2      A. It's multiple of EBITDA.
3      Q. Okay. Where do you get those multiples from?
4      A. Just from experience and discussing it as a
5  group. There's no spreadsheet or database that has this
6  stuff.
7      Q. Okay. Are those fairly standardized figures,
8  or are they super specific to the deal?
9      A. They're specific to the deals.
10      Q. When you invest in a company, do you take a
11  hands-on role?
12      A. What does that mean?
13      Q. Once you make a decision or Baymark Partners
14  makes the decision to invest in a company, how involved
15  are you with the company's operations?
16      A. If the company is performing well, it's
17  typically a weekly call.
18      Q. Okay.
19      A. If the company is not performing well, there's
20  a bit more involvement.
21      Q. And what does "a bit more involvement" mean?
22      A. Either follow-up calls, homework assignments
23  for the management team. That sort of stuff.
24      Q. Okay. Do you come out to the physical
25  facilities?

Page 21

1      A. Sometimes.
2      Q. Is that typical?
3      A. For what?
4      Q. For your typical company that Baymark Partners
5  invests in, do you typically go out to the physical
6  facilities on a regular basis?
7      A. Not on a regular basis.
8      Q. How often?
9      A. Typically -- well, COVID going on, I can't
10  answer that question. It's very rare right now.
11      Q. Historically, let's say 2017.
12      A. Depends if we have a quarterly board meeting
13  at the company, so that would be two to four times a
14  year.
15      Q. Okay. For a typical company?
16      A. Yep.
17      Q. Do you give management of the company
18  directions or orders?
19      A. What do you mean by that?
20      Q. Do you give them instructions?
21      A. To do what?
22      Q. Anything.
23      A. So that's pretty broad. There would be
24  instructions; for example to put together a KPI report.
25      (Reporter clarification.)

6 (Pages 18 to 21)

Matt Denegre   *   April 8, 2021

## Page 22

```
 1            THE REPORTER:  Matt, you trail off.  I
 2   really need you to speak up.
 3            MR. PERRIN:  Let's see.  I've got the
 4   volume up as loud as I can get it.  We're getting
 5   blasted away in here.
 6            THE REPORTER:  Okay.  All right.  Well,
 7   then, if I need him to repeat, I'll just ask him to
 8   repeat.
 9            MR. PERRIN:  Why don't we call in and use
10   this.
11            THE REPORTER:  Let's try that.  Let's go
12   off the record real quick.
13            (Break taken from 10:36 a.m. to
14            10:40 a.m.)
15        Q.  (BY MR. FREEMAN)  Mr. Denegre, I was asking
16   what instructions that you give to management of
17   companies that Baymark Partners invests in.  Could you
18   give me some more examples?
19        A.  Sure.  Usually there's a weekly key
20   performance indicator spreadsheet that the manager has
21   to prepare every week prior to our weekly calls.
22   There's also a budget that management will prepare, and
23   then there's ad hoc projects after that, whether it's
24   recruiting exercises, if we need to look at marketing.
25   But those are the really main two, budgets and weekly
```

## Page 23

```
 1   performance indicators.
 2        Q.  Okay.  What is the budget used for?
 3        A.  Cash.
 4        Q.  And what do you mean by that?
 5        A.  Cash management.
 6        Q.  And who manages the cash?
 7        A.  The company.
 8        Q.  What company?
 9        A.  The company we have invested in.
10        Q.  Okay.  Why is that provided to Baymark
11   Partners?
12        A.  Because we're the investor.
13        Q.  Okay.  What about the weekly KPI report?  What
14   is that used for?
15        A.  To monitor the performance of the company.
16        Q.  Okay.  And why is that?
17        A.  Why is what?
18        Q.  Why is it that you're monitoring the
19   performance of the company?
20        A.  Because we're an investor --
21        Q.  Okay.
22        A.  -- in the company.
23        Q.  Then what about the ad hoc projects?  What
24   examples are there of ad hoc projects?
25        A.  One example could be, let's look at market
```

## Page 24

```
 1   data for a city that we want to potentially begin
 2   marketing in.  So we would look at industry, what
 3   competitors are there.
 4        Q.  Okay.  What are other examples?
 5        A.  None are coming to mind right now.  I'm sure
 6   there's more.
 7        Q.  Nothing else?  So all you can think of, as we
 8   sit here right now, that you generally do with these
 9   companies is request a weekly key performance indicator
10   report, request periodic budgets and ad hoc projects,
11   the only one you can think of being market questions?
12        A.  Again, this is typical for most portfolio
13   companies, yes.
14        Q.  Okay.  Do you ever give the companies'
15   management directions?
16        A.  Directions to do what?
17        Q.  Anything.
18        A.  Well, asking for a key performance -- a
19   spreadsheet for your KPI would be a direction, so yes.
20        Q.  Okay.  Anything else?
21        A.  I don't recall.
22        Q.  Okay.  Do you ever make personnel decisions?
23        A.  Yes.
24        Q.  Okay.  Do you direct management with respect
25   to those personnel decisions?
```

## Page 25

```
 1        A.  It depends on the role, the personnel
 2   decision.  If it's a C-level type of employee, we would
 3   want to be involved in that decision.
 4        Q.  Who do you mean by "we"?
 5        A.  Baymark, the investor.
 6        Q.  Is that Baymark Partners and Tony Ludlow and
 7   Mr. Hook?
 8            MR. PERRIN:  Objection, form.
 9        A.  It depends.  Each company has different
10   oversight.  So it's usually a director with one managing
11   director.
12        Q.  (BY MR. FREEMAN)  Okay.  So that's either
13   Mr. Hook or Mr. Ludlow?
14        A.  Correct.
15        Q.  Okay.  Do you make any day-to-day business
16   decisions?
17        A.  No.
18        No day-to-day business decisions about the
19   companies that you invest in, that Baymark Partners
20   invests in?
21        A.  No.
22        Q.  With respect to -- are the personnel decisions
23   the only -- the only operating decisions that you --
24   Baymark Partners and you are involved in?
25        A.  Can you repeat the question?
```

7 (Pages 22 to 25)

Page 26

```
 1        Q.  Yeah.  Are personnel decisions the only
 2   operating decisions that you and Baymark Partners are
 3   involved in with respect to these companies?
 4        A.  There's probably other examples.
 5   Unfortunately, none come to mind right now.
 6        Q.  Okay.  What gives you or Baymark Partners the
 7   authority to make these decisions?
 8            MR. PERRIN:  Objection, form.
 9        A.  To request a key performance indicator or a
10   budget, as the majority investor, we would expect those
11   items to be delivered.
12        Q.  (BY MR. FREEMAN)  Sure.  And what about with
13   respect to personnel decisions?
14        A.  I'm not sure what gives us the authority.
15        Q.  Do you have authority to direct the day-to-day
16   operations?
17        A.  I'm not sure.
18        Q.  Does Baymark Partners have authority to direct
19   the day-to-day operations?
20        A.  I'm not sure.
21        Q.  With respect to ACET Global, LLC, what was
22   your role at ACET Global?
23        A.  Provided oversight.
24        Q.  Okay.  In what capacity did you do that?
25        A.  What do you mean by that?
```

Page 27

```
 1        Q.  In what capacity were you working in when you
 2   provided oversight?
 3            MR. PERRIN:  Objection, form.
 4        A.  I worked for Baymark Partners.
 5        Q.  (BY MR. FREEMAN)  So when you were -- when you
 6   were functioning with respect to ACET Global, were you
 7   working for Baymark Partners?
 8            MR. PERRIN:  Objection, form.
 9        A.  I think so.
10        Q.  (BY MR. FREEMAN)  Okay.  Did you believe you
11   were working for anyone else?
12        A.  No.
13        Q.  Were you a member of ACET Global, LLC?
14        A.  No.
15        Q.  Were you a manager of ACET Global, LLC?
16        A.  No.
17        Q.  Were you an officer?
18        A.  No.
19        Q.  Were you an employee?
20        A.  No.
21        Q.  Were you a contractor?
22        A.  No.
23        Q.  Were you an agent?
24        A.  What's an agent?
25        Q.  Did you believe yourself to be an agent of
```

Page 28

```
 1   ACET Global?
 2            MR. PERRIN:  Objection, form.
 3        A.  I'm not sure the definition of "agent," so
 4   because of that, the answer is no.
 5        Q.  (BY MR. FREEMAN)  Okay.  With respect to
 6   Baymark ACET Holdco, LLC, between 2017 and 2019, what
 7   was your role at Baymark ACET Holdco, LLC?
 8        A.  I didn't have a role.
 9        Q.  With respect to Baymark ACET Direct Invest,
10   LLC, between 2017 and 2019, what was your role at
11   Baymark ACET Direct Invest, LLC?
12        A.  I had a membership interest.
13        Q.  And what was that membership interest?
14        A.  I think it was $10,000.  I'm not sure of the
15   percentage.
16        Q.  You contributed $10,000?
17        A.  I did.
18        Q.  Okay.  But you're not sure of the percentage
19   that gave you?
20        A.  Correct.
21        Q.  Okay.  Was it a significant percentage or
22   relatively small?
23        A.  Relatively small.
24        Q.  Okay.  With respect to Baymark Management,
25   LLC, between 2017 and 2019, what was your role at
```

Page 29

```
 1   Baymark Management, LLC?
 2            MR. PERRIN:  Objection, form.
 3        A.  Well, I'm not sure if that's my employer or
 4   not.  So if I work for Baymark Management Partners, LLC,
 5   then I would be a director there.
 6        Q.  (BY MR. FREEMAN)  Okay.  I'll ask it this way.
 7   Baymark Partners, between 2017 and 2019, what was your
 8   role at Baymark Partners?
 9        A.  Director.
10        Q.  How did Baymark Partners determine to purchase
11   ACET Venture Partners' assets?
12            MR. PERRIN:  Objection, form.
13        A.  Well, it would have been a discussion amongst
14   the group.
15        Q.  (BY MR. FREEMAN)  Okay.
16        A.  And an LOI, letter of intent.
17        Q.  Okay.  And who was that group?
18            MR. PERRIN:  Objection, form.
19        A.  At the time, I'm not sure who was involved in
20   that.
21        Q.  (BY MR. FREEMAN)  Were you involved in that?
22        A.  I would have been.
23        Q.  Okay.  Was Mr. Ludlow?
24        A.  I'm not sure.
25        Q.  Was Mr. Hook?
```

8 (Pages 26 to 29)

Page 30

```
 1    A.  Yes.
 2    Q.  Why was it structured as an asset purchase?
 3    A.  We typically do asset purchases for most
 4  acquisitions.
 5    Q.  Okay.  Why not a stock purchase?
 6    A.  Primarily because there's -- all the liability
 7  that the company has carries over into the new
 8  ownership.
 9    Q.  So that's the primary reason?
10    A.  That's the primary reason.
11    Q.  Okay.  Are there any other reasons?
12    A.  The tax treatment is better for an asset
13  purchase.
14    Q.  Okay.  Any other reasons?
15    A.  A stock purchase -- well, in favor of a stock
16  purchase, it's easier, I believe, to transfer contracts
17  than having to get assignment and consent.  But that's
18  not a reason to do an asset purchase.
19    Q.  Okay.  With respect to the assets of ACET
20  Venture Partners, did Baymark Partners -- let's call it
21  facilitate or orchestrate the purchase of the assets of
22  at ACET Venture Partners?
23        MR. PERRIN:  Objection, form.
24    A.  We submitted a letter of intent, and ACET
25  Venture Partners accepted it.
```

Page 31

```
 1    Q.  (BY MR. FREEMAN)  Okay.  So there was an asset
 2  purchase of the assets of ACET Venture Partners?
 3    A.  Yes.
 4    Q.  And were those assets purchased by ACET
 5  Global, LLC?
 6    A.  I'm not sure if it was ACET Global, LLC -- I
 7  think it -- I think -- yes, I think that's the correct
 8  answer.
 9    Q.  Okay.  What were the components that were
10  being purchased by ACET Global?
11    A.  It would have been inventory, accounts
12  receivable, accounts payable, any working capital that
13  goes along with that.  And any intellectual property,
14  any equipment, fixed assets, that sort of stuff.
15    Q.  Okay.  Is there anything else?  Is that --
16    A.  I think that encompasses most of it.
17    Q.  Okay.  That is for Baymark Partners -- I guess
18  that is -- those are the primary assets that you would
19  be evaluating for the deal?
20        MR. PERRIN:  Objection, form.
21    A.  Those are the physical assets.  Then there's
22  obviously intangible assets that include customer lists,
23  customer relationships, brand, that sort of stuff.
24    Q.  (BY MR. FREEMAN)  Okay.  And so all of that
25  together, is that what you would be evaluating or
```

Page 32

```
 1  Baymark Partners would be evaluating?
 2    A.  Well, we look at cash flow, not the physical
 3  assets of the business.  We're more concerned about the
 4  cash flow of the company.
 5    Q.  Okay.  Does that cash flow have any
 6  relationship to the value of those assets?
 7        MR. PERRIN:  Objection, form.
 8    A.  If the assets being delivered -- yes, it does
 9  because those assets generate the cash flow of the
10  business.  So we need to have good inventory that turns
11  over, turns into sales.
12    Q.  (BY MR. FREEMAN)  Okay.  With respect to this
13  particular industry that ACET Venture Partners was
14  engaged in and ACET Global was engaged in, is there a
15  common valuation model for this industry?
16    A.  Not that I'm aware of.
17    Q.  Okay.  How did Baymark Partners value ACET
18  Venture Partners' assets?
19    A.  It was a multiple of adjusted EBITDA.
20    Q.  Okay.  Do you recall what the EBITDA was?
21    A.  I don't.
22    Q.  If I were to say EBITDA times four, would that
23  sound correct?
24    A.  I'm not sure because the business -- the
25  EBITDA fluctuated at closing.
```

Page 33

```
 1    Q.  Okay.  Did you look at any other metrics?
 2    A.  Not for valuing the company.
 3    Q.  Okay.  For other purposes?
 4    A.  No, not that I can recall.
 5    Q.  What about inventory turnover?
 6    A.  We didn't look at it.
 7    Q.  Okay.  Do you know what ACET Global's
 8  inventory turnover was?
 9        MR. PERRIN:  Objection, form.
10    A.  I don't.
11    Q.  (BY MR. FREEMAN)  Did you believe the purchase
12  of ACET Venture Partners' assets was a good deal?
13    A.  Considering that we lost our investment and
14  additional capital in the company, I don't think it was
15  a good deal.
16    Q.  Okay.  In 2017, did you believe the purchase
17  of the assets was a good deal?
18    A.  We did.
19    Q.  Did you?
20    A.  Did I, personally?
21    Q.  Yes, sir.
22    A.  I did.
23    Q.  Did you believe that the assets of ACET
24  Global, that the purchase of those assets was good
25  enough to invest in it personally?
```

Matt Denegre   *   April 8, 2021

---

Page 34

1           MR. PERRIN:  Objection, form.
2       A.  Based on the information that was provided to
3   us and the information that we reviewed that was sent
4   from the seller, we felt it was a good investment.
5       Q.  (BY MR. FREEMAN)  Okay.  Did you invest in it
6   personally?
7       A.  I have a $10,000 investment in Direct Invest,
8   so I did.
9       Q.  Okay.  What was the purpose of ACET Global,
10  LLC?
11          MR. PERRIN:  Objection, form.
12      A.  What do you mean by that?
13      Q.  (BY MR. FREEMAN)  What was the purpose of its
14  formation?
15      A.  To acquire the assets of ACET Venture
16  Partners.
17      Q.  Okay.  And what was its purpose of its
18  continuation thereafter?
19      A.  Well, it was in the business of selling
20  products.  So that's what it was doing.
21      Q.  Its purpose was to sell products?
22      A.  Yes, just like any other business.  It was
23  trying to make a profit.
24      Q.  Okay.  Who formed ACET Global, LLC?
25      A.  I'm not sure who personally formed ACET

---

Page 35

1   Global, LLC.
2       Q.  Okay.  Was Baymark Partners involved in that
3   process?
4       A.  Yes.
5       Q.  Is Anthony Ludlow the president of ACET
6   Global?
7       A.  I'm not sure.
8       Q.  Do you know if he -- if Anthony Ludlow has
9   ever been the president of ACET Global?
10      A.  He may have.  I'm not sure.
11      Q.  Okay.  Is Baymark ACET Holdco the manager of
12  ACET Global?
13      A.  I believe so.
14      Q.  Is Baymark ACET Holdco the sole manager of
15  ACET Global?
16      A.  I'm sorry.  Say that one more time.
17      Q.  Is Baymark ACET Holdco, LLC, the sole manager
18  of ACET Global?
19      A.  Yes.  ACET Global, LLC, yes.
20      Q.  What was William Szeto's position at ACET
21  Global?
22          MR. PERRIN:  Objection, form.
23      A.  He was a contractor and CEO.
24      Q.  (BY MR. FREEMAN)  Okay.  And what do you mean
25  by contractor?

---

Page 36

1       A.  He was paid a 1099.
2       Q.  Okay.  But he was the CEO --
3       A.  Yes.
4       Q.  -- of ACET Global?
5       A.  Of ACET Global, LLC.
6       Q.  Okay.  If I refer to him as "Bill" or
7   "Mr. Szeto," will you know who I'm referring to?
8       A.  Mr. Szeto, I will.  If you say "Bill," I might
9   not.
10      Q.  Okay.  What was David Hook's position or role
11  at ACET Global, LLC?
12      A.  I'm not sure.
13      Q.  Did he have a role or position at ACET Global?
14      A.  I'm not sure he did.
15      Q.  Okay.  What about Mr. Ludlow?  Did he have a
16  role or position at ACET Global?
17      A.  I'm not sure.
18      Q.  In 2017, how frequently were you at ACET
19  Global's offices?
20      A.  It would have been less than five times.
21      Q.  Okay.  What about in 2018?  How frequently
22  were you at ACET Global's offices?
23      A.  Probably the same amount.
24      Q.  Okay.  Why were you there?
25      A.  Initially, it was -- well, this would have

---

Page 37

1   been prior to ACET Global, LLC, so I can't answer that
2   part of the question.  This was a visit to ACET Venture
3   Partners, LLC, or whatever they were, just to visit the
4   company, see the operations.  Afterwards -- afterwards,
5   it would have been a visit with the bank, Super G.
6       Q.  Okay.
7       A.  We wanted to come by, see the operations.
8       Q.  Okay.
9       A.  I know they came by to visit when the company
10  was having troubles.
11      Q.  And when was that?
12      A.  Late 2017.
13      Q.  That Super G came to visit?
14      A.  Yes.
15      Q.  Did they come any other time?
16      A.  They may have.  I can't recall if Super G had
17  visited prior to ACET Global being formed or how many
18  times they visited after that, but it would have only
19  been a few times.
20      Q.  Okay.
21          MR. FREEMAN:  Take just a second here.
22  Karen, I realize I haven't pressed record on this, and I
23  do want to record.
24          THE REPORTER:  Okay.
25          MR. FREEMAN:  Can I do that from here?

---

10 (Pages 34 to 37)

Page 38

1     THE REPORTER: You can. I already made
2 you the host.
3     MR. FREEMAN: Thank you. I'll send y'all
4 a copy.
5     Q. (BY MR. FREEMAN) Mr. Denegre, were you
6 familiar with ACET Global's inventory?
7     A. I was familiar with some of the products in
8 the inventory.
9     Q. And how did you get that familiarity?
10    A. There would have been an inventory list sent
11 to me, as well as walking through the warehouse.
12    Q. Okay. Was that list part of the periodic
13 documents you would receive?
14    A. It wasn't a scheduled document. It would just
15 be a request item every now and then.
16    Q. Okay. Did you have signature authority over
17 ACET Global's bank account?
18    A. No.
19    Q. Did Mr. Hook?
20    A. He did at one point.
21    Q. When was that?
22    A. At the beginning of the transaction at the
23 closing in July of 2017.
24    Q. Okay. Was he taken off after that?
25    A. I can't recall if he was or not.

Page 39

1     Q. Okay. What about Mr. Ludlow?
2     A. What about him?
3     Q. Did he ever have signatory authority over ACET
4 Global's bank account?
5     A. No.
6     Q. Did Baymark ACET Holdco, LLC, have signatory
7 authority over ACET Global's bank account?
8        MR. PERRIN: Objection, form.
9     A. I'm not sure.
10    Q. (BY MR. FREEMAN) With respect to Baymark ACET
11 Holdco, LLC, is Anthony Ludlow the president of ACET
12 Holdco, LLC?
13    A. I'm not sure.
14    Q. Do you know if Mr. Hook is or has ever been
15 the president of ACET Holdco, LLC?
16    A. I would be speculating if I answered that, so
17 I'm not sure.
18    Q. You can speculate here.
19    A. Okay.
20       MR. PERRIN: Objection to counsel's
21 instruction.
22    Q. (BY MR. FREEMAN) If you were speculating, do
23 you believe Mr. Hook was ever the president of ACET
24 Holdco, LLC?
25       MR. PERRIN: Objection, form.

Page 40

1     A. I think he would have been.
2     Q. (BY MR. FREEMAN) Okay. Why do you think
3 that?
4     A. Because David Hook was involved in the initial
5 transaction.
6     Q. Okay. Was he the more hands-on directing
7 manager?
8     A. You cut out. Can you repeat it?
9     Q. Was he the more hands-on directing manager on
10 this particular company?
11    A. I'm not sure I would define him as "hands-on."
12 He was responsible for the company initially.
13    Q. Okay. What do you mean by "responsible"?
14    A. Well, he would provide oversight. Each
15 portfolio company has a managing director assigned to
16 it. It's a resource. He would be on the weekly calls
17 with Tomer. You know, we can't all manage all the
18 portfolio companies. We get split off in the firm, and
19 we work to -- a partner, a managing director and a
20 director work on portfolios together, so...
21    Q. Okay. And do you know if Anthony Ludlow was
22 ever the president of ACET Holdco, LLC?
23    A. I don't know.
24    Q. With respect to ACET Global's inventory, how
25 much inventory did ACET Global keep on hand?

Page 41

1     A. I would have to see the balance sheets.
2     Q. Okay. Do you know what that inventory
3 turnover rate was?
4        MR. PERRIN: Objection, form.
5     A. I don't.
6     Q. (BY MR. FREEMAN) Okay. Did ACET Global ever
7 owe a note, a promissory note to D&T Partners or Tomer
8 Damti?
9     A. I'm not sure if it was ACET Global, LLC, or
10 ACET Holdco that owed that note.
11    Q. Okay. Did one of them owe that note?
12    A. Yes.
13       MR. PERRIN: Objection, form.
14    Q. (BY MR. FREEMAN) Do you know who it was owed
15 to?
16    A. I would have to see the note agreement.
17    Q. Was that a -- but you understand it was owed
18 to either Tomer Damti or D&T Partners, LLC?
19       MR. PERRIN: Objection, form.
20    A. I know there was another firm, ACET Venture
21 Partners, that may have been owed that note. I would
22 have to see the note.
23    Q. (BY MR. FREEMAN) Okay. Was that a
24 $3.2 million note?
25    A. I would have to see the note.

Matt Denegre  *  April 8, 2021

Page 42

1    Q.  Okay.  How did that note come about?
2    A.  It would have been part of the Letter of
3  Intent as consideration paid to the seller.
4    Q.  Okay.  And how did Baymark Partners arrive at
5  that figure of that note?
6    A.  There's a cash -- well, the business is valued
7  off a multiple of EBITDA, and there's a portion of cash
8  that's paid to the seller, a seller note and a retained
9  stake.  I don't recall how we came up with that specific
10  figure, though.
11    Q.  Okay.  But did you -- did Baymark Partners
12  come to the determination that the value of those assets
13  of ACET Venture Partners was equal to the promissory
14  note plus the amount that was paid up front?
15        MR. PERRIN:  Objection, form.
16    A.  Again, when you say "assets," what are you
17  referring to?
18    Q.  (BY MR. FREEMAN)  The assets that were
19  purchased in the asset purchase agreement.
20    A.  Yes.  I think the valuation we put on the
21  company as a whole would entail all those numbers.
22    Q.  Okay.  When Baymark Partners/ACET Global
23  entered into this transaction, did you have any
24  discussion with anyone about the possibility that the
25  note to D&T Partners might not be paid?

Page 43

1    A.  I don't recall having that conversation.
2    Q.  Okay.  How did -- how did the parties intend
3  to pay that note?
4    A.  Out of the cash flow of the business.
5    Q.  Okay.  Did you have discussions with anyone
6  about that?
7    A.  I'm sure there were discussions.  I'm not sure
8  who they were with.
9    Q.  Would you have been involved in those
10  discussions?
11    A.  I would have.
12    Q.  And who do you believe they would have been
13  with?
14    A.  Well, most likely it would have been with the
15  senior lender.
16    Q.  Is that Super G?
17    A.  Correct.
18    Q.  So are you telling me that most of your
19  discussions about whether the note to D&T Partners would
20  be paid were with Super G Partners?
21        MR. PERRIN:  Objection, form.
22    A.  It would have been a discussion with Super G
23  as they were lending on the cash flow of the business.
24    Q.  (BY MR. FREEMAN)  Okay.
25    A.  I'm sure I had a discussion with our attorney

Page 44

1  at some point to talk about it.
2    Q.  Okay.
3    A.  And I'm sure I talked to Tomer about the
4  seller note at one point, as well.
5    Q.  Okay.  Did you have discussions with anyone
6  else?
7    A.  I may have probably talked about it internally
8  with the Baymark group.
9    Q.  Would that be Mr. Ludlow?
10    A.  I don't know if it would be Mr. Ludlow.  It
11  may have been Mr. Hook.
12    Q.  Okay.  When were those discussions, to your
13  best recollection?
14    A.  About the seller note?
15    Q.  Yes, sir.
16    A.  Are there specifics about the seller note?
17    Q.  About the payment of that note.
18        MR. PERRIN:  Objection, form.
19    A.  Well, it would have been prior to the closing
20  in July 2017.
21    Q.  (BY MR. FREEMAN)  Okay.  Did you ever have
22  discussions with anyone after that?
23        MR. PERRIN:  Objection, form.
24    A.  Regarding what?
25    Q.  (BY MR. FREEMAN)  The repayment of the note to

Page 45

1  D&T.
2    A.  We would have had a discussion internally at
3  Baymark.
4    Q.  And would that involve Mr. Hook?
5    A.  I'm not sure it would have involved Mr. Hook
6  or not.  It may have involved Mr. Hook.
7    Q.  Okay.  Who else would it have involved?
8    A.  Possibly Mr. Ludlow.
9    Q.  Okay.  Anyone else?
10    A.  Not that I can recall.
11    Q.  Okay.  What would those conversations have
12  involved?
13    A.  I don't remember.
14    Q.  So you don't remember having those
15  discussions?
16        MR. PERRIN:  Objection, form.
17    A.  At some point, we were all aware that -- we
18  were aware, being Baymark -- that ACET Global would have
19  to make those payments at some point.
20    Q.  (BY MR. FREEMAN)  Okay.  But you don't recall
21  discussing that with anyone after 2017?
22        MR. PERRIN:  Objection, form.
23    A.  I wish I could provide you specifics, but I
24  don't recall.
25    Q.  (BY MR. FREEMAN)  Okay.  Did you ever create a

Usher Reporting Services
(214) 755-1612

Matt Denegre   *   April 8, 2021

## Page 46

1  plan to repay that note?
2       MR. PERRIN: Objection, form.
3       A. Not that I recall.
4       Q. (BY MR. FREEMAN) Did you ever discuss setting
5  aside funds to pay that note?
6       A. After the closing, Baymark invested another
7  $100,000 to support the business.
8       Q. Okay.
9       A. Those weren't specifically earmarked for the
10  seller note or for Super G, but it was for the business
11  to try to grow. And as I mentioned, the business was
12  going to pay the seller note at some point. That was
13  the plan.
14       MR. FREEMAN: Objection, nonresponsive.
15       Q. (BY MR. FREEMAN) Did you ever set aside funds
16  to pay the seller note?
17       MR. PERRIN: Objection, form.
18       A. Did I personally set aside funds?
19       Q. (BY MR. FREEMAN) Well, did you, sure?
20       A. I did -- no, I did not.
21       Q. Did Baymark Partners?
22       MR. PERRIN: Objection, form.
23       A. No.
24       Q. (BY MR. FREEMAN) Did ACET Global?
25       A. No.

## Page 47

1       Q. Did anyone that you're aware of?
2       MR. PERRIN: Objection, form.
3       A. Again, no.
4       Q. (BY MR. FREEMAN) Was Mr. Szeto aware of the
5  note?
6       A. I'm not sure.
7       Q. Did you ever discuss the seller note with
8  Mr. Szeto?
9       A. I don't think we did.
10       Q. How do you explain that if Mr. Szeto is the
11  CEO of ACET Global?
12       MR. PERRIN: Objection, form.
13       A. Bill Szeto received financial statements every
14  month, so he would have seen them. It would have been
15  in the financials.
16       Q. (BY MR. FREEMAN) Was that --
17       A. I'm sorry?
18       MR. PERRIN: Let him finish his answer,
19  please. Go ahead.
20       A. I missed what you said, though.
21       Q. (BY MR. FREEMAN) Sorry. I thought you were
22  done talking; one of the pitfalls of Zoom. Didn't mean
23  to interrupt you.
24       A. Mr. Szeto would have received monthly
25  financial statements, which would have the seller note

## Page 48

1  on the balance sheet.
2       Q. And who did he receive those monthly
3  financials from?
4       A. The accountant in the company.
5       Q. Was that Jane Lin?
6       A. It would have been Jane Lin or the former
7  accountant.
8       Q. Okay. And you believe those financials
9  reflected the seller note?
10       A. I believe so.
11       Q. And when we say seller note, we're both
12  referring to the note that was owed to D&T Partners or
13  Tomer Damti as a result of the Asset Purchase Agreement?
14       A. Correct.
15       Q. When did you first come to believe that the
16  note, the seller note, would not be paid?
17       MR. PERRIN: Objection, form.
18       A. I think by the time summer 2018, it was clear
19  the business was not in a position to make not only
20  Super G payments, which were in front of the seller
21  note, but the seller note in general would not be paid
22  on time.
23       Q. (BY MR. FREEMAN) Why did you come to believe
24  that?
25       A. The company was on life support by that point.

## Page 49

1       Q. What do you mean by "life support"?
2       A. We could barely make payroll.
3       Q. And why could you barely make payroll?
4       A. There wasn't enough cash in the business.
5       Q. Then how were you making payroll?
6       A. Baymark was putting more money into the deal.
7       Q. How much more money did Baymark put in?
8       A. I don't have the exact number, but I believe
9  it was over $100,000.
10       Q. Okay. And why did Baymark put that in?
11       A. To keep the business running.
12       Q. So you think Baymark Partners invested another
13  $100,000 into ACET Global?
14       A. I'm not sure of the exact amount.
15       Q. But Baymark Partners made a substantial
16  additional contribution to ACET Global?
17       A. Yes.
18       Q. Did Baymark Partners require that anything be
19  done with that money?
20       A. Well, it was part of negotiating the Super G
21  payment, so we were able to reduce the loan payments to
22  Super G.
23       Q. Okay. So Baymark Partners was coordinating
24  with Super G in terms of the amount of additional money
25  Baymark Partners put into ACET Global?

13 (Pages 46 to 49)

Page 50

```
 1          MR. PERRIN:  Objection, form.
 2     A.  We were speaking to Super G, and Super G was
 3   aware that the company was struggling.
 4     Q.  (BY MR. FREEMAN)  Did Super G request that
 5   Baymark Partners put additional money into ACET Global?
 6     A.  In order to get amendments on the loan
 7   agreements, there was a requirement by Super G for
 8   Baymark to invest more capital.
 9     Q.  Okay.  And did Baymark oblige?
10     A.  Correct.  But in addition to that, Baymark
11   continued to invest capital outside of those agreements,
12   without Super G's consent.
13     Q.  Okay.  Can you explain what you mean by that?
14     A.  There were times where Bill Szeto would let me
15   know that there wouldn't be enough cash to make payroll.
16   So we would put in more money; Baymark would put more
17   money in.
18     Q.  Okay.  And how did that come about?  Mr. Szeto
19   made a direct request for the money?
20     A.  Mr. Szeto let me know that if we don't make an
21   investment, we're not able to make payroll, and that was
22   important to be able to do that to keep the business
23   alive.  We needed our employees, and people will quit if
24   you don't pay them.
25     Q.  So when he made that request, Baymark Partners
```

Page 51

```
 1   put additional money into ACET Global?
 2     A.  In addition, Bill was not cashing his paycheck
 3   to help support the business.
 4     Q.  Okay.  Was he expecting to ever get paid for
 5   those paychecks?
 6     A.  I would think so.
 7     Q.  How was he expecting to ever be paid?
 8     A.  From the business.
 9     Q.  From the business that ACET Global was
10   running?
11     A.  Correct.
12     Q.  Okay.  With respect to Mr. Damti, was
13   Mr. Damti ever employed by ACET Global, LLC?
14     A.  Yes.
15     Q.  And was he fired at some point?
16     A.  Yes.
17     Q.  Was that in February of 2018?
18     A.  I believe so.
19     Q.  Who fired Mr. Damti?
20     A.  I met Mr. Damti for -- we met at a coffee
21   shop, Starbucks.  I had a termination letter, which I
22   delivered to him.  I told him, You're being terminated
23   for cause, please hand over your keys, bank card, bank
24   token, which he did.  I said, You're no longer allowed
25   to go to the company.  We'll get your personal
```

Page 52

```
 1   belongings, which he didn't abide by.  He went back to
 2   the company later that night, I believe.  And that was
 3   the termination.
 4     Q.  Okay.  Who instructed you to fire Mr. Damti?
 5     A.  It would have been Mr. Hook or Mr. Ludlow.
 6     Q.  Okay.  Did you discuss that with them?
 7     A.  Yes.
 8     Q.  Okay.  And what did you discuss with them?
 9     A.  Well, there was a clear history by that point
10   of Tomer making bad decisions.  The company was
11   performing very poorly.  I'm happy to elaborate on those
12   decisions that Mr. Damti made.  And it was clear to us
13   that he no longer felt capable of running the company
14   and was not able to come up with any more ideas to help
15   the business grow, and it was time to make a change.
16     Q.  Okay.  When did you first engage in those
17   discussions?
18     A.  I don't recall.
19     Q.  How close in proximity to the date of
20   termination was it?
21     A.  Well, we had been having ongoing discussions
22   about the performance of the company, but the actual
23   termination would have been closer to the termination
24   date.
25     Q.  The actual discussions about the termination?
```

Page 53

```
 1     A.  Correct.
 2     Q.  Okay.  How many of those discussions did you
 3   have?
 4     A.  I don't remember.
 5     Q.  Did you ever put anything in writing about it?
 6     A.  There's a termination letter.  That's the only
 7   thing I'm aware of.
 8     Q.  Anything else to memorialize those concerns or
 9   those discussions prior to the date of termination?
10     A.  There would have been emails from Tomer with
11   issues that he was running into, whether it was
12   trademark infringement, buying counterfeit products,
13   getting kicked off Amazon, employee turnover.  All of
14   that would have been documented through emails from
15   Tomer.
16     Q.  Okay.  Was that intended to be your
17   documentation?
18          MR. PERRIN:  Objection, form.
19     A.  What do you mean by that?
20     Q.  (BY MR. FREEMAN)  Did you intend that to be
21   your documentation to justify the decision?
22          MR. PERRIN:  Objection, form.
23     A.  Well -- and in addition to the performance of
24   the company, yes, I think that's more than justified.
25     Q.  (BY MR. FREEMAN)  Did you recommend that he be
```

14 (Pages 50 to 53)

Page 54

```
 1   fired?
 2       A.  I'm not sure I did.
 3       Q.  Okay.  Who recommended that he be fired?
 4       A.  I don't recall.
 5       Q.  Okay.  Who signed the letter terminating him?
 6       A.  Do you have the letter?
 7       Q.  Excuse me?
 8       A.  Do you have a copy of the letter?
 9       Q.  I don't have it in front of me.
10       A.  It would have been either Mr. Ludlow or
11   Mr. Hook.
12       Q.  Who gave you the letter?
13       A.  Mr. Ludlow gave me the letter.
14       Q.  Okay.  Did you agree with the decision to
15   terminate Mr. Damti?
16       A.  I did.
17       Q.  Okay.  And did you hire anyone else after
18   that?
19       A.  No.  Bill Szeto was already working in the
20   company, so there were no additional hires after that
21   point.
22       Q.  How long had Bill Szeto been working at the
23   company?
24       A.  If I had to guess, it was probably a month,
25   maybe.
```

Page 55

```
 1       Q.  And what was his role prior to that time?
 2       A.  Prior to what time?
 3       Q.  Prior to the termination of Mr. Damti.
 4       A.  He was helping out with the business.  He was
 5   helping out with product selection.  He helped with
 6   fulfillment, trying to get some systems put in place.  I
 7   think that's really it.
 8       Q.  Okay.  Did he have a title?
 9       A.  We didn't give him an official title.
10       Q.  Okay.  Why not?
11       A.  Just never thought about it.
12       Q.  Okay.  Did you give anyone else titles?
13           MR. PERRIN:  Objection, form.
14       A.  I personally did not give anyone titles.
15       Q.  (BY MR. FREEMAN)  Okay.  Did Baymark Partners
16   give anyone titles?
17       A.  I don't believe so.
18       Q.  How did Mr. Szeto get his title as CEO?
19       A.  I suppose that would have come from Baymark
20   Partners.
21       Q.  Okay.  So Baymark Partners at least gave the
22   title of CEO to Mr. Szeto?
23           MR. PERRIN:  Objection, form.
24       A.  We did.
25       Q.  (BY MR. FREEMAN)  Okay.  In 2018, were you
```

Page 56

```
 1   concerned about ACET Global's performance?
 2       A.  Yes.
 3       Q.  What were you concerned about?
 4       A.  The company was not profitable.
 5       Q.  Okay.  And who did you discuss this with?
 6       A.  It would have been discussed with Tomer, Bill
 7   Szeto, Mr. Ludlow, Mr. Hook.
 8       Q.  Okay.  Go ahead.
 9       A.  And Super G.
10       Q.  Okay.  Did you have any discussions with any
11   of the employees of ACET Global?
12       A.  Regarding what?
13       Q.  Any concerns about the company's performance?
14       A.  I may have had conversation with the sales
15   manager about sales performance.
16       Q.  Okay.  And who is that?
17       A.  Her name was Monica -- I don't recall her last
18   name.
19       Q.  Okay.  Is that Plaskin?
20       A.  I believe so.
21       Q.  In terms of the concerns that you had about
22   ACET Global's performance, what specifically were you
23   concerned about?
24       A.  Sales, profitability, cash.
25       Q.  Okay.  And why?
```

Page 57

```
 1       A.  Well, the company was losing value very
 2   quickly, so our investments were getting wiped out.
 3       Q.  Okay.  What was causing that?
 4       A.  There's a handful of things that caused that.
 5   I think initially it was bad inventory that was
 6   delivered at closing that did not turn into sales.  So
 7   our sales right off the bat were very slow.  Tomer had
 8   made some bad purchases after the closing.  Products
 9   getting caught up in customs, defective products, not
10   being able to sell on Amazon.  We essentially missed our
11   Q4, which is the biggest quarter of the year.  By the
12   time Q1 came around in 2018, you know, we were
13   struggling.
14       Q.  Okay.  So with this bad inventory that was
15   provided at closing, what did you do to address that?
16       A.  Well, we suggested to mark the prices down to
17   move the inventory quicker to generate cash.
18       Q.  Okay.  Was that done?
19       A.  I'm not sure it was done.
20       Q.  Did you request that it be done?
21       A.  We suggested that it be done.
22       Q.  Okay.  What about with respect to Amazon?  Did
23   you do anything to fix that?
24       A.  Did I?  No.  I personally did not.
25       Q.  Okay.  Did Baymark Partners do anything?
```

15 (Pages 54 to 57)

Page 58

1    A.  Not that I'm aware of.
2    Q.  What did you or Baymark Partners do to address
3  any of these concerns with the business?
4    A.  Well, we started asking for a purchasing
5  budget to start monitoring cash a little closer.
6    Q.  Okay.  And what else?
7    A.  We brought in a marketing firm to help with
8  digital marketing.
9    Q.  Okay.  Who was that?
10    A.  L-U-X Group.
11    Q.  Okay.  What else did you do?
12    A.  Well, we tried restructuring the Super G note,
13  which they agreed to amend their note to keep more cash
14  in the business.
15    Q.  Okay.  And what else did you do?
16    A.  To help the business?
17    Q.  Yes, sir.
18    A.  We brought Bill in and terminated Tomer.
19    Q.  Okay.  What else did you do?
20    A.  I think that's about it.  There's probably
21  more, but you know, I don't know.
22    Q.  Okay.  With respect to the digital marketing
23  and the Lux Group, had Baymark Partners ever worked with
24  them before?
25    A.  I believe so.

Page 59

1    Q.  Okay.  Had you ever worked with them before?
2    A.  I can't recall if when I worked with Lux Group
3  it was before or after this time.
4    Q.  Okay.
5    A.  There was another portfolio company that we
6  used Lux Group on, and I can't recall the timeline when
7  it was done.
8    Q.  Was it a recommendation from Baymark Partners
9  to use Lux Group?
10    A.  It would have been.
11    MR. PERRIN:  Jason, whenever you get to a
12  stopping point, I think we could use a break.
13    MR. FREEMAN:  Yeah.  We're almost to a
14  good one.
15    MR. PERRIN:  Okay.
16    Q.  (BY MR. FREEMAN)  With respect to
17  restructuring the Super G notes, was Baymark Partners
18  involved in that process?
19    A.  Yes.
20    Q.  Was William Szeto involved in that process?
21    MR. PERRIN:  Objection, form.
22    A.  I want to be specific with the timeline here,
23  if we could.  So what example are you referring to?
24    Q.  (BY MR. FREEMAN)  Well, I want to say any
25  restructuring of the note.

Page 60

1    A.  Bill Szeto would not have been involved in
2  those discussions.
3    Q.  Okay.  Why was Baymark Partners the one
4  involved in those discussions with Super G?
5    A.  Well, Baymark Partners was the majority
6  shareholder of the company of ACET Global owned by ACET
7  Holdco, LLC.  Super G was a lender to that company.
8    Q.  Okay.  But why was the CEO of ACET Global not
9  involved in those discussions?
10    A.  He was involved in the discussions when we
11  asked Tomer if he would like to contribute capital as
12  Baymark was doing.  Tomer said no.
13    Q.  Okay.  When did Baymark Partners ask Tomer
14  Damti to contribute money?
15    A.  This would have been December 2017.
16    Q.  Okay.  Why wasn't Mr. Szeto, at any point
17  after that, involved in the conversations with Super G
18  about restructuring ACET Global's note?
19    A.  I'm not sure why he would be.  He was focused
20  on just keeping the business alive.
21    Q.  Okay.  What gave Baymark Partners the
22  authority to engage in those discussions with Super G?
23    MR. PERRIN:  Objection, form.
24    A.  As a majority shareholder, my understanding
25  was that was the appropriate partner to be talking to

Page 61

1  Super G as the lender in the company.
2    Q.  (BY MR. FREEMAN)  So that was your
3  understanding for the basis for the authority?
4    MR. PERRIN:  Objection, form.
5    A.  Correct.
6    Q.  (BY MR. FREEMAN)  Okay.  And Super -- and
7  Baymark Partners brought Bill Szeto in to take over.
8  Had Baymark Partners ever worked with Mr. Szeto before?
9    MR. PERRIN:  Objection, form.
10    A.  Bill Szeto was not brought in to take over the
11  company, first.  Number two, I'm not aware if Baymark
12  had worked with Bill Szeto on something prior or not.
13    Q.  (BY MR. FREEMAN)  When did you first meet
14  Mr. Szeto?
15    A.  It would have been Q4 2017.
16    MR. PERRIN:  Jason, we're getting close
17  to a stopping point?
18    MR. FREEMAN:  I think we're to a good
19  spot.
20    (Break taken from 11:41 a.m. to
21    11:54 a.m.)
22    Q.  (BY MR. FREEMAN)  Mr. Denegre, how many times
23  were the loans with Super G reworked or amended?
24    A.  If I recall, I think twice.
25    Q.  So that was two times with ACET Global?

16 (Pages 58 to 61)

Page 62

```
1     A.  Correct.
2     Q.  Okay.  Can you tell me about each of those?
3     A.  I can try.
4     Q.  Okay.
5     A.  Is there anything specific you want to know
6   about them?
7     Q.  Well, when did the first one occur?
8     A.  It was either December 2017 or January 2018.
9   I don't remember the exact amendment date.
10    Q.  Okay.  And why was that amended then?
11    A.  The company was having issues paying the
12  weekly cash requirements, and we needed to reduce those
13  payments to keep more cash in the business to obviously
14  run the business and buy more inventory.
15    Q.  Okay.  Were there any other reasons?
16    A.  No.
17    Q.  Okay.  What about the second one?  When did
18  that occur?
19    A.  Didn't know the exact date.  I can guess, if
20  you want me to take a guess.
21    Q.  Sure.
22         MR. PERRIN:  I would instruct the witness
23  not to speculate or guess.
24    Q.  (BY MR. FREEMAN)  Mr. Denegre, what is your
25  best estimate of when that occurred?
```

Page 63

```
1     A.  Between March 2018 and May 2018.
2     Q.  Okay.  And why was this amendment made?
3     A.  I'm not sure it was an amendment.
4     Q.  What was it?
5     A.  I think it was a forbearance.
6     Q.  Okay.  And what were the terms of this
7   forbearance?
8     A.  I don't recall.
9     Q.  Okay.  Generally, did they increase or
10  decrease the payments made by ACET Global?
11    A.  They would have decreased the payments.
12    Q.  The monthly payments?
13    A.  The weekly payments.
14    Q.  The weekly payments?
15    A.  Correct.
16    Q.  Did that change after a period of time?
17    A.  What do you mean?
18    Q.  Was the forbearance -- how long did the
19  forbearance last?
20    A.  I don't remember.
21    Q.  Did -- who drafted the forbearance agreement?
22    A.  I don't recall.
23    Q.  Who requested the forbearance agreement?
24    A.  I'm not sure how that work would.
25    Q.  Did Baymark Partners request the forbearance
```

Page 64

```
1   agreement?
2         MR. PERRIN:  Objection, form.
3     A.  I'm not -- it would have been -- it would have
4   been a conversation with Super G.  I'm not sure
5   specifically which party, whether it's Baymark Holdco.
6   I don't know how that all looks.  But there would have
7   been a conversation with Super G about continuing to
8   have struggles with the business and we need to reduce
9   the cash payments.
10    Q.  (BY MR. FREEMAN)  Okay.  Were you involved in
11  those conversations?
12    A.  Most likely.
13    Q.  Okay.  What do you recall about those
14  conversations?
15    A.  I don't recall specifics other than it would
16  have been -- it was with either Steve Bellah or Oren
17  Moses at Super G.  We made them aware that the company
18  was obviously continuing to have cash issues and that we
19  needed to do something to reduce the cash payments to
20  keep more cash in the business.
21    Q.  Okay.  Did those payments, were they set up to
22  increase in October of 2018?
23    A.  I don't recall.
24    Q.  Okay.  Was there any relationship between the
25  formation of Windspeed Trading, LLC, and ACET Global,
```

Page 65

```
1   LLC?
2         MR. PERRIN:  Objection, form.
3     A.  I'm not sure.  What do you mean by
4   "relationship"?
5     Q.  (BY MR. FREEMAN)  Let's change it then.  Was
6   there any relationship between Windspeed Trading, LLC,
7   and ACET Global, LLC?
8         MR. PERRIN:  Objection, form.
9     A.  Again, I'm not sure what "relationship" is.  I
10  don't know how to answer that.
11    Q.  (BY MR. FREEMAN)  Okay.  Give me one second.
12  Just looking this up in the dictionary here online, one
13  definition is "the way in which two or more concepts,
14  objects or people are connected."
15         Is there any manner in which they were
16  connected?
17         MR. PERRIN:  Objection, form.
18    A.  Windspeed would have been selling ACET's
19  inventory as required by Super G and being paid a
20  contractor fee out of ACET Global.  That's the only
21  relationship that I'm aware of.
22    Q.  (BY MR. FREEMAN)  So Windspeed was selling
23  ACET Global's inventory?
24         MR. PERRIN:  Objection, form.
25    A.  We were -- ACET Global was in default at this
```

17 (Pages 62 to 65)

Page 66

1  time, and Super G was having them do this.
2       Q.  (BY MR. FREEMAN)  What do you mean, Super G
3  was having them do this?
4       A.  Having Windspeed sell the inventory.
5       Q.  So Super G was directing Windspeed to sell
6  ACET Global's inventory?
7       A.  I'm not sure it was ACET Global's inventory at
8  that time.
9       Q.  Whose inventory was it?
10      A.  It could be Super G's.
11      Q.  Okay.  I thought you said that Windspeed was
12  paid a contractor fee?
13      A.  Yes.
14      Q.  Who paid that contractor fee?
15      A.  ACET Global had paid a fee to Windspeed, so
16  that's it.
17      Q.  So ACET Global paid a fee to Windspeed
18  Trading, LLC, to have Windspeed sell ACET Global's
19  assets?
20          MR. PERRIN:  Objection, form.
21      A.  Again, there's a line item on the P&L for
22  contractor labor.  I believe that's it.  But --
23      Q.  (BY MR. FREEMAN)  Okay.  And who required ACET
24  Global to make this payment to Windspeed?
25          MR. PERRIN:  Objection, form.

Page 67

1       A.  I'm actually not sure there ever was a payment
2  made.  There's just an expense line on ACET Global.
3       Q.  (BY MR. FREEMAN)  Okay.  So there's an expense
4  line item booked that was never actually paid; is that
5  correct?
6       A.  I'm not saying it was paid or not.  I don't
7  know.
8       Q.  Do you know why that expense item was booked?
9       A.  I don't.
10      Q.  Do you know who booked it?
11      A.  It would have been the accountant.
12      Q.  Do you know who instructed the accountant to
13  book it?
14      A.  I don't.
15      Q.  Do you know where the accountant would have
16  gotten instructions to book an expense?
17      A.  I don't.  And to be clear, I'm not 100 percent
18  certain that was even related to Windspeed.  There's a
19  line item on ACET Global's P&L that says contract labor.
20      Q.  Okay.  What leads you to believe that's what
21  it was related to?
22          MR. PERRIN:  Objection, form.
23      A.  Well, I knew -- I'm not sure who else it would
24  be related to.  It's just an assumption of mine, so...
25      Q.  (BY MR. FREEMAN)  Okay.  Why do you believe

Page 68

1  that Windspeed was selling ACET Global's inventory?
2          MR. PERRIN:  Objection, form.
3       A.  ACET Global had inventory that I believe
4  Windspeed was selling on behalf of ACET Global.
5       Q.  (BY MR. FREEMAN)  Okay.  And why do you
6  believe that?
7          MR. PERRIN:  Objection, form.
8       A.  Because there was cash coming into ACET
9  Global, and I'm not sure who else would be fulfilling
10  those orders.
11      Q.  (BY MR. FREEMAN)  When was there cash coming
12  into ACET Global?
13      A.  Well, there was cash coming to ACET Global
14  throughout the whole 2018 and parts of 2017.
15      Q.  Okay.  How long was cash coming into ACET
16  Global?
17      A.  I'm not sure.
18      Q.  Do you know when it stopped?
19      A.  I don't.
20      Q.  Okay.  How do you know that there was cash
21  coming into ACET Global?
22      A.  I looked at the bank statements for this
23  exercise.
24      Q.  How did you obtain those bank statements?
25      A.  Texas Capital Bank.

Page 69

1       Q.  Provided them to you?
2       A.  Provided, yes.
3       Q.  Did you request them directly from Texas
4  Capital Bank?
5       A.  I did.
6       Q.  Did you request them as a director of Baymark
7  Partners?
8          MR. PERRIN:  Objection, form.
9       A.  I don't recall.
10      Q.  (BY MR. FREEMAN)  Did you request them as an
11  employee of ACET Global?
12          MR. PERRIN:  Objection, form.
13      A.  I don't recall.
14      Q.  (BY MR. FREEMAN)  Okay.  Did you ever hold
15  yourself out as an employee or representative of ACET
16  Global?
17      A.  No.
18      Q.  Why did Texas Capital provide you with ACET
19  Global's bank statements?
20          MR. PERRIN:  Objection, form.
21      A.  Well, I requested them.
22      Q.  (BY MR. FREEMAN)  Okay.  What gave you the
23  authority to receive them?
24          MR. PERRIN:  Objection; form.
25      A.  David Hook was the signer on the accounts

18 (Pages 66 to 69)

Page 70

```
 1   initially.
 2        Q.  (BY MR. FREEMAN)  Okay.  So did David Hook
 3   request them or did you?
 4        A.  I requested them.
 5        Q.  And when was that?
 6        A.  Probably last month, from -- either March --
 7        Q.  I'm sorry.  The last --
 8        A.  March.
 9        Q.  March of?
10        A.  2021.
11        Q.  2021?  So you still receive the bank
12   statements for ACET Global?
13            MR. PERRIN:  Objection; form.
14        A.  I'm not sure I understand the question.
15        Q.  (BY MR. FREEMAN)  You've received them
16   recently, I guess?
17        A.  I requested them recently and received them.
18        Q.  And Mr. Hook is currently a signatory on those
19   accounts?
20            MR. PERRIN:  Objection; form.
21        A.  I'm not sure he is.  Texas Capital Bank didn't
22   ask.  They said, "Who are the signers on the account?"
23        Q.  Okay.
24        A.  These accounts have been closed for quite a
25   while.
```

Page 71

```
 1        Q.  (BY MR. FREEMAN)  Okay.  Why were you looking
 2   at the accounts in 2021?  Why were you requesting them?
 3            MR. PERRIN:  Go ahead.
 4        A.  It was a request for -- as part of discovery,
 5   is my understanding.
 6        Q.  (BY MR. FREEMAN)  Okay.  So what was the
 7   relationship between the formation of Windspeed Trading
 8   and ACET Global?
 9            MR. PERRIN:  Objection; form.
10        A.  I don't -- I don't think there is a
11   relationship.
12        Q.  (BY MR. FREEMAN)  Were they completely
13   unrelated?
14            MR. PERRIN:  Objection; form.
15        A.  They are two unrelated companies.
16        Q.  (BY MR. FREEMAN)  Okay.  Is Baymark
17   Partners -- does Baymark Partners have any relationship
18   to Windspeed Trading?
19            MR. PERRIN:  Objection; form.
20        A.  I'm not sure -- when I -- I know Baymark
21   Partners has a warrant.  And I'm not sure it's Baymark
22   Partners or what that entity is, but I know there's a
23   warranty of some sort that's related to Baymark.
24        Q.  (BY MR. FREEMAN)  Okay.  But was Baymark
25   Partners involved in the formation of Windspeed Trading,
```

Page 72

```
 1   in any way?
 2        A.  No.
 3        Q.  So Baymark Partners had nothing to do with the
 4   formation of Windspeed Trading?
 5        A.  No.
 6        Q.  And did you have anything to do with the
 7   formation of Windspeed Trading?
 8        A.  No.
 9        Q.  Okay.  And at any point thereafter, was
10   Baymark Partners involved with Windspeed Trading?
11            MR. PERRIN:  Objection; form.
12        A.  There was a transaction done related to
13   Windspeed Trading --
14        Q.  (BY MR. FREEMAN)  Okay.
15        A.  -- that Baymark Partners was already involved
16   in.
17        Q.  Okay.  What was that?
18        A.  There was a warrant.
19        Q.  Okay.  So the warrant -- do I understand that
20   to be a warrant to purchase ownership in Windspeed
21   Trading?
22            MR. PERRIN:  Objection; form.
23        A.  I'd actually have to see the warrant to look
24   at it.  I haven't looked at it.  I know there was a
25   warrant out there, and I'd have to see what entity it
```

Page 73

```
 1   was.  I can't speak to it.
 2        Q.  (BY MR. FREEMAN)  Why was that warrant issued?
 3            MR. PERRIN:  Objection; form.
 4        A.  Super G was making an investment in Windspeed
 5   Trading, and we had a relationship with Super G.  Super
 6   G would like to have our involvement with Windspeed
 7   Trading, and so we obviously wouldn't do that for free.
 8   We would need some compensation for our time.  And
 9   that's what the warrant was related to.
10        Q.  (BY MR. FREEMAN)  Okay.  So Baymark Partners
11   had a relationship with Super G?
12            MR. PERRIN:  Objection; form.
13        A.  Again, "relationship," I'm not sure how to
14   define that.
15        Q.  (BY MR. FREEMAN)  Connection -- any
16   connection?
17        A.  Just to be clear, we're independent -- Baymark
18   is independent of Super G.
19        Q.  Okay.
20        A.  So other --
21        Q.  What do you mean by that?
22        A.  Independent companies.
23        Q.  Okay.  Like two distinct legal entities?
24            MR. PERRIN:  Objection; form.
25        A.  Two distinct legal entities with uncommon
```

19 (Pages 70 to 73)

Page 74

```
 1   ownership.
 2        Q.  (BY MR. FREEMAN)  Okay.  Do those two distinct
 3   legal entities with uncommon ownership have any
 4   relationship?
 5        A.  It's strictly a transactional relationship,
 6   third party.
 7        Q.  Okay.  What is that relationship?
 8        A.  Super G is a lender.
 9        Q.  Okay.  And that's it?
10        A.  That's it.
11        Q.  Okay.  What -- did Super G obtain warrants in
12   Windspeed as well?
13        A.  I'm not sure if it was Super G or a different
14   entity.
15        Q.  Okay.  But those warrants that were given to
16   the Baymark party, that was the only relationship to
17   Windspeed?
18             MR. PERRIN:  Objection; form.
19        A.  Yes.  If we're defining that as a relationship
20   which is transactional, third party, independent, no
21   ownership -- common ownership, yes.
22        Q.  (BY MR. FREEMAN)  Prior to Windspeed's
23   formation, was ACET Global insolvent, or could it have
24   kept going?
25             MR. PERRIN:  Objection; form.
```

Page 75

```
 1        A.  I'm actually not sure when Windspeed was
 2   formed.
 3        Q.  (BY MR. FREEMAN)  Okay.  When do you believe
 4   it was formed?
 5        A.  It would have been, if I had to guess, later
 6   half of 2018.
 7        Q.  Okay.  And what makes you believe that?
 8        A.  Because there was a transaction done with --
 9   related to Windspeed in late 2018.
10        Q.  Prior to that time -- and I'll
11   represent to you that you're correct, it was in
12   September of 2018.  But prior to that time, was ACET
13   Global insolvent, or could it have kept going?
14             MR. PERRIN:  Objection; form.
15        A.  Well, prior to that time could indicate a
16   long -- a significant period.  So...
17        Q.  (BY MR. FREEMAN)  Let's call it the month
18   leading up to that.
19        A.  Was the company insolvent?  Is that the
20   question?
21        Q.  Yes, sir.
22             MR. PERRIN:  Objection; form.
23        A.  And what is "insolvency," so I can make sure
24   I'm answering this correct.
25        Q.  (BY MR. FREEMAN)  I mean, was it paying out
```

Page 76

```
 1   more than it was bringing in?
 2             MR. PERRIN:  Objection; form.
 3        A.  I'm not sure other than the cash flow in the
 4   business was nearly nonexistent.  And we owed -- ACET
 5   Global owed debts to quite a few vendors.
 6        Q.  (BY MR. FREEMAN)  Okay.  How long had it been
 7   that way?
 8        A.  Not sure.
 9        Q.  Just a few months or --
10             MR. PERRIN:  Objection; form.
11        Q.  (BY MR. FREEMAN)  -- longer?
12             MR. PERRIN:  Objection; form.
13        A.  Well, the additional capital that we had --
14   that Baymark put in certainly extended the life of the
15   business.  So it's hard to say when it truly was
16   becoming an insolvent issue.
17        Q.  (BY MR. FREEMAN)  Okay.  Did you ever believe
18   it had become insolvent?
19             MR. PERRIN:  Objection; form.
20        A.  I think by the summer of 2000 -- well,
21   primarily, the -- late summer 2018, the company was
22   clearly on its last -- I don't know how to describe
23   it -- on its last lifeline, I suppose.
24        Q.  (BY MR. FREEMAN)  Okay.  It was clearly -- I
25   mean, clearly going under as a going concern?
```

Page 77

```
 1             MR. PERRIN:  Objection; form.
 2        A.  It would need more capital to be infused in
 3   the company --
 4        Q.  (BY MR. FREEMAN)  Okay.
 5        A.  -- to keep it going.
 6        Q.  Did you believe that restructuring ACET Global
 7   would give Baymark an opportunity to turn its investment
 8   around?
 9             MR. PERRIN:  Objection; form.
10        A.  Baymark, by late summer, was not interested in
11   putting more capital into the business.
12        Q.  (BY MR. FREEMAN)  Okay.  Did you believe that
13   restructuring the business, ACET Global's business,
14   would give Baymark Partners an opportunity to turn its
15   investment around?
16             MR. PERRIN:  Objection; form.
17        A.  Potentially.
18        Q.  (BY MR. FREEMAN)  Did you believe that
19   restructuring ACET Global's business would help give
20   Baymark an opportunity to make a return on its
21   investment?
22             MR. PERRIN:  Objection; form.
23        A.  I don't think so.
24        Q.  (BY MR. FREEMAN)  No?
25        A.  At that point, it was a complete write-off.
```

Usher Reporting Services
(214) 755-1612

Page 78

1    Q.  Okay.  Were you trying to salvage what you
2  could from it?
3    A.  I think we were trying to do what was right
4  for the business itself.
5    Q.  Okay.  And at what point was it a complete
6  write-off?
7    A.  Certainly, by late summer 2018, it would have
8  been considered a complete write-off, I would think.
9    Q.  Is that July of 2018?
10   A.  Yes.
11   Q.  Okay.
12   A.  Or August, either one.
13   Q.  Okay.  Did you ever discuss the impact of
14  restructuring that business on ACET Global's creditors?
15       MR. PERRIN:  Objection; form.
16   A.  We had discussed with Super G, obviously, the
17  company was having issues.
18   Q.  (BY MR. FREEMAN)  Okay.
19   A.  And made them aware that, you know, this is --
20  that something needs to happen or else, you know,
21  there's not much here.
22   Q.  Baymark Partners made Super G aware of that
23  fact?
24   A.  Yes.
25   Q.  Okay.  And who specifically at Super G?

Page 79

1    A.  It would have been Steve Bellah.
2    Q.  What did you discuss in that regard?
3        MR. PERRIN:  Objection; form.
4    A.  I actually don't recall the discussion.
5    Q.  (BY MR. FREEMAN)  Okay.  Did you ever discuss
6  how the restructuring might impact any other creditors
7  of ACET Global?
8        MR. PERRIN:  Objection; form.
9    A.  I don't recall.
10   Q.  (BY MR. FREEMAN)  Okay.  Did you believe that
11  restructuring ACET Global's business would be in the
12  best interest of the creditors of ACET Global?
13       MR. PERRIN:  Objection; form.
14   A.  I'm not sure.
15   Q.  (BY MR. FREEMAN)  Did you ever discuss whether
16  it would be in the best interest of the creditors of
17  ACET Global?
18       MR. PERRIN:  Objection; form.
19   A.  It would have been a discussion with Super G
20  that without some sort of cash infusion or change in the
21  debt, there's nothing left here.  So...
22   Q.  (BY MR. FREEMAN)  Okay.  Did Windspeed Trading
23  maintain the financial records of ACET Global?
24       MR. PERRIN:  Objection; form.
25   A.  I'm not sure.  Jane Lin, who was the

Page 80

1  accountant at ACET Global, maintained the books.
2    Q.  (BY MR. FREEMAN)  Did you not have any
3  involvement with that?
4    A.  With what?
5    Q.  Maintaining the books.
6        MR. PERRIN:  Objection; form.
7    A.  No.  I was not a bookkeeper at the company.
8    Q.  (BY MR. FREEMAN)  No involvement with respect
9  to the maintenance of ACET Global's books?
10   A.  No involvement.
11   Q.  No involvement with respect to Windspeed
12  Trading's books?
13   A.  No.
14   Q.  And did you provide any oversight with respect
15  to either of those books?
16   A.  Oversight, not on Windspeed Trading.  On ACET
17  Global, it would have been -- we had reporting
18  requirements.  You know, monthly financials had to be
19  sent out.  So although the accountants were aware of
20  that, I had to make sure that also happened on a timely
21  manner.
22   Q.  Okay.  Did you provide instructions to
23  Windspeed Trading regarding ACET Global's financial
24  records?
25   A.  No.

Page 81

1    Q.  And you weren't compensated in any way to do
2  that?
3    A.  No.
4    Q.  How was Windspeed Trading's business model
5  different from ACET Global's?
6    A.  I'm not sure.
7    Q.  And why are you not sure?
8        MR. PERRIN:  Objection; form.
9    A.  I'm not involved with Windspeed.  I don't
10  know.
11   Q.  (BY MR. FREEMAN)  Okay.  You don't know if
12  Windspeed had different employees from ACET Global?
13       MR. PERRIN:  Objection; form.
14   A.  To be exact, I'd need to see the employee
15  roster.
16   Q.  (BY MR. FREEMAN)  Okay.  Do you know if
17  Windspeed Trading had any of the same employees as ACET
18  Global?
19   A.  I know Bill Szeto is at Windspeed Trading.  I
20  believe that -- I'd have to see the employee roster.  I
21  can't speak for certain.
22   Q.  Did Jane Lin go to work for Windspeed Trading?
23   A.  Again, if you show me a W-2 of Jane Lin at
24  Windspeed, I can answer that.
25   Q.  Okay.  But you never corresponded with her as

21 (Pages 78 to 81)

## Page 82

1    the accountant for Windspeed?
2        A.  She would have sent emails to me.
3        Q.  From Windspeed Trading?
4        A.  Yes.
5        Q.  So did you, in fact, understand her to be an
6    employee of Windspeed Trading?
7            MR. PERRIN:  Objection; form.
8        A.  Again, I'm not sure.  She worked potentially
9    on behalf of Windspeed or for Windspeed.  I don't know.
10       Q.  (BY MR. FREEMAN)  Okay.  Did you correspond
11   with anyone else at Windspeed?
12       A.  I have talked to Bill Szeto at Windspeed.
13       Q.  Okay.  Anyone else?
14       A.  I don't think so.
15       Q.  Did Windspeed have different inventory than
16   ACET Global?
17           MR. PERRIN:  Objection; form.
18       A.  I would think so.
19       Q.  (BY MR. FREEMAN)  What makes you think that?
20       A.  It's a different company.
21       Q.  And why does that make you think it would be
22   different inventory?
23           MR. PERRIN:  Objection; form.
24       A.  Because of that reason.
25       Q.  (BY MR. FREEMAN)  But for no other reason?

## Page 83

1        A.  No other reason.
2        Q.  Okay.  Where did Windspeed Trading receive its
3    funding?
4        A.  Again, to be certain, I would need to see the
5    bank statement to see where it came from.
6        Q.  Okay.  Where do you believe it received its
7    funding?
8            MR. PERRIN:  Objection; form.
9        A.  Super G Capital.
10       Q.  (BY MR. FREEMAN)  Why do you believe that?
11       A.  Well, everything in the -- in this lawsuit is
12   stating that, so I'm assuming that's what it is.
13       Q.  Did you, in fact, have involvement with
14   negotiating that loan?
15           MR. PERRIN:  Objection; form.
16       A.  I was involved in helping with the
17   transaction, and the loan would have been as part of
18   that, I suppose.  But, again, I'm not sure that was the
19   loan that financed Windspeed.
20       Q.  (BY MR. FREEMAN)  Okay.  But you're aware --
21   it's your understanding that Windspeed received a loan
22   from Super G as part of the transaction you were
23   involved in?
24           MR. PERRIN:  Objection; form.
25       A.  If you show me the loan agreement, then I can

## Page 84

1    confirm, yes, that looks correct.
2        Q.  (BY MR. FREEMAN)  Okay.  Without seeing the
3    loan agreement, you don't -- you don't know whether that
4    was ever arranged?
5        A.  I'm not sure if it's Super G Capital or a
6    different entity name.
7        Q.  Okay.
8        A.  I know they switched to a different company,
9    and so I'm not certain.
10       Q.  Super G switched to a different company?
11       A.  They switched to SG Credit Partners, I
12   believe.
13       Q.  When did they switch to SG Credit
14   Partners?
15       A.  I don't know.
16       Q.  Why did they switch to SG Credit Partners?
17           MR. PERRIN:  Objection; form.
18       A.  You'd have to ask them.
19       Q.  (BY MR. FREEMAN)  Okay.  But you understood
20   that to be Super G Capital?
21           MR. PERRIN:  Objection; form.
22       A.  Again, if you'd show me the loan agreement, I
23   can confirm.
24       Q.  (BY MR. FREEMAN)  Okay.  But did you
25   understand SG Capital Partners to be Super G Capital?

## Page 85

1            MR. PERRIN:  Objection; form.
2        A.  No.
3        Q.  (BY MR. FREEMAN)  Why then were you --
4        A.  To be clear, there were employees from Super G
5    Capital and SG Credit Partners.  They do similar-type
6    loans.  I don't know the ownership.  I don't know the
7    entities.  There's no reason to believe that it's the
8    same company.
9        Q.  Were those employees of SG Capital involved
10   with respect to ACET Global's loan?
11           MR. PERRIN:  Objection; form.
12       A.  Again, I don't -- I can't speak to that
13   because I don't specifically know who works for SG
14   Credit Partners.
15       Q.  (BY MR. FREEMAN)  Did you ever correspond with
16   anyone from SG Credit Partners about the ACET Global
17   loan with Super G Capital?
18       A.  I'm not sure I did.
19       Q.  Now, is it your understanding that Windspeed
20   had a loan from Super G Capital?
21           MR. PERRIN:  Objection; form.
22       A.  Again, if you show me the loan, I can confirm.
23       Q.  (BY MR. FREEMAN)  Did you ever refer to the
24   Windspeed loan from Super G Capital as the "ACET note"?
25           MR. PERRIN:  Objection; form.

Usher Reporting Services
(214) 755-1612

Page 86

1      A.  Potentially.
2      Q.  (BY MR. FREEMAN)  What do you mean
3  "potentially"?
4      A.  I would have see an email that says that.  I
5  know -- I don't know.  I don't recall.  So we'd have to
6  look at something.
7      Q.  Why would you refer to a loan to Windspeed
8  Trading from Super G Capital as the "ACET note"?
9          MR. PERRIN:  Objection; form.
10     A.  Well, Super G was -- ACET Global was in
11  default with Super G.  Super G was also financing
12  Windspeed, a separate transaction.  There was a
13  foreclosure going on.  It's very likely that there was
14  an mistake in the email with calling the loan the
15  correct name.
16     Q.  (BY MR. FREEMAN)  Why do you say it's very
17  likely that there was a mistake in an email calling it
18  that name?
19         MR. PERRIN:  Objection; form.
20     A.  Well, if you recall, I was working on helping
21  with the transaction with Windspeed on the Baymark side,
22  as well as ACET Global with Super G.  It's just -- it's
23  a possibility that the name in the email got titled
24  wrong.
25     Q.  (BY MR. FREEMAN)  Does anything lead you to

Page 87

1  believe that actually happened?
2          MR. PERRIN:  Objection; form.
3      A.  That what happened?
4      Q.  (BY MR. FREEMAN)  That you actually referred
5  to the wrong note as the "ACET note"?
6      A.  I believe so.
7      Q.  What leads you to believe that happened?
8      A.  Because Windspeed -- again, if I see the loan
9  agreement, that is not an ACET note.  It's probably a
10  different loan.
11     Q.  Okay.  When did Windspeed begin selling ACET
12  Global's inventory?
13     A.  I don't know.
14     Q.  Where did Windspeed Trading obtain its
15  inventory from?
16         MR. PERRIN:  Objection; form.
17     A.  You would have to ask Windspeed.
18     Q.  (BY MR. FREEMAN)  Okay.  You don't know where
19  Windspeed obtained any of the inventory that it sold in
20  2018?
21         MR. PERRIN:  Objection; form.
22     A.  No.
23     Q.  (BY MR. FREEMAN)  If it obtained that
24  inventory from ACET Global, was that through a
25  foreclosure sale?

Page 88

1          MR. PERRIN:  Objection; form.
2      A.  I'm not sure.
3      Q.  (BY MR. FREEMAN)  Do you know whether a
4  foreclosure sale ever occurred?
5          MR. PERRIN:  Objection; form.
6      A.  The foreclosure sale between who exactly?
7      Q.  (BY MR. FREEMAN)  Windspeed Trading and Super
8  G.  Do you know whether that --
9      A.  I don't --
10     Q.  You don't?
11     A.  I'm sorry?
12     Q.  You don't know whether it occurred?
13     A.  Do I know if what occurred?
14     Q.  A foreclosure sale from Super G Capital to
15  Windspeed Trading, LLC.
16     A.  Yes, there would have been a foreclosure that
17  occurred.
18     Q.  Okay.  And when did that occur?
19         MR. PERRIN:  Objection; form.
20     A.  There was a foreclosure on ACET Global.  I'm
21  not sure there was a foreclosure on Windspeed.
22     Q.  (BY MR. FREEMAN)  Okay.  When was there a
23  foreclosure on ACET Global?
24     A.  I think it was early 2019.
25     Q.  Okay.  Is that January of 2019?

Page 89

1      A.  I'm not sure.  You'd have to show me the
2  foreclosure.
3      Q.  Why do you -- why do you believe it was early
4  2019?
5      A.  Memory.
6      Q.  Okay.  And what about your memory makes you
7  believe that's the case?
8          MR. PERRIN:  Objection; form.
9      A.  Because I remember something like this
10  occurring in early 2019.
11     Q.  (BY MR. FREEMAN)  Okay.  But you weren't
12  involved in that process at all?
13     A.  In what process?
14     Q.  The foreclosure process.
15         MR. PERRIN:  Objection; form.
16     A.  How would I be involved in that?
17     Q.  (BY MR. FREEMAN)  Correct.  Were you --
18     A.  No.
19     Q.  No involvement at all?
20         MR. PERRIN:  Objection; form.
21     A.  My understanding is Super G foreclosed on ACET
22  Global.  Super G had requested documents for the
23  foreclosure, which I provided.  So there is some
24  involvement.
25     Q.  (BY MR. FREEMAN)  Okay.  But that's the extent

                                    23 (Pages 86 to 89)

Matt Denegre   *   April 8, 2021

## Page 90

1    of your involvement?
2        A.  From what I can recall.
3        Q.  Okay.  Do you generally have a pretty good
4    memory?
5        A.  No.
6        Q.  Okay.  Is there a reason for that?
7        A.  I wish I could tell.  I don't.  Certain things
8    I can recall, other things I can't.
9        Q.  Okay.  Did you discuss having Windspeed
10   Trading maintain two sets of books?
11           MR. PERRIN:  Objection; form.
12       A.  Again, I don't recall.
13       Q.  (BY MR. FREEMAN)  Did you ever direct Bill
14   Szeto to keep two sets of books?
15           MR. PERRIN:  Objection; form.
16       A.  I don't recall.
17       Q.  (BY MR. FREEMAN)  If you had, what would have
18   been the reasons?
19           MR. PERRIN:  Objection; form.
20       A.  Well, they're two separate companies, so there
21   should be two separate books.  So...
22       Q.  (BY MR. FREEMAN)  I agree.  It seems like
23   there should be.  Would there be any reasons for them to
24   have consolidated books or...
25       A.  There shouldn't be.

## Page 91

1           MR. PERRIN:  Objection; form.
2           (Exhibit 2 marked.)
3        Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting on
4    the screen what's marked as Exhibit 2.  Can you see
5    that?
6           MR. PERRIN:  Hold on one second.  Let me
7    pull it up.
8           THE WITNESS:  I can't see that on the
9    screen, but hold on.
10       Q.  (BY MR. FREEMAN)  Do you recognize this
11   document, Mr. Denegre?
12       A.  This exhibit?
13       Q.  Yes, sir.
14       A.  I don't.
15       Q.  If you look at the top, does that reflect an
16   email from William Szeto?
17       A.  Yes.
18       Q.  From a Windspeed Trading email address?
19       A.  Yes.
20       Q.  And is this email -- was it sent on
21   October 19th, 2018?
22       A.  Correct.
23       Q.  And was that to someone named Matt Denegre?
24       A.  Yes.
25       Q.  And was the subject line "Windspeed QuickBooks

## Page 92

1    file"?
2        A.  Yes.
3        Q.  Okay.  And is -- Matt Denegre, reflected here,
4    is that you?
5        A.  I don't know.
6        Q.  Okay.  You don't remember this email?
7        A.  I don't remember this.
8        Q.  And you don't believe you've had
9    correspondence with William Szeto from Windspeed Trading
10   about --
11       A.  I never -- go ahead.  Sorry.  Continue.
12       Q.  -- about Windspeed's QuickBooks file?
13           MR. PERRIN:  Objection; form.
14       A.  Again, I don't recall having that
15   conversation.  But assuming this is me, then there was
16   certainly a conversation.
17       Q.  (BY MR. FREEMAN)  Let's look below where
18   there's an email from Matt Denegre.
19       A.  Okay.
20       Q.  And the email address there is
21   mdenegre@baymarkpartners.com.  Is that your email
22   address, sir?
23       A.  Yes.
24       Q.  And was your email hacked at any time during
25   October of 2018?

## Page 93

1        A.  It may have been.
2        Q.  You think your email was hacked in October
3    of 2018?
4        A.  I didn't say that.  I said it may have been.
5    I'm not aware.
6        Q.  Okay.  Do you believe anybody hacked into your
7    emails and emailed William Szeto?
8        A.  No.
9        Q.  Do you believe this email is actually from
10   you?
11       A.  Yes.
12       Q.  And is what's reflected here on Exhibit 2, in
13   fact, a true and correct copy of the correspondence
14   between you and Mr. Szeto?
15           MR. PERRIN:  Objection; form.
16       A.  How can I tell?  It has my name.  It has
17   Bill's name.
18       Q.  (BY MR. FREEMAN)  Okay.  Do you deny that this
19   is, in fact, a real document?
20       A.  I'm assuming it's a correct document.
21       Q.  Okay.  If you look below at the Bates-labeled
22   page that says BP011763, do you understand that to mean
23   that Baymark Partners produced this document?
24       A.  I don't know that.
25       Q.  Is Baymark Partners in the habit of

Page 94

1    maintaining fake documents?
2         MR. PERRIN:  Objection; form.
3         A.  Not that I'm aware of.
4         Q.  (BY MR. FREEMAN)  Okay.  Do you believe this
5    to be a true and correct copy of the correspondence
6    between you and Mr. Szeto?
7         MR. PERRIN:  Objection; form.
8         A.  I assume it's a correct correspondence.
9         Q.  (BY MR. FREEMAN)  Okay.  If you look at the
10   email on the bottom, the email from you at your Baymark
11   Partners email address says, "Bill, Jane will need to
12   set up a new QuickBooks file for Windspeed and maintain
13   the old QuickBooks file for ACET."
14        Does that appear to be correct?
15        A.  That's how I read it.
16        Q.  Okay.  And does it go on to say, "It will need
17   to be two separate books for obvious reasons"?  Is that
18   correct?
19        A.  That's how I read it.
20        Q.  Okay.  What were the obvious reasons, sir?
21        A.  There's two separate companies.
22        Q.  Okay.  Two separate and distinct companies?
23        A.  Correct.
24        Q.  Okay.  Is that the only obvious reason?
25        A.  I can't think of another reason.

Page 95

1         Q.  Was that the reason that you were thinking of
2    when you sent this email?
3         MR. PERRIN:  Objection; form.
4         A.  I don't recall.
5         Q.  (BY MR. FREEMAN)  Okay.  But you instructed
6    Mr. Szeto to ensure that Jane maintained both
7    Windspeed's financial records and ACET Global's
8    financial records?
9         A.  That's what I'm suggesting here.
10        Q.  Okay.  Why did you do that?
11        A.  Because they're two separate companies.
12        Q.  Okay.  What is the structure of Windspeed?
13        A.  I have -- what do you mean by "structure"?
14        Q.  How is it structured?  What's your
15   understanding?
16        A.  There was a loan and equity, I suppose.
17        Q.  Okay.  How, if at all, are you involved?
18        A.  I'm sorry.  Say that again.
19        Q.  How, if at all, are you involved?
20        MR. PERRIN:  Objection; form.
21        A.  Currently, not at all.  I have no involvement.
22        Q.  (BY MR. FREEMAN)  Prior to currently.
23        A.  Well, I never worked for Windspeed.
24        Q.  Okay.  You never had any position with
25   Windspeed?

Page 96

1         MR. PERRIN:  I don't think -- are you
2    through with your answer?
3         THE WITNESS:  I'm through with the
4    answer.
5         MR. PERRIN:  Okay.  Excuse me.  Go ahead.
6         MR. FREEMAN:  And I'm sorry.  I didn't
7    catch all that.  What did you need?
8         MR. PERRIN:  I thought he wasn't through
9    with his -- I thought he might not be through with his
10   answer.  I asked if he was, and he said he was.  So I
11   said proceed.
12        MR. FREEMAN:  Okay.
13        Q.  (BY MR. FREEMAN)  If I cut you off at all, I
14   apologize.  I interpreted the pause as being -- being
15   completed.  Was there any more you wanted to add to that
16   answer?
17        A.  No.
18        Q.  Okay.  Did you ever have a position on
19   Windspeed's board?
20        A.  No.
21        Q.  Is there any reason that Bill Szeto would
22   believe you had a position on Windspeed's board?
23        MR. PERRIN:  Objection; form.
24        A.  I'm not sure why Bill would assume that.
25        Q.  (BY MR. FREEMAN)  Does Windspeed Trading abide

Page 97

1    by its Company Agreement?
2         MR. PERRIN:  Objection; form.
3         A.  You would have to ask Windspeed.
4         Q.  (BY MR. FREEMAN)  Do you know if Windspeed
5    makes an effort to abide by its Company Agreement?
6         MR. PERRIN:  Objection; form.
7         A.  I don't know.
8         Q.  (BY MR. FREEMAN)  Do you know if Windspeed has
9    a board?
10        A.  I'm not sure.
11        Q.  Do you know if its board -- do you know if
12   Mr. Ludlow is on that board?
13        MR. PERRIN:  Objection; form.
14        A.  I don't know for certain who is on the board.
15        Q.  (BY MR. FREEMAN)  Do you know if Mr. Hook is
16   on that board?
17        MR. PERRIN:  Objection; form.
18        A.  I don't know.
19        Q.  (BY MR. FREEMAN)  Have you ever had
20   discussions with Mr. Ludlow or Mr. Hook about the
21   Windspeed board?
22        A.  There would have been discussions initially at
23   some point.  I don't know when those discussions --
24   whether it was late 2018, but there would have been a
25   discussion at some point.

                                    25 (Pages 94 to 97)

Page 98

1    Q.  Why would there have been a discussion?
2    A.  I think Mr. Ludlow was on the board of
3  Windspeed at that time.
4    Q.  What leads you to believe that?
5    A.  I had seen an operating agreement.
6    Q.  When did you see an operating agreement?
7    A.  It was early 2019 or late 2018.
8    Q.  Okay.  And why did you see an operating
9  agreement?
10   A.  There was a transaction done with Windspeed
11 Trading, and I was involved in the transaction.
12   Q.  Okay.  And what was that transaction with
13 Windspeed Trading?
14   A.  Baymark got warrants in Windspeed Trading.
15   Q.  Okay.  Did Baymark Partners ever engage a law
16 firm to draft an operating agreement for Windspeed
17 Trading?
18   A.  I'm not sure.  Baymark had its own counsel,
19 Bill Szeto had his own counsel and Super G had their own
20 counsel.  I'm not sure.
21   Q.  Did Mr. Hook or Mr. Ludlow ever engage legal
22 counsel to draft an operating agreement for Windspeed
23 Trading?
24   A.  You would have to ask them.
25   Q.  To the best of your knowledge, if an attorney

Page 99

1  was drafting an operating agreement for Windspeed
2  Trading, would they have been representing Baymark
3  Partners?
4       MR. PERRIN:  Objection; form.
5    A.  I'm sorry.  Say that again.
6    Q.  (BY MR. FREEMAN)  If an attorney was drafting
7  an operating agreement for Windspeed Trading --
8    A.  Uh-huh.
9    Q.  -- would they have been representing Baymark
10 Partners?
11      MR. PERRIN:  Objection; form.
12   A.  I'm not sure.
13   Q.  (BY MR. FREEMAN)  Why are you not sure?
14      MR. PERRIN:  Objection; form.
15   A.  I don't know how to answer that question.
16   Q.  (BY MR. FREEMAN)  And why do you not know how
17 to answer it?
18   A.  Because I'm not sure how that attorney-client
19 privilege would work.  I really don't know.
20   Q.  Okay.  But you're not aware of Baymark
21 Partners ever engaging a law firm to draft an operating
22 agreement for Windspeed Trading?
23      MR. PERRIN:  Objection; form.
24   A.  I don't recall.
25   Q.  (BY MR. FREEMAN)  Okay.  Would you have been

Page 100

1  involved in that?
2       MR. PERRIN:  Objection; form.
3    A.  In drafting an operating agreement?
4    Q.  (BY MR. FREEMAN)  Yes, sir.
5    A.  No.  I'm not -- an attorney would have done
6  that.
7    Q.  Okay.  Would you have been involved in
8  discussions with that attorney?
9    A.  Potentially.
10   Q.  Why potentially?
11   A.  Because Baymark, at the time, got a warrant in
12 the operating agreement.
13   Q.  Okay.
14   A.  And I know there was some involvement with me.
15 I don't recall what those conversation were, but...
16   Q.  Who were those conversations with?
17      MR. PERRIN:  Objection; form.
18   A.  It would have been -- can we be more specific
19 with what we're trying to solve here or figure out?
20   Q.  (BY MR. FREEMAN)  Yep.  Any discussions about
21 the operating agreement with Windspeed Trading, LLC.
22   A.  There would have been discussions with our
23 attorney.
24   Q.  Okay.  And that's only because Baymark
25 Partners was obtaining a warrant in Windspeed Trading,

Page 101

1  LLC?
2       MR. PERRIN:  Objection; form.
3    A.  I can't say for certain other than I know we
4  have a -- Baymark Partners has a warrant in Windspeed.
5    Q.  (BY MR. FREEMAN)  Okay.  You've not ever
6  seen --
7       MR. PERRIN:  Jason, just to let you know,
8  it's about ten to 1:00.  When you get to a stopping
9  point, I'd like to take a short break for lunch.
10      MR. FREEMAN:  I agree.  We're pretty
11 close.  I'll try and get there in about ten minutes or
12 so.
13      MR. PERRIN:  All right.
14   Q.  (BY MR. FREEMAN)  Did you ever have -- let me
15 ask you this.  Did -- have you ever seen any board
16 minutes with respect to Windspeed?
17   A.  No.
18   Q.  Never any board resolutions with respect to
19 Windspeed?
20   A.  I don't think so.
21   Q.  Did you ever have any discussions with Bill
22 Szeto about Windspeed's board?
23   A.  I can't say for certain.
24   Q.  Did you ever have discussions where Mr. Szeto
25 told you that Windspeed doesn't have an official board?

26  (Pages 98 to 101)

Page 102

1    MR. PERRIN:  Objection; form.
2    A.  I don't recall that discussion.
3    Q.  (BY MR. FREEMAN)  Okay.
4        (Exhibit 3 marked.)
5    Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting up
6  on the screen what's marked as Exhibit 3.  Do you
7  recognize this document?
8    A.  No.
9    Q.  You don't recognize this document?
10   A.  I don't.
11   Q.  And you didn't review this document in
12  preparation for today?
13   A.  No.
14   Q.  Does this appear to be an email from William
15  Szeto to you in January of 2019?
16   A.  I'm just scrolling down and trying to find out
17  where this email starts.
18   Q.  Do you need me to scroll on the screen, or do
19  you have it there?
20       MR. PERRIN:  We have it right here.  You
21  can scroll up or down.  Either way you want, you can.
22   A.  Okay.  What was the question again?
23   Q.  (BY MR. FREEMAN)  Does this appear to be an
24  email from Mr. Szeto to you in January, January 21st,
25  2019?

Page 103

1    A.  It does.
2    Q.  And does it have a subject line of "Merged
3  Weekly Report Windspeed"?
4    A.  Well, it initially started as "merged weekly
5  report" without the name "Windspeed" in it.
6    Q.  Okay.  I'm looking at the top email there that
7  has a subject line, "re:  Merged weekly report
8  (Windspeed)."  Do you see that?
9    A.  I see that.
10   Q.  What does that refer to?
11   A.  I don't know.
12   Q.  Don't know?
13   A.  I don't know.
14   Q.  Okay.  No idea what "merged" means?
15   A.  No.
16   Q.  Okay.  Why would you be on an email that you
17  didn't know what the subject line meant?
18   A.  That happens more often than you think.  It
19  happens quite a bit, actually.
20   Q.  In this email to you on January 21st, 2019,
21  does Mr. Szeto state, "Since we do not have an official
22  board, we do not have a D&O policy for the board"?
23   A.  That's what he's saying.
24   Q.  Okay.  And do you -- do you believe this email
25  to be a true and correct copy of what's reflected

Page 104

1  thereon?
2    A.  I assume it is a true and correct copy.
3    Q.  Okay.  Do you believe it is?
4    A.  Yes.
5    Q.  Okay.  The immediately preceding email, is
6  that an email from you, sir, at your Baymark Partners
7  email address?
8    A.  At 5:42?
9    Q.  Yes, sir, on January 20th.
10   A.  Yes.
11   Q.  Okay.  And did you send that email to Steve
12  Bellah of Super G Capital, Tony Ludlow of Baymark
13  Partners and William Szeto of Windspeed Trading?
14   A.  Yes.
15   Q.  And below that, did you state, "I don't
16  believe Windspeed has D&O insurance"?
17   A.  Yes.
18   Q.  Okay.  Why was there a concern about D&O
19  insurance?
20   A.  I didn't have a concern.
21   Q.  Okay.  Why did you not believe Windspeed had
22  D&O insurance?
23   A.  There was no reason to believe it did.
24   Q.  Okay.  Well, if there was no reason to believe
25  it did and no reason to believe it didn't, why did you

Page 105

1  come to the conclusion that it didn't?
2        MR. PERRIN:  Objection; form.
3    A.  Bad decision-making, I suppose.
4    Q.  (BY MR. FREEMAN)  Okay.  If you look down at
5  the bottom, documents Bates labeled BP012328 and 29,
6  does that appear to be an email from Mr. Szeto to you on
7  January 18th, 2019?
8        MR. PERRIN:  What time?
9        MR. FREEMAN:  12:27 p.m.  It's the one
10  that's highlighted.
11   A.  Yes.
12   Q.  (BY MR. FREEMAN)  Okay.  Does that have Jane
13  at Windspeed Trading on the email as well?
14   A.  It does.
15   Q.  Okay.  And is Jane the accountant for
16  Windspeed Trading?
17   A.  I'm not sure her role.
18   Q.  Was she the accountant at Windspeed Trading?
19       MR. PERRIN:  Objection; form.
20   A.  I'm not sure what her role is at Windspeed
21  Trading.
22   Q.  (BY MR. FREEMAN)  Was she the accountant at
23  ACET Global?
24   A.  She was.
25   Q.  Okay.  And does the subject line there state,

Matt Denegre   *   April 8, 2021

## Page 106

1    "Merged weekly report"?
2        A.  It does.
3        Q.  Okay.  Did you receive a weekly report from
4    Windspeed Trading?
5        A.  I don't recall what this report would have
6    been.
7        Q.  You don't recall receiving a -- ever receiving
8    a weekly report from Windspeed Trading?
9            MR. PERRIN:  Objection; form.
10       A.  I don't.
11       Q.  (BY MR. FREEMAN)  Do you have any idea why
12   Mr. Szeto would send you specifically a weekly report
13   from Windspeed Trading?
14       A.  He was using -- or not -- "using" is not the
15   right word.  I was a sound board for Bill to put ideas
16   across.  So he was sharing, I suppose, Windspeed's
17   weekly reports.
18       Q.  To get ideas from you?
19       A.  Potentially.  Although I'm not sure I offered
20   any ideas.
21       Q.  Did you use Steven Bellah as a sounding board
22   to get ideas from yourself?
23           MR. PERRIN:  Objection; form.
24       A.  I don't -- I don't think so.
25       Q.  (BY MR. FREEMAN)  Okay.  If you look to the

## Page 107

1    next email directly above, there's an email -- there's a
2    correspondence from you to Steve Bellah.  Do you see
3    that, sir?
4        A.  At 3:42?
5        Q.  Yes, sir.
6        A.  I do.
7        Q.  Okay.  Did you forward this merged weekly
8    report to Steven Bellah?
9        A.  I'm not sure.  How can I tell?
10       Q.  Well, you can see that there's a line item
11   there where it demonstrates an email was sent from the
12   email address mdenegre@baymarkpartners.com at 4:24 p.m.
13   on January 18th, 2019, in this email thread.  Do you see
14   that?
15       A.  I do see that.
16       Q.  And below that, it states a password, 1761.
17   Do you see that?
18       A.  I see that.
19       Q.  And then do you see the salutation, "Best
20   regards, Matt Denegre, Baymark Partners"?  Do you see
21   that?
22       A.  I do.
23       Q.  Do you have any reason to believe you might
24   have sent this document to Steve Bellah of Baymark
25   Partners, along with a password to open it?

## Page 108

1        A.  I don't see where it says it was sent to Steve
2    Bellah.  I don't see that.
3        Q.  Okay.  Do you see above that where it states
4    the name "Steve Bellah"?
5        A.  At 3:42 p.m.?
6        Q.  Yes, sir.
7        A.  I do.
8        Q.  And do you see where it states that directly
9    above Matt Denegre, and it states a phone number of
10   (972) 742-5759?  Do you see that?
11       A.  Are you talking about below Steve's name?
12       Q.  Correct.
13       A.  (972) 742-5759?
14       Q.  Right.
15       A.  I do see that.
16       Q.  Okay.  Would you ever have sent a weekly
17   report from Windspeed to Steve Bellah?
18       A.  I may have.
19       Q.  Did you, in fact, do so regularly?
20       A.  Not sure I did.
21       Q.  Why are you not sure?
22       A.  Because it wouldn't be something I would send
23   regularly to Steve Bellah.
24       Q.  Okay.  Why is that?
25       A.  I'm not sure why I would send this to Steve

## Page 109

1    Bellah.
2        Q.  Okay.  Was this, in fact, a critical period of
3    time?
4            MR. PERRIN:  Objection; form.
5        A.  I don't recall.
6        Q.  (BY MR. FREEMAN)  Okay.  In this email on
7    January 18th, 2019, to you from Steve Bellah with the
8    subject line, "re: Merged weekly report (Windspeed),"
9    does Steve Bellah state, "We are waiting for your
10   counsel to turn a document"?
11       A.  Again, at 3:42 p.m.?
12       Q.  Yes, sir.
13       A.  Yes, it says that.
14       Q.  What is he referring to?  Do you know?
15       A.  I don't know.
16       Q.  You don't have any reason to know what he was
17   referring to?
18       A.  It's hard to say.  It doesn't say in the
19   email.
20       Q.  Okay.  If you'll look above that, there's an
21   email from what purports to be
22   mdenegre@baymarkpartners.com.  Is that you?
23       A.  Yes.
24       Q.  And is that sent on January 18th, 2019, at
25   5:07 p.m.?

28 (Pages 106 to 109)

Matt Denegre   *   April 8, 2021

## Page 110

1    A.  Yes.
2    Q.  Okay.  And does it state, "She is drafting the
3  amendment and restatement"?
4    A.  Yes.
5    Q.  Okay.  What amendment and restatement are you
6  referring to, sir?
7    A.  I don't know.
8    Q.  Do you remember any of this email
9  correspondence?
10    A.  Not really.
11    Q.  Did you have any phone conversations with
12  Steven Bellah during this time?
13    A.  I can't say for certain if I did or not.
14    Q.  Okay.
15        MR. FREEMAN:  Tell you what.  That's a
16  good place to stop.
17        MR. PERRIN:  All right.  What do you want
18  to do?
19        MR. FREEMAN:  We can go off the record.
20        (Break taken from 1:02 p.m. to 1:40 p.m.)
21    Q.  (BY MR. FREEMAN)  Mr. Denegre, who does
22  Baymark Partners use to prepare its tax returns?
23    A.  Not sure.
24    Q.  Okay.  Does it use the same company to prepare
25  the tax returns for its companies?

## Page 111

1    A.  I don't know.
2    Q.  Do you know if they use a company named
3  Howard?
4    A.  I don't know.
5    Q.  Okay.  Who prepared ACET Global's taxes for
6  2018?
7    A.  It was a CPA firm, Howard & Company.
8    Q.  Howard & Company?  Was Windspeed involved in
9  that process?
10    A.  No.
11    Q.  Was Bill Szeto?
12    A.  No.
13    Q.  Was Jane Lin?
14    A.  No.
15    Q.  Okay.  And neither of them were involved at
16  your instruction?
17        MR. PERRIN:  Objection; form.
18    A.  I don't think so.
19    Q.  (BY MR. FREEMAN)  Okay.  Did Baymark Partners
20  agree to pay for any tax preparation?
21    A.  I don't know.
22    Q.  Okay.  Did it agree to pay for any tax
23  preparation for Windspeed Trading?
24    A.  I don't know.
25    Q.  Did it agree to pay for any tax preparation

## Page 112

1  for ACET Global?
2    A.  I don't know.
3    Q.  Is there any reason that Baymark Partners
4  would have paid for that?
5        MR. PERRIN:  Objection; form.
6    A.  I'm not sure.
7    Q.  (BY MR. FREEMAN)  Okay.
8        (Exhibit 4 marked.)
9    Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting up
10  what's marked as Exhibit 4 on the screen.  Do you see
11  this?
12    A.  I see Exhibit 4.
13    Q.  Okay.  Do you recognize this document?
14    A.  I don't.
15    Q.  Okay.  Does this appear to be an email from
16  William Szeto at bill@windspeedtrading.com?
17    A.  Which email are you referring to?
18    Q.  Exhibit 4.
19    A.  Okay.  Which email here in particular?
20    Q.  Just look at the top, please.
21    A.  Okay.
22    Q.  Okay.  Does that appear to be an email from
23  William Szeto?
24    A.  Yes.
25    Q.  And is that email dated January 24th, 2019?

## Page 113

1    A.  Yes.
2    Q.  And is that email to Matt Denegre?
3    A.  Yes.
4    Q.  Is that you?
5    A.  I don't know.
6    Q.  Okay.  You don't know if that's you on the
7  email?
8    A.  There's other Matt Denegres.  I don't know.
9    Q.  Okay.  So this could be any other Matt
10  Denegre?
11    A.  Potentially.
12    Q.  Okay.  If you'll look below, the email right
13  before that, there's an email from Matt Denegre at
14  mdenegre@baymarkpartners.com.  Do you see that?
15    A.  I see that.
16    Q.  How many Matt Denegres are there at Baymark
17  Partners?
18    A.  One.
19    Q.  Okay.  Is that you?
20    A.  Yes.
21    Q.  Okay.  Is this -- does this appear to be an
22  email from you to William Szeto at
23  bill@windspeedtrading.com?
24    A.  Yes.
25    Q.  Okay.  Did you send an email to William Szeto

29 (Pages 110 to 113)

Page 114

```
1    on January 24th, 2019?
2         A.  According to this, I did.
3         Q.  Okay.  Does this appear to be a true and
4    correct copy that you sent to William Szeto on
5    January 24th, 2019?
6         A.  How can I tell if it's true and correct?
7         Q.  Well, do you have any reason to believe it's
8    not?
9         A.  I don't think so.
10        Q.  Does Baymark Partners keep false and incorrect
11   copies of documents?
12        A.  I don't know.
13        Q.  Do you know if the label at the bottom of this
14   page, BP012348, indicates that it was produced by
15   Baymark Partners?
16             MR. PERRIN:  I can answer that.  He
17   wouldn't know.  But, yes, it was produced by Baymark
18   Partners.
19        Q.  (BY MR. FREEMAN)  Have you seen any documents
20   that were reviewed by Baymark Partners?
21             MR. PERRIN:  Objection; form.
22        A.  Have I seen any documents reviewed by Baymark
23   Partners?  Is that the question?
24        Q.  (BY MR. FREEMAN)  Produced by Baymark Partners
25   in this lawsuit.
```

Page 115

```
1         A.  I have.
2         Q.  Okay.  Did they bear a Bates label on them?
3         A.  Today's the first I've actually noticed that
4    number.
5         Q.  Okay.  So you don't believe this is a correct
6    copy of an email from you?
7         A.  I don't believe I said that.
8         Q.  Okay.  Well, tell me what you said and what
9    you mean.
10        A.  I wasn't sure if it was a correct copy.
11        Q.  Okay.  So you don't -- you don't have reason
12   to believe this is a correct copy of this email?
13        A.  Assuming the attorney said it was fine, it's
14   fine.  So it must be correct.
15        Q.  Okay.  Directly below, as part of this email
16   strand, is there an email from William Szeto to you on
17   January 24th, 2019, at 8:09 a.m.?
18        A.  Yes.
19        Q.  Okay.  Does it refer to $69,000 in sales?
20        A.  There is a mention of 69K sales.
21        Q.  Okay.  Is that what you understand that to
22   mean, $69,000 in sales?
23        A.  You could assume that means $69,000 in sales.
24        Q.  Okay.  Does it state in this email, "I am
25   going to insist either one of you guy s to pay for a tax
```

Page 116

```
1    filing for ACET so all these can be handled"?  Is that
2    correct?
3         A.  Where are you reading that?
4         Q.  The first line of the email we're just looking
5    at.  I've got it highlighted on your screen.
6             MR. PERRIN:  He's got to put on his
7    glasses to see that from here.
8         A.  Okay.  I see the highlighted.
9         Q.  (BY MR. FREEMAN)  Does it say, from William
10   Szeto to you, "I am going to insist either one of you
11   guys to pay for a tax filing for ACET so all these can
12   be handled"?
13        A.  I don't see where it says from William Szeto
14   to you.  I have a tax filing.  I don't see that.
15        Q.  Okay.  I'm reading an email that's part of
16   what's Exhibit 4 on your screen, correct?
17        A.  Correct.
18        Q.  All right.  This email that we were just
19   looking at, up above, the email header states, "William
20   Szeto" -- "From William Szeto,
21   bill@windspeedtrading.com," correct?
22        A.  I see that.
23        Q.  Okay.  Does it say, "To Matt Denegre"?
24        A.  Yes.
25        Q.  And that's mdenegre@baymarkpartners.com,
```

Page 117

```
1    correct?
2         A.  Yes.
3         Q.  And that is you receiving this email from
4    William Szeto at Windspeed; is that correct?
5         A.  Yes.
6         Q.  Okay.  And does that email state, "I am going
7    to insist either one of you guys to pay for a tax filing
8    for ACET so all these can be handled"?
9         A.  I see that.
10        Q.  And then does he state, "Majority of this
11   sales were made when the company was still ACET and has
12   very little to do with Windspeed; is that correct?
13        A.  That's what the email says.
14        Q.  Okay.  And does it, after that, state, "A good
15   portion of the money we got as Windspeed was used to pay
16   for debts accumulated with ACET, and I simply do not
17   have money to spend for ACET anymore"?
18        A.  It reads that way.
19        Q.  Okay.  Does it appear that my reading is
20   pretty good and accurate?
21        A.  Yes.
22        Q.  Okay.  What is this email about?
23        A.  I'll have to read the whole email chain.  I
24   don't know what it's about.
25        Q.  Okay.  Let me -- let's go to the email
```

30 (Pages 114 to 117)

Page 118

1    directly above that where you responded. Let's see if
2    that's helpful. Do you see that, sir?
3        A. At 8:19 a.m.?
4        Q. At 8:14 a.m., your email responding.
5        A. Yes, I see that.
6        Q. Okay. Does it state, "The tax filing can be
7    paid by Baymark, but will need to be completed by
8    you/Jane"?
9        A. It reads that way.
10       Q. Okay. And is that, in fact, what it says?
11       A. Yes, that's what it says.
12       Q. Okay. And then does it say, "The books and
13   records aren't with us. It's my mistake for not
14   allocating some of the proceeds to budget for this, and
15   I've put myself in an unfortunate position"? Is that
16   correct?
17       A. That's what it reads.
18       Q. Why were you in an unfortunate position?
19       A. I don't know.
20       Q. You don't know what this email means?
21       A. I don't.
22       Q. You don't recall this email whatsoever?
23       A. No.
24       Q. Okay. And you don't recall ever reporting a
25   $69,000 management fee expense on your personal tax

Page 119

1    return related to ACET Global?
2        A. I'd have to look at my tax return.
3        Q. Does that seem like something you would
4    remember?
5        A. Not necessarily.
6        Q. Okay. Did you instruct Windspeed to combine
7    Windspeed financial reports with ACET Global's financial
8    reports?
9        A. Don't think so.
10       Q. You don't think you did?
11       A. No.
12       Q. Is there any reason you might have ever asked
13   for that?
14       A. Not that I can recall.
15       Q. Okay. Are you pretty certain you did not?
16       A. Not that I can recall.
17       Q. Given that Windspeed was a completely separate
18   company, is there any reason you would have asked for
19   that?
20           MR. PERRIN: Objection; form.
21       A. Not that I can recall.
22       Q. (BY MR. FREEMAN) Okay. I'm putting on the
23   screen what's marked as Exhibit 5. Do you see that,
24   sir?
25       A. I see it.

Page 120

1            (Exhibit 5 marked.)
2        Q. (BY MR. FREEMAN) And is this -- does this
3    appear to be correspondence between William Szeto,
4    bill@windspeedtrading.com and you?
5        A. I'm going to scroll down and look at the full
6    email first. What was the question?
7        Q. Does this appear to be email correspondence
8    between William Szeto and you?
9        A. Yes.
10       Q. Okay. And is this in February -- late
11   February of 2019; is that correct?
12       A. Yes.
13       Q. And what's the subject line of this
14   correspondence? Is the subject line "monthly financial
15   statement"?
16       A. The subject line is "re: Monthly financial
17   statement - 2019 - 01."
18       Q. Okay. What does that refer to?
19       A. I don't know.
20       Q. You don't know what those monthly financial
21   statements are?
22       A. I'm not sure. I'd have to see what the
23   financial statements were.
24       Q. Did you receive monthly financial statements
25   from Bill Szeto and Windspeed Trading in 2019?

Page 121

1        A. Bill Szeto would have shared financial
2    statements with me, yes.
3        Q. Did you receive them on a monthly basis?
4        A. I'm not sure I did, but I received them
5    periodically.
6        Q. And did you want those financial statements to
7    report -- to report ACET Global and Windspeed on a
8    combined basis?
9        A. No.
10       Q. No reason you would have wanted that, is
11   there?
12       A. No.
13       Q. Okay. If you'll look to the second page of
14   this exhibit, does that appear to be an email from Matt
15   Denegre of Baymark Partners?
16       A. Yes.
17       Q. And does that email from you to
18   bill@windspeedtrading.com state, "Can Jane combine the
19   January report with the historical monthly financials?"
20   Is that correct?
21       A. That's how it reads.
22       Q. Okay. What were you referring to?
23       A. I don't know.
24       Q. Okay. And you state there, "That way we can
25   start to build up a TTM and also see trends."

31 (Pages 118 to 121)

## Page 122

1  Do you know what that refers to, or do you
2  not remember?
3      A.  I don't recall.
4      Q.  Okay.  Do you remember how Bill responded to
5  this?
6      A.  I haven't seen these emails.  I don't remember
7  what these emails say.
8      Q.  Okay.  If you look to the response right above
9  that.
10     A.  Okay.
11     Q.  Bill Szeto to you, February 28th, 2019, at
12  12:16 p.m., do you see that?
13     A.  Yes.
14     Q.  And does he say, "I told her not to.  I do not
15  want to mix the ACET results together with the Windspeed
16  results in a single report.  The January report is a
17  pure Windspeed report and is not part of ACET combined
18  report."
19     Do you know what any of that is referring
20  to?
21     A.  I don't.
22     Q.  Is there any reason you would have responded
23  and still wanted them combined?
24     A.  I don't know how I responded to this.
25     Q.  Okay.  If you'll look right above that and

## Page 123

1  look at your response on February 28th, 2019, at
2  12:19 p.m., three minutes later, you state, "I would
3  still include it."  Do you see that?
4      A.  I see that.
5      Q.  Why did you say that?
6      A.  I don't know.
7      Q.  There's no reason you can think of for why you
8  would have wanted that included still?
9      A.  It would be speculating for me to say.
10     Q.  Did Bill agree to that?
11     A.  I don't know.
12     Q.  Okay.  Is it possible you wanted these
13  combined because they were the same business?
14     A.  I don't know.
15     Q.  You don't know if they were the same business?
16     A.  I know they weren't the same business.  They
17  were independent companies.
18     Q.  Okay.  Independent companies, but you wanted
19  their financial reporting on a combined basis?
20     MR. PERRIN:  Objection; form.
21     MR. FREEMAN:  What's the objection?
22     MR. PERRIN:  Objection; form.
23     MR. FREEMAN:  Basis?
24     MR. PERRIN:  Basis is the question is
25  vague and misleading and mischaracterizes his testimony.

## Page 124

1      A.  I don't recall this email, so I have no
2  opinion on it.
3      Q.  (BY MR. FREEMAN)  Okay.  After the
4  transaction, you know, this transition from ACET Global
5  to Windspeed, why was ACET Global still open?
6      MR. PERRIN:  Objection; form.
7      A.  I don't understand the question.
8      Q.  (BY MR. FREEMAN)  Well, after Windspeed was
9  started, why was ACET Global still open?
10     A.  They're two separate companies.  Why would --
11  that's my answer.  I don't know why they'd be related.
12     Q.  Completely unrelated?
13     A.  Yes.
14     Q.  Okay.  Did ACET Global have any operations at
15  that point?
16     A.  What time are we talking about?
17     Q.  After Windspeed Trading, LLC, was formed.
18     A.  And when was that?
19     Q.  Well, let's call that September 2018.
20     A.  Assuming that date is correct and ACET Global
21  would be operating at that time.
22     Q.  Okay.  Would you expect Windspeed to continue
23  operating in October of 2018?
24     A.  I have no opinion on that.
25     Q.  Okay.  Why is that?

## Page 125

1      A.  Because I have no -- how would I know?
2      Q.  You wouldn't know if ACET Global was operating
3  in October of 2018?
4      A.  I'm sorry.  I misunderstood your question.  My
5  apologies.  I thought you were referring to Windspeed.
6  So the question was again?
7      Q.  Question was:  Was ACET Global operating in
8  October of 2018?
9      A.  Yes.
10     Q.  Okay.  Why was it operating?
11     A.  Because it was in business, operating.
12     Q.  Okay.  What about -- what about as of going
13  into March, April 2019, why was ACET Global -- why was
14  it still open?
15     MR. PERRIN:  Objection; form.
16     A.  I wasn't aware -- I'm not sure it was open or
17  not at that date.
18     Q.  (BY MR. FREEMAN)  Okay.  There wasn't any
19  reason you know of for it to be open?
20     A.  Define "open."  I don't --
21     Q.  Well, not closed.
22     A.  I can't answer the question.  I don't have an
23  opinion on it.
24     (Exhibit 6 marked.)
25     Q.  (BY MR. FREEMAN)  Okay.  Didn't you mention

32 (Pages 122 to 125)

## Page 126

1    earlier that you had recently retrieved bank statements
2    for ACET Global?
3        A.  In March 2021, I requested bank statements for
4    ACET Global for the period of 2018 and parts of 2017.
5        Q.  Okay.  So is it your understanding the entity
6    still exists?
7        A.  I don't know.
8        Q.  You don't know?  I'm asking if you'll look at
9    your screen.  What's on there is Exhibit 6.  Do you see
10   that, sir?
11       A.  Okay.
12       Q.  Are you familiar with this document?
13       A.  I'm not.
14       Q.  Does this appear to be an email from you?
15       A.  Yes.
16       Q.  An email from you to Tomer Damti on
17   March 20th, 2019?
18       A.  Yep.
19       Q.  Is the subject line "ACET K-1"?
20       A.  Yes, it is.
21       Q.  And does your email to Tomer Damti state that,
22   "The business operations are closed (no activity);
23   however, the entity is still open for liability
24   protection"?
25       A.  Was that a question?

## Page 127

1        Q.  It is.
2        A.  What was the question?
3        Q.  Does your email to Tomer Damti -- did you
4    state, "The business operations are closed, (no
5    activity); however, the entity is still open for
6    liability protection"?
7        A.  Yes.
8        Q.  Okay.  What did you mean by that?
9        A.  I think it means exactly what it says.
10       Q.  And what does that mean?
11       A.  The business operations are closed, no
12   activity; however, the entity is still open for
13   liability protection.
14       Q.  And what did you mean by that?
15       A.  Exactly what it says.
16       Q.  Okay.  Can you elaborate?
17       A.  There's nothing to elaborate to that.
18       Q.  What does "open" mean?  Can you define it?
19       A.  Not closed.
20       Q.  That definition makes sense, doesn't it?
21           MR. PERRIN:  Is that a question, counsel?
22           MR. FREEMAN:  It is.
23       A.  It's the opposite of open, so I suppose.
24       Q.  (BY MR. FREEMAN)  Okay.  Is this, in fact, a
25   true and correct copy of the email that you sent to

## Page 128

1    Mr. Damti?
2        A.  I assume it is.
3        Q.  Okay.  Can you walk me through Super G
4    Capital's foreclosure of ACET Global's assets?
5        A.  I can't.
6        Q.  Why is that?
7        A.  I don't know all the specifics to it.
8        Q.  Okay.  Tell me what you do know.  What
9    happened?
10       A.  Super G foreclosed on ACET Global's assets.
11       Q.  Okay.  And why?
12       A.  ACET Global -- well, you'd have to ask Super
13   G.  I'm not sure why.  I can't speak for them.
14       Q.  What's your understanding of why?
15       A.  The company was in default, and that was one
16   of Super G's remedies, was to foreclose on the business.
17       Q.  Okay.  Why did you believe the foreclosure was
18   important?
19           MR. PERRIN:  Objection; form.
20       A.  When did I indicate that?
21       Q.  (BY MR. FREEMAN)  Well, did you believe it was
22   important?
23       A.  I'm not sure I have an answer to that.
24       Q.  Why do you not have an answer to that?
25       A.  It was important for closure on the business.

## Page 129

1            MR. LUDLOW:  Matthew, shut the fuck up.
2            MR. PERRIN:  Excuse me?
3            MR. FREEMAN:  Oh, my God.
4            MS. HARD-WILSON:  Who was that?
5            MR. FREEMAN:  I'm going to --
6            MR. PERRIN:  Who was that?
7            MR. FREEMAN:  Who was that?  I'm going to
8    get chambers involved here.  I need to know who that
9    was.
10           MR. PERRIN:  Karen, did you see anybody's
11   square light up?
12           THE REPORTER:  The -- I didn't see
13   anybody's square light up, but I saw that Mr. Ludlow's
14   box was unmuted and then became muted again, is what I
15   saw.
16           MR. LUDLOW:  Yeah, it's unmuted now.
17           MR. FREEMAN:  Okay.  That sounds like the
18   same voice.
19       Q.  (BY MR. FREEMAN)  Mr. Denegre, have you
20   discussed your deposition with anyone?
21       A.  Our attorneys.
22       Q.  Did you discuss your deposition with Anthony
23   Ludlow?
24       A.  Yes.
25       Q.  What did you discuss with Mr. Ludlow?

33 (Pages 126 to 129)

Page 130

1      A.  Mr. Ludlow suggested to tell the truth, to
2  pause after every question, make sure --
3      Q.  Did he ever ask you to shut the fuck up?
4      A.  Not that I'm aware of.
5      Q.  Did he ever -- was there ever a topic where he
6  told you you should shut the fuck up?
7          MR. PERRIN:  Objection; form.
8      A.  Not that I'm aware of.
9      Q.  (BY MR. FREEMAN)  Do you have any idea why he
10  would want you to shut the fuck up about any particular
11  topic?
12         MR. PERRIN:  Objection; form.
13     A.  I'm not certain he was talking to me.
14     Q.  (BY MR. FREEMAN)  Who would he have been
15  talking to?
16     A.  I don't know.
17     Q.  Okay.  He represented earlier on this
18  deposition that there was no one else in the room with
19  him.  Do you recall that?
20     A.  I don't recall that.
21     Q.  (BY MR. FREEMAN)  Do you know who was talking
22  when he stated that?
23         MR. PERRIN:  Objection; form.
24     A.  It was either you or me.
25     Q.  (BY MR. FREEMAN)  Okay.  Do you -- what did

Page 131

1  you discuss specifically with Mr. Ludlow?
2      A.  As I just mentioned, to the tell truth, take a
3  pause after every question, make sure I understand the
4  question, respond.
5      Q.  Did he ask you to take a really extended
6  pause?
7      A.  Not that I'm aware of.
8      Q.  Did he ask you to tell the truth about every
9  single topic?
10     A.  He said to tell the truth.
11     Q.  Was there any specific topic that you talked
12  about?
13     A.  No.
14     Q.  You didn't discuss any particular areas that
15  may come up in your deposition?
16     A.  No.
17     Q.  Nothing?  That's your sworn testimony under
18  penalty of perjury, sir?
19     A.  Yes.
20     Q.  Okay.  When did you discuss your deposition
21  with Anthony Ludlow?
22     A.  Probably two weeks ago.
23     Q.  And that's the only time you discussed it?
24     A.  Yes.
25     Q.  Okay.  And where were you?

Page 132

1      A.  In my office.
2      Q.  Okay.  And where was he?
3      A.  In my office.
4      Q.  Okay.  And what day was that?
5      A.  I don't remember.
6      Q.  Was there anyone else there?
7      A.  No.
8      Q.  How long was that conversation?
9      A.  It was less than five minutes.
10     Q.  Okay.  Less than five minutes; that's all
11  you've had for discussions with Mr. Ludlow?
12     A.  Regarding the deposition?
13     Q.  Correct?
14     A.  Correct.
15     Q.  Okay.
16         MR. FREEMAN:  I'm going to take a
17  five-minute break off the record.
18         (Break taken from 2:10 p.m. to 2:20 p.m.)
19     Q.  (BY MR. FREEMAN)  Mr. Denegre, just before we
20  continue, do you want to take a moment to correct any of
21  your prior testimony?
22     A.  No.
23     Q.  Okay.  So as we sit here at this moment, you
24  believe -- you maintain that all of your testimony to
25  this point in this deposition has been true and your

Page 133

1  best testimony?
2      A.  I do.
3      Q.  Okay.  And I have noticed you've looked off to
4  the side several times during this deposition --
5      A.  This is for my ear.  I have hard hearing, so I
6  have to turn it to the speaker to hear you.
7      Q.  Okay.
8          MR. PERRIN:  Jason --
9      A.  This is a window.  I'm just looking right out
10  the window.
11         MR. PERRIN:  That is the window, and I'm
12  on this side.
13     Q.  (BY MR. FREEMAN)  Okay.  And do you have any
14  ear devices in?
15     A.  I'm sorry?
16     Q.  Do you have --
17     A.  Have a hearing aid?
18     Q.  -- any devices in your ear?
19     A.  No.
20     Q.  Okay.  Mr. Denegre, can you walk me through
21  Super G's foreclosure of ACET Global's assets?
22     A.  I can't.
23     Q.  And why is that?
24     A.  Because I don't know about the foreclosure.
25     Q.  Okay.  Why do you not know about the

Page 134

```
 1    foreclosure?
 2         A.  Because I didn't do the foreclosure.
 3         Q.  Okay.  Do you know who did?
 4         A.  I assume we're referring to Super G
 5    foreclosing on ACET.
 6         Q.  Yes, sir.
 7         A.  Then I would assume Super G did the
 8    foreclosure.
 9         Q.  Okay.  Is there another foreclosure that is
10    relevant to this topic?
11         A.  I want to be specific with everything I tell
12    you, and that's why I'm asking.
13         Q.  Okay.  What do you know about what happened in
14    that foreclosure?
15         A.  Super G foreclosed on ACET.
16         Q.  Okay.  And why?
17         A.  You would have to ask Super G that.
18         Q.  Okay.  You don't know?  No reason to know?
19         A.  I didn't do the foreclosure.
20         Q.  Okay.  Why do you believe the foreclosure
21    occurred?
22         A.  I assume Super G felt it was in their best
23    interest to do a foreclosure.  But, again, you'd have to
24    ask Super G.
25         Q.  Okay.  Do you believe the foreclosure was
```

Page 135

```
 1    important?
 2              MR. PERRIN:  Objection; form.
 3         A.  It was important to Super G to have the
 4    foreclosure done.
 5         Q.  (BY MR. FREEMAN)  Okay.  And why?
 6         A.  Well, I'm assuming they wouldn't have done it
 7    if it wasn't important.
 8         Q.  Was it important to Baymark Partners?
 9         A.  No.
10         Q.  Why not?
11         A.  I wasn't aware that it would be important.  So
12    I can't comment on it.
13         Q.  Were creditors coming after ACET?
14         A.  Yes, there were -- at some point, there were
15    creditors, mainly shipping companies, that hadn't been
16    paid.
17         Q.  Did you ever want there to be a foreclosure so
18    you could solve that problem?
19         A.  Not that I'm aware of.
20         Q.  Okay.  Did we discuss this topic earlier?
21         A.  If you could remind me.
22         Q.  Okay.  Was there -- there was no reason,
23    though, that you or Baymark Partners felt the
24    foreclosure would be helpful?
25              MR. PERRIN:  Objection; form.
```

Page 136

```
 1         A.  Speaking personally, it was taking up -- ACET
 2    Global was taking up a lot of my time, but I don't have
 3    an opinion on the foreclosure.
 4         Q.  (BY MR. FREEMAN)  Okay.  Was Baymark Partners
 5    or were you involved in the foreclosure?
 6              MR. PERRIN:  Objection; form.
 7         A.  Who was -- my understanding of the foreclosure
 8    was between Super G and ACET Global.  I'm not -- so I
 9    don't know why Baymark would be involved in that.
10         Q.  (BY MR. FREEMAN)  I don't either.  But I'm
11    wondering, was Baymark involved in any way?
12              MR. PERRIN:  Objection; form.
13         A.  No.
14         Q.  (BY MR. FREEMAN)  Was Baymark Partners or were
15    you involved in the preparation of any documents related
16    to that foreclosure?
17         A.  Super G had requested a list of assets when
18    ACET Global was in default.  I sent those lists to ACET
19    Global -- or to Super G.
20         Q.  Okay.  Did you have any conversations with
21    Super G about the foreclosure?
22         A.  There may have been, but I don't remember
23    specifics.
24         Q.  What leads you to believe there may have been?
25         A.  Well, I had phone calls with Super G to
```

Page 137

```
 1    discuss ACET Global and the position that ACET Global
 2    was in, and so the foreclosure by Super G may have been
 3    brought up in those conversations.  I really can't
 4    recall.
 5         Q.  Okay.  When were those conversations?
 6         A.  This would have been late 2018.
 7         Q.  Okay.  Like, December, January -- I mean,
 8    November?
 9         A.  That's most likely.
10         Q.  And what specifically did you discuss about
11    foreclosure?
12         A.  I don't recall.
13         Q.  Who would those discussions have been with?
14         A.  Super G had Steve Bellah as their contact
15    person.  So it would have been likely between Steve
16    Bellah.
17         Q.  Okay.  Did you ever tell Mr. Bellah you wanted
18    to discuss how to move forward with foreclosure?
19         A.  I don't recall.
20         Q.  Okay.  Mr. Denegre, I'm putting on your screen
21    what's marked as Exhibit 7.  Do you see that, sir?
22         A.  Okay.
23              (Exhibit 7 marked.)
24         Q.  (BY MR. FREEMAN)  Do you recognize this
25    document, sir?
```

35 (Pages 134 to 137)

## Page 138

1    A. No.
2    Q. You don't recognize this?
3        MR. PERRIN: Let me look over your
4    shoulder. Okay.
5    Q. (BY MR. FREEMAN) Mr. Denegre, is this an
6    email from you to Steven Bellah of Super G Capital on
7    October 23rd, 2018?
8    A. It appears that way.
9    Q. All right. And is it, in fact, exactly what I
10   stated?
11   A. What did you state?
12   Q. Stated that this is an email from you, Matt
13   Denegre, to Steven Bellah, to Super G Capital on
14   October 23rd, 2018; is that correct?
15   A. I'm not certain that Steve Bellah is in Super
16   G's capacity. I don't know. I don't see his email
17   behind it.
18   Q. Okay. What leads you to believe he's not in
19   his Super G capacity?
20   A. Because I can't see his email.
21   Q. Okay. Was he in another capacity?
22   A. I don't know.
23   Q. Did he work for Baymark Partners?
24   A. No.
25   Q. Did he work with any company that was

## Page 139

1    associated with Baymark Partners?
2    A. No.
3    Q. Was he an agent of Baymark Partners?
4    A. No.
5    Q. Well, what other capacity was he working in?
6    A. I don't know. I'd have to see the email
7    address behind it.
8    Q. Okay. Did you have any business with him
9    through any other entity?
10   A. No.
11   Q. Did you correspond with him through some other
12   entity?
13   A. No.
14   Q. Okay. Did you know him to be an employee of
15   Super G Capital?
16   A. I did.
17   Q. Throughout the time that you had dealt with
18   him with respect to ACET Global, had he been an employee
19   of Super G Capital?
20   A. I can assume he was. I don't know that for
21   certain.
22   Q. Okay. Is the subject matter line of this
23   email address "ACET"?
24   A. Yes.
25   Q. Okay. And did you say, "Steve, I'd like to

## Page 140

1    discuss next steps for ACET Global and get your thoughts
2    on how to move forward with foreclosure"? Did I read
3    that correctly?
4    A. Yes.
5    Q. What does that mean?
6    A. It means exactly that.
7    Q. And what is that?
8    A. I'd like to discuss next steps for ACET Global
9    and get your thoughts on how to move forward with
10   foreclosure.
11   Q. Okay. Why did you want to get his thoughts on
12   how to move forward with foreclosure?
13   A. I can't recall.
14   Q. Was he hesitant to do a foreclosure?
15   A. I can't recall.
16   Q. Did Super G not want to do a foreclosure?
17   A. I can't recall.
18   Q. Did you keep after them to do a foreclosure?
19   A. Can't recall.
20   Q. You can't recall? You don't recall this email
21   at all?
22   A. No.
23   Q. And you don't recall any discussions about
24   ACET Global's foreclosure?
25   A. I don't recall specifics.

## Page 141

1    Q. And weren't there, in fact, a bunch more
2    emails about ACET Global's foreclosure?
3    A. I don't recall that.
4    Q. You don't recall any emails related to ACET
5    Global's foreclosure?
6    A. I don't.
7    Q. Or any discussions with Steve Bellah about
8    ACET Global's foreclosure?
9    A. I don't recall those.
10   Q. Perhaps at 4:00 o'clock on October 23rd, 2018?
11   A. No, I don't recall that.
12   Q. Okay. And you don't know what you would have
13   discussed with Steven Bellah?
14   A. On that specific time, on that date, no.
15   Q. Okay. Did Steven Bellah work for any other
16   company that was in a position to foreclose on ACET
17   Global?
18   A. I can't speak for Steven Bellah's position.
19   Q. Okay. Were you aware of him being in any
20   other -- with any other company that was in a position
21   to foreclose on ACET Global?
22   A. No.
23   Q. Do you know if he worked for D&T Partners?
24   A. I'm sorry, who?
25   Q. D&T Partners.

Page 142

1    A.  I don't know if he worked for D&T Partners.  I
2  assume he did not.
3    Q.  Okay.  You wouldn't have any reason to believe
4  that, right?
5    A.  I wouldn't.
6    Q.  But you wouldn't know of any other creditor
7  besides Super G or D&T Partners that was in a position
8  to foreclose on ACET Global's assets?
9    A.  I don't know.
10    Q.  Okay.
11    (Exhibit 8 marked.)
12    Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting up
13  on the screen Exhibit 8.  Do you recognize this
14  document?
15    MR. PERRIN:  Jason?
16    MR. FREEMAN:  Yes, sir.
17    MR. PERRIN:  Can I have short break for
18  about two minutes?
19    MR. FREEMAN:  Sure.
20    (Break taken from 2:34 p.m. to 2:38 p.m.)
21    Q.  (BY MR. FREEMAN)  Mr. Denegre, we were --
22  let's see -- I'm putting on the screen what's marked as
23  Exhibit 8.  Do you see that, sir?
24    A.  Yes.
25    Q.  Okay.  And is this an email -- at the top, is

Page 143

1  this an email from Bill Szeto at Windspeed to you?
2    A.  Yes.
3    Q.  Okay.  Was this from December 19th, 2018?
4    A.  Yes.
5    Q.  And does the subject line state, "ACET fixed
6  assets, inventory list"?
7    A.  It does.
8    Q.  Okay.  And what was this email about?
9    A.  I'm not sure.  I'd have to read the entire
10  email.
11    Q.  Okay.  Scan through it.  You have it there.
12  In fact, we can -- we can go down towards the bottom.
13    A.  Okay.
14    Q.  The first email in which you've -- you make a
15  statement is December 18th, 2018, at 5:00 o'clock p.m.
16  Is that to William Szeto?
17    A.  I'm sorry.  Which one are you highlighting?
18    Q.  It's -- it is Exhibit 8, the second page at
19  the bottom.
20    A.  Okay.
21    Q.  And it's dated December 18th, 2018.
22    A.  I see that.
23    Q.  Okay.  And did you state, "Bill, can you
24  update the sellable inventory list for ACET inventory;
25  we are updating the foreclosure documents"?  Is that

Page 144

1  correct?
2    A.  Yes.
3    Q.  Why was Bill Szeto preparing the inventory
4  list?
5    A.  Bill would be the only contact that I would
6  have that would have that information.
7    Q.  Okay.  You wouldn't have that information?
8    A.  No.
9    Q.  Did you ask for that inventory list?
10    A.  Super G -- I asked for it in this email, yes.
11    Q.  Had you asked for it before?
12    A.  For ACET's inventory list?
13    Q.  Yes, sir.
14    A.  I'm sure I have.
15    Q.  If you look below that, there's an email from
16  November 2nd, 2018, in which Mr. Szeto had sent --
17  there's an email exchange between you, Mr. Steve Bellah
18  and Bill Szeto.  And for sake of clarity, Steve Bellah's
19  email address is spelled out as steve@supergcapital.com.
20  Do you see that?
21    A.  I see that.
22    Q.  And is the subject line of that email, "ACET
23  fixed assets, inventory list"?
24    A.  Yes.
25    Q.  Okay.  And was that an email from you?

Page 145

1    A.  Yes, it was.
2    Q.  Okay.  Do you know why you were emailing about
3  that?
4    A.  I don't recall.  And it would be speculating
5  if I made a call on it.
6    Q.  Okay.  But you don't remember -- you don't
7  remember having any email correspondence regarding the
8  ACET foreclosure?
9    A.  Well, Super G had requested some documents
10  around ACET's assets, and so --
11    Q.  Did they do that --
12    A.  I'm sorry?
13    Q.  Go ahead.
14    A.  And so there would be an email correspondence
15  between me and Super G sending these lists.
16    Q.  Did they ask for this by phone?
17    A.  I don't remember.
18    Q.  Do you remember having any phone conversations
19  with Steve Bellah or anyone else at Super G in December
20  of 2018?
21    A.  There may have been.  I don't recall the
22  specifics and what those calls were, if there were any.
23    Q.  Okay.  What else would have prompted you to
24  ask William Szeto at Windspeed Trading for an updated
25  list of ACET's inventory?

Matt Denegre   *   April 8, 2021

## Page 146

1    A.  I don't think there would have been anything
2  else to ask for other than it was requested by Super G.
3    Q.  Okay.  And what did you mean by "We are
4  updating the foreclosure documents"?
5    A.  I'm not sure.  I'm not sure what documents
6  those are.
7    Q.  When did you first start preparing foreclosure
8  documents?
9    A.  I don't know.
10    Q.  Do you know what documents you were updating?
11    A.  I don't.
12    Q.  You don't know what you're referring to?
13    A.  I do not.
14    Q.  Okay.  Mr. Denegre, I'll show you what's
15  listed as Exhibit 9.
16        (Exhibit 9 marked.)
17    Q.  (BY MR. FREEMAN)  Do you see that, sir?  Do
18  you recognize this document?
19    A.  I don't recognize this specific email.
20    Q.  Okay.  Does that appear to be an email from
21  William Szeto at Windspeed Trading to you?
22    A.  Yes.
23    Q.  And does that appear to be an email from him
24  to you on January 2nd, 2019?
25    A.  Yes, it does.

## Page 147

1    Q.  Okay.  And does he say, "Matt, we can talk
2  now?"
3    A.  Yes.
4    Q.  And what was the subject of -- did you, in
5  fact, have a conversation with him following this email?
6    A.  Well, I need to read the entire email to
7  understand what this is about.
8    Q.  Let's look below it.  There's an email from
9  you, mdenegre@baymarkpartners.com, to William Szeto,
10  bill@windspeedtrading.com, on January 2nd, 2019.  Do you
11  see that?
12    A.  Yes.
13    Q.  And does the subject line state, "Weekly
14  report"?
15    A.  Yes, it does.
16    Q.  Do you know what that weekly report was?
17    A.  I don't.
18    Q.  And did you, in fact, ever receive weekly
19  reports?
20    A.  From who?
21    Q.  From Windspeed.
22    A.  I can't say for certain.
23    Q.  Was ACET Global even operating at this point
24  in time?
25    A.  I can't say for certain.

## Page 148

1    Q.  What business activities do you recall ACET
2  Global being engaged in from October 2018 on?
3    A.  Oh, I would assume the business was involved
4  in some activity, whether it was selling -- trying to
5  sell product.
6    Q.  Something that would necessitate a weekly
7  report?
8    A.  I don't think I was receiving weekly reports
9  from ACET at this point.
10    Q.  Okay.  Well, if not from ACET, who might
11  this -- what company might this weekly report that's
12  being sent to you from Windspeed Trading be about?
13    A.  Is there a report I could look at?  I really
14  don't recall what this report is.
15    Q.  Okay.  Well, let's look at what you said in
16  the email here.  It says, "Bill, let's catch up today."
17    A.  Okay.
18    Q.  It says, "Super G sent terms for the
19  assumption of the ACET note below."
20        What does that mean?
21    A.  It means what it says.
22    Q.  But I don't understand what that means.  Can
23  you explain it to me?
24    A.  Super G sent terms for the assumption of the
25  ACET note below.

## Page 149

1    Q.  Who was going to assume the ACET note?
2    A.  I don't know.
3    Q.  Why were you involved in that discussion?
4    A.  I had a relationship with Bill through ACET
5  Global, and also speaking through Super G.  So I presume
6  I was involved in these discussions.
7    Q.  But you don't remember being involved in those
8  discussions?
9        MR. PERRIN:  Objection; form.
10    A.  I don't remember the specifics.
11  Unfortunately, I don't.
12    Q.  (BY MR. FREEMAN)  Did you go on to say, "Once
13  we get this finalized, they will send out foreclosure
14  notices"?
15    A.  Yes.
16    Q.  Okay.  Who was going to send out foreclosure
17  notices?
18    A.  I would -- I would assume it was Super G that
19  would send the foreclosure notice.
20    Q.  And who would they send a foreclosure notice
21  to?
22    A.  It would be to ACET Global.
23    Q.  Okay.  To inform ACET Global that they were
24  foreclosing on its assets?
25    A.  Yes.

Usher Reporting Services
(214) 755-1612

Page 150

1     Q.  Okay.  Did you see that foreclosure notice
2  before it went out?
3     A.  I think I saw a draft of it.
4     Q.  Did you, in fact, give input to that draft?
5     A.  I don't recall.
6     Q.  Do you know if Baymark Partners gave input to
7  that draft?
8     A.  I don't recall.
9     Q.  But the date of this email to Mr. Szeto from
10  you is January 2nd, 2019; is that correct?
11     A.  Yes.
12     Q.  Is this indicating that the terms of the loan
13  were determined prior to a foreclosure notice even being
14  sent out?
15     A.  I don't know what this loan is referring to.
16     Q.  Okay.  Let's go down a little further in this
17  Exhibit 9.  On your screen is an email from William
18  Szeto to you a few days earlier, December 31st, 2018.
19  Is that -- do you see that?
20     A.  At 2:00 o'clock?  2:07?
21     Q.  Yes, sir.
22     A.  Yes.
23     Q.  Okay.  And does he state to you, "FYI, the low
24  cash in bank is due mainly to the payment on payroll tax
25  and payment to Super G for ACET Global"?

Page 151

1     A.  Yes, he does.
2     Q.  Do you know who was paying for ACET Global?
3     A.  I don't.  I'd have to look at the bank
4  statements.
5     Q.  Do you have any idea why William Szeto at
6  Windspeed Trading would be giving you this information
7  about ACET Global?
8     A.  I don't.
9     Q.  Okay.  But you don't remember any of this ever
10  occurring?
11     A.  Specifically, I do not.
12     Q.  Do you have any reason to believe that these
13  emails are not what they purport to be?
14     A.  I believe these emails are actual emails that
15  were sent.
16     Q.  And do you believe these are true and correct
17  copies of the emails that are reflected on here?
18     A.  I do.
19          (Exhibit 10 marked.)
20     Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm showing you
21  what's marked as Exhibit 10 on your screen.  Do you see
22  this, sir?
23     A.  Okay.
24     Q.  And does this appear to be an email from you,
25  Matt Denegre, to Alex Godinez on January 29th, 2019?

Page 152

1     A.  It does.
2     Q.  Who is Alex Godinez, sir?
3     A.  He worked -- he works or worked at Super G
4  Capital.
5     Q.  Okay.  And did you correspond with him
6  regularly?
7     A.  No.  He was -- I didn't, no.
8     Q.  No?  How frequently?
9     A.  Around this time, a bit more often.  I don't
10  know if he may have replaced someone at Super G, but...
11     Q.  Okay.  Around this late January time frame?
12     A.  I would say late 2018, first half of 2019.
13     Q.  Why were you corresponding with him a lot more
14  at this time?
15     A.  Well, we had -- he knew myself and Baymark and
16  Bill Szeto, so he was -- we were all kept in the loop on
17  stuff, and I was trying to help out.
18     Q.  Okay.  Was something pretty important going on
19  during that time?
20          MR. PERRIN:  Objection; form.
21     A.  I don't recall.
22     Q.  (BY MR. FREEMAN)  You don't recall if anything
23  important was going on in, let's call it, January
24  of 2019?
25     A.  I'm sure something important was going on.  I

Page 153

1  don't know what it is, though.
2     Q.  Something that might have had significant
3  impact to ACET Global?
4     A.  Well, we were in default at that time.
5     Q.  Okay.  You or ACET Global, y'all were in
6  default?
7     A.  ACET Global was in default.
8     Q.  Okay.  And had it been in default for a while?
9     A.  I am not sure of the specific date that we
10  were in default, but --
11     Q.  Was --
12     A.  Go ahead.
13     Q.  Was it first in default back in April of 2018?
14     A.  I don't know.  I can't --
15     Q.  Was it possibly in default every month
16  thereafter?
17     A.  It's certainly possible.
18     Q.  So what was so important that was going on in
19  January of 2019?
20     A.  Well, the company, Super G, had foreclosed,
21  and I believe they were going to foreclose on -- the
22  company were in default, and then there was a
23  foreclosure.
24     Q.  Okay.  Had they actually foreclosed at the
25  time of this email?

Usher Reporting Services
(214) 755-1612

Page 154

```
 1        A.  I'm not for certain when the foreclosure
 2   actually occurred.
 3        Q.  And if they had foreclosed at this time --
 4        A.  Uh-huh.
 5        Q.  -- since you didn't have anything to do with
 6   Windspeed, what business would you have had
 7   corresponding with them?
 8        A.  Well, Super G didn't have much of a
 9   relationship with Bill Szeto, and we had known Bill
10   prior to whatever date this is, so Super G wanted us to
11   stay involved.
12        Q.  Did you work for Super G?
13        A.  I've never worked for Super G.
14        Q.  Did you work for SG Capital Partners?
15        A.  No.
16        Q.  Okay.  What's the -- what is the -- well, let
17   me read it to you and ask -- tell me if this is correct.
18   The subject line here on your email to Alex Godinez on
19   January 29th, 2019, says, "Windspeed/ACET"; is that
20   correct?
21        A.  Yes.
22        Q.  What's the relationship between Windspeed and
23   ACET?
24        A.  There's two independent companies.  I believe
25   Super G was the lender on both companies.
```

Page 155

```
 1        Q.  So that's really the only relationship between
 2   them?
 3        A.  Think so.
 4        Q.  Okay.  Let's go down here to the bottom, sir.
 5   There's an email here from Alex Godinez on January 29th,
 6   2019, at 5:29 -- 5:23 p.m. to Matt Denegre at
 7   baymarkpartners.com.  Is that you, sir?
 8        A.  Yes, it is.
 9        Q.  Okay.  And this email from Alex Godinez at
10   Super G Capital to you with the subject line
11   "Windspeed/ACET" says, "Hi Matt, just wanted to
12   follow-up on status for the final version of the
13   foreclosure agreement.  Are we good to finalize?"
14            Did I read that correct, sir?
15        A.  You did.
16        Q.  Okay.  What is that referring to?
17        A.  It's referring to a foreclosure agreement, and
18   I'm not even quite sure what that foreclosure is.  I'm
19   assuming it's related to Super G's foreclosure on ACET.
20        Q.  Okay.  Did you have anything to do with that
21   foreclosure agreement?
22        A.  I don't think so, other than I provided
23   information to Super G when they requested information
24   about the assets.
25        Q.  Okay.  But you didn't have anything to do with
```

Page 156

```
 1   the actual foreclosure agreement?
 2        A.  I don't think so.
 3        Q.  Okay.  And nothing to do with the foreclosure
 4   notices?
 5        A.  I'm fairly certain foreclosure notices were
 6   sent out by Super G.
 7        Q.  Okay.  And you didn't need -- you didn't need
 8   anything to finalize the foreclosure agreement, did you?
 9        A.  I'm not aware of that, no.
10        Q.  Was Baymark Partners working on the
11   foreclosure agreement?
12        A.  I don't know.
13        Q.  Was Windspeed Trading working on the
14   foreclosure agreement?
15        A.  I don't -- I don't know for certain, but I
16   don't think they would be.
17        Q.  Okay.  Let's go to the -- your response, which
18   is highlighted on your screen.  It's from Matt Denegre.
19   It's mdenegre@baymarkpartners.com, January 29th, 2019,
20   at 3:26 p.m. to Alex Godinez of Super G Capital.  Still
21   the same subject line, "Windspeed/ACET."
22            Did I get all that correct?
23        A.  Yes, you did.
24        Q.  And does it state, "Alex, we still need the
25   dates on when the foreclosure notice got sent out or
```

Page 157

```
 1   when you plan to send them out, then we can finalize."
 2            Did I read that correct?
 3        A.  Yes, you did.
 4        Q.  Okay.  What did you mean by that?
 5        A.  I'm not sure other than what's being said
 6   here.
 7        Q.  Okay.  You don't even -- you don't really know
 8   what this means?
 9        A.  I'm not sure what this is specifically related
10   to other than what it says.
11        Q.  What do you mean by, "We can finalize"?
12        A.  I don't know.
13        Q.  Okay.  And what foreclosure notice are we
14   talking about there?  Which one were you talking about?
15        A.  I don't know what notice this is referring to.
16        Q.  Okay.  Were you aware of -- do you remember
17   any other foreclosure process that you've been
18   associated with?
19        A.  No -- yeah.  So this would be related to Super
20   G's foreclosure -- I have to assume that -- on ACET
21   Global.  But I'm not sure of a specific notice, what
22   that is.
23        Q.  Okay.  And does the subject line
24   "Windspeed/ACET," does that help you remember at all?
25        A.  Remember what specifically?
```

Usher Reporting Services
(214) 755-1612

Page 158

1    Q.  You know, what foreclosure we're talking about
2  here.
3    A.  This is Super G's foreclosure of ACET Global.
4    Q.  Of ACET Global?
5    A.  Yeah.
6    Q.  Okay.  And above that, did Mr. Godinez respond
7  back to you and say, "Okay, I don't believe that was
8  communicated with me; let me follow up with Steve"?
9    A.  Yes, I see that.
10    Q.  Okay.  Is he referring to Steve Bellah?
11    A.  I would assume that.
12    Q.  And does that mean that as of January 29th,
13  2019, Steve Bellah was still working with Super G
14  Capital?
15    A.  I don't know if he was or not at that time.
16    Q.  Okay.  And do you know why he would have been
17  informing Alex Godinez of the foreclosure process?
18    A.  I'm sorry.  Say that again.
19    Q.  Do you know why you would have been involving
20  Alex Godinez about the foreclosure process?
21    A.  Well, again, Super G had asked for ACET Global
22  items on -- for the foreclosure, so I would imagine I
23  was involved in some of that.  And those emails show
24  that.
25    Q.  Okay.  Did Super G Capital ever take

Page 159

1  possession of ACET Global's inventory?
2    A.  I'm not sure.  I don't -- are you referring to
3  the legal possession?  Physical possession?
4    Q.  Well, you can -- you can clarify what you mean
5  in how you answer it.  And you're free to use any -- any
6  definition you want of possession.  Just tell me what
7  you mean by it.
8      MR. PERRIN:  Objection; form.
9    A.  I don't believe Super G ever took physical
10  ownership of those assets.  They may have had legal
11  ownership of those.
12    Q.  (BY MR. FREEMAN)  And as far as the legal side
13  of it goes, is it fair to say that's something you
14  wouldn't be in a position to say one way or the other
15  about?
16    A.  Well, I know we were in default -- ACET Global
17  was in default.
18    Q.  Okay.
19    A.  And I believe that was the remedy of Super G.
20    Q.  Okay.  So you think they had legal possession
21  of ACET Global's inventory?
22    A.  I don't know for certain.  But if I had to
23  assume, yes, I believe they would probably have that
24  right.
25    Q.  Okay.  But you don't believe they ever had

Page 160

1  physical possession of the inventory?
2    A.  Not that I'm aware of.
3    Q.  Did they ever have physical possession of any
4  assets of ACET Global?
5    A.  No, I don't know when.
6    Q.  Okay.  With respect to the amended and
7  restated loan of Windspeed Trading, how was the amount
8  of that loan determined?
9    A.  I don't know.
10    Q.  Were you involved in that process?
11    A.  I may have been.
12    Q.  Does a figure around 514,000, does that sound
13  about right?
14    A.  That sounds about -- approximately right.  I
15  am not sure of the specifics, but sounds about right.
16    Q.  Let's call it -- for sake of our sanity,
17  let's call it 514,000.  How was that number arrived at?
18    A.  It would be speculating if I were to make a
19  statement on that.  I don't know.
20    Q.  Were you involved at all in the process of
21  arriving at that number?
22    A.  I may have been.  I don't -- I'd have to go
23  back and look.  I don't know.
24    Q.  Okay.  Did you believe that to be the value of
25  the assets that Windspeed Trading was purchasing from

Page 161

1  Super G?
2      MR. PERRIN:  Objection; form.
3    A.  Do I believe that that is the assets -- I have
4  no opinion on that.
5    Q.  (BY MR. FREEMAN)  Okay.  Did Windspeed Trading
6  ever acquire physical possession of the inventory from
7  Super G Capital?
8    A.  I don't know.
9    Q.  What do you believe to be the answer to that?
10      MR. PERRIN:  Objection; form.
11    A.  Did Windspeed ever acquire physical possession
12  of the assets from Super G?
13    Q.  (BY MR. FREEMAN)  Yes, sir.  The assets of
14  ACET Global.
15    A.  I believe they, at one point, purchased those
16  assets.  That's a fair assumption.
17    Q.  Okay.  Let's break it down then.  Where did
18  Windspeed obtain its physical possession of ACET
19  Global's assets from?
20    A.  Can you be a bit more clear of what the
21  question is?  I'm not following you.
22    Q.  Yeah.  Let's say did ACET Global's assets end
23  up in the possession of Windspeed at any point in time?
24    A.  Super G sold ACET Global's assets.
25    Q.  And when did that occur?

41 (Pages 158 to 161)

Page 162

```
 1        A.  I don't know the specific date.
 2        Q.  Sometime in, maybe, March of 2019?
 3        A.  Possibly, yep.
 4        Q.  Before that date, did Windspeed acquire the
 5   assets of ACET Global?
 6        A.  I'm not sure they did.  It would -- it would
 7   be up to Super G to make that decision.  I don't know.
 8        Q.  Did Windspeed obtain possession of the assets
 9   of ACET Global?
10        A.  I don't know.
11        Q.  Did they have physical possession of ACET
12   Global's inventory?
13        A.  I can't say for certain.
14        Q.  Were you receiving reports about that
15   inventory from Windspeed?
16        A.  About the ACET -- about the ACET inventory?
17        Q.  Yes, sir.
18        A.  It's possible.
19        Q.  In 2018?
20        A.  Without actually seeing the emails, I don't
21   remember, but it's possible.
22        Q.  What about January of 2019?
23        A.  Again, that's certainly possible.
24        Q.  And I think we've seen several of those emails
25   thus far, correct?
```

Page 163

```
 1        A.  Yeah, that's correct.
 2        Q.  So as of January 2019 and as of 2018, you were
 3   receiving reports from Windspeed about ACET Global's
 4   inventory, correct?
 5        A.  Yes.  If that's the dates on those emails,
 6   that would be -- that would sound correct.
 7        Q.  And that was, in fact, prior to March of 2019,
 8   correct?
 9        A.  That would be correct.
10        Q.  Why is that?
11        A.  Why is what?
12        Q.  Why were you receiving reports about ACET
13   Global's inventory prior to March of 2019?
14        A.  Super G was -- well, we were -- ACET Global
15   was in default with Super G, and Super G was planing to
16   do a foreclosure, and they wanted to see the assets.
17        Q.  Okay.  And that's why you were getting them
18   from Windspeed?
19        A.  Yes.  That's what -- that's correct.
20        Q.  And why did Windspeed have them?
21        A.  I think -- I actually don't know the reason
22   why Windspeed had the assets.  My guess, a conversation
23   between Super G and Windspeed.  I wasn't part of that.
24   I don't know.
25        Q.  But I thought Super G wanted all the
```

Page 164

```
 1   communication to go through you?
 2            MR. PERRIN:  Objection; form.
 3        A.  I thought so too.
 4        Q.  (BY MR. FREEMAN)  Okay.  But you're not aware
 5   of any conversation ever taking place directly between
 6   Windspeed and Super G, correct?
 7            MR. PERRIN:  Objection; form.
 8        A.  I'm not aware of any communication between
 9   Super G and Windspeed.
10        Q.  (BY MR. FREEMAN)  And if William Szeto
11   testified that he didn't have those conversations with
12   Super G, would he be lying?
13            MR. PERRIN:  Objection; form.
14        A.  I can't -- I don't know.  I don't know.
15        Q.  (BY MR. FREEMAN)  When did you first meet Bill
16   Szeto?
17        A.  I met Bill late 2017.
18        Q.  Okay.  And how did you meet him?
19        A.  I think he came to our office for lunch.
20        Q.  Okay.  And who had lunch with him?
21        A.  David Hook and myself.
22        Q.  Okay.  What about Mr. Ludlow?
23        A.  I don't think Mr. Ludlow was part of that.
24        Q.  Just you and Mr. Hook?
25        A.  Right.
```

Page 165

```
 1        Q.  Was Mr. Hook the one who was most involved on
 2   ACET Global?
 3            MR. PERRIN:  Objection; form.
 4        Q.  (BY MR. FREEMAN)  Was he the Baymark managing
 5   director who was most involved on ACET Global?
 6            MR. PERRIN:  Objection; form.
 7        A.  Initially, he was involved, but I'm not sure
 8   who was more involved at the end of it, whether it was
 9   David Hook or Tony Ludlow.
10        Q.  (BY MR. FREEMAN)  Okay.  So they both end up
11   pretty involved?
12            MR. PERRIN:  Objection; form.
13        A.  I'm not sure David Hook was all that involved,
14   and I'm not sure you would say Tony Ludlow was all that
15   involved.
16        Q.  (BY MR. FREEMAN)  Okay.  Would -- would they
17   have ever told you what to say about their involvement?
18        A.  No.
19        Q.  Okay.  Did you hire -- did y'all end up hiring
20   Bill Szeto?
21            MR. PERRIN:  Objection; form.
22        A.  Bill Szeto went in as a -- if I remember
23   correctly, a consultant for ACET Global for a day or
24   two.
25        Q.  (BY MR. FREEMAN)  Okay.  To go in and report
```

Page 166

1    back to you?
2        A.  Yeah, go in, report back to us.  Uh-huh.
3        Q.  So y'all head him to the Baymark Partners
4    office, correct?
5        A.  Yes.
6        Q.  All right.  You and Mr. Hook met with
7    Mr. Szeto at the Baymark Partners office; is that
8    correct?
9        A.  Yes.
10       Q.  And you and Mr. Hook had lunch with Mr. Szeto
11   at your Baymark Partners office?
12       A.  It would have been lunch, close by.
13       Q.  Okay.  To the Baymark Partners office?
14       A.  Correct.
15       Q.  And then you and Mr. Hook paid Mr. Szeto to go
16   and observe ACET Global?
17       A.  ACET was having difficulties.  This was late
18   2017.  Bill had experience with startups, and we asked
19   to get his opinions and thoughts on ways to improve the
20   business.  I'm not sure he actually was paid.  I think
21   he was doing this just to go in and take a look for us.
22       Q.  Okay.  Was he expecting something else besides
23   a paycheck?
24       A.  I don't think so, but you'd have to ask him.
25   I don't know.

Page 167

1        Q.  Did you have discussions with him at that time
2    about taking over as CEO of ACET Global?
3        A.  No.
4        Q.  Did you have discussions with him about Tomer
5    Damti?
6        A.  He would have reported back his thoughts on
7    the entire operation, and I can't recall if Tomer was
8    brought into that discussion or not.
9        Q.  And you don't know if he was paid for any of
10   this?
11       A.  I don't remember.
12       Q.  You don't know if Baymark Partners paid him?
13       A.  I'm not sure if they did or not.
14       Q.  But this was the first time you ever met Bill
15   Szeto?
16       A.  Yes.
17       Q.  And you had never heard of or discussed
18   Windspeed prior to that?
19       A.  In 2017?
20       Q.  Yes, sir.
21       A.  I wasn't aware of Windspeed.
22       Q.  Is there any reason you would have been aware
23   of it in 2017?
24       A.  I don't think it existed, but I'm not certain.
25   I've never -- I had not heard of Windspeed until late

Page 168

1    2018.
2        Q.  Did you have any discussion with Mr. Szeto in
3    2017 about moving the ACET Global assets to a new
4    company?
5        A.  No.
6        Q.  Did you end up having periodic calls with
7    Mr. Szeto?
8        A.  Not at that time.
9        Q.  Did Mr. Szeto ever report to you?
10       A.  No.
11       Q.  Okay.  And when were you first aware of
12   Windspeed?
13       A.  It would have been late 2018.  I'm not sure of
14   the exact date.
15       Q.  Okay.  There wasn't some other Windspeed you
16   were working with before that?
17       A.  Before what?
18       Q.  Before that time in 2018.
19       A.  No.
20       Q.  You're sure of that?
21       A.  Certain of it.
22       Q.  Absolutely certain?
23       A.  Yes.
24       Q.  Okay.  And, sir, I'm putting on the screen
25   what's marked as Exhibit 11.

Page 169

1        (Exhibit 11 marked.)
2        Q.  (BY MR. FREEMAN)  Do you see this, sir?
3        A.  Yes, I see this.
4        Q.  Okay.  Are you familiar with this exhibit?
5        A.  As of an hour ago, I am.
6        Q.  Okay.  What is this?
7        A.  I don't know.
8        Q.  Okay.  Does it appear to be a weekly recurring
9    calendar marker?
10       A.  Yes, it does.
11       Q.  And is the organizer Matt Denegre?
12       A.  Yes.
13       Q.  Okay.  And is the subject "Windspeed weekly
14   call"?
15       A.  Yes, it is.
16       Q.  Okay.  And is the date -- the starting date
17   June 13th of 2017?
18       A.  That's what it says in this email.
19       Q.  Was the ACET transaction closed in the summer
20   of 2017 as well?
21       A.  July 2017.
22       Q.  Okay.  Does this appear to be a true and
23   correct copy of what it reflects?
24       A.  This all looks true and correct, although
25   there was no Windspeed or knowledge of Windspeed during

Matt Denegre   *   April 8, 2021

Page 170

1 this time.
2      Q.  Why does this exist then?
3      A.  Well, there may have been a calendar invite at
4 some point that was updated in the future for Windspeed,
5 that maybe it was backdated.  Or it could have been a
6 date that was entered in wrong.
7      Q.  Did Baymark Partners regularly engage in
8 backdating?
9           MR. PERRIN:  Objection; form.
10     A.  When I refer to backdating, I'm saying it's a
11 mistake.
12     Q.  (BY MR. FREEMAN)  Oh, okay.
13          So if we moved this to June of 2017 -- of
14 2018, had you, at that point, had discussions about
15 Windspeed?
16     A.  In June of 2018?
17     Q.  Yes, sir.
18     A.  No.
19     Q.  So it wouldn't be that date, right?  And it
20 wouldn't make sense to move it back further back in
21 time.  So if we move it up to 2019, why would you be
22 having a weekly call about Windspeed in June of 2019?
23          MR. PERRIN:  Objection; form.
24     A.  I don't know what this is related to.
25     Q.  (BY MR. FREEMAN)  In fact, why would you ever

Page 171

1 be having a weekly call about Windspeed?
2      A.  I don't know.
3      Q.  Because this was a completely unrelated
4 company, right?  That's your testimony?
5      A.  Unrelated to ACET Global, yes.
6      Q.  Okay.  And unrelated to Baymark Partners?
7      A.  I believe so.
8      Q.  And unrelated to you?
9      A.  Unrelated to me.
10     Q.  And unrelated to Mr. Ludlow?
11     A.  I believe so.
12     Q.  And unrelated to Mr. Hook?
13     A.  I believe so.
14     Q.  And unrelated to any other Baymark Partners
15 affiliate?
16     A.  Yes.
17     Q.  Okay.  So, really, as we sit here, there's no
18 explanation for this Exhibit 11?
19     A.  None.  It doesn't make any sense.
20     Q.  But you had seen this prior to us sitting here
21 in this deposition and me asking you about it, correct?
22     A.  I was shown it during a break.
23     Q.  If I could, sir, I'll put on the screen what's
24 marked as Exhibit 12.
25          (Exhibit 12 marked.)

Page 172

1      Q.  (BY MR. FREEMAN)  Do you see is this document?
2      A.  Yes.
3      Q.  Are you familiar with this document, sir?
4      A.  I'm not.
5      Q.  You're not?  You don't remember this document?
6      A.  This email, I'm not, no.
7      Q.  Okay.  Does this appear to be an email from
8 William Szeto to you on September 29th, 2018?
9      A.  Yes, it does.
10     Q.  Okay.  And is the subject line "Windspeed
11 LLC"?
12     A.  Yes, it is.
13     Q.  Okay.  And the stated attachments, the
14 documents EIN Windspeed Trading, LLC, Certificate of
15 Formation, LLC, Operating Agreement - Windspeed Trading,
16 LLC, does that appear to be correct?
17     A.  Yes.
18     Q.  And did you, in fact, receive this email with
19 those attachments attached to it?
20     A.  I'm assuming I did.
21     Q.  Okay.  Who was your law firm?
22     A.  I don't know.
23     Q.  You don't know who you law firm is?
24     A.  For this is Hallett -- for what's going on
25 right now is Hallett & Perrin.

Page 173

1      Q.  Okay.  So when Mr. Szeto says, "Please feel
2 free to send these files to your law firm for tracking,"
3 is he referring to Hallett & Perrin?
4      A.  I would think so.
5      Q.  Okay.  And did you send the attachments to
6 your law firm as requested by Bill Szeto?
7      A.  I'm not sure if I did.
8      Q.  Okay.  And did Mr. Szeto state here, "I need
9 to have those information for the following processes";
10 and in Item Number 4, does he say, "Sending termination
11 letter to current employees"?
12     A.  Yes.
13     Q.  Okay.  Who are the current employees he's
14 referring to?
15          MR. PERRIN:  Objection; form.
16     Q.  (BY MR. FREEMAN)  What did you understand the
17 "current employees" to mean?
18     A.  I would think it's related to ACET Global's
19 employees.
20     Q.  Okay.  And why does he use the word "current"?
21     A.  Because it's his current employees?  I don't
22 know.
23     Q.  Okay.  Were those employees -- was there a
24 plan for them to become employees of another entity?
25     A.  I don't recall.

44 (Pages 170 to 173)

Matt Denegre   *   April 8, 2021

## Page 174

1    Q.  Did you ever have a discussion about those
2  employees of ACET Global becoming employees of another
3  entity?
4    A.  Not that I'm aware of.
5    Q.  Okay.  Number five, does it state, "Informing
6  marketplaces the change of name and banking information
7  for future payments"?  Is that correct?
8    A.  That's correct.
9    Q.  Did ACET Global change its name to Windspeed
10  Trading?
11    A.  I don't think so.
12    Q.  What did you understand Mr. Szeto to be
13  referring to where he said, "Informing marketplaces of
14  the change of name"?
15    A.  I don't know.
16    Q.  Okay.  And what did you understand him to be
17  referring to when he referenced "changing bank
18  information for future payments"?
19    A.  You would have to ask him.
20    Q.  Okay.  You wouldn't know what that means?
21    A.  I don't.
22    Q.  Did you ask for any of these items to be sent
23  to you?
24    A.  Not that I recall.
25    Q.  Did you want any of these items to be sent to

## Page 175

1  you?
2    A.  I don't think so.
3    Q.  Did anyone at Baymark Partners instruct you to
4  get copies of these documents?
5    A.  Not that I'm aware of.
6    Q.  Did Mr. Hook instruct you to get copies of
7  these documents?
8    A.  No.
9    Q.  Did Mr. Ludlow?
10    A.  I don't believe so.
11    (Exhibit 13 marked.)
12    Q.  (BY MR. FREEMAN)  Okay.  Mr. Denegre, I'm
13  putting on the screen what's marked as Exhibit 13.  Do
14  you see this, sir?
15    A.  Yes.
16    Q.  And do you recognize this email exchange?
17    A.  I recognize this first email.
18    Q.  Okay.  And is this an email from you, Matt
19  Denegre, to Tony Ludlow on September 10th, 2018?
20    A.  Yes.
21    Q.  Okay.  And is the subject line "corrected
22  version"?
23    A.  "Forward corrected version," uh-huh.
24    Q.  Uh-huh.  And does it state attachments, "Wind
25  down"?  Is that correct?

## Page 176

1    A.  Yes, it does.
2    Q.  Okay.  And in your email to Mr. Ludlow, do you
3  state, "Wind down plan for Super G for your review"?
4    A.  Yes.
5    Q.  Did Super G hire Baymark Partners?
6    A.  No.
7    Q.  What are you referring to here when you say,
8  "Wind down plan for Super G"?
9    A.  Let me just scan through the email, if I may.
10  Super G had requested a wind down plan for ACET Global.
11    Q.  Okay.  And why was that?
12    A.  The company was in default at this time.
13    Q.  Okay.  And why did there need to be a wind
14  down?
15    A.  That was Super G's request.
16    Q.  And what did you understand "wind down" to
17  mean?
18    A.  Essentially, close down the business.  I would
19  think that's what that meant.
20    Q.  So was this part of an effort to close down
21  ACET Global?
22    A.  Again, Super G was in default.  I think they
23  were weighing their options.  I don't think --
24    Q.  ACET Global --
25    A.  -- ACET Global was involved.

## Page 177

1    Q.  Right.  And so Super G wanted you to
2  coordinate a wind down plan?
3    MR. PERRIN:  Objection; form.
4    A.  Not sure what you mean by "coordinate."
5    Q.  (BY MR. FREEMAN)  Right.
6    A.  It was a request for a wind down plan.
7    Q.  Who requested a wind down plan?
8    A.  Super G.
9    Q.  All right.  And who put together the wind down
10  plan?
11    A.  Bill Szeto created the wind down plan.
12    Q.  And who reviewed it?
13    A.  I took a look at it.
14    Q.  And who else?
15    A.  Well, I can't speak for Tony if he reviewed it
16  or not.
17    Q.  All right.  Did you email it to Tony?
18    A.  Yes.
19    Q.  And did you tell him it was for your review?
20    A.  Yes.
21    Q.  And did you ever discuss it again with him
22  after sending that email?
23    A.  We may have.
24    Q.  What did you discuss with him?
25    A.  I don't remember.

Page 178

```
 1       Q.  You don't remember what you and Tony Ludlow
 2   discussed?  How many times did you and Tony Ludlow have
 3   a discussion about the wind down plan?
 4           MR. PERRIN:  Objection; form.
 5       A.  I don't recall.
 6       Q.  (BY MR. FREEMAN)  But you did have discussions
 7   or you didn't?
 8       A.  I'm not sure we did.
 9       Q.  Had he authorized you to engage in a wind down
10   plan for ACET?
11       A.  This was a request by Super G.
12       Q.  Okay.  And do you do everything Super G asks,
13   or do you have to get authorization from Tony Ludlow or
14   Mr. Hook?
15           MR. PERRIN:  Objection; form.
16       A.  Well, given that we were in default, Super G
17   would have every right to request this.
18       Q.  (BY MR. FREEMAN)  Okay.  Did you -- tell me
19   about your discussions with Super G about this.
20           MR. PERRIN:  Objection; form.
21       A.  I don't remember the discussions.  I know
22   there was a phone call prior to this, but I don't
23   remember what was discussed in those.
24       Q.  (BY MR. FREEMAN)  When was that phone call?
25       A.  I don't remember the specific date.
```

Page 179

```
 1       Q.  Who was it with?
 2       A.  I'd have to see the invitation.
 3       Q.  Was it close in time to this email of
 4   September 10th, 2018?
 5       A.  It would have been within a two-week time
 6   frame.
 7       Q.  Okay.  So within --
 8       A.  I'm going to correct that.  I'm actually not
 9   sure the wind down request came prior to this.  The wind
10   down request from Super G came in September.
11       Q.  So the wind down request from Super G actually
12   came after this?
13           MR. PERRIN:  Objection; form.
14       A.  No.  It came in September.  There was a
15   request from Super G for a wind down plan.
16       Q.  (BY MR. FREEMAN)  And how did they request
17   that?
18       A.  In an email.
19       Q.  And who did they make that request to?
20       A.  It would have been myself, and I'm not sure
21   who else was on the email.
22       Q.  Okay.  Have you produced a copy of that email?
23       A.  I would think so.
24       Q.  Would you be willing to review what's been
25   produced to verify whether you've produced that email?
```

Page 180

```
 1       A.  Of course.
 2       Q.  Appreciate that.
 3           So Mr. Szeto drafted this wind down plan?
 4       A.  He did.  He was at ACET Global and understood
 5   the day-to-day operations more than Baymark would.
 6       Q.  Did -- but this wind down plan didn't have
 7   anything to do with Windspeed, correct?
 8       A.  This is not related to Windspeed.
 9       Q.  No relation at all?
10       A.  No.
11       Q.  Okay.  And any relation to any company that
12   would become Windspeed?
13       A.  I didn't know Windspeed was even in existence
14   at this time.
15       Q.  Was there -- was this related to the concept
16   of forming a new entity and transferring assets to it?
17       A.  I don't think so.
18       Q.  No?  Just going to wind down ACET's business
19   completely?
20       A.  Again, Super G was considering all their
21   options.
22       Q.  Why would Super G want the business to be
23   completely wound down?
24       A.  You'd have to ask them.  I would have no idea.
25       Q.  With all of your experience in this line of
```

Page 181

```
 1   work, can you think of any reason that Super G would
 2   want ACET Global completely wound down?
 3       A.  The company was pretty much worthless at this
 4   time.  There was nothing left.  There's no reason to
 5   keep it alive.  That --
 6       Q.  Was it going to --
 7       A.  -- wasn't even an option.
 8       Q.  Would it be worth more to Super G completely
 9   wound down?
10       A.  You'd have to ask them.
11       Q.  Can you think of any reason that it would have
12   been worth more to Super G completely wound down?
13       A.  I don't have an opinion on it.  You would have
14   to ask --
15       Q.  Okay.  And you don't recall specifically
16   having a single discussion with Tony Ludlow about this
17   wind down plan?
18       A.  I don't recall the specifics.
19       Q.  Okay.  Did you let any third parties know that
20   you'd be winding down ACET Global?
21           MR. PERRIN:  Objection; form.
22       A.  I wasn't winding down ACET Global.  I'm not
23   sure I follow.
24       Q.  (BY MR. FREEMAN)  Did you ever engage in a
25   wind down plan with respect to ACET Global?
```

46 (Pages 178 to 181)

Matt Denegre    *    April 8, 2021

| Page 182 | Page 184 |
|---|---|

**Page 182**

1    A.  No.  Super G was in control at this point.  We
2  weren't.
3    Q.  Okay.  And below is the attachment that was
4  attached to this email that you sent to Mr. Ludlow.
5  Does this document -- second page of the exhibit, does
6  it state "Wind Down Plan" is the title?
7    A.  Yes.
8    Q.  Okay.  And does it state as one of the bullet
9  items, "Inventory Management?
10    A.  It does.
11    Q.  And "Sales Continuation"?
12    A.  Yes.
13    Q.  And below that, does it state a bullet, "Sales
14  and Office Staff"?
15    A.  Yes, it does.
16    Q.  And below that, is there a bullet that says,
17  "Relocating to temporary office space with current
18  office furniture and computers"?
19    A.  Yes, it does.
20    Q.  Okay.  Below -- down below, does it state,
21  "Current business files"?
22    A.  Yes.
23    Q.  Okay.  And on this third page of the exhibit,
24  is the title "Timeline and Cost for Wind Down"?
25    A.  Yes, it is.

**Page 183**

1    Q.  Okay.  Does it -- on the third line, on the
2  left side, does it state, "Salary accrual for Bill"?
3    A.  Yes.
4    Q.  What did you understand that to refer to?
5    A.  I don't believe that Bill was taking a
6  paycheck to keep more cash in the company.
7    Q.  Was Bill expecting something else in return?
8    MR. PERRIN:  Objection; form.
9    A.  I don't know.
10    Q.  (BY MR. FREEMAN)  Had something else been
11  promised?
12    A.  No.
13    Q.  Below that, does it state, "Arrange for last
14  two payroll checks"?
15    A.  Yes, it does.
16    Q.  And below that, does it say, "Pay Bill's
17  credit card"?
18    A.  Yes.
19    Q.  Below, down a couple lines, does it say,
20  "Perform last inventory prior to closing"?
21    A.  Yes, it does.
22    Q.  What did you understand closing to mean?
23    A.  Well, it's a wind down plan.  I imagine
24  there's a closing period at some point.
25    Q.  Okay.  Below that, does it say, "Price

**Page 184**

1  inventory which can be sold or transferred"?
2    A.  Yes, it does.
3    Q.  Okay.  What did you understand that to mean?
4    A.  I imagine this would be a liquidation.
5    Q.  Liquidation of ACET Global?
6    MR. PERRIN:  Objection; form.
7    A.  It's a liquidation of the inventory to sell
8  off what's leftover.
9    Q.  (BY MR. FREEMAN)  Okay.  Of ACET Global or
10  some other company?
11    A.  This is related to ACET Global.
12    Q.  Okay.  And below that, does it state, "Inform
13  all parties on impending closing"?
14    A.  Yes.
15    Q.  Okay.  Over to the right-hand side, one of the
16  lines there, "Inform all marketplaces on closing" --
17    A.  Okay.
18    Q.  -- what did you understand that to mean?
19    A.  I think this was notifying our customers that
20  the business was -- would be wound down.  I imagine
21  that's what it is.
22    Q.  Okay.  But not that it would be transferring
23  the business to Windspeed?
24    A.  No.
25    Q.  Just to let everybody know that ACET Global

**Page 185**

1  was going to wind down?
2    A.  That's what this plan is about.
3    Q.  And close?
4    A.  Correct.
5    Q.  Did you, in fact, inform any marketplaces that
6  ACET Global was closing?
7    A.  I'm not sure Super G went this direction, so
8  you'd have to ask them.
9    Q.  Okay.  But you wouldn't know anything about
10  that?
11    A.  Would not.
12    Q.  Because you were not involved in this?
13    MR. PERRIN:  Objection; form.
14    Q.  (BY MR. FREEMAN)  Is that a no?
15    A.  Involved with what?
16    Q.  You weren't involved in this wind down
17  process?
18    A.  I'm not sure the wind down even happened.  I
19  don't know if Super G took this plan or not.
20    Q.  Okay.  So your understanding is, then, that no
21  one on behalf of ACET Global notified a marketplace that
22  ACET Global was closing and just shutting down?
23    MR. PERRIN:  Objection; form.
24    A.  I'm not aware.
25    MR. FREEMAN:  Okay.  Y'all want to take a

47 (Pages 182 to 185)

## Page 186

1    quick break?
2        THE WITNESS:  Yep.
3        MR. PERRIN:  I think you read the
4    witness's mind.
5        (Break taken from 3:40 p.m. to 3:50 p.m.)
6        (Exhibit 14 marked.)
7    Q.  (BY MR. FREEMAN)  All right.  Is this showing
8    up on your screen, Mr. Denegre?
9        MR. PERRIN:  I'm putting it on the laptop
10   for him to look at close to him.
11       MR. FREEMAN:  Okay.
12   Q.  (BY MR. FREEMAN)  I'm putting up what's marked
13   as Exhibit 14, sir.  Have you ever seen this document?
14   A.  I don't recall.
15   Q.  Okay.  Is this an email from William Szeto at
16   the email address bill@windspeedtrading.com to you?
17   A.  I'm going to scroll down, if that's okay.
18   Q.  Yes, sir.
19   A.  It starts with Lori Barber, but I suppose
20   we're talking about the top here (indicating).
21   Q.  Yes, sir.
22   A.  Yes, I see that.
23   Q.  Okay.  Is this dated January 7th, 2019?
24   A.  Yes.
25   Q.  And the subject line is "Luluway fan page"?

## Page 187

1    A.  Yes, it is.
2    Q.  What is Luluway?
3    A.  Luluway was a website that sold -- that had
4    products listed.
5    Q.  Okay.  Products for who?
6    A.  Customers to buy.
7    Q.  Okay.  And what company was posting products
8    on Luluway?
9    A.  Initially, this was -- ACET Global would list
10   products on Luluway.
11   Q.  Okay.  Did any other company list products on
12   Luluway?
13   A.  I'm not aware.
14   Q.  Did Windspeed list products on Luluway?
15   A.  I don't know.
16   Q.  Did you ever authorize Windspeed to post
17   products on Luluway?
18       MR. PERRIN:  Objection; form.
19   A.  I wouldn't have -- I wouldn't have any
20   authority to do that.
21   Q.  (BY MR. FREEMAN)  Okay.  Did anyone at Baymark
22   Partners ever authorize Windspeed to post products on
23   Luluway?
24   A.  No.
25   Q.  And what was Luluway?  That was a -- was it a

## Page 188

1    web domain?
2    A.  Suppose you could call it a web domain.  I'm
3    calling it a website.
4    Q.  Website?  Towards the bottom, the initial
5    email here, is that an email from Lori Barber on
6    January 7th, 2019?
7    A.  Yes, it is.
8    Q.  And did she email you?
9    A.  She did.
10   Q.  And did she also email Tony Ludlow?
11   A.  Yes.
12   Q.  And Andy Waltman?
13   A.  Yes.
14   Q.  Okay.  And also Donna Tanner?
15   A.  Yes.
16   Q.  Okay.  And who is she with?  Is this the Lux
17   Group?
18   A.  Yes, it is.
19   Q.  Okay.  And did you mention earlier that you
20   believe the Lux Group had worked with Windspeed?
21   A.  I said earlier that the Lux Group had worked
22   with ACET Global.
23   Q.  Okay.  So they -- to your knowledge, they only
24   worked with ACET Global?
25   A.  Yes.

## Page 189

1    Q.  Okay.  Were they an outside consultant?
2    A.  For ACET Global?
3    Q.  Okay.  Is that --
4    A.  What was the question?
5    Q.  Were they an outside consultant of some sort?
6    A.  Are you referring to ACET Global?
7    Q.  Yes, sir.  No, well, I'm referring to Lux, the
8    company here.
9    A.  The company?  They're a -- I would
10   characterize them as a marketing firm.
11   Q.  Okay.  Is there any reason you would be the
12   first on the email?
13   A.  I don't know.
14   Q.  Did you do most of the correspondence with
15   Lori Barber, or did Tony Ludlow or Andy Waltman?
16   A.  I don't know the correspondence between Tony
17   or Andy with Lori Barber.
18   Q.  Okay.  Did you have any phone conversations
19   with Lori Barber?
20   A.  I'm sure I did at some point.
21   Q.  What did you discuss with her?
22   A.  Well, it would have been marketing initiatives
23   for our portfolio companies.
24   Q.  Okay.  With respect to ACET Global, what did
25   you discuss with her?

Page 190

1     A.  ACET Global, broadly speaking, it would have
2  been digital marketing.
3     Q.  Okay.  Was there -- did they assist with
4  digital marketing on Luluway?
5     A.  I can't say for certain, but I would assume
6  they did.
7     Q.  Okay.  Did you ever discuss shutting down ACET
8  Global with Lori Barber?
9     A.  I don't recall that.
10     Q.  Ever discuss winding down ACET, the wind down
11  plan, with Lori Barber?
12          MR. PERRIN:  Objection; form.
13     A.  What wind down plan?
14     Q.  (BY MR. FREEMAN)  Mr. Denegre, I'll show you
15  what we just covered was Exhibit 13.  Do you recall
16  prior to the break the exhibit referencing the wind down
17  plan?
18     A.  Yes.
19     Q.  Okay.
20     A.  No.
21     Q.  You never discussed that wind down plan with
22  Lori Barber?
23     A.  Not that I'm aware of.
24     Q.  Okay.  Did Bill Szeto have correspondence with
25  Lori Barber?

Page 191

1     A.  He would have at ACET Global.
2     Q.  Okay.  On Exhibit 14, Lori Barber's email that
3  we were just -- just looking at, did she state, "I know
4  you're in the process of winding down ACET"?  Is that
5  how she started her email?
6     A.  Yes.
7     Q.  Okay.  And this was in January of 2019,
8  correct?
9     A.  Correct.
10     Q.  Okay.  Mr. Denegre, who owns Windspeed?
11     A.  Bill Szeto.
12     Q.  And does Bill Szeto own 100 percent of
13  Windspeed?
14     A.  Yes.
15     Q.  Would you -- would you be concerned about
16  buying a company on which the majority of its stock was
17  subject to a warrant agreement?
18          MR. PERRIN:  Objection; form.
19     A.  I don't have an opinion on that.
20     Q.  (BY MR. FREEMAN)  Would you be concerned if
21  that warrant agreement was exercisable for $100?
22          MR. PERRIN:  Objection; form.
23     A.  I don't have an opinion on that.
24     Q.  (BY MR. FREEMAN)  Would that influence your
25  decision on whether to purchase the stock of that

Page 192

1  company?
2          MR. PERRIN:  Objection; form.
3     A.  No opinion.
4     Q.  (BY MR. FREEMAN)  As we sit here today, you're
5  telling me in your line of work, that would not be a
6  relevant factor?
7          MR. PERRIN:  Objection; form.
8     A.  A $100 exercise price?
9     Q.  (BY MR. FREEMAN)  Correct.
10     A.  I imagine it would be considered.
11     Q.  Would you consider that to be effectively
12  ownership in favor of the party holding those warrant
13  rights?
14          MR. PERRIN:  Objection; form.
15     A.  No.  It's a warrant.
16     Q.  (BY MR. FREEMAN)  Would you consider that to
17  be ownership that was exercisable by that party for a
18  nominal price?
19          MR. PERRIN:  Objection; form.
20     A.  No opinion.
21     Q.  (BY MR. FREEMAN)  Okay.  And who formed
22  Windspeed?
23     A.  Bill Szeto.
24     Q.  Okay.  And who drafted its operating
25  agreement?

Page 193

1     A.  My understanding is Bill Szeto and his counsel
2  drafted it.
3     Q.  Okay.  Was Windspeed -- was that basically the
4  "ACET newco"?
5          MR. PERRIN:  Objection; form.
6     A.  What is "ACET newco"?
7     Q.  (BY MR. FREEMAN)  Does that mean anything to
8  you?
9     A.  No.
10     Q.  To use the phrase "ACET's newco"?
11     A.  Nope.
12     Q.  Doesn't mean anything?
13     A.  No.
14          MR. PERRIN:  Objection; form.
15     Q.  (BY MR. FREEMAN)  If somebody used that in an
16  email, would you know what they were referring to?
17          MR. PERRIN:  Objection; form.
18     A.  I'd have to see the context of the email.
19     Q.  (BY MR. FREEMAN)  Okay.  Did you ever refer to
20  a company as ACET's newco with Tony Ludlow?
21     A.  I don't recall.
22     Q.  Would Tony Ludlow have known what you meant if
23  you referred to a company as "ACET's newco"?
24          MR. PERRIN:  Objection; form.
25     A.  You would have to ask Tony.

Usher Reporting Services
(214) 755-1612

Page 194

1     Q.  (BY MR. FREEMAN) Windspeed Trading, LLC, was
2  not ACET Newco?
3     A.  I don't believe so.
4     Q.  And there was no relationship between ACET
5  Global and Windspeed Trading, LLC?
6          MR. PERRIN:  Objection; form.
7     A.  Two independent companies.
8     Q.  (BY MR. FREEMAN)  Completely unrelated, right?
9          MR. PERRIN:  Objection; form.
10    A.  Right.
11         (Exhibit 15 marked.)
12    Q.  (BY MR. FREEMAN)  Mr. Denegre, I'm putting on
13 the screen what's marked as Exhibit 15.  Do you see
14 this, sir?
15    A.  I do.
16    Q.  And are you familiar with this document?
17    A.  I'm not.
18    Q.  Let's look at the top, sir.  Is this an email
19 from you, Matt Denegre?
20    A.  Yes.
21    Q.  Okay.  And is this an email that you sent to
22 Tony Ludlow on October 7th, 2018?
23    A.  Yes, it is.
24    Q.  Okay.  And is the subject line "ACET Newco"?
25    A.  Yes.

Page 195

1     Q.  There are some attachments to your email; is
2  that correct?
3     A.  Yes.
4     Q.  And are those attachments a PDF titled "EIN
5  Windspeed Trading, LLC" and a Word document entitled --
6  no, excuse me -- a PDF entitled "Certificate of
7  Formation" and a Word document entitled "LLC Operating
8  Agreement-Windspeed Trading, LLC"?
9     A.  Yes.
10    Q.  Okay.  And did you, in fact, send this email
11 to Tony Ludlow on October 7th, 2018?
12    A.  Yes.
13    Q.  And is this, in fact, a true and correct copy
14 of the email that you sent?
15    A.  Yes.
16    Q.  And did you state to Tony Ludlow, "These are
17 the formation documents for ACET's Newco."  Is that
18 correct?
19    A.  That's how it reads.
20    Q.  Okay.  Did you state there in that last
21 sentence of the paragraph, "The operating agreement will
22 certainly have changes and maybe a complete redo."  Is
23 that correct?
24    A.  Yes.
25    Q.  And did you state that you were going to send

Page 196

1  this to Julie?
2     A.  Yes.
3     Q.  Who is Julie?
4     A.  This would be Julie Smith.
5     Q.  Okay.  Did you send these documents to Julie
6  Smith?
7     A.  I don't remember.
8     Q.  Is Julie Smith an attorney?
9     A.  Yes.
10    Q.  And who does she work for?
11    A.  Hallett & Perrin.
12    Q.  Okay.  And you don't know if you sent these
13 documents to Julie?
14    A.  If there's an email that shows that, I will
15 know.
16    Q.  Okay.  But you would not know that independent
17 of an email showing that?
18    A.  Correct.
19    Q.  Okay.  Did Julie Smith, in fact, draft an
20 amended company agreement for Windspeed?
21    A.  I'm not sure who drafted an amended agreement
22 for Windspeed.
23    Q.  Okay.  Do you know whether that amended
24 company agreement for Windspeed was ever executed?
25    A.  I'm assuming it was executed.

Page 197

1     Q.  And why do you assume that?
2     A.  I think it was mentioned in this lawsuit.
3     Q.  Okay.  But you haven't seen it before?
4     A.  I may have seen it before.
5     Q.  Okay.  And just looking at that Exhibit 15,
6  did Baymark Partners, in fact, coordinate the structure
7  of Windspeed?
8          MR. PERRIN:  Objection; form.
9     A.  What do you mean by "coordinate the
10 structure"?  I'm not sure I follow.
11    Q.  (BY MR. FREEMAN)  Okay.  Let me ask it another
12 way.  Why did you believe there may be changes or a
13 complete redo necessary?
14    A.  I don't know.  I don't know what I was
15 thinking at this time.
16    Q.  Why would you tell that to Tony Ludlow?
17    A.  I don't know.
18    Q.  Did you have any discussion with Mr. Ludlow
19 after this email about ACET Newco?
20    A.  I don't know.
21    Q.  And are you referring to in this email -- are
22 you equating Windspeed Trading, LLC, as ACET Newco?
23         MR. PERRIN:  Objection; form.
24    A.  I think so.
25    Q.  (BY MR. FREEMAN)  Okay.  So you were telling

50 (Pages 194 to 197)

## Page 198

1    Tony Ludlow in this email that the ACET Newco is
2    Windspeed Trading, LLC?
3                MR. PERRIN:  Objection; form.
4         A.  I'm not sure that's the inference I'm trying
5    to put here.
6         Q.  (BY MR. FREEMAN)  Okay.  What is the
7    implication you were trying to put forward?
8         A.  I don't know.
9         Q.  Well, who would know?
10        A.  I'm not sure.
11        Q.  You don't know who would know?
12        A.  I assume I would know, but I don't recall.
13        Q.  Okay.
14             (Exhibit 16 marked.)
15        Q.  (BY MR. FREEMAN)  Putting on the screen what's
16   marked as Exhibit 16.  Do you see that, sir?
17        A.  I do.
18        Q.  Okay.  Is that an email -- on the top, is that
19   an email from William Szeto, email address
20   Bill@windspeedtrading.com to you, Matt Denegre on
21   October 17th, 2018?
22        A.  Yes.
23        Q.  Okay.  Is the subject line "Windspeed A&R
24   Company Agreement"?
25        A.  Yes, it is.

## Page 199

1         Q.  What did you mean by A&R Company Agreement?
2         A.  Amended and Restated Company Agreement.
3         Q.  And is that Windspeed Trading, LLC's, company
4    agreement you were referring to?
5         A.  It looks like that's the attachment.
6         Q.  Okay.  And did you state, "I am okay with it"?
7         A.  I did not state that.
8         Q.  Is that William Szeto stating that?
9         A.  Yes.
10        Q.  So was this in response to someone sending
11   Mr. Szeto a copy of the amended and restated Windspeed
12   Trading, LLC, Company Agreement?
13        A.  It looks like there's an email below that Bill
14   was on, and he was responding back to that email.
15        Q.  Okay.  And why did Bill only -- only send this
16   to you?
17        A.  I don't know.  I'm not sure why.
18        Q.  Okay.  And the last sentence there in Bill's
19   email says, "So what is the next steo?"  Does it appear
20   he meant "step"?
21        A.  I think so.
22        Q.  Does Bill fat-finger the keys sometimes?
23        A.  This time he certainly did.
24        Q.  What is he referring to there in terms of
25   asking what the next step was?

## Page 200

1         A.  I don't remember.
2         Q.  Okay.  Down below this email, is that an email
3    from Julie Smith?
4         A.  Yes, it is.
5         Q.  Is it an email sent on October 17th, 2018, to
6    you at your Baymark Partners email address to Mr. Szeto
7    at his Windspeed Trading address and to Alex Szeto at
8    his firm's address?
9         A.  Yes, it is.
10        Q.  Okay.  And does Ms. Julie Smith state,
11   "Attached is a draft of the Amended and Restated Company
12   Agreement for Windspeed Trading, LLC"?
13        A.  She does.
14        Q.  Did you understand that to mean that Ms. Smith
15   had drafted or amended Windspeed's company agreement?
16        A.  I would read this as she drafted an amended
17   and restated company agreement.
18        Q.  Okay.  And in terms of the attachment here on
19   Exhibit 16, attachment to that email address, is that,
20   in fact -- does it state that it's an amended and
21   restated company agreement of Windspeed Trading, LLC?
22        A.  Yes, it does.
23        Q.  Okay.  And the top of that draft, does it
24   state, "H&P draft 10/17/18"?
25        A.  Yes.

## Page 201

1         Q.  And did you understand that to refer to
2    Hallett & Perrin draft?
3         A.  I do.
4         Q.  Okay.  Did you want Windspeed's attorney to be
5    Hallett & Perrin?
6                MR. PERRIN:  Objection; form.
7         A.  I think Windspeed's attorney was Alexander
8    Szeto.
9         Q.  (BY MR. FREEMAN)  Did you ever tell Bill Szeto
10   that you wanted Hallett & Perrin to be Windspeed's law
11   firm?
12        A.  I don't recall if I did.
13        Q.  Did anyone ever tell you that Hallett & Perrin
14   needed to be the law firm for all of Baymark Partners'
15   companies?
16        A.  I don't think I have ever been told that.
17        Q.  Did anyone at Baymark Partners ever previously
18   work for Hallett & Perrin?
19        A.  My understanding is Tony Ludlow had worked for
20   Hallett & Perrin in the past.
21        Q.  Tony Ludlow was previously an attorney at
22   Hallett & Perrin?
23        A.  I'm told that.  I don't know if that's factual
24   or not.  I'm told that.
25        Q.  Do you know whether he was a partner at

Usher Reporting Services
(214) 755-1612

## Page 202

1    Hallett & Perrin?
2        A.  I don't.
3        Q.  Do you know how long he worked at Hallett &
4    Perrin?
5        A.  I don't.
6        Q.  But did you ever tell Bill Szeto that he
7    needed to use Hallett & Perrin as their attorney for
8    Windspeed?
9            MR. PERRIN:  Objection; form.
10       A.  I don't remember having that conversation.
11       Q.  (BY MR. FREEMAN)  Did you want to ensure that
12   you had just one law firm overseeing the transaction
13   with Windspeed Trading?
14           MR. PERRIN:  Objection; form.
15       A.  I don't recall.
16       Q.  (BY MR. FREEMAN)  Did Mr. Szeto actually want
17   to separate counsel?
18       A.  Mr. Szeto had his own attorney.
19       Q.  So he never used Hallett & Perrin?
20       A.  You would have to ask Bill that, Bill Szeto.
21       Q.  Okay.  But you would have never told him that
22   he needed to use Hallett & Perrin?
23       A.  Correct.
24           MR. PERRIN:  Objection; form.
25       A.  Not that I recall.

## Page 203

1        Q.  (BY MR. FREEMAN)  Okay.  Would it require an
2    email for you to recall that?
3            MR. PERRIN:  Objection; form.
4        A.  If you have an email, let's take a look.
5        Q.  (BY MR. FREEMAN)  I do.
6            (Exhibit 17 marked.)
7        Q.  (BY MR. FREEMAN)  Exhibit 17, sir.  Do you
8    recognize this document?
9        A.  I don't recognize this.
10       Q.  Does this appear to be an email from William
11   Szeto, email address at bill@windspeedtrading.com to
12   you, Matt Denegre, dated October 19th, 2018?
13       A.  I see that.
14       Q.  Okay.  And does the subject line state, "New
15   Office"?
16       A.  Yes.
17       Q.  And does this, in fact, appear to be a true
18   and correct copy of the email exchanged between you and
19   Mr. Szeto on or about that date?
20       A.  Yes.
21       Q.  And right below that, is that an email from
22   you, Matt Denegre at your address,
23   mdenegre@baymarkpartners.com?
24       A.  Yes, it is.
25       Q.  And is that dated October 19th, 2018, and to

## Page 204

1    William Szeto at his Windspeed Trading email address?
2        A.  Yes.
3        Q.  Okay.  Does he state -- do you state, "Using
4    the same counsel shouldn't matter.  Unrelated to the
5    separation.  It's going to get confusing using two
6    different law firms, and we use Hallett & Perrin on all
7    of our companies"?
8        A.  That's what I said.
9        Q.  Why did you say that?
10       A.  I'm not sure why I said it, and it certainly
11   wasn't telling Bill he had to do that.
12       Q.  It wasn't?
13       A.  No.
14       Q.  Okay.  Did Bill, in fact, ever do that?
15       A.  Bill had his own counsel.
16       Q.  Okay.  Down below that, had Mr. Szeto told you
17   that he was going to use Alex as their counsel to keep a
18   separation between ACET and Windspeed?
19       A.  Yes, he does.
20       Q.  Why did he want to keep a separation between
21   ACET and Windspeed?  Was there an attempt here to make
22   it look like they were two unrelated companies?
23           MR. PERRIN:  Objection; form.
24       A.  They are unrelated companies.
25       Q.  (BY MR. FREEMAN)  Okay.  But you're saying

## Page 205

1    here in your response to him you weren't actually asking
2    him to use Hallett & Perrin?
3            MR. PERRIN:  Objection; form.
4        A.  I was asking him to use Hallett & Perrin, but
5    not directing him.  And I don't believe he did.
6        Q.  (BY MR. FREEMAN)  Okay.  Let's keep going down
7    here, this email from you to Mr. Szeto at 11:09 a.m.,
8    Friday, October 19th.  You stated -- please tell me if
9    this is correct:  "Please keep counsel with Hallett &
10   Perrin after the lease."  Is that correct?
11       A.  Yes.
12       Q.  Okay.  And then you said, "They have all the
13   records from ACET, and that's who we use on all of our
14   companies."  Is that correct?
15       A.  Yes.
16       Q.  Okay.  What did you mean by "who we use on all
17   of our companies"?
18       A.  Typically for our transactions, we use Hallett
19   & Perrin.
20       Q.  Okay.  And they're a good law firm, right?
21       A.  I think so.
22       Q.  And they're known for their -- they're known
23   for their transactional work?
24       A.  Okay.
25       Q.  Okay.  What did you mean, though, by "all of

Page 206

1    our companies"?
2         MR. PERRIN: Objection; form.
3         A. I'm referring to Baymark's portfolio
4    companies.
5         Q. (BY MR. FREEMAN) Okay. And was this email
6    discussing Windspeed Trading, LLC?
7         A. I believe so.
8         Q. Okay. And so why would it then be important
9    that they use the same counsel as all of your other
10   companies?
11        MR. PERRIN: Objection; form.
12        A. It's not.
13        Q. (BY MR. FREEMAN) Then why would you ask
14   Mr. Szeto to use them like you used for all of your
15   other companies?
16        MR. PERRIN: Objection; form.
17        A. It was a suggestion, and if Bill wanted to do
18   that, he could.
19        Q. (BY MR. FREEMAN) Okay. But there was no
20   other reason because it was a completely separate,
21   unrelated company?
22        MR. PERRIN: Objection; form.
23        A. What was? What are you referring to?
24        Q. (BY MR. FREEMAN) Windspeed Trading was
25   completely separate and unrelated to Baymark Partners or

Page 207

1    ACET Global; is that correct?
2         A. Correct.
3         Q. That's your testimony?
4         A. (No audible response.)
5            (Exhibit 18 marked.)
6         Q. (BY MR. FREEMAN) Mr. Denegre, I'm putting up
7    on the screen what's marked as Exhibit 18. Do you see
8    that, sir?
9         A. I do.
10        Q. Do you recognize this document?
11        A. I do not.
12        Q. Is this an email from you, Matt Denegre, on
13   January 19th, 2019, to William Szeto?
14        A. Yes.
15        Q. And are you forwarding a document entitled
16   "Windspeed-Old ACET loan agreement"?
17        A. Yes.
18        Q. Okay. And what is that document?
19        A. It's an Amended and Restated Business Loan and
20   Security Agreement.
21        Q. Okay. And why were you receiving it?
22        A. Julie had sent it to me.
23        Q. Okay. And why did Julie send it to you?
24        A. She asked me to review the first two pages of
25   the addendum.

Page 208

1         Q. Okay. And what does she say here? Did she
2    say, "Matt, attached is a draft of an amended and
3    restated loan agreement that represents the old ACET
4    loan that Windspeed is going to assume"?
5         A. Yes, it does.
6         Q. What does that mean?
7         A. It means what it says.
8         Q. What is that?
9         A. Attached is a draft of an amended and restated
10   loan agreement that represents the old ACET loan that
11   Windspeed is going to assume.
12        Q. Was Windspeed going to assume ACET's loan?
13        A. I think so. I think so.
14        Q. Why? I thought these were unrelated
15   companies.
16        MR. PERRIN: Objection; form.
17        Q. (BY MR. FREEMAN) Why was it going to assume
18   ACET's loan?
19        MR. PERRIN: Objection; form.
20        A. You would have to talk to Windspeed and also
21   talk to Super G.
22        Q. (BY MR. FREEMAN) Okay. Would Julie Smith
23   know why?
24        MR. PERRIN: Objection; form.
25        A. I can't speak for Julie.

Page 209

1         Q. (BY MR. FREEMAN) Did you ever have a
2    discussion with her about why? And don't tell me why,
3    what you said, but did you ever discuss why with her?
4         MR. PERRIN: And I'll caution the witness
5    this calls for attorney-client communications.
6         A. I don't recall.
7         Q. (BY MR. FREEMAN) Why was she sending this to
8    you?
9         A. She asked me to review an addendum one, two
10   and three.
11        Q. Okay. But this would have been a loan that
12   Windspeed was going to assume; is that correct?
13        A. That's correct.
14        Q. And she asked you to review those pages to see
15   if they reflected the business terms; is that correct?
16        A. Yes.
17        Q. Okay. And why would she expect you -- did you
18   do anything to give me the impression that you would
19   know what those business terms were?
20        MR. PERRIN: Objection; form.
21        A. Well, I had been speaking with Super G.
22        Q. (BY MR. FREEMAN) But you don't remember this
23   email?
24        A. Unfortunately, I do not.
25        Q. And you don't remember reviewing this Amended

53 (Pages 206 to 209)

Page 210

1    and Restated Business Loan and Security Agreement?
2        A.   Specifically I don't recall reviewing this.
3        Q.   Or that the borrower named was Windspeed
4    Trading?
5        A.   What's the question?
6        Q.   You didn't remember reviewing a loan agreement
7    in which Windspeed Trading, LLC, was the borrower?
8        A.   I may have reviewed this.  I don't recall.
9        Q.   Do you know why you would have reviewed it?
10       A.   Well, I had been talking to Super G.  Super G
11   was keeping -- wanted us to stay involved.  I was asked
12   to review it, and I did.
13       Q.   Mr. Denegre I'm going to put on your screen
14   what's marked as Exhibit 19.  Do you see this, sir?
15       A.   Yes.
16            (Exhibit 19 marked.)
17       Q.   (BY MR. FREEMAN)  Are you familiar with this
18   document?
19       A.   I'm not.
20       Q.   Would you take a second to look over this?
21       A.   Okay.
22       Q.   Did Julie Smith email you and Bill Szeto?
23       A.   She did.
24       Q.   And was that email reflected here, was that
25   sent on March 26th, 2019?

Page 211

1        A.   I have March 22 -- I have March 22nd
2    initially.
3        Q.   Well, the email at the top --
4        A.   Yes, I see that now.
5        Q.   Okay.  March 26th, 2019, 12:54 p.m.  Is the
6    subject line -- is that correct, sir?
7        A.   Yes.
8        Q.   Is the subject line "Windspeed/Super G Loan
9    Agreement"?
10       A.   Yes.
11       Q.   Okay.  Let's look below here at Julie's email
12   from March 22nd, 2019, a couple of days before.  Was
13   that an email to William Szeto at his Windspeed Trading
14   address, Matt Denegre at your Baymark Partners email
15   address; is that correct?
16       A.   That's correct.
17       Q.   And does it say below -- it says, "Matt and
18   Super G confirmed the numbers on the first page of the
19   amended and restated loan agreement"?
20       A.   It says that.
21       Q.   Okay.  So did Baymark Partners, did it
22   determine what Windspeed was going to do in the ACET
23   foreclosure process?
24            MR. PERRIN:  Objection; form.
25       A.   Super G was the foreclosing entity, not

Page 212

1    Baymark.
2        Q.   (BY MR. FREEMAN)  And you didn't have anything
3    to do with that process, correct?
4        A.   Super G requested documents regarding the
5    assets of ACET.  Those documents were inventory, AR,
6    some fixed equipment.  And I provided Super G those
7    documents.
8        Q.   Okay.  And Baymark Partners didn't have
9    anything to do with the foreclosure process, correct?
10       A.   Correct.
11       Q.   Had that foreclosure process actually already
12   taken place as of the date of this email exchange?
13       A.   I'm not certain.
14       Q.   When did you understand that foreclosure
15   process to have taken place?
16       A.   It would have been early 2019.
17       Q.   Why were you emailing with Super G and William
18   Szeto in March of 2019?
19       A.   Well, I had a relationship with Super G as
20   well as with Bill Szeto.
21       Q.   Was that relationship limited to ACET Global?
22       A.   When I refer to "relationship," I'm talking
23   about a person-to-person relationship.
24       Q.   Okay.  Had you worked on any other companies
25   with Super G than ACET Global, LLC?

Page 213

1        A.   I helped provide some -- what I thought was a
2    good sound board for William Szeto at Windspeed.  I'm
3    not sure he would agree with that, but that would be it.
4        Q.   For the record, he did not.  But let me ask
5    you:  Did you deal with Super G with any other
6    companies?  Was ACET Global the only transaction you
7    dealt with Super G on?
8        A.   I worked with Super G to help on the Windspeed
9    transaction, as well.
10       Q.   Okay.  So prior to Windspeed, ACET Global was
11   the only company that you had worked with Super G on?
12       A.   Yes.
13       Q.   But Super G wanted to make sure that you and
14   Baymark Partners were involved in the Windspeed
15   transaction?
16            MR. PERRIN:  Objection; form.
17       A.   You would have to ask Super G.  My assumption
18   was they didn't have a relationship with Bill Szeto.
19       Q.   (BY MR. FREEMAN)  In fact, do you know that to
20   be the case?
21            MR. PERRIN:  Objection; form.
22       A.   Yes.
23       Q.   (BY MR. FREEMAN)  That's correct?  And did you
24   think they wanted you and Super G to be involved because
25   of your phenomenal track record with them?

54 (Pages 210 to 213)

## Page 214

1    A.  I'm sorry.  Who is "they"?
2    Q.  I asked it poorly.  Did Super G want and
3  Baymark involved because of you -- because of your track
4  record on transactions with Super G?
5        MR. PERRIN:  Objection; form.
6    A.  Super G felt that Baymark was a good party.
7  We had supported ACET throughout all its struggles and
8  didn't have a relationship with Bill Szeto and wanted to
9  keep Baymark involved.
10   Q.  (BY MR. FREEMAN)  But they were otherwise
11 completely unrelated companies?
12   A.  Which companies are you referring to?
13   Q.  Windspeed and ACET Global.
14   A.  Yes, unrelated.
15   Q.  Okay.  This Exhibit 19 that was on your
16 screen, was this, in fact, a true and correct copy of
17 the email correspondence reflected thereon?
18   A.  Yes.
19   Q.  Okay.  Mr. Denegre, I'm putting on the screen
20 what's marked as Exhibit 20.  Do you see this, sir?
21   A.  Okay.
22       (Exhibit 20 marked.)
23   Q.  (BY MR. FREEMAN)  Are you familiar with this
24 document?
25   A.  No.

## Page 215

1    Q.  Have you ever seen it before?
2    A.  I don't recognize it.
3    Q.  Okay.  Does this appear to be an email from
4  Brian Vanderwoude to Julie Smith on January 17th, 2019?
5    A.  From Julie to Brian?
6    Q.  Yes, sir.  No, from Brian on top.  From Brian
7  to Julie.
8    A.  Yes.
9    Q.  And below that, is there, in fact, an email
10 from Julie Smith to Brian Vanderwoude?
11   A.  Yes, there is.
12   Q.  Okay.  Had you had a discussion with Ms. Smith
13 around this time about the transaction they're
14 discussing in the email?
15   A.  We may have.
16   Q.  Okay.  What do you think you may have
17 discussed?
18   A.  I don't recall.
19   Q.  Okay.  Do you know who that discussion would
20 have been with?
21   A.  Well, Brian was Super G's counsel, so it
22 wouldn't have been with Brian.  Possibly Julie.
23   Q.  A discussion with Julie?
24   A.  Correct.
25   Q.  And Julie states here on her email down below

## Page 216

1  from January 3rd, states, "I spoke with Baymark after
2  our call on Monday."  What is she referring to, do you
3  know?
4    A.  I don't.
5    Q.  Says, "Because Steve has indicated that Super
6  G cannot fund the loan without Windspeed's assuming the
7  old ACET loan because its investors would not approve a
8  new loan to Windspeed, Baymark has agreed to allow
9  Windspeed to assume the ACET loan."  Do you see that?
10   A.  I see that.
11   Q.  Did you ever discuss allowing Windspeed to
12 assume the ACET loan?
13   A.  It wouldn't be our decision to do that.
14   Q.  Well, why would Baymark Partners' attorney,
15 Ms. Smith, be stating that after speaking with Baymark,
16 she understands that Baymark has agreed to allow
17 Windspeed to assume the ACET loan?
18   A.  I don't know why she says that.
19   Q.  Is she completely wrong?
20       MR. PERRIN:  Objection; form.
21   A.  I don't know if she's right or wrong.
22   Q.  (BY MR. FREEMAN)  Okay.  Did anyone at Baymark
23 Partners ever tell Julie Smith that they had agreed to
24 allow Windspeed to assume the ACET loan?
25   A.  Not that I'm aware of.

## Page 217

1    Q.  Okay.  So is Ms. Smith just going off rogue
2  here?
3        MR. PERRIN:  Objection; form.
4    A.  I didn't indicate that.  I just don't recall
5  the conversation.
6    Q.  (BY MR. FREEMAN)  Okay.  Did you, in fact,
7  personally represent that Baymark would assume the old
8  ACET note?
9    A.  Did I personally?
10   Q.  Yes, sir.
11   A.  No.
12   Q.  No way that occurred?
13   A.  It wouldn't be my decision to make that.
14   Q.  So someone would have had to tell you that?
15 If you were to make that representation, someone would
16 have had to authorize it?
17   A.  For me personally to assume ACET's loan?  Is
18 that the question?
19   Q.  No, for you to state that Baymark Partners had
20 allowed or would allow Windspeed to assume the ACET
21 Global note.
22   A.  Again, I don't recall ever saying that.
23   Q.  Okay.  If you said that, would you have had
24 authority to say that?
25       MR. PERRIN:  Objection; form.

Usher Reporting Services
(214) 755-1612

Page 218

```
 1        A.  I don't think it's up to me.
 2        Q.  (BY MR. FREEMAN)  Who would it be up to?
 3        A.  It would be up to Windspeed, I would imagine.
 4        Q.  Okay.  And who is Windspeed?
 5            MR. PERRIN:  Objection; form.
 6        A.  It's a company.
 7        Q.  (BY MR. FREEMAN)  Okay.  Mr. Denegre, I'm
 8  putting up on the screen what's marked as Exhibit 21.
 9  Do you see this, sir?
10        A.  Okay.
11            (Exhibit 21 marked.)
12        Q.  (BY MR. FREEMAN)  Is this an email from you?
13        A.  Yes.
14        Q.  And is this an email you sent to Steve Bellah
15  on January 2nd, 2019?
16        A.  Yes, it is.
17        Q.  Okay.  Is Steve Bellah an employee of Super G
18  Capital at this time?
19        A.  I believe he is.
20        Q.  Okay.  And is the subject line here "Weekly
21  Report"?
22        A.  Yes.  No.
23        Q.  No?
24        A.  No.  It is.  I'm sorry.  It says," Weekly
25  Report 1/1."
```

Page 219

```
 1        Q.  Okay.  Is this, in fact, a true and correct
 2  copy of your email correspondence with Mr. Bellah?
 3        A.  Yes.
 4        Q.  Okay.  And is there an attachment to this
 5  email?
 6        A.  Yes, there is.
 7        Q.  And does that attachment -- is it a PDF that
 8  states ACET/Default Notice?
 9        A.  Yes.
10        Q.  Why, sir, were you sending a default notice to
11  Steve Bellah?
12        A.  I'm not sure.  He must have asked me to take a
13  look at it.
14        Q.  Steve Bellah wanted your opinion about a
15  default notice?
16        A.  I imagine that's what he was asking for.
17        Q.  Okay.  Did you state here -- let me ask you
18  actually:  What leads you to believe that that's what he
19  was asking for?
20        A.  Because the default notice wouldn't come from
21  me.
22        Q.  Why wouldn't it come from you?
23        A.  I don't have any authority to put a default
24  notice out.
25        Q.  You definitely don't, do you?
```

Page 220

```
 1        A.  Correct.
 2        Q.  And Baymark Partners wouldn't have authority
 3  to put a default notice out, right?
 4        A.  That's correct.
 5        Q.  And Baymark Partners would have no business
 6  whatsoever drafting a default notice to ACET Global,
 7  would it?
 8            MR. PERRIN:  Objection; form.
 9        A.  I don't believe we drafted the default notice.
10        Q.  (BY MR. FREEMAN)  Do you believe that would be
11  improper for you to draft the ACET default notice?
12            MR. PERRIN:  Objection; form.
13        A.  If Super G asked us to draft a default notice,
14  I suppose we would have a discussion around it.  At this
15  position, it's up to them.  It's not up to us.
16        Q.  (BY MR. FREEMAN)  Okay.  But you don't believe
17  it would be improper for Baymark Partners to draft a
18  default notice to ACET Global?
19            MR. PERRIN:  Objection; form.
20        A.  Yes, and I don't believe we did draft the
21  default notice.
22        Q.  (BY MR. FREEMAN)  But yes, you believe it
23  would be improper to?
24            MR. PERRIN:  Objection; form.
25        A.  Again, it all depends on the context.  I can't
```

Page 221

```
 1  say it's appropriate or not.
 2        Q.  (BY MR. FREEMAN)  Can you give me any context
 3  whatsoever in which it would be appropriate for Baymark
 4  Partners to draft a default notice to ACET Global?
 5            MR. PERRIN:  Objection; form.
 6        A.  If Super G asked us to do it for some odd
 7  reason and said we'll pay your legal fees?  I don't
 8  know.
 9        Q.  (BY MR. FREEMAN)  So if Super G promised you
10  some money for it, it might be proper?
11            MR. PERRIN:  Objection; form.
12        A.  Possibly, but it's not my decision on who
13  drafts what.
14        Q.  (BY MR. FREEMAN)  And why in your mind would
15  that be proper?
16            MR. PERRIN:  Objection; form.
17        A.  I didn't say it was proper.
18        Q.  (BY MR. FREEMAN)  Okay.  But how does Super G
19  paying you some money or paying Baymark Partners some
20  money somehow make this potentially proper?
21        A.  You took me out of context there.
22        Q.  Well, I asked you to provide me the context,
23  any context in which it would be proper for Baymark
24  Partners to draft a default notice to ACET Global.
25            MR. PERRIN:  Is that a question?
```

56 (Pages 218 to 221)

Page 222

1          MR. FREEMAN: It is. I'm asking.
2          MR. PERRIN: I object to the form of the
3    question.
4      Q.  (BY MR. FREEMAN)  Is there --
5      A.  You can tell I don't really have an opinion on
6    this.  So I don't have an answer to you.
7      Q.  Okay.  Would you want to be associated with
8    having drafted a default notice to ACET Global?
9          MR. PERRIN: Objection; form.
10     A.  I don't have an opinion on it.
11     Q.  (BY MR. FREEMAN)  Okay.  Why don't you have an
12   opinion on it?
13     A.  It's over my pay grade.
14     Q.  What does that mean?
15     A.  I don't know how default notices work.  I'm
16   not a lender.  So you would have to ask -- you would
17   have to ask someone who is in that field.
18     Q.  Okay.  Is Tony Ludlow in that field?
19         MR. PERRIN: Objection; form.
20     A.  Is Tony Ludlow in what field?
21     Q.  (BY MR. FREEMAN)  That field, that pay grade.
22         MR. PERRIN: Objection; form.
23     A.  I don't know.  I don't believe Tony is a
24   lender.
25     Q.  (BY MR. FREEMAN)  Okay.  What about Mr. Hook?

Page 223

1          MR. PERRIN: Objection; form.
2      A.  What about?
3      Q.  (BY MR. FREEMAN)  Mr. Hook?
4      A.  Yes?
5      Q.  Is he in that field or in that pay grade?
6      A.  Nope.
7      Q.  Okay.  On this email, is this a true and
8    correct copy of your correspondence with Mr. Bellah?
9      A.  Yes.
10     Q.  And did you state here, "Yes, we agreed to
11   assume the old ACET note"?
12     A.  Yes, it says that.
13     Q.  What did you mean by that?
14     A.  We agreed to assume the old ACET note.
15     Q.  Right.  And what does that mean?
16         MR. PERRIN: Objection; form.
17     A.  It means what it says.
18     Q.  (BY MR. FREEMAN)  So did Baymark Partners
19   assume the old ACET note?
20     A.  No.
21     Q.  Well, then what does it mean?
22         MR. PERRIN: Objection; form.
23     A.  I don't know.  I would be speculating.  I'm
24   not for sure what this all means.
25     Q.  (BY MR. FREEMAN)  Who could I ask that would

Page 224

1    not be speculating about what this means?
2      A.  I don't know.
3      Q.  But this is your email, correct?
4      A.  It is.
5      Q.  And you drafted this email, correct?
6      A.  I did.
7      Q.  And this is your signature block below the
8    email, correct?
9      A.  Yes.
10     Q.  And it states, "Matt Denegre, Baymark
11   Partners," correct?
12     A.  Correct.
13     Q.  And you were a director at Baymark Partners,
14   correct?
15     A.  Yes.
16     Q.  And you stated, "Yes, we agreed to assume the
17   old ACET note."  Is that correct?
18     A.  That's correct.
19     Q.  But you don't have any idea what that means?
20         MR. PERRIN: Objection; form.
21     A.  I can speculate.
22     Q.  (BY MR. FREEMAN)  Please do.
23         MR. PERRIN: Objection; form.
24     A.  So when I refer to "we," I'm referring to Bill
25   Szeto and myself.  I'm speaking on behalf of Bill.

Page 225

1      Q.  (BY MR. FREEMAN)  Okay.  Did Bill assume the
2    old ACET note?
3      A.  I don't know how the transaction worked.
4      Q.  Right.  Did you assume the old ACET note?
5      A.  No.
6      Q.  Okay.  And you know that Bill did not assume
7    the old ACET note, correct?
8          MR. PERRIN: Objection; form.
9      A.  I don't know that for a fact.
10     Q.  (BY MR. FREEMAN)  Okay.
11     A.  You're asking for specifics.  I can't answer
12   it.
13     Q.  Let me ask you:  Do you have any reason -- any
14   reason to believe that Bill Szeto assumed the old ACET
15   note?
16         MR. PERRIN: Objection; form.
17     A.  Bill Szeto personally assumed the old ACET
18   note?
19     Q.  (BY MR. FREEMAN)  Correct.
20     A.  I don't think he did.
21     Q.  Okay.  So what did you mean here by, "We
22   agreed to assume the old ACET note"?
23         MR. PERRIN: Objection; form.
24     A.  This was -- this was likely referring to Bill
25   and Windspeed.

Matt Denegre   *   April 8, 2021

## Page 226

1      Q.  (BY MR. FREEMAN)  Okay.  When you said "we,"
2  did you mean by that that Windspeed was a completely
3  unrelated, separate, independent company?
4      A.  I don't know what I meant by "we."
5      Q.  Okay.  What was Bill's authority over ACET?
6      A.  Bill was a contractor at ACET and then CEO.
7      Q.  Okay.  Who were ACET Global's officers?
8      A.  I don't know.
9      Q.  No idea?
10      A.  (Moving head side to side.)
11      Q.  I'm putting up what's marked as Exhibit 1.  Do
12  you see this, sir?
13          (Exhibit 1 marked.)
14      A.  Yes.
15      Q.  (BY MR. FREEMAN)  Do you recognize this
16  document?
17      A.  I do.
18      Q.  And what is this?
19      A.  Voluntary Petition for Nonindividuals Filing
20  for Bankruptcy.
21      Q.  You understand this to be a bankruptcy
22  petition?
23      A.  Yes.
24      Q.  Filed by ACET Global, LLC?
25      A.  Yes.

## Page 227

1      Q.  Okay.  And does it list other d/b/a's as
2  Koolulu and Luluway?
3      A.  It was.
4      Q.  Okay.  Is there a debtor's address there, 5700
5  Granite Parkway in Plano, Texas?  Do you recognize that
6  address?
7      A.  I do.
8      Q.  You know it pretty well, don't you?
9      A.  I do.
10      Q.  Do you go there on a regular basis?
11      A.  Yes.
12      Q.  So did you go to ACET Global's address and
13  office on a regular basis?
14      A.  No.
15      Q.  Well, is this petition incorrect?
16      A.  No.
17      Q.  How do we reconcile that?
18          MR. PERRIN:  Objection; form.
19      A.  I believe that where the entity is listed as,
20  5700 Granite Parkway.
21      Q.  (BY MR. FREEMAN)  Okay.  Is that its address?
22      A.  I think on the formation documents it is.
23      Q.  Okay.  So ACET Global's address is 5700
24  Granite Parkway; is that right?
25      A.  From my memory referring to the formation

## Page 228

1  documents, I believe that's the entity location.
2      Q.  Suite 435, Plano, Texas 75024?
3      A.  Yes.
4      Q.  That's correct?  Is that anyone else's address
5  that you're aware of?
6      A.  It's the Baymark address as well.
7      Q.  The Baymark Partners address; is that correct?
8      A.  Correct.
9      Q.  Okay.  And did you see this document before it
10  was filed?
11      A.  I did.
12      Q.  Did anyone ask for you input on this document?
13      A.  Yes.
14      Q.  Did anyone ask you to review it?
15      A.  I would have been involved reviewing it.
16      Q.  Okay.  Did you believe it to be correct?
17      A.  I did.
18      Q.  Okay.  And you reviewed all of it, correct?
19      A.  Yes.
20      Q.  Okay.  And on the fourth page where it
21  reflects a president of ACET Global named Anthony
22  Ludlow, did you believe that, in fact, to be correct?
23      A.  Yes.
24      Q.  Okay.  And did Mr. Ludlow review this
25  document?

## Page 229

1      A.  Given that he signed it, I assumed he viewed
2  it.
3      Q.  Did you, in fact, discuss this document with
4  Mr. Ludlow?
5      A.  I think we did.
6      Q.  Okay.  How many times?
7      A.  I don't remember.
8      Q.  Okay.  Did y'all go through several drafts of
9  it?
10      A.  I don't think so.
11      Q.  Okay.  Did Mr. Ludlow ever express whether he
12  believed it was correct or incorrect?
13      A.  I think by signing it he's assuming it's
14  correct.
15      Q.  Okay.  Did you ever have any discussions with
16  Mr. Ludlow about the insider provisions?
17      A.  What are those?
18          MR. PERRIN:  Objection; form.
19      Q.  (BY MR. FREEMAN)  Any questions about whether
20  any assets had been transferred to an insider.
21      A.  Never.
22      Q.  Did you ever discuss that with Mr. Ludlow?
23      A.  No.
24      Q.  Never discussed that with the president of
25  ACET Global?

Usher Reporting Services
(214) 755-1612

Page 230

1    A.  Not that I recall.
2    Q.  Okay.  Did you ever discuss any of the other
3  specific provisions in this document with Mr. Ludlow?
4    A.  I can't recall what we discussed with the
5  document.
6    Q.  Okay.  Did you ever discuss the inventories
7  question on Page 24 asking, "Have any inventories of the
8  debtor's property been taken within two years before
9  filing this case?"
10       MR. PERRIN:  Objection; form.
11    A.  I see the question.
12    Q.  (BY MR. FREEMAN)  Right.  Did you ever -- did
13  you review this question that was marked "No"?
14    A.  Can you point me in the direction of where we
15  are again?
16    Q.  Yes, sir.  It's on the screen.  I have it
17  highlighted.
18    A.  I don't see it.
19       MR. PERRIN:  Not on the screen.
20    Q.  (BY MR. FREEMAN)  Oh, sorry.  Can you see
21  that, sir?
22    A.  Not -- what number is that?  I can't see it.
23    Q.  It's Number 27 of the questions on the
24  petition.
25    A.  I see that.

Page 231

1    Q.  Okay.  It's on the 24th page of the PDF.
2    A.  Got it.
3    Q.  And that question asks, "Have any inventories
4  of the debtor's property been taken within two years
5  before filing this case," correct?
6    A.  I read that.
7    Q.  And it says "no" as the answer?
8    A.  Correct.
9    Q.  Okay.  Is that a correct statement or false
10  statement?
11       MR. PERRIN:  Objection; form.
12    A.  Have any inventories of the debtor's property
13  been taken within two years -- well, given there was a
14  foreclosure, I'm not sure if that's -- if there was a
15  foreclosure, then I'm assuming the answer would have
16  been yes.
17    Q.  (BY MR. FREEMAN)  Right.  So this appears to
18  be a false bankruptcy petition, does it not?
19       MR. PERRIN:  Objection; form.
20    A.  By making a mistake you're indicating it's
21  false?
22    Q.  (BY MR. FREEMAN)  Well, I'm not implying it
23  was a mistake.
24    A.  Well --
25       MR. PERRIN:  Objection; form.

Page 232

1    A.  -- I don't recall having a discussion around
2  this, and I certainly don't recall making a statement
3  that's not correct.
4    Q.  (BY MR. FREEMAN)  But you were involved in
5  reviewing this document before it was filed, correct?
6    A.  I did.
7    Q.  And you -- did you or did you not indicate to
8  anyone that this question was incorrect?
9       MR. PERRIN:  Objection; form.
10    A.  I don't recall.
11    Q.  (BY MR. FREEMAN)  We reviewed a number of
12  exhibits earlier, and I can walk you back through them
13  if we need to.  But didn't we review some exhibits where
14  in 2019 you were exchanging inventories of ACET Global?
15       MR. PERRIN:  Objection; form.
16    A.  Exchanging inventories of ACET Global?  What
17  does that mean?
18    Q.  (BY MR. FREEMAN)  Were you not exchanging a
19  copy of an inventory of ACET Global in 2019?
20       MR. PERRIN:  Objection; form.
21    A.  I don't know what that means.  I'm sorry.  If
22  you could just reask it.
23    Q.  (BY MR. FREEMAN)  Sure.  Did you ever receive
24  a copy of an updated inventory in January of 2019?
25    A.  I did.

Page 233

1    Q.  And was that an inventory of ACET Global?
2    A.  Yes.
3    Q.  Updated to that date?
4    A.  Of course, I don't have the email in front of
5  me, but I imagine whatever the report title said was
6  probably tied to what the report was.
7    Q.  Did William Szeto indicate to you that it was
8  updated to that date?
9    A.  I would have to see the email.  I don't
10  remember what it says.
11    Q.  Okay.  So just going from what you recall,
12  because the documents will speak for themselves, right,
13  is this Question Number 27 on ACET Global's bankruptcy
14  petition, is it correctly answered?
15       MR. PERRIN:  Objection; form.
16    A.  It doesn't look -- what's the date on this?
17  This is two years before filing this case?
18    Q.  (BY MR. FREEMAN)  The date of this is
19  October 23rd, 2019, exactly one year after the Windspeed
20  Operating Company Agreement was executed.
21       MR. PERRIN:  Objection; form.
22    A.  Okay.
23    Q.  (BY MR. FREEMAN)  Right.  So within two years
24  before that case, before that date, had an inventory of
25  ACET Global's property been taken?

## Page 234

1     A.  Yes.

2     Q.  And did you, in fact, know that?

3     A.  I did not.

4     Q.  You didn't know?

5     A.  Of course I do, but this would have been a

6 mistake.

7         MR. PERRIN:  Objection; form.

8     Q.  (BY MR. FREEMAN)  Did Tony Ludlow know that?

9     A.  I'm not sure what Tony knew.

10     Q.  Okay.  Why was this bankruptcy petition filed?

11     A.  I don't know.

12     Q.  What was the purpose behind it?

13     A.  You would have to ask someone else.  I don't

14 know.

15     Q.  Okay.  Did you ever have any discussions with

16 Tony Ludlow about that?

17     A.  About this petition?

18     Q.  Correct.

19     A.  We may have.

20     Q.  Did you ever have any discussions with

21 Mr. Hook about that?

22     A.  I don't think so.

23     Q.  Did anyone ever indicate that they were

24 concerned that this would be a felony?

25         MR. PERRIN:  Objection; form.

## Page 235

1     A.  I -- no.

2     Q.  (BY MR. FREEMAN)  No one ever indicated they

3 had any concern about that?

4         MR. PERRIN:  Objection; form.

5     A.  I don't remember that.

6     Q.  (BY MR. FREEMAN)  Did Mr. Ludlow ever indicate

7 that he was concerned about submitting this document?

8     A.  No.

9     Q.  No?  And was there ever a discussion after the

10 fact about whether submitting this document was a

11 felony?

12     A.  No.

13     Q.  No?

14     A.  No.

15     Q.  Did you have any discussions about any other

16 questions on this petition?

17     A.  Not that I recall.

18     Q.  Okay.  And did Mr. Ludlow maintain this

19 position as president of ACET Global for at least the

20 year prior to filing this?

21     A.  I don't know.

22     Q.  Did you believe that to be the case?

23     A.  I didn't think about that.

24     Q.  Okay.  And do you believe that Question 28,

25 stating, "List the debtors, officers, directors,

## Page 236

1 managing members, general partners, members in control,

2 controlling shareholder or other persons in control of

3 the debtor at the time of the filing of this case," do

4 you know if anyone had changed prior to that?

5         MR. PERRIN:  Objection; form.

6     A.  I don't.

7     Q.  (BY MR. FREEMAN)  A question here --

8 Question 30 stating, "Payments, distributions or

9 withdrawals credited or given to insiders," did you ever

10 have any discussions with anyone about Question 30?

11     A.  Not that I recall.

12     Q.  And this question asks, "Within one year

13 before the filing of this case, did the debtor provide

14 an insider with value in any form, including salary,

15 other compensation, draws, bonuses, loans, credits on

16 loans, stock redemptions and options exercised?"  And do

17 you believe the answer is correctly stated there as no?

18     A.  I don't know.

19     Q.  Did you or Mr. Ludlow or Mr. Hook seek counsel

20 about this provision?

21     A.  I'm not sure if it was related to a specific

22 provision.  There was a bankruptcy attorney involved.

23     Q.  Okay.  How did you get to that bankruptcy

24 attorney?

25     A.  Phone call, I think.

## Page 237

1     Q.  Okay.  How did you get that attorney's phone

2 number?

3     A.  I think that was a referral.

4     Q.  And who referred that to you?

5     A.  I'm not sure for certain.

6     Q.  Okay.  Why is that?

7     A.  Because I don't know until I see something

8 that says different.

9     Q.  Okay.  Who were your attorneys?

10         MR. PERRIN:  Objection; form.

11     A.  For what?

12     Q.  (BY MR. FREEMAN)  Well, did Baymark Partners

13 or you, did y'all deal with any other attorneys that

14 represented you before this --

15         MR. PERRIN:  Objection; form.

16     Q.  (BY MR. FREEMAN)  -- or did Hallett & Perrin

17 represent Baymark Partners and all of its companies?

18         MR. PERRIN:  Objection; form.

19     A.  I can't answer the last question, but we've

20 used Hallett & Perrin before this.

21     Q.  (BY MR. FREEMAN)  Okay.  Did Hallett & Perrin

22 refer you to the bankruptcy attorney?

23     A.  I can't remember who referred us.

24     Q.  Okay.  Were there any other questions on this

25 document that were concerning?

60 (Pages 234 to 237)

## Page 238

1          MR. PERRIN:  Objection; form.
2      A.  (Moving head side to side.)
3      Q.  (BY MR. FREEMAN)  Is that a no?
4      A.  Well, you're asking me a question for
5  something that's been a while.  I don't remember what
6  was concerning or not.
7      Q.  You don't remember having any concern about
8  any other questions on this document?
9          MR. PERRIN:  Objection; form.
10      A.  Correct.
11      Q.  (BY MR. FREEMAN)  Who -- did ACET Global, did
12  it file its own tax returns?
13      A.  I'm sorry.  Say that again.
14      Q.  Did ACET Global, LLC, did it file its own
15  standalone tax returns?
16      A.  I believe it did.
17          MR. PERRIN:  Objection.  The witness let
18  me know he would like to take a bathroom break if
19  possible.
20          MR. FREEMAN:  Let's finish the short line
21  of questions.  Maybe one more and we can take a break.
22          MR. PERRIN:  All right.
23      Q.  (BY MR. FREEMAN)  Did ACET Global file its own
24  tax return, or did it roll up into another tax return?
25          MR. PERRIN:  Objection; form.

## Page 239

1      A.  ACET Global rolled up into ACET Holdco.
2      Q.  (BY MR. FREEMAN)  Okay.  Did that roll up into
3  anything else?
4      A.  There were investors in ACET Holdco.
5      Q.  Okay.  Who were those investors?
6      A.  I would have to look at the entity chart to be
7  exactly who it was.
8      Q.  Who do you remember?
9      A.  Tomer Damti would have had ownership.  I don't
10  recall the name of his equity.  And Baymark had an
11  ownership interest in Holdco.
12      Q.  Baymark Partners?  Did Baymark Partners, in
13  fact, own the rest of ACET Holdco?
14      A.  What do you mean by that?  I'm not sure I
15  follow.
16      Q.  Did Baymark Partners own the rest of it, or
17  were there a bunch of other investors?
18      A.  Within Baymark, it was just Baymark.  There
19  were no other investors.
20      Q.  Okay.  So ACET Global's tax return wasn't a
21  standalone return; it rolled up into a consolidated or
22  group tax return?
23          MR. PERRIN:  Objection; form.
24      A.  ACET Global was 100 percent owned by ACET
25  Holdco.

## Page 240

1      Q.  (BY MR. FREEMAN)  Okay.  Did it roll up to a
2  group tax return then?
3      A.  I'm not sure what that means.
4      Q.  Well, I'm wondering -- Question 31.
5          MR. PERRIN:  I'm wondering when we can
6  get a break.
7          MR. FREEMAN:  Yeah, this will be it.
8      Q.  (BY MR. FREEMAN)  Question 31 states, "Within
9  six years before filing this case, has the debtor been a
10  member of any consolidated group for tax purposes?"
11  That states no.  Does that appear to be correct?
12          MR. PERRIN:  Objection; form.
13      A.  I'm not sure.
14          MR. FREEMAN:  Okay.  Mr. Denegre, why
15  don't we go ahead and take a quick break.
16          (Break taken from 5:06 p.m. to 5:18 p.m.)
17      Q.  (BY MR. FREEMAN)  Mr. Denegre, we were talking
18  about the Baymark Voluntary Bankruptcy Petition before
19  the break.  Do you, in fact, recall if you did discuss
20  that with Mr. Ludlow?
21      A.  I don't.
22      Q.  Or whether he reviewed that document?
23      A.  Given that he signed it, I'm assuming he
24  reviewed it.
25          (Exhibit 36 marked.)

## Page 241

1      Q.  (BY MR. FREEMAN)  I'm putting on the screen
2  what's marked as Exhibit 36.  Do you see that, sir?  Is
3  that an email from you, Matt Denegre, on October 16,
4  2019, to Tony Ludlow?
5      A.  Yes.
6      Q.  Okay.  And is that the subject line stated
7  "Bankruptcy"?
8      A.  Yes.
9      Q.  And was this with respect to the ACET
10  bankruptcy petition we just reviewed?
11      A.  How can I tell?
12      Q.  I don't know.  What other bankruptcy would
13  this be in regard to?
14      A.  Scrolling down.  I'm going to take a look.
15      Q.  Okay.  Mr. Denegre, if you'll look at the
16  email that you sent on October 16th, I'm highlighting it
17  on the screen for you.  There are several attachments
18  reflected.  Is this document a true and correct copy of
19  the email that you sent to Mr. Ludlow?
20      A.  I think it is.
21      Q.  And does it include as an attachment among
22  others a bill of sale and a voluntary petition?
23      A.  I see the bill of sale.  I see the voluntary
24  petition, yes.
25      Q.  Okay.  Do you know what these documents were

61 (Pages 238 to 241)

## Page 242

1   related to?
2        A.  Can I look at the documents?
3        Q.  Well, just looking at this email -- I don't
4   have a lot of time left, so I kind of want to move
5   through this.  But looking at this email, was this in
6   regard to the ACET Global bankruptcy?
7        A.  Without -- I'm assuming that it is.
8        Q.  Right.  Do you, in fact, know that it is?
9        A.  I don't.
10       Q.  Okay.  Did you have discussions with
11  Mr. Ludlow about the bankruptcy prior to this?
12       A.  I'm not sure.
13       Q.  Okay.  If we look down below, is that an email
14  from Tony Ludlow to you on October 15th, 2019, with the
15  subject line "Bankruptcy"?
16       A.  Yes.
17       Q.  Okay.  And does he say to you, "Let's discuss
18  today"?
19       A.  Yes, he does.
20       Q.  And was your normal practice to have a
21  discussion with Mr. Ludlow when he asked you to have a
22  discussion?
23       A.  It would be.
24       Q.  Okay.  Did you have a discussion with
25  Mr. Ludlow?

## Page 243

1        A.  I don't recall.
2        Q.  Okay.  What was the bill of sale that was
3   attached to this document?
4        A.  Can we take a look?
5        Q.  Okay.  It's up on your screen.  It's part of
6   the documents that Baymark Partners produced.
7        A.  I understand.
8        Q.  Okay.  Does that appear to be the bill of sale
9   in which Super G Capital sold or purported to sell
10  assets of ACET Global to Windspeed Trading, LLC?
11       A.  Is that what this document says?
12       Q.  Well, that's what's stated in the first few
13  lines of the bill of sale, is it not?
14            MR. PERRIN:  Objection; form.
15       A.  This looks like a bill of sale.
16       Q.  (BY MR. FREEMAN)  Okay.  For the foreclosure
17  sale, correct?
18            MR. PERRIN:  Objection; form.
19       A.  It mentions foreclosure sale in that first
20  paragraph.
21       Q.  (BY MR. FREEMAN)  Okay.  And Super G Capital
22  as well?
23       A.  Yes.
24       Q.  And Windspeed Trading, LLC, as well?
25       A.  Yes.

## Page 244

1        Q.  Okay.  Let's scroll down and look at this
2   Exhibit 1, the inventory.  Is that, in fact, the
3   inventory that came from ACET Global?  Is that the
4   inventory you received from Bill Szeto?
5            MR. PERRIN:  He's going through it.
6        A.  The only way I can tell if this is the same
7   report is I would have to go look at what the attachment
8   was.  I don't know.
9        Q.  (BY MR. FREEMAN)  Okay.  Well, what I want to
10  know is why were you sending -- days before this
11  bankruptcy, why were you sending this bill of sale along
12  with other bankruptcy documents to Tony Ludlow?
13       A.  It doesn't say in the email why I was sending
14  these, other than bill of sale.  This is for Part 2.5,
15  statement of affairs.
16       Q.  We have seen in other emails that you've
17  provided explanation for things.  Is there a reason
18  there's no explanation given here?
19            MR. PERRIN:  Objection; form.
20       A.  By me giving you an explanation that I'm not
21  exactly sure is correct wouldn't be appropriate.
22       Q.  (BY MR. FREEMAN)  Okay.  But looking back at
23  the ACET Global bankruptcy petition that was reflected
24  in Exhibit 1, recall that there was a question there
25  about inventories.  "Have any inventories of the

## Page 245

1   debtor's property been taken within two years before
2   filing this case?"  And the answer there is no; is that
3   correct?
4            MR. PERRIN:  Objection; form.
5        Q.  (BY MR. FREEMAN)  And you reviewed this prior
6   to it being filed, correct?
7            MR. PERRIN:  Objection; form.
8        A.  I reviewed this file along with whoever our
9   counsel was at the time.
10       Q.  (BY MR. FREEMAN)  Okay.  And along with
11  Mr. Ludlow, correct?
12       A.  Again, I can't speak for Mr. Ludlow other than
13  I know he signed the document.
14       Q.  Okay.  But you had some discussions with him
15  about it, correct?
16       A.  His email asks us to have a discussion.  I'm
17  not sure if that happened or not.
18       Q.  Okay.  If this document was filed with a
19  Federal court on October 23rd, 2019, this email in which
20  you forward both the Voluntary Bankruptcy Petition and
21  the foreclosure sale -- bill of sale with the inventory
22  of ACET Global's assets to Mr. Ludlow just a few days
23  before, correct?
24            MR. PERRIN:  Objection; form.
25       A.  So the date on this email says October 16th,

62 (Pages 242 to 245)

Page 246

1   2019?
2   Q.  (BY MR. FREEMAN)  Correct.
3   A.  And what's your question?
4   Q.  I'm just asking, did you send him those items
5   several days before ACET Global's bankruptcy petition
6   was filed?
7   A.  I don't recall.
8   Q.  And did you have any discussion with
9   Mr. Ludlow about concerns about ACET Global's inventory
10  in relation to the bankruptcy petition?
11      MR. PERRIN:  Objection; form.
12  A.  Not that I recall.
13  Q.  (BY MR. FREEMAN)  Okay.
14      (Exhibit 37 marked.)
15  Q.  (BY MR. FREEMAN)  I'm going to put what's
16  marked as Exhibit 37 on your screen.  Do you see that,
17  sir?
18  A.  Yes.
19  Q.  Now, bankruptcy -- the bankruptcy that
20  occurred in 2019, had you discussed a bankruptcy prior
21  to that?
22  A.  I don't recall if we did or not.
23  Q.  Had you discussed the possibility of ACET
24  Global going into a bankruptcy?
25  A.  I don't recall.

Page 247

1   Q.  Did you discuss that with Super G?
2   A.  Can't recall.
3   Q.  Did you discuss that with Super G in 2018?
4   A.  I don't recall.
5   Q.  Maybe, like a year before this bankruptcy
6   petition?
7   A.  I don't recall.
8   Q.  Did you discuss it with Tony Ludlow, like, a
9   year before this bankruptcy petition?
10  A.  I don't recall.
11  Q.  If you will, sir, look at Exhibit 37.  This is
12  an email that says it's from Matt Denegre.  Do you see
13  that it's to Steve Bellah, Tony Ludlow and William
14  Szeto?
15  A.  Yes.
16  Q.  It's dated January 3rd, 2019, correct?
17  A.  Correct.
18  Q.  And I believe you previously told me that as
19  of at least January 7th, 2019, you still believed Steve
20  Bellah was working for Super G Capital; is that correct?
21  A.  I think he was still working for Super G
22  Capital.
23  Q.  Okay.  Let's scroll down this Exhibit 37, if
24  you will with me.  Mr. Denegre, there's an email there
25  on the third page, and this is yet another email from

Page 248

1   Matt Denegre, mdenegre@baymarkpartners.com to Steve
2   Bellah and Tony Ludlow, steve@supergcapital and
3   tludlow@baymarkpartners.com; is that correct?
4   A.  Yes.
5   Q.  Okay.  And this was sent on November 21st,
6   2018; is that correct, sir?
7   A.  I see November 27th, the one I'm looking at.
8   Q.  Look just below that one.  Do you see the one
9   on your screen that says November 21st, 2018?
10  A.  I'm there.  I see it.
11  Q.  Okay.  And let's look at what you state in
12  this email.  It says, "We had to bring her in last
13  minute because there are multiple parties involved,
14  (ACET Global, Windspeed, Baymark) and our corporate
15  counsel does not have bankruptcy/foreclosure expertise
16  within their firm."  Is that a correct statement, sir?
17  A.  That's what it says.
18  Q.  And did you, in fact, send this email?
19  A.  Yes.
20  Q.  And is this a true and correct copy of the
21  email that you sent?
22  A.  I think it is.
23  Q.  Okay.  Why did you send this?
24  A.  I don't know.
25  Q.  Okay.  What did you -- when you referred to

Page 249

1   corporate counsel, was that referring to Hallett &
2   Perrin?
3   A.  I would think it would be Hallett & Perrin.
4   Q.  Did Hallett & Perrin initially not want
5   anything to do with this bankruptcy or foreclosure?
6       MR. PERRIN:  Objection; form.
7   A.  I don't recall.
8   Q.  (BY MR. FREEMAN)  Okay.  What did you mean
9   there were multiple parties involved?  ACET Global,
10  Windspeed, Baymark?
11  A.  I don't know.  I'm not sure why those parties
12  are listed.
13  Q.  Okay.  At the time of this email, do you
14  recall there being a sense of urgency to do something?
15  A.  I don't.  I don't recall what was going on at
16  this moment.
17  Q.  Do you recall Steve Bellah having a sense of
18  urgency to do something?
19  A.  Specifically, I don't.
20  Q.  Okay.  If you look just below that, the email
21  from Steve Bellah on November 21st, 2018, to you and
22  Mr. Ludlow.  And he states, "Does she know there is a
23  sense of urgency here?"  Is that correct?
24  A.  I see that.
25  Q.  Why is there a sense of urgency?

63 (Pages 246 to 249)

Matt Denegre   *   April 8, 2021

---

Page 250

1    A.  You would have to ask Steve.  I don't recall
2  what sense of urgency there was at this time.
3    Q.  Okay.  And going to your email above that,
4  what bankruptcy or foreclosure are you referring to?
5    MR. PERRIN:  Objection; form.
6    Q.  (BY MR. FREEMAN)  Was that the bankruptcy of
7  ACET Global?
8    MR. PERRIN:  Objection; form.
9    A.  My email here says, "and our corporate counsel
10  does not have bankruptcy/foreclosure expertise within
11  their firm."
12    Q.  (BY MR. FREEMAN)  Was there, in fact, a plan
13  in 2018 to take ACET Global into bankruptcy?
14    A.  Not that I'm aware of.
15    Q.  Was there a plan to foreclose on the assets of
16  ACET Global?
17    A.  Super G may have had a plan.
18    Q.  Okay.  How did that impact Baymark Partners?
19    MR. PERRIN:  Objection; form.
20    A.  It didn't impact Baymark Partners.
21    Q.  (BY MR. FREEMAN)  Okay.  Why did you state
22  there were multiple parties involved?
23    A.  Not sure.
24    Q.  Okay.  You don't know what that means?
25    A.  I don't.  I'm sorry.

---

Page 251

1    Q.  Even looking at this, you didn't have anything
2  to do with ACET Global's foreclosure?
3    A.  Super G foreclosed on ACET.  Super G --
4    Q.  You didn't have anything do with that?
5    MR. PERRIN:  Objection; form.
6    A.  No.
7    Q.  (BY MR. FREEMAN)  And Baymark Partners didn't
8  have anything to do with that, right?
9    MR. PERRIN:  Objection; form.
10    A.  Nope.
11    Q.  (BY MR. FREEMAN)  And Tony Ludlow didn't have
12  anything do with that, correct?
13    A.  No.
14    Q.  And that was completely unrelated to Windspeed
15  Trading, LLC?
16    A.  What's that?
17    Q.  The foreclosure upon ACET Global's assets.
18    MR. PERRIN:  Objection; form.
19    A.  Yes.
20    Q.  (BY MR. FREEMAN)  And you also didn't have
21  anything to do with the bankruptcy filing of ACET Global
22  other than reviewing the petition; is that correct?
23    MR. PERRIN:  Objection; form.
24    A.  Yeah, I recall reviewing it, and I think that
25  was it.

---

Page 252

1    Q.  (BY MR. FREEMAN)  Okay.  Did you discuss your
2  deposition here with anyone prior to this deposition?
3    MR. PERRIN:  Objection; form.
4    A.  Discussed with our attorneys and Tony Ludlow.
5  I let David Hook know I had to go to a deposition.
6    Q.  Okay.
7    A.  My wife.  That was it.
8    Q.  (BY MR. FREEMAN)  Did you discuss anyone
9  else's deposition in this case with them?
10    A.  I don't recall.  I don't believe so.
11    Q.  Did you talk with Mr. Szeto after his
12  deposition?
13    A.  No.
14    Q.  No?  Did Tony Ludlow talk with Mr. Szeto after
15  his deposition?
16    A.  You would have to ask Tony that.
17    Q.  Okay.  Did you have a discussion with Tony
18  Ludlow about your deposition?
19    A.  Yes.
20    Q.  Okay.  When did you have that discussion?
21    MR. PERRIN:  Objection; form.
22    A.  It would have been one or two weeks ago.
23    Q.  (BY MR. FREEMAN)  Okay.  One or two weeks ago?
24  You're sure of that?
25    A.  It's within a two-week time frame.  I don't

---

Page 253

1  know the specific date, but I know it wasn't a month
2  ago.
3    Q.  How many times?
4    A.  Just once.
5    Q.  And where did you meet with him?
6    A.  In my office.
7    MR. PERRIN:  Objection; form.
8    Q.  (BY MR. FREEMAN)  In your office or his?
9    A.  My office.
10    Q.  Okay.  How long was that meeting?
11    MR. PERRIN:  Objection; form.
12    A.  I remember it being less than five minutes.
13    Q.  (BY MR. FREEMAN)  Okay.  Did you call into
14  Mr. Szeto's deposition?
15    A.  I did.
16    Q.  Did you watch Mr. Szeto's deposition?
17    A.  I listened to parts of it, and I watched other
18  parts of it.
19    Q.  Did you disagree with anything Mr. Szeto said?
20    MR. PERRIN:  Objection; form.
21    A.  I have no opinion on Mr. Szeto's deposition.
22    Q.  (BY MR. FREEMAN)  Okay.  Did you believe
23  everything that he said was truthful?
24    MR. PERRIN:  Objection; form.
25    A.  I have no opinion on it.

---

64 (Pages 250 to 253)

Page 254

1    Q.  (BY MR. FREEMAN)  Did you believe anything
2    that he said was inaccurate?
3              MR. PERRIN:  Objection; form.
4         A.  Given that he's under oath, I have to assume
5    everything that he said was truthful.
6         Q.  (BY MR. FREEMAN)  Okay.  So your testimony, as
7    you sit here today, is that you believe everything that
8    Mr. Szeto said in his deposition was truthful?
9              MR. PERRIN:  Objection; form.
10        A.  No.  I'm not going to have an opinion on that.
11        Q.  (BY MR. FREEMAN)  Okay.  Who else did you talk
12   to about Mr. Szeto's deposition?
13        A.  I only think to Mr. Szeto's
14   deposition with our attorneys.
15        Q.  Okay.
16        A.  And my wife.  My wife was wondering what I was
17   doing in the living room.
18        Q.  You didn't discuss it with Mr. Ludlow?
19        A.  No.
20        Q.  Steven Bellah?
21        A.  No.
22        Q.  Alex Godinez?
23        A.  No.
24        Q.  And not Mr. Szeto?
25        A.  No.

Page 255

1         Q.  How many times have you had discussions with
2    Tony Ludlow about this case?
3         A.  I don't know -- Tony Ludlow's been on emails
4    with our attorneys.
5              MR. PERRIN:  I would caution you not to
6    disclose any attorney-client communications.
7         A.  And phone calls with our attorneys.  Those
8    were the discussions.
9         Q.  (BY MR. FREEMAN)  Okay.  Did you ever have a
10   meeting with Mr. Ludlow, just you and Mr. Ludlow or you
11   and Mr. Ludlow with no attorneys about this case?
12             MR. PERRIN:  Objection; form.
13        A.  I don't recall.
14        Q.  (BY MR. FREEMAN)  Okay.  Do you recall having
15   a meeting with Mr. Ludlow to try to get documentation
16   about the foreclosure by Super G?
17        A.  Can you ask that again?
18        Q.  Yeah.  Did you ever have a meeting with
19   Mr. Ludlow to try to pull together documentation of the
20   foreclosure by Super G?
21        A.  I don't recall if I did or not.
22        Q.  Okay.  Was that not a specific topic of a
23   meeting maybe right before the bankruptcy petition was
24   filed?
25        A.  I don't remember.

Page 256

1              (Exhibit 31 marked.)
2         Q.  (BY MR. FREEMAN)  So I'm putting on the screen
3    what's marked as Exhibit 31.  Do you see that, sir?  Is
4    that a calendar invite from you to Mr. Ludlow on
5    December 19th, 2019, the subject matter "ACET lawsuit/
6    Documentation of foreclosure by Super G"?
7         A.  Yes.
8         Q.  Okay.  Is that, in fact, a true and correct
9    copy of that?
10        A.  Yes.
11        Q.  And did you, in fact, have a discussion with
12   Tony Ludlow on or around the date reflected there about
13   the foreclosure of ACET Global's assets?
14        A.  I don't recall if we did or not.
15        Q.  You don't recall having any discussion about
16   that with Mr. Ludlow?
17        A.  I do not.
18        Q.  Okay.  Have you had any discussions with Bill
19   Szeto about this case?
20             MR. PERRIN:  Objection; form.
21        A.  Yes, I did.
22        Q.  (BY MR. FREEMAN)  Okay.  When were those?
23        A.  Not sure.  Not sure of the exact date.  It
24   would have been last year.
25        Q.  Okay.  And what was that about?

Page 257

1         A.  Bill had called me to discuss the defendants
2    and who was representing the defendants.
3         Q.  Okay.  And what did you tell him?
4         A.  I said Hallett & Perrin were representing the
5    Baymark defendants, and you should have your own counsel
6    for Windspeed.
7         Q.  Okay.  Did you tell him that Baymark Partners
8    didn't want to be involved?
9         A.  I don't remember if I did or not.
10        Q.  Okay.  Is there any reason that Mr. Szeto
11   would have coordinated with Super G to prepare a
12   response in this case?
13             MR. PERRIN:  Objection; form.
14        A.  I don't know.
15             (Exhibit 32 marked.)
16        Q.  (BY MR. FREEMAN)  I'm putting on the screen
17   what's marked as Exhibit 32, sir.  It's an email --
18   email correspondence between William Szeto, Alex Szeto
19   and Steve Bellah.  Do you see that, sir?
20        A.  I see that.
21        Q.  Okay.  And this is dated September 25th, 2020.
22   Do you see that?
23        A.  Yes.
24        Q.  Okay.  And does it state from Mr. Szeto, "For
25   your information, we will have to respond.  I'm not

65 (Pages 254 to 257)

Page 258

1  copying Matt since he gave us the answer that Baymark
2  will no longer want to be involved with the lawsuit.
3  Before I go to see the lawyer, I would like to talk to
4  two of you to prepare our response and get whatever
5  document we have as backup." Do you see that?
6        MR. PERRIN: Objection; form.
7     A. I see the email, yes.
8     Q. (BY MR. FREEMAN) Did you, in fact, have a
9  conversation with William Szeto around the time of this
10 email?
11    A. I had a conversation with Bill Szeto
12 probably -- I know prior to this email, but it would
13 have been late summer-ish.
14    Q. Okay. What did you discuss?
15    A. Bill had asked who was representing the
16 defendant. I told him Hallett & Perrin was representing
17 the Baymark defendants, and you should get your own
18 counsel.
19    Q. Okay. Because he was part of Windspeed?
20    A. Correct.
21    Q. And Windspeed was a completely separate,
22 independent company?
23    A. Yes.
24    Q. That had no relationship whatsoever to Baymark
25 Partners?

Page 259

1        MR. PERRIN: Objection; form.
2     A. Yes.
3     Q. (BY MR. FREEMAN) Okay. Did you have a
4  discussion that also involved William Szeto and Steve
5  Bellah of Super G?
6     A. Not that I recall.
7     Q. You don't recall a conference call involving
8  you, Mr. Szeto and Super G?
9     A. I don't.
10    Q. But now, Mr. Szeto testified that that call,
11 in fact, did happen. Do you maintain that that part of
12 his testimony was false?
13    A. I can't give you an opinion on his testimony.
14    Q. Okay. Who hosted ACET Global's email
15 accounts?
16    A. There was a third-party email hosting company
17 that did that.
18    Q. Okay. Was that Rock Design Hosting?
19    A. It could be.
20    Q. Okay. Was it, in fact, Rock Design Hosting?
21    A. I don't know.
22    Q. Okay. Did you talk to Bill Szeto about
23 getting access to ACET Global's emails?
24    A. I did.
25    Q. When did you do that?

Page 260

1     A. That would have been 2020.
2     Q. Okay. Late 2020 or early, middle?
3     A. It would have been middle to late.
4     Q. Okay. What did you discuss with him?
5     A. As part of discovery, I wanted to get access
6  to all of the ACET emails. I wasn't sure how to do
7  that.
8     Q. And did Mr. Szeto know?
9     A. He suggested to call a firm.
10    Q. Okay. And was that possibly Rock Design
11 Hosting?
12    A. Potentially, yes.
13    Q. Okay. And did you, in fact, call that
14 company?
15    A. I did.
16    Q. Okay. And what did you discover?
17    A. That the emails on their server were cleared
18 out because of nonpayment. They don't hold that data
19 after a certain amount of time.
20    Q. So those emails had all been deleted?
21    A. If you want to call it deleted, I guess that's
22 the appropriate way. They don't keep data after a
23 certain amount of time.
24    Q. Those emails had been destroyed, correct?
25        MR. PERRIN: Objection; form.

Page 261

1     A. Yes, the third-party website or hosting site
2  would have gotten rid of those emails.
3     Q. (BY MR. FREEMAN) Did you believe that there
4  were relevant emails --
5        MR. PERRIN: Objection; form.
6     Q. (BY MR. FREEMAN) -- that were deleted?
7     A. I'm not sure. I think having access to all
8  the emails would be helpful. That's why I called them
9  to try to get those.
10    Q. Okay. Did Mr. Szeto say whether he had done
11 anything to try to preserve those emails?
12        MR. PERRIN: Objection; form.
13    A. He didn't say anything like that.
14    Q. (BY MR. FREEMAN) When did they say that those
15 emails were deleted?
16    A. Pretty soon after nonpayment, so I would
17 assume early 2018.
18    Q. Is that what they --
19    A. 2019, potentially.
20    Q. Is that, in fact, what they said?
21    A. To me, it was -- I can't give you the specific
22 dates. I do know it was a short term, and short, I mean
23 less than a year.
24    Q. Okay. Do you believe that those emails could
25 have been relevant to ACET Global's bankruptcy?

## Page 262

1     MR. PERRIN: Objection; form.
2     A. It didn't cross my mind.
3     Q. (BY MR. FREEMAN) No? Did Mr. Ludlow ever say
4  anything in that regard?
5     A. No.
6     Q. No? Why did you want to get these documents?
7     A. There was a request for discovery, and we felt
8  it was necessary to pull all the documents.
9     Q. Okay. But all of those documents that were
10 responsive had, in fact, been deleted?
11    MR. PERRIN: Objection; form.
12    A. Those emails were deleted by this party, this
13 third party.
14    Q. (BY MR. FREEMAN) Okay. And was this, in
15 fact, in December of 2020?
16    A. It may have been.
17       (Exhibit 33 marked.)
18    Q. (BY MR. FREEMAN) Okay. I'm putting on the
19 screen what's marked as Exhibit 33. Do you see that,
20 sir?
21    A. Okay.
22    Q. And after reviewing this document, was it, in
23 fact, Rock Design Hosting that had preserved access to
24 the emails?
25    A. Yes.

## Page 263

1     Q. And was that all of the ACET Global, LLC,
2  emails?
3     A. I assume so. This was the first time I had
4  heard of the company or who hosted the emails.
5     Q. Okay. But you got that information from Bill
6  Szeto?
7     A. Yes.
8     Q. What did --
9        MR. PERRIN: Karen, can we get a time
10 check, please?
11       THE REPORTER: Six hours and 18 seconds.
12       MR. FREEMAN: All right. We're almost
13 done.
14       MR. PERRIN: You're done. It's over six
15 hours.
16    Q. (BY MR. FREEMAN) One last question,
17 Mr. Denegre. What did Mr. Szeto say to you in your
18 conversation about the status of the ACET Global
19 electronic documents that had been deleted?
20       MR. PERRIN: Objection; form.
21    A. He didn't mention anything about deleted
22 emails.
23       MR. PERRIN: All right.
24       MR. FREEMAN: Pass the witness.
25       MR. PERRIN: Reserve questions, time of

## Page 264

1  trial.
2        MS. HARD-WILSON: Windspeed also
3  reserves.
4        THE REPORTER: Brenda, do you need a copy
5  of the deposition?
6        MS. HARD-WILSON: No, thank you.
7        THE REPORTER: Okay.
8        MR. PERRIN: Jason, you have been talking
9  about a document that I don't remember the number of it,
10 but it was one of your exhibits about the ACET Global
11 shutdown. And Mr. Denegre mentioned that he thought
12 that it had been requested by Super G by an email. And
13 you said, Had that been produced? It has. We checked,
14 and yes, that was produced.
15       MR. FREEMAN: Okay.
16       MR. PERRIN: It is Document BP006293.
17       MR. FREEMAN: Thank you very much. I
18 appreciate that.
19       MR. PERRIN: Email from Bellah dated
20 September 7th to Matt Denegre.
21       MR. FREEMAN: Okay.
22       MR. PERRIN: All right.
23       THE REPORTER: Ed, did you say you wanted
24 an expedited copy of the depo, correct?
25       MR. PERRIN: I don't think we need an

## Page 265

1  expedited copy of the depo.
2        (End of proceedings.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

67 (Pages 262 to 265)

## Page 266

```
1              CHANGES AND SIGNATURE
2    WITNESS NAME: MATT DENEGRE
3    DATE OF DEPOSITION: April 8, 2021
4    PAGE LINE    CHANGE       REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

## Page 267

```
1          I, MATT DENEGRE, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5          _____
6                   MATT DENEGRE
7    THE STATE OF _____)
8    COUNTY OF _____)
9
10         Before me, _____, on this day
11   personally appeared MATT DENEGRE, known to me (or proved
12   to me under oath or through _____
13   (description of identity card or other document)) to be
14   the person whose name is subscribed to the foregoing
15   instrument and acknowledged to me that they executed the
16   same for the purposes and consideration therein
17   expressed.
18         Given under my hand and seal of office this
19   _____ day of _____, _____.
20
21         _____
22                   NOTARY PUBLIC IN AND FOR
23                   THE STATE OF _____
24                   COMMISSION EXPIRES: _____
25
```

## Page 268

```
1                  NO. DC-19-09828
2    D&T PARTNERS, LLC      ) IN THE DISTRICT COURT
     (Successor in interest to )
3    ACET VENTURE PARTNERS,   )
     LLC),                 )
4                          )
     Plaintiff            ) DALLAS COUNTY, TEXAS
5                          )
     VS.                   )
6                          )
     ACET GLOBAL, LLC; BAYMARK )
7    ACET HOLDCO, LLC; BAYMARK ) 116th JUDICIAL DISTRICT
     MANAGEMENT, LCC; BAYMARK )
8    MANAGEMENT, LLC; BAYMARK  )
     PARTNERS; DAVID HOOK;   )
9    TONY LUDLOW; and         )
     WINDSPEED TRADING, LLC,
10
     Defendants
11
12
13          REPORTER'S CERTIFICATION
          DEPOSITION OF MATT DENEGRE
             April 8, 2021
14
15        I, Karen Usher, Certified Shorthand Reporter in and
16   for the State of Texas, hereby certify to the following:
17        That the witness, MATT DENEGRE, was duly sworn by
18   the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by
20   the witness;
21        That the deposition transcript was submitted on
22   APRIL 22, 2021 to the witness or to the attorney for the
23   witness for examination, signature and return to me by
24   MAY 12, 2021;
25        That the amount of time used by each party at the
```

## Page 269

```
1    deposition is as follows:
2         MR. JASON B. FREEMAN - 6 HOURS:1 MINUTES
          MR. EDWARD PERRIN - 00 HOURS:00 MINUTE(S)
3         MS. BRENDA HARD-WILSON - 00 HOURS:00 MINUTE(S)
4         That pursuant to information given to the
5    deposition officer at the time said testimony was taken,
6    the following includes counsel for all parties of
7    record:
8         MR. JASON B. FREEMAN, Attorney for Plaintiffs
          MR. EDWARD PERRIN, Attorney for Defendants
9         BAYMARK ENTITIES
          MS. BRENDA HARD-WILSON, Attorney for Defendants
10        WINDSPEED TRADING, LLC
11        I further certify that I am neither counsel for,
12   related to, nor employed by any of the parties or
13   attorneys in the action in which this proceeding was
14   taken, and further that I am not financially or
15   otherwise interested in the outcome of the action.
16        Further certification requirements pursuant to Rule
17   203 of TRCP will be certified to after they have
18   occurred.
19        Certified to by me this 14th day of April, 2021.
20
21        Karen Usher
22        MARY KAREN USHER, CSR # 5536
          Expiration: 1/31/2022
23        Firm Registration # 10278
          USHER REPORTING SERVICES
24        1326 Lochness Drive
          Allen, Texas 75013
25        (214) 755-1612
```

Matt Denegre  *  April 8, 2021

Page 270

```
 1          FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2      The original deposition _____ was _____ was not
 3  returned to the deposition officer;
 4      If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefore;
 6      If returned, the original deposition was delivered
 7  to MR. JASON FREEMAN, Custodial Attorney;
 8      That $_____ is the deposition officer's
 9  charges to the Plaintiff for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein on and filed with the
14  Clerk.
15      Certified to by me this ____ day of _____, 2020.
16
17
18      _____
        MARY KAREN USHER, CSR # 5536
19      Expiration: 1/31/2022
        Firm Registration # 10278
20      USHER REPORTING SERVICES
        1326 Lochness Drive
21      Allen, Texas 75013
        (214) 755-1612
22      karen@usherreporting.com
23
24
25
```

Usher Reporting Services
(214) 755-1612