PLAINTIFF'S
EXHIBIT

**3**

CAUSE NO. DC-19-09828

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC.), | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| vs. | § § | |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | § § § § § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § | 116th JUDICIAL DISTRICT |

*********************************************

REMOTE VIDEOCONFERENCED DEPOSITION OF

ANTHONY LUDLOW

APRIL 15, 2021

*********************************************

        REMOTE VIDEOCONFERENCED DEPOSITION OF ANTHONY

LUDLOW, produced as a witness at the instance of the

Plaintiff, and remotely duly sworn by agreement of all

counsel, was taken in the above-styled and numbered cause

on April 15, 2021, from 9:36 a.m. to 4:44 p.m., before

Karen L. D. Schoeve, CSR, RDR, CRR, in and for the State

of Texas, reported remotely by computerized machine

Page 2

1  shorthand, pursuant to the Texas Rules of Civil Procedure
2  and the provisions stated on the record or attached
3  hereto.
4
5       This deposition is being conducted remotely in
6  accordance with the current Emergency Order regarding the
7  COVID-19 State of Disaster, Paragraph 3.b and c.
8
9       REPORTER'S NOTE:  Exhibits were presented in
10  nonsequential order.
11
12      Please be advised that an UNCERTIFIED ROUGH
13  DRAFT version of this transcript exists.  If you are in
14  possession of said rough draft, please replace it
15  immediately with this CERTIFIED FINAL TRANSCRIPT.
16
17      Please note that due to the quality of a Zoom
18  videoconference and transmission of data and overspeaking
19  causes audio distortion which disrupts the process of
20  preparing a videoconference transcript.
21
22      Quotation marks are used for clarity and do not
23  necessarily reflect a direct quote.
24
25

Page 4

1                    INDEX
2                                PAGE
3  Appearances                    3
4  Stipulation - Objection by One is Objection    10
5  for All
6  Request for Production           140
7  Request For Production           141
8
9
10  ANTHONY LUDLOW
11    Examination By Mr. Freeman          11
12    Afternoon Session          127
13    Examination (Continued) By Mr. Freeman    127
14    Examination By Mr. Perrin          260
15
16
17  Signature and Changes          264
18
19  Certified Stenographic          266
20  Court Reporter's Certificate
21
22
23
24
25

Page 3

1            A P P E A R A N C E S
2  ************************************************
            ALL PARTIES APPEARED
3            REMOTELY VIA ZOOM
   ************************************************
4
5  FOR THE PLAINTIFF:
6    JASON B. FREEMAN, ESQUIRE
     FREEMAN LAW, PLLC
7    7011 Main Street
     Frisco, Texas 75034
8    T: 214.984.3410
     F: 214.984.3409
9    jason@freemanlaw.com
10
   FOR DEFENDANTS BAYMARK ENTITIES, DAVID HOOK and TONY
11  LUDLOW:
12    MR. EDWARD PERRIN, ESQUIRE
     HALLETT & PERRIN
13    1445 Ross Avenue, Suite 2400
     Dallas, Texas 75202
14    T: 214.953.0053
     eperrin@hallettperrin.com
15
16  FOR THE DEFENDANT WINDSPEED TRADING, LLC:
17    MS. BRENDA HARD-WILSON, ESQUIRE
     MR. TIMOTHY WOODS, ESQUIRE
18    HIGIER ALLEN
     2711 North Haskell Avenue, Suite 2400
19    Dallas, Texas 75204
     T: 972.371.2481
20    bhard-wilson@higierallen.com
     twoods@higierallen.com
21
   ALSO PRESENT:
22
     Matt Denegre, Client Representative
23       Baymark Entities
     Tomer Damti
24
   CERTIFIED STENOGRAPHIC COURT REPORTER:
25    Karen L. D. Schoewe, CRR, RDR, RSA

Page 5

1            EXHIBIT INDEX
2  NO.  DESCRIPTION                    PAGE
3  Exhibit 3            245
     ACET Global, LLC, letter dated
4    02/12/18 To Tomer Damti From Anthony
     Ludlow
5    Bates stamped DandTPartnersLLC000592
6  Exhibit 4            228
     E-mail thread dated 10/15-16/18 To
7    Steve Bellah From Matt Denegre
     Subject: Windspeed-revised WPA and
8    warrant, with attachment
     Bates stamped BP_006462 - 6495
9
   Exhibit 5            89
10    E-mail thread dated 01/07/19 To Matt
     Denegre From William Szeto
11    Subject: Luluway Fan Page
     Bates stamped BP_012168 - 12169
12
   Exhibit 7            192
13    E-mail dated 10/23/18 To Steve
     Bellah From Matt Denegre
14    Subject: ACET
     Bates stamped BP_005045
15
   Exhibit 8            31
16    E-mail dated 12/07/18 To Tony Ludlow
     From Matt Denegre
17    Subject: [Voicemail] New message in
     mailbox 1003 on Friday, December 07,
18    2018 at 08:37:09 AM
     Bates stamped BP_012078 - 79
19
   Exhibit 11            141
20    United States Bankruptcy Court for
     the Eastern District of Texas
21    Chapter 7, Official Form 201,
     Voluntary Petition for
22    Non-Individuals Filing for
     Bankruptcy for ACET Global, LLC,
23    signed 10/23/19
     (29 pages)
24
25

## Page 6

1   Exhibit 13          78
2       E-mail thread dated 09/10/18 To Tony
        Ludlow From Matt Denegre
3       Subject: Corrected Version, with
        attachment
4       Bates stamped BP_011286 - 11289

5   Exhibit 15          111
        E-mail thread dated 09/29/18 through
6       10/07/18 To Tony Ludlow From Matt
        Denegre
7       Subject: ACET Newco, with attachment
        Bates stamped BP_011295 - 11313
8   Exhibit 19          203
        E-mail thread dated 03/22-26/19 To
9       Julie A. Smith From William Szeto
        Subject: Windspeed/Super G-loan
10      agreement
        Bates stamped BP_012660 - 12661
11
    Exhibit 20          240
12      E-mail thread dated 11/20/18 through
        01/03/19 To Steve Bellah, et al.,
13      From Matt Denegre
        Subject: Follow up on Projections
14      Bates stamped BP_006872 - 6875
15  Exhibit 22          194
        E-mail thread dated 01/29/19 To Alex
16      Godinez From Matt Denegre
        Subject: Windspeed/ACET
17      Bates stamped BP_012377 - 12378
18  Exhibit 24          217
        E-mail thread dated 09/07/18 To Steve
19      Bellah From Matt Denegre
        Subject: ACET Plan, with attachment
20      Bates stamped BP_ 006279 - 6292
21  Exhibit 29          53
        E-mail thread dated 04/18/18 To Matt
22      Denegre and Steve Bellah From Tony
        Ludlow
23      Subject: ACET - Strategy
        Bates stamped BP_001481
24
25

## Page 8

1   Exhibit 46A          225
        E-mail dated 10/17/18 To Matt
2       Denegre, et al., From Julie A. Smith
        Subject: Windspeed-A&R company
3       agreement, with attachment
        Bates stamped BP_017717 - 17753
4
    Exhibit 47           235
5       E-mail thread dated 10/08-10/18 To
        Steve Bellah and Matt Denegre From
6       William Szeto
        Subject: Ownership (Newco)
7       Bates stamped BP_006407 - 6409
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 7

1   Exhibit 30          131
        Department of the Treasury Internal
2       Revenue Service Form 8879-PE, IRS
        e-file Signature Authorization for
3       Form 1065 for Baymark ACET Holdco,
        LLC, for 2019
4       (1 page)
5   Exhibit 34          153
        E-mail thread dated 12/13/17 To Tony
6       Ludlow From David Hook
        Subject: Check in
7       Bates stamped BP_011072 - 11073
8   Exhibit 36          150
        E-mail thread dated 10/15-16/19 To
9       Tony Ludlow From Matt Denegre
        Subject: Bankruptcy, with
10      attachments
        Bates stamped BP_013636 - 13751
11
    Exhibit 41          59
12      E-mail thread dated 03/14-15/18 To
        David Hook From Tony Ludlow
13      Subject: FedEx and DHL Payments
        (ACET)
14      Bates stamped BP_001458 - 1461
15  Exhibit 43          131
        Howard, LLP, letter To David Hook
16      From Paul Knutson, including copy of
        Form 8879-PE for Baymark ACET
17      Holdco, LLC, for 2019
        (25 pages)
18
    Exhibit 44          204
19      E-mail thread dated 01/03/19 through
        01/17/19 To Julie A. Smith From J.
20      Brian Vanderwoude
        Subject: Windspeed/Super G
21      transaction
        Bates stamped BP_018420 - 18422
22
    Exhibit 46          127
23      Unedited Rough Draft of Matt
        Denegre, dated 04/08/2021
24      (261 pages)
25

## Page 9

```
 1              P R O C E E D I N G S
 2
 3          THE COURT REPORTER:  If the attorneys could
 4   please state their appearances for the record, then I'll
 5   swear in the witness.
 6          MR. FREEMAN:  Jason Freeman on behalf of
 7   plaintiff, D&T Partners.
 8          MR. PERRIN:  Ed Perrin on behalf of
 9   defendants ACET Global; Baymark ACET Holdco, LLC; Baymark
10   ACET Direct Invest, LLC; Baymark Management, LLC; Baymark
11   Partners; David Hook; and Tony Ludlow.
12          THE COURT REPORTER:  Thank you.
13          MS. HARD-WILSON:  Brenda Hard-Wilson for
14   defendant Windspeed Trading.
15          THE COURT REPORTER:  Okay.
16   Matt?
17   Or someone can tell me who he is.
18          MR. DENEGRE:  Matt Denegre.  Hi, I'm with
19   Baymark.
20          MR. PERRIN:  Matt Denegre is a client
21   representative for the Baymark parties.
22          THE COURT REPORTER:  Thank you.
23   And Mr. Woods is with Brenda.  Okay.
24   (This line intentionally left blank.)
25   (This line intentionally left blank.)
```

Page 10

1              ANTHONY LUDLOW,
2    having been first duly sworn to tell the truth, the whole
3    truth, and nothing but the truth, so help him God,
4    testified as follows:
5              MR. FREEMAN:  Before we begin, I'm just
6    going to read in a -- I guess a few housekeeping matters.
7              I understand we've got an agreement among
8    counsel that any objections by defense counsel will apply
9    to all of the defendants so that they don't have to make
10   multiple objections.
11             Also understand we're taking this
12   deposition today in Mr. Ludlow's capacity as the
13   corporate representative of the -- we'll call the
14   "Baymark entities," all of the entities except for
15   Windspeed Trading LLC.
16             Could I also get everyone who is on -- who
17   is logged into Zoom -- I would just like to confirm that
18   everyone is alone on their Zoom, or to let us know if
19   there's anyone else in their room, for Mr. Damti and
20   Mr. Denegre.
21             MR. DENEGRE:  I'm alone.
22             MR. FREEMAN:  And, Tomer, can you confirm
23   the same?
24             MR. DAMTI:  I'm alone.
25             MR. FREEMAN:  And, Karen, just to make

Page 11

1    sure:  We are indeed recording?
2              THE COURT REPORTER:  Yes, sir, we are.
3              MR. FREEMAN:  Okay.  Thanks.
4              EXAMINATION
5    BY MR. FREEMAN:
6       Q.  Mr. Ludlow --
7              MR. PERRIN:  I mean -- Jason, one other
8    thing.  We have served Baymark Defendants' objections to
9    plaintiff's notice of deposition of the Baymark parties,
10   and this deposition is being taken subject to those
11   objections.
12      Q.  (BY MR. FREEMAN)  Mr. Ludlow, could you state
13   your full name for the record.
14      A.  Anthony Lynn Ludlow.
15      Q.  Mr. Ludlow, my name's Jason Freeman, and I
16   represent D&T Partners, LLC, the successor in interest to
17   ACET Venture Partners, LLC.
18             And do you understand that you're here
19   today in connection with a lawsuit between D&T Partners,
20   LLC, and ACET Global, LLC; Baymark ACET Holdco, LLC;
21   Baymark ACET Direct Invest, LLC; Baymark Management, LLC;
22   Baymark Partners; David Hook; yourself; and Windspeed
23   Trading LLC?
24      A.  I do.
25      Q.  And, Mr. Ludlow, have you ever given a

Page 12

1    deposition before?
2       A.  I have one time before.
3       Q.  And what -- when was that?
4       A.  I believe it was a couple years ago.
5       Q.  Okay.  And what did that involve?
6       A.  I think it was a case that a client was suing
7    his attorney.  I was a witness in that.
8       Q.  And who were the parties?
9       A.  I don't remember.  I don't remember.
10      Q.  Okay.  Do you know if it was in federal court
11   or state court?
12      A.  State court.
13      Q.  And were you a party?
14      A.  No, I was not.
15      Q.  What was the nature of your involvement?
16      A.  I think I was on a deal -- it was an asset
17   purchase deal or -- yeah.
18      Q.  Okay.  Was that deal at issue in the lawsuit?
19      A.  I don't know why the client was suing his
20   attorney.
21      Q.  Okay.
22      A.  I assume he didn't get the representation he
23   wanted.
24      Q.  Had that client been on the other end of the
25   deal?

Page 13

1       A.  I don't remember.
2       Q.  Okay.  What did you testify about?
3       A.  It was just -- I think I was just introducing
4    facts of the case, like introducing documents.
5       Q.  And do you remember what -- what entity you
6    were associated with that was involved in that deal?
7       A.  I don't know who was an entity other than just
8    me.  I don't really know.
9       Q.  Do you know what transaction it was?
10      A.  It was on J&G Concrete, I believe.
11      Q.  J&G Concrete?
12      A.  Yes.
13      Q.  Was that a party to the suit?
14      A.  I don't think so.  I don't know.  Since I
15   wasn't involved in a lot -- every deposition, I didn't
16   log it into memory.
17      Q.  Okay.  Were there any defaults in that -- as a
18   part of that deal, that transaction?
19      A.  I'm not sure what you're referring to, but I
20   don't think so and however that would apply.  It was a
21   legal malpractice case, from what I remember, so I don't
22   know about defaults.
23      Q.  Okay.  Do you understand that you're here under
24   oath today?
25      A.  I do.

4 (Pages 10 to 13)

Anthony Ludlow   *   May 15, 2021

Page 14

1    Q. And what does that mean to you?
2    A. To tell you the truth.
3    Q. So just a few ground rules. When I ask a
4    question, if you will, try to let me complete it before
5    you give an answer so that we can make a clean record.
6        When you give an answer, if you will, try
7    to give a verbal response so the court reporter can
8    notate everything down.
9        If I ask a question you don't understand,
10   just let me know, and I'll try to rephrase it or make it
11   more clear.
12       And as you know, if you need a break
13   anytime to use the restroom, get a drink, just let me
14   know; we'll take a break. And I'll probably just ask
15   that if there's a question on the table, that you answer
16   that.
17   A. (Nodded head.)
18   Q. Mr. Ludlow, why did ACET Global fail to pay the
19   $3.2 million note owed to D&T Partners?
20   A. The company didn't have any cash at that time.
21   Q. Were there any other reasons?
22   A. None that I can think of.
23   Q. What steps were taken to try to pay the note?
24   A. I'm not clear what you mean, other than trying
25   to have a functioning company prior to that point.

Page 15

1    Q. Was anything -- were any actions taken
2    specifically to attempt to pay the note?
3    A. The operation of the company, trying to make
4    the company survive as long as possible.
5    Q. Were any steps taken to position the company to
6    actually pay the note?
7    A. Again, I think that trying to operate the
8    company and keep it alive as long as possible is the best
9    way to have the creditors get repaid.
10   Q. Why did Baymark obtain warrants in Windspeed
11   Trading LLC?
12   A. I believe Bill Szeto formed Windspeed Trading
13   and then informed us that he wanted us to have warrants
14   of equity in the company. I'm assuming he thought that
15   we would then also put cash in the company, which we
16   never did.
17   Q. You never did?
18   A. No.
19   Q. So Mr. Szeto brought the Windspeed opportunity
20   to Baymark?
21   A. He did.
22   Q. How was Windspeed Trading LLC related to ACET
23   Global, LLC?
24       MR. PERRIN: Object to form.
25   A. I don't think it was related at all.

Page 16

1    Q. (BY MR. FREEMAN) Okay. Operations were not --
2    not related?
3    A. No.
4    Q. And its formation wasn't related to ACET
5    Global?
6    A. No.
7    Q. Was Baymark Partners concerned about any risks
8    related to Windspeed?
9    A. No.
10   Q. What role did Baymark Partners play in the
11   foreclosure of ACET Global's assets?
12   A. Well, under the original agreements, the
13   lenders had rights, and I think we tried to make sure
14   that we stuck by the rights that were set up originally,
15   when all the parties closed the agreement. I think
16   sticking to the rights we all agreed on is our basic
17   role.
18   Q. Okay. What do you mean by that? What specific
19   rights?
20   A. Under the Asset Purchase Agreement, I guess the
21   Note Agreement, and the Security Agreement that Super G
22   had, they'd all agreed on rights, and making
23   sure they stayed under those rights is how we would
24   protect it. And to also make sure there was no residual
25   risk to ACET after the foreclosure where they would come

Page 17

1    back and try and stick us with more risk or debt.
2    Q. Okay. What specific rights did Super G Capital
3    have?
4    A. I'm not gonna have those memorized, but it
5    would be under their Note Agreement and their Security
6    Agreement.
7    Q. Okay. Was there anything in particular that
8    you recall wanting to protect for Super G?
9    A. I don't know that I said I was protecting Super
10   G. I was protecting ACET Global, giving other parties no
11   more rights than what I felt we had already negotiated
12   under those agreements.
13   Q. Okay. But you wanted to stick by those --
14   those rights, or do what you could to?
15   A. As I recall.
16   Q. And what steps did Baymark Partners take to
17   stick by those rights?
18   A. Well, as things were presented to us, we would
19   consider them from -- I guess from Super G. We'd
20   consider those and vet those against, I guess, the
21   agreements that were there between us and counsel.
22   Q. So Baymark Partners' kind of only role was
23   evaluating proposals put forward by Super G?
24   A. Well, in the context that we're talking. I was
25   limiting my responses to -- I think your questions were

5 (Pages 14 to 17)

Page 18

1   around what role in the foreclosure.  So that was one
2   role.  Then if you expand it to say "The role of Baymark
3   is just only," that's cutting off, I think, a much
4   broader role that Baymark had as well as far as managing
5   and overseeing the operation, as well.  So I just want to
6   be clear, answer your question.
7       Q.  Fair enough.  And I think you're right.  I
8   didn't mean to -- I didn't mean to expand it that way.
9           Within the context of the foreclosure and
10  the various options, I guess, related to the foreclosure,
11  was Baymark Partners' only role there evaluating
12  proposals put forward by Super G Capital?
13      A.  And protecting -- and protecting ACET Global's
14  rights.
15      Q.  Okay.  As far as the steps that were actually
16  taken, did Baymark Partners play a more active role in
17  facilitating the foreclosure?
18          MR. PERRIN:  Objection; form.
19      A.  I don't know what you mean by "active role."  I
20  will say that as soon as the loan goes into default, the
21  bank has you.  And so the whole time you're working to
22  continue to support the company and run the company and
23  garner, I guess, trust in the bank.
24          Because I guess technically they can take
25  everything day one you default, and every day they don't

Page 19

1   is another day the company can survive.  So I don't know
2   if that's responsive to your question, but the role is --
3   that went on for a while.
4       Q.  (BY MR. FREEMAN)  Had Super G, in fact,
5   threatened to take all of ACET's assets?
6       A.  I don't think it's a -- I don't think there was
7   an explicit e-mail, but there was concern about the
8   direction of the company, what was being done to make --
9   ensure that it would survive beyond the -- six months
10  or when we got to Christmas, that time frame.
11      Q.  And why, again, was Baymark Partners involved
12  in the forfeiture process?
13          MR. PERRIN:  Objection; form.
14      A.  I don't know what you mean by "involved."
15  Again, involved with regards to protecting ACET's rights
16  and making sure that if somebody wanted to enact rights
17  that were outside of what we had all agreed to
18  beforehand -- I think that's what we'd want to make sure
19  of, then, separately.  You'd want to look at the
20  forfeiture items to make sure that afterwards there
21  wasn't blowback, more risk or liabilities put back on
22  us -- or ACET Global afterwards.  So that's the
23  participation, as in . . .
24          (Court reporter clarification.)
25      Q.  (BY MR. FREEMAN)  Mr. Ludlow, why was the

Page 20

1   forfeiture important?
2           MR. PERRIN:  Objection; form.
3       A.  I don't understand the form of the question.
4   "Important."  Important is a big third-party question
5   outside of -- are you speaking to me, or to everyone or
6   to the world, or just in general?
7       Q.  (BY MR. FREEMAN)  From your perspective, why
8   was -- why might the forfeiture -- why would it be
9   important?
10      A.  It's not important for ACET if it's something
11  the bank was gonna do.  It's important that it was done
12  correctly.  I guess you want to add importance to it.
13      Q.  Okay.  Any other reason?
14      A.  None that I can think of.  That would be the
15  primary reason.
16      Q.  Okay.  Did Super G ever take possession of ACET
17  Global's inventory?
18      A.  So, "possession," that sounds like a very
19  physical concept.  Like, did they come with a team of
20  guys and, like, put their hands on it?  I don't think so.
21          But "possession" as in letting people know
22  that that's their stuff through inference or e-mails,
23  yes.
24      Q.  How did they let people know that it was their
25  stuff?

Page 21

1       A.  It would -- at some point, I believe -- I'm
2   talking secondhand.  Through maybe Bill Szeto, directing
3   him since he was CEO of the company.  Letting him know
4   what they wanted done with their stuff.
5       Q.  So Super G was having correspondence or
6   discussions with Bill Szeto about ACET Global's
7   inventory?
8       A.  That would be an assumption on my part, but
9   that is my assumption.
10      Q.  So is it ACET Global's position that Super G
11  was having direct conversations with Mr. Szeto about ACET
12  Global's inventory?
13      A.  That's an assumption.  I don't know that I have
14  any e-mails to that effect, but I think that would be
15  common.
16      Q.  Is that also Baymark Partners' position?
17      A.  Yes.
18      Q.  When did Super G and Mr. Szeto engage in those
19  discussions?
20      A.  I wouldn't know when those started.  I can't
21  speak to any conversations Bill Szeto had directly with
22  Super G.  We brought him in, and they had never met.  And
23  then later on, they were talking more and us less.  So I
24  don't know that.
25      Q.  Did Windspeed Trading LLC ever take possession

6 (Pages 18 to 21)

Page 22

1   of ACET Global's inventory?
2       A. I'm not sure that the concept of possession,
3   you know, legal versus casual -- meaning did they exert
4   control over them physically, with a team of guys who
5   touched them?  I don't know -- I don't know what
6   Windspeed did.  I wasn't involved at Windspeed.
7       I do know that there was clear demarcation
8   at the time of foreclosure because the actual title went
9   over to Windspeed at that time.  But prior to that point,
10  you know, what Super G had them do with one versus the
11  other, I don't know.
12      Q. So prior to the foreclosure sale in March
13  of 2019, prior to the foreclosure sale, did Windspeed
14  Trading take physical possession of ACET Global's
15  inventory?
16      A. I don't know.
17      Q. Prior to the foreclosure sale in March of 2019,
18  did Windspeed engage in the sale of ACET Global's
19  inventory?
20      A. I don't know.  When you -- so you're asking me
21  what Windspeed did --
22      Q. Yes, sir.
23      A. -- with ACET Global's inventory?
24      I wouldn't know what Windspeed did.
25      Q. Okay.  Between October of 2018 and March

Page 23

1   of 2019, where was ACET Global's inventory located?
2       A. I don't know.  I know it was at a wax
3   (phonetic) at one point, and it might have been --
4   something that maybe -- Bill Szeto, what -- he would
5   know.
6       Q. Okay.  So if Bill Szeto testified about it, he
7   would be -- he would be the one with knowledge?
8       A. He would be the one with knowledge.
9       Q. Did ACET Global ever request that Windspeed
10  sell its inventory?
11      A. Say that again.
12      Q. Did ACET Global ever request that Windspeed
13  sell its inventory?
14      A. I don't know.  I don't believe so.
15      Q. Did ACET Global ever request that Windspeed
16  hold its inventory?
17      A. So I'm not sure what you're trying to ask.
18      And I want to be clear:  When you say "its
19  inventory," I have this idea that the inventory that's
20  under a secure senior lender, that's secured to the
21  senior lender, and I'm excluding from it that definition.
22      So are you saying items outside of the
23  secured lien -- from the secured lender or the stuff
24  that's secured by the senior lender?
25      When you say "its," who's "its"?

Page 24

1       I'm not being funny.  I'm just -- it
2   matters.
3       Q. So I'm referring to the inventory or assets
4   that were owned by Windspeed.
5       And just to be clear:  Let's work under the
6   assumption that even though there may be a lien, even a
7   senior lender lien, that the inventory is still, at that
8   point, owned by Windspeed.
9       And so my question encompasses inventory
10  that is owned by Windspeed, even if it is subject to a
11  lien.
12      And so with respect to the inventory at
13  issue, did ACET Global ever ask Windspeed Trading to hold
14  its inventory?
15      MR. PERRIN:  Objection; form.
16      A. I don't know.  And you used Windspeed's
17  inventory and Windspeed's -- had a lien on it, so I
18  wouldn't know about it.
19      But in your lead-up and in your question,
20  you asked about ACET, so I'm just going to answer for the
21  ACET.  So I don't know either way.
22      Q. (BY MR. FREEMAN)  If I used -- if I used the
23  word "Windspeed" as a lien -- I don't believe I did, but
24  if I did, I mean Super G's lien.  The senior lender's
25  lien.

Page 25

1       A. On ACET Global.
2       Q. On ACET Global's assets.
3       A. That's how I answered.
4       Q. Okay.  So you don't believe that ACET Global
5   ever requested Windspeed to hold any inventory?
6       MR. PERRIN:  Objection; form.
7       A. I don't believe so.
8       Q. (BY MR. FREEMAN)  And did Baymark Partners ever
9   make any of those requests?
10      MR. PERRIN:  Objection; form.
11      A. I don't think so.
12      Q. (BY MR. FREEMAN)  Mr. Ludlow, in December
13  of 2018 was Baymark Partners concerned about the
14  Windspeed structure?
15      MR. PERRIN:  Objection; form.
16      A. I don't know what a "Windspeed structure" is,
17  but I don't -- I don't recall being concerned about
18  Windspeed.
19      Q. (BY MR. FREEMAN)  Okay.  Did you have a
20  discussion with Matt Denegre about Baymark's options with
21  respect to the Windspeed structure?
22      MR. PERRIN:  Objection; form.
23      A. I have a feeling you want to present something
24  when you talk about "structure."
25      So if you go ahead and just make sure what

7 (Pages 22 to 25)

Anthony Ludlow   *   May 15, 2021

## Page 26

1   the "structure" is, I'd be glad to talk to it, but . . .
2        Q. (BY MR. FREEMAN)  It doesn't have to be that
3   word.  Just be -- the arrangement.  Did you have
4   discussions with Matthew Denegre about Baymark's options
5   with respect to the Windspeed arrangement?
6        MR. PERRIN:  Objection; form.
7        A. I feel like you might be asking warrants versus
8   equity.  That's the only discussion that I remember
9   talking about with Matt, or anything about Windspeed.
10       Q. (BY MR. FREEMAN)  Okay.  Did you ever discuss
11  whether you and Mr. Denegre were comfortable with the
12  Windspeed structure?
13       MR. PERRIN:  Objection; form.
14       A. I have to assert my same answer to the -- that
15  I just gave about warrants and equity.
16       Q. (BY MR. FREEMAN)  Did you discuss whether you
17  should tell Super G to move forward with a public
18  auction?
19       A. I don't remember that.
20       Q. An auction of ACET Global's assets?
21       A. Is this in the same time frame?
22       Q. December 2018.
23       A. Yeah, because it depends on the time frame.
24          Super G came in and wanted us to volunteer
25  the assets, and I said no.  And so that -- in that

## Page 27

1   context, it could have been a comment back to them.  So
2   I'd just have to see the context.
3        Q. Super G wanted you to -- wanted ACET Global to
4   volunteer the assets?
5        A. I think it's called an ABC, an assignment for
6   the benefit of creditors.  And I didn't want to do that.
7        Q. Okay.  And, now, what was that?
8        A. An ABC.  It was new to me.  An assignment for
9   the benefit of creditors, ABC.
10       Q. Okay.
11       A. I think it's a California thing.
12       Q. Okay.  Would that involve assigning over the
13  assets to the creditor?
14       A. I think it would involve giving them rights
15  that we didn't agree to in the original documents, and I
16  think it was easier for them somehow, but I just didn't
17  want to go outside what we agreed to before -- the
18  parties had agreed to.
19       Q. Okay.  So in December of 2018, did you have
20  discussions with Matt Denegre about an auction of ACET
21  Global's assets?
22       A. I don't know.  There were -- I could have.
23  There were ideas being thrown around at that time
24  regarding how Super G was gonna either take the -- have
25  us volunteer the items.  They were gonna take them from

## Page 28

1   us -- what they were gonna do.
2        I didn't think that they would foreclose.
3   That's why I didn't want to do the ABC.  So I thought
4   that would buy us more time, but they ultimately did
5   foreclose.
6        Q. Okay.
7        A. So maybe the auction -- if you have an e-mail,
8   I'd love to see it.  Maybe the auction had something to
9   do with buying time.
10       Q. Okay.  Well, did you have any discussions
11  with -- about Super G issuing a new note?
12       A. Discussions?  I might have -- I don't know that
13  I had direct discussions.  I don't know what their
14  internal politics are, how they wanted to do that.
15          I do know that they were gonna take the
16  note off of ACET Global, and that's what I was focused
17  on, and do a foreclosure that I wanted to happen
18  correctly.
19       Q. Okay.  Well, how did -- how would a new note be
20  related to the foreclosure?
21       A. I don't know that it would.  I just know that
22  our note was gonna go away, and that was my focus.
23       Q. Okay.  But you weren't -- y'all weren't
24  concerned about some new note being issued?
25       A. I don't know of concern other than to make sure

## Page 29

1   that things were done safely for ACET Global.
2        Q. Well, did you and Mr. Denegre have a
3   conversation in December of 2018 about having Super G go
4   forward with a public auction and issue a new note to
5   Windspeed that would replace the note between Super G and
6   ACET Global?
7        A. Yeah, this was in talks of how we were gonna
8   get the note off of us.  I'm sure we discussed a lot of
9   different options, how it was gonna get off ACET Global.
10       Q. Okay.  So you discussed a new note being taken
11  on by Windspeed?
12       A. I don't -- no, I think I was answering in
13  concern for what was gonna happen to ACET Global.  And
14  how Super G was gonna do it, whatever their politics
15  were -- because they would relay, you know, how they
16  were -- we were going to do the foreclosure and/or get
17  the note off of ACET Global.  You know, so that was our
18  concern, and how they did that was less of a concern.
19          But we were involved because they would --
20  they might tell us what they were gonna do or not do with
21  regard to those.  And so we followed along.
22       Q. But did you ever have a discussion about a new
23  note between Windspeed and Super G?
24       MR. PERRIN:  Objection; form.
25       A. I don't know.  I think my answers around that

Anthony Ludlow    *    May 15, 2021

## Page 30

1    kind of pepper around that. So it's possible, in the
2    context of all the things we were trying to do and
3    protect.
4         Q. (BY MR. FREEMAN) Okay. Do you know whether
5    Baymark Partners or ACET Global had any discussions about
6    Windspeed taking on a new note with Super G?
7         MR. PERRIN: Objection; form.
8         A. I would have to speculate. Again, I feel like
9    if you have an e-mail or something, I'd like to put it in
10   context if that's what we're focusing on.
11        Q. (BY MR. FREEMAN) Let me ask you this: In
12   December of 2018, did Baymark Partners consider offering
13   Tomer Damti any money?
14        A. Say that again, I'm sorry, the date.
15        Q. In December of 2018, did Baymark Partners
16   consider offering Tomer Damti any money?
17        A. I'm trying to remember. We also had an
18   employment case going on with him, and so possibly.
19        Q. Okay. Any other reason?
20        A. None that I can think of right now.
21        Q. Did Baymark consider offering Tomer Damti money
22   so it could obtain a release from Mr. Damti?
23        MR. PERRIN: Objection; form.
24        A. Yeah, I feel like I just answered that.
25        So if we're talking about money surrounding

## Page 31

1    the employment issue, if that's what it was, then we
2    would want a release anytime we do -- trade money related
3    to that scenario.
4         Q. (BY MR. FREEMAN) How about a release that
5    would allow Baymark Partners to move forward with the
6    Windspeed structure?
7         MR. PERRIN: Objection; form.
8         A. I don't remember having those discussions with
9    Tomer.
10        (Deposition Exhibit 8 marked for
11        identification.)
12        Q. (BY MR. FREEMAN) Okay. So, Mr. Ludlow, I'm
13   putting on the screen what's marked as Exhibit 8 to this
14   deposition. (Scared screen.)
15        Do you see that?
16        A. Yeah. And I'm going to look off to the side,
17   if that's okay, because it's smallish.
18        Q. Sure.
19        MR. PERRIN: I'm gonna put it -- it's on my
20   laptop.
21        THE WITNESS: Do you want to focus in or
22   just let me read it?
23        Q. (BY MR. FREEMAN) Go ahead and take a look.
24        A. Um-hum. (Examined exhibit.)
25        Okay. Uh-huh.

## Page 32

1         Q. Do you recognize this document?
2         A. I do now that I've read it.
3         Q. And is this an e-mail from Matt Denegre to you?
4         A. It is.
5         Q. On December 7th, 2018?
6         A. It is.
7         Q. And is this a true and correct copy of that
8    e-mail?
9         A. Let's assume it is. I think so.
10        Q. Does it appear to be?
11        A. It does.
12        Q. It appears that this e-mail thread began with a
13   receipt of a voicemail.
14        Do you see that?
15        A. Um-hum.
16        Q. Who was that voicemail from?
17        A. I wouldn't know.
18        Q. Okay. And do you know the phone number
19   214-491-9219?
20        A. Just to be honest, I don't know if many people
21   remember phone numbers these days -- it's in my iPhone --
22   but I'm sure we can find out who it is.
23        Q. Okay. But your answer is you don't know that
24   number offhand?
25        A. No. As we sit here now, I can't recollect who

## Page 33

1    that is.
2         Q. And in the context of this e-mail, can you
3    recollect who it could be?
4         A. I don't want to recollect when we can all be
5    sure. I don't want to guess when it's easy to find out
6    accurate information.
7         Q. Okay. Mr. Ludlow, did you forward this
8    voicemail to Matt Denegre?
9         A. Yes, it appears I did.
10        Q. And did Matt Denegre respond thereafter
11   indicating that there were several options?
12        A. Um-hum. Yep.
13        Q. And was one of those options to "offer Tomer
14   money (or a release from non-compete) to have him sign a
15   release and then move forward with the current
16   structure"?
17        A. That's what it says.
18        Q. Okay. And what does "the current structure"
19   mean?
20        A. I don't know. I don't know.
21        Q. Okay.
22        A. It's not that there was one structure at the
23   time. Super G -- I don't know that Super G had
24   formalized what they wanted to do or what their plans
25   were. I think they were hoping we'd put in more money.

Usher Reporting Services
(214) 755-1612

Anthony Ludlow    *    May 15, 2021

Page 34

1    We didn't.  I didn't know if they were gonna foreclose or
2    wind down or -- who knows what they were going to do.
3    And I also know that Tomer was looking to get
4    unemployment claims.  And we tried -- we ended up helping
5    him with that so he could file unemployment.  So I'm
6    not -- not sure what that is.
7        Q.  Okay.  So you don't know what this refers to
8    when you say the "current structure"?
9        A.  No, because it's at a point in time when things
10    were moving outside of that.
11        Q.  Okay.  Did Mr. Denegre offer another option in
12    his e-mail that was to "take our risks with current
13    structure and save time/money for Super G.  More risky
14    for Baymark"?
15        A.  Yeah.  That's Option Number 2 right there,
16    uh-huh.
17        Q.  Okay.  And do you know what that is referring
18    to?
19        A.  No, not with this siloed e-mail, but it lands
20    in time.  And so with some context, maybe, but sitting
21    here, no.
22        Q.  Okay.  In the context of the dispute at issue
23    in this case?
24        MR. PERRIN:  Objection; form.
25        A.  That's a statement that sounded like a

Page 35

1    question.  Can you just add more to that for me.
2        Q.  (BY MR. FREEMAN)  Yes.  Taken in the context of
3    the dispute at issue in this case, do you -- what is your
4    best -- best estimate of what this option was referring
5    to?
6        A.  I don't want to guess.
7        Q.  Can you tell me what your -- you believe it
8    could possibly be referring to?
9        A.  Maybe -- I don't know.  Surrounding
10    foreclosure, maybe.  I don't know.
11        Q.  So Baymark Partners' position is it doesn't
12    know what these first two options are referring to?
13        A.  Not as we sit here without context, no.
14        Q.  And that's also the position of ACET Global,
15    correct, and all of the entities that you represent?
16        A.  Correct.
17        Q.  Did Mr. Denegre also offer a third option,
18    which was to tell Super G that you were "not comfortable
19    with the current structure and to move forward with a
20    public auction and new note"?
21        A.  Yes.
22        Q.  Okay.  And did he also state "This will create
23    some frustration with Steve, but he will have to get over
24    it"?
25        A.  Yes, it does.  We weren't very -- always

Page 36

1    friendly with Super G.
2        Q.  Is -- was the voicemail that prompted this
3    e-mail, was that from someone named Steven?
4        A.  Are you referring to the phone number I didn't
5    under-- recognize below?
6        Q.  Yes, sir.  Was the voicemail that was left here
7    from Steven Bellah?
8        A.  I don't want to guess when we can all find out.
9    If it is or somebody knows, tell me.  I don't know.
10        Q.  Okay.  Do you -- do you maintain copies of
11    voicemails?
12        A.  I don't think so.
13        Q.  Okay.  Do you know if this -- this particular
14    e-mail with the voicemail still exists?
15        A.  I don't know.
16        Q.  How did -- how could the current structure have
17    saved time for Super G?
18        A.  I'm not sure that I can answer that, because
19    "current structure," that's a point in time.  I'd have to
20    know where we were at that point in time.  Because it's
21    this "current," it's that "current."  So I would have
22    to . . .
23        Q.  Right.  And this is, recall, in December
24    of 2018.  And just to put it in context -- and we'll go
25    through some documents to help refresh.

Page 37

1        But Windspeed was formed in September
2    of 2018, and the foreclosure sale was purportedly
3    conducted in March of 2019.  And so in reference -- you
4    know, in the context used in this e-mail, how could the
5    then current structure save time and money for Super G?
6        MR. PERRIN:  Objection; form.
7        A.  I'm not sure.
8        Q.  (BY MR. FREEMAN)  Okay.  And what is -- what is
9    being -- what did you understand to be referred to here
10    by the statement "take our risks"?
11        A.  I don't know.  I know that there was a period
12    of time when we were resisting Super G to try and keep
13    the company open, and they -- they were gonna do a
14    foreclosure.  They probably wanted it to go friendly.  We
15    were resisting that at this time.  So it's December.
16    That was after they asked to do the friendly one that
17    ACET opposed.  So we didn't want to make them angry.  Who
18    knows?  I don't know.
19        Q.  Okay.
20        A.  I actually don't know.
21        Q.  And do you know what's -- what you understand
22    the last sentence there, "more risky for Baymark," to
23    mean?
24        A.  Anytime you fight with any party, it's more
25    risky.

10  (Pages 34 to 37)

Anthony Ludlow   *   May 15, 2021

Page 38

1    Q. So that was just concern about Super G?
2    A. You're saying "more risky for Baymark" is
3  concern about Super G?
4    Q. Yes, sir.
5    A. "More risky for Baymark" means it's more risky
6  for Baymark, like, if we fight with Super G.
7    Q. Okay. So with the current structure, is that a
8  concern, that Super G might foreclose on the assets of
9  ACET Global?
10    A. I don't know if that's a concern.
11    Q. Was that a risk for Baymark?
12    A. I don't know if it's a risk.
13    Q. Well, how did -- how did Baymark bear risk with
14  respect to the then current structure?
15         MR. PERRIN: Objection; form.
16    A. I feel like you're spending a lot of time on
17  the then current structure, and I've indicated I'm not
18  exactly sure what the then current structure was, but
19  it's -- it's knowable. And so asking these out of
20  context makes it difficult for me to give you the
21  accurate answers that you want.
22    Q. (BY MR. FREEMAN) Okay. But you are here as
23  a -- as a corporate representative, correct?
24    A. I am.
25    Q. And -- but you don't know what this -- this

Page 39

1  e-mail is referring to for risk for Baymark?
2    A. This particular e-mail, that particular
3  sentence in the e-mail, no.
4    Q. Was there a reason, you know, you forwarded
5  this voicemail without any -- any written explanation in
6  your e-mail?
7    A. Is there a reason for nothing? I can't think
8  of anything, no.
9    Q. Did you believe Mr. Denegre would be familiar
10  with the subject matter of the voicemail?
11    A. I would assume so, yes.
12    Q. What public auction was being discussed here?
13    A. I would assume that would be part of the
14  foreclosure process that Super G's looking at.
15    Q. And why would Baymark have indicated it was not
16  comfortable with the alternative?
17    A. Well, that -- going back to my other answer, I
18  can't point in time. It's all figure-outable.
19         If we're not comfortable with the current
20  structure -- like maybe the ABC, where they wanted ACET
21  to hand stuff over, so we told them, "No, go to public
22  auction and foreclose if that's what you want to do."
23  That's what -- obviously, that would make Steve angrier.
24  They wouldn't like that. Super G wanted something easy.
25  That would not be easy. That would be my guess.

Page 40

1    Q. Okay. Well, what does -- what does "a new
2  note" mean here?
3    A. There was some discussion around how they were
4  gonna get that note off of us, off of ACET. They had a
5  problem with how it was going to get off of us. I don't
6  think it was ever our problem. It was up to them. How
7  they got that off is part of this.
8    Q. Okay. And why were they just offering to take a
9  new note from someone else?
10    A. I don't -- I don't think -- I don't know what
11  that means.
12    Q. What were they offering specifically about a
13  new note?
14    A. They weren't offering us anything.
15    Q. What were they proposing as a possible
16  scenario?
17    A. Sorry, I didn't mean to -- no more than they
18  were offering us a public auction. They weren't offering
19  us a public auction or a new note there. That's
20  something that they were going to have to do. They
21  weren't offering us a public auction.
22    Q. Were they discussing -- did they discuss
23  Windspeed taking on a new note?
24    A. They knew that our note was going to get
25  removed along with the assets. There was going to be a

Page 41

1  foreclosure, take our assets away. And as part of that,
2  they were going to relieve our note, either wipe it out
3  or assign it or whatever, but it was going to be off of
4  ACET Global's books.
5    Q. Okay. And why was that a problem for ACET
6  Global?
7    A. I don't know that that was a problem.
8    Q. Was that a problem for Baymark?
9    A. I don't think so.
10    Q. And why would Steve be frustrated with this
11  third option?
12    A. Steve would be frustrated if we didn't make it
13  easy for him to get those assets or whatever process he
14  wanted to do.
15    Q. Okay. Was Super G cooperating with Baymark or
16  ACET at this point in time?
17    A. I don't know what you mean by "cooperating." I
18  think we were talking about how they were going to -- we
19  either just hand them the assets or they're going to have
20  to take them from us.
21         And so I think making them take them from
22  us would sound like we were not cooperating, but that was
23  still allowed under the original documents. So maybe I
24  would say, yeah, we were cooperating commensurate with
25  the original documents in place.

11 (Pages 38 to 41)

Page 42

1    So that's how I'll answer, broadly,
2  "cooperating."
3        Q.  So Baymark cooperated with Super G to
4  facilitate a foreclosure and transfer of the assets --
5        MR. PERRIN:  Objection; form.
6        Q.  (BY MR. FREEMAN) -- to Super G?
7        A.  My answer is that ACET Global agreed to the
8  original documents that were in place -- were agreed by
9  the parties, which -- maybe Super G wanted to not do
10 that.  So we cooperated with the documents.
11       Q.  Okay.  Did you cooperate with Super G to
12 facilitate a foreclosure?
13       MR. PERRIN:  Objection; form.
14       A.  ACET Global was required to provide information
15 to them and not to resist.  I think in the Security
16 Agreement it actually says that -- not that I have it in
17 front of me -- we're required to participate on some
18 level and to not impede them.  I believe so.  Define that
19 as "cooperation" as you will, but it's in the documents.
20       Q.  (BY MR. FREEMAN) Was Super -- well, was
21 Baymark Partners in a position to dictate the
22 particular -- a particular -- a particular option that
23 would be taken here?
24       A.  When you say "particular option," you mean your
25 regard -- with regard to how the assets were taken from

Page 43

1  ACET Global?
2        Q.  Yes, sir.
3        A.  No.  Well, I guess the answer's yes because if
4  I agreed not to go by the documents, Super G would have
5  agreed to that.  So I could have agreed to go outside
6  what the parties agreed to.
7        So I guess I did -- I could have chose to
8  do that, but we chose to try and do a foreclosure which
9  we believe was pre-prescribed in the documents between
10 the parties.
11       Q.  Okay.  So then, yes, Baymark Partners was in a
12 position to dictate how -- how the foreclosure would go
13 forward?
14       MR. PERRIN:  Objection; form.
15       A.  I'll just stick with my prior answer.
16       I feel like I'm giving a nuanced answer and
17 you're putting it down to "so I had all this control and
18 I had the control to do something that nobody agreed to,
19 which I chose not to do."
20       Q.  (BY MR. FREEMAN)  Okay.
21       A.  We always had options to do things.
22       Q.  Okay.  What was understood here where
23 Mr. Denegre said "This will create some frustration with
24 Steve, but he will have to get over it"?
25       What did that last part mean, "he will have

Page 44

1  to get over it"?
2        A.  So at the expense of putting on record things
3  that I said again -- or maybe there's some nuance I can
4  add.
5        I believe at this time, they wanted us to
6  get the assets to them in an easy way, something that we
7  hadn't agreed to in the prior documents, because that was
8  easier for them as a California thing.  There's some laws
9  there that maybe we looked at and had decided we didn't
10 want to do that.  And I got the sense -- and this is just
11 between Matt and I internally -- that they wouldn't like
12 that.
13       I don't know if that is how they felt.
14 But, I mean, your lender says, "Hey, are you fine with
15 this?"
16       And you say, "No, we're going to stick with
17 the documents."
18       They usually don't say, "Thank you."
19       They usually are irritated.  So that's
20 what -- I'm sure that's what that meant.  I'm guessing
21 that's what that meant.
22       Q.  Okay.  Who is Steven Bellah?
23       A.  He is a representative -- or was at the time --
24 of Super G.
25       Q.  Okay.  Did you ever have a conversation with

Page 45

1  Steven Bellah and Matt Denegre about Tomer Damti or D&T
2  Partners' lien position against ACET Global's assets?
3        A.  We may have.
4        Q.  Did you have a conversation with them in which
5  you came to an agreement to work together to harm Tomer
6  Damti's position or D&T's position?
7        A.  No.
8        Q.  Did you have an agreement with them to ensure
9  that Tomer Damti would not receive payment on the
10 $3.2 million note?
11       A.  No.
12       Q.  Did you have an agreement with them to leverage
13 Baymark Partners' forces along with Super G's against
14 Tomer Damti or D&T Partners?
15       A.  (Shook head.)
16       Q.  Is that a "no"?
17       A.  No.  I'm sorry.
18       Q.  Did you ever have a conversation with Steven
19 Bellah and Matt Denegre in which you discussed a plan to
20 leverage an agreement against Tomer's inferior position?
21       A.  Not sure what that means.  There's some
22 generalities there.
23       Q.  Okay.  Well, any conversation ever with Steven
24 Bellah and Matt Denegre regarding leveraging a plan or
25 agreement against Tomer or D&T?

12 (Pages 42 to 45)

Page 46

1  A. I don't recall anything like that.
2  Q. Did you ever express a concern about having
3  Tomer regain the company, ACET Global?
4  A. I don't know if you're shifting time talking
5  about when -- before we terminated Tomer for his
6  performance.  Is that what you're talking about?
7  Q. No.  Let's call this after Tomer was
8  terminated.
9  A. I'm not sure.  I feel like if you have
10  something to look at, I'd be glad to look at it.
11  Q. In -- let's call it April of 2018.  Did you
12  have a conversation with Steven Bellah and Matt Denegre
13  regarding restructuring ACET Global's debt to Super G?
14  A. I don't recall when we -- when Super G started
15  having discussions about what they were gonna do with
16  their assets -- or with the default under the primary
17  loan.
18  Q. Did you discuss restructuring ACET Global's
19  note to allow for lower payments for a period of time?
20  A. We did that a number of times.  Try and keep
21  cash flow in the company and keep it going, yes.
22  Q. Okay.  And did you do that in April of 2018?
23  A. I'm sure we did -- or -- well, I guess that we
24  did.  We had a number of conversations from December
25  through I don't know when, through the middle of the

Page 47

1  year, maybe.
2  Q. Okay.  Did you have a discussion with Super G
3  about restructuring ACET Global's notes to provide time
4  to wind down ACET Global's business?
5  A. Possibly.
6  Q. Okay.  Can you tell me about those
7  conversations?
8  A. No.
9  Q. Why not?
10  A. Those are very specific conversations, and I
11  don't remember the content of -- but as I mentioned
12  before, once the company was in default, you know, you
13  have communications with your lender trying to convince
14  them to keep going, modify your payments so you can keep
15  cash flow in the business to keep going as long as you
16  can.
17  So that would be part and parcel with
18  working with your senior lender so they don't pull the
19  plug on you.
20  Q. So you think -- you think you did engage in
21  conversations with Super G Capital about restructuring
22  the note to provide time to wind down ACET Global's
23  business?
24  MR. PERRIN: Objection; form.
25  A. I don't -- I don't know if they were in concert

Page 48

1  or with the intention to wind down the business.
2  We did have conversations about
3  restructuring the note to reduce the payments.  And there
4  were conversations, later considered, about winding down
5  the business for Super G altogether.
6  I don't know if they're the same -- you're
7  trying to put those together in the same conversation.  I
8  don't know if it was.  I don't know if it matters.
9  Q. (BY MR. FREEMAN)  Why would Super G want --
10  want ACET Global's business wound down?
11  A. I don't --
12  MR. PERRIN: Objection; form.
13  A. I don't know why -- what their motivation would
14  be.  I guess if they wanted to foreclose on the assets or
15  sell the assets or wind the business down and take the
16  assets, it's their assets.  When they start asking about
17  how they want to execute their control, that's -- I'm
18  sure they would know.
19  Q. (BY MR. FREEMAN)  Did Super G ever express any
20  of those motivations?
21  MR. PERRIN: Objection; form.
22  A. I do believe at one time they asked us to
23  consider the options so they can decide what they wanted
24  to do with ACET Global.
25  Q. (BY MR. FREEMAN)  And what do you mean,

Page 49

1  "consider the options"?
2  A. Well, foreclosure or selling assets and taking
3  the cash, I guess.  I don't know what they'd do with a
4  wind-down.  But their options were now basically going to
5  exercise their rights under a failing loan.
6  Q. So Super G asked -- asked you to analyze a
7  wind-down scenario?
8  A. I believe so.
9  Q. And did Super G ask you to analyze a
10  foreclosure scenario?
11  A. I don't know.
12  Q. Were those two separate scenarios?
13  A. A wind-down is a scenario because a scenario
14  takes place over time.
15  A foreclosure is just something they do to
16  us.  We don't -- we don't have to consider that.
17  So if you think about where the genesis of
18  something comes, I don't think that Super G would know
19  what a wind-down would look like, what was involved,
20  because they didn't know the employees and stuff like
21  that.
22  When it's a foreclosure, they don't have to
23  know anything.  They just yank the assets.  So I don't
24  know that those were put together.
25  Q. Was there ever a discussion with Super G -- did

13 (Pages 46 to 49)

Anthony Ludlow   *   May 15, 2021

Page 50

1   you have any discussions with Super G about restructuring
2   the note to allow for time to establish a new entity that
3   could take over ACET Global's business?
4       A. I don't recall.
5       Q. You don't recall that or -- or no?
6       A. No. I don't recall.
7       Q. Okay. So is that possible, that you had
8   conversations with Super G about restructuring the note
9   to provide time to establish a new entity that could take
10  over ACET Global's business?
11      A. I don't want to speculate. If I don't recall,
12  I don't want to speculate what's possible.
13      Q. Okay. Could anything help you remember whether
14  that occurred?
15      A. Yeah. Specific information.
16      Q. And what kind of specific information?
17      A. If there's an e-mail or something that I just
18  don't recall.
19      Q. Okay. Did you discuss with Super G
20  restructuring the note to allow you to put a plan in
21  place that would allow ACET Global to transfer its
22  business while it defaulted on a loan to Tomer Damti that
23  was coming due in October of 2018?
24      A. I don't recall.
25      Q. But is that possible that you had that

Page 51

1   conversation?
2       A. I have a -- I don't want to speculate on what's
3   possible. Some people believe in ghosts. Is that
4   possible? I don't know. Let's not do "possible."
5   Just -- I don't recall.
6       Q. Okay. So the companies herein which you're
7   testifying on behalf of, the companies' position is they
8   don't know whether there was a discussion with Super G
9   about putting a plan in place to allow ACET Global to
10  transfer its business while it defaulted on a loan to
11  Tomer Damti that would come due in October of 2018?
12      A. I don't recall a conversation of that
13  particular, no.
14      Q. If you did, who would those conversations have
15  been with?
16          MR. PERRIN: Objection; form.
17      A. I don't know if you get to "if you did" when I
18  don't recall anything.
19          I'm not going to speculate. So if you want
20  me to make up an answer, like if -- I don't know.
21      Q. (BY MR. FREEMAN) I mean, you can answer how
22  you want. If you have -- if you believe something is
23  possible, you can answer that.
24      A. I don't recall.
25      Q. Okay. But as we sit here today, that's not out

Page 52

1   of the realm of possibility that you had a discussion
2   with Super G about putting a plan in place to allow ACET
3   Global to transfer its business while it defaulted on a
4   loan to Tomer Damti that was coming due in October
5   of 2018?
6       A. I don't believe so.
7       Q. You don't believe it occurred?
8       A. I don't believe so.
9       Q. Okay. Did Super G ask Baymark Partners to put
10  together a plan to wind down ACET Global? Is that your
11  testimony?
12      A. I believe Super G asked ACET to put together a
13  potential wind-down plan.
14      Q. A wind-down plan that would wind ACET down by
15  October of 2018?
16      A. I don't know the dates, but . . .
17      Q. And did Super G and ACET modify a loan in April
18  of 2018?
19      A. There were a number of modifications, so I
20  don't know the exact date, but . . .
21      Q. Do you know if there was a modification in
22  April of 2018?
23      A. I believe so.
24      Q. Did that modification significantly reduce
25  monthly payments for a period of time?

Page 53

1       A. I believe that was one of a few modifications
2   that reduced payments, yes.
3       Q. And did it provide for a balloon payment in
4   October of 2018?
5       A. I don't know.
6       Q. Do you recall if there was ever a balloon
7   payment in October of 2018?
8       A. No, I don't.
9       Q. Do you recall if one was ever required --
10  whether it was paid or not, but whether it was required?
11      A. I don't remember.
12          (Deposition Exhibit 29 marked for
13          identification.)
14      Q. (BY MR. FREEMAN) Mr. Ludlow, I'm placing on
15  the screen what's marked as Exhibit 29 to this
16  deposition. (Shared screen.)
17          Do you see that, sir?
18      A. I do.
19      Q. Okay. And is this an e-mail from you?
20      A. It is, yes.
21      Q. And is this an e-mail to Matt Denegre and Steve
22  Bellah?
23      A. It is.
24      Q. And is this e-mail Subject line "ACET -
25  Strategy"?

14 (Pages 50 to 53)

Anthony Ludlow   *   May 15, 2021

## Page 54

1      A. It is.

2      Q. And dated April 18th, 2018?

3      A. It is.

4      Q. And did you send this from your Baymark

5  Partners e-mail address?

6      A. I assume so.

7      Q. Okay. Did you state in here that "Even after

8  our next $15,000 infusion, the rate of its current growth

9  will not support the resumption of Super-G's payments or

10  Tomer's $3 million note payments that begin in October."

11      A. I'm sorry. That was a -- was that a question?

12  I thought it was --

13      Q. Yes, sir.

14      A. I was just reading along with you and then you

15  stopped.

16      Q. Is that what you stated in the e-mail?

17      A. Yes, I did.

18      Q. And then did you state that "We believe we can

19  grow the company to repay your outstanding amount at a

20  point further in the future than currently planned, but

21  have issues with doing so with debt payments and then

22  only to default on Tomer's debt and have him regain the

23  company we saved from his unfortunate stewardship"?

24      A. Yes.

25      Q. Okay. And also did you state, "I am open to

## Page 55

1  your reaction and hope to come to an agreement with you

2  that I can then leverage against Tomer's inferior

3  position"?

4      A. So it says, "I think a restructure of the debt,

5  of Super G and Tomer's, is the only way to survive past

6  May." So I think -- and I haven't read it all here, but

7  I think -- what's common is when you have debt positions

8  and everybody's taking cash out of the company, it can't

9  survive with cash pumps from the beginning.

10      So if people convert -- I haven't read

11  this here -- they convert their debt into equity, then

12  there's not a current pay on that, and then that leaves

13  cash in the business so it can survive and everybody has

14  a chance of getting their money back. The company makes

15  it.

16      Q. Okay. Why did you title the Subject line

17  "ACET - Strategy"?

18      A. Well, I would assume that this was --

19  identified a path to make ACET successful for everybody.

20      Q. Okay. And so that was the strategy you're

21  referring to?

22      A. I believe so. Whatever is in the body of the

23  e-mail.

24      Q. Okay. And what did you mean by "Tomer's

25  inferior position"?

## Page 56

1      A. Well, you have the senior lender, and then you

2  have the secondary lender. And so when you have a second

3  lien, that's a second lienholder.

4      Q. Okay. And what did you mean by "leverage

5  against Tomer's inferior position"?

6      A. Well, the odds of the senior getting paid back

7  or the secondary getting paid back are about zero at this

8  point, if I'm not mistaken, to look at the date here. So

9  everybody's in a bad spot. If everybody wants the

10  company to succeed and get anything back, they need to

11  convert their -- their payments. Which -- the company

12  has no chance of paying the senior loan demands -- or the

13  seller note at this point.

14      Q. Okay. But didn't you state in there that you

15  believed you could grow the company to repay the

16  outstanding amount?

17      A. That was always the hope.

18      Q. Okay. And was that also the belief?

19      A. Belief is a -- more hope than belief, but it

20  was a shot.

21      Q. Okay. So did you inaccurately state your --

22  what you meant in this e-mail?

23      MR. PERRIN: Objection; form.

24      A. Which part? Are you blanketing the whole

25  thing? Or you're making a comment on my "belief" versus

## Page 57

1  "hope"?

2      Q. (BY MR. FREEMAN) Yeah. Yes. By "belief," did

3  you have some idiosyncratic meaning of what that means,

4  or did you mean you believed you could grow the company?

5      MR. PERRIN: Objection; form.

6      A. We believed that we could grow the company.

7      Q. (BY MR. FREEMAN) Okay. And you believed you

8  could grow it to repay the outstanding debts, correct?

9      A. If there was a path, yes.

10      Q. What was Steve's reaction to this e-mail?

11      A. I don't remember. Ultimately he didn't do it.

12  I'm sure he didn't like it.

13      Q. Okay. Did you have discussions with Tomer

14  about this strategy?

15      A. I don't think so. Steve has to be on board

16  before we go any further. We'd have to get the senior on

17  board, because, again, if the senior yanks all your

18  assets away, I can't -- I can't do much with growing the

19  company that's not in my hands anymore.

20      Q. So Super G said no to this restructuring plan?

21      A. I would only have to assume so, since it didn't

22  happen.

23      Q. Had Baymark Partners considered shutting ACET

24  Global down prior to this time?

25      A. Prior to April 18th?

Usher Reporting Services
(214) 755-1612

Anthony Ludlow   *   May 15, 2021

Page 58

1    Q. Yes, sir.
2    A. Didn't they -- I think we did consider that
3    when Super G asked us to put a wind-down plan together
4    in -- didn't we say December just prior? So that would
5    force us to consider that.
6    Q. Well, and we were looking at -- go back to
7    Exhibit 8, I think you're referencing. But we were
8    looking in December of 2018.
9    A. '17.
10   Q. At some point -- at some point Super G
11   asked you to put together a wind-down plan?
12   A. They did.
13   Q. So prior to this April 18th, 2018, date, had
14   Baymark considered shutting ACET Global down?
15   A. It's possible. I think the company was -- this
16   is April of '18. I think it was staying alive just by us
17   paying payroll. Otherwise it would have been gone.
18       So, yeah, we might have discussed it since
19   it was only surviving by cash infusions by us to pay
20   payroll. Otherwise it was cash flow negative and not
21   surviving at this point.
22       So there might have been a discussion of,
23   "Why are we still putting money into a company just to
24   make payroll that's losing money?" But I don't know.
25   Q. Did -- did Baymark consider shutting ACET down

Page 59

1    so that creditors would not get paid?
2    A. No.
3        (Deposition Exhibit 41 marked for
4            identification.)
5    Q. (BY MR. FREEMAN) And I'm showing you,
6    Mr. Ludlow, what's marked as Exhibit 41. (Shared
7    screen.)
8        Do you see that?
9    A. One second. (Examined exhibit.) Yep. I see
10   it.
11   Q. Okay. And is this e-mail correspondence
12   between you and David Hook and Matt Denegre?
13   A. The one that you're showing. Normally I start
14   at the bottom, but does that matter?
15   Q. Sure.
16   A. We're somewhere in the middle.
17   Q. I can go to the bottom.
18   A. Okay.
19   Q. I'm going to go back up to the top.
20   A. Okay.
21   Q. I'm not focused on the e-mail at the top, but I
22   do want you to see everything there.
23   A. Okay. Thank you.
24   Q. (Scrolling.)
25   A. Okay.

Page 60

1    Q. Up top, is this an e-mail exchange between you,
2    David Hook, and Matt Denegre?
3    A. It is.
4    Q. And is it dated March 15th, 2018?
5    A. It is.
6    Q. And does this appear to be a true and correct
7    copy of that e-mail correspondence?
8    A. It appears to be an authentic e-mail. It does.
9    Q. And was -- was there a statement here at the
10   bottom of the first page of Exhibit 41 in which Mr. Hook
11   states, "I think we should consider not paying Super G"?
12   A. It does.
13   Q. And up above as part of that correspondence,
14   does Mr. Hook say, "Maybe we tell them to stop or we shut
15   the company down and they won't get anything"?
16   A. It does.
17   Q. Is he referring to a creditor not receiving
18   anything?
19   A. He was referring to if they don't cut their
20   payments back and let us survive, the company's gonna
21   die. I think it was probably already dying at this
22   point. And if they don't give us some breathing room,
23   yeah, no one's gonna get anything, and that's exactly
24   what that means.
25       And I think at the bottom of that e-mail,

Page 61

1    you'll see where we were starting to get collection calls
2    from DHL, from FedEx, and those guys. Maybe the rent was
3    being unpaid or shut at that point.
4        So those guys have immediate death threat
5    to the business if we can't shift, versus the debt guys
6    wanting to take the money out of the company where it
7    can't run.
8    Q. Okay. So shutting down the company was an
9    option?
10   A. Taking all the cash out effectively shuts down
11   the company anyway.
12   Q. So shutting down the company to make sure those
13   creditors don't get anything was an option?
14       MR. PERRIN: Objection; form.
15   A. I don't think that's what I'm saying. I'm
16   saying that if the company doesn't survive, they won't
17   get -- you're putting an intent on it.
18   Q. (BY MR. FREEMAN) Right. Well, what does this
19   statement mean here? It says -- Mr. Hook says, "Maybe we
20   tell them to stop or we shut the company down and they
21   won't get anything."
22   A. I think at this time, shutting the company down
23   means we were putting money into it to keep it alive.
24       We kept putting money in and money in. I
25   think since December, we put 50,000. Tomer put none, and

Usher Reporting Services
(214) 755-1612

Page 62

1     then we had to come back again and put more money in.
2 And I think we kept putting money in covering payroll all
3 the way down through the middle of 2018.
4         And if we stopped giving it lifeblood, it
5 would just shut down. So, yeah, that's what that means.
6 It was only alive because we were covering payroll.
7     Q. Okay. So you're telling me this e-mail
8 reflects -- reflects a conversation between you and
9 Mr. Hook and Mr. Denegre considering telling creditors
10 that you'll shut the company down?
11     A. No.
12     Q. No, that's not what this refers to?
13     A. It's referring to just the lender to adjust
14 their payment so we can survive.
15     Q. Okay. Is this considered leverage against the
16 creditor?
17     A. It's considered reality.
18     Q. And is --
19     A. That's what happens. If you don't have any
20 money to go on, they don't get paid.
21     Q. So leverage is reality?
22         MR. PERRIN: Objection; form.
23     A. No.
24     Q. (BY MR. FREEMAN) No. Is power reality?
25         MR. PERRIN: Objection; form.

Page 63

1     A. I don't know how to answer that.
2     Q. (BY MR. FREEMAN) Is inferiority a reality?
3     A. I'm not sure what you mean by that, but . . .
4     Q. I mean, is -- what's the philosophy here? What
5 are you telling me? I asked the question, you know, "Was
6 this considered leverage against the creditors?"
7         And the answer is, "That's just reality."
8         What does that mean?
9     A. If the company doesn't survive, nobody gets
10 paid. No -- lenders don't get paid, and the equity guys
11 don't get the money back either.
12     Q. At this point in time, who did you understand
13 your obligations to run to? The company? yourself?
14 creditors?
15     A. Obligation was to have the company survive.
16 ACET Global and ACET Holdco needed to survive and be
17 successful to repay its lenders, and then ultimately, if
18 it was very successful, it could repay the second
19 lienholders.
20         MR. PERRIN: Jason, we've been going an
21 hour. Are you at a stopping point?
22         MR. FREEMAN: We're pretty close. Yeah, we
23 are pretty close.
24     Q. (BY MR. FREEMAN) You responded to this "Yep,
25 definitely an option. We can strategize and then get

Page 64

1 back with them." What did you mean by that?
2     A. Similar to what I've been saying, when you go
3 to the -- see, the lenders don't actually know the state
4 of the company. So when you go to them and say, "Look,
5 we can't make payroll," or, "If you withhold your payment
6 or reduce your payment, we'll take that cash to either
7 make payroll or buy more inventory or do whatever the
8 operating guys want to do," that's where you go back to
9 them and negotiate.
10         Because at the end of the day, whether it's
11 a tough conversation or not, the company's in dire
12 straits. You modify so it can survive. And -- because
13 if the company doesn't survive, no one gets paid back.
14         So we have to go back to them, and it's
15 never a good conversation when you have to go to your
16 lender and say, "The company's not doing well, and I need
17 you to cut payments." They don't enjoy it. It's a
18 tough --
19     Q. How much additional money did Baymark Partners
20 put in after this e-mail?
21     A. After that? I know from the initial close,
22 just to fund after the company was in default to the end,
23 maybe $150,000, 155. I can get you a number, but that's
24 close.
25     Q. Was that prior to or after this e-mail -- the

Page 65

1 date of this e-mail?
2     A. It would -- that money started at December when
3 it -- when we were in trouble with the senior lender and
4 they wanted us to come and put money -- David, myself,
5 and Tomer. They wanted us all to put in money and -- to
6 show a vow of faith and that we believed in the business,
7 putting our own money in.
8         So from that point until the end, it was
9 about 150,000. So that was 50,000 at December, and then
10 I'm not sure where this cuts in because there was
11 tranches along. And we were at some point getting
12 e-mails continually asking for payroll money.
13     Q. Okay. And so are you telling me that --
14         MR. PERRIN: Are you --
15         MR. FREEMAN: I'm sorry?
16         MR. PERRIN: I need a break. I've had a
17 couple of cups of coffee, so when you get to it.
18         MR. FREEMAN: I'm probably, like, two
19 questions away from a break. Will that work for you?
20         MR. PERRIN: I'll keep my knees together.
21         MR. FREEMAN: I'm sympathetic.
22     Q. (BY MR. FREEMAN) Did you actually put in money
23 to keep -- to make payroll after this e-mail?
24     A. Yes.
25     Q. You did?

17 (Pages 62 to 65)

Anthony Ludlow   *   May 15, 2021

---

Page 66

1    A. Yes.
2    Q. How many times?
3    A. Four.
4    Q. Okay.
5    A. Three, four, five, something like that.
6    Q. Somewhere in that ballpark?
7    A. Less than 10.
8    Q. Okay.  And with respect to the conversation you
9   referenced just a bit ago with Super G in December
10  of 2017, are you telling me that Super G and you had a
11  discussion with Tomer Damti about having him put
12  additional money into the company?
13    A. Super G came to Baymark and said they wanted us
14  to show more support in the company and put more cash in.
15  And if so, they would agree to release -- there's some in
16  escrow that they were hanging on to to protect them.
17  They would allow to release that into the company to help
18  it survive.
19       They told us they expected it to come from
20  David, myself, and Tomer.  We went to Tomer and asked,
21  and he did not do so, and we waited as long as possible
22  not to tell Super G that because that sends a sign
23  that -- at least from the lender's eyes that the -- that
24  that person doesn't believe in the company enough to put
25  the money in.

---

Page 67

1    Q. Okay.
2    A. That was the conversation in December -- around
3   December.
4    Q. Did you ask Super G not to convey any of that
5   negativity to Tomer Damti?
6    A. No, I don't -- I don't think so.  We tried
7   to -- I don't -- we tried to keep that from Super G as
8   long as possible because we didn't want them to not think
9   that there were any nonbelievers on our side of the
10  fence.
11    Q. But did you ever ask Super G not to convey
12  information to Tomer Damti?
13    A. No.
14       MR. FREEMAN:  Y'all want to take a quick
15  restroom break?  I know Ed does.
16       MR. PERRIN:  Yeah, thank you.
17       THE COURT REPORTER:  Okay.  We're off the
18  record at 10:56 a.m.
19       (A recess was taken from 10:56 a.m. to
20       11:11 a.m.)
21       THE COURT REPORTER:  We're going back on
22  the record at 11:11 a.m.
23    Q. (BY MR. FREEMAN)  Mr. Ludlow, did you watch and
24  observe Mr. Hook's deposition?
25    A. I did.

---

Page 68

1    Q. And did you watch the entire deposition?
2    A. I believe so.  I might have stepped out for a
3   drink or something.  It was running, but I saw 95 percent
4   of it.
5    Q. Okay.  Was his testimony completely accurate?
6       MR. PERRIN:  Objection; form.
7    A. I believe so.
8    Q. (BY MR. FREEMAN)  Do you believe his testimony
9   was completely truthful?
10    A. Based upon David's involvement and what he
11  knows, probably so.
12    Q. Were there any inaccuracies that you noted?
13       MR. PERRIN:  Objection; form.
14    A. The only thing that comes to mind is when he
15  was talking about the corporate structure of the entities
16  and the reasons they're put together and the rigor that
17  we do that, I think he didn't appreciate the nuances of
18  that.
19    Q. (BY MR. FREEMAN)  Okay.
20    A. That's the only one that comes to mind.
21    Q. Were there any other inaccuracies?
22       MR. PERRIN:  Objection; form.
23    A. I don't -- I don't recall.
24    Q. (BY MR. FREEMAN)  Okay.  Did you disagree with
25  anything that he stated?

---

Page 69

1       MR. PERRIN:  Objection; form.
2    A. How long was he on?  Four hours?  Five hours?
3   So it's hard to know.  Complete acceptance of everything
4   he said in there -- and is it the way that I would say
5   it?  I don't know.
6    Q. (BY MR. FREEMAN)  Okay.  But you don't know if
7   you disagree with anything he stated?
8       MR. PERRIN:  Objection; form.
9    A. I mentioned one item that I thought, that the
10  corporate entities being just paper and corporate
11  formalities that we actually follow at meetings and stuff
12  like that.  So that was all.
13    Q. (BY MR. FREEMAN)  You watched Julie Smith's
14  deposition?
15    A. I did.
16    Q. And did you watch the whole deposition?
17    A. Almost all of it.  I might have stepped out to
18  get a drink or something.  It was running on my computer.
19    Q. Did you believe her testimony was completely
20  accurate?
21       MR. PERRIN:  Objection; form.
22    A. Sure.
23    Q. (BY MR. FREEMAN)  Did you believe her testimony
24  was completely truthful?
25    A. I believe so.

---

18 (Pages 66 to 69)

Anthony Ludlow   *   May 15, 2021

Page 70

1  Q. Were there any inaccuracies?
2       MR. PERRIN: Objection; form.
3  A. Nothing major enough to rise to the threshold
4  of being material inaccuracies, no.
5  Q. (BY MR. FREEMAN) Okay. And did you disagree
6  with anything that she stated?
7       MR. PERRIN: Objection; form.
8  A. No.
9  Q. (BY MR. FREEMAN) And, Mr. Ludlow, did you
10  watch Mr. Denegre's deposition?
11  A. I did.
12  Q. Did you watch the entire deposition?
13  A. Again, there were portions that I weren't
14  there. I was on vacation at the time in Colorado, so I
15  actually ate lunch and did some things too. It was
16  running, so I would say 80 percent of it.
17  Q. Okay. From the 80 percent that you saw, was
18  his testimony completely accurate?
19       MR. PERRIN: Objection; form.
20  A. Nothing material that popped out in my memory
21  as inaccurate.
22  Q. (BY MR. FREEMAN) Okay.
23  A. How long was he on? Was he about four hours
24  also? So it's a lot.
25       MR. PERRIN: Longer. Five or six.

Page 71

1       THE WITNESS: Oh, that's right. He's the
2  big one. So that's a lot.
3  Q. (BY MR. FREEMAN) Was his -- was his
4  testimony -- did you believe it to be completely
5  truthful?
6  A. I believe Matt is a truthful person.
7  Q. Okay. And did you believe his testimony that
8  he gave in the deposition was truthful?
9  A. From what I remember, yes.
10  Q. Okay. Is there anything that you've -- that
11  you are aware that you've forgotten?
12  A. Sounds like a trick question. Am I aware of
13  things I have forgotten? No.
14  Q. Do you believe -- did you disagree with
15  anything that he stated?
16  A. I don't believe so.
17  Q. And were you alone during his testimony?
18  A. Yes.
19  Q. Were you knowledgeable about the foreclosure
20  process at issue in this case?
21  A. "Foreclosure process" encompasses a lot of
22  parties. I know our part of it, the ACET Global part. I
23  know what rights were in the original agreements, of
24  course, in those. So, yeah, I was aware of it. I had
25  Julie Smith protecting us for that.

Page 72

1  Q. Okay. And were you aware of the importance of
2  the foreclosure process?
3  A. I'm not sure what the "importance of the
4  foreclosure process" is. Like to society? To me? To
5  Super G? To do it correctly is important, yes.
6  Q. Okay. What about to Baymark Partners? What
7  was the importance?
8  A. It was important to do it correctly and follow
9  what the parties had agreed to when we entered the deal,
10  when all three parties entered the deal.
11  Q. Do you know whether Mr. Denegre was
12  knowledgeable about the foreclosure process?
13  A. He might have been involved in parts, but I
14  don't know that he would know a lot of pieces of that.
15  Q. Would he be knowledgeable about the importance
16  or implications of the foreclosure process?
17       MR. PERRIN: Objection; form.
18  A. No more than doing it statutorily or what the
19  documents agreed. He would know that we wanted to do it
20  correctly. That's why we bring in professionals, to make
21  sure we follow the documents.
22  Q. (BY MR. FREEMAN) Okay. During Mr. Denegre's
23  deposition, you made a statement of, "Shut the fuck up";
24  is that correct?
25  A. I did.

Page 73

1  Q. What did you mean by that?
2  A. Well, I was shocked and embarrassed to find
3  that my microphone had been left on after the break. As
4  I was walking into the kitchen to get something to eat
5  and -- I was -- never had any intent for anybody on Earth
6  to ever hear that comment.
7       I came back as people were bristling. I
8  noticed that my mic was actually on. I didn't know how
9  that happened, and so I made the comment, I said, "Yeah,
10  my mic is on," and I claimed it.
11       So I apologize. That was beneath the
12  dignity of what I normally do, and that was not intended
13  for anybody to hear that.
14  Q. What did you -- what did you mean by that
15  statement?
16  A. Well, again, it's difficult to exonerate -- to
17  expand on a comment that wasn't meant for anybody on
18  Earth to hear. It's like yelling at the football game
19  when Troy Aikman wouldn't pass the ball, right?
20  Q. Does that mean it's like a situation where
21  something's happening that isn't what you want to happen?
22  A. Matt Denegre has worked for me since he was
23  very young. He interned with me. He's like a son. He's
24  in his young 30s. I'm in my early 50s.
25       And at the time -- and I'm going through

19 (Pages 70 to 73)

Anthony Ludlow   *   May 15, 2021

Page 74

1    memory here because I haven't reviewed anything. He -- I
2    think he had answered -- or been asked and answered a
3    question that you'd asked him two or three times, that he
4    had answered, and I felt like he was getting beat up.
5          And I'm not saying you're a bad guy, but
6    for him, I could see he was getting beat up. And so I
7    think my expression was to end his pain. He's already
8    answered the question a few times. Just be quiet and let
9    it set, because he was -- I can see when Matt gets
10   uptight. He also has a hearing problem, too, so the
11   whole thing was stressful for him.
12        Q. Were you concerned at all about the content of
13   his response?
14        A. No, because -- again, I'm going from memory. I
15   think he'd already answered a couple of times. I don't
16   want to guess. The record will show if that's true or
17   not. From what I remember, I think he had already
18   answered two or three times. So I wasn't worried about
19   the fourth answer, I guess.
20        Q. Okay. And if he hadn't actually answered the
21   question previously, would there be any other reason for
22   your statement?
23        A. Just my concern for Matt.
24        Q. Okay. And why would you -- why would you want
25   for Mr. Denegre not to provide answers or elaborate on

Page 75

1    his answers during his deposition?
2        A. I wouldn't.
3              I mean, I think I spoke to him before his
4    deposition and gave him instructions to answer truthfully
5    and to wait until you finish asking the questions because
6    there's times when Matt will jump in before you're done,
7    and I know sometimes the questions can be long.
8              So I maybe talked to him two minutes. So
9    that's the only advice I ever gave him.
10       Q. Did you have any concerns about how he was
11   responding to a question inquiring about the importance
12   of the foreclosure?
13       A. No.
14       Q. Do you believe that your statements during his
15   deposition impacted Mr. Denegre's testimony?
16       A. I do not.
17       Q. Do you believe that he would have provided a
18   more full answer had you not made that statement?
19       A. I don't think so. We can look at if he'd
20   already covered that question or not, but I don't think
21   it would have changed anything.
22       Q. I'll come back to probing that a little -- a
23   little bit, but did you -- did you discuss Mr. Denegre's
24   deposition with anyone?
25       A. No.

Page 76

1        Q. With respect to Mr. Denegre, does he have a
2    good memory, generally?
3        A. Matt is a bit of a processing machine, so when
4    he has information in front of him, he can coalesce it
5    pretty good. When he's away from it, he doesn't have,
6    like, instant recall. He needs to, like, refresh the
7    context.
8              So he's a very good analyst, but carrying
9    trivia facts, after time, not as good. So -- but, you
10   know, if you refresh his memory, he's good. But on
11   recall, you know, 50/50.
12       Q. Okay. So difficulty recalling events?
13       A. I don't know if I'm better than 50/50. So I
14   don't want to compare that in general. But, yeah,
15   that's -- Matt's a very good processor. He just needs a
16   lot of inputs at the time.
17       Q. Is he generally an honest person?
18       A. I know Matt to be very honest.
19       Q. And did you discuss Mr. Denegre's deposition
20   with him?
21       A. No.
22       Q. What about Mr. Hook? Did you discuss
23   Mr. Hook's deposition with him?
24       A. Nope, I don't think I talked to either of
25   them -- other than a few sentences -- since, to make sure

Page 77

1    that we didn't discuss it.
2        Q. So we were speaking earlier about Super G. And
3    I'd asked if Super G had requested that Baymark put
4    together a wind-down plan.
5              Am I correct that that occurred at some
6    point in time?
7        A. Yeah. Hang on here. You're kind of stripping
8    my gears, jumping around.
9              So we're back to did Super G ask us to do a
10   potential wind-down for them. Yes, they did.
11       Q. And did Super G request, as well, that ACET
12   Global put together a wind-down plan?
13       A. That's what I meant.
14       Q. Okay.
15       A. The ACET Global entities to put down its
16   wind-down plan, yes.
17       Q. And that was a plan to wind down ACET Global,
18   right?
19       A. Yes.
20       Q. Did Mr. Denegre work with Bill Szeto on the
21   wind-down plan for ACET Global?
22       A. Yeah. He probably did.
23       Q. Okay. And were you aware of that?
24       A. I don't know if I'd need to be, but I -- I
25   would assume so. That's fine.

20 (Pages 74 to 77)

Anthony Ludlow   *   May 15, 2021

Page 78

1    Q. Okay.
2    A. Just, for example, like, Bill Szeto is a really
3  smart guy, but I don't know if he's worked with a lot of
4  banks, presentationally speaking.  You know, Matt's
5  probably good at doing PowerPoints and putting the
6  information that Bill Szeto didn't have, so . . .
7    Q. Okay.  Did you or Mr. -- Mr. Denegre ever ask
8  Bill Szeto to make changes to the wind-down plan?
9    A. I'm sure if Matt said, "Hey, blue is a better
10 color than yellow," I guess that would technically be
11 yes.
12   Q. Any substantive changes?
13   A. I don't -- I don't know.  I think at this point
14 Bill was pretty much in control.  You've met Bill -- I've
15 met him a few times.  He's a big personality, so he's --
16 he takes advice lightly.
17   Q. (Shared screen.)
18   A. Is there something on the screen?
19   Q. There is.
20        (Deposition Exhibit 13 marked for
21        identification.)
22   Q. (BY MR. FREEMAN)  Are you familiar with this
23 Exhibit 13 to this deposition?
24   A. Yes, I see it.
25   Q. And is this an e-mail from Matt Denegre to you

Page 79

1  on September 10th, 2018?
2    A. It is.
3    Q. And the Subject line, does it state "Corrected
4  Version"?
5    A. Canceled -- oh, "Corrected Version," yes.
6    Q. And the attachment.  Does that say "Winddown"?
7  It appears to be a PowerPoint.
8    A. It does.  "Winddown1-2" PowerPoint
9  presentation, yes.
10   Q. Okay.  And in Mr. Denegre's e-mail to you, he
11 states, "Wind down plan for Super G for your review"; is
12 that correct?
13   A. Yes.
14   Q. And does this appear to be a true and correct
15 copy of the e-mail correspondence between you and
16 Mr. Denegre?
17   A. Yeah -- you just talking about the top part,
18 not the bottom part where Bill said --
19   Q. Yes, sir, but I'll scroll down so you see what
20 was attached.
21   A. I'm sure this is an accurate e-mail.  If you're
22 trying to make it authentic, it looks fine.
23   Q. Okay.  Why did Mr. Denegre send this wind-down
24 plan for your review?
25   A. Well, if you can recall David's deposition,

Page 80

1  he -- at some point when the company started
2  underperforming severely, he turned it over to Matt and
3  I -- or he delegated it to Matt and I to run it -- or to
4  manage it at that point.
5        So as Matt was doing this with Bill Szeto
6  before we went to Super G again, he would send it to me
7  just to make sure that if I wanted to look it over, I
8  could.  It's employee keeping his manager in the loop.
9    Q. Okay.  Did you look it over?
10   A. Lightly.  I mean, there's not a lot to look at.
11 The main thing I'd look at is if Super G wanted to take
12 assets or wind down the business, I wanted to see if they
13 were gonna stick us with any costs.  I think I probably
14 looked to see if there was any things they were going to
15 try and, cost-wise, stick ACET Global with.  That's --
16 that would probably be the extent of my review.
17   Q. Okay.  And was this wind-down of ACET Global,
18 was this just an internal matter, or was that something
19 that was being discussed outside of -- outside of your
20 group?
21   A. I'm not sure of the "group" that you refer to,
22 but I will tell you what did happen is I believe Super G
23 requested this.
24        Bill Szeto, I think this is his PowerPoint
25 presentation, like 90 percent of it.  Matt might have put

Page 81

1  some touches on it, and then it went out.  And I guess we
2  ultimately sent it to Super G at some point.
3    Q. Okay.
4    A. So those would be the parties, I guess:  Steve
5  Bellah, Bill Szeto, myself, and Matt.
6    Q. Okay.
7    A. So I don't know about "groups," but I think
8  those are the parties.
9    Q. Okay.  And just looking to the documents that
10 are attached on the e-mail, is the second page of this
11 exhibit titled "Wind Down Plan"?
12   A. It is.  Isn't that an opening of the PowerPoint
13 presentation?  That's not in the body of the e-mail,
14 correct?
15   Q. Correct, yes.  And does it refer to "Inventory
16 Management, Fulfillment Management"?
17   A. It does.
18   Q. And appears to be discussing in the context of
19 the wind-down of the "Current Location"?
20   A. That would be ACET Global, correct.
21   Q. Okay.  What did you understand "Current
22 Location" to mean?
23   A. Where do you see "Current Location," or did I
24 say it?
25   Q. I'm trying to highlight this for you.

21 (Pages 78 to 81)

Page 82

1          (Indicating.)
2          A. Yeah. Yeah. I don't know.
3          I don't know if we'd been threatened by the
4     landlord yet. I think I was already getting notices. I
5     don't think Tomer got them yet.
6          So the landlord, I think, was threatening
7     to lock us out at this point, so there might have had to
8     have been contingency plans to move before the landlord
9     seized all of our assets, and then we'd be really in
10    trouble. Because that's what landlords usually do.
11         Q. Okay.
12         A. That's my guess.
13         Q. Was there a plan to relocate the business?
14         A. I don't know. That would have been Bill, but I
15    know there was a concern that the landlord was coming to
16    change the locks, I think.
17         Q. And in the second large bullet point, it refers
18    to "Sales and Office Staff" and talks about "Relocating
19    to temporary office space with current office furniture
20    and computers."
21         A. Yeah. I got ahead of myself. There it is.
22         Q. And lists a number of other items including
23    "Customer Services," "Email Access," "Current Business
24    Files"?
25         A. Yes.

Page 83

1          Q. What did you understand all of this to be
2     referring to?
3          A. I guess I walked into my own answer. If the
4     landlord was coming, then they needed to get a new
5     location. So that's what they have to do so they
6     wouldn't lose their desks and chairs when the landlord
7     locks the premises up.
8          Q. Okay. So you were understanding this to refer
9     to continuing the business on -- at a new location?
10         A. Well, yeah. Winding it down -- it would be
11    nice if a wind-down was, like, a one-day event, but I
12    think to wind down a business can sometimes take two or
13    three months to process all the AP and the AR.
14         So you have to have some point of
15    operations to wind down so, I guess, that the lienholder
16    has -- can get full value of its assets. So it sounds
17    terrible. Yeah, that -- I think that's what this lists
18    down here, the winding it down. They've got to do it
19    from somewhere.
20         Q. Okay. Was that somewhere going to be
21    Windspeed's offices?
22         A. No, I don't know that there's any concept to me
23    or Matt of Windspeed at this time. This is I think in
24    response to Super G asking ACET if they're gonna wind it
25    down.

Page 84

1          Q. Was there a concept -- a broad concept of an
2     ACET Newco?
3          A. No.
4          Q. An entity that would take the place of ACET?
5          A. No.
6          Q. Now, continuing on to the next page of the
7     exhibit, it refers to -- "Time Line and Cost For Wind
8     Down" is the title.
9          A. Um-hum.
10         Q. And it states "Pay Bill's credit card,"
11    "Reserve For One Month's Rent."
12         And what did you understand "Reserve For
13    One Month's Rent" in this context?
14         A. I can assure you I did not read that at the
15    time, but I think it seems as if, if they were going to
16    be in a new location, they thought they could wind down
17    within a month.
18         I think down below it says they can do it
19    in two weeks. From 9-17 to 9-24, so maybe one week. So
20    maybe they needed a month's worth of rent somewhere to
21    effect this.
22         Q. Did this lead you to believe that maybe there
23    were not issues with the landlord at this time?
24         A. That's not debatable. It doesn't matter what I
25    think. I have a lot -- I have e-mails. I've seen the

Page 85

1     notes. I've seen the threats. It was an issue. It
2     doesn't matter what I think. That's a given.
3          Q. And below that, does it state "Perform Last
4     Inventory prior to closing"?
5          A. It does.
6          Q. And then below that, "Price inventory which can
7     be sold or transferred"?
8          A. Yep.
9          Q. On the right-hand side, it refers to "Inform
10    Building Owner on Closing" and "Inform all Market Places
11    on Closing" and "Inform all major customers on Closing."
12         What did these mean? What did you
13    understand these to mean?
14         A. Reading them now, I hope that it would mean
15    that -- tell all these people that the business is
16    closing. Quit calling me for payments. I was getting
17    collection calls from DHL and FedEx, landlords, people.
18    So maybe if we tell them that they're closed, they would
19    stop. That's probably what that means.
20         And then also, there's some people like
21    the -- is there marketing in here? Market Place, yes.
22    So the marketing -- you don't want people to continue to
23    work, and then they'll still bill you later. So you
24    probably want to let them know to stop, is my guess in
25    there.

Page 86

1    Q. Okay.
2    A. It seems normal.
3    Q. And informing all the major customers?
4    A. Yeah.
5    Q. Was this intended to inform them that the
6    operations would be transferring to a new entity?
7    A. No. I think there's nothing in here to
8    indicate that. This is for wind-down only, not for
9    transfer only.
10          I'm just reading the title there, right,
11   "time Line" -- that you highlighted -- "and Cost For Wind
12   Down Only," yeah.
13   Q. Was there any concern about the ACET Global's
14   employees, their termination?
15   A. Well, certainly. I was concerned about them.
16   That's why I funded payroll all those months. So at the
17   end, I know that I would want to at least fund that last
18   payroll hopefully, before they were terminated, so they
19   wouldn't work a week and get stiffed with no cash in the
20   bank.
21   Q. Okay. Was there -- was there any concern that
22   those employees would not have new employment?
23   A. I always worry about that with employees that
24   work for a company. When you go out, you always want to
25   make sure they have unemployment.

Page 87

1    Q. Were there discussions --
2    A. It would have been a concern. I'm sorry.
3    Q. Oh, no. Were there discussions about how to
4    line something up for them?
5    A. I don't think this indicates that, and I
6    didn't -- I didn't know how to do that.
7    Q. You didn't. Were you the president of ACET
8    Global at this time?
9    A. I believe David was the president of ACET
10   Global and had delegated the work to Matt and I. But
11   that's not a distinction that -- that matters that much.
12          David had delegated to me -- Matt and I at
13   that time. So I was acting under his direction and
14   auth- -- or under his authority.
15   Q. Okay. So at this time you had assumed
16   responsibility, we'll call it, on behalf of David Hook or
17   on behalf of Baymark Partners to oversee ACET Global?
18   A. That's right. The typical -- the management
19   relationship that we had was still in place. We
20   controlled the board, and that was our job, to put the
21   right people in place to operate it. And that hadn't
22   changed. Even if it went from David to me, it was still
23   Baymark -- under the Baymark agreement.
24   Q. Okay. And you indicated -- was there
25   discussion outside of your group about the wind-down of

Page 88

1    ACET Global?
2          MR. PERRIN: Objection; form.
3    A. So was there discussion, outside of the people
4    that I knew, about this? I wouldn't necessarily know.
5    Q. (BY MR. FREEMAN) Yes, sir.
6    A. I don't mean to be snarky, but outside my
7    group?
8    Q. Yeah. Outside of, let's call it, Baymark
9    Partners and ACET Global?
10   A. I don't want to state the obvious, but if we
11   sent our wind-down plan to Super G, I bet they read it.
12   And if that person who read it talked to someone else,
13   then they were having discussions, but . . .
14   Q. Anyone else, like contractors?
15   A. I don't know. I mean, on here -- you mean like
16   the listing of notifying these people on here? Like were
17   they actually notified?
18   Q. Yeah. That would be one.
19   A. I don't know.
20   Q. Did Baymark Partners refer Lori Barber or her
21   company to Windspeed Trading?
22   A. We did.
23   Q. Okay. How did that happen?
24   A. At some point, as an effort to keep the
25   business growing or to get it -- whatever -- Lori Barber

Page 89

1    does marketing, internet marketing. And so we brought
2    her in to help pump up the company as well. I think that
3    was early on. I don't have the dates. I don't think we
4    ever charged ACET for that. I think Baymark, since we
5    had a little relationship with Lori, we paid the tab for
6    Lori to come in and try to help ACET. So she's an
7    internet marketer. I think Lux24 is who she is.
8    Q. But was she helping Windspeed?
9    A. I don't -- I don't -- I wouldn't know.
10   Q. Okay.
11   A. She -- like, she works on a few of our
12   portfolio companies, but she has a lot of other clients
13   as well. She has the knowledge of the ACET stuff. If
14   Bill Szeto wanted to keep her on afterwards or pay her, I
15   don't know.
16          (Deposition Exhibit 5 marked for
17          identification.)
18   Q. (BY MR. FREEMAN) Okay. I'll put what's marked
19   as Exhibit 5 on the screen for you. (Shared screen.)
20          Do you see that?
21   A. One second. We have a big conference room
22   screen and a laptop here, which is a lot easier to see.
23   Okay. Yes, I see it.
24   Q. And I'm specifically looking down at an e-mail
25   towards the bottom of the first page.

Usher Reporting Services
(214) 755-1612

Anthony Ludlow   *   May 15, 2021

---

Page 90

1    A. Um-hum.
2    Q. Is that an e-mail from Lori Barber to -- to
3  Matt Denegre, you, and Andy Waltman, all of you at
4  Baymark Partners?
5    A. It is.
6    Q. And the Subject line, "Luluway Fan Page"?
7    A. Um-hum.
8    Q. So who is Lori Barber?
9    A. She's the owner or she's associated with
10  Lux24 -- or 214, I'm sorry.  I just saw the e-mail.  It's
11  Lux214.
12    Q. And this e-mail's dated January 7, 2019?
13    A. It is.
14    Q. And does she begin her e-mail by saying, "I
15  know you're in the process of winding down Acet"?
16    A. Yeah.
17    Q. Okay.  Now, why was Miss Barber -- why was
18  Miss Barber aware of the winding down of ACET?
19    A. Well, what -- I don't know.  But this is Lori
20  Barber to Matt, so I wasn't on these communications.
21        But at that time, the company -- what is
22  this, in January of '19?
23    Q. Yes, sir.
24    A. So I think the ACET Global and ACET Holdco
25  were -- nothing was happening at that point, I think,

---

Page 91

1  after somewhere in mid-'18s, when we stopped funding
2  payroll.  It was -- so we would tell Lori Barber, you
3  know, politely -- we wouldn't say, "Hey, we don't like
4  you, we don't want to use you."  We're just saying, "Hey,
5  this business is going to be going away or stop
6  functioning right now, so quit racking up costs that
7  Baymark's going to have to continue to pay."
8    Q. Okay.  Did -- did Windspeed take over using the
9  Luluway website?
10    A. If Super G gave it to them, then they did with
11  it whatever they wanted to do with it.
12    Q. Did ACET Global ever allow Windspeed to use the
13  Luluway website?
14    A. I wouldn't know so or -- but, again, that would
15  be encompassed of the assets that were under the guise of
16  Super G's inventory or note or Security Agreement, and so
17  if there was a direction by them to make it work, then I
18  guess they have the right to do that.
19    Q. Did you understand that Super G had the right
20  to transfer those assets prior to the foreclosure sale?
21    A. I think their Security Agreement says they
22  can take possession.  They can do what they want.  They
23  can hypothecate.  They can sell.
24        There's a -- I don't have it in front of
25  me, but, yes, I think that they can take control prior to

---

Page 92

1  actually taking in the foreclosure.
2    Q. Okay.  And in your role, with respect to ACET
3  Global, prior to the foreclosure sale, did Super G ever
4  do that?
5    A. That would be Bill Szeto, but I believe they
6  did.
7    Q. You believe that Super G did direct that it
8  would take possession of the inventory prior to the
9  foreclosure sale?
10    A. I don't think I said "take possession."  I
11  mean, that sounds like a very physical thing to do, like
12  guys with, you know, trucks taking it.
13        But they can guide, direct -- if the loan
14  is in default, those assets are theirs.  They have
15  dominion and control over them at that point.  So there's
16  a lot of influence that they get the second the senior
17  loan goes into default under the Security Agreement
18  that -- like I said, the original agreements we tried to
19  follow that all three parties agreed on.
20    Q. Okay.  Now, dominion and control sounds like a
21  physical thing.  Is that what you mean?
22    A. Fair enough.  Same thing I said on the
23  possession.  It -- I'm just trying to put together the
24  Security Agreement.  From what I understand, there's a
25  lot of things that they say they can do, and it covers

---

Page 93

1  basically everything.
2    Q. And what leads you to believe -- what do you --
3  what do you base that testimony on that you observed?
4        MR. PERRIN:  Objection; form.
5    A. I would love to answer that question, but it's
6  based on my testimony.  I'm not sure what "base that
7  testimony on that I observed."
8    Q. (BY MR. FREEMAN)  Well, so -- let me -- let me
9  ask you -- and it is fickle, and that's -- that's fair.
10        I understand your testimony to essentially
11  be that prior to the foreclosure sale, Super G did, in
12  fact, exercise rights and control over ACET Global's
13  inventory; is that correct?
14    A. Two things, yes.  I believe they had the right
15  to, and I believe they did.
16    Q. And that they actually took action with respect
17  to that inventory that reflected or was intended to
18  demonstrate their control over that inventory?
19    A. I -- that's a nuanced question, so I don't have
20  an answer.  But I would interpret it, Super G told Matt
21  or told Bill, "Hey, sell a necklace and give me the
22  money," or, "Do something with it."
23        Just something as simple as that, "Hey,
24  sell a necklace."  That would be an exercise in
25  control --

---

24  (Pages 90 to 93)

Page 94

1    Q. Okay.
2    A. -- pursuant to their Security Agreement. So --
3  but nothing like you said, here is an official document
4  that says, "I'm exhibiting all control," you know,
5  something very black and white like that. I never saw
6  anything like that.
7    Q. And what leads you to believe that that may
8  have occurred?
9    A. The fact that Super G was in communication with
10  Bill Szeto. That's what that would lead me to believe.
11    Q. Okay. Who at ACET was Super G in communication
12  with about the assets at that time?
13    A. Well, that would be Bill Szeto. That would be
14  the -- what did we say "that time" -- before I start
15  answering, what time is "that time"? Back then -- '19?
16    Q. Yeah. Let's put it from October of '18 on
17  until whenever the foreclosure sale occurs as the end
18  date.
19    A. Yeah.
20    Q. During all that -- during that time, are you
21  saying that Super G was in communication with Bill Szeto
22  of ACET Global?
23    A. Yes.
24    Q. Okay. And what was Bill Szeto's position at
25  ACET Global at that time?

Page 95

1    A. He was the CEO.
2    Q. Okay. Had he been delegated full authority
3  over ACET?
4    A. The CEO operates -- the board of directors
5  hires the guy, and then the CEO does everything else.
6  So, yeah, full authority.
7    Q. Okay. And were you in -- was Bill -- was Bill
8  Szeto in communication with anyone else at Baymark
9  Partners or at ACET Global about the status of ACET
10  Global's inventory during that period?
11    A. That's very specific. I think we were getting
12  updates, minimal updates on P&L, or updates of the profit
13  and loss of the business after some point in time.
14       It went into kind of a stasis mode where we
15  were just paying payroll. But they -- I don't think they
16  had enough cash to even buy inventory. But he was just
17  trying to keep it alive long enough to sell what
18  inventory there was to get going, to carry on, to get a
19  chance to revive the company.
20       So was he in contact or did he have
21  control? Yeah, he was talking to -- I guess it was
22  Super G at that time, and we would get updates. Did we
23  get separate inventory listing? No.
24    Q. So did Mr. Szeto provide you with updates about
25  his communications with Super G?

Page 96

1    A. I don't believe so. I think we were -- we were
2  communicating directly with Super G because that was --
3  at that time, that whole period is when they asked us to
4  do the friendly foreclosure or the ABC, whatever you want
5  to call it, the California thing. And we said no.
6       They were talking about, "Well, maybe we'll
7  just sell all the assets or we'll do a wind-down and take
8  the assets."
9       Or we'll do a -- they didn't say
10  foreclosure at that time. I kind of made them do that,
11  or suggested that. So, yeah, there was communication
12  amongst all parties.
13    Q. Okay. But you didn't have any communications
14  with Bill Szeto about what he was discussing with
15  Super G?
16    A. No. We were -- ACET Global was, again, trying
17  to enforce our rights and concerned that -- our immediate
18  concern was that -- were they gonna take our assets, and
19  then we'd be dead in the water, or if we could put them
20  off longer.
21       So that's what we were communicating.
22  That's why we resisted the friendly foreclosure, if we
23  can use that to refer to that ABC thing.
24    Q. Did -- did you have the impression that Bill
25  Szeto was in communication with Super G during that time?

Page 97

1    A. I do know that he communicated with them. I do
2  know that at first, when he first got hired on, early on,
3  he had a meeting with them. And then Super G was
4  communicating with us how Bill was doing.
5       And at some point, they stopped talking to
6  us, and they were talking to Bill at that point. I don't
7  know if Bill initiated that. Like I said, he's a big
8  personality. I wouldn't be surprised if he reached out
9  and took that over.
10    Q. Okay. And what -- what led you to believe that
11  they were talking directly with Bill Szeto?
12    A. No more than what I've indicated here.
13    Q. So nothing else specific?
14    A. (Shook head.) There's going to be a number of
15  e-mails that have Bill or me or Matt on it as well, and
16  Super G. So depending on the time, that'd be
17  communicating basically how the company's doing and how
18  is it going to make it.
19    Q. Did you refer to Windspeed as "ACET Newco"?
20    A. I don't believe so.
21    Q. Did you ever ask ACET lawyers to draft
22  formation documents for Windspeed Trading?
23    A. No.
24       MR. PERRIN: Objection; form.
25    A. No. Well, when you say -- when you say -- did

Anthony Ludlow   *   May 15, 2021

## Page 98

1  you say ACET Global's attorneys?
2      Q. (BY MR. FREEMAN) Yes, sir.
3      A. Yeah, so ACET Global had an attorney -- they
4  had a separate engagement for Baymark Partners
5  Management. That was a separate -- yeah.
6      Q. Okay. So, now, did -- did ACET Global have
7  attorneys?
8      A. Yes.
9      Q. And who were they?
10     A. ACET Global had Hallett & Perrin, Julie -- or
11  Gordon at first and then Julie.
12     Q. Okay. And did you -- did you ask Baymark
13  Partners' lawyers to draft formation documents for
14  Windspeed Trading?
15         MR. PERRIN: Objection; form.
16     A. I think I asked Baymark Partners Management's
17  attorneys to review those documents, which -- Bill Szeto
18  told me he was gonna give me a -- an equity piece or a
19  warrant in his company.
20     Q. (BY MR. FREEMAN) Did -- who was Baymark
21  Partners Management's attorneys?
22     A. Hallett & Perrin.
23     Q. Okay. And who -- who specifically within
24  Hallett & Perrin? Was that Julie Smith?
25     A. It was Julie, yes.

## Page 99

1      Q. Who was Baymark Partners' lawyers?
2      A. Hallett & Perrin.
3      Q. It was Hallett & Perrin. Was it specifically
4  Julie Smith?
5      A. Well, when you say "Baymark Partners," I think
6  I've used everybody at this -- well, not everybody, but
7  yeah. Julie and Gordon, and is there a Cassandra, too?
8  So, yeah.
9      Q. Most -- I mean, it was Hallett & Perrin, and
10  Julie Smith's one of -- one of the key attorneys?
11     A. Yes.
12     Q. What about for the other entities that you
13  represent here today? Who were their attorneys?
14     A. I can only speak to the ones I'm in control of.
15     Q. Okay.
16     A. So I know Bill or Windspeed had their own
17  person. And of course Super G would have their own
18  person. Then Hallett & Perrin for the entities that I
19  controlled.
20     Q. The others. So if I asked about whether
21  Baymark Partners' lawyers were requested to draft
22  formation documents for Windspeed Trading, is the answer
23  yes?
24         MR. PERRIN: Objection; form.
25     A. When you say "formation documents," I didn't

## Page 100

1  even -- I don't think we formed it. I think Bill Szeto
2  formed that.
3      Q. (BY MR. FREEMAN) And what do you mean by the
4  phrase "formation documents"?
5      A. Well, it was in existence by the time Bill
6  said, "Hey, I want to give you some equity in my company.
7  Maybe you could give me some money," which I never did.
8      Q. So that was the reason for Baymark Partners'
9  involvement with respect to Windspeed Trading?
10     A. I think Baymark Partners Management was the one
11  that was involved, not to draw a small distinction, but
12  it is a separate legal entity. So Baymark Partners
13  Management was the one that was involved with Bill.
14         I bet he expected us to continue to invest
15  in him because we had continued funding payroll before to
16  keep ACET Global going. And also he figured at some
17  point we could use our experience to find financing or
18  lending or something for him in the future. He was
19  trying to rope us in.
20     Q. Okay.
21     A. That's my understanding.
22     Q. Who owns Baymark Partners Management?
23     A. David and I.
24     Q. And how is that ownership split up?
25     A. I'd have to check, but let's go with 50/50.

## Page 101

1  That's fairly -- that's going to be accurate.
2      Q. Okay. When you're corresponding on behalf of
3  Baymark Partners Management, what e-mail address do you
4  use?
5      A. Keep it simple. It's all used under my
6  convenient e-mail address that I have at Baymark
7  Partners: tludlow@baymarkpartners.
8      Q. Okay. So you use your Baymark Partners e-mail
9  address. Do you use a different signature block?
10     A. No, I don't.
11     Q. Does -- do you have a different phone number
12  for Baymark Partners Management?
13     A. I do not.
14     Q. Different office location?
15     A. It is the same office location.
16     Q. Does it have different, distinct employees?
17     A. Trying to -- so there are certain people that
18  work on some or the other, but it's -- for convenience,
19  I'd say it's the same -- same employees. Different
20  employees work on different things.
21     Q. Same employees. Okay. Are they paid by
22  Baymark Partners?
23     A. Paid by Baymark Management.
24     Q. Baymark Management?
25     A. Baymark Partner -- yeah. Baymark Management.

26 (Pages 98 to 101)

Anthony Ludlow   *   May 15, 2021

---

Page 102

1    Q. Is that the entity we were just talking about,
2  or is that a different entity?
3    A. It's the same.
4    Q. The Baymark Partners Management?
5    A. No, Baymark Partners Management is different
6  than Baymark Management.
7    Q. Okay. Who owns Baymark Management?
8    A. David and I. 50/50.
9    Q. And the same for Baymark Group -- Baymark
10  Partners Management?
11    A. Yes.
12    Q. What is the purpose of Baymark Management?
13    A. Big question. We're a private equity firm that
14  partners and invests with companies to help -- provide
15  our expertise to help them grow. We invest in cash flow
16  businesses that we can get a multiple of the EBITDA and
17  grow them and sell them.
18    Q. Okay. So is that -- is that the -- the mother
19  company?
20    A. Baymark Partners?
21    MR. PERRIN: Objection; form.
22    Q. (BY MR. FREEMAN) Well, Baymark Management.
23    A. Yeah, that's -- yes. Yeah. And making sure
24  you're making a distinction -- it's not Partners
25  Management.

---

Page 103

1    Q. Yeah.
2    Q. Okay.
3    Q. I'm using a -- I'm trying to understand its
4  role, basically. How is it related to Baymark Partners?
5    A. I believe Baymark Partners is a d/b/a that is
6  for -- Baymark Management is where all the employees are.
7  The entity is Baymark Management.
8    Q. Okay. And do all the paychecks come from
9  Baymark Management?
10    A. They do.
11    Q. Okay. Do any of the other subsidiary Baymark
12  entities or d/b/a's, do they have a separate payroll?
13    A. Okay. So when you say "subsidiaries," we have
14  a lot of portfolio companies, and they all have separate
15  payrolls, but . . .
16    Q. Well, let me put it like this: I'm only
17  referring to those, you know, that are at issue here and
18  related to ACET Global and the chain up of ownership.
19    A. Yeah, no. No others.
20    Q. Did Baymark Partners Management, did it have --
21  you know, did it have a separate sign outside to
22  designate, outside the office?
23    A. No, it didn't.
24    Q. And no separate website, right?
25    A. No, it didn't.

---

Page 104

1    Q. Did it have its own accountants?
2    A. Well, yes.
3    Q. Okay. And who were those accountants?
4    A. It would be Jim Howard & Co., because as an
5  entity, it would be required to file -- have filings.
6    Q. Okay. So it had its own -- who paid for those
7  accountants?
8    A. Baymark Partners Management or David and I.
9    Q. Okay. So did you -- did you ask for or request
10  Baymark Partners' lawyers to draft any of the formation
11  documents for Windspeed Trading?
12    A. No. It was -- I think it was -- what I
13  recollect, it was already formed when we were asked to
14  come into it. I gave it to Julie and said, "Hey, make
15  sure that if I come into this entity" -- because I think
16  there was already an operational agreement that existed,
17  and it was probably, like, a single member, something
18  simple -- said, "If I'm gonna come in and get some
19  equity, make sure it's done correctly."
20    Q. Okay. So you were just discussing getting
21  equity in Windspeed?
22    A. I think what I said was since Bill Szeto was
23  going to be giving us equity, I was gonna accept it.
24  Make sure that it comports with an operating agreement
25  that has the protections that I need. And number one is

---

Page 105

1  not requiring me to put in any money.
2    Q. Okay. Were you intending -- so were you
3  intending to put any money into it?
4    A. No.
5    Q. But your understanding was that Bill Szeto was
6  asking you to be a member because you would fund it?
7    A. I don't actually know why he was doing it. My
8  assumption was that we -- we had shown a predilection to
9  give him money to cover payroll. In a desperate
10  situation, he thought we might be nice to have if he got
11  in trouble. And maybe some expertise when it came to
12  financing or lending later on. None of which we've done.
13    Q. You thought pretty highly of Bill Szeto?
14    A. Yeah. He had a good pedigree and a good
15  background. He's a --
16    Q. Pretty good CEO?
17    A. I think so. He's --
18    Q. He has a long history?
19    A. He has a -- he has a longer history than I do,
20  so yes.
21    Q. Was he a pretty sophisticated businessman?
22    A. He had been in some -- from what I understand,
23  some very complicated venture deals that had gone up and
24  done very well. So that means he's familiar with working
25  with investors, banks, negotiating deals. And I think he

---

27 (Pages 102 to 105)

Anthony Ludlow   *   May 15, 2021

Page 106

1  speaks another language that comes in handy if you're
2  going to be shipping from China.
3      Q. Okay. I'm guessing that's not French, right?
4      A. Yes. I don't want to say Mandarin versus --
5  there's a few Chinese dialects. I'm not sure which one
6  he speaks. I don't think it's French.
7      Q. Was -- but he was -- he was a pretty
8  sophisticated businessman? You bounced deals off of him
9  at times, right?
10     A. I had never met him. It was a friend of
11  David's. David had the experience with him before. So
12  David told me about him. Then I think he came to the
13  office one time; I met him. He was -- I think initially
14  he was hired to go in and just assess. Because I think
15  Bill Szeto was in retirement, so to speak, at the time.
16  And he was just to assess what the issues were to see how
17  drastic changes we'd have to make to get the company
18  revived again. That's how I met him.
19     Q. Okay. And when was that?
20     A. This is all verifiable, but if you want me to
21  guess, I think February -- no, January of maybe 2018.
22     Q. Okay. That general time frame when you first
23  met him.
24     A. Yeah. We -- we knew we needed help because
25  once Super G said, "Put in money or we're -- because

Page 107

1  you're in default, put in money or bad things are going
2  to happen," in that December that I mentioned before,
3  after that we needed to get pretty serious.
4          So we were going to have somebody -- an
5  outside somebody assess what -- why the company was
6  performing so poor. So it had to have been no sooner
7  than January.
8      Q. Okay. Why were you interested in going into
9  business with Bill Szeto?
10     A. Are you asking why we thought Bill Szeto would
11  make a good assessment of the company?
12     Q. Yeah. And specifically Windspeed, when you
13  were discussing obtaining equity in Windspeed.
14     A. Well, there's a certain -- well, he has a good
15  background. He wasn't gonna charge us anything. He was
16  coming out of retirement. He had a good background, and
17  he went in and looked at some things. He understands
18  about shipping. He understands about importing. He
19  understood the language.
20          So for him to go and do an assessment, it
21  would just give us another set of eyes to potentially
22  things we could do to improve the business.
23     Q. Okay. But with respect to -- with respect to
24  Windspeed, I mean, you understood him to be a, you know,
25  pretty sophisticated businessman, but you're not sure why

Page 108

1  he's just giving you equity in Windspeed?
2      A. So that -- I feel like you said why do I think
3  he's so good at Windspeed? Like we shifted from him
4  assessing ACET over to --
5      Q. Right.
6      A. -- why he's such a good businessman at
7  Windspeed.
8      Q. I'm -- no, I'm trying to understand why Baymark
9  Partners was interested in obtaining an equity stake in
10  Windspeed.
11     A. Bill asked us to take equity. At the time we
12  took it, it was -- I want to say equity or warrant. I
13  use those interchangeably.
14     Q. Right.
15     A. We took that. At the time that he offered and
16  we took it, we were taking a -- I forget what it was.
17  30 percent, a 30 percent ownership in debt. The company
18  had no operations, no income, and it was just debt.
19          So it was just a -- you know, we'd gotten
20  Bill and brought him into a company that had done poorly.
21  I thought it's the least we could do is to show him some
22  support there. But at the time we took it, it was
23  nothing but debt in the company.
24     Q. And you didn't intend to infuse any capital
25  into it?

Page 109

1      A. I did not and nor have I ever.
2      Q. And so how exactly were you -- were you doing
3  Bill a favor by taking equity in his company?
4      A. Well, he -- again, he thought that -- you don't
5  want to tell the guy, "I'm not gonna put anything" -- you
6  don't want to shut the guy down and tell him, "I'm not
7  actually going to put any more money into this."
8          If he thought that at some future point he
9  could use our expertise if they ever got the company
10  going, maybe we would help him there.
11     Q. Did you mislead Mr. Szeto into giving you
12  equity in Windspeed?
13     A. No.
14     Q. No? But he believed you were going to put
15  money into Windspeed?
16     A. He had hoped. Like I said, we'd shown a
17  predilection. When he would call up with ACET and say,
18  "Hey, I need to make payroll, come on, help me out," he
19  found us to be bleeding hearts, and there were many times
20  THAT I made payroll so that people weren't fired.
21          So I'm sure he wanted that to carry over,
22  should he get in trouble.
23     Q. Okay. But no other reason, really, you can
24  think of that he wanted to give you a 40 percent stake in
25  his company?

28 (Pages 106 to 109)

Anthony Ludlow   *   May 15, 2021

Page 110

1    A. No.
2    Q. Any reason he would have wanted to give another
3  40 percent stake to Super G?
4    A. That would be between him and Super G.  I
5  assume that Super G -- he got a loan from Super G, so I'm
6  sure that was their hope ticket, to maybe trade.
7    Q. You or Baymark Partners weren't involved in
8  that -- any of that discussion?
9    A. I wasn't.
10    Q. Wouldn't you want to know the details about a
11  potential 40 percent partner in the deal?
12    A. I had no involvement -- or no risk in that
13  deal, other than to make sure that I wasn't required to
14  put money in the deal, or blowback.  So if he was going
15  to hand that to me, I really had washed my hands of it at
16  that point.
17    Q. Didn't you have discussions with Mr. Denegre
18  about your risk in the deal?
19    A. No.
20    Q. You felt there was no risk in the Windspeed
21  structure?
22    MR. PERRIN:  Objection; form.
23    A. I don't -- I don't know what that means.  I
24  mean, all businesses have risk.  So I think you're
25  talking about a specific kind of risk, but when you say

Page 111

1  "no risk at all," I mean, risk that it will succeed, that
2  it will fail.  Risk that we're gonna actually want to
3  get -- he's not going to be able to buy -- I'm not --
4  it's a little bit more specific.
5    Q. (BY MR. FREEMAN)  Generally if you're
6  discussing risk in an e-mail, for example, you know, with
7  respect to a -- to a business, are you referring to just
8  that kind of implied background risk that exists in a
9  capitalistic society, the geopolitical risks, or are you
10  kind of referring to specific types of risks that may
11  have been identified?
12    A. Yeah, I'm sure if it's in an e-mail, that
13  there's some context or conversation that's there.
14    Q. Usually it's a particular risk, not sort of an
15  amorphous background risk that may exist, right?
16    A. Right.  So, yeah -- so if you have something
17  you want me to look at, I'd be glad to look at it.
18    Q. Let's go to one, I guess.
19    (Deposition Exhibit 15 marked for
20    identification.)
21    Q. (BY MR. FREEMAN)  I have up what's marked as
22  Exhibit 5 -- oop, sorry.  Exhibit 15.  (Shared screen.)
23    Do you see that, sir?
24    A. We got a false start there.
25    Yep, I do.  I do.

Page 112

1    Q. And is that an e-mail -- what's in Exhibit 15,
2  is that an e-mail from Matt Denegre to you on
3  October 7th, 2018?
4    A. It is.
5    Q. Okay.  And is the Subject line "ACET Newco"?
6    A. Uh-huh, it is.
7    Q. What did you understand "ACET Newco" to refer
8  to?
9    A. So below it, it says "EIN."  It appears that
10  there's Windspeed Trading formation documents attached to
11  it.  So I guess that's talking about Windspeed.
12    Q. So did you -- you understood ACET Newco to
13  refer to Windspeed Trading?
14    A. No.
15    Q. The attachments to this -- this e-mail, does it
16  state "EIN - Windspeed Trading LLC," a "Certificate of
17  Formation.pdf," and an "LLC Operating Agreement" from
18  Windspeed Trading LLC?
19    A. It does.
20    Q. Okay.  And did you ever read those documents?
21    A. No.
22    Q. Why were you receiving this e-mail?
23    A. I believe this is the beginning of Bill trying
24  to focus in to own pieces of Windspeed.
25    Q. Okay.  So this was -- was this Bill trying to

Page 113

1  make the hard sell to get Baymark Partners involved in
2  Windspeed?
3    A. I would guess so.  I'm looking at the e-mail
4  below.  I'd like to read the body of it and see what it
5  says.
6    Q. Okay.
7    A. Unless you don't want to cover that.
8    Q. We'll go through it, but we're -- I still want
9  to get to a few things at the top.
10    Were you talking with Matt Denegre about
11  proposals for ownership by Super G in Windspeed?
12    A. So say that again.  I'm sorry.  I was reading
13  at the same time.  Were we talking about proposals
14  for . . .
15    Q. Yeah.  Was there a discussion about Super G
16  becoming an owner in Windspeed Trading?
17    A. Well, I'm sure Super G was definitely talking
18  to Bill about his -- about their ownership in -- in -- is
19  it Windspeed?  Yeah.  Windspeed.
20    Q. And you're not very familiar with Windspeed
21  Trading, though?
22    A. Well, I am now.  It's become very popular these
23  days.  At the time, no.
24    Q. But you weren't -- you weren't at the time?
25  Okay.

29 (Pages 110 to 113)

Page 114

```
 1        A. No.
 2        Q. Did -- did you and Mr. Denegre or Baymark
 3   actually push back on Mr. Szeto and want more ownership
 4   in Windspeed?
 5        A. I don't know.  I remember talking about I
 6   wanted a warrant because it wasn't even worth filing
 7   taxes.  If you get a warrant, usually you don't get a
 8   K-1, and I didn't even think this entity was worth the
 9   $1500 to do the taxes on it.  So that's the conversation
10   I remember.
11        Q. Okay.  Okay.  Would it --
12        A. At the time when it was formed, I think, and
13   Super G put the money in, by the time our equity -- we
14   got our piece, it was all debt.  There was nothing but
15   debt.
16        Q. Did you think that maybe it would be worth more
17   in the future?
18        A. No, I did not.
19        Q. Maybe in a few weeks?
20        A. Did not.
21        Q. So if it was -- if it wasn't worth much and you
22   didn't expect that it would be worth much, why would --
23   why would Baymark be pushing for greater ownership
24   rights?
25            MR. PERRIN:  Objection; form.
```

Page 115

```
 1        A. I don't know.  I don't know if we were.  We can
 2   look at something.  I might be able to answer that.
 3        Q. (BY MR. FREEMAN)  I'm going to -- I'm going to
 4   scroll down.
 5            Let me just go to this e-mail from
 6   Mr. Szeto with the subject "Windspeed LLC" below this
 7   e-mail.
 8        A. Um-hum.
 9        Q. It refers to a number of items or processes
10   that Mr. Szeto needs to go through.
11        A. Um-hum.
12        Q. And refers to (as read) "Leasing space to show
13   that we are indeed a serious company," "Making offers to
14   current employees," "new bank account," "Sending
15   termination letter to the current employees," "Informing
16   market places the change of name and banking
17   information," and indicated, "We don't want to miss the
18   best selling season of the year," as though there was a
19   change right before the most advantageous part of the
20   year.
21            What did you understand Mr. Szeto to be
22   referring to in this -- this e-mail?
23        A. From the look of it, it looks like the
24   continuation of the wind-down plan before that he was
25   doing for Super G, because I'm seeing "leasing space,"
```

Page 116

```
 1   "current employees."  I see information to marketplaces.
 2            This all sounds familiar to that wind-down
 3   plan that we did -- that we did for Super G.  So
 4   apparently -- well, apparently.  I don't know.  This is
 5   probably something that he was doing with Super G.
 6        Q. And he was terminating the current employees
 7   but making offers to current employees.  What did you
 8   understand that to mean?
 9        A. Well, that would mean if -- if the employees
10   were going to be taken from ACET Global under Super G's
11   guidance and -- whatever they want to do, put it into, I
12   guess, Windspeed here.  That's what it sounds like.
13        Q. But you didn't know that was going to happen?
14        A. No.
15        Q. Okay.  And does this e-mail that you've
16   received here on October 7th, 2018, is this -- and that's
17   reflected here in Exhibit 15, is this a true and correct
18   copy of the correspondence?
19        A. I'll call it authentic.  I don't have any
20   reason to think it's not.
21        Q. Now, scrolling down, these are the attachments
22   to the e-mail.
23        A. Um-hum.
24        Q. I'm just scrolling down because I know you
25   wanted to see it.  But I don't have any questions for you
```

Page 117

```
 1   on those.
 2        A. Those are the standard -- is it Texas or
 3   Delaware?
 4        Q. I believe it's Texas.
 5        A. Because Texas and Delaware law is very similar.
 6   Had to have been one or the other, so . . .
 7        Q. Did -- so in this e-mail, where Mr. Denegre was
 8   referring about sending it to Julie -- and I assume
 9   that's Julie Smith of Hallett & Perrin?
10        A. Yes.  Safe -- yes.  That would be a safe
11   assumption.
12        Q. And did Baymark actually send the documents to
13   Julie?
14        A. I'm sure we did.  If she took the original
15   small draft and then made it a three-party agreement, I'm
16   sure she would have had to have gotten it.
17        Q. Okay.  And did she draft an amended company
18   agreement for Windspeed?
19        A. Yeah.  I believe she took it from a single
20   member to a multimember, which is a lot bigger.
21        Q. Okay.  And was that amended company agreement
22   for Windspeed actually executed?
23        A. Probably.  If you put it up and show me, I'll
24   agree to it, but probably.
25        Q. Now, I'm going to come back to it, but I'm
```

## Page 118

```
 1    just -- I'm asking from your memory.  Was -- do you know
 2    if it was executed by a Baymark party?
 3         A.  If it was executed, it probably would have been
 4    executed by a Baymark Partners and Management party.  But
 5    whatever signature blocks are, I bet it was signed.  I
 6    don't think it would be an unsigned document.
 7         Q.  Okay.  Let me ask you:  Who -- who hosted ACET
 8    Global's e-mail accounts?
 9         A.  I don't know.  There's a myriad of outside
10    hosting services.  It's -- I assume it's someone that
11    Tomer originally hired, but I don't know the name.
12         Q.  Was it Rotten Design Hosting?
13         A.  That sounds right.  Actually, that sounds
14    familiar.
15         Q.  Did Baymark Partners ever talk to Bill Szeto
16    about getting access to the ACET Global e-mails?
17         A.  We did.
18         Q.  When was that?
19         A.  Well, it was when we got discovery requests.
20    It was time to go out and collect up this information.
21    So we head online to David's and Matt's to put together,
22    and were going to pull those off, and asked Bill Szeto if
23    he could see if there was any information in there too.
24         Q.  Okay.  So was that in, like, 2020?
25         A.  Yeah.
```

## Page 119

```
 1         Q.  Sometime in there?
 2         A.  Yeah, I believe so.
 3         Q.  And it was for this particular lawsuit?
 4         A.  I apologize.  I don't remember when we got an
 5    initial discovery request, but it was right after that.
 6         Q.  Okay.
 7         A.  It was tied -- tied to that date.
 8         Q.  Just to get it on -- verbal.
 9             It was with respect to this lawsuit?
10         A.  Yes.
11             MR. PERRIN:  Jason, are we anywhere near a
12    stopping point?  It's about 12:20.
13             MR. FREEMAN:  We're real close.
14             MR. PERRIN:  Okay.
15         Q.  (BY MR. FREEMAN)  Did you talk to Rotten Design
16    Hosting?
17         A.  No.
18         Q.  Did Baymark?
19         A.  When you say "Baymark," as in . . .
20         Q.  Baymark Partners.
21         A.  I believe Matt gave them a call and found out
22    that those e-mails -- whatever their service is, when
23    they received nonpayment, I don't know, a year or two
24    prior to that, they held it for a few days and then
25    deleted it.
```

## Page 120

```
 1             So they were gone over a year, couldn't
 2    have been more than a year and a half, before we even
 3    called them, due to nonpayment back when we weren't
 4    paying all our other bills.
 5         Q.  Okay.
 6         A.  ACET Global wasn't paying their bills.  I said
 7    "we," but ACET Global wasn't paying their bills.
 8             And we inquired about do they have backups?
 9    Do they have anything?  And they -- what's gone is gone.
10         Q.  Okay.  Did -- did Bill Szeto have any input on
11    the status of those e-mails?
12         A.  Yes.  I apologize it got included in that
13    sweeping answer, but yes.  He -- we called him and found
14    out who the vendor was so we could call.
15         Q.  Okay.  And did he indicate whether he knew
16    about their status, or . . .
17         A.  He didn't know, or -- I don't think he called.
18    I think Matt might have called.  But regardless of the
19    outcome, the information that came back is once they
20    stopped receiving payment a long time ago, they held it
21    maybe 30 more days, and then they were gone.
22         Q.  Okay.
23         A.  That could have come from Bill or Matt.  If it
24    matters, I'll --
25         Q.  Okay.  Did Bill indicate whether he had taken
```

## Page 121

```
 1    any steps to preserve those e-mails?
 2         A.  Preserve the e-mails once we got notice of the
 3    lawsuit?
 4         Q.  Yeah, or -- or -- well, yes.  Preserve it --
 5         A.  You know, I'm sure he kept his e-mails and,
 6    again, by the time we reached out to find -- to capture
 7    those, they had been gone over a year.
 8         Q.  Okay.  Did he state whether he had done
 9    anything to preserve them, you know, in October of 2018
10    when ACET Global defaulted on a $3.2 million note?
11         A.  I don't want to get persnickety.  But no
12    conversation from Bill at all -- and first I heard you
13    say $3.2 million note; I think it was 2.88.  But that's
14    neither here nor there.
15         Q.  Well, with the accrued interest, wasn't it
16    closer to 4?
17         A.  I never heard that.
18         Q.  Well, either way we're talking about the same
19    note?
20         A.  Same note.
21         Q.  Only one note.  Let's call it 3 millionish.
22         A.  I'm okay with that.
23             MR. PERRIN:  Can you just call it "the
24    seller note"?
25             THE WITNESS:  Seller note.
```

31 (Pages 118 to 121)

Page 122

1    Q. (BY MR. FREEMAN)  Sure.  So the seller note.
2  Did Bill indicate that he had taken any steps to preserve
3  all of those ACET Global e-mails in October of 2018 when
4  ACET Global defaulted on the seller note?
5    A. No, he didn't.
6    Q. And did you take any steps to secure those ACET
7  Global e-mails in October of 2018 or thereafter around
8  the time that ACET Global had defaulted on the seller
9  note?
10    A. No.
11    Q. Did anyone from ACET Global take any steps to
12  preserve those e-mails?
13    A. No steps were taken after the nonpayment.
14    Q. And did anyone from Baymark Partners or any of
15  the other entities that you represent, did anyone take
16  any steps to preserve those e-mails?
17    A. No one took steps to preserve the e-mails.
18  After we stopped making payments on it, the account was
19  lost.
20    Q. Was there any concern in October of 2018 about
21  a potential lawsuit over the seller note?
22    A. I don't believe so.  I believe we were in
23  communication with Tomer; we were in communication with
24  Super G.  Everybody knew that the company was winding --
25  not winding down, but it was having a lot of difficulty

Page 123

1  at that time.  So if the -- everybody understood that
2  there was no money to be had from the company anyway.
3  There was no cash flow to pay the notes, the senior or
4  the subject.  So suing a company that didn't have any
5  assets or any cash flow, it just didn't -- it wasn't a
6  concern.
7    Q. Super G and Baymark Partners knew that there
8  was a winding up of ACET Global, but did you ever -- did
9  either of you ever have that discussion with Tomer Damti?
10    A. Yeah -- yeah.
11    Q. You did?
12    A. Yeah.  There's -- Tomer was aware.  I think we
13  still gave him financial updates throughout.  I can
14  remember an e-mail where he said, "Hey, what are we doing
15  with the company?  How's Super G behaving?  Is it
16  gonna -- is it still operating?"  And so there's e-mails
17  in there where we communicated with Tomer.
18    We were still talking with him, helping him
19  get some unemployment.  We released him from some of his
20  employment contract terms so he could do that and stuff
21  like that.  So it wasn't radio silence.
22    Q. Did -- but you had -- you had indicated to
23  Tomer Damti that you were engaging in a wind-down process
24  of ACET Global?
25    A. Tomer was aware of the state of the company.

Page 124

1    Q. And did you convey that to him?
2    A. I'm not sure who did.  I don't know that.  I
3  might have when I talked to him one time.  I'm sure Matt
4  did, or maybe he called Bill Szeto, too.  I don't know,
5  but . . .
6    Q. And what specifically leads you to believe that
7  Tomer Damti was aware that y'all were engaged in a
8  wind-down process of ACET?
9    MR. PERRIN:  Objection; form.
10    A. I think what I offered is that Tomer was aware
11  of the state of the business.  And also he's aware that
12  we were trying to see if we could beat Super G back to
13  give us some space.
14    I don't know about anything more than that,
15  or a wind-down, if it still existed.  But those all point
16  to no cash flow for anybody, so that's part of that.
17    Q. (BY MR. FREEMAN)  You're indicating that he was
18  aware of the economic circumstances of ACET Global,
19  right?
20    A. I am absolutely making -- saying that, yes.
21    Q. Are you also indicating that he -- that you had
22  made him aware of a deliberate attempt to wind ACET down?
23    MR. PERRIN:  Objection; form.
24    A. Again, I've already answered that.
25    Q. (BY MR. FREEMAN)  So you're not aware of a

Page 125

1  communication to Mr. Damti of a -- of a deliberate
2  attempt to wind ACET down?
3    A. I would like to check my records or what we
4  delivered.  We delivered, what, 19,000 documents?
5    MR. PERRIN:  Um-hum.
6    A. So let me go through --
7    MR. PERRIN:  Pages.
8    THE WITNESS:  Oh, pages.  I'm sorry.
9  Pages.
10    A. So let me go through and check, because I have
11  a very strong feeling that we did, repeatedly.  But
12  before I attest to you here, let me go and check my
13  documents that we sent over and see if I can't provide
14  that to you.
15    MR. PERRIN:  Jason, are we at a lunch break
16  point yet?
17    MR. FREEMAN:  I think we are.
18    MR. PERRIN:  All right.
19    MR. FREEMAN:  We can go ahead and go off
20  the record if y'all would like to take lunch now.
21    How long do y'all want?
22    MR. PERRIN:  I mean --
23    MR. FREEMAN:  30 minutes?
24    MR. PERRIN:  We can do 20, but 30?  All
25  right.

Page 126

```
 1              MR. FREEMAN:  You got it.
 2              THE COURT REPORTER:  Okay.  30 minutes.
 3     We're off the record at 12:27.  We'll reconvene at 1:00.
 4
 5              (A lunch recess taken from 12:27 p.m. to
 6                1:08 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 127

```
 1              AFTERNOON SESSION
 2
 3              THE COURT REPORTER:  We're back on the
 4     record at 1:08 p.m.
 5
 6              EXAMINATION (CONTINUED)
 7     BY MR. FREEMAN:
 8         Q.  Okay.  Mr. Denegre, before we had broke for
 9     lunch --
10              MR. PERRIN:  Jacob --
11              THE COURT REPORTER:  No.
12              MR. PERRIN:  I think you mean Mr. Ludlow.
13              MR. FREEMAN:  Sorry.  Excuse me.
14         Q.  (BY MR. FREEMAN)  Mr. Ludlow, before we had
15     broken for lunch, we had discussed Mr. Denegre's
16     testimony or deposition.
17              And, Mr. Ludlow, I'm going to upload a
18     document that we'll use -- we can mark as Exhibit 46.
19              (Deposition Exhibit 46 marked for
20                identification.)
21         Q.  (BY MR. FREEMAN)  You had -- I had asked about
22     the outburst during Mr. Denegre's deposition, and my
23     understanding from your testimony was you were concerned
24     that I might have been going a little hard on him.
25         A.  Yeah, it was more of an emotional response than
```

Page 128

```
 1     what you were doing.  Concern for Matt.
 2         Q.  Okay.
 3         A.  Yes.  I had said that, yes.
 4         Q.  And you had indicated you interjected because
 5     Mr. Denegre had already -- I guess already answered the
 6     question a few times?
 7         A.  I think what I said was, from my memory, since
 8     I haven't looked at it, I just remember that it was going
 9     on.  I'm not going to state that I know for a fact he had
10     answered a few times.
11              Again, it was never intended for anybody to
12     hear in the first place.  So it's -- tying it back to
13     what happened is . . .
14         Q.  Well, I mean, did you believe he'd fully
15     answered the question already?  Is that why?
16         A.  It's not tied to my outburst.  I was yelling at
17     a football game, effectively.  I didn't know my mic was
18     on, and I think that happens with these Zoom calls from
19     time to time.  So it was a mistake, definitely, that I
20     feel bad about.
21         Q.  Was it -- I mean, did you feel like -- I'm
22     trying to understand the motivation for the -- you know,
23     for the outburst.  I mean, was it that you didn't want
24     him to answer the question?
25         A.  I think what I expressed -- and, again, I'm
```

Page 129

```
 1     going from memory.  If I had -- had a chance to review
 2     it -- which I didn't, at break, actually.  I just ate a
 3     sandwich.
 4              I just had frustration over the fact
 5     that -- for Matt because it looked like -- I could see
 6     the look on his face, and he was -- like I said, he has
 7     trouble hearing, and he was leaning in, and so it was
 8     just -- a question that was asked, but I believe it was
 9     answered a few times, and asked.  As you do, you ask the
10     same question multiple different ways.  And so I felt he
11     had answered the question.  So I was saying that it's --
12     to myself, if I was Matt, it's okay.  Just be quiet.
13     You've said enough.
14         Q.  Okay.  It wasn't a concern that the answer he
15     was giving was sensitive, problematic?
16         A.  No.  No.  As a matter of fact, well -- I don't
17     know.  I'm sure you've asked me or will ask me the same
18     questions, and I'm sure we can cover it.  I don't know
19     what his answers were to those questions or those that
20     you come back around to, so . . .
21         Q.  All right.  I'm gonna put it on the screen real
22     quick.  (Shared screen.)
23              This is the rough draft from the court
24     reporter, and it was down here.  I'll try to highlight
25     this as best I can, but I was asking a line of questions
```

Page 130

1  on -- starting on page 125, line 16.
2          Asking Mr. Denegre, "Why did you believe
3  the foreclosure was important?"
4          And then he stated, "When did I indicate
5  that?"
6      A. I think you asked me the same question, right?
7      Q. Right. But he seems to be indicating that he's
8  never -- never said that or answered that before.
9          Then I asked, "Well, did you believe that
10  it was important?"
11          And he said, "I'm not sure I have an answer
12  to that." Kind of indicating he had not actually
13  answered it yet.
14          And I asked him, "Why do you not have an
15  answer to that?"
16          And his answer was, "It was important for
17  closure on the business."
18          And that's where the -- the interjection
19  comes in.
20          Was there possibly a different rationale or
21  understanding at that time?
22      A. No.
23      Q. That was what you were thinking?
24      A. I'm not sure what you mean by "different
25  rationale." But I -- I don't have a problem with his

Page 131

1  answer.
2          (Deposition Exhibit 43 marked for
3          identification.)
4      Q. (BY MR. FREEMAN) I'd like to show you what's
5  marked as Exhibit 43. (Shared screen.)
6          Do you recognize this document?
7      A. Looks like a tax filing. I'll get a closer
8  copy of it. But, yeah, this will be a Howard & Co.
9  tax -- end of the year's tax.
10      Q. And did you review this return?
11      A. Yeah, I take a quick look at them when they go
12  out.
13          (Deposition Exhibit 30 marked for
14          identification.)
15      Q. (BY MR. FREEMAN) (Shared screen.) And do you
16  know whose signature is reflected here on Exhibit 30?
17      A. That's mine.
18      Q. Okay. So looking at Exhibit 43, is this the
19  2019 tax return for Baymark ACET Holdco?
20      A. It looks to be an authentic copy of the tax
21  return.
22      Q. And Exhibit 30, does this appear to be a true
23  and correct copy of Form 8879-PE for Baymark ACET Holdco
24  LLC for 2019?
25      A. It does. Is that the same signature you showed

Page 132

1  me before?
2      Q. Yes, sir. Same document.
3      A. It does look the same, sure.
4      Q. And that's your signature, correct?
5      A. Still is, yes.
6      Q. All right. So did you sign this tax return
7  reflected on Exhibit 43?
8      A. I'm sure I did. Was the signature you showed
9  me not the signature of the whole return?
10      Q. It was. It was the signature authorizing the
11  electronic filing of the document.
12      A. Yeah. Right.
13      Q. You reviewed the return?
14      A. Yes. At a high level, because I was getting --
15  I look at what I'm getting allocated and what everybody
16  else was getting allocated and making sure it passes the
17  smell test. I don't do the particular entries. That's
18  all from the accounting books that goes to the
19  accountants. But, yeah, at a high level it makes sense.
20      Q. You kind of look for whether there's something,
21  I guess, big or significant that looks out of place?
22      A. I do. That's what I do.
23      Q. Okay. Do you know if Mr. Hook reviewed this
24  return?
25      A. He might have at a high level.

Page 133

1      Q. Do you know if Mr. Denegre did?
2      A. I think it's safe to assume that he took a look
3  at this. I don't have an e-mail, but I would attest that
4  he probably looked at it.
5      Q. What assets had Baymark ACET Holdco -- what
6  assets had it held?
7      A. So -- okay. "Had it held." At what point --
8  so ever? At that point in time? Help me. Again, I want
9  to get it accurate. It's so large. I'm trying to answer
10  honestly. It ends up being --
11      Q. No, I appreciate it. I'm not like -- I'm not
12  asking you for every asset, I guess, that ever could have
13  possibly passed through.
14          What I'm trying to get at: Was it
15  effectively a holding company or vehicle for ACET Global?
16      A. Yeah, I'm sorry. I wasn't paying attention.
17  Yeah. So Baymark ACET Holdco was a holdco, and its sole
18  asset was 100 percent ownership in ACET Global, the
19  operating company, we'll call it.
20      Q. Okay. Basically, if I'm understanding it
21  right, ACET Global's assets would flow up into the tax
22  return for Baymark ACET Holdco?
23      A. Yes, I believe so.
24      Q. The -- so this 2019 return appears to reflect
25  that it's a -- a final return. And it reflects the

34 (Pages 130 to 133)

Anthony Ludlow   *   May 15, 2021

## Page 134

1    principal business activity as "Wholesale Trade" and
2    "Consumer Goods."  And do you understand that to be ACET
3    Global's basic industry?
4        A.  Yes, with some level of interpretation, yes,
5    that's -- that covers it.
6        Q.  A little generic?
7        A.  Yes.
8        Q.  But basically.  Any reason to believe that
9    anything reported in this return is false or incorrect?
10       A.  Not materially, no.
11       Q.  And there's a -- particularly a Schedule L,
12   which is the balance sheet.
13       A.  Yep.
14       Q.  And it states that there was a beginning --
15   beginning balance for "Total assets," if you look here at
16   line 14b, a beginning balance in 2019 of a little over
17   $3 million in assets?
18       A.  Yeah, I see it.
19       Q.  And do you believe that to be -- have been
20   correct?
21       A.  Well, yes.  The intangible assets are basically
22   the amount that we overpaid for the business that gets
23   applied to goodwill.  It's a plugged figure when you
24   acquire a company, yes.
25       Q.  And the balance at the end of the year of 2019

## Page 135

1    is zero?
2        A.  Yeah, I think that's commensurate with
3    the . . .
4        Q.  With the foreclosure?
5        A.  Yeah, or cessation of the operations of the
6    business.
7        Q.  Okay.
8        A.  I know we filed a bankruptcy -- might have been
9    in '19 -- this might reflect, but it should have been
10   postbankruptcy, I'm guessing.
11       Q.  Okay.  And there is also on this tax return a
12   form set out on page 17.  It's -- and I'll scroll right
13   up.  It's part of a Form 8948.
14       A.  Um-hum.
15       Q.  And it references a "Sale From Foreclosure."
16       A.  Yeah.
17       Q.  And it references the "Date acquired" of the
18   assets at issue as 7-21-17?
19       A.  Um-hum.
20       Q.  And then the "Date sold or disposed of" as
21   January 1, '19?
22       A.  That's right.
23       Q.  Do you understand this to be related to the
24   assets purchased from ACET Global -- or, excuse me, the
25   assets purchased from ACET Partners Venture LLC?

## Page 136

1        A.  No.  Well, let me tell you what I think it is.
2    So the 2- -- there's no commas here.  I don't -- why
3    don't guys do that?  It's 2,900,000.
4        Q.  Yes.
5        A.  That is the zeroing out of the goodwill.  When
6    you buy a company, you have to do a -- the IRS requires
7    you to do a goodwill amount for the amount that you pay
8    over the assets, and put it in -- the hard assets, and
9    put it in here.  Once we got rid of the company or ceased
10   doing business, you have to zero out all accounts, and to
11   make that do, you have to unplug that number.
12           So up above, it was the 3 something.  They
13   had some liabilities or something that was offset against
14   that.  So that was just the resultant amount of writing
15   off of the goodwill, which is really -- a goodwill amount
16   is the amount that you overpaid for -- the amount that
17   you paid for a business over its assets when we purchased
18   it initially.  So that's just wiping that out.
19       Q.  And that's generally intended to capture
20   intangible value associated with those assets or the
21   business?
22       A.  Other than generally, I'll do one better.  That
23   specifically is the wiping out of the goodwill.
24       Q.  Well, this is -- so what's reflected here on
25   page 17 of this -- this Exhibit 43, is that -- that is

## Page 137

1    related to ACET Global, correct?
2        A.  We're on the same return, right?  Baymark ACET
3    Holdco -- yes.  So ACET Global, that's right.  It's
4    rolled up into one.
5        Q.  And -- okay.  If that is -- and I understand
6    what -- your testimony.
7            But why does the "Proceeds" column reflect
8    a little over $2.9 million in proceeds?
9        A.  Say it again.  So that's, again, just the
10   wiping out of the goodwill account.  We all know -- and
11   I'm gonna tag you with that knowledge -- especially that
12   that's not cash received from any sale.
13           That would be when you zero out the
14   account, it has the goodwill account -- the resultant
15   goodwill account.  And when you wipe it out -- you know,
16   the IRS doesn't give you a "Goodwill" column, so I think
17   that's the column you put it in.  If it's not the right
18   column, when you wipe out the goodwill.  So the out- --
19   outcome is the same.
20       Q.  Okay.  But there was no receipt of 2.9 million?
21       A.  No.
22       Q.  Did Super G ever pay 2.9 million?
23       A.  Because if there was 2.9 million, you'd have
24   one entry, and then you'd still have to wipe out your
25   goodwill.  You'd still have two entries resultant to

Usher Reporting Services
(214) 755-1612

Page 138

1   that.  So that's goodwill.  And no one's ever asked to
2   see the work papers.  If it becomes an issue, it's very
3   trackable.
4        Q.  Why isn't there, instead, a loss reflected with
5   no sales proceeds?
6        A.  A loss.  That's different than the closing out
7   of the account.  I mean, if we want to get into the work
8   papers of the tax accountants, I'd be glad to do it.
9   It's something easy to resolve.  It's not a mystery,
10  so . . .
11       Q.  Well, I mean, I'm trying to understand why it
12  reports proceeds of $2.9 million.
13       A.  It's the wiping out of the goodwill account.
14  The resultant amount of the goodwill account that was
15  there upon the initial acquisition.  So zeroing that out,
16  that's how it presents on the Schedule L.
17       Q.  Okay.
18       A.  If we go much further, we're going to expend my
19  knowledge.
20            I do have some passing knowledge of this,
21  at least to get us to this point.  But having me go
22  further and explain it into the point where it's not
23  truthful versus the facts -- it's easy to discover.  It's
24  not even that controversial.
25       Q.  Okay.  But Baymark ACET Holdco did report

Page 139

1   proceeds of $2.9 million related to the disposition of
2   ACET Global in 2019?
3        A.  We can do it like that.
4            So in our tax filing where it requires you
5   to record this information, the columns, as they're
6   labeled, required us to put the amounts in the label that
7   is coincidentally entitled "Proceeds" but, however,
8   reflects the goodwill wiping out of the account because
9   there's not a "Goodwill" column up there, if I'm not
10  mistaken.  So that's my answer.
11       Q.  Okay.  I'm just going back to the Schedule L.
12  Where is that $2.9 million reflected?
13       A.  So from what I understand -- I have to see the
14  papers, but when you have the amounts that you're wiping
15  out, you have the original goodwill that was there.
16  Before you zero it out, it's offset against either some
17  other resultant payables or liabilities.
18            So there's something that you net against
19  the -- so you have the outstanding payables -- or
20  something that you net against the goodwill.  So the
21  amount that you see is the resultant goodwill.  It's not
22  just a dropped goodwill from here to there.  There's a
23  netting against those in that column.  Because, again, it
24  doesn't say just "Goodwill."  It's a conglomeration of a
25  couple of things as well.

Page 140

1            So, again, it's a work paper that's easy to
2   obtain from the accountants.  I'd be glad to walk through
3   that at any time.
4        Q.  Well, is there anything on here, reflected on
5   this Schedule L balance sheet, that somehow nets to the
6   2.9 million?
7        A.  That would be my -- I believe so.
8        Q.  Do you know what it is?
9        A.  No, I don't.  I'd be glad to get that for you
10  after the call.
11       Q.  Okay.  I appreciate it, and I will take you up
12  on that.
13       A.  I'm not saying that in passing.  I mean it.
14       Q.  There were also -- on page 18, there are
15  reported management fees.
16       A.  That's correct.
17       Q.  About -- almost $180,000.  Now, did Baymark
18  ACET Holdco take a deduction for accrued management fees?
19       A.  I believe they did as an accrual accounting
20  repair because this isn't a cash -- this isn't a cash
21  return; this is accrual basis.  The amount of obligations
22  that they had for the management fees were put on the
23  books.  They were never paid.  So eventually that would
24  get zeroed out, I'm sure.
25       Q.  Okay.

Page 141

1        A.  That's accrual basis.
2        Q.  And there's also an item on here "Accrued
3   Interest Expense"?
4        A.  Um-hum.
5        Q.  Do you know what that refers to?
6        A.  I don't.  But I'd be glad to, along with
7   that -- if you star that, I could get you the work paper
8   where that -- where work went into that.
9        Q.  Nice.  Okay.
10            You had mentioned that ACET Global had
11  filed for bankruptcy?
12       A.  (Nodded head.)
13       Q.  And was that in October of 2019?
14       A.  That sounds about right.
15       Q.  Okay.
16       A.  If you can get the date, I'll confirm it for
17  you.
18       Q.  I'll pull the petition up.  One second.
19  (Shared screen.)
20       A.  Okay.
21            (Deposition Exhibit 11 marked for
22            identification.)
23       Q.  (BY MR. FREEMAN)  The petition should be on
24  your screen as Exhibit 11 to this deposition.
25       A.  I see it.

36 (Pages 138 to 141)

Page 142

1    Q. And did you file this -- this bankruptcy
2  petition?
3    A. Yes, I'm sure my name's on it. We got
4  counsel -- never done a bankruptcy before, so we got
5  counsel and met and helped us put it together. Yeah, but
6  I signed it. Reviewed and signed it.
7    Q. And were you the -- you signed it, and I'll --
8  I'll go to the page.
9    But did you sign it as president of ACET
10 Global?
11   A. I did. I did.
12   Q. Okay. And were you, in fact, the president of
13 ACET Global?
14   A. Probably at that time, to sign this, maybe we
15 went ahead and gave me the official title of president to
16 sign this instead of David signing it, but one and the
17 same. It was authorized by him or I.
18   Q. Okay. And on this bankruptcy petition, it
19 listed a $3.2 million -- $3.2 million note owed to
20 creditor, a secured -- a secured claim in favor of ACET
21 Venture Partners LLC; is that correct?
22   A. We might have overstated the amount, but that's
23 the seller note. Maybe we went too big on that. And
24 ACET Venture Partners -- I think that's who that was owed
25 to. I'm sure we looked at the note.

Page 143

1    Q. Okay. And so this was a recognition that there
2  was, in fact, a note of 3.23 million or thereabouts owed?
3    A. It was.
4    Q. The -- let me go down just a bit. (Scrolling.)
5    Now, there was a -- there's a question on
6  here -- or a series of questions.
7    Are you trying to give me vertigo?
8    Q. What's that?
9    A. Are you trying to give me vertigo? I mean, I
10 was . . .
11   Q. I'm getting it myself.
12   A. All right.
13   Q. It's a little bit difficult.
14   Let me see if I can get this thing there.
15 (Scrolling.) Okay.
16   So I am on page 24 of the petition, and
17 this is part of the form. And it -- I'm looking
18 specifically at page -- or Item Number 27. It references
19 inventories and asks, "Have any inventories of the
20 debtor's property been taken within 2 years before filing
21 this case?" And it's checked "No."
22   Do you believe that to be correct?
23   A. I do. But this gets into some very nuance-y
24 stuff between bankruptcy definitions of inventory versus
25 what you and I do.

Page 144

1    So, like, when we're talking about the
2  business in total and we say "inventory," we're just
3  talking about the sellable stuff we buy from China.
4    I think here we're talking about inventory
5  of everything that's in the business, including chairs
6  and desks.
7    And then there's -- I think there's another
8  layer to everything that's of this.
9    I don't know that they're -- and my
10 bankruptcy counsel guided me on this. But I think
11 there's also a concept where it's not an inventory of the
12 debtor's property if it has a lien on it. So it would be
13 the unencumbered items.
14   But -- so that's -- I guess upon the long
15 discussion of it, that's where we end up with the "no."
16   Q. Okay. And there's a listing in Item 28 of the
17 "debtor's officers, directors, managing members," you
18 know, "people in control." And it lists Baymark ACET
19 Holdco, LLC, as the only person or entity.
20   Do you believe that to be correct?
21   A. Yeah. I think before, like on that tax filing,
22 that Holdco is the one person who owns the interest of
23 Opco, which is ACET Global.
24   Q. Okay. And Item 29 it asks, "Within 1 year
25 before the filing of this case, did the debtor have

Page 145

1  officers, directors, managing members . . . in control of
2  the debtor who no longer hold those positions?"
3    And it checks "No." Do you believe that to
4  be correct?
5    A. So let me see here, what it's asking.
6  (Reading.) So "1 year before the filing of this case,
7  did the debtor," which is -- for this one just is Opco,
8  correct? Call it Opco, but -- "director, officer,
9  members in control of the debtor, or shareholders in
10 control of the debtor . . ."
11   Or the shareholder? Who's in control of
12 the shareholder?
13   Q. I think it's saying ACET Global, and it's
14 written broadly enough to include a shareholder in a
15 corporation.
16   A. Yeah, so it's --
17   Q. (Audio distortion.)
18   A. Yeah, it's probably referring to "did ACET
19 Holdco change," is how I read this.
20   Q. Okay.
21   A. I don't think ACET Holdco changed.
22   Q. Well --
23   A. I discussed that with our bankruptcy counsel,
24 but . . .
25   Q. Wasn't ACET Global the debtor here?

Usher Reporting Services
(214) 755-1612

Anthony Ludlow   *   May 15, 2021

---

Page 146

1    A. Yes.
2    Q. And did it have any officers who had been in
3  control of it who were no longer in those positions?
4    A. Through -- it's reaching up to the Holdco
5  level. So those didn't change.
6        But maybe you're referring to Tomer. So
7  Tomer was a CEO at the debtor level. So maybe that would
8  be considered, I'm not sure. I guess it might be.
9    Q. And Mr. Szeto.
10    A. What's that?
11    Q. Mr. Szeto. I think earlier you had said he was
12  the CEO and had control?
13    A. That might -- yeah, that might apply here.
14    Q. Okay. And then didn't you also become
15  president and there was a switching between you and
16  Mr. Hook?
17    A. Yeah. The -- yeah, that's right. The
18  president's a signatory -- well -- but that's fine.
19    Q. And so does this Number 29 appear to be
20  answered correctly?
21    A. I'm gonna have to defer to my bankruptcy
22  counsel, but I'd certainly have him look at it again. I
23  know -- I'm sure we discussed it before.
24    Q. Okay. And Number 30 refers to payments or
25  distributions to insiders and asked, "Within 1 year

---

Page 147

1  before filing this case, did the debtor provide an
2  insider with value in any form . . . including
3  options . . . ?"
4        Is -- does this appear to be answered
5  correctly?
6    A. Let me look. Just give me a second to read
7  this. (Reading.) "Did the debtor," but we should be Opco,
8  "provide an insider any form of value," so that's Tomer,
9  "salary."
10        Probably should have put Tomer on here.
11  And "credits" and "stock redemption." I don't know that
12  any other stock was issued.
13        Is this from the Opco? So do we issue
14  equity of the Opco is what it's asking here? Again,
15  normally I have the bankruptcy counsel walk me through
16  this, but I just want to make sure we're --
17    Q. Was this an issue that was given any focus in
18  the filing?
19    A. Well, I'm sure the bankruptcy counsel -- this
20  is all they do all day long, and this form is what, 40 --
21  I don't know how many questions it is. But if that's all
22  they do all day long, I'm sure they get pretty good at
23  doing 40 questions or however many are here.
24        So -- but, yes, it was a focus to --
25  certainly an intent to fill it out correctly.

---

Page 148

1    Q. Did you disclose to them the Baymark interest
2  in Windspeed?
3    A. I don't know whether I did or not, or if it was
4  relevant.
5    Q. Okay. But hadn't -- hadn't Windspeed acquired
6  ACET Global's assets?
7    A. Yeah, you're gonna try to catch me in an
8  ignorance loop here because I think I mentioned before, I
9  seem to remember, in Bankruptcy Code, the definition of
10  the debtor's assets doesn't include anything that has
11  liens on it. So if it had liens on it, it was never the
12  debtor's assets to be considered that they were
13  transferred out.
14        I might be mistaken, but that's, again, a
15  bankruptcy issue that I'd be glad to check on.
16    Q. And where did you obtain that understanding --
17  or where did Baymark attain that understanding?
18    A. We had bankruptcy counsel that reviewed this.
19    Q. And do you know specifically whether you or any
20  of the Baymark parties informed bankruptcy counsel about
21  Baymark's stake in Windspeed?
22    A. I don't want to review my discussions with
23  counsel, but they were well aware of all relevant facts.
24    Q. The next question here asks, "Within 6 years
25  before filing this case, has the debtor been a member of

---

Page 149

1  any consolidated group for tax purposes?" And we just
2  looked at a tax return in which the debtor was rolled up
3  into another group.
4        Do you know whether this question was
5  answered correctly?
6    A. Well, again, so this is a combination of tax
7  law versus bankruptcy law as well. There's many times
8  when single member LLCs are disregarded for taxation
9  purposes and treated as an entity versus when bankruptcy
10  might adopt the tax laws versus not, so that's a level
11  where bankruptcy counsel would certainly guide us through
12  that.
13    Q. Okay. And was that a specific issue raised?
14    A. I'm sure all issues in these questions were
15  thought out and discussed with bankruptcy counsel to fill
16  this out. The whole reason you hire bankruptcy counsel
17  is to do it correctly. If not, I could have done it
18  myself. That's not true; I couldn't have done it myself.
19    Q. Is -- and that's your signature on page 25,
20  right?
21    A. It is.
22    Q. And lists the position as "President"?
23    A. Correct.
24    Q. Who prepared the bankruptcy documents?
25    A. Michelle Shriro at her law firm. I'm drawing a

---

38 (Pages 146 to 149)

Page 150

1  blank. Shriro Levick, maybe, or Levick Shriro. I don't
2  even know if her name's on it.
3      Q. Okay. All right. But they prepared the
4  bankruptcy filings, their firm did?
5      A. Yeah, that's right. Questions of us,
6  information back to them. They fill it out. Check this,
7  check that answer. Collaborative effort.
8          (Deposition Exhibit 36 marked for
9          identification.)
10     Q. (BY MR. FREEMAN) And I'm putting on the screen
11 what's marked as Exhibit 36. (Shared screen.)
12         Are you familiar with this exhibit?
13     A. Appears to be an e-mail between Matt and me. I
14 can't see below, but yes. It looks like an e-mail.
15     Q. I'll scroll below just so you can see it.
16 (Scrolling.) Singer Levick, that's the law firm.
17     A. I missed that. Singer Levick.
18     Q. Does this appear to be an e-mail from Matt
19 Denegre to you?
20     A. Yes, it does.
21     Q. And it's on October 16th, 2019?
22     A. Um-hum.
23     Q. And it's got a Subject line of "Bankruptcy" and
24 has a number of attachments?
25     A. It does.

Page 151

1      Q. And does this appear to be a true and correct
2  copy of the e-mail reflected here?
3      A. It appears authentic, yes.
4      Q. And among those attachments, was there a Bill
5  of Sale attached?
6      A. That would indicate that there was. I don't
7  see it there, but that's not on there unless there is an
8  attachment, so I assume there was.
9      Q. I'll scroll down on it in just a second. But a
10 number of other attachments as well?
11     A. Yes.
12     Q. (Scrolling.) Does that appear to be the Bill
13 of Sale that's referenced?
14     A. It does, yes.
15     Q. Was -- does that Bill of Sale list or have as
16 an attachment to it an inventory of ACET Global's assets?
17     A. Well, again, the word "inventory," here. So
18 that says "Inventory." As you know, when you say
19 "inventory" in a Bill of Sale, it can be anything. So
20 it -- yeah, I don't know why there's no prices out there
21 or -- are there quantities? Yeah, there's quantities.
22         It's alphabetical. I don't know what all
23 the A's are at the beginning. But, yes, it appears to be
24 a list of stuff. I don't know if it -- does it have
25 desks on it, too, or is it just -- is it just the

Page 152

1  inventory? Because we say "inventory," casually, we
2  think of the stuff that's being sold from the company.
3      Q. Right.
4      A. But I think there's -- in a Bill of Sale when
5  they took everything, that would also include phones and
6  desks and stuff, so . . .
7      Q. Okay. Well, maybe -- is there also a list of
8  all of the equipment, including the desks and computers
9  and conference tables and chairs and glass tables and
10 scales?
11     A. Yes. For a Bill of Sale, they have a list of
12 things there.
13     Q. Okay. So this is kind of a list of all the
14 assets of ACET Global?
15     A. Again, that's a list of the assets that Super G
16 had a lien on, that they were taking, apparently, yes.
17     Q. Okay. And there were also listed all the
18 intangible assets, as well?
19     A. Um-hum. I would assume, yes. I didn't read it
20 all, but I'm sure we --
21     Q. Sorry.
22     A. I'm sure we got the good list. Yeah.
23     Q. And was -- was all of this -- was this all
24 provided to Super G as well?
25     A. Well, yeah. I think it's during a -- was that

Page 153

1  the Bill of Sale? So that would be during the
2  foreclosure time, so I think we're mixing times here.
3  That's October '19. I don't know when the foreclosure
4  was, but -- yeah, one of the items was not to impede
5  their foreclosure. And to make sure we got everything
6  out and they wouldn't say that we kept some stuff, we
7  would want to make sure we got that list.
8      Q. Okay.
9      A. Yes.
10     Q. Did -- gosh, here. (Shared screen.)
11         (Deposition Exhibit 34 marked for
12         identification.)
13     Q. (BY MR. FREEMAN) Exhibit -- probably see
14 what's marked as Exhibit 34 on the screen.
15         Does this appear to be an e-mail from David
16 Hook to you?
17     A. Is that two years earlier? So we have to have
18 changed topics. Okay. Yes. I'm sorry.
19     Q. When were you first -- when were you first
20 considering bankruptcy for ACET Global?
21     A. When were we first considering, like seriously?
22 I was getting all those calls from DHL -- well, I was
23 getting -- not from DHL, from their attorneys saying that
24 they were gonna file suit against -- I don't know why --
25 Baymark and they were gonna file suit against ACET

39 (Pages 150 to 153)

Anthony Ludlow   *   May 15, 2021

---

Page 154

1    Global.  DHL, FedEx, and the landlord started calling us.
2        So once it was a shell and all the assets
3    had been pulled out of it, all we had were these debts
4    and this noise.  We needed to just shut it down because
5    it was -- it wasn't in business anymore at that time.
6        Q.  Okay.  Were you considering -- and, well, let
7    me ask:  When was that timeline-wise?
8        A.  So the serious, leading up to the bankruptcy,
9    or would be just prior to that, after the foreclosure.
10   They -- Super G took everything that they had a lien on.
11   Then all we had were the debts that were left behind and
12   just clean it up.
13       Also let everybody know that it's been
14   discharged so they can write it off on their books.  DHL
15   stopped calling; landlord quit bugging us.
16       Q.  Were you first considering bankruptcy then,
17   like in -- is that late 2018 or . . .
18       A.  I don't know.  It would be '19, I guess.  So
19   when was this filed, you said?  2019?
20       Q.  October 2019.
21       A.  So probably before that at some point.  I'm not
22   sure.
23       Q.  Okay.  Were you considering, you know,
24   bankruptcy shortly after acquiring the assets that were
25   placed into ACET Global?

---

Page 155

1        A.  No.  I think when the thing went downhill so
2    fast, everybody was panicking.  And so we -- we had this
3    initial meeting where we had to go to the bank for the
4    first time and say, "Look" -- this is never good to do --
5    go to the bank after, what, four or five months and say,
6    "This isn't performing well."  They're gonna look at us,
7    and we're not gonna just say, "Too bad, so sad."  They're
8    gonna say, "We're gonna work with this, but you're gonna
9    have to cut your payments so we have enough cash to
10   survive."
11       And they have to decide if they're gonna
12   work with you or not.  Just let them know that this is a
13   dire situation, we all gotta lean in so this thing can
14   survive, and we all -- you know, all the creditors get
15   paid back.  Because, as an equity holder, I don't make
16   any money until after the creditors get paid back.
17       So, yeah, I'm sure we had talked about all
18   kinds of things.  Because I know before that
19   December '17 -- that 2017 conversation was the first time
20   when we went to Super G, and that's when they said,
21   "Tough.  Put in more money."
22       Q.  Is that the first time you considered
23   bankruptcy, or was it after that?
24       A.  I don't know that we seriously considered
25   bankruptcy, but you consider what you're going to do.

---

Page 156

1    How to keep the company going because it needs cash flow.
2        At some point, if it has the EBITDA, it's
3    throwing off a lot of cash, you can pay off your
4    creditors and you control the business as well.  But if
5    you can't buy product, no one gets paid.
6        Q.  Was there, in fact, a plan in 2017 to take ACET
7    Global into bankruptcy?
8        A.  There was no plan.
9        Q.  And so looking at Exhibit 34, was that an
10   e-mail from David Hook to you?
11       A.  Oh, there you go.  Just sent -- yeah.  So
12   that's 2017, right.  Like I was saying.  So, yeah, I'd
13   say this was to me, December 13th.  I'm assuming this
14   relates to it.
15       Q.  Okay.  And was there, like, an expensive dinner
16   with Super G in December of '17?
17       A.  I don't know.
18       Q.  There was something about a $680 dinner, I
19   think, that Mr. Hook had e-mailed you about?
20       A.  Uh-huh.
21       Q.  Was that with Super G?
22       A.  Can I see the rest of the e-mail with the
23   dinner on it?
24       Q.  Sure.  (Scrolling.)  Going down to the second
25   page.

---

Page 157

1        A.  Okay.  Yeah.  So that was around our firm
2    dinner.  That's -- I think I was finding out how much we
3    paid on our employees.  So I'm just talking to David down
4    here.  Like, he's at a conference, like Tony to David.
5        My "Conference is good.  Am I missing
6    anything?  I enjoyed our dinner.  We should do it again.
7    How much was it?"
8        So we'd started doing firm dinners at that
9    time for Baymark.
10       Q.  Okay.  And then did you --
11       A.  And we got off pretty cheap for the whole firm
12   for 680.  That's not --
13       Q.  Actually, that's pretty good, I will -- I will
14   say.
15       Did you -- did Mr. Hook make a statement
16   back saying "What about bankruptcy for ACET?"
17       A.  Um-hum.
18       Q.  And what did he mean by that?
19       A.  I think -- is there more conversations there?
20   Because I know we were talking about -- oh.  Yeah,
21   Super G doesn't -- because their payments were 15--
22   they were like $15,000 a week or every two weeks or
23   something like that, and that was just sucking out all
24   the cash.  And so they to pull off of that, and if not,
25   it's going to be -- it was going to be done quick.

---

Usher Reporting Services
(214) 755-1612

Page 158

1	Q. That's something y'all were having oral
2	conversations about?
3	A. Well, I mean, we were getting the financials
4	from the business right after we closed, and we closed
5	in, what, July 24 of '17.
6	So after that you start looking at it, and
7	the EBITDA went from, I think -- we closed -- we thought
8	it was 1.2, and we closed in July.
9	It turns out when we got the July
10	financials, it was 1.1 in EBITDA. It's okay the number
11	isn't exactly the same. And by December, I think it was
12	like 100,000. So it's 90 percent wrong. So the
13	EBITDA -- and it's in five months. And so you don't need
14	to do subtle math to figure out that that's a problem.
15	Q. Not gonna work.
16	A. Is there more below this one right here?
17	Q. No, sir. (Scrolling.)
18	A. Okay. All right.
19	Q. And did you -- did you respond to that, say "It
20	may be an option"?
21	A. Yes, I did respond to that, and that's what I
22	said.
23	Q. And Mr. Hook said "Agreed"?
24	A. He did.
25	Q. Now, was there any relationship between the

Page 159

1	formation of Windspeed Trading LLC and ACET Global?
2	A. None.
3	Q. None?
4	A. None.
5	Q. Was ACET --
6	A. Weren't they years apart?
7	Q. Excuse me?
8	A. Weren't they years apart?
9	Q. Oh, the for- -- the two formations? Well,
10	I'm -- so I'm asking was there a relationship between
11	ACET Global and the formation of Windspeed Trading?
12	A. No.
13	Q. At around that time, around the time of the
14	formation of Windspeed, was ACET insolvent?
15	A. You'll have to let me know -- and I'm sure it
16	was in those filings documents you went by. When was
17	Windspeed formed?
18	Q. I'll represent that it was formed in September
19	of 2018.
20	A. Okay. So now that I understand, what was the
21	question?
22	Q. Around that time, was ACET Global insolvent?
23	A. I don't think so. I think just prior to that,
24	we were still putting money in for payroll to try and buy
25	us to another week. So we were still making a go of it

Page 160

1	at the time.
2	I feel like "insolvent" might be, like, a
3	term of art or something that bears more weight than us
4	trying to do it because -- trying to keep the company
5	going.
6	Q. Well, was it -- was it bringing in enough
7	revenue to -- to pay its bills?
8	A. It was not able to catch up on its old bills.
9	We were getting calls. Yeah, there was definitely
10	difficulty there.
11	Q. Okay. How long had it been that way?
12	A. Off and on since December or January.
13	Q. Okay. Did you believe that restructuring ACET
14	Global might give Baymark an opportunity to turn its
15	investment around?
16	A. So restructuring -- and I'm not sure what you
17	mean by "restructuring," but I'll state it more
18	specifically. Getting relief from the debt payments
19	sucking out all the cash would give ACET a chance to
20	increase its EBITDA. And if it did that, the debt
21	holders get paid off first, and then possible for the
22	equity guys later. But, yeah.
23	You do the restructure -- remember when we
24	went into the business, we put an additional $200,000 in
25	cash to buy product. And we thought we had a lot more

Page 161

1	working capital day one. And we found out later it was
2	light about 360 -- $350,000 of working capital.
3	So we were missing some -- that was a
4	significant kick in the cash -- negative in the cash day
5	one. So we were chasing that right out of the gate.
6	Q. Okay. And wasn't there, in fact, an adjustment
7	of the purchase price as a result of the operating cash
8	you've referred to?
9	A. That's right. I don't have the exact amount,
10	but it's about 350.
11	Q. And did ACET Global ever fully tap its line
12	with Super G, its million dollar line?
13	A. I don't know that it had a line. Did it? Like
14	a revolver or something? I don't think it did.
15	Q. And initially didn't it have a million dollar
16	line that it took 750 on?
17	A. I don't -- I don't know that to be true. I
18	don't think so.
19	Q. Well --
20	A. And if so, once they saw the performance, I'm
21	sure they -- once we went into default, they took that
22	back pretty quick.
23	We wouldn't have known about the working
24	capital adjustment until months after the close, and by
25	then, I think the performance was already in trouble. So

41 (Pages 158 to 161)

Anthony Ludlow   *   May 15, 2021

---

Page 162

1  I don't -- I can check the time, but I'm not . . .
2      Q.  To my question, I'm really asking not about
3  restructuring a note but restructuring the entity or the
4  relationship among entities to conduct the ACET Global
5  business.
6          In that sense, did you believe that
7  restructuring ACET Global, or its business, would give
8  Baymark an opportunity to turn its investment around?
9      A.  No.  I don't know about restructure.  You have
10 a triage situation where if you don't have cash flow in
11 the business, nothing else matters.  And even if you
12 restructure it and it doesn't give you more cash, none of
13 that structure matters.  So you need the cash.
14         And the only people taking the cash -- and
15 I think they could pull it out of our account without us
16 even asking -- was Super G.
17         They actually made direct withdrawals
18 without our permission.  We did give them permission.  I
19 take that back.  So that was part of their loan
20 agreement, but . . .
21         So the only restructure that matters is if
22 we get cash to buy profits.
23     Q.  Okay.  Well, was there -- did you ever discuss
24 how restructuring ACET Global might impact creditors?
25     A.  Maybe.  It's kind of a broad question because

---

Page 163

1  whenever you talk about restructuring, again, to me, it
2  means going to the lenders.  And of course it would
3  affect the lenders and the creditors, DHL, the landlord,
4  all those guys.
5      Q.  And who would you have had those discussions
6  with?
7      A.  Well, I would start -- if I was gonna talk
8  about getting relief on the monthly or the weekly
9  payments, I would start with Super G so they'd quit
10 taking so many payments.
11     Q.  Okay.  Would you have had those discussions
12 with anyone else?
13     A.  Well, Baymark and Super G.  Do you want, like,
14 the people inside of Baymark and Super G or . . .
15     Q.  Yeah.  Who they'd have been with.
16     A.  Oh.  I'm sure Matt and I would have talked
17 about it.  Probably not David at that point.
18         And in Super G, the only person I ever
19 spoke with there, I think ever, was Bellah.  Yeah, Steve
20 Bellah.
21     Q.  Okay.  And did you ever discuss salvaging
22 Baymark's investment in ACET Global?
23     A.  You know, that's all the conversation.  And
24 it's all part and parcel with making the company survive.
25 So, yeah.  You want to make the company survive and

---

Page 164

1  viable.
2      Q.  Okay.  Did Windspeed Trading maintain the
3  financial records of ACET Global?
4      A.  I don't know how to answer that.  I mean, no.
5  They were separate companies, and they had separate
6  books.  But at some point -- it was the same employees
7  doing both, I assume.
8          Because at one point, if they were ACET
9  Global's employees keeping the books, I could see how
10 whenever they ended up getting pulled over to the
11 Windspeed entity, they -- I could see them either opening
12 new books or accidentally putting their books on ours.
13 So, yeah, there's same people, same software.  I could
14 see how they're -- it would be important to keep -- try
15 and keep them separate.
16     Q.  Did Windspeed have the same software?
17     A.  I would assume.  I don't know.
18     Q.  Why would you assume that?
19     A.  Well, because if Super G took all of our assets
20 and then sold them to Windspeed, I don't -- I don't know
21 that they would have other stock.
22     Q.  But by that time, wasn't ACET out of business?
23     A.  I don't -- I don't know what "that time" is,
24 but I don't know.
25     Q.  Because that time was around -- wasn't it in

---

Page 165

1  March 2019?
2      A.  2019.  So when was the foreclosure?  Or maybe I
3  should tell you I don't know when the foreclosure was.
4          But prior to that point, if Super G's
5  saying, "ACET, take what inventory you have and sell it
6  for cash, give me the cash," and then Windspeed is also
7  working, as well, separately, I wouldn't know.
8      Q.  Okay.
9      A.  It's still all the stuff they had control over.
10     Q.  Given you were overseeing ACET at that time,
11 did Super G ever notify you that it had received any
12 funds from the sale of ACET Global's inventory?
13     A.  Other than any payments it might have been
14 taking that it was entitled to, no.
15         I don't know how a payment that it would
16 take under their note is different than something that
17 would -- came from -- or how it was generated from the
18 sale of inventory or whatever.  I wouldn't know the
19 difference.
20     Q.  Did -- did Super G ever give you any kind of
21 accounting to reconcile or account for Windspeed's sale
22 of ACET Global's assets?
23     A.  So like a receipt?
24     Q.  Right.
25     A.  I guess the Bill of Sale.  But I didn't -- I

---

42 (Pages 162 to 165)

Page 166

1    didn't see if there was prices on there.
2         I mean, I know if we had all our assets on
3    our balance sheet, then the next day they're all gone, we
4    just write that to zero.
5         Q.  If Windspeed was selling ACET Global's assets
6    at the behest of Super G, did Super G give you any kind
7    of accounting to indicate that that was actually
8    happening?
9         A.  I never received anything like that, no.
10        Q.  Did you ever get an e-mail that indicated that
11   was happening?
12        A.  I don't think so.
13        Q.  Did you ever receive a phone number that
14   indicated -- a phone call that indicated that was
15   happening?
16        A.  I don't think so.
17        Q.  Was there any identifiable fact that you
18   observed that indicated that that was actually happening?
19        A.  No.
20        Q.  Was that, in fact, not actually happening?
21        A.  I don't know.
22        Q.  But you don't have anything to base -- to base
23   any testimony that Windspeed was actually selling ACET
24   Global's assets?  You don't have anything to base that
25   testimony on, do you?

Page 167

1         MR. PERRIN:  Objection; form.
2         A.  I just want to make sure you're asking a
3    question for the first time or a follow-up question.
4    Because it makes it sound like I indicated that Windspeed
5    was selling.  Are you indicating that I thought --
6         Q.  (BY MR. FREEMAN)  Oh.  And you're saying that
7    it wasn't.  Okay.  Then we're clear.
8         A.  Okay.
9         Q.  Okay.  Got it.
10            Did Baymark ever provide any instructions
11   to Windspeed regarding ACET Global's financial records?
12        A.  Well, I kind of set that one up.  So as before,
13   since I know the employees were the same, I would want to
14   make sure that, to the best -- they could not mix our
15   books up.
16            If it's going to be the same people before,
17   I'd want to have -- at least for tax purposes, have
18   separate books.  Make sure they were separated.
19        Q.  Okay.  So Baymark would have -- would have
20   asked Windspeed to make sure and keep separate books or
21   records for ACET Global?
22        A.  Well, Bill -- I'm sure it'd be Bill.  I guess.
23   I don't know.  Or we'd go through Matt.  But however it
24   was effected, we'd say, "Keep our books separate from
25   Windspeed books," I would suppose.

Page 168

1         Q.  Did Baymark or ACET Global compensate Windspeed
2    for that?
3         A.  No, no.
4         Q.  You mentioned earlier that the employees from
5    ACET Global had been "pulled over" to Windspeed.
6            What do you mean by that?
7         A.  I was just using casual parlance because I
8    think you had mentioned earlier that -- would I be
9    surprised to find out all the employees here ended up
10   over there?
11            But I was just going on something I thought
12   was understood.
13        Q.  Would -- does "pulled over," I mean, does that
14   kind of indicate, you know, they were brought along for
15   the change?
16        MR. PERRIN:  Objection; form.
17        A.  I'm sure at some point, they all would have had
18   to have been fired from ACET Global, and then if they
19   ended up at Windspeed, they'd all have to be hired there.
20   The time in between, I don't know.  That would -- Bill
21   would have coordinated that.
22        Q.  (BY MR. FREEMAN)  Okay.  And was that Bill's
23   job to coordinate that?
24        A.  I don't know what you mean by what Bill's job
25   is.  But he wanted employees.  He knew where to -- knew

Page 169

1    where they were available.  They'd all been fired.
2         Q.  Did Bill ever send you an e-mail indicating he
3    was going to pull those employees over to Windspeed?
4         A.  I think so.
5         Q.  Have you ever -- did you ever have any
6    discussions with any of those employees about being
7    pulled over into Windspeed?
8         A.  I don't think I ever spoke directly with any
9    employees at ACET Global.  I did get some apparent e-mail
10   from a Pablo complaining about the business model there.
11            But I don't know that anybody reached out
12   to me.  I went on-site one time and talked to people.
13   But I don't think about that at all.
14        Q.  How was Windspeed's business model different
15   from ACET Global's?
16        A.  I don't know.
17        Q.  You wouldn't -- you wouldn't know anything
18   about Windspeed's business model?
19        A.  No, I wouldn't.
20        Q.  Or the assets that it sold?
21        A.  No.  I mean, other than the assets it'd bought
22   from Super G, I don't know what it bought after that or
23   before that.
24        Q.  Would you know anything about Windspeed's
25   operations?

Usher Reporting Services
(214) 755-1612

Anthony Ludlow   *   May 15, 2021

---

Page 170

1    A. No, not directly. It's all guess.
2    Q. Okay. Would you know anything about its
3 dealings with customers or vendors?
4    A. No.
5    Q. So is it safe to say you wouldn't really know
6 much of anything about Windspeed Trading?
7       MR. PERRIN: Objection; form.
8    A. Yes. But based upon how you asked that
9 question, yes. I wouldn't know anything about how
10 Windspeed works at all.
11    Q. (BY MR. FREEMAN) Okay. Do you know where
12 Windspeed received its funding from?
13    A. I believe it got the initial -- a loan of
14 $200,000, I'm guessing, from Super G initially. After
15 that, I don't know. Not from me.
16    Q. Okay.
17    A. Or Baymark.
18    Q. Got it. How do you know that it got that loan
19 from Super G?
20    A. Because at the time -- back to earlier, when I
21 received the equity interest or the warrant, I know that
22 all that it had was that debt from Super G. So whatever
23 that was.
24    Q. Okay. Did you ever refer to the Windspeed loan
25 as "the ACET note"?

---

Page 171

1    A. Windspeed's loan as "the ACET note."
2       Well, there was -- be careful there,
3 because you're just coming off the $200,000 one, and
4 now -- I know at some point -- I don't know if we talked
5 about it -- ACET Global got rid of its note and it went
6 over there. It went over to Windspeed.
7       So that one, I could say we'd get the ACET
8 Global note off over to Windspeed. I don't know that
9 that would be talking about the $200,000 one.
10       I think those are separate ones. I believe
11 they are. I know -- I know ACET Global's was separate.
12    Q. Okay. What do you mean by "the note went over
13 to Windspeed"?
14    A. As part of the foreclosure, they also took the
15 note off of ACET Global.
16    Q. Okay.
17    A. I'm not using pretty words, but it was
18 "relieved" or "taken" or "assumed" or whatever. But it's
19 not on ACET Global anymore.
20    Q. Okay. So I can understand that. And that
21 sounds to me like the note owed by ACET Global was
22 effectively extinguished in some manner.
23       How do we get from there to "that note went
24 over to Windspeed"?
25    A. You'd have to ask Super G about that. I don't

---

Page 172

1 know what their issues were, what they had to do or what
2 their deal with Bill Szeto was. It might have been the
3 condition for Bill to keep going.
4       I don't know. All I know is it wasn't on
5 ACET Global.
6    Q. Okay. What leads you to believe that the ACET
7 Global note may have been -- may have gone over to
8 Windspeed?
9    A. Well, because there was an agreement that
10 was -- I apologize if I don't get the name right, but a
11 foreclosure or a transfer. Someone transferred --
12 where -- the note was transferred over or assumed or
13 whatever the magic language is.
14    Q. Okay. As part of the foreclosure sale?
15    A. I don't know. I don't -- yeah. I'm sure they
16 would have to go together because I wouldn't want them to
17 come back and say, "Oh, the stuff that you gave us was
18 completely undervalued for the note," which it was.
19       I didn't want them to come back and say,
20 "You owe -- you still owe me 300,000 under my note." I
21 wanted it to be a wash between the two.
22    Q. Okay. So are you telling me that the amount of
23 the note that Windspeed entered into with Super G, that
24 that was based upon the amounts that ACET Global owed or
25 had outstanding to Super G?

---

Page 173

1    A. I'll respond to the mirror image of that. I
2 don't know what Windspeed assumed, but I will tell you
3 that the amount of the note that was relieved from ACET
4 Global, that note was much more than the -- the assets
5 that they pulled out. And my concern was they would come
6 back and say, "Hey, you're still short. You owe us
7 money." So I wanted to be sure there was no blowback
8 from that.
9    Q. Okay. Why would you want to make sure there
10 was no blowback from that?
11    A. Go through all the problem of the foreclosure
12 and then having the note relieved, for them to come back
13 and go, "Oh, the note's not really gone. You still owe
14 300,000," that's bad.
15    Q. So it was Super G you were worried about?
16    A. Well, when I'm talking about doing a deal where
17 Super G's gonna take it, I want to make sure that the
18 liabilities associated with that didn't go from one known
19 quantity to a much -- one larger quantity post-closing.
20    Q. Okay. Was -- so if Windspeed took on a note
21 from Super G that ends up being equivalent to the amount
22 ACET Global owed at the time, are you telling me that
23 that -- that note was not actually tied to the value of
24 the assets that Super G foreclosed on?
25    A. Again, if you step back from whatever Windspeed

---

44 (Pages 170 to 173)

Anthony Ludlow   *   May 15, 2021

## Page 174

1  took on, I know the note that we relieved from ACET
2  Global was a much higher note than the assets that they
3  took.
4         How that ended from there, how much went to
5  them, and all that stuff, I don't know on that side.  But
6  I can tell you what was relieved from our side.  I can
7  state that.
8     Q.  Around the time of the foreclosure and the
9  foreclosure sale, was the amount owed to Super G by ACET
10  Global, was it about 514,000?
11    A.  If you'll allow me some room, yes.  I think the
12  original note was 785, 750.  We paid it down to maybe
13  near 400-ish.  But what happens is once you go into
14  default and get -- there are these penalties that show up
15  and accrued interest.  So it had gone back up to around
16  $500,000 at that time, so yes.  Kind of a long answer
17  longer.
18    Q.  That makes sense.  But was it about 514, 515 at
19  that time?
20    A.  Upon foreclosure, when they were going to do
21  it, yes.
22    Q.  And that amount that was owed to Super G by
23  ACET, that was not correlated with the value of ACET
24  Global's assets, correct?
25    A.  Correct.

## Page 175

1     Q.  Those were two just totally distinct things?
2     A.  The assets that they took in foreclosures were
3  vastly less valuable than the loan.
4     Q.  Okay.
5     A.  They did not correlate, correct.
6     Q.  What -- what do you base your conclusion that
7  the assets that Super G took from ACET Global were vastly
8  lower in value?
9     A.  Based upon the items that -- I mean, if you
10  could look at that list that was sent over, that list.
11        Well, let's do it this way:  At the time of
12  the deal -- we can assume that near the time of the deal
13  when Tomer was still there versus until later, the value
14  only went down.
15        I can peg it when Tomer was still there.
16  It's an e-mail when Tomer says the value of the inventory
17  is worth 300,000 and the net assets of the company are
18  $350,000 at the payables but before debt.  So call
19  that 350 back when Tomer was there.  If we assume
20  bleed-off, it would only be less thereafter.  So I don't
21  know how much below, but it was -- they weren't the same.
22    Q.  Okay.  And are you -- let me step back for a
23  second and ask you.
24        You evaluate companies for a living,
25  basically, right?

## Page 176

1     A.  Yes.
2     Q.  You decide whether or not to invest in a
3  potential portfolio company?
4     A.  I do.
5     Q.  And as part of that process, you evaluate and
6  value the assets of those potential portfolio companies,
7  right?
8     A.  So in our industry, it's -- all the assets that
9  happen to be there are not -- are just items that's part
10  of an engine that generates EBITDA.  And so we look at
11  EBITDA -- and it's a multiple of EBITDA.
12        There's some businesses -- and we don't do
13  a lot of these.  There's some businesses that will have
14  $30 million worth of assets and do 5 million in EBITDA,
15  right?  And then there's some businesses that have no
16  assets and do 5 million in EBITDA.
17        We tend to do asset-light businesses, and
18  so we're just -- and it's no different than other guys in
19  the industry.  It's -- all the brokers, all the private
20  equity firms follow a multiple of the EBITDA.  So to make
21  a long answer longer, it's focused on cash flow, which
22  I'm calling EBITDA, by the way.
23    Q.  Got it.  So you're kind of targeting companies
24  that may not require a high degree of capitalization
25  relative to the revenue they generate; is that kind of

## Page 177

1  right?
2     A.  Yeah, that's kind of right.  We need cash flow
3  companies.  If it does need capitalization or cash
4  infusion -- I think in this deal, we put in an additional
5  $200,000 at close -- we need that to turn quickly.
6        So buying inventory, selling it, and
7  getting it back within a three-month period is okay.  If
8  you buy a new Caterpillar, you know, a hard equipment
9  thing that is going to be around for 30 years, that's not
10  good.  We don't do business with those.
11    Q.  When you're evaluating a company, though,
12  you -- your financial model for valuation tends to be a
13  function of EBITDA?
14    A.  Yes.  Almost solely.
15    Q.  And you apply a multiple, generally, to that?
16    A.  We do.
17    Q.  It kind of depends upon the industry and
18  perhaps economic conditions generally?
19    A.  Um-hum.  Some time that we can grow it.
20    Q.  And when you're evaluating that, then, if it's
21  based on EBITDA, you're really not making that decision
22  based on a balance sheet; is that right?
23    A.  That's true.
24    Q.  You're effectively performing a valuation that
25  is a function of a profit and loss statement, right?

Usher Reporting Services
(214) 755-1612

Anthony Ludlow   *   May 15, 2021

---

Page 178

1    A. Converted into EBITDA, but yes. A cash flow
2  equivalent. EBITDA's not quite cash flow, but it's
3  close.
4    Q. Okay. And so when you're -- and that's a
5  common valuation approach, right?
6    A. It is.
7    Q. And when you're evaluating the value of a
8  company, then, you're not basing the value or your
9  decision about what you would be willing to pay for it
10 upon a balance sheet?
11   A. Okay. Well, you broadened it into some subtle
12 areas, but when you say "based on the balance sheet," the
13 debt also goes on the balance sheet, not just the assets.
14   Q. Okay.
15   A. And we're -- we're mindful of the debt as well.
16   Q. Okay.
17   A. But, yes, we do mind the balance sheet, but not
18 for assets.
19   Q. So you want to know -- you're gonna place a
20 value that's a function of -- a function of cash flow or
21 P&L; and then you're also gonna factor in, you know, how
22 burdened, I guess, with debt is that cash flow going to
23 be? That's the basic --
24   A. Yeah, potentially. It's just, I guess, in the
25 industry, and then if it grows -- usually if a

---

Page 179

1  business -- say if you get a million-dollar EBITDA
2  business that has multiple -- if you get it over
3  5 million in EBITDA, you can get a multiple expansion,
4  things like that.
5    Q. And what's the -- why do you apply a multiple
6  of EBITDA? Is it because a business is more multifaceted
7  than just the -- just its particular physical assets?
8    A. I wish I could say it's more esoteric, but
9  that's how the industry works. So I work with all the
10 people I show up with.
11       But I also understand that if we look at a
12 business and we're gonna pay them two years, three years
13 of their profits or their cash flow into the future, and
14 then also ask them to hang on to some of it, and we can
15 grow the business, as well, usually, if we hold the
16 business five years, there's two years on the end after
17 the growth that we've paid off the initial price, that
18 last two years on the end, if it's grown all five years,
19 is where we make our profit at the end.
20   Q. This valuation -- you know, this valuation
21 model that, you know, just everybody uses is -- I mean,
22 that's basically a convention that has come out of a
23 market process, right?
24   A. No. It's the one that I deal in every day. I
25 can't speak to the whole market.

---

Page 180

1    Q. Right. Well, I mean, as someone acquiring
2  businesses, are you looking at it -- you're looking at
3  more broadly than just the individual line item assets,
4  physical assets, right?
5    A. Yes.
6    Q. More goes into the value than just those items?
7    A. If by that you mean we look at EBITDA and all
8  the things that make it up, yes.
9    Q. Right. And aren't those -- in a sense, aren't
10 those proxies for other things that give a business
11 value, like existing contractual relationships, a track
12 record, workforce in place, other intangible assets,
13 brand recognition?
14       Aren't all of those things part of what
15 helps generate an EBITDA?
16   A. No. You kind of mixed metaphors there. You
17 started with aren't those equivalent to EBITDA, and then
18 you said, "Aren't some of those generating EBITDA?"
19       They can or can't. They're not -- they're
20 very difficult to measure, and they're inaccurate.
21       Again, when you value a company for the
22 cash flow, especially when you go to other people that
23 say, "Hey" -- when you have lenders or even, say, for
24 example, in our case, a seller that takes a note, they
25 obviously know it's going to be the cash flow that's

---

Page 181

1  going to pay them back, not these esoteric things that
2  you're talking about.
3    Q. Okay.
4    A. And lenders alike.
5    Q. Okay. So, you know, with all -- with all those
6  items, though, something else -- besides just the line
7  items that would flow into a balance sheet, right,
8  something else is creating value that gives rise to that
9  EBITDA.
10   A. I don't know if I follow you. I don't
11 disagree, but I don't follow.
12   Q. Okay. I'm just trying to understand. If
13 you're willing to pay more for a company than just the
14 assets that exist there, something must be creating value
15 beyond just those assets.
16   A. The EBITDA. For example, there's been
17 businesses that are -- say an architecture firm. They
18 may have a bunch of guys there, and architecture firms,
19 that get contracts, but I don't know if they have assets.
20 I assume they don't. They have a bunch of CAD machines
21 and stuff. But, you know, can make 10, $20 million
22 a year in the deals that they can do, but there's no
23 assets there.
24   Q. Okay.
25   A. But they have value. We don't buy those in

---

46 (Pages 178 to 181)

Page 182

```
 1   particular, but some people do.
 2       Q.  Right.  And so that's an intangible value,
 3   right?
 4       A.  What is?
 5       Q.  That sounds like there's an intangible value
 6   there that is giving rise to that.
 7       A.  Just cash flow.  It's the ability to provide a
 8   service at the moment and convert that into cash.
 9       Q.  Let me ask this a different way.  If -- when
10   Baymark acquired or engaged in the Asset Purchase
11   Agreement with what is now D&T Partners, was there
12   $3 million of physical assets that it was acquiring?
13       A.  No.
14       Q.  Was there a million dollars of physical assets
15   it was acquiring?
16       A.  (Shook head.)
17       Q.  Was there even $500,000 of physical assets?
18       A.  Maybe.  I mean, inventory was about 300,000.  I
19   give you the benefit of the doubt on some desks and
20   chairs.  Let's say that or below.
21       Q.  Say something between 300 and 500, roughly, of
22   assets?
23       A.  Sure.
24       Q.  So what is it -- and that's at the time when
25   Baymark acquires the entity?
```

Page 183

```
 1       A.  Yeah.
 2       Q.  And you came to the conclusion then that it was
 3   worth almost $4 million?
 4       A.  Yeah.  So it was -- so the cash flow books on
 5   the assets, so it's not relevant.  It's the amount of
 6   cash flow or EBITDA that it throws off at the end.
 7           I think the year that we came in, it was --
 8   you know, we do -- we try and look at the financial
 9   statements and see if it's gonna generate 1.2 million, I
10   think we thought at the time.  If it generates
11   $1.2 million every year thereafter, that's the value.
12   And so we put a multiple on that, and that's what we buy.
13   That's really just it.  And, I mean --
14       Q.  That's it?
15       A.  -- it seems like you could expand it and put
16   some other things.  You're going a little above my pay
17   grade, but --
18       Q.  No.  You're clearly -- you're in the pay grade
19   for me.  There are -- you may be above mine.  But I'm
20   trying to -- what I'm trying to reconcile from that now
21   is -- and this was the long way around, I guess.
22           But you're telling me that ACET Global, in
23   your mind, is in the red in terms of its value because
24   Tomer Damti e-mailed you telling you there was
25   300-and-something thousand dollars' worth of inventory.
```

Page 184

```
 1   And I'm asking:  How's that any different from when you
 2   acquired it?
 3       A.  I don't think I'd link those together.  Just,
 4   again, if we can focus on the cash flow, when we bought
 5   it in July -- I don't have the financials in front of me.
 6   July's performance was actually 1.1 in EBITDA.  By
 7   December it was like $150,000.  I think I'm right.
 8           So we went from being able to -- having a
 9   million dollars' worth of excess cash floating in per
10   year to having $150,000 of excess cash floating in by the
11   end of that year.  And that creates problems with buying
12   inventory and making payments to Super G, who had a note
13   that's not serviceable for $150,000 worth of EBITDA,
14   where it completely is at 1.1 -- or 1.2, especially.
15       Q.  Okay.
16           (Technical adjustment.)
17           THE WITNESS:  It might be the glare off my
18   forehead.
19           THE COURT REPORTER:  Sorry for the
20   interruption.
21       Q.  (BY MR. FREEMAN)  By the way, I got to tell
22   you, I was taking a deposition in another case last
23   week -- I thought you were gonna make fun of your
24   forehead.
25       A.  I did.
```

Page 185

```
 1       Q.  The lawyer got into it a bit with me, and the
 2   parting shot was, "Nice bald spot."
 3       A.  Oh, wow.  Let's not get to that level.
 4       Q.  Yours looks pretty good.
 5           MR. PERRIN:  Jason, I haven't gone there.
 6           MR. FREEMAN:  Excuse me?
 7           MR. PERRIN:  I haven't gone there.
 8           MR. FREEMAN:  No, you haven't.
 9           MR. PERRIN:  And you can talk about my
10   silver look here, too, so . . .
11           MR. FREEMAN:  Yours looks pretty good.  I
12   hope I get to that.  I'm trying to hold on to what I've
13   got.
14           MR. PERRIN:  Yeah, thanks.
15       Q.  (BY MR. FREEMAN)  Well, circling back, so . . .
16           Did you ever refer to the Windspeed loan as
17   "the ACET note"?
18       A.  I don't believe so.
19       Q.  And do you know when Windspeed -- if it did, do
20   you know when Windspeed began selling ACET's inventory?
21       A.  No, I don't.
22           Say that again.  When Windspeed started
23   selling ACET's inventory?
24       Q.  If it did, but . . .
25       A.  No.
```

47 (Pages 182 to 185)

Anthony Ludlow   *   May 15, 2021

Page 186

1    Q.  Did Baymark ever ask Windspeed to keep two sets
2  of books?
3    A.  If by that -- I'm sure we would have asked them
4  to be careful not to mix their books with ours.  Makes
5  taxes -- makes taxes hard.
6    Q.  Did Windspeed pay any of ACET's debts?
7    A.  Did Windspeed pay any of its own debts?  I
8  don't know.  I'm just making sure if you're asking if we
9  did.  I know we didn't.
10    Q.  Okay.
11    A.  Or -- ACET Global.  I said "we."  ACET Global
12  or Baymark.
13    Q.  Who prepared ACET Global's taxes for '18 and
14  '19?  Was that Howard?
15    A.  Howard and Co., yes.
16    Q.  Did Bill Szeto have any role in that?
17    A.  I don't know how granular you want to get.
18  Maybe if he had access to the books and records, he would
19  send a trial balance over -- or -- but, again, he had
20  access to the information.  But that would be it, would
21  be my guess.
22    Q.  Not, like -- to your knowledge, not, like, a
23  back-and-forth with the accountants?
24    A.  I wouldn't think so.  And I don't know that
25  Bill has that level of knowledge of tax stuff anyway.  I

Page 187

1  don't want to disparage the guy.  He's not here.  I don't
2  actually know.  He could be a tax -- he could be a tax
3  genius.
4    Q.  Was there a -- when F-- well let me ask it
5  this way.
6        In March of 2019 and thereafter, was there
7  any reason for ACET Global to be kept open rather than
8  shut down?
9    A.  Yeah, that's always a tough call.  A lot of
10  times, generally we could leave a business open because
11  you never know if some -- when there's an employee that
12  left angry, like Pablo.  He could come back and say there
13  was something.  And if we don't have an entity in place,
14  we don't have a place to put that complaint into that
15  entity with the normal corporate protections.
16        So you had protection in one regard by
17  leaving that open, if there's a sexual harassment or
18  something like that.
19        On the flip side, though, if you're getting
20  calls from vendors, sometimes we'll push to go ahead and
21  close it if it's established.  Almost never happens
22  anyway.  So it's a weighting between those two issues.
23    Q.  Okay.
24    A.  Did I answer your question?  I don't feel like
25  I did.

Page 188

1    Q.  I -- nope.  I mean, it makes some sense.  And
2  it was probably a bad question.
3        Let me ask you, with the foreclosure sale,
4  can you walk me through what you understand or know of
5  Super G Capital's foreclosure of ACET Global's assets,
6  kind of what happened?
7    A.  I'll do my best.  I believe at some point early
8  on, they came to us and said that they wanted to begin
9  the process of reclaiming the assets.
10        And I think early on at some point, they
11  wanted to do what's called an ABC or an assignment for
12  the benefit of creditors.  I'd never heard of that or --
13  certainly hadn't been involved in one.  But to me, I call
14  that a friendly foreclosure, where there's some voluntary
15  nature to that.  So we -- that's when they indicated that
16  they were getting serious about taking the assets.
17        We said no.  Honestly, I didn't -- I didn't
18  think they had the guts to do a foreclosure.  I thought
19  that would buy us time because banks do not like to take
20  assets back because they have to acknowledge that their
21  loan's failed.
22        So by putting the pressure on acknowledging
23  that the loan failed, I didn't think they'd make that
24  call and that would give us some more time.
25    Q.  Okay.

Page 189

1    A.  Time went on, and at some point it became clear
2  that they were gonna do a foreclosure.  And when they
3  said, "We're gonna do a foreclosure."  I was like, "Well,
4  let's get out the docs."  And so we, "Let's look at the
5  processes of foreclosure."  And at some point, under the
6  Security Agreement, we have to comply or can't resist.
7  And we went along with that process, and Julie helped
8  make sure we didn't go too far or too little with -- in
9  the foreclosure.
10        And I don't know if I'm getting the
11  dates -- helping you with the dates.  But they executed
12  the foreclosure, I think they did a notice or some deal
13  at the time and made sure all the parties got notified,
14  and then took the stuff.
15    Q.  Okay.  Did -- so that was really the only
16  reason for Baymark Partners' involvement in the
17  foreclosure?
18    A.  When you say "only," I mean, there's a lot of
19  risk for those original legal documents if -- if we don't
20  make them stick to the rights that we agreed to
21  originally, in the original documents, and then they come
22  back around and stick us with extra.
23        Or what if we did an inventory to them and
24  they come back and say, "The inventory isn't complete.
25  You kept some stuff," you know.  We did something with

48 (Pages 186 to 189)

Page 190

```
 1   this.
 2         So we want to make sure that we completely
 3   complied with what we needed to do, it was safe and
 4   there's no blowback where they come back and say --
 5   because we knew the assets we were giving them were below
 6   the value of the loan, and we didn't want them to come
 7   back, which, from my understanding, is common.  They'll
 8   say, "There's a shortage, and you still owe me X amount
 9   of dollars."
10        Q.  Okay.
11        A.  So we needed to make sure what small rights
12   that we had, we could enforce.
13        Q.  But you were giving them -- I mean, they were
14   getting all of the assets of the ACET Global?
15        A.  Whatever the lien covered, which I believe it's
16   a blanket lien over every single thing.  So basically
17   when you say "the assets," the lien that they had was
18   over the company, to the extent that when you buy a
19   company, either asset or stock sale, their lien covered
20   doing an asset acquisition of the company.  It's
21   everything.
22        Q.  And they were getting all of that free of any
23   debt?
24        A.  Well, whatever a lienholder -- a senior
25   lienholder's right is under those deals.  Again, I'm not
```

Page 191

```
 1   a lender, thank goodness.  However the lenders --
 2   whatever their rights are.
 3        Q.  You don't understand them to have been getting
 4   all of those assets subject to some junior creditor's
 5   lien, do you?
 6        A.  I'm not sure what the senior-ness of their lien
 7   gives them or doesn't give them in banking law or --
 8   yeah.
 9        Q.  Okay.  Did you talk to anyone about a
10   foreclosure on ACET in 2018?
11        A.  Foreclosure on ACET in 2018.  Didn't a
12   foreclosure take place in 2018?
13        Q.  I believe it's purported to have taken place in
14   2019.
15        A.  Okay, then.  Yeah, then.  I'm sure if there was
16   threats after the ABC, when they said, "Do the ABC," and
17   we said, "No," maybe they mentioned that they're gonna
18   have -- "Well, maybe we'll just do a foreclosure."  And I
19   said -- or, "Maybe you'll have to do a foreclosure."  You
20   know, the dance.  I don't know.
21             That's their remedy at that point.  Or they
22   can start telling us what to do with it, which -- I mean,
23   we're just trying to make the company run at that point.
24        Q.  Did Baymark -- did Baymark Partners want to
25   move forward with the foreclosure in 2018?
```

Page 192

```
 1        A.  No, I don't think we ever wanted to move
 2   forward with the foreclosure other than if it was gonna
 3   happen, it was gonna go by the books.
 4        Q.  Okay.  But you weren't, like, interested in
 5   trying to move it forward more quickly or just move it
 6   forward, I guess?
 7        A.  That meant the end of the hope of ACET Global
 8   to have the assets to pull itself out, and my
 9   half-million-dollar investment gets flushed at that
10   point, but I don't get -- (inaudible.)
11             (Deposition Exhibit 7 marked for
12             identification.)
13        Q.  (BY MR. FREEMAN)  Okay.  I'm putting on the
14   screen what's marked Exhibit 7.  (Shared screen.)
15             And this is an e-mail, isn't it, from Matt
16   Denegre to Steve Bellah?
17        A.  It is.
18        Q.  It's Matt Denegre at Baymark Partners, correct?
19        A.  It is.
20        Q.  The Subject line is "ACET"?
21        A.  Um-hum.
22        Q.  And do you know of another ACET than the ACET
23   we're discussing here?
24        A.  I'm sure it's ACET Global.
25        Q.  And he says to Mr. Bellah -- and Mr. Bellah's
```

Page 193

```
 1   with Super G, correct?
 2        A.  He is.
 3        Q.  He says, "I'd like to discuss next steps for
 4   ACET global and get your thoughts on how to move forward
 5   with this foreclosure."
 6             Do you see that?
 7        A.  I do.
 8        Q.  What did Baymark -- what did Baymark mean by
 9   this, wanting to "get thoughts on how to move forward
10   with this foreclosure"?
11        A.  This is between Matt and Steve Bellah, but I
12   understand the somewhat contentious nature.  I didn't
13   think that they would foreclose.  And I didn't think
14   that -- I don't know that Super G ever foreclosed on
15   anybody, either.  And making them realize that we're not
16   gonna do the ABC and "Maybe you want to do the
17   foreclosure" might get them to back off.  I don't know
18   what the intent would be here.
19        Q.  Okay.  Posturing.  Did Super G ever -- did
20   Super G ever indicate in an e-mail this proposed ABC
21   structure?
22        A.  I believe so.
23        Q.  And when do you believe that happened?
24        A.  I don't know.  It's around this time.  I
25   remember seeing an e-mail that actually had the
```

## Page 194

1  capitalized A, B, and C in there, so . . .
2      Q.  Okay.  And you think this e-mail from
3  Mr. Denegre, Exhibit 7, that it may just be Baymark
4  Partners posturing about the foreclosure?
5      A.  Or just to see what -- if they've ever done
6  one, just to get their thoughts on that.  I'm not sure.
7  It's meant to see -- and it would be my guess.  Because
8  this is October 23rd, and the foreclosure didn't happen
9  until, what, six months later.  So obviously they were
10  scared to do it.
11      Q.  Wasn't this around about the date of the
12  Windspeed Trading revised and reissued operating
13  agreement?
14      A.  It could have been.  I don't know.
15      Q.  And didn't you see that -- didn't you review
16  that?
17      A.  The Windspeed Trading Operating Agreement?
18      Q.  Yes, sir.
19      A.  I would have, yes.
20      Q.  Now, there were also some other e-mails here.
21          (Deposition Exhibit 22 marked for
22          identification.)
23      Q.  (BY MR. FREEMAN)  I'm placing on the screen
24  what's marked as Exhibit 22.  (Shared screen.)
25          Do you see that?

## Page 195

1      A.  Yes -- well, hang on.  I see it.  It's small.
2  He'll get it bigger.  Um-hum.
3          MR. PERRIN:  (Complied.)
4      Q.  (BY MR. FREEMAN)  And is this an e-mail
5  exchange between Matt Denegre of Baymark Partners and
6  Alex Godinez of Super G Capital?
7      A.  It is.
8      Q.  Okay.  And it's January 29th, 2019?
9      A.  Um-hum.
10      Q.  And Subject line:  "Windspeed/ACET"?
11      A.  Yes.
12      Q.  And what's the relationship there?  What do you
13  understand the relationship between Windspeed and ACET to
14  be?
15      A.  Well -- at this time, as I mentioned, I knew
16  that the ACET note was going to be transferred over to --
17  or assigned or whatever over to Windspeed.  In addition
18  to that, they were gonna foreclose on our assets as well.
19  I guess, finally, they decided to do this.
20      Q.  Okay.
21      A.  Based on -- based on the date, I think that's
22  where we're getting to with it.
23      Q.  Okay.  And was Super G asking -- asking you to
24  draft all the foreclosure sale documents?
25      A.  No.  I think on the foreclosure sale -- so on

## Page 196

1  the foreclosure, I guess there's a notice.  We probably
2  would have reviewed it, just to make sure it was not
3  saying something dangerous to us -- or to Global.
4          And then we would review the other
5  documents.  If that included the note being transferred
6  over, we would want to make sure that the note went over
7  without recourse back to us.
8      Q.  Okay.
9      A.  Just -- we -- that that was all in there.
10      Q.  Do you think -- was ACET Global or Baymark
11  Partners in a position at this point to require that?
12      A.  To require that?  Well, sure.  I mean, we did
13  have some rights, and -- very few of them.  I don't know
14  about "require," but we were able to exert what few
15  rights we had.
16      Q.  What leverage here did Baymark Partners or ACET
17  Global have against Super G to ensure that, you know, it
18  was completely relieved of liabilities?
19      A.  Well, I think there's just a common
20  understanding that if we're gonna have this, I guess,
21  this divorce or this breakup, that we all do it amicably
22  and dot your Ts and cross your I's.
23          Because there's always the chance that if
24  they stuck something back on this, we could sue them or
25  we could complain that their foreclosure was unfair, that

## Page 197

1  we were making payments.
2          And so to do this -- and when they do a
3  foreclosure, they want to make sure that it's clean and
4  it's in agreeance.  So everybody wants to make sure the
5  deal was complete and moves on, nobody gets surprised
6  later when they stick us with more cost, or we sue them
7  because they took our stuff and wrecked our business.
8      Q.  Well, aren't y'all, in fact, business partners
9  in Windspeed at this time?
10      A.  No.  I don't know who "y'all" is, but I'll say
11  no.
12      Q.  Is there a Baymark-affiliated entity that
13  was -- that had an economic interest in Windspeed?
14      A.  Yeah.  If you're talking about Baymark Partners
15  Management, that was -- that had the -- that did have a
16  equity piece.  I think I heard you say 40.  I said 30,
17  but you said 40.  I'm not sure.
18          But it had that equity piece in Windspeed.
19  And so Windspeed already had $200,000 in debt, and it was
20  about to take on another half million dollars in debt and
21  get some inventory for it.  So it was all a bunch of
22  debt.
23      Q.  Okay.  And would you be surprised to learn that
24  the testimony of Bill Szeto was that all of the inventory
25  was gone from ACET Global by the time this foreclosure

Anthony Ludlow   *   May 15, 2021

Page 198

1    purportedly happened in March of 2019?
2        MR. PERRIN:  Objection; form.
3        A.  Yeah, I wouldn't be surprised to hear him say
4    that.  What does it mean when he says "gone, all gone"?
5    Was it depleted from $300,000 down to 100,000 or -- I
6    don't know what he means by "gone."  But -- I didn't
7    watch Bill Szeto's testimony, but I wouldn't be surprised
8    by a lot of what he says, no.
9        Q.  (BY MR. FREEMAN)  Surprised to hear him say
10   that there was none of it left?
11       MR. PERRIN:  Objection; form.
12       A.  I think somewhere there might have been 30 -- I
13   don't know, but there had to be something there.
14       Q.  (BY MR. FREEMAN)  And so why is this Subject
15   line "Windspeed/ACET," Exhibit 22?
16       A.  Well, I have to look and see, but, again, if
17   we're -- there's a note coming from one, going to the
18   other.  Then there's going to be the asset foreclosure
19   that's coming out of one.  So it could be multi-topic --
20   topics to finalize debt.
21       Q.  But it's your testimony on behalf of each of
22   the entities that you represent that Super G was not
23   asking Baymark Partners or ACET Global or any of your
24   entities to draft forfeiture agreements?
25       MR. PERRIN:  Objection; form.

Page 199

1        A.  The word "draft" seems to be, like, something
2    somebody does alone in the dark and no one else is
3    involved.  There's attorneys everywhere on this deal.
4        I think Bill had his own attorney -- I know
5    he did.  Super G had an attorney.  We had an attorney.
6    So once the parties discuss a common interest, the
7    attorneys go and make it happen.  And just because --
8    like, when I'm doing a deal, just because one of the
9    attorneys that's not on their side advances the ball of
10   everybody doesn't mean he's doing the drafting.
11       So -- I'm burning a little bit that I think
12   everybody was involved in this process, and certainly us
13   less so because we had fewer rights, but that doesn't
14   mean we didn't get a seat at the table.
15       Q.  (BY MR. FREEMAN)  So Baymark's counsel or
16   ACET's counsel wouldn't -- you know, given that, wouldn't
17   be taking up the laboring oar of drafting the foreclosure
18   agreements, would it?
19       A.  "Laboring oar," I guess you mean the majority
20   of or the burden's work?  It doesn't matter.  Everybody
21   gets their say.  I don't know if we wrote some of it or
22   we commented on it.
23       You know, if you're writing an agreement
24   that's against you, you can do a lot of favorable things
25   in it that other people don't catch.  So if somebody

Page 200

1    asked me to write an agreement against myself, I'd be
2    glad to do that.  They might miss something.  So I
3    don't -- I don't know who did what.
4        Q.  Well, I mean, is it a -- is it a habit of
5    Baymark Partners to try to put things into agreements
6    that counterparties won't catch?
7        A.  If it's within the realm of business
8    negotiations, in the world of redlines, it doesn't
9    actually happen.  But usually on most documents, people
10   focus on -- on the things that they're concerned about
11   and they read over things, and if they're happy with it,
12   that's good for us.  They're represented by counsel who
13   do it for a living.
14       Q.  So I'm scrolling down on this Exhibit 22 to the
15   e-mail from Mr. Godinez at Super G Capital on
16   January 29th, 2019, and it was to Matt Denegre and
17   provides the Subject line "Windspeed/ACET."
18       And do you see that?
19       A.  I do.
20       Q.  And above that, I don't believe when
21   Mr. Denegre responded, that he indicated any lack of
22   clarity about what was being referred to; is that right?
23       A.  Just one second, I'll read it real quick.  So
24   this is on January 29th.  (Reading.)  Yeah.  That seems
25   to be what it says.  It's not confusing to me.

Page 201

1        Q.  Seems -- no.  So Mr. Godinez says, "Hi Matt,
2    Just wanted to follow up on status for the final version
3    of the foreclosure agreement.  Are we good to finalize?"
4        And is that consistent with your
5    understanding of Baymark Partners' role in the
6    foreclosure agreements?
7        A.  If you're asking us if they allowed us to
8    review it, they did.
9        Q.  Okay.  Did they ask you to redline it?
10       A.  I don't know.  I'm sure if review found a
11   misspelling, we would have let him know.
12       Q.  Any substantive changes?
13       A.  I doubt it.
14       Q.  Did -- who owns Windspeed?
15       A.  Who owns Windspeed?  I'm not sure right now.  I
16   think at the time, I had a warrant.  I think Super G had
17   it, and I would assume Bill Szeto does.  I don't know
18   where it stands.
19       Q.  Okay.  But you think Super G had ownership in
20   Windspeed?
21       A.  I believe so.  When I say "ownership," I'm
22   being casual, blending of warrant and ownership, save the
23   difference.
24       Q.  Got it.  So you think Bill Szeto had some?
25       A.  Yeah, he had to, right?  I mean, he put it

51 (Pages 198 to 201)

Page 202

1  together, and he's doing all this footwork. I would
2  assume he'd have some.
3      Q. Did -- and does Baymark Partners Management?
4      A. Yeah, the warrant that he told me was
5  40 percent.
6      Q. Right. And Super G, right?
7      A. That's the last I saw, yes.
8      Q. Did Bill Szeto do all the drafting for the --
9  for Windspeed's Operating Agreement?
10     A. Yes.
11         MR. PERRIN: Objection; form.
12     A. So, yes, he did all the drafting of the
13 Operating Agreement because it was only one person at the
14 time for Windspeed, from what I understand. And then
15 when we were added to it, we beefed it up and put all the
16 provisions and protections in for -- I guess it makes it
17 an amended and restated operating agreement once we came
18 in as warrant holders.
19     Q. (BY MR. FREEMAN) And I'll ask you, are you
20 familiar with this document?
21     A. By the title, I think it gives me a lot of
22 information, but yeah. I know what it's pertaining to.
23     Q. To tell you the truth, I don't know that that's
24 the one I meant to pull up. I'm not sure it's relevant.
25     A. It is an operating agreement. You probably can

Page 203

1  see that. It's the Windspeed one.
2      Q. It is. I'll tell you what. I'm gonna take
3  like, a five-minute break, if y'all don't mind, and go
4  off the record for just a second.
5      A. All right. I'll be here.
6         THE COURT REPORTER: All right. We're
7  going off the record at 2:51.
8         (A recess was taken from 2:51 p.m. to
9         3:08 p.m.)
10        THE COURT REPORTER: We're back on the
11 record at 3:08 p.m.
12        (Deposition Exhibit 19 marked for
13        identification.)
14     Q. (BY MR. FREEMAN) Mr. Ludlow, I'm sharing a
15 screen and putting up what's marked as Exhibit 19.
16 (Shared screen.)
17        Can you see that?
18     A. Yes. I've got a small one and a big one
19 coming. But go ahead.
20     Q. All right. It's an e-mail between Bill Szeto
21 and Julie Smith and Matt Denegre and Carrie Williamson, I
22 believe.
23     A. Yes.
24     Q. And it's from March 26th, 2019.
25        And have you ever seen this document

Page 204

1  before?
2      A. I don't believe so, but . . .
3      Q. Scroll through. This states -- in Julie's
4  e-mail with everyone just a few days before, it states,
5  "Attached are the final documents for the Windspeed
6  transaction."
7         And do you understand why Julie was
8  drafting the documents for the Windspeed transaction?
9      A. If she was -- I don't know what documents they
10 are. I don't know if they're attached on this. But
11 certainly she would have the one that had the foreclosure
12 and sale transfer agreement because it's protecting us
13 from the foreclosure.
14        Are there any others? And if there's a
15 separate one for the note transfer, that would be in
16 there. It's not the same one. She certainly would have
17 had hold of those. Does it say what the attachments are?
18     Q. No.
19     A. Okay.
20     Q. This one doesn't have it attached to it, I
21 think, because it's the earlier -- or the later e-mail.
22     A. I see.
23        (Deposition Exhibit 44 marked for
24        identification.)
25     Q. (BY MR. FREEMAN) Was -- I'll show you another

Page 205

1  exhibit here, Exhibit 44. (Shared screen.)
2         And this was an e-mail exchange between
3  Brian Vanderwoude and Julie Smith of Hallett & Perrin.
4  The subject is "Windspeed/Super G transaction."
5      A. Right.
6      Q. And was Julie Smith -- or Hallett & Perrin,
7  were they ever Windspeed's attorney?
8      A. No. You haven't shown anything, but didn't
9  Windspeed have their own attorney?
10     Q. I --
11     A. I think it was a son.
12     Q. Whose son?
13     A. Bill -- or William. Something like that. I
14 don't know his name.
15     Q. What leads you to believe that Windspeed --
16 that Julie Smith was not ever Windspeed's attorney?
17     A. Well, because she represented me for ACET
18 Global, and also Windspeed had their own attorney go over
19 that -- guy, what's that name? They had one that
20 wouldn't be Julie.
21     Q. Okay. But you're pretty sure that she wasn't?
22     A. Yes, I'm very sure.
23     Q. So in June -- in Brian's e-mail here to Julie,
24 he says, "I agree with you that it would be easier to
25 amend and restate the existing ACET loan agreement."

52 (Pages 202 to 205)

Page 206

```
 1      A. Um-hum.
 2      Q. Do you know what he's referring to?
 3      A. Let's do some guessing here.
 4          January 17th, I don't think they'd sorted
 5   out yet, at this time, if they were gonna do a -- just
 6   get rid of our note, and then Windspeed have a new one or
 7   just take our note.
 8          And so Vanderwoude represents Super G,
 9   right?  And so if he's representing Super G, he's
10   probably talked with them and realized that, "I don't
11   think that they can do a new note," that they have to go
12   through legal or stuff.
13          So to get this note over, they're just
14   gonna have to pull it over, which would be easier for
15   them and less trouble for them.
16          I don't know their politics, but I got a
17   sense that they weren't able to do a new note.  They had
18   to transfer ours.
19      Q. Okay.
20      A. That's what he's saying here, but I don't know.
21   I don't know if he got . . .
22      Q. Well, how's -- how is all of that related?  I
23   mean how is -- how is all that related, I guess?
24      A. Well, obviously they're working out the
25   methodology of how they're gonna get that loan off of
```

Page 207

```
 1   ACET, and I guess Brian, right here, is espousing his
 2   pain or what's easier for him under what -- under their
 3   political system to get that done, which, again, I don't
 4   care how they do it, as long as they take it.
 5      Q. Well, is this all related to the foreclosure?
 6      A. Well, it happened at the same time.  So when
 7   the assets went over, so we didn't get blowback -- and
 8   they also took the note, kind of together, we didn't want
 9   to have any blowback.
10          So, yeah, that -- whenever our -- again,
11   for ACET Global, whenever our note disappeared.  It went
12   away, it got transferred, and the assets went away.  That
13   is definitely related.
14      Q. Okay.  And that hadn't occurred as of the time
15   of this e-mail, correct?
16      A. I don't think so.  I think -- sorry for dates,
17   but I think you mentioned it happened in March of '19 is
18   when it happened, so this was before.
19      Q. Okay.  So why is all of that being worked out
20   before Windspeed had even purported to legally acquire
21   the assets?
22      A. I'm back to the fact that I think we stymied
23   them a little bit when we didn't do the ABC, so now
24   they're flailing on how they're going to get those assets
25   over.  We slowed them down, obviously, from October to
```

Page 208

```
 1   January, so we got that long.  But I don't know . . .
 2          What was your question?  Did I answer it?
 3   Do you want me to take another stab?  I don't think I
 4   did.
 5      Q. No.  I'm trying to figure out why, you know --
 6   first of all, why ACET Global's -- or Baymark's attorney
 7   is engaging in this transaction with Super G's attorney
 8   when ACET and Baymark are supposedly not a party to this
 9   transaction.
10      A. ACET's a party.  ACET is losing a note and it's
11   having its assets taken from it.  Dangerously so.
12   Because if they take out assets incorrectly, we're gonna
13   get blowback.  So we're definitely a party to it.  It has
14   to happen correctly.
15      Q. And then what I'm wondering, though, is how is
16   it that the parties have already orchestrated some kind
17   of loan or note that Windspeed would owe if Windspeed
18   hasn't even -- there hasn't been a foreclosure, there
19   hasn't been a foreclosure sale, assets hadn't --
20   Windspeed hasn't purported to legally acquire any of the
21   assets at issue?
22      A. So I guess -- guessing for Windspeed a little
23   bit here.  But the first one you said, "if there wasn't a
24   note yet."  I think Windspeed already had a note.  You
25   mentioned the $200,000 note already, but I think you're
```

Page 209

```
 1   talking about a different one, this note here, the one
 2   that was going to be assumed.  So that -- again, how it
 3   gets over that is either -- you could kill the ACET
 4   Global note and create a new one over there, and that
 5   would be their problem.  As long as they killed ours,
 6   that's all I cared about.
 7          And if they came back around and said, "No,
 8   we can't, it's gonna take us too long to write a new one
 9   over there" -- which, again, I don't care about -- "But I
10   need to take this one and move it over there."
11          "Great.  Make sure you do that."
12          So I don't know why they didn't get their
13   act together.  Like I said, I think they just wanted to
14   do an ABC, and we didn't do it.  So I don't know.
15      Q. If all of this is the case, why not -- why not
16   just agree to transfer all of the assets subject to the
17   notes over to Windspeed?
18      A. I don't know.  That would be to counsel.  That
19   sounds like an attorney option there.  There's a lot
20   of -- you had the senior lender and their docs.  You had
21   the Asset Purchase Agreement, the Security Agreement, and
22   all that stuff.  So there's -- there's a path that you
23   can take that's all been agreed upon.
24      Q. By everybody who's got a stake in it?
25      A. Yeah, when we did the first agreements,
```

53 (Pages 206 to 209)

Anthony Ludlow   *   May 15, 2021

---

Page 210

1  everybody saw those, and from what I understood, we were
2  going through those processes that were put in place
3  then.
4      Q.  And isn't the only -- the only loser in this
5  scenario, isn't it just the junior creditors?
6      A.  Well, depending on how you define "losers," I
7  would say myself, who gets no return on any equity, so
8  that's lost.  The -- all the debt holders lost.
9          I think everybody lost on this deal.  I
10  don't think there's lone-man losers here.  There's no
11  value in the company, and it's gone.
12      Q.  Right.  It's all in Windspeed now, isn't it?
13      A.  I don't know it's in Windspeed, but I would be
14  surprised if it's even functioning or existing.  I could
15  check, but I would be surprised if it's even a company.
16  I don't know.
17      Q.  But -- so was that option never even discussed,
18  just simply transferring all of the ACET assets over into
19  a new entity that would assume the note encumbering those
20  assets?
21      A.  All that was discussed from our side was to
22  resist Super G and not go along with their ABC because we
23  didn't think they would foreclose.  And it put them off
24  long enough -- the hope was that we could have a little
25  more time to run the company.

---

Page 211

1          But ultimately, I guess Bill set up
2  Windspeed, and Super G said we can take these assets and
3  run them, whatever's left.  I don't know how much of
4  those assets we got -- they got over there -- we gave
5  them.  So I don't -- I don't know -- about the only
6  way --
7          There's a lot of ways you could do it.
8  But, again, when we first did the initial deal docs,
9  there was these things that the parties agreed to, and I
10  think this drove us through to that.
11      Q.  Okay.  But doesn't that seem like a much, much
12  simpler structure, to simply transfer all of ACET
13  Global's assets to a new entity and have the new entity
14  assume the encumbering debt?
15      A.  I don't know about "easier."  Again, they had
16  their political issues.  I think Super G's a fund.  So
17  how they book things and how things look or what they
18  intended to do with it, I don't know.
19      Q.  But you're not suggesting that anybody here was
20  trying to -- you know, trying to hide the ball from any
21  regulators or anything, right?
22      A.  Anybody was trying to hide the ball from any
23  regulators?  I think the senior lender had a secured
24  interest and they -- they exercised it against ACET.
25      Q.  Okay.  But Baymark Partners was asking them to

---

Page 212

1  go ahead and move forward with the foreclosure in 2018,
2  right?
3      A.  We did throw that out there.  If they were
4  gonna do that, that was their only recourse at that time,
5  because I don't know if we were even paying them at that
6  point.  But, again, we were trying to keep cash flow in
7  the business, and they weren't -- they weren't getting
8  the loan back.
9      Q.  And if I understand this correctly, the assets
10  end up -- after the foreclosure sale, they end up -- all
11  of them end up with Windspeed, correct?
12      A.  I don't know.  I would assume that all of them
13  that were foreclosed upon went directly into Windspeed.
14  I don't know if they went to Super G first and held and
15  then they bought them separately or if it was a two-part
16  transaction.
17          If that was the case, there might have been
18  a case where Super G sold some of them to somebody else.
19  They had a portfolio of companies.  I don't know how many
20  of them ended up in Windspeed.  I don't know Super G's
21  portfolio.  But let's just assume the majority of them
22  went over there.  I don't know.
23      Q.  Okay.  And your understanding is that
24  Windspeed, as a result of that foreclosure agreement,
25  ends up taking on a note to Super G that is the same

---

Page 213

1  value as the one that ACET Global had owed to Super G?
2      A.  I think the way it's written is it was an
3  assumption, so it was actually the same note that went
4  over there.
5      Q.  Okay.  So at the end of the day --
6      A.  I think that's what this says.  Instead of
7  doing a new one, they just assumed.  Is that what it's
8  saying?  Yeah.
9      Q.  Right.  And so at the end of the day, then,
10  Windspeed has all of ACET's assets, and they're
11  encumbered by a note of the exact same value?
12      A.  Plus an additional note for $200,000 that was
13  done before.
14      Q.  Right.  All that owed to Super G?
15      A.  I believe so.
16      Q.  Right.  So --
17      A.  I don't know if they got other financing or
18  not.
19      Q.  Right.  So we all know what I mean when I say
20  "Who's the loser in this?"  Who's the loser besides the
21  junior creditors?
22          MR. PERRIN:  Objection; form.
23      A.  Everyone's a loser.
24      Q.  (BY MR. FREEMAN)  The junior creditor's liens
25  don't appear to follow into Windspeed, correct?

---

54 (Pages 210 to 213)

Page 214

```
 1        A.  No, they do not appear to follow into
 2   Windspeed.
 3        Q.  But Windspeed takes on all of ACET's assets for
 4   a note of exactly the same amount and also appears to
 5   have the wherewithal to pay on an even greater note?
 6        A.  I don't know if they're making payments --
 7   there's an assumption that they're making payments or
 8   not.  I don't know.
 9        Q.  And they have the benefit of Super G, who
10   provided the capital at issue, having a 40 percent
11   economic stake?
12        A.  They do.
13        Q.  One could view Super G's economic stake as
14   equity, right?
15        A.  I don't know if there was an equivalence
16   between those two.  Giving debt, because it has to be
17   repaid, which it does.
18        Q.  Sometimes it's hard to tell where the line
19   between debt and equity is, right?
20        A.  I don't know if that's a legal question or just
21   a functional question, but maybe.
22        Q.  Right.  So, I mean, we possibly have -- if we
23   want to view this as -- you know, Super G's capital as
24   equity here, we possibly have now moved all of ACET
25   Global's assets over to Windspeed, free and clear of any
```

Page 215

```
 1   encumbrance, as long as no one picks up on it, right?
 2            MR. PERRIN:  Objection; form.
 3        A.  Again, this purports to be in compliance with
 4   the original documents that were signed by the credit
 5   holders, senior and secondary, and also the Asset
 6   Purchase Agreement.  So whatever the effective -- at the
 7   end, it was following that agreement.
 8        Q.  (BY MR. FREEMAN)  How did you believe this to
 9   be consistent with the agreements that D&T Partners had
10   signed?
11        A.  Well, I'm speaking for all parties because the
12   agreements that we signed were -- I think they were all
13   signed by the senior lender, the seller note, and also
14   the Baymark Partners' parties.  And that is, we granted
15   security interests -- primary security interests in all
16   the assets, you know, blanket assets, to the senior
17   lender.
18            And then there was also security interests
19   for the secondary person, but they were behind the
20   senior, and that's what it means to be second in line.
21   And if the senior exercises those assets against, I
22   guess, the secondary and also the equities holders, I
23   guess that's their right.
24        Q.  Okay.  Did there come a time where Baymark
25   agreed to allow Windspeed to assume the ACET note?
```

Page 216

```
 1        A.  So are you saying did we allow Windspeed to
 2   assume the ACET note?  You're making it sound like we
 3   would ever resist that.  Like we -- no, we want to keep
 4   the note.  It's kind of ass-backwards, isn't it?  If
 5   somebody wants to take a half-a-million-dollars note off
 6   of me, they don't have to ask twice.  Like, if you ask me
 7   right now, I'll give you half-a-million-dollar note.  So
 8   I'm not sure if that's what you meant.
 9        Q.  Well, the whole thing seems ass-backwards to
10   me, too.  But I'm -- I'm wondering, is there any point in
11   time where Baymark told its attorney that Baymark would
12   agree to allow Windspeed to assume the ACET loan?
13            MR. PERRIN:  Objection; form.
14        A.  No, Baymark never told our attorneys that we
15   would allow Windspeed to assume the note.  We were glad,
16   and we would push it.
17        Q.  (BY MR. FREEMAN)  Are --
18        A.  If they wanted to take it with the foreclosure,
19   that's beneficial to ACET Global.
20        Q.  Okay.  Would there be any reason that Baymark's
21   or ACET's attorneys might have thought that Baymark
22   wouldn't want to have Windspeed assume the loan?
23        A.  I don't think so.  Other than if it wasn't done
24   correctly.  Like, if the loan was assumed as part of an
25   ABC with the foreclosures taken in a way that wasn't
```

Page 217

```
 1   allowed under the original documents, that wouldn't have
 2   been pre-negotiated, so probably would tell them not
 3   then.
 4        Q.  Okay.  And did -- dropping down here to the
 5   second page of this Exhibit 44, there's an e-mail from
 6   Julie Smith to Brian Vanderwoude on January 3rd, 2019.
 7        A.  Um-hum.
 8        Q.  And does she say, "I spoke with Baymark after
 9   our call on Monday."  And she says, "Baymark has agreed
10   to allow Windspeed to assume the ACET loan"; is that
11   right?
12        A.  Yes.
13        Q.  And what do you understand her to mean there?
14        A.  It means that we're not gonna resist if they
15   want to take that debt off of -- off of ACET.  I'm sure
16   it's part and parcel, along with how the foreclosure's
17   gonna go as well, because I think those happened at the
18   same time.  They had to have.
19            (Deposition Exhibit 24 marked for
20            identification.)
21        Q.  (BY MR. FREEMAN)  Okay.  So I'm pulling up
22   what's marked as Exhibit 24.  (Shared screen.)
23            Do you see that?
24        A.  I do.
25        Q.  Was Windspeed previously ACET Global?
```

Page 218

1    A.  No.  I don't -- I mean, that's easy to check
2   with the State, isn't it?  I mean, if it's filed -- I
3   think it was -- whenever it was filed -- says here when
4   it's filed.  September '18.
5        So if it was filed as Windspeed, I think
6   it's always been for Windspeed, as far as I know.  It was
7   never ACET Global, and if it was, it was not -- without
8   my knowledge.
9    Q.  Okay.
10    A.  It's a separate en- -- corporation.  They had
11   their -- I think from what you showed me, they had their
12   own filing docs, and I know ACET Global has their own
13   formation docs, for sure.  I know it's --
14    Q.  Was there --
15    A.  -- in mind.
16    Q.  Was there ever a plan to restructure ACET
17   Global?
18    A.  I think we've talked many times throughout
19   this.  Your term of "restructuring ACET Global" usually
20   involves getting relief on debt payments and doing
21   things, so yeah.  We even talked about times when they
22   cut their payments back a few times, so yes.
23    Q.  And are you familiar with this Exhibit 24?
24    A.  It looks like an e-mail between Matt and Steve,
25   and I'm included.

Page 219

1    Q.  Okay.  September 7th, 2018?
2    A.  Yes.
3    Q.  Subject line, "ACET Plan"?
4    A.  Um-hum.
5    Q.  And attachment entitled "ACET Plan (September
6   2018)"?
7    A.  Yes.
8    Q.  Okay.  And it says, "Steve, Attached is the
9   ACET plan," correct?
10    A.  Yes.
11    Q.  "The plan provides the company resources to
12   grow quickly and profitably under a restructured entity."
13    A.  Yep.
14    Q.  Is that correct?
15    A.  That is correct.
16    Q.  Okay.  What did you understand Baymark Partners
17   to mean by "restructured entity"?  Because I'm using your
18   words.
19    A.  So if this is at September, this is probably
20   our final plea to saying, "If you want this thing to go
21   forward, get this, not only do you need stop taking big
22   payments from us, but if you give us more money, then we
23   might can buy some product to move forward."  I don't
24   think they went for that.  I know they didn't.
25    Q.  Okay.  So they wouldn't agree to it?

Page 220

1    A.  Didn't matter whether they would or wouldn't.
2   They did not.  Because we -- they didn't do that.  I
3   think -- yeah.
4        I'm looking at what you're scrolling by
5   here.
6    Q.  Yeah, I'm just scrolling through so you can see
7   it.  (Scrolling.)
8    A.  Yeah.  Yeah, yeah.
9    Q.  You don't know what -- restructured entity,
10   though, not some new entity?
11    A.  Yeah, here's where we're talking about the
12   investments, and here's where we're behind on shipping.
13   Pay bills, a credit card bill of 16,000 has to be --
14   yeah.
15    Q.  (Scrolling.)  Okay.
16    A.  So is that the cash requirements we were asking
17   for there?  Hang on.
18    Q.  Right.  Was part of those cash requirements --
19   now, is that to pay some accrued expenses of ACET Global?
20    A.  It's salary accrued.  I don't know if that's
21   Bill's or other people's.  We were paying the employees
22   current because we were funding it still at the time.
23        So it might have just been Bill's old
24   salary.  Maybe he wanted to finally start getting paid.
25   He hadn't been -- I don't think he had been cashing his

Page 221

1   checks at this time, and probably to catch up on them.
2   And so the 200 and $500,000 -- it's not $500,000 -- so --
3   it's an odd amount.  It probably paid some old bills,
4   too.
5    Q.  Okay.
6    A.  So anytime it refers to anything accrued or old
7   bills, it's clearly talking about the current ACET Global
8   because any new, I don't think Windspeed had back -- old
9   freight charges and things like that, so that would be my
10   guess.
11    Q.  Okay.  And you mentioned it, the capital
12   requirement.  How much did Windspeed originally put
13   into -- how much did Super G originally put into
14   Windspeed?
15    A.  200,000, wasn't it?  I don't think it was 250.
16    Q.  Okay.  And this, actually the total capital
17   requirement here is $200,500; is that right?
18    A.  Yeah, some of which goes to old stuff, which is
19   not good if it's a blind product.
20    Q.  Right.  And so -- but this was --
21    A.  Almost half of it goes to non-inventory, like
22   60 goes to Bill, and then another 15,000 goes to other
23   stuff.  That's a waste.
24    Q.  Right.  And so this is the ACET Plan, right?
25    A.  It looks like it.

Page 222

1    Q. And this is in the same month that Windspeed is
2  formed?
3    A. Well, from what you've told me, it would seem,
4  yes. So . . .
5    Q. Just weeks before all of the employees of ACET
6  Global were pulled over to Windspeed?
7        MR. PERRIN: Objection; form.
8    A. So whenever they were moved from one place or
9  to the other is a fact. I don't know when that is, so I
10  don't want to say when it is or not. But in addition to
11  that, so all of this stuff here, again, is the reporting
12  of a failing company to the lender that has the security
13  interest on all this stuff. And so if they like this,
14  good for them. If they don't, then I guess Bill had a --
15  had Windspeed cooking.
16    Q. (BY MR. FREEMAN) Okay. And so all of that
17  just kind of the happenstance is the timing. And then
18  shortly thereafter, Super G provides an initial funding
19  to Windspeed of $200,000?
20    A. I believe so, yes.
21    Q. And do you know whether any of that money,
22  those funds that Windspeed had, were used to pay any of
23  ACET Global's debts?
24    A. I don't think so.
25    Q. No.

Page 223

1    A. I would have known because my debts never went
2  down. ACET Global's debts never went down, no.
3    Q. Okay.
4    A. So did the lender give us a loan to pay off a
5  lender or other debts? I don't think so. Because
6  Windspeed's a lender -- I mean, not Windspeed but Super G
7  is a lender. So did a debt holder give us money to pay a
8  debt holder? No.
9    Q. Right. But someone could owe a debt who wasn't
10  a borrower, right?
11    A. Probably.
12    Q. A debt doesn't necessarily indicate a lending
13  relationship?
14    A. I want to be careful getting into hypotheticals
15  because I want to be factual and truthful, so . . .
16    Q. So let's say DHL allows ACET Global to use its
17  services. You wouldn't characterize DHL as a lender,
18  would you?
19    A. They're a creditor. Certainly, they're not
20  secured, but yeah.
21    Q. So my point, it's not a lending relationship
22  but it is a creditor/debtor relationship?
23    A. Yes. DHL is a creditor.
24    Q. Okay. And like someone who sells all of the
25  assets -- all of their assets, they're not exactly

Page 224

1  lending money to the buyer, right?
2    A. Someone who sells all -- I feel like you're
3  trying to apply this to this company in a hypothetical.
4        So can we put names in there? So . . .
5    Q. So D&T Partners sells all of its assets to ACET
6  Global.
7    A. Um-hum.
8    Q. Fair to say you wouldn't characterize D&T in
9  that scenario as a bank or a lender, right?
10    A. Well, they're a noteholder. They are a lender.
11    Q. Right.
12    A. It's seller financing.
13    Q. Okay.
14    A. Not just assets.
15    Q. That can be, I guess, tomayto and tomahto,
16  right? I mean, there's a creditor relationship for sure.
17    A. Probably. The UCC -- well, anyway.
18    Q. Sorry?
19    A. I was just saying the UCC stuff is -- again, I
20  defer to counsel on that.
21    Q. Okay. I'll ask you -- pulling up -- so I'm
22  going to put this in the drop, what will be marked as
23  Exhibit 46. (Shared screen.)
24        MR. PERRIN: And, Jason, when you do that
25  before, it's not showing up on our screen. It just shows

Page 225

1  up as a "save as" on the desktop.
2        MR. FREEMAN: Let me see. (Technical
3  adjustment.)
4        Is this working?
5        MR. PERRIN: That works better. Yeah, we
6  can see that.
7        THE WITNESS: I'll just look on the screen
8  up here.
9    Q. (BY MR. FREEMAN) This is a -- marked this
10  document Exhibit 46.
11        MR. FREEMAN: Karen, I'm pretty sure that I
12  introduced a deposition earlier that I said we were gonna
13  mark as Exhibit 46?
14        THE COURT REPORTER: Yes, you did.
15        MR. FREEMAN: So I apologize for the
16  confusion. I suspect it will be easy to keep these
17  different, but maybe we'll actually call this 46A.
18        THE COURT REPORTER: So you want to keep
19  the prior 46. Do you want to make this 46A?
20        MR. FREEMAN: Yes, ma'am.
21        THE COURT REPORTER: Let's do that.
22        (Deposition Exhibit 46A marked for
23        identification.)
24    Q. (BY MR. FREEMAN) Did -- so was Baymark's law
25  firm or attorneys, were they involved in drafting the

57 (Pages 222 to 225)

## Page 226

1  Amended and Restated Company Agreement for Windspeed
2  Trading?
3      A.  I think I mentioned before, Wind-- Julie
4  Smith of Hallett & Perrin represented Baymark Partners
5  Management when it went from a single-member company
6  agreement to a multimember one.  We handled that.  She
7  restated that.
8      Q.  Okay.
9      A.  She added multiple parties to it.
10     Q.  Okay.  And was -- I'm showing you what's,
11  again, marked as 46A here.
12         The Amended and Restated Company Agreement
13  reflected here that was attached to the e-mail, does that
14  reflect an "H&P Draft" marker?
15     A.  It does.
16     Q.  And were your attorneys the primary drafters of
17  this document?
18     A.  I don't know what "primary" means, but I
19  believe -- I think when Julie took the original one, they
20  offered it to us and we said "No, this doesn't work."  So
21  she probably had a form, make it a multiparty one.
22     Q.  Okay.
23     A.  Everybody gets -- when you say "primary," that
24  means no one else gets to put inputs?  They don't have a
25  say?

## Page 227

1      Q.  No, just were they taking the laboring oar, I
2  guess.
3      A.  I'm gonna use that.  I believe she drafted
4  this, yes.
5      Q.  But Baymark and ACET were just -- there was no
6  relationship to the formation of Windspeed Trading?
7      A.  No.  We weren't -- I didn't know Windspeed
8  Trading -- so Windspeed Trading, I didn't even know it
9  existed until later, when -- I guess when Bill and his
10  son set it up and (unintelligible).
11     Q.  And was ACET Global or Baymark Partners related
12  to the Amended and Restated Company Agreement of
13  Windspeed Trading?
14     A.  Okay.  So I'm trying to keep images of all
15  these companies in my mind.
16        Ask that again.  Was -- and that's my
17  fault.  I lost track.  Say that again.
18     Q.  Well, and I'll tell you, why I'm using the
19  phraseology here is because I feel like you're drawing a
20  distinction between the technical formation of
21  Windspeed -- which, granted, we can agree is the
22  Certificate of Formation -- and perhaps the
23  reconstitution of Windspeed Trading as a result of the
24  Amended and Restated Company Agreement.
25        And so what I'm trying to figure out is --

## Page 228

1  about some date in September when a
2  Certificate of Formation is filed.
3      A.  Right.
4      Q.  What I'm trying to figure out is:  At any point
5  here, was Baymark Partners or ACET Global -- was it
6  related or was it part of -- was there some connection
7  between them and Windspeed Trading as reconstituted under
8  the Amended and Restated Company Agreement?
9         MR. PERRIN:  Objection; form.
10     A.  So to the question, I'll just answer it
11  directly.  And I'm not trying to draw a distinction
12  between formation date and amended and restated date.
13  But when Bill Szeto indicated to us that he wanted me to
14  receive equity or the warrant, I think I suggested
15  warrant because I didn't want the K-1.
16        That's when Julie got involved through
17  Baymark Partners Management, and -- to make sure that
18  this was done correctly, that I wouldn't have to put in
19  money or get stuck with some other bad stuff.
20     Q.  (BY MR. FREEMAN)  Okay.  And was she involved
21  in drafting the warrant purchase agreement?
22     A.  Yes.
23     Q.  And --
24     A.  I do believe so.
25        (Deposition Exhibit 4 marked for

## Page 229

1  identification.)
2      Q.  (BY MR. FREEMAN)  Okay.  And I'm putting up
3  what's marked as Exhibit 4 here, which is an e-mail from
4  Matt Denegre to Steve Bellah, Alex Godinez, and yourself?
5  (Shared screen.)
6      A.  Um-hum.
7      Q.  Does this appear to be a true and correct copy
8  of that document?
9      A.  Appears to be authentic, yes.
10     Q.  And there are a couple attachments
11  designated here.  One appears to be Version 3 of the
12  Windspeed Warrant Purchase Agreement and another Warrant
13  Purchase Agreement, Windspeed.
14        Does that appear right?
15     A.  It does.
16     Q.  The Subject line of this e-mail is
17  "Windspeed - revised WPA and warrant"?
18     A.  Right.
19     Q.  And I'll scroll down here to the attachments.
20  Is -- what's reflected here, it's the fourth page of
21  Exhibit 4, is this a Warrant Purchase Agreement draft?
22     A.  That's what it's titled.  I assume that's what
23  it is.
24     Q.  Is there a marker in the top right hand saying
25  "H&P Draft"?

Page 230

1    A. There is.
2    Q. And is this -- does this look like the Warrant
3    Purchase Agreement that Baymark entered into to obtain
4    warrant rights in Windspeed?
5    A. It looks -- and I can tell because there's,
6    like, brackets. So it looks like a form, so it's
7    probably in the same line, but I bet it looked a lot like
8    this.
9    Q. Okay.
10   A. But at some point -- which means it changed, or
11   information got put in, or dates were put in there.
12   Q. Okay. And were those -- was the exercise price
13   for those warrants, was it a hundred dollars?
14   A. It was.
15   Q. And was that to obtain, upon exercise,
16   40 percent of the company?
17   A. If it hadn't changed from this form, then yes.
18   Q. Okay. And that is what you had obtained -- or
19   the company had obtained?
20   A. Whoever ended up signing it. Baymark Partners
21   Management, then, yes. I think they got 40 percent of
22   $200,000 in debt. And then 40 percent of 8- -- $700,000
23   in debt, yes.
24   Q. Okay. So there was really no -- why -- if
25   that's what you're acquiring, why go to all this trouble,

Page 231

1    all this legal expense to draft all of these documents?
2    A. Again, if it was going to be given to us -- and
3    quite honestly I don't know how much expense it was, but
4    just to protect our interest -- and we weren't getting
5    stuck with a warrant or equity, I'm not going to try to
6    draw a distinction between the two.
7    Just to make sure we were protected and we
8    didn't have any -- I know Bill was wanting us to put
9    money in. He might have wanted me to put money in since
10   I'd been shown to have a soft heart for him funding --
11   keeping companies alive. So I just wanted to make sure.
12   Because often in these agreements, it would be a
13   requirement for the partners to put money in. I just
14   wanted to make sure that wasn't there.
15   Q. If Bill was such a sophisticated businessman,
16   why did he not insist upon some provision like that?
17   A. I guess he was smart. I don't know.
18   Q. Did he ever even ask for that?
19   A. No.
20   Q. Did you ever see his attorney request that?
21   A. No, I don't -- honestly, I didn't see any
22   drafts going back and forth.
23   Q. Well, did you see this draft?
24   A. I did. And obviously -- was I copied on there?
25   So if I saw it, I would have opened it. I'm not claiming

Page 232

1    I didn't see it. I probably did.
2    Q. Okay. I mean, did anybody ever say something
3    in an e-mail that, you know, "I want a provision that
4    requires Baymark to put money into Windspeed"?
5    A. No.
6    Q. Did anyone say that on a conference call?
7    A. No conference call.
8    Q. Text message?
9    A. No.
10   Q. I mean, was there ever even a discussion about
11   it?
12   A. No, no more -- no. Similar, when Bill Szeto
13   used to call us, you know, ACET Global, and say, "I can't
14   make payroll." He would tell Matt first. Matt would
15   have a bleeding heart, and Matt would come to me. And
16   Matt wouldn't go to David because David didn't want to
17   put in any more money.
18   So the money that Baymark put in, like,
19   those last few tranches, was solely from me. I didn't
20   even let David know. It went through Baymark, but he
21   was -- this was such a bad deal. But Matt's bleeding
22   heart and, you know, Bill's. So he probably thought he
23   could continue to play on my bleeding heart to put in
24   money at some point, which, again, I never have.
25   Q. Okay. If you and Baymark had such a bleeding

Page 233

1    heart, why were you taking 40 percent of this company?
2    A. Well, it's -- again, Bill Szeto was brought
3    into the company and then struggled. And he put it
4    together. If he wants to hand it to us because he thinks
5    at some point we can help him with money, which we
6    haven't -- haven't done -- I don't know how long it's
7    been, a year and a half or more. I haven't done that.
8    More than that. And if he thinks that we can provide him
9    expertise.
10   But Bill Szeto sounds good, but he doesn't
11   take expertise -- he doesn't take advice very well. And
12   I'm sure he didn't think Matt helped him a lot or I
13   helped him a lot either. So . . .
14   I haven't talked -- just so you know, I
15   haven't talked to Bill Szeto, not a single time, since
16   September or earlier, not once.
17   Q. Did you -- I mean, did you feel like you were
18   taking advantage of Bill Szeto with this agreement?
19   A. No.
20   Q. No?
21   A. No.
22   Q. Was there much negotiation about these figures?
23   A. I don't know if there was a couple versions
24   going back and forth. I bet it -- I bet Bill Szeto would
25   have had some discussions about how much he got or how

## Page 234

1  much Super G got.  And that's probably my guess.
2      Q.  Okay.  Would he have ever indicated that, you
3  know, this was to compensate Baymark for its investment
4  in ACET?
5      A.  I don't remember seeing that.
6      Q.  Would he ever have indicated that?
7      A.  I think -- "would have."  I don't -- I don't
8  know that he did.
9      Q.  Okay.  Why would he, if he did?  I mean, what's
10  the connection there?
11      A.  Again, we were the ones who brought him in in
12  the first place.  And he wanted our expertise.  Again, I
13  don't remember what's being granted here.  This is a
14  company that has more debt than even ACET Global had, and
15  its -- I don't know what its prospects are, but they
16  can't be great.  And I haven't received a financial
17  statement since.  I haven't seen anything, so . . .
18      Q.  Okay.
19      A.  Maybe in your discovery you've seen how they're
20  doing.  I don't know.
21          MR. PERRIN:  Karen, can we have a time
22  check?
23          THE COURT REPORTER:  Yes, sir.  I can do
24  that on a break and will let you know before we go back
25  on the record.

## Page 235

1          MR. PERRIN:  Very good, thank you.
2          THE COURT REPORTER:  We're off the record
3  at 3:52.
4          (A recess was taken from 3:52 p.m. to
5          4:03 p.m.)
6          THE COURT REPORTER:  All right.  We're back
7  on the record at 4:03.
8          (Deposition Exhibit 47 marked for
9          identification.)
10      Q.  (BY MR. FREEMAN)  So I am -- I'm going to put
11  on the screen what's marked as Exhibit 47.  (Shared
12  screen.)
13          And do you see that?
14      A.  I do.
15      Q.  And is -- is this an e-mail at the top from
16  Mr. Szeto to Steven Bellah, Matt Denegre, and yourself?
17      A.  It is.
18      Q.  And is it dated October 10th, 2018?
19      A.  It is, yes.
20      Q.  And is it -- is the Subject line "Re:
21  Ownership (Newco)"?
22      A.  Yes.
23      Q.  And what is -- what is that referring to?
24      A.  I don't know.  Would it be appropriate to read
25  the e-mail a little bit?

## Page 236

1      Q.  Sure.  Let me ask you.  Did -- it states here
2  from Bill that "We can have the call now."
3          Do you recall having a conversation with
4  Mr. Szeto, Steve Bellah, and Matt Denegre about ownership
5  in a new company at this time period?
6      A.  No.  It might have been with Matt.  I may or
7  may not have been there.  But I'm sure it probably took
8  place.
9      Q.  Do you --
10      A.  I don't think I was there.
11      Q.  Do you think that this -- would this be
12  regarding Windspeed?
13      A.  I don't know.  It -- probably.
14      Q.  Probably?
15      A.  I think so.
16      Q.  And why would you be discussing ownership in
17  Windspeed?
18      A.  Well, again, if Bill wants us to be part of his
19  company, then that's why we would be discussing it.
20      Q.  Okay.  But this would not -- your ownership
21  from that wouldn't be because of your past investment in
22  ACET Global?
23      A.  No.  No.
24      Q.  And so we'll go down here to Mr. Bellah's
25  e-mail to Matt Denegre, yourself, and Mr. Szeto on

## Page 237

1  October 9th.
2      A.  Um-hum.
3      Q.  And he says, "I need to speak with you about
4  the ownership split after consulting with counsel,"
5  and -- is that correct?
6      A.  Yes, that's what it says.
7      Q.  And below that, there's an e-mail from Matt
8  Denegre to Steve Bellah, yourself, and Mr. Szeto on
9  October 8th, 2018, and it states "Below are the proposed
10  equity splits from Bill"?
11      A.  Yes.
12      Q.  And "We (Baymark) are ok with this proposal
13  too"?
14      A.  Yep.
15      Q.  Is that correct?
16      A.  Yep.
17      Q.  It says, "Attached are the formation
18  documents"?
19      A.  Yep, that's right.
20      Q.  And this, below that, is that -- is the e-mail
21  that -- appears to be the e-mail Mr. Denegre is referring
22  to from Mr. Szeto?
23      A.  I see it.
24      Q.  It states, "After considering the amount of
25  investment you and Super G put into the ACET Global

Usher Reporting Services
(214) 755-1612

Anthony Ludlow   *   May 15, 2021

## Page 238

1　company, here is the percentage I am willing to live
2　with."
3　　　　Now, what would he be referring to that
4　would be related to your -- to Baymark's prior investment
5　in ACET Global?
6　　　A. Well, again, this is -- comes from Bill, so if
7　you want the definitive answer, you talk to him.
8　　　　But I would take that as the time and
9　energy in the support of him. That's what I take it as.
10　Was I on that? That wasn't to me, but that would be my
11　guess.
12　　　Q. No. You weren't, but you were on the e-mail
13　that --
14　　　A. I was above, yeah.
15　　　Q. -- that forwarded this.
16　　　　And there's a -- appears that Mr. Szeto has
17　listed out his proposal, which includes a "warrant for
18　40 percent"?
19　　　A. Um-hum.
20　　　Q. And appears to have set out the equity stakes
21　of the partners following a exercise of warrant rights?
22　　　A. It does, yeah. Undiluted and diluted there,
23　right.
24　　　Q. Right. So after the -- in the scenario after
25　the exercise of the warrant rights, Mr. Szeto states that

## Page 239

1　he's willing to live with Baymark having 40 percent,
2　himself having 20 percent, and Super G having 40 percent;
3　is that correct?
4　　　A. That is correct.
5　　　Q. And he used the phrase "I'm willing to live
6　with." What did you understand that to mean?
7　　　A. It seems like he's having a struggle internally
8　and he's come to this cathartic decision here to -- this
9　works for him for some reason.
10　　　Q. Okay. But that wasn't reflecting some sort of
11　ongoing bargaining or negotiation?
12　　　A. I never spoke with him about this at all, no.
13　　　Q. And Baymark wasn't pushing back or trying to
14　get a greater percentage?
15　　　A. No. I -- again, guessing. If there was any
16　pushback, I guess you'd have Super G's e-mails. Maybe he
17　was discussing it with Super G. I could see them wanting
18　more or less. I wouldn't know. They're the ones that
19　are fronting this deal. So I don't -- maybe that's what
20　it is. I don't know.
21　　　Q. Was -- was Super G bargaining on behalf of
22　Baymark?
23　　　A. No.
24　　　Q. Was Super G begging Baymark to be in Windspeed?
25　　　A. I don't think Super G ever asked us to be part

## Page 240

1　of it.
2　　　Q. So Super G wasn't asking Baymark to be part of
3　Windspeed?
4　　　A. No.
5　　　Q. But Mr. Szeto was just offering up 40 percent
6　of Windspeed to Baymark?
7　　　A. Yes, he was. Thought we could help him out.
8　　　Q. And he was doing that -- he doesn't state here
9　that it's -- it's because he wants Baymark to put in
10　additional money, does he?
11　　　A. No, he doesn't.
12　　　Q. And does he say he's doing it after considering
13　the amount of investment that Baymark put into the ACET
14　Global company?
15　　　A. He does say that.
16　　　　(Deposition Exhibit 20 marked for
17　　　　identification.)
18　　　Q. (BY MR. FREEMAN) I'll show you what's marked
19　as Exhibit 20. (Shared screen.)
20　　　　And, Mr. Ludlow, do you recognize this
21　document?
22　　　　Looks like an e-mail on January 3rd, 2019, yes.
23　　　Q. It's an e-mail from Matt Denegre to Steven
24　Bellah, Tony Ludlow, and Mr. Szeto?
25　　　A. It does.

## Page 241

1　　　Q. And does -- (scrolling.) Following down the
2　trail here, the e-mail trail, there's an earlier e-mail
3　from November of 2018 from Mr. Denegre to Steve Bellah
4　and yourself.
5　　　A. I see that.
6　　　Q. And it states, "Michelle has been jammed up
7　today and still needs to review the agreement. We had to
8　bring her in last minute because there were multiple
9　parties involved (ACET Global, Windspeed, Baymark) and
10　our corporate counsel does not have bankruptcy/
11　foreclosure expertise within their firm"?
12　　　A. Yeah.
13　　　Q. What do you understand that to be referring to?
14　　　A. So let me think. November 21st. I think
15　that's when they were still getting over the burn from
16　saying no to the friendly foreclosure, and we were gonna
17　do a straight foreclosure.
18　　　　And I don't have -- I don't know if people
19　here at Hallett & Perrin have the expertise in bankruptcy
20　or that type of foreclosure stuff. So that's why she was
21　brought in when they were gonna start foreclosing and do
22　this structure.
23　　　Q. And so -- so everyone was relying on Baymark's
24　counsel?
25　　　A. Well, ACET Global/us was relying on a

Page 242

1    foreclosure expert to protect me from if they were gonna
2    actually go through with the foreclosure, for them to do
3    it right.
4        Q.  Okay.
5        A.  Along with whatever the guideline -- because
6    I'd never heard of an ABC before.  I didn't know if that
7    was the same thing; it turned out it's not.  So I didn't
8    want to have any risk there.
9            And also the original deal docs didn't talk
10   about an ABC.  It just talked about the foreclosure
11   rights that the senior lender had, so that's where we
12   needed to stay.
13       Q.  And did -- anywhere in this communication, was
14   there reference to this ABC deal or --
15       A.  No.
16       Q.  -- structure?
17       A.  No.
18       Q.  Is there a reason for that?
19       A.  Probably because it was already dead by then.
20       Q.  Okay.  And this e-mail below from Mr. Bellah to
21   Mr. Denegre and yourself states that "My counsel has left
22   her a message.  Does she know there's a sense of urgency
23   here?"
24           What sense of urgency is he referencing?
25       A.  So I'm gonna go from memory here, but I

Page 243

1    remember early on some complaints that Michelle Shriro
2    didn't even return our call for two weeks or something.
3            So I think we were trying to find out if
4    she even wanted to work with us or not.  We wanted to get
5    moving, so she was -- I don't know that she even returned
6    our call for quite a long time.
7        Q.  So was Super G getting anxious at having to
8    wait?
9        A.  No, I think we're talking about my irritation
10   of having a professional that I reached out to not
11   respond.  I give them four to eight hours because it
12   doesn't take that long just to send an e-mail saying,
13   "Hey, let's talk.  I can get to you," and, "tell me
14   what's going on."  But to disappear and go dark on me --
15   so that's where I was -- does she understand that she
16   needs to talk to me?
17       Q.  Okay.  Let me ask you:  Did you terminate Tomer
18   Damti?
19       A.  Matt -- Matt was the one that delivered a
20   message that we wrote and I signed.
21       Q.  Okay.  But you intended to terminate Mr. Damti?
22       A.  I did.
23       Q.  Did Mr. Hook terminate Mr. Damti?
24       A.  No, he didn't.
25       Q.  Did he ask you to terminate Mr. Damti?

Page 244

1        A.  I was doing it under his direction.  I'm sure
2    David condones my action.
3        Q.  So he did ask you to do it?
4        A.  I don't know if he specifically asked me to do
5    it, but he was aware of it and was fine with it.
6        Q.  Okay.  How do you know that?
7        A.  Because I know David well.  We discussed the
8    performance of the company.  We discussed the -- he
9    understood there needed to be made a change, a change at
10   the company, and we were just executing that.
11       Q.  Okay.  Did you -- did you talk to him about it?
12       A.  Talk to David?
13       Q.  Yes, sir.
14       A.  Once you know somebody for 11 years, you have
15   this abbreviated sense of communication that conveys a
16   lot more than just the few words.
17           So from an outsider's point of view, yeah,
18   we had a brief conversation.  But to the insiders, David
19   and I, we understood where it stood.  I knew what he
20   wanted to do, and I -- I was gonna -- I agreed with him.
21       Q.  So okay.  But he didn't give you -- he didn't
22   give you some explicit instruction to go fire Tomer
23   Damti?
24       A.  We discussed it, and he approved of what we
25   were doing.  I think I actually showed him the message --

Page 245

1    or the note before it was sent.
2        Q.  Okay.
3        A.  That's it.
4            (Deposition Exhibit 3 marked for
5            identification.)
6        Q.  (BY MR. FREEMAN)  I'm putting on the screen
7    what I've marked as Exhibit 3.  (Shared screen.)
8            Do you see that?
9        A.  I do.
10       Q.  And did you sign this document?
11       A.  That is my signature, yes.
12       Q.  Did you draft this document?
13       A.  I'm not sure who drafted it, but it certainly
14   has my touch on it, yes.
15       Q.  Did you speak with Mr. Damti on February 12th,
16   2018?
17       A.  I don't believe so.
18       Q.  Okay.
19       A.  I didn't meet with him, no.
20       Q.  Okay.  And don't believe you had a conversation
21   with him?
22       A.  I've spoken to him since, a few times.
23       Q.  Okay.
24       A.  I don't know if it was immediately after or a
25   month after, but there's been a few times after.

62 (Pages 242 to 245)

Page 246

1    Q. Okay. The letter starts out: "This letter
2    confirms our discussion today." Is that accurate?
3    A. Yeah, that's regarding Matt's discussion with
4    Tomer.
5    Q. And during all this time, are you saying
6    because you had been delegated some authority, you were
7    kind of overseeing the company?
8    A. I am saying that, yes.
9    Q. I mean, are you the leader of the company?
10   A. I'm authorized to take this action, if that's
11   what you're asking. I don't know if you asked David, but
12   I'm sure he would agree.
13   Q. I mean, I'm trying to figure out specifically
14   what the authority is. I mean, were you like -- are you
15   the leader of the company? Or are you just doing -- I
16   mean, just another employee outside the company?
17   A. I'm acting as the designee of the board of
18   directors, number one, directly, since I'm on the board.
19       Number two, David, as president, delegated
20   these types of tasks to me as well. So I guess both
21   ways.
22   Q. Okay. And was this termination -- what was the
23   reason for the termination?
24   A. The poor performance of the company from the
25   time of closing to February. The EBITDA had dropped from

Page 247

1    1 million to zero.
2    Q. Okay. And I suspect that this is in February
3    of 2018, but I suspect that January of 2018 was a bad
4    month. Is that what prompted this?
5    A. Well, the performance all along, it's
6    directional. Going from a million in EBITDA cash flow to
7    zero is a problem. Subsequently caused our cash flow
8    problems with our banks.
9        But if you speak about January in
10   particular, let's dial down on that. In January we only
11   lost $82,000 in that month as compared to the prior
12   January where we lost $94,000. So was it better than the
13   year prior? Yes, but we still lost $82,000.
14   Q. Okay. Why is that?
15   A. The performance of the company.
16   Q. Did revenues go down?
17   A. It's -- the EBITDA went down. So the cash that
18   was available -- for example, if the revenue doubles or
19   triples, if it doesn't result in cash flow on the bottom
20   to pay your note with, you don't have any cash to buy
21   product or pay your notes with.
22       So if you get the best product ever in and
23   people want to buy it but you get it at no margin or
24   terrible cost and it comes in -- or you ship it air
25   freight versus ground shipping, you burn it all up in

Page 248

1    freight. So by the time all your expenses are covered,
2    you have no cash because you burned it all in improper
3    pricing when you buy it, or improper -- it's easy to
4    increase your revenue if you drop your price. If you
5    drop your price, you sell a ton of product, but you got
6    no margin. So cash flow, EBITDA, is the only thing that
7    matters.
8    Q. Was there a big, across-the-board drop in price
9    in January of 2018?
10   A. I don't know. I wasn't involved. Just to dial
11   down to it, Tomer was the CEO of the company at that
12   time. Those were decisions made by him. He understood
13   the industry at that time. So who was ever the leader --
14   the operational leader at the time, they take the hit for
15   the performance of the company.
16   Q. And you indicated that the prior January, the
17   company had lost 94,000?
18   A. I believe that was the -- yes, the EBITDA loss
19   that we applied --
20   Q. And this January 2018, how much did you say it
21   lost?
22   A. 82, I think.
23   Q. 82. Was -- just, I don't know, five or six
24   months before this, you had valued the company at about
25   4 million bucks?

Page 249

1    A. Prior to that, we valued -- the company had
2    1 point -- when we did the deal, I think I referred to
3    this, we did it thinking it had 1.2 million in EBITDA. I
4    think that was off of June's numbers because we were
5    closing in January, and you don't get those until later.
6        Turns out it was January was 1.1. That's
7    okay. Usually they're not spot on. So we valued it
8    based on 1.1 million in EBITDA, and that's correct.
9    Q. Okay. And you had -- and in doing so, you had
10   factored in the January of 2017 figures, right?
11   A. Yes. I believe that's what -- yeah.
12   Q. And so now the company is doing better than it
13   did the prior January, right?
14   A. What do you mean by "now"?
15   Q. Well, January 2018. You're telling me it
16   actually did better.
17   A. It lost -- (laughing.) It lost $82,000.
18   That's not -- that's not good by any means.
19   Q. Right. But compared to, you know, five months
20   before, when you had valued the company at about
21   4 million bucks, you were looking at January data that
22   was worse, right?
23   A. Their prior January was bad as well, for sure.
24   Q. All right. So why is it laughable for me to
25   question why the -- why all of a sudden the change?

Usher Reporting Services
(214) 755-1612

Page 250

```
 1        A. I want to answer your question.  So I didn't
 2   intend to laugh at you.  It's the world that I live in.
 3   When you lose 100,000 or $84,000 in a month after you'd
 4   already lost money in all the months prior -- so when
 5   your EBITDA -- let's just say your cash flow goes from a
 6   million to zero -- I'm not even taking January.
 7        At December, we were already at a hundred
 8   thousand in EBITDA, rounding now.  So that was gone to
 9   the point where the banks come in and start threatening
10   us, and we have to put more money in.  And then to have
11   January be a loser, too.
12        It is so far beyond the subtle
13   difference of -- well, it's a little bit better, a little
14   bit worse.  It's dire at this point.  There's a --
15   EBITDA's gone.  You don't have the cash flow to buy
16   products by December, even.
17        Q. Okay.  Now, you guys are good at your job,
18   right?
19        A. I don't know how to answer that.  I feel I do
20   as good as I can every day.
21        Q. I assume you're pretty good.  You appear to
22   have created a successful -- successful company.
23        Y'all factored in -- I mean, y'all
24   evaluated this and factored in the note payments, and you
25   modeled the expected cash flow, right?
```

Page 251

```
 1        A. We did.
 2        Q. And y'all did that at acquisition?
 3        A. That is true.  We did.
 4        Q. And there were substantial note payments that
 5   you were anticipating paying to Super G?
 6        A. Correct.
 7        Q. So this wasn't, you know, this new encumbrance
 8   or, you know, debt servicing payments.  These weren't
 9   unanticipated.
10        A. The fact that the payments were gonna exist
11   were not unanticipated, correct.
12        Q. And -- okay.  Let me ask you:  ACET Global,
13   what was your role at ACET Global from 2017 to 2019?
14        A. All right.  So that's a span.  So at first when
15   the deal was done, David and Matt were working on the
16   deal.
17        As it started to get into distress -- or
18   the EBITDA was dropping quick and the cash flow problem
19   right out of the gate, he turned it over to me -- or he
20   didn't think that it was a livable or a survivable deal.
21   It was going to have trouble, so he gave it to Matt and I
22   to manage -- or he delegated it to Matt and I.
23        I have a bit more operational background
24   and expertise, and Matt's very -- knew the business as
25   well.  And so my role, under the guise -- or the
```

Page 252

```
 1   delegation of David, from whatever that point was through
 2   to -- through to the end, was under David.
 3        And I guess ultimately, at the end, when I
 4   signed the bankruptcy, I became president at that point.
 5   But that was -- I'm just saying it was under the
 6   direction -- delegation of David prior to that point.
 7        Q. Okay.
 8        A. And also a board member.  So, you know, David
 9   was the president; but also, David and I are both the
10   board members.  And what he and I decide -- the board
11   members elect the operating level.
12        Q. Okay.  What about with respect to ACET
13   Holdco -- Baymark ACET Holdco LLC?
14        A. All right.  You got me.  Erase what I just
15   said, and now apply it to ACET Holdco.  Because I think
16   at ACET Opco down below, all decisions are pushed up to
17   the Holdco level.  So that's what I meant to say, the
18   Holdco level.  I apologize.
19        Q. Got it.
20        A. You got me.
21        Q. What about Baymark ACET Direct Invest LLC?
22        A. ACET Direct Invest is a entity where we collect
23   our limited partners and investors.  It's typical in all
24   our deals and private equity deals to make sure they
25   maintain their limited role.  And so it's really where
```

Page 253

```
 1   the money comes in and then invests in one unit.  So if
 2   we had two investors or 50 investors, consolidate them
 3   all into an investment vehicle, and that's what invests
 4   in.
 5        Q. Okay.  And what about Baymark Partners?
 6        A. Baymark Partners in this deal, the only
 7   connection it had was it had a management agreement to
 8   manage -- or have oversight -- again, back up at ACET
 9   Holdco, that's where the management came in as the board
10   of -- the directors.  Manage it at that level.  Receive a
11   fee for that through the agreement --
12        Q. Okay.
13        A. -- that we accrued.
14        Q. And what about Baymark Partners Management LLC?
15        A. Baymark Partners Management I don't think is
16   connected to ACET Global at all.  I think where that
17   comes in is it's the entity that's associated with the
18   Windspeed -- Bill Szeto -- Trading.
19        Q. Okay.  And Windspeed Trading, any role with
20   that?
21        A. Own the 40 percent equity.  It hasn't changed
22   from what you showed me.  And then also, there was a
23   board seat.
24        Q. Okay.  Who had that board seat?
25        A. I believe that was me.
```

64 (Pages 250 to 253)

## Page 254

1    Q. Okay. Would you be surprised to learn if it
2  was someone else?
3    A. If it was someone else, it might be David.
4    Q. Okay. You think David was the board member?
5    A. I don't know. I'm only saying that because
6  Bill Szeto knew David more than me. I think I've talked
7  to Bill Szeto maybe five times.
8    Q. Okay. In your life?
9    A. Yes.
10   Q. Oh. Okay. But he was David's contact or
11 connection somehow?
12   A. Back in David's old venture capital days, when
13 he would invest in companies and grow them and take them
14 public, he came in touch with Bill Szeto in that world.
15   Q. Okay. What did -- do you know what David did
16 with Windspeed Trading?
17   A. I don't think he did a single thing. I don't
18 think he knows anything much about it at all.
19   Q. But he was a board member?
20   A. I never said that. You asked me if I would be
21 surprised to find someone else is, and I guessed. I
22 don't know if he is. I thought I was.
23   Q. Okay. If you were, what did you do with
24 Windspeed?
25   A. I haven't done -- I think I signed the

## Page 255

1  agreement for the warrants or the Amended Operating
2  Agreement, and I don't -- I haven't done a lot since.
3  It's really Bill Szeto's company to run. Like I said, I
4  don't really have any contact with him.
5    Q. Okay. I mean, have you done any other --
6  anything else to interact with it?
7    A. No.
8        MR. FREEMAN: Folks, I think we're almost
9  at the end. Can I take just a few minutes' break here,
10 gather my thoughts and notes. And I don't think I even
11 need five minutes, and I think we'll be able to wrap up.
12       THE COURT REPORTER: All right. We'll go
13 off the record at 4:30 p.m.
14       (A recess was taken from 4:30 p.m. to
15       4:36 p.m.)
16       THE COURT REPORTER: We're back on the
17 record at 4:36 p.m.
18   Q. (BY MR. FREEMAN) Mr. Ludlow, who is Steven
19 Bellah?
20   A. (Muted.)
21   Q. I couldn't hear.
22   A. Am I allowed to say I messed up on the
23 microphone? Okay. So -- all right. Got it. Try again.
24       Steven Bellah, he is someone who works
25 for -- worked at the time as a representative for Super G

## Page 256

1  lender, at the time. I don't believe he works for them
2  anymore.
3    Q. Okay. Do you know who he works for?
4    A. No, I don't.
5    Q. Has he ever worked for Baymark Partners?
6    A. Never.
7    Q. Or any Baymark Partners entity?
8    A. Nope.
9    Q. Has he ever held a position at Windspeed
10 Trading, possibly a board position but any other
11 position?
12   A. I don't believe so.
13   Q. Have you ever had meetings in person with
14 Steven Bellah?
15   A. I have.
16   Q. When was the last time you had a meeting with
17 Mr. Bellah?
18   A. In person?
19   Q. Yes, sir.
20   A. I do remember -- and this might not be the last
21 one. I do remember taking Steve Bellah, when he came
22 into town, to the company to meet Tomer or to talk to
23 Tomer about -- because at the time we were trying to keep
24 Steve Bellah enthusiastic about the business.
25       So we were taking him there to give him --

## Page 257

1  you know, we kind of turned this thing around, we believe
2  it. When I believed it, I told him was going to bring in
3  Lori Barber and pay for it as well, to turn it around as
4  well. So I know he had a visit. And Matt went -- I
5  think Matt went with me as well during that visit to
6  ACET --
7    Q. Okay.
8    A. -- when Steve Bellah came into town.
9    Q. Was that close to the last time you met with
10 him in person?
11   A. I'll go ahead and say yes. I believe that's
12 probably true.
13   Q. Okay. Do you have calls with Mr. Bellah?
14   A. I don't. I haven't spoken to him in years.
15   Q. Okay. Did Mr. Bellah have any financial
16 interest in Windspeed?
17   A. I don't know. I'm gonna guess from what you
18 showed me, the warrant was not held by him. So other
19 than that, I wouldn't think so.
20   Q. Okay. Oh, sorry.
21   A. Is he on the board? I don't know.
22   Q. I believe he is on the Windspeed board or was
23 the Super G manager.
24   A. If he didn't get replaced when he got fired. I
25 don't know -- or I don't know if he got fired. I

## Page 258

1    shouldn't say that. I don't want to disparage anybody.
2    When he no longer worked for Super G.
3        Q. Did you ever have discussions with Mr. Bellah
4    about Tomer Damti?
5        A. Yes.
6        Q. What did you discuss?
7        A. Well, at first -- I'll just give you timeline.
8    I can't tell you when, but it started off, he's asking me
9    if we believed Tomer had what it took to do it, as he
10    started to become concerned. And at some point, we
11    received the pressure, "What are we gonna do about the
12    performance?"
13        And then by December -- that conversation
14    that I mentioned when we needed them to adjust payments,
15    he was asking me, "I want money from you guys, and I want
16    everybody who's working there to give us a vow of faith
17    and show that they believe in the company by putting up
18    money."
19        I think the money started off, like, 75,000
20    they wanted us to put in, and we got it down to 50. They
21    didn't care, but they wanted Tomer to be a piece of that.
22        So that was discussing Tomer at that time.
23        Q. Okay. Did you ever have discussions with
24    Mr. Bellah about moving assets from ACET Global to
25    Windspeed?

## Page 259

1        A. I don't know about moving assets. If you want
2    to encompass in that foreclosure, regardless of how you
3    do it, that is moving assets, even if they take them from
4    your hands. So maybe we discussed that. Or saying,
5    "Let's do an ABC." I don't know. I don't -- I don't
6    think so.
7        Q. Okay.
8        A. I don't think so.
9        Q. Just a few more questions on -- in preparing
10    for today's deposition, what did you do to prepare for
11    the deposition today?
12        A. Well, being a corporate representative of many
13    entities, I looked at a lot of e-mails. I read a lot of
14    documents that I could get my hands on, looked at the tax
15    records, and I met with my attorney here for a couple
16    hours yesterday.
17        Q. Okay. Did you talk with anyone else?
18        A. Not a person.
19        Q. You reviewed a lot of e-mails?
20        A. I looked at all the ones that we submitted and
21    documents and all the discovery stuff and our responses
22    to it.
23        MR. FREEMAN: Okay. I believe I'm done. I
24    don't have any more questions. So I will pass the
25    witness.

## Page 260

1        EXAMINATION
2    BY MR. PERRIN:
3        Q. Mr. Ludlow, a couple of times today,
4    Mr. Freeman has asked you some questions about an
5    utterance of yours that was heard during Mr. Denegre's
6    April 8th, 2021, deposition. Do you recall that?
7        A. I do.
8        Q. I want to ask you a couple more questions on
9    that.
10        Number one, how were you participating in
11    that deposition?
12        A. I was on vacation in Colorado and had my laptop
13    open on my dining room table.
14        Q. Did you ever have your video on during the
15    deposition?
16        A. No. No video.
17        Q. So why didn't you have your video on?
18        A. I was attempting to be a silent participant.
19        Q. Did you -- so without your video on, could
20    anyone see your face? your expressions? your reactions of
21    any kind?
22        A. No, I don't believe so. I don't think my
23    camera was ever on.
24        Q. Similarly, did you intend to have your audio
25    turned off?

## Page 261

1        A. I did.
2        Q. Now, when you made the statement that we've
3    been discussing, did you think anyone would hear it?
4        A. No. I was sure no one would hear it. I mean,
5    at the time it was just an excited utterance like when
6    you're watching a football game.
7        Q. Did you intend for anyone to hear?
8        A. No, absolutely not.
9        Q. How did you feel when you realized your mic was
10    on?
11        A. Well, it was a way -- it was a shock because
12    I'd just stepped up and I was stepping into the kitchen.
13    And when I made that comment, it was -- I could hear it
14    was silent behind me. And then somebody said, "What was
15    that?" or something. I went back and I started -- it was
16    shock. It was horror, and then it was embarrassment that
17    I realized my mic was on. And after a second of talking,
18    I think I actually said, "My mic is on."
19        And someone said, "Who is that?"
20        And I claimed it, and I said, "My mic was
21    on."
22        Q. Mr. Ludlow, were you trying to instruct or
23    influence anyone, including Mr. Denegre, in making that
24    statement?
25        A. I wasn't. It wasn't intended for anyone.

66 (Pages 258 to 261)

## Page 262

1    MR. PERRIN:  We reserve further questions
2  until time of trial.
3         THE COURT REPORTER:  All right.  May we go
4  off the record, everyone?
5
6         (Following discussion was had off the
7          written record.)
8         THE COURT REPORTER:  Mr. Perrin, would you
9  like the witness to read and sign?
10        MR. PERRIN:  Yes, ma'am.
11        THE COURT REPORTER:  And would you like a
12  copy?
13        MR. PERRIN:  Yes, ma'am.
14        THE COURT REPORTER:  Thank you.
15        And, Mr. Freeman, would you like regular
16  deliver or expedited delivery?
17        MR. FREEMAN:  Regular delivery is fine.
18        THE COURT REPORTER:  And would you like a
19  rough draft?
20        MR. FREEMAN:  Rough draft is great.  By
21  Monday is fine.
22        THE COURT REPORTER:  Mr. Perrin, would you
23  like a rough draft?
24        MR. PERRIN:  I never got a rough draft
25  before.  What's entailed in that with you?

## Page 263

1         THE COURT REPORTER:  I would be happy to
2  have the office get back to you with a quote and you can
3  decide.
4         MR. PERRIN:  That would be fine.
5         THE COURT REPORTER:  Will do.
6         Thank you, everyone.  Have a great rest of
7  the day.
8
9         (Remote deposition concluded at 4:44 p.m.,
10         April 15, 2021.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 264

1         CHANGES AND SIGNATURE
2  WITNESS NAME:  ANTHONY LUDLOW
3  DATE:  APRIL 15, 2021
4  PAGE/LINE   CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 265

1         I, ANTHONY LUDLOW, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5         _____
6             ANTHONY LUDLOW
7
   THE STATE OF _____)
8
   COUNTY OF _____)
9
10        Before me, _____, on this day
11 personally appeared ANTHONY LUDLOW, known to me (or
12 proved to me under oath or through
13 _____) (description of identity
14 card or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18     Given under my hand and seal of office this
19 _____ day of _____, 2021.
20
21
22
23        _____
24        NOTARY PUBLIC IN AND FOR
25        THE STATE OF _____

Page 266

```
 1              CAUSE NO. DC-19-09828
 2  D&T PARTNERS, LLC (successor  §  IN THE DISTRICT COURT
    in interest to ACET VENTURE   §
 3  PARTNERS, LLC.),              §
                                  §
 4        Plaintiff,              §
                                  §
 5  vs.                           §
                                  §
 6  ACET GLOBAL, LLC; BAYMARK     §  DALLAS COUNTY, TEXAS
    ACET HOLDCO, LLC; BAYMARK     §
 7  ACET DIRECT INVEST, LLC;      §
    BAYMARK MANAGEMENT, LLC;      §
 8  BAYMARK PARTNERS; DAVID       §
    HOOK; TONY LUDLOW; and        §
 9  WINDSPEED TRADING, LLC,       §
                                  §
10        Defendants.    §  116th JUDICIAL DISTRICT
11
12
13  **********************************************
14      REMOTE VIDEOCONFERENCED DEPOSITION OF
15                ANTHONY LUDLOW
16                 APRIL 15, 2021
17  **********************************************
18
19
20          CERTIFIED STENOGRAPHIC
21          COURT REPORTER'S CERTIFICATE
22
23      I, Karen L. D. Schoeve, Certified Shorthand
24  Reporter, in and for the State of Texas, hereby certify
25  to the following:
```

Page 268

```
 1  FOR DEFENDANTS BAYMARK ENTITIES, DAVID HOOK and TONY
    LUDLOW:
 2
        MR. EDWARD PERRIN, ESQUIRE
 3      HALLETT & PERRIN
        1445 Ross Avenue, Suite 2400
 4      Dallas, Texas 75202
        T: 214.953.0053
 5      eperrin@hallettperrin.com
 6
    FOR DEFENDANT WINDSPEED TRADING, LLC:
 7
        MS. BRENDA HARD-WILSON, ESQUIRE
 8      MR. TIMOTHY WOODS, ESQUIRE
        HIGIER ALLEN
 9      2711 North Haskell Avenue, Suite 2400
        Dallas, Texas 75204
10      T: 972.371.2481
        bhard-wilson@higierallen.com
11      twoods@higierallen.com
12
13
14      I further certify that I am neither counsel
15  for, related to, nor employed by any of the parties or
16  attorneys in the action in which this proceeding was
17  taken, and further that I am not financially or otherwise
18  interested in the outcome of the action.
19
20      Further certification requirements pursuant to
21  Rule 203 of TRCP will be certified to after they have
22  occurred.
23
24
25
```

Page 267

```
 1      That the witness, Anthony Ludlow, was remotely
 2  duly sworn by the officer and that the transcript of the
 3  oral deposition is a true record of the testimony given
 4  by the witness;
 5      That the deposition transcript was submitted on
 6  _____ to the witness or to the attorney
 7  for the witness for examination, signature and return to
 8  me by _____;
 9      That the amount of time used by each party at
10  the deposition is as follows:
11
12  JASON B. FREEMAN  - 05 HOUR(S):32 MINUTE(S)
        For the Plaintiff
13
    EDWARD PERRIN    - 00 HOUR(S):02 MINUTE(S)
14      For Defendants BAYMARK ENTITIES, DAVID HOOK and
        TONY LUDLOW
15
    BRENDA HARD-WILSON- 00 HOUR(S):00 MINUTE(S)
16      For Defendant WINDSPEED TRADING, LLC
17
18      That pursuant to information given to the
19  deposition officer at the time said testimony was taken,
20  the following includes counsel for all parties of record:
21  FOR THE PLAINTIFF:
22      JASON B. FREEMAN, ESQUIRE
        FREEMAN LAW, PLLC
23      7011 Main Street
        Frisco, Texas 75034
24      T: 214.984.3410
        F: 214.984.3409
25      jason@freemanlaw.com
```

Page 269

```
 1      Certified to by me this 25th day of April,
 2  2021.
 3
 4
 5  _____
 6  Karen L.D. Schoeve, CSR, RDR, CRR
    Realtime Systems Administrator
    Texas CSR No. 3354, Exp.: 10-31-2021
 7  NCRA Exp. Date: 09-30-21
    Usher Reporting Services
 8  Firm Registration 10278
    1326 Lochness Drive
 9  Allen, Texas 75013
    214-755-1612
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

68 (Pages 266 to 269)

Anthony Ludlow  *  May 15, 2021

Page 270

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2       The original deposition was/was not returned to the
 3   deposition officer on _____;
 4       If returned, the attached Changes and Signature page
 5   contains any changes and the reasons therefor;
 6       If returned, the original deposition was delivered
 7   to JASON B. FREEMAN, custodial attorney;
 8       That $_____ is the deposition officer's charges
 9   to the Plaintiff for preparing the original deposition
10   transcript and any copies of exhibits;
11       That the deposition was delivered in accordance with
12   Rule 203.3, and that a copy of this certificate was
13   served on all parties shown herein on and filed with the
14   Clerk.
15       Certified to by me this _____ day of
16   _____, 2021.
17
18
19
20   _____
     Karen L.D. Schoeve, CSR, RDR, CRR
21   Realtime Systems Administrator
     Texas CSR No. 3354, Exp.: 10-31-2021
22   NCRA Exp. Date:  09-30-21
     Usher Reporting Services
23   Firm Registration 10278
     1326 Lochness Drive
24   Allen, Texas 75013
     214-755-1612
25
```

Usher Reporting Services
(214) 755-1612