PLAINTIFF'S
EXHIBIT

7

Page 1

CAUSE NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC ) | IN THE DISTRICT COURT |
| (successor in interest to ) | |
| ACET VENTURE PARTNERS, ) | |
| LLC), ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | DALLAS COUNTY, TEXAS |
| ) | |
| ACET GLOBAL, LLC; BAYMARK ) | |
| ACET HOLDCO, LLC; BAYMARK ) | |
| ACET DIRECT INVEST, LLC; ) | |
| BAYMARK MANAGEMENT, LLC; ) | |
| BAYMARK PARTNERS; DAVID ) | |
| HOOK; TONY LUDLOW; and ) | |
| WINDSPEED TRADING, LLC, ) | |
| ) | |
| ) | |
| Defendants. | 116TH JUDICIAL DISTRICT |

-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

DAVID HOOK

April 12, 2021

-----------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

DAVID HOOK, produced as a witness at the instance of the

PLAINTIFF, and duly sworn, was taken in the above-styled

and numbered cause on April 12, 2021, from 1:04 p.m. to

5:34 p.m., via videoconference, before Wendy Golding,

CSR in and for the State of Texas, reported by machine

shorthand, pursuant to the Current Emergency Order

Regarding the COVID-19 State of Disaster.

Page 2

```
 1               A P P E A R A N C E S
              (All parties appearing remotely)
 2

 3   FOR THE PLAINTIFF:

 4       JASON B. FREEMAN
         ZACH MONTGOMERY
 5       Freeman Law, PLLC
         7011 Main Street
 6       Frisco, Texas 75034
         214-984-3410
 7       jason@freemanlaw.com
         zmontgomery@freemanlaw.com
 8

 9

     FOR THE DEFENDANTS BAYMARK ENTITIES:
10
         EDWARD PERRIN
11       Hallett & Perrin
         1445 Ross Avenue, Suite 2400
12       Dallas, Texas 75202
         214-953-0053
13       eperrin@hallettperrin.com

14
     FOR THE DEFENDANT WINDSPEED TRADING, LLC:
15
         BRENDA HARD-WILSON
16       TIM WOODS
         Higier Allen
17       2711 North Haskell Avenue
         Suite 2400
18       Dallas, Texas 75204
         972-371-2481
19       Bhard-wilson@higierallen.com
         Twoods@higierallen.com
20
21   ALSO PRESENT:
         Tomer Damti
22       Anthony Ludlow

23

24

25
```

Page 3

1                          INDEX

2                                        PAGE

3  Appearances.................................. 2

4

5  DAVID HOOK

6       EXAMINATION BY MR. FREEMAN.............. 7

7

8  Signature and Changes........................ 169

9  Reporter's Certificate....................... 171

10

11                   EXHIBITS        MARKED/IDENTIFIED

12  1    Bankruptcy Form 201..................... 19

13  2    Email dated October 19, 2018 from

14  William Szeto to Matt Denegre............... 82

15  3    Email dated January 21, 2019 from

16  William Szeto to Matt Denegre............... 99

17  4    Email dated January 24, 2019 from

18  William Szeto to Matt Denegre............... 100

19  5    Email dated February 28, 2019 from

20  William Szeto to Matt Denegre............... 106

21  6    Email dated March 20, 2019 from

22  Matt Denegre to Tomer Damti................. 110

23  8    Email dated December 19, 2018 from

24  William Szeto to Matt Denegre............... 115

25  9    Email dated January 2, 2019 from

Page 4

1    William Szeto to Matt Denegre................    127

2    10    Email dated January 29, 2019 from

3    Matt Denegre to Alex Godinez................    129

4    13    Email dated September 10, 2018 from

5    Matt Denegre to Tony Ludlow................    138

6    14    Email dated January 7, 2019 from

7    William Szeto to Matt Denegre................    145

8    25    Email dated October 16, 2018 from

9    Matt Denegre to Steve Bellah................    121

10   26    Email dated March 24, 2017 from

11   Matt Denegre to David Hook................    152

12   34    Email dated December 13, 2017 from

13   David Hook to Tony Ludlow................    26

14   36    Email dated October 16, 2019 from

15   Matt Denegre to Tony Ludlow................    22

16   44    Letter from Howard dated March 18, 2019

17   to David Hook................    153

18   45    Letter and return from Howard to

19   David Hook................    160

20   46    Email dated March 15, 2018 from

21   Tony Ludlow to David Hook................    30

22   47    Email dated October 31, 2018 from

23   Matt Denegre to Steve Bellah................    64

24   48    Forbearance Agreement................    58

25   51    Email dated April 11, 2018 from

Page 5

1    David Hook to Matt Denegre................    62

2    54    Amended and Restated Agreement........    90

3    55    Form 8879-PE.........................    154

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                  P R O C E E D I N G S

2                       DAVID HOOK,

3   having been first duly sworn, testified as follows:

4                  THE REPORTER:  Pursuant to the Current

5   Emergency Order regarding the COVID-19 State of

6   Disaster, this deposition of David Hook is being

7   conducted remotely via Zoom.  Today's date is April 12,

8   2021; and the time is 1:04 p.m.

9                  My name is Wendy Golding, Texas CSR No.

10  1942.  I have administered the oath and am reporting the

11  deposition remotely by stenographic means from my

12  residence within the State of Texas.  The witness has

13  represented to me under oath that he is David Hook.

14                 Would Counsel please state their

15  appearances and any agreements for the record.

16                 MR. FREEMAN:  This is Jason Freeman on

17  behalf of plaintiff.

18                 MR. PERRIN:  Ed Perrin on behalf of the --

19  all defendants, with the exception of Windspeed Trading,

20  Limited.  And I also represent the witness today, David

21  Hook.

22                 MS. HARD-WILSON:  And Brenda Hard-Wilson

23  for defendant Windspeed Trading, LLC.

24                 MR. FREEMAN:  First of all, I guess a

25  couple of matters and then -- and then the agreement.  I

David Hook  *  April 12, 2021

Page 7

1    think I need to get access to record.  And I believe you

2    can grant it to me.

3                  THE REPORTER:  Can we go off the record one

4    second, Counsel?

5                  MR. FREEMAN:  Yes.

6                        (OFF THE RECORD)

7                  MR. FREEMAN:  There were -- also, there's a

8    -- a running agreement among counsel that any objections

9    by any of the defendant counsel will also constitute an

10   objection by the other defendants.  Any other agreements

11   or issues?

12                 MS. HARD-WILSON:  No.  Thank you.

13                       EXAMINATION

14       Q.  (By Mr. Freeman)  Mr. Ludlow, could you state

15   your full name for the record.

16       A.  My name is David Hook.

17       Q.  Sorry, Mr. Hook.

18                 My name is Jason Freeman.  I represent D&T

19   Partners, LLC, as successor in interest to ACET Venture

20   Partners, LLC.

21                 Do you understand that I'm -- we're here

22   today in connection with the lawsuit between D&T

23   Partners; ACET Global, LLC; Baymark ACET Holdco, LLC;

24   Baymark ACET Direct Invest, LLC; Baymark Management,

25   LLC; Baymark Partners; David Hook; Tony Ludlow; and

David Hook  *  April 12, 2021

Page 8

1    Windspeed Trading, LLC?

2         A.  Yes.  I'm not sure about all of those entities.

3    But, yes, I know the reason why I'm here.

4         Q.  Okay.  Mr. Hook, have you ever given a

5    deposition before?

6         A.  I have not.

7         Q.  Okay.  Have you ever been in a -- involved in a

8    lawsuit before?

9         A.  I -- no.

10        Q.  No?

11             Have any of your companies been involved in

12   a lawsuit that you had to assist with in any way?

13        A.  No.

14        Q.  No?

15             Were -- were you not involved in a lawsuit

16   in -- in federal court, previously?

17        A.  Not that I recall.

18        Q.  Okay.  Do you understand that you're here today

19   under oath?

20        A.  Yes.

21        Q.  And -- and what does that mean to you?

22        A.  That I'm going to tell the truth.

23        Q.  Okay.  And you understand it's a crime to lie

24   under oath?

25        A.  Yes.

David Hook  *  April 12, 2021

Page 9

1     Q.  Okay.  Mr. Hook, when I ask a question -- these

2   are just some of the ground rules -- if you will, try to

3   let me complete it before you give an answer, just so

4   that we can make it as easy as possible on the court

5   reporter.

6     A.  Okay.

7     Q.  Also, whenever you give an answer, if you will,

8   please give a -- a verbal response so that she can --

9   she can make sure and memorialize the record.

10     A.  Okay.

11     Q.  If I ask a question that you don't understand,

12   please just let me know and -- and I'll rephrase it or

13   -- or try to ask it in a better way.

14     A.  Okay.

15     Q.  And with that, you know, I just ask:  Is it --

16   is it fair to say that if you don't tell me that you

17   don't understand a question, I can assume that you

18   understand it?

19     A.  Yes.

20     Q.  Okay.  And if at any time you need to take a

21   break and use the rest room, grab a drink, whatever,

22   just let me know.  No problem.  I will probably just ask

23   that if there's, you know, there's a question or a

24   certain line of questions that's being asked, I'll --

25   I'll just ask you to respond to those and then we can

David Hook   *   April 12, 2021

Page 10

1      take a break whenever you need.

2          A.   Okay.

3          Q.   Mr. Hook, during Matt Denegre's deposition,

4      Tony Ludlow instructed Mr. Denegre to "shut the fuck

5      up."  Are you aware of this?

6          A.   No.

7               MR. PERRIN:  Objection, form.

8          Q.   (By Mr. Freeman)  Have you discussed Matt

9      Denegre's deposition with anyone?

10         A.   No.

11         Q.   And you weren't aware of Mr. Ludlow's

12     statements during the deposition?

13         A.   No.

14         Q.   Assuming that -- that he had instructed Mr.

15     Denegre to -- to shut up, and specifically with the --

16     the language "shut the fuck up," do you -- would you

17     approve of that instruction?

18              MR. PERRIN:  Objection, form.

19         A.   Would you repeat the question?

20         Q.   (By Mr. Freeman)  Yes.  Would you approve of

21     that instruction?

22              MR. PERRIN:  Objection, form.

23              THE WITNESS:  Do I answer the question?

24              MR. PERRIN:  If you can.

25         A.   I'm sorry.  Will you ask the question one more

David Hook  *  April 12, 2021

Page 11

1  time?

2      Q.  (By Mr. Freeman)  Yes, sir.

3           Would -- do you approve of Mr. Ludlow's

4  instruction to Mr. Denegre during his deposition?

5           MR. PERRIN:  Objection, form.

6      A.  I -- I don't know.

7      Q.  (By Mr. Freeman)  You don't have an opinion on

8  whether it was appropriate to make the statement "shut

9  the fuck up"?

10     A.  No, I don't know the other circumstances in the

11  conversation.

12     Q.  Okay.  So you don't have an opinion on whether

13  it was appropriate for Mr. Ludlow to instruct Mr.

14  Denegre to shut up during his deposition?

15          MR. PERRIN:  Objection, form.

16     A.  No.

17     Q.  (By Mr. Freeman)  No?

18          MR. PERRIN:  Just pause a second.  Give me

19  -- if I need to make an objection, let me make it.

20          THE WITNESS:  Okay.

21          MR. PERRIN:  The court reporter is good;

22  she can't get us both talking at the same time.

23          THE WITNESS:  Okay.

24     Q.  (By Mr. Freeman)  Do you know what Mr. Ludlow

25  meant by that instruction?

David Hook  *  April 12, 2021

Page 12

1          MR. PERRIN:  Objection, form.

2     A.  I don't.

3     Q.  (By Mr. Freeman)  Does Mr. Denegre have a good

4  memory?

5     A.  I don't know.

6     Q.  Does he have -- frequently have difficulty

7  recalling events?

8     A.  I -- I don't know.

9     Q.  Okay.  Is he a pretty sharp guy?

10    A.  Yes.

11    Q.  Okay.  Is he generally honest?

12    A.  He is to me.

13    Q.  And what do you mean by that?

14         MR. PERRIN:  Objection, form.

15    A.  I don't know if he's honest to other people

16  because I'm not there.

17    Q.  (By Mr. Freeman)  Okay.  Do you believe him to

18  be honest to other people?

19         MR. PERRIN:  Objection, form.

20    A.  Yes.

21    Q.  (By Mr. Freeman)  Have you ever had any reason

22  to believe that he was not honest?

23    A.  No.

24    Q.  And did you discuss Mr. Denegre's deposition

25  with him?

David Hook  *  April 12, 2021

Page 13

1      A.  No.

2      Q.  Did you discuss it prior to his deposition?

3      A.  No.

4      Q.  Never?

5      A.  No.

6      Q.  Mr. Hook, why did Super G Capital fore --

7  foreclose on ACET Global's assets?

8      A.  I don't know.

9      Q.  What did you believe to be the legal

10  significance of that event?

11              MR. PERRIN:  Objection, form.

12      A.  I -- I don't know.

13      Q.  (By Mr. Freeman)  What was your involvement in

14  that process?

15      A.  Which process?

16      Q.  The foreclosure process.

17      A.  None.

18      Q.  Did you even know it occurred?

19      A.  No.

20      Q.  When did you first learn that it had occurred?

21      A.  I have no idea.

22      Q.  Okay.  Did Baymark Partners have any

23  involvement in that foreclosure process?

24              MR. PERRIN:  Objection, form.

25      A.  I don't know.

David Hook  *  April 12, 2021

Page 14

1       Q.  (By Mr. Freeman)  Okay.  Why don't you know?

2                   MR. PERRIN:  Objection, form.

3       A.  I don't know.

4       Q.  (By Mr. Freeman)  You signed ACET Holdco's tax

5  returns; correct?

6       A.  I don't know.

7       Q.  Okay.  Go ahead and put on the screen what's

8  marked as Exhibit 44.  Do you see this, sir?

9                   MR. PERRIN:  Jason, again, the screen is

10  far away.  I'm pulling it up on my computer in front of

11  him right here.

12      Q.  (By Mr. Freeman)  Are you able to see this,

13  sir?

14      A.  Yes, I see the first page, uh-huh.

15      Q.  Okay.  And do you recognize that -- that

16  letter?

17      A.  I -- I see the letter.  I don't know what you

18  mean by "recognize."

19      Q.  Okay.  Does that appear to be a letter from

20  your accounting firm to you?

21      A.  Yes, it does.

22      Q.  And does it appear to be dated March 18, 2019?

23      A.  Yes.

24      Q.  And do you have any reason to believe that it

25  is not what it purports to be?

David Hook  *  April 12, 2021

Page 15

1      A.  No.

2      Q.  Okay.  Does it appear to attach a federal tax

3  return?

4      A.  Yes.

5      Q.  Okay.  And did you sign this tax return when it

6  was filed?

7           MR. PERRIN:  Any place you want him to

8  look, Jason, or --

9           MR. FREEMAN:  No.  I just -- here's -- this

10  may be helpful.  So, what's on the screen -- your screen

11  is not going to sync up to mine, is it?

12           MR. PERRIN:  No.

13      Q.  (By Mr. Freeman)  Okay.  So, the third page of

14  the actual 1065.

15      A.  Yes.

16      Q.  Do you see your name listed there, sir?

17      A.  Yes.

18      Q.  Okay.  And did you -- did you execute this tax

19  return?

20      A.  I don't remember.

21      Q.  Okay.  Is this, in fact, the federal tax return

22  for Baymark ACET Holdco, LLC?

23      A.  No.

24      Q.  No?

25      A.  No.  It says Baymark ACET Direct Invest, LLC.

David Hook  *  April 12, 2021

Page 16

1      Q.  Exhibit -- are we looking at the same exhibit

2  here?

3      A.  Let's see here.

4      Q.  Exhibit 44?

5           MR. PERRIN:  We are on the page you last

6  directed him to, Page 3 of the return.

7      Q.  (By Mr. Freeman)  Okay.  Can you -- can you see

8  my screen at all?

9      A.  I can see your screen, but I can't read

10  anything from here.

11      Q.  Okay.  The first page of the form 1065 is the

12  eighth page of the PDF document.  Are we on that?

13           MR. PERRIN:  We will be in a second.

14           MR. FREEMAN:  Okay.

15           MR. PERRIN:  We are there.

16           MR. FREEMAN:  Okay.

17      Q.  (By Mr. Freeman)  Sir, do you -- do you see

18  that this is a tax return for Baymark ACET Holdco, LLC?

19      A.  Yes.

20      Q.  Is this a form 1065?

21      A.  Yes.

22      Q.  Okay.  And did you sign this document on behalf

23  of Baymark ACET Holdco, LLC?

24      A.  I don't remember.

25      Q.  Okay.  If you will scroll down two more pages,

David Hook  *  April 12, 2021

Page 17

1    the tenth page of the PDF, you'll see that your name is

2    listed there; is that correct?

3        A.   Yes.

4        Q.   Okay.  Does that help you remember?

5        A.   I don't remember signing this document.

6        Q.   Okay.  Would we need to speak with the

7    accountants to determine whether you signed this

8    document?

9             MR. PERRIN:  Objection, form.

10       A.   That -- that's up to you.

11       Q.   (By Mr. Freeman)  Okay.  I'm -- I'm asking it.

12   Would anyone else know?

13       A.   I -- I assume this firm would know, uh-huh.

14       Q.   Okay.  Did you review this document prior to it

15   being filed?

16       A.   I -- I don't remember.

17       Q.   Okay.  Did you ever ask Tony Ludlow to review a

18   return before it was filed?

19       A.   I don't remember.

20       Q.   Okay.  Did you ever ask Matthew Denegre to

21   review a return before it was filed?

22       A.   I don't remember.

23       Q.   Okay.  Mr. Hook, is there -- have you suffered

24   any -- any injuries in recent years, anything that might

25   affect your -- your recollection or memory?

David Hook  *  April 12, 2021

Page 18

1      A.  Not that I'm aware of.

2      Q.  No?

3              Are you on any medications today?

4      A.  Yes.

5      Q.  What medications are you on?

6      A.  A blood pressure medication and an allergy

7  medication.

8      Q.  Are you on any other medications that might

9  impact your cognitive abilities?

10     A.  Not that I'm aware of.

11     Q.  Okay.  Are you under the influence of any

12  drugs?

13     A.  No.

14     Q.  Okay.  Any other reason to believe that your

15  memory may be inhibited in any way today?

16     A.  No.

17     Q.  Okay.  Were you the president of ACET Global?

18     A.  I don't remember.

19     Q.  You don't remember if you ever served as the

20  president of ACET Global?

21     A.  No.

22     Q.  Okay.  Do you know how many presidents ACET

23  Global had?

24     A.  No.

25     Q.  Do you remember whether ACET Global ever filed

David Hook  *  April 12, 2021

Page 19

1    for bankruptcy?

2         A.  No.

3         Q.  You don't?

4         A.  No.

5         Q.  Would seeing a copy of the bankruptcy petition

6    help you remember that?

7         A.  I don't remember it.  If you show me it, I can

8    look at it.  But I won't remember it.

9         Q.  Okay.  I will place on the screen what's marked

10   as Exhibit 1.  Take a minute to look at that, Mr. Hook.

11             Do you remember ACET Global filing for

12   bankruptcy?

13        A.  No.

14        Q.  Was all of that handled by Mr. Ludlow?

15        A.  I don't know what you mean by "all of that."

16        Q.  Was the bankruptcy process handled by Mr.

17   Ludlow?

18        A.  I didn't know that there was one.

19        Q.  Okay.  Were you aware that the bankruptcy

20   petition for ACET Global, LLC listed a debt to ACET

21   Venture Partners of $3.23 million?

22        A.  No.

23        Q.  Okay.  Do you know who prepared the bankruptcy

24   documents?

25        A.  No.

David Hook  *  April 12, 2021

Page 20

1      Q.  Okay.  Sir, if you will see -- look to what's

2   on your screen.  It's the fifth page of Exhibit 1.  Do

3   you recognize that signature?

4      A.  No.

5      Q.  No?

6              Does that purport to be the signature of

7   Anthony Ludlow?

8      A.  That doesn't look like Tony's regular

9   signature.

10     Q.  Do you have any reason to believe that might be

11  forged?

12             MR. PERRIN:  Objection, form.

13     A.  No.

14     Q.  (By Mr. Freeman)  Okay.  If you will, look at

15  the fourth page of Exhibit 1.  Do you see there under --

16  under Item No. 17, there's a signature, purports to be

17  the signature of Anthony Ludlow.  Do you see that, sir?

18     A.  Yes.

19     Q.  Does that appear to be Mr. Ludlow's signature?

20     A.  No.

21     Q.  No?

22             Do you have any reason to believe that this

23  signature may have been forged?

24             MR. PERRIN:  Objection, form.

25     A.  No.

David Hook   *   April 12, 2021

Page 21

1      Q.   (By Mr. Freeman)   Why does this signature not

2    appear to be that of Mr. Ludlow?

3      A.   It doesn't look like his normal signature.

4      Q.   In what way does it appear different from his

5    normal signature?

6              MR. PERRIN:   Objection, form.

7      A.   Can you ask me the question a different way?

8      Q.   (By Mr. Freeman)   Yeah.

9              How does Mr. Ludlow's normal signature look

10   different from the one reflected here?

11             MR. PERRIN:   Objection, form.

12     A.   I'm not sure how to answer the question.   I

13   guess the "A" doesn't look the same.

14     Q.   (By Mr. Freeman)   Okay.   How does the "A" look

15   on his normal signature?

16     A.   Different than this one.

17     Q.   Okay.   And how does it look different?

18             MR. PERRIN:   Objection, form.

19             MR. FREEMAN:   Basis?

20             MR. PERRIN:   Asked over and over again.

21   He's told you it doesn't look like it, and you've asked

22   this six different ways.   Argumentative.

23             MR. FREEMAN:   I haven't gotten an answer

24   once.

25     Q.   (By Mr. Freeman)   All right.   How does it look

David Hook   *   April 12, 2021

Page 22

1   different?

2       A.  This "A" is larger than his right -- than his

3   other "A."

4       Q.  Okay.  Any other way?

5       A.  Well, there's a circle that goes into the --

6   where the president is, that doesn't seem his normal

7   way.

8       Q.  Okay.  Anything else?

9       A.  Well, those are the two things that I would

10  recognize.  I'm not sure I would recognize anything

11  else.

12      Q.  Okay.  Has Mr. Ludlow ever told you that he did

13  not sign the bankruptcy petition that was filed for ACET

14  Global?

15      A.  No.

16      Q.  Have you ever had any discussion with him about

17  ACET Global's bankruptcy?

18      A.  No.

19      Q.  Okay.  Did you ever discuss with anyone ACET

20  Global's bankruptcy?

21      A.  No.

22      Q.  Have you ever discussed the possibility that

23  ACET Global might go into bankruptcy?

24      A.  I don't recall.

25      Q.  Okay.  Show you what's marked as Exhibit 36.

David Hook  *  April 12, 2021

Page 23

1    Take a look, sir.  Appears to be an email between

2    Matthew Denegre and -- and Tony Ludlow containing a

3    number of bankruptcy-related documents.

4                   MR. PERRIN:  We just got it.  We just got

5    it up just now.  There we go.  All right.  36 is up.

6                   MR. FREEMAN:  Okay.

7         Q.  (By Mr. Freeman)  Mr. Hook, this appears to be

8    an email between Matthew Denegre and Tony Ludlow

9    exchanging a number of bankruptcy documents; is that

10   correct?

11        A.  That's what it says.

12        Q.  Okay.  And does that also appear to be what

13   this is?

14        A.  I guess.  I don't -- I don't know.  I didn't

15   know.

16        Q.  Do you find that things are often not what they

17   say they are?

18                   MR. PERRIN:  Objection, form.

19        A.  I don't have a comment on that question.

20        Q.  (By Mr. Freeman)  Okay.  Does this appear to be

21   an email exchanging a number of bankruptcy documents?

22        A.  Yes, it says, "Attached are the bankruptcy

23   documents."  That's what that says.

24        Q.  Great.  Is there a reason that you were not on

25   any of this bankruptcy correspondence?

David Hook   *   April 12, 2021

Page 24

1      A.  You'll have to ask them.

2      Q.  Okay.  You think that's something that Matthew

3  Denegre would remember?

4      A.  I have no idea.

5      Q.  Okay.  Did Baymark Partners coordinate the

6  bankruptcy filings with -- with its counsel?

7          MR. PERRIN:  Objection, form.

8      A.  Like I said multiple times, I wasn't aware of a

9  bankruptcy.

10     Q.  (By Mr. Freeman)  Okay.  Did you ever discuss

11  the possibility of ACET Global going into bankruptcy?

12     A.  I -- I don't recall any.

13     Q.  Okay.  Is that something you think you would

14  recall or --

15          MR. PERRIN:  Objection, form.

16     A.  I'm not sure how to answer that question.

17     Q.  (By Mr. Freeman)  Okay.  Have you ever

18  suggested that ACET Global should go into bankruptcy?

19     A.  I don't recall saying that.

20     Q.  Okay.  Did you have discussions about ACET

21  Global potentially being put into bankruptcy, back in

22  2017?

23     A.  I -- I don't recall any.

24     Q.  Okay.  Do you think -- have you ever used the

25  threat of bankruptcy as leverage against a creditor?

David Hook  *  April 12, 2021

Page 25

1      A.  I do not believe I have in almost 40 years of

2  being involved in companies.

3      Q.  Do you think that would be wrong, or you've

4  just never done it?

5      A.  I think it would be -- will you repeat the

6  question, please?

7      Q.  Yeah.

8          Do you think it would be wrong to use the

9  threat of bankruptcy against a creditor?

10      A.  It depends on the circumstance.

11      Q.  And can you explain what you mean by that?

12      A.  Well, I -- I'd have to have what the

13  circumstance is.

14      Q.  Okay.  Let's say a creditor is owed money by a

15  company.  Do you think it is okay for that company's

16  directors to threaten bankruptcy?

17          MR. PERRIN:  Objection, form.

18      A.  In almost all cases I would say that...

19      Q.  (By Mr. Freeman)  In almost all cases you would

20  say that.  That is your answer or --

21      A.  We have no interest in -- in doing any kind of

22  acts like that.

23      Q.  Okay.  So --

24      A.  But I don't -- I don't know all of the

25  different circumstances.  But we are not in business to

David Hook  *  April 12, 2021

Page 26

1   do that to anybody.

2        Q.  Do you think it would generally be wrong to

3   threaten bankruptcy to a creditor unless they -- they

4   reduce the payments that they're entitled to?

5             MR. PERRIN:  Objection, form.

6        A.  I don't know.  It depends on the circumstance.

7        Q.  (By Mr. Freeman)  Okay.  But you don't recall

8   ever having discussions about -- about ACET Global being

9   put into bankruptcy?

10       A.  No.

11       Q.  At any point?

12       A.  No.

13       Q.  Sir, if you will, I'm putting up what's Exhibit

14   34.  It's marked as Exhibit 34.  Do you see this, sir?

15       A.  Uh-huh.

16       Q.  And this is an email exchange between you and

17   Tony Ludlow?

18       A.  Yes, it is.

19       Q.  And is it an email exchange in December of

20   2017?

21       A.  December '17, yes.

22       Q.  Okay.  And if you'll go down to the email from

23   you, at the bottom of the first page, on December 13,

24   2017 from -- from David Hook, it says

25   DHook@BaymarkPartners.com.  Is that your email address?

Page 27

1              MR. PERRIN:  Where are you, Jason?  You

2  lost me.

3              MR. FREEMAN:  Bottom of Page 30 -- bottom

4  of Page 1 of Exhibit 34.

5              MR. PERRIN:  Okay.

6      Q.  (By Mr. Freeman)  Okay.  And there on the

7  second line of that, you said "what about bankruptcy for

8  ACET?"

9      A.  Yes.

10     Q.  Do you see that?  Is that a correct reading of

11  your email?

12     A.  Yes.

13     Q.  Okay.  And what did you mean by that?

14     A.  I don't recall.

15     Q.  Okay.  And you don't recall having any

16  discussions at all about the possibility of ACET Global

17  going into bankruptcy?

18     A.  No.

19     Q.  Okay.  You don't recall having any of those

20  discussions with Tony Ludlow; correct?

21     A.  No.

22     Q.  Okay.  Do you recall Mr. Ludlow's response in

23  which he said it may be an option if Super G doesn't

24  agree to reduce payments?

25     A.  That's what it says, uh-huh.

David Hook  *  April 12, 2021

Page 28

1     Q.  Okay.  But you don't know what this is about?

2     A.  Well, it must not have been a very deep

3  discussion because I answered "agreed."  So, it --

4     Q.  All right.

5     A.  -- seems to me to be very preliminary.  I don't

6  remember these emails.

7     Q.  Okay.  Does this appear to be a true and

8  correct copy of the email exchange between you and

9  Mr. Hook?

10    A.  Mr. -- yes, it does.

11    Q.  Okay.

12         MR. PERRIN:  I think -- I think you meant

13  Ludlow.

14    A.  Yeah, you meant --

15    Q.  (By Mr. Freeman)  Mr. Ludlow, yes.

16    A.  Yes, it does.

17    Q.  All right.  Thank you.

18         Have you ever -- have you ever stated that

19  it may be a viable strategy to simply not pay a

20  creditor?

21    A.  No.

22    Q.  Or to tell a creditor that, you know, maybe

23  they should stop trying to collect or you were going to

24  shut a company down?

25    A.  I don't recall ever having a conversation like

David Hook  *  April 12, 2021

Page 29

1  that.

2     Q.  Does that sound like something you would ever

3  say?

4     A.  No.  Actually, it's just the opposite of what I

5  would say.

6     Q.  Do you think you would ever -- you know, do you

7  think you would ever tell a creditor to stop trying to

8  collect or you would shut the company down and they

9  wouldn't get a penny?

10     A.  I don't recall ever doing that, no.

11     Q.  Okay.  Do you believe that would be wrong if

12  you did that?

13           MR. PERRIN:  Objection, form.

14     A.  It -- it depends on certain circumstances.

15     Q.  (By Mr. Freeman)  And what might it depend

16  upon?

17     A.  Either paying -- if we pay a creditor and the

18  company goes down the tubes, then obviously that that's

19  not the best interest of the company to do that.

20     Q.  Okay.  And what about the interests of the

21  creditor?

22           MR. PERRIN:  Objection, form.

23     A.  Well, if -- if the company goes down the tubes,

24  the creditor wouldn't be able to work with the company

25  in the future.

David Hook  *  April 12, 2021

Page 30

1      Q.  (By Mr. Freeman)  Okay.  So, then, it's your

2  testimony that it's okay to tell a creditor that if they

3  keep asking for payment, you'll shut the company down

4  and they won't get anything?

5      A.  In -- in certain circumstances.

6      Q.  Okay.  Okay.  Can you think of circumstances

7  where you've ever done that?

8      A.  I don't recall.

9      Q.  Okay.  But you think it can be okay to tell a

10  creditor that you're going to shut the company down and

11  they won't get anything?

12      A.  In certain circumstances.

13      Q.  Okay.  Any other circumstances you can think

14  of?

15      A.  Not off the top of my head.

16      Q.  Okay.  And, so, that does, then, after giving

17  it some more thought, sound like something you would

18  say?

19          MR. PERRIN:  Objection, form.

20      A.  No, it actually is not what I would -- be

21  something I would normally say.

22      Q.  (By Mr. Freeman)  Okay.  If you will, sir, turn

23  to Exhibit 46.  Do you see that document, sir?

24      A.  Just came up.

25      Q.  Is this an email -- is this an email chain

Page 31

1    among you, Mr. Ludlow, and Mr. Denegre?

2         A.  The first one is Mr. Szeto.  And then there's

3    Matt Denegre, uh-huh.

4         Q.  And does this appear to be a true and correct

5    copy of the email correspondence that's reflected here?

6         A.  Yes.

7         Q.  Okay.  And if you'll -- you'll look towards the

8    top, the first page, sir?

9         A.  Uh-huh.

10        Q.  The email right below that is an email --

11             MR. PERRIN:  Wait a minute, Jason.  He's

12   still reading up to that point.

13        A.  Okay.

14        Q.  (By Mr. Freeman)  Okay.  The email right below

15   that is from March 15, 2018 from David Hook,

16   DHook@BaymarkPartners.com?

17        A.  Uh-huh.

18        Q.  And that's your email address; correct?

19        A.  Uh-huh.  Yes.

20        Q.  And it says "maybe we tell them to stop or we

21   shut the company down and they won't get anything"?

22        A.  That's right.

23        Q.  And is that a correct reflection of your email,

24   sir?

25        A.  Yes, it is.

David Hook  *  April 12, 2021

Page 32

1     Q.  Okay.  And did Mr. Ludlow respond by saying

2  "yeah, definitely an option.  We can strategize and then

3  get back with them"?

4     A.  Yes.

5     Q.  Okay.  And on the subject line of this email,

6  does it state, in parentheses, "ACET"?

7     A.  Yes.

8     Q.  And did you understand that to refer to ACET

9  Global?

10    A.  Yes.

11    Q.  Okay.  Mr. Hook, what do you do for a living?

12    A.  I'm managing director of a private equity firm.

13    Q.  Okay.  And what is that private equity firm?

14    A.  Pardon me?

15    Q.  What is that private equity firm?

16    A.  What is it?

17    Q.  Yes, sir.

18    A.  We acquire companies.

19    Q.  Okay.  Well, let's start with what's the name

20  of it.

21    A.  Baymark Partners.

22    Q.  Baymark Partners.

23           Okay.  And how long have you done that?

24    A.  Almost 11 and a half years.

25    Q.  Okay.  And who do you report to?

David Hook  *  April 12, 2021

Page 33

1      A.   Tony Ludlow and I are partners -- equal

2  partners.

3      Q.   Okay.  Do you two own Baymark Partners?

4      A.   Yes.

5      Q.   Okay.  Are you 50/50?

6      A.   Yes.

7      Q.   Okay.  How do you determine whether to invest

8  in a company?

9      A.   I need you to be more specific than that.

10     Q.   Does Baymark Partners invest in other

11  companies?

12     A.   Yes.

13     Q.   Okay.

14     A.   No, we acquire them.

15     Q.   You acquire.  Okay.

16     A.   That's right.

17     Q.   Do you -- does Baymark Partners only engage in

18  transactions in which it obtains at -- at least a

19  majority or controlling position in a company?

20     A.   Yes.

21     Q.   Okay.  How do you determine whether to make

22  that investment?

23     A.   Mr. Freeman, there's a lot of things that go

24  into making an investment.

25     Q.   Right.  Let's start with some of them.

David Hook  *  April 12, 2021

Page 34

1      A.   The management team or the entrepreneurs.   The

2  second one is the market opportunity.   The other one is

3  if we like a company.   Another one is whether we can get

4  the company financed.

5      Q.   Okay.

6      A.   Those are four main reasons.

7      Q.   Okay.   How do you determine whether a

8  particular company is a -- makes good financial sense?

9      A.   We look at their financial statements in the

10  past, the -- the current ones, and projections for the

11  future.

12      Q.   Okay.   And what, specifically, do you look to

13  on those financial statements?

14      A.   Primarily EBITDA, revenue, and margins.

15      Q.   Okay.   And what do you mean by margins?

16      A.   Gross margins and EBITDA margins.

17      Q.   Okay.   And what is EBITDA margin?

18      A.   Earnings before interest, taxes, depreciation,

19  and amortization.

20      Q.   Okay.   And does Baymark Partners generally

21  adjust EBITDA in its evaluations or use a straight

22  EBITDA figure?

23      A.   I'm not sure I understand the question.   We

24  look at current EBITDA, trailing 12 months' adjusted

25  EBITDA.

David Hook  *  April 12, 2021

Page 35

1      Q.   Okay.  And what's -- what's a sign that EBITDA

2    is good or positive?

3      A.   Depends on the company and the industry.

4      Q.   Okay.  Let's say, like, the -- the industry we

5    are dealing with in this case.

6      A.   We would look for greater than 10 percent

7    EBITDA margins.

8      Q.   Okay.  And why is that?

9      A.   Because the higher the EBITDA, the better.

10     Q.   And why the better?

11     A.   Why is it better to have more profit?

12     Q.   Yeah.  Yeah.  Why is a higher EBITDA better?

13   Why, specifically?

14     A.   I'm not sure I understand the question.  Why is

15   -- why is it better for a company to be more profitable?

16   I think that's self-explanatory, isn't it?

17     Q.   I'm not sure.

18             Is EBITDA -- is EBITDA a measure of

19   profitability?

20     A.   Yes.

21     Q.   Okay.  Now we're starting to link it together.

22   Okay?  So, now, tell me from there why is it that you

23   believe a higher EBITDA is better?

24     A.   Well, a higher EBITDA is more attractive and

25   makes the company more valuable.

David Hook  *  April 12, 2021

Page 36

1       Q.  Okay.

2       A.  Depending on the circumstances.  But if you

3   have two companies, exactly the same industry, and one

4   has a 10 percent EBITDA margin and one has 20 percent

5   EBITDA margin, the 20 percent EBITDA margin company is

6   going to be worth more and be more valuable.

7       Q.  All things equal?

8       A.  Right.

9       Q.  Can a company have value without EBITDA?

10      A.  Possibly.

11      Q.  And what might lead it to have value?

12      A.  There might be some strategic region -- reason.

13      Q.  Right.  Like --

14      A.  Like Baymark Partners has never bought a

15  company with zero EBITDA.

16      Q.  Okay.  But a company could have that for

17  various reasons; right?

18      A.  Possibly, uh-huh.

19      Q.  Perhaps it is sitting on licensing rights.

20  Might that be a reason?

21      A.  Yes.

22      Q.  Or some sort of intellectual property --

23      A.  Yes.

24      Q.  -- that isn't marketed or monetized yet?

25      A.  Yes.

David Hook  *  April 12, 2021

Page 37

1      Q.  So there could be a number of reasons that

2  EBITDA might not be the best proxy or valuation model

3  for determining the value of a company; correct?

4              MR. PERRIN:  Objection, form.

5      A.  Yes.  But that's not the case in Baymark

6  Partners.  We -- we put a extremely high emphasis on

7  EBITDA.

8      Q.  (By Mr. Freeman)  And why is that?

9      A.  Because it's the cash flow of the business, and

10  you need cash flow to pay off debt.

11      Q.  Okay.  So the cash flow is important for

12  Baymark Partners?

13      A.  Yes.

14      Q.  Okay.  When -- when Baymark Partners invests in

15  a company, do you take a hands-on role?

16      A.  Define "hands-on."

17      Q.  Well, do you get involved or -- or are you

18  completely -- completely on the outside of the company?

19      A.  I'm sorry.  I really don't know how to answer

20  the question.  Rephrase the question, please.

21      Q.  Sure.

22              When -- when Baymark Partners invests in a

23  company, do you engage in any activities on behalf of

24  that company?

25              MR. PERRIN:  Objection, form.

David Hook   *   April 12, 2021

Page 38

1      A.   Define activities.

2      Q.   (By Mr. Freeman)  Operational activities.

3      A.   We monitor our companies.

4      Q.   Okay.  What do you mean by "monitor"?

5      A.   We review financial statements.  We review the

6  performance of the management team or people running the

7  business.  We look to help and assist the company in any

8  way that we can.  And every company is different.  So,

9  some items we do for some companies; other companies

10 don't need that.  So, we do a plethora of things to

11 monitor and assist the company in growing and building

12 the business.

13     Q.   Okay.  Do you oversee a company's operations?

14     A.   We -- we don't go and visit the company and

15 look at the operations.  But whenever we acquire a

16 company, we have a weekly call -- same day, same time --

17 and we are talking to management team or emailing

18 management team members throughout the week, depending

19 on what stage and the circumstances the company is in.

20     Q.   Okay.  Do you give management directions?

21     A.   We partner with management because they know

22 more about their business and their markets than we do.

23 So, we -- it's very much of a partnership.

24     Q.   It's like (audio distortion) for example?

25          MR. PERRIN:  Wait a minute.  I don't think

Page 39

1    he was through with his answer yet.

2         Q.  (By Mr. Freeman)  Oh.  Please, go ahead.

3         A.  Yes.  That's okay.  Yeah.  It's a partnership

4    philosophy that we have.

5         Q.  Okay.  For example --

6         A.  Very rarely do I ever tell a management team

7    that they have to do this.  That's not my style.

8         Q.  Okay.

9         A.  (Phone ringing)  Pardon me.

10        Q.  Sure.

11        A.  So, to -- I'm sorry.  I turned it off.

12        Q.  No problem.

13             Do -- does Baymark Partners make personnel

14   decisions on behalf of the companies?

15        A.  We can, uh-huh, yes.

16        Q.  Okay.  And what gives it the authority to do

17   that?

18             MR. PERRIN:  Objection, form.

19        A.  The legal documents when we close the

20   transaction.

21        Q.  (By Mr. Freeman)  Okay.  And how do they do

22   that, to your understanding?

23        A.  They're in the legal documents.

24        Q.  Does Baymark Partners make any day-to-day

25   business decisions on behalf of its companies?

David Hook  *  April 12, 2021

Page 40

1      A.  No.

2      Q.  No.

3            Okay.  ACET Global -- ACET Global, LLC --

4  are you familiar with the company?

5      A.  Yes.

6      Q.  Okay.  What -- what is your role, currently,

7  with ACET Global?

8      A.  I don't have any.

9      Q.  Okay.

10     A.  That I know of.

11     Q.  From 2017 to 2019, what was your role at ACET

12 Global?

13     A.  You would have to be more specific on your

14 dates.

15     Q.  Okay.  Well, at any point during there, I mean,

16 were there -- did you have any role at ACET Global?

17     A.  Yes.

18     Q.  Okay.  Can you tell me what that was?

19     A.  To oversee in -- the performance of the

20 company.

21     Q.  Okay.  In what capacity did you oversee the

22 performance of ACET Global?

23     A.  At what capacity?  I -- I was -- well, I was in

24 charge for Baymark Partners, that acquisition.  And I

25 worked on it with Matt Denegre.

David Hook  *  April 12, 2021

Page 41

1      Q.  Okay.  Were you ever the president of ACET
2  Global, LLC?
3      A.  I don't remember what my title was.
4      Q.  Okay.  So you were in charge of the acquisition
5  of ACET Global, LLC.  Did you remain in charge of that
6  company throughout its existence?
7      A.  No.
8      Q.  No?  When did you stop being in charge of it?
9      A.  I don't recall, but it wasn't very long.
10      Q.  Okay.  And what do you mean by not very long?
11      A.  Probably two to three, maybe four months.
12      Q.  Okay.  And why did you stop being in charge of
13  it?
14      A.  Because my partner took it over, Anthony
15  Ludlow.
16      Q.  Mr. Ludlow took over then?
17      A.  Yes.
18      Q.  Okay.  Was that in, like, February of 2018?
19      A.  I don't recall.
20      Q.  Okay.  Why did he take it over?
21      A.  Because the company had declined, and he was a
22  better person to work with a declining company than I
23  was.
24      Q.  Why was he a better person?
25      A.  Because my background is all in growing

David Hook  *  April 12, 2021

Page 42

1    businesses.  And, so, I went on to go work on other

2    companies.

3        Q.  Okay.  And why was he well suited for this

4    company?

5        A.  Because he's really good at working with

6    companies that were -- have -- have been -- have

7    declined or were in trouble.

8        Q.  Okay.  So, has Mr. Ludlow worked with quite a

9    number of companies that have declined?

10       A.  No.

11       Q.  No?

12            Has Mr. Ludlow worked with quite a number

13   of companies that have gone into default on their loans?

14       A.  No.

15       Q.  No?

16            Why was Mr. Ludlow suited to work with ACET

17   Global?

18       A.  It was just a better -- it was just a better

19   fit.  And we just decided, as a firm, that he would --

20   would take it over and I'd go on to other companies.

21       Q.  Did he have any special skills or relationships

22   that made him a good fit?

23       A.  Any skills or relationships.  Not -- not

24   particular relationships, but he's very good with

25   people.

David Hook  *  April 12, 2021

Page 43

1       Q.   Okay.  Baymark ACET Holdco, LLC.  Are you

2    familiar with the entity?

3       A.   I'm familiar with the name.

4       Q.   Okay.  From 2017 to 2019, what was your role at

5    Baymark ACET Holdco, LLC?

6       A.   Well, when we buy companies, there are multiple

7    entities.  So, my role is not different in any of the

8    entities.  It's the same role for all of them.

9       Q.   What do you mean by the same role for all of

10   them?

11      A.   Well, my role is to help management, management

12   teams, entrepreneurs help grow and expand their

13   business.  So, it doesn't matter what entity is

14   involved.  I'm trying to help our companies grow and

15   take them to the next level.

16      Q.   Okay.  Were you a -- were you a member of

17   Baymark ACET Holdco, LLC?

18      A.   I don't recall.  I'm involved in quite a --

19   quite a lot of entities.  So, I don't know exactly what

20   my title is in each entity.

21      Q.   Okay.  Were you a manager of Baymark ACET

22   Holdco?

23      A.   As I said, I don't remember.

24      Q.   Okay.  Were you the president of Baymark ACET

25   Holdco?

David Hook  *  April 12, 2021

Page 44

1     A.  I don't remember.

2     Q.  Okay.  Did you ever do any -- take any action

3  on behalf of Baymark ACET Holdco?

4     A.  Can you be more specific?

5     Q.  Any -- any -- did you ever engage in any act on

6  behalf of Baymark ACET Holdco?

7             MR. PERRIN:  Objection, form.

8     A.  Probably.

9     Q.  (By Mr. Freeman)  What do you -- what do you

10  think that was?

11     A.  Well, the company was not performing; and it

12  declined very rapidly.  So, we were looking to try to

13  help the company.  And I knew a guy named Bill Szeto

14  that I thought would be a really good fit to help the

15  company.  So, if that's an act, I introduced the company

16  to Bill Szeto.

17     Q.  Okay.  So, Baymark ACET Holdco was not doing

18  well?

19     A.  Well, ACET Global wasn't doing well.

20     Q.  Okay.

21     A.  Therefore the Holdco wasn't doing well.

22     Q.  Was that all that Holdco owned?

23     A.  I assume.

24     Q.  Okay.  What about Baymark ACET Direct Invest,

25  LLC?  Are you familiar with this company?

David Hook  *  April 12, 2021

Page 45

1      A.   Again, that's one of the multiple entities that

2   whenever we buy a company, we have.  So, my role is the

3   same in all the entities.

4      Q.   Why do you have multiple entities in all of the

5   deals that you have?

6      A.   For different reasons.

7      Q.   Okay.  What are those different reasons?

8      A.   There are -- there are legal reasons that you

9   will have to ask the attorneys.

10     Q.   Okay.  So, to you, they don't really make a

11  difference, but the -- the attorneys advise them?

12          MR. PERRIN:  Objection, form.

13     A.   No.  The advise -- attorneys don't advise them.

14  They set up in what we think is the best legal

15  structure.

16     Q.   (By Mr. Freeman)  Okay.  And why do you think

17  that that's the best legal structure?

18     A.   I don't know, Mr. Freeman.

19     Q.   Okay.  Is it designed to accomplish any

20  particular purpose?

21     A.   I'm sure it is.

22     Q.   Okay.  But you don't know what that purpose is?

23     A.   No.

24     Q.   Okay.  I mean, are these entities, like, they

25  just all kind of the same to you?

David Hook  *  April 12, 2021

Page 46

1            MR. PERRIN:  Objection, form.

2       A.  Yes, and -- yes.

3       Q.  (By Mr. Freeman)  Okay.  Baymark ACET Direct

4  Invest, LLC.  Are you familiar with that entity?

5       A.  I have heard the name.

6       Q.  Okay.  What -- what do you believe that to be,

7  if you know?

8       A.  I think that's where the investors -- that's

9  the entity where the investors are.

10      Q.  Okay.  Who are the investors?

11           MR. PERRIN:  Objection, form.

12      A.  I don't know specifically, but obviously,

13  Baymark is in there.  But I don't know what entity where

14  in that -- I would -- I would think.

15      Q.  (By Mr. Freeman)  Okay.  All right.  And you

16  don't know if there were other investors in the deal?

17           MR. PERRIN:  Objection, form.

18      A.  I don't recall.

19      Q.  (By Mr. Freeman)  Okay.  From 2017 to '19, what

20  was your role at Baymark ACET Direct Invest?

21      A.  I think I answered that question already,

22  haven't I?

23      Q.  Well, do you know if you were a member?

24           MR. PERRIN:  Objection, form.

25      A.  I told you, I don't.

David Hook  *  April 12, 2021

Page 47

1        Q.   (By Mr. Freeman)  Do you know if you were a

2   manager?

3              MR. PERRIN:  Objection, form.

4        A.   No.

5        Q.   (By Mr. Freeman)  Do you know if you were the

6   president?

7        A.   No.

8              MR. PERRIN:  Objection, form.

9        Q.   (By Mr. Freeman)  Baymark Partners.  What is

10  Baymark Partners?  What is the legal entity?

11             MR. PERRIN:  Objection, form.

12       A.   I think it's Baymark Partners, L -- LP, I

13  think.

14       Q.   (By Mr. Freeman)  So, when we refer to Baymark

15  Partners, we're referring to -- you understand that to

16  be Baymark Partners, LP; correct?

17       A.   That's right, the name of the firm.  Uh-huh.

18       Q.   Is there another Baymark Partners that you're

19  aware of?

20       A.   No.

21       Q.   And is that how you hold it out, as Baymark

22  Partners?

23             MR. PERRIN:  Objection, form.

24       A.   Yes.

25       Q.   (By Mr. Freeman)  And is that how other members

David Hook  *  April 12, 2021

Page 48

1    of Baymark Partners hold it out, as -- as Baymark

2    Partners?

3        A.  Yes.

4        Q.  Okay.

5        A.  That's the name of the firm.

6        Q.  Okay.  From 2017 to 2019, what was your role at

7    Baymark Partners?

8        A.  Well, I'm managing director.  I'm a founder of

9    the firm.  We buy companies, and we try to help them

10   grow and expand their business.  So, we assist

11   management, management teams, and entrepreneurs growing

12   their business.

13       Q.  Okay.  And are you compensated for that?

14             MR. PERRIN:  Objection, form.

15       A.  You need to be more specific.  Do I take a

16   salary?

17       Q.  (By Mr. Freeman)  Well, do you receive any --

18   any return for engaging in those activities?

19             MR. PERRIN:  Objection, form.

20       A.  I -- I take no salary.

21       Q.  (By Mr. Freeman)  Okay.  Do you stand to profit

22   in any other way?

23       A.  Yes, if our companies do well.

24       Q.  Okay.  And -- and how do you stand to profit if

25   they do well?

David Hook  *  April 12, 2021

Page 49

1      A.  Well, some companies, we get management fee and
2  we get ownership in the companies, and we also make our
3  investments in the companies.
4      Q.  Do you arrange for a management fee in all
5  deals that Baymark Partners engages in?
6      A.  Yes, we do, assuming that they can pay them.
7      Q.  Okay.  And who are those -- who are those
8  management fees made payable to?
9          MR. PERRIN:  Objection, form.
10     A.  Our management company.
11     Q.  (By Mr. Freeman)  And who is the management
12  company?
13     A.  Baymark Management.
14     Q.  So, Baymark Management, LLC?
15     A.  I -- I don't know if that's the exact title,
16  but Baymark Management's in there.  I don't know if it's
17  an LLC.
18     Q.  Okay.  Who owns Baymark Management, LLC?
19     A.  Tony Ludlow and I.
20     Q.  Okay.  Are y'all 50/50?
21     A.  Uh-huh.  Yes.
22     Q.  Okay.  And it's not owned by Baymark Partners?
23     A.  No.
24     Q.  Does it pay any funds to Baymark Partners?
25     A.  No.

David Hook  *  April 12, 2021

Page 50

1      Q.  Okay.  From 2017 to 2019, what was your role at

2   Baymark Management?

3      A.  Well, again, that's the firm's management

4   company.  So, it's the same -- whatever entity is

5   involved, I have the same role.

6      Q.  Okay.

7      A.  Or Baymark Management is our -- our entity that

8   we manage the firm.

9      Q.  Okay.

10     A.  So, we get management fees in; we have expenses

11  go out.

12     Q.  Okay.

13     A.  So, we are managing the firm.

14     Q.  So, if you take an act -- if you engage in an

15  act with respect to a company, is that -- are you doing

16  that through Baymark Management or through another

17  entity?

18              MR. PERRIN:  Objection, form.

19     A.  We're not doing that through Baymark

20  Management.

21     Q.  (By Mr. Freeman)  Okay.  Be some -- some other

22  capacity?

23              MR. PERRIN:  Objection, form.

24     A.  Yes.

25     Q.  (By Mr. Freeman)  So, like, if you give

David Hook  *  April 12, 2021

Page 51

1    directions for, you know, a -- a manager at a company,

2    you're not doing that through Baymark Management;

3    correct?

4              MR. PERRIN:  Objection, form.

5         A.  I'm not -- yeah.  The -- the entities -- you're

6    trying to make a distinction of entities, and you're

7    doing what's best for the company, and you're doing that

8    -- I don't look at it as we're doing it for this entity

9    or that entity.  We are trying to help people.  We are

10   trying to help entrepreneurs and management team members

11   grow their business.

12        Q.  (By Mr. Freeman)  Uh-huh.

13        A.  So, it doesn't matter what entity I'm working

14   on behalf of.  I'm trying to help people and businesses

15   grow.

16        Q.  Okay.  So you're not engaging in those

17   activities through Baymark Management; you're just doing

18   that personally?

19              MR. PERRIN:  Objection, form.

20        A.  No.  No.  I have a -- I work for Baymark

21   Management.

22        Q.  (By Mr. Freeman)  Okay.  So, for example, if

23   you terminate an employee, are you doing that through

24   Baymark Management?  Through Baymark Partners?  Is it

25   unclear?

David Hook  *  April 12, 2021

Page 52

1      A.   I don't know.

2      Q.   Okay.  Is it generally just unclear?

3           MR. PERRIN:  Objection, form.

4      A.   It's in the legal documents.

5      Q.   (By Mr. Freeman)  Okay.  So that will be

6  clearly spelled out in the legal documents?

7           MR. PERRIN:  Objection, form.

8      A.   The control of the company is -- should be in

9  the legal documents.

10     Q.   (By Mr. Freeman)  Okay.  Do you know where in

11 the legal documents?

12     A.   I don't.

13     Q.   Okay.  Windspeed Trading, LLC, are you familiar

14 with this company?

15     A.   I have heard the name.

16     Q.   Okay.  Nothing more, though, than hearing the

17 name?

18     A.   Not really.

19     Q.   Have you had any discussions about Windspeed

20 Trading, LLC?

21          MR. PERRIN:  Objection, form.

22     A.   Discussions with whom?  When?

23     Q.   (By Mr. Freeman)  Anyone.

24          MR. PERRIN:  Okay.  I would caution the

25 witness that to the extent this calls for

David Hook  *  April 12, 2021

Page 53

1   attorney/client communications, they should not be

2   included in your answer.

3        A.  Okay.

4        Q.  (By Mr. Freeman)  Did you have discussions

5   about Windspeed Trading, LLC with anyone other than your

6   attorneys?

7        A.  No.

8        Q.  No.  From 2017 to 2019, what was your role at

9   Windspeed Trading, LLC?  Did you have any role?

10       A.  I had no role.

11       Q.  You were not a member?

12       A.  No.

13       Q.  Not a manager?

14       A.  No.

15       Q.  Not a president?

16       A.  No.

17       Q.  Okay.  Can you explain to me how each of the

18   Baymark defendants in this case are -- are related?  And

19   I'll ask it in context of each one.  I'd kind of like to

20   understand.

21            ACET Global, LLC, who formed ACET Global?

22            MR. PERRIN:  Objection, form.

23       A.  I don't -- I don't know.  I assume attorneys

24   did.

25       Q.  (By Mr. Freeman)  Okay.  And you don't know who

David Hook  *  April 12, 2021

Page 54

1   its principals are?

2        A.  Well, again, I don't -- I don't know

3   specifically who did it.

4        Q.  Okay.  Do you know if it was any of your people

5   at Baymark Partners?

6        A.  I don't know of any, no.

7        Q.  Okay.  Do you know who owns ACET Global, LLC?

8        A.  No.

9        Q.  What about Baymark ACET Holdco, LLC?  Do you

10  know who formed that company?

11       A.  No.

12       Q.  Okay.  Baymark ACET Direct Invest, LLC.  Do you

13  know who formed that company?

14       A.  No.

15       Q.  Or Baymark Management, LLC?

16       A.  No.

17       Q.  Or Baymark partners?

18       A.  No.

19       Q.  Do you have an ownership interest in any of

20  these entities?

21            MR. PERRIN:  Objection, form.

22       A.  I -- ask me the question again.

23       Q.  (By Mr. Freeman)  Do you have an ownership

24  interest in any of those entities?

25       A.  Baymark Partners?

David Hook   *   April 12, 2021

Page 55

1      Q.  Yes, sir.  Is that it?

2      A.  Yes.  I have ownership position -- again, I

3   don't know the flow, but I have a position in Baymark

4   Partners and/or Baymark Management.

5      Q.  Okay.

6            MR. PERRIN:  We've been going about an hour

7   and 15.

8            MR. FREEMAN:  Do you want to take a break,

9   Mr. Hook?

10            THE WITNESS:  What?

11            MR. FREEMAN:  Do you want to take a break?

12            THE WITNESS:  Yeah, that's fine.

13            MR. FREEMAN:  All right.  How long do y'all

14   want?

15            MR. PERRIN:  Just five or ten minutes, just

16   to go down the hall and get something to drink.

17            MR. FREEMAN:  Sounds good.  We'll go off

18   the record.

19            (Break taken from 2:13 to 2:25.)

20            MR. FREEMAN:  Go back on the record.

21      Q.  (By Mr. Freeman)  Mr. Hook, you indicated you

22   -- you are not sure if you've ever been the president of

23   ACET Global?

24      A.  That's true.

25      Q.  Have you ever signed a document as the

David Hook  *  April 12, 2021

Page 56

1  president of a company that you were not actually the

2  president of?

3       A.  That was never my intention.  So, the -- no.

4       Q.  Okay.  So, if you signed a document as

5  president, is it safe to say that you were, in fact, the

6  president?

7            MR. PERRIN:  Objection, form.

8       A.  Yes, assuming -- assuming that the document was

9  prepared correctly.

10      Q.  (By Mr. Freeman)  Okay.  And before you sign a

11  document, do you attempt to ensure that it was prepared

12  correctly?

13      A.  No.

14      Q.  No?

15           And before you sign a document, do you

16  attempt to ensure that the designation beside your name,

17  stating your title, is correct?

18      A.  No.

19      Q.  So you're in the habit of just signing

20  documents no matter what they say your title is?

21           MR. PERRIN:  Objection, form.

22      A.  Repeat the question, please.

23      Q.  (By Mr. Freeman)  You're in the habit of

24  signing documents with titles beside your name that you

25  have no idea whether they are your correct title or not?

David Hook  *  April 12, 2021

Page 57

1    A.  If they come from a law firm, then that is

2    correct.  I don't have a habit of signing other

3    documents with my title that I don't know that's my

4    title.

5    Q.  Okay.  Like, for example, if you were to sign

6    loan documents, would you want to ensure that the title

7    that you're representing is correct?

8    A.  Yes.  If they've been reviewed by our

9    attorneys, then yes, I would do that.  If they weren't,

10   then I wouldn't -- wouldn't sign it.

11   Q.  Okay.  Has it been your experience that where

12   your attorneys have put a designation beside your name,

13   they are generally correct?

14   A.  Yes.  Generally correct, yes.

15   Q.  Okay.  And your attorneys, any time they're

16   preparing documents for you to sign, do they have access

17   to all of the relevant documents that would indicate

18   what your position is?

19   A.  Yes.

20   Q.  Okay.  Is William Szeto the president of ACET

21   Global, LLC?

22   A.  I don't know what his title is.

23   Q.  Do you know if he was ever the president of

24   ACET Global?

25   A.  I do not know that for sure.

David Hook  *  April 12, 2021

Page 58

1      Q.  Okay.  If you will, I'm putting on the screen

2   what's marked as Exhibit 48.  Do you see this document,

3   sir?

4      A.  Forbearance agreement?  Exhibit 48, yes.  It's

5   -- I'm looking at it right now.

6      Q.  Okay.  And do you recognize the document?

7      A.  No.

8      Q.  But it appears to be a forbearance agreement?

9      A.  Yes.

10      Q.  Okay.  Is that between Super G Capital, LLC and

11   ACET Global, LLC?

12      A.  That's what it says.

13      Q.  Okay.  And does it reflect a commencement date

14   of April 12th, 2018?

15      A.  Yes.

16      Q.  Okay.  If you go down to the ninth page of this

17   document, Bates label page BP006112 --

18      A.  I'm sorry.  You went too fast.  Could you

19   repeat that?

20      Q.  Yes, sir.  It's the ninth page of the document.

21   Got it?

22      A.  No.  I -- just one -- one second.

23      Q.  Okay.

24            MR. PERRIN:  6112?

25            MR. FREEMAN:  Yes, sir.

David Hook  *  April 12, 2021

Page 59

1      A.   Okay.  There's two signatures, uh-huh.

2      Q.   (By Mr. Freeman)  Who is listed as the borrower

3  on this document?

4      A.   The lender is Super G Capital.

5      Q.   Okay.  And who is the borrower?

6      A.   I don't know.  It doesn't say on this page.

7  Oh, the borrower.  I'm sorry.  ACET Global, LLC.

8      Q.   Okay.  And who is the listed signer there below

9  ACET Global, LLC?

10     A.   Myself, David J. Hook.

11     Q.   Okay.  And is that, in fact, your signature?

12     A.   I don't believe so.

13     Q.   No?  Do you believe that to be a falsified

14  signature?

15          MR. PERRIN:  Objection, form.

16     A.   I don't know what a falsified signature is.

17     Q.   (By Mr. Freeman)  Okay.  Do you believe someone

18  has faked your signature here?

19          MR. PERRIN:  Objection, form.

20     A.   I don't know.  That doesn't appear to be my

21  signature.

22     Q.   (By Mr. Freeman)  Why does it not appear to be

23  your signature?

24     A.   Because it doesn't look like my signature.

25     Q.   What about it does not look like your

David Hook  *  April 12, 2021

Page 60

1   signature?

2        A.  The letters.

3        Q.  Okay.  What letters?

4        A.  The letters on the line.

5        Q.  Okay.  All of them?  Like, nothing about this

6   looks like your signature?

7        A.  It's not my signature.

8        Q.  Okay.  Do you have any idea who might have put

9   your signature on this document?

10       A.  I don't know for a fact who signed this

11  signature.

12       Q.  Do you have any reason to believe it was anyone

13  in particular?

14       A.  If I would guess, it would either be Tony or

15  Matt, in which I gave them permission to sign my

16  signature.

17       Q.  Okay.  So you think you may have given

18  permission to sign it?

19       A.  That is a likely scenario.

20       Q.  Okay.  Was that a -- was that something you --

21  you did frequently?

22       A.  No, not frequently, but infrequently.

23       Q.  Okay.  Would that be an unusual thing to occur?

24            MR. PERRIN:  Objection, form.

25       A.  I don't know if it would be unusual.  Under

David Hook  *  April 12, 2021

Page 61

1   certain circumstances, I've allowed Tony and/or Matt to

2   sign my signature when I was not available to sign

3   myself.

4       Q.  (By Mr. Freeman)  Okay.  How do you generally

5   do that?  Do you do that by an oral conversation or by

6   email?

7       A.  Well, normally I'm not in the same location.

8   So, it would be over a telephone.

9       Q.  Okay.

10      A.  And I feel comfortable doing that because Tony

11  is an attorney.

12      Q.  Okay.  Okay.  So -- and what is the title

13  beside your name here?

14      A.  President.

15      Q.  Okay.  So, David J. Hook, president of ACET,

16  Global, LLC; correct?  That's what's reflected here?

17      A.  Yes, it is.

18      Q.  Okay.  Did Tony Ludlow sign this document?

19          MR. PERRIN:  Objection, form.

20      A.  I don't know.  I don't recall.

21      Q.  (By Mr. Freeman)  Okay.  Just going down

22  further to the eleventh page of this exhibit, this

23  Exhibit 48 --

24      A.  One second, please.  Just one second.

25      Q.  Yes, sir.

David Hook  *  April 12, 2021

Page 62

1      A.  Okay.  I have it.

2      Q.  Okay.  Is that also your signature, sir?

3      A.  No.

4      Q.  Okay.  Does that look like someone may have

5  signed it for you?

6      A.  Yes.

7      Q.  Okay.  And does that signature appear under the

8  -- under the name Baymark ACET Holdco, LLC?

9      A.  Yes.

10      Q.  Okay.  And -- and what's the title reflected

11  beside your name?

12      A.  President.

13      Q.  Okay.  Does this -- does this appear to state

14  that you were president of Baymark ACET Holdco, LLC?

15      A.  It appears that way, yes.

16      Q.  Okay.  Do you see what's on your screen now as

17  Exhibit 51, sir?

18      A.  Just a minute, please.  Okay.

19      Q.  Does this appear to be an email exchange

20  between you and Matthew Denegre?

21      A.  Yes, it is.

22      Q.  And also includes Tony Ludlow?

23      A.  Oh, yes, as copied.  Yes, I'm sorry.  Yes.

24      Q.  Is this dated April 11th, 2018?

25      A.  Yes.

David Hook  *  April 12, 2021

Page 63

1     Q.  Okay.  And is the subject matter of the email

2  ACET forbearance?

3     A.  Yes.

4     Q.  Okay.  And does this -- does this email below

5  request -- is this a request from Matt Denegre stating,

6  "Do you mind if Tony signs this one-time amendment for

7  you?  It requires your signature."

8     A.  Yes.

9     Q.  And is that kind of what you're referring to

10  earlier as -- as an instance where someone may have been

11  given authority to sign on your behalf?

12     A.  Yes.

13     Q.  Okay.  Were you, in fact, familiar with the --

14  the ACET Global forbearance by Super G?

15     A.  I'm sorry.  Will you ask that again, please?

16     Q.  Yes, sir.  Were you, in fact, familiar with the

17  ACET Global forbearance by Super G Capital?

18     A.  No.

19     Q.  Okay.  Did you have any involvement in it,

20  other than what's reflected here on this email?

21     A.  I don't believe so.

22     Q.  And, so, you would not know anything more about

23  it?

24     A.  I don't believe so.

25     Q.  Okay.  Put on the screen what's marked as

Page 64

1    Exhibit 48, sir.  Do you see that?

2              MR. PERRIN:  I think it's marked 47.

3         A.  47?

4         Q.  (By Mr. Freeman)  47.  Excuse me.

5         A.  That's okay.

6         Q.  Do you see that, sir?

7         A.  Yes.

8         Q.  Okay.  And do you know what this is?

9         A.  No.

10        Q.  Okay.  Does it state down below the -- the

11   document that's attached -- that it is a waiver of

12   conflicts and consent to representation?

13        A.  Wait a second.  I'm trying to read and trying

14   to hear your question.  I can't --

15              MR. PERRIN:  Go ahead and take a look at it

16   first.

17        A.  Wait.  Let me look at it, please.  Okay.

18        Q.  (By Mr. Freeman)  Okay.  Have you ever seen

19   this document before?

20        A.  I don't recall ever seeing it, no.

21        Q.  Okay.  Does it reflect that it's addressed to

22   your attention?

23        A.  Yes.

24        Q.  Does it reflect that it is addressed to your

25   attention as president of ACET Global, LLC?

David Hook  *  April 12, 2021

Page 65

1      A.  Yes.

2      Q.  And do you have any idea why this may have been

3  addressed to you as the president of ACET Global, LLC?

4      A.  No.

5      Q.  Okay.  And if you'll look down on the bottom,

6  the third page, there's a signature block.

7      A.  Yes.

8      Q.  For ACET Global, LLC.  Do you see that?

9      A.  Yes.

10     Q.  And is that your name that appears?

11     A.  Yes, that's my name and my signature.

12     Q.  Okay.  And does that state "president" on the

13  title?

14     A.  Yes.

15     Q.  And the date, is it 10-31-18?

16     A.  Yes.

17     Q.  And is that reflecting that you're the

18  president of ACET Global, LLC?

19     A.  Yes.

20     Q.  Okay.  And this letter, is this a letter from

21  ACET Global's legal counsel?

22     A.  I -- I don't know that.

23     Q.  Had you ever engaged Dorsey & Whitney, LLP to

24  represent --

25     A.  No.

David Hook  *  April 12, 2021

Page 66

1       Q.  No?

2       A.  I haven't, no.

3       Q.  No?

4            Do you know if anyone ever did?

5       A.  No.

6       Q.  Okay.  Did you engage the firm to represent

7  ACET Global in connection with Super G's foreclosure of

8  ACET's assets?

9       A.  I don't remember that.

10      Q.  No?

11           Do you recognize this statement that states

12  "the firm currently represents ACET in various

13  intellectual property matters"?

14      A.  I see that.

15      Q.  Okay.  And do you know what that is referring

16  to?

17      A.  No.

18      Q.  Okay.  Do you know what this letter is in

19  reference to?

20      A.  My recollection is this is the first time I've

21  seen this letter.

22      Q.  Okay.  So you don't believe this letter was

23  actually provided to you?

24      A.  Well, I wouldn't say that.  I signed it, but I

25  don't recall it.

David Hook  *  April 12, 2021

Page 67

1      Q.   Okay.  Do you recall authorizing Dorsey &

2   Whitney to represent Super G in the foreclosure of ACET

3   Global's assets?

4      A.   No.

5      Q.   Did you, in fact, assist Super G with

6   foreclosing upon ACET Global's assets?

7      A.   No.

8           MR. PERRIN:  Objection, form.

9      Q.   (By Mr. Freeman)  Why not?

10          MR. PERRIN:  Objection, form.

11     A.   I'm sorry.  Repeat the question.

12     Q.   (By Mr. Freeman)  Why didn't you assist Super G

13   in the foreclosure of ACET Global's assets?

14          MR. PERRIN:  Objection, form.

15     A.   Because it was between Super G and ACET Global.

16     Q.   (By Mr. Freeman)  Do you think that would have

17   been wrong?

18          MR. PERRIN:  Objection, form.

19     A.   It depends on the circumstance.

20     Q.   (By Mr. Freeman)  Right.  The circumstances

21   presented here?

22          MR. PERRIN:  Objection, form.

23     A.   I need a lot more information to answer that

24   question.

25     Q.   (By Mr. Freeman)  Okay.  So, let's say you're

David Hook  *  April 12, 2021

Page 68

1    the president of ACET Global.  Okay?

2         A.  Uh-huh.

3         Q.  And let's assume that ACET Global owes -- owes

4    a note to Super G Capital.  Let's assume that ACET

5    Global has more than $3 million of assets.  Okay?  Let's

6    assume that Super G would like to foreclose upon all of

7    ACET Global's assets and move it to a company in which

8    Baymark Partners has a controlling membership interest.

9              Do you believe that it would then be wrong

10   for you to assist Super G Capital with the foreclosure

11   of ACET Global's assets?

12             MR. PERRIN:  Objection, form.

13        A.  Well, there are a lot more circumstances that

14   are relevant in making that decision than what you've

15   given me.

16        Q.  (By Mr. Freeman)  What are they?

17        A.  Well, how about if the -- the cash in the bank

18   account was $5 and our assets were $100 and our

19   liabilities were $3 million.  So, at this point, it

20   would be reasonable to assume that we are trying to do

21   what's best for the company and save the company.

22        Q.  What's best for the company or what's best for

23   David Hook?

24        A.  Not what's best for David Hook.  At this point,

25   I would have preferred the company close down and go

David Hook   *   April 12, 2021

Page 69

1    away.

2         Q.  Okay.

3         A.  Because the performance of the company was so

4    bad that I knew we -- this was not a good acquisition

5    and that I had -- in 19-18, (sic) I did not think that

6    -- that we -- this company was going to make it or

7    survive.  So, in David Hook's best interests, this

8    company would have closed up and gone away.

9         Q.  Okay.  Did David Hook have any interest in

10   transferring this company's assets to Windspeed Trading,

11   LLC?

12        A.  Did I have any interest in it?

13        Q.  Yes, sir.

14             MR. PERRIN:  Objection, form.

15        A.  Like I said, I would have -- I would have -- I

16   would have preferred the company --

17        Q.  (By Mr. Freeman)  Just shut down and not pay

18   any creditors?

19             MR. PERRIN:  Objection, form.

20        Q.  (By Mr. Freeman)  Like you said in your email?

21             MR. PERRIN:  Objection, form.

22        A.  No.  I -- I have also said that I want to pay

23   creditors and want to pay debt holders.  And every

24   company --

25        Q.  (By Mr. Freeman)  Did you say that --

David Hook  *  April 12, 2021

Page 70

1              MR. PERRIN:  Wait a minute.  Let him finish

2    his answer.

3         A.  In any company we've ever acquired, I wanted to

4    pay all debts, all payables, all shareholders, all

5    creditors.

6         Q.  (By Mr. Freeman)  Okay.

7              MR. FREEMAN:  Objection, nonresponsive.

8         Q.  (By Mr. Freeman)  So, what had Dorsey and

9    Whitney represented ACET Global with respect to?

10        A.  I don't recall.

11        Q.  Okay.  And you don't know if you, as the

12   president of ACET Global, had hired Dorsey and Whitney

13   in any capacity?

14        A.  I don't recall that, no.

15        Q.  Okay.  Have you ever worked with Dorsey and

16   Whitney?

17        A.  I don't believe so.

18        Q.  Okay.  Do you know if anyone at ACET Global had

19   a relationship with Dorsey and Whitney?

20        A.  No, I do not.

21        Q.  Okay.  Who is Steven Bellah?

22        A.  He was our contact at Super G.

23        Q.  Okay.  Do you know Steven Bellah outside of

24   that capacity?

25        A.  No.  In fact, I totally forgot his name until

David Hook  *  April 12, 2021

Page 71

1    you just mentioned it.

2         Q.  When is the last time you spoke with Steven

3    Bellah?

4         A.  I -- I don't know.  Likely years.

5         Q.  Likely years?

6         A.  Yes.

7         Q.  Okay.  When is the last time you emailed him?

8         A.  I have no idea.

9         Q.  Okay.  Did Steven Bellah hold any positions at

10   Super G Capital?

11        A.  What kind of positions?

12        Q.  Did he have any employment or role at Super G

13   Capital?

14        A.  I assume so.  He was our contact there.

15        Q.  Okay.  Did he have any employment or -- or role

16   with Windspeed Trading, LLC?

17        A.  I don't know.

18        Q.  Okay.  What about ACET Global, LLC?

19        A.  Did he have a role?

20        Q.  Yes, sir.

21        A.  At -- at the company?

22        Q.  Yes.

23        A.  No.

24        Q.  Okay.  Any of the Baymark-affiliated entities?

25        A.  No.

David Hook  *  April 12, 2021

Page 72

1     Q.  Okay.  Did Mr. Bellah ever report to you about

2  ACET Global?

3              MR. PERRIN:  Objection, form.

4     A.  What do you mean by "report"?

5     Q.  (By Mr. Freeman)  Did he ever -- well, let's

6  just ask it this way:  Did he ever discuss ACET Global

7  with you?

8     A.  Yes.

9     Q.  Okay.  And when would those discussions have

10  taken place?

11     A.  Very early on, after we acquired the company.

12     Q.  Okay.  So, is that, like, 2017?

13     A.  I don't remember when we -- when we acquired

14  the company.

15     Q.  Okay.  What did you discuss with Steven Bellah?

16     A.  I don't recall specifically.

17     Q.  Okay.  So you don't recall any discussions with

18  Mr. Bellah?

19     A.  I recall that we had some, but I don't know

20  what the contents of those discussions were.

21     Q.  Okay.  Would they have dealt with the loan from

22  Super G to ACET Global?

23     A.  I would assume they would.

24     Q.  About ACET Global's performance?

25     A.  Yes.

David Hook  *  April 12, 2021

Page 73

1      Q.   What about Windspeed Trading?

2      A.   No.

3      Q.   No?

4           Why are you so sure that it didn't include

5    that?

6      A.   Because I wasn't involved with the company at

7    that time.

8      Q.   What time?

9      A.   That Windspeed was in existence.

10     Q.   Okay.  When was it in existence?

11     A.   I have no idea.

12     Q.   Okay.  So how do you know that you weren't

13   involved with the company when it was in existence if --

14     A.   Because I was -- I was only involved with ACET

15   Global for a short period of time.

16     Q.   Okay.  Did Windspeed possibly exist then?

17     A.   No.

18     Q.   How do you know that?

19     A.   Because I wasn't in any of the conversations.

20     Q.   What conversations?

21     A.   That there even was a Windspeed.

22     Q.   Okay.  And, so, how do you know it didn't exist

23   then?

24     A.   I was only involved with ACET Global, my

25   recollection is, for a few months after we acquired the

David Hook  *  April 12, 2021

Page 74

1    company.

2        Q.  Okay.  And how are you able to deduce from that

3    that Windspeed Trading did not exist?

4        A.  Because I had never heard of it before.

5        Q.  Okay.  And when did you first hear of it?

6        A.  After I stopped being involved.

7        Q.  Okay.  And when, after you stopped being

8    involved with ACET, did you hear about Windspeed

9    Trading?

10       A.  I can't recall a day, a month or even a year.

11       Q.  Okay.  But -- but it's fair to say that if you

12   hadn't heard about it prior to that, it didn't exist?

13              MR. PERRIN:  Objection, form.

14       A.  Well, I -- I don't know -- if I didn't know it

15   existed, I don't know when it started.

16       Q.  (By Mr. Freeman)  Okay.  Who would have -- who

17   would have told you about Windspeed Trading?

18       A.  Tony or Matt.

19       Q.  Tony or Matt?  Why would it have been Tony or

20   Matt?

21       A.  Because I work in the same firm that they do.

22       Q.  Okay.  And why would they have told you about

23   Windspeed Trading?

24       A.  I -- I don't know.

25       Q.  How is it relevant to any transaction you were

David Hook  *  April 12, 2021

Page 75

1   involved in?

2       A.  It wasn't relative to anything that I was

3   working on.

4       Q.  Okay.  Was it relevant to something they were

5   working on?

6               MR. PERRIN:  Objection, form.

7       A.  I -- I don't -- I don't know.

8       Q.  (By Mr. Freeman)  Okay.  And why do you believe

9   they would have told you about Windspeed Trading, then?

10              MR. PERRIN:  Objection, form.

11      A.  Probably -- well, because -- will you repeat

12  the question, please?

13      Q.  (By Mr. Freeman)  Yeah.  Why do you believe --

14  you stated you believe it was Tony Ludlow or Matt

15  Denegre who first told you about Windspeed Trading.  Why

16  do you believe they would have told you about Windspeed

17  Trading?

18      A.  In passing.  It was new information for me.

19      Q.  New information about what?

20      A.  That there was a company called Windspeed

21  Trading.

22      Q.  Okay.  Were they interested in investing in it?

23      A.  I have no idea.

24      Q.  Did they -- were they looking at obtaining a

25  loan for it?

David Hook  *  April 12, 2021

Page 76

1    A.  I have no -- I don't know.

2    Q.  Okay.  Why do you think they would have even

3  mentioned Windspeed Trading to you?

4          MR. PERRIN:  Objection, form.

5    A.  I don't know.  You'll have to ask them.

6    Q.  (By Mr. Freeman)  Were they involved in forming

7  Windspeed Trading?

8    A.  I have no idea.

9    Q.  Okay.  But your testimony earlier was if

10  Windspeed -- Baymark Partners is not going to get

11  involved in a company unless it acquires a -- a

12  controlling ownership interest; correct?

13          MR. PERRIN:  Objection, form.

14    A.  Yes.

15    Q.  (By Mr. Freeman)  Okay.  Did you ever have

16  discussions with Steven Bellah about Windspeed?

17    A.  No.

18    Q.  Did you ever have discussions with Steven

19  Bellah about Tomer Damti?

20    A.  Likely, because of his poor performance.

21    Q.  Steven Bellah's poor performance?

22    A.  No, Tomer's.

23    Q.  Oh, Tomer.  What did -- what did Tomer do that

24  constituted poor performance?

25    A.  When we bought the company, it was 400,000 of

Page 77

1  EBITDA.  Within two months, it was 100,000 of EBITDA.

2  So, the value of the company, in less than two months,

3  went off 75 percent.

4      Q.  Okay.  And, so, let me just make sure I've got

5  it right.  You -- the company, while it was controlled

6  by Tomer, had a -- a pretty significant EBITDA.  And

7  then when you came into the picture, it no longer had a

8  -- had a good EBITDA?

9          MR. PERRIN:  Objection, form.

10     A.  No.  That's not the way I'd characterize it at

11  all.

12     Q.  (By Mr. Freeman)  Okay.  And you -- you had

13  testified earlier that Baymark Partners would not be

14  interested in a company with zero EBITDA; correct?

15     A.  When we acquired it, that's true, yes.

16     Q.  Right.  And, so, if a company had zero EBITDA,

17  Baymark Partners would not get it.  You know, there

18  wouldn't be a business reason for Baymark Partners to

19  get involved in that company; correct?

20     A.  To acquire it.

21     Q.  Okay.

22     A.  If we're involved in the company and it goes

23  down to that, then obviously we -- we do everything we

24  can for the company to turn around and grow and expand.

25  But we are not -- we are not interested in acquiring a

David Hook  *  April 12, 2021

Page 78

1    company with zero EBITDA.

2        Q.  Okay.  So, like, if there's a company that you

3    don't have an ownership in, you're not going to be

4    interested in getting involved with that company if it's

5    got a zero EBITDA; correct?

6        A.  Correct.

7        Q.  Okay.  And that would not fit Baymark Partners'

8    financial model; correct?

9        A.  That's true.

10       Q.  Okay.  Could there be any reason that you would

11   -- Baymark Partners would get involved with a company

12   that had zero EBITDA?

13               MR. PERRIN:  Objection, form.

14       Q.  (By Mr. Freeman)  Or is it -- is that just

15   understood that that doesn't fit the model?

16               MR. PERRIN:  Objection, form.

17       A.  I -- would you repeat the question, please?

18       Q.  (By Mr. Freeman)  Sure.  Is it -- is there any

19   possible reason that Baymark Partners would, you know,

20   want to take a stake in an entity with zero EBITDA, or

21   is that just so understood that it doesn't fit Baymark

22   Partners' model that --

23       A.  Well, I would never say never.  But I don't --

24   I don't know off the top of my head where there would be

25   a circumstance.  But I would never say never.

David Hook  *  April 12, 2021

Page 79

1    Q.  Okay.

2    A.  If someone gave me -- if somebody gave us an

3  interest for free, you know, why wouldn't you take that?

4    Q.  What's an instance where someone has given you

5  an interest for free?

6    A.  I don't know.

7    Q.  Just a pure hypothetical.  You've never been

8  involved in a transaction where you've received an

9  interest for free, have you?

10    A.  No.  But I would certainly look forward for

11  that happening one day.

12    Q.  Did you have any discussions with Steven Bellah

13  about moving assets from ACET Global to Windspeed?

14    A.  No.

15    Q.  Okay.  Was there any relationship between the

16  formation of Windspeed Trading, LLC and ACET Global,

17  LLC?

18         MR. PERRIN:  Objection, form.

19    A.  Not -- not that I'm aware of.

20    Q.  (By Mr. Freeman)  Okay.  Was ACET Global

21  insolvent, or could it have kept going?

22    A.  I don't know.

23    Q.  Okay.  You don't remember, or you never knew?

24    A.  I never knew.

25    Q.  Did you ever believe that restructuring ACET

David Hook  *  April 12, 2021

Page 80

1    Global's business would help give Baymark an opportunity

2    to turn its investment around?

3         A.   Repeat the question again, please.

4         Q.   Sure.

5              Did you -- did you ever believe that

6    restructuring ACET Global's business would give Baymark

7    Partners an opportunity to turn its investment around?

8         A.   No, from -- no, I did not think the company was

9    going to turn around.

10        Q.   Okay.  Did you ever discuss restructuring ACET

11   Global's business operations?

12        A.   No.

13        Q.   Okay.  Did you ever discuss how restructuring

14   its operations might impact creditors?

15        A.   No.

16        Q.   Did Windspeed Trading maintain the financial

17   records of ACET Global?

18        A.   I -- I don't know.

19        Q.   But you were the president of ACET Global;

20   correct?

21        A.   Yes, I was.

22        Q.   Okay.  And you don't know if Windspeed Trading

23   ever maintained the financial records of ACET Global?

24        A.   No.

25        Q.   That's a no, they didn't?  Or no, you don't

David Hook  *  April 12, 2021

Page 81

1    know?

2         A.  No, I don't know.

3         Q.  Okay.  And you don't know whether there were

4    separate books and records for ACET Global and Windspeed

5    Trading?

6         A.  No.

7         Q.  Did you ever provide instructions to Windspeed

8    Trading regarding ACET Global's financial records?

9         A.  No.

10        Q.  How, exactly, did Windspeed Trading's business

11   model differ from ACET Global's?

12        A.  I don't even know what Windspeed's business

13   model is.

14        Q.  Okay.  You don't -- you don't know anything

15   about what Windspeed Trading did or does?

16        A.  No.

17        Q.  Okay.  Did you ever refer to Windspeed

18   Trading's loan as the ACET note?

19        A.  Not that I recall.

20        Q.  Okay.  Do you know when Windspeed Trading began

21   selling inventory?

22        A.  No.

23        Q.  Do you know where Windspeed Trading obtained

24   its inventory from?

25        A.  No.

David Hook  *  April 12, 2021

Page 82

1      Q.  Do you know whether the inventory that

2  Windspeed Trading sold was, in fact, ACET Global's

3  inventory?

4      A.  No.

5      Q.  Okay.  Do you ever ask -- have you ever asked

6  Matthew Denegre to have one of Baymark -- Baymark

7  Partners' companies keep two sets of books?

8      A.  No.

9      Q.  No?

10      A.  No.

11      Q.  Is -- was Matthew Denegre ever authorized to

12  request one of Baymark Partners' companies to keep two

13  sets of books?

14      A.  I don't know.

15      Q.  Okay.  If you'll look to what's on the screen

16  now as Exhibit 2.

17      A.  Wait.  Sorry -- we got disconnected.

18      Q.  That's okay.

19           MR. PERRIN:  No. 2.

20      A.  Okay.

21      Q.  (By Mr. Freeman)  Okay.  Does this document,

22  does it appear to reflect an email from Matt Denegre to

23  -- to William Szeto in October of 2018?

24      A.  I see October 19.

25      Q.  Okay.  October 19th?

David Hook  *  April 12, 2021

Page 83

1    A.  Bill Szeto -- from Bill Szeto to Matt Denegre

2  on Friday, October 19.

3    Q.  Of 2018?

4    A.  Yes.

5    Q.  Okay.  And, now, you were president of ACET

6  Global at that time; correct?

7    A.  I -- I don't know.

8    Q.  No?

9         What -- you -- we had seen that you had

10  executed a document around that time in your capacity as

11  president of ACET Global; is that correct?

12    A.  Okay.  If -- if that is true, then yes, it is

13  correct.

14    Q.  Okay.  What was Matthew Denegre's role at ACET

15  Global while you were the president of ACET Global?

16    A.  He didn't work for ACET Global.  He works for

17  Baymark Partners.

18    Q.  Okay.  So he worked for Baymark Partners.  Was

19  he authorized -- was Baymark Partners authorized to

20  engage any -- in any actions with respect to ACET Global

21  while you were the president of ACET Global?

22         MR. PERRIN:  Objection, form.

23    A.  Well, we owned the company.

24    Q.  (By Mr. Freeman)  Okay.  Baymark Partners owned

25  --

David Hook  *  April 12, 2021

Page 84

1        A.   So, that means -- Yeah.  So, we owned the

2    company.

3        Q.   Okay.  So, Baymark Partners owned ACET Global?

4        A.   Part of it.

5        Q.   What do you mean "part of it"?

6        A.   Majority.

7        Q.   Okay.  Baymark Partners owned the majority of

8    ACET Global?

9        A.   Yeah.  One of those entities.

10       Q.   Okay.  And this email from Matt Denegre tells

11   Mr. Szeto that Jane will need to set up a new QuickBooks

12   file for Windspeed and maintain the old QuickBooks file

13   for ACET.  "It will need to be separate books for

14   obvious reasons."

15            Do you know what he is referring to here?

16       A.   I don't, no.

17       Q.   And did you ever, as -- as the president of

18   ACET Global at this time, did you ever have any

19   discussions with Mr. Denegre about the reasons for

20   maintaining separate sets of books from Windspeed?

21       A.   No.

22       Q.   And what -- what is the reason that there would

23   even need to be a conversation about separate books

24   between ACET Global and Windspeed during this time when

25   you're the president of ACET Global?

David Hook  *  April 12, 2021

Page 85

1          MR. PERRIN:  Objection, form.

2     A.  I don't know.

3     Q.  (By Mr. Freeman)  Has Mr. Denegre ever stolen

4  money from you?

5     A.  No.

6     Q.  Has he ever stolen money from Baymark Partners?

7     A.  No.

8     Q.  Has he ever stolen money from any company that

9  is owned by Baymark Partners?

10    A.  No.

11    Q.  What do you think he's doing here?

12         MR. PERRIN:  Objection, form.

13    A.  I don't know.

14    Q.  (By Mr. Freeman)  Okay.

15    A.  You'll have to ask him.

16    Q.  Okay.  Do you think this is something that

17 Mr. Denegre would likely remember?

18         MR. PERRIN:  Objection, form.

19    A.  I don't know.

20    Q.  (By Mr. Freeman)  Okay.  As the president of

21 ACET Global, wouldn't you have been interested to know

22 what was -- what was going on here in this email?

23         MR. PERRIN:  Objection, form.

24    A.  If -- if the -- if I was still working on the

25 company and the company was my responsibility, I would

David Hook   *   April 12, 2021

Page 86

1    have.  But this -- this point, very likely that I had

2    passed it to Tony and Matt.

3         Q.  (By Mr. Freeman)  Okay.  And, so, at this

4    point, even though you're still the president of ACET

5    Global, you had passed all responsibilities on to Tony

6    Ludlow and Matt Denegre?

7              MR. PERRIN:  Objection, form.

8         A.  Very likely, yes.

9         Q.  (By Mr. Freeman)  Okay.  So, at this point,

10   even though you're still president of ACET Global, were

11   you taking any steps to attempt to protect the interests

12   of any creditors of ACET Global?

13             MR. PERRIN:  Objection, form.

14        A.  Like I said many times, I wasn't involved in

15   the decisions for the company.

16        Q.  (By Mr. Freeman)  Okay.  So, as president of

17   ACET Global, you weren't involved in any decisions with

18   respect to the company?

19        A.  Yes.

20             MR. PERRIN:  Objection, form.

21        A.  And you keep talking about president.  I'm

22   president of probably four employees.

23        Q.  (By Mr. Freeman)  Okay.  So, as president of --

24   of a company with several employees, were you not

25   involved in any decision making?

David Hook  *  April 12, 2021

Page 87

1              MR. PERRIN:  Objection, form.

2         A.  No.

3         Q.  (By Mr. Freeman)  Okay.  Is -- to your mind, is

4    it completely -- is a company completely insignificant

5    if it has, like, four employees?

6         A.  No.  It's -- it's -- all the companies we have

7    are significant.

8         Q.  Right.  And what is it about four employees

9    that makes a company unimportant?

10             MR. PERRIN:  Objection, form.

11        A.  I never said it wasn't important.  I just said

12   it was important.

13        Q.  (By Mr. Freeman)  What did you mean by it had,

14   like, four employees?

15        A.  I just want it to be on the record, the scope

16   of the size of the business.

17        Q.  Okay.  So, even though you were president of

18   that business, it -- it wasn't much of a priority to you

19   because it had four employees?

20             MR. PERRIN:  Objection, form.

21        A.  Again, it was the responsibility of our firm,

22   for Tony and Matt.

23        Q.  (By Mr. Freeman)  Okay.

24        A.  We don't think it's worth taking the legal fees

25   and the costs associated with changing the word

David Hook  *  April 12, 2021

Page 88

1    "president," particularly when a company was not doing

2    very well at this particular time.

3        Q.  It wasn't doing well under your leadership as

4    president?

5             MR. PERRIN:  Objection, form.

6        A.  It was not doing well of the person who was

7    running the business, and that was Tomer.

8        Q.  (By Mr. Freeman)  But, now, Tomer had been

9    fired by you long before this document; correct?

10       A.  I don't know when he was fired.

11       Q.  I'll represent to you it was in February of

12   2018.

13            But at this point in time, you're the --

14   you're the president, but you're not -- your testimony

15   is you weren't doing anything, weren't making any

16   decisions; yet you're having trouble figuring out how

17   the company started performing poorly; is that correct?

18            MR. PERRIN:  Objection, form.

19       A.  No.  The company started performing right when

20   we acquired the business.

21       Q.  (By Mr. Freeman)  Okay.  So it was performing

22   very well until Baymark Partners got involved; correct?

23            MR. PERRIN:  Object to form.

24       A.  No.  That's not correct.

25       Q.  (By Mr. Freeman)  Okay.  Do you know when

David Hook  *  April 12, 2021

Page 89

1   Windspeed received funding?

2       A.  No.

3       Q.  Do you know where Windspeed received its

4   funding from?

5       A.  No.

6       Q.  Do you know whether Windspeed had a loan from

7   Super G Capital?

8       A.  Repeat the question.

9       Q.  Do you know whether Windspeed Trading had a

10  loan from Super G Capital?

11      A.  No.

12      Q.  Do you know how Windspeed is structured?

13      A.  No.

14      Q.  You don't have any position at Windspeed?

15      A.  No.

16      Q.  Do you know whether Baymark does?

17          MR. PERRIN:  Objection, form.

18      A.  I am not sure.

19      Q.  (By Mr. Freeman)  Okay.

20      A.  Not sure.

21      Q.  Okay.  Have you ever seen the company agreement

22  for Windspeed Trading, LLC?

23      A.  No.

24          MR. FREEMAN:  Okay.  I'm going to take a

25  short break and go off the record.  I'm going to

David Hook  *  April 12, 2021

Page 90

1   circulate -- everyone's already got a copy of it -- but

2   circulate the company agreement of Windspeed Trading and

3   we'll add it as an exhibit to this deposition in just a

4   second.

5              (Break taken from 3:12 to 3:18.)

6        Q.  (By Mr. Freeman)  Mr. Hook, I'm showing you

7   what -- what's being marked as Exhibit 54 for this

8   deposition.

9        A.  Okay.

10       Q.  It's the -- it's the amended and restated

11  company agreement of Windspeed Trading, LLC.

12       A.  Okay.

13       Q.  And it's dated October 18th, 2018.

14       A.  Okay.  Yeah.

15       Q.  Are you familiar with this document?

16       A.  No.

17       Q.  Do you -- do you know whether Baymark Partners

18  or any of its affiliates have any interest in Windspeed

19  Trading, LLC?

20             MR. PERRIN:  Objection, form.

21       A.  I don't know for sure if we have anything or

22  not.

23       Q.  (By Mr. Freeman)  Okay.  And if you'll --

24  you'll turn with me to the eleventh page of that

25  document.

David Hook  *  April 12, 2021

Page 91

1       A.  Okay.

2       Q.  And specifically paragraph 3.1, which refers to

3   duties of board of managers.  Do you see that?

4                MR. PERRIN:  Wait a minute.  That's not

5   Page 11.

6                MR. FREEMAN:  Well --

7                THE WITNESS:  Seven.

8                MR. FREEMAN:  The eleventh page of the PDF.

9                MR. PERRIN:  Oh, I don't have the PDF.  So

10  I'm going to go --

11               MR. FREEMAN:  Yeah.  Page 7 of the

12  document.

13      A.  Okay.

14      Q.  (By Mr. Freeman)  Does that refer to the duties

15  of the board of managers?

16      A.  I see that here, uh-huh.

17      Q.  And it states that the business and affairs of

18  the company shall be managed by the board of managers?

19      A.  Yes.

20      Q.  And that the board of managers shall be solely

21  responsible for the operation and management of the

22  business of the company?

23      A.  Yes.

24      Q.  Okay.  And below that, in 3.2, does it state

25  that there is no control by members?

David Hook  *  April 12, 2021

Page 92

1      A.   Yes.

2      Q.   Okay.  And below that does it refer to -- does

3   it state that there shall be three managers on the board

4   of managers of the company?

5      A.   Yes.

6      Q.   Okay.  Below that, under the paragraph

7   appointment, does it state that Baymark shall be

8   entitled to appoint one manager of the board of

9   managers, referred to as the Baymark manager, so long as

10  Baymark is a warrant holder or member of the company?

11     A.   Yes.

12     Q.   Okay.  Is this a typical arrangement for

13  Baymark Partners?

14     A.   To be a manager?

15     Q.   To be -- yes.  Yeah.

16     A.   Yes.

17     Q.   It is typical?

18     A.   Yes.

19     Q.   And is a relationship as a warrant holder to a

20  company typical for Baymark Partners?

21     A.   No.

22     Q.   Can you think of another instance where Baymark

23  has -- Baymark Partners has obtained a warrant interest

24  in a company?

25     A.   I don't believe so.

David Hook  *  April 12, 2021

Page 93

1      Q.  Okay.  Are you aware of any other instance

2  where a Baymark Partners' affiliated entity obtained a

3  warrant in any other company?

4      A.  No.

5      Q.  So, as far as you can recall, this may be the

6  only instance where Baymark Partners or its affiliate

7  has obtained a warrant in a company?

8      A.  I believe that's true, yes.

9      Q.  Okay.  And if you'll look below, at 3.4B, sir,

10  it refers to Super G shall be entitled to appoint one

11  manager to the board of managers, known as the Super G

12  manager, so long as Super G is a warrant holder or

13  member of the company.

14          Do you see that?

15      A.  Yes.

16      Q.  Okay.  And do you know -- do you understand who

17  it refers to when it refers to Super G?

18      A.  Well, the lending firm, uh-huh.

19      Q.  Okay.  Super G Capital, LLC; is that correct?

20      A.  I don't know what their entity is.

21      Q.  Okay.  Well, is there any other Super G that

22  you're aware of?

23      A.  No.

24      Q.  Okay.  If you will look to the fifth page of

25  the document, and there's a definition for Super G.

David Hook  *  April 12, 2021

Page 94

1   Does it state that that means Super G Capital, LLC?

2       A.   Super G Capital, LLC, yes.

3       Q.   Okay.  And that's the lender you referred to;

4   correct?

5       A.   Yes.

6       Q.   Okay.  Has -- to the best of your knowledge,

7   has Baymark Partners or another Baymark-affiliated

8   entity ever sat on the board of managers of a company

9   along with a lender?

10      A.   Yes, that does happen.

11      Q.   Is that a frequent occurrence?

12      A.   I -- I don't -- I don't know.  I don't know.

13      Q.   I mean, how many instances can you think of?

14      A.   Well, our industry does hundreds, if not

15  thousands, of acquisitions a year using lenders.  So, I

16  have no idea what the -- the percentage of the lenders

17  being on the board.

18      Q.   Can -- can you name some examples for me where

19  Baymark Partners or Baymark Partners-affiliated entity

20  has served on a board of directors or board of managers,

21  along with a lender?

22      A.   I believe that there are companies in our

23  portfolio that the lenders are on the board, but I don't

24  recall the names of the companies at this time.

25      Q.   Okay.  But you're -- you're sure of it?

David Hook   *   April 12, 2021

Page 95

1      A.   I'm pretty sure.

2      Q.   Okay.  And that it's not an uncommon thing?

3      A.   It's not an uncommon thing, that's right.

4      Q.   Okay.  How many of those companies does Baymark

5  Partners or the Baymark Partners affiliate also own

6  warrant rights in?

7      A.   I'm sorry.  Repeat the question, please.

8      Q.   How many -- of those companies in which Baymark

9  Partners or its affiliate controls a board seat -- board

10  of managers, board of directors -- on the same board in

11  which a -- a lender controls a board seat, how many of

12  those companies does Baymark Partners or its affiliate

13  own warrant rights in?

14           MR. PERRIN:  Objection, form.

15      A.   As I said, I don't believe we have a company

16  that we own warrants.

17      Q.   (By Mr. Freeman)  You don't believe you have a

18  company that you own warrants in?

19      A.   That -- yes, that's true.

20      Q.   Other than Windspeed Trading?

21      A.   If you say we do, yes.

22      Q.   Okay.  So, would you say it's an unusual

23  transaction here for a Baymark entity to sit on the

24  board of Windspeed Trading and to hold warrant rights in

25  Windspeed Trading?

David Hook  *  April 12, 2021

Page 96

1          MR. PERRIN:  Objection, form.

2      A.  Again, repeat the question.  Are you talking

3  specifically about Wind -- Windspeed or other companies?

4      Q.  (By Mr. Freeman)  Windspeed.

5          I'm asking do you believe that it is an

6  unusual transaction for Baymark, or one of its

7  affiliates, to have both a member -- both a role as a

8  manager on the board of managers and to have warrant

9  rights in the company?

10     A.  Yes, that is unusual.

11     Q.  Okay.  What possible reason can you think of

12  for that arrangement?

13          MR. PERRIN:  Objection, form.

14     A.  That someone would like to have our expertise

15  involved in the company.

16     Q.  (By Mr. Freeman)  Okay.  Is that -- has that

17  ever been requested of Baymark Partners, to your

18  knowledge?

19     A.  Not to give us warrants.

20     Q.  Okay.  Has Baymark --

21     A.  Every -- every one of our companies wants our

22  expertise.  That's one of the reasons why they sell to

23  us.

24     Q.  And has Baymark Partners ever requested

25  warrants in a company?

David Hook  *  April 12, 2021

Page 97

1       A.  Not that I'm aware of.

2       Q.  Has a lender ever requested that Baymark

3   Partners take warrants in a company?

4       A.  Not that I'm aware of.

5       Q.  Okay.  Under paragraph 3.5, it states name of

6   manager and it states Anthony Ludlow beside that,

7   Baymark manager; is that correct?

8       A.  Yes.

9       Q.  And do you recognize each of the other two

10  managers, Steven Bellah and William Szeto?

11      A.  Yes.

12      Q.  Okay.  Is -- would Mr. Ludlow typically discuss

13  a transaction like this with you?

14      A.  No.

15      Q.  No?

16          Mr. Ludlow is authorized to engage in this

17  kind of transaction without your -- without your

18  knowledge?

19      A.  Yes.  I trust him implicitly.

20      Q.  Okay.  So he would have -- Mr. Ludlow never

21  told you about Baymark Partners' interest in Windspeed

22  Trading, then?

23          MR. PERRIN:  Objection, form.

24      A.  Not specifically, no.

25      Q.  (By Mr. Freeman)  Okay.  Let's look down --

David Hook  *  April 12, 2021

Page 98

1    look down to the signature page of this document.

2                    MR. PERRIN:  Page number, please?

3                    MR. FREEMAN:  Well, I think it's going to

4    be the 30th or 31st page on your -- your document.

5        A.  Okay.  I think I have the one.

6        Q.  (By Mr. Freeman)  Okay.  And do you see where

7    there's a signature block there under warrant holders?

8        A.  Yes.

9        Q.  Okay.  And does that state Baymark Partners

10   Management, LLC?

11       A.  Yes.

12       Q.  Okay.  And does that name there state Anthony

13   Ludlow, manager?

14       A.  Yes.

15       Q.  Okay.  Was Mr. Ludlow the manager of Baymark

16   Partners Management, LLC?

17       A.  Yes.

18       Q.  Okay.  And do you have any interest in Baymark

19   Partners Management, LLC?

20       A.  I don't know.

21       Q.  Okay.  Does that appear to be Mr. Ludlow's

22   signature?

23       A.  I -- I think so.

24       Q.  Okay.  Any reason to believe it's not?

25       A.  No.

David Hook  *  April 12, 2021

Page 99

1      Q.  Okay.  So, that's Mr. Ludlow signing as the

2  manager of Baymark Partners Management, LLC?

3      A.  Apparently so.

4      Q.  On the amended and restated company agreement

5  of Windspeed Trading, LLC?

6      A.  Yes.

7      Q.  Okay.  But you know nothing about this company?

8            MR. PERRIN:  Objection, form.

9      A.  Well, I don't know how to answer that question.

10  Define "nothing."

11      Q.  (By Mr. Freeman)  What's the meaning of is?

12            What -- what do you know?  What's the limit

13  of your knowledge about Windspeed Trading, LLC?

14      A.  Not very much.

15      Q.  Is it just what I've shown you today?

16      A.  Basically.

17      Q.  Okay.  I would like to show you what's marked

18  as Exhibit 3.  Do you see that document?

19      A.  No, not yet.

20      Q.  Okay.

21      A.  Okay.  Got it.

22      Q.  Okay.  Does this appear to be an email exchange

23  between Matt Denegre and William Szeto?

24      A.  Yes, the first one, uh-huh.

25      Q.  Okay.  And the subject line states "merged

David Hook  *  April 12, 2021

Page 100

1    weekly report," open parentheses, Windspeed?

2         A.  Uh-huh.

3         Q.  Is that correct?

4         A.  Uh-huh.

5         Q.  Do you have any idea what this is about?

6         A.  No idea.

7         Q.  Okay.  And any idea why Baymark Partners might

8    be emailing about Windspeed in January of 2019?

9         A.  No.

10        Q.  Okay.  Did -- did you ever have discussion

11   about whether Windspeed Trading had a real board?

12        A.  No.

13        Q.  Okay.  I'd like to show you what's marked as

14   Exhibit 24 -- excuse me -- Exhibit 4.

15        A.  Okay.  I have Exhibit 4.

16        Q.  Okay.  Does this appear to be still more email

17   correspondence between Mr. Szeto and Mr. Denegre?

18        A.  Yes.

19        Q.  Okay.  And if you -- you look through this,

20   this is Mr. Szeto at his WindspeedTrading.com email

21   address; is that correct?

22        A.  Yes.

23        Q.  Okay.  Do you have any idea what he -- they are

24   corresponding about?

25        A.  No.

David Hook  *  April 12, 2021

Page 101

1    Q.  Okay.  If you'll look there towards the bottom

2   of the first page, there's an email from Mr. Szeto to

3   Mr. Denegre on January 24, 2019.  Do you see that?

4    A.  Wait.  I'm sorry.  I'm sorry.  Say that again.

5    Q.  There's an email at the bottom of the first

6   page from Mr. Szeto to Mr. Denegre.  It's dated January

7   24, 2019 at 8:09 a.m.

8    A.  Okay.  You have it yellow highlighted?

9    Q.  Yes, sir.

10    A.  Okay.  I have that here.

11    Q.  Okay.  I'm going to read, starting at the

12   second sentence.  It says, "I am going to insist either

13   one of you guys to pay for a tax filing for ACET so all

14   of these can be handled.  Majority of the sales were

15   made when the company was still ACET and has very little

16   to do with Windspeed.  A good portion of the money we

17   got as Windspeed was used to pay for debts accumulated

18   with ACET, and I simply do not have money to spend for

19   ACET anymore."

20         Do you see that?

21    A.  Yes.

22    Q.  Do you know what transaction they're referring

23   to?

24    A.  No, I don't.

25    Q.  Okay.  And to the best of your knowledge, was

David Hook  *  April 12, 2021

Page 102

1    Mr. Denegre authorized to -- to engage in a transaction

2    with Windspeed?

3              MR. PERRIN:  Objection, form.

4         A.  Authorized by who?

5         Q.  (By Mr. Freeman)  Baymark Partners?  Yourself?

6    Anyone at Baymark Partners?

7              MR. PERRIN:  Same objection.

8         A.  Well, I trust Matt implicitly.  So, he is

9    authorized to do what he thinks he should do.

10        Q.  (By Mr. Freeman)  Okay.  So Baymark Partners

11   has authorized him to do -- to do what he's done here?

12             MR. PERRIN:  Objection, form.

13        A.  Yes.

14        Q.  (By Mr. Freeman)  Okay.  And it's fair that

15   Matt Denegre's actions would be binding on Baymark

16   Partners?

17             MR. PERRIN:  Objection, form.

18        A.  I don't know how to answer that question.

19        Q.  (By Mr. Freeman)  Okay.  What is it that you're

20   -- that's giving you trouble?

21        A.  I don't know the legal aspect of that answer to

22   that question.

23        Q.  I'm asking you kind of as a matter of fairness.

24   Is it fair that the actions taken by Mr. Denegre here,

25   that he was -- since he was authorized by Baymark

David Hook  *  April 12, 2021

Page 103

1    Partners, is it fair that those actions be binding upon

2    Baymark Partners?

3              MR. PERRIN:  Objection, form.

4         A.  I'll answer the question like this:  I trust

5    Matt.  Whether he's authorized on every single action he

6    takes all day long, all year long, for the last five or

7    six years, from a legal perspective, I don't know the

8    answer to that question.

9         Q.  (By Mr. Freeman)  Okay.  Do you think it's fair

10   that people who deal with him, that they should rest

11   assured that his actions are binding on Baymark

12   Partners?

13             MR. PERRIN:  Objection, form.

14        A.  In certain circumstances.

15        Q.  (By Mr. Freeman)  What certain circumstances?

16        A.  I don't know.  Give me an example, and I'll

17   tell you.

18        Q.  A creditor is owed $3.2 million from ACET

19   Global.  Should it -- should actions taken by

20   Mr. Denegre -- on behalf of Baymark Partners -- that

21   harm that creditor's ability to receive payment for its

22   loan, should those be binding on Baymark Partners?

23             MR. PERRIN:  Objection, form.

24        A.  Mr. Freeman, at this point, we are trying to

25   save ACET Global.  We are trying to do what we can, and

David Hook  *  April 12, 2021

Page 104

1  Mr. Szeto is running the business to save ACET Global.

2  We are not trying to harm any creditors.

3      Q.  (By Mr. Freeman)  Okay.  At what point?

4      A.  At what point?

5      Q.  Yes, sir.

6      A.  Until -- at what point that we don't have any

7  control of the company.

8      Q.  Okay.  Why would you not have control of the

9  company?

10      A.  For multiple reasons.

11      Q.  Okay.  What are those reasons?

12      A.  A bank could foreclose on the -- on the debt

13  and they take it over.

14      Q.  Okay.  Any other possible --

15      A.  Well, we got off the board.  Those are two

16  reasons that, on the top of my head, I can think about.

17  As long as we don't have control anymore.

18      Q.  Okay.  And what would happen if you didn't have

19  control anymore?  What would be appropriate, or what

20  would happen?

21          MR. PERRIN:  Objection, form.

22      A.  Like I said, we are in the business of

23  acquiring companies and helping management teams and

24  entrepreneurs grow their business.  We have a very

25  strong responsibility to the employees and their

David Hook  *  April 12, 2021

Page 105

1    families for companies to survive and to make it.  We

2    have no interest in being involved in companies that go

3    down or get into trouble.

4         Q.  (By Mr. Freeman)  Okay.  So, around the time of

5    this email that's reflected here on Exhibit 4 --

6         A.  Uh-huh, yes.

7         Q.  -- what -- what was -- what was -- you know,

8    what was Baymark Partners doing to try to help -- you

9    know, trying to help the creditors or the employees

10   of --

11        A.  I have no idea.

12        Q.  How do you know that it was?

13        A.  Because I know the integrity of Tony and Matt

14   and our firm, that this is what we do.

15        Q.  Okay.  And this is the same Tony, correct, that

16   instructed Matthew Denegre to "shut the fuck up" during

17   his deposition?

18             MR. PERRIN:  Object to the form of the

19   question and instruct the witness not to answer.

20        Q.  (By Mr. Freeman)  Okay.  Is this the same Mr.

21   Ludlow who told a witness not to answer a question in

22   his deposition?

23             MR. PERRIN:  Objection to the form.

24        A.  I -- I don't know.

25        Q.  (By Mr. Freeman)  Okay.  Mr. Ludlow's a

David Hook   *   April 12, 2021

Page 106

1    licensed attorney?

2         A.   Yes, he is.

3         Q.   He's a CPA?

4         A.   Yes, he is.

5         Q.   Okay.  In good standing?

6         A.   As far as I know.

7         Q.   Okay.  Have you ever heard him tell someone in

8    their deposition to -- to not answer a question?

9         A.   No.

10        Q.   Let me show you what's marked as Exhibit 5.

11             Mr. Hook, can you see from Exhibit 5 this

12   is a -- still another email from William Szeto at his

13   Windspeed Trading email address to Matthew Denegre.  Do

14   you see that?

15        A.   Yes, sir.

16        Q.   Okay.  And down below, you can see that Bill

17   tells Matt, "I do not want to mix the ACET results

18   together with the Windspeed results in a single report."

19             Do you know -- do you have any idea why he

20   would be making that statement?

21        A.   I don't know, but it seems to me that they are

22   two separate companies.

23        Q.   Right.  So he wants to keep them separate?

24        A.   That's what it appears to me.

25        Q.   And as the president of ACET, I assume you

David Hook  *  April 12, 2021

Page 107

1    would have wanted to make sure and keep their data

2    separate from Windspeed's as well?

3        A.   Again, I didn't know there was a Windspeed.

4        Q.   Okay.  But as the president of ACET Global, you

5    would have wanted to keep its data separate from

6    other --

7        A.   Separate -- separate from any other company,

8    yes.

9        Q.   And to keep its assets separate from any other

10   company?

11           MR. PERRIN:  Objection, form.

12       Q.   (By Mr. Freeman)  Correct?

13       A.   Yes.

14       Q.   And you would want to ensure that no other

15   company took over control of those assets; correct?

16           MR. PERRIN:  Objection, form.

17       A.   It depends on circumstances.

18       Q.   (By Mr. Freeman)  What circumstances?

19       A.   I don't know because I've never been in this

20   situation before.

21       Q.   Why would you want to give away your -- your

22   company's assets to another company?

23           MR. PERRIN:  Objection, form.

24       A.   Because we -- because in a lot of companies

25   assets don't mean anything.

David Hook  *  April 12, 2021

Page 108

1      Q.  (By Mr. Freeman)  What does that mean?

2      A.  Well, a consulting firm has people; and they

3  have desks and computers.  The important part of a

4  consulting firm is the people.  The desks and the

5  computers are not important.  A consulting firm is not

6  valued off of assets.  We don't value companies off of

7  assets.  I don't care what the assets are.  I care about

8  the cash flow and the EBITDA.

9      Q.  Okay.

10     A.  We don't care about the assets.

11     Q.  What about the intangibles?

12     A.  Give me an example.

13     Q.  I don't know.  On your example, we've got

14  consultants who have computers and desks; but their

15  ability to provide service and help to customers or

16  clients and to generate cash flow, does that come from

17  their intangibles?

18     A.  It -- it comes from the individuals of the

19  firm.

20     Q.  Right.  And their intellectual ability?

21     A.  Yes.

22     Q.  Their intellectual capacity, their ability to

23  analyze, dissect, provide valuable information back?

24     A.  Yes.

25     Q.  Okay.  And, so, in valuing a business, you

David Hook  *  April 12, 2021

Page 109

1    would place a value on that intangible; right?

2                MR. PERRIN:  Objection, form.

3        A.  Actually, we pretty much solely value

4    businesses on EBITDA.

5        Q.  (By Mr. Freeman)  Okay.

6        A.  We have a multiple of EBITDA.

7        Q.  Okay.  So, during this time here reflected in

8    Exhibit 5, while you're the president of ACET Global and

9    Matthew Denegre is corresponding with Mr. Szeto, and

10   Mr. Szeto is telling him I do not want to mix the ACET

11   results together with the Windspeed results, did you

12   know this was going on?

13               MR. PERRIN:  Objection, form.

14       A.  No.

15       Q.  (By Mr. Freeman)  No?

16               And you would indicate, though, as

17   president of ACET Global, you would have wanted to keep

18   that -- that data separate; correct?

19       A.  Yes.

20       Q.  Okay.  Why would Matthew Denegre tell him he

21   would go ahead and still -- still include it?

22               MR. PERRIN:  Objection, form.

23       A.  I don't know.  I read the email that Bill Szeto

24   is writing that to Matt, not Matt to Bill Szeto.

25       Q.  (By Mr. Freeman)  Okay.  And if you'll look

David Hook   *   April 12, 2021

Page 110

1    right above that, you will see an email from Matt

2    Denegre back to Mr. Szeto that says, "I would still

3    include it."

4         A.   I do see that, yeah.  I don't know why he would

5    answer that way.

6         Q.   Okay.  Let me show you what's marked as Exhibit

7    6, sir.

8                   MR. PERRIN:  Can we take a short break?

9                   MR. FREEMAN:  What's that?

10                  MR. PERRIN:  Can we have a short break real

11   quick?

12                  MR. FREEMAN:  Yeah.  Can we cover this

13   exhibit real quick?

14                  MR. PERRIN:  Yeah, go ahead.

15                  MR. FREEMAN:  And then we -- then I'll

16   agree with you.

17        A.   I'm sorry -- what?  Oh, Exhibit 6.

18        Q.   (By Mr. Freeman)  Exhibit 6.

19                  Mr. Hook, this is a -- an email from Matt

20   Denegre to Tomer Damti on March 20, 2019, with the

21   subject line "ACET K-1"?

22        A.   Uh-huh.

23        Q.   Have you ever seen this document before?

24        A.   No.

25        Q.   Okay.  And do you -- do you know what they are

David Hook  *  April 12, 2021

                                                Page 111

1    discussing here?

2        A.  Well, it says, "The business operations are

3    closed, no activity.  However, the entity is still open

4    for liability protection.  Because of that, you will

5    receive a K-1."

6        Q.  Okay.  Did you ever have any discussion with

7    Mr. Denegre about the -- the status of ACET?

8        A.  No.

9        Q.  No?

10       A.  No.

11       Q.  Or the reasons for keeping it open?

12       A.  No.

13       Q.  Okay.

14               MR. FREEMAN:  Yeah, y'all want to go ahead

15   and take a -- take a break?

16               MR. PERRIN:  Yeah, a quick one.

17               MR. FREEMAN:  All right.  We're off the

18   record.

19               (Break taken from 3:52 to 3:58.)

20               MR. FREEMAN:  Back on the record.

21       Q.  (By Mr. Freeman)  Mr. Hook, can -- can you walk

22   me through Super G Capital's foreclosure on ACET

23   Global's assets?

24               MR. PERRIN:  Objection, form.

25       A.  No.

David Hook  *  April 12, 2021

Page 112

1      Q.  (By Mr. Freeman)  And why is that?

2      A.  I don't recall it.

3      Q.  Didn't that occur during the period that you

4  were the president of ACET Global?

5      A.  Yes, but what I continue to describe to you

6  that I was not the person in charge of the company from

7  our firm at that time.

8      Q.  Okay.  Now, was -- was Baymark Partners the

9  president of ACET Global, LLC?

10     A.  No.

11     Q.  But you were the president of ACET Global, LLC;

12  correct?

13     A.  That was my title, yes.  Apparently so.

14     Q.  And while you were president of ACET Global,

15  LLC, didn't Super G Capital foreclose on ACET Global's

16  assets?

17     A.  While I was president?

18     Q.  Yes, sir.

19     A.  I guess so.

20     Q.  Okay.  But you don't remember that at all?

21     A.  No.

22     Q.  And -- and how do you not remember that at all

23  when you were president of the company?

24          MR. PERRIN:  Objection, form.

25     A.  Because I wasn't involved.

David Hook  *  April 12, 2021

Page 113

1      Q.  (By Mr. Freeman)  Okay.  And do you know if

2  those assets -- weren't those assets of ACET Global then

3  sold by Super G Capital to Windspeed Trading, LLC?

4      A.  I don't know.

5      Q.  Okay.  And didn't Baymark Partners have an

6  interest in Windspeed Trading, LLC?

7              MR. PERRIN:  Objection, form.

8      A.  I didn't know.

9      Q.  (By Mr. Freeman)  Didn't -- didn't one of its

10  affiliates, that you had an ownership interest in, own

11  warrants in Windspeed Trading, LLC?

12              MR. PERRIN:  Objection, form.

13      A.  I didn't know that specifically, no.

14      Q.  (By Mr. Freeman)  Okay.  So, Baymark Partners

15  was not involved in the foreclosure of ACET Global's

16  assets?

17      A.  I wasn't.

18      Q.  Okay.  What about Baymark Partners?

19      A.  Baymark Partners is an entity.

20      Q.  Right.  It's a partnership; correct?

21      A.  I believe so, yes.

22      Q.  Partnership between you and Tony Ludlow?

23              MR. PERRIN:  Objection, form.

24      A.  Yeah, I'm not sure the legal, but...

25      Q.  (By Mr. Freeman)  Is it a -- is it a

David Hook  *  April 12, 2021

Page 114

1   partnership that you and Mr. Ludlow carry on in Texas?

2            MR. PERRIN:  Objection, form.

3       A.  I believe that's true.

4       Q.  (By Mr. Freeman)  Okay.  From a particular

5   office location?

6       A.  Yes.

7       Q.  And what is that office location?

8       A.  5700 Granite Parkway in Plano, Texas.

9       Q.  Okay.  And -- and, so, was Super G -- I mean

10  was -- was Baymark Partners engaged in drafting any of

11  the foreclosure documents?

12            MR. PERRIN:  Objection, form.

13      A.  I don't know.

14      Q.  (By Mr. Freeman)  Okay.  Was Baymark Partners

15  engaged in any discussions with Super G Capital about

16  the foreclosure of ACET Global's assets?

17      A.  I don't know.

18      Q.  Okay.  Did anyone at Baymark Partners ever

19  discuss the foreclosure of ACET Global's assets with you

20  in 2018?

21      A.  Not that I recall.

22      Q.  Okay.  Did you ever have discussions with

23  anyone at Baymark Partners or ACET Global about

24  obtaining an inventory listing for the foreclosure?

25      A.  No.

David Hook  *  April 12, 2021

Page 115

1        Q.  Did anyone at Baymark Partners ever engage in

2    that process?

3        A.  I don't know.

4        Q.  Put what's marked as Exhibit 8 on the screen,

5    if you can see that.  Do you see that, sir?

6        A.  Yes.

7        Q.  Okay.  Does this appear to be an email between

8    Matt Denegre at his BaymarkPartners.com email address

9    and William Szeto at his WindstreamTrading.com email

10   address?

11       A.  Yes.

12       Q.  And does it state, as a subject line, "ACET

13   fixed assets, inventory lists"?

14       A.  Yes.

15       Q.  Okay.  And is this in December of 2018?

16       A.  Yes.

17       Q.  Okay.  Do you have any idea why they are

18   preparing this inventory list?

19       A.  No.

20       Q.  Okay.  And this wasn't -- you know, although

21   you're serving as president of ACET Global at this time,

22   this wasn't anything you knew anything about, was it?

23            MR. PERRIN:  Objection, form.

24       A.  That's right.

25       Q.  (By Mr. Freeman)  Okay.  And -- and down below,

David Hook  *  April 12, 2021

Page 116

1   you'll see that Mr. Denegre's email to Mr. Szeto, at

2   5:00 o'clock on December 18th, 2018, that he asks

3   Mr. Szeto, "Can you update the saleable inventory list

4   for ACET inventory?  We are updating the foreclosure

5   documents."

6              Did I read that correctly?

7       A.  Yes.

8       Q.  And did he -- did Mr. Denegre send that from

9   his BaymarkPartners.com email address?

10      A.  Yes.

11      Q.  And who did he -- who do you understand him to

12  have referred to when he says "we"?

13      A.  I don't know.

14      Q.  Okay.  Was Mr. Denegre running point on the

15  foreclosure of ACET Global's assets?

16      A.  I don't know.

17      Q.  If he was doing so, do you think that would

18  have been proper?

19              MR. PERRIN:  Objection, form.

20      A.  Yes.

21      Q.  (By Mr. Freeman)  Why do you say yes?

22      A.  Because he and Tony were working on ACET Global

23  at that time.

24      Q.  Okay.  So he and Tony were working on ACET

25  Global in December of 2018?

David Hook  *  April 12, 2021

Page 117

1      A.  Yes.

2      Q.  Okay.  And you think it would have been proper

3  for Mr. Denegre to obtain an ACET inventory because

4  Baymark Partners was updating the foreclosure documents?

5            MR. PERRIN:  Objection, form.

6      A.  I don't know.

7      Q.  (By Mr. Freeman)  Okay.  Did Baymark Partners

8  inform its legal counsel about all of the circumstances

9  of this transaction?

10      A.  I don't know.

11      Q.  Okay.  Generally does -- is it Baymark

12  Partners' practice to inform its counsel of all of the

13  circumstances related to legal transactions?

14            MR. PERRIN:  Objection, form.

15      A.  Say that again, please.

16      Q.  (By Mr. Freeman)  Is it generally Baymark

17  Partners' practice to inform its legal counsel of all of

18  the relevant circumstances surrounding a legal

19  transaction?

20      A.  Yes.

21      Q.  Okay.  And have you ever known Baymark Partners

22  not to do that?

23            MR. PERRIN:  Objection, form.

24      A.  No.

25      Q.  (By Mr. Freeman)  In all your years with the

Page 118

1   company, it has always provided its legal counsel with

2   all relevant surrounding circumstances related to a

3   legal transaction?

4             MR. PERRIN:  Objection, form.

5       A.  Well, that's a very general question; so, I

6   don't know how to answer that.

7       Q.  (By Mr. Freeman)  Okay.  Well, are you aware of

8   circumstances or -- or instances where Baymark Partners

9   has not provided its legal counsel with relevant

10  considerations?

11            MR. PERRIN:  Objection, form.

12      A.  I -- I mean, relevant is a very general term.

13  So, I don't know what's -- what's relative or not

14  relative.

15      Q.  (By Mr. Freeman)  Okay.  Okay.  Do you believe

16  it would be -- if Baymark Partners here was updating the

17  foreclosure documents on the foreclosure against ACET

18  Global, do you think it would be relevant to inform your

19  legal counsel that Baymark Partners has an interest in

20  Windspeed Trading, LLC?

21            MR. PERRIN:  Objection, form.

22      A.  I -- I don't know.  And I don't know all of the

23  timing involved in all that.  So, I just don't know.

24      Q.  (By Mr. Freeman)  Okay.  Well, let's assume, as

25  this email here from Mr. Denegre states, that, you know,

David Hook   *   April 12, 2021

Page 119

1   in December of 2018, when Baymark Partners is updating

2   the foreclosure documents to foreclose on ACET Global,

3   and let's assume that Baymark Partners holds warrants in

4   Windspeed Trading to acquire 40 percent of Windspeed for

5   $100.

6             Do you think that would be a relevant fact

7   that Baymark Partners should convey to its legal

8   counsel?

9             MR. PERRIN:  Objection, form.

10     A.  Well, I don't -- I don't know whether what you

11   just said is true or not.  I don't know if we -- how

12   many warrants we have.  So, I -- I don't know if your

13   question is truthful.

14     Q.  (By Mr. Freeman)  Okay.  Well, let's assume

15   that, in fact, Baymark Partners or its affiliate held --

16   held warrants to acquire 40 percent of Windspeed

17   Trading, LLC for a $100 exercise price at whatever point

18   in time it chose to exercise those warrants.  Let's

19   assume that's true.

20             Do you think that that's information that

21   Baymark Partners should convey to its legal counsel?

22             MR. PERRIN:  Objection, form.

23     A.  I -- I -- I don't know because there's a lot of

24   other circumstances that could be involved, which I

25   don't know about.

David Hook  *  April 12, 2021

Page 120

1      Q.   (By Mr. Freeman)  Okay.  What other

2   circumstances could be involved?

3      A.   Well, you're -- our goal, as I stated before,

4   was for ACET Global to survive and make it.  That's what

5   our intention is with every company.  So, we would be

6   doing things to help ACET Global survive.  So, what

7   these circumstances are and what transpired, I don't

8   know.

9      Q.   Okay.  As we sit here, it's difficult for you

10   to come to the conclusion or admit that Baymark Partners

11   or its affiliate's ownership of warrant interests in

12   Windspeed, it's difficult for you to admit or even just

13   state yeah, that's something that Baymark Partners

14   should convey to its legal counsel if they are going to

15   be involved in the foreclosure of ACET Global's assets?

16              MR. PERRIN:  Objection, form.  This is

17   getting a little abusive, Jason.

18              Mr. FREEMAN:  I am feeling a bit abused,

19   Ed.

20              MR. PERRIN:  No, I think you've got the

21   shoe on the wrong foot.

22      A.   So, will you ask the question again, please.

23      Q.   (By Mr. Freeman)  Yes, sir, I would be glad to.

24              So, I'm asking why is it so difficult for

25   you to acknowledge or to agree that Baymark Partners

David Hook  *  April 12, 2021

Page 121

1  should inform its legal counsel that it has ownership of

2  warrants that entitle it to ownership of 40 percent of

3  Windspeed, for $100, at its discretion, when its counsel

4  and Baymark Partners are engaged in the foreclosure of

5  ACET Global's assets?

6           MR. PERRIN:  Objection, form.

7      A.  Because I've said multiple times, Mr. Freeman,

8  I was not involved.  I was only involved for a few

9  months after the acquisition.  The company had tanked.

10  I didn't believe that their business model was going to

11  be successful.

12      Q.  (By Mr. Freeman)  Okay.  If you will, look at

13  Exhibit 25.  Mr. Hook, have you seen this document

14  before?

15      A.  No.

16      Q.  Okay.  And does this appear to be an email from

17  Matthew Denegre to Steve Bellah of Super G Capital, Alex

18  Godinez, and Tony Ludlow?

19      A.  Yes, it does.

20      Q.  It's from October of 2018, with certain

21  attachments that refer to a warrant purchase agreement?

22      A.  Yes.  And -- and you will notice that I'm not

23  on there.

24      Q.  Correct.  Is that right?  Is that by design?

25           MR. PERRIN:  Objection, form.

David Hook  *  April 12, 2021

Page 122

1      Q.  (By Mr. Freeman)  Okay.

2      A.  I -- I don't know.

3      Q.  Okay.  Is the document that's attached below,

4   do you understand that to have been sent by Julie Smith

5   of Hallet and Perrin?

6      A.  Wait a minute.

7              MR. PERRIN:  You want him to review the

8   document?

9              MR. FREEMAN:  Sure.  Take a quick look.

10             MR. PERRIN:  Quick look at a 30-page

11   document?

12      A.  Okay.

13      Q.  (By Mr. Freeman)  I'll point you to the

14   appropriate portion of it.

15      A.  Okay.

16             MR. PERRIN:  That's doubtful.

17             MR. FREEMAN:  Excuse me?  What was that?

18   What did you say there?  Excuse me, Ed.  I'd like to get

19   that on the record.  What did you say?

20             MR. PERRIN:  He's reading the document,

21   Jason.

22             MR. FREEMAN:  Was it "that's doubtful"?

23   Was that in response to me?

24             Ed, did I say I'll point you to the

25   relevant portion of the document I want you to look at,

David Hook  *  April 12, 2021

Page 123

1    and you said "that's doubtful"?

2                   MR. PERRIN:  Jason, I said --

3                   MR. FREEMAN:  What does that mean, Ed?

4    What'd that mean?  Huh?

5                   MR. PERRIN:  Jason, you have trouble

6    figuring out what's relevant.

7                   MR. FREEMAN:  Why do you say that, Ed?

8                   MR. PERRIN:  I'm not going to get into this

9    anymore, Jason.  Just --

10                  MR. FREEMAN:  But why do you -- why do I

11   have trouble finding -- figuring out what's relevant?

12                  MR. PERRIN:  That's -- that's something you

13   need to ask yourself.

14                  MR. FREEMAN:  Well, you're the one telling

15   me that.

16                  MR. PERRIN:  Well, apparently you don't

17   know that.  So, you'll find out on your own.

18                  MR. FREEMAN:  Okay.  Sure be nice if I knew

19   what you were talking about or anybody knew what you

20   were talking about.

21       A.  Okay.  Mr. Freeman, what's your question?

22       Q.  (By Mr. Freeman)  This warrant purchasing

23   agreement, it's the fourth page of the PDF, states on

24   the top Hallett & Perrin draft.  That's Edward Perrin's

25   firm.  Do you see that?

David Hook  *  April 12, 2021

Page 124

1     A.  Yes.

2     Q.  States that it's drafted by Edward Perrin's

3  firm on October 16th, 2018; is that correct?

4          MR. PERRIN:  Objection, form.

5     A.  It says H and P draft, 10-16-18.

6     Q.  (By Mr. Freeman)  Okay.  Do you understand H

7  and P to be Hallett & Perrin?

8     A.  Yes, I would assume that.

9     Q.  And -- and, in fact, Hallett & Perrin is the

10  law firm for all of your companies, isn't it?

11     A.  I don't know about that.

12     Q.  Is it the law firm you use for most of your

13  companies?

14     A.  Yes, it is.

15     Q.  Was Mr. Ludlow a former attorney at Hallett &

16  Perrin?

17     A.  Yes, he was.

18     Q.  Okay.  Did he work with Ed Perrin?

19     A.  I -- I don't know.  I don't know.

20     Q.  Okay.  So, this warrant purchase agreement that

21  was drafted by Hallett & Perrin on October 16th, 2018,

22  does this state here in the first paragraph -- and I

23  think this is part of what's relevant, though not all of

24  it -- that it's entered into between Windspeed Trading,

25  LLC and Super G/Baymark Partners, LLC?

David Hook  *  April 12, 2021

Page 125

1      A.  That's what it says.

2      Q.  Right.  Does that seem like that's maybe

3  relevant, something relevant that your -- your law firm

4  should know?

5           MR. PERRIN:  Objection, form.

6      A.  Well, they -- they drafted it.  So, I guess

7  they know it.

8      Q.  (By Mr. Freeman)  Right.  Seems like it is.

9           So, Super G and Baymark Partners as the

10  purchasers.  And if you will look below here, look to

11  the terms of the warrant for Super G in paragraph 1A,

12  this draft, this Hallett & Perrin draft, does it state

13  that there is an exercise price for the warrants of

14  $100?

15      A.  That's what it says.

16      Q.  Okay.  And above that, does it state that those

17  warrants will give the warrant holder 40 percent of

18  Windspeed?

19      A.  If they are exercised.

20      Q.  Right.  For a total exercise price of $100?

21           MR. PERRIN:  Objection, form.

22      A.  Yes.

23      Q.  (By Mr. Freeman)  Okay.  And that's not a lot

24  of money, is it?

25      A.  No.

David Hook  *  April 12, 2021

Page 126

1     Q.  All right.  You spend more than that on a

2  dinner.

3           MR. PERRIN:  Objection, form.

4     A.  Yes, sometimes I do.

5     Q.  (By Mr. Freeman)  Like, 680 bucks on a dinner

6  or something like that; right?

7           MR. PERRIN:  Objection, form.

8     A.  I don't know what you're talking about.

9     Q.  (By Mr. Freeman)  Okay.  Below that, does it

10  state for Baymark -- does it state that -- the exact

11  same terms?  There's an exercise price of $100?

12     A.  Yes.

13     Q.  All right.  And is that for an aggregate of 40

14  percent of the membership interest in Windspeed?

15     A.  That's what it says.

16     Q.  Okay.

17           MR. PERRIN:  Jason, if it'll save us time,

18  Jason, I'll stipulate that this draft says what it says.

19  The document speaks for itself.  And the man doesn't

20  have any knowledge of the transaction, as he said.

21  That's why I'm saying we're going through a bunch of

22  wasted time.  You go ahead.

23           MR. FREEMAN:  Yeah.  Appreciate it, Ed.  I

24  don't need your stipulation, though.

25           MR. PERRIN:  Okay.  Then go forward.

David Hook  *  April 12, 2021

Page 127

1                MR. FREEMAN:  And I -- it sounds to me like

2     we disagree about some material facts within that

3     stipulation.  But I appreciate the offer.

4         Q.  (By Mr. Freeman) So, do you -- do you believe

5     this would be a relevant fact for your law firm to know

6     if it's engaged in updating the foreclosure documents on

7     ACET Global?

8         A.  I -- I don't know because I've never been

9     involved in anything like this before.  So, I have no

10     idea what's relevant.

11         Q.  Okay.  And -- and based upon this and the date,

12     it looks like that is -- actually is a relevant fact

13     that your -- your law firm was aware of; correct?

14         A.  Apparently so, uh-huh.

15         Q.  Okay.  I'll show you what's marked as Exhibit

16     9, if you will, sir.

17         A.  Okay.

18         Q.  Does this appear to be an email between William

19     Szeto to Matt Denegre.

20         A.  Yes.

21         Q.  Okay.  January of 2019?

22         A.  Yes.

23         Q.  Okay.  And did -- Mr. Denegre states, "Super G

24     sent terms for the assumption of the ACET note below."

25     Is that correct?

David Hook  *  April 12, 2021

Page 128

1     A.   Wait a minute.  I haven't gotten there.  Just
2  one second.  Okay.  I have it in front of me now.  Okay.
3     Q.   Okay.  Does it state from Mr. Denegre, at his
4  Baymark Partners email address, "Super G sent terms for
5  the assumption of the ACET note below"?
6     A.   That's what it says, yes.
7     Q.   Okay.  And this email was sent while you were
8  the president of ACET Global; correct?
9     A.   I assume so.
10     Q.   Okay.  What assumption of your company's note
11  is Mr. Denegre referring to?
12          MR. PERRIN:  Objection, form.
13     A.   I -- I don't know.
14     Q.   (By Mr. Freeman)  No idea?  You never discussed
15  with Mr. Denegre anyone assuming your company's note?
16     A.   No.
17     Q.   You don't know anything about Windspeed Trading
18  assuming your company's note?
19     A.   No.
20     Q.   But you were president of ACET Global, and your
21  employee appears to be discussing the assumption of your
22  company's note; correct?
23          MR. PERRIN:  Objection, form.
24     A.   Yes.
25     Q.   (By Mr. Freeman)  Okay.  But you didn't know

David Hook  *  April 12, 2021

Page 129

1    anything about that; right?

2        A.  That's right.

3        Q.  Okay.  I would like for you to look at Exhibit

4    10, sir.  Does this appear to be an email sent from Matt

5    Denegre to Alex Godinez in late January 2019?

6        A.  January -- yes.

7        Q.  Okay.  And is the subject line

8    "Windspeed/ACET"?

9        A.  Yes.

10       Q.  Okay.  Why would there be a subject line of

11   Windspeed/ACET?  Do you have any idea?

12       A.  I don't.

13       Q.  Okay.  Down below, if you'll look towards the

14   bottom of the -- the first page, Mr. Denegre states, "We

15   still need the dates on when the foreclosure notice got

16   sent out or when you plan to send them out."

17               Any idea why he's asking for that?

18       A.  No.

19       Q.  He says, "Then we can finalize."

20       A.  That -- that's what it says.  But I don't know

21   why.

22       Q.  Okay.  He sent this email from his Baymark

23   Partners email address; correct?

24       A.  Yes.

25       Q.  Okay.  And then down below that, does there

David Hook  *  April 12, 2021

Page 130

1    appear to be an email from Alex Godinez to Mr. Denegre

2    in January 29th, 2019 stating, "Just want -- just wanted

3    to follow up on status for the final version of the

4    foreclosure agreement.  Are we good to finalize?"

5                    Does that -- did I read that correctly?

6        A.  Yes.

7        Q.  And this was an email between Alex Godinez at

8    Super G Capital and Matt Denegre at his Baymark Partners

9    email address with the subject line "Windspeed/ACET"; is

10   that correct?

11       A.  Yes.

12       Q.  Okay.  And that's the same ACET Global that --

13   that you were the president of at this time; correct?

14       A.  Correct.

15       Q.  Okay.  But you don't know what he's referring

16   to?

17       A.  I've never seen it before.

18       Q.  And you don't know what foreclosure agreement

19   he's referring to?

20       A.  No.

21       Q.  All right.  And no idea if this deals with the

22   assets of ACET Global or the assumption of those assets

23   by Windspeed Trading, LLC?

24       A.  No.

25       Q.  Okay.  How do you know Bill Szeto?

David Hook  *  April 12, 2021

Page 131

1          A.  I don't know how we first met.

2          Q.  Okay.  When do you believe you first met?

3          A.  Over ten years ago.

4          Q.  Okay.  Have you engaged in any business

5      transactions together over that ten years?

6                    MR. PERRIN:  Objection, form.

7          A.  Yes.

8                    MR. FREEMAN:  What's the basis for the

9      objection?

10                   MR. PERRIN:  You've already gone through

11     this line of questioning before.  Asked and answered.

12                   MR. FREEMAN:  What are you talking about,

13     Ed?

14                   MR. PERRIN:  Your questions earlier in the

15     deposition, Jason.

16                   MR. FREEMAN:  Okay.

17         Q.  (By Mr. Freeman)  So, yes, you've -- you've

18     engaged in business transactions with Mr. Szeto over

19     that course of years?

20         A.  Yes.

21         Q.  Okay.  What was the first transaction you

22     engaged in with Mr. Szeto?

23                   MR. PERRIN:  Objection, form.

24         A.  When I was -- had my venture capital firm, we

25     made an investment in a company that he was on the

David Hook  *  April 12, 2021

Page 132

1    management team of.

2         Q.  (By Mr. Freeman)  Okay.  What company was that?

3         A.  I don't remember the name.

4         Q.  Okay.  What other companies have you been

5    involved with Mr. Szeto in?

6         A.  That's it.  Just one.

7         Q.  So, just one time?

8         A.  Uh-huh, yes.

9         Q.  Is that -- is that when you met him?

10        A.  I don't recall.

11        Q.  Okay.  What -- what -- are y'all personal

12   friends or just business acquaintance?

13        A.  Business acquaintance.

14        Q.  Okay.  How did Mr. Szeto come to be involved

15   with ACET Global?

16        A.  I reached out to him.

17        Q.  Okay.  When did you reach out to him?

18        A.  I don't recall.

19        Q.  Okay.  Was it 2017?

20        A.  It was after we bought the company.  I don't

21   remember when we bought the company.

22        Q.  Okay.  What -- what prompted the call?

23        A.  ACET Global was failing.

24        Q.  Okay.  How was it failing?

25        A.  Well, the revenue was going down dramatically.

David Hook  *  April 12, 2021

Page 133

1    The EBITDA was going down dramatically.  It was a very

2    fragile company when we acquired it.  There's four or

3    five employees, cash flow issues.  The company was --

4    was failing and failing quickly.

5         Q.  Okay.  And, so, you called Mr. Szeto?

6         A.  Yes.

7         Q.  And what did you ask Mr. Szeto to do?

8         A.  If he would go take a look at the company and

9    see what his thoughts were.

10        Q.  Okay.  And how -- how did you make that happen?

11        A.  I probably called him on the telephone.

12        Q.  Okay.  Did you meet with him?

13        A.  I don't recall.  Probably.

14        Q.  Okay.  And then how did -- how did he get

15   involved in ACET Global?  Did he just show up, or did

16   you ask him to go over there?

17        A.  I don't recall the sequence of events.

18        Q.  Okay.  But you were the president of ACET

19   Global at that time; right?

20        A.  Apparently so, yes.

21        Q.  Okay.  And, so, did you hire Mr. Szeto?

22        A.  I think ACET Global hired Mr. Szeto.

23        Q.  So ACET Global hired Mr. Szeto?

24        A.  I believe so.

25        Q.  While you were the president of ACET Global;

David Hook   *   April 12, 2021

Page 134

1   correct?

2        A.   Correct.

3        Q.   And, so, ACET Global hires Mr. Szeto while you

4   were president and what?  Does he become the CEO of ACET

5   Global?

6        A.   I don't -- I don't recall what his title is,

7   but he was -- I don't recall.  I think he worked for

8   Tomer at the beginning.  And if I'm not mistaken, I

9   think he was working for free.  I don't -- I don't --

10  I'm not positive, but he could have worked for free for

11  a while under Tomer.

12       Q.   Okay.  Why would he work for free?

13       A.   Because he was retired and he had made enough

14  money and he thought that he could help the company.

15       Q.   Okay.  Was there anything promised to him?

16       A.   No, not that I know of.

17       Q.   No financial benefit whatsoever to go in and

18  run this company?

19            MR. PERRIN:  Objection, form.

20       A.   Well, like I said, I think he worked for free.

21  I don't know if he's -- took a salary or not.  I don't

22  recall.

23       Q.   (By Mr. Freeman)  Had he ever worked for you

24  for free before that?

25       A.   No.

David Hook  *  April 12, 2021

Page 135

1       Q.  Has he ever worked for you for free since that?

2       A.  No.

3       Q.  Okay.  Was he -- did he end up being a member

4   of Windspeed Trading, LLC?

5       A.  I don't know.

6       Q.  Okay.  So those are the only -- that and the

7   initial transaction that you may have met Bill through,

8   those are the only instances where you've ever worked

9   with -- with Mr. Szeto?

10      A.  That's right.

11      Q.  Okay.  What did he think about ACET Global?

12      A.  That the company was in trouble, that the

13  products that Tomer was getting weren't very good,

14  didn't think the business model was sustainable.  Those

15  are the things off the top of my head that I recollect.

16      Q.  Okay.  What -- did he tell you anything else

17  was wrong with ACET Global?

18      A.  Other than the company was in real trouble.

19      Q.  Okay.  Did he have any experience with -- with

20  E-commerce?

21      A.  I don't know.

22      Q.  Okay.  And do you know, you know, what his

23  basis was for concluding that the company was in real

24  trouble?

25      A.  He looked at the financial statements.

David Hook  *  April 12, 2021

Page 136

1       Q.  So he just looked at financial statements and
2   said hey, the company's in -- is in real bad trouble?
3       A.  All this is after he was there a period of
4   time.  I don't remember the exact period of time.
5       Q.  Okay.  Did he say what, specifically, he -- he
6   based that conclusion on?
7       A.  Being in the company, watching the operations,
8   looking at the financials, and seeing that the products,
9   you know, had -- had troubles.  And the operations of
10  the company were -- were not very good.
11      Q.  Okay.  I mean, did he say anything about, you
12  know, the -- the note obligations of -- of the company
13  being part of the equation?
14      A.  No.
15      Q.  No?
16          And how do you know he was -- he was there
17  and had -- had observed everything?
18      A.  Well, we met at the company.  We talked to him
19  on the phone.  I can't verify that every time I talked
20  to Bill Szeto that he was sitting in the company.
21      Q.  Okay.  But you had a number of calls with him
22  where you understood from what he said that he was there
23  at the company or had been?
24      A.  Yes.  That was my interpretation.
25      Q.  And then did -- did you have him ultimately

David Hook  *  April 12, 2021

Page 137

1  replace Tomer Damti?

2      A.  Yes.

3      Q.  Okay.  Did you do that, or did someone else?

4      A.  I don't recall whether I did it or Bill did it.

5  I don't recall.

6      Q.  Okay.  What gave you authority to -- to

7  terminate Tomer Damti?

8              MR. PERRIN:  Objection, form.

9      A.  Well, our entity owned the company.

10     Q.  (By Mr. Freeman)  What entity owned the

11 company?

12     A.  What -- the -- the Baymark Partners-related

13 entities owned the company.

14     Q.  Okay.  And what did you understand gave you

15 authority to fire Tomer Damti?

16     A.  Because the company was going down the tubes.

17     Q.  Okay.  So that gave you authority to fire Tomer

18 Damti?

19     A.  No.  The legal documents gave me the authority

20 to fire Tomer Damti.

21     Q.  Okay.  And what about the legal documents gave

22 you that authority?

23     A.  I don't know what specific section in the legal

24 documents gave me authority.

25     Q.  Okay.  Did you actually give someone else

David Hook  *  April 12, 2021

Page 138

1    directions to fire Tomer Damti or did you do --

2        A.  I just told you.  I don't remember.

3        Q.  Okay.  Were you ever involved in the formation

4    of a wind-down plan for ACET Global?

5        A.  No.  I never heard of a wind-down plan.

6        Q.  Okay.  As -- you know, as the president of ACET

7    Global, did you ever engage in formulating a wind-down

8    plan?

9             MR. PERRIN:  Objection, form.

10       A.  Mr. Freeman, will you please listen to my

11   questions?  I just told you I'd never heard of a

12   wind-down plan.

13       Q.  (By Mr. Freeman)  Okay.

14       A.  So, listen to my -- listen to my answers,

15   please.

16       Q.  Okay.  If you will, look at Exhibit 13, please,

17   sir.

18       A.  Okay.

19       Q.  Does this email refer to a wind-down plan?

20       A.  It says "wind-down plan for Super G for your

21   review."

22       Q.  Okay.  And this is -- this email looks like

23   it's addressed on September 10th of 2018; is that

24   correct?

25       A.  Yes.

David Hook  *  April 12, 2021

Page 139

1      Q.  And it's from Matt Denegre of Baymark Partners?

2      A.  Yes.

3      Q.  And during this time, you're still the

4  president of ACET Global; correct?

5      A.  Apparently so.

6      Q.  Okay.  Now, there's an email here on the first

7  page from Bill Szeto stating that he's the president and

8  CEO of ACET Global, LLC; is that correct?

9      A.  It says in his email title president, CEO.

10  Yes.

11      Q.  Okay.  How many presidents do you think there

12  were of ACET Global?

13      A.  I don't know.

14      Q.  Okay.  And why is -- why is your associate,

15  Matt Denegre, involved in this wind down?

16      A.  Because he and Tony were working on this

17  company.

18      Q.  What company?

19      A.  ACET Global.

20      Q.  Okay.  And, now, how do we know this is a wind

21  down for ACET Global?

22      A.  I didn't know.  This is the first I've heard of

23  a wind-down plan.

24      Q.  Did I say that it was a wind down of ACET

25  Global?

David Hook  *  April 12, 2021

Page 140

1        A.   Well, you said this was a wind-down plan.

2        Q.   Uh-huh.  And why would this be a wind-down plan

3   for ACET Global?  That -- you know, you're the president

4   of ACET Global at this time; right?

5             MR. PERRIN:  Objection, form.

6        A.   That's right.

7        Q.   (By Mr. Freeman)  And you're not aware of any

8   wind-down plan for ACET Global; right?

9        A.   Right.

10       Q.   And, so, why would we have a wind-down plan for

11   ACET Global?

12             MR. PERRIN:  Objection, form.

13       A.   Because we tried to save the company.

14       Q.   (By Mr. Freeman)  Okay.  By winding it down?

15       A.   Well, my -- assume that the decision had

16   already been made that we couldn't save the company.  I

17   don't know what the financial statements said at this

18   point.  So, I don't know what's the status.

19       Q.   Right.  But you were the president of the

20   company at this time; right?

21             MR. PERRIN:  Objection, form.

22       A.   Mr. Freeman, how many times are you going to

23   ask me this question?

24       Q.   (By Mr. Freeman)  What question?

25       A.   That I'm the president.

David Hook   *   April 12, 2021

Page 141

1    Q.  Were you the president at this time?

2              MR. PERRIN:  Objection, form; asked and

3    answered at least 20 times.  If you continue, Jason, we

4    are going to have to instruct him it's harassing.

5              MR. FREEMAN:  Okay.  Ed, as you know, there

6    are quite a few relevant periods in time here.  And I

7    think I'm entitled to ask a simple question with respect

8    to each one and put in it context.  So...

9              MR. PERRIN:  We've already covered that

10   every which way but Saturday.

11             MR. FREEMAN:  Okay.  Why don't we just do

12   it this way, then?  Do we -- do we all -- Ed, do you

13   want to stipulate that for all relevant periods Mr. Hook

14   was the president of ACET Global, LLC?  Do you want to

15   go ahead and stipulate to that?

16             MR. PERRIN:  Jason, you said you didn't

17   want to do stipulations.  So, keep asking your

18   questions.

19             MR. FREEMAN:  No, I -- I do.  I'm just fine

20   with that stipulation.  And we can do it and then you

21   don't have to object to it again.

22             MR. PERRIN:  Jason, I'm going to object to

23   your questions when they deserve it.  And, so, go ahead

24   and ask your questions.

25             MR. FREEMAN:  Okay.  But I'm -- I'm

David Hook  *  April 12, 2021

Page 142

1  understanding you, Ed, to not want me to have to ask

2  that again.  And, you know, again, if you'll just make

3  this simple stipulation, I won't need to ask it again.

4            MR. PERRIN:  Jason, the record speaks for

5  itself.

6            MR. FREEMAN:  It does.

7      Q.  (By Mr. Freeman)  Okay.  This wind-down plan

8  you said was for ACET Global?

9      A.  That's what the email says.  I haven't heard of

10  a wind-down plan.

11      Q.  Okay.

12      A.  So, let me say that again.  I have not heard of

13  a wind-down plan.

14      Q.  Okay.  Where does the email say it's for ACET

15  Global?

16      A.  I don't know that it does.

17      Q.  But you just said that it does; right?

18      A.  I said I've never heard of a wind-down plan for

19  any company.

20      Q.  Okay.  Pretty unusual to be creating a

21  wind-down plan?

22            MR. PERRIN:  Objection, form.

23      A.  I don't know.  I've never heard of it before.

24      Q.  (By Mr. Freeman)  Uh-huh.  Never heard of a

25  wind-down plan?

David Hook  *  April 12, 2021

Page 143

1      A.  No.

2      Q.  So you didn't teach Matt Denegre how to create

3  a wind-down plan; right?

4      A.  I've never taught anybody how to do a wind-down

5  plan.

6      Q.  Or how to review a wind-down plan?

7      A.  No.

8      Q.  Okay.  And you've never seen this document?

9      A.  No.

10      Q.  Okay.  Do you know what this document is

11  referring to here where it says "timeline and cost for

12  wind down"?

13      A.  I don't know.  I just said I've never seen it

14  before.

15      Q.  Okay.  You don't know what it's referring to

16  where it says "performed the last inventory prior to

17  closing, price inventory that can be sold or

18  transferred"?

19      A.  No.

20      Q.  No?

21              "Inform all marketplaces on closing"?

22      A.  No.

23      Q.  Or to inform all major customers on closing?

24      A.  No.

25      Q.  Or to send termination letters to all current

David Hook  *  April 12, 2021

Page 144

1  employees?

2      A.  No.

3      Q.  And you don't know what it's referring to here

4  where it states week of 9-24?

5      A.  No, other than it says week of 9-24.

6      Q.  Okay.  And do you recall if ACET Global, the

7  company that you were the president of, do you recall if

8  it sent termination letters to its employees around this

9  time?

10     A.  No.

11     Q.  No?

12          Did you authorize those termination

13  letters?

14     A.  No.

15     Q.  So, as the president of ACET Global, you didn't

16  even know that termination letters were sent out?

17     A.  That's right.

18     Q.  Okay.  These -- this cost summary, on the third

19  page, did you know what salary accrual for Bill Szeto

20  refers to?

21     A.  No.

22     Q.  Or "pay Bill's credit card," what that refers

23  to?

24     A.  No.

25     Q.  Okay.  So you don't know anything about this

David Hook  *  April 12, 2021

Page 145

1   wind-down plan?

2        A.   That's what I keep saying, yes.

3        Q.   Okay.   Look at Exhibit 14.   Do you know what

4   Luluway is?

5        A.   Lulu -- I've heard of the word, but I don't

6   know what it is.

7        Q.   Okay.   Where do you think you've heard of it?

8        A.   I don't -- I don't know.

9        Q.   Okay.   If you look below on this -- this email,

10  there's some email correspondence from Lori Barber.

11  Have you ever worked with Ms. Barber before?

12       A.   Yes.

13       Q.   Okay.   In fact, you worked with her a fair

14  amount on your companies?

15       A.   A little.

16       Q.   Okay.   And are there three people from Baymark

17  Partners on this email?

18       A.   Yes.

19       Q.   Matt Denegre, Tony Ludlow, and Andy Waltman?

20       A.   Yes.

21       Q.   This is in January of 2019; correct?

22       A.   Yes.

23       Q.   Now, you were the president of ACET Global at

24  that point in time.   Was it in the process of winding

25  down?

David Hook  *  April 12, 2021

Page 146

1      A.  I don't know.

2      Q.  How do you not know?

3      A.  Because Tony and Matt were working on this

4  company.  I was not.

5      Q.  Okay.  So, at this point in time, Lori Barber

6  tells your -- your associates, "I know you're in the

7  process of winding down ACET."  But had you ever

8  instructed Ms. Barber that you, as the president of ACET

9  Global, were going to wind down ACET?

10     A.  No.

11     Q.  Okay.  Do you have -- do you have any idea why

12 Ms. Barber may be under the impression that y'all were

13 in the process of winding down ACET?

14     A.  No.

15          MR. FREEMAN:  Okay.  I'm going to take a

16 five-minute break.  We can go off the record.

17          THE WITNESS:  Okay.

18          (Break taken from 4:50 to 4:57.)

19          MR. FREEMAN:  Go back on the record.

20     Q.  (By Mr. Freeman)  Mr. Hook, when did you first

21 hear about Super G Capital?

22     A.  Probably when we were looking for a lender for

23 ACET Global.

24     Q.  Okay.  Is that when you met Steve Bellah, or

25 did you already know him?

David Hook  *  April 12, 2021

Page 147

1          A.   I don't think I ever knew him before that.

2          Q.   Okay.  Did you meet him at an ACG Capital

3     Connection meeting?

4          A.   I don't recall.

5          Q.   What is ACG Capital Connection?

6          A.   ACG is -- ACC -- something grow -- AC Capital

7     Growth -- I guess I don't know.  But it's a -- it's a

8     group that lenders and private equity firms -- it's a

9     conference that -- that private equity firms and lenders

10    and others in our ecosystem of buying companies and

11    financing companies would attend.

12         Q.   Okay.  How long have you been involved in that?

13         A.   In ACG?

14         Q.   Yes, sir.

15         A.   I -- I don't know.

16         Q.   Okay.  About 2013 sound right?

17         A.   Since the -- the first time I ever went to an

18    ACG event is 2013?

19         Q.   I'm -- I'm asking.

20         A.   Yeah.  I -- I have no idea.

21         Q.   What about Mr. Ludlow?

22         A.   What about him?

23         Q.   Has he been involved in ACG Capital Connection?

24         A.   Probably.

25         Q.   Okay.  Do you know how long?

David Hook  *  April 12, 2021

Page 148

1     A.  No.

2     Q.  Okay.  Have you ever met Marc Cole?

3     A.  I don't think so.

4     Q.  No?

5          Do you know who Marc Coal is?

6     A.  No.

7     Q.  Do you know a Marc Coal associated with Super G

8  Capital?

9     A.  No.

10     Q.  Or SG Credit Partners?

11     A.  No.

12     Q.  What about Oren Moses?

13     A.  No.

14     Q.  Or Alex Godinez?

15     A.  No.

16     Q.  Okay.  Let's talk about ACET Global's

17  performance.  During 2017, how did it perform,

18  financially?

19     A.  I don't know.  Alls I can remember is that it

20  was at 100,000 in EBITDA, roughly, and declining

21  quickly.

22     Q.  Okay.  In 2017?

23     A.  I don't know what year it is, but it was right

24  after we bought the company.

25     Q.  Okay.  So, if you bought in it 2017, then 2017

David Hook  *  April 12, 2021

Page 149

1  is the year you're referring to?

2      A.  That's right.  The company went down basically

3  right away.

4      Q.  Okay.  And how about during 2018?

5      A.  I -- I don't know.

6      Q.  Okay.  Why did the company start to go down?

7      A.  Well, what I was told by Tomer was that in

8  getting the deal done, he spent a lot of time with his

9  partners in the middle of the night because of the time

10  change.  And, so, he didn't spend as much time on the

11  business.  And because there was a small number of

12  employees, he was responsible for quite a few functions

13  of the company; and that's the reason why the company

14  declined right off the bat.

15      Q.  Okay.  So that's your best understanding of why

16  the company declined in 2017?

17      A.  That's right.

18      Q.  Nothing more?  No more direct observation than

19  that, just from what you heard from Tomer?

20      A.  That's right.  That's how we get information

21  from -- from the company was through Tomer.

22      Q.  All right.  And Tomer was -- was Tomer pretty

23  concerned about the company?

24      A.  I hope so.

25      Q.  Right.  Like, let's say going into January

David Hook   *   April 12, 2021

Page 150

1   2018, right?  I mean, do you think pretty concerned

2   about the company's performance?

3        A.  I don't know because I don't know when, you

4   know, I handed off to Tony and -- and -- and Matt.

5        Q.  Okay.  I mean, do you think he would have been

6   concerned about the company's performance, even though

7   its revenues were substantially higher than the prior

8   January?

9        A.  I would have been, yes, because I didn't -- I

10  didn't like the business model and the premise of the

11  company.

12       Q.  Okay.  That you had chosen to purchase?

13       A.  Yes.

14       Q.  Okay.  But you'd been concerned with increasing

15  revenues and cash flow?

16       A.  Well, I wouldn't have been as concerned; but I

17  don't know the pretense of your question.  I don't know

18  if increasing net from 100,000 of EBITDA to 105,000.

19  So, I don't know.

20       Q.  Right.

21       A.  But I was concerned very early on because the

22  business model was not solid.

23       Q.  I mean, did you always -- like always have a

24  plan B if this thing didn't work or --

25       A.  No.

David Hook  *  April 12, 2021

Page 151

1    Q.  No?

2    A.  No.

3    Q.  There was never any discussion about a plan B?

4    A.  No.

5    Q.  No?

6            So it was always like this has got to work?

7    That's the only option?  Or was there some kind of plan

8    B that maybe, like, Super G would be a good fit for?

9    A.  No.  There was no plan B.

10   Q.  Never?  Not -- definitely not from the

11   beginning?

12   A.  No.

13   Q.  And what do you mean by there was no plan B?

14   A.  Again, our goal is to help entrepreneurs and

15   management teams grow their business.  So, you do that;

16   and every company is different.  All the circumstances

17   and every company are different.  And you try to solve

18   issues and problems and help the team grow and expand

19   their business.

20   Q.  Well, let me ask:  Was there, like, an

21   alternative structure for the ACET business that might

22   have been, you know, better for Baymark?

23   A.  No.

24   Q.  Not --

25   A.  I -- I don't know.  But we never -- never even

David Hook   *   April 12, 2021

Page 152

1    thought of anything like that.

2         Q.   Not like an option B structure to benefit

3    Baymark Partners or --

4         A.   No.   We -- we would have no interest in doing

5    anything like that.

6         Q.   Nothing to benefit Super G?

7         A.   No.

8         Q.   Okay.   Mr. Hook, putting up what's marked as

9    Exhibit 26.   Do you see that?

10        A.   Yeah.   Yes, I do.

11        Q.   And is that an email from Matt Denegre to you?

12        A.   Yes.

13        Q.   Regarding the ACG meeting and Super G?

14        A.   Yes.

15        Q.   And did he say that Super G would be perfect

16   for your option B structure with ACET Global?

17        A.   That's what the email says.

18        Q.   Okay.   Does that appear to be a true and

19   correct copy of that email?

20        A.   Yes, it does.

21        Q.   Okay.   So, didn't you, in fact, have a plan B

22   with respect to ACET Global?

23        A.   I -- I have no idea what plan option B is.

24        Q.   I mean, how did -- how did Super G fit into

25   your -- your plan B structure for the ACET business?

David Hook  *  April 12, 2021

Page 153

1      A.  I don't know.  I -- you need to listen to my

2  answer.  I don't know what option B is.  I never heard

3  of an option B.

4      Q.  Okay.  I would like to ask you, again, about

5  the tax returns for Baymark ACET Holdco.

6      A.  Okay.  Was that a question?

7      Q.  Well, I'm putting it up on your screen.

8      A.  Oh, sorry.

9          MR. PERRIN:  What number is it?

10         MR. FREEMAN:  Exhibit 44.

11     Q.  (By Mr. Freeman)  Now, this document, Exhibit

12  44, the first page is -- this is a letter to you?

13     A.  Yes.

14     Q.  Okay.  Dated March 18th, 2019; correct?

15     A.  Correct.

16     Q.  Right.  It says, "We have prepared and enclosed

17  your 2018 limited liability company return for the year

18  ended December 31st, 2018."  Correct?

19     A.  Yes.

20     Q.  Okay.  And it says, "The return has qualified

21  for electronic filing.  After you have reviewed your

22  return for completeness and accuracy, please sign, date,

23  and return form 8879-PE to our office.  We will then

24  submit your electronic return to the IRS."  Okay?

25     A.  Yes.

David Hook  *  April 12, 2021

Page 154

1      Q.  Do you recall if you received this -- this

2   letter?

3              MR. PERRIN:  Objection, form.

4      A.  No.

5      Q.  (By Mr. Freeman)  You don't recall receiving

6   it?

7      A.  No.

8      Q.  Okay.  Do you recall returning a form 8879-PE

9   to Howard?

10     A.  No.

11     Q.  Okay.  Do you believe that you did?

12     A.  Likely.

13     Q.  Okay.  I will go ahead and show you what we'll

14  -- we'll mark as Exhibit 55.  I'll send this around, but

15  does this -- does this appear to be a copy of an

16  8879-PE?

17     A.  Wait.  I'm sorry.  We are not on the right

18  page.

19             MR. PERRIN:  There's one -- there's one in

20  Exhibit 44 that's 2018.

21             MR. FREEMAN:  Right.  I'm asking about this

22  one.

23             MR. PERRIN:  That's a different one that

24  he's showing.

25     A.  Yeah, you have a different one than we do.

David Hook  *  April 12, 2021

                                                    Page 155

1       Q.  (By Mr. Freeman)  Okay.  Attach this here.

2   Okay.

3              Any reason to believe you didn't -- you

4   didn't authorize the filing of this tax return?

5       A.  I don't know.

6       Q.  Okay.  Have you ever done anything to correct

7   any of the treatment that was reflected in the return

8   that was attached to this March 18th, 2019 letter?

9              MR. PERRIN:  Objection, form.

10      A.  I don't know.

11      Q.  (By Mr. Freeman)  All right.  And is it

12  typically your habit to review tax returns before you

13  sign them?

14      A.  Define "review."

15      Q.  To read over them.

16      A.  Likely quickly.

17      Q.  Okay.  If something appeared incorrect to you,

18  would you point it out to the CPA?

19      A.  Yes, but that would be highly unlikely.

20      Q.  Because they get it right?

21      A.  I assume they get it right, and I look at them

22  quickly.

23      Q.  Okay.  And you give them access to everything

24  that they need; correct?

25      A.  Well, I give them access to the information

David Hook  *  April 12, 2021

Page 156

1   that I have.

2        Q.   Okay.  If they need information and ask for it,

3   you provide it?

4        A.   Absolutely.

5        Q.   Okay.  And you want the tax return to be as

6   accurate as possible before you file it; correct?

7        A.   Yes.  Correct.

8        Q.   Okay.  Now, is the only asset or was the only

9   asset of Baymark ACET Holdco, was that ACET Global, LLC?

10       A.   I don't know, but likely.

11       Q.   Okay.  And did you understand that all of ACET

12   Global's activities rolled up into the Baymark ACET

13   Holdco, LLC tax return?

14             MR. PERRIN:  Objection, form.

15       A.   Did I know that?  Probably not.

16       Q.   (By Mr. Freeman)  Okay.  Do you have any reason

17   to believe that anything in this tax return is false?

18       A.   No.

19       Q.   Any reason to believe anything in this tax

20   return is inaccurate?

21       A.   No, but obviously I haven't looked at it.

22       Q.   Okay.  I mean, would you -- would you notice if

23   there was -- I don't know, if there was a transaction

24   reflected for several million dollars, I mean, would you

25   look closely at that, or is that not a big deal?

David Hook  *  April 12, 2021

Page 157

1          MR. PERRIN:  Objection, form.

2      A.  It -- it -- it would depend.

3      Q.  (By Mr. Freeman)  And how would it depend?

4      A.  Well, I don't know how busy I was that day that

5  I got it.  I don't know if I had to sign it within an

6  hour.  I don't know all the circumstances around me

7  looking at the tax return.

8      Q.  Okay.  But if you're going to put your

9  signature on something under a penalty of perjury to the

10  federal government, are you going to make an effort to

11  review it and ensure that it's accurate?

12      A.  It depends.  I -- I trust our accounting firm.

13      Q.  Okay.  Okay.  So, I'd like to go down to Page

14  12 of this document.

15      A.  I'm not sure we have the right one.  Are you

16  looking for year 2019?  We have '18.

17      Q.  I'm looking at -- yeah, tax return as of

18  12-31-2018.

19          MR. PERRIN:  On what page?

20          MR. FREEMAN:  The eleventh -- the twelfth

21  page of the PDF.

22          (SOTTO VOCE DISCUSSION)

23          MR. FREEMAN:  All right.  Do you see that?

24          MR. PERRIN:  See what?

25          MR. FREEMAN:  There's a Schedule L on the

David Hook  *  April 12, 2021

Page 158

1    twelfth page of the PDF.

2              MR. PERRIN:  Yeah.

3        Q.  (By Mr. Freeman)  Okay.  If you'll look down

4    there within Schedule L, there is a line, line 12.  And

5    if you will look over to the right, there's a -- there's

6    a box for the end-of-the-year value.

7        A.  That's right, uh-huh.

8        Q.  And did you report to the federal government

9    that there were assets of $3.169 million as of

10   12-31-2018?

11       A.  Intangible assets.

12       Q.  Right?

13       A.  Yes.

14       Q.  Okay.  And that's what you reported to the

15   federal government was held by Baymark ACET Holdco, LLC

16   as of 12-31-2018; correct?

17       A.  Correct.

18       Q.  Okay.  And all that you're aware of it holding

19   is its interest in ACET Global, LLC; correct?

20       A.  Like I said, probably.

21       Q.  Right.  And you were the president of that

22   company; correct?

23       A.  Correct.

24       Q.  So you would have been in position to know its

25   activities and have access to anything you needed for

David Hook  *  April 12, 2021

Page 159

1    ACET Global; correct?

2                  MR. PERRIN:  Objection, form.

3         A.   Likely.

4         Q.   (By Mr. Freeman)  Okay.  On Baymark ACET

5    Holdco, LLC's tax return, if you'll look at the

6    twentieth page of the PDF, there's a line for a

7    management fee?

8         A.   Yes.

9         Q.   Management fee of $112,500; is that correct?

10        A.   Yes.

11        Q.   Did you report that expense to the federal

12   government?

13        A.   That's what the tax return says.

14        Q.   Okay.  Now, are you aware your lawyers have

15   represented that there was no management fee?

16                  MR. PERRIN:  Objection, form.

17        A.   I don't recall us ever taking a management fee

18   out of the company.

19        Q.   (By Mr. Freeman)  Okay.  Why is -- why is

20   Baymark ACET Holdco taking a deduction for $112,500?

21        A.   I don't know.

22                  MR. PERRIN:  Objection, form.

23        Q.   (By Mr. Freeman)  Now, on Page 17 of this --

24   this PDF, there's a form 8948.

25                  MR. PERRIN:  What page?

David Hook  *  April 12, 2021

Page 160

1                    MR. FREEMAN:  Well, actually, give me just

2      a second.

3           Q.  (By Mr. Freeman)  Let's look to -- let's look

4      at Exhibit 45, if you will.  And, Mr. Hook, the first

5      page of this document, is this a letter to you?

6           A.  Wait -- I'm sorry.  We are not there yet.

7                    MR. PERRIN:  Okay.

8           A.  Yes.

9           Q.  (By Mr. Freeman)  And is this a letter to you?

10          A.  Yes.

11          Q.  And is this for a return for Baymark ACET

12     Holdco, LLC for the year ended December 31st, 2019?

13          A.  Yes.

14          Q.  Okay.  And do you know whether you received

15     this letter or not?

16          A.  I don't recall.

17          Q.  Okay.  Do you know whether you authorized the

18     filing of the tax return that Howard provided to you?

19          A.  I don't -- I don't recall authorizing.

20          Q.  Okay.  So you don't believe you authorized this

21     to be filed?

22                   MR. PERRIN:  Objection, form.

23          A.  No.  I think -- no.

24          Q.  (By Mr. Freeman)  Okay.  If you'll go to the --

25     the twelfth page of this PDF, there's -- there's another

David Hook   *   April 12, 2021

Page 161

1  Schedule L.  And this -- this shows total assets, going

2  into 2019, as of 1-1-19, of over $3 million?

3      A.  Yes, intangible assets.  Uh-huh.

4      Q.  Right.  And a -- an end-of-year value of zero?

5      A.  Uh-huh.

6      Q.  Do you know why that is?

7      A.  I don't.

8      Q.  Okay.  Now, there's also, on Page 17,

9  seventeenth page of this PDF, there is a -- there's a

10 form that lists a sale from foreclosure.  Do you see

11 that?

12     A.  Yes.

13     Q.  Okay.  And does it state that the assets at

14 issue, the date acquired was 7-21-17?

15     A.  Yes.

16     Q.  And that is, in fact, the date that you

17 executed the asset purchase agreement?

18     A.  I don't know.

19     Q.  Okay.  It states that, in column C, the date

20 sold or disposed of was 1-1-2019.  Do you see that?

21     A.  Yes.

22     Q.  And then does it state that the proceeds were

23 $2,907,290?

24     A.  Yes.

25     Q.  What does that -- what happened to that $2.9

David Hook   *   April 12, 2021

Page 162

1    million?

2              MR. PERRIN:  Objection, form.

3         A.  I have no idea.

4         Q.  (By Mr. Freeman)  But this is the return that

5    -- that was provided to you from Howard?

6         A.  Yes.

7         Q.  And that was filed?

8         A.  It says "file copy."

9         Q.  Okay.  Because this is, right, I think what you

10   had, where you signed off on the 8879-PE.  What happened

11   to this 2.9, and why is it 2.9 million?

12             MR. PERRIN:  Objection, form.

13        A.  I -- I don't know.

14        Q.  (By Mr. Freeman)  You don't know?

15        A.  No.

16        Q.  Okay.  Mr. Hook, whenever -- for each of your

17   -- your Baymark entities involved in this -- you know,

18   we went over quite a number of them.  And you'll recall

19   these included ACET Global, LLC; Baymark ACET Holdco,

20   LLC; Baymark ACET Direct Invest, LLC; Baymark

21   Management, LLC; Baymark Partners -- the various

22   interest -- entities.  Do each of these entities have

23   their own email?

24             MR. PERRIN:  Objection, form.

25        A.  No.

David Hook  *  April 12, 2021

Page 163

1      Q.  (By Mr. Freeman)  No?

2      A.  No.

3      Q.  So, what email address do you use when you're

4  corresponding on behalf of those entities?

5      A.  David@Baymarkpartners or

6  Dhook@baymarkpartners.com.

7      Q.  Okay.  So that's your Baymark Partners' email

8  address?

9      A.  Those two are, uh-huh.

10      Q.  Okay.  And do you have a separate phone number

11  for each of these entities?

12      A.  No.

13      Q.  Okay.  So what phone number do you use when

14  you're corresponding on behalf of these entities?

15      A.  972-991-5457.

16      Q.  Is that your Baymark Partners' phone number?

17      A.  Yes.

18      Q.  Do each of these entities have separate bank

19  accounts?

20      A.  I don't think so.

21      Q.  Okay.  So they just use Baymark Partners' bank

22  accounts?

23          MR. PERRIN:  Objection, form.

24      A.  Yeah.  Again, the Baymark Management is our

25  operating company.

David Hook  *  April 12, 2021

Page 164

1     Q.  (By Mr. Freeman)  Okay.  And who are its

2  directors or officers?

3     A.  Tony Ludlow and myself.

4     Q.  Okay.  That's Baymark Management, LLC?

5     A.  I think it's an LLC.

6     Q.  With these other entities, did they -- did they

7  hold -- any of them have a board of directors?

8           MR. PERRIN:  Objection, form.

9     A.  No.

10     Q.  (By Mr. Freeman)  Did any of them hold

11  meetings?

12     A.  No.

13     Q.  Are there any minutes from any meetings related

14  to these companies?

15     A.  No.

16     Q.  Any resolutions for these companies?

17     A.  No.

18     Q.  Where were their offices?

19     A.  They were entities.  So, they're either -- in

20  our office at Baymark Partners.

21     Q.  So, they -- they shared Baymark Partners'

22  office?

23           MR. PERRIN:  Objection, form.

24     A.  It -- it's an entity.  It's a piece of paper.

25     Q.  (By Mr. Freeman)  Right.  So, I mean, I -- I

David Hook   *   April 12, 2021

Page 165

1    get it.  Each of these entities is -- just basically is

2    a piece of paper?

3                    MR. PERRIN:  Objection, form.

4        A.  Yes.

5        Q.  (By Mr. Freeman)  Okay.  I mean, did they have

6    any employees?

7        A.  No.

8        Q.  Did they have attorneys?

9        A.  No.

10       Q.  Did they have, you know, extra capital?

11       A.  No.

12       Q.  I mean, were these just, like, single-venture

13   entities; or did they have multiple purposes?

14       A.  No.

15                   MR. PERRIN:  Objection, form.

16       Q.  (By Mr. Freeman)  I mean, where did their

17   revenues go?

18       A.  They didn't have any revenues.

19       Q.  Did they have any, like, corporate processes or

20   formalities they went through?

21       A.  No.

22                   MR. PERRIN:  Objection, form.

23       Q.  (By Mr. Freeman)  Who ultimately controlled

24   them?

25                   MR. PERRIN:  Objection, form.

David Hook  *  April 12, 2021

Page 166

1        A.   I don't know how to answer that question.

2   There's no control.

3        Q.   (By Mr. Freeman)  I mean, who -- who ended up

4   controlling or making decisions for them?

5              MR. PERRIN:  Objection, form.

6        A.   They got formed due to the buying of the

7   company.  There's nothing that happens in there at all.

8        Q.   (By Mr. Freeman)  They don't do anything,

9   really?

10       A.   No.

11             MR. PERRIN:  Objection, form.

12       Q.   (By Mr. Freeman)  They're just a piece of paper

13  for the file to -- for all the paperwork?

14             MR. PERRIN:  Objection, form.

15       A.   They -- they serve a purpose, but it's a legal

16  purpose.

17       Q.   (By Mr. Freeman)  Okay.  Not like a real

18  economic purpose, I guess?

19             MR. PERRIN:  Objection, form.

20       A.   No.

21       Q.   (By Mr. Freeman)  Okay.  Did they have -- you

22  know, if they shared the office space with you, did they

23  have separate signs?

24             MR. PERRIN:  Objection, form.

25       A.   No.  And it's not "they."  There's no "they."

David Hook  *  April 12, 2021

Page 167

1          Q.  (By Mr. Perrin)  Okay.  I mean, did -- it's

2     just y'all?

3          A.  Yes.

4          Q.  Just Baymark Partners?

5          A.  Yes.

6          Q.  Okay.  I mean, did you keep a -- like,

7     effectively keep a consolidated balance sheet, then?

8                    MR. PERRIN:  Objection, form.

9          A.  No.  There's no bank account.  There's nothing.

10         Q.  (By Mr. Freeman)  Nothing.  Okay.

11                   Mr. Hook, I am -- I am truly almost done, I

12    think.  I'm going to take just a few minutes to run

13    through my notes and come back, and then I may have a

14    few more questions for you.  But you're close to the

15    end.

16                   THE WITNESS:  Okay.  Great.

17                   MR. FREEMAN:  That okay with everyone?

18                   THE WITNESS:  Yes.

19                   MR. FREEMAN:  Okay.  I'll go off the record

20    for a second.

21                   (Break taken from 5:28 to 5:33.)

22                   MR. FREEMAN:  Go back on the record.

23         Q.  (By Mr. Freeman)  Mr. Hook, I -- I appreciate

24    your time today, appreciate you sitting for these

25    questions.  I know it's not a fun process.  That

David Hook  *  April 12, 2021

Page 168

1    concludes the questions that I have for you.

2              You technically could have some additional

3    questions from the other parties.  Trends have been that

4    you are done, but I'll let them decide.

5              MR. FREEMAN:  So, I pass the witness.

6              MR. PERRIN:  For the Baymark parties, we'll

7    reserve our questions until time of trial.

8              MS. HARD-WILSON:  For Windspeed Trading, we

9    will also reserve.

10             MR. PERRIN:  Which means you are done.

11             (THE PROCEEDINGS WERE CONCLUDED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 169

1                    CHANGES AND SIGNATURE

2    WITNESS NAME: DAVID HOOK

3    DATE OF DEPOSITION: April 12, 2021

4    PAGE LINE        CHANGE            REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 170

1          I, DAVID HOOK, have read the foregoing

2     deposition and hereby affix my signature that same is

3     true and correct, except as noted above.

4

5                         _____

6                         DAVID HOOK

7     THE STATE OF _____)

8     COUNTY OF _____)

9

10        Before me, _____, on this day

11    personally appeared DAVID HOOK, known to me (or proved

12    to me under oath or through _____)

13    (description of identity card or other document) to be

14    the person whose name is subscribed to the foregoing

15    instrument and acknowledged to me that they executed the

16    same for the purposes and consideration therein

17    expressed.

18        Given under my hand and seal of office this

19    _____ day of _____, _____.

20

21                         _____

22                         NOTARY PUBLIC IN AND FOR

23                         THE STATE OF _____

24                         COMMISSION EXPIRES: _____

25

Page 171

1                    CAUSE NO. DC-19-09828

2    D&T PARTNERS, LLC          ) IN THE DISTRICT COURT
     (successor in interest to  )
3    ACET VENTURE PARTNERS,     )
     LLC),                      )
4                               )
         Plaintiff,             )
5                               )
     v.                         ) DALLAS COUNTY, TEXAS
6                               )
     ACET GLOBAL, LLC; BAYMARK  )
7    ACET HOLDCO, LLC; BAYMARK  )
     ACET DIRECT INVEST, LLC;   )
8    BAYMARK MANAGEMENT, LLC;   )
     BAYMARK PARTNERS; DAVID    )
9    HOOK; TONY LUDLOW; and     )
     WINDSPEED TRADING, LLC,    )
10
         Defendants.               116TH JUDICIAL DISTRICT
11

12
                    REPORTER'S CERTIFICATION
13                  DEPOSITION OF DAVID HOOK
                         April 12, 2021
14        I, Wendy Golding, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17        That the witness, DAVID HOOK, was duly sworn by the

18   officer and that the transcript of the oral deposition

19   is a true record of the testimony given by the witness;

20        That the deposition transcript was submitted on

21   _____to the witness or to the attorney

22   for the witness for examination, signature and return to

23   me by_____;

24        That the amount of time used by each party at the

25   deposition is as follows:

David Hook  *  April 12, 2021

Page 172

1   JASON B. FREEMAN - 3 HOURS:54 MINUTE(S)
   EDWARD PERRIN - 00 HOURS:00 MINUTE(S)
2   BRENDA HARD-WILSON - 00 HOURS:00 MINUTE(S)

3   That pursuant to information given to the

4 deposition officer at the time said testimony was taken,

5 the following includes counsel for all parties of

6 record:

7   JASON B. FREEMAN, Attorney for Plaintiff
   EDWARD PERRIN, Attorney for Defendants
8    ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC;
 BAYMARK ACET DIRECT INVEST, LLC; BAYMARK MANAGEMENT,
9 LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW
   BRENDA HARD-WILSON, Attorney for Defendant
10 WINDSPEED TRADING, LLC.

11   I further certify that I am neither counsel for,

12 related to, nor employed by any of the parties or

13 attorneys in the action in which this proceeding was

14 taken, and further that I am not financially or

15 otherwise interested in the outcome of the action.

16   Further certification requirements pursuant to Rule

17 203 of TRCP will be certified to after they have

18 occurred.

19   Certified to by me this _____ of _____ 2021

20

21    _____
    WENDY GOLDING, CSR # 1942
22    Expiration: 2/28/2023
    Firm Registration # 10278
23    USHER REPORTING SERVICES
    1326 Lochness Drive
24    Allen, Texas 75013
    (214) 755-1612
25    karen@usherreporting.com

David Hook  *  April 12, 2021

Page 173

1            FURTHER CERTIFICATION UNDER RULE 203 TRCP

2         The original deposition _____ was _____ was not

3    returned to the deposition officer;

4         If returned, the attached Changes and Signature

5    page contains any changes and the reasons therefore;

6         If returned, the original deposition was delivered

7    to _____, Custodial Attorney;

8         That $_____ is the deposition officer's

9    charges to the Plaintiff for preparing the original

10   deposition transcript and any copies of exhibits;

11        That the deposition was delivered in accordance

12   with Rule 203.3, and that a copy of this certificate was

13   served on all parties shown herein on and filed with the

14   Clerk.

15        Certified to by me this ____ day of _____, 2021.

16

17

18                    _____
                      WENDY GOLDING, CSR # 1942
19                    Expiration: 2/28/2023
                      Firm Registration # 10278
20                    USHER REPORTING SERVICES
                      1326 Lochness Drive
21                    Allen, Texas 75013
                      (214) 755-1612
22                    karen@usherreporting.com

23

24

25