PLAINTIFF'S
EXHIBIT

9

Page 206

NO. DC-19-09828

| | |
|---|---|
| D&T PARTNERS, LLC (Successor in interest to ACET VENTURE PARTNERS, LLC), | ) IN THE DISTRICT COURT )<br>)<br>)<br>) |
| Plaintiff | )<br>) |
| VS. | )<br>) DALLAS COUNTY, TEXAS |
| ACET GLOBAL, LLC; BAYMARK ACET HOLDCO, LLC; BAYMARK MANAGEMENT, LCC; BAYMARK MANAGEMENT, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; and WINDSPEED TRADING, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | ) 116th JUDICIAL DISTRICT |

---------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

MARC COLE

April 1, 2021

Volume 2
---------------------------------

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF MARC COLE, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on April 1, 2021, from 10:18 a.m. to 12:28 p.m., via videoconference, before Karen Usher, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 207

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4        MR. JASON B. FREEMAN
          MR. ZACHARY MONTGOMERY
 5        Freeman Law, PLLC
          2595 Dallas Parkway
 6        Site 420
          Frisco, Texas 75034
 7        (214) 984-3410
          jason@freemanlaw.com
 8        zmontgomery@freemanlaw.com
 9
10   FOR THE DEFENDANTS BAYMARK ENTITIES, DAVID HOOK, TONY
     LUDLOW:
11
          MR. EDWARD PERRIN
12        Hallett & Perrin
          1445 Ross Avenue
13        Suite 2400
          Dallas, Texas 75202
14        (214) 953-0053
          eperrin@hallettperrin.com
15
16
17   FOR THE DEFENDANT WINDSPEED TRADING, LLC:
18        MS. BRENDA HARD-WILSON
          MR. TIM WOODS
19        Higier Allen
          2711 North Haskell Avenue
20        Suite 2400
          Dallas, Texas 75204
21        (972) 371-2481
          bhard-wilson@higierallen.com
          twoods@higierallen.com
22
23
24
25
```

Page 208

```
 1   FOR THE WITNESS:
 2        MR. JOHN DAVID BLAKLEY
          Dunn Sheehan LLP
 3        3400 Carlisle Street
          Suite 200
 4        Dallas, Texas 75204
          (214) 764-8333
 5        jdblakley@dunnsheehan.com
 6
     ALSO PRESENT:
 7        Mr. Tomer Damti
          Mr. Matt Denegre
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 209

```
 1                    INDEX
                                     PAGE
 2   Appearances.......................... 207
 3
 4   MARC COLE, VOLUME 2
 5      EXAMINATION BY MR. PERRIN...................211
        EXAMINATION BY MR. FREEMAN..................268
 6
 7   Signature and Changes............................ 287
     Reporter's Certificate........................... 289
 8
 9                   EXHIBITS
10   NO.  DESCRIPTION                      PAGE
11   1    Management Fee Subordination Agreement........226
     2    Pledge Agreement..............................227
12   3    First Amendment to the Loan Agreement.........238
     4    Loan Agreement between Super G Capital and
13        Windspeed Trading.............................252
     5    Assignment and Assumption Agreement...........263
14   6    Email from Steve Bellah to the Baymark team...235
     7    Spreadsheet...................................242
15   9    Email dated July 2nd, 2018, from Mr. Bellah
          to Tony Ludlow and Matt Denegre...............247
16   10   Restructure plan for ACET Global..............249
     11   Wind-down plan................................250
17   12   Flow of funds.................................228
     13   ACET acquisition wire instructions............229
18
19
20
21
22
23
24
25
```

Page 210

```
 1              P R O C E E D I N G S
 2        MR. PERRIN:  One, I'd like to reflect
 3   we're on the record again with the continuation of the
 4   deposition of Marc Cole -- number one.  Number two, this
 5   deposition is being recorded by Mr. Freeman's office,
 6   and we request that a copy of the -- recording of the
 7   entire deposition as soon as possible.  Would that be
 8   possible, Zach?
 9        MR. MONTGOMERY:  Yes.
10        MR. PERRIN:  And I believe the
11   appearances today are the same, except I think, Zach,
12   you're here on behalf of the plaintiff?
13        MR. MONTGOMERY:  That is correct.
14        MR. PERRIN:  And it's Zach Montgomery,
15   for the record.
16        This deposition was adjourned from Monday
17   and is being continued today upon agreement of the
18   parties, and would like to ask if any objections going
19   forward with the deposition today with the parties and
20   counsel present.
21        MR. BLAKLEY:  This is J.D. Blakley,
22   counsel for the third-party deposition witness.  We have
23   agreed to be here for approximately an hour and a half
24   of additional record time and have no objection to
25   pursuing -- per that agreement that we made on Monday.
```

2 (Pages 207 to 210)

Page 211

1          MR. PERRIN:  Thank you, J.D.
2          All right.  Then let's -- let's move
3  forward then.  Just -- Mr. Montgomery, for your benefit,
4  we do have an agreement in place that one objection by
5  J.D. on behalf of the witness or the defendants will
6  serve as an objection for all, and we've had that
7  before.
8          And now I'd like to -- Mr. Cole, I would
9  like to remind you that you were sworn in at the
10  commencement of your deposition, and this is a
11  continuation of that deposition; so you're still under
12  oath.  Do you understand that?
13          THE WITNESS:  I understand.
14          MR. PERRIN:  All right.
15              EXAMINATION
16  BY MR. PERRIN:
17      Q.  Mr. Cole, I represent the following
18  defendants:  ACET Global, LLC, Baymark ACET Holdco, LLC,
19  Baymark ACET Direct Invest, LLC, Baymark Management,
20  LLC, Baymark Partners, LLC, David Hook, and Tony Ludlow.
21          Do you understand that?
22      A.  Yes.
23      Q.  I'd like to have an agreement with you.  When
24  I refer to the Baymark defendants, I'll be referring to
25  all those defendants.  All right?

Page 212

1      A.  Understood.
2      Q.  And at some point in time, I may refer to
3  "Baymark parties," and that will be the Baymark
4  defendants plus one other entity, which is Baymark
5  Partners Management, LLC.  Can we have that
6  understanding too?
7      A.  Yes.
8      Q.  Thank you.  Mr. Cole, has David Hook ever been
9  an owner, manager, member, officer, director or
10  otherwise affiliated with Super G?
11      A.  No.
12      Q.  Has any entity in which David Hook is or was
13  an owner, manager, member, officer, director ever been
14  an owner, manager, member or otherwise affiliated with
15  Super G?
16      A.  No.
17      Q.  Has Tony Ludlow ever been an owner, manager,
18  member, officer, director of Super G?
19      A.  No.
20      Q.  Has any entity in which you're aware Tony
21  Ludlow is or was an owner, manager, officer or director
22  ever been an owner, manager, member or otherwise
23  affiliated with Super G?
24      A.  No.
25      Q.  Has Baymark Partners ever been an owner,

Page 213

1  manager, member or otherwise of Super G?
2      A.  No.
3      Q.  Has any entity in which Baymark Partners is or
4  was an owner, manager, member, et cetera, ever been an
5  owner or manager or member of Super G?
6      A.  No.
7      Q.  Has Baymark Management, LLC, ever been an
8  owner, manager or member of Super G?
9      A.  No.
10      Q.  Prior to this transaction, has Super G ever
11  done business with David Hook?
12      A.  No.
13      Q.  Prior to this transaction, has Super G ever
14  done business with an entity in which David Hook is or
15  was an owner, manager, member, officer or director?
16      A.  Not that I'm aware of.
17      Q.  And prior to this transaction, has Super G
18  ever done business with Tony Ludlow?
19      A.  I don't believe so, no.
20      Q.  And prior to this transaction, has Super G
21  ever done any business with any entity in which Tony
22  Ludlow is or was an owner, manager, member, officer or
23  director?
24      A.  No.
25      Q.  Have you ever -- before this transaction, have

Page 214

1  you ever done business with any of the Baymark parties?
2      A.  I have not, no.
3      Q.  Has Super G?
4      A.  No.
5      Q.  Have you ever spoken to Tony Ludlow?
6      A.  I don't believe so.
7      Q.  Have you ever spoken to David Hook?
8      A.  I don't believe so.
9      Q.  Never met him?
10      A.  No.
11      Q.  How did you become -- you've already
12  testified, we've discussed, that this involved an Asset
13  Purchase Agreement -- this case does, involved an Asset
14  Purchase Agreement involving ACET Global and some other
15  parties, correct?
16      A.  Yes.
17      Q.  And that was in July of 2017?
18      A.  Approximately.
19      Q.  And I'll refer to that as the "APA
20  transaction" going forward.  Is that all right?  Do you
21  understand?
22      A.  Yes.
23      Q.  How did you become aware of the possible APA
24  transaction?
25      A.  I was the CFO of Super G Capital.  Super G

## Page 215

1  Capital was in the business of making commercial loans.
2  I had a Dallas-area loan officer named Steven Bellah who
3  brought to the firm's attention that there was an
4  opportunity to finance the acquisition of ACET.
5      Q.  And did he tell you anything about the parties
6  involved?
7      A.  My understanding was that a Dallas-area
8  private equity firm was acquiring a controlling interest
9  in the company, named -- and that party was Baymark.
10     Q.  Let me have one clarification for the record.
11 It was done in your last deposition.  I want to frame the
12 understanding with you as well, as was before, we're
13 asking you questions today as a corporate representative
14 on behalf of Super G.  And that is what I'm asking when
15 I say "you" or otherwise, unless I specify you
16 individually.  Can we have that agreement?
17     A.  Yes.
18     Q.  Would that change any of your prior answers
19 today?
20     A.  No.
21     Q.  Let's take a look, if you would, at
22 Plaintiff's Exhibit 8.  That's not Exhibit 8.
23     A.  No.
24     Q.  Exhibit 8 is the --
25     A.  The loan agreement.

## Page 216

1          MR. PERRIN:  Yeah.  I think you put up --
2  I think that's Defendants' Exhibit 8, Chase.
3          THE VIDEOGRAPHER:  Okay.  We may have
4  another issue.  Those are the only exhibits.  I was only
5  given Defendants' Exhibits.
6          THE REPORTER:  Ed, I sent him the exhibits
7  you sent me.
8          MR. PERRIN:  Karen, the other exhibits
9  were introduced in the last hearing -- in the first part
10 of this deposition.
11         THE REPORTER:  All right.  Let's go off
12 the record, and I'll send them to Chase right now.
13         MR. PERRIN:  Great.  Thank you.
14         (Break taken from 10:25 a.m. to
15          10:33 a.m.)
16     Q.  (BY MR. PERRIN)  Mr. Cole, this is Exhibit 8.
17 It's entitled a "Business Loan & Security Agreement"
18 dated July 20th, 2017.  Do you see that?
19     A.  I do.
20     Q.  And I'm going to ask that you take a look at
21 the signature page for that document, which is Page 27
22 of the document.
23     A.  Yes, I see it.
24     Q.  Page 27, whose signature is that on Page 27?
25     A.  David Hook.

## Page 217

1      Q.  If you look at Page 28, whose signature is
2  that?
3      A.  Mine.
4      Q.  Is that a true and correct copy of your
5  signature?
6      A.  Yes, it is.
7      Q.  Is this a true and correct copy of the
8  Business Loan & Security Agreement?
9      A.  Yes.
10     Q.  And if you look at this, it provides for an
11 amount of first loan of how much?
12     A.  $750,000.
13     Q.  Now, of that amount, only $733,308.44 was
14 disbursed.  Do you see that?
15     A.  Yes.
16     Q.  Yeah, the remaining disbursement amount on the
17 screen there.
18     A.  I see it.
19     Q.  Is this a -- generally, the standard form of
20 the loan agreement and security agreement used by Super
21 G?
22     A.  Yes, it was at the time.
23     Q.  Okay.  I'd ask you to turn to the fourth page
24 of this agreement, Section 2.8, "Escrow Account."
25     A.  Yes.

## Page 218

1      Q.  And what's the purpose of this provision?  Why
2  is your understanding you needed to have it?
3      A.  This was a very unusual provision for Super G
4  Capital.  We rarely used escrow accounts.  My belief is
5  that it was due in part to enhanced risk that I or
6  others saw in the transaction.
7      Q.  Okay.  If you look at Section 3, "Security
8  Interest in the Collateral," why, to your understanding,
9  is this provision included in the security agreement?
10     A.  This provision is standard in every commercial
11 loan agreement.  We -- Super G Capital is a secured
12 lender, and this is the provision to secure the
13 collateral.
14     Q.  And begins the -- outlining your legal rights
15 with respect to the collateral?
16     A.  Yes, the fundamental rights below.
17     Q.  And then if you look at the bottom of that
18 page, 3.4, it appoints Super G as the
19 "attorney-in-fact."  Do you see that?
20     A.  Yes.
21     Q.  And why would you want that?
22     A.  The lender would require that -- in the event
23 the borrower was acting improperly with the collateral,
24 that the lender has the ability to act as their
25 attorney-in-fact to make the proper decisions, for

Page 219

1    example, secure insurance if the assets were being
2    uninsured, put them in a secure location if the assets
3    were not being properly maintained.  It's meant to
4    protect the lender's collateral.
5        Q.  All right.  So this protects the lender's
6    collateral.
7            If you look at 3.4, in the third line, it
8    says you're going to take those steps and be
9    attorney-in-fact, "So as to permit the lender to take
10   any action and execute any instrument that Lender deem
11   necessary or advisable to accomplish the purpose of this
12   Agreement, including but not limited to the continuing
13   perfection of Lender's security interest."
14           Do you see that?
15       A.  I do.
16       Q.  Was it important to Super G that it be able to
17   take any acts necessary to protect its collateral?
18       A.  Yes.  It's a standard requirement in a
19   commercial loan transaction.
20       Q.  Did it do so in this case?
21       A.  Well, ultimately, yes, in the foreclosure of
22   the collateral.
23       Q.  Okay.  If you look at Page 10 of this
24   document, Section 6, "Negative Covenants" --
25       A.  Yes.

Page 220

1        Q.  -- 6.3 talks about disposition of assets.  Do
2    you see that?
3        A.  Yes.
4        Q.  All right.  According to your understanding,
5    could ACET Global do anything with these assets without
6    first getting your permission -- Super G's permission or
7    consent?
8            MR. FREEMAN:  Objection, form.
9        A.  You said Global could --
10           MR. PERRIN:  What's the nature of the
11   objection, Jason?
12           MR. FREEMAN:  It's an improper question.
13   You're asking for anything.
14           MR. PERRIN:  Thank you.
15       Q.  (BY MR. PERRIN)  Are you going to answer --
16           MR. FREEMAN:  It calls for a legal -- it
17   calls for a legal conclusion.
18       Q.  (BY MR. PERRIN)  Mr. Cole, did you have an
19   understanding of whether or not ACET Global could
20   dispose or do -- get rid of the assets in any way
21   without the consent or permission of Super G?
22       A.  ACET Global required Super G's permission
23   other than what is deemed to be an ordinary course sale,
24   meaning the regular selling of inventory as it would in
25   an arms-length transaction to a customer at standard

Page 221

1    rates.  Anything other than that required the lender's
2    permission.
3        Q.  Thank you.  If you look at -- on Page 12,
4    Section 7, "Events of Default."
5        A.  Yes.
6        Q.  Did events of default occur with respect to
7    the ACET Global loan?
8        A.  Yes.
9        Q.  Can you look at Section 8 on Page 14?
10       A.  Yes.
11       Q.  And this gives the remedies that are available
12   to Super G upon default?
13       A.  That's correct.
14       Q.  And under Section 8.3, it recites that Super G
15   had the right to make such payments and do such acts as
16   lenders considered necessarily or reasonable to protect
17   the security interest in the collateral; is that
18   correct?
19       A.  That's correct.
20       Q.  Is it your understanding you had the power to
21   do that?
22       A.  Yes.
23       Q.  And look at Section 8.5 at the top of the next
24   page.
25       A.  Yes, that's the sale of the collateral.

Page 222

1        Q.  So this gave Super G the right to sell the
2    collateral, according to your understanding?
3        A.  Yes.
4        Q.  Would you look at Addendum 2.
5            MR. PERRIN:  And Chase, that will be at
6    the bottom of the page.  It says, "Supplement - Page
7    32."
8        A.  I see it.
9            THE VIDEOGRAPHER:  I'm sorry.  The bottom
10   of which page?
11           MR. PERRIN:  The bottom -- there's two
12   numbers at the bottom of the page.  There's one for the
13   document, and then there's a stamp on there.  It says,
14   "Supplement Page."  It would be "Supplement- Page 31."
15       Q.  (BY MR. PERRIN)  If you go to the top of that
16   page, it's Addendum Conditions to Funding.  Do you see
17   that, Mr. Cole?
18       A.  Yes.
19       Q.  If you look at A(3), A(3) requires a
20   "Collateral Assignment of Rights Under Acquisition
21   Transaction Documents and Subordination Agreement
22   between the Borrower and Lender and acknowledged by
23   Seller Parties."
24           Do you see that?
25       A.  I do.

5 (Pages 219 to 222)

Page 223

1    Q.  Why was that a condition to funding?
2    A.  It was a condition of funding because there
3  were rights holders in the collateral, and Super G
4  Capital's loan was conditioned on being senior secured
5  first lien perfected in the assets.  And so that was a
6  condition to receive the capital, that Super G be
7  secured first --
8    Q.  What -- excuse me.  Are you through with
9  your -- I'm sorry.  Did I interrupt you, or are you
10  through?
11    A.  That was for the collateral assignment.  And
12  the subordination agreement was a condition precedent
13  because there was, as you know, a seller note which
14  needed to be subordinated to Super G Capital's full
15  collection of its loan and all obligations.
16    Q.  Why did Super G want the subordination
17  agreement to be acknowledged by the seller parties?
18    A.  Adding the subordinated note holder as -- to
19  the acknowledgment is deemed additional assurances, belt
20  and suspenders, if you will, that the party understands
21  that the senior lender will be paid in full before the
22  subordinated lender is paid.
23    Q.  If you look at conditions of funding on the
24  Addendum 2 at A, 5, it says, "Management Fee
25  Subordination Agreement among Manager, Borrower and

Page 224

1  Lender."  Why was that a condition to funding?
2    A.  I assume the management fee was being paid to
3  the buyer, Baymark; and similar to the subordination
4  agreement, it is imperative that the -- all parties,
5  including the equity sponsor, understand that the senior
6  lender will be paid in full before they are paid in the
7  liquidation.
8    Q.  So according to your understanding of the
9  agreement, nothing could be paid to the Baymark parties
10  that were the buyer before your loan was paid off?
11    A.  In the liquidation.  I would need to read the
12  management fee agreement to understand if there were
13  payments permitted on it during the amortization of the
14  senior loan.  But in a liquidation, those payments would
15  be frozen.
16    Q.  Are you aware whether any management fees were
17  ever paid by ACET Global?
18    A.  I'm not -- I don't recall.
19    Q.  If you look at Addendum 3, which is two more
20  pages back.  Under Addendum 3 of 1(a), it's a financial
21  covenant that, "At all times the Borrower will maintain
22  the aggregate sum of cash in its deposit accounts with
23  the Bank other than the Escrow Account equal to no less
24  than $50,000."
25    What was the purpose of that provision?

Page 225

1    A.  Purpose of that provision is to assure that
2  the business has adequate working capital to stay
3  solvent.
4    Q.  Did ACET Global violate that financial
5  covenant?
6    A.  They did.
7    MR. PERRIN:  Chase, can we now go to
8  Plaintiff's Exhibit Number 9?
9    Q.  (BY MR. PERRIN) Do you have that in front of
10  you, Mr. Cole?
11    A.  I do.
12    Q.  I'd ask you to turn to Page 42 of that
13  agreement.
14    A.  Yes.
15    Q.  Is that your signature?
16    A.  It is.
17    Q.  And you were signing on behalf of Super G
18  Capital?
19    A.  I did.
20    Q.  And on the prior page, can you tell me whose
21  signature that was?
22    A.  David Hook.
23    Q.  On behalf of ACET Global?
24    A.  Yes.
25    Q.  If this collateral assignment had not been

Page 226

1  signed, would Super G have funded the loan?
2    A.  No.
3    Q.  Please take a look now at Defendants'
4  Exhibit 1.
5    (Defendant's Exhibit 1 marked.)
6    Q.  (BY MR. PERRIN) Do you have that in front of
7  you?
8    A.  Let me confirm.  I have some loose papers that
9  I believe are Exhibit 1.
10    Q.  (BY MR. PERRIN) Look at the screen.  This is
11  what it's supposed to look like.  It's the "Management
12  Fee Subordination Agreement."
13    A.  Okay.  All right.  Found it.
14    Q.  Do you see that?
15    A.  Yes.
16    Q.  If you look at the -- one, two, three, four,
17  five -- sixth page of that marked BPOO1098.
18    A.  Yes.
19    Q.  And on the 198, that's signed on behalf of
20  Baymark Management and ACET Global by whom?
21    A.  David Hook.
22    Q.  On the next page, is that your signature on
23  behalf of Super G Capital?
24    A.  Yes, it is.
25    Q.  Is this a true and correct copy of the

6 (Pages 223 to 226)

Page 227

1    Management Fee Subordination Agreement?
2        A.  I believe it is.
3        Q.  I don't know if I asked you this about the
4    Collateral Assignment Agreement, which was Defendants'
5    Exhibit 9.  Was that a true and correct copy of the
6    Collateral Assignment that you signed?
7        A.  Yes, I believe so.
8        Q.  If you look at Defendants' Exhibit Number 2.
9        A.  Yes.
10           (Defendant Exhibit 2 marked.)
11       Q.  (BY MR. PERRIN)  This is entitled a "Pledge
12   Agreement."
13       A.  Yes.
14       Q.  If you'd look at the -- at Page 10 of the
15   Pledge Agreement.  The first page is signed by David
16   Hook on behalf of Baymark ACET Holdco.
17       A.  I see that.
18       Q.  Is that your signature -- on the second Page
19   10 at Bates stamp 001110, is that your signature on the
20   block for Super G Capital?
21       A.  Yes.
22       Q.  Is this a true and correct copy of the Pledge
23   Agreement?
24       A.  I believe so.
25       Q.  If you turn to Exhibit 12, Defendants'

Page 228

1    Exhibit 12.
2            (Defendant Exhibit 12 marked.)
3        A.  Excel spreadsheet.
4        Q.  (BY MR. PERRIN)  See that document showing
5    "Flow of Funds"?
6            THE WITNESS:  J.D., is this what you
7    emailed me this morning?
8            MR. BLAKLEY:  This should be in your
9    email box at 8:06 a.m. your time, should be.
10           THE WITNESS:  Okay.  I'll work off the one
11   on the screen.
12       A.  Yes, I see it.
13       Q.  (BY MR. PERRIN)  No, you're looking at the
14   wrong one.  It's Exhibit 12, which is a screenshot.
15       A.  Yes, I see it.
16       Q.  That's not --
17           MR. PERRIN:  All right.  Chase --
18           THE VIDEOGRAPHER:  I'm sorry.  That's
19   the -- that is not the right exhibit?
20           MR. PERRIN:  No.  It's the one before this
21   exhibit.
22           THE WITNESS:  I can pull it up from my
23   email.  Cash projection or flow of funds?
24           MR. PERRIN:  It should have at the top,
25   "ACET acquisition wire instructions, account

Page 229

1    information."  And the first section says, "Flow of
2    funds into ACET Global at closing."
3            MR. BLAKLEY:  It's going to be the second
4    attachment for you, Marc.
5            THE WITNESS:  I have it open on my
6    screen.
7            MR. PERRIN:  Chase, have you found that?
8            THE VIDEOGRAPHER:  Sorry.  I have not.
9    That is -- that is what I have emailed to me labeled
10   Defendant Exhibit 12.
11           MR. PERRIN:  What do you have as 13 then?
12           THE VIDEOGRAPHER:  One second.
13           MR. PERRIN:  All right.  Let's -- for the
14   record, we'll refer to this as Exhibit 13.  It is a --
15       A.  Yes, I have it.  I see it.  It matches.
16           (Defendant Exhibit 13 marked.)
17       Q.  (BY MR. PERRIN)  And this is entitled at the
18   top, "ACET acquisition wire instructions, account
19   information in U.S. dollars."
20           Do you see that?
21       A.  Yes.
22       Q.  And at the bottom of the page, it's Bates
23   stamped BP008411?
24       A.  I'm in the spreadsheet.
25       Q.  Okay.  Can you tell me how much money was

Page 230

1    flowed out of ACET Global at closing to the sellers?
2        A.  $850,000.
3        Q.  Now, in your prior --
4            MR. PERRIN:  And Chase, that's fine.  You
5    can take down the exhibits for now.
6        Q.  (BY MR. PERRIN)  Mr. Cole, earlier in your
7    deposition, you stated this was a cash flow deal.  What
8    do you mean by this is a "cash flow deal"?  What is
9    that -- what is a "cash flow deal"?
10       A.  Cash flow deal is where the lender, in this
11   case, Super G Capital, based its loan amount in part on
12   the earnings of the business, both historical and its
13   understanding of projected earnings, which would be used
14   to amortize the loan.
15       Q.  And did you perform those projections in -- on
16   this APA transaction?
17       A.  I personally did not.
18       Q.  I'm talking -- I'm taking your deposition as
19   Super G.
20       A.  Yes.
21       Q.  Did Super G make any determination as to
22   whether or not this loan and this amortization schedule
23   could be paid by ACET Global?
24       A.  Yes.
25       Q.  On paper, was it strong or weak?

7 (Pages 227 to 230)

Page 231

1     A.  On paper, the debt service coverage ratio was
2  over two times, which is considered strong.
3     Q.  And the cash flow is based upon the prior
4  earnings of the company or not?
5     A.  Super G Capital used an adjusted EBITDA as a
6  proxy for cash flow.  Yes, up -- including the prior
7  periods and the trailing 12-month period.
8     Q.  And if the adjusted EBITDA is overstated,
9  would that result in you making a larger loan than maybe
10 could have been accommodated or paid?
11    A.  Yes.
12    Q.  Now, in this case, after the closing, did ACET
13 Global ever come close to approximating those type of
14 cash flow numbers that you relied upon in making this
15 deal?
16        MR. FREEMAN:  Objection, form.
17    Q.  (BY MR. PERRIN)  Go ahead, Mr. Cole.  You can
18 answer that.
19    A.  No, it did not.
20    Q.  Do you have any opinion as to how accurate the
21 cash flow numbers were that you relied upon?
22        MR. FREEMAN:  Objection, form.
23    A.  My opinion is they were significantly
24 inaccurate.  They were significantly overstated.
25    Q.  (BY MR. PERRIN)  So let me ask you again.

Page 232

1  First of all, do you have an opinion as to whether or
2  not those cash flow numbers provided by the seller were
3  overstated?  Just let me know yes or no, and then I'll
4  ask you your opinion.
5     A.  Could you repeat the question?
6     Q.  Do you have an opinion as to whether or not
7  the cash flow numbers provided by the seller were
8  overstated?
9     A.  Yes, I have an opinion.
10    Q.  And what is that opinion?
11    A.  That those numbers were overstated.
12    Q.  Significantly?
13        MR. FREEMAN:  Objection, form.
14    A.  Yes, in my opinion.
15    Q.  (BY MR. PERRIN)  Overstated by how much?
16        MR. FREEMAN:  Objection, form.
17    A.  I'm not sure.
18    Q.  (BY MR. PERRIN)  And in a transaction like
19 this, is the seller note -- how would a seller note be
20 determined in a transaction like this?
21    A.  Could you ask the question a different way?
22    Q.  Yeah.  When you have a cash flow deal, what
23 normally does the seller's note represent?
24    A.  A portion of the acquisition consideration not
25 paid at closing.

Page 233

1     Q.  And that would be what type of portion -- and
2  how would that consideration be calculated?
3     A.  It's negotiated between the buyer and the
4  seller.  It is a function of the demand for the
5  acquisition.  Sellers want as much money up front as
6  possible, and buyers want to structure their cash out
7  the door to protect themselves.  And lenders, in this
8  case, are focused on the company having sufficient cash
9  flow to repay the senior lender.  And those three
10 parties either can find an acceptable solution, or
11 there's no transaction.
12    Q.  If a seller's note is based on cash flow, what
13 relationship does the value of that note have to do with
14 the value of the assets of the company?
15    A.  It's difficult for me to answer that question.
16 I believe, in this case, the seller note was not a
17 performance-based earn-out.  I'm not that close to the
18 Asset Purchase Agreement.  I believe this --
19    Q.  We went -- go ahead.  I'm sorry.  Are you --
20    A.  I believe the seller note was -- the payments
21 on the seller note were governed by the senior lender,
22 in this case, Super G Capital's ability to receive its
23 full payments of principal and interest.
24    Q.  We went over the subordination of the seller
25 note.  Is that a fairly standard practice in these type

Page 234

1  of transactions?
2     A.  Completely standard.
3     Q.  And in this case, according to your
4  understanding, the seller walked away from closing with
5  over $800,000?
6     A.  Yes.
7     Q.  Did anyone else receive any money from that
8  transaction and walk away with that?
9         MR. FREEMAN:  Objection, form.
10    A.  I don't see anyone else in the sources and
11 uses receiving money other than a loan was paid off,
12 which would also presumably benefit the seller.
13    Q.  (BY MR. PERRIN)  How much money did Baymark
14 ACET Holdco put into this transaction at the closing?
15    A.  $400,000.
16    Q.  And y'all put in 750?
17    A.  Thousand dollars, correct.
18    Q.  To the best of your knowledge, who was the
19 only person who walked away with cash in this closing
20 transaction?
21    A.  The seller.
22    Q.  All right.  After the closing, were there any
23 problems with the performance of ACET Global?
24    A.  Yes.
25    Q.  What type of problems?

8 (Pages 231 to 234)

Marc Cole Volume 2  *  April 1, 2021

Page 235

1   A.  While my memory of the events is not
2   particularly useful, my notes show that the loan needed
3   to be amended fairly quickly, and there was an amendment
4   in December of 2017 reducing the payment due to the
5   company's insufficient cash flow.
6        MR. FREEMAN:  Objection, form of the
7   prior question.
8   Q.  (BY MR. PERRIN)  Turn to Exhibit --
9   Defendants' Exhibit 6.
10        (Exhibit 6 marked.)
11   A.  I see an email.
12   Q.  (BY MR. PERRIN)  All right.  Could you take a
13   look at that and tell me what that is?
14        MR. FREEMAN:  Hey, Ed, have you provided
15   us a copy of these marked exhibits you've got?
16        MR. PERRIN:  Sure have.
17        MR. FREEMAN:  I don't think we've got
18   them marked like this.
19        MR. PERRIN:  I sent them to Karen like
20   that, and copied everybody on it.  She asked me to do
21   so.  I did so.
22        MR. FREEMAN:  Do y'all mind -- do you
23   mind shooting us a copy of these?
24        MR. PERRIN:  Karen, can you shoot him what
25   I sent to everybody or --

Page 236

1        THE REPORTER:  Sure.  If we can go off the
2   record for a moment.
3        MR. PERRIN:  Yeah, let's go off the record
4   for a minute.
5        (Break taken from 11:02 a.m. to
6   11:02 a.m.)
7        MR. PERRIN:  J.D., would you please
8   recite for the record what you found with respect to the
9   email requested about the Defendant's exhibits being
10   provided to the court reporter and counsel of record?
11        MR. BLAKLEY:  Yeah.  One second.  I am
12   looking at an email from Tuesday, March 30th at
13   3:46 p.m. from Stacey Goldfarb at Hallett & Perrin to
14   Ms. Usher, the court reporter, copying Woods, Brenda
15   Hard-Wilson, Ed Perrin, Jennifer Poe, Jason Freeman,
16   Mr. Silvestre, me and a jessica@freemanlaw.com, with a
17   Citrix attachment with 13 marked Defendant deposition
18   exhibits.
19        MR. PERRIN:  Thank you.
20   Q.  (BY MR. PERRIN)  With respect to -- now, if
21   you turn to Exhibit 6, Defendants' Exhibit 6.  Do you
22   have that in front of you, Mr. Cole?
23   A.  I do.
24   Q.  Have you had a chance to review that?
25   A.  I just did.

Page 237

1   Q.  Can you tell us what that is?
2   A.  It's an email from Super G Capital's employee,
3   Steve Bellah, to the Baymark team describing a
4   conversation around support for the company and making a
5   recommendation for a partial restructuring of the Super
6   G Capital loan.
7   Q.  Now, when you previously discussed that it had
8   to be amended in December of 2017, is this what you were
9   referring to?
10   A.  Yes.
11   Q.  And in the first paragraph, it talks about, at
12   the end, about the efforts of Lux 214, which Mr. Bellah
13   also viewed as an endorsement from ownership that you
14   were willing to invest in the continued development of
15   the company.  Was it your understanding that the Baymark
16   parties were willing to do so?
17   A.  I'm not familiar with Lux 214.
18   Q.  Well, in the second paragraph, it talks about
19   demonstrating their optimism with more financial support
20   for the company.  Do you see that?
21   A.  I do.
22   Q.  Was it your understanding that the principals
23   of Baymark ACET Holdco were willing to contribute more
24   capital?
25        MR. FREEMAN:  Objection, form.

Page 238

1   A.  I understand from this email that Super G
2   Capital's support for the company was predicated on
3   Baymark putting in more capital, more equity.
4   Q.  (BY MR. PERRIN)  And did Baymark do so?
5   A.  Yes.
6   Q.  And what was the amount they put in at this
7   time?
8   A.  It's difficult to tell from this email.  I
9   would need to see the -- I believe the loan was amended,
10   and I could -- okay.  I see the loan was amended.  If
11   you don't mind me skipping to Exhibit 8 -- no, that's a
12   different amendment.  I'm not sure whether we went with
13   what is labeled Scenario 1 or Scenario 2.
14   Q.  Well, I'll tell you what.  Take a look at
15   Defendants' Exhibit 3.
16        (Defendant Exhibit 3 marked.)
17   A.  Here's the amendment.
18   Q.  (BY MR. PERRIN)  Can you tell us what
19   Exhibit 3 is?
20   A.  Exhibit 3 is the first amendment to the loan
21   agreement which was entered on December 27, 2017.
22   Q.  And if you look at the signature page on that,
23   Bates stamp BP001437, is that your signature?
24   A.  Yes.
25   Q.  Is this a true and correct copy of amendment 1

9 (Pages 235 to 238)

Page 239

1 to loan agreement?
2    A.   Yes, I believe so.
3    Q.   And part of the consideration for that loan
4 agreement was Baymark ACET Holdco putting in an
5 additional $50,000?
6    A.   That would likely be captured in this
7 amendment, and I'm looking for the language.
8         MR. FREEMAN:  Objection, form.
9    A.   My understanding from the email correspondence
10 was that Super G Capital was conditioning the amendment
11 on an equity contribution.  A properly documented
12 amendment would have stated that contribution in
13 Section 3, "Conditions Precedent."  But I don't see that
14 here, so I'm not sure what was agreed to or what was
15 contributed to the company.
16    Q.   (BY MR. PERRIN)  If you'd look at the second
17 page of that amendment number 1, it shows the payment
18 amounts.  Do you see that?
19    A.   Yes.
20    Q.   And so at this point -- this loan was about 22
21 weeks in -- had ACET Global been making their $15,000 a
22 week payments timely up until this time?
23    A.   My belief is that it had.
24    Q.   And then under this amendment, it was going to
25 reduce the weekly payments for the next 12 weeks to

Page 240

1 $7500?
2    A.   Which appears to be the 50 percent reduction
3 described in the email, yes.
4    Q.   And then after that, it would go back up to
5 15,000 a week?
6    A.   Yes.
7    Q.   Now, leave a bookmark here, and I'll come back
8 to this.  But going back -- I want to take you back to
9 at the time the APA transaction was negotiated and
10 signed.  Okay?
11    A.   Yes.
12    Q.   At the time the APA agreement was negotiated
13 and signed, was it ever indicated to you that there was
14 any intent or plan to run ACET Global in such a way that
15 it would fail?
16    A.   No.
17    Q.   If there had been, would you have put any
18 money into this?
19    A.   Absolutely not.
20    Q.   At the time of the -- at the negotiation and
21 closing of the APA transaction, was there ever any
22 discussion or intent, to your knowledge, that -- to
23 drain ACET Holdco of all of its assets?
24         MR. FREEMAN:  Objection, form.
25    A.   No.

Page 241

1    Q.   (BY MR. PERRIN)  I couldn't hear your answer,
2 Mr. Cole.
3    A.   No.
4    Q.   At the time of the APA transaction negotiation
5 and closing, were you aware of any discussion or
6 indication or any preconceived plan to start another
7 business with ACET Global's assets?
8         MR. FREEMAN:  Objection, form.
9    A.   No.
10    Q.   (BY MR. PERRIN)  If there had been any
11 indication of any kind to you of any of the foregoing,
12 would you have -- would Super G have funded their loan?
13    A.   No.
14         MR. FREEMAN:  Objection, form.
15    Q.   (BY MR. PERRIN)  All right.  Let's turn back
16 to the nature of the troubles that the company was
17 having after the closing.  You first indicated that
18 there were problems which led to the first amendment.
19 Do you know of about any operational problems with the
20 company that led to that?
21    A.   I don't recall them.
22    Q.   You just knew it wasn't performing the way it
23 was reflected in the historical numbers?
24    A.   Correct.
25    Q.   Ask you to take a look -- so we looked at

Page 242

1 Exhibit 6, which was the email.  If you'd take a look at
2 Exhibit 6 again, Defendants' Exhibit 6, December 20,
3 2017 email.
4    A.   Yes.
5    Q.   You see the subject?  It says, "re:  ACET
6 Detailed Cash Projection."  Do you see that?
7    A.   Yes.
8    Q.   I'm going to ask you to take a look at
9 Defendants' Exhibit 7.
10         (Defendant Exhibit 7 marked.)
11    A.   The spreadsheet?
12    Q.   (BY MR. PERRIN)  Yes.  Is that the spreadsheet
13 that was attached to this email?
14         THE WITNESS:  J.D., is that cash
15 projection BP005948?
16         MR. BLAKLEY:  Yep.  Should be the first
17 attachment on that email I sent you.
18    A.   Okay.  I have it open.
19    Q.   (BY MR. PERRIN)  So you see those cash
20 projections?
21    A.   I see -- make sure I'm on the right tab.
22 Processing.  Heavy file; processing.
23    Q.   Let me just ask you to look at the screen
24 right now, if you would.
25    A.   Okay.

Usher Reporting Services
(214) 755-1612

Page 243

1  Q.  The first page shows a breakdown of 2014,
2  2015, 2016, and then December of 2017.  Was it your
3  understanding that was through December 2017 for those
4  numbers?
5  A.  Yes.
6  Q.  If you turn to the next page -- or look at the
7  next page, at the bottom of the December 17th -- or
8  December 2017 column, what does it show the net income
9  for the company in 2017?
10  A.  Could you scroll up once more?  I looked away.
11  2017 is the right-most column?
12  Q.  Yes.
13  A.  Okay.
14      MR. PERRIN:  And scroll down again, Chase.
15  A.  It shows a net loss of $388,000 and change.
16  Q.  (BY MR. PERRIN)  There are a number of tabs
17  attached to these projections, are there not?
18  A.  There are.
19  Q.  And, sir, is this type of discussion and
20  exchange of information consistent with trying to make
21  this deal work, in your mind?
22  A.  Could you ask the question differently?
23  Q.  Okay.  If someone intended just to let ACET
24  Global fail, would it make sense to go through this
25  extensive modeling and projection exercise?

Page 244

1  A.  I've never been part of a transaction
2  across --
3      MR. FREEMAN:  Objection, form.
4  A.  -- hundreds of transactions where any party
5  has intentionally let a business fail.
6  Q.  (BY MR. PERRIN)  In your opinion, was there
7  any intent or plan in this case to let ACET Global's
8  business fail?
9      MR. FREEMAN:  Objection, form.
10  A.  No.  Both the lender and the equity investor
11  were contributing further capital at this time.
12  Q.  (BY MR. PERRIN)  If you'd turn to Defendants'
13  Exhibit Number 8.
14  A.  "Forbearance Agreement."
15  Q.  Do you see that?
16  A.  I do.
17  Q.  It's dated April 12th, 2018?
18  A.  Yes.
19  Q.  And if you'd turn to the signature page at
20  BP006112.
21  A.  I see it.
22  Q.  Is that your signature under "Super G
23  Capital"?
24  A.  It is.
25  Q.  And who signed on behalf of ACET Global?

Page 245

1  A.  David Hook.
2  Q.  Is this a true and correct copy of the
3  Forbearance Agreement?
4  A.  Yes, I believe it is.
5  Q.  Now, this was less than four months after the
6  first amendment.  What led to the Forbearance Agreement,
7  to your understanding?
8  A.  The company's inability to meet its
9  obligations of debt service to Super G Capital and
10  minimum cash balance.
11  Q.  The minimum cash balance being what?
12  A.  $50,000.
13  Q.  And some of these facts are recited in the
14  Forbearance Agreement?
15  A.  Yes, I see them.
16  Q.  And in "Recitals of Fact," under C, it says
17  that, "The borrower failed to make weekly payments of
18  $15,000 due on March 22nd, 2018, and March 29th, 2018."
19      Do you see that?
20  A.  I do.
21  Q.  Is that a correct statement?
22  A.  It is.
23  Q.  And then in D, it talks about that the
24  borrower failed to maintain cash in deposit accounts
25  with its bank other than the escrow account of the

Page 246

1  $50,000 you talked about?
2  A.  Yes.
3  Q.  And so what did Super G agree to do to forbear
4  on its rights in return for action by ACET Global?
5  A.  In Section 6, Super G further lowered its loan
6  payments to $5,000 a week for a specified period of time
7  such that those payments would then increase.
8  Q.  Did it require -- go ahead.
9  A.  And there was -- and furthermore, Super G
10  required -- it looks like it's 6(b), further cash
11  investment in the company of $30,000.  I would expect to
12  see a fee or a penalty, but I don't see one here.
13  Q.  Does this Forbearance Agreement indicate to
14  you the willingness of ACET Global to try to move
15  forward with this loan?
16  A.  It does.
17  Q.  Does -- would you expect someone who is trying
18  to make ACET Global fail to enter any such type of
19  agreement?
20      MR. FREEMAN:  Objection, form.
21  A.  I don't know how to answer that other than the
22  sponsors continued to put cash into the company.
23      MR. FREEMAN:  Objection, nonresponsive.
24  Q.  (BY MR. PERRIN)  Well, let me ask you this
25  way.  Mr. Cole, did the sponsors continue to put cash in

Usher Reporting Services
(214) 755-1612

Page 247

1    the company?
2        A.  They did.
3        Q.  And what did that indicate to you?
4            MR. FREEMAN:  Objection, form.
5        A.  Support for the business.
6        Q.  (BY MR. PERRIN)  Excuse me.  I couldn't hear
7    your answer, Mr. Cole.
8        A.  Support for the business.
9        Q.  Let's turn to Defendants' Exhibit 9.
10           (Defendant Exhibit 9 marked.)
11       Q.  (BY MR. PERRIN)  This is an email dated
12   July 2nd, 2018, from Mr. Bellah to Tony Ludlow and Matt
13   Denegre regarding restructured amortization.  Can you
14   tell us what you understand about any restructured
15   amortization around July 2nd, 2018?
16       A.  My interpretation of this email is the company
17   is on life support at this point.  The original $15,000
18   payment, which was taken down to 7500, and then down
19   further, is now down to $1,000.  And if the investors
20   were to put in capital, then Super G would go down to
21   what is truly a nominal payment on the loan of $500.
22       Q.  And the sponsors continuing to put money in
23   indicated what to you?
24       A.  Further support.
25       Q.  Would it indicate to you in any way that they

Page 248

1    wanted the business to fail?
2            MR. FREEMAN:  Objection, form.
3        A.  No.
4        Q.  (BY MR. PERRIN)  Was this new payment schedule
5    complied with?
6        A.  This was an email agreement as of July.  And
7    from my notes, I believe it was not because I have a
8    notation about needing a further amendment in October,
9    and clearly, a foreclosure in January.  So I believe --
10   I recall some payments were made, but I believe this
11   was -- this, to me, indicates a company on life support,
12   and I think that's what happened.
13       Q.  And what do you recall about needing a further
14   amendment in October with respect to the ACET Global
15   loan?
16       A.  I would be speculating as to my memory at the
17   time, but --
18       Q.  I'm asking you -- I'll ask you today, as a
19   representative of Super G, what were the reasons for the
20   possible need for a further amendment in October?
21           MR. FREEMAN:  Objection, form.
22       A.  The company was unable to make any acceptable
23   debt service on the loan.  The company was insolvent by
24   any reasonable standard, which means the company needs
25   to be run for the benefit of all shareholders, including

Page 249

1    the creditors in the zone of insolvency.  And plans were
2    clearly discussed as to how to preserve all
3    stakeholders' claims here.
4        Q.  (BY MR. PERRIN)  And what plans were
5    discussed?
6        A.  From the review of the exhibits, there were
7    wind-down plans.  There were restructuring plans.  And
8    ultimately, a foreclosure was deemed by Super G to be
9    the best option.
10       Q.  Whose decision was that to make?
11       A.  Super G Capital decided to do the foreclosure,
12   so that decision was Super G's alone.
13       Q.  Look at Defendants' Exhibit 10.
14           (Defendant Exhibit 10 marked.)
15       A.  I see an email.
16       Q.  (BY MR. PERRIN)  Attachments to that email, do
17   you recognize that?
18       A.  I recognize that, at this point, Super G,
19   principally, Steve Bellah, was having discussions with
20   Baymark as to various paths forward to preserve value;
21   but I'm not familiar with the details of it.
22       Q.  And this was talking about a plan to
23   restructure ACET Global or some other entity?
24       A.  It's called "The ACET Plan."  It appear s to
25   be -- to be what it is, what it's labeled, a plan for

Page 250

1    ACET.
2        Q.  A restructure plan for ACET Global?
3        A.  Yes.
4        Q.  And then if you look at Defendants'
5    Exhibit 11.
6            (Defendant Exhibit 11 marked.)
7        A.  Wind-down plan.
8        Q.  Did Super G request a wind-down plan from ACET
9    Global?
10       A.  I don't recall requesting it.  I certainly
11   would have in a liquidation scenario.  That's
12   always a -- it's always an appropriate scenario to
13   review.
14       Q.  Was Super G willing to put any more money into
15   ACET Global in September of 2018?
16       A.  I can't answer that for specifically the month
17   of September.  I can tell from the options that money
18   was needed.
19           MR. FREEMAN:  Objection, form.
20       Q.  (BY MR. PERRIN)  Was it your understanding in
21   September of 2018 that Super G and ACET Global were in
22   discussions about restructuring?
23       A.  Yes.
24       Q.  And what was your understanding of those
25   restructuring discussions?

Usher Reporting Services
(214) 755-1612

Page 251

1    A.  Well, I recall my initial position was that
2  Super G was not going to contribute any additional
3  capital, and that either Baymark or the new CEO could
4  contribute capital.  On the other hand, I was looking to
5  mitigate a significant principal loss for Super G.
6    Q.  And how did you -- how did Super G determine
7  to do that?
8    A.  Well, I don't know the month that the decision
9  was made.  But ultimately, selecting between bad
10  options, I chose incorrectly; and we, in fact,
11  contributed capital to the foreclosure and the restart
12  plan.
13    Q.  And was that restart plan in another entity?
14    A.  It appears to have been in Windspeed Trading.
15    Q.  And why would you contribute that money to
16  Windspeed Trading and not to ACET Global?
17    A.  I don't know the decision-making at the time
18  between entities.  I know that it's -- that's the path
19  that was chosen based on what appeared to be the best
20  option for Super G.
21    Q.  Would Super G want any money it contributed to
22  be used to pay the seller note?
23    A.  No.
24    Q.  Now --
25    A.  The company was in -- was insolvent.

Page 252

1    Q.  If you'd look at Defendants' Exhibit 4.
2    (Defendant Exhibit 4 marked.)
3    Q.  (BY MR. PERRIN)  Can you -- wait a minute.
4  Let me -- yeah, Defendants' Exhibit 4.  Can you tell us
5  what that is?
6    A.  It's a loan agreement between Super G Capital
7  and Windspeed Trading for $200,000 in October of 2018.
8    Q.  And was this the option of all the bad options
9  that was chosen by Super G?
10    A.  Yes.
11    Q.  Did Super G require any concessions or
12  conditions to put that money into Windspeed?
13    A.  Yes.
14    Q.  What did it require?
15    A.  It required all of the economics associated
16  with this loan.  And it required a security to
17  participate in Windspeed's success if it were -- if the
18  loans were repaid and Windspeed was successful.
19    Q.  What security are you referring to?
20    A.  The warrant in Windspeed Trading.
21    Q.  Did you and Super G request any conditions or
22  concessions with respect to any of the Baymark parties?
23    A.  Well, I unsuccessfully demanded that they
24  participate in the funding of Windspeed, and they
25  refused.  And they instead offered to be -- to

Page 253

1  contribute labor and be helpful in the venture and that
2  they would receive an equity stake for their
3  contribution of labor.
4    Q.  So Baymark principals offered to lend support
5  and expertise, and in return, you gave -- you had them
6  be given a warrant?
7    A.  Yes.
8    Q.  Then Windspeed moved forward at that point.
9  Did -- had Mr. Bill Szeto -- did the company -- did
10  Super G have confidence in Bill Szeto at the time?
11    A.  We had -- we appreciated that our equity --
12  again, I use the term "sponsor," and that's how lenders
13  view the role of private equity groups -- that the
14  sponsor brought a solution to the table, and the
15  solution was a CEO, and that that CEO, as we discussed
16  in my prior deposition, had a track record of success
17  before him.  So it wasn't so much that we -- we did not
18  recruit Bill Szeto as much as Baymark did, which was, in
19  our minds, part of their support for the company,
20  because we did not intend to operate the business.
21    Q.  Were you aware whether the options of ACET
22  Global were shut down?
23    A.  I'm not aware.
24    Q.  Did you give any directions -- did Super G
25  give any directions to Bill Szeto about the handling of

Page 254

1  ACET collateral before the foreclosure?
2    A.  No.
3    Q.  When you -- did Super G ultimately decide to
4  foreclose on and take the collateral from ACET Global?
5    A.  Yes.
6    Q.  Please take a look at Exhibit 17.
7    A.  In the defendant's?
8    Q.  Plaintiff's Exhibit 17.  I'm sorry.
9    MR. FREEMAN:  Hey, Ed, how much longer
10  you got?
11    MR. PERRIN:  I think about 15 minutes.
12    MR. FREEMAN:  Okay.
13    A.  I see the notice of foreclosure.
14    MR. PERRIN:  And I'm looking at my notes.
15  It may be a little bit longer than that, Jason, but I'll
16  try to move it as quick as I can.
17    Q.  (BY MR. PERRIN)  Did you find that
18  foreclosure, Exhibit 17?
19    A.  Yes.
20    Q.  If you look at -- that's a foreclosure notice
21  dated January 31, 2019.  Is that your signature on the
22  second page?
23    A.  Yes.
24    Q.  Did Super G also send a copy of this letter to
25  Mr. Tomer Damti?

Page 255

1    A.  Yes.
2    Q.  Did Mr. Damti ever make any offer to Super G
3    to purchase any of the collateral?
4    A.  He did not.
5    Q.  Did he ever even contact Super G about it?
6    A.  No.
7    Q.  You previously, in your deposition, described
8    the foreclosure under Article IX of the UCC, and I don't
9    want to go back into that.  In doing that, though, you
10   mentioned "friendly foreclosure."  Can you tell us what
11   "friendly foreclosures" are?
12   A.  It's not a legal term, but it's my description
13   for a foreclosure process where the other parties,
14   including the equity investors, agree it is in
15   everybody's best interest and cooperate in the
16   foreclosure process.
17   Q.  Have you ever done a friendly foreclosure
18   before at Super G?
19   A.  I have.
20   Q.  Have you done any other Article IX or other
21   foreclosures at Super G?
22   A.  I'm not entirely sure.  I have certainly
23   done -- we've used the judicial process, but I'm not
24   aware of a -- of a -- of an additional foreclosure.
25   Q.  So after the foreclosure by Super G, who owned

Page 256

1    that property that was foreclosed upon?
2    A.  Super G Capital.
3    Q.  What could you do with it?
4    A.  Whatever the lender or Super G had intended.
5    Could use it; could sell it.
6    Q.  Could he keep it?
7    A.  Could keep it.
8    Q.  Why did Super G sell it to Windspeed?
9    A.  Super G is not in the commerce business or any
10   operating business.  It was in the loan business, and
11   Super G wanted to recover its loans.
12   Q.  Did Super G feel that moving forward through
13   Windspeed was the best way to do so?
14   A.  It was the best of bad options.
15   Q.  If you'd turn to Plaintiff's Exhibit 15.
16   A.  Yes.
17   Q.  This is a "Foreclosure Sale Agreement" you
18   previously identified?
19   A.  Yes.
20   Q.  Now, I'd ask you to take a look at the 14th
21   and 15th pages of that document.  There's a Bates stamp
22   at the bottom going -- "Motion for Summary Judgment,"
23   Page 87 and Page 88.  Do you see those?
24   A.  I see signatures, yes.
25   Q.  On the one that has "Motion For Summary

Page 257

1    Judgment - Page 87" on it, do you see who signed for
2    Windspeed Trading?
3    A.  William Szeto.
4    Q.  And the footer on that signature page says,
5    "Asset Purchase Agreement"?
6    A.  Yes.
7    MR. PERRIN:  Thank you, Chase.  Let's go
8    to the next page.
9    Q.  (BY MR. PERRIN)  On that next page, where --
10   under "Super G Capital," is that your signature?
11   A.  Yes.
12   Q.  And that says, "Signature page - Asset
13   Purchase Agreement," also?
14   A.  Yes.
15   Q.  If you turn back three pages, the remainder of
16   that document has "Foreclosure Sale Agreement" with a
17   page number on it.  Do you see that?
18   A.  I see it.
19   Q.  It goes all the way to the first page, doesn't
20   it?
21   A.  Yes.
22   Q.  Did Super G ever sell or purchase any other
23   assets with Windspeed other than this Foreclosure Sale
24   Agreement?
25   A.  Not to my knowledge.

Page 258

1    Q.  When you signed this Foreclosure Sale
2    Agreement on the signature page saying "Asset Purchase
3    Agreement," was it your intent at that time to be
4    signing the Foreclosure Sale Agreement?
5    A.  Yes.
6    Q.  Was it your intention in signing that to
7    effect that transaction?
8    A.  Yes.
9    Q.  If you look at -- after your signature page,
10   you have an Exhibit A.  This document references an
11   Exhibit A, a "Bill of Sale."
12   A.  Yes.
13   Q.  It also references Exhibit B, an "Assignment
14   and Assumption Agreement."  That would be the Motion For
15   Summary Judgment, Page 104.
16   A.  I see it.
17   Q.  So it references that's going to be another
18   document signed under this Foreclosure Sale Agreement?
19   Is that correct?
20   A.  The version I have is unsigned.
21   Q.  This is just the attachment at this point?
22   A.  Yes.
23   Q.  These are attachments to the Foreclosure Sale
24   Agreement saying these are going to be additional
25   documents that are executed under this agreement; is

## Page 259

1    that correct?
2          A.  Yes, these are the forms.  Yes, I see that.
3          Q.  And the third form is Exhibit C, the form of
4    the Amended Loan Agreement?
5          A.  Yes.
6          Q.  And these were all part of the Foreclosure
7    Sale Agreement, correct?
8          A.  Yes.
9          Q.  All right.  If you turn to Plaintiff's
10   Exhibit 7.
11         THE REPORTER:  Ed, I don't have a
12   Plaintiff's Exhibit 7.  I have 5, 8, 9, 15, 17, 23.
13         MR. PERRIN:  Karen, the file delivered to
14   all of us had 1 through 22.
15         THE REPORTER:  All right.  Give me just a
16   moment.
17         MR. FREEMAN:  Do y'all want to take five
18   minutes?
19         MR. PERRIN:  That works.  Let's do it.
20         (Break taken from 11:41 a.m. to
21          11:51 a.m.)
22         MR. FREEMAN:  Just real quick, on the
23   record, Mr. Blakley, there are a few exhibits it looks
24   like we're about to go into.  I understand that you had
25   a copy of those, and that I had previously circulated

## Page 260

1    those to all counsel; is that correct?
2          MR. BLAKLEY:  That's correct.  Ryan Dean
3    out of your office on March 25th at around 3:43 p.m.
4    sent a Zip file with 21 potential deposition exhibits
5    for Mr. Cole.  And that's what I have now forwarded on
6    to Ms. Usher and Chase, who is running the exhibits for
7    this deposition.
8          MR. FREEMAN:  Thank you.
9          Q.  (BY MR. PERRIN)  Mr. Cole, if you'd look at
10   Defendant's [sic] Exhibit 7, "Bill of Sale."
11         A.  Yes.
12         Q.  If you turn to the third page of that
13   document, "Signature Page - Bill of Sale."
14         A.  That is my signature.
15         Q.  Dated March 1, 2019?
16         A.  Yes.
17         MR. PERRIN:  Chase, are you trying to get
18   to it, or do you want us to move on?
19         MR. BLAKLEY:  I believe, Ed, you said
20   "Defendants' Exhibit 7," but you mean Plaintiff's
21   Exhibit 7 is the Bill of Sale.
22         MR. PERRIN:  You are right, J.D.  If I
23   said it, I misspoke.
24         THE VIDEOGRAPHER:  Thank you.  I was about
25   to ask that clarification as well.

## Page 261

1          MR. PERRIN:  I'm sorry, Chase.  How about
2    Defendant's -- Plaintiff's Exhibit 7.  I'm sorry.
3          Q.  (BY MR. PERRIN)  There we go.  Now, just to
4    clarify, Mr. Cole, will you turn to the third page of
5    that, the signature page?  That's your signature for
6    Super G Capital?
7          A.  Yes, it is.
8          Q.  And Bill of Sale dated March 1, 2019?
9          A.  Yes.
10         Q.  And this is a true and correct copy of the
11   Bill of Sale signed by you?
12         A.  I believe it is.
13         Q.  All right.  Let's look at Plaintiff's
14   Exhibit 4.  Do you see that?
15         A.  Yes.
16         Q.  And is this the -- well, can you tell us what
17   this is?
18         A.  Super G Capital sold the ACET collateral to
19   Windspeed Trading for the assignment of this note.  The
20   note says "514,144.86."  I believe that was a typo
21   because the foreclosure agreement was listed as
22   516,144.86.  But, in any case, that's what this is.
23   It's -- it is Windspeed assuming both the -- the
24   liability to Super G Capital.
25         Q.  And if you'd look at the top -- at the

## Page 262

1    beginning of that, it's dated March 1, 2019?
2          A.  Yes.
3          Q.  And if you turn to Page 15 of that document.
4          A.  Yes.
5          Q.  Whose signature is that?
6          A.  Mine.
7          Q.  Well, and there's two 15s.  The first 15 is, I
8    believe, Mr. Szeto?
9          A.  I see his signature on -- well, it says, "Page
10   16 of 19."
11         Q.  Page 15 of 19.
12         A.  Sorry.  There are two Page 15s.  Yes, he
13   signed on Page 15 of 19, as did I.
14         Q.  And then on the duplicate page on the next
15   page, you signed on behalf of Super G?
16         A.  Yes.
17         Q.  And so is Exhibit 4 a true and correct copy of
18   the Amended and Restated Business Loan and Security
19   Agreement dated March 1 to Windspeed Trading?
20         A.  Yes.
21         Q.  Then look at Defendants' Exhibit Number 5.
22         (Exhibit defendant 5 marked.)
23         A.  I see it.
24         MR. BLAKLEY:  Do you mean Plaintiff's
25   Exhibit Number 5 again?

## Page 263

1    MR. PERRIN: No, I mean Defendants'
2 Exhibit Number 5.
3    THE WITNESS: Thank you.
4    (Defendant Exhibit 5 marked.)
5    A. Yes, I see it.
6    Q. (BY MR. PERRIN) This is the "Assignment and
7 Assumption Agreement"?
8    A. Yes.
9    Q. Look at the third page, that it's effective
10 "as of the day and year first written above." And is
11 that your signature at Super G Capital?
12    A. Yes, it is.
13    Q. And on the preceding page, it's signed by
14 Mr. Szeto?
15    A. Correct.
16    Q. And this is a -- is this a true and correct
17 copy of the Assignment and Assumption Agreement?
18    A. I believe so.
19    Q. So we've gone over the Bill of Sale, the
20 Assignment and Assumption Agreement, and the Amended
21 Loan Agreement, correct?
22    A. Yes.
23    Q. And these are all attachments of the
24 Foreclosure Sale Agreement and made a part of it,
25 correct?

## Page 264

1    A. Yes.
2    Q. And they're all dated effective March 1, 2019,
3 correct?
4    A. Yes.
5    Q. And these exhibits, the Bill of Sale, the
6 Assignment and Assumption Agreement and Amended Loan
7 Agreement, those were done to effectuate the Foreclosure
8 Sale Agreement?
9    A. Yes.
10    Q. Have you ever had any other similar agreements
11 or any type of purchase or sale agreements with
12 Windspeed other than these documents involved in the
13 Foreclosure Sale Agreement?
14    A. I don't -- I cannot think of any. Well,
15 there's the op -- there's the operating agreement.
16    Q. Okay. And you've never had any other asset
17 purchase agreement of any kind with Windspeed other than
18 this Foreclosure Sale Agreement?
19    A. No.
20    Q. And it was your intent to sign the Foreclosure
21 Sale Agreement where provided?
22    A. Yes.
23    Q. If you'd take a look at Plaintiff's
24 Exhibit 15.
25    A. Yes.

## Page 265

1    Q. I'm not sure I asked you this, so I'm going to
2 ask you now. Is this a true and correct copy of the
3 Foreclosure Sale Agreement?
4    A. Yes, I believe it is.
5    Q. I'd ask you to turn to the signature pages.
6    A. Starting?
7    Q. They are on Motion for Summary Judgment, Page
8 87 and 88.
9    A. Yes.
10    Q. Did you intend -- when signing, where provided
11 on Summary Judgment Page 88, did you intend to sign the
12 Foreclosure Sale Agreement when you made that signature?
13    A. Yes.
14    Q. Plaintiff has asserted in pleadings with the
15 court that this is a falsified signature page.
16 Mr. Cole, is there any reason for anyone to believe, to
17 your knowledge, that this is a falsified signature page?
18    MR. FREEMAN: Objection, form.
19    A. Not to my knowledge.
20    Q. (BY MR. PERRIN) Mr. Cole, how would you
21 describe Super G's relationship with ACET Global?
22    A. Today, nonexistent.
23    Q. How about at the time the APA was signed?
24    MR. FREEMAN: Objection, form.
25    A. As of March 1, 2019?

## Page 266

1    Q. (BY MR. PERRIN) No, that's the Foreclosure
2 Sale Agreement. I'm going back to the original APA
3 transaction in July of 2017.
4    A. In July of 2017, ACET was a new loan client
5 being onboarded into Super G Capital in the ordinary
6 course of business.
7    Q. And how would you describe your relationship
8 with -- Super G's relationship with Windspeed?
9    A. As of what date?
10    Q. As of the date you made the first loan.
11    A. The first loan to Windspeed?
12    Q. Yes.
13    A. The $200,000 loan? It was -- the relationship
14 was cordial, cooperative; and I was hopeful that the new
15 money we provided for working capital would result in a
16 better outcome than ACET, and a better outcome than we
17 know happened in hindsight.
18    Q. Did you feel at that time that Super G was an
19 independent -- an entity independent of Windspeed?
20    A. Yes.
21    Q. Then, real quickly, Mr. Cole, if you would,
22 walk me through your history since your college degree
23 and any postgraduate degrees and your working history
24 going forward.
25    A. Short version, graduated Penn State University

16 (Pages 263 to 266)

Page 267

```
 1    1997 with a bachelor's in finance.  I went to work as an
 2    investment banking analyst for less than two years.  I
 3    entered a private equity firm known as Mellon Ventures
 4    in 2000 -- in 1999.  I had a -- over a four-year or
 5    five-year period, I was promoted several times.  Did
 6    buyouts, private equity investments and mezzanine loans.
 7            I left Mellon Ventures in 2004 to be a
 8    partner in what you would now refer to as a
 9    single-family office.  I made investments and loans over
10    a seven-year period.  I cofounded a business while in
11    that role that I am still a director of today.  And
12    through that experience, I met -- I purchased a business
13    in Chicago from an entrepreneur in California named
14    Darrin Ginsberg, who became a friend and mentor.  And in
15    2013, I moved to Newport Beach, California, to join
16    Super G Capital and work with Darrin Ginsberg.
17            And in 2018, I cofounded SG Credit
18    Partners, which I lead today.  And in 2019, we sold SG
19    Credit Partners to the private investors that I
20    mentioned earlier in my deposition.  And that is my
21    occupation.
22        Q.  So since 1999, you've been involved in private
23    equity and lending?
24        A.  Correct.
25        Q.  When ACET Global originally went into default,
```

Page 268

```
 1    why did Super G not foreclose at that time?
 2        A.  I did not have the portfolio management team
 3    or resources in place at Super G Capital at that time to
 4    move as swiftly and aggressively as a lender should; and
 5    I was, having had other loan losses, looking to both
 6    mitigate a loss and, if possible, defer a loss while we
 7    were growing our balance sheet.  I believed that we had
 8    a small investment firm that would support the company
 9    and was hopeful, as you saw in the email correspondence
10    with Steve, that different management and capital
11    support would result in Super G Capital's either full
12    recovery of capital or mitigating the loss of capital.
13        MR. PERRIN:  Mr. Cole, I think I will
14    pass the witness.
15        MS. HARD-WILSON:  We have no further
16    questions for Mr. Cole.
17        MR. FREEMAN:  I have a little re-cross.
18            EXAMINATION
19    BY MR. FREEMAN:
20        Q.  Mr. Cole, good to see you again.
21        A.  Mr. Freeman.
22        Q.  Mr. Cole, are you concerned about being named
23    as a defendant in this case?
24        MR. BLAKLEY:  Objection, form.
25        A.  Well, I wasn't until you just suggested it.
```

Page 269

```
 1        Q.  (BY MR. FREEMAN)  I'm not suggesting; I'm
 2    asking.  Are you concerned about your company being
 3    named?
 4        A.  Which company?
 5        Q.  SG Partners -- SG Credit Partners.
 6        A.  Well, SG Credit Partners was not in existence
 7    at the time, so I wouldn't expect it to be -- and it did
 8    not purchase the ACET or Windspeed loans, so I would not
 9    expect it to be named.
10        Q.  Was it -- was this loan not part of the
11    division that was ultimately transferred over to SG?
12        A.  The loan was not transferred, no.  Specific
13    performing assets were purchased at arm's length; but,
14    unfortunately for Darrin Ginsberg, my new partners had
15    no interest in purchasing non-performing loans.
16        MR. FREEMAN:  Objection, nonresponsive.
17        Q.  (BY MR. PERRIN)  There was discussion earlier
18    about the seller's data or some projections being
19    misstated or incorrect.  Do you recall that during your
20    deposition today?
21        A.  Yes.
22        MR. FREEMAN:  Ed, was that Exhibit 7,
23    Defendants' Exhibit 7?
24        MR. PERRIN:  He was asked about any
25    exhibit.
```

Page 270

```
 1        MR. FREEMAN:  No, just about the cash
 2    flow.
 3        MR. PERRIN:  I don't understand your
 4    question.
 5        MR. FREEMAN:  Okay.  Can we put
 6    Defendants' Exhibit 7 on the screen, P&L tab?
 7        MR. BLAKLEY:  Hey, Karen, as Chase works
 8    on that, can you let me know on the record time where
 9    we're at?
10        THE REPORTER:  I'm sorry.  Say that again,
11    Chase.
12        MR. BLAKLEY:  This is J.D.
13        THE REPORTER:  Oh, J.D.  Yeah.
14        MR. BLAKLEY:  Do you know where we're at
15    on the record time?
16        THE REPORTER:  Yes.  We are at one hour
17    and 26 minutes.
18        MR. BLAKLEY:  Okay.
19        MR. FREEMAN:  J.D., I'm not expecting
20    this to go too long.
21        MR. BLAKLEY:  Well, you've got four
22    minutes.
23        MR. FREEMAN:  Four minutes?  No.
24        MR. PERRIN:  That was the agreement for
25    coming back today, if you recall, hour-and-a-half record
```

17 (Pages 267 to 270)

Marc Cole Volume 2  *  April 1, 2021

---

Page 271

1   time.
2        MR. FREEMAN:  Then we're going to have to
3   do -- we're going to have to do it further.  I'm going
4   to need about 10 to 15.
5        MR. BLAKLEY:  I believe you've used more
6   than six hours of time, Jason.
7        MR. FREEMAN:  No, I didn't.  Guys, let's
8   just -- let's just get this over with.
9        THE WITNESS:  Let's get it over with, if
10  we can.  I've got a --
11       MR. BLAKLEY:  My recollection is that
12  Mr. Freeman used five hours and 41 minutes on Monday.
13  So you have 19 minutes, including what you've used so
14  far today.
15       MR. FREEMAN:  I'll try not to use all of
16  it.
17       MR. BLAKLEY:  Okay.
18  Q.  (BY MR. FREEMAN)  Mr. Cole, you mentioned that
19  you believed the seller's data was misstated?
20       MR. PERRIN:  Objection, form.
21  Q.  (BY MR. FREEMAN)  Is that correct?
22  A.  I don't think so.
23  Q.  What did you believe was misstated?  Was it
24  the cash flow projections?
25       MR. BLAKLEY:  Objection, form.

---

Page 272

1        MR. PERRIN:  Objection, form.
2   A.  I'm not sure how to answer the question.  I
3   don't know that the historicals were misstated.  I
4   believe the projections were overstated.
5   Q.  (BY MR. FREEMAN)  Okay.  And what do you base
6   that conclusion on?
7   A.  Well, it's very unusual to see a 50 percent
8   revenue drop-off.  And I can't even compute the
9   operating income drop-off.  But it is indicative of
10  either a change in the world, like we just went through
11  with COVID -- but I don't remember any happening at the
12  time, so it's -- clearly, there was a -- something
13  significant happened.  And therefore, it was not
14  forecasted, or we wouldn't have made the loan.
15  Q.  So you're referring to year 2017?
16       MR. PERRIN:  Objection, form.
17  Q.  (BY MR. FREEMAN)  Are you referring to year
18  2017?
19  A.  So in trailing 12 months, May of '17 --
20  Q.  Okay.
21  A.  -- the company had an adjusted EBITDA of a
22  million 35.  The projection Super G Capital was given
23  was a projection of a million nine for fiscal year of
24  2017.  And it appears that the company, rather than make
25  a million nine, lost money.  So --

---

Page 273

1   Q.  Who provided these cash flow projections to
2   Super G?
3        MR. PERRIN:  Objection, form.
4   Q.  (BY MR. FREEMAN)  Did Tomer Damti provide them
5   to Super G?
6   A.  I don't know who provided them.
7   Q.  Did the Baymark parties provide them to Super
8   G?
9        MR. BLAKLEY:  Objection, form.
10       MR. PERRIN:  Objection, form.
11  A.  Mr. Freeman, I'm not trying to avoid the
12  question.  I --
13  Q.  (BY MR. FREEMAN)  Just not sure?
14  A.  The way material makes it to me is in a
15  consolidated form prepared by the investment team.
16  Q.  Let me ask you some questions on this.  If the
17  figures there that you see were based on management --
18  new management diverting income, would that undermine
19  your conclusion about whether the projections provided
20  to Super G were correct?
21       MR. PERRIN:  Objection, form.
22  A.  Could you ask the question a different way?
23  Q.  (BY MR. FREEMAN)  Yes --
24  A.  I can see where it's going, but I was told not
25  to speculate.

---

Page 274

1   Q.  Yeah.  If new management had diverted income,
2   would that undermine your conclusion that the seller
3   provided incorrect data?
4        MR. PERRIN:  Objection, form.
5   A.  The projection provided to me was incorrect.
6   And it's -- I can't answer -- I understand the
7   significance of whether that was provided by the seller
8   or the buyer.  I wish I could answer that, but I don't
9   know the answer to that.
10  Q.  (BY MR. FREEMAN)  Could your conclusion about
11  whether the seller provided incorrect data change if you
12  learned that this was provided to Super G by the Baymark
13  parties?
14       MR. PERRIN:  Objection, form.
15  A.  In that hypothetical, yes.
16  Q.  (BY MR. FREEMAN)  If new management of ACET
17  Global had intentionally not paid the note, would that
18  undermine your conclusion?
19       MR. PERRIN:  Objection, form.
20  A.  Paid Super G Capital's note?
21  Q.  (BY MR. FREEMAN)  Correct.
22  A.  In that hypothetical, yes.
23  Q.  If new management had failed to pay inventory
24  vendors -- that is, if ACET Global's new management had
25  failed to pay its inventory vendors, could that change

---

18 (Pages 271 to 274)

Page 275

1    your conclusion?
2              MR. PERRIN:  Objection, form.
3         A.  I'm going to try to answer specifically.
4         Q.  (BY MR. FREEMAN)  Let me withdraw that
5    question for you.  Let me ask it a different way.
6              If ACET Global's new management had
7    intended to transfer ACET Global's assets to another
8    company to defraud the seller, would that undermine your
9    conclusion?
10             MR. PERRIN:  Objection, form.
11        A.  Well, it would be -- that action would be in
12   breach of the loan agreement and defrauding Super G
13   Capital.
14        Q.  (BY MR. FREEMAN)  But that can -- would that
15   undermine your conclusion that the seller provided
16   incorrect data?
17             MR. PERRIN:  Objection, form.
18        A.  Again, I -- the projections that I'm reviewing
19   are -- are significantly inconsistent with the
20   historical business.  But it would be an important data
21   point as to who provided Super G Capital those
22   projections, and I can't answer it.
23        Q.  (BY MR. FREEMAN)  Okay.  And on those -- those
24   projections -- that Exhibit 7, on those cash flow
25   projections, did that include an item for management

Page 276

1    fees?
2              MR. PERRIN:  Objection, form.
3         A.  The investment committee summary that I'm
4    reviewing is heavily consolidated.  It does not include
5    an item for management fees.  That said, Super G
6    Capital, in its analysis, may have had a detailed
7    financial statement that I'm not reviewing right now.
8         Q.  (BY MR. FREEMAN)  Okay.  Did that -- or did
9    the cash flow projections include a line item for
10   interest expense?
11             MR. PERRIN:  Objection, form.
12        A.  I'm looking at only a summary that has all
13   debt service aggregated.
14        Q.  (BY MR. FREEMAN)  Okay.  Do we have Exhibit 7
15   on the screen?  Well, the question was:  Did the cash
16   flow projections include an item for interest expense?
17        A.  This appears to be the operating data and does
18   not incorporate the financing.
19        Q.  Okay.  Can we -- can we click on the second
20   tab, and the title of this document, as you can see, is
21   "2017/12/19 cash flow Projections"; is that correct?
22        A.  Yes, I see that up top.
23        Q.  And was there, Mr. Cole, an adjustment for
24   interest expense?  I know you're waiting for that to
25   come up on the screen.

Page 277

1              MR. FREEMAN:  It's all the way to the
2    left.  There you go.
3              THE WITNESS:  He had it before.
4              MR. FREEMAN:  Yeah.
5              THE WITNESS:  This is the balance sheet?
6              MR. FREEMAN:  I think it's at the very
7    top.  There you go.
8         A.  There appears to be -- I see what's called
9    "old debt," which may have been the Bank of America
10   line --
11        Q.  (BY MR. FREEMAN)  Just to --
12             MR. FREEMAN:  Can I --
13             MR. PERRIN:  I would like you to let the
14   witness finish answering the question.
15             MR. FREEMAN:  It's not the -- it's not the
16   exhibit I've asked for.
17             THE VIDEOGRAPHER:  I'm sorry.  Defendants'
18   Exhibit 7 is an Excel spreadsheet.  I have it in a PDF
19   format.  So I'm not --
20             MR. FREEMAN:  Can I take control of the
21   screen and produce it on mine?
22             THE VIDEOGRAPHER:  I believe so.  Give me
23   a second.
24        Q.  (BY MR. FREEMAN)  Mr. Cole, I'll ask you a
25   couple of questions and come back to that.

Page 278

1              THE VIDEOGRAPHER:  You should have control
2    of it now.
3              MR. FREEMAN:  It says you are sharing, so
4    I don't have control of it.
5              THE VIDEOGRAPHER:  On mine, it says
6    waiting for Jason Freeman to control your screen.
7              MR. FREEMAN:  I wish I could, but I'm
8    clicking on "share screen," and it tells me that.
9              THE VIDEOGRAPHER:  Let me --
10        A.  I have the spreadsheet, and I can move pretty
11   quick through it.
12        Q.  (BY MR. FREEMAN)  Okay.  If you can, it's the
13   second tab, and I'm asking whether there's an adjustment
14   for interest expense.
15        A.  Okay.  I've got it open.  I'm on the P&L tab.
16   And there is -- I mean, there's year 2017.
17        Q.  Yes, sir.
18        A.  And I see a nominal amount called -- sorry.
19   Old debt is -- yes, there is an almost $300,000 interest
20   expense.
21        Q.  Is that significantly more than in any
22   preceding year?
23             MR. PERRIN:  Objection, form.
24        A.  Yes.
25        Q.  (BY MR. FREEMAN)  And are there adjustments

Usher Reporting Services
(214) 755-1612

Marc Cole Volume 2  *  April 1, 2021

---

Page 279

1    for "professional fees"?
2              MR. PERRIN:  Objection, form.
3         A.  I see "management adjustment."
4         Q.  (BY MR. FREEMAN)  Okay.  So there's an
5    adjustment for "management adjustment."  Is there an
6    adjustment for "owner compensation"?
7         A.  I don't see that in the add backs.
8         Q.  No?
9         A.  No.
10        Q.  If you look on Line 60?
11        A.  I see 201,000 of management adjustments.
12        Q.  Okay.  Yeah, management adjustments.  Do we
13   have a due diligence adjustment?
14        A.  $2,000 in 2017.
15        Q.  And are there pro forma adjustments?
16        A.  No, none.
17        Q.  Are you sure about that?  Not in 2017 solely.
18        A.  Well, I see -- in other periods, yes.
19        Q.  Okay.  Are there any Baymark fees listed, like
20   on Line 71?
21             MR. PERRIN:  Objection, form.
22        A.  29,000 and change in 2017.
23        Q.  (BY MR. FREEMAN)  Okay.  And under that due
24   diligence form, is there a "QOE" in parentheses?
25        A.  Yes.

---

Page 280

1         Q.  And do you understand that to refer to
2    "quality of earnings"?
3         A.  I do.
4         Q.  And if you'll look to the fifth tab in this
5    spreadsheet, "QOE Adjustment," do you know who prepared
6    this spreadsheet tab?
7         A.  I do not.
8              MR. PERRIN:  Objection, form.
9         Q.  (BY MR. FREEMAN)  Does it reflect management
10   adjustments?
11        A.  Yes, significant.
12        Q.  Does it reflect bad debt expenses?
13        A.  Yes.
14             MR. PERRIN:  Objection, form.
15        Q.  (BY MR. FREEMAN)  Does -- what specifically on
16   here do you believe is incorrect?
17             MR. PERRIN:  Objection, form.
18        A.  I would say, again, I believe the projection
19   is materially out of line with historical performance.
20        Q.  (BY MR. FREEMAN)  Okay.  And what on the P&L,
21   the cash flow statement, do you believe is --
22   specifically, you believe is incorrect?
23             MR. PERRIN:  Objection, form.
24        A.  Well, the projection that I have is adjusted
25   EBITDA of a million nine for the year 2017.

---

Page 281

1         Q.  (BY MR. FREEMAN)  Okay.
2         A.  And I'm not -- you're showing me a
3    spreadsheet.  I'm not sure whose spreadsheet this is,
4    but I'm -- my comments earlier about the projections
5    being overstated reflect the numbers of $5 million of
6    revenue and almost 2 million of adjusted EBITDA for the
7    year 2017 that are in my investment summary.
8         Q.  So Super G didn't even have this Exhibit 7
9    when it made the 2017 loan, did it?
10        A.  I don't know.
11             MR. PERRIN:  Objection, form.
12        Q.  (BY MR. FREEMAN)  Would you be familiar with
13   the metadata on this form that indicates it has an
14   author of Matt?
15             MR. PERRIN:  Objection, form.
16        A.  Okay.  Can you ask that question differently?
17        Q.  (BY MR. FREEMAN)  Are you familiar with the
18   metadata on this document and that it reflects an author
19   named Matt?
20        A.  I'm not familiar with the document.
21        Q.  Are you familiar that the metadata reflects
22   that this document was created on January 31st, 2018 at
23   3:11 p.m.?
24             MR. PERRIN:  Objection, form.
25             MR. FREEMAN:  I would like to put

---

Page 282

1    Exhibit 12 up.  This is Defendants' Exhibit 12.  The
2    other spreadsheet, ACET Flow of Funds.
3         Q.  (BY MR. FREEMAN)  Mr. Cole, were you familiar
4    with this document?
5         A.  I was as of this morning.
6         Q.  Super G didn't have this exact document in its
7    files when it made the loan in 2017, did it?
8         A.  I don't know --
9              MR. PERRIN:  Objection, form.
10        A.  -- the answer to that.
11        Q.  (BY MR. FREEMAN)  Are you familiar with its
12   author, Kyle Hynden?
13        A.  I don't know that name.
14             MR. PERRIN:  Objection, form.
15        Q.  (BY MR. FREEMAN)  For the Cortec Group?
16        A.  I don't know that name.
17        Q.  Are you familiar that the metadata reflects
18   that this document was last modified April 1st, 2021, at
19   11:53 a.m.?
20             MR. PERRIN:  Objection, form.
21        A.  I am not -- I have not seen this document
22   until this morning.
23        Q.  (BY MR. FREEMAN)  Okay.  And Mr. Cole, we
24   talked previously about a notice that you sent out in
25   late January of 2019 to Mr. Damti?

---

Usher Reporting Services
(214) 755-1612

Marc Cole Volume 2  *  April 1, 2021

## Page 283

1     A.  Yes.
2     Q.  And that was the foreclosure notice?
3     A.  Yes, January 2019.
4     Q.  And that notice was returned to sender, was it
5  not?
6              MR. PERRIN:  Objection, form.
7     A.  No, that's not my knowledge.
8     Q.  (BY MR. FREEMAN)  It wasn't returned to sender
9  stamped by the Post Office February 2nd, 2019?
10             MR. PERRIN:  Objection, form.
11    A.  I don't recall that, no.
12    Q.  (BY MR. FREEMAN)  No?  Could that be because
13  it was returned to Baymark Partners, LP, and ACET
14  Global, LLC, attention David Hook?
15             MR. PERRIN:  Objection, form.
16    A.  The letter that I sent --
17    Q.  (BY MR. FREEMAN)  Correct.
18    A.  -- from my office was returned to Baymark?
19    Q.  Did Baymark Partners, LP, send that notice?
20    A.  I don't believe so because I was carefully
21  following protocol to provide notice.  I would have
22  known that.
23    Q.  Okay.  You mentioned you didn't have a team in
24  place to do the foreclosure in 2018?
25    A.  To do the portfolio management.

## Page 284

1     Q.  Right.  Did Super G grow significantly
2  during -- throughout 2018?
3     A.  Yes.
4     Q.  What -- wasn't that the year that you started
5  SG?
6     A.  My team worked for Super G Capital until we --
7  we formed the legal entity in 2018, and we joined SG
8  Credit as our employer in April of 2019.
9     Q.  Okay.  So at that time, though, you know,
10  regardless of what staff you had, you had the team in
11  place that was sufficient to vet a restructuring plan,
12  correct?
13             MR. PERRIN:  Objection, form.
14    A.  Yes.
15    Q.  (BY MR. FREEMAN)  And that restructuring plan
16  was a transfer to Windspeed; is that correct?
17             MR. PERRIN:  Objection, form.
18             MR. BLAKLEY:  Objection, form.
19    A.  The restructuring plan was a foreclosure and a
20  sale of the assets to Windspeed.
21    Q.  (BY MR. FREEMAN)  Thank you.
22        And just to circle back to the projections
23  that we had, based on what you know, is it equally
24  possible that ACET Global's new management was the cause
25  of the deficiency in the projections?

## Page 285

1              MR. PERRIN:  Objection, form.
2     A.  Again, I don't know who prepared the
3  projections, the buyer or the seller, that Super G
4  Capital underwrote.
5     Q.  (BY MR. FREEMAN)  So based upon that, you
6  don't really have a basis to conclude that the seller
7  provided any inaccurate or false projections, do you?
8              MR. PERRIN:  Objection, form.
9     A.  No.  And I don't believe that I said that they
10  did.
11    Q.  (BY MR. FREEMAN)  Okay.  So it's not your
12  opinion that the seller of assets to ACET Global
13  provided incorrect projections in any respect?
14    A.  I'm not knowledgeable to make that opinion.  I
15  stand by my statement that the projections in Super G
16  Capital's possession as presented to me in summary form
17  appear to be overstated.
18    Q.  Okay.  And just a couple last questions.  Is
19  it customary to sign a loan agreement several weeks
20  after the date of the document?
21             MR. BLAKLEY:  Objection, form.
22    A.  No, that's not customary.
23    Q.  (BY MR. FREEMAN)  Did you sign any loan
24  documents here after they were signed by William Szeto?
25    A.  I don't know.  I'm not sure.  It's -- it was

## Page 286

1  Super G Capital's procedure back before the use of
2  DocuSign that the borrower would sign, would send the
3  agreement to Super G Capital's office, and then a Super
4  G Capital representative would sign upon receipt.
5     Q.  Okay.
6              MR. FREEMAN:  I believe that's all the
7  questions I have.  Pass the witness.
8              MR. BLAKLEY:  I don't have anything for
9  him.  Anybody else?
10             MR. PERRIN:  Good here.
11             MR. BLAKLEY:  All right.  Thank you,
12  Marc.
13        (End of proceedings.)
14
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 283 to 286)

## Page 287

```
 1              CHANGES AND SIGNATURE
 2    WITNESS NAME: MARC COLE
 3    DATE OF DEPOSITION: April 1, 2021
 4    PAGE LINE    CHANGE        REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

## Page 288

```
 1         I, MARC COLE, have read the foregoing
 2    deposition and hereby affix my signature that same is
 3    true and correct, except as noted above.
 4
 5         _____
 6                 MARC COLE
 7    THE STATE OF _____)
 8    COUNTY OF _____)
 9
10         Before me, _____, on this day
11    personally appeared MARC COLE, known to me (or proved to
12    me under oath or through _____)
13    (description of identity card or other document) to be
14    the person whose name is subscribed to the foregoing
15    instrument and acknowledged to me that they executed the
16    same for the purposes and consideration therein
17    expressed.
18         Given under my hand and seal of office this
19    _____ day of _____, _____.
20
21    _____
22         NOTARY PUBLIC IN AND FOR
23         THE STATE OF _____
24         COMMISSION EXPIRES: _____
25
```

## Page 289

```
 1    NO. DC-19-09828
 2    D&T PARTNERS, LLC      ) IN THE DISTRICT COURT
      (Successor in interest to )
 3    ACET VENTURE PARTNERS,   )
      LLC),                    )
 4                             )
 5                             ) DALLAS COUNTY, TEXAS
           Plaintiffs          )
 6                             )
      VS.                      )
 7                             )
      ACET GLOBAL, LLC; BAYMARK ) 116th JUDICIAL DISTRICT
      ACET HOLDCO, LLC; BAYMARK )
 8    MANAGEMENT, LCC; BAYMARK  )
      MANAGEMENT, LLC; BAYMARK
 9    PARTNERS; DAVID HOOK;
      TONY LUDLOW; and
10    WINDSPEED TRADING, LLC,
11
12         Defendants
13
                REPORTER'S CERTIFICATION
14              DEPOSITION OF MARC COLE
                    April 1, 2021
15
16         I, Karen Usher, Certified Shorthand Reporter in and
17    for the State of Texas, hereby certify to the following:
18         That the witness, MARC COLE, was duly sworn by the
19    officer and that the transcript of the oral deposition
20    is a true record of the testimony given by the witness;
21         That the deposition transcript was submitted on
22    APRIL 26, 2021 to the witness or to the attorney for the
23    witness for examination, signature and return to me by
24    MAY 16, 2021;
25         That the amount of time used by each party at the
```

## Page 290

```
 1    deposition is as follows:
 2         MR. JASON B. FREEMAN - 23 MINUTES
           MR. EDWARD PERRIN - 1 HOUR:23 MINUTES
 3         MS. BRENDA HARD-WILSON - 00 HOURS:00 MINUTE(S)
           MR. JOHN DAVID BLAKLEY - 00 HOURS:00 MINUTE(S)
 4         That pursuant to information given to the
 5    deposition officer at the time said testimony was taken,
 6    the following includes counsel for all parties of
 7    record:
 8         MR. JASON B. FREEMAN, Attorney for Plaintiff
           MR. EDWARD PERRIN, Attorney for Defendants Baymark
 9    entities
           MS. BRENDA HARD-WILSON, Attorney for Defendants
10    WINDSPEED TRADING, LLC
           MR. JOHN DAVID BLAKLEY, Attorney for the Witness
11
12         I further certify that I am neither counsel for,
13    related to, nor employed by any of the parties or
14    attorneys in the action in which this proceeding was
15    taken, and further that I am not financially or
16    otherwise interested in the outcome of the action.
17         Further certification requirements pursuant to Rule
18    203 of TRCP will be certified to after they have
19    occurred.
20         Certified to by me this 25th of April 2021.
21
22         _____
           MARY KAREN USHER, CSR # 5536
23         Expiration: 1/31/2022
           Firm Registration # 10278
24         USHER REPORTING SERVICES
           1326 Lochness Drive
25         Allen, Texas 75013
           (214) 755-1612
```

Marc Cole Volume 2  *  April 1, 2021

Page 291

1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition _____ was _____ was not
3   returned to the deposition officer;
4       If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefore;
6       If returned, the original deposition was delivered
7   to MR. JASON FREEMAN, Custodial Attorney;
8       That $_____ is the deposition officer's
9   charges to the Plaintiff for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein on and filed with the
14  Clerk.
15      Certified to by me this _____ day of _____, 2021.
16
17
18      _____
        MARY KAREN USHER, CSR # 5536
19      Expiration: 1/31/2022
        Firm Registration # 10278
20      USHER REPORTING SERVICES
        1326 Lochness Drive
21      Allen, Texas 75013
        (214) 755-1612
22      karen@usherreporting.com
23
24
25

23 (Page 291)