UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATT DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH; ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; and WINDSPEED TRADING, LLC, | § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-CV-01171-B |
| *Defendants*. | § § | |

**APPENDIX IN SUPPORT OF DEFENDANT BAYMARK ACET HOLDCO, LLC'SMOTION TO DISMISS PLAINTFF'S SECOND AMENDED COMPLAINT AND BRIEF IN SUPPORT**

| | |
|---|---|
| APP 001–003 | Affidavit of Edward P. Perrin, Jr. dated November 3, 2021 |
| APP 004-063 | Limited Liability Company Agreement of Baymark ACET Holdco, LLC "Holdco" dated July 20, 2017 |
| APP 064-066 | Status Report file-stamped May 21, 2021 filed in *Tomer Damti v. ACETGlobal, LLC*; Cause No. DC-18-04365 |
| APP 067-077 | Company Agreement of ACET Global, LLC dated July 6, 2017 |

| APP 078-127 | June 30, 2017 draft of the Security Agreement between Holdco and ACET Venture Partners, LLC, together with the e-mail from Cassandra Foster of Hallett & Perrin, P.C., counsel for Holdco, to Steve Kronegold, counsel for ACET Venture Partners, LLC, transmitting same |
|---|---|
| APP 128-142 | Pledge Agreement between Holdco and Super G Capital, LLC datedJuly 20, 2017 |
| APP 143-159 | Plaintiff's Second Amended Petition dated October 30, 2020 filed in *D&TPartners, LLC v. ACET Global, LLC et al.*; Cause No. DC- 19-09828 |
| APP 160 | Order finding ACET Global to be the Prevailing Party in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365 |
| APP 161-163 | Plaintiff's letter to the Court dated September 1, 2021 filed in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365 |
| APP 164 | Plaintiff's Notice of Appeal dated October 15, 2021 filed in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365 |
| APP 165-215 | Transcript of the Hearing on Non-Party Hallett & Perrin, PC's Motion for Protective Order and to Quash Plaintiff's Notice of Deposition to Edward P.Perrin, Jr., held April 7, 2021 in *D&T Partners, LLC v. ACET Global, LLC et al.*; Cause No. DC- 19-09828 |

Respectfully submitted,

/s/ Edward P. Perrin, Jr.
Edward P. Perrin, Jr.
State Bar No. 15796700
Jennifer R. Poe
State Bar No. 00794470
HALLETT & PERRIN, PC
1445 Ross Ave., Suite 2400
Dallas, TX 75202
Telephone: (214) 953-0053
Facsimile: (214) 922-4142
eperrin@hallettperrin.com
jpoe@hallettperrin.com

**ATTORNEYS FOR  DEFENDANTS**
**BAYMARK PARTNERS MANAGEMENT, LLC;**
**BAYMARK MANGEMENT, LLC;**
**BAYMARK ACET HOLDCO, LLC;**
**BAYMARK ACET DIRECT INVEST, LLC;**

**BAYMARK PARTNERS; DAVID HOOK;
TONY LUDLOW; AND MATTHEW DENEGRE**

## <u>CERTIFICATE OF SERVICE</u>

On July 22, 2022, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>*/s/ Edward P. Perrin, Jr.*            </u>
Edward P. Perrin, Jr.

4878-8948-2538, v. 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | |
| *Plaintiff*, | § § | |
| v. | § § § | |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATT DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH; ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; and WINDSPEED TRADING, LLC, | § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-CV-01171-B |
| *Defendants*. | § | |

## AFFIDAVIT OF EDWARD P. PERRIN, JR.

**STATE OF TEXAS**          §
                           §
**COUNTY OF DALLAS**        §

**BEFORE ME**, the undersigned notary, on this day personally appeared Edward P. Perrin, Jr., the affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

1.   My name is Edward P. Perrin, Jr.  I am over the age of eighteen (18) years.  I have never been convicted of a felony or a crime involving moral turpitude, and I am competent to give this affidavit testimony.  The facts stated herein are within my personal knowledge and are true and correct.

2.   Attached hereto at Exhibit A-1 is a true and correct copy of the Limited Liability Company Agreement of Baymark ACET Holdco, LLC ("Holdco") dated July 20, 2017.

3.   Attached hereto at Exhibit A-2 is a true and correct copy of the Status Report file-stamped May 21, 2021 filed in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365.

4.   Attached hereto at Exhibit A-3 is a true and correct copy of the Company Agreement of ACET Global, LLC dated July 6, 2017.

5.   Attached hereto at Exhibit A-4 is a true and correct copy of a June 30, 2017 draft of the Security Agreement between Holdco and ACET Venture Partners, LLC, together with the email from Cassandra Foster of Hallett & Perrin, P.C., counsel for Holdco, to Steve Kronengold, counsel for ACET Venture Partners, LLC, transmitting same.

6.   Attached hereto at Exhibit A-5 is a true and correct copy of the Pledge Agreement between Holdco and Super G Capital, LLC, dated July 20, 2017.

7.   Attached hereto at Exhibit A-6 is a true and correct copy of Plaintiff's Second Amended Petition dated October 30, 2020 filed in *D&T Partners, LLC v. ACET Global, LLC et al.*; Cause No. DC- 19-09828.

8.   Attached hereto at Exhibit A-7 is a true and correct copy of Order finding ACET Global to be the Prevailing Party in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365.

9.   Attached hereto at Exhibit A-8 is a true and correct copy of Plaintiff's letter to the Court dated September 1, 2021 filed in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365.

10.   Attached hereto at Exhibit A-9 is a true and correct copy of Plaintiff's Notice of Appeal dated October 15, 2021 filed in *Tomer Damti v. ACET Global, LLC*; Cause No. DC-18-04365.

11.   Attached hereto at Exhibit A-10 is a true and correct copy of Transcript of the Hearing on Non-Party Hallett & Perrin, PC's Motion for Protective Order and to Quash Plaintiff's Notice of Deposition to Edward P. Perrin, Jr., held April 7, 2021 in *D&T Partners, LLC v. ACET Global, LLC et al.*; Cause No. DC- 19-09828.

Edward P. Perrin, Jr.

**SUBSCRIBED AND SWORN TO** before me by Edward P. Perrin, Jr. on November 3, 2021, to which witness my hand and official seal of office.

VERONICA JAMAICA
Notary Public, State of Texas
Comm. Expires 07-08-2023
Notary ID 125360713

Notary Public in and for the State of Texas

My commission expires: 7/8/2023

AFFIDAVIT OF EDWARD P. PERRIN, JR. -          PAGE 3

**APP 003**

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### BAYMARK ACET HOLDCO, LLC

#### a Texas Limited Liability Company

THIS LIMITED LIABILITY COMPANY AGREEMENT OF BAYMARK ACET HOLDCO, LLC (this **"Agreement"**), dated as of July 20, 2017 (the **"Effective Date"**), is executed and agreed to by Baymark ACET Holdco, LLC, a Texas limited liability company (the **"Company"**), and the Members (as defined below). Certain capitalized terms used herein are defined in Article 12.

### RECITALS

A.    The Preferred Members desire to purchase, acquire, own and operate the business of ACET Ventures Partners LLC, a Texas limited liability company (**"Seller"**), and in connection with the execution of this Agreement, the Target (as defined below) has entered into the ACET Purchase Agreement (as defined below) with Seller and the other parties thereto for the purchase of all or substantially all of the assets of Seller.

B.    In connection with the transactions contemplated by the ACET Purchase Agreement, the Company issued to Seller certain Common Interests (as defined below) in exchange for Seller's contribution of services to the Company.

C.    In conjunction with the closing of the ACET Purchase Agreement, Seller distributed Seller's Common Interests to Mr. Tomer Damti, the sole owner of Seller. As a result, this Agreement shows Mr. Tomer Danti as the holder of such Common Interests and all references to "Seller Member" in this Agreement refer to Mr. Tomer Damti.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises of the parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the undersigned parties agree as follows:

### ARTICLE 1
### ORGANIZATION

1.1. <u>Formation</u>. The Company was organized as a Texas limited liability company by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on June 30, 2017 (the **"Certificate"**), under and pursuant to the Act.

1.2. <u>Name</u>. The name of the Company is "Baymark ACET Holdco, LLC." All Company business must be conducted in that name or such other names that comply with applicable law as the Board may select from time to time.

**EXHIBIT**

**A-1**

BP_002675

1.3. Registered Office; Registered Agent; Other Offices. The registered office of the Company required by the Act to be maintained in the State of Texas shall be the office named in the Certificate or such other office as the Board may designate from time to time consistent with the Act. The registered agent of the Company in the State of Texas shall be the initial registered agent designated in the Certificate or such other Person or Persons as the Board may designate from time to time consistent with the Act.

1.4. Principal Office; Other Offices. The principal office of the Company, where records are to be kept or made available, shall be Granite Park II, 5700 Granite Parkway, Suite 435, Plano, TX 75024 (the **"Principal Office"**). The location of the Principal Office may be changed by the Board from time to time. The Company may have such other offices as the Board may designate from time to time.

1.5. Business. The primary business of the Company is the Business, which shall be conducted indirectly through Subsidiaries. The Company may engage in the Business, or any other activity or purpose incidental thereto that is permitted for a limited liability company organized in the State of Texas.

1.6. Foreign Qualification. Prior to the Company conducting business in any jurisdiction other than the State of Texas, the Board shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board, each officer (and Member, as the case may be) shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and/or terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

1.7. Term. The period of duration of the Company is perpetual unless otherwise terminated in accordance with this Agreement.

1.8. Characterization. For federal income tax purposes, the Company shall be characterized as a partnership if there is more than one member, otherwise it will be disregarded. However, for state law purposes, the Company shall not be characterized as, or treated as, a partnership (or disregarded), nor shall any Member be characterized as, or treated as, a partner. The Board shall operate the Company in a manner consistent with such characterizations, and no Member shall take any act, or fail to take any act, that is not consistent with such characterizations.

## ARTICLE 2
## MEMBERSHIP; TRANSFERS OF INTERESTS; CONFIDENTIALITY

2.1. Members. The members of the Company (the **"Members"**) are set forth on Exhibit A hereto, and the term "Members" shall include any other Person hereafter admitted to the Company as a Member as provided in this Agreement. The term "Members" shall not include any Person who has ceased to be a member of the Company.

2

2.2.  <u>Representations and Warranties</u>.

(a)  <u>General</u>.  As of the Effective Date, each Member hereby severally (and not jointly) represents and warrants, as to itself but not as to any other Member, to the Company and to each other Member that: (i) if such Member is a corporation, it is duly organized, validly existing and in good standing under the law of the state of its incorporation and is duly qualified and in good standing as a foreign corporation in each jurisdiction in which it conducts business, or is required by applicable law to so qualify; (ii) if such Member is a limited liability company, it is duly organized, validly existing and (if applicable) in good standing under the law of the state of its organization and is duly qualified and (if applicable) in good standing as a foreign limited liability company in each jurisdiction in which it conducts business, or is required by applicable law to so qualify; (iii) if such Member is a partnership (other than a general partnership), business trust or other registered entity, it is duly formed, validly existing and (if applicable) in good standing under the law of the state of its formation, and if required by law is duly qualified to do business and (if applicable) in good standing in each jurisdiction in which it conducts business, or is required by applicable law to so qualify; (iv) if such Member is a corporation, limited liability company, partnership, trust or other entity, the Member has full corporate, limited liability company, partnership, trust or other applicable power and authority to execute and deliver this Agreement and to perform its obligations hereunder and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by such Member have been duly taken; (v) such Member has duly executed and delivered this Agreement; and (vi) such Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which such Member is bound.

(b)  <u>Investment Representations</u>.  As of the Effective Date, each Member hereby severally (and not jointly), as to itself but not as to any other Member, represents and warrants to, and covenants with, the Company and each of the other Members that (i) such Member understands that the Interests have not been registered for public sale under the Securities Act or the securities laws of any state and further understands that the Interests have not been approved or disapproved by the Securities and Exchange Commission or any other federal or state agency; (ii) such Member understands that there are substantial restrictions on the Transfer of Interests, including, but not limited to, (A) that Interests may not be Transferred except as permitted by this Article 2, and (B) that Interests may not be Transferred unless the Interests are registered or exempt from registration under applicable federal and state securities laws; (iii) such Member has reviewed and understands this Agreement in its entirety; (iv) such Member or its Affiliate responsible for approving this investment has knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of, and protecting such Member's interests in connection with, investing in Interests; and (v) such Member is acquiring the Interests for such Member's own account, for investment purposes only, and not with a view to the sale or other distribution thereof.

2.3.  <u>Interests</u>.  The Interests shall consist of Preferred Interests and Common Interests. The Interests held by each of the Members as of the Effective Date are set forth on <u>Exhibit A</u>.

BP_002677

2.4.  <u>Restrictions on Transfers.</u>

(a)  <u>Application of Provisions.</u>  The terms and provisions of Sections 2.4, 2.5, 2.6, 2.7 and 2.8 shall extend and apply to all Interests now owned by each of the Members and to all Interests as may hereafter be acquired by any Person, whether such Interests constitute the separate property or community property of any such Person, and regardless of the capacity in which title to such Interests is held or taken.  The terms and provisions of Sections 2.4, 2.5, 2.6, 2.7 and 2.8 shall also apply to all Interests to which the spouse of any Person is entitled by virtue of any community property or any other laws, and any spouse of a Member shall be required to sign a Consent of Spouse, the form of which is set forth on <u>Exhibit B.</u>

(b)  <u>Transfers Void.</u>  Each Member (and any other Person who hereafter acquires any Interests and becomes a party to this Agreement) agrees that it will not Transfer any Interests or any interest therein without the prior written approval of the Board and except as permitted or required by the terms of Sections 2.4, 2.5, 2.6, 2.7 and 2.8.  Any attempt to Transfer any Interests (or any interest therein) in violation of this Article 2 shall be null and void ab initio.

(c)  <u>Limitations on Transfer.</u>

(i)  <u>Transfers to Competitors; Compliance with Law.</u>  Except as otherwise specifically provided in this Agreement, (A) no Member may Transfer Interests to another Person (other than to the Company or another Member) if such Person or any Affiliate of such Person is directly engaged in the Business, and (B) any Transfer of Interests or any interest therein permitted or required by Sections 2.4, 2.5, 2.6, 2.7 and 2.8 shall be in compliance with federal and state securities laws, including, without limitation, the Securities Act.

(ii)  <u>Transfer Procedures.</u>  A Member may Transfer any or all of the Interests owned by such Member to any Person after compliance with the rights of first refusal and tag-along rights provided in Sections 2.5 and 2.6, as applicable.  Any such transferee shall become a party to and be bound by all the terms and conditions of this Agreement

(iii)  <u>Permissible Transfers.</u>

(A)  Any such transferee shall become a party to and be bound by all the terms and conditions of this Agreement.  Notwithstanding anything to the contrary in this Agreement, any Member may Transfer any or all of his, her or its Interests without compliance with the right of first refusal and tag-along rights provided in Sections 2.5 and 2.6, as applicable, to one or more Affiliates of such Member (any such Affiliate, as the case may be, a **"Permissible Transferee"**); *provided*, *however*, that as a condition to any such Transfer to a Permissible Transferee, the Permissible Transferee shall execute an instrument pursuant to which such Permissible Transferee agrees to be bound by and to comply with the terms of this Agreement as if such Permissible Transferee were the initial Member holding such Interests.  In no event shall a Permissible Transferee include any partnership, limited liability company, corporation, group or trust that is in receivership, bankruptcy, insolvency,

4

BP_002678

dissolution, liquidation or any similar proceeding (except probate) or any individual whose incompetence has been established pursuant to a judicial determination.

(B) If a Member Transfers Interests to a Permissible Transferee pursuant to Section 2.4(c)(ii)(A), such Permissible Transferee shall take and hold such Interests, and such Interests shall be subject to this Agreement and to all of the rights, obligations and restrictions provided herein to which the Interests would be subject when held by the initial transferor; *provided*, *however*, such Permissible Transferee shall not thereafter Transfer any of such Interests pursuant to this Section 2.4(c)(ii) other than to (i) the initial transferor, or (ii) a Person who is a Permissible Transferee with respect to either (a) the initial transferor from whom the Permissible Transferee obtained such Interests or (b) such Permissible Transferee.

2.5.  Right of First Refusal.  If at any time during the term of this Agreement any Member (for purposes of this Section, a **"Selling Member"**) proposes to make any Transfer of Interests to any Person pursuant to a bona fide written offer from a third party (other than a Transfer to a Permissible Transferee), then prior to effecting such Transfer:

(a)  Such Selling Member shall give the Company and the Members that are not the Selling Member (for purposes of this Section, the **"Other Members"**) written notice of the Selling Member's intention, specifying the Interests (the **"ROFR Interests"**), the proposed price therefor (the **"Transfer Price"**), the name of the proposed transferee or transferees and the other material terms upon which such Transfer is proposed to be made, including payment terms and such other terms and information as the Company or the Other Members may reasonably request in order to confirm the bona fide nature of the proposed transaction (collectively, the **"Transfer Notice"**).

(b)  The Company shall have the right, exercisable by written notice given to such Selling Member and the Other Members within ten (10) days after receipt of the Transfer Notice, to agree to purchase all (but not less than all) of the ROFR Interests at the Transfer Price and on the same terms as set forth in the Transfer Notice.  The Company, during such ten (10) day period, may advise such Selling Member of the Company's desire to exercise its right of first refusal set forth herein in writing as to all of the ROFR Interests, which exercise may be subject to the ability of the Company to obtain financing.  If the Company gives timely written notice of its desire to exercise its right of first refusal, the Company shall have an additional twenty (20) days following the initial ten (10) day period in which to secure financing, if necessary.  If the Company fails to redeem all of the ROFR Interests prior to the expiration of the above twenty (20) day period, then the Company shall be deemed to have advised the Selling Member of its inability to obtain financing and waived its right of first refusal and, thereafter, the provisions of Section 2.5(c) below shall apply.  At or prior to the end of such twenty (20) day period, the Company shall pay for the ROFR Interests or advise such Selling Member in writing (with a copy to each Other Member) that the Company is unable to obtain the financing.  Any ROFR Interests redeemed by the Company pursuant to this Section 2.5(b) shall be retired and shall no longer constitute outstanding Interests for purposes of this Agreement.

(c)  If the Company does not timely exercise its right of first refusal within the time period set forth in Section 2.5(b) or provides a notice within the above stated twenty (20) day

5

BP_002679

period that it is unable to obtain financing, each of the Other Members (other than the holders of Incentive Interests, Incentive Options and Option Interests, to the extent of such interests and options) shall have the option, exercisable by written notice given by such Other Members to the Selling Member within ten (10) days following the expiration of the Company's right of first refusal or receipt of the Company's notice that it will not exercise its right of first refusal, to purchase such Other Member's proportionate share of the ROFR Interests at the Transfer Price and on the same terms as set forth in the Transfer Notice.  Any Other Member, during such ten (10) day period, may advise such Selling Member of such Other Member's desire to exercise its right of first refusal set forth herein in writing.  If any Other Member declines to exercise its rights in writing or fails to exercise his, her, or its rights within such ten (10) day period, then the provisions in Section 2.5(d) below shall apply.  Each Other Member's proportionate share shall be determined based on (i) the ROFR Value of such Other Member's Interests relative to the ROFR Value of all Other Members' Interests; or (ii) in such proportions as the Other Members that exercise their rights under this Section 2.5 mutually agree in writing.

(d)  If one or more Other Members exercise their rights of first refusal pursuant to Section 2.5(c) and, after the expiration of the ten (10) day period during which the Other Members may so exercise their rights, no exercise was made with respect to a portion of the ROFR Interests to be Transferred by the Selling Member (such portion of the ROFR Interests collectively referred to as the **"Reoffered ROFR Interests"**), such Reoffered ROFR Interests shall be re-offered by the Selling Member to the exercising Other Members by written notice thereof.  Each such exercising Other Member shall have an additional ten (10) days following the receipt of such notice to notify the Selling Member in writing of his, her or its intent to purchase any Reoffered ROFR Interests and shall be entitled to purchase his, her or its proportionate share of such Reoffered ROFR Interests, which such proportionate share shall equal the ROFR Value of such Other Member's Interests relative to the aggregate ROFR Value of the Interests of the exercising Other Member(s), or, alternatively, in such proportions as the exercising Other Members mutually agree in writing.  The procedure set forth above shall continue until rights to purchase all (but not less than all) of the Selling Member's ROFR Interests have been exercised by the Company and/or Other Members in a timely manner.  If rights to purchase all (but not less than all) of the ROFR Interests identified in the Transfer Notice are not exercised by the Company and/or the Other Members in a timely manner, then the Selling Member shall have no obligation to sell any of the ROFR Interests to the Company and/or the Other Members and shall have the right, exercisable by written notice to the Company and all Other Members, to (i) rescind its offer to Transfer the ROFR Interests and retain all of the ROFR Interests, or (ii) Transfer the ROFR Interests pursuant to Section 2.5(f) below.  Any purchase of the ROFR Interests and/or the Reoffered ROFR Interests shall close, if at all, within twenty (20) days following the last exercise made by an Other Member with respect to the ROFR Interests and/or the Reoffered ROFR Interests, if at all.  If there is a failure to close as to any of the ROFR Interests and/or the Reoffered ROFR Interests, as the case may be, the Selling Member may elect to either rescind as provided in item (i) above, proceed to closing with those of the Other Members who have exercised their rights and who are ready and able to so close, or proceed to Transfer the ROFR Interests as provided in item (ii) above.

(e)  If the Company or the Other Member(s) (each an **"Optionor"**) exercise rights of first refusal hereunder to purchase all (but not less than all) of the ROFR Interests, a single closing for the purchase of the ROFR Interests shall take place within twenty (20) days after the

BP_002680

expiration of all applicable notice and financing-related waiting periods, which period of time shall be extended if necessary to comply with applicable securities laws, other federal law applicable to such transaction or similar state or local laws.  The exercise of an Optionor's right of first refusal under this Section 2.5 shall, subject to the Selling Member's rights to rescind as provided above, legally obligate such Optionor and the Selling Member to consummate the purchase of the ROFR Interests contemplated thereby, subject to the ability of the Optionor to arrange for financing, and each such Optionor and the Selling Member shall use all reasonable efforts to secure any approvals required in connection with such purchase and to consummate such transaction.

(f)  If none of the Company or any of the Other Members exercises its respective rights of first refusal under this Section 2.5 within the time allowed under this Agreement for such exercise, or fails to do so with respect to and/or to purchase all of the ROFR Interests (including any Reoffered ROFR Interests) pursuant to any such exercise or exercises in accordance with this Section 2.5, the Selling Member, subject to Section 2.6 and after first obtaining the consent of the Board, which shall not be unreasonably withheld, shall be free, during the period of the later of (i) thirty (30) days following the expiration of such time for exercise or such failure to purchase pursuant to any exercise, whichever occurs later and (ii) the Selling Member's compliance with Section 2.6, to sell the ROFR Interests specified in the applicable Transfer Notice to the proposed transferee specified in such Transfer Notice on the terms specified in such Transfer Notice.  If the proposed Transfer described in the Transfer Notice fails to close within the time frames set forth above or the terms thereof are modified in any material respect to be more favorable to the proposed purchaser than the terms specified in the Transfer Notice, the Selling Member shall again be subject to Section 2.4 and the right of first refusal provisions contained in this Section 2.5.

(g)  The purchase price for Interests purchased under this Section 2.5 by either the Company or the Other Members shall be the Transfer Price.  The purchase and sale shall otherwise be on the applicable terms and conditions set forth in the Transfer Notice.  The full amount of the purchase price for any Interests purchased pursuant to this Section 2.5 shall be paid in full in cash, by certified or cashier's check, or as agreed to in writing by the Selling Member and the Company or such Other Members, at the closing described in Section 2.5(e) hereof; *provided that*, if the Transfer Notice provided for payment for any of the ROFR Interests, in whole or in part, by means of any consideration other than cash, the Company or the Other Members, as the case may be, may purchase the Interests for such consideration, or for its cash equivalent.   A competent independent appraiser mutually selected by the Company (if applicable), the exercising Other Members (if applicable), and the Selling Member shall determine the cash equivalent of such consideration.   In the event that the Company (if applicable), the exercising Other Members (if applicable), and the Selling Member cannot select a mutually acceptable appraiser, each shall select a competent, independent appraiser, which appraisers shall then select a third (or fourth, as the case may be) competent, independent appraiser, whose determination as to value shall be conclusive and binding on the parties.  Costs of such appraisals shall be borne 50% by the Selling Member and 50% by the Company (the cost of which shall be specially allocated to the Other Members), if the Company is purchasing the Interests, or the exercising Other Members (such costs to be borne by the exercising Other Members based upon the ROFR Value of each exercising Other Member's Interests relative to the aggregate ROFR Value of the Interests of the exercising Other Members).

7

2.6.  Tag-Along Rights.

(a)  Subject to a Member first complying with Section 2.5, and provided the Company and the Other Members have not exercised rights to purchase (or have failed to purchase) all of the ROFR Interests proposed to be Transferred under Section 2.5 hereof, then if at any time a Member (for purposes of this Section, a **"Selling Member"** except that all Selling Members shall be aggregated and considered one "Selling Member" for purposes of this Section 2.6) proposes to Transfer Interests to a Person (other than Transfers to a Permissible Transferee) such that the Tag-Along Value of the Selling Member's Interests exceeds five percent (5%) of the aggregate Tag-Along Value of the Interests of all Members of the Company, including the Selling Member (a **"Tag-Along Sale"**), then, prior to effecting such Transfer, the Selling Member shall provide to the Company and the Members that are not the Selling Member (other than the holders of Incentive Interests, Incentive Options and Option Interests, to the extent of such interests and options) (the **"Tag Members"**) written notice of the Selling Member's intention, specifying in reasonable detail the Interests proposed to be Transferred (the **"Tag-Along Interests"**), the proposed price therefor (the **"Tag-Along Price"**), the name of the proposed transferee or transferees, the other material terms upon which such Transfer is proposed to be made, and such other terms and information as the Company or the Tag Members may reasonably request in order to confirm the bona fide nature of the proposed transaction (the **"Tag-Along Notice"**).  Each Tag Member shall have the right and option, exercisable as set forth below, to include in the Tag-Along Sale up to a specified portion of such Tag Member's Interests, which portion shall be equal to the product of (i) the Selling Member's Portion multiplied by (ii) a fraction, the numerator of which shall be the Tag-Along Value of the Tag Member's Interests, and the denominator of which shall be the aggregate of (A) the Tag-Along Value associated with the Selling Member's Interests, plus (B) the aggregate Tag-Along Value of all Tag Members' Interests.  The resulting portion shall be referred to as such Tag Member's **"Tag-Along Portion."** The Selling Member's Portion shall be reduced by each Tag Member's Tag-Along Portion, and the Selling Member shall not consummate the Tag-Along Sale unless each Tag-Along Portion of each Tag Member is included in the Tag-Along Sale, but only to the extent such Tag Member has properly elected to include such Tag-Along Portion in such Tag-Along Sale.

(b)  If any Tag Member is entitled and desires to exercise a tag-along right provided in Section 2.6(a) above, then it shall provide the Selling Member with written irrevocable notice specifying the Interests such Tag Member wishes to include in the Tag-Along Sale (which Interests shall not exceed such Tag Member's Tag-Along Portion) within ten (10) days after receipt of the Tag-Along Notice (the **"Tag-Along Notice Period"**) and shall simultaneously provide a copy of such notice to the Company.  Within ten (10) days following the expiration of the Tag-Along Notice Period, and in any event prior to the consummation of the Tag-Along Sale, each such Tag Member that has exercised its right to participate in the Tag-Along Sale by providing the required notice to the Selling Member within the Tag-Along Notice Period shall deliver to a representative of the Selling Member designated in the Tag-Along Notice or otherwise all documents required to be executed or delivered by such Tag Member in connection with the Transfer of such Tag Member's Interests pursuant to this Section 2.6 at the closing for such Tag-Along Sale against delivery to such Tag Member of the consideration therefor.

8

(c)  The consideration to be paid to each Member participating in the Tag-Along Sale in a transaction to which this Section 2.6 is applicable shall be the product of (i) the aggregate Tag-Along Price for all Interests Transferred in the Tag-Along Sale multiplied by (ii) a fraction, the numerator of which is the Tag-Along Value associated with the Interests being Transferred by such Member and the denominator of which is the aggregate Tag-Along Value of all Interests being Transferred by the Selling Member and all Tag Members; *provided*, *however*, the Board in its reasonable discretion shall reallocate the total consideration as necessary to account for any Distribution Limitation applicable to any Incentive Interests being Transferred by a Selling Member or a Tag Member.

(d)  If any Tag Member (i) does not elect before the end of the Tag-Along Notice Period to have all or any part of his, her or its Tag-Along Portion included in the Tag-Along Sale or (ii) fails to deliver to the Selling Member his, her or its Interests or any required documentation within the period described in Section 2.6(b) (collectively, a **"Tag-Along Failure"**), then such Tag Member will be deemed to have waived any and all rights under this Section 2.6 with respect to the Transfer of any or all of his, her or its Interests pursuant to such Tag-Along Sale.  The Selling Member shall have ninety (90) days (or such longer period as may be required to obtain any approval necessary under applicable securities laws, other federal law applicable to such transaction or similar state or local laws) after the Tag-Along Failure in which to Transfer all (but not less than all) of the applicable Interests at a price not higher than contained in the Transfer Notice and on terms not more favorable to the Selling Member than were contained in the Transfer Notice; thereafter, any proposed Transfer by such Selling Member of Interests shall be subject to this Section 2.6 and shall require a Transfer Notice.

(e)  Promptly after the consummation of a Tag-Along Sale, the Selling Member shall give notice thereof to the participating Tag Members, shall remit to each such Tag Member the total consideration for the Interests sold by such Tag Member pursuant thereto as computed pursuant to Section 2.6(c), and shall furnish such other evidence of the completion and time of completion of the Tag-Along Sale and the terms thereof as may be reasonably requested by any such Tag Member.

(f)  Notwithstanding anything contained in this Section 2.6 to the contrary, no Selling Member shall be liable to any Member based on the failure of a Tag-Along Sale to occur for any reason.

2.7.  Drag-Along Rights.

(a)  Subject to any control restrictions contained in any of the Loan Documents, if a Required Interest (for purposes of this Section 2.7, the **"Initiating Members"**) approves a Sale of the Company (as defined below) in writing specifying that this Section 2.7 shall apply to such transaction, then each Member and the Company hereby agree:

(i)  if such transaction (a **"Compelled Sale"**) requires Member approval, with respect to Interests that such Member owns or over which such Member otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Interests in favor of, and adopt, such Sale of the Company (together with any related amendments to the Certificate or this Agreement required in order to

9

implement such Sale of the Company) and to vote in opposition to any and all other proposals that could  delay or impair the ability of the Company to consummate such Sale of the Company;

      (ii)  if such transaction is a Sale of Interests, to sell the same proportion of Interests beneficially held by such Member as is being sold by the Initiating Members (based upon Drag Along Values) to the Person to whom the Initiating Members propose to sell their Interests (the **"Compelled Sale Interests"**) and on the same terms and conditions as specified in writing by the Initiating Members; *provided, however,* the Board in its reasonable discretion shall reallocate the total consideration as necessary to account for any Distribution Limitation applicable to any Incentive Interests being Transferred by an Initiating Member or other Member;

      (iii)  to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Initiating Members in order to carry out the terms and provision of this Section 2.7 including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, membership interest transfer documents (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents; *provided that,* except for fraud or intentional misrepresentation of a Member (for which only such Member shall be individually liable), such Member's liability shall be limited to its Pro Rata Share (as defined below) based upon the total consideration received by all Members in connection with a Sale of the Company, and no Member shall be liable for breaches of representations and warranties made by any other Member which relate only to the Member making such representations and warranties. For purposes of this Section 2.7, each Member's "Pro Rata Share" shall be equal to the ratio of (a) the consideration received by such Member to (b) the total consideration received by all Members;

      (iv)  not to deposit, and to cause its Affiliates not to deposit, except as provided in this Agreement, any Interests of the Company owned by such party or Affiliate in a voting trust or subject any Interests to any arrangement or agreement with respect to the voting of such Interests, unless specifically requested to do so by the acquiror in connection with the Sale of the Company;

      (v)  to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company and raise no objections to such sale or the process pursuant to which it was arranged; and

      (vi)  in the event that the Initiating Members, in connection with such Sale of the Company, appoint a Member representative (the **"Member Representative"**) with respect to matters affecting the Members under the applicable definitive transaction agreements following consummation of such Sale of the Company, (A) to consent to (1) the appointment of such Member Representative, (2) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (3) the payment of such Member's Pro Rata Share (from the

BP_002684

applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Member Representative in connection with such Member Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Members, and (B) not to assert any claim or commence any suit against the Member Representative or any other Member with respect to any action or inaction taken or failed to be taken by the Member Representative in connection with its service as the Member Representative, absent fraud or willful misconduct.

(b)  Notwithstanding the foregoing, a Member will not be required to comply with subsection (a) above in connection with any proposed Sale of the Company (the **"Proposed Sale"**), unless upon the consummation of the Proposed Sale (i) each holder of each class or series of the Company's Interests will receive the same form of consideration for their Interests of such class or series as is received by other holders in respect of their Interests of such same class or series of stock, (ii) each holder of a series of Preferred Interests will receive the same amount of consideration per unit of such series of Preferred Interests as is received by other holders in respect of their Preferred Interests of such same series, (iii) each holder of Common Interests will receive the same amount of consideration per unit of Common Interests as is received by other holders in respect of their Common Interests (subject to variances properly attributable to any Distribution Limitation applicable to any Incentive Interests), and (iv) unless the holders of a majority of the Preferred Interests elect to receive a lesser amount by written notice given to the Company at least 15 days prior to the effective date of any such Proposed Sale, the aggregate consideration receivable by all holders of the Preferred Interests and Common Interests shall be allocated among the holders of Preferred Interests and Common Interests on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Interests and the holders of Common Interests are entitled in a liquidation event (assuming for this purpose that the Proposed Sale is a liquidation event pursuant to Section 10.2 hereof) in accordance with this Agreement as in effect immediately prior to the Proposed Sale.

(c)  The Initiating Members shall give written notice (the **"Compelled Sale Notice"**) to each of the non-Initiating Members setting forth the terms and conditions, including the proposed sale price, of the Compelled Sale (the **"Compelled Sale Terms"**) and the name of the proposed purchaser. Pending consummation of the Compelled Sale, the Initiating Members shall promptly notify the non-Initiating Members of any material changes in the Compelled Sale Terms and any other material developments in connection with the Compelled Sale.

(d)  The Compelled Sale shall be consummated at a closing to be held in accordance with the Compelled Sale Terms. At the closing of the Compelled Sale, (i) the non-Initiating Members shall deliver to the Company transfer documents representing the Compelled Sale Interests, duly endorsed for transfer, if applicable, and all other documents reasonably requested by the Initiating Members, and (ii) the Company shall remit or cause to be remitted to the non-Initiating Members the consideration with respect to the Compelled Sale Shares.

(e)  As used herein, **"Sale of the Company"** shall mean:  (a) a transaction or series of related transactions in which a Person, or a group of related Persons, who is not an Affiliate of a Member acquires from Members of the Company Interests representing more than fifty percent

11

BP_002685

(50%) of the outstanding voting power of the Company or a Subsidiary thereof (a **"Sale of Interests"**); (b) any consolidation, share exchange or merger of the Company or a Subsidiary thereof with or into any other entity or person who is not an Affiliate of a Member, or any other reorganization, in which the Members of the Company, immediately prior to such consolidation, share exchange, merger or reorganization, or in the case of a Subsidiary, the Company, own less than fifty percent (50%) of the voting power of the surviving or successor entity (or in the event stock or ownership interests of an affiliated entity are issued in such transaction, less than fifty percent (50%) of the voting power of such affiliated entity) immediately after such consolidation, share exchange, merger or reorganization; or (c) a sale, lease, conveyance, exclusive license or other disposition of all or substantially all of the assets of the Company, including a sale of the equity interests of any Subsidiary, to a Person, or a group of related Persons, who is not an Affiliate of a Member, provided however, in each of the cases of (a), (b) and (c), the consideration for the transactions or series of related transactions is cash.

(f) Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to a designee of the Initiating Members, with full power of substitution, with respect to the matters set forth in this Section 2.7, and hereby authorizes him or her to represent and vote, if and only if the party (i) fails to vote, or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such party's Interests in favor of any Sale of the Company pursuant to and in accordance with the terms and provisions of this Section 2.7 of this Agreement or to take any action necessary to effect this Section 2.7. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to the terms hereof. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Interests and shall not hereafter, unless and until this Agreement terminates or expires pursuant to the terms hereof, purport to grant any other proxy or power of attorney with respect to any of the Interests, deposit any of the Interests into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Interests, in each case, with respect to any of the matters set forth herein.

(g) The Company will bear the reasonable costs and expenses incurred by the Company and the Members in connection with a Sale of the Company to the extent such costs and expenses are not otherwise paid by the purchaser. Costs incurred by any Member on his, her or its own behalf will not be shared by the Company or any other Member.

2.8. <u>Involuntary Transfers</u>.

(a) <u>Involuntary Transfers Subject to this Agreement</u>. Except as otherwise provided in this Agreement, in the event of an Involuntary Transfer of any Interests to any Person, the transferee (which term, as used herein, shall include any and all transferees and subsequent transferees of the initial transferee) shall take and hold such Interests subject to this Agreement and to all the obligations and restrictions applicable to the transferor, and shall observe and comply with this Agreement and with such obligations and restrictions. As used in this

12

BP_002686

Section 2.8 and elsewhere in this Agreement, the term **"Involuntary Transfer"** shall mean any transaction, proceeding or action by or in which a Member or other Person is involuntarily deprived or divested of any right, title or interest in or to any Interests (including, without limitation, a seizure under levy of attachment or execution, transfer to a trustee in bankruptcy or receiver or other officer or agency pursuant to a statute pertaining to escheat or abandoned property); *provided, however*, that "Involuntary Transfer" shall not be deemed to include any Transfer of Interests to a Permissible Transferee of a Member that occurs upon the death, divorce or a judicial determination of incompetence of such individual or the voluntary liquidation or dissolution of a Member.

(b) <u>Provisions in the Event of Involuntary Transfers</u>. If a Member shall receive a notice of, or otherwise becomes aware of, any proposed Involuntary Transfer of Interests of such Member (or portion thereof), such Member shall not take any action to approve any such transfer not in accordance with this Section, and the transferor pursuant to such Involuntary Transfer (or, if such transferor fails to do so, the transferee) shall forthwith give notice (the **"Involuntary Transfer Notice"**) simultaneously to the Company and to each of the other Members stating (i) when the Involuntary Transfer is to occur or the date on which the purported Involuntary Transfer occurred, (ii) the circumstances alleged to require such transfer, (iii) the Interests to be involuntarily transferred (the **"Offered Interests"**), and (iv) the name, address and capacity of the purported transferee. If the transferor Member or the transferee, as the case may be, fails to give the Involuntary Transfer Notice, then the Involuntary Transfer Notice may be given by the Company or by any Member, and the Involuntary Transfer Notice so given shall contain such of the information set forth in the preceding sentence as is known to the Person so giving the Involuntary Transfer Notice.

(c) <u>Exercise of Right to Purchase.</u> Upon receipt of the Involuntary Transfer Notice, the Company (or its designee, which may include any Member) shall have the option (but not the obligation), which shall be exercisable by written notice (**"Acceptance Notice"**) delivered to the Member and transferee, if applicable, whose Interests are or were subject to such Involuntary Transfer within thirty (30) days after receipt of the Involuntary Transfer Notice (the **"Notice Period"**), to purchase all (but not less than all) of the Offered Interests at the Fair Market Value thereof, subject to the restrictions, if any, set forth in the Ancillary Agreements.

(d) <u>Failure to Give Acceptance Notice</u>. If the Involuntary Transfer Notice shall have been duly delivered at least thirty-five (35) days prior to the Involuntary Transfer (or as soon as practicable if the prospect of the Involuntary Transfer is not known to the transferor prior to such 35-day period), and if an Acceptance Notice for all (but not less than all) of the Offered Interests is not given within the Notice Period, such failure shall be deemed an election not to purchase any Offered Interests subject to the options provided for in this Section 2.8 and such options shall thereupon expire.

(e) <u>Sale to the Company</u>. Subject to the restrictions, if any, set forth in the Loan Documents, the closing of the purchase of Offered Interests to be sold to the Company under this Section 2.8 shall be held at the Principal Office of the Company on the thirtieth (30th) day after the date on which the Notice Period shall have expired or at such other time and place as the parties to the transaction may agree. At such closing, the Member whose Interests are subject to the Involuntary Transfer shall deliver a written assignment of the Offered Interests, and such

BP_002687

Offered Interests shall be free and clear of any liens, claims, options, charges, encumbrances or rights (other than those arising hereunder) and the Member whose Interests are subject to the Involuntary Transfer shall so represent and warrant and further represent and warrant that such Member is the beneficial and record owner of such Offered Interests. Subject to the restrictions, if any, set forth in the Ancillary Agreements, the Company (or its designee, which may include any Member) shall deliver at the closing, by a certified bank check or by wire transfer, payment in full for the Offered Interests purchased by it; *provided*, *however*, if such purchase for cash cannot be effected without having a material impact on the Company's financial position, in the Company's reasonable discretion, then the payment for the Offered Interests may be made by delivering promissory notes on a basis to be reasonably agreed at such time by the Company and the transferor (such approval not to be unreasonably withheld by the transferor). At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(f) <u>Additional Rights of Purchase</u>. If an Involuntary Transfer of any Interests shall have occurred and either the Involuntary Transfer Notice was not timely given or the Member whose Interests were subject to the Involuntary Transfer was unable or failed to deliver an assignment and representations and warranties of such Interests meeting the requirements of Section 2.8(e), the Company (or its designee, which may include any Member) shall have the same right and option to purchase the Interests it would have had if the Involuntary Transfer Notice had been timely given except that the Involuntary Transfer Notice shall be given by the transferee of the Involuntary Transfer as soon as possible after the Involuntary Transfer has occurred. The closing of any purchase of Interests pursuant to this Section 2.8(f) shall be in accordance with the procedures set forth in Section 2.8(e), except that the date of such closing shall be the earlier of (i) the ninetieth (90th) day after the date of the Involuntary Transfer Notice or (ii) a date specified by the Company. If the provisions of this Section 2.8(f) shall be held to be unenforceable with respect to any particular Involuntary Transfer of Interests, the Company shall have a right of first refusal to purchase the Interests that were subject to the Involuntary Transfer at the Fair Market Value thereof if the transferee of the Involuntary Transfer subsequently obtains a bona fide offer for and desires to transfer such Interests, which right shall apply to the portion of such Interests proposed to be transferred and shall be governed by the provisions of this Section 2.8 as if the proposed transfer were an Involuntary Transfer.

(g) <u>Fair Market Value</u>. The **"Fair Market Value"** of an Interest means the amount that would be distributed with respect to such Interest if all of the assets of the Company were sold for their respective fair market values in an orderly sale (not a forced liquidation), inclusive of any applicable intangibles such as goodwill or going concern value, the liabilities of the Company were paid in full, and the net proceeds were distributed to the Members pursuant to Section 10.2(b)(ii), as such fair market value is determined in writing by (i) the Board and (ii) the Member selling, redeeming, converting or otherwise Transferring its Interests, as applicable; *provided*, *however*, that for purposes of determining Fair Market Value hereunder, no Interests shall be discounted due to any minority interest in the Company or a lack of marketability or liquidity with respect to such Interests. The Fair Market Value of all other non-cash assets, including any non-cash assets received as consideration with respect to any ROFR sale, Tag-Along sale or Drag-Along sale or in any other sale, disposition, merger, reorganization, consolidation, including as described in Article 9, or otherwise, or received with respect to a distribution from the Company shall mean the fair value for such assets or securities as between

14

BP_002688

a willing buyer and a willing seller in an arm's-length transaction occurring on the date of valuation as determined by the Board, taking into account all relevant factors determinative of value. If the parties (or in the case of the Common Members, a Majority of the Common Members) are unable to mutually agree with the Board upon the Fair Market Value as provided above, a third party investment banking firm shall be retained to determine the Fair Market Value, which shall be binding upon the parties. The third party investment banking or valuation firm shall be a firm that is mutually agreed upon by the transferor of such Involuntary Transfer and the Company; *provided, however*, that if the parties are unable to agree upon a firm, the disputing parties and the Company shall select a firm and the two firms shall select a third firm, and such third firm shall determine the Fair Market Value. The Company, on the one hand, and the disputing parties, on the other, shall each pay one-half of the costs of the firm determining Fair Market Value, and in the event that two firms are engaged to select such, each party shall pay the costs of its respective firm.

2.9. Repurchase From Departing Employee Members. Unless otherwise waived by the Board, upon the termination of employment of an Employee Member, the Company shall have the option (but not the obligation), which shall be exercisable by written notice delivered to the Employee Member within thirty (30) days after the date of his or her termination, to purchase any or all of the Interests then owned by such Employee Member at the Fair Market Value thereof, subject to the restrictions, if any, set forth in the Ancillary Agreements. The closing of any purchase of Interests pursuant to this Section 2.9 shall be in accordance with the procedures set forth in Section 2.8(e) and shall otherwise be governed by the terms and conditions of Section 2.8 as if the transfer were an Involuntary Transfer.

2.10. Additional Interests and Members.

(a) Subject to Sections 2.10(e) and 2.11 hereof, the Board is authorized to sell Additional Equity Interests; *provided, however*, that any purchaser of an Additional Equity Interest shall be required to execute a joinder agreement pursuant to which such purchaser agrees to become bound by and subject to the provisions of this Agreement. The Board shall reflect the issuance of any Additional Equity Interest in an amendment to Exhibit A to this Agreement, which such amendment shall reflect the Member's name (if not already listed on Exhibit A).

(b) The Board is authorized to issue additional Common Interests to employees, consultants, or other agents of the Company on such terms as the Board determines to be appropriate (subject to any restrictions herein) (**"Incentive Interests"**). The Board may also issue options to acquire Common Interests to employees, consultants, or other agents of the Company on such terms as the Board determines to be appropriate (**"Incentive Options"**). The aggregate number of Incentive Interests, Incentive Options and Interests issuable upon the exercise of Incentive Options (**"Option Interests"**) shall not have Sharing Percentages exceeding ten percent (10%) in the aggregate. Each Incentive Interest shall be subject to a Distribution Limitation (as further described in Section 4.1). Any Incentive Interests, Incentive Options and/or Option Interests issued by the Company shall be (i) non-voting and shall not be considered to be outstanding for purposes of any matters with respect to which a vote of the Members is required pursuant to the Act or this Agreement, and (ii) subject to certain restrictions on distributions as are provided in this Agreement (including, in the case of an Incentive Interest, a Distribution Limitation) and the applicable Award Agreement. The issuance and ownership of

15

BP_002689

any Incentive Interests, Incentive Options and Option Interests shall be governed by (i) this Agreement, (ii) if compensatory in nature, the Equity Incentive Plan, and (iii) any applicable Award Agreement.  To the extent any Incentive Interests or Option Interests (or Incentive Options) are issued to employees or independent contractors of the Company, this Section 2.10(b), together with the Equity Incentive Plan, any applicable Award Agreement and any other documents adopted or entered into by the Company in connection with such Interests, is intended to be a compensatory benefit plan as contemplated by Rule 701 promulgated under the Securities Act.  The Company shall be entitled to withhold from any payments, whether in the nature of compensation or distributions or otherwise, to cover any tax withholding obligation resulting from the exercise of the option.  The Board is hereby authorized to make any other adjustments to the Capital Accounts and distribution provisions of this Agreement as necessary to reflect the intent of the Members as described in this Section 2.10(b).

(c)  The Board shall reflect the issuance of any Incentive Interests and Option Interests, and, if applicable, the admission of a new Member, in an amendment to Exhibit A to this Agreement, which such amendment shall reflect the Member's name (if not already listed on Exhibit A), the type of membership interest issued (e.g., Common), such Member's Sharing Percentage, and the corresponding adjustments to the Sharing Percentages of the remaining Members as a result of such issuance or admission.  Any admission of a new Member is effective only after the new Member has executed and delivered to the Company a joinder agreement agreeing to be bound by the terms and conditions of this Agreement in such form as is acceptable to the Board.

(d)  The Board shall adopt the Equity Incentive Plan at such time as determined by the Board.

(e)  Except with respect to the issuance of Incentive Options, Incentive Interests and/or Option Interests pursuant to Section 2.10(b) hereof, the Board may not issue or authorize, and the Company shall not issue, Additional Equity Interests for less than the fair market value thereof, which value shall be determined by the Board in its reasonable discretion.

2.11.  Pre-Emptive Rights.

(a)  Right.  Each Member (other than the holders of Incentive Interests, Incentive Options or Option Interests, to the extent of such interests and options) shall have the pre-emptive right, but not the obligation, to purchase its *pro rata* share, or any lesser percentage, of any Additional Equity Interests that the Company proposes to sell pursuant to Section 2.10(a); *provided*, *however*, that the pre-emptive rights set forth in this Section 2.11 shall not apply to issuances of Incentive Options, Incentive Interests and/or Option Interests, securities issued in connection with debt, or securities issued in connection with a merger or acquisition transaction approved by the Board and a Required Interest.  For purposes of this Section 2.11, each Member's *pro rata* share of an Additional Equity Interest that the Company proposes to sell equals the product obtained by multiplying (i) the Additional Equity Interest that the Company proposes to sell by (ii) a fraction, the numerator of which is the Pre-emptive Value of each Member's Interests and the denominator of which is the aggregate Pre-emptive Value of all Members' Interests (in each case excluding Incentive Interests, Incentive Options and Option Interests).

16

BP_002690

(b) <u>Notice</u>. In the event that the Company proposes to undertake an issuance of an Additional Equity Interest, the Company will promptly give the Members written notice (the **"Sale Notice"**) of its intention to issue an Additional Equity Interest, which notice shall describe the Additional Equity Interest and the price and terms upon which the Company proposes to issue the same, the identity of the purchaser or purchasers (to the extent known) and shall set forth the Sharing Percentage proposed to be issued which the Member is entitled to purchase pursuant to Section 2.11(a). The Member will have fifteen (15) days from the date of receipt of any Sale Notice to (i) agree to purchase its proportionate share or lesser share of such Additional Equity Interest pursuant to this Section 2.11, for the price and upon the terms specified in the Sale Notice, by giving written notice to the Company stating therein its decision and the portion of the Additional Equity Interest to be purchased; or (ii) decline its pre-emptive rights herein. The failure by the Member to exercise its pre-emptive rights herein with respect to any Additional Equity Interest shall not prejudice such Member's pre-emptive rights under this Section 2.11(b) with respect to any subsequent Additional Equity Interest.

(c) <u>Subsequent Sale</u>. The Company will have forty-five (45) days following expiration of the period provided in Section 2.11(b) to sell the Additional Equity Interest as to which pre-emptive rights provided for herein were not exercised or exchanged at a price and upon such other terms as are specified in the Sale Notice. In the event the Company has not sold such Additional Equity Interest within said 45-day period or desires to sell such Additional Equity Interest to a purchaser not named in or on terms that differ from those described in the Sale Notice, the Company will not thereafter issue or sell any Additional Equity Interest without again complying with this Section 2.11.

2.12. <u>Specific Performance</u>. Each of the parties to this Agreement acknowledges that it shall be impossible to measure in money the damage to the Company or the Member(s) should any of them or any transferee or any legal representative of any party hereto fail to comply with any of the restrictions or obligations imposed by this Article 2, that every such restriction and obligation is material, and that in the event of any such failure, the Company or the Member(s) shall not have an adequate remedy at law or in damages. Therefore, each party hereto consents to the issuance of an injunction or the enforcement of other equitable remedies against such party at the suit of an aggrieved party to compel specific performance of all of the terms of this Article 2 and to prevent any disposition of Interests in contravention of any terms of this Article 2, and waives any defenses thereto, including, without limitation, the defenses of: (i) failure of consideration; (ii) breach of any other provision of this Agreement; and (iii) availability of relief in damages. Any action seeking specific performance under this Agreement shall be brought in the state or federal courts located in the State of Texas.

2.13. <u>Confidentiality</u>. The Members acknowledge that, from time to time, they may receive information from or regarding the Company or its Subsidiaries in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or its Subsidiaries or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company or its Subsidiaries and may not disclose it to any Person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Board promptly of any request for that information before disclosing it, if practicable), (ii) to any governmental regulatory agency or in connection with any judicial or governmental regulatory proceeding or as otherwise required by

17

BP_002691

law, (iii) to advisers or representatives of the Member or Persons to which that Member's Interest may be Transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 2.13, (iv) of information that the Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality, (v) to an Affiliate of such Member, or (vi) to the extent reasonably necessary to permit such Member to enforce any right it may have against the Company or its officers, Managers, or any other Members. The Members acknowledge that breach of the provisions of this Section 2.13 may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section 2.13 may be enforced by specific performance.

2.14. <u>Liability to Third Parties</u>. No Member shall be liable for the debts, obligations or liabilities of the Company or its Subsidiaries, including under a judgment decree or order of a court in excess of its required Capital Contributions to the Company.

2.15. <u>Withdrawal</u>. A Member does not have the right or power to withdraw from the Company as a Member.

2.16. <u>Lack of Authority</u>. Except as expressly authorized in this Agreement, no Member (other than a Manager or an officer acting within the scope of his or her authority) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.

### ARTICLE 3
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. <u>Contributions of Members</u>.

(a) Each Preferred Member shall make an initial Capital Contribution to the Company as set forth on <u>Exhibit A</u>.

(b) The Common Interests hereby issued to the Seller Member are intended to constitute "profits interests" in the Company within the meaning of Rev. Proc. 93-27 and Rev. Proc. 2001-43, for services rendered or to be rendered to the Company by the recipients. Accordingly, the Capital Account of the Seller Member at the time of issuance shall be $0.00 (zero dollars). The Common Interests hereby issued to the Seller Member will not be subject to a Distribution Limitation (as further described in Section 4.1). The Common Interests hereby issued to the Seller Member are not Incentive Interests (as further described in Section 2.10(b)).

3.2. <u>No Additional Contributions</u>. Subject to Section 3.1 and except as otherwise provided in Section 3.14, no Member shall have the obligation to make any additional Capital Contributions to the Company.

3.3. <u>Advances by Members</u>. Subject to the limitations herein and to other agreements of the Company, the Company is authorized to borrow from the Members on such terms as the Board deems appropriate, which shall be on commercially reasonable terms and conditions under the circumstances.

BP_002692

3.4.  <u>Capital Accounts</u>.  A separate Capital Account shall be established and maintained for each Member.  The Capital Account of each Member will be determined and adjusted as follows:

(a)  Each Member's Capital Account shall be increased by (i) the amount of money contributed by that Member to the Company (or deemed contributed pursuant to Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations), (ii) the Book Value of property contributed by that Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to a Member of Net Profit (and all items in the nature of income or gain that are specially allocated to the Member under Article 4 hereof).

(b)  Each Member's Capital Account shall be decreased by (i) the amount of money distributed to that Member by the Company (or deemed distributed pursuant to Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations), (ii) the Book Value of property distributed to that Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to a Member of Net Loss (and all items in the nature of deduction or loss that are specially allocated to the Member under Article 4 hereof).

3.5.  <u>Capital Account Adjustment for In-Kind Distributions</u>.  If the Company at any time distributes any of its assets in-kind to any Member, the Capital Account of each Member shall be adjusted to account for that Member's allocable share (as determined under Article 4 below) of the Net Profit or Net Loss that would have been realized by the Company had it sold the assets distributed for their respective Book Values (as adjusted pursuant to paragraph (c) of the definition of "Book Value" in Article 12 immediately prior to their distribution).

3.6.  <u>Capital Account Adjustment for Property Revaluation</u>.  The Capital Accounts shall be adjusted to reflect a revaluation of Company assets to their Book Values (as adjusted pursuant to <u>paragraph</u> (b) of the definition of "Book Value" in Article 12) on the date of adjustment upon the occurrence of any of the events set forth in paragraph (b) of the definition of "Book Value" in Article 12.  The adjustments to Capital Accounts shall reflect the manner in which the unrealized Net Profit or Net Loss inherent in the property would be allocated if there were a disposition of the Company's property at its fair market value on the date of adjustment.

3.7.  <u>Transfer of Interests</u>.  If any Interest is Transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to such Interest.

3.8.  <u>Incentive Interests; Incentive Options</u>.

(a)  To the extent any Incentive Interests are issued by the Company on or after the Effective Date, it is intended that such Incentive Interests constitute "profits interests" in the Company within the meaning of Rev. Proc. 93-27 and Rev. Proc. 2001-43, for services rendered or to be rendered to the Company by the recipient.  Accordingly, the Capital Account with respect to such Incentive Interests attributed to the recipient at the time of issuance will be $0.00

19

BP_002693

(zero dollars). Each Incentive Interest will be subject to a Distribution Limitation (as further described in Section 4.1).

(b) To the extent Incentive Options are granted hereunder, the Members recognize that the exercise of such an Incentive Option is an event described in Section 3.6 hereto requiring a revaluation of Company assets and intend that the exercise result in ordinary income to the Person exercising the Incentive Option to the extent of any attributed share of appreciation in Company assets existing as of the date such Person exercises the Incentive Option. To achieve this goal, immediately after the payment of the exercise price and a revaluation of Company assets to their fair market values, the following will occur and the Capital Accounts of the Members shall be further adjusted as follows (except as otherwise provided in the applicable Award Agreement):

(i) the Capital Account of the Person exercising the Incentive Option, which at that point will already reflect the payment of the exercise price, will be increased by an amount such that if the Company were liquidated immediately thereafter in accordance with Capital Accounts, such Person would receive net liquidation proceeds with respect to the Option Interest acquired pursuant to such Incentive Option equal to the net liquidation proceeds that would be received with respect to such Option Interest pursuant to Section 10.2(b)(ii) if all of the assets of the Company were sold for their respective fair market values (as determined pursuant to Section 8.4), the liabilities of the Company were paid in full, and liquidating distributions were made pursuant to Section 10.2(b);

(ii) the Person exercising such Incentive Option will recognize ordinary income as compensation (which income shall be recognized outside of the Company and not as an item of Company income) equal to the Capital Account adjustment described in subsection (i) above (i.e., the excess of the Capital Account with respect to the Option Interest acquired pursuant to such exercised Incentive Option over the exercise price with respect to such Incentive Option);

(iii) the Company shall recognize a compensation deduction equal to the adjustment described in subsection (i) above, which deduction, notwithstanding any indication in this Agreement to the contrary, shall be allocated to the Members pursuant to Section 4.5 immediately prior to the exercise of the Incentive Option and which deduction shall result in a decrease in the Capital Accounts of such Members by such amount; and

(iv) the Company shall be entitled to withhold an amount from any payments to the Person exercising the Incentive Option, whether in the nature of compensation or distributions or otherwise, to cover any tax withholding obligation resulting from the exercise of the Incentive Option.

(c) Notwithstanding anything contained in this Agreement to the contrary, the Board, upon the vote or written consent of a Required Interest, is hereby authorized and directed to make a safe harbor election (the **"Safe Harbor Election"**) under Proposed Treasury Regulations Section 1.83-3(l) and Notice 2005-43, or any successor regulations, notices, revenue procedures, or similar pronouncements (whether proposed, temporary, or final) thereto, to use

20

APP 023

liquidation value as the fair market value of any and all compensatory interests and options issued by the Company.  If at any time the forgoing authorization and/or direction is insufficient for purposes of effectuating the Safe Harbor Election, then the Members hereby acknowledge and agree that the then Tax Matters Partner shall amend this Agreement to the extent necessary to effectuate and carryout a Safe Harbor Election.  In the event any Member makes a tax reporting that is inconsistent with any Safe Harbor Election, then such Member hereby agrees to indemnify and hold harmless the Company and each of the other Members from any and all losses, costs, expenses, and other damages directly or indirectly suffered and/or incurred by the Company and/or each of the other Members from such inconsistent tax reporting. Each Member hereby acknowledges and agrees to provide written notice to the Company and the other Members of such inconsistent reporting or of any proposed adjustment by the applicable taxing authorities that would cause such Member to have an inconsistent reporting.

     3.9.  <u>Timing of Determinations</u>.   The Capital Account of each Member shall be determined after giving effect to all transactions which have been effected prior to the time when such determination is made giving rise to the allocation of Net Profit and Net Loss and to all contributions and distributions theretofore made.

     3.10.  <u>Capital Account Adjustments with respect to Loans</u>.  In the event that any Member makes a loan to the Company, such loan shall not be considered a Capital Contribution and shall not increase the Capital Account of the lending Member.  Repayment of such loans shall not be deemed to be distributions or withdrawals from the capital of the Company.

     3.11.  <u>Guaranteed Payments</u>.  Any fees, salary or similar compensation payable to a Member pursuant to this Agreement shall be deemed a guaranteed payment for federal income tax purposes and not a distribution to such Member for such purposes.  Such payments to a Member shall not reduce the Capital Account of such Member, except to the extent of its distributive share of any Net Loss or other downward capital adjustment resulting from such payment.

     3.12.  <u>No Duplicative Adjustments</u>.  A Member's Capital Account shall not be adjusted to reflect Net Profit or Net Loss attributable to the disposition of assets to the extent such Member's Capital Account previously reflected inherent gain or loss in the assets either upon the contribution of such assets to the Company by such Member or upon the revaluation of Company assets in accordance with this Agreement.

     3.13.  <u>Interpretation with Regard to Capital Accounts</u>.  It is the intention of the Members that the Capital Accounts be maintained in accordance with the capital account maintenance requirements of the Treasury Regulations under Code Section 704(b).  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of the Capital Accounts are intended to comply with such Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations and any amendment or successor provision thereto.  The Board also shall make any appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with the Treasury Regulations.  Nothing in this Section 3.13 shall permit the Board, or otherwise be interpreted, to alter any of the distribution provisions set forth in this Agreement, including, but not limited to, Sections 4.1, 4.2 and 10.2.

BP_002695

3.14.  Obligation to Repay or Restore.   A Member who has received distributions of Available Cash or Net Proceeds of a Capital Transaction shall be obligated, to the extent provided by the Act, to repay or restore to the Company all or a portion of the amount received if such distributions cause the fair market value of the Company's assets to be less than the Company's liabilities and such Member had knowledge that the distribution was in violation of this Section 3.14.  Subject to the foregoing requirement, no Member shall be required to pay to the Company or to any other Member any deficit or negative balance which may exist from time to time in his Capital Account; *provided, however*, in the event a Member erroneously receives distributions in excess of his interest in such distributions as specified in Sections 4.1 and 4.2 hereof (**"Excess Distributions"**), then, as between the Members but not for the benefit of other Persons, such Member shall be indebted to the Company for such Excess Distributions, and such indebtedness shall be payable on terms or on demand as may be prescribed by the Board.

## ARTICLE 4
## DISTRIBUTIONS AND ALLOCATIONS

4.1.  Distributions.   Subject to any restrictions on distributions in the Loan Documents, and provided that funds are available, Available Cash and/or Net Proceeds of a Capital Transaction shall be distributed at such times and in such amounts as the Board shall determine from time to time in its discretion.  Except as provided in Section 4.2, all distributions shall be made in the following order and priority:

(a)  First, one hundred percent (100%) to the Preferred Members *pro rata* in proportion to their relative accrued and unpaid Preferred Returns until the accrued and unpaid Preferred Return of each Preferred Member is reduced to zero;

(b)  Second, one hundred percent (100%) to the Preferred Members *pro rata* in proportion to their relative Unreturned Capital Contribution Accounts until the Unreturned Capital Contribution Account of each Preferred Member is reduced to zero; and

(c)  Thereafter, to the Members (the Common Members and the Preferred Members) pro rata in accordance with their respective Sharing Percentages;

*provided, however*, the cumulative amount to be distributed pursuant to this Article 4 or Section 10.2 with respect to any Incentive Interest since the date of issuance of such Incentive Interest shall not exceed the Distribution Limitation with respect to such Incentive Interest.  For this purpose, the "Distribution Limitation" of an Incentive Interest shall mean the amount that would be distributable with respect to such Incentive Interest if the Incremental Value Amount with respect to such Incentive Interest were distributed to the Members *pro rata* in accordance with their Sharing Percentages (subject to adjustment for the Distribution Limitation of each Incentive Interest other than the subject Incentive Interest).  The **"Incremental Value Amount"** with respect to such Incentive Interest as of any date of determination shall mean (A) the aggregate amount that would be distributed to all Members if all of the assets of the Company were sold for their respective fair market values (as determined pursuant to Section 8.4) and the liabilities of the Company were paid in full, minus (B) the aggregate amount that would have been distributed to all Members on the date of issuance of such Incentive Interest if, on such date, all of the assets of the Company had been sold for their respective fair market values on

22

BP_002696

such date (as determined pursuant to Section 8.4) and the liabilities of the Company had been paid in full. Any reduction in a distribution with respect to any Incentive Interest caused by the Distribution Limitation of such Incentive Interest shall be distributed among the Members *pro rata* in accordance with their respective Sharing Percentages (subject to any Distribution Limitations with respect to any other Incentive Interests).

4.2. Tax Distributions.

(a) Subject to any restrictions in the Loan Documents, provided that funds are available therefor and except as otherwise prohibited by law, prior to making any distributions of Available Cash to the Members pursuant to Section 4.1, the Company shall distribute an amount of Available Cash to each Member to provide such Member with cash to pay the income tax liability incurred on the taxable income or gain of the Company allocated to such Member pursuant to this Article 4, net of any taxable losses, deductions and credits of the Company allocated to such Member in the current or prior taxable years (and not previously taken into account pursuant to this sentence) (**"Tax Distributions"**). The Tax Distributions, if any, shall be determined by the Board, taking into account (i) the maximum combined federal, state and local individual tax rates in effect (taking into account the deductibility of state and local taxes for federal income tax purposes) at the time of such distribution (which such rates shall be determined with respect to the Member subject to the highest such rates, and applied uniformly to all Members), (ii) the amounts and character of income and loss thereof so allocated to the Members, (iii) the cumulative aggregate distributions previously made to the Members pursuant to this Section 4.2 since the Effective Date, and (iv) such other considerations as the Board determines in good faith to be appropriate; subject to the other provisions of this Section 4.2, and specifically subject to the discretion of the Board, Tax Distributions shall be made on a quarterly or other basis in a manner reasonably determined by the Board to enable the Members to satisfy both estimated and final tax payment requirements.

(b) To the extent any Tax Distribution is made to a Member pursuant to this Section 4.2, the future distributions to such Member pursuant to Sections 4.1(a), 4.1(b) and 4.1(c) shall be reduced by the amount of any prior Tax Distributions to such Member pursuant to this Section 4.2 which has not previously been applied to such a reduction.

4.3. Return of and Interest on Capital Contributions. No Member is entitled to the return of his Capital Contributions or his Capital Account or to be paid interest in respect of either his Capital Account or any Capital Contribution made by such Member to the Company except as provided in this Agreement.

4.4. Payments. The amount of any distribution or payment to a Member or a former Member or his, her or its legal representative whether pursuant to Article 4 or Section 10.2(b)(ii) may be made in cash or in kind or partially in cash and partially in kind in the reasonable discretion of the Board or liquidator under Article 10 less reasonable reserves established in the reasonable discretion of the Board or liquidator under Article 10 for known or unknown liabilities of the Company. All distributions of assets in kind shall be made at Book Value as determined in good faith by the Board pursuant to Section 3.6 and shall be distributed to the Members in the same manner as a distribution of Net Proceeds of a Capital Transaction would have been made if such assets had been sold or as a distribution would be made upon the

BP_002697

liquidation of the Company, as applicable.  The Net Profit or Net Loss resulting from such distribution will be allocated in accordance with Section 4.5.

4.5.  <u>Allocations of Net Profit and Net Loss</u>.

(a)  After taking into account the special allocations set forth in Sections 4.6 through 4.15, Net Profit and Net Loss for each Fiscal Year (or portion thereof) shall be allocated among the Members in the manner that will cause their Partially Adjusted Capital Accounts to equal, as soon as possible, their Targeted Accounts.

(b)  If any allocation of Net Loss would cause a Member to have an Adjusted Capital Account Deficit, that Net Loss shall be allocated to the other Members in accordance with their respective Sharing Percentages.

4.6.  <u>Company Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this Agreement to the contrary, if in any Fiscal Year or other period there is a net decrease in the amount of the Company Minimum Gain, then each Member shall first be allocated items of Gross Income for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in such Company Minimum Gain during such year (as determined under Treasury Regulations Section 1.704-2(g)(2)); *provided*, *however*, if there is insufficient Gross Income in a year to make the allocation specified above for all Members for such year, the Gross Income shall be allocated among the Members in proportion to the respective amounts they would have been allocated had there been an unlimited amount of Gross Income for such year.

4.7.  <u>Minimum Gain Chargeback for Member Nonrecourse Debt</u>.  Notwithstanding any other provision of this Agreement to the contrary other than Section 4.6, if in any year there is a net decrease in the amount of the Member Nonrecourse Debt Minimum Gain, then each Member shall first be allocated items of Gross Income for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in such Member Nonrecourse Debt Minimum Gain during such year (as determined under Treasury Regulations Section 1.704-2(i)(4)); *provided*, *however*, if there is insufficient Gross Income in a year to make the allocation specified above for all Members for such year, the Gross Income shall be allocated among the Members in proportion to the respective amounts they would have been allocated had there been an unlimited amount of Gross Income for such year.

4.8.  <u>Qualified Income Offset</u>.  Notwithstanding any other provision of this Agreement to the contrary (except Sections 4.6 and 4.7 which shall be applied first), if in any Fiscal Year or other period a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), such Member will be specially allocated items of Gross Income in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible.

4.9.  <u>Limit on Loss Allocations</u>.  Notwithstanding the provisions of Section 4.5 or any other provision of this Agreement to the contrary, Net Loss (or items thereof) shall not be allocated to a Member if such allocation would cause or increase such Member's Adjusted

24

BP_002698

Capital Account Deficit and shall instead be reallocated to the other Members, subject to the limitations of this Section 4.9.

4.10.  Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debts to which such Member Nonrecourse Deductions are attributable.

4.11.  Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year or other period shall be allocated among the Members in accordance with their Sharing Percentages.

4.12.  Code Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset under Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704 1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

4.13.  Reversal of Mandatory Allocations.  In the event that any Gross Income or Net Loss is allocated pursuant to Sections 4.6 through 4.12, subsequent Gross Income, Net Profit or Net Loss (or items thereof) will first be allocated (subject to Sections 4.6 through 4.12) to the Members in a manner which will result in each Member having a Capital Account balance equal to that which would have resulted had the original allocation of Gross Income or Net Loss (or items thereof) pursuant to Sections 4.6 through 4.12 not occurred; provided, however, no allocations pursuant to this Section 4.13 that are intended to offset allocations pursuant to Section 4.10 or Section 4.11 shall be made prior to the taxable year during which there is a net decrease in Member Nonrecourse Debt Minimum Gain or Company Minimum Gain, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Member Nonrecourse Debt Minimum Gain or Company Minimum Gain, and no such allocation pursuant to this Section 4.13 shall be made to the extent that the Board reasonably determines that it is likely to duplicate a subsequent mandatory allocation pursuant to Section 4.6 or Section 4.7.

4.14.  Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated Gross Income in the amount of such excess as quickly as possible; provided, however, that an allocation pursuant to this Section 4.14 shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided in this Article 4 have been made as if Section 4.8 and this Section 4.14 were not in this Agreement.

4.15.  Compliance with Code.  The foregoing provisions of this Agreement relating to the allocation of Net Profit and Net Loss are intended to comply with Treasury Regulations under

25

BP_002699

APP 028

Section 704(b) of the Code and shall, in general, be interpreted and applied in a manner consistent with such Treasury Regulations.

4.16. <u>Tax Allocations – Code Section 704(c)</u>.  In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value of the property.  If the Book Value of any Company asset is adjusted under the definition of Book Value in Article 12, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Treasury Regulations.  Allocations under this Section 4.16 shall be made utilizing the "remedial method" set forth in Treasury Regulations Section 1.704-3(d)(1), unless otherwise determined by the Board.  Any other elections or other decisions relating to allocations under this Section 4.16 will be made in any manner that the Board determines reasonably reflects the purpose and intention of this Agreement.  Allocations under this Section 4.16 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit, Net Loss or other items or distributions under any provision of this Agreement.

4.17. <u>Allocation on Transfer</u>.  If any Interest of the Company is Transferred, or a Member's Sharing Percentage is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year, the Company shall make an interim closing of its books as of such date of Transfer or admission and shall allocate Net Profit or Net Loss or items thereof based on such interim closing.  All Transfers of Interests or admissions or exclusions of Members occurring at any time during a month shall be deemed effective as of the opening of business on the first day of the subsequent month.

4.18. <u>Recapture Items</u>.  In the event there is any recapture of Depreciation or investment tax credit, the allocation of gain or income attributable to such recapture shall be shared by the Members in the same proportion as the deduction for such Depreciation or investment tax credit was shared.

4.19. <u>Economic Effect Equivalence</u>.  The allocations set forth in this Article 4 and the Capital Account maintenance rules set forth in this Agreement are intended to achieve "economic effect equivalence" as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(i) and shall be interpreted and applied by the Board consistent with such intent.  Nothing in this Section 4.19 shall permit the Board, or otherwise be interpreted, to alter any of the distribution provisions set forth in this Agreement, including, but not limited to, Sections 4.1, 4.2 and 10.2.

4.20. <u>Additional Allocation Provisions</u>.  The following rules will apply to the calculation and allocation of Net Profit, Net Loss and other items:

(a) For purposes of determining the Net Profit, Net Loss or any other item allocable to any period, Net Profit, Net Loss and other items will be determined on a daily, monthly or

26

other basis, as determined by the Board using any permissible method under Code Section 706 and the related Treasury Regulations.

(b) Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, credit and other allocations not provided for in this Agreement will be divided among the Members in the same proportions as they share Net Profit and Net Loss.

4.21.  Agreement to be Bound.  The Members agree to be bound by the provisions of this Article 4 in reporting their respective shares of Company income and loss for income tax purposes.

### ARTICLE 5
### MANAGEMENT OF THE COMPANY

5.1.  Board of Managers.  Subject to the terms of the Loan Documents, the Company shall be governed by a Board of Managers (the **"Board"**) which shall be configured and have the rights and responsibilities set forth in this Article 5.  If there are any inconsistencies between the Loan Documents and this Agreement (including Section 5.1 and Section 5.2 hereof), the terms of the Loan Documents shall prevail and control, until such time as the Loans have been satisfied and paid in full.

(a) The business and affairs of the Company shall be managed by or under the direction of its Board, which may exercise all powers of the Company and do all such lawful acts and things as are not by statute or by the Certificate or by this Agreement directed or required to be exercised and done by the Members.

(b) The Board shall be composed of three (3) Managers.  The number of Managers composing the Board may be increased or decreased by amendment of this Agreement.  Unless the Company is the sole manager thereof, the governing body of each Subsidiary of the Company (including the Target) shall be composed of the same individuals as the Board.

(c) The Board shall be constituted as follows (unless specifically defined otherwise, each, a **"Designated Manager"**):

(i) Two (2) Managers (collectively, the **"Baymark Managers"**) shall be individuals appointed by the Baymark Member.  The initial Baymark Managers shall be Mr. David Hook and Mr. Anthony Ludlow.

(ii) For so long as the Seller Member owns at least a 20% Sharing Percentage, one (1) Manager shall be appointed by the Seller Member (the **"Seller Member Manager"**), who shall initially be Mr. Tomer Damti; provided, that any Seller Member Manager that is not Mr. Tomer Damti must first be approved by the Board, which approval shall not be unreasonably withheld.

(d) Notwithstanding anything to the contrary in this Agreement, if at any time the Seller Member, Seller Member Manager, a Nonvoting Observer (as defined below), or any of their respective Affiliates (including spouses or former spouses) is in breach of the restrictive covenants set forth in this Agreement, any employment agreement with the Company or its

27

Subsidiaries and Affiliates, or the ACET Purchase Agreement, or any of the foregoing have violated their fiduciary duties to the Company or its Subsidiaries or Affiliates, and such violation continues after the expiration of ten (10) days following written notice of such violation, then a majority of the remaining members of the Board may by written consent (i) in the case of a Seller Member Manager, remove such Seller Member Manager from the Board, and any replacement thereof by Seller Member shall be approved by the Board, which approval shall not be unreasonably withheld, or (ii) in the case of Nonvoting Observer, remove such Nonvoting Observer, and any replacement thereof by Seller Member shall be approved by the Board, which approval shall not be unreasonably withheld.

(e) chairman (the **"Chairman"**) shall be selected by a majority of the Managers. All meetings of the Board shall be presided over by the Chairman. The Chairman shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting, and the conduct of discussion as seem to him or her in order. The Chairman shall have such other duties and powers as are set forth herein.

(f) Each Manager of the Company shall hold office until his or her death, resignation or removal. Any Designated Manager may be removed from the Board, with or without cause, only by the party who designated such Manager.

(g) Upon the occurrence of a vacancy in the Board, a replacement shall be elected by a majority of the remaining Managers or, in the case of a vacancy created by the departure of a Designated Manager, such replacement shall be appointed by the party who originally designated such Manager (provided that such party still holds the designation right).

(h) No Manager shall receive any compensation for serving as a Manager except that a Manager shall be reimbursed for expenses in accordance with Section 11.12.

(i) Subject to the terms and conditions of the Loan Documents, the following provisions relating to meetings of the Company's Board shall apply to this Agreement:

(i) The first meeting of each newly elected Board shall be held immediately following the annual meeting of the Members.

(ii) Regular meetings of the Board shall be held at least quarterly, and at least one such meeting will be held in person each year.

(iii) Regular meetings of the Board may be held with notice at such time and at such place either within or without the State of Texas as from time to time shall be prescribed by the Board.

(iv) Upon no less than forty-eight (48) hours' prior written notice (including by email or confirmed facsimile), special meetings of the Board may be called by (A) the Chairman, or (B) a majority of the Managers.

(v) The business to be transacted at, and the purpose of, any regular or special meeting of the Board shall be specified in the notice or waiver of notice of such meeting,

28

but shall not in any way limit the scope or nature of the business actually transacted at, or the purpose of, any such meeting.

(vi) A quorum of the Managers must be present for the transaction of any business by the Board. A quorum shall consist of Managers having a majority of the voting power of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(vii) Each Manager shall have one vote. The affirmative vote of a majority of the voting power of the Managers shall be necessary to constitute an act of the Board. The votes of interested Managers shall be counted for all purposes. A Manager who is present at a meeting of the Board at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(viii) Any action required or permitted to be taken at a meeting of the Board under the provisions of any applicable law, the Certificate or this Agreement may be taken without a meeting if a consent in writing setting forth the action so taken is signed by all Managers. Such consent shall have the same force and effect as a unanimous vote of the Board. Subject to the provisions required or permitted for notice of meetings, unless otherwise restricted by any applicable law, the Certificate or this Agreement, Managers shall be entitled to participate in and hold a meeting of such Board by conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such a meeting shall constitute presence in person at such meeting, except where a Person participates in the meeting or the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(j) Non-Voting Observer. For so long as the Seller Member owns less than a 20% Sharing Percentage, but at least a 3% Sharing Percentage, and in all cases subject to Subsection (d) above, the Seller Member shall be entitled to appoint a nonvoting observer who shall be entitled to attend and observe all meetings of the Board (the "NonVoting Observer") other than those wherein Seller Member is the subject of such meeting or such attendance is reasonably likely to impact any legal or other privilege applicable to such meeting or the discussion thereat.

5.2. Compensation.

(a) The Company shall have the option, but not the obligation, to (i) pay any Outside Manager a fee not to exceed $5,000 per year for services rendered as a Manager on the Board and (ii) reimburse such Outside Manager for travel expenses incurred in connection with attending meetings of the Board.

(b)  No Member shall be paid any fee or other compensation whatsoever for services as a Manager or otherwise, whether ordinary or extraordinary, foreseen or unforeseen, rendered to or for the benefit of the Company, except as otherwise provided in this Section 5.2 and except to the extent of reimbursements for expenses in accordance with Section 11.12.

(c)  Except as otherwise provided in this Agreement or in a specific employment agreement, with respect to any management-level employee or other Person who shall receive more than $75,000 per year from the Company in exchange for services provided thereto, the Board must approve (i) the payment of any such amount to such Person, (ii) any increase in the amount of compensation or other amounts in exchange for services provided by such employee or other Person, and (iii) any new hire of such a Person by the Company. The Company shall make compensation payments to the Members in their respective capacities as employees of the Company in accordance with the terms of any applicable employment agreements.

5.3.  Management Fee.  Subject to any restrictions in the Loan Documents and Available Cash, the Company shall pay to Baymark Management, LLC, a Texas limited liability company (the **"Management Company"**) a quarterly management fee (the **"Management Fee"**), as more specifically set forth in the Baymark Management Agreement, provided that, prior to the time Target achieves EBITDA (as reasonably determined by accountants for the Company) of at least $2,000,000, the annual Management Fee shall not exceed the greater of $150,000 or 5% of Target's EBITDA. To the extent due but not paid, the Management Fee shall accrue.

5.4.  Related Party Transactions Permitted.  The Company may (i) employ or retain a Member or a person directly or indirectly related to or affiliated with a Member to render or perform a service on behalf of the Company and/or (ii) contract to buy property from a Member or a Person directly or indirectly related to or affiliated with a Member, provided that (x) such related-party relationship is disclosed to the Board before the Company authorizes or enters into such transaction, and (y) the charges made for services rendered and materials furnished by such Member, Person or Persons must be reasonable and competitive with those charged by others in the same line of business and not so related. No contract or transaction between the Company and one or more of its Members, Managers or its officers, or between the Company and any other Person in which one (1) or more of its Members, Managers or its officers are managers or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the Member, Manager or officer is present at or participates in the meeting of the Board that authorizes the contract or transaction, or solely because his, her or its or their votes are counted for such purpose, if the material facts as to his, her or its relationship or interest and as to the contract or transaction are disclosed or are known to the Board, and the Board in good faith authorizes the contract or transaction by the affirmative vote of the disinterested Managers even though the disinterested Managers constitute less than a quorum.

5.5.  No Resignation.  Except pursuant to an authorized Transfer of all of his, her or its Interest in accordance with Sections 2.4, 2.5, 2.6, 2.7, 2.9 and 2.17, no Member shall have the right to resign from the Company as a Member prior to the dissolution and winding up of the Company without the prior written consent of the Board. Any Member which purports to resign from the Company in violation of the foregoing provision or which has ceased for any reason to be a Member shall be liable to the Company and the other Members for any damages sustained by reason of such resignation or cessation.

30

BP_002704

**APP 033**

5.6. <u>Officers</u>. Officers of the Company shall be elected from time to time as determined by the Board. The officers shall consist of a chief executive officer, a president, a vice president and a secretary and any such other officers as the Board may from time to time designate. Each such officer shall be elected by the Board, and shall have such authority and duties as the Board may, from time to time, delegate to such officer (subject to and in compliance with any employment contracts validly existing between the Company and any officer). Unless the Board otherwise specifies, if the title of an officer is one commonly used for officers of a business corporation formed under the Act, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with the office of such officer, subject to any specific delegation of authority and duties made to such officer by the Board pursuant to the preceding sentence. The officers of the Company shall hold office until their successors are duly elected and qualified or until their earlier death, resignation, or removal. An officer may resign at any time upon giving written notice to the Company. An officer may be removed by the Board with or without cause, but such removal shall be without prejudice to the employment agreement, contract or other legal rights, if any, of the person so removed. Election or appointment of the officers shall not of itself create contract rights. Any vacancy occurring by death, resignation, removal or otherwise shall be filled by the Board subject to the other provisions of this Agreement. The officers shall have general powers of oversight, supervision and management of the day-to-day business and affairs of the Company and shall see that all orders and resolutions of the Board are carried into effect. The officers shall have such other powers and duties as may be delegated by the Board from time to time. The officers shall be paid such compensation for their services as determined from time to time by the Board. The Company shall reimburse the officers for expenses in accordance with Section 11.12.

5.7. <u>Consent to ACET Purchase Agreement</u>. Notwithstanding anything herein to the contrary, the Members do hereby acknowledge and agree that David Hook and Anthony Ludlow were the initial Managers of the Company prior to the execution of this Agreement, and as such were and are authorized to (a) execute resolutions authorizing the ACET Purchase Agreement, the Loan Documents and any and all other documents ancillary to the transaction contemplated therein or thereby, and (b) to execute any and all such documents on behalf of the Company and its Subsidiaries and Affiliates.

## ARTICLE 6
## MEETINGS OF MEMBERS

6.1. <u>Meetings</u>.

(a) A quorum shall be present at a meeting of Members if the Members holding a Required Interest are represented at the meeting in person or by proxy. The withdrawal of any Member from the meeting or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. With respect to any matter, except as otherwise provided in this Agreement, the affirmative vote of a Required Interest represented in person or by proxy at a meeting of Members at which a quorum is present shall be the act of the Members.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof.

31

(c) Meetings of the Members may be called at any time by the Board, the Baymark Member, or one or more Members holding at least fifteen (15%) of the Interests by providing written notice thereof to all Members in accordance with Section 6.1(d). If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date the notice of that meeting is provided. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(d) Written, electronic or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) calendar days before the date of the meeting, either personally, by mail, email or confirmed facsimile, by or at the direction of the Board or Person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address provided for on Exhibit A, with postage thereon prepaid.

(e) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Board declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

6.2. Proxies. A Member may vote either in person or by proxy executed in writing by the Member. An electronic mail or similar transmission by the Member, or a facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Secretary, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Secretary of the Company (or such other Person as is designated by the Board). The Chairman shall in good faith decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the Chairman, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be with full power of substitution and shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two (2) or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority or, if only two Persons are designated as proxies, then both, of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one.

6.3. Conduct of Meetings. All meetings of the Members shall be presided over by the Chairman. The Chairman shall determine the order of business and the procedure at the meeting.

32

BP_002706

APP 035

6.4.  Action by Written Consent or Telephone Conference.

(a)  Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be delivered to all Members and signed by the holder or holders of Interests (which must include the Baymark Member) having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all Interests entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent.  A telegram, telex, cablegram, electronic mail or similar transmission by a Member, or a facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 6.4.  Notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action with five (5) Business Days from the date such action is taken.

(b)  The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Secretary.  Delivery to the Company's principal place of business shall be addressed to the Secretary's attention.

(c)  Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE 7
## INTRA-MEMBER LIABILITY, EXCULPATION AND INDEMNIFICATION

7.1.  Fiduciary Duties.  The Members hereby agree that all Managers shall owe to the Company those fiduciary duties as would be imposed on managers of a limited liability company subject to the Act.

7.2.  Liability to Company and One Another.  No Member, Manager or officer shall be liable for the debts, liabilities, contracts or any other obligation of the Company, except to the extent expressly provided herein or in the Act or as expressly provided otherwise.  No Member, Manager or officer shall be liable for the debts or liabilities of any other Member.  With respect to the Company and its business and the enterprise established by this Agreement, no Member, Manager or officer shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any act performed by it (a) within the scope of the authority conferred on it by this Agreement and in good faith, (b) based on the good faith opinion of legal counsel or other appropriate expert, or (c) otherwise made in good faith, except for acts constituting Disabling Conduct.  No Member shall be required to make any Capital Contributions, or loan the Company any funds, other than as expressly required in this Agreement.  Except as otherwise expressly provided herein, no Member shall have any priority

33

over any other Member as to the return of its Capital Contributions or as to compensation by way of income.

7.3. Exculpation. The following exculpatory provisions shall apply to this Agreement:

(a) Notwithstanding any other terms of this Agreement, whether express or implied, or any obligation or duty at law or in equity, neither a Manager, its Affiliates, nor any of their respective officers, directors, shareholders, members, partners, or employees nor any officer, employee, representative or agent of the Company and its Affiliates (each, individually, an **"Exculpated Person"** and, collectively, the **"Exculpated Persons"**) shall be liable to the Company or any Member for any act or omission (in relation to the Company, this Agreement, any related document or any transaction or investment contemplated hereby or thereby) taken or omitted in good faith by an Exculpated Person and in the reasonable belief that such act or omission is in or is not contrary to the best interest of the Company and is within the scope of authority granted to such Exculpated Person by this Agreement, provided that such act or omission does not constitute Disabling Conduct.

(b) An Exculpated Person may rely, and shall incur no liability in acting or refraining from acting in reliance, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, and may rely on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge and may rely on an opinion of counsel selected by such Exculpated Person with respect to legal matters unless such Exculpated Person acts in bad faith.

7.4. Indemnification.   The following indemnification provisions shall apply to this Agreement:

(a) To the fullest extent permitted by law, the Company (i) shall indemnify and hold harmless all Members, and all directors, officers, shareholders, members, partners, employees and Affiliates of a Member and (ii) shall indemnify all Managers, officers and employees of the Company and the Affiliates thereof (each, individually, an **"Indemnified Person"** and, collectively, the **"Indemnified Persons"**) from and against any and all losses, claims, demands, liabilities, expenses (including, without limitation, attorneys' fees and expenses), judgments, fines, penalties (including excise taxes and similar taxes and punitive damages), settlements, and other amounts arising from any and all claims, inquiries, demands, actions, suits or proceedings, civil, criminal, administrative, arbitrative or investigative or any appeal thereof (**"Proceedings"**) in which the Indemnified Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company, by reason of the fact that the Indemnified Person was serving as a manager, director, officer, partner, member, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, or which otherwise relates to or arises out of the Company, its property, its business or affairs, and in any instance is related to events occurring during the term of this Agreement.  The negative disposition of any action, suit or Proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Indemnified Person acted in a manner contrary to the

34

BP_002708

standard set forth in Section 7.4(b) below.  Any indemnification pursuant to this Section 7.4 shall be made only out of the assets of the Company.  IT IS EXPRESSLY ACKNOWLEDGED THAT THE INDEMNIFICATION PROVIDED IN THIS ARTICLE 7 COULD INVOLVE INDEMNIFICATION FOR NEGLIGENCE OR UNDER THEORIES OF STRICT LIABILITY.

(b)  An Indemnified Person shall not be entitled to indemnification under Section 7.4(a) with respect to any claim, issue or matter in which it has engaged in Disabling Conduct as determined by a court of competent jurisdiction.

(c)  To the fullest extent permitted by law, until it has been determined that the Indemnified Person is not entitled to be indemnified as authorized in Section 7.4(a), expenses (including reasonable legal fees) incurred by an Indemnified Person in defending any claim, demand, action, suit or Proceeding shall be advanced by the Company prior to the final disposition of such claim, demand, action, suit or Proceeding upon receipt by the Company of a written affirmation by the Indemnified Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 7 and a written undertaking by or on behalf of the Indemnified Person to repay such advanced amounts if it shall be determined that the Indemnified Person is not entitled to be indemnified as authorized in Section 7.4(a).  The Board may, in its sole discretion, require that any such undertaking pursuant to this Section 7.4(c) be secured by the assets of the Indemnified Person.

(d)  The indemnification provided by Section 7.4(a) shall be in addition to any other rights to which an Indemnified Person may be entitled under any agreement, by law or vote of the Members as a matter of law or otherwise, both as to action in the Indemnified Person's capacity as the Manager, an Affiliate thereof or a partner, director, officer, Member, or agent of the Company or an Affiliate thereof and, as to action in any other capacity, shall continue as to an Indemnified Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of an Indemnified Person.

(e)  The Board and the Company shall purchase and maintain insurance, to the extent and in such amounts as the Board shall, in its sole discretion, deem reasonable, on behalf of Indemnified Persons and such other Person(s) as the Board shall determine against any liability that may be asserted against or expenses that may be incurred by such Person in connection with activities of the Company or such indemnities regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.  The Company may enter into indemnity contracts with Indemnified Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 7.4 and containing such other procedures regarding indemnification as are appropriate.

(f)  In no event may any Indemnified Person subject the Members to personal liability by reason of any indemnification of an Indemnified Person under this Agreement or otherwise.

(g)  An Indemnified Person shall not be denied indemnification in whole or in part under this Section 7.4 solely because the Indemnified Person had an interest in the transaction

35

with respect to which the indemnification applies if the transaction is otherwise permitted by the terms of this Agreement.

(h) The provisions of this Section 7.4 are for the benefit of the Indemnified Persons and their heirs, successors, assigns, administrators and personal representatives and shall not be deemed to be for the benefit of any other Persons. The provisions of this Section 7.4 shall not be amended in any way that would adversely affect the Indemnified Persons without the consent of the Indemnified Persons. No amendment to or modification of this Agreement shall limit or eliminate the benefits provided to the Indemnified Persons pursuant to this Section 7.4 with respect to any act or omission which occurred prior to such amendment or modification.

(i) Notwithstanding any other provision of this Article 7, the Company may pay or reimburse expenses incurred by a Member, Manager or officer in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

(j) The Company hereby acknowledges that an Indemnified Person may have certain rights to indemnification, advancement of expenses and/or insurance provided by other sources. The Company hereby agrees (i) that it (or, to the extent applicable, its insurance provider) is the indemnitor of first resort (i.e., its obligations to an Indemnified Person are primary and any obligation of such other sources to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Indemnified Person are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by an Indemnified Person and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement without regard to any rights an Indemnified Person may have against such other sources, and (iii) irrevocably waives, relinquishes and releases such other sources from any and all claims against such other sources for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by such other sources on behalf of an Indemnified Person with respect to any claim for which such Indemnified Person has sought indemnification from the Company shall affect the foregoing, and such other sources shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Indemnified Person against the Company. Any such other sources are express third party beneficiaries of this Section 7.4(j) and, at the request of any Indemnified Person, the Company shall acknowledge its obligations under this Section 7.4(j) to any such other sources.

7.5. <u>Reliance on Agreement</u>. To the extent that, at law or in equity, an Indemnified Person acting in connection with the Company's business has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, the Managers and any other Indemnified Person shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnified Person.

36

APP 039

BP_002710

7.6. Savings Clause. If this Article 7 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person as to costs, charges and expenses (including attorneys' fees and expenses), claims, demands, liabilities, judgments, fines, penalties and amounts paid in settlement with respect to any Proceeding, to the full extent permitted by any applicable portion of this Article 7 that shall not have been invalidated and to the fullest extent permitted by applicable law.

**ARTICLE 8**
**FINANCIAL ACCOUNTING, REPORTS AND COVENANTS**

8.1. Tax Returns. The officers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company and its Subsidiaries, including making the elections described in Section 8.2 and shall cause a Schedule K-1 or any successor form to be prepared and delivered in a timely manner to the Members and no later than ninety (90) days after each year end, and, to the extent requested, copies of any filed tax returns. Each Member shall furnish to the officers all pertinent information in its possession relating to Company Operations that is necessary to enable the Company's tax returns to be prepared and filed.

8.2. Tax Elections. The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the Fiscal Year as the Company's fiscal year;

(b) to adopt an appropriate federal income tax method of accounting (which shall initially be the accrual method) and to keep the Company's books and records on such income tax method;

(c) if a distribution of Company property as described in Section 734 occurs or if a Transfer of an Interest as described in Code Section 743 occurs, on written request of any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company properties;

(d) with respect to the organization expenses of the Company and the startup expenditures of the Company, to elect to deduct such amounts to the extent permitted, and to amortize the remainder ratably over a period of 180 months as permitted by Code Sections 709(b) and 195; and

(e) any other election the Board may deem appropriate and in the best interests of the Company, except as provided herein.

If the Company elects pursuant to Code Section 754 to adjust the basis of Company properties on written request of a Member, such Member shall bear the cost of such election to the Company. Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement (including, without limitation, Section 1.8) shall be construed to sanction or approve such an election.

37

BP_002711

8.3. <u>Tax Matters Member</u>.

(a) The Baymark Member shall be the **"Tax Matters Partner"** of the Company pursuant to Code Section 6231(a)(7). In the event of an income tax audit of the Company or any judicial or administrative proceeding in connection with the income tax returns of the Company, the Tax Matters Partner shall be authorized to act for and, to the extent provided by the Code, its decision shall be binding upon, the Company and all Members.

(b) The Members acknowledge that the Bipartisan Budget Act of 2015 (the **"Bipartisan Budget Act"**) repeals the currently existing audit provisions for tax partnerships effective for taxable years beginning after December 31, 2017, and potentially makes tax partnerships liable for income taxes attributable to adjustments of partnership items of income, gain, loss, deduction or credit. The Board is authorized to address the audit provisions of the Bipartisan Budget Act as it may determine. This authority shall include the authority to amend the Agreement, to designate a "partnership representative," to make any election under the Bipartisan Budget Act provisions including requiring Members and assignees or former Members and assignees to file amended tax returns to reflect any such adjustments as provided in Code section 6225(c)(2), to elect under Code section 6226 to cause Members and assignees to take such adjustments into account on their own tax returns or, if applicable, in accordance with Code section 6221(b), to cause the Company to elect out of treatment under revised subchapter C of Chapter 63 of the Code.

8.4. <u>Valuation</u>. The valuation of the assets of the Company for the purpose of valuing distributions in kind made pursuant to Section 3.5 or Section 10.2 of this Agreement and for any other purpose shall be Fair Market Value (as set forth in Section 2.8(g)).

8.5. <u>Supervision; Inspection of Books</u>. Proper and complete books of account of the business of the Company and its Subsidiaries shall be kept under the supervision of the officers at the Principal Office. Such books shall be open to inspection by the Members, or their authorized representatives, at any reasonable time during normal business hours.

8.6. <u>Financial Statements</u>. The officers shall furnish or cause to be furnished to each of the Members:

(a) As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year of the Company, (i) a copy of the annual audit report of the Company for such Fiscal Year containing consolidated and consolidating balance sheets, statements of income, statements of members' equity, and statements of cash flows as of the end of such Fiscal Year and for the Fiscal Year then ended, in each case setting forth in comparative form the figures for the preceding Fiscal Year, all in reasonable detail and audited and certified by the Company's independent certified public accountants of recognized regional or national standing selected by the Company to the effect that such reports have been prepared in accordance with GAAP; and (ii) a comparison of the actual results during such Fiscal Year to those originally budgeted by the Company prior to the beginning of such Fiscal Year, together with a summary analysis of variances prepared by the Company's management. The annual audit report required hereby shall not be qualified or limited. The Company shall deliver copies

38

BP_002712

of all material reports and correspondence sent to the Company by its independent certified public accountants promptly upon receipt thereof;

(b) As soon as available, and in any event within thirty (30) days after the end of each calendar month, (i) a copy of an unaudited financial report of the Company as of the end of such calendar month and for the portion of the Fiscal Year then ended, containing a consolidated and consolidating balance sheet, statement of income, and statement of cash flows for the Company setting forth the figures for the corresponding period of the preceding Fiscal Year, together with a comparison of the actual results during such period to those originally budgeted by the Company for such period;

(c) On or before thirty (30) days prior to the beginning of each Fiscal Year, an annual budget and/or business plan for such Fiscal Year on a monthly basis, including projected consolidated and consolidating balance sheets, income statements, and cash flow statements for each month of such Fiscal Year, and, at the beginning of each quarter, all revisions thereto approved by the Board; and

(d) The provisions of paragraphs (a), (b), and (c) of this Section 8.6 shall terminate at the time the Company becomes subject to the reporting provisions of the Securities Exchange Act of 1934, as amended.

8.7. Withholding. Notwithstanding any provision in this Agreement to the contrary, the Company may withhold from any distribution or amount due to a Member any amounts required to be withheld pursuant to any applicable federal, state, or local tax requirements, with such withheld amount treated as if it was distributed to such Member. The determination of the Company as to the necessity of such withholding shall be binding upon the Members.

8.8. Dependency. The Members understand that the Company may be dependent upon third parties to provide timely and accurate information in connection with the preparation of financial, tax, and other reports or information concerning the Company, and that (as a result of matters outside its control) the Company may be unable to deliver reports and information within the respective time periods required by this Article. In these circumstances, the Company shall use commercially reasonable efforts to provide the required reports or information as soon as reasonably practicable after the specified period, but shall not be deemed to breach Article as a result of such delivery delays.

## ARTICLE 9
## REORGANIZATIONS; MERGERS AND CONSOLIDATIONS

9.1. Reorganizations. In the event the Board decides to convert the Company into a corporation or consummate a reorganization in connection with an initial public offering, the Board shall take all necessary actions to convert the Company (on a substantially tax-free basis, to the extent reasonably possible, to all Members) into a corporation organized under the laws of the State of Texas or consummate a reorganization, as applicable, which conversion or reorganization shall be effected by merger or by such other form of transaction as may be available under applicable law. In such conversion or reorganization, the Interests of the Members shall be exchanged, *pro rata* and without dilution, for equity interests in the new entity

39

BP_002713

with a value equal to the amount that would be distributed with respect to such Interests if the Company's assets were distributed in liquidation of the Company at Fair Market Value in accordance with Article 10. Any equity interests in the new entity shall possess, to the extent reasonably possible, characteristics no less favorable (in terms of preferences and other rights, including, but not limited to, the Seller Member receiving voting shares) than the characteristics of such Member's Interests immediately prior to such exchange. To the extent required by law, any Member shall be entitled to receive non-voting equity securities upon terms that, with respect to such non-voting nature, are acceptable to such Member or that such Member will not violate any regulatory restrictions applicable to such Member's ownership or control over the equity securities. In such event, the Members shall as soon as practicable thereafter execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, all instruments and documents that may be reasonably requested by the Board to (i) best effectuate the conversion of the Company to a corporation and (ii) keep in full force and effect, to the extent consistent with such conversion, the terms, provisions and conditions of this Agreement. It is the intent of the Members that the conversion of the Company into corporate form and the conversion or reorganization of any of the Company's operating divisions, whether currently existing or existing in the future, into corporate form are part of the Members' investment decision with respect to the Interests of the Members.

9.2. <u>Mergers and Consolidations</u>. In the event of a merger or consolidation of the Company pursuant to which the Company is not the surviving entity, any consideration provided to the Members in connection with such merger or consolidation shall be allocated or distributed, as appropriate, in accordance with Section 10.2.

**ARTICLE 10**
**DISSOLUTION, LIQUIDATION AND TERMINATION**

10.1. <u>Dissolution</u>. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(a) the determination of the Board;

(b) the occurrence of an event specified under the Act as one effecting dissolution;

(c) entry of a decree of judicial dissolution of the Company under the Act; and

(d) the sale of all or substantially all of the assets of the Company.

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

10.2. <u>Liquidation and Termination</u>. Upon dissolution of the Company, the Board shall act as liquidator or may appoint one or more individual Managers thereof to act as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to manage the Company

40

BP_002714

with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall apply the assets of the Company remaining after payment of the costs and expenses of winding up in the following priority:

(i) first, to the creditors of the Company all amounts due them from the Company in the order of priority established by law; and

(ii) thereafter, to the Members in accordance with the distribution priorities set forth in Section 4.1 hereof.

Notwithstanding the foregoing, distributions to the Members pursuant to this Section 10.2(b) shall properly take into account (and increase or decrease each Member's distributions pursuant to this Section 10.2(b) accordingly) any Tax Distributions previously made to any Member pursuant to Section 4.2 which have not previously reduced subsequent distributions to such Member (consistent with Section 4.2).  Any distributions of property that are not in immediately available funds shall be made a part of any distribution at its Fair Market Value, and such property shall be distributed in proportion to what such Person would receive upon this liquidation.

10.3.  Reserves.  The liquidator shall set up reserves as it deems reasonably necessary or appropriate for any contingent or unforeseen liabilities or obligations of the Company.  Said reserves may be paid over by the Members to a bank or an attorney-at-law, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the liquidator may deem advisable, such reserves shall be paid or distributed to the Members or their assigns in the order of priority provided for distributions pursuant to Section 10.2 hereof.

10.4.  Certificate of Termination.  On completion of the distribution of Company assets as provided herein (and the establishment of reserves pursuant to Section 10.3, if any), the Company is wound up, and the officers (or such other Person or Persons as the Act may require or permit) shall file a Certificate of Termination with the Secretary of State of the State of Texas, cancel any other filings made pursuant to Section 1.6, and take such other actions as may be necessary to terminate the Company.

10.5.  Compliance with Treasury Regulations.  It is the intent of the Members that the allocations and capital account maintenance provisions provided in this Agreement result in distributions required pursuant to Section 10.2(b)(ii) being in accordance with positive Capital Accounts as provided for in the Treasury Regulations under Code Section 704(b) (**"Target Capital Account Distribution Parity"**).  However, if after giving hypothetical effect to the allocations required by Article 4, the Capital Accounts of the Members are in such ratios or

41

balances such that Target Capital Account Distribution Parity is not fully achieved at the time that distributions are made pursuant to Section 10.2(b)(ii), such failure to fully achieve Target Capital Account Distribution Parity shall not affect or alter the distributions required by Section 10.2(b)(ii). Rather, the liquidator will have the power and authority to (i) cause other allocations of Gross Income, Net Profit and Net Loss (or items thereof) for the Fiscal Year that distributions are made pursuant to Section 10.2(b)(ii) to be made among the Members so as to achieve Target Capital Account Distribution Parity as closely as possible, and (ii) if Target Capital Account Distribution Parity has not been fully achieved pursuant to the application of clause (i), cause Gross Income, Net Profit and Net Loss (or items thereof) for all prior Fiscal Years for which U.S. federal income tax returns can be amended by the Company and all affected Members to be made among the Members so as to achieve Target Capital Account Distribution Parity as closely as possible.

## ARTICLE 11
## GENERAL PROVISIONS

11.1. Offset. Whenever the Company is to pay any sum to any Member pursuant to this Agreement, any amounts that such Member owes the Company may be deducted from that sum before payment; provided that ten (10) days' prior written notice of such application is given to the Member in question.

11.2. Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier or by facsimile transmission or electronic mail; and a notice, request or consent given under this Agreement is effective upon receipt by the Person to receive it. Receipt is deemed to occur three (3) days after deposit with the U.S. Postal Service consistent with this Section 11.2, affidavit or confirmation of delivery by a recognized national or international delivery service to such Member's notice address, or confirmation of fax or email. All notices, requests and consents to be sent to a Member must be sent to the address given for that Member on Exhibit A attached hereto, or such other address as that Member may specify by notice to the Company and the other Members in accordance with this Section 11.2. All notices, requests and consents to be sent to the Company must be sent to the Company's Principal Office address (set forth below). A copy of any notice, request, or consent sent to the Company must be given to each Member. Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. For the purposes of this Agreement:

The address for the Company is:        Baymark ACET Holdco, LLC
                                        Granite Park II
                                        5700 Granite Parkway, Suite 435
                                        Plano, Texas 75024
                                        Attention: Anthony Ludlow and/or David Hook

BP_002716

with a copy to:                     Hallett & Perrin, P.C.
                                    1445 Ross Avenue, Suite 2400
                                    Dallas, TX 75202
                                    Attention:  Gordon T. Foote II
                                    Telecopy No.:  214/922-4142

   The address for each Member shall be as set forth on <u>Exhibit A</u> attached hereto.

   11.3.  <u>Entire Agreement</u>.  This Agreement and the Ancillary Agreements constitute the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

   11.4.  <u>Effect of Waiver or Consent</u>.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any other Person or to declare any other Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

   11.5.  <u>Amendment or Modification</u>.

    (a)  Except for such amendments as result from the operation of the various provisions of this Agreement (including, without limitation, Section 3.8), this Agreement may be amended only by a written instrument signed by a Required Interest, which shall include the Seller Member.

    (b)  Notwithstanding Section 11.5(a) and 11.5(c), except as expressly provided otherwise in this Agreement, no amendment of this Agreement may modify the method of allocation of Net Profit or Net Loss, method of distributing Available Cash, Net Proceeds of a Capital Transaction or liquidation proceeds, modify any management rights, responsibilities or liabilities of the Board or any Manager, modify the method of determining the Board, modify the method of determining the Capital Accounts of any Member, reduce the requisite ownership interest of Members required to take action as specified in this Agreement, change the name of the Company to include the name of any of the Members, change the restrictions contained in Section 11.5(a) or this Section 11.5(b), or otherwise modify any provision herein that would adversely affect the rights or obligations of any Member or Members without proportionately affecting all the Members, unless each Member whose rights are so affected thereby has expressly consented in writing to such amendment.

    (c)  Subject to Section 11.5(b), the Board may make ministerial changes in this Agreement for the purpose of correcting errors and inconsistencies, to comply with federal, state and local rules, regulations and laws, to reflect the admission of new Members pursuant to Section 3.8 and otherwise to reflect amendments resulting from the operation of the various provisions of this Agreement, provided that the liability of the Members for Company debts shall

BP_002717

not be increased by such amendment nor shall the right of the Members to Company allocations or distributions be adversely affected thereby.

11.6. <u>Binding Effect</u>.  Subject to the restrictions on Transfer set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

11.7. <u>Governing Law; Severability</u>.  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Act or to the extent other statutes are incorporated into the Act, the applicable provision of the Certificate, the Act or other statute incorporated into the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

11.8. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

11.9. <u>Waiver of Certain Rights</u>.  Except as provided in Section 10.1, each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

11.10. <u>Notice to Members of Provisions of This Agreement</u>.  By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the Transfer of Interests set forth in Article 2 and (b) all of the provisions of the Certificate.

11.11. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

11.12. <u>Operating Expenses and Reimbursements</u>.  The Company shall bear (or reimburse the Members, Managers and officers, as applicable, for their payment of) all costs and expenses of every kind and description reasonably incurred in connection with the operation, liquidation and dissolution of the Company, including, but not limited to, travel expenses, fees of consultants, accountants, and attorneys, fees and expenses of the preparation of quarterly unaudited financial statements, the annual audit, if any, and tax returns of the Company, interest on indebtedness of the Company, and fees and expenses incurred in any litigation by or against the Company.

44

BP_002718

11.13. <u>Other Activities of Members</u>.   Except as otherwise expressly provided in this Agreement or in any agreement between or among any Member(s) and the Company or any of its Subsidiaries, each Member and its Affiliates may engage in and possess interests in other business ventures and investment opportunities.   Neither the Company nor any other Member shall have any rights in or to such ventures or opportunities or the income or profits therefrom by reason of this Agreement.   The Company renounces, to the fullest extent permitted by law, any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any Excluded Opportunity.   An **"Excluded Opportunity"** is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of the Baymark Member, any Baymark Manager or any of their Affiliates.

**ARTICLE 12**
**DEFINITIONS**

12.1.  <u>Definitions</u>.   As used in this Agreement, the following terms have the following meanings:

**"Acceptance Notice"** has the meaning given that term in Section 2.8(c).

**"ACET Purchase Agreement"** means that certain Asset Purchase Agreement entered into by and among Sellers, the Target, and the other parties thereto, on or about the date of this Agreement, for the purchase of all or substantially all of the assets of Sellers.

**"Act"** means the Texas Business Organizations Code and any successor statute, as amended from time to time.

**"Additional Equity Interests"** means, collectively, (a) Interests or other equity interests in the Company or any Subsidiary, (b) obligations, evidence of indebtedness or other securities convertible or exchangeable into Interests or other equity interests in the Company or any Subsidiary and (c) warrants, options or other convertible or exchangeable securities or other rights to purchase or otherwise acquire, in each case with or without consideration, Interests or other equity interests in the Company or any Subsidiary (d) debt securities issued by the Company or any Subsidiary, or (e) other interests in the Company.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(a)  credit to such Capital Account any amounts that such Member (i) is obligated to restore to the Company upon liquidation of his Interest in the Company (or which is so treated pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c)) pursuant to the terms of this Agreement or under state law, or (ii) is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (iii) the Member's share (as determined under Code Section 752) of any recourse indebtedness of the Company to the extent that such indebtedness could not be repaid out of the Company's assets if all of the Company's assets were sold at their respective Book Values as of the end of the Fiscal Year or other period and the proceeds from the sales were used to pay the Company's liabilities; and

45

(b) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith. For purposes of clause (a)(iii) above, the amounts computed pursuant to clause (a)(i) above for each Member shall be considered to be proceeds from the sale of the assets of the Company to the extent such amounts would be available to satisfy (directly or indirectly) the indebtedness specified in clause (a)(iii).

**"Affiliate"** means with respect to any Person: (a) a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Person in question; or (b) any Person who is (or is directly or indirectly through one or more intermediaries controlled by) a spouse, ancestor, descendant or sibling, or a trust created for the primary benefit of such Person, spouse, ancestor, descendant or sibling; or (c) any Person's members, managers, partners or shareholders. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or interests, by contract, or otherwise (but, for purposes of clarification, shall not include any individual who is employed by, or providing consulting services to, such Person).

**"Agreement"** has the meaning given that term in the introductory paragraph of this Agreement.

**"Ancillary Agreements"** means the ACET Purchase Agreement, the Loan Documents, and the ancillary documents executed and delivered in connection therewith.

**"Available Cash"** means all cash funds from Company Operations on hand or on deposit from time to time after (i) payment of all operating expenses payable as of the date in question, (ii) provision for payment of all outstanding and unpaid Company obligations due and payable as of the date in question or within sixty (60) days thereafter, and (iii) the establishment of such reasonable reserves as the Board deems appropriate for the operating needs of the Company. Available Cash shall not include or reflect any proceeds received or expenses incurred in connection with a Capital Transaction.

**"Award Agreement"** means a written agreement between the Company and a recipient of Incentive Interests, Option Interests or Incentive Options documenting an award thereof and pursuant to which the recipient agrees to the terms and conditions of this Agreement, the Equity Incentive Plan, and such other terms and conditions as the Board may prescribe.

**"Baymark"** has the meaning given that term in Section 2.17(a).

**"Baymark Management Agreement"** means that certain Management Agreement, dated as of the date hereof, by and between the Company and the Management Company.

**"Baymark Managers"** has the meaning given that term in Section 5.1(c)(i).

46

APP 049

BP_002720

"**Baymark Member**" shall mean Baymark ACET Direct Invest, LLC, a Texas limited liability company.

"**Bipartisan Budget Act**" has the meaning given to that term in Section 8.3(b).

"**Board**" shall mean the Board of Managers of the Company as established and operated pursuant to Section 5.1 and in accordance with this Agreement.

"**Book Value**" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Book Value of any asset contributed by a Member to the Company shall be the asset's gross fair market value at the time of the contribution;

(b)     The Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board in its reasonable judgment:

(i)     if an adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company as of (a) the acquisition of an additional Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution or as consideration for the performance of services on behalf of the Company, or (b) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an Interest in the Company;

(ii)     as of the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(iii)     whenever else allowed under Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or Proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(s).

(c)     The Book Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution; and

(d)     The Book Values of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), provided that Book Values will not be adjusted hereunder to the extent that the Board determines that an adjustment under clause (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this clause (d).

After the Book Value of any asset has been adjusted under clause (a), clause (b) or clause (d) above, Book Value will be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Net Profit and Net Loss.

"**Business**" means the business of a multi-national wholesale and direct sale company (business-to-consumer and business-to-business) providing sales and sales services (including

BP_002721

without limitation via the Internet and other media broadcast outlets), which includes but is not limited to purchasing, testing, marketing, logistics and fulfillment of products worldwide.

"**Business Day**" means any day other than a Saturday, Sunday or holiday on which national banking associations in the State of Texas are required or permitted by law to be closed.

"**Baymark**" has the meaning given that term in Section 2.17(a).

"**Call Closing**" has the meaning given that term in Section 2.17(b).

"**Call Interests**" has the meaning given that term in Section 2.17(a).

"**Call Notice**" has the meaning given that term in Section 2.17(a).

"**Capital Account**" means the capital account of a Member established and maintained in accordance with Section 3.4.

"**Capital Contribution**" means, with respect to any Member, the amount of money actually contributed (or deemed contributed pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(c)) to the Company and the initial Book Value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by that Member (net of any liabilities secured by such property that the Company is considered to assume or to take subject to under Code Section 752). Any reference in this Agreement to the Capital Contribution of a Member will include a Capital Contribution made by any prior Member with respect to the Interest of the Member.

"**Capital Transaction**" means the sale, exchange or other disposition of all or any portion of the property of the Company or its Subsidiaries other than in the ordinary course of business of the Company and its Subsidiaries. Capital Transactions include the financing or refinancing of property of the Company or its Subsidiaries that creates excess funds not needed for Company Operations and which funds are determined by action of the Board to be available for distribution to the Members.

"**Certificate**" has the meaning given that term in Section 1.1.

"**Chairman**" has the meaning given that term in Section 5.1(e).

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Common Interests**" means those Interests designated as such on <u>Exhibit A</u>. The Common Interests represent a membership interest in the Company that entitles the holders thereof to the rights, and subjects the holders thereof to the obligations, attributable to Common Interests as set forth in this Agreement.

"**Common Member**" means a Member holding a Common Interest in its capacity as such.

48

BP_002722

"**Company**" has the meaning given that term in the preamble.

"**Company Minimum Gain**" means the amount computed under Treasury Regulations Section 1.704-2(d)(1) with respect to the Company's Nonrecourse Liabilities.

"**Company Operations**" means all operations and activities of the Company and its Subsidiaries other than those related to or consisting of a Capital Transaction.

"**Compelled Sale**" has the meaning given that term in Section 2.7(a)(i).

"**Compelled Sale Interests**" has the meaning given that term in Section 2.7(a)(ii).

"**Compelled Sale Notice**" has the meaning given that term in Section 2.7(c).

"**Compelled Sale Terms**" has the meaning given that term in Section 2.7(c).

"**Control**," "**Controlled**," and "**Controlling**" mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Securities, by contract or otherwise.

"**Depreciation**" means for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the year or other period, except that (i) with respect to any asset the Book Value of which differs from its adjusted basis for federal income tax purposes and with respect to which the "remedial method" under Treasury Regulations Section 1.704-3(d) is used to eliminate such difference, Depreciation for such taxable year or other period shall be the amount of book basis recovered for such taxable year or other period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), and (ii) if the Book Value of any other asset differs from its adjusted basis for federal income tax purposes at the beginning of the year or other period, Depreciation will be an amount that bears the same ratio to the beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for the year or other period bears to the beginning adjusted tax basis, provided that if the federal income tax depreciation, amortization, or other cost recovery deduction for the year or other period is zero, Depreciation will be determined with reference to the beginning Book Value using any reasonable method selected by the Board.

"**Designated Manager**" has the meaning given that term in Section 5.1(c).

"**Disabling Conduct**" shall mean conduct that constitutes fraud, willful misconduct, bad faith or gross negligence or conduct that is knowingly outside the scope of conduct permitted in this Agreement or is a known violation of applicable laws.

"**Distribution Limitation**" has the meaning given that term in Section 4.1.

"**Drag-Along Value**" means, with respect to a Member's Interest, the amount that such Member would receive upon a deemed liquidation of the Company if all of the assets of the Company were sold for an imputed amount that, upon such liquidation, would generate

49

BP_002723

distributions pursuant to Section 10.2 to the Initiating Members based upon the price offered pursuant to Section 2.7 (grossed up to reflect a deemed purchase of 100% of the Interests).

"**Effective Date**" has the meaning given that term in the introductory paragraph of this Agreement.

"**Employee Member**" means a Member or an Affiliate of a Member who is an employee of the Company or any Subsidiary of the Company.

"**Equity Incentive Plan**" means the Equity Incentive Plan of the Company as may be adopted by the Board and as amended from time to time by the Board.

"**Excess Distributions**" has the meaning given that term in Section 3.14.

"**Excluded Opportunity**" has the meaning given that term in Section 11.13.

"**Exculpated Person**" has the meaning given that term in Section 7.3(a).

"**Fair Market Value**" has the meaning given that term in Section 2.8(g).

"**Fiscal Year**" means the period commencing on January 1 of each year and ending on December 31 of such year.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**Gross Income**" means for each Fiscal Year or other period, an amount equal to the Company's gross income as determined for federal income tax purposes for such Fiscal Year or period but computed with the adjustments specified in clauses (a) and (c) of the definition of Net Profit and Net Loss.

"**Incentive Interests**" has the meaning given that term in Section 2.10(b).

"**Incentive Options**" has the meaning given that term in Section 2.10(b).

"**Incremental Value Amount**" has the meaning given that term in Section 4.1.

"**Indemnified Person**" has the meaning given that term in Section 7.4(a).

"**Initiating Members**" has the meaning given that term in Section 2.7.

"**Interest**" or "**Interests**" refers to the membership interest(s) in the Company held by the Preferred Members and the Common Members, including the Common Interests (which includes Incentive Interests and Option Interests) and Preferred Interests.

"**Involuntary Transfer**" has the meaning given that term in Section 2.8(a).

"**Involuntary Transfer Notice**" has the meaning given that term in Section 2.8(b).

50

**"Lender"** means Super G Capital, LLC, a Delaware limited liability company, and its successors and assigns.

**"Loan"** means the loan made by the Lender to the Target in the original principal amount of up to $1,000,000.00 pursuant to the Loan Documents.

**"Loan Documents"** means, collectively, (i) that certain Business Loan and Security Agreement entered into on or about Effective Date by the Target and the Lender (the **"Loan Agreement"**), and the related notes, guaranties, security agreements, subordination agreements and the other documents, instruments or agreements executed in connection with the Loan Agreement, and (ii) any and all ancillary and collateral documents executed in connection therewith, including any refinancings, amendments, restatements, renewals and modifications thereto..

**"Majority of the Common Members"** means the Common Members who in the aggregate collectively hold a majority of the Sharing Percentages held by all Common Members.

**"Management Company"** has the meaning given that term in Section 5.3.

**"Management Fee"** has the meaning given that term in Section 5.3.

**"Manager"** means, initially, any Person named in the Certificate as an initial manager of the Company and, from and after the date hereof, any Person hereafter designated as a member of the Board, but does not include any Person who has ceased to be a member of the Board. The term "Manager" shall for all purposes have the same meaning as the term "manager" under the Act.

**"Member"** has the meaning given that term in Section 2.1.

**"Member Nonrecourse Debt"** means any Nonrecourse Liability of the Company for which any Member or related Person bears the economic risk of loss under Treasury Regulations Section 1.752-2.

**"Member Nonrecourse Debt Minimum Gain"** means the minimum gain attributable to Member Nonrecourse Debt as determined under Treasury Regulations Section 1.704-2(i)(3).

**"Member Nonrecourse Deductions"** means Company losses, deductions or Code Section 705(a)(2)(B) expenditures attributable to a particular Member Nonrecourse Debt. The amount of Member Nonrecourse Deductions for any Fiscal Year or other period shall be determined in accordance with the provisions of Treasury Regulations Section 1.704-2(i)(2).

**"Member Representative"** has the meaning given that term in Section 2.7(a)(vi).

**"Net Proceeds of a Capital Transaction"** means the gross proceeds received by the Company in connection with a Capital Transaction less (i) all costs and expenses incurred by the Company in connection with such Capital Transaction, including, without limitation, brokers' commissions, loan fees or other closing costs, (ii) the cost of any alteration, improvement, restoration or repair of Company assets necessitated by or incurred in connection with such

51

BP_002725

Capital Transaction, (iii) any reserves that the Board determines in good faith should be established by reason of such Capital Transaction, and (iv) the payment of any loans owed by the Company or its Subsidiaries to any of the Members related to the subject matter of such Capital Transaction, plus any other loans that should be appropriately paid in connection with such Capital Transaction, as determined by the Board in its reasonable discretion.

**"Net Profit"** and **"Net Loss"** means for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profit or Net Loss shall be subtracted from such taxable income or loss;

(c) gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property notwithstanding that the Book Value of such asset differs from its adjusted tax basis;

(d) gain or loss resulting from any adjustment pursuant to clause (b) of the definition of Book Value shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit or Net Loss hereunder;

(e) gain or loss resulting from any adjustment attributable to an in-kind distribution of assets to any Member pursuant to Section 3.5 shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit or Net Loss hereunder;

(f) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period as determined under Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3); and

(g) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to this Agreement shall not be taken into account in computing Net Profit and Net Loss.

**"Nonrecourse Deductions"** means losses, deductions or Code Section 705(a)(2)(B) expenditures attributable to Nonrecourse Liabilities of the Company. The amount of Nonrecourse Deductions for any Fiscal Year or other period shall be determined in accordance with the provisions of Treasury Regulations Section 1.704-2(c).

52

"**Nonrecourse Liability**" means a nonrecourse liability as defined in Treasury Regulations Section 1.752-1(a)(2).

"**NonVoting Observer**" has the meaning given that term in Section 5.1(j).

"**Notice Period**" has the meaning given that term in Section 2.8(c).

"**Offered Interests**" has the meaning given that term in Section 2.8(b).

"**Option Interests**" has the meaning given that term in Section 2.10(b).

"**Optionor**" has the meaning given that term in Section 2.5(e).

"**Other Members**" has the meaning given that term in Section 2.5(a).

"**Outside Manager**" means any Manager that is (i) not a Designated Manager and (ii) elected to the Board by a Required Interest.

"**Partially Adjusted Capital Accounts**" means, with respect to any Member for any Fiscal Year, the Capital Account of such Member at the beginning of such year, adjusted for all Capital Contributions and distributions during such year and all special allocations pursuant to Sections 4.6 through 4.15 with respect to such year before giving effect to any allocations of Net Profits or Net Loss pursuant to Section 4.5.

"**Permissible Transferee**" has the meaning given that term in Section 2.4(c)(ii)(A).

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint venture, estate, trust, unincorporated association, or other entity or organization and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pre-emptive Value**" means, with respect to a Member's Interests, the amount that such Member would receive upon a deemed liquidation of the Company if all of the assets of the Company were sold for the fair market value of the assets as reasonably determined by the Board and the net proceeds distributed to the Members pursuant to Section 10.2.

"**Preferred Interest**" means an Interest designated as such on Exhibit A. The Preferred Interest represents a membership interest in the Company that entitles the holders thereof to the rights, and subjects the holders thereof to the obligations, attributable to Preferred Interests as set forth in this Agreement.

"**Preferred Member**" means a Member holding a Preferred Interest in its capacity as such.

"**Preferred Return**" means, with respect to Preferred Interests, an amount equal to an annual return of ten percent (10%), compounded annually, on the daily outstanding amount of the Unreturned Capital Contribution Account with respect to such Preferred Interests calculated from the date of the Capital Contribution with respect to such Preferred Interests.

BP_002727

**APP 056**

**"Principal Office"** has the meaning given that term in Section 1.4.

**"Proceedings"** has the meaning given that term in Section 7.4(a).

**"Pro Rata Share"** has the meaning given that term in Section 2.7.

**"Proposed Sale"** has the meaning given that term in Section 2.7(b).

**"Reoffered ROFR Interests"** has the meaning given that term in Section 2.5(d).

**"Required Interest"** means one or more Members holding Interests (other than Incentive Interests or Option Interests) representing more than fifty percent (50%) of the Sharing Percentages, and including the consent of the Baymark Member.

**"ROFR Interests"** has the meaning given that term in Section 2.5(a).

**"ROFR Value"** means, with respect to a Member's Interests, the amount that such Member would receive upon a deemed liquidation of the Company if all of the assets of the Company were sold for an amount that, upon such liquidation, would generate distributions pursuant to Section 10.2 to the Selling Member which equal the Transfer Price.

**"Safe Harbor Election"** has the meaning given that term in Section 3.8(c).

**"Sale of the Company"** has the meaning given that term in Section 2.7(e).

**"Sale Notice"** has the meaning given that term in Section 2.11(b).

**"Sale of Interests"** has the meaning given that term in Section 2.7(e).

**"Securities"** means securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, evidences of indebtedness and other business interests of every type, including interests in any partnership or limited liability company.

**"Securities Act"** means the Securities Act of 1933, as amended.

**"Seller Member"** means Mr. Tomer Damti, a citizen of Israel and resident of the State of Texas.

**"Seller Member Manager"** has the meaning given that term in Section 5.1(c).

**"Sellers"** has the meaning given that term in the Recitals to this Agreement.

**"Selling Member"** has the meaning given that term in Sections 2.5 and 2.6(a), as applicable.

**"Selling Member's Portion"** means the Tag-Along Value of the Selling Member's Interests relative to the aggregate Tag-Along Value of all Members' Interests.

BP_002728

"**Sharing Percentage**" means, with respect to any Member, the applicable Sharing Percentage opposite such Member's name on the attached Exhibit A, as such Sharing Percentages may be amended from time to time.

"**Strike Price**" has the meaning given that term in Section 2.17(a).

"**Subsidiary**" means, with respect to any Person, any entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association, or other entity (other than a corporation), a majority of membership, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other entity gains or losses or shall be a manager, managing member, managing director or general partner of, or shall otherwise control the activities of, such limited liability company, partnership, association, or other entity. For avoidance of doubt, the Target is a Subsidiary of the Company. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"**Tag-Along Failure**" has the meaning given that term in Section 2.6(d).

"**Tag-Along Interests**" has the meaning given that term in Section 2.6(a).

"**Tag-Along Notice**" has the meaning given that term in Section 2.6(a).

"**Tag-Along Notice Period**" has the meaning given that term in Section 2.6(b).

"**Tag-Along Portion**" has the meaning given that term in Section 2.6(a).

"**Tag-Along Price**" has the meaning given that term in Section 2.6(a).

"**Tag-Along Sale**" has the meaning given that term in Section 2.6(a).

"**Tag-Along Value**" means, with respect to each Member's Interests, the amount that such Member would receive upon a deemed liquidation of the Company if all of the assets of the Company were sold for an imputed amount that, upon such liquidation, would cause the Selling Member to have an ending Capital Account, for purposes of Section 10.2, equal to the Tag-Along Price.

"**Tag Member**" has the meaning given that term in Section 2.6(a).

"**Target**" means ACET Global, LLC, a Texas limited liability company and wholly-owned Subsidiary of the Company.

55

BP_002729

**"Target Capital Account Distribution Parity"** has the meaning given that term in Section 10.5.

**"Targeted Accounts"** means, with respect to any Member for any Fiscal Year, (A) an amount equal to the hypothetical distribution such Member would receive if: (i) all Company assets, including cash, were sold for cash at an aggregate price equal to their Book Value (taking into account any adjustments to Book Value), (ii) all liabilities allocable to such assets were then satisfied according to their terms (limited, with respect to each Nonrecourse Liability, to the Book Value of the assets securing such liability), and (iii) all such proceeds from the disposition were distributed pursuant to Section 4.1, reduced by (B) such Member's share of Member Nonrecourse Debt Minimum Gain and Company Minimum Gain immediately prior to such sale.

**"Tax Distributions"** has the meaning given that term in Section 4.2.

**"Tax Matters Partner"** has the meaning given that term in Section 8.3.

**"Transfer"** means a sale, assignment, transfer, pledge, mortgage, grant of a security interest in, encumbrance, exchange, gift or other disposition.

**"Transfer Notice"** has the meaning given that term in Section 2.5(a).

**"Transfer Price"** has the meaning given that term in Section 2.5(a).

**"Treasury Regulations"** means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**"Unreturned Capital Contribution Account"** means, with respect to a Member, an account that shall be maintained with respect to such Member, the balance of which shall equal the aggregate Capital Contributions made by such Member with respect to the Member's Interest, less any distributions with respect to such Interest pursuant to Section 4.1(b), from and after the date of grant of such Interests.

12.2. <u>Construction</u>.  Whenever the context requires as to the construction of words used herein, the singular shall include the plural, and vice versa, and the masculine gender shall include the feminine and neuter genders, and vice versa.  Unless the context clearly indicates otherwise, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits are to exhibits attached hereto, each of which is made a part hereof for all purposes.

*[Signature pages follow]*

56

**SIGNATURE PAGE**

**MEMBERS:**

**BAYMARK ACET DIRECT INVEST,
LLC**

By: _____
Name:  David J. Hook
Title:    Manager


By: _____
     Tomer Damti, Individually

57

BP_002731

**APP 060**

**SIGNATURE PAGE**

**MEMBERS:**

**BAYMARK ACET DIRECT INVEST, LLC**

By: _____
Name:  David J. Hook
Title:   Manager

By: _____
        Tomer Damti, Individually

57

BP_002732

**APP 061**

EXHIBIT A
**Members, Capital Contributions, Interests**

| NAME | CAPITAL CONTRIBUTION | INITIAL CAPITAL ACCOUNT BALANCE | TYPE OF INTEREST | SHARING PERCENTAGE |
|---|---|---|---|---|
| **Baymark ACET Direct Invest, LLC**<br><br>Granite Park II<br>5700 Granite Parkway<br>Suite 435<br>Plano, TX 75024 | $400,000 | $400,000 | Preferred | 75.00% |
| **Mr. Tomer Damti**<br><br>1501 10th Street, Suite 100<br>Plano, Texas 75074 | $0.00 | $0.00 | Common | 25.00% |
| **TOTALS** | **$400,000** | **$400,000** | ------ | **100%** |

58

**APP 062**

**EXHIBIT B**

**FORM OF CONSENT OF SPOUSE**

The undersigned spouse hereby acknowledges and consents to the provisions of this Agreement, and further, acknowledges that any interest in the Company that he or she may have or may hereafter acquire shall be subject to all of the terms and provisions of this Agreement. Each undersigned spouse has executed this Consent of Spouse in order to bind any community property interest that he or she may have in the interest in the Company held by the Members and acknowledges that under no circumstances shall this Consent be construed as creating or evidencing any such community property interest.

Member: _TOMER DAVI_

Name: _TOMER DAVI_  7/20/17

Spouse: _____

Name: _OANA DAVI_

Date: _07/20/17_

BP_002734

FILED
5/21/2021 4:40 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Dorothy Strogen DEPUTY

# HALLETT&PERRIN

EDWARD P. PERRIN, JR.
Shareholder
D 214.922.4132 F 214.922.4142
eperrin@hallettperrin.com

March 21, 2021

*__Via E-Filing__*

Honorable Kristina Williams
192nd Civil District Court
George L. Allen, Sr. Courts Building
600 Commerce Street, 7th Floor New Tower
Dallas, Texas 75202

**STATUS REPORT**

Re:    Cause No. DC-18-04365; *Tomer Damti v. ACET Global, LLC;*
192nd Judicial District, Dallas County, Texas

Dear Judge Williams:

Purusant to the Court's May 17, 2021 Order ("Order"), counsel for Plaintiff and Defendant submit this status report letter.

The parties have informed their clients and other witnesses of the new trial date, and of the fact that no further continuances will be granted.

As directed by the Court's Order, the parties have contacted the Mediator appointed by the Court regarding scheduling mediation by July 9, 2021. The parties's counsel will confer as to any dates provided and work with the mediator to schedule mediation.

The Parties believes this matter is ready for trial.

Yours truly,

Jason B. Freeman               Edward P. Perrin, Jr.

EPP:vh

**EXHIBIT**

# A-2

1445 ROSS AVE., SUITE 2400 | DALLAS, TEXAS 75202
HALLETTPERRIN.COM

cc:
Jason B. Freeman                                  Via E-Filing
Matthew L. Roberts
Ryan C. Dean
Zach Montgomery
FREEMAN LAW, PLLC
7011 Main Street
Frisco, Texas 75034
Jason@freemanlaw-pllc.com

Ms. Veronica Vaughn                               Via E-mail
Court Coordinator
192nd Judicial District Court, Dallas Count
Veronica.Vaughn@dallascounty.org

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Veronica Jamaica on behalf of Edward Perrin
Bar No. 15796700
vjamaica@hallettperrin.com
Envelope ID: 53706808
Status as of 5/25/2021 11:29 AM CST

Associated Case Party: TOMER DAMTI

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Freeman | | jason@freemanlaw-pllc.com | 5/21/2021 4:40:20 PM | SENT |
| Edward Corts | | ecorts@freemanlaw-pllc.com | 5/21/2021 4:40:20 PM | SENT |
| Matthew L.Roberts | | Mroberts@freemanlaw.com | 5/21/2021 4:40:20 PM | SENT |
| Ryan C. Dean | | RDean@freemanlaw.com | 5/21/2021 4:40:20 PM | SENT |

Associated Case Party: ACET GLOBAL, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Veronica Jamaica | | vjamaica@hallettperrin.com | 5/21/2021 4:40:20 PM | SENT |
| Edward P.Perrin | | eperrin@hallettperrin.com | 5/21/2021 4:40:20 PM | SENT |
| Jennifer Poe | | jpoe@hallettperrin.com | 5/21/2021 4:40:20 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Teresa Jones | | Teresa.Jones@dallascounty.org | 5/21/2021 4:40:20 PM | SENT |
| Zachary Montgomery | | zmontgomery@freemanlaw.com | 5/21/2021 4:40:20 PM | SENT |

# COMPANY AGREEMENT
## OF
## ACET GLOBAL, LLC

This Company Agreement of ACET Global, LLC (this "Agreement") is entered into on July _to_, 2017 by and among Baymark ACET Holdco, LLC, a Texas limited liability company ("Holdco"), as the sole Member (defined below), and ACET Global, LLC, a Texas limited liability company, as the company (the "Company").

## Article I
## Formation

**1.1** **Formation.** The Certificate of Formation of ACET Global, LLC (the "Certificate") was filed with the Secretary of State for the State of Texas on June 30, 2017. Upon the filing of the Certificate, the Company was established as a Texas limited liability company pursuant to the Texas Business Organizations Code (the "Code"). Except as otherwise provided in this Agreement, the Code shall govern the rights and liabilities of the Managers (defined below) and the Members.

**1.2** **Office Address; Registered Office and Agent.** The principal place of business and the principal office of the Company will be Granite Park II, 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or at such other place as is determined by the Managers. The registered office of the Company shall be at Granite Park II, 5700 Granite Parkway, Suite 435, Plano, Texas 75024, and the Company's registered agent at that address will be David J. Hook, or such other office or agent as determined by the Managers.

**1.3** **Characterization.** For federal income tax purposes, the Company shall be characterized as an association taxable as a partnership if there is more than one member (as determined for federal income tax purposes), otherwise it will be disregarded. However, for state law purposes, the Company shall not be characterized as, nor treated as, a partnership (nor disregarded), nor shall any Member be characterized as, nor treated as, a partner. The Managers shall operate the Company in a manner consistent with such characterizations and neither the Managers nor any Member shall take any act, or fail to take any act, which is not consistent with such characterizations.

## Article II
## Name, Purpose and Term

**2.1** **Company Name.** The business of the Company shall be conducted under the name "ACET Global, LLC" and/or any other name approved by the Managers.

**2.2** **Purpose.** The principal purpose of the Company will be as set forth in the Certificate.

**2.3** **Term.** The term of the Company shall be perpetual unless earlier wound up and liquidated as provided in this Agreement or the Certificate.

-1-



EXHIBIT
A-3
BP_002661

**Article III**
**Capital Contributions**

**3.1** **Capital Contributions.** Following the filing of the Certificate, the initial Members shall be deemed to have contributed cash and property to the Company in the amount and on the date set forth in the Company's books and records. No interest shall be paid by the Company by reason of any capital contribution made by a Member, whether consisting of property, services or cash.

**3.2** **Additional Contributions.** No Member shall be required to make any additional capital contributions to the Company. The Managers may, however, accept capital contributions from the Members from time to time as it determines appropriate.

**3.3** **Capital Accounts.** During such period of time that the Company is taxed as a partnership for federal income tax purposes, the Company shall establish and maintain a capital account ("Capital Account") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended, and Treasury Regulations Section 1.704-l(b)(2)(iv).

**Article IV**
**Members**

**4.1** **Initial Members.** A "Member" (so called) shall mean an individual, organization or entity (a "Person") that has been admitted as, and continues as, a member of the Company. The initial Member of the Company is Holdco.

**4.2** **Member Interests.** Each Member's percentage interest in the income, gains, losses, deductions, voting rights and distributions, as may be affected by the terms of this Agreement are referred to in this Agreement as "Interests." Initially, Holdco has a 100% Interest.

**4.3** **Liability.** No Member shall be bound by, or personally liable for, obligations or liabilities of the Company beyond the amount of his or her required contributions to the capital of the Company, and no Member shall be required to contribute any capital to the Company in excess of the contributions for which he or she is personally liable under Article III.

**4.4** **Management.** No Member, other than a Member that also serves as a Manager or Officer (as defined below), shall participate in the operation or management of the business of the Company.

**4.5** **Annual Meeting.** If called by the Managers, the Members holding more than ten percent (10%) of the Interests, or if required by the Code, an annual meeting of the Members, commencing in calendar year 2018, shall be held at the office of the Company, or such other place as determined by the Managers, on a date to be determined by the Managers. At such meeting the Members shall transact such business as may properly be brought before the meeting.

-2-

**4.6    Special Meetings.**    Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, the Certificate or this Agreement, may be called by the holders of more than ten percent (10%) of all Interests entitled to vote at such meetings. Business transacted at a special meeting shall be confined to the purposes stated in the notice of the meeting.

**4.7    Notice.**    Written or printed notice stating the place, day and hour of a meeting of Members, and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days or, in the event of a merger or consolidation, not less than twenty (20) days, nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the individual calling the meeting, to each Member entitled to vote at the meeting.

**4.8    Quorum.**    At each meeting the holders of a majority of the Interests issued and outstanding and entitled to vote at such meeting, present in person or represented by proxy, shall be required and shall constitute a quorum of the Members for the transaction of business, unless a smaller percentage is otherwise provided by statute, the Certificate or this Agreement, but in no event shall a quorum consist of the holders of less than one-third of the Interests entitled to vote at such a meeting. If, however, such quorum shall not be present or represented at any meeting of the Members, the Members entitled to vote at such meeting, present in person or represented by proxy, shall have power to adjourn the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.

**4.9    Voting by Members.**    With respect to any matter other than a matter for which the affirmative vote of the holders of a specified portion of the Interests entitled to vote is required by the Code or this Agreement, the affirmative vote of the holders of a majority of the Interests represented in person or by proxy at a meeting of Members at which a quorum is present shall be the act of the Members.  Except as otherwise required by this Agreement or the Code, the Members shall be solely responsible for the election and removal of the Managers.

**4.10    Voting Procedure.**    At any meeting of the Members, every Member having the right to vote shall be entitled to vote in person, by proxy appointed by an instrument in writing subscribed by such Member, or by his or her duly authorized attorney-in-fact. No form of proxy or power of attorney bearing a date more than eleven (11) months prior to said meeting shall be valid, unless said instrument provides for a longer period. Each proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Such proxy shall be filed with the Manager or Secretary of the Company prior to or at the time of the meeting.

**4.11    Action Without Meeting; Telephone Meetings.**

(a)    Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or

-3-

BP_002663

holders of Interests having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all Interests entitled to vote on the action were present and voted.

(b)     Subject to applicable notice provisions and unless otherwise restricted by the Certificate, Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in such meeting shall constitute presence in person at such meeting, except where an individual's participation is for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**Article V**
**Management**

**5.1     Managers**.  The Company shall be managed by its "Managers" (whether one or more, herein so called). Holdco is designated as the initial Manager. The number of Managers may be increased or decreased by the Members.  Each Manager shall hold his or her or its office until his or her or its death, resignation or removal or until his or her or its successor is duly elected and qualified.

**5.2     Powers and Duties.**  The Manager is solely responsible for the operation and management of the business of the Company, and, except as otherwise expressly provided in this Agreement, possesses all rights and powers generally conferred by applicable law or deemed by the Manager as necessary, advisable or consistent in connection therewith. Specifically, the Manager has the power to do all things and perform all acts necessary and appropriate for successful accomplishment of the business purposes outlined in Section 2.2, including the specific rights, powers and authorities required or appropriate for the operation and management of the business of the Company, which, by way of illustration but not by way of limitation, shall include the right and power: (a) to acquire, own, lease and sell property or investments on behalf of the Company and any entity in which it holds a direct or indirect ownership interest (a "Subsidiary"); (b) to obtain any and all financing of the Company and its Subsidiaries, whether interim, permanent or otherwise, including loans from Members; (c) to replace, repair, sell or otherwise dispose of the assets of the Company and its Subsidiaries, or any portion of them; (d) to issue and sell Interests in the Company on such terms as determined appropriate by the Managers, and to amend this Agreement to admit such Person(s) as Member(s); (e) to cause the Company and its Subsidiaries to enter into contracts approved by the Managers in their sole discretion; and (f) to negotiate, execute and deliver all documents in conjunction with the accomplishment of any of the foregoing.

**5.3     Voting**. In the event there is more than one Manager, all decisions by the Managers must be approved by a majority of Managers.  Notwithstanding anything to the contrary in this Agreement, if there is more than one Manager, no Manager shall have the right or the power to make any decision on behalf of the Company unless and until the same has been authorized by a majority of the Managers or as otherwise required by this Agreement.

-4-

BP_002664

**APP 070**

**5.4     Removal of Manager; Vacancies**.   A Manager may be removed at any time, with or without cause, by the Members. If a vacancy is created by reason of death, disability, removal or resignation of a Manager, or because of an increase in the number of Managers to be elected, such vacancy shall be filled by the Members.

**5.5.     Compensation of Managers**.   Unless otherwise approved by the holders of a majority of the Interests, the Managers shall not be entitled to receive any compensation for the services they perform for the Company.   The Managers shall be reimbursed for actual expenditures incurred in the administration of the Company's business.

**5.6     Liability**.   The Managers and Officers of the Company shall perform their duties under this Agreement with ordinary prudence and in a manner reasonable under the circumstances.   No Manager or Officer shall be liable to the Company or the Members for any loss or liability caused by any act, or by the failure to do any act, unless such loss or liability is determined by a court of competent jurisdiction to have been caused by such Manager's or Officer's gross negligence, willful misconduct or bad faith.   In no event shall any Manager or Officer be liable by reason of a mistake in judgment made in good faith, or action or lack of action based on the advice of legal counsel.

**5.7     Indemnification and Advance of Expenses.**

(a)     The Company shall indemnify and/or advance expenses to any Person who was, is, or is threatened to be made a named defendant or respondent in a legal proceeding because such Person is or was a Member or Manager, EVEN IF SUCH INDEMNITY OR EXPENSES ARE ATTRIBUTABLE TO SUCH PERSON'S OWN NEGLIGENCE, to the fullest extent provided by, and in accordance with the procedures set forth in Section 101.401 and Chapter 8 of the Code and any other applicable laws; provided, however, that Chapter 8 of the Code shall be modified in the following respects as applied to the Company:

(i)     Indemnification of any Person who has satisfied the standard of conduct set forth in Section 8.101 of the Code shall be mandatory rather than optional. The determination under Section 8.101 of the Code that indemnification shall be made shall also constitute authorization of indemnification under Section 8.103.

(ii)     Advance of expenses to a Person who has satisfied the requirements of Section 8.104 of the Code shall be mandatory rather than optional.

(iii)     Payment or reimbursement of expenses to a Person pursuant to Section 8.106 of the Code in connection with his appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

(b)     Subject to Section 8.151 of the Code, the Company may purchase and maintain insurance or other arrangements on behalf of any Person who is or was a

-5-

Member or Manager against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would have the power to indemnify him against that liability under this Section or otherwise.

        (c)     The indemnification set forth in this Section shall not cause any Member or Manager to incur any personal liability of any Member or Manager to any third party.

     **5.8**    **Tax Matters Partner.**  Holdco is designated the "tax matters partner" of the Company and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.

     **5.9**    **Officers**.

        (a)     The Managers may, at any time in their sole discretion, designate one or more individuals to serve as officers of the Company ("Officers"). Officers may, but are not required to, be Members or Managers. Each Officer shall have such title, authority, duties and responsibilities as determined by the Managers in their sole discretion. An individual may hold more than one office. Each Officer shall hold office until he or she resigns, ceases to serve or is removed. Any Officer may be removed, either with or without cause, by the Managers.

        (b)     The salaries and other compensation, if any, of the Officers and agents of the Company shall be fixed from time to time by the Managers. Each Officer shall be indemnified by the Company as set forth in Section 5.7.

        (c)     Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if later, at the time of its receipt by a Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, either with or without cause, by the Managers whenever, in its judgment, the best interests of the Company shall be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed and that designation of an Officer shall not of itself create contract rights. The Managers, in their sole discretion, may fill any vacancy occurring in any office of the Company.

     **5.10**   **Action Without Meeting; Telephone Meetings**.

        (a)     Any action required or permitted to be taken at a meeting of the Managers may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the number of Managers that that would be necessary to take such action at a meeting at which all of the Managers entitled to vote on the action were present and voted.

BP_002666

(b)     Subject to applicable notice provisions and unless otherwise restricted by the Certificate, Managers may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in such meeting shall constitute presence in person at such meeting, except where an individual's participation is for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**5.11**    **Third Party Reliance**.   The Managers have full, complete and absolute authority over the Company's affairs. Any Person dealing with the Company shall rely completely and exclusively upon the authority of the Managers and shall accept any document, agreement, check or other instrument executed by the Managers on behalf of the Company as authorized under this Agreement.

**Article VI**
**Income, Loss and Distributions**

**6.1**    **Accounting Records**.   The Company shall keep books and records using the method of accounting determined by the Managers, in accordance with accepted accounting principles. The books and records shall be open for inspection and copying by any Member. The fiscal year of the Company shall be as determined by the Managers.

**6.2**    **Profits and Losses**. Except as provided in Section 8.2, all income, gains, losses and deductions of the Company shall be allocated for financial accounting and tax purposes, among the Members pro rata in accordance with their Interests.

**6.3**    **Distributions to Members**. All distributions of cash or property of the Company (a) shall be made at such times and in such amounts as determined by the Managers in their sole discretion, and (b) shall be made to the Members pro rata in accordance with their Interests.

**6.4**    **Limitations on Allocations**. Notwithstanding any provisions contained in this Agreement, during such times as the Company is taxed as a partnership for federal income tax purposes, should any provision conflict with the provisions contained in Treasury Regulations Section 1.704-1(b)(2)(iv), the provisions of said Treasury Regulations shall apply so as to cause the Company's provisions relating to allocations and distributions to be in compliance with such Treasury Regulations.

-7-

**Article VII**
**Transfer of Interests**

**7.1** **General Prohibition.** No Member may sell, assign, transfer, encumber or otherwise dispose of his or her Interest (a "Transfer"), or any part thereof, without the prior written consent of the other Members.

**7.2** **Pledgee's Rights; Membership Interests to be Governed by Article 8 of the Uniform Commercial Code.**

(a) All Interests in the Company shall be "securities" governed by Article 8 of the Uniform Commercial Code in any jurisdiction (a) that has adopted revisions to Article 8 of the Uniform Commercial Code substantially consistent with the 1994 revisions to Article 8 adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and (b) the laws of which may be applicable, from time to time, to the issues of perfection, the effect of perfection or non-perfection and the priority of a security interest in the Interests of the Company.

(b) Notwithstanding anything contained to the contrary contained in this Agreement, any Member may pledge or hypothecate any or all of its Interests in the Company, including, without limitation, all economic rights and privileges, all control rights, authority, and powers, and all status rights as a Member, to any lender to the Company or any affiliate of the Company, or to any agent acting on any such lender's behalf, and any transfer of any such Interests in the Company pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation will be permitted under this Agreement with no further action or approval required under this Agreement. Notwithstanding anything contained to the contrary in this Agreement, subject to the terms of the financing giving rise to any pledge or hypothecation of Interests in the Company, the lender (or agent) will have the right, to the extent set forth in the applicable pledge or hypothecation agreement, and without further approval of the pledging Member or any other Member and without becoming a Member (unless the applicable lender (or agent) expressly elects in writing to become a Member), to exercise the membership voting rights of the pledging Member. Notwithstanding anything contained to the contrary in this Agreement, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, to the extent set forth in the applicable pledge or hypothecation agreement, (i) the lender (or agent) or transferee of such lender (or agent), as the case may be, will, if it so elects, become a Member under this Agreement and will succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and will be bound by all of the obligations, of a Member under this Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (ii) following such exercise of remedies, the pledging Member will cease to be a Member and will have no further rights or powers under this Agreement. The execution and delivery of this Agreement by a Member will constitute any necessary approval of such Member under the Code to the foregoing provisions of this Section 7.2.

-8-

BP_002668

**Article IX**
**Miscellaneous**

**9.1     Amendments.**   This Agreement may only be amended or restated by an instrument executed by all Members.

**9.2     Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to its conflicts of laws principles.

**9.3     Successors and Assigns.** The provisions of this Agreement, including any amendments hereto, shall be binding upon and shall inure to the benefit of the Members and their respective beneficiaries, legal representatives, successors and assigns.

**9.4     Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which shall constitute one and the same instrument.

**9.5     NOTICE OF INDEMNIFICATION.**   THE MEMBERS ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT CONTAINS CERTAIN INDEMNIFICATION PROVISIONS PURSUANT TO SECTION 5.7.

*[Signature page follows.]*

BP_002669

(c)    So long as any pledge or hypothecation of any Interests in the Company is in effect, the Company shall not elect to opt-out of Article 8 of the Uniform Commercial Code in order for its Interests to become "general intangibles" governed by Article 9 of the Uniform Commercial Code as in effect in any relevant jurisdiction without the prior written consent of all pledgees of such Interests.

(d)    So long as any of the Interests is subject to a pledge or hypothecation, this Section 7.2 may not be amended or modified without the pledgee's (or the transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of Interests will be a third-party beneficiary of the provisions of this Section 7.2.

**7.3    Effect of Article.** Any purported Transfer of an Interest consummated in violation of this Article shall be null and void and of no force or effect. Any transferee acquiring an interest in the Company shall acquire the same subject to all the terms and provisions of this Agreement.

**Article VIII**
**Winding Up and Liquidation**

**8.1    Winding Up.** The Company shall wind up upon the expiration of its term as set forth in the Certificate, or if sooner upon the happening of one of the following events: (a) any event which, in the opinion of the Managers, would make it in the best interest of the Company to be terminated, (b) the withdrawal of the last remaining Member, or (c) the sale or other disposition of all or substantially all of the assets and operations of the Company, and the receipt of all payments with respect to such sale.

**8.2    Liquidation.** Upon liquidation, the Managers shall proceed diligently to wind up the business and affairs of the Company, allocate income and loss among the Members and distribute its properties and assets, if any; provided, however, if the Company liquidates as a result of the occurrence of an event described in Section 8.1(b), the Company can reconstitute itself and continue if the legal representative or successor of the last remaining Member agrees (a) to continue the Company, and (b) either (i) to become a Member effective as of the date of the withdrawal, or (ii) to designate another Person who agrees to become a Member effective as of the date of the withdrawal.  Distributions to Members upon the liquidation of the Company shall be made pro rata among the Members in accordance with the Members' Interests. Items of income, gain, loss and deduction in the year of liquidation shall be allocated among the Members in such manner as the Managers determine appropriate to cause the Capital Account balances of the Members to equal the respective amounts they are to receive in distributions upon liquidation of the Company.  The manner in which the Company is liquidated shall be within the absolute discretion of the Managers.

**8.3    Deficit Capital Account Balances.** Upon liquidation of the Company, no Member with a deficit balance in his or her Capital Account shall have any obligation to restore such deficit balance, or to make any contribution to the capital of the Company, except to the extent such Member is personally liable to make contributions to the capital of the Company pursuant to Article III of this Agreement.

-9-

BP_002670

**APP 076**

   This Agreement was executed on the day first written above but it is effective for all purposes as of the date the Certificate was filed with the Secretary of State for the State of Texas.

<u>**COMPANY**</u>:

ACET GLOBAL, LLC,
a Texas limited liability company

By:    Baymark ACET Holdco, LLC
Its:    Sole Manager

        By: _____
        Name:  David J. Hook
        Its:     President

<u>**MEMBER**</u>:

BAYMARK ACET HOLDCO, LLC

By: _____
Name:  David J. Hook
Its:     President

#496455v2
37606-17

Signature Page to Company Agreement of ACET Global, LLC

BP_002671

APP 077

| From: | Cassandra Foster |
|---|---|
| Sent: | Friday, June 30, 2017 1:09 PM |
| To: | Steve Kronengold |
| Cc: | David Hook; Matt Denegre (mdenegre@baymarkpartners.com); Gordon T. Foote |
| Subject: | ACET - Revised Seller Note/Payment Schedule and Revised Security Agreement |
| Attachments: | DOCS-#496974-v7-Seller_Note_(ACET).DOCX; DOCS-#497307-v2-ACET_Venture_(Seller)_Security_Agreement.DOCX; Rev. Seller Note Payment Schedule.xlsx; rl to prior SRK draft - Seller Note (ACET).pdf; rl to prior SRK draft - ACET Venture (Seller) Security Agreement.pdf |

Steve,

Please find attached for your review revised drafts of the Note and Security Agreement, reflecting the deal changes and prior comments, with redlines to the latest drafts received. A spreadsheet showing the calculations for the new Note payment schedule is also attached for your review. The numbers for the first month (July 2017) will change slightly since interest for July will only accrue for a partial month, making the final payment slightly higher.

We've bracketed the borrower name as Baymark is considering using another name for the new company; the entity has not been formed yet regardless, so this shouldn't affect anything other than updating the draft documents once the new name is confirmed.

Please note these drafts remain subject to Baymark's continuing review and approval. Please let us know if you would like to discuss.

I'll be traveling and out of the office from tomorrow (July 1st) through Tuesday July 4th, but will be checking email during that time, and will be back in the office on July 5th.

Thanks,
Cassandra

CASSANDRA FOSTER
Attorney

HALLETT&PERRIN
D 214.922.4139 F 214.922.4142
cfoster@hallettperrin.com | www.hallettperrin.com
1445 Ross Ave., Suite 2400 | Dallas, Texas 75202
Disclaimer

1



BP_015735

H&P Comments 6/30/17

[ACET ACQUISITION, LLC]

SECURED PROMISSORY NOTE

**Principal: $3,230,000**                                  **Issuance Date**: **July __, 2017**


For value received, **[ACET ACQUISITION, LLC]** ("**Maker**"), hereby promises to pay to the order of **ACET VENTURE PARTNERS LLC** or its assigns ("**Holder**") the principal sum of One Million Nine Hundred Twenty-Four Thousand Dollars and No/100 ($3,230,000.00) (as reduced pursuant to the terms hereof, the "**Principal**") when due, whether upon the payment dates (set forth below), acceleration, prepayment or otherwise (in each case in accordance with the terms hereof) and to pay interest ("**Interest**") on any outstanding Principal from the Issuance Date stated above ("**Issuance Date**") at the rate of fifteen percent (15%) per annum, compounded annually ("**Interest Rate**"), until the same becomes due and payable, whether upon each of the payment dates, or upon acceleration, prepayment or otherwise (in each case in accordance with the terms hereof).  Certain capitalized terms used herein are defined in Section 25.

This Note is being issued by Maker pursuant to the terms of the Asset Purchase Agreement.  The obligations under this Note are secured by the collateral described in the Security Agreement executed as of the date hereof by Holdco and Holder.

(1) PAYMENT OF THE PRINCIPAL.   The Principal shall be payable in consecutive monthly installments (each, a "**Monthly Installment**") commencing on the date which is the last day of the fifteenth (15th) month after the Issuance Date in accordance with the payment schedule set forth in Schedule 1 attached hereto, subject to adjustment as set forth herein.

(2) INTEREST; INTEREST RATE.  Interest on the outstanding principal of this Note shall commence accruing on the Issuance Date, and shall be computed on the basis of a 360-day year and actual days elapsed, and shall be payable in cash together with each Monthly Installment.  From and after the occurrence of an Event of Default, the Interest Rate shall be increased to the lesser of (i) 1.5% per month compounded monthly, or (ii) the maximum rate permitted under law from time to time (the "**Default Interest**").  All such Default Interest shall be paid at the time of, and as a condition precedent to, the curing of any such Event of Default.  In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure.

In no event shall the amount or rate of interest due and payable under this Note exceed the maximum amount or rate of interest allowed by applicable law, and, in the event any such excess payment is made by Maker or received by Holder, such excess sum shall be credited as a payment of principal (or, if no principal shall remain outstanding, shall be refunded to Maker).  It is the express intent hereof that Maker not pay and Holder not receive, directly or indirectly or in any manner, interest in excess of that which may be lawfully paid under applicable law.  All interest (including all charges, fees or other amounts deemed to be interest) which is paid or charged under this Note shall, to the maximum extent permitted by applicable law, be amortized,

BP_015736

allocated and spread on a pro rata basis throughout the actual term of this Note and any extension or renewal hereof.

(3) RIGHTS UPON EVENT OF DEFAULT.

(a) Event of Default.  Each of the following events shall constitute an "**Event of Default**":

(i)     the Maker's failure to pay to the Holder any amount of Principal, Interest, Default Interest or other amounts when and as due under this Note, provided that the failure to fully pay Principal, Interest or Default Interest when and as due continues for a period of at least three Business Days following Maker's receipt of written notice of default from the Holder;

(ii)     either of the Maker or Holdco, pursuant to or within the meaning of Title 11, U.S. Code, or any similar Federal, foreign or state law for the relief of debtors (collectively, "**Bankruptcy Law**"), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a "**Custodian**"), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(iii)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that is not dismissed within thirty (30) days of filing that (A) is for relief against the Maker or Holdco in an involuntary case, (B) appoints a Custodian of the Maker or Holdco or Baymark, or (C) orders a stay of proceedings against the Maker or Holdco, or the liquidation of the Maker or Holdco;

(iv)     the Maker breaches any material representation, warranty, covenant or other term or condition of the Asset Purchase Agreement or any other agreement contemplated therein (collectively, the "**Transaction Documents**") or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated thereby and hereby to which the Holder is a party, except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of at least thirty (30) consecutive days following Maker's receipt of written notice of default from the Holder; or

(v)     a Change of Control occurs.

(b) Acceleration Right.  Promptly after the Maker's obtaining knowledge of the occurrence of an Event of Default with respect to this Note, the Maker shall deliver written notice thereof (an "**Event of Default Notice**") to the Holder.  At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default and the expiration of any notice and cure period as provided for herein, the Holder may, by delivering written notice thereof to Maker, until such Event of Default is cured or waived, do any one or more of the following: (i) declare the entire unpaid balance of Principal and accrued, unpaid Interest upon this Note to be immediately due and payable, and/or (ii) pursue and enforce any of Holder's other rights and remedies under this Note and/or applicable law.

2

(c) In case an Event of Default has occurred and is continuing, the Holder may by written notice to Maker, in addition to the rights granted pursuant to Section 3(b) above, at the same time or different times, foreclose or otherwise exercise its rights pursuant to the Security Agreement.

(4) RIGHTS UPON FUNDAMENTAL TRANSACTION. The Maker shall not enter into or be party to a Fundamental Transaction, unless the Person formed by or surviving any such Fundamental Transaction (if other than the Maker) or the Person to which such Fundamental Transaction shall have been made (in the case of a sale or other conveyance of all or substantially all of Maker's properties or assets) assumes all the obligations of the Maker under this Note and the other Transaction Documents pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction, such approval not to be unreasonably withheld, conditioned or delayed. Upon any Fundamental Transaction, the successor entity to such Fundamental Transaction shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to such "Maker" shall refer instead to the successor entity) and may exercise every right and power of the Maker and shall assume all of the obligations of the Maker under this Note with the same effect as if such successor Person had been named as the Maker herein; *provided, however*, that the predecessor Maker shall not be relieved from its obligations under the Transaction Documents except in the case of a Fundamental Transaction that meets the requirements of this section (whereby a successor "Maker" has been substituted hereunder). The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions.

(5) OPTIONAL PREPAYMENT. Notwithstanding anything herein to the contrary, Maker shall have the right to prepay part or all of the outstanding Principal amount owed under this Note, together with any accrued but unpaid Interest, at any time and from time to time without any penalty or premium. In order to effectuate a prepayment as set forth above, Maker must give the Holder at least three (3) days' prior written notice of the anticipated prepayment. Following such prepayment, at Maker's option, the Monthly Installment schedule set forth in Schedule 1 attached hereto will be revised so that each remaining Monthly Installment of Principal is reduced by a percentage amount equal to the percentage amount by which the initial Principal amount of this Note has been reduced after giving effect to such prepayment (except for Monthly Installment No. 58, which will be equal to all remaining Principal then outstanding). At Maker's option in the event of such partial prepayment, Holder shall surrender the existing Note and Maker shall issue a replacement Note in the amount of the revised Principal amount and containing a revised schedule of Monthly Installments as contemplated in the preceding sentence, and otherwise in accordance with the terms of Section 11(d).

(6) SECURITY. This Note is secured to the extent and in the manner set forth in the Security Agreement.

(7) NON-CIRCUMVENTION. The Maker hereby covenants and agrees that the Maker will not, by amendment of constitutional documents or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action -- and shall ensure that none of the above actions is taken by Holdco -- avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at

3

BP_015738

all times in good faith carry out all of the provisions of this Note and take all action as may be reasonably requested by Holder from time to time to protect the rights of the Holder of this Note.

(8) <u>RIGHT OF SET-OFF</u>.  Subject to the terms of, and as further described in, Section **[7.8]** of the Asset Purchase Agreement, Maker will have the right to set off against any amounts payable to Holder hereunder those amounts determined to be payable from Holder or its owner to Maker pursuant to the terms of such section of the Asset Purchase Agreement.

(9) <u>RANK</u>.

(a) <u>Rank</u>.  All payments due under this Note shall be subordinate to the indebtedness of the Maker to Senior Lender under the Senior Loan Agreement.

(b) <u>Limitations on Payments</u>.  If payment of Principal or Interest hereunder would be prohibited by the terms of the Subordination Agreement or result in a default under the Senior Loan Agreement (in either case, a "<u>Senior Lender Default</u>"), Maker shall be required to pay only that amount of Principal or Interest as would not result in a Senior Lender Default.

(10)     <u>TRANSFER</u>.  Except for an assignment or transfer to the sole owner of Holder, this Note may not be offered, sold, assigned or transferred by the Holder, in whole or in part, without the consent of the Maker which consent shall not be unreasonably withheld or delayed, unless an Event of Default then exists.

(11)     <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>.  If this Note is to be transferred in accordance with Section 10, the Holder shall surrender this Note to the Maker, whereupon the Maker will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 11(d)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 11(d) to the Holder representing the outstanding Principal not being transferred.  The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions hereof and this Section 11(a), following prepayment of any portion of this Note pursuant to Section 5 or an adjustment to the Principal amount pursuant to Section 11(e), the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b) <u>Lost, Stolen or Mutilated Note</u>.  Upon receipt by the Maker of evidence reasonably satisfactory to the Maker of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Maker in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Maker shall execute and deliver to the Holder a new Note (in accordance with Section 11(d)) representing the outstanding Principal.

(c) <u>Note Exchangeable for Different Denominations</u>.  In the event of a partial assignment of this Note in accordance with Section 10, this Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Maker, for a new Note or Notes (in accordance with Section 11(d) and in principal amounts of at least $100,000) representing in the

4

BP_015739

aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) Issuance of New Notes.  Whenever the Maker is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 11(a) or Section 11(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall set forth accrued Interest (and Default Interest if applicable) on the Principal and Interest of this Note, from the Issuance Date.

(e) Revised Principal Under Asset Purchase Agreement.  In the event of an adjustment to Principal pursuant to Section **[2.3]** of the Asset Purchase Agreement, Holder shall surrender the existing Note and Maker shall issue a replacement Note in the amount of the revised Principal amount and otherwise in accordance with the terms of Section 11(d) above.

(12)    REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES.  The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and the other Transaction Documents at law or in equity, and nothing herein shall limit the Holder's right to pursue actual damages for any failure by the Maker to comply with the terms of this Note.  Amounts set forth or provided for herein with respect to payments (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Maker (or the performance thereof).

(13)    PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS.  If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Maker or other proceedings affecting Maker's creditors' rights and involving a claim under this Note, then the Maker shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, reasonable attorneys' fees and disbursements.

(14)    CONSTRUCTION; HEADINGS.  This Note shall be deemed to be jointly drafted by the Maker and Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(15)    FAILURE OR INDULGENCE NOT WAIVER.  No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a

5

BP_015740

waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(16)   ENTIRE AGREEMENT AND INTERPRETATION.   This Note, the Security Agreement, and the Asset Purchase  Agreement constitute the full and entire agreement and understanding of the parties to this Note with respect to the subjects hereof, and supersedes all previous discussions and agreements, if any, of the parties hereto with respect to the subject matter of this Note.  If this Note and the Asset Purchase Agreement conflict, then the terms of this Note shall control.  No party shall be liable for or bound in any other manner by any representations, warranties, covenants or agreements except as specifically set forth in this Note and the Asset Purchase Agreement.

(17)   NOTICES; PAYMENTS; NAMES.

(a) Notices.   Whenever notice is required or permitted to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section **[8.4]** of the Asset Purchase Agreement.

(b) Payments.   Whenever any payment of cash is to be made by the Maker to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America, via wire transfer of immediately available funds to the recipient bank account as shall be notified in writing to the Maker at least two (2) Business Days prior to the payment of any Monthly Installment.  Notwithstanding the above, and unless notified in writing otherwise, the payment shall be effected to the Holder's bank account, the details of which are detailed in Schedule A of this Note.  Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day.

(c) Names.   Each of Maker and Holder (i) acknowledges that Holder is required to change its legal name on or about the Issuance Date pursuant to the Asset Purchase Agreement, (ii) agrees that Maker may change its name without Holder's prior consent, and (iii) agrees to provide the other party with written notice, accompanied by evidence provided by the Office of the Secretary of State of the State of Texas, of such name change promptly following the same.

(18)   CANCELLATION.   After all Principal, accrued Interest and other amounts at any time owed on this Note has been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Maker for cancellation and shall not be reissued.

(19)   WAIVER OF NOTICE.   To the extent permitted by law, except as otherwise set forth herein, the Maker hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Security Agreement.

(20)   GOVERNING LAW.   This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of Texas, without giving effect to any choice

6

BP_015741

of law or conflict of law provision or rule (whether of the Texas or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than Texas.

(21) REPRESENTATIONS AND WARRANTIES OF MAKER. Maker hereby represents and warrants to the Holder that: (i) Maker has been duly formed, and is in good standing under the laws of its jurisdiction of organization, (ii) has the requisite power and authority to enter into and perform its obligations under this Note and to issue this Note pursuant to its terms, (iii) the execution, delivery and performance of this Note by Maker have been duly authorized by all necessary corporate action and no further consent or authorization of Maker or its board of directors or shareholder is required, (iv) this Note has been duly executed and delivered by Maker and constitutes the valid and binding obligations of Maker enforceable against Maker in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws effecting creditors' rights generally and by general principles of equity, (v) the membership interests to be transferred to the Holder pursuant to the Security Agreement, are and shall be at all times free and clean from any lien, pledge, other security interest, preemptive rights, rights of first refusal or any other third parties' rights (except for (a) the security interest granted to Senior Lender pursuant to the Senior Loan Agreement and (b) the security interest granted to the Holder pursuant to the Security Agreement), and (vi) there is no pending or, to Maker's knowledge, threatened, claim, audit, investigation, action or other legal proceeding or judgment, order or award of any court, agency or other governmental authority or arbitrator (each an "**Action**") which involves Maker or its assets and which would reasonably be expected to have a material adverse effect upon Maker or threaten the validity of this Note or any related document or transaction. Maker will immediately notify Holder in writing upon acquiring knowledge of any such Action.

(22) SEVERABILITY. In case any provision in this Note shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(23) **WAIVER OF JURY TRIAL. MAKER AND HOLDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING RELATED IN ANY WAY TO THIS NOTE AND THE SECURITY AGREEMENT.**

(24) **VENUE AND SERVICE OF PROCESS. MAKER AND HOLDER AGREE THAT ANY SUCH PROCEEDING MAY BE BROUGHT AND ENFORCED IN THE STATE AND FEDERAL COURTS LOCATED IN DALLAS COUNTY, TEXAS, AND MAKER AND HOLDER HEREBY WAIVE ANY OBJECTION TO JURISDICTION OR VENUE IN ANY SUCH PROCEEDING COMMENCED IN SAID COURTS. MAKER AND HOLDER FURTHER WAIVE PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS REQUIRED TO BE SERVED ON MAKER AND HOLDER, AS APPLICABLE, IN ANY SUCH PROCEEDING AND AGREE THAT THE SAME MAY BE SERVED, WITH THE SAME EFFECT AS PERSONAL SERVICE ON MAKER OR HOLDER, AS THE CASE MAY BE, WITHIN TEXAS, BY CERTIFIED OR REGISTERED MAIL ADDRESSED TO MAKER OR TO HOLDER, AS THE CASE MAY BE, AT ITS ADDRESS FOR NOTICES AS HEREIN PROVIDED.**

BP_015742

(25)    CERTAIN DEFINITIONS.  For purposes of this Note, the following terms shall have the following meanings:

(a) "**Asset Purchase Agreement**" means the Asset Purchase Agreement dated as of the Issuance Date made and entered into by and among Holder, the sole owner of Holder, and Maker.

(b) "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in Dallas, TX are authorized or required by law to remain closed.

(c) "**Change of Control**" means any Fundamental Transaction other than a Fundamental Transaction in which holders of at least 51% of the legal and beneficial ownership of, and control of, Holdco immediately prior to the Fundamental Transaction continue after the Fundamental Transaction to hold at least 51%, directly or indirectly, of the legal and beneficial ownership of, and control of, Maker.

(d) "**Fundamental Transaction**" means that the Maker shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Maker is the surviving entity) another Person, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Maker to another Person, or (iii) enter into a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person the intent of which is to accomplish any of the foregoing, or (iv) any transaction or business combination resulting in, directly or indirectly, Holdco not having control over Maker.

(e) "**Holdco**" means Baymark ACET Holdco, LLC, a limited liability company duly registered and validly existing under the laws of Texas.

(f) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(g) "**Security Agreement**" means that certain Security and Unit Pledge Agreement, dated as of the Issuance Date, by and between Holdco and Holder.

(h) "**Senior Lender**" means Super G Capital, LLC, a Delaware limited liability company, and its successors and assigns.

(i) "**Senior Loan Agreement**" means that certain Business Loan and Security Agreement by and between Maker and Senior Lender dated as of the Issuance Date, as it may be amended from time to time.

(j) "**Subordination Agreement**" means that certain Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement dated as of the Issuance Date between Maker and Senior Lender and acknowledged by Holder and the sole owner of Holder, as it may be amended from time to time.

[Signature Page Follows]

8

BP_015743

IN WITNESS WHEREOF, the Maker has caused this Note to be duly executed as of the Issuance Date set out above.

**[ACET ACUISITIONS, LLC]**

By: _____
    Name:  David J. Hook
    Title:  President

BP_015744

## Schedule 1

**Monthly Payment Schedule**

[to be inserted]

BP_015745

## Schedule A

**Holder's Bank Account Information**

[to be inserted]

37606/496974v7

BP_015746

H&P Draft 6/30/17

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is dated and entered into as of July __, 2017 by and between BAYMARK ACET HOLDCO, LLC, a Texas limited liability company ("Pledgor"), and ACET VENTURE PARTNERS LLC, a Texas limited liability company ("Secured Party").

## RECITALS

A.      Pledgor owns the Pledged Interests (as defined in Schedule I attached hereto) in [ACET ACQUISITION, LLC], a Texas limited liability company ("Borrower").

B.      Secured Party has made a loan to Borrower as evidenced by that certain Secured Promissory Note of even date herewith made by Borrower payable to the order of Secured Party (as amended, the "Note"); capitalized terms, which are used herein but not defined herein, shall have the meanings ascribed to them in the Note.

C.      As a condition to entering into the financing contemplated by the Note, Secured Party requires that Pledgor pledge in favor of Secured Party, and grant Secured Party a security interest in, all of the Pledged Interests (as such term is defined in Schedule I attached hereto) and any and all other rights of Pledgor in connection therewith.

D.      To induce Secured Party to make the financing contemplated by the Note, Pledgor is willing to enter into this Agreement with Secured Party.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.      Obligations Secured.  This Agreement and the security interest created hereby are given for the purpose of securing (i) Borrower's payment and performance obligations to Secured Party now or hereafter accruing under the Note; (ii) performance of each agreement of Pledgor contained in this Agreement, and (iii) any and all amendments, modifications, renewals and/or extensions of any of the foregoing, including but not limited to amendments, modifications, renewals or extensions which are evidenced by new or additional instruments, documents or agreements or which change the terms of any obligations secured hereby (all of the foregoing collectively referred to as the "Obligations").

2.      Grant of Security Interest.  For valuable consideration and to secure full payment and performance of the Obligations, Pledgor hereby delivers, pledges and grants a continuing security interest to Secured Party in all of Pledgor's right, title and interest, whether now existing or hereafter arising, in and to the following (collectively, the "Collateral"):

(a)      the Pledged Interests;

(b)      any documents, certificates, negotiable or non-negotiable instruments and any other writing evidencing the Pledged Interests or by which any deposit, transfer, negotiation, roll over, renewal, substitution, withdrawal or other disposition may be made with respect to the Pledged Interests (the "Documents");

BP_015747

(c)    all membership interest rights, rights to subscribe, stock splits, liquidating dividends, cash dividends, dividends paid in membership interests, new securities or other property of any kind, which Pledgor is or may hereafter be entitled to receive on account of the Pledged Interests, including without limitation any of the foregoing arising from that certain Company Agreement of Borrower (as may be amended or modified, the "Operating Agreement"); and

(d)    all proceeds of any sale, exchange or disposition of the property described in subparagraphs (a), (b) or (c) above, whether such disposition is voluntary or involuntary, including, without limitation, all rights to payment and returned premiums with respect to any insurance relating to any of the foregoing.

3.    Delivery of Documents; Priority. If necessary to perfect Secured Party's security interest therein, and except as otherwise provided in this Agreement, all Documents, how or hereafter evidencing any Collateral, shall be delivered into the possession of Secured Party so that Secured Party may perfect its security interest therein, and shall contain such endorsements or assignments as Secured Party may in its sole, but reasonable, discretion deem necessary or advisable.  For so long as any of the Obligations remain outstanding: (i) Pledgor shall not sell, assign, transfer, exchange, or otherwise dispose of the Collateral without Secured Party's prior written consent; and (ii) Secured Party is hereby irrevocably authorized and appointed as agent and attorney in fact of Pledgor, which appointment is coupled with an interest, to sign and deliver, if applicable, such documents, endorsements and instruments, including, but not limited to the Documents, and to take all such action in the name of Pledgor or Secured Party, as Secured Party may in its sole, but reasonable, discretion deem necessary or advisable to perfect, preserve or enforce its interest in and lien on the Collateral, in the event Pledgor fails to do so promptly following Secured Party's request or if an Event of Default then exists.  Notwithstanding the foregoing or anything else to the contrary herein, Secured Party acknowledges and agrees that for so long as the Borrower's obligations to Super G Capital, LLC, a Delaware limited liability company (with its successors and assigns, "Senior Lender") under that certain Business Loan and Security Agreement by and between the Borrower and Senior Lender dated as of the date hereof (as it may be amended from time to time, the "Senior Loan Agreement") remain outstanding, the priority of the lien and security interest granted hereunder will be subordinate to the lien in favor of Senior Lender evidenced by that certain Pledge Agreement between Pledgor and Senior Lender dated as of the date hereof (as it may be amended from time to time, the "Senior Pledge Agreement").

4.    Adjustments and Dividends.  If during the term of this Agreement, any non-cash dividend, reclassification, readjustment or other change is declared or made in the capital structure of Borrower or any option included within the Collateral is exercised, or both, all new, substituted and additional membership interests, or other securities or property, issued to Pledgor by reason of any such change or exercise shall be pledged and/or delivered to and held by Secured Party under the terms of this Agreement in the same manner as the Collateral originally pledged hereunder.  During the term of this Agreement, any other dividend or other distribution made on account of the Collateral will be included as "Collateral" pledged hereunder.

5.    Warrants and Rights.  If during the term of this Agreement, subscription warrants or any other rights or options shall be issued in connection with the Collateral, such warrants,

BP_015748

rights and options shall be immediately assigned by Pledgor to Secured Party to be held under the terms of this Agreement in the same manner as the Collateral originally pledged hereunder.

6.  Voting Rights; Taxes and Other Charges; Power of Attorney.

(a)  Pledgor will not exercise any voting or consensual rights or powers relating to any Collateral in a manner that materially impairs Secured Party's rights with respect to the Collateral.  Upon the occurrence of an uncured Event of Default and for so long as the same is continuing, Secured Party shall have, at its discretion, the option to exercise all voting powers and other organization rights pertaining to the Collateral.  Pledgor shall pay prior to delinquency all taxes, charges, liens and assessments against any of the Collateral and, upon Pledgor's failure to do so, Secured Party may, at its option, pay such charges and shall be the sole judge of the legality and validity thereof and the amount so paid shall become an obligation of Pledgor due hereunder upon demand.  During the term of this Agreement, Pledgor will agree not to amend the Operating Agreement in any way that materially adversely affects the Pledged Interests or the security interest granted hereunder, without the prior written consent of Secured Party, which may be withheld in its sole discretion.

(b)  Pledgor agrees that, except as otherwise provided in this Agreement, Secured Party may, while any uncured Event of Default exists, upon notice to Pledgor, either in Secured Party's name or in the name of Pledgor (i) notify the issuer of any Collateral, or any securities intermediary, to make payment to Secured Party of any amounts now or hereafter due or distributable on or in respect of any Collateral, (ii) enforce collection of any Collateral, whether by legal proceedings or otherwise, and endorse, receive and acknowledge receipt for all proceeds, dividends, interest, principal and other sums so collected, (iii) make any compromise or settlement Secured Party deems desirable or proper with respect to any Collateral, (iv) participate in any recapitalization, reclassification, reorganization, consolidation, redemption, stock split, merger or liquidation of any issuer of any Collateral and, in connection therewith, deposit or surrender control of any Collateral, accept money or other property in exchange for any Collateral, and take such other actions as Secured Party deems proper in connection therewith, (v) apply to the Obligations, in such order of application as Secured Party shall determine, in its sole discretion, any money or other property received on or in respect of, or in exchange for, any Collateral, or hold the same in a non-interest bearing account as additional or substitute Collateral pursuant to the provisions of this Agreement, (vi) cause all or any portion of the Collateral to be transferred into Secured Party's name or into the name of Secured Party's nominee, and (viii) exercise as to the Collateral all rights, powers and remedies of an Pledgor.  Pledgor irrevocably appoints Secured Party, or any officer of Secured Party, as Pledgor's true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, to sign or endorse any instrument, document or other writing necessary or desirable to transfer title or other rights to or in any of the Collateral, and to do all acts necessary or incidental to assert, protect and enforce Secured Party's rights in the Collateral and under this Agreement.

7.  Representations and Warranties.  For so long as any Obligations remain outstanding, Pledgor represents and warrants that: (a) Pledgor shall have full power, authority and legal capacity  to enter into and perform this Agreement and has taken all necessary action to authorize the execution, delivery and performance of this Agreement; (b) Pledgor owns the membership interests as defined in the Operating Agreement as indicated on Schedule I hereto; (c)

3

this Agreement constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms, subject to bankruptcy, insolvency or other similar laws affecting the rights of creditors generally; (d) the execution, delivery and performance of this Agreement will not violate any law, treaty or regulation applicable to Pledgor, any order or decree of any court, arbitrator or governmental agency, or any contractual undertaking to which Pledgor is a party or by which Pledgor may be bound; (e) no consents, licenses, approvals or authorizations of, exemptions by or registrations or declarations with, any governmental authority are required with respect to this Agreement; (f) all of the Pledged Interests have been duly authorized and validly issued and are fully paid and non-assessable; (g) Pledgor has good title to the Collateral free and clear of all liens and encumbrances except the interests created hereby and the first priority lien in favor of Senior Lender evidenced by the Senior Pledge Agreement, and the pledge of the Pledged Interests hereunder creates a valid lien on, and a security interest in, the Pledged Interests and the proceeds thereof; and (h) while any Event of Default exists, Secured Party shall have the absolute and unqualified right to sell, at public or private sale, or otherwise dispose of the Collateral, in whole or in part, without restriction, contingent only upon the conditions set forth in this Agreement and otherwise under applicable law.

8.    Further Assurances.  Pledgor covenants and agrees that: (i) it will execute and deliver, or cause to be executed and delivered, all such powers, proxies, instruments and documents as Secured Party may reasonably request from time to time in order to carry out the provisions and purposes hereof; (ii) it will take all such other action as Secured Party may reasonably request from time to time in order to carry out the provisions and purposes hereof; (iii) it will defend the right, title and security interest of Secured Party in and to the Pledged Interests and the proceeds thereof, maintain and preserve the lien and security interest provided for by this Agreement against the claim and demands of all third parties, and the Collateral will remain free and clear of all security interests and liens (other than in favor of Secured Party and in favor of Senior Lender under the Senior Pledge Agreement) throughout the term hereof; and (iv) it will forward to Secured Party, immediately upon receipt, copies of any material information or documents received by Pledgor in connection with the Collateral.  Pledgor warrants and represents that none of the Collateral constitutes margin securities for the purposes of Regulations T, U or X.

9.    Events of Default.  At Secured Party's option, it shall be an "Event of Default" under this Agreement upon:

(a)    The breach by Pledgor of any representation, warranty, covenant or provision hereof, which breach (if reasonably susceptible to cure) is not cured within fifteen (15) calendar days after the earlier of written notice from Secured Party or the date on which Pledgor had actual knowledge of such breach; or

(b)    The occurrence of any Event of Default (as defined in the Note).

10.    Remedies Upon Default.  In addition to the other remedies provided for herein, in the Note or otherwise available under applicable law, upon and after the occurrence of an Event of Default:

(a)    Secured Party may:

4

BP_015750

(i)    Exercise in respect of the Collateral any one or more of the rights and remedies available under the Texas Uniform Commercial Code and other applicable law;

(ii)    Sell or otherwise assign, give an option or options to purchase or dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange, broker's board or at any of the Secured Party's offices or elsewhere upon such terms and conditions as it may deem advisable and such prices as it may deem best, for cash, on credit or for future delivery without assumption of any credit risk, free of any claim or right of whatsoever kind (including any right or equity of redemption) of Pledgor, which claim, right and equity are hereby expressly waived and released. Secured Party shall have the right to the extent permitted by applicable law, upon any such sale or sales, public or private, to purchase the whole or any part of the Collateral so sold.  In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser thereof, but Secured Party shall incur no liability in case of the failure of such purchaser to pay for the Collateral so sold and, in case of such failure, the Collateral may again be sold as herein provided.

(b)    Any notice required by applicable law to be given by Secured Party of a sale of the Collateral, or any part thereof, or of any other intended action by Secured Party, which occurs not less than ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Pledgor thereof.  No notification need be given to the Pledgor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

(c)    Secured Party shall not be obligated to make any sale or other disposition of the Collateral or any part thereof unless the terms thereof shall, in its sole discretion, be satisfactory to it.  Secured Party may, if it deems it reasonable, postpone or adjourn the sale of any of the Collateral or any part thereof, from time to time by an announcement at the time and place of such sale or by announcement at the time and place of such postponed or adjourned sale, without being required to give a new notice of sale.  Pledgor agrees that Secured Party has no obligations to preserve rights against prior parties to the Collateral.

(d)    Pledgor acknowledges and agrees that Secured Party may comply with limitations or restrictions in connection with any sale of the Collateral in order to avoid any violation of applicable law or in order to obtain any required approval of the sale or of the purchase thereof by any governmental regulatory authority or official and, without limiting the generality of the foregoing, Pledgor acknowledges and agrees that Secured Party may be unable to effect a public sale of any or all of the Collateral by reason of certain prohibitions contained in the federal securities laws and applicable state securities laws, but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale. Notwithstanding any such circumstances, Pledgor acknowledges and agrees that such compliance shall not result in any such private sale for such reason alone being deemed to have been made in a commercially unreasonable manner.  Secured Party shall not be liable or accountable to Pledgor for any discount allowed by reason of the fact that the Collateral is sold in compliance with any

5

such limitation or restriction. Secured Party shall not be under any obligation to delay a sale of any of the Collateral for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the federal securities laws, or under applicable state securities laws, even if the issuer desires, requests or would agree to do so.

(e)     Any cash held by Secured Party as Collateral and all cash proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by Secured Party as Collateral for the Obligations and/or then or at any time thereafter applied, without any marshalling of rights, remedies or assets, and after payment of any amounts payable to Secured Party hereunder and, after deducting all reasonable costs and expenses of every kind in connection with the care, safekeeping, collection, sale, delivery or otherwise of any or all of the Collateral or in any way relating to the rights of Secured Party hereunder (including reasonable attorneys' fees and costs), to the payment of reduction of the Obligations. Pledgor agrees to pay on demand all such costs and expenses. Any surplus of such cash or cash proceeds held by Secured Party and remaining after payment in full of all the Obligations shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

Notwithstanding the foregoing or anything to the contrary herein, Secured Party acknowledges and agrees that so long as Borrower's obligations to Senior Lender under the Senior Loan Agreement remain outstanding, Secured Party's rights and remedies hereunder are subject to that certain Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement, dated as of the date hereof, between Senior Lender and the Borrower and acknowledged by Secured Party and its sole owner.

11.     <u>Special Covenants</u>.

(a)     <u>Waivers</u>. Pledgor hereby waives: (i) except as otherwise expressly provided in this Agreement, presentment for payment, demand, protest, and notice thereof as to any instrument, and all other notices and demands to which Pledgor might be entitled, including without limitation notice of all of the following: the acceptance hereof; the creation, existence, or acquisition of any Obligations; the amount of the Obligations from time to time outstanding; any adverse change in the Borrower's financial position; any other fact which might increase Pledgor's risk or liability; any default, partial payment or non-payment of all or any part of the Obligations; any and all agreements and arrangements between Secured Party and the Borrower and any changes, modifications, or extensions thereof; (ii) any right to require Secured Party to institute suit against, or to exhaust its rights and remedies against, the Borrower or any other person, or to exercise any other right or power, or pursue any other remedy Secured Party may have; (iii) any defense arising by reason of any disability or other defense of the Borrower or any endorser, guarantor, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of the Borrower or any endorser, guarantor, co-maker or other person, with respect to all or any part of the Obligations; and (iv) until the Obligations have been finally paid and performed in full, all rights of subrogation, reimbursement, and indemnity whatsoever, and all rights of recourse to or with respect to any assets or property of the Borrower and any collateral or security for any or all of the Obligations.

6

BP_015752

(b)  Consents.  Pledgor hereby consents and agrees that, without notice to or further consent by Pledgor and without affecting or impairing in any way Secured Party's rights hereunder, Secured Party may do any one or more of the following: (i) accelerate, accept partial payments of, compromise or settle, renew, extend the time for the payment, discharge, or performance of, refuse to enforce, and release all or any parties to, any or all of the Borrower's Obligations under the Note; (ii) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property, real, personal, or mixed, tangible or intangible, securing any or all of the Borrower's Obligations, or on which Secured Party at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefor in respect of any or all of such property; (iii) release, substitute or add any one or more endorsers or guarantors of all or any part of the Borrower's Obligations, including, without limitation one or more parties to this Agreement; (iv) amend, alter or change in any respect whatsoever any term or provision relating to any or all of the Borrower's Obligations, including any rate of interest thereon; and (v) exercise any right or remedy Secured Party may have with respect to any or all of the Borrower's Obligations or any property, real, personal or mixed, tangible or intangible, securing any or all of such Obligations or any guaranty thereof, including but not limited to judicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and no such action or proceeding shall affect Secured Party's rights hereunder notwithstanding the effect of any such action or proceeding upon any of Pledgor's rights, including without limitation, any destruction of Pledgor's right of subrogation against the Borrower.

(c)  Financial Condition of the Borrower.  Pledgor is fully aware of the financial condition of the Borrower and is executing and delivering this Agreement based solely upon its own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Secured Party with respect thereto.  Pledgor represents and warrants that Pledgor is in a position to obtain, and Pledgor hereby assumes full responsibility for obtaining, any additional information concerning the Borrower's financial condition and any other matter pertinent hereto as Pledgor may desire, and Pledgor is not relying upon or expecting Secured Party to furnish to Pledgor any information now or hereafter in Secured Party's possession concerning the same or any other matter.  Pledgor shall have no right to require Secured Party to obtain or disclose any information with respect to the Borrower's Obligations, the financial condition or character of the Borrower, the existence of any other collateral for any or all of the Borrower's Obligations, any action or non-action on the part of the Secured Party, the Borrower, or any other person, or any other matter, fact, or occurrence.

(d)  Additional Waivers.  The obligations of Pledgor hereunder shall be enforceable without regard to the validity, regularity or enforceability of any of the Borrower's Obligations or any of the documents related thereto, any guaranty of such Obligations or any collateral security documents securing any of such Obligations or securing any guaranty of such Obligations.  No exercise by Secured Party of, and no omission of Secured Party to exercise, any power or authority recognized herein and no impairment or suspension of any right or remedy of Secured Party against the Borrower, any other guarantor, maker or endorser or any collateral security shall in any way suspend, discharge, release, exonerate or otherwise affect any of Pledgor's obligations hereunder or any collateral security furnished by Pledgor or give to Pledgor any right of recourse against Secured Party.

7

BP_015753

(e)    Waiver of Marshalling.  Pledgor waives any right it may now or hereafter have to require Secured Party to marshal assets, to exercise rights or remedies in a particular manner, or to forbear from exercising such rights and remedies in any particular manner or order.

12.    Term.  This Agreement shall remain in full force and effect until all of the Obligations have been finally satisfied and paid and performed in full.  At the expiration of the term of this Agreement, Secured Party shall, at Pledgor's reasonable cost, return to Pledgor all membership interest certificates and other documents relating to this Agreement, together with any further documents necessary to establish that the within pledge is terminated.

13.    Notices.  Any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, emailed or sent by United States mail or courier service and shall be deemed to have been given when delivered in person, receipt of facsimile or email, or three (3) Business Days after depositing it in the United States mail, registered or certified, with postage prepaid and properly addressed.  Notices shall be sent to the addresses set forth below the signature of each party (until notice of a change thereof is delivered as provided in this Section 13).

14.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the heirs, administrators, successors and assigns of Secured Party and Pledgor, provided, however, that Pledgor may not assign any of its rights or delegate any of the Obligations hereunder without the prior written consent of Secured Party.  Secured Party may not sell, assign, transfer, participate, pledge or otherwise dispose of all or any part of the Obligations and/or the Collateral therefor without Pledgor's prior written consent, unless an Event of Default then exists, except to an assignee of the Note as permitted under Section 10 of the Note.  In the event of such transfer, each and every immediate and successive purchaser, assignee, transferee, participant, pledgee or holder of all or any part of the Obligations and/or the Collateral (each, a "Holder") shall have the right to enforce this Agreement, by legal action or otherwise, for its own benefit as fully as if such Holder were herein by name specifically given such rights.

15.    Attorneys' Fees.  In the event any action or proceeding is commenced to enforce the terms and provisions of this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the losing party therein, such prevailing party's costs and expenses, including, without limitation, reasonable attorneys' fees and costs and court costs.

16.    Integrated Agreement.  This Agreement sets forth the entire understanding of the parties with respect to the within matters, and may not be modified except by a writing signed by all parties.

17.    Severability.  If any clause or provision herein contained operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision shall be held for naught as though not contained herein, and the remainder of this Agreement shall remain operative and in full force and effect.

18.    Interpretation.  The representations, warranties and covenants of each person or entity constituting Pledgor are joint and several.  This Agreement has been reviewed and

8

BP_015754

negotiated by each of the parties and their counsel and, therefore, cannot be construed against the drafter.   Masculine and feminine terms shall include the neuter as applicable.

19.    <u>Governing Law; Forum Selection; Consent to Jurisdiction</u>.  Sections 20, 23 and 24 of the Note are hereby incorporated herein by this reference, with the names of the parties to this Agreement and the applicable documents being used instead of those in the Note.

20.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, and such counterparts will together constitute one and the same instrument. The signatures to this Agreement may be evidenced by facsimile or scanned email copies reflecting the party's signature hereto, and any such facsimile copy or scanned email copies will be sufficient to evidence the signature of such party as if it were an original signature. Any failure by either party to deliver original counterparts will not affect the validity or the delivery of this Agreement.

[Remainder of Page Is Intentionally Left Blank.
Signatures on Following Page.]

9

BP_015755

"PLEDGOR"

"SECURED PARTY"

BAYMARK ACET HOLDCO, LLC,
a Texas limited liability company

ACET VENTURE PARTNERS LLC,
a Texas limited liability company

By: _____
    David J. Hook, President

By: _____

    _____

Address for notices:

Address for notices:

Granite Park II
5700 Granite Parkway, Suite 435
Plano, Texas 75024
Attention:  David Hook
Email: dhook@baymarkpartners.com

_____
_____
_____
Attention: _____
Email: _____

with a copy to:

with a copy to:

Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attention:  Gordon T. Foote II
Email:  gfoote@hallettperrin.com

_____
_____
_____
Attention: _____
Email: _____

Security Agreement
Signature Page

BP_015756

**SCHEDULE I**
**[PLEDGED INTERESTS]**

All of Pledgor's right, title and interest in and to the following membership interests (the "Pledged Interests"), whether directly or beneficially owned, whether now owned or hereafter acquired, in [ACET ACQUISITION, LLC], a Texas limited liability company, owned as follows:

| NAME OF PLEDGOR | PERCENTAGE OF OWNERSHIP OF [ACET ACQUISITION, LLC] CONSTITUTING PLEDGED INTERESTS |
|---|---|
| Baymark ACET Holdco, LLC | 59% |

37606.17/497307v2

Security Agreement
Schedule I

BP_015757

Slipsheet - Spreadsheet File Extension
Rev. Seller Note Payment Schedule.xlsx

BP_015758

SRK Draft H&P Comments 6/25 30/17

**[ACET ACQUISITION, LLC]**

**SECURED PROMISSORY NOTE**

Principal: $1,924,000 3,230,000                                    Issuance Date:
[June]July __, 2017

        For value received, **[ACET ACQUISITION, LLC]** ("**Maker**"), hereby promises to pay to the order of **ACET VENTURE PARTNERS LLC** or its assigns ("**Holder**") the principal sum of One Million Nine Hundred Twenty-Four Thousand Dollars and No/100 ($1,924,000.00 3,230,000.00) (as reduced pursuant to the terms hereof, the "**Principal**") when due, whether upon the payment dates (set forth below), acceleration, prepayment or otherwise (in each case in accordance with the terms hereof) and to pay interest ("**Interest**") on any outstanding Principal from the Issuance Date stated above ("**Issuance Date**") at the rate of fifteen percent (15%) per annum, compounded annually ("**Interest Rate**"), until the same becomes due and payable, whether upon each of the payment dates, or upon acceleration, prepayment or otherwise (in each case in accordance with the terms hereof).  Certain capitalized terms used herein are defined in Section 25.

        This Note is being issued by Maker pursuant to the terms of the Asset Purchase Agreement.  The obligations under this Note are secured by the collateral described in the Security Agreement executed as of the date hereof by Holdco and Holder.

        (1) PAYMENT OF THE PRINCIPAL.  The Principal shall be payable in consecutive monthly installments (each, a "**Monthly Installment**") commencing on the date which is fifteen the last day of the fifteenth (15th) months month after the Issuance Date in accordance with the following payment schedule set forth in Schedule 1 attached hereto, subject to adjustment as set forth herein:.

10440212.2

| ~~Monthly Installment No.~~ | ~~Principal Amount (in US$)~~ | ~~Monthly Installment No.~~ | ~~Principal Amount (in US$)~~ |
|---|---|---|---|
| ~~1~~ | ~~75,000~~ | ~~14~~ | ~~85,000~~ |
| ~~2~~ | ~~75,000~~ | ~~15~~ | ~~85,000~~ |
| ~~3~~ | ~~75,000~~ | ~~16~~ | ~~87,500~~ |
| ~~4~~ | ~~77,500~~ | ~~17~~ | ~~87,500~~ |
| ~~5~~ | ~~77,,500~~ | ~~18~~ | ~~87,500~~ |
| ~~6~~ | ~~77,500~~ | ~~19~~ | ~~90,000~~ |
| ~~7~~ | ~~80,000~~ | ~~20~~ | ~~90,000~~ |
| ~~8~~ | ~~80,000~~ | ~~21~~ | ~~90,000~~ |
| ~~9~~ | ~~80,000~~ | ~~22~~ | ~~92,500~~ |
| ~~10~~ | ~~82,500~~ | ~~23~~ | ~~92,500~~ |
| ~~11~~ | ~~82,500~~ | ~~24~~ | ~~6,500~~ |
| ~~12~~ | ~~82,500~~ | ~~Total~~ | ~~1,924,000~~ |
| ~~13~~ | ~~85,000~~ | | |

(2) INTEREST; INTEREST RATE.  Interest on the outstanding principal of this Note shall commence accruing on the Issuance Date, and shall be computed on the basis of a 360-day year and actual days elapsed, and shall be payable in cash together with each Monthly Installment.  From and after the occurrence of an Event of Default, the Interest Rate shall be increased to the lesser of (i) 1.5% per month compounded monthly, or (ii) the maximum rate permitted under law from time to time (the "**Default Interest**").  All such Default Interest shall be paid at the time of, and as a condition precedent to, the curing of any such Event of Default. In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure.

In no event shall the amount or rate of interest due and payable under this Note exceed the maximum amount or rate of interest allowed by applicable law, and, in the event any such excess payment is made by Maker or received by Holder, such excess sum shall be credited as a payment of principal (or, if no principal shall remain outstanding, shall be refunded to Maker).  It is the express intent hereof that Maker not pay and Holder not receive, directly or indirectly or in any manner, interest in excess of that which may be lawfully paid under

BP_015760

**APP 103**

applicable law.  All interest (including all charges, fees or other amounts deemed to be interest) which is paid or charged under this Note shall, to the maximum extent permitted by applicable law, be amortized, allocated and spread on a pro rata basis throughout the actual term of this Note and any extension or renewal hereof.

(3) RIGHTS UPON EVENT OF DEFAULT.

(a) Event of Default.  Each of the following events shall constitute an "**Event of Default**":

(i)  the Maker's failure to pay to the Holder any amount of Principal, Interest, Default Interest or other amounts when and as due under this Note, provided that the failure to fully pay Principal, Interest or Default Interest when and as due continues for a period of at least three Business Days following Maker's receipt of written notice of default from the Holder;

(ii)  either of the Maker or Holdco, pursuant to or within the meaning of Title 11, U.S. Code, or any similar Federal, foreign or state law for the relief of debtors (collectively, "**Bankruptcy Law**"), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a "**Custodian**"), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(iii)  a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that is not dismissed within thirty (30) days of filing that (A) is for relief against the Maker or Holdco in an involuntary case, (B) appoints a Custodian of the Maker or Holdco or Baymark, or (C) orders a stay of proceedings against the Maker or Holdco, or the liquidation of the Maker or Holdco;

(iv)  the Maker breaches any material representation, warranty, covenant or other term or condition of the Asset Purchase Agreement or any other agreement contemplated therein (collectively, the "**Transaction Documents**") or any other agreement, document, certificate or other instrument delivered in connection with the transactions contemplated thereby and hereby to which the Holder is a party, except, in the case of a breach of a covenant which is curable, only if such breach continues for a period of at least thirty (30) consecutive days following Maker's receipt of written notice of default from the Holder; or

(v)  a Change of Control occurs.

(b) Acceleration Right.  Promptly after the Maker's obtaining knowledge of the occurrence of an Event of Default with respect to this Note, the Maker shall deliver written notice thereof (an "**Event of Default Notice**") to the Holder.  At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default and the expiration of any notice and cure period as provided for herein, the Holder may, by delivering written notice thereof to Maker, until such Event of Default is cured or waived, do any one or more of the following: (i) declare the entire unpaid balance of Principal

10440212.2            3

3

and accrued, unpaid Interest upon this Note to be immediately due and payable, and/or (ii) pursue and enforce any of Holder's other rights and remedies under this Note and/or applicable law.

(c) In case an Event of Default has occurred and is continuing, the Holder may by written notice to Maker, in addition to the rights granted pursuant to Section 3(b) above, at the same time or different times, foreclose or otherwise exercise its rights pursuant to the Security Agreement.

(4) RIGHTS UPON FUNDAMENTAL TRANSACTION.  The Maker shall not enter into or be party to a Fundamental Transaction, unless the Person formed by or surviving any such Fundamental Transaction (if other than the Maker) or the Person to which such Fundamental Transaction shall have been made (in the case of a sale or other conveyance of all or substantially all of Maker's properties or assets) assumes all the obligations of the Maker under this Note and the other Transaction Documents pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction, such approval not to be unreasonably withheld, conditioned or delayed. Upon any Fundamental Transaction, the successor entity to such Fundamental Transaction shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to such "Maker" shall refer instead to the successor entity) and may exercise every right and power of the Maker and shall assume all of the obligations of the Maker under this Note with the same effect as if such successor Person had been named as the Maker herein; *provided, however*, that the predecessor Maker shall not be relieved from its obligations under the Transaction Documents except in the case of a Fundamental Transaction that meets the requirements of this section (whereby a successor "Maker" has been substituted hereunder).  The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions.

(5) OPTIONAL PREPAYMENT.  Notwithstanding anything herein to the contrary, Maker shall have the right to prepay part or all of the outstanding Principal amount owed under this Note, together with any accrued but unpaid Interest, at any time and from time to time without any penalty or premium. In order to effectuate a prepayment as set forth above, Maker must give the Holder at least three (3) days' prior written notice of the anticipated prepayment.  Following such prepayment, at Maker's option, the Monthly Installment schedule set forth in ~~Section 1~~Schedule 1 attached hereto will be revised so that each remaining Monthly Installment of Principal is reduced by a percentage amount equal to the percentage amount by which the initial Principal amount of this Note has been reduced after giving effect to such prepayment (except for Monthly Installment No. ~~24,~~58, which will be equal to all remaining Principal then outstanding).  At Maker's option in the event of such partial prepayment, Holder shall surrender the existing Note and Maker shall issue a replacement Note in the amount of the revised Principal amount and containing a revised schedule of Monthly Installments as contemplated in the preceding sentence, and otherwise in accordance with the terms of Section 11(d).

(6) SECURITY.  This Note is secured to the extent and in the manner set forth in the Security Agreement.

~~10440212.2~~

4

~~- 4 -~~

BP_015762

(7) <u>NON-CIRCUMVENTION</u>.  The Maker hereby covenants and agrees that the Maker will not, by amendment of constitutional documents or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action -- and shall ensure that none of the above actions is taken by Holdco -- avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be reasonably requested by Holder from time to time to protect the rights of the Holder of this Note.

(8) <u>RIGHT OF SET-OFF</u>.  Subject to the terms of, and as further described in, Section **[7.8]** of the Asset Purchase Agreement, Maker will have the right to set off against any amounts payable to Holder hereunder those amounts ~~of any good faith indemnification claim of Maker as~~ determined to be payable from Holder or its ~~owners~~<u>owner</u> to Maker ~~under Section 7.8~~<u>pursuant to the terms of such section</u> of the Asset Purchase Agreement.

(9) <u>RANK</u>.

(a) <u>Rank</u>.  All payments due under this Note shall be subordinate to the indebtedness of the Maker to Senior Lender under the Senior Loan Agreement.

(b) <u>Limitations on Payments</u>.  If payment of Principal or Interest hereunder would be prohibited by the terms of the Subordination Agreement or result in a default under the Senior Loan Agreement (in either case, a "<u>Senior Lender Default</u>"), Maker shall be required to pay only that amount of Principal or Interest as would not result in a Senior Lender Default.

(10)   <u>TRANSFER</u>.  Except for an assignment or transfer to the ~~owners~~<u>sole owner</u> of Holder, this Note may not be offered, sold, assigned or transferred by the Holder, in whole or in part, without the consent of the Maker which consent shall not be unreasonably withheld or delayed, unless an Event of Default then exists.

(11)   <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>.  If this Note is to be transferred in accordance with Section 10, the Holder shall surrender this Note to the Maker, whereupon the Maker will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 11(d)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 11(d)) to the Holder representing the outstanding Principal not being transferred.  The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions hereof and this Section 11(a), following prepayment of any portion of this Note pursuant to Section 5 or an adjustment to the Principal amount pursuant to Section 11(e), the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b) <u>Lost, Stolen or Mutilated Note</u>.  Upon receipt by the Maker of evidence reasonably satisfactory to the Maker of the loss, theft, destruction or mutilation of this



~~10440212.2~~                                                    ~~- 5 -~~

<u>5</u>

Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Maker in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Maker shall execute and deliver to the Holder a new Note (in accordance with Section 11(d)) representing the outstanding Principal.

(c) <u>Note Exchangeable for Different Denominations</u>.  In the event of a partial assignment of this Note in accordance with Section 10, this Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Maker, for a new Note or Notes (in accordance with Section 11(d) and in principal amounts of at least $100,000) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>.  Whenever the Maker is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 11(a) or Section 11(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall set forth accrued Interest (and Default Interest if applicable) on the Principal and Interest of this Note, from the Issuance Date.

(e) <u>Revised Principal Under Asset Purchase Agreement</u>.  In the event of an adjustment to Principal pursuant to Section **[2.3]** of the Asset Purchase Agreement, Holder shall surrender the existing Note and Maker shall issue a replacement Note in the amount of the revised Principal amount and otherwise in accordance with the terms of Section 11(d) above.

(12)   <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES</u>.  The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and the other Transaction Documents at law or in equity, and nothing herein shall limit the Holder's right to pursue actual damages for any failure by the Maker to comply with the terms of this Note.  Amounts set forth or provided for herein with respect to payments (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Maker (or the performance thereof).

(13)   <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>.  If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Maker or other proceedings affecting Maker's creditors' rights and involving a claim under this Note, then the Maker shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with



such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, reasonable attorneys' fees and disbursements.

(14)   CONSTRUCTION; HEADINGS.   This Note shall be deemed to be jointly drafted by the Maker and Holder and shall not be construed against any person as the drafter hereof.  The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(15)   FAILURE OR INDULGENCE NOT WAIVER.   No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(16)   ENTIRE AGREEMENT AND INTERPRETATION.   This Note, the Security Agreement, and the Asset Purchase  Agreement constitute the full and entire agreement and understanding of the parties to this Note with respect to the subjects hereof, and supersedes all previous discussions and agreements, if any, of the parties hereto with respect to the subject matter of this Note.  If this Note and the Asset Purchase Agreement conflict, then the terms of this Note shall control.  No party shall be liable for or bound in any other manner by any representations, warranties, covenants or agreements except as specifically set forth in this Note and the Asset Purchase Agreement.

(17)   NOTICES; PAYMENTS; NAMES.

(a) Notices.   Whenever notice is required or permitted to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section **[8.4]** of the Asset Purchase Agreement.

(b) Payments.   Whenever any payment of cash is to be made by the Maker to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America, via wire transfer of immediately available funds to the recipient bank account as shall be notified in writing to the Maker at least two (2) Business Days prior to the payment of any Monthly Installment.  Notwithstanding the above, and unless notified in writing otherwise, the payment shall be effected to the Holder's bank account, the details of which are detailed in Schedule A of this Note.  Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day.

(c) Names.   Each of Maker and Holder (i) acknowledges that Holder is required to change its legal name on or about the ~~the~~ Issuance Date pursuant to the Asset Purchase Agreement, (ii) agrees that Maker may change its name ~~within sixty (60) days after the Issuance Date~~ without Holder's prior consent, and (iii) agrees to provide the other party with written notice, accompanied by evidence provided by the Office of the Secretary of State of the State of Texas, of such name change promptly following the same.

BP_015765

(18)   CANCELLATION.   After all Principal, accrued Interest and other amounts at any time owed on this Note has been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Maker for cancellation and shall not be reissued.

(19)   WAIVER OF NOTICE.   To the extent permitted by law, except as otherwise set forth herein, the Maker hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Security Agreement.

(20)   GOVERNING LAW.   This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of Texas, without giving effect to any choice of law or conflict of law provision or rule (whether of the Texas or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than Texas.

(21)   REPRESENTATIONS AND WARRANTIES OF MAKER.   Maker hereby represents and warrants to the Holder that: (i) Maker has been duly formed, and is in good standing under the laws of its jurisdiction of organization, (ii) has the requisite power and authority to enter into and perform its obligations under this Note and to issue this Note pursuant to its terms, (iii) the execution, delivery and performance of this Note by Maker have been duly authorized by all necessary corporate action and no further consent or authorization of Maker or its board of directors or shareholder is required, (iv) this Note has been duly executed and delivered by Maker and constitutes the valid and binding obligations of Maker enforceable against Maker in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws effecting creditors' rights generally and by general principles of equity, (v) the membership interests to be transferred to the Holder pursuant to the Security Agreement, are and shall be at all times free and clean from any lien, pledge, other security interest, preemptive rights, rights of first refusal or any other third parties' rights (except for (a) the security interest granted to Senior Lender pursuant to the Senior Loan Agreement and (b) the security interest granted to the Holder pursuant to the Security Agreement), and (vi) there is no pending or, to Maker's knowledge, threatened, claim, audit, investigation, action or other legal proceeding or judgment, order or award of any court, agency or other governmental authority or arbitrator (each an "**Action**") which involves Maker or its assets and which would reasonably be expected to have a material adverse effect upon Maker or threaten the validity of this Note or any related document or transaction. Maker will immediately notify Holder in writing upon acquiring knowledge of any such Action.

(22)   SEVERABILITY.   In case any provision in this Note shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(23)   **WAIVER OF JURY TRIAL. MAKER AND HOLDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING RELATED IN ANY WAY TO THIS NOTE AND THE SECURITY AGREEMENT.**

10440312.2

– 8 –

8

BP_015766

(24)   <u>VENUE AND SERVICE OF PROCESS</u>.   **MAKER AND HOLDER AGREE THAT ANY SUCH PROCEEDING MAY BE BROUGHT AND ENFORCED IN THE STATE AND FEDERAL COURTS LOCATED IN DALLAS COUNTY, TEXAS, AND MAKER AND HOLDER HEREBY WAIVE ANY OBJECTION TO JURISDICTION OR VENUE IN ANY SUCH PROCEEDING COMMENCED IN SAID COURTS.   MAKER AND HOLDER FURTHER WAIVE PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS REQUIRED TO BE SERVED ON MAKER AND HOLDER, AS APPLICABLE, IN ANY SUCH PROCEEDING AND AGREE THAT THE SAME MAY BE SERVED, WITH THE SAME EFFECT AS PERSONAL SERVICE ON MAKER OR HOLDER, AS THE CASE MAY BE, WITHIN TEXAS, BY CERTIFIED OR REGISTERED MAIL ADDRESSED TO MAKER OR TO HOLDER, AS THE CASE MAY BE, AT ITS ADDRESS FOR NOTICES AS HEREIN PROVIDED.**

(25)   <u>CERTAIN DEFINITIONS</u>.   For purposes of this Note, the following terms shall have the following meanings:

(a) "**Asset Purchase Agreement**" means the Asset Purchase Agreement dated ~~June [●], 2017~~as of the Issuance Date made and entered into by and among Holder, the sole owner of Holder, and Maker.

(b) "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in Dallas, TX are authorized or required by law to remain closed.

(c) "**Change of Control**" means any Fundamental Transaction other than a Fundamental Transaction in which holders of at least 51% of the legal and beneficial ownership of, and control of, Holdco immediately prior to the Fundamental Transaction continue after the Fundamental Transaction to hold at least 51%, directly or indirectly, of the legal and beneficial ownership of, and control of, Maker.

(d) "**Fundamental Transaction**" means that the Maker shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Maker is the surviving entity) another Person, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Maker to another Person, or (iii) enter into a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person the intent of which is to accomplish any of the foregoing, or (iv) any transaction or business combination resulting in, directly or indirectly, Holdco not having control over Maker.

(e) "**Holdco**" means Baymark ACET Holdco, LLC, a limited liability company duly registered and validly existing under the laws of Texas.

(f) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

BP_015767

(g) "**Security Agreement**" means that certain Security and Unit Pledge Agreement, dated as of the Issuance Date, by and between Holdco and Holder.

(h) "**Senior Lender**" means Super G Capital, LLC, a Delaware limited liability company, and its successors and assigns.

(i) "**Senior Loan Agreement**" means that certain Business Loan and Security Agreement by and between Maker and Senior Lender dated ~~June [●], 2017,~~as of the Issuance Date, as it may be amended from time to time.

(j) "**Subordination Agreement**" means that certain Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement dated ~~June [●], 2017~~as of the Issuance Date between Maker and Senior Lender and acknowledged by Holder and ~~its owners~~the sole owner of Holder, as it may be amended from time to time.

[Signature Page Follows]

~~37606.17/496974v5~~

~~10440212.2~~                                     ~~-10-~~
10

IN WITNESS WHEREOF, the Maker has caused this Note to be duly executed as of the Issuance Date set out above.

**[ACET ACUISITIONS, LLC]**

By:_____
    Name: David J. Hook
    Title: President

10440212.2

BP_015769

**Schedule 1**

**Monthly Payment Schedule**

[to be inserted]

BP_015770

**<u>Schedule A</u>**

**<u>Holder's Bank Account Information</u>**

[to be inserted]

37606/496974v7

BP_015771

**APP 114**

Document comparison by Workshare Compare on Friday, June 30, 2017
12:58:06 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS/496974/6 |
| Description | DOCS-#496974-v6-Seller_Note_(ACET) |
| Document 2 ID | PowerDocs://DOCS/496974/7 |
| Description | DOCS-#496974-v7-Seller_Note_(ACET) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 40 |
| Deletions | 86 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 126 |

BP_015772

~~SRK~~H&P Draft 6/~~25~~30/17

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is dated and entered into as of ~~June~~July __, 2017 by and between BAYMARK ACET HOLDCO, LLC , a Texas limited liability company ("Pledgor"), and ACET VENTURE PARTNERS LLC, a Texas limited liability company ("Secured Party").

### RECITALS

A.    Pledgor owns the Pledged Interests (as defined in Schedule I attached hereto) in [ACET ACQUISITION, LLC], a Texas limited liability company ("Borrower").

B.    Secured Party has made a loan to Borrower as evidenced by that certain Secured Promissory Note of even date herewith made by Borrower payable to the order of Secured Party (as amended, the "Note"); capitalized terms, which are used herein but not defined herein, shall have the meanings ascribed to them in the Note.

C.    As a condition to entering into the financing contemplated by the Note, Secured Party requires that Pledgor pledge in favor of Secured Party, and grant Secured Party a security interest in, all of the Pledged Interests (as such term is defined in Schedule I attached hereto) and any and all other rights of Pledgor in connection therewith.

D.    To induce Secured Party to make the financing contemplated by the Note, Pledgor is willing to enter into this Agreement with Secured Party.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.    Obligations Secured.  This Agreement and the security interest created hereby are given for the purpose of securing (i) Borrower's payment and performance obligations to Secured Party now or hereafter accruing under the Note; (ii) performance of each agreement of Pledgor contained in this Agreement, and (iii) any and all amendments, modifications, renewals and/or extensions of any of the foregoing, including but not limited to amendments, modifications, renewals or extensions which are evidenced by new or additional instruments, documents or agreements or which change the terms of any obligations secured hereby (all of the foregoing collectively referred to as the "Obligations").

2.    Grant of Security Interest.  For valuable consideration and to secure full payment and performance of the Obligations, Pledgor hereby delivers, pledges and grants a continuing security interest to Secured Party in all of Pledgor's right, title and interest, whether now existing or hereafter arising, in and to the following (collectively, the "Collateral"):

(a)    the Pledged Interests;

(b)    any documents, certificates, negotiable or non-negotiable instruments and any other writing evidencing the Pledged Interests or by which any deposit, transfer, negotiation, roll over, renewal, substitution, withdrawal or other disposition may be made with respect to the Pledged Interests (the "Documents");

(c)    all membership interest rights, rights to subscribe, stock splits, liquidating dividends, cash dividends, dividends paid in membership interests, new securities or other property of any kind, which Pledgor is or may hereafter be entitled to receive on account of the Pledged Interests, including without limitation any of the foregoing arising from that certain Company Agreement of Borrower (as may be amended or modified, the "Operating Agreement"); and

(d)    all proceeds of any sale, exchange or disposition of the property described in subparagraphs (a), (b) or (c) above, whether such disposition is voluntary or involuntary, including, without limitation, all rights to payment and returned premiums with respect to any insurance relating to any of the foregoing.

3.    <u>Delivery of Documents; Priority</u>.  If necessary to perfect Secured Party's security interest therein, and except as otherwise provided in this Agreement, all Documents, how or hereafter evidencing any Collateral, shall be delivered into the possession of Secured Party so that Secured Party may perfect its security interest therein, and shall contain such endorsements or assignments as Secured Party may in its sole, but reasonable, discretion deem necessary or advisable.  For so long as any of the Obligations remain outstanding: (i) Pledgor shall not sell, assign, transfer, exchange, or otherwise dispose of the Collateral without Secured Party's prior written consent; and (ii) Secured Party is hereby irrevocably authorized and appointed as agent and attorney in fact of Pledgor, which appointment is coupled with an interest, to sign and deliver, if applicable, such documents, endorsements and instruments, including, but not limited to the Documents, and to take all such action in the name of Pledgor or Secured Party, as Secured Party may in its sole, but reasonable, discretion deem necessary or advisable to perfect, preserve or enforce its interest in and lien on the Collateral, in the event Pledgor fails to do so promptly following Secured Party's request or if an Event of Default then exists.  Notwithstanding the foregoing or anything else to the contrary herein, Secured Party acknowledges and agrees that for so long as the Borrower's obligations to Super G Capital, LLC, a Delaware limited liability company (with its successors and assigns, "Senior Lender") under that certain Business Loan and Security Agreement by and between the Borrower and Senior Lender dated as of the date hereof (as it may be amended from time to time, the "Senior Loan Agreement") remain outstanding, the priority of the lien and security interest granted hereunder will be subordinate to the lien in favor of Senior Lender evidenced by that certain Pledge Agreement between Pledgor and Senior Lender dated as of the date hereof (as it may be amended from time to time, the "Senior Pledge Agreement").

4.    <u>Adjustments and Dividends</u>.  If during the term of this Agreement, any non-cash dividend, reclassification, readjustment or other change is declared or made in the capital structure of Borrower or any option included within the Collateral is exercised, or both, all new, substituted and additional membership interests, or other securities or property, issued to Pledgor by reason of any such change or exercise shall be pledged and/or delivered to and held by Secured Party under the terms of this Agreement in the same manner as the Collateral originally pledged hereunder.  During the term of this Agreement, any other dividend or other distribution made on account of the Collateral will be included as "Collateral" pledged hereunder.

5.    <u>Warrants and Rights</u>.  If during the term of this Agreement, subscription warrants or any other rights or options shall be issued in connection with the Collateral, such warrants,

2

rights and options shall be immediately assigned by Pledgor to Secured Party to be held under the terms of this Agreement in the same manner as the Collateral originally pledged hereunder.

6.      Voting Rights; Taxes and Other Charges; Power of Attorney.

(a)      Pledgor will not exercise any voting or consensual rights or powers relating to any Collateral in a manner that materially impairs Secured Party's rights with respect to the Collateral.  Upon the occurrence of an uncured Event of Default and for so long as the same is continuing, Secured Party shall have, at its discretion, the option to exercise all voting powers and other organization rights pertaining to the Collateral.  Pledgor shall pay prior to delinquency all taxes, charges, liens and assessments against any of the Collateral and, upon Pledgor's failure to do so, Secured Party may, at its option, pay such charges and shall be the sole judge of the legality and validity thereof and the amount so paid shall become an obligation of Pledgor due hereunder upon demand.  During the term of this Agreement, Pledgor will agree not to amend the Operating Agreement in any way that materially adversely affects the Pledged Interests or the security interest granted hereunder, without the prior written consent of Secured Party, which may be withheld in its sole discretion.

(b)      Pledgor agrees that, except as otherwise provided in this Agreement, Secured Party may, while any uncured Event of Default exists, upon notice to Pledgor, either in Secured Party's name or in the name of Pledgor (i) notify the issuer of any Collateral, or any securities intermediary, to make payment to Secured Party of any amounts now or hereafter due or distributable on or in respect of any Collateral, (ii) enforce collection of any Collateral, whether by legal proceedings or otherwise, and endorse, receive and acknowledge receipt for all proceeds, dividends, interest, principal and other sums so collected, (iii) make any compromise or settlement Secured Party deems desirable or proper with respect to any Collateral, (iv) participate in any recapitalization, reclassification, reorganization, consolidation, redemption, stock split, merger or liquidation of any issuer of any Collateral and, in connection therewith, deposit or surrender control of any Collateral, accept money or other property in exchange for any Collateral, and take such other actions as Secured Party deems proper in connection therewith, (v) apply to the Obligations, in such order of application as Secured Party shall determine, in its sole discretion, any money or other property received on or in respect of, or in exchange for, any Collateral, or hold the same in a non-interest bearing account as additional or substitute Collateral pursuant to the provisions of this Agreement, (vi) cause all or any portion of the Collateral to be transferred into Secured Party's name or into the name of Secured Party's nominee, and (viii) exercise as to the Collateral all rights, powers and remedies of an Pledgor. Pledgor irrevocably appoints Secured Party, or any officer of Secured Party, as Pledgor's true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, to sign or endorse any instrument, document or other writing necessary or desirable to transfer title or other rights to or in any of the Collateral, and to do all acts necessary or incidental to assert, protect and enforce Secured Party's rights in the Collateral and under this Agreement.

7.      Representations and Warranties.  For so long as any Obligations remain outstanding, Pledgor represents and warrants that: (a) Pledgor shall have full power, authority and legal capacity to enter into and perform this Agreement and has taken all necessary action to authorize the execution, delivery and performance of this Agreement; (b) Pledgor owns the

BP_015775

membership interests as defined in the Operating Agreement as indicated on Schedule I hereto; (c) this Agreement constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms, subject to bankruptcy, insolvency or other similar laws affecting the rights of creditors generally; (d) the execution, delivery and performance of this Agreement will not violate any law, treaty or regulation applicable to Pledgor, any order or decree of any court, arbitrator or governmental agency, or any contractual undertaking to which Pledgor is a party or by which Pledgor may be bound; (e) no consents, licenses, approvals or authorizations of, exemptions by or registrations or declarations with, any governmental authority are required with respect to this Agreement; (f) all of the Pledged Interests have been duly authorized and validly issued and are fully paid and non-assessable; (g) Pledgor has good title to the Collateral free and clear of all liens and encumbrances except the interests created hereby and the first priority lien in favor of Senior Lender evidenced by the Senior Pledge Agreement, and the pledge of the Pledged Interests hereunder creates a valid lien on, and a security interest in, the Pledged Interests and the proceeds thereof; and (h) while any Event of Default exists, Secured Party shall have the absolute and unqualified right to sell, at public or private sale, or otherwise dispose of the Collateral, in whole or in part, without restriction, contingent only upon the conditions set forth in this Agreement and otherwise under applicable law.

8.     Further Assurances.  Pledgor covenants and agrees that: (i) it will execute and deliver, or cause to be executed and delivered, all such powers, proxies, instruments and documents as Secured Party may reasonably request from time to time in order to carry out the provisions and purposes hereof; (ii) it will take all such other action as Secured Party may reasonably request from time to time in order to carry out the provisions and purposes hereof; (iii) it will defend the right, title and security interest of Secured Party in and to the Pledged Interests and the proceeds thereof, maintain and preserve the lien and security interest provided for by this Agreement against the claim and demands of all third parties, and the Collateral will remain free and clear of all security interests and liens (other than in favor of Secured Party and in favor of Senior Lender under the Senior Pledge Agreement) throughout the term hereof; and (iv) it will forward to Secured Party, immediately upon receipt, copies of any material information or documents received by Pledgor in connection with the Collateral.  Pledgor warrants and represents that none of the Collateral constitutes margin securities for the purposes of Regulations T, U or X.

9.     Events of Default.  At Secured Party's option, it shall be an "Event of Default" under this Agreement upon:

(a)     The breach by Pledgor of any representation, warranty, covenant or provision hereof, which breach (if reasonably susceptible to cure) is not cured within fifteen (15) calendar days after the earlier of written notice from Secured Party or the date on which Pledgor had actual knowledge of such breach; or

(b)     The occurrence of any Event of Default (as defined in the Note).

10.     Remedies Upon Default.  In addition to the other remedies provided for herein, in the Note or otherwise available under applicable law, upon and after the occurrence of an Event of Default:

4

BP_015776

(a)    Secured Party may:

(i)    Exercise in respect of the Collateral any one or more of the rights and remedies available under the Texas Uniform Commercial Code and other applicable law;

(ii)    Sell or otherwise assign, give an option or options to purchase or dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange, broker's board or at any of the Secured Party's offices or elsewhere upon such terms and conditions as it may deem advisable and such prices as it may deem best, for cash, on credit or for future delivery without assumption of any credit risk, free of any claim or right of whatsoever kind (including any right or equity of redemption) of Pledgor, which claim, right and equity are hereby expressly waived and released. Secured Party shall have the right to the extent permitted by applicable law, upon any such sale or sales, public or private, to purchase the whole or any part of the Collateral so sold. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser thereof, but Secured Party shall incur no liability in case of the failure of such purchaser to pay for the Collateral so sold and, in case of such failure, the Collateral may again be sold as herein provided.

(b)    Any notice required by applicable law to be given by Secured Party of a sale of the Collateral, or any part thereof, or of any other intended action by Secured Party, which occurs not less than ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Pledgor thereof. No notification need be given to the Pledgor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

(c)    Secured Party shall not be obligated to make any sale or other disposition of the Collateral or any part thereof unless the terms thereof shall, in its sole discretion, be satisfactory to it. Secured Party may, if it deems it reasonable, postpone or adjourn the sale of any of the Collateral or any part thereof, from time to time by an announcement at the time and place of such sale or by announcement at the time and place of such postponed or adjourned sale, without being required to give a new notice of sale. Pledgor agrees that Secured Party has no obligations to preserve rights against prior parties to the Collateral.

(d)    Pledgor acknowledges and agrees that Secured Party may comply with limitations or restrictions in connection with any sale of the Collateral in order to avoid any violation of applicable law or in order to obtain any required approval of the sale or of the purchase thereof by any governmental regulatory authority or official and, without limiting the generality of the foregoing, Pledgor acknowledges and agrees that Secured Party may be unable to effect a public sale of any or all of the Collateral by reason of certain prohibitions contained in the federal securities laws and applicable state securities laws, but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale. Notwithstanding any such circumstances, Pledgor acknowledges and agrees that

5

such compliance shall not result in any such private sale for such reason alone being deemed to have been made in a commercially unreasonable manner.  Secured Party shall not be liable or accountable to Pledgor for any discount allowed by reason of the fact that the Collateral is sold in compliance with any such limitation or restriction.  Secured Party shall not be under any obligation to delay a sale of any of the Collateral for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the federal securities laws, or under applicable state securities laws, even if the issuer desires, requests or would agree to do so.

(e)     Any cash held by Secured Party as Collateral and all cash proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by Secured Party as Collateral for the Obligations and/or then or at any time thereafter applied, without any marshalling of rights, remedies or assets, and after payment of any amounts payable to Secured Party hereunder and, after deducting all reasonable costs and expenses of every kind in connection with the care, safekeeping, collection, sale, delivery or otherwise of any or all of the Collateral or in any way relating to the rights of Secured Party hereunder (including reasonable attorneys' fees and costs), to the payment of reduction of the Obligations.  Pledgor agrees to pay on demand all such costs and expenses.  Any surplus of such cash or cash proceeds held by Secured Party and remaining after payment in full of all the Obligations shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

Notwithstanding the foregoing or anything to the contrary herein, Secured Party acknowledges and agrees that so long as Borrower's obligations to Senior Lender under the Senior Loan Agreement remain outstanding, Secured Party's rights and remedies hereunder are subject to that certain Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement, dated as of the date hereof, between Senior Lender and the Borrower and acknowledged by Secured Party and its ~~owners~~sole owner.

11.   Special Covenants.

(a)     Waivers.  Pledgor hereby waives:  (i) except as otherwise expressly provided in this Agreement, presentment for payment, demand, protest, and notice thereof as to any instrument, and all other notices and demands to which Pledgor might be entitled, including without limitation notice of all of the following:  the acceptance hereof; the creation, existence, or acquisition of any Obligations; the amount of the Obligations from time to time outstanding; any adverse change in the Borrower's financial position; any other fact which might increase Pledgor's risk or liability; any default, partial payment or non-payment of all or any part of the Obligations; any and all agreements and arrangements between Secured Party and the Borrower and any changes, modifications, or extensions thereof; (ii) any right to require Secured Party to institute suit against, or to exhaust its rights and remedies against, the Borrower or any other person, or to exercise any other right or power, or pursue any other remedy Secured Party may have; (iii) any defense arising by reason of any disability or other defense of the Borrower or any endorser, guarantor, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of the Borrower or any endorser, guarantor, co-maker or other person, with respect to all or any part of the Obligations; and (iv) until the Obligations have been finally paid and performed in full, all rights of subrogation, reimbursement, and indemnity

6

BP_015778

whatsoever, and all rights of recourse to or with respect to any assets or property of the Borrower and any collateral or security for any or all of the Obligations.

(b)    Consents.  Pledgor hereby consents and agrees that, without notice to or further consent by Pledgor and without affecting or impairing in any way Secured Party's rights hereunder, Secured Party may do any one or more of the following: (i) accelerate, accept partial payments of, compromise or settle, renew, extend the time for the payment, discharge, or performance of, refuse to enforce, and release all or any parties to, any or all of the Borrower's Obligations under the Note; (ii) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property, real, personal, or mixed, tangible or intangible, securing any or all of the Borrower's Obligations, or on which Secured Party at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefor in respect of any or all of such property; (iii) release, substitute or add any one or more endorsers or guarantors of all or any part of the Borrower's Obligations, including, without limitation one or more parties to this Agreement; (iv) amend, alter or change in any respect whatsoever any term or provision relating to any or all of the Borrower's Obligations, including any rate of interest thereon; and (v) exercise any right or remedy Secured Party may have with respect to any or all of the Borrower's Obligations or any property, real, personal or mixed, tangible or intangible, securing any or all of such Obligations or any guaranty thereof, including but not limited to judicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and no such action or proceeding shall affect Secured Party's rights hereunder notwithstanding the effect of any such action or proceeding upon any of Pledgor's rights, including without limitation, any destruction of Pledgor's right of subrogation against the Borrower.

(c)    Financial Condition of the Borrower.  Pledgor is fully aware of the financial condition of the Borrower and is executing and delivering this Agreement based solely upon its own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Secured Party with respect thereto.  Pledgor represents and warrants that Pledgor is in a position to obtain, and Pledgor hereby assumes full responsibility for obtaining, any additional information concerning the Borrower's financial condition and any other matter pertinent hereto as Pledgor may desire, and Pledgor is not relying upon or expecting Secured Party to furnish to Pledgor any information now or hereafter in Secured Party's possession concerning the same or any other matter.  Pledgor shall have no right to require Secured Party to obtain or disclose any information with respect to the Borrower's Obligations, the financial condition or character of the Borrower, the existence of any other collateral for any or all of the Borrower's Obligations, any action or non-action on the part of the Secured Party, the Borrower, or any other person, or any other matter, fact, or occurrence.

(d)    Additional Waivers.  The obligations of Pledgor hereunder shall be enforceable without regard to the validity, regularity or enforceability of any of the Borrower's Obligations or any of the documents related thereto, any guaranty of such Obligations or any collateral security documents securing any of such Obligations or securing any guaranty of such Obligations.  No exercise by Secured Party of, and no omission of Secured Party to exercise, any power or authority recognized herein and no impairment or suspension of any right or remedy of Secured Party against the Borrower, any other guarantor, maker or endorser or any collateral security shall in any way suspend, discharge, release, exonerate or otherwise affect any of

7

Pledgor's obligations hereunder or any collateral security furnished by Pledgor or give to Pledgor any right of recourse against Secured Party.

(e)     Waiver of Marshalling.  Pledgor waives any right it may now or hereafter have to require Secured Party to marshal assets, to exercise rights or remedies in a particular manner, or to forbear from exercising such rights and remedies in any particular manner or order.

12.     Term.  This Agreement shall remain in full force and effect until all of the Obligations have been finally satisfied and paid and performed in full.  At the expiration of the term of this Agreement, Secured Party shall, at Pledgor's reasonable cost, return to Pledgor all membership interest certificates and other documents relating to this Agreement, together with any further documents necessary to establish that the within pledge is terminated.

13.     Notices.  Any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, emailed or sent by United States mail or courier service and shall be deemed to have been given when delivered in person, receipt of facsimile or email, or three (3) Business Days after depositing it in the United States mail, registered or certified, with postage prepaid and properly addressed.  Notices shall be sent to the addresses set forth below the signature of each party (until notice of a change thereof is delivered as provided in this Section 13).

14.     Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the heirs, administrators, successors and assigns of Secured Party and Pledgor, provided, however, that Pledgor may not assign any of its rights or delegate any of the Obligations hereunder without the prior written consent of Secured Party.  Secured Party may not sell, assign, transfer, participate, pledge or otherwise dispose of all or any part of the Obligations and/or the Collateral therefor without Pledgor's prior written consent, unless an Event of Default then exists, except to an assignee of the Note as permitted under Section 10 of the Note.  In the event of such transfer, each and every immediate and successive purchaser, assignee, transferee, participant, pledgee or holder of all or any part of the Obligations and/or the Collateral (each, a "Holder") shall have the right to enforce this Agreement, by legal action or otherwise, for its own benefit as fully as if such Holder were herein by name specifically given such rights.

15.     Attorneys' Fees.  In the event any action or proceeding is commenced to enforce the terms and provisions of this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the losing party therein, such prevailing party's costs and expenses, including, without limitation, reasonable attorneys' fees and costs and court costs.

16.     Integrated Agreement.  This Agreement sets forth the entire understanding of the parties with respect to the within matters, and may not be modified except by a writing signed by all parties.

17.     Severability.  If any clause or provision herein contained operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision shall be held for naught as though not contained herein, and the remainder of this Agreement shall remain operative and in full force and effect.

8

18.     Interpretation.   The representations, warranties and covenants of each person or entity constituting Pledgor are joint and several.   This Agreement has been reviewed and negotiated by each of the parties and their counsel and, therefore, cannot be construed against the drafter.   Masculine and feminine terms shall include the neuter as applicable.

19.     Governing Law; Forum Selection; Consent to Jurisdiction.   Sections 20, 23 and 24 of the Note are hereby incorporated herein by this reference, with the names of the parties to this Agreement and the applicable documents being used instead of those in the Note.

20.     Counterparts.   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, and such counterparts will together constitute one and the same instrument. The signatures to this Agreement may be evidenced by facsimile or scanned email copies reflecting the party's signature hereto, and any such facsimile copy or scanned email copies will be sufficient to evidence the signature of such party as if it were an original signature. Any failure by either party to deliver original counterparts will not affect the validity or the delivery of this Agreement.

[Remainder of Page Is Intentionally Left Blank.
Signatures on Following Page.]

9

BP_015781

"PLEDGOR"                                    "SECURED PARTY"

BAYMARK ACET HOLDCO, LLC,                     ACET VENTURE PARTNERS LLC,
a Texas limited liability company             a Texas limited liability company

By: _____          By: _____
     David J. Hook, President                      _____


Address for notices:                          Address for notices:

Granite Park II                               _____
5700 Granite Parkway, Suite 435               _____
Plano, Texas 75024                            _____
Attention:  David Hook                        Attention: _____
Email: dhook@baymarkpartners.com   Email: _____

with a copy to:                               with a copy to:

Hallett & Perrin, P.C.                        _____
1445 Ross Avenue, Suite 2400                  _____
Dallas, Texas 75202                           _____
Attention:  Gordon T. Foote II                Attention: _____
Email:  gfoote@hallettperrin.com   Email: _____

Security Agreement
Signature Page

BP_015782

**SCHEDULE I**
**[PLEDGED INTERESTS]**

All of Pledgor's right, title and interest in and to the following membership interests (the "Pledged Interests"), whether directly or beneficially owned, whether now owned or hereafter acquired, in [ACET ACQUISITION, LLC], a Texas limited liability company, owned as follows:

| NAME OF PLEDGOR | PERCENTAGE OF OWNERSHIP OF [ACET ACQUISITION, LLC] CONSTITUTING PLEDGED INTERESTS |
|---|---|
| Baymark ACET Holdco, LLC | [69]59% |

37606.17/497307v12

Security Agreement
Schedule I

BP_015783

Document comparison by Workshare Compare on Friday, June 30, 2017
12:48:57 PM

| Input: | |
|---|---|
| Document 1 ID | file://I:\CXF\Baymark\ACET - Super G\Security Agr 25 June 17 (SRK).docx |
| Description | Security Agr 25 June 17 (SRK) |
| Document 2 ID | PowerDocs://DOCS/497307/2 |
| Description | DOCS-#497307-v2-ACET_Venture_(Seller)_Security_Agreement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 12 |
| Deletions | 6 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 18 |

BP_015784

**PLEDGE AGREEMENT**

THIS PLEDGE AGREEMENT (this "Agreement") is dated and entered into as of July 20, 2017 by and between the undersigned ("Pledgor"), and SUPER G CAPITAL, LLC, a Delaware limited liability company ("Secured Party").

RECITALS

A.    Pledgor owns the Pledged Interests (as defined in Schedule I attached hereto) in ACET GLOBAL, LLC, a Texas limited liability company ("Borrower").

B.    Secured Party and Borrower have entered into that certain Business Loan and Security Agreement of even date (as amended, the "Loan Agreement"); capitalized terms, which are used herein but not defined herein, shall have the meanings ascribed to them in the Loan Agreement.

C.    As a condition to entering into the financing contemplated by the Loan Agreement, Secured Party requires that Pledgor pledge in favor of Secured Party, and grant Secured Party a first priority security interest in, all of the Pledged Interests and any and all other rights of Pledgor in connection therewith.

D.    To induce Secured Party to make the financing contemplated by the Loan Agreement, Pledgor is willing to enter into this Agreement with Secured Party.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.    Obligations Secured.  This Agreement and the security interest created hereby are given for the purpose of securing (i) Borrower's payment and performance obligations to Secured Party now or hereafter accruing under the Loan Documents; (ii) performance of each agreement of Pledgor contained in this Agreement, and (iii) any and all amendments, modifications, renewals and/or extensions of any of the foregoing, including but not limited to amendments, modifications, renewals or extensions which are evidenced by new or additional instruments, documents or agreements or which change the terms of any obligations secured hereby (all of the foregoing collectively referred to as the "Obligations").

2.    Grant of Security Interest.  For valuable consideration and to secure full payment and performance of the Obligations, Pledgor hereby delivers, pledges and grants a continuing security interest to Secured Party in all of Pledgor's right, title and interest, whether now existing or hereafter arising, in and to the following (collectively, the "Collateral"):

(a)    the Pledged Interests;

(b)    any documents, certificates, negotiable or non-negotiable instruments and any other writing evidencing the Pledged Interests or by which any deposit, transfer, negotiation, roll over, renewal, substitution, withdrawal or other disposition may be made with respect to the Pledged Interests (the "Documents");

EXHIBIT
**A-5**   BP_007961

(c)     all membership interest rights, rights to subscribe, stock splits, liquidating dividends, cash dividends, dividends paid in membership interests, new securities or other property of any kind, which Pledgor is or may hereafter be entitled to receive on account of the Pledged Interests, including without limitation any of the foregoing arising from that certain Company Agreement of Borrower (as may be amended or modified, the "Operating Agreement"); and

(d)     all proceeds of any sale, exchange or disposition of the property described in subparagraphs (a), (b) or (c) above, whether such disposition is voluntary or involuntary, including, without limitation, all rights to payment and returned premiums with respect to any insurance relating to any of the foregoing.

3.     Delivery of Documents; Priority. If necessary to perfect Secured Party's security interest therein, and except as otherwise provided in this Agreement, all Documents, how or hereafter evidencing any Collateral, shall be delivered into the possession of Secured Party so that Secured Party may perfect its security interest therein, and shall contain such endorsements or assignments as Secured Party may in its sole, but reasonable, discretion deem necessary or advisable.  For so long as any of the Obligations remain outstanding: (i) Pledgor shall not sell, assign, transfer, exchange, or otherwise dispose of the Collateral without Secured Party's prior written consent; and (ii) Secured Party is hereby irrevocably authorized and appointed as agent and attorney in fact of Pledgor, which appointment is coupled with an interest, to sign and deliver, if applicable, such documents, endorsements and instruments, including, but not limited to the Documents, and to take all such action in the name of Pledgor or Secured Party, as Secured Party may in its sole, but reasonable, discretion deem necessary or advisable to perfect, preserve or enforce its interest in and lien on the Collateral, in the event Pledgor fails to do so promptly following Secured Party's request or if an Event of Default then exists.

4.     Adjustments and Dividends. If during the term of this Agreement, any non-cash dividend, reclassification, readjustment or other change is declared or made in the capital structure of Borrower or any option included within the Collateral is exercised, or both, all new, substituted and additional membership interests, or other securities or property, issued to Pledgor by reason of any such change or exercise shall be pledged and/or delivered to and held by Secured Party under the terms of this Agreement in the same manner as the Collateral originally pledged hereunder.  Except as expressly provided in the Loan Agreement, if during the term of this Agreement, any other dividend or other distribution is made on account of the Collateral, Pledgor shall immediately deliver all such dividends or other distributions to Secured Party in the same form received and in the same manner as the Collateral pledged hereunder.

5.     Warrants and Rights. If during the term of this Agreement, subscription warrants or any other rights or options shall be issued in connection with the Collateral, such warrants, rights and options shall be immediately assigned by Pledgor to Secured Party to be held under the terms of this Agreement in the same manner as the Collateral originally pledged hereunder.

6.     Voting Rights; Taxes and Other Charges; Power of Attorney.

(a)     Pledgor will not exercise any voting or consensual rights or powers relating to any Collateral in a manner that materially impairs Secured Party's rights with respect

2

to the Collateral.  Upon the occurrence of an uncured Event of Default and for so long as the same is continuing, Secured Party shall have, at its discretion, the option to exercise all voting powers and other organization rights pertaining to the Collateral.  Pledgor shall pay prior to delinquency all taxes, charges, liens and assessments against any of the Collateral and, upon Pledgor's failure to do so, Secured Party may, at its option, pay such charges and shall be the sole judge of the legality and validity thereof and the amount so paid shall become an obligation of Pledgor due hereunder upon demand.  During the term of this Agreement, except as provided in Section 6.7 of the Loan Agreement, Pledgor will agree not to amend the Operating Agreement without the prior written consent of Secured Party, which may be withheld in its sole discretion.

(b)     Pledgor agrees that, except as otherwise provided in this Agreement, Secured Party may, while any uncured Event of Default exists, upon notice to Pledgor, either in Secured Party's name or in the name of Pledgor (i) notify the issuer of any Collateral, or any securities intermediary, to make payment to Secured Party of any amounts now or hereafter due or distributable on or in respect of any Collateral, (ii) enforce collection of any Collateral, whether by legal proceedings or otherwise, and endorse, receive and acknowledge receipt for all proceeds, dividends, interest, principal and other sums so collected, (iii) make any compromise or settlement Secured Party deems desirable or proper with respect to any Collateral, (iv) participate in any recapitalization, reclassification, reorganization, consolidation, redemption, stock split, merger or liquidation of any issuer of any Collateral and, in connection therewith, deposit or surrender control of any Collateral, accept money or other property in exchange for any Collateral, and take such other actions as Secured Party deems proper in connection therewith, (v) apply to the Obligations, in such order of application as Secured Party shall determine, in its sole discretion, any money or other property received on or in respect of, or in exchange for, any Collateral, or hold the same in a non-interest bearing account as additional or substitute Collateral pursuant to the provisions of this Agreement, (vi) cause all or any portion of the Collateral to be transferred into Secured Party's name or into the name of Secured Party's nominee, and (viii) exercise as to the Collateral all rights, powers and remedies of an Pledgor.  Pledgor irrevocably appoints Secured Party, or any officer of Secured Party, as Pledgor's true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, to sign or endorse any instrument, document or other writing necessary or desirable to transfer title or other rights to or in any of the Collateral, and to do all acts necessary or incidental to assert, protect and enforce Secured Party's rights in the Collateral and under this Agreement.

7.     Representations and Warranties.   For so long as any Obligations remain outstanding, Pledgor represents and warrants that: (a) Pledgor shall have full power, authority and legal capacity to enter into and perform this Agreement and has taken all necessary action to authorize the execution, delivery and performance of this Agreement; (b) Pledgor owns the membership interests as defined in the Operating Agreement as indicated on Schedule I hereto; (c) this Agreement constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms, subject to bankruptcy, insolvency or other similar laws affecting the rights of creditors generally; (d) the execution, delivery and performance of this Agreement will not violate any law, treaty or regulation applicable to Pledgor, any order or decree of any court, arbitrator or governmental agency, or any contractual undertaking to which Pledgor is a party or by which Pledgor may be bound; (e) no consents, licenses, approvals or authorizations of, exemptions by or registrations or declarations with, any governmental authority are required with

3

BP_007963

respect to this Agreement; (f) all of the Pledged Interests have been duly authorized and validly issued and are fully paid and non-assessable; (g) Pledgor has good title to the Collateral free and clear of all liens and encumbrances except the interests created hereby and the subordinate lien securing the Subordinated Debt owed to ACET Venture Partners LLC, a Texas limited liability company (with its successors or assigns, "Seller"), evidenced by that certain Security Agreement between Pledgor and Seller dated as of the date hereof (as it may be amended from time to time as permitted under the Loan Documents, the "Subordinate Security Agreement"), and the pledge of the Pledged Interests hereunder create a valid first priority lien on, and a first priority security interest in, the Pledged Interests and the proceeds thereof; (h) while any Event of Default exists, Secured Party shall have the absolute and unqualified right to sell, at public or private sale, or otherwise dispose of the Collateral, in whole or in part, without restriction, contingent only upon the conditions set forth in this Agreement and otherwise under applicable law; and (i) the Pledged Interests constitute all of the issued and outstanding membership interests of Borrower.

        8.     <u>Further Assurances</u>.  Pledgor covenants and agrees that: (i) it will execute and deliver, or cause to be executed and delivered, all such powers, proxies, instruments and documents as Secured Party may reasonably request from time to time in order to carry out the provisions and purposes hereof; (ii) it will take all such other action as Secured Party may reasonably request from time to time in order to carry out the provisions and purposes hereof; (iii) it will defend the right, title and security interest of Secured Party in and to the Pledged Interests and the proceeds thereof, maintain and preserve the lien and security interest provided for by this Agreement against the claim and demands of all third parties, and the Collateral will remain free and clear of all security interests and liens (other than in favor of Secured Party and in favor of Seller under the Subordinated Security Agreement) throughout the term hereof; and (iv) it will forward to Secured Party, immediately upon receipt, copies of any material information or documents received by Pledgor in connection with the Collateral.  Pledgor warrants and represents that none of the Collateral constitutes margin securities for the purposes of Regulations T, U or X.

        9.     <u>Events of Default</u>.  At Secured Party's option, it shall be an "Event of Default" under this Agreement upon:

             (a)     The breach by Pledgor of any representation, warranty, covenant or provision hereof, which breach (if reasonably susceptible to cure) is not cured within fifteen (15) calendar days after the earlier of written notice from Secured Party or the date on which Pledgor had actual knowledge of such breach;

             (b)     A petition or action for relief shall be filed by or against Pledgor or Borrower, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Pledgor or Borrower; or upon the dissolution or termination of the business of Pledgor or Borrower and in each case, in the event of any of the foregoing which constitutes an involuntary proceeding against Pledgor or Borrower, such proceeding is not dismissed within forty-five (45) days of the date of commencement; or

4

(c)     The occurrence of any Event of Default (as defined in the Loan Agreement).

10.     Remedies Upon Default. In addition to the other remedies provided for herein, in the other Loan Documents or otherwise available under applicable law, upon and after the occurrence of an Event of Default:

(a)     Secured Party may:

(i)     Exercise in respect of the Collateral any one or more of the rights and remedies available under the California Uniform Commercial Code and other applicable law;

(ii)     Sell or otherwise assign, give an option or options to purchase or dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange, broker's board or at any of the Secured Party's offices or elsewhere upon such terms and conditions as it may deem advisable and such prices as it may deem best, for cash, on credit or for future delivery without assumption of any credit risk, free of any claim or right of whatsoever kind (including any right or equity of redemption) of Pledgor, which claim, right and equity are hereby expressly waived and released. Secured Party shall have the right to the extent permitted by applicable law, upon any such sale or sales, public or private, to purchase the whole or any part of the Collateral so sold. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser thereof, but Secured Party shall incur no liability in case of the failure of such purchaser to pay for the Collateral so sold and, in case of such failure, the Collateral may again be sold as herein provided.

(b)     Any notice required by applicable law to be given by Secured Party of a sale of the Collateral, or any part thereof, or of any other intended action by Secured Party, which occurs not less than ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice to Pledgor thereof. No notification need be given to the Pledgor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

(c)     Secured Party shall not be obligated to make any sale or other disposition of the Collateral or any part thereof unless the terms thereof shall, in its sole discretion, be satisfactory to it. Secured Party may, if it deems it reasonable, postpone or adjourn the sale of any of the Collateral or any part thereof, from time to time by an announcement at the time and place of such sale or by announcement at the time and place of such postponed or adjourned sale, without being required to give a new notice of sale. Pledgor agrees that Secured Party has no obligations to preserve rights against prior parties to the Collateral.

(d)     Pledgor acknowledges and agrees that Secured Party may comply with limitations or restrictions in connection with any sale of the Collateral in order to avoid any violation of applicable law or in order to obtain any required approval of the sale or of the purchase thereof by any governmental regulatory authority or official and, without limiting the

BP_007965

generality of the foregoing, Pledgor acknowledges and agrees that Secured Party may be unable to effect a public sale of any or all of the Collateral by reason of certain prohibitions contained in the federal securities laws and applicable state securities laws, but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale.  Notwithstanding any such circumstances, Pledgor acknowledges and agrees that such compliance shall not result in any such private sale for such reason alone being deemed to have been made in a commercially unreasonable manner.  Secured Party shall not be liable or accountable to Pledgor for any discount allowed by reason of the fact that the Collateral is sold in compliance with any such limitation or restriction.  Secured Party shall not be under any obligation to delay a sale of any of the Collateral for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the federal securities laws, or under applicable state securities laws, even if the issuer desires, requests or would agree to do so.

(e)     Any cash held by Secured Party as Collateral and all cash proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by Secured Party as Collateral for the Obligations and/or then or at any time thereafter applied, without any marshalling of rights, remedies or assets, and after payment of any amounts payable to Secured Party hereunder and, after deducting all reasonable costs and expenses of every kind in connection with the care, safekeeping, collection, sale, delivery or otherwise of any or all of the Collateral or in any way relating to the rights of Secured Party hereunder (including reasonable attorneys' fees and costs), to the payment of reduction of the Obligations.  Pledgor agrees to pay on demand all such costs and expenses.  Any surplus of such cash or cash proceeds held by Secured Party and remaining after payment in full of all the Obligations shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

11.     Special Covenants.

(a)     Waivers.  Pledgor hereby waives:  (i) except as otherwise expressly provided in this Agreement, presentment for payment, demand, protest, and notice thereof as to any instrument, and all other notices and demands to which Pledgor might be entitled, including without limitation notice of all of the following:  the acceptance hereof; the creation, existence, or acquisition of any Obligations; the amount of the Obligations from time to time outstanding; any adverse change in the Borrower's financial position; any other fact which might increase Pledgor's risk or liability; any default, partial payment or non-payment of all or any part of the Obligations; any and all agreements and arrangements between Secured Party and the Borrower and any changes, modifications, or extensions thereof; (ii) any right to require Secured Party to institute suit against, or to exhaust its rights and remedies against, the Borrower or any other person, or to exercise any other right or power, or pursue any other remedy Secured Party may have; (iii) any defense arising by reason of any disability or other defense of the Borrower or any endorser, guarantor, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of the Borrower or any endorser, guarantor, co-maker or other person, with respect to all or any part of the Obligations; and (iv) until the Obligations have been finally

6

BP_007966

APP 133

paid and performed in full, all rights of subrogation, reimbursement, and indemnity whatsoever, and all rights of recourse to or with respect to any assets or property of the Borrower and any collateral or security for any or all of the Obligations.

(b)      Consents.  Pledgor hereby consents and agrees that, without notice to or further consent by Pledgor and without affecting or impairing in any way Secured Party's rights hereunder, Secured Party may do any one or more of the following:  (i) accelerate, accept partial payments of, compromise or settle, renew, extend the time for the payment, discharge, or performance of, refuse to enforce, and release all or any parties to, any or all of the Borrower's Obligations under the Loan Documents; (ii) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property, real, personal, or mixed, tangible or intangible, securing any or all of the Borrower's Obligations, or on which Secured Party at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefor in respect of any or all of such property; (iii) release, substitute or add any one or more endorsers or guarantors of all or any part of the Borrower's Obligations, including, without limitation one or more parties to this Agreement; (iv) amend, alter or change in any respect whatsoever any term or provision relating to any or all of the Borrower's Obligations, including any rate of interest thereon; and (v) exercise any right or remedy Secured Party may have with respect to any or all of the Borrower's Obligations or any property, real, personal or mixed, tangible or intangible, securing any or all of such Obligations or any guaranty thereof, including but not limited to judicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and no such action or proceeding shall affect Secured Party's rights hereunder notwithstanding the effect of any such action or proceeding upon any of Pledgor's rights, including without limitation, any destruction of Pledgor's right of subrogation against the Borrower.

(c)      Financial Condition of the Borrower.  Pledgor is fully aware of the financial condition of the Borrower and is executing and delivering this Agreement based solely upon its own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Secured Party with respect thereto.  Pledgor represents and warrants that Pledgor is in a position to obtain, and Pledgor hereby assumes full responsibility for obtaining, any additional information concerning the Borrower's financial condition and any other matter pertinent hereto as Pledgor may desire, and Pledgor is not relying upon or expecting Secured Party to furnish to Pledgor any information now or hereafter in Secured Party's possession concerning the same or any other matter.  Pledgor shall have no right to require Secured Party to obtain or disclose any information with respect to the Borrower's Obligations, the financial condition or character of the Borrower, the existence of any other collateral for any or all of the Borrower's Obligations, any action or non-action on the part of the Secured Party, the Borrower, or any other person, or any other matter, fact, or occurrence.

(d)      Additional Waivers.  The obligations of Pledgor hereunder shall be enforceable without regard to the validity, regularity or enforceability of any of the Borrower's Obligations or any of the documents related thereto, any guaranty of such Obligations or any collateral security documents securing any of such Obligations or securing any guaranty of such Obligations.  No exercise by Secured Party of, and no omission of Secured Party to exercise, any power or authority recognized herein and no impairment or suspension of any right or remedy of

7

BP_007967

Secured Party against the Borrower, any other guarantor, maker or endorser or any collateral security shall in any way suspend, discharge, release, exonerate or otherwise affect any of Pledgor's obligations hereunder or any collateral security furnished by Pledgor or give to Pledgor any right of recourse against Secured Party.

        (e)    <u>Waiver of Marshalling</u>. Pledgor waives any right it may now or hereafter have to require Secured Party to marshal assets, to exercise rights or remedies in a particular manner, or to forbear from exercising such rights and remedies in any particular manner or order.

        12.    <u>Term</u>. This Agreement shall remain in full force and effect until all of the Obligations have been finally satisfied and paid and performed in full. At the expiration of the term of this Agreement, Secured Party shall, at Pledgor's reasonable cost, return to Pledgor all membership interest certificates and other documents relating to this Agreement, together with any further documents necessary to establish that the within pledge is terminated.

        13.    <u>Notices</u>. Any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, emailed or sent by United States mail or courier service and shall be deemed to have been given when delivered in person, receipt of facsimile or email, or three (3) Business Days after depositing it in the United States mail, registered or certified, with postage prepaid and properly addressed. Notices shall be sent to the addresses set forth below the signature of each party (until notice of a change thereof is delivered as provided in this <u>Section 13</u>).

        14.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the heirs, administrators, successors and assigns of Secured Party and Pledgor, provided, however, that Pledgor may not assign any of its rights or delegate any of the Obligations hereunder without the prior written consent of Secured Party. Secured Party may, from time to time, without the consent of Pledgor (but with prompt notice to Pledgor thereafter), sell, assign, transfer, participate, pledge or otherwise dispose of all or any part of the Obligations and/or the Collateral therefor. In such event, each and every immediate and successive purchaser, assignee, transferee, participant, pledgee or holder of all or any part of the Obligations and/or the Collateral (each, a "<u>Holder</u>") shall have the right to enforce this Agreement, by legal action or otherwise, for its own benefit as fully as if such Holder were herein by name specifically given such rights. Pledgor agrees that the rights of any such Holder hereunder or with respect to the related Obligations shall not be subject to any defense, set off or counterclaim that Pledgor may assert or claim against Secured Party, and that any such Holder shall have all of the Secured Party's rights hereunder but none of the Secured Party's obligations that accrued prior to the date of such assignment, so long as the Secured Party remains liable therefor. Secured Party shall have an unimpaired right to enforce this Agreement for its benefit with respect to that portion of the Obligations which Secured Party has not sold, assigned, transferred participated, pledged or otherwise disposed of.

        15.    <u>Attorneys' Fees</u>. In the event any action or proceeding is commenced to enforce the terms and provisions of this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the losing party therein, such prevailing party's costs and expenses, including, without limitation, reasonable attorneys' fees and costs and court costs.

8

BP_007968

16.    Integrated Agreement.  This Agreement sets forth the entire understanding of the parties with respect to the within matters, and may not be modified except by a writing signed by all parties.

17.    Severability.  If any clause or provision herein contained operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision shall be held for naught as though not contained herein, and the remainder of this Agreement shall remain operative and in full force and effect.

18.    Interpretation.  The representations, warranties and covenants of each person or entity constituting Pledgor are joint and several.  This Agreement has been reviewed and negotiated by each of the parties and their counsel and, therefore, cannot be construed against the drafter.  Masculine and feminine terms shall include the neuter as applicable.

19.    Governing Law; Forum Selection; Consent to Jurisdiction; Judicial Reference; Counterparts.  Sections 11, 12 and 15 of the Loan Agreement are hereby incorporated herein by this reference, with the names of the parties to this Agreement and the applicable documents being used instead of those in the Loan Agreement.

[Remainder of Page Is Intentionally Left Blank.
Signatures on Following Page.]

9

BP_007969

**APP 136**

"PLEDGOR"

BAYMARK ACET HOLDCO, LLC,
a Texas limited liability company

By: _____
    David J. Hook, President

Address for notices:

Granite Park II
5700 Granite Parkway, Suite 435
Plano, Texas 75024
Attention: David Hook
Email: dhook@baymarkpartners.com

With a copy to:

Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attention: Gordon T. Foote II
Email: gfoote@hallettperrin.com

"SECURED PARTY"

SUPER G CAPITAL, LLC, a Delaware
limited liability company

By: _____
    Marc Cole, Chief Financial Officer

Address:

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660

10

BP_007970

**APP 137**

"PLEDGOR"

BAYMARK ACET HOLDCO, LLC,
a Texas limited liability company

By: _____
     David J. Hook, President

Address for notices:

Granite Park II
5700 Granite Parkway, Suite 435
Plano, Texas 75024
Attention:  David Hook
Email: dhook@baymarkpartners.com

With a copy to:

Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attention:  Gordon T. Foote II
Email:  gfoote@hallettperrin.com

"SECURED PARTY"

SUPER G CAPITAL, LLC, a Delaware
limited liability company

By: _____
     Marc Cole, Chief Financial Officer

Address:

23 Corporate Plaza, Suite 100
Newport Beach, CA 92660

10

BP_007971

**APP 138**

**SCHEDULE I**
**[PLEDGED INTERESTS]**

All of Pledgor's right, title and interest in and to the following membership interests (the "Pledged Interests"), whether directly or beneficially owned, whether now owned or hereafter acquired, in ACET GLOBAL, LLC, a Texas limited liability company, owned as follows:

| NAME OF PLEDGOR | PERCENTAGE OF OWNERSHIP |
|---|---|
| Baymark ACET Holdco, LLC | 100% |

BP_007972

**APP 139**

BP_007973



ACET GLOBAL, LLC
A Texas Limited Liability Company
Limited Liability Company

This Certifies that _____ Baymark ACET Holdco, LLC _____ is the owner of

One Hundred (100%) percent of the membership interest _____ entered in the above named Limited Liability Company

and is entitled to the full benefits and privileges of such interest, subject to the duties and obligations, as

more fully set forth in the Limited Liability Company Agreement.

In Witness Whereof, the Limited Liability Company has caused this Certificate, and the interest

it represents, to be executed by an Authorized person this ____ 1st day of ____ July

_____, 2017 .

David J. Hook, President

David J. Hook, Secretary

BP_007974

ASSIGNMENT OF MEMBERSHIP INTEREST

For value received, the receipt and sufficiency of which is hereby acknowledged, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Baymark ACET Holdco, LLC, a Texas limited liability company ("Assignor"), hereby sells, assigns, transfers and conveys to _____ ("Assignee"), all of Assignor's rights, title and interest in and to a one hundred percent (100.00%) membership interest in ACET Global, LLC, a Texas limited liability company (the "Company") represented by Certificate No. 01, which constitutes all of the membership interests Assignor holds in the Company, which Assignor hereby represents and covenants to Assignee shall be assigned and transferred to Assignee free and clear of any and all liens, encumbrances, claims, restrictions on sale, transfer or voting).

Dated as of _____, 2017.

Assignor:

**Baymark ACET Holdco, LLC**

By: _____
Name: David J. Hook
Title:  President

Assignee:

_____

By: _____
Name: _____
Title: _____

498240v1

BP_007975

**APP 142**

FILED
10/30/2020 6:52 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jeremy Jones DEPUTY

CAUSE NO. DC-19-09828

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| ACET GLOBAL, LLC | § § | |
| BAYMARK ACET HOLDCO, LLC; | § | 116th JUDICIAL DISTRICT |
| BAYMARK ACET DIRECT INVEST, LLC; | § | |
| BAYMARK MANAGEMENT, LLC; | § | |
| BAYMARK PARTNERS; | § | |
| DAVID HOOK; TONY LUDLOW; and | § | |
| WINDSPEED TRADING, LLC. | § § | |
| Defendants. | § § | |

## PLAINTIFF'S SECOND AMENDED PETITION

NOW COMES D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC), Plaintiff, and files this its Second Amended Petition complaining of ACET Global, LLC; Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC; Baymark Partners; David Hook; Tony Ludlow; and Windspeed Trading, LLC, Defendants, and states as follows:

### I. DISCOVERY CONTROL PLAN

1. D&T Partners, as Plaintiff, intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure.

### II. CLAIM FOR RELIEF

2. D&T Partners seeks monetary relief over $1,000,000, but not more than $5,000,000.


EXHIBIT
A-6

### III. PARTIES

3.  Plaintiff, D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC), is a limited liability company formed in the state of Texas.

4.  Defendant, ACET Global, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

5.  Defendant, Baymark ACET Holdco, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

6.  Defendant, ACET Direct Invest, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

7.  Defendant, Baymark Management, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

8.  Defendant, Baymark Partners, is on information and belief, a private equity firm operating as a partnership with its principal place of business at 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

9.  Defendant, Windspeed Trading, LLC, is a limited liability company formed in the state of Texas and may be served with process at 2711 N. Haskell Ave., Suite 2400, Dallas, Texas 75024, or wherever it may be found.

10. Defendant, David Hook, is an individual and a managing director of Baymark Partners at all times relevant to this complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

**APP 144**

11. Defendant, Tony Ludlow, is an individual and managing director of Baymark Partners at all times relevant to this complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

### IV. VENUE

12. Pursuant to Texas Civil Practice and Remedies Code § 15.002(a)(1)-(2), venue for this case is proper in Dallas County, Texas, because all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas.  Venue is further proper by consent.

### V.  FACTS

13. Pursuant to an Asset Purchase Agreement (the "APA") dated July 14, 2017, ACET Global, LLC purchased the assets of ACET Venture Partners, LLC.  ACET Global, LLC was wholly owned and controlled by Baymark ACET Holdco, LLC.

14. Prior to the APA, Baymark ACET Holdco, LLC was wholly owned and controlled by Baymark ACET Direct Invest, LLC, which was controlled by Anthony Ludlow and David Hook.  ACET Direct Invest, LLC remained the majority member of Baymark ACET Holdco, LLC after the APA. Ludlow and Hook ultimately controlled Baymark ACET Direct Invest and, by extension, also controlled Baymark ACET Holdco and ACET Global, LLC.  Ludlow and Hook also ultimately exercised control over Baymark Management, as well as Baymark Partners.  Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC; Baymark Partners; Anthony Ludlow; and David Hook, are collectively referred to herein as the "Baymark parties."  At all times described herein, the Baymark parties acted in concert under the control of Ludlow and Hook.

15. Under the APA, ACET Global agreed to (1) pay $850,000 to ACET Venture Partners, subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000

in favor of ACET Venture Partners (the "Note"); and (3) to provide ACET Venture Partners with a 25% common membership interest in Baymark ACET Holdco, LLC.

16. Hook and Ludlow, through Baymark ACET Direct Invest, LLC and ACET Global, LLC, induced ACET Venture Partners to enter into the APA by, in part, providing a 25% membership interest in Baymark ACET Holdco, LLC. That interest was never registered with the Securities Exchange Commission or Texas State Securities Board.

17. As part of the transaction, ACET Global, LLC entered into a Promissory Note with ACET Venture Partners, memorializing the $3,230,000 payable to ACET Venture Partners. The first installment payment was to come due in October of 2018.

18. Separately, Baymark ACET Holdco, LLC entered into a Security Agreement (the "Security Agreement") with ACET Venture Partners. Under the Security Agreement, Baymark ACET Holdco, LLC granted a security interest to ACET Venture Partners in 59% of the membership interest of ACET Global, LLC. That interest was never registered with the Securities & Exchange Commission or Texas State Securities Board.

19. Irrespective of any agreement, the principals for the Baymark parties, Hook and Ludlow, ensured Tomer Damti that he would be the CEO of ACET Global and that Damti would maintain managerial authority and discretion. Mr. Damti's presence as CEO would, given his knowledge of the business, operations, and industry, safeguard Plaintiff's interest in the transaction and was a substantial inducement to enter into the transaction. In reality, Hook and Ludlow did not actually intend to keep Damti as the CEO or to provide him with managerial authority or discretion. Hook and Ludlow refused to allow him authority to function as a CEO and then Ludlow improperly terminated and removed him.

20. Following the APA, David Hook  then caused ACET Global to enter into a Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement (the "Collateral

Assignment") with Super G Capital, LLC, which provided that Super G Capital, LLC would provide a term loan facility of up to $1,000,000. The Collateral Assignment contemplated that ACET Venture Partners's security interest under the Security Agreement would be subordinated to the lien held by Super G Capital. ACET Venture Partners agreed to subordinate its security interest to Super G Capital, LLC and accept a 25% common membership interest in Baymark ACET Holdco, LLC with the understanding that Damti would maintain managerial authority and discretion and that ACET Global did not intend (and that Hook and Ludlow did not intend to cause it) to default on the loan to ACET Venture Partners or default on the loan from Super G Capital. As a result, Hook and Ludlow, on false pretenses, induced ACET Venture Partners to subordinate its security interest pursuant to the Collateral Assignment.

21. Following the APA, Baymark ACET Direct Invest controlled ACET Global through ACET Holdco, LLC. In effect, however, the Baymark parties (and ultimately Ludlow and Hook) controlled, whether directly or indirectly, Baymark ACET Direct Invest and ACET Holdco, LLC. Ludlow and Hook, through Baymark ACET Direct Invest and ACET Holdco, LLC, caused ACET Global to fail to pay vendors, carriers, and others. Baymark ACET Direct Invest and ACET Holdco deliberately took steps designed and intended to cause ACET Global to fail financially and to default on its Notes.

22. In fact, its principals never intended to fulfill the Note to ACET Ventures Partners. Hook, by consummating the transaction, fraudulently misrepresented that he intended to cause ACET Global, LLC to fulfill the Note, and thereby induced ACET Venture Partners to enter into the Note and related documents, such as the Collateral Assignment. The subsequent actions of the Baymark parties, as described in paragraphs 23 and 24, further demonstrates the intent to defraud ACET Ventures Partners. Ludlow and Hook made further fraudulent misrepresentations pertaining to their intent and ability to continue to run the business with respect to which the assets that were the subject of the APA were attributable; their intent to invest additional amounts into the

underlying business associated with the assets; that Baymark Management, LLC would provide services or services justifying any management fee; that ACET Global would maintain Tomer Damti as the CEO of ACET Global; that funds from the Super G loan would be used to build the business; and regarding their intent to fulfill their obligations under the Note. Baymark ACET Direct Invest's actions directly harmed the value of ACET Venture Partners's security and the Note.

23. Baymark ACET Direct Invest and ACET Holdco and its principals drained ACET Global of its funds and assets to their enrichment and to ACET Global's detriment. Hook and Ludlow exercised direct control over Baymark ACET Direct Invest and ACET Holdco. Pursuant to section 5.3 of Baymark ACET Holdco's Company Agreement, Baymark ACET Holdco was to pay a quarterly management fee (the "Management Fee") of no more than the greater of $150,000 or 5% of ACET Global's EBIDTA to Baymark Management, LLC. On information and belief, Baymark Management, LLC was owned by Tony Ludlow and David Hook. Thus, Ludlow and Hook acted as both the managers of Baymark Management, LLC and exercised control over ACET Global and Baymark ACET Holdco. Ludlow and Hook had planned to and were successful in utilizing this Management Fee to drain ACET Global and Baymark ACET Holdco of all of their assets and capital, whether from a cash flow perspective or in terms of its balance sheet based on accrued/owed liabilities that deliberately placed it in an insolvent position. On information and belief, even after ACET Global became insolvent, Hook and Ludlow continued to drain it of its assets through a Management Fee. They paid or accrued recurring "management fees" to Baymark ACET Holdco and/or Baymark Management, LLC, which did not correspond to services or value provided, and caused improper management fees to be paid or owed even as ACET Global and Baymark ACET

Holdco became insolvent.  The management fee was also used as a device to cause ACET Global to appear to be financially unsound.

24. Within approximately a year—and before the Note came due—Hook and Ludlow caused the creation of a new and separate entity, Windspeed Trading, LLC.  Ludlow and Hook caused the transfer of substantially all of the assets of ACET Global to Windspeed Trading, LLC, thereby removing all of the value of ACET Global, which served as security for the Note and further decreased the value of Baymark ACET Holdco, LLC.  This act, or series of acts, was in violation of the Secured Promissory Note and related Security Agreement.  It also evidenced that Hook and Ludlow fraudulently caused Plaintiff to enter into the related transaction in the first place.

25. Such omissions, misrepresentations, and acts furthered a scheme to defraud, and did defraud, the Plaintiff in connection with the sale of a security interest in ACET Holdco, LLC.

26. Under the existing Amended and Restated Seller Note, ACET Global, LLC was to make payments to D&T Partners, LLC (the successor-in-interest to ACET Venture Partners) on October 31, 2018.  ACET Global failed to make the payment due on October 31, 2018 and has failed to make any payment thereafter.  ACET Global has indicated that it will not make any payments under the Note.

### VI. CLAIMS

### Count I: Breach of Contract

### (ACET Global, LLC, Baymark ACET Holdco, LLC)

27. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

28. ACET Global breached the APA and Note by, among other actions or inactions, defaulting on the installment payments due thereunder.  ACET Global breached the APA and Note when it failed to make installment payments to ACET Venture Partners beginning at least as

of October 31, 2018.  Its continued failure to satisfy the terms of the APA constitutes a breach of contract, causing the entire principal amount of $3,230,000 plus accrued interest to become due immediately.

### Count II: Breach of Contract (Security Agreement)

### (ACET Global, LLC, BAYMARK ACET Holdco, LLC)

29. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

30. ACET Global and Baymark ACET Holdco breached the Security Agreement and Secured Promissory Note by engaging in a "Fundamental Transaction" without approval from ACET Venture Partners.  Section (4) of the Secured Promissory Note provides that "[t]he Maker shall not enter into or be a party to a Fundamental Transaction, unless . . . pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction . . . ."  Section 25(d) of the Secured Promissory Note defines a "Fundamental Transaction" as, among other things, "one or more related transactions . . . [that] sell, assign, transfer, convey or otherwise dispose of all of substantially all of the properties or assets of [ACET Global, LLC]."

31. On information and belief, ACET Global caused the transfer of substantially all of its assets, including goodwill and intangible assets, to Windspeed Trading, LLC.  This act, or series of acts, breached the Security Agreement and Secured Promissory Note.

### Count III: Declaratory Judgment

### (Windspeed Trading, LLC)

32. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

**APP 150**

33. Plaintiff seeks a declaratory Judgment that Windspeed Trading, LLC has assumed all obligations under the Note and Security Agreement.  Section (4) of the Security Agreement provides that "[u]pon any Fundamental Transaction, the successor entity to such Fundamental Transaction [here, Winspeed Trading, LLC] shall succeed to, and be substituted for . . . and shall assume all of the obligations of the Maker under this Note with the same effect as if such successor Person had been named as the Maker herein . . . ."

**Count IV: Fraudulent Inducement**

**(ACET Global, Baymark ACET Direct Invest, ACET Holdco, Hook, Ludlow)**

34. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

35. ACET Global, Baymark ACET Direct Invest, ACET Holdco, and its principals, specifically including Hook and Ludlow, fraudulently induced ACET Venture Partners to enter into the APA and related documents.  ACET Global, Baymark ACET Direct Invest, ACET Holdco and Hook and Ludlow made numerous representations to Plaintiff, all of which were material representations pertaining to their intent and ability to continue to run the business with respect to which the assets that were the subject of the APA were attributable; their intent to invest additional amounts into the underlying business associated with the assets; that Baymark Management, LLC would provide services or services justifying any management fee; that ACET Global and that Hood and Ludlow would maintain Tomer Damti as the CEO of ACET Global and that they would provide him with authority to operate the business; that funds from the Super G loan would be used to build the business; and their intent to fulfill their obligations under the Note.  At the time Defendants made these representations, Defendants knew the representations were false or were made recklessly, as positive assertions and without knowledge of their truth. Defendants made the representations with the intent that Plaintiff

act on them. Relying on the representations made by Defendants as set out above, Plaintiff

entered into the APA.   Plaintiff relied on these representations and would not have entered

into the APA had it not believed the representations and relied on them.

### Count V: Common Law Fraud

### (Hook, Ludlow)

36. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as

if set forth here in full.

37. Ludlow and Hook made material false representations to Plaintiff with the knowledge of their

falsity or with reckless disregard of the truth with the intention that such representations be

acted upon by Plaintiff, and that Plaintiff relied on these representations to its detriment. As

a proximate result of such fraud, Plaintiff sustained the damages described more fully herein.

### Count VI: Breach of Fiduciary Duty

### (ACET Global, LLC, Baymark ACET Holdco, LLC)

38. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as

if set forth here in full.

39. ACET Global and Baymark ACET Holdco, the controlling member of ACET Global, had a

fiduciary relationship with, and owed a fiduciary duty to, ACET Venture Partners.  ACET

Global and Baymark ACET Holdco breached its duties to ACET Venture Partners. During

the period since ACET Global became insolvent or was in the zone of insolvency, ACET

Global and Baymark ACET Holdco owed a fiduciary duty of care to preserve the assets of

ACET Global for the benefit of its creditors, including Plaintiff.  ACET Global and Baymark

ACET Holdco breached its fiduciary duty by willfully and/or through gross negligence (i)

allowing the business and assets to waste, (ii) failing to cause ACET Global to pay under the

Note, and (iii) failing to cause ACET Global to otherwise comply with the terms of the Note.

Baymark ACET Holdco's breaches resulted in injury to Plaintiff, and also significant benefit to Defendants.

40. During the relevant time, ACET Global did not make any payments to Plaintiff.  Instead, Baymark ACET Holdco caused ACET Global to remit revenues and/or accrued payments to the ultimate benefit of Baymark Management, LLC in the form of Management Fees.  As ACET Global's financial conditions declined, Baymark ACET Holdco continued to allow ACET Global to make payments and/or accrue payments to Baymark Management, LLC.  These payments constituted improper self-dealing transactions.  The improper payments and neglect/waste of the business were the proximate cause of the damages suffered by Plaintiff.

41. The conduct of Baymark ACET Holdco was intentional, willful, and/or grossly negligent.  As such, it is liable for exemplary and/or punitive damages.

### Count VII: Aiding and Abetting Breach of Fiduciary Duties to Plaintiff

### (Hook, Ludlow, Baymark Management, LLC)

42. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

43. Hook and Ludlow aided and abetted ACET Global **and** Baymark ACET Holdco in breaching the duties of care and loyalty they owed to Plaintiff.

44. Ludlow and Hook knew or should have known that ACET Global was insolvent, and because it was insolvent, ACET Global owed a fiduciary duty to manage its assets for the benefit of its creditors, including Plaintiff.  Ludlow and Hook directly controlled Baymark Management, LLC and its operations inured to their personal benefit.  Baymark Management, LLC, Hook, and Ludlow knowingly participated in self-dealing described above by accepting payments or obligations for management fees from (directly or indirectly) ACET Global while Baymark Management, LLC, Hook, and Ludlow had actual knowledge that ACET Global was

insolvent.  Baymark Management, LLC's acceptance, through the efforts of Hook and Ludlow, of payments from ACET Global aided and abetted ACET Global in breaching the fiduciary duties owed to Plaintiff.  The actions of Baymark Management, LLC and Ludlow and Hook in aiding and abetting such acts were materially and substantially detrimental to Plaintiff and caused substantial damages to Plaintiff.  Moreover, Hook and Ludlow breached their fiduciary duties, causing damages to Plaintiff.

### Count VIII: Texas Uniform Fraudulent Transfer Act

### (Hook, Ludlow, ACET Global, Windspeed Trading, LLC)

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

46. Hook, Ludlow, ACET Global, and Windspeed Trading, LLC violated the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Comm. Code 24.001 *et seq.*, by transferring substantially all of the assets of ACET Global to Windspeed Trading, LLC.  These transfers were made after or within a reasonable time before Plaintiff's claims arose.  These transfers and obligations are also fraudulent because Hood, Ludlow, and ACET Global made the transfers and obligations with actual intent to hinder, delay, or defraud Plaintiff.

### Count IX: Texas Securities Act 33A(2)

### (Hook, Ludlow, Baymark ACET Direct Invest, Baymark ACET Holdco, LLC)

47. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

48. Hook, Ludlow, Baymark ACET Direct Invest and Baymark ACET Holdco, LLC sold securities, namely the interest in Baymark ACET Holdco, LLC, and/or a security interest in ACET Global, LLC, in violation of Texas Securities Act section 33A(2).  Baymark ACET Direct Invest and Baymark ACET Holdco, LLC offered and sold securities by means of an

untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made not misleading.

49. Texas Securities Act 33A(2) provides as follows:

> **(1) Untruth or Omission. —** A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

Tex. Rev. Civ. Stat. Art. 581-33

50. Indeed, the use of fraud and fraudulent practices in connection with the offer for sale and sale of securities is prohibited by Sections 4F, 25-1, and 32A of the Securities Act. In Section 4F of the Securities Act, fraud is defined as follows:

> The term "fraud" or "fraudulent practice" shall include any misrepresentations, in any manner, of a relevant fact; any promise or representation or prediction as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; . . . provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

Tex. Rev. Civ. Stat. Art. 581-4

51. Moreover, under Section 33F(2) of the Securities Act:

> **(2)** A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A . . . jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

Tex. Rev. Civ. Stat. Art. 581-33

52. Hook, Ludlow, Baymark ACET Direct Invest and Baymark ACET Holdco, LLC are jointly and severally liable with ACET Global because of their direct control of ACET Global as the offeror or because of their material aid to ACET Global with the intent to deceive or defraud or with reckless disregard for the truth or the law.

53. Hook, Ludlow, Baymark ACET Direct Invest and Baymark ACET Holdco, LLC in the issuance, sale, promotion, negotiations, advertisement, or distribution of securities in the State of Texas, have engaged in fraud and fraudulent practices by misrepresenting material facts and intentionally failing to disclose material facts as outlined above.  Hook, Ludlow, Baymark ACET Direct Invest and Baymark ACET Holdco, LLC, with the intent to deceive or defraud or with reckless disregard for the truth or the law, have materially aided, and are materially aiding, one another in the fraudulent practices set forth herein.

### Count X: Texas Securities Act 33A(F)

### (Ludlow, Hook)

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

55. Hook and Ludlow acted as control persons and aiders of ACET Global, within the meaning of section 33A(F) of the Texas Securities Act.  By virtue of their positions with ACET Global, and ultimate ownership of ACET Global and other relevant parties, Ludlow and Hook had the power and authority to cause ACET Global to engage in the conduct complained of herein and materially aided the seller in furthering the fraud. By reason of such conduct, Ludlow and Hook are jointly and severally liable pursuant to section 33A(F) of the Texas Securities Act.

### Count XI: Civil Conspiracy

56. Defendants, in combination with one another, agreed to accomplish for an unlawful purpose or a lawful purpose by unlawful means, one or more of the violations described above,

including to breach the fiduciary duties that ACET Global and/or ACET Holdco owed to Plaintiff. Defendants, ultimately by and through Ludlow and Hook, had a meeting of the minds on the object or course of action to divert Plaintiffs funds and property under the above causes of action. One or more of the Baymark parties, at the direction of Hook and Ludlow, committed an unlawful, overt act to further this object or course of action. Plaintiff has suffered a substantial injury as a proximate result of these wrongful acts.

### Count XII: Attorney's Fees

### (ACET Global)

57. Paragraph 13 of the Promissory Note provides as follows:

> If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note . . . then the Maker shall pay the costs incurred by the Holder for such collection, enforcement or action . . . including, but not limited to, reasonable attorneys' fees and disbursements.

### VII.   DAMAGES

58. Plaintiff seeks monetary relief over $1,000,000, but not more than $5,000,000, which is within the jurisdictional limits of this Court.

59. As a result of the foregoing causes of action, Plaintiff suffered the following damages:

      67.1. Direct and compensatory damages;

      67.2. Lost profits from the operation of its pre-existing business;

      67.3. Loss of Goodwill;

      67.4. Exemplary damages.

60. Plaintiff further specifically pleads for the remedy of rescission.

61. The conduct of the Defendants was intentional, willful, and/or grossly negligent.  As such, they are liable for exemplary and/or punitive damages.

## VIII.   JURY DEMAND

62. Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## IX. REQUEST FOR DISCLOSURE

**63.** Under Texas Rule of Civil Procedure 194, Plaintiff requests that the Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## PRAYER

WHEREFORE Plaintiff asks to be awarded a judgment against Defendants for actual damages, rescission, court costs, attorney's fees, and all other relief to which Plaintiff is entitled.

Respectfully submitted,

By: /s/ Jason Freeman
Jason B. Freeman
TX Bar No. 24069736
Ryan C. Dean
TX Bar No. 24109798
Freeman Law, PLLC
2595 Dallas Parkway, Suite 420
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw-pllc.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

This is to certify that on this 30th day of October, 2020, a true and correct copy of the foregoing document was served via the court's e-file system, upon:

Edward P. Perrin, Jr.
Hallett & Perrin
1445 Ross Ave., Suite 2400
Dallas, TX 75202
(214) 922-4132 (Telephone)
(214) 922-4142 (Fax)
EPerrin@hallettperrin.com

**APP 158**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason Freeman
Bar No. 24069736
jason@freemanlaw-pllc.com
Envelope ID: 47704469
Status as of 11/3/2020 8:18 AM CST

Associated Case Party: D&T PARTNERS, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Freeman | | jason@freemanlaw-pllc.com | 10/30/2020 6:52:27 PM | SENT |

Associated Case Party: ACET GLOBAL, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Veronica Jamaica | | vjamaica@hallettperrin.com | 10/30/2020 6:52:27 PM | SENT |
| Edward P.Perrin | | eperrin@hallettperrin.com | 10/30/2020 6:52:27 PM | SENT |
| Jennifer R.Poe | | jpoe@hallettperrin.com | 10/30/2020 6:52:27 PM | SENT |
| Michelle Shriro | | mshriro@singerlevick.com | 10/30/2020 6:52:27 PM | SENT |

Associated Case Party: WINDSPEED TRADING, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Timothy Woods | | twoods@higierallen.com | 10/30/2020 6:52:27 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jim Bradbury | | jim@bradburycounsel.com | 10/30/2020 6:52:27 PM | SENT |
| Courtney CoxSmith | | ccox@bradburycounsel.com | 10/30/2020 6:52:27 PM | SENT |
| Jason Freeman | 24069736 | jason@freemanlaw-pllc.com | 10/30/2020 6:52:27 PM | SENT |
| Michelle E.Shriro | | mshriro@singerlevick.com | 10/30/2020 6:52:27 PM | SENT |

CAUSE NO. DC-18-04365

| | | |
|---|---|---|
| **TOMER DAMTI,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **ACET GLOBAL, LLC,** | § | |
| | § | |
| **Defendant.** | § | **192ND JUDICIAL DISTRICT** |

<u>**ORDER GRANTING DEFENDANT'S MOTION TO**</u>
<u>**DECLARE ACET GLOBAL, LLC THE PREVAILING PARTY**</u>

On this day the Court considered Defendant ACET Global, LLC's ("ACET") Motion to Declare ACET Global, LLC the Prevailing Party (the "Motion"). The Court, having considered the Motion, Plaintiff's response, ACET's reply in support of the Motion, any evidence properly before the Court, and the arguments of counsel, if any, is of the opinion that the Motion is well founded and should be GRANTED.

The Court finds that Plaintiff Tomer Damti ("Plaintiff") nonsuited his claims against ACET without prejudice to avoid an unfavorable ruling on the merits.

IT IS THEREFORE ORDERED that Defendant's Motion to Declare ACET Global, LLC the Prevailing Party is hereby GRANTED.

IT IS FURTHER ORDERED that ACET is the prevailing party in this lawsuit and is entitled to its reasonable attorneys' fees and costs.

9/1/2021 10:02:22 AM

SIGNED this _____ day of _____, 2021.

_____
JUDGE PRESIDING

**ORDER GRANTING DEFENDANT'S MOTION TO DECLARE ACET GLOBAL, LLC THE**
**PREVAILING PARTY – PAGE 1**


EXHIBIT
A-7

FILED
9/1/2021 4:59 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jeremy Jones DEPUTY



Jason B. Freeman                                           Jason@FreemanLaw.com
Managing Member

7011 MAIN STREET · FRISCO, TX 75034
PHONE (214) 984-3410 · TOLL FREE (855) 676-1040 · FAX (214) 984-3409
WWW.FREEMANLAW.COM

September 1, 2021

*Via E-Filing and Email*

**Re:     Damti v. Acet Global, LLC, Cause No. DC-18-04365**

Dear Judge Williams:

  Defendant filed a motion for declaratory relief, asking the court to declare it to be the prevailing party. Plaintiff objected to the Court hearing the motion because the Court's live and in-force Order prohibited the motion and unambiguously ordered that the Court *would not* hear such a motion.[1] Moreover, Defendant filed a revised motion yesterday—August 31, 2021—with revisions, a revised and new affidavit *dated August 31, 2021*, and different exhibits. Nonetheless, the Court granted it a hearing today—September 1, 2021—despite its live order, Rule 166a, and notions of due process. The Court ordered Plaintiff to file a letter brief by 5:00 PM today regarding attorney's fees and related evidentiary issues.[2]

  At the outset, Plaintiff maintains its objections and reasserts that the hearing was improper and that the Court's denial of Plaintiff's right to present evidence and witnesses was improper. "Parties are entitled to rely on a trial court's pre-trial order." *Hull v. S. Coast Catamarans, L.P.,* 365 S.W.3d 35, 43 (Tex. App.—Houston [1st Dist.] 2011) (citing *Dennis v. Haden,* 867 S.W.2d 48, 51 (Tex.App.-Texarkana 1993, writ denied); *Shenandoah Associates v. J & K Properties, Inc.,* 741 S.W.2d 470, 477–78 (Tex.App.-Dallas 1987, writ denied). The arbitrary application of a Court's orders constitutes a reversible abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998).

  Regardless, however, Defendant is not entitled to any attorneys' fees. The Texas Supreme Court has stressed that in order to obtain fees as a "prevailing party," a defendant or other party must obtain actual and meaningful relief that materially alters the parties' legal

---

[1] Notably, Defendant did not ever plead an action for declaratory relief—thus, not only was the motion in violation of the Court's Order (an order that Defendant previously successfully invoked to remove a summary judgment hearing on *Plaintiff's* motion for summary judgment), but it also sought and obtained relief that it did not plead.

[2] In light of the very compressed time frame to provide a brief, counsel has endeavored to research and brief the issues in conformity with the Court's timeframe.



EXHIBIT
A-8

September 1, 2021
Page 2

relationship. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650 (Tex. 2009). But here, Defendant has done no such thing.

Instead, Plaintiff nonsuited its claims "*without prejudice*." A nonsuit is effective from the moment it is filed and "a *nonsuit without prejudice* works no such change in the parties' legal relationship; typically, the plaintiff remains free to re-file the same claims seeking the same relief." *Epps v. Fowler*, 351 S.W.3d 862, 869 (Tex. 2011) (emphasis added). Indeed, Plaintiff can refile its claims if it so chooses and hereby expresses the intent to do so.

The Texas Supreme Court has held that even when a plaintiff obtains favorable jury findings but no damages, he is not entitled to attorney's fees under contractual language entitling a prevailing party to such fees. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650 (Tex. 2009). Indeed, it has addressed that question in no uncertain terms:

> when a contract mandates attorney's fees to a "prevailing party," a term undefined in the contract, has a party "prevailed" if the jury finds the other side violated the contract but awards no money damages? We agree with the United States Supreme Court, which holds that to prevail, a claimant must obtain actual and meaningful relief, something that materially alters the parties' legal relationship. That is, a plaintiff must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief. . . . We thus reach the same conclusion as in another breach-of-contract case decided today: "a client must gain something before attorney's fees can be awarded."

*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 652 (Tex. 2009).

The language at issue in *Intercontinental Grp.* was not distinguishable in any way that supports a different result here. In that case, the contractual provision at issue stated as follows:

> *Attorney's fees*. If either party named herein brings an action to enforce the terms of this Contract or to declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to his reasonable attorney's fees to be paid by losing party as fixed by the court.

*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 652 (Tex. 2009). Here, the language at issue provides as follows:

> Attorneys' Fees and Costs. In the event of any claim, controversy or dispute arising out of or relating to this Agreement, or the breach hereof, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs in connection with any court proceeding.

Although defendant brought an action in this matter, it has not obtained an award of damages. And its pleadings do not contain any pending or other cause of action. Plaintiff non-suited his claims *without prejudice* to refiling them and "the plaintiff remains free to re-file the same claims seeking the same relief." *Epps v. Fowler*, 351 S.W.3d 862, 869 (Tex. 2011).

**APP 162**

September 1, 2021
Page 3

Simply put, Defendant has not obtained actual and meaningful relief that materially alters the parties' legal relationship.

Moreover, as Plaintiff's counsel informed the Court today, this case and these claims are not properly before the Court. In fact, Defendant did not plead a cause of action. It raised a provision that, just as section 38.001 (which it raises here as well), requires that the party prevail on a distinct cause of action. Indeed, to recover attorneys' fees, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Time Out Grocery v. The Vanguard Grp., Inc.*, 187 S.W.3d 41, 43 (Tex. App.—Dallas 2005) (applying section 38.001). The cases are legion requiring that a party first prevail on a cause of action to give rise to a right to attorney's fees and the outcome should not be different here.

I note that it appears that the Court has entered an order today. That order, however, contains "declarations" that (i) were not contained or requested in Defendant's pleadings and (ii) were not specifically requested in Defendant's motion. Relief that is not expressly presented to the Court may not be granted in a motion for summary judgment. Rule 166a.

Should the Court, however, reach the question of attorney's fees, it must conduct an evidentiary hearing, particularly in light of the glaring issues raised by counsel. *Siddiqui v. W. Bellfort Prop. Owners Ass'n*, 819 S.W.2d 657, 659 (Tex. App. 1991) ("Furthermore, there is nothing in the petition to indicate that there was an agreement between the parties fixing an amount for attorney's fees. Thus, it was error for the trial court to award such relief because "[a]ttorney's fees are by their very nature unliquidated unless the exact amount is fixed by agreement.") (citing *Freeman v. Leasing Associates, Inc.*, 503 S.W.2d 406, 408 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); *Nettles v. Del Lingco*, 638 S.W.2d 633 (Tex.App.—El Paso 1982, no writ).); same case: *Siddiqui v. W. Bellfort Prop. Owners Ass'n*, 819 S.W.2d 657, 659 (Tex. App.—El Paso 1991) ("The trial court's failure to conduct an evidentiary hearing on the issue of attorney's fees requires this Court to reverse and remand that particular portion of the default judgment.") (citing *Nettles*, 638 S.W.2d at 636; *In Int. of C.L.W.*, 485 S.W.3d 537, 542 (Tex. App.—San Antonio 2015) ("If damages are unliquidated, a court rendering a default judgment must hear evidence on damages.") (citing TEX. R. CIV. P. 243; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex.1992). Attorney's fees "are by their very nature unliquidated unless the exact amount is fixed by agreement."

Sincerely,

Jason Freeman

FILED
10/15/2021 1:31 PM
DALLAS CO., TEXAS
FELICIA PITRE
DISTRICT CLERK

Shelia Bradley DEPUTY

**CAUSE NO. DC-18-04365**

| | | |
|---|---|---|
| **TOMER DAMTI,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **ACET GLOBAL, LLC,** | § | |
| | § | |
| Defendant. | § | **192ⁿᵈ JUDICIAL DISTRICT** |

**NOTICE OF APPEAL**

Notice is hereby given that TOMER DAMTI ("the Plaintiff") hereby appeals to the Court of

Appeals for the Fifth District of Texas at Dallas, from the Order Denying Tomer Damti's Motion to

Dismiss Pursuant to the Texas Anti-SLAPP Statute entered on October 6, 2021.

Respectfully submitted,

By: */s/Jason B. Freeman*
    Jason B. Freeman
    Texas Bar No. 24069736
    Matthew L. Roberts
    Texas Bar No. 24098330
    Zachary J. Montgomery
    Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Facsimile:  214.984.3409
Jason@freemanlaw.com
Mroberts@freemanlaw.com
ZMontgomery@freemanlaw.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2021, the foregoing document was served upon all counsel

of record in accordance with the Texas Rules of Civil Procedure.

By: */s/Jason B. Freeman*
    Jason B. Freeman

NOTICE OF APPEAL -

Page 1 of 1



*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1                       REPORTER'S RECORD
                        VOLUME 1 OF 1 VOLUMES
 2                TRIAL COURT CAUSE NO. DC-19-09828

 3    D&T PARTNERS, LLC (SUCCESSOR ) IN THE DISTRICT COURT
      IN INTEREST TO ACET VENTURE  )
 4    PARTNERS, LLC)               )
                                   )
 5    vs.                          ) 116th JUDICIAL DISTRICT
                                   )
 6    ACET GLOBAL, LLC; BAYMARK    )
      ACET HOLDCO, LLC; BAYMARK    )
 7    ACET DIRECT INVEST, LLC;     )
      BAYMARK MANAGEMENT, LLC;     )
 8    BAYMARK PARTNERS; DAVID HOOK;)
      TONY LUDLOW; AND WINDSPEED   )
 9    TRADING, LLC                 )
      TRADING, LLC                 ) DALLAS COUNTY, TEXAS

10

11

12         _____

13    NON-PARTY HALLETT & PERRIN, PC'S MOTION FOR PROTECTIVE
      ORDER AND TO QUASH PLAINTIFF'S NOTICE OF DEPOSITION TO
14                   EDWARD P. PERRIN, JR.
           _____

15

16

17

18

19         On the 7th day of April, 2021, the following

20    proceedings came on to be held via Zoom in the

21    above-titled and numbered cause before the Honorable

22    Tonya Parker, Judge Presiding, held in Dallas County,

23    Texas.

24         Proceedings reported by computerized stenotype

25    machine.
```

LANETTA WILLIAMS, CSR, RPR, CRR

**APP 165**

EXHIBIT
**A-10**

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1                              **APPEARANCES**

2    Jason B. Freeman
     SBOT NO. 24069736
3    Freeman Law, PLLC
     7011 Main Street
4    Frisco, Texas 75034
     Telephone:  214-984-3409
5    Attorney for Plaintiff

6    Edward P. Perrin, Jr.
     SBOT NO. 15796700
7    Jennifer R. Poe
     SBOT NO. 00794470
8    Hallett & Perrin, PC
     1445 Ross Avenue, Suite 2400
9    Dallas, Texas 75202
     Telephone:  214-953-0053
10   Attorneys for DEFENDANTS ACET GLOBAL, LLC, BAYMARK ACET
     HOLDO, LLC, BAYMARK ACET DIRECT INVEST, LLC, BAYMARK
11   MANAGEMENT, LLC, BAYMARK PARTNERS, DAVID HOOK AND TONY
     LUDLOW
12
     Brenda Hard-Wilson
13   SBOT NO. 2196550
     Higier Allen & Lautin, P.C.
14   The Tower at Cityplace
     2711 North Haskell Avenue, Suite 2400
15   Dallas, Texas 75204
     Telephone:  972-716-1888
16   Attorney for Defendant Windspeed Trading, LLC

17

18

19

20

21

22

23

24

25

LANETTA WILLIAMS, CSR, RPR, CRR

**APP 166**

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1                          VOLUME 1

2    NON-PARTY HALLETT & PERRIN, PC'S MOTION FOR PROTECTIVE

3    ORDER AND TO QUASH PLAINTIFF'S NOTICE OF DEPOSITION TO

4                      EDWARD P. PERRIN, JR.

5    APRIL 7, 2021
                                                    PAGE VOL.
6    Reporter's Certificate ..........................51   1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1                    **P R O C E E D I N G S**

2              *THE COURT:*  I am now ready to go on the

3    record in Cause No. 19-09828.  This is the matter styled

4    *D&T Partners, LLC vs. Acet Global, LLC, et al.*

5              Counsel, your appearances for the Court's

6    record.

7              *MR. FREEMAN:*  Your Honor, this is Jason

8    Freeman on behalf of the plaintiffs?

9              *MR. PERRIN:*  Your Honor, this is Ed

10   Perrin on behalf of all the defendants with the

11   exception of Windspeed who are the -- and my clients are

12   the movants on the motion.

13             *MS. HARD-WILSON:*  Your Honor, this is

14   Brenda Hard-Wilson for defendant Windspeed Trading.

15             *MR. PERRIN:*  Your Honor, on this call

16   also is Jennifer Poe of my office, but I'll be handling

17   the argument.

18             *THE COURT:*  All right.  Thank you.

19             And of course as you've made reference to

20   in your opening comments, Mr. Perrin, this is a motion

21   brought by what is referred to in the documents as the

22   Baymark defendants seeking protection and to quash your

23   deposition in this matter.  And so you have teed up the

24   motion to protect as well as the motion to quash the

25   deposition notice.  And the Court has had the

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   opportunity to review the motion as well as the response
 2   and I am ready to proceed with arguments on the motion.
 3                  MR. PERRIN:  Thank you, your Honor.
 4                  Your Honor, as a preliminary matter,
 5   let's first put the discovery in this case in context.
 6   In September of last year, plaintiffs produced their
 7   first request for production of documents to the Baymark
 8   defendants.  On that same day, they attempted to
 9   circumvent the discovery process by using an improper
10   statutory request for books and records under the Texas
11   Business and Organizations Code.  That was refused.  And
12   then before the responses were even due, they served
13   Hallett & Perrin with a subpoena, the law firm with a
14   subpoena, to the counsel of record, for work performed
15   for the Baymark defendants which was protected by
16   privilege, duplicative of the discovery requests.  And
17   on the 5th of October, we filed another motion for
18   protective order and to quash the subpoena.  It sat
19   there dormant until the plaintiffs set that for hearing
20   about a week ago.  It's set next week.
21                  And now -- let's see, last night -- as we
22   discussed at the last hearing, Mr. Freeman has taken the
23   position that I don't even have the authority to
24   represent my clients because his clients have foreclosed
25   on a security interest that they really didn't have on
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1    the -- on the ownership interest and has tried to
 2    interfere with the discovery process by, one, telling me
 3    that I can't answer questions in deposition, and this
 4    morning sending me another e-mail advising that they are
 5    going to contact the accountants for the defendant --
 6    Baymark defendants and retain their records there.  And
 7    then this morning he sends me another e-mail telling me
 8    that because the Court has denied his motion for
 9    continuance that he's going to sue me and my firm in a
10    separate lawsuit.
11                  That leads up to where we are today on
12    what they have been doing in harassment and the
13    discovery tactics.  They unilaterally noticed my
14    deposition leading to the filing of this motion.  The
15    motion is straightforward.  It sets forth reasons in
16    law, very simply, for why this is inherently
17    unreasonable, harassing and burdensome.  Importantly, it
18    directly invades the attorney-client and work product
19    privileges.
20                  On its face, cases, and as cited in our
21    motion, the taking of an opposing counsel's deposition
22    is strongly disfavored and improper.  It disrupts the
23    function of counsel in an adversary proceeding of
24    jurisprudence.  It disrupts the attorney-client
25    relationship.  It lowers the standards of the profession
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   and already adds to the significant time and cost of
 2   litigation, not to mention this Court's time.  And as
 3   the In re Baptist case put it, as cited in our brief at
 4   Page 140, doing so would cause a prohibitive, quote,
 5   chilling intervention of the attorney-client
 6   relationship under the guise of looking for facts.
 7                  Most telling about the plaintiff's
 8   response is they don't even attempt to address that law.
 9   They don't attempt to address the law holding that the
10   party seeking to depose the opposing attorney shoulders
11   a heavy burden of proving the necessity of such a
12   deposition.  They must show that -- they must show there
13   are no other means to obtain the information.  They must
14   show that the information sought is relevant and
15   privileged.  They must show it's crucial to the
16   preparation of their case.  And even if they show all of
17   that, they must show that there are no -- they must show
18   there are -- that less intrusive methods are unavailable
19   to obtain that information.
20                  Amazingly, the only argument that -- that
21   the plaintiff offers that counsel -- that depositions of
22   counsel of record are allowed is a reference to
23   Rule 3.08 of the Rules of Professional Responsibility,
24   Lawyer as a Witness, which he asserts in the response at
25   Page 3 for the proposition that 3.08 -- the Rule 3.08
```

```
 1    prohibits a lawyer from serving as an advocate when a
 2    member of his firm is called as a witness.  One doesn't
 3    have to look at Rule 3.08 to know that's not the law,
 4    but any cursory reading of 3.08 shows that it says the
 5    exact opposite.
 6              Rule 3.08(b) specifically states that a
 7    lawyer may serve as a advocate when a member in his firm
 8    is testifying.  But most telling of the comments,
 9    Comment 8 to that rule, This Rule does not prohibit the
10    lawyer who may or will be a witness from participating
11    in the preparation of a matter for presentation to a
12    tribunal.  And then at the end of that it says, Even in
13    those situations, however, another lawyer in the
14    testifying lawyer's firm may act as an advocate
15    providing that the client's consent is informed -- is
16    given.
17              Rule 10 is even more important.  It said,
18    This Rule 8 should not be used as a tactical weapon to
19    deprive the opposing party of the right to be
20    represented by the lawyer of his or her choice.  And at
21    the end it says, Likewise, a lawyer should not seek to
22    disqualify an opposing lawyer by unnecessarily calling
23    that lawyer as a witness.  Such unintended applications
24    of this rule, if allowed, would subvert the true purpose
25    of conventing it into a mere tactical weapon in
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   litigation, which is what has happened here.

 2                  Your Honor, any review of the rules of

 3   professional responsibility ethics opinions would

 4   show -- Ethics Opinion 471 or 475 all confirm that

 5   counsel may function as I'm doing when another witness

 6   in the firm -- lawyer in their firm may be a witness.

 7                  Most telling is the supreme court in the

 8   case of Ayers vs. Canales, 790 S.W.2d 554, a Texas

 9   Supreme Court from 1990.  In that case, the law firm was

10   being sued under an oral contingent referral fee.  And

11   although both the lawyer and his law firm were parties

12   to the case, the supreme court did not disqualify

13   members of their firm from representing the firm in the

14   case.  Of importance in that decision, the supreme court

15   said, However, Rule 3.08 should not be used as a

16   tactical weapon to deprive the opposing party of the

17   right to be represented by the lawyer of his or her

18   choice because reducing such rule to a use would subvert

19   its purpose.

20                  And then it also points out that in

21   Subparagraph C in Comment 8 to Rule 3.08, which I just

22   read to you, make it clear that another lawyer

23   testifying in a testifying lawyer's firm may act as an

24   advocate and cites the Dondi case on that as well.

25                  So, your Honor, the -- the only argument
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1  that they say that says it's prohibited is Rule 3.08.

2  And any cursory ruling of that rule and any cases

3  related to it state the exact opposite.  They otherwise

4  don't address the legal issue at all.

5          Turning to the facts.  As set forth in

6  the motion and the affidavit, my only role with respect

7  to any matters involved in this case has been as counsel

8  of record.  My first involvement, my first having

9  anything to do with this case was after the litigation

10  was filed and I was engaged to defend it.  That is in

11  Paragraph 6 of my affidavit.

12          Paragraph 4 of my affidavit, 5 and 6 run

13  through this.  As the Court is aware from the other

14  hearings and also from these motions, this involves a

15  transaction in 2017 under an asset purchase agreement

16  series of transactions where my clients acquired the

17  assets of the plaintiff.  I wasn't involved in that.  As

18  my affidavit points out, that was handled by a lawyer --

19  two lawyers at my firm, Gordon Foote and Cassandra

20  Foster.  Mr. Foote has left this firm.  He went to be

21  counsel for his church -- head counsel for his church in

22  South America.  Ms. Foster is no longer with our firm,

23  but she's still out there.

24          Paragraph 5 talks about the other matters

25  that are at issue in this case.  One I'll -- is defined

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   as the Super G Debt, which talks about the indebtedness
 2   to the independent third party lender, Super G,
 3   subsequent negotiations with that lender and Super G
 4   Capital about the indebtedness and the foreclosure on
 5   that indebtedness at issue in the case and that
 6   collateral.
 7               Paragraph 5 also defines the Windspeed
 8   transactions, about the formation and operation of
 9   Windspeed Trading, plus the issuance of warrants to
10   Super G, the lender, and to another entity that's not a
11   party to the case.  Baymark Partners Management, LLC.
12   Julie Smith at my firm handled those transactions.
13   Ms. Smith's deposition is scheduled in this case next
14   week.
15               Paragraph 6 explains that I had no
16   involvement before being retained in this lawsuit and
17   nothing before.  Yet typical of the plaintiff's
18   unsupported assertions is in their response at
19   paragraph -- at Page 14, the plaintiff claims that I
20   never state I have no personal knowledge of facts in the
21   case.  A cursory review of my affidavit shows exactly
22   otherwise.  Paragraphs 4, 5 and 6 that I just read to
23   you, including Paragraph 6, where I state under oath, I
24   had no involvement in any manner, as counsel or
25   otherwise, in connection with the APA transactions, the
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   Super G debt or the Windspeed transactions, which are
 2   defined in the above paragraphs, and my only involvement
 3   in any transaction at issue in this lawsuit is as
 4   litigation counsel.  Your Honor, I'm counsel of record.
 5   I'm an advocate.  I'm not a fact witness and the
 6   plaintiff has not and cannot show otherwise.
 7             So instead, what does the plaintiff do?
 8   Their response makes a -- numerous, wholly unsupported
 9   assertions about my supposed knowledge without pointing
10   to anything, not one thing that would even suggest any
11   pre-litigation connection between me and the events in
12   question.  For example, plaintiff's response at Page 1,
13   Mr. Perrin is a fact witness and a central one.  At
14   Page 1 again, He is the most knowledgeable person at his
15   firm on the matters at issue.  Page 5, He is being
16   deposed because he's an important key witness, although
17   I was not involved in any transactions.  Page 5, He is
18   the managing member of his firm, and as such, is in the
19   single best position to know case determinative
20   information.  That is what they say.
21             That statement about being the managing
22   partner of the firm, first of all, would indicate to me
23   that no one -- anybody who worked at a firm knows that's
24   not the case.  But there's no basis or authority for
25   that statement whatsoever, that the managing partner
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1    necessarily knows everything that goes on.  And quite
 2    frankly, it's also incorrect.  As of April 1, I was no
 3    longer the managing partner.  So that would mean, I
 4    assume, Leland de la Garza, our new managing partner, is
 5    now the most knowledgeable person in the firm.  It is a
 6    fatal logical leap.
 7              He then says in the response at
 8    Paragraph 13 in bold emphasis in the brief, There's no
 9    other source of such information.  That is the only
10    statement they give of any kind without any factual
11    support to do so.  Well, your Honor, he said that I am
12    the managing partner of the firm.  This is an apex
13    deposition.
14              So let's look at what the case law says
15    about apex depositions.  In Bullock vs. American Heart
16    Association, 360 S.W.2d -- S.W.3d 661 -- it's the Dallas
17    Court of Appeals 2012 case -- the Dallas Court of
18    Appeals discussed apex depositions and upheld the trial
19    court's granting of the motion to quash several such
20    notices of apex, of general counsel and the like.  At
21    Page 666 of that case, it states, quote, An apex
22    deposition is the deposition of a corporate officer who
23    is at the top of the corporate hierarchy.  In ordering
24    or preventing an apex deposition, the trial court must
25    apply the guidelines set out in Crown Central.  And
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1   that's referring to *Crown Central Petroleum vs. Garcia*

2   904 F.2d 193 (sic), Texas Supreme Court 2000.

3                   Under Crown Central, a corporation may

4   shield a high level corporate official from a deposition

5   by filing an affidavit by the official denying knowledge

6   of the relevant facts.  At Page 666, -67, When the court

7   determines by the motion -- by -- the court is to

8   determine a motion by first considering whether the

9   proponent of the deposition has arguably shown the

10  official has any unique or superior personal knowledge

11  of discoverable information.  If the proponent fails to

12  make such showing, the trial court should grant the

13  motion for protective order and first require the party

14  seeking the depositions to attempt to obtain the

15  discovery through less intrusive means.

16                  The supreme court then said, The

17  affidavits of the individuals show they were not

18  directly involved in the transaction at issue and had no

19  personal knowledge of the issues in the case.  The same

20  thing is true here and they issued mandamus that those

21  depositions cannot take place.

22                  And importantly, at Footnote 4 on

23  Page 667, the Bullock court said, We are deeply troubled

24  by Bullock's unsubstantiated invective suggesting that

25  the AHA is probably hiding counsel because he gave them

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   advise on who -- on how to break the law.  Attorneys owe
 2   opposing counsel a duty of courtesy and should not abuse
 3   the opposing party or engage in offensive conduct and it
 4   cited the Dondi case.
 5              On the apex issue alone before you even
 6   get into the attorney-client privilege conduct, there's
 7   no connection between the underlying claims and me,
 8   period, much less any unique or superior personal
 9   knowledge of any kind.  And for that reason alone it
10   should be denied.
11              But turning back to the standards -- and
12   we brought this up because that was in the response.  In
13   the standards set forth in our motion, they say there's
14   no other way to obtain this information.  They don't --
15   they don't contest or controvert that they have a heavy
16   burden to prove here.  The many things they must show
17   and satisfy, they don't even attempt to do so.  They --
18   there's no other source of that information is their
19   only response to all of that law.  There is no attempt
20   to show that I have information about those transactions
21   period other than managing partner, much less that I
22   have some information that no one else does or there's
23   no other means to obtain it or what I know is crucial to
24   the case that cannot be obtainable anywhere else and
25   that all those efforts have been exhausted.
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1           And even so, it still has to be relevant
2    and non-privileged.  And since all of my information in
3    this case is only since I became counsel of record and
4    had no involvement in those, it could be nothing but
5    privileged and, quite frankly, work product and core
6    work product.
7           But, again, let's go back to that
8    statement, There's no other source for that information.
9    Really?  No showing whatsoever.  What about the 19,000
10   pages of documents we've produced about these
11   transactions and the people on those?  What about the
12   parties that are involved?  What about the other
13   counsel?  What about the counsel for Super G?  What
14   about the counsel for the plaintiff themselves that are
15   on the documents attached to their response?  What about
16   Julie Smith in my office?
17          Yeah.  We pointed out in our motion that
18   Julie Smith who handled the latter transactions,
19   plaintiff doesn't even address or mention that, doesn't
20   acknowledge that her deposition is going forward next
21   week.  It does not acknowledge that Ms. Smith as well as
22   Gordon Foote and Cassandra as well and the Super G
23   counsel are all over the pre-litigation e-mails and the
24   exhibits.  They make no attempt to explain why Ms. Smith
25   and the other counsel of record or the parties who

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1    negotiated -- actually negotiated the deals would not

 2    have more knowledge than me; that these parties who

 3    negotiated the deals and the counsel involved who were

 4    actually involved in the transactions when they were

 5    happening would have more -- I would have more knowledge

 6    than them.

 7                    In fact, in his response, the plaintiff

 8    knowingly and misleadingly makes generic references to

 9    this being an e-mail from Hallett & Perrin, this being

10    an e-mail from Hallett & Perrin without specifying it.

11    Well, take a look at those, your Honor.  Spoiler alert.

12    My name is not in there anywhere on those e-mails.

13    This -- as I said, it ignores the 19,000 pages, other

14    counsel and so forth.

15                    So in trying to frame this, his desire to

16    depose me as, quote, not to harass or annoy me, the

17    plaintiff makes the following statement at Page 13 of

18    their response:  D&T Partners is not seeking discovery

19    from Mr. Perrin with respect to advice he provided as

20    part of this litigation.  It only seeks testimony from

21    him with respect to the underlying transactional facts.

22    The problem with that is, I had no involvement in those

23    underlying transactions, I had no personal knowledge of

24    those underlying transactional facts.  Instead

25    everything I know about this case I learned as
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1    litigation counsel.

2                    In other words, the plaintiff points to

3    nothing that would even tangentially connect me to the

4    underlying transactions when they were taking place

5    which would be necessary to get this deposition or for

6    any application of the purported crime fraud privilege.

7                    So what do they do when they don't have

8    the facts?  They do the same thing they did -- or the

9    law -- they do the same thing they did in the summary

10   judgment.  They throw a 582-page bucket of mud on the

11   wall as a response with 36 exhibits, A through double G,

12   that they leave the Court to sift through to find what

13   they're pointing to.  Again, it suffers from the same

14   flaws as their motion for summary judgment, unsupported

15   and unproven allegations that just simply attempt to

16   deflect and obfuscate the lack of basis for their

17   response to the motion.

18                    There are 32 exhibits, your Honor.  There

19   are only two that even reference me, that is Exhibit H,

20   the certificate of conference on this case, and the

21   Exhibit I.  They were dated March 29th, '20 and

22   September 26th, 2019, all well after this case was filed

23   and made in connection with my role as counsel of

24   record.

25                    Simply put, even if this tardy response

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1    is considered, the plaintiff cannot point to one thing

2    in that 582 pages that infers, much less shows that I

3    had any involvement in those transactions, much less any

4    unique and superior personal knowledge.

5              Now, one thing I think we finally need to

6    put a dead horse to bed here.  Plaintiff's response

7    again raises the September 26th, 2019 e-mail that I sent

8    to him as counsel of record as being a misrepresentation

9    to him and now to the Court.  Let's take a look at that.

10   See if I've got it here.

11             *(Pausing)*

12             *MR. PERRIN:*  Well, at this point, I'm

13   having trouble bringing that up.  But do you have that

14   in front of you, your Honor.

15             *THE COURT:*  I do.

16             *MR. PERRIN:*  Your Honor, this e-mail in

17   the first paragraph references that I'm writing to

18   follow up on our call of last week.  We had had a call

19   the week before with Mr. Freeman and specifically with

20   regard to the issue of plaintiff's purported claims

21   against Windspeed which the -- the gist of that call,

22   there were several things discussed, but with respect to

23   the purported claims against Windspeed, we were pointing

24   out that apparently the plaintiff didn't know that there

25   had been an Article 9 foreclosure on the assets of Acet

```
 1   Global and that Acet Global didn't transfer anything to
 2   Windspeed, but there was a foreclosure by the third
 3   party lender, Super G, that then transferred and sold
 4   those assets to Windspeed.  So we had given him -- we
 5   said we would give him some documentation and so forth.
 6   We did so.
 7                   And if you go down to the fourth
 8   paragraph -- the second paragraph it talks about the
 9   notice letter.  This is the notice of foreclosure letter
10   we sent which was attached.  In the fourth paragraph it
11   says, I am also attaching for your reference publicly
12   available documents as to the management of Super G.
13   Further information about Super G can be found on Super
14   G's website and gives the website.  And then, expressly
15   my position as counsel of record, I trust you will agree
16   that this documentation/information confirms what we
17   discussed last week, mainly that Super G is wholly
18   independent from any defendants named in the plaintiff's
19   lawsuit.
20                   And we say, It's a simple fact, they had
21   a superior lien based on loan to Acet Global.  It
22   exercised its rights under that lien.  And since his
23   client's lien was then subordinated, the client could
24   have no claim related to that disposition.  So the
25   thrust of the conversation and the follow-up was
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1   Windspeed is not a party and No. 2 is Super G had an

2   independent loan out there.

3                  Well, with respect to the Windspeed

4   question, Mr. Freeman has represented to this Court and

5   does it again in every filing that it's a

6   misrepresentation because we represented that they were

7   not -- that -- yeah, that Super G is wholly independent

8   from any defendants named in the lawsuit.  We had told

9   him we don't control them, they are out there and they

10  are a third party.

11                 Well, at this time, we had also told him

12  that Windspeed wasn't a party.  They filed their

13  original petition on July -- this is in the Court's

14  files -- on July 12th, 2019.  Windspeed's not listed in

15  the caption or defendant in the style of the case.

16  Windspeed is not listed as a defendant in the preamble.

17  Windspeed is not listed under the parties in the heading

18  of Part 3.  It's listed under Count 3, declaratory

19  judgment, but that does not make them a party.  Under

20  Texas Rules of Civil Procedure 79, The petition shall

21  state the names and the parties and their residences, if

22  known, together with the contents prescribed in

23  Rule 7 -- 47 above.

24                 The original petition doesn't have

25  Windspeed in there as a defendant.  The civil case

LANETTA WILLIAMS, CSR, RPR, CRR

**APP 185**

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   information sheet they file with that petition also does
 2   not list Windspeed.  We had told him, Windspeed is not a
 3   defendant.
 4              Plaintiff filed its first amended
 5   petition after that conversation and after my e-mail on
 6   October 2nd, which now says they list him -- Windspeed
 7   as the defendant.  They list defendant in the preamble.
 8   They list it in the parties heading.  They then for the
 9   first time had service issued under the second amended
10   petition -- on the first amended petition on October
11   11th and the return was service was done on the 14th of
12   October.
13              So your Honor, this was a call that I
14   made because it appeared to me that plaintiff's counsel
15   did not know the facts.  Number 1, we said Windspeed is
16   not a party and they shouldn't be a party because they
17   received the goods from an independent lender that
18   foreclosed.  He disagrees that Super G's independent.
19   We think that that's clear that they are.  But when I
20   say independent, we don't control them.  And -- and even
21   if Windspeed was a party, they were independent, but he
22   says -- but they weren't even a party at the time.
23   That's the nature of this horrible misrepresentation
24   that he says and this was done as parties do, as an
25   advocate making my position known.  He has beat this
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1   horse to death and we just wanted to address it today

2   for the Court.

3                    THE COURT:  Thank you, Counsel.

4                    Given the time, I'm going to go ahead and

5   turn it over to you, Mr. Freeman, for a response.  As

6   you-all know, I have another docket starting at 3:15.

7   And Mr. Freeman, you may proceed.

8                    MR. FREEMAN:  Thank you, your Honor.  And

9   if I could have the ability to share.  I guess I have

10  it.

11                   THE COURT:  You do.

12                   MR. FREEMAN:  Thank you, your Honor.

13                   I'm just going to go straight to the --

14  straight to our points.  Mr. Perrin's the managing

15  shareholder of Hallett & Perrin.  His -- their website

16  currently holds him out as the managing shareholder and

17  he was throughout the period -- the periods at issue.

18                   Hallett Perrin has represented literally

19  every party, other than the plaintiffs here, but every

20  party in this case.  They have represented Super G,

21  Windspeed, Acet, all of the Baymark parties.  There are

22  a number of associated and other attorneys who had

23  worked on these matters throughout, but as Mr. Perrin

24  recognizes, most of them have moved on and are out of

25  the state or out of the country.

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1                 Your Honor, if I could, I'd like to go to
 2    what's marked as Exhibit A.  And your Honor, this is
 3    Page 17 of the appendix.  And you'll note that this is
 4    an e-mail at the top from March 27th of 2019 from Julie
 5    Smith and it attaches -- to Julie Smith and it attaches
 6    a foreclosure sale agreement.  That's the foreclosure
 7    sale agreement at issue here.
 8                 The statement says, I've confirmed that
 9    scanned copies are acceptable to Super G.  Fully
10    executed copies are attached.  As you look below, you
11    can see that Ms. Smith is with Hallett & Perrin and that
12    there are -- there is e-mail correspondence below in
13    which they were throughout March and into late March
14    obtaining executed copies and revising drafts
15    throughout.  And a copy of that foreclosure sale
16    agreement here that is attached is attached which stated
17    that it is dated as of March 1st, 2019.  Very important
18    here when we're talking about the supposed dates of
19    transfers of inventory and a supposed foreclosure sale
20    agreement that purports to be transferring all of Acet
21    Global's old inventory.
22                 Now, they say -- Mr. Perrin just
23    represented to you that Acet Global didn't transfer
24    anything to Windspeed.  Well, that is contrary to all of
25    the testimony that we've had in depositions from
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   everyone.  Here is Windspeed's corporate rep deposition,
 2   Mr. Szeto, who is the CEO.  And I've pulled out from
 3   Page 199 where I'm asking him about employees who were
 4   employees at Acet Global as of September 28th, 2018 and
 5   they moved to being Windspeed employees within a matter
 6   of days, everyone single one of them.
 7                  He goes on to testify, and this is one of
 8   the multiple, multiple times:  There were some items
 9   that were shipping for Acet Global at that time as part
10   of the inventory and that was long before Windspeed
11   Trading had anything to ship.  So they were -- whatever
12   they were shipping in October, it was for Acet Global
13   not for Windspeed Trading.  The Windspeed Trading
14   merchandise didn't come in until the end of December and
15   beginning of January.  There was one item that we
16   purchased with Windspeed's money that he came in, was
17   one item and that was it.  So whatever they were
18   shipping at that time was for Acet Global, was for the
19   inventory.
20                  Okay.
21                  Question:  So Windspeed was finishing up
22   Acet's business?
23                  Answer:  Right.  Windspeed had nothing to
24   ship at that time.
25                  Question:  So it was just continuing
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1    Acet's business?
 2                    Answer:  Yes.
 3                    Down at the bottom I asked him -- I
 4    continued:
 5                    That was easy because it was pretty much
 6    all of the same equipment, wasn't it?
 7                    Answer:  Yes.
 8                    Question:  And it was easy because it was
 9    all the same vendors, right?
10                    Answer:  Yes.
11                    Question:  And it was easy because it was
12    pretty much all the same customers, wasn't it?
13                    Answer:  Yes.
14                    Your Honor, he goes on later -- he goes
15    on later to testify, this is Mr. Szeto, All they know
16    was we are moving the inventory to a temporary housing
17    location so it will not be locked up by the landlord
18    because lack of rent and that's all we know.  This is
19    referring to the transfer from Acet to Windspeed.
20                    And I stated:  But it was moved over to
21    Windspeed's new office in 2018, right?
22                    At the end of November, that was after we
23    rented the building.
24                    Your Honor, again, we're talking about a
25    foreclosure sale agreement document that is dated by
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   Hallett & Perrin as occurring March 1st, 2019 when

 2   Windspeed is here admitting that all of those assets

 3   that were supposedly foreclosed upon that they were

 4   transferred to Windspeed in 2018.  That is consistent

 5   with every employee to testify thus far.

 6               All of the testimony -- Mr. Szeto, the

 7   corporate rep for Windspeed, goes on here on Page 218.

 8   I asked him:

 9               So you didn't do anything to segregate

10   the Acet inventory at Windspeed?

11               As I answered you earlier, there was no

12   Windspeed Trading inventory, nothing to segregate.

13               I said:  Got it.  And Windspeed just kept

14   carrying out the sales of that inventory, right?

15               Answer:  Yes.

16               Question:  So Windspeed during this time

17   was selling the old Acet inventory?

18               Answer:  Yes.

19               Because there were still orders coming

20   in?

21               Yes.

22               So Windspeed was selling off all the Acet

23   inventory?

24               Answer:  Yes.

25               Your Honor, Hallett & Perrin has
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   represented everyone in this case.  If you look back to
 2   Exhibit A, Appendix Page 18, again, you see that they
 3   are referring, and I've highlighted it there, they are
 4   referring to obtaining Windspeed's executed signatures
 5   from her client.
 6                 If you look to Page 31, your Honor,
 7   you'll see in these documents that Hallett & Perrin is
 8   the notice party for Windspeed Trading.
 9                 Your Honor, if you go to Exhibit B,
10   Page 110 of the appendix -- go to Page 110, you will see
11   further correspondence here between Ms. Smith of Hallett
12   & Perrin regarding the Acet inventory as of 1/24/2019.
13   Recall Windspeed already said that it was selling off
14   all of the Acet inventory in 2018.  But this is an
15   e-mail from Hallett & Perrin as of January 28th, 2019
16   saying, Here is an updated inventory listing for the
17   foreclosure agreement.  Below that you see Ms. Smith
18   corresponding with her clients, Baymark Partners.  Matt
19   Denegre is corresponding on with her January 28th, 2019
20   forwarding her an Acet inventory.  He obtained that as
21   you can see below from William Szeto, the CEO of Acet
22   Global and of Windspeed.
23                 Your Honor, at Exhibit C, we see again
24   more correspondence with Ms. Smith.  This is on
25   January 25th.  She says she's making sure she
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

 1  understands the parties will sign the foreclosure sale

 2  agreement today.  This is like three months before this

 3  all actually happens.  And they say, Then Super G will

 4  send out the notice.  So she's coordinating -- Hallett &

 5  Perrin is coordinating with Super G, the supposedly

 6  antagonist lender that is foreclosing on these assets

 7  that both Super G and Baymark -- the Baymark defendants

 8  are about to acquire through Windspeed.

 9              It goes on to say here from Hallett &

10  Perrin on January 25th, The foreclosure sale agreement

11  you sent me looks good.  Can you update the Windspeed

12  address for notice purposes to be the same as in the

13  amended and restated loan agreement also.  And that

14  amended and restated loan agreement is supposedly to

15  purchase this inventory.  William Szeto will sign as the

16  manager of Windspeed.

17              Your Honor, if you look at Exhibit D, we

18  see Matt Denegre -- remember Matt Denegre from Baymark

19  Partners -- sending along to multiple parties here, Alex

20  Godinez who is with Super G, Tony Ludlow who is one of

21  the named defendants here, Steven Bellah who is with

22  Super G.  And we're on October 16th, 2018, within days

23  of the formation and execution of the operating

24  agreement of Windspeed which was drafted by Hallett &

25  Perrin.

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1           Now, on this he says -- Matt Denegre
2   says, Attached is the drafted -- the revised draft of
3   the WPA.  Well, let's look below at what the Baymark
4   parties are sending, this WPA to Super G.  But before,
5   let's look first and see where they got it.  On
6   October 15th, Hallett & Perrin sent Matt Denegre of
7   Baymark Partners, William Szeto at his
8   bill@acetglobal.com e-mail address along with another
9   attorney from the law firm that currently represents
10  Windspeed.  And it states, This is the revised WPA and
11  warrant, okay.
12          And below that, your Honor, we have the
13  warrant purchase agreement, which we only discovered all
14  of this very recently.  It bears the statement, H&P
15  draft, 10/16/2018.  There are multiple H&P drafts here.
16  This is an agreement between Windspeed and Super
17  G/Baymark Partners as though they are one party here.
18          Your Honor, as you go below, you find out
19  that there's a total exercise price of a nominal $100 to
20  acquire 40 percent each of Windspeed.  They owned
21  Windspeed.
22          Your Honor, if you go to Page 149 -- you
23  go to -- and here's yet another of the warrant purchase
24  agreements reflecting Hallett & Perrin as the drafter.
25  If you go to Page 149, your Honor, you'll see that

MOTION FOR PROTECTIVE ORDER AND TO QUASH
APRIL 7, 2021

1  there's an e-mail on January 28th that's between Steve

2  Bellah, reflecting his Super G Capital e-mail address,

3  and Matt Denegre, again of Baymark Partners, reflecting

4  the Acet notice of private sale.  So why is Baymark

5  Partners here coordinating with Super G to send out --

6  to send out a notice of foreclosure sale when Windspeed

7  has already said -- has said in their deposition that

8  they were already selling off all of those assets as of

9  2018, they have sold them all off.

10            Your Honor, they have -- as you continue

11  on here you see that Hallett & Perrin is involved in

12  this from every angle and we see what's attached here

13  which is amazing to me.  This is what they're

14  coordinating on the draft of and that the clients of

15  theirs are sending out.

16            So it says, Here's the notice of

17  disposition.  This ends up being the basic document that

18  was sent out on January -- at the end of January of 2019

19  to supposedly inform Acet Global that there was going to

20  be a foreclosure, except to David Hook, one of the named

21  parties here and one of the principals -- one of two

22  principals of the Baymark party defendants.

23            Your Honor, it's reflecting the notice

24  and disposition and sale of collateral.  And as you

25  know, what is all that collateral?  All that inventory

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1    of Acet that was already sold off.  All of the

2    testimony -- and I know we're running out of time, your

3    Honor, but all of the testimony thus far is that Super G

4    never took possession of the inventory ever.  That is

5    Super G's testimony, that is Marc Cole's testimony, that

6    is the testimony of every employee of Windspeed.  They

7    are all unanimous.  This inventory never changed hands.

8    It was transferred from Acet directly to Windspeed and

9    Windspeed began selling it and no one could tell the

10   difference between this inventory and any other

11   inventory that came in.

12              So here's all of that collateral, all of

13   the collateral, all of the testimony this was all --

14   this was already being sold or sold off by Windspeed.

15   Your Honor, I informed Mr. Perrin -- despite all of that

16   background, I informed Mr. Perrin early on in this case

17   and I've informed him a number of times about this

18   issue.  Before I get there, though, I want to point out

19   again another e-mail between Matt Denegre and Steve

20   Bellah, subject line, Acet, dated October 23rd, 2018.

21   This is the year that Windspeed is already selling off

22   all of Acet's assets and Matt Denegre is e-mailing Steve

23   Bellah of Super G, says, I'd like to discuss the next

24   steps for Acet Global and get your thoughts on how to

25   move forward with the foreclosure.  They wanted that

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

 1   foreclosure to happen.  It was going to provide legal

 2   cover for what happened.

 3               What I want to know is why was Hallett &

 4   Perrin drafting foreclosure sale agreements and drafting

 5   foreclosure notices six months later for those assets.

 6   That's what I want to know.  That's why I want to talk

 7   to the managing shareholder of Hallett & Perrin.  And as

 8   you know, I -- Mr. Perrin can make representations about

 9   what he personally was involved with.  That does not

10   mean that he's not a fact witness and it does not mean

11   that he doesn't have relevant and discoverable

12   information, information that may lead me to admissible

13   evidence even if his is not.

14               Your Honor, I can go on, but I have here

15   in an e-mail that very easily summarizes this, it's

16   fairly recent.  I have sent Mr. Perrin an e-mail --

17   e-mails requesting that he address the

18   misrepresentations with you and with me.  And I have

19   sent that to him at least five times.  Never once have I

20   received a response.  This one again here lays out --

21   this is a copy -- it's terrible markings by me, but this

22   is a copy of what was in our original complaint that was

23   on file at the time Mr. Perrin made those

24   representations.

25               Your Honor, they were -- they were

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1  incorrect, and I understand being an advocate, but I
 2  will never knowingly make a misrepresentation to
 3  opposing counsel and that is not something that's
 4  allowed.  That goes beyond the scope of being an
 5  advocate.
 6             Your Honor, if you look to Exhibit J
 7  here, Page -- this is the amended and restated company
 8  agreement of Windspeed Trading.  And we look down to
 9  Page 181 of this document -- excuse me, 192, you'll see
10  here -- again, should is the Windspeed company agreement
11  drafted by Hallett & Perrin.  And it says here -- this
12  is the one that all the parties -- all the defendants
13  maintain Bill Szeto owns.  But as you saw before,
14  warrants are exercisable by the Baymark defendants and
15  by Super G for a nominal amount of money to gain
16  complete control of this company.
17             It says, The duty of the board managers.
18  The business and affairs of the company will be managed
19  by a board of managers, no control by members.  Okay.
20  Who are these managers that supposedly don't own this
21  company but that are being given this level of control?
22  Okay.  Here is one.  Baymark shall be entitled to
23  appoint one manager to the board of managers, the
24  Baymark manager, so long as Baymark is a warrant holder.
25  Super G is entitled to appoint one manager, the Super G
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

 1  manager.

 2          So back in October of 2019, these parties

 3  were conspiring to create Windspeed to place all of the

 4  economic ownership and control with Baymark and Super G

 5  and then to have Baymark through its attorneys

 6  effectuate a foreclosure of Acet's assets so that they

 7  could be transferred to Windspeed, which Baymark and

 8  Super G owned and controlled and so they could transfer

 9  them three of my client's $3.2 million lien against

10  those assets.

11          Your Honor, this -- all of the documents

12  establish -- establishing all of those relationships,

13  they were all drafted by Hallett & Perrin.  If you look

14  to Page 218, your Honor.  Page 218 is the warrant

15  agreements at issue here.  Again, they were sent out to

16  Baymark and to Bill Szeto, William Szeto, again at his

17  Acet Global e-mail address, so while he's still the CEO

18  of Acet Global, by Hallett & Perrin and they drafted

19  these warrant agreements to ensure that actual control

20  at all times remain with their breadwinning client,

21  Baymark.  Exhibit D, your Honor, Page 118, shows the

22  same thing and Exhibit F of Page 173.

23          I've set out in Page 4 of your response,

24  again, screenshots of the causes of action against

25  Windspeed Trading that were in our original complaint.

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   And those are the ones that there were -- there were
 2   misrepresentations on.  And I think those
 3   representations they have become -- hopefully your Honor
 4   can see how they have become remarkably significant in
 5   this case.  The collusion among Baymark and Super G and
 6   Windspeed is central.  It's at the heart of this case.
 7   There's some reason that Hallett & Perrin doesn't want
 8   to let go of this case and that's fine.  I don't care
 9   who their attorney is.  I just care that I'm being
10   treated honestly and getting what I ask for and being
11   given correct representations.
12                   But your Honor, the record is extremely
13   clear that they formed Windspeed together.  Exhibit U
14   demonstrates when Windspeed Trading was formed by Bill
15   Szeto, at least the certificate of formation.  Exhibit V
16   demonstrates right before that date because that date
17   was -- excuse me, if you'll look to the top right-hand
18   corner, 9/27/2018, September 27th, 2018.  Several days
19   later, William Szeto, again at his Acet Global e-mail
20   address, is e-mailing Steven Bellah of Super G, Matt
21   Denegre of Baymark Partners and Tony Ludlow about
22   ownership of Newco.  And I wonder what Newco is.
23                   Well, Page 426 here, they continue to
24   talk about it.  Steve Bellah of Super G e-mails on the
25   next day, October 9th, to Baymark Partners, Tony Ludlow
```

MOTION FOR PROTECTIVE ORDER AND TO QUASH
APRIL 7, 2021

```
 1   and Acet Global's CEO, William Szeto, who had just

 2   formed Windspeed's certificate of formation and says, I

 3   need to speak with you about the ownership split after

 4   consulting with counsel.  Baymark's counsel, as we know,

 5   is Hallett & Perrin.  I am still working on the issue,

 6   but the structure may need to be tweaked but not

 7   substantively.  It says, Below are the proposed equity

 8   splits from Baymark.  We -- from Bill.  We, Baymark, are

 9   okay with the proposal.

10              Below that is from Bill Szeto at his Acet

11   Global e-mail address stating, After considering the

12   amount of investment you, Baymark, and Super G put into

13   the Acet Global company, here is the percentage I'm

14   willing to live with.  And there's an undiluted and then

15   there's after -- after the warrants that everyone knew

16   would be exercised.  Baymark owns 40 percent -- he calls

17   this the ownership -- Bill Szeto owns 20 percent for his

18   part and Super G owns 40 percent for its part.

19              Your Honor, then Exhibit J on Page 217,

20   Exhibit J again reflects that around this time Super

21   G -- Baymark's counsel and Windspeed's counsel was

22   sending over these warrant agreements that are being

23   discussed in those e-mails.  And then Exhibit X, which

24   is Page 429 of the appendix reflects October 17th,

25   Windspeed receives its new amended and restated company
```

LANETTA WILLIAMS, CSR, RPR, CRR

**APP 201**

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

 1   agreement which we -- we looked at from Matt Denegre.

 2   And below that is reflected Hallett & Perrin draft

 3   10/17/2018.  And then they orchestrated the transfer of

 4   everything from Acet to Windspeed.

 5                Exhibit Y, Page 466, your Honor, Exhibit

 6   Y states -- it's from William Szeto at his Acet Global

 7   account to Jane Lin, one of the employees, on

 8   October 9th, 2018.  There's something wrong with this

 9   thing.  Jane this is to inform you that your employment

10   with Acet Global is terminated effective September 28th,

11   2018.  Testimony you're going to see from all of them is

12   they didn't even they know they were working for

13   Windspeed.  They're told retroactively that they were

14   terminated from Acet and all of a sudden, hello, you're

15   working for Windspeed.  So they transfer not just the

16   assets but the employees.

17                Your Honor, on Page 469, this is an --

18   this is a letter from -- supposedly from Windspeed

19   Trading, Bill Szeto, who is now the president and CEO of

20   the Windspeed Trading, in early 2019 closing all of the

21   Acet Global bank accounts because they had already sold

22   off all the inventory and taken all of the revenue from

23   it.

24                Exhibit GG, which is 567, this one, your

25   Honor, these are various pieces of correspondence sent

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1   out during this period.  So this is from an account

2   holder Acet Global, LLC doing business as Baymark Acet

3   Holdco, LLC.  This is sent from William Szeto as you'll

4   see in the signature line below.  But again, this is

5   Acet Global doing business as Baymark Acet Holdco.  And

6   who's the president and CEO?  William Szeto.  As of

7   July 5th, 2018, president and CEO of Acet Global and

8   Baymark Acet Holdco, LLC.

9                    Below that we see correspondence from

10  Acet Global, its CEO, William Szeto, 3/29/2018.  Below

11  that, correspondence from Acet Global from its CEO

12  William Szeto, the founder of Windspeed.  And it just

13  continues on.  He's the CEO of all of these Baymark

14  entities.  He's the CEO of all of these Acet companies.

15  He's the CEO of Windspeed.

16                    On Page -- on Page 581 of the appendix,

17  your Honor, there's yet another here from -- directly

18  from Baymark Acet Holdco, LLC, from William Szeto, its

19  president and CEO.  He's the president and CEO of these

20  Baymark parties.

21                    Your Honor, in 2020, Baymark -- and this

22  is just kind of the -- the icing on the cake, I guess,

23  is Baymark Acet Holdco, this entity that Windspeed's CEO

24  is also the CEO of, on their tax return, they report

25  sales proceeds of $2,907,290 from a sale from a

LANETTA WILLIAMS, CSR, RPR, CRR

**APP 203**

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1  foreclosure and the date of acquisition is the same date

2  as the Acet asset purchase agreement.  And this is the

3  value net of setoffs from that 3.2 million.  So they're

4  recognizing here to the IRS.

5              So, your Honor, they're all over it.

6  Hallett & Perrin is all over it.  I don't bring this to

7  harass, to annoy.  I have a key witness.  The firm

8  played a pivotal role.  They represented every side in

9  this transaction.  Most all of these attorneys have

10  moved on.  Mr. Perrin is and was the managing

11  shareholder in the best position to know this important

12  information.  He misrepresented the parties'

13  relationships despite all of that history that I just

14  disclosed there.  I want to know, and I think I'm

15  entitled to know a number of things, what was disclosed

16  to the parties, reasoning behind the structure of the

17  transaction, why was Hallett & Perrin engaged in this

18  foreclosure process six months after all the assets have

19  been transferred and sold out.  What was Hallett &

20  Perrin's role in the bankruptcy.  There are false

21  statements in that bankruptcy petition, which I've

22  showed you before, that are inconsistent with their

23  positions here.

24              Your Honor, I could go on.  I know my

25  time -- my welcome is up, but I appreciate you taking

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1  the -- having patience with me.
 2              THE COURT:  Thank you-all for the
 3  arguments that you've put forward.
 4              So in the first instance with regard to
 5  this representation and the idea that Mr. Perrin has
 6  misrepresented something to the Court as well as to you,
 7  my understanding is that at the time that the
 8  representation was made in the e-mail from Mr. Perrin to
 9  you about the affiliation of the other defendants to
10  Windspeed, Windspeed was not a defendant in the case,
11  although mentioned in the pleading as a part of the
12  reference to the declaratory judgment.  Is that an
13  untrue statement that they were not a defendant in the
14  case at that time?
15              MR. FREEMAN:  Not entirely accurate.
16  They were named under two causes of action as the party
17  against whom it was asserted.  So they were actually
18  name.  And I think in both of those they were -- at
19  least one of those they were the only party named.
20              THE COURT:  Well, that they are mentioned
21  as a part of a factual recitation doesn't make them a
22  party defendant to the case.  Were they a defendant?
23  Because the e-mail specifically said there's an
24  independent relationship from the defendants.  And so
25  were they a defendant?
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1                    MR. FREEMAN:  It says named defendant.

 2      And granted, this is why I've asked over and over for an

 3      explanation from him as to what it was.  If it's gonna

 4      get into word splicing, you know, I -- my argument to

 5      you would be, okay, please at least give me that

 6      explanation for it if we're going to say we're playing a

 7      really cute game here with words.  But if that's the

 8      case, one, I don't think it's accurate because I did

 9      name them as a defendant; but two, I think that's also

10      very misleading.

11                    THE COURT:  Excuse me one second,

12      Mr. Freeman.

13                    Mr. Perrin, you specifically reference a

14      live pleading that was in effect at the time that you

15      sent that e-mail.  Would you remind me what the date is

16      of that pleading.

17                    MR. PERRIN:  The date of that pleading is

18      July 12th, 2019.  It's the plaintiff's original

19      petition.

20                    (Pausing)

21                    MR. FREEMAN:  Your Honor, it's Count 3 is

22      one of them.

23                    (Pausing)

24                    THE COURT:  So I'm looking at that

25      pleading.  Windspeed is not listed as a defendant in the
```

```
 1  style of the case and they are not listed as a party in

 2  the party section of that pleading, although I

 3  appreciate, as I said, the reference that's made in

 4  connection with the declaratory judgment.  But you know

 5  referring to an entity or an individual in connection

 6  with a cause of action doesn't make them a party to a

 7  lawsuit, a party defendant especially.

 8              And so the reason I'm bringing that up is

 9  because when you go through the effort to suggest that

10  there's malfeasance on the part of counsel with regard

11  to their representations to the Court and then I go and

12  look at the pleading and it turns out that the person

13  who actually is overstating what the record shows is

14  you, that concerns me.  Because they're not listed in

15  the style and they're not listed as a party at all, let

16  alone as a party defendant.

17              MR. FREEMAN:  As he knows, your Honor, we

18  had a direct conversation about this and this was why we

19  amended to -- to list it.  But I did inform him we

20  considered them a defendant and they were listed there

21  and we had that discussion and that's what prompted this

22  e-mail.  Now, I understand the distinction, but we're

23  not getting into defined terms here in terms of what he

24  said.  He tells me that they are entirely independent of

25  all of the names.  Well, your Honor, not only is that --
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1  we're talking about one thing here, but as you remember,

 2  Mr. Ludlow is the board member, he's a manager of

 3  Windspeed.  And there's others that are involved.  And

 4  there's no disputed here that he's a named defendant.

 5             THE COURT:  Are you maintaining the

 6  position that in this pleading that I'm looking at that

 7  Windspeed is a named defendant in this case?

 8             MR. FREEMAN:  Your Honor, they're

 9  clearly -- they're not ultimately -- I don't think they

10  can be made a party to it, we didn't serve them with

11  process as a result of it, but I did tell him we had

12  intended to name -- to name them in the case, make them

13  a party, and we did name them.  I mean, looking here on

14  my screen, and this is why I say it is misleading, Count

15  3 is a declaratory judgment against Windspeed Trading.

16  Plaintiff seeks a declaratory judgment that Windspeed

17  Trading has assumed all obligations.  I mean, we've

18  named them right there.  We seek a declaratory judgment

19  that Windspeed Trading has assumed all obligations under

20  the note.

21             THE COURT:  You know that -- you know

22  that on this pleading, you could not get a judgment

23  against Windspeed Trading, right?

24             MR. FREEMAN:  I would agree with that.

25             THE COURT:  Okay.  Mr. Freeman, I
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   appreciate you agreeing to that because there have

 2   been -- I just cannot describe to you the amount of time

 3   that the Court has invested to take and make copious

 4   review of the hundreds of pages of documents that you've

 5   put in front of me to try to survive summary judgment

 6   both against Windspeed and against the Baymark

 7   defendants.  And the Court has tried to, you know, just

 8   be meticulous in following -- as you know, this is a --

 9   this is the definition of complex commercial litigation,

10   this case.  And to try to walk through it and follow it

11   and make sure that I clearly understand it and that I

12   give your client what they're entitled to, which is for

13   me to resolve every doubt in their favor, and to make

14   sure that I examine the record to make sure that I hold

15   your client to the responsibility of bringing me a

16   material issue of fact and more than a scintilla in the

17   no-evidence context, the Court has -- that's the reason

18   why I still have the ruling right now is because of the

19   amount of time that the Court has tried to take to do

20   it.  So when we're now here and I can't get you to just

21   say to me flat out, Windspeed is not a defendant in this

22   case as of this pleading, that -- you can imagine the

23   consternation that that causes me.

24           MR. FREEMAN:  I can appreciate that, your

25   Honor.  I do.  What I will -- what I will tell you here
```

LANETTA WILLIAMS, CSR, RPR, CRR

**APP 209**

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   is when we talk about a named defendant -- I understand
 2   what you're saying.  I agree with you, right.  I -- I
 3   couldn't get a judgment or it sure wouldn't stand up on
 4   appeal, right.  But I have named them in this case and
 5   that is why I'm saying it's misleading.
 6             Now, I do understand the distinction and
 7   I'm not meaning to walk a fine line with you, but that's
 8   why I've asked him over and over to explain this to me
 9   and I've gotten zero response.  Had I gotten that
10   understanding from it, that might have -- that might
11   have helped to resolve this, but no one would explain it
12   to me.  No one would tell me why this party is un -- you
13   know, unrelated.  And when you look at -- I mean, when
14   you see all the background here, it's very -- it's a
15   very suspicious transaction.
16             THE COURT:  I understand the arguments
17   that you've made in connection with the summary
18   judgment.  And I appreciate, you know, the Court hasn't
19   signed the order yet.  So you'll have a presentation
20   here to walk through the evidence.  I've done it too.  I
21   get it.
22             The question that is in front of me today
23   is whether or not there's a basis on this record for me
24   to order Mr. Perrin to sit for a deposition.  And every
25   e-mail that you've shown me that relates to Hallett &
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   Perrin has Julie Smith's name to it.  And Julie Smith is
 2   going to be deposed on the 13th.  There's nothing in
 3   front of me that provides a basis for Mr. Perrin to be
 4   deposed.  And what I understand is that you further have
 5   sought the deposition of a corporate representative of
 6   Hallett & Perrin which is set for the Court to decide on
 7   another day.  And perhaps some of the arguments you've
 8   made today, the Court will for hear you reprise those in
 9   that proceeding.  But as it relates to Mr. Perrin and
10   whether or not there's a basis for the Court to require
11   him individually to sit for a deposition, I've not seen
12   anything that suggests other than what he has attested
13   to in his affidavit.  And for that reason, the Court is
14   going to sign the order on the motion to quash and the
15   motion for protection.
16              Finally, let me just say that on the
17   motion for summary judgment, the -- I expect to get an
18   order out on that today, certainly no later than
19   tomorrow.  I'm going to try to do it today.  But as you
20   know, I'm late for my next hearing so I've got to get to
21   that.
22              In any event, what I wanted to say is
23   this, there is -- you know, there are times, as you
24   know, Mr. Freeman, because you mentioned it to me in the
25   hearing where the movants purport to move against a
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   particular, quote/unquote, Baymark defendant, and then
 2   you take the position, we don't even have a claim
 3   against the particular defendant, we don't even have
 4   that claim against that particular, quote/unquote,
 5   Baymark defendant.  And I found some confusion with
 6   regard to that in the record as I've reviewed it.  And I
 7   will just say this, you-all are going to try this case
 8   to the Court.  I hope I'm a fairly smart person, but
 9   we've got to pare this case down.
10                   And my view is this, that if the issue is
11   that defendants don't know whether a certain,
12   quote/unquote, Baymark defendant has a claim, that's one
13   to be dealt with with special exceptions not with a
14   motion for summary judgment.  And to the extent that
15   it's specially excepted to, the Court can require more
16   specificity at to, you know, who is the Baymark party
17   being referred to.  We've seen all sorts of versions of
18   a Baymark entity and there is a lack of clarity in some
19   spaces about who the claim is being maintained against
20   and that is going to have to be cleaned up, certainly
21   before we have any kind of trial in convection this.
22                   As for today, Mr. Perrin, I believe
23   you've uploaded an order in connection with your motion.
24                   MR. PERRIN:  We have, your Honor.
25                   THE COURT:  All right.  Then the Court
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

```
 1   will get the order entered.  And if there's nothing
 2   else, you-all are excused.
 3                   MR. FREEMAN:  Your Honor, I think we have
 4   a couple of motions for leave related to the MSJ filings
 5   and I would just --
 6                   THE COURT:  I saw one motion for leave
 7   and I signed an order related to that motion for leave.
 8   I signed that the day of the hearing, so I have that
 9   order.  I'm not sure -- when you say a couple, I'm not
10   sure what the second one is.
11                   MR. FREEMAN:  I think that's it.  My
12   memory is getting --
13                   THE COURT:  All right.
14                   MR. PERRIN:  Your Honor, we also had
15   objections to the evidence as well.
16                   THE COURT:  Well, I'm glad you mentioned
17   that, Mr. Perrin, because I did not see an order on your
18   objections.
19                   MR. PERRIN:  We uploaded that, but we'll
20   do that again.
21                   THE COURT:  If it's uploaded, I'll go
22   back and look again.  I didn't see it.  But if you say
23   it's uploaded, I'll go back and look again.  I don't
24   want you to have to send something that you've already
25   filed.  If it's in the Court's file, you don't need to
```

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1    do it again.  I'll go back and look.

2              MR. PERRIN:  We'll double-check on this

3    end too.

4              THE COURT:  Already.  Thank you-all.

5              MR. PERRIN:  Thank you.

6              (Proceedings concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MOTION FOR PROTECTIVE ORDER AND TO QUASH*
*APRIL 7, 2021*

1   STATE OF TEXAS

2   COUNTY OF DALLAS

3

4      I, Lanetta Williams, Official Court Reporter in and

5   for the 116th District Court of Dallas, State of Texas,

6   do hereby certify that the above and foregoing contains

7   a true and correct transcription of all portions of

8   evidence and other proceedings requested in writing by

9   counsel for the parties to be included in this volume of

10  the Reporter's Record in the above-styled and numbered

11  cause, all of which occurred in open court via Zoom and

12  were reported by me.

13     I further certify that this Reporter's Record of the

14  proceedings truly and correctly reflects the exhibits,

15  if any, offered by the respective parties.

16     I further certify that the total cost for the

17  preparation of this Reporter's Record is $371.00 and was

18  paid by Hallett & Perrin, P.C.

19
                            /s/ Lanetta Williams
20                          _____
                            Lanetta Williams, CSR, RPR, CRR
21                          Texas CSR 6216
                            Official Court Reporter
22                          116 District Court
                            Dallas County, Texas
23                          600 Commerce Street, 6th Floor
                            Suite 620C
24                          Dallas, Texas 75202
                            Telephone:  214-653-7159
25                          Expiration:  10/31/2021