UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATT DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH; ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; and WINDSPEED TRADING, LLC, | § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-CV-01171-B |
| *Defendants*. | § § | |

**APPENDIX IN SUPPORT OF BAYMARK DEFENDANTS'
MOTION TO DISMISS PLAINTFF'S SECOND AMENDED COMPLAINT
AND BRIEF IN SUPPORT**

| | |
|---|---|
| APP 001 – APP 016 | Plaintiff's First Amended Petition in Cause No. DC-19-09828, in the 116th Judicial District Court, Dallas County, Texas (filed October 2, 2019) |
| APP 017 – APP 025 | Employment Agreement (Exhibit H to Asset Purchase Agreement by and among ACET Global, LLC (Buyer), ACET Venture Partners LLC (Seller) and Tomer Damti (Owner)) |

Respectfully submitted,


/s/ Edward P. Perrin, Jr.
Edward P. Perrin, Jr.
State Bar No. 15796700
Jennifer R. Poe
State Bar No. 00794470
HALLETT & PERRIN, PC
1445 Ross Ave., Suite 2400
Dallas, TX 75202
Telephone: (214) 953-0053
Facsimile: (214) 922-4142
eperrin@hallettperrin.com
jpoe@hallettperrin.com

**ATTORNEYS FOR DEFENDANTS
BAYMARK PARTNERS MANAGEMENT, LLC;
BAYMARK MANGEMENT, LLC;
BAYMARK ACET HOLDCO, LLC;
BAYMARK ACET DIRECT INVEST, LLC;
BAYMARK PARTNERS; DAVID HOOK;
TONY LUDLOW; AND MATTHEW DENEGRE**


## CERTIFICATE OF SERVICE

On July 22, 2022, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ Edward P. Perrin, Jr.
Edward P. Perrin, Jr.


4877-2487-1210, v. 1

FILED
DALLAS COUNTY
10/2/2019 5:40 PM
FELICIA PITRE
DISTRICT CLERK
Darling Tellez

CAUSE NO. DC-19-09828

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | |
| Plaintiff, | § § | IN THE DISTRICT COURT |
| v. | § § | DALLAS COUNTY, TEXAS |
| ACET GLOBAL, LLC | § § | |
| BAYMARK ACET HOLDCO, LLC, | § | 116th JUDICIAL DISTRICT |
| BAYMARK ACET DIRECT INVEST, LLC; | § | |
| BAYMARK MANAGEMENT, LLC; | § | |
| BAYMARK PARTNERS; | § | |
| DAVID HOOK; TONY LUDLOW; and | § | |
| WINDSPEED TRADING, LLC. | § § | |
| Defendants. | § § | |

## PLAINTIFF'S FIRST AMENDED PETITION

NOW COMES D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC), Plaintiff, and files this Original Petition complaining of ACET Global, LLC; Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC; Baymark Partners; David Hook; Tony Ludlow; and Windspeed Trading, LLC, Defendants, and states as follows:

### I.  DISCOVERY CONTROL PLAN

1.  D&T Partners, as Plaintiff, intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure.

### II.  CLAIM FOR RELIEF

2.  D&T Partners seeks monetary relief over $1,000,000.

**APP 001**

## III. PARTIES

3. Plaintiff, D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC), is a limited liability company formed in the state of Texas.

4. Defendant, ACET Global, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

5. Defendant, Baymark ACET Holdco, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

6. Defendant, ACET Direct Invest, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

7. Defendant, Baymark Management, LLC, is a limited liability company formed in the state of Texas and may be served with process at 5700 Granite Parkway, Suite 435, Plano, Texas 75024, or wherever it may be found.

8. Defendant, Baymark Partners, is on information and belief, a private equity firm operating as a partnership with its principal place of business at 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

9. Defendant, Windspeed Trading, LLC, is a limited liability company formed in the state of Texas and may be served with process at 2711 N. Haskell Ave., Suite 2400, Dallas, Texas 75024, or wherever it may be found.

10. Defendant, David Hook, is an individual and a managing director of Baymark Partners at all times relevant to this complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

11. Defendant, Tony Ludlow, is an individual and managing director of Baymark Partners at all times relevant to this complaint. He can be served with process at his office at Baymark Partners, 5700 Granite Parkway, Suite 435, Plano, Texas 75024.

## IV. VENUE

12. Pursuant to Texas Civil Practice and Remedies Code § 15.002(a)(1)-(2), venue for this case is proper in Dallas County, Texas, because all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas. Venue is further proper by consent.

## V. FACTS

13. Pursuant to an Asset Purchase Agreement (the "APA") dated July 14, 2017, ACET Global, LLC purchased the assets of ACET Venture Partners, LLC. ACET Global, LLC was wholly owned and controlled by Baymark ACET Holdco, LLC.

14. Prior to the APA, Baymark ACET Holdco, LLC was wholly owned and controlled by Baymark ACET Direct Invest, LLC, which was controlled by Anthony Ludlow and David Hook. ACET Direct Invest, LLC remained the majority member of Baymark ACET Holdco, LLC after the APA. Ludlow and Hook ultimately controlled Baymark ACET Direct Invest and, by extension, also controlled Baymark ACET Holdco and ACET Global, LLC. Ludlow and Hook also ultimately exercised control over Baymark Management, as well Baymark Partners. Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; Baymark Management, LLC; Baymark Partners; Anthony Ludlow; and David Hook, are collectively referred to herein as the "Baymark parties." At all times described herein, the Baymark parties acted in concert under the control of Ludlow and Hook.

15. Under the APA, ACET Global agreed to (1) pay $850,000 to ACET Venture Partners, subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000

in favor of ACET Venture Partners (the "Note"); and (3) to provide ACET Venture Partners with a 25% common membership interest in Baymark ACET Holdco, LLC.

16. The Baymark parties induced ACET Venture Partners to enter into the APA by, in part, providing a 25% membership interest in Baymark ACET Holdco, LLC. That interest was never registered with the Securities Exchange Commission or Texas State Securities Board.

17. As part of the transaction, ACET Global, LLC entered into a Promissory Note with ACET Venture Partners, memorializing the $3,230,000 payable to ACET Venture Partners. The first installment payment was to come due in October of 2018.

18. Separately, Baymark ACET Holdco, LLC entered into a Security Agreement (the "Security Agreement") with ACET Venture Partners. Under the Security Agreement, Baymark ACET Holdco, LLC granted a security interest to ACET Venture Partners in 59% of the membership interest of ACET Global, LLC. That interest was never registered with the Securities & Exchange Commission or Texas State Securities Board.

19. Irrespective of any agreement, the principals for the Baymark parties, which are the same individuals for each party, stated that they would ensure that Tomer Damti would be the CEO of ACET Global and that Damti would maintain managerial authority and discretion. Mr. Damti's presence as CEO would, given his knowledge of the business, operations, and industry, safeguard Plaintiff's interest in the transaction and was a substantial inducement to enter into the transaction. In reality, the Baymark parties did not actually intend to keep Damti as the CEO or to provide him with managerial authority or discretion. The Baymark parties refused to allow him authority to function as a CEO and then improperly terminated and removed him.

20. Following the APA, the Baymark parties then caused ACET Global to enter into a Collateral Assignment of Rights Under Acquisition Transaction Documents and Subordination Agreement (the "Collateral Assignment") with Super G Capital, LLC, which provided that Super G Capital, LLC

would provide a term loan facility of up to $1,000,000. The Collateral Assignment contemplated that ACET Venture Partners's security interest under the Security Agreement would be subordinated to the lien held by Super G Capital. ACET Venture Partners agreed to subordinate its security interest to Super G Capital, LLC and accept a 25% common membership interest in Baymark ACET Holdco, LLC with the understanding that Damti would maintain managerial authority and discretion and the Baymark parties did not intend to default on the loan to ACET Venture Partners or default on the loan from Super G Capital. As a result, the Baymark parties, on false pretenses, induced ACET Venture Partners to subordinate its security interest pursuant to the Collateral Assignment.

21. Following the APA, Baymark ACET Direct Invest controlled ACET Global through ACET Holdco, LLC. In effect, however, the Baymark parties (and ultimately Ludlow and Hook) controlled, whether directly or indirectly, Baymark ACET Direct Invest and ACET Holdco, LLC. The Baymark parties, through Baymark ACET Direct Invest and ACET Holdco, LLC, caused ACET Global to fail to pay vendors, carriers, and others. And the Baymark parties took other steps that harmed ACET Venture Partners' interest in ACET Global and the Note owed to ACET Venture Partners. Baymark ACET Direct Invest and ACET Holdco deliberately took steps designed and intended to cause ACET Global to fail financially and to default on its Notes.

22. In fact, its principals never intended to fulfill the Note to ACET Ventures Partners. The Baymark parties, by consummating the transaction, fraudulently misrepresented that they intended to fulfill the Note, and thereby induced ACET Venture Partners to enter into the Note and related documents, such as the Collateral Assignment. The subsequent actions of the Baymark parties, as described in paragraphs 23 and 24, further demonstrates the intent to defraud ACET Ventures Partners. The Baymark parties made further fraudulent misrepresentations pertaining to their intent and ability to continue to run the business with respect to which the assets that were the subject of the APA were attributable; their intent to invest additional amounts into the underlying business associated

with the assets; that Baymark Management, LLC would provide services or services justifying any management fee; that ACET Global and the Baymark parties would maintain Tomer Damti as the CEO of ACET Global; that funds from the Super G loan would be used to build the business; and regarding their intent to fulfill their obligations under the Note.  Baymark ACET Direct Invest's actions directly harmed the value of ACET Venture Partners's security and the Note.

23. Baymark ACET Direct Invest and ACET Holdco and its principals drained ACET Global of its funds and assets to their enrichment and to ACET Global's detriment.  Pursuant to section 5.3 of Baymark ACET Holdco's Company Agreement, Baymark ACET Holdco was to pay a quarterly management fee (the "Management Fee") of no more than the greater of $150,000 or 5% of ACET Global's EBIDTA to Baymark Management, LLC.   On information and belief, Baymark Management, LLC was owned by Tony Ludlow and David Hook.  Thus, Ludlow and Hook acted as both the managers of Baymark Management, LLC and exercised control over ACET Global and Baymark ACET Holdco.  The Baymark parties had planned to and were successful in utilizing this Management Fee to drain ACET Global and Baymark ACET Holdco of all of their assets and capital, whether from a cash flow perspective or in terms of its balance sheet based on accrued/owed liabilities that deliberately placed it in an insolvent position.  On information and belief, even after ACET Global became insolvent, the Baymark parties continued to drain it of its assets through a Management Fee.  They paid or accrued recurring "management fees" to Baymark ACET Holdco and/or Baymark Management, LLC, which did not correspond to services or value provided, and caused improper management fees to be paid or owed even as ACET Global and Baymark ACET Holdco became insolvent.  The management fee was also used as a device to cause ACET Global to appear to be financially unsound.

24. Within approximately a year—and before the Note came due—the Baymark parties caused the creation of a new and separate entity, Windspeed Trading, LLC.  On information and belief, the

Baymark parties caused the transfer of substantially all of the assets of ACET Global to Windspeed Trading, LLC, thereby removing all of the value of ACET Global, which served as security for the Note and further decreased the value of Baymark ACET Holdco, LLC.  This act, or series of acts, was in violation of the Secured Promissory Note and related Security Agreement.  It also evidenced that the Baymark parties fraudulently caused Plaintiff to enter into the related transaction in the first place.

25. Such omissions, misrepresentations, and acts furthered a scheme to defraud, and did defraud, the Plaintiff in connection with the sale of a security interest in ACET Holdco, LLC.

26. Under the existing Amended and Restated Seller Note, ACET Global, LLC was to make payments to D&T Partners, LLC (the successor-in-interest to ACET Venture Partners) on October 31, 2018.  ACET Global failed to make the payment due on October 31, 2018, and has failed to make any payment thereafter.  ACET Global has indicated that it will not make any payments under the Note.

## VI. CLAIMS

### Count I: Breach of Contract

### (ACET Global, LLC and Baymark ACET Holdco, LLC)

27. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

28. ACET Global breached the APA and Note by, among other actions or inactions, defaulting on the installment payments due thereunder.  ACET Global breached the APA and Note when it failed to make installment payments to ACET Venture Partners beginning at least as of October 31, 2018.  Its continued failure to satisfy the terms of the APA constitutes a breach of contract, causing the entire principal amount of $3,230,000 plus accrued interest to become due immediately.

**Count II: Breach of Contract (Security Agreement)**

**(ACET Global, LLC AND BAYMARK ACET Holdco, LLC)**

29. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

30. ACET Global and Baymark ACET Holdco breached the Security Agreement and Secured Promissory Note by engaging in a "Fundamental Transaction" without approval from ACET Venture Partners.  Section (4) of the Secured Promissory Note provides that "[t]he Maker shall not enter into or be a party to a Fundamental Transaction, unless . . . pursuant to written agreements in form and substance satisfactory to the Holder and approved by the Holder prior to such Fundamental Transaction . . . ."  Section 25(d) of the Secured Promissory Note defines a "Fundamental Transaction" as, among other things, "one or more related transactions . . . [that] sell, assign, transfer, convey or otherwise dispose of all of substantially all of the properties or assets of [ACET Global, LLC]."

31. On information and belief, ACET Global caused the transfer of substantially all of its assets, including goodwill and intangible assets, to Windspeed Trading, LLC.  This act, or series of acts, breached the Security Agreement and Secured Promissory Note.

**Count III: Declaratory Judgment**

**(Windspeed Trading, LLC)**

32. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

33. Plaintiff seeks a declaratory Judgment that Windspeed Trading, LLC has assumed all obligations under the Note and Security Agreement.  Section (4) of the Security Agreement provides that "[u]pon any Fundamental Transaction, the successor entity to such Fundamental Transaction [here, Winspeed Trading, LLC] shall succeed to, and be substituted for . . . and

**APP 008**

shall assume all of the obligations of the Maker under this Note with the same effect as if such successor Person had been named as the Maker herein . . . .”

## Count IV: Fraudulent Inducement

### (The Baymark parties)

34. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

35. ACET Global, Baymark ACET Direct Invest, ACET Holdco, and its principals, operating through ACET Global, fraudulently induced ACET Venture Partners to enter into the APA and related documents.   ACET Global, Baymark ACET Direct Invest, ACET Holdco and their principals made numerous representations to Plaintiff, all of which were material representations pertaining to their intent and ability to continue to run the business with respect to which the assets that were the subject of the APA were attributable; their intent to invest additional amounts into the underlying business associated with the assets; that Baymark Management, LLC would provide services or services justifying any management fee; that ACET Global and the Baymark parties would maintain Tomer Damti was the CEO of ACET Global; that funds from the Super G loan would be used to build the business; and their intent to fulfill their obligations under the Note.  At the time Defendants made these representations, Defendants knew the representations were false or were made recklessly, as positive assertions and without knowledge of their truth. Defendants made the representations with the intent that Plaintiff act on them. Relying on the representations made by Defendants as set out above, Plaintiff entered into the APA.   Plaintiff relied on these representations and would not have entered into the APA had it not believed the representations and relied on them.

**APP 009**

### Count V: Common Law Fraud

### (The Baymark parties)

36. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

37. Defendants made material false representations to Plaintiff with the knowledge of their falsity or with reckless disregard of the truth with the intention that such representations be acted upon by Plaintiff, and that Plaintiff relied on these representations to its detriment. As a proximate result of such fraud, Plaintiff sustained the damages described more fully herein.

### Count VI: Breach of Fiduciary Duty

### (Baymark ACET Holdco, LLC)

38. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

39. Baymark ACET Holdco, the controlling member of ACET Global, had a fiduciary relationship with, and owed a fiduciary duty to, ACET Venture Partners.  Baymark ACET Holdco breached its duties to ACET Venture Partners. During the period since ACET Global became insolvent or was in the zone of insolvency, Baymark ACET Holdco owed a fiduciary duty of care to preserve the assets of ACET Global for the benefit of its creditors, including Plaintiff. Baymark ACET Holdco breached its fiduciary duty by willfully and/or through gross negligence (i) allowing the business and assets to waste, (ii) failing to cause ACET Global to pay under the Note, and (iii) failing to cause ACET Global to otherwise comply with the terms of the Note. Baymark ACET Holdco's breaches resulted in injury to Plaintiff, and also significant benefit to Defendants.

40. During the relevant time, ACET Global did not make any payments to Plaintiff.  Instead, Baymark ACET Holdco caused ACET Global to remit revenues and/or accrued payments to

the ultimate benefit of Baymark Management, LLC in the form of Management Fees.  As ACET Global's financial conditions declined, Baymark ACET Holdco continued to allow ACET Global to make payments and/or accrue payments to Baymark Management, LLC.  These payments constituted improper self-dealing transactions.  The improper payments and neglect/waste of the business were the proximate cause of the damages suffered by Plaintiff.

41. The conduct of Baymark ACET Holdco was intentional, willful, and/or grossly negligent.  As such, it is liable for exemplary and/or punitive damages.

### Count VII: Aiding and Abetting Breach of Fiduciary Duties to Plaintiff

### (The Baymark parties)

42. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

43. The Baymark parties aided and abetted Baymark ACET Holdco in breaching the duties of care and loyalty it owed to Plaintiff.  Moreover, because of their unique positions, relationships, control, and access to information, the Baymark parties directly owed fiduciary duties to Plaintiff.

44. The Baymark parties knew or should have known that ACET Global was insolvent, and because it was insolvent, ACET Global owed a fiduciary duty to manage its assets for the benefit of its creditors, including Plaintiff.  Baymark Management, LLC knowingly participated in self-dealing described above by accepting payments or obligations for management fees from (directly or indirectly) ACET Global while Baymark Management, LLC had actual knowledge that ACET Global was insolvent.  Baymark Management, LLC's acceptance of payments from ACET Global aided and abetted ACET Global in breaching the fiduciary duties owed to Plaintiff.  The actions of Baymark Management, LLC and the Baymark parties in aiding and abetting such acts were materially and substantially detrimental to Plaintiff and

**APP 011**

caused substantial damages to Plaintiff.   Moreover, the Baymark parties breached their fiduciary duties, causing damages to Plaintiff.

### Count VIII: Texas Uniform Fraudulent Transfer Act

### (The Baymark parties; Windspeed Trading, LLC)

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

46. The Baymark parties violated the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Comm. Code 24.001 *et seq.*, by transferring substantially all of the assets of ACET Global to Windspeed Trading, LLC.  These transfers were made after or within a reasonable time before Plaintiff's claims arose.   These transfers and obligations are also fraudulent because Defendants made the transfers and obligations with actual intent to hinder, delay, or defraud Plaintiff.

### Count IX: Texas Securities Act 33A(2)

### (The Baymark Parties)

47. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

48. The Baymark parties sold securities, namely the interest in Baymark ACET Holdco, LLC, and/or a security interest in ACET Global, LLC, in violation of Texas Securities Act section 33A(2).  The Baymark parties offered and sold securities by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made not misleading.

49. Texas Securities Act 33A(2) provides as follows:

> (1) **Untruth or Omission. —** A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

Tex. Rev. Civ. Stat. Art. 581-33

50. Indeed, the use of fraud and fraudulent practices in connection with the offer for sale and sale of securities is prohibited by Sections 4F, 25-1, and 32A of the Securities Act. In Section 4F of the Securities Act, fraud is defined as follows:

The term "fraud" or "fraudulent practice" shall include any misrepresentations, in any manner, of a relevant fact; any promise or representation or prediction as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; . . . provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

Tex. Rev. Civ. Stat. Art. 581-4

51. Moreover, under Section 33F(2) of the Securities Act:

**(2)** A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A . . . jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

Tex. Rev. Civ. Stat. Art. 581-33

52. The Baymark parties are jointly and severally liable with ACET Global because of their direct control of ACET Global as the offeror or because of their material aid to ACET Global with the intent to deceive or defraud or with reckless disregard for the truth or the law.

53. The Baymark parties, in the issuance, sale, promotion, negotiations, advertisement, or distribution of securities in the State of Texas, have engaged in fraud and fraudulent practices

by misrepresenting material facts and intentionally failing to disclose material facts as outlined above. The Baymark parties, with the intent to deceive or defraud or with reckless disregard for the truth or the law, have materially aided, and are materially aiding, one another in the fraudulent practices set forth herein.

### Count X: Texas Securities Act 33A(F)

### (The Baymark Parties)

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-26 above as if set forth here in full.

55. The Baymark parties acted as control persons and aiders of ACET Global, within the meaning of section 33A(F) of the Texas Securities Act.  By virtue of their positions with ACET Global, and ownership of ACET Global, the Baymark parties had the power and authority to cause ACET Global to engage in the conduct complained of herein and materially aided the seller in furthering the fraud. By reason of such conduct, the Baymark parties are jointly and severably liable pursuant to section 33A(F) of the Texas Securities Act.

### Count XI: Civil Conspiracy

56. The Baymark parties, in combination with one another, agreed to accomplish for an unlawful purpose or a lawful purpose by unlawful means, one or more of the violations described above, including to breach the fiduciary duties that ACET Global and/or ACET Holdco owed to Plaintiff. The Baymark parties had a meeting of the minds on the object or course of action to divert Plaintiffs funds and property under the above causes of action. One or more of the Baymark parties committed an unlawful, overt act to further this object or course of action. Plaintiff has suffered a substantial injury as a proximate result of these wrongful acts.

### Count XII: Attorney's Fees

57. Paragraph 13 of the Promissory Note provides as follows:

**APP 014**

> If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note . . . then the Maker shall pay the costs incurred by the Holder for such collection, enforcement or action . . . including, but not limited to, reasonable attorneys' fees and disbursements.

58. Moreover, Plaintiff is entitled to attorneys fees by statute, including pursuant to Texas Civil Practice and Remedies Code sec. 38.001.

## VII.    DAMAGES

59. Plaintiff seeks monetary relief over $1,000,000, which is within the jurisdictional limits of this Court.

60. As a result of the foregoing causes of action, Plaintiff suffered the following damages:

      67.1. Direct and compensatory damages;

      67.2. Lost profits from the operation of its pre-existing business;

      67.3. Loss of Goodwill;

      67.4. Exemplary damages.

61. Plaintiff further specifically pleads for the remedy of rescission.

62. The conduct of the Baymark parties was intentional, willful, and/or grossly negligent.  As such, they are liable for exemplary and/or punitive damages.

## VIII.   JURY DEMAND

63. Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## IX. REQUEST FOR DISCLOSURE

64. Under Texas Rule of Civil Procedure 194, Plaintiff requests that the Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## PRAYER

WHEREFORE Plaintiff asks to be awarded a judgment against Defendants for actual damages, rescission, court costs, attorney's fees, and all other relief to which Plaintiff is entitled.

Respectfully submitted,

By: /s/ Jason Freeman
Jason B. Freeman
TX Bar No. 24069736
Ryan C. Dean
TX Bar No. 24109798
Freeman Law, PLLC
2595 Dallas Parkway, Suite 420
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw-pllc.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that on this 2nd day of October, 2019, a true and correct copy of the foregoing document was served via the court's e-file system, upon:

Edward P. Perrin, Jr.
Hallett & Perrin
1445 Ross Ave., Suite 2400
Dallas, TX 75202
(214) 922-4132 (Telephone)
(214) 922-4142 (Fax)
EPerrin@hallettperrin.com

## EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (the "Agreement"), dated as of July 20, 2017 (the "Effective Date") is made by and between ACET Global, LLC, a Texas limited liability company (the "Company"), and Tomer Damti ("Employee"). The Company and Employee are referred to in this Agreement individually as a "Party" and, collectively, as the "Parties."

### RECITALS:

A.　　Pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement") dated on or about the date hereof and entered into by the Company, ACET Venture Partners, LLC, a Texas limited liability company ("Seller"), Employee, and other parties, the Company is acquiring substantially all of the assets of Seller (the "Transaction").

B.　　Upon consummation of the Transaction on or about the Effective Date, the Company is engaged in the business of operating a multi-national wholesale and direct sale company (business-to-consumer and business-to-business) providing sales and sales services (including without limitation via the Internet and other media broadcast outlets), which includes but is not limited to purchasing, testing, marketing, logistics and fulfillment of products worldwide (the "Business").

C.　　Employee was an owner and employee of Seller prior to the Transaction.

D.　　The Company would not have completed the Transaction but for Employee's agreement to enter into this Agreement with the Company.

E.　　The Company and Employee desire to enter into this Agreement to clarify the terms and conditions of Employee's employment by the Company.

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

**1.　　Employment/Duties**. Company agrees to employ Employee in the position of Chief Executive Officer of the Company. Employee will be responsible for performing those duties that are reasonably assigned to Employee by the manager of the Company (the "Manager"), or by those individuals designated by the Manager to assign such duties. The Company will provide appropriate training to Employee to permit him to perform his duties competently.

**2.　　Term of Agreement**. This Agreement shall commence on the Effective Date and shall continue until the fifth (5th) year anniversary of the Effective Date (the "Initial Term"), unless earlier terminated in accordance with the terms of this Agreement. At the end of the Initial Term, this Agreement shall automatically renew for successive one-year terms (each one-year period, a "Renewal Term"), unless, at least one hundred twenty (120) days prior to the

EMPLOYMENT AGREEMENT—PAGE 1

expiration of the Initial Term and any applicable Renewal Term, either Party informs the other Party of its intent not to renew this Agreement for a Renewal Term. This Agreement may be terminated during the Initial Term or during any Renewal Term as set forth in Section 8. The Parties agree that the obligations created in Sections 6, 7, 9, 10, 11, and 12 of this Agreement will survive the termination of Employee's employment with the Company.

    **3.**    **Employee's Responsibilities**. Employee agrees that during the term of his employment by the Company he will devote his full business time and his best efforts and abilities to the performance of his duties for the Company. Employee agrees to act with the Company's best interest in mind at all times. Employee will conduct himself at the highest professional standards of ethics and integrity. Employee agrees to use his best efforts and skills to preserve the business of the Company and the good will of its customers, employees and persons having business relations with the Company. Employee will comply with all applicable laws and with all the Company's policies and procedures.

    **4.**    **No Limitations**. Employee warrants and represents that he is under no contractual, judicial or other restraint that impairs his right or legal ability to enter into this Agreement and to carry out his duties and responsibilities for the Company.

    **5.**    **Compensation and Benefits**.

    (a)    Base Salary. The Company shall pay to Employee a Base Salary of $164,000 per year (the "Base Salary"). The Base Salary shall be paid in approximately equal installments on such dates as Company pays its employees generally, all as may be determined by the Company from time to time and in accordance with applicable law and subject to applicable legal deductions and withholding.

    (b)    Annual Discretionary Bonus. During the term of this Agreement, Employee will be eligible to receive an annual discretionary bonus up to an amount equal to $35,000. The Company will determine the bonus compensation, if any, to be paid pursuant to this Section 5(b) in its sole discretion. Any bonus compensation paid pursuant to this Section 5(b) will be subject to applicable legal deductions and withholding. To be eligible to receive bonus compensation, Employee must be employed by the Company on the date the bonus is due to be paid by the Company.

    (c)    Quarterly Bonuses. Beginning October 1, 2017 and continuing on the first day of each of the following four calendar quarters, the Company shall pay to Employee $10,000 (for a total of $50,000). Any bonus compensation paid pursuant to this Section 5(c) will be subject to applicable legal deductions and withholding.

    (d)    Other Benefits. The Company will reimburse Employee expenses approved in advance by Manager, and will provide Employee vacation and other employment benefits the Company provides to similarly-situated full-time employees of the Company.

6.    **Training and Confidential Information**.  The Company will provide Employee with such specialized training as the Company in its sole discretion deems necessary or beneficial to Employee's performance of his job duties.   The Company will also provide confidential and proprietary information to Employee regarding its customers, prospective customers, vendors, prospective vendors, suppliers, prospective suppliers, employees, sales, purchasing, pricing, services, computer programs, websites, operations, marketing strategies and financial performance (collectively referred to herein as the "Confidential Information"). Employee understands and agrees that information and materials Employee develops and/or creates during Employee's employment with the Company related to the Company's business and/or operations also constitute Confidential Information.  Employee acknowledges and agrees that the Company has policies and procedures to maintain the secrecy of the Confidential Information, and Employee agrees to follow all such policies and procedures.  Employee further agrees to immediately inform the Company if Employee is aware of a violation of any such policy or procedure, or believes that such policies and procedures are not effective to maintain the secrecy of the Confidential Information. Employee understands and agrees that during and after the term of his employment with the Company he will not directly or indirectly use or disclose any Confidential Information for any reason other than the advancement of the Company's business interests.  The Parties agree that the restrictions in this Section regarding Confidential Information do not cover public information, information created by entities other than the Company for dissemination to the public or information generally known in the Company's industry.

7.    **Restrictive Covenants**.  In consideration for the commitments made by the Company to Employee in this Agreement regarding the Company's employment and training of Employee and the Company's disclosure of its confidential and proprietary information to Employee, Employee agrees to the restrictions set out in this Section.  Employee recognizes and agrees that these restrictions are necessary to protect the Company's customer base, good will, confidential information and other business interests.  Accordingly, Employee hereby covenants and agrees as follows:

(a)    Non-Competition. Commencing on the Effective Date and continuing for a period of one (1) year following the termination of his employment with the Company (the "Restricted Period"), Employee shall not, directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor or stockholder of any company or business organization, engage in any business activity, or have a financial interest in any business activity, that is in competition with the Business as currently conducted anywhere in North America ("Competitive Activity").   For the purposes of clarity, the engagement of Employee pursuant to this Agreement shall not be deemed a Competitive Activity.

(b)    Non-Solicitation. During the Restricted Period, Employee shall not, directly or indirectly, (i) solicit the business of any person who is a prior or existing customer of the Company for any reason other than the advancement of the Company's business interests, (ii) cause, induce or attempt to cause or induce any customer or other business relation of the Company to cease doing business with Company, or (3) provide the same services provided by the Company to any customer of the Company on behalf

EMPLOYMENT AGREEMENT—PAGE 3

of any other person or entity; provided, however, that after the termination of Employee's employment with the Company, the restrictions in this Section 7(b) will only apply to a customer if Employee had personal contact with the customer and/or received Confidential Information regarding the customer during his employment with the Company.

(c)     Non-Hire.  During the Restricted Period, Employee shall not, directly or indirectly, on his own behalf or on behalf of any other person, (i) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company, or (ii) use or disclose to any person any personal information regarding any of the Company's employees or independent contractors.

(d)     Non-Access.  Commencing on the date of his termination from the Company and continuing thereafter, Employee shall not access the Company's computer systems, download files or any information from the Company's computer systems or in any way interfere, disrupt, modify or change any computer program used by the Company or any data stored on the Company's computer systems.

(e)     Amendment.  If the covenants contained in Sections 7(a), (b) and (c) of this Agreement, or any portion thereof, are found by any court having jurisdiction to be too broad in scope, whether as to activities, time period, geographic area or otherwise, these covenants will nevertheless remain effective but will be considered amended to the extent considered by such court to be reasonable, and will be fully enforceable as so amended.

8.     **Termination of Agreement**.  During the Initial Term and any Renewal Term, this Agreement may be terminated as set forth below.

(a)     Death or Disability.  This Agreement shall automatically terminate upon the death of Employee or upon Employee's becoming disabled to the extent that he cannot perform the essential functions of his position as determined in good faith by a physician reasonably acceptable to the Company.  In the event this Agreement is terminated pursuant to this subsection, the Company shall pay to Employee only the Base Salary and all benefits due to him through the effective date of the termination of his employment.

(b)     With Notice.  Either Party may terminate this Agreement for any reason by giving the other Party thirty (30) days' prior written notice of its intent to terminate. Upon giving such notice the Parties shall meet and in good faith confer regarding Employee's work responsibilities during the notice period.  During the notice period, Employee agrees to use his reasonable efforts to continue his work for the Company and the Company agrees to continue compensating Employee until his termination date with the same compensation and benefits as Employee received immediately before the notice was given.  If the Company terminates this Agreement pursuant to this subsection

during the Initial Term, Employee will be eligible to receive the Release Payment as set forth in Section 8(d). In the event this Agreement is terminated pursuant to this subsection during a Renewal Term, the Company shall pay to Employee only the Base Salary due to hi through the date of his termination.

(c)     For Cause. The Company may terminate this Agreement "for cause." For purposes of this Agreement "for cause" shall be defined as the following: (i) willful and continued failure by Employee to perform his duties, (ii) failure to follow reasonable business-related directions from the Company, (iii) theft from the Company or its customers, (iv) conviction of a felony, or (v) any other material conduct that is contrary to the best interests of the Company or adversely affects the culture or reputation of the Company. In the event this Agreement is terminated pursuant to this subsection, the Company shall pay to Employee only the Base Salary and all benefits due to him through the effective date of his termination.

(d)     Release Payment. This Section 8(d) only applies during the Initial Term and if the Company terminates this Agreement pursuant to Section 8(b). In the event of termination by the Company under Section 8(b), Employee shall receive a release payment in an amount equal to the lesser of (i) six months of Employee's Base Salary, or (ii) Employee's Base Salary for the remainder of the Initial Term. Any payment due under this Section 8(d) (any "Release Payment") will be made in equal installments consistent with the Company's regularly scheduled pay periods. The Company will be obligated to pay the Release Payment to Employee if and only if Employee executes, no later than thirty (30) days after the date this Agreement terminates, a separation agreement in a form approved by the Company that contains a general release in favor of the Company and other standard terms. The Company will provide such separation agreement to Employee within seven (7) days after the date this Agreement terminates.

9.     **Return of Property to the Company**. Upon the termination of his employment with the Company, Employee agrees to promptly provide the Company with a written inventory of all Company-owned property in his possession or under his control and to promptly return to the Company all Company-owned property in his possession or control, including but not limited to Confidential Information. After his termination Employee will not retain copies of any documents or other property belonging to the Company. Employee will use his reasonable efforts to delete, permanently remove or otherwise erase those copies of any Company-owned property that resides on Employee's hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems. The obligations of Employee with respect to any such Company-owned property shall survive until the same is deleted, removed or otherwise erased from such hard drives, file services, computer backup, disaster recovery or electronic media continuity systems.

10.     **Required Notice.** Employee agrees that during the term of this Agreement and the one-year period following his termination of employment with the Company, prior to beginning any new employment he will provide the Company with thirty (30) days' written notice regarding his new employment. The notice will identify Employee's new employer,

describe the duties Employee will perform for the new employer, and confirm that Employee has informed his new employer of his confidentiality and other obligations under this Agreement.

      **11.**    <u>**Waiver of Right to Jury Trial**</u>.  NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, EMPLOYEE AND COMPANY SHALL, AND HEREBY DO, IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY, CLAIM, OR CAUSE OF ACTION ARISING OUT OF OR RELATNG TO EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, THE TERMINATION OF THAT EMPLOYMENT, OR THIS AGREEMENT (EITHER ALLEGED BREACH OR ENFORCEMENT).

      **12.**    <u>**Inventions; Developments**</u>. Employee acknowledges that the Company owns all Intellectual Property Rights (defined below) in any material created, generated or contributed by him in connection with his employment by the Company.  Employee agrees that any and all written materials and writings ("<u>Work</u>") that are developed by Employee for the Company's use during the term of his employment shall be deemed a "work made for hire" within the meaning of the United States Copyright Act, Title 17, United States Code, which vests all copyright interest in and to the Work in the Company.  Employee agrees to notify the Company of any Work conceived or developed by him in connection with and during the term of his Employment.  In exchange for the covenants in this Agreement and other good and valuable consideration, Employee acknowledges and agrees that all of the Work (and all rights therein, including, without limitation, copyright) belongs to and shall be the sole and exclusive property of the Company.  If for any reason the Work would not be considered a work made for hire under applicable law, then in exchange for the covenants in this Agreement and other good and valuable consideration, Employee does hereby sell, assign, and transfer to the Company, its successors and assigns, the entire right, title and interest in and to the Work, including all copyrights and other Intellectual Property Rights in the Work, and any registrations and copyright applications or other applications relating thereto and any renewals and extensions thereof, and in and to all works based upon, derived from, or incorporating the Work, and in and to all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, and in and to all causes of action, either in law or in equity for past, present, or future infringement based on the copyrights and all other rights corresponding to the foregoing throughout the world.  Employee will cooperate with reasonable and lawful requests by the Company to enable it to perfect the assignment of its Intellectual Property Rights.  Employee waives all of his legal rights in respect of any Intellectual Property created by him alone, or with others, in connection with the Work.  For the purposes of this Agreement, "<u>Intellectual Property</u>" is defined to include, but not be limited to, the following:  (a) inventions, ideas, discoveries, treatments and improvements, whether patentable or unpatentable; (b) trademarks and designs; and (c) copyrightable works.  "<u>Intellectual Property Rights</u>" shall mean the following: (x) all property rights in connection with Intellectual Property; (y) any right to have Confidential Information kept confidential; and (z) any application or right to apply for registration of any rights in connection with Intellectual Property.

      **13.**    <u>**Governing Law, Jurisdiction, and Venue.**</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other

jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas. In respect of any action, suit or other proceeding relating to this Agreement, the Company and Employee each hereby irrevocably submit to the exclusive jurisdiction of any state or federal court located in Dallas County, Texas.

**14.** <u>**Severability**</u>. If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then both Parties will be relieved of all obligations arising under such provision, but only to the extent it is illegal, unenforceable, or void. The Parties intend that this Agreement will be deemed amended by modifying any such illegal, unenforceable, or void provision to the extent necessary to make it legal and enforceable while preserving its intent, or if such is not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives. Notwithstanding the foregoing, if the remainder of this Agreement will not be affected by such declaration or finding and is capable of substantial performance, then each provision not so affected will be enforced to the extent permitted by law.

**15.** <u>**Waiver**</u>. No delay or omission by either Party to exercise any right or power under this Agreement will impair such right or power or be construed as a waiver thereof. A waiver by either Party of any of the covenants to be performed by the other or any breach thereof will not be construed to be a waiver of any succeeding breach thereof or of any other covenant contained in this Agreement. All remedies provided for in this Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

**16.** <u>**Notices**</u>. Any notices, consents, demands, requests, approvals and other communications to be given under this Agreement by either Party to the other shall be deemed to have been duly given if given in writing and personally delivered or sent by mail (registered or certified) or by a recognized "next-day delivery service" to (a) if to the Company, the address of the Company's corporate headquarters, and (b) if to Employee, the address identified on Employee's payroll check or such other address as Employee may have advised the Company in writing.

**17.** <u>**Entire Agreement**</u>. This Agreement represents the entire agreement relating to employment between the Company and Employee, and is included as part of the Purchase Agreement. No prior or subsequent promises, representation, or understandings relative to any terms or conditions of employment are to be considered as part of this Agreement or as binding unless expressed in writing signed by the Parties.

**18.** <u>**Amendment**</u>. This Agreement may be amended only in a writing signed by both Parties.

**19.** <u>**Drafting**</u>. It is agreed to by both Parties that there should be no effect given to which Party drafted this Agreement.

**20.** <u>**Assignment**</u>. This Agreement shall be binding on the Parties' respective successors, heirs, and assigns. The Company agrees that, in connection with any transaction

involving a change in control of Company, Company will require as a condition to that transaction that any purchaser, acquiror, or surviving entity (in the event of a merger) acknowledge and agree to its obligation to assume this Agreement in its capacity as a successor to Company, and that upon assumption, this Agreement shall inure to the benefit of, and be fully enforceable by, any successor and/or assignee. Employee may not assign this Agreement.

21.   **Acknowledgment**.  By signing below, the Parties certify and represent that they have carefully read and considered the foregoing Agreement and fully understand all provisions of this Agreement and understand the consequences of signing this Agreement, and have signed this Agreement voluntarily and without coercion, undue influence, threats, or intimidations of any kind or type whatsoever.

22.   **Attorneys' Fees and Costs**.  In the event of any claim, controversy or dispute arising out of or relating to this Agreement, or the breach hereof, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs in connection with any court proceeding.

*(Signature page follows.)*

IN WITNESS WHEREOF, each Party has duly executed and delivered this Employment Agreement as of the Effective Date.

**COMPANY**:

**ACET GLOBAL, LLC**

By: _____

Name: David Hook

Title:  President

**EMPLOYEE:**

_____

Tomer Damti