UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATT DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH; ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; and WINDSPEED TRADING, LLC, | § § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-CV-01171-B |
| *Defendants.* | § | |

---

**APPENDIX IN SUPPORT OF DEFENDANTS DAVID HOOK AND
TONY LUDLOW'S MOTION TO DISMISS PLAINTFF'S SECOND AMENDED
COMPLAINT AND BRIEF IN SUPPORT**

---

| | |
|---|---|
| APP 001-020 | *Larry Greb, et al. v. Mark Singleton, III, et al.*; Cause No. 3:18-cv-01439-M- First Amended Complaint, dated October 15, 2018 [Docket No. 19] |
| APP 021-035 | *Larry Greb, et al. v. Mark Singleton, III, et al.*; Cause No. 3:18-cv-01439-M- Order Granting Motion to Dismiss and Requiring RICO Case Statement, dated September 30, 2019 [Docket No. 41] |
| APP 036-077 | *State Farm Mutual Automobile Insurance Company, et al. v. Complete Pain Solutions LLC n/k/a Complete Pain Solutions PLLC, et al.;* Cause No. 4:20-cv-02606- Complaint, dated July 23, 2020 [Docket No. 1] |

Respectfully submitted,

*/s/ Edward P. Perrin, Jr.*

Edward P. Perrin, Jr.
State Bar No. 15796700
Jennifer R. Poe
State Bar No. 00794470
HALLETT & PERRIN, PC
1445 Ross Ave., Suite 2400
Dallas, TX 75202
Telephone: (214) 953-0053
Facsimile: (214) 922-4142
eperrin@hallettperrin.com
jpoe@hallettperrin.com

**ATTORNEYS FOR  DEFENDANTS
BAYMARK PARTNERS MANAGEMENT, LLC;
BAYMARK MANGEMENT, LLC;
BAYMARK ACET HOLDCO, LLC;
BAYMARK ACET DIRECT INVEST, LLC;
BAYMARK PARTNERS; DAVID HOOK;
TONY LUDLOW; AND MATTHEW DENEGRE**

## <u>CERTIFICATE OF SERVICE</u>

On July 22, 2022, I electronically submitted the foregoing document with the Clerk of the Court for the U.S.  District Court, Northern District of Texas, using the electronic  case filing system of the Court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Edward P. Perrin, Jr.*

Edward P. Perrin, Jr.

4894-1163-7034, v. 1

## FIN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **LARRY GREB, RL WAXAHACHIE PROPERTIES, INC., And RL LUBBOCK OPERATIONS LP** | § § § § | |
| **PLAINTIFFS,** | § § | |
| **VS.** | § § | **Case No. 3:18-cv-01439-M** |
| **MARK SINGLETON, III, CITIZENS NATIONAL BANK OF TEXAS TONY LUDLOW, DAVID HOOK AND BAYMARK PARTNERS** | § § § § § | |
| **DEFENDANTS** | § § | **JURY TRIAL DEMANDED** |

### FIRST AMENDED COMPLAINT

### I.

PLAINTIFFS, Larry Greb, RL Waxahachie Properties, Inc., and RL Lubbock Operations, LP, file this, their First Amended Complaint, complaining of Mark Singleton III, Citizens National Bank of Texas, Tony Ludlow, David Hook and Baymark Partners, as follows:

### JURISDICTION AND VENUE

1.      This action is instituted, *inter alia*, under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO"), and under the state law principles of conspiracy and fraud to recover damages--including threefold damages pursuant to 18 U.S.C. §1964(c) and punitive damages under Texas Common law, as well as the costs of this suit, including reasonable attorneys fees -- sustained by Plaintiffs as the result of injury to his business and property caused by the Defendants as set out below.

**FIRST AMENDED ORIGINAL COMPLAINT**
**PAGE 1**

2.      This Court has jurisdiction over the federal claims based upon 18 U.S.C. §1964 and 28 U.S.C. § 1331; it has jurisdiction over the state claims based on the principles of pendent and ancillary jurisdiction.

3.      Venue is proper in this district based on 18 USC §1965 and 28 USC §1391 because this is the district where Defendants reside, can be found and it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

4.      In connection with the acts alleged in this Complaint, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce and the United States mail.

5.      The Citizens National Bank ("CNB"), is an enterprise within the meaning of 18 U.S.C. §1961(4) which operates in interstate commerce and the activities of which affect interstate commerce.

## II.

### PARTIES

6.      Plaintiff, Larry Greb, is an individual and the former 60% owner and an officer of various companies that formed a concrete pipe business with locations in Waxahachie, Texas and Lubbock, Texas.

7.      RL Waxahachie Properties, Inc., formerly known as J&G Concrete Products, Inc., was the primary entity through which Larry Greb owned and operated the J&G concrete pipe business in Waxahachie, Texas. Greb was a 60% owner during 2015.  He is the 100% owner now.

8.      RL Lubbock Operations, LP, is a Texas Limited Partnership with its principal place of business in Paris, Texas.  It was formerly known as South Plains Concrete Products, LP and it was the owner of the Lubbock operations of the J&G Companies.  Greb is the 100% owner of  RL Lubbock Operations, LP.

9.      Defendant, Mark Singleton, III, is an individual and the President of Citizens National Bank of Texas in Waxahachie ("CNB").  He was also one of board members of Citizens National Bank of Texas during all times relevant to this action.  He is also Chairman of the Board of Citizens National Bank of Texas.  He has appeared.

10.      Defendant, Citizens National Bank of Texas ("CNB") is a federally chartered independent bank which is 100% owned by First Citizens Bank Shares, Inc., a bank holding company.  It has appeared.

11.      Defendant, Tony Ludlow, is an individual and managing director of Baymark Partners at all times relevant to this complaint.  He has appeared.

12.      Defendant David Hook is an individual and a managing director of Baymark Partners at all times relevant to this complaint.  He has appeared.

13.      Defendant, Baymark Partners is, on information and belief, a private equity firm operating as a partnership with its principal place of business at 5700 Granite Parkway, Suite 435, Plano, Texas   75024.  On information and belief, it is controlled by Tony Ludlow and David Hook and operates primarily for their benefit.

**FIRST AMENDED ORIGINAL COMPLAINT**
**PAGE 3**

## III.

### BACKGROUND FACTS

14.     In 2003, Larry Greb and Rick Johnson formed a company known as J&G

Concrete Products, Inc.  It was a concrete pipe company operating in Waxahachie, Texas.  In

2003,  J & G borrowed just over $3,000,000 from Citizens National Bank of Texas to start the

business.  Both Greb and Johnson personally guaranteed the loans.  Sometime later Greb and

Johnson set up a second concrete pipe plant in Lubbock, Texas which they called South Plains

Concrete Products, LP.  Hereafter the Greb Johnson combined companies will be called "the

J&G entities."  The J&G entities business did well until 2009 when the recession of 2008 slowed

down operations as construction slowed.  Between 2003 and 2014, Greb put over $4,500,000 of

his own money into the J&G entities to keep them operating and Greb–individualy--borrowed

money from CNB to pay down the J&G debt and support the J&G entities during this time.  In

addition to borrowing to pay down CNB debt, Greb also pledged his personal assets, including a

ranch in East Texas, a ranch in Oklahoma and an apartment complex in Paris, Texas for

additional security on the CNB loans.

15.     By 2013, Greb and Johnson had turned J&G around and it was making money and

cash flowing.  Although its finances had greatly improved by 2013, it was in a technical default

under two of its loans to CNB.  These two loans had face values of $3,251,550 (loan # 102140)

and $1,396,000 (# 106299).  The outstanding balance on these loans was substantially less than

face value; however, these two loans were in technical default because they had reached their

maturity dates: July 1, 2005 and December 15, 2011 respectively.  These technical default

occurred because CNB's borrowing limits required it to have participants in the loans, and prior

to 2014, CNB's participant banks did not wish to continue participating in CNB loans, and CNB could not, therefore, renew the loans.  Thus, even though the J & G entities had returned to profitability, they were operating in the black and servicing their CNB loans, CNB could not refinance the loans due to its relationship with its participant bank.

16.     In 2013 and 2014, CNB and Mark Singleton were pressuring Greb and J&G to either sell the company or refinance the debt.  However, at this same time, CNB, through Singleton and other officers, were taking actions, as set out below, that made it virtually impossible for J&G to actually refinance the CNB debt.  Nevertheless, J&G through Greb was not only trying to refinance the CNB debt, it was also attempting to find a buyer for the J&G entities.  In April, 2014, while the refinance attempts were ongoing, CNB posted the J&G properties in Waxahachie and Lubbock for foreclosure.  It also posted all the real property owned by Larry Greb -- his two ranches, one in Oklahoma and one in Texas, as well as his apartment complex in Paris, Texas – for foreclosure.

17.     In order to foreclose, CNB, at the direction of Singleton, mailed foreclosure notices through the U.S. Mail.  It did so on April 15, 2014.  As set out below, each one of the mailings was done in violation of 18 U.S.C.§ 1341.

18.     When CNB declared all the J&G notes in default ( a total of 7 notes) and posted the J&G entities and Greb's property for foreclosure, only two of the notes were actually past their maturity dates: loan numbers 102140 and 106299.  Not only had the remaining notes not reached their maturity dates in 2014, the J&G entities were making interest and principal payments on all the notes.  What is more, the total value of the collateral securing the notes–including Greb's personal property–was in excess of $27,000,000.  And despite the

**FIRST AMENDED ORIGINAL COMPLAINT**
**PAGE 5**

massively over secured condition of the debt, CNB was seeking to foreclose on 100% of the collateral at the same time.

19.    In addition to the above, at the time of the foreclosure posting, CNB had fraudulently inflated the amount of debt J&G owed CNB.  On J&G's books the loan balance was $7.5 million.  CNB claimed the balance was nearly $10,000,000.  Moreover, there were no cross default rights on the Liberty Loan, or indeed on most of the current loans.  By claiming that J&G owed more than $2,000,000 more than it actually owed, and that it was in default on numerous notes that were not in default, but current, CNB was effectively preventing J&G from refinancing the debt with any other bank because no one knew how much another bank would have to advance to take out CNB and J&G was not going to refinance more debt than it actually owed.  Thus, CNB's and Singleton's actions effectively foreclosed any realistic possibility that J&G might be able to refinance the debt, thus preserving the CNB debt so that CNB could foreclose on $27 million dollars worth of real estate. This fraudulent scheme, coupled with the mailings in the U.S. mail in furtherance of the scheme, constituted mail fraud in violation of 18.C. §1341.

20.    This $10,000,000 had no basis in reality and was a fraudulent statement.  For instance, CNB was claiming that one loan, number 110032, which had been paid and for which J&G had a receipt marked "Paid in Full," had an outstanding balance in excess of $400,000 and this was part of the basis for the foreclosure.  To revive the fully paid loan number 110032, CNB had, without notice to, or the agreement of Greb or J&G, simply substituted another note--a J&G loan it had purchased from another bank (Liberty National of Paris, Texas) for approximately

$200,000--for loan number 110032, which had been paid off.  But the loan purchased from Liberty National was not in default and it had a maturity date of August 15, 2018.

21.     In April, 2014 when CNB sought to foreclose in on J&G and Greb, it was vastly over secured and J&G was paying principal and interest on the loans.  On information and belief, CNB had no legitimate banking reason for foreclosing at that time. On information and belief, the actual reason for posting at that time was to secure a profit significantly over the amount it was entitled to based on the notes by taking of property worth 27 million dollars for a debt of about 8 million dollars.  Between Larry Greb's personal real estate assets, all of which CNB was seeking to foreclose on, and the J&G properties in Waxahachie and Lubbock, Texas, CNB saw an opportunity to acquire property, that even at a post foreclosure price, would bring CNB millions more than it could get by simply collecting on its loans.

22.     CNB's foreclosure action, in April, 2014, was a fraudulent action that involved the use of the mails in violation of 18 U.S.C., § 1341.  CNB represented that seven notes were in default, including a note that was paid in full.  It did so in order to acquire assets worth in excess of $27,000,000.  It did so in mailings on April 15, 2014.  Each one of those mailings was a separate violation of 18 U.S.C., § 1341.

23.     In May, 2014, Larry Greb, Rick Johnson and various J&G entities filed suit against CNB to stop the illegal foreclosure action attempted as set out in paragraph 20 above.  J&G raised many of the issues cited above.  The Plaintiffs secured a temporary restraining order that stopped the foreclosure, and with the issues set out above, and others, it was clear that CNB was not going to be able to foreclose without litigating all these issues and that its fraudulent scheme to take the Greb and J&G properties was not going to occur.  For this reason, CNB entered into a

standstill agreement with the J&G entities on the litigation while Greb sought purchasers for the J&G companies so that J&G could pay CNB and retain some of its equity in the J&G assets. J&G also sought out alternate financing but this was complicated by CNB's actions in inflating the loan balance.

24.     On June 25, 2014, Larry Greb and Rick Johnson entered into a letter of intent to sell the J&G entities to a company called Ausable Capital Partners for $20,000,000.  For a variety of reasons, this deal was never consummated, and the offering price was dropped to $15,000,000.  In 2015 another company, previously affiliated with Ausable stepped into Ausable's shoes and tried to purchase J&G for $15,000,000.  This company was Baymark Partners ("Baymark").  In May, 2015, a letter of intent was executed between Baymark and the J&G entities.  The letter of intent was non-binding; i.e. it allowed either party to withdraw from the purchase and sale at any time for any reason.  Larry Greb signed that agreement fully intending to use the time of the Letter of Intent to find refinancing--if possible--so he could avoid selling his company for $15,000,000, a price which he knew was only half J&G's true value in a reasonable sale.

25.     During 2014 and 2015, a large multinational company known as Hanson Building Materials (later renamed  Forterra) was making numerous acquisitions of concrete pipe companies throughout the United States.  It was making these acquisitions based on a multiple of the companies' earnings which, based on J&G's earnings, would have set the value of J&G above $30,000,000.  The information surrounding Hanson's acquisition including the prices paid compared to earnings was publically available information.

26.      By June, 2015, Mark Singleton was well aware of the publicly available information about the Hanson/Forterra acquisitions.  He knew that the value of J&G - -  if sold to Hanson, at the same sale to earing ration as the other sales - - was in the neighborhood of $30,000,000.  In June and July, 2015, according to CNB's claims, J&G owed CNB 9.4 million dollars. At the same time, the liquidation value of J&G according to appraisals accepted by the bank was in excess of $17,000,000.  In addition, CNB held security interests in Larry Greb's personal real estate worth in excess of $10,000,000.  Thus, CNB held a secured position with property worth, on liquidation, approximately $27,000,000 on debt that it acknowledged was no more than $9,400,000.

27.      In addition, during 2014 and 2015, J&G had been paying down principle and interest at a rate of $102,000 a month while still showing in excess of $2,000,000 worth of profit. In June, 2015, Mark Singleton and the directors of CNB and the RICO conspirators knew that they could all make significantly more money by forcing the sale of J&G to Baymark and taking an equity position in the post purchase of J&G.  Singleton and CNB's original plan, in April, 2014, to foreclose and take the J&G and Greb assets had been frustrated; however, this new plan would still give Singleton and the other owners of CNB another means to increase their profit far above the amount they were contractually entitled to: their principal and interest on the loans. Accordingly, Singleton secretly, and without telling Greb, entered into an agreement with Baymark, through Tony Ludlow and David Hook, to advance Baymark the funds to purchase J&G in exchange for Baymark, Hook and Ludlow giving CNB a share of the profits on the resale of J&G.  This would allow Baymark to acquire J&G at half its value and to force Larry Greb to sell to Baymark.

**FIRST AMENDED ORIGINAL COMPLAINT**
**PAGE 9**

**APP 009**

28.     In exchange for offering the purchase funds to Baymark, CNB took a 7.5% profit participation in the resale of J&G after the Baymark purchase.  It accomplished this by acquiring warrants, issued at the direction of Baymark to CNB, at the closing of the purchase of J&G by Baymark.

29.     Throughout this time, Larry Greb was seeking alternative financing and using other efforts to save the company from being bought by Baymark at less than one-half the value of the company.  These included efforts to sell the company to Hanson Building Material.  Greb met with the CEO of Hanson, Plamen Jordanoff, and others, to explore a Hanson purchase of J&G.  However, because in the spring and summer of 2015, Hanson was sold to a new owner, the manager in charge at Hanson (which was renamed Forterra) temporarily slowed Hanson's acquisition program.

30.     In April, May and June, 2015, Greb also contacted several banks, including Comerica Bank and Texas Capital Bank, to try and secure alternative financing.  When Tony Ludlow learned that Greb was seeking alternative financing, he communicated with those potential J&G financial sources to stop them from offering loans to J&G to take out CNB's debt.  He did so by falsely stating that Baymark had a letter of intent with J&G that prevented J&G from seeking alternative financing.

31.     Ludlow did this to ensure that Greb could only sell his interest in J&G to Baymark.

32.     Ludlow, Hook, Baymark and Singleton all knew that Hanson/Forterra was buying up concrete pipe companies at a multiple of earnings that would have valued J&G at approximately twice what Baymark was paying for J&G.

**FIRST AMENDED ORIGINAL COMPLAINT**
**PAGE 10**

33.     CNB had a contractual legal right to be paid its principal and interest based on its banking relationship with J&G.  It had no legal right to force Greb to sell J&G to a group - - that included CNB - - so that group could then resell J&G for a profit at a price that was substantially above the amount of its debt plus interest. But that is exactly what Singleton, Baymark, Ludlow and Hook illegally all conspired to do.

34.     In June of 2015, Hook, Ludlow, Baymark and Singleton entered into a conspiracy to defraud Greb out of his interest in J&G that conspiracy required all parties to use their efforts to enure the same of J&G to BayMark; this included whatever efforts were necessary to ensure that Greb could not refinance the debt to CNB and thus remove CNB from a foreclosure position.  In the first week of August, 2015, after the conspiracy was in place, Greb informed Singleton, at a meeting at CNB, that, in the next several weeks, he intended to bring Singleton a check to pay all of CNB's loans to J&G.  The conspirators all knew that if Greb was allowed to do this, the conspiracy to defraud him out of his interest would fail.  So the conspirators did whatever was necessary to ensure that Greb would not be able to pay off the CNB debt with an advance from another financial institution.

35.     A few days after Greb's informed Singleton that he was going to be able to take out CNB, the conspirators began a flurry of activity to insure the Baymark purchase was the only J&G option.  On August 10, 2015, in furtherance of their fraudulent scheme, Mark Singleton caused CNB to post all the J&G properties for foreclosure on September 1, 2015, along with all of Larry Greb's personal real estate in Texas and Oklahoma.  He did so at a time when J&G was paying in excess of $102,000 per month towards both principle and interest on the outstanding loans and while it's loans were substantially over collateralized..  The real purpose of the

foreclosure was to cut off Greb's ability to refinance the CNB debt.  CNB's foreclosure action on August 10, 2014, was part of a fraudulent scheme which involved the use of the mails in violation of 18 U.S.C., § 1341.  It included 5 mailings on August 10, 2015 to ???.  Each one of these mailings was a separate violation of 18 U.S.C., § 1341.

36.     Then, on August 18, 2015, eight days after the foreclosure notice was posted, CNB and Mark Singleton, as a part of, and in furtherance of the conspiracy, caused CNB to file an injunction action against Larry Greb, personally, to stop him from seeking other purchasers or other financial institutions to refinance the debt owed to CNB.  This was just 10 days after Greb had told Singleton that he expected to be able to pay off CNB.  On August 21, 2015, the district court in Waxahachie held a hearing on the injunction action designed to prevent Greb from finding other financing.

37.     In an affidavit filed with and for the TRO application, Singleton swore under oath that CNB's sole purpose in seeking the injunction against Larry Greb was to protect the value of its collateral on its loans.  This was a blatant lie and a fraud on the Court and Greb.  Tony Ludlow, for himself and Baymark, attended the TRO hearing designed to stop Greb from frustrating the conspiracy to defraud Greb out of his interest in the J& G entities.  Singleton then caused John Wray, his attorney, to stand up in court at a temporary injunction hearing and represent to the judge that the sole purpose of the injunction was to preserve the bank's collateral.  This statement was false and known by Singleton and Ludlow to be false.  It was a fraud on the court; it was also a fraud on Larry Greb and it was a fraud on J&G.  At this very time, the bank's collateral position was more than secure and it was virtually guaranteed  payment.  Moreover, J&G was paying down the note and paying all the interest.  It could have continued to do so until

the note was fully retired or until Larry Greb could sell the company to Forterra, the exact

transaction that Mark Singleton was seeking for himself and his co-conspirators, Hooks, Ludlow,

Baymark and CNB.

38.     The Court in Waxahachie, based on the fraudulent statements of John Wray and

Mark Singleton, granted an injunction against Larry Greb which had the effect of keeping Greb

from seeking financing or another buyer in the short time left to him before foreclosure.

39.     After the grant of this injunction, Greb was faced with virtually no choice:  he had

to either sell his 60% interest in J&G to Baymark (and its unknown investor, CNB) or face the

loss of the company and virtually all of his personal assets.  On August 28, 7 days after the TRO

hearing, he signed a final  agreement to sell his 60% to Baymark.  From this point forward, Greb

no longer had any choice, so long as he was unaware of the terms of the "deal" between Baymark

and CNB, there was no longer anything he could do to retain his company.  He had to sell it or

face losing everything he owned, including his ranches in Oklahoma and Texas.

40.     It is clear from Mark Singleton's deposition, taken in a companion case, that he

was fully willing to undertake such efforts and such fraud at any time he saw the opportunity.  He

attempts this fraud, to varying degrees twice within two years, first in April/May of 2014, and

again in August/September of 2015.  The second attempt was successful.  His willingness to

engage in such fraudulent conduct is clear.  He almost certainly undertook similar transactions in

the past and he constitutes a continuing threat in the community because he will do the same

again.  Singleton conspired with other members of the bank board and with Tony Ludlow, David

Hook and Baymark to commit a fraud upon Larry Greb and J&G and there is a continuing threat

that he will do the same in the future to other borrowers unless he is stopped.  This fraudulent

scheme, coupled with the April, 2014 mail fraud constitutes a closed period of racketeering

action that lasted for over a year.  The fact that it demonstrates a willingness to do the same in the

future also qualifies it as an open period of racketeering action.

41.    Within 4 months after Baymark purchased J&G, it entered into negotiations with

Forterra to sell J&G for $32,000,000, more than twice what it paid for J&G.  In October, 2016,

barely a year after the Baymark fund and its co-conspirators conspired to fraudulently coerce

Larry Greb into selling the company for less than one-half of what it was worth, Baymark sold

the company for $32,000,000 to Forterra.  7.5% of the profits from that sale went to CNB for a

total of nearly 1.6 million dollars.  All of this was over and above a 100% payoff on its loans,

both legitimate and fraudulent, including 100% of the interest alleged.

## IV.

## RICO

42.    CNB is an enterprise operating in interstate commerce whose business affects

interstate commerce.  Mark Singleton, Tony Ludlow, Baymark and Hook participated in the

affairs of that enterprise through a pattern of racketeering activity as set out above and below.

Singleton has participated in the affairs of the enterprise through a pattern of racketeering activity

at two different times in the years of 2014 and 2015.  The first was in the April/May 2014 and the

second in August/September 2015.  During the second set of racketeering activity he engaged co-

conspirators, BayMark, Hook and Ludlow, who willingly and knowingly conspired to assist him

in the participation of the affairs of CNB through racketeering activity, i.e. mail fraud, for their

own financial gain.

**FIRST AMENDED ORIGINAL COMPLAINT**
**PAGE 14**

**APP 014**

43.     In order to perpetrate their scheme, it was necessary to use the United States mail to make the scheme work.  Critical to the scheme was the mailing, through at least 5 certified letters, on August 10, 2015, to Larry Greb, the J&G entities, and other entities in which CNB had a security interest.  These letters contained foreclosure notices on all of Greb's real property, and all of J&G's property, both in Waxahachie and in Lubbock.  This constituted at least 7 separate mailings prior to and on August 10, 2015, in order to effectuate the fraudulent scheme.  Each use by the conspirators of the mails was a separate violation of 18 USC §1341 (mail fraud).

44.     In addition, because a one of Greb's ranches that was pledged as collateral was in Oklahoma, Singleton, either personally or through agents acting on his behalf and on his instructions, for the benefit of himself and the RICO conspirators, used the telephones in interstate commerce to contact the Hobart, Oklahoma law firm of Talley and Talley to arrange the foreclosure of Greb's ranch in Oklahoma.  These phone calls were an integral part of the conspiracy and they were made to effectuate the conspiracy.  As such they constituted acts of wire fraud in violation of 19 USC § 1343.

45.     Larry Greb's 60% interest in the J&G entities would have been worth between 13 and 17 million dollars had he been able to secure the resale to Forterra:  Singleton, Baymark, Hook, and Ludlow, through the use of the their fraudulent scheme, took Greb's profits for themselves.  Larry Greb is entitled to recover 3 times his actual damages, together with attorney's fees and interest, for all of which he hereby sues.

## V.

### COUNT ONE - RACKETEERING ACTIVITY

46.      Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-45 above as if set forth here in full.

47.      The actions of defendants, Ludlow, Singleton, Baymark and Hook, constitute violations of 18 USC §1962 (c). These Defendants have participated in the affairs of an enterprise through a pattern of racketeering activity, that included mail fraud and wire fraud.

### CONTINUING THREAT UNDER RICO

48.      Singleton and the other directors and officers of CNB had as their goal, throughout 2014 and 2015, to use CNB as a vehicle to illegally profit from their lending customer over and above simply the legitimate return on their loan interest.  They attempted it in 2014 and, on information and belief, they have no doubt employed the same kind of subterfuge with other  bank customers both before and after J&G and Greb and they will no doubt continue to do so in the future.

49.      As a part of the agreement to sell J&G to Baymark, the litigation begun in April, 2014 was ended with a release of all claims against the Defendants except fraud claims and it dismissed the litigation against CNB with prejudice.  For this reason, the 2014 claims that are directly against CNB that are outlined here are res judicata.  Those acts, however, consisted of mail fraud and as such, are predicate acts of racketeering for purposes of demonstrating continuity. They are set out here to provide clear evidence that these Defendants had a long term goal of illegal profits and constitute both a closed period for continuity purposes, and an open threat that they will continue such illegal actions if their conduct is not sanctioned.

50.     Defendants, Ludlow, Baymark, Hook, and Singleton's violations of the Racketeer Influenced and Corrupt Organizations Act ,18 USC §1961(4), have damaged Plaintiffs in their business and property in an amount to be determined but not less than $13,000,000.  In addition, Greb and the J&G entities are entitled to treble damages in an amount to be determined but not less $30,000,000, together with attorney's fees in an amount to be determined but not less than $500,000.00.

## VI.

## COUNT TWO: RICO CONSPIRACY

51.     Plaintiffs repeat and reallege each and every allegation set out in paragraphs 1-50 above.

52.     All of the RICO Defendants conspired to defraud Greb and the J&G entities in violation of USC §1962(c).  That conspiracy to defraud was a violation of 18 USC §1962(d).

53.     Defendants, Ludlow, Baymark, Hook, and Singletons' conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ,18 USC §1961(4), have damaged Plaintiffs in their business and property in an amount to be determined but not less than $13,000,000.  In addition, Greb and the J&G entities are entitled to treble damages in an amount to be determined but not less $30,000,000, together with attorney's fees in an amount to be determined but not less than $500,000.00.

## VII.

## COUNT THREE - COMMON LAW FRAUD

54.     Plaintiffs repeat and reallege each and every allegation set out in paragraphs 1-53 above.  Defendants' actions, through representing to the Courts and to the Plaintiffs that by

forcing Larry Greb to complete the Baymark transaction they were only acting to preserve their collateral were false and known to be false at the time. Tony Ludlow's acts on behalf of himself, Hook and BayMark, including negotiating the wrongful agreement with Singleton between CNB and BayMark, calling Comerica Bank and Texas Capital Bank and lying to them about the terms of the Letters of Intent and assisting in the TRO action, were all acts of constructive fraud and acts in furtherance of the conspiracy to defraud Larry Greb and J&G.

55.     CNB and Mark Singleton had an obligation to disclose to Larry Greb that their true reasons for forcing the foreclosure at this time and bringing the injunction action was not merely to preserve their security interest in the payment of the debt, but to take Greb's and the J&G entities assets for resale at twice the price.

56.     The Bank's failure to disclose to Larry Greb that its true interest was to steal his property for resale for 1.6 million dollars over and above what it was entitled to under its promissory notes, was a constructive and an actual fraud on Larry Greb. Larry Greb relied on the representations by the Bank and the failure to disclose its profit interest in deciding to close the Baymark transaction rather than proceeding with an injunction to stop the Bank's foreclosure.

57.     Had Larry Greb known that the Bank was going to do all of the following in order to fraudulently acquire his assets in the J&G entities:

      a.      give up all its collateral positions in real property other than the J&G entities property;

      b.      that it was not going to require any guarantee from Baymark or Ludlow or Hook;

      c.      that it was going to advance another 2.5 million dollars to ensure that the sale to Baymark went through;

      d.      that it was going to take a 7.5% equity position in the new company; then Larry Greb would have sued personally, and caused the J&G entities to sue, to stop the foreclosure and, with those facts, any reasonable rational judge based on the law would have granted an injunction to stop the foreclosure.

58.   The test for granting an injunction in the State of Texas in a state court is probable success on the merits and a balancing of the harms in the event the injunction is granted.  Had any trial court been presented with the facts set out above about what the CNB was doing to force J&G to sell to Baymark, that trial court would have granted Larry Greb a temporary injunction against foreclosure pending the outcome of the litigation.  Had it done so, Larry Greb would have been able to sell his company to Forterra and secured an additional 13-17 million dollars.

59.   Larry Greb, RL Waxahachie Properties, Inc., and RL Lubbock Operations, LP have been damaged in their business and property in an amount to be determined but not less than $13,000,000.  In addition, because the Bank's conduct was egregious and outrageous, he is entitled to punitive or exemplary damages in an amount to be determined but not less than an additional $20,000,000 for all of which he sues.

## VII.

## PRAYER FOR RELIEF

Larry Greb,  RL Waxahachie Properties, Inc., and RL Lubbock Operations, LP, requests that upon final trial they have judgment as follows:

      a.      On Counts One and Two of the Complaint, judgment, jointly and severally, against all the RICO Defendants in an amount to be determined but not less $13,000,000, trebled according to law, together with attorney's fees of not less than $500,000;

b.    On Count Three of the Complaint, judgment, jointly and severally, against all Defendants in an amount to be determined but not less than $13,000,000, together with putative or exemplary damages in an amount to be determined but not less than $20,000,000;

c.    All costs of court, together with pre-judgment and post-judgment interest; and

d.    Such other and further relief to which Plaintiffs may show themselves justly entitled.

### JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues triable to a jury.

Respectfully submitted,

THE MOSHER JUSTICE CENTER

/s/ Michael D. Mosher
MICHAEL D. MOSHER
STATE BAR NO. 14580100
ROLAND A. MOSHER
STATE BAR NO. 24098147
THE MOSHER JUSTICE CENTER
50 NORTH MAIN
PARIS, TEXAS   75460
(903) 785-4721 TELEPHONE
(903) 785-5319 FAX
mdm@mosherjusticectr.com
ram@mosherjusticectr.com

DATE: October 15, 2018

### CERTIFICATE OF SERVICE

On October 15, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served counsel of record for all parties electronically through the Court's electronic case filing system as authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

/s/ Michael D. Mosher
Michael D. Mosher

**FIRST AMENDED ORIGINAL COMPLAINT
PAGE 20**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| LARRY GREB, RL WAXAHACHIE PROPERTIES, INC., and RL LUBBOCK OPERATIONS, LP, | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | Civil Action No. 3:18-cv-01439-M |
| MARK SINGLETON, III, CITIZENS NATIONAL BANK OF TEXAS TONY LUDLOW, DAVID HOOK, and BAYMARK PARTNERS, | §<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | § | |

**ORDER GRANTING MOTION TO DISMISS AND REQUIRING RICO CASE STATEMENT**

Before the Court is the Motion to Dismiss (ECF No. 27), filed by Defendants Mark Singleton, III and Citizens National Bank of Texas ("the CNB Defendants"), and the Motion to Dismiss (ECF No. 26), filed by Defendants Tony Ludlow, David Hook, and Baymark Partners ("the Baymark Defendants").

The Court finds that Plaintiffs fail to plead the required predicate acts of fraud to support RICO mail and wire fraud claims. Plaintiffs' common law fraud claims are also insufficiently pleaded, because Plaintiffs do not allege what misrepresentations were made, that Singleton made misrepresentations with the intent to induce Plaintiffs to rely on them, nor that they actually relied on the misrepresentations. The constructive fraud allegations are insufficient because the facts alleged do not allow the Court to reasonably infer the existence of a duty whose breach would give rise to a claim. Finally, the claims against David Hook are purely conclusory and thus cannot survive a motion to dismiss. Thus, for the reasons more particularly stated

below, Defendants' Motions to Dismiss (ECF Nos. 26–27) are **GRANTED**.  The Court will

require Plaintiffs to amend and to file a RICO case statement, reminding Plaintiffs of their

obligations under Federal Rule of Civil Procedure 11.

## I.     Background[1]

Plaintiffs are Larry Greb, RL Waxahachie Properties, Inc., and RL Lubbock Operations,

LP.  Larry Greb is the former 60% owner of two concrete pipe businesses, J&G Concrete

Products, Inc. in Waxahachie, Texas, and South Plains Concrete Products, LP in Lubbock,

Texas.  The Court will refer to these two companies together as "the J&G entities."  RL

Waxahachie Properties, Inc. was the primary entity through which Greb owned and operated the

Waxahachie business.  (ECF No. 19 ¶ 7).  RL Lubbock Operations, LP owned the Lubbock

business.  (*Id.* ¶ 8).  Greb is now the sole owner of both RL Waxahachie Properties, Inc. and RL

Lubbock Operations, LP.  (*Id.* ¶¶ 7–8).

Defendants are Mark Singleton, CNB, Tony Ludlow, David Hook, and Baymark

Partners.  Mark Singleton is President of CNB.  (*Id.* ¶ 9).  Tony Ludlow and David Hook are co-

managing directors of Baymark, a private equity firm.  (*Id.* ¶¶ 11–13).

When Greb formed J&G Concrete Products, Inc. in 2003, the company took out seven

loans from CNB, totaling approximately $3 million.  (*Id.* ¶¶ 14, 18; *see also id.* ¶¶ 7–8).

Between 2003 and 2014, Greb borrowed money from CNB to pay the debt of J&G Concrete

Products, Inc., and to support the J&G entities, pledging certain of his properties as additional

security on the seven CNB loans.  (*Id.* ¶ 14).  Specifically, Greb pledged two ranches, one in East

Texas and one in Oklahoma, and an apartment complex in Paris, Texas.  (*Id*).  By 2013,

---

[1] This section contains the facts alleged by Plaintiffs in their First Amended Complaint.  (ECF No. 19).

however, two of the J&G entities' CNB loans were in "technical default," because their maturity dates had passed.  (*Id.* ¶ 15).

In April 2014, CNB sought to foreclose on the J&G entities and Greb's pledged real property by mailing foreclosure notices to Greb.  (*Id.* ¶¶ 16–17, 22).  In May 2014, Plaintiffs sued CNB ("the May 2014 litigation"), claiming that the foreclosure action was illegal because only two of the seven loans were in default, CNB inflated the amount owed on the loans, and the $27 million combined value of the J&G entities and Greb's pledged property grossly exceeded the $8 million balance on the loans.  (*Id.* ¶¶ 18–19, 21, 23).  Plaintiffs secured a temporary restraining order stopping the foreclosure.  (*Id.* ¶ 23).  Plaintiffs assert that the CNB Defendants' goal was to acquire property worth millions more than they could get by simply collecting on the loans.  (*Id.* ¶ 21).  To retain control of the J&G entities and Greb's pledged property, Plaintiffs claim that throughout the May 2014 litigation and thereafter, Greb constantly sought a buyer for the J&G entities, and the J&G entities constantly sought alternative financing.  (*Id.* ¶¶ 23–24, 29–30).

Amidst these efforts, in May 2015, Plaintiffs signed a non-binding letter of intent to sell Greb's interest in the J&G entities to Baymark, for $15 million.  (*Id.* ¶¶ 13, 24).  As a condition of the sale, Plaintiffs released the CNB Defendants from any claims, except fraud claims, stemming from the May 2014 litigation.  (*Id.* ¶ 49).  Plaintiffs assert they were unaware that CNB had advanced to Baymark the funds to purchase the J&G entities, and that CNB received a 7.5% interest in the profits of any resale of the J&G entities by Baymark.  (*Id.* ¶¶ 27–28).  Plaintiffs allege that this arrangement was part of Defendants' conspiracy to acquire the J&G entities for less than their fair value, so Defendants could resell them and share the profits.  (*Id.* ¶ 22).  Plaintiffs claim that Defendants knew that the fair value of the J&G entities was about

$30 million, because it was public knowledge that a large multinational company, now known as Forterra, was acquiring U.S. concrete pipe companies based on a multiple of their earnings. (*Id.* ¶¶ 25, 32). Plaintiffs claim that, as part of the alleged conspiracy, a Baymark managing director, Ludlow, made false statements to several banks to prevent the J&G entities from obtaining alternative financing. (*Id.* ¶¶ 30, 54).

On August 10, 2015, CNB again posted the J&G entities and Greb's pledged property for foreclosure and mailed foreclosure notices. (*Id.* ¶ 35). Plaintiffs allege that Singleton phoned an Oklahoma law firm to arrange the foreclosure of Greb's ranch in Oklahoma. (*Id.* ¶¶ 14, 44).

In August 2015, CNB sued Greb ("the August 2015 litigation") and obtained an injunction to prevent Greb from seeking alternative financing or buyers for the J&G entities. (*Id.* ¶¶ 36–38, 58). Singleton allegedly claimed during a hearing that CNB was only trying to protect its collateral on the outstanding loans. (*Id.* ¶¶ 36–37, 54). After the injunction was issued, Greb signed a final agreement to sell his 60% share in the J&G entities to Baymark, for $15 million. (*Id.* ¶ 39). Four months later, Baymark began negotiating a resale of the J&G entities to Forterra and completed the sale for $32 million in October 2016. (*Id.* ¶ 41). Plaintiffs allege that CNB's 7.5% stake in the resale profits earned it $1.6 million. (*Id.*).

Plaintiffs claim violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–62 et seq., based on acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 19 U.S.C. § 1343, and common law and constructive fraud. (*Id.* ¶¶ 42–59).

## II.   Legal Standards

### A.   Fed. R. Civ. P. 12(b)(6) and 9(b)

Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' First Amended Complaint for failure to state a claim. When ruling on a motion to dismiss

4

**APP 024**

pursuant to Rule 12(b)(6), the Court must take the allegations of the complaint as true, resolving

ambiguities or doubts regarding sufficiency of claims in favor of the plaintiff.  *Fernandez–*

*Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)*.*  A pleading must contain "a

short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2).  While Rule 8 does not require "detailed factual allegations," it demands more

than naked assertions devoid of factual support.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A

pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause

of action will not suffice."  *Id.*

      For fraud claims, Federal Rule of Civil Procedure 9(b) requires a party to plead the

"circumstances constituting fraud" with particularity.  A plaintiff must set forth the "who, what,

when, where, and how" of the alleged fraud.  *U.S. ex rel. Thompson v. Columbia/HCA*

*Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

### B.  RICO Claims

      A claimant asserting a RICO violation must plead causation and injury.  *Tristar Inv'rs,*

*Inc. v. Am. Tower Corp.*, No. 3:12-cv-0499-M, 2014 WL 1327663, at *12 (N.D. Tex.

Apr. 3, 2014) (Lynn, J.).  The defendant's conduct must have been both a "but for" and

proximate cause of the claimant's injury.  *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268

(1992); *Tristar*, 2014 WL 1327663, at *12.  Proximate cause is present if the injury or damage

directly resulted from or was a reasonably probable consequence of the challenged act(s).

*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015).  The claimant must also

demonstrate injury to his or its business or property due to the predicate acts.  *Sedima v. Imrex*

*Co.*, 473 U.S. 479, 496 (1985).

To survive a motion to dismiss for failure to state a RICO claim, Plaintiffs must have pleaded the presence of "1) a person who engages in 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise." *In re Burzynski*, 989 F.2d 733, 741 (5th Cir. 1993). Colloquially, these requirements are known as RICO person, RICO pattern, and RICO enterprise. *See id.* at 742, 744. A RICO person poses or has posed a continuous threat of engaging in racketeering. *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 242 (5th Cir. 1988). The threat need not be ongoing but must have been continuous at one point, so isolated and sporadic incidents cannot support a finding that a defendant is a RICO person. *Crowe v. Henry,* 43 F.3d 198, 204 (5th Cir. 1995). Even though Hook is a co-managing director of Baymark, Plaintiffs do not allege that he committed any specific act upon which to base a RICO claim. Plaintiffs have thus failed to adequately plead that Hook is a RICO person.

A pattern of racketeering activity requires at least two related predicate acts that have continuity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). To be sufficiently related, the acts must have the same or similar purposes, results, participants, victims, or methods. *Id.* Continuity, which can be either "open-ended" or "closed-ended," exists when the predicate acts constitute or threaten continued criminal activity such that there is a distinct threat of long-term criminal activity, and the entity exists for the purpose of engaging in criminal activity, or the predicate acts are a regular way of conducting an ongoing legitimate business. *Id.* at 241–43. For a predicate act of mail fraud to violate 18 U.S.C. § 1341, the mailing need only be "incident to an essential part of the scheme." *Schmuck v. United States,* 489 U.S. 705, 711 (1989).

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal

entity." 18 U.S.C. § 1961(4). The claimant must prove that "(1) such an enterprise existed; (2) the activities of the enterprise affected interstate or foreign commerce; (3) the defendant was 'employed by' or 'associated with' the enterprise; (4) the defendant participated in the conduct of the enterprise's affairs; and (5) the participation was through 'a pattern of racketeering activity.' " *United States v. Jones*, 873 F.3d 482, 489–90 (5th Cir. 2017). The enterprise must exist "for purposes other than simply to commit the predicate acts." *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989).

A RICO conspiracy under 18 U.S.C. § 1962(d) requires proof that the defendants agreed to commit a substantive RICO offense with knowledge of, and in agreement about, the overall objective of the offense. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).

### C. Common Law Fraud

Under Texas law, the elements of common law fraud are: a material misrepresentation that is false and made with knowledge of its falsity or with reckless disregard for the truth, with the intention to induce the other party to act upon it, and that was relied upon by the party, and which caused injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). Omissions or non-disclosures may be as misleading as a misrepresentation of fact when a party has a duty to disclose. *Guevara v. Lackner*, 447 S.W.3d 566, 578 (Tex. App.— Corpus Christi 2014).

### III. Analysis

In essence, what Plaintiffs claim is that they were in default on two loans, that Defendant CNB posted more than two loans for foreclosure, that Plaintiffs got an injunction to prevent that foreclosure, and that CNB, in conspiracy with the other Defendants, again sought foreclosure when Plaintiffs may or may not have been in default, and that CNB consulted a foreclosure

lawyer in Oklahoma, and made a large profit when Baymark bought J&G for less than its fair value, which was Defendants' plan all along. (*See* ECF No. 19). As described below, those facts do not properly plead a RICO violation or fraud.

### A. RICO Claims

Plaintiffs allege that CNB's mailing of foreclosure notices preceding the May 2014 and August 2015 litigation and a phone call to an Oklahoma law firm in 2015 constitute the predicate acts of mail and wire fraud, respectively, in violation of RICO, because they furthered the alleged conspiracy. (ECF No. 19 ¶¶ 43–44). Mail fraud requires a scheme to defraud, and use of the mail for the purpose of executing, or attempting to execute, the scheme. *Schmuck*, 489 U.S. at 721; 18 U.S.C. § 1341. The requirements of wire fraud directly parallel those of mail fraud, but require the use of an interstate phone call or electronic communication made in furtherance of the scheme. *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994) (holding that the essential elements of wire fraud are a scheme to defraud and the use of, or causing the use of, interstate wire communications to execute the scheme); *see also* 18 U.S.C. § 1343.

Plaintiffs admit that CNB had the right to foreclose on the property securing loans whose maturity dates had passed. *See* ECF No. 19 ¶ 15 (acknowledging that the two loans in question were in default "because they had reached their maturity dates: July 1, 2005 and December 15, 2011, respectively"); *see also id.* ¶ 33 ("CNB had a contractual legal right to be paid its principal and interest based on its banking relationship with [the J&G entities]"). Even if only two of the seven loans were in default, Plaintiffs do not allege that this precluded foreclosure on at least some of the property securing those two loans. Plaintiffs allege that five of the loans were not in default in 2014. (*Id.* ¶ 18). They do not allege that those five loans were not in default in 2015. Thus, the mailing of foreclosure notices and steps to foreclose do not

sufficiently plead fraud. Similarly, Singleton's alleged August 2015 call on behalf of CNB to an Oklahoma law firm to arrange the foreclosure of Greb's Oklahoma ranch do not sufficiently plead fraud, because Plaintiffs allege that the Oklahoma ranch was part of the pledged property securing the loans. (*Id.* ¶¶ 14, 18, 44).

Plaintiffs also assert claims of wire fraud against Defendant Tony Ludlow, who, on behalf of Baymark, allegedly called several banks to make false claims about the J&G entities' right to acquire alternative financing, all to further the alleged conspiracy. (*Id*. ¶¶ 30–31, 54). Missing are details on which banks Ludlow called, when he called them, and what he told them. Because these details are necessary to satisfy the heightened pleading standard under Rule 9(b), the alleged calls to banks are not sufficiently pleaded to constitute fraud. Thus, Plaintiffs have failed to sufficiently plead the predicate acts of fraud necessary to a RICO claim.

The continuity element of the predicate acts can be "open-ended," which is defined as "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). Here, Plaintiffs baldly conclude that Defendants have employed the same tactics with other bank customers and will do so with future customers. (ECF No. 19 ¶¶ 40, 48). They first conclude that merely because Singleton, Ludlow, and Hook remain principals of CNB or Baymark, they are participants in an "ongoing and legitimate" RICO enterprise. (ECF No. 31 at 20).

The inherently finite nature of a scheme must be considered in determining the potential threat of repetition. *Walker v. Allianz Life Ins. Co. of N. Am.*, No. 3-08-cv-2051-M, 2009 WL 1883418, at *5 (N.D. Tex. June 30, 2009) (Lynn, J.). According to Plaintiffs, the sole object of Defendants' scheme was to hasten and effectuate the sale of the J&G entities to Baymark so that, upon resale, both CNB and Baymark could profit from a foreseeably and significantly higher

resale value.  The alleged scheme is inherently terminable.  Since Defendants accomplished their

goal, there is little reason to believe their actions will recur.  *Id.* (finding no open-ended

continuity when the objective of the alleged past conduct was to shut down plaintiff's business);

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.,* 67 F.3d 463, 466 (2d Cir. 1995) (holding that open-

ended continuity did not exist in scheme to deprive a defendant of all assets to avoid repaying a

promissory note).  Plaintiffs have thus failed to establish "open-ended" continuity.

A claimant can also demonstrate continuity over a closed period by establishing that a

series of related predicate acts extended for a substantial period of time.  *H.J. Inc.*, 492 U.S. at

242.  Predicate acts committed over "a few weeks or months" that threaten no future criminal

conduct do not suffice.  *Id.*  Here, the predicate acts are not sufficiently alleged to be related,

because the mailing of foreclosure notices preceding the May 2014 litigation was enjoined,

leaving only the actions in August 2015.  (ECF No. 19 ¶¶ 17, 30, 35).  Plaintiffs have also not

pleaded any details about any other customers who had similar experiences.  In short, Plaintiffs

have not successfully alleged either an open- or closed-ended pattern of racketeering activity,

and the continuity requirement is therefore insufficiently pleaded.

Moreover, Plaintiffs' allegation that Hook, as a co-managing director of Baymark with

Ludlow, was also a co-conspirator, is not sufficiently pleaded.  The Fifth Circuit in *Chaney*

reaffirmed that persons cannot be held liable for a RICO conspiracy merely by evidence of

association with other conspirators "or by evidence that places the defendant in a climate of

activity that reeks of something foul."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th

Cir. 2010) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)).  Although

Plaintiffs repeatedly allege that Hook "willingly and knowingly" conspired with the other

Defendants, they offer no details to substantiate this claim other than the fact that Hook was one

of Baymark's principals.  (ECF No. 19 ¶ 42).  This is insufficient to plead a RICO conspiracy

claim against Hook.

### B.   Fraud Claims

Plaintiffs also allege common law fraud against the CNB Defendants.  (*Id.* ¶¶ 54–59).

Plaintiffs claim Singleton, as a representative of CNB, misrepresented the reasons for the 2015

foreclosure action in the August 2015 litigation when he claimed that CNB's sole motive was to

protect its collateral.  (*Id.* ¶ 37).  Plaintiffs allege that Singleton's representations were false and

were made knowingly, because Singleton allegedly knew that only two of the seven loans were

in default, that the balance owed was inflated, and that CNB had a profit motive behind its

foreclosure action due to its alleged resale profit sharing deal with Baymark.  (*Id.*).  Plaintiffs

further allege that the purpose of Singleton's alleged misrepresentations was to pressure Greb to

sell the J&G entities to Baymark, and cause Plaintiffs injury. (*Id.* ¶¶ 54–56).

However, Plaintiffs do not allege that Singleton made the representations with the intent

to induce Plaintiffs to rely upon them, by selling the J&G entities to Baymark.  Nor do Plaintiffs

allege that they actually relied on Singleton's alleged misrepresentations in deciding to sell the

J&G entities for "less than one-half of what [they were] worth."  (*Id.* ¶ 41).  In fact, Plaintiffs

allege that the "the *Court* in Waxahachie, based on the fraudulent statements," granted the

injunction against Greb, which gave him "virtually no choice" but to sell the J&G entities to

Baymark.  (*Id.* ¶¶ 38–39) (emphasis added).  Thus, Plaintiffs allege that the court, not Greb,

relied on the alleged misrepresentations.  Greb is only alleged to have relied on the entry of an

injunction in deciding to sell the J&G entities to Baymark.

Plaintiffs allege that CNB's failure to disclose to Greb its alleged true motive, which was

to effectively force him to sell the J&G entities to Baymark, constituted common law fraud on

Greb.  (*Id.* ¶ 56).  However, Plaintiffs again fail to allege that CNB failed to disclose its alleged

true motive with the intent to induce Greb to rely on it.  Thus, Plaintiffs have insufficiently

pleaded common law fraud against the CNB Defendants.

Plaintiffs also allege constructive fraud against the Baymark Defendants.  (*Id.* ¶ 54).

Constructive fraud is the breach of a legal or equitable duty that is fraudulent "because of its

tendency to deceive others, to violate confidence, or to injure public interests." *Gillum v.*

*Republic Health Corp.*, 778 S.W.2d 558, 571 (Tex. App.—Dallas 1989).  Courts do not find such

duties lightly, and the mere fact that the parties to a transaction trust one another does not

establish a confidential relationship that prompts duties. *Envtl. Procedures, Inc. v. Guidry*, 282

S.W.3d 602, 628 (Tex. App.—Houston [14th Dist.] 2009); *see also Schlumberger Tech. Corp. v.*

*Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).  Contracting parties presumably contract for their

mutual benefit.  *Id.*

Plaintiffs claim that several alleged acts by Ludlow on behalf of Baymark constitute

constructive fraud: negotiating the "wrongful agreement" with the CNB Defendants, calling

banks to make false statements about the negotiations with Plaintiffs, and assisting in the 2015

foreclosure proceedings.  (ECF No. 19 ¶ 54).  However, as buyers of the J&G entities, the

Baymark Defendants dealt with Plaintiffs at arm's length.  No special relationship existed that

would give rise to such a duty.  Thus, Plaintiffs cannot bring a constructive fraud claim against

the Baymark Defendants.  *See generally Gillum*, 778 S.W.2d 558.  In sum, all of Plaintiffs' fraud

claims are insufficiently pleaded.

For the foregoing reasons, Defendants' Motions to Dismiss (ECF Nos. 26–27) are

**GRANTED**.  Plaintiffs have until October 21, 2019 to amend their pleading to attempt to

resolve the identified defects, and to file a separate RICO case statement.  This statement shall

include the facts made the basis of Plaintiffs' RICO claim after conducting a "reasonable inquiry" as required by Rule 11 of the Federal Rules of Civil Procedure.  This case statement must be in a form which uses the numbers and letters set forth below, and shall state in detail and with specificity the following information:

1. State whether the alleged unlawful conduct is in violation of 18 U.S.C. § 1962 (a), (b), (c), or (d).

2. List each defendant and state the alleged misconduct and basis of liability of each defendant.

3. List other alleged wrongdoers and state the alleged misconduct of each.

4. List the alleged victims and state how each victim was allegedly injured.

5. Describe the pattern of racketeering activity alleged for each RICO claim.  The description of the pattern of racketeering must include the following information:

    (a) List the alleged predicate acts and the specific statutes which were allegedly violated;

    (b) Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;

    (c) If the RICO claim is based upon the predicate offenses of wire fraud, mail fraud, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Proc. 9(b).  Identify the time, place, and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;

    (d) Describe how the predicate acts form a "pattern of racketeering activity"; and

    (e) State whether the alleged predicate acts relate to each other as part of a common plan.  If so, describe in detail.

6. Describe in detail the alleged enterprise for each RICO claim.  A description of the enterprise shall include the following information:

    (a) State the names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;

**APP 033**

(b)     Describe the structure, purpose, function, and course of conduct of the enterprise;

(c)     State whether any defendants are employees, officers, or directors of the alleged enterprise;

(d)     State whether any defendants are associated with the alleged enterprise;

(e)     State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself or members of the enterprise; and

(f)     If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

7.     State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.

8.     Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.

9.     Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.

10.     Describe the effect of the activities of the enterprise on interstate or foreign commerce.

11.     If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:

(a)     State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt;

(b)     Describe the use or investment of such income.

12.     If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.

13.     If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:

(a)     State who is employed by or associated with the enterprise; and

14

**APP 034**

        (b)     State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).

14.     If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.

15.     Describe the alleged injury to business or property.

16.     Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

17.     List the damages sustained by reason of the violation of § 1962, indicating the amount for which each defendant is allegedly liable.

18.     Provide any additional information that might be helpful to the Court in processing the RICO claim.

**SO ORDERED**.

September 30, 2019.

BARBARA M. G. LYNN
CHIEF JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| | ) | |
| COMPLETE PAIN SOLUTIONS LLC n/k/a | ) | **PLAINTIFFS DEMAND** |
| COMPLETE PAIN SOLUTIONS PLLC; | ) | **TRIAL BY JURY** |
| ALJ FLORENCE SPARROW, M.D.; | ) | |
| SEE LOONG CHIN, M.D.; and MMRI HOLDCO LLC | ) | |
| n/k/a MRI HOLDCO ROLLOVER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm

County Mutual Insurance Company of Texas ("State Farm County"), for their Complaint against

Defendants Complete Pain Solutions, LLC n/k/a Complete Pain Solutions, PLLC ("Complete

Pain"); Alj Florence Sparrow, M.D. ("Dr. Sparrow"); See Loong Chin, M.D. ("Dr. Chin"); and

MMRI Holdco LLC n/k/a MRI Holdco Rollover, LLC ("MMRI Holdco") (collectively,

"Defendants"), allege as follows:

**I.      NATURE OF THE ACTION**

1.      This action is brought by State Farm Mutual and State Farm County based upon

hundreds of medical bills and supporting documentation that are fraudulent, which Dr. Sparrow,

Dr. Chin, and Complete Pain have knowingly submitted, and caused to be submitted, to State Farm

Mutual and State Farm County for medically unnecessary evaluations, spinal injections, and

related procedures, which were purportedly provided to individuals ("patients") who were

involved in motor vehicle accidents and asserted claims for damages against State Farm Mutual and State Farm County or individuals who were eligible for insurance benefits under State Farm Mutual and State Farm County policies.

2.      As discussed below, Dr. Sparrow and Dr. Chin (collectively, the "Doctor Defendants") falsely purport to legitimately examine patients reporting neck and/or back pain and prescribe either:  (1) the same type of spinal injections, namely a medically unnecessary series of three epidural steroid injections ("ESIs") in at least one region of the spine for nearly all such patients and ESIs in multiple spinal regions for numerous patients, (*see* Exs. 1A, 1B); and/or (2) spinal MRIs whose results are used to support the Doctor Defendants' eventual recommendation and/or performance of ESIs and also serve to bolster demand packages directed to State Farm Mutual and State Farm County from personal injury attorneys ("PI Attorneys") (*see* Ex. 2).  Dr. Sparrow, Dr. Chin, and occasionally other doctors at Complete Pain then purport to perform such injections on certain patients without regard to whether they are needed.  (*See* Ex. 3.)

3.      The bills and supporting documentation Complete Pain and the Doctor Defendants submit, and cause to be submitted, to State Farm Mutual and State Farm County are fraudulent because:

a.      the Doctor Defendants do not perform legitimate examinations of the patients;

b.      patterns in the findings within the initial examination reports ("Initial Exam Reports") prepared by the Doctor Defendants are not credible and serve as pretext to support their predetermined recommendations for spinal MRIs and/or recommendations for three medically unnecessary ESIs in at least one region of the spine – and often multiple regions – for nearly all patients reporting neck and/or back pain (*see* Exs. 1A, 1B);

c.      many of the patients at issue undergo spinal MRIs at Memorial MRI & Diagnostic, LLC n/k/a Memorial MRI & Diagnostic, PLLC ("Memorial"), a facility sharing the same ownership and many of the same office locations as Complete Pain, and the Doctor Defendants use the purported positive findings made by Memorial radiologists on virtually all spinal MRIs they

read as justification to support their predetermined and medically unnecessary ESI recommendations. (*See* Ex. 2.) Several MRI films read by Memorial radiologists reveal they have documented conditions that do not exist or exaggerated the severity of age-expected degenerative conditions that may exist;

d.   the ESIs the Doctor Defendants recommend and purportedly perform are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' liability insurance claims;

e.   the boilerplate operative reports ("Operative Reports") prepared by the Doctor Defendants and occasionally other doctors at Complete Pain for the ESIs they purportedly perform are not credible based upon patterns in the patients' responses to the ESIs (*see* Ex. 3); and

f.   the Doctor Defendants and other doctors at Complete Pain purportedly perform epidurograms in addition to fluoroscopic imaging when conducting ESIs, which is not credible, not medically necessary, and performed to justify a significant additional charge from Complete Pain for each purported epidurogram.

4.   The fraudulent scheme enriches Defendants by exploiting two common claims scenarios, namely (a) bodily injury claims ("BI Claims") made by individuals not substantially at fault for automobile accidents to the insurance companies of the individuals who are substantially at fault for such accidents ("At-Fault Drivers"), in which they seek to recover economic losses (including past and future medical expenses) and noneconomic losses (including pain and suffering); and (b) underinsured/uninsured motorist claims ("UM Claims") made by individuals to their own insurance companies if their recoveries under BI Claims from the At-Fault Drivers' insurance companies are insufficient to compensate the individuals for their economic and non-economic losses as a result of the accident.

5.   Under Texas law, insurers may be subject to substantial liability if they fail to accept "reasonable" settlement demands on BI Claims. Specifically, under the *Stowers* doctrine, if (1) an insurer for an At-Fault Driver fails to accept a reasonable settlement demand at or within policy limits in a short time frame, often 30 days or less, specified in the written demand from the

injured party's PI Attorney, and (2) the At-Fault Driver incurs a judgment in excess of policy limits at trial, the insurer may be subject to liability for the excess judgment. *See G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. 1929).

6.      With respect to UM Claims, Texas law provides an insurer may likewise be liable to its own insured for bad faith if it "fail[s] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear."  TEX. INS. CODE § 541.060(a)(2)(A); *see also* TEX. INS. CODE § 542.003.  If found liable for bad faith, an insurer may be responsible for its insured's compensatory damages, attorneys' fees, and potentially treble damages.  TEX. INS. CODE § 541.152.

7.      Dr. Sparrow, Dr. Chin, and Complete Pain's scheme is designed to enrich Defendants by inducing State Farm Mutual and State Farm County to: (1) rely on their bills and supporting documentation that on their face substantiate the need for, and often the performance of, one or more ESIs for nearly all patients reporting neck and/or back pain; and (2) settle BI and UM Claims within policy limits, and often for all or most of the limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

8.      To facilitate their scheme, Dr. Sparrow, Dr. Chin, and Complete Pain:  (a) prepare fraudulent Initial Exam Reports to create the appearance patients suffered serious injuries that warrant the need for a series of three ESIs, often to more than one spinal region; (b) prepare fraudulent Operative Reports for each ESI that the Doctor Defendants and other Complete Pain doctors purportedly perform, documenting their purported use of epidurograms and the patient's purported positive response from each injection; (c) prepare bills from Complete Pain with typical charges of $550 for the initial examinations and improperly unbundled charges totaling more than

$9,000 for each ESI procedure, including a $1,650 charge for each medically unnecessary epidurogram purportedly performed during each ESI; and (d) provide these fraudulent documents and bills to the PI Attorneys representing the patients in BI Claims and UM Claims who, in turn, submit the bills and documentation to State Farm Mutual and State Farm County to support written time limit demands to settle the claims, often within 15 days or less.  (*See* Ex. 4, Demand Appendix; *see also* Ex. 5, Demand Letter for Patient M.L. ("[A]n insurance company placing the interests of its insured over its own interests would be compelled to accept this offer, and would be subject to liability recognized under . . . *Stowers* . . . in the event Plaintiff was to achieve a judgment in excess of policy limits.").)

9.     Dr. Sparrow, Dr. Chin, and Complete Pain's fraudulent bills and supporting documentation are designed to be and, in fact, have been substantial factors in inducing State Farm Mutual and State Farm County to settle the BI Claims and UM Claims at issue by causing them to make higher settlement offers than would be warranted without the fraudulent bills and supporting documentation from Complete Pain and the Doctor Defendants.  (*See* Ex. 4, Demand Appendix.) Absent Dr. Sparrow, Dr. Chin, and Complete Pain's fraudulent bills and supporting documentation, many, if not most, of these claims would involve primarily chiropractic and/or physical therapy treatment for alleged soft tissue injuries with total medical expenses that would be significantly less than policy limits.  The fraudulent examination reports with recommendations for a series of three ESIs and the performance of one or more medically unnecessary ESIs with total corresponding charges of over $9,000 per injection procedure, cause the severity and potential value of the claims to be artificially and substantially inflated.

10.     State Farm Mutual and State Farm County have sustained damages of more than $1.9 million in settling the BI and UM Claims at issue.  Dr. Sparrow, Dr. Chin, and Complete

Pain's fraudulent documentation and bills have been a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying substantially more to settle these claims than they would have had they known Dr. Sparrow, Dr. Chin, and Complete Pain's bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of Dr. Sparrow, Dr. Chin, and Complete Pain's scheme and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

11.    The scheme began at least as early as September 2015 and has continued uninterrupted since that time.

12.    State Farm Mutual and State Farm County bring this action asserting statutory claims under 18 U.S.C. § 1962(c) and (d) ("RICO"), as well as a common law claim for money had and received to recover actual damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme, plus treble damages and costs, including reasonable attorneys' fees.

## II.    JURISDICTION AND VENUE

13.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the RICO causes of action brought under 18 U.S.C. §§ 1961 et seq. because they arise under the laws of the United States.

14.    Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the money-had-and-received cause of action because it is so related to the RICO causes of action over which the Court has original jurisdiction that they form part of the same case or controversy.

15.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because Defendants reside here and a substantial part of the events or omissions that gave rise to the causes of action occurred here.

III.     **THE PARTIES**

    A.     **Plaintiffs**

16.     State Farm Mutual Automobile Insurance Company is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is licensed and engaged in the business of insurance in Texas.

17.     State Farm County Mutual Insurance Company of Texas is a citizen of the state of Texas.  It is incorporated under the laws of the state of Texas, with its principal place of business in Dallas, Texas.  State Farm County is licensed and engaged in the business of insurance in Texas.

    B.     **Defendants**

18.     Defendant Alj Florence Sparrow, M.D. resides in and is a citizen of the state of Texas.  Dr. Sparrow has been licensed to practice medicine in Texas since 1995.  She was also licensed to practice medicine in Florida from 2000 until 2013.  Starting in or about September 2015, she began performing evaluations and spinal injections at Complete Pain.  Since that time, Dr. Sparrow, Dr. Chin, and Complete Pain have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1A, 1B, 2, and 3.

19.     Defendant See Loong Chin, M.D. resides in and is a citizen of the State of Texas.  Dr. Chin has been licensed to practice medicine in Texas since 2015.  Starting in or about September 2015, Dr. Chin began performing evaluations and spinal injections at Complete Pain.

Since that time, Dr. Chin, Dr. Sparrow, and Complete Pain have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1A, 1B, 2, and 3.

20.     Defendant Complete Pain Solutions, LLC n/k/a Complete Pain Solutions, PLLC was originally formed as a manager-managed Texas limited liability company on April 15, 2015. Complete Pain listed Memorial as its initial manager on its Certificate of Formation at the address 1241 Campbell Rd., Houston, Texas 77055, which is also one of Complete Pain's four locations. On November 15, 2018, Complete Pain filed its Public Information Report with the Texas Secretary of State, which listed Anthony Ludlow ("Ludlow") as its only Director and MMRI Holdco as its 100% owner.  On August 13, 2019, Complete Pain filed its 2019 Public Information Report, which again listed Ludlow as its sole Director and MMRI Holdco as the 100% owner of Complete Pain.  On September 25, 2019, Complete Pain filed an Amended and Restated Certificate of Formation changing its name to Complete Pain Solutions, PLLC, and listing its sole member as Memorial MRI & Diagnostic, PLLC.  According to that filing, Complete Pain's principal office is now located at 9434 Katy Fwy, Suite 408, Houston, TX 77055, which is also Memorial's principal office.  Complete Pain and Memorial also share the same tax identification numbers and radiologic licenses.  Complete Pain provides pain management services at four locations, each of which it shares with Memorial:  (a) 1241 Campbell Road, Houston, Texas 77055; (b) 1900 N Loop West, Ste. 160, Houston, Texas 77018; (c) 11111 S Highway 6, Ste. B, Sugar Land, Texas 77498; and (d) 1360 W. Campbell Rd., Ste. 122, Richardson, Texas 75080.  Since in or about September 2015, Complete Pain has knowingly submitted, and caused to be submitted, hundreds of medical bills

and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1A, 1B, 2, and 3.

21.     Defendant MMRI Holdco LLC n/k/a MRI Holdco Rollover, LLC is a Texas limited liability corporation formed on or about February 16, 2012.  According to its Certificate of Formation, the company has been managed by a Board of Managers, which includes Ludlow and David J. Hook ("Hook"), and its corporate address is 1345 Noel Road, Suite 1607, Dallas, Texas, 75240.  On information and belief, both Ludlow and Hook are managing directors of Baymark Management, LLC, a private equity firm in Dallas, Texas.  On October 14, 2019, MMRI Holdco filed a Certificate of Amendment to its Certificate of Formation changing its name to MRI Holdco Rollover, LLC.  In addition to owning Complete Pain, on information and belief, MMRI Holdco has also held a 100% percent ownership interest in Memorial from approximately August 2014 to October 2019.  On information and belief, for at least the period of time for which it was Complete Pain's sole owner, MMRI Holdco received a portion of the funds obtained through Dr. Sparrow, Dr. Chin, and Complete Pain's fraudulent scheme.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Legitimate Diagnosis and Treatment of Neck and Back Pain

22.     When a patient complains of neck and back pain following a motor vehicle accident, a licensed professional must obtain a detailed history and perform a legitimate examination to arrive at a proper diagnosis.  Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision making to design a legitimate treatment plan tailored to the unique needs of each patient.

23.     The decision of which, if any, types of treatment are appropriate for a patient, as well as the level, frequency, and duration of the various treatments should be individualized.  This individualized decision must consider the patient's unique circumstances, including his or her:

(a) age; (b) social, family, and medical history; (c) physical condition, limitations, and abilities; (d) location, nature, and severity of the injury and symptoms; (e) response to any previous treatment; and (f) the nature of the accident.

24.     Treatment plans should generally start with conservative care that is not invasive, such as anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.  If patients' symptoms are not relieved through conservative care, other forms of treatment may be appropriate to relieve their symptoms, including various kinds of injections and other procedures designed to reduce pain and other symptoms caused by inflammation, irritation, or other conditions.  As with any other treatment option, whether to perform any kind of injection or other procedure should be tailored to the unique circumstances of each patient.

### B.     The Doctor Defendants' Purported Treatment Runs Contrary to the Legitimate Use of ESIs and Other Common Spinal Injections

25.     A provider may recommend and perform injections to treat pain in areas of the spine and to diagnose the source of the pain.  Because injections are invasive, expose patients to ionizing radiation, often involve the injection of steroids into the body, and may involve the use of sedation, they present associated risks as well as increased costs to patients.  Therefore, injections should be performed only when appropriate indications are present and they are medically necessary to diagnose and/or treat pain in and around the spine or other structures, to alleviate pain to facilitate conservative care, or to alleviate pain after conservative care has failed or is not an option.  Three common types of spinal injections are ESIs, facet injections ("FIs"), and medial branch blocks ("MBBs").

26.     The indications for ESIs are different than the indications for FIs and MBBs.  The common clinical indication for ESIs is nerve-related pain radiating from the neck into the

shoulders or arms or from the lower back into the buttocks or legs. By contrast, the common clinical indication for FIs and MBBs is chronic pain primarily concentrated in the back or neck (i.e., axial pain). As discussed below, in a legitimate pain management clinical setting, across a population consisting of hundreds of patients complaining of neck and/or back pain, one would expect a mixture of patients for which (1) no spinal injections would be indicated, (2) ESIs would be indicated, (3) FIs would be indicated, (4) MBBs would be indicated, and (5) muscular injections, such as trigger point injections ("TPIs"), would be indicated. In other words, one would not expect to see spinal injections indicated for virtually all patients with neck and/or back pain, nor would one expect to see ESIs indicated for virtually all such patients. (*See* Ex. 1B, Diagnosis and Treatment Plan Appendix.)

27.     Moreover, there are three basic types of ESIs – interlaminar, caudal, and transforaminal injections – each of which may be performed to relieve a patient's symptoms by introducing steroid medications into the epidural spaces surrounding the vertebral levels at which the suspected pain-generating pathologies exist. An interlaminar ESI involves inserting a needle into the posterior epidural space between two adjacent vertebral lamina and delivering anesthetic and steroids, which then typically spread to epidural spaces above and below the injected space. A caudal ESI involves inserting a needle through the sacral hiatus (a small boney opening just above the tailbone) to deliver anesthetic and steroids that typically spread to epidural spaces above the injected space. A transforaminal ESI involves inserting a needle into the intervertebral neural foramen. In a transforaminal ESI, the provider injects the anesthetic and steroid into the area referred to as the "nerve sleeve," which allows the steroid to travel up the sleeve and into a targeted epidural space. Although there is an increased level of technical expertise required to perform transforaminal ESIs, this type of injection allows for greater precision in targeting the source of

the patient's pathology, which results in a more concentrated delivery of the steroid into the affected area.  As discussed below, the Doctor Defendants routinely recommend and purport to perform interlaminar ESIs – which they identify as "translaminar" ESIs on their Operative Reports – but rarely caudal and never the more targeted, skill-intensive approach of transforaminal ESIs.

28.     Prior to recommending and performing an ESI, a thorough physical examination involving several orthopedic, neurological, and other tests is required to evaluate for associated sensory, motor, or reflex deficits in the involved limb(s) to help guide treatment and establish a baseline status before initiating invasive treatments such as injections.  Normally, the clinical findings and indications are correlated with radiologic evidence (e.g., MRIs) of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain and/or physical examination findings and may be attributable to pathologies in and around the nerve roots.  As discussed below, the Doctor Defendants' Initial Exam Reports reveal the same cursory examination findings and result in recommendations that virtually all patients with neck and/or back pain who have undergone MRIs receive a series of three ESIs in at least one spinal region and, for many such patients, a recommendation for a series of three ESIs in at least two separate spinal regions.  (*See* Exs. 1A, 1B.)

29.     A recommendation for a "series of three" ESIs is not medically necessary. According to guidelines published by the North American Spine Society, the American Academy of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, the Anesthesia Patient Safety Foundation, the American Society of Interventional Pain Physicians, and the Spine Intervention Society, a routine series of three injections after only an initial evaluation, like those recommended by the Doctor Defendants for nearly all patients, is never indicated.  That is because patients should be examined and assessed after each ESI to determine if another injection is

warranted.  A patient who receives minimal or no relief from an initial ESI is less likely to benefit from a second ESI.  Likewise, if a patient receives minimal or no relief from his or her first and second ESIs, it is even less likely the patient will benefit from additional ESIs.  Therefore, based upon the very low likelihood of success after a failed ESI and the associated risks and costs, as a general matter, repeat ESIs should not be recommended without an interval assessment of the patient's response and unless the patient gets more than minimal relief from prior ESIs.

30.     The patterns in the injections recommended by the Doctor Defendants and purportedly performed by the Doctor Defendants and other Complete Pain doctors are not credible. State Farm Mutual and State Farm County have thus far identified 484 Complete Pain patients who complained of neck and/or back pain when they were purportedly examined by Dr. Sparrow or Dr. Chin.  (See Exs. 1A-1B, Initial Exam Appendices.)  Of those patients, 336 either (a) received a spinal injection recommendation from the Doctor Defendants during their initial exam, (b) received one or more injections after their initial exam without a formal recommendation documented in any examination report, or (c) received a "cost estimate" from Complete Pain after their initial exam indicating they required one or more injections.  Of those 336 patients, 332 were recommended and/or received interlaminar ESIs,[1] two received a recommendation for a TPI, one received caudal ESIs without a formal recommendation, one received a cost estimate for a non-spinal injection (to their wrist) despite also having back pain, and none were recommended to receive FIs, MBBs, or transforaminal ESIs.[2]  Moreover, of those patients who were recommended

---

[1] One of these 332 patients received a recommendation for a TPI in addition to Dr. Sparrow's recommendation that he undergo a series of three cervical interlaminar ESIs.

[2] Three patients underwent additional procedures after undergoing one or more of their recommended ESIs – one receiving an MBB, one receiving a facet, and the other receiving an "epidural blood patch."  In all three cases, the Doctor Defendants performed the additional

interlaminar ESIs, more than 40% were recommended a series of three ESIs in two or more regions of the spine, meaning that the Doctor Defendants recommended these patients undergo *six or nine total injections*.  (Ex. 1B, Diagnosis and Treatment Plan Appendix.)

31.     Further, for the 148 patients who were not recommended an injection and/or did not receive an injection from Complete Pain, 114 of them (a) had not yet received an MRI at the time of their Complete Pain visit, (b) received a referral for an MRI from Dr. Sparrow or Dr. Chin, and (c) never returned to Complete Pain for a follow-up examination or injection.  Thus, it is likely they too would have received the same recommendations as virtually all other Complete Pain patients had they returned.  In any event, even the 34 patients who did not receive an injection recommendation, injection, or MRI referral nevertheless received the same cursory examinations with the same pattern findings that are not credible, and for many of them, the Initial Exam Reports specifically describe a medical condition for which injections may be contraindicated or indicate that injections were not recommended because the patient presented a high risk.

### 1.     Fluoroscopic Guidance and Epidurography

32.     To assist with needle placement, ESIs are typically performed under fluoroscopic guidance.  Fluoroscopy is a radiological imaging technique used to obtain real-time images of the internal structures of a patient to help guide the path and proper placement of the needle during an injection.  When fluoroscopic guidance is used, a physician inserts a needle into the targeted area, injects a contrast dye, and takes a picture using radiological imaging, which the physician uses to confirm the needle is in the correct position.  Once it is confirmed the needle is in the correct position, the injection of the medication can be performed.  As described below, Complete Pain

procedures without documenting any meaningful rationale for why such procedures were performed.

almost always improperly "unbundles" its charge for fluoroscopy, which amounts to $975 per procedure, when the cost of fluoroscopy should be included in the charge for each ESI.

33.     Unlike the use of fluoroscopic guidance, epidurography is not medically necessary to ensure appropriate needle placement for ESIs.  Epidurograms are typically indicated only if there is a concern regarding a condition, pathology, or structural abnormality in and around the patient's spine that might affect the flow of steroids into the targeted space.  Moreover, when an epidurogram is indicated, the provider performing the procedure should prepare a separate report of his or her findings from the epidurogram so future providers have the opportunity to incorporate those findings in further treatment of the patient.

34.     Almost all Operative Reports for Complete Pain patients undergoing ESIs document epidurograms were performed without identifying any potential spinal condition, pathology, or abnormality that might obstruct the flow of steroids in the spine.  Additionally, the Doctor Defendants and other Complete Pain doctors performing ESIs fail to provide a separate report of their findings from the epidurogram.  Instead, they merely include a single sentence in each report regarding the purported epidurograms, noting they were able to "identif[y] the needle tip within the epidural space with contrast medium spreading cephalad in caudal from the needle tip.[]"   (*See, e.g.,* Ex. 6, Operative Report for Patient A.P.)  The routine use of medically unnecessary epidurograms appears designed to justify a separate $1,650 charge for each epidurogram purportedly performed during each ESI.

### 2.     Risks and Costs Associated with Spinal Injections

35.     Because ESIs entail the insertion of needles into areas in and around the spine, injections may be performed under fluoroscopic guidance and typically include the use of steroids, these injections involve potentially serious risks and substantially increased costs for the patient.

Therefore, ESIs should not be performed unless they are medically necessary, and if they are performed, attempts should be made to minimize the risks and costs. The risks associated with these injection procedures include those associated with the patient's exposure to ionizing radiation from the use of fluoroscopy, the side effects and complications from steroids (e.g., increased blood sugar, increased blood pressure, immunity reduction, adrenal suppression, psychosis, acute and chronic changes to the skin and bones such as fractures, avascular necrosis, and osteoporosis), and the direct procedure risks from the injection such as bleeding, infection, nerve injury, paralysis, and even death. The performance of ESIs to multiple regions of the spine at the same time, as the Doctor Defendants often perform, only compounds these risks. Finally, the costs associated with the injection procedures are substantial, as evident in Complete Pain's typical charge, which is over $9,000 per ESI.

36.     As discussed next, the Doctor Defendants did not perform legitimate exams or make legitimate exam findings. Instead, despite the associated risks and costs, the Doctor Defendants' examinations were performed as a pretext to support their recommendation for a series of three ESIs, often to more than one region of the spine, and in many instances the purported performance of one or more interlaminar ESIs. This was done to substantially inflate the seriousness and potential value of BI and UM Claims to cause State Farm Mutual and State Farm County to settle those claims within policy limits, and often for all or most of those limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

**C.     The Fraudulent Evaluations and Treatment Recommendations**

37.     The scheme begins with Dr. Sparrow or Dr. Chin conducting cursory initial evaluations that serve as mere pretext for their recommendation of a series of three interlaminar ESIs in at least one region of the spine for virtually every patient reporting neck and/or back pain,

and in multiple areas of the spine for many such patients.  During their initial evaluations, the Doctor Defendants purport to take the patients' history, perform physical exams, reach diagnoses, and arrive at a treatment plan, all of which are documented in their Initial Exam Reports.

        **1.**    **Fraudulent Exam Findings**

38.    The Initial Exam Reports do not reflect the patient's legitimate examination findings or a medically necessary treatment plan.  Rather, they are boilerplate, include only scant details about the patient's condition, and reveal non-credible patterns.  (*See* Ex. 1A.)  For instance, in the "History of Present Illness" section of each report, the Doctor Defendants virtually always document the patient's crash "has affected his/her activities of daily living," regardless of the severity or location of the patients' condition(s) or symptoms.  (*Id.*, column H.)  Next, in the "Review of Systems" section, the Doctor Defendants find virtually every patient experiences no abnormalities in twelve distinct systems within their body, including constitutional, eyes, ears, nose, mouth, throat, cardiovascular, respiratory, gastrointestinal, skin, psychiatric, and neurological.  (*Id.*, column I.)  Finally, in the "Physical Exam" section, Dr. Sparrow and Dr. Chin virtually always find the patient's (a) motor strength is 5/5 in his or her neck and extremities, (b) sensation to both upper and lower extremities is "intact," (c) deep tendon reflexes are "equal," and (d) gait is normal.  (*Id.*, columns J-M.)  The uniformity of these same findings across hundreds of patients, and particularly hundreds of patients with radiculopathies and other conditions that would warrant ESIs, is not credible and suggests the Doctor Defendants did not legitimately examine or evaluate the patients in these areas.

39.    The Doctor Defendants also fail to meaningfully account for the patients' prior medical conditions or treatment.  Based upon the risks and costs associated with ESIs, patients' medical and treatment histories are important considerations in determining whether to

recommend or perform spinal injections.  Among other things, physicians should consider the time and circumstances surrounding the onset of the patient's symptoms, the nature and duration of any treatment the patients have received, and the nature, level, and progress of the patients' responses to such treatment.  Although nearly all patients received some form of prior medical care before seeing Dr. Sparrow or Dr. Chin, their Initial Exam Reports include minimal discussion regarding the care provided or the patients' responses to earlier treatment.  Specifically, the Initial Exam Reports virtually always note: "[w]hen [pain] did not improve [after the crash], [s/]he went to see [provider] and was started on appropriate therapy.  Patient reports temporary relief."  (*See e.g.*, Ex. 7, Initial Exam Report for Patient W.L.)  This description is not meaningful, as it provides no information regarding the type of treatment the patient received, how long he or she received it, the extent and duration of the relief, and why he or she may have stopped treatment.  Moreover, the Initial Exam Reports provide no indication that Dr. Sparrow or Dr. Chin have ever attempted to obtain or review the records associated with the patients' prior treatment and factor them into their examinations or treatment plans.

40.     For example, for patient J.R., Dr. Sparrow recommended a lumbar ESI even though J.R. had not yet undergone any chiropractic or other conservative therapy.  Dr. Sparrow conducted an initial examination of J.R. on November 23, 2016, approximately two weeks after his accident.  (Ex. 8, Initial Exam Report for J.R.)  Dr. Sparrow's Initial Exam Report reflects that J.R. complained of constant low back pain and, because J.R. had yet to undergo an MRI, Dr. Sparrow referred him for a lumbar MRI and indicated he should continue physical therapy with his "treating provider" (when he had no such provider).  (*Id.*)  After he underwent an MRI six days later at Memorial, which revealed two purported lumbar herniations, J.R. returned to Complete Pain on December 13, 2016, at which time he underwent a lumbar interlaminar ESI from Dr. Chin, who

conducted no apparent physical examination prior to administering the injection.  (Ex. 9, MRI and

Operative Report for J.R.)

41.     For several other patients, the limited descriptions of the patients' prior care in

Initial Exam Reports are often inconsistent with their chiropractic records.  For instance, patient

E.B. began treating with his chiropractor on September 9, 2016, one day after his accident, at

which time he reported severe low back pain that he rated as 10 out of 10.   (Ex. 10, Initial Chiro

Records for E.B.)  After more than two months of therapy, during which his documented pain

symptoms consistently improved, patient E.B.'s chiropractic records on November 21, 2016,

reflect his pain was 3 out of 10 and otherwise describe his low back pain as "aching" and that it

"comes and go[es]."  (Ex. 11, Chiro Records for E.B.)  On that same date, Dr. Sparrow prepared

an Initial Exam Report for patient E.B., which noted he had only experienced "temporary relief"

from his prior conservative care and complained of "constant low back pain."  (Ex. 12, Initial

Exam Report for E.B., at 1.)  Based on these findings and others, Dr. Sparrow recommended that

E.B. undergo a series of three lumbar ESIs (*id.* at 2), and Complete Pain generated an estimate

totaling over $28,000 for the ESIs, even though E.B.'s chiropractic records reflected steady

improvement over the course of months.  (Ex. 13, Complete Pain Cost Estimate for E.B.)

42.     The Doctor Defendants virtually always conclude their Initial Exam Reports with

recommendations that patients receive either (1) a series of three interlaminar ESIs, often in more

than one spinal region, if (a) they complain of generalized neck and/or back pain, regardless of

whether the pain radiates to the patients' limbs; and (b) they have undergone one or more spinal

MRIs that reveal any evidence of a purported disc herniation, protrusion, or bulge in their spine,

regardless of whether the location and severity of any pathologies correlate with the distribution

of the patients' symptoms; or (2) spinal MRIs whose findings are then used to support the Doctor

Defendants' recommendations for a series of three ESIs and also serve to bolster demand packages for PI Attorneys.  (*See* Ex. 4, Demand Appendix.)

43.    The Doctor Defendants' pain descriptions are non-specific and non-credible. Indeed, Dr. Sparrow and Dr. Chin rarely ever quantify the patients' pain levels on a 5- or 10-point scale and instead virtually always describe the pain as "constant" without any indication of the severity of the purported "constant pain."  (*See* Ex. 1A, columns O, S.)  Moreover, even in the rare instances where they do provide a pain score, their descriptions are often inconsistent with those reflected in records from the patient's other providers.  For instance, patient T.B. was discharged by her chiropractor on January 17, 2017, with a pain rating of 3 out of 10 and a notation that her pain was "improving."  (Ex. 14, Chiro Records for T.B.)  Nine days later, Dr. Sparrow prepared an Initial Exam Report for T.B., in which she documented "the patient complains of constant low back pain with a low back pain score of 9/10" with no indication of any occurrence in the prior nine days causing her extreme pain.   (Ex. 15, Initial Exam Report for T.B.)

44.    One patient has testified that she never experienced or complained of pain that was documented on her Initial Exam Report.  Specifically, patient A.P. testified that, when she appeared for her initial examination at Complete Pain, she only experienced neck and mid back pain, but not low back pain. (Ex. 16, 6/22/2018 Tr. of A.P. at 28:6-16; 35:19-20.)  Yet in her Initial Exam Report for A.P., Dr. Sparrow documents that A.P. experienced "constant neck, mid back *and low back pain*." (Ex. 17, Initial Exam Report for A.P., at 1 (emphasis added).)   Further, Dr. Sparrow found her to have limited range of motion, tenderness, and pain on extension and flexion of the low back, and she purportedly tested positive for facet loading bilaterally in that region.  (*Id*. at 2.)  Because A.P. had yet to undergo an MRI, Dr. Sparrow recommended she undergo cervical, thoracic, and lumbar MRIs.  (*Id*.)  Approximately one month later, after undergoing MRIs at

Memorial that purportedly revealed herniations and/or bulges in all three regions, A.P. returned to receive both a cervical interlaminar ESI and a lumbar interlaminar ESI from Dr. Chin on the same date without undergoing any additional evaluation and without receiving a formal recommendation for those procedures. (Ex. 18, MRI and Operative Reports for A.P.)

45.    Determining whether an ESI is indicated for any patient requires the performance of a legitimate physical examination, which the Doctor Defendants fail to perform.  For patients reporting neck pain during their initial evaluation, Dr. Sparrow and Dr. Chin include only a few short phrases regarding their purported neck examination in which they virtually always find the patients experience "limited range of motion" and "tenderness . . . throughout the paravertebral muscles of the cervical spine," *see* Ex. 1A, columns P-Q, and often note the patients experience "pain with extension and flexion."  For patients reporting low back pain, Dr. Sparrow and Dr. Chin likewise include only a few short phrases regarding their purported lower back examination, in which they virtually always find the patients experience:   (a) "limited range of motion"; (b) "tenderness . . . throughout the paravertebral muscles of the lumbar spine"; (c) pain on extension and/or flexion, and often both; and (d) a positive finding on the facet loading test.  (*Id.*, columns T-W.)  Such uniformity in the general nature of the examination findings across patients is not credible.

46.    The limited information provided on the Initial Exam Reports regarding the Doctor Defendants' purported neck and/or low back findings is not sufficient to evaluate the patients' conditions.  For instance, the "limited" range of motion findings made by the Doctor Defendants for virtually all patients reporting neck and/or back pain fail to include documentation regarding: (a) the specific tests performed to reach particular findings; (b) any objective quantification of the severity of the findings (aside from the word "limited"); (c) the specific muscle groups, nerves,

and/or spinal levels impacted by the findings; or (d) how the findings impact the patients' treatment.

47.     The Doctor Defendants also routinely document the Spurling's test for cervical patients and the straight leg raise test ("SLR test") for lumbar patients, but their findings are not documented in a meaningful manner and the results of those tests do not appear to have any impact on the patients' recommended treatment. The Spurling's test is performed by a doctor turning the patient's head to each side while extending and applying downward pressure. The SLR test is performed by a doctor having the patient lay on his or her back, then lifting each of the patient's legs while his or her knee remains straight. These tests are generally indicated when a patient complains of pain that radiates into his or her upper extremities (for the Spurling's test) or lower extremities (for the SLR test) so that a doctor can determine whether nerve root irritation is the cause of the patient's symptoms. If the patient experiences pain while the tests are being performed, then the tests are positive and indicate the presence of nerve root irritation, a condition often associated with disc protrusions and/or radiculopathies, which could be indications for an ESI. Importantly, when a test is positive, the doctor should document that patient's specific responses. For instance, when an SLR test is positive, the provider should record the affected leg and the angle (in degrees) at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms, and to establish a baseline to assess the patient's progress, or lack thereof, over time. When the Doctor Defendants conduct the Spurling's and SLR tests, they document only basic findings regarding the generalized location of the purported test result (e.g., "positive Spurling's on the left" or "straight leg raise is positive bilaterally") with no other necessary information.

48.     Moreover, the purported results of the Spurling's and SLR tests do not appear to have any impact on the Doctor Defendants' treatment recommendations.  For instance, in the Initial Exam Report for patient Y.R., Dr. Sparrow noted Y.R. complained of "constant neck pain" with no mention of radiating symptoms.  (Ex. 19, Initial Exam Report for Y.R., at 1.)  Despite the lack of radiating symptoms, Dr. Sparrow nevertheless purportedly performed a Spurling's test, which she found was "[n]egative . . . bilaterally."  (*Id.* at 2.)  Nevertheless, Dr. Sparrow ultimately recommended that Y.R. undergo a series of three cervical interlaminar ESIs, even though Y.R.'s purported exam did not reveal the indications and corresponding test results to warrant that procedure.  (*Id.*)  Similarly, for patient J.B., Dr. Chin's Initial Exam Report notes that J.B. complained of "constant low back pain" with no mention of radiating symptoms.  (Ex. 20, Initial Exam Report for J.B., at 1.)  Dr. Chin then purportedly performed an SLR test, which he found was "negative bilaterally."  (*Id.* at 2.)  Dr. Chin ultimately recommended J.B. to undergo a series of three cervical interlaminar ESIs.  (*Id.*)  The symptomology and test results for Y.R. and J.B. do not justify a single ESI, much less a series of three.

### 2.     Fraudulent MRI Findings

49.     The Initial Exam Reports also contain a section devoted to MRI findings, which the Doctor Defendants use to further support their medically unnecessary ESI recommendations.  In that section, the Doctor Defendants (a) repeat the principal findings from the patients' MRI reports, including most notably the existence of any herniations, protrusions, or bulges; and (b) for virtually all patients, include a stock sentence that indicates, "[b]ased on [the] history, MRI report and physical exam[,]" the patient can benefit from a series of three interlaminar ESIs.  (*See* Ex. 1B, column Q; *see also, e.g.,* Ex. 21, Initial Exam Report for R.F.)

50.     Nearly two-thirds of patients treating at Complete Pain receive their MRIs at Memorial, the MRI facility that shares the same ownership and locations as Complete Pain.  As evident in the chart attached hereto as Exhibit 2, the radiologists from Memorial (the "Memorial Radiologists") made a positive finding of disc pathology in at least one spinal region for every single Complete Pain patient who had one or more spinal MRIs at Memorial.  (*See* Ex. 2, MRI Appendix.)  The Memorial Radiologists' routine positive MRI findings across hundreds of patients are not credible.

51.     For those patients for whom State Farm Mutual and State Farm County have obtained MRI films, it is apparent the Memorial Radiologists prepared MRI reports reflecting findings of abnormalities that did not exist and/or findings that grossly exaggerated the severity of abnormalities that may have existed to support medically unnecessary ESI recommendations.  For instance, patient C.T.'s cervical MRI at Memorial was interpreted as abnormal at C6-C7 with a "[b]road-based 2 mm central protrusion-subligamentous disc herniation extend[ing] into the epidural fat and indent[ing] the thecal sac with contact on the ventral cervical cord, and associated moderate canal stenosis, 7.9 mm AP."  (Ex. 22, Memorial Report for C.T.)  The MRI film of patient C.T.'s cervical spine, however, reveals no herniation or protrusion at C6-C7, no stenosis, no extension into the epidural fat, no indentation of the thecal sac, and no contact with the spinal cord.  In her Initial Exam Report for C.T., Dr. Sparrow merely adopted the MRI report's findings and proceeded to recommend that C.T. undergo a series of three cervical interlaminar ESIs.  (Ex. 23, Initial Exam Report for C.T.).

52.     Patient S.W. underwent both a cervical MRI and lumbar MRI at Memorial, both of which were interpreted by a Memorial Radiologist.  In his report for S.W.'s cervical MRI, the radiologist noted positive findings at C5-C6, including a 3.5 mm herniation that extended into the

epidural fat and indented the thecal sac, as well as associated stenosis.  (Ex. 24, Memorial Report

for S.W. (Cervical).)    Further, the radiologist specifically found "[t]he intervertebral disc

demonstrates decreased central hyperintensity with preservation of the disc height, may suggest

an acute/subacute injury with leakage of [the] central disc contents."  (*Id.*)  In other words, he

specifically included language in his report suggesting that S.W.'s purported herniation was the

result of her accident.  The Memorial Radiologist reached similar findings in his report for S.W.'s

lumbar MRI, including a 2 mm herniation at L5-S1 that extended into the epidural fat and indented

the thecal sac, as well as stenosis.  (Ex. 25, Memorial Report for S.W. (Lumbar).)  Further, he

included an identical sentence in his lumbar report regarding purported leakage of disc contents

that "may suggest an acute/subacute injury."  (*Id.*)  The films for S.W.'s cervical and lumbar MRIs,

however, reveal no herniations, no stenosis, no extension into the epidural fat, no indentation of

the thecal sac, and no leakage of disc contents (and thus no evidence of an "acute/subacute injury").

As was the case with patient C.T., Dr. Sparrow merely adopted these findings in his Initial Exam

Report and recommended that S.W. undergo a series of three cervical ESIs and a series of three

lumbar ESIs.  (Ex. 26, Initial Exam Report for S.W.)

      53.    In addition to supporting the Doctor Defendants' injection recommendations, the

Memorial Radiologists' fraudulent MRI reads also serve to bolster demand packages for PI

Attorneys.  Specifically, PI Attorneys often use Memorial's findings in their demand letters to

support the purported severity of the patient's condition and the need for extensive treatment,

including ESIs, and substantial associated charges.  For example, the PI Attorney for patient C.T.

(*see supra,* paragraph 51) touted the "abnormal" MRI findings in his demand letter as follows:

> As a result of this accident caused by your insured our client has incurred damages including, but not limited to the medical bills enclosed. Her Doctor referred her for a Cervical MRI on June 21, 2017 that demonstrate at C6-C7 a broad-based 2 mm central protrusion-subligamentous disc herniation extends into the epidural fat and indents the thecal sac, with contact on the ventral cervical cord, and associated moderate canal stenosis, 7.9 mm AP. Her Doctor referred her for a 3 Cervical Epidural Steroid Injections.

(Ex. 27, Demand Letter for C.T., at 2.)  Based in part on these findings and Dr. Sparrow's recommendation for a series of three cervical ESIs, the PI Attorney demanded that State Farm Mutual pay "$50,000 or policy limits" within ten days.  (*See id.*)  As an additional example, the demand letter submitted by the attorney for patient J.B. touted his herniation findings from Memorial as follows:

> **J▮▮B▮▮▮▮ Injuries Are Severe**
>
> Your insured's negligence caused J▮▮ B▮▮▮▮ to suffer disc herniations in two different parts of his back. At L5-S1 there is a 2.2 mm central disc herniation which indents the thecal sac. My client is also suffering from a disc herniation at L4-L5 which measures 3.0mm in diameter, and it contacts the nerve roots in the lateral recesses. There is also evidence of moderate canal stenosis which measures 8.1mm in diameter.  As you can see, there are numerous objective findings to support the nature and severity of Mr. B▮▮▮▮'s claimed injuries.

(Ex. 28, Demand Letter for Patient J.B.)  Based on these findings and J.B.'s current and future treatment costs, including most notably more than $10,000 in bills from Complete Pain for an examination and one lumbar ESI and an estimate of "future expenses [that] could reasonably reach tens of thousands of dollars more" based on J.B.'s purported need for additional ESIs at Complete Pain, patient J.B.'s attorney demanded that State Farm County pay "the lesser of insurance 'policy limits' or $450,000" within 18 days.  (*See id.*)

### 3.    Fraudulent Diagnoses

54.    Based on the non-credible complaints and findings contained in the Initial Exam Reports, including the fraudulent MRI findings from the Memorial Radiologists, the Doctor

Defendants diagnose virtually all patients reporting neck and/or back pain with the same diagnoses. Specifically, for those patients reporting neck and/or back pain that received MRIs at the time of their initial examination, Dr. Sparrow and Dr. Chin virtually always conclude the patients suffer from both radiculopathies and herniated nucleus pulposuses in the affected spinal regions.[3] (Ex. 1B, columns H-K.) These identical diagnoses across hundreds of patients are not credible and merely serve as pretext for the Doctor Defendants' routine recommendations to receive a series of three interlaminar ESIs in one or more regions of the spine.

55.     The Doctor Defendants' documented radiculopathy diagnoses fail to include basic important information necessary to support the diagnoses and are often inconsistent with patients' symptoms and test results. Radiculopathies are injuries to the sensory or motor nerve roots, which run along the sides of the spine at each vertebral level, and a proper radiculopathy diagnosis should document the specific nerve root(s) (e.g., "left C5 radiculopathy") causing the patient's pain. The Doctor Defendants only document the spinal region of the purported condition (e.g., "cervical radiculopathy" or "lumbar radiculopathy") and make no effort to identify the vertebral levels of the cervical or lumbar spine where they have indicated the radiculopathies to describe the nature, severity, or distribution patterns of the radicular symptoms or correlate their diagnosis to the patient's symptoms.

56.     Moreover, the Doctor Defendants also frequently reach radiculopathy diagnoses even where a patient reports no radiating pain, which is the principal symptom associated with a radiculopathy. For example, in the Initial Exam Report for patient Y.R., Dr. Sparrow noted that

---

[3] For those patients that have not yet received an MRI at the time of their initial evaluation, get referred out for an MRI, and return to Complete Pain at a later date, the Doctor Defendants rarely ever conduct a follow-up examination before administering ESIs. For these patients, the Doctor Defendants virtually always include these same diagnoses in their Operative Reports for the ESI procedures those patients receive.

Y.R. complained of "constant neck pain" with no mention of radiating symptoms. (*See* Ex. 19, Initial Exam Report for Y.R.) Despite the lack of radiating symptoms and negative results on the Spurling's test – a test used to assess the presence of a potential cervical radiculopathy – Dr. Sparrow nevertheless diagnosed Y.R. with "cervical radiculopathy" and recommended she undergo a series of three cervical interlaminar ESIs. (*Id.*) Similarly, for patient J.B., Dr. Chin's Initial Exam Report notes that J.B. complained of "constant low back pain" with no mention of radiating symptoms. (*See* Ex. 20, Initial Exam Report for J.B.) Despite the lack of radiating symptoms and a negative SLR test – a test used to assess the presence of a potential lumbar radiculopathy – Dr. Chin nevertheless diagnosed J.B. with "lumbar radiculopathy" and recommended J.B. undergo a series of three lumbar interlaminar ESIs. (*Id.*) Likewise, Dr. Sparrow diagnosed patient F.S. with both cervical radiculopathy and lumbar radiculopathy, despite the fact she never complained of radiating pain, only "constant neck . . . and low back pain," and her corresponding Spurling's and SLR test results were normal. (Ex. 29, Initial Exam Report for F.S.) Based on these diagnoses, Dr. Sparrow recommended F.S. receive a series of three cervical ESIs and a series of three lumbar ESIs. (*Id.*)

57.     Similarly, the Doctor Defendants' diagnoses of herniated nucleus pulposuses often do not correlate to imaging findings. A herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disc is forced through a weakened part of the disc, and it is synonymous with herniation and protrusion findings on MRI films. The Doctor Defendants routinely reach herniated nucleus pulposuses diagnoses even for patients whose MRI reports reveal only bulges with no associated tearing along the spine. (*Compare* Ex. 30, Lumbar MRI Report for K.S. *with* Ex. 31, Initial Exam Report for K.S.)

### 4.       Fraudulent Treatment Recommendations

58.       Based upon the patient complaints, findings, and diagnoses documented in the fraudulent Initial Exam Report, the Doctor Defendants subject virtually all patients reporting neck and/or back pain to predetermined injection recommendations, which are not tailored to the unique needs of any patient, not altered based upon previous treatments by other providers, not altered due to changes in the patients' conditions, and subject patients to substantial undue risks and costs. Indeed, in their Initial Exam Reports, Dr. Sparrow and Dr. Chin purport to base their injection recommendations on the patient's "history, MRI report and physical exam and the continued complaints of pain and radiculopathy symptoms," even when the patient does not experience any "radiculopathy symptoms" (*i.e.*, radiating pain) and his or her exam findings suggest that no injection is warranted.  (Ex. 1B, column Q; *see also* Ex. 31,  Initial Exam Report for K.S.)

59.       The Doctor Defendants recommend virtually all patients with neck and/or back pain receive the exact same type of spinal injection, namely interlaminar ESIs.  As described above, of the 336 Complete Pain patients at issue who received a formal recommendation for a injection, received an injection without a formal recommendation, or received a "cost estimate" for recommended injections, 332 were recommended and/or received interlaminar ESIs, two received recommendations only for TPIs, one received two separate caudal ESIs without a formal recommendation, one received a cost estimate for a wrist injection despite also having back pain, and none were recommended or received FIs, MBBs, or transforaminal ESIs during their initial evaluations.  As described above, FIs and MBBs are also common types of spinal injections, and they have different indications than ESIs.  Across hundreds of patients in a legitimate pain management clinical setting, one would expect to see significant variation in the types of procedures recommended and performed.

**APP 064**

60.     Moreover, when making their routine recommendations for interlaminar ESIs, the Doctor Defendants virtually always recommend the injections be performed in a "series of three." (Ex. 1B, column O.)   As described above, peer-reviewed medical literature and professional medical society guidelines establish there is no legitimate basis to recommend and perform a series of three ESIs, let alone uniformly do so.   Instead, patients should be examined and assessed after each injection to determine if another injection is warranted.   Accordingly, a recommendation for a series of three ESIs—like those routinely recommended by the Doctor Defendants—is never indicated.   This holds particularly true for the more than 40% of Complete Pain patients who receive recommendations for a series of three ESIs in two or more areas of the spine, meaning the Doctor Defendants recommend that those patients undergo six or more injections based on an initial examination.

### D.     The Fraudulent Operative Reports

61.     For those patients who appear for and receive one or more of their recommended ESIs, the Doctor Defendants and other Complete Pain doctors prepare Operative Reports for the procedures, which Complete Pain submits, and causes to be submitted, along with the Initial Exam Reports and bills, to State Farm Mutual and State Farm County.   Like the Initial Exam Reports, the Operative Reports are boilerplate and not credible.   (Ex. 3, Injection Appendix.)

62.     The Operative Reports reveal virtually every patient receiving an injection also purportedly required an epidurogram.   As described above, epidurograms are typically indicated only if there is a concern regarding a condition, pathology, or structural abnormality in and around the patient's spine that might affect the flow of steroids.   Also, when conducted, a provider should prepare a separate report documenting the findings of the epidurogram.   The Operative Reports provide only a stock sentence regarding the purported epidurograms, noting that they were able to "identif[y] the needle tip within the epidural space with contrast medium spreading cephalad in

caudal from the needle tip[.]" (Ex. 6, Operative Report for A.P.) In other words, the Operative Reports never identify any potential condition, pathology, or structural abnormality to justify performing the epidurogram and also never identify any actual condition, pathology, or structural abnormality discovered *during* the epidurogram.

63.     The routine use of medically unnecessary epidurograms appears designed to justify a separate $1,650 charge for each epidurogram. Remarkably, Complete Pain bills epidurograms for each ESI performed, even if multiple ESIs are performed on the same date of service. For instance, Dr. Chin performed cervical, thoracic, and lumbar ESIs on patient R.R. on the same date, and he purported to perform an epidurogram on each spinal region. (Ex. 32, Operative Reports for R.R.) Accordingly, Complete Pain submitted three separate $1,650 charges for the medically unnecessary epidurograms. (Ex. 33, Complete Pain Bills for R.R.)

64.     Furthermore, the Doctor Defendants and other providers performing injections at Complete Pain document for almost every patient who supposedly received an ESI the "patient tolerated this procedure well" in the Operative Reports. It is not credible that, across hundreds of patients with different spinal structures and mechanisms of injury, the Doctor Defendants and other Complete Pain doctors encountered no complications with any of these procedures.

**E.     All of the Above Procedures Were Recommended and Performed to Support Fraudulent Charges**

65.     The purported services described above were designed and carried out to enrich Defendants by inflating the value of BI and UM Claims submitted to State Farm Mutual and State Farm County, causing State Farm Mutual and State Farm County to settle BI and UM Claims that otherwise might not have been settled or pay substantially more to settle the claims, from which Defendants received payment from the PI Attorneys.

66.     For each ESI purportedly performed, Complete Pain prepares a bill totaling over $9,000, which improperly "unbundles" the procedure into the eleven distinct charges.   For instance, the superbill for patient G.C. reflects the following charges for a single ESI procedure:

```
11/02/16  INJECT  LUMBAR SACRAL C  5511.00    .00    .00    .00   5511.00
11/02/16  EPIDUROGRAPHY             1650.00    .00    .00    .00   1650.00
11/02/16  SURGICAL TRAY              200.00    .00    .00    .00    200.00
11/02/16  PRE-OP/RECOVERY ROOM       400.00    .00    .00    .00    400.00
11/02/16  NEEDLE STERILE ANY SIZE     50.00    .00    .00    .00     50.00
11/02/16  OFFICE VISIT EST. LEVEL    250.00    .00    .00    .00    250.00
11/02/16  DEXAMETHASONE SODIUM PH    200.00    .00    .00    .00    200.00
11/02/16  LIDOLOG KIT                710.00    .00    .00    .00    710.00
11/02/16  FLUOROSCOPIC GUIDANCE S    975.00    .00    .00    .00    975.00
11/02/16  LIDOCAINE                  150.00    .00    .00    .00    150.00
11/02/16  LOW OSMOLAR CONTRAST 30     20.00    .00    .00    .00     20.00
```

(Ex. 34, Complete Pain Superbill for G.C.)   Virtually all of these charges, including the "pre-op/recovery room," surgical tray, steroid (dexamethasone), and lidocaine, should be included as part of the injection charge and should not be billed separately.   Moreover, it is improper to bill a separate office visit charge on the day of a procedure, which Complete Pain routinely does.   By "unbundling" the charges in this manner, Complete Pain is able to submit a greater aggregate charge and give the appearance patients receive additional services beyond the ESI.

67.     For those patients that receive more than one ESI on a single date of service, Complete Pain bills all of the aforementioned eleven charges two or three times, even though some of them are duplicative.   For instance, patient R.K. purportedly received ESIs in the cervical, thoracic, and lumbar regions of her spine on the same date of service, and Complete Pain proceeded to prepare bills for three office visits, three "pre-op/recovery rooms," and three surgical trays, as well as three times each for the remaining eight charges Complete Pain routinely submits for each ESI.   (Ex. 35, R.K. Bills.)   Additionally, without any explanation or documentation, Complete Pain also billed three additional charges for "moderate sedation" and three additional charges for a sedative (midazolam hydrochloride).   (*Id.*)   Collectively, the bills totaled *more than $29,000* for a single date of service.

68.     Complete Pain also routinely submits separate charges for fluoroscopic guidance ($975) and epidurography ($1,650) for each ESI purportedly performed.  These routine charges are inappropriate for multiple reasons.  First, as described above, performing and billing for an epidurogram is only appropriate when:  (1) there is a suspected abnormality along the spine that would affect the flow of steroid (which the Doctor Defendants and other Complete Pain doctors fail to identify or document) and (2) a separate report is prepared (which the Doctor Defendants and other Complete Pain doctors never prepare).  Second, even assuming the epidurography charges are legitimate (and they are not), the billing code for epidurography includes fluoroscopic imaging, and thus it is inappropriate to bill an additional charge for fluoroscopy.  And third, despite the Centers for Medicare & Medicaid Services (CMS) adopting new billing codes for ESIs that include fluoroscopic imaging in 2017, Complete Pain nevertheless continues to bill those new codes along with separate "unbundled" charges for fluoroscopic imaging.

69.     Complete Pain's charges are grossly excessive.  Even setting aside the improperly unbundled charges for supplies and other overhead, Complete Pain's routine charges for ESIs and epidurograms alone are more than one thousand percent higher than the corresponding reimbursement rates paid by Medicare to providers in the Houston area over the relevant periods, as demonstrated in the following charts:

**2016 COMPARISON OF CHARGES**

| Procedure (CPT Codes) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62310-62311) | $5,511 | $247.33 | 2,128% |
| Interlaminar ESI – Lumbar/Sacral (62312-62313) | $5,511 | $228.10 | 2,316% |

| Procedure (CPT Codes) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Epidurogram (72275) | $1,650 | $115.85 | 1,324% |

### 2017 COMPARISON OF CHARGES

| Procedure (CPT Codes) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62320-62321) | $5,511 | $172.22 | 3,099% |
| Interlaminar ESI – Lumbar/Sacral (62323) | $5,511 | $251.21 | 2,093% |
| Epidurogram (72275) | $1,650 | $118.24 | 1,295% |

### 2018 COMPARISON OF CHARGES

| Procedure (CPT Code) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62320-62321) | $5,511 | $256.97 | 2,044% |
| Interlaminar ESI – Lumbar/Sacral (62323) | $5,511 | $253.64 | 2,073% |
| Epidurogram (72275) | $1,650 | $119.21 | 1,284% |

70.     Complete Pain's excessive charges are intended to inflate the value of BI and UM Claims by increasing the medical expenses allegedly incurred, or which may be incurred, by the patients as a result of their accidents, to induce State Farm Mutual and State Farm County to settle those claims within policy limits, and often at or near policy limits, to protect themselves and their

insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

**F.  State Farm Mutual and State Farm County's Injuries Are Directly Related to and a Natural Consequence of Dr. Chin, Dr. Sparrow, and Complete Pain's Fraudulent Scheme**

71.  The Doctor Defendants and Complete Pain are obligated legally and ethically to act honestly and with integrity.  Yet, the Doctor Defendants and Complete Pain have submitted, and caused to be submitted, to State Farm Mutual and State Farm County bills and documentation that are fraudulent in that they represent the underlying services were actually rendered and were medically necessary when they were not.

72.  The object of the Doctor Defendants and Complete Pain's scheme is to enrich Defendants by causing State Farm Mutual and State Farm County to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to settle BI and UM Claims that otherwise might not have been settled, or by paying substantially more to settle BI and UM Claims than they would have had they known the Doctor Defendants and Complete Pain's bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of the Doctor Defendants and Complete Pain's scheme, and the damages incurred by State Farm Mutual and State Farm County were the direct result and natural consequence of the scheme.

73.  State Farm Mutual and State Farm County have been damaged more than $1.9 million in settling the BI and UM Claims at issue.  The Doctor Defendants and Complete Pain's fraudulent documentation and bills were a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying substantially more to settle these claims than they would have if they had known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of the Doctor Defendants' and Complete Pain's scheme

and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to more than $1.9 million in damages, or to a lesser amount to be proven at trial, but no less than the amount Defendants actually received as a result of the scheme.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D.)

74.    State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 73 above.

75.    Complete Pain Solutions, LLC n/k/a Complete Pain Solutions, PLLC is a corporation and an "enterprise" (the "Complete Pain Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

76.    The Doctor Defendants are and have been employed by and/or associated with the Complete Pain Enterprise.

77.    Since at least September 2015 and continuing uninterrupted to the present, the Doctor Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Complete Pain Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud State Farm Mutual and State Farm County by submitting and causing to be submitted fraudulent bills and supporting documentation for examinations, injections, and related services which either were not legitimately performed or were not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by State Farm Mutual and State Farm County and delivered on or about the dates reflected on Ex. 4.

78.     Specifically, the bills and supporting documentation the Doctor Defendants submit, and cause to be submitted, for these services through Complete Pain are fraudulent because:

a.      the Doctor Defendants do not perform legitimate examinations of the patients;

b.      patterns in the findings within the Initial Exam Reports prepared by the Doctor Defendants are not credible and serve as pretext to support their predetermined recommendations for spinal MRIs and/or recommendations for three medically unnecessary ESIs in at least one region of the spine – and often multiple regions – for nearly all patients reporting neck and/or back pain (*see* Exs. 1A, 1B);

c.      many of the patients at issue undergo spinal MRIs at Memorial, a facility sharing the same ownership and many of the same office locations as Complete Pain, and the Doctor Defendants use the purported positive findings made by the Memorial Radiologists on virtually all spinal MRIs they read as justification to support their predetermined and medically unnecessary ESI recommendations. (*See* Ex. 2.) Several MRI films read by the Memorial Radiologists reveal they have documented conditions that do not exist or exaggerated the severity of age-expected degenerative conditions that may exist;

d.      the ESIs the Doctor Defendants recommend and purportedly perform are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' insurance claims;

e.      the boilerplate Operative Reports prepared by the Doctor Defendants and occasionally other doctors at Complete Pain for the ESIs they purportedly perform are not credible based upon patterns in the patients' responses to the ESIs (*see* Ex. 3); and

f.      the Doctor Defendants and other doctors at Complete Pain purportedly perform epidurograms in addition to fluoroscopic imaging when conducting ESIs, which is not credible, not medically necessary, and performed to justify a significant additional charge from Complete Pain for each purported epidurogram.

79.     The bills and corresponding mailings, which comprise the pattern of racketeering activity identified through the date of this Complaint, are described in part in Exs. 1A, 1B, 2, 3, and 4, attached hereto.  Representative samples of these bills and supporting documentation are attached as Exs. 6-14-15, 17-26, 29-35.

80.     State Farm Mutual and State Farm County have been injured in their business and property by reason of the above-described conduct in excess of $1.9 million.  The fraudulent documentation and bills Complete Pain and the Doctor Defendants submit, and cause to be submitted, through Complete Pain are at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and by paying substantially more to settle BI and UM Claims than they would have paid had they known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the intended targets of the scheme, and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D. for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D.)

81.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein each allegation in Paragraphs 1 through 73 above.

82.     The Doctor Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Complete Pain Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud State Farm Mutual and State Farm County by submitting and causing to be submitted, fraudulent bills and supporting

documentation for examinations, injections, and related services which either were not performed, were not legitimately performed, or were not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by State Farm Mutual and State Farm County and delivered on or about the dates reflected on Exhibit 4.

83.     Both of the Doctor Defendants knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, injections, and related services, which either were not performed, were not legitimately performed, or were not medically necessary, to State Farm Mutual and State Farm County.

84.     State Farm Mutual and State Farm County have been injured in their business and property because of the Doctor Defendants' above-described conduct in that they have collectively paid more than $1.9 million based upon the fraudulent charges.

85.     State Farm Mutual and State Farm County have been injured in their business and property by reason of the above-described conduct in excess of $1.9 million.  The fraudulent documentation and bills Complete Pain and the Doctor Defendants submit, and cause to be submitted, through Complete Pain are at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and by paying substantially more to settle BI and UM Claims than they would have paid had they known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the intended targets of the scheme, and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D. for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### MONEY HAD AND RECEIVED
#### (Against All Defendants)

86.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 73 above.

87.     State Farm Mutual and State Farm County conferred a benefit upon Defendants by paying more than $7.1 million to settle the BI and UM Claims at issue, and Complete Pain and the Doctor Defendants' fraudulent bills and supporting documentation were at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and pay substantially more to settle BI and UM Claims than they would have had they known the bills and documentation were fraudulent.

88.     The money Defendants obtained in connection with the BI and UM Claims at issue in equity and good conscience belongs to and should be returned to State Farm Mutual and State Farm County.

89.     Defendants are in a unique position to know the amount of money they received from the more than $6.1 million that State Farm Mutual has paid and the more than $1.0 million State Farm County has paid to settle the BI and UM Claims at issue.  State Farm Mutual and State Farm County are not currently aware of the precise amount of money Defendants received. However, based upon the substantial amounts of Complete Pain's charges in the BI and UM Claims at issue – more than $4 million – State Farm Mutual and State Farm County allege, on information and belief, that the amounts received by Defendants are substantial.

90.     Because Complete Pain and the Doctor Defendants' services were not performed, not legitimately performed, or not medically necessary, they had no value. Therefore, in equity and good conscience, Defendants should be required to pay restitution to State Farm Mutual and State Farm County in an amount equal to the total amounts they received as a result of the more than $7.1 million that State Farm Mutual and State Farm County collectively paid to settle the BI and UM Claims at issue.

91.     Based upon Complete Pain and the Doctor Defendants' material misrepresentations and other affirmative acts to conceal their conduct from State Farm Mutual and State Farm County, their injuries were inherently undiscoverable. Despite State Farm Mutual and State Farm County's diligence in uncovering the injurious conduct, State Farm Mutual and State Farm County did not discover and should not have reasonably discovered that its damages were attributable to Defendants' conduct until May 2017, at the earliest.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants for the above-described damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm County demand a trial by jury.

Dated this 23rd day of July, 2020.

By: /s/ Ross O. Silverman

Ross O. Silverman
(*admission pro hac vice pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com

ATTORNEY-IN-CHARGE FOR
PLAINTIFFS STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY AND STATE FARM
COUNTY MUTUAL INSURANCE
COMPANY OF TEXAS

Of Counsel:

Jared T. Heck
(*admission pro hac vice pending*)
Amelia M. Chapple
(*admission pro hac vice pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
jared.heck@katten.com
amelia.chapple@katten.com

Micah Kessler
Nistico, Crouch & Kessler, P.C.
1900 West Loop South, Suite 800
Houston, TX 77027
(713) 781-2889
mkessler@nck-law.com

**APP 077**