UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC | § § § § § § | |
| and | § § | |
| ACET Global, LLC, | § § | |
| **Plaintiffs,** | § § | |
| v. | § § | CIVIL CAUSE NO. 3:21-cv-01171-B |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; BAYMARK MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; et al., | § § § § § § § § § § § | |
| **Defendants.** | § § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE BAYMARK
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
COMPLAINT AND BRIEF IN SUPPORT**

Jason B. Freeman
  TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................................................... ii

**TABLE OF AUTHORITIES** .............................................................................................. iii

**I.   Argument.** ................................................................................................................ 3

   A.   The Pattern Requirement. ......................................................................................4
   B.   Continuity. ................................................................................................................8
   C.   A Defendant Is Not Required to Commit Each Predicate Act. ..........................20
   D.   Standard of Review under Rule 12(b)(6). .............................................................22

**II.   The SAC Adequately Alleges a Pattern Implicating the Baymark Defendants.** ............ 23

   A.   The SAC Establishes the Predicate Acts. ............................................................33
      1.   Bankruptcy Fraud. ........................................................................................33
      2.   Obstruction of Justice. ..................................................................................37
      3.   Money Laundering. .......................................................................................38
         i.   The Elements. .........................................................................................39
            a.   Property valued at more than $10,000 that was derived from a specified unlawful activity. .............................................................................................................39
            b.   The defendants engaged in a financial transaction with the property. .........................41
            c.   The defendant's knowledge that the property was derived from unlawful activity. ....42
      4.   Mail/Wire Fraud. ..........................................................................................43
   B.   Causation. ................................................................................................................45

**III.   Section 1962(a).** ................................................................................................... 47

**IV.   State Law Claims.** ............................................................................................... 47

   A.   Common-Law Fraud. .............................................................................................47
   B.   Breach of Fiduciary Duty/Aiding and Abetting Breach of Fiduciary Duty. ...........50
   C.   Texas Uniform Fraudulent Transfer Act. ............................................................53
   D.   Civil Conspiracy. ....................................................................................................55

**V.   Prayer.** .................................................................................................................. 56

**CERTIFICATE OF SERVICE** .......................................................................................... 57

## TABLE OF AUTHORITIES

**Cases**

*Abell v. Potomac Ins. Co.*,
  946 F.2d 1160 (5th Cir. 1991) .................................................................................... 10
*Abraham v. Singh*,
  480 F.3d 351 (5th Cir. 2017) ...................................................................... 8, 10, 11, 16
*Akin v. Q-L Invs., Inc.*,
  959 F.2d 521 (5th Cir. 1992) ........................................................................................6
*Allstate Ins. Co. v. Plambeck*,
  802 F.3d 665 (5th Cir. 2015) .................................................................................... 45
*Anderton v. Cawley*,
  378 S.W.3d 38 (Tex. App.—Dallas 2012) ................................................................ 55
*Armco Industrial Credit Corp. v. SLT Warehouse Co.*,
  782 F.2d 475 (5th Cir. 1986) .................................................................................... 11
*At the Airport v. ISATA*,
  438 F.Supp.2d 55 (E.D.N.Y. 2006) ........................................................................... 17
*Bank of Mongolia v. M&P Glob. Fin. Servs.*,
  2010 WL 11549711 (S.D. Fla. Sept. 3, 2010) ........................................................... 20
*Berman, Tr. for Est. of Michael S. Goldberg, LLC v. LaBonte*,
  622 B.R. 503 (D. Conn. 2020) .................................................................................. 34
*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) .................................................................................................. 44
*Bridgewater v. Double Diamond-Delaware, Inc.*,
  2010 WL 1875617 (N.D. Tex. May 10, 2010) ............................................. 3, 16, 17, 19
*Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.*,
  770 F.Supp. 1351 (E.D. Wis. 1991) ........................................................................... 21
*Cadle Company v. Flanagan*,
  271 F.Supp.2d 378 (D. Conn. 2003) ......................................................................... 33
*Calcasieu Marine Nat'l Bank v. Grant*,
  943 F.2d 1453 (5th Cir. 1991) .................................................................................. 10
*Cardwell v. Gurley*,
  2018 WL 3454800 (Tex. App.—Dallas 2018) ............................................................ 51
*Casperone v. Landmark Oil & Gas Corp.*,
  819 F.2d 112 (5th Cir. 1987) .........................................................................20, 22, 43
*City of New York v. Bello*,
  579 Fed. Appx. 15 (2d Cir. 2014) .............................................................................. 21
*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) .................................................................................... 22
*Commercial Metals Co. v. Chazanow*,
  2009 WL 3853704 (N.D. Tex. 2009) ........................................................................ 19
*Conkling v. Turner*,
  18 F.3d 1285 (5th Cir. 1994) .................................................................................... 22
*Cty. of El Paso, Tex. v. Jones*,
  2009 WL 4730305 (W.D. Tex. Dec. 4, 2009) ...................................................4, 20, 22
*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*,
  814 F.Supp.2d 698 (N.D. Tex. 2011) ...............................................................16, 17, 18

*Delta Truck & Tractor, Inc. v. J.I. Case Co.,*
  855 F.2d 241 (5th Cir. 1988) ........................................................................ 10, 11
*Efron v. Embassy Suites (Puerto Rico), Inc.,*
  223 F.3d 12 (1st Cir. 2000) .............................................................................. 8, 9
*First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.,*
  150 F. Supp. 2d 624 (S.D.N.Y. 2001) ................................................................. 44
*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,*
  385 F.3d 159 (2d Cir. 2004)................................................................ 33, 34, 44, 46
*First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago,*
  1985 WL 1118 (N.D. Ill. Mar.10, 1985) ............................................................. 21
*Funk v. Stryker Corp.,*
  631 F.3d 777 (5th Cir. 2011) ............................................................................... 6
*George v. Blue Diamond Petroleum, Inc.,*
  718 F. Supp. 539 (W.D. La. 1989)........................................................... 20, 21, 43
*Greb v. Singleton,*
  2019 WL 13210371 (N.D. Tex. Sept. 30, 2019) ............................................ 2, 6, 12
*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989) ............................................................................... Passim
*Hoggett v. Brown,*
  971 S.W.2d 472 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) .................. 48
*Howell Hydrocarbons, Inc. v. Adams,*
  897 F.2d 183 (5th Cir. 1990) ............................................................................ 10
*Howell Petroleum Corp. v. Weaver,*
  780 F.2d 1198 (5th Cir. 1986) .......................................................................... 22
*ICONICS, Inc. v. Massaro,*
  192 F.Supp.3d 254 (2016)................................................................................... 8
*In re Burzynski,*
  989 F.2d 733 (5th Cir. 1993) ............................................................................ 10
*In re Commonwealth/Tesoro Petroleum Corp. Securities Litigation,*
  467 F. Supp. 227 (W.D. Tex. 1979) ................................................................... 16
*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
  623 F.Supp.2d 798 (S.D. Tex. 2009) .................................................................. 21
*In re Performance Nutrition, Inc.,*
  239 B.R. 93 (Bankr. N.D. Tex. 1999) ................................................................ 21
*In re Sigma Sys., Inc.,*
  2010 WL 148176 (Bankr. E.D. Tex. Jan. 11, 2010) ............................................. 33
*In re Urcarco Securities Litigation,*
  148 F.R.D. 561 (N.D. Tex. 1993)....................................................................... 16
*Janvey v. Golf Channel, Inc.,*
  487 S.W.3d 560 (Tex. 2016) ........................................................................ 54, 55
*Jones v. Bock,*
  ⸺ U.S. ⸺, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ......................................... 10
*Lowrey v. Texas A&M Univ. Sys.,*
  117 F.3d 242 (5th Cir. 1997) ............................................................................ 22
*Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co.,*
  86 Tex. 143, 24 S.W. 16 (1893) ......................................................................... 51
*Malvino v. Delluniversita,*
  840 F.3d 223 (5th Cir. 2016) ............................................................................... 8

*Mitchell Energy Corp. v. Martin,*
  616 F. Supp. 924 (S.D. Tex. 1985) ............................................................... 16
*Pinkerton v. United States,*
  328 U.S. 640 (1946) ...................................................................................... 21
*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,*
  879 F.2d 10 (2d Cir. 1989) ........................................................................... 18
*Prostok v. Browning,*
  112 S.W.3d 876 (Tex. App.—Dallas 2003) .................................................. 51
*R.A.G.S. Couture, Inc. v. Hyatt,*
  774 F.2d 1350 (5th Cir. 1985) ................................................................ 11, 20
*Reves v. Ernst & Young,*
  507 U.S. 170 (1993) ........................................................................................ 3
*Riddell v. Riddell Washington Corp.,*
  866 F.2d 1480 (D.C. Cir. 1989) ................................................................... 21
*Salinas v. United States,*
  522 U.S. 52 (1997) ........................................................................................ 21
*Schmuck v. United States,*
  489 U.S. 705 (1989) ...................................................................................... 43
*Simmons v. Jackson,*
  2019 WL 3043927 (N.D. Tex. June 7, 2019) ................................................ 20
*Smith v. Cooper/T. Smith Corp.,*
  846 F.2d 325 (5th Cir. 1988) ....................................................................... 11
*St. Germain v. Howard,*
  556 F.3d 261 (5th Cir. 2009) .......................................................................... 4
*Super Future Equities, Inc. v. Wells Fargo Bank Minnesota NA,*
  2007 WL 9717366 (N.D. Tex. 2007) (Boyle, J.) .......................................... 17
*Swierkiewicz v. Sorema N. A.,*
  534 U.S. 506 (2002) ...................................................................................... 22
*Tigrett v. Pointer,*
  580 S.W.2d 375 (Tex. App.—Dallas 1978) .................................................. 50
*Tobin Canning Co. v. Fraser,*
  81 Tex. 407 (Tex. 1891) ............................................................................... 51
*United States v. Alaniz,*
  726 F.3d 586 (5th Cir. 2013) ....................................................................... 38
*United States v. Andrade,*
  788 F.2d 521 (8th Cir. 1986) ....................................................................... 20
*United States v. Arledge,*
  533 F.3d 881, 891 (5th Cir. 2008) ............................................................... 43
*United States v. Crispo,*
  306 F.3d 71 (2d Cir. 2002) ........................................................................... 37
*United States v. Davis,*
  752 F.2d 963 (5th Cir. 1985) ....................................................................... 37
*United States v. Delgado,*
  401 F.3d 290 (5th Cir. 2005) .................................................................... 5, 10
*United States v. Elliott,*
  571 F.2d 880 (5th Cir. 1978) .................................................................... 3, 19
*United States v. Finney,*
  714 F.2d 420 (5th Cir. 1983) ................................................................... 20, 43

*United States v. Griffin*,
  589 F.2d 200 (5th Cir. 1979) ............................................................................... 37
*United States v. Hurley*,
  63 F.3d 1 (1st Cir. 1995) ..................................................................................... 21
*United States v. Indelicato*,
  865 F.2d 1370 (2d Cir. 1989) .............................................................................. 18
*United States v. Kanneganti*,
  565 F.3d 180 (5th Cir.2009) ................................................................................ 16
*United States v. Lane*,
  474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) ......................................... 20
*United States v. McBride*,
  362 F.3d 360 (6th Cir. 2004) ............................................................................... 37
*United States v. Omoruyi*,
  260 F.3d 291 (3d Cir. 2001) ................................................................................ 38
*United States v. Partin*,
  552 F.2d 621 (5th Cir. 1977) ............................................................................... 37
*United States v. Phillips*,
  664 F.2d 971 (5th Cir. 1981) ..................................................................................4
*United States v. Posada-Rios*,
  158 F.3d 832 (5th Cir. 1998) ..................................................................................5
*United States v. Rasheed*,
  663 F.2d 843 (9th Cir. 1981) ............................................................................... 37
*United States v. Russell*,
  255 U.S. 138 (1921) ............................................................................................ 37
*United States v. Whitfield*,
  590 F.3d 325 (5th Cir. 2009) ............................................................................... 43
*United States v. Williams*,
  874 F.2d 968 (5th Cir. 1989) ......................................................................... 36, 37
*Whelan v. Winchester Prod. Co.*,
  319 F.3d 225 (5th Cir.2003) ................................................................................ 10
*Williams v. WMX Techs., Inc.*,
  112 F.3d 175 (5th Cir. 1997) ............................................................................... 16
*Word of Faith World Outreach Center Church, Inc. v. Sawyer*,
  90 F.3d 118 (5th Cir. 1996) ........................................................................... 8, 10

## Statutes

18 U.S.C. § 152 ............................................................................................... 33, 34
18 U.S.C. § 157 .................................................................................................... 33
18 U.S.C. § 1341 ............................................................................................. 20, 43
18 U.S.C. § 1343 .................................................................................................. 20
18 U.S.C. § 1503 ............................................................................................. 36, 37
18 U.S.C. § 1832 .................................................................................................. 15
18 U.S.C. § 1956(a)(1) ......................................................................................... 42
18 U.S.C. § 1956(c)(6) ......................................................................................... 41
18 U.S.C. § 1956(c)(7) ......................................................................................... 41
18 U.S.C. § 1956(c)(7)(A), (D) ........................................................................... 38
18 U.S.C. § 1957(a) ................................................................................... 38, 39, 42

18 U.S.C. § 1961 ................................................................................................................. 15

18 U.S.C. §§ 2314 and 2315 ............................................................................................. 15

31 U.S.C. § 5312(a)(2)(P) ................................................................................................. 41

Tex. Bus. & Comm. Code § 24.005(a) .............................................................................. 55

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................................... 22

**Other Authorities**

Robert Michaels, Twice the Effort but Three Times the Reward: Rico Claims for Receivers and
    Trustees, Am. Bankr. Inst. J., July 2013 ......................................................................... 46

"Matt, shut the fuc# up."

> ~ **Tony Ludlow**, improperly interjecting and instructing his partner, Matthew Denegre, during Denegre's deposition; Ludlow is a licensed Texas attorney, officer of the court, and CPA; former Hallett & Perrin attorney; President of Baymark Partners, LP; Baymark Partners; Baymark ACET Holdco, LLC; Baymark ACET Direct Invest, LLC; and "the Baymark Director" of Windspeed Trading, LLC.

The Court should deny the Baymark Defendants' Motion to Dismiss.[1]   The Plaintiffs have properly pled a pattern and continuity.[2]  The Second Amended Complaint ("SAC"), taken as true and with all reasonable inferences drawn in Plaintiffs' favor, pleads a series of elaborate, sophisticated, and coordinated acts of deception that played out over a **four-plus-year period** featuring **no less than 100 predicate RICO acts**.  (SAC ¶ (i)). Baymark Partners has employed the same set of schemes to defraud a large number of creditors of multiple target companies—including at least 24 creditors here.  (SAC ¶ (ii)).

The primary players here have been defendants in multiple civil RICO suits, including a wholly separate and prior suit alleging that in 2014 they,[3] through "Baymark Partners," entered into a purchase agreement with a seller and then conspired with a lending entity—with whom they 'partnered' through undisclosed "warrants"—to illegally foreclose on property by mailing foreclosure notices where their "goal was to acquire property worth millions more than they could get by simply collecting on the

---

[1] This Response is filed subject to Plaintiffs' Motion for Leave to Exceed Page Limit, which Plaintiffs file concurrently. The factual recitation set forth herein will, counsel believes, greatly assist the Court in analyzing the various motions.  Any repetition of factual recitations herein has been made to group and place the relevant facts in the context of each specific predicate act challenged by the Defendants—with the belief that such grouping will greatly streamline the Court's review and job.

Moreover, Plaintiffs have filed a SAC, which addresses all issues identified in the Court's May 9, 2022 Order.  Should the Court believe that a separate pleading issue exists, Plaintiffs request that the Court grant leave to file a subsequent amended complaint.

[2] Plaintiffs hereby adopt and incorporate their separate responses to the motions to dismiss filed by Defendants SG Credit Partners, Inc. and Marc Cole, Super G Capital LLC and Steven Bellah, the Windspeed Employees, Hallett & Perrin, P.C. and Julie A. Smith, Baymark ACET Holdco, LLC, the Baymark Defendants, and David Hook and Tony Ludlow, as well as the arguments incorporated therein.

[3] Ludlow, Hook, and Baymark Partners.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE BAYMARK DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**                                                    **Page 1**

loans." That scheme sounds remarkably familiar. It parallels the scheme they carried out here and itself underscores the continued threat.[4] That continued threat was underscored yet again when Baymark Partners' director interjected during a deposition focused on this very scheme and corruptly demanded that a deponent "shut . . . up" during his deposition—conduct that illustrates a willingness to engage in repeated, compounding, and increasingly bold acts of fraud that presents a serious continuing threat. (SAC ¶ 320)

Viewed from the standpoint of the relevant events here, their repeated schemes and acts over a substantial period of time gave rise to closed-period continuity. Viewed from the larger perspective of their ongoing business, their schemes and acts demonstrate open-ended continuity.

Moreover, the defendants attempt to downplay their continued threat by arguing that there was some finite end to their scheme because, it is argued, a purported "foreclosure sale" extinguished the D&T Note, wiping their hands clean and freeing them from the need to engage in any further acts of fraud to complete their scheme. No more threat; no possibility of repetition, they claim. The alleged "foreclosure sale" at issue is a red herring.

The defendants miss the point: The fundamental point is that there _never was_ a "foreclosure sale." It was a complete sham.[5] There were only documents falsely memorializing something that never actually transpired. There was no finite event that ever marked an "end" to the schemes. Indeed, as Plaintiffs allege in the SAC, the defendants had siphoned off millions in assets months before they created after-the-fact documents to leave a fake trail. If the purported "sale" was the end goal, why had millions in assets already been siphoned off? In fact, it was only a year and a half into their scheme that they considered multiple new strategies (of which the fake "foreclosure" sale

---

[4] _Greb v. Singleton_, No. 3:18-CV-01439-M, 2019 WL 13210371, at *1 (N.D. Tex. Sept. 30, 2019). Hallet & Perrin prepared the underlying transaction at issue in that case; it also represented the Baymark Defendants in the litigation.

[5] In addition, the defendants themselves even argue in their briefing that there was no "foreclosure;" rather, they maintain there was a "UCC1 sale." (_See, e.g._, Dkt. No. 102-1, ¶ 1).

documentation was one possible option) to deal with issues (such as D&T/Damti's counsel making inquiries)and that they determine, after discussing with their counsel and co-defendant, that the scheme was legally "riskier" than some alternatives, but "not to a point that it [was] too risky" to engage in.  (SAC ¶19). The fake sale was not the "impetus" for anything; it was not the "end goal;" rather, it was a calculated means to an illegal end; merely a post-hoc attempt to cover up and further. But it was not by any means the last predicate act of fraud in their series of related, continuous fraudulent acts.  Indeed, the SAC alleges (and demonstrates) that their frauds continued for years after.

## I.    Argument.

As set forth below, the Plaintiffs have properly pled a RICO pattern and continuity, as well as the requisite predicate acts.  The Baymark Defendants have essentially recycled their prior motion. Notably, as before, they do not brief any arguments on "continuity."  They use the word, itself, only two times in their motion (pp. 1, 6), both times in passing and with no briefing whatsoever.  Neither they, nor their co-defendants, have advanced any arguments or explanations that address the amendments contained in the SAC.

"The proscriptions of the RICO statute have broad reach; the 'RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.'" *Bridgewater v. Double Diamond-Delaware, Inc.*, No. CIV.A.3:09-CV-1758-B, 2010 WL 1875617, at *11 (N.D. Tex. May 10, 2010) (citing *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978)).

The Supreme Court, "in rejecting a pinched construction of RICO's provision for a private civil action . . . has explained that, in enacting RICO:

> Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises." 473 U.S., at 499, 105 S. Ct., at 3286. Legitimate businesses "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences"; and, as a result, § 1964(c)'s use "against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued.

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249 (1989).

And "[t]he statute 'makes clear that RICO liability is not limited to those with a formal position in the enterprise,' nor does it require 'primary responsibility' or 'significant control.'" *Bridgewater v. Double Diamond-Delaware, Inc.*, No. CIV.A.3:09-CV-1758-B, 2010 WL 1875617, at *11 (N.D. Tex. May 10, 2010) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)).

### A. The Pattern Requirement.

The SAC properly pleads a pattern. A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity. *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009). The Supreme Court has explained that:

> [C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." § 3575(e)§ 3575(e). We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice.

*H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989).

It has likewise recognized that the legislative history "shows that Congress indeed had a fairly flexible concept of a pattern in mind." *Id.* at 239. While isolated, sporadic criminal offenses will not do, a RICO "pattern" merely requires showing a relationship between the predicate act and a threat of continuing activity. *Id.*

In the Fifth Circuit, as in other circuits, a plaintiff may show continuing racketeering activity by alleging facts indicating that the predicate acts are "part of an ongoing entity's regular way of doing business." *Cty. of El Paso, Tex. v. Jones*, No. EP-09-CV-00119-KC, 2009 WL 4730305, at *13 (W.D. Tex. Dec. 4, 2009); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242-243 (1989) ("The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting

defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'").

Indeed, the bar is not a high one. It is sufficient if the racketeering acts are related in some way to the affairs of the charged enterprise. *United States v. Phillips*, 664 F.2d 971, 1011-12 (5th Cir. 1981) (RICO pattern may consist of "different or unrelated crimes" provided that they are "related to the affairs of the enterprise"). For example, it is sufficient that the racketeering acts furthered the goals of or benefitted the enterprise. *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005). It is likewise sufficient that the enterprise—or the defendant's role in the enterprise—enabled the defendant to commit, or facilitated the commission of, the racketeering acts. *United States v. Posada-Rios*, 158 F.3d 832, 856-57 (5th Cir. 1998). See also Criminal RICO: A Manual For Federal Prosecutors, Sixth Revised Edition (2016), p. 118.

The Fifth Circuit's precedent stays true to the "fairly flexible concept of a pattern" that the Supreme Court has identified:

> The Supreme Court has recently explained the concept of a pattern of racketeering activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L. Ed.2d 195 (1989). A plaintiff must show two or more predicate acts of racketeering which are related and which amount to or pose a threat of continued criminal activity. *Id.* at 239, 109 S.Ct. at 2900. The element of relatedness is satisfied if the criminal conduct embraces criminal acts **"that have the same purposes, results, participants, victims, *or* methods of commission, *or* otherwise are interrelated by distinguishing characteristics and are not isolated events."** Continuity may be established, *inter alia,* by a showing that the predicates "are a regular way of conducting defendant's ongoing legitimate business, or of conducting or participating in an ongoing RICO enterprise."

*Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 533 (5th Cir. 1992) (emphasis added).[6, 7]

---

[6] Baymark, Hook, and Ludlow have been named in other federal RICO lawsuits. *See Greb et al. v. Singleton et al.*, No. 3:18-cv-01439-M (N.D. Tex.), Dkt. No. 1.; *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (noting that it is well-established and "clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.").

Particularly given their interests in a mind-numbing number of other entities—most of which have the same naming conventions as the entities at issue here—it is quite evident that their scheme at issue here is part of an ongoing threat that demonstrates continuity. The large number of entities also demonstrates one of the major reasons that Hallett & Perrin, who filed an application with the federal government stating, under penalty of perjury, that it was facing serious "economic uncertainty" that threatened its ability to sustain "ongoing operations" (SAC ¶ 6). Secretary of State records, which the Court may take judicial notice of, directly tied to Hook, alone, include: ACET Global, LLC-RA-David J. Hook; Baymark ACET Direct Invest, LLC-GOVERNING PERSON-David Hook; RA-David J. Hook; Baymark Acet Holdco, LLC-RA-David J. Hook; Baymark Coastal Common, LLC-MANAGER; RA-David J. Hook; Baymark Coastal Direct Invest, LLC-MANAGER; RA-David J. Hook; Baymark Coastal Holdco, LLC-DIRECTOR; RA-David J. Hook; Baymark Coastal Management, LLC-SECRETARY; DIRECTOR-David Hook; RA-David J. Hook; Baymark Denver Glass Common, LLC-MANAGER; RA-David J. Hook; Baymark Denver Glass Direct Invest, LLC-MANAGER; RA-David J. Hook; Baymark Hercules Common, LLC-MANAGER-David J. Hook; Baymark Hercules Direct Invest, LLC-MANAGER; RA-David J. Hook; Baymark Hercules Management, LLC-MANAGER; RA-David J. Hook; Baymark Investments, LLC-MEMBER-David Hook; Baymark Management, LLC-MEMBER-David Hook; Baymark Neck & Back Management-MANAGER-David J. Hook; Baymark Partners Management LLC-MANAGER-David J. Hook; Baymark Partners, LLC-GOVERNING PERSON-David Hook; Baymark Sheer Strength Direct Invest, LLC-MANAGER; RA-David J. Hook; Baymark Sheer Strength Holdco, LLC-MANAGER; DIRECTOR; RA-David J. Hook; Baymark Sheer Strength Management, LLC-MANAGER; RA-David J. Hook; Baymark US RES Management, LLC-MANAGER; DIRECTOR;-David Hook; RA-David J. Hook; Baymark-MMRI Management, LLC-CHAIRMAN & SECRETARY-David Hook; BMP AEI Common, LLC-MANAGER-David J. Hook; BMP AEI Direct Invest, LLC-MANAGER-David J. Hook; BMP AEI Management, LLC-MANAGER-David J. Hook; BMP Brilliance Common, LLC-MANAGER; RA-David J. Hook; BMP Brilliance Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP Brilliance Management, LLC-MANAGER; RA-David J. Hook; BMP Cul-Mac Direct Invest, LLC-MANAGER; RA-David Hook; BMP Cul-Mac Holdco, LLC-MANAGER; RA-David J. Hook; BMP DFW Neuro Common, LLC-MANAGER-David J. Hook; BMP DFW Neuro Direct Invest, LLC-MANAGER-David J. Hook; BMP DFW Neuro Management, LLC-MANAGER-David J. Hook; BMP DI Richardson Diagnostic, LLC-GOVERNING PERSON-David Hook; BMP EDI Common, LLC-RA-David J. Hook; BMP EDI Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP EDI Holdco, LLC-MANAGER; RA-David J. Hook; BMP EDI Management, LLC-MANAGER-David J. Hook; BMP Midwest Salt Common, LLC-MANAGER; RA-David J. Hook; BMP Midwest Salt Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP Midwest Salt Holdco, LLC-MANAGER; RA-David J. Hook; BMP MTP Common, LLC-MANAGER-David J. Hook; BMP MTP Direct Invest, LLC-MANAGER-David J. Hook; BMP MTP Management, LLC-MANAGER-David J. Hook; BMP Perfume Spot Common, LLC-MANAGER; RA-David J. Hook; BMP Perfume Spot Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP Perfume Spot Holdco, LLC-MANAGER; RA-David J. Hook; BMP Perfume Spot Management, LLC-MANAGER-David J. Hook; RA-David Hook; BMP Rackmount Solutions Common, LLC-MANAGER; RA-David J. Hook; BMP Rackmount Solutions Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP Rackmount Solutions, LLC-RA-David J. Hook; BMP RevTel, LLC-RA-David J. Hook; BMP Slappey Common, LLC-MANAGER; RA-David J. Hook; BMP Slappey Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP Slappey Employees, LP-RA-David J. Hook; BMP Slappey Holdco, LLC-MANAGER-David Hook; RA-David J. Hook; BMP Slappey Management, LLC-MANAGER; RA-David J. Hook; BMP Swanson Common, LLC-MANAGER; RA-David J. Hook; BMP Swanson Direct Invest, LLC-MANAGER; RA-David J. Hook; BMP Swanson Holdco, LLC-MANAGER; RA-David J. Hook; BMP Swanson Management, LLC-MANAGER; RA-David J. Hook; BMP US Rack Distributors, LLC-RA-David J. Hook; Brilliance Holdco, LLC-MANAGER; RA-David J. Hook; Brilliance LED, LLC-RA-David J. Hook; Coastal Screen and Rail, LLC-MANAGER-David Hook; RA-David J. Hook; Cul-Mac Industries, LLC-RA-David J. Hook; Denver Glass Interiors, LLC-RA-David J. Hook; Eastern DataComm, LLC-RA-David J. Hook; EDI Texas, Inc.-RA-David J. Hook; GDI Technology, LLC-RA-David J. Hook; Handy Networks, LLC-RA-David J. Hook; ITV Data Res, LLC-RA-David J. Hook; J&G Concrete Holdco, LLC-SECRETARY-David Hook; Midwest Salt, LLC-RA-David J. Hook; On Tech, LLC-RA-David J. Hook; PERFUME SPOT, LLC-RA-David J. Hook; Rackmount Solutions Holdco, LLC-MANAGER; RA-David J. Hook; REVTEL Communications, LLC-RA-David

In *Akin*, for example, the Fifth Circuit underscored the low bar.  In that case, the court had "little trouble" concluding that a company's consistently sending correspondence through the mail—acts alleged to be a predicate act of mail fraud—in an effort to sell limited partnership interests could, if proven, constitute a pattern of racketeering activity.  *Id.*

---

[7] Secretary of State records, which the Court may take judicial notice of, directly tied to Ludlow include Baymark ACET Direct Invest, LLC-GOVERNING PERSON-Anthony Ludlow; Baymark Coastal Common, LLC-MANAGER-Anthony L. Ludlow; Baymark Coastal Direct Invest, LLC-MANAGER-Tony Ludlow; Baymark Coastal Holdco, LLC-DIRECTOR-Tony Ludlow; Baymark Coastal Management, LLC-PRESIDENT; DIRECTOR-Tony Ludlow; Baymark Denver Glass Common, LLC-MANAGER-Anthony L. Ludlow; Baymark Denver Glass Direct Invest, LLC-MANAGER-Anthony L. Ludlow; Baymark Hercules Common, LLC-MANAGER; RA-Anthony L. Ludlow; Baymark Hercules Direct Invest, LLC-MANAGER-Anthony L. Ludlow; Baymark Hercules Management, LLC-MANAGER-Anthony L. Ludlow; Baymark Investments, LLC-MEMBER; RA-Anthony L. Ludlow; Baymark Management, LLC-MEMBER-Anthony Ludlow; Baymark Neck & Back Management, LLC-MANAGER-Anthony Ludlow; RA-Anthony L. Ludlow; Baymark Partners Management, LLC-MANAGER-Anthony Ludlow; RA-Anthony L. Ludlow; Baymark Partners, LLC-GOVERNING PERSON; RA-Anthony Ludlow; Baymark Projects, LLC-PRESIDENT; DIRECTOR-Tony Ludlow; RA-Anthony L. Ludlow; Baymark Sheer Strength Direct Invest, LLC-MANAGER-Anthony L. Ludlow; Baymark Sheer Strength Management, LLC-MANAGER-Anthony L. Ludlow; Baymark US RES Management, LLC-MANAGER; DIRECTOR-Anthony Ludlow; Baymark-MMRI Management, LLC-PRESIDENT & ASST; DIRECTOR-Anthony Ludlow; RA-Anthony L. Ludlow; BMP AEI Common, LLC-MANAGER; RA-Anthony L. Ludlow; BMP AEI Direct Invest, LLC-MANAGER; RA-Anthony L. Ludlow; BMP AEI Investment, LP-RA-Anthony L. Ludlow; BMP AEI Management, LLC-MANAGER; RA-Anthony L. Ludlow; BMP Brilliance Common, LLC-MANAGER-Anthony L. Ludlow; BMP Brilliance Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP Brilliance Management, LLC-MANAGER-Anthony L. Ludlow; BMP CUL-Mac Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP DFW Neuro Common, LLC-MANAGER; RA-Anthony L. Ludlow; BMP DFW Neuro Direct Invest, LLC-MANAGER; RA-Anthony L. Ludlow; BMP DFW Neuro Management, LLC-MANAGER; RA-Anthony L. Ludlow; BMP DFW Neuropathy MSO, LLC-RA-Anthony L. Ludlow; BMP DI Richardson Diagnostic, LLC-RA-Anthony L. Ludlow; BMP EDI Holdco, LLC-MANAGER-Anthony L. Ludlow; BMP EDI Management, LLC-MANAGER; RA-Anthony L. Ludlow; BMP Midwest Salt Common, LLC-MANAGER-Anthony L. Ludlow; BMP Midwest Salt Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP Midwest Salt Holdco, LLC-MANAGER-Anthony L. Ludlow; BMP MTP Common, LLC-MANAGER; RA-Anthony L. Ludlow; BMP MTP Investment, LP-RA-Anthony L. Ludlow; BMP MTP Management, LLC-MANAGER; RA-Anthony L. Ludlow; BMP Perfume Spot Common, LLC-MANAGER-Anthony L. Ludlow; BMP Perfume Spot Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP Perfume Spot Holdco, LLC-MANAGER-Anthony L. Ludlow; BMP Perfume Spot Management, LLC-MANAGER-Anthony L. Ludlow; BMP Rackmount Solutions Common, LLC-MANAGER-Anthony L. Ludlow; BMP Rackmount Solutions Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP Slappey Common, LLC-MANAGER-Anthony L. Ludlow; BMP Slappey Management, LLC-MANAGER-Anthony L. Ludlow; BMP Slappy Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP Swanson Common, LLC-MANAGER-Anthony L. Ludlow; BMP Swanson Direct Invest, LLC-MANAGER-Anthony L. Ludlow; BMP Swanson Holdco, LLC-MANAGER-Anthony L. Ludlow; BMP Swanson Management, LLC-MANAGER-Anthony L. Ludlow; Brilliance Holdco, LLC-MANAGER-Anthony L. Ludlow; Coastal Screen and Rail, LLC-MANAGER-Tony Ludlow; Complete Pain Solutions, PLLC-DIRECTOR-Tony Ludlow; Cul-Mac Realty, LLC-RA-Anthony L. Ludlow; J&G Concrete Holdco, LLC-PRESIDENT-Tony Ludlow; RA-Anthony L. Ludlow; MBP Cul-Mac Holdco, LLC-Manager-Anthony J. Ludlow; MBP MTP Direct Invest, LLC-MANAGER; RA-Anthony L. Ludlow; Memorial MRI & Diagnostic, PLLC-DIRECTOR-Tony Ludlow; MRI Holdco Rollover, LLC-DIRECTOR-Tony Ludlow; NBC Holdco, LLC-PRESIDENT; DIRECTOR-Anthony Ludlow; Pazicara Productions, LLC-MANAGER; DIRECTOR; RA-Anthony L. Ludlow; Rackmount Solutions Holdco, LLC-MANAGER-Anthony Ludlow; T.C. Frisco, LLC-MANAGER; DIRECTOR-Anthony Ludlow; RA-Anthony L. Ludlow.

**B. Continuity.**

The SAC properly pleads the continuity prong.  To satisfy the continuity requirement under RICO, a plaintiff must sufficiently plead either a "closed period of repeated conduct," or an open-ended period of conduct that "by its nature projects into the future with a threat of repetition."  *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016) (quoting *H.J. Inc.*, 492 U.S. at 241); *Word of Faith World Outreach Center Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996).  Closed periods of continuity generally require "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242.  For these purposes, eighteen months presumptively spans a "substantial period of time."  *See id.*; *see also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2017) (two years sufficient); *H.J. Inc.*, 492 U.S. at 242 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]").

Alternatively, a plaintiff may demonstrate sufficient continuity for RICO purposes if the plaintiff alleges facts that would show an open-ended period of conduct.  *H.J., Inc.*, 492 U.S. at 241-42. For these purposes, open-ended continuity consists of a "specific threat of repetition extending indefinitely into the future," or "that the predicates are a regular way of conducting [a] defendant's ongoing legitimate business."  *H.J. Inc.*, 492 U.S. at 242-43.

With respect to closed-period continuity, the SAC alleges a non-exhaustive list of at least 100 RICO predicate acts from June 13, 2017, through May 15, 2021, with harm to more than 24 RICO victims, such as Plaintiffs, the bankruptcy trustee, and Global's creditors.  (Dkt. No. 91, at ¶¶ 317-18). These facts, taken as true, support a presumptive span of a substantial period of time for RICO continuity.  *See also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) ("Unlike our precedents identifying a single transaction, there are multiple victims, and there is no reason to suppose that this systematic victimization . . . would not have continued indefinitely had the Plaintiffs not filed this lawsuit."); *ICONICS, Inc. v. Massaro*, 192 F.Supp.3d 254, 270 (2016) (citing *Efron v. Embassy Suites (Puerto*

*Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000)); *see id.* ("While the set of victims alleged by plaintiffs is not expansive, it includes not only [plaintiffs] but also, through the frauds committed in the bankruptcy process, the bankruptcy court and bankruptcy trustee.").

Moreover, the SAC sufficiently pleads open-ended continuity. Specifically, the SAC alleges that: (i) the Baymark Defendants exist for the primary purpose of illegally acquiring equity stakes in target companies and siphoning their assets and value at the expense of their creditors and stakeholders; (ii) defendants, in their deposition testimony, have expressly stated that they continue to regularly evaluate new businesses and acquisition opportunities to expand the RICO enterprise's operations; (iii) the Baymark Defendants have been named in a prior federal RICO lawsuit for the same or similar conduct as that alleged in this lawsuit; and (iv) the Baymark Defendants have made off with Global's trade secrets and continue to profit from the same even today. (Dkt. No. 91, at 3 & at ¶¶ 320-21).

Notably, Plaintiffs do *not* plead or maintain that the impetus for the predicate acts was a fraudulent foreclosure sale; that is, those acts were not merely to lay the groundwork for a foreclosure sale. To the contrary, Plaintiff pleads that there was, in fact, no foreclosure sale. The purported foreclosure sale <u>never took place</u>. The defendants created the façade of such a sale; that effort was just another related fraudulent act in a long line of fraudulent acts that occurred both before and after.

Said another way, the prospect of a faux foreclosure sale was not the reason that the defendants engaged in other fraudulent acts; they did not do so to "set the stage" for a foreclosure, but rather made a calculation, in light of where things stood at that time (e.g., in light of Damti's counsel's formal overtures), that a fake foreclosure was the best maneuver *at that time* to continue carrying out their overarching fraud. Indeed, the defendants did not initially plan to carry out a fake foreclosure sale as part of their fraud. As alleged in the SAC, they actually vetted multiple options and, after being advised of the legal risks inherent in the fake foreclosure, opted to pursue that route.

Notably, the Fifth Circuit has cautioned against "turning the . . . continuity prong into a stringent pleading requirement," as the defendants ask the court to do here. *Abraham v. Singh*, 480 F.3d 351, 355–56 (5th Cir. 2007). The Fifth Circuit has provided that:

> In light of the liberal pleading standard with which the Plaintiffs' allegations must be viewed, *see Jones v. Bock,* ⸺ U.S. ⸺, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007), the district court erred in turning the Supreme Court's explanation of the continuity prong into a stringent pleading requirement. *See Whelan v. Winchester Prod. Co.,* 319 F.3d 225, 231 (5th Cir.2003); *see also H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902 ("[Showing continuity] may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity. We can, however, begin to delineate the requirement."). For pleading purposes, we must determine whether a pattern of racketeering has been alleged that is sufficiently similar to what the Supreme Court contemplated in its *H.J., Inc.* discussion and what this Court has held to constitute a pattern of racketeering activity. At this early stage, a plaintiff's burden is not tied to the precise language that the Supreme Court used but to the Court's general explanation of the statute. Thus, the Court itself provided examples of how the continuity element may be satisfied and cautioned that the analysis "depends on the specific facts of each case ... [and] cannot be fixed in advance with such clarity that it will always be apparent." *Id.* at 242–43, 109 S.Ct. at 2902.

> Based on these standards, Plaintiffs have sufficiently pled "a continuity of racketeering activity, or its threat." *Id.* at 241, 109 S.Ct. at 2902. The Plaintiffs did not allege predicate acts "extending over a few weeks or months and threatening no future criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. Rather, they alleged that the Defendants engaged in at least a two-year scheme involving repeated international travel to convince up to 200 or more Indian citizens to borrow thousands of dollars to travel to the United States only to find upon their arrival that things were not as they had been promised. *See, e.g., United States v. Delgado,* 401 F.3d 290, 298 (5th Cir.2005); *Abell v. Potomac Ins. Co.,* 946 F.2d 1160, 1168 (5th Cir. 1991). Moreover, the allegations include not just Plaintiffs' recruitment in India but also their treatment in the United States. Unlike our precedents identifying a single illegal transaction, there are multiple victims, and there is no reason to suppose that this systematic victimization allegedly begun in November 2000 would not have continued indefinitely had the Plaintiffs not filed this lawsuit. *Cf. Word of Faith,* 90 F.3d at 123; *In re Burzynski,* 989 F.2d 733, 743 (5th Cir. 1993); *Calcasieu Marine Nat'l Bank v. Grant,* 943 F.2d 1453, 1464 (5th Cir. 1991); *Howell Hydrocarbons, Inc. v. Adams,* 897 F.2d 183, 193 (5th Cir. 1990); *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 244 (5th Cir. 1988).

> After a careful review of the complaint, we are confident that the allegations satisfy the liberal pleading standard and allege continuity of racketeering activity. The district court erred in granting the Defendants' motion to dismiss on this basis.

*Abraham v. Singh*, 480 F.3d 351, 355–56 (5th Cir. 2007).  The *Abraham* court's liberal approach to continuity pleading was not a one-off.  It was consistent with decades of Fifth Circuit precedent, holding that pleading of the continuity prong is not judged by an onerous standard:

> In most cases, pleading the existence of a "pattern of racketeering activity" will supply this element of continuity to the RICO person. The continuous threat requirement may not be satisfied if no more is pled than that the person has engaged in a limited number of predicate racketeering acts. Two isolated acts of racketeering have been held sufficient to constitute a pattern under this Circuit's unique precedent.

*Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988).  The Fifth Circuit's *Delta Truck* panel, in referring to the circuit's "unique" precedent, explained the court's case law holding that a mere two related acts related to a single business transaction constitutes a pattern of racketeering:

> In any circuit other than ours, it may have been proper to dismiss Delta's complaint on the ground that the numerous alleged acts of mail and wire fraud were parts of a single, otherwise lawful corporate merger not constituting a pattern of racketeering. But in *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir. 1985), a panel of this court held that two acts of mail fraud that related to a single business transaction constituted a pattern of racketeering activity. The district court declined to follow *R.A.G.S.* because of its lack of analysis and because of the statement in *Armco Industrial Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 481 (5th Cir. 1986), that the "'pattern of racketeering activity' language" in the RICO statute is something that must be interpreted in "the future." Several panels of this court have been critical of *R.A.G.S.,*[3] but each has been bound, as we are, by the rule of *R.A.G.S.* A request to reconsider *R.A.G.S.* "can only be made to the entire court sitting en banc, not to another panel." *Smith v. Cooper/T. Smith Corp.,* 846 F.2d 325, 329 (5th Cir. 1988) [vacated by August 1, 1988 order for rehearing en banc]. The district court was not free to depart from *R.A.G.S.* We must assume a sufficient pattern of racketeering activity was alleged.

*Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 243 (5th Cir. 1988).  And this, combined with *Delta Truck's* recognition that "[i]n most cases, pleading the existence of a 'pattern of racketeering activity' will supply this element of continuity to the RICO person," makes clear that the Plaintiffs have properly and sufficiently pled continuity.

Moreover, this case does not present a mere business dispute.  It presents a series of elaborate, sophisticated, and coordinated acts of deception that played out over **a four-plus-year period** and featured **no less than 100 predicate RICO acts**.  (SAC ¶ (i)).  The Baymark Defendants carried out,

through "Baymark Partners" the same basic *modus operandi* that they have carried out to defraud a large number of creditors of multiple target companies—including at least 24 creditors here.  (SAC ¶ (ii)). Each time, Baymark sought to illegally acquire a significant equity stake in an operating company for very little, or no, capital outlay.  *Id.*  Their pattern of predicate acts—along with the repeated nature of their fraudulent schemes through acquisitions that sit at the heart of their purported business operations—reflect an ongoing, regular way of doing business that presents a threat of long-term, continued criminal activity (i.e., open-ended continuity).  *Id.*

"Baymark Partners" seeks to illegally acquire equity stakes in target companies and siphon their assets and value at the expense of their creditors and stakeholders.  (SAC ¶ (iii). For example, Baymark Partners, Hook, and Ludlow were defendants in another federal RICO lawsuit.  *See Greb et al. v. Singleton et al.*, No. 3:18-cv-01439-M (N.D. Tex.), Dkt. No. 1.  In that case, they engaged in a strikingly similar scheme to that at issue here: There, a creditor, CNB, "entered into an agreement with Baymark, through Tony Ludlow and David Hook, to advance Baymark the funds to purchase J&G [the "ACET Global" of that saga] in exchange for Baymark, Hook and Ludlow giving [the lender] a [hidden] share of the profits on the resale of J&G[] [i]n exchange for offering the purchase funds to Baymark. . . . It accomplished this by acquiring warrants, issued at the direction of Baymark to CNB, at the closing of the purchase of J&G by Baymark."  *Id.* Complaint, ¶¶ 27, 28.  In that case, the lender (much like Super G, here) who partnered with Baymark (through undisclosed warrants, much like Super G here) "sought to foreclose [just like Super G did here] on the" property at issue "by mailing foreclosure notices to [the Plaintiff]".  *Greb v. Singleton*, No. 3:18-CV-01439-M, 2019 WL 13210371, at *1 (N.D. Tex. Sept. 30, 2019).  In *Greg*, the "Plaintiffs sued . . . claiming that the foreclosure action was illegal" and that the defendants' "goal was to acquire property worth millions more than they could get by simply collecting on the loans."  *Id.*  Those events occurred during 2014 and 2015.

In yet another case that involved RICO allegations and related schemes, an entity that was owned by Baymark Partners (through the same "Holdco" structure used in the D&T case) and that was managed by a Board of Managers comprised of just Ludlow and Hook, was sued by State Farm Mutual Insurance Company of Texas for their participation and benefit in a multi-million-dollar healthcare fraud scheme carried out by the entity that they controlled.  4:20-cv-02606 (filed on 07/23/2020) (S.D. Tex.).[8]  There, they facilitated a multi-million-dollar insurance fraud through events that occurred from 2015 to 2020.

In the particular sub-scheme at the center of *this* case, Baymark Partners engaged in a series of connected, interrelated frauds intended to wrongfully disguise, hide, and launder their acquisition of an equity stake in ACET Global's ongoing business operations.  (SAC ¶ (v)).  In doing so, the Defendants defrauded multiple creditors—indeed, more than 24 creditors of ACET Global alone. D&T Partners, it so happened, was the largest creditor of this large pool of victims.  Much like Greb in Baymark's fraudulent scheme to illegally acquire J&G, D&T was left defrauded.

The Defendants engaged in repeated fraudulent conduct, from fraudulent transfers, to laundering funds, to a fraudulent bankruptcy proceeding, to the obstruction of proceedings.  (SAC ¶ (vi)).  Just as in the J&G fraud, they colluded with a creditor and provided the creditor with a secret ownership interest in order to defraud another interest holder.  Just as in the J&G fraud, they used "warrants" to hide the ownership stakes.  They engaged in the same M.O.; the same series of schemes. Viewed from the standpoint of the relevant events here, their repeated schemes and acts over a substantial period of time gave rise to closed-period continuity.  Viewed from the larger perspective of their ongoing business, their schemes and acts demonstrate open-ended continuity.

---

[8] The entity is listed as a Baymark Partners' portfolio company on Baymark's website: https://baymarkpartners.com/portfolio/.

But, while such a showing is sufficient, it is certainly not necessary.  As the Supreme Court has recognized:

> [A]lthough proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes.

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989).  Nonetheless, the Supreme Court's analysis there makes clear that continuity *can* be shown simply by multiple schemes.

But the Supreme Court has also recognized that continuity can be shown in any manner of ways, including where "the racketeering acts themselves include a specific threat of repetition" and where "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." As it has explained:

> A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242–43, 109 S. Ct. 2893, 2902, 106 L. Ed. 2d 195 (1989).

Notably, here there was *never* any foreclosure sale.  There was no finite event that ever marked an "end" to the schemes.  The Defendants simply executed and circulated several documents designed to actively hide the fact that no such event ever occurred.  Instead, those false documents were simply

another sub-scheme in the coordinated series of schemes that they carried out in order to strip ACET Global's trade secrets and assets from its creditors and stakeholders and to hide and obfuscate their involvement, acts, and profit—as well as their investment of that profit in subsequent related schemes. It was designed to deter the plaintiff from discovering their frauds.

The Baymark Defendants carried out their series of schemes designed to defraud ACET Global's creditors over the course of more than four years.  Rather than an isolated or discrete event involving a simple, run-of-the-mill disguised transfer, they engaged in an extraordinary series of elaborate, sophisticated, and coordinated acts of deception that even corruptly leveraged the legal system itself, demonstrating broad, ongoing criminal behavior that is squarely within the civil RICO statute's crosshairs.

 As part of this effort, they stole millions of dollars, selling ACET Global's assets off through interstate commerce,[9] and making off with ACET Global's valuable trade secrets.[10]  This sophisticated fraud involved the siphoning off of ACET Global's intellectual property and the use of a secret set of books, kept at Baymark Partners' command, to hide the financial machinations.  Baymark and its principals laundered the funds and proceeds of their frauds through a string of shell entities.  They then carried out a bankruptcy fraud designed to cover up the fraud.[11]  Baymark and its principals then engaged in a scheme of soliciting and committing perjury and obstruction of proceedings—their then-latest scheme to obfuscate their frauds.  They committed tax fraud to further the scheme.

Moreover, the RICO Enterprise's actions were not aimed solely at the Plaintiffs but multiple other victims, including ACET Global's multiple other creditors: DHL Express; FedEx; Immanuel Industrial Co., Ltd.; Lux.24; Pet Life LLC; Johnson Lancaster & Associates; Damti; UPS Supply Chain; and UPS Warehouse. (SAC ¶ 319)

---

[9] In violation of 18 U.S.C. §§ 2314 and 2315, which constitutes "racketeering activity" under 18 U.S.C. § 1961.
[10] In violation of 18 U.S.C. § 1832 (theft of trade secrets), which constitutes "racketeering activity" under 18 U.S.C. § 1961.
[11] The bankruptcy court denied relief.

Further, there is a continuing threat of the Defendants' scheme, as the RICO Enterprise continues to actively undertake new acquisition opportunities to expand its enterprise—and the scope of the threat to the next round of creditors and stakeholders. The Defendants have testified to regularly evaluating new businesses to expand Windspeed's operations—businesses that would suffer the same fate as ACET Global based on the Defendants' actions.  The defendants conduct implies a willingness to engage in repeated, compounding, and increasingly bold acts of fraud that presents a serious continuing threat.  (SAC ¶ 320). And to this very day, the Defendants continue to illegally utilize and profit off of ACET Global's trade secrets—trade secrets that they have not protected and that secured substantial legal obligations.  (SAC ¶ 321)

As this Court has noted, RICO is applicable to a broad range of disputes that arise out of business frauds, such as the dispute in *Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F.Supp.2d 698 (N.D. Tex. 2011) (J. Boyle). In that case, the plaintiff adequately alleged mail and wire fraud predicate acts ("mailing and emailing of false reports that concealed the poor performance [of the defendants]") that carried out a simple scheme to violate a business contract and hide the defects and deficient construction work.  By comparison, the fraudulent schemes at issue here were substantially more expansive, intricate, and sophisticated.  And they did not involve "normal" acts.

As this very Court has recognized, "[t]he Fifth Circuit has held that the continuity requirement, though related to fraudulent predicate acts, need not meet heightened pleading requirements." *Bridgewater v. Double Diamond-Delaware, Inc.*, No. CIV.A.3:09-CV-1758-B, 2010 WL 1875617, at *11 (N.D. Tex. May 10, 2010) (J. Boyle) (citing *Abraham v. Singh*, 480 F.3d 351, 355-56 (5th Cir. 2007).[12]

---

[12] Even where Rule 9 pleading standards apply, they are more than adequately satisfied here, as this Court's own precedent makes clear:

> Though this burden requires specificity, a "complainant need not, however, state all facts pertinent to a case to satisfy the requirements of Rule 9(b)." *Mitchell Energy Corp. v. Martin*, 616 F. Supp. 924, 927 (S.D. Tex. 1985). "Rule 9(b) does not 'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after Twombly must make relief plausible, not merely conceivable, when taken as true." *United States v. Kanneganti*, 565 F.3d

By comparison to the facts and schemes set forth herein, the *Bridgewater* case involved a remarkably straightforward alleged fraud.

Indeed, this Court has found a pattern sufficiently pled (and has therefore rejected a motion to dismiss) where the RICO plaintiff failed to even identify, in its pleading or in its motion papers, the particular subsection of § 1962 that formed the bases of its RICO claim.  *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota NA*, 2007 WL 9717366 (N.D. Tex. 2007) (Boyle, J.).  In that case, the pattern and scheme was summarized in no more than six sentences and involved little more than defendants conspiring to issue false reports to certificate holders misstating financial metrics in order to deter the certificate holders from questioning advances that were paid out, keeping a singular fraudulent scheme alive.  *Id.* at 3-4.

On other occasions, this Court has made clear that the pleading requirements at issue here are satisfied.  For example, in *Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F.Supp.2d 698, 713 (N.D. Tex. 2011) (J. Boyle), this Court addressed a motion to dismiss a civil RICO complaint

---

180, 186 (5th Cir.2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). In alleging a RICO scheme involving mail or wire fraud, it is not necessary to assert that each defendant personally made fraudulent mailings or wires; rather " Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud." *At the Airport v. ISATA*, 438 F.Supp.2d 55, 61 (E.D.N.Y. 2006). Where a "plaintiff claims that mail and wire fraud were in *712 furtherance of a larger scheme to defraud ... Rule 9(b) 'only requires the plaintiff to delineate, with adequate particularity, the specific circumstances constituting the overall fraudulent scheme.'" *Id.*

*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F.Supp.2d 698, 711-12 (N.D. Tex. 2011) (J. Boyle).

In considering whether a party's fraud claims satisfy the requirements of Rule 9(b), the "focal point" of a court's inquiry is whether the pleading satisfies the purposes of the Rule. Mitchell Energy, 616 F. Supp. at 927 (quoting *In re Commonwealth/Tesoro Petroleum Corp. Securities Litigation*, 467 F. Supp. 227, 250 (W.D. Tex. 1979)). " Rule 9(b) serves three purposes: [f]irst, the Rule ensures that defendants receive fair notice of the plaintiffs' claims; second, it protects the defendants' reputations from unfounded allegations of improper conduct, and third, the Rules helps prevent the institution of strike suits." *In re Urcarco Securities Litigation*, 148 F.R.D. 561, 564 (N.D. Tex. 1993); *see Mitchell Energy*, 616 F. Supp. at 927 (listing the same general purposes, though in place of "strike suits" providing that Rule 9(b) seeks to preclude plaintiffs from bringing suit as a "pretext for discovery" in order to discover whether any fraudulent acts have occurred).

*Id.* at 712.

that involved only a single plaintiff and defendant in a relatively simple business dispute and rejected the defendant's motion to dismiss for the plaintiff's alleged failure to plead a "pattern" of activities:

> PSI contends that activities occurring over the course of a single construction project cannot raise to the level of a "pattern" of racketeering activity. (Def.'s Mot. Dismiss pp. 8-9). Specifically, PSI argues that the Amended Complaint fails to allege how long, how often, or the number of times the predicate acts occurred so as to determine whether a "pattern" existed. PSI also once again points out that Plaintiff does not point to any particular documents it alleges were fraudulent. Once again, Plaintiff does not directly respond to these contentions.

*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F.Supp.2d 698, 713 (N.D. Tex. 2011) (J. Boyle).  The Court, summarily rejecting the defendant's "pattern" argument, responded as such:

> The Court disagrees. In order to establish a pattern of racketeering activity, a plaintiff need not demonstrate multiple schemes. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir. 1989). "Congress did not mean 'to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme.'" *Id.* (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)). Instead, continuity can be established "in various ways," including the nature of an enterprise or "the sheer number of predicate acts over several years." *Id.*
>
> In the instant case, Plaintiff alleges that Newell's earthwork was deficient "[f]rom the start," yet PSI nevertheless represented to Plaintiff by means of its reports, summaries, and invoices that the work was acceptable. Plaintiff alleges that PSI willfully emailed or faxed these false reports, summaries, and invoices, bribed employees to remain silent on the known defects on the project, and intimidated other employees to prevent the revelation of their misdeeds. These related acts formed a pattern over the course of the Project, which sufficiently satisfies the RICO Statute.
>
> Accordingly, the Court finds Plaintiff has adequately plead the existence of a pattern of racketeering activity, and PSI's Motion to Dismiss is DENIED.

*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F.Supp.2d 698, 713 (N.D. Tex. 2011) (J. Boyle).  By comparison, the alleged singular scheme in *Cypress/Spanish* was relatively simple and straightforward—and all of the handful of types of acts that were alleged there are alleged within this Complaint.

As this very Court has also noted, "The proscriptions of the RICO statute have broad reach; the 'RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the

enterprise.'" *Bridgewater v. Double Diamond-Delaware, Inc.*, No. CIV.A.3:09-CV-1758-B, 2010 WL 1875617, at *11 (N.D. Tex. May 10, 2010) (J. Boyle) (citing *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978)). And as this Court has also noted, quoting the Supreme Court, for purposes of determining whether a pattern has been plead, predicate acts are related where the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Commercial Metals Co. v. Chazanow*, 2009 WL 3853704 (N.D. Tex. 2009) (J. Boyle) (quoting *H.J. Inc. v. Nw. Bell Tell. Co.*, 492 U.S. 229, 239 (1989).

This Court has noted that the standard for adequately alleging a series of similar predicate acts is not high. *E.g., id.*, at *7 (J. Boyle) (a series of similar predicate acts of mail and wire fraud regularly conducted through the MI enterprise that, as alleged, are not isolated or sporadic events. Thus, CMC has adequately pleaded that the predicate acts are related.") And because "[t]he Fifth Circuit has held that the continuity requirement, though related to fraudulent predicate acts, need not meet heightened pleading requirements," *id.*, continuity is easily satisfied here. *Id.* ("That CMC's Complaint does not firmly fix the dates of the alleged conduct is therefore not fatal. While there is no clear line delineating the point when a period of closed-ended conduct reaches a "substantial period of time," CMC's allegations—acts that continued for thirty two months—extend well beyond the periods of weeks or months that have been found to be inadequate.")

Here, there were two or more related instances of mail fraud, wire fraud, money laundering, and bankruptcy fraud, among other predicate violations. They extended over a four-plus-year period. The acts were not isolated events. They were an interrelated series of events with a common purpose. The victims were the same.

### C.  A Defendant Is Not Required to Commit Each Predicate Act.

A civil RICO defendant "need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme. *Casperone v. Landmark Oil & Gas Corp.,* 819 F.2d 112, 115 (5th Cir. 1987) (per curiam) (citing *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1354 (5th Cir. 1985); *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983)); *Simmons v. Jackson*, No. 3:15-CV-01700-S-BT, 2019 WL 3043927, at *3 (N.D. Tex. June 7, 2019), *report and recommendation adopted*, No. 3:15-CV-1700-S-BT, 2019 WL 3034668 (N.D. Tex. July 11, 2019); *Cty. of El Paso, Tex. v. Jones*, No. EP-09-CV-00119-KC, 2009 WL 4730305, at *22 (W.D. Tex. Dec. 4, 2009); *George v. Blue Diamond Petroleum, Inc.,* 718 F. Supp. 539, 550–51 (W.D. La. 1989), *aff'd sub nom. George v. Blue Diamond*, 922 F.2d 838 (5th Cir. 1990); *Bank of Mongolia v. M&P Glob. Fin. Servs.*, No. 08-60623, 2010 WL 11549711, at *4 (S.D. Fla. Sept. 3, 2010).

For example, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails." *United States v. Finney,* 714 F.2d 420, 423 (5th Cir. 1983).   In *George v. Blue Diamond Petroleum*, the district court demonstrated that even predicate acts intended to quell questions and inquiry into the fraudulent scheme will sustain a civil RICO action:

> The court also notes that the sending of letters by Associates, Richard Decker and Moss Creek following the incredibly poor performance on the wells in question was designed to lull the investors into a false sense of security about their investments. These letters, which had the result of postponing inquiry by the investors and making the transactions seem less suspicious, each constitute themselves a violation of 18 U.S.C. § 1341. *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986). In sum, the mailings in question served the defendants' purpose of furthering their scheme to defraud investors.

> Additionally, Richard Decker engaged in wire fraud by making telephone calls in furtherance of the scheme. The elements of wire fraud, 18 U.S.C. § 1343, are identical to those for mail fraud, except use of the wires rather than of the mails must be shown. *United States v. Andrade,* 788 F.2d 521, 527 (8th Cir. 1986), *cert. denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). Here, Decker talked with George numerous times on the telephone. During these conversations, Decker assured George that the

Prospect was doing well. Like the letters, these statements were made for the purpose
of executing the defendants' scheme.

*George v. Blue Diamond Petroleum, Inc.,* 718 F. Supp. 539, 550–51 (W.D. La. 1989), *aff'd sub nom. George v.
Blue Diamond*, 922 F.2d 838 (5th Cir. 1990).  See also *Salinas v. United States*, 522 U.S. 52, 64 (1997).

In addition, in *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), the Supreme Court held that,
"acts in furtherance of [a] conspiracy are ... attributable to the other[ ] [co-conspirators] for the purpose
of holding them responsible for the substantive offense." *Pinkerton v. United States,* 328 U.S. 640, 646-
47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).  See also *United States v. Hurley,* 63 F.3d 1, 22 (1st Cir. 1995)
(applying *Pinkerton* liability to co-conspirators in determining criminal penalties for RICO
violations); *Riddell v. Riddell Washington Corp. .,* 866 F.2d 1480, 1493 (D.C. Cir. 1989) (holding that acts
of fraudulent concealment could be imputed to all co-conspirators); *In re Enron Corp. Sec., Derivative &
ERISA Litig.,* 623 F.Supp.2d 798, 834 (S.D. Tex. 2009) (*citing In re Performance Nutrition, Inc.,* 239 B.R.
93, 99, 113 (Bankr. N.D. Tex. 1999)) ("Once a civil conspiracy is found, each coconspirator is
responsible for any action in furtherance of the conspiracy performed by other conspirators. In other
words, each action in a civil conspiracy is imputed to each coconspirator regardless of who actually
performed the acts."); *Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.,* 770 F.Supp. 1351,
1371-72 (E.D. Wis. 1991) (stating that a RICO defendant is "responsible for offenses committed by
his fellow conspirators"); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago,* No. 80-
C-6401, 1985 WL 1118, at *8 (N.D. Ill. Mar.10, 1985) (applying co-conspirator liability to meet
predicate act requirement in civil RICO claim).  Indeed, a defendant may be liable for conspiracy even
though he was incapable of committing the substantive offense.  *Salinas v. United States*, 522 U.S. 52,
64 (1997); *City of New York v. Bello*, 579 Fed. Appx. 15, 17 (2d Cir. 2014) ("A party 'may be liable for
[RICO conspiracy even though he was incapable of committing the substantive offense.'")

Moreover, "a defendant may be liable for predicate acts committed by codefendants if he or
she aided and abetted in the commission of those acts or was sufficiently connected to the fraudulent

scheme." *Cty. of El Paso, Tex. v. Jones*, No. EP-09-CV-00119-KC, 2009 WL 4730305, at *20 (W.D. Tex. Dec. 4, 2009) (citing *Conkling v. Turner*, 18 F.3d 1285, 1293 (5th Cir. 1994); *Casperone,* 819 F.2d at 115).

### D.  Standard of Review under Rule 12(b)(6).

In the Fifth Circuit, motions to dismiss for failure to state a claim under Rule 12(b)(6) are "viewed with disfavor and . . . [are] rarely granted." *Brown v. Phoenix Life Ins. Co.*, 843 Fed. Appx 533, 538-39 (5th Cir. 2021).  The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true.  *Massey v. EMC Morg. Corp.*, 546 Fed. Appx 477, 480 (2013).  Accordingly, the district court may not dismiss a complaint under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021); *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372 (5th Cir. 2012) (post-*Twombly* and *Iqbal*).  The relevant question in determining whether a motion to dismiss should be granted is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."  See *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372-73 (5th Cir. 2012) (noting the "strict standard of review under Rule 12(b)(6)").

According to Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b)'s heightened particularly requirement with respect to claims of fraud is a limited exception to Rule 8's notice pleading standard. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. . . . This Court, however, has declined to extend such exceptions to other contexts.").  Accordingly, Rule 9(b) requires the Plaintiffs to plead the wire, mail, and bankruptcy fraud predicates with particularity; however, Rule 9(b) is inapplicable to all other RICO elements.  *See, e.g., Howell Petroleum Corp. v. Weaver*, 780 F.2d 1198, 1199 (5th Cir. 1986) (holding

that pleading RICO elements is governed by the "liberal notice-pleading procedure of the Federal Rules of Civil Procedure). To the extent the Defendants attempt to broaden Rule 9(b)'s application to non-fraud elements, they are mistaken, and only the Rule 8 pleading standard should apply.

## II.      The SAC Adequately Alleges a Pattern Implicating the Baymark Defendants.

The SAC alleges two or more related instances of mail fraud, wire fraud, money laundering, and bankruptcy fraud, among other predicate violations.  The acts were not isolated events.  They were an interrelated series of events with a common purpose: to loot a company in order to defraud a creditor.  The victims were the same: ACET Global and D&T Partners.

As set forth in the first paragraph of the SAC, on April 15, 2021, Tony Ludlow instructed Matthew Denegre to "shut the fuc* up" during a sworn deposition in response to a question about the fraudulent foreclosure at the heart of the fraud and this case.   (SAC ¶ 1) Following Ludlow's direction, Denegre then feigned any memory of the fraudulent foreclosure.  (*Id.*). Ludlow was the principal of Baymark Partners Management, LLC; Baymark ACET Direct Invest, LLC; and Baymark Partners.  (SAC n. 6) He was a former partner of Hallett & Perrin.  (SAC ¶ 1). He was attending the deposition in his capacity as corporate representative of Baymark Partners; Baymark Holdco; and Baymark Management.  (SAC, Exh. 1).

In the second paragraph, the Plaintiffs plead that the Baymark Defendants backdated the purported foreclosure—an act they admit was carried out by Hallett & Perrin and Julie Smith.  (In the Attorney Defendants' Motion to Dismiss, the attorneys—the Baymark Defendants' authorized agent—make one of several malpractice-esque admissions against the interest of their clients in an effort to protect themselves, stating that the "backdating" wasn't *their* fault because it was "done by the Attorney Defendants '*at Baymark's instruction*.'") (Mot. to Dismiss, Doc. No. 97, p. 13).  The act of fraudulently falsifying the "foreclosure" documents occurred in March of 2018.  (SAC ¶¶ 121-122, 250).

The two acts had the common purpose of hiding what happened to ACET Global's assets. They were carried out by the same people. They demonstrate a wanton lack of regard for the truth. They are distinctive steps that honest people don't take. And they are separated by roughly three years.

In the third paragraph, Plaintiffs allege that Baymark Partners and its directors carried out the transfer of ACET Global's assets to an entity (Windspeed) that Baymark Partners and its directors "secretly owned." (SAC ¶ 2). The SAC then alleges that they "drafted, executed, and backdated" documents to falsify the foreclosure. (SAC ¶ 2). It alleges that they utilized a "secret set of books," laundered proceeds through a "string of shell entities," and that the Baymark Defendants then engaged in the solicitation of perjury and committed perjury and obstruction. (*Id.*).

After alleging D&T Partners' security interest in the assets of ACET Global, (SAC ¶ 5), the SAC alleges that the Baymark Defendants "carried out a fraudulent scheme to transfer ACET Global's assets and business operations to a new entity that they secretly owned and controlled." (SAC ¶ 6). The SAC then drills down, specifically alleging that the Baymark Defendants transferred all of ACET Global's assets and business operations to Windspeed. (SAC ¶ 7). The SAC alleges that the Baymark Defendants affirmatively hid their interest in Windspeed by directing Szeto to file a Certificate of Formation with the state that failed to disclose their interest. (SAC ¶ 8). As the SAC specifically alleges, that false statement and omission occurred on September 27, 2018. (*Id.*). It marked yet another false statement on a formal document with the purpose of hiding the beneficiaries of the transfer of ACET Global's assets, because disclosing those beneficiaries would reflect the fraudulent nature of the transaction.

The SAC then alleges and demonstrates that the Baymark Defendants transferred all of ACET Global's assets and operations to Windspeed in October 2018. (SAC ¶ 11, 12). The SAC alleges that in October of 2018, the Baymark Defendants (i) caused Szeto to wrongfully serve as CEO of ACET Global and Windspeed (SAC ¶ 12); (ii) transferred all of ACET Global's employees to

Windspeed; (iii) transferred all of ACET Global's assets to Windspeed; (iv) maintained "two separate books *for obvious reasons*" for Windspeed and ACET Global; (v) required "consolidated reports" for ACET Global and Windspeed; (vi) in concert with the Baymark Defendants, Windspeed usurped ACET Global's website and published a carbon copy of ACET Global's former website; (vii) in concert with the Baymark Defendants, Windspeed began to sell the same distinct and unique ACET products that would later be reflected on ACET Global's inventory of items in a fraudulent "Foreclosure Sale Agreement," which would not be drafted and executed for another six months; (viii) did not segregate ACET Global's inventories from Windspeed's, but instead sold both off indiscriminately; (ix) "s[old] off all the ACET inventory;" (xi) the Defendants diverted revenues from the sale of ACET Global's inventory; (xii) continued to conduct ACET's business operations, purchasing new assets and inventory under ACET Global's existing accounts; "finishe[d] up ACET's business," utilizing the "same employees," "same equipment," "same vendors," and "the same customers," all under Windspeed and usurped ACET Global's partner and marketplace accounts and relationships; (xiii) wrongfully attempted to change an issued IRS Form 1099-K, which reported that Windspeed had received revenue in every month of 2018, to reflect that the revenue reported was to ACET instead; and (xiv) caused the intentional deletion of all of ACET Global's emails and electronic data after the October 2018 default on the D&T Note.  (SAC ¶ 12)

Next, the SAC alleges that in October of 2018, the Baymark Defendants deliberately failed to preserve ACET's emails and electronic documents, knowingly facilitating the destruction of key and incriminating documents.  (SAC ¶ 13)  Indeed, the SAC alleges that just one month after a breach of the $3.2 million D&T Note, Hallett & Perrin and the Baymark Defendants ensured that ACET Global's emails and electronic files were destroyed.  (SAC ¶ 13)

The SAC alleges that on October 23, 2018, the Baymark Defendants knowingly filed a false bankruptcy petition.  (SAC ¶ 17)  It alleges that the Baymark Defendants filed a fraudulent bankruptcy

petition in an effort to cover up the fraud.  (SAC ¶ 17).  It alleges a host of specific false statements, such as falsely stating that ACET Global had not transferred any inventory; that no books and records existed; that no inventories had been taken in two years; that no storage unit had been used within a year; that ACET Global had not transferred any property other than in the ordinary course of business; and that property transferred to Super G was valued at no more than $30,000.  (SAC ¶ 18).  All of these false statements shared the common purpose that motivated Ludlow's obstructionist deposition instruction, the foreclosure documents, and the falsification and hiding of the beneficial owners of Windspeed: hiding the date, nature, and circumstances, as well as the beneficiaries, of the fraudulent transfer of ACET Global's assets.  The series of acts was carried out by the same cast of characters with the same victims and results.  They were interrelated, rather than isolated events.  And they were memorialized in a "Wind Down" plan and various electronic communications.

Moreover, as the SAC alleges, all of this was undertaken after Hallett & Perrin and Julie A. Smith specifically discussed with them the criminal and civil fraud risks that would attend the Baymark Defendants with respect to the foreclosure transaction.  (SAC ¶ 19).  Aware of the risks, the Baymark Defendants nonetheless carried out the "foreclosure" fraud in an attempt to defraud a creditor and hide the true nature of the asset transfer.

In addition, the SAC alleges that Baymark, Hook and Ludlow made a false representation in 2017 that Damti would remain as the CEO of ACET Global and would maintain managerial authority and discretion.  (SAC ¶ 71).  Then on February 12, 2018, Denegre, Ludlow and Baymark purported to terminate Damti on false terms.  (SAC ¶ 83).  The period between the false representation to Damti and Ludlow's instructions to Denegre was roughly four years.  The core participants and ultimate victims were the same.  The acts were part of an interrelated series of steps to carry out the same fraud.

The SAC alleges that the Baymark Defendants caused an April 2018 Forbearance Agreement with the specific intention of providing the necessary time to then carry out the steps of the "Wind Down" plan to transfer all of ACET Global's assets and business operations to Windspeed in a manner that would allow the conspirators the continue the business operations free of D&T's lien. (SAC ¶ 90).  It was yet another document created on fraudulent pretenses, sent through electronic means, that was part of, and for the purpose of carrying out, the scheme to defraud.  It was a key event reflecting the forethought behind, and sophistication of, the scheme and further reflecting the participants' *modes operandi* and the scheme's distinguishing characteristics.

The SAC alleges that the "wind down" plan involved a series of events to "Wind Down [ACET's]  *Current*  Location,"  "price [ACET's] inventory which can be sold or transferred [to Windspeed]," "[r]elocating to temporary office space with *current* office furniture and computers," "perform last inventory prior to closing," "inform all parties on impending closing," "inform all marketplaces on closing," "send termination letter to all current employees," and "making offers to current employees," among other things.  (SAC ¶¶ 105-108).  The "wind down" plan was circulated among the core leader participants and reads like a fraudster's manifesto, reinforcing complete knowledge of, and premediated efforts to hide, the wrongful acts. The subsequent acts, such as the core leader participants' unanimous feigning of any knowledge of a "wind down" plan in their depositions solidified the evidence that they were and are acutely aware of their wrongful acts (and that they corruptly committed perjury).  The written plan memorialized the interrelated nature of the series of acts carried out for the same purpose, with the same results, victims, and methods of commission.  Ludlow's corrupt directive to one of the other leaders during a deposition was something of an exclamation point, underscoring that awareness.  And their attorney's willingness to represent to another member of the bar that Windspeed had no relationship to any

Baymark parties demonstrated that there was literally no length this group would not go to in order to carry out and hide their fraud.

To continue, Plaintiffs' SAC drills down into numerous acts that demonstrate that the Baymark Defendants orchestrated and carried out the fraudulent scheme. For instance, paragraph 107 of the SAC contained the following email between Szeto and Denegre:



In the September 29, 2018 email, Szeto—who signs off as "President and CEO" of "ACET Global, LLC"—corresponds about "Windspeed LLC," noting the need for the "formation of [a] *new* payroll account," (item no. 2); "creating a *new* bank account" (item no. 3); "sending termination letter to *current* employees" (item no. 4); "informing market places the *change of name and banking information for future payments*," because he did "not want to miss the best selling season of the year" in the transition of the business to Windspeed. (SAC ¶ 107). These acts were interrelated to the steps previously taken to lay the groundwork to execute the "wind up" plan. They were carried out with the coordination of

the same participants, resulting in the wrongful transfer of ACET's assets, and harming the same victims through the same methods of commission with the same ultimate purpose.

The SAC alleges, quoting from Julie A. Smith's deposition, that Hallett & Perrin drafted and provided warrant purchase agreement documents in connection with the formation of Windspeed Trading, LLC.  (SAC ¶ 127).  The SAC also alleges that the Baymark Defendants established Ludlow as the "Baymark Director" of Windspeed to maintain control over Windspeed.  (SAC ¶ 129).  The SAC alleges that the Baymark Defendants had Hallett & Perrin draft Windspeed's company agreement to ensure Baymark maintained this control.  (SAC ¶ 152, 167, 168).  The SAC alleges that the Baymark Defendants then caused the Amended and Restated Company Agreement of Windspeed to be executed two weeks before the D&T Note came due.  (SAC ¶ 156).

Then, the SAC alleges that the Baymark Defendants and Julie A. Smith specifically transmitted the documents at issue via electronic means and specifically then initiated a wire transfer as part of the fraudulent transaction:

> **From:** "Julie A. Smith"
> **Date:** Thursday, October 18, 2018 at 3:03 PM
> **To:** Alex Godinez , WILLIAM SZETO , "Matt Denegre (mdenegre@baymarkpartners.com)" , "Alexander Szeto (aszeto@higierallen.com)" , Steve Bellah
> **Cc:** "Carrie P. Williamson"
> **Subject:** RE: Windspeed executed documents
>
> Great! Congratulations, folks. The transaction is closed!
>
> Alex G, can you send around the fed reference number for the wire transfer to indicate you have initiated the wire?
>
> Julie A. Smith
> Shareholder
> Hallett & Perrin, P.C.
> 1445 Ross Avenue, Suite 2400
> Dallas, Texas 75202
> Direct: 214.922.4113 Fax: 214.953.0053
> jsmith@hallettperrin.com | www.hallettperrin.com
> Disclaimer

(SAC ¶ 157).

These acts were part and parcel of the series of sophisticated, interrelated steps taken by the same core participants to carry out the fraudulent scheme against the same victims with the same result: wrongfully transferring assets and hiding the Baymark Defendants' benefit thereof.

Indeed, the SAC alleges that "Windspeed was established as a sham; it was nothing more than a vehicle to fraudulently transfer the assets and business operations of ACET Global for the benefit of Baymark, Windspeed and Szeto—all free of D&T Partners' security interest."  (SAC ¶ 158).   It alleges that the Baymark Defendants "fraudulently transferred all of ACET Global's assets and business operations to Windspeed in late October of 2018" and concocted a fake "foreclosure" as "a sham" that "was designed to . . . to hide the fraud and to help the defendants carry out their scheme." (SAC ¶ 180).  It alleges that Szeto was installed *by Baymark Defendants* as a "puppet" CEO of Windspeed and that the Baymark Defendants "used Szeto to hide Baymark and Super G's ownership, control and association to Windspeed."   (SAC ¶ 159). It alleges that the Baymark Defendants established Windspeed, owned and controlled Windspeed, lied under oath about having any ownership or control over Windspeed, contradicted one another under oath regarding their control over Windspeed, set up Windspeed to provide them with perpetual authority over its activities, worked in concert with their attorney at Hallett & Perrin to achieve this control and ownership, set up a "sham" board that did not recognize corporate formalities, and did all of this at the time that it and the other parties knew "that Windspeed would acquire the assets of Acet Global."  (SAC ¶ 162 - 179).

Denegre, Hook, Ludlow, and Baymark Partners all testified that there was "no relationship" between ACET Global and the formation of Windspeed.  (SAC ¶ 132-135).  They all initially testified that they had never heard of any plan to wind down Windspeed—until they were confronted with their numerous emails specifically discussing and formulating the "wind down" plan.  The SAC demonstrates and alleges that this testimony was false and was intended to obstruct proceedings and

to further hide the fraud.  (SAC ¶ 132-136).  These obvious lies demonstrate their clear awareness of the acts and the wrongfulness of those acts.  They demonstrate awareness of their fraudulent intent.

Even though the Baymark Defendants and their co-conspirators claim that there is not and never was a relationship or connection between ACET Global and Windspeed, the SAC alleges that every single employee of ACET Global was transferred over to Windspeed when the "wind down" was executed. (SAC ¶ 182). That is, ACET Global's entire workforce simply transferred over to Windspeed.  (SAC ¶ 182.  The email correspondence between Denegre and Szeto pasted on page 28 of *this* brief reflects the relationship quite clearly.

The SAC also alleges that the Baymark Defendants' agent, Ed Perrin and Hallett & Perrin, specifically made misrepresentations in an effort to hide the fraud.  (SAC ¶ 128, 128).  These misrepresentations were acts of fraud and predicate acts that furthered the fraud and RICO violations.

The SAC alleges that after transferring ACET Global's business over to Windspeed, the Baymark Defendants maintained "two sets of books."  (SAC ¶ 2, 12, 185-189).  Indeed, even though Denegre and the Baymark Defendants refused to testify about the matter, the SAC nonetheless provides "a thousand words" in a picture snippet of their directives to maintain "separate books for obvious reasons":

From: Matt Denegre <mdenegre@baymarkpartners.com>
Date: Friday, October 19, 2018 at 9:34 AM
To: WILLIAM SZETO <bill@acetglobal.com>
Subject: WIndspeed QuickBooks File

Bill,

Jane will need to set up a new QuickBooks file for Windspeed and maintain the old QuickBooks file for ACET.  It will need to be two separate books for obvious reasons.  All the ongoing ACET sales/expenses will still need to be recorded in the ACET QuickBooks.  We can figure out the opening balance sheet entries for Windspeed after the funding.

Best Regards,

**Matt Denegre**
Baymark Partners
O: 972-991-5457 | M: 214-625-3344
www.baymarkpartners.com

(SAC ¶ 188).  The SAC is replete with directives from the Baymark Defendants to consolidate ACET Global's and Windspeed's financial information.  (e.g., SAC ¶ 191 – 194).

The SAC alleges that "After forming Windspeed, the Defendants [including the Baymark Defendants] jointly engaged to fraudulently transfer all of the assets and business operations of ACET Global over to Windspeed."  (SAC ¶ 196).  The SAC alleges that they "expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts."  (SAC ¶ 202).  The SAC further alleges that in 2018, "Windspeed [owned/controlled by the Baymark Defendants] began to hold ACET Global's inventory out for sale on its website."  (*Id.*) The SAC alleges that "[a]s of at least December 12, 2018, Windspeed's website was a carbon copy of the former ACET Global website." (*Id.*).  That is, the SAC specifically alleges that on or before December 12, 2018 "Windspeed was already marketing inventory items included in Super G's [fraudulent] Notice of Disposition and Sale of Collateral and the Bill of Sale" that were used to "paper up" the foreclosure sale.  (SAC ¶ 203).

The SAC alleges that the Baymark Defendants did not account for ACET Global's assets and there was no segregation of assets.  (SAC ¶ 205, 208).  It alleges that, in concert with the Baymark Defendants, "Windspeed simply continued to sell ACET Global's inventory, pocketing the revenues for itself and its owners [including the Baymark Defendants]."  (SAC ¶ 206).  It alleges that the Baymark Defendants and Windspeed simply continued ACET Global's busines operations and relationships.  (SAC ¶ 210-212).  The SAC alleges that the Baymark Defendants and Windspeed diverted revenues and closed out ACET's bank accounts.  (SAC ¶ 213).  All of the revenues accrued to the benefit of the beneficial owners.

The SAC alleges (and demonstrates) that Baymark Defendants, with the assistance of Hallett & Perrin, drafted a "foreclosure notice" long after they had carried out the transfer of the assets to Windspeed.  (SAC ¶ 235).  The notice was concocted shortly after D&T's counsel sent a demand letter to Baymark for the defaulted $3.2 million.  (Doc. No. 63, Exh. 1)  It alleges that the Baymark

Defendants continuously engaged in acts to drive the fraudulent foreclosure process forward long after the assets had already been transferred and sold off.  (SAC ¶ 231). It alleges that Windspeed, a unique name, was the name that Szeto's father has used for business, and that the Baymark Defendants had scheduled a weekly calendar to discuss project "Windspeed" that first began on June 13, 2017, just prior to the date that the initial Asset Purchase Agreement was executed, allowing the Baymark Defendants to acquire the ACET assets.  (SAC ¶ 67).  The Baymark Defendants' violative acts continue to this day, as they have attempted to fraudulently represent ACET Global in state court proceedings with the goal of shutting down the inquiry into the events at issue and with the goal of continuing to mask the bankruptcy fraud.

### A.  The SAC Establishes the Predicate Acts.

#### 1.  Bankruptcy Fraud.

The Baymark Defendants argue that the plaintiffs have incorrectly asserted a claim of bankruptcy fraud under 18 U.S.C. § 157, which is not a predicate act.  (Mot. to Dismiss, pp. 15-17).  But the plaintiffs have alleged violations of section 152 (false oaths and claims involving bankruptcy).  "While bankruptcy fraud under 18 U.S.C. § 157 cannot form a predicate act under RICO, a claim of bankruptcy fraud under 18 U.S.C. § 152 can."  *In re Sigma Sys., Inc.*, No. 07-42092, 2010 WL 148176, at *4 (Bankr. E.D. Tex. Jan. 11, 2010) (citing *Cadle Company v. Flanagan*, 271 F.Supp.2d 378, 385 (D. Conn. 2003)).

Next, in support of their motion, the Baymark Defendants cite to *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004).  But that case hurts, not helps, their cause.  There, the Second Circuit noted that "a debtor who has followed a course of conduct that inevitably leads to bankruptcy is fairly presumed to have perpetrated a fraudulent scheme."  *Id.* It further noted that "a debtor who has deliberately transferred assets a year and a day prior to filing a petition has clearly

engaged in a thinly-veiled attempt to avoid the preference rule." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 179 (2d Cir. 2004)

Ludlow and the Baymark Defendants surreptitiously transferred ACET Global's assets and business operations in late October of 2018. (SAC ¶ 11).  They filed a bankruptcy petition on October 23, 2019—almost exactly a year later. (SAC ¶ 17). They did so on the heels of a lawsuit, as part of an effort to further hide their fraud. (*Id*).

The court in *First Capital Asset Management* recognized:

> that "navigat[ing] the estate through the bankruptcy system," . . . preparing "filings and schedules containing erroneous information," and "participat[ing] in devising a scheme to conceal [assets] from the bankruptcy trustee" all amounted to conducting or participating in the affairs of a[n enterprise for purposes of RICO.]

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 177 (2d Cir. 2004).  See also *Berman, Tr. for Est. of Michael S. Goldberg, LLC v. LaBonte*, 622 B.R. 503, 532 (D. Conn. 2020) ("We have concluded that where a bankruptcy estate is a RICO enterprise, a [party] who engages in bankruptcy fraud conducts or participates in the conduct of the affairs of the enterprise; thus, it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise.")

Section 152 specifically covers "concealment of assets; false oaths and claims."  It prohibits, among other things:

(1) knowingly and fraudulently conceal[ing] from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;

(2) knowingly and fraudulently make[ing] a false oath or account in or in relation to any case under title 11;

(3) knowingly and fraudulently make[ing] a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;

. . .

(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfer[ing] or conceal[ing] any of his property or the property of such other person or corporation;

(8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceal[ing], destroy[ing], mutilate[ing], falsif[ying], or make[ing] a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or

(9) after the filing of a case under title 11, knowingly and fraudulently withhold[ing] from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor,

The SAC alleges that the Baymark Defendants filed a bankruptcy petition on behalf of ACET Global. (SAC ¶¶ 17and 257).  In their sworn statement, they acknowledged that Plaintiff had a valid $3.2 million claim against ACET Global. In that bankruptcy petition, they also informed the bankruptcy court of the value of the assets that ACET Global had transferred to Super G: $30,000. (SAC ¶ 257).  They used the bankruptcy as an attempt to wash their hands of the fraud.  (SAC ¶ 265).

In the section of the bankruptcy petition titled, "Details About the Debtor's Business or Connections to Any Business," Ludlow and the Baymark Defendants set forth a number of materially false statements designed to hide the fraud from creditors, trustees, and the court.  (SAC ¶ 266).  They made false statements about the names of accountants and bookkeepers who maintained ACET Global's records.  (SAC ¶ 268, 269). They made false statements, writing "none," in response to an obligation to list all persons who prepared or reviewed ACET Global's financial statements.  (SAC ¶ 270-71).  They provided false information about the person who had possession of ACET Global's books of account and records as part of an effort to hide the fraud.  (SAC ¶ 272).

The SAC alleges that the Baymark Defendants falsely stated that no inventories had been taken of ACET Global's assets.  (SAC ¶ 274-279).  It also alleges that they deliberately falsified the names of persons in control of ACET Global, again to hide the fraud.  (SAC ¶ 280-82).

The SAC alleges that the Baymark Defendants falsified documents to hide the fact that insiders had received value from ACET Global's assets.  (SAC ¶ 282).  It alleges that the Baymark Defendants deliberately failed to list associated entities.  (SAC ¶ 284).  It alleges that the Baymark Defendants deliberately failed to list property that was stored in storage units (which were used to carry out the fraudulent transfer).  (SAC ¶ 286).  It alleges that they failed to disclose bank accounts held in the name of ACET Global.  (SAC ¶ 287-88).  It alleges that the Baymark Defendants deliberately falsified the list of transfers out of ACET Global, providing a false "none" as an answer, all as part of an effort to hide the fraudulent transfers.  (SAC ¶ 289).

The SAC alleges that the Baymark Defendants engaged in a host of other material misrepresentations designed to hide their fraud, including falsifying the value of the ACET Global's property (SAC ¶ 293), falsifying the value of the property transferred to Windspeed (SAC ¶ 294), falisyfing the timing of the transfer of assets prior to bankrtupcy (*id.*), and falsifying the list of insiders, directors, and officers who received a benefit from ACET Global's assets (SAC ¶ 296).  The SAC also alleges that the Baymark Defendants "deliberately and knowingly gave false testimony" in judicial proceedings as "part of a scheme to carry out their fraud, to obstruct justice, and **to mask their bankruptcy fraud**."  (SAC ¶ 19).

The SAC sets forth a copy of the bankruptcy petition.  Ludlow and the Baymark Defendants engaged in numerous and repeated interactions with the trustee and bankruptcy court.  That fact is certainly a natural implication of filing a fraudulent bankruptcy petition.  Indeed, the bankruptcy docket reflects repeated interactions with the bankruptcy court, and this Court can and should take judicial notice of such fact.

## 2.   Obstruction of Justice.[13]

The SAC also alleges violations of 18 U.S.C. § 1503.  Section 1503 provides as follows:

**Whoever** . . . **corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice**, shall be punished . . . .

(emphasis added).

"The omnibus clause," quoted above, "clearly forbids *all* corrupt endeavors to obstruct or impede the due administration of justice."  *United States v. Williams*, 874 F.2d 968, 976 (5th Cir. 1989).  Due administration of justice refers to "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed."  *Id.* at 977 (quoting *United States v. Partin,* 552 F.2d 621, 641 (5th Cir. 1977), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *United States v. Griffin,* 589 F.2d 200, 203 n. 4 (5th Cir. 1979)).

Success is not the measuring stick.   Even "an *un*successful 'endeavor' to obstruct justice violates section 1503; justice need not actually have been obstructed. *United States v. Williams*, 874 F.2d 968, 981 (5th Cir. 1989) (citing *United States v. Russell,* 255 U.S. 138, 41 (1921); *United States v. Rasheed*, 663 F.2d 843, 853 (9th Cir. 1981)).  *United States v. Davis,* 752 F.2d 963, 968, 973 & n. 11 (5th Cir. 1985) (urging and advising a witness to testify falsely violates section 1503; when so solicited, the witness had already secretly agreed to cooperate with the government and the conversation was recorded).

Section 1503 plainly provides that it is a violation to "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice."  When Ludlow issued the instruction for Denegre to "shut the fuc* up" in his deposition in response to questions about the foreclosure, Ludlow endeavored to impede the "due administration of justice" by a "communication." (SAC ¶ 1)

---

[13] Plaintiffs note that they could easily have alleged under a violation under section 1512 as well.

His violations also conveyed an implicit threat to counsel in an attempt to corruptly thwart counsel's efforts.

Likewise, when Ludlow and the Baymark Defendants intentionally concealed ACET Global's financial assets during bankruptcy proceedings, they violated section 1503. *United States v. Crispo*, 306 F.3d 71, 81 (2d Cir. 2002) (section 1503 covers bankruptcy proceedings, to hold otherwise would be an "absurd result"); *United States v. McBride*, 362 F.3d 360, 372 (6th Cir. 2004) (fraudulent involuntary bankruptcy petition served as basis for section 1503 conviction.

The SAC is replete with alleged violations of bankruptcy fraud carried out with intention and a corrupt motive.  (See Section (B)(i) of this Response)

### 3.  Money Laundering.

The Baymark Defendants argue that Plaintiffs have failed to "plead facts to [even] suggest" that the Baymark Defendants engaged in money laundering—namely, that they engaged in transactions involving proceeds from a specified unlawful activity.  (Mot. to Dismiss, pp. 13-14).  The Baymark Defendants are incorrect.

The elements of a money laundering violation of 18 U.S.C. § 1957(a) are: (i) "property valued at more than $10,000 that was derived from a **specified unlawful activity**;" (ii) "the defendant's engagement in a **financial transaction** with the property;" and (iii) "the defendant's knowledge that the property was derived from unlawful activity."  *United States v. Alaniz*, 726 F.3d 586, 602 (5th Cir. 2013).  The defendant need only know that the funds were illicit and engaged in a "financial transaction" with them—not whether he engaged in laundering.  *United States v. Alaniz*, 726 F.3d 586, 602 (5th Cir. 2013) n. 6.

Money laundering under section 1956(a)(1) requires: "(1) an actual or attempted financial transaction; (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) ... knowledge that the transactions

were designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity." *United States v. Omoruyi,* 260 F.3d 291, 294–95 (3d Cir. 2001).

A "specified unlawful activity" is defined as, among other things, any violation of "an offense listed in section 1961(1) [and] . . . . section 152 (relating to concealment of assets; false oaths and claims; bribery)." 18 U.S.C. § 1956(c)(7)(A), (D).  Among the acts listed in section 1961(1) are, among others, any act indictable under section 1341 (mail fraud), section 1343 (wire fraud), any offense involving fraud connected with a case under title 11, section 1832 (theft of trade secrets), section 2314 (relating to interstate transportation of stolen property, and section 2315 (same), among others of relevance.

### i.  The Elements.

The elements of a money laundering violation of 18 U.S.C. § 1957(a) are set forth and demonstrated below:

#### a.  Property valued at more than $10,000 that was derived from a specified unlawful activity.

Here, the SAC alleges that ACET Global owed a $3.2 million note to D&T Partners.  (SAC ¶ 6).  It alleges that "Baymark held majority beneficial ownership in, and control over, ACET Global." (SAC ¶ 5). It alleges that before the $3.2 million note to D&T became due, the Baymark Defendants carried out the fraudulent transfer of ACET Global's assets (tangible and intangible) and complete business operations to a new entity: Windspeed.  (SAC ¶ 6). The SAC alleges that the Baymark Defendants beneficially owned and controlled Windspeed.  (SAC ¶ 7). The SAC alleges that ACET's assets alone were worth more than $3 million.  (SAC ¶ 16).  It alleges that the Baymark Defendants judicially admitted in a bankruptcy petition that those assets were worth more than $10,000.  (SAC ¶ 17).  And it alleges that the Baymark Defendants submitted a 2019 tax return to the IRS "reflecting that Baymark had received $2,907,290 in 'proceeds' from the foreclosure sale of ACET Global's assets."  (SAC ¶ 22)

However sliced, the SAC alleges that property valued at more than $10,000 was involved in the Baymark Defendants' scheme and was derived from a specified unlawful activity. A specified unlawful activity includes, among other things, any act indictable under section 1341 (mail fraud), section 1343 (wire fraud), any offense involving fraud connected with a case under title 11, section 1832 (theft of trade secrets), section 2314 (relating to interstate transportation of stolen property, section 2315 (same). As set forth below in section B(iv), the proceeds were clearly derived from wire and mail fraud. Much the same, as set forth above in section B(i), the proceeds were just as clearly derived from an offense involving fraud connected with a case under title 11 (the false statements in bankruptcy proceedings).

The proceeds likewise derived from violations of section 1832 (theft of trade secrets). That section prohibits the following:

(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
(4) attempts to commit any offense described in paragraphs (1) through (3); or
(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy . . . .

The SAC alleges that the Baymark Defendants appropriated all of ACET Global's assets to Windspeed, including intellectual property, vendor relationships, customer relationships (SAC ¶ 12); usurped ACET's partners and marketplace accounts and relationships (*id.*); and transferred its entire operations (SAC ¶ 11), all through fraudulent, deceptive means. It alleges that they caused the theft of its website, which held out hundreds of products for sale in the court of interstate commerce. (e.g.,

(SAC ¶ 202, 203).  The SAC alleges that the entire fraudulent scheme was orchestrated to injure ACET Global and D&T Partners, for the benefit of someone other than ACET Global.  Thus, the SUA of section 1832 violation likewise existed.

Likewise, the SAC alleges facts constituting a violation of section 2314 (relating to interstate transportation of stolen property) and section 2315 (same).  Section 2314 applies to, among others:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more

The SAC alleges conduct that plainly violates both 2314 and 2315.  As set forth above, the Baymark Defendants devised or intended to devise a scheme or artifice to defraud (the fraudulent transfer, for example)—or, in an effort to obtain money or property by means of false or fraudulent pretenses, representations or promises, caused the transportation in interstate commerce in execution of a scheme to defraud another person (D&T and ACET Global) of property or money having a value of more than $5,000.  Section 2315 is equally applicable.

### b. The defendants engaged in a financial transaction with the property.

Likewise, the Baymark Defendants engaged in a financial transaction with the property.  The term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means . . . or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.  18 U.S.C. § 1956(c)(6).

A financial institution includes, among other applicable terms, "a loan or finance company" and an investment company. 18 U.S.C. § 1956(c)(7); 31 U.S.C. § 5312(a)(2)(P).  The entire fraudulent scheme involved transactions with Super G Capital, which—though not a prototypical financial

institution in the everyday, colloquial sense of the phrase—engaged in "loan transaction[s]," (SAC ¶ 76), had "loan clients," (SAC ¶ 80), maintained an "investment committee," (SAC ¶ 79), and invested in Windspeed and extended a loan to Windspeed. (SAC ¶¶ 176-179). Super G is a limited liability company formed in Delaware with an address in California. (SAC ¶ 40). It engaged in lending and investments activities with persons domiciled in and residing in Texas. It was engaged in, and its activities affected, interstate commerce. (SAC ¶¶ 328).

In addition, the Baymark Defendants, as part of their fraud, caused the theft of bank accounts. (SAC ¶ 214). They caused ACET's revenues to be diverted (SAC ¶ 213) to Windspeed, and kept two sets of books. (SAC ¶ 185-188). They took over ACET Global's bank accounts, (SAC ¶ 214), and caused its bank accounts to be closed. (SAC ¶ 213). And they usurped ACET's payment accounts. (SAC ¶ 215).

For good measure, the SAC also alleges that the Baymark Defendants caused the fraudulent payment of a "management fee of $112,500 to" their controlled entity, Baymark Partners Management, LLC (SAC ¶ 22)—one of the Baymark Defendants and one of the "string of shell entities" (SAC ¶ 65) that Hook (the managing partner of the Baymark Defendants) describes as "just a piece of paper" (SAC ¶ 63, 64) that "do[es]n't do anything" (SAC ¶ 64) and that was a "façade" (SAC ¶ 65) and had no "real economic purpose" (SAC ¶ 65)—all, as the SAC alleges, "to siphon off funds for the benefit of Baymark's principals." (SAC ¶ 22)

### c. The defendant's knowledge that the property was derived from unlawful activity.

The SAC alleges that the Baymark Defendants engaged in the fraudulent scheme fully appreciating the legal risks. (SAC ¶ 19). It alleges that they were advised that the scheme gave rise to criminal and civil fraud risks. (SAC ¶ 19). It alleges that they even exchanged emails with Hallett & Perrin specifically discussing the fraudulent scheme stating that although the scheme was legally risky, they would pursue it. (SAC ¶ 19).

As the foregoing analysis demonstrates, the Baymark Defendants engaged in money laundering in violation of 18 U.S.C. § 1957(a).  Those facts also demonstrate violations of 18 U.S.C. § 1956(a)(1).  They demonstrate an (i) actual or attempted financial transaction; (ii) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (iv) ... knowledge that the transactions were designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.  With respect to the fourth prong, the very nature of the fraud and the deliberate requests to backdate the foreclosure transaction demonstrate their knowledge.  Likewise, their false representations in bankruptcy demonstrate knowledge. Much the same, Ludlow's directive to Denegre to "shut the fuc# up" when questioned in a deposition about the fraudulent foreclosure demonstrates knowledge.

### 4.   Mail/Wire Fraud.

The Baymark Defendants argue that Plaintiffs "make[] no attempt" to plead facts showing a scheme to defraud by means of false or fraudulent representation, nor to tie any purported email or wire "fraud" to any false or fraudulent representation."  (Mot. to Dismiss, p. 17).  Once again, the Baymark Defendants are wrong.

Mail and wire fraud involve (1) a plan or sheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mail or wires will be used; and (4) actual use of the mail or wires.  *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009).  The mailings and wirings need not be fraudulent themselves; it is sufficient that they further a fraudulent scheme.  *Schmuck v. United States*, 489 U.S. 705 (1989) ("innocent" mailings sufficient for purposes of mail fraud).  *See also United States v. Arledge*, 533 F.3d 881, 891 (5th Cir. 2008).  *George v. Blue Diamond Petroleum, Inc.*, 718 F. Supp. 539, 550–51 (W.D. La. 1989), *aff'd sub nom. George v. Blue Diamond*, 922 F.2d 838 (5th Cir. 1990) ("letters, which had the result of postponing inquiry by the investors and making the transactions seem less suspicious, each

constitute themselves a violation of 18 U.S.C. § 1341.") ("the mailings in question served the defendants' purpose of furthering their scheme to defraud investors. Additionally, Richard Decker engaged in wire fraud by making telephone calls in furtherance of the scheme.")

By way of background, a defendant "need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *See Casperone,* 819 F.2d at 115. Specifically, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails." *United States v. Finney,* 714 F.2d 420, 423 (5th Cir. 1983).

In *Bridge v. Phoenix Bond & Indemnity Co.,* the Supreme Court held that where a RICO claim is predicated on alleged mail or wire fraud, a plaintiff need not show that it relied on the defendant's alleged misrepresentations to establish the RICO claim or to establish proximate cause. *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 647-61 (2008) (rejecting RICO defendants' arguments that Congress intended mail fraud under RICO to incorporate the common law fraud requirement of first-party reliance).

Moreover, "[a] strong inference of fraudulent intent is made out 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.,* 150 F. Supp. 2d 624, 632 (S.D.N.Y. 2001), *aff'd sub nom. First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159 (2d Cir. 2004).

The SAC alleges that the Baymark Defendants engaged in the fraudulent scheme while fully appreciating the legal risks. (SAC ¶ 19). It alleges that they were aware that the scheme gave rise to criminal and civil fraud risks. (SAC ¶ 19). It alleges that they even exchanged emails with Hallett & Perrin specifically discussing the fraudulent scheme, stating that although the scheme was legally risky, they would pursue it. (SAC ¶ 19). Their fraudulent intent is further demonstrated by their deliberate

requests to backdate the foreclosure transaction; false representations in bankruptcy; and Ludlow's directive to Denegre to "shut the fuc# up" when questioned in a deposition about the fraudulent foreclosure demonstrates knowledge.

The SAC is replete with allegations and even pictures of emails in furtherance of the transactions and alleged scheme, deposition testimony admitting to emails in furtherance of the transactions and alleged scheme, and there is an allegation and picture of a purported letter regarding the purported foreclosure sale set forth in paragraph 231 of the SAC that the SAC alleges was drafted by the Baymark Defendants, (SAC ¶ 235) and that states that it was sent "Via Certified mail, Return Receipt Requested" to the attention of David Hook at his Baymark address.  (SAC ¶ 231).  The referenced emails and letters repeatedly set forth the precise date, time and content of the exchanges, and reflect the parties to those exchanges.  (e.g., SAC ¶ 255, 261, 264).  Each was a distinct act of wire or mail fraud.

Moreover, each of the false statements on the bankruptcy petition constituted acts of wire fraud, as they were electronically transmitted.  The docket for the bankruptcy proceedings also reflects mailings in furtherance of those proceedings, which were based on false representations and were a part of the pattern of conduct involved in the scheme to defraud.

### B.  Causation.

The Baymark Defendants, continuing their shotgun defense, put forth a one-paragraph, scarecrow-like causation argument that Plaintiffs have failed to "explain" how they could possibly have been injured by the foregoing acts. (Mot. to Dismiss, p. 19).  Plaintiffs are tempted to rebut with the what-planet-are-you-possibly-living-on defense, but for the sake of completeness, will "explain."

The Baymark Defendants caused ACET Global to be depleted of *all* of its assets—assets that were valued at more than $3 million by the Baymark Defendants after the fact.  But-for their acts, in other words, ACET Global would have had, and have been worth, more than $3 million more, and

would have had an ongoing business operation.  That fact was not only completely foreseeable—and thus a proximate effect of their cause—it was *inevitable* and was the *intended* effect.  *See e.g., Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015) ("Regardless of how proximate cause is sliced, Allstate proved it. There is no plausible argument that the insurers were unforeseeable victims or otherwise wronged by the caprice of chance.")  Had they not engaged in their scheme, that is, ACET Global would have continued about its business; its losses were an injury that flowed directly and naturally from the wrongful acts.

Much the same, the Baymark Defendants caused D&T to lose $3.2 million plus interest. D&T's note was secured by ACET Global's assets—all of them.  But-for their acts, in other words, D&T Partners would have been paid the $3.2 million it was contractually owed and promised. Otherwise, it would have exercised its legitimate security interest in the assets to satisfy the debt.  It would seem, on this planet at least, that deliberately gutting ACET of all of its assets, putting it into a fraudulent bankruptcy, and concocting fraudulent foreclosure documents to hide the entire thing, would naturally injure and damage D&T Partners, whom ACET owed $3.2 million.  That result likewise seems not only foreseeable, but also inevitable.  And the injury is directly connected to the wrongful acts.[14]

The Baymark Defendants' reliance upon *First Capital Asset management, Inc. v. Satinwood, Inc.*, which has already been shown to be an unhelpful case to their cause, is borderline laughable as well as deliberately misleading.  That case involved a judgement creditor bringing civil rico claims predicated on allegations that a judgement debtor engaged in acts designed to hinder their collection of a judgment.  The Baymark Defendants quote from the case, not only incorrectly, but also by

---

[14] As other have recognized, "If such an acquisition sets the table for the enterprise to be looted, the enterprise itself, acting through a receiver, may have suffered the requisite "investment injury" to assert § 1962(a) claims against the "acquirers."  Robert Michaels, <u>Twice the Effort but Three Times the Reward: Rico Claims for Receivers and Trustees</u>, Am. Bankr. Inst. J., July 2013, at 58, 59.

omitting (i) the fact that the quote was not a holding by the appellate court, but was a simple recitation of the district court's rationale, and (ii) more troublingly, failing to even note or alert this Court to footnote 10 appended those quotes, which also stated: "In a later opinion, *see infra,* the District Court expanded on this analysis somewhat, clarifying the point that the claim for Lost Debt injuries was dismissed, not simply because Plaintiffs lacked standing [i.e., because of causation], **but more precisely because that claim was not ripe for review**." That is a pretty big omission when the (purported) quote is their sole legal ground in a one-paragraph argument.

## III.    Section 1962(a).

The SAC set out a clear claim under section 1962(a). The Baymark Defendants' enterprise gave rise to returns and income. They invested those returns into their enterprise, allowing it to be carried out over the four-plus-year period. As set forth throughout the SAC and herein, the SAC clearly pleads income and use of those funds in the enterprise, as well as injury.

## IV.    State Law Claims.

Continuing their sporadic, shotgun approach, in footnote 105, the Baymark Defendants state that "Plaintiff's state law claims are also addressed in various detail in the other Defendants' brief." The reference could not be much more vague. If it is intended to incorporate by reference other "various" arguments in unspecified "other Defendants'" briefing, it does not and Plaintiffs specifically object to such effort.

### A.  Common-Law Fraud.

The Baymark Defendants argue that the Plaintiffs "Make almost no attempt" to identify any alleged misrepresentations. Moreover, the Baymark Defendants use all but one paragraph of their arguments in this respect attempting to recast what Plaintiff has plead, stating that "Plaintiff appears to be claiming that it was fraudulently induced," rather than asserting a common-law fraud claim. (Mot. to Dismiss pp. 21-22). Incorrect. Plaintiffs' counsel knows how to assert a fraudulent

inducement claim and how to assert a cause of action for common law fraud. Plaintiffs' counsel asserted the latter intentionally and clearly.

Thus, Plaintiffs devote all of one half-hearted paragraph to addressing the cause of action that Plaintiff actually pled. And they are mistaken in their argument. For starters, where, as here, the defendants deliberately destroyed all of the entity's (ACET's) emails and much of its electronic data (just months after causing ACET to default on a $3.2 million note), they can hardly be heard to claim that the plaintiff hasn't alleged their fraudulent acts with sufficient specificity. That is even more so where—despite clear conflicts of interest—they have asserted attorney-client privilege over their communications, despite the crime-fraud exception and despite the fact that the privilege protects one set of "clients" (Baymark Defendants) but hurts another category of purported "clients" (ACET Global). Nonetheless, Plaintiffs have more than adequately pled fraud.

The Attorney Defendants have judicially admitted that the Baymark Defendants instructed them to backdate documents and that they did so. The misrepresented date was designed to hide the fraud and prolong its secrecy and increase the cost and effort necessary to ferret it out.

Moreover, the Baymark Defendants, through their agents, represented that Super G Capital was not related or affiliated with the Baymark Defendants. (SAC ¶ 128). That representation is and was fundamental to the nature of the transactions.

Under Texas law, a duty to disclose may arise in numerous circumstances: (1) when there is a special or fiduciary relationship; (2) when one party voluntarily discloses partial information, but fails to disclose the whole truth; (3) when one party makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression. *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex. App.— Houston [14th Dist.] 1997, pet. denied).

In early 2019, after Damti called Bellah completely unaware that Bellah was in on the fraud against D&T, Bellah informed Damti that "he [Bellah] was unaware of Windspeed"—despite the fact that Bellah was already serving as Super G's board manager of Windspeed.  (SAC ¶ 299).  Bellah's fraudulent misrepresentation was designed to prevent Damti and D&T from learning about the fraud, preventing him from taking steps prior to their destruction of all of ACET's electronic records and emails and preventing D&T from recovering.  Damti confided his suspicions and even strategy to Bellah.  Bellah used this information to help carry out the fraud.

The fact that the foreclosure sale was a sham provides a further basis to infer fraudulent intent. Szeto, who served as CEO of ACET Global after Mr. Damti's termination at the behest of the Baymark Defendants informed a then-confidant only three months before the formation of Windspeed that:

> In June 2018, [Szeto] called me into his office and mentioned that ACET Global had a high amount of debt and that **he was going to "start another business." He suggested he "had friends," and that if ACET Global went bankrupt, [Szeto] could continue the operations with a new company.**

(SAC ¶ 99) (emphasis added). The inference is clear: the Baymark Defendants had a pre-conceived plan or scheme, which implies the requisite falsity, knowledge, and intent.

The evidence also demonstrates that the **Baymark Defendants, in concert with Szeto[15] and his band of conspirators, were already transferring ACET Global's business and assets to Windspeed prior to the purported foreclosure and sale agreements that were purportedly signed on March 1, 2019**. Specifically, on January 10, 2019, **nearly two months before the "foreclosure,"** Szeto issued a memo on Windspeed letterhead in his capacity as President & CEO of

---

[15] Plaintiffs note that source records indicate that during the days and weeks surrounding the formation of Windspeed, Szeto also corresponded with another attorney who he had known for a long time and who assisted Denegre, Szeto, and the Baymark Parties.  To date, those parties have claimed privilege over such communications.  Without clear substantiation, Plaintiffs have consciously chosen not to bring that attorney or his law firm into this case as defendants. Plaintiffs do intend, however, to seek and invoke a crime-fraud exception with respect to such correspondence.

Windspeed, requesting that "three accounts under ACET Global LLC" be closed effective immediately—suggesting that Szeto was already transferring assets of ACET Global to Windspeed prior to any "sale" cited by Windspeed.  (SAC ¶ 216).  Additionally, Jane Lin, a former employee of ACET Global, executed an Authorize.Net Request for a New Account Owner on December 5, 2018. Using her **Windspeed email address**, Jane Lin listed herself as the "New Account Owner" for **an account held in ACET Global's name**. (SAC ¶ 12, FN 21).   The agreements executed between Windspeed and Super G Capital did not occur until **March 1, 2019**, but a snapshot of Windspeed's website on **December 12, 2018** shows that Windspeed was **already marketing inventory items included in Super G Capital, LLC's Notice of Disposition and Sale of Collateral and the Bill of Sale executed between Super G Capital and Windspeed**.  (SAC ¶ 203). Such items include, but are not limited to, the "Iphone 6/6 Plus Sport Armband," "Mini Portable USB Rechargeable Battery Clip Fan," and "Bye Bye Clog."  (*Id.*).  To be clear, Windspeed copied ACET Global's website and product descriptions, **even down to an exact product description typographical error**.  (*Id.*). The parties were clearly engaged in carrying out a fraudulent scheme.

And they made multiple representations to the Plaintiffs.  Plaintiff relied upon the Baymark Defendant's misrepresentations.  (SAC ¶ 452).

## B.  Breach of Fiduciary Duty/Aiding and Abetting Breach of Fiduciary Duty.

D&T Partners was a creditor of ACET Global.  (SAC ¶ 5). D&T Partners (and its predecessor, ACET Venture Partners, LLC) was the single largest creditor of ACET Global—by a magnitude of perhaps 50.   (*Id.*). The Baymark Defendants, here, repeatedly maintain that ACET Global was financially distressed, insolvent, and unable to satisfy its obligations.[16] As a result of these admissions that ACET Global was in the zone of insolvency or had long since passed across it, ACET Global

---

[16] The Court can take judicial notice of the Baymark Defendants' filings and motions for summary judgment in the state court case.

and its controlling officers, managers, and under the circumstances, members, had a fiduciary duty to protect the interests of creditors—here, the largest secured creditor: D&T Partners/ACET Venture Partners, LLC. *Tigrett v. Pointer*, 580 S.W.2d 375, 383 (Tex. App.—Dallas 1978), *writ refused NRE* (1979).

An insolvent entity in such distress owes its fiduciary duties to its creditors, rather than its members:

> Its assets then become a trust fund for the benefit of all its creditors; consequently, its stockholders have no right, directly or indirectly through the managing officers, to pay or secure some of the creditors at the expense of others. *Lyons-Thomas Hardware Co. v. Perry Stove Mfg. Co.*, 86 Tex. 143, 24 S.W. 16, 23 (1893). In this situation, all the directors become trustees with the duty to see that the assets are devoted to the payment of corporate debts, without preferring one creditor over another.

*Id.* This proposition is not a novel one. As the Texas Supreme Court long ago recognized:

> The assets of an insolvent corporation is [sic.] a fund subject to the claims of creditors, and upon which they have an equitable lien for the payment of their demands. The property is chargeable in the hands of the directors as trust, for the preservation of which they are bound to good faith and fair dealings in the management and disposition thereof. They are the agents and trustees of the corporation, and when they deal with its important interests they are charged with the utmost fairness, ***and will not be permitted to reap benefits to the injury of the corporation and its creditors. The law will not permit the directors to participate in acts relative to the corporate property that will result in their personal and private advantage***, to the injury of the corporation, when their duty requires them to use all reasonable efforts to the accomplishment of results that will benefit the corporation, and the creditors and stockholders thereof. The law will not permit a director of an insolvent corporation to purchase all of its assets, or by his purchase of all the assets render the incorporation insolvent, at execution sale to which he is not a party, for a less consideration than the value of the property, without requiring him to account for the property or its value. When a director so purchases the property, and refuses to account for the same or its value, he is chargeable with the property or its value, with the profits or interest accruing therefrom, as a trust fund for the use and benefit of the corporation, its creditors and stockholders.

*Tobin Canning Co. v. Fraser*, 81 Tex. 407, 413 (Tex. 1891) (string citing numerous cases) (emphasis added). *See also Cardwell v. Gurley*, 2018 WL 3454800, at *4 (Tex. App.—Dallas 2018) (fiduciary duties owed with respect to LLC); *Prostok v. Browning*, 112 S.W.3d 876, 913–14 (Tex. App.—Dallas 2003), aff'd in part, rev'd in part, 165 S.W.3d 336 (Tex. 2005) ("if management of a debtor-in-possession

breaches the fiduciary duties owed to creditors, those creditors can sue management for the damages caused by the breach.")

But again, here the Baymark Defendants arranged a scheme in which they created (they maintain) an insolvent entity (ACET Global) under the control of its principals, Ludlow and Hook, and its manager Baymark ACET Holdco, which was under the control of *its* principals, Ludlow and Hook, and Denegre personally. The then-CEO (William Szeto) of that company (ACET Global) formed a new entity (Windspeed) with the assistance of, and that was paid for by, the Baymark Defendants and Super G Capital.

While he continued as the CEO of ACET Global and was being paid by Ludlow and Hook, Szeto also took on the role of CEO of Windspeed. Windspeed, notably was "owned" and controlled by Baymark (40%); Super G Capital (40%); and Szeto (20%). Windspeed began to steal ACET Global's intellectual property, expropriating its website (SAC ¶¶ 12 and 197), transferring its bank and payment accounts to its benefit (SAC ¶ 202), and holding its assets out for sale (*Id.*)—all of this beginning in 2018. Windspeed; ACET Global; and Baymark ACET Holdco were all represented by Perrin in the transactions. Indeed, Hallett & Perrin was even a notice party for Windspeed in its after-the-fact fraudulent Foreclosure Sale Agreement with Super G Capital. (SAC ¶ 14). And in a subsequent effort to continue to mislead and hide the prior fraud and breaches, Perrin, acutely aware of all of the relationships among the parties made the following representation to undersigned counsel:

> I trust you will agree that this documentation/information confirms what we discussed last week, namely that Super G is wholly independent from any of the Defendants [e.g., Baymark Partners and Windspeed] named in Plaintiff's lawsuit.

(SAC ¶ 128).

After the events above, the Baymark Defendants voluntarily placed ACET Global into bankruptcy and falsely informed the federal court and bankruptcy trustee that they had only transferred "$30,000" of assets to Super G Capital, all in an effort to hide the frauds and violations.

They also conspicuously failed to disclose their interest in those assets or Windspeed, or their transfer of those assets for the benefit of Super G Capital.

Notably, throughout the transactions at issue, the Baymark Defendants were agents with respect to the Plaintiff. The Security Agreement and Note placed obligations upon them to safeguard both the value of ACET Global and its assets and placed them in a position of agency. As a result, fiduciary obligations arose out of agency law as well. They certainly were not entitled to breach a duty of loyalty by engaging in a self-dealing transaction that accrued to their benefit and resulted in harm to ACET Global and ACET's largest secured creditor: D&T Partners.

Likewise, the Baymark Defendants owed informal fiduciary duties to Plaintiff. They were placed in a position of trust and confidence with respect to the Plaintiffs' interests. (SAC ¶¶ 454-455). They exercised all control over ACET Global.  (SAC ¶¶ 6, 93, 215).  They controlled its financial affairs. They controlled (and shutdown and diverted) its bank accounts and payment accounts.  (SAC ¶¶ 202, 216, 288).  They exercised possession of its assets.  They held themselves out as the president and manager.  (SAC ¶ 85-86, 168, 216, 298, 307, 454).  They maintained the (undisclosed) relationships with key parties: Super G Capital and Windspeed.  (SAC ¶¶ 129, 216).  Indeed, they exercised ownership and control over Windspeed and orchestrated a transfer of assets among these key parties. (SAC ¶¶ 6-7, 461-463). As discussed elsewhere, they made representations upon which D&T relied. (SAC ¶ 452). They were experienced and sophisticated deal makers.  (SAC ¶ 2).  D&T was not.  (SAC ¶ 6, FN 10).  In this context, they owed informal fiduciary duties to Plaintiff. They were obligated to place D&T's and ACET's interests above their own. And they were certainly not entitled to engaged in self-dealing by siphoning off ACET Global's assets to a newly- and discreetly-formed entity run by ACET Global's CEO for their benefit and to the detriment of the Plaintiff.

### C.  Texas Uniform Fraudulent Transfer Act.

The "foreclosure sale" was not an arms-length transaction made in the ordinary course of business.[17] For example, the evidence demonstrates as follows:

- Baymark Partners Management, LLC owns and controls a 40% interest in Windspeed;

- Anthony Ludlow is the "Baymark Director" on the board of Windspeed. Super G Capital also has the right to appoint, and has appointed, a board member for Windspeed. Additionally, Windspeed's company agreement provides that no member has control over any aspect of Windspeed. Indeed, the board of directors, by majority (which is controlled together between Baymark and Super G Capital).

- William Szeto, the CEO of ACET Global and current CEO of Windspeed, stated to a former employee of ACET Global that "he was going to 'start another business.'" According to that employee, "[Szeto] suggested he 'had friends,' and that if ACET Global went bankrupt, [Szeto] could continue the operations with a new company." Website screenshots demonstrate that Windspeed copied ACET Global's website and product descriptions, even down to the exact same typographical error made on ACET Global's website;

- William Szeto and the Baymark Defendants formed Windspeed on September 27, 2018—while he was still CEO of ACET Global. Szeto served as CEO for ACET Global and Windspeed **at the same time**;

- The Baymark Defendants had already transferred and usurped all of ACET Global's business to Windspeed prior to the faux foreclosure, which was concocted after a formal legal demand letter for the defaulted amounts owed to D&T. They were marketing and selling assets specifically listed in the foreclosure and sale agreement six months before they executed the faux "foreclosure" documents—there was, in other words, nothing left to foreclose on.

- The "foreclosing lender," **Super G, also owns and controls 40% of Windspeed** and holds the right to appoint a manager to Windspeed's board of directors. In other words, Windspeed surreptitiously purported to acquire assets in a "foreclosure sale" from **its owner and board member** (though Windspeed didn't actually "pay" a dime);

- Matt Denegre, a manager at Baymark Partners, sent an email to ACET Global's CPA in August 2020 that the foreclosure of ACET Global occurred in **September 2018** (well before the actual foreclosure), which coincides precisely with the formation of Windspeed.

The purpose of the Texas Uniform Fraudulent Transfer Act ("TUFTA") is "to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Janvey v. Golf*

---

[17] Notably, Mr. Perrin's firm prepared the documents at issue **and even represented Windspeed** in the transactions.

*Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016). Under TUFTA, a transfer made with actual or constructive intent to defraud any creditor may be avoided to the extent necessary to satisfy the creditor's claims. Tex. Bus. & Comm. Code § 24.005(a).

This was not an arms-length transaction made in the ordinary course of business. It was a collusive foreclosure sale between Windspeed, Super G Capital, and the Baymark Defendants made to hinder, delay, or defraud D&T Partners

**D. Civil Conspiracy.**

The Baymark Defendants should also not prevail with respect to Plaintiff's civil conspiracy claim.

The elements of civil conspiracy are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Anderton v. Cawley*, 378 S.W.3d 38, 60 (Tex. App.—Dallas 2012). Those elements are satisfied by even a cursory review of the basic facts:

- **Two or more persons.** Multiple parties were involved in the transfer of ACET Global's assets, including, but not limited to: Windspeed, William Szeto, ACET Global, Tony Ludlow, David Hook, Super G Capital, and all of the Baymark Defendants.

- **An object to be accomplished.** Here, the object to be accomplished was the removal of ACET Global's assets to defraud a creditor. The course of conduct, emails, and acts demonstrate the object.

- **A meeting of the minds on the object or course of action.** A meeting of the minds occurred. The course of conduct, emails, and acts demonstrate the object. The "wind down" plan memorializes this.

- **One or more unlawful, overt acts.** The SAC is replete with unlawful overt acts.

- **Damages as a proximate result.** The Baymark Defendants' actions and the actions of their co-conspirators, caused a default on a $3.2 million note and unlawfully removed ACET Global's assts.

V.    <u>Prayer.</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Court deny the Baymark Defendants' Motion to Dismiss.  Moreover, to the extent that the Court intends to otherwise grant any portion of their Motion, Plaintiffs hereby request leave to replead to remedy any purported deficiencies.  Finally, the Plaintiffs request that the Court grant Plaintiffs all other relief, at law or in equity, to which they may show themselves justly entitled.

Dated: September 2, 2022

/s/ Jason B. Freeman
Jason B. Freeman
Texas Bar No. 24069736
Matthew L. Roberts
Texas Bar No. 24098330
Thomas L. Fahring III
Texas Bar No. 24074194
Gregory W. Mitchell
Texas Bar No. 00791285
Zachary J. Montgomery (forthcoming)
Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

On September 2, 2022, I filed the foregoing document with the clerk o court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or *pro se* parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

By: */s/ Jason B. Freeman*
Jason B. Freeman