UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC | § § § § § | |
| and | § § | |
| ACET Global, LLC, | § § | |
| **Plaintiffs,** | § § | |
| v. | § § | CIVIL CAUSE NO. 3:21-cv-01171-B |
| BAYMARK PARTNERS, LP; BAYMARK PARTNERS MANAGEMENT, LLC; BAYMARK MANAGEMENT, LLC; SUPER G CAPITAL, LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; et al., | § § § § § § § § § § § | |
| **Defendants.** | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO WINDSPEED
AND MR. SZETO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
PURSUANT TO RULE 12(b)(6) AND BRIEF IN SUPPORT**

Jason B. Freeman
 TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iii

**I.**   **Introduction.** ........................................................................................................1

**II.**   **Background.** ..........................................................................................................3

**III.**   **Relevant Facts.** ....................................................................................................3

    A.   ACET Global Purchases the Assets of ACET Venture Partners, LLC. .....................3
    B.   Szeto and Windspeed Trading, LLC. .......................................................................4
    C.   The "Wind Down" of Global. .................................................................................5
    D.   Windspeed. .............................................................................................................5
    E.   The Hiding of Global's Inventory ............................................................................6
    F.   Windspeed Creates a Carbon Copy Website of Global's Website. ...........................6
    G.   Windspeed Takes Over the Global Accounts. ..........................................................7
    H.   D&T Partners' Demand for Payment on the D&T Note. .........................................7
    I.   The Cover Up and Fake Forfeiture Notice. .............................................................7
    J.   The Fraudulent Bankruptcy Filing and Contradictory Tax Filings. ..........................8
    K.   State Court Litigation. .............................................................................................9

**IV.**   **Standard of Review Under Rule 12(b)(6).** ..........................................................9

**V.**   **Standard of Review Under Rule 9(b).** ...............................................................9

**VI.**   **Arguments and Authorities.** ..............................................................................10

    A.   RICO Claims. ........................................................................................................10
        1.   Plaintiffs' 18 U.S.C. § 1962(c) Claims. .............................................................11
            i.   The Complaint Properly Establishes a Pattern of Racketeering. ....................12
            ii.   The Complaint Alleges Sufficient Involvement by the Windspeed Actors in the Pattern of Racketeering. ..................................................................................................13
            iii.   Plaintiffs have Properly Pled an Enterprise. ................................................15
        2.   Plaintiffs' 18 U.S.C. § 1962(a) Claims. .............................................................18
        3.   Plaintiffs' 18 U.S.C. § 1962(d) Claims. .............................................................19
            i.   Plaintiff's Allegations that the Windspeed Actors Committed Mail and Wire Fraud are Predicate Acts. ..........................................................................................................20
            ii.   Plaintiff's Allegations that the Windspeed Actors Lied Under Oath are Predicate Acts. 21
            iii.   Plaintiff's Allegations that the Windspeed Actors Engaged in Money Laundering are Predicate Acts. .....................................................................................................22
    B.   State Law Causes of Action. ..................................................................................23
        1.   Fraud. .............................................................................................................23
        2.   Breach of Fiduciary Duty and Aiding and Abetting. .........................................24
        3.   Texas Uniform Fraudulent Transfer Act. ..........................................................24
        4.   Civil Conspiracy. .............................................................................................25

**VII.**   **Prayer.** ...............................................................................................................25

**CERTIFICATE OF SERVICE** .....................................................................................27

## TABLE OF AUTHORITIES

### Cases

*Abraham v. Singh,*
480 F.3d 351 (5th Cir. 2007) ........................................................................ 12, 17

*Allstate Ins. Co. v. Benhamou,*
190 F. Supp. 3d 631 (S.D. Tex. 2016) ................................................................ 17

*Allstate Ins. Co. v. Plambeck,*
802 F.3d 665 (5th Cir. 2015) ............................................................................ 16

*Anderton v. Cawley,*
378 S.W.3d 38 (Tex. App.—Dallas 2012) .......................................................... 25

*Bank of Mongolia v. M&P Global Fin. Svs.,*
2010 WL 11549711 (S.D. Fla. Sept. 3, 2010) .................................................... 14

*Boyle v. U.S.,*
556 U.S. ...................................................................................................... 11, 15, 16

*Brown v. Phoenix Life Ins. Co.,*
843 Fed. Appx 533 (5th Cir. 2021) ...................................................................... 9

*Casperone v. Landmark Oil & Gas Corp.,*
819 F.2d 112 (5th Cir. 1987) ............................................................................ 14

*Cedric Kushner Promotions, Ltd. v. King,*
533 U.S. 158 (2001) .......................................................................................... 18

*Chaney v. Dreyfus Serv. Corp.,*
595 F.3d 219 (5th Cir. 2010) ............................................................................ 20

*Collins v. Morgan Stanley Dean Witter,*
224 F.3d 496 (5th Cir. 2000) ........................................................................ 20, 25

*Cypress/Spanish Ft. I, L.P. v. Pro. Serv. Indus., Inc.,*
814 F. Supp. 2d 698 (N.D. Tex. 2011) ...................................................... 2, 12, 16, 21

*Delta Truck & Tractor, Inc. v. J.I. Case Co.,*
855 F.2d 241 (5th Cir. 1988) ............................................................................ 11

*Dorsey v. Portfolio Equities, Inc.,*
540 F.3d 333 (5th Cir. 2008) .............................................................................. 7

*Efron v. Embassy Suites (P.R.), Inc.,*
223 F.3d 12 (1st Cir. 2000) .......................................................................... 2, 13

*El Paso, Tex. v. Jones,*
2009 WL 4730305 (W.D. Tex. Dec. 4, 2009) .................................................... 14

*Funk v. Stryker Corp.,*
631 F.3d 777 (5th Cir. 2011) .............................................................................. 3

*George v. Blue Diamond Petroleum, Inc.,*
718 F. Supp. 539 (W.D. La. July 20, 1989) ...................................................... 14

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,*
313 F.3d 305 (5th Cir. 2002) ............................................................................ 19

*H.J. Inc. v. Nw. Bell Tel. Co.,*
492 U.S. 229 (1989) .......................................................................................... 12

*Howell Petroleum Corp. v. Weaver,*
780 F.2d 1198 (5th Cir. 1986) .......................................................................... 10

*ICONICS, Inc. v. Massaro,*
 192 F.Supp.3d 254 (D. Mass. 2016) ............................................................... 13

*Janvey v. Dillon Gage, Inc. of Dallas,*
 856 F.3d 377 (5th Cir. 2017) ............................................................................ 24

*Lucas v. Ocwen Home Loan Servicing,*
 2014 WL 7059274 (N.D. Tex. Nov. 21, 2014) ................................................ 16

*Massey v. EMC Morg. Corp.,*
 546 Fed. Appx 477 (5th Cir. 2013) .................................................................... 9

*Nottingham v. Richardson,*
 499 Fed. Appx. 368 (5th Cir. 2012) ................................................................. 10

*Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.,*
 9 F.4th 247 (5th Cir. 2021) .............................................................................. 10

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,*
 879 F.2d 10 (2d Cir. 1989) .......................................................................... 2, 12

*Provost v. First Guaranty Bank,*
 2019 WL 3412432 (E.D. La. July 29, 2019) .................................................... 17

*Reves v. Ernst & Young,*
 507 U.S. 170 (1993) .......................................................................................... 13

*Salinas v. United States,*
 522 U.S. 52 (1997) ............................................................................................ 20

*Sedima v. Imrex Co., Inc.,*
 473 U.S. 479 (1985) .................................................................................... 10, 11

*Simmons v. Jackson,*
 2019 WL 3043927 (N.D. Tex. June 7, 2019) ................................................... 13

*Snow Ingredients, Inc. v. SnoWizard Incorporated,*
 833 F.3d 512 (5th Cir. 2015) ............................................................................ 22

*St. Germain v. Howard,*
 556 F.3d 261 (5th Cir. 2009) ............................................................................ 12

*St. Paul Mercury Ins. Co. v. Williamson,*
 224 F.3d 425 (5th Cir. 2000) ...................................................................... 17, 18

*Swierkiewicz v. Sorema N. A.,*
 534 U.S. 506 (2002) .......................................................................................... 10

*Tigrett v. Pointer,*
 580 S.W.3d 375 (Tex. App.—Dallas 1978) ..................................................... 24

*Torrey v. Infectious Diseases Society of Am.,*
 2018 WL 10124894 (E.D. Tex. Sept. 27, 2018) .............................................. 20

*Trenholm v. Ratcliff,*
 646 S.W.2d 927 (Tex. 1983) ............................................................................ 23

*U.S. v. Dovalina,*
 262 F.3d 472 (5th Cir. 2001) ............................................................................ 23

*U.S. v. Elliott,*
 571 F.2d 880 (5th Cir. 1978) ...................................................................... 13, 16

*U.S. v. Maltos,*
 985 F.2d 743 (5th Cir. 1992) ............................................................................ 20

*U.S. v. Posada-Rios,*
 158 F.3d 832 (5th Cir. 1998) ............................................................................ 20

*U.S. v. Turkette,*
 452 U.S. 576 (1981) .......................................................................................... 16

*United Healthcare Sevices, Inc. v. Next Health, LLC,*
   2021 WL 764035 (N.D. Tex. Feb. 26, 2021) ................................................................. 23
*United States v. Finney,*
   714 F.2d 420 (5th Cir. 1983) ....................................................................................... 14
*United States v. Indelicato,*
   865 F.2d 1370 (2d Cir.1989) .................................................................................... 2, 12
*Varela v. Gonzales,*
   2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) ............................................................. 10
*West Tex. Nat. Bank v. FEC Holdings, LP,*
   2013 WL 2158658 (W.D. Tex. May 17, 2013) ........................................................... 17
*Zastrow v. Houston Auto Imports Greenway, Ltd.,*
   789 F.3d 553 (5th Cir. 2015) ...................................................................................... 22

## **Statutes**

18 U.S.C. § 1961(1) ......................................................................................................... 11
18 U.S.C. § 1961(3) ..................................................................................................... 11, 16
18 U.S.C. § 1961(4) ..................................................................................................... 11, 16
18 U.S.C. § 1961(5) ......................................................................................................... 11
18 U.S.C. § 1962(a) ............................................................................................... 18, 19, 20
18 U.S.C. § 1962(b) ......................................................................................................... 20
18 U.S.C. § 1962(c) ............................................................................................... 11, 19, 20
18 U.S.C. § 1962(d) ............................................................................................... 11, 19, 20
18 U.S.C. § 1964(c) ......................................................................................................... 10
Tex. Bus. & Com. Code § 24.005(a)(1) ............................................................................ 24

## **Rules**

Fed. R. Civ. P. 9(b) ......................................................................................................... 10
Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1, 9, 10, 17

Plaintiffs, by and through counsel, file this response in opposition to Defendants Windspeed Trading, LLC ("Windspeed") and William Szeto's ("Szeto" and collectively with the previously referenced defendant, the "Windspeed Actors") combined motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). For the reasons set forth below, Plaintiffs respectfully request that this Court deny the Motion. Plaintiffs hereby adopt and incorporate their separate responses to the motions to dismiss filed by Defendants SG Credit Partners, Inc. and Marc Cole, Super G Capital LLC and Steven Bellah, the Windspeed Employees, Hallett & Perrin, P.C. and Julie A. Smith, Baymark ACET Holdco, LLC, the Baymark Defendants, and David Hook and Tony Ludlow, as well as the arguments incorporated therein.

## I.    Introduction.

This case does *not* present a mere business dispute. Rather, the facts in the Second Amended Complaint ("SAC" or "Complaint"), taken as true, clearly demonstrate that the named Defendants in this action, including the Windspeed Actors, engaged in a series of elaborate, sophisticated, and coordinated acts of deception that spanned a ***four-year period***, culminating in **no less than 100 RICO predicate acts**, and damages to ***more than 24 RICO victims***. The facts as alleged in the 194-page SAC overwhelmingly support Plaintiffs' RICO claim.

For example, after chronologically listing over 100 predicate acts, the Plaintiffs specifically state, in part, in their Second Amended Complaint the following:

> The non-exhaustive list of at least 100 predicate acts described above spanned at least from June 13, 2017, through May 15, 2021—a span of nearly four (4) years—and continues through the present based on the Defendants' recent actions.

> Moreover, the RICO Enterprise's actions were not aimed solely at the Plaintiffs but multiple other victims, including ACET Global's multiple other creditors: DHL Express; FedEx; Immanuel Industrial Co., Ltd.; Lux.24; Pet Life LLC; Johnson Lancaster & Associates; Damti; UPS Supply Chain; and UPS Warehouse. *See* Exhibit 19.

(Dkt. 91, at ¶¶ 318–19).

Moreover, despite the Windspeed Actors' contentions otherwise, the Plaintiffs plausibly plead the second element of their RICO claims—that the Defendants engaged in a pattern of racketeering activity.  Contrary to its reliance on *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12 (1st Cir. 2000), this Court held (11 years later) in *Cypress/Spanish Ft. I, L.P. v. Pro. Serv. Indus., Inc.* the following:

> In order to establish a pattern of racketeering activity, a plaintiff need not demonstrate multiple schemes. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 16 (2d Cir. 1989). "Congress did not mean 'to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme.' " *Id.* (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989)). Instead, continuity can be established "in various ways," including the nature of an enterprise or "the sheer number of predicate acts over several years." *Id.*

*Cypress/Spanish Ft. I, L.P. v. Pro. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 714 (N.D. Tex. 2011) (Boyle, J.).

That is, even where a plaintiff alleges a RICO claim involving one scheme, one project, one primary victim, and predicate acts consisting primarily of mail and wire fraud—as was the case in *Cypress/Spanish*—the plaintiff may still establish a pattern of racketeering activity. In their Second Amended Complaint, the Plaintiffs allege far more than the plaintiff in *Cypress/Spanish*.

Indeed, the SAC incorporates, among other additions, a new section: Summary of the Pattern of Fraudulent Activity and the RICO Enterprise's Continuing Threat.  (Dkt. 91, at ¶¶ 315–21).  It is here that the Plaintiffs summarily describe the structure of the RICO enterprise; provide a non-exhaustive, chronological list of the Defendants' more than 100 predicate acts; list multiple other victims of the RICO enterprise's actions (at least 24); and describe the continued threat posed by the RICO enterprise.  (*Id.*).

Finally, as discussed *infra*, the Plaintiffs' SAC properly pleads a RICO enterprise, meets Rule 9(b)'s heightened pleading standard with respect to the Windspeed Actors' predicate acts, and sufficiently pleads Plaintiffs' supplemental state causes of action.

## II.    Background.

Plaintiffs' SAC alleges causes of action against the Windspeed Actors under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  In addition to the RICO claims, the Complaint alleges causes of action under Texas law for: (i) aiding and abetting breach of fiduciary duties; (ii) claims under the Texas Uniform Fraudulent Transfer Act; and (iii) civil conspiracy.  The 194-page Complaint is well pled.  Taken together, the Complaint alleges that the Defendants, including the Windspeed Actors, engaged in a pre-conceived, collective, and concerted effort to effectively steal and misappropriate all of the assets from an existing business, D&T Partners, LLC ("D&T Partners"), through the fraudulent guise of what the Defendants now attempt to label as a lawful foreclosure and/or sale. (Dkt. No. 102-1, at ¶¶ 3–4).

## III.    Relevant Facts.

### A.    ACET Global Purchases the Assets of ACET Venture Partners, LLC.

In the summer of 2017, Baymark Partners, LP ("Baymark") and its principals, David Hook ("Hook"), Tony Ludlow ("Ludlow"),[1] and Matthew Denegre ("Denegre") approached Tomer Damti ("Damti"), seeking to purchase the assets of ACET Ventures, LLC ("ACET"), an e-commerce business that Damti owned. (Dkt. No. 91, ¶ 60).  To facilitate the purchase of assets, Baymark formed another entity, Global.  (Id., ¶ 61).  And, through an Asset Purchase Agreement, dated July 14, 2017 (the "APA"), Global purchased all of the assets of ACET.[2]  (Id., ¶ 62; see also Exhibit 23).

---

[1] Baymark, Hook, and Ludlow have been named in at least one other federal RICO lawsuit.  See Greb et al. v. Singleton et al., No. 3:18-cv-01439-M (N.D. Tex.), Dkt. No. 1; see also Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (noting that it is well-established and "clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.").  Plaintiffs adopt and incorporate by reference the pleadings in Greb.

[2] As mentioned infra, Denegre had a calendar invite on Outlook a month **prior** to the execution of the APA regarding "Windspeed."  Windspeed Trading, LLC would eventually be the name of the entity that all of the parties would elect to use in 2018 as a vehicle to fraudulently transfer the assets of Global away from D&T Partners.  And, the name of Windspeed Trading, LLC was chosen because William Szeto's ("Szeto") father was partial to that name prior to his death—i.e., the other Defendants in this lawsuit had no connection to the name Windspeed Trading, LLC.  (Dkt. No. 91, ¶ 67).  Szeto would also later become the CEO of Global and Windspeed and effectively the 20% owner of Windspeed.  See infra.

Under the APA, Global agreed to: (1) pay $850,000 to D&T Partners, LLC ("D&T Partners"), subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners; and (3) provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC ("Baymark Holdco"). (*Id.*, ¶ 68). As part of the transaction, Global executed a promissory note with D&T Partners, memorializing the $3,230,000 payable to D&T Partners (the "D&T Note"). (*Id.* ¶ 69). The D&T Note required a first installment payment to D&T Partners on October 31, 2018. (*Id.*). Separately, Baymark Holdco entered into a security agreement with D&T Partners. (*Id.*, ¶ 70).

### B.   Szeto and Windspeed Trading, LLC.

When the APA was entered into, Baymark had not yet formed Windspeed. (*Id.*, ¶ 67). Curiously, however, Denegre had a recurring weekly call scheduled on his calendar for "Windspeed" **that began roughly a month prior to the closing date of the APA**. (*Id.*).

On or around February 14, 2018, Szeto became the CEO of Global. (*Id.*, ¶ 85). According to Hook, Szeto "work[ed] for free" with no financial promise made to him or expectation of a financial award. (*Id.*, ¶ 86).

Although Baymark was in compliance with the Super G Note—a $1 million term loan facility from Super G Capital, LLC ("Super G") and Global—in February 2018, or the month in which Damti was terminated, Global "defaulted" on its note to Super G shortly after Szeto was named CEO of Global. (*Id.*, ¶¶ 88–89). At the time of the default, "Global had millions of dollars of assets and an ongoing business operation." (*Id.*, ¶ 229).

Because of the "default," Baymark and Super G entered into a Forbearance Agreement in April of 2018, which provided for a forbearance period until October 25, 2018. (*Id.*, ¶ 90). Significantly, the forbearance period ended just days before the D&T Note payments would become due to D&T Partners. (*Id.*). Pursuant to the Forbearance Agreement, Global would "wind down"

and transfer its assets and business operations to a newly-formed entity:  Windspeed.  (*Id.*).  Super G relied on Baymark to "come up with [the] plan" and Baymark and its principals offered the restructuring plan to Super G.  (*Id.*, ¶ 119).

### C.  The "Wind Down" of Global.

In April of 2018, Baymark began to set the stage to execute their "wind down" plan.  (*Id.*, ¶ 100).  Szeto, while serving as the CEO of Global, worked closely with Denegre and Ludlow to fine tune the "wind down" plan and, ultimately, to put the plan into action.  (*Id.*). According to an email written by Ludlow, the parties expressly wanted to ensure that Global did not "default on Tomer [Damti's] debt and have [Damti] regain the company."  (*Id.*, ¶ 115).

On September 27, 2018, while he was still CEO of Global, Szeto filed a Certificate of Formation Limited Liability Company for Windspeed.  (*Id.*, ¶ 126).  Szeto continued to serve as CEO of both Global and Windspeed at the same time.  (*Id.*).

### D.  Windspeed.

On October 18, 2018, or two weeks before the D&T Note payment would become due on October 31, 2018, Szeto, on behalf of Windspeed; Ludlow, on behalf of BP Management; and Cole, on behalf of Super G, executed an Amended and Restated Company Agreement of Windspeed ("Company Agreement").  (*Id.*, ¶ 156).   Under the Company Agreement, they became business partners with the following beneficial ownership:  BP Management (40%), Super G (40%), and Szeto (20%).  (*Id.*, ¶¶ 156, 161).  The Company Agreement provided Super G and BP Management with perpetual authority to appoint and control a board member of Windspeed's three-person board, in addition to the right to replace those board members.  (*Id.*, ¶ 168).  Under the Company Agreement, the board members managed all of the business and affairs of Windspeed by majority—*i.e.*, Super G and BP Management maintained complete control.  (*Id.*).

In October of 2018, Szeto began serving as the CEO of Windspeed. (*Id.*, ¶ 181). Later, every employee of Global was transferred to Windspeed after the "wind down" was executed. (*Id.*, ¶ 182). Specifically, each employee was notified on October 9, 2018, via email that they had been terminated from Global effective September 28, 2018, and that their employment with Windspeed had become effective thereafter. (*Id.*, ¶ 183).

### E. The Hiding of Global's Inventory.

After Windspeed was formed, Szeto, Ketter, and Tomerlin caused the transfer of all of Global's inventory to Windspeed. (*Id.*, ¶¶ 196–98). In an attempt to conceal the true nature of the transfer, Ketter and Tomerlin obtained a temporary storage unit at CubeSmart Self Storage of Dallas ("CubeSmart") in September of 2018 to hold Global's inventory. (*Id.*, ¶ 198). Rather than establishing the CubeSmart account in the name of Windspeed or Global, Tomerlin used her own name and personal address to set up the account. (*Id.*). After Global's inventory was transferred to Windspeed, Windspeed continued to sell the inventory with the same customer marketplaces and the same software used by Global. (*Id.*, ¶ 199).

### F. Windspeed Creates a Carbon Copy Website of Global's Website.

In 2018, Windspeed and Torres "expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts." (*Id.*, ¶ 202). Indeed, "[a]s of at least December 12, 2018, Windspeed's website was a carbon copy of the former ACET Global website." (*Id.*). The Windspeed website included postings holding out for sale hundreds of products—distinct and unique products—that were in fact one and the same as those later reflected in Global's inventory of items in the Foreclose Sale Agreement. (*Id.*). Accordingly, Windspeed continued to sell Global's inventory, pocketing the revenues for itself and its owners. (*Id.*, ¶¶ 206–07).

### G. **Windspeed Takes Over the Global Accounts.**

On December 5, 2018, Lin, a former employee of Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of a Global account. (*Id.*, ¶ 214). Lin used her Windspeed email address and listed herself as the "New Account Owner" for an account held in Global's name. (*Id.*).

### H. **D&T Partners' Demand for Payment on the D&T Note.**

D&T Partners demanded payment on the D&T Note. (Dkt. No. 91, at ¶ 13–14). Indeed, by letter dated December 9, 2018, D&T Partners' attorney sent a demand letter to Baymark, Global, and Hallett & Perrin. (Ex. 1).[3] In the demand letter, D&T Partners communicated to Baymark, Global, and Hallett & Perrin that the D&T Note was in default. (*Id.*).

### I. **The Cover Up and Fake Forfeiture Notice.**

Many months after the purported transfer of Global's assets to Windspeed and the wind-down of Global, and apparently to circumvent the growing demands by D&T Partners for Defendants to pay on the D&T Note, on January 31, 2019, Super G (in coordination with Baymark) issued a Notice of Forfeiture ("Forfeiture Notice"). (*Id.*, ¶ 231; *see also* Ex. 17). The Baymark Defendants and Windspeed engaged Hallett & Perrin to represent them, and Hallett & Perrin drafted the Forfeiture Notice. (*Id.*, ¶¶ 231–36). The Forfeiture Notice was sent to the attention of Hook at his Baymark address (not the old Global address). (*Id.*, ¶ 231). Moreover, the Forfeiture Notice was issued well after all parties, including Hallett & Perrin, had full knowledge that the assets at issue (*i.e.*, Global's assets) had already been transferred months before to Windspeed, an entity that was beneficially owned and controlled by Super G, BP Management, and Szeto. (*Id.*, ¶ 232). Because Global had already transferred all of its assets and operations to Windspeed several months before, there was no

---

[3] Although not attached to the Complaint, the Court may consider the demand letter sent by D&T Partners to the Defendants because it is referenced in the Complaint. (Dkt. No. 91, at ¶ 13–14). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

physical foreclosure sale as Windspeed continued those operations and sold off the inventory.  (*Id.*, ¶ 237).

### J.  The Fraudulent Bankruptcy Filing and Contradictory Tax Filings.

On October 23, 2019, Global filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy with the Eastern District of Texas seeking relief under Chapter 7 of the Bankruptcy Code. (Dkt. No. 91, ¶ 257; *see also* Ex. 19).  Ludlow signed the petition on behalf of Global.  (*Id.*).  In the petition, Global acknowledged that it owed ACET Ventures Partners, LLC $3,230,000. (*Id.*)  Global also asserted that it had transferred within 1 year $30,000 of property to Super G on "01/2019" and that it had no significant assets. (*Id.*)

The bankruptcy petition contained a multitude of false statements designed to conceal assets from the bankruptcy trustee and from D&T Partners, the latter of which had already filed a lawsuit against Global, Windspeed, and Baymark in the District Court of Dallas County on July 12, 2019.[4] (Dkt. No. 91, ¶ 17).  For example, the petition requested information as to whether "inventories of the debtor's property . . . [had] been taken within 2 years before filing this case?" (Dkt. No. 91, ¶ 274–75).  Ludlow and Global answered "No".  (*Id.*).  In deposition testimony in the state court action, the Global parties admitted that this answer was wrong and that only days prior to the bankruptcy filing they had reviewed Global's purported inventory.  (*Id.*, ¶¶ 275–79).  In addition, the petition requested Global to "[l]ist any property kept in storage units or warehouses within one year before filing this case." (*Id.*, ¶ 286).  Ludlow and Global answer "None".  (*Id.*).  However, CubeSmart records indicate that Tomerlin, Ketter, and/or Windspeed moved Global's inventory into storage at least as of October 25, 2018 and moved such inventory from storage on or about November 16, 2018.  The bankruptcy petition contained many other fraudulent representations.  (*Id.*, ¶ 18).

---

[4] Plaintiffs request the Court take judicial notice of this lawsuit in state court.  *See D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC),* Plaintiff v. *ACET Global, LLC, et al.*, No. DC-19-09828 (District Court of Dallas County, 116th Judicial District).

Significantly, the federal tax returns of the relevant entity, Baymark ACET Holdco, LLC, which held Global's membership interests, represented that Global's assets were significantly more than Global had reported on the bankruptcy petition. (Dkt. No. 91, ¶ 16). More specifically, on its 2018 IRS Form 1065, *U.S. Return of Partnership Income*, Baymark ACET Holdco, LLC represented that it had $3,023,970 of total assets as of December 31, 2018. (*Id.*, ¶ 311). In addition, the 2019 IRS Form 1065, *U.S. Return of Partnership Income*, for Baymark ACET Holdco, LLC reported that the entity had received $2,907,290 in "proceeds" from the "foreclosure sale" of Global's assets. (*Id.*, ¶ 22).

### K. State Court Litigation.

During the state court litigation, the Defendants attempted to further the RICO enterprise through more deceit and strong-arm tactics. For example, during the deposition of Denegre, after Plaintiffs' counsel asked an important question regarding the foreclosure sale at issue, Ludlow stated: "Matthew [Denegre], shut the fuc* up." (Dkt. No. 91, ¶ 1). Thereafter, taking his cue from Ludlow, Denegre refused to answer the question. (*Id.*). Szeto also engaged in discussions with the Global/Windspeed employees prior to their scheduled depositions and instructed them on how to answer questions that may be asked by Plaintiffs' counsel. (Dkt. No. 91, Ex. 2, Tr. 109:15-25; 115:19-25; 116:1-3). To date, Windspeed continues its business operations with Szeto as its CEO. (*Id.*, Ex. 2, Tr. 32:1-5).

### IV.   Standard of Review Under Rule 12(b)(6).

In the Fifth Circuit, motions to dismiss for failure to state a claim under Rule 12(b)(6) are "viewed with disfavor and . . . [are] rarely granted." *Brown v. Phoenix Life Ins. Co.*, 843 Fed. Appx 533, 538-39 (5th Cir. 2021). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Massey v. EMC Mortg. Corp.*, 546 Fed. Appx 477, 480 (5th Cir. 2013). Accordingly, the district court may not dismiss a complaint under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief." *Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021); *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372 (5th Cir. 2012) (post-*Twombly* and *Iqbal*).  The relevant question in determining whether a motion to dismiss should be granted is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."  *See Nottingham v. Richardson*, 499 Fed. Appx. 368, 372-73 (5th Cir. 2012) (noting the "strict standard of review under Rule 12(b)(6)").

### V.       Standard of Review Under Rule 9(b).

According to Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened particularly requirement with respect to claims of fraud is a limited exception to Rule 8's notice pleading standard. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. . . . This Court, however, has declined to extend such exceptions to other contexts."). Accordingly, Rule 9(b) requires the Plaintiffs to plead the wire, mail, and bankruptcy fraud predicates with particularity; however, Rule 9(b) is inapplicable to all other RICO elements. *See, e.g.*, *Howell Petroleum Corp. v. Weaver*, 780 F.2d 1198, 1199 (5th Cir. 1986) (holding that pleading RICO elements is governed by the "liberal notice-pleading procedure of the Federal Rules of Civil Procedure"). To the extent the Defendants attempt to broaden Rule 9(b)'s application to non-fraud elements, they are mistaken, and only the Rule 8 pleading standard should apply.

### VI.      Arguments and Authorities.

### A.      RICO Claims.

"The Racketeer Influence and Corrupt Organization Act, originally passed to target mobsters and organized crime, has been interpreted to reach even 'respected and legitimate' businesses that violate the Act's prohibitions." *Varela v. Gonzales*, 2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) (citing *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985)).  Accordingly, 18 U.S.C. § 1964(c) provides a private

civil action and treble damages for those who are injured by violations of RICO's substantive provisions, including 18 U.S.C. § 1962(c) and (d). *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985). Plaintiffs have brought claims against the Windspeed Actors under 18 U.S.C. § 1962(c) and (d). (Dkt. No. 91, ¶¶ 322–407, 422–50).

Under both 18 U.S.C. § 1962(c) and (d), three threshold elements must be met: (1) a person must engage in (2) a pattern of racketeering activity; (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497–98.

### 1. Plaintiffs' 18 U.S.C. § 1962(c) Claims.

18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." For these purposes, the RICO statute provides the following definitions for each relevant term:

- A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

- A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Boyle v. U.S.*, 556 U.S. at 944 ("This enumeration of included enterprises is obviously broad, encompassing any . . . group of individuals associated in fact.").

- "Racketeering activity" is defined mean certain proscribed acts, *see* 18 U.S.C. § 1961(1), and a "pattern of racketeering activity" means "at least two acts of racketeering activity . . . which occurred within ten years . . . after the commission of a prior act of racketeering activity," *see* 18 U.S.C. § 1961(5).

i.     **The Complaint Properly Establishes a Pattern of Racketeering.**

Despite the Motion's assertions otherwise, the Complaint sufficiently pleads that the Defendants engaged in a pattern of racketeering activity.  That is, the Defendants engaged in two or more predicate criminal acts that were related and amounted to or posed a threat of continued criminal activity.  *See St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009).  This Court has held that a pattern may be established multiple ways, even where there is one scheme or one victim:

> In order to establish a pattern of racketeering activity, a plaintiff need not demonstrate multiple schemes. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir. 1989). "Congress did not mean 'to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme.'" *Id.* (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)). Instead, continuity can be established "in various ways," including the nature of an enterprise or "the sheer number of predicate acts over several years." *Id.*

*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F. Supp. 2d 698, 713 (N.D. Tex. 2011) (J. Boyle).

Further, the pattern of racketeering's continuity prong may be established by (1) a closed period of repeated conduct, or (2) to past conduct that by its nature projects into the future with a threat of repetition.  *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989).  Plaintiffs' allegations must be viewed liberally, particularly with respect to RICO's continuity prong.  *See Abraham v. Singh*, 480 F.3d 351, 355–56 (5th Cir. 2007).

Here, Plaintiffs have established both closed and open-ended continuity and summarized the Defendants' pattern of fraudulent activity and the RICO enterprise's continuing threat.  (Dkt. No. 91, at ¶¶ 315–21).[5]  Specifically, Plaintiffs provided a non-exhaustive, chronological list of at least 100 predicate acts spanning at least from June 13, 2017, through May 15, 2021—a span of nearly four (4) years.  (*Id.*, at ¶¶ 317–18).  *See Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2017) (two years is sufficient to establish a closed period of continuity).  Moreover, Plaintiffs pled that the RICO enterprise's actions

---

[5] *See also* Dkt. No. 91, at ¶¶ 373–404.

were aimed at the Plaintiffs, as well as multiple other victims, including the bankruptcy court, the bankruptcy trustee, and ACET Global's multiple other creditors.  (*Id.*, at ¶¶ 319).  *See, e.g.*, *ICONICS, Inc. v. Massaro*, 192 F.Supp.3d 254, 270 (D. Mass. 2016) (citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000)); *see id.* ("While the set of victims alleged by plaintiffs is not expansive, it includes not only [plaintiffs] but also, through the frauds committed in the bankruptcy process, the bankruptcy court and bankruptcy trustee.").  Further, Plaintiffs clearly stated that the Defendants' scheme poses a continuous threat, as the Defendants have testified to regularly evaluating new businesses and acquisition opportunities to expand the RICO enterprise's operations.  (*Id.*, at ¶¶ 320).

### ii.    The Complaint Alleges Sufficient Involvement by the Windspeed Actors in the Pattern of Racketeering.

The Motion also seeks to downplay or, in some cases, completely ignore many of the allegations that Plaintiffs have made against the Windspeed Actors.  For example, the Windspeed Actors contend that Plaintiffs have simply alleged Windspeed was a "sham" and Szeto was a "puppet," somehow suggesting these characterizations absolve them of any RICO liability.  (Dkt. No. 102-1, at ¶¶ 10–12).  In fact, the Motion suggests that Plaintiffs have not provided any evidence that the Windspeed Actors exercised any control or authority.  (Dkt. No. 102-1, at ¶¶ 40, 42).  The Motion misinterprets Plaintiffs' burdens at this early stage of the litigation.

Indeed, contrary to the Motion's contentions, federal courts have concluded that the RICO statute has broad reach: "[its] net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise."  *U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).  And the RICO statute "makes clear that RICO liability is not limited to those with formal positions in the enterprise," nor does it require "primary responsibility" or "significant control."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  This Court has also recently re-affirmed the longstanding position of the Fifth Circuit Court of Appeals: "[u]nder RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme."  *Simmons v. Jackson*, No. 3:15-

cv-01700-S-BT, 2019 WL 3043927, at *3 (N.D. Tex. June 7, 2019), *report and recommendation adopted*, No. 3:15-cv-1700-S-BT, 2019 WL 3034668 (N.D. Tex. July 11, 2019) (citing *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987) (per curiam); *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983); *see also Bank of Mongolia v. M&P Global Fin. Svs.*, No. 08-60623, 2010 WL 11549711, at *4 (S.D. Fla. Sept. 3, 2010) (same); *George v. Blue Diamond Petroleum, Inc.*, 718 F. Supp. 539, 550 (W.D. La. July 20, 1989) (same).

As the Fifth Circuit has held, a civil RICO defendant "need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *Casperone*, 819 F.2d at 115; *see also City of El Paso, Tex. v. Jones*, No. EP-09-cv-00119-KC, 2009 WL 4730305, at *22 (W.D. Tex. Dec. 4, 2009). For example, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails." *Finney*, 714 F.2d at 423.

Here, the allegations in the Complaint, taken as true, conclusively show that the Windspeed Actors were sufficiently connected to the fraudulent scheme. More specifically, Plaintiffs have alleged, in part, that: (1) Matt Denegre had a recurring weekly call scheduled on his calendar for "Windspeed"—a name used by Szeto's father—that first began on June 13, 2017; (2) Szeto became the CEO of Global on or around February 14, 2018; (3) Szeto deliberately caused Global to fail to pay the D&T Note, vendors, carriers, and others and fail financially; (4) Windspeed and Szeto drained Global of its funds and assets; (5) in June 2018, Szeto bragged to Monica Plaskett that he was going to "start another business," that Szeto "had friends," and that Szeto would continue Global's operations with a new company if Global went bankrupt; (6) Szeto worked closely with Denegre and Ludlow to fine tune Global's "wind down" plan; (7) Szeto, while CEO for Global, formed Windspeed on September 27, 2018; (8) Szeto served as CEO of Global and Windspeed at the same time; (9) on October 18, 2018, Szeto, on behalf of Windspeed, executed the Amended and Restated Company

Agreement of Windspeed, which provided ownership interests to BP Management and Super G; (10) Szeto transferred each of Global's employees to Windspeed, issuing retroactive employment termination letters to the employees; (11) Szeto instructed Global's/Windspeed's accountant to maintain two sets of books; (12) Szeto and Windspeed transferred Global's inventory and assets to Windspeed in 2018; (13) upon receipt of Global's inventory, Windspeed began selling Global's inventory; (14) Windspeed expropriated and copied Global's website; (15) Szeto and Windspeed closed Global's bank accounts and diverted Global's payment accounts; (16) Windspeed purchased new assets and inventory under Global's existing accounts; (17) Szeto, on behalf of Windspeed, executed the backdated Foreclosure Sale Agreement in late March 2019; (18) Szeto deliberately caused the loss and destruction of key Global emails and electronic evidence; (19) Windspeed deleted its website; and (20) Szeto and Windspeed gave demonstrably false testimony during their deposition.[6] (Dkt. No. 91, at ¶¶ 317).

Significantly, nearly *all* of these acts occurred well before the purported "foreclosure sale" that never actually occurred.  Further, the fact that the Windspeed Actors may have been characterized as a "sham" or "puppet" is irrelevant as to whether they were sufficiently connected to the fraudulent scheme.  *See also Boyle*, 556 U.S. at 946 (concluding that the relationships among those associated with the enterprise-in-fact need not involve a "hierarchical structure" or "chain of command.").  And with respect to the Windspeed Actors, and Szeto in particular, their actions objectively show that acted in a manner outside the scope of their purpose or employment with either Windspeed and/or Global.

### iii.    Plaintiffs have Properly Pled an Enterprise.

The Motion contends that Plaintiffs have failed to properly plead an "enterprise" as that term is used in the RICO statute.  (Dkt. No. 102-1, ¶ 5).  As indicated above, a RICO "enterprise" is any

---

[6] It should be noted that the deposition of Szeto conducted on April 2, 2021, that is referenced and incorporated in Plaintiffs' Complaint was in Szeto's personal capacity and in Szeto's capacity as representative of Windspeed.

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Industries, Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. Aug. 29, 2011) (Boyle, J.) ("An 'enterprise' is broadly defined by the Act, and it 'can be either a legal entity or an association-in-fact.'"). The Supreme Court in *Boyle* has held that "[t]his enumeration of included enterprises is obviously broad, encompassing any . . . group of individuals associated in fact." *Boyle v. United States*, 556 U.S. 938, 944 (2009); *U.S. v. Elliott*, 571 F.2d 880, 897 (5th Cir. 1978) (noting that Congress gave the term "enterprise" a very broad meaning). There is no requirement that the enterprise pursue lawful means. *See Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 674 (5th Cir. 2015) (citing *U.S. v. Turkette*, 452 U.S. 576 (1981)).

Here, Plaintiffs have identified 22 RICO "persons" under 18 U.S.C. § 1961(3). (Dkt. No. 91). Moreover, Plaintiffs have alleged that Baymark Partners was an entity enterprise within the meaning of 18 U.S.C. § 1961(4) (Dkt. No. 91, at ¶ 35). Curiously, the Windspeed Actors make no arguments as to why they were not RICO "persons" with respect to the alleged Baymark Partners enterprise. Rather, the Windspeed Actors focus all of their efforts on Plaintiffs' alternative allegations of an association-in-fact enterprise. *Compare* Dkt. No. 91, at ¶ 35 ("Baymark Partners is an enterprise within the meaning of 18 U.S.C. § 1961(4) . . .") *with* Dkt. No. 102-1, at ¶ 33 ("The only . . . [enterprise] pled by the Plaintiff [sic] . . . is an association in fact."). Because the Windspeed Actors have apparently waived any argument that the Windspeed Actors were not RICO persons with respect to the Baymark Partners enterprise, the Motion should be denied on these grounds.[7]

Moreover, Plaintiffs have properly pled an alternative association-in-fact enterprise. Although far from clear, the Motion appears to contend that Windspeed is not a RICO person or part of an

---

[7] To the extent the Windspeed Actors attempt to file a reply brief raising new arguments on this issue, the Court should deem them waived. *See, e.g., Lucas v. Ocwen Home Loan Servicing*, No. 3:13-cv-1057-G, 2014 WL 7059274, n. 12 (N.D. Tex. Nov. 21, 2014) ("[A] Court generally will not consider arguments raised for the first time in a reply brief.").

association-in-fact enterprise because: (1) the racketeering activity "occurred over a limited period of time and was completed . . . early in 2019"; (2) Windspeed is not a RICO person distinct from the enterprise; and (3) Windspeed "exercised no control over its creation and use as a racketeering vehicle." (Dkt. No. 102-1, at ¶¶ 39–40). Further, the Motion suggests that Szeto, as an officer and employee of Windspeed and/or Global, should be completely absolved of RICO liability. (Dkt. No. 102-1, at ¶¶ 41–42). In support of their claim, the Motion simply suggests that Plaintiffs' characterization of Szeto "makes it apparent that [Szeto] did not exercise the control nor authority which is required to establish somebody as a RICO person." (Dkt. No. 102-1, at ¶ 42). On the basis of these contentions alone, the Windspeed Actors argue that their roles make them distinct from the association-in-fact enterprise. The Windspeed Actors are mistaken.

The Motion badly conflates the terms RICO "person" and RICO "enterprise." Although it is true that a RICO defendant may not be both a "person" and an "enterprise," it is equally true that a RICO defendant may be both a person and a *part* of the enterprise. *See, e.g.*, *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000). Similar to the facts at issue here, federal courts in other cases have universally concluded that employees may be named as RICO persons separate and distinct from the alleged entity-employer RICO enterprise. *See, e.g., Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 648-50 (S.D. Tex. 2016) (and cited cases); *West Tex. Nat. Bank v. FEC Holdings, LP*, No. MO:11-cv-0086-RAJ, 2013 WL 2158658 (W.D. Tex. May 17, 2013); *Provost v. First Guaranty Bank*, No. 18-8845, 2019 WL 3412432, at *4 (E.D. La. July 29, 2019) (and cited cases).

The Fifth Circuit has also recognized this concept of law. For example, in *Abraham*, the court concluded that it was sufficient to survive a Rule 12(b)(6) motion where the plaintiff pled and identified an employee as a RICO person and a corporate-employer as the distinct enterprise. *See Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007) ("This allegation is sufficient to demonstrate that the RICO person, an individual employee of the corporation, is distinct from the RICO enterprise,

the corporation itself."); *see also St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) ("Otherwise, an individual member of a collective enterprise, such as an association-in-fact could not be prosecuted for violations of 1962(c) because he or she would not be considered distinct from the enterprise."); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) (holding that RICO applies "when . . . a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority.").

Here, Plaintiffs have alternatively pled an association-in-fact enterprise consisting of the 22-named Defendants in this lawsuit.  As detailed in the Complaint, each of the 22-named RICO Defendants furthered the goal of the unlawful scheme—*i.e.*, effectively stealing the assets of an existing business and continuing that business through the sale of inventory.  Because each Windspeed Actor is alleged to be a *part* of the association-in-fact enterprise (and not merely part of Windspeed and/or Global as enterprises), the Motion's assertion that Plaintiffs have failed to plead an association-in-fact enterprise is mistaken.  The Windspeed Actors are separate and distinct for purposes of the RICO enterprise requirement.

## 2. Plaintiffs' 18 U.S.C. § 1962(a) Claims.

The Motion argues that the Plaintiffs fail to state a claim under 18 U.S.C. § 1962(a) against the Windspeed Actors, as Plaintiffs' injuries were solely "derived from the RICO enterprise reinvesting illegally derived funds back into the enterprise."  (Dkt. No. 102-1, at ¶¶ 48–49).  This, however, is a mischaracterization of the Complaint. To establish a violation under 18 U.S.C. § 1962(a), a plaintiff must prove: (1) the existence of an enterprise, (2) the defendants' derivation of income from a pattern of racketeering activity, and (3) the use of any part of that income in acquiring an interest in or operating the enterprise. *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000).

Additionally, for a viable 18 U.S.C. § 1962(a) claim, any injury must flow from the use or investment of racketeering income. *Id.*

Here, Plaintiffs sufficiently pled their claims under 18 U.S.C. § 1962(a). As discussed *supra*, Plaintiffs have pled the existence of an enterprise and the Defendants derived income from a pattern of racketeering activity. Further, Plaintiffs have pled that their injury flowed from the use of investment of the racketeering income. The Defendants, including the Windspeed Actors, received income from the pattern of racketeering through the fraudulent transfer and reinvested the proceeds back into the enterprise, and the Defendants also received income from the continued operation of Windspeed—income that was used or invested back into the enterprise. (Dkt. No. 91, at ¶ 413). The actions of the Defendants proximately caused *and continue to cause* injuries to Plaintiffs. (Dkt. No. 91, at ¶ 420). In effect, Windspeed and Szeto's continued operation of Windspeed, perpetuated the fraudulent transfer, using Global's inventory, assets, and income to further Global's inability to pay creditors, particularly D&T Partners.

### 3.  Plaintiffs' 18 U.S.C. § 1962(d) Claims.

The Motion contends that "[b]ecause the claims against Windspeed and Mr. Szeto fail . . ., the claim for conspiracy under Section 1962(d) must also fail and should be dismissed with prejudice as to them." (Dkt. No. 102-1, at ¶ 51). As an initial matter, Plaintiffs have sufficiently pled a claim against the Windspeed Actors under 18 U.S.C. § 1962(c). Moreover, even if this Court concludes that Plaintiffs' substantive RICO claim under 18 U.S.C. § 1962(c) fails, Plaintiffs request that the Court permit Plaintiffs an opportunity to amend their Complaint and not dismiss it in its entirety with prejudice. *See, e.g., Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see*

*also Torrey v. Infectious Diseases Society of Am.*, No. 5:17-cv-00190-RWS, 2018 WL 10124894 (E.D. Tex. Sept. 27, 2018) (same with respect to RICO claims).[8]

Alternatively, the Motion argues that Plaintiffs must meet Rule 9(b)'s heightened particularity pleading requirement with respect to its RICO claims grounded in predicate acts of fraud.  (*Id.*, at ¶¶ 52–53).  18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of . . . [18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), or 18 U.S.C. § 1962(c)]."  Thus, to establish a conspiracy claim under 18 U.S.C. § 1962(d), a plaintiff must establish that: (1) "two or more people agreed to commit a substantive RICO offense;" and (2) the defendant "knew of and agreed to the overall objective of the RICO offense."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).

Due to the clandestine nature of conspiracies, a plaintiff may not be able to muster direct evidence of the conspiracy, and, therefore, the agreement, knowledge of and participation in the conspiracy "may be inferred from the development and collocation of circumstances."  *U.S. v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (quoting *U.S. v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)).  Moreover, a conspirator need not know all of the details of the enterprise and identities or all of the co-conspirators as long as the evidence allows for the inference that each conspirator knowingly participated in some manner in the overall objective of the conspiracy.  *Id.* at 858.  But, "[a] conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor."  *Chaney*, 595 F.3d at 239 (quoting *Salinas v. U.S.*, 522 U.S. 52, 65 (1997)).

### i.    <u>Plaintiff's Allegations that the Windspeed Actors Committed Mail and Wire Fraud are Predicate Acts.[9]</u>

---

[8] Regardless, so long as the plaintiff alleges the elements necessary for a § 1962(d) claim, the conspiracy claim stands—whether or not companion claims under another subsection of § 1962 are dismissed. *See Salinas v. United States*, 522 U.S. 52, 65 (1997).

[9] *See also* Dkt. No. 91, at ¶¶ 366–72. The Windspeed Actors attempt to generally shield themselves from the predicate acts by their assertion that Szeto lacked the requisite knowledge to commit the predicate acts.  Such statements are irrelevant at this stage in litigation, as all facts pleaded in the complaint must be taken as true.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

In their Motion, the Windspeed Actors argue that Plaintiffs "make outlandish claims of predicate acts against Mr. Szeto." (Dkt. No. 102-1, at ¶ 24). In their own words, the Windspeed Actors argue that the predicate acts are "not criminal acts" and "will not establish liability against Mr. Szeto." (*Id.*, ¶ 25). However, in alleging a RICO scheme involving mail or wire fraud, it is *not necessary* to assert that each defendant personally made fraudulent mailings or wires; rather Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud. *Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Industries, Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. Aug. 29, 2011) (Boyle, J.).

Further, where a plaintiff claims that mail and wire fraud were in furtherance of a larger scheme to defraud, Rule 9(b) only requires the plaintiff to delineate, with adequate particularity, the specific circumstances constituting the overall fraudulent scheme. *Id.* at 712. Here, Plaintiffs have delineated the specific circumstances constituting the overall fraudulent scheme perpetrated by the Defendants, including Windspeed and Szeto. Further, with respect to mail fraud, Plaintiffs specifically pled that the Forfeiture Notice was issued via mail "with all of the parties having full knowledge that the assets at issue had all already been transferred months before to Windspeed, an entity that was beneficially owned and controlled by Super G, BP Management, and Szeto." (Dkt. No. 91, at ¶¶ 232, 439). Moreover, with respect to wire fraud, Plaintiffs have specifically pled Szeto and Windspeed's involvement in multiple emails and also included **screenshots of said emails**, clearly demonstrating the who, what, when, where, how, and why of the Windspeed Actors' connection to wire fraud. (*See, e.g.*, Dkt. No. 91, at ¶¶ 107, 143, 149, 157, 163, 183–84).

ii.    **Plaintiff's Allegations that the Windspeed Actors Lied Under Oath are Predicate Acts.[10]**

In their Motion, the Windspeed Actors contend that Plaintiffs' allegations in the Complaint that they falsely testified under oath in state court litigation are not sufficient to support predicate acts

---

[10] *See also* Dkt. No. 91, at ¶¶ 345–49.

under the RICO statute.  (Dkt. No. 102-1, at ¶ 26).  In support, the Windspeed Actors cite to two decisions from the Fifth Circuit Court of Appeals:  *Snow Ingredients, Inc. v. SnoWizard Incorporated*, 833 F.3d 512 (5th Cir. 2015) and *Zastrow v. Houston Auto Imports Greenway, Ltd.*, 789 F.3d 553 (5th Cir. 2015).  As discussed below, the facts in *Snow Ingredients* and *Zastrow* are inapposite to the facts of Plaintiffs' RICO lawsuit.

In *Snow Ingredients*, Southern Snow, a plaintiff, alleged the RICO predicate acts of obstruction of justice and witness tampering.  833 F.3d at 524.  Specifically, it alleged "that SnoWizard, its owner, and its attorneys engaged in a criminal racket based on obstruction of justice."  *Id.* at 520.  On these facts, the Fifth Circuit concluded that bad faith litigation absent corruption could not sustain a civil RICO claim.  *Id.* at 525.  Unlike the facts in *Snow Ingredients*, and as discussed *supra*, Plaintiffs have alleged numerous predicate acts under RICO that occurred prior to the state litigation.

Similarly, *Zastrow* does not apply to the facts of this case.  In *Zastrow*, the Fifth Circuit assumed that two phone calls and a letter constituted predicate acts under § 1503 for obstruction of justice.  789 F.3d at 560.  Based on these predicate acts—all of which occurred within the month of January 2013—the Fifth Circuit reasonably concluded that Zastrow had failed to meet the RICO continuity requirement.  *Id.* at 558, 560-61.  Again, these facts do not echo the facts in this case—as shown *supra*, the predicate acts extended over a sufficient period of time to meet the RICO continuity requirement.

### iii.    Plaintiff's Allegations that the Windspeed Actors Engaged in Money Laundering are Predicate Acts.[11]

In their Motion, the Windspeed Actors argue that Plaintiffs' allegations regarding money laundering are not sufficient to establish that the predicate act occurred.  (Dkt. No. 102-1, at ¶ 27).  Specifically, the Windspeed Actors state the Complaint "fails to sufficiently allege that Mr. Szeto was aware of Plaintiff's secured loan."  (*Id.*).

---

[11] *See also* Dkt. No. 91, at ¶¶ 350–59.

To establish a money laundering violation, a plaintiff must plead that a RICO defendant: (1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity. *United Healthcare Sevices, Inc. v. Next Health, LLC*, No. 3:17-CV-00243-E-BT, 2021 WL 764035, at *9 (N.D. Tex. Feb. 26, 2021) (citing *U.S. v. Dovalina*, 262 F.3d 472, 475 (5th Cir. 2001). Plaintiffs have met their burden. As discussed *supra*, Windspeed and Szeto knowingly stripped Global of its inventory, assets, employees, etc. (while Szeto was Global's CEO) and proceeded to operate Global's business, using the assets and selling the inventory to Windspeed's (and Szeto's) benefit and to Global's (and Plaintiffs') harm. The Windspeed Actors' focus on their respective awareness of Plaintiffs' interest in Global's property is a red herring and not relevant to the analysis here.

## B. State Law Causes of Action.

### 1. Fraud.

The Windspeed Actors contend that Plaintiffs' claim against Szeto "fails for the simple purpose that the Complaint does not notify the reader of a single misrepresentation which Mr. Szeto ever made to Plaintiff." (Dkt. No. 102-1, at ¶ 57). To prevail on a common law fraud claim, a plaintiff must prove that: (1) the defendant made a material representation (or omission) that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). Here, as discussed *supra* and in the Complaint, Szeto, in his capacity as CEO of both Global and Windspeed as well as owner of Windspeed, clearly made materially false representations to Global, a named Plaintiff in this case, resulting in Szeto, Windspeed, and the other Defendants stripping Global and Global's shareholders and creditors of their rightful assets and interests.

### 2.  **Breach of Fiduciary Duty and Aiding and Abetting.**

The Windspeed Actors argue that Plaintiffs have not sufficiently pled that Szeto was a fiduciary to D&T Partners and Global.  Despite the Windspeed Actor's cursory arguments, an insolvent entity does, in fact, owe fiduciary duties to its creditors, rather than its members.  *See Tigrett v. Pointer*, 580 S.W.3d 375, 383 (Tex. App.—Dallas 1978), *writ refused NRE* (1979).  Szeto, as CEO of Global, owed a fiduciary duty to D&T Partners—a creditor of Global—and a fiduciary duty to Global—the company in which he was the chief officer.  Again, as discussed *supra* and *infra* and in the Complaint, Szeto executed the fraudulent scheme in conjunction with the Defendants—including Szeto's company, Windspeed, which aided and abetted his breach—to strip Global of its assets and operations, thereby breaching Szeto's duty to D&T Partners and Global.

### 3.  **Texas Uniform Fraudulent Transfer Act.**

TUFTA pursues one overriding goal: "to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors."  *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 385 (5th Cir. 2017).  Thus, under TUFTA, a creditor may sue a third party that received a fraudulent transfer from the debtor and recovered its losses by voiding that transaction.  *Id.*  A transfer is fraudulent under TUFTA if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1).  A fraudulent transfer can be proven in two ways:  directly or circumstantially.  *Janvey*, 856 F.3d at 385.  "Since intent . . . is seldom susceptible of direct proof, courts have relied on badges of fraud," eleven of which are listed in the statute, as circumstantial evidence of fraud."  *Id.*  Here, Windspeed and Szeto worked in concert with the other Defendants to perpetrate a fraud on D&T Partners. As discussed *supra*, Szeto, while serving as Global and Windspeed at the same time, fraudulently transferred Global's assets to Windspeed—a company beneficially owned and controlled by Szeto, BP Management, and Super G, another creditor of Global—freeing Windspeed and Szeto of Global's debt owed to D&T Partners.  To the extent, the

Windspeed Actors argue that Windspeed did not receive the transfer of any assets from Global, Plaintiffs have pled to the contrary, and all facts pleaded in the Complaint must be taken as true. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

### 4. Civil Conspiracy.

The Windspeed Actors' suggestion that Plaintiffs' "failure to adequately allege the underlying causes of action for this claim renders this cause of action meritless" is completely overstated. (Dkt. No. 102-1, at ¶ 69). Under Texas law, the elements of civil conspiracy are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Anderton v. Cawley*, 378 S.W.3d 38, 60 (Tex. App.—Dallas 2012). As discussed *supra*, Plaintiffs have satisfied each element. Szeto and Windspeed (two or more persons), along with the other Defendants, set out to divest Global of its assets and the Defendants' respective financial obligations to D&T Partners (object to be accomplished). In June 2018, Szeto, while CEO of Global, stated he would start another business and continue Global's operations with a new company (a meeting of the minds on the object or course of action).[12] Szeto did, in fact, start another business in the form of Windspeed, and Windspeed orchestrated the divestiture of Global's assets (one or more unlawful, overt acts). Plaintiffs were injured by Windspeed's and Szeto's actions—Global lost its assets, and the D&T Note was not paid to D&T Partners (damages as a proximate result).

### VII. Prayer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Court deny Windspeed and Mr. Szeto's Motion to Dismiss. Moreover, to the extent that the Court intends to otherwise grant any portion of their Motion, Plaintiffs hereby request leave to replead to remedy any

---

[12] Szeto, Ludlow, Hook, and Cole were involved with both Global and Windspeed, further supporting a meeting of the minds occurred.

purported deficiencies.  Finally, the Plaintiffs request that the Court grant Plaintiffs all other relief, at law or in equity, to which they may show themselves justly entitled.

Dated: September 2, 2022

/s/ Jason B. Freeman
Jason B. Freeman
Texas Bar No. 24069736
Matthew L. Roberts
Texas Bar No. 24098330
Thomas L. Fahring III
Texas Bar No. 24074194
Gregory W. Mitchell
Texas Bar No. 00791285
Zachary J. Montgomery (forthcoming)
Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

On September 2, 2022, I filed the foregoing document with the clerk o court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or *pro se* parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

By: <u>*/s/ Jason B. Freeman*</u>
         Jason B. Freeman