UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC<br><br>and<br><br>ACET Global, LLC,<br><br>**Plaintiffs,**<br><br>v.<br><br>BAYMARK PARTNERS, LP;<br>BAYMARK PARTNERS<br>MANAGEMENT, LLC;<br>BAYMARK MANAGEMENT, LLC;<br>SUPER G CAPITAL, LLC;<br>SG CREDIT PARTNERS, INC.;<br>BAYMARK ACET HOLDCO, LLC;<br>BAYMARK ACET DIRECT INVEST, LLC;<br>BAYMARK PARTNERS;<br>et al.,<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL CAUSE NO. 3:21-cv-01171-B |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO THE WINDSPEED EMPLOYEES' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)

Jason B. Freeman
TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

I.    Summary. .................................................................................................................. 1

II.   Background Facts. ..................................................................................................... 4

    A.   The Baymark Defendants. .................................................................................. 4
    B.   The Baymark Defendants Continued Pattern of Unlawful Conduct. .................. 4
    C.   The APA. ............................................................................................................ 5
    D.   The Super G Collateral Assignment. ................................................................. 5
    E.   Damti's Termination. ......................................................................................... 6
    F.   Szeto and Windspeed Trading, LLC. ................................................................. 6
    G.   The "Wind Down" of Global. ............................................................................ 7
    H.   Windspeed. ......................................................................................................... 7
    I.   The Concealment of Global's Inventory. ............................................................ 8
    J.   Windspeed Creates a Carbon Copy Website of Global's Website. ...................... 8
    K.   Windspeed Takes Over the Global Accounts. ..................................................... 8
    L.   D&T Partners' Demand for Payment on the D&T Note. ..................................... 9
    M.   The Cover Up and Fake Forfeiture Notice. ....................................................... 9
    N.   The Purported Foreclosure Sale. ....................................................................... 9
    O.   The Fraudulent Bankruptcy Filing and False Tax Filings. ............................... 10
    P.   State Court Litigation. ..................................................................................... 11

III.  Standard of Review Under Rule 12(b)(6). ............................................................. 12

IV.   Arguments and Authorities. ................................................................................... 12

    A.   RICO Claims. .................................................................................................. 12
        1.   Plaintiffs have Sufficiently Pled a Pattern of Racketeering. ......................... 13
            i.   The SAC Sufficiently Pleads Both Closed-Period and Open-Ended Continuity under RICO. ......................................................................................................... 13
            ii.   Although the SAC Sufficiently Pleads Continuity Regarding More than One Scheme and More than One Victim, the Windspeed Actor's Contentions that a Single Scheme, Single Victim Theory Cannot Survive as a Matter of Law is Wrong. ................................... 15
        2.   The Windspeed Actors are Proper RICO Defendants in this Lawsuit. ........... 16
            i.   The Windspeed Actors are Separate and Distinct from the RICO Enterprise. ............. 16
            ii.   The Windspeed Actors are Proper RICO Defendants Because They Each Furthered the RICO Enterprise. ........................................................................................... 20
        3.   Plaintiffs have Sufficiently Pled a RICO Conspiracy Claim under 18 U.S.C. § 1962(d). .... 23
    B.   State Law Causes of Action. ............................................................................. 24

V.    Prayer. .................................................................................................................... 25

    CERTIFICATE OF SERVICE .............................................................................. 27

## TABLE OF AUTHORITIES

### Cases

*Abraham v. Singh,*
480 F.3d 351 (5th Cir. 2007) ............................................................... 3, 13, 14, 22

*Allstate Ins. Co. v. Benhamou,*
190 F. Supp. 3d 631 (S.D. Tex. 2016) ......................................................... 3, 22

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................... 21

*Bank of Mongolia v. M&P Global Fin. Svs.,*
2010 WL 11549711 (S.D. Fla. Sept. 3, 2010) ................................................. 23

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................... 21

*Bridgewater v. Double Diamond-Delaware, Inc.,*
2010 WL 1875617 (N.D. Tex. May 10, 2010) .................................................... 3

*Brown v. Phoenix Life Ins. Co.,*
843 Fed. Appx 533 (5th Cir. 2021) ............................................................ 12

*Casperone v. Landmark Oil & Gas Corp.,*
819 F.2d 112 (5th Cir. 1987) ................................................................. 23

*Cedric Kushner Promotions, Ltd. v. King,*
533 U.S. 158 (2001) ........................................................................... 16

*Chaney v. Dreyfus Serv. Corp.,*
595 F.3d 219 (5th Cir. 2010) ................................................................. 24

*Cuvillier v. Sullivan,*
503 F.3d 397 (5th Cir. 2007) ................................................................. 21

*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.,*
814 F. Supp. 2d 698 (N.D. Tex. 2011) ......................................................... 15

*Delta Truck & Tractor, Inc. v. J.I. Case Co.,*
855 F.2d 241 (5th Cir. 1988) ................................................................. 13

*Efron v. Embassy Suites (Puerto Rico), Inc.,*
223 F.3d 12 (1st Cir. 2000) ................................................................. 14

*Funk v. Stryker Corp.,*
631 F.3d 777 (5th Cir. 2011) ................................................................. 4

*George v. Blue Diamond Petroleum, Inc.,*
718 F. Supp. 539 (W.D. La. July 20, 1989) .................................................... 23

*George v. SI Group, Inc.,*
36 F.4th 611 (5th Cir. 2022) ............................................................... 3, 21

*Greb v. Singleton,*
2019 WL 13210371 (N.D. Tex. Sept. 30, 2019) .................................................. 4

*H.J. Inc. v. Nw. Bell Tel. Co.,*
492 U.S. 229 (1989) ...................................................................... 12, 13, 14, 15

*ICONICS, Inc. v. Massaro,*
192 F.Supp.3d 254 (D. Mass. 2016) ............................................................ 14

*Malvino v. Delluniversita,*
840 F.3d 223 (5th Cir. 2016) ................................................................. 13

*Massey v. EMC Morg. Corp.*,
   546 Fed. Appx 477 (5th Cir. 2013) ............................................................................ 12
*Nottingham v. Richardson*,
   499 Fed. Appx. 368 (5th Cir. 2012) ......................................................................... 12
*Office Outfitters, Inc. v. A.B. Dick Co., Inc.*,
   83 F. Supp. 2d 772 (E.D. Tex. 2000) ....................................................................... 15
*Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.*,
   9 F.4th 247 (5th Cir. 2021) ...................................................................................... 12
*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*,
   879 F.2d 10 (2d Cir. 1989) ........................................................................................ 15
*Provost v. First Guaranty Bank*,
   2019 WL 3412432 (E.D. La. July 26, 2019) .................................................. 3, 20, 22
*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ................................................................................................ 3, 23
*Sedima v. Imrex Co., Inc.*,
   473 U.S. 479 (1985) ............................................................................................ 12, 13
*Simmons v. Jackson*,
   2019 WL 3043927 (N.D. Tex. June 7, 2019) ............................................................ 23
*St. Paul Mercury Ins. Co. v. Williamson*,
   224 F.3d 425 (5th Cir. 2000) ................................................................................ 3, 22
*U.S. v. Elliott*,
   571 F.2d 880 (5th Cir. 1978) ................................................................................ 3, 23
*U.S. v. Maltos*,
   985 F.2d 743 (5th Cir. 1992) ..................................................................................... 24
*U.S. v. Posada-Rios*,
   158 F.3d 832 (5th Cir. 1998) ..................................................................................... 24
*United States v. Finney*,
   714 F.2d 420 (5th Cir. 1983) ..................................................................................... 23
*United States v. Indelicato*,
   865 F.2d 1370 (2d Cir. 1989) .................................................................................... 15
*Varela v. Gonzales*,
   2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) .......................................................... 12
*Wackman v. Rubsamen*,
   602 F.3d 391 (5th Cir. 2010) ..................................................................................... 25
*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) ..................................................................................... 22
*West Tex. Nat. Bank v. FEC Holdings, LP*,
   2013 WL 2158658 (W.D. Tex. May 17, 2013) ...................................................... 3, 22
*Williams v. Duke Energy Intern., Inc.*,
   681 F.3d 788 (6th Cir. 2012) ..................................................................................... 14
*Word of Faith World Outreach Center Church, Inc. v. Sawyer*,
   90 F.3d 118 (5th Cir. 1996) ....................................................................................... 13
*Zastrow v. Houston Auto Imports Greenway Ltd.*,
   789 F.3d 553 (5th Cir. 2015) ..................................................................................... 20

**<u>Statutes</u>**

18 U.S.C. § 1961(3) ........................................................................................................ 17
18 U.S.C. § 1961(4) ........................................................................................................ 17
18 U.S.C. § 1962(c) ....................................................................................... 12, 13, 16, 20
18 U.S.C. § 1962(d) ........................................................................................... 12, 13, 23
18 U.S.C. § 1964(c) ........................................................................................................ 12

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 2, 12

Plaintiffs, by and through their counsel, file this response in opposition to Defendants Ms. Zhexian Lin ("**Lin**"), Ms. Dama Marie Tomerlin ("**Tomerlin**"), Ms. Padasamai Vattana ("**Vattana**"), and Ms. Vanessa Torres ("**Torres**," and collectively with Lin, Tomerlin, and Vattana, the "**Windspeed Actors**") combined motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "**Motion**").[1]   For the reasons set forth below, Plaintiffs respectfully request that this Court deny the Motion.  For purposes of this response, Plaintiffs hereby adopt and incorporate by this reference each of their separate responses and arguments to the motions to dismiss filed against Defendants SG Credit Partners, Inc. and Marc Cole, Super G Capital LLC and Steven Bellah, Windspeed Trading, LLC and William Szeto, Hallett & Perrin, P.C. and Julie A. Smith, Baymark ACET Holdco, LLC, the Baymark Defendants, and David Hook and Tony Ludlow.

## I.      Summary.

This case does *not* present a mere business dispute.  Rather, the facts in the Second Amended Complaint ("**SAC**"), taken as true and with all reasonable inferences drawn in Plaintiffs' favor, clearly demonstrate that the named defendants in this action, including the Windspeed Actors, engaged in a series of elaborate, sophisticated, and coordinated acts of deception that spanned approximately a ***four-year period***, culminating in ***no less than 100 RICO predicate acts***, and damages to ***more than 24 RICO victims***.  In sum, the well-pleaded facts in the 194-page SAC conclusively support Plaintiffs' RICO and pendent State law claims.

The Motion contends otherwise.  First, the Motion contends that Plaintiffs have failed to plead "continuity in either the closed or open sense . . . [because t]he only stated and alleged goal of the alleged 'scheme' is, was, and always will be the foreclosure sale which was concluded years ago."

---

[1] Although Paula Ketter was also named in the Second Amended Complaint, she has failed to file any responsive pleading to the Second Amended Complaint.  Accordingly, there is no live motion to dismiss or other dispositive motion with respect to Plaintiffs' claims against her.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE WINDSPEED EMPLOYEES' MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**                    **Page 1**

(Motion, ¶¶ 2-3, 43).   Contrary to the Motion's contentions, Plaintiffs have sufficiently pled both closed continuity and open-ended continuity.

With respect to closed continuity, the SAC alleges that the pattern of criminal racketeering by the collective defendants occurred for approximately four years resulting in harm to more than 24 RICO victims through, among other things, a purported "foreclosure sale" of Global's assets *and* a fraudulent bankruptcy filing.  With respect to open-ended continuity, the SAC alleges that:  (1) the Baymark Defendants[2] exist for the primary purpose of illegally acquiring entity stakes in target companies and siphoning their assets and value at the expense of their creditors and stakeholders; (ii) the Baymark Defendants continue to regularly evaluate new businesses and acquisition opportunities to expand its RICO enterprise's operations; (iii) the Baymark Defendants are no stranger to allegations of RICO fraud in federal court; and (iv) the Baymark Defendants have successfully made off with Global's trade secrets and continue to profit from those trade secrets today.  Either of these theories of continuity are sufficient to support Plaintiffs' RICO claims.

Second, the Motion makes various arguments that the Windspeed Actors should not be liable as RICO defendants.  According to the Motion, "there is nothing to suggest that [they] are distinct RICO persons which are separate and apart from the RICO entities which Plaintiff[s] allege[ ] form an association-in-fact enterprise."  (Motion, ¶ 5).  Moreover, the Motion effectively argues that solely because of their purported status as non-officer and non-manager employees of Windspeed Trading, LLC ("**Windspeed**"), they should be effectively insulated from the RICO statute, regardless of the allegations made against them in the SAC.  (Motion, ¶¶ 28, 48-55).

Because the Windspeed Actors have brought a Rule 12(b)(6) motion, their thread-bare contentions that they *performed any role* other than what has been alleged against them in the SCA is

---

[2] For purposes of this response, the "Baymark Defendants" refers to Baymark Partners, LP; BP Management; Baymark ACET Holdco, LLC; Baymark ACET Direct Investment, LLC; Baymark; David Hook; Tony Ludlow; and Matthew Denegre.

premature at this stage of the proceedings. *See George v. SI Group, Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) ("[A] Rule 12(b)(6) motion tests the sufficiency of the pleadings, not the merits of the case."). And, in any event, the well-established precedent in this circuit has overwhelmingly held that employees (even of a RICO enterprise) may be named as proper RICO defendants. *See, e.g., St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) ("Although a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise. In such a case, the individual defendant is distinct from the organizational entity."); *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007); *see also Provost v. First Guaranty Bank*, No. 18-8845, 2019 WL 3412432, at *4 (E.D. La. July 26, 2019), and cited cases therein; *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 648-50 (S.D. Tex. 2016), and cited cases; *West Tex. Nat. Bank v. FEC Holdings, LP*, No. MO:11-cv-0086-RAJ, 2013 WL 2158658 (W.D. Tex. May 17, 2013). This rationale applies regardless of whether the employee is an officer or even a lower-level employee of the enterprise. *See, e.g., U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978); *Bridgewater v. Double Diamond-Delaware, Inc.*, No. 309-cv-1758-B, 2010 WL 1875617, at *11 (N.D. Tex. May 10, 2010) (Boyle, J.) (*citing Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993)). Put simply, the Motion's arguments otherwise lack merit.

Third, with respect to the RICO and state law conspiracy causes of action, the Motion contends that Plaintiffs have failed to show the elements of a conspiracy. (Motion, ¶¶ 64-57).[3] Because the Windspeed Actors furthered and were instrumental to the RICO enterprise, as discussed more fully below, the Motion is mistaken.

---

[3] Plaintiffs note that the paragraphs in the Motion related to the state causes of action confusingly go from paragraphs 64 through 67 then from paragraphs 54 through 57.

II.     **Background Facts.**

A.  **The Baymark Defendants.**

The Baymark Defendants exist for the primary purpose of illegally acquiring equity stakes in target companies and siphoning their assets and value at the expense of their creditors and stakeholders.  (Dkt. No. 91, at pg. 3).  Significantly, many of the Baymark Defendants have been named in at least one other RICO lawsuit in this same district.  *See Greb v. Singleton*, No. 3:18-cv-01439-M, 2019 WL 13210371 (N.D. Tex. Sept. 30, 2019).[4]  Similar to the allegations that they now face in **_this_** lawsuit, the plaintiffs in *Greb* alleged that the Baymark Defendants participated in a foreclosure transaction whereby they sought to "acquire [certain entities] for less than their fair market value, so [that they] could resell and share the profits."  *See id.*, Slip Op. at 1-2.  Notably, the allegations made by the *Greb* plaintiffs against the Baymark Defendants relate to conduct and acts taken by the Baymark Defendants in mid-2015.  *Id.*, Slip Op. at 2.

B.  **The Baymark Defendants Continued Pattern of Unlawful Conduct.**

Consistent with their continuous pattern of racketeering activity, approximately two years after their *Greb* RICO scheme, in the summer of 2017, the Baymark Defendants moved again to unlawfully acquire the trade secrets and assets of another company:  ACET Venture Partners (n/k/a and referred to throughout as "**D&T Partners**").  (Dkt. No. 91, ¶ 60).  At this time, Tomer Damti ("**Damti**") owned and operated D&T Partners as a successful e-commerce business.  (Id.).  To facilitate the purchase of D&T Partners' trade secrets and other assets, the Baymark Defendants formed another entity, ACET Global, LLC ("**Global**"). (Id., ¶ 61).  And through an Asset Purchase Agreement, dated

---

[4] Plaintiffs request that this Court take judicial notice of the allegations made against the Baymark Defendants in *Greb*.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (noting that it is well-established and "clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.").

July 14, 2017 (the "**APA**"), Global purchased all of the assets of D&T Partners.[5]   (*Id.*, ¶ 62; *see also* Exhibit 23).

### C.  The APA.

Under the APA, Global agreed to:  (1) pay $850,000 to D&T Partners, subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners; and (3) provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC ("**Baymark Holdco**").  (*Id.*, ¶ 68).  As part of the transaction, Global executed a promissory note with D&T Partners, memorializing the $3,230,000 payable to D&T Partners (the "**D&T Note**").  (*Id.* ¶ 69).  The D&T Note required a first installment payment to D&T Partners on October 31, 2018.  (*Id.*).  Separately, Baymark Holdco entered into a security agreement with D&T Partners.  (*Id.*, ¶ 70).

### D.  The Super G Collateral Assignment.

After the APA, Hook caused Global to enter into a Collateral Assignment (the "**Collateral Assignment**") with Super G Capital, LLC ("**Super G**"), which provided that Super G would provide a term loan facility of up to $1 million (the "**Super G Note**").  (*Id.*, ¶ 72).

D&T Partners subordinated its security interest to Super G based on the Baymark Defendants' representations in June and July of 2017 that:  (1) Damti would maintain managerial authority and discretion; and (2) Global did not intend (and that the Baymark Defendants did not intend to cause it) to default on the loan to D&T Partners or default on the loan from Super G.  (*Id.*, ¶ 81).

---

[5] As mentioned *infra*, Denegre had a calendar invite on Outlook a month **prior** to the execution of the APA regarding "Windspeed."  Windspeed Trading, LLC would eventually be the name of the entity that all of the parties would elect to use approximately a year later in 2018 as a vehicle to fraudulently transfer the assets of Global away from D&T Partners. And, the name of Windspeed Trading, LLC was chosen because William Szeto's ("**Szeto**") father was partial to that name prior to his death—*i.e.*, the other Defendants in this lawsuit had no connection to the name Windspeed Trading, LLC. (Dkt. No. 91, ¶ 67).  Szeto would also later become the CEO of Global and Windspeed and effectively the 20% owner of Windspeed.  *See infra.*  Put simply, the Baymark Defendants and Szeto had their plan to siphon the assets from D&T Partners approximately a year prior to establishing Windspeed.

E.  **Damti's Termination.**

On February 12, 2018, Denegre, purporting to represent Ludlow and Baymark, informed Damti that he was terminating Damti's employment with Global.  (*Id.*, ¶ 83; *see also* Exhibit 25). Although Denegre, who was not an employee or agent of Global, stated that the termination was based on poor performance, at the time of the February termination, January 2018 revenues for Global were 248.26% more than those in January 2017.  (*Id.*, ¶¶ 83–84).

F.  **Szeto and Windspeed Trading, LLC.**

When the APA was entered into, Baymark had not yet formed Windspeed. (*Id.*, ¶ 67). Curiously, however, Denegre had a recurring weekly call scheduled on his calendar for "Windspeed" **that began roughly a month prior to the closing date of the APA**.  (*Id.*).

On or around February 14, 2018, Szeto became the CEO of Global.  (*Id.*, ¶ 85).  According to Hook, Szeto "work[ed] for free" with no financial promise made to him or expectation of a financial award.  (*Id.*, ¶ 86).

Although Baymark was in compliance with the Super G Note in February 2018, or the month in which Damti was terminated, Global "defaulted" on its note to Super G shortly after Szeto was named CEO of Global.  (*Id.*, ¶¶ 88–89).  At the time of the default, "Global had millions of dollars of assets and an ongoing business operation."  (*Id.*, ¶ 229).

Because of the "default," Baymark and Super G entered into a Forbearance Agreement in April of 2018, which provided for a forbearance period until October 25, 2018.  (*Id.*, ¶ 90). Significantly, the forbearance period ended just days before the D&T Note payments would become due to D&T Partners.  (*Id.*).  Pursuant to the Forbearance Agreement, Global would "wind down" and transfer its assets and business operations to a newly-formed entity:  Windspeed.  (*Id.*).  Super G relied on Baymark to "come up with [the] plan" and Baymark and its principals offered the restructuring plan to Super G.  (*Id.*, ¶ 119).

**G.  The "Wind Down" of Global.**

In April of 2018, Baymark began to set the stage to execute their "wind down" plan.  (*Id.*, ¶ 100).  Szeto, while serving as the CEO of Global, worked closely with Denegre and Ludlow to fine tune the "wind down" plan and, ultimately, to put the plan into action.  (*Id.*). According to an email written by Ludlow, the parties expressly wanted to ensure that Global did not "default on Tomer [Damti's] debt and have [Damti] regain the company."  (*Id.*, ¶ 115).

On September 27, 2018, while he was still CEO of Global, Szeto filed a Certificate of Formation of Limited Liability Company for Windspeed.  (*Id.*, ¶ 126).  Szeto continued to serve as CEO of both Global and Windspeed at the same time.  (*Id.*).

**H.  Windspeed.**

On October 18, 2018, or two weeks before the D&T Note payment would become due on October 31, 2018, Szeto, on behalf of Windspeed; Ludlow, on behalf of BP Management; and Cole, on behalf of Super G, executed an Amended and Restated Company Agreement of Windspeed ("**Company Agreement**").  (*Id.*, ¶ 156).  Under the Company Agreement, they became business partners with the following beneficial ownership:  BP Management (40%), Super G (40%), and Szeto (20%).  (*Id.*, ¶¶ 156, 161).  The Company Agreement provided Super G and BP Management with perpetual authority to appoint and control a board member of Windspeed's three-person board, in addition to the right to replace those board members.  (*Id.*, ¶ 168).  Under the Company Agreement, the board members managed all of the business and affairs of Windspeed by majority—*i.e.*, Super G and BP Management maintained complete control.  (*Id.*).

In October of 2018, Szeto began serving as the CEO of Windspeed.  (*Id.*, ¶ 181).  Later, every employee of Global was transferred to Windspeed after the "wind down" was executed.  (*Id.*, ¶ 182). Specifically, each employee was notified on October 9, 2018, via email that they had been terminated

from Global effective September 28, 2018, and that their employment with Windspeed had become effective thereafter. (*Id.*, ¶ 183).

**I.    The Concealment of Global's Inventory.**

After Windspeed was formed, Szeto, Ketter, and Tomerlin caused the transfer of all of Global's inventory to Windspeed.  (*Id.*, ¶¶ 196–98).  In an attempt to conceal the true nature of the transfer, Ketter and Tomerlin obtained a temporary storage unit at CubeSmart Self Storage of Dallas ("**CubeSmart**") in September of 2018 to hold Global's inventory.  (*Id.*, ¶ 198).  Rather than establishing the CubeSmart account in the name of Windspeed or Global, Tomerlin used her own name and personal address to set up the account.  (*Id.*).  After Global's inventory was transferred to Windspeed, Windspeed continued to sell the inventory with the same customer marketplaces and the same software used by Global.  (*Id.*, ¶ 199).

**J.    Windspeed Creates a Carbon Copy Website of Global's Website.**

In 2018, Windspeed and Torres "expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts."  (*Id.*, ¶ 202).  Indeed, "[a]s of at least December 12, 2018, Windspeed's website was a carbon copy of the former ACET Global website."  (*Id.*).  The Windspeed website included postings holding out for sale hundreds of products—distinct and unique products—that were in fact one and the same as those later reflected in Global's inventory of items in the Foreclose Sale Agreement.  (*Id.*).  Accordingly, Windspeed continued to sell Global's inventory, pocketing the revenues for itself and its owners.  (*Id.*, ¶¶ 206–07).

**K.    Windspeed Takes Over the Global Accounts.**

On December 5, 2018, Lin, a former employee of Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of a Global account.  (*Id.*, ¶ 214).  Lin used her Windspeed email address and listed herself as the "New Account Owner" for an account held in

Global's name. (*Id.*). Other actions of the Windspeed Actors to further the RICO scheme are discussed in more length *supra*.

**L.  D&T Partners' Demand for Payment on the D&T Note.**

D&T Partners demanded payment on the D&T Note. (Dkt. No. 91, at ¶ 13–14). Indeed, by letter dated December 9, 2018, D&T Partners' attorney sent a demand letter to Baymark, Global, and Hallett & Perrin. (Id.)  In the demand letter, D&T Partners communicated to Baymark, Global, and Hallett & Perrin that the D&T Note was in default. (Id.).

**M.  The Cover Up and Fake Forfeiture Notice.**

Many months after the purported transfer of Global's assets to Windspeed and the wind-down of Global, and apparently to circumvent the growing demands by D&T Partners for Defendants to pay on the D&T Note, on January 31, 2019, Super G (in coordination with Baymark) issued a Notice of Forfeiture ("**Forfeiture Notice**"). (*Id.*, ¶ 231; *see also* Ex. 17). The Baymark Defendants and Windspeed engaged Hallett & Perrin to represent them, and Hallett & Perrin drafted the Forfeiture Notice. (*Id.*, ¶¶ 231–36). The Forfeiture Notice was sent to the attention of Hook at his Baymark address (not the old Global address). (*Id.*, ¶ 231). Moreover, the Forfeiture Notice was issued well after all parties, including Hallett & Perrin, had full knowledge that the assets at issue (*i.e.*, Global's assets) had already been transferred ***months before to Windspeed***, an entity that was beneficially owned and controlled by Super G, BP Management, and Szeto. (*Id.*, ¶ 232). Because Global had already transferred all of its assets and operations to Windspeed several months before, there was no physical foreclosure sale as Windspeed continued those operations and sold off the inventory. (*Id.*, ¶ 237).

**N.  The Purported Foreclosure Sale.**

The parties executed a Foreclosure Sale Agreement that reflected a sales date of March 1, 2019. (*Id.*, ¶ 247; Ex. 18). However, the parties executed and completed the sale after March 1, 2019. (*Id.*, ¶ 248). Indeed, the parties purposely backdated the Foreclosure Sale Agreement to make it appear as if

the sale had occurred earlier.  (*Id.*). In addition, according to the Foreclosure Sale Agreement, the "purchase price" (*i.e.*, the amount Windspeed agreed to "pay" to Super G) equaled the exact amount that was owed under the Super G Note.  (*Id.*, ¶ 251–52).

### O. The Fraudulent Bankruptcy Filing and False Tax Filings.

On October 23, 2019, Global filed a fraudulent and false Voluntary Petition for Non-Individuals Filing for Bankruptcy with the Eastern District of Texas seeking relief under Chapter 7 of the Bankruptcy Code. (Dkt. No. 91, ¶ 257; *see also* Ex. 19).  Ludlow signed the petition on behalf of Global.  (*Id.*).  In the petition, Global acknowledged that it owed ACET Ventures Partners, LLC $3,230,000. (*Id.*)  Global also asserted that it had transferred within 1 year $30,000 of property to Super G on "01/2019" and that it had no significant assets. (*Id.*)

The bankruptcy petition contained a multitude of false statements designed to conceal assets from the bankruptcy trustee (and the bankruptcy court, for that matter) and from D&T Partners, the latter of which had already filed a lawsuit against Global, Windspeed, and Baymark in the District Court of Dallas County on July 12, 2019.[6]  (Dkt. No. 91, ¶ 17).  For example, the petition requested information as to whether "inventories of the debtor's property . . . [had] been taken within 2 years before filing this case?" (Dkt. No. 91, ¶ 274–75).  Ludlow and Global answered "No".  (*Id.*).  In deposition testimony in the state court action, the Global parties admitted that this answer was wrong and that only days prior to the bankruptcy filing they had reviewed Global's purported inventory.  (*Id.*, ¶¶ 275–79).  In addition, the petition requested Global to "[l]ist any property kept in storage units or warehouses within one year before filing this case."  (*Id.*, ¶ 286).  Ludlow and Global answer "None".  (*Id.*).  However, CubeSmart records would show that Tomerlin, Ketter, and/or Windspeed moved Global's inventory into storage at least as of October 25, 2018, and moved such inventory from

---

[6] Plaintiffs request the Court take judicial notice of this lawsuit in state court.  *See D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC),* Plaintiff v. *ACET Global, LLC, et al.,* No. DC-19-09828 (District Court of Dallas County, 116th Judicial District).

storage on or about November 16, 2018.  The bankruptcy petition contained many other fraudulent representations.  (*Id.*, ¶ 18).  At the time the fraudulent bankruptcy petition was filed, Global had multiple creditors, including, but not limited to:  DHL Express; FedEx; Immanuel Industrial Co., Ltd.; Lux.24; Pet Life LLC; Johnson Lancaster & Associates; Damti; UPS Supply Chain; and UPS Warehouse. (Id., ¶ 319).

Significantly, the federal tax returns of the relevant entity, Baymark ACET Holdco, LLC, which held Global's membership interests, represented that Global's assets were significantly more than Global had reported on the bankruptcy petition.  (Dkt. No. 91, ¶ 16).  More specifically, on its 2018 IRS Form 1065, *U.S. Return of Partnership Income*, Baymark ACET Holdco, LLC represented that it had $3,023,970 of total assets as of December 31, 2018. (*Id.*, ¶ 311). In addition, the 2019 IRS Form 1065, *U.S. Return of Partnership Income*, for Baymark ACET Holdco, LLC reported that the entity had received $2,907,290 in "proceeds" from the "foreclosure sale" of Global's assets.  (*Id.*, ¶ 22).

## P. **State Court Litigation.**

During the state court litigation, the Defendants attempted to further the RICO enterprise through more deceit and strong-arm tactics.  For example, during the deposition of Denegre, after Plaintiffs' counsel asked an important question regarding the foreclosure sale at issue, Ludlow stated: "Matthew [Denegre], shut the fuc* up."  (Dkt. No. 91, ¶ 1).  Thereafter, taking his cue from Ludlow, Denegre refused to answer the question.  (*Id.*).  Szeto also engaged in discussions with the Global/Windspeed employees prior to their scheduled depositions and instructed them on how to answer questions that may be asked by Plaintiffs' counsel.  (Dkt. No. 91, Ex. 2, Tr. 109:15-25; 115:19-25; 116:1-3).  To date, Windspeed continues its business operations with Szeto as its CEO.  (*Id.*, Ex. 2, Tr. 32:1-5).

### III.   Standard of Review Under Rule 12(b)(6).

In the Fifth Circuit, motions to dismiss for failure to state a claim under Rule 12(b)(6) are "viewed with disfavor and . . . [are] rarely granted." *Brown v. Phoenix Life Ins. Co.*, 843 Fed. Appx 533, 538-39 (5th Cir. 2021). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Massey v. EMC Morg. Corp.*, 546 Fed. Appx 477, 480 (5th Cir. 2013). Accordingly, the district court may not dismiss a complaint under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021); *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372 (5th Cir. 2012) (post-*Twombly* and *Iqbal*). The relevant question in determining whether a motion to dismiss should be granted is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *See Nottingham v. Richardson*, 499 Fed. Appx. 368, 372-73 (5th Cir. 2012) (noting the "strict standard of review under Rule 12(b)(6)").

### IV.   Arguments and Authorities.

#### A.   RICO Claims.

"The Racketeer Influence and Corrupt Organization Act, originally passed to target mobsters and organized crime, has been interpreted to reach even 'respected and legitimate' businesses that violate the Act's prohibitions." *Varela v. Gonzales*, 2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) (citing *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both legitimate and illegitimate enterprises."); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245-46 (1989). Accordingly, 18 U.S.C. § 1964(c) provides a private civil action and treble damages for those who are injured by violations of RICO's substantive provisions, including 18 U.S.C. § 1962(c) and (d). *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985). Plaintiffs have brought claims against the Windspeed Actors under 18 U.S.C. § 1962(c) and (d). (Dkt. No. 91, ¶¶ 322–407, 422–50).

Under both 18 U.S.C. § 1962(c) and (d), three threshold elements must be met: (1) a person must engage in (2) a pattern of racketeering activity; (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497–98.

## 1. Plaintiffs have Sufficiently Pled a Pattern of Racketeering.

To establish a pattern of racketeering activity, "a plaintiff must show both a relationship between the predicate offenses . . . and the threat of continuing activity." *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016). In their Motion, the Windspeed Actors contend that the SAC fails to sufficiently plead continuity under RICO. (Motion, ¶¶ 42-43). More specifically, the Motion contends that Plaintiffs have not met their burden of showing closed-period continuity or open-ended continuity because "[t]he purpose of the alleged RICO activity remains the singular goal of transferring ACET Global assets to Windspeed." (Id., ¶¶ 42-43). This simply is not true—and demonstratively so, as discussed below.

### i. The SAC Sufficiently Pleads Both Closed-Period and Open-Ended Continuity under RICO.

To satisfy the continuity requirement under RICO, a plaintiff must sufficiently plead either a "closed period of repeated conduct," or an open-ended period of conduct that "by its nature projects into the future with a threat of repetition." *Malvino* 840 F.3d at 231 (quoting *H.J. Inc.*, 492 U.S. at 241); *Word of Faith World Outreach Center Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996). Closed periods of continuity generally require "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. For these purposes, eighteen months presumptively spans a "substantial period of time." *See id.*; *see also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2017) (two years sufficient); *H.J. Inc.*, 492 U.S. at 242 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]").

Alternatively, a plaintiff may demonstrate sufficient continuity for RICO purposes if the plaintiff alleges facts that would show an open-ended period of conduct. *H.J., Inc.*, 492 U.S. at 241-42. For these purposes, open-ended continuity consists of a "specific threat of repetition extending indefinitely into the future," or "that the predicates are a regular way of conducting [a] defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 242-43.

The SAC sufficiently pleads both closed-period and open-ended continuity. With respect to closed-period continuity, the SAC alleges a non-exhaustive list of at least 100 RICO predicate acts from at least June 13, 2017, through May 15, 2021,[7] with harm to more than 24 RICO victims, such as Plaintiffs, the bankruptcy trustee, and Global's creditors. (Dkt. No. 91, at ¶¶ 317-18; Ex. 19). These facts, taken as true, support a presumptive span of a substantial period of time for RICO continuity. *See also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) ("Unlike our precedents identifying a single transaction, there are multiple victims, and there is no reason to suppose that this systematic victimization . . . would not have continued indefinitely had the Plaintiffs not filed this lawsuit."); *ICONICS, Inc. v. Massaro*, 192 F.Supp.3d 254, 270 (D. Mass. 2016) (citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000)); *see also id.* ("While the set of victims alleged by plaintiffs is not expansive, it includes not only [plaintiffs] but also, through the frauds committed in the bankruptcy process, the bankruptcy court and bankruptcy trustee.").

Moreover, the SAC sufficiently pleads open-ended continuity. Specifically, the SAC alleges that: (i) the Baymark Defendants exist for the primary purpose of illegally acquiring equity stakes in target companies and siphoning their assets and value at the expense of their creditors and stakeholders; (ii) defendants, in their deposition testimony, have expressly indicated that they continue

---

[7] As indicated *supra*, the RICO pattern of activity likely occurred as far back as 2015, as shown by the same allegations made in the *Greb* case. Plaintiffs intend to conduct additional discovery on this issue when this case moves to discovery. *See also Williams v. Duke Energy Intern., Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (noting federal courts reluctance to dismiss a RICO claim under Rule 12(b)(6) "where the facts underlying the claims are within the defendant's control.").

to regularly evaluate new businesses and acquisition opportunities to expand the RICO enterprise's

operations; (iii) the Baymark Defendants have been named in a prior federal RICO lawsuit for the

same or similar conduct as that alleged in this lawsuit; and (iv) the Baymark Defendants have made

off with Global's trade secrets and continue to profit from the same even today.   (Dkt. No. 91, at 3

& at ¶¶ 320-21).

> **ii.**        **Although the SAC Sufficiently Pleads Continuity Regarding More than One Scheme and More than One Victim, the Windspeed Actor's Contentions that a Single Scheme, Single Victim Theory Cannot Survive as a Matter of Law is Wrong.**

Although the allegations in the SAC are more than sufficient to meet both close-period and

open-ended RICO continuity, Plaintiffs further note that this Court has held that a pattern may also

be sufficiently shown in multiple other ways, even where there is one scheme or one victim:

> In order to establish a pattern of racketeering activity, a plaintiff need not demonstrate multiple schemes. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir. 1989). "Congress did not mean 'to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme.'" *Id.* (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)). Instead, continuity can be established "in various ways," including the nature of an enterprise or "the sheer number of predicate acts over several years." *Id.*

*Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F. Supp. 2d 698, 713 (N.D. Tex. 2011)

(Boyle, J.).   Indeed, more than 30 years ago, the Supreme Court in *H.J. Inc.* specifically rejected the

contentions now raised by the Windspeed Actors—*i.e.*, that a single scheme or transaction cannot

constitute a pattern of racketeering activity as a matter of law.   *H.J., Inc.*, 492 U.S. at 240-41; *see also*

*Office Outfitters, Inc. v. A.B. Dick Co., Inc.*, 83 F. Supp. 2d 772, 778 (E.D. Tex. 2000) ("Furthermore,

Defendants' single-transaction argument is of the kind the Supreme Court sought to avoid with its

opinion in *H.J., Inc.*").   To the extent that the Court concludes that the SAC only alleges a single-

scheme, single-victim theory (a point in which Plaintiffs would disagree), Plaintiffs have nevertheless

corrected the deficiencies raised by the Court in its Memorandum Opinion and Order dated May 9,

2022.

### 2.  **The Windspeed Actors are Proper RICO Defendants in this Lawsuit.**

The Motion contends that the Windspeed Actors should not be liable under the RICO statute as RICO defendants because:  (i) "there is nothing to suggest that [they] are distinct RICO persons which are separate and apart from the RICO entities which Plaintiff[s] allege[ ] form an association-in-fact enterprise[;]" (ii) they were "working in furtherance of their normal duties as employees of a going concern," and (iii) they did not have sufficient control or authority over the RICO enterprise or the predicate acts.  (Motion, ¶¶ 5, 28, 48-55).  Each of these contentions is addressed below.

### i.  **The Windspeed Actors are Separate and Distinct from the RICO Enterprise.**

Pursuant to 18 U.S.C. § 1962(c) (emphasis ours):

> It shall be unlawful ***for any person employed by or associated with any enterprise*** engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Thus, in order for a plaintiff to establish RICO liability, he or she must allege and prove the existence of two distinct entities:  (1) a "person;" and (2) an "enterprise."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

In their Motion, the Windspeed Actors argue that the SAC fails to allege a differentiation between the acts of the Windspeed Actors and the acts of the enterprise, the latter of which they contend is an association-in-fact enterprise.  (Dkt. No. 101-1, at ¶¶ 45-52).  The Windspeed Actors are mistaken.

Here, the SAC alleges that the Baymark Defendants constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).[8]  (Dkt. No. 91, ¶ 35).  In addition, the SAC alleges that the Baymark Defendants "exist[ ] for the primary purpose of illegally acquiring equity stakes in target companies

---

[8] Plaintiffs incorporate specifically by this reference their association-in-fact arguments in their responses to the motions to dismiss made by the other defendants.

and siphoning their assets and value at the expense of their creditors and stakeholders." (Dkt. No. 91, at pg. 3).

With respect to the Windspeed Actors, the SAC alleges each is a "person" within the meaning of 18 U.S.C. § 1961(3). (Id., ¶ 326). The SAC also makes the following separate allegations with respect to each Windspeed Actor:

Lin.[9]

- Lin is an individual and was an accountant for Windspeed and Global at all relevant times. (Dkt. No. 91, ¶ 52).

- Lin reviewed and accepted a backdated offer of employment with Windspeed while working at Global. (Dkt. No. 91, ¶ 184).

- On December 5, 2018, Lin assisted in the RICO scheme through usurping Global's partner and marketplace accounts and relationships through the execution of an Authorize.Net Request for a New Account Owner to be the new account owner of a Global account (by using her Windspeed email address). (Dkt. No. 91, ¶¶ 12, 214 & FN 21).

- Lin's acts on December 5, 2018—particularly her submission of a change of ownership request to Global's Authorize.Net account for Windspeed--constituted a predicate act of wire fraud. (Dkt. No. 317).

- Lin's acts on December 27, 2018—particularly her execution and submission of an Insertion Order, pursuant to an RDC-Merchant Promotion Agreement with Global, on behalf of Windspeed—constituted a predicate act of wire fraud. (Id.).

- Lin's acts on January 18, 2019—particularly her emails with Szeto and Denegre regarding the "merger" of Windspeed and Global's financial data—constituted a predicate act of wire fraud. (Id.).

- Lin's acts on January 24, 2019, March 4, 2019, and March 7-11, 2019—particularly her email exchanges with Denegre, Windspeed, and Szeto--regarding a false 2018 tax return for Global—constituted separate predicate acts of wire fraud.[10] (Id.).

- Lin agreed to maintain "two sets of books" for Global and Windspeed in January 2019 at the direction of Szeto. (Dkt. No. 91, ¶ 185).

---

[9] The Motions' much less limited recitation of the facts related to Lin are provided in paragraph 28(a) of the Motion. (Dkt. No. 101-1).
[10] The Motion suggests that several employees did not know Denegre "beyond exchanges of mere pleasantries." (Dkt. No. 101-1 ¶ 29).

- Lin had regular communications with Windspeed, Szeto, and Denegre regarding Global's finances and taxes.[11]  (Dkt. No. 91, ¶ 195).

- Lin's acts on March 26, 2021—particularly her obstruction of justice and wire fraud related to her false deposition under the instruction of Szeto—constituted separate predicate acts.  (Dkt. No. 91, ¶317).

- The Baymark Defendants conspired with, among others, Lin, to carry out a series of interrelated schemes to fraudulently siphon off Global's trade secrets and assets for their own benefit.  (Dkt. No. 91, ¶ 315).

- Lin was a "front-line conspirator[ ] of the RICO enterprise who, despite being [a] lower-level participant[ was] absolutely critical to carrying out the scheme to siphon off [Global's] assets and trade secrets." (Dkt. No. 91, ¶ 316).

Tomerlin.

- Tomerlin is an individual and was a fulfillment center employee at Windspeed and Global at all relevant times.  (Dkt. No. 91, ¶ 53).

- Tomerlin assisted the RICO defendants in moving the inventory from Global to Windspeed by obtaining a temporary storage unit at CubeSmart Self Storage at Dallas in September 2018 (Dkt. No. 91, ¶ 198).

- To conceal their fraud, the RICO defendants set up the account with CubeSmart only under Tomerlin's name and by using her personal address.  (Dkt. No. 91, ¶ 198).

- Windspeed later sold the Global inventory.  (Dkt. No. 91, ¶ 207).

- Tomerlin continued to sell and fulfill orders of Global's inventory well into 2019.  (Dkt. No. 91, ¶ 209).

- Tomerlin's acts on September 10, 2018—particularly her participation in bribery by accepting a reward of an offer of employment from Szeto for her participation in the fraud—constituted a separate predicate act.  (Dkt. No. 91, ¶ 317).

- Tomerlin's acts on September 12–14, 2018—particularly her participation in obtaining the CubeSmart storage unit for concealing the Global inventory—constituted a separate predicate act.  (Dkt. No. 91, ¶ 317).

- Tomerlin's acts on February 4, 2019—particularly her execution of a DHL shipment on behalf of Windspeed regarding Global's products—constituted a separate predicate act.  (Dkt. No. 91, ¶ 317).

---

[11] *See supra*, Footnote 8.

- Tomerlin's acts on March 26, 2021—particularly her obstruction of justice and wire fraud regarding her false deposition testimony—constituted a separate predicate act. (Dkt. No. 91, ¶ 317).

- The Baymark Defendants conspired with, among others, Tomerlin, to carry out a series of interrelated schemes to fraudulently siphon off Global's trade secrets and assets for their own benefit. (Dkt. No. 91, ¶ 315).

- Tomerlin was a "front-line conspirator[ ] of the RICO enterprise who, despite being [a] lower-level participant[ was] absolutely critical to carrying out the scheme to siphon off [Global's] assets and trade secrets." (Dkt. No. 91, ¶ 316).

Vattana.

- Vattana is an individual and was a sales manager for Windspeed and Global at all relevant times. (Dkt. No. 91, ¶ 54).

- Vattana continued to sell and fulfill orders of Global's inventory well into 2019. (Dkt. No. 91, ¶ 209).

- Vattana's acts on September 10, 2018—particularly her participation in bribery by accepting a reward of an offer of employment from Szeto for her participation in the fraud—constituted a separate RICO predicate act. (Dkt. No. 91, ¶ 317).

- Vattana's acts on February 6 and 9, 2019—particularly her fulfilling a Zulily purchase order and shipping Global's products for Windspeed—constituted separate RICO predicate acts. (Dkt. No. 91, ¶ 317).

- Vattana's acts on April 5, 2021—particularly her obstruction of justice and wire fraud regarding her false deposition testimony—constituted a separate RICO predicate act. (Dkt. No. 91, ¶ 317).

- The Baymark Defendants conspired with, among others, Vattana to carry out a series of interrelated schemes to fraudulently siphon off Global's trade secrets and assets for their own benefit. (Dkt. No. 91, ¶ 315).

- Vattana was a "front-line conspirator[ ] of the RICO enterprise who, despite being [a] lower-level participant[ was] absolutely critical to carrying out the scheme to siphon off [Global's] assets and trade secrets." (Dkt. No. 91, ¶ 316).

Torres.

- Torres is an individual and employee at Windspeed and Global at all relevant times. (Dkt. No. 91, ¶ 56).

- Torres expropriated Global's website and began to close its bank accounts and divert its payment accounts.  (Dkt. No. 91, ¶ 202).

- Torres's acts on September 10, 2018—particularly her participation in bribery by accepting a reward of an offer of employment from Szeto for her participation in the fraud—constituted a predicate act.  (Dkt. No. 91, ¶ 317).

- Torres's acts on December 12, 2018—particularly her intentional copying of Global's website under Windspeed's name—constituted a predicate act.  (Dkt. No. 91, ¶ 317).

- The Baymark Defendants conspired with, among others, Torres to carry out a series of interrelated schemes to fraudulently siphon off Global's trade secrets and assets for their own benefit.  (Dkt. No. 91, ¶ 315).

- Torres was a "front-line conspirator[ ] of the RICO enterprise who, despite being [a] lower-level participant[ was] absolutely critical to carrying out the scheme to siphon off [Global's] assets and trade secrets."  (Dkt. No. 91, ¶ 316).

In light of the multitude of allegations against the various Windspeed Actors and the acts of the enterprise itself, the SAC has alleged sufficient differentiation.  Indeed, the statutory language of section 1962(c) recognizes that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs . . .  one must participate in the operation or management of the enterprise itself." *Zastrow v. Houston Auto Imports Greenway Ltd.*, 789 F.3d 553, 565 n. 7 (5th Cir. 2015); *see also Provost v. First Guaranty Bank*, No. 18-8845, 2019 WL 3412432, at *4 (E.D. La. July 26, 2019), and cases cited therein.  As shown in the SAC, each of the Windspeed Actors contributed directly and indirectly to the RICO scheme; in sum, the well-pleaded allegations in the SAC support RICO differentiation between them and the RICO enterprise.

## ii.     The Windspeed Actors are Proper RICO Defendants Because They Each Furthered the RICO Enterprise.

The Motion also contends that the Windspeed Actors are improper RICO defendants because they were "working in furtherance of their normal duties as employees of a going concern." (Motion, ¶ 5).  In addition, the Motion contends that they are improper RICO defendants because they did not

have sufficient control or authority over the RICO enterprise or the predicate acts.  (Dkt. No. 101-1, ¶¶ 28, 48-55).

Initially, Plaintiffs dispute the Motion's characterization of each Windspeed Actors' purported role as merely employees.[12]  And, in any event, the Motion's attempted characterization of their respective roles in the RICO scheme has nothing to do with the issue presently before the Court: whether it is proper to dismiss the Windspeed Actors under Rule 12(b)(6).  *See George v. SI Group, Inc.*, 36 F.4th 611, 619 ("[A] Rule 12(b)(6) motion tests the sufficiency of the pleadings, not the merits of the case.").

For Plaintiffs to survive the Motion's Rule 12(b)(6) motion, the SAC must merely articulate "grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Therefore, the SAC must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Significantly, plausibility is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Under these governing standards, a reviewing court "must accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

---

[12] For example, Windspeed Trading, LLC has answered an interrogatory in the state litigation that provides that Torres acted on her own in registering a domain at windspeedtradingllc.com in October 2018 without Szeto's authorization or knowledge.  The Windspeed Actors apparently seek to dispute the roles each worker had via the Rule 12(b)(6) standard and not the more appropriate Rule 56 standard, which will come later in these proceedings.

In this case, the well pleaded facts—taken as true and with all reasonable inferences drawn in favor of Plaintiffs—supports a plausible claim to relief under the RICO statute. Although the Windspeed Actors may have purportedly had employment roles with Windspeed, they also acted independently to further the RICO scheme. And their actions were critical to its success: they caused or assisted in the transfer of Global's assets and trade secrets to Windspeed through various acts of fraud and deception. The Motion's apparent attempt to have this Court view all inferences in its favor should be squarely rejected by the Court.

But even if the Windspeed Actors were acting under the guise of their respective employment roles, well-established Fifth Circuit precedent provides that they nevertheless may be named as RICO defendants if they furthered the RICO scheme. *See, e.g., St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) ("Although a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise. In such a case, the individual defendant is distinct from the organizational entity."); *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007); *see also Provost v. First Guaranty Bank*, No. 18-8845, 2019 WL 3412432, at *4 (E.D. La. July 26, 2019), and cited cases therein; *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 648-50 (S.D. Tex. 2016) (and cited cases); *West Tex. Nat. Bank v. FEC Holdings, LP*, No. MO:11-cv-0086-RAJ, 2013 WL 2158658 (W.D. Tex. May 17, 2013).

Finally, the Motion contends that the Windspeed Actors are improper RICO defendants because they did not have sufficient control or authority over the RICO enterprise. (Dkt. No. 101-1, ¶¶ 28, 48-55). This contention is belied by this circuit's case law and the allegations in the SAC.

Contrary to the Motion's contentions, federal courts—including this circuit—have held that the RICO statute has broad reach: "[its] net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). And the RICO statute "makes clear that RICO liability is not limited to those with formal positions in the

enterprise," nor does it require "primary responsibility" or "significant control." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

In line with this well-established authority, this Court has also recently re-affirmed the longstanding position of the Fifth Circuit Court of Appeals: "[u]nder RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *Simmons v. Jackson*, No. 3:15-cv-01700-S-BT, 2019 WL 3043927, at *3 (N.D. Tex. June 7, 2019), *report and recommendation adopted*, No. 3:15-cv-1700-S-BT, 2019 WL 3034668 (N.D. Tex. July 11, 2019) (citing *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987) (per curiam); *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983); *see also Bank of Mongolia v. M&P Global Fin. Svs.*, No. 08-60623, 2010 WL 11549711, at *4 (S.D. Fla. Sept. 3, 2010) (same); *George v. Blue Diamond Petroleum, Inc.*, 718 F. Supp. 539, 550 (W.D. La. July 20, 1989) (same).  For example, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails." *Finney*, 714 F.2d at 423.

Here, the allegations in the SAC are sufficient to connect the Windspeed Actors to the fraudulent scheme.  *See Simmons*, supra.  Accordingly, the Windspeed Actors are proper RICO defendants in this lawsuit.

### 3. <u>Plaintiffs have Sufficiently Pled a RICO Conspiracy Claim under 18 U.S.C. § 1962(d).</u>

The Motion contends that "[b]ecause the claims against the Windspeed Employees fail . . ., the claim for conspiracy under Section 1964(d) must also fail and should be dismissed with prejudice as to them." (Motion, ¶ 59).  Plaintiffs disagree, for the reasons already discussed above, that they have not sufficiently pled RICO claims against the Windspeed Actors or any other defendant in this lawsuit.

Moreover, Plaintiffs can show the necessary elements to support a RICO conspiracy against the Windspeed Actors.  To establish a RICO conspiracy, Plaintiffs must allege that (1) "two or more

people agreed to commit a substantive RICO offense;" and (2) the defendant "knew of and agreed to the overall objective of the RICO offense." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010). Because conspiracies are by their very nature secretive, federal courts have recognized that a plaintiff may not be able to muster direct evidence of the conspiracy, and, therefore the agreement, knowledge of and participation in the conspiracy "may be inferred from the development and collocation of circumstances." *U.S. v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (quoting *U.S. v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)). Indeed, a conspirator need not even know all the details of the enterprise or the identities or all of the co-conspirators provided the evidence allows for the inference that each conspirator knowingly participated in some manner in the overall objective of the conspiracy. *Id.* at 858.

Here, Plaintiffs' allegations, taken as true and with all reasonable inferences in its favor, support its claims that the Windspeed Actors knowingly participated in some manner in the overall objective of the conspiracy. For example, the employees accepted bribes to work for Windspeed and agreed with Szeto to go along with the sham that they had been retroactively terminated—presumably for the purposes of concealment. (Dkt. No. 91, ¶¶ 183, 317). Moreover, Tomerlin used her individual name and address (and not Global's or Windspeed's) on a CubeSmart storage unit to better conceal the Global inventory from creditors. (Dkt. No. 91, ¶ 198). By way of further example, Lin spoke often with Denegre and assisted in the preparation of a false federal tax return for 2018. (Dkt. No. 91, ¶ 317). And Vattana and Torres assisted in their respective roles as well, as already discussed at length above. (Id.).

### B. <u>State Law Causes of Action.</u>

Plaintiffs incorporate by this reference all of their other state law cause of action arguments that were submitted as responses to the other defendants' motions to dismiss. However, with respect to the civil conspiracy causes of action, Plaintiffs note that the Motion contends that "nowhere is there

any allegation that the Windspeed Employees agreed to conspire with any parties to commit unlawful acts or commit lawful acts by unlawful means. (Motion, ¶ 57 [sic]). Under Texas law, Plaintiffs are not required to show an express agreement; rather, the agreement may be shown by evidence of a course of conduct from which a tacit agreement to act in concert may be inferred. *See, e.g., Wackman v. Rubsamen*, 602 F.3d 391, 4099 (5th Cir. 2010). For the reasons already provided in the RICO conspiracy claim portion of this response, Plaintiffs have sufficiently alleged civil conspiracy.

V.   **Prayer.**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Court deny the Motion. Moreover, to the extent that the Court intends to otherwise grant any portion of their Motion, Plaintiffs hereby request leave to replead to remedy any purported deficiencies. *See, e.g., Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) ("Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so."). Additionally, Plaintiffs request that the Court grant them all other relief, at law or in equity, to which they may show themselves justly entitled.

Dated: September 2, 2022

/s/ Jason B. Freeman
Jason B. Freeman
Texas Bar No. 24069736
Matthew L. Roberts
Texas Bar No. 24098330
Thomas L. Fahring III
Texas Bar No. 24074194
Gregory W. Mitchell
Texas Bar No. 00791285
Zachary J. Montgomery (forthcoming)
Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409

Jason@freemanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

On September 2, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or *pro se* parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

By: <u>*/s/ Jason B. Freeman*</u>
    Jason B. Freeman