UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| D&T PARTNERS, LLC (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC<br><br>and<br><br>ACET Global, LLC,<br><br>         **Plaintiffs,**<br><br>v.<br><br>BAYMARK PARTNERS, LP;<br>BAYMARK PARTNERS MANAGEMENT, LLC;<br>BAYMARK MANAGEMENT, LLC;<br>SUPER G CAPITAL, LLC;<br>SG CREDIT PARTNERS, INC.;<br>BAYMARK ACET HOLDCO, LLC;<br>BAYMARK ACET DIRECT INVEST, LLC;<br>BAYMARK PARTNERS;<br>et al.,<br><br>         **Defendants.** | § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL CAUSE NO. 3:21-cv-01171-B |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO SUPER G CAPITAL LLC'S AND STEVEN BELLAH'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Jason B. Freeman
  TX Bar No. 24069736

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEY FOR PLAINTIFFS**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ....................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

I.    Background. ........................................................................................................... 1

II.   General Facts. ...................................................................................................... 2

    A.  ACET Global Purchases the Assets of ACET Venture Partners, LLC. ................ 2
    B.  The Super G Collateral Assignment. ............................................................ 2
    C.  Damti's Termination. ................................................................................. 3
    D.  Szeto and Windspeed Trading, LLC. ............................................................ 3
    E.  The "Wind Down" of Global. ..................................................................... 4
    F.  Windspeed. ............................................................................................. 4
    G.  The Hiding of Global's Inventory. ............................................................... 5
    H.  Windspeed Creates a Carbon Copy Website of Global's Website. ..................... 5
    I.  Windspeed Takes Over the Global Accounts. ................................................. 6
    J.  D&T Partners' Demand for Payment on the D&T Note. ................................. 6
    K.  The Cover Up and Fake Forfeiture Notice. ................................................... 6
    L.  The Purported Foreclosure Sale. ................................................................ 7
    M.  The Fraudulent Bankruptcy Filing and Contradictory Tax Filings. .................. 7
    N.  State Court Litigation. ............................................................................... 8

III.  Standard of Review Under Rule 12(b)(6). ........................................................... 9

IV.  Standard of Review Under Rule 9(b). ................................................................. 9

V.   Arguments and Authorities. ............................................................................. 10

    A.  RICO Claims. ........................................................................................ 10
        1.  Plaintiffs' 18 U.S.C. § 1962(c) Claims. ................................................ 11
        2.  Defendants are RICO "Persons". ........................................................ 14
        3.  Predicate Acts. ............................................................................... 15
        4.  Reliance and Proximate Cause. .......................................................... 16
        5.  Plaintiffs have Properly Pled an Association-in-Fact. .............................. 17
        6.  Plaintiffs have Properly Pled the Defendants' Involvement in the RICO Pattern of
Racketeering. .................................................................................................. 18
        7.  Plaintiffs' 18 U.S.C. § 1962(d) Claims. ............................................... 19
    B.  State Law Claims. ................................................................................... 20
        1.  Common Law Fraud. ....................................................................... 20
        2.  Aiding and Abetting Breach of Fiduciary Duties. .................................. 20
        3.  Texas Uniform Fraudulent Transfer Act ............................................. 21
        4.  Civil Conspiracy. ........................................................................... 21

VI.  Prayer. .............................................................................................................. 22

CERTIFICATE OF SERVICE ............................................................................... 23

## TABLE OF AUTHORITIES

### Cases

*Abraham v. Singh,*
  480 F.3d 351 (5th Cir. 2007) ................................................................................. 13
*Allstate Ins. Co. v. Benhamou,*
  190 F. Supp. 3d 631 (S.D. Tex. 2016) .................................................................. 13
*Allstate Ins. Co. v. Plambeck,*
  802 F.3d 665 (5th Cir. 2015) ................................................................................. 12
*Bank of Mongolia v. M&P Global Fin.,*
  2010 WL 11549711 (S.D. Fla., Sept. 3, 2020) .............................................. 15, 18
*Boyle v. United States,*
  556 U.S. 938 (2009) ................................................................................. 11, 17, 18
*Brown v. Phoenix Life Ins. Co.,*
  843 Fed. Appx 533 (5th Cir. 2021) ......................................................................... 9
*Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.,*
  770 F.Supp. 1351 (E.D. Wis. 1991) ...................................................................... 16
*Casperone v. Landmark Oil & Gas Corp,*
  819 F.2d 112 (5th Cir. 1987) .......................................................................... 15, 18
*Cedric Kushner Promotions, Ltd. v. King,*
  533 U.S. 158 (2001) .............................................................................................. 13
*Chaney v. Dreyfus Serv. Corp.,*
  595 F.3d 219 (5th Cir. 2010) ................................................................................. 20
*Crowe v. Henry,*
  43 F.3d 198 (5th Cir. 1995) ................................................................................... 14
*Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Industries, Inc.,*
  814 F. Supp. 2d 698 (N.D. Tex. Aug. 29, 2011) ............................................ 11, 19
*Delta Truck & Tractor, Inc. v. J.I. Case Co.,*
  855 F.2d 241 (5th Cir. 1988) ................................................................................. 10
*Dorsey v. Portfolio Equities, Inc.,*
  540 F.3d 333 (5th Cir. 2008) ................................................................................... 6
*First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago,*
  1985 WL 1118 (N.D. Ill. Mar.10, 1985) ............................................................... 16
*George v. Blue Diamond Petroleum, Inc.,*
  718 F.Supp. 539 (W.D. La., July 20, 1989) .................................................... 15, 18
*H.J. Inc. v. Northwestern Bell Telephone Co.,*
  492 U.S. 229 (1989) .............................................................................................. 19
*Howell Petroleum Corp. v. Weaver,*
  780 F.2d 1198 (5th Cir. 1986) ............................................................................... 10
*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
  623 F.Supp.2d 798 (S.D. Tex. 2009) .................................................................... 16
*In re Performance Nutrition, Inc.,*
  239 B.R. 93 (Bankr. N.D. Tex. 1999) ................................................................... 16
*Lucas v. Ocwen Home Loan Servicing,*
  2014 WL 7059274 (N.D. Tex. Nov. 21, 2014) ...................................................... 12

*Massey v. EMC Morg. Corp.,*
   546 Fed. Appx 477 (5th Cir. 2013) .................................................................... 9
*Nottingham v. Richardson,*
   499 Fed. Appx. 368 (5th Cir. 2012) .................................................................... 9
*Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.,*
   9 F.4th 247 (5th Cir. 2021) .................................................................... 9
*Pinkerton v. United States,*
   328 U.S. 640 (1946) .................................................................... 15
*Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,*
   879 F.2d 10 (2d Cir. 1989) .................................................................... 19
*Provost v. First Guaranty Bank,*
   2019 WL 3412432 (E.D. La. July 29, 2019) .................................................................... 13
*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) .................................................................... 18
*Riddell v. Riddell Washington Corp.,*
   866 F.2d 1480 (D.C. Cir. 1989) .................................................................... 16
*Salinas v. U.S.,*
   522 U.S. 52 (1997) .................................................................... 20
*Sedima v. Imrex Co., Inc.,*
   473 U.S. 479 (1985) .................................................................... 10
*St. Paul Mercury Ins. Co. v. Williamson,*
   224 F.3d 425 (5th Cir. 2000) .................................................................... 13
*Swierkiewicz v. Sorema N. A.,*
   534 U.S. 506 (2002) .................................................................... 9
*U.S. v. Elliott,*
   571 F.2d 880 (5th Cir. 1978) .................................................................... 11, 18
*U.S. v. Maltos,*
   985 F.2d 743 (5th Cir. 1992) .................................................................... 20
*U.S. v. Posada-Rios,*
   158 F.3d 832 (5th Cir. 1998) .................................................................... 20
*U.S. v. Turkette,*
   452 U.S. 576 (1981) .................................................................... 12
*United States v. Hurley,*
   63 F.3d 1 (1st Cir. 1995) .................................................................... 15
*Varela v. Gonzales,*
   2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) .................................................................... 10
*West Tex. Nat. Bank v. FEC Holdings, LP,*
   2013 WL 2158658 (W.D. Tex. May 17, 2013) .................................................................... 13

## Statutes

18 U.S.C. § 1961(1) .................................................................... 11
18 U.S.C. § 1961(3) .................................................................... 11, 12, 14
18 U.S.C. § 1961(4) .................................................................... 11, 12
18 U.S.C. § 1961(5) .................................................................... 11
18 U.S.C. § 1962(a) .................................................................... 2, 10, 19
18 U.S.C. § 1962(b) .................................................................... 19

18 U.S.C. § 1962(c) ................................................................................................. 2, 10, 11, 19
18 U.S.C. § 1962(d) ...................................................................................................... 2, 10, 19
18 U.S.C. § 1964(c) ............................................................................................................... 10

## **Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................ 9, 10
Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 1, 9

Plaintiffs, by and through counsel, file this response in opposition to Defendants Super G Capital, LLC's ("**Super G**") and Steven Bellah's ("**Bellah**") (together, the "**Defendants**") motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "**Motion**").[1]  For the reasons set forth below, Plaintiffs respectfully request that this Court deny the Motion.  Plaintiffs hereby adopt and incorporate their separate responses to the motions to dismiss filed by Defendants Windspeed Trading, LLC and William Szeto, SG Credit Partners, Inc. and Marc Cole, the Windspeed Employees, Hallett & Perrin, P.C. and Julie A. Smith, Baymark ACET Holdco, LLC, the Baymark Defendants, and David Hook and Tony Ludlow, as well as the arguments incorporated therein.

## I.      **Background.**

Plaintiffs' Second Amended Complaint (the "**SAC**" or "**Complaint**") alleges causes of action against the Defendants under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"). In addition to the RICO claims, the Complaint alleges causes of action under Texas law for:  (i) aiding and abetting breach of fiduciary duties; (ii) claims under the Texas Uniform Fraudulent Transfer Act; and (iii) civil conspiracy.  The 194-page Complaint is well pled.  Taken together, the Complaint alleges that the Defendants engaged in a pre-conceived, collective and concerted effort to effectively steal and misappropriate all of the assets from an existing business, D&T Partners, LLC ("**D&T Partners**"), through the fraudulent guise of what the Defendants now attempt to label as a lawful foreclosure and/or sale (Dkt. No. 99, at pp. 13-25).

The Motion contends that Plaintiffs' RICO claims should be dismissed under Rule 12(b)(6) of the Federal Rules of Procedure because Plaintiffs have not properly alleged: (1) a RICO "enterprise," (Dkt. No. 99, at pp. 7-8; (2) that the Defendants are distinct RICO "persons" separate and apart from the alleged RICO "enterprise," (Dkt. No. 99, at pp. 8-9); (3) that the Defendants had

---

[1] Plaintiffs have filed a SAC, which addresses all issues identified in the Court's May 9, 2022 Order.  Should the Court believe that a separate pleading issue exists, Plaintiffs request that the Court grant leave to file a subsequent amended complaint.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO SUPER G CAPITAL LLC'S AND
STEVEN BELLAH'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT      Page 1**

sufficient involvement in the RICO "enterprise" to give rise to RICO liability, (Dkt. No. 99, at pp. 7-8); and (4) a cognizable violation of 18 U.S.C. § 1962(a), (c) or RICO conspiracy under 18 U.S.C. § 1962(d) pled with particularity under Rule 9(b), (Dkt. No. 99, at pp. 12-13).  With respect to the state law claims, the Motion contends that none are recognizable and, if they are, the Court should decline to exercise supplemental jurisdiction over those claims.  (Dkt. No. 99, at pp. 13-25).

## II.    General Facts.

### A.    ACET Global Purchases the Assets of ACET Venture Partners, LLC.

In the summer of 2017, Baymark Partners, LP ("**Baymark**") and its principals, David Hook ("**Hook**"), Tony Ludlow ("**Ludlow**"), and Matthew Denegre ("**Denegre**") approached Tomer Damti ("**Damti**"), seeking to purchase the assets of ACET Ventures, LLC ("**ACET**"), an e-commerce business that Damti owned.  (Dkt. No. 91, ¶ 60).  To facilitate the purchase of assets, Baymark formed another entity, ACET Global ("**Global**").  (*Id.*, ¶ 61).  And, through an Asset Purchase Agreement, dated July 14, 2017 (the "**APA**"), Global purchased all of the assets of ACET.  (*Id.*, ¶ 62).

Under the APA, Global agreed to:  (1) pay $850,000 to D&T Partners, subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners; and (3) provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC ("**Baymark Holdco**").  (*Id.*, ¶ 68).  As part of the transaction, Global executed a promissory note with D&T Partners, memorializing the $3,230,000 payable to D&T Partners (the "**D&T Note**").  (*Id.* ¶ 69).  The D&T Note required a first installment payment to D&T Partners on October 31, 2018.  (*Id.*).  That first installment payment was never made.  (*Id.* ¶85) Separately, Baymark Holdco entered into a security agreement with D&T Partners.  (*Id.*, ¶ 70).

### B.    The Super G Collateral Assignment.

After the APA, Hook caused Global to enter into a Collateral Assignment (the "**Collateral Assignment**") with Super G Capital, LLC ("**Super G**"), whose senior executive at all times relative

to the Complaint, was Defendant Bellah.  The Collateral Assignment provided that Super G would provide a term loan facility of up to $1 million (the "**Super G Note**").  (*Id.*, ¶ 72).

D&T Partners subordinated its security interest to Super G based on Hook, Ludlow, and Baymark's representations in June and July of 2017 that:  (1) Damti would maintain managerial authority and discretion; and (2) Global did not intend (and that Baymark, Hook, and Ludlow did not intend to cause it) to default on the loan to D&T Partners or default on the loan from Super G.  (*Id.*, ¶ 81).

### C.  Damti's Termination.

On February 12, 2018, Denegre, purporting to represent Ludlow and Baymark, informed Damti that he was terminating Damti's employment with Global.  (*Id.*, ¶ 83).  Although Denegre, who was not an employee or agent of Global, stated that the termination was based on poor performance, at the time of the February termination, January 2018 revenues for Global were 248.26% more than those in January 2017.  (*Id.*, ¶¶ 83-84).

### D.  Szeto and Windspeed Trading, LLC.

When the APA was entered into, Baymark had not yet formed Windspeed.  (*Id.*, ¶ 67). Curiously, however, Denegre had a recurring weekly call scheduled on his calendar for "Windspeed" **that began roughly a month prior to the closing date of the APA**.  (*Id.*).

On or around February 14, 2018, Szeto became the CEO of Global.  (*Id.*, ¶ 85).  According to Hook, Szeto "work[ed] for free" with no financial promise made to him or expectation of a financial award.  (*Id.*, ¶ 86).

Although Baymark was in compliance with the Super G Note in February 2018, or the month in which Damti was terminated, Global, as part of its plan created and agreed to by Baymark, Super G and Bellah, "defaulted" on its note to Super G shortly after Szeto was named CEO of Global.  (*Id.*,

¶¶ 88-89). At the time of the default, "Global had millions of dollars of assets and an ongoing business operation." (*Id.*, ¶ 229).

Because of the "default," Baymark and Super G entered into a Forbearance Agreement in April of 2018, which provided for a forbearance period until October 25, 2018. (*Id.*, ¶90). Significantly, the forbearance period ended just days before the D&T Note payments would become due to D&T Partners. (*Id.*). Pursuant to the Forbearance Agreement, Global would "wind down" and transfer its assets and business operations to a newly-formed entity: Windspeed. (*Id.*). Super G relied on Baymark to "come up with [the] plan" and Baymark and its principals offered the restructuring plan to Super G. (*Id.*, ¶ 119). Super G and Bellah were more than happy to go along, because it was clear that, by virtue of the plan, they would take over the assets of ACET Global while avoiding the debt to D&T Partners.

### E.  The "Wind Down" of Global.

In April of 2018, Baymark began to set the stage to execute their "wind down" plan. (*Id.*, ¶ 100). Szeto, while serving as the CEO of Global, worked closely with Denegre and Ludlow to fine tune the "wind down" plan and, ultimately, to put the plan into action. (*Id.*). According to an email written by Ludlow, the parties expressly wanted to ensure that Global did not "default on Tomer [Damti's] debt and have [Damti] regain the company." (*Id.*, ¶ 115).

On September 27, 2018, while he was still CEO of Global, Szeto filed a Certificate of Formation Limited Liability Company for Windspeed. (*Id.*, ¶ 126). Szeto continued to serve as CEO of both Global and Windspeed at the same time. (*Id.*).

### F.  Windspeed.

On October 18, 2018, or two weeks before the D&T Note payment would become due on October 31, 2018, Szeto, on behalf of Windspeed; Ludlow, on behalf of BP Management; and Cole, on behalf of Super G, executed an Amended and Restated Company Agreement of Windspeed

("**Company Agreement**"). (*Id.*, ¶ 156). Under the Company Agreement, they became business partners with the following beneficial ownership: BP Management (40%), Super G (40%), and Szeto (20%). (*Id.*, ¶¶ 156, 161). The Company Agreement provided Super G and BP Management with perpetual authority to appoint and control a board member of Windspeed's three-person board, in addition to the right to replace those board members. (*Id.*, ¶ 168). Under the Company Agreement, the board members managed all of the business and affairs of Windspeed by majority—*i.e.*, Super G and BP Management maintained complete control. (*Id.*).

In October of 2018, Szeto began serving as the CEO of Windspeed. (*Id.*, ¶ 181). Later, every employee of Global was transferred to Windspeed after the "wind down" was executed. (*Id.*, ¶ 182). Specifically, each employee was notified on October 9, 2018, via email that they had been terminated from Global effective September 28, 2018, and that their employment with Windspeed had become effective thereafter. (*Id.*, ¶ 183).

### G.  The Hiding of Global's Inventory.

After Windspeed was formed, Szeto, Ketter, and Tomerlin caused the transfer of all of Global's inventory to Windspeed. (*Id.*, ¶¶ 196–98). In an attempt to conceal the true nature of the transfer, Ketter and Tomerlin obtained a temporary storage unit at CubeSmart Self Storage of Dallas ("CubeSmart") in September of 2018 to hold Global's inventory. (*Id.*, ¶ 198). Rather than establishing the CubeSmart account in the name of Windspeed or Global, Tomerlin used her own name and personal address to set up the account. (*Id.*). After Global's inventory was transferred to Windspeed, Windspeed continued to sell the inventory with the same customer marketplaces and the same software used by Global. (*Id.*, ¶ 199).

### H.  Windspeed Creates a Carbon Copy Website of Global's Website.

In 2018, Windspeed and Torres "expropriated ACET Global's website and began to close its bank accounts and divert its payment accounts." (*Id.*, ¶ 202). Indeed, "[a]s of at least December 12,

2018, Windspeed's website was a carbon copy of the former ACET Global website." (*Id.*). The Windspeed website included postings holding out for sale hundreds of products—distinct and unique products—that were in fact one and the same as those later reflected in Global's inventory of items in the Foreclose Sale Agreement. (*Id.*). Accordingly, Windspeed continued to sell Global's inventory, pocketing the revenues for itself and its owners. (*Id.*, ¶¶ 206–07).

## I. Windspeed Takes Over the Global Accounts.

On December 5, 2018, Lin, a former employee of Global, executed an Authorize.Net Request for a New Account Owner to be the new account owner of a Global account. (*Id.*, ¶ 214). Lin used her Windspeed email address and listed herself as the "New Account Owner" for an account held in Global's name. (*Id.*).

## J. D&T Partners' Demand for Payment on the D&T Note.

D&T Partners demanded payment on the D&T Note. (Dkt. No. 91, at ¶ 13–14). Indeed, by letter dated December 9, 2018, D&T Partners' attorney sent a demand letter to Baymark, Global, and Hallett & Perrin. (Ex. 1).[2] In the demand letter, D&T Partners communicated to Baymark, Global, and Hallett & Perrin that the D&T Note was in default. (*Id.*).

## K. The Cover Up and Fake Forfeiture Notice.

Many months after the purported transfer of Global's assets to Windspeed and the wind-down of Global, and apparently to circumvent the growing demands by D&T Partners for Defendants to pay on the D&T Note, on January 31, 2019, Super G (in coordination with Baymark) issued a Notice of Forfeiture ("Forfeiture Notice"). (*Id.*, ¶ 231; *see also* Ex. 17). The Baymark Defendants and Windspeed engaged Hallett & Perrin to represent them, and Hallett & Perrin drafted the Forfeiture Notice. (*Id.*, ¶¶ 231–36). The Forfeiture Notice was sent to the attention of Hook at his Baymark

---

[2] Although not attached to the Complaint, the Court may consider the demand letter sent by D&T partners to the Defendants because it is referenced in the Complaint. (Dkt. No. 91, at ¶ 13–14). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

address (not the old Global address). (*Id.*, ¶ 231). Moreover, the Forfeiture Notice was issued well after all parties, including Hallett & Perrin, had full knowledge that the assets at issue (*i.e.*, Global's assets) had already been transferred months before to Windspeed, an entity that was beneficially owned and controlled by Super G, BP Management, and Szeto. (*Id.*, ¶ 232). Because Global had already transferred all of its assets and operations to Windspeed several months before, there was no physical foreclosure sale as Windspeed continued those operations and sold off the inventory. (*Id.*, ¶ 237).

### L.  The Purported Foreclosure Sale.

The parties executed a Foreclosure Sale Agreement that reflected a sales date of March 1, 2019. (*Id.*, ¶ 247; Ex. 18). However, the parties executed and completed the sale after March 1, 2019. (*Id.*, ¶ 248). Indeed, the parties purposely backdated the Foreclosure Sale Agreement to make it appear as if the sale had occurred earlier. (*Id.*). In addition, according to the Foreclosure Sale Agreement, the "purchase price" (*i.e.*, the amount Windspeed agreed to "pay" to Super G) equaled the exact amount that was owed under the Super G Note. (*Id.*, ¶ 251–52).

### M. The Fraudulent Bankruptcy Filing and Contradictory Tax Filings.

On October 23, 2019, Global filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy with the Eastern District of Texas seeking relief under Chapter 7 of the Bankruptcy Code. (Dkt. No. 91, ¶ 257; Complaint Ex. 19). Ludlow signed the petition on behalf of Global. (*Id.*) In the petition, Global acknowledged that it owed ACET Ventures Partners, LLC $3,230,000. (*Id.*) Global also asserted that it had transferred within one year $30,000 of property to Super G on "01/2019" and that it had no significant assets. (*Id.*).

The bankruptcy petition contained a multitude of false statements designed to conceal assets from the bankruptcy trustee and from D&T Partners, the latter of which had already filed a lawsuit

against Global, Windspeed, and Baymark in the District Court of Dallas County on July 12, 2019.[3] (Dkt. No. 91, ¶ 17). For example, the petition requested information as to whether "inventories of the debtor's property . . . [had] been taken within 2 years before filing this case?" (Dkt. No. 91, ¶ 274–75). Ludlow and Global answered "No". (*Id*.). In deposition testimony in the state court action, the Global parties admitted that this answer was wrong and that only days prior to the bankruptcy filing they had reviewed Global's purported inventory. (*Id.*, ¶¶ 275–79). In addition, the petition requested Global to "[l]ist any property kept in storage units or warehouses within one year before filing this case." (*Id.*, ¶ 286). Ludlow and Global answer "None". (*Id.*). However, CubeSmart records indicate that Tomerlin, Ketter, and/or Windspeed moved Global's inventory into storage at least as of October 25, 2018 and moved such inventory from storage on or about November 16, 2018. The bankruptcy petition contained many other fraudulent representations. (*Id.*, ¶ 18).

Significantly, the federal tax returns of the relevant entity, Baymark ACET Holdco, LLC, which held Global's membership interests, represented that Global's assets were significantly more than Global reported on the bankruptcy petition. (Dkt. No. 91, ¶ 16). More specifically, on its 2018 IRS Form 1065, *U.S. Return of Partnership Income*, Baymark ACET Holdco, LLC represented that it had $3,023,970 of total assets as of December 31, 2018. (*Id.*, ¶ 311). In addition, the 2019 IRS Form 1065, *U.S. Return of Partnership Income*, for Baymark ACET Holdco, LLC reported that the entity had received $2,907,290 in "proceeds" from the "foreclosure sale" of Global's assets. (*Id.*, ¶ 22).

### N. State Court Litigation.

During the state court litigation, the Defendants attempted to further the RICO enterprise through more deceit and strong-arm tactics. For example, during the deposition of Denegre, after Plaintiffs' counsel asked an important question regarding the foreclosure sale at issue, Ludlow stated:

---

[3] Plaintiffs request the Court take judicial notice of this lawsuit in state court. *See D&T Partners, LLC (successor in interest to ACET Venture Partners, LLC),* Plaintiff v. *ACET Global, LLC, et al.*, No. DC-19-09828 (District Court of Dallas County, 116th Judicial District).

"Matthew [Denegre], shut the fuc* up." (Dkt. No. 91, ¶ 1). Thereafter, taking his cue from Ludlow, Denegre refused to answer the question. (*Id.*). Szeto also engaged in discussions with the Global/Windspeed employees prior to their scheduled depositions and instructed them on how to answer questions that may be asked by Plaintiffs' counsel. (Dkt. No. 91, Ex. 2, Tr. 109:15-25; 115:19-25; 116:1-3). To date, Windspeed continues its business operations with Szeto as its CEO. (*Id.*, Ex. 2, Tr. 32:1-5).

### III.   Standard of Review Under Rule 12(b)(6).

In the Fifth Circuit, motions to dismiss for failure to state a claim under Rule 12(b)(6) are "viewed with disfavor and . . . [are] rarely granted." *Brown v. Phoenix Life Ins. Co.*, 843 Fed. Appx 533, 538-39 (5th Cir. 2021). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Massey v. EMC Morg. Corp.*, 546 Fed. Appx 477, 480 (5th Cir. 2013). Accordingly, the district court may not dismiss a complaint under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Petrobras Am., Inc. v. Samsung Heavy Ind. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021); *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372 (5th Cir. 2012) (post-*Twombly* and *Iqbal*). The relevant question in determining whether a motion to dismiss should be granted is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." See *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372-73 (5th Cir. 2012) (noting the "strict standard of review under Rule 12(b)(6)").

### IV.   Standard of Review Under Rule 9(b).

According to Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened particularly requirement with respect to claims of fraud is a limited exception to Rule 8's notice pleading standard. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard

applies to all civil actions, with limited exceptions. . . . This Court, however, has declined to extend such exceptions to other contexts."). Accordingly, Rule 9(b) requires the Plaintiffs to plead the wire, mail, and bankruptcy fraud predicates with particularity; however, Rule 9(b) is inapplicable to all other RICO elements. *See, e.g., Howell Petroleum Corp. v. Weaver*, 780 F.2d 1198, 1199 (5th Cir. 1986) (holding that pleading RICO elements is governed by the "liberal notice-pleading procedure of the Federal Rules of Civil Procedure). To the extent the Defendants attempt to broaden Rule 9(b)'s application to non-fraud elements, they are mistaken, and only the Rule 8 pleading standard should apply.

## V.   Arguments and Authorities.

### A.   RICO Claims.

"The Racketeer Influence and Corrupt Organization Act, originally passed to target mobsters and organized crime, has been interpreted to reach even 'respected and legitimate' businesses that violate the Act's prohibitions." *Varela v. Gonzales*, 2013 WL 5658606 (N.D. Tex. Oct. 17, 2013) (citing *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985)). Accordingly, 18 U.S.C. § 1964(c) provides a private civil action and treble damages for those who are injured by violations of RICO's substantive provisions, including 18 U.S.C. § 1962(c) and (d). *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985). Plaintiffs have brought claims against Defendant Super G under 18 U.S.C. § 1962(a), (c) and (d), and Defendant Bellah under 18 U.S.C. § 1962(c) and (d). (Dkt. No. 91, ¶¶ 322-407; 408-421; and 422-450).

Under both 18 U.S.C. § 1962(c) and (d), three threshold elements must be met:  (1) a person must engage in (2) a pattern of racketeering activity; (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497-98.

1.   __Plaintiffs' 18 U.S.C. § 1962(c) Claims.__

18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Boyle v. U.S.*, 556 U.S. at 994 ("This enumeration of included enterprises is obviously broad, encompassing any . . . group of individuals associated in fact."). "Racketeering activity" is defined under RICO to mean certain proscribed acts, *see* 18 U.S.C. § 1961(1), and a "pattern of racketeering activity" means "at least two acts of racketeering activity . . . which occurred within ten years . . . after the commission of a prior act of racketeering activity," *see* 18 U.S.C. § 1961(5).

i.       **Plaintiffs have Properly Pled an Enterprise.**

The Motion contends that Plaintiffs have failed to properly plead an "enterprise" as that term is used in the RICO statute. (Dkt. No. 99, pp. 7-8). As indicated above, a RICO "enterprise" is any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Industries, Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. Aug. 29, 2011) (Boyle, J.) ("An 'enterprise' is broadly defined by the Act, and it 'can be either a legal entity or an association-in-fact.'"). The Supreme Court in Boyle has held that "[t]his enumeration of included enterprises is obviously broad, encompassing any . . . group of individuals associated in fact." *Boyle v. United States*, 556 U.S. 938, 944 (2009); *U.S. v. Elliott*, 571 F.2d 880, 897 (5th Cir. 1978) (noting that Congress gave the term "enterprise" a very broad meaning). There is no requirement that the enterprise pursue

lawful means.  See *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 674 (5th Cir. 2015) (citing *U.S. v. Turkette*, 452 U.S. 576 (1981)).

Here, Plaintiffs have identified 22 RICO "persons" under 18 U.S.C. § 1961(3).  (Dkt. No. 91).  Moreover, Plaintiffs have alleged that Baymark Partners was an entity enterprise within the meaning of 18 U.S.C. § 1961(4) (Dkt. No. 91, at ¶ 35).  Curiously, the Windspeed Actors make no arguments as to why they were not RICO "persons" with respect to the alleged Baymark Partners enterprise.  Rather, the Windspeed Actors focus all of their efforts on Plaintiffs' alternative allegations of an association-in-fact enterprise.  *Compare* Dkt. No. 91, at ¶ 35 ("Baymark Partners is an enterprise within the meaning of 18 U.S.C. § 1961(4) . . .") *with* Dkt. No. 102-1, at ¶ 33 ("The only . . . [enterprise] pled by the Plaintiff [sic] . . . is an association in fact.").  Because the Windspeed Actors have apparently waived any argument that the Windspeed Actors were not RICO persons with respect to the Baymark Partners enterprise, the Motion should be denied on these grounds.[4]

Moreover, Plaintiffs have properly pled an alternative association-in-fact enterprise.  Although far from clear, the Motion appears to contend that Windspeed is not a RICO person or part of an association-in-fact enterprise because: (1) the racketeering activity "occurred over a limited period of time and was completed . . . early in 2019"; (2) Windspeed is not a RICO person distinct from the enterprise; and (3) Windspeed "exercised no control over its creation and use as a racketeering vehicle." (Dkt. No. 102-1, at ¶¶ 39–40). Further, the Motion suggests that Szeto, as an officer and employee of Windspeed and/or Global, should be completely absolved of RICO liability.  (Dkt. No. 102-1, at ¶¶ 41–42).  In support of their claim, the Motion simply suggests that Plaintiffs' characterization of Szeto "makes it apparent that [Szeto] did not exercise the control nor authority which is required to establish somebody as a RICO person." (Dkt. No. 102-1, at ¶ 42).  On the basis

---

[4] To the extent the Windspeed Actors attempt to file a reply brief raising new arguments on this issue, the Court should deem them waived.  *See, e.g., Lucas v. Ocwen Home Loan Servicing*, No. 3:13-cv-1057-G, 2014 WL 7059274, n. 12 (N.D. Tex. Nov. 21, 2014) ("[A] Court generally will not consider arguments raised for the first time in a reply brief.").

of these contentions alone, the Windspeed Actors argue that their roles make them distinct from the association-in-fact enterprise. The Windspeed Actors are mistaken.

The Motion badly conflates the terms RICO "person" and RICO "enterprise." Although it is true that a RICO defendant may not be both a "person" and an "enterprise," it is equally true that a RICO defendant may be both a person and a *part* of the enterprise. *See, e.g., St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000). Similar to the facts at issue here, federal courts in other cases have universally concluded that employees may be named as RICO persons separate and distinct from the alleged entity-employer RICO enterprise. *See, e.g., Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 648-50 (S.D. Tex. 2016) (and cited cases); *West Tex. Nat. Bank v. FEC Holdings, LP*, No. MO:11-cv-0086-RAJ, 2013 WL 2158658 (W.D. Tex. May 17, 2013); *Provost v. First Guaranty Bank*, No. 18-8845, 2019 WL 3412432, at *4 (E.D. La. July 29, 2019) (and cited cases).

The Fifth Circuit has also recognized this concept of law. For example, in *Abraham*, the court concluded that it was sufficient to survive a Rule 12(b)(6) motion where the plaintiff pled and identified an employee as a RICO person and a corporate-employer as the distinct enterprise. *See Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007) ("This allegation is sufficient to demonstrate that the RICO person, an individual employee of the corporation, is distinct from the RICO enterprise, the corporation itself."); *see also St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) ("Otherwise, an individual member of a collective enterprise, such as an association-in-fact could not be prosecuted for violations of 1962(c) because he or she would not be considered distinct from the enterprise."); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) (holding that RICO applies "when . . . a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority.").

Here, Plaintiffs have alternatively pled an association-in-fact enterprise consisting of the 22-named Defendants in this lawsuit. As detailed in the Complaint, each of the 22-named RICO Defendants furthered the goal of the unlawful scheme—*i.e.*, effectively stealing the assets of an existing business and continuing that business through the sale of inventory. Because each Windspeed Actor is alleged to be a *part* of the association-in-fact enterprise (and not merely part of Windspeed and/or Global as enterprises), the Motion's assertion that Plaintiffs have failed to plead an association-in-fact enterprise is mistaken. The Windspeed Actors are separate and distinct for purposes of the RICO enterprise requirement.

### 2.  Defendants are RICO "Persons".

Contrary to Defendants' assertions, Defendants are both clearly RICO "persons" under 18 U.S.C. § 1961(3). As noted above, a RICO "person" is simply "any individual or entity capable of holding a legal or beneficial interest in property." The Fifth Circuit has recognized that "[t]his is a very broad definition. *Crowe v. Henry*, 43 F.3d 198 (5th Cir. 1995).

The facts outlined in Plaintiffs' Complaint clearly establish Bellah and Super G as persons subject to a civil RICO claim. Super G and Bellah, with Bellah acting as Super G's senior executive, both were actively and continuously involved in the secret plan to steal the assets of ACET Global and place them outside of the reach of Plaintiffs. Accomplishing this ultimate goal required Defendants to engage in multiple predicate acts – some of which they participated directly, others indirectly. Effecting the illegal foreclosure required the direct involvement of Defendants in engaging in wire and mail fraud, of which they were directly involved. *See* Complaint, ¶¶ 12, 226, 231-235, 253-256, 299-300, 315-317, 328, 361. Defendants were also indirectly involved in other predicate acts, including bankruptcy fraud, money laundering, and obstruction of justice that were all part of the "master plan" required to pull off Defendants' heist.

In addition to the continuous nature of the multiple acts required in order to effect the Defendants' ultimate goal, the conduct involved began at least as early as 2018 and is continuing to the present, and there is a continued threat of repetition of such conduct.

### 3. __Predicate Acts.__

The Complaint identified multiple predicate acts of wire fraud and mail fraud committed on the part of Defendants. Instances of mail fraud include the mailing of a Notice of Forfeiture/Notice of Foreclosure (Complaint, ¶¶231, 439), and a Notice of Disposition and Sale of Collateral (Complaint, ¶¶14, 203). Instances of wire fraud are represented by repeated communications in implementing the fraudulent plan. *See, e.g.,* Complaint, ¶¶111, 157, 183, 220, 223, 224, 227, 233, 250, 300.

Defendants herein were also indirectly involved in the bankruptcy fraud, money laundering, and obstruction of justice that was all a part of the overall plan to fraudulently transfer the assets of ACET Global and avoid the debt of Plaintiffs.

Moreover, the Fifth Circuit has recognized that associates in an associate-in-fact enterprise may be liable under RICO even if they do not commit two or more predicate acts themselves. *See Casperone v. Landmark Oil & Gas Corp*, 819 F.2d 112 (5th Cir. 1987) ("Under RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme."); *see also Bank of Mongolia v. M&P Global Fin. Svs.* No. 08-60623, 2010 WL 11549711, at *4 (S.D. Fla., Sept. 3, 2020) (same); *George v. Blue Diamond Petroleum, Inc.*, 718 F.Supp. 539, 550 (W.D. La., July 20, 1989) (same).

In addition, in *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), the Supreme Court held that, "acts in furtherance of [a] conspiracy are ... attributable to the other[ ] [co-conspirators] for the purpose of holding them responsible for the substantive offense." *Pinkerton v. United States,* 328 U.S. 640, 646-47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). See also *United States v. Hurley,* 63 F.3d 1, 22 (1st Cir. 1995) (applying *Pinkerton* liability to co-conspirators in determining criminal penalties for RICO

violations); *Riddell v. Riddell Washington Corp. .,* 866 F.2d 1480, 1493 (D.C. Cir. 1989) (holding that acts of fraudulent concealment could be imputed to all co-conspirators); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 623 F.Supp.2d 798, 834 (S.D. Tex. 2009) (*citing In re Performance Nutrition, Inc.,* 239 B.R. 93, 99, 113 (Bankr. N.D. Tex. 1999)) ("Once a civil conspiracy is found, each coconspirator is responsible for any action in furtherance of the conspiracy performed by other conspirators. In other words, each action in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the acts."); *Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.,* 770 F.Supp. 1351, 1371-72 (E.D. Wis. 1991) (stating that a RICO defendant is "responsible for offenses committed by his fellow conspirators"); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago,* No. 80-C-6401, 1985 WL 1118, at *8 (N.D. Ill. Mar.10, 1985) (applying co-conspirator liability to meet predicate act requirement in civil RICO claim).

### 4. Reliance and Proximate Cause.

Defendants fairly miraculously claim that Plaintiffs have failed to plead reliance or proximate cause with regard to the predicate acts. While the Complaint is admittedly long, its length does not excuse a simple failure to read it. Reliance and proximate cause are established throughout. Put simply, Plaintiffs relied in fraudulent representations, which were all part of Defendants' overall plan, that Defendants' actions were intended to maximize the value of the debt to Plaintiffs. This included the fraudulently induced subordination agreement (Complaint, ¶¶81-82) – when Defendants never had any intent whatsoever to ever make a payment on the D&T Note (Complaint, ¶89). This was clearly evidenced by the timing of the Forbearance Agreement (Complaint, ¶90). The entire fraudulent scheme very clearly "proximately caused" Plaintiffs' damages in the failure to make even the very first payment on the D&T Note.

### 5.   Plaintiffs have Properly Pled an Association-in-Fact.

Defendants argue that Plaintiffs fail "to allege the existence of an enterprise by association in fact with its own structure and purpose apart from the alleged commission of the racketeering activities." (Motion, p. 8).  In doing so, however, Defendants ignore recent caselaw on the issue.

To establish an association-in-fact enterprise, a plaintiff must allege at least three structural features: (1) purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.  *Boyle v. U.S.*, 556 U.S. 938, 946 (2009). "If the alleged enterprise is an association-in-fact, the plaintiff must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit." *Id.*, at 945.

The Defendants all had a common purpose – to fraudulently transfer the assets of ACET Global out of the reach of Plaintiffs.  The Defendants herein had informal relationships that all contributed to the overall scheme.  Defendants herein were primarily involved with planning and implementing the details of the "wind-down" plan whereby ACET Global would be artificially wound down and the assets of the entity simply transferred over to Windspeed, the new entity.  Defendants were integrally involved in that process.  Furthermore, an association-in-fact

> need not have a hierarchical structure or a 'chain of command';
> decisions may be made on an ad hoc basis and by any number of
> methods—by majority vote, consensus, a show of strength, etc.
> Members of the group need not have fixed roles; different members
> may perform different roles at different times. The group need not
> have a name, regular meetings, dues, established rules and regulations,
> disciplinary procedures, or induction or initiation ceremonies. While
> the group must function as a continuing unit and remain in existence
> long enough to pursue a course of conduct, nothing in RICO exempts
> an enterprise whose associates engage in spurts of activity punctuated
> by periods of quiescence. Nor is the statute limited to groups whose
> crimes are sophisticated, diverse,  complex, or unique; . . .

*Boyle*, 556 U.S. at 948.

Defendants meet all of the required elements of an association-in-fact.

6.   **Plaintiffs have Properly Pled the Defendants' Involvement in the RICO Pattern of Racketeering.**

Defendants are proper defendants in this action.  Federal courts have reasoned that the RICO statute has broad reach:  "[its] net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise."  *U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).  The RICO statute also "makes clear that RICO liability is not limited to those with formal positions in the enterprise," nor does it require "primary responsibility" or "significant control."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Rather, all that is required is that a plaintiff plead sufficient facts to show that the defendants, by their "words or actions . . . objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate acts."  *U.S. v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).  A plaintiff need not show that all of the associates in an associate-in-fact enterprise committed the two predicate acts.  *See Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112 (5th Cir. 1987) ("Under RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme."); *Bank of Mongolia v. M&P Global Fin. Svs.*, No. 08-60623, 2010 WL 11549711, at *4 (S.D. Fla. Sept. 3, 2010) (same); *George v. Blue Diamond Petroleum, Inc.*, 718 F. Supp. 539, 550 (W.D. La. July 20, 1989) (same).

Here, the allegations in the Complaint are sufficient to demonstrate that the Defendants objectively manifested an agreement to participate in the affairs of the association-in-fact enterprise. Even to the extent that Defendants were not higher-level plays in the conduct is irrelevant for purposes of RICO liability.  *See Boyle*, 556 U.S. at 946 (concluding that the relationships among those associated with the enterprise-in-fact need not involve a "hierarchical structure or 'chain of command'").

Defendants' allegations that the Complaint only alleges conduct amounting to a "single, lawful transaction" with no threat of continuing illegal conduct is without merit. As referenced above, the Complaint alleges multiple violations of federal statutes that have occurred over a substantial period of time and that are ongoing. The suggestion that stealing a company out from underneath an unwitting business owner amounts to a "single, lawful transaction" is preposterous. Committing mail fraud is not part of a single, lawful transaction. Committing wire fraud or bankruptcy fraud is not part of a single, lawful transaction. Committing perjury as part of obstruction of justice is not part of a single, lawful transaction.

The Fifth Circuit, citing to the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229 (1989), explained the concept of a pattern of racketeering activity, pointing out that

> The element of relatedness is satisfied if the criminal conduct embraces criminal acts "**that have the same purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events**." Continuity may be established, *inter alia,* by a showing that the predicates "are a regular way of conducting defendant's ongoing legitimate business, or of conducting or participating in an ongoing RICO enterprise. [emphasis added]

Moreover, this Court has explicitly held that "[i]n order to establish a pattern of racketeering activity, a plaintiff need not demonstrate multiple schemes." *Cypress/Spanish Fort I, L.P. v. Professional Service Industries, Inc.*, 814 F.Supp. 2d 698 (N.D. Tex., Aug. 29, 2011) (citing *Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir. 1989).

### 7.  Plaintiffs' 18 U.S.C. § 1962(d) Claims.

18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of . . . [18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), or 18 U.S.C. § 1962(c)]." Thus, to establish a conspiracy claim under 18 U.S.C. § 1962(d), a plaintiff must establish that: (1) "two or more people agreed to commit a substantive RICO offense;" and (2) the defendant "knew of and

agreed to the overall objective of the RICO offense." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010).  Due to the clandestine nature of conspiracies, a plaintiff may not be able to muster direct evidence, and, therefore, the agreement, knowledge of and participation in the conspiracy "may be inferred from the development and collocation of circumstances." *U.S. v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (quoting *U.S. v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)).  Moreover, a conspirator need not know all of the details of the enterprise and identities or all of the co-conspirators as long as the evidence allows for the inference that each conspirator knowingly participated in some manner in the overall objective of the conspiracy.  *Id.* at 858.  But, "[a] conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor." *Chaney*, 595 F.3d at 239 (quoting *Salinas v. U.S.*, 522 U.S. 52, 65 (1997)).

    **B.** <u>**State Law Claims.**</u>

        **1.** <u>**Common Law Fraud.**</u>

       In early 2019, after Damti called Bellah completely unaware that Bellah was in on the fraud against D&T, Bellah informed Damti that "he [Bellah] was unaware of Windspeed"—despite the fact that Bellah was already serving as Super G's board manager of Windspeed.  (Complaint ¶ 299).  Bellah's fraudulent misrepresentation was designed to prevent Damti and D&T from learning about the fraud, preventing him from taking steps prior to their destruction of all of ACET's electronic records and emails and preventing D&T from recovering.  Damti confided his suspicions and even strategy to Bellah.  Bellah used this information to help carry out the fraud.

       As set out in detail herein and in the multiple responses, Plaintiffs have more than adequately pled claims of fraud.

        **2.** <u>**Aiding and Abetting Breach of Fiduciary Duties.**</u>

       As to Plaintiffs' state-law claim for aiding and abetting breach of fiduciary duties, Defendants' primary argument is that, if the underlying claim for breach of fiduciary duty fails, then the aiding and

abetting such breach must fail as well.  To that principle, Plaintiffs do not disagree. However, such argument adds little to a motion to dismiss.

Plaintiffs adequately pled breach of fiduciary duty on the part of multiple defendants and supported such claim with ample evidence.  The named defendants owed a fiduciary duty of care to preserve the assets of ACET Global for the benefit of its creditors, including Plaintiff, and they failed to satisfy that duty.

Defendants herein knowingly participated and aided those defendants in carrying out the scheme that has been described in great detail herein and in the Complaint.  Therefore, the claim for aiding and abetting breach of fiduciary duty has been adequately pled.

### 3.  Texas Uniform Fraudulent Transfer Act.

Defendants want to paint a picture of innocence as it relates to the fraudulent transfer of the assets of ACET Global, but the facts, as well-laid out in the Complaint, paint a very different picture. Defendants were intimately involved in the scheme to steal the assets of ACET Global and avoid paying creditors including Plaintiffs.

Once again, Defendants herein knowingly participated and aided all other defendants in carrying out the fraudulent transfer scheme that has been described in great detail herein and in the Complaint.  Therefore, the claim against Defendants for violation of the Texas Uniform Fraudulent Transfer Act has been adequately pled.

### 4.  Civil Conspiracy.

Yet again, Defendants improperly seek to defend a civil conspiracy claim by simply incorporating motions filed by multiple other defendants.  The Court should reject and strike such attempt and focus solely on the Defendants' Motion, which fails to support any inadequate pleading as it relates to civil conspiracy.

The Complaint is replete with details regarding the conspiracy between and among all of the defendants, and role of Defendants herein is well described. For Defendants to pretend that they were somehow not aware of the harm caused or of the wrongful conduct in which they were engaging is simply mind-boggling. Defendants executed the plan that took the assets of one company – a company more than capable of paying its debts and which had substantial business – to another company with the goal of no longer paying the transferring company's debt. And they didn't do it alone. Each defendant played their part.

Plaintiffs have adequately pled a cause of action for civil conspiracy.

## VI.   Prayer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Court deny Super G and Bellah's Motion to Dismiss. Moreover, to the extent that the Court intends to otherwise grant any portion of their Motion, Plaintiffs hereby request leave to replead to remedy any purported deficiencies. Finally, the Plaintiffs request that the Court grant Plaintiffs all other relief, at law or in equity, to which they may show themselves justly entitled.

Dated: September 2, 2022

/s/ Jason B. Freeman
Jason B. Freeman
Texas Bar No. 24069736
Matthew L. Roberts
Texas Bar No. 24098330
Thomas L. Fahring III
Texas Bar No. 24074194
Gregory W. Mitchell
Texas Bar No. 00791285
Zachary J. Montgomery (forthcoming)
Texas Bar No. 24098130

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

On September 2, 2022, I filed the foregoing document with the clerk o court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or *pro se* parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).


By:  */s/ Jason B. Freeman*
        Jason B. Freeman