UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **D&T PARTNERS (successor in interest to ACET VENTURE PARTNERS, LLC), Directly and Derivatively on Behalf of ACET GLOBAL, LLC and BAYMARK ACET HOLDCO, LLC,** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. 3:21-CV-1171-B** |
| **BAYMARK PARTNERS LP; BAYMARK PARTNERS MANAGEMENT, LLC; SUPER G CAPITAL LLC; SG CREDIT PARTNERS, INC.; BAYMARK ACET HOLDCO, LLC; BAYMARK ACET DIRECT INVEST, LLC; BAYMARK PARTNERS; DAVID HOOK; TONY LUDLOW; MATTHEW DENEGRE; WILLIAM SZETO; MARC COLE; STEVEN BELLAH; ZHEXIAN "JANE" LIN; DANA MARIE TOMERLIN; PADASAMAI VATTANA; PAULA KETTER; VANESSA TORRES; WINDSPEED TRADING, LLC; JULIE SMITH; and HALLETT & PERRIN P.C.,** | § | |
| **Defendants.** | § | |

MEMORANDUM OPINION & ORDER

Before the Court are Defendants SG Credit Partners, Inc. ("SG Credit") and Marc Cole's (Doc. 96); Hallett & Perrin, P.C. ("Hallett & Perrin") and Julie A. Smith's (Doc. 97); Super G Capital LLC ("Super G") and Steven Bellah's (Doc. 98); Zhexian Lin, Dana Marie Tomerlin, Padasamai Vattana, and Vanessa Torres (collectively, "Windspeed Employees")'s (Doc. 101); Windspeed Trading, LLC ("Windspeed") and William Szeto's (Doc. 102); Baymark ACET Holdco,

LLC ("Holdco")'s (Doc. 103); Baymark Partners Management, LLC ("BP Management"), Baymark Management, LLC, Baymark ACET Direct Invest, LLC, Baymark Partners ("Baymark"), and Matthew Denegre (collectively, the "Baymark Defendants")'s (Doc. 105); David Hook and Tony Ludlow's (Doc. 107) Motions to Dismiss. Because Plaintiffs have not established a "pattern of racketeering activity" as required under the statute, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' RICO claims and **DISMISSES** Plaintiffs' state-law claims for lack of federal jurisdiction.

## I.

## BACKGROUND[1]

This is a business dispute between a former secured creditor and a newly formed company and its associated parties. The secured creditor, D&T Partners, LLC ("D&T Partners"), alleges that the Defendants executed a scheme to avoid liability from a $3.2 million loan by "fraudulently transferring" the assets from the foreclosed company, ACET Global, LLC ("ACET Global"), to the new company, Windspeed, through multiple acts of wire fraud, mail fraud, bankruptcy fraud, and obstruction of justice. Doc. 91, Second Am. Compl., ¶¶ 1–25.

In 2017, Baymark, a Texas-based "general partnership between Hook and Ludlow" of which Denegre is also a director, approached Tomer Damti of D&T Partners[2] to purchase D&T Partners because of its "successful e-commerce business." *Id.* ¶¶ 45–49, 60. Baymark purchased D&T Partners through a newly formed entity, ACET Global, on July 14, 2017. *Id.* ¶¶ 61–62. Hook and Ludlow

[1] The facts are as Plaintiffs allege in the Second Amended Complaint. But given the factual overlap between the First and Second Amended Complaints, the Court borrows from its previous Order (Doc. 89) where appropriate.

[2] At the time, the company was known as ACET Venture Partners, LLC. Doc. 91, Second Am. Compl., ¶ 60. However, the successor in interest is D&T Partners, *id.* ¶ 36, so the Court will refer to the entity singularly as D&T Partners to minimize confusion.

represented that Damti would be the CEO of ACET Global (the "Damti representation"). *Id.* ¶¶ 71, 389. Under the Asset Purchase Agreement (the "APA"), "ACET Global agreed to (1) pay $850,000 to D&T Partners, subject to certain adjustments; (2) provide a subordinated secured promissory note in the amount of $3,230,000 in favor of D&T Partners [(the 'D&T Note')]; and (3) to provide D&T Partners with a 25% common membership interest in Baymark ACET Holdco, LLC." *Id.* ¶ 68. The first payment for the D&T Note was due in October 2018. *Id.* ¶ 69.

After the APA, ACET Global took on another loan. Specifically, "Hook caused ACET Global to enter into a Collateral Assignment ('the Collateral Assignment')" with the lender Super G[3] in return for a $1,000,000 term loan facility. *Id.* ¶ 72. As part of this agreement, D&T Partners subordinated its security interest to Super G based on the Damti representation and ACET Global's representation that it did not intend to default on either loan. *Id.* ¶ 81.

But in February 2018, Denegre, director of Baymark, terminated Damti as CEO of ACET Global and replaced him with Szeto. *Id.* ¶¶ 83–85. The following month, ACET Global defaulted on its note to Super G. *Id.* ¶ 89. Because of the default, in April 2018 ACET Global and Super G entered into a forbearance agreement to waive loan payments "until October 25, 2018—just days before the D&T Note payments would become due." *Id.* ¶¶ 89–90.

Approximately five months later, "Szeto filed a Certificate of Formation for a Limited Liability Company for Windspeed . . . at the behest of Baymark Partners." *Id.* ¶ 126. Windspeed's company agreement, drafted by the law firm Hallett & Perrin, provided for an ownership split between BP Management (a shell entity owned by Ludlow and Hook), Super G, and Szeto. *Id.* ¶¶ 127, 161. Super

[3] Super G's Chief Financial Officer was Marc Cole. Doc. 91, Second Am. Compl., ¶ 75. When Cole transitioned to SG Credit, the Collateral Assignment also transferred from Super G to SG Credit. *See id.* ¶ 80.

G also gave Windspeed, a then-assetless company, a $200,000 loan with the expectation that Windspeed would ultimately acquire ACET Global's assets. *Id.* ¶¶ 176–79.

In September 2018, ACET Global, through Denegre and Szeto, executed a "wind down" plan to transfer its assets to the newly formed company, Windspeed (the "fraudulent transfer"). *Id.* ¶¶ 100, 104. An employee of ACET Global rented a temporary storage unit to store ACET Global's physical assets and inventory and later moved these assets and inventory into Windspeed's new office and warehouse. *Id.* ¶¶ 197–98. On October 9, 2018, Szeto emailed ACET Global employees retroactively terminating their employment for ACET Global as of September 28, 2018. *Id.* ¶ 183. Szeto also instructed Windspeed's accountant, "to maintain 'two sets of books,'" one set for ACET Global and one for Windspeed. *Id.* ¶ 185. During the "wind down" in late October 2018, ACET Global transferred all assets, business operations, and employees to Windspeed. *Id.* ¶¶ 182, 196.

At the same time, Windspeed assumed ACET Global's business operations as its own. *Id.* ¶¶ 194, 199, 204. "Windspeed's website was a carbon copy of the . . . ACET Global website" and Windspeed sold "the inventory with the same customer marketplaces and the same software used at ACET Global." *Id.* ¶ 199. Windspeed continued ACET Global's business operations, "pocket[ed] the revenues" from the sale of ACET Global's unsegregated inventory, closed ACET Global's bank accounts, and assumed ACET Global's other accounts. *Id.* ¶¶ 206–08, 210, 213–17.

"On October 31, 2018, the first monthly installment under the D&T Note became due," but "[a]ccording to the Defendants' plan, they purposefully caused ACET Global to fail to pay [D&T Partners]" and the other creditors. *Id.* ¶ 228. Baymark discussed the risks of a possible fraudulent transfer of assets with its legal counsel Hallett & Perrin in December 2018. *Id.* ¶ 122. Hallett & Perrin further discussed the issue with Super G's counsel. *Id.*

"On January 31, 2019, Super G . . . issued a Notice of Forfeiture," and Baymark sought to move forward with the foreclosure. *Id.* ¶¶ 231, 233. Hallett & Perrin drafted the foreclosure sale agreements, backdated to March 1, 2019, and "ensure[d] that Windspeed . . . did not assume the liability" of the D&T Note. *Id.* ¶¶ 247–50. Under the agreement, Super G sold ACET Global's assets to Windspeed "for a loan in the amount of $514,144.86," which closely matched the $514,515 amount due on the ACET Global loan from Super G. *Id.* ¶ 254. During the Super G foreclosure sale agreement, Hallett & Perrin represented Baymark, BP Management, ACET Global, and Windspeed—parties with competing interests. *Id.* ¶¶ 218–20.

On October 23, 2019, ACET Global filed a Voluntary Petition for Bankruptcy that listed the $3,200,000 D&T Partners liability, $30,000 in transferred property, and contained multiple false representations to the bankruptcy court about the attributes of ACET Global. *Id.* ¶¶ 257, 266–98. The bankruptcy court closed the case on January 29, 2020 without discharging ACET Global. Order Closing the Case, *In re ACET Global, LLC*, No. 19-42878 (Bankr. E.D. Tex. Jan. 29, 2020).

Since the "fraudulent transfer," Defendants have attempted to obstruct and cover the alleged fraud. In March 2021, counsel for Super G and Cole emailed D&T Partners' counsel stating that Super G "is no longer in business" and was in "the process of liquidating all assets." *Id.* ¶ 300. Several individual Defendants stonewalled or changed their testimony after being presented with conflicting evidence during depositions in another related case. *Id.* ¶¶ 101–02, 109–13, 116–18, 246, 253, 302–06. Shortly after defaulting on the D&T Note, Szeto and Baymark deliberately "caused the loss and destruction of" ACET Global's emails and electronic records. *Id.* ¶¶ 307–08. Windspeed deleted its website. *Id.* ¶ 309.

D&T Partners, as the successor in interest to ACET Venture Partners, LLC, sues directly and derivatively on behalf of ACET Global[4] and Baymark ACET Holdco, LLC. *Id.* at 1–2. D&T Partners brings claims for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), common law fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duties, violation of the Texas Uniform Fraudulent Transfer Act, civil conspiracy, and respondeat superior and/or agency liability. *Id.* ¶¶ 322–467.

The Court previously ruled on several Defendants' Motions to Dismiss (Doc. 89). In that order, the Court dismissed all the claims without prejudice because Plaintiffs had not pleaded a "pattern of racketeering activity" as required under RICO. *Id.* at 11. Plaintiffs were given an additional 30 days to file a second amended complaint, *id.* at 17, which Plaintiffs filed on June 8, 2022 (Doc. 91). Defendants again filed eight separate motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6).

Plaintiffs' updated complaint, which now spans 194 pages and 476 paragraphs, alleges many of the same facts as the Original and First Amended Complaints (Docs. 1, 36). Plaintiffs' primary changes are, first, to the number and span of predicate acts alleged. The Court in its previous order identified eighteen predicate acts, which it pulled primarily from the Plaintiffs' Response. *See* Doc. 89, Order, 9 n.2. Plaintiffs now allege a list of approximately 100 predicate acts, including mail fraud, wire fraud, theft of trade secrets, bribery, lying under oath, bankruptcy fraud, obstruction of justice, concealment, and money laundering. Doc. 91, Second Am. Compl., ¶¶ 317–18.

The predicate acts also span a longer period than the eighteen months pleaded in the First Amended Complaint. *See* Doc. 89, Order, 12. Specifically, Plaintiffs' list now contains wire fraud

[4] D&T Partners is the "sole manager of ACET Global" and has "legal ownership" of ACET Global. Doc. 91, Second Am. Compl., ¶ 6 n.10.

beginning in June 2017 and ends with obstruction of justice and wire fraud in May 2021. *See* Doc. 91, Second Am. Compl., ¶¶ 317–18. The predicate acts, Plaintiffs say, span nearly four years and "continue[] through the present based on Defendants' recent actions." *Id.* ¶ 318. Defendants' scheme also presents a "continuing threat" because "Defendants have testified to regularly evaluating new businesses to expand Windspeed's operations—businesses that would suffer the same fate as ACET Global based on Defendants' actions." *Id.* ¶ 320.

Second, Plaintiffs point to two other lawsuits involving Hook, Ludlow, and Baymark Partners. *Id.* ¶¶ (iii)–(iv). These lawsuits, Plaintiffs assert, show the Baymark Defendants operate with the "primary purpose of illegally acquiring equity stakes in target companies and siphoning off their assets and value at the expense of their creditors and stakeholders." *Id.* ¶ (iii).

The first lawsuit, *Greb v. Singleton*, involved a borrower that had defaulted on multiple notes. 2019 WL 13210371, at *1 (N.D. Tex. Sept. 30, 2019) (Lynn, C.J.).[5] The creditor sought foreclosure on the properties and business pledged as collateral, but the borrower alleged that the creditor had inflated the amount owed and was seeking millions more than it could get by simply collecting on the loans. *Id.* Despite seeking alternative financing and buyers, the borrower ultimately agreed to sell his interest to Baymark for $15 million. *Id.* at *2. The borrower alleged he was unaware, however, that the creditor and Baymark had struck a deal in which the creditor would advance Baymark the funds to purchase the borrower's interest, and the creditor would take a 7.5% interest in the profits of any resale. *Id.* Four months later, Baymark resold the entity for $32 million, more than double what it had paid the borrower. *Id.* The borrower sued, alleging violations under the RICO statute.

[5] The Court draws on the facts as provided in the complaints of the respective lawsuits, since the lawsuits are incorporated by reference into the Plaintiffs' Second Amended Complaint and are part of the public record. *See, e.g.*, *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

*Id.* But the court dismissed the claims, holding that the borrower had failed to adequately plead fraud and continuity sufficient for RICO, among other infirmities. *Id.* at *4–5.

The second case, *State Farm Mutual Automobile Insurance Co. v. Complete Pain Solutions, LLC*, also involves RICO claims and is still ongoing, but neither Baymark, Hook, nor Ludlow are named as defendants in the suit. *See* Doc. 1, Compl., 4:20-CV-2606 (S.D. Tex. filed July 23, 2020). Rather, the RICO claims are against two doctors who allegedly submitted fraudulent medical bills to an insurance company. *Id.* ¶¶ 74–85. Hook, Ludlow, and Baymark are only tangentially connected, in that Baymark purportedly owns the medical entity for which the doctors worked and Hook and Ludlow serve on its Board of Managers. *Id.* ¶ 21. The only claim against the two medical entity defendants, however, is a state-law claim for "money had and received." *Id.* ¶¶ 86–91.

Despite Plaintiffs' expansion of both the number of predicate acts and the time frame during which they took place, the Court still finds the allegations insufficient to support a "pattern of racketeering activity" as required under the statute. The Court draws such a conclusion even assuming all allegations are viable predicate acts under the RICO statute—a generous assumption at best.[6] Likewise, Plaintiffs' references to two related lawsuits do not plead facts to establish a pattern.

[6] Plaintiffs have not, for example, pleaded facts sufficient to establish the elements of mail or wire fraud for many of the supposed predicate acts in the list. Mail and wire fraud require, among other things, that the mailing be "incident to an essential part of the scheme." *See United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006).

## II.

## LEGAL STANDARD

A. *Rule 12(b)(6) Standard*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III.

## ANALYSIS

### A. *RICO*

D&T Partners brings three RICO claims for violations of 18 U.S.C. § 1962(a), (c), and (d). Doc. 91, Second Am. Compl., ¶¶ 322–467. The claims under subsections (c) and (d) are against all Defendants, while the claim under subsection (a) is against Baymark Partners, Ludlow, Hook, Denegre, Super G, SG Credit, BP Management, Smith, and Hallett & Perrin. *See id.* Because there are common elements in each subsection, *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995), the Court will analyze the RICO claims together.

All four subsections of § 1962 have three common elements: "1) a person who engages in 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Id.* (emphasis omitted). The statute broadly defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3); *Boyle v. United States*, 556 U.S. 938, 944 (2009). "To establish th[e] pattern [element], a plaintiff must show both a relationship between the predicate offenses . . . and the threat of continuing activity." *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016). "[A]n enterprise . . . 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Boyle*, 556 U.S. at 945.

Several Defendants reiterate the argument raised in their prior motions to dismiss that D&T Partners fails to plausibly plead the second element—a pattern of racketeering activity. *E.g.,* Doc. 107, Hook & Ludlow's Mot., 3–14; Doc. 99, Super G & Bellah's Br., 7, 10–11; Doc. 105, Baymark's

Mot., 1 n.1 (adopting and incorporating other Defendants' arguments by reference); Doc. 96-1, SG Credit & Cole's Br., 11 (same). The Court agrees.

Congress intended a "natural and commonsense approach to RICO's pattern element." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). "A pattern is not formed by sporadic activity, and a person cannot be subjected to the sanctions of [RICO] simply for committing two widely separated and isolated criminal offenses." *Id.* at 239 (internal quotations and citations omitted). Rather, a "pattern" of racketeering activity exists when the racketeering predicate acts are (1) related and (2) "amount to or pose a threat of continued criminal activity." *Id.*

Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. A "threat of continued criminal activity," or "continuity," "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Aside from the "closed-end" and "open-end" framework, the Fifth Circuit has held that "where alleged RICO predicate acts are part and parcel of a single, otherwise lawful transaction, a 'pattern of racketeering activity' has not been shown." *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 123 (5th Cir. 1996).

Several cases provide color. In *Word of Faith*, for example, a church sued ABC network for RICO violations after a broadcast criticized the church's handling of donations. *Id.* at 120–21. The church alleged a list of predicate acts including wire fraud, mail fraud, theft, and obstruction of justice. *Id.* at 121. The Fifth Circuit, however, held that the alleged acts lacked continuity and

instead "were part of a single, lawful endeavor—namely the production of television news reports concerning a particular subject." *Id.* at 123.

By comparison, the Fifth Circuit found continuity sufficient for a pattern in *Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007). There, the defendants were accused of recruiting Indian citizens under false pretenses to become steelworkers in Louisiana. *Id.* at 353. Upon the Indian citizens' arrival, they were stripped of their passports, housed in poor conditions, and had their wages skimmed. *Id.* at 354. The pattern, the court held, involved the defendants' "repeated international travel" followed by the poor working conditions they imposed in the United States. *Id.* at 356. Perhaps most importantly, the allegations amounted to "systematic victimization" that would have likely "continue[d] indefinitely had the Plaintiffs not filed this lawsuit." *Id.*

Here, Plaintiffs have failed to allege the "threat of continued criminal activity" necessary to establish a pattern. *See H.J. Inc.*, 492 U.S.S at 239. Rather, the alleged predicate acts are "part and parcel of a single, otherwise lawful transaction," namely, a loan default and purported foreclosure sale. *See Word of Faith*, 90 F.3d at 123. Indeed, upon closer examination, the predicate acts all wrap up into a singular fraudulent scheme: The Baymark Defendants, with the help of a law firm, colluded with a senior creditor to fraudulently transfer ACET Global's assets to a different entity and used a sham foreclosure, fraudulent bankruptcy, and obstruction of justice to cover their tracks. Doc. 91, Second Am. Compl., ¶¶ 1–25. Unlike the repeated and "systematic victimization" in *Abraham*, the victims here are limited to the subordinated creditors of ACET Global. The scheme came to its natural conclusion—whether there was a foreclosure sale or not—when the assets were siphoned out of ACET Global. Beyond the singular scheme, Plaintiffs' assertion of a "continuing threat" because

Defendants regularly seek out new business opportunities and these "businesses [] would suffer the same fate as ACET Global" is entirely conclusory. *See id.* ¶ 320.

Plaintiffs argue the list of roughly 100 predicate acts spanning over four years is enough to establish continuity. *Id.* ¶ (i). But Plaintiffs' predicate acts rely heavily on instances of alleged mail and wire fraud. "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000). Indeed, upon closer inspection, of the list of "at least 100 predicate acts," roughly 60 are premised exclusively on supposed mail or wire fraud. *See* Doc. 91, Second Am. Compl., ¶¶ 317–18. The Court resists Plaintiffs' attempt to establish a pattern of racketeering simply by tallying every back-and-forth email Defendants sent. As several circuits have observed:

> Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions [under RICO] dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time. Given its "natural and common sense approach to RICO's pattern element," we think it unlikely that Congress intended RICO to apply in the absence of a more significant societal threat.

*U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir. 1990) (quoting *Marshall-Silver Const. Co. v. Mendel*, 894 F.2d 593, 597 (3d Cir. 1990)); *see also Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

Nor do Defendants' fraudulent acts relating to the bankruptcy proceedings transform a single fraudulent transaction into an ongoing scheme or pattern of racketeering. Plaintiffs cite to *First*

*Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) to support the proposition that bankruptcy fraud can serve as a predicate act. *See* Doc. 91, Second Am. Compl., ¶¶ 335–37. But in that case, the Second Circuit also went on to rule *against* a finding of continuity despite defendants' fraudulent conveyances and subsequent misrepresentations to the bankruptcy court. *Satinwood*, 385 F.3d at 182. The court instead held that defendant had "engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceeding." *Id.* The scheme was "inherently terminable" and it "defie[d] logic to suggest that a threat of continued looting activity exists when . . . there is nothing left to loot." *Id.* at 181–82. Like in *Satinwood*, the fraudulent bankruptcy at issue here represents a continuation of a "single scheme" to defraud creditors which was "inherently terminable" when the assets were siphoned off to Windspeed. *See id.*

Finally, Plaintiffs point to two previous lawsuits involving Defendants as evidence of a pattern of racketeering activity, but Plaintiffs have not adequately pleaded the underlying facts. In *Word of Faith*, the Fifth Circuit briefly addressed the use of prior lawsuits in pleading a pattern of racketeering activity and noted that "[p]leading the mere existence of lawsuits is not the same as pleading the facts that demonstrate predicate illegal acts as the defendant's regular way of doing business." 90 F.3d at 124.

Plaintiffs here cite to the lawsuits as evidence that Baymark Partners' primary purpose is to "illegally acquir[e] equity stakes in target companies and siphon[] their assets and value." Doc. 91, Second Am. Compl., ¶ (iii). But Plaintiffs' coverage of *Greb*—the case with facts most like those present here—consists of a single paragraph stating that the scheme was "strikingly similar" and describing the arrangement between the creditor and the borrower entity. *See id.* While the Court

notes the facial similarity, without more, Plaintiffs have not pleaded facts sufficient to establish a pattern of racketeering. Additionally, the only defendants involved in *Greb* were Baymark Partners, Ludlow, and Hook. But Plaintiffs' claims here, and the purported RICO enterprise, involve a host of defendants stretching well beyond Baymark. Doc. 91, Second Am. Compl. The second lawsuit Plaintiffs cite stands on even weaker footing, as the RICO claims are solely against the doctors in question. Baymark, Ludlow, and Hook are only tangentially involved through ownership of the entity, which in turn is being sued only for "money had and received." *See* Doc. 1, Compl., *State Farm*, 4:20-CV-2606 (S.D. Tex. filed July 23, 2020). The "mere existence" of these lawsuits, without facts demonstrating illegal predicate acts as Defendants' "regular way of doing business," cannot support a pattern. *See Word of Faith*, 90 F.3d at 124.

Therefore, because Plaintiffs have not established continuity sufficient for a pattern of racketeering under RICO, the Court **DISMISSES** all RICO claims.

*B. State-law Claims*

Plaintiffs pleaded the Court's subject matter jurisdiction under 28 U.S.C. § 1331, which grants the Court "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Doc. 91, Second Am. Compl., ¶ 26. Because the Court dismisses Plaintiffs' federal law claims, the Court must now analyze whether to retain jurisdiction of the state-law claims under supplemental jurisdiction.

"A district court has 'wide discretion' in deciding whether it should retain jurisdiction over state law claims once all federal claims have been eliminated." *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011). The general rule in the Fifth Circuit "is to dismiss state claims when the

federal claims to which they are [supplemental][7] are dismissed." *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992). And "when the . . . federal-law claim[s] [are] eliminated at an 'early stage' of the litigation, the district court has 'a powerful reason to choose not to continue to exercise jurisdiction.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988)). In such a case, "the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."[8] *Id.* at 586–87 (quoting *Carnegie-Mellon*, 484 U.S. at 350 n.7).

All factors counsel this Court to decline supplemental jurisdiction over Plaintiffs' state-law claims: the case is at the motion-to-dismiss stage, the parties can reuse any litigation work in the state court at little to no additional cost to the litigants, dismissal will not prejudice the parties, and state courts are more familiar with their respective jurisdiction's laws. *See Parker & Parsley*, 972 F.2d at 587–90. Accordingly, the Court declines to exercise supplemental jurisdiction over the state-law claims and **DISMISSES** them.

[7] "Supplemental jurisdiction" encompasses the former terms of "pendent" and "ancillary" jurisdiction. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005).

[8] Under § 1367(c) the Court may decline supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Section 1367(c)(3) applies because the Court dismisses the RICO claims, leaving only state-law claims. *See* Doc. 91, Second Am. Compl.

C. *Leave to Amend*

The liberal standard for leave to amend a complaint under Rule 15(a) is "tempered by the necessary power of a district court to manage a case." Fed. R. Civ. P. 15(a); *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003). In deciding whether to grant leave to amend, the district court may consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment." *Schiller*, 342 F.3d at 566.

The Court finds dismissal with prejudice appropriate in this case. Plaintiffs' Second Amended Complaint is their third bite at the apple and the second time the Court has assessed the sufficiency of their allegations. *See* Doc. 89, Order. Moreover, Plaintiffs have opted for volume over clarity in their amendments by adding more to the complaint—including, at times, full pages of deposition transcripts—without establishing how the facts fit into their RICO claims. More importantly, the Court finds that given the nature of Plaintiffs' allegations, further attempts to replead the singular transaction at issue as a "pattern of racketeering" would be futile and a waste of the parties' and Court's resources. Plaintiffs' RICO claims are therefore **DISMISSED WITH PREJUDICE** and Plaintiffs' state-law claims are **DISMISSED** for lack of federal jurisdiction.

## IV.

## CONCLUSION

For the foregoing reasons, Defendants SG Credit and Marc Cole's (Doc. 96); Super G and Steven Bellah's (Doc. 98); Baymark Defendants' (Doc. 105); and Hook and Ludlow's (Doc. 107) Motions to Dismiss are **GRANTED**. Because the deficiencies in Plaintiffs' pleadings apply to all

Defendants, all of Plaintiffs' RICO claims against each Defendant are **DISMISSED WITH PREJUDICE**, and all of Plaintiffs' state-law claims are **DISMISSED** for lack of federal jurisdiction. Hallett & Perrin and Julie A. Smith's (Doc. 97); Windspeed Employees' (Doc. 101); Windspeed and Szeto's (Doc. 102); and Holdco's (Doc. 103) Motions to Dismiss are **MOOT.**

**SO ORDERED**.

**SIGNED: October 21, 2022**

**JANE J. BOYLE**
**UNITED STATES DISTRICT JUDGE**